New York County Surrogate's Court
MISCELLANEOUS DEPT.

NOV 0 4 2010

FILED

Clerk _____

STATE OF NEW YORK
SURROGATE'S COURT: COUNTY OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - x
In the Matter of the Application of
ORLY GENGER, as a person interested, for the
removal of DALIA GENGER as Trustee of the
Orly Genger 1993 Trust pursuant to SCPA §711(11)
- - - - - - - - - - - - - - - - - - - - - - - - - - - x

NOTICE OF MOTION
TO DISMISS

File No. 0017/2008

PLEASE TAKE NOTICE that upon the annexed affirmation of Robert A. Meister and all

prior proceedings had herein, DALIA GENGER, as Trustee of the Orly Genger 1993 Trust, will

move this Court sitting, at 31 Chambers Street, Room 509, New York, New York, at 10:00 a.m.

in the fore noon of on November 23, 2010, or as soon as counsel can be heard, for an Order

dismissing the Second Amended Petition on the grounds that the Petition fails to state a valid

claim for removal or surcharge of Dalia Genger as Trustee of the Orly Genger 1993 Trust.

Pursuant to CPLR §2214(b), any answering papers must be served so as to be received by

November 16, 2010.

TO:
Cozen O'Connor
250 Park Avenue
New York, NY 10017
Counsel for Petitioner
Attn:   Judith E. Siegel-Baum, Esq.
        Stephanie Lehman, Esq.

PEDOWITZ & MEISTER LLP

By _____
    Robert A. Meister
    1501 Broadway, Suite 800
    New York, NY 10036
    212.403.7330
    Attorneys for DALIA GENGER,
    as Trustee of the Orly Genger 1993 Trust

STATE OF NEW YORK
SURROGATE'S COURT: COUNTY OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - x

In the Matter of the Application of

ORLY GENGER, as a person interested, for the
removal of DALIA GENGER as Trustee of the
Orly Genger 1993 Trust pursuant to SCPA §711(11)
- - - - - - - - - - - - - - - - - - - - - - - - - x

AFFIRMATION IN SUPPORT OF
MOTION TO DISMISS SECOND
AMENDED PETITION

File No. 0017/2008

ROBERT A. MEISTER, a member of the New York Bar, hereby affirms under the

penalties of perjury:

1       I am a member of the Bar and of the firm of Pedowitz & Meister LLP, counsel of

record for Dalia Genger, as Trustee of the Orly Genger 1993 Trust (the "Orly Trust"). I make

this affirmation in support of her motion of to dismiss the Second Amended Petition of

beneficiary Orly Genger ("Orly") on the grounds that the Petition fails to state a valid claim for

removal or surcharge of Dalia Genger as Trustee of the Orly Trust. (Similar motions to dismiss

the original Petition and the First Amended Petition were not decided and presumably are now

moot in light of the motion the Second Amended Petition.)

2       First, Dalia Genger cannot be removed or surcharged on the basis of events that

occurred before she became trustee or when, at Petitioner's instance in her Prior Proceeding,

Dalia Genger had been directed by this Court not to act. However, many of the events of which

the Petition complains either preceded Dalia Genger becoming Trustee in January, 2008, or were

events that occurred in 2008 prior to the December 31, 2008 Decision where Dalia Genger took

no action after being so directed by Surrogate Roth who was considering Orly's prior petition to

remove Dalia Genger as Trustee, which petition was denied on December 31, 2008. See

Decision and Order, *Orly Genger v. Fang*, et al., Surrg. Ct., N. Y. Co., file 17/2008, December

31, 2008, at 3-4 (hereinafter "December 31, 2008 Decision"), Exhibit A hereto. Second, as

shown below, the few subsequent events pleaded in the Second Amended Petition do not justify

removal or surcharge. Thus the Petition alleges no facts that could be the basis of removing Dalia Genger as Trustee or surcharging her.

3       It is undisputed that Dalia Genger did not become Trustee until January 4, 2008. December 31, 2008 Decision, Exhibit A. At Petitioner's instance, an accounting action has commenced against prior trustee Leah Feng which will adjudge and resolve any alleged misconduct that occurred prior to Dalia Genger's becoming Trustee. Additionally, in the course of the Prior Proceeding, on March 4, 2008, Surrogate Roth directed Dalia Genger, as Trustee, that during the pendency of that proceeding, "no actions were to be taken with reference to the Trust assets." See August 28, 2008 letters from Orly Genger's then counsel, Lawrence M. Rosenstock, Esq., to Dalia Genger and her former counsel, Exhibit B hereto.

4       The Petition itself alleges that the events of which it complains either preceded Dalia Genger becoming Trustee 2008 or occurred in 2008 after Surrogate Roth directed Dalia Genger, as Trustee, that during the pendency of that proceeding. Thus the Petition alleges no facts that could be the basis of removing Dalia Genger as Trustee or surcharging her.

5       The only events during 2008 on which the Petition bases its claim for removal and surcharge were events over which Dalia Genger, as Trustee, had and could have had no control: - - the Sagi Trust's alleged sale of common stock of Trans-Resources, Inc. ("TRI") and TPR Investment Associates, Inc.'s declaring a default and foreclosing on D&K LP's Note.

6       Dalia Genger is not and never was trustee of the Sagi Trust, and neither the Orly Trust nor Dalia Genger, as Trustee of the Orly Trust, was a party to the Sagi Trust sale of TRI stock. As shown by the Stock Purchase Agreement, of which I obtained a copy and attach as Exhibit C, that sale was purportedly made in August, 2008 by the Sagi Trust, acting through its trustee, Rochelle Fang. Moreover, Orly's tenuous claim of injury – her contention that Orly Trust owns shares of TRI stock, which supposedly lost value as a result of the Sagi Trust shares –

is completely undercut by the Final Judgment Order of the Delaware Chancery Court determining that the transfer of TRI shares to the Orly Trust was void under the TRI Shareholders' Agreement and thus [Arie Genger and] "the Orly Trust have been found to not be the record or beneficial owners of the [TRI] shares transferred to them". <u>TRI Investors, et. al. v. Arie Genger,</u> Civil Action Number 3994-VCS (August 18, 2010); Exhibit C, at ¶ 9.   While there is an appeal pending, if the Delaware Supreme Court affirms the decision that the Orly Trust's ownership of TRI shares was void *ab initio*, any allegations that they lost value based on the Sagi Trust's sale would be totally baseless and no basis to remove Dalia Genger as Trustee.   Even if the Delaware Supreme Court reverses that decision, is nothing that Dalia, as trustee of the Orly Genger Trust, could have done to prevent the Sagi Trust from selling its TRI shares and thus there is no basis to remove or surcharge Dalia Genger.

       7      Nor could Dalia Genger, as Trustee of the Orly Trust, prevent TPR Investment Associates, Inc. ("TPR") from declaring a default and foreclosing on the promissory Note made by D&K LP that the Orly Trust had guaranteed.   Undisputed are the following facts:

    A.     The Orly Trust is not a shareholder of TPR. (December 31, 2008 Decision, Exhibit A at 6);

    B.     The Orly Trust is a 48% Limited Partner in D&K LP.  (December 31, 2008 Decision Exhibit A at 6);

    C.     In 1993, D&K LP made and delivered to TPR an $8,950,000 Note that states it was to be repaid by December 21, 2003, in partial consideration for D&K LP's purchase of common stock of TRI, which stock was pledged to secure the Note. (Second Amended Petition ¶9 and Note, Exhibit E to Second Amended Petition);

D.    A prior trustee of the Orly Trust -- not Dalia Genger -- signed a written guarantee

of the Note in 1993 in which the Orly Trust "assumes and becomes liable for"

48% of the Note "and agrees that the Holder may enforce this Note, to the extent

of such liability, as if the [Orly Trust] were the Maker thereof." (Second Amended

Petition ¶9 and Note, Exhibit E to Second Amended Petition); and

E.    The Second Amended Petition alleges that the Note has not been repaid and that

D&K LP stopped making payments on the Note in 1999.  Second Amended

Petition ¶9.

By admitting that the Note had been paid in accordance with its terms until 1999, the Second

Amended Petition belied its contention that the note was uncollectable.

8      The Second Amended Petition does not allege that TPR ever renounced its rights

under the Note and guarantee by destroying the Note or by delivering the Note or a signed

writing cancelling or renouncing the Note, as required by NY UCC §3-605(1) for the Note to

become unenforceable.  It is hornbook law that the enforceability of a Note is not affected by a

mere statement by the maker or guarantor that the Note is unenforceable.  As the court held in

*Ber v. Johnson*, 163 A.D.2d 817, 818 (4th Dep't 1990):

> Because defendants' original obligation constituted a note and guarantee, it was required
> to be in writing *(see,* Uniform Commercial Code § 3-104 [1], [2]; General Obligations
> Law § 5-701 [a] [2]) and the Statute of Frauds precludes an oral executory modification.
> '[W]here an original agreement comes within [the] provisions of the statute of frauds
> requiring certain agreements to be in writing, the statute of frauds renders invalid and
> ineffectual a subsequent oral agreement changing the terms of the written contract, no
> matter how slight the attempted variation or by whom it was made' ( 61 NY Jur 2d,
> Frauds, Statute of, §140, at 217-218; *see, M. H. Metal Prods. Corp. v April,* 251 NY 146,
> 150; *Van Iderstine Co. v Barnet Leather Co.,* 242 NY 425, 430; *Heroux v Page,* 107
> AD2d 862, 863; *Awad & Co. v Pillsbury Mills,* 9 AD2d 870, *lv denied* 8 NY2d 705,
> *appeal dismissed* 8 NY2d 747; *cf.,* General Obligations Law §§ 5-1103, 15-301 [1], [2]).
> Thus, defendants may not rely on plaintiff's alleged oral acceptance of the stock as the
> basis for their defense of modification.

Thus the 2006 statement by Mr. Sagi Genger that D&K LP and its partners "deny the enforceability of the Note" (Second Amended Petition Exhibit K) would not constitute a defense to TPR's declaration of default and foreclosure, as a matter of law. And the Petition gives no legally sufficient reason why the Note and guarantee would not be enforceable as the note is enforceable on its face. Nor would enforceability of the Note have been affected if Dalia Genger *had* stated "that no one was ever supposed to foreclose on the Note," as the Second Amended Petition claims in ¶41. But she did not so state; in the document cited basis for that assertion Dalia Genger in a post-judgment divorce mediation merely stated that the purpose of a Board Resolution was "to carry out our [Dalia and Arie Genger's] understanding that <u>I [Dalia Genger] would not be in the position to foreclose on the D&K Note, and to take for myself an interest that Arie and I intended for the children.</u>" (Emphasis added.) As the Note and guarantee were enforceable in accordance with their terms, Dalia Genger's failure to take some unspecified action could not be a basis to remover her as trustee or surcharge her.

9      The Second Amended Petition makes no allegations that Dalia Genger at any time pledged or encumbered the Orly Trust's shares of TRI stock. Moreover, all allegations concerning Dalia Genger's management of the Trust's TRI shares are now moot in light of the Delaware Chancery Court decision.

10      Further, the Second Amended Petition's claim that Dalia Genger violated her fiduciary duties by providing a general release from claims against the General Partner of D & K LP arising prior to January 31, 2009 alleges no facts that could be the basis of removing Dalia Genger as Trustee or surcharging her. The Petition failed to plead any instance of wrongdoing by the General Partner of D & K LP or any rights or claims against the General Partner of D & K LP that accrued prior to January 31, 2009. It should also be noted that the release only extends "to

the fullest extent permitted" thus, on its face, is limited in scope to avoid any potential breach of fiduciary duty.  Therefore, the Second Amended Petition fails to set forth any plausible grounds that would give adequate grounds to remove Dalia Genger as Trustee for that reason.

11     The Second Amended Petition's vague unspecific allegations that Dalia Genger failed to adequately protect the assets of the trust in the Delaware Chancery Court Proceedings do not state a valid claim for a breach of fiduciary duty.  The Delaware Chancery Court held that the purported transfers of TRI shares violated a TRI shareholder's agreement because required consent of other shareholders was not obtained, but neither Dalia Genger nor the Orly Trust was involved in that transaction and the Second Amended Petition does not and cannot claim that the Trust's interests failed to be adequately represented in the Delaware litigation.  The Second Amended Petition neglects to draw attention to the fact that 1) the Settlor of the trust himself, Arie Genger, testified in this action in favor of the validity of the transfers and employed competent representation (Davis Polk) to defend his rights as well as the rights of the Orly Genger Trust, and 2) Orly Genger herself testified in the Delaware proceedings to protect her interests, although the Delaware Chancery Court found her testimony to be incredible, discussing what occurred at a meeting that she did not attend.  Dalia Genger's decision not to intervene in that litigation spared the Orly Trust substantial legal fees, certainly was within her discretion as Trustee and does not raise a valid ground for removal as Trustee.

12     As the Petition does not allege any action or inaction by Dalia Genger during the time she was Trustee and free from judicial restraint nor any action that she could have taken, there is no basis for this proceeding and the Petition should be dismissed.

_____
Robert A. Meister

SURROGATE'S COURT : NEW YORK COUNTY

JAN 0 2 2009

---------------------------------------- X

In the Matter of the Trust Established
on December 13, 1993, by ARIE GENGER       File No. 0017/2008
for the Benefit of ORLY GENGER.

---------------------------------------- X

R O T H ,  S .

   This is a contested application by the primary beneficiary

(Orly Genger) of an irrevocable inter vivos trust established by

her father, Arie Genger, seeking the appointment of a successor

trustee or, alternatively, the appointment of a "special trustee"

to investigate alleged wrongdoing concerning the trust.

Petitioner's mother, Dalia Genger (grantor's former wife),

contends that she is the duly appointed successor trustee and

that there is no basis to appoint another fiduciary for any

purpose.

   The trust agreement, dated December 13, 1993, provides for

discretionary income and principal distributions to Orly for life

with remainder to her descendants or, if none, to the grantor's

descendants in trust.

   Article SEVENTH (B), (D), (E), and (G) of the trust

instrument sets forth the following procedure for the resignation

of trustees and the appointment of their successors.

   A trustee may resign by delivering a signed and acknowledged

instrument of resignation in person or by certified or registered

mail to the other trustee and to either the grantor or the income

beneficiary.  Such resignation is effective upon the receipt of

the acknowledged instrument by the other trustee (if there is

one) and the grantor or the income beneficiary or at such later date as may be specified in the instrument.

A trustee may appoint his or her successor by delivering a signed and acknowledged instrument in the same manner as described above for resignation. Any such appointment, however, is valid only if the appointee qualifies by delivering a signed and acknowledged instrument of acceptance in person or by certified or registered mail to each trustee and the grantor or the income beneficiary within 30 days after the later of 1) the date on which a copy of the appointment instrument is delivered to him or her, and 2) the effective date of the appointment as set forth in the appointment instrument. It is observed that there is no provision that requires a resigning trustee to appoint a successor or that there always be two trustees in office.

The original two trustees served until October 2004, when they resigned and appointed David Parnes and Eric Gribitz as their successors. On February 12, 2007, Mr. Gribitz resigned without appointing a successor. On April 26, 2007, Mr. Parnes resigned and appointed as his successor Leah Fang in a signed and acknowledged instrument. Although Ms. Fang noted her acceptance at the bottom of such instrument, her signature was not acknowledged. However, in another document entitled "Release" executed and acknowledged by Ms. Fang the same day, she, as

2

trustee, purported to discharge Mr. Parnes from liability.  It is
undisputed that thereafter Ms. Fang acted as trustee.   Indeed,
Ms. Fang's contention that she received a number of requests for
information from petitioner and that petitioner referred to her
in writing and orally as trustee is not disputed by petitioner.

On December 12, 2007, Ms. Fang, without resigning in
accordance with the trust agreement, attempted to appoint
Patricia Enriquez, as successor trustee.  Her designation of Ms.
Enriquez, however, was by an unacknowledged letter in which she
referred to her own resignation as taking effect upon Ms.
Enriquez's acceptance of the appointment.  Ms. Enriquez accepted
by signing the letter, but such acceptance was not acknowledged
and, in any event, there is nothing in the record to suggest that
such "acceptance" was delivered in accordance with the trust
instrument.  Two weeks later, an attorney for Ms. Enriquez
notified petitioner's counsel by email that her client had
advised that she had no intention to overcome the procedural
omissions.

On January 3, 2008, Ms. Fang and Dalia Genger signed before
a notary a memorandum in which Ms. Fang stated that "to the
extent that I am still vested with any powers to appoint trustees
of the [trust], I confirm your appointment."  The next day, Ms.
Fang executed an acknowledged instrument of resignation and
appointment of successor trustee naming Dalia as her successor

3

and Dalia, on the same day, executed an acknowledged instrument of acceptance. It is undisputed that such documents were delivered in accordance with the trust requirements.

We address first that portion of the instant application which seeks the appointment of a successor trustee on the ground that Dalia was not validly appointed. In such connection, petitioner argues first that, because Ms. Fang's signature on the bottom of Mr. Parnes's appointment instrument was not acknowledged, she never accepted the position in accordance with the trust agreement (and thus could not appoint Dalia her successor). However, such argument ignores the "Release" mentioned above that Ms. Fang executed the same day. Such instrument, which was signed and duly acknowledged, unequivocally establishes Ms. Fang's acceptance of the position. Since petitioner does not challenge the authenticity of such instrument or Mr. Parnes' contention, supported by the record, that it was delivered in accordance with the trust instrument and, as noted above, petitioner thereafter communicated with Ms. Fang as trustee, Ms. Fang properly qualified as successor trustee.

Petitioner's second argument that, in any event, Ms. Fang's appointment of Dalia was ineffective because Ms. Fang had previously resigned as trustee is also without merit. Simply put, Ms. Fang had not previously resigned because her letter to Ms. Enriquez did not contain the formalities (i.e., an

4

acknowledgment) required by the trust agreement. Moreover, although not a model of clarity, the letter makes clear that Ms. Fang did not intend to leave the trust without a trustee in the event that Ms. Enriquez failed to qualify, which is exactly what happened. Thus, Ms. Fang had authority to appoint Dalia as her successor.

Since there is no dispute that the instrument of resignation and appointment executed by Ms. Fang on January 4, 2008, and Dalia's instrument of acceptance of the same date were executed and delivered in accordance with the trust agreement, Dalia is the duly appointed successor trustee of the trust. To find otherwise would be to ignore the chronology of events and the purpose of the provisions at issue, namely to ensure that the trust always has a fiduciary ready, willing and able to act. The fact that petitioner does not wish her mother to be the fiduciary because she considers her an adversary in a broader intra-family dispute does not provide a basis to ignore the grantor's intent, as reflected in the trust instrument, that an acting trustee, and not the beneficiary, decides who shall become a successor trustee. Accordingly, petitioner's application to appoint a successor trustee is denied.

We next turn to petitioner's alternate request for relief, namely that a "special trustee" be appointed for the "purpose of investigation and taking discovery with respect to the wrongful

5

dealings concerning the assets and income of the trust."

It is noted initially that petitioner's only allegations of "wrongful dealings" concern a close corporation, TPR Investment Associates, Inc.  She contends that her brother Sagi, who is an officer of TPR, and Dalia, who was a shareholder at the time this proceeding was commenced, are engaged in a "wrongful scheme" to divert assets to themselves and, as a result, Dalia "could not possibly" investigate wrongdoing at TPR, which the petition describes as the "greatest" asset of the trust.

However, the premise of the application, namely that the trust's interest in TPR would enable the trustee to investigate or seek relief from TPR, does not appear to be correct. Petitioner does not dispute Dalia's assertion, supported in the record, that the trust is not a shareholder of TPR at all. Rather, D&K LP, an entity in which the trust owns a 48 percent interest, in turn owns approximately 50 percent of TPR. Petitioner does not explain what appears to be a material misstatement concerning TPR's relationship to the trust.  Nor does she identify how a trustee under such circumstances might be in a position to "investigate and address the TPR issues".

In any event, assuming arguendo that a trustee would somehow be able to investigate alleged misconduct at TPR, petitioner's vague and speculative allegations of "wrongful conduct" at TPR from which Dalia purportedly benefitted do not warrant the

6

appointment of a "special trustee".  Similarly, petitioner's

allegations (made upon information and belief) that Dalia had

knowledge of alleged improper acts by former trustee, David

Parnes, in relation to TPR are patently insufficient to warrant

the remedy of a "special trustee".  In such connection, it is

noted that Mr. Parnes and Ms. Fang have been directed to account

for their proceedings as trustees (<u>Matter of Genger</u>, NYLJ, Feb.

25, 2008, at 29, col 3), giving petitioner a forum to seek relief

for most of the conduct about which she complains.

Finally, it is observed that petitioner has not alleged that

Dalia has refused a request for information, which would warrant

relief (SCPA 2102), or has failed as trustee to protect trust

assets.  Indeed, it appears that Dalia (who states that she is

ready and able to act as fiduciary) has yet to assume the duties

of trustee in deference to her daughter's position in this

litigation.  As a validly appointed trustee, she should be given

the opportunity to do what she deems necessary to manage and

protect the trust's assets.

Based upon the foregoing, the appointment of a "special

trustee" is unwarranted at this time and, accordingly, the

application is denied, without prejudice to renewal if future

7

circumstances warrant such relief.

This decision constitutes the order of the court.

_____
S U R R O G A T E

Dated: December 31, 2008

# MARKEWICH AND ROSENSTOCK LLP

8 East 41ˢᵗ Street • Fifth Floor • New York, New York 10017

*tel:* (212) 542-3156  *fax:* (212) 481 1761   *lrosenstock@mrlawllp.com*

Lawrence M. Rosenstock
Eve Rachel Markewich

Robert Markewich
of counsel

August 28, 2008

## BY HAND AND MAIL

Dalia Genger
200 East 65ᵗʰ Street, 32W
New York, New York 10021

Re:    1993 Orly Genger Trust

Dear Ms. Genger:

It has come to our attention that you may be considering attempting to act on behalf of the Orly Genger Trust (the "Trust").

We remind you that you have no authority to act for the Trust and that on March 4, 2008 Surrogate Roth directed that no actions were to be taken with reference to the Trust assets. Should you violate the Court order, or in any way interfere with the ownership and/or value of the Trust assets or take any action with respect to Trust assets, we will hold you personally responsible for any loss or damage that may be incurred and seek to hold you in contempt.  To the extent others are involved in guiding or facilitating wrongful conduct on your part, we will also seek remedies against them.

We reserve any and all rights with respect to your conduct concerning the Trust.

Very truly yours,

Lawrence M. Rosenstock

LMR:js

cc:   Jonathan G. Kortmansky, Esq. (by hand)
      Sulllivan & Worcester LLP

      Orly Genger

Genger-letter dalia genger 8-28.doc

# MARKEWICH AND ROSENSTOCK LLP

8 East 41st Street • Fifth Floor • New York, New York 10017

*tel:* (212) 542-3156  *fax:* (212) 481 1761   *lrosenstock@mrlawllp.com*

Lawrence M. Rosenstock
Eve Rachel Markewich

Robert Markewich
of counsel

August 28, 2008

**BY HAND AND EMAIL**

Jonathan G. Kortmansky, Esq.
Sullivan & Worcester LLP
1290 Avenue of the Americas
New York, New York 10104

Re:   1993 Orly Genger Trust

Dear Mr. Kortmansky:

I am writing you on behalf of Orly Genger, the beneficiary of the Orly Genger Trust(the "Trust").  By letter dated August 28, 2008, a copy of which is enclosed, we advised Dalia Genger, among other things, that when we were before the court on this matter on March 4, 2008, Surrogate Roth directed that no actions were to be taken with respect to Trust assets.  As attorneys for Dalia Genger we expect that you will so advise your client of this direction and to take all appropriate steps to see that she complies with Surrogate Roth's order.

Very truly yours,

Lawrence M. Rosenstock

LMR:js

cc:   Hon. Surrogate Renee R. Roth
Orly Genger

Genger-letter dalia genger 8-28.doc

# STOCK PURCHASE AGREEMENT

by and among

**TR INVESTORS, LLC,**

**GLENCLOVA INVESTMENT CO.,**

**NEW TR EQUITY I, LLC**

and

**NEW TR EQUITY II, LLC**

as Purchasers,

**SAGI GENGER 1993 TRUST**

as Seller

and

**TPR INVESTMENT ASSOCIATES, INC.**

Dated as of August 22, 2008

## STOCK PURCHASE AGREEMENT

THIS STOCK PURCHASE AGREEMENT ("Agreement"), dated as of the 22nd day of August, 2008, by and among TR Investors, LLC, a Delaware limited liability company ("TR Investors"), Glenclova Investment Co., a Cayman Islands corporation, ("Glenclova"), New TR Equity I, LLC, a Delaware limited liability company ("Equity I") and New TR Equity II, LLC, a Delaware limited liability company ("Equity II" and collectively with TR Investors, Glenclova and Equity I, the "Purchasers"), the Sagi Genger 1993 Trust ( "Seller"), and TPR Investment Associates, Inc., a Delaware corporation ("TPR").

### W I T N E S S E T H:

WHEREAS, Seller is the record and beneficial owner of an aggregate of one thousand one hundred two and eight-tenths (1,102.80) shares of common stock (the "Common Stock"), par value $.01 per share, of Trans-Resources, Inc., a Delaware corporation (the "Company");

WHEREAS, Seller desires to sell to TR Investors, and TR Investors desires to purchase from Seller, two hundred seventy five and seven-tenths (275.70) shares of Common Stock (the "TR Investors Shares");

WHEREAS, Seller desires to sell to Glenclova, and Glenclova desires to purchase from Seller, two hundred seventy five and seven-tenths (275.70) shares of Common Stock (the "Glenclova Shares");

WHEREAS, Seller desires to sell to Equity I, and Equity I desires to purchase from Seller, two hundred seventy five and seven-tenths (275.70) shares of Common Stock (the "Equity I Shares"); and

WHEREAS, Seller desires to sell to Equity II, and Equity II desires to purchase from Seller, two hundred seventy five and seven-tenths (275.70) shares of Common Stock (the "Equity II Shares" together with the TR Investors Shares, the Glenclova Shares and the Equity I Shares, the "Shares").

NOW, THEREFORE, in consideration of the mutual promises and covenants set forth herein, the parties hereto, intending to be legally bound hereby, agree as follows:

1.  Sale of Shares.  Upon the terms of this Agreement, the Purchasers, severally and not jointly, hereby purchase, acquire and accept from Seller, and the Seller hereby sells, conveys assigns, transfers and delivers to the Purchasers, all right, title and interest in and to the Shares as follows:

(a)   TR Investors hereby purchases, acquires and accepts from Seller, and the Seller hereby sells, conveys assigns, transfers and delivers to TR Investors, all right, title and interest in and to the TR Investors Shares, free and clear of any and all liens, obligations or encumbrances;

(b)   Glenclova hereby purchases, acquires and accepts from Seller, and the Seller hereby sells, conveys assigns, transfers and delivers to Glenclova, all right, title and interest in and to the Glenclova Shares, free and clear of any and all liens, obligations or encumbrances; and

(c)   Equity I hereby purchases, acquires and accepts from Seller, and the Seller hereby sells, conveys assigns, transfers and delivers to Equity I, all right, title and interest in and to the Equity I Shares, free and clear of any and all liens, obligations or encumbrances.

(d)   Equity II hereby purchases, acquires and accepts from Seller, and the Seller hereby sells, conveys assigns, transfers and delivers to Equity II, all right, title and interest in and to the Equity II Shares, free and clear of any and all liens, obligations or encumbrances.

2.   Consideration and Closing Deliveries.

(a)   Upon the terms of this Agreement, in consideration of the sale of the Shares to the Purchasers and the other agreements of the Seller contained herein, the Purchasers, herewith cause to be delivered to the Seller through and pursuant to the Escrow Agreement (as defined below), in full payment for the aforesaid sale of the Shares, an aggregate amount equal to twenty six million seven hundred fifteen thousand four hundred sixteen dollars ($26,715,416) (the "Purchase Price") as follows:

(i)   in respect of the TR Investors Shares, (a) by wire transfer of a portion of the Purchase Price equal to $1,718,750 in immediately available funds to the Escrow Agent (as hereinafter defined) and then by the Escrow Agent to a bank account designated in writing by the Seller, and (b) a portion of the Purchase Price equal to $4,960,104 by wire transfer to the Escrow Agent to be held by the Escrow Agent pursuant to Section 2(b) hereof;

(ii)   in respect of the Glenclova Shares, (a) by wire transfer of a portion of the Purchase Price equal to $1,718,750 in immediately available funds to the Escrow Agent (as hereinafter defined) and then by the Escrow Agent to a bank account designated in writing by the Seller, and (b) a portion of the Purchase Price equal to $4,960,104 by wire transfer to the Escrow Agent to be held pursuant to Section 2(b) hereof; and

(iii)   in respect of the Equity I Shares, (a) by wire transfer of a portion of the Purchase Price equal to $1,718,750 in immediately available funds to the Escrow Agent (as hereinafter defined) and then by the Escrow Agent to a bank account designated in writing by the Seller, and (b) a portion of the Purchase Price equal to

3

$4,960,104 by wire transfer to the Escrow Agent to be held pursuant to Section 2(b) hereof.

(iv)   in respect of the Equity II Shares, (a) by wire transfer of a portion of the Purchase Price equal to $1,718,750 in immediately available funds to the Escrow Agent (as hereinafter defined) and then by the Escrow Agent to a bank account designated in writing by the Seller, and (b) a portion of the Purchase Price equal to $4,960,104 by wire transfer to the Escrow Agent to be held pursuant to Section 2(b) hereof.

(b)   The parties are herewith entering into an Escrow Agreement (the "Escrow Agreement"), among the Purchasers Seller and Troutman Sanders LLP, as escrow agent (the "Escrow Agent"), pursuant to which the Purchasers, severally and not jointly, are depositing the amounts set forth in Sections 2(a)(i)(b), 2(a)(ii)(b), 2(a)(iii)(b) and 2(a)(iv)(b) hereof (collectively, the "Escrow Amount") to be held pursuant to this Agreement and the Escrow Agreement.

(c)   As promptly as practicable, Seller shall deliver to the Escrow Agent, either (i) stock certificates representing the Shares issued in the name of Seller, accompanied by stock powers duly executed in blank with appropriate transfer stamps, if any, affixed, and any other documents that are necessary to transfer title to the shares to the Purchasers (or any designee of the Purchasers), free and clear of any and all liens, obligations or encumbrances, or (ii) stock certificates issued in the names of TR Investors, Glenclova, Equity I and Equity II for the TR Investor Shares, the Glenclova Shares, the Equity I Shares and the Equity II Shares, respectively, in each case free and clear of any and all liens, obligations or encumbrances.

(d)   Subject to Section 2(e) hereof, upon the delivery of stock certificates required by Section 2(c), the Escrow Agent shall release the Escrow Amount to the Seller in accordance with the terms and conditions of the Escrow Agreement.

(e)   Notwithstanding the foregoing, Seller may at any time following the date hereof, direct the Escrow Agent to release up to an aggregate of $500,000 of the Escrow Amount, provided such amounts are held in escrow at such time, to a charity or charities of its choice pursuant to the terms and conditions of the Escrow Agreement.

3.   Closing.  The closing of the transactions contemplated in this Agreement (the "Closing") is taking place at the offices of The Trump Group at 3:00 p.m., Eastern Daylight Time, on the date hereof (the "Closing Date").

4.   Representations and Warranties of Seller.  In connection with the purchase and sale of the Shares referred to in Section 1 hereof and the execution and performance of this Agreement, Seller represents and warrants to the Purchasers as follows:

(a)   Seller is the record and beneficial owner of all right, title and interest in and to all of the Shares and had good and transferable title thereto, free and clear of all liens, obligations, encumbrances, restrictions, pledges, charges, options, preemptive rights, subscription rights, warrants, calls, security interests, and claims of every kind.



4

(b)    Seller has the full right, power, and authority to sell and deliver the Shares in accordance with this Agreement.

(c)    The delivery of the Shares delivered pursuant to Sections 1 and 2 hereof will transfer valid title thereto, free and clear of all liens, obligations, encumbrances, restrictions, pledges, charges, options, preemptive rights, subscription rights, warrants, calls, security interests, and claims of every kind.

(d)    The execution, delivery, and performance of this Agreement, the consummation of the transactions contemplated hereby, and the compliance with or fulfillment of the terms and provisions of this Agreement or of any other agreement or instrument contemplated by this Agreement, do not and will not (i) contravene any law, rule, or regulation of any state or of the United States; (ii) contravene any order, writ, award, judgment, decree, or other determination that affects or binds Seller or the Company, or any of their respective properties; (iii) conflict with, result in a breach of, constitute a default under, or give rise to a right of termination under any contract, agreement, note, deed of trust, mortgage, trust, lease, governmental or other license, permit, or other authorization, or any other instrument or restriction to which Seller or the Company is a party; or (iv) require Seller to obtain the approval, consent, or authorization of, or to make any declaration, filing, or registration with, any third party or any foreign, federal, state, county, or local court, governmental authority, or regulatory body.

(e)    Seller is not subject to any order, writ, award, judgment, decree, or determination, is not a party to or bound by any contract, agreement, note, deed of trust, mortgage, trust, lease, governmental or other license, permit, or other authorization, or other instrument or restriction that could conflict with, impair, impose restrictions or otherwise prevent or delay the execution, delivery, or performance of this Agreement or the consummation of the transactions contemplated by this Agreement.

(f)    This Agreement is the legal, valid, and binding agreement of Seller and is enforceable in accordance with its terms, subject to (i) bankruptcy, insolvency, fraudulent conveyance, reorganization, moratorium, or other laws or equitable principles relating to or affecting the enforcement of creditors' rights generally, and (ii) the effect of general principles of equity, including, without limitation, concepts of materiality, reasonableness, good faith and fair dealing (regardless of whether considered in a proceeding in equity or at law),.

(g)    None of the representations and warranties of Seller contained herein and none of the written information or written documents furnished to the Purchasers or any of their respective representatives by Seller or its representatives is false or misleading in any material respect or omits to state a fact herein or therein necessary to make the statements made herein not misleading in any material respect.

(h)    Seller has made an independent decision to sell the Shares based on the information available to it and that it has determined is adequate for that purpose, Seller has had the opportunity to review all information which it deems relevant to its decision to sell

5

the Shares, and Seller has not relied on any information (in any form, whether written or oral) furnished by or on behalf of the Purchasers or the Company in making that decision.

(i)     Neither the Purchasers, nor the Company has given any investment advice or rendered any opinion to Seller as to whether the sale of the Shares is prudent or suitable, and Seller is not relying on any representation or warranty other than those made by the Purchasers expressly in this Agreement.

(j)     Seller is a sophisticated investor with respect to the Shares and has adequate information concerning the Shares.  Seller believes, by reason of its and its beneficiary's business and financial experience and the information and knowledge that its beneficiary holds with respect to the Company and its business, that it is capable of evaluating the merits and risks of the sale and of protecting its own interest and the interest of its beneficiary in connection with the transactions contemplated by this Agreement.  Seller has had the opportunity to have legal counsel review and advise it with respect to the terms of this Agreement.

(k)     Seller acknowledges that (i) the Purchasers currently may have material information regarding the condition (financial or otherwise), results of operations, businesses, properties, plans, and prospects of the Company that may be material to a decision to sell the Shares ("Excluded Information") and that such Excluded Information may affect the value of the Shares.  Seller further acknowledges that it has determined to sell the Shares notwithstanding its lack of knowledge of the Excluded Information.  Seller represents that it has adequate information concerning the business and financial condition of the Company and its affiliates to make an informed decision regarding the sale of the Shares pursuant hereto and has independently and without reliance upon the Purchasers made its own analysis and decision to sell the Shares pursuant hereto.  Seller acknowledges that the sale of the Shares is the result of independent arm's-length negotiations between Seller and the Purchasers.

5.     Representations and Warranties of the Purchasers.  In connection with the purchase and sale of the Shares referred to in Section 1 hereof and the execution and performance of this Agreement, each Purchaser represents and warrants, severally and not jointly, to Seller as follows:

(a)     Such Purchaser has the full right, capacity, power, and authority to execute and deliver this Agreement, to consummate the transactions contemplated by this Agreement, and to comply with the terms, conditions, and provisions of this Agreement.

(b)     The execution, delivery, and performance of this Agreement, the consummation of the transactions contemplated hereby and the compliance with or fulfillment of the terms and provisions of this Agreement or of any other agreement or instrument contemplated by this Agreement, do not and will not (i) contravene any law, rule, or regulation of any state or of the United States; (ii) contravene any order, writ, award, judgment, decree, or other determination that affects or binds such Purchaser or any of its properties; (iii) conflict with, result in a breach of, constitute a default under, or give rise to a right of termination under any contract, agreement, note, deed of trust, mortgage, trust, lease, governmental or other license, permit, or other authorization, or any other instrument or restriction to which such

6

Purchaser is a party or by which any of its properties may be affected or bound; or (iv) require such Purchaser to obtain the approval, consent, or authorization of, or to make any declaration, filing, or registration with, any third party or any foreign, federal, state, county, or local court, governmental authority, or regulatory body that has not been obtained in writing prior to the date of this Agreement.

(c)     Such Purchaser is not subject to any order, writ, award, judgment, decree, or determination nor a party to nor bound by any deed of trust, mortgage, trust, lease, governmental or other license, permit, or other authorization, contract, agreement, note, or other instrument or restriction that could conflict with or prevent the execution, delivery, or performance of this Agreement or the consummation of the transactions contemplated hereby.

(d)     This Agreement is the legal, valid, and binding agreement of such Purchaser and is enforceable in accordance with its terms, subject to (i) bankruptcy, insolvency, fraudulent conveyance, reorganization, moratorium, or other laws or equitable principles relating to or affecting the enforcement of creditors' rights generally and, (ii) the effect of general principles of equity, including, without limitation, concepts of materiality, reasonableness, good faith and fair dealing (regardless of whether considered in a proceeding in equity or at law).

(e)     Such Purchaser hereby acknowledges receipt of copies of the Irrevocable Proxy, dated as of October 29, 2004, issued by Seller in favor of Arie Genger with respect to the Shares (the "Proxy"), a back-up form of voting trust agreement and voting trust certificate delivered in connection with the Proxy and the letter agreement dated October 29, 2004 with respect to the transfer of the Shares from TPR to Seller.

(f)     Such Purchaser has no actual knowledge of any contract, agreement, note, or other instrument or restriction to which the Seller is subject that could conflict with or prevent the execution, delivery, or performance of this Agreement or the consummation of the transactions contemplated hereby.

6.    Covenants.  Promptly following the execution hereof, Seller shall use all best efforts to cause the Company to recognize Seller as the record and beneficial owner of the Shares in the Company's stock registry.  In furtherance of the foregoing, Seller shall use all best efforts to promptly submit through the Escrow Agent or directly as instructed by the Purchasers a lost certificate affidavit in respect of the Shares to the Company, substantially in the form attached hereto as Exhibit A, and cause the Company to deliver to it (or the Escrow Agent as instructed by the Purchasers) a validly issued stock certificate in respect of the Shares to Seller in Seller's name.  To the extent that Seller is asked by the Purchasers to commence a lawsuit or other proceeding in furtherance of the foregoing, the Purchasers shall select legal counsel for such matters, and shall pay the legal expenses and fees in connection therewith on Seller's behalf.

7.    Indemnification.  Seller agrees to indemnify, defend and hold harmless each Purchaser and its affiliates and controlling persons, and its and their respective directors, officers, employees and agents (collectively, the "Indemnified Group"), at any time after the Closing Date, from and against all demands, claims, actions, or causes of action, assessments,

7

losses, damages, deficiencies, liabilities (including strict liability), costs, and expenses of investigation, including, without limitation, interest, penalties and reasonably attorney's fees and expenses and consultants fees (collectively, "Damages") asserted against, resulting to, imposed upon, or incurred by any member of the Indemnified Group, directly or indirectly, by reason of or resulting from:

(a)     a breach of any representation, warranty, covenant, or agreement of the Seller contained in or made pursuant to this Agreement or any related agreement;

(b)     any failure of the Company to recognize the Seller as the record and beneficial owner of the Shares; and

(c)     any Shares that are subject to any liens, obligations or encumbrances.

8.    Survival of Representations, Warranties, Covenants, and Agreements. All representations, warranties, covenants, and agreements made in this Agreement shall survive the execution of this Agreement, the closing of the transactions contemplated hereby, and the delivery of the certificates or other evidence of the Shares sold hereunder for a period of three (3) years after the Closing.

9.    Rescission. Each of the Purchasers and Seller hereby agree, that in the event that any member of the Indemnified Group makes a claim for indemnification pursuant to Section 7(b) or 7(c), the Purchasers, may in their sole and absolute discretion, elect to void the transactions contemplated hereby and promptly receive a full refund by Seller of the Purchase Price.

10.    Valid Transfer. If at any time following the Closing Date, it is determined that Seller is not the record and beneficial owner of the Shares as of the date hereof by virtue of the transfer of the Shares to it by TPR being deemed to have been void or for any other reason, and that all right, title and interest in and to the Shares is held by TPR, subject only to the plaintiff's asserted rights under the Stockholders Agreement asserted in the action styled Glenclova Investment Co. v. Trans-Resources, Inc. and TPR Investment Associates, Inc., Case No. 08-CIV-7140 (JFK), pending in the United States District Court for the Southern District of New York, the parties hereby agree that (a) this Agreement and the transactions contemplated hereby shall be deemed to have been entered into and consummated with TPR, (b) the Purchasers shall retain all right, title and interest in and to the Shares as if purchased from TPR pursuant to this Agreement, (c) TPR shall look only to Seller for any payments made by the Purchasers pursuant to this Agreement, (d) the Purchasers shall have no liability or obligation to TPR in respect of the Shares, and (e) all representations, warranties, covenants and agreements made by Seller herein, shall be deemed to have been made by TPR as of the date hereof.

11.    Other Shares. If at any time following the Closing Date, it is determined that Arie Genger is not the record and beneficial owner of the 794.40 shares of Common Stock of the Company purportedly transferred to him by TPR in October, 2004 and/or that Orly Genger 1993 Trust is not the record and beneficial owner of the 1,102.80 shares of Common

8

Stock of the Company purportedly transferred to such Trust by TPR in October, 2004, and that TPR is determined to be the record or beneficial owner of any such shares, in either or both cases by virtue of the transfer of such shares being deemed to have been void or for any other reason (the shares being so effected being referred to herein as the "Affected Shares") then TPR shall promptly transfer 64% of the Balance Shares (as such term is defined in the Stockholders Agreement dated March 30, 2001, among TPR, TR Investors, Glenclova and the Company (the "Stockholders Agreement")) to TR Investors and Glenclova in accordance with the terms of Section 1.6 of the Stockholders Agreement whether or not such agreement is then still in effect.

12. _Entire Agreement_.  This Agreement and the Letter Agreement set forth the entire agreement between the parties hereto with respect to the purchase and sale of the Shares contemplated herein and supersedes all prior written or oral agreements or understandings between the parties hereto relating to the subject matter hereof.

13. _Benefit_.  This Agreement shall be binding upon and inure to the benefit of the respective legal representatives, heirs, successors, and assigns of the parties.  This Agreement may not be assigned by the Purchasers or Seller.

14. _Notices_.  All notices and other communications, whether required or otherwise, made under this Agreement shall be in writing and shall be deemed to have been given if personally delivered or mailed by registered, certified, or first-class mail, postage prepaid, or sent by overnight delivery, telex, telegram, or facsimile transmission:

if to Seller, to it at:

        Sagi Genger 1993 Trust
        1211 Park Avenue
        New York, New York 10128
        Attention:  Mr. Sagi Genger
        Fax:  (802) 375-2949

if to Purchasers, to the appropriate Purchaser at:

        TR Investors, LLC
        c/o The Trump Group
        4 Stage Coach Run
        East Brunswick, New Jersey  08816
        Attention:  James M. Lieb, Esq.
        Fax: (732) 390-3319

        New TR Equity I, LLC
        c/o The Trump Group
        4000 Island Blvd
        Williams Island, Florida 33160
        Attention: Mr. Jules Trump

<center>9</center>

New TR Equity II, LLC
c/o The Trump Group
4000 Island Blvd
Williams Island, Florida 33160
Attention: Mr. Eddie Trump
Fax: (305) 933-9514

Glenclova Investment Co.
c/o Carmel Investment Fund
TK House
Bayside Executive Park
West Bay Street and Blake Road
Nassau, Bahamas
Attention: Mr. Robert Smith
Fax: (242) 327-2289

with copy, in each instance, to:

Mark S. Hirsch, Esq.
404 Park Avenue South, 6th Floor
New York, New York 10019
Fax:(917) 546-7009

or to such other address or to such other person as one party shall have last designated by notice to the other party hereto. Notices delivered personally or by overnight delivery shall be effective upon delivery. Notices properly addressed and delivered by mail, return receipt requested, shall be effective upon deposit with the United States Postal Service. Notices sent by telex, telecopier, or facsimile transmission shall be effective upon confirmation of transmission.

15. Paragraph Headings. The headings of paragraphs contained in this Agreement are provided for convenience only. They form no part of this Agreement and shall not affect its construction or interpretation. All references to paragraphs in this Agreement refer to the corresponding paragraphs of this Agreement.

16. Amendment. Neither this Agreement nor any terms or provisions hereof may be changed, waived, discharged, or terminated orally, or in any manner other than by an instrument in writing signed by the party against whom the enforcement of the change, waiver, discharge, or termination is sought.

17. Counterparts. This Agreement may be executed simultaneously in counterparts, each of which shall be deemed to be an original, but all of which together shall constitute one and the same instrument. It shall not be necessary that any single counterpart be executed by all parties provided that each party shall have executed at least one counterpart.

18. Further Assurances. Each of the parties hereto shall use all best efforts to do all things necessary or advisable to make effective the transactions contemplated hereby and

10

shall cooperate and take such action as may be reasonably requested by the other party in order to carry out fully the provisions and purposes of this Agreement and the transactions contemplated hereby and to vest in the Purchasers all rights in respect of the Shares, including, but not limited to, the right to vote, exercise rights under the Stockholders Agreement and transfer the Shares. From and after the Closing Date, the parties hereto agree to execute or cause to be executed such further agreements, documents or instruments as may be reasonably requested by one of the parties hereto in order to effect the transactions contemplated hereunder or to exercise any and all rights in respect of the Shares, including, but not limited to, the right to vote, exercise rights under the Stockholders Agreement and transfer the Shares.

19. <u>Jurisdiction</u>. Each party hereby consents to the exclusive jurisdiction of the courts of the State of Delaware as to all matters relating to the enforcement, interpretation, or validity of this Agreement, and if such party is a non-resident of the State of Delaware, appoints the Secretary of State of the State of Delaware as its agent for service of process.

20. <u>Specific Performance</u>. The parties agree that this Agreement may be enforced in equity, and that specific performance or other equitable relief would be an appropriate remedy in any such action, in addition to any monetary or other damages which may be proved. It is accordingly agreed that the Purchasers, in addition to any other remedy to which they may be entitled in law or in equity, shall be entitled to an injunction or injunctions to prevent breaches of this Agreement and to compel specific performance of this Agreement, without the need for proof of actual damages. Seller agrees to waive, and to cause its affiliates to waive, any requirements for the securing or posting of any bond in connection with such remedy. Seller also agrees to reimburse the Purchasers for all costs and expenses, including attorneys' fees, incurred by it in successfully enforcing Seller's or its affiliates' obligations hereunder.

21. <u>Governing Law</u>. This Agreement shall be governed by the laws of the State of Delaware, without regard to any conflicts of law principles.

22. <u>Severability</u>. If any provision of this Agreement or the application thereof to any person or circumstance shall be invalid or unenforceable to any extent, the remainder of this Agreement and the application of such provisions to other persons or circumstances shall not be affected thereby and shall be enforced to the greatest extent permitted by law.

23. <u>No Presumption Against the Drafter</u>. Each of the parties to this Agreement participated in the drafting of this Agreement and the interpretation of any ambiguity contained in the Agreement will not be affected by the claim that a particular party drafted any provision hereof.

[SIGNATURE PAGE FOLLOWS]

11

IN WITNESS WHEREOF, the parties have duly executed this Agreement effective as of the date and year first above-written.

TR INVESTORS, LLC

By: _____
Name: Jim Lieb
Title: Executive Vice-President

GLENCLOVA INVESTMENT CO.

By: _____
Name: Robert Smith
Title:   Chairman

NEW TR EQUITY I, LLC

By: _____
Name: MARK S. HIRSCH
Title: EXECUTIVE VP/GEN'L COUNSEL

NEW TR EQUITY II, LLC

By: _____
Name:
Title:

SAGI GENGER 1993 TRUST

By: _____
Name: Rochelle Fang
Title:   Trustee

TPR INVESTMENT ASSOCIATES, INC.

By: _____
Name: Sagi Genger
Title:   President

12



<div style="text-align:center; border:1px solid black;">

# GRANTED

</div>

**IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE**

| | |
|---|---|
| TR INVESTORS, LLC, GLENCLOVA INVESTMENT CO., NEW TR EQUITY I, LLC, and NEW TR EQUITY II, LLC, and TRANS-RESOURCES, INC., <br><br>          Plaintiffs, <br><br>    v. <br><br> ARIE GENGER, <br><br>          Defendant. | |
| ARIE GENGER, <br><br>        Counterclaim Plaintiff, <br><br>    v. <br><br> TR INVESTORS, LLC, GLENCLOVA INVESTMENT CO., NEW TR EQUITY I, LLC, and NEW TR EQUITY II, LLC, and TRANS-RESOURCES, INC., <br><br>        Counterclaim Defendants. | Civil Action No. 3994-VCS |

## FINAL JUDGMENT ORDER

For the reasons set forth in this Court's Opinions of December 9, 2009, February 3, 2010, July 23, 2010, and August 9, 2010 (the "Opinions"), this _____ day of August, 2010, IT IS HEREBY ORDERED that:

1.    Unless otherwise provided herein, all defined terms in this Final Judgment Order shall have the same meanings ascribed to them under the Court's Opinions.

2.    TR Investors, LLC ("Investors") is the owner of 1,740.7641 shares of the authorized and issued stock of Trans-Resources, Inc. ("Trans-Resources").

3.    Glenclova Investment Co. ("Glenclova") is the owner of 1,553.4931 shares of the authorized and issued stock of Trans-Resources.

4.     New TR Equity I, LLC ("Equity I") is the owner of 275.7 shares of the authorized and issued stock of Trans-Resources.

5.     New TR Equity II, LLC ("Equity II") is the owner of 275.7 shares of the authorized and issued stock of Trans-Resources.

6.     The foregoing ownership holdings of Investors and Glenclova include 64% of the Balance Shares, as that term is defined in the Stockholders Agreement, representing 66.4144 shares of the authorized and issued stock of Trans-Resources.

7.     As a result of the foregoing, Investors, Glenclova, Equity I and Equity II are presently the owners of a total of 3,845.6572 shares, or 67.7477%, of the authorized and issued stock of Trans-Resources.

8.     TPR is the record and beneficial owner of all Trans-Resources shares not presently owned by the Plaintiffs.

9.     Arie Genger and the Orly Genger Trust are not (and have not been since at least the date of execution of the Stockholders Agreement) the record or beneficial owners of any Trans-Resources shares.

10.     No Trans-Resources shares presently owned by Plaintiffs are subject to any proxy of any kind in favor of Arie Genger.

11.     All of the transfers of shares of the authorized and issued stock of Trans-Resources that Arie Genger purported to cause TPR to make in 2004 (to himself, the Sagi Genger 1993 Trust, and the Orly Genger 1993 Trust) were in violation of the Stockholders Agreement.

2

12. As a result, the transfers were void, the purportedly transferred shares continued to be owned by TPR, and Investors and Glenclova had the right under Section 3.2 of the Stockholders Agreement to buy all of the shares purportedly transferred by TPR.

13. In exchange for, among other consideration, such right under Section 3.2 of the Stockholders Agreement to purchase the Trans-Resources shares purportedly transferred in 2004 from TPR to Arie Genger and the Orly Genger 1993 Trust, Investors, Glenclova, Equity I and Equity II obtained the contractual right to purchase those shares pursuant to a Letter Agreement dated August 22, 2008, between TPR and those entities.

14. If Investors, Glenclova, Equity I and Equity II exercise their rights under the Letter Agreement, they may purchase the shares improperly transferred in 2004 to Arie Genger and the Orly Genger 1993 Trust per the terms of the Letter Agreement, will own such shares, and may vote those shares (which are not subject to any proxy of any kind in favor of Arie Genger).

15. Trans-Resources need not recognize Arie Genger or the Orly Genger 1993 Trust as stockholders.

16. Defendant Arie Genger is ordered to pay reasonable attorneys' fees and expenses to Plaintiffs, in accordance with this Court's December 9, 2009 and February 3, 2010 Opinions, in the amount of $3,200,000, based on Mr. Genger's agreement that he will not challenge the reasonableness of the amount of such fee award (whether on appeal or otherwise), except on the ground that it was improper to award any sanction, including attorneys' fees or expenses, for this Court's contempt finding against Mr. Genger.

17. This Order constitutes a final judgment as to all counts of Plaintiffs' Amended and Verified Complaint Under 8 *Del. C.* § 225, dated March 11, 2009.

18.    This Order constitutes a final judgment as to Arie Genger's Counterclaim dated March 30, 2009.

19.    Unless and until otherwise ordered by the Delaware Court of Chancery or the Supreme Court of the State of Delaware, or agreed to in writing by the parties to the above action, Arie Genger and his agents, servants, employees, attorneys, advisors and all persons acting in concert or participation with any of them (including but not limited to Orly Genger and the Orly Genger 1993 Trust to the extent they are so acting), and each of their successors and assigns, shall not, during the pendency of any appeal from this Court's Opinions and Orders in this action, commence or prosecute any legal proceeding (other than this action and any appeal arising therefrom) in any state court constituting a collateral attack on, attempt to prevent implementation of, or relitigation of, any of the Court's holdings set out in paragraphs 2 through 16 (inclusive) of this Final Judgment Order; provided, however, that (x) the foregoing shall not limit the ability of any of the individuals or entities named herein to: (1) commence litigation or to assert added claims or counterclaims in existing litigation so as to comply with any statute of limitations or other doctrine that would subsequently bar such claim, so long as the person making such filing shall contemporaneously apply for a stay of such litigation or claim for the duration of the pendency of this appeal, or (2) make any necessary filings in litigation already filed or commenced against them, so long as they contemporaneously apply for a stay of that proceeding for the duration of the pendency of this appeal; and (y) Arie Genger shall have the right to seek an order from a court of competent jurisdiction requiring TPR Investment Associates, Inc. and its officers and directors to place in escrow the proceeds of sale of the shares of TRI referenced in paragraph 14 of this Order.  For the avoidance of doubt, nothing in this Order shall prohibit the commencement or prosecution of claims against TPR Investment

4

Associates, Inc. and its officers and directors and other relevant parties for fiduciary or other misconduct, so long as, during the pendency of this appeal, the persons commencing that action do not seek therein to collaterally attack, prevent the implementation of, or relitigate this Court's holdings described in paragraphs 2 through 16 above.

20.     The Second Amended Status Quo Order entered by the Court on December 30, 2008 is hereby terminated and dissolved.

_____

The Honorable Leo E. Strine, Jr.

This document constitutes a ruling of the court and should be treated as such.

|  |  |
|---|---|
| **Court:** | DE Court of Chancery Civil Action |
| **Judge:** | Leo E Strine |
| **File & Serve Transaction ID:** | 32722444 |
| **Current Date:** | Aug 18, 2010 |
| **Case Number:** | 3994-VCS |
| **Case Name:** | CLOSED 8/17/2010 CONF ORDER T R Investors LLC vs Arie Genger |
| **Court Authorizer:** | Leo E Strine |

**/s/ Judge Leo E Strine**

STATE OF NEW YORK
SURROGATE'S COURT: COUNTY OF NEW YORK
------------------------------------------------------------------X
In the Matter of the Application of                          **AFFIDAVIT OF SERVICE**
ORLY GENGER, as a person interested, for the
removal of DALIA GENGER as Trustee of the              File No. 0017/2008
Orly Genger 1993 Trust pursuant to SCPA §711(11)
------------------------------------------------------------------X

STATE OF NEW YORK          )
                           : ss.:
COUNTY OF NEW YORK         )

     David Bartky, being duly sworn, deposes and says: I am over the age of 18 years

and not a party to this action.  On the 2nd day of November, 2010, I served the annexed

NOTICE OF MOTION TO DISMISS on Petitioner by sending same via pre-paid first

class U.S. mail to:

               Judith E. Siegel-Baum, Esq.
               Stephanie Lehman, Esq.
               Cozen O'Connor PC
               250 Park Avenue
               New York, NY 10017,

her counsel of record.

                                         David Bartky

Sworn to before me this
2nd day of November, 2010.

_____
Notary Public

**ROBERT A. MEISTER**
**Notary Public, State of New York**
**No. 31-02ME2653350**
**Qualified in New York County**
**Commission Expires March 30, 2011**