**EXHIBIT E**

## TPR INVESTMETN ASSOCIATES, INC.

### SHAREHOLDERS AGREEMENT

SHAREHOLDERS AGREEMENT, dated as of October 30, 2004, among D&K Limited Partnership, a Delaware limited partnership ("D&K"), and Dalia Genger, an individual residing at 210 East 65th Street, Apt 11J, New York, NY 10021("Dalia Genger") (collectively the "Shareholders" and individually, a "Shareholder") and TPR Investment Associates, Inc., a Delaware corporation (the "Corporation").

### W I T N E S S E T H:

WHEREAS, D&K owns a direct interest in the Corporation of 49% of the outstanding capital stock of the Corporation; and

WHEREAS, Dalia Genger owns a direct interest in the Corporation of the remaining 51% of the outstanding capital stock of the Corporation, and 4% of D&K, which constitutes a 1.47% indirect interest in the Corporation; and

WHEREAS, the parties desire to enter into this Agreement in order to provide for the management of the Corporation and to impose certain restrictions with respect to the sale, transfer or other disposition of the shares of the capital stock of the Corporation ("Shares") upon the terms and conditions hereinafter set forth.

NOW, THEREFORE, in consideration of the premises and the mutual covenants hereinafter set forth, the parties hereto agree as follows:

### SECTION I

### LEGENDS

All certificates representing shares of Common Stock issued by the Corporation, after the date hereof, to either of the Shareholders shall be subject to this Agreement and shall bear the following legends:

"The shares evidenced by this certificate or any certificate issued

in exchange or transfer therefor are and will be subject to, and may not be transferred except in accordance with, the terms of a certain Shareholders Agreement, dated as of October 30, 2004, by and among the Shareholders of the Corporation and the Corporation, which agreement provides, among other things, for restrictions on the sale, transfer and disposition of the shares of the Corporation, an executed copy of which agreement is on file at the principal office of the Corporation."

## SECTION 2

## MANAGEMENT OF THE CORPORATION

2.1     Board of Directors. The Board of Directors of the Corporation ("Board") shall initially consist of two (2) directors, as follows:

(i) Dalia Genger shall be a director, and shall have the right to appoint a director in her stead; and

(ii) D&K shall have the right to appoint a director; the first director appointed by D&K shall be Mr. Sagi Genger ("Sagi").

2.2     Management. Sagi will be appointed by the Board, to serve as Chief Executive Officer of the Corporation, and David Parnes will be appointed by the Board to serve as Vice President. Compensation of the Corporation's officers will be set by the Board.

## SECTION 3

## RESTRICTIONS ON SALES OR OTHER DISPOSITION OF COMMON STOCK

3.1     Sale of Shares of Common Stock. During the term of this Agreement, the

parties to this Agreement shall not, either directly or indirectly, sell, assign, pledge, transfer, mortgage, grant any lien or security interest in, convey or otherwise dispose of, encumber or grant any other interest in ("Transfer"), all or any Shares now owned or hereafter acquired by each party, except as hereinafter provided. The term "Shares" as used in this Agreement shall include all shares of Common Stock, whether presently issued or hereafter acquired, scrip representing fractional shares of Common Stock, options, rights and warrants for shares of Common Stock, securities convertible into or exchangeable for shares of Common Stock, or shares of Common Stock received by way of dividend or upon an increase, reduction, substitution or reclassification of the Common Stock, or upon any reorganization of the Corporation or any other interest or right in and to shares of Common Stock of the Corporation.

3.2     Board Approval. No Shareholder shall Transfer any Shares or any interest in any Shares owned by such Shareholder, in whole or in part, and no such attempted Transfer shall be treated as effective for any purpose without obtaining the prior written consent of the Board.

3.3     Sale of Shares and Determination of Buy-Out Price. If a Shareholder desires to Transfer all of the Shares owned by such Shareholder (the "Initiating Shareholder"), such Initiating Shareholder shall notify the other Shareholder in writing (the "Sale Notice"), stating the total number of Shares, owned directly and indirectly by the Initiating Shareholder, which are to be Transferred. The Initiating Shareholder and the other Shareholder will meet, no later than two calendar months following receipt of the Sale Notice by the other Shareholder (the "Sale Meeting") at which time the Shareholders will determine the Buy-Out Price. Prior to a Sale Meeting, the books of the Corporation will be open to the Shareholders and they will cooperate with each other in connection with the impending sale. In addition, up to date audited financials for the Corporation will be provided to the Shareholders. The Corporation will reasonably cooperate with any outside expert hired by any Shareholder to assist in the sale process.

(2) *The Sale Meeting.* At the Sale Meeting the Shareholders will adhere to the following process:

(i) a coin will be tossed in the air by a person mutually acceptable to the Shareholders;

(ii) the Initiating Shareholder will be designated as "Head" (i.e. - the side of the coin where the profile of a person is impressed) and the other Shareholder will be designated as "Tail" (i.e. - the other side of the coin);

(iii) if the Head side of the coin shall lay face up - the Initiating Shareholder will become the Evaluating Shareholder, and if the Tail side of the coin shall lay face up - the other Shareholder shall become the Evaluating Shareholder;

(iv) the Evaluating Shareholder shall value and indicate in writing within seven (7) business days following the coin toss to the other Shareholder (the "Notified Shareholder"), the sum at which he or she values one Share ("Evaluated Share Value");

(v) within seven (7) business days following receipt of the Evaluated Share Value from the Evaluating Shareholder ("Determination Date"), the Notified Shareholder shall notify the Evaluating Shareholder in writing whether he intends to acquire from, or to sell to, the Evaluating Shareholder his Shares (based on the Evaluated Share Value and the number of Shares in question) in which case the Notified Shareholder shall agree to either (a) remit to the Evaluating Shareholder the appropriate amount based on the Evaluated Share Value, or (b) receive from the Evaluating Shareholder the appropriate amount based on the Evaluated Share Value.

"Transferring Shareholder" shall mean the Shareholder that ultimately pays to the

other Shareholder, by way of advancement and a Note, the Buy Out Price, and "_Purchasing Shareholder_" shall me the Shareholder that ultimately receives, by way of advancement and a Note, the Buy Out Price.

(b)   *Closing and Payment of Buyout Price*  The consummation of the sale of the Shares (the "_Closing_") shall be held in the offices of the Corporation, or at such other location as agreed by the Shareholders, at 10:00 a.m. on the twentieth (20th) business day following the Sale Meeting (the "_Closing Date_").

(i) On or before the Closing Date, the Transferring Shareholder shall deliver duly executed certificates in valid form evidencing the Shares to be sold and purchased, duly endorsed for transfer, free and clear of any liens or encumbrances;

(ii)   on or before sixty (60) days from the Closing Date ("_Initial Payment_"), the Purchasing Shareholder shall deliver to the Transferring Shareholder immediately available funds by wire transmit to an account designated by the Transferring Shareholder, or a certified or bank check, in an amount equal to no less ten percent (10%) of the applicable Buyout Price;

(iii)   any remaining balance of the applicable Buyout Price shall be paid by the Purchasing Shareholder on or before the seventh monthly anniversary of the Initial Payment (the "_Ending Date_").

(c)   *Participation of Corporation.* In order to facilitate the Transfer of Shares, from the Transferring Shareholder to the Purchasing Shareholder, the Corporation will provide the necessary funds, in lieu of the Purchasing Shareholder, to pay the Buyout Price to the Transferring Shareholder. The Shareholders agree to cause the Corporation to provide such funds, and will

execute and deliver all of the documents reasonably necessary for the Corporation to effectuate the foregoing payment, including, without limitation, necessary resolutions and consents.

    (d)   *Board and Management Participation.* From the Determination Date through the Ending Date, the Transferring Shareholder will not actively engage in the management of the Corporation, and will abstain from voting - or cause his/her appointed member on the Board to vote, in any way inconsistent with the vote of the Purchasing Shareholder.

## SECTION 4

## TERM

This Agreement shall terminate either by (i) the consent of the parties hereto, or (ii) upon the consummation of the transfer of Shares, and the receipt of the full Buyout Price by the Transferring Shareholder on the Ending Date.

## SECTION 5

## MISCELLANEOUS

5.1   Complete Agreement. This Agreement constitutes the complete understanding among the parties hereto with respect to the subject matter hereof, and, no amendment or modification or waiver hereof shall be valid unless made pursuant to an instrument in writing signed by the party against whom such amendment, modification or waiver is sought to be enforced.

5.2   *Successors and Assigns.* All of the terms and provisions of this Agreement shall inure to the benefit of and be binding upon the heirs, successors, personal representatives, successors and permitted assigns of the respective parties hereto.

5.3   Waivers. The failure of any party hereto to give notice of the breach or non-fulfillment of any term or condition of this Agreement shall not constitute a waiver thereof, nor shall the waiver of any breach or non-fulfillment of any term or condition of this Agreement constitute a waiver of any other breach or non-fulfillment of that or any other term or condition of this Agreement.

5.4   Amendments. This Agreement may be amended at any time by a writing setting forth such amendment, signed by the Corporation and by both of the Shareholders and/or their permitted designees, it being understood that any such amendment shall not affect any rights or obligations which may have arisen prior thereto by virtue of the operation of the provisions of this Agreement.

5.5   Future Instruments. Each of the parties hereto agrees to execute and deliver all such future instruments and take such other and further action as may be reasonably necessary or appropriate to carry out the provisions of the Agreement and the intention of the parties as expressed herein.

5.6   Governing Law. This Agreement will be governed and interpreted in accordance with laws of the State of Delaware, without application of its conflicts of law provisions.

5.7   Arbitration. Any controversy, claim or dispute between the parties directly or indirectly arising out of this Agreement shall be settled by arbitration, held in Manhattan, New York. Either party may give written notification to the other party requesting arbitration to resolve any controversy, claim or dispute arising out of this Agreement between the parties.

In the event that a dispute is submitted to arbitration, there shall be one (1) arbitrator (the "Arbitrator") selected (x) by the parties or (y) if the parties fail to select an Arbitrator within twenty (20) days following receipt of a list of potential arbitrators from the American Arbitration Association ("AAA"), the Arbitrator shall be selected by the AAA. The Arbitration shall be conducted as promptly as practicable after the selection of the Arbitrator in accordance with the Commercial Arbitration Rules and Mediation

Procedures. The Arbitrator shall be someone who has at least fifteen (15) years of commercial law experience or who was a judge of a court of general jurisdiction.

5.8   Notices. All notices, offers, acceptances and other communications to be made, served or given hereunder (each, a "Notice") shall be in writing and shall be sent by overnight courier service, certified mail, return receipt requested, postage prepaid, or personally delivered, to the recipient party's address set forth on the signature page hereof or shall be sent by electronically confirmed facsimile transmission to the recipient party's facsimile transmission number if such a facsimile transmission number is set forth on the signature page hereof. Such Notices shall also be sent to the recipient Shareholder's attorney at the address or facsimile transmission number of such attorney set forth beneath such Shareholder's signature hereto. Either Shareholder may, by Notice to the other Shareholder given in the manner prescribed above in this Paragraph, designate another address or transmission number to which Notices to him and/or his attorney shall be sent. All Notices made or given in accordance herewith shall be effective on the date of facsimile transmission or personal delivery, the day on which delivery by overnight courier service is guaranteed, or three (3) days after mailing, provided such Notice is in fact received.

5.9   Miscellaneous. Each of the Shareholders agrees that he will consent to and approve any amendment of the Certificate of Incorporation or By-laws of the Corporation which may be necessary or advisable in order to conform any of the provisions of this Agreement or any amendments hereto to the applicable laws of the State of Delaware as now in effect or hereafter enacted.

5.10   Separability of Provisions. Each provision of this Agreement shall be considered separable and if for any reason any provision or provisions herein are determined to be invalid or contrary to any existing or future law, such invalidity shall not impair the operation of or affect those portions of this Agreement which are valid.

5.11   Section Headings. The Section headings contained in this Agreement are for convenience of reference only and shall not affect the meaning or interpretation hereto.

5.12   Counterparts. This Agreement may be executed in any number of counterparts, and by different parties on separate counterparts. All such counterparts together shall constitute one and the same instrument.

5.13   Number and Gender. Each definition or pronoun herein shall be deemed to refer to the singular, plural, masculine, feminine or neuter as the context requires. Words such as "herein," "hereinafter," "hereof," "hereto" and "hereunder," when used with reference to this Agreement, refer to this Agreement as a whole, unless the context otherwise requires.

*********************

IN WITNESS WHEREOF, the parties hereto have duly executed this Shareholders Agreement as of the day and year first above written.

TPR Investment Associates, Inc.
By: Sagi Genger, its Chief Executive Officer

D&K Limited Partnership
By: D&K GP LLC, its general partner
By: Sagi Genger, its manager

Dalia Genger

**EXHIBIT F**

# Memorandum

To:      David Parnes

CC:      Dalia Genger

From:    Sagi Genger

Date:    August 2, 2006

Re:      Assignment by TPR of D&K LP's 1993 Promissory Note

Dear David,

This will set in writing what I recently proposed to you:

I fully acknowledge the commitment to you to sponsor your MBA studies;

Instead of making the next payment due, in connection with the MBA fees (approximately $12,000), TPR Investment Associates Inc. ("TPR") will assign to you a promissory note made in its favor by D&K LP ("Note").

This promissory Note will be assigned to you on an 'as is' basis.

D&K LP and its partners have a variety of claims against TPR, and deny the enforceability of the Note.

5.  Collections by you on the Note will be deposited into a separate account, preferably with a mutually acceptable escrow agent. Such amounts collected will be released to you on the earlier of (a) December 31, 2013, or (b) your declaration that you will make no further claims in connection with the Note.

6.  D&K will refrain from making claims against TPR, so long as the Note is not enforced by you against it. However, should your collection efforts result in D&K making a counter-claim against TPR -- the funds in the escrow account will be applied towards TPR's defense and any other related outlays, before making any distributions therefrom.

7.  You will not assign the Note to any third party without the consent of D&K and TPR.

1

August 2, 2006

8. TPR will retain the right to 7.5% of your net collections and the right to enforce the note.

9. Additional terms in connection with the assignment of the Note will follow.

Be advised that we hereby waive all past, present or future existing conflict of interest we may have.

TPR Investment Associates, Inc.
By: Sagi Genger, President

D&K LP
By: D&K GP LLC
By: Sagi Genger, Managing Member

Read this 2 day of August 2006

2

**EXHIBIT G**

GENGER VS. GENGER

PROCEEDINGS - 9/7/07

*Reviewed*

CONCORDANCE AND CONDENSED TRANSCRIPT
PREPARED BY:



*Ellen Grauer*
COURT REPORTING Co. LLC

TOWER 56, 126 EAST 56TH STREET, FIFTH FLOOR, NEW YORK, NEW YORK 10022
PHONE: (212) 750-6434   FAX: (212) 750-1097
WWW.ELLENGRAUER.COM

Page 446

PARNES - CROSS

(2) Q. If you take a look at that. This is
(3) a summary —
(4)    THE ARBITRATOR: Do you have a copy
(5) for counsel?
(6)    MR. GENGARO: Yes.
(7) Q. — of all the checks to you — the
(8) checks are behind there — either to you or on
(9) your behalf?
(10)   A. Right.
(11) Q. Totaling about $240,000 over the
(12) past two and a half years or so; does that
(13) sound about right?
(14)   A. Over the past three years, yes.
(15) Q. That you received from TPR, right?
(16)   A. Correct.
(17) Q. In October of 2004, just before the
(18) stipulation was entered into, Dalia Genger
(19) required and Sagi Genger that the trustees of
(20) the children's trusts be changed, right?
(21)   A. I don't remember it being Dalia
(22) required that or Sagi. I mean, Sagi was
(23) involved, but Dalia required that.
(24)   Actually, I think Arie required
(25) that, because they were indirectly to hold

Page 447

PARNES - CROSS

(2) stock of TRI, and both Sagi and Arie were
(3) concerned to let TRI function as it is without
(4) disturbing them, and they were looking for
(5) people, trustees who would be acceptable, and
(6) the names that were suggested were two
(7) long-time friends of Sagi, Eric Gribetz and
(8) myself.
(9) Q. Well the trust already had two
(10) trustees for years, right?
(11)   A. Yes, they were Sash Spencer and
(12) Larry Small.
(13) Q. It wasn't Arie Genger's idea to
(14) change those?
(15)   A. It was Dalia. It had to be mutually
(16) acceptable on both of them.
(17) Q. It wasn't Arie's demand that the
(18) trustees be changed? That was from Dalia and
(19) Sagi, right?
(20)   A. That was — I don't think it was
(21) from Sagi. It was probably from Dalia, yes.
(22) Q. And the trustees were, in fact,
(23) replaced, and you were substituted as a trustee
(24) along with Eric Gribetz of both Orly and Sagi's
(25) trust, correct?

Page 448

PARNES - CROSS

(2)   A. Correct.
(3) Q. As a result of being a trust, you
(4) know as a lawyer you owed Orly and Sagi a
(5) fiduciary duty, right?
(6)   A. Correct.
(7) Q. And you, therefore, cannot take any
(8) position or engage or approve a transaction in
(9) which you're involved that is contrary to Orly
(10) or Sagi's interest, right?
(11)   MR. VELIE: Objection.
(12)   THE ARBITRATOR: Sustained that —
(13) any position?
(14) Q. You can't engage in a transaction
(15) that is contrary to Orly and Sagi's interests,
(16) correct?
(17)   MR. VELIE: Same objection.
(18)   THE ARBITRATOR: Sustained.
(19) Q. Are you familiar with the D&K note?
(20)   A. Yes.
(21) Q. You know that that Dalia Genger and
(22) Sagi Genger have taken a position in this
(23) arbitration that the D&K notes have no value?
(24)   A. I did not realize that this was in
(25) this arbitration. I knew at the stipulation

Page 449

PARNES - CROSS

(2) that was the case.
(3) Q. Do you know that is the case now?
(4)   A. Now that you tell me, yes.
(5) Q. Are you aware that Dalia Genger
(6) signed — take a look at Exhibit 71. That is
(7) our exhibit. This is an affidavit that Dalia
(8) Genger signed in the matrimonial case dated
(9) February 14th of '07. Do you see that?
(10)   A. Yes, I see it.
(11) Q. Dalia Genger swears in here in
(12) paragraph 4 that in August 2006, TPR sold the
(13) D&K note but retained a nominal contingent
(14) interest for $12,000, right?
(15)   A. Right.
(16) Q. Now, the D&K note was a secured
(17) promissory note, right?
(18)   A. I do not remember, but —
(19) Q. You don't know that it was a secured
(20) note?
(21)   A. I don't remember. I didn't see the
(22) note for a while.
(23) Q. Now, the third party that Dalia
(24) Genger who is referring to who bought the note
(25) is you, right?

GENGER                          BSA XMAX(16/16)                          VS. GENGER
PROCEEDINGS - 9/7/07

Page 450

PARNES - CROSS

(1)
(2)    A.    Right.
(3)    Q.    Now there is a – if you look in –
(4)    if you turn the page, there is a TPR – it's
(5)    AG 1925 at the bottom.
(6)          THE ARBITRATOR:  I'm sorry.  What
(7)    exhibit?
(8)    Q.    Right behind the affidavit there is
(9)    a TPR resolution that authorizes the sale of
(10)   the D&K note, correct?
(11)   A.    Yes.
(12)   Q.    And it requires that the sale be to
(13)   an unrelated third party, right?
(14)   A.    Right.
(15)   Q.    Now, you agree that you are not an
(16)   unrelated third party, right?
(17)         MR. VELIE:  Objection.
(18)         THE ARBITRATOR:  I'll allow it.
(19)   A.    Not entirely.  I'm not related.  I
(20)   don't have a stake in the company.
(21)   Q.    You're an officer of TPR, right?
(22)   A.    Yes, officially I am an officer of
(23)   TPR.
(24)   Q.    You were paid only $250,000 from the
(25)   company, right?

Page 451

PARNES - CROSS

(1)
(2)    A.    Over three years, right.
(3)    Q.    You're a lawyer for the company,
(4)    right?
(5)    A.    Right.
(6)    Q.    And you're the trustees of the two
(7)    children's trust, right?
(8)    A.    Right.
(9)    Q.    Are you aware -- maybe you're not
(10)   aware -- that Dalia was ordered in this
(11)   arbitration to produce the sale of documents
(12)   for the sale of the D&K note?
(13)   A.    Okay.
(14)         THE ARBITRATOR:  "Okay" being what?
(15)         THE WITNESS:  Fine.  If she ordered
(16)   it, she ordered it.  What can I do?
(17)   Q.    Look at Exhibit 67.
(18)         MR. VELIE:  You're talking about
(19)   your number?
(20)         MR. GENGARO:  Yes, our number 67.
(21)         MR. OPPENHEIM:  If you can specify
(22)   for the record to make it clear.
(23)         MR. GENGARO:  Yes, it's our exhibit.
(24)   Q.    It's at the back, at the bottom with
(25)   Bates number – I'm looking at AG1914.  You see

Page 452

PARNES - CROSS

(1)
(2)    they are all Bates numbered in order?
(3)    A.    I have it.
(4)    Q.    This is the document that Dalia
(5)    produced in this arbitration as being the sale
(6)    document of the D&K note?
(7)    A.    Right.
(8)    Q.    You signed this memo and agreed to
(9)    the terms on the second page, correct?
(10)   A.    Correct.
(11)   Q.    And under the terms of this memo you
(12)   are to become the holder of the D&K note,
(13)   right?
(14)   A.    Right.
(15)   Q.    · So that D&K is now no longer
(16)   required to make payment to TPR, right?
(17)   A.    Right.
(18)   Q.    It's going to pay you, right?
(19)         MR. VELIE:  Objection.  This
(20)   document speaks for itself and has a
(21)   number of conditions in it.
(22)         THE ARBITRATOR:  I'll allow the
(23)   question.
(24)         Can you answer the question?
(25)   A.    Correct.  It says what it says.

Page 453

PARNES - CROSS

(1)
(2)    Q.    This is over an $8 million note?
(3)    A.    Face value of 8 million.
(4)    Q.    Are you in possession of the note?
(5)    A.    I believe I have the note, yes.
(6)    Q.    Are you also in possession of the
(7)    security for the note?
(8)    A.    That I do not remember.  If it is
(9)    part of a bundle, I probably have the bundle,
(10)   yes.
(11)   Q.    You bought a note with a face value
(12)   over $8 million, right?
(13)   A.    Right.
(14)   Q.    You know it had security, right?
(15)   A.    No.
(16)   Q.    You don't know it was secured?
(17)   A.    No.
(18)   Q.    So nobody told you that it was
(19)   secured by 49 percent of TPR's stock?
(20)   A.    To be honest, what I know about the
(21)   note was that it had basically was
(22)   uncollectable.  It had no value.
(23)   Q.    But you paid $12,000 for it?
(24)   A.    Yes.
(25)   Q.    So you paid $12,000 for what you

Page 454

PARNES - CROSS

(1)
(2) believe to be a worthless note?
(3) A.   Yes.
(4) Q.   You have not made any effort to
(5) collect on this note, correct?
(6) A.   Correct.
(7) Q.   Let me look at some of the terms of
(8) this note, of this assignment, this memo.
(9) According to this memo, you're
(10) buying the note in paragraph 3 on an as-is
(11) basis?
(12) A.   Right.
(13) Q.   What does that mean?
(14) A.   No changes, no amendments are being
(15) made to it.
(16) Q.   And you also were assigned the
(17) collateral for the note, right?
(18) A.   Right.
(19) Q.   So you now have the security?
(20) A.   Right.
(21) Q.   So if the note is not paid, you can
(22) foreclose on that security and take ownership
(23) of 49 percent of TPR stock?
(24) A.   Theoretically, yes.
(25) Q.   Correct?

Page 455

PARNES - CROSS

(1)
(2) A.   Theoretically it is correct.
(3) Q.   And that stock, according to the —
(4) let's pull out the stipulation.  The pages
(5) aren't numbered.
(6) If you go to the scheduled TPR
(7) assets, it's Schedule III (1).  So on that
(8) schedule of TPR assets that was attached to the
(9) stipulation, it shows that the book value of
(10) TPR at that time was $11.6 million, right?
(11) A.   If that's what it says, that's what
(12) it says.
(13) Q.   So the minimum value, approximately,
(14) of the 49 percent security that you hold for
(15) this D&K note is over $5 million, right?
(16) MR. VELIE:  Objection.  If we are
(17) doing arithmetic, that's the arithmetic,
(18) but are you asking him to value the
(19) company.
(20) MR. GENGARO:  He holds the note.  He
(21) holds the collateral.  It's multimillion
(22) dollars.  I assume he knows how valuable
(23) this is to him.
(24) MR. VELIE:  He testified —
(25) THE ARBITRATOR:  We are wasting

Page 456

PARNES - CROSS

(1)
(2) time.
(3) The answer is?
(4) Q.   That's approximately right, right?
(5) A.   If I valued the note at what it was,
(6) yes.  49 percent of 11 million is about
(7) 5 million, yes.
(8) Q.   Now, the memo also says that — if
(9) we look at the memo, this is Exhibit 67?
(10) MR. VELIE:  Whose Exhibit 67?
(11) MR. LENTZ:  Our Exhibit 67.
(12) THE ARBITRATOR:  Respondent's
(13) Exhibit 67.
(14) Q.   The memo says that D&K has claims
(15) against TPR and denies that the note is
(16) enforceable.  Do you see that?
(17) A.   Give me one moment and I'll see it.
(18) THE ARBITRATOR:  This is
(19) Respondent's 67?
(20) MR. LENTZ:  Yes, page 1914.
(21) Q.   Paragraph 6, it says here in
(22) number 5 that collections by you on the note
(23) will be deposited into a separate account
(24) preferably with a mutually acceptable escrow
(25) agent.  Do you see that?

Page 457

PARNES - CROSS

(1)
(2) A.   Yes.
(3) Q.   So you cannot even collect on this
(4) note, right?
(5) A.   I can collect — that is not true.
(6) If I wanted to collect, I can collect.  There
(7) is a mechanism where the funds go into.
(8) Q.   An escrow account?
(9) A.   An escrow account, and then they are
(10) divvied up and then goes to what you showed me
(11) earlier, that TPR retained a nominal stake in
(12) the note.
(13) Q.   The memo says that D&K agrees to not
(14) make any claims against TPR as long as you
(15) don't collect on the note, right?
(16) A.   Right.
(17) Q.   If you do collect, the money you
(18) collect has to be used to pay TPR's legal fees,
(19) right?
(20) A.   Right.
(21) Q.   You're not allowed to assign this
(22) note, right?
(23) A.   Right.
(24) Q.   And TPR actually is entitled to
(25) receive seven and a half percent of your net

Page 458
(1)         PARNES - CROSS
(2)   collections, right?
(3)      A.   That is correct.
(4)      Q.   Who signed this memo for TPR?
(5)      A.   For TPR, Sagi Genger.
(6)      Q.   Who signed it for D&K?
(7)      A.   Sagi, as the GP.
(8)      Q.   So Sagi wearing both of his hats,
(9)   two different hats, signed this memo purporting
(10)  to sell you an over $8 million note secured by
(11)  49 percent of TPR for $12,000 pursuant to these
(12)  terms?
(13)     A.   Correct.
(14)     Q.   Did you give Sagi legal advice
(15)  regarding this memo?
(16)     A.   No.
(17)        THE ARBITRATOR:  The memo says that,
(18)  "This will set in writing what I recently
(19)  proposed to you." How is that proposed to
(20)  you?
(21)        THE WITNESS:  Orally.
(22)        THE ARBITRATOR:  Did you agree to
(23)  this arrangement?
(24)        THE WITNESS:  Yes.
(25)        THE ARBITRATOR:  How?

Page 459
(1)         PARNES - CROSS
(2)        THE WITNESS:  Orally, and then he
(3)   said he wanted to reduce it to writing,
(4)   and he reduced it to writing.
(5)        THE ARBITRATOR:  Did you sign
(6)   anything to memorialize it?
(7)        THE WITNESS:  This is what I signed,
(8)   the second page on the bottom.  That's my
(9)   signature.
(10)     Q.   That's your signature, right?
(11)     A.   That's my signature.
(12)        THE ARBITRATOR:  That is your
(13)  signature?
(14)        THE WITNESS:  Yes.
(15)     Q.   Looking at the note itself.  This is
(16)  the first part of Exhibit 67, AG1890.  The
(17)  trusts each signed this note, the children's
(18)  trusts, and are obligated on 48 percent of the
(19)  note each, correct?
(20)     A.   Correct.
(21)     Q.   And so as a result of this note -- I
(22)  beg your pardon -- as a result of your purchase
(23)  of the note, the D&K note, the trusts are now
(24)  obligated to pay you, right?
(25)     A.   Right.

Page 460
(1)         PARNES - CROSS
(2)      Q.   So the trusts that you are the
(3)   trustee of, so now you are wearing your hat as
(4)   trustee for Orly and Sagi's trust, are required
(5)   to pay yourself a note worth over -- with a
(6)   face value of over $8 million, correct?
(7)      A.   Correct.  That is precisely why I
(8)   got the note.
(9)      Q.   You are now in conflict for the
(10)  beneficiaries for why you got the trust?
(11)  You're now their creditor?
(12)     A.   No.
(13)     Q.   You're not their creditor?
(14)     A.   That is precisely the reason for
(15)  which I agreed to buy the note, because I was
(16)  trustee, and you're taking this out of context.
(17)        This was a problematic note that was
(18)  part of a tax planning mechanism that was put
(19)  back in 1993, and throughout the agreement, the
(20)  negotiating separation agreement, the note
(21)  presented a problem, and there are two issues
(22)  that I remember with this, one being that it
(23)  should go away -- the word that everybody used
(24)  around was to bury them in the woods.  The
(25)  second problem was that if TPR had control of

Page 461
(1)         PARNES - CROSS
(2)   it, Dalia could collect and go to her children
(3)   and collect.
(4)        With Dalia it was very easy to deal,
(5)   because there was an arrangement that was
(6)   reached whereby the ownership of TPR, the
(7)   control of TPR, the management of TPR would be
(8)   changed and it would not be put in Dalia's
(9)   hands.
(10)       As to how to bury the note in the
(11)  woods, that was left to Sagi to deal with after
(12)  everything was signed.
(13)       Before the stipulation was signed --
(14)  after the stipulation was signed, he made
(15)  efforts to try and get rid of the note and was
(16)  not able to.  He met with lawyers, with tax
(17)  counsels, et cetera, and the only way was to
(18)  sign was with somebody else.
(19)       I -- because, as you said, I was the
(20)  trustee of both the children, Sagi and Orly, I
(21)  felt I had -- that would be the honorable and
(22)  moral thing to do was to buy the note precisely
(23)  since I was a trustee, so it couldn't fall in
(24)  someone else's hand, and then they could go and
(25)  collect against them.

Page 462

PARNES - REDIRECT

(2)   Q.   Did you make disclosure to Arie
(3)   Genger at the time you bought this note?
(4)   A.   No, I don't remember doing so.
(5)   Q.   Did you get consent from both of the
(6)   beneficiaries for this transaction of the
(7)   trust?
(8)   A.   No.
(9)   Q.   You did not?
(10)  A.   No.
(11)  Q.   There is nothing in the stipulation
(12)  that says this note is going to be buried, is
(13)  there?
(14)  A.   No, there was no -- I'm telling you
(15)  I was there, so I can tell you that that was
(16)  the concern.
(17)       MR. GENGARO:  That's all I have.
(18)
(19)  REDIRECT EXAMINATION
(20)  BY MR. VELIE:
(21)  Q.   We are going to start with our
(22)  Exhibit 11.  It is the flow chart.
(23)       When Mr. Gengaro asked you about
(24)  this flow chart and shows you what was proposed
(25)  to be done with the real estate venture, did he

Page 463

PARNES - REDIRECT

(2)   point out to you that the purchase price by
(3)   Omniway which is to Gilad Sharon was supposed
(4)   to be $1.25 million?
(5)   A.   No.
(6)   Q.   That appears on the chart under
(7)   Omniway; is that correct?
(8)   A.   Correct.
(9)   Q.   Let's go to Exhibit 44.  That's our
(10)  exhibit.  If you recall, this is your
(11)  memorandum to Ed Klimerman, February 24, 2003;
(12)  is that correct?
(13)  A.   Yes.
(14)  Q.   It says, "In the beginning of
(15)  March 2002 I sent a revised set of documents to
(16)  Gilad, if you -- and they were returned
(17)  unsigned."
(18)       If you recall, did they reflect the
(19)  contemplated purchase price of $1.25 million?
(20)  A.   Yes.
(21)  Q.   Those documents were never signed;
(22)  is that correct?
(23)  A.   They were never signed.
(24)  Q.   And, in fact, if you look deeper
(25)  into this exhibit, there is a subscription

Page 464

PARNES - REDIRECT

(2)   agreement dated 2/6/2002.  It's about three or
(3)   four pages in.
(4)   A.   Yes, I have it.
(5)   Q.   It's five pages in.  It is a
(6)   subscription agreement.  It's unsigned by
(7)   Omniway; is that correct?
(8)   A.   That's correct, yes.
(9)   Q.   That indicates that Omniway was to
(10)  pay $1.25 million for the interest in the
(11)  Canadian venture; is that correct?
(12)  A.   That is correct.
(13)  Q.   This was returned to you unsigned?
(14)  A.   Unsigned by Omniway, yes.
(15)  Q.   Behind that is a promissory note
(16)  dated February 6, 2002.
(17)       Take a look at the end on page 4.
(18)  Was that returned to you unsigned?
(19)  A.   Yes.
(20)  Q.   So this was returned to you
(21)  unsigned, and the amount that is contemplated
(22)  in the secured promissory note is
(23)  $1.25 million; is that correct?
(24)  A.   That is correct, yes.
(25)  Q.   So the deal, as you understood it

Page 465

PARNES - REDIRECT

(2)   and as reflected in Exhibit 44, when you --
(3)       MR. LENTZ:  I ask it not be a
(4)   leading question, please.
(5)       THE ARBITRATOR:  Let's get through
(6)   with this.  It's okay.
(7)   Q.   In your memorandum of February 24,
(8)   2003, the note you're describing is a deal for
(9)   Gilad to buy this for $1.25 million; isn't that
(10)  correct?
(11)       MR. LENTZ:  Objection.  Leading.
(12)  It's his own witness.
(13)       THE ARBITRATOR:  Overruled.
(14)  A.   $1,250,000 was the price that was
(15)  discussed, yes.
(16)  Q.   As far as you know, that price was
(17)  never paid, and Gilad never became shareholder
(18)  on that basis; is that correct?
(19)  A.   Not at that time, no.
(20)  Q.   He became a shareholder in the
(21)  documents I showed you; is that correct?
(22)  A.   Yes, that is correct.
(23)  Q.   The ones that your notes indicate
(24)  are in March of '04 -- March of '03?
(25)  A.   Following that, yes.

**EXHIBIT H**

*Reviewed*

# GENGER VS. GENGER

## PROCEEDINGS - 9/6/07

### CONCORDANCE AND CONDENSED TRANSCRIPT
### PREPARED BY:



Ellen Grauer
COURT REPORTING Co. LLC
TOWER 56, 126 EAST 56TH STREET, FIFTH FLOOR, NEW YORK, NEW YORK 10022
PHONE: (212) 750-6434   FAX: (212) 750-1097
WWW.ELLENGRAUER.COM

GENGER                                    BSA XMAX(33/33)                              VS. GENGER
                                        PROCEEDINGS - 9/6/07

---

Page 366

(1)
(2)      Q.   Tell us briefly what the note is and
(3)   why it was prepared in the first place.
(4)      A.   The documents reflect that in 1993
(5)   there was a partnership that was previously set
(6)   up in 1998 that was owned originally by my
(7)   sister and me directly and then contributed
(8)   into trusts with my mother being the general
(9)   partner with a four percent interest.
(10)         That partnership acquired 49 percent
(11)  of TPR in 1993 with $1.2 million in cash, and
(12)  if memory serves, a note for $8,950,000, which
(13)  is commonly referred to as the D&K note.
(14)     Q.   Do you have an understanding of what
(15)  that transaction was for?  Did you participate
(16)  in it in any way?
(17)     A.   Yes.
(18)     Q.   Tell us what you understood the
(19)  purpose of the transaction.
(20)     A.   Essentially an estate planning tool,
(21)  to transfer wealth.
(22)     Q.   From the parents to the children?
(23)     A.   Yes.
(24)     Q.   That's the basic background of the
(25)  D&K note?

---

Page 367

(1)
(2)      A.   Yes.
(3)      Q.   Are you aware that your father
(4)   contends that you should have valued the D&K
(5)   note as an offset to the imbalance that you
(6)   determined when you gave your January
(7)   instructions?
(8)      A.   I'm aware that he recently
(9)   researched that, yes.
(10)     Q.   When you say, "Recently," when is
(11)  the first time you're aware that he raised this
(12)  as an issue?
(13)     A.   Sometime in 2007.  I'm sorry.  That
(14)  was wrong.  I think the issue was first raised
(15)  in December 2006.
(16)     Q.   That was in court proceedings?
(17)     A.   That was, not in court proceedings,
(18)  but in lawyerly proceedings.
(19)     Q.   A contention was made by counsel in
(20)  the opening, and I'll call your attention to
(21)  it, that the DDK or one of the DDK reports
(22)  shows payment by Dalia and Arie of part of the
(23)  D&K note.
(24)         Would you explain that transaction?
(25)     A.   Well, my mother as the general

---

Page 368

(1)
(2)   partner — you have to remember this was set up
(3)   before there were LLC's, so she was personally
(4)   the general partner, was on the hook for four
(5)   percent of the note and, therefore,
(6)   matrimonially we were on the hook for four
(7)   percent of the note.
(8)         So there were only two alternatives.
(9)   Either have the note, that four percent
(10)  forgiven and incur a tax liability, or put the
(11)  money back into TPR, which essentially means
(12)  that approximately the amount that went —
(13)  would have gone to the IRS, went to the
(14)  children, and it became part of the TPR basket.
(15)     Q.   Let's now go to the issue of did you
(16)  make a determination whether or not to value
(17)  the D&K note with respect to whether or not
(18)  there was an imbalance.
(19)     A.   With respect to the residual,
(20)  96 percent?
(21)     Q.   Yes.
(22)     A.   Yes, I made a determination.
(23)     Q.   What was the determination you made,
(24)  and how did you reach it?
(25)     A.   It was to be excluded.

---

Page 369

(1)
(2)      Q.   You excluded it from the valuation?
(3)      A.   Excluded.  It is not in the
(4)   valuation.
(5)      Q.   Can you tell us your reasoning
(6)   process?  And we will show you the documents,
(7)   if any, that you need to do this.
(8)      A.   Sure.
(9)      Q.   Let's first take a look at Article
(10)  III of the stipulation, Exhibit 161 at
(11)  Article III.
(12)         MR. VELIE:  While everybody sort of
(13)  finds the place, I am going to ask another
(14)  question, if I may.
(15)         THE ARBITRATOR:  Please.
(16)     Q.   What was the status of the D&K note?
(17)  Was it being paid?
(18)     A.   At what point in time?
(19)     Q.   At any point you want to tell us
(20)  about.  Was it originally paid?  What happened?
(21)     A.   Well, there were payments.  My
(22)  understanding is that there were payments
(23)  through the year 2000, and then essentially it
(24)  was — there were no payments.  I shouldn't say
(25)  it was in default because I believe it was

---

## Page 370

(1)
(2) never declared a default, but there were no
(3) payments made except until the payments were
(4) made in connection with a stipulation.
(5)     Q.   The payment that you just described
(6) a moment ago?
(7)     A.   The four percent.
(8)     Q.   Was there any effort made on
(9) anybody's part to collect the note when
(10) payments were not being made?
(11)     A.   Well, there is a pro forma letter
(12) sent by Mr. Klimerman to my mother during the
(13) divorce which said, you know, you should be
(14) paying this note, but it didn't even declare it
(15) in default. There was no intention of
(16) collecting the money.
(17)     Q.   Let's go to Article III, and tell us
(18) why you determined that Article III excludes a
(19) valuation of the D&K note.
(20)     A.   If you go to the second page of
(21) Article III —
(22)     Q.   Page 18?
(23)     A.   Yes — you'll see that the assets of
(24) TPR are defined to be in three categories; A, B
(25) and C. And those categories are supposed to be

## Page 371

(1)
(2) annotated on Schedule III, which is the TPR
(3) balance sheet, and that is just clear from the
(4) language. There is a drafting error.
(5)     If you go to Schedule III —
(6)     Q.   Let's look at that together.
(7) Schedule III (1), I believe it is. Sagi, take
(8) a look at Schedule III (1.)?
(9)     A.   If you look at Schedule III (1),
(10) you'll see there is no designation at all, and
(11) that is just a drafting of that. That is it.
(12)     Q.   Are there documents that indicate
(13) what was intended by the parties?
(14)     A.   Yes, there are a lot of documents,
(15) but let's turn to a few of them.
(16)     Q.   Let's take a look at Exhibit 71.
(17)     A.   I'm at the memorandum from Ed
(18) Klimerman to me.
(19)     MR. LENTZ:   Just the very first
(20) page?
(21)     MR. VELIE:   We are going to look at
(22) a couple of pages.
(23)     MR. LENTZ:   Just as a general rule,
(24) I'll try to remember to do this, too.
(25) When you're on a multi-page exhibit, give

## Page 372

(1)
(2) me a chance to catch up with you before
(3) you start questioning.
(4)     MR. VELIE:   You have been asking me,
(5) and I hope I have been accommodating you.
(6)     MR. LENTZ:   You have been.   Very
(7) much so.
(8)     Q.   Let's take a look together at the
(9) first page. This is a memo by hand to you from
(10) Edward Klimerman?
(11)     A.   Well, it's a — this is a typed memo
(12) to me from Ed Klimerman which is signed by hand
(13) which reads, "As discussed yesterday, enclosed
(14) are two copies of exhibits to the agreement.
(15) Please note that I'm still missing exhibits.   I
(16) included" —
(17)     THE ARBITRATOR:   Some exhibits.
(18)     THE WITNESS:   Excuse me, your Honor.
(19) (Reading)  I included the cover sheets for
(20) all of the exhibits and for Exhibit H,
(21) book value of TPR, which is what we are
(22) about to discuss.  I have made handwritten
(23) changes which will be typed in for the
(24) final version.
(25)     Q.   Let's take a look now —

## Page 373

(1)
(2) unfortunately, these pages aren't numbered.
(3)     Can you tell us, is this the
(4) handwritten notations you received from
(5) Mr. Klimerman enclosed with the memorandum you
(6) just read?
(7)     A.   Yes.
(8)     Q.   If it needs any explanation, can
(9) you — what is category A?
(10)     A.   Category A refers to cash and
(11) investments.
(12)     Q.   Category B?
(13)     A.   Category B in this format says,
(14) "Loan receivables."
(15)     Category C says, "Art at costs," but
(16) most importantly, the stock subscription due
(17) from D&K, which is the D&K note, is not in any
(18) category.
(19)     Q.   It's not circled by Mr. Klimerman?
(20)     A.   No. It says, "See attached schedule
(21) investments."
(22)     Q.   It's about two pages later?
(23)     A.   Well, it's the next page, and it
(24) continues. It doesn't appear anywhere. That's
(25) the most direct evidence.

GENGER                          BSA XMAX(15/25)                          VS. GENGER
                            PROCEEDINGS - 9/6/07

---

Page 374

(1)
(2)        MR. VELIE: Judge, I just want to
(3)    make sure you have seen a page that looks
(4)    like this which says on it C and A.
(5)        THE ARBITRATOR: Yes, I have it all.
(6)        THE WITNESS: There is another set
(7)    of documents which perhaps -- is this our
(8)    last subject? Because our subject has a
(9)    time.
(10)       Q.   No, we are briefly going to deal
(11)   with furniture and a few other things.
(12)       A.   Allow me to describe it. There
(13)   are --
(14)       MR. GENGARO: What is the question?
(15)       THE ARBITRATOR: Are there any other
(16)   documents?
(17)       Q.   Are there any other documents that
(18)   bear on this issue?
(19)       A.   There are e-mails in July. If you
(20)   want, we can have them produced here,
(21)   essentially saying --
(22)       MR. VELIE: They are at Exhibit 68
(23)   and 205. 205 is the July e-mail.
(24)       THE ARBITRATOR: Which one do you
(25)   need? 205 or 68?

---

Page 375

(1)
(2)        Q.   Do you want the July one, Sagi?
(3)        A.   No, I want to start with -- no, 68.
(4)    This is e-mail that is basically to all the
(5)    lawyers forwarded to my father, and the
(6)    relevant part is, "Please note that in my
(7)    analysis I'm adjusting downwards the value of
(8)    the personal assets to reflect the
(9)    worthlessness of the D&K note which is stated
(10)   at nominal value on the auditor's balance
(11)   sheet," and then it continues on to other
(12)   things.
(13)       Q.   Do you want to refer to it?
(14)       A.   Yes. The next important e-mail --
(15)   this has some sort of an Excel attachment to
(16)   it. This Excel attachment then morphs into
(17)   having additional things in it on July 5th.
(18)       MR. LENTZ: Please let me catch up.
(19)   I'm sorry. Is this part of the same
(20)   exhibit?
(21)       MR. VELIE: Yes, he's on the same
(22)   exhibit. When it morphs, you want
(23)   Exhibit 205.
(24)       A.   I'm not in 205.
(25)       Q.   You're in 68?

---

Page 376

(1)
(2)        A.   So I need 205.
(3)        Q.   Yes, coming up.
(4)        MR. LENTZ: So we are done with 68?
(5)        THE WITNESS: Yes.
(6)        A.   This e-mail of it is worthless
(7)    appears multiple times. Then if you go to the
(8)    July 5th, 2004 e-mail, it says -- this is an
(9)    e-mail -- really, excuse me. I'm not used to
(10)   doing this.
(11)       MR. LENTZ: Just talk a little bit
(12)   slower.
(13)       MR. VELIE: Judge, are you with us?
(14)       THE ARBITRATOR: I am.
(15)       THE WITNESS: This is a note from me
(16)   to my father that basically says, take a
(17)   look at the tab labeled disbursements
(18)   which is a new addition to the spreadsheet
(19)   that he received earlier, meaning
(20)   everything I received in the previous tab
(21)   from the previous e-mail plus this one,
(22)   and this is a draft of Schedule 22A.
(23)       The difference between this and
(24)   Schedule 22A is that this is keyed off of
(25)   the April balance sheet, which is what I

---

Page 377

(1)
(2)    had available at the time, and
(3)    Schedule 22A is keyed off of the
(4)    October 1st balance sheet.
(5)        If one looks here, okay, or at
(6)    Schedule 22A, you'll find that if you take
(7)    the book value of TPR without the D&K note
(8)    included and multiply it by 53 percent,
(9)    because 52.85 percent is too precise for
(10)   me, you get to precisely the value here.
(11)   So the schedule --
(12)       Q.   What is the significance of that
(13)   piece of arithmetic?
(14)       A.   The point is what it shows is that
(15)   reflected in that schedule is a zero valuation
(16)   for the D&K note. That's actually scheduled in
(17)   the agreement, and just do the arithmetic;
(18)   you'll see that it is there. So Schedule 22A
(19)   essentially started with an e-mail of the D&K
(20)   note is worthless. That is that.
(21)       Then I think that the final matter
(22)   on this is the October 30th -- I mean, I bring
(23)   in a lot of information, but I want to save
(24)   time.
(25)       If we skip to the October 30, 2006

---

Page 378

(1)
(2)    note from Edward Klimerman --
(3)         MR. KORTMANSKY: It is Exhibit 127.
(4)         THE WITNESS: -- this is a
(5)    memorandum to me from my father's
(6)    attorney, Edward Klimerman, raising a
(7)    variety of issues.
(8)         No, this is the wrong memorandum.
(9)    This is the October 23rd memorandum. I
(10)   want the October 30th memorandum.
(11)        THE ARBITRATOR: 127 is
(12)   October 30th.
(13)   Q.   The scheme of arrangement is
(14)   chronological?
(15)   A.   I'm sorry, excuse me. Forgive me.
(16)        So this is a memorandum,
(17)   October 30th. The importance of October 30th
(18)   is that it was a date set in writing between my
(19)   parents for sort of no more issues after this
(20)   date, and the D&K note is not on here despite
(21)   the fact that it's been -- there have been
(22)   multiple times in which it would have come up,
(23)   and the memorandum ends, "Unless I hear from
(24)   you by the end of the day tomorrow, these are
(25)   the only open issues you have undertaken to

Page 379

(1)
(2)    resolve. Once all of these open points are
(3)    finally resolved, it is expected that, as
(4)    contemplated by the stipulation of settlement,
(5)    you will render a final accounting. As we
(6)    discussed this morning, we will set up a
(7)    meeting for tomorrow afternoon," blah, blah,
(8)    blah.
(9)         As far as I'm concerned, that --
(10)   Q.   is that the reason that you did not
(11)   value the D&K note?
(12)   A.   Yes.
(13)   Q.   Thank you.
(14)        Did you want to raise other reasons?
(15)   A.   I just want to point out that the
(16)   D&K note itself is not only mentioned in the
(17)   agreement; it's actually attached to the
(18)   agreement.
(19)        There is no secret to the fact that
(20)   the D&K note exists. It was known. It's
(21)   discussed in both D&K reports, and in every
(22)   draft of the D&K report there is a section
(23)   titled, "Notes Outstanding to TPR," and it
(24)   discussed the D&K note and then doesn't include
(25)   it in the tally.

Page 380

(1)
(2)         So I think -- if that doesn't kill
(3)    the issue, I don't know what does. That's it.
(4)    Q.   What would have been the impact of a
(5)    collection of the D&K note had TPR collected
(6)    it?
(7)    A.   Against D&K?
(8)    Q.   Yes.
(9)    A.   It would have been essentially to,
(10)   you know, enforce the pledge, which I guess
(11)   means going and selling a minority interest in
(12)   a private company to somebody and, frankly,
(13)   reversing the estate planning that was
(14)   contemplated to begin with.
(15)   Q.   Did you understand that to be
(16)   anybody's idea during the stipulation, to
(17)   reverse the estate planning?
(18)        MR. GENGARO: He's not competent to
(19)   testify what is in other people's head.
(20)   Objection.
(21)        THE ARBITRATOR: Sustained.
(22)   Q.   What is your understanding of that
(23)   issue?
(24)   A.   There was like 14 percent of TRI
(25)   given to the kids under estate planning. No

Page 381

(1)
(2)    one was reversing the estate planning.
(3)    Q.   Thank you.
(4)        MR. VELIE: We are going to shift
(5)    gears here.
(6)        THE ARBITRATOR: This is the last
(7)    two questions.
(8)        MR. VELIE: I'm down to my last two
(9)    pages.
(10)       I believe what I got here are --
(11)   what these have to do with are various
(12)   counterclaims by Arie, I believe.
(13)   Q.   Let's take a look quickly at -- do
(14)   you understand that your father has made sort
(15)   of a counterclaim against your mother relating
(16)   to a company called OBB?
(17)   A.   Yes.
(18)   Q.   Tell us what you understand it is.
(19)   A.   First you have to understand what
(20)   was in the September memo. This was an unusual
(21)   situation where OBB -- and I don't remember
(22)   what the other property is.
(23)   Q.   That's Exhibit 113.
(24)   A.   OBB and some other property that --
(25)   Q.   The September memo is 113.

**EXHIBIT I**

AMERICAN ARBITRATION ASSOCIATION
NEW YORK CITY
-----------------------------------------------------------X
                                                          :    Index No. 13 170 Y 00966 07
                                                          :
                                                          :
Dalia Genger,                                             :
                                                          :    PRE-HEARING
                    Claimant,                             :    MEMORANDUM OF CLAIMANT
                                                          :    DALIA GENGER
              -against-                                   :
                                                          :
                                                          :
  Arie Genger,                                            :
                                                          :
                    Respondent.                           :
-----------------------------------------------------------X

Claimant Dalia Genger ("Dalia") respectfully submits this pre-hearing memorandum in
support of her claim for an award: (a) that Respondent Arie Genger ("Arie") pay Dalia
$37,366,620 in compliance with Article XII (the audit provisions) of a Stipulation of Settlement
("Stipulation") dated October 30, 2004, incorporated by reference into the Judgment of Divorce
(the "Judgment") entered on January 13, 2005; (b) that Arie pay Dalia the additional sum of
$4,731,463 as directed by the parties' attorney-in-fact appointed pursuant to the Stipulation; (c)
and that Arie pay Dalia a further amount of $3 million for a 50% share of the marital interest in
AG Real Estate Partners L.P; and (4) costs and attorneys' and experts' fees as called for in the
Stipulation.

## INTRODUCTION

This arbitration presents one simple issue: did the husband, Arie, prevent his wife, Dalia,
from obtaining one half the value of the marital estate?  The Stipulation was clear and provided:
"it is the intention of the parties that upon completion of implementation of this Agreement, each
party shall have received distributions equal to approximately 50% of the aggregate value of the

{N0094161; 7}

waited to object until the audit was complete and Arie's misstatements were uncovered, Arie cannot now object. *See e.g., General Motors Acceptance Corp. v. Clifton-Fine Central School District*, 85 N.Y.2d 232, 236 (1995) ("Waiver may be established by affirmative conduct or by failure to act so as to evince an intent not to claim a purported advantage."). . . . . . . . . . . . . . . . . .

5. Arie's Complaint About the Conduct of the Audit is Without Merit.

We expect that Arie will claim that FTI is not an independent auditor because it was retained by Dalia. That objection makes no sense since the Stipulation expressly provides for Dalia's selection of the auditor and makes plain that the audit is to protect Dalia's rights.

We anticipate that Arie may contend that the audit was not conducted in accordance with Generally Accepted Accounting Procedures (GAAP). The audit called for in the stipulation was to test the "correctness and completeness" of the disclosures in Schedule II(1), not to attest or opine that the marital balance sheet was presented in accordance with GAAP.

6. Arie's Claims Regarding The D&K Notes Are Without Merit.

Arie claims that Sagi should have valued the D&K note as an asset received by Dalia as part of the value she received upon the distribution of TPR shares to her.

This claim is belied by Article III of the Stipulation which governs the determination of the value Dalia received upon the distribution to her of TPR, and the assets owned by TPR.

Article III identified the assets of TPR distributed to Dalia, and described how they were to be valued. The assets to be valued were classified in three categories: cash and marketable securities, designated as Category A on Schedule III(1); assets with an accepted value designated as Category B on Schedule III(1)); and assets as to which neither party accepts the valuation, designated as Category C on Schedule III(1). A potential ambiguity requiring parol evidence arises as the Schedules annexed to the Stipulation failed to identify which assets were included in

Classes A, B and C. That ambiguity is resolved by a writing made by Arie's attorney, Edward Klimerman, identifying all of the classified assets to be valued (copy annexed as Exhibit B to this memorandum). As can be seen clearly from Mr. Klimerman's handwritten notation, the D&K Note was not included in the classes of assets to be valued. This is not surprising, since collection by TPR of the D&K Note would simply transfer wealth from the children, Sagi and Orly, to their parents, Arie and Dalia, thus undoing the estate planning scheme which had transferred that wealth to the children. In any event, Arie waived his right to raise this issue. Arie agreed to raise all issues he had with the September Report by October 30, 2006 but failed to do so.

Further, Schedule II(2)(a) which reflects the initial value of TPR was calculated without assigning any value to the D&K Note. This zero valuation was consented to be Arie.

If further proof is required, we will show that the parties took extraordinary steps to be certain that the Note would never be collected by TPR (owned by Dalia), including putting the Note out of Dalia's control, and authorizing its transfer for nominal value to a third party.

## POINT III

### ARIE'S OTHER CLAIMS ARE WITHOUT MERIT

A.     OBB Resorts Paper and Sage Development

Contrary to Arie's claims that the assets should be sold, Arie and Dalia understood that for book purposes the value of those two assets would be zero, and that Arie would receive his pro rata marital share of any distributions received by TPR in connection with those assets. Arie waived his right to object to this arrangement by failing to raise it timely. Arie had agreed to raise all issues with the September Report by October 30, 2006.

**EXHIBIT J**

AMERICAN ARBITRATION ASSOCIATION
Commercial Arbitration Tribunal
NEW YORK CITY
-------------------------------------------------X
                            :
Dalia Genger                       :
              Claimant,      :
                            :
        -against-         :
                            :
Arie Genger                     :
              Respondent.  :
                            :
-------------------------------------------------X

Case No. 13 170 Y 00996 07

FINAL ARBITRATION AWARD

I, the undersigned Arbitrator, having been designated in accordance with the terms of the arbitration agreement entered into between the above-named parties dated October 26, 2004, and having been duly sworn, and having duly heard the proofs and allegations of the Parties, do hereby AWARD, as follows:

## Procedural Background

This arbitration was commenced on May 31, 2007. The parties thereafter engaged in extensive discovery, including the production of documents. Various pre-hearing applications for relief were argued, considered and resolved. Hearings began on December 4, 2007 and proceedings were closed on March 26, 2008. There were approximately 14 days of hearings and the transcript of the hearings is in excess 2500 pages. The parties have made extensive pre and post hearing submissions.

The parties to this arbitration Claimant Dalia Genger (Claimant, Dalia or Wife) and the Respondent Arie Genger (Respondent, Arie or Husband) entered into a Stipulation of Settlement (Stipulation) on October 26, 2004 to equitably distribute their marital property as of January 31, 2002, and as of the date of the agreement. The parties are seeking monetary awards, costs and

### D&K Note

Arie claims he should be awarded one half of the value of the D&K Note, or $2,420,694 plus interest from the date of the Stipulation. Arie claims this is part of the value Dalia received upon the distribution of TPR shares.

The arbitrator finds for Dalia on this issue. The D&K note was a part of the estate planning scheme to transfer wealth to the children. The parties never intended for this note to be collected and to do so would re-transfer wealth back to the parents and defeat their estate plan.

The note was also excluded from valuation under the Stipulation as evidenced in a writing by Arie's attorney Edward Klimmerman which did not include it as an asset to be valued, and the D&K note was not included by the open issue list provided by Klimmerman in response to Sagi's November instructions.

Finally, although the sale of the note for $12,000 to David Parnes in 2006 is questionable, the note was out of Dalia's control, and it could be transferred for nominal consideration to a third party. The arbitrator therefore dismisses Arie's D&K note claim.

### Valor Life Annuities

Dalia seeks $5,700,000 a trebled award for the value of Valor Life annuity policies not listed in the marital balance sheet. Arie asserts the Valor Life annuity policies were exchanges for life insurance policies distributed to him pursuant to the Stipulation.

The Arbitrator finds for Arie on this issue. The evidence established that Arie exchanged the three whole life policies for the Valor Life annuity policies. This policy exchange occurred a year and a half after the Agreement. The life insurance policies received by Arie under the Stipulation became Valor Life Annuities. The arbitrator therefore dismisses Dalia's Valor Life claim.

In these proceedings the Arbitrator has made material findings for and against each party and there is no clear prevailing party, therefore under this provision no party can be awarded payment for the above charges.

The administrative fees of the American Arbitration Association totaling $26,509.81 shall be borne as incurred by the parties.

The compensation and expenses of the Arbitrator, E. Leo Milonas totaling $131,908.74 shall be borne equally by the parties.

The parties shall unless otherwise expressly directed herein, bear their costs, legal fees, and other expenses as incurred.

This award is in full settlement of all claims and counterclaims submitted to this arbitration, unless otherwise specifically provided. All claims not expressly granted are hereby, denied.

_5/6/08_
Date

_E. Leo Milonas_

I. E. Leo Milonas, do hereby affirm upon my oath as Arbitrator that I am the individual described in and who executed this instrument, which is my Award.

_5/6/08_
Date

_E. Leo Milonas_

18

# EXHIBIT K

# AMENDED AND RESTATED LIMITED PARTNERSHIP AGREEMENT

## OF

## D & K LIMITED PARTNERSHIP

This AMENDED AND RESTATED LIMITED PARTNERSHIP AGREEMENT (this "Agreement") of D&K Limited Partnership (the "Partnership") is made as of the 30th day of October , 2004, by and among the 1993 Orly Genger Trust (the "OG Trust"), the 1993 Sagi Genger Trust (the "SG Trust"), each a limited partner of the partnership, and D&K GP LLC, the general partner of the Partnership.

WHEREAS, the Partnership was formed as a limited partnership pursuant to the provisions of the Delaware Limited Partnership Act, by the filing of a Certificate of Limited Partnership with the Office of the Secretary of State of the State of Delaware and the execution of the Limited Partnership Agreement of the Partnership dated as of December 31, 1988 (the "Original Agreement"); and

WHEREAS, the Original Agreement was subsequently amended several times to reflect, among others, the replacement of the limited partners, the replacement of the general partner, as well as amendments to specific provisions of the Original Agreement and amendments thereto; and

WHEREAS, the parties hereto desire to restate all previous amendments and to enter into this Amended and Restated Limited Partnership Agreement of the Partnership to serve as the governing document of the Partnership;

NOW, THEREFORE, in consideration of the mutual promises and agreements herein made and intending to be legally bound hereby, the parties hereby restate the Original Agreement, and amendments thereto, in its entirety to read as follows:

1

1. **Formation of Partnership.** (a) The Partnership was formed, under the name D & K Limited Partnership (the "Partnership"), as a limited partnership under the provisions of the Delaware Limited Partnership Act, as indicated in the preamble of this Agreement, and the execution of the Original Agreement. If requested by the General Partner, the Limited Partners shall promptly execute all certificates and other documents consistent with the terms of this Agreement necessary for the General Partner to accomplish all filing, recording, publishing and other acts as may be appropriate to comply with all requirements for (a) the formation and operation of a limited partnership under the laws of the State of Delaware, (b) if the General Partner deems it advisable, the operation of the Partnership as a limited partnership, or partnership in which the Limited Partners have limited liability, in all jurisdictions where the Partnership proposes to operate and (c) all other filings required to be made by the Partnership.

(b) The general partner of the Partnership is D&K GP LLC, a Delaware limited liability company, and any successor individual or corporation admitted to the Partnership as general partner (the "General Partner"). The limited partners of the Partnership shall be the SG Trust and the OG Trust, and any other persons who are admitted to the Partnership as additional or substituted limited partners in Paragraph 17 (the "Limited Partners") (the Limited Partners and the General Partner, shall be referred to herein as "Partners", and each -- a "Partner").

2. **Purpose.** The purpose of the Partnership is to acquire and hold an equity interest (initially, represented by 240 common shares) in TPR Investment Associates, Inc., a Delaware corporation ("TPR") and other legal business activities as determined by the General Partner.

3. **Place of Business.** The principal place of business of the Partnership shall be located at 1211 Park Avenue, New York, N.Y. 10128, or at such other location(s) as may hereafter be determined by the General Partner on notice to the Limited Partners.

4. **Term.** The term of the Partnership shall continue until December 31, 2038; provided, however, that the Partnership shall be dissolved prior to such date upon the happening of any of the following events:

(a) upon the written election to terminate made by the General Partner at any time. which election shall be sent to the other Partners;

(b) upon the death, bankruptcy, incapacity, or other withdrawal of the General Partner, unless within ninety (90) days after such event, all of the Limited Partners elect to reconstitute the Partnership, continue its business and elect a new general partner.

(c) in the event the Partnership has distributed all of its assets.

5. **Capital Contributions**.

(a) The Capital Contributions of the Partners consists of the following: :

| | |
|---|---|
| D&K GP LLC | $50,000 |
| 1993 Sagi Genger Trust | $600,000 |
| 1993 Orly Genger Trust | $600,000 |

(b) Each of the Partners shall assume personal liability under any and all indebtedness incurred by the Partnership to finance (and refinance) the purchase by the Partnership of the equity interest in TPR referred to in Paragraph 2 hereof. The Partners shall share such liability among themselves in accordance with their interests in the Partnership, and any payment by a Partner of its share of such liability shall be deemed to be a contribution to the capital of the Partnership as to which such Partner has no rights of contribution or subrogation.

6. **Interest in Partnership**.    Each Partner's interest in the Partnership shall be equal to the proportion that the then balance in his or her capital account bears to the aggregate balance of all of the Partners' capital accounts; where applicable this computation shall be governed by the specific stipulations in Paragraphs 7 and 8 hereof.

3

7.   **Capital Account.**   A capital account has been established as shown per "5(a)". Accounts shall be maintained in accordance with the applicable regulations under the Internal Revenue Service as amended ("the "Code"), and Income Tax Regulations (the "Regulations") promulgated under the Code.  Interest shall not be paid on any capital account and no Partner shall have the right to withdraw any part of his capital account until dissolution of the Partnership, and then such distribution or withdrawal shall be governed by paragraph 14 hereof. No Partner shall have the right to bring an action for partition.  Each Partner's capital account shall be credited by capital contributions.  The parties agree that as of the date hereunder the capital accounts are as per "5(a)" without regard to previous payments made by any of the Partners.  In consideration for such, the Partners recognize the note originally issued in the amount of $8,950,000 referred to in paragraph 5 the "Note" as a liability of each Limited Partner to the Partnership as denoted.  Partnership rights as per "22" may also be used to enforce collection of the Note by the Partnership.  Any attempted interference by a Partner or a person beneficially owning an in interest in the Partnership automatically and irrevocably vests the General Partner with the right to revert the capital account of any Partner to a percentage based upon his actual pro rata contributions, expel, or otherwise suspend the membership and all rights accumulated in connection therewith without notice and hold his share of partnership assets as collateral for payments due.  Upon thirty days notice the Partnership may demand full payment of the Limited Partner's pro rata share of the Note.

8.   **Profits and Losses.**   The net profits and net losses of the Partnership shall be shared by the Partners in proportion to the then balances in their respective capital accounts.  The terms "net profits" and "net losses" shall mean the net profits and net losses of the Partnership as determined for federal income tax purposes.

9.   **Management.**

(a)  Except as expressly provided herein, the management and control of the day-to-day operations of the Partnership and the maintenance of the Partnership property shall rest exclusively with the General Partner.  (b)  To the fullest extent permitted by law, the General Partner shall have complete authority over and exclusive control and management of the business and affairs of the Partnership and all of the Partnership property and all rights, powers

4

and authority appropriate therefore. The powers and discretion of the General Partner on behalf of the Partnership shall include, but shall not be limited to, making investments, selling assets, lending money for any lawful purpose whatsoever, borrowing money for any lawful purpose whatsoever, borrowing money for any lawful purpose whatsoever (and posting assets of the Partnership as collateral therefore), making tax elections under the Code, making distributions to the Partners (subject to Paragraph 10 hereof), executing guarantees for any lawful purpose whatsoever (and posting assets of the Partnership as collateral therefore) and doing all other acts or things necessary to carry out and implement the purposes of the Partnership, provided that each such action is taken upon reasonable terms to the Partnership. The General Partner may delegate, in writing, any of her powers under this Agreement.

(c) Any document, instrument or agreement to be executed and delivered by and on behalf of the Partnership shall be effective is signed and delivered by the General Partner or a delegee of the General Partner.

(d) Each of the other Partners hereby gives its approval to any action taken or to be taken on behalf of the Partnership by the General Partner, and agrees that it shall have no cause of action against the Partnership or the General Partner except for any claim based upon:

(i) the fraud, bad faith or willful misconduct of a Partner, or

(ii) the breach by a Partner of any provision of this Agreement or of any other written agreement to which the Partnership and such person are parties.

(e) No Limited Partner shall take part in the control or management of the Partnership or of the business of the Partnership, nor shall it have any authority to act for or to bind the Partnership in any way.

(f) The Partners acknowledge that the General Partner, its managing member(s), officers, employees and representatives, as the case may be, are hereby released from all liability and are hereby held harmless for any acts or omission they might have taken in their various capacities, whether as officers, employees, representatives, or the like, of TPR or of the Partnership. The Partners further acknowledge that certain actions between TPR and the Partnership, conducted

5

under the direction, instructions or supervision of said employees, officers, managing members, representatives and the like, would be considered 'self dealing'. The Partners hereby indemnify the General Partner, its managing members, officers, employees, representatives and the like, to the fullest extent permitted by law, from any such actions or omissions including, but not limited to, actions considered 'self dealing'.

10.     **Drawings of Income and Principal.**

(a) After making provisions for current debts and other obligations of the Partnership and establishing reasonable reserves for the reasonable needs of the Partnership's business, the General Partner shall distribute, not less frequently than annually, all of the remaining cash of the Partnership.

(b) During the Partnership year of 2038 all of the then remaining principal and accumulated income of the Partnership shall be distributed to the Partners and, upon the final distribution, the Partnership shall terminate.

(c) All distributions of principal, accumulated income and current income made to the Partners shall be made in proportion to each of the Partner's interest as set forth in Paragraph 6 hereof, and the available amount shall be computed after taking into account debts and reserves such as are permitted under Paragraph 14 hereof.

11.     **Transfer of Partnership Interest.**  A Partner may not sell, assign, or encumber his or its interest in the Partnership or otherwise withdraw or retire from the Partnership without the prior written consent of the other Partners.  No sale or exchange of any interest in the Partnership may be made if the transfer of the interest sought to be sold or exchanged may result, in the opinion of legal counsel to the Partnership, in (i) the termination of the Partnership under Section 708 of the Code, or (ii) the violation of any applicable federal or state securities law.

12.     **Title to Property and Bank Accounts.**  The property of the Partnership shall be held in the name of the Partnership or the General Partner as nominee for the Partnership.  All Partnership funds shall be deposited in its name in such bank account or accounts as shall be designated by the General Partner and all withdrawals therefrom shall be made upon the

signature of the General Partner or such person or persons as shall be so designated by the General Partner.

13.   Books.      The General Partner shall cause the Partnership to keep accounts and complete books and records of the business of the Partnership at the principal place of business of the Partnership, and each Partner shall at all reasonable times have access thereto.

14.   **Termination.**

(a) Upon the termination and dissolution of the Partnership, if the Partnership is not continued pursuant to the terms of this Agreement, the General Partner or, if there is no General Partner, any person elected by a majority of the Limited Partners to perform such liquidation of the assets of the Partnership, shall proceed with the orderly liquidation of the assets of the Partnership, and the net proceeds of such liquidation shall be applied and distributed in the following order of priority:

( i ) to the payment of any debts and liabilities of the Partnership and the expenses of liquidation;

( ii )   to the establishment of any reserves which the General Partner may deem reasonably necessary to meet any contingent or unforeseen liabilities or obligations of the Partnership or of the Partners arising out of or in connection with the Partnership;

( iii )   the balance, if any, shall be distributed among the Partners in proportion to and to the extent of the then positive balances in their respective capital accounts (as determined after giving effect to all capital account adjustments for the Partnership's taxable year during which the liquidation occurs); and

( iv )   if any Partner has a deficit balance in his or her capital account (as determined after giving effect to all capital account adjustments for the Partnership's taxable year during which the liquidation occurs), such Partner shall be unconditionally obligated to pay the amount of such deficit balance to the Partnership by the end of such taxable year (or, if later, within ninety (90) days after the date of such liquidation), which amounts shall be applied and distributed in accordance with the provisions of this Paragraph. The General Partner may accept in lieu thereof, collateral, assurance of availability of collateral, or other secured guarantees

7

which the General Partner reasonably deems to be adequate substitutes for such Partner's payment.

(b) In the event it becomes necessary to make distribution of Partnership property in kind, such property shall be transferred and conveyed to the Partners so as to vest in each of them as a tenant in common as undivided interest in the whole of said property in proportion to and to the extent of the then balances in their respective capital accounts.

15.    **Death of Partner**.    The death, bankruptcy, dissolution or withdrawal of a limited partner shall not dissolve the Partnership.

16.    **Notice.**   All notices and other communications required or permitted under this Agreement shall be in writing and may be personally delivered, sent by first class mail, postage prepaid, or electronically delivered, to an address regularly used by the addressee, with acknowledgement receipt, to the Partners at their addresses as shown from time to time on the records of the Partnership, or as may reasonably be known to the General Partner. Any Partner may specify a different address by notifying the General Partner in writing of such different address. All notices and other communications required or permitted under this Agreement shall be deemed to have been received on the day when personally delivered, on the day the electronic acknowledgement has been received by sender, or three days after being mailed in the manner provided in this Section 16, as the case may be.

17.    **Admission of New Partners**.   The Partnership may admit a new Partner upon the majority consent of all of the then existing Partners; consent of the General Partner shall be necessary; such consent to be granted or withheld at the General Partner's sole and unfettered discretion.

18.    **Governing Law**.   The Partnership is formed under the laws of the State of Delaware and the Delaware Uniform Limited Partnership Act.

19. **Liability of the Partners**.

(a)    Ceneral.    The Partnership hereby indemnifies and agrees to hold each Partner harmless with respect to any claim, liability, damage, cost or expense (including reasonable attorney's fees and disbursements) incurred by reason of any act performed or omitted to be performed as a Partner or in connection with the assets or business of the Partnership, except that no Partner shall be indemnified where he or she is found in a final non-appealable judgment to have committed fraud, bad faith or willful misconduct

(b) Indemnification of General Partner

(i)    To the maximum extent permitted by law, the Partnership, its receiver, or its trustee shall indemnify, save harmless, and pay all judgments and claims against the General Partner, and its members and managers, their respective officers, directors, agents, stockholders, members, managers, partners and other Affiliates, and any other person who serves at the request of the General Partner on behalf of the Partnership as an officer, director, member, partner, employee or agent of the Partnership or any other present or future entity (in each case, an "Indemnitee") and all loss, damage or expense incurred by any Indemnitee or by the Partnership by reason of any act performed or omitted to be performed by any Indemnitee in connection with the Partnership (including, but not limited to, attorneys' fees and other costs and expenses incurred by any Indemnitee in connection with the investigation and defense of any action based on any such act or omission, which attorneys' fees and any other costs and expenses shall be paid as incurred, and any amounts expended in the settlement of any claim of liability, loss or damage).

(ii)    Without limiting the generality of the foregoing, in the event of any action by a Limited Partner (other than an Affiliate of the General Partner) against any Indemnitee, including a Partnership derivative suit or any class action, the Partnership shall indemnify, save harmless, and pay all costs and expenses of such Indemnitee, including attorneys' fees incurred in the defense of such action, which shall be paid as incurred.

(iii)    No Indemnitee shall have any liability to the Partnership or the Limited Partners except liabilities of any Indemnitee for any loss, damage or expense which, by a final

judgment or other final adjudication, has been determined to have arisen from such Indemnitee's fraud, willful misconduct or bad faith, which fraud, willful misconduct or bad faith in each case has been determined to have been material to the cause of action adjudicated. Notwithstanding the provisions of Sections 8.4(a) and 8.4(b), no Indemnitee shall be indemnified for any loss, damage or expense if a final judgment or other final adjudication adverse to such Indemnitee establishes that such Indemnitee's loss, damage or expense arose from such Indemnitee's fraud, willful misconduct or bad faith which, in each case, was material to the cause of action so adjudicated and in the event of any such adverse final judgment or other final determination establishing such Indemnitee's fraud, willful misconduct or bad faith material to the cause of action so adjudicated, such Indemnitee shall reimburse to the Partnership any costs and expenses, including attorneys fees, previously advanced to such Indemnitee. Limited Partners shall not be individually obligated with respect to such indemnification beyond their respective Commitments.

20. **Self-Dealing**. The fact that any Partner is directly or indirectly interested in or connected with any person, firm or corporation employed by the Partnership to render or perform a service or from which or to whom the Partnership may buy or sell merchandise or other property shall not prohibit the General Partner from employing such person, firm or corporation or from dealing with him or her or it, and neither the Partnership nor the other Partners thereof shall have any rights in or to any income or profits derived therefrom by such person, firm or corporation.

21. **Power of Attorney**. Each Limited Partner hereby constitutes and appoints the General Partner the true and lawful attorney-in-fact for each Limited Partner and in the name, place and stead of each Limited Partner from time to time to execute and file:

(i)     any certificates and other instruments which may be required to be filed by the Partnership under the laws of the State of Delaware or any other governmental authority having jurisdiction thereover, or which he General Partner shall deem it advisable, in its sole discretion, to file;

10

(ii)       any certificates or other instruments amending or modifying the
           Certificate of Limited Partnership of the Partnership as provided therein;

(iii)      any certificates or other instruments which may be required to effectuate
           the dissolution and termination of the partnership and/or the cancellation
           of the Certificate of Limited Partnership; and

(iv)       any amendment of this Agreement which the General Partner is authorized
           to make in accordance with the provisions of this Agreement.

it being expressly understood and intended by each of the Partners that such powers of attorney
are coupled with an interest. The foregoing powers of attorney shall be irrevocable and shall
survive any assignment of the whole or any part of the interest in the Partnership of a Limited
Partner and shall be binding upon the assignee thereof.

22.    **Authority of General Partner with respect to holdings in TRI**

(a) The Partners acknowledge that each one of the Limited Partners holds 102.80
shares of TRI, representing 19.42766% of the common stock of TRI (each, a "LP TRI
Interest(s)").

(b) The General Partner is hereby conferred the authority, in its sole and
unfettered discretion to mortgage, hypothecate, pledge, create a security interest in or lien upon,
or otherwise encumber the LP TRI Interests, for the benefit of the Partnership or that of third
parties, in connection with the Note.

(c) Should the General Partner encumber the LP TRI Interests, as permitted under
section (b) above - each Limited Partner shall have the right to redeem its LP TRI Interest to the
full extent of such LP's pro-rated participation, responsibility or liability for the unpaid amount
of the Note.

(d) Each Limited Partner hereby constitutes and appoints the General Partner the true and lawful attorney in fact for each Limited Partner and in the name, place and stead of each Limited Partner from time to time in connection with (i) placing a mortgage, hypothecate, pledge, creating a security interest in or lien upon, or otherwise encumbering the LP TRI interests in connection with the Note, (ii) removing such mortgage, hypothecation, pledge, security interest, lien or other encumber, placed on the LP TRI Interests, and (iii) negotiating, settling or otherwise handling or managing any rights attached to, or emanating from, the LP TRI Interest and dealing with the LP TRI interests until payment of the Note has been resolved.

(e) Each Limited Partner agrees that it shall not during the term of this Agreement either directly or indirectly, transfer, sell, assign, mortgage, hypothecate, pledge, create a security interest in or lien upon, encumber, donate, contribute, place in trust (including a voting trust), or otherwise voluntarily or involuntarily dispose of (each, a "Transfer") said Limited Partner's LP TRI Interest

23.    **Authority of General Partner to Vary Tax Allocations; Tax Matters Partner.**

(a) It is the intent of the Partners that each Partner's distributive share of taxable income or tax loss, and of each item of income, gain, loss, preference, deduction, or credit entering into the computation thereof, shall be determined and allocated in accordance with this Agreement to the fullest extent permitted by Section 704(b) of the Code. In order to preserve and protect the determinations and allocations provided for in this Agreement, the General Partner is authorized and directed to allocate tax income, gain, loss, preference, deduction, or credit (or any item thereof) arising in any year differently than as may otherwise be provided for in this Agreement to the extent that allocating tax income, gain, loss, preference, deduction, or credit (or any item thereof) in the manner provided for in this Agreement would cause the determinations and allocations of each Partner's distributive share of tax income, gain, loss, preference, deduction, or credit (or item thereof) not to be permitted by Section 704 (b) of the Code and applicable Regulations.

In making any such new allocations the General Partner is authorized to act only after having been advised by counsel to the Partnership and the accountants for the Partnership

12

that in their opinion, under Section 704 (b) of the Code and applicable Regulations, ( i ) the new allocation is necessary, and ( ii ) the new allocations is the minimum modification of the allocations otherwise provided for in this Agreement necessary in order to assure that, either in the current year or in any preceding year, each Partner's distributive share of tax income, gain, loss, preference, deduction, or credit (or item thereof) is determined and allocated in accordance with this Agreement to the fullest extent permitted by Section 704 (b) of the Code and applicable Regulations.

If the General Partner is required to make any new allocation in a manner less favorable to the Limited Partners than is otherwise provided for in the Agreement, the General Partner is authorized and directed, insofar as she is advised by counsel and the accountants for the Partnership that it is permitted by Section 704 (b) of the Code and applicable Regulations, to allocate tax income, gain, loss, preference, deduction, or credit (or item thereof) arising in later years in a manner so as to bring the allocations of tax income, gain, loss, preference, deduction, or credit (or item thereof) to the Limited Partners as near as possible to the allocations otherwise contemplated by this Agreement.

(b)     The General Partner is hereby designated as Tax Matters Partner of the Partnership, as provided in the Regulations pursuant to Section 6231 of the Code. Each Partner, by the execution of this Agreement, consents to such designation of the Tax Matters Partner and agrees to execute , certify, acknowledge, deliver, swear to, file and record at the appropriate public offices such documents as may be necessary or appropriate to evidence such consent. The Tax Matters Partner is hereby authorized, but not required:

(i)     to enter into any settlement with the Internal Revenue Service or the Secretary of the Treasury (the "Secretary") with respect to any tax audit or judicial review, in which agreement the Tax Matters Partner may expressly state that such agreement shall bind the other partners, except that such settlement agreement shall not bind any Partner who (within the time prescribed pursuant to the Code and applicable Regulations) files a statement with the Secretary provided that the Tax Matters Partner shall not have the authority to enter into a settlement agreement on the behalf of such Partner;

13

   (ii) in the event that a notice of final administrative judgment at the Partnership level of any item required to be taken into account by a Partner for tax purposes a "final judgment") is mailed to the Tax Matters Partner, to seek judicial review of such final adjustment, including the filing of a petition for readjustment with the Tax Court, the District Court of the United States for the district in which the Partnership's principal place of business is located, or the United States Claims Court;

   (iii) to intervene in any action brought by any other Partner for judicial review of a final adjustment;

   (iv) to file a request for an administrative adjustment with the Secretary at any time and, if any part of such request is not allowed by the Secretary, to file a petition for judicial review with respect to such request;

   (v) to enter into an agreement with the Internal Revenue Service to extend the period for assessing any tax which is attributable to any item required to be taken into account by a Partner for tax purposes, or an item affected by such item; and

   (vi) to take any other action on behalf of the Partners or the Partnership in connection with any administrative or judicial tax proceeding to the extent permitted by applicable law or regulations.

24. **Agreement in Counterparts**. This Agreement may be executed in any number of counterparts which together shall constitute one and the same instrument.

25. **Rules of Construction**. Each paragraph of this Agreement shall be considered severable, and if for any reason any paragraph or paragraphs herein are determined to be invalid and contrary to any existing or future laws, such invalidity shall not impair the operation or

14

affect the portions of this Agreement which are valid.

26.   **Headings.** Headings contained in this Agreement are inserted only as a matter of convenience and in no way define, limit, extend or describe the scope of this Agreement or the intent of any provisions hereof.

27.   **Creditors.** None of the provisions of this Agreement shall be for the benefit of or enforceable by any creditor of the Partnership, as creditor, or for the benefit of any other individual, corporation or entity.

28.   **Entire Agreement.** This Agreement constitutes the entire agreement among the parties pertaining to the subject matter hereof and supersedes all prior and contemporaneous agreements and understandings of the parties in connection therewith. No covenant, representation or condition not expresses in this Agreement shall affect or be effective to interpret, change or restrict the express provisions of this Agreement.

29.   **Pronouns.** All pronouns and any variations thereof shall be deemed to refer to the masculine, feminine, neuter, singular and plural as the identity of the person or persons may require.

30.   **Binding Effect.** This Agreement shall inure to the benefit of, and be binding upon, the parties hereto and their respective heirs, successors, executors, administrators, legal representatives and permitted assigns.

31.   **Further Assurances.** Each Partner agrees to do such further acts and to execute such documents as may be reasonably requested in furtherance of, and to carry out and implement the purposes of, t his Agreement and the transactions contemplated herein.

32.   **Amendment.** This Agreement may not be modified except by a writing signed by Partners holding a majority in interest of the Partnership; in the event such majority in interest included only the Limited Partners – the consent of the General Partner shall be required as well.

15

**EXHIBIT L**

# ORIGINAL

1

SUPREME COURT OF THE STATE OF NEW YORK

COUNTY OF NEW YORK

------------------------------------------------- x

ORLY GENGER,

                      Plaintiff,      Index No.

                                       100697/08

        -against-

SAGI GENGER,

                    Defendant.

------------------------------------------------- x

        DEPOSITION of the Non-Party Witness, ROCHELLE
FANG, taken by the Plaintiff, pursuant to Subpoena,
held at Supreme Court of New York 60 Centre Street,
New York, New York, on August 22nd, 2011, at 2:30
p.m., before a Notary Public of the State of New
York.

**************************************************

BARRISTER REPORTING SERVICE, INC.

120 Broadway

New York, N.Y. 10271

212-732-8066

2

```
 1
 2   A P P E A R A N C E S:
 3
 4         ZEICHNER ELLMAN & KRAUSE, LLP
                 Attorneys for Plaintiff
 5               575 Lexington Avenue
                 New York, New York 10022
 6
           BY:   BRYAN D. LEINBACH, ESQ.
 7
 8
 9         DUANE MORRIS, LLP
                 Attorneys for Defendant
10               1540 Broadway
                 New York, New York 10006
11
           BY:   EVANGELOS MICHAILIDIS, ESQ.
12
13
14         LYONS McGOVERN, LLP
                 Attorneys for Non-Party Witness
15               399 Knollwood Road
                 White Plains, New York 10603
16
           BY:   DESMOND C.B. LYONS, ESQ.
17
18
19
                          xxxxx
20
21
22
23
24
25
```

3

```
 1
 2                    S T I P U L A T I O N S
 3     IT IS HEREBY STIPULATED AND AGREED by and between the
 4     attorneys for the respective parties hereto, that:
 5     All rights provided by the C.P.L.R., and Part 221 of
 6     the Uniform Rules for the Conduct of Depositions,
 7     including the right to object to any question, except
 8     as to form, or to move to strike any testimony at this
 9     examination is reserved; and in addition, the failure
10     to object to any question or to move to strike any
11     testimony at this examination shall not be a bar or
12     waiver to make such motion at, and is reserved for,
13     the trial of this action.
14     This deposition may be sworn to by the witness being
15     examined before a Notary Public other than the Notary
16     Public before whom this examination was begun, but the
17     failure to do so or return the original of this
18     examination to counsel, shall not be deemed a waiver
19     of the rights provided by Rule 3116 of the C.P.L.R.,
20     and shall be controlled thereby.
21     The filing of the original of this deposition is
22     waived.
23     IT IS FURTHER STIPULATED, that a copy of this
24     examination shall be furnished to the attorney for the
25     witness being examined without charge.
```

4

```
 1                      R. Fang
 2     R O C H E L L E   F A N G ,
 3             Having been first duly sworn before a
 4             Notary Public of the State of New York,
 5             was Examined and testified as follows:
 6     EXAMINATION
 7     BY MR. LEINBACH:
 8     Q.    Please state your name for the record.
 9     A.    Rochelle Fang.
10     Q.    What is your address?
11     A.    253 West 73rd Street, apartment 14A,
12     New York, New York 10023.
13             MR. LEINBACH:  I am noticing
14          here I don't see any bank statements.
15          You have not collected it yet?
16             MR. LYONS:  We will not.  They
17          are not responsive to the subpoena.
18             MR. LEINBACH:  Why?
19             MR. LYONS:  They are not
20          responsive.  They don't relate to the
21          companies at issue to the subpoena.
22          That's what the Order calls for.
23             MR. LEINBACH:  The Order also
24          calls for evidence of income or
25          transfers made to or from Ms. Fang.
```

1                          R. Fang

2        Are those evidences of bank

3        statements?

4                MR. LYONS:  It doesn't say that

5        in the Order.

6                MR. LEINBACH:  Judge Solomon

7        said that at the last hearing on

8        several occasions.

9                MR. LYONS:  Arguably

10       responsive.

11               MR. LEINBACH:  I recall on

12       several occasions documents that are

13       arguably responsive that would relate

14       to those things.  You are saying there

15       are no statements that reflect

16       transfers of income that go to or from

17       Ms. Fang?  Is that what you are

18       saying?

19               MR. LYONS:  From what

20       companies?  From the companies you are

21       referring to in the subpoena?

22               MR. LEINBACH:  It would be all

23       of the companies that are referred to.

24               MR. LYONS:  To Ms. Fang.

25               MR. LEINBACH:  To Ms. Fang or

6

```
 1                    R. Fang
 2      from Ms. Fang?
 3               MR. LYONS:  You can ask.  I
 4      don't think so.
 5               MR. LEINBACH:  That was one of
 6      the things that Judge Solomon
 7      specifically stated you should bring
 8      today.
 9               MR. LYONS:  Ask her the
10      question in her background.
11               THE WITNESS:  I don't know.
12               MR. LYONS:  Do the bank records
13      show transfers?
14               THE WITNESS:  What kind of
15      transfers?
16               MR. LEINBACH:  We will go on
17      the record.  I want to understand, for
18      starters, are you saying essentially
19      those records, you don't have them
20      here today?
21               MR. LYONS:  We don't have
22      those.
23               MR. LEINBACH:  Did you bring
24      any records with you today?
25               MR. LYONS:  What you have is
```

```
 1                        R. Fang
 2        what I have produced.
 3                MR. LEINBACH:  Judge Solomon
 4        was fairly clear that you should bring
 5        all records here today which reflect
 6        transfers and what it sounds like --
 7        it sounds like, to me -- I want to
 8        make sure I understand that you didn't
 9        bring those records.
10                You don't know whether or not
11        there were transfers?
12                MR. LYONS:  I was advised that
13        there are no transfers or no bank
14        records that show transfers.  That's
15        why I don't have them.
16                MR. LEINBACH:  I have no idea
17        how long Judge Solomon is going to be
18        on the bench.  My suggestion is that
19        we will double check in an hour to see
20        whether she is available.
21                MR. LYONS:  See what other
22        documents you need.  We will get you
23        whatever documents you requested,
24        provided they are responsive.
25   Q.   Good afternoon.  My name is Bryan
```

```
1                      R. Fang

2    Leinbach.  I will ask you some questions.

3            I first ask:  Have you been deposed

4    before?  Have you ever been deposed?

5    A.      In my divorce.

6    Q.      Have you ever been deposed on any

7    other occasion?

8    A.      Not that I can recall.

9    Q.      I am going to explain briefly to you

10   the deposition process.  This might be

11   familiar to you, but I would like to get the

12   rules out so we understand what is going on.

13           You understand that you were just

14   sworn, given an oath to tell the truth?  Do

15   you understand?

16           Is that a yes or no?

17   A.      That's a yes.

18   Q.      With regards to answering questions,

19   if the answer to the question is yes or no, I

20   ask that you state yes or no so that the

21   reporter can actually take that down.  That's

22   because the court reporter cannot translate

23   nods.

24   A.      Okay.

25   Q.      In order for you to tell the truth I
```

1                    R. Fang

2    would ask that you listen carefully to each

3    of the questions that I ask and only respond

4    to a question if you understand that

5    question.

6            Do you understand my instructions?

7    A.     Yes, I do.

8    Q.     If you do not understand a question

9    that I ask, I would ask that you please tell

10   me that you don't understand it and I will

11   make an attempt to ask it in a different way

12   so it is easy to understand.

13           Do you understand that instruction?

14   A.     Yes.

15   Q.     If you have a need to take a break,

16   please tell me and I will make sure that I do

17   everything I can to accommodate you.  My only

18   caveat to that is if there is a question

19   currently pending I ask you to respond to

20   that question before we take a break.

21           Do you understand that instruction?

22   A.     Yes.

23   Q.     Are you currently taking any

24   medications that would impair your ability to

25   give truthful testimony today?

10

1                          R. Fang

2   A.      No.

3   Q.      Can you please state your name for the

4   record?

5   A.      Rochelle A. Fang.

6   Q.      Can you give us your current address?

7   A.      253 West 73rd Street.

8   Q.      How long have you been living at that

9   address?  A ballpark is fine.

10  A.      Ballpark it at nine years.

11  Q.      You have been living there for nine

12  years continuously at that address?

13  A.      Yes.

14  Q.      Are you currently employed?

15  A.      No.

16  Q.      Have you been employed in the last 10

17  years?

18  A.      No.

19  Q.      Can you give me or can you tell me the

20  source of your income at this moment?

21  A.      Yes, it is money and things I have

22  inherited from my father.

23  Q.      You have an inheritance and monies,

24  but can you tell me what "monies" means?

25  A.      It is all inherited from my father.

1                     R. Fang

2      Q.    Your income comes in the form of an

3    inheritance payment?

4      A.    Investments that are made for me.

5      Q.    Who makes those investments for you?

6      A.    One is my very bright and very loving

7    son-in-law, Sagi Genger.  The other is my

8    very bright and very lovely nephew, Gary Ran,

9    R-A-N.

10     Q.    Is Mr. Ran a financial advisor?

11     A.    Yes, he is.

12     Q.    Can you give me Mr. Ran's address, if

13   you know it?

14     A.    No.  I know the name of his company,

15   it is Telemus, T-E-L-E-M-U-S, Capital.

16     Q.    You said Mr. Ran is your nephew?

17     A.    Yes.

18     Q.    Did you say Mr. Genger provides you

19   with investment advice?

20     A.    Not advice.  He invests for me.

21     Q.    Could you tell me what investments you

22   currently have?

23     A.    I don't know.

24     Q.    Could you tell me who would know?

25     A.    My son-in-law, as would Gary.

1                           R. Fang

2     Q.     Do you know which investments Mr. Ran

3     is investing for you?

4     A.     No.

5     Q.     Do you know whether any of the

6     investments -- any of the things that you are

7     currently invested in are companies that are

8     owned or controlled by any member of the

9     Genger family?

10    A.     I don't know for sure.  Honestly, I

11    don't.

12    Q.     Would Sagi know?

13    A.     I would think so.

14    Q.     Could you tell me about how much you

15    made from investments in the last year?

16    A.     You would know by looking at my tax

17    returns.  I don't know.

18    Q.     Do you currently have an accountant?

19    A.     Yes.

20    Q.     Who is your current accountant?

21    A.     Gayer, G-A-Y-E-R, Jonas.

22    Q.     Mr. Gayer prepares your taxes?

23    A.     I am sorry?

24    Q.     Does Mr. Gayer prepare your taxes?

25    A.     Yes, like an accountant.

1                         R. Fang

2    Q.    Are there any other services that

3    Mr. Gayer provides to you besides taxes?

4    A.    Not that I can recall.

5    Q.    Besides Mr. Gayer do you have any

6    other accountants that work for you or do you

7    employ any other accountants?

8    A.    No.

9    Q.    Besides Mr. Ran and Mr. Genger, I mean

10   Sagi Genger, do you have any other financial

11   advisors?

12   A.    No.

13              MR. LEINBACH:  I would like to

14         mark this as Exhibit 1.

15              (Whereupon a subpoena duces

16         tecum ad testificandum was marked

17         Plaintiff's Exhibit 1 for

18         identification as of this date.)

19   Q.    I am looking at what was marked as

20   Plaintiff's Exhibit 1.  It is a subpoena

21   duces tecum ad testificandum addressed to

22   Rochelle Fang, address 253 West 73rd Street,

23   New York, New York.  The subpoena is dated

24   April 27, 2011.

25              I would like you to take a look at

14

```
 1                          R. Fang
 2    this document.  Take your time to look it
 3    over.
 4            Have you seen this document before?
 5    A.      This one?
 6    Q.      Yes.
 7    A.      I don't remember.  I don't know.
 8    Q.      You don't recall if you have seen this
 9    document before?
10    A.      No, I don't.
11    Q.      Is there anything I could show you
12    that would refresh your memory?
13    A.      I got stuff from Orly.  To tell you
14    the truth I see those things, but my eyes
15    glaze over and I call an attorney.
16    Q.      When you say "stuff" what do you mean?
17    A.      Whatever papers I got.  I mean, to
18    tell you the truth, there were papers.
19    Q.      What kinds of papers?
20    A.      Legal papers.
21    Q.      Where do those papers come?
22    A.      Well, the last time they came they
23    were served to my doorman, my concierge to be
24    more specific, and then I think some came in
25    the mail.
```

1                    R. Fang

2    Q.    Do you remember what those documents

3    looked like, the documents that came to your

4    doorman?

5    A.    I didn't read them all.  They

6    mentioned, as best I recall, Riverside, which

7    I know something, and I sort of looked at

8    that and said, "Why do I have this?"

9    Q.    When you say "this" are you referring

10   to the document you got from your doorman?

11   A.    Yes.

12   Q.    What did you do when you received the

13   document from your doorman?

14   A.    What did I do?  I am trying to

15   remember.  I think I called my lawyer.

16   Q.    Who is your lawyer?

17   A.    Now he is my lawyer.  I don't remember

18   who my lawyer was before.  Interesting, I

19   have gone totally blank.

20   Q.    Is there anyone who would know who

21   your lawyer was when you say before?

22              THE WITNESS:  Would you?

23              MR. LYONS:  I can't testify.

24   Q.    To make sure that we understand, you

25   can't ask Mr. Lyons to testify for you.  You

16

1                          R. Fang

2       can say if you don't understand the question.

3       Or if you don't know, you can say that.

4       A.      I don't really remember.

5       Q.      Is there anyone that would know?

6       A.      Maybe my son-in-law, I guess.

7       Q.      By your son-in-law do you mean Sagi

8       Genger?

9       A.      That's the person we are discussing

10      here.  Yes.

11      Q.      Is there anyone else that you spoke

12      with besides your lawyer at the time about

13      the documents that you received from the

14      doorman?

15      A.      You know, it's been a while.  I don't

16      remember who I called or what I did.  Of

17      course it is upsetting, especially when I am

18      asked something I don't have the vaguest idea

19      about.

20      Q.      Do you know if you talked to your

21      son-in-law?

22      A.      I probably did.

23      Q.      Do you remember what you talked about?

24      A.      I probably asked him what Riverside

25      was, because I really didn't know.

1                         R. Fang

2    Q.    Do you remember what Sagi told you?

3    A.    No, I don't remember.

4    Q.    Did you speak with Mr. Ran?

5    A.    No.  He has nothing to do with this.

6    Absolutely he has nothing to do with this.

7    Q.    When you say "with this" what does

8    that mean?

9    A.    With River -- he doesn't have anything

10   to do with Riverside.  He has nothing to

11   do -- this is not mine.  This has nothing to

12   do with me.

13   Q.    When you say "this has nothing to do

14   with me" what is it that you are talking

15   about?

16   A.    Riverside.

17   Q.    Do you know what Riverside is?

18   A.    Well, I found out that Riverside is a

19   property in Canada, but up until then I

20   didn't have the vaguest idea what it was.

21   Q.    Who told you that?

22   A.    You know, I don't remember who finally

23   told me.

24   Q.    Do you know when you first learned?

25   A.    No, I don't, but it was post the

1                           R. Fang

2     papers.

3     Q.      When you say post papers, what does

4     that mean?

5     A.      Post the subpoena.

6     Q.      Post receiving the subpoena?

7     A.      Yes.

8     Q.      Do you recall if you spoke with your

9     lawyer about receiving the subpoena or do you

10    recall whether you did any sort of search for

11    documents?

12    A.      I don't remember.

13    Q.      You don't remember?

14    A.      No, I don't.

15    Q.      Do you ever recall making any search

16    for documents with regards to the subpoena?

17    A.      I know very well -- I have a

18    one-bedroom apartment.  I don't have an

19    office.  There is no searching for documents

20    that I know nothing about.

21    Q.      To be clear, the answer is no?

22    A.      It wasn't necessary to search for

23    documents.  Where would they be; in my oven?

24    Q.      Did you speak with your financial

25    advisors, either Mr. Genger or Mr. Ran, about

19

```
1                         R. Fang
2    this subpoena?
3    A.      I certainly didn't speak to Mr. Ran,
4    that's not the kind of investments -- it
5    would be different.  Did I speak to Sagi?  I
6    don't remember.  To be honest with you, I
7    don't remember.  So much has gone on in my
8    life since then.  I am almost 68 years old.
9    I don't remember.  I don't remember what I
10   had for breakfast yesterday.
11   Q.      Do you remember whether you asked
12   Mr. Genger to collect documents for you with
13   regard to the subpoena?
14   A.      I doubt that I did.  I don't remember.
15   Q.      When you say that you doubt that you
16   did, can you tell me why?
17   A.      Because I don't have anything to do
18   with this.  I said I have no idea what
19   Riverside was until I got your subpoena.  I
20   don't know.  I didn't know.  I haven't the
21   vaguest idea of what this is, so I wouldn't
22   ask him because why would I.
23   Q.      Just to be clear, and I am asking for
24   a yes or no answer, did you or did you not
25   speak with your son-in-law?
```

1               R. Fang

2          Do you recall speaking with your

3    son-in-law?

4    A.     I don't recall.

5    Q.     Do you recall whether or not you spoke

6    to Mr. Gayer about collecting documents?

7    A.     No.

8    Q.     You don't remember or you did not

9    speak with him?

10   A.     I did not speak to Mr. Gayer.  I speak

11   to him about my tax returns.

12   Q.     You didn't ask him or did not contact

13   him with regard to the subpoena at all?

14   A.     No.

15   Q.     Did you ask your lawyer at the time to

16   collect documents with regard to the

17   subpoena?

18   A.     I don't remember.

19   Q.     In speaking about this now has that

20   jarred your recollection as to who your

21   attorney was?

22   A.     No, not at all.  I have no memory.

23   Q.     You mentioned there was a time that

24   someone told you about Riverside and that

25   this was --

```
 1                      R. Fang
 2    A.     Post subpoena.
 3    Q.     Once you learned what Riverside was
 4    did you do any sort of search for documents?
 5    A.     I knew very well I had nothing to do
 6    with it.
 7    Q.     Once you knew what Riverside was did
 8    you ask anyone to collect documents for you?
 9    A.     I don't think so.  I don't remember.
10    Q.     You don't remember?
11    A.     No.
12    Q.     Ms. Genger --
13    A.     I am not Ms. Genger.
14    Q.     I am sorry, that was a slip.
15           Ms. Fang --
16    A.     Yes.
17    Q.     -- have you spoken with anyone about
18    this litigation?  When I say "this
19    litigation" I mean the caption which is on
20    the subpoena.
21                MR. LYONS:  I will object to
22           the question to the extent it calls
23           for disclosure of any attorney-client
24           communication.
25                Other than your attorney.
```

22

```
 1                       R. Fang
 2    A.     Other than my attorney, I don't know.
 3    Q.     You don't recall?
 4    A.     No.
 5    Q.     Did you speak with your son-in-law
 6    about this litigation?
 7    A.     I certainly mentioned it because it
 8    concerns him.
 9    Q.     Do you recall what your son-in-law
10    told you about this?
11    A.     No, I don't.
12    Q.     Did you speak with anyone from Duane
13    Morris?
14    A.     Who is that?
15    Q.     The law firm of Duane Morris.
16    A.     Who is Duane Morris?
17    Q.     It is a law firm.
18           Did you speak to anyone from the law
19    office?
20    A.     Absolutely not.
21    Q.     Have you ever spoken to a man named
22    Alan Sash?
23    A.     Yes.
24    Q.     Can you please tell me about your
25    conversations with Mr. Sash?
```

1                          R. Fang

2    A.     That was to a lawyer.  Am I supposed

3    to be telling these things?

4    Q.     You understand Mr. Sash to have been

5    your lawyer?

6    A.     He wasn't my lawyer.

7    Q.     Do you recall what you said to

8    Mr. Sash?

9    A.     Absolutely not.

10   Q.     When was this that you spoke to

11   Mr. Sash?

12   A.     I really don't remember.

13   Q.     Do you know in what context it was

14   that you spoke with Mr. Sash?

15   A.     I don't remember that, either.

16   Q.     Have you ever spoken with anyone named

17   Jacqueline Gerald?

18   A.     Not that I can recall.

19   Q.     Have you ever spoken with anyone named

20   David Parness?

21   A.     A while ago, yes.

22   Q.     Do you know who Mr. Parness is?

23   A.     He is a very good friend of my

24   son-in-law and daughter.

25   Q.     Do you know the last time you spoke

1                          R. Fang

2    with Mr. Parness?

3    A.      No, I don't.

4    Q.      Have you spoken with Mr. Parness about

5    this litigation?  And when I say "this

6    litigation" I mean the captioned matter

7    that's in the subpoena.

8    A.      I don't think this was happening the

9    last time I spoke to him.  I don't know.

10   Q.      Do you recall the last time you spoke

11   with Mr. Parness?

12   A.      No.

13   Q.      Do you speak with Mr. Parness often?

14   A.      No.  He is a little young to be my

15   friend.

16   Q.      Have you spoken with someone by the

17   name of John De La Portez?

18   A.      No, I don't know the name.  It sounds

19   kind of musical.

20   Q.      I remember wondering the expression on

21   your face was kind of odd.

22   A.      It sounds like a very dangerous

23   sounding name, actually.

24   Q.      Have you ever spoken with a man named

25   Evan Michailidis?

25

1                        R. Fang

2              MR. LYONS:  Other than this

3        morning?

4   A.     No -- that's you.  I just met

5   Mr. Michailidis today.  That was the first

6   time.

7   Q.     Besides Mr. Genger, and by Mr. Genger

8   I mean Sagi Genger, have you spoken to any

9   other members of your family about this

10  litigation?

11  A.     I am sure I spoke to members of my

12  family.  Wouldn't you?

13  Q.     Fair enough.

14          Who was it?  Could you tell me who it

15  was that you spoke to about this litigation?

16  A.     Mostly my sister.

17  Q.     Who is your sister?

18  A.     My sister is Shirley LaTessa.  I

19  complained to my sister.  That's what sisters

20  are for.

21  Q.     Have you spoken with your daughter

22  about this litigation?

23  A.     Elana?

24  Q.     Yes.

25  A.     You know, considering, I don't

26

1                           R. Fang

2    remember saying much to her about it.

3    Q.      Do you recall ever speaking with her

4    about it?

5    A.      I may have, I don't recall.

6    Q.      Do you have any other daughters?

7    A.      Yes, I have two others.  And no.

8    Q.      Two other daughters?

9    A.      And no, I did not speak with them.

10   Q.      Do you recall whether there was anyone

11   else that you spoke to about the litigation

12   as is stated there on the subpoena?

13   A.      My boyfriend.

14   Q.      What is your boyfriend's name?

15   A.      Why is that important?

16   Q.      Well, I am allowed to ask questions

17   that I believe are relevant.

18           Can you please answer the question?

19                   MR. LYONS:  You can answer the

20           question.

21   A.      Barry Marcus.

22   Q.      The last name?

23   A.      M-A-R-C-U-S.

24   Q.      Have you ever heard of a law firm

25   named McLaughlin and Stern?

```
1                          R. Fang

2      A.      Yes.

3      Q.      How do you know that name?

4      A.      It is my son-in-law's firm, or was at

5      some time.

6      Q.      Do you recall speaking, ever speaking

7      with anyone at the law firm of McLaughlin and

8      Stern?

9                     MR. LYONS:  You already asked

10                 about Alan Sash and Jacqueline Gerard.

11                 Other than them?

12     A.      I didn't speak to them about the

13     litigation, I never spoke to anybody by that

14     name, Jacqueline.  I did speak to Alan Sash,

15     I told you I did, the contents of what I

16     don't remember.

17                     MR. LEINBACH:  I would like to

18                 mark this as Plaintiff's Exhibit 2.

19                     (Whereupon a letter dated May

20                 26, 2011 was marked Plaintiff's

21                 Exhibit 2 for identification as of

22                 this date.)

23     Q.      I am looking at what was marked as

24     Plaintiff's Exhibit 2.  It is a letter from

25     me dated May 26, 2011 to Rochelle Fang.
```

1                    R. Fang

2          I would like you to take a look at

3     this document marked Plaintiff's Exhibit 2.

4     A.     All right.

5     Q.     Do you recognize this document?

6     A.     Do I recognize it?  Probably I don't

7     recognize it.  Did I get something like this?

8     Very likely I did.  I am sure when I saw that

9     my mind went totally blank.

10    Q.     Do you remember when it was that you

11    received this?

12    A.     No, I don't.

13    Q.     Do you remember whether it was early

14    May or April?

15    A.     I don't remember when I got it.

16    Q.     You don't remember receiving the

17    document?

18    A.     No, I don't remember what time frame

19    it was.

20    Q.     You do remember receiving it?

21    A.     It looks familiar.  I can't tell you

22    if that's the exact wording or anything else.

23    It looks like something I may have gotten,

24    the date of which I have no idea.

25    Q.     Do you remember what you did when you

```
 1                    R. Fang
 2    got this letter?
 3    A.      Besides getting hysterical, no, I
 4    don't remember.
 5    Q.      Do you remember whether or not you
 6    spoke with --
 7    A.      I don't remember who I spoke with or
 8    what I did and I absolutely don't remember.
 9    Q.      Did you speak with an attorney when
10    you received this letter?
11    A.      I don't know.  That's in May.  I don't
12    know.
13    Q.      By you don't know do you mean you
14    don't remember?
15    A.      I don't remember.  It is not that I
16    don't know, I don't remember.
17    Q.      Do you recall whether or not you spoke
18    with your son-in-law Sagi Genger?
19    A.      I don't recall.
20    Q.      Do you recall whether you contacted an
21    attorney when you received this letter?
22    A.      I don't recall.
23    Q.      Do you recall whether you spoke with
24    anyone else?
25    A.      I don't recall.
```

1                         R. Fang

2    Q.    Can you recall when it was that you

3    contacted your current attorney?  By "current

4    attorney" I mean Mr. Lyons.

5    A.    You know, I really don't know the date

6    of my current attorney.  I really don't

7    remember.

8    Q.    How long has your current attorney

9    represented you?  Once again, I mean

10   Mr. Lyons.

11   A.    I know who you mean.  I can't

12   remember.

13   Q.    Do you know how it was that you were

14   introduced to your current attorney?

15   A.    Yes.

16   Q.    Can you please tell me what the

17   circumstances were that you met Mr. Lyons?

18   A.    I am sure it was some sort of

19   irrelevant request and I believe Alan Sash

20   introduced me to Desmond.

21   Q.    Do you recall when this was?

22   A.    No.

23   Q.    Do you recall that conversation with

24   Mr. Sash, what Alan told you?

25   A.    No.

1                        R. Fang

2    Q.     You just recall that Mr. Sash

3    recommended Mr. Lyons to you?

4    A.     Yes.

5    Q.     Did you speak with Mr. Lyons?

6    A.     I don't remember if I spoke with him

7    then or not.

8    Q.     Do you know what contact it was --

9    A.     No, I don't.

10   Q.     -- that Mr. Sash --

11   A.     No, I don't.

12   Q.     Do you know about when that was?

13   A.     No.   I can't remember how long he has

14   been my attorney, that should be clue enough.

15   Q.     Would it have been before or after

16   receiving the subpoena documents?

17   A.     I don't recall.

18   Q.     You don't recall?

19   A.     I don't recall.

20   Q.     Do you know when you retained

21   Mr. Lyons to be your lawyer?

22   A.     You asked me that.   I don't remember.

23   Q.     Do you pay for Mr. Lyons' services?

24   A.     No.

25   Q.     Who pays for Mr. Lyons' services?

32

1                       R. Fang

2    A.     I don't know.

3    Q.     You don't know who pays for Mr. Lyons'

4    services?

5    A.     No, but it is not me.

6    Q.     You don't pay for Mr. Lyons' services?

7    A.     Right.

8    Q.     Do you know who would know?

9    A.     My son-in-law would know.

10   Q.     Your son-in-law would know who pays

11   for your lawyer?

12   A.     Yes.

13   Q.     Do you know whether or not your

14   son-in-law pays for your lawyer?

15   A.     I don't know for sure if he does, I am

16   not involved in the monetary...

17   Q.     I would like you to look at Exhibit

18   number 2 once more.

19   A.     Which is this, yes.

20   Q.     Plaintiff's Exhibit 2 is the letter

21   right in front of you.

22          Do you see here, when I say "here" I

23   will read to you, there is -- the second

24   sentence from the bottom it begins:   "To date

25   we have not received any documents from you.

```
 1                         R. Fang
 2      Please provide us with all documents
 3      requested in the subpoena by May 31.  If you
 4      fail to provide us with requested documents,
 5      plaintiff will seek appropriate relief from
 6      the New York County Supreme Court including
 7      an Order holding you in contempt of Court for
 8      your failure to comply with the subpoena."
 9           Do you see that?
10      A.   Yes.
11      Q.   Ms. Fang, do you understand what it
12      means to be held in contempt of Court?
13      A.   Yes.
14      Q.   What do you think that the word
15      contempt means?  What does that mean?
16      A.   That I have not done what the Court
17      asked me to do.
18      Q.   Do you understand the penalty for
19      being held in contempt of Court?
20               MR. LYONS:  I object to all of
21           this.  I don't think you need to get
22           into it.  The letter is clear.  Your
23           subpoena is clear.
24               MR. LEINBACH:  Your objection
25           is noted.
```

34

```
 1                      R. Fang
 2              MR. LYONS:  I don't think we
 3          need her to have a lecture on what it
 4          means to be held in contempt.
 5              MR. LEINBACH:  I understand.
 6          Your objection is noted.
 7   Q.     Would you please answer the question?
 8   A.     What is your question?
 9              MR. LEINBACH:  Could you read
10          back to me the question?
11              (Whereupon the record was read
12          back by the reporter.)
13              THE WITNESS:  Is that the
14          question?
15   Q.     Yes.
16   A.     I believe you go to jail.
17   Q.     Do you recall at all whether you were
18   concerned when you received this letter?
19   A.     I was asked for things that I don't
20   have.  Therefore, there was no way that I am
21   holding the Court in contempt when I cannot
22   produce what I do not have, which is anything
23   having to do with Riverside.
24   Q.     Did you feel you had to contact anyone
25   about the subpoena?
```

35

```
 1                   R. Fang
 2    A.    I am sure I contacted, but I am
 3    telling you I can't remember what happened in
 4    May, Mr. Leinbach.  I am not that young, I
 5    tend to forget things easily and I am sure I
 6    was highly stressed at the time and I have no
 7    memory of what I did.
 8              MR. LEINBACH:  Can you mark
 9         this as Plaintiff's Exhibit 3?
10              (Whereupon an e-mail dated June
11         15, 2011 was marked Plaintiff's
12         Exhibit 3 for identification as of
13         this date.)
14    Q.    Looking at what was marked as
15    Plaintiff's Exhibit 3, it is an e-mail
16    addressed to me from Desmond Lyons dated
17    June 15, 2011.  Attached to that e-mail to me
18    is an affidavit, two pages in length.  The
19    caption is Orly Genger versus Sagi Genger and
20    that proposed affidavit was to be sworn to by
21    Rochelle Fang.
22              MR. LYONS:  Let me state my
23         objection.  Ms. Fang is not copied on
24         the e-mail, number 1.  To testify to
25         the e-mail itself, to the extent any
```

1              R. Fang

2         question refers to any information,

3         conversation that she had with me

4         prior to my preparation of the

5         affidavit, I am going to object, as

6         well as to her testifying to any

7         conversation she had with me.

8              Finally, this was a draft in an

9         effort to resolve an issue of the

10        subpoena from lawyer to lawyer,

11        arguably for settlement purposes.  I

12        will object to it on that grounds, as

13        well.

14   Q.   Ms. Fang, can you please take a look

15   at what was marked as Plaintiff's 3?

16   A.   I just did.

17   Q.   Have you ever seen this document

18   before?

19   A.   I don't recall seeing it.

20   Q.   Do you recall when you saw it?

21   A.   I don't recall seeing it.

22   Q.   You don't recall seeing it at all?

23   A.   I may have, but I don't recall.

24   Q.   Is there any document that I could

25   show you other than this that might refresh

1                         R. Fang

2    your recollection as to whether you have seen

3    this document?

4    A.      I doubt it.  I am not saying I didn't

5    see it, I am saying I don't recall seeing it.

6    Q.      It doesn't look familiar?

7            Does it look familiar to you?

8    A.      I don't know, honestly, what it was

9    supposed to be.  A lot of things were going

10   on in my life.  I may have seen it, but

11   honestly if you asked me when or where or

12   what, I don't remember.  I am not going to

13   say I didn't see it, either.

14   Q.      Understood.

15           Let's take a look at this document.

16   If you look at the document, if you look to

17   paragraph 4, paragraph 4 reads:  "To my

18   knowledge, I do not currently have nor have I

19   ever had any partnership interest in

20   Riverside."

21   A.      As far as I knew.

22   Q.      When you say as far as you knew, what

23   does that mean?

24   A.      I don't know.  I don't know anything

25   about Riverside.  What is in my portfolio

38

```
 1                      R. Fang
 2   with my son-in-law, I don't know what is in
 3   there, so I don't know.  As far as I know, I
 4   don't.
 5   Q.      You believe paragraph 4 is accurate as
 6   you sit here today?
 7   A.      Yes, absolutely.
 8   Q.      You don't believe you have any
 9   interest in it yourself?
10   A.      At this moment I believe I do, but at
11   that time I didn't.
12   Q.      When is it that you came to believe
13   that you had an interest in Riverside?
14              MR. LYONS:  It is a partnership
15          interest?
16   A.      Just very recently.
17   Q.      When was that?
18   A.      Maybe within the last week.
19   Q.      You learned in the last week?
20   A.      Yes.  I don't know what's in my
21   portfolio, that's not my job.  If I was so
22   interested in that I would do it myself; all
23   right?
24   Q.      When you say your portfolio, what is
25   it that you mean?
```

```
 1                        R. Fang
 2   A.      Whatever my investments are.  It is
 3   just a broad word, it has no great legal
 4   meaning.  I am not selecting it out, it is
 5   just a word.  I am not a business person, I
 6   don't know what the correct term would be,
 7   that's the one I chose.
 8   Q.      Would your financial advisors know
 9   what is in your portfolio?
10   A.      Well, they should.
11   Q.      By your "financial advisors" I guess
12   would Sagi Genger know?
13   A.      Yes.
14   Q.      Mr. Ran?
15   A.      Absolutely not.
16   Q.      He would not.  Why is it you say that?
17   A.      The kinds of things he invests in are
18   S&P stocks, bonds, that kind of stuff.
19   Q.      The investments that Mr. Genger
20   invests for you is different?
21   A.      I imagine some of that, as well.  He
22   has free reign to do what he wants.  I don't
23   know what else he has in it.
24   Q.      When you say he has free reign --
25   A.      They both do.
```

40

1                       R. Fang

2     Q.      When you say free reign, what does

3     that mean?

4     A.      They can buy and sell as they wish.

5     Q.      Do they have to inform you before they

6     buy and sell?

7     A.      No.

8     Q.      Would it be accurate to say that they,

9     by "they" I mean Mr. Genger and Mr. Ran, can

10    buy things without your knowledge?

11    A.      Sure.

12    Q.      Do you know whether or not Mr. Genger,

13    and by "Mr. Genger" I mean Sagi Genger, or

14    Mr. Ran have a power of attorney with regard

15    to you?

16    A.      I don't remember.

17    Q.      You don't recall?

18    A.      I don't recall.

19    Q.      How is it that you learned that you

20    had a partnership interest in Riverside?

21    A.      I don't remember.  I don't know.

22    Q.      Do you remember who told you?

23              MR. LYONS:  I will object to

24         the question.  I am not sure she

25         testified that she learned she had a

41

1                         R. Fang

2              partnership interest.  I think she

3              testified she had an interest.

4      A.      I don't know about partnership

5      interest.

6      Q.      What do you mean?  What did you learn

7      that you had an interest in?

8                    MR. LYONS:  Can you repeat the

9              question?

10     Q.      What did you learn that you had an

11     interest in?

12     A.      I didn't learn that I had an interest

13     in anything.  Just that somehow Riverside was

14     included in some of the things my son-in-law

15     has done for me, but I don't know what I have

16     in it.  I don't even know what the hell it

17     is, as I told you numerous times.

18     Q.      I am trying to understand how it is

19     that obviously you came to know, as you said,

20     about a week ago that you had some sort of an

21     interest in Riverside.  That's fairly recent.

22     I am wondering how it was that that happened.

23     A.      I don't really remember.

24     Q.      Let's look at paragraph number 5.

25     A.      There are two paragraph 5s.

```
 1                        R. Fang
 2   Q.    That's a good catch, actually.  Let's
 3   look at the first paragraph number 5.
 4            As you sit here today do you believe
 5   that this statement "I am not in possession
 6   of any documents responsive to the subpoena"
 7   do you believe that statement is true?
 8   A.    Yes.
 9   Q.    You believe you don't have any
10   documents in your possession?
11   A.    Having to do with Riverside?
12   Q.    Yes.
13   A.    Absolutely not.
14   Q.    What do you understand the word
15   possession to mean?
16   A.    That I have something to do with this
17   company, some papers in my possession.
18   Q.    To be clear, do you understand that
19   word to mean or do you understand that
20   that -- do you believe that either your
21   accountants or either your present or past
22   lawyers have any documents in their
23   possession which would relate or were
24   responsive to the subpoena?
25   A.    The only person would be my accountant
```

43

```
 1                          R. Fang
 2    and you have that, so that's it.  If I had
 3    anything, but I don't have papers in my pile
 4    of whatever old magazines and such that would
 5    have anything to do with Riverside.
 6    Q.     I understand.
 7           Did you ask your accountant to provide
 8    you with the documents which would relate to
 9    Riverside?
10    A.     Eventually I did.
11    Q.     When was that?
12    A.     Are you kidding?  I haven't the
13    vaguest idea of what point I asked him for
14    that.
15    Q.     Do you have an idea as to whether it
16    was before --
17    A.     I don't remember.
18               MR. LYONS:  Let him finish his
19           question.
20               THE WITNESS:  Sorry.
21    Q.     Do you have an idea of whether it was
22    before or after you received the letter?
23    A.     This letter?
24    Q.     The letter which was marked
25    Plaintiff's Exhibit 2.
```

1                          R. Fang

2    A.      I don't know.

3    Q.      Do you recall whether or not you spoke

4    with or asked any of your lawyers to provide

5    documents?

6    A.      After this letter, I don't know for

7    sure.   I can't tell you when I asked.   I

8    don't know.

9    Q.      Let's look at Plaintiff's Exhibit 3,

10   the affidavit, the second paragraph five,

11   that paragraph reads:   "With the exception of

12   my lawyers, I have had no communications with

13   anyone relating to Riverside or the Riverside

14   companies" --

15   A.      That would be true.

16   Q.      Let me finish.

17   A.      Sorry.

18   Q.      -- "nor any material communication

19   with anyone concerning this lawsuit."

20           Do you understand that sentence or do

21   you believe that sentence is true now as you

22   sit here?

23               MR. LYONS:   She did testify

24           earlier that she had some

25           conversations.   I assume your question

45

1               R. Fang

2        relates to other conversations?

3               MR. LEINBACH:  It relates to

4        all conversations.

5               MR. LYONS:  She already

6        testified that she had conversations.

7               MR. LEINBACH:  I understand.

8   A.   Talking about Riverside?

9   Q.   Yes.

10  A.   No, no.  I don't know what it is.  How

11  can I be having conversations about it?

12  Q.   Once you learned that you had an

13  interest in Riverside, as you stated, did you

14  have any conversations with anyone?

15  A.   I really don't remember.

16  Q.   You don't recall?

17  A.   I don't recall.

18  Q.   You don't recall whether you had any

19  conversations or with whom you had

20  conversations with?

21  A.   I don't recall whether I had any

22  conversations.  I talk a lot.  How can I

23  remember what I spoke about to whom or what?

24  Q.   I will ask once again:  Do you believe

25  this statement is true as you sit here now?

1                    R. Fang

2    A.    How can I talk about Riverside

3    companies when I know nothing about them?  If

4    you are talking about going to a subpoena, of

5    course I told people I am coming to a

6    subpoena.  About what, no, I don't know.  I

7    don't understand why I am here, if you want

8    to know the truth.

9    Q.    You stated you don't understand why

10   you are here?

11   A.    No.

12                MR. LYONS:  Do you want to take

13              a break?

14                THE WITNESS:  I wouldn't mind

15              taking a break.

16                MR. LEINBACH:  There is no

17              question pending at this point.  If

18              you would like to take a break, that's

19              fine.

20                (Whereupon all parties went to

21              Judge Solomon's chambers.)

22                THE COURT:  On July 25 I wrote

23              an Order granting a motion directing

24              Ms. Fang to respond to a subpoena

25              duces tecum and ad testificandum by

```
 1                      R. Fang
 2       showing up on or before today at
 3       10:00 o'clock with an original and one
 4       legible copy of all arguably
 5       responsive documents referred to in
 6       the subpoena which I was enforcing by
 7       that July 25 Order.
 8            Some of the material were tax
 9       returns.  I allowed her to do some
10       redacting as explained in something
11       which appears to be scribble.
12            About 20 minutes ago the
13       parties came to the courtroom and when
14       I was able to come out to see what
15       they wanted I understood there was
16       some problem about compliance with
17       this Order.
18            Why don't we do this:
19       Mr. Lyons, she is your client; right?
20            MR. LYONS:  Yes, Your Honor.
21            THE COURT:  This subpoena was
22       served sometime well before my July
23       Order; right?
24            MR. LYONS:  Yes.
25            MR. LEINBACH:  Yes.
```

48

```
 1                       R. Fang
 2              THE COURT:  I am not talking to
 3       you.  And resistance was had so the
 4       matter was presented to me.
 5              Now I need to know, Mr. Lyons,
 6       what material your client has today
 7       pertaining to her partnership interest
 8       in Riverside properties (Canada
 9       limited partnership).
10              MR. LYONS:  Your Honor, we
11       produced to the defendant a copy of
12       the Riverside Limited Partnership
13       partnership agreement, as well as
14       Ms. Fang's tax returns from 2006 to
15       2009 tax returns.
16              THE COURT:  Do they reflect
17       anything that is derived from or
18       negatively derived from --
19              MR. LYONS:  It is from
20       Riverside.  Yes, Your Honor.  As you
21       instructed in our last appearance
22       here, Your Honor, I redacted from
23       those tax returns anything that is not
24       related to Riverside or the entities
25       named in the subpoena.
```

49

1           R. Fang

2           THE COURT:  What is the problem

3   with whatever you got in response to

4   number 1, Mr. Leinbach?

5           MR. LEINBACH:  My response is

6   response to all, I can explain.  In

7   the deposition as it is taking place,

8   so far Ms. Fang has testified that she

9   does not have any documents in her own

10  possession which relate to Riverside

11  or any of the entities listed in the

12  subpoena.

13          However, she stated repeatedly

14  that she does not know what documents

15  would be in the possession of others.

16          THE COURT:  Who are the others?

17          MR. LEINBACH:  Her accountant,

18  Mr. Gayer, and also her financial

19  advisors who she identified as her

20  son-in-law Sagi Genger and another

21  individual, an individual named Gary

22  Ran.

23          THE COURT:  I already directed

24  Mr. Gayer to comply with something.

25          MR. LEINBACH:  Yes, you have,

1               R. Fang

2       but unfortunately I need to bring to

3       your attention he has failed to do so,

4       as well, but that's an issue outside

5       of this.

6               THE COURT:  Go ahead.

7               MR. LEINBACH:  She stated she

8       had no idea whether or not she had

9       requested such documents from those

10      parties.

11              THE COURT:  In connection with

12      complying with the subpoena or ever?

13      Let me finish.  It has been a very

14      long day.

15              MR. LEINBACH:  I apologize.

16              THE COURT:  What else?  What

17      other material was brought, Mr. Lyons?

18      Why don't you tell me what else was

19      brought?

20              MR. LYONS:  In addition to

21      redacting tax returns, I brought

22      unredacted tax returns so if

23      Mr. Leinbach were to ask her about the

24      unredacted or what was redacted she

25      could identify things on there and

```
 1                       R. Fang
 2        identify that nothing else is an AG
 3        related entity or having anything to
 4        do with Riverside.
 5             She is prepared to do that.  He
 6        has not asked her any questions about
 7        that.  Those were K-1's from
 8        Riverside.  The inquiries were made
 9        not by Ms. Fang but by me to
10        Mr. Gayer, her accountant, to the
11        attorneys for Mr. Genger who acts as
12        the limited -- the general partner.
13             THE COURT:  You are blocking
14        her.
15             MR. LYONS:  I made inquiries to
16        the attorneys for Mr. Genger, as well
17        as the accountants, to try to get
18        whatever documents they had.  They
19        gave me what they had.  I bought it in
20        here today.  I did as you instructed.
21        I redacted what was supposed to be
22        redacted.
23             THE COURT:  I gave her an
24        option.  I didn't tell her to redact
25        it.  Don't put words in my mouth.
```

```
 1                    R. Fang
 2              What is the problem?  What do
 3         you want of the Court today?
 4              MR. LEINBACH:  I don't think or
 5         it sounds to me, based upon everything
 6         that I have gotten from the witness
 7         and also from the testimony -- the
 8         conversations that I had with
 9         Mr. Lyons and Mr. Michailidis, I don't
10         believe there has been a complete
11         search for documents responsive to the
12         subpoena.
13              THE COURT:  Were you
14         administered an oath today?  Would you
15         stand up?
16              THE WITNESS:  Yes.
17              THE COURT:  There is no
18         question.  Did you do anything
19         yourself among whatever spaces you
20         controlled to look for material listed
21         in the subpoena?
22              THE WITNESS:  I had -- I don't
23         have it.  I didn't even know what it
24         was, to be honest with you.
25              THE COURT:  Do you keep any
```

53

1               R. Fang

2      books and records of your financial

3      affairs?

4               THE WITNESS:  Not really.

5               THE COURT:  Are you somebody's

6      pawn?

7               THE WITNESS:  I wouldn't call

8      myself a pawn.

9               THE COURT:  What do you do to

10     take care of your financial affairs?

11              THE WITNESS:  I have two

12     advisors.

13              THE COURT:  They are?

14              THE WITNESS:  One is Gary Ran,

15     who runs Telemus Capital and has been

16     listed as one of the top ten money

17     managers in the country by Forbes.

18              THE COURT:  Does he take care

19     of your, I will call them investments

20     --

21              THE WITNESS:  Yes.

22              THE COURT:  Could I finish my

23     sentence, please?

24              THE WITNESS:  I am sorry.

25              THE COURT:  I will call them

54

1                           R. Fang

2       investments to cover any financial

3       arrangements you have with your

4       son-in-law.  Does this gentleman have

5       any role in that?

6                 THE WITNESS:  No.

7                 THE COURT:  You understand this

8       subpoena here is directed to your

9       son-in-law's businesses in which you

10      may have an interest?

11                THE WITNESS:  Yes.

12                THE COURT:  Who controls the

13      paper related to your son-in-law's

14      businesses in which you may have an

15      interest?

16                THE WITNESS:  My son-in-law.

17                THE COURT:  Have you demanded

18      that he provide to you copies of

19      everything which might reflect your

20      interest in this so that you will not

21      be found in contempt for failing to

22      have done that?

23                MR. LYONS:  I did that on her

24      behalf.

25                THE COURT:  What did you get

55

```
 1                    R. Fang

 2         from Mr. Genger?

 3              MR. LYONS:  I got it through

 4         his attorneys.  I got the limited

 5         partnership agreement.

 6              THE COURT:  What else?

 7              MR. LYONS:  That's it.

 8              MR. LEINBACH:  The answer is

 9         nothing else.  That's my concern.

10              THE COURT:  You will deal with

11         it professionally.  She is a fool or a

12         pawn or he is in violation of some

13         obligation he has to her and,

14         accordingly, to the Court.  I will

15         determine in due course.

16              MR. LEINBACH:  I believe in

17         standing here today that there is a

18         violation of this subpoena.  If

19         Mr. Genger is Ms. --

20              THE COURT:  Excuse me, Ms. Fang

21         will tell us what request, if any, she

22         made of Mr. Genger, the son-in-law, as

23         opposed to the father-in-law.  We

24         might be able to get a little further

25         along.  You can't speak for her.
```

56

1                          R. Fang

2          THE WITNESS:  I requested my

3     lawyer to request from my son-in-law

4     whatever documents were necessary for

5     your Court.

6          THE COURT:  Do you not talk to

7     your son-in-law?

8          THE WITNESS:  Yes.

9          THE COURT:  Is there any reason

10    why you didn't ask him yourself?

11    Nobody says you can't talk to him if

12    he is your financial advisor for a

13    certain universe of investments.  Then

14    you directly will at least have done

15    something to suggest that you yourself

16    tried to comply with not only my Order

17    but the subpoena.

18          It is not really funny.

19          THE WITNESS:  I don't think it

20    is funny.  I am trying to think did I

21    ask him.

22          THE COURT:  You got this

23    subpoena quite some time ago.

24          THE WITNESS:  Yes.

25          THE COURT:  It was originally

1                          R. Fang

2        returnable in May.  There was plenty

3        of time to have a sit down with

4        counsel, if necessary, so the material

5        sought could be explained to you if

6        you didn't understand words on the

7        page and then so you could sit down

8        with Sagi Genger and find out what

9        exists.  I think you are derelict, you

10       and Mr. Lyons, in not having had that.

11               She has investments.  Do we

12       have books and records, checkbooks

13       that she may have used to issue

14       transfers to invest in these

15       businesses?  What are we doing?

16               MR. LYONS:  I don't have any of

17       that, Judge.

18               THE COURT:  Did she ever

19       transfer any funds or things of value

20       to Mr. Sagi Genger to use in

21       connection with these real estate

22       transactions?

23               MR. LYONS:  Well, she wouldn't

24       have done that directly.

25               THE COURT:  I don't know, she

```
 1                    R. Fang
 2        told us the real money guy who I hope
 3        protects her real money has nothing to
 4        do with Sagi Genger's business.  Did I
 5        correctly get it?
 6             THE WITNESS:  That is part of
 7        my money, the main money is with my
 8        nephew, Gary Ran.
 9             THE COURT:  We are not
10        interested --
11             THE WITNESS:  You just asked
12        me.
13             THE COURT:  Listen up.  We are
14        not interested in what you brought to
15        the table before you met a Genger and
16        kept separate from a Genger.  Good for
17        you for keeping it separate.
18             What we are interested in is
19        what you did with the Gengers not
20        because we care about your money, but
21        we want to know what came into Sagi's
22        hands and how he treated it in
23        connection with such obligation as he
24        may or may not have had to his sister.
25        That's his only purpose.
```

```
 1                    R. Fang
 2             I have no, at the moment,
 3       position on who in this lawsuit
 4       between the sister and the brother is
 5       right or wrong or correct or incorrect
 6       in respect of a claim.  All I am doing
 7       is trying to get the professionals
 8       representing the siblings to have as
 9       much information as possible, and you
10       were thought to have some useful
11       information.
12             I don't believe in burdening
13       people unrelated to things.  Mr. Lyons
14       has to get this seriously through his
15       head, your head, and perhaps use the
16       offices of Sagi Genger.
17             MR. MICHAILIDIS:  Mr. Lyons did
18       speak to my colleague, Mr. De La
19       Portez.  We spoke to Sagi.  What we
20       have been dealing with here, which is
21       really no easy way to explain it, we
22       have received several very, very
23       encompassing very broad document
24       requests by plaintiff's counsel.
25             THE COURT:  Right.
```

60

```
 1                    R. Fang
 2           MR. MICHAILIDIS:  Of course,
 3       naturally we have made every effort up
 4       to this point to produce documents
 5       that are responsive.
 6           THE COURT:  Give me a list of
 7       what was produced that was responsive,
 8       that every effort was made.
 9           MR. MICHAILIDIS:  I don't have
10       a list with me.  I didn't think it was
11       going to be an issue.  It is our
12       understanding that we produced --
13           THE COURT:  What have you
14       produced?
15           MR. MICHAILIDIS:  Your Honor,
16       the books and records, transaction
17       histories.
18           THE COURT:  Of what?
19           MR. MICHAILIDIS:  The Riverside
20       entities.
21           THE COURT:  What do the books
22       and records of the Riverside entities
23       consist of?
24           MR. MICHAILIDIS:  In terms of
25       the financial history of the entity, I
```

61

1                         R. Fang

2         would presume.

3                 THE COURT:  You presume.  You

4         told me what you produced.  You took

5         the responsibility for producing, so I

6         am asking what did you produce?  You

7         say "I presume."  Now you can't

8         presume if you didn't produce.

9                 MR. MICHAILIDIS:  Unfortunately

10        , we are incoming counsel.  If you

11        remember, McLaughlin and Stern

12        previously represented Sagi.  We have

13        been acting in a representative

14        capacity for the past month and a

15        half.  Bryan and I have had

16        conversations and I have had

17        conversations with Mr. Gayer, as well.

18                We have heard that there is --

19        we are trying to work with opposing

20        counsel.  We are not trying to hide

21        anything.  We are of the belief that

22        we have already produced items that

23        are both responsive and nonresponsive,

24        frankly.

25                THE COURT:  You are talking a

```
 1                    R. Fang
 2      lot, but you had Joe agree that you
 3      could show up at 2 o'clock and the
 4      building is locked tight at 5 o'clock
 5      and Eli is going to lock the door at
 6      4:30, so you had two and a half hours
 7      to accomplish not a lot if you are
 8      first talking to me.
 9          Either you do or don't know
10      what the witness has that's responsive
11      to items 1 through 8.  It is not very
12      long.  It is not particularly prefaced
13      and it is not hard to follow.
14          Go through this list whenever
15      you reconvene, I take it it will be
16      tomorrow at 10 o'clock, because you
17      didn't use today fully, and go through
18      this list and the witness will say
19      what she did or didn't do that she
20      knows about from other people's work
21      about complying with the subpoena
22      which was issued to her, not to Sagi's
23      lawyer or to her lawyer.
24          MR. LEINBACH:  If I might, Your
25      Honor, I have already asked her
```

```
1                    R. Fang
2       questions about that.
3                THE COURT:  If she answered it,
4       go home.
5                MR. LEINBACH:  All of these
6       questions, her response is she knows
7       nothing about any investments that
8       were made.
9                THE COURT:  She would not be
10      the first woman to say that I relied
11      on a man in my family.
12               MR. LEINBACH:  That's fine.
13               THE COURT:  You can't beat her
14      up on it.
15               MR. LEINBACH:  I understand
16      that, as well.  When I asked her about
17      documents in her possession or control
18      she did not remember.
19               THE COURT:  Between May and now
20      what she did, that's a little hard to
21      believe.  She looks like a functioning
22      person, I assume.  I assume, I don't
23      mean to embarrass you, I want to be
24      sure that whatever is on your left
25      cheekbone on the skin is not
```

1                          R. Fang

2          interfering with your functioning

3          today.

4                    THE WITNESS:  No.

5                    THE COURT:  You are okay?

6                    THE WITNESS:  I tend to

7          dehydrate.

8                    THE COURT:  I am talking from

9          here it looks like a nasty piece of

10         business, only here.  If your eye is

11         otherwise damaged, I don't know.

12                   THE WITNESS:  No, I can see.

13                   THE COURT:  You're okay?

14                   THE WITNESS:  Yes.

15                   THE COURT:  I want to be sure

16         before we keep going.  Go ahead.

17                   MR. LEINBACH:  She stated she

18         did not know or recall whether or not

19         she ever talked to anybody.  When I

20         asked her to identify the lawyer who

21         is representing her when she received

22         the subpoena, she couldn't identify

23         who the lawyer was or whether she

24         talked to or asked that person to get

25         documents.

1          R. Fang

2          THE COURT:  That's all

3     credibility.  Mr. Lyons will give her

4     advice accordingly.

5          MR. LEINBACH:  When I asked

6     what efforts would be done when we

7     took a break he stated to me the only

8     thing he did was talk to Mr. De La

9     Portez and Mr. Michailidis, and

10    Mr. Michailidis' statement to me is

11    the only thing they did was assume

12    they had already produced everything.

13         There were no additional

14    searches done with regards to

15    documents that related to Rochelle

16    Fang's interest in any companies that

17    she has an interest in.

18         MR. MICHAILIDIS:  That's not

19    true.

20         MR. LYONS:  That's not true.

21         THE COURT:  I made myself

22    clear.  The deposition is finished for

23    today.  I think Ms. Fang and her

24    lawyers should have a little sit down

25    and see how they are going to go about

66

```
 1                    R. Fang
 2          complying with some semblance of
 3          effort with this Order and the
 4          subpoena, tomorrow or whenever you
 5          want to do it.
 6               (Time noted:  4:30 p.m.)
 7
 8          _____
 9                    ROCHELLE FANG
10
11   Subscribed and sworn to before
12   me this   day of        , 2011.
13   _____
14          Notary Public
15
16
17
18
19
20
21
22
23
24
25
```

67

```
 1
 2                    E X H I B I T S
 3    PLAINTIFF'S

      FOR IDENTIFICATION      DESCRIPTION        PAGE
 4
 5    1        Subpoena duces tecum ad            13
 6             testificandum
 7    2        Letter dated May 26, 2011          27
 8    3        E-mail dated June 15, 2011         35
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

68

```
 1
 2                    C E R T I F I C A T E
 3            I, LORI CERRANO, hereby certify that the
 4      DEPOSITION of ROCHELLE FANG was held before me on
 5      the 22nd day of August, 2011; that said witness was
 6      duly sworn before the commencement of the testimony;
 7      that the testimony was taken stenographically by
 8      myself and then transcribed by myself; that the
 9      party was represented by counsel as appears herein;
10            That the within transcript is a true record
11      of the DEPOSITION of said witness;
12            That I am not connected by blood or marriage
13      with any of the parties; that I am not interested
14      directly or indirectly in the outcome of this
15      matter; that I am not in the employ of any of the
16      counsel.
17            IN WITNESS WHEREOF, I have hereunto set my
18      hand this 24th      day of  Aug      , 2011.
19
20            - - - - Lori Cerrano
                          LORI CERRANO
21
22
23
24
25
```

```
1
2                         ERRATA SHEET
          PAGE/LINE                 CORRECTION
3         _____      _____
4         _____      _____
5         _____      _____
6         _____      _____
7         _____      _____
8         _____      _____
9         _____      _____
10        _____      _____
11        _____      _____
12        _____      _____
13        _____      _____
14        _____      _____
15        _____      _____
16        _____      _____
17        _____      _____
18        _____      _____
19        _____      _____
20        _____      _____
21        _____      _____
22        _____      _____
23        _____      _____
24        _____      _____
25
```

## A

ability 9:24
able 47:14 55:24
absolutely 17:6 22:20 23:9 29:8
    38:7 39:15 42:13
accommodate 9:17
accomplish 62:7
accountant 12:18,20,25 42:25
    43:7 49:17 51:10
accountants 13:6,7 42:21 51:17
accurate 38:5 40:8
acting 61:13
action 3:13
acts 51:11
ad 13:16,21 46:25 67:5
addition 3:9 50:20
additional 65:13
address 4:10 10:6,9,12 11:12
    13:22
addressed 13:21 35:16
administered 52:14
advice 11:19,20 65:4
advised 7:12
advisor 11:10 56:12
advisors 13:11 18:25 39:8,11
    49:19 53:12
affairs 53:3,10
affidavit 35:18,20 36:5 44:10
afternoon 7:25
AG 51:2
ago 23:21 41:20 47:12 56:23
agree 62:2
AGREED 3:3
agreement 48:13 55:5
ahead 50:6 64:16
Alan 22:22 27:10,14 30:19,24
allowed 26:16 47:9
answer 8:19 18:21 19:24 26:18,19
    34:7 55:8
answered 63:3
answering 8:18
anybody 27:13 64:19
apartment 4:11 18:18
apologize 50:15
appearance 48:21
appears 47:11 68:9
appropriate 33:5
April 13:24 28:14
arguably 5:9,13 36:11 47:4

arrangements 54:3
asked 16:18,24 19:11 27:9 31:22
    33:17 34:19 37:11 43:13 44:4,7
    51:6 58:11 62:25 63:16 64:20,24
    65:5
asking 19:23 61:6
assume 44:25 63:22,22 65:11
Attached 35:17
attempt 9:11
attention 50:3
attorney 3:24 14:15 20:21 21:25
    22:2 29:9,21 30:3,4,6,8,14 31:14
    40:14
attorneys 2:4,9,14 3:4 51:11,16
    55:4
attorney-client 21:23
August 1:12 68:5
available 7:20
Avenue 2:5

## B

B 67:2
back 34:10,12
background 6:10
ballpark 10:9,10
bank 4:14 5:2 6:12 7:13
bar 3:11
BARRISTER 1:23
Barry 26:21
based 52:5
beat 63:13
begins 32:24
begun 3:16
behalf 54:24
belief 61:21
believe 26:17 30:19 34:16 38:5,8
    38:10,12 42:4,7,9,20 44:21
    45:24 52:10 55:16 59:12 63:21
bench 7:18
best 15:6
blank 15:19 28:9
blocking 51:13
blood 68:12
bonds 39:18
books 53:2 57:12 60:16,21
bottom 32:24
bought 51:19
boyfriend 26:13
boyfriend's 26:14

break 9:15,20 46:13,15,18 65:7
breakfast 19:10
briefly 8:9
bright 11:6,8
bring 6:7,23 7:4,9 50:2
broad 39:3 59:23
Broadway 1:23 2:10
brother 59:4
brought 50:17,19,21 58:14
Bryan 2:6 7:25 61:15
building 62:4
burdening 59:12
business 39:5 58:4 64:10
businesses 54:9,14 57:15
buy 40:4,6,10

## C

C 2:2 4:2 68:2,2
call 14:15 53:7,19,25
called 15:15 16:16
calls 4:22,24 21:22
Canada 17:19 48:8
capacity 61:14
Capital 11:15 53:15
caption 21:19 35:19
captioned 24:6
care 53:10,18 58:20
carefully 9:2
catch 42:2
caveat 9:18
Centre 1:11
CERRANO 68:3,20
certain 56:13
certainly 19:3 22:7
certify 68:3
chambers 46:21
charge 3:25
check 7:19
checkbooks 57:12
cheekbone 63:25
chose 39:7
circumstances 30:17
claim 59:6
clear 7:4 18:21 19:23 33:22,23
    42:18 65:22
client 47:19 48:6
clue 31:14
colleague 59:18
collect 19:12 20:16 21:8

collected 4:15
collecting 20:6
come 14:21 47:14
comes 11:2
coming 46:5
commencement 68:6
communication 21:24 44:18
communications 44:12
companies 4:21 5:20,20,23 12:7
    44:14 46:3 65:16
company 11:14 42:17
complained 25:19
complete 52:10
compliance 47:16
comply 33:8 49:24 56:16
complying 50:12 62:21 66:2
concern 55:9
concerned 34:18
concerning 44:19
concerns 22:8
concierge 14:23
Conduct 3:6
connected 68:12
connection 50:11 57:21 58:23
considering 25:25
consist 60:23
contact 20:12 31:8 34:24
contacted 29:20 30:3 35:2
contempt 33:7,12,15,19 34:4,21
    54:21
contents 27:15
context 23:13
continuously 10:12
control 63:17
controlled 3:20 12:8 52:20
controls 54:12
conversation 30:23 36:3,7
conversations 22:24 44:25 45:2,4
    45:6,11,14,19,20,22 52:8 61:16
    61:17
copied 35:23
copies 54:18
copy 3:23 47:4 48:11
correct 39:6 59:5
CORRECTION 69:2
correctly 58:5
counsel 3:18 57:4 59:24 61:10,20
    68:9,16
country 53:17

County 1:2 33:6
course 16:17 46:5 55:15 60:2
court 1:2,11 8:22 33:6,7,12,16,19
    34:21 46:22 47:21 48:2,16 49:2
    49:16,23 50:6,11,16 51:13,23
    52:3,13,17,25 53:5,9,13,18,22,25
    54:7,12,17,25 55:6,10,14,20
    56:5,6,9,22,25 57:18,25 58:9,13
    59:25 60:6,13,18,21 61:3,25
    63:3,9,13,19 64:5,8,13,15 65:2
    65:21
courtroom 47:13
cover 54:2
credibility 65:3
current 10:6 12:20 30:3,3,6,8,14
currently 9:19,23 10:14 11:22
    12:7,18 37:18
C.B 2:16
C.P.L.R 3:5,19

—————
D
—————

D 2:6
damaged 64:11
dangerous 24:22
date 13:18 27:22 28:24 30:5 32:24
    35:13
dated 13:23 27:19,25 35:10,16
    67:7,8
daughter 23:24 25:21
daughters 26:6,8
David 23:20
day 50:14 66:12 68:5,18
De 24:17 59:18 65:8
deal 55:10
dealing 59:20
deemed 3:18
defendant 1:7 2:9 48:11
dehydrate 64:7
demanded 54:17
deposed 8:3,4,6
deposition 1:9 3:14,21 8:10 49:7
    65:22 68:4,11
Depositions 3:6
derelict 57:9
derived 48:17,18
DESCRIPTION 67:3
Desmond 2:16 30:20 35:16
determine 55:15
different 9:11 19:5 39:20

directed 49:23 54:8
directing 46:23
directly 56:14 57:24 68:14
disclosure 21:23
discussing 16:9
divorce 8:5
document 14:2,4,9 15:10,13 28:3
    28:5,17 36:17,24 37:3,15,16
    59:23
documents 5:12 7:22,23 15:2,3
    16:13 18:11,16,19,23 19:12 20:6
    20:16 21:4,8 31:16 32:25 33:2,4
    42:6,10,22 43:8 44:5 47:5 49:9
    49:14 50:9 51:18 52:11 56:4
    60:4 63:17 64:25 65:15
doing 57:15 59:6
door 62:5
doorman 14:23 15:4,10,13 16:14
double 7:19
doubt 19:14,15 37:4
draft 36:8
Duane 2:9 22:12,15,16
duces 13:15,21 46:25 67:5
due 55:15
duly 4:3 68:6

—————
E
—————

E 2:2,2 4:2,2 67:2 68:2,2
earlier 44:24
early 28:13
easily 35:5
easy 9:12 59:21
effort 36:9 60:3,8 66:3
efforts 65:6
either 18:25 23:15 37:13 42:20,21
    62:9
Elana 25:23
Eli 62:5
ELLMAN 2:4
embarrass 63:23
employ 13:7 68:15
employed 10:14,16
encompassing 59:23
enforcing 47:6
entities 48:24 49:11 60:20,22
entity 51:3 60:25
ERRATA 69:2
especially 16:17
ESQ 2:6,11,16

essentially 6:18
estate 57:21
Evan 24:25
EVANGELOS 2:11
Eventually 43:10
evidence 4:24
evidences 5:2
exact 28:22
examination 3:9,11,16,18,24 4:6
examined 3:15,25 4:5
exception 44:11
Excuse 55:20
Exhibit 13:14,17,20 27:18,21,24
   28:3 32:17,20 35:9,12,15 43:25
   44:9
exists 57:9
explain 8:9 49:6 59:21
explained 47:10 57:5
expression 24:20
extent 21:22 35:25
eye 64:10
eyes 14:14
e-mail 35:10,15,17,24,25 67:8

**F**

F 4:2 68:2
face 24:21
fail 33:4
failed 50:3
failing 54:21
failure 3:9,17 33:8
Fair 25:13
fairly 7:4 41:21
familiar 8:11 28:21 37:6,7
family 12:9 25:9,12 63:11
Fang 1:10 4:1,9,25 5:1,17,24,25
   6:1,2 7:1 8:1 9:1 10:1,5 11:1
   12:1 13:1,22 14:1 15:1 16:1 17:1
   18:1 19:1 20:1 21:1,15 22:1 23:1
   24:1 25:1 26:1 27:1,25 28:1 29:1
   30:1 31:1 32:1 33:1,11 34:1 35:1
   35:21,23 36:1,14 37:1 38:1 39:1
   40:1 41:1 42:1 43:1 44:1 45:1
   46:1,24 47:1 48:1 49:1,8 50:1
   51:1,9 52:1 53:1 54:1 55:1,20
   56:1 57:1 58:1 59:1 60:1 61:1
   62:1 63:1 64:1 65:1,23 66:1,9
   68:4
Fang's 48:14 65:16

far 37:21,22 38:3 49:8
father 10:22,25
father-in-law 55:23
feel 34:24
filing 3:21
finally 17:22 36:8
financial 11:10 13:10 18:24 39:8
   39:11 49:18 53:2,10 54:2 56:12
   60:25
find 57:8
fine 10:9 46:19 63:12
finish 43:18 44:16 50:13 53:22
finished 65:22
firm 22:15,17 26:24 27:4,7
first 4:3 8:3 17:24 25:5 42:3 62:8
   63:10
five 44:10
follow 62:13
follows 4:5
fool 55:11
Forbes 53:17
forget 35:5
form 3:8 11:2
found 17:18 54:21
frame 28:18
frankly 61:24
free 39:22,24 40:2
friend 23:23 24:15
front 32:21
fully 62:17
functioning 63:21 64:2
funds 57:19
funny 56:18,20
furnished 3:24
further 3:23 55:24

**G**

G 4:2
Gary 11:8,25 49:21 53:14 58:8
Gayer 12:21,22,24 13:3,5 20:6,10
   49:18,24 51:10 61:17
general 51:12
Genger 1:3,6 11:7,18 12:9 13:9,10
   16:8 18:25 19:12 21:12,13 25:7
   25:7,8 29:18 35:19,19 39:12,19
   40:9,12,13,13 49:20 51:11,16
   55:2,19,22 57:8,20 58:15,16
   59:16
Gengers 58:19

Genger's 58:4
gentleman 54:4
Gerald 23:17
Gerard 27:10
getting 29:3
give 9:25 10:6,19 11:12 60:6 65:3
given 8:14
glaze 14:15
go 5:16 6:16 34:16 50:6 62:14,17
   63:4 64:16 65:25
going 7:17 8:9,12 36:5 37:9,12
   46:4 60:11 62:5 64:16 65:25
good 7:25 23:23 42:2 58:16
gotten 28:23 52:6
granting 46:23
great 39:3
grounds 36:12
guess 16:6 39:11
guy 58:2
G-A-Y-E-R 12:21

**H**

H 4:2 67:2
half 61:15 62:6
hand 68:18
hands 58:22
happened 35:3 41:22
happening 24:8
hard 62:13 63:20
head 59:15,15
heard 26:24 61:18
hearing 5:7
held 1:11 33:12,19 34:4 68:4
hell 41:16
hereto 3:4
hereunto 68:17
hide 61:20
highly 35:6
histories 60:17
history 60:25
holding 33:7 34:21
home 63:4
honest 19:6 52:24
honestly 12:10 37:8,11
Honor 47:20 48:10,20,22 60:15
   62:25
hope 58:2
hour 7:19
hours 62:6

hysterical 29:3

## I

idea 7:16 16:18 17:20 19:18,21
  28:24 43:13,15,21 50:8
identification 13:18 27:21 35:12
  67:3
identified 49:19
identify 50:25 51:2 64:20,22
imagine 39:21
impair 9:24
important 26:15
included 41:14
including 3:7 33:6
income 4:24 5:16 10:20 11:2
incoming 61:10
incorrect 59:5
Index 1:4
indirectly 68:14
individual 49:21,21
inform 40:5
information 36:2 59:9,11
inheritance 10:23 11:3
inherited 10:22,25
inquiries 51:8,15
instructed 48:21 51:20
instruction 9:13,21
instructions 9:6
interest 37:19 38:9,13,15 40:20
  41:2,3,5,7,11,12,21 45:13 48:7
  54:10,15,20 65:16,17
interested 38:22 58:10,14,18
  68:13
Interesting 15:18
interfering 64:2
introduced 30:14,20
invest 57:14
invested 12:7
investing 12:3
investment 11:19
investments 11:4,5,21 12:2,6,15
  19:4 39:2,19 53:19 54:2 56:13
  57:11 63:7
invests 11:20 39:17,20
involved 32:16
irrelevant 30:19
issue 4:21 36:9 50:4 57:13 60:11
issued 62:22
items 61:22 62:11

## J

Jacqueline 23:17 27:10,14
jail 34:16
jarred 20:20
job 38:21
Joe 62:2
John 24:17
Jonas 12:21
Judge 5:6 6:6 7:3,17 46:21 57:17
July 46:22 47:7,22
June 35:10,17 67:8

## K

keep 52:25 64:16
keeping 58:17
kept 58:16
kidding 43:12
kind 6:14 19:4 24:19,21 39:18
kinds 14:19 39:17
knew 21:5,7 37:21,22
Knollwood 2:15
know 6:11 7:10 11:13,14,23,24
  12:2,5,10,12,16,17 14:7 15:7,20
  16:3,5,15,20,25 17:17,22,24
  18:17,20 19:20,20 22:2 23:13,22
  23:25 24:9,18 25:25 27:3 29:11
  29:12,13,16 30:5,5,11,13 31:8
  31:12,20 32:2,3,8,8,9,10,13,15
  37:8,24,24 38:2,3,3,20 39:6,8,12
  39:23 40:12,21 41:4,15,16,19
  44:2,6,8 45:10 46:3,6,8 48:5
  49:14 52:23 57:25 58:21 62:9
  64:11,18
knowledge 37:18 40:10
knows 62:20 63:6
KRAUSE 2:4
K-1's 51:7

## L

L 3:2 4:2,2
La 24:17 59:18 65:8
LaTessa 25:18
law 22:15,17,18 26:24 27:7
lawsuit 44:19 59:3
lawyer 15:15,16,17,18,21 16:12
  18:9 20:15 23:2,5,6 31:21 32:11
  32:14 36:10,10 56:3 62:23,23
  64:20,23
lawyers 42:22 44:4,12 65:24

learn 41:6,10,12
learned 17:24 21:3 38:19 40:19,25
  45:12
lecture 34:3
left 63:24
legal 14:20 39:3
legible 47:4
Leinbach 2:6 4:7,13,18,23 5:6,11
  5:22,25 6:5,16,23 7:3,16 8:2
  13:13 27:17 33:24 34:5,9 35:4,8
  45:3,7 46:16 47:25 49:4,5,17,25
  50:7,15,23 52:4 55:8,16 62:24
  63:5,12,15 64:17 65:5
length 35:18
letter 27:19,24 29:2,10,21 32:20
  33:22 34:17 43:22,23,24 44:6
  67:7
Let's 37:15 41:24 42:2 44:9
Lexington 2:5
life 19:8 37:10
limited 48:9,12 51:12 55:4
list 60:6,10 62:14,18
listed 49:11 52:20 53:16
listen 9:2 58:13
litigation 21:18,19 22:6 24:5,6
  25:10,15,22 26:11 27:13
little 24:14 55:24 63:20 65:24
living 10:8,11
LLP 2:4,9,14
lock 62:5
locked 62:4
long 7:17 10:8 30:8 31:13 50:14
  62:12
look 13:25 14:2 28:2 32:17 36:14
  37:6,7,15,16,16 41:24 42:3 44:9
  52:20
looked 15:3,7
looking 12:16 13:19 27:23 35:14
looks 28:21,23 63:21 64:9
LORI 68:3,20
lot 37:9 45:22 62:2,7
lovely 11:8
loving 11:6
Lyons 2:14,16 4:16,19 5:4,9,19,24
  6:3,9,12,21,25 7:12,21 15:23,25
  21:21 25:2 26:19 27:9 30:4,10
  30:17 31:3,5,21,23,25 32:3,6
  33:20 34:2 35:16,22 38:14 40:23
  41:8 43:18 44:23 45:5 46:12

47:19,20,24 48:5,10,19 50:17,20
51:15 52:9 54:23 55:3,7 57:10
57:16,23 59:13,17 65:3,20

## M

magazines 43:4
mail 14:25
main 58:7
making 18:15
man 22:21 24:24 63:11
managers 53:17
Marcus 26:21
mark 13:14 27:18 35:8
marked 13:16,19 27:20,23 28:3
35:11,14 36:15 43:24
marriage 68:12
material 44:18 47:8 48:6 50:17
52:20 57:4
matter 24:6 48:4 68:15
McGOVERN 2:14
McLaughlin 26:25 27:7 61:11
mean 13:9 14:16,17 16:7 17:8
18:4 21:19 24:6 25:8 29:13 30:4
30:9,11 33:15 37:23 38:25 40:3
40:9,13 41:6 42:15,19 63:23
meaning 39:4
means 10:24 33:12,15 34:4
medications 9:24
member 12:8
members 25:9,11
memory 14:12 20:22 35:7
mentioned 15:6 20:23 22:7
met 25:4 30:17 58:15
Michailidis 2:11 24:25 25:5 52:9
59:17 60:2,9,15,19,24 61:9 65:9
65:10,18
mind 28:9 46:14
mine 17:11
minutes 47:12
moment 10:20 38:10 59:2
monetary 32:16
money 10:21 53:16 58:2,3,7,7,20
monies 10:23,24
month 61:14
morning 25:3
Morris 2:9 22:13,15,16
motion 3:12 46:23
mouth 51:25
move 3:8,10

musical 24:19
M-A-R-C-U-S 26:23

## N

N 2:2 3:2 4:2
name 4:8 7:25 10:3 11:14 24:17
24:18,23 26:14,22 27:3,14
named 22:21 23:16,19 24:24
26:25 48:25 49:21
nasty 64:9
naturally 60:3
necessary 18:22 56:4 57:4
need 7:22 9:15 33:21 34:3 48:5
50:2
negatively 48:18
nephew 11:8,16 58:8
never 27:13
New 1:2,2,11,12,12,13,24 2:5,5,10
2:10,15 4:4,12,12 13:23,23 33:6
nine 10:10,11
nods 8:23
nonresponsive 61:23
Non-Party 1:9 2:14
Notary 1:13 3:15,15 4:4 66:14
noted 33:25 34:6 66:6
noticing 4:13
number 32:18 35:24 41:24 42:3
49:4
numerous 41:17
N.Y 1:24

## O

O 3:2 4:2
oath 8:14 52:14
object 3:7,10 21:21 33:20 36:5,12
40:23
objection 33:24 34:6 35:23
obligation 55:13 58:23
obviously 41:19
occasion 8:7
occasions 5:8,12
odd 24:21
office 18:19 22:19
offices 59:16
okay 8:24 64:5,13
old 19:8 43:4
once 21:3,7 30:9 32:18 45:12,24
one-bedroom 18:18
opposed 55:23
opposing 61:19

option 51:24
order 4:22,23 5:5 8:25 33:7 46:23
47:7,17,23 56:16 66:3
original 3:17,21 47:3
originally 56:25
Orly 1:3 14:13 35:19
outcome 68:14
outside 50:4
oven 18:23
owned 12:8
o'clock 47:3 62:3,4,16

## P

P 2:2,2 3:2
page 57:7 67:3
pages 35:18
PAGE/LINE 69:2
paper 54:13
papers 14:17,18,19,20,21 18:2,3
42:17 43:3
paragraph 37:17,17 38:5 41:24
41:25 42:3 44:10,11
Parness 23:20,22 24:2,4,11,13
part 3:5 58:6
particularly 62:12
parties 3:4 46:20 47:13 50:10
68:13
partner 51:12
partnership 37:19 38:14 40:20
41:2,4 48:7,9,12,13 55:5
party 68:9
pawn 53:6,8 55:12
pay 31:23 32:6
payment 11:3
pays 31:25 32:3,10,14
penalty 33:18
pending 9:19 46:17
people 46:5 59:13
people's 62:20
person 16:9 39:5 42:25 63:22
64:24
pertaining 48:7
piece 64:9
pile 43:3
place 49:7
Plains 2:15
plaintiff 1:4,10 2:4 33:5
plaintiff's 13:17,20 27:18,20,24
28:3 32:20 35:9,11,15 36:15

43:25 44:9 59:24 67:3
please 4:8 9:9,16 10:3 22:24 26:18
  30:16 33:2 34:7 36:14 53:23
plenty 57:2
point 43:13 46:17 60:4
Portez 24:17 59:19 65:9
portfolio 37:25 38:21,24 39:9
position 59:3
possession 42:5,10,15,17,23 49:10
  49:15 63:17
possible 59:9
post 17:25 18:3,5,6 21:2
power 40:14
prefaced 62:12
preparation 36:4
prepare 12:24
prepared 51:5
prepares 12:22
present 42:21
presented 48:4
presume 61:2,3,7,8
previously 61:12
prior 36:4
probably 16:22,24 28:6
problem 47:16 49:2 52:2
process 8:10
produce 34:22 60:4 61:6,8
produced 7:2 48:11 60:7,12,14
  61:4,22 65:12
producing 61:5
professionally 55:11
professionals 59:7
properties 48:8
property 17:19
proposed 35:20
protects 58:3
provide 33:2,4 43:7 44:4 54:18
provided 3:5,19 7:24
provides 11:18 13:3
Public 1:13 3:15,16 4:4 66:14
purpose 58:25
purposes 36:11
pursuant 1:10
put 51:25
p.m 1:13 66:6

_____ Q _____

question 3:7,10 6:10 8:19 9:4,5,8
  9:18,20 16:2 21:22 26:18,20

34:7,8,10,14 36:2 40:24 41:9
  43:19 44:25 46:17 52:18
questions 8:2,18 9:3 26:16 51:6
  63:2,6
quite 56:23

_____ R _____

R 2:2 4:1,2 5:1 6:1 7:1 8:1 9:1
  10:1 11:1 12:1 13:1 14:1 15:1
  16:1 17:1 18:1 19:1 20:1 21:1
  22:1 23:1 24:1 25:1 26:1 27:1
  28:1 29:1 30:1 31:1 32:1 33:1
  34:1 35:1 36:1 37:1 38:1 39:1
  40:1 41:1 42:1 43:1 44:1 45:1
  46:1 47:1 48:1 49:1 50:1 51:1
  52:1 53:1 54:1 55:1 56:1 57:1
  58:1 59:1 60:1 61:1 62:1 63:1
  64:1 65:1 66:1 68:2
Ran 11:8,10,16 12:2 13:9 17:4
  18:25 19:3 39:14 40:9,14 49:22
  53:14 58:8
Ran's 11:12
read 15:5 32:23 34:9,11
reads 37:17 44:11
real 57:21 58:2,3
really 16:4,25 23:12 30:5,6 41:23
  45:15 53:4 56:18 59:21
reason 56:9
recall 5:11 8:8 13:4 14:8 15:6 18:8
  18:10,15 20:2,4,5 22:3,9 23:7,18
  24:10 26:3,5,10 27:6 29:17,19
  29:20,22,23,25 30:2,21,23 31:2
  31:17,18,19 34:17 36:19,20,21
  36:22,23 37:5 40:17,18 44:3
  45:16,17,18,21 64:18
received 15:12 16:13 28:11 29:10
  29:21 32:25 34:18 43:22 59:22
  64:21
receiving 18:6,9 28:16,20 31:16
recognize 28:5,6,7
recollection 20:20 37:2
recommended 31:3
reconvene 62:15
record 4:8 6:17 10:4 34:11 68:10
records 6:12,19,24 7:5,9,14 53:2
  57:12 60:16,22
redact 51:24
redacted 48:22 50:24 51:21,22
redacting 47:10 50:21

referred 5:23 47:5
referring 5:21 15:9
refers 36:2
reflect 5:15 7:5 48:16 54:19
refresh 14:12 36:25
regard 19:13 20:13,16 40:14
regards 8:18 18:16 65:14
reign 39:22,24 40:2
relate 4:20 5:13 42:23 43:8 49:10
related 48:24 51:3 54:13 65:15
relates 45:2,3
relating 44:13
relevant 26:17
relied 63:10
relief 33:5
remember 14:7 15:2,15,17 16:4
  16:16,23 17:2,3,22 18:12,13
  19:6,7,9,9,11,14 20:8,18 21:9,10
  23:12,15 24:20 26:2 27:16 28:10
  28:13,15,16,18,20,25 29:4,5,7,8
  29:14,15,16 30:7,12 31:6,13,22
  35:3 37:12 40:16,21,22 41:23
  43:17 45:15,23 61:11 63:18
repeat 41:8
repeatedly 49:13
reporter 8:21,22 34:12
REPORTING 1:23
representative 61:13
represented 30:9 61:12 68:9
representing 59:8 64:21
request 30:19 55:21 56:3
requested 7:23 33:3,4 50:9 56:2
requests 59:24
reserved 3:9,12
resistance 48:3
resolve 36:9
respect 59:6
respective 3:4
respond 9:3,19 46:24
response 49:3,5,6 63:6
responsibility 61:5
responsive 4:17,20 5:10,13 7:24
  42:6,24 47:5 52:11 60:5,7 61:23
  62:10
retained 31:20
return 3:17
returnable 57:2
returns 12:17 20:11 47:9 48:14,15
  48:23 50:21,22

**right** 3:7 28:4 32:7,21 38:23 47:19
    47:23 59:5,25
**rights** 3:5,19
**River** 17:9
**Riverside** 15:6 16:24 17:10,16,17
    17:18 19:19 20:24 21:3,7 34:23
    37:20,25 38:13 40:20 41:13,21
    42:11 43:5,9 44:13,13 45:8,13
    46:2 48:8,12,20,24 49:10 51:4,8
    60:19,22
**Road** 2:15
**Rochelle** 1:9 4:9 10:5 13:22 27:25
    35:21 65:15 66:9 68:4
**role** 54:5
**Rule** 3:19
**rules** 3:6 8:12
**runs** 53:15
**R-A-N** 11:9

——————————— S ———————————

**S** 2:2 3:2,2 67:2
**Sagi** 1:6 11:7 12:12 13:10 16:7
    17:2 19:5 25:8 29:18 35:19
    39:12 40:13 49:20 57:8,20 58:4
    59:16,19 61:12
**Sagi's** 58:21 62:22
**Sash** 22:22,25 23:4,8,11,14 27:10
    27:14 30:19,24 31:2,10
**saw** 28:8 36:20
**saying** 5:14,18 6:18 26:2 37:4,5
**says** 56:11
**scribble** 47:11
**search** 18:10,15,22 21:4 52:11
**searches** 65:14
**searching** 18:19
**second** 32:23 44:10
**see** 4:14 7:19,21 14:14 32:22 33:9
    37:5,13 47:14 64:12 65:25
**seeing** 36:19,21,22 37:5
**seek** 33:5
**seen** 14:4,8 36:17 37:2,10
**selecting** 39:4
**sell** 40:4,6
**semblance** 66:2
**sentence** 32:24 44:20,21 53:23
**separate** 58:16,17
**seriously** 59:14
**served** 14:23 47:22
**SERVICE** 1:23

**services** 13:2 31:23,25 32:4,6
**set** 68:17
**settlement** 36:11
**SHEET** 69:2
**Shirley** 25:18
**show** 6:13 7:14 14:11 36:25 62:3
**showing** 47:2
**siblings** 59:8
**sister** 25:16,17,18,19 58:24 59:4
**sisters** 25:19
**sit** 38:6 42:4 44:22 45:25 57:3,7
    65:24
**skin** 63:25
**slip** 21:14
**Solomon** 5:6 6:6 7:3,17
**Solomon's** 46:21
**somebody's** 53:5
**son-in-law** 11:7,25 16:6,7,21
    19:25 20:3 22:5,9 23:24 29:18
    32:9,10,14 38:2 41:14 49:20
    54:4,16 55:22 56:3,7
**son-in-law's** 27:4 54:9,13
**sorry** 12:23 21:14 43:20 44:17
    53:24
**sort** 15:7 18:10 21:4 30:18 41:20
**sought** 57:5
**sounding** 24:23
**sounds** 7:6,7 24:18,22 52:5
**source** 10:20
**spaces** 52:19
**speak** 17:4 18:24 19:3,5,25 20:9
    20:10,10 22:5,12,18 24:13 26:9
    27:12,14 29:9 31:5 55:25 59:18
**speaking** 20:2,19 26:3 27:6,6
**specific** 14:24
**specifically** 6:7
**spoke** 16:11 18:8 20:5 23:10,14,25
    24:9,10 25:11,15 26:11 27:13
    29:6,7,17,23 31:6 44:3 45:23
    59:19
**spoken** 21:17 22:21 23:16,19 24:4
    24:16,24 25:8,21
**stand** 52:15
**standing** 55:17
**starters** 6:18
**state** 1:2,13 4:4,8 8:20 10:3 35:22
**stated** 6:7 26:12 45:13 46:9 49:13
    50:7 64:17 65:7
**statement** 42:5,7 45:25 65:10

**statements** 4:14 5:3,15
**stenographically** 68:7
**Stern** 26:25 27:8 61:11
**STIPULATED** 3:3,23
**stocks** 39:18
**Street** 1:11 4:11 10:7 13:22
**stressed** 35:6
**strike** 3:8,10
**stuff** 14:13,16 39:18
**subpoena** 1:10 4:17,21 5:21 13:15
    13:20,23 18:5,6,9,16 19:2,13,19
    20:13,17 21:2,20 24:7 26:12
    31:16 33:3,8,23 34:25 36:10
    42:6,24 46:4,6,24 47:6,21 48:25
    49:12 50:12 52:12,21 54:8 55:18
    56:17,23 62:21 64:22 66:4 67:5
**Subscribed** 66:11
**suggest** 56:15
**suggestion** 7:18
**supposed** 23:2 37:9 51:21
**Supreme** 1:2,11 33:6
**sure** 7:8 9:16 12:10 15:24 25:11
    28:8 30:18 32:15 35:2,5 40:11
    40:24 44:7 63:24 64:15
**sworn** 3:14 4:3 8:14 35:20 66:11
    68:6
**S&P** 39:18

——————————— T ———————————

**T** 3:2,2 67:2 68:2,2
**table** 58:15
**take** 8:21 9:15,20 13:25 14:2 28:2
    36:14 37:15 46:12,18 53:10,18
    62:15
**taken** 1:10 68:7
**talk** 45:22 46:2 56:6,11 65:8
**talked** 16:20,23 64:19,24
**talking** 17:14 45:8 46:4 48:2
    61:25 62:8 64:8
**tax** 12:16 20:11 47:8 48:14,15,23
    50:21,22
**taxes** 12:22,24 13:3
**tecum** 13:16,21 46:25 67:5
**Telemus** 11:15 53:15
**tell** 8:14,25 9:9,16 10:19,24 11:21
    11:24 12:14 14:13,18 19:16
    22:24 25:14 28:21 30:16 44:7
    50:18 51:24 55:21
**telling** 23:3 35:3

ten 53:16
tend 35:5 64:6
term 39:6
terms 60:24
testificandum 13:16,21 46:25
    67:6
testified 4:5 40:25 41:3 45:6 49:8
testify 15:23,25 35:24 44:23
testifying 36:6
testimony 3:8,11 9:25 52:7 68:6,7
thing 65:8,11
things 5:14 6:6 10:21 12:6 14:14
    23:3 34:19 35:5 37:9 39:17
    40:10 41:14 50:25 57:19 59:13
think 6:4 12:13 14:24 15:15 21:9
    24:8 33:14,21 34:2 41:2 52:4
    56:19,20 57:9 60:10 65:23
thought 59:10
tight 62:4
time 14:2,22 16:12 20:15,23 23:25
    24:9,10 25:6 27:5 28:18 35:6
    38:11 56:23 57:3 66:6
times 41:17
today 6:8,20,24 7:5 9:25 25:5 38:6
    42:4 47:2 48:6 51:20 52:3,14
    55:17 62:17 64:3 65:23
told 17:2,21,23 20:24 22:10 27:15
    30:24 40:22 41:17 46:5 58:2
    61:4
tomorrow 62:16 66:4
top 53:16
totally 15:19 28:9
transaction 60:16
transactions 57:22
transcribed 68:8
transcript 68:10
transfer 57:19
transfers 4:25 5:16 6:13,15 7:6,11
    7:13,14 57:14
translate 8:22
treated 58:22
trial 3:13
tried 56:16
true 42:7 44:15,21 45:25 65:19,20
    68:10
truth 8:14,25 14:14,18 46:8
truthful 9:25
try 51:17
trying 15:14 41:18 56:20 59:7

61:19,20
two 26:7,8 35:18 41:25 53:11 62:6
T-E-L-E-M-U-S 11:15

U

U 3:2
understand 6:17 7:8 8:12,13,15
    9:4,6,8,10,12,13,21 15:24 16:2
    23:4 33:11,18 34:5 41:18 42:14
    42:18,19 43:6 44:20 45:7 46:7,9
    54:7 57:6 63:15
understanding 60:12
understood 37:14 47:15
unfortunately 50:2 61:9
Uniform 3:6
universe 56:13
unredacted 50:22,24
unrelated 59:13
upsetting 16:17
use 57:20 59:15 62:17
useful 59:10

V

vaguest 16:18 17:20 19:21 43:13
value 57:19
versus 35:19
violation 55:12,18

W

waived 3:22
waiver 3:12,18
want 6:17 7:7 46:7,12 52:3 58:21
    63:23 64:15 66:5
wanted 47:15
wants 39:22
wasn't 18:22 23:6
way 9:11 34:20 59:21
week 38:18,19 41:20
went 28:9 46:20
West 4:11 10:7 13:22
WHEREOF 68:17
White 2:15
wish 40:4
witness 1:9 2:14 3:14,25 6:11,14
    15:22 34:13 43:20 46:14 52:6,16
    52:22 53:4,7,11,14,21,24 54:6
    54:11,16 56:2,8,19,24 58:6,11
    62:10,18 64:4,6,12,14 68:5,11
    68:17
woman 63:10

wondering 24:20 41:22
word 33:14 39:3,5 42:14,19
wording 28:22
words 51:25 57:6
work 13:6 61:19 62:20
wouldn't 19:21 25:12 46:14 53:7
    57:23
wrong 59:5
wrote 46:22

X

x 1:3,7 67:2
xxxxx 2:19

Y

year 12:15
years 10:10,12,17 19:8
yesterday 19:10
York 1:2,2,11,12,12,14,24 2:5,5
    2:10,10,15 4:4,12,12 13:23,23
    33:6
young 24:14 35:4

Z

ZEICHNER 2:4

1

1 13:14,17,20 35:24 49:4 62:11
    67:5
10 10:16 62:16
10:00 47:3
10006 2:10
10022 2:5
10023 4:12
100697/08 1:4
10271 1:24
10603 2:15
120 1:23
13 67:5
14A 4:11
15 35:11,17 67:8
1540 2:10

2

2 27:18,21,24 28:3 32:18,20 43:25
    62:3 67:7
2:30 1:12
20 47:12
2006 48:14
2009 48:15

**2011** 1:12  13:24  27:20,25  35:11,17
  66:12  67:7,8  68:5,18
**212-732-8066** 1:24
**22nd** 1:12  68:5
**221** 3:5
**25** 46:22  47:7
**253** 4:11  10:7  13:22
**26** 27:20,25  67:7
**27** 13:24  67:7

---
**3**

**3** 35:9,12,15  36:15  44:9  67:8
**31** 33:3
**3116** 3:19
**35** 67:8
**399** 2:15

---
**4**

**4** 37:17,17  38:5
**4:30** 62:6  66:6

---
**5**

**5** 41:24  42:3  62:4
**5s** 41:25
**575** 2:5

---
**6**

**60** 1:11
**68** 19:8

---
**7**

**73rd** 4:11  10:7  13:22

---
**8**

**8** 62:11