SURROGATE'S COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

---

In the Matter of the Application of ORLY
GENGER, as a person interested, for the
removal of DALIA GENGER, as Trustee of the
Orly Genger 1993 Trust pursuant to SCPA § 711(11)

---

File No. 0017/2008



New York County Surrogate's Court
MISCELLANE ... EPT.

FEB 1 4 2013

FILED
Clerk_____

## SWORN STATEMENT OF ORLY GENGER
## IN SUPPORT OF HER ORDER TO SHOW CAUSE

STATE OF NEW YORK      )
                       ) ss.:
COUNTY OF NEW YORK  )

**ORLY GENGER**, being duly sworn, deposes and says the following:

1.      I am the Petitioner (the "<u>Petitioner</u>") in the above-captioned proceeding.  I am also the sole present beneficiary of the Orly Genger 1993 Trust (the "<u>Orly Trust</u>"). Respondent, Dalia Genger ("<u>Dalia</u>")[1], is my mother and the sole Trustee of the Orly Trust.

2.      The relief I seek is narrow, but crucial – to continue restraining Dalia from prosecuting an unnecessary, duplicative litigation specifically designed to destroy the only asset in my Orly Trust she has not already destroyed.  Sixteen months ago, the New York Supreme Court immediately stayed this "Delaware Chancery Action," and it remains partially restrained to this day.  I simply ask that this Court stay Dalia from proceeding with the Delaware Chancery Action until my Petition to remove her is decided.

### THE REQUESTED RELIEF

3.      I submit this Affidavit in support of my Order to Show Cause and Motion (the "<u>Motion</u>") for an Order:

---

[1] Unless otherwise defined herein, capitalized terms utilized in this Affidavit shall have the same meanings ascribed to them as in the Third Amended Petition (the "<u>TAP</u>").

(a) Granting Petitioner's Motion for a preliminary injunction enjoining Dalia, together with any and all of her agents, assigns, employees, representatives, attorneys, and/or anyone acting on Dalia's behalf either directly or indirectly or in concert with her, from: (i) proceeding with and/or taking any action of any kind or nature, with respect to the action Dalia previously commenced in the Delaware Chancery Court entitled, *"Dalia Genger as Trustee of the Orly Genger 1993 Trust v. TR Investors LLC*, C.A. No. 6906-CS" (the "Delaware Chancery Action") including, but not limited to, the continuation of the prosecution of said Delaware Chancery Action; and, (ii) proceeding with any other existing actions or proceedings and/or commencing any future actions or proceedings in the Delaware Chancery Court, and/or any other local, state or federal courts on behalf of the Orly Trust (other than those actions and proceedings which are already pending in the Supreme Court of the State of New York, County of New York) which concern, relate to, pertain to and/or have any effect whatsoever upon any and all assets of the Orly Trust including, but not limited to, the Orly Trust's direct, indirect or beneficial interests in Trans-Resources, Inc. and TPR Investment Associates, Inc; and,

(b) Granting such other and further relief as this Court deems to be just, equitable and proper.

4.    I am also requesting that pending the hearing and determination of this Motion and until further Order of this Court, Dalia Genger, as Trustee, and any and all of her agents, assigns, employees, representatives, attorneys, and/or anyone acting on Dalia's behalf either directly or indirectly or in concert with her are hereby temporarily restrained from: (i) proceeding with and/or taking any action with respect to the Delaware Chancery Action; (ii) proceeding with any other existing actions or proceedings and/or commencing any future actions or proceedings in the Delaware Chancery Court, and/or any other local, state or federal courts on behalf of the Orly Trust (other than in those actions and proceedings which are already pending in the Supreme Court of the State of New York, County of New York) which concern, relate to, pertain to and/or have any effect whatsoever upon any and all assets of the Orly Trust including, but not limited to, the Orly Trust's direct, indirect or beneficial interests in Trans-Resources, Inc. and TPR Investment Associates, Inc., together with such other and further relief as this Court deems to be just, equitable and proper.

## WHY A PRELIMINARY INJUNCTION AND TEMPORARY RESTRAINING ORDER ARE NEEDED

5.    I need a preliminary injunction and temporary restraining order to enjoin Dalia, from, *inter alia*, continuing to prosecute the Delaware Chancery Action she filed as part of legal maneuver to rob the New York Supreme Court of jurisdiction,  Dalia's prosecution of the Delaware Chancery Action: (i) is an unnecessary waste of Orly Trust assets; (ii) will rob me of my chosen forum; (iii) is an integral part of her scheme with my brother, Sagi Genger ("Sagi"), to pledge, encumber, transfer, dissipate and loot all of Orly Trust's assets; (iv) is an egregious breach of her fiduciary duties to me and the Orly Trust; and, (v) will result in irreparable injury to me and the Orly Trust.

6.    Dalia purports to bring this Delaware Chancery Action to obtain a declaration that the Orly Trust beneficially owns the Orly Trust TRI Shares (defined below). However, the same Delaware Chancery Court previously ruled against the Orly Trust, determining the Orly Trust did not have a beneficial ownership interest in the Orly Trust TRI Shares.

7.    The Delaware Supreme Court overturned this ruling on a crucial technicality, finding that the Chancery Court lacked personal jurisdiction over the Orly Trust because the Orly Trust was not a party to that action. Dalia's Delaware Chancery Action is designed to cure this jurisdictional defect that protects the Orly Trust, and subject the Orly Trust to the jurisdiction of a court that already has ruled against the Orly Trust. There is no other reason for Dalia bringing this action in Delaware, instead of New York.

8.    If Dalia is allowed to continue her prosecution of the Delaware Chancery Action, a Court pre-disposed and almost certain to rule against the Orly Trust's interests, the Orly Trust TRI Shares will be stripped from the Orly Trust and revert back to TPR (i.e., to my brother, Sagi).[2]  Indeed, as set forth below, Dalia's past actions show that she has previously

---

[2] As set forth in my TAP, Dalia was responsible for improperly placing Sagi in complete control over TPR and thus, in a position of power over Petitioner by allowing Sagi to control the management and majority ownership of TPR. Thus, for all practical purposes, TPR and Sagi are one and the same. What benefits TPR benefits Sagi. Dalia and TPR (i.e. Sagi) previously orchestrated the sham foreclosure sale of the Orly Trust's only other significant asset,

taken action to dissipate the Orly Trust's assets in contravention of her fiduciary duties to me, as the sole present beneficiary. As a result, Dalia should not be allowed to take further action to harm me by continuing to prosecute the Delaware Chancery Action in a venue and in a manner that is contrary to my interests.

9.     Beneficial ownership should be decided in New York, in an action brought and prosecuted by me, rather than by someone like Dalia who already has shown herself unfit to be Trustee. (For a full description of Dalia's various wrongful acts as a trustee, see the TAP and the Hochberg Affirmation filed contemporaneously herewith). Indeed, the Delaware Supreme Court stated that who owns the Orly Trust TRI Shares should be determined in New York – where my New York TRI Action (defined below) is pending. Ignoring this instruction, Dalia is wasting my Orly Trust assets by hiring additional Delaware counsel to start a new proceeding in a foreign jurisdiction, rather than just proceeding in New York. The Delaware Chancery Action has been stayed for over a year without prejudice to Dalia or the Orly Trust, and all other parties to the Delaware Chancery Action remain stayed.

10.     Finally, there is no reason why Dalia must prosecute the Delaware Chancery Action now, prior to the Surrogate Court ruling on my petition to remove Dalia.

11.     Dalia now claims a recent decision as to her personally now allows her to continue her harmful Delaware Chancery Action as the Trustee of my Orly Trust. She is wrong. This motion to restrain Dalia follows.

### I COMMENCED THE NEW YORK TRI ACTION ON BEHALF OF THE ORLY TRUST TO PROTECT MY INTERESTS IN THE ORLY TRUST TRI SHARES

12.     In 2004 as part of my father Arie and mother Dalia's divorce settlement,

---

its interest in shares of TPR which caused the Orly Trust's interest in the shares to be stripped away. Petitioner commenced a separate action against Dalia, TPR and Sagi as a result of their actions taken in regard to this sham foreclosure sale which is still pending before the Court in New York (defined in the TAP as the "New York TPR Action"). Dalia and Sagi's scheme to strip away the Orly Trust's shares of TPR is also connected to their scheme to strip the Orly Trust of the Orly Trust TRI Shares, because Sagi's control over TPR also means control over the Orly Trust TRI Shares.

TPR transferred its 52.85% interest in TRI[3] as follows: (i) 13.99% to Arie (the "Arie TRI Shares"); (ii) 19.43% to the Orly Trust (previously defined as the "Orly Trust TRI Shares"); and, (iii) 19.43% to the Sagi Trust (the "Sagi Trust TRI Shares"), (collectively, the "2004 Genger TRI Transfer")[4] The 2004 Genger TRI Transfer was also made in furtherance of the Genger family estate plan that both my brother, Sagi, and I should share equally in the family's wealth.[5]

13. Unbeknownst to me, in August 2008, Rochelle Fang, the Trustee of the Sagi Trust for only two weeks (and Sagi's mother-in-law) and Sagi, as President of TPR, attempted to sell the Sagi Trust TRI Shares to various entities controlled directly and indirectly by Jules and Eddie Trump (the "Trump Group") for the sum of $26.7 million dollars.[6]

14. At the same time and without my prior knowledge, Sagi, as President of TPR, entered into a letter agreement dated August 22, 2008 with the Trump Group (the "Side Letter Agreement"). Pursuant to the Side Letter Agreement, TPR (controlled by Sagi) purportedly agreed to sell the Orly Trust TRI Shares to the Trump Group at a price that was $10.3 million dollars - approximately 60% less than the Trump Group paid for the Sagi Trust TRI Shares.[7] Annexed hereto as **Exhibit "1"** is a copy of the Side Letter Agreement.

15. After executing the Side Letter Agreement, the Trump Group commenced

---

[3] TRI is a successful and valuable company which was formed by Arie and is engaged in the business of manufacturing specialty chemical products for agricultural and industrial end uses. Upon information and belief, in 2008, TRI had after tax earnings in excess of $150,000,000 and sales of approximately $1 billion dollars. Thus, the Orly Trust TRI Shares are an extremely valuable asset which are worth in excess of tens of millions of dollars.

[4] The Orly Trust and the Sagi Trust each granted Arie an irrevocable lifetime voting proxy over their respective shares of TRI. (See TAP, **Exhibit "C"**). The intent behind the voting proxies and the Genger's divorce Settlement Agreement was for Arie to maintain majority 58.85% controlling voting rights for the Arie TRI Shares, the Orly Trust TRI Shares and the Sagi Trust TRI Shares for the duration of his life.

[5] Dalia has acknowledged in prior pleadings and sworn testimony (as recently as December 13, 2012) that it was always her and Arie's original intent to equally distribute their wealth to both me and Sagi. See, e.g., TAP, **Exhibit "I,"** p. 26 (excerpt from Dalia's Pre-Trial Memorandum); Petitioner's Opposition Affidavit, **Exhibit "JJ,"** p. 148:4-11 (Dalia 12/13/12 Dep Tr.); Petitioner's Opposition Affidavit, **Exhibit "KK,"** ¶ 8 (Dalia 03/11/08 Aff.). Of course, as set forth in my papers, Dalia has worked hard to make sure, despite her words to the contrary, everything I have goes to Sagi.

[6] The Trump Group owned the 47.15% remaining minority interest in TRI.

[7] Under the Side Letter Agreement, Sagi-controlled TPR also purported to sell the Arie TRI Shares, once again for a fraction of what the Trump Group paid for the Sagi Trust TRI Shares, without Arie Genger's knowledge or consent.

a special proceeding under Section 225 of the Delaware General Corporation Law in the Delaware Chancery Court, seeking a determination of the composition of TRI's board of directors and who had the right to vote TRI's shares of common stock. (See *TR Investors, LLC et al v. Arie Genger and TPR Investment Associates, Inc.*, Delaware Chancery Court, Civil Action No. 6697-CS, the "TRI Chancery Action.")  In the TRI Chancery Action, Sagi and TPR (controlled by Sagi) aligned himself with the Trump Group.  Sagi and TPR (controlled by Sagi) also have aligned themselves with the Trump Group in the New York TRI Action.

16.   By decision dated August 9, 2010 (which amended an earlier decision dated July 23, 2010), the Delaware Chancery Court held, among other things, that the 2004 Genger TRI Transfer by TPR was void and that Arie and the Orly Trust had no beneficial ownership interest in the Arie TRI Shares or the Orly Trust TRI Shares even though neither the Orly Trust nor I were parties to that case (the "August 2010 Delaware Decision").  Annexed hereto as **Exhibit "2"** is a copy of the August 2010 Delaware Decision.

17.   In July 2009, I renewed my Petition to remove Dalia as Trustee of the Orly Trust by commencing this proceeding.  In connection with my petition to remove Dalia, I obtained an Order from this Court that expressly prohibited Dalia from taking any action which "…otherwise alter[s] the Orly Trust's interests in TRI at least ten days prior to such act" (the "July 2009 Order").  Annexed hereto as **Exhibit "3"** is a copy of the July 2009 Order.

18.   In response to TPR (i.e Sagi's) attempts to sell the Orly Trust TRI Shares without my knowledge or consent, I commenced an action entitled *Arie Genger and Orly Genger, in her individual capacity and on behalf of The Orly Genger 1993 Trust v. Sagi Genger, TPR Investment Associates, Inc., Dalia Genger, The Sagi Genger 1993 Trust, Glenclova Investment Company, TR Investors, LLC, New TR Equity I, LLC, Jules Trump, Eddie Trump and Mark Hirsch*, Index No. 651089/2010 (the "New York TRI Action") on July 26, 2010, seeking, among other things, a determination that the Orly Trust was the beneficial owner of the Orly Trust TRI Shares.

19.   On July 28, 2011, the Delaware Supreme Court ultimately reversed the

6

August Delaware Decision regarding Arie and the Orly Trust, finding that the Delaware Chancery Court lacked the necessary personal jurisdiction over Arie or the Orly Trust, and therefore, the Court <u>could not</u> determine the beneficial ownership of the Arie TRI Shares and the Orly Trust TRI Shares. The Delaware Supreme Court further held that the beneficial ownership of the Arie TRI Shares and the Orly Trust TRI Shares should be determined in a Court that had jurisdiction over all the indispensable parties. Indeed, the Delaware Supreme Court <u>did not remand</u> the TRI Chancery Action to the Delaware Chancery Court and stated instead that beneficial ownership of the Orly Trust TRI Shares should be decided in <u>New York</u>. Annexed hereto as **Exhibit "4"** is a copy of the Delaware Supreme Court's decision. (<u>See</u> Page 44 and Page 44, n.98)

## DALIA'S COMMENCED THE DELAWARE CHANCERY ACTION IN A DELIBERATE AND TRANSPARENT ATTEMPT TO HARM THE ORLY TRUST AND PETITIONER

20.   On October 4, 2011, <u>fifteen (15) months after I commenced the New York TRI Action</u> and <u>without informing me</u>, Dalia commenced the Delaware Chancery Action, seeking the same thing that I am seeking in the New York TRI Action: a determination that the Orly Trust is the beneficial owner of the Orly Trust TRI Shares. Annexed hereto as **Exhibit "5"** is a copy of Dalia's complaint in the Delaware Chancery Action.

21.   By commencing the Delaware Chancery Action without prior notice to me, Dalia knowingly violated this Court's July 2009 Order in this case. Specifically, Dalia did not give me any notice of her intention to commence the Delaware Chancery Action. If Dalia had told me of her intention to file the Delaware Chancery Action ten days before she filed it, <u>as this Court's Order requires</u>, I would have immediately sought a ruling from this Court to prevent her from filing the case.

22.   In addition, by filing the Delaware Chancery Action, Dalia specifically ignored the rulings of the New York Supreme Court that I had the authority to bring actions on behalf of the Orly Trust. Specifically, by Amended Decision dated July 28, 2010, the New

7

York Supreme Court found:

> Plaintiff argues, and none of the defendants dispute her, that as beneficiary of the Orly Genger 1993 Trust, she has the right to assert causes of action on behalf of the trust, citing *Velez v Feinstein*, 87 AD2d 309 (1st Dept. 1982) (where trustee has failed to enforce a claim on behalf of the trust, the beneficiary may do so)…Defendants' [including Dalia, Sagi and TPR] arguments in opposition are not persuasive.

(See Amended Decision and Order dated July 28, 2010, annexed hereto as **Exhibit "6"**, p. 4.) The New York County Supreme Court later recognized its prior ruling in an Amended Decision and Order dated January 2, 2013 in the New York TRI Action (See Amended Decision and Order dated January 2, 2013, annexed hereto as **Exhibit "7"**, p. 10.)

23.   In its July 28, 2010 Amended Decision, the New York Supreme Court also refused to dismiss claims for fraud, aiding and abetting fraud, and breach of fiduciary duty against Dalia, holding that I had asserted a credible, *prima facie* case against her for fraud. See Ex. 6, pp. 17-19.

24.   Further, by filing the Delaware Chancery Action in Delaware, Dalia specifically ignores the ruling of the Delaware Supreme Court's direction that the beneficial ownership of the Orly Trust TRI Shares should be determined in New York, where all indispensible parties, including me and the Orly Trust, are subject to jurisdiction. Both Dalia and I are residents of New York. In addition, the Orly Trust is a trust that was created by and governed by New York law. (See TAP, **Exhibit "A"**, copy of Orly Trust, Article Sixth (Governing Law)). Indeed, every party necessary to a determination of who owns the Orly Trust TRI Shares are parties to, and have appeared in the pending New York TRI Action. The Orly Trust would not be subject to jurisdiction in Delaware, absent Dalia's unilateral and improper attempt to submit the Orly Trust to Delaware jurisdiction.

25.   By filing the Delaware Chancery Action in Delaware, Dalia is affirmatively wasting Trust assets. To prosecute the Delaware Chancery Action, Dalia had to hire a separate set of Delaware lawyers, in addition to the New York lawyers that represent her

in her capacity as Trustee of the Orly Trust. Dalia's decision to file a complaint on behalf of the Orly Trust in Delaware is even more suspect when you consider that, only one year earlier, Dalia commenced an action on behalf of the Orly Trust in New York County Supreme Court entitled *DALIA GENGER, as Trustee on behalf of the Orly Genger 1993 Trust, and DALIA GENGER, in her individual capacity, v. ARIE GENGER*, Index No. 113862/2010, thus recognizing the New York Supreme Court's ability to protect the Orly Trust and decide all issues.

      26.   To "fund" her Delaware Chancery Action, Dalia has also jeopardized Trust assets, pledging millions of dollars to a mysterious St. Kitts entity, MSCo., and making her removal as Trustee a "condition of default" that will allow that entity to foreclose on all the Orly Trust's assets without notice anywhere in the world.

> Events of Default. It is expressly agreed that the entire principal amount of this Note, together with all accrued interest thereon, shall immediately become due and payable... upon the happening of any of the following events (each an "Event of Default"):
>
> ...
>
> (c) the resignation, removal or other change in the Trustee...
>
>                ***
>
> 21. Jurisdiction. The Parties irrevocably agree that, should either Party [the Orly Trust or MSCo.] institute any legal action or proceeding in any jurisdiction ... each Party irrevocably agrees that it and its assets are, and shall be, subject to such legal action or proceeding in respect of its obligations under this Agreement.

Credit and Forbearance Agreement dated May 15, 2012, annexed hereto as **Exhibit "8"** at sec. § 21; and $4,420,000 Amended and Restated Promissory Note dated May 15, 2012, annexed hereto as **Exhibit "9"** at sec. 2.1, respectively.

      27.   Most troubling, during a recent deposition. Dalia could identify no other reason or jurisdiction for her Delaware Chancery Action. The best Dalia could do was to plead

that she chose to commence the Delaware Chancery Action in Delaware because "[T]hat's what my lawyer suggested to do." Annexed hereto as **Exhibit "10"** are true and complete copies of the December 13, 2012 and February 7, 2013 transcripts of Dalia's deposition (See pp. 107:8-25; 108:1-20.)

28.     This is not the first time Dalia's counsel, attorney Robert Meister, has tried to divest the New York Court of jurisdiction, acting against the interests of me and my Orly Trust. Specifically, on August 11, 2011, Mr. Meister's firm brought an interpleader action – apparently without telling Dalia (Dalia's February 7, 2013 deposition transcript, Exhibit 10, pp. 129:24-131:16)[8] – to try to divest the NY Court of jurisdiction. Unsurprisingly, the SDNY court labeled this maneuver, paid for by my Trust, and which I had to oppose with my own monies, both a "sham" and entirely "gratuitous," and summarily dismissed the Interpleader. (See Opinion and Order of SDNY Court dated June 14, 2012, annexed hereto as **Exhibit "11"** at pp. 38-39 (emphasis added) ("In this Court's view, the only way to put a stop to, or at least lessen, the forum shopping and jurisdictional sparring is for this Court to bow out of the race, abstain from entertaining these sham interpleader actions as a matter of equitable discretion, and let the state courts (likely the New York Supreme Court) proceed to the merits.")

29.     The facts (and common sense) demonstrate that Dalia's decision to commence the Delaware Chancery Action was not taken with my interests in mind. Indeed, the only possible explanation for Dalia's decision to commence the Delaware Chancery Action

---

[8] While Dalia now claims she did not know about, or authorize, the Interpleader, this cannot be true given that her purported "settlement" of the litigations I brought to protect my interests from her makes denial of the Interpleader a "condition of default . . "

> Manhattan hereby covenants and agrees that … Manhattan agrees to forbear from collection of amounts due and owing on the Note, … until the earliest to occur of (i) the date on which Dalia no longer serves as Trustee of the Trust, (ii) the final resolution of the Interpleader Action, or (iii) November 1, 2014

Credit and Forbearance Agreement dated May 15, 2012, Exhibit 7 at sec. 6.2 (emphasis added). Upon "default," $4.424 million of my Trust's assets becomes immediately due and payable to a mysterious St. Kitt's entity (MSCo.), and the rest of my Orly Trust assets become subject to foreclosure.

was to try to <u>lose</u> there, and cause beneficial ownership of the Orly Trust TRI Shares to go to TPR and Sagi instead).

## DALIA AND ALL OF THE CO-DEFENDANTS TO THE NEW YORK TRI ACTION HAVE BEEN ENJOINED BY JUSTICE FEINMAN FROM PURSUING THE DELAWARE CHANCERY ACTION

30. When I learned of the Delaware Chancery Action, I immediately sought and obtained relief from the New York Court Supreme Court restraining Dalia from prosecuting the action. Specifically, by Order dated October 26, 2011, the New York Supreme Court (Feinman, J.) enjoined Dalia from prosecuting the Delaware Chancery Action. Annexed hereto as **Exhibit "12"**is a copy of the New York Supreme Court's October 26, 2011 Order.

31. I also sought and obtained Orders from the New York County Supreme Court which stopped the other parties to the Delaware Chancery Action – TPR and the Trump Group – from prosecuting the Delaware Chancery Action. Specifically, by Orders dated November 9, 2011, Justice Feinman enjoined TPR and the Trump Group from prosecuting the Delaware Chancery Action and further confirmed his October 26, 2011 Order which enjoined Dalia from pursuing the Delaware Chancery Action. On April 9, 2012, the New York County Supreme Court issued an Interim Order confirming that Dalia, TPR, and the Trump Group were restrained from continuing to prosecute the Delaware Chancery Action until further order from this Court. Annexed hereto as **Exhibits "13" and "14"** are copies of the New York Supreme Court's November 9, 2011 Order and April 9, 2012 Interim Decision and Order, respectively.

32. By Decision and Order dated December 17, 2012, the New York Supreme Court (Jaffe, J.) (as amended by Amended Decision and Order dated January 2, 2013) dismissed all causes of action against Dalia in the New York TRI Action. I have timely appealed the New York Supreme Court's December 17, 2012 and January 2, 2013 Decisions to the First Department. Dalia's dismissal was later set forth in a January 24, 2013 Judgment, which states that:

all claims against Defendant Dalia Genger are severed and dismissed with prejudice, and all temporary restraining orders and preliminary injunctions issued against her in this action are vacated <u>unless the subject(s) thereof has/have been restrained in another pending action in which case they/it shall not be vacated…</u>

(Judgment dated January 24, 2013 in New York TRI Action, annexed hereto as **Exhibit "15"**) (emphasis added). <u>Thus, the Supreme Court has expressly invited Orly to seek supporting restraints against Dalia in this and other courts.</u>

:         33.   Dalia's counsel, Robert Meister, has taken the position that the January 24, 2013 Judgment in the New York TRI Action has lifted the New York Supreme Court's prior injunctions restraining Dalia <u>as trustee</u> from prosecuting the Delaware Chancery Action on behalf of the Orly Trust. (<u>See</u> January 29, 2013 Letter from Robert Meister, annexed hereto as **Exhibit "16"**). By contrast, I am informed my counsel in the New York TRI Action told Mr. Meister the January 24, 2013 Judgment does not release the Orly Trust from the injunctions because the Orly Trust remains a party in the New York TRI Action and the New York Supreme Court has already ruled that I have the right to prosecute these actions on behalf of the Orly Trust.

34.   A compliance conference in the New York TRI Action is scheduled for February 20, 2013.  Both my Supreme Court counsel and Dalia's counsel, Mr. Meister, intend to address the New York Supreme Court's January 24, 2013 Judgment.  Notably, the restraints against TPR and the Trump Group remain in place and unchanged.

35.   If Dalia is allowed to continue to prosecute the Delaware Chancery Action in Delaware where the Delaware Chancery Court has already ruled (without jurisdiction to do so) that the Orly Trust does not beneficially own the Orly Trust TRI Shares, the Orly Trust will be effectively stripped of its TRI Shares.[9]

---

[9] Dalia alleged in her Motion to Dismiss the TAP that the Orly Trust benefitted under the terms of certain settlement agreements which were entered into by her in secret and without Petitioner's knowledge (See TAP and Petitioner's Opposition Affidavit for the detailed discussion pertaining to the TPR Settlement Agreements).  In exchange for giving Sagi all rights to TPR, and releasing Sagi and Dalia from all claims, the Orly Trust gets the TRI Shares (still subject to attack in Delaware) and still owes over $4 million, and has pledged all its assets, to MSCo. Demonstrably, this purported settlement harms the Orly Trust.  The "value" is deliberately meaningless and is truly

36.   As set forth above, Dalia has no reasonable or logical reason for seeking to continue the Delaware Chancery Action.  The New York TRI Action is still pending and has been actively litigated by the parties for more than the past two years. All of the parties that would be necessary to make a determination of ownership to the Orly Trust TRI shares, including the Orly Trust, are already parties to the New York TRI Action.  As a result, the relief Dalia seeks in the Delaware Chancery Action is duplicative of the determination I'm already seeking in the New York TRI Action on the Orly Trust's behalf: a determination that the Orly Trust beneficially owns the Orly Trust TRI Shares.

37.   Moreover, there is no reason the Delaware Chancery Action must be reinvigorated now, before the Court decides whether Dalia has been working for or against the Orly Trust.

## DALIA SHOULD NOT BE ALLOWED TO TAKE ANY ACTION ON BEHALF OF THE ORLY TRUST PENDING THIS COURT'S DETERMINATION OF THE TAP IN LIGHT OF HER NUMEROUS BREACHES OF HER FIDUCIARY DUTIES

38.   Dalia should not be allowed to prosecute the Delaware Chancery Action, because she has already shown time and again that she is not acting in my interests or the Trust's interests, but for the benefit of herself and my brother Sagi.  A summary of these various actions, many of which are underscored by recent testimony and documents, include:

(i)    Dalia deliberately failed to inform me and affirmatively concealed from me, Sagi's actions with respect to the sham foreclosure sale of the Orly Trust's indirect interest in the common stock of TPR, all of which greatly benefitted Sagi and injured me as beneficiary of the Orly Trust.  The lack of notice prevented me from protecting the asset by either trying to enjoin the sale or bidding at the sale (see TAP ¶¶ 55-56);

(ii)   In January 2009, Dalia entered in to the Meeting Agreement, which allowed Sagi (as manager of D & K Limited Partnership) to encumber the Orly Trust TRI Shares in order to set the stage for a sham foreclosure of

a "mirage in the desert" in light of the Secret Agreements and MSCo's  purported right to foreclose and collect upon the Notes and seize all the proceeds from TPR's purported sale of the Orly Trust TRI Shares.

the Orly Trust TRI shares, thus stripping the Orly Trust of this valuable asset (see TAP ¶¶ 48-54);

(iii)   Dalia entered into the various Secret Agreements (as previously defined in the TAP) on purported behalf of the Orly Trust without prior notice to me and has deliberately concealed same from Petitioner. Dalia's entry into the Secret Agreements has placed the remaining assets of the Orly Trust in peril of being foreclosed upon and dissipated by an unknown entity which was recently formed in St. Kitts (see TAP ¶¶ 76-78);

(iv)   As part of the above-mentioned Secret Agreements, Dalia made her own removal an "Event of Default" that would make millions in debt immediately due and payable by the Orly Trust, without the cash to pay (see $4,420,000 Amended and Restated Promissory Note dated May 15, 2012, Exhibit "9" at sec. 2.1);

(iv)   Dalia violated the restraints and injunctions imposed upon her as provided in this Court's July 2009 Order by commencing the Dalia Delaware Chancery Action and entering into the Secret Agreements without prior notice to Petitioner (see July 2009 Order, Exhibit "3"); and,

(v)   Dalia violated the restraints and injunctions imposed upon her as provided in both the New York TRI Action and the New York TPR Action (see Reply Memo of Law dated August 13, 2012, annexed hereto as **Exhibit "17"** at pp. 2-10).

39.   Dalia's actions since her initial appointment as Trustee have all been craftily designed to dissipate and encumber the Orly Trust's assets to benefit herself and my brother Sagi to my detriment.

40.   Demonstrably, I am the one that has the most to lose. In light of her prior breach of her fiduciary duties, my mother, Dalia, should not be allowed to take any further action on behalf of the Orly Trust, especially while my TAP to remove her as Trustee is still pending before this Court.

## PETITIONER HAS NO ADEQUATE REMEDY AT LAW

41.   Petitioner has no adequate legal remedy and must seek the assistance of this Court in equity. As the New York County Supreme Court already has determined, monetary damages are insufficient to remedy the Orly Trust and the Petitioner in this case should Dalia be allowed to proceed with her dubious and unnecessary Delaware Chancery

14

Action.

42.  I have no reason to believe that Dalia will ever be able to satisfy any judgment against her for the catastrophic damages caused by Dalia's breaches of her fiduciary duties and the looting of the Orly Trust's assets.  Any such judgment is likely to amount to in excess of tens of millions of dollars.  The only real relief this Court can provide is to issue the requested restraints.  By issuing these restraints and others, the Court simply maintains the status quo, while keeping Dalia from further harming the Orly Trust.

## PROCEDURAL RECITALS

43.  Pursuant to CPLR §6001, I hereby attest that I have never sought nor secured any provisional remedies against Dalia, except as specifically set forth herein.  As stated above, I previously obtained an injunction in the New York TRI Action enjoining Dalia from proceeding with the Delaware Chancery Action.  (See Exhibit "12".)

44.  Dalia has asserted that this injunction has been lifted and intends to proceed with the Delaware Chancery Action.  (See Exhibit "16").  I disagree that the injunction has been lifted, but, in any event, it is respectfully submitted that Dalia's actions directly affect my TAP and proceedings before this Court to remove her as Trustee and compel her to provide a compulsory accounting.  Therefore, this Court is an appropriate forum to hear and determine this Motion.

45.  Pursuant to CPLR §2217(b), no prior application for the relief requested herein has been made either to this or any other Court except as set forth immediately above.

**WHEREFORE,** Petitioner respectfully requests that the relief sought in Petitioner's Motion be granted in its entirety together with such other and further relief as this Court deems to be just equitable and proper.

_____
**ORLY GENGER**

Sworn to before me this
/3ʳᵈ day of February, 2013

_____
Notary Public

PETER JANOVSKY
Notary Public, State of New York
No. 31-4949976
Qualified in New York County,
Commission Expires April 17, 20__

16

August 22, 2008

TPR Investment Associates, Inc.
c/o Trans-Resources, Inc.
200 West 57th Street
New York, NY 10019

Gentlemen:

Reference is hereby made to that certain Stock Purchase Agreement (the "Purchase Agreement") entered into as of the date hereof, by and among TR Investors, LLC, a Delaware limited liability company ("TR Investors"), Glenclova Investment Co., a Cayman Islands corporation, ("Glenclova"), New TR Equity I, LLC, a Delaware limited liability company ("Equity I") and New TR Equity II, LLC, a Delaware limited liability company ("Equity II" and collectively with TR Investors, Glenclova and Equity I, the "Purchasers", the final Genger 1995 Trust ("Seller", and TPR Investment Associates, Inc., a Delaware corporation ("TPR"). Capitalized terms not otherwise defined in this letter shall have the meaning assigned to them in the Purchase Agreement.

In connection with the transactions contemplated by the Purchase Agreement, if at any time following the Closing Date, it is determined that Arie Genger is not the record and beneficial owner of the 794.40 shares of Common Stock of the Company purportedly transferred to him by TPR in October, 2004 and/or that Orly Genger 1993 Trust is not the record and beneficial owner of the 1,102.80 shares of Common Stock of the Company purportedly transferred to such Trust by TPR in October, 2004, and that TPR is the record or beneficial owner of any such shares, in either or both cases by virtue of the transfer of such shares being deemed to have been void or for any other reason (the shares being so affected being referred to herein as the "Affected Shares") then (a) upon written request from the Purchasers, TPR shall promptly take all necessary action to effect the transfer of all Affected Shares (other than the Balance Shares to be transferred pursuant to Section 11 of the Purchase Agreement) to the Purchasers in the same proportion as the Shares are being sold to them pursuant to the Purchase Agreement, for a price per share equal to the lesser of (i) the value of each Affected Share at the time of the October 2004 purported transfers (the "Transfer Date") based upon an aggregate value for all of the issued and outstanding shares of Common Stock of the Company of $33,000,000 (as determined in the arbitration proceedings between Arie Genger and Dalia Genger by

August 22, 2008
Page 2

Judge Miltonas or such other arbitrator), or (ii) the valuation of each Affected Share at the Transfer Date determined in accordance with the Stockholders Agreement (provided that the determined valuation shall not be deemed to be the $1.00 for which the Affected Shares were transferred by TPR).

In consideration of the foregoing, the parties hereby acknowledge and agree, that (i) within ten (10) days after delivery of the stock certificates required by Section 2.1(e) of the Agreement, Purchasers shall cause to be filed an amended complaint or, if necessary, a motion to file an amended complaint, in the action styled Glenclova Investment Co. v. Trans-Resources, Inc. and TPR Investment Associates, Inc., Case No. 08-CIV-7140 (JFK), pending in the United States District Court for the Southern District of New York, which shall limit the plaintiff's request for relief from TPR to specific performance of the Stockholders Agreement and related declaratory relief, and not seek damages or monetary relief from TPR and (ii) in the event that plaintiff is not awarded the specific performance referenced above, TPR hereby, assigns all of its right, title and interest in and to any claims or causes of action that TPR may have or may have had against Arie Genger and/or the Orly

[BALANCE OF PAGE INTENTIONALLY LEFT BLANK]

August 22, 2008
Page 3

Ganger 1993 Trust relating to, or arising from, the purported transfer of shares of
Common Stock of the Company from TPR to such persons.

Please signify your agreement to the terms of this letter by signing
below.

Sincerely,

TR INVESTORS, LLC

By: _____
Name: Jim Lieb
Title: Executive Vice-President

GLENCLOVA INVESTMENT CO.

By: _____
Name: Robert Smith
Title: Chairman

NEW TR EQUITY I, LLC

By: _____
Name: MARK C. HAUCH
Title: Exec V P/ GEN 'L COUNSEL

NEW TR EQUITY II, LLC

By: _____
Name: MARK J. HAUCH
Title: Exec VP/ GEN 'L COUNSEL

Acknowledge and Agreed
as of August 22, 2008

TPR INVESTMENT ASSOCIATES, INC.

By: _____

506391-Wilmington Server 1A - MSW

August 22, 2008
Page 4

Name: Sagi Genger
Title:  President



EFiled: Aug 9 2010 2:48P
Transaction ID 32562561
Case No. 3994-VCS

**COURT OF CHANCERY
OF THE
STATE OF DELAWARE**

LEO E. STRINE, JR.
VICE CHANCELLOR

New Castle County Courthouse
Wilmington, Delaware 19801

Date Submitted: August 4, 2010
Date Decided: August 9, 2010

Thomas J. Allingham II, Esquire
Skadden, Arps, Slate, Meagher & Flom LLP
One Rodney Square
P.O. Box 636
Wilmington, DE 19899-0636

Donald J. Wolfe, Jr., Esquire
Potter Anderson & Corroon LLP
1313 North Market Street
P.O. Box 951
Wilmington, DE 19899-0951

 RE:   *TR Investors, LLC, et al. v. Arie Genger*, C.A. No. 3994-VCS

Dear Counsel:

 This letter addresses an issue raised by the Trump Group's[1] proposed order

implementing my July 23, 2010 memorandum opinion (the "Opinion"). That proposed

order included language determining that the Trump Group had the right to purchase

shares of Trans-Resources, Inc. ("Trans-Resources") that Arie Genger caused TPR

Investment Associates ("TPR") to transfer in 2004 to the trust for his daughter Orly (the

"Orly Trust") and to himself personally.[2] That language differed from my July 23, 2010

memorandum opinion (the "Opinion"), which only held that the Trump Group was

entitled to the Trans-Resources shares transferred in 2004 to the trust of Genger's son

---

[1] There are four named plaintiffs in this action: TR Investors, LLC, Glenclova Investment Co.,
New TR Equity I, LLC, and New TR Equity II, LLC (collectively, the "Trump Group").
[2] Letter from Thomas J. Allingham II to the Hon. Leo E. Strine, Jr. (July 27, 2010) (enclosing
proposed order).

*TR Investors, LLC, et al. v. Arie Genger*
C.A. No. 3994-VCS
August 9, 2010
Page 2 of 9

Sagi (the "Sagi Trust"). Implicit in the Trump Group's proposed order is the assertion that I reached an incorrect — or, perhaps more accurately, an incomplete — conclusion as to the Trump Group's ability to acquire all of Trans-Resources' shares.

A full blow-by-blow account of the complex series of share transfers and contracts leading up to the issue at hand can be found in the Opinion. It suffices to say here that my conclusion that the Trump Group was entitled only to the shares transferred to the Sagi Trust (the "Sagi Shares") was based on the fact that the Trump Group had entered into a Purchase Agreement in 2008 for the Sagi Shares. That Purchase Agreement included a provision indicating that, if the share transfer to the Sagi Trust were found void, then the share purchase would be between the Trump Group and TPR, which Sagi Genger controlled by 2008. Thus, the Purchase Agreement appeared to be a broad settlement of the dispute as to the Trans-Resources shares *held by the Sagi Trust.* For that reason, I found the Trump Group to have appropriately purchased the shares transferred to the Sagi Trust. But, I declined to address the control of the shares improperly transferred to the Orly Trust or Genger himself. In so concluding, I was motivated by the fact that determining whether the Trump Group was entitled to the shares wrongly transferred to Genger and the Orly Trust was unnecessary to determine control in this action pursuant to 8 *Del. C.* § 225.[3]

---

[3] My reasoning was as follows:

*TR Investors, LLC, et al. v. Arie Genger*
C.A. No. 3994-VCS
August 9, 2010
Page 3 of 9

What I overlooked was a side letter agreement (the "Letter Agreement") executed

contemporaneously with the Purchase Agreement. In that Letter Agreement, the Trump

Group contracted with TPR to purchase the shares that had purportedly been transferred

to Genger and the Orly Trust in 2004 if it were found that those transfers were improper.[4]

When read in conjunction with the Purchase Agreement, the Letter Agreement indicates

that the Trump Group contracted with TPR not only for the shares transferred to the Sagi

---

Although the 2004 Transfers violated the terms of the Stockholders Agreement, which in Section 3.2 provides that the Trump Group can purchase all of TPR's shares, the Trump Group cannot purchase the shares transferred to Arie Genger or the Orly Trust because the Trump Group must abide by the settlement terms to which it agreed in the Purchase Agreement. Because the 2004 Transfers violated the Stockholders Agreement, Arie Genger and the Orly Trust have been found to not be the record or beneficial owners of the shares transferred to them. Per Section 11 of the Purchase Agreement, that entitles the Trump Group to 64% of the Balance Shares, and nothing more beyond the Sagi Shares that it has already bought. As to the Transfer from TPR to Arie Genger himself, the major problem was the lack of notice. Under the Stockholders Agreement, Genger could receive shares from TPR so long as he: (1) gave proper notice to the Trump Group entities; and (2) signed on to the Stockholders Agreement. He did neither and, as a result, cannot exercise any rights under the Stockholders Agreement. Although the Trump Group believes that Genger's violation should require him to transfer all of his Trans-Resources shares to the Trump Group, that remedy is disproportionate. That sort of relief is unnecessary to this control dispute and therefore this § 225 action. Nevertheless, Trans-Resources appears entitled, in any event, to deny Genger the right to vote his shares until he gives formal notice and signs on to the Stockholders Agreement. As to the Orly Trust, it is not before the court, and the shares it was wrongly transferred are also not necessary for the Trump Group to exercise control. Therefore, I do not issue any ruling as to those shares, because that is unnecessary in this § 225 action. Obviously, my finding that the shares were wrongly transferred creates problems for Arie Genger, but that exposure is a result of his own secretive contract breach.

*TR Investors, LLC v. Genger*, 2010 WL 2901704, at *19 (Del. Ch. July 23, 2010).
[4] JX-226 (Letter Agreement (Aug. 22, 2008)) (the "Letter Agreement").

*TR Investors, LLC, et al. v. Arie Genger*
C.A. No. 3994-VCS
August 9, 2010
Page 4 of 9

Trust, but for all of the shares that TPR originally held before the wrongful transfers were effected.

Thus, it is clear that I issued my original decision in ignorance of a material fact, which is that there was a binding contract between TPR and the Trump Group as to the shares held by Genger and the Orly Trust (the "Arie and Orly Shares"). In addition, in determining that I need not reach the issue of who owned the Arie and Orly Shares, I overlooked at that point in my reasoning the fact that, under the Stockholders Agreement,[5] even though the Trump Group would have the right to appoint four of Trans-Resources' six directors as the holder of the Sagi Shares, the right to designate the remaining two directors could depend on who controls the Arie and Orly Shares.[6] Moreover, I also ignored the reality that Genger himself sought to have this court declare who was the rightful owner of the Arie and Orly Shares.[7] Although the Orly Trust was

---

[5] JX-101 (Stockholders Agreement (2001)) (the "Stockholders Agreement") at § 1.2(c).

[6] Thus, determining whether the Trump Group is entitled to purchase the Arie and Orly Shares is within the scope of a § 225 action. *See Levinhar v. MDG Med., Inc.,* 2009 WL 4253211, at *11 (Del. Ch. Nov. 24, 2009) ("Although Section 225 actions are summary proceedings, claims that bear on the appropriate composition of the board of directors may be brought in connection with a Section 225 action."); *Agranoff v. Miller,* 1999 WL 219650, at *17 (Del. Ch. Apr. 12, 1999), *aff'd,* 1999 WL 636634 (Del. July 28, 1999) (stating that in a § 225 action, "[t]he court can determine any legal or factual issue, the resolution of which can affect the outcome of a corporate election . . . or of any other stockholder vote").

[7] *See* Genger's Answer and Counterclaim, Claim for Relief ¶ (c) (requesting a declaration that "Mr. Genger is the rightful owner of 13.99% of TRI shares and the Orly Trust is the rightful owner of 19.43% of TRI shares, subject to the Irrevocable Proxy granted to Mr. Genger"); Stipulated Pre-Trial Order § III.A ¶ 3 (stating that an issue of fact remaining to be litigated was "[w]hether the October 2004 transfers of [Trans-Resources] common stock to Arie Genger and to the Orly Genger 1993 Trust (the "Orly Trust") and the Sagi Trust can and should be found void without also voiding or reforming the related transactions"). In light of those requests,

*TR Investors, LLC, et al. v. Arie Genger*
C.A. No. 3994-VCS
August 9, 2010
Page 5 of 9

not formally before the court, Orly Genger provided testimony in aid of her father's case
and is clearly working in concert with him on a joint legal strategy. For example, shortly
after the Opinion was issued on July 23, 2010, Arie Genger and Orly Genger jointly
sought and obtained an ex parte temporary restraining order against TPR in New York
state court for the purpose of preventing TPR from transferring any shares.[8] Her rights
were fully protected and argued by two of the nation's best law firms, who sought to have
me declare that she was the rightful owner of the shares transferred to her.

After considering these factors, to which I gave inadequate attention, I now
determine the following, which is largely consistent with my original ruling. As
previously held, all of the transfers Genger caused TPR to make in 2004 were in violation
of the Stockholders Agreement. In that circumstance, the Trump Group was given the
right to purchase the transferred shares. In my original decision, I overlooked the reality
that the Trump Group had struck a deal with TPR to remedy the improper transfers not
only as to the transfer of the Sagi Shares, but also as to the transfers of the Arie and Orly
Shares.[9] In my original decision, I also gave inadequate weight to the principle of

---

Genger's recent arguments that determining ownership of the Arie and Orly Shares is outside the
scope of the § 225 action come with little grace because they are inconsistent with his own
litigation position. *See* Letter from Donald J. Wolfe, Jr. to the Hon. Leo E. Strine, Jr. (Aug. 4,
2010)) (arguing that determining ownership of the Arie and Orly Shares is outside the scope of
this § 225 proceeding).

[8] *See* Letter from Thomas J. Allingham II to the Hon. Leo E. Strine, Jr. (July 27, 2010)
(explaining the ex parte temporary restraining order Arie and Orly Genger obtained over the
weekend).

[9] *See Genger*, 2010 WL 2901704, at *19 ((reflecting an ignorance that the Trump Group had
entered in the Letter Agreement providing that TPR will sell the Arie and Orly Shares to the

*TR Investors, LLC, et al. v. Arie Genger*
C.A. No. 3994-VCS
August 9, 2010
Page 6 of 9

freedom of contract. Under the plain language of the Letter Agreement, it was the right

of the Trump Group to purchase all the improperly transferred shares, not just the ones

transferred to the Sagi Trust.[10] In issuing what I thought was dictum to the effect that it

would be disproportionate to award the Arie and Orly Shares to the Trump Group,[11] I

ignored the important reality that leaving Genger and the Orly Trust with the Shares

would arguably put Genger in a position to claim two members on the Trans-Resources

board, if he were allowed to cure his transfer to himself and if the Orly Trust were

allowed to keep the shares it had wrongly received.[12] In my view, that error in thinking is

material as it would stick the Trump Group in a continued relationship with Genger after

he had done precisely what the Stockholders Agreement had been designed to prevent —

enmesh the Trump Group in his family disputes.[13] As important, in treating this as a

remedial issue I could side-step, I too lightly overrode the parties' contractual bargain.

The Stockholders Agreement provides the Trump Group with a right to purchase the

shares from TPR when Trans-Resources shares are transferred to a non-permitted

---

Trump Group if Genger and the Orly Trust are not found to be beneficial owners of the Trans-Resources shares transferred to them).
[10] Letter Agreement 1-2.
[11] *See Genger*, 2010 WL 2901704, at *19 ("Although the Trump Group believes that Genger's violation should require him to transfer all of his Trans-Resources shares to the Trump Group, that remedy is disproportionate.").
[12] *See id.* (failing to focus upon this important issue).
[13] *See Genger*, 2010 WL 2901704, at *3-5 (discussing evidence showing that the purpose of the Stockholders Agreement was to prevent the Genger family's infighting from infecting the governance of Trans-Resources).

*TR Investors, LLC, et al. v. Arie Genger*
C.A. No. 3994-VCS
August 9, 2010
Page 7 of 9

transferee.[14] That provision is not ambiguous and given that, it was clearly contractually permissible for the Trump Group to resolve any difference about the repurchase option by a consensual bargain with TPR. My passing sympathetic thought about the extent of the remedy has no place trumping a contractual remedy choice. Nor did that thought adequately consider the reality that Genger would likely attempt to argue that the Trump Group had to elect two of his nominees to the board because he and the Orly Trust supposedly retained control of approximately 32% of the shares. The Trump Group bargained to avoid being in such a tangled relationship with the Gengers if he engaged in improper transfers by securing a right to acquire *all* shares subject to an improper transfer, not just enough to get a voting majority.

My earlier ruling slighted this problem, and suggested that Arie Genger could simply cure the improper transfer to himself by providing proper notice and by signing on to the Stockholders Agreement.[15] It ignored that if he could be let off the hook like that by an equitable softie like me and, if the Orly Trust was left with its shares, he could argue that the Trump Group was bound to elect two directors of his choosing to the board. Now that all the relevant factors have been adequately considered by me, it is clear that I gave these considerations too little weight and improperly reduced the Trump Group's contractual rights.

---

[14] Stockholders Agreement §§ 3.2, 3.3(b); *see also* Letter from Thomas J. Allingham II to the Hon. Leo E. Strine, Jr. (Aug. 4, 2010) at 6.
[15] *See Genger*, 2010 WL 2901704, at *19.

*TR Investors, LLC, et al. v. Arie Genger*
C.A. No. 3994-VCS
August 9, 2010
Page 8 of 9

Of course, it may well be that the bargain that TPR — a company that Arie Genger allowed to pass out of his control — struck poses some equitable problem for TPR. That is, it may be that Genger and Orly Genger have claims against TPR and Sagi Genger over how the price paid by the Trump Group for the Arie and Orly Shares was allocated. In that sense, the endgame of this struggle would be fitting if regrettable, in that the Gengers would find themselves fighting over a pot of money and who should get what. To that point, it may be that the Trump Group would be wise to pay the consideration for the Arie and Orly Shares into a court in New York, and allow the Gengers to have at it about who gets the proceeds. The resolution of any such dispute, however, is not relevant to the determination that both the Trump Group and Genger have asked me to make.

That determination is whether the Arie and Orly Shares are validly owned by Arie Genger and the Orly Trust. Again, the answer is no, they are not. The transfers were invalid. That left the Trump Group with the right to purchase the Shares from TPR, and thus TPR and the Trump Group were free to settle that dispute by a new bargain for sale. If the Trump Group exercises its rights under the Letter Agreement, it will own the shares improperly transferred to Genger and the Orly Trust, and neither of those transferees ever had a legitimate interest in the shares. If those transferees have any beef with TPR or Sagi Genger, the transferees are free to file suit against them. But the Trump Group may purchase the Arie and Orly Shares per the terms of the Letter Agreement, may vote those

*TR Investors, LLC, et al. v. Arie Genger*
C.A. No. 3994-VCS
August 9, 2010
Page 9 of 9

Shares, and Trans-Resources need not recognize Genger or the Orly Trust as stockholders.

In revising my earlier decision to address this issue, I therefore correct my failure to focus as closely as I should have on the control consequences of the transfers to Genger and the Orly Trust, the primacy that should be given to the contractual remedy provision, the bargain-destroying consequences of not according the Trump Group the full benefit of the Stockholders Agreement, and the inequity of subjecting the Trump Group to attempts by Genger to relitigate issues that he sought to litigate in this court.

For all these reasons, I treat the proposed order submission of the Trump Group as a motion for reargument, a motion I hereby grant, and will issue a final judgment in favor of the Trump Group in conformity with this decision.

> Very truly yours,
>
> */s/ Leo E. Strine, Jr.*
>
> **Vice Chancellor**

LESJr/eb

At the Surrogate's Court held in and for the County
of New York, at the Courthouse, 31 Chambers
Street, New York, New York on the __1__ day of
~~June~~ 2009
~~July~~

New York County Surrogate's Court
DATA ENTRY DEPT.
Date: _July 1, 2009_

PRESENT: HON. __Troy K. Webber__
                                    Surrogate

In the Matter of the Application of

ORLY GENGER, as a person interested,
for the removal of DALIA GENGER
as Trustee of the Orly Genger 1993 Trust
pursuant to SCPA §711 (11)

File No.: 0017/2008

ORDER TO SHOW CAUSE
WITH TEMPORARY
RESTRAINTS

On reading and filing the annexed Verified Petition of Petitioner, ORLY GENGER, and

the exhibits, verified on the 22nd day of June, 2009, and the memorandum of law in support of

Petitioner's Verified Petition dated June 22, 2009,

LET the Respondent, DALIA GENGER, the sole fiduciary of the Orly Genger 1993

Trust, show cause before Surrogate __Troy K. webber__ at the Surrogate's Court, 31 Chambers ~~Sitting at 60 Centre~~

~~Room 309~~

Street, New York, New York, on the __5th__ day of ~~June~~ _August_ 2009 at 10:00 o'clock in the forenoon of that

day or as soon thereafter as counsel may be heard why an order should not be entered:

            (a)      Enjoining and restraining Respondent, her agents and all other persons

acting on her behalf from withdrawing, selling disposing, transferring, assigning, removing,

pledging, redeeming, mortgaging, encumbering, liening, hypothecating or secreting the Orly

Trust's 19.43% interest in Trans-Resources, Inc., ("TRI"), a closely held corporation, founded by

Arie Genger, Petitioner's father and Respondent's former husband of Respondent and any other

assets which may be remaining in the Orly Trust;

NYO_XFBRA13N03311U

(b)  Removing Respondent as Trustee of the Orly Trust for breaching her

fiduciary duties, wasting and dissipating the assets of the Orly Trust and imprudently managing

and injuring the property committed to her charge;

(c)  Surcharging Respondent in the amount of the loss of the value of Orly's

interest in TPR as determined by the Court and awarding Petitioner costs and attorneys' fees;

(d)  Appointing Michael D. Grohman, Esq. as successor trustee;

(e)  Waiving any requirement that Petitioner post an undertaking; and

(f)  Granting Petitioner such further relief deemed necessary or proper.

ORDERED that, during the pendency of this proceeding, Respondent, ~~her agents and all~~ [and/or her counsel] are required to give notice by overnight mail to petitioners counsel of any 1) offer ~~other persons acting on her behalf are temporarily restrained from withdrawing, selling,~~ to purchase the Orly Trusts 19.3% interest in TRI within 10 days of receiving ~~disposing, transferring, assigning, removing, pledging, redeeming, mortgaging, encumbering,~~ such offer and 2) act by Respondent, her agents and all other persons ~~liening, hypothecating or recording the Orly Trust's 19.43% interest in TRI and other assets~~ acting on her behalf to assign, mortgage, pledge, redeem, encumber, sell or ~~remaining in the Orly Trust; and it is further~~ otherwise alter the Orly Trusts interest in TRI at least 10 days prn to such act ~~ORDERED~~ and it ORDERED that service of a copy of this Order and the papers upon which it is based

shall be served on Respondent by personal service at either her residence, located at 200 East

65th Street, Apt. 32W, New York, New York 10021, or any other address at which she can be

located, on or before ~~July 7~~, 2009; and it is further

'  ORDERED, that any responsive papers shall be filed by July 29, 2009.

~~ENTER~~

Surrogate

## IN THE SUPREME COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| ARIE GENGER, | § | |
| | § | No. 592, 2010 |
| Defendant/Counterclaim | § | |
| Plaintiff-Below, | § | Court Below: Court of Chancery of |
| Appellant, | § | the State of Delaware |
| | § | |
| v. | § | |
| | § | C.A. No. 3994 |
| TR INVESTORS, LLC, | § | |
| GLENCLOVA INVESTMENT CO., | § | |
| NEW TR EQUITY I, LLC, | § | |
| NEW TR EQUITY II, LLC, and | § | |
| TRANS-RESOURCES, INC., | § | |
| | § | |
| Plaintiffs/Counterclaim | § | |
| Defendants-Below, | § | |
| Appellees. | § | |

Submitted: May 25, 2011
Decided: July 18, 2011

Before **STEELE**, Chief Justice, **HOLLAND**, **BERGER**, **JACOBS** and **RIDGELY**, Justices, constituting the Court *en Banc*.

Upon Appeal from the Court of Chancery. **AFFIRMED IN PART and REVERSED IN PART**.

Stephen P. Lamb, Esquire (argued), of Paul, Weiss, Rifkind, Wharton & Garrison LLP, Wilmington, Delaware; Of Counsel: Eric Alan Stone and Jaren Elizabeth Janghorbani, Esquires, of Paul, Weiss, Rifkind, Wharton & Garrison LLP, New York, New York; for Appellant.

Thomas J. Allingham II (argued), Anthony W. Clark and Robert A. Weber, Esquires, of Skadden, Arps, Slate, Meagher & Flom LLP, Wilmington, Delaware; for Appellees.

Kevin F. Brady, Esquire, of Connolly Bove Lodge & Hutz LLP, Wilmington, Delaware; Of Counsel: Daniel B. Garrie, Esquire, of Focused Solution Recourse Delivery Group, LLC, Bellevue, Washington; for *Amici Curiae* Focused Solution Resource Delivery Group, the Organization of Legal Professionals, and Security Mentors, LLC.

**JACOBS**, Justice:

This appeal arises out of a contest for control of Trans-Resources, Inc. ("Trans-Resources"), a Delaware corporation. The Trump Group, whose members are the plaintiffs-below appellees,[1] brought a Court of Chancery action under 8 *Del. C.* § 225[2] against Arie Genger ("Genger"), the defendant-below appellant,[3] to determine which stockholder group possessed the majority voting interest entitled to elect the Trans-Resources board of directors. In two separate opinions and a final judgment order, the Court of Chancery concluded that the Trump Group collectively owned 67.7477% of the Trans-Resources shares, and that the Trump Group's majority vote would determine the lawful membership of the corporation's board.[4] The Court of Chancery also determined that Genger had violated a *status quo* court order prohibiting the destruction of certain electronically stored documents and materials pending the litigation, and

---

[1] The Trump Group, who are also counter-claim defendants, include TR Investors, LLC ("Investors"), Glenclova Investment Co. ("Glenclova"), New TR Equity I, LLC, and New TR Equity II, LLC (collectively, the "Trump Group").

[2] 8 *Del. C.* § 225 (authorizing the Court of Chancery to "determine the validity of any election, appointment, removal, or resignation of any director or officer of any corporation, and the right of any person to hold or continue to hold such office. . . .").

[3] Genger is also a counterclaim-defendant below.

[4] Final Judgment Order at ¶ 7, C.A. 3994 (Del. Ch. Aug. 18, 2010) (the "Final Judgment Order"); *TR Investors, LLC v. Genger*, 2010 WL 3279385 (Del. Ch. Aug. 9, 2010) (the "Side Letter Op."); *TR Investors, LLC v. Genger*, 2010 WL 2901704, at *22 (Del. Ch. July 23, 2010) (the "Merits Op.").

sanctioned Genger for those violations.[5]   For the reasons discussed below, we affirm in part and reverse in part the judgment of the Court of Chancery.

## FACTUAL AND PROCEDURAL BACKGROUND[6]

A. The Stockholders Agreement

In 1985, Genger[7] formed Trans-Resources, a Delaware corporation that specializes in manufacturing fertilizer and producing chemicals for agricultural use.   Trans-Resources was wholly owned by TPR Investment Associates, Inc. ("TPR"), an entity that in turn was wholly owned by Genger, his wife, and his family trusts.   As TPR's majority shareholder, Genger also controlled Trans-Resources.   Genger's wife, Dalia, and their two children, Orly and Sagi, held minority shareholder interests in TPR.   The children's TPR shares were held in two separate trusts, the "Orly Trust" and the "Sagi Trust," respectively.

Although initially successful, by 2001 Trans-Resources was nearly insolvent.   Its bonds were trading at a fraction of their $230 million face value. Genger attempted to negotiate a resolution with Trans-Resources' bondholders, but those negotiations were unsuccessful and Trans-Resources faced the prospect of

---

[5] *TR Investors, LLC v. Genger*, 2009 WL 4696062, at *12, 16 (Del. Ch. Dec. 9, 2009) (hereinafter "Spoliation Op.").

[6] The facts recited are based on the Court of Chancery's post-trial findings of fact.

[7] Because the Genger family members all share the same last name, we refer to Sagi, Orly, and Dalia Genger by their first names to avoid confusion with Arie.

2

bankruptcy. Jules Trump ("Jules"),[8] a close friend of Genger for nearly 25 years, viewed this state of affairs as a valuable business opportunity and caused two Trump Group members, Glenclova and Investors, to purchase $220 million (face value) of Trans-Resources' bonds for $25 million.

Glenclova and Investors then entered into an agreement with Trans-Resources and TPR to convert their bond holdings into an equity interest in Trans-Resources (the "Stockholders Agreement"). Under the Stockholders Agreement, Genger's equity ownership interest in Trans-Resources (through TPR) was reduced from 100% to 52.85%, and Glenclova and Investors owned the remaining 47.15%. In exchange for agreeing to become minority shareholders, Glenclova and Investors extracted certain protections, including significant board representation and veto rights. Those protections were embodied in the Stockholders Agreement.

Glenclova and Investors also sought to ensure that TPR (or some other acceptable Genger-controlled entity) would be the only other Trans-Resources stockholder. To accomplish that, the Stockholders Agreement restricted the transfer of Trans-Resources shares to any persons or entities except those that were designated therein as "Permitted Transferees." If a party to the agreement wished to transfer or sell its shares to a non-Permitted Transferee, the selling party must

---

[8] As with the Genger family, the Trump family members all share the same last name. We refer to Jules and Eddie Trump by their first names to avoid confusion.

3

first give written notice to the other Trans-Resources shareholders, who would then have a right of first refusal. A transfer that failed to comply with those restrictions and the prior notice requirement would automatically be deemed invalid and void, and would trigger the non-selling shareholders' right to purchase the invalidly-transferred shares (the "Purchase Rights").[9]

B. The 2004 Transfers

On October 26, 2004, Arie and Dalia Genger divorced. In the Gengers' divorce settlement agreement, Arie Genger represented that "[e]xcept for the Consent of TPR . . . no consent, approval or similar action of any person is required in connection with the transfer of [Trans-Resources] Stock as contemplated hereby. . . ." That representation was false. In fact, the prior consent of the Trump Group signatories to the Stockholders Agreement (i.e., Glenclova and Investors) was required.

Three days later, on October 29, 2004, Genger transferred his controlling stock interest in TPR to Dalia. Simultaneously, he caused TPR to transfer its 52.85% ownership in Trans-Resources as follows: (i) to himself, approximately 13.9% of those shares; and (ii) to each of the Orly Trust and the Sagi Trust, approximately 19.5% of those shares. Those transfers are collectively referred to in this Opinion as the "2004 Transfers." Under the agreement that documented the

---

[9] Under the Stockholders Agreement, a non-selling shareholder's Purchase Rights would also be triggered if the improper transfer resulted in a change of control of the selling party.

4

2004 Transfers, the trustees of both Trusts purported to give irrevocable lifetime proxies to Genger to vote the Trans-Resources shares held by each Trust (the "Irrevocable Proxies" or "Proxies").

## C. The Funding Agreement and The 2008 Purchase Agreement

When he effectuated the 2004 Transfers, Genger knew that neither Trust was a "Permitted Transferee" of the Trans-Resources shares under the Stockholders Agreement. Despite that, Genger did not notify Glenclova or Investors of the 2004 Transfers, nor did he provide to those Trump Group entities copies of the Irrevocable Proxies or his divorce settlement agreement. Genger claims, nonetheless, that Glenclova and Investors had actual notice of the 2004 Transfers, because he (Genger) orally told Jules about them on several occasions. In both the trial court and this Court, the Trump Group (and Jules) disputed that claim, and steadfastly insisted that Genger never told them of the 2004 Transfers. All parties agree that Genger never formally or specifically disclosed the 2004 Transfers to Glenclova or Investors until June 2008—four years after those transactions took place. That disclosure was made in the circumstances next described.

During the spring of 2008, Trans-Resources again ran into financial difficulty and was facing foreclosure on an overdue bank debt. Again, the Trump Group stepped in and offered to provide Trams-Resources the additional funding needed for repayment—this time, however, in exchange for additional equity that

5

would give Glenclova and Investors majority voting control. Genger agreed to those terms, which were documented in the "2008 Funding Agreement." On June 13, 2008, Genger met with Eddie Trump ("Eddie") and Mark Hirsch, the Trump Group's general counsel ("Hirsch"), to discuss the Funding Agreement. At that meeting, Hirsch handed Genger—and asked him to verify—a document that identified and listed the Trans-Resources stockholders as TPR, Glenclova, and Investors. Confronted with that verification request, Genger had no choice but to disclose that: (i) TPR was no longer a stockholder of Trans-Resources, and (ii) TPR's shares in Trans-Resources had been transferred to himself and to the Orly and Sagi Trusts four years earlier, in the 2004 Transfers. Genger claims, nonetheless, that at that meeting and thereafter, the Trump Group "ratified" the 2004 Transfers. The Trump Group assiduously contest that claim as well.

On June 25, 2008, the Trans-Resources board and stockholders met to consider and approve the 2008 Funding Agreement. At that meeting, the Trump Group representatives expressed their frustration over Genger's (hitherto undisclosed) violation of the Stockholders Agreement. At no point during that meeting or thereafter did the Trump Group tell Genger or anyone else that they approved the 2004 Transfers. To induce the Trump Group to enter into the Funding Agreement, Genger assured them that Glenclova and Investors would obtain majority voting control of Trans-Resources. Genger also promised that the

6

Trump Group would not encounter any objection from Sagi, Genger's then-estranged son, to Genger voting the Sagi Trust's Trans-Resources shares under the Irrevocable Proxy. Based on those representations, the Trump Group decided to proceed with the Funding Agreement.

All that turned out to be wasted effort, however, because shortly thereafter Genger backed out of the 2008 Funding Agreement, having devised a solution that would avoid relinquishing his control of Trans-Resources. That solution was to "upstream" sufficient funds from a Trans-Resources subsidiary to pay Trans-Resources' overdue bank debt. The end result was that Trans-Resources no longer needed the additional capital promised by the 2008 Funding Agreement, and the Trump Group did not obtain their promised majority voting control. Having backed away from the 2008 Funding Agreement, Genger then threatened, at an August 1, 2008 meeting, to sue the Trump Group if they challenged the legal validity of the 2004 Transfers.

In response to Genger's litigation threat, on August 8, 2008, Glenclova invoked its Purchase Rights, conferred by the Stockholders Agreement, to acquire all the Trans-Resources shares purportedly covered by the 2004 Transfers.[10]

---

[10] Specifically, the Trump Group claims that its Purchase Rights were triggered by two independent events, to which the Trump Group never consented: (1) when the Trump Group was not given the opportunity to exercise its first refusal rights as to the 2004 Transfers; and (2) when Genger transferred his majority ownership interest in TPR to Dalia as a result of their divorce settlement agreement, which resulted in a change of control of TPR. *See* Complaint at ¶ 2-3, Case No. 08-CIV-7140 (JFK) (S.D.N.Y. Aug. 11, 2008).

7

Genger rejected that Purchase Rights invocation, claiming that he had previously informed Jules of the 2004 Transfers at the time of his divorce, and, thus, whatever Purchase Rights Glenclova may have obtained under the Stockholders Agreement had long expired. In response to Genger's refusal to honor its claimed Purchase Rights, Glenclova filed a lawsuit in the United States District Court for the Southern District of New York (the "New York litigation") to enforce the Stockholders Agreement, including its Purchase Rights provision.[11] The New York litigation is still pending.

Aware that the New York litigation would be lengthy and perhaps take years to resolve, the Trump Group decided upon a more efficient and expedited course of action: to acquire the Trans-Resources shares that TPR purportedly transferred to the Sagi Trust in the 2004 Transfers (the "Sagi Trust Shares"). Because the Sagi Trust Shares represented a 19.5% stock interest, their acquisition would enlarge the Trump Group's equity interest in Trans-Resources to one of absolute majority control—approximately 67% of the company's voting power. On August 22, 2008, the Trump Group, TPR, and the Sagi Trust reached, and formally entered into, an agreement (the "2008 Purchase Agreement") under which the Trump Group purchased the Sagi Trust Shares. Section 10 of the 2008 Purchase Agreement provided that if the 2004 Transfers were determined to be legally

---

[11] *Glenclova Inv. Co. v. Trans-Resources, Inc.*, Docket No. 08-CIV-7140 (JFK) (S.D.N.Y.).

8

void—as the Trump Group claimed they were—then the Sagi Trust Shares would be deemed—and treated as if they had been—transferred to the Trump Group directly by TPR (now controlled by Sagi),[12] and not by the Sagi Trust.  The purpose of Section 10 was to enable the Trump Group to "cover all its bases," regardless of the outcome of the legal dispute with Genger over the validity of the 2004 Transfers.

That same day, the Trump Group entered into a separate agreement (the "Side Letter Agreement") with TPR (represented by its controller, Sagi), wherein the Trump Group acquired an option to purchase the Trans-Resources shares purportedly transferred to Genger and to the Orly Trust in the 2004 Transfers.[13] The Side Letter Agreement would be triggered only if the 2004 Transfers were judicially determined to be legally void.  In that event, the legal and beneficial ownership of those shares would be deemed to have remained with TPR.  The only signatories to the Side Letter Agreement were the Trump Group and TPR.[14]  The Orly Trust was not a signatory, nor was Genger.

---

[12] Sagi and Dalia serve as the directors of the TPR board, and Sagi is the chief executive officer of TPR.

[13] Specifically, the Side Letter Agreement required that TPR, "upon written request from the [Trump Group] . . . take all necessary action to effect the transfer of [the disputed Trans-Resources] Shares. . . ."

[14] Sagi signed the Side Letter Agreement on behalf of TPR, in his capacity as president of TPR.

D. The Section 225 Chancery Action

By purchasing the Sagi Trust Shares, the Trump Group now owned (through its affiliated entities) the majority equity position in Trans-Resources. On August 25, 2008, the Trump Group exercised its newly-acquired voting control by executing and delivering a written shareholder consent that: (1) removed Genger as a Trans-Resources director, (2) elected Eddie and Hirsch to the Trans-Resources board, and (3) confirmed the prior election of Jules and of Robert Smith to that board. Genger refused to recognize the Trump Group's written consent, claiming that it was invalid and of no legal effect.

The next day, August 26, 2008, the Trump Group filed a Delaware Court of Chancery action under 8 *Del. C.* § 225, for a determination that as Trans-Resources' majority stockholder, the Trump Group was entitled to designate and elect a majority of the members of the Trans-Resources board.[15] The Trump Group's central claim was that the 2004 Transfers were void *ab initio* because: (i) they did not comply with the notice and consent requirements of the Stockholders Agreement, and (ii) therefore, the Trump Group was contractually entitled, under its Purchase Rights, to acquire all of the Trans-Resources shares transferred by

---

[15] As discussed in *infra*, Part III, the Trump Group initially sought a determination of which stockholder group was entitled to elect four of the six Trans-Resources directors. By the time this case was appealed to this Court, however, the scope of the Section 225 action had been expanded, by agreement of all parties, to encompass a determination of which group was entitled to elect the remaining two directors, as well.

10

TPR in 2004. In response, Genger counterclaimed for a determination that the 2004 Transfers were valid, because he had given Jules oral notice of the 2004 Transfers at the time that transaction occurred, and that Jules did not object. Alternatively, Genger claimed, and asked the Court of Chancery to declare, that: (i) the Trump Group's purchase of the Sagi Trust Shares in 2008 operated to "ratify" the 2004 Transfers, and (ii) as a consequence, Genger continued to control Trans-Resources and was entitled to elect a majority of its board.

On September 26, 2008, one month after the Trump Group commenced the Section 225 action, the parties settled their dispute and entered into a stipulated final judgment, which the Court of Chancery approved. That stipulated judgment declared that the Trump Group's designees constituted a lawful majority of the Trans-Resources board.

## E. The Re-Opening of the Section 225 Action and The Spoliation Opinion

Unfortunately, that did not end the dispute. Two weeks after the entry of the stipulated final judgment, the Trump Group moved for relief from that judgment and to re-open the Section 225 proceeding. The Trump Group claimed that, after taking control of Trans-Resources, they discovered that Genger had destroyed documents relevant to the Section 225 action in violation of a document preservation order entered by the Court of Chancery on August 29, 2008 (the "Status Quo Order"). The Vice Chancellor granted the Trump Group's motion and

11

re-opened the case. After conducting a trial in September 2009, the trial court

concluded that Genger had violated, and was in contempt of, the Status Quo Order,

because he had caused the deletion of files stored on his work computer at Trans-

Resources.[16] The trial court further found that after deleting those computer files,

Genger directed an employee to use special software that "wiped" the unallocated

free space on both his computer's hard drive and on a Trans-Resources computer

server. That made it impossible, even by use of computer forensic techniques, to

recover any deleted files that were stored in those computers' unallocated free

space.[17]

As a sanction for those acts of spoliation, the Court of Chancery raised

Genger's evidentiary burden by one level. That is, on any issue in which Genger

had the burden of proof, he would have to satisfy that burden by clear and

convincing evidence, rather than by a preponderance of the evidence.[18] Because

Genger's conduct called his credibility into question, the trial court also ruled that

Genger's uncorroborated testimony would not be sufficient to establish any

material fact.[19] Finally, the trial court awarded the Trump Group $750,000 of the

---

[16] *Spoliation Op.*, 2009 WL 4696062, at *12, 16 (Del. Ch. Dec. 9, 2009).

[17] *Id.* at *16-17.

[18] *Id.* at *18-19.

[19] *Id.*

attorneys' fees they incurred to investigate and litigate Genger's spoliation of computer documents.[20] The parties later agreed that Genger would pay an additional $3.2 million fee to the Trump Group, an amount that the court also awarded.[21]

F. The Merits Opinion and The Side Letter Opinion

In December 2009, the Court of Chancery conducted a separate trial on the merits of the Section 225 claims. In its Merits Opinion, handed down on July 23, 2010, the trial court determined that the Trump Group lawfully possessed a majority voting interest and the resulting right to elect the majority of Trans-Resources' board.[22] Specifically, the Court of Chancery found that Genger never notified the Trump Group of the 2004 Transfers until June 13, 2008.[23] Nor did the Trump Group ever "ratify" the 2004 Transfers after that disclosure, for two separate reasons. First, the Trump Group repeatedly and steadfastly took the position that the 2004 Transfers had occurred in violation of the Stockholders

---

[20] Id. at *19.

[21] The $3.2 million represented the additional reasonable expert fees, technology consultant fees, special master fees, and other unreimbursed expenses incurred in investigating and litigating Genger's spoliation of evidence. Final Judgment Order at ¶ 16, C.A. 3994 (Del. Ch. Aug. 18, 2010); see also TR Investors, LLC v. Genger, 2010 WL 541687 (Del. Ch. Feb. 3, 2010) (distinguishing between the attorneys' fees, and the expert and technology consultant fees incurred during the investigation of Genger's spoliation).

[22] Merits Op., 2010 WL 2901704, at *22 (Del. Ch. July 23, 2010).

[23] Id. at *13.

13

Agreement.[24]  Second, Genger failed to prove that the Trump Group had "benefited in any way that suggests ratification," especially given Genger's repudiation of the 2008 Funding Agreement before it was ever signed.[25]  Finally, the Court of Chancery held that even if the Trump Group had implicitly ratified the 2004 Transfers, the Trump Group still had lawful voting control of Trans-Resources, because they acquired the Sagi Trust Shares free of the Irrevocable Proxy.[26]  The Trump Group, therefore, owned the Sagi Trust Shares by virtue of the 2008 Purchase Agreement, unburdened by any right of Genger to vote those Shares. That 2008 acquisition gave the Trump Group majority voting control of Trans-Resources and the concomitant right to designate and elect four of the company's six directors.

Two weeks later, after issuing its Merits Opinion, the Court of Chancery issued a supplemental opinion (the "Side Letter Opinion") on August 9, 2010.[27] The Side Letter Opinion addressed the ownership of the Trans-Resources shares purportedly transferred to the Orly Trust (the "Orly Trust Shares") and to Genger (the "Genger Shares") in the 2004 Transfers.  In the Side Letter Opinion, the Vice

---

[24] *Id.* at *16.

[25] *Id.*

[26] *Id.* at *20-21.

[27] *Side Letter Op.*, 2010 WL 3279385 (Del. Ch. Aug. 9, 2010).

14

Chancellor acknowledged that the Orly Trust "was not formally before the court" in any capacity.[28] The court determined, nonetheless, that neither Genger nor the Orly Trust beneficially owned any Trans-Resources shares.[29] Rather, the Genger Shares and the Orly Trust Shares continued to be owned by TPR, with the result that Trans-Resources "need not recognize Genger or the Orly Trust as stockholders."[30] Therefore, under the Side Letter Agreement, the Trump Group was entitled to vote both the Genger Shares and the Orly Trust Shares, and thereby elect the remaining two members of the six-person Trans-Resources board.[31]

Genger has appealed from the final judgment that flows from all three of these opinions—the Spoliation, the Merits, and the Side Letter Opinions.

### ANALYSIS

Genger raises three claims of error on this appeal. *First*, as to the Spoliation Opinion, he contends that the Court of Chancery erroneously concluded that he destroyed evidence in violation of the Status Quo Order; consequently, the court abused its discretion by finding him in contempt and by awarding sanctions

---

[28] *Id.* at *1.

[29] *Id.* at *3; *see also* Final Judgment Order at ¶ 9, C.A. 3994 (Del. Ch. Aug. 18, 2010) ("Arie Genger and the Orly Genger Trust are not . . . the record or beneficial owners of any Trans-Resources shares.").

[30] *Side Letter Op.* at *3; *see also* Final Judgment Order at ¶ 8 ("TPR is the record and beneficial owner of all Trans-Resources shares not presently owned by [the Trump Group].").

[31] *Side Letter Op.* at *3 ("[T]he Trump Group may purchase the [Genger] and Orly [Trust] Shares per the terms of the [Side] Letter Agreement, may vote those shares. . . .")

15

entirely disproportionate to any violation. *Second*, as to the Merits Opinion, Genger claims that the Court of Chancery erred by concluding that: (i) the Trump Group never ratified his transfer of Trans-Resources shares to the Sagi Trust (as part of the 2004 Transfers), and (ii) the Irrevocable Proxy associated with the Sagi Trust Shares was invalid and unenforceable. *Third*, Genger argues that the trial court exceeded its jurisdiction by adjudicating, in the Side Letter Opinion, the beneficial ownership of the Orly Trust Shares and the Genger Shares, because neither the Orly Trust nor TPR—both indispensable parties to any such adjudication—were properly before the trial court or subject to its *in personam* jurisdiction.

Genger's claims rest, in whole or in part, on the premise that the trial court erred as a matter of law. We review a trial court's formulation and application of legal principles *de novo*.[32] To the extent that Genger attacks the trial court's factual findings, we will not disturb those findings unless they are clearly erroneous and not supported by the record.[33]

## I. The Spoliation Opinion

Genger's first claims that because the Court of Chancery erroneously found that he caused material evidence to be spoliated, it abused its discretion by holding

---

[32] *Oberly v. Kirby*, 592 A.2d 445, 462 (Del. 1991).

[33] *Osborn v. Kemp*, 991 A.2d 1153, 1158 (Del. 2010).

him in contempt of the August 29, 2008 Status Quo Order. Alternatively, Genger argues that even if the trial court's contempt and spoliation findings are correct, the resulting sanctions were an abuse of the court's discretion, because the $3.2 million expert and attorneys' fee award was disproportionate and excessive.

A trial court has broad discretion to fashion and impose discovery sanctions.[34] In exercising appellate review, this Court "will not disturb a trial judge's decision regarding sanctions imposed for discovery violations absent an abuse of discretion."[35] "Although we may not substitute our own notions of what is right for those of the trial judge, the trial judge's decision to impose sanctions must be just and reasonable."[36] To the extent a decision to impose sanctions is factually based, we accept the trial court's factual findings so long as they are sufficiently supported by the record, are the product of an orderly and logical reasoning process, and are not clearly erroneous.[37] Moreover, "[where] factual findings are based on determinations regarding the credibility of witnesses . . . the

---

[34] *Lehman Capital v. Lofland*, 906 A.2d 122, 131 (Del. 2006).

[35] *Id.* (internal quotation marks and alteration omitted); *see also Cabrera v. State*, 840 A.2d 1256, 1263 (Del. 2004) ("We review for abuse of discretion the sanction imposed by a trial court because of a discovery violation.").

[36] *Lehman Capital*, 906 A.2d at 131 (quoting *Chavin v. Cope*, 243 A.2d 694, 695 (Del. 1968) and *In re Rinehardt*, 575 A.2d 1079, 1082 (Del. 1990)) (internal quotation marks and alteration marks omitted).

[37] *Stegemeier v. Magness*, 728 A.2d 557, 561 (Del. 1999).

17

deference already required by the clearly erroneous standard of appellate review is enhanced."[38]

For the reasons that follow, we conclude that Genger's arguments are without factual or legal merit.  We therefore uphold the Court of Chancery's spoliation and contempt findings and the resulting sanctions imposed.

## A. Was There A Basis For The Trial Court To Find Spoliation And Adjudicate Contempt?

Genger first claims that the evidence was insufficient to establish that he had destroyed relevant documents or that the Trump Group was thereby prejudiced. Because there can be no spoliation without a factually-grounded determination that documents were destroyed, Genger argues, the trial court's spoliation finding lacks record support.  Moreover, because the Status Quo Order did not expressly require the unallocated free space on his computer's hard drive to be preserved, no spoliation or contempt finding would be proper.[39]  That Order directed only that

---

[38] *Cede & Co. v. Technicolor, Inc.,* 758 A.2d 485, 491 (Del. 2000).

[39] In computing terms, "unallocated space" refers to the logical (as opposed to physical) space on a hard drive that the computer's operating system, such as Microsoft Windows, *can* write to, because it is considered empty or "free."  Unallocated space is the opposite of "allocated" space, which is the space on the hard drive where the operating system has already written data files to. Normally, files can only be written to the unallocated "free" space.  *See, e.g., What is unallocated space?,* WHERE IS YOUR DATA? (Oct. 3, 2008), http:// whereismydata.wordpress.com/ (hereinafter "*Unallocated Space*").

On a new (or newly-formatted) hard drive, virtually all of the hard drive space is unallocated space.  That unallocated space is normally filled with zeros (as opposed to ones).  As the computer writes files to the hard drive, the zeros are overwritten with the file data.  When a file is deleted from a computer, the computer's operating system marks the previously allocated

the parties refrain from "tampering with, destroying or in any way disposing of any [Trans-Resources]-related documents, books or records." Because no provision in the Status Quo Order expressly addressed his computer's unallocated free space, Genger claims that the trial court erred by adjudicating him in contempt.

Genger also urges us to reverse on a broader ground—namely, that requiring a party-litigant to preserve a computer's unallocated free space whenever a document-retention policy is in place, would impossibly burden a company-litigant by effectively requiring the company to refrain from using its computers entirely. Genger argues that in the course of a computer's normal operation, its operating

---

space as unallocated. The data from the file itself, however, remains on the hard drive. *See, e.g., Nucor Corp. v. Bell*, 251 F.R.D. 191, 198 (D.S.C. 2008) (explaining unallocated space as it relates to deleted files). For example, assume that a user saves a 10GB movie file onto a new 500GB hard drive. Once the movie file's data is written to the hard drive, the computer's operating system recognizes that the hard drive is 2% allocated space (*i.e.*, the movie file), and 98% unallocated space. If the user now deletes the movie file, the operating system updates the hard drive status to show that there is 100% unallocated space. Of the 500GB of unallocated space, 10GB of that would be the old movie file data, while the remaining 490GB would be zeros. *See, e.g., Unallocated Space.* With normal computer usage, until new files are written to the hard drive, the movie file data will remain deleted but still be recoverable from the hard drive. Even if new files are written to the hard drive, those new files must overwrite the same unallocated space as the movie file data, before the movie file is destroyed and becomes unrecoverable. *See, e.g., Nucor*, 251 F.R.D. at 198; *MMI Products, Inc. v. Long*, 231 F.R.D. 215, 216 (D. Md. 2005).

By using special software, computer forensic experts can recover the 10GB movie data file, even though that file has already been deleted by the user. This recovery process, however, can be performed only if the unallocated free space has not been "wiped"—*i.e.*, overwritten with zeros—or written over with new data files. In the example above, wiping the unallocated free space would result in overwriting the old movie data with zeros, thereby making recovery of that movie file impossible. *See, e.g., Leon v. IDX Sys. Corp.*, 464 F.3d 951, 956 (9th Cir. 2006) (affirming district court's finding that the unallocated free space on a user's computer had been intentionally wiped, thereby making recovery of any files in that space impossible); *Krumwiede v. Brighton Assoc., L.L.C.*, 2006 WL 1308629, at *5 (N.D. Ill. May 8, 2006) (explaining how defragmentation will overwrite existing unallocated space).

19

system is constantly overwriting the unallocated free space by creating and deleting temporary files.[40] Given that technological reality, to expand the scope of a routine document-retention order so as to require preservation of unallocated free space would impose an unworkable standard.[41]

We do not read the Court of Chancery's Spoliation Opinion to hold that as a matter of routine document-retention procedures, a computer hard drive's unallocated free space must always be preserved. The trial court rested its spoliation and contempt findings on more specific and narrow factual grounds—that Genger, despite knowing he had a duty to preserve documents, intentionally took affirmative actions to destroy several relevant documents on his work computer. These actions prevented the Trump Group from recovering those deleted documents for use in the Section 225 and the New York litigations.[42] The

---

[40] For example, every time a user powers on a computer, the computer's operating system will write temporary files to the unallocated hard drive space. Those temporary files are then deleted when the computer is shut down. *See, e.g., Mintel Int'l Group, Ltd. v. Neergheen,* 2010 WL 145786, at *8 (N.D. Ill. Jan. 12, 2010) (finding that even non-user initiated software may have destroyed data); *Antioch Co. v. Scrapbook Borders Inc.,* 210 F.R.D. 645, 652 (D. Minn. 2002) (discussing how normal computer usage may destroy data); *see also Schedule Disk Defragmenter to run regularly,* http://windows.microsoft.com/en-US/windows-vista/Schedule-Disk-Defragmenter-to-run-regularly (indicating that Windows automatically schedules disk defragmentation actions to occur at least once a week to improve computer performance).

[41] The *amici curiae,* Focused Solution Recourse Delivery Group, LLC, The Organization of Legal Professionals, and Security Mentors LLC, have also filed a brief in support of Genger's position on broader contention.

[42] *Spoliation Op.,* 2009 WL 4696062, at *7, 16 (Del. Ch. Dec. 9, 2009); *see also id.* at *10 ("I do conclude that [Genger] intended to limit the ability of the Trump Group to find additional documents that might aid it in its litigation battles with him.").

record establishes that Genger acted furtively, by (among other things) directing an employee to wipe his computer's unallocated free space using a program called "SecureClean" at around 1:00 a.m. on September 8, 2008.[43] Thereafter, that same employee ran SecureClean on the Trans-Resources company server on September 10, 2008.[44] At no point did Genger ever consult with the Trump Group or its counsel before directing that those actions be taken.

The Trump Group remained unaware of the impact of Genger's covert conduct until weeks later, when the Trump Group found itself unable to locate copies of documents that should have been available on Genger's work computer.[45] Specifically, copies of eight separate documents and/or emails should have been— but were not—found on either the Trans-Resources company server or Genger's work computer.[46] The absence of those documents was determined to have prejudiced the Trump Group, because "[d]ifferent versions of documents or e-mail

---

[43] *Id.* at *7. The record shows that Genger's technology advisor, Oren Ohana, had run SecureClean on the "DeepClean" option, which was the most thorough. The DeepClean option permanently overwrote the unallocated free space on the hard drive with new strings of unintelligible data. *Id.*

[44] *Id.*

[45] *Id.* at *11-13.

[46] *Id.* at *11 (explaining that under the established protocol, where Genger would have saved the relevant files on the Trans-Resources server); *id.* at *12 (identifying eight relevant emails, some with attachments, that were not found on the computer image of Genger's hard drive, and noting that Genger "was not a routine 'deleter'" and had accumulated thousands of e-mails in his inbox).

chains can take on material importance if there are alterations or additions to them. And who received what and when can be crucial."[47]  From those missing documents the trial court inferred that other relevant documents would likely have been stored on Genger's computer and/or the Trans-Resources server, and had been permanently deleted and were now unrecoverable.[48]  It was on that specific, narrow factual basis that the trial court: (i) found that Genger had spoliated evidence by intentionally destroying documents, (ii) sanctioned him for that spoliation, and (iii) adjudicated him in contempt of the August 29, 2008 Status Quo Order.

We affirm the Court of Chancery's findings and resulting sanctions, because the trial court did not abuse its discretion or commit any erroneous finding of law or fact.  Our affirmance should not be viewed as extending beyond the confines of this setting—*i.e.*, where a party is found intentionally to have taken affirmative steps to destroy or conceal information to prevent its discovery at a time that party is under an affirmative obligation to preserve that information.  It is noteworthy that there is no evidence or claim in this case, that the use of the SecureClean

---

[47] *Id.* at *12.

[48] *Id.*

22

program fell within Trans-Resources' ordinary and routine data retention and deletion procedures.[49]

To avoid future repetitions of the "unallocated free space" issue presented here, we suggest that the parties and the trial court address any unallocated free space question that might arise before a document retention and preservation order is put in place. We recognize that instances may arise where a party-litigant will have a legitimate reason to preserve unallocated free space on a computer's hard drive. In addressing that issue, the parties must be mindful that court-ordered discovery of electronically-stored information should be limited to what is

---

[49] For example, the outcome perhaps might be different if Trans-Resources had a data retention policy whereby SecureClean was run on employees' computers and the company's servers every three months, and coincidentally, that scheduled run was to occur on September 8, 2008. *See Sears, Roebuck & Co. v. Midcap*, 893 A.2d 542, 548 (Del. 2006) (recognizing that the rationale for giving an adverse inference instruction would not necessarily apply where evidence was destroyed "accidentally or where records are purged under a routine document destruction policy."). We also note that other state and federal courts have differed in their approach to determining whether destruction of evidence due to routine document destruction policies warrants sanctions such as an adverse inference instruction. *Compare, e.g., Reish v. Penn. State Univ.*, 2011 WL 2015350, at *7 (M.D. Pa. May 24, 2011) (finding no spoliation where document destruction was a function of routine company policy) *with R.F.M.A.S., Inc. v. So*, 271 F.R.D. 13, 24 (S.D.N.Y. 2010) (noting that failure to suspend "any routine document destruction or other processes involved in the ordinary course of business that might result in the destruction of potentially relevant evidence" may result in sanctions); *see also Victor Stanley Inc. v. Creative Pipe, Inc.*, 269 F.R.D. 497, 542-553 (D. Md. 2010) (comparing the various approaches taken by the United States Circuit Courts of Appeal).

"reasonably accessible."[50] That determination, by its very nature, must be made on a case-by-case basis.[51]

## B. Was the $3.2 Million Fee Award An Abuse of Discretion?

Genger next claims that even if the Court of Chancery's spoliation and contempt findings were correct, the court abused its discretion by awarding the Trump Group an additional $3.2 million in fees as a sanction for those violations. He argues that that fee award was disproportionate to any violations, particularly since the trial court had earlier imposed as sanctions a heightened burden of proof and a prior $750,000 attorneys' fees award.

Assuming without deciding that $3.2 million falls on the higher end of the range of a reasonable fee, the record establishes that Genger expressly waived his right to challenge the reasonableness of that award. The Court of Chancery's Final Judgment Order expressly recites that Genger "agree[d] that he w[ould] not challenge the reasonableness of the amount of such fee award (whether on appeal or otherwise), except on the ground that it was improper to award any sanction . . .

---

[50] *See* FED. R. CIV. P. 26(b)(2)(B) (limiting discovery of electronically-stored information to that which is "reasonably accessible"); *Rimkus Consult. Grp. v. Cammarata*, 688 F.Supp.2d 598, 612 (S.D. Tex. 2010) (analyzing the duty to preserve by focusing on proportionality and reasonableness); *Zubulake v. UBS Warburg LLC*, 220 F.R.D. 212, 216-18 (S.D.N.Y. 2003) (recognizing that a corporation does not have a duty to preserve "every" data source, because such a rule would "cripple large corporations . . . [that] are almost always involved in litigation").

[51] *Rimkus Consult. Grp.*, 688 F.Supp.2d at 613.

24

for [the Court of Chancery's] contempt finding. . . ."[52]   Therefore, this issue was not properly preserved for appeal and, at most, is reviewable only for plain error.[53]

We find no plain error.   The $3.2 million figure was not arbitrarily determined. The amount of attorneys, expert, and technology consultant fees was hotly contested, and that $3.2 million figure was the result of the parties' compromise.[54]   In these circumstances, the reasonableness of that fee award does not, nor could it, constitute plain error. Consequently, that award must be upheld.

## II. The Merits Opinion

Genger next claims that the Court of Chancery erroneously concluded, in its Merits Opinion, that the Trump Group did not ratify the 2004 Transfer to the Sagi Trust. Genger contends that the Trump Group, by its conduct, twice ratified those transfers after the June 13, 2008 meeting at which the Trump Group was first told about them.   Genger also attacks, as legally erroneous, the Vice Chancellor's determination that the Irrevocable Proxy associated with the Sagi Trust Shares was invalid under New York law and that, in any event, the Proxy did not run with the Sagi Trust Shares after those shares were sold to the Trump Group.

---

[52] Final Judgment Order at ¶ 16, C.A. 3994 (Del. Ch. Aug. 18, 2010).

[53] *Beebe Med. Ctr., Inc. v. Bailey*, 913 A.2d 543, 550 (Del. 2006) (noting that "waiver occurs where a party fails to object or raise that issue on appeal, unless the error is plain.").

[54] *See* Final Judgment Order at ¶ 16.

25

Both arguments fail because they ignore the trial court's factual findings and lack legal merit. Our reasons follow.

## A. Did the Trump Group Ratify The 2004 Transfer To the Sagi Trust?

Genger claims that the undisputed facts establish that the Trump Group twice ratified the 2004 Transfers to the Sagi Trust. The first ratification, Genger argues, occurred at the June 25, 2008 meeting when the Trump Group solicited and accepted Genger's vote of the Sagi Trust Shares to approve the (later repudiated) 2008 Funding Agreement. Genger claims that by recognizing his right to vote the Sagi Trust Shares, the Trump Group necessarily ratified the disputed 2004 Transfers. The second ratification is said to have occurred when the Trump Group purchased the disputed Trans-Resources shares from the Sagi Trust under the 2008 Purchase Agreement. Without the 2004 Transfers, Genger insists, the Sagi Trust would have had no Trans-Resources shares to sell to the Trump Group. Therefore, the 2004 Transfers were necessarily ratified if the 2008 Purchase Agreement was to have any legal force. Neither argument, in our view, has merit.

Ratification is an equitable defense[55] that precludes a party "who [has] accept[ed] the benefits of a transaction from thereafter attacking it."[56] Ratification

---

[55] *Frank v. Wilson & Co.*, 32 A.2d 277, 283 (Del. 1943).

[56] *Giammalvo v. Sunshine Min. Co.*, 1994 WL 30547 at *10 (Del. Ch. Jan. 31, 1994) (citing *Kahn v. Household Acq. Corp.*, 591 A.2d 166, 177 (Del. 1991)), *aff'd* 651 A.2d 787 (Del. 1994).

may be either express or implied through a party's conduct, but it is always a "voluntary and positive act."[57]   It is undisputed that the Trump Group never expressly or formally ratified the 2004 Transfers.   The Court of Chancery explicitly found that "[a]t no point did the Trump Group tell Genger that it [had] accepted the 2004 Transfers."[58]   The sole issue, then, becomes whether the Trump Group, by its post-June 13, 2008 conduct,[59] implicitly ratified the 2004 Transfers. The record establishes that no implied ratification of the 2004 Transfers by the Trump Group ever took place.

Implied ratification occurs "[w]here the conduct of a complainant, subsequent to the transaction objected to, is such as reasonably to warrant the conclusion that he has accepted or adopted it, [and] his ratification is implied through his acquiescence."[60]   Ratification of an unauthorized act may be found from conduct "which can be rationally explained *only* if there were an election to treat a supposedly unauthorized act as in fact authorized."[61]   Ratification may also be found where a party "receives and retains the benefit of [that transaction]

---

[57] *Frank*, 32 A.2d at 283.

[58] *Merits Op.*, 2010 WL 2901704, at *16 (Del. Ch. July 23, 2010).

[59] The relevant date is June 13, 2008, because that was when Genger had first informed the Trump Group of the 2004 Transfers. *Id.* at *13-14.

[60] *Frank*, 32 A.2d at 283.

[61] *Dannley v. Murray*, 1980 WL 268061, at *4 (Del. Ch. July 3, 1980) (emphasis added).

without objection, [] thereby ratify[ing] the unauthorized act and estop[ping] itself from repudiating it. . . ."[62]

The Court of Chancery found "no basis to conclude that the Trump Group assented to the 2004 Transfers by accepting Genger's vote on behalf of the Sagi and Orly Trust[s] in favor of the [2008] Funding Agreement."[63]   The record evidence fully supports that finding.  The Trump Group never received or retained any benefit from the 2008 Funding Agreement, and ratification is not the only rational explanation for the Trump Group's conduct.  The uncontroverted evidence shows that the Trump Group was reluctant to invest additional risk capital into Trans-Resources, and would do that only if given majority voting control.  The Trump Group agreed to enter into the 2008 Funding Agreement with Genger, because Genger represented that he "would rectify [his] violation of the Stockholders Agreement by ensuring that the Trump Group had voting control."[64]   Moreover—and of critical importance—the parties never performed or even executed the 2008 Funding Agreement, because Genger repudiated it.[65]   In these

---

[62] *Hannigan v. Italo Petroleum Corp. of Am.*, 47 A.2d 169, 172-73 (Del. 1945) (quoting 3 THOMPSON ON CORPS., § 2121 (3d ed.)); *Dannley*, 1980 WL 268061, at *4 (noting that implicit ratification "may arise by the retention of benefits with knowledge of the unauthorized acts"); *see also Frank*, 32 A.2d at 282; *Giammalvo*, 1994 WL 30547, at *10.

[63] *Merits Op.*, 2010 WL 2901704, at *16.

[64] *Id.* at *17.

[65] *Id.* at *16.

circumstances, the Trump Group's willingness to accept Genger's vote on behalf of the Sagi and Orly Trusts in favor of the 2008 Funding Agreement cannot be fairly viewed as acquiescing in the 2004 Transfers. That is because the Trump Group never received the negotiated benefit (*i.e.*, voting control) that was to be the *quid pro quo* for the Trump Group's alleged willingness to accept and recognize Genger's vote on those Trusts' behalf.[66]

Nor can the Trump Group's conduct after the June 13, 2008 meeting be "fairly viewed only as evincing an intent to approve the unauthorized acts"[67] (here, the 2004 Transfers). Contrary to Genger's assertion, the 2008 Purchase Agreement did not implicitly ratify the 2004 Transfers, because in that 2008 Agreement, the Sagi Trust and TPR expressly conveyed only such interest as they may have had in the disputed Trans-Resources shares. Moreover, in Section 10 of the 2008 Purchase Agreement, both the purported transferor (TPR) and the purported transferee (the Sagi Trust) agreed on a mechanism whereby the Trump Group's share acquisition would be fully protected if the 2004 Transfers were determined to be void. Thus, the 2008 Purchase Agreement itself fatally undermines any claim that the Trump Group intended, by its conduct, to "ratify" the 2004 Transfers.

---

[66] *See Hannigan*, 47 A.2d at 172-73; *Dannley*, 1980 WL 268061, at *4.

[67] *Dannley*, 1980 WL 268061, at *5.

At no point did the Trump Group ratify the 2004 Transfers, either expressly or by implication. To the contrary, at all times the Trump Group acted consistently with their position that the 2004 Transfers were void.[68]  Genger's ratification claim, therefore, fails on factual and legal grounds.

## B. Were The Sagi Trust Shares Purchased Subject To The Irrevocable Proxy?

Genger next claims that the Merits Opinion erroneously determined that the Irrevocable Proxy was both legally invalid and, in any event, inapplicable to the shares acquired in the 2008 Purchase Agreement.  The Court of Chancery held that even if the Trump Group did ratify the 2004 Transfer of the Trans-Resources shares to the Sagi Trust, the Sagi Trust Shares, once acquired by the Trump Group under the 2008 Purchase Agreement, were no longer subject to Genger's Irrevocable Proxy.  The court so held for three reasons.  First, the Irrevocable Proxy did not explicitly provide that it was to run with the Sagi Trust Shares if those shares were sold, nor did the Proxy explicitly reserve any voting powers to Genger in the event of a sale or transfer.[69]  Second, even if the Proxy language was ambiguous on that point, public policy considerations relating to the separation of voting control from underlying economic stock ownership, which would result in

---

[68] *Merits Op.*, 2010 WL 2901704, at *16 (finding that "the clear and consistent message from the Trump Group to Genger at all relevant times was that the Stockholders Agreement had been violated.").

[69] *Id.* at *20.

30

"empty voting," required construing the Proxy strictly against any implied reservation of voting power.[70]   Third, and in any case, the Proxy was not "irrevocable" under New York law, because neither Genger nor the Sagi Trust were Trans-Resources shareholders, as Sections 609 and 620 of the New York Business Corporation Law required that they be, at the time the Proxy was executed.[71]

Genger challenges these conclusions.  With respect to the third issue— whether the Proxy was "irrevocable" under New York law—Genger claims that both he and the Sagi Trust were, in fact, Trans-Resources shareholders at the time the Proxy was executed.  Genger asserts that the Proxy was executed on October 30, 2004, one day after he effectuated the 2004 Transfers to the Sagi Trust and to himself.   Therefore, Genger tells us, the Proxy satisfied the requirements of Sections 609 and 620 of the New York Business Corporation Law.

This argument suffers from two fatal flaws.  First, it was never fairly presented to the trial court.  Second, it is unsupported by the record.  Genger represented to the Vice Chancellor that "the Sagi Trust executed the Irrevocable

---

[70] *Id.* at *20-21.

[71] *Id.* at *21. The Court of Chancery found that New York law governed the Irrevocable Proxy. The trial court's choice of law has not been appealed.  Under New York law, a proxy is irrevocable where the proxy is held by "[a] person designed by or under paragraph (a) of section 620." N.Y. BUS. CORP. LAW § 609(f).  Section 620, paragraph (a), applies only to "[a]n agreement between two or more shareholders. . . ." N.Y. BUS. CORP. LAW § 620(a).

31

Proxy on October 29, 2004," *the same day* that the 2004 Transfers were executed. At no point did Genger argue to the Court of Chancery (as he now argues to us) that the Irrevocable Proxy was executed *the day after* the 2004 Transfers took place. We therefore decline to consider Genger's first argument, raised for the first time on appeal, because it was never fully and fairly presented to the trial court, as Supreme Court Rule 8 requires.[72]

On the second issue—the Irrevocable Proxy's inapplicability—Genger contends that the Court of Chancery read the Proxy language too narrowly, by incorrectly applying a new, uncharted form of "heightened scrutiny" and thereby concluding that the Proxy created "empty voting" concerns. That was error, Genger argues, because the only legal principle applicable here is that a purchaser that buys shares with notice of an irrevocable proxy takes those shares subject to that proxy. Because the Trump Group knew of the existence of the Proxy at the time it negotiated the 2008 Purchase Agreement, Genger claims, that fact alone triggered the Proxy's applicability. That the Proxy contained no language explicitly binding subsequent transferees is of no relevance.

This argument cannot withstand scrutiny either. First, as a matter of law, the Proxy was not "irrevocable," because it did not satisfy the applicable New York

---

[72] DEL. SUP. CT. R. 8; *see also Russell v. State*, 5 A.3d 622, 627 (Del. 2010) ("Under Supreme Court Rule 8 and general appellate practice, this Court may not consider questions on appeal unless they were first fairly presented to the trial court for consideration.").

32

statutory requirements. Whether or not the Trump Group knew of the Proxy at the time they purchased the Sagi Trust Shares is immaterial, because a contracting party's knowledge of a proxy's existence cannot cure that proxy's non-compliance with controlling statutory requirements, or transmute a terminable proxy into one that is irrevocable under New York statutory law.

Finally, and apart from its failure to satisfy applicable statutory requirements, the Proxy's plain language defeats Genger's position. The Proxy relevantly provided that:

> The [Sagi Trust] . . . does hereby constitute and appoint Arie Genger
> . . . to vote as its proxy, all shares of common stock of [Trans-
> Resources] *which are now or hereafter owned by the Trust*, at any and
> all meetings of the stockholders of Trans-Resources. . . .

Contrary to Genger's claim, the Court of Chancery did not interpret that Proxy language too narrowly. By its plain terms, the Proxy language applied only to the Trans-Resources shares "owned" by the Sagi Trust. That is, the Proxy would attach only to those Trans-Resources shares that were "now or hereafter *owned by the Trust*." The Proxy contains no provision that would bind any *subsequent* owner of those shares. Once sold or transferred to a subsequent owner, those shares were no longer "owned by the [Sagi] Trust" and therefore, were no longer subject to the Proxy. Genger cannot complain that the trial court erroneously interpreted the Proxy where its plain language compels that interpretation.

33

For these reasons, we uphold the judgment of the Court of Chancery insofar as it adjudicates the merits of the Trump Group's Section 225 claims.

### III. The Side Letter Opinion

Genger's third and final claim of error is that the Court of Chancery exceeded its authority by deciding the issues addressed in its August 9, 2010 Side Letter Opinion. That opinion (to reiterate) invalidated the 2004 Transfers of Trans-Resources shares to the Orly Trust and to Genger himself, and adjudicated the Trump Group as the lawful record and beneficial owner of those transferred shares.[73]

In its Merits Opinion, the trial court initially declined to reach the ownership issues relating to the Orly Trust and the Genger Shares, because those issues were "unnecessary" to resolve the Section 225 voting control dispute.[74] Later, however, in its supplemental Side Letter Opinion, the court noted that: (i) in deciding the Section 225 issues, it had overlooked the 2008 Side Letter Agreement, and (ii) it was necessary to determine who owned the Orly Trust Shares and the Genger Shares, because the right to elect two of the Trans-Resources' six directors would

---

[73] *Side Letter Op.*, 2010 WL 3279385 (Del. Ch. Aug. 9, 2010).

[74] *Merits Op.*, 2010 WL 2901704, at *19 ("I do not issue any ruling as to [the Orly Trust] shares, because that is unnecessary in this § 225 action."); *see also id.* (finding that requiring Genger to transfer all of his Trans-Resources shares to TPR to be "unnecessary to this control dispute and therefore this § 225 action.").

34

arguably depend upon that determination.[75] The trial court justified adjudicating the ownership of the Genger Shares at that late stage, because Genger "himself sought to have this court declare who was the rightful owner of the [Genger] and Orly [Trust] Shares."[76] In its Final Judgment Order, the court ultimately determined that neither Genger nor the Orly Trust were "the record or beneficial owners of any Trans-Resources shares,"[77] and that TPR was "the record and *beneficial owner* of all Trans-Resources shares not presently owned by the [Trump Group]."[78]

In an about-face, Genger now claims that the Court of Chancery lacked the power to determine that the Trump Group lawfully purchased the Orly Trust Shares and the Genger Shares from TPR. He first argues that the trial court lacked *in personam* jurisdiction over the Orly Trust and TPR, because neither stockholder was made a party to the Section 225 action in any capacity. Second, he claims that all the Side Letter Agreement gave the Trump Group was an option to purchase the Genger and Orly Trust Shares—an option which was never exercised. Finally, Genger contends that adjudicating the validity of the 2004 Transfers under the Side

---

[75] *Side Letter Op.*, 2010 WL 3279385, at *1.

[76] *Id.*

[77] Final Judgment Order at ¶ 9, C.A. 3994 (Del. Ch. Aug. 18, 2010).

[78] *Id.* at ¶ 8 (emphasis added).

35

Letter Agreement exceeded the Court of Chancery's jurisdiction, because the Trump Group's right to buy, and TPR's right to sell, the Genger Shares and the Orly Trust Shares were "collateral" issues, *i.e.*, unnecessary to resolve the merits of the Section 225 claims. We agree with Genger's first claim, do not reach the second, and reject the third.[79]

The purpose of a Section 225 action "is to provide a quick method for review of the corporate election process to prevent a Delaware corporation from being immobilized by controversies about whether a given officer or director is properly holding office."[80] A Section 225 proceeding is summary in character, and its scope is limited to determining those issues that pertain to the validity of actions to elect or remove a director or officer.[81] "In determining what claims are cognizable in a [Section] 225 action, the most important question that must be answered is whether the claims, if meritorious, would help the court decide the

---

[79] Because our disposition of the issues relating to the Court of Chancery's Side Letter Opinion rests on jurisdictional grounds, we do not reach or address Genger's argument that the Side Letter Agreement conferred only an option to purchase the Genger Shares and the Orly Trust Shares, and that the Trump Group never exercised that contractual option.

[80] *Box v. Box*, 697 A.2d 395, 398 (Del. 1997).

[81] *See id.; Nevins v. Bryan*, 885 A.2d 233, 244 n.34 (Del. Ch. 2005); *Adlerstein v. Wertheimer*, 2002 WL 205684, at *7 (Del. Ch. Jan. 25, 2002) ("Because it is summary in nature, a Section 225 proceeding is limited to those issues that must necessarily be considered in order to resolve a disputed corporate election process."); *Arbitrium (Cayman Islands) Handels AG v. Johnston*, 1997 WL 589030, at *3 (Del. Ch. Sept. 17, 1997) (explaining that a Section 225 proceeding has the limited scope of determining "the validity of a corporate election or to determine the right of a person to hold a corporate office in the event that such office is claimed by more than one person." (citation omitted)).

36

proper composition of the corporation's board or management team."[82]  If not, then

those claims "are said to be 'collateral' to the purpose of a [Section] 225 action and

must be raised in a [separate] plenary action."[83]

A Section 225 proceeding is not an *in personam* action.  Rather, it is "in the

nature of an *in rem* proceeding,"[84] where the "defendants" are before the court, not

individually, but rather, as respondents being invited to litigate their claims to the

*res* (here, the disputed corporate office) or forever be barred from doing so.  The

one exception is the corporation itself, which is the entity that embodies the "*res*,"

and is only party before the Court in its "individual" capacity.  The *in rem*

character of a Section 225 action "imposes important limits on the scope of [a]

court's remedial powers even as to claims bearing on whether a person lawfully

holds corporate office."[85]  For example, in a Section 225 action, a plaintiff may

claim that a director-respondent does not validly hold corporate office because that

---

[82] *Agranoff v. Miller*, 1999 WL 219650, at *17 (Del. Ch. Apr. 12, 1999) (internal citation omitted), *aff'd as modified*, 737 A.2d 530 (Table), 1999 WL 636634 (Del. 1999).

[83] *Id.* (internal citation omitted); *see also Box*, 697 A.2d at 398 (holding that a Section 225 action should not be used "for trying purely collateral issues").

[84] *Arbitrium*, 1997 WL 589030, at *4.

[85] *Agranoff*, 1999 WL 219650, at *18.

37

director obtained the office through fraud, deceit, or breach of contract.[86] The Court of Chancery may adjudicate that claim in a Section 225 proceeding, but only for the limited purpose of determining the corporation's *de jure* directors and officers. In a Section 225 proceeding the court "cannot go further and actually rescind a transaction procured through such unlawful behavior or award money damages to those harmed by that behavior."[87] That type of ultimate relief can only be obtained in a plenary action in a court that has *in personam* jurisdiction over any necessary or indispensable parties.[88]

Given the jurisdictional limitations that inhere in a Section 225 action, we affirm the judgment of the Court of Chancery insofar as it determines the *record* ownership of the disputed Trans-Resources shares in the Side Letter Opinion and the Final Judgment Order. All parties agree that the adjudication of record ownership was necessary to determine which side was lawfully entitled to elect the

---

[86] *See, e.g., Kahn Bros. & Co. v. Fischbach Corp.*, 1988 WL 122517, at *5 (Del. Ch. Nov. 15, 1988) (examining whether director obtained position via fraud); *Garrett v. Brown*, 1986 WL 6708, at *2, 6-11 (Del. Ch. June 13, 1986), *aff'd*, 511 A.2d 1044 (Del. 1986) (addressing whether a stockholder's right of first refusal had been violated in a Section 225 proceeding); *Schroder v. Scotten, Dillon Co.*, 299 A.2d 431, 435-36 (Del. Ch. 1972) (deciding whether, under Section 225, the failure to give certain board members notice of special meetings voided the subsequent director elections that occurred at those meetings).

[87] *Agranoff*, 1999 WL 219650, at *18; *Marks v. Menoutis*, 1992 WL 22248, at *5 (Del. Ch. Feb. 3, 1992) ("This Court cannot directly order a transaction to be rescinded in a § 225 proceeding.").

[88] *Agranoff*, 1999 WL 219650, at *18. The New York litigation is an example of such a plenary proceeding.

38

remaining two directors of the Trans-Resources board. We so conclude, even though initially the scope of the Section 225 action was limited to which side—the Trump Group or Genger—had the lawful power to designate the four directors who would comprise the Trans-Resources board majority.[89]

This procedural posture was altered, however, after the Court of Chancery issued its Merits Opinion. At that point, all parties agreed that the scope of the Section 225 action should be expanded to encompass which side had the right to designate and elect the two remaining Trans-Resources directors. That additional question arose because the parties disputed whether the Trump Group was entitled, under its Purchase Rights conferred by the Stockholders Agreement, to acquire the Trans-Resources shares transferred to Genger and the Orly Trust in the 2004 Transfers.[90] If the Trump Group was so entitled, then as a legal matter those shares would continue to be held by TPR, and Genger and the Orly Trust would have no Trans-Resources shares to vote to elect the remaining two directors. If, however,

---

[89] The Trump Group's complaint initially sought a determination that the Trump Group "ha[d] the right, as majority stockholders, to designate and cause the election of their two new designees to the board and to continue the directorships of their two existing designees." And, in a letter to the trial court, the Trump Group represented that "[t]his summary proceeding concerns a dispute between two groups over which is entitled to elect a *majority* of the board of directors of Trans-Resources. . . ." Even after the stipulated settlement agreement fell through, resulting in the Section 225 action being re-opened and litigated to a conclusion, the Trump Group's position was that "[t]he section 225 action is . . . to resolve a dispute over the composition of [Trans-Resources'] board and who is entitled to elect a *majority* of the directors." Similarly, Genger's counterclaim sought a Court of Chancery declaration that he, as majority stockholder, had the sole right to designate and elect four of the six Trans-Resources directors.

[90] *Side Letter Op.*, 2010 WL 3279385, at *1 (Del. Ch. Aug. 9, 2010).

the Trump Group had no contractual right to purchase the Genger and the Orly

Trust Shares, then under the Stockholders Agreement, Genger would be entitled to

designate the remaining two Trans-Resources directors.[91]   Consequently, despite

having earlier concluded that it was unnecessary to address these issues, the Court

of Chancery, at the urging of all parties, now decided that it was necessary, and

that it had the power to decide which party was entitled to vote the Genger and the

Orly Trust Shares in the Section 225 action.

If the only new issue decided at this late stage was who constituted the

lawful record owners of the Genger and Orly Trust shares, the Court of Chancery's

Side Letter Opinion and subsequent Final Judgment Order would pose no problem.

The trial court determined that TPR was the record owner and entitled to vote.

But, the trial court went further—undoubtedly motivated by a desire to promote

litigation efficiency—and adjudicated questions of ultimate beneficial ownership

---

[91] In that latter scenario, Genger would have a 13.9% stock ownership interest and the Orly Trust would have a 19.5% stock ownership interest.  Section 1.2(c) of the Stockholders Agreement provides that:

> If the TPR Stockholders own less than 50% of the outstanding Shares, the group owning the greater number of Shares as between the TPR Stockholders and the Non-TPR Stockholders shall designate four directors and the other group shall, so long as it owns a number of Shares equal to at least 15% of the [] Shares [initially purchased], designate two directors.

Under the Stockholders Agreement, a non-Permitted Transferee stockholder is designated as a TPR Stockholder or a Non-TPR Stockholder depending upon which of the two groups it acquired its shares from.

40

as well. In doing that, however, the Court of Chancery crossed a jurisdictional line and exceeded its powers under Section 225.

An adjudication of who has the right to vote disputed corporate shares for Section 225 purposes cannot constitute a binding adjudication of who beneficially owns those shares, because a Section 225 action is by its nature an *in rem*, not a plenary, proceeding. Only in a plenary proceeding before a court that has *in personam* jurisdiction over the litigants may the court adjudicate the litigants' property interest in disputed corporate shares.[92] Here, the Orly Trust and TPR were never made parties to a plenary proceeding where the trial court had *in personam* jurisdiction over them.[93]

---

[92] *See Staar Surgical Co. v. Waggoner*, 588 A.2d 1130, 1131 (Del. 1991) (holding that under Section 225's predecessor statute, the Court of Chancery could not adjudicate equitable ownership of the disputed voting shares). *See also Rosenfield v. Standard Elec. Equip. Corp.*, 83 A.2d 843, 845 (Del. Ch. 1951) ("Where conflicting stock claims arise in connection with the review of an election under [Section 225's predecessor statute,] this court has the power, even though the claimants be not parties, to decide who had the right to vote the stock in dispute. This does not of course constitute a binding determination of ownership as between the conflicting claimants unless they are parties who have been served with effective process."); *Technicorp Int'l II, Inc. v. Johnston*, 1997 WL 538671, at *7 (Del. Ch. Aug. 25, 1997) (acknowledging that even a narrow reading of *Rosenfield* holds that "an adjudication of ultimate title to (or voiding of) a party's stock is not a remedy available in a § 225 proceeding.").

[93] To be more precise, the record contains no evidence that the Orly Trust and TPR were formally summoned or given an opportunity to be heard even in the Section 225 action. Despite that, we affirm the Court of Chancery's record ownership determinations for limited Section 225 purposes, because the Orly Trust's and TPR's interests in the board election were adequately represented by Genger and the Trump Group, respectively, and no party to the Section 225 action has objected to the trial court determining the record ownership of, and right to vote, the TPR and Orly Trust Shares.

41

In this case, Genger voluntarily asked the trial court to determine that he *beneficially* owned 13.99%, and that the Orly Trust *beneficially* owned 19.43%, of the Trans-Resources shares.   To be sure, Genger and the Trump Group were legally free to consent to the Court of Chancery exercising plenary *in personam* jurisdiction over themselves personally.  What Genger and the Trump Group could not do, however, was consent to that court's exercising personal jurisdiction over anyone else—in this case the Orly Trust or TPR—without valid authorization. Only those entities, through their authorized representatives, were legally empowered to give their consent.

The Court of Chancery never obtained consensual *in personam* jurisdiction over TPR, which was a party to the 2004 Transfers.  Without having consented-to personal jurisdiction over TPR, the trial court could not enlarge the Section 225 proceeding into a concurrent plenary action that would empower the court to determine the ultimate beneficial ownership of the Genger and the Orly Trust Shares.

Nor could the trial court exercise personal jurisdiction over the Orly Trust. Although not altogether clear, it appears that personal jurisdiction was exercised on the basis that Orly Genger, a trust beneficiary, had voluntarily appeared as a non-party witness at the Section 225 trial.  That trial did not implicate the beneficial

42

ownership of the Orly Trust Shares,[94] and the Court of Chancery itself acknowledged that the Orly Trust was "not formally before the court."[95] The trial transcript shows that Orly's testimony related only to whether her father, Genger, had verbally informed Jules of the 2004 Transfers either at the time Genger and Dalia divorced or at some point thereafter, before the parties' June 13, 2008 meeting. Orly's willingness to testify before the trial court in her individual capacity as Genger's daughter did not constitute legal consent to the Court of Chancery's exercising *in personam* jurisdiction over the Orly Trust.[96] A separate

---

[94] *Cf. Shaffer v. Heitner*, 433 U.S. 186, 213 (1977) (explaining that mere ownership of stock in a Delaware corporation, without more, was insufficient to form a constitutionally sufficient basis for the court to exercise *in personam* jurisdiction over the stockholder, because the stock sequestered was "not the subject matter of [the] litigation," and that "the underlying cause of action [was not] related to the [stock]").

[95] *Side Letter Op.*, 2010 WL 3279385, at *1.

[96] *See India S.S. Co. Ltd. v. Kobil Petroleum Ltd.*, 620 F.3d 160, 161-62 (2d Cir. 2010) ("Jurisdiction over a person is conceptually distinct from jurisdiction over the person's property.... The validity of an attachment order [over the person's property] therefore is not settled by a court's attainment of *in personam* jurisdiction over the property owner. Consent to one does not imply or effect consent to the other."). *Cf. In re Real Estate Title & Settlement Servs. Antitrust Litig.*, 869 F.2d 760, 770-71 (3d Cir. 1989), *cert. denied*, 493 U.S. 821 (1989) (concluding that a school board's appearance in federal district court to move to opt out of class action, and appeal of denial of that motion, did not constitute consent to exercise of personal jurisdiction by district court over the school board); *Trans-Asiatic Oil Ltd., S.A. v. Apex Oil Co.*, 804 F.2d 773, 778-79 (1st Cir. 1986) (recognizing that a party's "initial entry of a restricted appearance manifested its lack of consent to personal jurisdiction," but that party's subsequent actions "constituted a waiver of its jurisdictional defenses.").

Although we have recognized that "an individual may submit to the jurisdiction of the court by appearance," those appearances have occurred in the context of "legal arrangements" such as a contractual forum selection clause, an arbitration agreement, or through a party's voluntary use of certain state procedures such as filing a lawsuit in state court. *Massey v. Ball*, 595 A.2d 390, 394 (Del. 1991) (quoting *Ins. Corp. of Ireland, Ltd. v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 703-04 (1982)). None of those "legal arrangements" are implicated here.

43

consent, by an authorized representative of the Orly Trust, was required to accomplish that, and there is no evidence or claim that such consent was ever obtained.

To summarize, the trial court lacked personal jurisdiction over either the Orly Trust or TPR, which was required for a binding adjudication of the beneficial ownership of their respective stock ownership interests.[97]   Without personal jurisdiction over these entities, the Court of Chancery lacked the power to augment TPR's beneficial ownership interest, or diminish the Orly Trust's beneficial ownership interest, in Trans-Resources by adjudicating that TPR beneficially owned the Genger Shares and Orly Trust Shares.[98]   Therefore, the beneficial ownership determinations that flow from the Court of Chancery's August 9, 2010 Side Letter Opinion and its August 18, 2010 Final Judgment Order must be reversed.

## *CONCLUSION*

The judgment of the Court of Chancery is affirmed in so far as it embodies and implements the rulings in the Merits and Spoliation Opinions; and is reversed to the extent it adjudicates the beneficial ownership of the Orly Trust Shares and

---

[97] *Rosenfield v. Standard Elec. Equip. Corp.*, 83 A.2d 843, 845 (Del. Ch. 1951).

[98] Such an adjudication of beneficial ownership can occur only by a court with personal jurisdiction over all indispensable parties. The federal court in the New York litigation would be such a court.

the Genger Shares based on the determinations made in its August 9, 2010 Side Letter Opinion and August 18, 2010 Final Judgment Order.

EFiled: Oct 4 2011 12:39P
Transaction ID 40170462
Case No. 6906-

## IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | |
|---|---|
| DALIA GENGER, as Trustee of the Orly Genger 1993 Trust,<br><br>Plaintiff,<br><br>v.<br><br>TR INVESTORS, LLC, GLENCLOVA INVESTMENT CO., NEW TR EQUITY I, LLC, NEW TR EQUITY II, LLC, TRANS-RESOURCES, INC. and TPR INVESTMENT ASSOCIATES, INC.,<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)   Civil Action No. _____<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

### VERIFIED COMPLAINT

Plaintiff Dalia Genger ("Dalia"), as Trustee of the Orly Genger 1993 Trust (the

"Orly Trust"), by her undersigned attorneys, for her Verified Complaint against

Defendants TR Investors, LLC ("Investors"), Glenclova Investment Co. ("Glenclova"),

TR Equity I, LLC ("Equity I"), TR Equity I, LLC ("Equity II" and together with

Investors, Glenclova and Equity I, "The Trump Group"), TPR Investment Associates,

Inc. ("TPR") and Trans-Resources, Inc. ("Trans-Resources") alleges upon knowledge,

information and belief as follows:

### NATURE OF THE ACTION

1.     On October 29, 2004, as part of a wider multi-million dollar divorce

settlement agreement between Arie Genger ("Arie") and Dalia, Arie caused TPR to

transfer 794.40 shares (13.99%) of Trans-Resource's stock to himself, and 1,102.80

shares (19.43%) of Trans-Resources stock to each of the 1993 Sagi and Orly Trusts.

I

2.      In reliance upon (i) Arie's representation that no consent or approval was required for TPR to transfer the shares to her children and (ii) the representation that Arie caused TPR to make that the shares being transferred to the Orly Trust were "free and clear of any liens, claims or encumbrances" and that the transfer "does not violate the certificate of Incorporation of TPR or *any agreement to which TPR is subject*" (emphasis added), Dalia gave up valuable claims in the divorce settlement to ensure that her children's trusts would be well funded. The Orly Trust also relied on those representations in purchasing the Trans-Resources shares.

3.      On October 30, 2004, Trans-Resource issued a share certificate in the name of the Orly Trust for 1,102.80 shares of Trans-Resources common stock. The share certificate was signed by Arie, as President of Trans-Resources, and Edward Klimerman, Assistant Secretary of Trans-Resources and outside counsel to the company.

4.      Trans-Resources delivered the Orly Trust's share certificate to Arie, who was contractually obligated to act as the Orly Trust's proxy for voting the Trans-Resources shares. Arie maintained possession of the Orly Trusts' original share certificate and sent a copy of it to both Dalia and the Orly Trust.

5.      Thus, the Orly Trust is a bona fide and protected purchaser of the Trans-Resources stock because (i) value was given for the Orly Trust's shares of Trans-Resources stock, (ii) the Orly Trust did not have notice of any adverse claim to the shares represented by its share certificate, and (iii) the Orly Trust obtained control of its Trans-Resources share certificate by way of its delivery to Arie, who held the certificate on the Orly Trust's behalf.

2

6.     Consequently, the Orly Trust seeks a declaratory judgment that it is the beneficial owner of the 1,102.80 shares of Trans-Resources stock represented by the share certificate.

## PARTIES

7.     The Plaintiff Dalia Genger ("Dalia") is the mother of Sagi Genger ("Sagi") and Orly Genger ("Orly") and the former wife of Arie Genger ("Arie"). Dalia is the trustee of the 1993 Orly Genger Trust.

8.     Defendant Trans-Resources, a privately-held Delaware Corporation, is a manufacturer and worldwide distributor of agricultural fertilizer.

9.     Defendant TPR, a Delaware corporation, is the record holder of the 1,102.80 shares that the Orly Trust purchased in 2004.

10.     Defendant Investors, a New Jersey Limited Liability Company, purportedly exercised its rights under the 2008 Side Letter Agreement to purchase from TPR the Trans-Resources common stock that was previously purchased by the Orly Trust.

11.     Defendant Glenclova, a Cayman Islands company, purportedly exercised its rights under the 2008 Side Letter Agreement to purchase from TPR the Trans-Resources common stock that was previously purchased by the Orly Trust.

12.     Defendant Equity I, a Delaware limited liability company, purportedly exercised its rights under the 2008 Side Letter Agreement to purchase from TPR the Trans-Resources common stock that was previously purchased by the Orly Trust.

13.     Defendant Equity II, a Delaware limited liability company, purportedly exercised its rights under the 2008 Side Letter Agreement to purchase from TPR the Trans-Resources common stock that was previously purchased by the Orly Trust.

3

## JURISDICTION

14.     This Court has jurisdiction over this action pursuant to 8 *Del. C.* § 111 and 10 *Del. C.* § 6501, *et. seq.*

## FACTUAL BACKGROUND

**The 2001 Stockholders Agreement**

15.     In 1985, Arie formed Trans-Resources.

16.     Until 2001, TPR held Arie's 100% stake in Trans-Resources. TPR was owned by Arie, Dalia and their two children, Sagi and Orly. As TPR's majority (51%) shareholder, Arie controlled Trans-Resources.

17.     Dalia, Sagi and Orly, through the Sagi and Orly Trusts (which were established by Arie in 1993 as part of a Genger family estate plan), held a minority (49%) interest in TPR.

18.     In 2001, Glenclova and Investors entered into an agreement with Trans-Resources and TPR to convert their bond holdings into an equity interest in Trans-Resources (the "Stockholders Agreement"). Under the Stockholders Agreement, Glenclova and Investors acquired 47.15% of Trans-Resources common stock from Arie (through TPR), thereby reducing Arie's ownership interest in Trans-Resources to 52.85%.

19.     The Stockholders Agreement restricted the transfer of Trans-Resources stock to any persons or entities except those who were designated as "Permitted Transferees." If a party to the Stockholders Agreement wished to transfer or sell its shares to a non-Permitted Transferee, the selling party was required to give written notice to the other Trans-Resources shareholders, who would have a right of first refusal. A transfer that failed to comply with those restrictions and the prior notice requirement

4

would be deemed invalid and void, and would trigger the non-selling shareholders' right to purchase the invalidly-transferred shares.

**The Orly Trust Receives Trans-Resources Stock, for Valuable Consideration, Without Notice of Any Adverse Claim**

20.     After years of litigation regarding their divorce, on October 30, 2004, Arie and Dalia executed a stipulation of settlement (the "Divorce Agreement").

21.     The Divorce Agreement equitably divided Arie and Dalia's marriage assets and provided for certain assets to be transferred to the Sagi and Orly Trusts, assets in which they already had an equitable stake through their minority ownership in TPR.

22.     Thus, simultaneously with the Divorce Agreement, TPR entered into an agreement (the "Letter Agreement") with the Sagi and Orly trusts to sell, transfer and convey 1,102.80 shares of Trans-Resources stock to each of those entities. *See* Letter Agreement dated October 29, 2004, attached hereto as Exhibit A.

23.     Arie, as CEO of Trans-Resources, represented in the Divorce Agreement that "[e]xcept for the Consent of TPR . . . no consent, approval or similar action of any person is required in connection with the transfer of [Trans-Resources] Stock as contemplated hereby . . . ."

24.     Moreover, in the Letter Agreement, which transferred the Trans-Resources stock from TPR to the Orly Trust, Arie caused TPR to represent that "the shares are being transferred hereunder free and clear of any liens, claims or encumbrances and such transfer does not violate the certificate of Incorporation of TPR or any agreement to which TPR is subject." Ex. A.

25.     Dalia relied on those representations in giving up certain claims in the divorce so as to financially benefit her children's trusts and provide for their inheritance.

5

The Orly Trust also relied on those representations in purchasing the Trans-Resources shares from TPR.

**Trans-Resources Delivers a Stock Certificate to the Orly Trust**

26.     On October 30, 2004, Trans-Resources issued a stock certificate to the Orly Trust for 1,102.80 shares of its common stock.

27.     The stock certificate was signed by Arie as President of Trans-Resources, and Edward Klimerman, as Assistant Secretary of Trans-Resources.

28.     The transfer of the Trans-Resources stock to the Orly Trust in October 2004 was registered in the books and records of Trans-Resources.

29.     Trans-Resources delivered the Orly Trust's share certificate to Arie, the Orly Trust's proxy for voting the Trans-Resources shares.

30.     Arie maintained physical possession of the Orly Trust's stock certificate, and forwarded a copy of the certificate to both Dalia and the Orly Trust.

**The Trump Group Exercises an Option to Purchase the Orly Trust Shares**

31.     On August 22, 2008, TPR entered into an agreement with the Trump Group to sell the Trump Group an option to purchase the Trans-Resources shares transferred to the Orly Trust in 2004 if a court found that the transfers of the Trans-Resources shares were void (the "Side Letter Agreement").

32.     The Side Letter Agreement expressly provides that if a court determines "that the Orly Genger 1993 Trust is not the record and beneficial owner of the 1,102.80 shares of Common Stock of the of the Company purportedly transferred to such Trust by TPR in October, 2004," then Trump Group could exercise an option to purchase those shares.

6

33.    In February 2011, the Trump Group exercised its option to purchase the

Trans-Resources stock held by the Orly Trust.

## The Supreme Court Reverses this Court's Holding Regarding Beneficial Ownership of the Shares Held in the Orly Trust

34.    On July 18, 2011, the Delaware Supreme Court affirmed, among other

things, this Court's finding in its August 9, 2010 Side Letter Opinion (the "Side Letter

Opinion") that TPR was the record owner of the shares transferred to Arie pursuant to the

2004 Letter Agreement.

35.    The Delaware Supreme Court reversed this Court's determinations in the

Side Letter Opinion and August 18, 2010 Final Judgment Order to the extent that it

adjudicated "the beneficial ownership of the Orly Trust Shares." (Op. at 44)

36.    This action addresses one of the issues that the Delaware Supreme Court

held that this Court did not have jurisdiction to decide: the Orly Trust's beneficial

ownership of the Trans-Resources shares.

## COUNT I
### (Declaratory Judgment that the Orly Trust is the Beneficial Owner of 1,102.80 of Trans-Resources Common Stock)

37.    Plaintiff repeats, re-alleges and incorporates by reference the allegations

set forth above in the preceding paragraphs.

38.    Based upon representations that Arie made or caused to be made that the

restrictions in the Stock Purchase Agreement did not apply or were waived, the Trustee

for the Orly Trust, Dalia (the eventual Trustee) and Orly had no knowledge, either actual

or constructive, of any current or potential adverse claim against those shares.

39.    In reliance upon those representations, Dalia provided valuable

consideration for the Trans-Resources shares that TPR transferred to the Orly Trust by

7

relinquishing significant claims in the divorce. In further reliance upon those representations, the Orly Trust purchased the 1,102.80 shares of Trans-Resources stock.

40.     The share certificate issued to the Orly Trust was signed by authorized officers of Trans-Resources.

41.     Trans-Resources delivered the Orly Trust's share certificate to Arie, who held possession of it as the Orly Trust's proxy for voting the shares. Arie delivered a copy of the share certificate to the Orly Trust and Dalia.

42.     Because the Orly Trust acquired the legal rights to the Trans-Resources shares for value, with no knowledge of any adverse claim, it is a "bona fide purchaser" or protected purchaser whose rights to the Trans-Resources shares may not be nullified by the Trump Group.

43.     The Orly Trust is entitled to a declaratory judgment that it is the beneficial owner of Trans-Resources shares that it purchased from TPR in October 2004.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court enter an order:

a)     Declaring that the Orly Trust is the beneficial owner of the 1,102.80
         Trans-Resources shares that it purchased in 2004, for all purposes;

b)     Requiring Trans-Resources to pay to the Orly Trust any dividends that
         have been issued on the Trans-Resources shares since the Orly Trust
         acquired them on October 29, 2004.

c)     Granting the Orly Trust such other and further relief as the Court deems
         just and proper.

8

Dated: October 4, 2011

CONNOLLY BOVE LODGE & HUTZ LLP

*/s/ Jeremy D. Anderson*

Jeremy D. Anderson (No. 4515)
The Nemours Building
1007 N. Orange Street
P. O. Box 2207
Wilmington, DE 19899
Tel: (302) 658-9141
Fax: (302) 658-5614
*Attorneys for Plaintiff*

4493617_1.DOC

9

Filed 10/08/19   Page 88 of 121

SUPREME COURT OF THE STATE OF NEW YORK — NEW YORK COUNTY
PRESENT:          HON. PAUL G. FEINMAN          PART    12
                        J.S.C.

Orly Genger, etc.

                                      AMENDED DECISION
                                      & ORDER
                                      INDEX NO.     109749/09 E

                                      MOT. DATE     _____

        - v -                         MOT. SEQ. NO.     001-006

Dalia Genger, et al.                  MOT. CAL. NO.     _____

                                              **E-FILE**

The following papers, numbered 1 to _____ were read on this motion to/for _____

|  | PAPERS NUMBERED |
|---|---|
| Notice of Motion/Petition/O.S.C. — Affidavits — Exhibits | _____ |
| Answering Affidavits — Exhibits | _____ |
| Replying Affidavits | _____ |

**CROSS-MOTION:**  ☒ Yes  ☐ No

Upon the foregoing papers, it is

ORDERED that the decision and orders of this court dated June 28, 2010 and filed on July 2, 2010 which resolved motions bearing sequence numbers 001, 002, 003, 004, 005 and 006 are hereby vacated and recalled. This "gray" sheet (short form order) and the annexed Amended Decision & Order shall be substituted in their stead as the decision & order for the motions bearing seg. nos. 001 through 006, inclusive.

So ordered,

Dated: 7/28/2010
        7:25 PM
                        _____
                        J.S.C.

Check one:  ☐ FINAL DISPOSITION   ☒ NON-FINAL DISPOSITION
Check if appropriate:   ☐ DO NOT POST   ☐ REFERENCE
                        ☐ PC DATE_____   ☐ CC Date_____

MOTION/CASE IS RESPECTFULLY REFERRED TO JUSTICE

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK: CIVIL TERM: PART 12
-----------------------------------------------------------------------X
ORLY GENGER, in her individual capacity and on
behalf of the Orly Genger 1993 Trust (both in its
individual capacity and on behalf of D & K
Limited Partnership),

                Plaintiff,

          against

DALIA GENGER, SAGI GENGER, D & K GP
LLC, and TPR INVESTMENT ASSOCIATES,
INC.,

                Defendants.
-----------------------------------------------------------------------X

Index No.  109749/2009E
Mot. Seq. Nos.  001 through
               006

***AMENDED***
**DECISION AND ORDER**

**For the Plaintiff:**
Zeichner Ellman & Krause LLP
575 Lexington Avenue
New York, NY 10022
(212) 223-0400

**For Dalia Genger:**
Pedowitz & Meister LLP
1501 Broadway
New York, NY 10036
(212) 403-7330

**For D&K GP, LLC:**
Finkelstein Newman Ferrara LLP
225 Broadway
New York, NY 10007

**For Sagi Genger:**
McLaughlin & Stern, LLP
260 Madison Avenue
New York, NY 10016
(212) 448-1100

**For TPR:**
Lyons McGovern, LLP
The Hennessy House
16 New Broadway
Sleepy Hollow, NY 10591
(914) 631-1336

     E-filed papers considered in review of this motion brought by order to show cause for a preliminary injunction, motions for summary judgment, and motion to amend:

| | **Papers:** | **E-File Number:** |
|---|---|---|
| **Seq. No. 001** | Order to Show Cause & TRO, Exhibits, Memo of Law in Support | 6, 7, 7-1, 9 |
| | Affidavit & Affirmation in Opposition, Exhibits, Memo of Law | 35, 35-1 - 35-8, 36, 37 |
| | Affidavit & Affirmation in Opposition, Memo of Law, Exhibit | 38, 39, 40, 40-1 |
| **Seq. No. 002** | Notice of Motion, Affirmations, Exhibits | 12, 13, 13-1 - 13-6, 18, 18-1 - 18-9 |
| | Pl.'s Omnibus Memo. of Law in Opp. | 52 |
| | Reply Memo of Law (Dalia Genger) | 61 |
| | Reply Memo of Law | 65 |
| **Seq. No. 003** | Notice of Motion, Affirmation, Exhibits, Memo of Law | 15, 16, 16-1 - 16-9, 19 |
| | Pl.'s Omnibus Memo. of Law in Opp. | 52, 53 |
| | Memo of Law in Reply, Affirmation, Exhibit | 59, 60, 60-1 |
| | Reply Affirmation, Exhibits, Memo of Law | 62, 62-1, 64 |
| **Seq. No. 004** | Notice of Motion, Affirmation, Memo of Law, Exhibits | 20, 21, 22, 22-1 - 22-8 |
| | Pl.'s Omnibus Memo. of Law in Opp. | 52, 54 |
| **Seq. No. 005** | Notice of Motion, Affirmation, Memo of Law, Exhibits | 27, 28, 29, 29-1 |
| | Pl.'s Omnibus Memo. of Law in Opp. | 52, 55 |
| **Seq. No. 006** | Notice of Motion, Affirmation, Exhibits | 45, 46, 46-1 - 46-7 |
| | Affirmation in Opp., Memo of Law, Exhibits | 47, 48, 48-1 - 48-2 |
| | Affirmation in Reply & Opp | 49 |

1

| | |
|---|---|
| Affirmation in Opposition | 50 |
| Memo of Law in Reply | 51 |
| Affirmation in Opposition, Memo of Law, Exhibits | 56, 57, 57-1 - 57-2 |
| Memo of Law in Reply | 58 |
| Transcript of Oral Argument | 69 |

**PAUL G. FEINMAN, J.:**

The decision and order dated June 28, 2010, and filed on July 2, 2010, resolving the motions bearing sequence number 001 through 006, is hereby recalled and vacated and the following decision and order substituted in its stead.[1]

The motions bearing sequence numbers 001 through 006 are consolidated for the purpose of decision.

In motion sequence number 001, plaintiff moves by order to show cause for a preliminary injunction and a temporary order restraining defendants from removing from the State or otherwise disturbing shares of D&K Limited Partnership's 48 percent ownership interest in the common stock of TPR Investment Associates, until there is a judicial determination as to who owns these closely held family shares.[2] At oral argument, the court continued the TRO pending determination of these motions.

In motion sequence numbers 002 through 005, each of the defendants originally moved to dismiss the complaint on various grounds. By interim order dated October 21, 2009, these motions were converted pursuant to CPLR 3211 ( c) to motions for summary judgment (Doc. 41,

---

[1]At oral argument held on July 28, 2010 on a related matter, the parties consented to the court's issuance of this revised decision and order without further submissions.

[2]Under the terms of the original TRO signed at the time of the signing of the Order to Show Cause, defendants and their agents are stayed from removing or disposing in any manner the shares at issue. Plaintiff was directed to provide an undertaking in the amount of $150,000.

2

42, 43, 44).[3]

In motion sequence number 006, plaintiff moves for leave to amend the complaint and submits a proposed amended verified complaint containing additional allegations and naming an additional defendant.

All the motions are opposed.

For the reasons set forth below, the motion for a preliminary injunction is granted; the motions by defendants for summary judgment are each granted in part and otherwise denied, and the motion to amend the complaint is granted to the extent indicated.

### Background

The litigants are members of a nuclear family and certain of their family-owned corporations and companies.  The central issue concerns the intent behind the signing of a promissory note and pledge agreement in December 1993, executed as part of estate planning tools of the parents of plaintiff Orly Genger and her brother, Sagi Genger, one of the defendants. Plaintiff contends that the note and pledge agreement were part of an entire estate planning scheme by which plaintiff's father, Arie Genger, and plaintiff's mother Dalia Genger, planned to provide for their two children, plaintiff and defendant Sagi Genger, with the greatest amount of funding possible and with minimum tax consequences.  Arie and Dalia Genger were divorced in 2004 and the gravamen of this complaint is that in the years following the divorce, plaintiff's mother and brother have deliberately not adhered to the intent behind the promissory note and pledge, and have schemed to seize control of some of the family's closely held companies. Their schemes have been to the detriment of one of the entities, the D&K Limited Partnership,

---

[3]Documents and exhibits are referred herein by their designated e-filing document number in the New York State Court's E-Filing System.

an entity partially owned by the Orly Genger 1993 Trust, and for the benefit of Sagi Genger and for defendant TPR Investment Associates, on which Sagi and Dalia Genger serve as the directors, and of which Sagi Genger is chief executive officer. Among the other relief sought by plaintiff is an injunction restraining further actions that would irreparably harm D&K Ltd. Partnership's ability to recover its interest in the shares originally held by it, that defendants be denied any ability to further erode the holdings of the Orly Genger 1993 Trust, and that shares already sold be returned to the ownership of the Ltd. Partnership.

Plaintiff argues, and none of the defendants dispute her, that as beneficiary of the Orly Genger 1993 Trust, she has a right to assert causes of action on behalf of the trust, citing *Velez v Feinstein*, 87 AD2d 309 (1st Dept. 1982) (where trustee has failed to enforce a claim on behalf of the trust, the beneficiary may do so). She further argues that as the Orly Genger 1993 Trust is a limited partner of D&K Ltd. Partnership, she has the right to assert causes of action on behalf of the Partnership as against TPR Investment and the other defendants, citing among other cases, *CCG Assoc. I v Riverside Assoc.*, 157 AD2d 435, 442 (1st Dept. 1990) ("[t]he right of a limited partner to bring an action on behalf of the partnership to enforce a right belonging to the partnership is beyond dispute") (Pl Memo of Law [Doc. 9:4] p. 1 n. 1).[4] Defendants' arguments in opposition are not persuasive.

According to the verified complaint (Doc. 7-1), plaintiff and her brother Sagi are individually beneficiaries of irrevocable trusts established in 1993 by their parents. Each trust was funded with a $600,000 gift. As established, the Orly Genger Trust and the Sagi Genger Trust together owned 96 percent in defendant D&K Ltd. Partnership, a family-owned limited

---

[4]Unless otherwise noted, all factual allegations are taken from plaintiff's verified complaint (Doc. 7-1).

partnership. Dalia Genger held the remaining four percent interest, and acted as the general manager. Defendant TPR Investment Associates, Inc. is a corporation founded by plaintiff's father, Arie Genger who originally was the sole shareholder, and serves as a holding company for the family's interests. Sagi Genger is presently Chief Executive Officer and a member of the board. Prior to 1993, TPR Investment held a majority interest in non-party Trans-Resources, Inc., a closely held private corporation.[5]

Around the time the two trusts were funded in1993, D&K Ltd. Partnership purchased 240 shares of common stock, comprising 49 percent of all shares, in TPR Investment for $10,200,000. The Orly and Sagi Trusts each paid $600,000, Dalia Genger paid $50,000, and D&K Ltd. Partnership executed a promissory note dated December 21, 1993 for $8,950,000, in satisfaction of the balance (Ver. Compl. [Doc. 7-1] ¶ 16, citing attached Ex. 1 [eFile Doc. 7-1:49 *et seq.*]). The note was signed by Dalia Genger as General Partner of D&K Ltd. Partnership. The note required that D&K Ltd. Partnership repay principal and accrued interest in annual installments over a ten-year period. Both trusts, and Dalia Genger, assumed proportional liability for repayment. The note was secured with a Pledge Agreement dated December 21, 1993, signed by Dalia Genger, in which D&K Ltd. Partnership pledged its 240 TPR Investment shares as collateral for repayment of the note (Ver. Compl. [Doc. 7-1] ¶ 18) According to the September 6, 2007, testimony of Sagi Genger in the arbitration proceeding concerning his parents' divorce, the purpose of the note was "[e]ssentially an estate planning tool, to transfer wealth," with the intent to minimize taxes owed by the family members (Doc. 46-5:150-152 [S.

---

[5]Trans-Resources is the parent company of several subsidiaries that provide growers with specialty fertilizer and industrial chemicals, and is one of the two largest produces of potassium nitrate in the world (Ver. Compl. [Doc. 7-1] ¶ 12).

Genger EBT, pp. 366, 368]).  As a result of the purchase by D&K Ltd. Partnership of TPR Investment stock, the Orly and Sagi trusts each acquired 23.52 percent indirect interest in TPR Investment, and Dalia acquired a 1.96 percent indirect interest.  Arie Genger retained 51 percent ownership.

As alleged in the complaint, each member of the family understood and agreed, in the "desire to ensure equal wealth transfer to Sagi and Orly and with the estate-planning purposes underlying the creation of the Trusts and D&K [Ltd. Partnership]'s purchase of the TPR shares," that the note and Pledge Agreement "would never be enforced by any of them" (Ver. Compl. [Doc. 7-1] ¶ 20).  Sagi Genger in particular was charged with ensuring that the promissory note and Pledge Agreement would not be enforced and, in the first years, took "specific steps to fulfill that charge," an example of which follows here (Ver. Compl. [Doc. 7-1] ¶ 20).

D&K Ltd. Partnership made payments on the note until 1999 and then ceased.  In November 2002, TPR Investment sent a letter to D&K Ltd. Partnership seeking payment of the past due principal and interest (Doc. 29-1:77-78]).  Sagi Genger, TPR's CEO, explained during his testimony in the above-mentioned arbitration proceeding that this November 2002 letter was merely "pro forma," and that there was no intent to collect on the note  (Doc. 46-5:153 [S. Genger EBT, p. 370]).

In October 2004, Dalia and Arie Genger were divorced, resulting in certain changes to the ownership of certain family entities, memorialized in the Stipulation and Agreement of Settlement, dated October 26, 2004 (Ver. Compl. [Doc. 7-1] ¶ 22, citing Ex. 2 [Doc. 7-1:66 *et seq.*]).  In particular, Dalia Genger received sole ownership of Arie Genger's 250 shares of TPR Investment, the Trans-Resources shares were redistributed such that Dalia Genger owned no shares in that company, and Arie Genger was granted a lifetime voting proxy over the family

6

Trans-Resources shares (Stipulation pp. 5, 8-14 [Doc. 7-1:71, 73-80]). The Stipulation and Agreement of Settlement gave Sagi Genger "full and complete authority" to sell non-liquid assets and distribute them as he saw fit, subject to his fiduciary duties to effectuate the intent of the parties entering the Agreement (Stipulation p. 7 [Doc. 7-1:73]). However, the net proceeds were to be distributed so as to minimally fund a "basic escrow account" after which monies were to go to TPR Investment "in satisfaction of the parties' indebtedness" (Stipulation p. 8 [Doc. 7-1:74]).

Despite the changes, both the Orly and Sagi trusts continued to have equal ownership interests in Trans-Resources shares as well as in the TPR Investment shares owned by D&K Ltd. Partnership (Ver. Compl. [Doc. 7-1] ¶ 23).

Also on October 26, 2004, TPR Investment, Arie Genger, and Dalia Genger signed an Assumption Agreement which acknowledged the promissory note's existence and noted that at that juncture, approximately $9,980,000, inclusive of interest, was owed by D&K Ltd. Partnership to TPR Investment (Doc. 22-4).

In addition, also on the same date, Sagi and Dalia Genger formed D&K GP LLC to serve as the general partner for D&K Ltd. Partnership (Pl. Mot. 001, Ex. 5 ¶ 5 [Doc. 7-1:151]). Under the agreement, Dalia Genger transferred her general partnership interest in D&K Ltd. Partnership, in exchange for a 99 percent interest in D&K GP; Sagi Genger was granted power to select the manager. Accordingly, D&K GP LLC now held a four percent interest in D&K Ltd. Partnership.

Plaintiff alleges that in the years subsequent to the divorce, Dalia Genger has sought, in collusion with her son Sagi Genger, to "destroy" her former husband financially, and their actions have threatened to destroy plaintiff financially as well (Ver. Compl.[Doc. 7-1] ¶ 25).

7

Thus, when Dalia in effect ceded her control over D&K Ltd. Partnership to Sagi, the restructuring left only the two trusts liable to TPR Investment for repayment of the promissory note (Ver. Compl.[Doc. 7-1] ¶ 27). In August 2006, Sagi Genger on behalf of TPR Investment, assigned the promissory note to David Parnes,[6] but stated in writing to Parnes that "D&K LP and its partners have a variety of claims against TPR, and deny the enforceability of the Note." (Ver. Compl. [Doc. 7-1] ¶ 47, citing Ex. 8 [Doc. 7-1:179-*et seq.*]). In 2007, Sagi Genger allegedly stripped Dalia Genger of her majority interest in TPR Investment by selling an interest to his mother-in-law, Rochelle Fang (Ver. Compl. [Doc. 7-1] ¶ 32). In late 2007 or early 2008, Dalia Genger divested herself of the balance of her TPR Investment shares, leaving Sagi Genger in direct control of TPR Investment and its interest in the promissory note (Ver. Compl. [Doc. 7-1] ¶ 33). As a result, Sagi Genger in essence now wore two hats, as CEO of TPR Investment, the creditor of the note, and as manager of D&K Ltd. Partnership, the debtor on the note (Ver. Compl. [Doc. 7-1] ¶ 34).

In November 2007, Sagi Genger and Leah Fang executed an "Amended and Restated Limited Partnership Agreement of D&K Limited Partnership," permitting D&K GP to "mortgage, hypothecate, pledge, create a security interest in or lien upon, or otherwise encumber the L[imited] P[artner] TRI Interests, for the benefit of the Partnership (Doc. 46-5:218). The document was signed by Sagi Genger, managing member of D&K GP LLC, the General Partner, and Leah Fang, as sole trustee for both the Sagi Genger 1993 Trust and the Orly Genger 1993 Trust, the Limited Partners (Doc. 46-5:223). Plaintiff only learned of this document's existence

---

[6] Parnes is a former trustee of the Orly Genger 1993 Trust, the present trustee of the Sagi Genger 1993 Trust, an officer of TPR Investment and director of Trans-Resources (Ver. Compl. [Doc. 7-1] ¶ 46). Parnes testified during the arbitration proceeding that the purpose of the transfer of the note to him was to prevent collection by any others (*Id.*).

in 2009.

In January 2008, Dalia Genger was appointed successor trustee to the Orly Genger 1993 Trust (Ver. Compl. [Doc. 7-1] ¶ 39). She succeeded several other individuals, including two long-term friends of her son's and her son's sister-in-law. As trustee, Dalia has "complete control over the assets of the Orly Trust, including its ownership interests in TPR (through D&K) and TRI" (Ver. Compl. [Doc. 7-1] ¶ 41).

In 2008, TPR Investment, through CEO Sagi Genger, reclaimed the promissory note from Parnes, and in August 2008, notified D&K Ltd. Partnership's general manager (Sagi Genger), that it was in default under the note and that if it failed to satisfy the full terms of the note, its shares would be sold at public auction (Ver. Compl. [Doc. 7-1] ¶ 52, citing Ex. 10 [Doc. 7-1:185-186]). As the payment was not made, D&K Ltd. Partnership was informed by TPR Investment that the latter would sell the former's 240 shares of common stock in TPR Investment to the highest qualified bidder on February 27, 2009 (Ver. Compl., Ex. 11 [Doc. 7-1:187-188]). Notice was not provided to either of the trusts, but was published in THE NEW YORK POST in October 2008 and again in February 2009 (Ver. Compl. [Doc. 7-1] ¶¶ 52-53, citing Ex. 12 [Doc. 7-1:189-191]).

On January 31, 2009, the general partner of D&K Ltd. Partnership, that is to say D&K GP, and the limited partners, the Sagi and Orly trusts, and TPR Investment, memorialized a document called "Meeting of Partners of D&K LP - Jan. 31, 2009 & Agreement," in which it was agreed that D&K GP could sign for the Limited Partnership and for each individual partner when making the limited partners' assets subject to a pledge (Doc. 22-4:17-18).[7] This same

---

[7]Plaintiff alleges she first learned of this agreement only when the documents were provided as part of defendants' papers submitted in their motions to dismiss (Am. Ver. Compl.[Doc. 46-4] ¶

9

agreement included the promise of TPR Investment that it would "refrain from enforcing the note against each limited partner for thirty days." (*Id.* [Doc. 22-4:18] ¶ 8).[8]

The note was foreclosed upon on February 27, 2009, less than the 30 days indicated in the Agreement date, and D&K Ltd. Partnership's 240 shares of TPR Investment were purchased back by TPR, decreasing the obligations of D&K Ltd. Partnership under the promissory note, and leaving a balance of approximately $8.8 million that continues to be guaranteed by the Orly and Sagi trusts (Ver. Compl. [Doc. 7-1] ¶ 57, citing Ex. 13 [Doc. 7-1:192-194]).   Plaintiff and her attorney only learned in early June 2009 that the note had been foreclosed and that the pledged shares had been sold back to the company (Ver. Compl. [Doc. 7-1] ¶ 65).   Plaintiff has made a written demand that TPR Investment return the pledged shares to D&K Ltd. Partnership, but TPR has declined to comply (Ver. Compl. [Doc. 7-1] ¶ 69, citing Ex. 20 [Doc. 7-1:225-227]).

Also in August 2008, Rochelle Fang, as trustee of the Sagi Genger 1993 Trust, and Sagi Genger, sold that trust's interest in Trans-Resources to another group (named "Trump"), which sale divested Arie Genger from control and put the company in the control of the Trump group (Ver. Compl. [Doc. 7-1] ¶ 60, citing Ex.14 [Doc. 7-1:195-207]).   The validity of this sale is under challenge in Delaware Chancery Court, although plaintiff Orly Genger has not joined in that action (Ver. Compl. [Doc. 7-1] ¶ 61).

After this purported sale of the Sagi Genger Trust's shares of Trans-Resources, plaintiff feared her trust's shares would not be protected from sale.   She requested in writing from her

94).

[8]The copy of the document e-filed with the court is not clear enough to discern who signed on behalf of the trusts, although presumably it was Dalia Genger, or on behalf of TPR Investment.

mother as trustee in January 2009 and again in June 2009 that the Orly Genger 1993 Trust retain all of its shares of Trans-Resources and that they not be sold, but Dalia Genger has refused to agree, or even to respond (Ver. Compl. [Doc. 7-1] ¶¶ 63, 66, citing Ex. 15, 16 [Doc. 7-1:208-215]). Plaintiff, who had brought a proceeding in Surrogate's Court to remove her mother as trustee at the time of her appointment in January 2008, an application which was denied as being premature (Ver. Compl. [Doc. 7-1] ¶¶ 39-40), brought a second application on June 22, 2009, seeking to enjoin Dalia Genger or her agents from doing anything to affect the Orly Genger 1993 Trust's Trans-Resources shares, to remove Dalia as trustee and appoint another in her stead based on breach of fiduciary duties, and for a surcharge for damages (Ver. Compl.[Doc. 7-1] ¶ 67). At this juncture, the Surrogate's Court has ordered that Dalia Genger provide at least 10 days notice before disposing of any of the trust's Trans-Resources shares (Ver. Compl.[Doc. 7-1] ¶ 68, citing Ex.19 [Doc. 7-1:222- 224]).

Plaintiff contends that Dalia Genger has failed to act in the best interests of the Orly Genger 1993 Trust, that Sagi Genger has acted in a self-dealing manner and together with Dalia Genger has undermined the estate plans that intended for both children to benefit equally from the family's wealth (Ver. Compl. [Doc. 7-1] ¶ 58). Plaintiff fears that through defendants' continued scheming, the Orly Genger 1993 Trust's one remaining asset, its ownership of the Trans-Resources shares, will also be wrongly divested (Ver. Compl. [Doc. 7-1] ¶ 59).

The verified complaint alleged 16 causes of action against the various defendants, including replevin of the shares from TPR Investment back to D&K Ltd. Partnership, and a request for a preliminary injunction.

As stated above, defendants each submitted pre-answer motions to dismiss which, after notice by the Court, have been converted to motions for summary judgment pursuant to CPLR

11

3211 ( c). Subsequent to the filing by defendants of their motions, plaintiff moved to amend her complaint "to address, among other things," the defendants' "scheme regarding the Orly Trust's TRI Shares," and the involvement in the scheme of Leah Fang, the proposed additional defendant (Pl. Mot. 006, Ex. D, Part 1, Proposed First Am. Ver. Compl., [Doc. 46-4] ¶ 95).   The proposed first amended verified complaint contains an additional four causes of action, two against Leah Fang, and two seeking additional declaratory relief, and amends certain of the original causes of action to include the new allegations and those against Leah Fang.

### Legal Analysis

For convenience, the motion to amend will be addressed first, and then the preliminary injunction, followed by the motions to dismiss. Because the motion to amend the complaint is granted, the remainder of this decision addresses the claims as alleged in the amended complaint.

A.    Motion to Amend the Verified Complaint (Sequence Number 006)

Leave to amend pleadings is to be freely given upon terms that may be just (CPLR 3025 [b]). In addition, CPLR 3025 (a) permits any party to amend a pleading once, without court permission provided it is done under one of the following circumstances: within 20 days of the service of the original pleading; at any time before the period for responding to it has expired, or within 20 days after the service of a responsive pleading. Plaintiff proffers a proposed amended complaint to add a new defendant and new causes of action (Doc 46-4).

Contrary to defendants' arguments, case law holds that where a defendant has not answered the complaint but instead interposed a motion to dismiss, as was done here, the plaintiff may amend her complaint once as of right, because defendants, by making pre-answer motions, have extended their time to answer (see, Johnson v Spence, 286 AD2d 481 [2d Dept. 2001]; STS Mgt. Dev., Inc. v New York State Dept. of Taxation & Fin., 254 AD2d 409 [2d Dept.

12

2001]; *Miller v General Motors Corp.*, 99 AD2d 454 [1st Dept. 1984], *aff'd* 64 NY2d 1081 [1985]). Although defendants oppose, plaintiff is entitled to serve and file her amended complaint without review by the court, although the rulings below on defendants' motions shall refine the scope of the proposed amended complaint and require her to file and serve a second amended complaint. Defendants' arguments in opposition, including that there is another action pending, can be pled as affirmative defenses. Plaintiff's motion to amend her complaint is thus granted to the extent indicated.

B.    Motion for Preliminary Injunction (Sequence Number 001)

Among the purposes of a preliminary injunction are maintaining the status quo and preventing irreparable injury to a party (*see, e.g., Ma v Lien*, 198 AD2d 186 [1st Dept. 1993], *lv dismissed* 83 NY2d 847 [1994]). To prevail, the party seeking injunctive relief must demonstrate a likelihood of success on the merits; that it will suffer irreparable injury if the relief is not granted; and that the equities balance in its favor (*Aetna Ins. Co. v Capasso*, 75 NY2d 860, 862 [1990]). A preliminary injunction should generally not be granted where there are issues of fact (*Lincoln Plaza Tenants Corp. v MDS Properties Dev. Corp.*, 169 AD2d 509 [1st Dept. 1991]; *but see Ma v Lien, supra* at 187 ["even where the facts are in dispute, the nisi prius court can find that a plaintiff has a likelihood of success on the merits, from the evidence presented"]). If money damages are an adequate remedy, irreparable harm does not exist and injunctive relief should be denied (*Sterling Fifth Assoc. v Carpentille Corp., Inc.*, 5 AD3d 328, 330 [1st Dept. 2004]).

Plaintiff argues that the shares of Ltd. Partnership are unique chattel as contemplated by CPLR 7109, and that accordingly the court should grant a preliminary injunction restraining defendants from disposing of the shares until order of the court. She argues that the D&K Ltd.

13

Partnership shares are unique because they are shares of a closely held family company which represents an ownership in another closely held family company, TPR Investment, and that their value is dependent, at least in part, on the outcome of the family litigation currently before the Delaware Chancery Court concerning Trans-Resources (Pl. Memo of Law, 5-6 [Doc. 9:8-9]).

Under CPLR 7109, where the chattel is unique, the court may grant a preliminary injunction or temporary restraining order that it may not be transferred, sold, pledged, assigned or otherwise disposed of until the court orders (CPLR 7109 [a]). Defendants argue that the shares are in essence fungible, and that if appropriate, money damages would fully compensate plaintiff (TPR [S. Genger] Aff. in Opp. [Doc. 39] ¶ 6). Sagi Genger avers that the "TPR shares are currently not for sale and there is no intention to sell them at this time or in the near future." (S. Genger Aff. in Opp. [Doc. 35] ¶ 5). He makes no statements concerning the TRI shares. Plaintiff's argument, however, is that her parents never meant for the promissory note to be enforced, but rather that the trust funds remain intact for the two children. The recent actions taken by defendants concerning the promissory note which have negatively impacted the Orly Genger 1993 Trust, and the sale of the Trans-Resources shares belonging to the Sagi Genger 1993 Trust, possibly foretell defendants' plans to sell her trust's shares of Trans-Resources and thus she seeks court intervention to prevent further dissipation of the trust.

The granting of a preliminary injunction is a discretionary remedy (*Ross v Schenectady*, 259 App. Div. 774, 774 [3d Dept. 1940]; *Dabrinsky v Seagate Assn.*, 239 NY 321 [1925]). Here, where the family shares at issue are intertwined among various family entities, defendants have not offered sufficient evidence to show that the shares of either TPR Investment or Trans-Resources owned by the Orly Genger 1993 Trust are not "unique" and should not be protected from transfer, sale, or assignment until this litigation is ultimately decided. In addition, given

14

that defendant Sagi Genger states there is no immediate plan to sell or otherwise dispose of the TPR Investment shares, an injunction is not likely to cause much harm to defendants. The balance of equities therefore lies in favor of plaintiff. Accordingly, the motion for a preliminary injunction is granted.

## *Motions for Summary Judgment*

The proponent of a summary judgment motion must make a prima facie showing of entitlement to judgment as a matter of law, tendering sufficient evidence to eliminate any material issues of fact from the case (*Winegrad v New York Univ. Med. Ctr.*, 64 NY2d 851, 853 [1985]). Evidentiary proof must be submitted in admissible form (*Zuckerman v City of N.Y.*, 49 NY2d 557, 562 [1980]). Parties in opposition must submit "evidentiary facts or materials, by affidavit or otherwise ... demonstrating the existence of a triable issue of ultimate fact." (*Tortorello v Carlin*, 260 AD2d 201, 204 [1ᵗ Dept. 1999]). "Issue finding and not issue resolving" is the proper role of the court in deciding such motions (*Winegrad, supra*, at 853). Regardless of the sufficiency of the opposing papers, in the absence of admissible evidence sufficient to preclude any material issue of fact, summary judgment is unavailable (*Alvarez v Prospect Hosp.*, 68 NY2d 320, 324 [1986]).

None of the converted motions for summary judgment contains first-person affidavits, and all rely upon documentary evidence and the pleadings for the bases of their motions. Although plaintiff objects to the lack of first-person affidavits, the converted motions are nonetheless considered by the court and decided on their merits.

Plaintiff argues that all of the motions should be preemptively denied based on the doctrines of issue preclusion and judicial estoppel, pointing to the testimony and evidence presented at the arbitration which resulted in the May 6, 2008, award entitled *Dalia Genger v*

15

*Arie Genger*, Case No. 13 170 Y 00996 07 (American Arbitration Assn., Commercial Arbitration Tribunal, NYC). (Doc. 46-5:131 *et seq.*]). The doctrine of issue preclusion serves to bar a party from "relitigating in a subsequent action or proceeding an issue that was raised in a prior action or proceeding and decided against that party or those in privity, whether or not the tribunals or causes of action are the same" (*Ryan v New York Tel. Co.*, 62 NY2d 494, 500 [1984]; *see also, Parker v Blauvelt Volunteer Fire Co.*, 93 NY2d 343, 349 [1999]). The doctrine of judicial estoppel prohibits a party that has assumed a certain position in a prior legal proceeding and secured a judgment in its favor, from assuming a contrary position in another action simply because the party's interests have changed (*City of N.Y. v College Point Sports Assn., Inc.*, 61 AD3d 33, 44 n. 1 [2d Dept. 2009], citations omitted). Notably, of course, the arbitration concerned issues arising from the divorce of plaintiff's parents, and determined, among other questions, that the promissory note could not be enforced by either parent as against each other. This is not the issue raised by plaintiff in her litigation. Additionally, because the testimony by Sagi Genger, Dalia Genger, and others in that arbitration was offered to answer the questions of whether the note was enforceable, and its value, *as between the former husband and wife*, the witnesses and parties did not address the value or enforceability of the note *as between the children* of Arie and Dalia Genger, *or the family owned companies*. Thus, the testimony adduced in the arbitration may well be admissible in this action, but there is no collateral estoppel effect.

C.   Dalia Genger's Motion for Summary Judgment (Sequence Number, 002)

The first amended verified complaint alleges three causes of action against Dalia Genger: breach of fiduciary duty (1st cause of action), fraud (5th cause of action), and conspiracy to commit fraud (8th cause of action).

16

As argued by defendant, the claim of breach of fiduciary duty is also at issue in a proceeding currently before the Surrogate's Court entitled *In the Matter of the Application of Orly Genger, as a person interested, for the removal of Dalia Genger as Trustee of the Orly Genger 1993 Trust pursuant to SCPA § 711 (1)*, File No. 17/2008 (Surrogate's Court NY County). Plaintiff does not address this argument. Accordingly, in the interest of judicial economy, the branch of defendant's motion seeking summary judgment and dismissal as to the complaint's 1st cause of action, is granted, on the ground that the same claim is pending in another court proceeding (CPLR 3211 [a] [4]).

The 5th Cause of Action sounds in fraud, while the 8th Cause of Action alleges conspiracy to commit fraud among the four defendants. As an initial matter, it is well established that "a mere conspiracy to commit a fraud is never of itself a cause of action," although allegations of conspiracy are permitted to connect the actions of separate defendants with an otherwise actionable tort (*Alexander & Alexander of N.Y. Inc. v Fritzen*, 68 NY2d 968, 969 [1986] [citation omitted]). As explained in *Brackett v Griswold*, "[t]he allegation that there was a conspiracy to commit the fraud does not effect the substantial ground of action," and "[t]he *gravamen* is fraud and damage, and not the conspiracy." (112 NY 454, 466-467 [1889]). "The allegation and proof of a conspiracy in an action of this character is only important to connect a defendant with the transaction and to charge him [*sic*] with the acts and declarations of his [*sic*] co-conspirators, where otherwise he [*sic*] could not have been implicated." (*Id.*). Accordingly, the 8th cause of action is dismissed as against this defendant, and the others.

To state a claim for fraud, plaintiff must allege "a material misrepresentation of a fact, knowledge of its falsity, an intent to induce reliance, justifiable reliance . . . and damages" (*Eurycleia Partners, LP v Seward & Kissel, LLP*, 12 NY3d 553, 559 [2009]). In addition, under

17

CPLR 3016 (b), the circumstances constituting the wrong must be stated in detail.

Defendant Dalia Genger argues that plaintiff's claims are unspecific and general in nature. In particular, she argues that there is no allegation of the manner in which plaintiff relied on any of her statements, or in what manner she, defendant, could have prevented the enforcement of the promissory note and the foreclosure sale. Although plaintiff argues in opposition that Dalia Genger made many statements over the years, including sworn statements, affirming that all interested parties to the note had agreed that TPR Investment would never seek to enforce the promissory note (Am. Ver. Compl. [Doc. 46-4] ¶¶ 62, 145-147), none of defendant's statements *explicitly* make this assertion other than in the context of the divorce proceedings. However, plaintiff also argues that even after she requested that her mother, as trustee, not encumber the remaining assets of the trust, her mother signed the January 2009 Meeting Agreement which gave power to D&K GP - the company controlled by Dalia and Sagi Genger - to pledge the Orly Genger 1993 Trust's shares of Trans-Resources as security for the promissory note, and which indemnified Sagi Genger, among others. There are also the transactions over the years that apparently have given Sagi Genger, and Dalia Genger, potential control over family assets in a way that has harmed plaintiff's share.

When claiming that the defendants together acted to commit a fraud, the plaintiff need not allege and prove that each defendant committed every element of fraud but only facts which support an inference that the defendants knowingly agreed to cooperate in a fraudulent scheme (*Snyder v Puente De Brooklyn Realty Corp*, 297 AD2d 432, 435 [3d Dept.2002], *lv denied*, 99 NY2d 506 [2003]; *LeFebre v New York Life Ins. & Ann. Corp.*, 214 AD2d 911, 912 [3d Dept. 1995]). Plaintiff alleges that the various defendants together committed fraud by, for example, creating the conditions that resulted in the "sham sale" of the TPR Investment assets owed by

18

D&K Ltd. Partnership, and agreeing in the January 2009 Meeting Agreement to give power to D&K GP, the company controlled by Dalia and Sagi, to pledge the Orly Trust's shares of Trans-Resources as security for the promissory note (Am. Ver. Compl. [Doc. 46-4] ¶¶ 76-68, 151). Plaintiff asked repeatedly for information about her trust, but because defendant has not been forthcoming nor kept her informed, she did not know that there was any need to attempt to protect the assets of her trust.

The evidence and arguments provided by both parties show that there is a question of fact as to whether Dalia Genger acted with intent to commit fraud against plaintiff's trust, and to lull plaintiff into a false sense of security as to the status of her trust. Accordingly, the branch of defendant's motion to dismiss the 5th cause of action is denied.

D.    Sagi Genger's Motion for Partial Summary Judgment (Sequence Number 003)

Defendant Sagi Genger seeks summary judgment and dismissal of the 6th, 7th, 8th, and 16th causes of action.[9]

The 6th cause of action sounds in fraud. The elements of fraud are set out above in the discussion of Dalia Genger's motion. The complaint focuses on the statements made by defendant in particular during the 2007 - 2008 arbitration proceeding, which helped form the basis for the arbitrator's decision that the parties never intended for the note to be collected and that it was not an asset to be valued, statements of which the plaintiff was aware and which caused her to believe that her trust fund was secure and that no one would enforce the note.

The 7th cause of action alleges aiding and abetting fraud. The elements of aiding and abetting fraud are that there exists a fraud, the defendant knew of the fraud, and the defendant

---

[9]He does not seek summary judgment as to the 2nd, 3rd, or 4th causes of action, in which he is also named.

provided substantial assistance to advance the fraud's commission (*M&T Bank Corp. v*

*Gemstone CDO VII, Ltd.*, 23 Misc. 3d 1105A; 881 NYS2d 364, 2009 NY Slip Op 50590(U)

{Sup. Ct., Erie County 2009], *aff'd in part, mod in part*, 68 AD3d 1747 [4th Dept. 2009],

quotation and citation omitted). The complaint contends that defendant and D&K GP knowingly

assisted in the "sham sale" of the D&K Ltd. Partnership shares, failed to notify the Partnership

members of the foreclosure and sale, the sale of which harmed the Orly Trust, and entered into

the Meeting Agreement which now allows defendant and D&K GP to pledge or encumber the

Trans-Resources shares owned by the Orly Genger 1993 Trust.

Defendant argues that summary judgment is appropriate based on the documentary

evidence. He contends that prior to this litigation, plaintiff never claimed that the note or pledge

agreement were invalid. Among the evidence he points to in arguing the note's enforceability, is

testimony of Arie Genger acknowledging that payments were made by D&K Ltd. Partnership on

the promissory note (Doc. 16-4:3-4]) , the Assumption Agreement signed by Dalia, Arie, and

Sagi Genger on October 25, 2004, acknowledging the nearly $10,000,000 due under the note

(Doc. 16-6]), the November 19, 2008 letter from plaintiff's counsel to the Surrogate, stating in

part that "D&K [Ltd. Partnership] is indebted on a multi-million dollar note to TPR, which is

secured by D&K's 49% stock interest, and which has not been serviced for years" (Doc. 16-8]),

and a document signed by plaintiff dated December 27, 2007, in which she states that the trust

"is indebted in the amount of approximately $4.5 million" (Doc. 16-9]).

Defendant also argues that the statute of frauds bars plaintiff's 6th and 7th causes of action

because plaintiff claims that the promissory note has been orally modified. General Obligations

Law § 5-701 requires that agreements which by their terms are not to be performed within one

year, or which are promises to answer for the debt or default of another person, must be in

writing and subscribed by the party to be charged therewith (GOL § 5-7-1 [a] [1]-[2]). The parol evidence rule of the General Obligations Law provides that where a written agreement contains a provision stating that it cannot be changed orally, then such a document cannot be changed by executory agreement unless it is in writing, signed by the party against whom enforcement of the change is sought (GOL § 15-301 [1]). Thus, defendant argues that plaintiff cannot claim that the parties legally agreed, orally, that the note would not be enforceable.

Defendant's arguments are unpersuasive. Courts have also found, specifically in regard to promissory notes, that when parties contest whether a notice is enforceable, there is an issue of fact that survives summary judgment and the statute of frauds will not prevent the court's examination of parol evidence on the issue. For example, in *Greenleaf v Lachman*, the Court examined a promissory note allegedly executed so as to avoid negative income tax treatment, and found an exception to the parol evidence rule in order to allow admission of parol evidence, not to vary the terms of the writing, but to show that a "writing, although purporting to be a contract, is, in fact, no contract at all." (216 AD2d 65, 66 [1st Dept.1995], *lv denied* 88 NY2d 802 [1996]). Similarly, in *Dayan v Yurkowski*, the Court denied summary judgment and held that the defendant's parol evidence should be considered to show that the note, while valid on its face, was not intended to take effect (238 AD2d 541 [2d Dept. 1997]; *see also, Paolangeli v Cowles*, 208 AD2d 1174, 1175 [3d Dept. 1994]).

Here, where plaintiff and all the defendants copiously cite to factual support, a material issue of fact exists regarding the intention of the note's enforceability. While the documents speak for themselves, plaintiff raises material questions of fact concerning the actual intent behind the promissory note. She argues that the promissory note's purpose was to facilitate the estate planning of Arie Genger and the transfer of funds between the family members with

21

lessened tax consequences. Indeed, it is curious that interest payments were made by the Partnership for several years and then ceased, and that Sagi Genger testified that TPR Investment's 2002 notice was "pro forma" and not meant as an actual request that payment be made. It could be found that enforcement of the note's terms was only made after Sagi Genger allegedly came into control of both TPR Investment and D&K Ltd. Partnership. Given the testimonial evidence in particular, there is a question of fact as to whether the promissory note was intended to be an enforceable agreement, and it would be premature to apply a Statute of Frauds analysis to the cause of action. In addition, as plaintiff has established that there are questions of fact as to whether defendant acted with intent to defraud plaintiff and D&K Ltd. Partnership and provided substantial assistance to D&K GP in particular to advance the fraud's commission, the branch of the motion seeking summary judgment and dismissal of the 6th and 7th causes of action is denied.

The 8th cause of action alleges conspiracy to commit fraud. For the same reasons set forth above in discussing Dalia Genger's motion, this branch of defendant's motion is granted.

The 16th cause of action alleges promissory estoppel. This is an equitable cause of action and must allege "a clear and unambiguous promise by defendants upon which [the plaintiff] reasonably and foreseeably relied to [plaintiff's] detriment." (*401 Hotel, L.P. v MTI/The Image Group, Inc.*, 251 AD2d 125, 126 [1[st] Dept. 1998]). Here, plaintiff alleges that it was the promise and intent of Arie Genger and the family as a whole, that the promissory note was not to be enforced, so as to preserve the trust accounts, and that she relied on that promise these many years only to learn that one of the main assets of her trust account had been sold in violation of the promise. Defendant argues not only that the documents state otherwise, but that plaintiff may not assert promissory estoppel in order to avoid the affirmative defense of the statute of

22

frauds, citing *Cohen v Brown, Harris, Stevens, Inc.*, 64 NY2d 728 (1984), and *Lowinger v Lowinger*, 287 AD2d 39, 45 (1st Dept. 2001), *lv denied* 98 NY2d 605 (2002).

While the assertion of the statute of frauds is often sufficient to cause a dismissal of a claim of promissory estoppel, exceptions include where "the circumstances are such as to render it unconscionable to deny" the promise upon which the plaintiff has relied (*see, Philo Smith & Co. v. USLIFE Corp.*, 554 F.2d 34, 36 [2d Cir. [NY] 1977]). Here, where there are questions of fact as to whether defendants intentionally breached the family agreement concerning the entirety of the estate planning and unconscionably caused plaintiff to lose a significant amount of her trust funds to their benefit, with the possibility of losing all of the funds, defendant has not established entitlement to summary judgment and dismissal of the claim of promissory estoppel notwithstanding his defense of the statute of frauds (*see, Swerdloff v Mobil Oil Corp.*, 74 AD2d 258, 261 [2d Dept.], *lv denied* 50 NY2d 913 [1980]). Accordingly, defendant's motion for summary judgment and dismissal of the 16th cause of action is denied.

E.     D&K GP's Motion for Partial Summary Judgment (Sequence Number 004)

Defendant D&K GP seeks summary judgment and dismissal of "all" the causes of action of the complaint as against it, but its motion papers specifically addresses only the 4th, 6th, 7th, and 8th causes of action.[10]

As an initial issue, D&K GP argues that plaintiff, "in her capacity as beneficiary under the Orly Trust and in the Orly Trust's capacity as limited partner in D&K LP, agreed not to bring an action against D&K GP." (Lyons [D&K GP] Aff. [Doc. 21] ¶ 5). Specifically, defendant points to the "Amended and Restated Limited Partnership Agreement of D&K Limited

---

[10]D&K GP did not seek summary judgment as against the 2nd or 3rd causes of action, in which it is also named as a defendant.

Partnership," in which Leah Fang as trustee for both the Orly and Sagi trusts, agreed that the trusts expressly waived their right to bring an action against D&K GP, the General Partner; Sagi Genger signed on behalf of D&K GP (Doc. 22-8). Accordingly, D&K GP argues that summary judgment and dismissal of the claims against it should be dismissed in their entirety. However, this agreement provides that its partners, which include the Orly Genger 1993 Trust, may sue for "fraud, bad faith, or willful misconduct." (Doc. 22-8:5). Plaintiff alleges that there has been bad faith and fraud by various family entities as concerns the enforcement of the promissory note, and including various documents signed on behalf of the Genger trusts, as well as D&K Ltd. Partnership. At the very least, there appear to be irregularities. Summary judgment and dismissal on this ground is not appropriate.

The 4th cause of action, brought by the Orly Genger 1993 Trust and D&K Ltd. Partnership against both defendant D&K GP and Sagi Genger, claims defendants prevented the Ltd. Partnership from honoring its obligations under the note, and that it tortiously interfered with the contract.

Tortious interference with contractual relations consists of four elements: a contract between plaintiff and a third party; the defendant's knowledge of the contract; the defendant's intentional inducement of the third party to breach or otherwise render performance impossible; and resulting damages to plaintiff (*Kronos, Inc. v AVX Corp.*, 81 NY2d 90, 94 [1993], citation omitted). Defendant argues that, as the general partner to D&K Ltd. Partnership, it is a party to the contract at issue, that it, too, has also been injured by the nonpayment and resulting foreclosure, and that a party to a contract cannot tortiously interfere with the contract (Def. Memo of Law § IV [Doc. 22:12]). Plaintiff argues that according to Sagi Genger's testimony during the arbitration proceeding, Dalia Genger had repaid her four percent interest in the

24

promissory note, and that therefore D&K GP was not a party to the agreement.

Here, the contract is the promissory note between D&K Ltd. Partnership and TPR Investment. Defendant D&K GP knew of the contract, but was also the general partner of the Limited Partnership from 2004 onward, and thus is understood to be a party to the contract. This is because the management of the property and the business of the partnership are vested exclusively in the general partners (*Durant v Abendroth*, 97 NY 132, 144 [1884]). By law, a general partner in a limited partnership is subject to all the restrictions and liabilities of a partner in a partnership without limited partners, although it may not undertake certain actions without the written consent of the limited partners, as defined in the statute (Limited Partnerships § 98). Thus, plaintiff's argument that Dalia Genger had repaid the interest she owed on the promissory note, does not divest defendant of its rights and duties as general partner. Accordingly, as it was the general partner of D&K Ltd. Partnership, no claim of tortious interference with the contract may lie. Summary judgment and dismissal of the 4th cause of action against defendant is granted.

The 6th and 7th causes of action are fraud, and aiding and abetting fraud. The elements of both causes of action have been previously set forth. There are questions of material fact as to whether defendant engaged in fraud and in aiding and abetting fraud, and accordingly the branch of defendant's motion for summary dismissal of these two causes of action is denied.

The branch of the motion to dismiss the 8th cause of action, claiming conspiracy to commit fraud, is granted, for the reasons stated previously as concerns the other defendants.

F.    TPR's Motion for Summary Judgment (motion sequence no. 005)

Defendant TPR moves for summary judgment and dismissal of the 8th, 9th, 10th, 11th, 12th, 13th, 14th, 15th, and 16th causes of action as against it. In sum, it argues that the documentary evidence establishes that there are no material questions of fact that would preclude a grant of

25

summary judgment and dismissal of the complaint as against it.

The branch of the motion to dismiss the 8th cause of action, alleging conspiracy to commit fraud, is granted for the reasons set forth above concerning the other defendants.

The 9th cause of action seeks declaratory relief and damages pursuant to NY UCC §§ 9-627, 610, and 611-614, as concerns the notice of foreclosure and the sale. UCC § 9-610 provides that every aspect of the disposition of collateral after a default must be commercially reasonable. UCC § 9-611 ( c) (2) provides that before the disposition of collateral, the secured party shall send an authenticated notification of disposition to "any secondary obligor." UCC § 9-612 (b) provides that for a non-consumer transaction, 10 days is sufficient notice before the disposition. UCC § 9-613 (a) (4) requires that for the notification of disposition to be sufficient, it must include a statement that the debtor is entitled to an accounting of the unpaid indebtedness and the charge, if any, for an accounting. UCC § 9-613 (a) (5) requires that for the notification of disposition to be sufficient, it must state the time and place of the public disposition or the time after which any other disposition is to be made. UCC § 9-627 provides that simply because a greater amount could have been obtained is not in itself sufficient to preclude the secured party from establishing that the disposition was made in a commercially reasonable manner, and describes what are commercially reasonable dispositions.

The complaint alleges that TPR Investment failed to properly notify the Orly Genger 1993 Trust or Orly Genger of the sale of the shares of TPR owed by D&K Ltd. Partnership, and that the notice of August 31, 2008 failed to state that D&K Ltd. Partnership is entitled to an accounting of its unpaid indebtedness, or to provide the time and place of the disposition of the collateral. In addition, the $2,200,000 sale price was only a "fraction" of the original $10,200,000 purchase price, and failed to take into consideration certain potential monies

26

received from the sale of TRI shares to the Trump group.

Defendant TPR Investment argues that it fully complied with the UCC requirements when noticing the default and conducting the foreclosure sale. In addition, it argues that even if it could be found that plaintiff never received notice of the default and sale, she has not alleged that she suffered repressible damages, as she makes only a generalized statement that the shares sold for a fraction of their original purchase price (Def. Memo of Law [Doc.29] p. 8, citing Ver. Compl. [Doc. 7-1] ¶ 146]). It also argues that plaintiff does not offer any evidence as to what the fair market value of the TPR Investment shares might have been and, as stated explicitly in the statute, an enforcement will not be found commercially unviable simply because a greater amount could have been obtained (UCC § 9-627 [a]).

An examination of the notice shows that certain of the complaint's allegations have no merit but that others are meritorious (Def. Memo of Law [Doc. 29] p. 7, citing Ex. K [Doc. 29-1:136]). The notice is not addressed to either of the limited partners, the Orly or Sagi Genger trusts, who as guarantors, are secondary obligors, and there is no proof of service provided by defendant establishing notification. The notice indicates that the date of the sale was February 27, 2009, but does not indicate the date of the notice itself, meaning that defendant has not established that the 10-day rule was adhered to. Furthermore, given that the January 31, 2009, Meeting Agreement stated in paragraph 8 that TPR would wait 30 days until selling the shares, it appears that the sale on February 27, 2009 was premature in any event (see Doc. 22-4:17-18]). As for the claimed violation of UCC § 9-627, there remain questions of fact as to whether the sale was itself conducted in a commercially reasonable manner as set forth in the statute, whether or not the shares were sold at a value far lesser value than their worth. However, the notice clearly indicates the date, time, and location of the sale, and also that D&K Ltd.

27

Partnership is entitled to an accounting and includes the telephone number to call. Accordingly, the branch of defendant's motion seeking summary judgment and dismissal of the 9th cause of action is granted solely to the extent that the claims seeking declarations of violations of UCC § 9-613 (a) (4) and (a) (5), are dismissed. The remainder of the 9th cause of action remains.

The 10th cause of action alleges conversion and seeks replevin, and the 11th cause of action seeks a judgment declaring that D&K Ltd. Partnership has a superior right to possess chattel under CPLR 7101. Conversion is when a person, without authority, intentionally exercises control over the property of another person and interferes with the other person's right of possession (see, Sporn v MCA Records Inc., 58 NY2d 482, 487 [1983]). Replevin, under Article 71 of the CPLR, is a remedy ancillary to an action to recover a chattel (see Sears Roebuck & Co. v Austin, 60 Misc. 2d 908, 908 [Civ. Ct., NY County 1969]). Defendant argues that plaintiff does not adequately plead the elements of conversion and thus cannot establish that replevin is appropriate, nor does she show that she is entitled in the 11th cause of action to a declaration that she has a superior right to that of defendant's in the TPR Investment shares. It argues that plaintiff does not establish that its assuming ownership rights to the shares was unauthorized, nor does she show that D&K Ltd. Partnership or any other entity had a superior right.

The claim of conversion and replevin, and the declaration as to whose right is superior, go to the heart of plaintiff's complaint. Because, as set forth in the discussion above, there are disputed questions of fact as to the intent of the promissory note and Pledge Agreement and whether enforcement of them was ever contemplated, there can be no summary determination as to who is entitled to the shares and no declaratory relief granted at this time. Accordingly, the branches of defendant's motion for summary dismissal of the 10th and 11th causes of action are

denied.

The 12th cause of action seeks a preliminary injunction to enjoin TPR Investment from in any matter disposing of the TPR shares pending a final determination of the declaratory judgment branch of the complaint. This cause of action is redundant of the motion separately brought by plaintiff and opposed by defendants on grounds similar to those articulated by defendant in its motion for summary judgment. As the plaintiff's motion for a preliminary injunction has been granted as set forth above, summary judgment and dismissal of this cause of action is granted. Of course, if what plaintiff is seeking is a permanent injunction, the cause of action would have to be repleaded.

The 13th cause of action seeks a constructive trust on behalf of D&K Ltd. Partnership. In equity, a constructive trust may be imposed when the movant establishes that there is a confidential or fiduciary relationship, a promise, a transfer in reliance thereon, and unjust enrichment (*Sharp v Kosmalski*, 40 NY2d 119, 121 [1976], citations omitted). Defendant argues that there is no relationship between it and plaintiff, perhaps overlooking that this claim is brought on behalf of D&K Ltd. Partnership, a minority shareholder of TPR Investment. It is disputed as to whether TPR Investment owed a fiduciary duty of care to minority shareholder D&K Ltd. Partnership (*see Alpert v 28 Williams St. Corp.*, 63 NY2d 557, 568 [1984] [fiduciary duty of majority to minority shareholders; *Salm v Feldstein*, 20 AD3d 469 [2d Dept. 2005] [fiduciary duty of managing member of company and co-member to plaintiff]). The parties dispute, of course, whether defendant was among the entities promising that the promissory note would never be enforced. Defendant argues that there was no transfer in reliance, however plaintiff sufficiently argues that D&K Ltd. Partnership pledged its shares of TPR in reliance of the promise that the note would be not enforced, citing *Lester v Zimmer*, 147 AD2d 340, 341-

29

342 (3d Dept. 1989), which notes that the elements of a constructive trust are "flexible," and the "transfer" should be interpreted broadly. Whether defendant was unjustly enriched is a matter to be determined at trial. Accordingly, as there are questions of fact, summary judgment is denied as to the 13th cause of action.

The 14th and 15th causes of action, brought on behalf of the Orly Genger 1993 Trust, allege constructive and actual fraudulent conveyance under New York Debtor & Creditor Law §§ 273, 276, and 277. Section 273 of the Debtor and Creditor Law provides that "every conveyance made . . . by a person who is or will be thereby rendered insolvent is fraudulent as to creditors without regard to his actual intent if the conveyance is made or the obligation is incurred without a fair consideration." Section 276 of the Debtor & Creditor Law provides that a conveyance is actually fraudulent if it was made with actual intent "to hinder, delay, or defraud either present or future creditors." Section 277 provides that a conveyance of partnership property made either when the partnership is insolvent or will be rendered insolvent by the conveyance, is fraudulent as to partnership creditors if the conveyance is made (a) to a partner even if there is a promise by the partner to pay partnership debts, or (b) to a non-partner without fair consideration to the partnership.

None of these statutes apply to the facts here, and defendant's motion for summary judgment and dismissal of the two causes of action must be granted based on failure to state a cause of action. In New York, only creditors may maintain actions for fraudulent conveyance (*Geren v Quantum Chemical Corp.*, 99 F3d 401, 1995 WL 737512, **2 [2d Cir. [NY] 1995], citing *Pappa Bros. v Thompson*, 214 NYS2d 13, 15 [Sup. Ct. Nassau County, 1961]). Although plaintiff argues that the Orly Genger 1993 Trust is a creditor, she is misapplying the statute. A creditor is defined as an entity "having any claim, whether matured or unmatured, liquidated or

30

unliquidated, absolute, fixed or contingent." (Debtors & Creditors Law § 270). The complaint alleges that certain of the assets of the trust were wrongly conveyed to defendant by the actions of Sagi Genger. However, to establish a constructive fraudulent conveyance, plaintiff must demonstrate: (1) that there was a conveyance; (2) that the defendant would become insolvent as a result of the conveyance; and (3) there was no fair consideration for the conveyance (see, *United States v Sweeney*, 418 F. Supp. 2d 492, 498 [SDNY 2006], citation omitted). To establish intentional fraudulent conveyance, plaintiff must show in addition that there was actual intent "to hinder, delay, or defraud . . . creditors" (*Sweeney*, at 498). Not only does plaintiff not establish that she is a creditor who has a claim, but she does not allege that *defendant* became insolvent because of the conveyance of the TPR shares. Furthermore, she offers nothing more than the statement that the shares were bought by TPR Investment for a "fraction" of their original value, to establish that there was no fair consideration. Her reliance on Debtor and Creditor Law § 277 is also misplaced, based on the facts alleged in the pleadings. Accordingly, the 14th and 15th causes of action are dismissed on summary judgment.

The 16th cause of action alleges promissory estoppel on behalf of D&K Ltd. Partnership. Defendant's motion for summary dismissal of this cause of action is denied for the same reasons set forth in the discussion of the branch of Sagi Genger's motion for summary judgment and dismissal of this cause of action.

Therefore,

As to Motion Sequence Number 001, due deliberation having been had, and it appearing to this Court that a cause of action exists in favor of the plaintiff and against the defendants and that the plaintiff is entitled to a preliminary injunction on the ground that the subject of the action is unique and that the defendants threaten to do an act in violation of the plaintiff's rights

respecting the subject of the action, tending to render the judgment ineffectual, as set forth in the aforesaid decision, it is

ORDERED that the undertaking is continued in the sum of $150,000.00, conditioned that the plaintiff, if it is finally determined that she was not entitled to an injunction, will pay to the defendants all damages and costs which may be sustained by reason of this injunction; and it is further

ORDERED that defendants, their agents, servants, employees and all other persons acting under the jurisdiction, supervision and/or direction of defendants, are enjoined and restrained, during the pendency of this action, from doing or suffering to be done, directly or through any attorney, agent, servant, employee or other person under the supervision or control of defendant or otherwise, any of the following acts: removing the Shares from the state, or otherwise transferring, selling, pledging, assigning, or otherwise disposing of the Shares; and it is further

ORDERED that as to Motion Sequence Number 002, the motion for summary judgment by Dalia Genger is granted only to the extent of dismissing the 1st and 8th causes of action as against her in the first amended verified complaint, and is otherwise denied; and it is further

ORDERED that as to Motion Sequence Number 003, the motion for partial summary judgment by Sagi Genger is granted only to the extent of dismissing the 8th cause of action as against him in the first amended verified complaint, and is otherwise denied; and it is further

ORDERED that as to Motion Sequence Number 004, the motion for partial summary judgment by D&K GP is granted only to the extent of dismissing the 4th and 8th causes of action against it in the first amended verified complaint, and is otherwise denied, and it is further

ORDERED that as to Motion Sequence Number 005, the motion for summary judgment

32

by TPR Investment Associates, Inc., is granted only to the extent of dismissing the 8th, 12th, 14th, and 15th causes of action in their entirety as against this defendant, and as to the 9th cause of action, dismissing the claims alleging violations of UCC § 9-613 (a) (4) and (a) (5); and the motion is otherwise denied; and it is further

ORDERED that as to Motion Sequence Number 006, the motion to amend the complaint is granted to the extent set forth above; plaintiff shall e-file and serve a second amended complaint incorporating the limitations set forth herein, and serve it on all parties who shall then serve their answers in accordance with the CPLR; and it is further

ORDERED that the parties shall appear for a preliminary conference in Supreme Court, 60 Centre Street, room 212, on September 15, 2010, at 2:15 p.m.

This constitutes the decision and order of the court.

Dated: July 28, 2010
New York, New York

_Paul G. Feinman_
J.S.C.