# SUPREME COURT OF THE STATE OF NEW YORK — NEW YORK COUNTY

PRESENT: _____ JAFFE _____

*Justice*

Amended Decision

PART 12

_____

Genger

- v -

Genger

_____

INDEX NO. 651089/2010

MOTION DATE _____

MOTION SEQ. NO. 006

MOTION CAL. NO. _____

The following papers, numbered 1 to _____ were read on this motion to/for _____

|  | PAPERS NUMBERED |
|---|---|
| Notice of Motion/ Order to Show Cause — Affidavits — Exhibits ... | 1,2,3, |
| Answering Affidavits — Exhibits | 4,5 |
| Replying Affidavits | 6 |

**Cross-Motion:** ☐ Yes ☐ No

Upon the foregoing papers, it is ordered that this motion is resolved by the annexed Decision and order

**MOTION/CASE IS RESPECTFULLY REFERRED TO JUSTICE FOR THE FOLLOWING REASON(S):**

Dated: 1/2/13

_____
J.S.C.

**Check one:** ☐ FINAL DISPOSITION ☑ NON-FINAL DISPOSITION

**Check if appropriate:** ☐ DO NOT POST ☐ REFERENCE

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK : PART 12
----------------------------------------------------------------------------x
ARIE GENGER and ORLY GENGER, in her individual        Index No. 651089/2010
capacity and on behalf of THE ORLY GENGER 1993
TRUST,

                                      Argued:           3/13/12
                        Plaintiffs,       Mot. seq. nos.:    006-007,
                                                        009-011, 015
       -against-

                                         **AMENDED DECISION**
                                        **AND ORDER**
SAGI GENGER, TPR INVESTMENT ASSOCIATES,
INC., DALIA GENGER, THE SAGI GENGER 1993
TRUST, ROCHELLE FANG, individually and as trustee
of THE SAGI GENGER 1993 TRUST, GLENCLOVA
INVESTMENT COMPANY, TR INVESTORS, LLC,
NEW TR EQUITY I, LLC, NEW TR EQUITY II, LLC,
JULES TRUMP, EDDIE TRUMP and MARK HIRSCH,

                        Defendants.
----------------------------------------------------------------------------x
BARBARA JAFFE, JSC:

      By notices of motion dated October 14, 2011, defendants move pursuant to CPLR 3211

for an order dismissing various causes of action asserted in the third amended and supplemental

complaint of Arie Genger and his daughter Orly Genger, in her individual capacity and on behalf

of the Orly Genger 1993 Trust (complaint). By order to show cause dated September 13, 2012,

defendants Glenclova Investment Company, TR Investors, LLC, New TR Equity I, LLC, New

TR Equity II, LLC, Jules Trump, Eddie Trump, and Mark Hirsch (Trump Group) move pursuant

to CPLR 2214(c) for an order permitting them to supplement the record of its motion (sequence

15) with a recent decision of the Delaware Chancery Court. On or about October 17, 2012, I was

assigned to Part 12 where this action pends.

      In his complaint, Arie advances 10 causes of action including, as pertinent here, a

declaratory judgment authorizing him to reform the divorce settlement stipulation between him

and his ex-wife, Dalia Genger, the mother of Orly and Sagi Genger and trustee of the Orly Trust; constructive trust; breach of fiduciary duty, conspiracy and aiding and abetting breach of fiduciary duty; unjust enrichment and rescission; breach of contract; tortious interference with contract, and aiding and abetting tortious interference of contract; and preliminary and permanent injunctions.

## I. BACKGROUND

The history of this action is set out in opinions rendered by the justice previously assigned, the Surrogate's Court, the Delaware Chancery Court, the Delaware Supreme Court, and the United States District Court for the Southern District of New York (Southern District). Therefore, the only background provided here is for the purpose of addressing the instant motions.

In 1993, as part of a family estate plan for the benefit of his children Sagi and Orly, Arie established the Sagi Trust and the Orly Trust (the Trusts). In 2001, TPR Investment Associates (TPR), a Genger family-controlled corporation, entered into a stockholders agreement with Trump Group, whereby Trump Group obtained the right to purchase all of TPR's 3,000 shares in Trans-Resources, Inc. (TRI), another Genger family-controlled corporation. The agreement also provided that consent was required for any share transfers, except those to a "permitted transferee." (Stockholders Agreement, § 3.1).

### A. The divorce stipulation

In 2004, Arie and Dalia settled their bitterly contested divorce by entering into a so-ordered stipulation distributing their marital assets, including their interests in TPR and TRI. At the time, Arie held 51 percent of TPR's stock with the remaining 49 percent held by D&K

2

Limited Partnership (D&K). Dalia held four percent of D&K; the Sagi Trust, and the Orly Trust held 48 percent each. TPR held 52.85 percent of TRI's common stock, and the remaining 47.15 percent was held by Trump Group.

Pursuant to the divorce stipulation and related documentation, Arie agreed to transfer his 51 percent interest in TPR to Dalia, with the proviso that TPR divest its 3,000 shares of TRI common stock on the following terms: (1) Sagi would become TPR's president and chief executive officer; (2) TPR would transfer to Arie 794.4 shares of TRI common stock (the Arie Shares), representing a 13.4 percent interest in TRI; (3) TPR would transfer to each of the Trusts 1,102.8 shares of TRI common stock (the Sagi Trust Shares and the Orly Trust Shares, each representing a 19.43 percent interest in TRI); and (4) each of the Trusts would execute agreements providing for, *inter alia*, Arie's irrevocable right to vote the Sagi Trust Shares and the Orly Trust Shares in TRI for the duration of his life. (2004 Transfers). The divorce stipulation includes a clause which provides, in effect, that in the event any of the terms therein are voided by a court of competent jurisdiction, the parties thereto may seek a court-ordered reformation of the affected terms to give effect to the parties' original intent. (Divorce Stipulation, Art. XVI, at 47-48).

In 2007, Dalia commenced an arbitration proceeding against Arie, contesting the distribution of marital assets under the divorce stipulation. In 2008, an arbitration award in the proximate amount of $3.85 million was entered in Dalia's favor.

### B. Trump Group's acquisition of TRI shares

In early 2008, when TRI faced financial difficulties, Arie, now in control of TRI by virtue of the 2004 Transfers, explored the possibility of obtaining capital funding for it from

3

Trump Group, in exchange for increasing Trump Group's equity position to become TRI's

majority stockholder. While a funding plan was being negotiated and drafted, TRI's financial

condition significantly improved. Arie then reneged on the funding agreement and threatened to

sue Trump Group if it challenged the 2004 Transfers.

Subsequently, Trump Group asserted its right under the TRI stockholders agreement to

purchase all of TPR's 3,000 TRI shares, and maintained that the 2004 Transfers under the

divorce settlement and underlying transaction documents were invalid because Arie never sought

its consent, as is required by the TRI stockholders agreement. Thus, on August 11, 2008, Trump

Group filed an action in the Southern District against TPR and TRI, asserting that the 2004

Transfers were invalid as violative of the stockholders agreement. Arie intervened, and TPR

interposed a third-party complaint against him, seeking a declaratory judgment that TPR is the

true owner of all TRI shares, and that Arie had tortiously interfered with TPR's contractual and

property rights in executing the divorce stipulation. In response, Arie asserted in his third-party

answer various counterclaims substantially similar to those asserted in the instant action.

On or about August 22, 2008, Trump Group and TPR entered into a stock purchase

agreement, whereby TPR agreed to sell the Sagi Trust's 1102.8 shares of TRI common stock to

Trump Group for $26.7 million, which would result in Trump Group becoming TRI's majority

stockholder. On the same day, the parties entered into a side letter agreement, whereby TPR

agreed that, in the event that the 2004 Transfers of the TRI shares by TPR to the Orly Trust and

Arie were determined to be invalid, Trump Group would be entitled to purchase directly from

TPR the Orly Trust Shares and the Arie Shares at less than 60 percent of the per share price paid

by Trump Group for the Sagi Trust Shares.

4

On August 25, 2008, after purchasing the Sagi Trust Shares from TPR, Trump Group

commenced in the Delaware Chancery Court a "Section 225 proceeding" under Title 8 of the

Delaware Code, asserting that it was in control of TRI via its purchase of the Sagi Trust Shares

pursuant to the stock purchase agreement, and sought a judicial determination of the composition

of TRI's board of directors.  In an opinion dated July 23, 2010, the Chancery Court ruled, *inter*

*alia,* that because the 2004 Transfers violated the TRI stockholders agreement, and because

Trump Group never ratified the 2004 Transfers despite Arie's contrary allegation, by virtue of the

stock purchase agreement, Trump Group owned the Sagi Trust Shares, giving it the majority

voting control of TRI. (*TR Investors, LLC, v Genger*, 2010 WL 2901704 [Del. Ch. Ct. 2010]).

The court concluded as follows:

> [T]he Trump Group controls the Trans-Resources board for the following reasons: (1) the
> Trump Group never received notice of the 2004 Transfers, which were made in violation
> of the Stockholders Agreement, until June 2008; and (2) the Trump Group did not ratify
> those Transfers when it bought the transferred shares from Sagi Genger and TPR.
> Because it never ratified the wrongful transaction, the Trump Group was free to deal with
> the relevant transferor, TPR, and its transferee, the Sagi Trust, and settle the matter by
> acquiring the wrongly transferred shares in an agreed upon negotiation. In doing so, the
> Trump Group clearly reserved its position that TPR made a void transfer, has proven that
> its position was correct, and is entitled, as a result, to be deemed to have taken the shares
> from TPR as a settlement of the improper Transfers. In the alternative, even if the Trump
> Group ratified the 2004 Transfers-which it did not-I find that the Trump Group did not
> purchase the shares from Sagi Genger subject to the proxy in favor of Arie Genger.
> Therefore, the Trump Group holds a majority equity and voting stake in Trans-Resources,
> and its ability to vote its shares is unaffected by the proxy.

(*TR Investors, LLC,* 2010 WL 2901704, *2).

Thereafter, in an opinion dated August 9, 2010, the Chancery Court expanded its ruling,

holding that the Arie and Orly Trust Shares transferred in 2004 were also invalid, thereby

entitling Trump Group to buy those shares from TPR pursuant to the side letter agreement if it

5

chose to do so. (*TR Investors, LLC v Genger*, 2010 WL 3279385 [Del. Ch. Ct. 2010]). Plaintiffs commenced the instant action promptly after the Chancery Court issued its July 2010 opinion.

While Arie was seeking relief in this court, he appealed the Chancery Court rulings. In an opinion dated July 19, 2011, the Delaware Supreme Court affirmed that part of the Chancery Court's findings and rulings that Trump Group had legally purchased the Sagi Trust Shares from TPR, giving it majority control of TRI, but it reversed the Chancery Court's August opinion as to the beneficial ownership of the Arie Shares and Orly Trust Shares absent personal jurisdiction over TPR and the Orly Trust which were not parties to the section 225 proceeding. (*Genger v TR Investors, LLC*, 26 A3d 180 [Del. Sup. Ct. 2011]). Promptly thereafter, Trump Group and Arie, which were parties to the Delaware court proceedings, negotiated a form of the Revised Final Judgment Order (Final Order) that reflected and implemented the various findings and rulings of the Delaware Chancery Court and the Delaware Supreme Court. It expressly provides that members of Trump Group are the "owners of . . . 67.7477 percent of the authorized and issued stock" of TRI, that TPR is the "record owner of all [TRI] shares not presently owned" by Trump Group, and that Arie and the Orly Trust "are not and have not been since at least the date of execution of the Stockholders Agreement the record owners of any [TRI] shares." (Final Order, ¶¶ 2-8). The Final Order was adopted and signed by the Chancery Court, and entered in the docket on or about August 19, 2011.

### C. Additional lawsuits arising from Trump Group's acquisition of TRI shares

On about July 22, 2011, in response to the Delaware Supreme Court's ruling, Trump Group commenced an action against Arie and TPR in the Delaware Chancery Court, seeking a declaration that it is both the record and beneficial owner of the Arie Shares. On October 4,

6

2011, Dalia, as trustee of the Orly Trust, also filed an action in the Delaware Chancery Court against Trump Group and TPR, seeking a declaration that the Orly Trust is the beneficial owner of the Orly Trust Shares. Pursuant to two separate temporary restraining orders, dated October 26, 2011 and November 9, 2011, and issued by the previously assigned justice, Dalia, TPR and Trump Group were prohibited from proceeding with the Delaware declaratory judgment actions. In addition to the foregoing court actions, counsels for TPR and Trump Group, in their capacity as escrow agents with respect to the sales of the Orly Trust Shares and the Arie Shares to Trump Group, filed separate interpleader actions in the Southern District and deposited escrowed funds of approximately $10.3 million and $7.4 million, respectively, with the Southern District clerk. As a result, there were no less than six separate actions pending in three different jurisdictions relating to the issue of the beneficial ownership of the Arie Shares and the Orly Trust Shares.

### D. Instant motions

On March 13, 2012, oral argument on defendants' motions was heard by the previously assigned justice pending the Southern District's determination as to its jurisdiction to hear and adjudicate the primary issue of whether Arie and the Orly Trust each, respectively, has a beneficial interest in the Arie Shares and the Orly Trust Shares, which is at the heart of the parties' dispute. In an opinion dated June 14, 2012, the Southern District observed that the parties had created "a headache-inducing jurisdictional conflict" in requesting that it "clean up the mess they made by determining which of the federal or state courts should decide the issue underpinning all their claims - that is, the beneficial ownership of the Arie Shares and Orly Trust Shares." (*Glenclova Investments Co. v Trans-Resources, Inc., et al.,* __ F Supp 2d __, 2012 WL 2196670, at *5 [SDNY 2012]). While that court took "no position on the question of forum," in

7

light of the temporary restraining orders staying litigation in Delaware as to the issue of beneficial ownership of the Orly Trust Shares and "the difficulty the Delaware Chancery Court may have in obtaining personal jurisdiction over Arie and Orly," the Southern District concluded that the foregoing "strongly suggests that the parties agree to litigate their claims in the New York Supreme Court." (*Id.* at 19).

## II. ANALYSIS

In considering a motion to dismiss pursuant to CPLR 3211(a)(7), the court must determine whether the pleadings state a cause of action. The motion must be denied if, from the four corners of the pleadings, factual allegations are discerned which, taken together, manifest any cause of action cognizable at law. (*Richbell Info. Servs. v Jupiter Partners*, 309 AD2d 288, 289 [1st Dept 2003], *quoting 511 W. 232nd Owners Corp. v Jennifer Realty Corp.*, 98 NY2d 144, 151-152 [2002]). The pleadings are afforded a liberal construction, and the court is to accord plaintiffs the benefit of every possible favorable inference. (*Simkin v Blank,* 19 NY3d 46, 52 [2012]). However, while factual allegations in a complaint should be accorded every favorable inference, bare legal conclusions and inherently incredible facts are insufficient. (*Matter of Sud v Sud*, 211 AD2d 423, 424 [1st Dept 1995]).

Moreover, "[w]hen the moving party offers evidentiary material, the court is required to determine whether the proponent of the [complaint] has a cause of action, not whether [he or] she has stated one." (*Asgahar v Tringali Realty, Inc.*, 18 AD3d 408, 409 [2d Dept 2005]). And, a cause of action may not be maintained if it is barred by, *inter alia*, collateral estoppel, res judicata or issue preclusion. (CPLR 3211[a][5]).

8

### A. Trump Group's motion to dismiss (motion sequence number 011)

The complaint contains the following causes of action against Trump Group: declaratory judgment to reform the divorce stipulation (first cause of action); constructive trust, unjust enrichment, rescission, breach of fiduciary duty, aiding and abetting or conspiracy to commit a breach (second, third, fourth, and fifth causes of action); tortious interference with contract (ninth cause of action); and preliminary and permanent injunction (fifth and tenth causes of action). The gist of the complaint is that, because the 2004 Transfers effected by the divorce stipulation were held void and unenforceable by the Delaware courts, the divorce stipulation must be reformed in such a manner that Arie will resume beneficial ownership of the 3,000 shares of TRI stock that TPR owned before the 2004 Transfers. According to plaintiffs, any act of defendants that is inconsistent with Arie's beneficial ownership in such shares of stock is actionable and warrants the payment of damages.

### 1. Collateral estoppel

Seeking dismissal of the complaint, Trump Group argues that plaintiffs' claims are collaterally estopped by the Delaware courts' determination of factual and legal issues and even if plaintiffs are entitled to relitigate the issues underlying their claims, the complaint nonetheless does not state a cause of action. It identifies the following issues of fact and law that were decided by the Delaware courts: the invalidity of the 2004 Transfers that Arie caused TPR to make to himself and to the Orly and Sagi Trusts in violation of the TRI stockholders agreement, thereby entitling Trump Group to purchase all of TPR's 3,000 shares of stock in TRI; Trump Group's entitlement to control TRI as of 2004 when Arie caused TPR to breach the stockholders agreement; Arie's failure to provide notice of the 2004 Transfers and to obtain Trump Group's

9

consent to the Transfers, which violated the stockholders agreement; and Trump Group's

ownership of 67.7 percent of TRI shares upon its purchase of the Sagi Trust Shares from TPR

pursuant to the 2008 purchase agreement with TPR, which is now controlled by Sagi, as its

current president and chief executive officer.

Arie argues in opposition that because: (1) the issues listed by Trump Group were

decided in a statutorily limited section 225 *in rem* summary proceeding and not in a plenary

action; and (2) the Delaware Supreme Court held that an adjudication of the right to vote

corporate shares is not binding with respect to the beneficial ownership of such shares, the

section 225 proceeding in the Chancery Court did not result in a determination of the beneficial

ownership of all 3,000 TRI shares. He also contends that the Delaware courts' findings do not

bind him because they neither conflict with the causes of action he advances in his complaint, nor

are they essential to the Delaware courts' determinations, and because the court imposed on him

a higher burden of proof. (Arie's Opposition Brief, at 11-13; Hearing Transcript, March 13,

2012, at 63). He does not contend that he did not have a full and fair opportunity to litigate in the

Delaware courts. Rather, he contends that "essential parties were missing." (Arie's opposition

brief, at 14).

Orly joins Arie's arguments and adds that, contrary to the position taken by TPR and

Sagi, as well as Trump Group, she has legal standing to represent the Orly Trust, per the holding

of the previously assigned justice. (*Genger v Genger*, NY County, June 28, 2010, Feinman, J.,

index no. 109749/2009). Thus, both she and Dalia assert that they may act on behalf of the Orly

Trust unless and until the Surrogate's Court rules otherwise in an appropriate action there. Orly

also denies that she is collaterally estopped by the Delaware decisions as she was not a party to

10

those proceedings and had no opportunity to litigate the issues there.

While a non-party may not be estopped from arguing a position previously litigated, many of the issues listed by Trump Group are closely related to the Delaware courts' invalidation of the 2004 Transfers and constitute the primary bases for the instant action, and Orly does not allege that her participation as a litigant or party in the Delaware proceedings would have altered the Delaware courts' findings and rulings that relate to the invalidation. In any event, the Delaware Supreme Court recognized that Delaware has no jurisdiction over the Orly Trust and TPR, and thus specifically left open the issue of the beneficial ownership of the Orly Trust Shares. Thus, that Orly did not litigate the 2004 Transfers issues in Delaware does not appear to have prejudiced her rights, and she does not argue otherwise. And, as Arie is estopped from arguing some of the issues (*infra*, at 12-16), and as Orly does not distinguish her arguments and issues from Arie's, instead fully adopting them, to the extent that the Delaware findings and rulings on the issues relating to such arguments apply to both Arie and Orly, and to which this court gives full faith and credit (US Const, art IV, § 1; *Ho v McCarthy,* 90 AD3d 710, 711 [2d Dept 2011]), they also bind Orly here. In this regard, I need not decide whether there is any merit to Trump Group's argument that, although Orly and the Orly Trust were not parties in the Delaware proceedings, their interest was fully represented by Arie, who acted as a fiduciary, was in privity with Orly, and actively litigated the issues raised in the Delaware proceedings on behalf of Orly and the Orly Trust.

Accordingly, where applicable, or unless otherwise specified or the context otherwise requires, all references hereinafter to "Arie" include "Orly" and the "Orly Trust." However, to avoid any possibility of risk or confusion, the decretal paragraphs set forth at the conclusion of

11

this decision and order will, where applicable, reflect the separate rulings with respect to Arie and Orly and/or the Orly Trust.

In claiming that he retains a beneficial interest in all 3,000 TRI shares including the Sagi Trust Shares purchased by Trump Group from TPR, Arie overlooks the Final Order which he himself negotiated and which gives neither Arie nor the Orly Trust record ownership of any TRI shares. And he identifies no clause or provision in the Delaware courts' opinions suggesting that he has a beneficial ownership interest in the Sagi Trust Shares. Therefore, any allegation or claim by Arie in opposition to Trump Group's motion that TPR's record ownership of all 3,000 TRI shares "remained subject to his beneficial ownership claims" has no factual or legal basis. (Arie's Opposition Brief, at 15-17). Indeed, Arie acknowledges that "[t]he Chancery Court also held that the Trumps owned the Sagi [Trust] shares under the 2008 Agreement and that the Sagi Trust Irrevocable Proxy [held by Arie] was not valid under New York or Delaware law." (*Id.* at 9).

Many of Arie's claims against Trump Group in this action are integrally related to the Delaware courts' invalidation of the 2004 Transfers, and the Delaware Supreme Court noted that Arie had "voluntarily asked the trial court to determine that he beneficially owned 13.99 percent" of TRI shares, and that Arie and Trump Group "were legally free to consent to the jurisdiction of the Court of Chancery exercising plenary *in personam* jurisdiction over themselves personally." (*Genger v TR Investors, LLC*, 26 A3d 180, 202 [Del. Sup. Ct. 2011]).

That a section 225 proceeding was *in rem* has no bearing on the preclusive effect of a decision on a subsequent action. (*Johnston v Arbitrium [Cayman Islands] Handels AG*, 198 F3d 342, 348 [2d Cir 1999] ["Under applicable Delaware law . . . the determination of an issue

12

actually litigated and decided against a defendant in an in rem case may have collateral estoppel effect in a subsequent in personam proceeding"]). In *Johnston*, the Second Circuit expressly rejected the argument that issues decided in a section 225 proceeding concerning disputed ownership and control of corporate shares could not collaterally estop claims raised in a subsequent *in personam* action involving findings and determinations made in the prior *in rem* action. And TPR and the Orly Trust's absence from Delaware was the basis for the Delaware Supreme Court's reversal of the Chancery Court's ruling with respect to the issue of beneficial ownership of the Arie Shares and the Orly Trust Shares, but not as to other findings and rulings of the Chancery Court.

The higher burden of proof imposed on Arie in the Chancery Court to prove the factual issues by clear and convincing evidence is immaterial. The Second Circuit in *Kosakow v New Rochelle Radiology Assoc.,* analyzed applicable New York law, as set forth by the Court of Appeals in *Schwartz* and followed in *Parker, supra,* and stated, in relevant part:

> The *Schwartz* opinion counsels that a functional approach should
> be taken in analyzing collateral estoppel in New York, and that it
> should not be applied rigidly . . . Notably, under this functional
> test, the court did not mention the burden of proof, let alone
> describe it as a dispositive factor. While there is a certain logical
> appeal to the decision in *Nesbitt* [that collateral estoppel may not
> apply if there is a difference in the burden of proof], *the value of*
> *collateral estoppel in fostering judicial economy and avoiding*
> *inconsistent results would be severely compromised if every shift in*
> *the burden of proof would make collateral estoppel unavailable*.
> . . . It follows that the New York Court of Appeals would similarly
> reject the proposition that collateral estoppel can never be applied
> where there is a difference in the burden of proof. *Schwartz's*
> practical approach to the issue dictates that parties not be permitted
> to relitigate the same issues, despite differing burdens of proof,
> where it is evident that burden of proof played little or no role in
> the prior factual determination.

13

*(Kosakow,* 274 F3d 706, 731-732 [2d Cir 2001][emphasis added]). Absent any New York authority to the contrary offered by Arie, *Kosakow* is persuasive. Moreover, the Chancery Court imposed on Arie a higher burden of proof as a sanction for spoliating evidence and contempt of court. To permit him to relitigate his claims here would render the sanction nugatory.

And, following *Kosakow,* the Second Circuit recently held that where a plaintiff had a full and fair opportunity to litigate her claims in an earlier Article 78 proceeding under New York law, she was collaterally estopped from advancing those claims in the federal action notwithstanding the difference in the applicable burdens of proof between the proceeding and a subsequent action in the federal court. *(Constantine v Teachers Coll.*, 448 Fed Appx 92, 94-95, 2011 WL 4509542 [2d Cir 2011]).

Most importantly, the underlying facts and record clearly reflect that Arie had a full and fair opportunity in the Delaware courts to litigate the issues regarding invalidation of the 2004 Transfers. *(Schwartz v Public Adm'r of County of Bronx*, 24 NY2d 65, 73 [1969] [while burden of proving identity of issues rests on proponent of collateral estoppel, opponent bears burden of proving that he or she did not have full and fair opportunity to litigate issues in earlier action]); *accord Parker v Blauvelt Volunteer Fire Co.*, 93 NY2d 343, 349 [1999]). Accordingly, to the extent that the allegations in support of the causes of action asserted in the complaint are contradicted by the findings and rulings of the Delaware courts, Arie is collaterally estopped from relitigating them. (CPLR 3211[a][5]).

2. Declaratory judgment to reform the divorce stipulation (first cause of action)

Arie seeks a declaratory judgment against Trump Group and other defendants to reform the divorce stipulation based on: (1) the provision giving the parties the right to seek a

14

court-ordered reformation to reflect their original intent in the event that any portion of the stipulation is held to be invalid; (2) the Delaware courts' invalidation of the 2004 Transfers and the irrevocable proxies held by Arie to vote the Orly Trust Shares and the Sagi Trust Shares; and (3) his and Dalia's mutual mistake in believing that the 2004 Transfers and the irrevocable proxies were valid. In seeking reformation, Arie wants, *inter alia*, the 3,000 TRI shares held by TPR prior to the 2004 Transfers placed in a new entity to be controlled by him, and for him to retain all voting rights to such shares. (Complaint, ¶¶ 175-189). This is the only cause of action where Orly and the Orly Trust are not co-plaintiffs with Arie.

The Southern District observed not only that the instant action is "little more than a collateral attack on the Delaware Supreme Court ruling," but that authorizing Arie to reform the corporate ownership structure in TPR and TRI, including allowing him to retain his voting rights in all 3,000 shares of TRI stock, constitutes a collateral attack on the Delaware courts' determinations, whereby they unequivocally ruled, *inter alia*, that he has no right to vote any of the shares because the irrevocable voting proxies held by him pursuant to the 2004 Transfers are invalid. (*Glenclova Investments Co. v Trans-Resources, Inc., et al.,* __ F Supp 2d __, 2012 WL 2196670, at *5). It also noted that Arie's federal counterclaims, which are substantially similar to those advanced here, including the reformation claim, are directed against 13 counterclaiming defendants including Dalia, even though 12 of them were not parties to the divorce stipulation, and "the majority of the counterclaims do not name Dalia at all." (*Id.* at 17). Moreover, the Southern District observed that:

> even though Arie is the party who made false representations in the [Divorce] Stipulation of Settlement, his reformation claim does not seek to right that wrong. Instead, he wants to change the terms of

15

> the [Stipulation] in a manner designed to undo the Delaware
> Chancery Court's finding of liability against him, thereby allowing
> him to avoid the consequences of his own breach of the 2001 [TRI]
> Stockholders Agreement - Trump Group's right to purchase those
> invalidly transferred shares.

(*Id.* at 17). Consequently, Arie is collaterally estopped from seeking a declaratory judgment to

reform the divorce stipulation, at least as asserted against Trump Group, as it is "little more than

a collateral attack on the Delaware Supreme Court ruling," and as Trump Group is not a party to

the divorce stipulation. Although Arie maintains that Trump Group is a necessary party because

it holds the 3,000 TRI shares needed to implement the reformation, the remedy of reformation or

rescission is unavailable against a nonparty to a contract. (*Baranek v Baranek*, 54 AD3d 789, 790

[2d Dept 2008]).

And, as Trump Group was not a party to the divorce stipulation, Arie's and Dalie's

alleged "mutual mistake" in effecting the 2004 Transfers is immaterial and may not be used as a

defense in Arie's dispute with Trump Group. Moreover, Arie seeks to undo the Delaware courts'

adverse findings against him and Trump Group's right to buy the "invalidly transferred shares,"

notwithstanding that they were transferred as a result of his misrepresentation in the divorce

stipulation that no consent, other than TPR's, was required for the 2004 Transfers. In any event,

any equitable or contractual right in favor of Arie to reform the divorce stipulation does not

override the pre-existing contractual right of Trump Group to purchase the invalidly transferred

shares, when it was Arie then in control of TPR who caused TPR to breach the TRI stockholders

agreement.

### 3. Constructive trust, unjust enrichment and rescission (second and fourth causes of action)

The elements of a cause of action for a constructive trust are: "(1) a confidential or

16

fiduciary relation; (2) a promise, express or implied; (3) a transfer made in reliance on that promise; and (4) unjust enrichment." (*Wachovia Sec., LLC v Joseph*, 56 AD3d 269, 271 [1ˢᵗ Dept 2008]). Arie asserts that New York courts frequently impose constructive trusts with "sufficient flexibility" to prevent enrichment and that the "constructive trust doctrine is not rigidly limited." (Arie's Opposition Brief, at 20).

Arie alleges that Trump Group is not a bona fide purchaser, and that a constructive trust should be imposed in his favor with respect to all 3,000 shares of TRI stock that reverted to TPR because Trump Group, as well as Sagi, TPR's current president, owe fiduciary and contractual duties to Arie and the Orly Trust. (*Id.* at 23). According to Trump Group, however, it had neither a confidential nor fiduciary relationship with Arie and/or the Orly Trust.

Courts have held that "a person wrongfully acquiring property can be treated as a constructive trustee notwithstanding the lack of a fiduciary relationship." (*See eg In re Koreag, Controle et Revision S.A. v Refco F/X Assoc.*, 961 F2d 341, 353 [2d Cir 1992]), *citing Simonds v Simonds*, 45 NY2d 233, 242 [1978]). Whether Trump Group was a bona fide purchaser or whether it owed a confidential or fiduciary relationship need not be decided for purposes of addressing Arie's claim for a constructive trust.

In an earlier decision in this action entered on January 3, 2012 (motion sequence numbers 004 and 005), the previously assigned justice denied plaintiffs' request for an order enjoining defendants from taking certain actions, including any act to sell or transfer the Arie and Orly Trust Shares pending a final adjudication of beneficial interest, finding that an injunction would interfere with TRI's management in which Trump Group holds majority control, that plaintiffs have alternative remedies even if they obtain a final judicial determination of beneficial interest,

17

and that requiring Trump Group and TPR to comply with the court's order in giving 10 business days' notice to plaintiffs of a proposed future transaction, except with respect to share dilution, is sufficient to maintain the status quo. (*Genger v Genger*, Dec. 28, 2011 [Sup Ct, NY County]).

The same considerations render unnecessary Arie's claim for a constructive trust as, *inter alia*, the notice requirement affords plaintiffs a sufficient opportunity to seek judicial relief in the event that defendants propose to enter into a transaction that may adversely affect plaintiffs' asserted interest in the Arie Shares and the Orly Trust Shares.

In order to plead a cause of action for unjust enrichment adequately, a plaintiff must allege "that (1) the other party was enriched, (2) at that party's expense, and (3) that it is against equity and good conscience to permit the other party to retain what is sought to be recovered." (*Georgia Malone, Inc. v Rieder*, 19 NY3d 511, 515 [2012], *citing Mandarin Trading Ltd. v Wildenstein*, 16 NY3d 173, 182 [2011]).

In his complaint, Arie alleges, *inter alia*, that: (1) TPR/Sagi had no authority to sell the 3,000 TRI shares to Trump Group when the Delaware courts had determined that the 2004 Transfers were void *ab initio* as the shares then reverted to TPR subject to Arie's interest by virtue of the divorce stipulation; (2) the purchase price paid by Trump Group for the 3,000 TRI shares under the purchase agreement for the Sagi Trust Shares and the side letter agreement for the Arie Shares and Orly Trust Shares was a fraction of the value of such shares; and (3) Trump Group was not a bona fide purchaser and would be unjustly enriched if allowed to benefit from TPR's sale of the TRI shares.

Trump Group does not specifically deny that the per share price paid for the Arie and the Orly Trust Shares was significantly lower than that for the Sagi Trust Shares, and its assertion

18

that the Delaware courts have held that it was "entitled to buy TPR's TRI shares at 2004 values,

which were far less than the $26 million Trump Group paid TPR just for the Sagi Trust Shares"

does not defeat a claim of unjust enrichment because that portion of the Chancery Court's

opinion does not address the purchase price for the Arie Shares and Orly Trust Shares or the side

letter agreement, nor does it compare the per share price difference. Moreover, Trump Group's

contention that the claim for unjust enrichment requires a fiduciary or confidential relationship,

and must be pleaded with specificity, is not supported by the opinions it cites in its moving

papers. Rather, a fiduciary or confidential relation is an element of a constructive trust claim.

(*Supra*, at 16-17). Consequently, Arie has sufficiently alleged, for the purpose of CPLR

3211(a)(7), a claim for unjust enrichment.

Rescission is a part of the fourth cause of action. As Trump Group was not a party to the

divorce stipulation, and for the reasons fully discussed above in connection with the dismissal of

the reformation claim (*supra*, at 16-18), rescission does not lie against Trump Group.

4. Permanent injunction (fifth cause of action) and preliminary injunction (tenth cause of action)

Plaintiffs seek to preliminarily and permanently enjoin Trump Group from transferring,

selling, pledging, assigning, diluting, voting or otherwise disposing of all 3,000 shares of TRI

stock that reverted to TPR as a result of the Delaware court rulings. The reasons set forth above

for dismissing the constructive trust claim (*supra*, at 16-18) apply equally here. In addition, the

Delaware courts held that Arie and the Orly Trust are not the record owners of any TRI shares,

and that no TRI shares owned by Trump Group or owned of record by TPR are subject to any

proxy of any kind in favor of Arie. (Final Order, ¶¶ 7-10). Thus, granting the requested

injunctive relief in plaintiffs' favor to enjoin Trump Group and TPR from exercising their

19

respective voting rights in the TRI shares would constitute a collateral attack on the court rulings.

## 5. Breach of fiduciary duty, conspiracy, and aiding and abetting breach of fiduciary duty (third cause of action)

The elements of a cause of action for a breach of fiduciary duty are: "the existence of a fiduciary relationship . . . misconduct by the defendant, and . . . damages . . . caused by the defendant's misconduct." (*Rut v Young Adult Inst., Inc.*, 74 AD3d 776, 777 [2d Dept 2010]). Arie alleges, *inter alia*, that: (1) upon becoming the majority shareholder of TRI in 2008 after purchasing the Sagi Trust Shares from TPR, Trump Group owed a fiduciary duty to him and the Orly Trust as the "known beneficial owners" of the Arie Shares and Orly Trust Shares in TRI; and (2) as a majority shareholder, Trump Group breached its fiduciary duty by purchasing the Arie Shares and the Orly Trust Shares at a significant discount, thereby advancing its scheme to squeeze Arie out of TRI. (Complaint, ¶¶ 209-214).

Although Trump Group does not deny that it became a majority shareholder of TRI after it purchased the Sagi Trust Shares in 2008 and that as a majority shareholder, it owed a fiduciary duty to TRI minority shareholders (*Richbell Info. Servs.*, 309 AD2d at 300 ["(a) majority shareholder in a close corporation is in a fiduciary relationship with the minority"]), it denies knowing that plaintiffs were beneficial owners of any TRI shares, and thus could owe them no fiduciary duty.

Even assuming that Trump Group was unaware that plaintiffs were beneficial owners in 2008 when it entered into the side letter agreement to buy the Arie Shares and the Orly Trust Shares, it became aware of it by 2011 when it exercised its option to buy Arie's and the Orly Trust's shares, as since at least 2008, they asserted beneficial ownership in the shares, even if it

20

had not yet been judicially determined.

Trump Group also denies owing any duty because when it executed the side letter agreement it was not a majority shareholder, and that, even assuming it owed a fiduciary duty, the sole duty was to refrain from using its majority power to oppress the minority, and Arie does not allege that TPR, the minority shareholder, was oppressed.

Here, the fiduciary duty arose in 2008 after the Sagi Trust Shares were purchased, and the allegation is that the duty was breached in 2011 when Trump Group bought the Arie Shares and the Orly Trust Shares at a deep discount with the intent of removing plaintiffs, who have claimed, at least indirectly, to be putative minority shareholders of TRI through their interest in TPR, after the Delaware courts ruled that the 2004 Transfers were void and the transferred Arie Shares and Orly Trust Shares reverted to TPR. In any event, "whether such [fiduciary] obligation exists is necessarily fact-specific to the particular case," and it would be premature to dismiss the claim before discovery is undertaken to ascertain the facts. (*Weiner v Lazard Freres & Co.*, 241 AD2d 114, 122 [1st Dept 1998]). Consequently, for all of these reasons and for purposes of CPLR 3211(a)(7), the complaint adequately states a claim for breach of fiduciary duty against Trump Group.

It is also alleged, in addition to the direct breach of fiduciary duty, that Trump Group conspired with other defendants, and aided and abetted them in the breach of their fiduciary duty. To state a claim of aiding and abetting a breach of fiduciary duty, the complaint must contain facts to support "a fiduciary duty owed to plaintiff . . . a breach of that duty, and [the] defendant's substantial assistance in effecting the breach,'" which resulted in damages. (*Monaghan v Ford Motor Co.*, 71 AD3d 848, 850 [2d Dept 2010]). While an entity such as TPR owes no fiduciary

21

duty to its shareholders under New York and Delaware laws, as argued by Trump Group, the complaint is replete with allegations that Sagi, as TPR's president, breached fiduciary duties he owed to Arie, as well as other allegations that the 2008 purchase agreement and the side letter agreement constituted a $26.7 million bribe offered by Trump Group to Sagi, to betray and rob his father and sister of their interests in the relevant TRI shares, and to squeeze them out of TRI at unconscionably low prices. (Complaint, ¶¶ 123, 135).

The complaint thus contains sufficient factual allegations supporting a claim that Sagi breached his fiduciary duty to Arie (*infra*, at 27-28), as does the claim that Trump Group aided and abetted Sagi in breaching it. Moreover, "actual knowledge" of the alleged wrongdoing "need only be pleaded generally . . . particularly at the pre-discovery stage." (*Oster v Kirschner,* 77 AD3d 51, 55 [1st Dept 2010]).

However, the complaint is not only bereft of an explicit and independent allegation of conspiracy, but such a cause of action does not exist, as it is well settled that "a mere conspiracy to commit a [tort] is never of itself a cause of action," even though allegations of a conspiracy are permitted to connect defendants with an otherwise actionable tort. (*See Alexander & Alexander v Fritzen*, 68 NY2d 968, 969 [1986]).

### 6. Tortious interference with contract (eighth cause of action)

The elements of a cause of action for tortious interference of contract are: "(1) the existence of a valid contract between the plaintiff and a third party, (2) the defendant's knowledge of that contract, (3) the defendant's intentional procurement of the third party's breach of that contract, and (4) damages." (*Chung v Wang*, 79 AD3d 693, 694 [2d Dept 2010]).

The complaint contains allegations that Trump Group interfered with several contracts,

22

including the divorce stipulation, the 2004 Transfer documents between Arie and TPR, and the 2004 voting trust agreements between Arie and the Orly and Sagi Trusts.  However, absent any allegation in the complaint that Dalia breached the divorce stipulation and the related documentation, there can be no finding that Trump Group tortiously interfered with the divorce stipulation and the related documentation.

Although the Delaware courts held that the 2004 Transfers are void, Arie argues that the Delaware Chancery Court held that the 2004 Transfers are unenforceable, whereas the 2004 Transfer documents and the 2004 voting trust agreements are void. (Arie's Opposition Brief, at 32).  He also maintains, however, that "[on] July 23, 2010, the Delaware Chancery Court issued a lengthy written decision which held that the 2004 transfers of TPR's TRI shares to Arie, the Sagi Trust and the Orly Trust pursuant to the Divorce Decree were void . . . ." (*Id.* at 9).  Arie then asks that instead of considering the illegal contract void in toto, the illegal provision be severed, thereby permitting the validation of the balance of the agreement. (*Id.* at 33).  In his view, because the 2004 Transfer documents and voting trust agreements contained "valid and binding provisions" that required Sagi and TPR to take "all necessary actions . . . to complete or perfect the transactions contemplated hereby," a tortious interference claim may be alleged against Trump Group for causing the other defendants to breach these contractual provisions. (*Id.*).

Trump Group, however, rightly maintains that "because the 2001 Stockholders Agreement prohibited any transfers to the Trusts, any purported obligations on the part of TPR and Sagi to cooperate with such improper transfers cannot be enforced and cannot give rise to an interference claim [against Trump Group.]" (Trump Group's Reply Brief, at 19).  And, as Arie failed to provide notice to Trump Group with respect to TPR's transfer of the Arie Shares to

23

himself, which notice was required by the stockholders agreement even though he was a permitted transferee, the transfer of the Arie Shares was also void, as determined by the Delaware court.

### B. Motion of TPR and Sagi Trust to dismiss (motion sequence number 010), motion of Rochelle Fang, individually and as trustee of Sagi Trust to dismiss (motion sequence number 009), and motion of Sagi to dismiss (motion sequence number 007)

The complaint contains various causes of action against TPR, Sagi Trust, Sagi and Rochelle Fang (Fang), trustee of the Sagi Trust, including: a declaratory judgment to reform the divorce stipulation (first cause of action); constructive trust (second cause of action); breach of fiduciary duty, conspiracy and aiding and abetting in the breach of fiduciary duty (third cause of action); unjust enrichment and rescission (fourth cause of action); breach of contract (sixth and seventh causes of action); aiding and abetting tortious interference with contract (ninth cause of action); as well as preliminary and permanent injunctions (fifth and tenth causes of action). These defendants seek the dismissal of all of these causes of action as asserted against each of them. They also contend that this court lacks jurisdiction over the Sagi Trust, but they do not refute the assertion that the Sagi Trust is a New York trust and that its beneficiary resides in New York.

#### 1. Declaratory judgment for reformation (first cause of action)

It cannot be disputed that TPR, Sagi Trust, Sagi, and Fang are not parties to the divorce stipulation. Yet, Arie argues in opposition to these defendants' motions to dismiss that, because reformation of the divorce stipulation requires these defendants' participation, they are "necessary parties" to the reformation process and that complete relief cannot be obtained in their absence. (Arie's Opposition Brief, at 9-10). The reasons set forth above, in connection with

24

Trump Group's motion to dismiss the declaratory judgment for reformation against it (*supra*, at 14-16), apply equally to the instant claim against these defendants.

### 2. Constructive trust, unjust enrichment and rescission (second and fourth causes of action)

The cause of action for a constructive trust claim against TPR, Sagi, the Sagi Trust and Fang fails for the same reasons set forth above in connection with dismissal of that cause of action against Trump Group. (*Supra*, at 16-18). More specifically, as TPR and Sagi are required to give 10 days' notice to plaintiffs of a proposed transaction (except share dilution) involving the Arie and Orly Trust Shares (*Genger v Genger*, Dec. 28, 2011 [Sup Ct, NY County]), such notice is sufficient to afford them an opportunity to seek any necessary judicial relief.

Arie argues that allowing TPR to retain any benefit arising from its record ownership of the TRI shares that reverted to it as a result of invalidation of the 2004 Transfers constitutes unjust enrichment because TPR had divested itself of such TRI shares "in consideration for and as a condition of Arie giving up his 51 percent ownership interest in TRI." (Arie's Opposition Brief, at 10-12). However, it was Arie who had control of TPR before the 2004 Transfers and it was he who caused TPR to enter into the 2004 Transfers, which were invalidated by the Delaware courts.

However, to the extent that Arie alleges in the complaint that TPR entered into the 2008 side letter agreement with Trump Group to sell the Arie Shares and the Orly Trust Shares at a discount and that TPR benefited from the transaction at his expense and that of Orly and the Orly Trust, there exists a viable claim of unjust enrichment, which the Chancery Court apparently noticed when it observed that "it may be that [Arie] Genger and Orly Genger have claims against TPR and Sagi Genger over how the price paid by Trump Group for the Arie and Orly Shares was

25

allocated . . . If those transferees [i.e., Arie and the Orly Trust] have any beef with TPR or Sagi Genger, the transferees are free to file suit against them." (*TR Investors, LLC v Genger*, 2010 WL 3279385, \*3 [Del. Ch. Ct. 2010]).

Arie also argues that an inference must be drawn that "Fang benefited at Arie's expense from her involvement in the conspiracy designed to squeeze [him] out of TRI [and] her central role and complicity in accepting the $26.7 million bribe paid to the Sagi Trust by Trump Group for the purported sale of the Sagi Trust TRI shares." (Arie's Opposition Brief, at 12). He fails to allege, however, with any particularity, that Fang, individually or in her capacity as trustee of the Sagi Trust, was unjustly enriched, and at oral argument, Arie's counsel stated, in relevant part that the "claim is for aiding and abetting. For some reason [Fang] was brought back for a very short period of time . . . to execute the 2008 Stockholders [sic] Agreement, and we have alleged that they aided and abetted each other . . . and that [Fang] was the alter ego and co-agent of Sagi in his breaches of fiduciary duty. That is why she's in the case." (Hearing Transcript, March 13, 2012, at 139). Thus, the claim against Fang is based on her aiding and abetting Sagi in his breach of fiduciary duty, rather than on the allegation that she was unjust enriched, either individually or as trustee for the Sagi Trust. Moreover, Arie does not explain in either the complaint or his Opposition Brief how the Sagi Trust itself was unjustly enriched, and Arie failed in the Delaware court proceedings to mount a successful challenge to Trump Group's purchase of the Sagi Trust Shares.

Sagi contends that as unjust enrichment constitutes a "quasi-contract claim" and as there are "written contracts dealing with the same subject matter," the cause of action for unjust enrichment is not viable. (Sash Affirmation in Support of [Sagi] Motion to Dismiss, ¶ 12).

26

However, Arie, Orly and/or the Orly Trust were not parties to the 2008 side letter agreement and thus they have no standing to assert a breach of contract claim. Moreover, the side letter agreement was executed by Trump Group and TPR, by Sagi, and he knew or should have known that Arie and Orly have asserted beneficial interest claims in the Arie Shares and Orly Trust Shares since at least 2008, but he nonetheless caused TPR to sell the Shares in 2011 at an allegedly heavily discounted price. Indeed, Arie asserts that TPR is controlled by Sagi, and that Sagi, *inter alia*, breached his fiduciary duties and was unjustly enriched. In light of the foregoing, and given the position of the Delaware Chancery Court on the issue (*supra*, at 25-26), the unjust enrichment claim against Sagi is viable.

As TPR, Sagi, the Sagi Trust and Fang were not parties to the divorce stipulation, however, the cause of action seeking rescission has no factual or legal basis. (*Supra*, at 19).

### 3. Breach of fiduciary duty, conspiracy and aiding and abetting breach (third cause of action)

Arie fails to set forth any statutory or decisional law for the proposition that a corporation, such as TPR, takes on or otherwise assumes the fiduciary duties of its directors and officers such as Sagi, to its purported shareholders, such as Arie and the Orly Trust. Indeed, a corporation owes no fiduciary duties to its shareholders. (*See Gates v Bea Assoc., Inc.*, 1990 WL 180137, *6 [SD NY 1990] [to permit aiding and abetting claim against corporation would "completely undermine and negate the rule that a corporation does not have fiduciary duties to its shareholders."]).

The breach of fiduciary claim against the Sagi Trust and Fang is based, according to Arie, on their obligation, individually and as trustee under the divorce stipulation and the 2004 Transaction documents, to ensure that Arie would maintain voting control over the Sagi Trust

27

Shares for the duration of his life. (Arie's Opposition Brief, at 17). However, the voting trust agreements and the proxies held by Arie with respect to the Sagi Trust and Orly Trust Shares as well as the Arie Shares were invalidated by the Delaware courts, due to Arie's breach or violation of the stockholders agreement.

Arie also alleges that the Sagi Trust and Fang aided and abetted Sagi and Trump Group in breaching the respective fiduciary duties they owed to him. As the Delaware courts upheld the sale of the Sagi Trust Shares to Trump Group, and absent any allegation that the Sagi Trust and Fang owe Arie a fiduciary duty with respect to the Arie Shares and the Orly Trust Shares, the Sagi Trust and Fang could not have aided and abetted Trump Group or Sagi in breaching their fiduciary duties in such a transaction. Similarly, the complaint does not set forth facts as to why Orly can assert a breach of fiduciary duty claim against Fang, inasmuch as Orly does not allege that she is also a beneficiary of the Sagi Trust which Fang served as the trustee.

Sagi conclusorily denies owing a fiduciary duty to Arie, just as TPR owes no fiduciary duty to Arie. However, the complaint is replete with allegations of a fiduciary duty owed to Arie by Sagi, individually and as a TPR officer, which was breached by Sagi in causing TPR to enter into the stock purchase and side letter agreements, when he used his position as president of TPR and caused TPR to sell the Arie and Orly Trust Shares to Trump Group at a fraction of their fair market value. And, Sagi does not dispute that a director or officer of a corporation owes fiduciary duties to the corporation and its shareholders. Indeed, the Southern District observed that, even if Arie's reformation counterclaim constitutes a basis for abstaining from exercising jurisdiction, certain of his other counterclaims do not compel abstention, "particularly the claims for breach of fiduciary duty against Sagi and others (premised on Sagi's implementation of the

28

2008 side letter agreements on behalf of TPR) . . . ." (*Glenclova Investments Co. v Trans-Resources, Inc., et al.,* ___ F Supp 2d ___, 2012 WL 2196670, at *17 [SDNY 2012]).  The aiding and abetting breach of fiduciary duty claim against Sagi also survives Sagi's motion to dismiss, as discussed above relating to the survival of the breach of fiduciary duty claim against Trump Group (*supra*, at 20-22), and it is alleged that Sagi assisted or aided and abetted Trump Group in the breach of such duty.

### 4.  Breach of contract against TPR and Sagi Trust (sixth and seventh causes of action)

To state a claim for breach of contract, the complaint must allege the existence of a contract, plaintiff's performance, defendant's nonperformance, and resulting damages. (*Elisa Dreier Reporting Corp. v Global NAPS Networks, Inc.*, 84 AD3d 122, 127 [2d Dept 2011]).

Arie alleges that "TPR breached the 2004 Transfer Agreement by executing the 2008 Stock Purchase and Side Letter Agreements and purporting to sell the TRI shares to Trump Group in disregard of Arie's beneficial and voting rights, thereby failing to effectuate the express intent of the parties to the 2004 Transaction Documents and the [divorce stipulation.]" (Arie's Opposition Brief, at 22).  As discussed *supra*, at 25, Arie brought about his own loss of voting rights in the TRI shares, in spite of the voting trust agreements and the irrevocable proxies held by him, by causing TPR to enter into the 2004 Transfers without obtaining the required consent, as a result of which the Delaware courts found the proxies unenforceable.  Moreover, Arie was not a party to the 2008 side letter agreements which allegedly sought to deprive Arie and Orly of the asserted claims of beneficial interests in the Arie and Orly Trust Shares when such shares reverted to TRP, albeit such interests have not been judicially determined, and thus has no standing to assert a breach of contract claim as to these agreements.

29

Further, the breach of contract claim in the seventh cause of action against the Sagi Trust is not viable for the same reason that the breach of fiduciary duty claim against the Sagi Trust is not, as discussed above. (*Supra*, at 27).

Arie also observes that defendants "conveniently ignore the fact that the Delaware Courts made no determinations as to the validity of the Back-Up Voting Trust Agreements, the express intent of which was to ensure that Arie would maintain voting control . . . in the event the irrevocable proxies were determined to be invalid." (Arie's Opposition Brief, at 23). Having failed to raise this claim or issue in Delaware, the argument is precluded, and in any event, does not apply as to Orly as any voting right under the back-up voting trust agreements was held only by Arie. In the Delaware proceedings, voting right was clearly an important issue for Arie. Thus, his belated attempt to raise it now is untenable and a waste of judicial resources. (*Olawoyin v 520 W. 43rd St. Partners, LLC*, 34 Misc 3d 130 [A], 2011 NY Slip Op 52328 [U], *1 [App Term, 1st Dept 2011] [plaintiff's claim "properly dismissed under familiar principles of res judicata, since the claim could have been litigated in the prior . . . proceeding between the parties"]; *see also Landau, P.C. v LaRossa, Mitchell & Ross*, 11 NY3d 8, 12-13 [2008] ["once a claim is brought to a final conclusion, all other claims arising out of the same transaction or series of transactions are barred, even if based upon different theories or if seeking a different remedy."]).

### 5. Aiding and abetting tortious interference with contract (ninth cause of action)

In the complaint, Arie alleges that Sagi, Fang and the Sagi Trust "each had knowledge of [Trump Group's] tortious interference with the 2004 TPR Transaction Agreement and the [divorce stipulation]" as well as "the 2004 Voting Trust Agreements," and that each had aided

30

and abetted, and provided substantial assistance to Trump Group in committing tortious acts. (Complaint, ¶¶ 253-256). As the tortious interference of contract claim against Trump Group (eighth cause of action) is legally insufficient (*supra*, at 22-24), so too is the aiding and abetting claim against Sagi, Fang and the Sagi Trust as they cannot have aided and abetted Trump Group in committing a tort that could not have been committed. Moreover, no liability for tortious interference generally attaches when the defendant is a party to the subject contract (*UBS Sec. L.L.C. v Highland Capital Mgt., L.P.*, 86 AD3d 469, 476-477 [1st Dept 2011]), and Arie offers no proposition of law to the contrary.

In addition, Arie contends that the Sagi Trust "aided and abetted Trump Group's tortious interference with the Back-Up Voting Trust Agreement between Arie and the Orly Trusts." (Arie's Opposition Brief, at 24). However, as discussed *supra*, at 30, any claim made by Arie with respect to the back-up voting trust agreement is res judicata, and the allegation that the Sagi Trust aided and abetted Trump Group in violating the agreement has no legal basis as the agreement is longer legally enforceable.

### 6. Preliminary and permanent injunctions (fifth and tenth causes of action)

For the reasons set forth in conjunction with the dismissal of the fifth and tenth causes of action against Trump Group (*supra*, at 19-20), these causes of action against TPR, Sagi, Fang and the Sagi Trust are also not viable.

### C. Motion of Dalia Genger to dismiss (motion sequence number 006)

In his complaint, Arie asserts causes of action against Dalia for a declaratory judgment to reform the divorce stipulation (first cause of action), constructive trust (second cause of action), unjust enrichment and rescission (fourth cause of action), and permanent injunction (fifth cause

31

of action).

### 1. Declaratory judgment for reformation (first cause of action)

According to Arie, the reformation claim is based on: (1) the right set forth in the divorce stipulation entitling him to seek reformation when the 2004 Transfers were voided by the Delaware courts; and (2) mutual mistake in that both he and Dalia reasonably believed that the 2004 Transfers were valid when they signed the divorce stipulation.

Dalia argues that the reformation claim must be dismissed because: (1) the relevant provision in the divorce stipulation was not triggered by the Delaware court which held only that Arie failed to give notice or seek consent of the other shareholders, such as the Trump Group, for the 2004 Transfers and did not hold that the provision was void or unenforceable; (2) Arie is barred from altering the economics of the divorce stipulation because the $3.85 million 2007-2008 arbitration award in favor of Dalia effected a final resolution and conclusion of all disputes thereunder; and (3) there was no mutual mistake because Arie knew that the consent of other shareholders was required for the 2004 Transfers.

Although the Delaware courts' ruling voiding the 2004 Transfers arguably gives rise to a claim for contractual reformation, the scope of the reformation sought is precluded because Arie seeks, *inter alia*, full control of all 3,000 shares of TRI stock and the voting rights related thereto, and the Delaware courts ruled that Trump Group outright owns 67.7 percent of all TRI shares, including the 1,100 Sagi Trust Shares, and that TPR is the record owner and has voting rights as to those TRI shares that are not currently owned by Trump Group. Thus, the requested reformation constitutes an impermissible collateral attack on the Delaware court's decisions, which are entitled to full faith and credit. Moreover, as observed by the Southern District,

32

instead of seeking to right the wrong he had committed with respect to the divorce stipulation, Arie seeks a declaratory judgment to undo the Delaware rulings and avoid the consequences of his own breach of the TRI stockholders agreement. (*Supra*, at 15-16). Thus, any right to reformation Arie might have had pursuant to the divorce stipulation is vitiated by the Delaware court rulings and by his own acts.

As Arie's claim is brought after the 2004 Transfers were invalidated by the Delaware courts in 2010, it could not have been raised before or during the conclusion of the arbitration proceedings in 2008. (*See Indosuez Intl. Fin. v National Reserve Bank*, 304 AD2d 429, 430 [1st Dept 2003] [res judicata inapplicable if claim arose after conclusion of prior action]). Thus, the arbitration award has no impact on the instant reformation claim.

In the alternative, Arie contends that the divorce stipulation may be equitably, as opposed to contractually, reformed due to a "mutual mistake." Although he maintains that both he and Dalia "reasonably believed" that the 2004 Transfers were valid, he was discredited by the Delaware courts, and Dalia denies it. Moreover, the Delaware Supreme Court specifically stated that "[Arie's] misrepresentation was false. In fact, the prior consent of Trump Group signatories to the Stockholders Agreement . . . was required," and that "when [Arie] effectuated the 2004 Transfers, [he] knew that neither [the Orly or the Sagi] Trust was a 'Permitted Transferee' of the [TRI] shares under the Stockholders Agreement." (*Genger v TR Investors, LLC*, 26 A3d 180, 184, 185 [Del. Sup. Ct. 2011]). Therefore, crediting Arie's unsubstantiated or conclusory allegation of a "mutual mistake," would result in an improper end run around the Delaware courts' determinations.

And, the Court of Appeals recently rebuffed a husband's attempt to reopen a divorce

settlement based on alleged post-divorce changes in asset valuation. (*Simkin v Blank*, 19 NY3d 46 [2012]). There, the husband alleged that he and his wife were mutually mistaken about the value of an investment account as it had never actually existed due to Bernard Madoff's Ponzi scheme. First, the Court observed that "a claim predicated on mutual mistake must be pleaded with the requisite particularity necessitated under CPLR 3016 (b) . . . [and] that the mutual mistake must exist at the time the contract is entered into and must be substantial," and that any court-ordered relief of reformation is reserved only for "exceptional situations." (*Id.* at 52). The Court, moreover, analogized the circumstances with a dispute over marital assets that unexpectedly gained or lost value after the dissolution of the marriage. (*Id.* at 55). Here, it is apparent that the value of TRI shares increased subsequent to the execution of the divorce stipulation and that Arie did not expect that the economic scheme he had carefully devised under it would be invalidated by the court.

2. Constructive trust, unjust enrichment and rescission (second and fourth causes of action)

Arie alleges that Dalia has been unjustly enriched because (1) the 2004 Transfers were voided and the transferred shares reverted to TPR, and (2) if Dalia were permitted to retain the 51 percent interest in TPR she received under the divorce stipulation while Arie was divested of his 14 percent interest in TRI and his right to vote 52.25 percent of the TRI shares which he controlled prior to the voiding of those transfers, Dalia would be unjustly enriched at his expense. Thus, Dalia's alleged unjust enrichment stems from the voiding of the 2004 Transfers by the Delaware court. As the voiding of the 2004 Transfers was due to Arie's own acts in causing TPR to violate the shareholders agreement, as found by the Chancery Court, Arie cannot complain that Dalia was unjustly enriched by it. The same holds true for the cause of action for rescission.

34

In addition, as unjust enrichment is an element required for the imposition of a constructive trust, and as Arie has failed to show that Dalia was unjustly enriched, the constructive trust cause of action cannot stand as a matter of law. (*Simonds v Simonds*, 45 NY2d 233, 242 [1978] [purpose of constructive trust is to prevent unjust enrichment]). Alternatively, the constructive trust claim fails because the current facts do not warrant the relief requested, the reasons for which are set forth above (*supra*, at 16-18) in conjunction with Trump Group's motion to dismiss an identical claim against it.

### 3.  Permanent injunction (fifth cause of action)

Arie argues in opposition to Dalia's motion to dismiss that Dalia should be permanently enjoined from interfering with his asserted interest in the TRI shares because his claims of reformation/rescission, constructive trust and unjust enrichment will result in an unraveling of the 2004 Transaction documents and the divorce stipulation, and will likely result in Dalia holding interests in the TRI shares.  Thus, Arie argues that an injunction will prevent her from interfering with his interests in those shares.  (Arie's Opposition Brief, at 20-21).  Because all of the above claims against Dalia have no merit, there is no basis for granting injunctive relief.

### D.  Motion of Trump Group to supplement the record (motion sequence number 015)

The Trump Group's motion to supplement the record on its motion is denied as, in light of the above findings, the documents it seeks to add are unnecessary.

### III. CONCLUSION

Based on all of the foregoing, it is hereby

ORDERED, that with respect to motion sequence number 006, the motion of defendant Dalia Genger seeking dismissal of all causes of action asserted in the complaint as against her is

granted in all respects, and the complaint is severed and dismissed as against said defendant with costs and disbursements as taxed by the Clerk of the Court, and the Clerk is directed to enter judgment accordingly; it is further

ORDERED, that with respect to motion sequence number 007, the motion of defendant Sagi Genger seeking dismissal of all causes of action asserted in the complaint as against him is granted to the extent of dismissing the first, second, fourth (rescission only), fifth, ninth and tenth causes of action, and is otherwise denied; it is further

ORDERED, that with respect to motion sequence number 009, the motion of defendant Rochelle Fang, individually and as trustee of the Sagi Genger 1993 Trust (the Sagi Trust), seeking dismissal of all causes of action asserted in the complaint as against her is granted in all respects, and the complaint is severed and dismissed as against said defendant with costs and disbursements as taxed by the Clerk of the Court, and the Clerk is directed to enter judgment accordingly; it is further

ORDERED, that with respect to motion sequence number 010, the motion of defendant TPR Investment Associates (TPR) seeking dismissal of all causes of action asserted in the complaint as against TPR is granted to the extent of dismissing the first, second, third, fourth (rescission only), fifth, sixth, and tenth causes of action, and is otherwise denied; it is further

ORDERED, that with respect to the motion sequence number 010, the motion of the Sagi Trust seeking dismissal of all causes of action asserted in the complaint as against the Sagi Trust is granted in all respects, and the complaint is severed and dismissed as against said defendant with costs and disbursements as taxed by the Clerk of the Court, and the Clerk is directed to enter judgment accordingly; it is further

36

ORDERED, that with respect to motion sequence number 011, the motion of defendants Glencova Invesment Company, TR Investors, LLC, New TR Equity I, LLC, New TR Equity II, LLC, Jules Trump, Eddie Trump and Mark Hirsch (collectively, Trump Group) seeking dismissal of all causes of action asserted in the complaint against Trump Group is granted to the extent of dismissing the first, second, third (conspiracy only), fourth (rescission only), fifth, eighth and tenth causes of action, and is otherwise denied; and it is further

ORDERED, that the conspiracy cause of action asserted against any of the defendants as part of the aiding and abetting causes of action sounding in tort is dismissed; it is further

ORDERED, that defendants Glenclova Investment Company, TR Investors, LLC, New TR Equity I, LLC, New TR Equity II, LLC, Jules Trump, Eddie Trump, and Mark Hirsch's motion for permission to supplement the record is denied.

ENTER:

Barbara Jaffe, JSC

DATED:      January 3, 2013
            New York, New York

37

## CREDIT AND FORBEARANCE AGREEMENT AND
## SECOND AMENDMENT AND RESTATEMENT OF PROMISSORY NOTE

THIS CREDIT AND FORBEARANCE AGREEMENT AND SECOND AMENDMENT AND RESTATEMENT OF PROMISSORY NOTE is made effective as of May __, 2012 (this "**Agreement**") by and between the ORLY GENGER 1993 TRUST, a trust settled on December 13, 1993 (the "**Trust**") pursuant to that certain Trust Agreement dated December 13, 1993 (the "**Trust Agreement**") between Arie Genger as grantor and Lawrence M. Small and Sash A. Spenser as original Trustees, acting through Dalia Genger, its current Trustee ("**Dalia**" or "**Trustee**"), and MANHATTAN SAFETY COMPANY, LTD., a corporation organized under the laws of St. Kitts, W.I. ("**Manhattan**"). Capitalized terms not otherwise defined herein have the meanings ascribed to them in Section 1.2 below.

### RECITALS

**A.**     The Trust wishes to obtain additional financing and the forbearance in the enforcement of the 2011 Note so as to improve its ability to assert and defend its rights in the TRI Proceedings to the TRI Shares.

**B.**     Manhattan wishes to obtain certain representations and warranties in consideration for providing additional financing in the amount of up to Four Hundred Thousand Dollars and No Cents ($400,000.00) (the "**Manhattan Financing**") and its agreement to forbear in the enforcement of the 2011 Note.

**C.**     TPR Investment Associates, Inc., a Delaware corporation ("**TPR**"), and the Trust entered into an agreement on or about October 29, 2004 (the "**Share Transfer**") whereby TPR contracted to sell to the Trust 1,102.8 shares (the "**TRI Shares**") of Trans Resources, Inc., a Delaware corporation ("**TRI**"), for a nominal consideration.

**D.**     Certain former indirect shareholders of TRI have challenged the validity of the Share Transfer in various legal proceedings and other parties have engaged in litigation and arbitration proceedings relating to various issues concerning TRI, its shares and the appropriate consideration for the purchase and sale of shares of TRI, as well as the appointment of, and validity of actions taken by, the Trustee (collectively the "**TRI Proceedings**").

**E.**     The Trust, TPR, and D&K LP, a Delaware limited partnership ("**D&K**"), entered into a Settlement Agreement dated October 2, 2011 as subsequently amended and restated in an Amended and Restated Settlement Agreement dated March 16, 2012 (the "**Settlement**").

**F.**     Pursuant to the Settlement, (i) TPR relinquished in favor of the Trust any economic interest held by it in the TRI Shares and assigned to the Trust its right to any economic benefit of the TRI Shares, including any proceeds from the sale thereof, including the approximately Ten Million Three Hundred Thousand Dollars ($10,300,000) (the "**Minimum Payment**") in proceeds from the sale of the TRI Shares to TR Investors, LLC, Glencova Investment Co., New TR Equity I, LLC and New TR Equity II, LLC

(collectively, the "**Trump Group**") pursuant to the terms of a letter agreement dated August 22, 2008 (the "**Trump Sale Agreement**") between TPR and the Trump Group and (ii) an obligation of approximately Four Million Five Hundred Thousand Dollars of D&K to TPR, guaranteed by the Trust, representing the net amount following the partial foreclosure of an Eight Million Nine Hundred and Fifty Thousand Dollars ($8,950,000) obligation evidenced by a promissory note in the original principal amount, was cancelled and replaced by a new promissory note of the Trust in the original principal amount of Four Million Dollars ($4,000,000) payable to TPR (the "**2011 Note**").

      **G.**    In connection with the TRI Proceedings, Pedowitz & Meister, the escrow agent holding funds approximating the Minimum Amount (the "**Escrowed Amount**") pursuant to a certain Escrow Agreement dated as of September 1, 2010 (the "**Escrow Agreement**"), filed an interpleader action (the "**Interpleader Action**") currently pending in the United States District Court for the Southern District of the State of New York (the "**Court**") in *Pedowitz v. TPR*, 11 Civ. 5602 and deposited the Escrowed Amount with the Court to hold pending its determination as to which party is entitled to the Escrowed Amount.

      **H.**    Pursuant to that certain Agreement Amending Terms of Promissory Note dated as of October 3, 2011, certain provisions of the 2011 Note were amended (as so amended, the "**Amended Note**").

      **I.**    TPR has agreed to sell and assign the Note to Manhattan as evidenced by that certain Bill of Sale and Note Assignment of even date herewith.

      **J.**    Manhattan has agreed to make the Manhattan Loan in two installments: (1) an initial advance (the "**Initial Advance**") of Two Hundred Thousand Dollars and No Cents ($200,000.00), as evidenced by a promissory note in the principal amount of Two Hundred Thousand Dollars and No Cents ($200,000.00) (the "**New Note**"), payable as provided herein, and (2) an additional advance (the "**Additional Advance**") of Two Hundred Thousand Dollars and No Cents ($200,000.00) to be made upon request by the Trust, and evidenced by the note as amended and restated to provide for a face amount of Four Million Two Hundred Forty Thousand Dollars and No Cents ($4,240,000.00) (the "**Amended and Restated Note**" or the "**Note**") (inclusive of the Forbearance Fee if paid as provided herein), with the Additional Advance to bear interest from the date made on the terms of this Agreement and the Note. The Manhattan Loan, including both the Initial Advance and the Additional Advance, shall be subject to certain conditions, including the Trust's agreement to amend and restate the 2011 Note and enter into this Agreement.

      **NOW, THEREFORE,** for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto, each intending to be legally bound, agree as follows:

## 1.    Definitions.

      1.1    <u>General</u>.   Capitalized terms used in this Agreement shall have the respective meanings ascribed thereto in Section 1 of this Agreement or as otherwise may be provided in other provisions of this Agreement. Terms defined in the Note, the

Settlement or the New Note and not otherwise defined in this Agreement shall have the same meanings in this Agreement as in the Note, Settlement or New Note, as the case may be. Except as otherwise expressly set forth herein, each reference herein to "the Agreement," "this Agreement," "herein," "hereunder" or "hereof" shall be deemed a reference to this Agreement. If there is any inconsistency between this Agreement, the Note, the Settlement or the New Note, this Agreement shall govern and control.

1.2   Definitions. In this Agreement:

"Additional Advance" has the meaning set forth in Recital J.

"Affiliate" or "Affiliates" means "affiliate" as defined in either (a) Bankruptcy Code §101(2) or (b) Rule 144 of the Securities Act.

"Agreement" means this Credit and Forbearance Agreement and Second Amended and Restated Promissory Note.

"Amended Note" has the meaning set forth in Recital H.

"Amended and Restated Note" has the meaning set forth in Recital J.

"Bankruptcy Code" means the Bankruptcy Reform Act of 1978, 11 U.S.C. §§101 et seq., as amended.

"Bill of Sale" means the bill of sale and note assignment relating to the assignment of the 2011 Note.

"Business Day" means any day that is not (a) a Saturday, (b) a Sunday or (c) any other day on which the Federal Reserve Bank of New York is closed.

"Claim" has the meaning specified in Section 7.1.

"Claimant" means any person or entity claiming, or having a right to claim, a mechanic's lien against the Minimum Payment or the TRI Shares, or any portion thereof, or who is delivered, or has the right to deliver, a stop notice in connection with the payment by Trust of its obligations under the Note.

"Code" means the Internal Revenue Code of 1986, as amended, and the rules and regulations promulgated under it.

"Court" has the meaning set forth in Recital G.

"Dalia" means Dalia Genger, the current Trustee of the Trust.

"D&K" means D&K LP, a Delaware limited partnership.

"Debtor Relief Law" means the Bankruptcy Code, and together with any other bankruptcy or insolvency law, assignments for the benefit of creditors, formal or informal moratoria, compositions, or extensions generally with creditors, or proceedings seeking reorganization, arrangement, liquidation, receivership, or other similar relief.

"**Distribution**" means any payment of principal, interest, penalty or costs paid by or on behalf of the Trust in connection with the Note or the Transferred Rights.

"**Encumbrance**" or, if used as a verb, "**Encumber**," means any (a) mortgage, pledge, lien, security interest, charge, hypothecation, security agreement, security arrangement or encumbrance or other adverse claim against title of any kind; (b) purchase, option, call or put agreement or arrangement; (c) subordination agreement or arrangement; or (d) agreement or arrangement to create or effect any of the foregoing.

"**Entity**" means any individual, partnership, corporation, limited liability company, association, estate, trust, business trust, Governmental Authority, fund, investment account or other entity.

"**Escrow Agreement**" has the meaning set forth in Recital G.

"**Escrowed Amount**" has the meaning set forth in Recital G.

"**Forbearance Fee**" means a fee of Forty Thousand Dollars and No Cents ($40,000), being equal to one percent (1%) of Four Million Dollars and No Cents ($4,000,000.00), the face amount of the 2011 Note, paid in consideration of Manhattan's agreement to forbear as provided in this Agreement.

"**Governmental Authority**" means any federal, state, or other governmental department, agency, institution, authority, regulatory body, court or tribunal, foreign or domestic, and includes arbitration bodies, whether governmental, private or otherwise.

"**Indemnified Party**" has the meaning specified in Section 7.2.

"**Indemnifying Party**" has the meaning specified in Section 7.2.

"**Initial Advance**" has the meaning set forth in Recital J.

"**Insolvent**" has the meaning set forth in Section 4(h).

"**Interpleader Action**" has the meaning set forth in Recital G.

"**Liability**" or "**Liabilities**" shall mean all debts, obligations and other liabilities of any kind or nature (whether known, unknown, accrued, or not accrued, absolute or contingent, liquidated or unliquidated, due or to become due, asserted or unasserted or otherwise).

"**Knowledge**" means the actual knowledge of Trustee.

"**Manhattan**" means Manhattan Safety Company, Ltd., a corporation organized under the laws of St. Kitts, W.I.

"**Manhattan Indemnitees**" has the meaning specified in Section 7.1.

"**Manhattan Loan**" has the meaning set forth in Recital B.

"**Minimum Payment**" means Ten Million Three Hundred Thousand Dollars and No Cents ($10,300,000.00).

"**New Note**" means the promissory note in the face principal amount of Two Hundred Thousand Dollars and No Cents ($200,000.00), comprising the Initial Advance of the Manhattan Loan and having the Trust as maker and Manhattan as payee, which evidences the Manhattan Loan.

"**Note**" has the meaning set forth in Recital J.

"**Party**" means the Trust, Trustee or Manhattan, as applicable, and their respective successors and permitted assigns.

"**Reimbursement Claims**" means any claim of TPR or the Trust arising in connection with the return to, disgorgement by, or reimbursement of, TPR or the Trust, or any other Entity, of all or any portion of any payment or transfer received by TPR or Trust on account of the Transferred Rights, including any claims arising under Bankruptcy Code §502(h).

"**Sagi**" means Sagi Genger, the President and the sole primary beneficiary (together with his children) of the Sagi Genger 1993 Trust, the owner of a majority of the shares of TPR.

"**Securities Act**" means the Securities Act of 1933, 15 U.S.C. §§77a et seq., as amended, and the rules and regulations promulgated under it.

"**Settlement**" means that certain amended and restated settlement agreement dated as of March 16, 2012 by and among TPR, the Trust and D&K.

"**Share Proceeds**" means any proceeds in cash or kind paid or payable to the Trust relating to the TRI Shares.

"**Share Transfer**" has the meaning set forth in Recital D.

"**TPR**" means TPR Investment Associates, Inc., a Delaware corporation.

"**TRI**" means Trans Resources, Inc., a Delaware corporation.

"**TRI Shares**" means the 1,102.8 shares of TRI transferred to the Trust pursuant to the Share Transfer.

"**TRI Proceedings**" has the meaning set forth in Recital D.

"**Transferred Rights**" means any and all of Manhattan's right, title, and interest in, to and under the Note and the Settlement (solely to the extent those rights of TPR in the Settlement which have been transferred by TPR to Manhattan relate to amounts payable under the Note), including:

> (a)     all amounts funded by or payable to TPR under the Settlement relating to the Note, and all obligations owed to TPR in connection

with the Note, including but not limited to, accrued and unpaid interest;

(b)     any proof of claim;

(c)     all claims (including "claims" as defined in Bankruptcy Code §101(5)), suits, causes of action, and any other right of TPR, whether known or unknown, against Trust, the Trustee or any of their respective Affiliates, agents, representatives, contractors, advisors, or any other Entity that in any way is based upon, arises out of or is related to any of the foregoing, including, to the extent permitted to be assigned under applicable law, all claims (including contract claims, tort claims, malpractice claims, and claims under any law governing the purchase and sale of, or indentures for, securities), suits, causes of action, and any other right of TPR against any attorney, accountant, financial advisor, or other Entity arising under or in connection with the Note and the Transferee Rights or the transactions related thereto or contemplated thereby;

(d)     all cash, securities, or other property, and all setoffs and recoupments, received, applied, or effected by or for the account of TPR under the Note (whether for principal, interest, fees, reimbursement obligations, or otherwise) from and after the date of this Agreement, and all cash, securities, interest, dividends, and other property that may be exchanged for, or distributed or collected with respect to, any of the foregoing;

(e)     the economic benefit received by TPR relating to the Note transferred to Manhattan; and

(f)     all proceeds of the foregoing.

"Trump Group" has the meaning set forth in Recital F.

"Trump Sale Agreement" has the meaning set forth in Recital F.

"Trust" has the meaning set forth in the heading of this Agreement.

"Trustee" has the meaning set forth in the heading of this Agreement.

"2011 Note" has the meaning set forth in Recital F.

DG 00195

**2.     Recitals True.** The Recitals are hereby incorporated into this Agreement and made a part hereof. The Trust and the Trustee, jointly and severally, represent and warrant that the Recitals are true and correct in all material respects and do not fail to state a fact necessary to make them not misleading.

**3.     Amendment and Restatement of Note; Agreement to Make the Manhattan Loan.**

3.1     The Trust as maker agrees to amend and restate the 2011 Note, in the form attached as **Exhibit A** hereto (the "**Amended and Restated Note**"), including but not limited to amendments to (i) add covenants with respect to (A) the waiver of defenses to payment of amounts payable under the Note and (B) prohibitions on (1) any Encumbrance on (x) the TRI Shares or (y) the Minimum Payment or any other payment the Trust may receive or be entitled to receive from (a) the Court or (b) any other party, in connection with the TRI Shares or otherwise, and (2) (x) any (a) borrowing or any agreement to borrow money, or (b) guaranty, agreement to indemnify or other agreement to create any contingent monetary obligation, or (y) the incurrence of any material Liability, other than costs for legal services relating to the TRI Proceedings, which in no event, without the prior consent of Manhattan, shall exceed in aggregate Five Hundred Thousand Dollars and No Cents ($500,000.00), and (ii) amend the face amount of the Note to Four Million Two Hundred Forty Thousand Dollars and No Cents ($4,240,000.00) to reflect the Additional Advance of the Manhattan Loan and the Forbearance Fee, in the event such are made and payable under the terms of this Agreement and the Note.

3.2     On the terms set forth in the Amended and Restated Note, in the form attached as **Exhibit A** hereto, and the New Note, in the form attached as **Exhibit B** hereto, and subject to the conditions set forth in this Agreement and in the Amended and Restated Note and the New Note, Manhattan agrees to make, and the Trust agrees to accept, the Manhattan Loan.

**4.     Representations and Warranties of the Trust and Trustee.** Trust and Trustee, each jointly and severally, represents and warrants to Manhattan as of the date of this Agreement that:

(a)     Trust (i) is duly organized and validly existing under the laws of its jurisdiction of organization or incorporation, (ii) is in good standing under such laws and (iii) has full power and authority to execute, deliver and perform its obligations under this Agreement, the Note and the New Note.

(b)     Trust's execution, delivery, and performance of this Agreement, , the Note and the New Note will not result in a breach or violation of any provision of (i) Trust's organizational documents, (ii) any statute, law, writ, order, rule or regulation of any Governmental Authority applicable to Trust, (iii) any judgment, injunction, decree or determination of any Governmental Authority applicable to Trust or (iv) any contract, indenture, mortgage, loan agreement, note, lease or other agreement, document or instrument to which

DG 00196

Trust may be a party, by which Trust may be bound or to which any of the assets of Trust is subject.

(c)    (i)    This Agreement, the Note and the New Note each (A) has been duly and validly authorized by Trustee on behalf of Trust, executed and delivered by Trust and (B) are the legal, valid and binding obligations of Trust, enforceable against Trust in accordance with their respective terms, except that such enforceability against Trust may be limited by bankruptcy, insolvency, or other similar laws of general applicability affecting the enforcement of creditors' rights generally and by a court's discretion in relation to equitable remedies; and

        (ii)    no notice to, registration with, consent or approval of or any other action by any relevant Governmental Authority or other Entity is or will be required for Trust to execute, deliver, and perform its obligations under, this Agreement, the Note and the New Note.

(d)    Trust is a good faith claimant to the Share Proceeds or the TRI Shares, as the case may be, and its claim thereto is free and clear of any Encumbrance.

(e)    Other than the TRI Proceedings and any other proceedings disclosed in writing by Trust to Manhattan, no proceedings are pending against the Trust, the Trustee or any of their respective Affiliates or, to the best of Trust's and Trustee's Knowledge, threatened against the Trust, the Trustee or any of their respective Affiliates before any relevant Governmental Authority that, individually or in aggregate, may materially and adversely affect any action taken or to be taken by Trust under this Agreement, including the sale and assignment of the Note by TPR to Manhattan and the Transferred Rights to Manhattan, or the Manhattan Loan as evidenced by the New Note.

(f)    Trust has no (A) payment obligation, including any contingent payment obligation in the nature of a guarantee or indemnification or similar obligation, to any individual, Entity or Governmental Authority, and has entered into no agreement that could reasonably result in a payment obligation to any party for any amount that individually or together with other payment obligation of the Trust is equal to or greater than Five Hundred Thousand Dollars and No Cents ($500,000.00) and (B) Liability to any individual, Entity or Governmental Authority that individually or together with any other Liability may adversely affect repayment of the Note or the New Note or the value of Trust's interest in the Minimum Payment or TRI Shares, as the case may be.

(g)     To the best of Trust's and Trustee's Knowledge, neither the Trust nor the Trustee or any other party to the TRI Proceedings has received any notice or has any reasonable basis to believe that the Trust will not be entitled to receive one or the other of (A) an amount not less than the Minimum Payment or (B) the TRI Shares upon final determination and exhaustion of all appeals or challenges to such final determination, of all the material matters at issue in the TRI Proceedings.

(h)     Trust is not now insolvent and will not be rendered insolvent by any of the transactions contemplated by this Agreement. As used herein, "**insolvent**" means that the sum of the debts and probable Liabilities of Trust exceeds the fair saleable value of its assets. Trust is not in receivership, nor is an application for receivership pending. No proceedings are pending by or against Trust in bankruptcy or reorganization in any state or federal court under any Debtor Relief Law, nor has it committed any act of bankruptcy as such terms are used in the Bankruptcy Code. Immediately after giving effect to the consummation of the transactions contemplated by this Agreement, (i) Trust will be able to pay its Liabilities as they become due in the usual course of its business; (ii) Trust will not have assets (calculated at fair market value) that exceed its Liabilities; and (iii) taking into account all pending and threatened litigation, final judgments against Trust for money damages are not reasonably anticipated to be rendered at a time when, or in amounts such that, Trust will be unable to satisfy any such judgments promptly in accordance with their terms (taking into account the maximum probable amount of such judgments in any such actions and the earliest reasonable time at which such judgments might be rendered) as well as all other obligations of Trust. The cash available to Trust, taking into account all other anticipated uses of cash, as well as taking into account reasonably anticipated payments on insurance covering such actions and Liabilities, will be sufficient to pay all such debts and judgments promptly in accordance with their terms.

(i)     No broker, finder or other Entity acting under the authority of the Trust, the Trustee or any of their respective Affiliates is entitled to any broker's commission or other fee in connection with the transactions contemplated by this Agreement, including but not limited to the Manhattan Loan and New Note, for which Manhattan could be responsible.

5.     **Manhattan's Representations and Warranties.** Manhattan represents and warrants to Trustee as of the date of this Agreement that:

(a)     Manhattan (i) is duly organized and validly existing under the laws of its jurisdiction of organization or incorporation, (ii) is in good

standing under such laws and (iii) has full power and authority to execute, deliver and perform its obligations under, this Agreement.

(b)     Manhattan's execution, delivery, and performance of this Agreement have not resulted and will not result in a breach or violation of any provision of (i) Manhattan's organizational documents, (ii) any statute, law, writ, order, rule or regulation of any Governmental Authority applicable to Manhattan, (iii) any judgment, injunction, decree or determination of any Governmental Authority applicable to Manhattan or (iv) any contract, indenture, mortgage, loan agreement, note, lease or other agreement, document or instrument by which Manhattan may be a party, by which Manhattan may be bound or to which any of the assets of Manhattan is subject.

(c)     (i)     This Agreement and the Manhattan Loan each (A) has been duly and validly authorized by Manhattan's board of directors or authorized committee thereof or other party which must approve the same pursuant to Manhattan's organizational documents, executed and delivered by Manhattan and (B) are the legal, valid and binding obligations of Manhattan, enforceable against Manhattan in accordance with their respective terms, except that such enforceability may be limited by bankruptcy, insolvency, or other similar laws of general applicability affecting the enforcement of creditors' rights generally and by a court's discretion in relation to equitable remedies; and

(ii)     no notice to, registration with, consent or approval of or any other action by any relevant Governmental Authority or other Entity is or will be required for Manhattan to execute, deliver, and perform its obligations this Agreement and the Manhattan Loan.

(d)     No broker, finder or other Entity acting under the authority of Manhattan or any of its Affiliates is entitled to any broker's commission or other fee in connection with the transactions contemplated by this Agreement, including the Manhattan Loan, for which the Trust could be responsible.

(e)     Manhattan is an "accredited investor" as defined in Rule 501 under the Securities Act. Without characterizing the Manhattan Loan and New Note as a "security" within the meaning of applicable securities laws, Manhattan has not made any offers to sell, or solicitations of any offers to buy, all or any portion of the Manhattan Loan or the New Note in violation of any applicable securities laws.

6.    **Covenants.**

    6.1    The Trust hereby covenants and agrees as follows:

        (a)    Trust shall not Encumber the TRI Shares, its interest in the TRI Shares or any proceeds of the TRI Shares or any material amount of its assets for so long as any amount is owed under this Note.

        (b)    Trust acknowledges the sale and assignment of the 2011 Note and the Transferred Rights to Manhattan and agrees to deliver all amounts payable with respect to the Note and the Transferred Rights to Manhattan at the address provided to Trust in writing by Manhattan.

        (c)    Trust hereby waives any defenses it may have to payment of amounts payable under the Note, including all defenses it may have with respect to Manhattan, TPR or any other prior holder of the Note.

        (d)    Trust agrees that it shall not borrow or enter into any agreement to borrow an aggregate amount greater than Four Hundred Thousand Dollars and No Cents ($400,000.00), including amounts borrowed as part of the Manhattan Loan; provided, however, that this shall not prevent Trust from engaging in agreements for services with attorneys and others in connection with the TRI Proceedings; and provided, further, that Trust may borrow such additional sums as may be subordinated to the Manhattan Loan, on terms and subject to conditions satisfactory to Manhattan.

    6.2    Manhattan hereby covenants and agrees that notwithstanding any payment default under the Note or the New Note, but subject to the Trust's compliance with all other terms and conditions of the Note and the New Note, Manhattan agrees to forbear from collection of amounts due and owing on the Note, and not take any action, including the commencement of any proceeding, to collect amounts due under the Note or the New Note, until the earliest to occur of (i) the date on which Dalia no longer serves as Trustee of the Trust, (ii) the final resolution of the Interpleader Action or (iii) November 1, 2014; provided, however, that notwithstanding the foregoing, Manhattan may take any action reasonably necessary to ensure the payment of all amounts payable under the Note or the New Note, including, but not limited to, the acceleration of the obligations under the Note or the New Note and the commencement of enforcement actions to collect amounts owing under the Note and or the New Note upon the occurrence of (x) any event of default under the Note or the New Note, other than a payment default or (y) any action by an individual or Entity which Manhattan believes may adversely affect the Trust's ability to fully perform all of its obligations under this Agreement, the Note, the Manhattan Loan or the New Note.

    6.3    The Forbearance Fee shall be payable by increasing the amount outstanding under the Note by the amount of the Forbearance Fee effective November 1, 2012 if the Note is not previously paid in full by such date.

7.    **Indemnification.**

7.1    Trust and the Trustee, jointly and severally, shall indemnify, defend, and hold Manhattan and its officers, directors, agents, partners, members, controlling Entities and employees (collectively, "**Manhattan Indemnitees**") harmless from and against any liability, claim, cost, loss, judgment, damage or expense, including reasonable attorneys' fees and expenses (collectively, a "**Claim**") that any Manhattan Indemnitee incurs or suffers as a result of, or arising out of (i) a breach of any of Trust representations, warranties, covenants or agreements in this Agreement, (ii) any legal or arbitral proceeding, any investigation or any actions preliminary or related to any of the foregoing, which relates to, or arises from, the same factual basis as, the TRI Proceedings, (iii) compliance with any subpoena or other demand to be deposed, testify or produce documents in a proceeding before a Governmental Authority or an arbitrator or (iv) otherwise resulting from any action taken by any Claimant; provided, however, that the indemnification obligations of the Trustee under this Agreement (x) shall not include Claims made after Dalia no longer serves as Trustee of the Trust and (y) are in the nature of a surety for the obligations of the Trust and are conditional upon demand first being made upon, and a good faith attempt made to collect from, the Trust as provided in Section 7.3 below; and provided, further, that the foregoing proviso shall not be construed in any way to limit the indemnification obligations of the Trust under this Agreement.

7.2    If a third party commences any action or makes any demand against Manhattan Indemnities for which any Manhattan Indemnitees ("**Indemnified Party**") is entitled to indemnification under this Agreement, such Indemnified Party shall promptly notify Trust and Dalia (collectively and individually "**Indemnifying Party**") in writing of such action or demand; provided, however, that if the Indemnified Party assumes the defense of the action and fails to provide prompt notice to the Indemnifying Party, such failure shall not limit in any way the Indemnifying Party's obligation to indemnify the Indemnified Party except to the extent that such failure materially prejudices the Indemnifying Party's ability to defend the action. The Indemnifying Party may, at its own expense and without limiting its obligation to indemnify the Indemnified Party, participate in the defense of such action with counsel reasonably satisfactory to the Indemnified Party, or the Indemnifying Party may, at its own expense and without limiting its obligation to indemnify the Indemnified Party, assume the defense of such action with counsel reasonably acceptable to the Indemnified Party. In any event, the Indemnified Party that has assumed the defense of such action shall provide the Trust and Dalia with copies of all notices, pleadings, and other papers filed or served in such action. Neither Party shall make any settlement or adjustment without prior written consent, which consent (a) in the case of the Indemnifying Party will not be unreasonably withheld if the settlement or adjustment involves only the payment of money damages by the Indemnifying Party and (b) in the case of the Indemnified Party may be withheld for any reason if the settlement or adjustment involves performance or admission by the Indemnified Party.

7.3    In the event of the occurrence of a Claim for which an Indemnified Party is entitled to indemnification hereunder, the Indemnified Party shall first make demand upon, and seek payment and performance from, the Trust, and then, and only if, after such demand the Trust fails to pay or perform as required by this Agreement, shall the

Indemnified Party seek payment and performance from the Trustee. Amounts payable by the Indemnifying Party, to the extent not paid by an Indemnifying Party, may be added to the principal amount Note and shall accrue interest from the date of the incurrence of such expense by the Indemnified Party at the prevailing rate of interest as provided under the Note.

7.4     Each indemnity in this Agreement is a continuing obligation, separate and independent from the other obligations of the Trust and Dalia and survives termination of this Agreement or any transfer pursuant to Section 10 of this Agreement. It is not necessary for a Party to incur expense or make payment before enforcing a right of indemnity conferred by this Agreement.

**8.     Costs and Expenses.** Trust and Manhattan each agrees to bear its own, legal and other costs and expenses for preparing, negotiating, executing and delivering this Agreement and any related documents and consummating the transaction contemplated by this Agreement, including legal and other costs and expenses relating to the amendment of the Amended Note, the Manhattan Loan and the New Note.

**9.     Notices.**

9.1     All communications between the Parties in respect of, or notices, requests, directions, consents or other information sent under, this Agreement shall be in writing, hand delivered or sent by overnight courier, electronic transmission or telecopier, addressed to the relevant Party at its address, electronic mail or facsimile number specified in **Schedule 9.1** to this Agreement at such other address, electronic mail or facsimile number as such Party may subsequently request in writing. All such communications and notices shall be effective upon receipt.

9.2     If Trust receives any notices, correspondence or other documents in respect of the Transferred Rights, the Note or the Settlement that, to the best of Trust's Knowledge, were not sent to Manhattan, Trust shall promptly forward them to Manhattan.

**10.     Further Transfers.**

10.1     Manhattan may sell, assign, grant a participation in, or otherwise transfer all or any portion of the Note or Transferred Rights, this Agreement, its rights under this Agreement, the Manhattan Loan or the New Note, or any interest in any of the foregoing without the consent of or notice to Trust.

10.2     Trust may assign its rights under this Agreement without the prior written consent of Manhattan; provided, however, that Trust may not delegate its obligations under this Agreement without the prior written consent of Manhattan.

**11.     Exercise of Rights and Remedies.**

11.1     No amendment of any provision of this Agreement shall be effective unless it is in writing and signed by the Parties, and no waiver of any provision of this Agreement, nor consent to any departure by either Party from it, shall be effective unless

DG 00202

it is in writing and signed by the affected Party, and then such waiver or consent shall be effective only in the specific instance and for the specific purpose for which given.

11.2    No failure on the part of a party to exercise, and no delay in exercising, any right or remedy under this Agreement shall operate as a waiver by such Party, nor shall any single or partial exercise of any right or remedy under this Agreement preclude any other or further exercise thereof or the exercise of any other right or remedy. The rights and remedies of each Party provided herein (a) are cumulative and are in addition to, and are not exclusive of, any rights or remedies provided by law (except as otherwise expressly set forth in this Agreement) and (b) are not conditional or contingent on any attempt by such Party to exercise any of its rights or remedies under any other related document or against the other Party or any other Entity.  In no event may either Party recover from the other Party any special, consequential or punitive damages.

**12.     Survival; Successors and Assigns.**

12.1    All representations, warranties, covenants, indemnities and other provisions made by the Parties shall be considered to have been relied upon by the Parties, shall (as to representations and warranties) be true and correct as of the date of this Agreement and any other date set forth in Sections 4 or 5, as the case may be, and shall survive the execution, delivery and performance of this Agreement.

12.2    This Agreement, including the representations, warranties, covenants and indemnities contained in this Agreement, shall inure to the benefit of, be binding upon and be enforceable by and against the Parties and their respective successors and permitted assigns.

**13.     Further Assurances.** Each Party agrees to (i) execute and deliver, or cause to be executed and delivered, all such other and further agreements, instruments and other documents and (ii) take or cause to be taken all such other and further actions as the other Party may reasonably request to effectuate the intent and purposes, and carry out the terms, of this Agreement.

**14.     Disclosure.**

14.1    Each Party agrees that, without the prior consent of the other Party, it shall not disclose the contents of this Agreement to any individual or Entity, except that any Party may make any such disclosure (a) as required to implement or enforce this Agreement, (b) if required to do so by any law, court, regulation, subpoena or other legal process, (c) to any Governmental Authority or self-regulatory Entity having or asserting jurisdiction over it, (d) if its attorneys advise it that it has a legal obligation to do so or that failure to do so may result in it incurring a liability to any other Entity or sanctions that may be imposed by any Governmental Authority, (e) to its Affiliates, professional advisors and auditors or (f) as set forth in Section 14.2.

14.2    Manhattan may disclose the contents of this Agreement to any proposed transferee, assignee, participant, or other Entity proposing to enter into contractual relations with Manhattan in respect of the Note or Transferred Rights, the Manhattan Loan or the New Note or any part of them.

**15.    Entire Agreement; Conflict.**

15.1    This Agreement constitutes the entire agreement of the Parties with respect to the transactions contemplated here by and supersedes all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, representations and warranties in respect thereof, all of which have become merged and finally integrated into this Agreement.

15.2    As between Manhattan and the Trust, if there is any inconsistency or conflict between this Agreement and any other document, the provisions of this Agreement shall govern and control.

**16.    Counterparts; Telecopies.** This Agreement may be executed in multiple counterparts and all of such counterparts taken together shall be deemed to constitute one and the same instrument.  Transmission by telecopier, facsimile or other form of electronic transmission of an executed counterpart of this Agreement shall be deemed to constitute due and sufficient delivery of such counterpart, and shall have the same force and effect as a manually executed original.  Each fully executed counterpart of this Agreement shall be deemed to be a duplicate original.

**17.    Relationship Between Manhattan and the Trust.** The relationship between Manhattan and the Trust shall be that of lender and borrower.  Neither is a trustee or agent for the other, nor does either have any fiduciary obligations to the other.  This Agreement shall not be construed to create a partnership or joint venture between the Parties.

**18.    Severability.** The illegality, invalidity or unenforceability of any provision of this Agreement under the law of any jurisdiction shall not affect its legality, validity or enforceability under the law of any other jurisdiction nor the legality, validity or enforceability of any other provision.

**19.    Governing Law.** THIS AGREEMENT, THE RIGHTS AND OBLIGATIONS OF THE PARTIES UNDER THIS AGREEMENT AND ANY CLAIM OR CONTROVERSY DIRECTLY OR INDIRECTLY BASED UPON OR ARISING OUT OF THIS AGREEMENT OR THE TRANSACTION (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY), INCLUDING ALL MATTERS OF CONSTRUCTION, VALIDITY AND PERFORMANCE, SHALL IN ALL RESPECTS BE GOVERNED BY AND INTERPRETED, CONSTRUED AND DETERMINED IN ACCORDANCE WITH, THE INTERNAL LAWS OF THE STATE OF NEW YORK (WITHOUT REGARD TO ANY CONFLICTS OF LAW PROVISION THEREOF THAT WOULD REQUIRE THE APPLICATION OF THE LAWS OF ANY OTHER JURISDICTION).

**20.    Waiver of Trial by Jury.** THE PARTIES HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVE, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT THAT THEY MAY HAVE TO TRIAL BY JURY OF ANY CLAIM OR CAUSE OF ACTION, OR IN ANY LEGAL PROCEEDING, DIRECTLY OR INDIRECTLY BASED UPON OR ARISING OUT OF THIS AGREEMENT OR THE TRANSACTION (WHETHER BASED ON CONTRACT,

DG 00204

TORT OR ANY OTHER THEORY).  EACH PARTY (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF THE OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTY HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.

**21.     Jurisdiction.** The Parties irrevocably agree that, should either Party institute any legal action or proceeding in any jurisdiction (whether for an injunction, specific performance, damages or otherwise) in relation to this Agreement or the transactions contemplated by this Agreement, no immunity (to the extent that it may at any time exist, whether on the grounds of sovereignty or otherwise) from such action or proceeding shall be claimed by it or on its behalf, any such immunity being hereby irrevocably waived, and each Party irrevocably agrees that it and its assets are, and shall be, subject to such legal action or proceeding in respect of its obligations under this Agreement.

**22.     Interpretation.**

22.1     This Agreement and any annexes, schedules or other documents attached to or incorporated by reference into the Agreement.

22.2     Terms used in the singular or the plural include the plural and the singular, respectively; "includes" and "including" are not limiting; and "or" is not exclusive.

22.3     Any reference to a Party includes such Party's successors and permitted assigns.

22.4     Unless otherwise indicated, any reference to:

(a)     this Agreement or any other agreement, document or instrument shall be construed as a reference to this date of this Agreement or, as the case may be, such other agreement, document or instrument as the same may have been, or may at any time before the date of this Agreement be, in effect as modified, amended or supplemented as of the date of this Agreement Date; and

(b)     a statute, law, order, rule or regulation shall be construed as a reference to such statute, law, order, rule or regulation as it may have been, or may at any time before the date of this Agreement be, in effect as modified, amended or supplemented as of the date of this Agreement.

22.5     Section and other headings and captions are included solely for convenience of reference and are not intended to affect the interpretation of any provision of this Agreement.

22.6    This Agreement shall be deemed to have been jointly drafted by the Parties and no provision of it shall be interpreted or construed for or against either Party because such Party actually or purportedly prepared or requested such provision, any other provision or the Agreement as a whole.

23.    **Legal Counsel.** Each Party acknowledges that it or she has been represented by its own legal counsel in connection with the negotiation and drafting of this Agreement. Accordingly, this document shall not be construed against the draftsman. Any rule of construction to the contrary shall be ignored.

[SIGNATURE PAGE FOLLOWS]

DG 00206

**IN WITNESS WHEREOF,** the parties have caused this Agreement to be duly executed as of the date first written above.

**TRUST:**

ORLY GENGER 1993 TRUST

By: _Dalia Genger_
      Dalia Genger, Sole Trustee

STATE OF _New York_ )
                        )SS:
COUNTY OF _New York_ )

The foregoing was sworn to, subscribed and acknowledged before me this 15th day of May, 2012, by Dalia Genger, as Sole Trustee of The Orly Genger 1993 Trust. She is personally known to me or has produced a driver's license as identification.

                      Print or Stamp Name: _____
                      Notary Public: _____
                      Commission No.: _____
                      My Commission Expires: _____

MAGDALENA CHARLOTTEN
NOTARY PUBLIC, State of New York
No. 01CH6059474
Qualified in New York County
Certificate Filed in Kings, Queens,
Westchester, Bronx Counties
Commission Expires May 29, 20 15

**DALIA:**

By: _Dalia Genger_
      Dalia Genger, Individually

STATE OF _New York_ )
                        )SS:
COUNTY OF _New York_ )

The foregoing was sworn to, subscribed and acknowledged before me this 15th day of May, 2012, by Dalia Genger. She is personally known to me or has produced a driver's license as identification.

                      Print or Stamp Name: _____
                      Notary Public: _____
                      Commission No.: _____
                      My Commission Expires: _____

MAGDALENA CHARLOTTEN
NOTARY PUBLIC, State of New York
No. 01CH6059474
Qualified in New York County
Certificate Filed in Kings, Queens,
Westchester, Bronx Counties
Commission Expires May 29, 20 15

DG-00207

**MANHATTAN:**

MANHATTAN SAFETY COMPANY, LTD.,
a corporation organized under the laws of St. Kitts, W.I.

By: _____       _____
          Greg Gilpin-Payne, President                 Witness: Leah Crag-Chaderton

                                                                    _____
                                                                    Witness: Yulanda Vanterpool

<u>**SCHEDULE 9.1**</u>

**NOTICES**

**Trust:**

Pedowitz & Meister
1501 Broadway, Suite 800
New York NY 10036-5505
Attention: Robert Meister

**Dalia:**
200 East 65th - apt 32w
New York, NY
Attention: Trustee

**Manhattan:**

858 Zenway Blvd
Frigate Bay
St Kitts, W.I.

EXECUTION VERSION

## AMENDED AND RESTATED
## PROMISSORY NOTE

$4,240,000.00

October 3, 2011

FOR VALUE RECEIVED, the undersigned, the ORLY GENGER 1993 TRUST ("**Maker**" or the "**Trust**"), a trust settled on December 13, 1993 pursuant to that certain Trust Agreement dated December 13, 1993 (the "**Trust Agreement**") and as authorized by its current sole trustee, Dalia Genger ( "**DG**" or "**Trustee**"), promises to pay to the order of MANHATTAN SAFETY COMPANY, LTD., a corporation organized under the laws of St. Kitts, W.I. ("**Manhattan;**" together with its successors and assigns, the "**Holder**"), the principal amount of FOUR MILLION TWO HUNDRED FORTY THOUSAND DOLLARS AND NO CENTS ($4,240,000.00) ("**Principal**"), or such other amount as may have been advanced under this Note, as provided herein, together with accrued interest calculated from (i) the date of the Original Note (as herein after defined) on the face amount of the Original Note, (ii) (x) such date or dates, if any, on which an Additional Advance (as herein defined) is made on the amount of the Additional Advance made on such date or dates, (iii) November 1, 2012, in the case of an advance in payment of the Forbearance Fee, on the Forbearance Fee or (iv) the date or dates of the incurrence of any cost or expense by an Indemnified Party on the amount of such cost or expense (each an "**Indemnity Payment**" and collectively, the "**Indemnity Payments**") which is not paid by an Indemnifying Party, at the rate of three percent (3%) percent per annum on the unpaid Principal balance or such other interest rate then prevailing and payable under this Note, computed on the basis of the actual number of days elapsed a year of 360 days.

This Amended and Restated Note amends and restates that certain promissory note dated October 3, 2011 in the original principal amount of Four Million Dollars and No Cents ($4,000,000.00) (the "**Original Note**") and is issued in replacement thereof. This Note is the Note contemplated by that certain Credit and Forbearance Agreement and Second Amendment and Restatement of Promissory Note dated May __, 2012 (the "**Agreement**") by and between the Trust and Manhattan. Among other things, the Original Note has been amended to provide for the possibility of (i) additional advance(s) ("**Additional Advances**") made to Maker, (ii) the payment of a Forbearance Fee by Maker under the terms of the Agreement and this Note and (iii) the incurrence by Maker of an obligation to pay an Indemnity Payment. Capitalized terms used herein without definition shall have the meanings ascribed to them in the Agreement.

## 1. Payments and Prepayments.

1.1     Principal and interest shall be paid to Holder at the address set forth in the Agreement or such other address as may appear the books and records of the Maker or such other place as the Holder hereof from time to time shall designate in writing to Maker.

1.2     Principal and all accrued and unpaid interest shall be due and payable on the date (the "**Maturity Date**") which is the earliest to occur of:

(a)     November 1, 2012; or

DG 00979

(b)    the date of Maker's receipt of the proceeds ("**TRI Shares Proceeds**") from the sale of shares (the "**TRI Shares**") of Trans Resources, Inc., a Delaware corporation ("**TRI**"), either pursuant to the interpleader action (the "**Interpleader Action**") pending in the United States District Court for the Southern District of the State of New York (the "**Court**") in *Pedowitz v. TPR*, 11 Civ. 5602, or otherwise.

1.3     Notwithstanding anything to the contrary, to the extent that the Court awards the Trust any of the interpleaded funds, the Trust shall first apply such funds to the extent necessary to pay this Note, including all accrued and unpaid interest hereon, in full, before applying such funds for any other purpose.

## 2.  Events of Default.

2.1     Events of Default. It is expressly agreed that the entire Principal amount of this Note, together with all accrued interest thereon, shall immediately become due and payable (without demand for payment, notice of nonpayment, presentment, notice of dishonor, protest, notice of protest, or any other notice, all of which are hereby expressly waived by Maker) upon the happening of any of the following events (each, an "**Event of Default**"):

(a)    the entry of a decree or order by the court having jurisdiction in the premises adjudging Maker a bankrupt or insolvent, or approving as properly filed a petition seeking arrangement, adjudgment or composition of or in respect of Maker under the Federal Bankruptcy Code or any other applicable Federal or state law, or appointing a receiver, liquidator, assignee, or trustee, sequestrator (or other similar official) of Maker, or of any part of its property, and the continuance of any such decree or order unstayed and in effect for a period of thirty (30) consecutive days; or

(b)    the institution by Maker of proceedings to be adjudicated a bankrupt or insolvent, or the consent by it to the institution of bankruptcy or insolvency proceedings against it, or the filing by it of the petition or answer or consent by it to the filing of any such petition or answer or consent seeking relief under the Federal Bankruptcy Code or any other applicable Federal or state law or the consent by it to the filing of any such petition or to the appointment of a receiver, liquidator, assignee, trustee, sequestrator (or other similar official) of Maker or any part of its property, or the making by it of an assignment for the benefit of the creditors, or the admission by it in writing of its inability to pay its debts generally as they come due; or

(c)    the resignation, removal or other change in the Trustee, including, but not limited to, the addition of one or more additional Trustees; or

(d)    the creation of any lien or other Encumbrance on any asset of Maker; or

(e)    the breach by Maker of any of its representations, warranties or covenants under the Agreement; or

(f)    the sale or other transfer of all or any material part of Maker's properties and assets; or

DG 00980

(g) a default by Maker in any payment of principal of or interest on any other obligation for money borrowed (or on any obligation under conditional sale or other title retention agreement or on any obligation secured by purchase money mortgage or on any obligation under notes payable or drafts accepted representing extensions of credit but excluding deposits) beyond any period of grace provided with respect thereto, or defaults in the performance of any other agreement under which any such obligation is created (or if any other event of default under any such agreement shall occur and be continuing) if the effect of such event or default is to cause, or to permit the creditor or creditors of such obligation (or a trustee on behalf of such creditor or creditors) to cause, such obligations to become due prior to its stated maturity; or

(h) the failure to pay any amount payable to Holder when due and payable, subject to the provisions of the Agreement and Section 2.2 of this Note which provide for forbearance by the Holder from collection of amounts payable to Holder under this Note.

2.2 Upon the occurrence of an Event of Default, Holder may, without limiting any other rights it may have at law or in equity, declare the unpaid Principal of and accrued and unpaid interest on this Note due and payable, whereupon the same shall be due and payable without presentment, demand, protest or other notice of any kind, all of which Maker expressly waives, and Holder may proceed to enforce payment of such Principal and accrued and unpaid interest or any part thereof in such manner as it may elect in its sole discretion; provided, however, that Holder agrees to forbear from commencing any action to enforce collection of such amounts to the extent provided in the Agreement.

**3. Overdue Rate.** From and after November 1, 2012 or upon the occurrence of an Event of Default if earlier, the unpaid indebtedness then evidenced by this Note shall thereafter bear interest at the lesser of rate of twenty five percent (25%) per annum or the maximum legal rate of interest (the "**Overdue Rate**").

**4. Covenants.** The Trust hereby covenants and agrees that (1) it shall not create or permit any Encumbrance on (x) the TRI Shares or (y) the Minimum Payment or any other payment that the Trust may receive or be entitled to receive from (a) the Court or (b) any other party in connection with the Interpleader Action or otherwise relating to the TRI Shares and (2) it will not (x) (a) borrow or enter into any agreement to borrow any amount of money, or (b) guaranty, indemnify or otherwise create any contingent monetary obligation, or (y) incur any material Liability, other than costs for legal services relating to the TRI Proceedings, which in no event, without the prior consent of Holder, exceed in aggregate Five Hundred Thousand Dollars and No Cents ($500,000.00).

**5. Waiver And Consent.** Maker: (a) waives demand, presentment, protest, notice of dishonor, suit against or joinder of any other person, and all other requirements necessary to charge or hold Maker liable with respect to the obligations evidenced by the Note; and (b) waives any right to immunity from any such action or proceeding and waives any immunity or exemption of any property, wherever located, from garnishment, levy, execution, seizure or attachment prior to or in execution of judgment, or sale under execution or other process for the collection of debts.

FTL.DOCS 5928254 10 3

6. **Costs, Indemnities And Expenses**.  Maker agrees to pay all filing fees and similar charges and all costs incurred by Holder in collecting or attempting to collect the obligations evidenced by the Note and such right shall extend beyond the entry of a final, non-appealable judgment of a court of competent jurisdiction ("**Final Judgment**") including attorneys' fees, whether or not involving litigation and/or appellate, administrative or bankruptcy proceedings.  Such entitlement or attorneys' fees shall not merge with the entry of a Final Judgment and shall continue post-judgment unless and/or until any and all indebtedness due Holder is fully satisfied.  Maker agrees to pay any documentary stamp taxes, intangible taxes or other taxes (except for federal or state franchise or income taxes based on Holder's net income) which may now or hereafter apply to this Note, and Maker agrees to indemnify and hold Holder harmless from and against any liability, costs, attorneys' fees, penalties, interest or expenses relating to any such taxes, as and when the same may be incurred.  Maker agrees to pay Holder any and all attorneys' and paralegals' fees at all pre-trial, trial and appellate levels in respect of any litigation or collection efforts based hereon, or arising out of, or related hereto whether, under or in connection with this Note and/or any agreement contemplated to be executed in conjunction herewith, or any course of conduct, course of dealing, statements (whether verbal or written) or actions of any party.

7. **Miscellaneous**.

7.1     **Governing Law**.  This Note shall be governed by, and construed and enforced in accordance with the laws of the State of New York, without giving effect to the principles of conflicts of law thereof.

7.2     **Jurisdiction**.  Trust and the Trustee each irrevocably agree that, should either of them institute any legal action or proceeding in any jurisdiction (whether for an injunction, specific performance, damages or otherwise) in relation to this Note or the transactions contemplated by this Note, no immunity (to the extent that it may at any time exist, whether on the grounds of sovereignty or otherwise) from such action or proceeding shall be claimed by it or on its behalf, any such immunity being hereby irrevocably waived, and the Trust and the Trustee each irrevocably agrees that their respective assets are, and shall be, subject to such legal action or proceeding in respect of its obligations under this Note.

7.3     **Time of the Essence**.  Time shall be of the essence with respect to the terms of this Note.  This Note cannot be changed or modified orally.

7.4     **Interpretation**.  The term "**Holder**" shall be deemed to include any subsequent holder(s) of this Note.  Whenever used in this Note, the term "person" means any individual, firm, corporation, trust or other organization or association or other enterprise or any governmental or political subdivision, agency, department or instrumentality thereof.  Whenever used in this Note, words in the singular include the plural, words in the plural include the singular, and pronouns of any gender include the other genders, all as may be appropriate.  Captions and paragraph headings in this Note are for convenience only and shall not affect its interpretation

7.5     **Invalidity**.  Any provision of this Note which is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction only, be ineffective only to the extent of such

DG 00982

prohibition or unenforceability without invalidating the remaining provisions hereof or affecting the validity or enforceability of such provision in any other jurisdiction. To the extent that Maker may lawfully waive any law that would otherwise invalidate any provision of this Note, Maker hereby waives the same, to the end that this Note shall be valid and binding and enforceable against it in accordance with all of its terms.

7.6     Prepayment Permitted. This Note may be prepaid in whole or in part at any time without penalty. Except as otherwise required by law or by the provisions of this Note, payments received by Holder hereunder shall be applied first against expenses and indemnities, next against accrued interest, and next in reduction of the outstanding principal balance of the Note, except that during the continuance of any Event of Default, Holder may apply such payments in any order of priority determined by Holder in its exclusive judgment.

7.7     Notices. Except as otherwise required by the provisions of this Note, any notice required to be given to Maker shall be deemed sufficient if made personally or if mailed, postage prepaid, to such Maker's address as it appears in the Agreement.

7.8     Benefit. All of the terms of this Note shall inure to the benefit of Holder and its heirs, executors, administrators, personal representatives, successors and assigns, and shall be binding upon Maker and its successors and assigns, jointly and severally.

7.9     No Waiver. No failure on the part of the Holder to exercise, and no delay in the exercise of any right, remedy or power hereunder or under any document or agreement executed in connection herewith shall operate as a waiver hereof or thereof nor shall any single or partial exercise by the Holder of any right, remedy or power hereunder or thereunder preclude any other or future exercise of any other right, remedy or power.

7.10    Change, Modification or Waiver. This Note may not be changed or modified orally, nor may any right or provision hereof be waived orally, but in each instance only by an instrument in writing signed by the party against which enforcement of such change, modification or waiver is sought.

7.11    No Usury. In the event, Holder, in enforcing its rights hereunder determines that charges and fees incurred in connection with this Note may, under the applicable laws relating to usury, cause the interest rate herein to exceed the maximum rate allowed by law, then such interest shall be recalculated and any excess over the maximum interest permitted by such laws shall be credited to the then outstanding principal amount of the Note to reduce said balance by the amount of such excess. It is the intent of the Holder that the Maker, under no circumstance, shall Maker be required to pay, nor shall the Holder be entitled to collect, any interest that is in excess of the maximum rate permitted under the applicable laws relative to usury.

7.12    Waiver of Trial by Jury. THE MAKER AND THE HOLDER WAIVE THE RIGHT TO TRIAL BY JURY IN ANY ACTION OR PROCEEDING BASED UPON, ARISING OUT OF OR IN ANY WAY CONNECTED TO THIS NOTE.

DG 00983

7.13   Assignment. This Note may be negotiated, endorsed, assigned, transferred and/or pledged subject to compliance with the requirements of applicable federal and state securities law by delivery of the original Note.  This Note shall be binding upon Maker and Maker's successors and assigns.

[SIGNATURE PAGE TO FOLLOW]

DG 00984

**IN WITNESS WHEREOF,** Maker has duly executed this Note as of the date first written above.

**MAKER:**

THE ORLY GENGER 1993 TRUST

By:   *Dalia Genger*
     Dalia Genger, sole Trustee

STATE OF *New York* )
                      )SS:
COUNTY OF *New York* )

The foregoing was sworn to, subscribed and acknowledged before me this _15th_ day of _May_, 2012, by Dalia Genger, as sole Trustee of The Orly Genger 1993 Trust.  She is personally known to me or has produced a driver's license as identification.

                     _____
                     Print or Stamp Name: _____
                     Notary Public:_____
                     Commission No.: _____
                     My Commission Expires: _____

MAGDALENA CHARLOTTEN
NOTARY PUBLIC, State of New York
No. 01CH6059474
Qualified in New York County
Certificate Filed in Kings, Queens,
Westchester, Bronx Counties
Commission Expires May 29, 20__

FTL.DOCS 5928254 10

DG 00985

*ORLY GENGER VS.*
*DALIA GENGER, et al*

*DALIA GENGER*
*December 13, 2012*



**COURT REPORTING**
Co. LLC

126 East 56th Street, Fifth Floor New York, New York 10022
PHONE: (212) 750-6434   FAX: (212) 750-1097
**www.ELLENGRAUER.com**

*Original File 102224.TXT*
**Min-U-Script® with Word Index**

**Page 1**

```
 1  SUPREME COURT OF THE STATE OF NEW YORK
 2  COUNTY OF NEW YORK
    ------------------------------------------X
 3  ORLY GENGER in her individual capacity
    and on behalf of the Orly Genger 1993
 4  Trust (both in its individual capacity
    and on behalf of D&K Limited Partnership),
 5
                   Plaintiff,
 6
       - against -
 7
    DALIA GENGER, SAGI GENGER, LEAH FANG,
 8  D&K GP LLC, and TPR INVESTMENT ASSOCIATES,
    INC.,
 9
                   Defendant
10
    Index No. 100697/08
11  ------------------------------------------X
12
13              575 Lexington Avenue
                New York, New York
14
                December 13, 2012
15              10:37 a.m.
16
17          DEPOSITION of DALIA GENGER, taken
18  before Annette M. Montalvo, RMR, and a Notary
19  Public in and for the State of New York.
20
21
22
23      ELLEN GRAUER COURT REPORTING CO. LLC
24        126 East 56th Street, Fifth Floor
          New York, New York  10022
              212-750-6434
25              REF:  102224
```

**Page 2**

```
 1  A P P E A R A N C E S:
 2
 3  ZEICHNER ELLMAN & KRAUSE LLP
 4  On Behalf of the Plaintiff,
 5      575 Lexington Avenue
 6      New York, New York  10022
 7  BY:  YOAV GRIVER, Esq.
 8       BRYAN D. LEINBACH, Esq.
 9       212-223-0400
10       ygriver@zeklaw.com
11
12
13  PEDOWITZ & MEISTER LLP
14  On Behalf of the Witness,
15      570 Lexington Avenue
16      New York, New York  10022
17  BY:  ROBERT A. MEISTER, Esq.
18       MARISA H. WARREN, Esq.
19       212-403-7333
20       robert.meister@pedowitzmeister.com
21
22
23
24
25
```

**Page 3**

```
 1  A P P E A R A N C E S: (Cont'd)
 2
 3  PAUL S. ZILBERFEIN, Esq.
 4  On Behalf of Leah Fang,
 5  78 Old Orchard Road
 6  New Rochelle, New York  10804
 7  914-297-0110
 8  paul@zilberfeinlaw.com
 9
10
11  DUANE MORRIS LLP
12  On Behalf of TPR Investment Associates, Inc.,
13  1540 Broadway
14  New York, New York  10036
15     BY: JOHN DELLAPORTAS, Esq.
16  212-692-1012
17  dellajo@duanemorris.com
18
19
20     ALSO PRESENT:
21  SAGI GENGER
22  WALTER P. STASIUK, Wachtel Masyr & Missry
23
24
25
```

**Page 4**

```
 1  ------------------ I N D E X --------------------
 2  WITNESS                  EXAMINATION BY      PAGE
 3  DALIA GENGER             MR. GRIVER             6
 4
 5
 6  Telephone call to Hon. Barbara Jaffe          134
 7
 8
 9  ---------------- E X H I B I T S ----------------
10  GENGER            DESCRIPTION          FOR I.D.
11  Exhibit 1         Answer to the second        8
12                    Amended complaint
13  Exhibit 2         Summons and second          8
14                    Amended verified
15                    Complaint
16  Exhibit 3         Dalia Genger amended        9
17                    Responses to plaintiff's
18                    Interrogatories
19  Exhibit 4         Leah Fang trust document   37
20  Exhibit 5         Instrument of acceptance   42
21                    Of trustee
22  Exhibit 6         Release                    68
23  Exhibit 7         Document                   68
24  Exhibit 8         Document                   92
25  Exhibit 9         1/4/2008 memo             108
```

Page 5

```
 1  ----------- E X H I B I T S (Cont'd)-----------
 2  GENGER          DESCRIPTION       FOR I.D.
 3  Exhibit 10      1993 promissory note and    149
 4                  Pledge agreement
 5  Exhibit 11      Final arbitration award     151
 6  Exhibit 12      Letter                      162
 7  Exhibit 13      Document                    168
 8  Exhibit 14      Dalia Genger affidavit      173
 9  Exhibit 15      1/31/2009 meeting and       209
10                  Agreement
11
12
13         (EXHIBITS RETAINED BY ATTORNEY GRIVER)
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 6

1 (WHEREUPON, the witness was duly
2 sworn.)
3 D A L I A   G E N G E R, called as a witness
4 herein, having been first duly sworn by a
5 Notary Public of the State of New York,
6 was examined and testified as follows:
7
8 **EXAMINATION**
9   **BY MR. GRIVER:**
10 Q. Would you state your name for the
11 record, please.
12 **A. Dalia Genger.**
13 Q. And what is your address?
14 **A. It is 200 East 65th Street, Apartment**
15 **32W. The zip code is 10065.**
16 Q. Ms. Genger, you understand that you
17 have just been sworn to tell the truth?
18 **A. Yes.**
19 Q. And you understand that it is your
20 obligation to tell the truth today?
21 **A. Absolutely.**
22 Q. In order to do that, if I ask you a
23 question and you don't understand it, please let
24 me --
25 **A. Yes, I know the procedure.**

Page 7

1   **GENGER**
2 Q. You know the procedures?
3 **A. Yes.**
4 Q. Okay. And if you answer the question,
5 I only want you to answer questions that you
6 understand; do you understand that?
7 **A. Yes.**
8 Q. What is your date of birth?
9 **A. June 15, 1946.**
10 Q. Which would make you how old today?
11 **A. 66, I guess.**
12 Q. You are the trustee of the Orly Genger
13 trust?
14 **A. '93 yes.**
15 Q. Is that correct?
16 **A. It is correct. Yes.**
17 Q. Do you suffer from any mental or
18 physical problem that would prevent you from
19 being a trustee to the Orly Genger trust?
20 **A. No.**
21 Q. And in this deposition, as we go
22 through it, whenever I speak about the Orly trust
23 or the trust, I am talking about the Orly Genger
24 1993 trust; do you understand?
25 **A. Absolutely. Yes.**

Page 8

1   **GENGER**
2 Q. I ask you again, do you suffer from any
3 mental or physical problem that would prevent you
4 from --
5 **A. I said no.**
6   **MR. MEISTER:** Wait until he finishes
7 the question.
8   **BY MR. GRIVER:**
9 Q. Do you suffer from any mental or
10 physical problem that would prevent you from
11 telling the truth and testifying here today?
12 **A. No.**
13   **MR. GRIVER:** Let's start with some
14 housekeeping matters. I am going to hand the
15 witness three exhibits that have been premarked
16 as Dalia Exhibits 1 through 3.
17   Dalia Exhibit 1 is Dalia Genger's
18 answer to the second amended complaint in this
19 action.
20   (Dalia Exhibit 1, answer to the
21   second amended complaint, marked.)
22   **MR. GRIVER:** Dalia Exhibit 2 are copies
23 of the summons and second amended verified
24 complaint in this matter.
25   (Dalia Exhibit 2, summons and

Page 9

GENGER

1  second amended verified complaint,
2  marked.)
3       MR. GRIVER: And Dalia Exhibit 3 is a
4  copy of defendant Dalia Genger's amended
5  responses to plaintiff's interrogatories in this
6  action.
7       (Dalia Exhibit 3, Dalia Genger
8       amended responses to plaintiff's
9       interrogatories, marked.)
10      BY MR. GRIVER:
11  Q.  Ms. Genger, looking at Dalia Exhibit
12  1 --
13  A.  Yes.
14  Q.  -- your answer, is that your signature
15  on the last page?
16  A.  Yeah, I am sure it is there, if you say
17  so.  Yes, it is my signature.
18  Q.  And so you signed this answer under
19  oath on the 20th day of September 2010?
20  A.  September 30, right.  I won't remember,
21  but it says here, so.
22  Q.  If you look on the last page, because I
23  want to be precise, Ms. Genger.
24      MR. MEISTER: Are you asking her what

Page 10

GENGER

1  she remembers or are you asking her what it says?
2       BY THE WITNESS:
3  A.  I don't remember exactly what date, but
4  I believe you that that's the date.
5       BY MR. GRIVER:
6  Q.  When was the last time you saw this
7  answer to the second amended --
8  A.  When was the last time that I saw this
9  document?
10  Q.  Yes.
11  A.  I don't remember.
12  Q.  You didn't look at it in preparing for
13  your deposition today?
14  A.  I think that one should not be prepared
15  for deposition.  Isn't it true?
16  Q.  So you did nothing to prepare yourself
17  for this deposition?  You didn't look at any
18  documents, you didn't speak to your attorney?
19  A.  I did speak with my attorney.
20  Q.  And in the course of that did he show
21  you documents?
22  A.  He gave me some documents, but I didn't
23  look at them.
24  Q.  Okay.  If you look at what's been

Page 11

GENGER

1  marked as Exhibit 3?
2  A.  Exhibit 3?
3  Q.  If you look on the last page, page 12,
4  is that your signature?  As sworn by --
5  A.  Yeah, it is my signature.
6  Q.  And that's sworn by you on the 29th day
7  of March 2012?
8  A.  Right.
9  Q.  When was the last time you saw these
10  interrogatory responses?
11  A.  This document, actually, I read again
12  like two days ago.
13  Q.  Okay.  Do you have any changes to this
14  document that you want to make upon reading it
15  again two days ago?
16  A.  No, I don't think so.
17  Q.  Ms. Genger, you are the current trustee
18  of the Orly Genger trust?
19  A.  Can you repeat?
20  Q.  You are the trustee of the Orly Genger
21  trust?
22  A.  Yes.
23  Q.  And you have been the trustee of the
24  Orly Genger trust since January 4 of 2008; is

Page 12

GENGER

1  that correct?
2  A.  Right.
3  Q.  And Orly Genger is the lifetime
4  beneficiary of the trust, do you know that?
5  A.  Yes.
6  Q.  And do you understand that as trustee
7  you are supposed to protect the trust?
8  A.  Absolutely.
9  Q.  And as trustee, are you supposed to put
10  the interests of the trust ahead of your
11  interests?
12  A.  Obviously.
13  Q.  And as trust you are supposed to act in
14  the best interests of the trust?
15  A.  Of the trust.  Yes.
16  Q.  And as trustee you are supposed to put
17  the trust of -- the interests of Orly Genger as
18  beneficiary ahead of your own interests?
19  A.  I agree with you.
20  Q.  And, indeed, you are supposed to put
21  her interests ahead of the interest of anybody
22  else?
23  A.  Absolutely.
24  Q.  Have you done so?

ORLY GENGER VS.
DALIA GENGER, et al

DALIA GENGER
December 13, 2012

---

**Page 13**

GENGER

1
2  A.  Yes, I believe I did.
3  Q.  Every action that you have done as
4  trustee --
5  A.  Yeah.
6  Q.  Every action that you have done as
7  trustee you have put the interests of the trust
8  and Orly Genger ahead of your interests?
9      MR. ZILBERFEIN: Note my objection to
10  the form.
11     THE WITNESS: What did he say?
12     MR. MEISTER: He made a technical
13  objection. You can answer.
14     BY THE WITNESS:
15  A.  Yes, obviously, my responsibility as a
16  trustee was obviously the major thing that I was
17  responsible for, and any other -- no other thing
18  would change it, I mean.
19     BY MR. GRIVER:
20  Q.  And you have done so?
21  A.  Yes. I believe I did.
22  Q.  Who are the -- since January 4 of 2008
23  when you became trustee, who are the attorneys
24  for the trust?
25  A.  Well, I really don't remember in 2008.

---

**Page 14**

GENGER

1
2  I just know that Robert Meister is currently my
3  attorney, but I am not sure when we began -- when
4  I started to be his client.
5  Q.  Just so the record is clear,
6  Mr. Meister is the attorney for the Orly Genger
7  trust?
8  A.  Yes.
9  Q.  You have retained him as attorney for
10  the trust?
11  A.  Yes.
12  Q.  Are there any other attorneys that you
13  have retained on behalf of the trust?
14  A.  I don't remember.
15  Q.  Does the law firm of Sullivan &
16  Worcester ring a bell?
17  A.  It rings a bell, but I don't remember
18  in connection to what.
19  Q.  Okay. When do you --
20  A.  Wait a minute. Maybe Delaware, I
21  think. I don't remember.
22  Q.  Okay. When did you hire Mr. Meister
23  and his law firm to represent the trust?
24  A.  I just said, I don't remember the date.
25  Q.  Do you remember the year?

---

**Page 15**

GENGER

1
2  A.  I believe it was 2008 or '09. I don't
3  know.
4  Q.  Before you hired Mr. Meister to be the
5  attorney for the trust, had you met Mr. Meister
6  before?
7  A.  No.
8  Q.  How did you find Mr. Meister?
9  A.  He was recommended by another lawyer.
10  Q.  Do you remember the name of this other
11  lawyer?
12  A.  No.
13  Q.  Do you remember who this other lawyer
14  worked for?
15  A.  No.
16  Q.  How is it that you came to be talking
17  to this lawyer?
18  A.  I don't remember.
19  Q.  Was it a lawyer for Sagi?
20  A.  No. I don't think so.
21  Q.  Had Mr. Meister or his law firm ever
22  done work for you as an individual?
23  A.  Yes.
24  Q.  Before he was retained by you to
25  represent the trust?

---

**Page 16**

GENGER

1
2  A.  I don't think -- I don't remember it
3  was before or after.
4  Q.  Okay. What work was Mr. Meister
5  retained on an individual basis for --
6      MR. MEISTER: Objection.
7  Attorney-client privilege. Instruct the witness
8  not to answer.
9      MR. ZILBERFEIN: I join that objection.
10     MR. GRIVER: Just on the topic?
11     THE WITNESS: On the topic --
12     MR. MEISTER: No.
13     MR. GRIVER: Okay.
14     BY MR. GRIVER:
15  Q.  Is Mr. Meister representing you on an
16  individual -- in an individual capacity?
17  A.  You just asked me that, and I said yes.
18  Q.  Okay. In what is Mr. Meister
19  representing you in an individual capacity?
20     THE WITNESS: Didn't you say that's a
21  question I should not answer?
22     MR. MEISTER: Well --
23     BY THE WITNESS:
24  A.  It is to fight a lawsuit that Orly has
25  against me, basically.

---

Page 17

1    GENGER
2    BY MR. GRIVER:
3  Q.  And you are talking about this lawsuit?
4  A.  I don't know that.  There are so many,
5  I don't keep track of them.
6  Q.  In the lawsuit you have initiated
7  against Orly Genger, who is your lawyer?
8  A.  You mean in the divorce?
9  Q.  In the Dalia Genger versus Arie Genger
10  action?
11  A.  You mean the divorce, right?
12  Q.  Okay.  The reformation?
13  A.  The stipulation --
14  Q.  Yes.
15  A.  -- and all that?  Yeah.
16    MR. ZILBERFEIN: Note my objection to
17  the question.
18    BY MR. GRIVER:
19  Q.  Who is representing you in that?
20  A.  Yeah.  I am trying to remember the name
21  of the firm.  But I remember the name of one
22  lawyer, was a partner.  He's Kortmansky.  And the
23  other guy, I don't remember his name.
24  Q.  Okay.  Just so we are clear on the
25  record as we sit here today, Mr. Meister is

Page 18

1    GENGER
2  representing you both in an individual
3  capacity --
4  A.  That's true.
5  Q.  -- and on behalf of the trust?
6  A.  Uh-huh.
7    MR. ZILBERFEIN: "Uh-huh" means yes?  I
8  don't know.
9    THE WITNESS: What?
10    BY MR. GRIVER:
11  Q.  He is asking that you answer yes or no
12  instead of "uh-huh" or nodding your head.
13  A.  Yes.  Yes.
14  Q.  Do you get two sets of bills from --
15  strike that.
16    When Mr. Meister bills you for the work
17  that he or his firm does on behalf of the Orly
18  Genger trust, do you get a bill?
19  A.  I wish I didn't, but I do get.
20  Q.  Okay.  And it is a physical piece of
21  paper?
22  A.  Absolutely.  Yes.
23  Q.  And when Mr. Meister does work for you
24  as an individual, Dalia Genger, does he bill you
25  for those?

Page 19

1    GENGER
2  A.  Yes.
3  Q.  And do you get a physical piece of
4  paper?
5  A.  Yes.
6  Q.  Are the two pieces of paper different
7  or are they the same?
8  A.  Which two pieces of paper?
9  Q.  Does he bill you separately for the
10  work that he does on behalf of the trust?
11  A.  Yes.
12  Q.  So he makes --
13  A.  He says -- it says Dalia Genger
14  trustee, and, otherwise, it is just Dalia Genger.
15    MR. GRIVER: As representative of the
16  beneficiary of the Orly Genger trust, I would ask
17  for copies of all bills that you have provided to
18  Ms. Genger as trustee of the Orly Genger trust.
19    MR. ZILBERFEIN: I join in all
20  requests.
21    MR. GRIVER: Mr. Meister, any reaction,
22  yes, no, maybe?
23    MR. MEISTER: I have no reaction.  No.
24    Can you give us for a moment, we have a
25  filing issue.

Page 20

1    GENGER
2    MR. GRIVER: Off the record.
3    MR. MEISTER: Thank you.  Let's take a
4  minute or two recess.
5    (WHEREUPON, there was a short
6    interruption from 10:52 a.m. to
7    10:54 a.m.)
8    MR. GRIVER: Back on the record.
9    Can you read my last question back.
10    (WHEREUPON, the record was read by
11    the reporter as requested.)
12    BY MR. GRIVER:
13  Q.  Are you able to distinguish in your
14  mind when you seek Mr. Meister's advice on behalf
15  of the trust and when you seek his advice on an
16  individual basis?
17  A.  Yes.
18  Q.  Do you believe that having the same set
19  of attorneys is in the best interest of the Orly
20  Genger trust?
21    MR. ZILBERFEIN: Note my objection to
22  the form.
23    THE WITNESS: I'm sorry, I don't know
24  what --
25    BY MR. GRIVER:

Page 21

GENGER
2 Q. I will re-ask the question again.
3 Do you believe that having the same set
4 of attorneys representing the Orly Genger trust
5 and you individually is in the best interest of
6 the Orly Genger trust?
7 A. Yes, I do, otherwise, I wouldn't do it.
8 Q. Okay. Do you believe that that is the
9 best way to protect the Orly Genger trust?
10 A. Yes.
11 Q. You have no concern whatsoever that
12 there may be a conflict between your interests
13 and the interests of the trust?
14 A. No.
15 MR. ZILBERFEIN: Objection.
16 BY MR. GRIVER:
17 Q. Who has been paying the invoices of the
18 Pedowitz and Meister law firm in connection with
19 its work on behalf of the trust?
20 A. I am paying it.
21 Q. You have paid every penny?
22 A. Every penny.
23 MR. MEISTER: Well, may I just correct
24 the record there?
25 MR. GRIVER: Go ahead.

Page 22

GENGER
2 MR. MEISTER: Ms. Genger has paid for
3 work representing her as trustee. There's a
4 small subset of bills which were rendered for
5 actions in which the trust, through its trustee,
6 was attempting to perfect or secure or get
7 recognized its interests as owners of TRI shares,
8 and those bills were paid for by the trust.
9 MR. GRIVER: That would be the Dalia
10 Delaware action that was stayed by Feinman?
11 MR. MEISTER: The Dalia Delaware action
12 that was stayed by Feinman, and also I believe
13 there were claims asserted in the Pedowitz and
14 Meister interpleader asserted against the Trump
15 Group on the one hand and TRI on the other.
16 BY MR. GRIVER:
17 Q. Who has been paying the bills that are
18 sent to you directly as an individual?
19 A. I was paying them.
20 Q. Has anyone been providing you with
21 funds to pay those bills?
22 A. No.
23 Q. Have you been using trust assets to pay
24 those bills?
25 A. Never.

Page 23

GENGER
2 Q. Have you taken out any loans to pay
3 those bills?
4 A. No.
5 Q. Have you taken out any loans to pay the
6 bills that were incurred on behalf of the trust?
7 MR. MEISTER: Can I have it read back,
8 please.
9 (WHEREUPON, the record was read by
10 the reporter as requested.)
11 BY THE WITNESS:
12 A. Actually, I don't know how to answer
13 this.
14 BY MR. GRIVER:
15 Q. Do you not understand my question?
16 A. No, I understand your question, if I
17 took any loans to pay bills.
18 Regarding the Orly trust, right?
19 Q. Yes.
20 A. Well, yeah, I think at the end there
21 was a loan made by -- to secure -- whatever
22 safety, there was a firm, a firm that -- the name
23 of which I can't recall exactly, but it is
24 Manhattan Safety whatever.
25 Q. Okay. Do you know how much money this

Page 24

GENGER
2 Manhattan company lent you?
3 A. $200,000.
4 Q. Other than the $200,000 loan from
5 Manhattan Safety Company, has anyone else paid
6 you in order to --
7 A. Me as Dalia or me as trustee?
8 Q. You as trustee. Has anyone paid you as
9 trustee?
10 A. No.
11 Q. As we sit here today is Mr. Meister
12 representing you as trustee or is Mr. Meister
13 representing you on an individual basis?
14 A. As trustee.
15 Q. Not as an individual, but as trustee?
16 A. Yeah.
17 Q. Okay. When Mr. Meister prepared you
18 for this deposition, was he preparing you as
19 trustee of the trust or was he preparing you as
20 Dalia the individual?
21 A. Again, he didn't prepare me.
22 MR. ZILBERFEIN: Objection.
23 BY MR. GRIVER:
24 Q. When you spoke to him before this
25 deposition and he showed you certain documents,

Page 25

```
1       GENGER
2   he was doing that as the lawyer for the trust --
3   A.  Trust, yes.
4   Q.  -- correct?
5       And what documents did Mr. Meister show
6   you?
7   A.  Basically, he gave me documents, but I
8   did never went over them except this one.
9       MR. MEISTER: Referring to Dalia
10  Exhibit 3.
11      THE WITNESS: Yes.  Exhibit 3.
12      BY MR. GRIVER:
13  Q.  Did he show you Dalia Exhibit 2, the
14  complaint in this case?
15  A.  He probably did, but I didn't read it.
16  Q.  What did Mr. Meister tell you?
17  A.  I don't remember.
18  Q.  When was this preparation session?
19  A.  A few days ago.
20  Q.  Well, today is Thursday.  Was it
21  yesterday, Wednesday?  Was it Tuesday?  Was it
22  Monday?
23  A.  I don't remember exactly what date it
24  was.
25  Q.  Was it this week?
```

Page 26

```
1       GENGER
2   A.  Probably, but I don't remember that we
3   talked about it.
4   Q.  So as we sit here today on Thursday,
5   you can't remember if you met with Mr. Meister?
6   A.  I mean, I remember that I met with him,
7   but I don't remember that we went over this
8   paper.
9       MR. MEISTER: Referring to Dalia
10  Exhibit 2.
11      BY MR. GRIVER:
12  Q.  I am simply asking you, on what day did
13  you meet with Mr. Meister this week?
14  A.  I met with him Tuesday and briefly
15  yesterday.
16  Q.  Okay.  And for how long did you meet
17  with Mr. Meister on Tuesday?
18  A.  I don't know.  When I get the bill, I
19  probably will know.  But I can't think of it at
20  this time.
21  Q.  Well, was it the whole day --
22  A.  No, it wasn't the whole day.
23  Q.  Half a day?
24  A.  I can't afford a whole day.
25      What?
```

Page 27

```
1       GENGER
2   Q.  Half a day?
3   A.  No.  It is like a couple of hours.
4   Q.  Okay.  So then simply say a couple of
5   hours.
6   A.  Please don't tell me what to say.
7   Q.  And Mr. Meister told you what in those
8   sessions?
9   A.  Well, he raised some points that I
10  might be asked.
11  Q.  And what were those?
12  A.  All this saying interrogatory questions
13  that I already answered.
14  Q.  So as we sit here today, you don't
15  remember what points you and Mr. Meister
16  discussed two days ago?
17  A.  I do remember.
18  Q.  So then please put it on the record and
19  tell me what points did you and Mr. Meister
20  discuss --
21  A.  I am telling you --
22  Q.  -- two days ago.
23  A.  -- we discussed this document, the
24  Exhibit 3 document.
25  Q.  Okay.  But what you said was that he
```

Page 28

```
1       GENGER
2   went over topics that might be covered in this
3   deposition, correct?
4   A.  He told me what -- can you ask me
5   again.
6   Q.  Sure.
7       When you and Mr. Meister spoke two days
8   ago on Tuesday --
9   A.  Right.
10  Q.  -- you and he discussed topics that may
11  be raised in this deposition, correct?
12  A.  That's true, and those were the topics,
13  yeah.
14  Q.  Okay.  And could you please tell me
15  which topics you remember Mr. Meister raising on
16  Tuesday?
17  A.  Let me look what it says so I tell you.
18      MR. GRIVER: Let the record reflect
19  that the witness is looking through what's been
20  marked as Dalia Exhibit 3.
21      BY MR. GRIVER:
22  Q.  Ms. Genger, I am going to allow you to
23  look, but let me ask you, absent looking at that
24  document you have no independent recollection of
25  the topics that Mr. Meister went through with you
```

Page 29

1     GENGER
2  two days ago?
3  A.  No, I do have a recollection.
4  Q.  Okay.  So please --
5  A.  Overall, it is how did I manage the
6   Orly trust.  In general, I mean.
7  Q.  Okay.  Any specific things that you did
8   that were discussed on Tuesday, to your
9   recollection?
10  A.  Any specifics?
11  Q.  Uh-huh.
12     THE WITNESS: I think it is a kind of
13  privileged information, don't you think, that
14  whatever I discussed with you --
15     BY MR. GRIVER:
16  Q.  Unless Mr. Meister instructs you not to
17  answer, you must answer my questions.
18  A.  No, I am just encouraging him.
19  Q.  Okay.
20  A.  The topics were, you know, as I became
21   a trustee, why did I become a trustee.
22  Q.  Okay.
23  A.  What is my purpose, what are my
24   responsibilities.  And, in general, that's what
25   it is.  What are my responsibilities.

Page 30

1     GENGER
2  Q.  Did he go over any of the actions you
3   have taken as trustee?
4  A.  Action and nonaction.
5  Q.  He went over actions and nonactions.
6     Which actions and nonactions did you
7   discuss with Mr. Meister two days ago?
8  A.  Well, the nonaction that was raised is
9   me not notifying Orly about the foreclosure on
10   the D&K LP note.
11  Q.  Okay.  And was that the only nonaction
12   that you and he discussed?
13  A.  As far as I remember.
14  Q.  And what actions did you and
15   Mr. Meister discuss two days ago?
16  A.  What actions?
17  Q.  Uh-huh.
18  A.  Well, to begin with -- no.
19     That the trust is suing the Trumps,
20   that's kind of the last action, in order to
21   clarify that Orly owns the shares.
22  Q.  The shares of TRI?
23  A.  TRI, yes.
24  Q.  So as we sit here today you believe as
25   trustee of the Orly Genger trust that Orly owns

Page 31

1     GENGER
2   the TI shares, the trust owns --
3  A.  The trust, yeah.
4  Q.  What other actions?
5  A.  What other actions?  I really don't
6   remember any other actions.
7  Q.  Okay.
8  A.  I mean, there were lawsuits and stuff,
9   where, really, my lawyers looked through to
10   answer, but I actively not do anything -- I mean,
11   I read it.  There were lawsuits, and I really am
12   not so familiar with all the lawsuits.  There
13   were many of them.
14  Q.  So you and Mr. Meister --
15  A.  So probably my lawyer answered.
16  Q.  Okay.  Just to be clear, so, yes, two
17   days ago you and Mr. Meister went and discussed
18   the other lawsuits that you are involved in?
19  A.  No.
20  Q.  So then --
21  A.  Actually, we didn't discuss any
22   lawsuits because --
23  Q.  I'm sorry, Ms. Genger, then what were
24   you trying to say to me?
25  A.  I am trying to say --

Page 32

1     GENGER
2     MR. MEISTER: Objection.  I don't
3  understand --
4     MR. GRIVER: You are not under oath.
5     BY MR. GRIVER:
6  Q.  What were you trying to say?
7     MR. MEISTER: I'm objecting to the form
8  of the question.  It's an incomprehensible
9  question.
10     MR. ZILBERFEIN: I join in the
11  objection.
12     MR. MEISTER: She is trying to answer
13  your question.  If you don't put a clear
14  question --
15     MR. GRIVER: Okay.  If she doesn't
16  understand the question, she can ask me to --
17     MR. MEISTER: She understood it.
18     MR. GRIVER: Then she should answer.
19     MR. MEISTER: She did.
20     MR. GRIVER: Excellent.
21     Can I have my question read back then.
22     (WHEREUPON, the record was read by
23     the reporter as requested.)
24     MR. MEISTER: Excuse me.  Waiving your
25  hand is not a question, Mr. Griver.

ORLY GENGER VS.
DALIA GENGER, et al

DALIA GENGER
December 13, 2012

Page 33

1    GENGER
2    BY MR. GRIVER:
3  Q.  Can you answer that question?
4      MR. MEISTER: She's answered it.
5  Please put a fresh question.
6      MR. GRIVER: Can you read Ms. Genger's
7  answer.
8      (WHEREUPON, the record was read by
9      the reporter as requested.)
10      MR. MEISTER: I continue with the
11  objection. She's answered your question. You
12  asked her a question, and she's answered it.
13      BY MR. GRIVER:
14  Q.  Ms. Genger, what were you trying to
15  say?
16      MR. MEISTER: Objection. Instruct the
17  witness not to answer you. You are harassing
18  her.
19      MR. GRIVER: And, Robert, I am going to
20  ignore you for the rest of this deposition, but
21  please do not prevent your witness from answering
22  the questions from now on.
23      BY MR. GRIVER:
24  Q.  Ms. Genger, how many lawsuits --
25      MR. MEISTER: Mr. Griver, you are

Page 34

1    GENGER
2  entitled to make -- I am going to do my job.
3      BY MR. GRIVER:
4  Q.  Ms. Genger, how many lawsuits is the
5  trust involved in?
6  A.  I don't know. I can't count. Many
7  lawsuits. I don't know.
8  Q.  As trustee of the Orly Genger trust,
9  how many lawsuits is the Orly Genger trust
10  involved in?
11  A.  I didn't count.
12  Q.  Okay. Well, I would like you to count
13  now.
14      MR. DELLAPORTAS: Why don't you help
15  her by telling her how many times you have sued,
16  Yoav.
17      BY THE WITNESS:
18  A.  Yeah, because there are so many
19  lawsuits I can't keep track of it. I just know
20  that my resources are being reduced every month.
21      MR. DELLAPORTAS: Start by telling her
22  how many times you have sued it, Yoav. We are
23  here billing, wasting our time.
24      BY THE WITNESS:
25  A.  No, I really don't, because it is hard

Page 35

1    GENGER
2  to follow how many times my daughter sued me. I
3  mean, really.
4      BY MR. GRIVER:
5  Q.  How many times -- how many lawsuits has
6  the Dalia Genger -- excuse me.
7      How many lawsuits have you initiated as
8  trustee on behalf of the Orly Genger trust?
9  A.  The only lawsuit is against the Trumps,
10  the Trump Group. That's what I remember.
11  Q.  And how many other -- and as trustee of
12  the Orly Genger trust, you, as we sit here today,
13  don't know how many lawsuits that the trust is
14  involved in?
15  A.  No, I don't keep track of it.
16  Q.  When the bills come in from
17  Mr. Meister's law firm, do you review those
18  bills?
19  A.  I review the bottom line, yeah.
20  Q.  But you don't look to see --
21  A.  No, I do. I do.
22  Q.  Do you check to -- do you check to make
23  sure that he's charging you for cases that the
24  Orly trust is involved in?
25  A.  Yes. I mean --

Page 36

1    GENGER
2  Q.  Do you have -- do you keep a list?
3  A.  No, I don't keep a list.
4  Q.  Okay.
5      MR. MEISTER: May I ask what this has
6  to do with this lawsuit, Mr. Griver?
7      BY MR. GRIVER:
8  Q.  How do you keep track --
9      MR. MEISTER: Excuse me. I am asking a
10  question. What does this have to with --
11      BY THE WITNESS:
12  A.  I don't keep track. I told you
13  already.
14      MR. MEISTER: Dalia, wait a moment,
15  please.
16      MR. GRIVER: You can instruct her not
17  to answer or you can object to the question --
18      MR. ZILBERFEIN: Let's not talk over
19  each other. You are making the court reporter
20  nervous. One at a time. Please.
21      BY MR. GRIVER:
22  Q.  How do you keep track of the lawsuits
23  as the trustee of the Orly --
24  A.  I told you, I don't keep track of the
25  lawsuits.

ORLY GENGER VS.
DALIA GENGER, et al

DALIA GENGER
December 13, 2012

Page 37

1       **GENGER**
2   Q.  Ms. Genger, we are going to talk now
3   about your actions and inactions --
4   A.  Okay.
5   Q.  -- as the trustee of the trust.
6       You became trustee on January 4, 2008,
7   correct?
8   A.  Right.
9       MR. GRIVER: I have marked this as
10  Dalia Exhibit 4.
11      (Dalia Exhibit 4, Leah Fang trust
12      document, marked.)
13      BY MR. GRIVER:
14  Q.  Ms. Genger, do you recognize what I
15  have marked as Dalia Exhibit 4?
16  A.  I need a minute to look at it.
17      Yes.
18      MR. MEISTER: What's the pending
19  question?
20      BY THE WITNESS:
21  A.  Yeah.
22      BY MR. GRIVER:
23  Q.  And what is Dalia Exhibit 4?
24  A.  What is it?
25  Q.  What is it?

Page 38

1       **GENGER**
2   A.  Instrument of resignation of trustee
3   and appointment of successor for trustee.
4   Q.  And is that your signature --
5   A.  No.
6   Q.  -- on the document?
7   A.  No. It Leah's signature.
8   Q.  Were you aware of this?
9   A.  That I was designated to be a trustee?
10      MR. ZILBERFEIN: Object to the form.
11      BY MR. GRIVER:
12  Q.  Yes.
13  A.  If I was aware that I was --
14  Q.  Yes.
15  A.  Obviously.
16  Q.  On January 4, 2008?
17  A.  Yes. This is when I became a trustee.
18  Q.  You didn't become a trustee on -- you
19  didn't become a trustee on January 3 or January
20  2, correct?
21      MR. ZILBERFEIN: Object to the form.
22      BY THE WITNESS:
23  A.  I don't remember exactly the dates, but
24  I know that I was a successor trustee.
25      BY MR. GRIVER:

Page 39

1       **GENGER**
2   Q.  Now, were you aware at the time that
3   you accepted the trusteeship of the Orly Genger
4   trust that beneficiary Orly Genger did not wish
5   for you to be the trustee?
6       MR. ZILBERFEIN: Objection.
7       MR. DELLAPORTAS: Lack of foundation.
8       BY THE WITNESS:
9   A.  I don't know what's going on here.
10      BY MR. GRIVER:
11  Q.  Do you not understand my question?
12  A.  No, I don't understand why -- what the
13  remarks these gentlemen --
14      MR. MEISTER: If other counsel make a
15  statement for the record, that's just for the
16  record, so you don't have to pay attention to it.
17  You just listen to Mr. Griver.
18      THE WITNESS: I didn't know that.
19      So what is the question again?
20      BY MR. GRIVER:
21  Q.  Ms. Genger, so we are clear from here
22  on out, if you don't understand a question, say
23  so, and I will repeat it or fix it.
24  A.  Yeah, I don't remember right now the
25  question. I just did not understand the fact

Page 40

1       **GENGER**
2   that these gentlemen here are objecting or not
3   objecting or whatever remarks he makes.
4   Q.  His objections are for the record.
5   A.  Okay. For the record. So I don't
6   really have to pay attention to it, right?
7   Q.  You may or you may not. But you still
8   must answer any question I --
9   A.  I didn't say I won't answer. I just
10  didn't know what --
11  Q.  Here's my next question.
12  A.  What is the question?
13  Q.  At the time you accepted appointment as
14  trustee of the Orly Genger trust, were you aware
15  that Orly Genger did not wish for you to be
16  trustee?
17      MR. ZILBERFEIN: Objection.
18      MR. DELLAPORTAS: Lack of foundation.
19      BY THE WITNESS:
20  A.  No. At the beginning I was not aware.
21      BY MR. GRIVER:
22  Q.  Okay. When did you become aware that
23  Orly didn't wish for you --
24  A.  When she start suing me to remove me
25  from being a trustee, and I don't remember what

Page 41

```
 1      GENGER
 2  date it was.
 3  Q.  Well, before you accepted the
 4  trusteeship, did you speak to Orly?
 5      MR. ZILBERFEIN: Objection.
 6      BY MR. GRIVER:
 7  Q.  Did you speak to Orly about whether or
 8  not you should accept the trusteeship?
 9  A.  No.
10  Q.  Did you speak to anyone?
11      MR. ZILBERFEIN: Objection.
12      BY THE WITNESS:
13  A.  Did I speak to anyone?
14      BY MR. GRIVER:
15  Q.  Did you speak to anyone about whether
16  or not you should accept the trusteeship of the
17  Orly Genger trust?
18  A.  Well, I --
19      MR. ZILBERFEIN: Same objection.
20      BY THE WITNESS:
21  A.  I did -- no, I don't remember.
22      BY MR. GRIVER:
23  Q.  Okay.  How did you first become aware
24  that Leah Fang wished to appoint you as trustee
25  of the Orly Genger trust?
```

Page 42

```
 1      GENGER
 2      MR. ZILBERFEIN: Objection.
 3      BY THE WITNESS:
 4  A.  Can you repeat that.
 5      MR. GRIVER: Can you repeat that,
 6  please.
 7      (WHEREUPON, the record was read by
 8      the reporter as requested.)
 9      BY THE WITNESS:
10  A.  Obviously, when she nominated me.
11      BY MR. GRIVER:
12  Q.  Okay.  And how did you become aware
13  that she had nominated you to become trustee?
14      MR. ZILBERFEIN: Objection.
15      BY THE WITNESS:
16  A.  When I got the paper, I was aware of
17  it.
18      MR. GRIVER: Let me have this marked as
19  Dalia Exhibit 5.
20      (Dalia Exhibit 5, instrument of
21      acceptance of trustee, marked.)
22      BY MR. GRIVER:
23  Q.  We have marked as Dalia 4 Leah's
24  resignation and appointment of successor, and we
25  have marked as Dalia 5 the instrument of
```

Page 43

```
 1      GENGER
 2  acceptance of trustee.
 3  A.  Right.
 4  Q.  Now, did Leah -- okay.
 5      How did you get the document marked as
 6  Dalia 5?
 7      MR. ZILBERFEIN: Objection.
 8      BY THE WITNESS:
 9  A.  I don't remember.
10      BY MR. GRIVER:
11  Q.  Is it something that you typed up?
12  A.  No.  I didn't type this up.
13  Q.  So someone provided it to you to sign?
14  A.  Obviously.
15  Q.  And --
16  A.  It is a lawyer probably.
17  Q.  Seymour Fang is the notary public.  Do
18  you know who Seymour Fang is?
19  A.  Yes.
20  Q.  Does this refresh your recollection as
21  to where you were when you signed this document?
22  A.  Where I was?
23  Q.  Yes.
24  A.  Physically?
25  Q.  Yes.  Physically.
```

Page 44

```
 1      GENGER
 2  A.  With the notary, of course.
 3  Q.  But do you know where?
 4  A.  Where?
 5  Q.  Yes.
 6  A.  The location?  I don't remember.
 7  Q.  Do you know when you signed this
 8  document?
 9      MR. ZILBERFEIN: Objection.
10      BY THE WITNESS:
11  A.  Whenever it says here, January 4.
12      BY MR. GRIVER:
13  Q.  Do you know what time of the day?
14  A.  No, I don't remember that.
15  Q.  Was it in the morning, was it at night?
16  A.  I don't remember.
17  Q.  No idea whatsoever?
18  A.  No, I guess it wasn't midnight, but it
19  was during the day.
20  Q.  But all you can remember is at some
21  time during the day --
22  A.  Yeah.
23  Q.  -- you signed this document?
24      Okay.  Before signing this document,
25  did you discuss whether or not you should be
```

Page 45

GENGER

1 trustee with anyone?
2
3 MR. ZILBERFEIN: Objection.
4 BY THE WITNESS:
5 A. If I should be a trustee? Yeah,
6 actually, it is a big responsibility.
7 BY MR. GRIVER:
8 Q. So before you signed this document when
9 you were considering whether or not to become
10 the trustee of the Orly Genger trust, who did you
11 discuss --
12 A. In general. In general.
13 MR. ZILBERFEIN: Objection.
14 BY THE WITNESS:
15 A. In general, I knew that a problem will
16 arise when Leah was going to resign as the
17 trustee of Orly Genger trust, and someone should
18 have been -- there was a need for someone to be a
19 trustee.
20 BY MR. GRIVER:
21 Q. And who did you discuss this with? Did
22 you discuss it with Leah, did you discuss it with
23 anyone?
24 MR. ZILBERFEIN: Objection.
25 MR. MEISTER: Objection. Form.

Page 46

GENGER

1
2 BY THE WITNESS:
3 A. Well, this is a family affair, okay.
4 So, obviously, there was a problem, and since it
5 is very difficult and impossible to find a
6 trustee or person that would serve as a trustee,
7 not being paid, and exposed to many lawsuits, I
8 couldn't find anyone else to do this job. So I
9 accepted this nomination in order to serve Orly
10 trust to the best of my ability.
11 BY MR. GRIVER:
12 Q. Okay. My question to you, Ms. Genger,
13 was simple. While you were considering whether
14 or not to become the trustee of the Orly Genger
15 trust, did you speak about that to anybody; yes
16 or no?
17 A. Yes, I did.
18 MR. ZILBERFEIN: Objection.
19 BY MR. GRIVER:
20 Q. Who did you speak to?
21 A. I speak to my family, including Sagi,
22 Rochelle, Leah, because it was a problem that we
23 had to resolve.
24 Q. Did you speak with Elana?
25 A. Yes.

Page 47

GENGER

1
2 Q. And by Elana, I mean Sagi's wife Elana?
3 A. That's the one, yeah.
4 Q. So you spoke with Sagi, with Rochelle
5 Fang, with Leah Fang, and with Elana Genger?
6 A. With my family, yes.
7 Q. Did you speak to anyone else in your
8 family?
9 A. I don't remember.
10 Q. Did you speak with Orly?
11 A. No, I did not speak with Orly.
12 Q. Why didn't you speak with Orly?
13 MR. ZILBERFEIN: Objection.
14 BY THE WITNESS:
15 A. I didn't speak with Orly because I was
16 sure that she would understand that her best
17 interest -- that I would serve to the best of my
18 ability her interest and take care of her needs,
19 as I did throughout my life as her mother.
20 BY MR. GRIVER:
21 Q. I see.
22 So is that the only reason you didn't
23 speak to Orly is because you were confident --
24 A. Yeah.
25 Q. Is there a reason why you thought Sagi

Page 48

GENGER

1
2 would be uncomfortable about you being trustee so
3 you had to speak with him?
4 A. No. I didn't think that Sagi would be
5 uncomfortable or comfortable.
6 Q. Then why did you speak with Sagi?
7 A. Because the problem -- it was a problem
8 that somebody had to serve as a trustee. So
9 that's why we discussed it.
10 Q. Did Sagi come to you with the idea of
11 you serving as a trustee?
12 A. What? Again?
13 Q. Did Sagi come to you with the idea of
14 you serving as trustee?
15 A. No.
16 MR. ZILBERFEIN: Objection.
17 BY THE WITNESS:
18 A. I volunteered.
19 BY MR. GRIVER:
20 Q. Who did you volunteer to?
21 A. I volunteered. There was --
22 MR. ZILBERFEIN: Objection.
23 BY THE WITNESS:
24 A. -- an opening, and I volunteered to
25 take the job.

Page 49

1    GENGER
2    BY MR. GRIVER:
3  Q.  How did you know there was an opening?
4  A.  Because --
5    MR. ZILBERFEIN: Objection.
6    BY THE WITNESS:
7  A.  -- Leah was very frustrated, and she
8  wanted to resign. I was aware of it.
9    BY MR. GRIVER:
10 Q.  Okay. And why was Leah frustrated?
11   MR. MEISTER: Objection. Calls for the
12 operation of someone else's mind.
13   MR. ZILBERFEIN: Objection.
14   BY MR. GRIVER:
15 Q.  If you know.
16   MR. ZILBERFEIN: Join. I object.
17   MR. MEISTER: She can't possibly know.
18   BY MR. GRIVER:
19 Q.  You just testified that Leah was
20 frustrated. On what basis did you believe that
21 Leah was frustrated?
22 A.  I am assuming that she was being sued
23 and harassed, and then hospitalized as a
24 consequence of the conduct of Orly, my daughter.
25 Q.  So you mentioned before that there was

Page 50

1    GENGER
2  a problem that you were trying to resolve. What
3  was the problem?
4  A.  The problem was to find a trustee for
5  Orly trust.
6  Q.  Do you know what -- so at this time
7  Orly and Leah Fang were in conflict; is that
8  correct?
9    MR. MEISTER: Objection.
10   MR. ZILBERFEIN: Objection. I join.
11   MR. MEISTER: It is a legal conclusion.
12   MR. GRIVER: Objection noted.
13   THE WITNESS: Can you repeat the
14 question.
15   BY MR. GRIVER:
16 Q.  At the time you believe that Leah was
17 frustrated because you mentioned something about
18 a hospital, you mentioned something about a
19 conflict of some problem, why did Leah -- did you
20 have an understanding as to why Leah wished to
21 resign as trustee?
22   MR. ZILBERFEIN: At what point in time?
23   BY THE WITNESS:
24 A.  Why Leah -- you have to ask her. I
25 don't know.

Page 51

1    GENGER
2    MR. ZILBERFEIN: I object to the
3  question.
4    BY THE WITNESS:
5  A.  I don't know.
6    MR. GRIVER: Can I have the answer
7  back, please.
8    (WHEREUPON, the record was read by
9    the reporter as requested.)
10   BY MR. GRIVER:
11 Q.  At the time --
12   MR. GRIVER: Read my question back,
13 please.
14   (WHEREUPON, the record was read by
15   the reporter as requested.)
16   BY MR. GRIVER:
17 Q.  Did you have an understanding as to why
18 Leah wished to resign as trustee?
19   MR. MEISTER: She just answered that.
20 She said she doesn't know.
21   MR. ZILBERFEIN: Note my objection.
22   MR. MEISTER: Move on to your next
23 question, please.
24   BY MR. GRIVER:
25 Q.  Is that your answer, your full answer,

Page 52

1    GENGER
2  that you don't know?
3  A.  I do not know exactly, but I can assume
4  that a person who takes this kind of --
5  volunteers to take this job and ends up in the
6  hospital is not a happy person.
7  Q.  Okay.
8    MR. ZILBERFEIN: Note my objection to
9  any assumption.
10   BY MR. GRIVER:
11 Q.  You said Leah ended up --
12 A.  I assume. I assume.
13 Q.  That was your assumption at the time --
14 A.  Yeah.
15 Q.  -- that you took the --
16 A.  She was not happy.
17   MR. MEISTER: I am going to put this on
18 the record -- excuse me, Mr. Griver.
19   Dalia, you have to wait, please, until
20 Mr. Griver finishes his question because if you
21 start to talk at the same time --
22   THE WITNESS: Okay.
23   MR. MEISTER: -- the court reporter
24 can't get it.
25   BY MR. GRIVER:

ORLY GENGER VS.
DALIA GENGER, et al

DALIA GENGER
December 13, 2012

Page 53

GENGER

2 Q. You said that Leah ended up in the
3 hospital?
4 A. Yes. As far as I know. Yes.
5 Q. Did you have an understanding as to why
6 Leah ended up in the hospital?
7    MR. ZILBERFEIN: Objection.
8    BY THE WITNESS:
9 A. Again, I assumed she had a nervous
10 breakdown.
11    BY MR. GRIVER:
12 Q. Because of her --
13 A. Harassment.
14 Q. Okay. Because of harassment.
15    Harassment by whom?
16 A. I don't know. I'm not a doctor. I
17 really don't know why they hospitalized her.
18 Q. Okay. But you understood that Leah was
19 being harassed?
20 A. Yes.
21    MR. ZILBERFEIN: Objection.
22    BY MR. GRIVER:
23 Q. Harassed by whom?
24 A. By Orly's lawyers.
25 Q. In connection with Leah's functioning

Page 54

GENGER

2 as trustee of the trust?
3 A. I would assume so.
4    MR. ZILBERFEIN: Objection.
5    BY MR. GRIVER:
6 Q. And did you understand why Leah was
7 being harassed?
8 A. No.
9    MR. ZILBERFEIN: Objection. Asked and
10 answered.
11    BY MR. GRIVER:
12 Q. Did you understand why Orly's attorneys
13 were in conflict with Ms. Fang?
14    MR. ZILBERFEIN: Objection.
15    BY THE WITNESS:
16 A. No.
17    BY MR. GRIVER:
18 Q. Did you understand that Orly might not
19 be pleased with the work Leah was doing as
20 trustee?
21    MR. ZILBERFEIN: Objection.
22    BY THE WITNESS:
23 A. I don't know exactly what Leah at the
24 time did, that Orly did not -- was not happy
25 with.

Page 55

GENGER

2    MR. GRIVER: Could you read back that
3 answer, please.
4    (WHEREUPON, the record was read by
5    the reporter as requested.)
6    MR. GRIVER: Mark that answer so I can
7 come back to it.
8    BY MR. GRIVER:
9 Q. How did you know that Leah was being
10 harassed?
11    MR. ZILBERFEIN: Objection.
12    BY THE WITNESS:
13 A. How did I know?
14    BY MR. GRIVER:
15 Q. Uh-huh.
16 A. Well, she's part of my family, so I
17 guess it was known.
18 Q. So she told you?
19 A. Leah did not tell me that.
20 Q. So Sagi told you?
21 A. Actually, her mother told me.
22 Q. Rochelle Fang?
23 A. Right.
24 Q. Did you ever pick up the phone to Orly
25 and say, "Orly, what's going on?"

Page 56

GENGER

2 A. No.
3 Q. Did you ever try to get Orly's side of
4 the story?
5    MR. ZILBERFEIN: Objection.
6    BY THE WITNESS:
7 A. No, I was not involved then in Orly's
8 affair.
9    BY MR. GRIVER:
10 Q. Well, at that time you had no -- you
11 had no connection to Orly; is that right?
12    MR. ZILBERFEIN: Objection.
13    BY THE WITNESS:
14 A. Right. She tried to avoid me.
15    BY THE WITNESS:
16 Q. Well, in this case, you chose not to
17 pick up the phone to ask her what was going on;
18 isn't that right?
19    MR. ZILBERFEIN: Objection.
20    BY THE WITNESS:
21 A. After she never answered my calls and
22 my texts --
23    BY MR. GRIVER:
24 Q. Did you ever --
25 A. -- messages.

Page 57

GENGER

2 Q. Did you ever call Orly up to find out
3 what her disagreement was with Leah Fang?
4    MR. MEISTER: Objection. Asked and
5 answered.
6    MR. ZILBERFEIN: Objection.
7    BY THE WITNESS:
8 A. No.
9    BY THE WITNESS:
10 Q. Did you ever go to Orly's house to talk
11 to her directly and ask her?
12 A. No.
13    MR. ZILBERFEIN: Objection.
14    BY MR. GRIVER:
15 Q. Did you ever send her an e-mail?
16    MR. ZILBERFEIN: Objection.
17    BY THE WITNESS:
18 A. I don't remember.
19    BY MR. GRIVER:
20 Q. Did you ever write her a letter saying:
21 "What's going on, Orly? Why are you in conflict
22 with Leah Fang?"
23    MR. DELLAPORTAS: Object to form.
24    MR. ZILBERFEIN: Objection.
25    BY THE WITNESS:

Page 58

GENGER

2 A. No, it wasn't my business, really.
3    MR. DELLAPORTAS: Object to form. And
4 I just note for the record that Ms. Orly Genger
5 is not in attendance today. You may proceed.
6    BY MR. GRIVER:
7 Q. In sum or in substance, did you do
8 anything to try and understand what the conflict
9 was between Orly and Leah Fang?
10    MR. ZILBERFEIN: Objection.
11    BY THE WITNESS:
12 A. No.
13    MR. ZILBERFEIN: Can you read back the
14 question and answer.
15    (WHEREUPON, the record was read by
16    the reporter as requested.)
17    BY MR. GRIVER:
18 Q. Did Sagi discuss your appointment with
19 you prior to your acceptance of the appointment?
20 A. Sagi discussed with me prior to my
21 appointment?
22 Q. Uh-huh.
23 A. Me taking the trusteeship, you mean?
24 Q. Taking it or not taking it, did you
25 discuss whether -- did you discuss the potential

Page 59

GENGER

2 of you being appointed trustee with Sagi before
3 you accepted the appointment?
4    MR. ZILBERFEIN: Objection.
5    BY THE WITNESS:
6 A. As far as I remember, I did discuss
7 with Sagi the fact that I am willing to
8 volunteer.
9    BY MR. GRIVER:
10 Q. And do you recall anything else about
11 that conversation?
12    MR. ZILBERFEIN: Objection.
13    BY THE WITNESS:
14 A. No.
15    BY MR. GRIVER:
16 Q. Was there more than one conversation?
17 A. I don't think so.
18 Q. Did you talk to any lawyer before you
19 decided to accept the appointment as trustee?
20    MR. ZILBERFEIN: Objection.
21    BY THE WITNESS:
22 A. I don't remember that.
23    BY MR. GRIVER:
24 Q. Do you remember what it is -- strike
25 that.

Page 60

GENGER

2 Previously you testified that you
3 discussed whether or not you would become trustee
4 of the Orly trust with your family; do you recall
5 that testimony?
6    MR. ZILBERFEIN: Objection.
7    BY THE WITNESS:
8 A. Yes, I said that I did discuss it
9 because the problem was that somebody has to
10 become a trustee.
11    BY MR. GRIVER:
12 Q. Did you search for anybody else besides
13 yourself who might be willing to become a
14 trustee?
15    MR. MEISTER: Can I have the question
16 read back, please.
17    BY THE WITNESS:
18 A. Yeah. I was --
19    MR. MEISTER: Wait, wait. I would like
20 to have the question read back.
21    (WHEREUPON, the record was read by
22    the reporter as requested.)
23    MR. ZILBERFEIN: Objection.
24    MR. MEISTER: Object to the form.
25    THE WITNESS: So after all this

Page 61

1    GENGER
2  objection, what is the question?
3      MR. GRIVER: Repeat the question,
4  please.
5      BY THE WITNESS:
6  A.  Well, I was thinking about maybe some
7  kind of firm, an independent firm that might take
8  care of -- might take care of Orly Genger trust,
9  but eventually all the options led to the fact
10  that somebody like me that cares about Orly and
11  is willing to make a lot of sacrifices, I was
12  basically the only person left.
13      MR. GRIVER: Can you repeat my
14  question.
15      Because I am not sure that you answered
16  the question I asked.
17      THE WITNESS: Okay.
18      (WHEREUPON, the record was read by
19      the reporter as requested.)
20      BY THE WITNESS:
21  A.  I was thinking about some options.
22      BY MR. GRIVER:
23  Q.  Okay.  Did you do -- and you identified
24  that option as maybe a firm --
25  A.  An independent firm.  But then they

Page 62

1    GENGER
2  would want to be paid, and then, obviously, as a
3  trust, there are regular roles.
4  Q.  Do you do any investigation, did you --
5  I understand that you thought of it.
6      Did you do any action in order to see
7  if someone else --
8  A.  There was no point in doing any action.
9  Q.  Why was there no point?
10  A.  Because I don't think that anyone would
11  take such a job to be a trustee, to risk
12  resources and being sued constantly, and would
13  have Orly's interest in mind, as I did.
14  Q.  Okay.  I'm sorry.
15      Had Orly Genger sued anyone before
16  January 1 of 2008?
17      MR. ZILBERFEIN: Objection.
18      BY MR. GRIVER:
19  Q.  If you know.
20  A.  I don't know.  Really, I didn't --
21  Q.  You said -- I understand what you said.
22      But let's just -- so we are clear on the record,
23  you did not pick up the phone and talk to anyone
24  to see if they might be interested in serving as
25  the Orly Genger trustee?

Page 63

1    GENGER
2      MR. ZILBERFEIN: Objection.
3      MR. MEISTER: Except as previously
4  testified, Mr. Griver?
5      BY MR. GRIVER:
6  Q.  Did you pick up the phone and call
7  anybody to see if they would be willing to serve
8  as trustee?
9  A.  No, I didn't know anyone that would
10  potentially be able to do that because of the
11  history of this.
12  Q.  Did you task anyone --
13  A.  No, I didn't.
14  Q.  Did you task anyone with trying to find
15  somebody else besides yourself?
16      MR. ZILBERFEIN: Objection.
17      BY THE WITNESS:
18  A.  Didn't you ask me this question before,
19  if I tried to find anyone?
20      BY MR. GRIVER:
21  Q.  Did you ask someone else to try and
22  find anyone?
23  A.  No.  Because there's no point in doing
24  that.
25  Q.  Did you -- did Sagi look for anyone

Page 64

1    GENGER
2  besides yourself, do you know?
3  A.  I don't know what Sagi did or didn't
4  do.
5  Q.  Okay.  As far as you know, he didn't
6  look for anybody?
7      MR. ZILBERFEIN: Objection.
8      BY THE WITNESS:
9  A.  I do not know what Sagi did or didn't
10  do.
11      BY MR. GRIVER:
12  Q.  What about Rochelle Fang?
13  A.  I don't know what she did.
14      MR. ZILBERFEIN: Objection.
15      BY MR. GRIVER:
16  Q.  Did you ask Rochelle Fang if she did
17  anything?
18  A.  No, I didn't ask.
19  Q.  Did you ask Leah Fang if she looked for
20  anybody besides you?
21      MR. ZILBERFEIN: Objection.
22      BY MR. GRIVER:
23  A.  No.  I don't remember.
24      BY MR. GRIVER:
25  Q.  Do you know who a Patricia Enriquez is?

Page 65

1      GENGER
2  A.  Who?
3  Q.  Patricia Enriquez?
4  A.  I don't remember this name.
5  Q.  Were you aware that before you became
6    trustee Leah Fang had attempted to appoint a
7    Patricia Enriquez?
8  A.  I was not aware. I don't know who it
9    is.
10  Q.  Were you --
11      MR. ZILBERFEIN: Objection.
12      BY MR. GRIVER:
13  Q.  Were you aware of the fact that
14    Patricia Enriquez attempted to accept the
15    position of Orly Genger trustee?
16      MR. ZILBERFEIN: Objection.
17      BY THE WITNESS:
18  A.  No, I was not aware of it.
19      BY MR. GRIVER:
20  Q.  Tell me everything you remember about
21    your conversations with Rochelle Fang in
22    connection with whether or not you would or would
23    not become trustee of the Orly trust.
24      MR. ZILBERFEIN: Objection.
25      BY THE WITNESS:

Page 66

1      GENGER
2  A.  I don't remember exactly what we talked
3    about, but we did discuss the fact that there is
4    a need to fulfill -- to fill up the position of
5    being a trustee in Orly trust.
6      BY MR. GRIVER:
7  Q.  And tell me all you can remember about
8    your conversations with Leah Fang regarding
9    whether or not you would become trustee of the
10    Orly trust.
11      MR. ZILBERFEIN: Objection.
12      MR. MEISTER: Was that Leah Fang?
13      MR. GRIVER: Yes. Leah Fang.
14      THE WITNESS: Again, can you repeat the
15    question.
16      MR. GRIVER: Sure.
17      BY MR. GRIVER:
18  Q.  Tell me everything that you can recall
19    about your conversations with Leah Fang about
20    whether or not you would serve as trustee of the
21    Orly trust.
22      MR. ZILBERFEIN: Objection.
23      BY THE WITNESS:
24  A.  I don't remember what exactly we
25    discussed.

Page 67

1      GENGER
2      BY MR. GRIVER:
3  Q.  Can you please tell me everything you
4    recall about your conversations with Elana
5    Genger?
6  A.  It is all the same kind of
7    conversation, there is a problem and somebody has
8    to be found.
9  Q.  Did you have any conversations with,
10    let's say, Leah's attorneys?
11  A.  No, I never talked to Leah's attorneys.
12    I don't know who they are.
13  Q.  Did you review any documents before you
14    became trustee in order to determine whether or
15    not you would become trustee?
16      MR. ZILBERFEIN: Objection.
17      BY MR. GRIVER:
18  A.  I don't remember.
19      BY MR. GRIVER:
20  Q.  You don't recall looking -- asking for
21    any balance sheets or asking for any
22    communications between Leah and Orly, anything
23    like that? You don't remember anything like
24    that?
25      MR. ZILBERFEIN: Objection.

Page 68

1      GENGER
2      BY THE WITNESS:
3  A.  No, I don't remember.
4      MR. GRIVER: Let me have this marked as
5    Dalia Exhibit 6.
6      (Dalia Exhibit 6, release,
7      marked.)
8      MR. GRIVER: Let me have this marked as
9    Dalia Exhibit 7.
10      (Dalia Exhibit 7, document,
11      marked.)
12      BY MR. GRIVER:
13  Q.  Let's take a look at Dalia 7.
14  A.  Dalia 7?
15  Q.  Yes.
16  A.  Let me look at it first.
17  Q.  Okay.
18  A.  It is very unclear, this copy. I don't
19    think I have ever seen this document before.
20  Q.  And on about December and January of
21    December of 2007 and January 2008 --
22      MR. MEISTER: I am going to object
23    because you blurred it and I couldn't understand.
24      THE WITNESS: Yeah.
25      MR. GRIVER: I will start over.

Page 69

1      GENGER
2   MR. MEISTER: Thank you.
3   BY MR. GRIVER:
4 Q.  So at the time that you accepted
5   appointment as trustee of the Orly Genger trust,
6   you were not aware that a Ms. Patricia Enriquez
7   had accepted to act as successor trustee --
8   MR. ZILBERFEIN: Objection.
9   BY MR. GRIVER:
10 Q.  -- just a few weeks before?
11   MR. ZILBERFEIN: Objection.
12   BY THE WITNESS:
13 A.  I was not aware of it.
14   BY MR. GRIVER:
15 Q.  Okay.  I take it that Patricia Enriquez
16   is not a member of the Genger family?
17 A.  I don't think so.
18 Q.  You think she is or you think she
19   isn't?
20 A.  She isn't.
21 Q.  Okay.  Let's look at Dalia 6, please.
22   Do you recognize this document?
23 A.  Yes.
24 Q.  What is this document?
25 A.  It is giving a release to Leah.

Page 70

1      GENGER
2 Q.  Is this one of the documents that
3   Mr. Meister showed you on Tuesday or Wednesday of
4   this week?
5 A.  No.
6 Q.  When was the last time you saw this
7   document?
8 A.  When?  At the date that it was written.
9 Q.  Okay.  Who wrote this document?
10   MR. ZILBERFEIN: Objection.
11   BY THE WITNESS:
12 A.  I would assume my lawyer.  I didn't
13   write this.
14   BY MR. GRIVER:
15 Q.  Well, I thought you testified that you
16   had not run your acceptance as trustee by any
17   lawyer?
18   MR. ZILBERFEIN: Objection.  It doesn't
19   make it --
20   BY MR. GRIVER:
21 Q.  Am I correct?
22   MR. ZILBERFEIN: It is not related to
23   the document.
24   MR. GRIVER: Can I have the question
25   read back, please.

Page 71

1      GENGER
2   (WHEREUPON, the record was read by
3   the reporter as requested.)
4   THE WITNESS: So, again, what is the
5   question?
6   BY MR. GRIVER:
7 Q.  You had previously testified that you
8   had not discussed with any attorneys whether or
9   not you would become trustee of the Orly trust;
10   do you recall that testimony?
11 A.  Yes.
12 Q.  So you have just said now that -- I
13   understand your attorney drafted this on December
14   29, 2007.
15   MR. ZILBERFEIN: Objection.
16   MR. MEISTER: She said her attorney.
17   BY MR. GRIVER:
18 Q.  Do you know which attorney drafted
19   this?
20 A.  I don't remember which one.
21 Q.  Was this -- when you are talking about
22   an attorney, are you talking about an attorney
23   for you?
24   MR. ZILBERFEIN: Note my objection.
25   She's already stated she doesn't know which

Page 72

1      GENGER
2   attorney drafted this.
3   BY THE WITNESS:
4 A.  I don't remember which one, really.
5   BY MR. GRIVER:
6 Q.  How do you know an attorney drafted
7   this?
8 A.  Because I wouldn't be able to write
9   something like that.
10 Q.  Okay.  Could this be something that
11   Leah wrote?
12   MR. ZILBERFEIN: Objection.
13   BY THE WITNESS:
14 A.  No, for sure not Leah.
15   BY MR. GRIVER:
16 Q.  Leah is an attorney, isn't --
17 A.  It is to Leah Fang.
18 Q.  What?
19 A.  It is addressed to Leah Fang.
20 Q.  Okay.
21 A.  So she didn't write it.
22   MR. ZILBERFEIN: Objection.
23   BY MR. GRIVER:
24 Q.  Is Leah Fang an attorney?
25 A.  As far as I know, she is.

Page 73

1      **GENGER**
2  Q.  Could she have -- well --
3  **A.  She didn't write it. That's for sure.**
4  Q.  How do you know?
5      **MR. ZILBERFEIN:** Objection.
6      **BY THE WITNESS:**
7  **A.  Because I said, a lawyer wrote it, but**
8  **it is not Leah Fang.**
9      **BY MR. GRIVER:**
10 Q.  And on what basis do you say that a
11 lawyer wrote it but not Leah Fang?
12     **MR. ZILBERFEIN:** Objection.
13     **BY THE WITNESS:**
14 **A.  Because it is addressed to her, and I**
15 **don't believe that Leah would do such a thing.**
16     **BY MR. GRIVER:**
17 Q.  It has on the top of it, it says Dalia
18 Genger; do you see that?
19 **A.  Yes.**
20 Q.  Is that an indication it came from your
21 computer?
22 **A.  I don't know if it is my computer or my**
23 **lawyer's computer.**
24 Q.  Okay. When you say your lawyer's
25 computer, which lawyer --

Page 74

1      **GENGER**
2  **A.  That I told you. I don't remember --**
3  Q.  You don't remember his name?
4  **A.  -- which lawyer was at that time my**
5  **lawyer.**
6  Q.  Now, is that your signature on the
7  bottom?
8  **A.  Yes.**
9  Q.  And do you understand what this
10 document does or purports to do?
11     **MR. ZILBERFEIN:** Objection.
12     **BY MR. GRIVER:**
13 Q.  To your understanding, what does this
14 document do?
15     **MR. ZILBERFEIN:** Same objection.
16     **BY THE WITNESS:**
17 **A.  Identifies a release, Leah.**
18     **BY MR. GRIVER:**
19 Q.  Okay. And it releases Leah to, it
20 says, the maximum extent permissible under law;
21 do you see that?
22 **A.  What?**
23 Q.  This document says that it releases
24 Leah and holds her harmless, quote, to the
25 maximum extent permissible under the law and the

Page 75

1      **GENGER**
2  trust agreement; do you see that?
3  **A.  I don't see it, but I believe it is**
4  **there.**
5  Q.  Look on the third line.
6      **MR. MEISTER:** Can I point it out?
7      **BY THE WITNESS:**
8  **A.  It doesn't matter. I believe you.**
9      **BY MR. GRIVER:**
10 Q.  So you were -- on December 29, 2007,
11 you were okay with releasing Leah to the maximum
12 extent permissible under the law in the trust
13 agreements, correct?
14     **MR. ZILBERFEIN:** Objection.
15     **BY THE WITNESS:**
16 **A.  Yeah.**
17     **BY MR. GRIVER:**
18 Q.  At the time that you attempted to
19 release Leah to the maximum extent permissible
20 under the law and trust agreements, did you
21 have any idea what Leah had or had not done as
22 trustee during her time as the trustee of the
23 Orly Genger trust?
24 **A.  I just don't remember exactly what she**
25 **had or has not done.**

Page 76

1      **GENGER**
2  Q.  Okay. You did no investigation before
3  you signed this document as to what Leah had or
4  had not done; isn't that correct?
5      **MR. ZILBERFEIN:** Objection.
6      **BY THE WITNESS:**
7  **A.  I did — I really don't remember**
8  **exactly, but I know that at the time I didn't**
9  **think that Leah has done anything harmful to**
10 **Orly.**
11     **BY MR. GRIVER:**
12 Q.  Okay.
13     **MR. MEISTER:** Is this a good time to
14 take a break?
15     **MR. GRIVER:** No. Let me finish this.
16 I understand. Let me finish this set of
17 questions.
18     **BY MR. GRIVER:**
19 Q.  You said, "At the time I did not think
20 Leah had done anything harmful to Orly"?
21 **A.  Yeah.**
22 Q.  But you did no investigation to find
23 that out, did you?
24     **MR. ZILBERFEIN:** Objection.
25     **BY THE WITNESS:**

Page 77

1    GENGER
2 A.  I don't know how you are defining
3  "investigation."
4    BY MR. GRIVER:
5 Q.  You didn't talk to Orly, did you?
6 A.  No.
7    MR. ZILBERFEIN: Objection.
8    BY MR. GRIVER:
9 Q.  Did you talk to Orly's lawyers?
10 A.  No. I already said that.
11 Q.  Did you have your lawyer talk to Orly's
12  lawyers to do an investigation?
13    MR. ZILBERFEIN: Objection.
14    BY THE WITNESS:
15 A.  I don't remember.
16    BY MR. GRIVER:
17 Q.  Do you remember doing anything in sum
18  or in substance to determine what Leah had or had
19  not done before you sent her this exoneration on
20  December 29, 2007?
21 A.  I know that at that time, at the time,
22  I was aware of some of the conflict that -- I
23  mean, some of the conflicts that have happened,
24  and I didn't find anything wrong with whatever
25  Leah did.

Page 78

1    GENGER
2 Q.  And what did Leah do?
3 A.  I don't remember exactly what it was.
4 Q.  Okay. And so in finding out what Leah
5  did or did not do, the most you did was talk to
6  Leah?
7 A.  Yeah.
8    MR. ZILBERFEIN: Objection.
9    BY MR. GRIVER:
10 Q.  And based on what Leah said, you
11  exonerated her, held her harmless and indemnified
12  her for whatever she may or may not have done?
13    MR. ZILBERFEIN: Objection.
14    BY MR. GRIVER:
15 Q.  Isn't that correct?
16    MR. MEISTER: To the maximum extent
17  permitted by law and the trust agreement.
18    MR. ZILBERFEIN: Objection.
19    BY MR. GRIVER:
20 Q.  You can answer.
21 A.  I indemnified her, yes.
22 Q.  Let me ask you this: How is that in
23  the trust's best interest to exonerate someone
24  and indemnify them? You understand what
25  "indemnify" means?

Page 79

1    GENGER
2 A.  Tell me what it means.
3 Q.  "Indemnify" means that if someone sues
4  her, you pay her bills. That's what "indemnify"
5  means. Did you understand that at the time you
6  indemnified her on December 29, 2007?
7    MR. ZILBERFEIN: Objection.
8    BY THE WITNESS:
9 A.  I don't understand what --
10    MR. ZILBERFEIN: Objection to the
11  definition of the attorney's --
12    BY THE WITNESS:
13 A.  I was not aware of this legal term.
14    BY MR. GRIVER:
15 Q.  Then let's be clear.
16    At the time you signed this document
17  did you have an understanding of what
18  "indemnification" meant?
19 A.  No.
20 Q.  None whatsoever?
21    MR. ZILBERFEIN: Objection.
22    BY THE WITNESS:
23 A.  No. I thought that this was a standard
24  way of writing this kind of release.
25    BY MR. GRIVER:

Page 80

1    GENGER
2 Q.  Who told you that it was a standard way
3  of writing this release?
4    MR. ZILBERFEIN: Objection.
5    BY THE WITNESS:
6 A.  I said I thought. I didn't say
7  somebody told me.
8    BY MR. GRIVER:
9 Q.  Okay. What was the basis of your
10  thinking that?
11    MR. ZILBERFEIN: Objection.
12    BY THE WITNESS:
13 A.  Because we have many cases, that there
14  is a standard way of expressing objection or
15  other things, legal things, that it is a kind of
16  standard way of writing things.
17    BY MR. GRIVER:
18 Q.  Understood.
19    But what, to your understanding, at the
20  time that you signed this memo of December 29,
21  2007, that's marked as Dalia 6, what was your
22  understanding of what an indemnification was?
23 A.  That she's not -- that she cannot be
24  sued, I guess. She's released from any
25  wrongdoing.

Page 81

GENGER

1
2 Q. Okay. Let's look at it. It says the
3 indemnification includes any actions by the
4 beneficiaries and the agents, including any
5 expenses or injury incurred on your part, in
6 connection with service. Do you see that part?
7 It is right here.
8 A. I am sure it is there. Yes. I see.
9 So what's the question?
10 Q. Okay. So what does "indemnification"
11 mean?
12 MR. MEISTER: Objection.
13 MR. ZILBERFEIN: Objection.
14 BY MR. GRIVER:
15 Q. To your understanding --
16 MR. MEISTER: She's answered it. Move
17 on to your next point. And better than that,
18 let's take a break.
19 MR. ZILBERFEIN: I join in the break.
20 MR. DELLAPORTAS: If we are taking a
21 break, I need to put a statement on the record
22 because we have now gone for 90 minutes, and we
23 have yet to ask any questions relevant to the D&K
24 action.
25 MR. GRIVER: Excuse me.

Page 82

GENGER

1
2 MR. DELLAPORTAS: I am putting a
3 statement on the record.
4 MR. GRIVER: You are not putting a
5 statement on the record.
6 MR. DELLAPORTAS: I am putting a
7 statement on the record. This has been noticed
8 for a deposition in the D&K action. We have not
9 had a single question relevant to the D&K action.
10 MR. GRIVER: Call the judge.
11 MR. DELLAPORTAS: Do not interrupt me.
12 MR. GRIVER: You are interrupting my
13 questioning of this witness.
14 Can I have the question read back to
15 me.
16 MR. DELLAPORTAS: There is no question
17 pending.
18 THE WITNESS: You know what? I am
19 going to leave if this is how this --
20 MR. MEISTER: Dalia --
21 MR. GRIVER: Read my question back,
22 please.
23 BY MR. GRIVER:
24 Q. My question is, on May -- on
25 December --

Page 83

GENGER

1
2 MR. MEISTER: He started putting a
3 statement on the record.
4 MR. DELLAPORTAS: No one is asking a
5 question until I finish putting my statement on
6 the record.
7 BY MR. GRIVER:
8 Q. On December 29 --
9 MR. DELLAPORTAS: Please give me the
10 courtesy of speaking --
11 BY MR. GRIVER:
12 Q. On December 29 --
13 MR. DELLAPORTAS: Counsel, I will keep
14 speaking until she puts on the record what I
15 said.
16 MR. GRIVER: Put everything he says on
17 the record because I want to go -- that's fine.
18 THE COURT REPORTER: Okay. But only
19 one person can speak at a time.
20 MR. GRIVER: Can I see if a question is
21 open on the record.
22 MR. DELLAPORTAS: No one is doing
23 anything until I speak.
24 THE COURT REPORTER: There was a
25 question, and then there was an objection.

Page 84

GENGER

1
2 MR. MEISTER: There was an objection
3 because the question was answered. Do you want
4 to go back? Do you want to waste time?
5 MR. GRIVER: She did not answer the
6 question.
7 THE WITNESS: You did ask me that.
8 MR. GRIVER: Did you answer the
9 question?
10 THE WITNESS: Yes, I did.
11 MR. MEISTER: Yes, she did.
12 Now let's take our break.
13 MR. DELLAPORTAS: Anyone can break, and
14 I am putting this on the record.
15 We have been going for -- put this on
16 the record, because in fairness to opposing
17 counsel, I think I need to put this on the record
18 so they are on notice.
19 We have gone for 90 minutes. None of
20 the questions have related to the D&K action.
21 The discovery seems to be geared to, what I can
22 gather, to issues relevant to the surrogate court
23 action. That's fine, but we are not here for
24 that action.
25 I am not counsel to that action. This

Page 85

GENGER

1   GENGER
2   deposition hasn't been crossed noticed in that
3   action, and yet my client is incurring legal
4   fees. We intend to apply once this case is over
5   for reimbursement of those legal fees based on
6   the misrepresentation from Orly's counsel that
7   the questioning of this deposition was going to
8   be related to the D&K action.
9   If Orly's counsel wishes to question
10  Ms. Genger about matters as to why she was hired,
11  why she didn't resign, and so and so forth, that
12  should have been noticed in the surrogate court
13  action.
14  We are here based on a
15  misrepresentation, the fees are increasing, and I
16  would strongly recommend to Ms. Orly Genger's
17  counsel that he may move on to some topics
18  relevant to the discussion because, as I said,
19  the bill is increasing.
20      MR. ZILBERFEIN: I join.
21      MR. MEISTER: Now I would like to take
22  a break.
23      MR. ZILBERFEIN: Before you start, I
24  want to join in counsel's statement, and I agree
25  100 percent with what he says. And I don't think

Page 86

1   GENGER
2   that it is proper for you to be asking this line
3   of questioning, especially since this has not
4   been noticed properly.
5       MR. GRIVER: I would direct both
6   counsel to read count 4 of the operative
7   complaint, it is right there, as Exhibit 2, to
8   Dalia's deposition.
9       BY MR. GRIVER:
10  Q.  Ms. Genger --
11      MR. MEISTER: No, no. We are taking a
12  break.
13      MR. GRIVER: Stop.
14      MR. MEISTER: You are not asking any
15  more questions.
16      MR. GRIVER: I have -- you are
17  asking --
18      MR. MEISTER: Do you want me to urinate
19  on your carpet here, Counsel? We have been going
20  for an hour and a half. We are taking a break.
21      MR. GRIVER: You have two counsel.
22      BY MR. GRIVER:
23  Q.  How is this --
24      MR. MEISTER: No. She's stepping out.
25      MR. GRIVER: All right. You called for

Page 87

1   GENGER
2   a break.
3       MR. DELLAPORTAS: Just for the record,
4   I see nothing in count 4 which has any relevance
5   to any of the questions.
6       MR. GRIVER: I would note that
7   Mr. Meister and the other counsel are not to
8   discuss the substance of this deposition during
9   the break.
10      MR. MEISTER: I would note that I need
11  to know where the men's room is.
12      MR. ZILBERFEIN: Is there a gag order?
13      (WHEREUPON, a recess was had from
14      12:07 p.m. to 12:19 p.m.)
15      (WHEREUPON, Attorney Lance Harris
16      entered the deposition
17      proceedings.)
18      BY MR. GRIVER:
19  Q.  Ms. Genger, we are back on record. You
20  are still under oath. Do you understand that?
21  A.  Yes.
22  Q.  Ms. Genger, how is it in the Orly
23  trust's best interest for you as trustee to
24  exonerate someone without knowing exactly what
25  they did or did not do?

Page 88

1   GENGER
2   A.  I believed that Leah did her best to
3   protect Orly.
4   Q.  For example, at the time that you
5   signed this, on December 29, 2007, what is it
6   that you believed that Leah did as trustee of the
7   trust?
8   A.  I don't remember what was at that time.
9   Q.  Now, if you look at Dalia Exhibit 6, it
10  is dated December 29, 2007, correct?
11  A.  Yes.
12  Q.  Were you trustee of the Orly Genger
13  trust on December 29, 2007?
14  A.  Not yet, officially.
15  Q.  Okay.
16  A.  Wasn't it January?
17  Q.  2008?
18  A.  Right.
19  Q.  So you weren't even trustee?
20  A.  Right.
21  Q.  So the first thing you did even before
22  you became trustee was immediately to release
23  Leah to the maximum extent permissible under the
24  law and the trust agreement?
25      MR. MEISTER: Objection.

Page 89

GENGER
BY THE WITNESS:
3 A.  Well, if I signed it --
BY MR. GRIVER:
5 Q.  If you signed it?
6 A.  I spoke with whatever lawyer I had at
7   the time, and --
8      MR. MEISTER: Objection if you are
9   going to discuss what you discussed with your
10  lawyer.  Say you spoke with a lawyer.
11     BY THE WITNESS:
12 A.  I spoke with my lawyer.
13     MR. MEISTER: Don't reveal what you
14  said to him or her.
15     BY MR. GRIVER:
16 Q.  Did you speak to him in connection with
17  you becoming trustee of the Orly trust?
18 A.  Yeah.
19 Q.  Did you sign this document as trustee
20  of the 1993 Orly Genger trust?
21 A.  Did you -- can you repeat.
22 Q.  Yes.
23     You signed this document as trustee of
24  the 1993 Orly Genger trust, correct?
25 A.  Yes.  And I did so because I had

Page 90

GENGER
discussion with my lawyer.
3 Q.  Okay.  And --
4      MR. ZILBERFEIN: Note my objection to
5   this line of questioning.
6      BY MR. GRIVER:
7 Q.  And what did the lawyer tell you?
8      MR. ZILBERFEIN: Can I get my objection
9   in, please.
10     The document, although it has a date on
11  the top, it doesn't have a date near the
12  signature.  We don't know when the witness signed
13  this.
14     BY MR. GRIVER:
15 Q.  Did you -- what did the lawyer tell
16  you?
17     MR. MEISTER: Objection.  Instruct her
18  not to --
19     BY THE WITNESS:
20 A.  I can't tell you.
21     MR. GRIVER: You are going to instruct
22  her not to answer for something that she --
23     BY THE WITNESS:
24 A.  No, I know that I cannot --
25     MR. MEISTER: Dalia.

Page 91

GENGER
MR. GRIVER: Let's set the foundation
3   for this then.
4      BY MR. GRIVER:
5 Q.  You purported to sign this memo as
6   trustee of the trust?
7 A.  Right.  But I don't know which date,
8   really.
9 Q.  You spoke to the lawyer, as trustee of
10  the trust, correct?
11     MR. MEISTER: No.  Objection.  She
12  hasn't said in what capacity she spoke to the
13  lawyer.
14     MR. GRIVER: Why don't you --
15     BY MR. GRIVER:
16 Q.  Answer my question.
17     MR. GRIVER: No speaking objections.
18  Thank you.
19     BY THE WITNESS:
20 A.  What was the question again?
21     BY MR. GRIVER:
22 Q.  When you spoke to the lawyer, it was in
23  order to get this document that you would sign as
24  trustee of the trust?
25     MR. MEISTER: Object on the grounds of

Page 92

GENGER
attorney-client privilege.  Instruct the witness
3   not to answer.
4      BY MR. GRIVER:
5 Q.  Okay.  Is that your signature on the --
6 A.  Yeah.  And it was noted there is no
7   date.
8 Q.  So as we sit here today, you don't know
9   whether you signed this document when you were
10  actually trustee?
11 A.  I'm not sure.  I'm not — I don't
12  remember if I was or wasn't.
13     MR. GRIVER: Okay.  Let me have this
14  marked as Dalia 8.
15     (Dalia Exhibit 8, document,
16  marked.)
17     BY MR. GRIVER:
18 Q.  Before you signed the document that was
19  marked as Dalia 6, previous document, had you
20  instructed anyone -- before you signed this
21  document marked as Dalia 6, the December 29, 2007
22  exoneration --
23 A.  Can you repeat the question now.
24 Q.  Yes.
25     Before you signed the document marked

Case 1:19-cv-09319-AKH   Document 1-39   Filed 10/08/19   Page 90 of 224
ORLY GENGER VS.                                                    DALIA GENGER
DALIA GENGER, et al                                              December 13, 2012

Page 93

```
1     GENGER
2  as Dalia 6, the December 29, 2007 exoneration,
3  did you task anybody with conducting any
4  investigation as to what Leah did or did not do
5  as trustee?
6  A. I don't remember.
7  Q. You don't remember doing so?
8  A. I don't remember, yeah, if I did or I
9  didn't do.
10 Q. Do you have any documents at home
11 showing the results of any investigation of Leah
12 Fang's activities on or about the time of Dalia
13 6?
14 A. I have to look. I didn't look at my
15 files.
16 Q. Providing --
17 A. I don't remember now if I do or I don't
18 have any documents.
19 Q. You remember providing documents in
20 this case?
21 A. If it was needed, I am sure my lawyer
22 told me to do so.
23 Q. Have you looked through your files as
24 trustee as part of providing documents in this
25 case?
```

Page 95

```
1     GENGER
2  question.
3  Q. Yes.
4     Do you remember if you signed Exhibit 8
5  before Exhibit 5?
6  A. No.
7  Q. Do you remember if you signed Exhibit 8
8  after Exhibit 5?
9  A. No.
10 Q. As we sit here today it is possible
11 that you signed -- strike that.
12    At some point you became involved in a
13 surrogate proceeding where Orly attempted to have
14 you removed as trustee; do you remember that?
15 A. Generally, I know that she did that.
16 Q. At any time did you let Surrogate Roth
17 know about the documents that have been marked as
18 Dalia 6 and Dalia 8?
19 A. You have to ask my lawyer because I
20 don't know.
21    MR. DELLAPORTAS: At this point --
22 objection. Are you seriously --
23    BY THE WITNESS:
24 A. All day we are going to talk about this
25 point?
```

Page 94

```
1     GENGER
2  A. I don't remember. I don't remember if
3  I did so or not.
4     MR. GRIVER: Could you tag that,
5  please.
6     BY MR. GRIVER:
7  Q. Let's look at what's been marked as
8  Dalia 8.
9  A. Yes.
10 Q. Dalia 8 is a memo dated January 4,
11 2008.
12 A. Yes.
13 Q. And this is you reiterating your
14 indemnification letter to you of December 29,
15 2007; do you see that?
16 A. Right.
17    MR. MEISTER: Objection to form.
18    BY MR. GRIVER:
19 Q. Do you remember the exact date that you
20 signed what's been marked as Dalia 8?
21 A. No.
22 Q. Do you remember whether you signed this
23 document before or after you signed what's been
24 marked as Dalia Exhibit 5?
25 A. Exhibit 5? So can you repeat the
```

Page 96

```
1     GENGER
2     MR. DELLAPORTAS: This is pretty
3  explicitly related to the surrogate court action.
4  You brought us all here, Yoav. Can you ask some
5  questions about this case? You didn't cross
6  notice this.
7     MR. GRIVER: If you would look to your
8  left, you see a representative of Leah Fang.
9  Leah Fang has moved to dismiss the D&K note
10 action based on these releases.
11    MR. DELLAPORTAS: Great.
12    MR. ZILBERFEIN: That motion is
13 pending --
14    MR. GRIVER: Accordingly, this is part
15 of this case, and I can ask --
16    MR. ZILBERFEIN: That's fully
17 submitted, and the arguments are moot at this
18 point.
19    MR. LEINBACH: There's no CPLR section
20 whatsoever that prevents us from taking discovery
21 on any point of law which has been raised in this
22 case, either by us or by you.
23    MR. GRIVER: All right. Repeat my
24 question.
25    MR. DELLAPORTAS: We are going to
```

Page 97

1    GENGER
2  make --
3    THE WITNESS: You know --
4    MR. GRIVER: Repeat my question.
5    BY MR. GRIVER:
6  Q.  I will ask my question again.
7    At any time, to your knowledge, did you
8  let Surrogate Roth know about the documents that
9  have been marked as Dalia 6 and Dalia 8?
10    MR. ZILBERFEIN: Note my objection to
11  this whole line of questioning regarding the
12  surrogate court proceeding.
13    MR. DELLAPORTAS: Same objection.
14    BY THE WITNESS:
15  A.  I don't remember this because my
16  lawyer, whoever it was at the time, I am sure
17  submitted the papers that were -- the judge asked
18  for.
19    BY MR. GRIVER:
20  Q.  What consideration, if any, did the
21  trust receive in exchange for the documents that
22  have been marked as Dalia 6 and Dalia 8?
23    MR. DELLAPORTAS: Object to form.
24    MR. ZILBERFEIN: Objection.
25    MR. DELLAPORTAS: Lack of foundation.

Page 98

1    GENGER
2  Objection.
3    BY THE WITNESS:
4  A.  What was the direction?
5    MR. ZILBERFEIN: Assumes facts that
6  have not been established.
7    BY THE WITNESS:
8  A.  I don't understand the question.
9    BY MR. GRIVER:
10  Q.  What did the trust get in exchange for
11  giving Leah a maximum release and
12  indemnification?
13    MR. DELLAPORTAS: Same objection.
14    MR. ZILBERFEIN: Objection.
15    BY THE WITNESS:
16  A.  I'm not aware of any -- not aware of
17  any consideration with the process.
18    BY MR. GRIVER:
19  Q.  Okay.  Look, please, at what's been
20  marked as Dalia Exhibit 1.
21  A.  Exhibit 1.
22    Are we going to finish this today or
23  next week? I mean, because there is a limit of
24  how much I can sit here.
25  Q.  Now, this is -- now you verified this

Page 99

1    GENGER
2  answer?
3    MR. MEISTER: Objection.  Asked and
4  answered.
5    BY MR. GRIVER:
6  Q.  Do you understand what a verification
7  is? If you look at the last page of Exhibit 1.
8  A.  Yes.  "Verified" means that I accepted
9  whatever it is.
10  Q.  And you accepted it under oath?
11  A.  Okay.
12  Q.  And, in other words, you swore to the
13  truth of the allegations except -- to the truth
14  of the statements in your answer, except for
15  those matters which you say were upon information
16  and belief?
17  A.  I guess.
18  Q.  Before you signed that verification,
19  did you read your answer?
20  A.  I did.
21  Q.  Did you work on it with your attorney?
22  A.  At the time.
23  Q.  I note that it is signed by Robert
24  Meister.
25    Did you also --

Page 100

1    GENGER
2  A.  I said at the time.
3  Q.  Okay.  Look at paragraph 5 of your
4  answer, please.
5  A.  Here? Where? I don't know what page
6  it is.
7  Q.  It is on page 1.
8  A.  Deny the allegation, you mean?
9  Q.  Yes.  It says, quote:  Denies the
10  allegations contained in paragraph 5 of the
11  complaint, except denies knowledge or information
12  sufficient to form a belief as to the acts of
13  Leah Fang.
14    Do you see that?
15  A.  Let me look at this. I have to
16  remember what was -- denies the allegation
17  contained in paragraph 5 of the complaint.
18  Q.  Uh-huh.
19  A.  Where is the complaint?
20  Q.  Okay.  That's Exhibit 2.  That's
21  Exhibit 2 to your deposition.  It is right there
22  in front of you.  And there's actually on page 3.
23    MR. MEISTER: It's actually on page
24  numbered 3.
25    THE WITNESS: Page number 3.

1    GENGER
2    BY MR. GRIVER:
3  Q.  So --
4  A.  So paragraph 5 here.
5  Q.  Yes.
6       MR. MEISTER: Is there a question?
7       THE WITNESS: Let me read it first.
8       MR. GRIVER: Mr. Meister, please let
9    your client read paragraph 5.
10       BY THE WITNESS:
11  A.  That I colluded?
12       BY MR. GRIVER:
13  Q.  This is Leah Fang colluded. Well, you
14    and Leah, yes.
15  A.  That I colluded with Leah? I am just
16    reading this, telling you right now that there
17    was no collusion whatsoever. I didn't collude
18    with anyone and --
19       MR. MEISTER: Wait until there's a
20    question, please.
21       BY MR. GRIVER:
22  Q.  I want you to please concentrate on
23    when it talks about the acts of Leah Fang,
24    because --
25       MR. MEISTER: I'm sorry, where what

1    GENGER
2    talks about --
3       BY MR. GRIVER:
4  Q.  In response to paragraph 5 of the
5    complaint, you specifically denied under oath
6    knowledge or information sufficient to form a
7    belief as to the acts of Leah Fang. I am asking
8    you to read about the facts of Leah Fang so we
9    may talk about Leah Fang's acts as to --
10  A.  I didn't investigate, as you know, and
11    it was being recorded that I didn't investigate
12    Leah Fang, as far as I remember.
13  Q.  So as of September 28, 2010 when you
14    signed the answer under oath, you still did not
15    have knowledge or information sufficient for you
16    to form a belief as to the acts of Leah Fang;
17    isn't that correct?
18       MR. MEISTER: As to the allegations in
19    paragraph 9 concerning the acts of Leah Fang.
20       BY MR. GRIVER:
21  Q.  Sufficient to form a belief as to the
22    acts of Leah Fang.
23       MR. MEISTER: As alleged.
24       MR. ZILBERFEIN: Every act she has ever
25    done? Is that what you --

1    GENGER
2       MR. MEISTER: Come on.
3       THE WITNESS: I am going to go.
4    Really.
5       MR. ZILBERFEIN: Objection to the
6    ludicrous question on behalf of counsel.
7       MR. MEISTER: Noted. Objection to
8    form.
9       MR. GRIVER: I will ask again.
10       MR. ZILBERFEIN: I object to this whole
11    line of questioning.
12       MR. GRIVER: Noted.
13       MR. ZILBERFEIN: The witness has
14    already stated that she didn't remember if she
15    did an investigation or not, and now you are
16    trying to get a different answer.
17       THE WITNESS: Why I am sitting on this
18    so long? Really.
19       MR. MEISTER: Wait for the question.
20       BY MR. GRIVER:
21  Q.  As of September 28, 2010, did you have
22    knowledge or information --
23  A.  If it says that I didn't have, I didn't
24    have.
25       MR. MEISTER: Excuse me. Wait until he

1    GENGER
2    finishes the question.
3       BY MR. GRIVER:
4  Q.  As we --
5       MR. MEISTER: Mr. Griver, stop when I
6    am speaking or we are walking out of here. Is
7    that clear?
8       MR. GRIVER: You may object to my
9    questions.
10       MR. MEISTER: That's right. And when I
11    am in the middle of objecting and instructing,
12    you keep your mouth shut. Is that clear?
13       Okay. Ms. Genger, wait until he
14    finishes his question before you start to speak
15    and then answer the question to the best of your
16    ability. This is not a contest in speaking.
17       THE WITNESS: Okay.
18       BY MR. GRIVER:
19  Q.  Ms. Genger, between the time you became
20    trustee of the Orly Genger trust to the date that
21    you signed your answer --
22  A.  September 30.
23  Q.  -- September 28 of 2010, had you
24    instructed anyone as trustee of the Orly Genger
25    trust to investigate the actions or inactions of

Page 105

```
 1      GENGER
 2   Leah Fang?
 3   A. I don't remember if I did.
 4   Q.  Okay.  As trustee of the Orly Genger
 5   trust, between January 4 of 2008 and September 28
 6   of 2010, did you investigate in any way the
 7   actions or inactions of Leah Fang as trustee?
 8      MR. ZILBERFEIN: Objection.  Asked and
 9   answered.
10      BY THE WITNESS:
11   A.  Is there a question hanging in the air?
12      MR. GRIVER: Yes.
13   Can you read the question back, please.
14   (WHEREUPON, the record was read by
15   the reporter as requested.)
16      BY THE WITNESS:
17   A.  I don't remember.
18      BY MR. GRIVER:
19   Q.  Look, please, at paragraph 75 of both
20   the complaint, which is Exhibit 2 to your
21   deposition, and your answer, which is Exhibit 1
22   to your deposition.
23   A.  Wait.  Again, what is it?
24      MR. MEISTER: I will get it for you.
25      BY MR. GRIVER:
```

Page 106

```
 1      GENGER
 2   Q.  Ms. Genger --
 3   A.  Can I just -- I don't know what you are
 4   talking about.  I have to -- where should I be
 5   looking now?
 6   Q.  We will get to that in a second.
 7   Before then, just to finish up, have
 8   you at any time between January 4, 2008 -- strike
 9   that.
10   Have you at any time investigated the
11   actions or inactions of Leah Fang or instructed
12   anybody to do that investigation?
13   A.  I don't remember.
14   Q.  So as we sit here today, you still
15   don't have sufficient information or belief as to
16   what Leah did or did not do as trustee?
17      MR. MEISTER: As alleged in paragraph 5
18   of the complaint?
19      MR. GRIVER: In any way.
20      MR. ZILBERFEIN: Note my objection.
21      BY THE WITNESS:
22   A.  I don't know where you are getting --
23      BY MR. GRIVER:
24   Q.  Okay.  I will make it simple for you.
25   I will withdraw the question and make it simple.
```

Page 107

```
 1      GENGER
 2   A.  Okay.
 3   Q.  As we sit here today, you don't know
 4   what Leah Fang did or did not do as trustee of
 5   the Orly trust, do you?
 6   A.  At the time I did, but now I don't
 7   remember.  And that's the truth.
 8   Q.  Well, when you say at that time --
 9   A.  At the time, subsequently when I became
10   a trustee of Orly trust, I don't know when I was
11   aware that -- of her actions.  But today if you
12   ask me, I don't remember what it was.
13   Q.  Well, so you have no recollection as
14   you sit here today what her actions were?
15   A.  Yeah.
16   Q.  Okay.  Have you ever heard of the
17   D&K -- have you ever heard of the D&K agreement,
18   what we have called the D&K agreement?
19      MR. MEISTER: Objection.  Form.
20      BY THE WITNESS:
21   A.  D&K agreement?
22      MR. MEISTER: I don't see how she can
23   answer --
24      BY MR. GRIVER:
25   Q.  Have you ever heard of a document
```

Page 108

```
 1      GENGER
 2   signed by Leah Fang as trustee dated November 22,
 3   2007?
 4   A.  I don't remember.  I don't know.
 5      MR. GRIVER: I am going to mark as
 6   Exhibit 9 the amended and restated limited
 7   partnership agreement of D&K limited partnership,
 8   signed by Leah Fang as sole trustee of the 1993
 9   Orly Genger trust on the 22nd day of November
10   2007.  I note for the record that this is also
11   Exhibit 19 to the complaint.
12   (Dalia Exhibit 9, 1/4/2008 memo,
13   marked.)
14      BY MR. GRIVER:
15   Q.  Looking -- seeing this document, does
16   that refresh your recollection, have you ever
17   seen this document before?
18   A.  Amended and restated --
19   Q.  And my question is --
20   A.  I have to read it because everything
21   looks the same to me.
22      MR. GRIVER: Mark the time, please.
23   (Time noted: 12:45 p.m.)
24      BY THE WITNESS:
25   A.  What is this word here?
```

ORLY GENGER VS.
DALIA GENGER, et al

DALIA GENGER
December 13, 2012

---

**Page 109**

GENGER

BY MR. GRIVER:

3 Q. What page are you on?

4 A. 3.

5 Q. Upon the written election to terminate
6 made by the general firm at any time.
7 Ms. Genger, you have read the first two
8 pages. Does this refresh your recollection as to
9 whether you have ever seen this document?
10 Ms. Genger?

11 MR. MEISTER: First two pages?

12 MR. GRIVER: Yes.

13 BY MR. GRIVER:

14 Q. Based on reading the first two pages of
15 this document, do you recall ever seeing this
16 document before?

17 A. I can't say that it refreshes my
18 memory.

19 Q. And so far you don't recall ever seeing
20 this document before?

21 A. I do not recall. I might have seen it,
22 but I don't recall if I did.

23 MR. MEISTER: Do you want her to
24 continue to read the rest of the 16-page
25 document?

---

**Page 110**

GENGER

2 MR. GRIVER: I do. As trustee of the
3 trust, I think it is incumbent upon her to do so,
4 provided she hasn't done so already.

5 BY MR. GRIVER:

6 Q. Ms. Genger, what page are you on now?

7 A. 4. It takes me a long time.

8 Q. I understand. As we got to -- now
9 having read four pages of what's been marked as
10 Dalia 9, does this refresh your recollection as
11 to whether you have ever seen this document?

12 A. As I answered you before, I might have
13 seen it, but right now, I can't say for sure --

14 Q. Okay.

15 A. -- that I did. I imagine that I did.

16 Q. Did you ever --

17 MR. MEISTER: Objection. Move to
18 strike.

19 BY MR. GRIVER:

20 Q. Did you ever speak --

21 MR. MEISTER: Mr. Griver, when I am
22 speaking you have to --

23 MR. GRIVER: You move to strike.

24 MR. MEISTER: You have to let me put my
25 objection on the record.

---

**Page 111**

GENGER

2 MR. GRIVER: Okay. Go ahead.

3 MR. MEISTER: I've just done it. I
4 hope you have it all.

5 MR. GRIVER: You moved to strike?
6 Okay.

7 MR. MEISTER: If you don't talk, you
8 can hear.

9 BY MR. GRIVER:

10 Q. Ms. Genger, do you recall discussing
11 with Leah Fang at any time the document that --
12 this document that Leah Fang signed on --

13 A. I don't remember. I don't remember.

14 MR. MEISTER: You have to wait until he
15 finishes the question.

16 BY MR. GRIVER:

17 Q. You don't remember speaking with Leah
18 Fang about this document before you exonerated
19 her, correct?

20 A. At any time I don't remember.

21 Q. So I take it then that as we sit here
22 today, you have no idea what consideration, if
23 any, the Orly trust received in exchange for
24 signing this document that's been marked as Dalia
25 9?

---

**Page 112**

GENGER

2 A. I am not aware if there was any
3 consideration.

4 Q. So --

5 A. I mean, maybe --

6 Q. All right.

7 MR. MEISTER: Just answer the question.

8 MR. LEINBACH: I would like the record
9 to reflect that Mr. Meister, counsel for Dalia
10 Genger, has been touching her at many points
11 during the deposition before she answers
12 questions.

13 MR. MEISTER: Actually --

14 THE WITNESS: He didn't touch me.
15 Excuse me.

16 MR. MEISTER: Excuse me, Dalia. Let me
17 answer.

18 I didn't touch her. I put my hand out
19 to indicate when she came to the end of the
20 question, to stop speaking.

21 MR. LEINBACH: Okay. Well, this is
22 obviously a record which is not --

23 THE WITNESS: You know what? I would
24 like to see from there what's going on under the
25 table. It is ridiculous. What are we doing

---

Page 113

1　　GENGER
2　here?
3　　MR. DELLAPORTAS: I just want to object
4　for the record. New York practice is very clear
5　that only one attorney may speak for any one
6　party at a deposition. That one attorney is
7　Mr. Griver. I would object to Mr. Leinbach
8　saying word one on the record at this deposition,
9　and I would move to strike that which he just
10　said. Thank you.
11　　MR. MEISTER: While we are in a break,
12　I will notice that it is 4 minutes of 1:00, and I
13　did ask an hour or so ago of Mr. Griver when he
14　is planning on taking a lunch break, and
15　suggested that 1:00 would be a good time.
16　　THE WITNESS: Yeah. I didn't have
17　breakfast.
18　　BY MR. GRIVER:
19　Q. Okay. I will just ask you this,
20　Ms. Genger. Do you believe that -- strike that.
21　　I will be happy to do a lunch break
22　after Ms. Genger finishes reviewing this document
23　so I may ask three or four questions about this
24　document. But I would like her to --
25　A. You know, it is very difficult for a

Page 114

1　　GENGER
2　layperson to read legal documents, in general, I
3　believe that's the case.
4　　So if you want me really to read it
5　thoroughly, it will take me a long time. Are you
6　willing to wait? Because it is a fact.
7　Q. Ms. Genger, are you aware of the effect
8　of this document on the Orly Genger trust, as we
9　sit here today?
10　A. No.
11　　MR. MEISTER: So it's our lunch break
12　time?
13　　BY MR. GRIVER:
14　Q. So as we sit here today you have no
15　idea why this document was created?
16　A. Today, I don't remember why it was.
17　Q. So this document could have been
18　created for a good reason or for a bad reason,
19　you don't know?
20　A. I don't know for what reason exactly it
21　was created.
22　Q. So this document could have been
23　created because Leah Fang was conspiring with
24　Sagi Genger, and they created this document?
25　A. Definitely that's not the case.

Page 115

1　　GENGER
2　Q. Why is it definitely not the case?
3　A. Because I know the people that I deal
4　with. And I know my son, and I know Leah, and
5　there is no way -- and you said belief. There's
6　no way there was any collusion to harm Orly
7　trust.
8　Q. Doesn't that depend on what Leah did or
9　did not do and why?
10　A. No. It depends on the people, okay.
11　And I know the people, and I know that they won't
12　do anything to harm Orly.
13　　MR. MEISTER: Okay. Ms. Genger, I'm
14　going to again instruct you on the record, please
15　wait until the end --
16　　MR. GRIVER: So --
17　　MR. MEISTER: Excuse me, Mr. Griver.
18　　MR. GRIVER: I'm sorry. Go ahead.
19　　MR. MEISTER: Until the end of
20　Mr. Griver's question.
21　　THE WITNESS: Are you allowed to touch
22　him, by the way?
23　　MR. LEINBACH: I'm not touching him.
24　　THE WITNESS: Yeah, you were touching.
25　I think we're not allowed to touch anybody.

Page 116

1　　GENGER
2　　BY MR. GRIVER:
3　Q. Okay. Now, Ms. Genger, look at
4　paragraph --
5　　MR. GRIVER: You know what? Let's take
6　a half hour for lunch.
7　　THE WITNESS: Thank you.
8　　MR. GRIVER: And we'll come back and
9　start with paragraph 75. So if you would like
10　to --
11　　THE WITNESS: I need more than a half
12　hour. I didn't eat breakfast, also.
13　　MR. GRIVER: Okay. 35 minutes.
14　　(WHEREUPON, the deposition was
15　recessed from 12:59 p.m. until
16　2:06 p.m.)
17　　(WHEREUPON, Attorney Lance Harris
18　exited the deposition
19　proceedings.)
20　　* * * * *
21
22
23
24
25

Page 117

GENGER

MR. GRIVER: Could you note the time that we left and the time that we came back. On the record. It is 2:06.

MR. ZILBERFEIN: I just want to put a statement on the record before we get going. What was the attorney's name that was here? Do you have it?

THE COURT REPORTER: Lance Harris.

MR. ZILBERFEIN: What was the attorney's name that was here? I want to put a statement on the record before we begin.

I am going to note that at about 12:06, after we came -- after a 12:06 break this afternoon, Attorney Lance Harris appeared. His appearance was not put on the record. It is my understanding that Mr. Harris is not an attorney of record for anyone in this litigation. Moreover, it is my understanding after speaking to Mr. Hoffman, that Lance Harris at some point represented Leah Fang, my client, in this proceeding or other proceedings.

Therefore, there's an inherent conflict here that I wasn't aware of when Mr. Harris entered the room. Therefore, I am going to

Page 118

GENGER

preserve my objection to each and every question that was asked after the break when Mr. Harris was present. And if he comes in again, I am going to preserve my objections again to each and every question that's asked if he reappears.

That's basically my position. And I am going -- the objection that I preserved is in connection with striking each and every question and answer that has been asked and answered in Mr. Harris' presence.

MR. GRIVER: All right. I will just note for the record that I am not sure that you can preserve an objection that you didn't actually make, nor did anyone else make at Mr. Harris' presence. Certainly he was not invisible and anybody could have done so.

In addition, I think that your factual statements on the record are absolutely -- are incorrect, and, you know, I question where you got them. But you are free to do whatever you want and spend whatever amount of your client's money that you wish to in making those motions.

If you can give me a CPLR provision or any kind of ruling that would allow you to do

Page 119

GENGER

what you have threatened to do, I would appreciate it.

MR. ZILBERFEIN: Can you give me a CPLR provision that would permit Mr. Harris to be here during this deposition?

MR. GRIVER: Sure.

MR. LEINBACH: There was no objection to his presence, as de facto.

MR. DELLAPORTAS: His presentation wasn't announced.

MR. ZILBERFEIN: Right. Especially when it wasn't put on the record.

MR. LEINBACH: His presence was open and notorious. He was sitting in the room.

MR. MEISTER: It may have been open and notorious. I don't know who he was, and to this moment I still don't.

MR. LEINBACH: The court reporter did.

MR. MEISTER: Is he associated with your firm?

MR. ZILBERFEIN: No, the court reporter didn't know who he was until during the lunch attorney for the plaintiff told her who he was.

MR. GRIVER: Right, sure, because

Page 120

GENGER

someone asked the question. Now, if someone did not know who Mr. Harris was, then they were certainly able to ask --

MR. ZILBERFEIN: You know I didn't know who he was. Why didn't you put a statement on the record? Once again --

MR. GRIVER: Because he's always been --

MR. ZILBERFEIN: -- you don't give anyone the benefit of the doubt. You just go ahead and you want to steamroll everybody, and I think that's what you've been doing.

MR. GRIVER: I think we are done here.

MR. MEISTER: Just so we are clear, is he associated with your firm?

MR. GRIVER: No, he is not associated with my firm, he is associated with Orly Genger because he is Orly's attorney.

MR. DELLAPORTAS: Who invited him to attend this deposition and gave him notice?

MR. ZILBERFEIN: Yeah. Who invited him to attend and gave him notice?

MR. DELLAPORTAS: I will just note for the record that TPR did not invite him to attend,

ORLY GENGER VS.
DALIA GENGER, et al

DALIA GENGER
December 13, 2012

---

Page 121

GENGER

1    GENGER
2    his presence was not announced, and had his
3    presence been announced, we would have
4    immediately objected to it because he has no
5    business being here.
6        MR. GRIVER: John, you are welcome to
7    put in an affidavit saying you didn't notice his
8    presence when he walked in.
9        MR. LEINBACH: I want to make a
10   statement for the record as well.
11       Mr. Dellaportas has been in court with
12   Mr. Harris before, and he knows very well exactly
13   who he is.
14       MR. DELLAPORTAS: That was two years
15   ago. I wasn't sure what he was doing here.
16       MR. ZILBERFEIN: And I knew -- you know
17   what, I am appearing here for Ms. Fang, right,
18   and you assumed I knew?
19       MR. LEINBACH: You can ask.
20       MR. GRIVER: I assume that if you have
21   a question, that's why God gave you a mouth.
22       Let's continue.
23       MR. DELLAPORTAS: We join in the
24   objection. We just note for the record that TPR
25   did not invite him to attend, and had he

---

Page 122

1    GENGER
2    announced his presence, we would have objected.
3    Please proceed.
4        BY MR. GRIVER:
5    Q. Before the break, Ms. Genger, we were
6    speaking about Leah Fang, the beginning of your
7    involvement as a trustee and your purported
8    releases to Ms. Fang.
9        Did you provide Orly Genger with copies
10   of your two supposed releases to Ms. Fang?
11       MR. DELLAPORTAS: Object to form.
12       MR. ZILBERFEIN: Same objection.
13       THE WITNESS: I should answer this?
14       MR. GRIVER: Yes.
15       BY THE WITNESS:
16   A. Okay. If it was required, I am sure my
17   lawyer did that. Otherwise, it wasn't sent to
18   Orly.
19       BY MR. GRIVER:
20   Q. I am asking you, did you --
21   A. I do not remember. I am saying, if it
22   was required of me to do so, I am sure my lawyer
23   did it, sent it. And if it wasn't required, it
24   was not done.
25   Q. As we sit here today, do you think it

---

Page 123

1    GENGER
2    is a good idea for a trustee to provide just the
3    minimum of information to the beneficiary, or all
4    the information that you think is important?
5        MR. MEISTER: Objection.
6        MR. ZILBERFEIN: Same objection.
7        THE WITNESS: I mean, if there is an
8    objection, I should answer?
9        BY MR. GRIVER:
10   Q. Even with an objection, you should
11   answer.
12   A. Okay. I think that all that relevant
13   information to her case should be -- she should
14   be informed.
15   Q. Okay. Do you think it is relevant that
16   you gave Leah Fang maximum releases and
17   indemnifications?
18       MR. MEISTER: Objection. Relevant to
19   what?
20       BY MR. GRIVER:
21   Q. Relevant to your job as a trustee?
22       MR. ZILBERFEIN: Note my objection to
23   "maximum" and the form of the question.
24       MR. MEISTER: Join in.
25       BY THE WITNESS:

---

Page 124

1    GENGER
2    A. My opinion is that Orly and her lawyer,
3    might be you or someone else, obviously knew
4    about the release because you are talking about
5    it. So, obviously, you knew about it. So in one
6    way or another, you did get this document.
7        BY MR. GRIVER:
8    Q. Do you think it would -- do you think
9    that these releases are relevant information that
10   you should have sent to Orly Genger?
11   A. I am not sure.
12   Q. Okay. As trustee of the trust, did you
13   ask counsel for the trust as to whether this is
14   information that should have been sent to Orly
15   Genger? And I am specifically referring to the
16   releases set forth as Exhibits 6 and 8 to your
17   deposition today.
18       MR. MEISTER: Objection.
19       BY THE WITNESS:
20   A. I don't remember.
21       MR. MEISTER: Attorney-client
22   privilege.
23       MR. GRIVER: Are you instructing the
24   witness not to answer about questions she asked
25   as a trustee to counsel for the trust?

---

Page 125

1    GENGER
2    MR. MEISTER: Yes.
3    MR. GRIVER: Okay.
4    BY MR. GRIVER:
5  Q. Ms. Genger, did you consult with
6    counsel for the trust as trustee of the trust
7    regarding these indemnifications?
8    MR. MEISTER: You may answer that yes
9    or no.
10   BY THE WITNESS:
11 A. I don't remember.
12   BY MR. GRIVER:
13 Q. Do you have any -- who was your
14   attorney at the time?
15 A. What day was it?
16 Q. About December 2007, January 2008?
17 A. January '08, right.
18 Q. Uh-huh.
19 A. I guess it was --
20   THE WITNESS: It wasn't you?
21   BY THE WITNESS:
22 A. I don't remember when we started with
23   Mr. Meister.
24   BY MR. GRIVER:
25 Q. Was counsel for the trust Jonathan

Page 126

1    GENGER
2    Kortmansky?
3  A. Oh, Kortmansky, right.
4    I really don't remember.
5  Q. But he was --
6  A. I guess it was, if you say so. I
7    really don't remember.
8  Q. No, I am asking you as trustee of the
9    trust.
10   Was Jonathan Kortmansky an attorney for
11   the trust?
12 A. I guess he was.
13   MR. MEISTER: She just answered she
14   doesn't remember.
15   THE WITNESS: Yeah.
16   MR. MEISTER: She is guessing.
17   BY THE WITNESS:
18 A. You are asking me the same thing.
19   MR. GRIVER: Don't put your hand on the
20   witness. Do not tell the witness to stop
21   talking. It is her answer. If it is too long
22   for you, you have instructed her repeatedly to
23   just answer the question. If she chooses to give
24   a speaking answer, she may do so.
25   It is not your job to stop her, either

Page 127

1    GENGER
2    by telling her to be quiet or by holding your
3    hand upon her.
4    MR. MEISTER: But it is my job --
5    MR. GRIVER: It is time for you to stop
6    that.
7    MR. MEISTER: It is my job to get my
8    objection out on the record.
9    MR. GRIVER: No, it is not your -- you
10   can put that in, you can put that in after she
11   speaks.
12   MR. MEISTER: No, I cannot put it in
13   because --
14   MR. GRIVER: If you are too slow --
15   MR. MEISTER: -- I start to make my
16   objection, and I am entitled to finish.
17   MR. GRIVER: And she is entitled to
18   answer the question.
19   MR. MEISTER: Not over my objection.
20   MR. GRIVER: Okay.
21   BY MR. GRIVER:
22 Q. Is Jonathan Kortmansky, is he the
23   attorney for the 1993 trust?
24 A. He might have been. I really do not
25   remember when I stopped my relationship with

Page 128

1    GENGER
2    Kortmansky and when I hired Robert Meister.
3  Q. But during your relationship with
4    Mr. Kortmansky, he was the attorney for the Orly
5    Genger trust, correct?
6  A. I don't remember. I really do not
7    remember.
8  Q. You don't remember? You don't
9    remember --
10 A. I don't remember who was the lawyer at
11   that time -- my lawyer at the time.
12 Q. Did the Orly Genger trust have a
13   lawyer?
14 A. Yes, I am sure it did.
15 Q. Was it Mr. Kortmansky?
16   MR. MEISTER: Objection. Asked and
17   answered.
18   BY THE WITNESS:
19 A. You just asked me, and I told you. I
20   am not going to change my answer.
21   BY MR. GRIVER:
22 Q. You don't remember?
23 A. Exactly.
24 Q. Okay.
25 A. Really, I don't remember.

Page 129

1    **GENGER**
2  Q.  How is it in the best interest of the
3  Orly trust to not provide Orly Genger with the
4  information that you had released Leah Fang from
5  all liability?
6  A.  **How -- again, can you ask me.**
7    **MR. GRIVER:** Can you read the question
8  back.
9    (WHEREUPON, the record was read by
10   the reporter as requested.)
11   **BY THE WITNESS:**
12 A.  **I think I said before that I wasn't**
13 **sure if she got the documents or not.  If I -- I**
14 **stated that if it was required, my lawyer did it,**
15 **and if it wasn't required, it was not sent.**
16   **BY MR. GRIVER:**
17 Q.  Okay.  Who is the trustee of the trust?
18  You or your lawyer?
19 A.  **I am the trustee.**
20 Q.  Okay.  So as trustee of the trust,
21  how --
22 A.  **I asked my lawyer.**
23 Q.  How is it -- well, you don't remember
24  if you asked your lawyer, do you?  You don't
25  remember?

Page 130

1    **GENGER**
2  A.  **I don't remember, right.  But it**
3  **doesn't mean that he didn't act upon it.**
4    **MR. DELLAPORTAS:** And I would like to
5  object.  There was a representation from counsel
6  that this line of questioning related to cause of
7  action number 4.  I have read cause of action
8  number 4.  It makes no mention of this release
9  that we're talking about.  This is not a claim in
10  this action.  It may be a claim in the surrogate
11  court proceeding, but I really resent being
12  dragged here for discovery that has some
13  relevance to the surrogate court proceeding.  I
14  will be seeking legal fees for this.
15   **MR. GRIVER:** You know what?  We will be
16  speaking to the court about this because --
17   **MR. ZILBERFEIN:** Why don't we do that
18  sooner than later.
19   **MR. GRIVER:** Well, you know what?
20  Let's do that.
21   **MR. DELLAPORTAS:** I'd rather do that
22  than have you take false discovery for the rest
23  of the deposition.  You are wasting our time,
24  Yoav.
25   **MR. GRIVER:** You know what?  One day I

Page 131

1    GENGER
2  hope you actually read the complaint.
3    **MR. DELLAPORTAS:** I read the complaint.
4  Can you point me to paragraph --
5    **MR. ZILBERFEIN:** Can put us --
6    **MR. GRIVER:** Could you read the
7  question back, please.
8    **MR. DELLAPORTAS:** Point us to the
9  paragraph in the complaint where it is relevant
10  so we can address this.
11   **MR. ZILBERFEIN:** Why don't you get the
12  judge on the phone now.
13   **MR. DELLAPORTAS:** I will withdraw my
14  objection if --
15   **MR. GRIVER:** 48 and 49.  And then you
16  might want to look at the motion for summary
17  judgment filed by Leah Fang.
18   Can you read the question and answer
19  back so I can get an answer from the witness,
20  please.
21   **MR. DELLAPORTAS:** It does not mention
22  the release anywhere in 48 or 49.  Let's call the
23  court.  Stop it.  We are calling the court.  We
24  are calling the court.  Stop this.
25   **MR. GRIVER:** All right.  Off the

Page 132

1    GENGER
2  record.
3    (WHEREUPON, discussion was had off
4    the record.)
5    **MR. LEINBACH:** As I stated before, we
6  wanted to call the court and ask for their
7  availability because we thought there were issues
8  that occurred during -- previous to the break.
9    I spoke with -- I believe it was the
10  judge's secretary.  She checked the judge's
11  availability and I was told that the judge is
12  available anytime before 4:00 to have a
13  conversation.
14   I suggested 3:30.  She said that was
15  fine.  Apparently -- I had no idea if you would
16  like to do it now instead --
17   **THE COURT REPORTER:** Do you want to
18  stay on the record?
19   **MR. LEINBACH:** I think this should be
20  on the record.
21   **MR. GRIVER:** I don't think the witness
22  and Sagi should be in the room for this.
23   **MR. S. GENGER:** What?
24   **MR. GRIVER:** I don't think the witness
25  or Sagi should be in the room for this.

ORLY GENGER VS.
DALIA GENGER, et al

DALIA GENGER
December 13, 2012

---

Page 133

1    GENGER
2    **MR. S. GENGER:** I am a party.
3    **MR. LEINBACH:** Yes, you are a party,
4    but you are not a lawyer.
5    **MR. S. GENGER:** So?
6    **MR. ZILBERFEIN:** What CPLR section is
7    that?
8    **MR. LEINBACH:** You are supposed to be
9    deposed in this.
10   **MR. ZILBERFEIN:** What CPLR section is
11   that?
12   **MR. LEINBACH:** What New York practice
13   actually says is you're not supposed to obtain
14   information --
15   **MR. ZILBERFEIN:** What section --
16   **MR. LEINBACH:** New York practice.
17   **MR. DELLAPORTAS:** He is a party to the
18   action.
19   **MR. S. GENGER:** I am representing
20   myself personally then.
21   **MR. GRIVER:** You are not representing
22   yourself personally.
23   **MR. DELLAPORTAS:** You do not represent
24   yourself personally.
25   (WHEREUPON, at 2:24 p.m., a

---

Page 134

1    GENGER
2    telephone call was made to the
3    chambers of Judge Barbara Jaffe,
4    and the following proceedings were
5    had via telephonic communications,
6    to wit:)
7    **MR. LEINBACH:** Hello.  This is Bryan
8    Leinbach.  Once again, I called about probably
9    five minutes ago to ask for Justice Jaffe's
10   availability for a deposition.
11   **FEMALE VOICE:** Yes.
12   **MR. LEINBACH:** It appears the parties
13   all want to speak right now.  So I wanted to see
14   if the justice could speak with us right now.
15   **FEMALE VOICE:** Wait.  Hold on one
16   second.
17   **MR. LEINBACH:** Thank you.
18   (WHEREUPON, the following further
19   proceedings were had via
20   telephonic communications with
21   Judge B. Jaffe, to wit:)
22   **THE COURT:** Hello?  Judge Jaffe on the
23   phone.
24   **MR. LEINBACH:** Good afternoon, your
25   Honor.  This is Bryan Leinbach of Zeichner Ellman

---

Page 135

1    GENGER
2    & Krause.  And also with me is Yoav Griver.
3    **THE COURT:** Right, right.  And you
4    represent again?
5    **MR. LEINBACH:** We represent Orly
6    Genger.
7    I should state right off the bat, of
8    course I told your secretary that we were calling
9    because there were issues that had arisen during
10   the deposition of Dalia Genger.  So there's a
11   court reporter --
12   **THE COURT:** Who is here for Dalia
13   again?
14   **MR. MEISTER:** Robert Meister and Marisa
15   Warren, your Honor.
16   **THE COURT:** Okay.
17   **MR. LEINBACH:** I just also wanted to
18   note, of course, because this is a deposition,
19   there's a court reporter here that's
20   transcribing.
21   **THE COURT:** There's a what?
22   **MR. LEINBACH:** There's a court reporter
23   that is present.
24   **THE COURT:** Yes, that I got.
25   **MR. LEINBACH:** I just wanted to inform

---

Page 136

1    GENGER
2    you.
3    **MR. ZILBERFEIN:** Do you want everyone's
4    appearance?
5    **THE COURT:** I just want to know who's
6    there and who's going to be talking to me.
7    **MR. GRIVER:** In addition to lawyers for
8    the plaintiff and for the deponent Dalia
9    Genger --
10   **THE COURT:** That's Mr. Griver, right?
11   **MR. GRIVER:** That's correct, your
12   Honor, yes.  I'm Yoav Griver.  We also have Sagi
13   Genger here.  We have the attorney for TPR,
14   Jonathan Dellaportas.  We have an attorney here
15   for Leah Fang, Paul Zilberfein.
16   **MR. ZILBERFEIN:** Correct, your Honor.
17   I am cocounsel to Leah Fang.
18   **MR. GRIVER:** And we also have an
19   attorney from Orly's other set of lawyers,
20   Wachtel and Masyr.  It is Walter Stasiuk.
21   **THE COURT:** Okay.
22   **MR. GRIVER:** So that's is who is in the
23   room, along with the deponent, Dalia Genger.
24   **THE COURT:** Okay.
25   **MR. GRIVER:** There are a number of

---

Case 1:19-cv-09319-AKH   Document 1-39   Filed 10/08/19   Page 101 of 224
ORLY GENGER VS.
DALIA GENGER, et al
DALIA GENGER
December 13, 2012

Page 137

1   GENGER
2   reasons that we're calling during the deposition.
3   There have been some attempts to instruct the
4   witness, contrary to practice. In addition,
5   Mr. Dellaportas has made the assertion that the
6   line of questions that I am asking are irrelevant
7   to the litigation.
8       THE COURT: Wait a minute. What?
9       MR. GRIVER: That the line of
10  questioning that I am questioning the deponent
11  about is irrelevant to this litigation. I
12  believe that Mr. Dellaportas will use that as a
13  tactic to try and prevent a continuation of the
14  deposition of Dalia Genger, should it be
15  necessary.
16      In addition, if the court could
17  instruct the attorneys to limit themselves to
18  nonspeaking objections --
19      THE COURT: Yes. Please do that.
20      MR. GRIVER: -- things will certainly
21  move faster.
22      THE COURT: I do want that to happen.
23  If you have an objection, place it on the record
24  with the word "objection," but move on.
25      MR. GRIVER: Thank you, your Honor.

Page 138

1   GENGER
2       In addition, there should be no
3   attempts to stop the witness from talking by
4   placing your hand upon the witness' shoulder or
5   upon the --
6       THE COURT: Nothing. Nothing. Don't
7   touch the witness at all. Leave it alone. Let's
8   just get through it. Anything that is
9   inadmissible or irrelevant can be redacted later
10  on on motions or at trial or whatever. But not
11  now. Let it go.
12      MR. GRIVER: Thank you, your Honor.
13      MR. MEISTER: Your Honor, this is
14  Robert Meister for Dalia Genger.
15      THE COURT: Yes.
16      MR. MEISTER: I have made some
17  objections on the ground of attorney-client
18  privilege, and I have stated the grounds, and I
19  have also instructed the witness not to answer.
20  Of course --
21      THE COURT: Those should be an
22  exception, would they not? I mean, when it is --
23      MR. MEISTER: Yes.
24      THE COURT: -- something that's
25  privileged or confidential, that is, of course,

Page 139

1   GENGER
2   acceptable.
3       MR. GRIVER: Your Honor, I think that
4   that will be subject to dispute, but I agree with
5   Mr. Meister that that can be a dispute that is
6   taken care of at a later date, and we will make
7   the record at this deposition.
8       THE COURT: Fine. Anything else?
9       MR. DELLAPORTAS: Yes, your Honor.
10  John Dellaportas for TPR.
11      Our concern, and one of the reasons we
12  welcomed getting the court involved early, is we
13  have seen a practice in these Genger family
14  matters where witnesses are subjected to
15  questioning which relates to other matters for
16  which there has not been notice, but not for the
17  matter at hand.
18      And here we have had two hours of
19  questioning. It is related to all matters of
20  issues involving how and why Ms. Genger was
21  appointed, who's paying her legal bills, why she
22  gave release to one party or another --
23      THE COURT: Mr. Dellaportas, as I
24  mentioned, you can place your objection on the
25  record. Period. At another time, at trial, you

Page 140

1   GENGER
2   can, you know, redact it, whatever. I am not
3   interested in it now.
4       MR. DELLAPORTAS: Okay. We understand,
5   your Honor. The only concern was that the
6   questioning relates to a pending surrogate court
7   action which we are not a party to, not all the
8   parties are necessarily here. Doesn't relate to
9   the action for which we are here, and we would
10  like to reserve the right to seek fees at the end
11  of this if we're brought here for questioning on
12  another matter for which there's never been
13  cross --
14      THE COURT: I am not even thinking
15  about it, quite frankly.
16      MR. GRIVER: Your Honor, this is Yoav
17  Griver, and I thank you for your time.
18      It's very simple. The reason I was
19  asking these questions is because they are
20  germane to a summary judgment motion that is
21  currently before your Honor. They are also
22  germane to paragraphs 48 and 49 and 140, at a
23  minimum, of the complaint. Dalia Genger is a
24  trustee. Me being able to ask her about actions
25  as trustee is germane to this action because --

ORLY GENGER VS.
DALIA GENGER, et al

DALIA GENGER
December 13, 2012

---

**Page 141**

1    GENGER
2    THE COURT: You will put that on the
3  record at some other time. I don't care about it
4  right now. And if it is germane to the summary
5  judgment motion, it is not because it is already
6  submitted, and I am not going to be considering
7  it.
8    MR. GRIVER: Your Honor, well --
9    THE COURT: If that's the one that's
10 been submitted already.
11   MR. ZILBERFEIN: That correct, your
12 Honor. That's the one that's already fully
13 submitted and before your Honor for decision.
14   MR. GRIVER: Your Honor, there's
15 always -- I understand your Honor's position. It
16 is just that the concern is raised because as
17 Sagi Genger did not show up for deposition either
18 on Tuesday or on Wednesday, and, therefore, I do
19 believe based on past practice that
20 Mr. Dellaportas will then try and object on
21 behalf of Ms. Genger, should this deposition
22 carry on past a single day.
23   Now, in these matters, every deposition
24 to date has passed on because while there are few
25 witnesses, they span actions over years and

---

**Page 142**

1    GENGER
2  multiple --
3    THE COURT: You know, if this is what
4  the family wants to do, that's what they will do.
5  They haven't been deterred from their litigation
6  for many, many years. That's up to them. They
7  want to stay and get deposed forever, God bless
8  them. If they were sensible, they would settle
9  this case. But they are not. They are not
10 sensible. So they are going to be fighting and
11 paying you guys money and you are getting rich.
12 Okay.
13   MR. GRIVER: Thank you, your Honor. I
14 think your instructions have been helpful.
15   THE COURT: Thank you.
16   MR. MEISTER: Let the record note that
17 the telephone conference is now concluded and the
18 phone is now disconnected.
19   (WHEREUPON, at 2:33 p.m., the
20   telephonic communications were
21   disconnected, and the deposition
22   proceedings resumed, to wit:)
23   THE WITNESS: So what are we -- what
24 does this mean? I don't understand.
25   MR. MEISTER: Just wait for a question.

---

**Page 143**

1    GENGER
2    MR. ZILBERFEIN: Can I just say
3  something on the record here? What time are we
4  going to be breaking for the day? Can we get
5  that down on the record?
6    MR. GRIVER: We started at 10:30 as an
7  accommodation, so I think we will end at --
8  instead of ending at 5:00, we will end at 5:30.
9    MR. ZILBERFEIN: Is that okay with
10 everyone?
11   MR. GRIVER: If we are at a point where
12 we have another 15 minutes or so if we continue
13 and get this deposition completed, then I am sure
14 everybody will have the indulgence. You have
15 been in depositions before. You know how it is.
16 But let's try to aim for 5:00, 5:30.
17   MR. ZILBERFEIN: Okay.
18   MR. GRIVER: Okay. Now, if you can
19 read back, please, my last question to the
20 witness so that she may answer it. And if you
21 can on the transcript put the question because it
22 has been a while.
23   (WHEREUPON, the record was read by
24   the reporter as requested, as
25   follows, page 129, line 23,

---

**Page 144**

1    GENGER
2  through page 130, line 3:
3    "QUESTION: How is it -- well, you
4   don't remember if you asked your
5   lawyer, do you? You don't
6   remember?
7   "ANSWER: I don't remember, right.
8   But it doesn't mean that he didn't
9   act upon it.)
10   MR. DELLAPORTAS: Same objection.
11   MR. ZILBERFEIN: Join.
12   MR. GRIVER: Okay.
13   BY MR. GRIVER:
14 Q.  As trustee of the Orly Genger trust,
15 how is it in Orly Genger's best interest for you
16 not to tell her about the releases that you
17 attempted to provide Leah Fang as previous --
18   MR. ZILBERFEIN: Objection.
19   BY THE WITNESS:
20 A.  I didn't say that I didn't provide the
21 releases. I said if it was required, she
22 probably got it because my lawyer sent it. And
23 if it wasn't required, she didn't get it.
24   BY MR. GRIVER:
25 Q.  But you are supposed to act in the best

---

Page 145

1    GENGER
2  interest of the trust, correct?
3    MR. MEISTER: Objection.  Asked and
4  answered.
5    MR. ZILBERFEIN: Objection.  You keep
6  asking the same question.
7    BY THE WITNESS:
8  A.  So what's the question?
9    BY MR. GRIVER:
10  Q.  You, as trustee, you have the duty --
11  A.  My answer is whatever is required of me
12  to do and act, I do it.  Whatever is not
13  required, I don't do it.
14  Q.  And in determining what is or is not
15  required, you, as trustee of the trust, go to the
16  trust attorneys, correct?
17  A.  Yes.
18  Q.  And if they tell you to do something,
19  you do it?
20  A.  Probably.
21  Q.  And if they tell you not to do
22  something, you don't do it?
23  A.  Probably.
24  Q.  So you rely -- yes or no.  Not
25  probably.

Page 146

1    GENGER
2  If the attorneys for the trust --
3    MR. DELLAPORTAS: Objection.
4    BY MR. GRIVER:
5  Q.  -- tell you to do something, do you do
6  it?
7    MR. MEISTER: Objection.  Hypothetical.
8    MR. ZILBERFEIN: Objection.
9    BY THE WITNESS:
10  A.  It is hypothetical.
11    BY MR. GRIVER:
12  Q.  As a general matter, do you follow your
13  attorney's advice?
14    MR. MEISTER: Objection.
15    MR. ZILBERFEIN: Did she?  At what
16  period of time?
17    MR. MEISTER: What advice are you
18  talking about?
19    BY MR. GRIVER:
20  Q.  As trustee of the trust --
21  A.  In general, I --
22    MR. ZILBERFEIN: Objection.
23    BY THE WITNESS:
24  A.  -- I follow the -- I follow whatever my
25  lawyer tells me to do.

Page 147

1    GENGER
2    BY MR. GRIVER:
3  Q.  Okay.  And as we sit here today do you
4  remember whether you discussed sending --
5  A.  We said that already.
6  Q.  Did you discuss sending or not
7  sending --
8  A.  I said I didn't remember.
9  Q.  Okay.
10    MR. MEISTER: Several times.
11    BY MR. GRIVER:
12  Q.  Let me finish the question.
13  A.  I'm sorry.
14  Q.  Did you discuss with your -- the
15  attorneys for the trust sending or not sending
16  the releases that you attempted to provide Leah
17  Fang?
18    MR. MEISTER: Objection.  Asked and
19  answered several times.
20    THE WITNESS: Yeah.
21    MR. ZILBERFEIN: Objection.
22    BY THE WITNESS:
23  A.  I don't remember.  I told you.
24    BY MR. GRIVER:
25  Q.  At some point you and your former

Page 148

1    GENGER
2  husband, Arie Genger, got divorced, correct?
3  A.  At some point, yes.
4  Q.  And there was an estate plan for the
5  benefit of your two children, Sagi and --
6  A.  That's right.
7  Q.  -- Orly, correct?
8  A.  Right.  Correct.
9  Q.  And the intent was that Orly and Sagi
10  were to share equally; is that also correct?
11  A.  Yes.
12  Q.  When you began as trustee of the Orly
13  Genger trust, the trust had shares in the D&K LP
14  company?
15    MR. MEISTER: Objection.
16    BY THE WITNESS:
17  A.  Right.
18    BY MR. GRIVER:
19  Q.  Correct?
20    MR. MEISTER: Didn't have shares in the
21  LP.
22    BY MR. GRIVER:
23  Q.  Had an interest --
24  A.  D&K LP had shares.
25  Q.  D&K LP had shares in --

Page 149

GENGER
1      GENGER
2  A.  Of TPR.
3  Q.  And the Orly trust had an interest in
4  D&K?
5  A.  Yes.
6      MR. GRIVER: Can we have this marked as
7  10.  For the record, Dalia 10 is the promissory
8  note and pledge agreement from 1993.
9      (Dalia Exhibit 10, 1993 promissory
10     note and pledge agreement,
11     marked.)
12     BY MR. GRIVER:
13 Q.  Is that your signature on the second
14 page of Exhibit 10?
15 A.  The second page?
16     MR. MEISTER: Third page.
17     BY THE WITNESS:
18 A.  Here.  In the promissory note, yes.  As
19 a general partner.  Yeah.
20     BY MR. GRIVER:
21 Q.  As a general partner of D&K LP,
22 correct?
23 A.  Right.
24 Q.  That's what you were in 1993?
25 A.  Yeah.  Right.

Page 150

GENGER
1      GENGER
2  Q.  And do you recognize this promissory
3  note and pledge agreement?
4  A.  Yeah.
5  Q.  Okay.  Can you tell me what was the
6  purpose of this promissory note?
7  A.  That it was really based on the notion
8  that -- it was to establish, really, a -- I can't
9  talk any more.
10     In order for the children to have
11 ownership, some ownership in TPR.  And that's why
12 the note was -- I mean, they got 240 shares, that
13 they worked for the million 2 that they received
14 from Arie and me, and a promissory note, and the
15 D&K note of whatever it is.  So in a way, we were
16 transferring ownership of TPR to the children.
17 It is estate planning.
18 Q.  And the estate plan was both children
19 should share in TPR equally?
20 A.  Right.
21     MR. MEISTER: Objection.  Asked and
22 answered.
23     BY MR. GRIVER:
24 Q.  Now, this note came up in your divorce
25 proceedings, did it not?

Page 151

GENGER
1      GENGER
2  A.  It might.  I don't remember.  It might
3  have.
4  Q.  Do you recall the fact that you took
5  the position that the D&K note should be valued
6  at zero dollars as part of your divorce
7  proceedings?
8  A.  Can you repeat the question.
9  Q.  In the marital arbitration before
10 Justice Milonis --
11 A.  Right.
12 Q.  -- do you recall taking the position
13 that the D&K note should be valued at zero?
14 A.  I don't remember such a statement.
15     MR. GRIVER: Let me have marked as
16 Exhibit 11 the final arbitration award from the
17 proceeding before Justice Milonis.
18     (Dalia Exhibit 11, final
19     arbitration award, marked.)
20     BY MR. GRIVER:
21 Q.  And if I could direct your attention to
22 page 15 where it discusses the D&K note.
23 A.  Okay.  I am on 15.
24 Q.  Okay.
25 A.  Any particular part that you want me to

Page 152

GENGER
1      GENGER
2  pay attention to?
3  Q.  Yes.  It is the three paragraphs under
4  D&K note.
5  A.  I don't see here where I'm stating that
6  the note really is zero.
7  Q.  Okay.  We will talk about it.
8      First of all, did you attend the
9  arbitration, the marital arbitration?
10 A.  Yes.
11 Q.  Were you there for the testimony of
12 Sagi in the arbitration?
13 A.  Yes.
14 Q.  Were you there for the testimony of
15 David Parnes?
16 A.  Yes.
17 Q.  As you sit here today, do you recall
18 anything that they said that you disagreed with?
19     MR. MEISTER: Objection.  It is
20 improper form.
21     MR. DELLAPORTAS: Object to form.
22     MR. ZILBERFEIN: Join.
23     BY THE WITNESS:
24 A.  I should answer?  I don't remember.
25 Because there were so many things there, I am

Case 1:19-cv-09319-AKH   Document 1-39   Filed 10/08/19   Page 105 of 224
ORLY GENGER VS.                                                                    DALIA GENGER
DALIA GENGER, et al                                                         December 13, 2012

Page 153

1       **GENGER**
2   **sure there was some things that I agreed or**
3   **disagreed with.  I mean, it is natural.**
4       **BY MR. GRIVER:**
5   Q.  Okay.  Do you recall that Arie was
6   claiming that he should be awarded one-half of
7   the value of the D&K note?
8   A.  **It says here, Arie claims he should be**
9   **awarded one-half of the value of D&K note.**
10  Q.  And that the arbitrator disagreed with
11  him and found for you on that issue; do you see
12  that?
13  A.  **What?  Again?**
14  Q.  The arbitrator found for you on the
15  issue where you disagreed with Arie?
16  A.  **I disagree, yeah.**
17  Q.  And it says here, quote, the D&K note
18  was a part of the estate planning scheme to
19  transfer wealth to the children, period, end
20  quote?
21  A.  **That's true.**
22  Q.  And it also goes on to say:  The
23  parties never intended for this note to be
24  collected, and to do so would retransfer wealth
25  back to the parents and defeat the estate

Page 154

1       **GENGER**
2   planning; do you see that?
3   A.  **Yes.  In '93 it was the intention.**
4   **Obviously, the circumstances changed since '93.**
5   Q.  And when exactly did circumstances
6   change?
7   A.  **When I got divorced.**
8   Q.  Well, this was something that you were
9   talking about in 2008, correct, this is the --
10  A.  **After the divorce, obviously, because**
11  **in actuality, the parents were paying the debt,**
12  **the note, okay.**
13  Q.  Okay.
14  A.  **It is obvious because neither Sagi or**
15  **Orly didn't have any resources to pay the note.**
16  **So this was a way that we thought that we can**
17  **transfer assets to the children.  But once I**
18  **got -- I divorced my husband -- I mean, the**
19  **circumstances changed because neither I -- I**
20  **didn't have also the resources to pay the note,**
21  **and the note was -- the D&K note was paid**
22  **previously by us, but it should have been paid by**
23  **the kids.  Isn't it?**
24  Q.  Well, let me ask you this:  When did
25  you get divorced from Arie?

Page 155

1       **GENGER**
2   A.  **2004.**
3   Q.  2004.
4       Now, at the time that you entered into
5   the note, you and your husband, Sagi, and Orly,
6   never intended for the note to be collected,
7   correct, it was just there as a mechanism to make
8   an equal distribution between Sagi and Orly?
9       **MR. MEISTER:** Objection to the form of
10  the question.
11      **BY THE WITNESS:**
12  A.  **It is not true.  That is not true.**
13      **BY MR. GRIVER:**
14  Q.  What is not true about my statement?
15  A.  **The note should not have been -- never**
16  **collected.**
17  Q.  It says here the parties never intended
18  for this note to be collected?
19  A.  **Yeah.  In '93.**
20  Q.  Well, this was a position you were
21  taking in 2008, correct?
22      **MR. MEISTER:** Objection.
23      **MR. DELLAPORTAS:** Object to form.
24      **MR. MEISTER:** You are reading what
25  someone else said, not what she said.

Page 156

1       **GENGER**
2       **BY MR. GRIVER:**
3   Q.  Was that the position you took in the
4   marital arbitration?
5       **MR. DELLAPORTAS:** Object to form.
6       **MR. ZILBERFEIN:** Objection.
7       **BY MR. GRIVER:**
8   Q.  Can you answer my question, please?
9   A.  **Can you ask me again.  What is your**
10  **question?**
11  Q.  In the marital arbitration, did you not
12  take the position that the note was never to be
13  collected?
14      **MR. MEISTER:** Object to the form of the
15  question, and also the grammar.  At least a
16  double negative.
17      **MR. GRIVER:** Could you read back the
18  question.
19      **THE WITNESS:** Again, yeah.
20      (WHEREUPON, the record was read by
21      the reporter as requested.)
22      **MR. MEISTER:** My objection stands.
23      **BY THE WITNESS:**
24  A.  **I want to explain.  If I did say so,**
25  **that note was --**

Page 157

1     GENGER
2     BY MR. GRIVER:
3  Q.  First answer my question and then I
4  will let you make any statement that you want.
5     MR. GRIVER: Can you read back the
6  question, because it is a yes or no question.
7     BY THE WITNESS:
8  A.  So where did I say it is not going to
9  be collected?
10    BY MR. GRIVER:
11 Q.  I am just asking, in the marital
12 arbitration, did you not take the position that
13 the note was not to be collected?
14    MR. MEISTER: Same objection to form
15 and to grammar.
16    BY THE WITNESS:
17 A.  I didn't say -- I didn't state this
18 particular position.
19    BY MR. GRIVER:
20 Q.  What position did you take?
21 A.  Position that I took, that the D&K note
22 is the problem that we have to deal with since
23 the kids do not have any resources to pay the
24 note. And we should be creative in getting rid
25 of the note. We tried to do so by selling the

Page 158

1     GENGER
2  note to someone that we trust.
3  Q.  And the problem with the note was that
4  you didn't want anyone to collect on the note,
5  correct?
6  A.  The problem was that the kids could not
7  afford to pay the note.
8  Q.  And so getting rid of -- giving the
9  note to somebody else --
10 A.  Selling the note. Selling the note.
11 Q.  In an attempt to make sure that no one
12 would try to collect the note?
13 A.  Yes. So we sold it to a friend that
14 promised it is not going to collect, foreclose
15 the note.
16 Q.  Because no one in the Genger family
17 intended for the note to be collected?
18    MR. MEISTER: Objection. Compound
19 question. Also requires the operation of other
20 people's minds.
21    MR. DELLAPORTAS: Objection. Calls for
22 speculation.
23    MR. ZILBERFEIN: Objection.
24 Repeat the question.
25 (WHEREUPON, the record was read by

Page 159

1     GENGER
2  the reporter as requested.)
3     BY THE WITNESS:
4  A.  At that time when we were divorcing,
5  the kids did not have any means to pay the note.
6  And since both parents I think wanted to
7  accommodate the children, the way that I saw it
8  is to somehow get rid of the note, legally,
9  because the note is a note and it has to be paid.
10    BY MR. GRIVER:
11 Q.  And you didn't want it to be paid?
12 A.  What I wanted or don't want really
13 doesn't matter. I mean, legally, it has to be
14 paid.
15 Q.  You gave it to David Parnes --
16 A.  Right.
17 Q.  -- so that it would not be collected
18 upon?
19 A.  Yeah. I am telling you that. Because
20 he promised he is not going to collect on the
21 note. But Orly sued him. Orly sued David
22 because he was willing to accommodate us.
23 Q.  But the reason you gave it to
24 Mr. Parnes is so the note would not be collected?
25    MR. MEISTER: Objection. Asked and

Page 160

1     GENGER
2  answered several times.
3     BY THE WITNESS:
4  A.  Yeah, I said we tried to make the life
5  of the kids easier so the note will disappear.
6     BY MR. GRIVER:
7  Q.  And you are saying that at some
8  point --
9  A.  But Orly objected to it, so we got back
10 the note. We got back the note that they had to
11 pay.
12 Q.  Did you know that David Parnes had
13 given back the note?
14 A.  Yes, because he was sued. So he gave
15 back the note.
16 Q.  Did you know at the time that he gave
17 the note back that he had given the note back?
18 A.  When he did it, yes. I know that he
19 gave it back.
20 Q.  How did you know that?
21 A.  Because he was sued, and as a result he
22 says, "I don't want to do you any favors, go and
23 take back the note."
24 Q.  Did he say that to you?
25 A.  No. He didn't say it to me.

ORLY GENGER VS.
DALIA GENGER, et al

DALIA GENGER
December 13, 2012

Page 161

GENGER

1
2 Q. Did he say -- he said it to Sagi,
3 didn't he?
4 A. He might have said it to Sagi. I know
5 that's the way that he reacted. And I think it
6 is very normal, that somebody does a favor and
7 gets sued, so.
8 Q. Did he react that way to you, or did he
9 react that way to somebody else?
10 A. To somebody else that informed me about
11 the way he acted.
12 Q. And that person who informed you about
13 the way David Parnes acted was Sagi Genger?
14 A. Absolutely.
15 Q. Did you tell Orly that David Parnes had
16 reacted to a suit and had given the note back?
17 A. I did not tell her.
18 Q. As trustee you did not think that was
19 something you needed to do?
20      MR. MEISTER: Objection. She wasn't
21 trustee then. This was 2006.
22      BY THE WITNESS:
23 A. Yeah. I became trustee in 2008.
24      BY MR. GRIVER:
25 Q. You believe that Mr. Parnes rescinded

Page 162

GENGER

1
2 the assignment in 2006; is that correct?
3 A. That he gave back the D&K note? At
4 some point, I don't know exactly when, but --
5 Q. You thought --
6 A. Whenever he was sued by Orly, then he
7 said, "Take back the note. I don't want to get
8 involved in this."
9 Q. And was that -- when was this?
10 A. I don't remember when Orly sued him. I
11 mean, I'm not keeping track of all the suits.
12      MR. GRIVER: Well, let me have this
13 marked as Exhibit 12.
14      (Dalia Exhibit 12, letter,
15      marked.)
16      MR. GRIVER: And while Mr. Leinbach is
17 handing out Exhibit 12, I will remind Mr. Meister
18 that the court has just instructed everyone to
19 not testify or instruct the witness as to dates,
20 places, times, or anything else. And so,
21 therefore, your testimony is not appreciated and
22 is also wrong.
23      MR. MEISTER: I didn't testify.
24      MR. GRIVER: Yes, you did.
25      MR. MEISTER: I made an objection.

Page 163

GENGER

1
2      MR. GRIVER: You said it is 2006.
3 That's a speaking objection.
4      MR. DELLAPORTAS: Trickery doesn't
5 really get us anywhere, Yoav. Just try to ask
6 questions.
7      BY MR. GRIVER:
8 Q. Okay. Looking at Dalia 12, does this
9 refresh your recollection that David Parnes
10 returned the note on November 25 of 2008?
11 A. As was stated, I did not actually --
12 wait a second. This letter was addressed to Sagi
13 Genger.
14 Q. Uh-huh.
15 A. Okay.
16 Q. Right.
17 A. And I remember that Sagi talked about
18 it.
19 Q. What did he tell you?
20 A. Because it was outrageous.
21 Q. And what did he tell you?
22 A. That David, who had the best
23 intentions, to help us, to get rid of the note,
24 got sued by Orly. What her motivation is, I do
25 not know, but she wanted, I guess, to owe money.

Page 164

GENGER

1
2 Q. And she wanted the note to be collected
3 upon?
4 A. Yeah. She wanted to carry a debt of
5 about $5 million. I mean, it doesn't make sense,
6 but that's the way she reacted.
7 Q. And you thought that that was against
8 the intent of the parties --
9 A. I thought it doesn't make sense that
10 somebody will say, "You know what, I'm really
11 dying to pay -- to owe $5 million."
12 Q. As trustee of the Orly Genger trust,
13 did you speak to Orly about Mr. Parnes' recision
14 of the assignment --
15 A. No. No way.
16 Q. Did you have your attorneys speak to
17 Orly Genger's attorneys about the recision of the
18 assignment?
19 A. This I don't remember.
20 Q. Okay. Did you ever go to your
21 attorneys as trustee of the trust and ask them as
22 attorneys for trustee -- as attorneys for the
23 trust, what should you do in this situation?
24 A. I don't remember.
25 Q. Okay. But you never told Orly about

Case 1:19-cv-09319-AKH    Document 1-39    Filed 10/08/19    Page 108 of 224
ORLY GENGER VS.                                                                    DALIA GENGER
DALIA GENGER, et al                                                          December 13, 2012

Page 165

GENGER

1    GENGER
2    this recision of assignment, correct?
3        MR. MEISTER: Objection. Asked and
4    answered.
5        BY THE WITNESS:
6    A.  We were not on speaking terms.
7        BY MR. GRIVER:
8    Q.  Well, you could have written her a
9    letter?
10   A.  I know.
11       MR. MEISTER: Objection. That's not a
12   question.
13       BY MR. GRIVER:
14   Q.  But you chose not to write her a
15   letter?
16       MR. MEISTER: Objection. That's not a
17   question. If you are talking about --
18       BY MR. GRIVER:
19   Q.  Isn't that correct?
20   A.  I did not notify Orly in any way
21   because her lawyers were aware already that this
22   happened.
23   Q.  Her lawyer were aware? How do you know
24   that her lawyers were aware already?
25   A.  Because later on there is a

Page 166

GENGER

1    GENGER
2    continuation to this story. That's why I know.
3    Because she sued David. So, obviously, she knew
4    what's happening.
5    Q.  Other than her suing David, you have no
6    other reason to think that --
7    A.  I didn't have control of what she's
8    doing by her own initiative.
9    Q.  But as trustee of the trust you could
10   have provided her with the information that David
11   was rescinding --
12   A.  I could do many things.
13   Q.  But you chose not to, correct?
14   A.  This particular case, I knew that she
15   knows already.
16   Q.  Okay. And who was your lawyer in May
17   of 2008?
18   A.  2008?
19   Q.  Uh-huh.
20   A.  I think it was Mr. Meister, wasn't it?
21   No? No. So I am wrong then.
22   Q.  So you don't recall --
23   A.  I don't remember when, really, I
24   started to work with Mr. Meister.
25   Q.  Okay. It was never the intent of the

Page 167

GENGER

1    GENGER
2    parties for TPR to ever collect on the D&K note;
3    isn't that correct?
4        MR. DELLAPORTAS: Objection. Calls for
5    speculation.
6        MR. ZILBERFEIN: Join.
7        BY THE WITNESS:
8    A.  Now, can you repeat the question.
9        BY MR. GRIVER:
10   Q.  Sure.
11       It was never the intent of any of the
12   parties to --
13   A.  Any of the parties, meaning?
14   Q.  To the D&K note?
15   A.  Who is any of the parties?
16   Q.  Well, let's -- okay.
17       When you signed the promissory note --
18   A.  Right.
19   Q.  -- to TPR on December 21 of 1993, it
20   was never your intent that TPR collect on the
21   note, correct?
22       MR. DELLAPORTAS: Object to form.
23       MR. ZILBERFEIN: Objection.
24       BY THE WITNESS:
25   A.  Okay.

Page 168

GENGER

1    GENGER
2        BY MR. GRIVER:
3    Q.  Just a simple yes or no.
4    A.  It should have been collected, but we
5    didn't imagine that the kids are going to pay the
6    note, I mean.
7    Q.  You were general partner of D&K GP
8    until October of 2004; is that correct?
9    A.  Yes.
10   Q.  And you divorced your husband in, I
11   think you said, 2005?
12   A.  4.
13   Q.  2004?
14   A.  Yes.
15   Q.  Now, if I can show you this, which I
16   will mark as Dalia 13.
17       (Dalia Exhibit 13, document,
18       marked.)
19       BY MR. GRIVER:
20   Q.  Part of this notice of default --
21   A.  Wait a second. What's the date here?
22   Q.  August 31 of 2008.
23   A.  All right.
24   Q.  Part of the notice of default notes
25   that D&K GP had failed to make regular payments

Page 169

1     GENGER
2 since 2000.
3     Now, from --
4     MR. MEISTER: Is that a predicate, or
5 are you reading the note -- reading this?
6     BY MR. GRIVER:
7 Q. Do you see that?
8 A. Yeah. It is -- you know, this is
9 really complicated so let's take it slowly, okay.
10 Q. Page 1, line 3.
11 A. Right.
12 Q. I will just ask you this: Isn't it
13 true that D&K GP failed to make regular payments
14 on the notes since 2000?
15 A. Right.
16 Q. Okay. Now, at that time, you were the
17 general partner of D&K GP?
18 A. Right.
19 Q. You had the money to make those
20 payments?
21 A. No, I didn't.
22 Q. You didn't?
23 A. No, I didn't. I mean, the GP was
24 looked upon as a marital debt, okay, and I paid
25 half of it, and my husband paid half of it, okay.

Page 170

1     GENGER
2 And that was the story. And the fact that my
3 husband stopped paying -- because I was never in
4 charge of the finances in our household. So he
5 was the one that decided if he is going to pay or
6 not to pay.
7 Q. Okay.
8 A. I had nothing to do with that.
9 Q. At the -- in front of the court --
10 strike that.
11     During the marital -- strike that
12 again.
13     Why did you not want the note to be
14 returned to TPR?
15     MR. MEISTER: Objection. Assumes a
16 fact not in evidence.
17     BY THE WITNESS:
18 A. Why did I not want the note to be a
19 burden for my children?
20     BY MR. GRIVER:
21 Q. No. To be returned to TPR?
22     MR. MEISTER: Same objection.
23     BY THE WITNESS:
24 A. Because the note is a -- the note had
25 to be paid, okay, and, obviously, I did not want

Page 171

1     GENGER
2 the children to pay the note.
3     BY MR. GRIVER:
4 Q. And because returning the note to TPR
5 would result in the destruction of the Genger
6 family planning, that Orly and Sagi would share
7 equally in TPR, correct?
8 A. Yeah, unfortunately, we had a divorce,
9 and things change. But originally we were hoping
10 that the children will own part of the company,
11 and we will be able to finance the note, pay the
12 note. But it didn't happen.
13 Q. Now, when the --
14     MR. GRIVER: Could I have that answer
15 read back, please.
16     (WHEREUPON, the record was read by
17     the reporter as requested.)
18     BY MR. GRIVER:
19 Q. Now, your intention was that David
20 Parnes would keep the note forever, correct?
21 A. Yeah.
22 Q. Past the time of your divorce?
23 A. Yes. He will keep it. And later on, I
24 mean, we might have found some other solution,
25 legal solution, so that no one is going to get --

Page 172

1     GENGER
2 no one will be in a position to collect on the
3 note.
4 Q. You, yourself, did not want the note to
5 be collected?
6 A. I did not want the children to pay the
7 note, for the children will pay the note.
8 Q. You did not want --
9 A. Because I did not -- I personally did
10 not want the children to owe money to anyone.
11 Q. You did not want the note to be
12 collected, correct, not by David Parnes, not by
13 anyone?
14 A. I didn't want, but that's my want.
15     MR. MEISTER: Objection.
16     BY THE WITNESS:
17 A. But, legally, obviously, it has to be
18 paid.
19     BY MR. GRIVER:
20 Q. Well, you are not an attorney, correct?
21 A. What?
22 Q. You are not an attorney?
23 A. It is true, but I do have some
24 knowledge about notes.
25 Q. Okay. Now, David Parnes returned the

ORLY GENGER VS.
DALIA GENGER, et al

DALIA GENGER
December 13, 2012

Page 173

1      GENGER
2    note in 2008, correct?
3        MR. MEISTER: I'm sorry.  Can you say
4    the end again.
5        BY MR. GRIVER:
6    Q.  David Parnes returned the note in 2008,
7    correct?
8    A.  I guess that's when he did.  Yeah.
9        MR. GRIVER: Okay.  Let me have this
10   marked as Dalia 14.  For the record, Exhibit 14
11   is an affidavit of Dalia Genger.
12       (Dalia Exhibit 14, Dalia Genger
13       affidavit, marked.)
14       BY MR. GRIVER:
15   Q.  Ms. Genger, is that your signature on
16   page 4?
17   A.  Yes.
18   Q.  This is an affidavit that you submitted
19   in the surrogate court on March 11, 2008?
20   A.  Yes.
21   Q.  And this is after your divorce,
22   correct?
23   A.  (Indicating).
24   Q.  And this is after the marital
25   arbitration with Justice Milonis?

Page 174

1      GENGER
2    A.  I think so, yeah.
3    Q.  Okay.  Now, if you could look, please,
4    you can read as much as you want, but I am going
5    to ask you about paragraphs 8 and 9.
6    A.  Ask me specifically about what
7    paragraphs?
8    Q.  Paragraphs 8 and 9.
9    A.  8 and 9?
10   Q.  Uh-huh.
11   A.  8 is what we discussed before, right?
12   Yeah.  I didn't get anything.  8.  And then 9,
13   too?
14   Q.  I want you to read as much of this
15   affidavit as you want because, among other
16   things, I want to know whether you still agree
17   with it.
18   A.  So far what I am reading is true.
19   Q.  And you have read --
20   A.  Because it is a disaster to get back
21   the note if you couldn't get rid of it.  I mean,
22   I just don't understand the logic of Orly's
23   actions.  In general, I mean, I always put my
24   children --
25       MR. MEISTER: Is there a question

Page 175

1      GENGER
2    pending?
3        THE WITNESS: No, there's no question.
4    Okay.
5        BY MR. GRIVER:
6    Q.  Ms. Genger, in general --
7    A.  In general --
8        MR. MEISTER: No, no.  I insist there
9    be a question.  I object.
10   Q.  Please continue.
11   A.  Okay.  I will continue.
12       In general, I always put my children's
13   interests before my interest, my personal
14   interest, and that's the way I behave, and I --
15   that's my philosophy, and that's why I didn't
16   want the kids to bear the consequences of paying
17   $9 million.
18   Q.  And you wanted the children to share
19   equally?
20   A.  I wanted -- the original purpose was
21   the children will share equally the assets that
22   they were given.
23   Q.  Thank you.
24       In paragraph 8, the last sentence:  I

Page 176

1      GENGER
2    do not stand to gain anything personally by the
3    agreement, other than protecting the estate plan
4    implemented for the benefit of my children,
5    unquote.  Do you see that language?
6    A.  Yes.  I do not stand to gain.  Yeah.
7    Q.  On March 11, 2008, when you signed this
8    affidavit under oath --
9    A.  Again --
10   Q.  -- was the estate plan still in effect?
11   A.  Can you say this again.
12   Q.  Sure.
13       On March 11, 2008 when you signed this
14   affidavit --
15   A.  This affidavit, yeah.
16   Q.  -- was the estate plan still in effect?
17       MR. DELLAPORTAS: Objection.
18       MR. ZILBERFEIN: Objection.
19       BY MR. GRIVER:
20   Q.  That you had set up?
21       MR. DELLAPORTAS: Object to form.
22       MR. MEISTER: Object to the form of the
23   question.
24       BY THE WITNESS:
25   A.  Well, the way I see it is that the

Page 177

1   GENGER
2   estate planning was done -- was signed in '93,
3   not foreseeing what the future is going to be,
4   namely that I will divorce my husband and there
5   will be no one to pay the note, okay.
6       BY MR. GRIVER:
7   Q.   In 2008 when you signed this affidavit,
8   you were trying to prevent Orly from putting in a
9   new trustee because you thought that doing so
10  would destroy the estate plan, correct?
11  A.   I prevented what?
12  Q.   You say -- just look at paragraph 8.
13  A.   8?
14  Q.   Paragraph 8.
15  A.   Yes.
16  Q.   Was the estate plan implemented for the
17  benefit of your children still in effect in March
18  of 2008?
19      MR. MEISTER: Objection.
20      BY THE WITNESS:
21  A.   When you say the estate planning, do
22  you mean that the note is valid?
23      BY MR. GRIVER:
24  Q.   No.  What I am saying is, is that in
25  March of 2008, you did not want the note returned

Page 179

1   GENGER
2   Q.   Okay.
3   A.   Yeah.
4   Q.   So you did not --
5   A.   So basically --
6   Q.   Go ahead.
7   A.   Basically, this statement came about
8   because I think the candidate that was supposed
9   to serve as a trustee, I did not trust.
10  Q.   And you were afraid that --
11  A.   Yeah, I was afraid that --
12  Q.   -- he would cause the note to be
13  returned to TPR, which would recreate a related
14  party obligation --
15      MR. DELLAPORTAS: Objection.
16      BY THE WITNESS:
17  A.   No.  The note was returned --
18      MR. DELLAPORTAS: Ms. Genger, when I
19  state an objection, you have to let me state it.
20      THE WITNESS: Okay.  I'm sorry.
21      MR. DELLAPORTAS: Object to form.
22  Mischaracterizes the record.
23      MR. ZILBERFEIN: I object as well.
24      BY THE WITNESS:
25  A.   Let me understand.

Page 178

1   GENGER
2   to TPR?
3   A.   It is true.
4   Q.   Because to do so would be to destroy
5   the estate plan?
6   A.   Right.
7   Q.   In fact, you did not want Orly to have
8   a new trustee appointed because you were afraid
9   that one of the things he would do would be to
10  collect on the note and therefore --
11  A.   No, I don't remember saying that.
12      Where does it say?
13  Q.   Well, look at 9.
14  A.   9.
15  Q.   These are your words.
16  A.   Okay.  Fine.
17  Q.   The note --
18  A.   I accept that it's my words.  I just
19  don't remember the --
20  Q.   If the note is returned to TPR --
21  A.   If the note is returned to TPR, which
22  my daughter seems to seek through the appointment
23  of a new trustee, it would recreate a related
24  party obligation and would have to be accelerated
25  or forgiven.

Page 180

1   GENGER
2       MR. MEISTER: Can I have the question
3   read back, please.
4       (WHEREUPON, the record was read by
5       the reporter as requested.)
6       BY MR. GRIVER:
7   Q.   Let's start from the beginning.
8       You still agree with paragraph 9 of
9   your affidavit, correct?
10  A.   I agree that if someone that I do not
11  trust will be a person that only my husband
12  trusts and not both of us trust, I wasn't sure
13  that he's not going to return the note.
14  Q.   And returning the note would destroy
15  the value of the Orly trust?
16  A.   Right.
17  Q.   And what it would do, it would wipe out
18  the assets of the trust in satisfaction of the
19  obligation under the note, correct?
20  A.   It is true, isn't it?
21  Q.   And you said that -- and then at the
22  very bottom you say:  This result is inconsistent
23  with my responsibilities to my children as their
24  mother and as trustee of the Orly trust, period.
25  Do you see that?

---

Page 181

1     GENGER
2  A.  I don't see, but, yes, it is.
3  Q.  No, let's take a look at it.  It's the
4     next to the last sentence.
5  A.  Yes.  This result is inconsistent with
6     my responsibilities to my children as their
7     mother, their caring mother, and as a trustee of
8     Orly trust.  Obviously, this would have
9     bankrupt -- I mean, if they had to pay the note,
10    it would bankrupt the trust.
11 Q.  And such a result would be inconsistent
12    with your role as mother and as trustee?
13 A.  It is true.
14 Q.  And you did not want to see the Orly
15    trust -- you did not want to see the value of the
16    Orly trust destroyed, did you?
17 A.  Absolutely.
18 Q.  No matter who destroyed it?
19 A.  Obviously.  I mean, always.  As I said,
20    no matter what, I always had my first -- my first
21    concern was for Orly's interest.
22 Q.  And you were telling the court that
23    unlike Mr. Coleman, who you did not trust, you
24    would be there to protect the trust as trustee of
25    the Orly trust, correct?

---

Page 182

1     GENGER
2     MR. MEISTER: Objection.  Is that what
3  you are reading?
4     BY MR. GRIVER:
5  Q.  Is that why you sent in this affidavit,
6     to let the court know you would protect the
7     trust?
8  A.  Where are you seeing this?
9  Q.  I am just asking you.  You wanted to
10    be --
11 A.  I -- okay.  Let me explain.  Okay.  I
12    did not trust my husband or all these other
13    people that were associated with him because they
14    just follow his instructions, okay.  And that
15    caused a lot of problems, okay.  And I did not
16    want to see Orly's trust being wiped out.
17 Q.  Okay.  Now, since you have been
18    trustee, Orly's trust has been wiped out?
19    MR. DELLAPORTAS: Objection.
20 Mischaracterizes the record.
21    MR. ZILBERFEIN: Objection.
22    BY MR. GRIVER:
23 Q.  TPR collected on the note, didn't it?
24    MR. DELLAPORTAS: Objection.  That's a
25 different question.

---

Page 183

1     GENGER
2     BY THE WITNESS:
3  A.  Sagi --
4     MR. ZILBERFEIN: Objection.
5     BY MR. GRIVER:
6  Q.  TPR collected on the note, correct?
7  A.  If you are talking about the fact that
8     Sagi sued D&K LP, right?  Are you talking about
9     this?
10 Q.  I am asking, to your knowledge, as
11    trustee of the trust --
12 A.  Orly --
13 Q.  -- has the D&K note been collected by
14    TPR?
15 A.  The D&K note was -- I guess, partially,
16    I mean, yeah.  Again, I mean, it is really very
17    confusing.  Can you ask me again the question.
18 Q.  TPR has collected on the D&K note,
19    correct?
20 A.  TPR has collected on the note -- are
21    you alluding to the fact that Sagi -- TPR sold in
22    an auction the TPR shares?  Are you talking --
23 Q.  TPR bought in an action the TPR shares.
24 A.  Right.
25 Q.  D&K sold --

---

Page 184

1     GENGER
2  A.  Right.  Yeah.
3  Q.  Sagi sold the shares and bought the
4     shares?
5  A.  Absolutely.  Yes.  I mean, TPR.
6  Q.  So which means that --
7  A.  TPR sold and bought its own shares from
8     D&K LP.
9  Q.  Which is not what you wanted?
10 A.  Yeah, but, I couldn't stop it.  What
11    could I do.
12 Q.  Well, you could not stop it -- well,
13    let me ask you this.
14    Exhibit 13, please.  Did you ever see
15    this --
16 A.  Yeah.
17 Q.  -- notice of default?
18 A.  Yeah.
19 Q.  When did you see this notice of
20    default?
21 A.  I don't remember exactly when.
22 Q.  When did you first see it?
23 A.  I don't remember when.
24 Q.  Well, do you remember -- let me look.
25    Did you ever receive the notice in the

---

Case 1:19-cv-09319-AKH   Document 1-39   Filed 10/08/19   Page 113 of 224
ORLY GENGER VS.                                                        DALIA GENGER
DALIA GENGER, et al                                              December 13, 2012

Page 185

1     GENGER
2   mail -- strike that.
3       Did you ever receive the notice on or
4   about August 31, 2008?
5   A. I remember that I saw it.
6   Q. Okay. Did you -- let me point you to
7   Dalia Exhibit 3.
8   A. Yeah. What page?
9   Q. Look at interrogatory number 1. This
10  is a question to you. Did you receive the
11  8-31-08 notice? That's the note notice marked --
12  A. I responded I don't remember receiving
13  the notice.
14  Q. Okay. And is that still true?
15  A. I just said that I don't remember that.
16  But I did say that I remember that I was -- I did
17  see this document. I don't know if it was -- if
18  it came by mail or whatever.
19  Q. Well, you do go on to say your attorney
20  Robert Meister received a copy of the notice on
21  May 19, 2009; do you see that?
22  A. So it is true then.
23  Q. That's after the sale?
24  A. Yeah. I guess.
25  Q. Do you remember receiving a copy of the

Page 186

1     GENGER
2   notice before the sale?
3   A. Before the sale? I am trying to
4   remember. Yeah. I was aware that Sagi is going
5   to take the step --
6   Q. I understand that at some point you
7   became aware. I am asking did you receive the
8   8-31-08 notice prior to your attorney receiving a
9   copy of the notice on May 19?
10  A. That's the answer. I don't remember.
11  Q. Okay. And you don't remember receiving
12  such a notice then?
13  A. I don't remember. I might have.
14  Q. Or you might not have?
15  A. Right.
16  Q. Did you ever tell Orly about the
17  8-31-08 notice?
18  A. No.
19  Q. Why not?
20  A. Because, first of all, I might have not
21  received it, so I didn't tell her. And, second,
22  this was something that I could not stop.
23  Q. Okay. We will -- let's talk about
24  that. Why could you not stop it?
25  A. Because TPR -- I didn't have any

Page 187

1     GENGER
2   influence on TPR in the way that I can stop them
3   from acting to foreclose on the note.
4   Q. Did you go to Sagi and say, "What are
5   you doing? Why are you doing this?" Did you
6   ever asking Sagi that?
7   A. I might not have received them, as we
8   said, so I don't know if I said it or not.
9   Q. At any time before the sale on February
10  27, 2009, did you try and stop the sale by going
11  to Sagi and saying, "don't do this," or words to
12  that effect?
13  A. If I was aware of that before, I might
14  have told him, but --
15  Q. I don't want you to speculate.
16  A. I am saying because I do not remember.
17  Q. You don't remember ever going to Sagi
18  and saying, "Please don't do this sale"?
19  A. No, I didn't say that.
20  Q. Or words to that effect?
21  A. Right. I did not say that because it
22  is not my place to say it. He can do whatever he
23  wants. He has a note, and he wanted to collect
24  on it.
25      MR. GRIVER: Could you repeat her

Page 188

1     GENGER
2   answer, please.
3       (WHEREUPON, the record was read by
4       the reporter as requested.)
5       BY MR. GRIVER:
6   Q. Did you as trustee go to the trust
7   attorneys and try and find a way to prevent or
8   delay the sale?
9   A. I don't remember.
10  Q. By that time your attorneys would be
11  Mr. Meister?
12  A. I guess. Yeah.
13  Q. Did you ever go to Mr. Meister in an
14  attempt to find a legal way to stop the sale?
15  A. No.
16  Q. Let me show you what's been marked
17  as --
18  A. I tell you, I didn't have intentions to
19  participate in this because there was -- we
20  didn't have any resources to compete, I mean, in
21  auction.
22      MR. MEISTER: Can we take a break now,
23  please?
24      BY MR. GRIVER:
25  Q. Ms. Genger, do you need a break?

ORLY GENGER VS.
DALIA GENGER, et al

DALIA GENGER
December 13, 2012

Page 189

1    GENGER
2  A.  I guess so.  Yeah.
3    MR. GRIVER: Okay.  Let's take a break.
4  I ask that you not speak to anyone about your
5  testimony.  Five minutes?
6    MR. MEISTER: Five minutes.
7    (WHEREUPON, a recess was had from
8    3:34 p.m. to 3:42 p.m.)
9    MS. WARREN: Are we on the record?
10  During the break, I was in the bathroom
11  with Ms. Genger, who approached me and said that
12  she might have made a mistake in her past
13  testimony.  I cut her off before she could tell
14  me the substance of any mistake that she thought
15  that she made.  But if she feels that a mistake
16  is made, I would like to just ask that we give
17  her an opportunity to clarify the record.
18    MR. LEINBACH: That sounds absolutely
19  reasonable.
20    BY MR. GRIVER:
21  Q.  Ms. Genger, this correction that you
22  made, did anyone talk to you about this
23  correction?  I am not talking about Ms. Warren.
24  I am saying did you speak with Sagi or anyone
25  else, and that's why you remember this?

Page 190

1    GENGER
2  A.  No, no.
3  Q.  Okay.  Why don't you put your
4  correction on the record.
5  A.  Okay.  The correction is that once I
6  was aware that this notice existed, I did consult
7  with my lawyer, and I chose not to inform Orly.
8  Q.  When you say that you consulted with
9  your attorney, you were consulting as trustee of
10  the trust?
11  A.  As a trustee, obviously.
12  Q.  And you were going to this attorney
13  understanding that he represented the trust?
14  A.  The trust.
15  Q.  He represented the trust?
16  A.  The trust.
17  Q.  And you were seeking advice as trustee
18  for what is best for the trust?
19  A.  Right.
20  Q.  And the beneficiary of the trust?
21  A.  Obviously.
22  Q.  And that was Mr. Meister?
23  A.  Uh-huh.
24  Q.  And did he provide you advice?
25  A.  Yes.

Page 191

1    GENGER
2  Q.  And what was his advice?
3  A.  I don't think I can tell you that.
4    MR. GRIVER: Mr. Meister, are you --
5    BY MR. GRIVER:
6  Q.  I don't hear any objection from
7  Mr. Meister instructing you not to answer.  So
8  what was Mr. Meister's advice?
9  A.  Okay.  So we weighed our options --
10    MR. ZILBERFEIN: You mean to the extent
11  it is attorney-client privilege?
12    BY THE WITNESS:
13  A.  I think it is privileged, but we --
14    BY MR. GRIVER:
15  Q.  Go ahead.
16  A.  Okay.  So we weighed the options that
17  we had, and we concluded that there is nothing
18  that I can do to stop Sagi from, you know, doing
19  whatever he did with the auction.
20  Q.  There's nothing you could do to stop --
21  A.  Yeah.
22  Q.  Did you -- and how long was this
23  conversation with your attorney?  Was it --
24  A.  You want me to say -- are you kidding?
25  Q.  Did you discuss it for an hour?  Did

Page 192

1    GENGER
2  you discuss it for half an hour?
3  A.  I don't know.  I have to look in my
4  bills.  I don't know.
5  Q.  Again, I will ask for the bill --
6  A.  Yeah.
7  Q.  -- so that we can discuss this.
8    Did you at the time -- how long had
9  Mr. Meister been your attorney, the attorney for
10  the trust?
11  A.  I don't remember when we started.  I
12  don't remember when I -- when he started to be
13  the lawyer for the trust.  I don't remember what
14  date it was.
15  Q.  Besides your attorney, did you speak to
16  anybody else about it?
17  A.  No.
18  Q.  Did you speak with Sagi?
19  A.  No.
20  Q.  Do you know --
21    MR. MEISTER: Can we go off the record
22  for a second and take a break?
23    MR. GRIVER: No, not in the middle of
24  this.
25    BY THE WITNESS:

Page 193

1    GENGER
2  A.  Okay.  What is the question?  I did not
3   discuss with Sagi.
4    BY MR. GRIVER:
5  Q.  Okay.  Well, did your lawyer at the
6   time know about the position you had taken in the
7   marital arbitration?
8  A.  If he knew?  I don't know if he knew.
9  Q.  Okay.  Did you and your attorney
10  discuss --
11    MR. MEISTER: Mr. Griver, you a moment
12  ago asked that we produce a copy of a bill
13  reflecting conversations, and I have a copy of
14  that bill with me.
15    MR. GRIVER: Are these all the bills?
16    MR. MEISTER: Beg pardon?
17    MR. GRIVER: Are these all of your
18  bills?
19    MR. ZILBERFEIN: It's two pages.  I
20  don't think two pages are all of his bills.
21    THE WITNESS: They are concerning the
22  discussion --
23    MR. MEISTER: Dalia, let me say it.
24  It is a bill dated March 5, 2009
25  covering the period of February 4, 2009 through

Page 194

1    GENGER
2  February 27, 2009.  And I do not believe it is
3  privileged.  I do not intend to waive any
4  attorney-client privilege.  If you will let me
5  produce it with that caveat, I am prepared to
6  produce it.
7    MR. GRIVER: Is it your position that
8  that document is privileged?
9    MR. MEISTER: Looking at it, I do not
10  believe that it contains any confidential
11  communications from my client to me, nor any
12  legal advice which I rendered.  It merely
13  reflects the facts of the conversations and the
14  dates and the times.
15    MR. GRIVER: I will take that because
16  then it is certainly not privileged, but I will
17  tell you it is my position that if you are the
18  attorney for the trust giving advice to the
19  trustee of the trust, that there is no privilege.
20    MR. MEISTER: I understand that's your
21  contention.  What I'm saying is without acceding
22  to that, if you will accept it without that being
23  a concession, I am prepared to produce it.
24    MR. GRIVER: That is fine.
25    MR. MEISTER: Would you like to make

Page 195

1    GENGER
2  copies?
3    MR. LEINBACH: Sure, and I will give it
4  back.  I will make one for every one.
5    MR. MEISTER: Thank you.
6    BY MR. GRIVER:
7  Q.  All right.  What options did you
8   discuss --
9    MR. MEISTER: Why don't you wait
10  until -- because it is going to enable her to
11  answer some questions which she didn't remember
12  which you just asked.
13    MR. GRIVER: All it is is your time.
14  That's for your deposition we will get into that.
15  What I am talking about now with Ms. Genger is
16  her memory.
17    BY MR. GRIVER:
18  Q.  What options did you discuss with
19   Mr. Meister at that time regarding --
20  A.  The option, if I have any tools that I
21   can use to stop Sagi from having this auction.
22  Q.  Did you --
23  A.  You know, he had a note, and legally he
24   was collecting on the note.  I mean --
25  Q.  Any --

Page 196

1    GENGER
2  A.  I mean TPR.
3    MR. GRIVER: Any memoranda, any
4  documents, any e-mails related to these
5  conversations between you as trust -- and
6  regarding any advice that you gave to Dalia
7  Genger as trustee, did or did not give to Dalia
8  Gener as trustee, I would like that.  And I am
9  putting my demand on the record right now.
10    BY MR. GRIVER:
11  Q.  Did you discuss with Mr. Meister the
12  possibility of calling up Sagi and saying, "Hey,
13  please stop"?
14  A.  I don't remember that I -- I believe
15   I -- I never had any chance of stopping him, so I
16   didn't call.
17  Q.  Did you discuss with Mr. Meister the
18  possibility of suing Sagi to stop him?
19  A.  What?
20  Q.  Suing TPR to stop him?
21  A.  I'm sorry?
22  Q.  Did you discuss the possibility of
23   suing to prevent the sale?
24  A.  No.  Because I am not really believing
25   in taking legal actions and spending money of the

ORLY GENGER VS.
DALIA GENGER, et al

DALIA GENGER
December 13, 2012

---

Page 197

1    **GENGER**
2    **trust to be defeated in this case.**
3    Q.  Okay.  Did you tell -- at the time that
4    you were speaking with Mr. Meister, did he have
5    all of the documentation for the marital
6    arbitration, do you know?
7    **A.  I don't know if he had.  He might.**
8    Q.  Did you discuss with Mr. Meister the
9    possibility of letting Orly know about the sale?
10   **A.  I don't remember it.**
11   Q.  Did you discuss with -- strike that.
12       You know what an auction is, correct?
13   **A.  Yes, I do.**
14   Q.  People show up, you try and get the
15   most money?
16   **A.  Yeah, the most money.  This is how**
17   **you --**
18   Q.  Did you discuss with Mr. Meister the
19   possibility of letting Orly know so that other
20   people could go in and bid on the TPR asset?
21   **A.  No, I did not discuss this.**
22   Q.  That was not an option that you
23   considered?
24   **A.  No.**
25   Q.  Is that an option that was raised by

---

Page 198

1    **GENGER**
2    Mr. Meister?
3    **A.  I don't think so.**
4    Q.  Did you consider letting Arie know
5    about the sale?
6    **A.  I presume that if I didn't notice Orly,**
7    **of course I didn't notify Arie.  It is not my**
8    **duty to notify Arie if there is a sale, an**
9    **auction of shares.**
10   Q.  If there is -- is it your duty as a
11   trustee to try and get the best price for the
12   shares?
13   **A.  It is why --**
14       MR. MEISTER: Objection.
15       BY THE WITNESS:
16   **A.  This is why there is an auction.**
17       BY MR. GRIVER:
18   Q.  And so do you think that Arie --
19   **A.  It is Sagi's responsibility.  Wherever**
20   **he's selling the shares, it is his responsibility**
21   **to let people know that there is an auction and**
22   **get bids on that.**
23   Q.  And you did not think that --
24   **A.  It is not my responsibility.**
25   Q.  It is not your responsibility as

---

Page 199

1    **GENGER**
2    trustee to do that?
3    **A.  No.**
4    Q.  How is it --
5    **A.  Because I didn't.**
6    Q.  Because you didn't?
7    **A.  Because it wasn't my auction.**
8    Q.  Okay.  Well, but it was -- but the Orly
9    trust had an interest in that auction?
10   **A.  It is true.**
11   Q.  Okay.  And so why didn't you call up
12   Arie and say, "Hey, Arie, those TPR shares are
13   for sale"?
14   **A.  Because Arie's interest is not the same**
15   **as my interest or Orly's interest.**
16   Q.  Isn't it Orly's interest to get the
17   best price for her interest?
18   **A.  It is.**
19   Q.  Okay.  So isn't getting as many people
20   as possible who want to buy the shares --
21   **A.  But it is not my responsibility to**
22   **collect people that will participate in the**
23   **auction.  Sagi followed the procedure that he**
24   **should have, the procedure for an auction, and he**
25   **followed whatever he was supposed to do.  And**

---

Page 200

1    **GENGER**
2    **whoever was aware of it is fine and participated**
3    **in the auction.**
4    Q.  And you weren't going to let Arie know?
5    **A.  Not Arie or anybody else.**
6    Q.  How do you know that it is Sagi's
7    responsibility only to get people to show up at
8    his auction?  Is that something that Mr. Meister
9    told you?
10       MR. MEISTER: Objection.  Compound.
11       BY THE WITNESS:
12   **A.  In general, in general, if you have --**
13   **you auction something, you want people to be**
14   **aware of the auction and bid on it, and, you**
15   **know, have the highest price possible.**
16       BY MR. GRIVER:
17   Q.  Did Mr. Meister or anyone at his law
18   firm tell you that it was not your responsibility
19   as trustee to try and get the highest price for
20   the TPR D&K interest?
21       MR. MEISTER: Read that back, please.
22       (WHEREUPON, the record was read by
23       the reporter as requested.)
24       BY THE WITNESS:
25   **A.  He never said that.  He never told me**

---

Case 1:19-cv-09319-AKH   Document 1-39   Filed 10/08/19   Page 117 of 224
ORLY GENGER VS.                                                    DALIA GENGER
DALIA GENGER, et al                                              December 13, 2012

Page 201

1      **GENGER**
2   **that I shouldn't look for -- what was the**
3   **question again?**
4      **BY MR. GRIVER:**
5   Q.  Yes.
6      Did Mr. Meister tell you that you
7   shouldn't look for other people to participate in
8   the auction?
9      MR. MEISTER: Just so we are clear,
10  your question is should not?
11     MR. GRIVER: Should not.
12     **BY THE WITNESS:**
13  A.  **That other people --**
14     **BY MR. GRIVER:**
15  Q.  Let me rephrase it, and please listen.
16     Did Mr. Meister or anyone else at his
17  law firm tell you that it was not your
18  responsibility as trustee to try and maximize the
19  price at the auction?
20  A.  **I don't remember that we discussed that**
21  **subject, that option.**
22  Q.  Did you and Mr. Meister discuss what
23  your responsibilities are as trustee with regard
24  to the UCC auction?
25  A.  **The UCC?**

Page 202

1      **GENGER**
2   Q.  With regard to the auction?
3   A.  **Again, I am getting tired.  What are**
4   **you saying?**
5   Q.  Did you and Mr. Meister discuss what
6   your responsibilities were as trustee with regard
7   to the auction?
8   A.  **With regard to the auction?  I think,**
9   **basically, what was discussed is if I -- if the**
10  **trust in any way can be a participant in the**
11  **auction.**
12  Q.  And what did Mr. Meister say?
13  A.  **And, obviously, we didn't have the**
14  **resources to participate.**
15  Q.  What about other people participating
16  in the auction?
17  A.  **I don't know about other people.**
18  Q.  Who had the resources?  You never asked
19  Mr. Meister?
20     MR. MEISTER: Can I have the question
21  read back, please.
22     **BY THE WITNESS:**
23  A.  **I never --**
24     MR. GRIVER: Wait, Dalia.
25     (WHEREUPON, the record was read by

Page 203

1      GENGER
2   the reporter as requested.)
3      MR. MEISTER: Object to the form.
4      **BY MR. GRIVER:**
5   Q.  Let me clean that up.
6      You never asked Mr. Meister about
7   getting other people involved in the auction?
8   A.  **Participate in the auction.  I don't**
9   **remember that we discussed other people.**
10  Q.  Do you understand that it is your job
11  as trustee to get the best price at the auction?
12     MR. MEISTER: Objection.  Asked and
13  answered several times now.
14     MR. DELLAPORTAS: Object to form.
15     **BY THE WITNESS:**
16  A.  **Yes, you did ask me.**
17     MR. ZILBERFEIN: Objection.
18     **BY MR. GRIVER:**
19  Q.  One way to get the best price possible
20  is to get as many people bidding as possible.
21     MR. MEISTER: Objection.  That's not a
22  question.
23     MR. DELLAPORTAS: Objection.  That's
24  not a question.
25     **BY THE WITNESS:**

Page 204

1      GENGER
2   A.  **Do you want to teach me?**
3      MR. MEISTER: No, no.  Wait until
4   there's a question, Dalia.
5      **BY MR. GRIVER:**
6   Q.  One way to get the best price is to get
7   as many people bidding as possible?
8      MR. DELLAPORTAS: Object to form.
9      MR. ZILBERFEIN: Objection.
10     **BY MR. GRIVER:**
11  Q.  Correct?
12     MR. MEISTER: Join the objection.
13     **BY MR. GRIVER:**
14  Q.  I am waiting.
15  A.  **Yeah, I guess it is correct.  Yeah.**
16  Q.  Why did you then did you not let Arie
17  know that --
18  A.  **Yeah, because I particularly did not**
19  **want Arie to be involved as far as Orly's assets**
20  **are concerned in any way.**
21  Q.  Okay.
22     MR. MEISTER: Can we go off the record
23  for a second?
24     MR. GRIVER: No.  Well, I'm almost
25  done.

ORLY GENGER VS.
DALIA GENGER, et al

DALIA GENGER
December 13, 2012

Page 205

GENGER
BY MR. GRIVER:
1  GENGER
2  BY MR. GRIVER:
3  Q.  If Sagi was going to pay $2 million for
4  Orly's assets, and Arie was going to pay $3
5  million for Orly's assets, at the end of the
6  day --
7  A.  At the same time, Arie is doing other
8  things, like paying your bills instead of Orly.
9  You understand?  That's my -- that's where I am
10  going, because you are not objective.  You are
11  being paid not by Orly, but by somebody else,
12  like my husband.  It is financing this
13  deposition.  And that's why I didn't want Arie to
14  be involved in this auction.
15  Q.  Because his money is tainted?
16  A.  No.  Because his interest -- Orly's
17  interest is not the same as Aric's interest.
18  That's why.  Airy's interest is to have control
19  over Orly's assets, I believe.
20  Q.  And if Arie had paid $5 million --
21  A.  He wouldn't.  He didn't have any money
22  because we just split our marital assets, and he
23  got five and I got five.  So how could he pay?
24  Q.  Did you check to see if he could, or
25  did you let --

Page 206

1  GENGER
2  A.  I didn't check because I know.
3  Q.  You didn't check because --
4  A.  Unless he hid some money that I don't
5  know about because then I have to get part of it.
6  I don't know.
7  Q.  You didn't check because -- you didn't
8  check because you didn't want Arie to
9  participate?
10  A.  No, that not true.
11  MR. ZILBERFEIN: Are you testifying?
12  BY THE WITNESS:
13  A.  I'm just saying --
14  MR. ZILBERFEIN: Objection.  The
15  attorney is testifying.
16  BY THE WITNESS:
17  A.  -- that I didn't check because I knew
18  what his financial condition is at that time,
19  because we were supposed to have the same amount
20  of assets or money or whatever you call it, okay.
21  BY MR. GRIVER:
22  Q.  And you don't think --
23  A.  And if he had some extra money, then it
24  was marital money that I was supposed to get part
25  of it.

Page 207

1  GENGER
2  Q.  And you are not sure that he -- and you
3  thought that Arie couldn't find some friends of
4  his who might participate in the auction?
5  A.  I don't know if he has friends.
6  Q.  But if Arie participated and didn't
7  have as much money as Sagi, that's fine.  But
8  isn't it a possibility that he would have been
9  able to get more money?
10  A.  There's always possibilities of
11  anything to happen.  The earthquake, the building
12  going on fire, I don't know.
13  Q.  So as trustee, why didn't you explore
14  that possibility?
15  A.  I told you already.  Because I knew how
16  much Arie has.  And, personally, I know my
17  husband.  I was married 33 years.  And I know
18  what's happening between Arie, unfortunately, and
19  Orly.
20  Q.  And why didn't you tell Orly?
21  A.  What?  Because Orly at this time was
22  brainwashed already, so I couldn't talk to her,
23  candidly, even though I did try.
24  Q.  And if Orly had known, then Arie would
25  have known, correct?

Page 208

1  GENGER
2  A.  This did not occur to me at all.
3  Q.  It didn't occur to you that if you told
4  Orly about the sale that she would tell her
5  father?  That didn't occur to you at all?
6  MR. MEISTER: Objection.  Asked and
7  answered.  The immediately preceding answer.
8  THE WITNESS: I have to have some candy
9  here.  My mouth is very dry.
10  MR. GRIVER: Can you read back my
11  question, please.
12  (WHEREUPON, the record was read by
13  the reporter as requested.)
14  BY THE WITNESS:
15  A.  I didn't think about it at the time.
16  But I am telling you frankly, I didn't want Arie
17  to be involved in this auction.
18  BY MR. GRIVER:
19  Q.  And did it --
20  A.  Because I know my husband.  I'm sorry.
21  Q.  Did it occur to Mr. Meister that if you
22  told Orly, that Orly would tell Sagi?
23  A.  I don't know if it occurred to him.
24  You should ask him.  I don't know.
25  Q.  Did Mr. Meister instruct you that it is

ORLY GENGER VS.
DALIA GENGER, et al

DALIA GENGER
December 13, 2012

Page 209

1   GENGER
2   your job as trustee to get the best price for the
3   trust assets?
4       MR. ZILBERFEIN: Objection. Asked and
5   answered.
6       BY THE WITNESS:
7   A.  Yeah.
8       MR. MEISTER: Join in the objection.
9       BY THE WITNESS:
10  A.  Yeah, I said, I do not remember talking
11  about it.
12      MR. GRIVER: Let me show you what I
13  have marked as Exhibit 15. For the record,
14  Exhibit 15 is the meeting of partners of D&K LP
15  January 31, 2009 and agreement.
16      (Dalia Exhibit 15, 1/31/2009
17  meeting and agreement, marked.)
18      BY MR. GRIVER:
19  Q.  That is you signing on behalf of the
20  Orly Genger trust?
21  A.  Right.
22  Q.  So do you recall this agreement?
23  A.  Yeah.
24  Q.  Could you tell me, please, first of
25  all, who drafted it, do you know?

Page 210

1   GENGER
2   A.  A lawyer. I don't know which one. I
3   didn't draft it.
4   Q.  Was it your lawyer or Sagi's lawyer?
5       MR. MEISTER: Objection. Compound.
6       MR. DELLAPORTAS: Object to form.
7       BY THE WITNESS:
8   A.  I really don't know which lawyer was
9   it.
10      MR. ZILBERFEIN: Objection.
11      BY THE WITNESS:
12  A.  My duty was to read it and sign.
13      BY MR. GRIVER:
14  Q.  Did you read it before you signed it?
15  A.  Yeah.
16  Q.  And do you understand what it does?
17  A.  Yeah.
18  Q.  What does it do?
19  A.  As far as I am concerned, I got what I
20  wanted.
21  Q.  Which is?
22  A.  Which is number 8.
23  Q.  Number 8?
24  A.  Refrain from enforcing the note against
25  each limited partner for 30 days. To calm down

Page 211

1   GENGER
2   everyone.
3   Q.  30 days, okay.
4   A.  Yeah.
5   Q.  And you needed those 30 days to do
6   what, exactly?
7   A.  First of all, to have a conversation
8   with my attorney.
9   Q.  Uh-huh.
10  A.  And, also, my intent was to talk to
11  Sagi and ask him to try -- ask him not to sue his
12  sister, the trust, Orly's trust. And so it did
13  happen that until today, Sagi never sued Orly's
14  trust.
15      Why are you laughing, it is not true?
16  Q.  So in those 30 days --
17  A.  Yeah.
18  Q.  -- you spoke to Sagi?
19  A.  Yeah.
20  Q.  And you told him --
21  A.  I spoke many times to Sagi, that he
22  wanted to act in a way that he felt like acting
23  because he was getting sued right and left, and
24  he was very angry. And I tried to calm him down
25  and tried to talk to him not to sue his sister.

Page 212

1   GENGER
2   Q.  Well, what this says, this 8 doesn't
3   say that TPR Investment Associates, Inc., has
4   agreed to not sue Orly Genger. It doesn't say
5   that.
6   A.  It doesn't say, but for me, my
7   intention was to start pursuing Sagi not to sue
8   Orly Genger trust. And I was successful in doing
9   that.
10  Q.  You were afraid that Sagi would sue
11  Orly's trust for what exactly?
12  A.  There's always something to sue. He
13  can foreclose on the --
14  Q.  On the note?
15  A.  Yeah.
16  Q.  Okay. So he didn't sue, but he did
17  foreclose on the note?
18  A.  He foreclosed on the D&K LP.
19  Q.  He foreclosed on the note, and got --
20  A.  D&K LP, but not directly Orly trust.
21  Q.  What other -- TPR also agreed to
22  refrain from enforcing the note for 30 days,
23  correct?
24  A.  Yeah.
25  Q.  Okay.

ORLY GENGER VS.
DALIA GENGER, et al

DALIA GENGER
December 13, 2012

---

Page 213

GENGER

1    GENGER
2  A.  That's the 30 days we are talking
3    about.
4  Q.  Did you speak to Sagi about not
5    enforcing the note?
6  A.  I spoke to Sagi about not suing Orly's
7    trust.
8  Q.  But it was okay that he sell the note?
9  A.  You mean the auction?
10  Q.  Yes.  You okay with the auction?
11  A.  I wasn't okay with it, but I had
12    nothing that I could do to prevent him.
13  Q.  You didn't tell him don't do it because
14    it will destroy the estate planning?
15  A.  No, I did not tell him.
16  Q.  In sum or in substance you never told
17    him?
18  A.  What?
19  Q.  In sum or in substance you never told
20    him that?
21    MR. ZILBERFEIN: Objection.
22    MR. MEISTER: Objection to form.
23    BY MR. GRIVER:
24  Q.  Correct?
25  A.  We said that -- I said that I did talk

---

Page 214

GENGER

1    GENGER
2  with my lawyer, what are the options, and --
3  Q.  I am not talking about your lawyer.  I
4  am talking about Sagi.
5    MR. MEISTER: Please let her finish the
6  answer.
7    BY MR. GRIVER:
8  Q.  I am talking about your conversation
9  with Sagi.  What did you -- what in your
10  conversation -- please tell me all about your
11  conversation.
12  A.  Yes.  The conversation is that Sagi
13    should restrain himself from suing Orly's trust,
14    even though he was very angry at his sister, the
15    way she treated him by, you know, being sued
16    right and left.  And, you know, I understand it.
17    You can be very angry when somebody does it to
18    you.  So I just wanted him not to sue the trust.
19  Q.  So as trustee you got him to not sue
20  the trust?
21  A.  Right.
22  Q.  But you permitted him to proceed with
23  the auction?
24  A.  I didn't permit him.  I didn't permit
25    him.  He did what he thought he can -- he should

---

Page 215

GENGER

1    GENGER
2  do.
3  Q.  Did he -- well --
4  A.  He didn't ask my permission.
5  Q.  Did you ask him not to do the auction?
6  A.  You asked me this already, and I
7    answered.
8  Q.  You did not?
9  A.  I did answer.
10  Q.  You did ask him?
11  A.  I did answer this question.
12  Q.  I understand.  Just so we are clear
13  because then I am going to go ask additional
14  questions on it.
15    You did not ask him to not do the
16  auction?
17    MR. MEISTER: Objection.  Compound and
18  negative.
19    MR. DELLAPORTAS: Asked and answered.
20    MR. ZILBERFEIN: Objection.  Asked and
21  answered.
22    MR. DELLAPORTAS: She said it is not
23  her place to tell him what to do.
24    MR. ZILBERFEIN: She is also --
25    MR. DELLAPORTAS: We are all in the

---

Page 216

GENGER

1    GENGER
2  room.  We all heard it.
3    MR. ZILBERFEIN: She --
4    THE WITNESS: I am speaking --
5    MR. MEISTER: Don't argue with him.
6  Wait for a question.
7    MR. LEINBACH: You are entitled to
8  objections, pursuant to the judge's --
9    MR. ZILBERFEIN: Yeah, but he can't be
10  asking the same question ten times.
11    THE WITNESS: We have a limited time
12  that I can sit here.  I'm getting tired.
13    MR. ZILBERFEIN: You are getting the
14  same question over and over and over again.
15    THE WITNESS: I am getting tired.
16    MR. MEISTER: Please don't argue with
17  him.
18    THE WITNESS: You ask me so many
19  questions.  I can't -- it's going to be the same
20  answer.
21    BY MR. MEISTER:
22  Q.  Dalia, please just --
23    MR. S. GENGER: It's Ms. Genger.
24    BY MR. GRIVER:
25  Q.  Ms. Genger, please just listen to my

---

ORLY GENGER VS.
DALIA GENGER, et al

DALIA GENGER
December 13, 2012

---

Page 217

1       GENGER
2   question and answer.
3       MR. S. GENGER: She's not your friend,
4   Yoav.  She's the witness.
5       BY MR. GRIVER:
6   Q.  Did you ask Sagi in that conversation
7   to not proceed with the auction, yes or no?
8       MR. DELLAPORTAS: Objection.
9       MR. ZILBERFEIN: Objection.
10      BY THE WITNESS:
11  A.  After consulting with my lawyer, I did
12  not ask him to do that.
13      BY MR. GRIVER:
14  Q.  Because why?
15  A.  Because I didn't think that I would be
16  able to stop him.  It was his right to do it.  I
17  couldn't ask him to do it, not to do it.
18  Q.  Sagi also has a right to sue --
19  A.  Right.
20  Q.  -- the Orly trust?
21  A.  Yeah.  But my focus was on the TRI
22  shares that Orly claimed were worth millions and
23  hundreds of millions of dollars.  So in
24  comparison, giving up TPR shares, it was peanuts.
25  Q.  Did you ask Sagi to promise to not do

---

Page 218

1       GENGER
2   anything with the TI shares after the auction?
3   A.  Obviously.  After -- the auction was on
4   TPR shares, not TRI shares.
5   Q.  Did you ask -- since your focus was on
6   the TI shares, did you talk to Sagi about not
7   doing anything to the TI shares in that
8   conversation?
9   A.  Yes, I did, because he could have sued
10  the trust and then foreclosed on the TRI shares.
11  Q.  And what did Sagi tell you?  Did he
12  promise not to do that?
13  A.  After many, many arguments and personal
14  fights that we had, he agreed not to do it.  And
15  he did until today, he never sued Orly's trust.
16      Is this funny?
17  Q.  In return for TPR agreeing to refrain
18  from enforcing the note for 30 days --
19  A.  I didn't hear the beginning of the
20  question.
21  Q.  If you look at the meeting agreement,
22  TPR agrees to not enforce the note for 30 days,
23  correct?
24  A.  TPR Investment has agreed to refrain
25  from enforcing the note against each limited

---

Page 219

1       GENGER
2   partner for 30 days.  Right.
3   Q.  But TPR did not agree to refrain from
4   enforcing the note against D&K LP directly, or is
5   that included in paragraph 8?
6       MR. MEISTER: Compound and
7   incomprehensible.  So I object.
8       BY THE WITNESS:
9   A.  Yes, it is hard for me -- Sagi did sue
10  the D&K LP, but he didn't see Orly's trust.
11      BY MR. GRIVER:
12  Q.  So far?
13  A.  Well, it is many years.  I mean, it is
14  a long time.  Seeing at least 30 days.
15  Q.  And in exchange you gave him a general
16  release?
17  A.  We both got -- I mean, each party got a
18  release.
19  Q.  You got a release, and he got a
20  release?
21  A.  That's true.
22  Q.  Certain people didn't get a release?
23  A.  Who didn't get a release?
24      MR. MEISTER: Wait for a question.
25      BY MR. GRIVER:

---

Page 220

1       GENGER
2   Q.  Arie didn't get a release, correct?
3   A.  Arie?
4   Q.  Arie didn't get a release?
5   A.  It is his problem.  I don't know.
6   Q.  Okay.  William Dowd didn't get a
7   release?
8       MR. MEISTER: Is there a question?
9       BY THE WITNESS:
10  A.  This is not -- they are not partners in
11  D&K LP.
12      MR. MEISTER: Wait for the question.
13  Wait for the question.
14      THE WITNESS: Okay.
15      BY MR. GRIVER:
16  Q.  Well, why were these persons identified
17  by you in this paragraph?
18  A.  It is partnership of the D&K LP.  And
19  there were -- the parties that you mentioned are
20  not parties in the D&K LP.  That's why they
21  didn't get the release.  They are not included in
22  these documents.  They are not part of these
23  documents.
24  Q.  But why did you mention them
25  specifically if they weren't included?

---

Page 221

GENGER

2  A.  You asked me about Arie, and I didn't
3     mention these names.
4  Q.  I am asking you why are they mentioned
5     in the bottom of paragraph 1 as not being
6     released?
7  A.  Again, ask me the question.
8  Q.  Why are those included as -- why are
9     those persons, Arie Genger, William Dowd,
10    Lawrence Small, and Edward Kilmerman, not
11    included in the general release?
12 A.  They were not included because they
13    were not part of the D&K LP.  They were not
14    partners in D&K LP.
15 Q.  So why was it necessary to mention them
16    by name?
17 A.  I guess the lawyer found it necessary
18    to mention it.
19    MR. ZILBERFEIN: Take a bathroom break,
20 please.
21    MR. GRIVER: Let's go off the record.
22    (WHEREUPON, a recess was had from
23    4:18 p.m. to 4:28 p.m.)
24    MR. GRIVER: The parties have agreed to
25 adjourn Dalia's deposition until February 7,

Page 222

GENGER

2  2013.
3     MR. MEISTER: Also at 10:30, please.
4     MR. GRIVER: Also at 10:30.  That date
5  is okay with the deponent, the deponent's
6  attorney, and all the other attorneys in this
7  case.
8     (WHEREUPON, at 4:28 p.m., by
9     agreement of the parties, the
10    deposition of D. GENGER was
11    adjourned until Thursday, February
12    7, 2013, at 10:30 a.m., and the
13    deponent reserved her right to
14    read and sign the transcript.)

Page 223

1  A C K N O W L E D G M E N T

2

3  STATE OF              )
4                        :ss
5  COUNTY OF             )
6
7     I, DALIA GENGER, hereby certify that I
8  have read the transcript of my testimony taken
9  under oath in my deposition of December 13,
10 2012; that the transcript is a true, complete
11 and correct record of my testimony, and that
12 the answers on the record as given by me are
13 true and correct.
14
15
16
17    _____
17    DALIA GENGER
18
19
20 Signed and Subscribed to
21 before me, this   day
22 of     , 2012.
23    _____
24 Notary Public, State of New York
25

Page 224

1              C E R T I F I C A T E

2

3  STATE OF NEW YORK  )
4                     ) ss.:
5  COUNTY OF NEW YORK )
6
7     I, ANNETTE M. MONTALVO, Registered Merit
8  Reporter and Notary Public within and for the
9  State of New York, do hereby certify:
10    That DALIA GENGER, the witness whose
11 deposition is hereinbefore set forth, was duly
12 sworn by me and that such deposition is a true
13 record of the testimony given by such witness.
14    I further certify that I am not related
15 to any of the parties to this action by blood or
16 marriage and that I am in no way interested in
17 the outcome of this matter.
18    IN WITNESS WHEREOF, I have hereunto set
19 my hand this 27th day of December, 2012.
20
21
22
23
24
25 _____
   ANNETTE M. MONTALVO

Page 225

```
1                    ***ERRATA***

2         ELLEN GRAUER COURT REPORTING  CO. LLC
           126 East 56th Street, Fifth Floor
3                New York, New York 10022
                     212-750-6434
4

5   NAME OF CASE: GENGER vs. GENGER
    DATE OF DEPOSITION: December 13, 2012
6   NAME OF WITNESS: DALIA GENGER

7   PAGE  LINE   FROM       TO       REASON

8    ___|___|_____|_____|_____

9    ___|___|_____|_____|_____

10   ___|___|_____|_____|_____

11   ___|___|_____|_____|_____

12   ___|___|_____|_____|_____

13   ___|___|_____|_____|_____

14   ___|___|_____|_____|_____

15   ___|___|_____|_____|_____

16   ___|___|_____|_____|_____

17   ___|___|_____|_____|_____

18   ___|___|_____|_____|_____

19   ___|___|_____|_____|_____

20   ___|___|_____|_____|_____

21                    _____

22  Subscribed and sworn before me

23   this____ day of _____, 20__.

24   _____      _____

25    (Notary Public)      My Commission Expires:
```

ORLY GENGER VS.
DALIA GENGER, et al

DALIA GENGER
December 13, 2012

**$**

**$2 (1)**
205:3
**$200,000 (2)**
24:3,4
**$3 (1)**
205:4
**$5 (3)**
164:5,11;205:20
**$9 (1)**
175:18

**0**

**08 (1)**
125:17
**09 (1)**
15:2

**1**

**1 (13)**
8:16,17,20;9:13;
62:16;98:20,21;99:7;
100:7;105:21;169:10;
185:9;221:5
**1/31/2009 (1)**
209:16
**1/4/2008 (1)**
108:12
**1:00 (2)**
113:12,15
**10 (4)**
149:7,7,9,14
**10:30 (4)**
143:6;222:3,4,12
**10:52 (1)**
20:6
**10:54 (1)**
20:7
**100 (1)**
85:25
**10036 (1)**
3:14
**10065 (1)**
6:15
**10804 (1)**
3:6
**11 (5)**
151:16,18;173:19;
176:7,13
**12 (5)**
11:4;162:13,14,17;
163:8
**12:06 (2)**
117:13,14
**12:07 (1)**
87:14
**12:19 (1)**
87:14
**12:45 (1)**

108:23
**12:59 (1)**
116:15
**129 (1)**
143:25
**13 (4)**
168:16,17;184:14;
223:9
**130 (1)**
144:2
**14 (3)**
173:10,10,12
**140 (1)**
140:22
**15 (7)**
7:9;143:12;151:22,23;
209:13,14,16
**1540 (1)**
3:13
**16-page (1)**
109:24
**19 (3)**
108:11;185:21;186:9
**1946 (1)**
7:9
**1993 (9)**
7:24;89:20,24;108:8;
127:23;149:8,9,24;
167:19

**2**

**2 (10)**
8:22,25;25:13;26:10;
38:20;86:7;100:20,21;
105:20;150:13
**2:06 (2)**
116:16;117:4
**2:24 (1)**
133:25
**2:33 (1)**
142:19
**200 (1)**
6:14
**2000 (2)**
169:2,14
**2004 (4)**
155:2,3;168:8,13
**2005 (1)**
168:11
**2006 (3)**
161:21;162:2;163:2
**2007 (15)**
68:21;71:14;75:10;
77:20;79:6;80:21;88:5,
10,13;92:21;93:2;94:15;
108:3,10;125:16
**2008 (29)**
11:25;13:22,25;15:2;
37:6;38:16;62:16;68:21;
88:17;94:11;105:5;
106:8;125:16;154:9;
155:21;161:23;163:10;

166:17,18;168:22;173:2,
6,19;176:7,13;177:7,18,
25;185:4
**2009 (6)**
185:21;187:10;
193:24,25;194:2;209:15
**2010 (5)**
9:20;102:13;103:21;
104:23;105:6
**2012 (3)**
11:8;223:10,22
**2013 (2)**
222:2,12
**20th (1)**
9:20
**21 (1)**
167:19
**212-692-1012 (1)**
3:16
**22 (1)**
108:2
**22nd (1)**
108:9
**23 (1)**
143:25
**240 (1)**
150:12
**25 (1)**
163:10
**27 (2)**
187:10;194:2
**28 (4)**
102:13;103:21;
104:23;105:5
**29 (13)**
71:14;75:10;77:20;
79:6;80:20;83:8,12;
88:5,10,13;92:21;93:2;
94:14
**29th (1)**
11:7

**3**

**3 (17)**
8:16;9:4,8;11:2,3;
25:10,11;27:24;28:20;
38:19;100:22,24,25;
109:4;144:2;169:10;
185:7
**3:30 (1)**
132:14
**3:34 (1)**
189:8
**3:42 (1)**
189:8
**30 (12)**
9:21;104:22;210:25;
211:3,5,16;212:22;
213:2;218:18,22;219:2,
14
**31 (3)**
168:22;185:4;209:15

**32W (1)**
6:15
**33 (1)**
207:17
**35 (1)**
116:13

**4**

**4 (22)**
11:25;13:22;37:6,10,
11,15,23;38:16;42:23;
44:11;86:6;87:4;94:10;
105:5;106:8;110:7;
113:12;130:7,8;168:12;
173:16;193:25
**4:00 (1)**
132:12
**4:18 (1)**
221:23
**4:28 (2)**
221:23;222:8
**48 (3)**
131:15,22;140:22
**49 (3)**
131:15,22;140:22

**5**

**5 (16)**
42:19,20,25;43:6;
94:24,25;95:5,8;100:3,
10,17;101:4,9;102:4;
106:17;193:24
**5:00 (2)**
143:8,16
**5:30 (2)**
143:8,16

**6**

**6 (13)**
68:5,6;69:21;80:21;
88:9;92:19,21;93:2,13;
95:18;97:9,22;124:16
**65th (1)**
6:14
**66 (1)**
7:11

**7**

**7 (6)**
68:9,10,13,14;221:25;
222:12
**75 (2)**
105:19;116:9
**78 (1)**
3:5

**8**

**8 (24)**

92:14,15;94:8,10,20;
95:4,7,18;97:9,22;
124:16;174:5,8,9,11,12;
175:25;177:12,13,14;
210:22,23;212:2;219:5
**8-31-08 (3)**
185:11;186:8,17

**9**

**9 (12)**
102:19;108:6,12;
110:10;111:25;174:5,8,
9,12;178:13,14;180:8
**90 (2)**
81:22;84:19
**914-297-0110 (1)**
3:7
**93 (5)**
7:14;154:3,4;155:19;
177:2

**A**

**ability (3)**
46:10;47:18;104:16
**able (8)**
20:13;63:10;72:8;
120:4;140:24;171:11;
207:9;217:16
**absent (1)**
28:23
**Absolutely (10)**
6:21;7:25;12:9,24;
18:22;118:19;161:14;
181:17;184:5;189:18
**acceding (1)**
194:21
**accelerated (1)**
178:24
**accept (6)**
41:8,16;59:19;65:14;
178:18;194:22
**acceptable (1)**
139:2
**acceptance (4)**
42:21;43:2;58:19;
70:16
**accepted (9)**
39:3;40:13;41:3;46:9;
59:3;69:4,7;99:8,10
**accommodate (2)**
159:7,22
**accommodation (1)**
143:7
**Accordingly (1)**
96:14
**act (8)**
12:14;69:7;102:24;
130:3;144:9,25;145:12;
211:22
**acted (2)**
161:11,13

ORLY GENGER VS.
DALIA GENGER, et al

DALIA GENGER
December 13, 2012

**acting (2)**
187:3;211:22
**action (31)**
8:19;9:7;13:3,6;17:10;
22:10,11;30:4,20;62:6,8;
81:24;82:8,9;84:20,23,
24,25;85:3,8,13;96:3,10;
130:7,7,10;133:18;
140:7,9,25;183:23
**actions (20)**
22:5;30:2,5,6,14,16;
31:4,5,6;37:3;81:3;
104:25;105:7;106:11;
107:11,14;140:24;
141:25;174:23;196:25
**actively (1)**
31:10
**activities (1)**
93:12
**acts (7)**
100:12;101:23;102:7,
9,16,19,22
**actuality (1)**
154:11
**actually (13)**
11:12;23:12;31:21;
45:6;55:21;92:10;
100:22,23;112:13;
118:15;131:2;133:13;
163:11
**addition (5)**
118:18;136:7;137:4,
16;138:2
**additional (1)**
215:13
**address (2)**
6:13;131:10
**addressed (3)**
72:19;73:14;163:12
**adjourn (1)**
221:25
**adjourned (1)**
222:11
**advice (11)**
20:14,15;146:13,17;
190:17,24;191:2,8;
194:12,18;196:6
**affair (2)**
46:3;56:8
**affidavit (11)**
121:7;173:11,13,18;
174:15;176:8,14,15;
177:7;180:9;182:5
**afford (2)**
26:24;158:7
**afraid (4)**
178:8;179:10,11;
212:10
**afternoon (2)**
117:15;134:24
**again (37)**
8:2;11:12,16;21:2;
24:21;28:5;39:19;48:12;

53:9;66:14;71:4;91:20;
97:6;103:9;105:23;
115:14;118:4,5;120:7;
129:6;134:8;135:4,13;
153:13;156:9,19;
170:12;173:4;176:9,11;
183:16,17;192:5;201:3;
202:3;216:14;221:7
**against (8)**
16:25;17:7;22:14;
35:9;164:7;210:24;
218:25;219:4
**agents (1)**
81:4
**ago (14)**
11:13,16;25:19;27:16,
22;28:8;29:2;30:7,15;
31:17;113:13;121:15;
134:9;193:12
**agree (7)**
12:20;85:24;139:4;
174:16;180:8,10;219:3
**agreed (6)**
153:2;212:4,21;
218:14,24;221:24
**agreeing (1)**
218:17
**agreement (16)**
75:2;78:17;88:24;
107:17,18,21;108:7;
149:8,10;150:3;176:3;
209:15,17,22;218:21;
222:9
**agreements (2)**
75:13,20
**agrees (1)**
218:22
**ahead (10)**
12:11,19,22;13:8;
21:25;111:2;115:18;
120:12;179:6;191:15
**aim (1)**
143:16
**air (1)**
105:11
**Airy's (1)**
205:18
**allegation (2)**
100:8,16
**allegations (3)**
99:13;100:10;102:18
**alleged (2)**
102:23;106:17
**allow (2)**
28:22;118:25
**allowed (2)**
115:21,25
**alluding (1)**
183:21
**almost (1)**
204:24
**alone (1)**
138:7

**along (1)**
136:23
**although (1)**
90:10
**always (8)**
120:8;141:15;174:23;
175:13;181:19,20;
207:10;212:12
**amended (9)**
8:18,21,23;9:2,5,9;
10:8;108:6,18
**among (1)**
174:15
**amount (2)**
118:22;206:19
**angry (3)**
211:24;214:14,17
**announced (4)**
119:11;121:2,3;122:2
**answered (29)**
27:13;31:15;33:4,11,
12;51:19;54:10;56:21;
57:5;61:15;81:16;84:3;
99:4;105:9;110:12;
118:10;126:13;128:17;
145:4;147:19;150:22;
160:2;165:4;203:13;
208:7;209:5;215:7,19,21
**Apartment (1)**
6:14
**Apparently (1)**
132:15
**appearance (2)**
117:16;136:4
**appeared (1)**
117:15
**appearing (1)**
121:17
**appears (1)**
134:12
**apply (1)**
85:4
**appoint (2)**
41:24;65:6
**appointed (3)**
59:2;139:21;178:8
**appointment (10)**
38:3;40:13;42:24;
58:18,19,21;59:3,19;
69:5;178:22
**appreciate (1)**
119:3
**appreciated (1)**
162:21
**approached (1)**
189:11
**arbitration (12)**
151:9,16,19;152:9,9,
12;156:4,11;157:12;
173:25;193:7;197:6
**arbitrator (2)**
153:10,14
**argue (1)**

216:5,16
**arguments (2)**
96:17;218:13
**Arie (33)**
17:9;148:2;150:14;
153:5,8,15;154:25;
198:4,7,8,18;199:12,12;
200:4,5;204:16,19;
205:4,7,13,20;206:8;
207:3,6,16,18,24;
208:16;220:2,3,4;221:2,
9
**Arie's (2)**
199:14;205:17
**arise (1)**
45:16
**arisen (1)**
135:9
**asserted (2)**
22:13,14
**assertion (1)**
137:5
**asset (1)**
197:20
**assets (11)**
22:23;154:17;175:22;
208:18;204:19;205:4,5,
19,22;206:20;209:3
**assignment (4)**
162:2;164:14,18;
165:2
**associated (5)**
119:20;120:16,17,18;
182:13
**Associates (2)**
3:12;212:3
**assume (6)**
52:3,12,12;54:3;
70:12;121:20
**assumed (2)**
53:9;121:18
**Assumes (2)**
98:5;170:15
**assuming (1)**
49:22
**assumption (2)**
52:9,13
**attempt (2)**
158:11;188:14
**attempted (6)**
65:6,14;75:18;95:13;
144:17;147:16
**attempting (1)**
22:6
**attempts (2)**
137:3;138:3
**attend (5)**
120:21,23,25;121:25;
152:8
**attendance (1)**
58:5
**attention (4)**
39:16;40:6;151:21;

152:2
**attorney (46)**
10:19,20;14:3,6,9;
15:5;71:13,16,18,22,22;
72:2,6,16,24;87:15;
99:21;113:5,6;116:17;
117:15,17;119:24;
120:19;125:14;126:10;
127:23;128:4;136:13,14,
19;172:20,22;185:19;
186:8;190:9,12;191:23;
192:9,9,15;193:9;
194:18;206:15;211:8;
222:6
**Attorney-client (6)**
16:7;92:2;124:21;
138:17;191:11;194:4
**attorneys (20)**
13:23;14:12;20:19;
21:4;54:12;67:10,11;
71:8;137:17;145:16;
146:2;147:15;146:16,17,
21,22,22;188:7,10;222:6
**attorney's (4)**
79:11;117:7,11;
146:13
**auction (38)**
183:22;188:21;
191:19;195:21;197:12;
198:9,16,21;199:7,9,23,
24;200:3,8,13,14;201:8,
19,24;202:2,7,8,11,16;
203:7,8,11;205:14;
207:4;208:17;213:9,10;
214:23;215:5,16;217:7;
218:2,3
**August (2)**
168:22;185:4
**availability (3)**
132:7,11;134:10
**available (1)**
132:12
**avoid (1)**
56:14
**award (2)**
151:16,19
**awarded (2)**
153:6,9
**aware (33)**
38:8,13;39:2;40:14,
20,22;41:23;42:12,16;
49:8;65:5,8,13,18;69:6,
13;77:22;79:13;98:16,
16;107:11;112:2;114:7;
117:24;165:21,23,24;
186:4,7;187:13;190:6;
200:2,14

---

**B**

**Back (44)**
20:8,9;23:7;32:21;
51:7,12;55:2,7;58:13;

Ellen Grauer Court Reporting Co. LLC

60:16,20;70:25;82:14,
21;84:4;87:19;105:13;
116:8;117:3;129:8;
131:7,19;143:19;
153:25;156:17;157:5;
160:9,10,13,15,17,17,19,
23;161:16;162:3,7;
171:15;174:20;180:3;
195:4;200:21;202:21;
208:10

**bad (1)**
114:18

**balance (1)**
67:21

**bankrupt (2)**
181:9,10

**Barbara (1)**
134:3

**based (7)**
78:10;85:5,14;96:10;
109:14;141:19;150:7

**basically (7)**
16:25;25:7;61:12;
118:7;179:5,7;202:9

**basis (6)**
16:5;20:16;24:13;
49:20;73:10;80:9

**bat (1)**
135:7

**bathroom (2)**
189:10;221:19

**bear (1)**
175:17

**became (12)**
13:23;29:20;37:6;
38:17;65:5;67:14;88:22;
95:12;104:19;107:9;
161:23;186:7

**become (16)**
29:21;38:18,19;40:22;
41:23;42:12,13;45:9;
46:14;60:3,10,13;65:23;
66:9;67:15;71:9

**becoming (1)**
89:17

**Beg (1)**
193:16

**began (2)**
14:3;148:12

**begin (2)**
30:18;117:12

**beginning (4)**
40:20;122:6;180:7;
218:19

**Behalf (13)**
3:4,12;14:13;18:5,17;
19:10;20:14;21:19;23:6;
35:8;103:6;141:21;
209:19

**behave (1)**
175:15

**belief (7)**
99:16;100:12;102:7,

16,21;106:15;115:5

**believing (1)**
196:24

**bell (2)**
14:16,17

**beneficiaries (1)**
81:4

**beneficiary (6)**
12:5,19;19:16;39:4;
123:3;190:20

**benefit (4)**
120:11;148:5;176:4;
177:17

**besides (5)**
60:12;63:15;64:2,20;
192:15

**best (22)**
12:15;20:19;21:5,9;
46:10;47:16,17;78:23;
87:23;88:2;104:15;
129:2;144:15,25;
163:22;190:18;198:11;
199:17;203:11,19;
204:6;209:2

**better (1)**
81:17

**bid (2)**
197:20;200:14

**bidding (2)**
203:20;204:7

**bids (1)**
198:22

**big (1)**
45:6

**bill (9)**
18:18,24;19:9;26:18;
85:19;192:5;193:12,14,
24

**billing (1)**
34:23

**bills (20)**
18:14,16;19:17;22:4,
8,17,21,24;23:3,6,17;
35:16,18;79:4;139:21;
192:4;193:15,18,20;
205:8

**birth (1)**
7:8

**bless (1)**
142:7

**blurred (1)**
68:23

**both (7)**
18:2;86:5;105:19;
150:18;159:6;180:12;
219:17

**bottom (4)**
35:19;74:7;180:22;
221:5

**bought (3)**
183:23;184:3,7

**brainwashed (1)**
207:22

**break (25)**
76:14;81:18,19,21;
84:12,13;85:22;86:12,
20;87:2,9;113:11,14,21;
114:11;117:14;118:3;
122:5;132:8;188:22,25;
189:3,10;192:22;221:19

**breakdown (1)**
53:10

**breakfast (2)**
113:17;116:12

**breaking (1)**
143:4

**briefly (1)**
26:14

**Broadway (1)**
3:13

**brought (2)**
96:4;140:11

**Bryan (2)**
134:7,25

**building (1)**
207:11

**burden (1)**
170:19

**business (2)**
58:2;121:5

**buy (1)**
199:20

## C

**call (9)**
57:2;63:6;82:10;
131:22;132:6;134:2;
196:16;199:11;206:20

**called (4)**
6:3;86:25;107:18;
134:8

**calling (5)**
131:23,24;135:8;
137:2;196:12

**Calls (4)**
49:11;56:21;158:21;
167:4

**calm (2)**
210:25;211:24

**came (8)**
15:16;73:20;112:19;
117:3,14;150:24;179:7;
185:18

**Can (96)**
11:20;13:13;19:24;
20:9;23:7;28:4;32:16,
21;33:3,6;36:16,17;42:4,
5;44:20;50:13;51:6;
52:3;55:6;58:13;60:15;
61:13;66:7,14,18;67:3;
70:24;75:6;78:20;82:14;
83:19,20;84:13,21;
89:21;90:8;92:23;94:25;
96:4,15;98:24;105:13;
106:3;107:22;111:8;

118:14,24;119:4;
121:19;127:10,10;129:6,
7;131:4,5,10,18,19;
138:9;139:5,24;140:2;
143:2,4,18,21;149:6;
150:5;151:8;154:16;
156:8,9;157:5;167:8;
168:15;173:3;174:4;
176:11;180:2;183:17;
187:2,22;188:22;191:3,
18;192:7,21;195:21;
202:10,20;204:22;
208:10;212:13;214:17,
25;216:12

**candidate (1)**
179:8

**candidly (1)**
207:23

**candy (1)**
208:8

**capacity (4)**
16:16,19;18:3;91:12

**care (5)**
47:18;61:8,8;139:6;
141:3

**cares (1)**
61:10

**caring (1)**
181:7

**carpet (1)**
86:19

**carry (2)**
141:22;164:4

**case (16)**
25:14;56:16;85:4;
93:20,25;96:5,15,22;
114:3,25;115:2;123:13;
142:9;166:14;197:2;
222:7

**cases (2)**
35:23;80:13

**cause (3)**
130:6,7;179:12

**caused (1)**
182:15

**caveat (1)**
194:5

**certain (2)**
24:25;219:22

**Certainly (4)**
118:16;120:4;137:20;
194:16

**certify (1)**
223:7

**chambers (1)**
134:3

**chance (1)**
196:15

**change (4)**
13:18;128:20;154:6;
171:9

**changed (2)**
154:4,19

**changes (1)**
11:14

**charge (1)**
170:4

**charging (1)**
35:23

**check (8)**
35:22,22;205:24;
206:2,3,7,8,17

**checked (1)**
132:10

**children (20)**
148:5;150:10,16,18;
153:19;154:17;159:7;
170:19;171:2,10;172:6,
7,10;174:24;175:19,22;
176:4;177:17;180:23;
181:6

**children's (1)**
175:13

**chooses (1)**
126:23

**chose (4)**
56:16;165:14;166:13;
190:7

**circumstances (3)**
154:4,5,19

**claim (2)**
130:9,10

**claimed (1)**
217:22

**claiming (1)**
153:6

**claims (2)**
22:13;153:8

**clarify (2)**
30:21;189:17

**clean (1)**
203:5

**clear (13)**
14:5;17:24;31:16;
32:13;39:21;62:22;
79:15;104:7,12;113:4;
120:15;201:9;215:12

**client (5)**
14:4;85:3;101:9;
117:21;194:11

**client's (1)**
118:22

**cocounsel (1)**
136:17

**code (1)**
6:15

**Coleman (1)**
181:23

**collect (10)**
158:4,12,14;159:20;
167:2,20;172:2;178:10;
187:23;199:22

**collected (1)**
153:24;155:6,16,18;
156:13;157:9,13;
158:17;159:17,24;

164:2;168:4;172:5,12;
  182:23;183:6,13,18,20
collecting (1)
  195:24
collude (1)
  101:17
colluded (3)
  101:11,13,15
collusion (2)
  101:17;115:6
comfortable (1)
  48:5
communications (5)
  67:22;134:5,20;
  142:20;194:11
company (4)
  24:2,5;148:14;171:10
comparison (1)
  217:24
compete (1)
  188:20
complaint (17)
  8:18,21,24;9:2;25:14;
  86:7;100:11,17,19;
  102:5;105:20;106:18;
  108:11;131:2,3,9;140:23
complete (1)
  223:10
completed (1)
  143:13
complicated (1)
  169:9
Compound (5)
  158:18;200:10;210:5;
  215:17;219:6
computer (4)
  73:21,22,23,25
concentrate (1)
  101:22
concern (5)
  21:11;139:11;140:5;
  141:16;181:21
concerned (2)
  204:20;210:19
concerning (2)
  102:19;193:21
concession (1)
  194:23
concluded (2)
  142:17;191:17
conclusion (1)
  50:11
condition (1)
  206:18
conduct (1)
  49:24
conducting (1)
  93:3
conference (1)
  142:17
confident (1)
  47:23
confidential (2)

138:25;194:10
conflict (8)
  21:12;50:7,19;54:13;
  57:21;58:8;77:22;
  117:23
conflicts (1)
  77:23
confusing (1)
  183:17
connection (8)
  14:18;21:18;53:25;
  56:11;65:22;81:6;89:16;
  118:9
consequence (1)
  49:24
consequences (1)
  175:17
consider (1)
  198:4
consideration (4)
  97:20;98:17;111:22;
  112:3
considered (1)
  197:23
considering (3)
  45:9;46:13;141:6
conspiring (1)
  114:23
constantly (1)
  62:12
consult (2)
  125:5;190:6
consulted (1)
  190:8
consulting (2)
  190:9;217:11
contained (2)
  100:10,17
contains (1)
  194:10
Cont'd (1)
  3:1
contention (1)
  194:21
contest (1)
  104:16
continuation (2)
  137:13;166:2
continue (6)
  33:10;109:24;121:22;
  143:12;175:11,12
contrary (1)
  137:4
control (2)
  166:7;205:18
conversation (12)
  59:11,16;67:7;132:13;
  191:23;211:7;214:8,10,
  11,12;217:6;218:8
conversations (8)
  65:21;66:8,19;67:4,9;
  193:13;194:13;196:5
copies (4)

8:22;19:17;122:9;
  195:2
copy (7)
  9:5;68:18;185:20,25;
  186:9;193:12,13
correction (4)
  189:21,23;190:4,5
counsel (18)
  39:14;83:13;84:17,25;
  85:6,9,17;86:6,19,21;
  87:7;103:6;112:9;
  124:13,25;125:6,25;
  130:5
counsel's (1)
  85:24
count (5)
  34:6,11,12;86:6;87:4
COUNTY (1)
  223:5
couple (2)
  27:3,4
course (7)
  10:21;44:2;135:8,18;
  138:20,25;198:7
court (55)
  36:19;52:23;83:18,24;
  84:22;85:12;96:3;97:12;
  117:9;119:19,22;
  121:11;130:11,13,16;
  131:23,23,24;132:6,17;
  134:22;135:3,11,12,16,
  19,21,22,24;136:5,10,21,
  24;137:8,16,19,22;
  138:6,15,21,24;139:8,
  12,23;140:6,14;141:2,9;
  142:3,15;162:18;170:9;
  173:19;181:22;182:6
courtesy (1)
  83:10
covered (1)
  28:2
covering (1)
  193:25
CPLR (5)
  96:19;118:24;119:4;
  133:6,10
created (5)
  114:15,18,21,23,24
creative (1)
  157:24
cross (2)
  96:5;140:13
crossed (1)
  85:2
current (1)
  11:18
currently (2)
  14:2;140:21
cut (1)
  189:13

                    D

D&K (51)
  30:10;81:23;82:8,9;
  84:20;85:8;96:9;107:17,
  17,18,21;108:7;148:13,
  24,25;149:4,21;150:15;
  151:5,13,22;152:4;
  153:7,9,17;154:21;
  157:21;162:3;167:2,14;
  168:7,25;169:13,17;
  183:8,13,15,18,25;
  184:8;200:20;209:14;
  212:18,20;219:4,10;
  220:11,18,20;221:13,14
Dalia (98)
  6:12;8:16,17,17,20,22,
  25;9:4,5,8,8,12;17:9;
  18:24;19:13,14;22:9,11;
  24:7,20;25:9,13;26:9;
  28:20;35:6;36:14;37:10,
  11,15,23;42:19,20,23,
  25;43:6;52:19;68:5,6,9,
  10,13,14;69:21;73:17;
  80:21;82:20;88:9;90:25;
  92:14,15,19,21;93:2,12;
  94:8,10,20,24;95:18,18;
  97:9,9,22,22;98:20;
  108:12;110:10;111:24;
  112:9,16;135:10,12;
  136:8,23;137:14;
  138:14;140:23;149:7,9;
  151:18;162:14;163:8;
  168:16,17;173:10,11,12,
  12;185:7;193:23;196:6,
  7;202:24;204:4;209:16;
  216:22;223:7,17
Dalia's (2)
  86:8;221:25
date (18)
  7:8;10:4,5;14:24;
  25:23;41:2;70:8;90:10,
  11;91:7;92:7;94:19;
  104:20;139:6;141:24;
  168:21;192:14;222:4
dated (4)
  88:10;94:10;108:2;
  193:24
dates (3)
  38:23;162:19;194:14
daughter (3)
  35:2;49:24;178:22
David (15)
  152:15;159:15,21;
  160:12;161:13,15;163:9,
  22;166:3,5,10;171:19;
  172:12,25;173:6
day (19)
  9:20;11:7;26:12,21,
  22,23,24;27:2;44:13,19,
  21;95:24;108:9;125:15;
  130:25;141:22;143:4;
  205:6;223:21
days (20)
  11:13,16;25:19;27:16,

22;28:7;29:2;30:7,15;
  31:17;210:25;211:3,5,
  16;212:22;213:2;
  218:18,22;219:2,14
de (1)
  119:9
deal (2)
  115:3;157:22
debt (3)
  154:11;164:4;169:24
December (19)
  68:20,21;71:13;75:10;
  77:20;79:6;80:20;82:25;
  83:8,12;88:5,10,13;
  92:21;93:2;94:14;
  125:16;167:19;223:9
decided (2)
  59:19;170:5
decision (1)
  141:13
default (1)
  168:20,24;184:17,20
defeat (1)
  153:25
defeated (1)
  197:2
defendant (1)
  9:5
defining (1)
  77:2
Definitely (2)
  114:25;115:2
definition (1)
  79:11
Delaware (3)
  14:20;22:10,11
delay (1)
  188:8
dellajo@duanemorriscom (1)
  3:17
DELLAPORTAS (74)
  3:15;34:14,21;39:7;
  40:18;57:23;58:3;81:20;
  82:2,6,11,16;83:4,9,13,
  22;84:13;87:3;95:21;
  96:2,11,25;97:13,23,25;
  98:13;113:3;119:10;
  120:20,24;121:11,14,23;
  122:11;130:4,21;131:3,
  8,13,21;133:17,23;
  136:14;137:5,12;139:9,
  10,23;140:4,14;141:20;
  144:10;146:3;152:21;
  155:23;156:5;158:21;
  163:4;167:4,22;176:17,
  21;179:15,18,21;182:19,
  24;203:14,23;204:8;
  210:6;215:19,22,25;
  217:8
demand (1)
  196:9
denied (1)
  102:5

ORLY GENGER VS.
DALIA GENGER, et al

**Denies (3)**
100:9,11,16
**Deny (1)**
100:8
**depend (1)**
115:8
**depends (1)**
115:10
**deponent (5)**
136:8,23;137:10;
222:5,13
**deponent's (1)**
222:5
**deposed (2)**
133:9;142:7
**deposition (43)**
7:21;10:14,16,18;
24:18,25;28:3,11;33:20;
82:8;85:2,7;86:8;87:8,
16;100:21;105:21,22;
112:11;113:6,8;116:14,
18;119:6;120:21;
124:17;130:23;134:10;
135:10,18;137:2,14;
139:7;141:17,21,23;
142:21;143:13;195:14;
205:13;221:25;222:10;
223:9
**depositions (1)**
143:15
**designated (1)**
38:9
**destroy (4)**
177:10;178:4;180:14;
213:14
**destroyed (2)**
181:16,18
**destruction (1)**
171:5
**determine (2)**
67:14;77:18
**determining (1)**
145:14
**deterred (1)**
142:5
**different (3)**
19:6;103:16;182:25
**difficult (2)**
46:5;113:25
**direct (2)**
86:5;151:21
**direction (1)**
98:4
**directly (4)**
22:18;57:11;212:20;
219:4
**disagree (1)**
153:16
**disagreed (4)**
152:18;153:3,10,15
**disagreement (1)**
57:3
**disappear (1)**

160:5
**disaster (1)**
174:20
**disconnected (2)**
142:18,21
**discovery (4)**
84:21;96:20;130:12,
22
**discuss (35)**
27:20;30:7,15;31:21;
44:25;45:11,21,22,22;
58:18,25,25;59:6;60:8;
66:3;87:8;89:9;147:6,
14;191:25;192:2,7;
193:3,10;195:8,18;
196:11,17,22;197:8,11,
18,21;201:22;202:5
**discussed (18)**
27:16,23;28:10;29:8,
14;30:12;31:17;48:9;
58:20;60:3;66:25;71:8;
89:9;147:4;174:11;
201:20;202:9;203:9
**discusses (1)**
151:22
**discussing (1)**
111:10
**discussion (4)**
85:18;90:2;132:3;
193:22
**dismiss (1)**
96:9
**dispute (2)**
139:4,5
**distinguish (1)**
20:13
**distribution (1)**
155:8
**divorce (9)**
17:8,11;150:24;151:6;
154:10;171:8,22;
173:21;177:4
**divorced (5)**
148:2;154:7,18,25;
168:10
**divorcing (1)**
159:4
**doctor (1)**
53:16
**document (61)**
10:10;11:12,15;27:23,
24;28:24;37:12;38:6;
43:5,21;44:8,23,24;45:8;
68:10,19;69:22,24;70:7,
9,23;74:10,14,23;76:3;
79:16;89:19,23;90:10;
91:23;92:9,15,18,19,21,
25;94:23;107:25;
108:15,17;109:9,15,16,
20,25;110:11;111:11,12,
18,24;113:22,24;114:8,
15,17,22,24;124:6;
168:17;185:17;194:8

**documentation (1)**
197:5
**documents (20)**
10:19,22,23;24:25;
25:5,7;67:13;70:2;
93:10,18,19,24;95:17;
97:8,21;114:2;129:13;
196:4;220:22,23
**dollars (2)**
151:6;217:23
**done (20)**
12:25;13:3,6,20;
15:22;75:21,25;76:4,9,
20;77:19;78:12;102:25;
110:4;111:3;118:17;
120:14;122:24;177:2;
204:25
**double (1)**
156:16
**doubt (1)**
120:11
**Dowd (2)**
220:6;221:9
**down (3)**
143:5;210:25;211:24
**draft (1)**
210:3
**drafted (5)**
71:13,18;72:2,6;
209:25
**dragged (1)**
130:12
**dry (1)**
208:9
**DUANE (1)**
3:11
**duly (2)**
6:1,4
**during (13)**
44:19,21;75:22;87:8;
112:11;119:6,23;128:3;
132:8;135:9;137:2;
170:11;189:10
**duty (4)**
145:10;198:8,10;
210:12
**dying (1)**
164:11

**E**

**early (1)**
139:12
**earthquake (1)**
207:11
**easier (1)**
160:5
**East (1)**
6:14
**eat (1)**
116:12
**Edward (1)**
221:10

**effect (6)**
114:7;176:10,16;
177:17;187:12,20
**either (3)**
96:22;126:25;141:17
**Elana (5)**
46:24;47:2,2,5;67:4
**election (1)**
109:5
**Ellman (1)**
134:25
**else (22)**
12:23;24:5;46:8;47:7;
59:10;60:12;62:7;63:15,
21;118:15;124:3;139:8;
155:25;158:9;161:9,10;
162:20;189:25;192:16;
200:5;201:16;205:11
**else's (1)**
49:12
**e-mail (1)**
57:15
**e-mails (1)**
196:4
**enable (1)**
195:10
**encouraging (1)**
29:18
**end (10)**
23:20;112:19;115:15,
19;140:10;143:7,8;
153:19;173:4;205:5
**ended (3)**
52:11;53:2,6
**ending (1)**
143:8
**ends (1)**
52:5
**enforce (1)**
218:22
**enforcing (6)**
210:24;212:22;213:5;
218:18,25;219:4
**Enriquez (6)**
64:25;65:3,7,14;69:6,
15
**entered (1)**
87:16;117:25;155:4
**entitled (4)**
34:2;127:16,17;216:7
**equal (1)**
155:8
**equally (5)**
148:10;150:19;171:7;
175:20,22
**especially (2)**
86:3;119:12
**Esq (2)**
3:3,15
**establish (1)**
150:8
**established (1)**
98:6

**estate (14)**
148:4;150:17,18;
153:18,25;176:3,10,16;
177:2,10,16,21;178:5;
213:14
**even (6)**
88:19,21;123:10;
140:14;207:23;214:14
**eventually (1)**
61:9
**everybody (2)**
120:12;143:14
**everyone (3)**
143:10;162:18;211:2
**everyone's (1)**
136:3
**evidence (1)**
170:16
**exact (1)**
94:19
**exactly (20)**
10:4;23:23;25:23;
38:23;52:3;54:23;66:2,
24;75:24;76:8;78:3;
87:24;114:20;121:12;
128:23;154:5;162:4;
184:21;211:6;212:11
**EXAMINATION (1)**
6:8
**examined (1)**
6:6
**example (1)**
88:4
**Excellent (1)**
32:20
**except (5)**
25:8;63:3;99:13,14;
100:11
**exception (1)**
138:22
**exchange (4)**
97:21;98:10;111:23;
219:15
**Excuse (9)**
32:24;35:6;36:9;
52:18;81:25;103:25;
112:15,16;115:17
**Exhibit (59)**
8:17,20,22,25;9:4,8,
12;11:2,3;25:10,11,13;
26:10;27:24;28:20;
37:10,11,15,23;42:19,
20;68:5,6,9,10;86:7;
88:9;92:15;94:24,25;
95:4,5,7,8;98:20,21;
99:7;100:20,21;105:20,
21;108:6,11,12;149:9,
14;151:16,18;162:13,14,
17;168:17;173:10,12;
184:14;185:7;209:13,14,
16
**exhibits (3)**
8:15,16;124:16

ORLY GENGER VS.
DALIA GENGER, et al

DALIA GENGER
December 13, 2012

existed (1)
190:6
exited (1)
116:18
exonerate (2)
78:23;87:24
exonerated (2)
78:11;111:18
exoneration (3)
77:19;92:22;93:2
expenses (1)
81:5
explain (2)
156:24;182:11
explicitly (1)
96:3
explore (1)
207:13
exposed (1)
46:7
expressing (1)
80:14
extent (7)
74:20,25;75:12,19;
78:16;88:23;191:10
extra (1)
206:23

**F**

fact (12)
39:25;59:7;61:9;
65:13;66:3;114:6;151:4;
170:2,16;178:7;183:7,21
facto (1)
119:9
facts (3)
98:5;102:8;194:13
factual (1)
118:18
failed (2)
168:25;169:13
fairness (1)
84:16
false (1)
130:22
familiar (1)
31:12
family (11)
46:3,21;47:6,8;55:16;
60:4;69:16;139:13;
142:4;158:16;171:6
Fang (60)
3:4;37:11;41:24;
43:17,18;47:5,5;50:7;
54:13;55:22;57:3,22;
58:9;64:12,16,19;65:6,
21;66:8,12,13,19;72:17,
19,24;73:8,11;96:8,9;
100:13;101:13,23;102:7,
8,12,16,19,22;105:2,7;
106:11;107:4;108:2,8;
111:11,12,18;114:23;

117:21;121:17;122:6,8,
10;123:16;129:4;
131:17;136:15,17;
144:17;147:17
Fang's (2)
93:12;102:9
far (11)
30:13;53:4;59:6;64:5;
72:25;102:12;109:19;
174:18;204:19;210:19;
219:12
faster (1)
137:21
father (1)
208:5
favor (1)
161:6
favors (1)
160:22
February (5)
187:9;193:25;194:2;
221:25;222:11
feels (1)
189:15
fees (5)
85:4,5,15;130:14;
140:10
Feinman (2)
22:10,12
felt (1)
211:22
FEMALE (2)
134:11,15
few (3)
25:19;69:10;141:24
fight (1)
16:24
fighting (1)
142:10
fights (1)
218:14
filed (1)
131:17
files (2)
93:15,23
filing (1)
19:25
fill (1)
66:4
final (2)
151:16,18
finance (1)
171:11
finances (1)
170:4
financial (1)
206:18
financing (1)
205:12
find (13)
15:8;46:5,8;50:4;57:2;
63:14,19,22;76:22;
77:24;188:7,14;207:3

finding (1)
78:4
fine (8)
83:17;84:23;132:15;
139:8;178:16;194:24;
200:2;207:7
finish (8)
76:15,16;83:5;98:22;
106:7;127:16;147:12;
214:5
finishes (6)
8:6;52:20;104:2,14;
111:15;113:22
fire (1)
207:12
firm (19)
14:15,23;15:21;17:21;
18:17;21:18;23:22,22;
35:17;61:7,7,24,25;
109:6;119:21;120:16,
18;200:18;201:17
first (16)
6:4;41:23;68:16;
88:21;101:7;109:7,11,
14;152:8;157:3;181:20,
20;184:22;186:20;
209:24;211:7
five (5)
134:9;189:5,6;205:23,
23
fix (1)
39:23
focus (2)
217:21;218:5
follow (5)
35:2;146:12,24,24;
182:14
followed (2)
199:23,25
following (2)
134:4,18
follows (2)
6:6;143:25
foreclose (4)
158:14;187:3;212:13,
17
foreclosed (3)
212:18,19;218:10
foreclosure (1)
30:9
foreseeing (1)
177:3
forever (2)
142:7;171:20
forgiven (1)
178:25
form (35)
13:10;20:22;32:7;
38:10,21;45:25;57:23;
58:3;60:24;94:17;97:23;
100:12;102:6,16,21;
103:8;107:19;122:11;
123:23;152:20,21;155:9,

23;156:5,14;157:14;
167:22;176:21,22;
179:21;203:3,14;204:8;
210:6;213:22
former (1)
147:25
forth (2)
85:11;124:16
found (5)
67:8;153:11,14;
171:24;221:17
foundation (4)
39:7;40:18;91:2;97:25
four (2)
110:9;113:23
frankly (2)
140:15;208:16
free (1)
118:21
fresh (1)
33:5
friend (2)
158:13;217:3
friends (2)
207:3,5
front (2)
100:22;170:9
frustrated (5)
49:7,10,20,21;50:17
fulfill (1)
66:4
full (1)
51:25
fully (2)
96:16;141:12
functioning (1)
53:25
funds (1)
22:21
funny (1)
218:16
further (1)
134:18
future (1)
177:3

**G**

gag (1)
87:12
gain (2)
176:2,6
gather (1)
84:22
gave (15)
10:23;25:7;120:21,23;
121:21;123:16;139:22;
159:15,23;160:14,16,19;
162:3;196:6;219:15
geared (1)
84:21
Gener (1)
196:8

general (21)
29:6,24;45:12,12,15;
109:6;114:2;146:12,21;
149:19,21;168:7;
169:17;174:23;175:6,7,
13;200:12,12;219:15;
221:11
Generally (1)
95:15
GENGER (363)
3:21;6:12,16;7:1,12,
19,23;8:1:9:1,8,12,24;
10:1;11:1,18,19,21,25;
12:1,4,18;13:1,8;14:1,6;
15:1;16:1;17:1,7,9,9;
18:1,18,24;19:1,13,14,
16,18,18;20:1,20;21:1,4,
6,9;22:1,2;23:1;24:1;
25:1;26:1;27:1;28:1,22;
29:1;30:1,25;31:1,23;
32:1;33:1,14,24;34:1,4,
8,9;35:1,6,8,12;36:1;
37:1,2,14;38:1;39:1,3,4,
21;40:1,14,15;41:1,17,
25;42:1;43:1;44:1;45:1,
10,17;46:1,12,14;47:1,5;
48:1;49:1;50:1;51:1;
52:1;53:1;54:1;55:1;
56:1;57:1;58:1,4;59:1;
60:1;61:1;8:62:1,15,25;
63:1;64:1;65:1,15;66:1;
67:1,5;68:1;69:1,5,16;
70:1;71:1;72:1;73:1,18;
74:1;75:1,23;76:1;77:1;
78:1;79:1;80:1;81:1;
82:1;83:1;84:1;85:1,10;
86:1,10;87:1,19,22;88:1,
12;89:1,20,24;90:1;
91:1;92:1;93:1;94:1;
95:1;96:1;97:1;98:1;
99:1;100:1;101:1;102:1;
103:1;104:1,13,19,20,
24;105:1,4;106:1,2;
107:1;108:1,9;109:1,7,
10;110:1,6;111:1,10;
112:1,10;113:1,20,22;
114:1,7,8,24;115:1,13;
116:1,3;117:1;118:1;
119:1;120:1,18;121:1;
122:1,5,9;123:1;124:1,
10,15;125:1,5;126:1;
127:1;128:1,5,12;129:1,
3;130:1;131:1;132:1,23;
133:1,2,5,19;134:1;
135:1,6,10;136:1,9,13,
23;137:1,14;138:1,14;
139:1,13,20;140:1,23;
141:1,17,21;142:1;
143:1;144:1,14;145:1;
146:1;147:1;148:1,2,13;
149:1;150:1;151:1;
152:1;153:1;154:1;
155:1;156:1;157:1;

ORLY GENGER VS.
DALIA GENGER, et al

DALIA GENGER
December 13, 2012

158:1,16;159:1;160:1;
161:1,13;162:1;163:1,
13;164:1,12;165:1;
166:1;167:1;168:1;
169:1;170:1;171:1,5;
172:1;173:1,11,12,15;
174:1;175:1,6;176:1;
177:1;178:1;179:1,18;
180:1;181:1;182:1;
183:1;184:1;185:1;
186:1;187:1;188:1,25;
189:1,11,21;190:1;
191:1;192:1;193:1;
194:1;195:1,15;196:1,7;
197:1;198:1;199:1;
200:1;201:1;202:1;
203:1;204:1;205:1;
206:1;207:1;208:1;
209:1,20;210:1;211:1;
212:1,4,8;213:1;214:1;
215:1;216:1,23,23,25;
217:1,3;218:1;219:1;
220:1;221:1,9;222:1,10;
223:7,17
**Genger's (6)**
8:17;9:5;33:6;85:16;
144:15;164:17
**gentlemen (2)**
39:13;40:2
**germane (4)**
140:20,22,25;141:4
**gets (1)**
161:7
**given (5)**
160:13,17;161:16;
175:23;223:12
**giving (5)**
69:25;98:11;158:8;
194:18;217:24
**God (2)**
121:21;142:7
**goes (1)**
153:22
**good (5)**
76:13;113:15;114:18;
123:2;134:24
**GP (5)**
168:7,25;169:13,17,23
**grammar (2)**
156:15;157:15
**Great (1)**
96:11
**GRIVER (422)**
6:9;8:8,13,22;9:4,11;
10:6;13:19;16:10,13,14;
17:2,18;18:10;19:15,21;
20:2,8,12,25;21:16,25;
22:9,16;23:14;24:23;
25:12;26:11;28:18,21;
29:15;32:4,5,15,18,20,
25;33:2,6,13,19,23,25;
34:3;35:4;36:6,7,16,21;
37:9,13,22;38:11,25;

39:10,17,20;40:21;41:6,
14,22;42:5,11,18,22;
43:10;44:12;45:7,20;
46:11,19;47:20;48:19;
49:2,9,14,18;50:12,15;
51:6,10,12,16,24;52:10,
18,20,25;53:11,22;54:5,
11,17;55:2,6,8,14;56:9,
23;57:14,19;58:6,17;
59:9,15,23;60:11;61:3,
13,22;62:18;63:4,5,20;
64:11,15,24;65:12,19;
66:6,13,16,17;67:2,19;
68:4,8,12,25;69:3,9,14;
70:14,20,24;71:6,17;
72:5,15,23;73:9,16;
74:12,18;75:9,17;76:11,
15,18;77:4,8,16;78:9,14,
19;79:14,25;80:8,17;
81:14,25;82:4,10,12,21,
23;83:7,11,16,20;84:5,8;
86:5,9,13,16,21,22,25;
87:6,18;89:4,15;90:6,14,
21;91:2,4,14,15,17,21;
92:4,13,17;94:4,6,18;
96:7,14,23;97:4,5,19;
98:9,18;99:5;101:2,8,12,
21;102:3,20;103:9,12,
20;104:3,5,8,18;105:12,
18,25;106:19,23;107:24;
108:5,14,22;109:2,12,
13;110:2,5,19,21,23;
111:2,5,9,16;113:7,13,
18;114:13;115:16,17,18;
116:2,5,8,13;117:2;
118:12;119:7,25;120:8,
14,17;121:6,20;122:4,
14,19;123:9,20;124:7,
23;125:3,4,12,24;
126:19;127:5,9,14,17,
20,21;128:21;129:7,16;
130:15,19,25;131:6,15,
25;132:21,24;133:21;
135:2;136:7,10,11,12,
18,22,25;137:9,20,25;
138:12;139:3;140:16,
17;141:8,14;142:13;
143:6,11,18;144:12,13,
24;145:9;146:4,11,19;
147:2,11,24;148:18,22;
149:6,12,20;150:23;
151:15,20;153:4;
155:13;156:2,7,17;
157:2,5,10,19;159:10;
160:6;161:24;162:12,16,
24;163:2,7;165:7,13,18;
167:9;168:2,19;169:6;
170:20;171:3,14,18;
172:19;173:5,9,14;
175:5,10;176:19;177:6,
23;180:6;182:4,22;
183:5;187:25;188:5,24;
189:3,20;191:4,5,14;

192:23;193:4,11,15,17;
194:7,15,24;195:6,13,
17;196:3,10;198:17;
200:16;201:4,11,14;
202:24;203:4,18;204:5,
10,13,24;205:2;206:21;
208:10,18;209:12,18;
210:13;213:23;214:7;
216:24;217:5,13;219:11,
25;220:15;221:21,24;
222:4
**Griver's (1)**
115:20
**ground (1)**
138:17
**grounds (2)**
91:25;138:18
**Group (2)**
22:15;35:10
**guess (16)**
7:11;44:18;55:17;
80:24;99:17;125:19;
126:6,12;163:25;173:8;
183:15;185:24;188:12;
189:2;204:15;221:17
**guessing (1)**
126:16
**guy (1)**
17:23
**guys (1)**
142:11

## H

**Half (8)**
26:23;27:2;86:20;
116:6,11;169:25,25;
192:2
**hand (8)**
8:14;22:15;32:25;
112:18;126:19;127:3;
138:4;139:17
**handing (1)**
162:17
**hanging (1)**
105:11
**happen (4)**
137:22;171:12;
207:11;211:13
**happened (2)**
77:23;165:22
**happening (2)**
166:4;207:18
**happy (4)**
52:6,16;54:24;113:21
**harassed (5)**
49:23;53:19,23;54:7;
55:10
**harassing (1)**
33:17
**Harassment (3)**
53:13,14,15
**hard (2)**

34:25;219:9
**harm (2)**
115:6,12
**harmful (2)**
76:9,20
**harmless (2)**
74:24;78:11
**Harris (11)**
87:15;116:17;117:9,
15,17,20,24;118:3;
119:5;120:3;121:12
**Harris' (2)**
118:11,16
**head (1)**
18:12
**hear (3)**
111:8;191:6;218:19
**heard (4)**
107:16,17,25;216:2
**held (1)**
78:11
**Hello (2)**
134:7,22
**help (2)**
34:14;163:23
**helpful (1)**
142:14
**hereby (1)**
223:7
**herein (1)**
6:4
**Here's (1)**
40:11
**Hey (2)**
196:12;199:12
**hid (1)**
206:4
**highest (2)**
200:15,19
**himself (1)**
214:13
**hire (1)**
14:22
**hired (3)**
15:4;85:10;128:2
**history (1)**
63:11
**Hoffman (1)**
117:20
**Hold (1)**
134:15
**holding (1)**
127:2
**holds (1)**
74:24
**home (1)**
93:10
**Honor (17)**
134:25;135:15;
136:12,16;137:25;
138:12,13;139:3,9;
140:5,16,21;141:8,12,
13,14;142:13

**Honor's (1)**
141:15
**hope (2)**
111:4;131:2
**hoping (1)**
171:9
**hospital (4)**
50:18;52:6;53:3,6
**hospitalized (2)**
49:23;53:17
**hour (6)**
86:20;113:13;116:6,
12;191:25;192:2
**hours (3)**
27:3,5;139:18
**house (1)**
57:10
**household (1)**
170:4
**housekeeping (1)**
8:14
**hundreds (1)**
217:23
**husband (12)**
148:2;154:18;155:5;
168:10;169:25;170:3;
177:4;180:11;182:12;
205:12;207:17;208:20
**Hypothetical (2)**
146:7,10

## I

**idea (8)**
44:17;48:10,13;75:21;
111:22;114:15;123:2;
132:15
**identified (2)**
61:23;220:16
**Identifies (1)**
74:17
**ignore (1)**
33:20
**imagine (2)**
110:15;168:5
**immediately (3)**
88:22;121:4;208:7
**implemented (2)**
176:4;177:16
**important (1)**
123:4
**impossible (1)**
46:5
**improper (1)**
152:20
**inactions (4)**
37:3;104:25;105:7;
106:11
**inadmissible (1)**
138:9
**Inc (2)**
3:12;212:3
**included (6)**

219:5;220:21,25;
221:8,11,12
**includes (1)**
81:3
**including (2)**
46:21;81:4
**incomprehensible (2)**
32:8;219:7
**inconsistent (3)**
180:22;181:5,11
**incorrect (1)**
118:20
**increasing (2)**
85:15,19
**incumbent (1)**
110:3
**incurred (2)**
23:6;81:5
**incurring (1)**
85:3
**indeed (1)**
12:21
**indemnification (6)**
79:18;80:22;81:3,10;
94:14;98:12
**indemnifications (2)**
123:17;125:7
**indemnified (3)**
78:11,21;79:6
**indemnify (4)**
78:24,25;79:3,4
**independent (2)**
28:24;61:7,25
**indicate (1)**
112:19
**Indicating (1)**
173:23
**indication (1)**
73:20
**individual (12)**
15:22;16:5,16,16,19;
18:2,24;20:16;22:18;
24:13,15,20
**individually (1)**
21:5
**indulgence (1)**
143:14
**influence (1)**
187:2
**inform (2)**
135:25;190:7
**information (15)**
29:13;99:15;100:11;
102:6,15;103:22;
106:15;123:3,4,13;
124:9,14;129:4;133:14;
166:10
**informed (3)**
123:14;161:10,12
**inherent (1)**
117:23
**initiated (2)**
17:6;35:7

**initiative (1)**
166:8
**injury (1)**
81:5
**insist (1)**
175:8
**instead (4)**
18:12;132:16;143:8;
205:8
**Instruct (11)**
16:7;13:16;36:16;
90:17,21;92:2;115:14;
137:3,17;162:19;208:25
**instructed (6)**
92:20;104:24;106:11;
126:22;138:19;162:18
**instructing (3)**
104:11;124:23;191:7
**instructions (2)**
142:14;182:14
**instructs (1)**
29:16
**Instrument (3)**
38:2;42:20,25
**intend (2)**
85:4;194:3
**intended (4)**
153:23;155:6,17;
158:17
**intent (6)**
148:9;164:8;166:25;
167:11,20;211:10
**intention (3)**
154:3;171:19;212:7
**intentions (2)**
163:23;188:18
**interest (27)**
12:22;20:19;21:5;
47:17,18;62:13;78:23;
87:23;129:2;144:15;
145:2;148:23;149:3;
175:14,15;181:21;199:9,
14,15,15,16,17;200:20;
205:16,17,17,18
**interested (2)**
62:24;140:3
**interests (12)**
12:11,12,15,18,19,22;
13:7,8;21:12,13;22:7;
175:14
**interpleader (1)**
22:14
**interrogatories (2)**
9:6,10
**interrogatory (3)**
11:11;27:12;185:9
**interrupt (1)**
82:11
**interrupting (1)**
82:12
**interruption (1)**
20:6
**into (2)**

155:4;195:14
**investigate (4)**
102:10,11;104:25;
105:6
**investigated (1)**
106:10
**investigation (9)**
62:4;76:2,22;77:3,12;
93:4,11;103:15;106:12
**Investment (3)**
3:12;212:3;218:24
**invisible (1)**
118:17
**invite (2)**
120:25;121:25
**invited (2)**
120:20,22
**invoices (1)**
21:17
**involved (13)**
31:18;34:5,10;35:14,
24;56:7;95:12;139:12;
162:8;203:7;204:19;
205:14;208:17
**involvement (1)**
122:7
**involving (1)**
139:20
**irrelevant (3)**
137:6,11;138:9
**issue (3)**
19:25;153:11,15
**issues (4)**
84:22;132:7;135:9;
139:20

**J**

**Jaffe (3)**
134:3,21,22
**Jaffe's (1)**
134:9
**January (17)**
11:25;13:22;37:6;
38:16,19,19;44:11;
62:16;68:20,21;88:16;
94:10;105:5;106:8;
125:16,17;209:15
**job (11)**
34:2;46:8;48:25;52:5;
62:11;123:21;126:25;
127:4,7;203:10;209:2
**JOHN (3)**
3:15;121:6;139:10
**join (15)**
16:9;19:19;32:10;
49:16;50:10;81:19;
85:20,24;121:23;
123:24;144:11;152:22;
167:6;204:12;209:8
**Jonathan (4)**
125:25;126:10;
127:22;136:14

**judge (7)**
82:10;97:17;131:12;
132:11;134:3,21,22
**judge's (3)**
132:10,10;216:8
**judgment (2)**
131:17;140:20;141:5
**June (1)**
7:9
**Justice (5)**
134:9,14;151:10,17;
173:25

**K**

**keep (14)**
17:5;34:19;35:15;
36:2,3,8,12,22,24;83:13;
104:12;145:5;171:20,23
**keeping (1)**
162:11
**kidding (1)**
191:24
**kids (7)**
154:23;157:23;158:6;
159:5;160:5;168:5;
175:17
**Kilmerman (1)**
221:10
**kind (8)**
29:12;30:20;52:4;
61:7;67:6;79:24;80:15;
118:25
**knew (11)**
45:15;121:16,18;
124:3,5;166:3,14;193:8,
8;206:17;207:15
**knowing (1)**
87:24
**knowledge (7)**
97:7;100:11;102:6,15;
103:22;172:24;183:10
**known (3)**
55:17;207:24,25
**knows (2)**
121:12;166:15
**Kortmansky (8)**
17:22;126:2,3,10;
127:22;128:2,4,15
**Krause (1)**
135:2

**L**

**Lack (3)**
39:7;40:18;97:25
**Lance (5)**
87:15;116:17;117:9,
15,20
**language (1)**
176:5
**last (13)**
9:16,23;10:7,9;11:4,

10;20:9;30:20;70:6;
99:7;143:19;175:25;
181:4
**later (5)**
130:18;138:9;139:6;
165:25;171:23
**laughing (1)**
211:15
**law (14)**
14:15,23;15:21;21:18;
35:17;74:20,25;75:12,
20;78:17;88:24;96:21;
200:17;201:17
**Lawrence (1)**
221:10
**lawsuit (5)**
16:24;17:3,6;35:9;
36:6
**lawsuits (16)**
31:8,11,12,18,22;
33:24;34:4,7,9,19;35:5,
7,13;36:22,25;46:7
**lawyer (59)**
15:9,11,13,17,19;17:7,
22;25:2;31:15;43:16;
59:18;70:12,17;73:7,11,
25;74:4,5;77:11;89:6,10,
10,12;90:2,7,15;91:9,13,
22;93:21;95:19;97:16;
122:17,22;124:2;128:10,
11,13;129:14,18,22,24;
133:4;144:5,22;146:25;
165:23;166:16;190:7;
192:13;193:5;210:2,4,4,
8;214:2,3;217:11;
221:17
**lawyers (8)**
31:9;53:24;77:9,12;
136:7,19;165:21,24
**lawyer's (2)**
73:23,24
**layperson (1)**
114:2
**Leah (104)**
3:4;37:11;41:24;43:4;
45:16,22;46:22;47:5;
49:7,10,19,21;50:7,16,
19,20,24;51:18;52:11;
53:2,6,18;54:6,19,23;
55:9,19;57:3,22;58:9;
64:19;65:6;66:8,12,13,
19;67:22;69:25;72:11,
14,16,17,19,24;73:8,11,
15;74:17,19,24;75:11,
19,21;76:3,9,20;77:18,
25;78:2,4,6,10;88:2,6,
23;93:4,11;96:8,9;
98:11;100:13;101:13,14,
15,23;102:7,8,9,12,16,
19,22;105:2,7;106:11,
16;107:4;108:2,8;
111:11,12,17;114:23;
115:4,8;117:21;122:6;

123:16;129:4;131:17;
  136:15,17;144:17;
  147:16
**Leah's (5)**
  38:7;42:23;53:25;
  67:10,11
**least (2)**
  156:15;219:14
**leave (2)**
  82:19;138:7
**led (1)**
  61:9
**left (5)**
  61:12;96:8;117:3;
  211:23;214:16
**legal (12)**
  50:11;79:13;80:15;
  85:3,5;114:2;130:14;
  139:21;171:25;188:14;
  194:12;196:25
**legally (4)**
  159:8,13;172:17;
  195:23
**LEINBACH (30)**
  96:19;112:8,21;113:7;
  115:23;119:8,14,19;
  121:9,19;132:5,19;
  133:3,8,12,16;134:7,8,
  12,17,24,25;135:5,17,22,
  25;162:16;189:18;
  195:3;216:7
**lent (1)**
  24:2
**letter (6)**
  57:20;94:14;162:14;
  163:12;165:9,15
**letting (3)**
  197:9,19;198:4
**liability (1)**
  129:5
**life (2)**
  47:19;160:4
**lifetime (1)**
  12:4
**limit (1)**
  98:23;137:17
**limited (5)**
  108:6,7;210:25;
  216:11;218:25
**line (12)**
  35:19;75:5;86:2;90:5;
  97:11;103:11;130:6;
  137:6,9;143:25;144:2;
  169:10
**list (2)**
  36:2,3
**listen (3)**
  39:17;201:15;216:25
**litigation (4)**
  117:18;137:7,11;
  142:5
**LLP (1)**
  3:11

**loan (2)**
  23:21;24:4
**loans (3)**
  23:2,5,17
**location (1)**
  44:6
**logic (1)**
  174:22
**long (8)**
  26:16;103:18;110:7;
  114:5;126:21;191:22;
  192:8;219:14
**look (39)**
  9:23;10:13,18,24,25;
  11:4;28:17,23;35:20;
  37:16;63:25;64:6;68:13,
  16;69:21;75:5;81:2;
  88:9;93:14,14;94:7;
  96:7;98:19;99:7;100:3,
  15;105:19;116:3;
  131:16;174:3;177:12;
  178:13;181:3;184:24;
  185:9;192:3;201:2,7;
  218:21
**looked (4)**
  31:9;64:19;93:23;
  169:24
**looking (8)**
  9:12;28:19,23;67:20;
  106:5;108:15;163:8;
  194:9
**looks (1)**
  108:21
**lot (2)**
  61:11;182:15
**LP (18)**
  30:10;148:13,21,24,
  25;149:21;183:8;184:8;
  209:14;212:18,20;219:4,
  10;220:11,18,20;221:13,
  14
**ludicrous (1)**
  103:6
**lunch (5)**
  113:14,21;114:11;
  116:6;119:23

**M**

**mail (2)**
  185:2,18
**major (1)**
  13:16
**makes (3)**
  19:12;40:3;130:8
**making (2)**
  36:19;118:23
**manage (1)**
  29:5
**Manhattan (3)**
  23:24;24:2,5
**many (30)**
  17:4;31:13;33:24;

34:4,6,9,15,18,22;35:2,5,
  5,7,11,13;46:7;80:13;
  112:10;142:6,6;152:25;
  166:12;199:19;203:20;
  204:7;211:21;216:18;
  218:13,13;219:13
**March (7)**
  11:8;173:19;176:7,13;
  177:17,25;193:24
**Marisa (1)**
  135:14
**marital (12)**
  151:9;152:9;156:4,11;
  157:11;169:24;170:11;
  173:24;193:7;197:5;
  205:22;206:24
**Mark (4)**
  55:6;108:5,22;168:16
**marked (46)**
  8:21;9:3,10;11:2;
  28:20;37:9,12,15;42:18,
  21,23,25;43:5;68:4,7,8,
  11;80:21;92:14,16,19,
  21,25;94:7,20,24;95:17;
  97:9,22;98:20;108:13;
  110:9;111:24;149:6,11;
  151:15,19;162:13,15;
  168:18;173:10,13;
  185:11;188:16;209:13,
  17
**married (1)**
  207:17
**Masyr (2)**
  3:22;136:20
**matter (8)**
  8:24;75:8;139:17;
  140:12;146:12;159:13;
  181:18,20
**matters (7)**
  8:14;85:10;99:15;
  139:14,15,19;141:23
**maximize (1)**
  201:18
**maximum (9)**
  74:20,25;75:11,19;
  78:16;88:23;98:11;
  123:16,23
**may (23)**
  21:12,23;28:10;36:5;
  40:7,7;58:5;78:12,12;
  82:24;85:17;102:9;
  104:8;113:5,23;119:16;
  125:8;126:24;130:10;
  143:20;166:16;185:21;
  186:9
**Maybe (5)**
  14:20;19:22;61:6,24;
  112:5
**mean (45)**
  13:18;17:8,11;26:6;
  29:6;31:8,10;35:3,25;
  47:2;58:23;77:23;81:11;
  98:23;100:8;112:5;

123:7;130:3;138:22;
  142:24;144:8;150:12;
  153:3;154:18;159:13;
  162:11;164:5;168:6;
  169:23;171:24;174:21,
  23;177:22;181:9,19;
  183:16,16;184:5;
  188:20;191:10;195:24;
  196:2;213:9;219:13,17
**meaning (1)**
  167:13
**means (8)**
  18:7;78:25;79:2,3,5;
  99:8;159:5;184:6
**meant (1)**
  79:18
**mechanism (1)**
  155:7
**meet (2)**
  26:13,16
**meeting (3)**
  209:14,17;218:21
**MEISTER (272)**
  8:6;9:25;13:12;14:2,6,
  22;15:4,5,8,21;16:4,6,
  12,15,18,22;17:25;
  18:16,23;19:21,23;20:3;
  21:18,23;22:2,11,14;
  23:7;24:11,12,17;25:5,9,
  16;26:5,9,13,17;27:7,15,
  19;28:7,15,25;29:16;
  30:7,15;31:14,17;32:2,7,
  12,17,19,24;33:4,10,16,
  25;36:5,9,14;37:18;
  39:14;45:25;49:11,17;
  50:9,11;51:19,22;52:17,
  23;57:4;60:15,19,24;
  63:3;66:12;68:22;69:2;
  70:3;71:16;75:6;76:13;
  78:16;81:12,16;82:20;
  83:2;84:2,11;85:21;
  86:11,14,18,24;87:7,10;
  88:25;89:8,13;90:17,25;
  91:11,25;94:17;99:3,24;
  100:23;101:6,8,19,25;
  102:18,23;103:2,7,19,
  25;104:5,10;105:24;
  106:17;107:19,22;
  109:11,23;110:17,21,24;
  111:3,7,14;112:7,9,13,
  16;113:11;114:11;
  115:13,17,19;119:16,20;
  120:15;123:5,18,24;
  124:18,21;125:2,8,23;
  126:13,16;127:4,7,12,
  15,19;128:2,16;135:14,
  14;138:13,14,16,23;
  139:5;142:16,25;145:3;
  146:7,14,17;147:10,18;
  148:15,20;149:16;
  150:21;152:19;155:9,22,
  24;156:14,22;157:14;
  158:18;159:25;161:20;

162:17,23,25;165:3,11,
  16;166:20,24;169:4;
  170:15,22;172:15;
  173:3;174:25;175:8;
  176:22;177:19;180:2;
  182:2;185:20;188:11,13,
  22;189:6;190:22;191:4,
  7;192:9,21;193:11,16,
  23;194:9,20,25;195:5,9,
  19;196:11,17;197:4,8,
  18;198:2,14;200:8,10,
  17,21;201:6,9,16,22;
  202:5,12,19,20;203:3,6,
  12,21;204:3,12,22;
  208:6,21,25;209:8;
  210:5;213:22;214:5;
  215:17;216:5,16,21;
  219:6,24;220:8,12;222:3
**Meister's (3)**
  20:14;35:17;191:8
**member (1)**
  69:16
**memo (4)**
  80:20;91:5;94:10;
  108:12
**memoranda (1)**
  196:3
**memory (2)**
  109:18;195:16
**men's (1)**
  87:11
**mental (3)**
  7:17;8:3,9
**mention (6)**
  130:8;131:21;220:24;
  221:3,15,18
**mentioned (6)**
  49:25;50:17,18;
  139:24;220:19;221:4
**merely (1)**
  194:12
**messages (1)**
  56:25
**met (4)**
  15:5;26:5,6,14
**middle (2)**
  104:11;192:23
**midnight (1)**
  44:18
**might (24)**
  27:10;28:2;54:18;
  60:13;61:7,8;62:24;
  109:21;110:12;124:3;
  127:24;131:16;151:2,2;
  161:4;171:24;186:13,14,
  20;187:7,13;189:12;
  197:7;207:4
**million (7)**
  150:13;164:5,11;
  175:18;205:3,5,20
**millions (2)**
  217:22,23
**Milonis (3)**

151:10,17;173:25
**mind (3)**
20:14;49:12;62:13
**minds (1)**
158:20
**minimum (2)**
123:3;140:23
**minute (4)**
14:20;20:4;37:16;
137:8
**minutes (8)**
81:22;84:19;113:12;
116:13;134:9;143:12;
189:5,6
**Mischaracterizes (2)**
179:22;182:20
**misrepresentation (2)**
85:6,15
**Missry (1)**
3:22
**mistake (3)**
189:12,14,15
**moment (4)**
19:24;36:14;119:18;
193:11
**Monday (1)**
25:22
**money (17)**
23:25;118:23;142:11;
163:25;169:19;172:10;
196:25;197:15,16;
205:15,21;206:4,20,23,
24;207:7,9
**month (1)**
34:20
**moot (1)**
96:17
**more (5)**
59:16;86:15;116:11;
150:9;207:9
**Moreover (1)**
117:19
**morning (1)**
44:15
**MORRIS (1)**
3:11
**most (3)**
78:5;197:15,16
**mother (6)**
47:19;55:21;180:24;
181:7,7,12
**motion (4)**
96:12;131:16;140:20;
141:5
**motions (2)**
118:23;138:10
**motivation (1)**
163:24
**mouth (3)**
104:12;121:21;208:9
**Move (8)**
51:22;81:16;85:17;
110:17,23;113:9;137:21,

24
**moved (2)**
96:9;111:5
**much (6)**
23:25;98:24;174:4,14;
207:7,16
**multiple (1)**
142:2
**must (2)**
29:17;40:8
**myself (1)**
133:20

## N

**name (11)**
6:10;15:10;17:20,21,
23;23:22;65:4;74:3;
117:7,11;221:16
**namely (1)**
177:4
**names (1)**
221:3
**natural (1)**
153:3
**near (1)**
90:11
**necessarily (1)**
140:8
**necessary (3)**
137:15;221:15,17
**need (8)**
37:16;45:18;66:4;
81:21;84:17;87:10;
116:11;188:25
**needed (3)**
93:21;161:19;211:5
**needs (1)**
47:18
**negative (2)**
156:16;215:18
**neither (2)**
154:14,19
**nervous (2)**
36:20;53:9
**New (12)**
3:6,6,14,14;6:5;113:4;
133:12,16;177:9;178:8,
23;223:24
**next (5)**
40:11;51:22;81:17;
98:23;181:4
**night (1)**
44:15
**nodding (1)**
18:12
**nominated (2)**
42:10,13
**nomination (1)**
46:9
**nonaction (3)**
30:4,8,11
**nonactions (2)**

30:5,6
**None (2)**
79:20;84:19
**nonspeaking (1)**
137:18
**nor (2)**
118:15;194:11
**normal (1)**
161:6
**Notary (4)**
6:5;43:17;44:2;223:24
**Note (145)**
13:9;17:16;20:21;
30:10;51:21;52:8;58:4;
71:24;87:6,10;90:4;
96:9;97:10;99:23;
106:20;108:10;117:2,
13;118:13;120:24;
121:24;123:22;135:18;
142:16;149:8,10,18;
150:3,6,12,14,15,24;
151:5,13,22;152:4,6;
153:7,9,17,23;154:12,
15,20,21,21;155:5,6,15,
18;156:12,25;157:13,21,
24,25;158:2,3,4,7,9,10,
10,12,15,17;159:5,8,9,9,
21,24;160:5,10,10,13,15,
17,17,23;161:16;162:3,
7;163:10,23;164:2;
167:2,14,17,21;168:6;
169:5;170:13,18,24,24;
171:2,4,11,12,20;172:3,
4,7,7,11;173:2,6;174:21;
177:5,22,25;178:10,17,
20,21;179:12,17;180:13,
14,19;181:9;182:23;
183:6,13,15,18,20;
185:11;187:3,23;195:23,
24;210:24;212:14,17,19,
22;213:5,8;218:18,22,
25;219:4
**noted (5)**
50:12;92:6;103:7,12;
108:23
**notes (3)**
168:24;169:14;172:24
**notice (24)**
84:18;96:6;113:12;
120:21,23;121:7;
139:16;168:20,24;
184:17,19,25;185:3,11,
11,13,20;186:2,8,9,12,
17;190:6;198:6
**noticed (4)**
82:7;85:2,12;86:4
**notify (3)**
165:20;198:7,8
**notifying (1)**
30:9
**notion (1)**
150:7
**notorious (2)**

119:15,17
**November (3)**
108:2,9;163:10
**number (7)**
100:25;130:7,8;
136:25;185:9;210:22,23
**numbered (1)**
100:24

## O

**oath (8)**
9:20;32:4;87:20;
99:10;102:5,14;176:8;
223:9
**object (33)**
36:17;38:10,21;49:16;
51:2;57:23;58:3;60:24;
68:22;91:25;97:23;
103:10;104:8;113:3,7;
122:11;130:5;141:20;
152:21;155:23;156:5,
14;167:22;175:9;
176:21,22;179:21,23;
203:3,14;204:8;210:6;
219:7
**objected (3)**
121:4;122:2;160:9
**objecting (4)**
32:7;40:2,3;104:11
**objection (210)**
13:9,13;16:6,9;17:16;
20:21;21:15;24:22;32:2,
11;33:11,16;39:6;40:17;
41:5,11,19;42:2,14;43:7;
44:9;45:3,13,24,25;
46:18;47:13;48:16,22;
49:5,11,13;50:9,10,12;
51:21;52:8;53:7,21;
54:4,9,14,21;55:11;56:5,
12,19;57:4,6,13,16,24;
58:10;59:4,12,20;60:6,
23;61:2;62:17;63:2,16;
64:7,14,21;65:11,16,24;
66:11,22;67:16,25;69:8,
11;70:10,18;71:15,24;
72:12,22;73:5,12;74:11,
15;75:14;76:5,24;77:7,
13;78:8,13,18;79:7,10,
21;80:4,11,14;81:12,13;
83:25;84:2;88:25;89:8;
90:4,8,17;91:11;94:17;
95:22;97:10,13,24;98:2,
13,14;99:3;103:5,7;
105:8;106:20;107:19;
110:17,25;118:2,8,14;
119:8;121:24;122:12;
123:5,6,8,10,18,22;
124:18;127:8,16,19;
128:16;131:14;137:23,
24;139:24;144:10,18;
145:3,5;146:3,7,8,14,22;
147:18,21;148:15;

150:21;152:19;155:9,
22;156:6,22;157:14;
158:18,21,23;159:25;
161:20;162:25;163:3;
165:3,11,16;167:4,23;
170:15,22;172:15;
176:17,18;177:19;
179:15,19;182:2,19,21,
24;183:4;191:6;198:14;
200:10;203:12,17,21,23;
204:9,12;206:14;208:6;
209:4,8;210:5,10;
213:21,22;215:17,20;
217:8,9
**objections (6)**
40:4;91:17;118:5;
137:18;138:17;216:8
**objective (1)**
205:10
**obligation (4)**
6:20;178:24;179:14;
180:19
**obtain (1)**
133:13
**obvious (1)**
154:14
**Obviously (22)**
12:13;13:15,16;38:15;
42:10;43:14;46:4;62:2;
112:22;124:3,5;154:4,
10;166:3;170:25;
172:17;181:8,19;190:11,
21;202:13;218:3
**occur (4)**
208:2,3,5,21
**occurred (2)**
132:8;208:23
**October (1)**
168:8
**Off (8)**
20:2;131:25;132:3;
135:7;189:13;192:21;
204:22;221:21
**officially (1)**
88:14
**Old (2)**
3:5;7:10
**once (5)**
85:4;120:7;134:8;
154:17;190:5
**one (36)**
10:15;17:21;22:15;
25:8;36:20;47:3;59:16;
70:2;71:20;72:4;83:4,
19,22;113:5,5,6,8;124:5;
130:25;134:15;139:11,
22;141:9,12;158:11,16;
170:5;171:25;172:2;
177:5;178:9;195:4,4;
203:19;204:6;210:2
**one-half (2)**
153:6,9
**only (10)**

7:5;30:11;35:9;47:22;
61:12;83:18;113:5;
140:5;180:11;200:7
**open (3)**
83:21;119:14,16
**opening (1)**
48:24;49:3
**operation (2)**
49:12;158:19
**operative (1)**
86:6
**opinion (1)**
124:2
**opportunity (1)**
189:17
**opposing (1)**
84:16
**option (5)**
61:24;195:20;197:22,
25;201:21
**options (7)**
61:9,21;191:9,16;
195:7,18;214:2
**Orchard (1)**
3:5
**order (9)**
6:22;24:6;30:20;46:9;
62:6;67:14;87:12;91:23;
150:10
**original (1)**
175:21
**originally (1)**
171:9
**Orly (160)**
7:12,19,22,23;11:19,
21,25;12:4,18;13:8;
14:6;16:24;17:7;18:17;
19:16,18;20:19;21:4,6,9;
23:18;29:6;30:9,21,25,
25;34:8,9;35:8,12,24;
36:23;39:3,4;40:14,15,
23;41:4,7,17,25;45:10,
17;46:9,14;47:10,11,12,
15,23;49:24;50:5,7;
54:18,24;55:24,25;
56:11;57:2,21;58:4,9;
60:4;61:8,10;62:15,25;
65:15,23;66:5,10,21;
67:22;69:5;71:9;75:23;
76:10,20;77:5;85:16;
87:22;88:3,12;89:17,20,
24;95:13;104:20,24;
105:4;107:5,10;108:9;
111:23;114:8;115:6,12;
120:18;122:9,18;124:2,
10,14;128:4,12;129:3,3;
135:5;144:14,15;148:7,
9,12;149:3;154:15;
155:5,8;159:21,21;
160:9;161:15;162:6,10;
163:24;164:12,13,17,25;
165:20;171:6;177:8;
178:7;180:15,24;181:8,

14,16,25;183:12;186:16;
190:7;197:9,19;198:6;
199:8;205:8,11;207:19,
20,21,24;208:4,22,22;
209:20;212:4,8,20;
217:20,22
**Orly's (30)**
53:24;54:12;56:3,7;
57:10;62:13;77:9,11;
85:6,9;120:19;136:19;
174:22;181:21;182:16,
18;199:15,16;204:19;
205:4,5,16,19;211:12,
13;212:11;213:6;
214:13;218:15;219:10
**otherwise (3)**
19:14;21:7;122:17
**out (15)**
23:2,5;39:22;57:2;
75:6;76:23;78:4;86:24;
104:6;112:18;127:8;
162:17;180:17;182:16,
18
**outrageous (1)**
163:20
**over (14)**
25:8;26:7;28:2;30:2,5;
36:18;68:25;85:4;
127:19;141:25;205:19;
216:14,14,14
**Overall (1)**
29:5
**owe (3)**
163:25;164:11;172:10
**own (4)**
12:19;166:8;171:10;
184:7
**owners (1)**
22:7
**ownership (3)**
150:11,11,16
**owns (2)**
30:21,25;31:2

---

**P**

**page (21)**
9:16,23;11:4,4;99:7;
100:5,7,22,23,25;109:3;
110:6;143:25;144:2;
149:14,15,16;151:22;
169:10;173:16;185:8
**pages (6)**
109:8,11,14;110:9;
193:19,20
**paid (18)**
21:21;22:2,8;24:5,8;
46:7;62:2;154:21,22;
159:9,11,14;169:24,25;
170:25;172:18;205:11,
20
**paper (6)**
18:21;19:4,6,8;26:8;

42:16
**papers (1)**
97:17
**paragraph (20)**
100:3,10,17;101:4,9;
102:4,19;105:19;
106:17;116:4,9;131:4,9;
175:25;177:12,14;
180:8;219:5;220:17;
221:5
**paragraphs (5)**
140:22;152:3;174:5,7,
8
**pardon (1)**
193:16
**parents (3)**
153:25;154:11;159:6
**Parnes (12)**
152:15;159:15,24;
160:12;161:13,15,25;
163:9;171:20;172:12,
25;173:6
**Parnes' (1)**
164:13
**part (15)**
55:16;81:5,6;93:24;
96:14;151:6,25;153:18;
168:20,24;171:10;206:5,
24;220:22;221:13
**partially (1)**
183:15
**participant (1)**
202:10
**participate (7)**
188:19;199:22;201:7;
202:14;203:8;206:9;
207:4
**participated (2)**
200:2;207:6
**participating (1)**
202:15
**particular (3)**
151:25;157:18;166:14
**particularly (1)**
204:18
**parties (3)**
134:12;140:8;153:23;
155:17;164:8;167:2,12,
13,15;220:19,20;221:24;
222:9
**partner (7)**
17:22;149:19,21;
168:7;169:17;210:25;
219:2
**partners (3)**
209:14;220:10;221:14
**partnership (3)**
108:7,7;220:18
**party (9)**
113:6;133:2,3,17;
139:22;140:7;178:24;
179:14;219:17
**passed (1)**

141:24
**past (4)**
141:19,22;171:22;
189:12
**Patricia (6)**
64:25;65:3,7,14;69:6,
15
**PAUL (2)**
3:3;136:15
paul@zilberfeinlawcom (1)
3:8
**pay (28)**
22:21,23;23:2,5,17;
39:16;40:6;79:4;152:2;
154:15,20;157:23;
158:7;159:5;160:11;
164:11;168:5;170:5,6;
171:2,11;172:6,7;177:5;
181:9;205:3,4,23
**paying (10)**
21:17,20;22:17,19;
139:21;142:11;154:11;
170:3;175:17;205:8
**payments (3)**
168:25;169:13,20
**peanuts (1)**
217:24
**Pedowitz (2)**
21:18;22:13
**pending (5)**
37:18;82:17;96:13;
140:6;175:2
**penny (2)**
21:21,22
**people (20)**
115:3,10,11;182:13;
197:14,20;198:21;
199:19,22;200:7,13;
201:7,13;202:15,17;
203:7,9,20;204:7;219:22
**people's (1)**
158:20
**percent (1)**
85:25
**perfect (1)**
22:6
**Period (5)**
139:25;146:16;
153:19;180:24;193:25
**permissible (5)**
74:20,25;75:12,19;
88:23
**permission (1)**
215:4
**permit (3)**
119:5;214:24,24
**permitted (2)**
78:17;214:22
**person (7)**
46:6;52:4,6;61:12;
83:19;161:12;180:11
**personal (2)**
175:14;218:13

**personally (6)**
133:20,22,24;172:9;
176:2;207:16
**persons (2)**
220:16;221:9
**philosophy (1)**
175:16
**phone (7)**
55:24;56:17;62:23;
63:6;131:12;134:23;
142:18
**physical (5)**
7:18;8:3,10;18:20;
19:3
**Physically (2)**
43:24,25
**pick (4)**
55:24;56:17;62:23;
63:6
**piece (2)**
18:20;19:3
**pieces (2)**
19:6,8
**place (4)**
137:23;139:24;
187:22;215:23
**places (1)**
162:20
**placing (1)**
138:4
**plaintiff (2)**
119:24;136:8
**plaintiff's (2)**
9:6,9
**plan (8)**
148:4;150:18;176:3,
10,16;177:10,16;178:5
**planning (8)**
113:14;150:17;
153:18;154:2;171:6;
177:2,21;213:14
**please (62)**
6:11,23;23:8;27:6,18;
28:14;29:4;33:5,21;
36:15,20;42:6;51:7,13,
23;52:19;55:3;60:16;
61:4;67:3;69:21;70:25;
82:22;83:9;90:9;94:5;
98:19;100:4;101:8,20,
22;105:13,19;108:22;
115:14;122:3;131:7,20;
137:19;143:19;156:8;
171:15;174:3;175:11;
180:3;184:14;187:18;
188:2,23;196:13;
200:21;201:15;202:21;
208:11;209:24;214:5,
10;216:16,22,25;221:20;
222:3
**pleased (1)**
54:19
**pledge (2)**
149:8,10;150:3

ORLY GENGER VS.
DALIA GENGER, et al

DALIA GENGER
December 13, 2012

**pm (12)**
87:14,14;108:23;
116:15,16;133:25;
142:19;189:8,8;221:23,
23;222:8
**point (21)**
50:22;62:8,9;63:23;
75:6;81:17;95:12,21,25;
96:18,21;117:20;131:4,
8;143:11;147:25;148:3;
160:8;162:4;185:6;
186:6
**points (4)**
27:9,15,19;112:10
**position (17)**
65:15;66:4;118:7;
141:15;151:5,12;
155:20;156:3,12;157:12,
18,20,21;172:2;193:6;
194:7,17
**possibilities (1)**
207:10
**possibility (7)**
196:12,18,22;197:9,
19;207:8,14
**possible (6)**
95:10;199:20;200:15;
203:19,20;204:7
**possibly (1)**
49:17
**potential (1)**
58:25
**potentially (1)**
63:10
**practice (6)**
113:4;133:12,16;
137:4;139:13;141:19
**preceding (1)**
208:7
**precise (1)**
9:24
**predicate (1)**
169:4
**premarked (1)**
8:15
**preparation (1)**
25:18
**prepare (2)**
10:17;24:21
**prepared (4)**
10:15;24:17;194:5,23
**preparing (1)**
10:13;24:18,19
**presence (8)**
118:11,16;119:9,14;
121:2,3,8;122:2
**PRESENT (3)**
3:20;118:4;135:23
**presentation (1)**
119:10
**preserve (3)**
118:2,5,14
**preserved (1)**

**118:8**
**presume (1)**
198:6
**pretty (1)**
96:2
**prevent (9)**
7:18;8:3,10;33:21;
137:13;177:8;188:7;
196:23;213:12
**prevented (1)**
177:11
**prevents (1)**
96:20
**previous (3)**
92:19;132:8;144:17
**Previously (4)**
60:2;63:3;71:7;154:22
**price (9)**
198:11;199:17;
200:15,19;201:19;
203:11,19;204:6;209:2
**prior (3)**
58:19,20;186:8
**privilege (7)**
16:7;92:2;124:22;
138:18;191:11;194:4,19
**privileged (6)**
29:13;138:25;191:13;
194:3,8,16
**probably (10)**
25:15;26:2,19;31:15;
43:16;134:8;144:22;
145:20,23,25
**problem (18)**
7:18;8:3,10;45:15;
46:4,22;48:7,7;50:2,3,4,
19;60:9;67:7;157:22;
158:3,6;220:5
**problems (1)**
182:15
**procedure (3)**
6:25;199:23,24
**procedures (1)**
7:2
**proceed (4)**
58:5;122:3;214:22;
217:7
**proceeding (6)**
95:13;97:12;117:22;
130:11,13;151:17
**proceedings (8)**
87:17;116:19;117:22;
134:4,19;142:22;
150:25;151:7
**process (1)**
98:17
**produce (4)**
193:12;194:5,6,23
**promise (2)**
217:25;218:12
**promised (2)**
158:14;159:20
**promissory (7)**

**149:7,9,18;150:2,6,14;**
167:17
**proper (1)**
86:2
**properly (1)**
86:4
**protect (5)**
12:8;21:9;88:3;
181:24;182:6
**protecting (1)**
176:3
**provide (7)**
122:9;123:2;129:3;
144:17,20;147:16;
190:24
**provided (4)**
19:17;43:13;110:4;
166:10
**providing (4)**
22:20;93:16,19,24
**provision (2)**
118:24;119:5
**Public (3)**
6:5;43:17;223:24
**purported (2)**
91:5;122:7
**purports (1)**
74:10
**purpose (2)**
29:23;150:6;175:21
**pursuant (1)**
216:8
**pursuing (1)**
212:7
**put (30)**
12:10,17,21;13:7;
27:18;32:13;33:5;52:17;
81:21;83:16;84:15,17;
110:24;112:18;117:5,11,
16;119:13;120:6;121:7;
126:19;127:10,10,12;
131:5;141:2;143:21;
174:23;175:13;190:3
**puts (1)**
83:14
**putting (8)**
82:2,4,6;83:2,5;84:14;
177:8;196:9

## Q

**quiet (1)**
127:2
**quite (1)**
140:15
**quote (4)**
74:24;100:9;153:17,
20

## R

**raised (6)**
27:9;28:11;30:8;

**96:21;141:16;197:25**
**raising (1)**
28:15
**rather (1)**
130:21
**react (2)**
161:8,9
**reacted (3)**
161:5,16;164:6
**reaction (2)**
19:21,23
**read (71)**
11:12;20:9,10;23:7,9;
25:15;31:11;32:21,22;
33:6,8;42:7;51:8,12,14;
55:2,4;58:13,15;60:16,
20,21;61:18;70:25;71:2;
82:14,21;86:6;99:19;
101:7,9;102:8;105:13,
14;108:20;109:7,24;
110:9;114:2,4;129:7,9;
130:7;131:2,3,6,18;
143:19,23;156:17,20;
157:5;158:25;171:15,
16;174:4,14,19;180:3,4;
188:3;200:21,22;202:21,
25;208:10,12;210:12,14;
222:14;223:8
**reading (8)**
11:15;101:16;109:14;
155:24;169:5,5;174:18;
182:3
**really (33)**
13:25;31:5,9,11;
34:25;35:3;40:6;53:17;
58:2;62:20;72:4;76:7;
91:8;103:4,18;114:4;
126:4,7;127:24;128:6,
25;130:11;150:7,8;
152:6;159:12;163:5;
164:10;166:23;169:9;
183:16;196:24;210:8
**reappears (1)**
118:6
**re-ask (1)**
21:2
**reason (8)**
47:22,25;114:18,18,
20;140:18;159:23;166:6
**reasonable (1)**
189:19
**reasons (2)**
137:2;139:11
**recall (18)**
23:23;59:10;60:4;
66:18;67:4,20;71:10;
109:15,19,21,22;111:10;
151:4,12;152:17;153:5;
166:22;209:22
**receive (5)**
97:21;184:25;185:3,
10;186:7
**received (5)**

**111:23;150:13;**
185:20;186:21;187:7
**receiving (4)**
185:12,25;186:8,11
**recess (4)**
20:4;87:13;189:7;
221:22
**recessed (1)**
116:15
**recision (3)**
164:13,17;165:2
**recognize (1)**
37:14;69:22;150:2
**recognized (1)**
22:7
**recollection (9)**
28:24;29:3,9;43:20;
107:13;108:16;109:8;
110:10;163:9
**recommend (1)**
85:16
**recommended (1)**
15:9
**record (97)**
6:11;14:5;17:25;20:2,
8,10;21:24;23:9;27:18;
28:18;32:22;33:8;39:15,
16;40:4,5;42:7;51:8,14;
52:18;55:4;58:4,15;
60:21;61:18;62:22;71:2;
81:21;82:3,5,7;83:3,6,
14,17,21;84:14,16,17;
87:3,19;105:14;108:10;
110:25;112:8,22;113:4,
8;115:14;117:4,6,12,16,
18;118:13,19;119:13;
120:7;25;121:10,24;
127:8;129:9;132:2,4,18,
20;137:23;139:7,25;
141:3;142:16;143:3,5,
23;149:7;156:20;
158:25;171:16;173:10;
179:22;180:4;182:20;
188:3;189:9,17;190:4;
192:21;196:9;200:22;
202:25;204:22;208:12;
209:13;221:21;223:11,
12
**recorded (1)**
102:11
**recreate (2)**
178:23;179:13
**redact (1)**
140:2
**redacted (1)**
138:9
**reduced (1)**
34:20
**Referring (3)**
25:9;26:9;124:15
**reflect (2)**
28:18;112:9
**reflecting (1)**

193:13
reflects (1)
    194:13
reformation (1)
    17:12
Refrain (5)
    210:24;212:22;
    218:17,24;219:3
refresh (5)
    43:20;108:16;109:8;
    110:10;163:9
refreshes (1)
    109:17
regard (4)
    201:23;202:2,6,8
Regarding (6)
    23:18;66:8;97:11;
    125:7;195:19;196:6
regular (3)
    62:3;168:25;169:13
reimbursement (1)
    85:5
reiterating (1)
    94:13
relate (1)
    140:8
related (9)
    70:22;84:20;85:8;
    96:3;130:6;139:19;
    178:23;179:13;196:4
relates (2)
    139:15;140:6
relationship (2)
    127:25;128:3
release (23)
    68:6;69:25;74:17;
    75:19;79:24;80:3;88:22;
    98:11;124:4;130:8;
    131:22;139:22;219:16,
    18,19,20,22,23;220:2,4,
    7,21;221:11
released (3)
    80:24;129:4;221:6
releases (11)
    74:19,23;96:10;122:8,
    10;123:16;124:9,16;
    144:16,21;147:16
releasing (1)
    75:11
relevance (2)
    87:4;130:13
relevant (10)
    81:23;82:9;84:22;
    85:18;123:12,15,18,21;
    124:9;131:9
rely (1)
    145:24
remarks (2)
    39:13;40:3
remember (148)
    9:21;10:4,12;13:25;
    14:14,17,21,24,25;
    15:10,13,18;16:2;17:20,

21,23;25:17,23;26:2,5,6,
7;27:15,17;28:15;30:13;
31:6;35:10;38:23;39:24;
40:25;41:21;43:9;44:6,
14,16,20;47:9;57:18;
59:6,22,24;64:23;65:4,
20;66:2,7,24;67:18,23;
68:3;71:20;72:4;74:2,3;
75:24;76:7;77:15,17;
78:3;88:8;92:12;93:6,7,
8,17,19;94:2,2,19,22;
95:4,7,14;97:15;100:16;
102:12;103:14;105:3,
17;106:13;107:7,12;
108:4;111:13,13,17,20;
114:16;122:21;124:20;
125:11,22;126:4,7,14;
127:25;128:6,7,8,9,10,
22,25;129:23,25;130:2;
144:4,6,7;147:4,8,23;
151:2,14;152:24;
162:10;163:17;164:19,
24;166:23;178:11,19;
184:21,23,24;185:5,12,
15,16,25;186:4,10,11,
13;187:16,17;188:9;
189:25;192:11,12,13;
195:11;196:14;197:10;
201:20;203:9;209:10
remembers (1)
    10:2
remind (1)
    162:17
remove (1)
    40:24
removed (1)
    95:14
rendered (2)
    22:4;194:12
repeat (17)
    11:20;39:23;42:4,5;
    50:13;61:3,13;66:14;
    89:21;92:23;94:25;
    96:23;97:4;151:8;
    158:24;167:8;187:25
repeatedly (1)
    126:22
rephrase (1)
    201:15
reporter (34)
    20:11;23:10;32:23;
    33:9;36:19;42:8;51:9,
    15;52:23;55:5;58:16;
    60:22;61:19;71:3;83:18,
    24;105:15;117:9;
    119:19,22;129:10;
    132:17;135:11,19,22;
    143:24;156:21;159:2;
    171:17;180:5;188:4;
    200:23;203:2;208:13
represent (5)
    14:23;15:25;133:23;
    135:4,5

representation (1)
    130:5
representative (2)
    19:15;96:8
represented (3)
    117:21;190:13,15
representing (10)
    16:15,19;17:19;18:2;
    21:4;22:3;24:12,13;
    133:19,21
requested (23)
    20:11;23:10;32:23;
    33:9;42:8;51:9,15;55:5;
    58:16;60:22;61:19;71:3;
    105:15;129:10;143:24;
    156:21;159:2;171:17;
    180:5;188:4;200:23;
    203:2;208:13
requests (1)
    19:20
required (10)
    122:16,22,23;129:14,
    15;144:21,23;145:11,13,
    15
requires (1)
    158:19
rescinded (1)
    161:25
rescinding (1)
    166:11
resent (1)
    130:11
reserve (1)
    140:10
reserved (1)
    222:13
resign (5)
    45:16;49:8;50:21;
    51:18;85:11
resignation (2)
    38:2;42:24
resolve (2)
    46:23;50:2
resources (8)
    34:20;62:12;154:15,
    20;157:23;188:20;
    202:14,18
responded (1)
    185:12
response (1)
    102:4
responses (3)
    9:6,9;11:11
responsibilities (6)
    29:24,25;180:23;
    181:6;201:23;202:6
responsibility (10)
    13:15;45:6;198:19,20,
    24,25;199:21;200:7,18;
    201:18
responsible (1)
    13:17
rest (3)

33:20;109:24;130:22
restated (2)
    108:6,18
restrain (1)
    214:13
result (5)
    160:21;171:5;180:22;
    181:5,11
results (1)
    93:11
resumed (1)
    142:22
retained (4)
    14:9,13;15:24;16:5
retransfer (1)
    153:24
return (2)
    180:13;218:17
returned (10)
    163:10;170:14,21;
    172:25;173:6;177:25;
    178:20,21;179:13,17
returning (2)
    171:4;180:14
reveal (1)
    89:13
review (3)
    35:17,19;67:13
reviewing (1)
    113:22
rich (1)
    142:11
rid (5)
    157:24;158:8;159:8;
    163:23;174:21
ridiculous (1)
    112:25
right (78)
    9:21;11:9;12:3;17:11;
    23:18;28:9;37:8;39:24;
    40:6;43:3;55:23;56:11,
    14,18;81:7;86:7,25;
    88:18,20;91:7;94:16;
    96:23;100:21;101:16;
    104:10;110:13;112:6;
    118:12;119:12,25;
    121:17;125:17;126:3;
    130:2;131:25;134:13,
    14;135:3,3,7;136:10;
    140:10;141:4;144:7;
    148:6,8,17;149:23,25;
    150:20;151:11;159:16;
    163:16;167:18;168:23;
    169:11,15,18;174:11;
    178:6;180:16;183:8,24,
    184:2;186:15;187:21;
    190:19;195:7;196:9;
    209:21;211:23;214:16,
    21;217:16,18,19;219:2;
    222:13
ring (1)
    14:16
rings (1)

14:17
risk (1)
    62:11
Road (1)
    3:5
Robert (7)
    14:2;33:19;99:23;
    128:2;135:14;138:14;
    185:20
Rochelle (7)
    3:6;46:22;47:4;55:22;
    64:12,16;65:21
role (1)
    181:12
roles (1)
    62:3
room (7)
    87:11;117:25;119:15;
    132:22,25;136:23;216:2
Roth (2)
    95:16;97:8
ruling (1)
    118:25
run (1)
    70:16

S

sacrifices (1)
    61:11
safety (3)
    23:22,24;24:5
SAGI (71)
    3:21;15:19;46:21;
    47:4,25;48:4,6,10,13;
    55:20;58:18,20;59:2,7;
    63:25;64:3,9;114:24;
    132:22,25;136:12;
    141:17;148:5,9;152:12;
    154:14;155:5,8;161:2,4,
    13;163:12,17;171:6;
    183:3,8,21;184:3;186:4;
    187:4,6,11,17;189:24;
    191:18;192:18;193:3;
    195:21;196:12,18;
    199:23;205:3;207:7;
    208:22;211:11,13,18,21;
    212:7,10;213:4,6;214:4,
    9,12;217:6,18,25;218:6,
    11;219:9
Sagi's (4)
    47:2;198:19;200:6;
    210:4
sale (13)
    185:23;186:2,3;187:9,
    10,18;188:8,14;196:23;
    197:9;198:5,8;199:13;
    208:4
same (24)
    19:7;20:18;21:3;
    41:19;52:21;67:6;74:15;
    97:13;98:13;108:21;
    122:12;123:6;126:18;

ORLY GENGER VS.
DALIA GENGER, et al

DALIA GENGER
December 13, 2012

144:10;145:6;157:14;
170:22;199:14;205:7,
17;206:19;216:10,14,19
**satisfaction (1)**
180:18
**saw (6)**
10:7;9;11:10;70:6;
159:7;185:5
**saying (14)**
27:12;57:20;113:8;
121:7;122:21;160:7;
177:24;178:11;187:11,
16,18;189:24;194:21;
196:12;202:4;206:13
**scheme (1)**
153:18
**search (1)**
60:12
**second (14)**
8:18,21,23;9:2;10:8;
106:6;134:16;149:13,
15;163:12;168:21;
186:21;192:22;204:23
**secretary (2)**
132:10;135:8
**section (4)**
96:19;133:6,10,15
**secure (2)**
22:6;23:21
**seeing (5)**
108:15;109:15,19;
182:8;219:14
**seek (4)**
20:14,15;140:10;
178:22
**seeking (2)**
130:14;190:17
**seems (2)**
84:21;178:22
**sell (1)**
213:8
**selling (4)**
157:25;158:10,10;
198:20
**send (1)**
57:15
**sending (5)**
147:4,6,7,15,15
**sense (2)**
164:5,9
**sensible (2)**
142:8,10
**sent (9)**
22:18;77:19;122:17,
23;124:10,14;129:15;
144:22;182:5
**sentence (2)**
175:25;181:4
**separately (1)**
19:9
**September (7)**
9:20,21;102:13;
103:21;104:22,23;105:5

**seriously (1)**
95:22
**serve (7)**
46:6,9;47:17;48:8;
63:7;66:20;179:9
**service (1)**
81:6
**serving (3)**
48:11,14;62:24
**session (1)**
25:18
**sessions (1)**
27:8
**set (7)**
20:18;21:3;76:16;
91:2;124:16;136:19;
176:20
**sets (1)**
18:14
**settle (1)**
142:8
**Several (4)**
147:10,19;160:2;
203:13
**Seymour (2)**
43:17,18
**share (5)**
148:10;150:19;171:6;
175:19,22
**shares (27)**
22:7;30:21,22;31:2;
148:13,20,24,25;150:12;
183:22,23;184:3,4,7;
198:9,12,20;199:12,20;
217:22,24;218:2,4,4,6,7,
10
**sheets (1)**
67:21
**short (1)**
20:5
**shoulder (1)**
138:4
**show (9)**
10:21;25:5,13;141:17;
168:15;188:16;197:14;
200:7;209:12
**showed (2)**
24:25;70:3
**showing (1)**
93:11
**shut (1)**
104:12
**side (1)**
56:3
**sign (6)**
43:13;89:19;91:5,23;
210:12;222:14
**signature (11)**
9:15,18;11:5,6;38:4,7;
74:6;90:12;92:5;149:13;
173:15
**signed (37)**
9:19;43:21;44:7,23;

45:8;76:3;79:16;80:20;
88:5;89:3,5,23;90:12;
92:9,18,20,25;94:20,22,
23;95:4,7,11;99:18,23;
102:14;104:21;108:2,8;
111:12;167:17;176:7,
13;177:2,7;210:14;
223:20
**signing (3)**
44:24;111:24;209:19
**simple (5)**
46:13;106:24,25;
140:18;168:3
**simply (2)**
26:12;27:4
**single (3)**
82:9;141:22
**sister (3)**
211:12,25;214:14
**sit (19)**
17:25;24:11;26:4;
27:14;30:24;35:12;92:8;
95:10;98:24;106:14;
107:3,14;111:21;114:9,
14;122:25;147:3;
152:17;216:12
**sitting (2)**
103:17;119:15
**situation (1)**
164:23
**slow (1)**
127:14
**slowly (1)**
169:9
**small (2)**
22:4;221:10
**sold (5)**
158:13;183:21,25;
184:3,7
**sole (1)**
108:8
**solution (2)**
171:24,25
**somebody (13)**
48:8;60:9;61:10;
63:15;67:7;80:7;158:9;
161:6,9,10;164:10;
205:11;214:17
**somehow (1)**
159:8
**someone (15)**
43:13;45:17,18;49:12;
62:7;63:21;78:23;79:3;
87:24;120:2,2;124:3;
155:25;158:2;180:10
**son (1)**
115:4
**sooner (1)**
130:18
**sorry (10)**
20:23;31:23;62:14;
101:25;115:18;147:13;
173:3;179:20;196:21;

208:20
**sounds (1)**
189:18
**span (1)**
141:25
**speak (35)**
7:22;10:19,20;41:4,7,
10,13,15;46:15,20,21,
24;47:7,10,11,12,15,23;
48:3,6;83:19,23;89:16;
104:14;110:20;113:5;
134:13,14;164:13,16;
189:4,24;192:15,18;
213:4
**speaking (16)**
83:10,14;91:17;104:6,
16;110:22;111:17;
112:20;117:19;122:6;
126:24;130:16;163:3;
165:6;197:4;216:4
**speaks (1)**
127:11
**specific (1)**
29:7
**specifically (4)**
102:5;124:15;174:6;
220:25
**specifics (1)**
29:10
**speculate (1)**
187:15
**speculation (2)**
158:22;167:5
**spend (1)**
118:22
**spending (1)**
196:25
**split (1)**
205:22
**spoke (13)**
24:24;28:7;47:4;89:6,
10,12;91:9,12,22;132:9;
211:18,21;213:6
**ss (1)**
223:4
**stand (2)**
176:2,6
**standard (4)**
79:23;80:2,14,16
**stands (1)**
156:22
**start (11)**
8:13;34:21;40:24;
52:21;68:25;85:23;
104:14;116:9;127:15;
180:7;212:7
**started (7)**
14:4;83:2;125:22;
143:6;166:24;192:11,12
**STASIUK (2)**
3:22;136:20
**State (8)**
6:5,10;135:7;157:17;

179:19,19;223:3,24
**stated (6)**
71:25;103:14;129:14;
132:5;138:18;163:11
**statement (16)**
39:15;81:21;82:3,5,7;
83:3,5;85:24;117:6,12;
120:6;121:10;151:14;
155:14;157:4;179:7
**statements (2)**
99:14;118:19
**stating (1)**
152:5
**stay (2)**
132:18;142:7
**stayed (2)**
22:10,12
**steamroll (1)**
120:12
**step (1)**
186:5
**stepping (1)**
86:24
**still (11)**
40:7;87:20;102:14;
106:14;119:18;174:16;
176:10,16;177:17;
180:8;185:14
**stipulation (1)**
17:13
**Stop (23)**
86:13;104:5;112:20;
126:20,25;127:5;131:23,
24;138:3;184:10,12;
186:22,24;187:2,10;
188:14;191:18,20;
195:21;196:13,18,20;
217:16
**stopped (2)**
127:25;170:3
**stopping (1)**
196:15
**story (3)**
56:4;166:2;170:2
**Street (1)**
6:14
**strike (13)**
18:15;59:24;95:11;
106:8;110:18,23;111:5;
113:9,20;170:10,11;
185:2;197:11
**striking (1)**
118:9
**strongly (1)**
85:16
**stuff (1)**
31:8
**subject (2)**
139:4;201:21
**subjected (1)**
139:14
**submitted (6)**
96:17;97:17;141:6,10,

ORLY GENGER VS.
DALIA GENGER, et al

DALIA GENGER
December 13, 2012

13;173:18
**Subscribed (1)**
223:20
**subsequently (1)**
107:9
**subset (1)**
22:4
**substance (6)**
58:7;77:18;87:8;
189:14;213:16,19
**successful (1)**
212:8
**successor (4)**
38:3,24;42:24;69:7
**sue (11)**
211:11,25;212:4,7,10,
12,16;214:18,19;217:18;
219:9
**sued (22)**
34:15,22;35:2;49:22;
62:12,15;80:24;159:21,
21;160:14,21;161:7;
162:6,10;163:24;166:3;
183:8;211:13,23;
214:15;218:9,15
**sues (1)**
79:3
**suffer (3)**
7:17;8:2,9
**sufficient (5)**
100:12;102:6,15,21;
106:15
**suggested (2)**
113:15;132:14
**suing (8)**
30:19;40:24;166:5;
196:18,20,23;213:6;
214:13
**suit (1)**
161:16
**suits (1)**
162:11
**Sullivan (1)**
14:15
**sum (4)**
58:7;77:17;213:16,19
**summary (3)**
131:16;140:20;141:4
**summons (2)**
8:23,25
**supposed (13)**
12:8,10,14,17,21;
122:10;133:8,13;
144:25;179:8;199:25;
206:19,24
**sure (31)**
9:17;14:3;28:6;35:23;
47:16;61:15;66:16;
72:14;73:3;81:8;92:11;
93:21;97:16;110:13;
118:13;119:7,25;
121:15;122:16,22;
124:11;128:14;129:13;

143:13;153:2;158:11;
167:10;176:12;180:12;
195:3;207:2
**surrogate (1)**
84:22;85:12;95:13,16;
96:3;97:8,12;130:10,13;
140:6;173:19
**swore (1)**
99:12
**sworn (5)**
6:2,4,17;11:5,7

**T**

**table (1)**
112:25
**tactic (1)**
137:13
**tag (1)**
94:4
**tainted (1)**
205:15
**talk (22)**
36:18;37:2;52:21;
57:10;59:18;62:23;77:5,
9,11;78:5;95:24;102:9;
111:7;150:9;152:7;
186:23;189:22;207:22;
211:10,25;213:25;218:6
**talked (4)**
26:3;66:2;67:11;
163:17
**talking (24)**
7:23;15:16;17:3;
71:21,22;106:4;124:4;
126:21;130:9;136:8;
138:3;146:18;154:9;
165:17;183:7,8,22;
189:23;195:15;209:10;
213:2;214:3,4,8
**talks (2)**
101:23;102:2
**task (3)**
63:12,14;93:3
**teach (1)**
204:2
**technical (1)**
13:12
**telephone (2)**
134:2;142:17
**telephonic (3)**
134:5,20;142:20
**telling (9)**
8:11;27:21;34:15,21;
101:16;127:2;159:19;
181:22;208:16
**tells (1)**
146:25
**ten (1)**
216:10
**term (1)**
79:13
**terminate (1)**

109:5
**terms (1)**
165:6
**testified (6)**
6:6;49:19;60:2;63:4;
70:15;71:7
**testify (2)**
162:19,23
**testifying (3)**
8:11;206:11,15
**testimony (9)**
60:5;71:10;152:11,14;
162:21;189:5,13;223:8,
11
**texts (1)**
56:22
**Therefore (5)**
117:23,25;141:18;
162:21;178:10
**thinking (4)**
61:6,21;80:10;140:14
**third (2)**
75:5;149:16
**thoroughly (1)**
114:5
**though (2)**
207:23;214:14
**thought (14)**
47:25;62:5;70:15;
79:23;80:6;132:7;
154:16;162:5;164:7,9;
177:9;189:14;207:3;
214:25
**threatened (1)**
119:2
**three (3)**
8:15;113:23;152:3
**throughout (1)**
47:19
**Thursday (3)**
25:20;26:4;222:11
**TI (4)**
31:2;218:2,6,7
**times (12)**
34:15,22;35:2,5;
147:10,19;160:2;
162:20;194:14;203:13;
211:21;216:10
**tired (3)**
202:3;216:12,15
**today (29)**
6:20;7:10;8:11;10:14;
17:25;24:11;25:20;26:4;
27:14;30:24;35:12;58:5;
92:8;95:10;98:22;
106:14;107:3,11,14;
111:22;114:9,14,16;
122:25;124:17;147:3;
152:17;211:13;218:15
**told (26)**
27:7;28:4;36:12,24;
55:18,20,21;74:2;80:2,7;
93:22;119:24;128:19;

132:11;135:8;147:23;
164:25;187:14;200:9,
25;207:15;208:3,22;
211:20;213:16,19
**took (5)**
23:17;52:15;151:4;
156:3;157:21
**tools (1)**
195:20
**top (2)**
73:17;90:11
**topic (2)**
16:10,11
**topics (7)**
28:2,10,12,15,25;
29:20;85:17
**touch (5)**
112:14,18;115:21,25;
138:7
**touching (3)**
112:10;115:23,24
**TPR (46)**
3:12;120:25;121:24;
136:13;139:10;149:2;
150:11,16,19;167:2,19,
20;170:14,21;171:4,7;
178:2,20,21;179:13;
182:23;183:6,14,18,20,
21,22,23,23;184:5,7;
186:25;187:2;196:2,20;
197:20;199:12;200:20;
212:3,21;217:24;218:4,
17,22,24;219:3
**track (8)**
17:5;34:19;35:15;
36:8,12,22,24;162:11
**transcribing (1)**
135:20
**transcript (3)**
143:21;222:14;223:8,
10
**transfer (2)**
153:19;154:17
**transferring (1)**
150:16
**treated (1)**
214:15
**TRI (7)**
22:7,15;30:22,23;
217:21;218:4,10
**trial (2)**
138:10;139:25
**Trickery (1)**
163:4
**tried (6)**
56:14;63:19;157:25;
160:4;211:24,25
**true (21)**
10:16;18:4;28:12;
153:21;155:12,12,14;
169:13;172:23;174:18;
178:3;180:20;181:13;
185:14,22;199:10;

206:10;211:15;219:21;
223:10,13
**Trump (2)**
22:14;35:10
**Trumps (2)**
30:19;35:9
**trust (181)**
7:13,19,22,23,24;
11:19,22,25;12:5,8,11,
14,15,16,18;13:7,24;
14:7,10,13,23;15:5,25;
18:5,18;19:10,16,18;
20:15,20;21:4,6,9,13,19;
22:5,8,23;23:6,18;24:19;
25:2,3;29:6;30:19,25;
31:2,3;34:5,8,9;35:8,12,
13,24;37:5,11;39:4;
40:14;41:17,25;45:10,
17;46:10,15;50:5;54:2;
60:4;61:8;62:3;65:23;
66:5,10,21;69:5;71:9;
75:2,12,20,23;78:17;
88:7,13,24;89:17,20,24;
91:6,10,24;97:21;98:10;
104:20,25;105:5;107:5,
10;108:9;110:3;111:23;
114:8;115:7;124:12,13,
25;125:6,6,25;126:9,11;
127:23;128:5,12;129:3,
17,20;144:14;145:2,15,
16;146:2,20;147:15;
148:13,13;149:3;158:2;
164:12,21,23;166:9;
179:9;180:11,12,15,18,
24;181:8,10,15,16,23,24,
25;182:7,12,16,18;
183:11;188:6;190:10,13,
14,15,16,18,20;192:10,
13;194:18,19;196:5;
197:2;199:9;202:10;
209:3,20;211:12,12,14;
212:8,11,20;213:7;
214:13,18,20;217:20;
218:10,15;219:10
**trustee (163)**
7:12,19;11:18,21,24;
12:7,10,17;13:4,7,16,23;
19:14,18;22:3,5;24:7,8,
9,12,14,15,19;29:21,21;
30:3,25;34:8;35:8,11;
36:23;37:5,6;38:2,3,9,
17,18,19,24;39:5;40:14,
16,25;41:24;42:13,21;
43:2;45:2,5,10,17,19;
46:6,6,14;48:2,8,11,14;
50:4,21;51:18;54:2,20;
59:2,19;60:3,10,14;
62:11,25;63:8;65:6,15,
23;66:5,9,20;67:4,14,15;
69:5,7;70:16;71:9;
75:22,22;87:23;88:6,12,
19,22;89:17,19,23;91:6,
9,24;92:10;93:5,24;

Case 1:19-cv-09319-AKH   Document 1-39   Filed 10/08/19   Page 139 of 224
ORLY GENGER VS.
DALIA GENGER, et al
DALIA GENGER
December 13, 2012

95:14;104:20,24;105:4,
7;106:16;107:4,10;
108:2,8;110:2;122:7;
123:2,21;124:12,25;
125:6;126:8;129:17,19,
20;140:24,25;144:14;
145:10,15;146:20;
148:12;161:18,21,23;
164:12,21,22;166:9;
177:9;178:8,23;179:9;
180:24;181:7,12,24;
182:18;183:11;188:6;
190:9,11,17;194:19;
196:7,8;198:11;199:2;
200:19;201:18,23;
202:6;203:11;207:13;
209:2;214:19
trusteeship (5)
39:3;41:4,8,16;58:23
trusts (1)
180:12
trust's (2)
78:23;87:23
truth (6)
6:17,20;8:11;99:13,
13;107:7
try (16)
56:3;58:8;63:21;
137:13;141:20;143:16;
158:12;163:5;187:10;
188:7;197:14;198:11;
200:19;201:18;207:23;
211:11
trying (11)
17:20;31:24,25;32:6,
12;33:14;50:2;63:14;
103:16;177:8;186:3
Tuesday (8)
25:21;26:14,17;28:8,
16;29:8;70:3;141:18
two (23)
11:13,16;18:14;19:6,
8;20:4;27:16,22;28:7;
29:2;30:7,15;31:16;
86:21;109:7,11,14;
121:14;122:10;139:18;
148:5;193:19,20
type (1)
43:12
typed (1)
43:11

U

UCC (2)
201:24,25
unclear (1)
68:18
uncomfortable (2)
48:2,5
under (6)
9:19;32:4;74:20,25;
75:12,20;87:20;88:23;

99:10;102:5,14;112:24;
152:3;176:8;180:19;
223:9
understood (3)
32:17;53:18;80:18
unfortunately (2)
171:8;207:18
Unless (2)
29:16;206:4
unlike (1)
181:23
unquote (1)
176:5
up (23)
43:11,12;52:5,11;
53:2,6;55:24;56:17;
57:2;62:23;63:6;66:4;
106:7;141:17;142:6;
150:24;176:20;196:12;
197:14;199:11;200:7;
203:5;217:24
upon (12)
11:15;99:15;109:5;
110:3;127:3;130:3;
138:4,5;144:9;159:18;
164:3;169:24
urinate (1)
86:18
use (2)
137:12;195:21
using (1)
22:23

V

valid (1)
177:22
value (4)
153:7,9;180:15;
181:15
valued (2)
151:5,13
verification (2)
99:6,18
verified (4)
8:23;9:2;98:25;99:8
versus (1)
17:9
via (2)
134:5,19
VOICE (2)
134:11,15
volunteer (2)
48:20;59:8
volunteered (3)
48:18,21,24
volunteers (1)
52:5

W

Wachtel (2)
3:22;136:20

Wait (26)
8:6;14:20;36:14;
52:19;60:19,19;101:19;
103:19,25;104:13;
105:23;111:14;114:6;
115:15;134:15;137:8;
142:25;163:12;168:21;
195:9;202:24;204:3;
216:6;219:24;220:12,13
waiting (1)
204:14
waive (1)
194:3
Waiving (1)
32:24
walked (1)
121:8
walking (1)
104:6
WALTER (2)
3:22;136:20
wants (2)
142:4;187:23
Warren (3)
135:15;189:9,23
waste (1)
84:4
wasting (2)
34:23;130:23
way (33)
21:9;79:24;80:2,14,
16;105:6;106:19;115:5,
6,22;124:6;150:15;
154:16;159:7;161:5,8,9,
11,13;164:6,15;165:20;
175:15;176:25;187:2;
188:7,14;202:10;
203:19;204:6,20;
211:22;214:15
wealth (2)
153:19,24
Wednesday (3)
25:21;70:3;141:18
week (4)
25:25;26:13;70:4;
98:23
weeks (1)
69:10
weighed (2)
191:9,16
welcome (1)
121:6
welcomed (1)
139:12
weren't (3)
88:19;200:4;220:25
what's (18)
10:25;28:19;37:18;
39:9;55:25;57:21;81:9;
94:7,20,23;98:19;110:9;
112:24;145:8;166:4;
168:21;188:16;207:18
whatsoever (5)

21:11;44:17;79:20;
96:20;101:17
whenever (3)
7:22;44:11;162:6
WHEREUPON (36)
6:1;20:5,10;23:9;
32:22;33:8;42:7;51:8,
14;55:4;58:15;60:21;
61:18;71:2;87:13,15;
105:14;116:14,17;
129:9;132:3;133:25;
134:18;142:19;143:23;
156:20;158:25;171:16;
180:4;188:3;189:7;
200:22;202:25;208:12;
221:22;222:8
Wherever (1)
198:19
whole (5)
26:21,22,24;97:11;
103:10
who's (3)
136:5,6;139:21
wife (1)
47:2
William (2)
220:6;221:9
willing (6)
59:7;60:13;61:11;
63:7;114:6;159:22
wipe (1)
180:17
wiped (2)
182:16,18
wish (5)
18:19;39:4;40:15,23;
118:23
wished (3)
41:24;50:20;51:18
wishes (1)
85:9
wit (3)
134:6,21;142:22
withdraw (2)
106:25;131:13
without (3)
87:24;194:21,22
witness (212)
6:1,3;8:15;10:3;13:11,
14;16:7,11,20,23;18:9;
20:23;23:11;25:11;
28:19;29:12;33:17,21;
34:17,24;36:11;37:20;
38:22;39:8,18;40:19;
41:12,20;42:3,9,15;43:8;
44:10;45:4,14;46:2;
47:14;48:17,23;49:6;
50:13,23;51:4;52:22;
53:8;54:15,22;55:12;
56:6,13,15,20;57:7,9,17,
25;58:11;59:5,13,21;
60:7,17,25;61:5,17,20;
63:17;64:8,22;65:17,25;

66:14,23;67:17;68:2,24;
69:12;70:11;71:4;72:3,
13;73:6,13;74:16;75:7,
15;76:6,25;77:14;79:8,
12,22;80:5,12;82:13,18;
84:7,10;89:2,11;90:12,
19,23;91:19;92:2;95:23;
97:3,14;98:3,7,15;
100:25;101:7,10;103:3,
13,17;104:17;105:10,16;
106:21;107:20;108:24;
112:14,23;113:16;
115:21,24;116:7,11;
122:13,15;123:7,25;
124:19,24;125:10,20,21;
126:15,17,20,20;128:18;
129:11;131:19;132:21,
24;137:4;138:3,7,19;
142:23;143:20;144:19;
145:7;146:9,23;147:20,
22;148:16;149:17;
152:23;155:11;156:19,
23;157:7,16;159:3;
160:3;161:22;162:19;
165:5;167:7,24;170:17,
23;172:16;175:3;
176:24;177:20;179:16,
20,24;183:2;191:12;
192:25;193:21;198:15;
200:11,24;201:12;
202:22;203:15,25;
206:12,16;208:8,14;
209:6,9;210:7,11;216:4,
11,15,18;217:4,10;
219:8;220:9,14
witness' (1)
138:4
witnesses (2)
139:14;141:25
Worcester (1)
14:16
word (3)
108:25;113:8;137:24
words (5)
99:12;178:15,18;
187:11,20
work (10)
15:22;16:4;18:16,23;
19:10;21:19;22:3;54:19;
99:21;166:24
worked (2)
15:14;150:13
worth (1)
217:22
write (6)
57:20;70:13;72:8,21;
73:3;165:14
writing (3)
79:24;80:3,16
written (3)
70:8;109:5;165:8
wrong (3)
77:24;162:22;166:21

**wrongdoing (1)**
  80:25
**wrote (4)**
  70:9;72:11;73:7,11

## Y

**year (1)**
  14:25
**years (5)**
  121:14;141:25;142:6;
  207:17;219:13
**yesterday (2)**
  25:21;26:15
**Yoav (9)**
  34:16,22;96:4;130:24;
  135:2;136:12;140:16;
  163:5;217:4
**York (8)**
  3:6,14,14;6:5;113:4;
  133:12,16;223:24

## Z

**Zeichner (1)**
  134:25
**zero (3)**
  151:6,13;152:6
**ZILBERFEIN (173)**
  3:3;13:9;16:9;17:16;
  18:7;19:19;20:21;21:15;
  24:22;32:10;36:18;
  38:10,21;39:6;40:17;
  41:5,11,19;42:2,14;43:7;
  44:9;45:3,13,24;46:18;
  47:13;48:16,22;49:5,13,
  16;50:10,22;51:2,21;
  52:8;53:7,21;54:4,9,14,
  21;55:11;56:5,12,19;
  57:6,13,16,24;58:10,13;
  59:4,12,20;60:6,23;
  62:17;63:2,16;64:7,14,
  21;65:11,16,24;66:11,
  22;67:16,25;69:8,11;
  70:10,18,22;71:15,24;
  72:12,22;73:5,12;74:11,
  15;75:14;76:5,24;77:7,
  13;78:8,13,18;79:7,10,
  21;80:4,11;81:13,19;
  85:20,23;87:12;90:4,8;
  96:12,16;97:10,24;98:5,
  14;102:24;103:5,10,13;
  105:8;106:20;117:5,10;
  119:4,12,22;120:5,10,
  22;121:16;122:12;
  123:6,22;130:17;131:5,
  11;133:6,10,15;136:3,
  15,16;141:11;143:2,9,
  17;144:11,18;145:5;
  146:8,15,22;147:21;
  152:22;156:6;158:23;
  167:6,23;176:18;
  179:23;182:21;183:4;

191:10;193:19;203:17;
204:9;206:11,14;209:4;
210:10;213:21;215:20,
24;216:3,9,13;217:9;
221:19
**zip (1)**
  6:15

1   D GENGER - UNCERTIFIED ROUGH DRAFT - 2/7/13

2

3   REALTIME ROUGH DRAFT AND UNCERTIFIED TRANSCRIPT

4      The realtime/rough ASCII draft is

5   unedited and uncertified and may contain

6   untranslated stenographic symbols, an occasional

7   Reporter's note, a misspelled proper name and/or

8   nonsensical word combinations.

9

10     (WHEREUPON, the witness was duly

11     affirmed.)

12     (Resumed)

13

14     Examination resumed

15

16   BY MR. GRIVER:

17   Q.  Mrs. Genger, you understand you have

18   just been resworn in this deposition?

---

12   the original 15 exhibits to your deposition as

13   well as the transcript of your prior day of

14   deposition on December 13, at 2012. Did you

15   review your transcript before today?

16   A.  The transcript, you mean whatever that

17   I was deposed on?

18   Q.  Yes.

19   A.  I went through it. Yes.

20   Q.  You read it?

21   A.  Briefly. But not like thoroughly,

22   because I notice that there are some mistakes

23   that has -- not substantial maybe, but like

24   somebody said something, it wasn't the person

25   that said it, but I don't know exactly what it is

       3

1   D GENGER - UNCERTIFIED ROUGH DRAFT - 2/7/13

2   over here.

3   Q.  Do you have any answers that you would

4   like to amend based on your review of the

---

19   A.  Uh-huh.

20   Q.  Ms. Genger, I would ask that you

21   verbalize your answers, don't go uh-huh

22   A.  I am sorry. Yes. Because I saw that

23   you did that in my deposition, so I thought it is

24   allowed. But I will remember that.

25   Q.  Okay. So let me ask you again --

       2

1   D GENGER - UNCERTIFIED ROUGH DRAFT - 2/7/13

2   A.  Yes.

3   Q.  Just let me ask you again for the

4   record, you understand --

5   A.  Yes, I do understand

6   MR. MEISTER: Wait until he finishes

7   his questions before you give the answer.

8   Otherwise the court reporter --

9   THE WITNESS: Okay, Bob.

10   BY MR. GRIVER:

11   Q.  I place before you a copy of your --

---

5   transcript?

6   A.  I have to read it more thoroughly, you

7   know, in order to answer that.

8   Q.  But as we sit here today, you did not

9   in your review identify any questions that you

10   misanswered?

11   A.  I cannot answer it because I didn't

12   read it thoroughly.

13   Q.  But in whatever review you did, you did

14   not identify any questions that you need to

15   reanswer?

16   A.  No.

17   Q.  And have you reviewed the exhibits 1

18   through 15, before today?

19   A.  No. I didn't. These are the exhibits?

20   Q.  Yes.

21   A.  No, I didn't. I mean, maybe some of

22   them I did.

23   Q.  Did you meet with Mr. Meister or any

24   other counsel to prepare for today's deposition?

25   A.  Yes. Yes, I did.

4

1   D. GENGER - UNCERTIFIED ROUGH DRAFT - 2/7/13

2   Q.   Who did you meet with?

3   A.   With Bob and his assistant

4   Q.   That's Marissa Warren?

5        THE WITNESS:  What?

6   A.   Yes.

7   Q.   And when did you meet with them?

8   A.   It was yesterday.  No.  The day before

9   Q.   And for how long did you meet?

10  A.   I think it was like two hours, or so.

11  Q.   Did Mr. Meister or his assistant

12  provide you with any documents?

13  A.   They provided me with documents that I

14  should have had before, I think.

15  Q.   And which documents were those?

16  A.   I don't remember

17  Q.   But these are documents that you did

18  not think you had before?

19  A.   I might have had, I don't remember.

20       MR. GRIVER:  Robert, to the extent that

21  you provided Ms. Genger with new documents, I

22  would ask that they be produced.

23       MR. MEISTER:  I don't know what you

24  mean by new documents

25       MR. GRIVER  She says there are

5

1   D. GENGER - UNCERTIFIED ROUGH DRAFT - 2/7/13

2   documents she has seen before to the extent any

3   other documents you showed her have not been

4   produced in in action.

5        MR. MEISTER:  Okay.

6        MR. GRIVER:  I ask they be produced.

7        MR. MEISTER:  For the record, I don't

8   think I showed her any documents that haven't

9   been produced to you.

10       THE WITNESS:  No.  The point is that --

11  okay.

12  BY MR. GRIVER:

13  Q.   Ms. Genger, if you can please look at

14  Dalia Exhibit 6.  Did Sagi Genger prepare --

15  A.   Let me just get through it and see what

16  it is.

17  Q.   Okay.

18  A.   It is to Leah from me --

19       MR. MEISTER:  Don't.

20       THE WITNESS:  I am just saying it

21  aloud

22       MR. MEISTER:  What you say aloud, the

23  court reporter has to write it down.

24       THE WITNESS:  I'm sorry.  It is so much

25  work.  I'm sorry.

6

1   D. GENGER - UNCERTIFIED ROUGH DRAFT - 2/7/13

2   BY THE WITNESS:

3   A.   Okay.

4   BY MR. GRIVER:

5   Q.   Ms. Genger, did Sagi Genger draft this

6   document that's been marked Exhibit 6?

7   A.   Not to my knowledge.

8   Q.   Did you draft it?

9   A.   No.

10       MR. MEISTER:  Objection.  Asked and

11  answered.

12  BY THE WITNESS:

13  A.   I did not draft it.

14  BY MR. GRIVER:

15  Q.   Do you recall as we sit here today who

16  did?

17       MR. MEISTER.  Objection.  Asked and

18  answered.

19  A.   No.  As I said, the lawyer drafted it.

20  I don't know how to draft my legal matters.

21  Q.   Was that lawyer David Parnes?

22  A.   I don't know.

23  Q.   You don't remember which lawyer?

24  A.   No.

25  Q.   You don't even remember if it was your

7

1   D. GENGER - UNCERTIFIED ROUGH DRAFT - 2/7/13

2   lawyer?

3      A.   I know it is a lawyer.  Because I

4   didn't do it.

5      Q.   All right.  Look at Exhibit 8, please.

6      A.   Exhibit 8.

7      Q.   Wait a second.  One question.

8      You say that you know a lawyer did it

9   because?

10     A.   Because it is not my --

11     Q.   You didn't do it?

12     A.   It is not my style of writing.

13     Q.   How do you know that Sagi didn't

14   prepare this?

15     A   How did I know that Sagi didn't prepare

16   it?

17     Q.   Yes.

18     A.   Because he is not a lawyer.

19     Q.   You think that only lawyers can prepare

20   a document like this?

21     A.   Yes.

22     Q.   Is that the only reason you don't

23   believe Sagi prepared the document marked as

24   Exhibit 6?

25     A.   Yes.

8

1   D. GENGER - UNCERTIFIED ROUGH DRAFT - 2/7/13

2      Q.   Look at Exhibit 8?

3      A.   Yeah.

4      Q.   Did Sagi Genger prepare this document?

5      A.   I have no idea.

6      Q.   Did Sagi Genger give you this document

7   for you to sign?

8      A.   I don't remember.

9      Q.   Look at Exhibit 6 again.  Did Sagi

10   Genger give you Exhibit 6 for you to sign?

11     A.   I don't remember.

12     Q.   Ms. Genger, if you could look please at

13   page 207 of your transcript, from the first day

14   of your deposition.

15     A.   Yeah.  What do you want?

16     Q.   On page -- on page 207, at line 22, you

17   call Orly brainwashed already.  Do you see that?

18     A.   Right.

19     Q.   What did you mean by that?

20     A.   That she was talked about, certain

21   subject, over and over, and she was convinced

22   that whoever talked to her is telling her the

23   truth, and she should believe in it.

24     Q.   And the person who was talking to her

25   is Arie Genger?

9

1   D. GENGER - UNCERTIFIED ROUGH DRAFT - 2/7/13

2      A   Only this time -- brainwashed I

3   couldn't talk to her, candidly, even though I did

4   try ('STP-FPLT quoting from exhibit).

5      I didn't mention Arie's name here in

6   this answer.

7      Q.   But when you say that Orly was

8   brainwashed, brainwashed by whom?

9      A.   By whoever talked to her.

10     Q.   And who do you think that is?

11     A.   Somebody that had interest in her

12   thinking whatever she was thinking.

13     Q.   And who would that be?

14     A.   Could be anyone.  I mean, anyone that

15   has interest in whatever she answered.

16     Q.   Okay.  And when you said that she was

17   brainwashed you did not mean she was brainwashed

18   by Arie, is that what your testimony is now?

19     A.   No.  I didn't say that

20     Q.   Okay.  So who did you --

21     A.   I said that it might be any person that

22   had interest for her to think a certain way or

23   believe in something that she believes in.

24     Q.   So on that basis you could have been

25   brainwashed, for example, by Sagi Genger?

10

1   D. GENGER - UNCERTIFIED ROUGH DRAFT - 2/7/13

2   A.   Might be

3   Q.   And is there any reason why you don't

4   want to identify Arie as a person who you

5   believed --

6   A.   I didn't say I don't want to.

7   Q.   Is that who you believed brainwashed

8   Orly?

9   A.   That's the end of the question?

10   Q.   Yes. I would like you to answer.

11   A.   I don't know if it was Arie, or it

12   might have been her lawyer, one of her lawyers,

13   for example. I mean, there are certain people

14   that want her to believe in certain things. And

15   that's why I cannot say if it was Sagi or Arie,

16   or one of her lawyers.

17   Q.   Okay. And what certain things did they

18   want her to believe?

19   A.   I didn't read the whole thing, so I

13   sale, did you?

14   A.   That's true. That's what I said.

15   Q.   And why did you not tell Arie about the

16   UCC sale?

17   A.   Because I had no interest to tell him.

18   Q.   Why?

19   A.   Because it is not my role to tell him

20   and inform him about the UCC sale.

21   Q.   Why isn't it your role to tell him

22   about the UCC sale?

23   A.   I have many things that are not my

24   role. I mean, should I inform him about other

25   things that happened? No.

12

1   D. GENGER - UNCERTIFIED ROUGH DRAFT - 2/7/13

2   Q.   Did you know at the time that Arie

3   Genger had an interest in obtaining the TPR

4   shares?

5   A.   No.

20   don't know what we are talking about.

21   Q.   Well, in this line of questioning, I

22   will represent to you, this is when you made the

23   decision not to let Arie Genger know about the

24   sale, about the UCC sale of the TPR shares, and

25   you decided not to let Orly know about the UCC

11

1   D. GENGER - UNCERTIFIED ROUGH DRAFT - 2/7/13

2   sale of the TPR shares?

3   A.   I want to read this.

4   MR. MEISTER:   Wait wait.

5   THE WITNESS:   I am not going to --

6   MR. MEISTER:   Wait, Dalia. Let me put

7   my objection.

8   I object that that mischaracterizes the

9   testimony. I don't think this testimony that she

10   made a decision not to tell Orly --

11   BY MR. GRIVER:

12   Q.   You did not tell Orly about the UCC

6   Q.   You didn't think that at is all is --

7   A.   How should I know?   He never

8   communicated with me.

9   Q.   You didn't suspect that all he might be

10   interested in obtaining shares of his family

11   company?

12   MR. MEISTER:   Put it on the record.

13   Mrs. Genger, please wait until

14   Mr. Griver finishes --

15   A.   You are right   You are right

16   I am sorry.

17   Q.   Can you read my question back please

18   A.   That was the question?   Yes.   (Read

19   back).

20   A.   No.

21   BY MR. GRIVER:

22   Q.   That thought never crossed your mind?

23   A.   No.

24   Q.   What about Orly -- strike that.

25   Did you tell Orly about the UCC sale

13

D. GENGER - UNCERTIFIED ROUGH DRAFT - 2/7/13

2  before it happened?

3     A    We went over it.  No, I didn't tell

4  her.

5     Q.   Okay.  Why didn't you tell Orly?

6         MR. MEISTER:  Objection.  Asked and

7  answered.

8     A.   Because you asked me that.

9     Q.   Yes.

10    A    And I did answer, and I will give you

11  the same answer.

12    Q.   By all means.

13    A.   The answer is that there was no way

14  that the trust could fight any -- had no means to

15  buy or compete in the auction, that's one.  Of

16  the reasons that I didn't tell her.

17        And, secondly, I don't think it is one

18  of my roles to tell her about the auction.  The

19  thing is that TPR went through legal procedures

20  in order to go through the auction.  They did

21  follow the procedure, and unfortunately, the

22  results were what they were.  Whatever they were.

23    Q.   I am asking you Ms. Genger --

24    A.   Yes.

25    Q.   -- it never crossed your mind that this

14

D. GENGER - UNCERTIFIED ROUGH DRAFT - 2/7/13

2  might be something that Orly would be interested

3  in, that --

4     A    She never conveyed to me any desires or

5  things that she wants or doesn't want.  She

6  didn't communicate with me.  I mean, I am her

7  mother and she knows I am her trustee, too.  She

8  could have picked up the phone and tell me,

9  mommy, or my trustee, I am not interested in -- I

10  want to participate in this auction.  She didn't

11  do that.

12    Q.   Okay.  And you never thought to apprise

13  her?  You never thought to tell her about it?

14    A.   No.  Because if it would have been

15  important enough for her, she would pick up the

16  phone and tell me.

17    Q.   Okay.  And how would Orly know about

18  the auction in order to tell you?

19    A    She -- there was a procedure.  She

20  should have been aware of the procedure.  Legal

21  procedure.

22    Q.   And what is the legal procedure?

23    A.   To advertise it in -- and that was in

24  New York post.

25    Q.   Right.  And there was no requirement

15

D. GENGER - UNCERTIFIED ROUGH DRAFT - 2/7/13

2  you believe to -- for the -- for TPR to apprise

3  you as the trustee of the upcoming sale?

4     A.   Again, who do you -- repeat the

5  question.

6     Q.   You don't believe that there was a

7  requirement for TPR to apprise you as trustee of

8  the sale?

9         MR. MEISTER:  Objection.  Calls for

10  legal conclusion.

11    A.   TPR?

12    Q.   Yes.

13    A.   Requires me?  Why should TPR require me

14  to do anything?  What my role is in TPR?  I am

15  the trustee of Orly trust.

16    Q.   Do you believe that TPR had a

17  responsibility to tell you --

18    A.   I have no idea what TPR's

19  responsibilities are.

20        MR. MEISTER:  Dalia, let him finish the

21  question.

22  BY THE WITNESS:

23    A.   I have no idea what the

24  responsibilities are.

25    Q.   Did it ever occur to you that perhaps

16

1   D. GENGER - UNCERTIFIED ROUGH DRAFT - 2/7/13

2   Orly might be able to find financing in order to

3   show up at the UCC sale?

4      A.  No, it never occurred to me.

5      Q.  Did you ever seek financing for the

6   trust?

7      A.  I said that I did entertain, I did --

8   no.  Actually.  No.  That was another question

9   that you asked me.  Ask me again.  I am sorry.

10     Q.  Did you seek any financing in order to

11  be able to appear at the UCC sale and maintain

12  control of the TPR shares?

13     A.  No.

14     Q.  Did you talk to any bank?

15     MR. MEISTER:  About that?

16     THE WITNESS:  Yeah.

17     Q.  Did you talk to any bank about the fact

18  that there was an UCC sale and you would like to

19  show up to bid?

20     A.  No, I did not talk to any bank.

14  BY THE WITNESS:

15     A.  I didn't think --

16     Q.  Yes or no.

17     A.  -- it is my role.

18     Q.  So you decided it wasn't your role so

19  you weren't going to tell Arie, correct?

20     A.  I decided that I don't have to notify

21  anyone about the auction, okay.

22     Q   Did --

23     A.  Including Arie.

24     Q.  Did you talk to a lawyer in your

25  capacity as trustee of the Orly Genger trust

18

1   D. GENGER - UNCERTIFIED ROUGH DRAFT - 2/7/13

2   about stopping the sale?

3      MR. MEISTER:  Objection.  This was all

4   gone over at the prior deposition.

5      Wait a minute, wait a minute, wait a

6   minute.

21     Q   Any financing source of any kind?

22     A   No.  No.  No.

23     Q   Any friends?

24     A   No.  I didn't.

25     Q.  Okay.  So you just looked at how much

17

1   D. GENGER - UNCERTIFIED ROUGH DRAFT - 2/7/13

2   money the Orly Genger trust had on the account?

3      A.  Yes.

4      Q.  And said well that's less than 4

5   million dollars so I am done; is that correct?

6      A.  More or less.  Yes.

7      Q.  And you said I am not going to tell

8   Arie, correct?

9      MR. MEISTER:  Objection.

10     A.  No, I didn't say that.

11     Q   You decided you were not going to tell

12  Arie; isn't that correct?

13     MR. MEISTER:  Objection.

7      THE WITNESS  I am not going to sit

8   here the whole day.  I can't.

9      MR. MEISTER:  Dalia, please.

10     A.  I am not 20 years old.  I can't --

11     MR. MEISTER:  Please don't interrupt

12  me.  I object to you asking the same questions.

13     If you don't have fresh questions, then

14  I will consider the deposition --

15     MR. GRIVER:  I most certainly do, and I

16  have a reason for asking it, and thank you very

17  much.  From now on no speaking objections.  Just

18  make your objection and be done.

19     THE WITNESS:  Okay.

20  BY MR. GRIVER:

21     Q.  As for you, Ms. Genger, did you talk to

22  a lawyer about trying to stop the sale, yes or

23  no?

24     MR. MEISTER:  Objection.  Asked and

25  answered.

19

1  D. GENGER - UNCERTIFIED ROUGH DRAFT - 2/7/13

2  A.  What was the question again?

3  Q.  Did you talk to a lawyer about trying

4  to stop the UCC sale?

5  A.  I don't remember.

6  Q.  You are not -- are you relying on

7  advice of counsel to protect your actions as

8  trustee in not trying to stop the UCC sale?

9  MR. MEISTER:  Objection.  Calls for

10  legal conclusion.  Let move on you have covered

11  this.  Dalia, wait a minute.

12  You have covered all of this at the

13  beginning of the first session of the deposition.

14  We are not going to have this first session of

15  the deposition repeated.

16  THE WITNESS:  Again?

17  MR. MEISTER:  So if you would like to

18  move on to fresh material --

19  MR. GRIVER:  Bob, it is not being

20  repeated.  What I am doing is laying a foundation

21  in order to find out if she's relying on advice

22  of counsel.  If she is, then I will get that

23  advice.

24  MR. MEISTER:  You can put it --

25  MR. GRIVER:  I will get that advice

20

1  D. GENGER - UNCERTIFIED ROUGH DRAFT - 2/7/13

2  from her right now.

3  MR. MEISTER:  You had questions on

4  this.  She told you her answers.

5  MR. GRIVER:  And we had subsequent --

6  MR. MEISTER:

7  MR. GRIVER:  Subsequent communications

8  where you said, you know, make your case, and

9  bring it to the Court.  So I am going --

10  MR. MEISTER:  I don't understand what

11  you are talking about.

12  Do you want me to find the section

13  where you asked this?

14  MR. GRIVER:  I am not talking to you.

15  MR. MEISTER:  No, no, I am sorry.

16  Mr. Griver.

17  MR. GRIVER:  Find me the question where

18  I asked her this question, and you can do that,

19  she is going to ask it in the meantime.

20  MR. MEISTER:  No, she is not.  Wait a

21  minute.

22  BY MR. GRIVER:

23  Q.  Did -- strike that.

24  Ms. Genger, are you relying on advice?

25  A.  I am going to get up and walk away.  I

21

1  D. GENGER - UNCERTIFIED ROUGH DRAFT - 2/7/13

2  can't take this.  I can't take this.

3  Q.  Mrs. Genger, simple question.  Are you

4  relying on advice of counsel?

5  A.  Usually I do.

6  Q.  To shield your actions in not

7  attempting to stop the UCC sale?

8  A.  Usually when I decide something, in

9  general, I take the advice and I consult with my

10  lawyer, okay.

11  Q.  I am not talking about generally.  I am

12  talking specifically with regard to your decision

13  not to attempt to stop the UCC sale?

14  A.  So specifically I told you then that I

15  don't remember.

16  Q.  Okay.  So in that event you are not

17  relying on advice of counsel?

18  A.  I didn't say that.

19  MR. MEISTER:  Objection.

20  A.  I said I don't remember.  I might have

21  Q.  Okay.  But as we sit here today you

22  don't remember what that advice was, as we sit

23  here today you don't remember if you were given

24  advice?

25  A.  No.

22

1   D. GENGER - UNCERTIFIED ROUGH DRAFT - 2/7/13

2   Q.   Or you don't remember what that advice

3   was?

4   A.   I didn't say that. I said I don't

5   remember if I asked for advice. I didn't say

6   that I didn't get any advice, or which advice did

7   I get.

8   Q.   Read back her last question. (Read

9   back)?

10   THE WITNESS: Thank you.

11   BY MR. GRIVER:

12   Q.   Read that again, please.

13   (WHEREUPON, the record was read by

14   the reporter as requested.)

15   BY MR. GRIVER:

16   Q.   Did you get advice regarding the UCC

17   sale?

18   MR. MEISTER: Objection. Asked and

19   answered.

20   BY THE WITNESS:

21   A.   You just asked me. I mean, really, are

22   we going to -- I mean, this costs me money, you

23   know. This costs me money, if you are going to

24   ask me ten times the same question, I am giving

25   you ten times the same answer, I am not going to

23

1   D. GENGER - UNCERTIFIED ROUGH DRAFT - 2/7/13

2   pay my lawyer, and I am going to go to court. I

3   mean this is -- you are harassing me.

4   Q.   Mrs. Genger, calm down. If you

5   would --

6   A.   I would like to calm down.

7   Q.   If you would provide yes or no answers,

8   it will be helpful. If you quit changing your

9   answer, it will be helpful.

10   A.   I am not changing. If you read my

11   answers, you would see that I am very consistent

12   with my answers.

13   Q.   Read her last answer.

14   And Mrs. Genger I would like you to pay

15   attention to where you stated something that

16   makes it unclear whether or not you actually got

17   advice.

18   (Read back?

19   MR. MEISTER: For the record, the first

20   session of the deposition, at page 191, after

21   Mr. Genger asked whether she consulted with a

22   lawyer (Mr. Griver, thank you, he asked the

23   question at line 2, what was his advice. And

24   then after dialogue, there was an answer at line

25   16, quote: Okay. We weighed the options we had

24

1   D. GENGER - UNCERTIFIED ROUGH DRAFT - 2/7/13

2   and we concluded there's nothing I can do to stop

3   Sagi, you know, doing whatever he did, with the

4   auction.

5   And it goes on. This topic was covered

6   in extenso.

7   BY MR. GRIVER:

8   Q.   What options did you weigh? If you are

9   going with that testimony, that you actually did

10   seek a lawyer's advice. Then I will ask you what

11   options did you weigh?

12   A.   I don't remember. I don't remember.

13   Q.   Okay. What actions did you take as a

14   result of that advice?

15   A.   Of what?

16   Q.   Did you speak to anyone about trying to

17   stop the sale after you spoke to your attorney?

18   A.   Can you repeat the question.

19   (WHEREUPON, the record was read by

20   the reporter as requested.)

21   BY THE WITNESS:

22   A.   No.

23   BY MR. GRIVER:

24   Q.   Okay. On page 208 of your transcript,

25   if you could read, please, pages --

25

1  D. GENGER - UNCERTIFIED ROUGH DRAFT - 2/7/13

2      MR. MEISTER:  Just a second.

3   A.  We have to get to the right page here.

4   Q.  Page 208 lines 15 through 20.

5   A.  Sorry, what line you said?

6      MR. MEISTER:  15.

7  BY MR. GRIVER:

8   Q.  Lines 15 through 20.

9   A.  You have to --

10     MR. MEISTER:  You have to go back to

11  the question, though.

12  A.  Question.  Was, can you -- from where?

13  No, the question is --

14     MR. MEISTER:  The question is in line

15  3.

16     THE WITNESS:  Question, if you told

17  Orly about the sale, she would tell her father,

18  that didn't occur to you at all.

19     MR. MEISTER:  And the answer at line

20  15.

21

22  A.  Answer:  I didn't think about it at the

---

23  time.  But I am telling you frankly, I didn't

24  want Arie to be involved in this auction.

25  (Quoting from transcript(

26

---

1   D. GENGER - UNCERTIFIED ROUGH DRAFT - 2/7/13

2      Okay.

3  BY MR. GRIVER:

4   Q.  And you continue on and say, because I

5  know my husband, do you see that?

6   A.  Yes, I do know my husband.

7   Q.  What did you mean by that?

8   A.  My ex-husband.

9      MR. MEISTER:  Your ex-husband.

10  A.  His character.  It -- /REU.

11  Q.  Okay.  Why -- what was it about your

12  ex-husband Arie Genger that made you not want him

13  to be involved in the auction?

14  A.  He is dishonest person, that's my

15  conclusion.

---

16  Q.  Okay.  And how did you believe that

17  that dishonesty might affect the auction?  What

18  was your --

19  A.  It will affect the results of the

20  auction in a way that will not benefit Orly.

21  Q.  By him buying the TPR shares?

22  A.  I don't know if he would buy or not.

23  How should I know?  Hypothetically, I cannot

24  answer you.  It is a hypothetical question.

25  Q.  You said you didn't want him to be

27

---

1   D. GENGER - UNCERTIFIED ROUGH DRAFT - 2/7/13

2  involved.  I am asking you if Arie Genger had

3  bought the TPR shares --

4   A.  If if if  I don't know.  What

5  happened.

6   Q.  One second --

7   A.  If if if.

8   Q.  If -- let's explore all the options.

---

9      Either Arie could show up and not buy

10  the TPR shares --

11  A.  I am not answering hypothetical

12  questions, okay, because it is hypothetical

13  answer.  So I don't know.  I don't know what

14  would happen.

15  Q.  You considered what might happen if

16  Arie Genger bid in deciding not to tell him about

17  the UCC sale, so I am asking you?

18     MR. MEISTER:  Objection.  That's not

19  her testimony.  The testimony that you just asked

20  her to read, what, is quote, did you -- I didn't

21  think about it at the time.  Closed quote.  Okay.

22  So don't mischaracterize her prior testimony.

23  BY MR. GRIVER:

24  Q.  Ms. Genger, what -- how could Arie's

25  presence at the UCC sale harm the Orly Genger

28

---

1   D. GENGER - UNCERTIFIED ROUGH DRAFT - 2/7/13

2  Trust?

3      MR. MEISTER:  Objection.

4  BY MR. GRIVER:

5      Q.   As trustee, please answer the question

6      A.   First of all, I said at the time I

7  didn't think about involvement

8      Q.   Please answer my question.  Please just

9  answer my question  Read back the question

10  please.

11      A.   I don't want my ex-husband to be

12  involved in finances that I am responsible for

13  being a trustee.  I don't want him -- I didn't

14  want him to be involved in anything financial

15  that I will also responsible.  Things that has to

16  do with Orly because I don't trust him.

17      Q.   Okay.

18      A.   Okay.

19      Q.   How would Arie's participation in

20  the --

21      A.   He is a dishonest person.  I am cutting

22  you short because I told you that already.

16      A.   That's what happened

17      Q.   -- as trustee I am asking you --

18      A.   Okay.

19      Q.   If Arie Genger had paid more money than

20  TPR did for the TPR shares, how would that have

21  harmed the Orly Genger Trust?

22      A.   You really trying my patience.

23      Q.   I just want an answer to that question,

24  please.

25      A.   I said before, that I would stay away

30

1      D. GENGER - UNCERTIFIED ROUGH DRAFT - 2/7/13

2  from any financial involvement of Arie that has

3  to do with Orly financial affairs.  That's my

4  answer.

5      Q.   Okay.

6      A.   If he paid more or less or much more,

7  it doesn't matter.  I just don't trust the guy,

8  and I am the trustee and I made this decision,

23      Q.   Okay.  Other than your belief in his

24  dishonesty, how is his buying the TPR shares for

25  more money --

29

1      D. GENGER - UNCERTIFIED ROUGH DRAFT - 2/7/13

2      A.   No other ways.

3      Q.   -- for more money than TPR was willing

4  to buy the TPR shares, how would that harm the

5  trust?

6      MR. MEISTER:  Objection.

7      THE WITNESS:  As I said, we discussed

8  it before  How would you know that I -- are you

9  assuming that Arie would buy the shares in a

10  higher price than whoever bought the shares?

11      Q.   If he had?

12      A.   If.  If he.

13      Q.   Yes.

14      A.   If if if.  But if I don't know if

15      Q.   Ms. Genger --

9  okay.  Because I happen to know the guy.  It is

10  not a stranger.  It is somebody that I lived with

11  like 35 years.  So I know with whom I am dealing,

12  okay?  Is this clear?

13      Q.   And, again, I am going to ask you.

14      A.   Again?

15      Q.   Excuse me.  I don't understand.  How

16  does Arie Genger's honesty, how does that taint

17  any moneys that he would pay for shares?

18      MR. MEISTER:  Objection.

19      Q.   I am just --

20      A.   Because that's not the end of the

21  story, you know.  There's things come after

22  buying the shares.

23      Q.   Such as?

24      A.   Consequences.

25      Q.   Such as?

31

1      D. GENGER - UNCERTIFIED ROUGH DRAFT - 2/7/13

2   A.   Of something.

3   Q.   Such as?

4   A.   I don't know, we are talking if.  I

5   don't know.  If.  If he would have paid.  If he

6   would have paid.  Then I would have -- discuss

7   with you, but.

8   Q.   If he had paid 8 million dollars for

9   the TPR shares, what future consequences would

10   have been negative for the trust?

11       MR. MEISTER:  Objection.

12   Q.   Ms. Genger, you are trustee.  You swore

13   that you would protect the trust.  You swore you

14   are able to protect the trust I am asking a

15   simple question.

16       I am asking you what negative

17   consequences do you believe would have resulted

18   from Arie Genger paying more money for the TPR

19   shares than TPR did?

20       MR. MEISTER:  Objection.

21   A.   You are very naive, you know.  You have

22   only just want to spend time, just spending time

23   asking questions, around, around the same

24   subject, okay.

25   Q.   And answer -- please answer my

32

1   D. GENGER - UNCERTIFIED ROUGH DRAFT - 2/7/13

2   question.

3   A.   And it is a fact that Arie was not able

4   to get his hand on the Orly's shares, okay.  It

5   is very disappointing to him, and to you, who you

6   are being paid by Arie, okay.  So that's why I

7   think that your reputation is a little bit

8   tainted in objectivity, is tainted when you ask

9   me this questions, okay.

10   Q.   Perhaps --

11       MR. MEISTER:  Can we take a break for a

12   minute.

13       MR. GRIVER:  I am brainwashed, too,

14   perhaps.

15       MR. MEISTER:  Can we take a break for a

16   minute.

17       MR. GRIVER:  I ask that she answer my

18   question, and then she can take a break.

19   BY MR. GRIVER:

20   Q.   Please repeat my question for the

21   record, type it out on the record, please.

22   )   Read back) insert text of question in

23   read back)?

24       MR. MEISTER:  Note my objection.

25

33

1   D. GENGER - UNCERTIFIED ROUGH DRAFT - 2/7/13

2   A.   Where are we standing now?

3   Q.   I am waiting for you to answer the

4   question

5   A.   What?  This is the question that you

6   asked like 20 minutes ago?

7   Q.   The one that you have not answered,

8   that she repeated for you, for your convenience.

9   Yes.  Would you like her to repeat it again?

10   A.   Yes.

11       MR. GRIVER:  Madam court reporter

12   please.

13

14       (WHEREUPON, the record was read by

15       the reporter as requested.)

16       MR. MEISTER:  Objection

17       THE WITNESS:  What negative

18   consequences?  You asked?

19   Q.   Yes.

20   A.   The negative consequences, I cannot

21   answer this question because I don't believe that

22   your question comes in good faith to protect

23   Orly's interest, because as we sit here, as we

24   sit here, your mind is also thinking about, I

25   mean, Arie's interest.  Specifically you are

34

1   D. GENGER - UNCERTIFIED ROUGH DRAFT - 2/7/13

2   asking about Arie's interest over and over and

3   over, okay.  So it is obvious that somebody is

4   pushing Arie's name here all the time.  Okay.

5        And that's why I don't feel comfortable

6   to answer you questions that are not objectively

7   being put forward as -- I have to find the word.

8   As pushing Orly's benefit in this kind of auction

9   or sale.

10   Q   As an attorney for Orly and Orly's

11   trust, I believe that if someone had come into

12   that auction and paid more money, it would have

13   benefited the trust because the trust would have

14   had more money?

15   A   If somebody would have come.

16        MR. MEISTER:  Objection

17   BY MR. GRIVER:

18   Q   That's why I am asking.  So I would ask

19   that you please answer the question.

20   A   I am answering.

21   Q   As trustee, what negative consequences

22   did you believe might result if Ane Genger had

23   paid more money for the TPR shares than TPR?

24        MR. MEISTER:  Excuse me.  Objection

25   A   Ane would have come, if he wanted to.

35

1   D. GENGER - UNCERTIFIED ROUGH DRAFT - 2/7/13

2   Q.   He --

3   A.   He could have come if he wanted to.  If

4   he was so eager, he should have read the

5   newspapers every day and come.  But he didn't do

6   it.  So he didn't come.  So my role is to go and

7   call him and tell him?

8   Q   Your role is not to call him --

9   A.   I could have called also another

10   millionaire or billionaire and asked him to come

11   and participate, but I didn't do it, because I am

12   not going to sit here every day and make phone

13   calls to all the millionaires in the country.

14        MR. MEISTER:  Let the record reflect in

15   part of your answer where she said, so my role is

16   to call him and tell him to come here, she was --

17   inflection indicated she was asking a question.

18   It was not a declarative statement.

19        Okay.  Can we take our break please.

20        MR. GRIVER:  Sure.  Let me have it

21   Exhibit 16.

22

23        (Dalia Exhibit /*, marked.)

24        (WHEREUPON, a recess was had.)

25        11:19, 1124)

36

1   D. GENGER - UNCERTIFIED ROUGH DRAFT - 2/7/13

2   BY MR. GRIVER:

3   Q   You are aware that at the time that

4   Sagi Genger on behalf of TPR began taking steps

5   to foreclose on the note, that Orly was seeking

6   to have you removed as trustee?

7   A.   Right.

8   Q   And you know that before you were

9   appointed at trustee, Orly had been in conflict

10   with Leah Fang the previous trustee?

11   A.   Yes.

12   Q   Okay.  And you testified I believe

13   previously that you never -- that you don't know

14   what exactly the conflict was, and you had not

15   sought to understand what that conflict was?

16   A.   Right

17   Q   But you knew, did you not, from the

18   conflict with Leah Fang and from Orly's actions

19   against you that Orly was, in fact, deeply

20   concerned about her trust and her trust assets?

21        MR. MEISTER:  Objection.  You misspoke.

22        THE WITNESS:  Can you repeat

23   A   Orly what?

24   Q   Did you not understand from Orly's

25   actions with regard to Leah Fang and with regard

37

1   D. GENGER - UNCERTIFIED ROUGH DRAFT - 2/7/13

2   to you that Orly was concerned about?

3   A.  Concerned about protection of?

4   Concerned about?

5   Q.  Protection of her trust assets?

6   A.  Concerned?  You mean, did I --

7   Q.  Yes.  Did you think that Orly was

8   concerned about her trust assets?

9   A.  No, I was not aware of that.

10   Q.  You -- so did you believe that Orly did

11   not care what happened to the assets of her

12   trust?

13   A.  I am sure she, like any normal person,

14   she is concerned about her assets.

15   Q.  Okay.  So knowing that like any other

16   normal person she would be concerned about her

17   trust assets, why didn't you tell her, by phone,

18   by mail, by any means you chose?

19   A.  Yeah.

20   Q.  About the fact that those assets were

21   about to be sold?

22   A.  Why --

23       MR. MEISTER:  Objection.  Assumes a

24   fact not in evidence.

---

25   BY THE WITNESS:

                        38

1   D. GENGER - UNCERTIFIED ROUGH DRAFT - 2/7/13

2   A.  I --

3       MR. MEISTER:  And.

4   A.  Is there a connection --

5       MR. MEISTER:  Objection to the form.

6       THE WITNESS:

7   A.  Is there -- I don't understand.  Is

8   there a connection between the question that you

9   asked me now to the question before that she's

10   concerned about her assets, and now you are

11   asking me what?

12   Q.  If you assumed that Orly like any

13   normal person was concerned about her trust

14   assets, why did you not provide the courtesy of

15   calling up and letting her know that TPR was

16   foreclosing on some of those asset?

17       MR. MEISTER:  Objection.  Assumes a

---

18   fact not in evidence.  Objection to form.  And

19   objection to this whole line has been gone over

20   and over and over

21   A.  My answer is, if Orly was so concerned

22   she could have given me a phone call.  I am her

23   mother and she knows my number.

24   Q.  And as her mother you didn't think you

25   should call up and let your daughter know?

                        39

1   D. GENGER - UNCERTIFIED ROUGH DRAFT - 2/7/13

2       MR. MEISTER:  Objection.  Asked and

3   answered.  Numerous times.

4   A.  How many times, I mean, really.  You

5   know.

6   Q.  Answer the question.

7   A.  So I told you, if she was so concerned

8   that I am doing something wrong, when she was

9   very concerned she did write me a letter, okay

10   Apparently this time she didn't find the time or

---

11   the necessity to write me any letter concerning

12   me, selling the shares to the trump group, for

13   example.  Then she did.  Now she didn't.  Why?

14   Because she was concerned less?  Or she didn't

15   have the time?  I have no idea.

16   Q.  As her mother, don't you think you

17   should have called on the phone and let her know

18   about the sale?

19       MR. MEISTER:  Objection.  Asked and

20   answered.

21   BY MR. GRIVER:

22   Q.  Just yes or no.

23   A.  The same question that we --

24   Q.  Yes.  Until you give me an answer, yes.

25       As her mother don't you think you

                        40

1   D. GENGER - UNCERTIFIED ROUGH DRAFT - 2/7/13

2   should have picked up the phone and told her

3   about the foreclosing on the TPR assets?

4    A.   No.

5         MR. MEISTER:  Objection.  Asked and

6    answered.

7    BY MR. GRIVER:

8    Q.   Okay.  Take a look at what's been

9    marked as Exhibit 16, please.  This is, for the

10   record, Exhibit 16 is an affirmation in support

11   of the motion to dismiss further amended petition

12   signed by Robert Meister on or about November 19,

13   2012.

14        Did you review this document before it

15   was submitted on behalf of -- purportedly on

16   behalf of the Orly Genger Trust and you as

17   trustee?

18        MR. MEISTER:  First of all, I note that

19   this is a document submitted in a different

20   litigation.  Secondly, it was not submitted on

21   behalf of the Orly Genger trust.  So it is

22   mischaracterizing it.  Submitted on behalf of

23   Ms. Genger, as trustee, in response to a

24   petition, third amended petition to remove her as

25   trustee.

41

1    D. GENGER - UNCERTIFIED ROUGH DRAFT - 2/7/13

2         I further note that this is not a

3    deposition in that action.

4         MR. GRIVER:  And I will simply note

5    that one of the actions against Ms. Genger in

6    this case is for fraud in her actions as trustee.

7         THE WITNESS:  Fraud?

8    Q.   Fraud.  That's correct.

9         MR. MEISTER:  Actually, I think --

10   A.   Get to the point.

11        MR. MEISTER:  It is not interactions as

12   trustee, what is left in this case after the

13   trustee claims were dismissed by -- in the very

14   first motion, is an allegation that Mrs. Genger

15   colluded and committed fraud individually,

16   colluded with Sagi Genger.  None of these

17   questions seem to relate to what is left in this

18   case.

19        MR. GRIVER:  That's not true at all,

20   but thank you for that, Robert.

21   Q.   If you would look at paragraph 8.

22   Actually, paragraph 21, says it better.

23   Paragraph 21

24   A.   21.  Okay.

25        MR. MEISTER:  Page 12.

42

11   Q.   -- action?

12        Okay.  If you can look at paragraph 21

13   particularly the second sentence.

14   A.   When you say the note, which note do

15   you mean?  The D&K note?

16   Q.   The D&K note, yes.

17   A.   Yes, I remember that.

18   Q.   And --

19   A.   I was -- yeah.

20        MR. MEISTER:  Wait until there's a

21   question.

22   BY MR. GRIVER:

23   Q.   So does it -- is it your position

24   that --

25   A.   I am sorry.  What is TAP?

43

1    D. GENGER - UNCERTIFIED ROUGH DRAFT - 2/7/13

2    BY THE WITNESS:

3    A.   Okay.

4         MR. GRIVER:

5    A.   So what part of 21?

6    Q.   Yes.  But first I will ask you because

7    I don't believe I received an answer to my

8    question, did you review this document before it

9    was submitted in the --

10   A.   I don't remember.

1    D. GENGER - UNCERTIFIED ROUGH DRAFT - 2/7/13

2    Q.   Third amended petition.

3    A.   What?

Q. Third amended petition.

A. (Reading document).

Q.

A. Okay. I read it

Q. Are you taking the position that you could not tell Orly Genger about the notice of default of the D&K note which was dated August 31, 2008, because you had been instructed by Surrogate Roth to take no action?

A. Actually, yes. I remember that I was -- I was notified that I shouldn't do anything because Orly asked from the judge that I shouldn't take any action.

Q. And so because of Surrogate Roth's order you took no auction --

A. I don't remember it because of this or because of that. But I knew that I couldn't take any action. I don't remember.

Q. You couldn't take any action of Surrogate Roth's order?

A. It says so.

Q. I know that's -- I know that's what

Mr. Meister's claims. I am asking you as trustee, did you believe that Surrogate Roth order required to you to take no action?

A. Yes. I believe so.

Q. No. Let me finish.

So Surrogate Roth's order required to you to take no action of any kind as --

A. I was not allowed --

Q. -- as trustee?

A. Yeah.

Q. You were not allowed?

A. Yeah.

Q. You couldn't even call your daughter and tell her because of that, is that your position because Surrogate Roth told you to take no action to harm the sales of the trust?

MR. MEISTER: Objection. Mischaracterizes what Surrogate Roth said.

A. So what's the question?

Q. Well, I will rephrase it.

So what was your understanding of Surrogate Roth's impact on your ability to act?

A. That I don't have an ability to act.

Q. In any way?

A. If she said not to act, so I would say in any way. She didn't say in any way, but I assumed that that's what she meant. Otherwise she would specify in which way I can take an action.

Q. Okay.

A. I would assume.

Q. I am not asking you to assume, Ms. Genger.

A. I am not a lawyer. I don't know the way these things are written.

Q. But as trustee, what was -- I'm asking simply what your understanding was as trustee?

A. That I shouldn't take any action.

Q. And your understanding, did that prevent you from even calling up your daughter and letting her know about the sale?

A. Yeah.

Q. So your understanding is that Justice Roth's order even prevented you letting people knowing about a sale? It was that broad, correct?

A. I was instructed not to take any action, and that's what I did. I didn't take any

action.

Q. And what was the basis for your understanding, that you could take no action?

47

5   A.   What's the basis?  Because the judge

6   said so.

7   Q.   Okay.  Any other basis?

8   A.   Maybe, but I don't remember at the

9   moment.

10   Q.   Did you discuss -- strike that.

11   Did you discuss Justice Roth's --

12   excuse me.

13   Did you discuss Surrogate Roth's order

14   with Sagi?

15   A.   No.

16   Q.   Now, Justice Roth issued the order we

17   have been discussing where you were not to take

18   any actions to effect the trust assets in March

19   of 2008.  Do you recall that?

20   A.   Is this regarding to the trump group?

21   Q.   No.  This is in -- the trump group --

22   this is regarding to you --

23   A.   Yes.

24   Q.   -- not taking any action as trustee

25   because at the time Orly was seeking to remove

1   D  GENGER - UNCERTIFIED ROUGH DRAFT - 2/7/13

2   you as trustee because she did not believe that

3   you --

4   A.   Okay.  The fraudulent and so and so

5   forth?

6   Q.   No, just that you were you would not be

7   a good trustee.  Just that you would not --

8   Ms. Genger.

9   MR. MEISTER:   Don't make jokes,

10   Mrs. Genger.  This is anything you say on the

11   record --

12   MR. GRIVER:   I don't think she was

13   joking.

14   MR. GRIVER:

15   Q.   Ms. Genger, were you joking?

16   A.   Of course I was joking.  Would I say

17   about myself that I am --

18   Q.   Ms. --

19   A.   -- fraudulent?

20   Q.   Then I ask you just simply answer the

21   question --

22   A.   Okay.  What is the question?

23   Q.   -- because you are under oath.

24   Do you recall that Surrogate Roth's

25   direction that no actions were to be taken by you

48

1   D  GENGER - UNCERTIFIED ROUGH DRAFT - 2/7/13

2   in reference to the trust assets, that that order

3   was issued on or about March 4 of 2008, do you

4   recall that?

5   A.   I recall that it was something like

6   that, but the date, I am not sure about.

7   Q.   I will represent to you it was March 4,

8   2008, and it lasted until January 1 of 2009.

9   A.   Okay.

10   Q.   So during that time, you were not

11   allowed to take any actions whatsoever, correct?

12   A.   Okay.

13   Q.   Did she answer?

14   Court reporter:  She said okay.

15   MR. GRIVER:   Okay.  Let's have this

16   marked as 17.

17   (Dalia Exhibit /*, marked.)

18   BY MR. GRIVER:

19   Q.   Is that your signature, Ms. Genger?

20   A.   All right.  Yes.  But I have to

21   familiarize myself because you know, I am not --

22   Q.   Go ahead and do that.  But is that your

23   signature on Exhibit 17?

24   A.   Yes.  I know, I know.  I said, I know.

25   But I have now to --

49

1   D  GENGER - UNCERTIFIED ROUGH DRAFT - 2/7/13

2   Q.   Now that you have identified you as

3   having signed this document, go ahead and read

4   it.

5   A.   Yes.  Now I am reading it.  And I am

6   trying to see to what we are talking here about.

7   Amending something.

8   Q.   Okay.  For the --

9   A.   Paragraph 32, what is paragraph 32.

10   Q.   Ms. Genger, you can read it.  If you

11   look at Exhibit 9 of your Exhibit 9, that's the

12   D&K restated and amended partnership agreement

13   A.   Okay.  I am just -- okay.

14       MR. MEISTER:  Everything you say

15   including, I am turning to this, the reporter has

16   to write down.

17       THE WITNESS:  She has to write it down

18   I'm sorry.

19       MR. MEISTER:  So don't say anything

20   except when Mr. Griver asks you a question and

21   then you answer.

22       THE WITNESS:  Okay.  I'm fine.  Okay.

23   BY MR. GRIVER:

24   Q.   For the record, Exhibit 17 is an

25   amendment on or about August 22, 2008, to the

50

---

20   get it.  That's why I am talking.

21       MR. MEISTER:  But don't talk -- if you

22   wait for the question, and then when the question

23   is over and you can answer.

24   BY MR. GRIVER:

25   Q.   Ms. Genger, who drafted this amendment?

51

---

1   D. GENGER - UNCERTIFIED ROUGH DRAFT - 2/7/13

2   A.   I wouldn't know.

3   Q.   Did Sagi Genger draft this amendment?

4   A.   When I say I wouldn't know, it includes

5   Sagi, other lawyers, I wouldn't know.  Somebody

6   drafted it.  I didn't draft it.

7   Q.   Did you have --

8   A.   I did not draft it.

9   Q.   Do you recall anything related to your

10   signing of this amendment?

11   A.   I have to refresh my memory.  I don't

12   remember.

---

1   D. GENGER - UNCERTIFIED ROUGH DRAFT - 2/7/13

2   amended and restated limited partnership

3   agreement of D&K limited partnership

4   A.   Paragraph 22?  With authority of

5   general partners, this is what you mean?  Page

6   11.

7   Q   Yeah.

8   A.   What is it?

9   Q.   Ms. Genger, this is an amendment to the

10   D&K limited partnership agreement, to which the

11   Orly Genger Trust was a partner.  And this is a

12   change that took place in August of 2008 --

13   A.   Yeah.

14   Q.   -- during the time of Surrogate Roth's

15   order.

16   A.   Order that what, that I shouldn't --

17       MR. MEISTER:  Just wait for the

18   question.

19       THE WITNESS:  I don't -- no.  I don't

---

13   Q   Well, I have given you an opportunity

14   to read the amendment.  Does that refresh your

15   recollection as to the circumstances?

16   A.   I need time to read it.

17   Q   Take it.

18   A.   Okay.  (Witness reading document)

19       MR. GRIVER:  Let me have this marked as

20   18 while we're waiting.

21       (Dalia Exhibit /*, marked.)

22       MR. MEISTER:  As far as the I know, the

23   only question is, have you signed Exhibit 17, and

24   you answered that, or he asked you if that's your

25   signature.

52

---

1   D. GENGER - UNCERTIFIED ROUGH DRAFT - 2/7/13

2   A.   What is the question?

3   BY MR. GRIVER:

4   Q.   Do you recall the circumstances of you

5   signing this amendment?

6    A.   The circumstances?  You mean about what

7    was it, you mean?

8    Q.   About what was it, when you signed it,

9    who was there when you signed it, anything?

10   A.   I want to make sure that I am looking

11   at the right paragraph, because it says paragraph

12   22, is corrected to read so and so, right.

13        So paragraph 22 --

14   Q.   Amended?

15   A.   Right.  And it is in page 11, right?

16   Is what you mean?  I want to make sure we are

17   looking at the same document.

18   Q.   Page 11 through 12.

19   A.   Okay.  I am just trying to find the

20   exact -- the correcting number here, right?  The

21   number of shares, I am trying to see what it is,

22   and it is probably something that I was --

23   Q.   If you look at the end of 22-A the very

24   first line very last thing is --

25   A.   22.

                        53

---

1    D. GENGER - UNCERTIFIED ROUGH DRAFT - 2/7/13

2    Q.   Very last thing is 102.80.

3    A.   22-A okay.  Okay.  So there is a

4    correction to the percentage, I guess.

5    Q.   Okay.

6    A.   Because here it says percentage, and

7    here it says shares.

8    Q.   There's also a relaxation, saying

9    termination or termination of restrictions,

10   right, language was added at the end, do you see

11   that, in the amendment?

12   A.   At the end --

13   Q.   If you look at Exhibit 17, you will see

14   that additional language was added at its end.

15   Do you see that?

16   A.   Certain restriction might be relaxed.

17   Okay.

18   Q.   Do you recall -- do you have any

19   recollection of the circumstances of the signing

---

20   of this amendment?

21   A.   No, I don't remember that.

22   Q.   Okay.  Was this change in the

23   amendment, was this your idea or somebody else's

24   idea?

25   A.   I'm sorry, I didn't understand.

                        54

---

1    D. GENGER - UNCERTIFIED ROUGH DRAFT - 2/7/13

2    Q.   This amendment that's been marked as

3    Exhibit 17, was this your idea or somebody else's

4    idea?

5    A.   Idea, you said, you mean?

6    Q.   Yes.

7    A.   I don't know whose idea it was.

8    Q.   You don't even remember if it was your

9    idea, is that your testimony?

10   A.   I don't remember whose idea it was,

11   that's what I am saying.

12   Q.   Was it your idea?

---

13   A.   I said I don't remember so I -- it

14   might be mine, it might be somebody else  I

15   don't remember.

16   Q.   So at the time when you were -- at the

17   time that you were instructed by Surrogate Roth

18   not to take any action, it could have been your

19   idea to amend the D&K agreement?

20   A.   I said I don't remember.  I didn't say

21   that I did.

22   Q.   So it would have been?

23   A.   I said I don't remember.

24   Q.   So it is a possibility correct?

25   A.   If they want to hang on possibilities,

                        55

---

1    D. GENGER - UNCERTIFIED ROUGH DRAFT - 2/7/13

2    hang on possibilities --

3        MR. MEISTER:  Objection calls for

4    hypothetical.

5        THE WITNESS:  Hypothetical.

6   Q.   If you can't remember whether or not it
7   was your idea, then it is possible it is your
8   idea, correct?
9       MR. MEISTER:  Stop badgering the
10   witness.  She said she doesn't matter.
11       Excuse me.  Dalia.  Dalia.  Let me get
12   my objection on the record.
13       She said she answered your question.
14   Don't ask her hypothetical questions.  Let's not
15   have to get the judge on the phone again.
16       MR. GRIVER:  Every time we get the
17   judge on the phone, it goes against you.
18       MR. MEISTER:  It don't go against me
19   Yoav
20   BY MR. GRIVER:
21   Q.   You don't remember if this was your
22   idea or not, correct?
23   A.   I do not remember if it was my idea,
24   and that's my answer.
25   Q.   Okay.  It could have been your idea, it
                    56

21   Q.   Okay.  Ms. Genger, how would it be in
22   the Orly Genger Trust's best interests to add the
23   language at the end that provided that the
24   restrictions of paragraph 22 of the D&K amended
25   and restated agreement could be relaxed or
                    57

1   D. GENGER - UNCERTIFIED ROUGH DRAFT - 2/7/13
2   terminated with the consent of the general
3   partner, which is Sagi Genger and TRI associates
4   Inc., where Sagi Genger was the CEO at the time?
5   A.   I don't remember.
6       MR. MEISTER:  Objection.
7   Mischaracterization.
8   A.   I told you I don't remember.  That I
9   made this correction.  So how can I answer this
10   question now.
11   BY MR. GRIVER:
12   Q.   At the time that you signed this --
13   well, strike that.

1   D. GENGER - UNCERTIFIED ROUGH DRAFT - 2/7/13
2   could have been Rochelle Fang's idea, it could
3   have been Sagi Genger's idea, correct?
4   A.   Or my lawyer's idea.
5   Q.   And who was your lawyer at the time?
6   A.   Indicating.  Sitting next to me.
7       MR. MEISTER:  No.  Objection.
8   BY MR. GRIVER:
9   Q.   Mr. Kortmansky?
10   A.   Either -- Kortmansky, okay.  So just
11   show you how much I remember.
12   Q.   And this was an amendment that you
13   signed as trustee of the Orly Genger Trust,
14   correct?
15       MR. MEISTER:  Objection.  Asked and
16   answered.
17   BY MR. GRIVER:
18   Q.
19   A.   Yes, you said that's when I was not
20   supposed to.  So I guess I was --

14       Ms. Genger, you are the trustee of the
15   trust now.  Okay?
16   A.   Right.
17   Q.   You are still charged with protecting
18   the trust.  So I am asking you --
19   A.   I am charged?
20   Q.   With protecting the trust.  It is your
21   responsibility to protect the trust, correct?
22   A.   Yeah.
23   Q.   So --
24   A.   It is my privilege.
25   Q.   As trustee of the trust, what possible
                    58

1   D. GENGER - UNCERTIFIED ROUGH DRAFT - 2/7/13
2   best interest could there be for the Orly Genger
3   trust for those restrictions to be relaxed or
4   terminated in a way set forth in the amendment?
5       MR. MEISTER:  Objection.
6   BY THE WITNESS:

7    A.   At the time, I am sure I had my

8   reasons, but now I don't remember what they were.

9   BY MR. GRIVER:

10   Q.   Okay.  As trust of the trust, on what

11   basis, as we sit here today, could you possibly

12   think?

13   A.   As I sit here today, I don't know what

14   I was thinking then.

15   Q.   Okay.  At the time that you signed this

16   amendment, had you received a copy of the amended

17   and restated limited partnership agreement that

18   was being amended?

19   A.   I don't remember

20   Q.   Had you read it?

21   A.   I don't remember.

22   Q.   Do you recall whether or not you

23   provided this amendment to an attorney to review,

24   before you signed it?

25   A.   I don't remember.

                         59

---

1   D. GENGER - UNCERTIFIED ROUGH DRAFT - 2/7/13

2    Q.   Okay.  Did Sagi Genger just give you

3   this document and ask you to sign it?

4    A.   I didn't say that Sagi Genger gave me

5   the document.  Why you putting words in my mouth?

6    Q.   You don't remember how it came to be

7   given to you for signature?

8    A.   No, I don't remember.

9    Q.   All right.  At any time did you let the

10   surrogate court know about this amendment had been

11   made to the D&K amended and restated limited

12   partnership agreement?

13   A.   I don't remember.

14   Q.   Okay.  At anytime while -- let me ask

15   you, as you sit here today, should you have -- I

16   will represent to you that there's nothing in the

17   files that indicate that you did.

18      As we sit here today do you believe

19   that you should have let the surrogate court know

20   about this amendment?

---

21   MR. MEISTER:  Objection.  Calls --

22   first of all, objection to form.  Secondly, it

23   calls for a legal conclusion, and it has nothing

24   whatsoever to do with this case.

25   BY THE WITNESS:

                         60

---

1   D. GENGER - UNCERTIFIED ROUGH DRAFT - 2/7/13

2    A.   I repeat what he is saying.

3   BY MR. GRIVER

4    Q.   Okay.  And as trustee do you think you

5   should have apprised Surrogate Roth about this

6   amendment?  Yes or no?

7    A.   I don't have any idea if I should or

8   shouldn't at the time.

9    Q.   Okay.  As we sit here today, do you

10   think it would have been appropriate for you to

11   do so?

12   A.   I don't remember what was it about.  So

13   I can't tell you what I thought -- who should

---

14   have done.

15   Q.   Let me show you what's been marked as

16   Exhibit 18.

17      (Daha Exhibit /*, marked )

18   BY MR. GRIVER:

19   Q.   Ms. Genger this is another document for

20   the record, called amendment to the amended and

21   restated limited partnership agreement of D&K

22   limited partnership.

23      It is dated as of November 2008.

24   A.   November?  November 22.  Yes.  So what

25   is the question?

                         61

---

1   D. GENGER - UNCERTIFIED ROUGH DRAFT - 2/7/13

2    Q.   Is that your signature on the second

3   page?

4    A.   I didn't say it was my signature here.

5    Q.   Did you ever give anyone permission to

6   sign on your behalf this document?

7  A.  I don't see my name here, so.

8  Q.  Well, at the -- in November of 2008,

9  you were trustee of the trust, correct?

10  A.  In November 2008, I was the trustee of

11  the trust.  Right.

12  Q.  Okay.  Do you recognize the signature

13  directly on top of yours?

14  MR. MEISTER:  Objection.  There is no

15  signature of hers.

16  BY MR. GRIVER:

17  Q.  Directly on top of -- do you see the

18  signature?

19  A.  It doesn't spell my name anywhere so

20  why should I sign?

21  Q.  Did you see the signature for the 1993

22  Sagi Genger trust, do you recognize --

23  A.  No.

24  Q.  Do you recognize the second for D&K

25  LLP?

62

---

1  D. GENGER - UNCERTIFIED ROUGH DRAFT - 2/7/13

2  A.  I don't recall Orly signature here  I

3  don't see if it is a line.

4  Q.  Do you recognize Sagi Genger's

5  signature?

6  A.  On the top I do.

7  Q.  But as we sit here today, you don't

8  believe that's your signature on behalf of the

9  1993 Orly Genger Trust?

10  A.  No.

11  Q.  And as we sit here today you don't

12  recall ever giving anyone permission to sign on

13  your behalf this document that's been marked?

14  A.  I know that my son has some rights to

15  sign, but no, I don't think in this case.

16  Q.  Well, that's not the question.

17  A.  Not as a trustee for sure

18  Q.  My question is, did you give anyone

19  permission to sign?

20  A.  No.

21  Q.  On your behalf, this document that's

---

22  been marked as Exhibit 18?

23  A.  No.  No.

24  Q.  Okay.  Now, I note that you -- that I

25  note that this document was produced by you, it

63

---

1  D. GENGER - UNCERTIFIED ROUGH DRAFT - 2/7/13

2  has Bates stamps, DG 146 and 147.

3  A.  Where is this document?

4  MR. MEISTER:  Wait for a question.

5  BY MR. GRIVER:

6  Q.  Do you see those exhibits, those Bates

7  numbers?

8  A.  I don't know who put the stamps on

9  Q.  No, no.  Look at the bottom.  It says

10  DG 146 and 147?

11  MR. MEISTER:  If the question is, does

12  this document have DG 146 and 147, I will

13  stipulate it does.

14  Q.  And that means, Ms. Genger, that this

---

15  was produced by you in this litigation?

16  A.  That's what you said.  I don't know if

17  it is true.

18  MR. MEISTER:  It means it was produced

19  by her including her counsel, as to anything she

20  or her counsel had in their possession

21  MR. GRIVER:  Okay.

22  BY MR. GRIVER:

23  Q.  Ms. Genger?

24  A.  What?  Something happened?

25  MR. MEISTER:  That's the way you

64

---

1  D. GENGER - UNCERTIFIED ROUGH DRAFT - 2/7/13

2  requested the draft for production.

3  Q.  Ms. Genger?

4  A.  I don't understand.

5  Q.  Ms. Genger, when did you receive this

6  document?

7  A.  I don't remember.

8     Q.   Did you ever -- did you ever seek to
9   understand why someone was purporting to sign on
10   behalf of the 1993 Orly Genger Trust when it was
11   not your signature on this document?
12     A.   No.  Because I don't remember when I
13   got it, and when I saw it, and when I read it.
14     Q.   I am not asking when  I am asking do
15   you recall ever doing anything to understand who
16   signed --
17     A.   No, I don't recall.
18     Q.   Okay.  Do you recall any effort by you
19   to understand the meaning and effect of this
20   document?
21     A.   No, I don't recall.
22     Q.   How would this amendment be in the best
23   interest of the Orly Genger Trust?
24     MR. MEISTER:  This amendment, that she
25   didn't sign, that she doesn't remember ever
                              65

1     D. GENGER - UNCERTIFIED ROUGH DRAFT - 2/7/13
2   seeing before?  No.  No.
3     MR. GRIVER:  It came from --
4     MR. MEISTER:  Objection.
5     MR. GRIVER:  It came from her
6   possession or from --
7     MR. MEISTER:  It didn't come from her,
8   it came from her or her counsel because that's
9   the way you drafted your --
10     MR. GRIVER:
11     Q.   Ms. Genger, did it come from your
12   possession?
13     A.   I am saying you are harassing me, you
14   know that
15     Q.   No, I am asking you --
16     A.   You are harassing me.
17     Q.   Ms. Genger, you are trustee?
18     A.   I know that I am trustee, and I am
19   doing the best that I can.
20     Q.   Okay.  As trustee --
21     A.   In order to protect my child okay.

22     MR. MEISTER:  Dalia, wait.
23     A.   Thanks to you.
24     MR. MEISTER:  Please don't make
25   speeches  Wait for his question.  Listen to the
                              66

1     D. GENGER - UNCERTIFIED ROUGH DRAFT - 2/7/13
2   question.  If you can answer it, answer it
3   BY MR. GRIVER:
4     Q.   How does Exhibit 18 protect your child?
5     A.   I don't know.
6     Q.   Okay.  Did you ever task anyone with
7   investigating who purported sign on behalf of
8   Orly Genger Trust?
9     A.   I don't remember.
10     Q.   Did you ever --
11     A.   I don't remember  If I ever
12     Q.   Did you ever task anyone with
13   attempting understand the effect of --
14     A.   I don't remember --

15     Q.   -- this amendment?
16     A.   -- if I ever did this
17     Q.   Did you ever attempt to determine why
18   these changes were being made?
19     A.   I don't remember if I ever did.
20     Q.   Ms. Genger, if you look at Exhibit 9, I
21   will make this very simple.
22     A.   You promise?
23     Q.   I am only going to try.
24     MR. MEISTER:  Dalia, please don't do
25   this.
                              67

1     D. GENGER - UNCERTIFIED ROUGH DRAFT - 2/7/13
2   BY MR. GRIVER:
3     Q.   To your knowledge, was Exhibit 9 ever
4   altered, amended, changed, revised, fixed,
5   superceded, in any way by you?
6     A.   I don't remember.
7     MR. MEISTER:  Objection.

8  BY MR. GRIVER:

9  Q.  Okay. Are there any other alterations,

10  amendments, changes, revisions, fixes, or

11  supersessions of Exhibit 9 other than the one we

12  have discussed today?

13      MR. MEISTER: Objection to the form the

14  question

15  A.  I don't remember anyway.

16  Q.  If there were other changes to Exhibit

17  9, would they not be in your possession as

18  trustee?

19  A.  I don't remember if I have it or don't

20  have it.

21  Q.  Do you keep files as trustee?

22  A.  I do have some files. Yes.

23  Q.  Did you produce all of those files to

24  your counsel for review and production?

25  A.  Yes.

                    68

1  D. GENGER - UNCERTIFIED ROUGH DRAFT - 2/7/13

2  Q.  In November of 2008, who was your

3  counsel?

4  A.  I believe it was -- 2008?

5  Q.  Uh-huh.

6      MR. MEISTER: You told her before it

7  was Mr. Kortmansky. She says she didn't remember

8  and you told her it was --

9  A.  I said I don't remember, even for

10  something that happened five minutes ago.

11  Q.  And it was Mr. Kortmansky?

12  A.  I guess if you tell me so.

13  Q.  Ms. Genger, I am asking you, do you

14  have any recollection as to who your attorney was

15  in November of 2008?

16  A.  I recall what you told me that it was

17  Mr. Kortmansky.

18  Q.  In producing documents in this case,

19  did you go to Mr. Kortmansky and ask him to

20  review his files?

21  A.  I don't remember.

22  Q.  You -- you don't remember seeking that?

23  A.  No. I don't remember.

24  Q.  Do you know if your production includes

25  files from Mr. Kortmansky?

                    69

1  D. GENGER - UNCERTIFIED ROUGH DRAFT - 2/7/13

2  A.  Whatever I had, I gave to my lawyer.

3  Q.  I am not asking for what you have, I am

4  asking did you make sure that Mr. Kortmansky

5  provided documents to Mr. Meister?

6  A.  To Mr. Meister? I believe he did.

7  Q.  And on what do you base that belief?

8  A.  Because he is an honest lawyer who does

9  his job correctly, and that's Mr. Meister

10  received it.

11  Q.  How do you know that Mr. Meister

12  received files from Mr. Kortmansky?

13      MR. MEISTER: That wasn't the question.

14  Your question was did she believe.

15      THE WITNESS: Which I do believe.

16      MR. MEISTER: You are asking whether

17  she knows.

18      THE WITNESS: Yeah. I don't know for

19  fact. I didn't go and check page by page. But I

20  believe that lawyers behave honestly, and this

21  is --

22      MR. MEISTER: Not off the record.

23  Instead of berating the witness, you can ask me

24  simply when I became successor counsel, did I ask

25  Kortmansky for his files, in the firm, and the

                    70

1  D. GENGER - UNCERTIFIED ROUGH DRAFT - 2/7/13

2  answer would be yes. I have an envelope or

3  whatever the thing was that he turned over as his

4  files.

5      THE WITNESS: So why are you asking me

6  these kind of questions? I cannot answer.

7  BY MR. GRIVER:

8  Q.  Did this document mark as Exhibit 8,

9   did this come from your file?

10   A.   You think I see from here.

11   Q.   You have a copy.   This document --

12        MR. MEISTER:   We are back on 18.

13   BY MR. GRIVER:

14   Q.   This document marked as Exhibit 18.

15   Did this -- was this -- did this come from your

16   files or Mr. Kortmansky's files?

17        MR. MEISTER:   Objection.  Form,

18   disjunctive compound.

19   A.   That's the one without the signature?

20   Q.   Well, it came from your files or it

21   came from Mr. Kortmansky's files?

22        MR. MEISTER:   Objection to form.

23   Disjunctive compound.

24   BY THE WITNESS:

25   A.   I don't remember.

                    71

1    D. GENGER - UNCERTIFIED ROUGH DRAFT - 2/7/13

23   Q.   Ms. Genger, when you signed the

24   amendment to the D&K limited partnership

25   agreement marked as Exhibit 17, were you aware

                    72

1    D. GENGER - UNCERTIFIED ROUGH DRAFT - 2/7/13

2    that TPR had entered into a side letter agreement

3    with the Trump Group as to the sale of the Orly

4    Genger Trust shares of TRI?

5    A.   A side letter agreement?

6    Q.   Uh-huh.

7         MR. MEISTER:   Read the question back,

8    please.

9    A.   Yeah.   I am not so sure.

10        MR. MEISTER:   Listen to the question.

11        (Read back).

12   BY THE WITNESS:

13   A.   I have nothing to do with the TPR, so I

14   they didn't notify me.   I am not aware.   I was

15   not aware.

2         MR. GRIVER:

3    Q.   You don't remember this came from your

4    files?

5    A.   I don't remember from which file it

6    came.

7    Q.   Okay.   You don't remember this came

8    from Mr. Kortmansky's files, correct?

9    A.   What I said, I don't remember, from

10   which, I mean also from Kortmansky.

11   Q.   In producing documents in this case --

12   A.   Yeah.

13   Q.   -- other than yourself and

14   Mr. Kortmansky and Mr. Meister's files, was there

15   any other places that you went to in order to

16   produce documents in this case?

17   A.   I don't think so.

18        MR. GRIVER:   Before we go -- take a

19   two-minute break.

20        (WHEREUPON, a recess was had.)

21        1206 to 1218

22        MR. GRIVER:

16   BY MR. GRIVER:

17   Q.   Okay.   Did you seek to ascertain why

18   this document was presented to you as of August

19   22, 2008?

20   A.   Can you ask these question again.

21   Q.   Sure.

22        Did you seek to ascertain why this

23   document was presented to you as of August 22,

24   2008?

25   A.   I did not seek to ascertain why.

                    73

1    D. GENGER - UNCERTIFIED ROUGH DRAFT - 2/7/13

2    Q.   Ms. Genger, if you can please look at

3    what's been previously marked as Exhibit 15

4    Ms. Genger, do you recall when you found out

5    about the August 2008 TPR TI transactions?

6         MR. MEISTER:   Can I have that read back

7    please.

8    A.   It is hard for me to -- all these

9    names.

10    Q.  Okay.  Just listen to the question,

11    Ms. Genger, and if you don't understand the

12    question, I will be happy to rephrase it.

13    A.  Everything, and I don't -- I am getting

14    confused.

15    Q.  If you are confused, you don't

16    understand the question, as I instructed you

17    before, I will be happy to repeat it until you do

18    understand.

19    A.  Okay.  So ask me, please.

20    BY MR. GRIVER:

21    Q.  I will ask it again.

22        When did you find out about the August

23    2008 TPR TI transaction?

24    A.  2008?

25    Q.  August 2008, TPR TI transactions with

74

1    D. GENGER - UNCERTIFIED ROUGH DRAFT - 2/7/13

24    it as they were taking place?

25        MR. MEISTER:  Objection.

75

1    D. GENGER - UNCERTIFIED ROUGH DRAFT - 2/7/13

2    A.  I may or may not.  I said I don't

3    remember.

4    BY MR. GRIVER:

5    Q.  Can you think of anything that would

6    refresh your recollection as to when you did find

7    out about those transactions?

8    A.  No.

9    Q.  Look at Exhibit 15, please.

10    A.  Okay.  Yes, if you want me -- I have to

11    read it carefully because, and this is

12    completely -- I can't read it.  I mean, this is

13    the same here?  The two pages are the same as --

14    Q.  We have discussed some of it in your

15    prior deposition.

16    A.  Yeah.  Is this -- these two pages are

2    the Trump Group?

3    A.  You are talking about something else

4    about 2008.

5    Q.  Ms. Genger, there were transactions

6    involving the TPR and TRI shares with the Trump

7    Group in August of 2008, involving your son Sagi

8    Genger?

9    A.  Yes.

10    Q.  And TPR and the Sagi trust.

11        My question is when did you find out

12    about these transactions?

13    A.  I can't tell you.  I don't remember.

14    Q.  Did you know about those transactions

15    when they were both happening?

16    A.  I knew there was some transaction

17    between Sagi Genger and the Trump Group, but I

18    don't remember the date.

19    Q.  Okay.  When you found out about it,

20    were the transactions taking place or had they

21    already taken place?

22    A.  I don't remember.

23    Q.  So it is -- so you may have known about

17    the same?  One and two?

18    Q.  1 and 2 and then there's --

19    A.  I know.  But these are two pages are

20    the same because this one I cannot read.  And

21    this one is --

22    Q.  Oh, is it -- it is the same document

23    with different signatures, right?

24    A.  Different signature.  Okay.

25    Q.  Signatures are a little better?

76

1    D. GENGER - UNCERTIFIED ROUGH DRAFT - 2/7/13

2    A.  Okay.  Okay.  So what is the question

3    now?

4    Q.  My question to you is, was this an

5    actual physical meeting?

6    A.  You mean, if it was at the firm

7    physically

8    Q.  Yes.

9    A.  I would say physically.

10    Q.    And who was at the meeting?

11    A.    First of all, I'm not -- I don't see

12    my -- the trust. Yeah. I see here, yes. Sagi

13    Genger.

14          MR. MEISTER: Can you read back the

15    question please.

16    A.    The question again.

17          (WHEREUPON, the record was read by

18          the reporter as requested.)

19    A.    Who was at the meeting? Whoever signed

20    it, per the document.

21    Q.    Okay.

22    A.    Which is me.

23    Q.    Okay.

24    A.    Okay. Which is Sagi, and document --

25    okay. I would say TPR Investment Associates

                          77

1     D. GENGER - UNCERTIFIED ROUGH DRAFT - 2/7/13

2     Inc., I cannot recall who this person was because

24          MR. MEISTER: Objection. Move to

25    strike because she --

                          78

1     D. GENGER - UNCERTIFIED ROUGH DRAFT - 2/7/13

2     BY MR. GRIVER:

3     Q.    Are you speculating?

4     A.    I am speculating.

5     Q.    I am asking you please not to

6     speculate.

7     A.    Yeah. No, I am assuming, that's why I

8     am saying.

9     Q.    I am asking you --

10    A.    So I don't know then.

11    Q.    You should --

12    A.    I don't remember.

13    Q.    You don't remember bringing a lawyer to

14    the meeting?

15    A.    I don't remember, yeah. That's why I

16    said I assume because usually I would.

3     it is hard also to read.

4     Q.    Could it also have been Sagi in his

5     capacity?

6          MR. MEISTER: Objection. Hypothetical.

7     A.    It could. I mean, but I don't know.

8     BY MR. GRIVER:

9     Q.    All right.

10    A.    I really don't know

11    Q.    And who represented the Sagi Genger

12    trust?

13    A.    Rochelle. Probably at the time, I

14    would think.

15    Q.    Were there any lawyers there?

16    A.    Lawyers?

17    Q.    Yes.

18    A.    I don't remember.

19    Q.    Did you bring a lawyer to the meeting?

20    A.    Again, I am sorry?

21    Q.    Did you bring a lawyer to the meeting?

22    A.    I would assume, yes, because I wouldn't

23    sign anything without a lawyer.

17    Q.    Now, we have discussed in your prior

18    deposition day what efforts you did or did not

19    make between the signing of this meeting and the

20    UCC sale. And we also discussed, if you recall,

21    that you wanted the 30 days to try and convince

22    Sagi not to sue his sister?

23    A.    Right.

24    Q.    Correct?

25    A.    I mean --

                          79

1     D. GENGER - UNCERTIFIED ROUGH DRAFT - 2/7/13

2          MR. MEISTER: There's no question.

3     Wait.

4     A.    For the trust. I am correcting him.

5     The trust.

6          MR. MEISTER: Dalia, wait for the

7     question.

8          THE WITNESS: Okay.

9     Q.    So you wanted to spend 30 days to

10 convince Sagi not to sue the Orly Genger Trust?

11    A. I was hoping that that's what I will

12 going to achieve.

13    Q. And it was a standstill for 30 days,

14 correct?

15    A. It was stand still until today.

16    Q. No, but the meeting agreement provided

17 for --

18    A. 30 days.

19    Q. Okay. Did TPR actually wait for 30

20 days?

21    A. To not to sue?

22    Q. Not to enforce the note, if you look

23 at --

24    A. Not to sue Orly's trust.

25    Q. Look at Exhibit -- look at paragraph 8

<div align="center">80</div>

1   D. GENGER - UNCERTIFIED ROUGH DRAFT - 2/7/13

2 of Exhibit 15.

---

3    A. TPR investments -- agreed to refrain

4 from enforcing the note against each limited

5 partner for 30 days (reading from exhibit).

6    Q. Now the two limited partners were the

7 Orly Genger and 1993 trust and the Sagi Genger

8 1993 trust, correct?

9    A. Okay. Yes.

10    Q. Did TPR refrain from enforcing the note

11 against the Orly Genger Trust for 30 days?

12    A. Yes.

13    Q. And on what do you base that answer?

14    A. Because they didn't enforce the note.

15    Q. Well --

16    A. As far as I know.

17    Q. Okay. At the time that you signed

18 this, did you check to see whether there was an

19 actual risk of enforcement of the note against

20 the Sagi Genger trust?

21      MR. MEISTER: Objection.

22    A. It is not my business.

23      MR. MEISTER: To form.

24 BY THE WITNESS:

---

25    A. I am Orly's trustee, I am not Sagi's

<div align="center">81</div>

1   D. GENGER - UNCERTIFIED ROUGH DRAFT - 2/7/13

2 trust trustee. I am not trustee of Sagi's trust.

3 My concern is for Orly trust.

4    Q. Okay. And as trustee you made sure

5 that TPR abided by its agreement not to enforce

6 the note for 30 days, correct?

7      MR. MEISTER: Objection.

8 Mischaracterizes.

9      MR. GRIVER: Well, let me --

10      MR. MEISTER: No, you are not going to

11 play that game.

12      MR. GRIVER: As trustee --

13      MR. GRIVER:

14    Q. As trustee --

15    A. Why are you harassing me? Why are you

16 doing this? We want to finish. I mean -- I told

17 you, he did not enforce. He did not enforce

---

18 the -- he did not enforce the note on Orly's

19 trust.

20    Q. Never?

21    A. Not in this 30 days.

22    Q. And you as trustee made sure that that

23 was -- that that happened, correct?

24    A. That that did happen.

25    Q. That the 30 days was honored by TPR?

<div align="center">82</div>

1   D. GENGER - UNCERTIFIED ROUGH DRAFT - 2/7/13

2    A. Right.

3    Q. .

4      (Dalia Exhibit /*, marked.)

5      MR. GRIVER: For the record, what's

6 been marked as Exhibit 19 is a memo from Sagi

7 Genger to David Parnes cc D&K GP and dated August

8 2, 2006.

9      MR. GRIVER:

10    Q. Ms. Genger, do you recall seeing this

11  memo before?

12      MR. MEISTER:  Before her preparation

13  for this?

14  BY MR. GRIVER:

15      Q.  At anytime?

16      A.  I saw it today.  I saw it today

17  actually.

18      Q.  You saw it today.

19          Did you see it two days ago in your

20  preparation for --

21      A.  No.  I saw it today actually.

22      Q.  Is is that the first time you recall

23  seeing this document?

24      A.  Yes.

25      Q.  Okay.  As far as you recall you did not

                        83

1   D. GENGER - UNCERTIFIED ROUGH DRAFT - 2/7/13

2   actually receive this memorandum; is that

3   correct?

4       A.  I don't remember if I received this.

5       Q.  Okay.

6       A.  But today I did see it.

7       Q.  Okay.  You saw this -- you saw this

8   particular document before we began this

9   deposition?

10      A.  Yeah.  I didn't read it, but I saw it

11  today, and I noted to my lawyer that this -- that

12  this paper I didn't see before.

13      Q.  So if you look at paragraph 4, it says,

14  D&K LP and its partners have a variety of claims

15  against TPR and deny the enforceability of the

16  note.

17          And this is a memorandum that's signed

18  by Sagi, both as on behalf of D&K LP and behalf

19  of TPR investments?

20      A.  It says.

21      Q.  Okay.  So this is Mr. Sagi on behalf of

22  D&K and TPR stating to Mr. Parnes that D&K LP

23  have a variety of claims against TPR and deny the

24  enforceability of the note, correct?

25      MR. MEISTER:  Asking her to construe a

                        84

1   D. GENGER - UNCERTIFIED ROUGH DRAFT - 2/7/13

2   document which isn't hers, and you are

3   mischaracterizing what this states.

4       MR. GRIVER:  Well, she can certainly --

5       MR. MEISTER:  Objection as to form.

6   Come on, your cant can't be that weak that you

7   have to resort to trickery.

8       MR. GRIVER:  You know, my case is very

9   strong, and I think that these two days of

10  depositions have demonstrated that.

11          We will move on.

12      MR. MEISTER:  We don't --

13      MR. GRIVER:  I am going to ask you the

14  question again.

15  BY MR. GRIVER:

16      Q.  And ignore Mr. Meister for the rest of

17  this deposition.

18      A.  What?

19      Q.  Okay.  The when --

20      A.  What do did you say?  To ignore my

21  lawyer?

22      Q.  When Sagi stated that D&K denies

23  enforceability of the note in paragraph 4 of this

24  memorandum, do you know why he was denying the

25  enforceability of the note?

                        85

1   D. GENGER - UNCERTIFIED ROUGH DRAFT - 2/7/13

2       A.  No. I have no idea.  Because I have

3   seen this like -- I told you.  I saw it today

4   before I saw it.

5       MR. MEISTER:  Just answer the question.

6       A.  I don't know what Sagi was thinking.

7       Q.  Okay.  When you were trying to

8   determine whether or not to -- strike that.

9           Was there ever a time when you were

10  tried to determine whether or not you could stop

11   the UCC sale of the D&K note?

12        MR. MEISTER:  Objection.  Asked and

13   answered, not only today but also --

14        MR. GRIVER:  Withdrawn.

15   Q.   You testified there was a time when you

16   explored whether or not you could stop the UCC

17   sale, correct?

18   A.   I was contemplating whether it can be

19   stopped.  But there was no -- I couldn't find any

20   solution to this event from stopping.

21   Q.   Did you speak with Sagi in trying to

22   stop it, in trying to stop the UCC sale, did you

23   speak with Sagi Genger?

24   A.   I don't remember if I spoke with him.

25   Q.   Okay.  In trying to stop --

                          86

---

1    D. GENGER - UNCERTIFIED ROUGH DRAFT - 2/7/13

2    A    At the time.

3    Q.   In trying to stop the sale, did you ask

---

                          87

---

1    D. GENGER - UNCERTIFIED ROUGH DRAFT - 2/7/13

2    for any documents it might have related to the

3    enforceability of the note?

4    A.   I don't remember.

5    Q.   Okay.  Did you ask TPR for any

6    documents it might have related to the

7    enforceability of the note?

8    A.   No, I don't remember.

9    Q.   Did you ask anybody --

10   A.   I don't remember.

11   Q.   Okay.  Well, come on, Ms. Genger, you

12   would remember if you asked somebody for

13   documents?

14        MR. MEISTER:  Don't argue with the

15   witness.

16   A    No, no.

17        MR. MEISTER:  Don't argue with the

18   witness.  You have asked the question, she says

---

4    Mr. Sagi Genger to provide you any documents that

5    might be relevant to the enforceability of the

6    note?

7    A.   I don't remember if I talked to him, so

8    how do I know if I asked him.

9    Q.   Did you seek to collect documents

10   relevant to the enforceability of the note?

11   A.   No, I didn't seek.

12   Q.   Did you -- you did not ask Sagi, for

13   example, to provide you any documents he may have

14   related to the enforceability of the note, isn't

15   that correct?

16   A.   Can you ask me the question, not this

17   one, the one before you asked me, not this one,

18   the one before.

19   Q.   Did you ask Sagi Genger to provide you

20   with documents related to the enforceability of

21   the note so you could determine whether --

22   A.   I said no.  Now you are saying, for

23   example, did you ask this, or, obviously, it is

24   included in the answer that was before.

25   Q.   As a limited partner, did you ask D&K

---

19   she doesn't remember.  Next question.

20   Q.   Do you really not recall whether you

21   asked anybody for documents?

22        MR. MEISTER:  Objection.  Asked and

23   answered.

24   A.   If you said "really," it doesn't

25   change.  When I said I don't remember, I don't

                          88

---

1    D. GENGER - UNCERTIFIED ROUGH DRAFT - 2/7/13

2    remember.  Really or not really.

3    Q.   If you had asked -- if you had asked

4    for documents don't you think you would remember?

5        MR. MEISTER:  Objection.

6    BY THE WITNESS:

7    A.   No, I don't think I would remember.

8    Q.   Do you recall looking through stacks of

9    documents looking for any possibility to prevent

10   the sale of the TPR shares at the UCC sale?

11   A.   Can you repeat.

12   Q.   Read the question?

13   A.   No, not the question   Can you repeat

14   the ten last questions that the lawyer asked me

15   Q.   Ms. Genger --

16   A.   No, because it is the same question so

17   I have to concentrate now.

18   Q.   In paragraph 6 of the memorandum?

19   A.   Of this memorandum that I saw five

20   minutes ago?  Yes

21   Q.   You saw it today this morning?

22   A.   Yes  Before I saw Bob, I saw that

23   Q.   Who showed it to you?

24   A.   It was on the pile of some papers.

25   Q.   Where were these papers?

89

1   D GENGER - UNCERTIFIED ROUGH DRAFT - 2/7/13

2   A.   On his desk.

3   Q.   On Mr. Meister's desk?

4   A.   Yes.  And I said I am not familiar with

90

1   D. GENGER - UNCERTIFIED ROUGH DRAFT - 2/7/13

2   not the easiest case, okay, for a layperson.

3       I am really not familiar with this

4   document, so if you ask me about number 6 or 5 or

5   4, my answer is that I do not understand the

6   circumstances of when this was born, this was

7   created

8   Q.   Okay.  When you became trustee, you

9   knew that the collection of the D&K note was an

10   issue, correct?

11   A.   Yes.

12   Q.   Did you ever seek from D&K or TPR as a

13   result all documents related to the

14   enforceability of the note so you could best

15   protect the trust?

16   A.   We had a settlement agreement

17   Q.   From anytime when you became trustee on

18   or about January 4, 2008?

5   it.

6   Q.   Did you meet with Mr Meister today,

7   did you prepare for your deposition?

8   A.   I came to pick him up to come here.

9   Q.   And it was --

10   A.   It wasn't when we prepared for the

11   deposition

12   Q.   You just saw this document for the

13   first time today?

14   A.   Yes, yes

15   Q.   Okay  Do you have any idea why in

16   paragraph 6 D&K was talking about making a

17   counterclaim against TPR upon any attempt --

18   A.   I can't -- don't talk too fast.  I am

19   getting tired

20   Q.   In paragraph 6 D&K says if collection

21   efforts are made, it could result in D&K making a

22   counterclaim against TPR.  Do you know the basis

23   for --

24   A.   Let me read this  You know, let me

25   read this, okay.  Because you know that that's

91

19   A.   Yeah

20   Q.   -- all the way until the UCC sale in

21   February 2009, did you at any time in that period

22   of time, did you seek to collect documents

23   related to the enforceability of the note so that

24   you could best protect the trust?

25   A.   No.

91

1   D GENGER - UNCERTIFIED ROUGH DRAFT - 2/7/13

2       MR MEISTER:  We are changing to a new

3   line?  Can we take our lunch break now please?

4       MR GRIVER:  Let's go off the record  )

5       (WHEREUPON, the deposition was

6       recessed until TIME/TIME,

7       DATE/DATE ) 12 43 to 1:38

8

9

10

11

D. GENGER - UNCERTIFIED ROUGH DRAFT - 2/7/13

12
13
14
15
16
17
18
19
20
21
22
23
24
25

92

1  D. GENGER - UNCERTIFIED ROUGH DRAFT - 2/7/13
2      MR. GRIVER: On the record.
3  BY MR. GRIVER:
4  Q.  Ms. Genger, directing your attention to
5  Exhibit 13, this is the notice of enforcement.
6  When did you receive -- strike that.
7      Did you ever receive this document?
8  A.  No.
9  Q.  Let me have this --
10 A.  Maybe my lawyer did, but I don't
11 remember.
12 Q.  Did you or your lawyer receive this
13 document before the UCC sale?
14 A.  I personally did not receive it.
15 Q.  Did your lawyer receive this document
16 before the UCC sale?
17 A.  Did you?
18     MR. MEISTER: I wasn't your lawyer
19 then.
20     THE WITNESS: Oh, you weren't? So we
21 have to ask the other lawyer.
22 BY MR. GRIVER:
23 Q.  Okay. In the files of Mr. Kortmansky,
24 was there a copy of this notice in them?
25     MR. MEISTER: There was not.

93

1  D. GENGER - UNCERTIFIED ROUGH DRAFT - 2/7/13
2      MR. GRIVER: Let me have this marked as
3  Exhibit 20.
4      (Dalia Exhibit /*, marked.)
5      MR. GRIVER: For the record, Exhibit 20
6  is an undated memorandum or notice to D&K limited
7  partnership from TPR Investment Associates Inc.,
8  informing D&K of the UCC sale.
9      THE WITNESS: So TPR --
10     MR. MEISTER: Wait for a question.
11 BY MR. GRIVER:
12 Q.  Ms. Genger, have you seen this document
13 before?
14 A.  No.
15 Q.  Did you see this document anytime
16 before the UCC sale?
17 A.  No. I don't remember if I have seen
18 this before.
19 Q.  Was this document that's been marked as
20 Exhibit 20, was it in the files of
21 Mr. Kortmansky?
22 A.  Really, I don't know.
23     MR. GRIVER: Was it in the files of
24 Mr. Kortmansky?
25     MR. MEISTER: This document does not

94

1  D. GENGER - UNCERTIFIED ROUGH DRAFT - 2/7/13
2  look familiar to me. I am not sure I have seen
3  it before. If it were in the files of
4  Mr. Kortmansky, I think I would have produced it
5  in response to your discovery request.
6      MR. GRIVER: Let me show you what I
7  will mark as Exhibit 21.
8      (Dalia Exhibit /*, marked.)
9  BY MR. GRIVER:
10 Q.  For the record, Exhibit 21 are certain
11 documents sent to Robert Meister from David
12 Parnes, on or about May 19, 2009. Included in

13   those documents is what's been previously marked

14   as Exhibit 20.

15     A.  Okay.

16     Q.  Ms. Genger, what I am going to ask you

17   to do is look through those documents and

18   identify any documents in this package that you

19   received prior to the UCC sale.

20     A.  I will look quickly over it.

21       MR. MEISTER:  Take your time.

22   BY MR. GRIVER:

23     Q.  Take your time.  If there's any

24   document that you received prior to the UCC sale,

25   please let me know.

1   D. GENGER - UNCERTIFIED ROUGH DRAFT - 2/7/13

2     A.  This is something that you showed me

3   before right.

4     Q.  That's correct.  That's Exhibit 13.  My

5   only question --

6     A.  No, I didn't see it before.

7     Q.  Okay.

8     A.  But it looked familiar because I saw --

9     Q.  Uh-huh.

10     A.  No.

11     Q.  Just to make it clear on the record,

12   you have -- strike that.

13       Just to make it clear on the record,

14   you did not receive any of the documents that

15   comprise Exhibit 21 to your affidavit before the

16   UCC sale; is that correct?

17       MR. MEISTER:  Objection to the form.  I

18   think you mean Exhibit 21 to your affidavit.

19       MR. MEISTER:  Strike that.

20       I think that was the previous same as

21   the previous question, and she answered correct.

22       MR. GRIVER:  Okay.

23     A.  I did not.

24     Q.  You did not receive any of these

25   documents before the UCC sale; is that correct?

1   D. GENGER - UNCERTIFIED ROUGH DRAFT - 2/7/13

2     A.  Right.

3     Q.  You did not attend the UCC sale?

4     A.  No.

5     Q.  Did you send anyone --

6     A.  No.

7     Q.  You didn't send any lawyers or anybody

8   to represent the interests of the Orly Genger

9   Trust?

10     A.  Right.

11     Q.  All right.  Ms. Genger if you could

12   look at Exhibit 1 to your deposition.  I will

13   remind you since it has been a while on the last

14   page is your signature, saying that you have read

15   the answer and know the con --

16     A.  Answer to what.

17     Q.  You have read this document?

18     A.  Oh, that I read the document.

19     Q.  Exhibit 1 is your answer to the second

20   amended complaint in this action.  And it is

21   verified which means --

22     A.  Wait a second.  You are saying that I

23   signed this as what?  As an answer to?

24     Q.  You signed this -- you signed this

25   answer to the second amended complaint.  If you

1   D. GENGER - UNCERTIFIED ROUGH DRAFT - 2/7/13

2   look on the last page you verified its contents

3   as being true?

4     A.  That I read it and whatever is in here

5   is true?  That's what it says?  Okay.  Okay, yeah

6   I am getting slower now, because I am tired

7   already.  Okay.

8       MR. MEISTER:  So what's the question.

9   BY MR. GRIVER:

10     Q.  I am just setting the stage.  If you

11   look at paragraph 3?

12     A.  3, okay.

13    Q.   You deny -- I will read it.

14         You in paragraph 3 you quote, deny

15    knowledge or information sufficient to form a

16    belief as to whether the default was improperly

17    noticed or whether the foreclosure was improper,

18    period, unquote.

19         Do you see that?

20    A.   Yes.  I want to read it loud so I --

21    this is paragraph 3 what I am reading now right

22    Q.   Right.

23    A.   (Read document.)

24    Yeah.

25    Q.   Okay.  Ms. Genger, my question to you

                    98

1    D. GENGER - UNCERTIFIED ROUGH DRAFT - 2/7/13

2    is, quite simple.  As trustee, why did you not

3    obtain the knowledge or information sufficient

4    for you to determine whether the default was

5    improperly noticed before the UCC sale occurred?

1    D. GENGER - UNCERTIFIED ROUGH DRAFT - 2/7/13

2    a notice.

3    Q.   Okay.  TPR did not send you a notice?

4    A.   They might have.  But I didn't receive

5    it.  That's my answer.

6    Q.   But as of 2010 -- well, did you ever

7    ask, did you ever ask TPR whether they sent it to

8    you?

9    A.   How would I know that they are supposed

10   to send it to me?

11   Q.   In determining whether the UCC sale was

12   accurate, didn't you ask Sagi for all documents

13   that he sent to you, just to make sure?

14        MR. Meister:  Objection.  Assumes a

15   fact not in evidence.

16   BY THE WITNESS:

17   A.   I cannot determine ahead of time what

18   Sagi's supposed to do.  I don't know exactly what

19   he's supposed to do.

20   Q.   All right.  And you did not -- you did

6    A.   Can you ask me again.

7    Q.   Read it back.

8         (WHEREUPON, the record was read by

9         the reporter as requested.)

10   A.   Because I knew that I mean, I knew the

11   procedures were the legal procedures that TPR was

12   supposed to follow, and I knew that they -- the

13   note was in default.  So what's the question

14   then?

15   Q.   Well, as -- in 2010, in verifying this

16   answer, you stated that you did not have

17   knowledge or information sufficient to form a

18   belief as to whether the default was improperly

19   noticed?

20   A.   But I noticed nobody paid the note so

21   it's sufficient for me.

22   Q.   The notice.  The UCC sale requires

23   certain things to happen.

24        As trustee why is it that --

25   A.   I don't know.  TPR should have sent me

                    99

21   not conduct an investigation, did you?

22   A.   No.  I am not -- I'm not in the

23   investigation business.

24   Q.   Why is it that you as trustee did not

25   obtain knowledge or information sufficient to

                    100

1    D. GENGER - UNCERTIFIED ROUGH DRAFT - 2/7/13

2    determine whether or not the foreclosure was

3    improper, either before the foreclosure or after

4    the foreclosure?

5    A.   Whether it was --

6    Q.   How do you know?

7    A.   Because it went ahead and it was

8    proper, somebody bought it, somebody bought the

9    stock.

10   Q.   Do you understand one of the things

11   Orly is seeking in this litigation is to unwind

12   that sale?

13   A.   Okay.  She can do that.  It is her

14  right.

15  Q.  Okay.  As you as trustee, did you not

16  have any responsibility to make sure that the

17  foreclosure was proper before it happened?

18  A.  But it was proper, I said in my opinion

19  it was proper.

20  Q.  Are you your opinion based on what?

21  A.  Because the procedure was followed,

22  Sagi -- whatever requirements were -- he had to

23  meet in order to have the auction going on, he

24  fulfilled and it looked to me that it was proper.

25  Q.  So what procedures is it that you

101

1  D. GENGER - UNCERTIFIED ROUGH DRAFT - 2/7/13

2  believe were followed that made this sale proper?

3  A.  The procedure I knew that the

4  procedures were that he should put in the

5  newspaper, some notice about the public auction,

6  and he did so, apparently.

7  Q.  And is it -- who is it that told you

8  that that was the procedure that was required to

9  be done?  Was it Sagi or was it somebody else?

10  A.  No.  Sagi.

11  Q.  Sagi told you?

12  A.  Yeah

13  Q.  Anybody else?

14  A.  No.

15  Q.  As we sit here today have you done any

16  investigation since the UCC sale until today to

17  determine whether the foreclosure was proper or

18  improper?

19  A.  I didn't investigate if it was proper

20  or improper.

21  Q.  Have you asked any of your attorneys to

22  determine whether the foreclosure was proper or

23  improper.

24  A.  No, I didn't ask

25  Q.  As trustee of the trust don't you think

102

1  D. GENGER - UNCERTIFIED ROUGH DRAFT - 2/7/13

2  it is your responsibility to make sure that the

3  foreclosure was proper or improper?

4  A.  Can you ask this again.

5  MR. MEISTER:  Read it back please.

6  (WHEREUPON, the record was read by

7  the reporter as requested.)

8  BY MR. GRIVER:

9  Q.  Strike that.  Let me ask the question

10  better.

11  As trustee of the trust, isn't it your

12  responsibility to determine whether the

13  foreclosure sale was proper?

14  A.  If I had doubts I would have

15  investigated, but I didn't have any doubts.

16  Q.  And that's based on --

17  A.  On what was proper.

18  Q.  And that's based on what Sagi told you?

19  A.  It is based on the fact that I have

20  trust in whatever Sagi told me.

21  Q.  Okay.  Any other basis?

22  A.  And the fact that he told me what the

23  procedure is.

24  Q.  Okay.  And any other basis?

25  A.  I don't remember if there were any

103

1  D. GENGER - UNCERTIFIED ROUGH DRAFT - 2/7/13

2  other basis.

3  Q.  Is there anything I can show you today

4  that would refresh your recollection?

5  A.  I am sure you do have.

6  Q.  I am asking you now is there -- do you

7  have -- other than Sagi explained to you what the

8  procedure is and you trusting Sagi, is there any

9  or basis for your determination that the sale was

10  proper?

11  A.  No.  I don't remember any other.

12  Q.  And you have not charged your attorneys

13  with investigating to make sure that the sale was

14 proper?

15   A.   I don't remember that I changed -- that

16 attorney charged me for that, they might have.

17   Q.   No.  That you instructed your -- strike

18 that.

19        And you have never instructed your

20 attorneys to determine --

21   A.   I never say never because I don't

22 remember.  I don't use this word even with me

23 because I don't remember.

24   Q.   Fine.

25        You don't remember ever instructing

                        104

1    D. GENGER - UNCERTIFIED ROUGH DRAFT - 2/7/13

2 your attorneys to determine whether the

3 foreclosure was proper, is that fair?

4    A.   I don't remember that I ever instructed

5 my lawyer to investigate if it is proper or

6 improper.  I don't remember if I did that or not.

7    Q.   Okay.  Ms. Genger, I am really quite

8 curious why don't you just resign as trustee?

9    A.   Because I want to -- because I want to

10 protect my daughter's assets.

11   Q.   And why don't you agree to accept a

12 cotrustee acceptable to your daughter?

13        MR. MEISTER:  Objection.  Assumes a

14 fact not in evidence.

15        MR. GRIVER:  I will --

16   Q.   Would you accept a cotrustee acceptable

17 to your daughter?

18        MR. Meister:  Objection.  This is not a

19 question relating to the litigation.

20        MR. GRIVER:  That's not true.  It has

21 never come up.

22   Q.   I am asking you now as we sit here

23 today under oath as trustee?

24   A.   When Orly will sit with me and talk

25 with me, then I will discuss it with her.  If

                        105

1    D. GENGER - UNCERTIFIED ROUGH DRAFT - 2/7/13

2 Orly is willing to sit with me and talk with me,

3 then I will discuss it with her.  With all

4 honesty.  Because I just want whatever is good

5 for her.  Yes.  And if you will show me --

6        MR. Meister:  You have answered the

7 question.

8        THE WITNESS:  Okay.

9        MR. Meister:  Mr. Griver, can I ask

10 that you not grunt after the witness' answer.

11        (Dalia Exhibit /*, marked.) 22

12   Q.   Ms. Genger, do you recall on or about

13 October 24 -- strike that.

14        Do you recall on or about October 4,

15 2011, you filed an action in the chancery court

16 of the state of Delaware on behalf of the trust?

17   A.   Right.

18   Q.   And this is a copy of the verified

19 complaint in that --

20   A.   I believe you, yeah.

21   Q.   And that's your signature before the

22 exhibits, verifying the allegations --

23   A.   Yes, that's my signature, right.

24   Q.   So before this complaint was filed, you

25 read it, you considered what it said, and you

                        106

1    D. GENGER - UNCERTIFIED ROUGH DRAFT - 2/7/13

2 agreed with its --

3    A.   Yeah.

4    Q.   Okay.  And I take it that before

5 verifying it, you read this complaint carefully?

6    A.   Yeah.

7    Q.   Whose idea was it to bring a lawsuit in

8 the state of Delaware on behalf of the trust?

9    A.   It was my idea.

10   Q.   And did anyone -- did you discuss that

11 idea with anyone?

12   A.   I might discuss it with Bob.

13   Q.   Did you discuss it with -- did you

14 discuss it with Sagi?

15   A.   No.

16   Q.   Did you discuss it with anybody else?

17   A.   No.  Only with my lawyer.

18   Q.   Okay.  Do you know if your lawyer

19   discussed it with Sagi or anybody else?

20   A.   I have no idea what he discussed with

21   Sagi.  He doesn't tell me.

22   Q.   Okay.

23        MR. GRIVER:  Robert, I asked for this

24   before but I would like to -- I think that the

25   actions of Ms. Genger as trustee, there is no

107

1    D. GENGER - UNCERTIFIED ROUGH DRAFT - 2/7/13

2    privilege as to them.  And so on behalf of the

3    beneficiary I would ask for all records,

4    communications, et cetera, in your possession,

5    related to the Dalia Delaware action.  I put this

6    in writing after Ms. Genger's first deposition,

7    and I reiterate it today

---

1    D. GENGER - UNCERTIFIED ROUGH DRAFT - 2/7/13

2    23?

3    A.   Yes.

4    Q.   That's if you look at the --

5    A.   End.

6    Q.   Response is October 21, 2010.

7    A.   October 2, 2010.

8    Q.   Right.

9    A.   Okay.

10   Q.   So the year before?

11   A.   I just want to ask a question, that it

12   is a technical question.

13   Q.   Sure.

14   A.   That the addresses that are mentioned

15   here are current for this date?

16   Q.   The other --

17   A.   Like, for example, reside at 26

18   hundred.

19        MR. MEISTER:  He can't answer.  This is

20   not --

21   A.   From the court okay I got it.

---

8    BY MR. GRIVER:

9    Q.   How is it that you got the idea of

10   bringing a lawsuit in Delaware, Ms. Genger?

11   A.   It was I think quite simple decision,

12   because in Delaware, they courts were familiar

13   with the Genger case, so to speak, and they spend

14   a lot of time, and very familiar with the case,

15   and I wanted the trust to be represented, and to

16   solidify Orly's claim to the TRI shares.

17   Q.   Okay.  Let me mark this as 23

18        (Dalia Exhibit /*, marked.)

19   A.   Let me get a chance to read it.

20   BY MR. GRIVER:

21   Q.   Now, Ms. Genger --

22   A.   What date was it, by the way?

23   Q.   Was what?  This is --

24   A.   What date was it

25   Q.   The New York complaint that's Exhibit

108

22   Q.   Ms. Genger, this is a complaint brought

23   by you and your attorneys on behalf of yourself

24   and on behalf of the Orly Genger trust?

25   A.   Okay.  Against Arie Genger.

109

1    D. GENGER - UNCERTIFIED ROUGH DRAFT - 2/7/13

2    Q.   Yes.  Do you recall authorizing this

3    complaint?

4    A.   I am sure I did.  But I have to -- I

5    read it because I don't remember.

6    Q.   You don't remember bringing a

7    complaint --

8    A.   No, I remember that I did, but I have

9    to read it in order to remember exactly the

10   details, if this is, you know, that's what I

11   mean.  Because my capacity to remember all these

12   documents is getting really limited.

13   Q.   Ms. Genger, my question to you is this:

14   Having already brought a lawsuit a year before on

15  behalf of the Orly trust, and with regard to the

16  Delaware actions effects upon the trust, why did

17  you bring a separate action in Delaware a year

18  later?

19      MR. MEISTER: I object. This is first

20  of all.

21      MR. GRIVER: This is her action as

22  trustee. You are working for her, she is not

23  working for you. I ask you limit yourself to

24  objections, just saying the word, and asked and

25  answered, objection to form.

110

1  D. GENGER - UNCERTIFIED ROUGH DRAFT - 2/7/13

2      THE WITNESS: Okay. So ask me again

3  the question

4      Q.  Read the question back please.

5      A.  Why.

6          (WHEREUPON, the record was read by

7          the reporter as requested.)

8      MR. MEISTER: And now I will object --

9  wait a minute. I am putting my objection here on

10  the record

11          Because first of all I object to the

12  form of the question. In part --

13      MR. GRIVER: No speaking objections.

14  Speaking objections are not allowed in New York.

15  Thank you. Objection to the form. That's fine.

16      MR. MEISTER: And because it

17  mischaracterizes --

18      MR. GRIVER: The time of trial, that

19  will be up to a court of law.

20      MR. GRIVER

21      Q.  Ms. Genger, let me ask the question be

22  read back to you so you can make sure that you

23  have it and duly considered in your answer.

24

25          (WHEREUPON, the record was read by

111

1      D. GENGER - UNCERTIFIED ROUGH DRAFT - 2/7/13

2          the reporter as requested.)

3  BY THE WITNESS:

4      A.  So you mean why did I do it in New York

5  and then the Delaware?

6      Q.  Yes.

7      A.  That's what you meant?

8      Q.  Yes.

9      A.  There was some technical reason

10      Q.  And that was?

11      A.  And at the moment I don't remember what

12  it was, but my lawyer told me at the time what

13  was it. But at the moment, I don't remember what

14  it was.

15      Q.  And that was Mr. Meister?

16      A.  Yes

17      Q.  Okay

18      A.  It was some technicality.

19      MR. GRIVER: Mr. Meister, I would ask

20  you provide any information regarding why the

21  decision was made to bring a separate Delaware

22  action as opposed to bringing an action in New

23  York.

24  BY MR. GRIVER:

25      Q.  Mrs. Genger, you do understand that New

112

1      D. GENGER - UNCERTIFIED ROUGH DRAFT - 2/7/13

2  York courts are more than able to determine

3  whether someone is a holder in due course of

4  stock?

5      A.  Again, the question

6      Q.  Ms. Genger, do you know the basis for

7  your Delaware action?

8      A.  The basis?

9      Q.  Yes

10      A.  No, you didn't ask me this question

11  before

12      Q.  I am going to ask the question.

13      A.  Asked me before, you asked me a

14  question, and I want --

15      MR. MEISTER: There's a new question.

16    MR. GRIVER:  It is a new question.

17    A.  New question okay.

18    BY MR. GRIVER:

19    Q.  Do you understand the basis for your

20    Delaware action?

21    A.  Yes.  I wanted the trust to be

22    represented in Delaware in order to solidify

23    Orly's claim for the TRI shares, because they

24    discussed over there and she went by herself to

25    represent herself in the trial that they had over

113

1    D. GENGER - UNCERTIFIED ROUGH DRAFT - 2/7/13

2    there, and I wanted to intervene for her benefit

3    as her trustee.  I mean, my motivation were only

4    good not bad.

5    Q.  Well, so you said let me ask you this.

6

7    MR. MEISTER:  Object to the form of the

8    question.  Excuse me.  I am going to object to

2    BY THE WITNESS:

3    A.  I am not a lawyer, but I believe that

4    Orly has the right to get her shares because she

5    is a victim of what her father did, not follow

6    the procedures when he transferred or improperly

7    transferred supposedly Orly's shares from a TPR

8    to her trust.

9    Q.  And is there any reason --

10    A.  And she is a victim that she has to get

11    her shares.

12    Q.  Is there any reason you couldn't have

13    made that same claim in New York?

14    A.  I have no idea.  I have no idea.  I am

15    not a lawyer.  I have no idea.

16    Q.  Did you understand at the time you

17    brought this action in Delaware, that the

18    chancery court had determined that the 3,000

19    shares of TRI stock the Orly trust shares were

20    owned by TPR?  Did you understand that that is

21    what the chancery court in Delaware had

22    determined?

9    the form of the question  Now you start a new

10    question.

11    BY MR. GRIVER:

12    Q.  Do you understand what is the legal

13    basis for your claim in Delaware that the Orly

14    trust still owns the shares?

15    MR. MEISTER:  Objection.

16    Mischaracterizes evidence.  So therefore it is on

17    objection as to form.

18    A.  The question is, if I understand the

19    legal basis?

20    Q.  Yes.

21    A.  On which I complained?

22    Q.  On which you claimed that the Orly

23    trust still owns the shares.

24    THE WITNESS:  Yeah.

25    MR. MEISTER:  Same objection

114

1    D. GENGER - UNCERTIFIED ROUGH DRAFT - 2/7/13

23    MR. MEISTER:  Objection as to form.

24    And mischaracterizes the decision.

25    MR. GRIVER:

115

1    D. GENGER - UNCERTIFIED ROUGH DRAFT - 2/7/13

2    Q.  I am just asking yes or no, Ms. Genger?

3    A.  Ask me the question again please

4    Q.  Did you know when you brought the

5    Delaware action that the chancery court in

6    Delaware?

7    A.  Chancery is the Supreme Court.

8    Q.  Lower court.

9    A.  Lower court.  Okay.

10    Q.  That did you know that the Delaware

11    chancery court, which is the court in which you

12    filed the Delaware action?

13    A.  Yeah.

14    Q.  Had determined that the 3,000 shares of

15    TRI stock in the Orly trust were owned by TPR?

16   A.   Well --
17        MR. MEISTER: Objection.
18        MR. GRIVER: Strike that.
19
20   Q.   That all shares -- strike that.
21        That the --
22        MR. MEISTER: Put a fresh question.
23        MR. GRIVER: I will do that.
24   BY MR. GRIVER:
25   Q.   Were you aware when you filed in
                            116

1    D. GENGER - UNCERTIFIED ROUGH DRAFT - 2/7/13
2    Delaware court that the 1,102.8 shares of TRI
3    stock, that the Delaware court had already
4    determined that those shares and other shares of
5    TRI stock were owned by TPR?
6        MR. MEISTER: Objection.
7    BY THE WITNESS:
8    A.   Yeah.

9    BY MR. GRIVER:
10   Q.   Did you know that?
11   A.   I knew that there was a question of
12   owning a share or benefiting from the share. I
13   knew that there was a question of owning or
14   benefiting, and that was the question that I
15   based my complaint on. I know that there was a
16   question there that was not clear if owning the
17   share means also benefiting from the shares.
18   There was something that was unclear, I know it
19   was unclear by also my lawyer. It was not clear.
20   Q.   But you understood did you not that on
21   August 18, 2010, the Delaware chancery court
22   issued a final judgment order in the TRI investor
23   V Arie Genger case, that found that the 3,000
24   shares of TRI stock, including the shares of the
25   Orly trust were in fact owned by TPR, you knew
                            117

1    D. GENGER - UNCERTIFIED ROUGH DRAFT - 2/7/13

2    that correct?
3        MR. MEISTER: Can I have that read back
4    please.
5        (WHEREUPON, the record was read by
6        the reporter as requested.)
7    Q.   I will refer to you paragraph 22 of
8    your New York complaint if you need to refresh
9    your recollection.
10   A.   No, no, I remember there was a decision
11   like that, however, this did not stop me from
12   challenging the court and looking in a fresh way
13   at the case of Orly.
14   Q.   But given the choice between filing in
15   New York state and filing your case in Delaware,
16   why did you choose to go to Delaware where the
17   chancery court had already determined that the
18   TRI stock were owned by TPR? Why didn't you go
19   to New York where that determination had not yet
20   been made?
21       MR. MEISTER: Objection as to form.
22   A.   That's what my lawyer suggested to do.
23   Q.   You're relying on --

24   A   Yeah.
25   Q.   That would be Mr. Meister?
                            118

1    D. GENGER - UNCERTIFIED ROUGH DRAFT - 2/7/13
2    A.   Yeah. I rely on my lawyer's advice.
3    Q.   And Mr. Meister --
4    A.   You think that I know exactly what
5    court is better for me to win for Orly for the
6    shares? I am trying to do whatever is good for
7    her.
8    Q.   And this determination to bring a case
9    in Delaware as opposed to New York was a decision
10   made exclusively by yourself and your lawyer
11   Mr. Meister?
12   A.   The decision to sue?
13   Q.   In Delaware?
14   A.   The complaint in Delaware was
15   exclusively made by us.
16   Q.   And by us, you mean yourself and

17  Mr. Meister?
18  A.  Right.
19  Q.  Okay.  With no input from anybody else?
20  A.  Right.
21  Q.  No input from any one else, be it a
22  lawyer, or another member of the Genger family?
23  A.  No, no.
24  Q.  Or the Trump Group?
25  A.  It is my complaint.  It is not somebody
119

10  date of filing?
11  A.  I don't remember
12  Q.  Did Mr. Meister tell anyone before the
13  date of filing?
14  A.  Ask him.  I don't know.  I don't know.
15  Q.  To your knowledge did Mr. Meister tell
16  anybody?
17  A.  I don't know.  I don't remember if he
18  said.  I have no knowledge.
19  Q.  Did you tell Orly before you filed
20  this?
21  A.  No.
22  Q.  Did you tell anybody else to your
23  memory?
24  A.  You asked me this question.  I said no.
25  No.  This is -- this was a decision made by my
120

1  D. GENGER - UNCERTIFIED ROUGH DRAFT - 2/7/13
2  else's complaint.
3  Q.  And no one else -- was anyone else
4  surprised of the bringing of this lawsuit?
5  A.  What do you mean, did they check in the
6  street from one person to another?
7  BY MR. GRIVER:
8  Q.  Did you tell anybody, did you tell
9  anyone you were bringing this action before the

1  D. GENGER - UNCERTIFIED ROUGH DRAFT - 2/7/13
2  lawyer and me, that it is the right thing to do.

3  Q.  With no input from anybody?
4  A.  Right.
5  Q.  No discussion with anybody?
6  A.  Right.  You are going to ask me again?
7  Q.  You understand that the Delaware
8  chancery court was overturned as to its
9  determination that the Orly trust shares actually
10  belonged to TPR based on the fact that the Orly
11  trust was not in front of the Delaware courts?
12  Were you aware that that --
13  A.  You have to repeat it again.  It is
14  getting late.
15  Q.  Were you aware?
16  A.  Yeah.
17  Q.  When you filed your Delaware case?
18  A.  Yeah, right.
19  Q.  That the Delaware Supreme Court had
20  reversed the chancery court determination that
21  the Orly trust TRI shares, belonged to TPR, were
22  owned by TPR, because the Orly trust was not --
23  A.  Represented.

24  Q.  In Delaware?
25  A.  And that's why I went there, and I
121

1  D. GENGER - UNCERTIFIED ROUGH DRAFT - 2/7/13
2  represented as a trustee.
3  Q.  And Mr. Meister --
4  A.  And hoping that that will help Orly's
5  case, because I was a trustee before they said
6  that she was not represented, she couldn't
7  represent herself because she needed a trustee to
8  represent her.
9  Q.  And that was -- and that was --
10  A.  That's how I came to the idea that I
11  should go there and fight for her.
12  Q.  As opposed to fighting for her in New
13  York?
14  A.  I don't know why you putting this New
15  York thing.
16  Q.  Because --

17    A    The thing is that we want to win the
18    shares.  What does it matter if it is in New York
19    or Delaware.
20    Q    Because you had already sued in New
21    York, why didn't you just sue again in New York?
22    A    Because if you sue again, you have
23    another chance.  As many times as you sue, your
24    chances are getting bigger and bigger.  You
25    should know that by now.

                          122

1    D. GENGER - UNCERTIFIED ROUGH DRAFT - 2/7/13
2    Q    You had to sue again either in Delaware
3    or you had to sue again in New York.  Why did you
4    choose Delaware?  Because it's based on
5    Mr. Meister's advice?
6         MR. MEISTER:  Objection.  Compound
7    objection.  Asked and answered.
8    BY THE WITNESS:
9    A    I sued in Delaware, I told you why.

3         Was your -- is it your testimony here
4    today that your decision to sue in the state of
5    Delaware as opposed to the state of New York or
6    any other state is based on the advice of
7    Mr. Meister?
8    A    Yes.
9    Q    And that based on that advice you as
10   trustee determined to sue in the state of
11   Delaware?
12   A    Right.
13   Q    And you did that with a full
14   understanding of what had happened in -- what the
15   chancery court decision was?
16   A    Yes.
17   Q    Correct?  And with a full understanding
18   of what the Delaware Supreme Court had said,
19   correct?
20   A    Yes.
21        MR. GRIVER:  Okay.  Mr. Meister I would
22   like to see any information regarding that
23   decision.  And I would like that as soon as
24   possible.

10   BY MR. GRIVER:
11   Q    But why not New York?
12   A    Because I sued already in New York.
13   Q    And you didn't want to sue twice?
14        MR. MEISTER:  Sue who twice?
15   Objection.  No.  Objection.
16        THE WITNESS:  You are getting me
17   confused.
18        MR. MEISTER:  Dalia.  Wait until I get
19   my objection out, please.
20        THE WITNESS:  He is confusing me.  I
21   don't know.  He confuses me.
22        MR. MEISTER:  Because the question is
23   improper.
24   BY MR. GRIVER:
25   Q    You didn't -- you had sued -- strike

                          123

1    D. GENGER - UNCERTIFIED ROUGH DRAFT - 2/7/13
2    that.

25        MR. MEISTER:  I will note for the
                          124

1    D. GENGER - UNCERTIFIED ROUGH DRAFT - 2/7/13
2    record I don't see what that has to do with any
3    of the allegations in this action, or for that
4    matter, any other action.
5         MR. LEINBACH:  Verified complaint was
6    filed after our complaint was filed.  Delaware
7    action, so obviously we couldn't --
8         THE WITNESS:  What?  What happened?
9         MR. LEINBACH:  Couldn't plead events
10   that took place when the action was brought.
11        MR. GRIVER:  As on behalf of the
12   beneficiary of trust, I am asking the trustee, to
13   provide the information relate -- all
14   information, all conversations, all input
15   provided, all conversations had, related to the
16   bringing of a Delaware complaint.
17        THE WITNESS:  Okay.

18      MR. MEISTER:  I suggest you put that in

19  writing pursuant to the CPLR, so that I can file

20  my formal response.

21      MR. GRIVER:  I have put that -- I have

22  already written to you about that.

23      MR. GRIVER:  Can we take a break

24  please

25      (WHEREUPON, a recess was had.)

125

1   D. GENGER - UNCERTIFIED ROUGH DRAFT - 2/7/13

2       2.23-226.

3   BY MR. GRIVER:

4   Q.   The Orly Genger trust is paying for the

5   Delaware DJ action filed by you?

6   A.   The Orly Genger trust is paying for the

7   Delaware action?  At the time I told you that I

8   seek and I don't know if that's the case, that I

9   -- at the time I told you that I was paying the

10  bills by myself at the point where I needed

4   Q.   Okay

5   A.   Who is suing?  Orly suing?  The trust

6   is suing?

7       MR. MEISTER:  This was asked and

8   answered.

9   Q.   The trust is suing?

10  A.   Obviously.

11  Q.   Okay.  In the New York action, the

12  complaint that's been marked as Exhibit 23, who

13  is paying?

14  A.   The UCC, so to speak?

15  Q.   No.  This New York action, brought on

16  behalf of yourself individually and behalf the

17  Orly trust?

18  A.   Whoever is suing, this is the one that

19  pays.

20  Q.   In this case you are suing both

21  individually and purportedly on behalf of the

22  trust?

23  A.   Yeah.

24  Q.   So my question is who is paying it?

11  financial help, and some of it came with a

12  settlement with TPR where we got $100,000, and

13  then there was the note from Manhattan safety,

14  whatever name it is.  Safety Manhattan.

15  Q.   So to sum up the Delaware --

16  A.   My bill, I guess, one of those

17  accounts.

18  Q.   The Delaware action is being paid for

19  by the Orly trust, correct?

20      MR. MEISTER:  I think this was covered

21  in the first session of deposition.

22      THE WITNESS:  I told you, somebody --

23      MR. MEISTER:  She testified.

24      THE WITNESS:  Somebody has to pay it.

25  Q.   And who's paying?  That my only

126

1   D. GENGER - UNCERTIFIED ROUGH DRAFT - 2/7/13

2   question?

3   A.   Whoever is suing.

25      MR. MEISTER:  She answered the question

127

1   D. GENGER - UNCERTIFIED ROUGH DRAFT - 2/7/13

2   already.

3   A.   Financially I do the proper thing.

4   When it is individually, me, I pay.  When it is

5   the trust, the trust pays, from whatever finances

6   we can, you know, have available.  In the

7   beginning I paid everything for the trust.

8   Q.   In this case, you are sawing both

9   individually and on -- 50/50?

10      MR. MEISTER:  No.  Excuse me.  She

11  answered this.  You got an answer on the record.

12  I corrected the record the first time.  This is

13  clear.

14      MR. GRIVER:  Show me.

15      MR. MEISTER:  Show you.  All right.  We

16  are going to suspend.  We are going to suspend.

17  I am going to show him --

18   MR. GRIVER: I withdraw the instruction

19   that you show me.

20   BY MR. GRIVER:

21   Q.   I want to know it was a 50/50 split?

22        MR. MEISTER: There whereas no 50/50

23   split. She paid for the action against Arie,

24   paid for the Delaware action, as this was stated

25   before. If you either listen to your answers or

128

1   D. GENGER - UNCERTIFIED ROUGH DRAFT - 2/7/13

2   read the transcript. You will know that.

3   BY MR. GRIVER:

4   Q.   As we sit here now who paying for the

5   Arie action in New York, is it you or is it the

6   trust?

7   A.   Let me tell you something.

8   Q.   I just want an answer to my question.

9   A.   Whoever sues -- that's the person who

10   pays. If I sue, I pay. If the trust sues, the

4   Q.   Whose idea was it to bring an

5   interpleader action?

6   A.   Okay. This is an open issue, and it --

7   I am glad that you brought it up, because it

8   might be that the firm would have to pay for it

9   because I did not initiate it.

10   Q.   You did not okay this?

11   A.   The interpleader, no. So we will have

12   a discussion about it.

13   Q.   Okay.

14   A.   And we see who going to pay.

15   Q.   Have they -- has Pedowitz & Meister

16   tried to bill you as trustee for the time spent

17   on the interpleader action?

18   A.   Truly, I don't know.

19   Q.   Mr. Meister, to the extent that --

20   A.   This will be resolved.

21        MR. MEISTER: As I stated on the

22   record, first session, the first time you asked

23   these series of questions.

24        MR. GRIVER: I never asked these

25   questions on this.

11   trust pays. That's how it was. So I don't know

12   specifically if you ask me this or this or that.

13   Q.   Okay.

14   A.   That's what it is. That's the rule, I

15   think.

16   Q.   So the whose idea was it?

17   A.   Can I collect now the money that trust

18   owes me, my money?

19        MR. MEISTER: Don't ask questions.

20   Just wait for the next question, if he asks a

21   permissible question. Especially if it's a fresh

22   question.

23   BY MR. GRIVER:

24   Q.   Are you aware at some point Pedowitz &

25   Meister brought interpleader action in the

129

1   D. GENGER - UNCERTIFIED ROUGH DRAFT - 2/7/13

2   southern district of New York?

3   A.   Yes. Right.

130

1   D. GENGER - UNCERTIFIED ROUGH DRAFT - 2/7/13

2        MR. MEISTER: You want an answer or

3   just want to harass the witness?

4        MR. GRIVER: I will take an answer from

5   you.

6        MR. MEISTER: Okay. The charges for

7   bringing the interpleader action have not been

8   billed to anyone. The charges for the trust's

9   answer and claim over against TPR, which resulted

10   in TPR agreeing that the trust was the beneficial

11   owner was billed to the trust

12   BY MR. GRIVER:

13   Q.   Did Pedowitz & Meister consult with

14   you, Ms. Genger, before bringing the interpleader

15   action?

16   A.   No, they did not consult with me.

17   Q.   To your knowledge, did Pedowitz &

18   Meister consult with anybody before bringing the

19   interpleader action?

20   A.   I have no idea.

21   Q.   You never asked them on what --

22   A.   No, why should I ask him, I mean.

23   Q.   You never asked him why they were

24   bringing an interpleader?

25   A.   No, I have other things in my life.  I

131

1      D. GENGER - UNCERTIFIED ROUGH DRAFT - 2/7/13

2   don't pick up the phone and ask Bob, why did you

3   do the interpleader, the action, or, I hardly

4   know what is an interpleader action even.

5   Q.   Did you ask him if they were doing it

6   on your behalf or on behalf of the trust since

7   they represent you in both capacities?

8   A.   I knew that there is some kind of legal

9   move that apparently Meister and Podowitz &

10   Meister decided to do with the escrow account.

11   And I thought to myself, that that's the right

5   he did it

6   Q.   Okay.  Do you think --

7   A.   I don't know even what is an

8   interpleader.  I don't know, that's taking the

9   escrow account from his company to the court,

10   this is what it is?

11   Q.   Yes.

12   A.   Okay.

13   Q.   And on what basis would it be to the

14   benefit of the Orly trust to do that?

15   A.   I have no idea.

16   Q.   Well, as the trustee you are charged

17   with making sure the actions taken on your

18   behalf --

19   A.   I trusted that he has a good judgment

20   to do something for benefit of Orly trust, I am

21   going start suspecting my own lawyer for the

22   trust is going to do action that would be against

23   the beneficiary of the trust?

24   Q.   Did you ask him to explain why he --

25   why Pedowitz & Meister did what it did?

12   thing to do.  I didn't ask him if it is necessary

13   thing, I am not a lawyer  I mean, I am just the

14   client  If he thinks that that's the right thing

15   to do, you know, I follow him.  Whatever he says.

16   And if it is a mistake, or if he did it by his

17   own initiative, and it was not correct, he should

18   be paying for it, or we should discuss this,

19   later on.  Nobody's trying to steal money from

20   each other.  I mean, this is --

21   Q.   Did you think this was -- on what basis

22   did you think that this was a good thing to bring

23   the --

24   A.   I didn't think it is a good thing.

25   Q.   Did you ask Mr. Meister whether he was

132

1      D. GENGER - UNCERTIFIED ROUGH DRAFT - 2/7/13

2   bringing it on behalf of yourself as an

3   individual, or --

4   A.   I didn't talk to him.  I just knew that

133

1      D. GENGER - UNCERTIFIED ROUGH DRAFT - 2/7/13

2   A.   No.

3   Q.   Okay.  Did you ask Pedowitz & Meister

4   whether it took this action to benefit you as an

5   individual as opposed to you as trustee?

6   A.   An individual?

7   Q.   Sure.  They represent -- Pedowitz &

8   Meister represents you as an individual, correct?

9   A.   Right.  No, I never thought about this

10   as an individual  I thought about it as an

11   action that has to do with the trust.  Because it

12   is an account, it was an account for Orly.

13   Q.   As we sit here today, can you explain

14   to me why the Pedowitz & Meister interpleader

15   action would have benefited the Orly trust?

16   A.   I have no idea.  That's -- it is

17   something technical that the lawyers decided to

18   do.  And I don't know why.

19     MR. GRIVER:  Okay.  Mr. Meister to the

20  extent that you take the position that Pedowitz &

21  Meister did this to -- on behalf of Dalia Genger

22  as trustee or Orly Genger trust, I would ask for

23  all records in the interpleader action why it was

24  taken, who you discussed it with, what was the

25  basis for doing so, including but not limited to

                        134

1  D. GENGER - UNCERTIFIED ROUGH DRAFT - 2/7/13

2  any discussions that you had with co defendants

3  or co defendant's counsel.

4     THE WITNESS:  This is a long list of

5  requests, you want us to write it down because I

6  won't remember.

7     MR. MEISTER:  Don't answer.

8     THE WITNESS:  She is taking it.  Okay.

9

10    MR. GRIVER:  Let's have this marked as

11  Exhibit 24.

5  There's so many papers.  I don't remember.

6     MR. MEISTER:  You have answered the

7  question.

8     MR. GRIVER:  Let me have this marked as

9  25.

10    (Dalia Exhibit /*, marked.)

11  BY MR. GRIVER:

12    Q.  For the record, what's been marked as

13  Exhibit 25 is a letter dated December 17, 2007,

14  and a promissory note in connection with letter

15  agreement 12-17-07.  It has been Bates stamped DG

16  1 through 5.

17    Ms. Genger, let me know when you are

18  ready to discuss what's been marked --

19    A.  Ask me the question maybe it will be

20  easier for me to read it if I can focus more on

21  the answer.

22    Q.  Okay.  Why don't you also look at Dalia

23  3  I have think the easiest way to get this.

24  Look at Dalia 3, what's been marked as Dalia 3.

25  Those are your amended responses to plaintiff's

                        136

12    (Dalia Exhibit /*, marked.)

13    MR. GRIVER:  For the record, Exhibit 24

14  is the interpleader complaint, Pedowitz & Meister

15  LLP, the TPR Investment Associates Inc., et al..

16    A.  Yeah.

17  BY MR. GRIVER:

18    Q.  You are telling me, Ms. Genger, you had

19  no advance knowledge that this complaint was

20  going to be filed?

21    MR. MEISTER:  Is that a new question or

22  is it -- the question is, whether or not he had

23  told you before.

24  BY MR. GRIVER:

25    Q.  Ms. Genger, did you have advance

                        135

1  D. GENGER - UNCERTIFIED ROUGH DRAFT - 2/7/13

2  knowledge that this complaint was going to be

3  filed by Pedowitz & Meister?

4     A.  I don't remember.  I don't remember.

1  D. GENGER - UNCERTIFIED ROUGH DRAFT - 2/7/13

2  interrogatories and please look at interrogatory

3  30.

4     MR. MEISTER:  Is there a pending

5  question.

6     MR. GRIVER:  I am waiting for her to be

7  ready.

8     A.  You told me to look at interrogatory --

9     Q.  Number 30 in your response?

10    A.  And the response.  Yeah.

11    Q.  Okay.  Interrogatory number 30 says,

12  Ms. Genger why don't you read into the record

13  interrogatory number 30.

14    MR. MEISTER:  Read a.

15    A.  Said each transfer of your shares.

16    State each transfer, pledge, and/or

17  sale of your shares of TPR, including in your

18  answer, the date of each transfer, pledge, or

19  sale; the recipient of the TPR share; the number

20   of shares transferred, pledged or sold, and the
21   consideration for each transfer, pledge or sale.
22          The response is, on December 17, 2007,
23   I sold 250 shares of the common stock of TPR to
24   TPR for its 5 million dollars note.
25     Q.   When you gave that interrogatory

137

1      D. GENGER - UNCERTIFIED ROUGH DRAFT - 2/7/13
2   response, were you referring to the documents
3   that have been marked as Exhibit 25?
4     A.   The question is, as I understand it, me
5   selling the shares, right, to TPR.
6     Q.   That's the thing.  What happened on
7   12-17-07?
8     A.   Wait a second.
9     Q.   Was a redemption?
10    A.   Okay.  12-17, yeah.  I said, that I
11   sold it, 250 shares.
12    Q.   And when you said that you were

6     A.   To TPR.
7     Q.   You sold the shares to TPR?
8     A.   Yeah.
9     Q.   And what you call a sale, but what I
10   would characterize as redemption is what's marked
11   as Exhibit 25, these are the documents,
12   memorializing that redemption?
13    A.   Yes.  I sold all my shares to TPR.
14    Q.   Okay.  For 5 million dollars?
15    A.   Right.
16    Q.   Did you -- okay.
17          And those were all the shares of TPR?
18    A.   All the shares.  All my share.
19    Q.   And that took place on December 17,
20   2007?
21    A.   Yes.
22    Q.   So as of December 17, 2007, you were no
23   longer a shareholder?
24          MR. MEISTER:  As of December 18
25    A.   Yeah.  I guess.

139

13   referencing the documents that have been marked
14   as Exhibit 25, correct?
15    A.   Can you repeat that.  I am sorry.
16    Q.   Here's my concern, Ms. Genger, and it
17   is a small one.
18    A.   Yeah.  A small one.
19    Q.   What's been marked as Exhibit 25, is
20   actually a redemption, it is not a sale.  Those
21   are different things.  When you redeem shares to
22   a company, and they become -- and they go back to
23   the company that's called a redemption not a
24   sale.
25          So I just wanted to make sure that your

138

1      D. GENGER - UNCERTIFIED ROUGH DRAFT - 2/7/13
2   answer is based on these documents --
3     A.   I sold the shares.  I don't have the
4   shares to TPR.
5     Q.   To TPR?

1      D. GENGER - UNCERTIFIED ROUGH DRAFT - 2/7/13
2     Q.   As December 17 or 18, 2007, you were no
3   longer a shareholder?
4     A.   Yeah.  17 or 18.  Yeah
5     Q.   And why is it that you decided to sell
6   your shares on December 17?
7     A.   On that date?
8     Q.   Yes.
9     A.   I wouldn't know why this specific date.
10    Q.   Was it because Ms. Enriquez attempted
11   to make you the trustee of the trust on December
12   18?
13    A.   I don't think so.
14    Q.   Was it in preparation for -- become
15   trustee?
16    A.   No, I knew that I am going to assume
17   the -- I knew that potentially, I will have to be
18   Orly's trustee, and enjoy the your company so
19   many times here.  So I prepared myself to be

20   eligible to have this honor to be trustee of Orly
21   trust and be sued countless times.
22   Q.
23   A.   I am just explaining to you what is --
24       MR. MEISTER:  Adding additional things
25   to express your emotions don't help the record.

140

1   D. GENGER - UNCERTIFIED ROUGH DRAFT - 2/7/13
2   So just answer the question.
3   BY MR. GRIVER:
4   Q.   Now, why is it that you sold your
5   shares -- strike that.
6       Why is it that you allowed TPR to
7   redeem your shares for 5 million dollars?
8   A.   Why?  I can do whatever I want.  What
9   do you mean?
10   Q.   Strike that.  Didn't you apply TPR to
11   redeem the shares of the company because that --
12   A.   You said redeem.  Is that not sale?  I

13   want to understand.  What are you telling me?
14   Redeem or sell?  I want to understand what is the
15   difference is.
16   Q.   Okay.
17   A.   When you are saying that.
18   Q.   Look at Exhibit 14, paragraph 10,
19   Exhibit 14 is an affidavit of yours.  Sworn to on
20   March 11, 2008 and look at paragraph 10.  Page 3
21   to 4.
22   A.   Okay.
23   Q.   Second sentence.
24   A.   Okay.  You mean this is what Orly's
25   writing?

141

1   D. GENGER - UNCERTIFIED ROUGH DRAFT - 2/7/13
2   Q.   This is what you wrote.  You signed it?
3   A.   Where?  Where does it say, Orly Genger,
4   petitioner, against me.
5   Q.   Dalia 14.  Affidavit of Dalia Genger?

6       MR. MEISTER:  Yes.
7   A.   Okay.  I got it  Affidavit of Dalia
8   Genger.  Okay.  I'm sorry.  It is number ten you
9   said.
10   Q.   Yes.  Paragraph 10?
11   A.   Yeah.
12       Okay.  So, what?  So I guess redeem
13   means that I am kind of giving -- I am selling
14   the shares to the company?
15   Q.   Selling --
16   A.   The shares --
17   Q.   Letting the shares go back to the
18   company?
19   A.   I mean going from me.
20   Q.   To TPR?
21   A.   To TPR.  Okay.
22   Q.   And --
23   A.   For my ownership to TPR ownership.
24   Q.   And you did that because both Orly and
25   Sagi would share equally?

142

1   D. GENGER - UNCERTIFIED ROUGH DRAFT - 2/7/13
2   A.   Yeah.
3   Q.   And it was important to you that that
4   happened because you wanted to treat both your
5   children equally?
6   A.   Obviously.
7   Q.   And it was important to you that you
8   let the court know that in its decision as to
9   whether or not you should be trustee?
10   A.   I don't know if that was the reason,
11   but, yeah, obviously I want both my kids to be
12   treated equally.
13   Q.   And this was information that you chose
14   to share with the trustee in --
15   A.   With the trustee?
16   Q.   Excuse me.  This is information --
17   strike that.
18       The fact that you were redeeming your
19   shares back to TPR was information you wanted the
20   surrogate court to know in connection with the

21   surrogate court's determination as to whether you
22   should be trustee, correct?
23   A.   Yeah.
24   Q.   All right.   So now let's -- and now
25   let's look at what's known as Exhibit 25.

143

1    D. GENGER - UNCERTIFIED ROUGH DRAFT - 2/7/13
2    A.   Okay.
3    Q.   This is TPR's redemption of your 250
4    shares, correct?
5    A.   Right.   This is the same 250 that we
6    were talking before, right?
7    Q.   Yes.
8         Did the shares go back to TPR?
9    A.   Yes.
10   Q.   Did the -- has TPR been paying the
11   promissory note as agreed?
12   A.   Yes.
13   Q.   So as of January 15, 2013, you have

7         MR. GRIVER:   Okay.
8    BY MR. GRIVER:
9    Q.   Is the agreement evidenced by the
10   documents that have been marked as Exhibit 25,
11   that is the 12-17-07 letter, and the promissory
12   note in connection with that letter --
13   A.   I have to stop you, because you have to
14   start again start at beginning again.   I didn't
15   get it.
16   Q.   I will start over.
17   A.   I didn't get it.
18   Q.   Has the agreement memorialized by --
19   A.   Here --
20   Q.   By the documents attached as Exhibit
21   25?
22   A.   Yeah.
23   Q.   That is the 12-17-07 letter, and the
24   attached promissory note, was that agreement
25   later altered, amended, changed, revised, fixed,

145

14   received $180,000 from TPR in exchange for your
15   250 shares?
16   A.   If you calculate it, correctly
17   calculate it, whatever it is.   Yeah.   I did get
18   that.
19   Q.   That's -- okay.   So if we were to look
20   at your tax returns it would show both the
21   redemption of your shares and exchange for the $5
22   million note and it would show these yearly
23   payments about TPR, correct?
24   A.   Again.
25        MR. MEISTER:   Objection.   I don't see

144

1    D. GENGER - UNCERTIFIED ROUGH DRAFT - 2/7/13
2    how the -- tax returns showed the redemption.   I
3    don't understand what --
4         MR. GRIVER:   Well, because she is
5    getting paid by TPR.
6    A.   Yes.   I am getting paid by TPR.

1    D. GENGER - UNCERTIFIED ROUGH DRAFT - 2/7/13
2    or superceded in any way?
3    A.   I don't remember that it was.   I don't
4    remember that it was revised.
5    Q.   Okay.   Have you gotten only $180,000 in
6    exchange for your 250 shares or have you gotten
7    more than that?
8    A.   I got whatever I was supposed to get.
9    Q.   Pursuant to this agreement?
10   A.   Yeah.
11   Q.   There was --
12   A.   I mean, I gave the shares -- I sold the
13   shares.
14   Q.   So the shares are now with TPR?
15   A.   Yes.   100 percent over there.   I don't
16   have a single share at home.
17   Q.   No, but I am asking are those shares
18   still with TPR?
19        MR. MEISTER:   How would she know.
20   A.   Ask TPR?   Do you know what TPR is

21   doing? I'm not there. I am not a director. Do
22   I know where they are?
23      Q.   So you had no way of knowing what
24   happened, whether those shares are still with
25   TPR?

146

1    D. GENGER - UNCERTIFIED ROUGH DRAFT - 2/7/13
2       A.   I am not part of TPR. I don't know.
3       Q.   Let me ask you this. Is there any
4    board resolution approving the redemption of
5    these 250 shares back to TPR?
6       A.   I didn't understand the question.
7       Q.   Is there a board resolution?
8       A.   Board resolution of TPR.
9       Q.   Yes. Is there a TPR board resolution
10   approving the redemption to you -- excuse me.
11   Is there a TPR board resolution approving of the
12   redemption of these 250 shares back to TPR in
13   exchange for $5 million?

7       Q.   All I am simply asking, is there a TPR
8    resolution --
9       A.   We have to check. We have to check.
10   I'm not sure.
11      Q.   I will represent to you I have received
12   none in production in this case
13      A.   Okay.
14      Q.   Do you recall there being one?
15      A.   I don't recall.
16      Q.   Who drafted these documents?
17      A.   You know my answer. I don't draft
18   these. I am not a lawyer. I don't know how to
19   draft it. A lawyer draft it, and who was the
20   lawyer, I do not know.
21      Q.   Are you sure --
22      A.   This is always the answer that I will
23   give you because I really don't know.
24      Q.   Are you sure that a lawyer drafted it,
25   or do you think that Sagi drafted it?

148

14      A.   You mean if there is a paper that TPR
15   issued for my giving them the 250 -- selling them
16   or whatever, the 250 shares?
17      Q.   Yes.
18      A.   If they issued such a paper?
19      Q.   Yes.
20      A.   I don't know. But I imagine that yes,
21   I mean, it should be.
22           MR. MEISTER: Just --
23   BY MR. GRIVER:
24      Q.   Ms. Genger, that means at that time you
25   were a director of TPR, so I am asking you --

147

1    D. GENGER - UNCERTIFIED ROUGH DRAFT - 2/7/13
2       A.   No, I was immediately not directly
3    after that.
4       Q.   And was there a --
5       A.   Immediately I gave my shares, I was not
6    a director.

1    D. GENGER - UNCERTIFIED ROUGH DRAFT - 2/7/13
2           MR. MEISTER: Objection. Compound,
3    calls for speculation.
4    BY MR. GRIVER:
5       Q.   Well --
6       A.   If Sagi is a lawyer then he might have
7    drafted it, but he is not a lawyer.
8       Q.   The lawyer who drafted it, do you
9    know -- would the lawyer who drafted it, was it a
10   lawyer for Sagi or TPR?
11      A.   I do not know. I told you.
12      Q.   If you don't know, you don't know?
13      A.   I don't know this.
14      Q.   How did the purchase price of -- how
15   was the purchase price of $5 million determined?
16      A.   Sagi had an estimate of the value of
17   the company, and this is how it came about, the
18   number.
19      Q.   He had a written estimate or he just
20   told you that he thought that was a fair price?
21      A.   Maybe he had a written. I don't

22  remember if he had it written or not.

23  Q.  Okay.  And was there any --

24  A.  This was close to my divorce, that's

25  why it was easy to calculate at the time.

149

1    D. GENGER - UNCERTIFIED ROUGH DRAFT - 2/7/13

2    Q.  Did you have a TPR stock certificates

3  at that time that you signed over to TPR?

4    A.  I think I might have, yeah.  Yes.  Yes.

5  Yes, I did.

6    Q.  Let's go back to the valuation.  This

7  was -- as we sit here today do you know whether

8  it was a written valuation or not?

9    A.  I don't know.

10     MR. MEISTER:  She answered that.

11     THE WITNESS:  I don't know.  I know

12  that it was close to my divorce so it was kind of

13  easy because, you know, we had mediation and you

14  know, with my husband.  And so it was quite easy

8    A.  It was close to the divorce, the

9  arbitration that we had.  We had arbitration

10  after the divorce.

11    Q.  And do you know when this arbitration

12  ended?

13    A.  I don't remember the date.

14     MR. MEISTER:  We would like to take a

15  five-minute break while you are searching.

16     MR. GRIVER:  I have it right here.

17     THE WITNESS:  Okay.  So ask me.

18  BY MR. GRIVER:

19    Q.  The final arbitration award is dated

20  May 6, 2008.  It is Dalia Exhibit 11 to this

21  deposition.

22     So this was during -- this was

23  during --

24    A.  During, yeah, yeah, I see.  It is --

25     MR. MEISTER:  Can we take a break now

151

15  to know how much the value of my shares is.

16    Q.  The valuation, was it valuation done by

17  Sagi?

18    A.  I don't know who did the valuation.

19    Q.  You didn't do the valuation?

20    A.  No.  I am not qualified to do that.

21    Q.  Do you recall any third party company

22  or third party of any kind doing a valuation to

23  come up with the $5 million figure?

24    A.  I don't recall that.

25    Q.  How long were there any negotiations

150

1    D. GENGER - UNCERTIFIED ROUGH DRAFT - 2/7/13

2  whatsoever with regard to this document?

3     MR. MEISTER:  Referring to.

4    A.  The $5 million you mean?

5  BY MR. GRIVER:

6    Q.  What do you mean by close to the

7  divorce?

1    D. GENGER - UNCERTIFIED ROUGH DRAFT - 2/7/13

2     MR. GRIVER:  Last question then we will

3  take a break.

4  BY MR. GRIVER:

5    Q.  Was there agreement provided to the --

6  provided as part of the arbitration by you or by

7  Sagi?

8    A.  No.

9    Q.  Okay.  We can take a break.

10     (WHEREUPON, a recess was had.)

11     3:04-310.

12     MR. GRIVER:  Back on the record.

13  BY MR. GRIVER:

14    Q.  Ms. Genger I am going to have to

15  correct one thing on the record.  If you look at

16  the December 17, 2007 --

17    A.  Wait a second.

18    Q.  -- letter, it says you will be paid not

19  30,000 a year over the next 25 years, $30,000 a

20  month?

21    A.  That's true.

22    Q.    Over the next 25 years?

23          So my question to you is has TPR been

24    paying that amount of money to you $30,000 a

25    month?

152

1     D. GENGER - UNCERTIFIED ROUGH DRAFT - 2/7/13

2     A.    Yeah.

3     Q.    Since January 15, 2008?

4     A.    That was actually the amount that the

5     judge awarded me when we had the beginning when

6     we were divorcing, that's the amount that the

7     judge awarded me monthly, by the way.

8     Q.    Okay. I am just asking whether TPR has

9     been paying you $30,000 a month instruments?

10    A.    They were paying me, yeah.

11    Q.    Before the redemption of the 250

12    shares?

13          MR. MEISTER:  I'm sorry.

14    A.    Before the redemption

15          MR. MEISTER.  New question.

16    A.    No. No. They didn't pay me anything

17    before they got the shares.

18    BY MR. GRIVER

19    Q.    Since January 15 of 2008, as provided

20    in this letter dated December 17, 2007 that's

21    what I am looking at, Ms. Genger.

22    A.    Yeah.

23    Q.    It says will you receive $30,000 a

24    month starting on January 15, 2008.  So my

25    question to you is, has TPR been paying you

153

1     D. GENGER - UNCERTIFIED ROUGH DRAFT - 2/7/13

2     $30,000 a month since January 15, 2008?

3     A.    I have to check and come back to you.

4     Q.    You don't --

5     A.    I have to check and come back to you

6     Q.    Well, let me ask you this.

7          Last month, did you get a check from

8     TPR on January 15, 2013?

9     A.    Yeah, I am getting checks from TPR.

10    Q.    Are you getting checks for these 250

11    shares, that's what I am asking you?

12    A.    Yeah.  I am getting checks from TPR for

13    the shares.  I mean, what's -- it is a new

14    question?

15    Q.    And you have been receiving $30,000 a

16    month since January 15, 2008 for these 250

17    shares?

18    A.    I am receiving not exactly 30,000,

19    because I don't need exactly 30,000.  When I --

20    there is -- this is a document between TPR,

21    right, and me.

22    Q.    Correct.

23    A.    Okay.  Now, whenever I need and I don't

24    need, whenever there is a necessity for me to

25    get money, I ask for the money, if there's no

154

1     D. GENGER - UNCERTIFIED ROUGH DRAFT - 2/7/13

2     need, I don't ask for it.

3     Q.    And you ask for that money from Sagi?

4     A.    From TPR.

5     Q.    And who through Sagi -- you let Sagi

6     know you need money and he gives you?

7     A.    There's nobody else there.

8     Q.    And --

9     A.    I mean -- who else.

10    Q.    And is it however much money you need

11    or is it limited to $30,000?

12    A.    It is limited to whatever they owe me.

13    Q.    And is there a subsequent document of

14    any kind memorializing that change in the terms

15    of the agreement?

16          MR. MEISTER:  Asked and answered.  So

17    objection.

18    BY THE WITNESS

19    A.    I don't recall if there is any

20    document.

21    BY MR. GRIVER:

22    Q.    When you gave your shares --

23   A.  You mean redeem, right?

24     MR. MEISTER:  Don't use that word

25  again.

155

1   D. GENGER - UNCERTIFIED ROUGH DRAFT - 2/7/13

2     THE WITNESS:  He said redeem so I have

3  to ask.

4     MR. MEISTER:  You don't have to ask

5  BY MR. GRIVER:

6   Q.  When you signed over your stock

7  certificates to TPR as part of the redemption,

8  did you keep a copy for your records?

9   A.  I am sure there is a copy somewhere.

10   Q.  Okay.  I would ask for a copy of those.

11   A.  It is probably TPR has it.

12   Q.  No, I asked whether you kept a copy?

13     MR. MEISTER:  And she said she is sure

14  there is a copy.

15   A.  I don't know.  If I had it, I gave it

16  to Sagi  I don't know if I kept for my records

17  because I thought that Sagi wouldn't ask me again

18  for 250 shares.

19   Q.  Okay.  If TPR redeemed your 250 shares,

20  then D&K owned -- okay

21     Did TPR give you anything when you gave

22  them the stock certificates?  Any document, did

23  they give you any document?

24   A.  When I give them the shares?

25   Q.  When you signed over the shares?

156

1   D. GENGER - UNCERTIFIED ROUGH DRAFT - 2/7/13

2   A.  If they gave me any document?

3   Q.  Yes.

4   A.  I don't remember if they did.

5   Q.  To the extent that Ms. Genger has a

6  copy of that I would appreciate that.

7     THE WITNESS:  Okay.

8  BY MR. GRIVER:

9   Q.  Did TPR give you anything after you

10  signed over the stock certificates to it?

11     MR. MEISTER:  You mean anything other

12  than the checks?  Money.

13  BY MR. GRIVER:

14   Q  Anything other than the checks?

15   A.  You mean like gold, jewelry?

16   Q.  Any kind of documentation.

17   A.  Again, after I gave them the 250

18  shares, if they gave me any additional some kind

19  of papers?

20   Q.  Yes.

21   A.  To establish that there is some kind of

22  an exchange you mean

23   Q.  Yes.

24   A.  I don't remember, but --

25   Q.  To the extent you have copies of these

157

1  D  GENGER - UNCERTIFIED ROUGH DRAFT - 2/7/13

2  checks from TPR memorializing these payments?

3   A  Okay.

4   Q.  These monthly payments, I would --

5   A.  Appreciate.

6   Q.  -- appreciate a copy.

7     When you get these checks, are these

8  checks from TPR or are these checks from Sagi, or

9  is this from some other company?

10   A.  No.  They are not checks from Sagi.

11   Q.  Are they checks from TPR?

12   A  I couldn't say.

13   Q  Do you recall -- do you recall what

14  entity is -- what entity's checks these are?

15   A  No, I cannot.

16   Q  As we sit here today you are not sure

17  those checks are TPR checks?

18   A.  I didn't say that they are checks  You

19  are assuming that they are checks.

20   Q.  Okay.  Do you get checks?

21   A.  No.

22   Q.  Do you get wire transfers?

23   A.   Yes.

24   Q.   Are these wire transfers from TPR

25   accounts?

                        158

1    D. GENGER - UNCERTIFIED ROUGH DRAFT - 2/7/13

2    A.   I don't know.

3    Q.   Are these wire --

4    A.   I think --

5    Q.   Transfers from Sagi?

6    A.   No, not from Sagi.

7    Q.   How do you know they are from Sagi, but

8    you don't know anything else.

9    A.   I know they are not from Sagi.

10   Q.   How?

11   A.   Because Sagi is not supporting me.  He

12   cannot afford to support me.

13   Q.   Are these checks from -- are these

14   checks from E&G -- strike that.  Are these wire

15   transfers E&G.

16         MR. MEISTER:  E&G?

17   A.   What is E&G?

18   Q.   It is a company that's -- a company

19   that Sagi has?

20   A.   No.

21   Q.   Are these --

22   A.   I don't know what is E&G.

23   Q.   Are these wire transfers from Bazzad

24   /(?

25   A.   No.

                        159

1    D. GENGER - UNCERTIFIED ROUGH DRAFT - 2/7/13

2         MR. GRIVER:  B-a-t-z-a-d-

3    BY THE WITNESS:

4    A.   I don't remember if they are

5    Q.   Okay.  These wire transfers do you know

6    what bank they are coming from?

7    A.   No.

8    Q.   Do you know what bank they are going

9    into?

10   A.   To my bank.

11   Q.   And which bank is that?

12   A.   Citibank.

13   Q.   Citibank?

14   A.   Yes.

15   Q.   Do you know which specific branch?

16         MR. MEISTER:  Which specific branch the

17   wires go into?

18         MR. GRIVER:  Yes.  It has been a long

19   day.

20         MR. MEISTER:  Yes, it has.

21   BY MR. GRIVER:

22   Q.   Do you know the account, do you know

23   which account it goes into?

24   A.   If I know my account number, by heart?

25   No, I don't.

                        160

1    D. GENGER - UNCERTIFIED ROUGH DRAFT - 2/7/13

2         MR. MEISTER:  He wants to know whether

3    it is your account.

4    A.   My account, my account.

5    Q.   It goes into your account?

6    A.   The -- yes.

7    Q.   The account for Dalia Genger?

8    A.   Yes.

9    Q.   Okay.  Upon redemption, D&K LLP then

10   would have controlled approximately 96 percent of

11   TPR, is that your recollection?

12         MR. MEISTER:  You are using the word

13   redemption.  If you mean redemption or sale

14   A.   I am losing you now.  If it is D&K and

15   this -- I am losing.  I don't understand any more

16   what you are saying.

17   Q.   When shares are redeemed, they become

18   treasury shares, and they no longer count towards

19   the percentage of ownership.  So that means if

20   your 250 shares were redeemed by TPR, it made the

21   remaining shares more valuable, which is why

22   redeeming the shares allowed the Orly trust and

23   the Sagi trust to share equally.

24   A.   What I have to consult an accountant.

25   I don't know what you are --

161

1   D. GENGER - UNCERTIFIED ROUGH DRAFT - 2/7/13

2        MR. MEISTER:  Wait for a question.

3   A.   I don't know what you are talking

4   about.

5        MR. MEISTER:  Wait until a question.

6   BY MR. GRIVER:

7   Q.   To your knowledge, was there ever a

8   time when the -- when D&K LLP owned 96 percent of

9   TPR?

10   A.   96 percent of TPR?

11   Q.   Yes.

12   A.   I am getting confused.

13   Q.   Well, I will just repeat it again.  I

14   think it is simple question.

15        Was there ever a time to your

16   understanding when D&K LLP owned approximately 96

10   Q.   What was the effect on the Orly trust

11   of the redemption?

12        MR. MEISTER:  I'm going to object to

13   the form of the question.

14   A.   The whole exercise was for me to be

15   available for Orly to be a trustee.  I don't know

16   what you are asking me now.

17   Q.   All right.  Let me show you what I am

18   going to mark as Exhibit 26.

19        (Dalia Exhibit /*, marked.)

20        MR. GRIVER:

21        (WHEREUPON, the record was read by

22        the reporter as requested.)

23        THE WITNESS:  Now, can I read this

24   quietly?  Because it is hard for me to

25   concentrate already.

163

1   D. GENGER - UNCERTIFIED ROUGH DRAFT - 2/7/13

2        MR. GRIVER:  Sure.

17   percent of TPR?

18   A.   In the beginning of history, before we

19   got divorce when it was --

20   Q.   How about after December 17, of 2007,

21   did D&K LLP own approximately 96 percent of TPR?

22   A.   Can you ask me again, what is the date?

23   What -- can we schedule another date?  I am

24   getting --

25        MR. MEISTER:  Read the question back.

162

1   D. GENGER - UNCERTIFIED ROUGH DRAFT - 2/7/13

2   He is referring to this date.

3   A.   What are you saying now.

4        MR. GRIVER:  Repeat the question,

5   please.

6        (WHEREUPON, the record was read by

7        the reporter as requested.)

8   A.   I don't know.  That's my answer

9   BY MR. GRIVER:

3        THE WITNESS:  (Witness reading

4   document).

5        THE WITNESS:  Okay.  Now when you say

6   security agreement, you mean the note that D&K

7   note.

8   Q.   Yes, the D&K note.

9   A.   It will be clear to me.

10   Q.   This is from the sale of the UCC sale

11   of the D&K

12        MR. MEISTER:  Is there a pending

13   question?

14   Q.   Let me ask you the question so when you

15   go through it you will be able to know.

16   A.   So this was an action --

17   Q.   On the date of the auction?

18   A.   Yeah.

19   Q.   Who else owned TPR shares, to your

20   knowledge?

21   A.   Except, I mean -- I mean, TPR

22   obviously, and the I guess the D&K limited,

23   right.

24   Q.   Uh-huh.  Rochelle Fang owned ten shares
25   I believe.

                    164

1    D. GENGER - UNCERTIFIED ROUGH DRAFT - 2/7/13
2    A.   You know, all these little things, I am
3    not familiar with.
4    Q.   Anyone else that you know?
5        MR. MEISTER:  Just so it is clear, she
6    says she is not familiar.  You are telling her
7    something and she says she is not familiar.
8        MR. GRIVER:  Okay.
9        THE WITNESS:  I am not familiar I just
10   understand that this is something that you showed
11   me before and I told you it is part of this
12   auction and I wasn't there, I don't know and
13   whatever you say.
14   Q.   On that date did Sagi own shares?
15   A.   What.
16   Q.   On that date did Sagi own shares?

17   A.   He -- if he owned shares.
18   Q.   In TPR?
19   A.   I don't remember when he bought the
20   shares from the group.  I don't remember what
21   date it was.  Because Sagi -- no.  Sagi --
22   shares.  I mixing things around I'm sorry.
23   Q.   I am talking about TPR shares?
24   A.   Yes.  TPR shares.
25   Q.   On this date did Sagi own TPR shares?
                    165

1    D. GENGER - UNCERTIFIED ROUGH DRAFT - 2/7/13
2    A.   I don't know.
3    Q.   On this date did you own TPR shares?
4    A.   On this --
5    Q.   On February 27, 2009 did you own TPR
6    shares?
7    A.   When did I sell the shares?  I don't
8    remember any more the date.  December 17, 07, and
9    when this took place?  So no, I didn't because

10   this happened in February 09  So I didn't.  I
11   didn't because I sold my shares, so.
12       MR. GRIVER:  Okay.  I am going to ask
13   that the redacted bank statements be provided
14   evidencing those wire transfers from TPR.
15       THE WITNESS:  What?
16       MR. GRIVER:  That was to Mr. Meister.
17       THE WITNESS:  Oh, okay.
18       MR. GRIVER:  Not to you.
19       MR. GRIVER:  So I am clear on the
20   record what I would like is redacted bank
21   statements showing the wire transfers into
22   Ms. Genger's account from whatever source those
23   transfers come.
24   Q.   Whose idea was it, Ms. Genger, to try
25   and settle the D&K note case without Orly Genger?
                    166

1    D. GENGER - UNCERTIFIED ROUGH DRAFT - 2/7/13
2    A.   Whose idea was it to sell?

3    Q.   To settle --
4    A.   To settle?
5    Q.   -- without Orly Genger, yes  Strike
6    that.  Let's create a record
7        On or about October --
8    A.   Show me the papers so I remember.
9        MR. MEISTER:  Wait for the question.
10   BY MR. GRIVER:
11   Q.   Do you recall entering into a
12   settlement agreement trying --
13   A.   There was some kind of settlement
14   hoping that we would finish this nightmare, yes.
15   Q.   Okay.  And whose idea was it to try and
16   enter into the settlement agreement?
17   A.   All the people that wanted peace and
18   not war.
19   Q.   Well, I would like a name instead of a
20   description.  Whose idea --
21   A.   My idea, my son's idea, TPR's idea.
22   Q.   The lawyers idea?
23   A.   Yes.  People who want to finish with
24   the case.

25   Q.   Okay.  Mr. Meister's idea?

167

1   D. GENGER - UNCERTIFIED ROUGH DRAFT - 2/7/13

2   A.   Right.

3   Q.   Mr. Dellaportas' idea?

4   A.   But not your idea, because you want to

5   continue and continue with this.

6        MR. MEISTER:  Just answer the question.

7   BY MR. GRIVER:

8   Q.   Just answer the question.

9   A.   So that's part of my answer.

10   Q.   Just answer the question I asked.

11   A.   Somebody who doesn't want to settle.

12   You don't you understand that.

13   Q.   Your idea, correct?

14   A.   Yes.  I want to settle.

15   Q.   Sagi's idea?

16   A.   I hope you also want to settle.

17        MR. MEISTER:  Excuse me.  Dalia, just

11        MR. GRIVER:  That's it, and then a few

12   additional questions.

13        THE WITNESS:  And what?

14        MR. MEISTER:  Dalia.  Let's take a

15   five-minute break.

16        MR. GRIVER:  That's the key area.

17        MR. MEISTER:  And I am going to suggest

18   you and I go outside and get some fresh air.

19        THE WITNESS:  Okay.  Let's go.

20        (WHEREUPON, a recess was had.)

21        3:34-351.

22

23        MR. GRIVER:  Exhibit 27.

24        (Dalia Exhibit /*, marked.)

25   BY MR. GRIVER

169

1   D. GENGER - UNCERTIFIED ROUGH DRAFT - 2/7/13

2   Q.   Ms. Genger, do you recognize this

3   document for the record this document is titled

18   answer the question, or we will be here today

19   until midnight and tomorrow.

20        THE WITNESS:  That's really incentive.

21        MR. GRIVER:  Do you need a break,

22   Ms. Genger?

23   A.   I might need a break soon.

24        MR. GRIVER:  Why don't we take just a

25   break so that --

168

1   D. GENGER - UNCERTIFIED ROUGH DRAFT - 2/7/13

2   A.   No, I am getting frustrated because you

3   know, we want to finish this, we want to finish

4   this.

5        MR. MEISTER:  How much longer do you

6   have, Yoav?

7        MR. GRIVER:  I have the 8 agreements

8   that involve the Manhattan safety company and

9   their attempt at settlement.

10        MR. MEISTER:  That's it?

4   settlement agreement, and there's Bates ranges DG

5   1101 to 1110.

6        Ms. Genger, do you recognize this

7   document?

8   A.   Although it looks familiar --

9        MR. MEISTER:  The question is --

10   A.   Can I ask Bob something?  Because --

11   Q.   Is it a privilege issue?

12   A.   I'm not sure if this is the settlement

13   agreement because I thought -- there was

14   something else.

15   Q.   Well, there are additional documents,

16   but I will note on page 7 of the document, which

17   is Bates stamp DG 107 is your signature?

18   A.   Right.  Yes.

19   Q.   But if you want to take a break and

20   ask --

21   A.   I just want to look over it one more

22   time, okay.

23   Q.   Yes.

24        MR. MEISTER:  While she's doing that, I

25   will note for the record that I thought we had

170

1   D. GENGER - UNCERTIFIED ROUGH DRAFT - 2/7/13
2   produced a copy which also had the counterpart
3   signature, of TPR.
4        MR. GRIVER:  You anticipated one of my
5   questions.  Is there a counterpart signature of
6   TPR?
7        MR. MEISTER:  Yes.
8        THE WITNESS:  I'm not sure that that's
9   the exhibit I looked at.
10       MR. GRIVER:  Do you know who signed it?
11       MR. MEISTER:  I believe it was Yonite
12   Sternberg.
13       MR. GRIVER:  She signed the amended and
14   restated.
15       MR. MEISTER:  As far as I believe.
16
17   A.   So in general, what is the question?

11   represent to you that we have not received any
12   drafts of the settlement agreement.  Are there
13   drafts that have not been provided?
14       MR. MEISTER:  I don't think we have any
15   drafts.  I do know we have a copy which has -- or
16   signature page which has the signature for TPR.
17   BY MR. GRIVER:
18   Q.   Ms. Genger, do you know who took the
19   laboring hand in drafting this settlement
20   agreement?
21   A.   Who drafted this?
22   Q.   Yes.  Was it your lawyer was it his
23   lawyers?  Who took --
24   A.   Whoever signed it, their lawyer did
25   this document.

172

1   D. GENGER - UNCERTIFIED ROUGH DRAFT - 2/7/13
2   Q.   Did Mr. Meister discuss with you any
3   drafts of the settlement agreement?

18   So I will read it --
19   Q.   I have a bunch of questions.
20   A.   A bunch?
21       MR. MEISTER:  Start with the first one.
22   What's the pending question.
23   BY MR. GRIVER
24   Q.   Whether there were any drafts of this
25   settlement agreement.  That would be my first

171

1   D. GENGER - UNCERTIFIED ROUGH DRAFT - 2/7/13
2   question.  Electronic or otherwise.
3   A.   I don't know if there are drafts.
4   Q.   So let me ask -- is that on the record?
5        Court reporter:  Yes.
6   BY MR. GRIVER:
7   Q.   As we sit here today, you don't recall
8   there being any drafts of this agreement?
9   A.   I don't recall.
10       MR. GRIVER:  Mr. Meister, I will

4   A.   I do not remember.
5   Q.   Do you recall making any changes to the
6   settlement agreement?
7   A.   No.
8   Q.   Was it your lawyer's who, you know, had
9   the major responsibility of issuing a draft of
10   the settlement agreement for all parties or did
11   your lawyers receive the settlement agreement for
12   comment?
13   A.   No.  It is -- it is a mutual --
14       (WHEREUPON, there was a short
15       interruption.)
16       MR. GRIVER:  Let's go back.
17
18   BY MR. GRIVER:
19   Q.   So we're clear, you did not make any
20   changes to the settlement agreement that --
21   A.   I don't recall that there were any
22   changes.  But the lawyers worked together in
23   order to come to this settlement.
24   Q.   Which law firm or lawyer took the hand
25   in drafting this agreement?

173

1   D. GENGER - UNCERTIFIED ROUGH DRAFT - 2/7/13

2     MR. MEISTER:  Took the hand?

3   Q.  Yes.

4     MR. MEISTER:  Objection as to form.

5     MR. GRIVER:

6   Q.  Which lawyer --

7   A.  Who participated --

8   Q.  Someone had to be in charge of drafting

9  the settlement agreement and circulating it for

10  comments.  Which lawyer or law firm did that?

11   A.  It was -- this came as the lawyers came

12  together with ideas, and they put it in writing

13  I don't think there was one single lawyer that

14  came with this and said you sign, you sign.  It

15  is kind of cooperation between parties that

16  wanted to settle.

17     MR. GRIVER:  Okay.  Mr. Meister, to the

18  extent there are any drafts available, electronic

19  or otherwise of the settlement agreement, or the

20  amended and restated settlement agreement or any

21  of the other documents --

22     THE WITNESS:  This I don't know.

23     MR. GRIVER:  -- I would ask they be

24  provided.

25  BY MR. GRIVER:

174

1   D. GENGER - UNCERTIFIED ROUGH DRAFT - 2/7/13

2   Q.  How long did these discussions take to

3  reach the settlement agreement?  Was it decided

4  in a day, in a week, how long?

5   A.  I don't remember.  I have no idea.

6   Q.  Were these in person discussions, were

7  they over the phone, were you involved in

8  these -- strike that.

9     Let's ask this:  Were you involved in

10  any of these discussions?

11   A.  Yes.  I was there when it was

12  discussed.

13   Q.  You were present?

14   A.  Yeah.

15   Q.  Where were you?

16   A.  I think it was Bob's office?  No.  I --

17   Q.  Because Duane Morris' offices?  Sagi's

18  lawyer's office?

19   A.  Sagi lawyer's office maybe.

20   Q.  Sagi lawyer's office?

21   A.  Maybe, yeah, because I said something,

22  wrong, obviously.

23     MR. MEISTER:  If you don't remember you

24  don't remember.

25  BY THE WITNESS:

5   A.  One of the lawyers.

6   Q.  Okay.  Was there a lawyer there in

7  these discussions representing you personally?

8   A.  Representing me personally?

9   Q.  Uh-huh.

10   A.  You know that Bob represents me

11  personally, and represents the trust.

12   Q.  Okay.

13   A.  So I didn't ask him at one moment, at a

14  certain moment if he's talking on this side of

15  his mouth or the other side of his mouth  I

16  don't know.  I can't tell you

17   Q.  Mr. Meister was representing both the

18  trust and you personally in these settlement

19  negotiations?

20   A.  No.  This settlement is not between me.

21  It is between the trust.

22   Q.  But it does release you from all

23  liability?

24     MR. MEISTER:  Objection.

25   Q.  Doesn't it?

175

1   D. GENGER - UNCERTIFIED ROUGH DRAFT - 2/7/13

2   A.  I thought it was there, but I was

3  wrong.

4   Q.  Was there a lawyer there in these --

176

1    D. GENGER - UNCERTIFIED ROUGH DRAFT - 2/7/13

2    A.   Where does it say so?

3    Q.   Let's take a look.  Page 5, paragraph 4

4    mutually releases?

5    A.   1105.

6    Q.   1105.  E.  Paragraph 4 mutual releases

7    A.   Release one another.  Including --

8    Q.   Okay.

9    A.   Yeah.  No.  But I'm trying to see if

10   I'm part of this personally.  I don't see

11   personally that I am represented here.

12   Q.   You see that it --

13   A.   I don't see personally, Dalia Genger.

14   Q.   You see -- well, let me read it to you.

15   The parties to the settlement agreement hereby

16   irrevocably and fully release one another

17   including all current directors officers

18   trustees, et cetera, et cetera

12   didn't release Dalia.

13   THE WITNESS:  You made sure it is not

14   there

15   BY MR. GRIVER:

16   Q.   D&K LLP also released you as trustee,

17   correct?

18   A.   If it says so.  I don't remember.

19   Q.   And motions for --

20   A.   I was in the capacity as trustee, not

21   as Dalia Genger.

22   Q.   Okay.  Let's go -- why would it be in

23   the trust's best interest in release you as

24   trustee?

25   MR. MEISTER:  Objection.

178

1    D. GENGER - UNCERTIFIED ROUGH DRAFT - 2/7/13

2    BY MR. GRIVER:

3    Q.   From all claims?

4    MR. MEISTER:  Objection.  Trust didn't

19   You are the trustee, correct?

20   A.   Right.  As the trustee I am released,

21   but not personally

22   Q.   Okay.  Well --

23   MR. MEISTER:  Just so we are clear,

24   release the other parties, there's no release by

25   the trust to the trustee.

177

1    D. GENGER - UNCERTIFIED ROUGH DRAFT - 2/7/13

2    Q.   It says the parties to the settlement

3    agreement hereby irrevocably fully release one

4    another.

5    MR. MEISTER:  Right.  One another.

6    MR. GRIVER:  So the trust is released,

7    and the trustee is released.

8    MR. MEISTER:  By TPR.

9    MR. MEISTER:  I know you are trying to

10   mischaracterize this as the trust releasing

11   Dalia, but it is not there because the trust

5    release her, and I really don't like your trying

6    to confuse the witness, at 4:00, in the end of a

7    day, by misrepresenting the legal documents to a

8    layperson.

9    THE WITNESS:  And I just said that I

10   just went -- we repeated.  I repeated that we

11   made sure that I personally was not released.

12   Q.   Okay.

13   A.   Only as a trustee, not as an

14   individual.  Please.

15   Q.   Very good.  Let's look at paragraph 8,

16   attorneys' fees.

17   A.   What?

18   Q.   Attorneys' fees.  Do you understand

19   what paragraph 8 does?

20   A.   Let me get to it first.  Exhibit A you

21   mean.

22   Q.   Paragraph 8 on DG 1106

23   A.   I mean, it is not enumerated.  Oh, I'm

24   sorry.  Attorneys' fees.

25   BY MR. GRIVER:

179

1  D. GENGER - UNCERTIFIED ROUGH DRAFT - 2/7/13

2  Q. Do you understand what paragraph 8

3  does?

4  A. I have to read it. I am very slow.

5  Q. We will wait it is important you

6  understand this document.

7  A. Yes. It takes me a long time. It is

8  hard for me.

9  Q. Let me know when I can ask you.

10  A. Okay. So ask me the question and then

11  I will read if again. Because it is difficult.

12  Q. This paragraph provides that if a

13  beneficiary of a party --

14  A. Of this agreement.

15  Q. Right. A beneficiary of a party of

16  this agreement, beneficiary of a party to this

17  agreement would be Orly?

18  A. Right. Orly trust you mean?

19  Q. No. It is because the Orly is

20  beneficiary?

21  A. Of the trust, okay.

22  Q. So if Orly either asserts a new claim

23  against TPR or D&K, or continues with an existing

24  claim against TPR and D&K and is unsuccessful,

25  then the trust is liable for the attorneys' fees

180

1  D. GENGER - UNCERTIFIED ROUGH DRAFT - 2/7/13

2  of D&K and TPR. That's what this paragraph does.

3  My question to you, Ms. Genger, is how

4  is that in the benefit of the trust?

5  A. Okay. So what you are saying -- let me

6  see if I understand. Okay. That Orly here is a

7  beneficiary -- is a beneficiary, right?

8  Q. Correct.

9  A. Okay. Who else is a beneficiary,

10  except Orly? I am asking you because I am not --

11  I don't understand.

12  Q. The Orly Genger 1993 trust who is the

13  beneficiary of the Orly Genger 1993 trust?

14  A. It is Orly. So who else is a --

15  another beneficiary.

16  Q. But Orly is a beneficiary?

17  A. Yes. I am saying yes. But are there

18  any other beneficiaries that we are talking here?

19  Q. Contingent beneficiaries, but a

20  beneficiary, Orly is the beneficiary?

21  A. Orly is beneficiary, yes, I agree.

22  Q. So if she either continues with her

23  claims, or asserts a new claim against TPR or D&K

24  and is unsuccessful, the Orly trust is liable for

25  the attorneys' fees of D&K and/or TPR.

181

1  D. GENGER - UNCERTIFIED ROUGH DRAFT - 2/7/13

2  Did you understand that that was the

3  result of this paragraph when you signed it as

4  trustee on October 3, 2011?

5  A. I just want to understand. I want to

6  know if I understood, that Orly is a beneficiary

7  if she continues.

8  Q. Yes.

9  A. To sue, to sue?

10  Q. Yes.

11  A. The other parties that are involved in

12  this agreement?

13  Q. Yes.

14  A. She -- the trust will be liable for the

15  cost of her suing, right?

16  Q. That's correct.

17  MR. MEISTER: If the defendant wins.

18  THE WITNESS: If the -- if she wins.

19  MR. MEISTER: If she loses and

20  defendants win.

21  THE WITNESS: If she loses, usually it

22  is customary --

23  Q. Not in America. No.

24  A. So what country is it --

25  Q. Let me ask you this: When you signed

182

D. GENGER - UNCERTIFIED ROUGH DRAFT - 2/7/13

2  this agreement?

3      A.   No.  The agreement is to make the

4  parties come to a point that they won't sue each

5  other, that they will come to a point when they

6  agree that we should come to terms where everyone

7  is satisfied with what is getting and it not

8  going to continue to sue.

9      Q.   How is it in the Orly -- strike that.

10     First of all, when you signed this

11  agreement did you understand the settlement

12  agreement when you signed it?

13     A.   I thought I did.

14     Q.   Did you review it with your attorneys?

15     A.   Yes.

16     Q.   Did they explain it to you?

17     A.   Yeah.

18     Q.   Did you understand that you were --

19  that you are providing that the Orly trust would

---

13     A.   We said that we --

14     Q.   Just answer my question?

15     A.   We work together.  So I don't know if

16  it was Bob or John, or his assistant or Bob's

17  assistant, I do not know.  I did not put it there

18  because I am not smart enough, okay, to write

19  this document.  But one of the lawyers put it

20  there because settlement is settlement.  We want

21  to finish with the story.

22     Q.   And this meeting where this agreement

23  was reached, where -- how long did this agreement

24  take place?

25     A.   You asked me this.

                        184

---

D. GENGER - UNCERTIFIED ROUGH DRAFT - 2/7/13

2      Q.   No.  How long?

3      A.   I don't remember.

4      Q.   Half a day, one day, more than a day?

5      A.   I don't remember.  I really don't

---

20  be paying -- paying attorneys' fees?

21     A.   I don't want Orly to continue with out

22  basis, I am saying, without basis.  If she has

23  basis to sue she should sue.  But without basis

24  she shouldn't sue any of the other participants

25  here because it cost money to the trust.  And she

                        183

---

D. GENGER - UNCERTIFIED ROUGH DRAFT - 2/7/13

2  owns the trust and she's going to lose money.

3      Q.   And so --

4      A.   And that's why we want everybody stop

5  suing each other, because it costs money.  This

6  is the settlement.  That's why it is called a

7  settlement.  People want -- they will stop suing

8  each other.  That's the whole point.

9      Q.   Whose idea was it to have this attorney

10  fees provision?

11     A.   I don't know whose idea.

12     Q.   And you thought it was --

---

6  remember

7      Q.   When you got there were they still

8  drafting the agreement, or was it ready for

9  signature when you got there?

10     A.   I don't remember.  There were so many

11  papers written, who can remember.

12     Q.   In your previous answer you talked

13  about John.  Who is John?

14     A.   John -- John Dellaportas, that is

15  Sagi's lawyer I think.  I think that's the one.

16     Q.   What other lawyers were there?

17     A.   I don't remember there was another

18  lawyer.

19     Q.   Is there anyone representing -- were

20  there any other lawyers there representing Sagi

21  other than Mr. Dellaportas?

22     A.   I don't believe so.

23     Q.   Do you remember what John said?

24     A.   Are you kidding me?  No.  I don't

25  remember what he said.

                        185

D. GENGER - UNCERTIFIED ROUGH DRAFT - 2/7/13

1

2  Q  So --

3  A  This is -- the result of --

4  Q  And so you thought it would be a good

5  idea to put in an attorney's fees provision that

6  would try and prevent Orly from suing on behalf

7  of her trust?

8  A  I think that what the product of the

9  work of the lawyers of the parties concerned

10  thought that this is a very good idea to settle

11  once and for all this arguments and fights that

12  we have about Orly's rights.

13  Q  When was this meeting was it on October

14  3?

15  A  Whenever it says. I don't know.

16  Q  This meeting was on the date that this

17  agreement was executed, is that correct?

18  A  If it says so. You think I remember

19  what date it was?

20  Q  Well, it says --

---

14  A  It is for Orly's benefit. I am not

15  suing --

16  Q  But if you lose, you have to pay?

17  A  I am not going to lose.

18  Q  You are not going to lose?

19  A  I am not going to lose.

20  Q  I see.

21  So Orly's got -- any lawsuit Orly

22  brings, she is going to lose, but any lawsuit you

23  bring, you are going to win?

24  MR. MEISTER: Wait a minute. You are

25  arguing with the witness.

187

---

D. GENGER - UNCERTIFIED ROUGH DRAFT - 2/7/13

1

2  MR. GRIVER: I am trying to understand

3  if that's her belief.

4  A  What I am saying is, first of all, I am

5  not sure if that was the day it says so, but I'm

6  not sure that that was exactly the date that I

---

21  MR. MEISTER: If you don't remember --

22  BY MR. GRIVER:

23  Q  Signature, October 23, 2011?

24  A  Whatever it says. I don't remember if

25  it was then it was then.

186

---

D. GENGER - UNCERTIFIED ROUGH DRAFT - 2/7/13

1

2  Q  Well, the day after you signed this

3  agreement you brought suit in Delaware didn't

4  you?

5  A  What?

6  Q  The day after you signed this agreement

7  to try and stop all these lawsuits from

8  proliferating, you brought a new lawsuit in

9  Delaware, isn't that correct?

10  A  But this --

11  Q  Correct? It is correct, right?

12  A  Yeah, but in all --

13  Q  That doesn't count?

---

7  signed was the date that really it happened

8  because many times we know that things are signed

9  and it is not the same exactly the same date.

10  Q  Let me understand this. You are saying

11  it is possible you put an incorrect date as the

12  date of your signature?

13  A  What I am saying is, that many times,

14  by the time the document is printed it is not

15  exactly the date that it is signed.

16  Q  Okay.

17  A  It happens.

18  Q  Fine.

19  Well, on August 8 of 2011, your

20  lawyers --

21  A  I mean aren't you --

22  MR. MEISTER: Wait for the question.

23  Don't argue with him.

24  BY MR. GRIVER:

25  Q  Now, on August 8, 2011 Pedowitz &

188

1    D. GENGER - UNCERTIFIED ROUGH DRAFT - 2/7/13

2    Meister brought this interpleader action, right,

3    that's an additional lawsuit, correct?

4        A.   Ask him.  It is not my idea,

5    interpleader.

6        Q.   All right.  And on October -- let's

7    look at paragraph one, the consideration.

8            On behalf of the trust, you disclaimed

9    any --

10       A.   Wait, wait, wait a second.  You are

11   looking at number 1, page 1104.

12       Q.   Yes.

13       A.   Consideration.

14       Q.   Yes.  Subpart B the OG trust.

15       A.   Where is subpart B?  I don't know

16       Q.   It is after subpart A it is about 1, 2,

17   3, 4 -- it is about six lines down?

18       A    Okay.  Okay.  So what are you

19   complaining that TPR --

20           MR. MEISTER:  He is not complaining

21   He may be asking you a question.  He hasn't yet.

22   BY MR. GRIVER

23       Q.   In this -- you will agree with me that

24   in this paragraph one, the OG trust disposed of

25   its interest in TPR and gave them to TPR?

                        189

1    D. GENGER - UNCERTIFIED ROUGH DRAFT - 2/7/13

2            MR. MEISTER:  Objection.  Not what it

3    says.

4    BY MR. GRIVER

5        Q    Well, let me put it this way.  What is

6    your understanding of what the OG trust did in

7    order to get into this settlement?  What was its

8    consideration that it provided, as trustee, what

9    consideration did the OG trust provide?

10       A.   That Orly Genger Trust got from TPR

11   $100,000 for legal fees.  Okay.

12       Q.   So the lawyers got paid.  Good.

13           What else?

14       A.   Aren't you one of the lawyers?

15       Q.   What else?

16       A.   You should look for it.

17       Q.   What else?

18       A.   (Reading document).  What are you

19   asking me?  What is what?

20       Q.   I am asking as trustee, what was the --

21   what did the OG trust give up in order to reach

22   the settlement?

23       A.   Okay.  What I see here is that TPR

24   relinquished all economic interest in favor of

25   Orly Genger Trust, okay.  It is a good thing,

                        190

7    in order to reach settlement?

8        A    Let me continue to read it because in

9    the many time it just -- it is getting to

10   something.

11           (Reading document).

12           I don't see anything here that Orly

13   Genger trust is giving up actually.

14       Q.   At the time -- at the time that you

15   signed this agreement, what was your

16   understanding as to what the OG trust gave up?

17       A.   My Orly Genger Trust, my understanding

18   was that Orly Genger Trust was getting things.

19       Q.   And giving up nothing?

20       A.   In this particular, paragraph I don't

21   see she is giving up anything.

22       Q    Look at --

23       A.   She is getting economic benefits from

24   the shares, that we know that she should maybe

25   not get if TPR would not be generous enough to do

                        191

1    D. GENGER - UNCERTIFIED ROUGH DRAFT - 2/7/13

2    right.

3        Q.   I am asking you what did the OG trust

4    give up?

5        A    OG trust?

6        Q    What is the Orly Genger Trust give up

D. GENGER - UNCERTIFIED ROUGH DRAFT - 2/7/13

2  it.

3     Q.   So at the time that you signed this

4  agreement, you did not believe that the OG trust

5  was giving up anything?

6     A.   I am saying based on this.

7     Q.   Please answer my question.

8        At the time that you signed this

9  agreement, wasn't it your understanding that the

10  OG trust was gig giving up nothing?

11     A.   There would be some release.

12     Q.   Other than claims against the other

13  people?

14     A.   Yeah.

15     Q.   You did not believe the OG trust was

16  giving up anything else?

17     A.   Is this a question?

18     Q.   It is --

19     A.   Or a statement?  A question?  I have to

20  read the whole thing because I --

21     Q.   Read my question back.

22     A.   No, I have to read the whole thing

23  because I so far, did not find anything.

24     Q.   I am just asking, at the time that you

25  signed the agreement, what did you believe that

192

D. GENGER - UNCERTIFIED ROUGH DRAFT - 2/7/13

2  OG trust was giving up?

3     A.   At the time I believe that Orly Genger

4  trust its debt was reduced to $4 million, I mean

5  the note was reduced to $4 million.

6     Q.   I am not talking?

7     A.   To 4 and a half million.  What, it is

8  not true?

9     Q.   Go ahead and answer the question as you

10  see fit.

11     A.   You have $100,000 from TPR.  Okay.  You

12  got economic benefits for the shares of TRI.

13  Okay.  And I am thinking what else.  There was

14  something else that they got.  What the trust

15  gave, I at the moment cannot see.  Maybe you can

16  point it out to me.  I don't see it here.

17     Q.   Can I have that read back?

18     A.   And the release

19     Q.   If you finished, I will have the court

20  report read it back so that you can listen to

21  your answer and add anything that you may have

22  missed.

23        (Read back)

24        THE WITNESS:  Okay.  So tell me what --

25  BY MR. GRIVER:

193

D. GENGER - UNCERTIFIED ROUGH DRAFT - 2/7/13

2     Q.   Any other benefits that you believe the

3  trust got from this agreement?

4     A.   The release.

5     Q.   Anything else?

6     A.   I have to read it because I am really

7  tired, and I have to start reading it from the

8  beginning.

9     Q.   Look at paragraph one B to show what

10  the OG trust gave up.

11     A.   One B.

12     Q.   One B.  Page 4.  DG 1104?

13     A.   Consideration.

14     Q.   Look at B.  The OG trust.

15     A.   B that's what we looked at before,

16  right.

17     Q.   Yes.

18     A.   The OG trust.

19        (Reading document).

20        If you mean that it is -- OG trust --

21  how do you mean, that the transfer to TPR is

22  limited partnership interests in D&K, that's what

23  you meant?

24     Q.   Yes.  Did OG trust transfer to TPR's

25  limited partnership interest in D&K the D&K

194

1   D. GENGER - UNCERTIFIED ROUGH DRAFT - 2/7/13

2   interest; do you see that? ^ SpEx

3   A.   Yes.

4   Q.   So on that date you as trustee

5   transferred to TPR the trust's D&K interest,

6   correct?

7   A.   The trust's -- D&K interest

8   Q.   Yes.  That's how it is defined here.

9   A.   Right.  I am trying to think on -- I am

10  getting confused already.

11  Q.   Well, I will start it simple.

12  A.   I am confused already.

13  Q.   On the date you signed this settlement

14  agreement?

15  A.   Yeah.

16  Q.   Did you know that the trust was

17  transferring to TPR its D&K interest, yes or no?

18  A.   It says so.  It says so.  But I just --

19  I just for my own thing, because I just -- I now

20  am getting confused, who was the trust D&K

21  interest that was -- that was given up.

---

22  Q.   Well, my first question is, at the time

23  that you signed this agreement, did you know that

24  the Orly Genger Trust was transferring to TPR its

25  D&K interest?  Did you know that?

195

1   D. GENGER - UNCERTIFIED ROUGH DRAFT - 2/7/13

2   A.   Can you repeat this.

3   Q.   Sure

4        On the day that you signed the

5   settlement agreement, did you understand that the

6   Orly Genger Trust was transferring to TPR its D&K

7   interest?

8   A.   Are you talking now about the sale of

9   the TPR shares?

10  Q.   No I am talking about --

11  A.   I am getting completely confused now.

12  I you know --

13  Q.   Ms. Genger, it says in this document,

14  that the OG trust hereby transfers to TPR its D&K

---

15  interest.  At the time that you signed the

16  agreement, did you understand that the OG trust

17  was giving up its D&K interest?

18  A.   I don't know what's the D&K interest.

19  Q.   Okay.  Did you understand --

20  A.   I don't know.  Maybe at the time I

21  understood.  But right now I can't understand it

22  any more.  I am confused completely.

23  Q.   Did you understand on or about October

24  3, 2011 when you signed this agreement, that the

25  OG trust was a limited partner in D&K?

196

1   D. GENGER - UNCERTIFIED ROUGH DRAFT - 2/7/13

2   A.   I don't know how to answer this

3   question.

4   Q.   On the date that you signed this

5   agreement, what was the monetary value of the

6   Orly Genger Trust's D&K interest?

7   A.   This is where I am getting confused.

---

8   Q.   Had you valued the D&K interest in any

9   way?

10  A.   Whatever you are asking now, I don't

11  know how to answer because I am completely

12  confused.  Really.  I am confused.  You have to

13  come again or --

14      MR. GRIVER:  Let's take a break.

15  A.   I am confused already.

16      MR. GRIVER:  Let's take a break.

17      Off the record.

18      (WHEREUPON, a recess was had from

19      4:31-4:35.)

20      MR. GRIVER:  On the record.  The

21  parties have agreed to continue Ms. Genger's

22  deposition to Monday, the 11 of February,

23  commencing at 11 am, to take half a day, which

24  means three to four hours of questioning

25          * * * * *

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------X                    6-14-12
GLENCLOVA INVESTMENT CO.,                  :
                                           :
                     Plaintiff,            :
                                           :
        -against-                          :      No. 08 Civ. 7140 (JFK)
                                           :
TRANS-RESOURCES, INC. and TPR              :
INVESTMENT ASSOCIATES, INC.,               :
                                           :
                     Defendants.           :
----------------------------------X
PEDOWITZ & MEISTER LLP,                    :
                                           :
                     Plaintiff,            :
                                           :
        -against-                          :      No. 11 Civ. 5602 (JFK)
                                           :
TPR INVESTMENT ASSOCIATES, INC.,           :
GLENCLOVA INVESTMENT CO., TR               :
INVESTORS, LLC, NEW TR EQUITY I,           :
LLC, NEW TR EQUITY II, LLC, DALIA          :
GENGER, as trustee of the Orly             :
Genger 1993 Trust, and ORLY                :
GENGER,                                    :
                                           :
                     Defendants.           :
----------------------------------X
SKADDEN, ARPS, SLATE, MEAGHER &            :
FLOM, LLP,                                 :
                                           :
                     Plaintiff,            :
                                           :
        -against-                          :      No. 11 Civ. 7923 (JFK)
                                           :
TPR INVESTMENT ASSOCIATES, INC.,           :
GLENCLOVA INVESTMENT CO., TR               :
INVESTORS, LLC, NEW TR EQUITY I,           :
LLC, NEW TR EQUITY II, LLC, and            :
ARIE GENGER,                               :      **Opinion and Order**
                                           :
                     Defendants.           :
----------------------------------X

1

APPEARANCES:

For Glenclova Investment Co.; TR Investors, LLC; New TR
Equity I, LLC; New TR Equity II, LLC; Eddie Trump; Jules
Trump; Mark Hirsch; Skadden, Arps, Slate, Meagher & Flom,
LLP
Thomas Allingham
Anthony Clark
William Frank
SKADDEN, ARPS, SLATE, MEAGHER & FLOM, LLP

For TPR Investment Associates, Inc.
John Dellaportas
DUANE MORRIS, LLP

Evangelos Michailidis
SNOW BECKER KRAUSS, P.C.

For Arie Genger
Paul Montclare
Lauren Wachtler
MITCHELL SILBERBERG & KNUPP LLP

For Dalia Genger; Pedowitz & Meister LLP
Robert Meister
Marisa Warren
PEDOWITZ & MEISTER LLP

For Sagi Genger
Alan Sash
McLAUGHLIN & STERN LLP

For Orly Genger
Elliot Silverman
WACHTEL, MASYR & MISSRY LLP

**JOHN F. KEENAN, United States District Judge:**

Before the Court are ten motions, variously styled, taking

competing views on whether the Southern District of New York,

the New York Supreme Court, or the Delaware Chancery Court

should determine the beneficial ownership of shares in a

closely-held corporation.

## I.    Background

### A.    The Parties and Procedural History

These three cases, along with numerous other state court
cases, constitute a bitter and seemingly endless battle for
control of Trans-Resources, Inc. ("Trans-Resources"), a Delaware
corporation that manufactures and sells chemicals for
agricultural use.  The contenders include Arie Genger ("Arie")
and his adult daughter Orly Genger ("Orly") in one camp;
Glenclova Investment Co. ("Glenclova"), TR Investors, LLC
("Investors"), New TR Equity I, LLC, New TR Equity II, LLC,
Eddie Trump, Jules Trump, and Mark Hirsch (collectively, the
"Trump Group") in a second camp; Arie's former wife Dalia Genger
("Dalia"), who is the trustee of a trust benefitting her
estranged daughter Orly, in a third; and, indirectly, former
Trans-Resources majority owner TPR Investment Associates, Inc.
("TPR") and its current President, Sagi Genger ("Sagi"), who is
Arie and Dalia's adult son.  The following facts are taken from
the findings of the Delaware Chancery Court in TR Investors, LLC
v. Genger, C.A. No. 3994-VCS, 2010 WL 2901704 (Del. Ch. July 23,
2010); they are consistent with all of the many pleadings in
these cases and, unless otherwise noted, are undisputed.

Arie formed Trans-Resources in 1985.  Trans-Resources was a
wholly-owned subsidiary of TPR, a Genger family holding company.
Arie owned a 51% majority of TPR, through which he controlled

3

Trans-Resources; his wife and children owned minority interests
in TPR.  By 2001, Trans-Resources had run into financial
difficulty; to save the company from bankruptcy, Jules Trump
caused two Trump Group members, Glenclova and Investors to
purchase the vast majority of Trans-Resources' outstanding bonds
at a substantial discount.  Then, on March 31, 2001, Glenclova
and Investors entered into a Stockholders Agreement with Trans-
Resources and TPR, pursuant to which Glenclova and Investors
converted their bond holdings into a 47.15% equity stake in
Trans-Resources.  TPR, which was controlled by Arie, retained
the 52.85% majority share.  The Stockholders Agreement
prohibited either party from transferring their shares in Trans-
Resources to anyone other than a limited number of permitted
transferees and required written notice prior to any transfer.
Violation of the terms of the Stockholders Agreement gives non-
selling shareholders the right to purchase any invalidly
transferred shares.

     In 2004, Arie and Dalia divorced.  In connection with their
divorce settlement, on October 29, 2004, Arie caused TPR to
transfer its 52.85% stake in Trans-Resources as follows:
approximately 13.9% to Arie himself (the "Arie Shares");
approximately 19.5% to the Sagi Genger 1993 Trust (the "Sagi
Trust"), a trust created for his son's benefit (the "Sagi Trust
Shares"); and 19.5% to the Orly Genger 1993 Trust (the "Orly

                                4

Trust"), a trust created for his daughter's benefit (the "Orly
Trust Shares").[1]   The legitimacy of these transfers is at the
heart of the Glenclova, Pedowitz, and Skadden complaints.

In 2008, Trans-Resources again ran into financial
difficulty, so Arie offered the Trump Group additional shares in
Trans-Resources in exchange for a capital infusion.   The
Chancery Court found that in the course of finalizing the deal
in June 2008, but not before, the Trump Group learned about
Arie's 2004 transfer of Trans-Resources shares to himself and
his children's trusts.   Despite the fact that these transfers
violated the terms of the 2001 Stockholders Agreement, the Trump
Group agreed to go forward with the deal, likely because it
would give them majority control of Trans-Resources.   Shortly
thereafter, however, Arie reneged on the funding agreement and
threatened to sue the Trump Group if they challenged the
validity of the 2004 share transfers.   In response, Glenclova
invoked its right under the 2001 Stockholders Agreement to
purchase all of the Trans-Resources shares Arie transferred to
himself, the Sagi Trust, and the Orly Trust in 2004.   Arie
disputed Glenclova's right to purchase the shares, so Glenclova
filed suit in the Southern District of New York on August 11,

---

[1] For the sake of clarity, the Court adopts the rounded
percentage figures as referenced by the parties, cognizant of
the fact that they do not add up to 52.85% exactly.

2008 to enforce the Stockholders Agreement.  See Glenclova Inv.
Co. v. Trans-Resources, Inc., No. 08 Civ. 7140 (JFK).

To cover all of its bases, the Trump Group also entered
into two agreements to separately purchase the shares Arie
purported to transfer to himself and his children's trusts in
2004.  First, on August 22, 2008, the Trump Group entered into a
stock purchase agreement with TPR, which is controlled by Sagi,
and the Sagi Trust to acquire the Sagi Trust Shares - either
from TPR or the Sagi Trust, whichever party was judicially
determined to own the shares.  Second, the Trump Group entered
into a side letter agreement with TPR giving the Trump Group an
option to purchase the Arie Shares and the Orly Trust Shares,
should a court determine that the 2004 transfers were void such
that TPR (and not Arie or the Orly Trust) retained legal and
beneficial ownership of the disputed shares.

After acquiring the Sagi Trust Shares, on August 25, 2008,
the Trump Group, believing itself to be the majority shareholder
of Trans-Resources, elected four representatives to the board of
directors and removed Arie as a director.  Arie refused to
recognize the Trump Group's majority ownership position, so the
Trump Group filed suit in Delaware Chancery Court for a
determination pursuant to Title 8, Delaware Code, Section 225
that it was entitled to designate and elect a majority of the
board of directors of Trans-Resources.  See TR Investors, LLC v.

6

Arie Genger, C.A. No. 3994-VCS (Del. Ch. Ct.).  The TR Investors
and Glenclova cases, filed in the span of just two weeks, form
the first layer of the jurisdictional conflict now facing the
Court.

The Trump Group filed two lawsuits, but the parties were
initially able to agree that the dispute should proceed in a
single court.  Although Arie moved to intervene as a defendant
in the Glenclova action on September 5, 2008, the Court
adjourned oral argument on that motion thirteen times while the
Delaware Chancery action advanced through discovery and a three-
day trial.  This was done at Arie's request because he
represented to this Court that the Delaware proceedings would
likely resolve the issues in the federal Glenclova case.
Finally, on July 23, 2010, then-Vice Chancellor Strine issued a
comprehensive opinion in the Delaware Chancery case, finding in
relevant part that:  (1) Arie did not give the Trump Group
notice of the 2004 transfer of Trans-Resources shares to
himself, the Sagi Trust, and the Orly Trust as required under
the 2001 Stockholders Agreement; (2) the 2004 share transfers
were void; and (3) by virtue of the August 22, 2008 letter
agreement, the Trump Group owned the Sagi Trust Shares, giving
the Trump Group majority voting control of Trans-Resources.  TR
Investors, 2010 WL 2901704, at *13-20.  In an opinion dated
August 9, 2010, Vice Chancellor Strine expanded his ruling,

7

holding that the Arie and Orly Trust share transfers in 2004
were similarly

> invalid. That left the Trump Group with the right to
> purchase the Shares from TPR, and thus TPR and the
> Trump Group were free to settle that dispute by a new
> bargain for sale. If the Trump Group exercises its
> rights under the [2008 side] Letter Agreement, it will
> own the shares improperly transferred to [Arie] and
> the Orly Trust, and neither of those transferees ever
> had a legitimate interest in the shares.

TR Investors, LLC v. Genger, C.A. No. 3994-VCS, 2010 WL 3279385,
at *3 (Del. Ch. Aug. 9, 2010).

In light of this ruling, on September 1, 2010, the Trump
Group entered into an escrow agreement with TPR, the Orly Trust,
Orly, as beneficiary of the trust, and the law firm of Pedowitz
& Meister LLP ("Pedowitz"). (Escrow Agreement, Declaration of
Robert A. Meister in Support of Dalia Genger's Motion to Enjoin,
Ex. A). Pursuant to this agreement, in February 2011, the Trump
Group exercised its right to purchase the Orly Trust Shares, but
agreed to deposit the $10,314,005 proceeds of the sale in escrow
with Pedowitz in light of continuing litigation. Similarly, in
September 2010, the Trump Group entered into an escrow agreement
with TPR and the law firm of Skadden, Arps, Slate, Meagher &
Flom LLP ("Skadden, Arps"). (Escrow Agreement, Declaration of
Lauren J. Wachtler in Support of Arie Genger's Motion to
Dismiss, Ex. I). In February 2011, the Trump Group exercised
its option to purchase the Arie Shares for $7,428,994.

8

$5,928,994 of the proceeds from the sale of the Arie Shares was deposited in an escrow account with Skadden, Arps, and the remaining $1.5 million was eventually deposited in a second, separate escrow account.

## B.   Additional Litigation

Immediately following Vice Chancellor Strine's July 23, 2010 opinion, Arie and Orly filed suit in New York Supreme Court against TPR, Sagi, and Dalia seeking a declaration that Arie was entitled to reform his divorce settlement as if the 2004 Trans-Resources share transfers never happened; this is little more than a collateral attack on the Delaware Supreme Court ruling. The complaint was later amended to add the Trump Group parties, the Sagi Trust, and Rochelle Fang, the trustee of the Sagi Trust, to the lawsuit.  See Arie & Orly Genger v. Sagi Genger, et al., Index No. 651089/2010 (N.Y. Sup. Ct.).  Arie then obtained several orders in New York Supreme Court, including: (1) an October 5, 2010 order directing that the proceeds of the sale of the Arie Shares to the Trump Group be held in escrow pending a preliminary injunction hearing; and (2) a February 17, 2011 order enjoining TPR and Sagi from using or converting $1.5 million in proceeds they received from the sale of the Arie Shares to the Trump Group.  Thus, Skadden, Arps holds in escrow $1.5 million of the $7,428,994 proceeds of the sale of the Arie Shares, subject to a New York state court injunction.

9

On August 16, 2010, TPR filed a third-party complaint against Arie in the Glenclova action and stipulated to Arie's right to intervene. This stipulation resolved Arie's long-delayed motion to intervene. Arie then filed a number of counterclaims against various parties generally seeking to reform his 2004 divorce settlement so that his 2004 share transfers and loss of control of Trans-Resources would be voided. The Glenclova counterclaims are identical to the claims in the Arie & Orly Genger New York Supreme Court action.

At the same time Arie was pursuing relief in New York Supreme Court, the Delaware Chancery case went up on appeal to the Delaware Supreme Court. On July 18, 2011, the Delaware Supreme Court affirmed in part, leaving intact the Chancery Court's findings that the 2004 share transfers were invalid, and that the Trump Group legally purchased the Sagi Trust's 19.5% stake in Trans-Resources, giving the Trump Group majority voting control of the corporation. However, the Delaware Supreme Court reversed the Chancery Court's August 9, 2010 supplemental determination regarding the beneficial ownership of the Trans-Resources shares transferred to Arie and the Orly Trust. The Court found that

> [a]n adjudication of who has the right to vote
> disputed corporate shares for Section 225 purposes
> cannot constitute a binding adjudication of who
> beneficially owns those shares, because a Section 225
> action is by its nature an in rem, not a plenary,

10

proceeding.  Only in a plenary proceeding before a
court that has in personam jurisdiction over the
litigants may the court adjudicate the litigants'
property interest in disputed corporate shares.  Here,
the Orly Trust and TPR were never made parties to a
plenary proceeding where the trial court had in
personam jurisdiction over them.

Genger v. TR Investors, LLC, 26 A.3d 180, 201-02 (Del. 2011).

Absent in personam jurisdiction, the Chancery Court erred in

determining the beneficial ownership of the Arie Shares and the

Orly Trust Shares.  Id. at 202-03.  The Delaware Supreme Court

suggested that the Glenclova case in this District would be "an

example of such a plenary proceeding" where jurisdiction could

be obtained over the necessary parties.  Id. at 200 n.88.

In response to the Delaware Supreme Court ruling, on July

22, 2011, the Trump Group filed a plenary action against Arie

and TPR in Delaware Chancery Court seeking a declaration that it

is both the record and beneficial owner of the Arie Shares.  See

TR Investors, LLC, et al. v. Arie Genger, et al., C.A. No. 6697-

CS (Del. Ch.).

On August 11, 2011, Pedowitz, the escrow agent for the

$10,314,005 proceeds of the sale of the Orly Trust Shares to the

Trump Group, filed an interpleader action pursuant to 28 U.S.C.

§ 1335 in the Southern District of New York.  See Pedowitz &

Meister LLP v. TPR Inv. Assocs., Inc., et al., 11 Civ. 5602

(S.D.N.Y.).  The Pedowitz complaint states that no party to the

September 1, 2010 Escrow Agreement has made a demand for payment

11

of the escrowed funds, but Orly, as beneficiary of the Orly
Trust, objects to any release of escrowed funds without her
consent.   Nevertheless, plaintiff Pedowitz alleges that two or
more of TPR, the Trump Group, Dalia, as trustee of the Orly
Trust, and Orly are adverse claimants to the funds held in
escrow and seeks a determination as to which party is entitled
to the funds.   The escrowed funds have since been deposited with
the Clerk of Court.

On October 4, 2011, Dalia, as trustee of the Orly Trust,
filed a plenary action in Delaware Chancery Court against the
Trump Group and TPR seeking a declaration that the Orly Trust is
the beneficial owner of the Orly Trust Shares.   See Dalia Genger
v. TR Investors, LLC, et al., C.A. No. 6906-CS (Del. Ch.).
However, on October 26, 2011, Orly obtained a temporary
restraining order in New York Supreme Court preventing Dalia
from proceeding with her plenary action in Delaware Chancery
Court.   On November 9, 2011 Orly obtained another temporary
restraining order preventing TPR and the Trump Group from
proceeding in the Dalia Genger plenary action in Delaware
Chancery Court.   Thus, the New York Supreme Court has
effectively stayed litigation of the beneficial ownership of the
Orly Trust Shares in Delaware.

On November 7, 2011, Skadden, Arps, the escrow agent for
the $7,428,994 proceeds of the sale of the Arie Shares from TPR

12

to the Trump Group, filed an interpleader action pursuant to 28
U.S.C. § 1335 in the Southern District of New York.  See
Skadden, Arps, Slate, Meagher & Flom LLP v. TPR Inv. Assocs.,
Inc., et al., No. 11 Civ. 7923 (S.D.N.Y.).  The Skadden
complaint does not state that any party has made a demand for
payment of the escrowed funds, but Arie asserts an interest in
the funds and objects to any release.  Thus, plaintiff Skadden,
Arps alleges that two or more of TPR, the Trump Group, and Arie
are adverse claimants to the funds held in escrow and seeks a
determination as to which party is entitled to the funds.
$5,928,994 of the escrowed funds has been deposited with the
Clerk of Court; the remaining $1.5 million continues to be
restrained by the New York Supreme Court.

In summary, there are no fewer than six pending lawsuits in
three jurisdictions, all relating to the beneficial ownership of
the Arie and Orly Trust Shares:

| Court | Caption | Docket No. | Subject |
|---|---|---|---|
| S.D.N.Y. | Glenclova Inv. Co. v. Trans-Resources, Inc. | 08 Civ. 7140 | Arie Shares and Orly Trust Shares |
| S.D.N.Y. | Pedowitz & Meister LLP v. TPR Inv. Assocs., Inc., et al. | 11 Civ. 5602 | Orly Trust Shares |
| S.D.N.Y. | Skadden, Arps, Slate, Meagher & Flom LLP v. TPR Inv. Assocs., Inc., et al. | 11 Civ. 7923 | Arie Shares |
| N.Y. Sup. | Arie & Orly Genger v. Sagi Genger, et al. | 651089/2010 | Arie Shares and Orly Trust Shares |
| Del. Ch. | Dalia Genger v. TR Investors, LLC, et al. | 6906-CS | Orly Trust Shares |

13

| Del. Ch. | TR Investors, LLC, et al. v. Arie Genger, et al. | 6697-CS | Arie Shares |

There are, however, other cases pending in New York Supreme
Court that present related claims flowing from the same facts as
recounted above.  For example, on July 9, 2009, Orly filed suit
against her mother Dalia, her brother Sagi, and TPR seeking,
inter alia, breach of fiduciary duty and fraud damages for their
alleged "looting" of the Orly Trust, including the Orly Trust's
interest in TPR.  See Orly Genger v. Dalia Genger, et. al.,
Index No. 109749/2009 (N.Y. Sup. Ct.).  Additionally, on October
21, 2010, Dalia, in both her individual and trustee capacities,
filed suit against her ex-husband Arie, alleging that his
failure to validly transfer Trans-Resources shares to the Orly
Trust violated their stipulated divorce settlement.  See Dalia
Genger v. Arie Genger, Index No. 113862/2010 (N.Y. Sup. Ct.).

## II.    Discussion

By their own actions, the parties have created a headache-
inducing jurisdictional conflict; they now ask this Court to
clean up the mess they made by determining which of the federal
or state courts should decide the issue underpinning all of
their claims – that is, the beneficial ownership of the Arie
Shares and Orly Trust Shares.  As a general proposition, the
Anti-Injunction Act restrains the district court from
"grant[ing] an injunction to stay proceedings in a State court

14

except as expressly authorized by Act of Congress." 28 U.S.C. §
2283. Consequently, prior to August 2011, the Court had no
authority to head off this jurisdictional train wreck by
directing the New York and/or Delaware state courts to stay
their hands. However, after the filing of no fewer than six
state court lawsuits, the stakeholder plaintiffs came back to
the federal court seeking interpleader. Interestingly, most of
the parties have no interest in a federal court determination of
the rights of the claimants to the Arie Share and Orly Trust
Share proceeds; instead, they ask the Court to use the
interpleader statute injunction power under 28 U.S.C. § 2361 to
direct them to a single forum. Their requests come in the form
of various motions to dismiss, stay, and enjoin which,
unsurprisingly, fall into three categories: (1) TPR and Dalia
want the Court to stay the New York Supreme Court actions and
the Delaware Chancery Court plenary actions and decide on the
merits who beneficially owns the Arie Shares and the Orly Trust
Shares; (2) Arie and Orly move to dismiss the federal actions to
which they are parties and ask the Court to stay the Delaware
Chancery Court actions so the merits of their claims can proceed
in New York Supreme Court; and (3) the Trump Group asks this
Court to stay the federal actions and the New York Supreme Court
actions so the merits of their claims can proceed in Delaware
Chancery Court.

## A.    Pedowitz and Skadden Statutory Interpleaders

As all the parties invoke the interpleader injunction power as the mechanism for their requested relief, the Court begins its analysis with the viability of the Pedowitz and Skadden interpleader actions.  Orly has moved to dismiss or stay the Pedowitz interpleader (Pedowitz Docket No. 8) and Arie has moved to dismiss or stay the Skadden interpleader (Skadden Docket No. 25) on largely identical grounds, so the Court will address them collectively.

### 1.    § 1335 Jurisdiction

First, Arie argues that the Skadden interpleader action should be dismissed for lack of subject matter jurisdiction. The Court will also consider this argument in relation to the Pedowitz interpleader since "subject-matter jurisdiction, because it involves a court's power to hear a case, can never be forfeited or waived," obliging the district court "to determine whether subject-matter jurisdiction exists, even in the absence of a challenge from any party." Arbaugh v. Y&H Corp., 546 U.S. 500, 514 (2006) (internal citation omitted).

The sole basis of jurisdiction alleged in the Pedowitz and Skadden interpleader complaints is the federal interpleader statute, 28 U.S.C. § 1335.  Pursuant to this section, the district court has original jurisdiction over statutory interpleader cases where "[t]wo or more adverse claimants, of

16

diverse citizenship . . . are claiming or may claim to be
entitled" to money or property worth at least $500.  Only
minimal diversity - that is, diversity of citizenship between at
least two claimants - is necessary.  See Truck-A-Tune, Inc. v.
Re, 23 F.3d 60, 62 (2d Cir. 1994).  The diversity and amount in
controversy requirements are prerequisites to the district
court's exercise of jurisdiction in a statutory interpleader
case.  See Franceskin v. Credit Suisse, 214 F.3d 253, 259 (2d
Cir. 2000) (dismissing statutory interpleader claims for lack of
subject matter jurisdiction where claimants were all citizens of
Argentina, failing to satisfy § 1335's diversity requirement);
RCA Records v. Hanks, 548 F. Supp. 979, 981 (S.D.N.Y. 1982)
("Subject matter jurisdiction in statutory interpleader actions
rests on diversity of citizenship between any two adverse
claimants and an amount in controversy of $500 or more.").
Similarly, in this Circuit, "a deposit [with the court of the
res in controversy] or a bond is a jurisdictional prerequisite
for statutory interpleader relief."  Fed. Ins. Co. v. Tyco Int'l
Ltd., 422 F. Supp. 2d 357, 396 (S.D.N.Y. 2006) (internal
quotation omitted); see Metal Transp. Corp. v. Pac. Venture S.S.
Corp., 288 F.2d 363, 365 (2d Cir. 1961) ("As a general rule,
when a sum of money is involved, a district court has no
jurisdiction of an action of interpleader if the stakeholder
deposits a sum smaller than that claimed by the claimants.").

With respect to the Pedowitz interpleader, the complaint alleges that TPR is a Delaware corporation, Investors, New TR Equity I, and New TR Equity II are Delaware limited liability companies, Glenclova is a Cayman Islands corporation, and Dalia and Orly are New York residents.  Thus, there is minimal diversity amongst the potential claimants.  The $10,314,005 res more than satisfies the amount in controversy requirement, and the entirety of the res has been deposited with the Clerk of Court.  With respect to the Skadden interpleader, the complaint alleges that TPR is a Delaware corporation, Investors is a New Jersey limited liability company, New TR Equity I and New TR Equity II are Delaware limited liability companies, Glenclova is a Cayman Islands corporation, and Arie is a Florida resident. Again, there is minimal diversity amongst the potential claimants to the $7,428,994 at stake.  However, only $5,928,994 of the res has been deposited with the Clerk of Court.  Skadden, Arps still holds in escrow $1.5 million that it has not deposited into the Court's registry, likely because of the New York Supreme Court restraining order.  Although this jurisdictional defect could be cured by the posting of a bond, it is not the sole barrier to the exercise of jurisdiction.  See Fed. Ins. Co., 422 F. Supp. 2d at 396; Phillips, Son & Neal, Inc. v. Borghi & Co., No. 86 Civ. 8544, 1987 WL 27690, at *2 (S.D.N.Y. Dec. 10, 1987).

Arie's main challenge to subject matter jurisdiction

involves the adverse claimants requirement of § 1335.  Although

some courts in this Circuit treat the existence of adverse

claimants as an element of the interpleader claim, adversity is

more commonly considered a necessary prerequisite to the

maintenance of subject matter jurisdiction over statutory

interpleader cases.  Compare Coopers & Lybrand, L.L.P. v.

Michaels, No. 94 Civ. 5643, 1995 WL 860760, at *5 (E.D.N.Y. Oct.

31, 1995) ("A jurisdictional prerequisite to [statutory]

interpleader is the existence of adverse claims to property held

in plaintiff's possession."), Pine Run Props., Inc. v. Pine Run

Ltd., No. 90 Civ. 6289, 1991 WL 280719, at *8 (S.D.N.Y. Dec. 26,

1991) (dismissing statutory interpleader claim for lack of

subject matter jurisdiction because "In order to invoke

statutory interpleader, there must exist adverse claims to the

property held in plaintiffs' possession, so that plaintiffs risk

multiple or inconsistent liabilities with respect to the

property"), and Phillips, Son & Neal, Inc., 1987 WL 27690, at *2

("An additional prerequisite for interpleader jurisdiction is

that there be adverse claims to the property made by claimants

of diverse citizenship."), with Catizone v. Memry Corp., 897 F.

Supp. 732, 740 (S.D.N.Y. 1995) (denying plaintiff's motion for

summary judgment on interpleader claim for failure to establish

existence of competing claims to certain securities).  Thus, the