

SURROGATE'S COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

---

In the Matter of the Application of ORLY
GENGER, as a person interested, for the
removal of DALIA GENGER, as Trustee of the
Orly Genger 1993 Trust pursuant to SCPA § 711(11)

File No. 0017/2008



---

### ATTORNEY'S STATEMENT IN OPPOSITION TO RESPONDENT DALIA GENGER'S MOTION TO DISMISS PETITIONER'S THIRD AMENDED PETITION TO REMOVE RESPONDENT AS TRUSTEE

STATE OF NEW YORK    )
                                           ) ss.:
COUNTY OF NEW YORK  )

    **Ralph R. Hochberg,** an attorney duly admitted to practice law in the courts of the State of New York, affirms the following under penalties of perjury:

    1.     I am a Partner of the law firm of Platzer, Swergold, Karlin, Levine, Goldberg & Jaslow, LLP, the attorneys for the petitioner, Orly Genger (the "<u>Petitioner</u>" or "<u>Orly</u>") and am fully familiar with the facts and circumstances herein by virtue of the records and documents kept in the legal file maintained by this office.

    2.     This Affidavit is respectfully submitted in opposition to Dalia Genger's ("<u>Dalia</u>" or "<u>Respondent</u>") Motion to Dismiss (the "<u>Motion to Dismiss</u>") the Third Amended Petition (the "<u>TAP</u>")[1] which seeks a decree:

             (a)     Providing for the immediate removal of Dalia as Trustee of the Orly Genger 1993 Trust (the "<u>Orly Trust</u>") as a result of her: (i) numerous and continuous breaches of her fiduciary duties to the Orly Trust and

---

[1] Because it is verified, the TAP also functions as a sworn affidavit, and its contents constitute sworn evidence of Dalia's wrongdoing. <u>See</u> NY CPLR § 105(u) (A "verified pleading" may be utilized as an affidavit whenever the latter is required"). A copy of the TAP with Exhibits is annexed hereto and made part of the Appendix Exhibits to this Affirmation.

Petitioner as its sole present beneficiary; (ii) waste and dissipation of the Orly Trust's assets; (iii) repeated and willful engagement in an ongoing fraudulent scheme with Sagi to loot, encumber, pledge and transfer the assets of the Orly Trust; (iv) deliberate and willful violation and contempt of the prior Order of this Court dated July 1, 2009 (the "July 2009 Order") (as well as her deliberate and willful violation and contempt of prior restraining Orders imposed upon her by other New York Courts in related proceedings) as set forth herein; and, (v) imprudent management and injury to the assets of the Orly Trust committed to her charge;

(b)     Suspending the Letters of Appointment heretofore issued to Dalia;

(c)     Appointing Joel Isaacson as successor trustee; and,

(d)     Granting such other and further relief as this Court deems to be just equitable and proper.

## PRELIMINARY STATEMENT

3.     Dalia's Motion to Dismiss should be denied.  It is clear that both prior to and after becoming Trustee, Dalia has acted in a manner which has solely benefitted and continues to solely benefit her and her son, Sagi Genger ("Sagi"), and which has injured and continues to injure Orly as beneficiary of the Orly Trust.  The facts and documents set forth in the TAP show that Dalia has breached and continues to breach her fiduciary obligations as Trustee in numerous instances and is clearly unfit to serve as Orly's Trustee.

4.     Specifically, Dalia has egregiously breached her fiduciary duties as Trustee of the Orly Trust by engaging in a scheme with Sagi to loot the assets the Orly Trust to benefit her and Sagi, as evidenced by her actions and inactions, which include, but are not limited to, the following:

(a)     Dalia deliberately failed to inform, affirmatively concealed from Orly and others, and failed to try to prevent, the sham foreclosure sale by Sagi of the Orly Trust's valuable stock interests in TPR (the "Sham TPR Foreclosure Sale"), so Sagi could greatly benefit to the detriment and injury of Orly and the Orly Trust.  Had Dalia been a true Trustee, she would have acted to enjoin the sale, or at least provided notice to other potential bidders known to her so the best price possible was obtained for the TPR Shares.  Instead, Dalia did nothing.  This lack of notice

prevented Orly from protecting the asset by either trying to enjoin the sale or ensuring additional bidding at the sale;

(b)     Dalia is attempting to dissipate the Orly Trust's sole remaining asset, the Orly Trust TRI Shares (as previously defined in the TAP), by commencing an action in the Delaware Chancery Court (the "Delaware Chancery Action") in which she sought a declaratory judgment with respect to the beneficial ownership and disposition of the Orly Trust TRI Shares.   Dalia's commencement of the Delaware Chancery Action was a calculated strategy on her part to injure the Orly Trust because this same Chancery Court had previously ruled that TPR (which is controlled by Sagi) was the beneficial owner of the Orly Trust TRI Shares, and not the Orly Trust. The Delaware Supreme Court reversed the Chancery Court on the happy technicality that the Chancery Court lacked personal jurisdiction over the Orly Trust, as the Orly Trust was not party to that Delaware *in rem* proceeding. Dalia's action is designed to cure that jurisdictional defect, and give the Chancery Court jurisdiction over the Orly Trust.  In other words, Dalia has deliberately chosen to spend precious Trust assets bringing an action in the very Court that already has ruled against the Orly Trust;

(c)     Dalia commenced the Delaware Chancery Action even though all the parties to Dalia's purported Delaware action (the Orly Trust, TPR, and the Trump Group entities) are located in New York, and Petitioner had previously commenced an action in New York County Supreme Court (previously defined in the TAP as the "New York TRI Action") that will determine the beneficial ownership and disposition of the Orly Trust TRI Shares.  Notably, the Court in the New York TRI Action enjoined Trustee Dalia (and all other parties) from prosecuting or otherwise proceeding with the Delaware Chancery Action and further determined that the Orly was authorized to seek a determination concerning the ownership of the Orly Trust TRI Shares on behalf of the Orly Trust;

(d)     Dalia's counsel has recently indicated that Dalia intends to continue her prosecution of the Delaware Chancery Action notwithstanding the fact that: (i) the Court's prior Orders and rulings in the New York TRI Action have enjoined Dalia from doing so and have further authorized Orly to proceed on behalf of the Orly Trust; (ii) Dalia has been enjoined from prosecuting the Delaware Chancery Action since its initial inception approximately sixteen (16) months ago; (iii) Dalia is seeking the same "beneficial ownership" determination in the Delaware Chancery Action that Orly has been actively litigating on behalf of the Orly Trust in the New York TRI Action for more than the past two (2) years and as such, Dalia's prosecution of the Delaware Chancery Action constitutes duplicative litigation and a complete waste of the Orly Trust's assets; and (iv) the Chancery Court is certain to rule against the Orly Trust's interests as it previously did before[2];

---

[2] For all of the forgoing reasons, Petitioner has previously filed an Order to Show Cause with this Court seeking to enjoin Dalia as Trustee from prosecuting or otherwise proceeding with the Delaware Chancery Action. In addition, the New York Supreme Court has given Orly permission to seek clarification that the Supreme Court's recent Order

(e)    Dalia entered into the Secret Agreements (as previously defined in the TAP) on purported behalf of the Orly Trust without prior notice to Petitioner and deliberately concealed same from Petitioner and the New York Supreme Court for almost a year. Dalia's entry into the Secret Agreements has placed $4.44 million dollars and any other remaining assets of the Orly Trust in peril of being foreclosed upon and dissipated by a newly-created and unknown St. Kitts entity;

(f)    Dalia has made the defeat of an interpleader proceeding brought by her counsel; her removal as Trustee; and/or appointment of a co-Trustee, "conditions of default" making the $4.44 million immediately payable to the St. Kitt's entity, and the rest of the Orly Trust's assets subject to immediate foreclosure without notice anywhere in the world. Notably, the interpleader action (defined in the TAP as the "Pedowitz & Meister Interpleader Action") already has been defeated, having been correctly labeled by the United States District Court for the Southern District Of New York as a "gratuitous," "sham" proceeding;

(g)    Dalia violated the restraints and injunctions imposed upon her as provided in this Court's July 2009 Order by commencing the Delaware Chancery Action and entering into the Secret Agreements without prior notice to Petitioner; and,

(h)    Dalia violated the restraints and injunctions imposed upon her as provided in both the New York TRI Action and the New York TPR Action.

5.    Dalia's serial violations of her duties as Trustee resulted from the bitter and acrimonious divorce proceeding between Arie Genger ("Arie") and Dalia, which created an irreconcilable schism in the Genger family. Dalia and Sagi perceived that Orly sided with Arie in the 2004 divorce, with Dalia even testifying that she considers Orly to have been "brainwashed."

6.    Dalia has lost all sense of objectivity with respect to her duties and obligations as the Trustee of the Orly Trust and the fiduciary duties that she owes Orly as the Orly Trust's sole present beneficiary.[3] Even worse, Dalia's every action and inaction as Trustee of the Orly Trust

---

dismissing Dalia as an individual from the New York TRI Action was not meant to affect the injunction preventing Dalia as Trustee from prosecuting her Delaware Chancery Action. Copies of the Affidavit of Orly Genger and Affirmation of Ralph Hochberg submitted in support of the Order to Show Cause (without Exhibits) are annexed hereto as part of the Appendix Exhibits and are incorporated herein by reference.

[3] In the Motion to Dismiss, Dalia asserts the novel theory that, because the Orly Trust provides for remainder

4

is designed to hurt Orly, benefit Sagi and satisfy Dalia's need to revenge herself upon Arie. As a result, with the exception of Sagi, Dalia is possibly the worst person to serve as Trustee. She is inherently conflicted and prevented from exercising her fiduciary duties as Trustee because her true loyalty lies with Orly's older brother, Sagi, the person who is determined to loot the Orly Trust of all of its assets. Moreover, she is hostile towards Orly because she views Orly as the "brain washed" extension of Arie.

7.      Without the intervention of this Court, and the immediate removal of Dalia as Trustee, the Orly Trust and its remaining assets will continue to be in immediate peril.

8.      Notably, Dalia testified during her deposition taken on December 13, 2012 in the New York TPR Action that the decision for her to become Trustee of the Orly Trust was a "family decision." When asked to identify her family, Dalia did not include Orly, the sole present beneficiary of the Orly Trust. Rather, she included Sagi, his wife, Elana, his sister-in-law, Leah, (the prior Trustee of the Orly Trust) and Sagi's Mother-in-law, Rochelle. Dalia's exclusion of Orly as part of the "family" is telling. See Dalia Dep. Tr. At 41-48. (Annexed hereto as **Exhibit "JJ"** is a true and complete copy of Dalia's deposition transcript.)

9.      Given the family dynamics, Dalia's motivation for becoming Trustee of the Orly Trust is clear: to obtain control over the Orly Trust's assets in order to pledge, encumber, transfer and dissipate same for her and Sagi's benefit. By simply allowing Joel Isaacson to step in as the disinterested third-party successor trustee to the Orly Trust, Dalia could end years of bitter litigation before this Court. It is respectfully submitted that her unwillingness to do so speaks volumes as to where her true motivations lie. While Dalia claimed she was acting as Trustee only

---

interests to Orly's children (which Orly does not presently have) and that, upon her death, her interest passes to the beneficiaries of the Sagi Trust, this somehow means that Orly has less of an interest in the Orly Trust and its assets. This is obviously not the case. As the sole present beneficiary of the Orly Trust, Orly has a clear vested interest in how the Orly Trust's assets are managed, cared for and disposed of, and is acting to protect those assets.

to protect Orly from Arie, the sad fact is that at the end of the day, Dalia's actions may leave Orly with nothing. Dalia's hatred of Arie has motivated her to exact retribution upon Orly.

10.     In any event, the gross distortions of the facts and the prior legal proceedings offered by Dalia in her Motion to Dismiss cannot successfully obscure that Orly has set forth sufficient evidence to support Dalia's removal as trustee. Certainly, Dalia falls far short of "conclusively" proving that, accepting the facts in Orly's TAP as true and affording Orly every possible favorable inference, Orly has absolutely "no claim" justifying Dalia's removal as Trustee. Having failed to meet this legal standard, (See, e.g., Lawrence v. Miller, 11 N.Y.2d 588, 595 (2008), cited to in accompanying Memorandum of Law), Dalia's Motion to Dismiss must be entirely denied.

## SURROGATE ROTH'S PRIOR DENIAL OF PETITIONER'S INITIAL PETITION TO REMOVE DALIA AS TRUSTEE WAS EXPRESSLY WITHOUT PREJUDICE TO RENEW. THE TAP SETS FORTH NEW AND ADDITIONAL GROUNDS TO REMOVE DALIA AS TRUSTEE

11.     In the Motion to Dismiss, Dalia alleges that "...little has occurred since the Prior Decision [Judge Roth's December 31, 2008 Decision]...". (Motion to Dismiss, Paragraph "5"). Nothing could be further from the truth. Every amendment of the Petition to remove Dalia as Trustee of the Orly Trust has been precipitated by Petitioner's discovery of new acts which Dalia has taken, without any prior notice to Orly, in violation of her fiduciary obligations to the Orly Trust.

12.     For example, unbeknownst to Orly or Surrogate Roth, Dalia and Sagi were already acting to strip the Orly Trust of its shares of TPR (as described in the TAP) when Surrogate Roth rendered her December 31, 2008 decision. Indeed, Orly only discovered the Sham TPR Foreclosure Sale of the Orly Trust's shares of TPR approximately six months after Surrogate Roth's decision. (See TAP, Paragraph "57" and **Exhibit "R"**).

6

13.   Likewise, the filing of the TAP was precipitated by discovery of the Secret Agreements, which Dalia hid from Orly and the New York Supreme Court for almost a year.[4]

14.   Although Dalia's attempt to portray Surrogate Roth's prior decision as somehow precluding Orly from seeking her removal, the language contained in Surrogate Roth's decision clearly shows that this is not the case:

> [T]he appointment of a "special trustee" is unwarranted **at this time** and accordingly, the application is denied, **without prejudice to renewal if future circumstances warranted such relief.** (emphasis added)
> (See TAP, **Exhibit "M"**, Pages "7" and "8")

15.   For the reasons set forth herein and in the TAP, it is respectfully submitted that Dalia's actions subsequent to Surrogate Roth's Decision (and those actions and events Dalia hid from Surrogate Roth prior to Surrogate Roth's Decision) warrant her immediate removal as Trustee of the Orly Trust.

### DALIA'S ACTIONS PRIOR TO HER BEING APPOINTED AS TRUSTEE OF THE ORLY TRUST ALLOWED SAGI TO GAIN CONTROL OVER BOTH TPR AND D & K AND PAVED THE GROUND WORK FOR THEIR SCHEME TO LOOT THE ORLY TRUST OF ITS ASSETS

16.   Dalia would like this Court to completely disregard all of her actions prior to her appointment as successor Trustee in 2008. By these pre-2008 actions (i.e., giving Sagi control over TPR and D & K), Dalia set the stage for her scheme with Sagi to loot the Orly Trust's assets which scheme has continued throughout Dalia's tenure as Trustee.

---

[4]   Dalia contends the forgoing amendments to the Petition as an attempt to "judge shop". (Motion to Dismiss, Paragraph "4"). This is untrue. Certainly, this is an ironic accusation coming from Dalia's counsel, who initiated The Pedowitz & Meister Interpleader Action that Judge Keenan accurately described as a "sham," as "gratuitous," and as being specifically designed "to strong-arm adversaries into a particular forum of choice." (See Glencova Inv. Co. v. Trans-Resources, Inc., 874 F. Supp. 2d 292 (S.D.N.Y. 2012).

### A.  At Dalia's urging the D & K Note is found to be uncollectible as a matter of law

17.  As set forth in the TAP, both the Orly Trust and the Sagi Trust were liable to TPR under the D & K Note. Dalia, Sagi and David Parnes (Sagi's lawyer and business partner) all testified in the Genger divorce arbitration, that the D & K Note (also referred to by the parties as the "Note") was never intended to be enforced against D & K or the two Trusts because doing so would destroy the family estate planning.

18.  Based upon the forgoing and at Dalia's own urging, the Honorable E. Leo Milonas issued a Final Arbitration Award specifically finding that, from its inception, everyone knew the D & K Note was never to be collected:

> "The arbitrator finds for Dalia on this issue. The D&K note was part of the
> estate planning scheme to transfer wealth to the children. The parties never
> intended for this note to be collected and to do so would re-transfer wealth
> back to the parents and defeat their estate plan.
> (See **Exhibit "J"**, Final Arbitration Award in Genger divorce proceeding,
> Page "15")

19.  Dalia specifically urged the arbitrator and took the position in a sworn pleading that the D & K Note was not collectible because it would undo her and Arie's estate planning to transfer wealth to Orly and Sagi:

> "...collection by TPR of the D & K Note would simply transfer
> wealth from the children, Sagi and Orly, to their parents,
> Arie and Dalia, thus undoing the estate planning scheme which
> had transferred that wealth to the children.
> (See TAP, **Exhibit "I"**, excerpt from Dalia's Pre-Trial Memorandum
> Page "26")

20.  Sagi and David Parnes supported Dalia's position on this issue through their sworn testimony.

   • the Note "was uncollectible." Testimony of TPR Vice President and
     Officer David Parnes (TAP Ex. "G", p. 453);

- collecting the Note would improperly "revers[e] the estate planning that was contemplated to begin with." Testimony of TPR CEO and D&K GP Manager Sagi Genger (TAP Ex. "H", p. 380)

- "There was like 14 percent of TRI given to the kids under the estate planning.  No one was reversing the estate planning."  Sagi Testimony (TAP Ex. "H", p. 380-381);

- Sagi determined that the D & K Note (a TPR asset) was worthless because it was uncollectible: "Please note that in my analysis I'm adjusting downwards the value of the personal assets to reflect the worthlessness of the D&K Note which is stated at nominal value on the auditor's balance sheet." TAP Ex. "H" (Sagi Testimony), p. 375

- the D & K Note "was part of a tax planning mechanism that was put back in 1993" and the Genger family agreed to "bury [the Note] in the woods" to prevent collection.  Parnes Testimony (TAP Ex. "G", p. 460-461);

- Sagi was in charge of burying the Note in the woods.  Parnes Testimony (id.);

21.     Dalia has reiterated her position taken in the Genger divorce arbitration that collection of the D & K Note would undo the Genger family estate planning in her Affidavit previously submitted to this Court and sworn to on March 11, 2008.  Annexed hereto as **Exhibit "KK"** is a copy of Dalia's Affidavit. (See, e.g., Paragraph "9")[5]

22.     At Dalia's urging and to her multi-million dollar benefit[6], Justice Milonas made his finding that the D & K Note was never intended to be collected.  Now that she has allowed

---

[5] Notably, Dalia maintained the sworn position that the D & K Note was uncollectible by TPR even after she divested herself of all TPR shares and Sagi took control of TPR. Id. Contrary to her sworn statement to Surrogate Roth, however, Dalia did nothing to prevent Sagi-controlled TPR from enforcing the D & K Note. Indeed, Dalia deliberately told no one about the impending sale, did nothing to prevent the Sham TPR Foreclosure Sale, and made no attempt to obtain the best price possible for the TPR Shares (so those shares could go to her son, Sagi), which would have directly benefitted the Orly Trust.

[6] Because the matrimonial arbitrator determined that the D & K Note was worthless and uncollectible as argued by Dalia in the arbitration, Dalia ultimately received a substantially greater amount of money in the divorce settlement than she would have otherwise received without such a finding.

the D & K Note to be collected by TPR (i.e., Sagi) to the Orly Trust's harm, Dalia has conveniently reversed her position and claimed that the D & K Note was clearly collectible.

**B.    Dalia and Sagi's scheme to put Sagi in charge of TPR**

23.    As previously set forth in the TAP, Dalia and Sagi schemed to put Sagi in charge of both TPR, the holder of the D & K Note, and D & K, the Note's maker. (See TAP, Paragraphs "23" and "24" for example).  Dalia and Sagi's machinations allowed Sagi as CEO of TPR to notify *himself* as the general manager of D & K, that D & K was in default under the D & K Note paving the way for the Sham TPR Foreclosure Sale of the Orly Trust's shares of TPR, which were pledged as collateral.  Sagi's obvious conflict of interest in these dual roles is self-apparent and was intended by both him and Dalia.

24.    Dalia's feigned innocence concerning the events that led to the Sham TPR Foreclosure Sale (See Motion to Dismiss, Paragraph "16") are belied by the fact that Dalia was previously the 51% majority owner of TPR as a result of Arie and Dalia's divorce settlement and was directly responsible for appointing Sagi as both TPR's CEO and as a board member. (See TAP, Paragraphs "24" and "25", Footnote "1").

25.    Indeed, Dalia's divestiture of her TPR shares only strengthened Sagi's control over TPR.  After Dalia's sale of her TPR shares, Sagi was in effective control of the majority of the shares of TPR because: (a) approximately 49% of the shares of TPR were owned by D & K (which Sagi controlled); and (b) 2% of TPR's shares were beneficially owned by Rochelle Fang (Sagi's Mother-in-law) and were also controlled by Sagi.  (See Generally, TAP, Paragraph "39", Footnote "3")

26.    Sagi's control over the management of TPR was crucial to Dalia and Sagi's scheme in many ways.

27.    Sagi's control over TPR allowed him to orchestrate the Sham TPR Foreclosure Sale. As indicated above, the Orly Trust owned its shares of TPR indirectly through its interest in D & K. Because of Dalia's actions, Sagi was in effective control of both TPR, the holder of the D & K Note, and D & K, the maker of the D & K Note. This was also in stark contradiction to Dalia's prior sworn Affidavit submitted to this Court in which she represented that the D & K Note should not be returned to or enforced by TPR because it would destroy the value of both the Orly Trust and the Sagi Trust. (See **Exhibit "KK",** Paragraph "9").

28.    TPR's (i.e. Sagi's) Sham TPR Foreclosure Sale of the Orly Trust's shares of TPR was devastating to the Orly Trust because it resulted in the loss of this valuable asset. Moreover, this foreclosure paved the groundwork for Sagi and Dalia's subsequent attempts to loot the Orly Trust of its sole remaining asset, the Orly Trust TRI Shares. This was only possible because Dalia ceded control of TPR to Sagi before she became Trustee.

29.    Therefore, Dalia's actions subsequent to her appointment as Trustee of the Orly Trust must be viewed in this context and not in the "vacuum" preferred by her counsel. There is no "bright dividing line" between Dalia's actions prior to becoming the Trustee of the Orly Trust and her actions subsequent thereto. They are all intertwined as part of her and Sagi's overall scheme to loot the Orly Trust of its assets.

30.    Once Sagi was in charge of both TPR and D & K, and Dalia was appointed Trustee of the Orly Trust, Dalia and Sagi carried out the scheme they set in motion prior to Dalia's appointment. Dalia needed to be appointed as the Trustee of the Orly Trust for the scheme to work. As set forth below, Dalia's actions and inactions subsequent to her appointment as Trustee of the Orly Trust clearly indicate that she was either a willing participant or a pawn in

this scheme. In either case, her actions and inactions as Trustee constitute a breach of her fiduciary duties to Petitioner and warrant her removal.

## DALIA'S CLAIM THAT SHE DID NOT ACT IMPROPERLY WITH RESPECT TO THE SHAM TPR FORECLOSURE SALE IS BOTH ERRONEOUS AND DISINGENUOUS

31.    Dalia alleges in Paragraph "8" of the Motion to Dismiss that she cannot be held accountable for TPR's declaration of a default under the D & K Note (See copy of default notice previously annexed as **Exhibit "S"** to TAP) which led to the Sham TPR Foreclosure Sale of the Orly Trust's interest in TPR.[7] Dalia also claims that she was prohibited from taking any action to stop the Sham TPR Foreclosure Sale by Surrogate Roth. Lastly, Dalia alleges that the Sham TPR Foreclosure Sale was proper because contrary to Petitioner's assertion, the D & K Note was always intended to be enforced. (See Motion to Dismiss Paragraphs "15" through "21").

32.    These statements are all belied by the sworn facts and testimony set forth on the TAP.

33.    First, Surrogate Roth's Order instructed Dalia to take no action to harm the Orly Trust and its assets. The Court's Order could not reasonably be construed as a purported "gag order" preventing Dalia from notifying Orly or others about TPR's notice of default. Moreover, Surrogate Roth's instructions did not compel Dalia to abrogate her fiduciary duties to protect the assets of the Orly Trust from dissipation. Nor did it prevent Dalia from apprising the Court of the impending sale and seeking a lift of the purported "gag order." Finally, Dalia's broad construction of this Order stands in distinct contrast to the way Dalia ignored – and now claims

---

[7] Dalia further claims that Petitioner has alleged "...no act that Dalia Genger did to participate in the foreclosure..." and that "...Dalia could not prevent TPR from declaring a default and foreclosing on the promissory Note made by D & K LP that the Orly Trust had guaranteed." (See Motion to Dismiss, Paragraph "15"). This is simply not true. First, as a fiduciary, Dalia's failure to act is a violation. Second, Dalia could have gone to Court to prevent the foreclosure. Indeed, the New York Supreme Court already has found that "a material issue of fact exists regarding the intention of the note's enforceability". July 28, 2010 Order (Ex. Z to TAP) at 21.

to narrowly construe – the various restraints she violated in filing the Delaware Chancery Action, and in entering into the Secret Agreements.

34.     As set forth in the TAP, Dalia knew of Sagi's plan to foreclose on the D & K Note as early as August, 2008, and withheld this information from Petitioner for almost ten months. Even then, Dalia only provided the information after the Sham TPR Foreclosure Sale had taken place, and only after she received a demand letter from Orly's prior counsel. (See TAP, **Exhibit "R")**

35.     Dalia does not dispute this. By her testimony, she expressly acknowledges that "I [Dalia] chose not to inform Orly" about the default notice issued by TPR in connection with the Sham TPR Foreclosure Sale. See **Exhibit "JJ"**, Page 190, Lines "3" through "11")

36.     Dalia's conscious decision not to inform Orly of TPR's (i.e., Sagi's) default notice under the D & K Note is completely inexcusable and constitutes a gross violation of her fiduciary duties. The fact that Dalia purportedly consulted with counsel before choosing not to inform Orly does not absolve her from her fiduciary duties.

37.     Further, Dalia testified that she made no efforts to stop Sagi from proceeding with the Sham TPR Foreclosure Sale.

> Q.     You don't remember ever going to Sagi and saying, "Please don't do this sale"?
> A.     No, I didn't say that.
> Q.     Or words to that effect?
> A.     Right, I did not say it because its's not my place to say it. He [Sagi] can do whatever he wants. He has a note and he wanted to collect on it.
> (See **Exhibit "JJ"**, Page 187, Lines "17" through "24")

38.     Dalia also testified that she made no efforts to inform Petitioner of the foreclosure auction of the Orly Trust's shares of TPR:

> Q.     Did you discuss with Mr. Meister the possibility of letting Orly know [of the auction] so that other people could go in and bid on the TPR Asset?

> A.    No, I did not discuss this.
> Q.    That was not an option you considered?
> A.    No.
>       (See **Exhibit "JJ"**, Page 197, Lines "18" through "24")

39.    Dalia also testified that she made no efforts to find any additional bidders for the

auction to maximize the potential value of the TPR asset.

> Q.    Isn't it Orly's interest to get the best price for her interest?
> A.    It is.
> Q.    Okay.  So isn't getting as many people as possible who want to buy the
>       shares-
> A.    But it is not my responsibility to collect people that will participate in the
>       auction.
>       (See **Exhibit "JJ"**, Page 199, Lines "16" through "23")

40.    Notably, Dalia has testified that the sole basis for thinking the foreclosure sale

was proper was because Sagi told her so.  See **Exhibit "LL"**, (Pages 334-336) annexed hereto,

which is a copy of the transcript of Dalia's continued deposition on February 7, 2013.

41.    As set forth above and in the TAP, Dalia acknowledged that it was her and Arie's

estate plan for Sagi and Orly to share equally in the distribution of the Genger family's wealth as

brother and sister (See **Exhibit "I"**, excerpt from Dalia's Pre-Trial Memorandum Page "26").

42.    Dalia confirmed this in her testimony:

> Q.    And there was an estate plan for the benefit of your two children,
>       Sagi and –
> A.    That's right.
> Q.    --Orly, correct?
> A.    Right.  Correct.
> Q.    And the intent was that <u>Orly and Sagi were to share equally</u>; is that also
>       correct?
> A.    Yes.
> (emphasis supplied) (See **Exhibit "JJ"**, Page 148, Lines "4" through "11")

43.    Despite the Genger family estate plan and her testimony, Dalia alleges in the

Motion to Dismiss that the D & K Note was enforceable and thus, the Sham TPR Foreclosure

Sale was proper.  Petitioner sets forth at length above and in the TAP all of the reasons why the

D & K Note was never intended to be enforced. (See TAP, Paragraphs "31" through "35" and **Exhibits "G" through "J"**) Once again, Dalia's allegations are belied by the evidence.

44.     In fact, Justice Feinman specifically denied Dalia's Motion for Summary Judgment in the New York TPR Action with respect to this issue of the D & K Note's enforceability.  Justice Feinman determined in his July 28, 2010 decision that:

> "...a material issue of fact exists regarding the intention of the note's [the D & K Note's] enforceability.  While the documents speak for themselves, plaintiff raises material questions of fact concerning the actual intent behind the promissory note.  Given the testimonial evidence in particular, there is a question of fact as to whether the promissory note was intended to be an enforceable agreement, and it would be premature to apply a Statute of Frauds analysis to the cause of action."
> (See **Exhibit "Z"** to TAP Pages "21" and "22)

45.     In summary, Dalia's scheme to place Sagi in a position which enabled him to loot the Orly Trust's shares of TPR, combined with: (i) Dalia's conscious and willful decision not to inform Orly of TPR's purported default under the D & K Note; (ii) Dalia's conscious and willful decision not to notify Orly about the Sham TPR Foreclosure Sale and give Orly an opportunity to protect the Orly Trust's interests in TPR; (iii) Dalia's lack of any effort to stop Sagi-controlled TPR from looting the Orly Trust of its shares of TPR, notwithstanding Dalia's testimony under oath about the Genger family estate plan to treat both children equally; (iv) Dalia's complete lack of oversight and intervention in the sham auction; (v) the fact that the D & K Note was never intended to be enforced for the reasons set forth here and in the TAP; (vi) Dalia's deliberate attempt to conceal the sale from Orly until many months after the sale occurred; and (vii) her refusal to try to maximize the value of the TPR shares at the auction to ensure the shares went to her son, Sagi, and not her hated ex-husband, Arie, all represent clear and un-controvertible breaches of her fiduciary duties as trustee of the Orly Trust.

## DALIA ACTIONS AND INACTIONS WITH RESPECT TO
## THE ORLY TRUST TRI SHARES CONSTITUTE A
## GROSS BREACH OF HER FIDUCIARY DUTIES

46.     In the Motion to Dismiss, Dalia alleges that her actions and inactions with respect

to the Orly Trust TRI Shares were proper because: (i) she was not a trustee of the Sagi Trust and

therefore, she did not cause the sale of the Sagi Trust's shares of TRI nor could she have

prevented it in any way; and, (ii) she commenced the Delaware Chancery Action against the

Trump Group and TRI to purportedly "protect" the Orly Trust's interests in the Orly Trust TRI

Shares.

47.     As set forth below, these contentions are meritless.   Indeed, Dalia's actions and

inactions with respect to the Orly Trust TRI Shares were specifically intended to dissipate and

further harm the Orly Trust's assets, not protect it as she claims.

48.     As set forth in the TAP, TPR previously held a 52.85% interest in TRI.  The

remaining minority interest in TRI (47.15%) was owned by the Trump Group.  As part of Arie

and Dalia's divorce Settlement Agreement entered into in 2004, TPR's 52.85% interest in TRI

was transferred as follows: (i) 13.99% to Arie (the "Arie TRI Shares"); (ii) 19.43% to the Orly

Trust (previously defined as the "Orly Trust TRI Shares"); and, (iii) 19.43% to the Sagi Trust

(the "Sagi Trust TRI Shares"),  (collectively, the "2004 Genger TRI Transfer")[8]

49.     This equal distribution of the shares of TRI to the Orly Trust and the Sagi Trust

was consistent with the Genger family estate plan and Dalia's testimony that Sagi and Orly were

to share equally in the distribution of the Genger family's wealth as brother and sister.

---

[8]   The Orly Trust and the Sagi Trust each granted Arie an irrevocable lifetime voting proxy over their respective
shares of TRI. (See TAP, **Exhibit "C"**).  The clear and obvious intent behind the voting proxies and the Genger's
divorce Settlement Agreement was for Arie to maintain majority 58.85% controlling voting rights for the Arie TRI
Shares, the Orly Trust TRI Shares and the Sagi Trust TRI Shares for the duration of his life.

50.     On August 22, 2008, unbeknownst to Petitioner, Rochelle Fang (Sagi's Mother-in-law) who had been appointed Trustee of the Sagi Trust, attempted to sell the Sagi Trust TRI Shares to the Trump Group for the sum of $26.7 million dollars, who thereafter purported to hold 66.58% of TRI's outstanding common stock.  In connection with the supposed sale, Sagi and David Parnes (the present Trustee of the Sagi Trust) were given seats on TRI's board of directors.  This sale, which was consummated after Dalia was appointed successor trustee of the Orly Trust, has diluted and diminished the value of the Orly Trust TRI Shares since Arie will no longer have a controlling interest in TRI (which he previously had by virtue of his voting proxy over the Trusts' shares, see **Exhibit "C"** to the TAP) and thus, the Orly Trust would no longer own a portion of the controlling block of TRI shares, thereby greatly decreasing their value.

51.     To make matters worse, unbeknownst to Orly, Sagi also entered into a side agreement with the Trump Group whereby he purportedly agreed as President of TPR that in the event the 2004 Genger TRI Transfer by TPR was deemed to be void, Sagi on behalf of TPR would: (a) be entitled to keep the $26.7 million dollar purchase price for the Sagi Trust TRI Shares; and, (b) have the purported right on behalf of TPR to sell the Orly Trust TRI Shares at a price that was $10.3 million dollars or approximately 60% less than that which was paid by the Trump Group for the Sagi Trust TRI Shares notwithstanding the fact that the Orly Trust and the Sagi Trust held the exact same amount of shares of TRI.[9]

52.     The shares of TRI were worth multiples of what the Trump Group paid to Sagi for the Sagi Trust TRI Shares, let alone the 60% discount for said price that Sagi purportedly negotiated with the Trump Group for the Orly Trust TRI Shares without Petitioner's knowledge

---

[9]  The side agreement also provided that Sagi would have the purported right on behalf of TPR to sell the Arie TRI Shares to the Trump Group for the sum of approximately $7.4 million dollars, which is also a fraction of their true value.

or consent. Upon information and belief, in 2008, at the time that Sagi purported to agree to the $26.7 million dollar purchase price and the 60% discount for the Orly Trust TRI Shares, TRI had after tax earnings in excess of $150,000,000 and sales of approximately $1 billion dollars.

53.     As set forth in the TAP, in response to Sagi's actions, Arie and Orly commenced the New York TRI Action to determine, *inter alia*, the ownership of the Orly Trust TRI Shares.

54.     As if the proposed sale of the Orly Trust TRI Shares for a grossly inadequate amount of consideration was not damaging enough to Orly, Dalia's actions taken in response to the proposed sale of the Orly Trust TRI Shares to the Trump Group were specifically designed to assist Sagi in causing further harm to the Orly Trust.

55.     In an *in rem* summary proceeding commenced by the Trump Group in 2008 in the Delaware Chancery Court, the Trump Group sought, *inter alia,* a determination that the 2004 Genger TRI Transfer was void and that the shares reverted to TPR (i.e. Sagi), thus paving the way for Sagi to consummate the sale of the Orly Trust TRI Shares (and the Arie TRI Shares) for a fraction of their value.  (See *TR Investors, LLC et al v. Arie Genger and TPR Investment Associates, Inc.*, Delaware Chancery Court, Civil Action No. 6697-CS, the "TRI Chancery Action")  Sagi has aligned himself with the Trump Group in both the TRI Chancery Action and in the New York TRI Action.  Sagi would avariciously like to see the TRI shares revert back to TPR, because essentially, he is TPR.

56.     By decision dated August 28, 2010, Chancellor Strine determined in the TRI Chancery Action that the 2004 Genger TRI Transfer by TPR was void, that Arie and the Orly Trust had no beneficial ownership interest in the Arie Shares or the Orly Trust TRI Shares and thus, the shares reverted to TPR (i.e Sagi).  Chancellor Strine made this decision notwithstanding

the fact that neither the Orly Trust nor Petitioner were a party to that proceeding (the "Chancellor Strine Decision").

57.     The Delaware Supreme Court ultimately reversed the portion of the Chancellor Strine Decision which determined that Arie and the Orly Trust were not the beneficial owners of the Arie Shares and the Orly Trust TRI Shares on the grounds that it was beyond the jurisdiction of the Court. The Delaware Supreme Court further held that the beneficial ownership of those shares needed to be adjudicated in a plenary action in a jurisdiction where the Court has *in personam* jurisdiction over **all** indispensable parties.

58.     Arie and Orly commenced the New York TRI Action to adjudicate this issue. In 2011, many months after the commencement of the New York TRI Action and without prior notice to Petitioner as required under the July 2009 Order, Dalia, as Trustee of the Orly Trust, commenced the Delaware Chancery Action seeking a declaration that the Orly Trust is the beneficial owner of the Orly Trust TRI Shares. Dalia has been restrained from pursuing this action pursuant to a prior Order of the Court issued in the New York TRI Action.[10]

59.     Dalia's commencement of the action before the same Delaware Chancery Court that previously ruled against the Orly Trust and Petitioner's interests as beneficiary, was intended for the devious and transparent purpose of helping Sagi complete TPR's sale of the Orly Trust TRI Shares (and the Arie TRI Shares) to the Trump Group at a fraction of their true value, all to the detriment of the Orly Trust.

---

[10]   Dalia's counsel has asserted that this restraint has been lifted by Justice Barbara Jaffe in the New York TRI Action and that Dalia intends to proceed with the Delaware Chancery Action.  As a result, Petitioner filed an Order to Show Cause with this Court seeking a temporary restraining order and injunction restraining Dalia from doing so because of the potential devastating detrimental effect that Dalia proceeding with the Delaware Chancery Action would have upon the Orly Trust's assets and Petitioner as its beneficiary.

60.     Specifically, Chancellor Strine's August 28, 2010 decision (previously defined as the "Chancellor Strine Decision") that the Orly Trust had no beneficial ownership interest in the Orly Trust TRI Shares, was reversed on the grounds that the Delaware Court did not have personal jurisdiction over the Orly Trust.

61.     By commencing the Delaware Chancery Action, Dalia clearly and transparently attempted to cure the very jurisdictional defect that had protected the Orly Trust!   Dalia commenced the Delaware Chancery Action knowing full well that the Chancery Court was pre-disposed to ruling against Petitioner's best interests.  With the jurisdictional issue out of the way; Dalia would know it was almost a certainty that the Chancery Court would rule once again that the 2004 Genger TRI Transfer was void and that the Orly Trust TRI Shares would revert back to TPR.  Not surprisingly, the Delaware Chancery Court recently affirmed its findings in a related case.  See **Exhibit "MM"**, Memorandum and Opinion of Chancellor Strine dated February 18, 2013.

62.     To date, Dalia has provided no reason why she had to spend Orly Trust funds to file a separate action in the very court most likely to rule against the Orly Trust.  Nor has she explained why she is still seeking to litigate that case 16 months later, rather than let it remain stayed.

## THE MEETING AGREEMENT WAS GROSSLY IMPROPER AND
## CONSTITUTED A BREACH OF DALIA'S FIDUCIARY DUTIES

63.     On or about January 31, 2009, only weeks after making sworn statements to the Surrogate Court that she intended to protect the Orly Trust's assets, Dalia executed a document entitled "Meeting of Partners of D & K LP- Jan. 31, 2009 & Agreement" (the "Meeting Agreement").  (See **Exhibit "O"** to TAP).  The Meeting Agreement purported to grant D & K

GP (i.e., Sagi) unfettered authority to encumber the Orly Trust TRI Shares and purported to indemnify and release Sagi and Dalia of any actions taken in connection with same. (See **Exhibit "O"**, Paragraphs "1" and "3")

64.    As set forth in the TAP, the Orly Trust received no consideration and no direct or indirect benefit in exchange for the substantial concession, Dalia, acting as Trustee, gave to D & K GP (controlled by Sagi) under the Meeting Agreement.

65.    Significantly, the Meeting Agreement was negotiated and executed without ever informing Petitioner or her counsel.  Moreover, Dalia never informed Orly of the Meeting Agreement's existence, even though Orly repeatedly requested information from Dalia about the Orly Trust's assets during this time.  Indeed, the Meeting Agreement was only disclosed, some ten months later in connection with the New York TPR Action.

66.    In the Motion to Dismiss, Dalia alleges that the Meeting Agreement does not provide D & K GP (i.e. Sagi) with unfettered authority to encumber the Orly Trust TRI Shares and attempts to depict the Meeting Agreement as an innocuous "clarification of pre-existing rights".  Further Dalia alleges that there "...was no harm from D&K LP's 2009 pro forma indemnification and release of D&K LP's former general partner." [Dalia] (See Motion to Dismiss, Paragraphs "22" and "23")  Once again, Dalia's arguments are refuted by the plain language of the Meeting Agreement:

> The partners wish to clarify that the authority vested in the General Partner to make limited partners' assets subject to a pledge shall be done in substantially the same manner in which TPR Investment Associates, Inc. shares were pledged in conjunction with the aforementioned note [the D & K Note]. However, the General Partner shall be authorized to sign for the partnership and/or each individual partner.
> (See **Exhibit "O"** to TAP Paragraph "3")

67.     This language allows D & K GP to pledge the Orly Trust TRI Shares without Petitioner's consent in order to provide the groundwork for another sham foreclosure sale of the Orly Trust TRI Shares.

68.     That Dalia and Sagi might attempt to orchestrate another sham foreclosure sale to loot the Orly Trust of the Orly Trust TRI Shares is no idle concern.  As set forth below and in the TAP, as a result of Dalia and Sagi's actions in entering into the Secret Agreements, the Orly Trust TRI Shares have already been placed in peril of being foreclosed upon by Manhattan Safety Company ("MSCo"), a recently created St. Kitts entity, without a notice to the Orly Trust and anywhere in the world.  (See TAP, Paragraphs Numbered "79" through "93")

69.     Remarkably, Dalia kept these Secret Agreements hidden from Orly and the New York Supreme Court for nine months, from October 2011 until July 2012.

70.     Clearly, Dalia's entry into the Secret Agreements are not the actions of a trustee who wishes to comply with her fiduciary duties or the Courts' restraining orders.  Rather, they constitute the actions of an individual who shows no regard for her fiduciary duties whatsoever.  Moreover, Dalia's attempt to indemnify herself from any actions taken in conjunction with the Meeting Agreement only further highlights this point.[11]

## THE TPR SETTLEMENT AGREEMENT AND AMENDED TPR SETTLEMENT AGREEMENT ARE NOT BENEFICIAL TO THE ORLY TRUST'S INTERESTS

71.     Dalia alleges in the Motion to Dismiss that the TPR Settlement Agreement and

---

[11] Dalia's contentions in the Motion to Dismiss that her release is purportedly limited in some way because it only releases her to the "fullest extent permitted [by law]" is unpersuasive. (See Motion to Dismiss, Paragraph "23") Further, in addition to the purported Release, Dalia makes the Orly Trust responsible for paying everyone's attorneys fees, should Orly continue to sue for recovery of the stolen Orly Trust assets. (See e.g., TAP, **Exhibit "HH"**, Amended TPR Settlement Agreement, Paragraph "7")

the TPR Amended Settlement Agreement (collectively, the "TPR Settlement Agreements") were purportedly beneficial to the Orly Trust. (See Motion to Dismiss Paragraphs "29" and "30").

72.     Nothing could be further from the truth. In examining Dalia's allegations that the TPR Settlement Agreements (both of which were entered into by Dalia without any prior notice to Petitioner and her counsel in violation of the July 2009 Order and the Supreme NY Restraining Orders) were purportedly beneficial to the Orly Trust, it is important to note that both TPR Settlement Agreements attempt to legitimize the TPR Sham Foreclosure Sale and the purported deficiency under the D & K Note.

73.     In other words, the TPR Settlement Agreements are premised on (i) the enforceability of the Note; (ii) the legality of the Sham TPR Foreclosure Sale; and, (iii) the legality of the deficiency resulting from the Sham TPR Foreclosure Sale. Each of these premises, however, are still being adjudicated by the parties in the New York TPR Action! In fact, Justice Feinman specifically denied Dalia's Motion for Summary Judgment in the New York TPR Action with respect to this issue holding that material issues of fact exist regarding the D & K Note's enforceability. (See **Exhibit "Z"** to TAP Pages 21-22)

74.     Dalia also alleges that the Orly Trust benefitted under the terms of the TPR Settlement Agreements because TPR purportedly relinquished its rights to the proceeds of the Orly Trust TRI Shares, specifically the grossly inadequate $10.3 million dollar purchase price which was negotiated by Sagi without Petitioner's knowledge or consent. This contention is nothing more than a further attempt by Dalia to legitimize Sagi's purported agreement with the Trump Group to sell the Orly Trust TRI Shares at a fraction of their value. (See Motion to Dismiss, Paragraph "30(b)"). Further, this purported concession is meaningless and is truly a "mirage in the desert" in light of the Secret Agreements and MSCo's purported right to collect

$4.44 million from the Orly Trust, and then foreclose upon the remaining of Orly Trust TRI Shares, anywhere in the world and without any notice whatsoever.

75.     Dalia further alleges that the TPR Settlement Agreements "...ends the relationship between the Orly Trust and D & K and "cancel[s] and void[s] the Amended D & K Partnership Agreement and the "Meeting Agreement" of which Orly complains in this action, eliminating any contention that the Orly Trust was damaged by those agreements..." (See Motion to Dismiss, Paragraph "30(c)")

76.     In other words, the TPR Settlement Agreements purport to have the Orly Trust transfer all its interests in D & K and disclaim all interest in TPR. However, the whole purpose behind Petitioner's commencement of the New York TPR Action is for Petitioner to reclaim the improperly foreclosed shares of TPR for the Orly Trust. Therefore, the TPR Settlement Agreements constituted nothing more than an extra-judicial "stealth mission" by Dalia and Sagi to avoid the Court's adjudication of the New York TPR Action.

77.     Dalia alleges that the TPR Settlement Agreements contain "...no release in favor of Dalia Genger... and no benefits for Dalia Genger  (See Motion to Dismiss, Paragraph "30(d)").   This is unequivocally false. Paragraph "3" of the Amended TPR Settlement Agreement provides as follows:

> Mutual Releases.  The parties to this settlement agreement hereby irrevocably and fully release one another, including all current and former directors, officers, trustees, fiduciaries, agents, advisors and other representatives of each of the parties...whether for acts in their fiduciary or individual capacities...from all claims, causes of action, lawsuits, demands, liability of any kind, asserted or unasserted, known or unknown, suspected or unsuspected, direct or derivative, in connection with the 1993 Note, the TRI Shares, the Share Transfer, the DK Interest, the TPR Interest, the 2008 Letter Agreement, or any other matters, through the date of this Agreement
> (emphasis added) (See **Exhibit "HH"** to TAP, Amended TPR Settlement Agreement, Paragraph "3")

78.     Dalia alleges that the Credit and Forbearance Agreement (defined as the "Credit

Agreement" in the TAP) and the Notes do not "...pledge anything as security or otherwise

"allow the potential foreclosure against valuable collateral" as alleged in TAP ¶8." (See Motion

to Dismiss, Paragraph "32"). This is also unequivocally false. In fact, the Orly Trust TRI Shares

are subject to potential foreclosure without any notice to Petitioner or her counsel whatsoever.

The Amended Promissory Note provides:

> Upon the occurrence of an Event of Default, Holder may...<u>declare the unpaid
> Principal of and accrued and unpaid interest on this Note due and payable</u>,
> whereupon the same shall be due and payable without presentment, demand,
> protest or other notice of any kind, all of which Maker expressly waives, and
> Holder may <u>proceed to enforce payment of such Principal and accrued and unpaid
> interest or any part thereof in such manner as it may elect in its sole discretion</u>...
> (emphasis supplied) (**Exhibit "DD"** to TAP, Amended Promissory Note,
> Paragraph "2.2")

79.    The Credit Agreement also provides that

> ... each Party [including the Orly Trust] irrevocably agrees that it is and **its assets
> are**, and shall be subject to such legal action or proceeding in respect of its
> obligations under this Agreement. (emphasis added)
> (See **Exhibit "CC"** to TAP, Credit Agreement, Paragraph "21")

80.    Dalia's allegation that the dismissal of the Pedowitz & Meister Interpleader

Action is not an "Event of Default" under the Secret Agreements (See Motion to Dismiss,

Paragraph "32", Footnote 8) is belied by the clear and unequivocal language contained in the

Credit Agreement:

> "Manhattan [MSCo] hereby covenants and agrees that ... Manhattan
> agrees to forbear from collection of amounts due and owing on the Note,
> ... until the earliest to occur of (i) the date on which Dalia no longer
> serves as Trustee of the Trust, (ii) <u>the final resolution of the Interpleader
> Action</u> [the Pedowitz & Meister Interpleader Action] or (iii) November 1,
> 2014" (emphasis added)
> (See **Exhibit "CC"** to TAP, Credit Agreement, Paragraph "6.2")

81.    It is not disputed that the Pedowitz & Meister Interpleader Action has been

dismissed and is thus "finally resolved", thereby triggering the above-mentioned Event of

Default.[12]

82.    Finally, Dalia's making her removal as Trustee, or the appointment of a co-Trustee, an "Event of Default" under the Secret Agreements is clear and unimpeachable evidence of why Dalia is not a suitable trustee.

### DALIA CLEARLY AND BLATANTLY VIOLATED THE PROVISIONS OF THE JULY 2009 ORDER NOTWITHSTANDING HER CLAIMS TO THE CONTRARY

83.    In the Motion to Dismiss, Dalia alleges that she has always complied with the provisions of the July 2009 Order which provides in relevant part that Dalia is required:

> "to give notice by overnight mail to petitioner's [Orly's] counsel of any 1) offer to purchase the Orly Trust's 19.3% interest in TRI within 10 days of receiving such offer and 2) act by Respondent [Dalia], her agents, and all other persons acting on her behalf to assign, mortgage, pledge, redeem, encumber, sell or otherwise alter the Orly Trust's interest in TRI at least 10 days prior to such act."
> (See Motion to Dismiss, Paragraphs "25" and "26" and Exhibit "10")
> (A copy of the July 2009 Order is annexed hereto as **Exhibit "NN"**)

84.    As previously stated above, without prior notice to Petitioner, and in a transparent forum shopping move designed to further Sagi's scheme of selling the Orly Trust TRI Shares to the Trump Group at a fraction of their value, Dalia deviously commenced the Delaware Chancery Action to determine the beneficial ownership interest of the Orly Trust TRI Shares.

85.    Plainly, Dalia's commencement of the Delaware Chancery Action to purportedly determine the ownership of the Orly Trust TRI Shares constitutes an action which "alters" the Orly Trust's interest in the Orly Trust TRI Shares.   Notwithstanding the forgoing, Dalia deliberately chose not to inform Petitioner and in doing so, violated the July 2009 Order.

---

[12] Dalia's newly-minted contention that her attorneys filed the Pedowitz & Meister Interpleader Action without telling her (See Exhibit "LL", Pages 363-367) is frankly unbelievable. Dalia's contention that this was a "rogue act" by her counsel is belied by the multiple documents she signed making final resolution of the Pedowitz & Meister Interpleader Action an "Event of Default."

86.     As previously set forth in the TAP, Dalia's entry into the Secret Agreements without prior notice to Petitioner also violated the July 2009 Order. Dalia does not and cannot contend that she provided Petitioner or her counsel with any prior notice of the Secret Agreements. Rather, she audaciously asserts that she did not do anything that constitutes a "purchase, assignment, mortgage, pledge, redemption, encumbrance, sale or other alteration of the Orly Trust's interest in TRI" (See Motion to Dismiss, Paragraph "25"). This position is absurd, given the plain language of the Secret Agreements.[13]

87.     Dalia's execution of the Notes on purported behalf of the Orly Trust in favor of TPR (i.e. Sagi), which were subsequently assigned by TPR to MSCo were clearly "...act[s] by Dalia, her agents and all other persons acting on her behalf to **assign**, mortgage, pledge, redeem, encumber, sell or otherwise **alter** the Orly Trust's interest in TRI..." (emphases added).

88.     Further, as a result of the Secret Agreements, the Orly Trust TRI Shares have clearly been been "pledged", "encumbered" or "altered" because in the event of a default, they are subject to potential foreclosure by MSCo as a result of the assignment.

89.     As indicated above, the Orly Trust TRI Shares are subject to potential foreclosure without any notice to Petitioner or her counsel whatsoever. (See: (i) provisions of Paragraph "2.2" of the Amended Promissory Note attached as **Exhibit "DD"** to TAP, cited to above; and (ii) provisions of Paragraph "21" of the Credit Agreement attached as **Exhibit "CC"** to TAP previously cited to above)

90.     As discussed above and previously stated in the TAP, one of these purported

---

[13] The way Dalia treats the July 2009 Order stands in marked contrast with her extremely broad interpretation of Surrogate Roth's "do no harm" order as a "gag order" that somehow prevented Dalia even from telling Orly about the upcoming Sham TPR Foreclosure Sale. The only way to harmonize these two differing approaches by Dalia is to recognize that Dalia will adopt whatever interpretation supposedly excuses her harmful acts and breaches of fiduciary duty.

"Events of Default" – the dismissal of the Pedowitz & Meister Interpleader Action -- has already occurred. Another "Event of Default" – Dalia's removal as Trustee or the appointment of a co-trustee – is a direct challenge to this Court, and cannot be squared with Dalia's duty to put Orly, and not Dalia, first.

91.     The Notes "alter" and constitute a "pledge" of and "encumbrance" against the Orly Trust's interest in Orly Trust TRI Shares by allowing MSCo. to enforce the Notes against all the Orly Trust's assets upon Dalia's removal, or a determination of the Pedowitz & Meister Interpleader Action.

92.     In conclusion, it is respectfully submitted that Dalia was well aware of the provisions contained in the July 2009 Order and willfully disobeyed them by entering into the Secret Agreements without any prior notice to Petitioner and her counsel as mandated by the Order.  It is further respectfully submitted that Dalia's actions in entering into the Secret Agreements, which has ultimately placed the Orly Trust TRI Shares in jeopardy, is such an egregious breach of Dalia's fiduciary duties that it alone, constitutes grounds for her removal as Trustee.

93.     Dalia's claim that her actions with respect to the Orly Trust TRI Shares did not violate the Stipulation entered into between the parties on or about September 8, 2010 because it did not involve any "attempts to vote the Orly Trust TRI Shares" is similarly unavailing.  As specifically set forth in the Stipulation, the prior restraints against Dalia which were previously ordered by Surrogate Webber on July 1, 2009 (the July 2009 Order) were included as part of the Stipulation. In other words, the Stipulation only adds additional restraints previously imposed by the July 2009 Order, it doesn't limit same.  Thus, Dalia violated the stipulated restraints contained in the September 8, 2010 Stipulation for the exact same above-described reasons that

she violated the July 2009 Order.

## DALIA VIOLATED THE PROVISIONS OF THE SUPREME COURT'S JULY 28, 2010 ORDER ENTERED IN THE NEW YORK TPR ACTION

94. Dalia boldly states in her Motion to Dismiss that nothing contained in the Secret

Agreements violates the provisions of Justice Feinman's July 28, 2010 Order and Injunction[14] in

the New York TPR Action. Dalia is wrong.

95. Justice Feinman issued a preliminary injunction and determined:

Due deliberation having been had, and it appearing to this Court that a cause of action exists in favor of the plaintiff and against the defendants and that plaintiff is entitled to a preliminary injunction on the ground that the subject of the action is unique and that the defendants threaten to do an act in violation of the plaintiff's rights respecting the subject of the action, tending to render the judgment ineffectual, as set forth in the aforesaid decision, it is ...

ORDERED that defendants, their agents, servants, employees, and all other persons acting under the jurisdiction, supervision, and/or direction of defendants, are enjoined and restrained, during the pendency of this action, from doing or suffering to be done, directly, or through any attorney, agent, servant, employee, or other person under the supervision or control of defendant or otherwise, any of the following acts: removing the Shares from the state, or otherwise transferring, selling, pledging, assigning, or otherwise disposing of the Shares.

(See TAP, **Exhibit "Z",** July 28, 2010 Order and Injunction at 31-32 (emphases added).

The "Shares" mean the "D&K Limited Partnership's 48 percent ownership interest in the

common stock of TPR Investment Associates." Id. at 2.

96. Dalia violated the provisions of the July 28, 2010 Order and Injunction by

purporting to relinquish the Orly Trust's interest in TPR and transfer the Orly Trust's interest in

D&K. In doing so, Dalia violated the provisions of the July 28, 2010 Order and Injunction

---

[14] The July 28, 2010 Order which is annexed as **Exhibit "Z"** to the TAP, amended the Court's prior Order dated June 28, 2010, which is annexed as **Exhibit "V"** to the TAP. The July 28, 2010 Order , contains the same language enjoining Dalia from taking any action with respect to Orly Trust's shares of TPR as contained in the June 28, 2010 Order.

which forbade her from "transferring, pledging, assigning or otherwise disposing of the [Orly Trust TPR] Shares. Id. at 31-32. A summary of Dalia's violation of the July 28, 2010 Order and Injunction appears immediately below.

| What the Court Ordered | What Dalia Did |
| --- | --- |
| ORDERED that defendants...are enjoined and restrained, during the pendency of this action, from...transferring,[15] selling, pledging, assigning, or otherwise disposing[16] of the [TPR] Shares.<br><br>**Exhibit "Z"-** July 28, 2010 Order and Injunction at 32 (emphases added) | ... the OG Trust [the Orly Trust] – irrespective of any claim made or asserted on its behalf by Orly Genger – hereby transfers to TPR its limited partnership interest in DK (the "DK Interest"), and disclaims[17] any interest in, any shares of or TPR, either directly or indirectly through DK (the "TPR Interest").<br><br>See **Exhibit "GG"** to TAP, TPR Settlement Agreement ¶ 1 (emphases added) See **Exhibit "HH"** to TAP, Amended TPR Settlement Agreement ¶ 1 |

97.     The above-referenced provisions of the TPR Settlement Agreements cannot be squared with either the language or plain intent of the July 28, 2010 Order and Injunction.   It is respectfully submitted that, based upon this provision alone, the Court can conclude that Dalia breached her fiduciary duty to Petitioner.

98.     Dalia laughably contends that nothing in the Secret Agreements:

> ...transferred, sold, pledged, assigned, or otherwise disposed of the [Orly Trust TPR] Shares, which in fact the Orly Trust no longer owned

---

[15] "transfer [trans-fûr] *vt* to carry, convey, to another place; to give, hand over, to another person, esp legally; ..." WEBSTER'S DICTIONARY & THESAURUS 401 (2005) (emphasis added); "transfer, *n*. 1. Any mode of disposing of or parting with an asset or an interest in an asset...The term embraces every method – direct or indirect, absolute or conditional, voluntary or involuntary – of disposing of or parting with property or with an interest in property..." BLACK'S LAW DICTIONARY 1216 (7th ed. 2000)

[16] "dispose [dis-pōź] *vt* to arrange; to influence-*vi* to settle a matter finally..." WEBSTER'S DICTIONARY & THESAURUS 111 (2005) (emphasis added); "disposition (dis-pə-zish-ən), *n*. 1. The act of transferring something to another's care or possession, esp. by deed or will; the relinquishing of property..." BLACK'S LAW DICTIONARY 382 (7th ed. 2000).

[17] "disclaim [dis-klām] *vi* . . . to renounce all legal claim to – *n* disclaimer, a denial of legal claim; a writing embodying this." WEBSTER'S DICTIONARY & THESAURUS 109 (2005).

and were owned by TPR by virtue of the foreclosure. Thus, contrary
to the TAP's assertion (e.g., ¶90 (b)), there was no violation of the
Supreme Court's June 28, 2010 Order. (Motion to Dismiss, Paragraph "38")

99. Dalia's contention ignores the fact that the Supreme Court issued the July 28,

2010 Order and Injunction after the Sham TPR Foreclosure Sale, and to preserve the status quo.

Dalia (and the co-defendants to that action) were forbidden from any further transfer or disposal

of the Orly Trust's indirect interest in the shares of TPR until that Court - and not Dalia or her

co-defendants - determined who would own those shares.

> Here, where the family shares at issue are intertwined among various family entities,
> defendants have not offered sufficient evidence to show that the shares of TPR
> Investment or Trans-Resources owned by the Orly Genger 1993 Trust are not
> "unique" and should not be protected from transfer, sale or assignment until this
> litigation is ultimately decided....Accordingly, the motion for a preliminary
> injunction is granted.
>
> **See Exhibit "Z",** Id. at 14-15 (emphases added); see also id. at 32.

100. Plainly, the TPR Settlement Agreements did exactly what the July 28, 2010 Order

and Injunction specifically prohibited. The TPR Settlement Agreements purport to transfer the

Orly Trust's D&K interest; the TPR Settlement Agreements also purportedly dispose of the Orly

Trust's claimed interest in TPR's common stock by "settl[ing]...finally" the matter of the Orly

Trust's interest in TPR. See **Exhibit "GG",** TPR Settlement Agreement ¶ 1 and **Exhibit "HH",**

Amended TPR Settlement Agreement ¶ 1. In other words, instead of deferring "until this

litigation is ultimately decided" (See **Exhibit "Z",** July 28, 2010 Order and Injunction at 14, 32),

Dalia has disposed of the Orly Trust's "direct[] or indirect[]" interest in TPR "irrespective of any

claim" (and, by extension, any "ultimate decision") by the New York Supreme Court in the New

York TPR Action.

101. By its very nature and intent, the secret settlement entered into by Dalia (without

Petitioner!) violated the July 28 2010 Order and Injunction. Simply put: the July 28, 2010 Order

and Injunction (which sought to preserve the status quo ownership of the TPR Shares until the New York Supreme Court decided Petitioner's claims) cannot be squared with the TPR Settlement Agreements (which sought to extinguish Petitioner's claims by violently rearranging who owned the TPR Shares). It is respectfully submitted that if Dalia's actions in this regard are not a violation of the July 28, 2010 Order and Injunction, then said Order is meaningless.

## DALIA VIOLATED THE PROVISIONS OF THE SUPREME COURT'S DECEMBER 28, 2011 ORDER ENTERED IN THE NEW YORK TRI ACTION

102. Dalia alleges in the Motion to Dismiss that she did not violate the December 28, 2011 Order and Injunction (the "December 28, 2011 Order and Injunction") in the New York TRI Action because the only injunctive relief entered by the Court in said action was solely against TPR and the Trump Group. (See Motion to Dismiss, Paragraph "39")

103. Specifically, Dalia alleges "That Order [the December 28, 2011 Order] did not impose any restrictions on Dalia Genger." (See Motion to Dismiss, Paragraph "39").

104. This is completely false. The December 28, 2011 Order and Injunction contains the following injunctive language which enjoins Dalia from taking certain actions:

> "ORDERED that the portion of plaintiffs' motions seeking to enjoin the the defendants [which includes Dalia] from making demands upon and using or spending the proceeds derived from the purported sale by TPR Investment Associates, Inc. (TPR) to the Trump Group (as such term is defined above) of the Arie shares and the Orly Trust shares is granted, pending the determination by a court of competent jurisdiction the beneficial ownership of such shares;..."
> (See copy of December 28, 2011 Order and Injunction annexed as **Exhibit "AA"** to the TAP, Page "14")

105. A summary of Dalia's violation of the December 28, 2011 Order and Injunction appears immediately below:

| What Court Ordered | What Dalia Did |
|---|---|
| ORDERED that the portion of plaintiffs' [Arie | 1.2  Principal [$4,240,000] and all accrued and |

| What Court Ordered | What Dalia Did |
|---|---|
| and Orly Genger] motions seeking to <u>enjoin the defendants [including Dalia, Sagi, and TPR] from making demands upon and using</u>[18] <u>or spending</u>[19] <u>the proceeds</u> derived from the purported sale by TPR Investment Associates, Inc. (TPR) to the Trump Group (as such term is defined above) of the Arie shares and the Orly Trust shares <u>is granted</u>, pending the determination by a court of competent jurisdiction the beneficial ownership of such shares.<br><br>December 28, 2011 Order at 14 (emphases added) [Index No. 651089, Docket No. 210] | unpaid interest shall be due and payable on the date (the "Maturity Date") which is the earliest to occur of:<br>(a) November 1, 2012; or<br>(b) the date of Maker's receipt of the proceeds ("TRI Shares Proceeds") from the sale of shares (the "TRI Shares") of Trans Resources, Inc., a Delaware corporation ("TRI") either pursuant to the [Pedowitz] Interpleader action (the "Interpleader Action") ... or otherwise.<br><br>1.3 Notwithstanding anything to the contrary, to the extent that the Court awards the Trust any of the interpleaded funds, the Trust shall first apply such funds to the extent necessary to pay this Note, including all accrued and unpaid interest thereon, in full, before applying such funds for any other purpose.<br><br>See **Exhibit "DD"** to TAP, Amended Promissory Note §§ 1.2, 1.3 |
| | Notwithstanding anything to the contrary, to the extent that the Court awards the Trust any of the interpleaded funds, the Trust shall first apply such funds to the extent necessary to pay this Note, including all accrued and unpaid interest thereon, in full, before applying such funds for any other purpose.<br><br>See **Exhibit EE** TAP, 200K Note § 1.3 |
| | 3.2 On the terms set forth in the Amended and Restated Note . . . and the New Note [200K Note], and subject to the conditions set forth in this Agreement and in the Amended and Restated Note and the New Note, Manhattan |

---

[18] "use [ūz] *vt* to put to some purpose; to avail oneself of; to employ as an instrument; make use of (a person); to exercise; to deal with; treat; to consume; expend (often with up)." WEBSTER'S DICTIONARY & THESAURUS 416 (2005).

[19] "spend [spend] *vt* to expend, to pay out (money); to give, bestow, employ (eg one's energies) for any purpose;...*vi* to expend money." WEBSTER'S DICTIONARY & THESAURUS 362 (2005).

| What Court Ordered | What Dalia Did |
| --- | --- |
| | agrees to make, and the Trust agrees to accept, the Manhattan Loan.<br><br>See **Exhibit "CC"**, Credit Agreement § 3.2 |

106. Based upon the forgoing, Dalia's actions by entering into the Secret Agreements violated the provisions of the December 28, 2011 Order and Injunction because they constitute both a use and expenditure of the proceeds of the Orly Trust TRI Shares.

### DALIA'S ADDITIONAL BREACH OF FIDUCIARY DUTY BY RELEASING THE PRIOR TRUSTEE, LEAH FANG, WITHOUT ANY INVESTIGATION WHATSOEVER

107. Dalia recently testified at her deposition that her first act as Trustee was to try to release Sagi's sister-in-law, Leah Fang, from all possible claims (including fraud claims) while acting as prior Trustee of the Orly Trust. Dalia testified that she did so without conducting any investigation whatsoever. (See **Exhibit "JJ"**, Pages 75-78). Dalia further testified that she did so without speaking with Orly or her counsel (See **Exhibit "JJ"**, Page 76-77). Dalia further testified that she did so notwithstanding her acknowledgment that there was some issue between Orly and Leah, who was purportedly being "harassed" by Orly's attorneys in connection with her acting as Trustee of the Orly Trust. (See **Exhibit "JJ"**, Pages 53-54). Annexed collectively hereto as **Exhibit "OO"** are copies of the forgoing releases.

108. Of course, Dalia never informed Surrogate Roth that she had tried to release Leah Fang from all claims, without any investigation or other basis for knowing what Leah had done as Trustee of the Orly Trust. Unsurprisingly, what Leah Fang had done during her time as Trustee was assist her brother-in-law, Sagi, in defrauding the Orly Trust. See TAP.

109. All of the forgoing further demonstrates that Dalia has breached her fiduciary duties to Orly. Indeed, rather than worry about protecting the best interests of the Orly Trust and

her daughter, Orly, as beneficiary, Dalia was more concerned with Sagi's sister-in-law's purported "nervous breakdown," allegedly caused by the "harassment" of Orly and Orly's attorneys. (See **Exhibit "JJ"**, Pages 53-54.)

## NOTICE OF THE TAP TO SAGI

110.    Dalia alleges in the Motion to Dismiss that Petitioner was required to serve a copy of the TAP upon the Sagi Genger Trust, as it is a contingent remainder beneficiary under the provisions of the Orly Trust in the event that Petitioner dies without children.

111.    David Parnes, the Trustee of the Sagi Trust was previously served with copies of the Petition to remove Dalia as Trustee of the Orly Trust and the Second Amended Petition by overnight delivery. The Sagi Trust has never appeared or never opposed the relief sought therein and accordingly has defaulted.

112.    Notwithstanding the Sagi Trust's forgoing default and expressly without prejudice to Petitioner's right to assert that the Sagi Trust is not entitled to any further notice, undersigned counsel caused Mr. Parnes to be served with a copy of the TAP on February 1, 2013, and will serve him with any subsequent papers filed by Petitioner in this proceeding via overnight delivery. Annexed hereto as **Exhibit "PP"** is a copy of the Affidavit of Service of the TAP upon David Parnes. Therefore, there is no further basis for Dalia to complain about same, especially in light of the fact that Sagi is well aware of what is presently transpiring in this Court through Dalia and her counsel.

## CONCLUSION

113.    For all the reasons set forth herein and previously set forth in the TAP, it is respectfully submitted that Petitioner has sufficiently set forth claims of relief in the TAP to immediately remove Dalia as Trustee of the Orly Trust and for the other relief requested therein, and that the Motion to Dismiss should be denied in its entirety.

RALPH HOCHBERG

Sworn to before me this
26th day, of February, 2013

Notary Public

TERESA SADUTTO CARLEY
NOTARY PUBLIC, STATE OF NY
REG. # 02SA6204737
NY COUNTY, EXP. 4-20-2013

*ORLY GENGER VS.*
*DALIA GENGER, et al*

*DALIA GENGER*
*December 13, 2012*



**Ellen Grauer**
**COURT REPORTING**
Co. LLC

126 East 56th Street, Fifth Floor New York, New York 10022
PHONE: (212) 750-6434   FAX: (212) 750-1097
**www.ELLENGRAUER.com**

*Original File 102224.TXT*
Min-U-Script® with Word Index

ORLY GENGER VS.
DALIA GENGER, et al

DALIA GENGER
December 13, 2012

---

**Page 1**

```
 1  SUPREME COURT OF THE STATE OF NEW YORK
 2  COUNTY OF NEW YORK
    ------------------------------------------x
 3  ORLY GENGER in her individual capacity
    and on behalf of the Orly Genger 1993
 4  Trust (both in its individual capacity
    and on behalf of D&K Limited Partnership),
 5                          Plaintiff,
 6
    - against -
 7
    DALIA GENGER, SAGI GENGER, LEAH FANG,
 8  D&K GP LLC, and TPR INVESTMENT ASSOCIATES,
    INC.,
 9
                            Defendant
10
    Index No. 100697/08
11  ------------------------------------------x
12
13                575 Lexington Avenue
                  New York, New York
14
                  December 13, 2012
15                10:37 a.m.
16
17          DEPOSITION of DALIA GENGER, taken
18  before Annette M. Montalvo, RMR, and a Notary
19  Public in and for the State of New York.
20
21
22          ELLEN GRAUER COURT REPORTING CO. LLC
23            126 East 56th Street, Fifth Floor
                New York, New York  10022
24                   212-750-6434
                     REF:  102224
25
```

---

**Page 2**

```
 1  A P P E A R A N C E S :
 2
 3  ZEICHNER ELLMAN & KRAUSE LLP
 4  On Behalf of the Plaintiff,
 5       575 Lexington Avenue
 6       New York, New York  10022
 7  BY:  YOAV GRIVER, Esq.
 8       BRYAN D. LEINBACH, Esq.
 9       212-223-0400
10       ygriver@zeklaw.com
11
12
13  PEDOWITZ & MEISTER LLP
14  On Behalf of the Witness,
15       570 Lexington Avenue
16       New York, New York  10022
17  BY:  ROBERT A. MEISTER, Esq.
18       MARISA H. WARREN, Esq.
19       212-403-7333
20       robert.meister@pedowitzmeister.com
21
22
23
24
25
```

---

**Page 3**

```
 1   A P P E A R A N C E S : (Cont'd)
 2
 3  PAUL S. ZILBERFEIN, Esq.
 4  On Behalf of Leah Fang,
 5  78 Old Orchard Road
 6  New Rochelle, New York  10804
 7  914-297-0110
 8  paul@zilberfeinlaw.com
 9
10
11  DUANE MORRIS LLP
12  On Behalf of TPR Investment Associates, Inc.,
13  1540 Broadway
14  New York, New York  10036
15    BY: JOHN DELLAPORTAS, Esq.
16  212-692-1012
17  dellajo@duanemorris.com
18
19
20    ALSO PRESENT:
21  SAGI GENGER
22  WALTER P. STASIUK, Wachtel Masyr & Missry
23
24
25
```

---

**Page 4**

```
 1  ----------------- I N D E X ------------------
 2  WITNESS                  EXAMINATION BY      PAGE
 3  DALIA GENGER             MR. GRIVER             6
 4
 5
 6  Telephone call to Hon. Barbara Jaffe         134
 7
 8
 9  --------------- E X H I B I T S --------------
10  GENGER        DESCRIPTION              FOR I.D.
11  Exhibit 1     Answer to the second          8
12                Amended complaint
13  Exhibit 2     Summons and second            8
14                Amended verified
15                Complaint
16  Exhibit 3     Dalia Genger amended          9
17                Responses to plaintiff's
18                Interrogatories
19  Exhibit 4     Leah Fang trust document     37
20  Exhibit 5     Instrument of acceptance     42
21                Of trustee
22  Exhibit 6     Release                      68
23  Exhibit 7     Document                     68
24  Exhibit 8     Document                     92
25  Exhibit 9     1/4/2008 memo               108
```

---

ORLY GENGER VS.
DALIA GENGER, et al

DALIA GENGER
December 13, 2012

Page 5

```
1    ----------- E X H I B I T S (Cont'd)-----------
2    GENGER              DESCRIPTION        FOR I.D.
3    Exhibit 10          1993 promissory note and   149
4                        Pledge agreement
5    Exhibit 11          Final arbitration award    151
6    Exhibit 12          Letter                     162
7    Exhibit 13          Document                   168
8    Exhibit 14          Dalia Genger affidavit     173
9    Exhibit 15          1/31/2009 meeting and      209
10                       Agreement
11
12
13        (EXHIBITS RETAINED BY ATTORNEY GRIVER)
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 6

1    (WHEREUPON, the witness was duly
2    sworn.)
3    D A L I A   G E N G E R, called as a witness
4    herein, having been first duly sworn by a
5    Notary Public of the State of New York,
6    was examined and testified as follows:
7
8    **EXAMINATION**
9    **BY MR. GRIVER:**
10   Q.  Would you state your name for the
11   record, please.
12   A.  **Dalia Genger.**
13   Q.  And what is your address?
14   A.  **It is 200 East 65th Street, Apartment**
15   **32W.  The zip code is 10065.**
16   Q.  Ms. Genger, you understand that you
17   have just been sworn to tell the truth?
18   A.  **Yes.**
19   Q.  And you understand that it is your
20   obligation to tell the truth today?
21   A.  **Absolutely.**
22   Q.  In order to do that, if I ask you a
23   question and you don't understand it, please let
24   me --
25   A.  **Yes, I know the procedure.**

Page 7

1        **GENGER**
2    Q.  You know the procedures?
3    A.  **Yes.**
4    Q.  Okay.  And if you answer the question,
5    I only want you to answer questions that you
6    understand; do you understand that?
7    A.  **Yes.**
8    Q.  What is your date of birth?
9    A.  **June 15, 1946.**
10   Q.  Which would make you how old today?
11   A.  **66, I guess.**
12   Q.  You are the trustee of the Orly Genger
13   trust?
14   A.  **'93 yes.**
15   Q.  Is that correct?
16   A.  **It is correct.  Yes.**
17   Q.  Do you suffer from any mental or
18   physical problem that would prevent you from
19   being a trustee to the Orly Genger trust?
20   A.  **No.**
21   Q.  And in this deposition, as we go
22   through it, whenever I speak about the Orly trust
23   or the trust, I am talking about the Orly Genger
24   1993 trust; do you understand?
25   A.  **Absolutely.  Yes.**

Page 8

1        **GENGER**
2    Q.  I ask you again, do you suffer from any
3    mental or physical problem that would prevent you
4    from --
5    A.  **I said no.**
6        MR. MEISTER: Wait until he finishes
7    the question.
8        BY MR. GRIVER:
9    Q.  Do you suffer from any mental or
10   physical problem that would prevent you from
11   telling the truth and testifying here today?
12   A.  **No.**
13       MR. GRIVER: Let's start with some
14   housekeeping matters.  I am going to hand the
15   witness three exhibits that have been premarked
16   as Dalia Exhibits 1 through 3.
17       Dalia Exhibit 1 is Dalia Genger's
18   answer to the second amended complaint in this
19   action.
20       (Dalia Exhibit 1, answer to the
21       second amended complaint, marked.)
22       MR. GRIVER: Dalia Exhibit 2 are copies
23   of the summons and second amended verified
24   complaint in this matter.
25       (Dalia Exhibit 2, summons and

ORLY GENGER VS.
DALIA GENGER, et al

DALIA GENGER
December 13, 2012

---

Page 9

1    GENGER
2    second amended verified complaint,
3    marked.)
4        MR. GRIVER: And Dalia Exhibit 3 is a
5    copy of defendant Dalia Genger's amended
6    responses to plaintiff's interrogatories in this
7    action.
8        (Dalia Exhibit 3, Dalia Genger
9    amended responses to plaintiff's
10   interrogatories, marked.)
11   BY MR. GRIVER:
12   Q.  Ms. Genger, looking at Dalia Exhibit
13   1 --
14   A.  Yes.
15   Q.  -- your answer, is that your signature
16   on the last page?
17   A.  Yeah, I am sure it is there, if you say
18   so.  Yes, it is my signature.
19   Q.  And so you signed this answer under
20   oath on the 20th day of September 2010?
21   A.  September 30, right.  I won't remember,
22   but it says here, so.
23   Q.  If you look on the last page, because I
24   want to be precise, Ms. Genger.
25       MR. MEISTER: Are you asking her what

---

Page 10

1    GENGER
2    she remembers or are you asking her what it says?
3        BY THE WITNESS:
4    A.  I don't remember exactly what date, but
5    I believe you that that's the date.
6        BY MR. GRIVER:
7    Q.  When was the last time you saw this
8    answer to the second amended --
9    A.  When was the last time that I saw this
10   document?
11   Q.  Yes.
12   A.  I don't remember.
13   Q.  You didn't look at it in preparing for
14   your deposition today?
15   A.  I think that one should not be prepared
16   for deposition.  Isn't it true?
17   Q.  So you did nothing to prepare yourself
18   for this deposition?  You didn't look at any
19   documents, you didn't speak to your attorney?
20   A.  I did speak with my attorney.
21   Q.  And in the course of that did he show
22   you documents?
23   A.  He gave me some documents, but I didn't
24   look at them.
25   Q.  Okay.  If you look at what's been

---

Page 11

1    GENGER
2    marked as Exhibit 3?
3    A.  Exhibit 3?
4    Q.  If you look on the last page, page 12,
5    is that your signature?  As sworn by --
6    A.  Yeah, it is my signature.
7    Q.  And that's sworn by you on the 29th day
8    of March 2012?
9    A.  Right.
10   Q.  When was the last time you saw these
11   interrogatory responses?
12   A.  This document, actually, I read again
13   like two days ago.
14   Q.  Okay.  Do you have any changes to this
15   document that you want to make upon reading it
16   again two days ago?
17   A.  No, I don't think so.
18   Q.  Ms. Genger, you are the current trustee
19   of the Orly Genger trust?
20   A.  Can you repeat?
21   Q.  You are the trustee of the Orly Genger
22   trust?
23   A.  Yes.
24   Q.  And you have been the trustee of the
25   Orly Genger trust since January 4 of 2008; is

---

Page 12

1    GENGER
2    that correct?
3    A.  Right.
4    Q.  And Orly Genger is the lifetime
5    beneficiary of the trust, do you know that?
6    A.  Yes.
7    Q.  And do you understand that as trustee
8    you are supposed to protect the trust?
9    A.  Absolutely.
10   Q.  And as trustee, are you supposed to put
11   the interests of the trust ahead of your
12   interests?
13   A.  Obviously.
14   Q.  And as trust you are supposed to act in
15   the best interests of the trust?
16   A.  Of the trust.  Yes.
17   Q.  And as trustee you are supposed to put
18   the trust of -- the interests of Orly Genger as
19   beneficiary ahead of your own interests?
20   A.  I agree with you.
21   Q.  And, indeed, you are supposed to put
22   her interests ahead of the interest of anybody
23   else?
24   A.  Absolutely.
25   Q.  Have you done so?

---

Page 13

GENGER

2 A. Yes, I believe I did.
3 Q. Every action that you have done as
4 trustee --
5 A. Yeah.
6 Q. Every action that you have done as
7 trustee you have put the interests of the trust
8 and Orly Genger ahead of your interests?
9     MR. ZILBERFEIN: Note my objection to
10 the form.
11     THE WITNESS: What did he say?
12     MR. MEISTER: He made a technical
13 objection. You can answer.
14     BY THE WITNESS:
15 A. Yes, obviously, my responsibility as a
16 trustee was obviously the major thing that I was
17 responsible for, and any other -- no other thing
18 would change it, I mean.
19     BY MR. GRIVER:
20 Q. And you have done so?
21 A. Yes. I believe I did.
22 Q. Who are the -- since January 4 of 2008
23 when you became trustee, who are the attorneys
24 for the trust?
25 A. Well, I really don't remember in 2008.

Page 14

GENGER

2 I just know that Robert Meister is currently my
3 attorney, but I am not sure when we began -- when
4 I started to be his client.
5 Q. Just so the record is clear,
6 Mr. Meister is the attorney for the Orly Genger
7 trust?
8 A. Yes.
9 Q. You have retained him as attorney for
10 the trust?
11 A. Yes.
12 Q. Are there any other attorneys that you
13 have retained on behalf of the trust?
14 A. I don't remember.
15 Q. Does the law firm of Sullivan &
16 Worcester ring a bell?
17 A. It rings a bell, but I don't remember
18 in connection to what.
19 Q. Okay. When do you --
20 A. Wait a minute. Maybe Delaware, I
21 think. I don't remember.
22 Q. Okay. When did you hire Mr. Meister
23 and his law firm to represent the trust?
24 A. I just said, I don't remember the date.
25 Q. Do you remember the year?

Page 15

GENGER

2 A. I believe it was 2008 or '09. I don't
3 know.
4 Q. Before you hired Mr. Meister to be the
5 attorney for the trust, had you met Mr. Meister
6 before?
7 A. No.
8 Q. How did you find Mr. Meister?
9 A. He was recommended by another lawyer.
10 Q. Do you remember the name of this other
11 lawyer?
12 A. No.
13 Q. Do you remember who this other lawyer
14 worked for?
15 A. No.
16 Q. How is it that you came to be talking
17 to this lawyer?
18 A. I don't remember.
19 Q. Was it a lawyer for Sagi?
20 A. No. I don't think so.
21 Q. Had Mr. Meister or his law firm ever
22 done work for you as an individual?
23 A. Yes.
24 Q. Before he was retained by you to
25 represent the trust?

Page 16

GENGER

2 A. I don't think -- I don't remember it
3 was before or after.
4 Q. Okay. What work was Mr. Meister
5 retained on an individual basis for --
6     MR. MEISTER: Objection.
7 Attorney-client privilege. Instruct the witness
8 not to answer.
9     MR. ZILBERFEIN: I join that objection.
10     MR. GRIVER: Just on the topic?
11     THE WITNESS: On the topic --
12     MR. MEISTER: No.
13     MR. GRIVER: Okay.
14     BY MR. GRIVER:
15 Q. Is Mr. Meister representing you on an
16 individual -- in an individual capacity?
17 A. You just asked me that, and I said yes.
18 Q. Okay. In what is Mr. Meister
19 representing you in an individual capacity?
20     THE WITNESS: Didn't you say that's a
21 question I should not answer?
22     MR. MEISTER: Well --
23     BY THE WITNESS:
24 A. It is to fight a lawsuit that Orly has
25 against me, basically.

ORLY GENGER VS.
DALIA GENGER, et al

DALIA GENGER
December 13, 2012

---

Page 17

1     GENGER
2     BY MR. GRIVER:
3  Q.  And you are talking about this lawsuit?
4  A.  I don't know that.  There are so many,
5     I don't keep track of them.
6  Q.  In the lawsuit you have initiated
7     against Orly Genger, who is your lawyer?
8  A.  You mean in the divorce?
9  Q.  In the Dalia Genger versus Arie Genger
10    action?
11 A.  You mean the divorce, right?
12 Q.  Okay.  The reformation?
13 A.  The stipulation --
14 Q.  Yes.
15 A.  -- and all that?  Yeah.
16    MR. ZILBERFEIN: Note my objection to
17    the question.
18    BY MR. GRIVER:
19 Q.  Who is representing you in that?
20 A.  Yeah.  I am trying to remember the name
21    of the firm.  But I remember the name of one
22    lawyer, was a partner.  He's Kortmansky.  And the
23    other guy, I don't remember his name.
24 Q.  Okay.  Just so we are clear on the
25    record as we sit here today, Mr. Meister is

---

Page 19

1     GENGER
2  A.  Yes.
3  Q.  And do you get a physical piece of
4     paper?
5  A.  Yes.
6  Q.  Are the two pieces of paper different
7     or are they the same?
8  A.  Which two pieces of paper?
9  Q.  Does he bill you separately for the
10    work that he does on behalf of the trust?
11 A.  Yes.
12 Q.  So he makes --
13 A.  He says -- it says Dalia Genger
14    trustee, and, otherwise, it is just Dalia Genger.
15    MR. GRIVER: As representative of the
16    beneficiary of the Orly Genger trust, I would ask
17    for copies of all bills that you have provided to
18    Ms. Genger as trustee of the Orly Genger trust.
19    MR. ZILBERFEIN: I join in all
20    requests.
21    MR. GRIVER: Mr. Meister, any reaction,
22    yes, no, maybe?
23    MR. MEISTER: I have no reaction.  No.
24    Can you give us for a moment, we have a
25    filing issue.

---

Page 18

1     GENGER
2     representing you both in an individual
3     capacity --
4  A.  That's true.
5  Q.  -- and on behalf of the trust?
6  A.  Uh-huh.
7     MR. ZILBERFEIN: "Uh-huh" means yes?  I
8     don't know.
9     THE WITNESS: What?
10    BY MR. GRIVER:
11 Q.  He is asking that you answer yes or no
12    instead of "uh-huh" or nodding your head.
13 A.  Yes.  Yes.
14 Q.  Do you get two sets of bills from --
15    strike that.
16    When Mr. Meister bills you for the work
17    that he or his firm does on behalf of the Orly
18    Genger trust, do you get a bill?
19 A.  I wish I didn't, but I do get.
20 Q.  Okay.  And it is a physical piece of
21    paper?
22 A.  Absolutely.  Yes.
23 Q.  And when Mr. Meister does work for you
24    as an individual, Dalia Genger, does he bill you
25    for those?

---

Page 20

1     GENGER
2     MR. GRIVER: Off the record.
3     MR. MEISTER: Thank you.  Let's take a
4     minute or two recess.
5     (WHEREUPON, there was a short
6     interruption from 10:52 a.m. to
7     10:54 a.m.)
8     MR. GRIVER: Back on the record.
9     Can you read my last question back.
10    (WHEREUPON, the record was read by
11    the reporter as requested.)
12    BY MR. GRIVER:
13 Q.  Are you able to distinguish in your
14    mind when you seek Mr. Meister's advice on behalf
15    of the trust and when you seek his advice on an
16    individual basis?
17 A.  Yes.
18 Q.  Do you believe that having the same set
19    of attorneys is in the best interest of the Orly
20    Genger trust?
21    MR. ZILBERFEIN: Note my objection to
22    the form.
23    THE WITNESS: I'm sorry, I don't know
24    what --
25    BY MR. GRIVER:

---

ORLY GENGER VS.
DALIA GENGER, et al

DALIA GENGER
December 13, 2012

---

Page 21

1    GENGER
2  Q. I will re-ask the question again.
3     Do you believe that having the same set
4  of attorneys representing the Orly Genger trust
5  and you individually is in the best interest of
6  the Orly Genger trust?
7  A. Yes, I do, otherwise, I wouldn't do it.
8  Q. Okay. Do you believe that that is the
9  best way to protect the Orly Genger trust?
10 A. Yes.
11 Q. You have no concern whatsoever that
12 there may be a conflict between your interests
13 and the interests of the trust?
14 A. No.
15    MR. ZILBERFEIN: Objection.
16    BY MR. GRIVER:
17 Q. Who has been paying the invoices of the
18 Pedowitz and Meister law firm in connection with
19 its work on behalf of the trust?
20 A. I am paying it.
21 Q. You have paid every penny?
22 A. Every penny.
23    MR. MEISTER: Well, may I just correct
24 the record there?
25    MR. GRIVER: Go ahead.

---

Page 22

1    GENGER
2    MR. MEISTER: Ms. Genger has paid for
3  work representing her as trustee. There's a
4  small subset of bills which were rendered for
5  actions in which the trust, through its trustee,
6  was attempting to perfect or secure or get
7  recognized its interests as owners of TRI shares,
8  and those bills were paid for by the trust.
9    MR. GRIVER: That would be the Dalia
10 Delaware action that was stayed by Feinman?
11    MR. MEISTER: The Dalia Delaware action
12 that was stayed by Feinman, and also I believe
13 there were claims asserted in the Pedowitz and
14 Meister interpleader asserted against the Trump
15 Group on the one hand and TRI on the other.
16    BY MR. GRIVER:
17 Q. Who has been paying the bills that are
18 sent to you directly as an individual?
19 A. I was paying them.
20 Q. Has anyone been providing you with
21 funds to pay those bills?
22 A. No.
23 Q. Have you been using trust assets to pay
24 those bills?
25 A. Never.

---

Page 23

1    GENGER
2  Q. Have you taken out any loans to pay
3  those bills?
4  A. No.
5  Q. Have you taken out any loans to pay the
6  bills that were incurred on behalf of the trust?
7    MR. MEISTER: Can I have it read back,
8  please.
9    (WHEREUPON, the record was read by
10    the reporter as requested.)
11    BY THE WITNESS:
12 A. Actually, I don't know how to answer
13 this.
14    BY MR. GRIVER:
15 Q. Do you not understand my question?
16 A. No, I understand your question, if I
17 took any loans to pay bills.
18    Regarding the Orly trust, right?
19 Q. Yes.
20 A. Well, yeah, I think at the end there
21 was a loan made by -- to secure -- whatever
22 safety, there was a firm, a firm that -- the name
23 of which I can't recall exactly, but it is
24 Manhattan Safety whatever.
25 Q. Okay. Do you know how much money this

---

Page 24

1    GENGER
2  Manhattan company lent you?
3  A. $200,000.
4  Q. Other than the $200,000 loan from
5  Manhattan Safety Company, has anyone else paid
6  you in order to --
7  A. Me as Dalia or me as trustee?
8  Q. You as trustee. Has anyone paid you as
9  trustee?
10 A. No.
11 Q. As we sit here today is Mr. Meister
12 representing you as trustee or is Mr. Meister
13 representing you on an individual basis?
14 A. As trustee.
15 Q. Not as an individual, but as trustee?
16 A. Yeah.
17 Q. Okay. When Mr. Meister prepared you
18 for this deposition, was he preparing you as
19 trustee of the trust or was he preparing you as
20 Dalia the individual?
21 A. Again, he didn't prepare me.
22    MR. ZILBERFEIN: Objection.
23    BY MR. GRIVER:
24 Q. When you spoke to him before this
25 deposition and he showed you certain documents,

---

ORLY GENGER VS.
DALIA GENGER, et al

DALIA GENGER
December 13, 2012

Page 25

1    GENGER
2   he was doing that as the lawyer for the trust --
3 A.   Trust, yes.
4 Q.   -- correct?
5      And what documents did Mr. Meister show
6   you?
7 A.   Basically, he gave me documents, but I
8   did never went over them except this one.
9      MR. MEISTER: Referring to Dalia
10  Exhibit 3.
11     THE WITNESS: Yes.  Exhibit 3.
12     BY MR. GRIVER:
13 Q.   Did he show you Dalia Exhibit 2, the
14  complaint in this case?
15 A.   He probably did, but I didn't read it.
16 Q.   What did Mr. Meister tell you?
17 A.   I don't remember.
18 Q.   When was this preparation session?
19 A.   A few days ago.
20 Q.   Well, today is Thursday.  Was it
21  yesterday, Wednesday?  Was it Tuesday?  Was it
22  Monday?
23 A.   I don't remember exactly what date it
24  was.
25 Q.   Was it this week?

Page 26

1    GENGER
2 A.   Probably, but I don't remember that we
3   talked about it.
4 Q.   So as we sit here today on Thursday,
5   you can't remember if you met with Mr. Meister?
6 A.   I mean, I remember that I met with him,
7   but I don't remember that we went over this
8   paper.
9      MR. MEISTER: Referring to Dalia
10  Exhibit 2.
11     BY MR. GRIVER:
12 Q.   I am simply asking you, on what day did
13  you meet with Mr. Meister this week?
14 A.   I met with him Tuesday and briefly
15  yesterday.
16 Q.   Okay.  And for how long did you meet
17  with Mr. Meister on Tuesday?
18 A.   I don't know.  When I get the bill, I
19  probably will know.  But I can't think of it at
20  this time.
21 Q.   Well, was it the whole day --
22 A.   No, it wasn't the whole day.
23 Q.   Half a day?
24 A.   I can't afford a whole day.
25     What?

Page 27

1    GENGER
2 Q.   Half a day?
3 A.   No.  It is like a couple of hours.
4 Q.   Okay.  So then simply say a couple of
5   hours.
6 A.   Please don't tell me what to say.
7 Q.   And Mr. Meister told you what in those
8   sessions?
9 A.   Well, he raised some points that I
10  might be asked.
11 Q.   And what were those?
12 A.   All this saying interrogatory questions
13  that I already answered.
14 Q.   So as we sit here today, you don't
15  remember what points you and Mr. Meister
16  discussed two days ago?
17 A.   I do remember.
18 Q.   So then please put it on the record and
19  tell me what points did you and Mr. Meister
20  discuss --
21 A.   I am telling you --
22 Q.   -- two days ago.
23 A.   -- we discussed this document, the
24  Exhibit 3 document.
25 Q.   Okay.  But what you said was that he

Page 28

1    GENGER
2   went over topics that might be covered in this
3   deposition, correct?
4 A.   He told me what -- can you ask me
5   again.
6 Q.   Sure.
7      When you and Mr. Meister spoke two days
8   ago on Tuesday --
9 A.   Right.
10 Q.   -- you and he discussed topics that may
11  be raised in this deposition, correct?
12 A.   That's true, and those were the topics,
13  yeah.
14 Q.   Okay.  And could you please tell me
15  which topics you remember Mr. Meister raising on
16  Tuesday?
17 A.   Let me look what it says so I tell you.
18     MR. GRIVER: Let the record reflect
19  that the witness is looking through what's been
20  marked as Dalia Exhibit 3.
21     BY MR. GRIVER:
22 Q.   Ms. Genger, I am going to allow you to
23  look, but let me ask you, absent looking at that
24  document you have no independent recollection of
25  the topics that Mr. Meister went through with you

ORLY GENGER VS.
DALIA GENGER, et al

DALIA GENGER
December 13, 2012

Page 29

1    GENGER
2  two days ago?
3  A.  No, I do have a recollection.
4  Q.  Okay.  So please --
5  A.  Overall, it is how did I manage the
6  Orly trust.  In general, I mean.
7  Q.  Okay.  Any specific things that you did
8  that were discussed on Tuesday, to your
9  recollection?
10  A.  Any specifics?
11  Q.  Uh-huh.
12    THE WITNESS:  I think it is a kind of
13  privileged information, don't you think, that
14  whatever I discussed with you --
15    BY MR. GRIVER:
16  Q.  Unless Mr. Meister instructs you not to
17  answer, you must answer my questions.
18  A.  No, I am just encouraging him.
19  Q.  Okay.
20  A.  The topics were, you know, as I became
21  a trustee, why did I become a trustee.
22  Q.  Okay.
23  A.  What is my purpose, what are my
24  responsibilities.  And, in general, that's what
25  it is.  What are my responsibilities.

Page 30

1    GENGER
2  Q.  Did he go over any of the actions you
3  have taken as trustee?
4  A.  Action and nonaction.
5  Q.  He went over actions and nonactions.
6    Which actions and nonactions did you
7  discuss with Mr. Meister two days ago?
8  A.  Well, the nonaction that was raised is
9  me not notifying Orly about the foreclosure on
10  the D&K LP note.
11  Q.  Okay.  And was that the only nonaction
12  that you and he discussed?
13  A.  As far as I remember.
14  Q.  And what actions did you and
15  Mr. Meister discuss two days ago?
16  A.  What actions?
17  Q.  Uh-huh.
18  A.  Well, to begin with -- no.
19    That the trust is suing the Trumps,
20  that's kind of the last action, in order to
21  clarify that Orly owns the shares.
22  Q.  The shares of TRI?
23  A.  TRI, yes.
24  Q.  So as we sit here today you believe as
25  trustee of the Orly Genger trust that Orly owns

Page 31

1    GENGER
2  the TI shares, the trust owns --
3  A.  The trust, yeah.
4  Q.  What other actions?
5  A.  What other actions?  I really don't
6  remember any other actions.
7  Q.  Okay.
8  A.  I mean, there were lawsuits and stuff,
9  where, really, my lawyers looked through to
10  answer, but I actively not do anything -- I mean,
11  I read it.  There were lawsuits, and I really am
12  not so familiar with all the lawsuits.  There
13  were many of them.
14  Q.  So you and Mr. Meister --
15  A.  So probably my lawyer answered.
16  Q.  Okay.  Just to be clear, so, yes, two
17  days ago you and Mr. Meister went and discussed
18  the other lawsuits that you are involved in?
19  A.  No.
20  Q.  So then --
21  A.  Actually, we didn't discuss any
22  lawsuits because --
23  Q.  I'm sorry, Ms. Genger, then what were
24  you trying to say to me?
25  A.  I am trying to say --

Page 32

1    GENGER
2    MR. MEISTER:  Objection.  I don't
3  understand --
4    MR. GRIVER:  You are not under oath.
5    BY MR. GRIVER:
6  Q.  What were you trying to say?
7    MR. MEISTER:  I'm objecting to the form
8  of the question.  It's an incomprehensible
9  question.
10    MR. ZILBERFEIN:  I join in the
11  objection.
12    MR. MEISTER:  She is trying to answer
13  your question.  If you don't put a clear
14  question --
15    MR. GRIVER:  Okay.  If she doesn't
16  understand the question, she can ask me to --
17    MR. MEISTER:  She understood it.
18    MR. GRIVER:  Then she should answer.
19    MR. MEISTER:  She did.
20    MR. GRIVER:  Excellent.
21    Can I have my question read back then.
22    (WHEREUPON, the record was read by
23    the reporter as requested.)
24    MR. MEISTER:  Excuse me.  Waiving your
25  hand is not a question, Mr. Griver.

ORLY GENGER VS.
DALIA GENGER, et al

DALIA GENGER
December 13, 2012

---

Page 33

1    GENGER
2    **BY MR. GRIVER:**
3 Q. Can you answer that question?
4    **MR. MEISTER: She's answered it.**
5 Please put a fresh question.
6    **MR. GRIVER: Can you read Ms. Genger's**
7 answer.
8    (WHEREUPON, the record was read by
9    the reporter as requested.)
10    **MR. MEISTER: I continue with the**
11 objection. She's answered your question. You
12 asked her a question, and she's answered it.
13    **BY MR. GRIVER:**
14 Q. Ms. Genger, what were you trying to
15 say?
16    **MR. MEISTER: Objection. Instruct the**
17 witness not to answer you. You are harassing
18 her.
19    **MR. GRIVER: And, Robert, I am going to**
20 ignore you for the rest of this deposition, but
21 please do not prevent your witness from answering
22 the questions from now on.
23    **BY MR. GRIVER:**
24 Q. Ms. Genger, how many lawsuits --
25    **MR. MEISTER: Mr. Griver, you are**

---

Page 34

1    GENGER
2 entitled to make -- I am going to do my job.
3    **BY MR. GRIVER:**
4 Q. Ms. Genger, how many lawsuits is the
5 trust involved in?
6 **A. I don't know. I can't count. Many**
7 **lawsuits. I don't know.**
8 Q. As trustee of the Orly Genger trust,
9 how many lawsuits is the Orly Genger trust
10 involved in?
11 **A. I didn't count.**
12 Q. Okay. Well, I would like you to count
13 now.
14    **MR. DELLAPORTAS: Why don't you help**
15 her by telling her how many times you have sued,
16 Yoav.
17    **BY THE WITNESS:**
18 **A. Yeah, because there are so many**
19 **lawsuits I can't keep track of it. I just know**
20 **that my resources are being reduced every month.**
21    **MR. DELLAPORTAS: Start by telling her**
22 how many times you have sued it, Yoav. We are
23 here billing, wasting our time.
24    **BY THE WITNESS:**
25 **A. No, I really don't, because it is hard**

---

Page 35

1    **GENGER**
2    **to follow how many times my daughter sued me. I**
3    **mean, really.**
4    **BY MR. GRIVER:**
5 Q. How many times -- how many lawsuits has
6 the Dalia Genger -- excuse me.
7    How many lawsuits have you initiated as
8 trustee on behalf of the Orly Genger trust?
9 **A. The only lawsuit is against the Trumps,**
10    **the Trump Group. That's what I remember.**
11 Q. And how many other -- and as trustee of
12 the Orly Genger trust, you, as we sit here today,
13 don't know how many lawsuits that the trust is
14 involved in?
15 **A. No, I don't keep track of it.**
16 Q. When the bills come in from
17 Mr. Meister's law firm, do you review those
18 bills?
19 **A. I review the bottom line, yeah.**
20 Q. But you don't look to see --
21 **A. No, I do. I do.**
22 Q. Do you check to -- do you check to make
23 sure that he's charging you for cases that the
24 Orly trust is involved in?
25 **A. Yes. I mean --**

---

Page 36

1    **GENGER**
2 Q. Do you have -- do you keep a list?
3 **A. No, I don't keep a list.**
4 Q. Okay.
5    **MR. MEISTER: May I ask what this has**
6 to do with this lawsuit, Mr. Griver?
7    **BY MR. GRIVER:**
8 Q. How do you keep track --
9    **MR. MEISTER: Excuse me. I am asking a**
10 question. What does this have to with --
11    **BY THE WITNESS:**
12 **A. I don't keep track. I told you**
13    **already.**
14    **MR. MEISTER: Dalia, wait a moment,**
15 please.
16    **MR. GRIVER: You can instruct her not**
17 to answer or you can object to the question --
18    **MR. ZILBERFEIN: Let's not talk over**
19 each other. You are making the court reporter
20 nervous. One at a time. Please.
21    **BY MR. GRIVER:**
22 Q. How do you keep track of the lawsuits
23 as the trustee of the Orly --
24 **A. I told you, I don't keep track of the**
25 **lawsuits.**

---

ORLY GENGER VS.
DALIA GENGER, et al

DALIA GENGER
December 13, 2012

---

Page 37

1    GENGER
2 Q.  Ms. Genger, we are going to talk now
3    about your actions and inactions --
4 A.  Okay.
5 Q.  -- as the trustee of the trust.
6      You became trustee on January 4, 2008,
7    correct?
8 A.  Right.
9      MR. GRIVER: I have marked this as
10   Dalia Exhibit 4.
11     (Dalia Exhibit 4, Leah Fang trust
12     document, marked.)
13   BY MR. GRIVER:
14 Q.  Ms. Genger, do you recognize what I
15   have marked as Dalia Exhibit 4?
16 A.  I need a minute to look at it.
17   Yes.
18     MR. MEISTER: What's the pending
19   question?
20   BY THE WITNESS:
21 A.  Yeah.
22   BY MR. GRIVER:
23 Q.  And what is Dalia Exhibit 4?
24 A.  What is it?
25 Q.  What is it?

---

Page 38

1    GENGER
2 A.  Instrument of resignation of trustee
3    and appointment of successor for trustee.
4 Q.  And is that your signature --
5 A.  No.
6 Q.  -- on the document?
7 A.  No. It Leah's signature.
8 Q.  Were you aware of this?
9 A.  That I was designated to be a trustee?
10     MR. ZILBERFEIN: Object to the form.
11   BY MR. GRIVER:
12 Q.  Yes.
13 A.  If I was aware that I was --
14 Q.  Yes.
15 A.  Obviously.
16 Q.  On January 4, 2008?
17 A.  Yes. This is when I became a trustee.
18 Q.  You didn't become a trustee on -- you
19   didn't become a trustee on January 3 or January
20   2, correct?
21     MR. ZILBERFEIN: Object to the form.
22   BY THE WITNESS:
23 A.  I don't remember exactly the dates, but
24   I know that I was a successor trustee.
25   BY MR. GRIVER:

---

Page 39

1    GENGER
2 Q.  Now, were you aware at the time that
3    you accepted the trusteeship of the Orly Genger
4    trust that beneficiary Orly Genger did not wish
5    for you to be the trustee?
6      MR. ZILBERFEIN: Objection.
7      MR. DELLAPORTAS: Lack of foundation.
8      BY THE WITNESS:
9 A.  I don't know what's going on here.
10     BY MR. GRIVER:
11 Q.  Do you not understand my question?
12 A.  No, I don't understand why -- what the
13   remarks these gentlemen --
14     MR. MEISTER: If other counsel make a
15   statement for the record, that's just for the
16   record, so you don't have to pay attention to it.
17   You just listen to Mr. Griver.
18     THE WITNESS: I didn't know that.
19     So what is the question again?
20     BY MR. GRIVER:
21 Q.  Ms. Genger, so we are clear from here
22   on out, if you don't understand a question, say
23   so, and I will repeat it or fix it.
24 A.  Yeah, I don't remember right now the
25   question. I just did not understand the fact

---

Page 40

1    GENGER
2    that these gentlemen here are objecting or not
3    objecting or whatever remarks he makes.
4 Q.  His objections are for the record.
5 A.  Okay. For the record. So I don't
6    really have to pay attention to it, right?
7 Q.  You may or you may not. But you still
8    must answer any question I --
9 A.  I didn't say I won't answer. I just
10   didn't know what --
11 Q.  Here's my next question.
12 A.  What is the question?
13 Q.  At the time you accepted appointment as
14   trustee of the Orly Genger trust, were you aware
15   that Orly Genger did not wish for you to be
16   trustee?
17     MR. ZILBERFEIN: Objection.
18     MR. DELLAPORTAS: Lack of foundation.
19     BY THE WITNESS:
20 A.  No. At the beginning I was not aware.
21     BY MR. GRIVER:
22 Q.  Okay. When did you become aware that
23   Orly didn't wish for you --
24 A.  When she start suing me to remove me
25   from being a trustee, and I don't remember what

---

ORLY GENGER VS.
DALIA GENGER, et al

DALIA GENGER
December 13, 2012

Page 41

1 **GENGER**
2 date it was.
3 Q.  Well, before you accepted the
4 trusteeship, did you speak to Orly?
5     MR. ZILBERFEIN: Objection.
6     BY MR. GRIVER:
7 Q.  Did you speak to Orly about whether or
8 not you should accept the trusteeship?
9 A.  No.
10 Q.  Did you speak to anyone?
11    MR. ZILBERFEIN: Objection.
12    BY THE WITNESS:
13 A.  Did I speak to anyone?
14    BY MR. GRIVER:
15 Q.  Did you speak to anyone about whether
16 or not you should accept the trusteeship of the
17 Orly Genger trust?
18 A.  Well, I --
19    MR. ZILBERFEIN: Same objection.
20    BY THE WITNESS:
21 A.  I did -- no, I don't remember.
22    BY MR. GRIVER:
23 Q.  Okay. How did you first become aware
24 that Leah Fang wished to appoint you as trustee
25 of the Orly Genger trust?

Page 42

1    **GENGER**
2    MR. ZILBERFEIN: Objection.
3    BY THE WITNESS:
4 A.  Can you repeat that.
5    MR. GRIVER: Can you repeat that,
6 please.
7    (WHEREUPON, the record was read by
8    the reporter as requested.)
9    BY THE WITNESS:
10 A.  Obviously, when she nominated me.
11    BY MR. GRIVER:
12 Q.  Okay. And how did you become aware
13 that she had nominated you to become trustee?
14    MR. ZILBERFEIN: Objection.
15    BY THE WITNESS:
16 A.  When I got the paper, I was aware of
17 it.
18    MR. GRIVER: Let me have this marked as
19 Dalia Exhibit 5.
20    (Dalia Exhibit 5, instrument of
21    acceptance of trustee, marked.)
22    BY MR. GRIVER:
23 Q.  We have marked as Dalia 4 Leah's
24 resignation and appointment of successor, and we
25 have marked as Dalia 5 the instrument of

Page 43

1    **GENGER**
2 acceptance of trustee.
3 A.  Right.
4 Q.  Now, did Leah -- okay.
5    How did you get the document marked as
6 Dalia 5?
7    MR. ZILBERFEIN: Objection.
8    BY THE WITNESS:
9 A.  I don't remember.
10    BY MR. GRIVER:
11 Q.  Is it something that you typed up?
12 A.  No. I didn't type this up.
13 Q.  So someone provided it to you to sign?
14 A.  Obviously.
15 Q.  And --
16 A.  It is a lawyer probably.
17 Q.  Seymour Fang is the notary public. Do
18 you know who Seymour Fang is?
19 A.  Yes.
20 Q.  Does this refresh your recollection as
21 to where you were when you signed this document?
22 A.  Where I was?
23 Q.  Yes.
24 A.  Physically?
25 Q.  Yes. Physically.

Page 44

1    **GENGER**
2 A.  With the notary, of course.
3 Q.  But do you know where?
4 A.  Where?
5 Q.  Yes.
6 A.  The location? I don't remember.
7 Q.  Do you know when you signed this
8 document?
9    MR. ZILBERFEIN: Objection.
10    BY THE WITNESS:
11 A.  Whenever it says here, January 4.
12    BY MR. GRIVER:
13 Q.  Do you know what time of the day?
14 A.  No, I don't remember that.
15 Q.  Was it in the morning, was it at night?
16 A.  I don't remember.
17 Q.  No idea whatsoever?
18 A.  No, I guess it wasn't midnight, but it
19 was during the day.
20 Q.  But all you can remember is at some
21 time during the day --
22 A.  Yeah.
23 Q.  -- you signed this document?
24    Okay. Before signing this document,
25 did you discuss whether or not you should be

Page 45

```
1    GENGER
2  trustee with anyone?
3     MR. ZILBERFEIN: Objection.
4     BY THE WITNESS:
5  A. If I should be a trustee?  Yeah,
6  actually, it is a big responsibility.
7     BY MR. GRIVER:
8  Q.  So before you signed this document when
9  you were considering whether or not to become
10 trustee of the Orly Genger trust, who did you
11 discuss --
12 A.  In general.  In general.
13    MR. ZILBERFEIN: Objection.
14    BY THE WITNESS:
15 A.  In general, I knew that a problem will
16 arise when Leah was going to resign as the
17 trustee of Orly Genger trust, and someone should
18 have been -- there was a need for someone to be a
19 trustee.
20    BY MR. GRIVER:
21 Q.  And who did you discuss this with?  Did
22 you discuss it with Leah, did you discuss it with
23 anyone?
24    MR. ZILBERFEIN: Objection.
25    MR. MEISTER: Objection.  Form.
```

Page 46

```
1    GENGER
2    BY THE WITNESS:
3  A.  Well, this is a family affair, okay.
4  So, obviously, there was a problem, and since it
5  is very difficult and impossible to find a
6  trustee or person that would serve as a trustee,
7  not being paid, and exposed to many lawsuits, I
8  couldn't find anyone else to do this job.  So I
9  accepted this nomination in order to serve Orly
10 trust to the best of my ability.
11    BY MR. GRIVER:
12 Q.  Okay.  My question to you, Ms. Genger,
13 was simple.  While you were considering whether
14 or not to become the trustee of the Orly Genger
15 trust, did you speak about that to anybody; yes
16 or no?
17 A.  Yes, I did.
18    MR. ZILBERFEIN: Objection.
19    BY MR. GRIVER:
20 Q.  Who did you speak to?
21 A.  I speak to my family, including Sagi,
22 Rochelle, Leah, because it was a problem that we
23 had to resolve.
24 Q.  Did you speak with Elana?
25 A.  Yes.
```

Page 47

```
1    GENGER
2  Q.  And by Elana, I mean Sagi's wife Elana?
3  A.  That's the one, yeah.
4  Q.  So you spoke with Sagi, with Rochelle
5  Fang, with Leah Fang, and with Elana Genger?
6  A.  With my family, yes.
7  Q.  Did you speak to anyone else in your
8  family?
9  A.  I don't remember.
10 Q.  Did you speak with Orly?
11 A.  No, I did not speak with Orly.
12 Q.  Why didn't you speak with Orly?
13    MR. ZILBERFEIN: Objection.
14    BY THE WITNESS:
15 A.  I didn't speak with Orly because I was
16 sure that she would understand that her best
17 interest -- that I would serve to the best of my
18 ability her interest and take care of her needs,
19 as I did throughout my life as her mother.
20    BY MR. GRIVER:
21 Q.  I see.
22    So is that the only reason you didn't
23 speak to Orly is because you were confident --
24 A.  Yeah.
25 Q.  Is there a reason why you thought Sagi
```

Page 48

```
1    GENGER
2  would be uncomfortable about you being trustee so
3  you had to speak with him?
4  A.  No.  I didn't think that Sagi would be
5  uncomfortable or comfortable.
6  Q.  Then why did you speak with Sagi?
7  A.  Because the problem -- it was a problem
8  that somebody had to serve as a trustee.  So
9  that's why we discussed it.
10 Q.  Did Sagi come to you with the idea of
11 you serving as a trustee?
12 A.  What?  Again?
13 Q.  Did Sagi come to you with the idea of
14 you serving as trustee?
15 A.  No.
16    MR. ZILBERFEIN: Objection.
17    BY THE WITNESS:
18 A.  I volunteered.
19    BY MR. GRIVER:
20 Q.  Who did you volunteer to?
21 A.  I volunteered.  There was --
22    MR. ZILBERFEIN: Objection.
23    BY THE WITNESS:
24 A.  -- an opening, and I volunteered to
25 take the job.
```

ORLY GENGER VS.
DALIA GENGER, et al

DALIA GENGER
December 13, 2012

---

Page 49

1      GENGER
2      BY MR. GRIVER:
3 Q.  How did you know there was an opening?
4 A.  Because --
5      MR. ZILBERFEIN: Objection.
6      BY THE WITNESS:
7 A.  -- Leah was very frustrated, and she
8  wanted to resign. I was aware of it.
9      BY MR. GRIVER:
10 Q.  Okay. And why was Leah frustrated?
11      MR. MEISTER: Objection. Calls for the
12  operation of someone else's mind.
13      MR. ZILBERFEIN: Objection.
14      BY MR. GRIVER:
15 Q.  If you know.
16      MR. ZILBERFEIN: Join. I object.
17      MR. MEISTER: She can't possibly know.
18      BY MR. GRIVER:
19 Q.  You just testified that Leah was
20  frustrated. On what basis did you believe that
21  Leah was frustrated?
22 A.  I am assuming that she was being sued
23  and harassed, and then hospitalized as a
24  consequence of the conduct of Orly, my daughter.
25 Q.  So you mentioned before that there was

---

Page 50

1      GENGER
2  a problem that you were trying to resolve. What
3  was the problem?
4 A.  The problem was to find a trustee for
5  Orly trust.
6 Q.  Do you know what -- so at this time
7  Orly and Leah Fang were in conflict; is that
8  correct?
9      MR. MEISTER: Objection.
10      MR. ZILBERFEIN: Objection. I join.
11      MR. MEISTER: It is a legal conclusion.
12      MR. GRIVER: Objection noted.
13      THE WITNESS: Can you repeat the
14  question.
15      BY MR. GRIVER:
16 Q.  At the time you believe that Leah was
17  frustrated because you mentioned something about
18  a hospital, you mentioned something about a
19  conflict of some problem, why did Leah -- did you
20  have an understanding as to why Leah wished to
21  resign as trustee?
22      MR. ZILBERFEIN: At what point in time?
23      BY THE WITNESS:
24 A.  Why Leah -- you have to ask her. I
25  don't know.

---

Page 51

1      GENGER
2      MR. ZILBERFEIN: I object to the
3  question.
4      BY THE WITNESS:
5 A.  I don't know.
6      MR. GRIVER: Can I have the answer
7  back, please.
8      (WHEREUPON, the record was read by
9      the reporter as requested.)
10      BY MR. GRIVER:
11 Q.  At the time --
12      MR. GRIVER: Read my question back,
13  please.
14      (WHEREUPON, the record was read by
15      the reporter as requested.)
16      BY MR. GRIVER:
17 Q.  Did you have an understanding as to why
18  Leah wished to resign as trustee?
19      MR. MEISTER: She just answered that.
20  She said she doesn't know.
21      MR. ZILBERFEIN: Note my objection.
22      MR. MEISTER: Move on to your next
23  question, please.
24      BY MR. GRIVER:
25 Q.  Is that your answer, your full answer,

---

Page 52

1      GENGER
2  that you don't know?
3 A.  I do not know exactly, but I can assume
4  that a person who takes this kind of --
5  volunteers to take this job and ends up in the
6  hospital is not a happy person.
7 Q.  Okay.
8      MR. ZILBERFEIN: Note my objection to
9  any assumption.
10      BY MR. GRIVER:
11 Q.  You said Leah ended up --
12 A.  I assume. I assume.
13 Q.  That was your assumption at the time --
14 A.  Yeah.
15 Q.  -- that you took the --
16 A.  She was not happy.
17      MR. MEISTER: I am going to put this on
18  the record -- excuse me, Mr. Griver.
19  Dalia, you have to wait, please, until
20  Mr. Griver finishes his question because if you
21  start to talk at the same time --
22      THE WITNESS: Okay.
23      MR. MEISTER: -- the court reporter
24  can't get it.
25      BY MR. GRIVER:

---

Page 53

1    GENGER
2 Q.  You said that Leah ended up in the
3  hospital?
4 A.  Yes.  As far as I know.  Yes.
5 Q.  Did you have an understanding as to why
6  Leah ended up in the hospital?
7    MR. ZILBERFEIN: Objection.
8    BY THE WITNESS:
9 A.  Again, I assumed she had a nervous
10  breakdown.
11    BY MR. GRIVER:
12 Q.  Because of her --
13 A.  Harassment.
14 Q.  Okay.  Because of harassment.
15    Harassment by whom?
16 A.  I don't know.  I'm not a doctor.  I
17  really don't know why they hospitalized her.
18 Q.  Okay.  But you understood that Leah was
19  being harassed?
20 A.  Yes.
21    MR. ZILBERFEIN: Objection.
22    BY MR. GRIVER:
23 Q.  Harassed by whom?
24 A.  By Orly's lawyers.
25 Q.  In connection with Leah's functioning

Page 54

1    GENGER
2  as trustee of the trust?
3 A.  I would assume so.
4    MR. ZILBERFEIN: Objection.
5    BY MR. GRIVER:
6 Q.  And did you understand why Leah was
7  being harassed?
8 A.  No.
9    MR. ZILBERFEIN: Objection.  Asked and
10  answered.
11    BY MR. GRIVER:
12 Q.  Did you understand why Orly's attorneys
13  were in conflict with Ms. Fang?
14    MR. ZILBERFEIN: Objection.
15    BY THE WITNESS:
16 A.  No.
17    BY MR. GRIVER:
18 Q.  Did you understand that Orly might not
19  be pleased with the work Leah was doing as
20  trustee?
21    MR. ZILBERFEIN: Objection.
22    BY THE WITNESS:
23 A.  I don't know exactly what Leah at the
24  time did, that Orly did not -- was not happy
25  with.

Page 55

1    GENGER
2    MR. GRIVER: Could you read back that
3  answer, please.
4    (WHEREUPON, the record was read by
5    the reporter as requested.)
6    MR. GRIVER: Mark that answer so I can
7  come back to it.
8    BY MR. GRIVER:
9 Q.  How did you know that Leah was being
10  harassed?
11    MR. ZILBERFEIN: Objection.
12    BY THE WITNESS:
13 A.  How did I know?
14    BY MR. GRIVER:
15 Q.  Uh-huh.
16 A.  Well, she's part of my family, so I
17  guess it was known.
18 Q.  So she told you?
19 A.  Leah did not tell me that.
20 Q.  So Sagi told you?
21 A.  Actually, her mother told me.
22 Q.  Rochelle Fang?
23 A.  Right.
24 Q.  Did you ever pick up the phone to Orly
25  and say, "Orly, what's going on?"

Page 56

1    GENGER
2 A.  No.
3 Q.  Did you ever try to get Orly's side of
4  the story?
5    MR. ZILBERFEIN: Objection.
6    BY THE WITNESS:
7 A.  No, I was not involved then in Orly's
8  affair.
9    BY MR. GRIVER:
10 Q.  Well, at that time you had no -- you
11  had no connection to Orly; is that right?
12    MR. ZILBERFEIN: Objection.
13    BY THE WITNESS:
14 A.  Right.  She tried to avoid me.
15    BY THE WITNESS:
16 Q.  Well, in this case, you chose not to
17  pick up the phone to ask her what was going on;
18  isn't that right?
19    MR. ZILBERFEIN: Objection.
20    BY THE WITNESS:
21 A.  After she never answered my calls and
22  my texts --
23    BY MR. GRIVER:
24 Q.  Did you ever --
25 A.  -- messages.

ORLY GENGER VS.
DALIA GENGER, et al

DALIA GENGER
December 13, 2012

---

Page 57

GENGER

2 Q. Did you ever call Orly up to find out
3  what her disagreement was with Leah Fang?
4      MR. MEISTER: Objection. Asked and
5  answered.
6      MR. ZILBERFEIN: Objection.
7      BY THE WITNESS:
8 A. No.
9      BY THE WITNESS:
10 Q. Did you ever go to Orly's house to talk
11   to her directly and ask her?
12 A. No.
13      MR. ZILBERFEIN: Objection.
14      BY MR. GRIVER:
15 Q. Did you ever send her an e-mail?
16      MR. ZILBERFEIN: Objection.
17      BY THE WITNESS:
18 A. I don't remember.
19      BY MR. GRIVER:
20 Q. Did you ever write her a letter saying:
21   "What's going on, Orly? Why are you in conflict
22   with Leah Fang?"
23      MR. DELLAPORTAS: Object to form.
24      MR. ZILBERFEIN: Objection.
25      BY THE WITNESS:

---

Page 58

GENGER

2 A. No, it wasn't my business, really.
3      MR. DELLAPORTAS: Object to form. And
4  I just note for the record that Ms. Orly Genger
5  is not in attendance today. You may proceed.
6      BY MR. GRIVER:
7 Q. In sum or in substance, did you do
8  anything to try and understand what the conflict
9  was between Orly and Leah Fang?
10      MR. ZILBERFEIN: Objection.
11      BY THE WITNESS:
12 A. No.
13      MR. ZILBERFEIN: Can you read back the
14  question and answer.
15      (WHEREUPON, the record was read by
16      the reporter as requested.)
17      BY MR. GRIVER:
18 Q. Did Sagi discuss your appointment with
19  you prior to your acceptance of the appointment?
20 A. Sagi discussed with me prior to my
21  appointment?
22 Q. Uh-huh.
23 A. Me taking the trusteeship, you mean?
24 Q. Taking it or not taking it, did you
25  discuss whether -- did you discuss the potential

---

Page 59

GENGER

2  of you being appointed trustee with Sagi before
3  you accepted the appointment?
4      MR. ZILBERFEIN: Objection.
5      BY THE WITNESS:
6 A. As far as I remember, I did discuss
7   with Sagi the fact that I am willing to
8   volunteer.
9      BY MR. GRIVER:
10 Q. And do you recall anything else about
11   that conversation?
12      MR. ZILBERFEIN: Objection.
13      BY THE WITNESS:
14 A. No.
15      BY MR. GRIVER:
16 Q. Was there more than one conversation?
17 A. I don't think so.
18 Q. Did you talk to any lawyer before you
19   decided to accept the appointment as trustee?
20      MR. ZILBERFEIN: Objection.
21      BY THE WITNESS:
22 A. I don't remember that.
23      BY MR. GRIVER:
24 Q. Do you remember what it is -- strike
25   that.

---

Page 60

GENGER

2      Previously you testified that you
3  discussed whether or not you would become trustee
4  of the Orly trust with your family; do you recall
5  that testimony?
6      MR. ZILBERFEIN: Objection.
7      BY THE WITNESS:
8 A. Yes, I said that I did discuss it
9   because the problem was that somebody has to
10   become a trustee.
11      BY MR. GRIVER:
12 Q. Did you search for anybody else besides
13  yourself who might be willing to become a
14  trustee?
15      MR. MEISTER: Can I have the question
16  read back, please.
17      BY THE WITNESS:
18 A. Yeah. I was --
19      MR. MEISTER: Wait, wait. I would like
20  to have the question read back.
21      (WHEREUPON, the record was read by
22      the reporter as requested.)
23      MR. ZILBERFEIN: Objection.
24      MR. MEISTER: Object to the form.
25      THE WITNESS: So after all this

---

Page 61

1    GENGER
2  objection, what is the question?
3       MR. GRIVER: Repeat the question,
4  please.
5       BY THE WITNESS:
6  A.  Well, I was thinking about maybe some
7  kind of firm, an independent firm that might take
8  care of -- might take care of Orly Genger trust,
9  but eventually all the options led to the fact
10 that somebody like me that cares about Orly and
11 is willing to make a lot of sacrifices, I was
12 basically the only person left.
13      MR. GRIVER: Can you repeat my
14 question.
15      Because I am not sure that you answered
16 the question I asked.
17      THE WITNESS: Okay.
18      (WHEREUPON, the record was read by
19      the reporter as requested.)
20      BY THE WITNESS:
21 A.  I was thinking about some options.
22      BY MR. GRIVER:
23 Q.  Okay.  Did you do -- and you identified
24 that option as maybe a firm --
25 A.  An independent firm.  But then they

Page 62

1    GENGER
2  would want to be paid, and then, obviously, as a
3  trust, there are regular roles.
4  Q.  Do you do any investigation, did you --
5  I understand that you thought of it.
6      Did you do any action in order to see
7  if someone else --
8  A.  There was no point in doing any action.
9  Q.  Why was there no point?
10 A.  Because I don't think that anyone would
11 take such a job to be a trustee, to risk
12 resources and being sued constantly, and would
13 have Orly's interest in mind, as I did.
14 Q.  Okay.  I'm sorry.
15      Had Orly Genger sued anyone before
16 January 1 of 2008?
17      MR. ZILBERFEIN: Objection.
18      BY MR. GRIVER:
19 Q.  If you know.
20 A.  I don't know.  Really, I didn't --
21 Q.  You said -- I understand what you said.
22      But let's just -- so we are clear on the record,
23 you did not pick up the phone and talk to anyone
24 to see if they might be interested in serving as
25 the Orly Genger trustee?

Page 63

1    GENGER
2       MR. ZILBERFEIN: Objection.
3       MR. MEISTER: Except as previously
4  testified, Mr. Griver?
5       BY MR. GRIVER:
6  Q.  Did you pick up the phone and call
7  anybody to see if they would be willing to serve
8  as trustee?
9  A.  No, I didn't know anyone that would
10 potentially be able to do that because of the
11 history of this.
12 Q.  Did you task anyone --
13 A.  No, I didn't.
14 Q.  Did you task anyone with trying to find
15 somebody else besides yourself?
16      MR. ZILBERFEIN: Objection.
17      BY THE WITNESS:
18 A.  Didn't you ask me this question before,
19 if I tried to find anyone?
20      BY MR. GRIVER:
21 Q.  Did you ask someone else to try and
22 find anyone?
23 A.  No.  Because there's no point in doing
24 that.
25 Q.  Did you -- did Sagi look for anyone

Page 64

1    GENGER
2  besides yourself, do you know?
3  A.  I don't know what Sagi did or didn't
4  do.
5  Q.  Okay.  As far as you know, he didn't
6  look for anybody?
7       MR. ZILBERFEIN: Objection.
8       BY THE WITNESS:
9  A.  I do not know what Sagi did or didn't
10 do.
11      BY MR. GRIVER:
12 Q.  What about Rochelle Fang?
13 A.  I don't know what she did.
14      MR. ZILBERFEIN: Objection.
15      BY MR. GRIVER:
16 Q.  Did you ask Rochelle Fang if she did
17 anything?
18 A.  No, I didn't ask.
19 Q.  Did you ask Leah Fang if she looked for
20 anybody besides you?
21      MR. ZILBERFEIN: Objection.
22      BY THE WITNESS:
23 A.  No.  I don't remember.
24      BY MR. GRIVER:
25 Q.  Do you know who a Patricia Enriquez is?

ORLY GENGER VS.
DALIA GENGER, et al

DALIA GENGER
December 13, 2012

---

Page 65

1    GENGER
2  A.  Who?
3  Q.  Patricia Enriquez?
4  A.  I don't remember this name.
5  Q.  Were you aware that before you became
6   trustee Leah Fang had attempted to appoint a
7   Patricia Enriquez?
8  A.  I was not aware.  I don't know who it
9   is.
10 Q.  Were you --
11     MR. ZILBERFEIN: Objection.
12     BY MR. GRIVER:
13 Q.  Were you aware of the fact that
14  Patricia Enriquez attempted to accept the
15  position of Orly Genger trustee?
16     MR. ZILBERFEIN: Objection.
17     BY THE WITNESS:
18 A.  No, I was not aware of it.
19     BY MR. GRIVER:
20 Q.  Tell me everything you remember about
21  your conversations with Rochelle Fang in
22  connection with whether or not you would or would
23  not become trustee of the Orly trust.
24     MR. ZILBERFEIN: Objection.
25     BY THE WITNESS:

---

Page 66

1    GENGER
2  A.  I don't remember exactly what we talked
3   about, but we did discuss the fact that there is
4   a need to fulfill -- to fill up the position of
5   being a trustee in Orly trust.
6     BY MR. GRIVER:
7  Q.  And tell me all you can remember about
8   your conversations with Leah Fang regarding
9   whether or not you would become trustee of the
10  Orly trust.
11     MR. ZILBERFEIN: Objection.
12     MR. MEISTER: Was that Leah Fang?
13     MR. GRIVER: Yes.  Leah Fang.
14     THE WITNESS: Again, can you repeat the
15  question.
16     MR. GRIVER: Sure.
17     BY MR. GRIVER:
18 Q.  Tell me everything that you can recall
19  about your conversations with Leah Fang about
20  whether or not you would serve as trustee of the
21  Orly trust.
22     MR. ZILBERFEIN: Objection.
23     BY THE WITNESS:
24 A.  I don't remember what exactly we
25  discussed.

---

Page 67

1    GENGER
2     BY MR. GRIVER:
3  Q.  Can you please tell me everything you
4   recall about your conversations with Elana
5   Genger?
6  A.  It is all the same kind of
7   conversation, there is a problem and somebody has
8   to be found.
9  Q.  Did you have any conversations with,
10  let's say, Leah's attorneys?
11 A.  No, I never talked to Leah's attorneys.
12  I don't know who they are.
13 Q.  Did you review any documents before you
14  became trustee in order to determine whether or
15  not you would become trustee?
16     MR. ZILBERFEIN: Objection.
17     BY THE WITNESS:
18 A.  I don't remember.
19     BY MR. GRIVER:
20 Q.  You don't recall looking -- asking for
21  any balance sheets or asking for any
22  communications between Leah and Orly, anything
23  like that?  You don't remember anything like
24  that?
25     MR. ZILBERFEIN: Objection.

---

Page 68

1    GENGER
2     BY THE WITNESS:
3  A.  No, I don't remember.
4     MR. GRIVER: Let me have this marked as
5   Dalia Exhibit 6.
6     (Dalia Exhibit 6, release,
7     marked.)
8     MR. GRIVER: Let me have this marked as
9   Dalia Exhibit 7.
10     (Dalia Exhibit 7, document,
11     marked.)
12     BY MR. GRIVER:
13 Q.  Let's take a look at Dalia 7.
14 A.  Dalia 7?
15 Q.  Yes.
16 A.  Let me look at it first.
17 Q.  Okay.
18 A.  It is very unclear, this copy.  I don't
19  think I have ever seen this document before.
20 Q.  And on about December and January of
21  December of 2007 and January 2008 --
22     MR. MEISTER: I am going to object
23  because you blurred it and I couldn't understand.
24     THE WITNESS: Yeah.
25     MR. GRIVER: I will start over.

---

ORLY GENGER VS.
DALIA GENGER, et al

DALIA GENGER
December 13, 2012

---

Page 69

GENGER
1   GENGER
2   MR. MEISTER: Thank you.
3   BY MR. GRIVER:
4   Q.  So at the time that you accepted
5   appointment as trustee of the Orly Genger trust,
6   you were not aware that a Ms. Patricia Enriquez
7   had accepted to act as successor trustee --
8   MR. ZILBERFEIN: Objection.
9   BY MR. GRIVER:
10  Q.  -- just a few weeks before?
11  MR. ZILBERFEIN: Objection.
12  BY THE WITNESS:
13  A.  I was not aware of it.
14  BY MR. GRIVER:
15  Q.  Okay.  I take it that Patricia Enriquez
16  is not a member of the Genger family?
17  A.  I don't think so.
18  Q.  You think she is or you think she
19  isn't?
20  A.  She isn't.
21  Q.  Okay.  Let's look at Dalia 6, please.
22  Do you recognize this document?
23  A.  Yes.
24  Q.  What is this document?
25  A.  It is giving a release to Leah.

---

Page 70

1   GENGER
2   Q.  Is this one of the documents that
3   Mr. Meister showed you on Tuesday or Wednesday of
4   this week?
5   A.  No.
6   Q.  When was the last time you saw this
7   document?
8   A.  When?  At the date that it was written.
9   Q.  Okay.  Who wrote this document?
10  MR. ZILBERFEIN: Objection.
11  BY THE WITNESS:
12  A.  I would assume my lawyer.  I didn't
13  write this.
14  BY MR. GRIVER:
15  Q.  Well, I thought you testified that you
16  had not run your acceptance as trustee by any
17  lawyer?
18  MR. ZILBERFEIN: Objection.  It doesn't
19  make it --
20  BY MR. GRIVER:
21  Q.  Am I correct?
22  MR. ZILBERFEIN: It is not related to
23  the document.
24  MR. GRIVER: Can I have the question
25  read back, please.

---

Page 71

1   GENGER
2   (WHEREUPON, the record was read by
3   the reporter as requested.)
4   THE WITNESS: So, again, what is the
5   question?
6   BY MR. GRIVER:
7   Q.  You had previously testified that you
8   had not discussed with any attorneys whether or
9   not you would become trustee of the Orly trust;
10  do you recall that testimony?
11  A.  Yes.
12  Q.  So you have just said now that -- I
13  understand your attorney drafted this on December
14  29, 2007.
15  MR. ZILBERFEIN: Objection.
16  MR. MEISTER: She said her attorney.
17  BY MR. GRIVER:
18  Q.  Do you know which attorney drafted
19  this?
20  A.  I don't remember which one.
21  Q.  Was this -- when you are talking about
22  an attorney, are you talking about an attorney
23  for you?
24  MR. ZILBERFEIN: Note my objection.
25  She's already stated she doesn't know which

---

Page 72

1   GENGER
2   attorney drafted this.
3   BY THE WITNESS:
4   A.  I don't remember which one, really.
5   BY MR. GRIVER:
6   Q.  How do you know an attorney drafted
7   this?
8   A.  Because I wouldn't be able to write
9   something like that.
10  Q.  Okay.  Could this be something that
11  Leah wrote?
12  MR. ZILBERFEIN: Objection.
13  BY THE WITNESS:
14  A.  No, for sure not Leah.
15  BY MR. GRIVER:
16  Q.  Leah is an attorney, isn't --
17  A.  It is to Leah Fang.
18  Q.  What?
19  A.  It is addressed to Leah Fang.
20  Q.  Okay.
21  A.  So she didn't write it.
22  MR. ZILBERFEIN: Objection.
23  BY MR. GRIVER:
24  Q.  Is Leah Fang an attorney?
25  A.  As far as I know, she is.

---

Page 73

1     GENGER
2  Q.  Could she have -- well --
3  A.  She didn't write it.  That's for sure.
4  Q.  How do you know?
5     MR. ZILBERFEIN: Objection.
6     BY THE WITNESS:
7  A.  Because I said, a lawyer wrote it, but
8  it is not Leah Fang.
9     BY MR. GRIVER:
10 Q.  And on what basis do you say that a
11 lawyer wrote it but not Leah Fang?
12    MR. ZILBERFEIN: Objection.
13    BY THE WITNESS:
14 A.  Because it is addressed to her, and I
15 don't believe that Leah would do such a thing.
16    BY MR. GRIVER:
17 Q.  It has on the top of it, it says Dalia
18 Genger; do you see that?
19 A.  Yes.
20 Q.  Is that an indication it came from your
21 computer?
22 A.  I don't know if it is my computer or my
23 lawyer's computer.
24 Q.  Okay.  When you say your lawyer's
25 computer, which lawyer --

Page 74

1     GENGER
2  A.  That I told you.  I don't remember --
3  Q.  You don't remember his name?
4  A.  -- which lawyer was at that time my
5  lawyer.
6  Q.  Now, is that your signature on the
7  bottom?
8  A.  Yes.
9  Q.  And do you understand what this
10 document does or purports to do?
11    MR. ZILBERFEIN: Objection.
12    BY MR. GRIVER:
13 Q.  To your understanding, what does this
14 document do?
15    MR. ZILBERFEIN: Same objection.
16    BY THE WITNESS:
17 A.  Identifies a release, Leah.
18    BY MR. GRIVER:
19 Q.  Okay.  And it releases Leah to, it
20 says, the maximum extent permissible under law;
21 do you see that?
22 A.  What?
23 Q.  This document says that it releases
24 Leah and holds her harmless, quote, to the
25 maximum extent permissible under the law and the

Page 75

1     GENGER
2  trust agreement; do you see that?
3  A.  I don't see it, but I believe it is
4  there.
5  Q.  Look on the third line.
6     MR. MEISTER: Can I point it out?
7     BY THE WITNESS:
8  A.  It doesn't matter.  I believe you.
9     BY MR. GRIVER:
10 Q.  So you were -- on December 29, 2007,
11 you were okay with releasing Leah to the maximum
12 extent permissible under the law in the trust
13 agreements, correct?
14    MR. ZILBERFEIN: Objection.
15    BY THE WITNESS:
16 A.  Yeah.
17    BY MR. GRIVER:
18 Q.  At the time that you attempted to
19 release Leah to the maximum extent permissible
20 under the law and the trust agreements, did you
21 have any idea what Leah had or had not done as
22 trustee during her time as the trustee of the
23 Orly Genger trust?
24 A.  I just don't remember exactly what she
25 had or has not done.

Page 76

1     GENGER
2  Q.  Okay.  You did no investigation before
3  you signed this document as to what Leah had or
4  had not done; isn't that correct?
5     MR. ZILBERFEIN: Objection.
6     BY THE WITNESS:
7  A.  I did -- I really don't remember
8  exactly, but I know that at the time I didn't
9  think that Leah has done anything harmful to
10 Orly.
11    BY MR. GRIVER:
12 Q.  Okay.
13    MR. MEISTER: Is this a good time to
14 take a break?
15    MR. GRIVER: No.  Let me finish this.
16 I understand.  Let me finish this set of
17 questions.
18 Q.  You said, "At the time I did not think
19 Leah had done anything harmful to Orly"?
20 A.  Yeah.
21 Q.  But you did no investigation to find
22 that out, did you?
23    MR. ZILBERFEIN: Objection.
24    BY THE WITNESS:

ORLY GENGER VS.
DALIA GENGER, et al

DALIA GENGER
December 13, 2012

---

Page 77

GENGER

1
2 A. I don't know how you are defining
3 "investigation."
4     BY MR. GRIVER:
5 Q. You didn't talk to Orly, did you?
6 A. No.
7     MR. ZILBERFEIN: Objection.
8     BY MR. GRIVER:
9 Q. Did you talk to Orly's lawyers?
10 A. No. I already said that.
11 Q. Did you have your lawyer talk to Orly's
12 lawyers to do an investigation?
13     MR. ZILBERFEIN: Objection.
14     BY THE WITNESS:
15 A. I don't remember.
16     BY MR. GRIVER:
17 Q. Do you remember doing anything in sum
18 or in substance to determine what Leah had or had
19 not done before you sent her this exoneration on
20 December 29, 2007?
21 A. I know that at that time, at the time,
22 I was aware of some of the conflict that -- I
23 mean, some of the conflicts that have happened,
24 and I didn't find anything wrong with whatever
25 Leah did.

---

Page 78

GENGER

1
2 Q. And what did Leah do?
3 A. I don't remember exactly what it was.
4 Q. Okay. And so in finding out what Leah
5 did or did not do, the most you did was talk to
6 Leah?
7 A. Yeah.
8     MR. ZILBERFEIN: Objection.
9     BY MR. GRIVER:
10 Q. And based on what Leah said, you
11 exonerated her, held her harmless and indemnified
12 her for whatever she may or may not have done?
13     MR. ZILBERFEIN: Objection.
14     BY MR. GRIVER:
15 Q. Isn't that correct?
16     MR. MEISTER: To the maximum extent
17 permitted by law and the trust agreement.
18     MR. ZILBERFEIN: Objection.
19     BY MR. GRIVER:
20 Q. You can answer.
21 A. I indemnified her, yes.
22 Q. Let me ask you this: How is that in
23 the trust's best interest to exonerate someone
24 and indemnify them? You understand what
25 "indemnify" means?

---

Page 79

GENGER

1
2 A. Tell me what it means.
3 Q. "Indemnify" means that if someone sues
4 her, you pay her bills. That's what "indemnify"
5 means. Did you understand that at the time you
6 indemnified her on December 29, 2007?
7     MR. ZILBERFEIN: Objection.
8     BY THE WITNESS:
9 A. I don't understand what --
10     MR. ZILBERFEIN: Objection to the
11 definition of the attorney's --
12     BY THE WITNESS:
13 A. I was not aware of this legal term.
14     BY MR. GRIVER:
15 Q. Then let's be clear.
16     At the time you signed this document
17 did you have an understanding of what
18 "indemnification" meant?
19 A. No.
20 Q. None whatsoever?
21     MR. ZILBERFEIN: Objection.
22     BY THE WITNESS:
23 A. No. I thought that this was a standard
24 way of writing this kind of release.
25     BY MR. GRIVER:

---

Page 80

GENGER

1
2 Q. Who told you that it was a standard way
3 of writing this release?
4     MR. ZILBERFEIN: Objection.
5     BY THE WITNESS:
6 A. I said I thought. I didn't say
7 somebody told me.
8     BY MR. GRIVER:
9 Q. Okay. What was the basis of your
10 thinking that?
11     MR. ZILBERFEIN: Objection.
12     BY THE WITNESS:
13 A. Because we have many cases, that there
14 is a standard way of expressing objection or
15 other things, legal things, that it is a kind of
16 standard way of writing things.
17     BY MR. GRIVER:
18 Q. Understood.
19     But what, to your understanding, at the
20 time that you signed this memo of December 29,
21 2007, that's marked as Dalia 6, what was your
22 understanding of what an indemnification was?
23 A. That she's not -- that she cannot be
24 sued, I guess. She's released from any
25 wrongdoing.

---

ORLY GENGER VS.
DALIA GENGER, et al

DALIA GENGER
December 13, 2012

Page 81

GENGER

2 Q.  Okay.  Let's look at it.  It says the
3 indemnification includes any actions by the
4 beneficiaries and the agents, including any
5 expenses or injury incurred on your part, in
6 connection with service.  Do you see that part?
7 It is right here.
8 A.  I am sure it is there.  Yes.  I see.
9 So what's the question?
10 Q.  Okay.  So what does "indemnification"
11 mean?
12 MR. MEISTER: Objection.
13 MR. ZILBERFEIN: Objection.
14 BY MR. GRIVER:
15 Q.  To your understanding --
16 MR. MEISTER: She's answered it.  Move
17 on to your next point.  And better than that,
18 let's take a break.
19 MR. ZILBERFEIN: I join in the break.
20 MR. DELLAPORTAS: If we are taking a
21 break, I need to put a statement on the record
22 because we have now gone for 90 minutes, and we
23 have yet to ask any questions relevant to the D&K
24 action.
25 MR. GRIVER: Excuse me.

Page 82

GENGER

2 MR. DELLAPORTAS: I am putting a
3 statement on the record.
4 MR. GRIVER: You are not putting a
5 statement on the record.
6 MR. DELLAPORTAS: I am putting a
7 statement on the record.  This has been noticed
8 for a deposition in the D&K action.  We have not
9 had a single question relevant to the D&K action.
10 MR. GRIVER: Call the judge.
11 MR. DELLAPORTAS: Do not interrupt me.
12 MR. GRIVER: You are interrupting my
13 questioning of this witness.
14 Can I have the question read back to
15 me.
16 MR. DELLAPORTAS: There is no question
17 pending.
18 THE WITNESS: You know what?  I am
19 going to leave if this is how this --
20 MR. MEISTER: Dalia --
21 MR. GRIVER: Read my question back,
22 please.
23 BY MR. GRIVER:
24 Q.  My question is, on May -- on
25 December --

Page 83

GENGER

2 MR. MEISTER: He started putting a
3 statement on the record.
4 MR. DELLAPORTAS: No one is asking a
5 question until I finish putting my statement on
6 the record.
7 BY MR. GRIVER:
8 Q.  On December 29 --
9 MR. DELLAPORTAS: Please give me the
10 courtesy of speaking --
11 BY MR. GRIVER:
12 Q.  On December 29 --
13 MR. DELLAPORTAS: Counsel, I will keep
14 speaking until she puts on the record what I
15 said.
16 MR. GRIVER: Put everything he says on
17 the record because I want to go -- that's fine.
18 THE COURT REPORTER: Okay.  But only
19 one person can speak at a time.
20 MR. GRIVER: Can I see if a question is
21 open on the record.
22 MR. DELLAPORTAS: No one is doing
23 anything until I speak.
24 THE COURT REPORTER: There was a
25 question, and then there was an objection.

Page 84

GENGER

2 MR. MEISTER: There was an objection
3 because the question was answered.  Do you want
4 to go back?  Do you want to waste time?
5 MR. GRIVER: She did not answer the
6 question.
7 THE WITNESS: You did ask me that.
8 MR. GRIVER: Did you answer the
9 question?
10 THE WITNESS: Yes, I did.
11 MR. MEISTER: Yes, she did.
12 Now let's take our break.
13 MR. DELLAPORTAS: Anyone can break, and
14 I am putting this on the record.
15 We have been going for -- put this on
16 the record, because in fairness to opposing
17 counsel, I think I need to put this on the record
18 so they are on notice.
19 We have gone for 90 minutes.  None of
20 the questions have related to the D&K action.
21 The discovery seems to be geared to, what I can
22 gather, to issues relevant to the surrogate court
23 action.  That's fine, but we are not here for
24 that action.
25 I am not counsel to that action.  This

ORLY GENGER VS.
DALIA GENGER, et al

DALIA GENGER
December 13, 2012

---

Page 85

GENGER

2 deposition hasn't been crossed noticed in that
3 action, and yet my client is incurring legal
4 fees. We intend to apply once this case is over
5 for reimbursement of those legal fees based on
6 the misrepresentation from Orly's counsel that
7 the questioning of this deposition was going to
8 be related to the D&K action.
9   If Orly's counsel wishes to question
10 Ms. Genger about matters as to why she was hired,
11 why she didn't resign, so and so forth, that
12 should have been noticed in the surrogate court
13 action.
14   We are here based on a
15 misrepresentation, the fees are increasing, and I
16 would strongly recommend to Ms. Orly Genger's
17 counsel that he may move on to some topics
18 relevant to the discussion because, as I said,
19 the bill is increasing.
20   MR. ZILBERFEIN: I join.
21   MR. MEISTER: Now I would like to take
22 a break.
23   MR. ZILBERFEIN: Before you start, I
24 want to join in counsel's statement, and I agree
25 100 percent with what he says. And I don't think

---

Page 86

GENGER

2 that it is proper for you to be asking this line
3 of questioning, especially since this has not
4 been noticed properly.
5   MR. GRIVER: I would direct both
6 counsel to read count 4 of the operative
7 complaint, it is right there, as Exhibit 2, to
8 Dalia's deposition.
9   BY MR. GRIVER:
10 Q. Ms. Genger --
11   MR. MEISTER: No, no. We are taking a
12 break.
13   MR. GRIVER: Stop.
14   MR. MEISTER: You are not asking any
15 more questions.
16   MR. GRIVER: I have -- you are
17 asking --
18   MR. MEISTER: Do you want me to urinate
19 on your carpet here, Counsel? We have been going
20 for an hour and a half. We are taking a break.
21   MR. GRIVER: You have two counsel.
22   BY MR. GRIVER:
23 Q. How is this --
24   MR. MEISTER: No. She's stepping out.
25   MR. GRIVER: All right. You called for

---

Page 87

GENGER

2 a break.
3   MR. DELLAPORTAS: Just for the record,
4 I see nothing in count 4 which has any relevance
5 to any of the questions.
6   MR. GRIVER: I would note that
7 Mr. Meister and the other counsel are not to
8 discuss the substance of this deposition during
9 the break.
10   MR. MEISTER: I would note that I need
11 to know where the men's room is.
12   MR. ZILBERFEIN: Is there a gag order?
13   (WHEREUPON, a recess was had from
14   12:07 p.m. to 12:19 p.m.)
15   (WHEREUPON, Attorney Lance Harris
16   entered the deposition
17   proceedings.)
18   BY MR. GRIVER:
19 Q. Ms. Genger, we are back on record. You
20 are still under oath. Do you understand that?
21 A. Yes.
22 Q. Ms. Genger, how is it in the Orly
23 trust's best interest for you as trustee to
24 exonerate someone without knowing exactly what
25 they did or did not do?

---

Page 88

GENGER

2 A. I believed that Leah did her best to
3 protect Orly.
4 Q. For example, at the time that you
5 signed this, on December 29, 2007, what is it
6 that you believed that Leah did as trustee of the
7 trust?
8 A. I don't remember what was at that time.
9 Q. Now, if you look at Dalia Exhibit 6, it
10 is dated December 29, 2007, correct?
11 A. Yes.
12 Q. Were you trustee of the Orly Genger
13 trust on December 29, 2007?
14 A. Not yet, officially.
15 Q. Okay.
16 A. Wasn't it January?
17 Q. 2008?
18 A. Right.
19 Q. So you weren't even trustee?
20 A. Right.
21 Q. So the first thing you did even before
22 you became trustee was immediately to release
23 Leah to the maximum extent permissible under the
24 law and the trust agreement?
25   MR. MEISTER: Objection.

---

ORLY GENGER VS.
DALIA GENGER, et al

DALIA GENGER
December 13, 2012

Page 89

1     GENGER
2     BY THE WITNESS:
3  A.  Well, if I signed it --
4     BY MR. GRIVER:
5  Q.  If you signed it?
6  A.  I spoke with whatever lawyer I had at
7     the time, and --
8     MR. MEISTER: Objection if you are
9     going to discuss what you discussed with your
10    lawyer.  Say you spoke with a lawyer.
11    BY THE WITNESS:
12 A.  I spoke with my lawyer.
13    MR. MEISTER: Don't reveal what you
14    said to him or her.
15    BY MR. GRIVER:
16 Q.  Did you speak to him in connection with
17    you becoming trustee of the Orly trust?
18 A.  Yeah.
19 Q.  Did you sign this document as trustee
20    of the 1993 Orly Genger trust?
21 A.  Did you -- can you repeat.
22 Q.  Yes.
23    You signed this document as trustee of
24    the 1993 Orly Genger trust, correct?
25 A.  Yes.  And I did so because I had

Page 90

1     GENGER
2     discussion with my lawyer.
3  Q.  Okay.  And --
4     MR. ZILBERFEIN: Note my objection to
5     this line of questioning.
6     BY MR. GRIVER:
7  Q.  And what did the lawyer tell you?
8     MR. ZILBERFEIN: Can I get my objection
9     in, please.
10    The document, although it has a date on
11    the top, it doesn't have a date near the
12    signature.  We don't know when the witness signed
13    this.
14    BY MR. GRIVER:
15 Q.  Did you -- what did the lawyer tell
16    you?
17    MR. MEISTER: Objection.  Instruct her
18    not to --
19    BY THE WITNESS:
20 A.  I can't tell you.
21    MR. GRIVER: You are going to instruct
22    her not to answer for something that she --
23    BY THE WITNESS:
24 A.  No, I know that I cannot --
25    MR. MEISTER: Dalia.

Page 91

1     GENGER
2     MR. GRIVER: Let's set the foundation
3     for this then.
4     BY MR. GRIVER:
5  Q.  You purported to sign this memo as
6     trustee of the trust?
7  A.  Right.  But I don't know which date,
8     really.
9  Q.  You spoke to the lawyer, as trustee of
10    the trust, correct?
11    MR. MEISTER: No.  Objection.  She
12    hasn't said in what capacity she spoke to the
13    lawyer.
14    MR. GRIVER: Why don't you --
15    BY MR. GRIVER:
16 Q.  Answer my question.
17    MR. GRIVER: No speaking objections.
18    Thank you.
19    BY THE WITNESS:
20 A.  What was the question again?
21    BY MR. GRIVER:
22 Q.  When you spoke to the lawyer, it was in
23    order to get this document that you would sign as
24    trustee of the trust?
25    MR. MEISTER: Object on the grounds of

Page 92

1     GENGER
2     attorney-client privilege.  Instruct the witness
3     not to answer.
4     BY MR. GRIVER:
5  Q.  Okay.  Is that your signature on the --
6  A.  Yeah.  And it was noted there is no
7     date.
8  Q.  So as we sit here today, you don't know
9     whether you signed this document when you were
10    actually trustee?
11 A.  I'm not sure.  I'm not -- I don't
12    remember if I was or wasn't.
13    MR. GRIVER: Okay.  Let me have this
14    marked as Dalia 8.
15    (Dalia Exhibit 8, document,
16    marked.)
17    BY MR. GRIVER:
18 Q.  Before you signed the document that was
19    marked as Dalia 6, previous document, had you
20    instructed anyone -- before you signed this
21    document marked as Dalia 6, the December 29, 2007
22    exoneration --
23 A.  Can you repeat the question now.
24 Q.  Yes.
25    Before you signed the document marked

ORLY GENGER VS.
DALIA GENGER, et al

DALIA GENGER
December 13, 2012

Page 93

1    GENGER
2  as Dalia 6, the December 29, 2007 exoneration,
3  did you task anybody with conducting any
4  investigation as to what Leah did or did not do
5  as trustee?
6  A.  I don't remember.
7  Q.  You don't remember doing so?
8  A.  I don't remember, yeah, if I did or I
9  didn't do.
10  Q.  Do you have any documents at home
11  showing the results of any investigation of Leah
12  Fang's activities on or about the time of Dalia
13  6?
14  A.  I have to look.  I didn't look at my
15  files.
16  Q.  Providing --
17  A.  I don't remember now if I do or I don't
18  have any documents.
19  Q.  You remember providing documents in
20  this case?
21  A.  If it was needed, I am sure my lawyer
22  told me to do so.
23  Q.  Have you looked through your files as
24  trustee as part of providing documents in this
25  case?

Page 94

1    GENGER
2  A.  I don't remember.  I don't remember if
3  I did so or not.
4    MR. GRIVER:  Could you tag that,
5  please.
6    BY MR. GRIVER:
7  Q.  Let's look at what's been marked as
8  Dalia 8.
9  A.  Yes.
10  Q.  Dalia 8 is a memo dated January 4,
11  2008.
12  A.  Yes.
13  Q.  And this is you reiterating your
14  indemnification letter to you of December 29,
15  2007; do you see that?
16  A.  Right.
17    MR. MEISTER:  Objection to form.
18    BY MR. GRIVER:
19  Q.  Do you remember the exact date that you
20  signed what's been marked as Dalia 8?
21  A.  No.
22  Q.  Do you remember whether you signed this
23  document before or after you signed what's been
24  marked as Dalia Exhibit 5?
25  A.  Exhibit 5?  So can you repeat the

Page 95

1    GENGER
2  question.
3  Q.  Yes.
4    Do you remember if you signed Exhibit 8
5  before Exhibit 5?
6  A.  No.
7  Q.  Do you remember if you signed Exhibit 8
8  after Exhibit 5?
9  A.  No.
10  Q.  As we sit here today it is possible
11  that you signed -- strike that.
12    At some point you became involved in a
13  surrogate proceeding where Orly attempted to have
14  you removed as trustee; do you remember that?
15  A.  Generally, I know that she did that.
16  Q.  At any time did you let Surrogate Roth
17  know about the documents that have been marked as
18  Dalia 6 and Dalia 8?
19  A.  You have to ask my lawyer because I
20  don't know.
21    MR. DELLAPORTAS:  At this point --
22  objection.  Are you seriously --
23    BY THE WITNESS:
24  A.  All day we are going to talk about this
25  point?

Page 96

1    GENGER
2    MR. DELLAPORTAS:  This is pretty
3  explicitly related to the surrogate court action.
4  You brought us all here, Yoav.  Can you ask some
5  questions about this case?  You didn't cross
6  notice this.
7    MR. GRIVER:  If you would look to your
8  left, you see a representative of Leah Fang.
9  Leah Fang has moved to dismiss the D&K note
10  action based on these releases.
11    MR. DELLAPORTAS:  Great.
12    MR. ZILBERFEIN:  That motion is
13  pending --
14    MR. GRIVER:  Accordingly, this is part
15  of this case, and I can ask --
16    MR. ZILBERFEIN:  That's fully
17  submitted, and the arguments are moot at this
18  point.
19    MR. LEINBACH:  There's no CPLR section
20  whatsoever that prevents us from taking discovery
21  on any point of law which has been raised in this
22  case, either by us or by you.
23    MR. GRIVER:  All right.  Repeat my
24  question.
25    MR. DELLAPORTAS:  We are going to

Page 97

1    GENGER
2  make --
3    THE WITNESS: You know --
4    MR. GRIVER: Repeat my question.
5    BY MR. GRIVER:
6 Q. I will ask my question again.
7    At any time, to your knowledge, did you
8 let Surrogate Roth know about the documents that
9 have been marked as Dalia 6 and Dalia 8?
10    MR. ZILBERFEIN: Note my objection to
11 this whole line of questioning regarding the
12 surrogate court proceeding.
13    MR. DELLAPORTAS: Same objection.
14    BY THE WITNESS:
15 A. I don't remember this because my
16 lawyer, whoever it was at the time, I am sure
17 submitted the papers that were -- the judge asked
18 for.
19    BY MR. GRIVER:
20 Q. What consideration, if any, did the
21 trust receive in exchange for the documents that
22 have been marked as Dalia 6 and Dalia 8?
23    MR. DELLAPORTAS: Object to form.
24    MR. ZILBERFEIN: Objection.
25    MR. DELLAPORTAS: Lack of foundation.

Page 98

1    GENGER
2 Objection.
3    BY THE WITNESS:
4 A. What was the direction?
5    MR. ZILBERFEIN: Assumes facts that
6 have not been established.
7    BY THE WITNESS:
8 A. I don't understand the question.
9    BY MR. GRIVER:
10 Q. What did the trust get in exchange for
11 giving Leah a maximum release and
12 indemnification?
13    MR. DELLAPORTAS: Same objection.
14    MR. ZILBERFEIN: Objection.
15    BY THE WITNESS:
16 A. I'm not aware of any -- not aware of
17 any consideration with the process.
18    BY MR. GRIVER:
19 Q. Okay. Look, please, at what's been
20 marked as Dalia Exhibit 1.
21 A. Exhibit 1.
22    Are we going to finish this today or
23 next week? I mean, because there is a limit of
24 how much I can sit here.
25 Q. Now, this is -- now you verified this

Page 99

1    GENGER
2 answer?
3    MR. MEISTER: Objection. Asked and
4 answered.
5    BY MR. GRIVER:
6 Q. Do you understand what a verification
7 is? If you look at the last page of Exhibit 1.
8 A. Yes. "Verified" means that I accepted
9 whatever it is.
10 Q. And you accepted it under oath?
11 A. Okay.
12 Q. And, in other words, you swore to the
13 truth of the allegations except -- to the truth
14 of the statements in your answer, except for
15 those matters which you say were upon information
16 and belief?
17 A. I guess.
18 Q. Before you signed that verification,
19 did you read your answer?
20 A. I did.
21 Q. Did you work on it with your attorney?
22 A. At the time.
23 Q. I note that it is signed by Robert
24 Meister.
25    Did you also --

Page 100

1    GENGER
2 A. I said at the time.
3 Q. Okay. Look at paragraph 5 of your
4 answer, please.
5 A. Here? Where? I don't know what page
6 it is.
7 Q. It is on page 1.
8 A. Deny the allegation, you mean?
9 Q. Yes. It says, quote: Denies the
10 allegations contained in paragraph 5 of the
11 complaint, except denies knowledge or information
12 sufficient to form a belief as to the acts of
13 Leah Fang.
14    Do you see that?
15 A. Let me look at this. I have to
16 remember what was -- denies the allegation
17 contained in paragraph 5 of the complaint.
18 Q. Uh-huh.
19 A. Where is the complaint?
20 Q. Okay. That's Exhibit 2. That's
21 Exhibit 2 to your deposition. It is right there
22 in front of you. And there's actually on page 3.
23    MR. MEISTER: It's actually on page
24 numbered 3.
25    THE WITNESS: Page number 3.

ORLY GENGER VS.
DALIA GENGER, et al

DALIA GENGER
December 13, 2012

Page 101

GENGER

1     GENGER
2     BY MR. GRIVER:
3  Q.   So --
4  A.   So paragraph 5 here.
5  Q.   Yes.
6     MR. MEISTER: Is there a question?
7     THE WITNESS: Let me read it first.
8     MR. GRIVER: Mr. Meister, please let
9  your client read paragraph 5.
10    BY THE WITNESS:
11 A.   That I colluded?
12    BY MR. GRIVER:
13 Q.   This is Leah Fang colluded.  Well, you
14 and Leah, yes.
15 A.   That I colluded with Leah?  I am just
16 reading this, telling you right now that there
17 was no collusion whatsoever.  I didn't collude
18 with anyone and --
19    MR. MEISTER: Wait until there's a
20 question, please.
21    BY MR. GRIVER:
22 Q.   I want you to please concentrate on
23 when it talks about the acts of Leah Fang,
24 because --
25    MR. MEISTER: I'm sorry, where what

Page 102

GENGER

1     GENGER
2  talks about --
3     BY MR. GRIVER:
4  Q.   In response to paragraph 5 of the
5  complaint, you specifically denied under oath
6  knowledge or information sufficient to form a
7  belief as to the acts of Leah Fang.  I am asking
8  you to read about the facts of Leah Fang so we
9  may talk about Leah Fang's acts as to --
10 A.   I didn't investigate, as you know, and
11 it was being recorded that I didn't investigate
12 Leah Fang, as far as I remember.
13 Q.   So as of September 28, 2010 when you
14 signed the answer under oath, you still did not
15 have knowledge or information sufficient for you
16 to form a belief as to the acts of Leah Fang;
17 isn't that correct?
18    MR. MEISTER: As to the allegations in
19 paragraph 9 concerning the acts of Leah Fang.
20    BY MR. GRIVER:
21 Q.   Sufficient to form a belief as to the
22 acts of Leah Fang.
23    MR. MEISTER: As alleged.
24    MR. ZILBERFEIN: Every act she has ever
25 done?  Is that what you --

Page 103

GENGER

1     GENGER
2     MR. MEISTER: Come on.
3     THE WITNESS: I am going to go.
4  Really.
5     MR. ZILBERFEIN: Objection to the
6  ludicrous question on behalf of counsel.
7     MR. MEISTER: Noted.  Objection to
8  form.
9     MR. GRIVER: I will ask again.
10    MR. ZILBERFEIN: I object to this whole
11 line of questioning.
12    MR. GRIVER: Noted.
13    MR. ZILBERFEIN: The witness has
14 already stated that she didn't remember if she
15 did an investigation or not, and now you are
16 trying to get a different answer.
17    THE WITNESS: Why I am sitting on this
18 so long?  Really.
19    MR. MEISTER: Wait for the question.
20    BY MR. GRIVER:
21 Q.   As of September 28, 2010, did you have
22 knowledge or information --
23 A.   If it says that I didn't have, I didn't
24 have.
25    MR. MEISTER: Excuse me.  Wait until he

Page 104

GENGER

1     GENGER
2  finishes the question.
3     BY MR. GRIVER:
4  Q.   As we --
5     MR. MEISTER: Mr. Griver, stop when I
6  am speaking or we are walking out of here.  Is
7  that clear?
8     MR. GRIVER: You may object to my
9  questions.
10    MR. MEISTER: That's right.  And when I
11 am in the middle of objecting and instructing,
12 you keep your mouth shut.  Is that clear?
13    Okay.  Ms. Genger, wait until he
14 finishes his question before you start to speak
15 and then answer the question to the best of your
16 ability.  This is not a contest in speaking.
17    THE WITNESS: Okay.
18    BY MR. GRIVER:
19 Q.   Ms. Genger, between the time you became
20 trustee of the Orly Genger trust to the date that
21 you signed your answer --
22 A.   September 30.
23 Q.   -- September 28 of 2010, had you
24 instructed anyone as trustee of the Orly Genger
25 trust to investigate the actions or inactions of

ORLY GENGER VS.
DALIA GENGER, et al

DALIA GENGER
December 13, 2012

Page 105

1    GENGER
2  Leah Fang?
3  **A.  I don't remember if I did.**
4  Q.  Okay.  As trustee of the Orly Genger
5  trust, between January 4 of 2008 and September 28
6  of 2010, did you investigate in any way the
7  actions or inactions of Leah Fang as trustee?
8      **MR. ZILBERFEIN:** Objection.  Asked and
9  answered.
10     **BY THE WITNESS:**
11 **A.  Is there a question hanging in the air?**
12     **MR. GRIVER:** Yes.
13  Can you read the question back, please.
14  (WHEREUPON, the record was read by
15  the reporter as requested.)
16     **BY THE WITNESS:**
17 **A.  I don't remember.**
18     **BY MR. GRIVER:**
19 Q.  Look, please, at paragraph 75 of both
20  the complaint, which is Exhibit 2 to your
21  deposition, and your answer, which is Exhibit 1
22  to your deposition.
23 **A.  Wait.  Again, what is it?**
24     **MR. MEISTER:** I will get it for you.
25     **BY MR. GRIVER:**

Page 106

1    GENGER
2  Q.  Ms. Genger --
3  **A.  Can I just -- I don't know what you are**
4  **talking about.  I have to -- where should I be**
5  **looking now?**
6  Q.  We will get to that in a second.
7  Before then, just to finish up, have
8  you at any time between January 4, 2008 -- strike
9  that.
10  Have you at any time investigated the
11  actions or inactions of Leah Fang or instructed
12  anybody to do that investigation?
13 **A.  I don't remember.**
14 Q.  So as we sit here today, you still
15  don't have sufficient information or belief as to
16  what Leah did or did not do as trustee?
17     **MR. MEISTER:** As alleged in paragraph 5
18  of the complaint?
19     **MR. GRIVER:** In any way.
20     **MR. ZILBERFEIN:** Note my objection.
21     **BY THE WITNESS:**
22 **A.  I don't know where you are getting --**
23     **BY MR. GRIVER:**
24 Q.  Okay.  I will make it simple for you.
25  I will withdraw the question and make it simple.

Page 107

1    GENGER
2  **A.  Okay.**
3  Q.  As we sit here today, you don't know
4  what Leah Fang did or did not do as trustee of
5  the Orly trust, do you?
6  **A.  At the time I did, but now I don't**
7  **remember.  And that's the truth.**
8  Q.  Well, when you say at that time --
9  **A.  At the time, subsequently when I became**
10 **a trustee of Orly trust, I don't know when I was**
11 **aware that -- of her actions.  But today if you**
12 **ask me, I don't remember what it was.**
13 Q.  Well, so you have no recollection as
14  you sit here today what her actions were?
15 **A.  Yeah.**
16 Q.  Okay.  Have you ever heard of the
17  D&K -- have you ever heard of the D&K agreement,
18  what we have called the D&K agreement?
19     **MR. MEISTER:** Objection.  Form.
20     **BY THE WITNESS:**
21 **A.  D&K agreement?**
22     **MR. MEISTER:** I don't see how she can
23  answer --
24     **BY MR. GRIVER:**
25 Q.  Have you ever heard of a document

Page 108

1    GENGER
2  signed by Leah Fang as trustee dated November 22,
3  2007?
4  **A.  I don't remember.  I don't know.**
5      **MR. GRIVER:** I am going to mark as
6  Exhibit 9 the amended and restated limited
7  partnership agreement of D&K limited partnership,
8  signed by Leah Fang as sole trustee of the 1993
9  Orly Genger trust on the 22nd day of November
10  2007.  I note for the record that this is also
11  Exhibit 19 to the complaint.
12  (Dalia Exhibit 9, 1/4/2008 memo,
13  marked.)
14     **BY MR. GRIVER:**
15 Q.  Looking -- seeing this document, does
16  that refresh your recollection, have you ever
17  seen this document before?
18 **A.  Amended and restated --**
19 Q.  And my question is --
20 **A.  I have to read it because everything**
21 **looks the same to me.**
22     **MR. GRIVER:** Mark the time, please.
23  (Time noted: 12:45 p.m.)
24     **BY THE WITNESS:**
25 **A.  What is this word here?**

ORLY GENGER VS.
DALIA GENGER, et al

DALIA GENGER
December 13, 2012

---

Page 109

GENGER
BY MR. GRIVER:
Q. What page are you on?
A. 3.
Q. Upon the written election to terminate made by the general firm at any time.
    Ms. Genger, you have read the first two pages. Does this refresh your recollection as to whether you have ever seen this document? Ms. Genger?
    MR. MEISTER: First two pages?
    MR. GRIVER: Yes.
    BY MR. GRIVER:
Q. Based on reading the first two pages of this document, do you recall ever seeing this document before?
A. I can't say that it refreshes my memory.
Q. And so far you don't recall ever seeing this document before?
A. I do not recall. I might have seen it, but I don't recall if I did.
    MR. MEISTER: Do you want her to continue to read the rest of the 16-page document?

---

Page 110

GENGER
    MR. GRIVER: I do. As trustee of the trust, I think it is incumbent upon her to do so, provided she hasn't done so already.
    BY MR. GRIVER:
Q. Ms. Genger, what page are you on now?
A. 4. It takes me a long time.
Q. I understand. As we got to -- now having read four pages of what's been marked as Dalia 9, does this refresh your recollection as to whether you have ever seen this document?
A. As I answered you before, I might have seen it, but right now, I can't say for sure -- 
Q. Okay.
A. -- that I did. I imagine that I did.
Q. Did you ever -- 
    MR. MEISTER: Objection. Move to strike.
    BY MR. GRIVER:
Q. Did you ever speak -- 
    MR. MEISTER: Mr. Griver, when I am speaking you have to -- 
    MR. GRIVER: You move to strike.
    MR. MEISTER: You have to let me put my objection on the record.

---

Page 111

GENGER
    MR. GRIVER: Okay. Go ahead.
    MR. MEISTER: I've just done it. I hope you have it all.
    MR. GRIVER: You moved to strike? Okay.
    MR. MEISTER: If you don't talk, you can hear.
    BY MR. GRIVER:
Q. Ms. Genger, do you recall discussing with Leah Fang at any time the document that -- this document that Leah Fang signed on -- 
A. I don't remember. I don't remember.
    MR. MEISTER: You have to wait until he finishes the question.
    BY MR. GRIVER:
Q. You don't remember speaking with Leah Fang about this document before you exonerated her, correct?
A. At any time I don't remember.
Q. So I take it then that as we sit here today, you have no idea what consideration, if any, the Orly trust received in exchange for signing this document that's been marked as Dalia 9?

---

Page 112

GENGER
A. I am not aware if there was any consideration.
Q. So -- 
A. I mean, maybe -- 
Q. All right.
    MR. MEISTER: Just answer the question.
    MR. LEINBACH: I would like the record to reflect that Mr. Meister, counsel for Dalia Genger, has been touching her at many points during the deposition before she answers questions.
    MR. MEISTER: Actually -- 
    THE WITNESS: He didn't touch me. Excuse me.
    MR. MEISTER: Excuse me, Dalia. Let me answer.
    I didn't touch her. I put my hand out to indicate when she came to the end of the question, to stop speaking.
    MR. LEINBACH: Okay. Well, this is obviously a record which is not -- 
    THE WITNESS: You know what? I would like to see from there what's going on under the table. It is ridiculous. What are we doing

---

ORLY GENGER VS.                                                                      DALIA GENGER
DALIA GENGER, et al                                                                December 13, 2012

Page 113

1      GENGER
2   here?
3      MR. DELLAPORTAS: I just want to object
4   for the record.  New York practice is very clear
5   that only one attorney may speak for any one
6   party at a deposition.  That one attorney is
7   Mr. Griver.  I would object to Mr. Leinbach
8   saying word one on the record at this deposition,
9   and I would move to strike that which he just
10  said.  Thank you.
11     MR. MEISTER: While we are in a break,
12  I will notice that it is 4 minutes of 1:00, and I
13  did ask an hour or so ago of Mr. Griver when he
14  is planning on taking a lunch break, and
15  suggested that 1:00 would be a good time.
16     THE WITNESS: Yeah.  I didn't have
17  breakfast.
18     BY MR. GRIVER:
19  Q.  Okay.  I will just ask you this,
20  Ms. Genger.  Do you believe that -- strike that.
21     I will be happy to do a lunch break
22  after Ms. Genger finishes reviewing this document
23  so I may ask three or four questions about this
24  document.  But I would like her to --
25  A.  You know, it is very difficult for a

Page 114

1      GENGER
2   layperson to read legal documents, in general, I
3   believe that's the case.
4      So if you want me really to read it
5   thoroughly, it will take me a long time.  Are you
6   willing to wait?  Because it is a fact.
7   Q.  Ms. Genger, are you aware of the effect
8   of this document on the Orly Genger trust, as we
9   sit here today?
10  A.  No.
11     MR. MEISTER: So it's our lunch break
12  time?
13     BY MR. GRIVER:
14  Q.  So as we sit here today you have no
15  idea why this document was created?
16  A.  Today, I don't remember why it was.
17  Q.  So this document could have been
18  created for a good reason or for a bad reason,
19  you don't know?
20  A.  I don't know for what reason exactly it
21  was created.
22  Q.  So this document could have been
23  created because Leah Fang was conspiring with
24  Sagi Genger, and they created this document?
25  A.  Definitely that's not the case.

Page 115

1      GENGER
2   Q.  Why is it definitely not the case?
3   A.  Because I know the people that I deal
4   with.  And I know my son, and I know Leah, and
5   there is no way -- and you said belief.  There's
6   no way there was any collusion to harm Orly
7   trust.
8   Q.  Doesn't that depend on what Leah did or
9   did not do and why?
10  A.  No.  It depends on the people, okay.
11  And I know the people, and I know that they won't
12  do anything to harm Orly.
13     MR. MEISTER: Okay.  Ms. Genger, I'm
14  going to again instruct you on the record, please
15  wait until the end --
16     MR. GRIVER: So --
17     MR. MEISTER: Excuse me, Mr. Griver.
18     MR. GRIVER: I'm sorry.  Go ahead.
19     MR. MEISTER: Until the end of
20  Mr. Griver's question.
21     THE WITNESS: Are you allowed to touch
22  him, by the way?
23     MR. LEINBACH: I'm not touching him.
24     THE WITNESS: Yeah, you were touching.
25  I think we're not allowed to touch anybody.

Page 116

1      GENGER
2      BY MR. GRIVER:
3   Q.  Okay.  Now, Ms. Genger, look at
4   paragraph --
5      MR. GRIVER: You know what?  Let's take
6   a half hour for lunch.
7      THE WITNESS: Thank you.
8      MR. GRIVER: And we'll come back and
9   start with paragraph 75.  So if you would like
10  to --
11     THE WITNESS: I need more than a half
12  hour.  I didn't eat breakfast, also.
13     MR. GRIVER: Okay.  35 minutes.
14     (WHEREUPON, the deposition was
15  recessed from 12:59 p.m. until
16  2:06 p.m.)
17     (WHEREUPON, Attorney Lance Harris
18  exited the deposition
19  proceedings.)
20     * * * * *
21
22
23
24
25

ORLY GENGER VS.
DALIA GENGER, et al

DALIA GENGER
December 13, 2012

---

Page 117

1   GENGER
2   MR. GRIVER: Could you note the time
3   that we left and the time that we came back.
4       On the record. It is 2:06.
5   MR. ZILBERFEIN: I just want to put a
6   statement on the record before we get going.
7       What was the attorney's name that was
8   here? Do you have it?
9   THE COURT REPORTER: Lance Harris.
10  MR. ZILBERFEIN: What was the
11  attorney's name that was here? I want to put a
12  statement on the record before we begin.
13      I am going to note that at about 12:06,
14  after we came -- after a 12:06 break this
15  afternoon, Attorney Lance Harris appeared. His
16  appearance was not put on the record. It is my
17  understanding that Mr. Harris is not an attorney
18  of record for anyone in this litigation.
19  Moreover, it is my understanding after speaking
20  to Mr. Hoffman, that Lance Harris at some point
21  represented Leah Fang, my client, in this
22  proceeding or other proceedings.
23      Therefore, there's an inherent conflict
24  here that I wasn't aware of when Mr. Harris
25  entered the room. Therefore, I am going to

---

Page 118

1   GENGER
2   preserve my objection to each and every question
3   that was asked after the break when Mr. Harris
4   was present. And if he comes in again, I am
5   going to preserve my objections again to each and
6   every question that's asked if he reappears.
7       That's basically my position. And I am
8   going -- the objection that I preserved is in
9   connection with striking each and every question
10  and answer that has been asked and answered in
11  Mr. Harris' presence.
12  MR. GRIVER: All right. I will just
13  note for the record that I am not sure that you
14  can preserve an objection that you didn't
15  actually make, nor did anyone else make at
16  Mr. Harris' presence. Certainly he was not
17  invisible and anybody could have done so.
18      In addition, I think that your factual
19  statements on the record are absolutely -- are
20  incorrect, and, you know, I question where you
21  got them. But you are free to do whatever you
22  want and spend whatever amount of your client's
23  money that you wish to in making those motions.
24      If you can give me a CPLR provision or
25  any kind of ruling that would allow you to do

---

Page 119

1   GENGER
2   what you have threatened to do, I would
3   appreciate it.
4   MR. ZILBERFEIN: Can you give me a CPLR
5   provision that would permit Mr. Harris to be here
6   during this deposition?
7   MR. GRIVER: Sure.
8   MR. LEINBACH: There was no objection
9   to his presence, as de facto.
10  MR. DELLAPORTAS: His presentation
11  wasn't announced.
12  MR. ZILBERFEIN: Right. Especially
13  when it wasn't put on the record.
14  MR. LEINBACH: His presence was open
15  and notorious. He was sitting in the room.
16  MR. MEISTER: It may have been open and
17  notorious. I don't know who he was, and to this
18  moment I still don't.
19  MR. LEINBACH: The court reporter did.
20  MR. MEISTER: Is he associated with
21  your firm?
22  MR. ZILBERFEIN: No, the court reporter
23  didn't know who he was until during the lunch
24  attorney for the plaintiff told her who he was.
25  MR. GRIVER: Right, sure, because

---

Page 120

1   GENGER
2   someone asked the question. Now, if someone did
3   not know who Mr. Harris was, then they were
4   certainly able to ask --
5   MR. ZILBERFEIN: You know I didn't know
6   who he was. Why didn't you put a statement on
7   the record? Once again --
8   MR. GRIVER: Because he's always
9   been --
10  MR. ZILBERFEIN: -- you don't give
11  anyone the benefit of the doubt. You just go
12  ahead and you want to steamroll everybody, and I
13  think that's what you've been doing.
14  MR. GRIVER: I think we are done here.
15  MR. MEISTER: Just so we are clear, is
16  he associated with your firm?
17  MR. GRIVER: No, he is not associated
18  with my firm, he is associated with Orly Genger
19  because he is Orly's attorney.
20  MR. DELLAPORTAS: Who invited him to
21  attend this deposition and gave him notice?
22  MR. ZILBERFEIN: Yeah. Who invited him
23  to attend and gave him notice?
24  MR. DELLAPORTAS: I will just note for
25  the record that TPR did not invite him to attend,

---

ORLY GENGER VS.
DALIA GENGER, et al

DALIA GENGER
December 13, 2012

---

Page 121

GENGER

2 his presence was not announced, and had his
3 presence been announced, we would have
4 immediately objected to it because he has no
5 business being here.
6    MR. GRIVER: John, you are welcome to
7 put in an affidavit saying you didn't notice his
8 presence when he walked in.
9    MR. LEINBACH: I want to make a
10 statement for the record as well.
11    Mr. Dellaportas has been in court with
12 Mr. Harris before, and he knows very well exactly
13 who he is.
14    MR. DELLAPORTAS: That was two years
15 ago. I wasn't sure what he was doing here.
16    MR. ZILBERFEIN: And I knew -- you know
17 what, I am appearing here for Ms. Fang, right,
18 and you assumed I knew?
19    MR. LEINBACH: You can ask.
20    MR. GRIVER: I assume that if you have
21 a question, that's why God gave you a mouth.
22    Let's continue.
23    MR. DELLAPORTAS: We join in the
24 objection. We just note for the record that TPR
25 did not invite him to attend, and had he

---

Page 122

GENGER

2 announced his presence, we would have objected.
3    Please proceed.
4    BY MR. GRIVER:
5 Q. Before the break, Ms. Genger, we were
6 speaking about Leah Fang, the beginning of your
7 involvement as a trustee and your purported
8 releases to Ms. Fang.
9    Did you provide Orly Genger with copies
10 of your two supposed releases to Ms. Fang?
11    MR. DELLAPORTAS: Object to form.
12    MR. ZILBERFEIN: Same objection.
13    THE WITNESS: I should answer this?
14    MR. GRIVER: Yes.
15    BY THE WITNESS:
16 A. Okay. If it was required, I am sure my
17 lawyer did that. Otherwise, it wasn't sent to
18 Orly.
19    BY MR. GRIVER:
20 Q. I am asking you, did you --
21 A. I do not remember. I am saying, if it
22 was required of me to do so, I am sure my lawyer
23 did it, sent it. And if it wasn't required, it
24 was not done.
25 Q. As we sit here today, do you think it

---

Page 123

GENGER

2 is a good idea for a trustee to provide just the
3 minimum of information to the beneficiary, or all ·
4 the information that you think is important?
5    MR. MEISTER: Objection.
6    MR. ZILBERFEIN: Same objection.
7    THE WITNESS: I mean, if there is an
8 objection, I should answer?
9    BY MR. GRIVER:
10 Q. Even with an objection, you should
11 answer.
12 A. Okay. I think that all that relevant
13 information to her case should be -- she should
14 be informed.
15 Q. Okay. Do you think it is relevant that
16 you gave Leah Fang maximum releases and
17 indemnifications?
18    MR. MEISTER: Objection. Relevant to
19 what?
20    BY MR. GRIVER:
21 Q. Relevant to your job as a trustee?
22    MR. ZILBERFEIN: Note my objection to
23 "maximum" and the form of the question.
24    MR. MEISTER: Join in.
25    BY THE WITNESS:

---

Page 124

GENGER

2 A. My opinion is that Orly and her lawyer,
3 might be you or someone else, obviously knew
4 about the release because you are talking about
5 it. So, obviously, you knew about it. So in one
6 way or another, you did get this document.
7    BY MR. GRIVER:
8 Q. Do you think it would -- do you think
9 that these releases are relevant information that
10 you should have sent to Orly Genger?
11 A. I am not sure.
12 Q. Okay. As trustee of the trust, did you
13 ask counsel for the trust as to whether this is
14 information that should have been sent to Orly
15 Genger? And I am specifically referring to the
16 releases set forth as Exhibits 6 and 8 to your
17 deposition today.
18    MR. MEISTER: Objection.
19    BY THE WITNESS:
20 A. I don't remember.
21    MR. MEISTER: Attorney-client
22 privilege.
23    MR. GRIVER: Are you instructing the
24 witness not to answer about questions she asked
25 as a trustee to counsel for the trust?

---

ORLY GENGER VS.
DALIA GENGER, et al

**DALIA GENGER**
December 13, 2012

Page 125

1    GENGER
2    MR. MEISTER: Yes.
3    MR. GRIVER: Okay.
4    BY MR. GRIVER:
5    Q.  Ms. Genger, did you consult with
6    counsel for the trust as trustee of the trust
7    regarding these indemnifications?
8    MR. MEISTER: You may answer that yes
9    or no.
10   BY THE WITNESS:
11   A.  I don't remember.
12   BY MR. GRIVER:
13   Q.  Do you have any -- who was your
14   attorney at the time?
15   A.  What day was it?
16   Q.  About December 2007, January 2008?
17   A.  January '08, right.
18   Q.  Uh-huh.
19   A.  I guess it was --
20   THE WITNESS: It wasn't you?
21   BY THE WITNESS:
22   A.  I don't remember when we started with
23   Mr. Meister.
24   BY MR. GRIVER:
25   Q.  Was counsel for the trust Jonathan

Page 126

1    GENGER
2    Kortmansky?
3    A.  Oh, Kortmansky, right.
4    I really don't remember.
5    Q.  But he was --
6    A.  I guess it was, if you say so. I
7    really don't remember.
8    Q.  No, I am asking you as trustee of the
9    trust.
10   Was Jonathan Kortmansky an attorney for
11   the trust?
12   A.  I guess he was.
13   MR. MEISTER: She just answered she
14   doesn't remember.
15   THE WITNESS: Yeah.
16   MR. MEISTER: She is guessing.
17   BY THE WITNESS:
18   A.  You are asking me the same thing.
19   MR. GRIVER: Don't put your hand on the
20   witness. Do not tell the witness to stop
21   talking. It is her answer. If it is too long
22   for you, you have instructed her repeatedly to
23   just answer the question. If she chooses to give
24   a speaking answer, she may do so.
25   It is not your job to stop her, either

Page 127

1    GENGER
2    by telling her to be quiet or by holding your
3    hand upon her.
4    MR. MEISTER: But it is my job --
5    MR. GRIVER: It is time for you to stop
6    that.
7    MR. MEISTER: It is my job to get my
8    objection out on the record.
9    MR. GRIVER: No, it is not your -- you
10   can put that in, you can put that in after she
11   speaks.
12   MR. MEISTER: No, I cannot put it in
13   because --
14   MR. GRIVER: If you are too slow --
15   MR. MEISTER: -- I start to make my
16   objection, and I am entitled to finish.
17   MR. GRIVER: And she is entitled to
18   answer the question.
19   MR. MEISTER: Not over my objection.
20   MR. GRIVER: Okay.
21   BY MR. GRIVER:
22   Q.  Is Jonathan Kortmansky, is he the
23   attorney for the 1993 trust?
24   A.  He might have been. I really do not
25   remember when I stopped my relationship with

Page 128

1    GENGER
2    Kortmansky and when I hired Robert Meister.
3    Q.  But during your relationship with
4    Mr. Kortmansky, he was the attorney for the Orly
5    Genger trust, correct?
6    A.  I don't remember. I really do not
7    remember.
8    Q.  You don't remember? You don't
9    remember --
10   A.  I don't remember who was the lawyer at
11   that time -- my lawyer at the time.
12   Q.  Did the Orly Genger trust have a
13   lawyer?
14   A.  Yes, I am sure it did.
15   Q.  Was it Mr. Kortmansky?
16   MR. MEISTER: Objection. Asked and
17   answered.
18   BY THE WITNESS:
19   A.  You just asked me, and I told you. I
20   am not going to change my answer.
21   BY MR. GRIVER:
22   Q.  You don't remember?
23   A.  Exactly.
24   Q.  Okay.
25   A.  Really, I don't remember.

ORLY GENGER VS.
DALIA GENGER, et al

DALIA GENGER
December 13, 2012

Page 129

1    **GENGER**
2  Q. How is it in the best interest of the
3  Orly trust to not provide Orly Genger with the
4  information that you had released Leah Fang from
5  all liability?
6  A. How -- again, can you ask me.
7       MR. GRIVER: Can you read the question
8  back.
9       (WHEREUPON, the record was read by
10      the reporter as requested.)
11      **BY THE WITNESS:**
12  A.  **I think I said before that I wasn't**
13  **sure if she got the documents or not.  If I -- I**
14  **stated that if it was required, my lawyer did it,**
15  **and if it wasn't required, it was not sent.**
16      **BY MR. GRIVER:**
17  Q. Okay. Who is the trustee of the trust?
18  You or your lawyer?
19  A.  **I am the trustee.**
20  Q. Okay. So as trustee of the trust,
21  how --
22  A.  **I asked my lawyer.**
23  Q. How is it -- well, you don't remember
24  if you asked your lawyer, do you? You don't
25  remember?

Page 130

1       GENGER
2  A.  **I don't remember, right.  But it**
3  **doesn't mean that he didn't act upon it.**
4       MR. DELLAPORTAS: And I would like to
5  object. There was a representation from counsel
6  that this line of questioning related to cause of
7  action number 4. I have read cause of action
8  number 4. It makes no mention of this release
9  that we're talking about. This is not a claim in
10  this action. It may be a claim in the surrogate
11  court proceeding, but I really resent being
12  dragged here for discovery that has some
13  relevance to the surrogate court proceeding. I
14  will be seeking legal fees for this.
15      MR. GRIVER: You know what? We will be
16  speaking to the court about this because --
17      MR. ZILBERFEIN: Why don't we do that
18  sooner than later.
19      MR. GRIVER: Well, you know what?
20  Let's do that.
21      MR. DELLAPORTAS: I'd rather do that
22  than have you take false discovery for the rest
23  of the deposition. You are wasting our time,
24  Yoav.
25      MR. GRIVER: You know what? One day I

Page 131

1       GENGER
2  hope you actually read the complaint.
3       MR. DELLAPORTAS: I read the complaint.
4  Can you point me to paragraph --
5       MR. ZILBERFEIN: Can put us --
6       MR. GRIVER: Could you read the
7  question back, please.
8       MR. DELLAPORTAS: Point us to the
9  paragraph in the complaint where it is relevant
10  so we can address this.
11      MR. ZILBERFEIN: Why don't you get the
12  judge on the phone now.
13      MR. DELLAPORTAS: I will withdraw my
14  objection if --
15      MR. GRIVER: 48 and 49. And then you
16  might want to look at the motion for summary
17  judgment filed by Leah Fang.
18      Can you read the question and answer
19  back so I can get an answer from the witness,
20  please.
21      MR. DELLAPORTAS: It does not mention
22  the release anywhere in 48 or 49. Let's call the
23  court. Stop it. We are calling the court. We
24  are calling the court. Stop this.
25      MR. GRIVER: All right. Off the

Page 132

1       GENGER
2  record.
3       (WHEREUPON, discussion was had off
4       the record.)
5       MR. LEINBACH: As I stated before, we
6  wanted to call the court and ask for their
7  availability because we thought there were issues
8  that occurred during -- previous to the break.
9       I spoke with -- I believe it was the
10  judge's secretary. She checked the judge's
11  availability and I was told that the judge is
12  available anytime before 4:00 to have a
13  conversation.
14      I suggested 3:30. She said that was
15  fine. Apparently -- I had no idea if you would
16  like to do it now instead --
17      THE COURT REPORTER: Do you want to
18  stay on the record?
19      MR. LEINBACH: I think this should be
20  on the record.
21      MR. GRIVER: I don't think the witness
22  and Sagi should be in the room for this.
23      MR. S. GENGER: What?
24      MR. GRIVER: I don't think the witness
25  or Sagi should be in the room for this.

ORLY GENGER VS.
DALIA GENGER, et al

DALIA GENGER
December 13, 2012

---

Page 133

1   GENGER
2   MR. S. GENGER: I am a party.
3   MR. LEINBACH: Yes, you are a party,
4   but you are not a lawyer.
5   MR. S. GENGER: So?
6   MR. ZILBERFEIN: What CPLR section is
7   that?
8   MR. LEINBACH: You are supposed to be
9   deposed in this.
10  MR. ZILBERFEIN: What CPLR section is
11  that?
12  MR. LEINBACH: What New York practice
13  actually says is you're not supposed to obtain
14  information --
15  MR. ZILBERFEIN: What section --
16  MR. LEINBACH: New York practice.
17  MR. DELLAPORTAS: He is a party to the
18  action.
19  MR. S. GENGER: I am representing
20  myself personally then.
21  MR. GRIVER: You are not representing
22  yourself personally.
23  MR. DELLAPORTAS: You do not represent
24  yourself personally.
25  (WHEREUPON, at 2:24 p.m., a

---

Page 134

1   GENGER
2   telephone call was made to the
3   chambers of Judge Barbara Jaffe,
4   and the following proceedings were
5   had via telephonic communications,
6   to wit:)
7   MR. LEINBACH: Hello. This is Bryan
8   Leinbach. Once again, I called about probably
9   five minutes ago to ask for Justice Jaffe's
10  availability for a deposition.
11  FEMALE VOICE: Yes.
12  MR. LEINBACH: It appears the parties
13  all want to speak right now. So I wanted to see
14  if the justice could speak with us right now.
15  FEMALE VOICE: Wait. Hold on one
16  second.
17  MR. LEINBACH: Thank you.
18  (WHEREUPON, the following further
19  proceedings were had via
20  telephonic communications with
21  Judge B. Jaffe, to wit:)
22  THE COURT: Hello? Judge Jaffe on the
23  phone.
24  MR. LEINBACH: Good afternoon, your
25  Honor. This is Bryan Leinbach of Zeichner Ellman

---

Page 135

1   GENGER
2   & Krause. And also with me is Yoav Griver.
3   THE COURT: Right, right. And you
4   represent again?
5   MR. LEINBACH: We represent Orly
6   Genger.
7   I should state right off the bat, of
8   course I told your secretary that we were calling
9   because there were issues that had arisen during
10  the deposition of Dalia Genger. So there's a
11  court reporter --
12  THE COURT: Who is here for Dalia
13  again?
14  MR. MEISTER: Robert Meister and Marisa
15  Warren, your Honor.
16  THE COURT: Okay.
17  MR. LEINBACH: I just also wanted to
18  note, of course, because this is a deposition,
19  there's a court reporter here that's
20  transcribing.
21  THE COURT: There's a what?
22  MR. LEINBACH: There's a court reporter
23  that is present.
24  THE COURT: Yes, that I got.
25  MR. LEINBACH: I just wanted to inform

---

Page 136

1   GENGER
2   you.
3   MR. ZILBERFEIN: Do you want everyone's
4   appearance?
5   THE COURT: I just want to know who's
6   there and who's going to be talking to me.
7   MR. GRIVER: In addition to lawyers for
8   the plaintiff and for the deponent Dalia
9   Genger --
10  THE COURT: That's Mr. Griver, right?
11  MR. GRIVER: That's correct, your
12  Honor, yes. I'm Yoav Griver. We also have Sagi
13  Genger here. We have the attorney for TPR,
14  Jonathan Dellaportas. We have an attorney here
15  for Leah Fang, Paul Zilberfein.
16  MR. ZILBERFEIN: Correct, your Honor.
17  I am cocounsel to Leah Fang.
18  MR. GRIVER: And we also have an
19  attorney from Orly's other set of lawyers,
20  Wachtel and Masyr. It is Walter Stasiuk.
21  THE COURT: Okay.
22  MR. GRIVER: So that's is who is in the
23  room, along with the deponent, Dalia Genger.
24  THE COURT: Okay.
25  MR. GRIVER: There are a number of

---

ORLY GENGER VS.
DALIA GENGER, et al

DALIA GENGER
December 13, 2012

Page 137

1    GENGER
2    reasons that we're calling during the deposition.
3    There have been some attempts to instruct the
4    witness, contrary to practice.  In addition,
5    Mr. Dellaportas has made the assertion that the
6    line of questions that I am asking are irrelevant
7    to the litigation.
8        THE COURT: Wait a minute.  What?
9        MR. GRIVER: That the line of
10   questioning that I am questioning the deponent
11   about is irrelevant to this litigation.  I
12   believe that Mr. Dellaportas will use that as a
13   tactic to try and prevent a continuation of the
14   deposition of Dalia Genger, should it be
15   necessary.
16       In addition, if the court could
17   instruct the attorneys to limit themselves to
18   nonspeaking objections --
19       THE COURT: Yes.  Please do that.
20       MR. GRIVER: -- things will certainly
21   move faster.
22       THE COURT: I do want that to happen.
23   If you have an objection, place it on the record
24   with the word "objection," but move on.
25       MR. GRIVER: Thank you, your Honor.

Page 138

1    GENGER
2        In addition, there should be no
3    attempts to stop the witness from talking by
4    placing your hand upon the witness' shoulder or
5    upon the --
6        THE COURT: Nothing.  Nothing.  Don't
7    touch the witness at all.  Leave it alone.  Let's
8    just get through it.  Anything that is
9    inadmissible or irrelevant can be redacted later
10   on on motions or at trial or whatever.  But not
11   now.  Let it go.
12       MR. GRIVER: Thank you, your Honor.
13       MR. MEISTER: Your Honor, this is
14   Robert Meister for Dalia Genger.
15       THE COURT: Yes.
16       MR. MEISTER: I have made some
17   objections on the ground of attorney-client
18   privilege, and I have stated the grounds, and I
19   have also instructed the witness not to answer.
20   Of course --
21       THE COURT: Those should be an
22   exception, would they not?  I mean, when it is --
23       MR. MEISTER: Yes.
24       THE COURT: -- something that's
25   privileged or confidential, that is, of course,

Page 139

1    GENGER
2    acceptable.
3        MR. GRIVER: Your Honor, I think that
4    that will be subject to dispute, but I agree with
5    Mr. Meister that that can be a dispute that is
6    taken care of at a later date, and we will make
7    the record at this deposition.
8        THE COURT: Fine.  Anything else?
9        MR. DELLAPORTAS: Yes, your Honor.
10   John Dellaportas for TPR.
11       Our concern, and one of the reasons we
12   welcomed getting the court involved early, is we
13   have seen a practice in these Genger family
14   matters where witnesses are subjected to
15   questioning which relates to other matters for
16   which there has not been notice, but not for the
17   matter at hand.
18       And here we have had two hours of
19   questioning.  It is related to all matters of
20   issues involving how and why Ms. Genger was
21   appointed, who's paying her legal bills, why she
22   gave release to one party or another --
23       THE COURT: Mr. Dellaportas, as I
24   mentioned, you can place your objection on the
25   record.  Period.  At another time, at trial, you

Page 140

1    GENGER
2    can, you know, redact it, whatever.  I am not
3    interested in it now.
4        MR. DELLAPORTAS: Okay.  We understand,
5    your Honor.  The only concern was that the
6    questioning relates to a pending surrogate court
7    action which we are not a party to, not all the
8    parties are necessarily here.  Doesn't relate to
9    the action for which we are here, and we would
10   like to reserve the right to seek fees at the end
11   of this if we're brought here for questioning on
12   another matter for which there's never been
13   cross --
14       THE COURT: I am not even thinking
15   about it, quite frankly.
16       MR. GRIVER: Your Honor, this is Yoav
17   Griver, and I thank you for your time.
18       It's very simple.  The reason I was
19   asking these questions is because they are
20   germane to a summary judgment motion that is
21   currently before your Honor.  They are also
22   germane to paragraphs 48 and 49 and 140, at a
23   minimum, of the complaint.  Dalia Genger is a
24   trustee.  Me being able to ask her about actions
25   as trustee is germane to this action because --

ORLY GENGER VS.
DALIA GENGER, et al

DALIA GENGER
December 13, 2012

Page 141

1    GENGER
2       THE COURT: You will put that on the
3    record at some other time. I don't care about it
4    right now. And if it is germane to the summary
5    judgment motion, it is not because it is already
6    submitted, and I am not going to be considering
7    it.
8       MR. GRIVER: Your Honor, well --
9       THE COURT: If that's the one that's
10   been submitted already.
11      MR. ZILBERFEIN: That correct, your
12   Honor. That's the one that's already fully
13   submitted and before your Honor for decision.
14      MR. GRIVER: Your Honor, there's
15   always -- I understand your Honor's position. It
16   is just that the concern is raised because as
17   Sagi Genger did not show up for deposition either
18   on Tuesday or on Wednesday, and, therefore, I do
19   believe based on past practice that
20   Mr. Dellaportas will then try and object on
21   behalf of Ms. Genger, should this deposition
22   carry on past a single day.
23      Now, in these matters, every deposition
24   to date has passed on because while there are few
25   witnesses, they span actions over years and

Page 142

1    GENGER
2    multiple --
3       THE COURT: You know, if this is what
4    the family wants to do, that's what they will do.
5    They haven't been deterred from their litigation
6    for many, many years. That's up to them. They
7    want to stay and get deposed forever, God bless
8    them. If they were sensible, they would settle
9    this case. But they are not. They are not
10   sensible. So they are going to be fighting and
11   paying you guys money and you are getting rich.
12   Okay.
13      MR. GRIVER: Thank you, your Honor. I
14   think your instructions have been helpful.
15      THE COURT: Thank you.
16      MR. MEISTER: Let the record note that
17   the telephone conference is now concluded and the
18   phone is now disconnected.
19      (WHEREUPON, at 2:33 p.m., the
20      telephonic communications were
21      disconnected, and the deposition
22      proceedings resumed, to wit:)
23      THE WITNESS: So what are we -- what
24   does this mean? I don't understand.
25      MR. MEISTER: Just wait for a question.

Page 143

1    GENGER
2       MR. ZILBERFEIN: Can I just say
3    something on the record here? What time are we
4    going to be breaking for the day? Can we get
5    that down on the record?
6       MR. GRIVER: We started at 10:30 as an
7    accommodation, so I think we will end at --
8    instead of ending at 5:00, we will end at 5:30.
9       MR. ZILBERFEIN: Is that okay with
10   everyone?
11      MR. GRIVER: If we are at a point where
12   we have another 15 minutes or so if we continue
13   and get this deposition completed, then I am sure
14   everybody will have the indulgence. You have
15   been in depositions before. You know how it is.
16   But let's try to aim for 5:00, 5:30.
17      MR. ZILBERFEIN: Okay.
18      MR. GRIVER: Okay. Now, if you can
19   read back, please, my last question to the
20   witness so that you may answer it. And if you
21   can on the transcript put the question because it
22   has been a while.
23      (WHEREUPON, the record was read by
24      the reporter as requested, as
25      follows, page 129, line 23,

Page 144

1    GENGER
2    through page 130, line 3:
3       "QUESTION: How is it -- well, you
4       don't remember if you asked your
5       lawyer, do you? You don't
6       remember?
7       "ANSWER: I don't remember, right.
8       But it doesn't mean that he didn't
9       act upon it.)
10      MR. DELLAPORTAS: Same objection.
11      MR. ZILBERFEIN: Join.
12      MR. GRIVER: Okay.
13      BY MR. GRIVER:
14   Q.  As trustee of the Orly Genger trust,
15   how is it in Orly Genger's best interest for you
16   not to tell her about the releases that you
17   attempted to provide Leah Fang as previous --
18      MR. ZILBERFEIN: Objection.
19      BY THE WITNESS:
20   A.  I didn't say that I didn't provide the
21   releases. I said if it was required, she
22   probably got it because my lawyer sent it. And
23   if it wasn't required, she didn't get it.
24      BY MR. GRIVER:
25   Q.  But you are supposed to act in the best

ORLY GENGER VS.
DALIA GENGER, et al

DALIA GENGER
December 13, 2012

Page 145

```
1     GENGER
2  interest of the trust, correct?
3        MR. MEISTER: Objection. Asked and
4  answered.
5        MR. ZILBERFEIN: Objection. You keep
6  asking the same question.
7        BY THE WITNESS:
8  A. So what's the question?
9        BY MR. GRIVER:
10 Q. You, as trustee, you have the duty --
11 A. My answer is whatever is required of me
12    to do and act, I do it. Whatever is not
13    required, I don't do it.
14 Q. And in determining what is or is not
15    required, you, as trustee of the trust, go to the
16    trust attorneys, correct?
17 A. Yes.
18 Q. And if they tell you to do something,
19    you do it?
20 A. Probably.
21 Q. And if they tell you not to do
22    something, you don't do it?
23 A. Probably.
24 Q. So you rely -- yes or no. Not
25    probably.
```

Page 146

```
1     GENGER
2  If the attorneys for the trust --
3        MR. DELLAPORTAS: Objection.
4        BY MR. GRIVER:
5  Q. -- tell you to do something, do you do
6  it?
7        MR. MEISTER: Objection. Hypothetical.
8        MR. ZILBERFEIN: Objection.
9        BY THE WITNESS:
10 A. It is hypothetical.
11        BY MR. GRIVER:
12 Q. As a general matter, do you follow your
13    attorney's advice?
14        MR. MEISTER: Objection.
15        MR. ZILBERFEIN: Did she? At what
16    period of time?
17        MR. MEISTER: What advice are you
18    talking about?
19        BY MR. GRIVER:
20 Q. As trustee of the trust --
21 A. In general, I --
22        MR. ZILBERFEIN: Objection.
23        BY THE WITNESS:
24 A. -- I follow the -- I follow whatever my
25    lawyer tells me to do.
```

Page 147

```
1     GENGER
2        BY MR. GRIVER:
3  Q. Okay. And as we sit here today do you
4    remember whether you discussed sending --
5  A. We said that already.
6  Q. Did you discuss sending or not
7    sending --
8  A. I said I didn't remember.
9  Q. Okay.
10        MR. MEISTER: Several times.
11        BY MR. GRIVER:
12 Q. Let me finish the question.
13 A. I'm sorry.
14 Q. Did you discuss with your -- the
15    attorneys for the trust sending or not sending
16    the releases that you attempted to provide Leah
17    Fang?
18        MR. MEISTER: Objection. Asked and
19    answered several times.
20        THE WITNESS: Yeah.
21        MR. ZILBERFEIN: Objection.
22        BY THE WITNESS:
23 A. I don't remember. I told you.
24        BY MR. GRIVER:
25 Q. At some point you and your former
```

Page 148

```
1     GENGER
2  husband, Aric Genger, got divorced, correct?
3  A. At some point, yes.
4  Q. And there was an estate plan for the
5    benefit of your two children, Sagi and --
6  A. That's right.
7  Q. -- Orly, correct?
8  A. Right. Correct.
9  Q. And the intent was that Orly and Sagi
10    were to share equally; is that also correct?
11 A. Yes.
12 Q. When you began as trustee of the Orly
13    Genger trust, the trust had shares in the D&K LP
14    company?
15        MR. MEISTER: Objection.
16        BY THE WITNESS:
17 A. Right.
18        BY MR. GRIVER:
19 Q. Correct?
20        MR. MEISTER: Didn't have shares in the
21    LP.
22        BY MR. GRIVER:
23 Q. Had an interest --
24 A. D&K LP had shares.
25 Q. D&K LP had shares in --
```

ORLY GENGER VS.
DALIA GENGER, et al

DALIA GENGER
December 13, 2012

Page 149

1    GENGER
2  A.  Of TPR.
3  Q.  And the Orly trust had an interest in
4    D&K?
5  A.  Yes.
6      MR. GRIVER: Can we have this marked as
7    10. For the record, Dalia 10 is the promissory
8    note and pledge agreement from 1993.
9      (Dalia Exhibit 10, 1993 promissory
10     note and pledge agreement,
11     marked.)
12     BY MR. GRIVER:
13 Q.  Is that your signature on the second
14   page of Exhibit 10?
15 A.  The second page?
16     MR. MEISTER: Third page.
17     BY THE WITNESS:
18 A.  Here. In the promissory note, yes. As
19   a general partner. Yeah.
20     BY MR. GRIVER:
21 Q.  As a general partner of D&K LP,
22   correct?
23 A.  Right.
24 Q.  That's what you were in 1993?
25 A.  Yeah. Right.

Page 150

1    GENGER
2  Q.  And do you recognize this promissory
3    note and pledge agreement?
4  A.  Yeah.
5  Q.  Okay. Can you tell me what was the
6    purpose of this promissory note?
7  A.  That it was really based on the notion
8    that -- it was to establish, really, a -- I can't
9    talk any more.
10     In order for the children to have
11   ownership, some ownership in TPR. And that's why
12   the note was -- I mean, they got 240 shares, that
13   they worked for the million 2 that they received
14   from Arie and me, and a promissory note, and the
15   D&K note of whatever it is. So in a way, we were
16   transferring ownership of TPR to the children.
17   It is estate planning.
18 Q.  And the estate plan was both children
19   should share in TPR equally?
20 A.  Right.
21     MR. MEISTER: Objection. Asked and
22   answered.
23     BY MR. GRIVER:
24 Q.  Now, this note came up in your divorce
25   proceedings, did it not?

Page 151

1    GENGER
2  A.  It might. I don't remember. It might
3    have.
4  Q.  Do you recall the fact that you took
5    the position that the D&K note should be valued
6    at zero dollars as part of your divorce
7    proceedings?
8  A.  Can you repeat the question.
9  Q.  In the marital arbitration before
10   Justice Milonis --
11 A.  Right.
12 Q.  -- do you recall taking the position
13   that the D&K note should be valued at zero?
14 A.  I don't remember such a statement.
15     MR. GRIVER: Let me have marked as
16   Exhibit 11 the final arbitration award from the
17   proceeding before Justice Milonis.
18     (Dalia Exhibit 11, final
19     arbitration award, marked.)
20     BY MR. GRIVER:
21 Q.  And if I could direct your attention to
22   page 15 where it discusses the D&K note.
23 A.  Okay. I am on 15.
24 Q.  Okay.
25 A.  Any particular part that you want me to

Page 152

1    GENGER
2  pay attention to?
3  Q.  Yes. It is the three paragraphs under
4    D&K note.
5  A.  I don't see here where I'm stating that
6    the note really is zero.
7  Q.  Okay. We will talk about it.
8      First of all, did you attend the
9    arbitration, the marital arbitration?
10 A.  Yes.
11 Q.  Were you there for the testimony of
12   Sagi in the arbitration?
13 A.  Yes.
14 Q.  Were you there for the testimony of
15   David Parnes?
16 A.  Yes.
17 Q.  As you sit here today, do you recall
18   anything that they said that you disagreed with?
19     MR. MEISTER: Objection. It is
20   improper form.
21     MR. DELLAPORTAS: Object to form.
22     MR. ZILBERFEIN: Join.
23     BY THE WITNESS:
24 A.  I should answer? I don't remember.
25   Because there were so many things there, I am

ORLY GENGER VS.
DALIA GENGER, et al

DALIA GENGER
December 13, 2012

Page 153

GENGER

1    **GENGER**
2  sure there was some things that I agreed or
3  disagreed with. I mean, it is natural.
4    **BY MR. GRIVER:**
5  Q.  Okay. Do you recall that Arie was
6  claiming that he should be awarded one-half of
7  the value of the D&K note?
8  **A.  It says here, Arie claims he should be**
9  **awarded one-half of the value of D&K note.**
10  Q.  And that the arbitrator disagreed with
11  him and found for you on that issue; do you see
12  that?
13  **A.  What? Again?**
14  Q.  The arbitrator found for you on the
15  issue where you disagreed with Arie?
16  **A.  I disagree, yeah.**
17  Q.  And it says here, quote, the D&K note
18  was a part of the estate planning scheme to
19  transfer wealth to the children, period, end
20  quote?
21  **A.  That's true.**
22  Q.  And it also goes on to say:  The
23  parties never intended for this note to be
24  collected, and to do so would retransfer wealth
25  back to the parents and defeat the estate

Page 154

GENGER

1    **GENGER**
2  planning; do you see that?
3  **A.  Yes. In '93 it was the intention.**
4  **Obviously, the circumstances changed since '93.**
5  Q.  And when exactly did circumstances
6  change?
7  **A.  When I got divorced.**
8  Q.  Well, this was something that you were
9  talking about in 2008, correct, this is the --
10  **A.  After the divorce, obviously, because**
11  **in actuality, the parents were paying the debt,**
12  **the note, okay.**
13  Q.  Okay.
14  **A.  It is obvious because neither Sagi or**
15  **Orly didn't have any resources to pay the note.**
16  **So this was a way that we thought that we can**
17  **transfer assets to the children. But once I**
18  **got -- I divorced my husband -- I mean, the**
19  **circumstances changed because neither I -- I**
20  **didn't have also the resources to pay the note,**
21  **and the note was -- the D&K note was paid**
22  **previously by us, but it should have been paid by**
23  **the kids. Isn't it?**
24  Q.  Well, let me ask you this:  When did
25  you get divorced from Arie?

Page 155

GENGER

1    GENGER
2  **A.  2004.**
3  Q.  2004.
4  Now, at the time that you entered into
5  the note, you and your husband, Sagi, and Orly,
6  never intended for the note to be collected,
7  correct, it was just there as a mechanism to make
8  an equal distribution between Sagi and Orly?
9    MR. MEISTER: Objection to the form of
10  the question.
11    **BY THE WITNESS:**
12  **A.  It is not true. That is not true.**
13    **BY MR. GRIVER:**
14  Q.  What is not true about my statement?
15  **A.  The note should not have been -- never**
16  **collected.**
17  Q.  It says here the parties never intended
18  for this note to be collected?
19  **A.  Yeah. In '93.**
20  Q.  Well, this was a position you were
21  taking in 2008, correct?
22    MR. MEISTER: Objection.
23    MR. DELLAPORTAS: Object to form.
24    MR. MEISTER: You are reading what
25  someone else said, not what she said.

Page 156

GENGER

1    GENGER
2    **BY MR. GRIVER:**
3  Q.  Was that the position you took in the
4  marital arbitration?
5    MR. DELLAPORTAS: Object to form.
6    MR. ZILBERFEIN: Objection.
7    **BY MR. GRIVER:**
8  Q.  Can you answer my question, please?
9  **A.  Can you ask me again. What is your**
10  **question?**
11  Q.  In the marital arbitration, did you not
12  take the position that the note was never to be
13  collected?
14    MR. MEISTER: Object to the form of the
15  question, and also the grammar. At least a
16  double negative.
17    MR. GRIVER: Could you read back the
18  question.
19    THE WITNESS: Again, yeah.
20    (WHEREUPON, the record was read by
21  the reporter as requested.)
22    MR. MEISTER: My objection stands.
23    **BY THE WITNESS:**
24  **A.  I want to explain. If I did say so,**
25  **that note was --**

ORLY GENGER VS.
DALIA GENGER, et al

DALIA GENGER
December 13, 2012

---

Page 157

1    **GENGER**
2    **BY MR. GRIVER:**
3  Q.  First answer my question and then I
4  will let you make any statement that you want.
5       MR. GRIVER: Can you read back the
6  question, because it is a yes or no question.
7       **BY THE WITNESS:**
8  A.  **So where did I say it is not going to**
9  **be collected?**
10      **BY MR. GRIVER:**
11 Q.  I am just asking, in the marital
12 arbitration, did you not take the position that
13 the note was not to be collected?
14      MR. MEISTER: Same objection to form
15 and to grammar.
16      **BY THE WITNESS:**
17 A.  **I didn't say -- I didn't state this**
18 **particular position.**
19      **BY MR. GRIVER:**
20 Q.  What position did you take?
21 A.  **Position that I took, that the D&K note**
22 **is the problem that we have to deal with since**
23 **the kids do not have any resources to pay the**
24 **note. And we should be creative in getting rid**
25 **of the note. We tried to do so by selling the**

---

Page 158

1    **GENGER**
2    **note to someone that we trust.**
3  Q.  And the problem with the note was that
4  you didn't want anyone to collect on the note,
5  correct?
6  A.  **The problem was that the kids could not**
7  **afford to pay the note.**
8  Q.  And so getting rid of -- giving the
9  note to somebody else --
10 A.  **Selling the note. Selling the note.**
11 Q.  In an attempt to make sure that no one
12 would try to collect the note?
13 A.  **Yes. So we sold it to a friend that**
14 **promised it is not going to collect, foreclose**
15 **the note.**
16 Q.  Because no one in the Genger family
17 intended for the note to be collected?
18      MR. MEISTER: Objection. Compound
19 question. Also requires the operation of other
20 people's minds.
21      MR. DELLAPORTAS: Objection. Calls for
22 speculation.
23      MR. ZILBERFEIN: Objection.
24 Repeat the question.
25      (WHEREUPON, the record was read by

---

Page 159

1    **GENGER**
2    the reporter as requested.)
3       **BY THE WITNESS:**
4  A.  **At that time when we were divorcing,**
5  **the kids did not have any means to pay the note.**
6  **And since both parents I think wanted to**
7  **accommodate the children, the way that I saw it**
8  **is to somehow get rid of the note, legally,**
9  **because the note is a note and it has to be paid.**
10      **BY MR. GRIVER:**
11 Q.  And you didn't want it to be paid?
12 A.  **What I wanted or don't want really**
13 **doesn't matter. I mean, legally, it has to be**
14 **paid.**
15 Q.  You gave it to David Parnes --
16 A.  **Right.**
17 Q.  -- so that it would not be collected
18 upon?
19 A.  **Yeah. I am telling you that. Because**
20 **he promised he is not going to collect on the**
21 **note. But Orly sued him. Orly sued David**
22 **because he was willing to accommodate us.**
23 Q.  But the reason you gave it to
24 Mr. Parnes is so the note would not be collected?
25      MR. MEISTER: Objection. Asked and

---

Page 160

1    **GENGER**
2    answered several times.
3       **BY THE WITNESS:**
4  A.  **Yeah, I said we tried to make the life**
5  **of the kids easier so the note will disappear.**
6       **BY MR. GRIVER:**
7  Q.  And you are saying that at some
8  point --
9  A.  **But Orly objected to it, so we got back**
10 **the note. We got back the note that they had to**
11 **pay.**
12 Q.  Did you know that David Parnes had
13 given back the note?
14 A.  **Yes, because he was sued. So he gave**
15 **back the note.**
16 Q.  Did you know at the time that he gave
17 the note back that he had given the note back?
18 A.  **When he did it, yes. I know that he**
19 **gave it back.**
20 Q.  How did you know that?
21 A.  **Because he was sued, and as a result he**
22 **says, "I don't want to do you any favors, go and**
23 **take back the note."**
24 Q.  Did he say that to you?
25 A.  **No. He didn't say it to me.**

---

Page 161

```
 1     GENGER
 2  Q. Did he say -- he said it to Sagi,
 3  didn't he?
 4  A.  He might have said it to Sagi.  I know
 5  that's the way that he reacted.  And I think it
 6  is very normal, that somebody does a favor and
 7  gets sued, so.
 8  Q.  Did he react that way to you, or did he
 9  react that way to somebody else?
10  A.  To somebody else that informed me about
11  the way he acted.
12  Q.  And that person who informed you about
13  the way David Parnes acted was Sagi Genger?
14  A.  Absolutely.
15  Q.  Did you tell Orly that David Parnes had
16  reacted to a suit and had given the note back?
17  A.  I did not tell her.
18  Q.  As trustee you did not think that was
19  something you needed to do?
20     MR. MEISTER: Objection.  She wasn't
21  trustee then.  This was 2006.
22     BY THE WITNESS:
23  A.  Yeah.  I became trustee in 2008.
24     BY MR. GRIVER:
25  Q.  You believe that Mr. Parnes rescinded
```

Page 162

```
 1     GENGER
 2  the assignment in 2006; is that correct?
 3  A.  That he gave back the D&K note?  At
 4  some point, I don't know exactly when, but --
 5  Q.  You thought --
 6  A.  Whenever he was sued by Orly, then he
 7  said, "Take back the note.  I don't want to get
 8  involved in this."
 9  Q.  And was that -- when was this?
10  A.  I don't remember when Orly sued him.  I
11  mean, I'm not keeping track of all the suits.
12     MR. GRIVER: Well, let me have this
13  marked as Exhibit 12.
14     (Dalia Exhibit 12, letter,
15     marked.)
16     MR. GRIVER: And while Mr. Leinbach is
17  handing out Exhibit 12, I will remind Mr. Meister
18  that the court has just instructed everyone to
19  not testify or instruct the witness as to dates,
20  places, times, or anything else.  And so,
21  therefore, your testimony is not appreciated and
22  is also wrong.
23     MR. MEISTER: I didn't testify.
24     MR. GRIVER: Yes, you did.
25     MR. MEISTER: I made an objection.
```

Page 163

```
 1     GENGER
 2     MR. GRIVER: You said it is 2006.
 3  That's a speaking objection.
 4     MR. DELLAPORTAS: Trickery doesn't
 5  really get us anywhere, Yoav.  Just try to ask
 6  questions.
 7     BY MR. GRIVER:
 8  Q.  Okay.  Looking at Dalia 12, does this
 9  refresh your recollection that David Parnes
10  returned the note on November 25 of 2008?
11  A.  As was stated, I did not actually --
12  wait a second.  This letter was addressed to Sagi
13  Genger.
14  Q.  Uh-huh.
15  A.  Okay.
16  Q.  Right.
17  A.  And I remember that Sagi talked about
18  it.
19  Q.  What did he tell you?
20  A.  Because it was outrageous.
21  Q.  And what did he tell you?
22  A.  That David, who had the best
23  intentions, to help us, to get rid of the note,
24  got sued by Orly.  What her motivation is, I do
25  not know, but she wanted, I guess, to owe money.
```

Page 164

```
 1     GENGER
 2  Q.  And she wanted the note to be collected
 3  upon?
 4  A.  Yeah.  She wanted to carry a debt of
 5  about $5 million.  I mean, it doesn't make sense,
 6  but that's the way she reacted.
 7  Q.  And you thought that that was against
 8  the intent of the parties --
 9  A.  I thought it doesn't make sense that
10  somebody will say, "You know what, I'm really
11  dying to pay -- to owe $5 million."
12  Q.  As trustee of the Orly Genger trust,
13  did you speak to Orly about Mr. Parnes' recision
14  of the assignment?
15  A.  No.  No way.
16  Q.  Did you have your attorneys speak to
17  Orly Genger's attorneys about the recision of the
18  assignment?
19  A.  This I don't remember.
20  Q.  Okay.  Did you ever go to your
21  attorneys as trustee of the trust and ask them as
22  attorneys for trustee -- as attorneys for the
23  trust, what should you do in this situation?
24  A.  I don't remember.
25  Q.  Okay.  But you never told Orly about
```

ORLY GENGER VS.
DALIA GENGER, et al

DALIA GENGER
December 13, 2012

Page 165

1    GENGER
2  this recision of assignment, correct?
3      MR. MEISTER: Objection.  Asked and
4  answered.
5    BY THE WITNESS:
6  A.  We were not on speaking terms.
7    BY MR. GRIVER:
8  Q.  Well, you could have written her a
9  letter?
10 A.  I know.
11     MR. MEISTER: Objection.  That's not a
12 question.
13    BY MR. GRIVER:
14 Q.  But you chose not to write her a
15 letter?
16     MR. MEISTER: Objection.  That's not a
17 question.  If you are talking about --
18    BY MR. GRIVER:
19 Q.  Isn't that correct?
20 A.  I did not notify Orly in any way
21 because her lawyers were aware already that this
22 happened.
23 Q.  Her lawyer were aware?  How do you know
24 that her lawyers were aware already?
25 A.  Because later on there is a

Page 166

1    GENGER
2  continuation to this story.  That's why I know.
3  Because she sued David.  So, obviously, she knew
4  what's happening.
5  Q.  Other than her suing David, you have no
6  other reason to think that --
7  A.  I didn't have control of what she's
8  doing by her own initiative.
9  Q.  But as trustee of the trust you could
10 have provided her with the information that David
11 was rescinding --
12 A.  I could do many things.
13 Q.  But you chose not to, correct?
14 A.  This particular case, I knew that she
15 knows already.
16 Q.  Okay.  And who was your lawyer in May
17 of 2008?
18 A.  2008?
19 Q.  Uh-huh.
20 A.  I think it was Mr. Meister, wasn't it?
21 No?  No.  So I am wrong then.
22 Q.  So you don't recall --
23 A.  I don't remember when, really, I
24 started to work with Mr. Meister.
25 Q.  Okay.  It was never the intent of the

Page 167

1    GENGER
2  parties for TPR to ever collect on the D&K note;
3  isn't that correct?
4      MR. DELLAPORTAS: Objection.  Calls for
5  speculation.
6      MR. ZILBERFEIN: Join.
7    BY THE WITNESS:
8  A.  Now, can you repeat the question.
9      BY MR. GRIVER:
10 Q.  Sure.
11    It was never the intent of any of the
12 parties to --
13 A.  Any of the parties, meaning?
14 Q.  To the D&K note?
15 A.  Who is any of the parties?
16 Q.  Well, let's -- okay.
17    When you signed the promissory note --
18 A.  Right.
19 Q.  -- to TPR on December 21 of 1993, it
20 was never your intent that TPR collect on the
21 note, correct?
22     MR. DELLAPORTAS: Object to form.
23     MR. ZILBERFEIN: Objection.
24     BY THE WITNESS:
25 A.  Okay.

Page 168

1    GENGER
2    BY MR. GRIVER:
3  Q.  Just a simple yes or no.
4  A.  It should have been collected, but we
5  didn't imagine that the kids are going to pay the
6  note, I mean.
7  Q.  You were general partner of D&K GP
8  until October of 2004; is that correct?
9  A.  Yes.
10 Q.  And you divorced your husband in, I
11 think you said, 2005?
12 A.  4.
13 Q.  2004?
14 A.  Yes.
15 Q.  Now, if I can show you this, which I
16 will mark as Dalia 13.
17    (Dalia Exhibit 13, document,
18    marked.)
19    BY MR. GRIVER:
20 Q.  Part of this notice of default --
21 A.  Wait a second.  What's the date here?
22 Q.  August 31 of 2008.
23 A.  All right.
24 Q.  Part of the notice of default notes
25 that D&K GP had failed to make regular payments

Page 169

1    GENGER
2  since 2000.
3     Now, from --
4     MR. MEISTER: Is that a predicate, or
5  are you reading the note -- reading this?
6     BY MR. GRIVER:
7  Q.  Do you see that?
8  A.  Yeah.  It is -- you know, this is
9  really complicated so let's take it slowly, okay.
10  Q.  Page 1, line 3.
11  A.  Right.
12  Q.  I will just ask you this:  Isn't it
13  true that D&K GP failed to make regular payments
14  on the notes since 2000?
15  A.  Right.
16  Q.  Okay.  Now, at that time, you were the
17  general partner of D&K GP?
18  A.  Right.
19  Q.  You had the money to make those
20  payments?
21  A.  No, I didn't.
22  Q.  You didn't?
23  A.  No, I didn't.  I mean, the GP was
24  looked upon as a marital debt, okay, and I paid
25  half of it, and my husband paid half of it, okay.

Page 170

1    GENGER
2  And that was the story.  And the fact that my
3  husband stopped paying -- because I was never in
4  charge of the finances in our household.  So he
5  was the one that decided if he is going to pay or
6  not to pay.
7  Q.  Okay.
8  A.  I had nothing to do with that.
9  Q.  At the -- in front of the court --
10  strike that.
11     During the marital -- strike that
12  again.
13     Why did you not want the note to be
14  returned to TPR?
15     MR. MEISTER: Objection.  Assumes a
16  fact not in evidence.
17     BY THE WITNESS:
18  A.  Why did I not want the note to be a
19  burden for my children?
20     BY MR. GRIVER:
21  Q.  No.  To be returned to TPR?
22     MR. MEISTER: Same objection.
23     BY THE WITNESS:
24  A.  Because the note is a -- the note had
25  to be paid, okay, and, obviously, I did not want

Page 171

1    GENGER
2  the children to pay the note.
3     BY MR. GRIVER:
4  Q.  And because returning the note to TPR
5  would result in the destruction of the Genger
6  family planning, that Orly and Sagi would share
7  equally in TPR, correct?
8  A.  Yeah, unfortunately, we had a divorce,
9  and things change.  But originally we were hoping
10  that the children will own part of the company,
11  and we will be able to finance the note, pay the
12  note.  But it didn't happen.
13  Q.  Now, when the --
14     MR. GRIVER: Could I have that answer
15  read back, please.
16     (WHEREUPON, the record was read by
17     the reporter as requested.)
18     BY MR. GRIVER:
19  Q.  Now, your intention was that David
20  Parnes would keep the note forever, correct?
21  A.  Yeah.
22  Q.  Past the time of your divorce?
23  A.  Yes.  He will keep it.  And later on, I
24  mean, we might have found some other solution,
25  legal solution, so that no one is going to get --

Page 172

1    GENGER
2  no one will be in a position to collect on the
3  note.
4  Q.  You, yourself, did not want the note to
5  be collected?
6  A.  I did not want the children to pay the
7  note, for the children will pay the note.
8  Q.  You did not want --
9  A.  Because I did not -- I personally did
10  not want the children to owe money to anyone.
11  Q.  You did not want the note to be
12  collected, correct, not by David Parnes, not by
13  anyone?
14  A.  I didn't want, but that's my want.
15     MR. MEISTER: Objection.
16     BY THE WITNESS:
17  A.  But, legally, obviously, it has to be
18  paid.
19     BY MR. GRIVER:
20  Q.  Well, you are not an attorney, correct?
21  A.  What?
22  Q.  You are not an attorney?
23  A.  It is true, but I do have some
24  knowledge about notes.
25  Q.  Okay.  Now, David Parnes returned the

ORLY GENGER VS.
DALIA GENGER, et al

DALIA GENGER
December 13, 2012

Page 173

1    GENGER
2    note in 2008, correct?
3       MR. MEISTER: I'm sorry. Can you say
4    the end again.
5       BY MR. GRIVER:
6    Q. David Parnes returned the note in 2008,
7    correct?
8    A. I guess that's when he did. Yeah.
9       MR. GRIVER: Okay. Let me have this
10   marked as Dalia 14. For the record, Exhibit 14
11   is an affidavit of Dalia Genger.
12      (Dalia Exhibit 14, Dalia Genger
13      affidavit, marked.)
14      BY MR. GRIVER:
15   Q. Ms. Genger, is that your signature on
16   page 4?
17   A. Yes.
18   Q. This is an affidavit that you submitted
19   in the surrogate court on March 11, 2008?
20   A. Yes.
21   Q. And this is after your divorce,
22   correct?
23   A. (Indicating).
24   Q. And this is after the marital
25   arbitration with Justice Milonis?

Page 174

1    GENGER
2    A. I think so, yeah.
3    Q. Okay. Now, if you could look, please,
4    you can read as much as you want, but I am going
5    to ask you about paragraphs 8 and 9.
6    A. Ask me specifically about what
7    paragraphs?
8    Q. Paragraphs 8 and 9.
9    A. 8 and 9?
10   Q. Uh-huh.
11   A. 8 is what we discussed before, right?
12   Yeah. I didn't get anything. 8. And then 9,
13   too?
14   Q. I want you to read as much of this
15   affidavit as you want because, among other
16   things, I want to know whether you still agree
17   with it.
18   A. So far what I am reading is true.
19   Q. And you have read --
20   A. Because it is a disaster to get back
21   the note if you couldn't get rid of it. I mean,
22   I just don't understand the logic of Orly's
23   actions. In general, I mean, I always put my
24   children --
25      MR. MEISTER: Is there a question

Page 175

1    GENGER
2    pending?
3       THE WITNESS: No, there's no question.
4    Okay.
5       BY MR. GRIVER:
6    Q. Ms. Genger, in general --
7    A. In general --
8       MR. MEISTER: No, no. I insist there
9    be a question. I object.
10      BY MR. GRIVER:
11   Q. Please continue.
12   A. Okay. I will continue.
13      In general, I always put my children's
14   interests before my interest, my personal
15   interest, and that's the way I behave, and I --
16   that's my philosophy, and that's why I didn't
17   want the kids to bear the consequences of paying
18   $9 million.
19   Q. And you wanted the children to share
20   equally?
21   A. I wanted -- the original purpose was
22   the children will share equally the assets that
23   they were given.
24   Q. Thank you.
25      In paragraph 8, the last sentence: I

Page 176

1    GENGER
2    do not stand to gain anything personally by the
3    agreement, other than protecting the estate plan
4    implemented for the benefit of my children,
5    unquote. Do you see that language?
6    A. Yes. I do not stand to gain. Yeah.
7    Q. On March 11, 2008, when you signed this
8    affidavit under oath --
9    A. Again --
10   Q. -- was the estate plan still in effect?
11   A. Can you say this again.
12   Q. Sure.
13      On March 11, 2008 when you signed this
14   affidavit --
15   A. This affidavit, yeah.
16   Q. -- was the estate plan still in effect?
17      MR. DELLAPORTAS: Objection.
18      MR. ZILBERFEIN: Objection.
19      BY MR. GRIVER:
20   Q. That you had set up?
21      MR. DELLAPORTAS: Object to form.
22      MR. MEISTER: Object to the form of the
23   question.
24      BY THE WITNESS:
25   A. Well, the way I see it is that the

ORLY GENGER VS.
DALIA GENGER, et al

DALIA GENGER
December 13, 2012

Page 177

GENGER

1   **GENGER**
2   **estate planning was done -- was signed in '93,**
3   **not foreseeing what the future is going to be,**
4   **namely that I will divorce my husband and there**
5   **will be no one to pay the note, okay.**
6      **BY MR. GRIVER:**
7   Q.  In 2008 when you signed this affidavit,
8   you were trying to prevent Orly from putting in a
9   new trustee because you thought that doing so
10  would destroy the estate plan, correct?
11  A.  I prevented what?
12  Q.  You say -- just look at paragraph 8.
13  A.  8?
14  Q.  Paragraph 8.
15  A.  Yes.
16  Q.  Was the estate plan implemented for the
17  benefit of your children still in effect in March
18  of 2008?
19      MR. MEISTER: Objection.
20      BY THE WITNESS:
21  A.  When you say the estate planning, do
22  you mean that the note is valid?
23      BY MR. GRIVER:
24  Q.  No.  What I am saying is, is that in
25  March of 2008, you did not want the note returned

Page 178

1   **GENGER**
2   to TPR?
3   A.  It is true.
4   Q.  Because to do so would be to destroy
5   the estate plan?
6   A.  Right.
7   Q.  In fact, you did not want Orly to have
8   a new trustee appointed because you were afraid
9   that one of the things he would do would be to
10  collect on the note and therefore --
11  A.  No, I don't remember saying that.
12  Where does it say?
13  Q.  Well, look at 9.
14  A.  9.
15  Q.  These are your words.
16  A.  Okay.  Fine.
17  Q.  The note --
18  A.  I accept that it's my words.  I just
19  don't remember the --
20  Q.  If the note is returned to TPR --
21  A.  If the note is returned to TPR, which
22  my daughter seems to seek through the appointment
23  of a new trustee, it would recreate a related
24  party obligation and would have to be accelerated
25  or forgiven.

Page 179

1   **GENGER**
2   Q.  Okay.
3   A.  Yeah.
4   Q.  So you did not --
5   A.  So basically --
6   Q.  Go ahead.
7   A.  Basically, this statement came about
8   because I think the candidate that was supposed
9   to serve as a trustee, I did not trust.
10  Q.  And you were afraid that --
11  A.  Yeah, I was afraid that --
12  Q.  -- he would cause the note to be
13  returned to TPR, which would recreate a related
14  party obligation --
15      MR. DELLAPORTAS: Objection.
16      BY THE WITNESS:
17  A.  No.  The note was returned --
18      MR. DELLAPORTAS: Ms. Genger, when I
19  state an objection, you have to let me state it.
20      THE WITNESS: Okay.  I'm sorry.
21      MR. DELLAPORTAS: Object to form.
22  Mischaracterizes the record.
23      MR. ZILBERFEIN: I object as well.
24      BY THE WITNESS:
25  A.  Let me understand.

Page 180

1   **GENGER**
2      MR. MEISTER: Can I have the question
3   read back, please.
4      (WHEREUPON, the record was read by
5      the reporter as requested.)
6      BY MR. GRIVER:
7   Q.  Let's start from the beginning.
8   You still agree with paragraph 9 of
9   your affidavit, correct?
10  A.  I agree that if someone that I do not
11  trust will be a person that only my husband
12  trusts and not both of us trust, I wasn't sure
13  that he's not going to return the note.
14  Q.  And returning the note would destroy
15  the value of the Orly trust?
16  A.  Right.
17  Q.  And what it would do, it would wipe out
18  the assets of the trust in satisfaction of the
19  obligation under the note, correct?
20  A.  It is true, isn't it?
21  Q.  And you said that -- and then at the
22  very bottom you say:  This result is inconsistent
23  with my responsibilities to my children as their
24  mother and as trustee of the Orly trust, period.
25  Do you see that?

Page 181

1  GENGER
2  A.  I don't see, but, yes, it is.
3  Q.  No, let's take a look at it.  It's the
4  next to the last sentence.
5  A.  Yes.  This result is inconsistent with
6  my responsibilities to my children as their
7  mother, their caring mother, and as a trustee of
8  Orly trust.  Obviously, this would have
9  bankrupt -- I mean, if they had to pay the note,
10  it would bankrupt the trust.
11  Q.  And such a result would be inconsistent
12  with your role as mother and as trustee?
13  A.  It is true.
14  Q.  And you did not want to see the Orly
15  trust -- you did not want to see the value of the
16  Orly trust destroyed, did you?
17  A.  Absolutely.
18  Q.  No matter who destroyed it?
19  A.  Obviously.  I mean, always.  As I said,
20  no matter what, I always had my first -- my first
21  concern was for Orly's interest.
22  Q.  And you were telling the court that
23  unlike Mr. Coleman, who you did not trust, you
24  would be there to protect the trust as trustee of
25  the Orly trust, correct?

Page 182

1  GENGER
2  MR. MEISTER:  Objection.  Is that what
3  you are reading?
4  BY MR. GRIVER:
5  Q.  Is that why you sent in this affidavit,
6  to let the court know you would protect the
7  trust?
8  A.  Where are you seeing this?
9  Q.  I am just asking you.  You wanted to
10  be --
11  A.  I -- okay.  Let me explain.  Okay.  I
12  did not trust my husband or all these other
13  people that were associated with him because they
14  just follow his instructions, okay.  And that
15  caused a lot of problems, okay.  And I did not
16  want to see Orly's trust being wiped out.
17  Q.  Okay.  Now, since you have been
18  trustee, Orly's trust has been wiped out?
19  MR. DELLAPORTAS:  Objection.
20  Mischaracterizes the record.
21  MR. ZILBERFEIN:  Objection.
22  BY MR. GRIVER:
23  Q.  TPR collected on the note, didn't it?
24  MR. DELLAPORTAS:  Objection.  That's a
25  different question.

Page 183

1  GENGER
2  BY THE WITNESS:
3  A.  Sagi --
4  MR. ZILBERFEIN:  Objection.
5  BY MR. GRIVER:
6  Q.  TPR collected on the note, correct?
7  A.  If you are talking about the fact that
8  Sagi sued D&K LP, right?  Are you talking about
9  this?
10  Q.  I am asking, to your knowledge, as
11  trustee of the trust --
12  A.  Orly --
13  Q.  -- has the D&K note been collected by
14  TPR?
15  A.  The D&K note was -- I guess, partially,
16  I mean, yeah.  Again, I mean, it is really very
17  confusing.  Can you ask me again the question.
18  Q.  TPR has collected on the D&K note,
19  correct?
20  A.  TPR has collected on the note -- are
21  you alluding to the fact that Sagi -- TPR sold in
22  an auction the TPR shares?  Are you talking --
23  Q.  TPR bought in an action the TPR shares.
24  A.  Right.
25  Q.  D&K sold --

Page 184

1  GENGER
2  A.  Right.  Yeah.
3  Q.  Sagi sold the shares and bought the
4  shares?
5  A.  Absolutely.  Yes.  I mean, TPR.
6  Q.  So which means that --
7  A.  TPR sold and bought its own shares from
8  D&K LP.
9  Q.  Which is not what you wanted?
10  A.  Yeah, but, I couldn't stop it.  What
11  could I do.
12  Q.  Well, you could not stop it -- well,
13  let me ask you this.
14  Exhibit 13, please.  Did you ever see
15  this --
16  A.  Yeah.
17  Q.  -- notice of default?
18  A.  Yeah.
19  Q.  When did you see this notice of
20  default?
21  A.  I don't remember exactly when.
22  Q.  When did you first see it?
23  A.  I don't remember when.
24  Q.  Well, do you remember -- let me look.
25  Did you ever receive the notice in the

Page 185

1    GENGER
2  mail -- strike that.
3     Did you ever receive the notice on or
4  about August 31, 2008?
5  A.  I remember that I saw it.
6  Q.  Okay.  Did you -- let me point you to
7  Dalia Exhibit 3.
8  A.  Yeah.  What page?
9  Q.  Look at interrogatory number 1.  This
10  is a question to you.  Did you receive the
11  8-31-08 notice?  That's the note notice marked --
12  A.  I responded I don't remember receiving
13  the notice.
14  Q.  Okay.  And is that still true?
15  A.  I just said that I don't remember that.
16  But I did say that I remember that I was -- I did
17  see this document.  I don't know if it was -- if
18  it came by mail or whatever.
19  Q.  Well, you do go on to say your attorney
20  Robert Meister received a copy of the notice on
21  May 19, 2009; do you see that?
22  A.  So it is true then.
23  Q.  That's after the sale?
24  A.  Yeah.  I guess.
25  Q.  Do you remember receiving a copy of the

Page 186

1    GENGER
2  notice before the sale?
3  A.  Before the sale?  I am trying to
4  remember.  Yeah.  I was aware that Sagi is going
5  to take the step --
6  Q.  I understand that at some point you
7  became aware.  I am asking did you receive the
8  8-31-08 notice prior to your attorney receiving a
9  copy of the notice on May 19?
10  A.  That's the answer.  I don't remember.
11  Q.  Okay.  And you don't remember receiving
12  such a notice then?
13  A.  I don't remember.  I might have.
14  Q.  Or you might not have?
15  A.  Right.
16  Q.  Did you ever tell Orly about the
17  8-31-08 notice?
18  A.  No.
19  Q.  Why not?
20  A.  Because, first of all, I might have not
21  received it, so I didn't tell her.  And, second,
22  this was something that I could not stop.
23  Q.  Okay.  We will -- let's talk about
24  that.  Why could you not stop it?
25  A.  Because TPR -- I didn't have any

Page 187

1    GENGER
2  influence on TPR in the way that I can stop them
3  from acting to foreclose on the note.
4  Q.  Did you go to Sagi and say, "What are
5  you doing?  Why are you doing this?"  Did you
6  ever asking Sagi that?
7  A.  I might not have received them, as we
8  said, so I don't know if I said it or not.
9  Q.  At any time before the sale on February
10  27, 2009, did you try and stop the sale by going
11  to Sagi and saying, "don't do this," or words to
12  that effect?
13  A.  If I was aware of that before, I might
14  have told him, but --
15  Q.  I don't want you to speculate.
16  A.  I am saying because I do not remember.
17  Q.  You don't remember ever going to Sagi
18  and saying, "Please don't do this sale"?
19  A.  No, I didn't say that.
20  Q.  Or words to that effect?
21  A.  Right.  I did not say that because it
22  is not my place to say it.  He can do whatever he
23  wants.  He has a note, and he wanted to collect
24  on it.
25     MR. GRIVER:  Could you repeat her

Page 188

1    GENGER
2  answer, please.
3     (WHEREUPON, the record was read by
4  the reporter as requested.)
5  BY MR. GRIVER:
6  Q.  Did you as trustee go to the trust
7  attorneys and try and find a way to prevent or
8  delay the sale?
9  A.  I don't remember.
10  Q.  By that time your attorneys would be
11  Mr. Meister?
12  A.  I guess.  Yeah.
13  Q.  Did you ever go to Mr. Meister in an
14  attempt to find a legal way to stop the sale?
15  A.  No.
16  Q.  Let me show you what's been marked
17  as --
18  A.  I tell you, I didn't have intentions to
19  participate in this because there was -- we
20  didn't have any resources to compete, I mean, in
21  auction.
22     MR. MEISTER:  Can we take a break now,
23  please?
24  BY MR. GRIVER:
25  Q.  Ms. Genger, do you need a break?

Page 189

1   GENGER
2 A. I guess so. Yeah.
3       MR. GRIVER: Okay. Let's take a break.
4   I ask that you not speak to anyone about your
5   testimony. Five minutes?
6       MR. MEISTER: Five minutes.
7       (WHEREUPON, a recess was had from
8       3:34 p.m. to 3:42 p.m.)
9   MS. WARREN: Are we on the record?
10      During the break, I was in the bathroom
11  with Ms. Genger, who approached me and said that
12  she might have made a mistake in her past
13  testimony. I cut her off before she could tell
14  me the substance of any mistake that she thought
15  that she made. But if she feels that a mistake
16  is made, I would like to just ask that we give
17  her an opportunity to clarify the record.
18      MR. LEINBACH: That sounds absolutely
19  reasonable.
20      BY MR. GRIVER:
21 Q. Ms. Genger, this correction that you
22  made, did anyone talk to you about this
23  correction? I am not talking about Ms. Warren.
24  I am saying did you speak with Sagi or anyone
25  else, and that's why you remember this?

Page 190

1   GENGER
2 A. No, no.
3 Q. Okay. Why don't you put your
4   correction on the record.
5 A. Okay. The correction is that once I
6   was aware that this notice existed, I did consult
7   with my lawyer, and I chose not to inform Orly.
8 Q. When you say that you consulted with
9   your attorney, you were consulting as trustee of
10  the trust?
11 A. As a trustee, obviously.
12 Q. And you were going to this attorney
13  understanding that he represented the trust?
14 A. The trust.
15 Q. He represented the trust?
16 A. The trust.
17 Q. And you were seeking advice as trustee
18  for what is best for the trust?
19 A. Right.
20 Q. And the beneficiary of the trust?
21 A. Obviously.
22 Q. And that was Mr. Meister?
23 A. Uh-huh.
24 Q. And did he provide you advice?
25 A. Yes.

Page 191

1   GENGER
2 Q. And what was his advice?
3 A. I don't think I can tell you that.
4       MR. GRIVER: Mr. Meister, are you --
5       BY MR. GRIVER:
6 Q. I don't hear any objection from
7   Mr. Meister instructing you not to answer. So
8   what was Mr. Meister's advice?
9 A. Okay. So we weighed our options --
10      MR. ZILBERFEIN: You mean to the extent
11  it is attorney-client privilege?
12      BY THE WITNESS:
13 A. I think it is privileged, but we --
14      BY MR. GRIVER:
15 Q. Go ahead.
16 A. Okay. So we weighed the options that
17  we had, and we concluded that there is nothing
18  that I can do to stop Sagi from, you know, doing
19  whatever he did with the auction.
20 Q. There's nothing you could do to stop --
21 A. Yeah.
22 Q. Did you -- and how long was this
23  conversation with your attorney? Was it --
24 A. You want me to say -- are you kidding?
25 Q. Did you discuss it for an hour? Did

Page 192

1   GENGER
2   you discuss it for half an hour?
3 A. I don't know. I have to look in my
4   bills. I don't know.
5 Q. Again, I will ask for the bill --
6 A. Yeah.
7 Q. -- so that we can discuss this.
8       Did you at the time -- how long had
9   Mr. Meister been your attorney, the attorney for
10  the trust?
11 A. I don't remember when we started. I
12  don't remember when I -- when he started to be
13  the lawyer for the trust. I don't remember what
14  date it was.
15 Q. Besides your attorney, did you speak to
16  anybody else about it?
17 A. No.
18 Q. Did you speak with Sagi?
19 A. No.
20 Q. Do you know --
21      MR. MEISTER: Can we go off the record
22  for a second and take a break?
23      MR. GRIVER: No, not in the middle of
24  this.
25      BY THE WITNESS:

ORLY GENGER VS.
DALIA GENGER, et al

DALIA GENGER
December 13, 2012

---

Page 193

1   GENGER
2   A. Okay. What is the question? I did not
3   discuss with Sagi:
4       BY MR. GRIVER:
5   Q. Okay. Well, did your lawyer at the
6   time know about the position you had taken in the
7   marital arbitration?
8   A. If he knew? I don't know if he knew.
9   Q. Okay. Did you and your attorney
10  discuss --
11      MR. MEISTER: Mr. Griver, you a moment
12  ago asked that we produce a copy of a bill
13  reflecting conversations, and I have a copy of
14  that bill with me.
15      MR. GRIVER: Are these all the bills?
16      MR. MEISTER: Beg pardon?
17      MR. GRIVER: Are these all of your
18  bills?
19      MR. ZILBERFEIN: It's two pages. I
20  don't think two pages are all of his bills.
21      THE WITNESS: They are concerning the
22  discussion --
23      MR. MEISTER: Dalia, let me say it.
24  It is a bill dated March 5, 2009
25  covering the period of February 4, 2009 through

---

Page 194

1   GENGER
2   February 27, 2009. And I do not believe it is
3   privileged. I do not intend to waive any
4   attorney-client privilege. If you will let me
5   produce it with that caveat, I am prepared to
6   produce it.
7       MR. GRIVER: Is it your position that
8   that document is privileged?
9       MR. MEISTER: Looking at it, I do not
10  believe that it contains any confidential
11  communications from my client to me, nor any
12  legal advice which I rendered. It merely
13  reflects the facts of the conversations and the
14  dates and the times.
15      MR. GRIVER: I will take that because
16  then it is certainly not privileged, but I will
17  tell you it is my position that if you are the
18  attorney for the trust giving advice to the
19  trustee of the trust, that there is no privilege.
20      MR. MEISTER: I understand that's your
21  contention. What I'm saying is without acceding
22  to that, if you will accept it without that being
23  a concession, I am prepared to produce it.
24      MR. GRIVER: That is fine.
25      MR. MEISTER: Would you like to make

---

Page 195

1   GENGER
2   copies?
3       MR. LEINBACH: Sure, and I will give it
4   back. I will make one for every one.
5       MR. MEISTER: Thank you.
6       BY MR. GRIVER:
7   Q. All right. What options did you
8   discuss --
9       MR. MEISTER: Why don't you wait
10  until -- because it is going to enable her to
11  answer some questions which she didn't remember
12  which you just asked.
13      MR. GRIVER: All it is is your time.
14  That's for your deposition we will get into that.
15  What I am talking about now with Ms. Genger is
16  her memory.
17      BY MR. GRIVER:
18  Q. What options did you discuss with
19  Mr. Meister at that time regarding --
20  A. The option, if I have any tools that I
21  can use to stop Sagi from having this auction.
22  Q. Did you --
23  A. You know, he had a note, and legally he
24  was collecting on the note. I mean --
25  Q. Any --

---

Page 196

1   GENGER
2   A. I mean TPR.
3       MR. GRIVER: Any memoranda, any
4   documents, any e-mails related to those
5   conversations between you as trust -- and
6   regarding any advice that you gave to Dalia
7   Genger as trustee, did or did not give to Dalia
8   Gener as trustee, I would like that. And I am
9   putting my demand on the record right now.
10      BY MR. GRIVER:
11  Q. Did you discuss with Mr. Meister the
12  possibility of calling up Sagi and saying, "Hey,
13  please stop"?
14  A. I don't remember that I -- I believe
15  I -- I never had any chance of stopping him, so I
16  didn't call.
17  Q. Did you discuss with Mr. Meister the
18  possibility of suing Sagi to stop him?
19  A. What?
20  Q. Suing TPR to stop him?
21  A. I'm sorry?
22  Q. Did you discuss the possibility of
23  suing to prevent the sale?
24  A. No. Because I am not really believing
25  in taking legal actions and spending money of the

---

Page 197

1   **GENGER**
2   **trust to be defeated in this case.**
3   Q. Okay. Did you tell -- at the time that
4   you were speaking with Mr. Meister, did he have
5   all of the documentation for the marital
6   arbitration, do you know?
7   **A. I don't know if he had. He might.**
8   Q. Did you discuss with Mr. Meister the
9   possibility of letting Orly know about the sale?
10  **A. I don't remember it.**
11  Q. Did you discuss with -- strike that.
12      You know what an auction is, correct?
13  **A. Yes, I do.**
14  Q. People show up, you try and get the
15  most money?
16  **A. Yeah, the most money. This is how**
17  **you --**
18  Q. Did you discuss with Mr. Meister the
19  possibility of letting Orly know so that other
20  people could go in and bid on the TPR asset?
21  **A. No, I did not discuss this.**
22  Q. That was not an option that you
23  considered?
24  **A. No.**
25  Q. Is that an option that was raised by

Page 198

1       GENGER
2   Mr. Meister?
3   **A. I don't think so.**
4   Q. Did you consider letting Arie know
5   about the sale?
6   **A. I presume that if I didn't notice Orly,**
7   **of course I didn't notify Arie. It is not my**
8   **duty to notify Arie if there is a sale, an**
9   **auction of shares.**
10  Q. If there is -- is it your duty as a
11  trustee to try and get the best price for the
12  shares?
13  **A. It is why --**
14      MR. MEISTER: Objection.
15      BY THE WITNESS:
16  **A. This is why there is an auction.**
17      BY MR. GRIVER:
18  Q. And so do you think that Arie --
19  **A. It is Sagi's responsibility. Wherever**
20  **he's selling the shares, it is his responsibility**
21  **to let people know that there is an auction and**
22  **get bids on that.**
23  Q. And you did not think that --
24  **A. It is not my responsibility.**
25  Q. It is not your responsibility as

Page 199

1       GENGER
2   trustee to do that?
3   **A. No.**
4   Q. How is it --
5   **A. Because I didn't.**
6   Q. Because you didn't?
7   **A. Because it wasn't my auction.**
8   Q. Okay. Well, but it was -- but the Orly
9   trust had an interest in that auction?
10  **A. It is true.**
11  Q. Okay. And so why didn't you call up
12  Arie and say, "Hey, Arie, those TPR shares are
13  for sale"?
14  **A. Because Arie's interest is not the same**
15  **as my interest or Orly's interest.**
16  Q. Isn't it Orly's interest to get the
17  best price for her interest?
18  **A. It is.**
19  Q. Okay. So isn't getting as many people
20  as possible who want to buy the shares --
21  **A. But it is not my responsibility to**
22  **collect people that will participate in the**
23  **auction. Sagi followed the procedure that he**
24  **should have, the procedure for an auction, and he**
25  **followed whatever he was supposed to do. And**

Page 200

1       **GENGER**
2   **whoever was aware of it is fine and participated**
3   **in the auction.**
4   Q. And you weren't going to let Arie know?
5   **A. Not Arie or anybody else.**
6   Q. How do you know that it is Sagi's
7   responsibility only to get people to show up at
8   his auction? Is that something that Mr. Meister
9   told you?
10      MR. MEISTER: Objection. Compound.
11      BY THE WITNESS:
12  **A. In general, in general, if you have --**
13  **you auction something, you want people to be**
14  **aware of the auction and bid on it, and, you**
15  **know, have the highest price possible.**
16      BY MR. GRIVER:
17  Q. Did Mr. Meister or anyone at his law
18  firm tell you that it was not your responsibility
19  as trustee to try and get the highest price for
20  the TPR D&K interest?
21      MR. MEISTER: Read that back, please.
22      (WHEREUPON, the record was read by
23      the reporter as requested.)
24      BY THE WITNESS:
25  **A. He never said that. He never told me**

ORLY GENGER VS.
DALIA GENGER, et al

DALIA GENGER
December 13, 2012

Page 201

GENGER

1   GENGER
2   that I shouldn't look for -- what was the
3   question again?
4       BY MR. GRIVER:
5   Q.   Yes.
6       Did Mr. Meister tell you that you
7   shouldn't look for other people to participate in
8   the auction?
9       MR. MEISTER: Just so we are clear,
10  your question is should not?
11      MR. GRIVER: Should not.
12      BY THE WITNESS:
13  A.   That other people --
14      BY MR. GRIVER:
15  Q.   Let me rephrase it, and please listen.
16      Did Mr. Meister or anyone else at his
17  law firm tell you that it was not your
18  responsibility as trustee to try and maximize the
19  price at the auction?
20  A.   I don't remember that we discussed that
21  subject, that option.
22  Q.   Did you and Mr. Meister discuss what
23  your responsibilities are as trustee with regard
24  to the UCC auction?
25  A.   The UCC?

Page 202

1   GENGER
2   Q.   With regard to the auction?
3   A.   Again, I am getting tired. What are
4   you saying?
5   Q.   Did you and Mr. Meister discuss what
6   your responsibilities were as trustee with regard
7   to the auction?
8   A.   With regard to the auction? I think,
9   basically, what was discussed is if I -- if the
10  trust in any way can be a participant in the
11  auction.
12  Q.   And what did Mr. Meister say?
13  A.   And, obviously, we didn't have the
14  resources to participate.
15  Q.   What about other people participating
16  in the auction?
17  A.   I don't know about other people.
18  Q.   Who had the resources? You never asked
19  Mr. Meister?
20      MR. MEISTER: Can I have the question
21  read back, please.
22      BY THE WITNESS:
23  A.   I never --
24      MR. GRIVER: Wait, Dalia.
25      (WHEREUPON, the record was read by

Page 203

1   GENGER
2   the reporter as requested.)
3       MR. MEISTER: Object to the form.
4       BY MR. GRIVER:
5   Q.   Let me clean that up.
6       You never asked Mr. Meister about
7   getting other people involved in the auction?
8   A.   Participate in the auction. I don't
9   remember that we discussed other people.
10  Q.   Do you understand that it is your job
11  as trustee to get the best price at the auction?
12      MR. MEISTER: Objection. Asked and
13  answered several times now.
14      MR. DELLAPORTAS: Object to form.
15      BY THE WITNESS:
16  A.   Yes, you did ask me.
17      MR. ZILBERFEIN: Objection.
18      BY MR. GRIVER:
19  Q.   One way to get the best price possible
20  is to get as many people bidding as possible.
21      MR. MEISTER: Objection. That's not a
22  question.
23      MR. DELLAPORTAS: Objection. That's
24  not a question.
25      BY THE WITNESS:

Page 204

1   GENGER
2   A.   Do you want to teach me?
3       MR. MEISTER: No, no. Wait until
4   there's a question, Dalia.
5       BY MR. GRIVER:
6   Q.   One way to get the best price is to get
7   as many people bidding as possible?
8       MR. DELLAPORTAS: Object to form.
9       MR. ZILBERFEIN: Objection.
10      BY MR. GRIVER:
11  Q.   Correct?
12      MR. MEISTER: Join the objection.
13      BY MR. GRIVER:
14  Q.   I am waiting.
15  A.   Yeah, I guess it is correct. Yeah.
16  Q.   Why did you then did you not let Arie
17  know that --
18  A.   Yeah, because I particularly did not
19  want Arie to be involved as far as Orly's assets
20  are concerned in any way.
21  Q.   Okay.
22      MR. MEISTER: Can we go off the record
23  for a second?
24      MR. GRIVER: No. Well, I'm almost
25  done.

ORLY GENGER VS.
DALIA GENGER, et al

DALIA GENGER
December 13, 2012

Page 205

1   GENGER
2   BY MR. GRIVER:
3   Q. If Sagi was going to pay $2 million for
4   Orly's assets, and Arie was going to pay $3
5   million for Orly's assets, at the end of the
6   day --
7   A. At the same time, Arie is doing other
8   things, like paying your bills instead of Orly.
9   You understand? That's my -- that's where I am
10  going, because you are not objective. You are
11  being paid not by Orly, but by somebody else,
12  like my husband. It is financing this
13  deposition. And that's why I didn't want Arie to
14  be involved in this auction.
15  Q. Because his money is tainted?
16  A. No. Because his interest -- Orly's
17  interest is not the same as Arie's interest.
18  That's why. Airy's interest is to have control
19  over Orly's assets, I believe.
20  Q. And if Arie had paid $5 million --
21  A. He wouldn't. He didn't have any money
22  because we just split our marital assets, and he
23  got five and I got five. So how could he pay?
24  Q. Did you check to see if he could, or
25  did you let --

Page 206

1   GENGER
2   A. I didn't check because I know.
3   Q. You didn't check because --
4   A. Unless he hid some money that I don't
5   know about because then I have to get part of it.
6   I don't know.
7   Q. You didn't check because -- you didn't
8   check because you didn't want Arie to
9   participate?
10  A. No, that not true.
11      MR. ZILBERFEIN: Are you testifying?
12      BY THE WITNESS:
13  A. I'm just saying --
14      MR. ZILBERFEIN: Objection. The
15  attorney is testifying.
16      BY THE WITNESS:
17  A. -- that I didn't check because I knew
18  what his financial condition is at that time,
19  because we were supposed to have the same amount
20  of assets or money or whatever you call it, okay.
21      BY MR. GRIVER:
22  Q. And you don't think --
23  A. And if he had some extra money, then it
24  was marital money that I was supposed to get part
25  of it.

Page 207

1   GENGER
2   Q. And you are not sure that he -- and you
3   thought that Arie couldn't find some friends of
4   his who might participate in the auction?
5   A. I don't know if he has friends.
6   Q. But if Arie participated and didn't
7   have as much money as Sagi, that's fine. But
8   isn't it a possibility that he would have been
9   able to get more money?
10  A. There's always possibilities of
11  anything to happen. The earthquake, the building
12  going on fire, I don't know.
13  Q. So as trustee, why didn't you explore
14  that possibility?
15  A. I told you already. Because I knew how
16  much Arie has. And, personally, I know my
17  husband. I was married 33 years. And I know
18  what's happening between Arie, unfortunately, and
19  Orly.
20  Q. And why didn't you tell Orly?
21  A. What? Because Orly at this time was
22  brainwashed already, so I couldn't talk to her,
23  candidly, even though I did try.
24  Q. And if Orly had known, then Arie would
25  have known, correct?

Page 208

1   GENGER
2   A. This did not occur to me at all.
3   Q. It didn't occur to you that if you told
4   Orly about the sale that she would tell her
5   father? That didn't occur to you at all?
6       MR. MEISTER: Objection. Asked and
7   answered. The immediately preceding answer.
8       THE WITNESS: I have to have some candy
9   here. My mouth is very dry.
10      MR. GRIVER: Can you read back my
11  question, please.
12      (WHEREUPON, the record was read by
13  the reporter as requested.)
14      BY THE WITNESS:
15  A. I didn't think about it at the time.
16  But I am telling you frankly, I didn't want Arie
17  to be involved in this auction.
18      BY MR. GRIVER:
19  Q. And did it --
20  A. Because I know my husband. I'm sorry.
21  Q. Did it occur to Mr. Meister that if you
22  told Orly, that Orly would tell Sagi?
23  A. I don't know if it occurred to him.
24  You should ask him. I don't know.
25  Q. Did Mr. Meister instruct you that it is

ORLY GENGER VS.
DALIA GENGER, et al

**DALIA GENGER**
December 13, 2012

Page 209

1   GENGER
2   your job as trustee to get the best price for the
3   trust assets?
4       MR. ZILBERFEIN: Objection. Asked and
5   answered.
6       BY THE WITNESS:
7 A.   Yeah.
8       MR. MEISTER: Join in the objection.
9       BY THE WITNESS:
10 A.   Yeah, I said, I do not remember talking
11   about it.
12       MR. GRIVER: Let me show you what I
13   have marked as Exhibit 15. For the record,
14   Exhibit 15 is the meeting of partners of D&K LP
15   January 31, 2009 and agreement.
16       (Dalia Exhibit 15, 1/31/2009
17   meeting and agreement, marked.)
18       BY MR. GRIVER:
19 Q.   That is you signing on behalf of the
20   Orly Genger trust?
21 A.   Right.
22 Q.   So do you recall this agreement?
23 A.   Yeah.
24 Q.   Could you tell me, please, first of
25   all, who drafted it, do you know?

Page 210

1   GENGER
2 A.   A lawyer. I don't know which one. I
3   didn't draft it.
4 Q.   Was it your lawyer or Sagi's lawyer?
5       MR. MEISTER: Objection. Compound.
6       MR. DELLAPORTAS: Object to form.
7       BY THE WITNESS:
8 A.   I really don't know which lawyer was
9   it.
10       MR. ZILBERFEIN: Objection.
11       BY THE WITNESS:
12 A.   My duty was to read it and sign.
13       BY MR. GRIVER:
14 Q.   Did you read it before you signed it?
15 A.   Yeah.
16 Q.   And do you understand what it does?
17 A.   Yeah.
18 Q.   What does it do?
19 A.   As far as I am concerned, I got what I
20   wanted.
21 Q.   Which is?
22 A.   Which is number 8.
23 Q.   Number 8?
24 A.   Refrain from enforcing the note against
25   each limited partner for 30 days. To calm down

Page 211

1   **GENGER**
2   everyone.
3 Q.   30 days, okay.
4 A.   Yeah.
5 Q.   And you needed those 30 days to do
6   what, exactly?
7 A.   **First of all, to have a conversation**
8   **with my attorney.**
9 Q.   Uh-huh.
10 A.   **And, also, my intent was to talk to**
11   **Sagi and ask him to try -- ask him not to sue his**
12   **sister, the trust, Orly's trust. And so it did**
13   **happen that until today, Sagi never sued Orly's**
14   **trust.**
15       **Why are you laughing, it is not true?**
16 Q.   So in those 30 days --
17 A.   Yeah.
18 Q.   -- you spoke to Sagi?
19 A.   Yeah.
20 Q.   And you told him --
21 A.   **I spoke many times to Sagi, that he**
22   **wanted to act in a way that he felt like acting**
23   **because he was getting sued right and left, and**
24   **he was very angry. And I tried to calm him down**
25   **and tried to talk to him not to sue his sister.**

Page 212

1   **GENGER**
2 Q.   Well, what this says, this 8 doesn't
3   say that TPR Investment Associates, Inc., has
4   agreed to not sue Orly Genger. It doesn't say
5   that.
6 A.   It doesn't say, but for me, my
7   intention was to start pursuing Sagi not to sue
8   Orly Genger trust. And I was successful in doing
9   that.
10 Q.   You were afraid that Sagi would sue
11   Orly's trust for what exactly?
12 A.   There's always something to sue. He
13   can foreclose on the --
14 Q.   On the note?
15 A.   Yeah.
16 Q.   Okay. So he didn't sue, but he did
17   foreclose on the note?
18 A.   He foreclosed on the D&K LP.
19 Q.   He foreclosed on the note, and got --
20 A.   D&K LP, but not directly Orly trust.
21 Q.   What other -- TPR also agreed to
22   refrain from enforcing the note for 30 days,
23   correct?
24 A.   Yeah.
25 Q.   Okay.

ORLY GENGER VS.                                                    DALIA GENGER
DALIA GENGER, et al                                              December 13, 2012

---

Page 213

1     GENGER
2  A.  That's the 30 days we are talking
3  about.
4  Q.  Did you speak to Sagi about not
5  enforcing the note?
6  A.  I spoke to Sagi about not suing Orly's
7  trust.
8  Q.  But it was okay that he sell the note?
9  A.  You mean the auction?
10 Q.  Yes.  You okay with the auction?
11 A.  I wasn't okay with it, but I had
12 nothing that I could do to prevent him.
13 Q.  You didn't tell him don't do it because
14 it will destroy the estate planning?
15 A.  No, I did not tell him.
16 Q.  In sum or in substance you never told
17 him?
18 A.  What?
19 Q.  In sum or in substance you never told
20 him that?
21     MR. ZILBERFEIN: Objection.
22     MR. MEISTER: Objection to form.
23     BY MR. GRIVER:
24 Q.  Correct?
25 A.  We said that -- I said that I did talk

---

Page 214

1     GENGER
2  with my lawyer, what are the options, and --
3  Q.  I am not talking about your lawyer.  I
4  am talking about Sagi.
5     MR. MEISTER: Please let her finish the
6  answer.
7     BY MR. GRIVER:
8  Q.  I am talking about your conversation
9  with Sagi.  What did you -- what in your
10 conversation -- please tell me all about your
11 conversation.
12 A.  Yes.  The conversation is that Sagi
13 should restrain himself from suing Orly's trust,
14 even though he was very angry at his sister, the
15 way she treated him by, you know, being sued
16 right and left.  And, you know, I understand it.
17 You can be very angry when somebody does it to
18 you.  So I just wanted him not to sue the trust.
19 Q.  So as trustee you got him to not sue
20 the trust?
21 A.  Right.
22 Q.  But you permitted him to proceed with
23 the auction?
24 A.  I didn't permit him.  I didn't permit
25 him.  He did what he thought he can -- he should

---

Page 215

1     GENGER
2  do.
3  Q.  Did he -- well --
4  A.  He didn't ask my permission.
5  Q.  Did you ask him not to do the auction?
6  A.  You asked me this already, and I
7  answered.
8  Q.  You did not?
9  A.  I did answer.
10 Q.  You did ask him?
11 A.  I did answer this question.
12 Q.  I understand.  Just so we are clear
13 because then I am going to go ask additional
14 questions on it.
15     You did not ask him to not do the
16 auction?
17     MR. MEISTER: Objection.  Compound and
18 negative.
19     MR. DELLAPORTAS: Asked and answered.
20     MR. ZILBERFEIN: Objection.  Asked and
21 answered.
22     MR. DELLAPORTAS: She said it is not
23 her place to tell him what to do.
24     MR. ZILBERFEIN: She is also --
25     MR. DELLAPORTAS: We are all in the

---

Page 216

1     GENGER
2  room.  We all heard it.
3     MR. ZILBERFEIN: She --
4     THE WITNESS: I am speaking --
5     MR. MEISTER: Don't argue with him.
6  Wait for a question.
7     MR. LEINBACH: You are entitled to
8  objections, pursuant to the judge's --
9     MR. ZILBERFEIN: Yeah, but he can't be
10 asking the same question ten times.
11     THE WITNESS: We have a limited time
12 that I can sit here.  I'm getting tired.
13     MR. ZILBERFEIN: You are getting the
14 same question over and over and over again.
15     THE WITNESS: I am getting tired.
16     MR. MEISTER: Please don't argue with
17 him.
18     THE WITNESS: You ask me so many
19 questions.  I can't -- it's going to be the same
20 answer.
21     BY MR. MEISTER:
22 Q.  Dalia, please just --
23     MR. S. GENGER: It's Ms. Genger.
24     BY MR. GRIVER:
25 Q.  Ms. Genger, please just listen to my

---

ORLY GENGER VS.
DALIA GENGER, et al

DALIA GENGER
December 13, 2012

---

Page 217

1   GENGER
2   question and answer.
3      MR. S. GENGER: She's not your friend,
4   Yoav. She's the witness.
5      BY MR. GRIVER:
6   Q.  Did you ask Sagi in that conversation
7   to not proceed with the auction, yes or no?
8      MR. DELLAPORTAS: Objection.
9      MR. ZILBERFEIN: Objection.
10     BY THE WITNESS:
11  A.  After consulting with my lawyer, I did
12  not ask him to do that.
13     BY MR. GRIVER:
14  Q.  Because why?
15  A.  Because I didn't think that I would be
16  able to stop him. It was his right to do it. I
17  couldn't ask him to do it, not to do it.
18  Q.  Sagi also has a right to sue --
19  A.  Right.
20  Q.  -- the Orly trust?
21  A.  Yeah. But my focus was on the TRI
22  shares that Orly claimed were worth millions and
23  hundreds of millions of dollars. So in
24  comparison, giving up TPR shares, it was peanuts.
25  Q.  Did you ask Sagi to promise to not do

---

Page 218

1   GENGER
2   anything with the TI shares after the auction?
3   A.  Obviously. After -- the auction was on
4   TPR shares, not TRI shares.
5   Q.  Did you ask -- since your focus was on
6   the TI shares, did you talk to Sagi about not
7   doing anything to the TI shares in that
8   conversation?
9   A.  Yes, I did, because he could have sued
10  the trust and then foreclosed on the TRI shares.
11  Q.  And what did Sagi tell you? Did he
12  promise not to do that?
13  A.  After many, many arguments and personal
14  fights that we had, he agreed not to do it. And
15  he did until today, he never sued Orly's trust.
16     Is this funny?
17  Q.  In return for TPR agreeing to refrain
18  from enforcing the note for 30 days --
19  A.  I didn't hear the beginning of the
20  question.
21  Q.  If you look at the meeting agreement,
22  TPR agrees to not enforce the note for 30 days,
23  correct?
24  A.  TPR Investment has agreed to refrain
25  from enforcing the note against each limited

---

Page 219

1   GENGER
2   partner for 30 days. Right.
3   Q.  But TPR did not agree to refrain from
4   enforcing the note against D&K LP directly, or is
5   that included in paragraph 8?
6      MR. MEISTER: Compound and
7   incomprehensible. So I object.
8      BY THE WITNESS:
9   A.  Yes, it is hard for me -- Sagi did sue
10  the D&K LP, but he didn't see Orly's trust.
11     BY MR. GRIVER:
12  Q.  So far?
13  A.  Well, it is many years. I mean, it is
14  a long time. Seeing at least 30 days.
15  Q.  And in exchange you gave him a general
16  release?
17  A.  We both got -- I mean, each party got a
18  release.
19  Q.  You got a release, and he got a
20  release?
21  A.  That's true.
22  Q.  Certain people didn't get a release?
23  A.  Who didn't get a release?
24     MR. MEISTER: Wait for a question.
25     BY MR. GRIVER:

---

Page 220

1   GENGER
2   Q.  Arie didn't get a release, correct?
3   A.  Arie?
4   Q.  Arie didn't get a release?
5   A.  It is his problem. I don't know.
6   Q.  Okay. William Dowd didn't get a
7   release?
8      MR. MEISTER: Is there a question?
9      BY THE WITNESS:
10  A.  This is not -- they are not partners in
11  D&K LP.
12     MR. MEISTER: Wait for the question.
13  Wait for the question.
14     THE WITNESS: Okay.
15     BY MR. GRIVER:
16  Q.  Well, why were these persons identified
17  by you in this paragraph?
18  A.  It is partnership of the D&K LP. And
19  there were -- the parties that you mentioned are
20  not parties in the D&K LP. That's why they
21  didn't get the release. They are not included in
22  these documents. They are not part of these
23  documents.
24  Q.  But why did you mention them
25  specifically if they weren't included?

---

ORLY GENGER VS.
DALIA GENGER, et al

DALIA GENGER
December 13, 2012

---

Page 221

1   GENGER
2 A.  You asked me about Arie, and I didn't
3    mention these names.
4 Q.  I am asking you why are they mentioned
5    in the bottom of paragraph 1 as not being
6    released?
7 A:  Again, ask me the question.
8 Q.  Why are those included as -- why are
9    those persons, Arie Genger, William Dowd,
10   Lawrence Small, and Edward Kilmerman, not
11   included in the general release?
12 A.  They were not included because they
13   were not part of the D&K LP.  They were not
14   partners in D&K LP.
15 Q.  So why was it necessary to mention them
16   by name?
17 A.  I guess the lawyer found it necessary
18   to mention it.
19     MR. ZILBERFEIN: Take a bathroom break,
20 please.
21     MR. GRIVER: Let's go off the record.
22     (WHEREUPON, a recess was had from
23   4:18 p.m. to 4:28 p.m.)
24     MR. GRIVER: The parties have agreed to
25   adjourn Dalia's deposition until February 7,

---

Page 222

1   GENGER
2 2013.
3     MR. MEISTER: Also at 10:30, please.
4     MR. GRIVER: Also at 10:30.  That date
5 is okay with the deponent, the deponent's
6 attorney, and all the other attorneys in this
7 case.
8     (WHEREUPON, at 4:28 p.m., by
9 agreement of the parties, the
10 deposition of D. GENGER was
11 adjourned until Thursday, February
12 7, 2013, at 10:30 a.m., and the
13 deponent reserved her right to
14 read and sign the transcript.)
15
16
17
18
19
20
21
22
23
24
25

---

Page 223

1   A C K N O W L E D G M E N T
2
3 STATE OF          )
4            :ss
5 COUNTY OF          )
6
7     I, DALIA GENGER, hereby certify that I
8 have read the transcript of my testimony taken
9 under oath in my deposition of December 13,
10 2012; that the transcript is a true, complete
11 and correct record of my testimony, and that
12 the answers on the record as given by me are
13 true and correct.
14
15
16 _____
17   DALIA GENGER
18
19
20 Signed and Subscribed to
21 before me, this   day
22 of     , 2012.
23
24 _____
25 Notary Public, State of New York

---

Page 224

1     C E R T I F I C A T E
2
3 STATE OF NEW YORK   )
4             ) ss.:
5 COUNTY OF NEW YORK )
6
7     I, ANNETTE M. MONTALVO, Registered Merit
8 Reporter and Notary Public within and for the
9 State of New York, do hereby certify:
10     That DALIA GENGER, the witness whose
11 deposition is hereinbefore set forth, was duly
12 sworn by me and that such deposition is a true
13 record of the testimony given by such witness.
14     I further certify that I am not related
15 to any of the parties to this action by blood or
16 marriage and that I am in no way interested in
17 the outcome of this matter.
18     IN WITNESS WHEREOF, I have hereunto set
19 my hand this 27th day of December, 2012.
20
21
22
23
24
25 ANNETTE M. MONTALVO

---

ORLY GENGER VS.
DALIA GENGER, et al

DALIA GENGER
December 13, 2012

Page 225

```
 1                    ***ERRATA***
 2          ELLEN GRAUER COURT REPORTING  CO. LLC
              126 East 56th Street, Fifth Floor
 3                New York, New York 10022
                       212-750-6434
 4
 5    NAME OF CASE: GENGER vs. GENGER
      DATE OF DEPOSITION: December 13, 2012
 6    NAME OF WITNESS: DALIA GENGER
 7    PAGE  LINE  FROM    TO         REASON
 8      ___|___|_____|_____|_____
 9      ___|___|_____|_____|_____
10      ___|___|_____|_____|_____
11      ___|___|_____|_____|_____
12      ___|___|_____|_____|_____
13      ___|___|_____|_____|_____
14      ___|___|_____|_____|_____
15      ___|___|_____|_____|_____
16      ___|___|_____|_____|_____
17      ___|___|_____|_____|_____
18      ___|___|_____|_____|_____
19      ___|___|_____|_____|_____
20      ___|___|_____|_____|_____
21      _____
22    Subscribed and sworn before me
23    this_____day of _____, 20__.
24    _____    _____
25    (Notary Public)        My Commission Expires:
```

ORLY GENGER VS.
DALIA GENGER, et al

DALIA GENGER
December 13, 2012

**$**

**$2 (1)**
205:3
**$200,000 (2)**
24:3,4
**$3 (1)**
205:4
**$5 (3)**
164:5,11;205:20
**$9 (1)**
175:18

**0**

**08 (1)**
125:17
**09 (1)**
15:2

**1**

**1 (13)**
8:16,17,20;9:13;
62:16;98:20,21;99:7;
100:7;105:21;169:10;
185:9;221:5
**1/31/2009 (1)**
209:16
**1/4/2008 (1)**
108:12
**1:00 (2)**
113:12,15
**10 (4)**
149:7,7,9,14
**10:30 (4)**
143:6;222:3,4,12
**10:52 (1)**
20:6
**10:54 (1)**
20:7
**100 (1)**
85:25
**10036 (1)**
3:14
**10065 (1)**
6:15
**10804 (1)**
3:6
**11 (5)**
151:16,18;173:19;
176:7,13
**12 (5)**
11:4;162:13,14,17;
163:8
**12:06 (2)**
117:13,14
**12:07 (1)**
87:14
**12:19 (1)**
87:14
**12:45 (1)**
108:23
**12:59 (1)**
116:15
**129 (1)**
143:25
**13 (4)**
168:16,17;184:14;
223:9
**130 (1)**
144:2
**14 (3)**
173:10,10,12
**140 (1)**
140:22
**15 (7)**
7:9;143:12;151:22,23;
209:13,14,16
**1540 (1)**
3:13
**16-page (1)**
109:24
**19 (3)**
108:11;185:21;186:9
**1946 (1)**
7:9
**1993 (9)**
7:24;89:20,24;108:8;
127:23;149:8,9,24;
167:19

**2**

**2 (10)**
8:22,25;25:13;26:10;
38:20;86:7;100:20,21;
105:20;150:13
**2:06 (2)**
116:16;117:4
**2:24 (1)**
133:25
**2:33 (1)**
142:19
**200 (1)**
6:14
**2000 (2)**
169:2,14
**2004 (4)**
155:2,3;168:8,13
**2005 (1)**
168:11
**2006 (3)**
161:21;162:2;163:2
**2007 (15)**
68:21;71:14;75:10;
77:20;79:6;80:21;88:5,
10,13;92:21;93:2;94:15;
108:3,10;125:16
**2008 (29)**
11:25;13:22,25;15:2;
37:6;38:16;62:16;68:21;
88:17;94:11;105:5;
106:8;125:16;154:9;
155:21;161:23;163:10;

166:17,18;168:22;173:2,
6,19;176:7,13;177:7,18,
25;185:4
**2009 (6)**
185:21;187:10;
193:24,25;194:2;209:15
**2010 (5)**
9:20;102:13;103:21;
104:23;105:6
**2012 (3)**
11:8;223:10,22
**2013 (2)**
222:2,12
**20th (1)**
9:20
**21 (1)**
167:19
**212-692-1012 (1)**
3:16
**22 (1)**
108:2
**22nd (1)**
108:9
**23 (1)**
143:25
**240 (1)**
150:12
**25 (1)**
163:10
**27 (2)**
187:10;194:2
**28 (4)**
102:13;103:21;
104:23;105:5
**29 (13)**
71:14;75:10;77:20;
79:6;80:20;83:8,12;
88:5,10,13;92:21;93:2;
94:14
**29th (1)**
11:7

**3**

**3 (17)**
8:16;9:4,8;11:2,3;
25:10,11;27:24;28:20;
38:19;100:22,24,25;
109:4;144:2;169:10;
185:7
**3:30 (1)**
132:14
**3:34 (1)**
189:8
**3:42 (1)**
189:8
**30 (12)**
9:21;104:22;210:25;
211:3,5,16;212:22;
213:2;218:18,22;219:2,
14
**31 (3)**
168:22;185:4;209:15

**32W (1)**
6:15
**33 (1)**
207:17
**35 (1)**
116:13

**4**

**4 (22)**
11:25;13:22;37:6,10,
11,15,23;38:16;42:23;
44:11;86:6;87:4;94:10;
105:5;106:8;110:7;
113:12;130:7,8;168:12;
173:16;193:25
**4:00 (1)**
132:12
**4:18 (1)**
221:23
**4:28 (2)**
221:23;222:8
**48 (3)**
131:15,22;140:22
**49 (3)**
131:15,22;140:22

**5**

**5 (16)**
42:19,20,25;43:6;
94:24,25;95:5,8;100:3,
10,17;101:4,9;102:4;
106:17;193:24
**5:00 (2)**
143:8,16
**5:30 (2)**
143:8,16

**6**

**6 (13)**
68:5,6;69:21;80:21;
88:9;92:19,21;93:2,13;
95:18;97:9,22;124:16
**65th (1)**
6:14
**66 (1)**
7:11

**7**

**7 (6)**
68:9,10,13,14;221:25;
222:12
**75 (2)**
105:19;116:9
**78 (1)**
3:5

**8**

**8 (24)**

92:14,15;94:8,10,20;
95:4,7,18;97:9,22;
124:16;174:5,8,9,11,12;
175:25;177:12,13,14;
210:22,23;212:2;219:5
**8-31-08 (3)**
185:11;186:8,17

**9**

**9 (12)**
102:19;108:6,12;
110:10;111:25;174:5,8,
9,12;178:13,14;180:8
**90 (2)**
81:22;84:19
**914-297-0110 (1)**
3:7
**93 (5)**
7:14;154:3,4;155:19;
177:2

**A**

**ability (3)**
46:10;47:18;104:16
**able (8)**
20:13;63:10;72:8;
120:4;140:24;171:11;
207:9;217:16
**absent (1)**
28:23
**Absolutely (10)**
6:21;7:25;12:9,24;
18:22;118:19;161:14;
181:17;184:5;189:18
**acceding (1)**
194:21
**accelerated (1)**
178:24
**accept (6)**
41:8,16;59:19;65:14;
178:18;194:22
**acceptable (1)**
139:2
**acceptance (4)**
42:21;43:2;58:19;
70:16
**accepted (9)**
39:3;40:13;41:3;46:9;
59:3;69:4,7;99:8,10
**accommodate (2)**
159:7,22
**accommodation (1)**
143:7
**Accordingly (1)**
96:14
**act (8)**
12:14;69:7;102:24;
130:3;144:9,25;145:12;
211:22
**acted (2)**
161:11,13

**acting (2)**
187:3;211:22
**action (31)**
8:19;9:7;13:3,6;17:10;
22:10,11;30:4,20;62:6,8;
81:24;82:8,9;84:20,23,
24,25;85:3,8,13;96:3,10;
130:7,7,10;133:18;
140:7,9,25;183:23
**actions (20)**
22:5;30:2,5,6,14,16;
31:4,5,6;37:3;81:3;
104:25;105:7;106:11;
107:11,14;140:24;
141:25;174:23;196:25
**actively (1)**
31:10
**activities (1)**
93:12
**acts (7)**
100:12;101:23;102:7,
9,16,19,22
**actuality (1)**
154:11
**actually (13)**
11:12;23:12;31:21;
45:6;55:21;92:10;
100:22,23;112:13;
118:15;131:2;133:13;
163:11
**addition (5)**
118:18;136:7;137:4,
16;138:2
**additional (1)**
215:13
**address (2)**
6:13;131:10
**addressed (3)**
72:19;73:14;163:12
**adjourn (1)**
221:25
**adjourned (1)**
222:11
**advice (11)**
20:14,15;146:13,17;
190:17,24;191:2,8;
194:12,18;196:6
**affair (2)**
46:3;56:8
**affidavit (11)**
121:7;173:11,13,18;
174:15;176:8,14,15;
177:7;180:9;182:5
**afford (2)**
26:24;158:7
**afraid (4)**
178:8;179:10,11;
212:10
**afternoon (2)**
117:15;134:24
**again (37)**
8:2;11:12,16;21:2;
24:21;28:5;39:19;48:12;

53:9;66:14;71:4;91:20;
97:6;103:9;105:23;
115:14;118:4,5;120:7;
129:6;134:8;135:4,13;
153:13;156:9,19;
170:12;173:4;176:9,11;
183:16,17;192:5;201:3;
202:3;216:14;221:7
**against (8)**
16:25;17:7;22:14;
35:9;164:7;210:24;
218:25;219:4
**agents (1)**
81:4
**ago (14)**
11:13,16;25:19;27:16,
22;28:8;29:2;30:7,15;
31:17;113:13;121:15;
134:9;193:12
**agree (7)**
12:20;85:24;139:4;
174:16;180:8,10;219:3
**agreed (6)**
153:2;212:4,21;
218:14,24;221:24
**agreeing (1)**
218:17
**agreement (16)**
75:2;78:17;88:24;
107:17,18,21;108:7;
149:8,10;150:3;176:3;
209:15,17,22;218:21;
222:9
**agreements (2)**
75:13,20
**agrees (1)**
218:22
**ahead (10)**
12:11,19,22;13:8;
21:25;111:2;115:18;
120:12;179:6;191:15
**aim (1)**
143:16
**air (1)**
105:11
**Airy's (1)**
205:18
**allegation (2)**
100:8,16
**allegations (3)**
99:13;100:10;102:18
**alleged (2)**
102:23;106:17
**allow (2)**
28:22;118:25
**allowed (2)**
115:21,25
**alluding (1)**
183:21
**almost (1)**
204:24
**alone (1)**
138:7

**along (1)**
136:23
**although (1)**
90:10
**always (8)**
120:8;141:15;174:23;
175:13;181:19,20;
207:10;212:12
**amended (9)**
8:18,21,23;9:2,5,9;
10:8;108:6,18
**among (1)**
174:15
**amount (2)**
118:22;206:19
**angry (3)**
211:24;214:14,17
**announced (4)**
119:11;121:2,3;122:2
**answered (29)**
27:13;31:15;33:4,11,
12;51:19;54:10;56:21;
57:5;61:15;81:16;84:3;
99:4;105:9;110:12;
118:10;126:13;128:17;
145:4;147:19;150:22;
160:2;165:4;203:13;
208:7;209:5;215:7,19,21
**Apartment (1)**
6:14
**Apparently (1)**
132:15
**appearance (2)**
117:16;136:4
**appeared (1)**
117:15
**appearing (1)**
121:17
**appears (1)**
134:12
**apply (1)**
85:4
**appoint (2)**
41:24;65:6
**appointed (3)**
59:2;139:21;178:8
**appointment (10)**
38:3;40:13;42:24;
58:18,19,21;59:3,19;
69:5;178:22
**appreciate (1)**
119:3
**appreciated (1)**
162:21
**approached (1)**
189:11
**arbitration (12)**
151:9,16,19;152:9,9,
12;156:4,11;157:12;
173:25;193:7;197:6
**arbitrator (2)**
153:10,14
**argue (2)**

216:5,16
**arguments (2)**
96:17;218:13
**Arie (33)**
17:9;148:2;150:14;
153:5,8,15;154:25;
198:4,7,8,18;199:12,12;
200:4,5;204:16,19;
205:4,7,13,20;206:8;
207:3,6,16,18,24;
208:16;220:2,3,4;221:2,
9
**Arie's (2)**
199:14;205:17
**arise (1)**
45:16
**arisen (1)**
135:9
**asserted (2)**
22:13,14
**assertion (1)**
137:5
**asset (1)**
197:20
**assets (11)**
22:23;154:17;175:22;
180:18;204:19;205:4,5,
19,22;206:20;209:3
**assignment (4)**
162:2;164:14,18;
165:2
**associated (5)**
119:20;120:16,17,18;
182:13
**Associates (2)**
3:12;212:3
**assume (6)**
52:3,12,12;54:3;
70:12;121:20
**assumed (2)**
53:9;121:18
**Assumes (2)**
98:5;170:15
**assuming (1)**
49:22
**assumption (2)**
52:9,13
**attempt (2)**
158:11;188:14
**attempted (6)**
65:6,14;75:18;95:13;
144:17;147:16
**attempting (1)**
22:6
**attempts (2)**
137:3;138:3
**attend (5)**
120:21,23,25;121:25;
152:8
**attendance (1)**
58:5
**attention (4)**
39:16;40:6;151:21;

152:2
**attorney (46)**
10:19,20;14:3,6,9;
15:5;71:13,16,18,22,22;
72:2,6,16,24;87:15;
99:21;113:5,6;116:17;
117:15,17;119:24;
120:19;125:14;126:10;
127:23;128:4;136:13,14,
19;172:20,22;185:19;
186:8;190:9,12;191:23;
192:9,9,15;193:9;
194:18;206:15;211:8;
222:6
**Attorney-client (6)**
16:7;92:2;124:21;
138:17;191:11;194:4
**attorneys (20)**
13:23;14:12;20:19;
21:4;54:12;67:10,11;
71:8;137:17;145:16;
146:2;147:15;164:16,17,
21,22,22;188:7,10;222:6
**attorney's (4)**
79:11;117:7,11;
146:13
**auction (38)**
183:22;188:21;
191:19;195:21;197:12;
198:9,16,21;199:7,9,23,
24;200:3,8,13,14;201:8,
19,24;202:2,7,8,11,16;
203:7,8,11;205:14;
207:4;208:17;213:9,10;
214:23;215:5,16;217:7;
218:2,3
**August (2)**
168:22;185:4
**availability (3)**
132:7,11;134:10
**available (1)**
132:12
**avoid (1)**
56:14
**award (2)**
151:16,19
**awarded (2)**
153:6,9
**aware (33)**
38:8,13;39:2;40:14,
20,22;41:23;42:12,16;
49:8;65:5,8,13,18;69:6,
13;77:22;79:13;98:16,
16;107:11;112:2;114:7;
117:24;165:21,23,24;
186:4,7;187:13;190:6;
200:2,14

**B**

**Back (44)**
20:8,9;23:7;32:21;
51:7,12;55:2,7;58:13;

60:16,20;70:25;82:14,
21;84:4;87:19;105:13;
116:8;117:3;129:8;
131:7,19;143:19;
153:25;156:17;157:5;
160:9,10,13,15,17,17,19,
23;161:16;162:3,7;
171:15;174:20;180:3;
195:4;200:21;202:21;
208:10
**bad (1)**
114:18
**balance (1)**
67:21
**bankrupt (2)**
181:9,10
**Barbara (1)**
134:3
**based (7)**
78:10;85:5,14;96:10;
109:14;141:19;150:7
**basically (7)**
16:25;25:7;61:12;
118:7;179:5,7;202:9
**basis (6)**
16:5;20:16;24:13;
49:20;73:10;80:9
**bat (1)**
135:7
**bathroom (2)**
189:10;221:19
**bear (1)**
175:17
**became (12)**
13:23;29:20;37:6;
38:17;65:5;67:14;88:22;
95:12;104:19;107:9;
161:23;186:7
**become (16)**
29:21;38:18,19;40:22;
41:23;42:12,13;45:9;
46:14;60:3,10,13;65:23;
66:9;67:15;71:9
**becoming (1)**
89:17
**Beg (1)**
193:16
**began (2)**
14:3;148:12
**begin (2)**
30:18;117:12
**beginning (4)**
40:20;122:6;180:7;
218:19
**Behalf (13)**
3:4,12;14:13;18:5,17;
19:10;20:14;21:19;23:6;
35:8;103:6;141:21;
209:19
**behave (1)**
175:15
**belief (7)**
99:16;100:12;102:7,

16,21;106:15;115:5
**believing (1)**
196:24
**bell (2)**
14:16,17
**beneficiaries (1)**
81:4
**beneficiary (6)**
12:5,19;19:16;39:4;
123:3;190:20
**benefit (4)**
120:11;148:5;176:4;
177:17
**besides (5)**
60:12;63:15;64:2,20;
192:15
**best (22)**
12:15;20:19;21:5,9;
46:10;47:16,17;78:23;
87:23;88:2;104:15;
129:2;144:15,25;
163:22;190:18;198:11;
199:17;203:11,19;
204:6;209:2
**better (1)**
81:17
**bid (2)**
197:20;200:14
**bidding (2)**
203:20;204:7
**bids (1)**
198:22
**big (1)**
45:6
**bill (9)**
18:18,24;19:9;26:18;
85:19;192:5;193:12,14,
24
**billing (1)**
34:23
**bills (20)**
18:14,16;19:17;22:4,
8,17,21,24;23:3,6,17;
35:16,18;79:4;139:21;
192:4;193:15,18,20;
205:8
**birth (1)**
7:8
**bless (1)**
142:7
**blurred (1)**
68:23
**both (7)**
18:2;86:5;105:19;
150:18;159:6;180:12;
219:17
**bottom (4)**
35:19;74:7;180:22;
221:5
**bought (3)**
183:23;184:3,7
**brainwashed (1)**
207:22

**break (25)**
76:14;81:18,19,21;
84:12,13;85:22;86:12,
20;87:2,9;113:11,14,21;
114:11;117:14;118:3;
122:5;132:8;188:22,25;
189:3,10;192:22;221:19
**breakdown (1)**
53:10
**breakfast (2)**
113:17;116:12
**breaking (1)**
143:4
**briefly (1)**
26:14
**Broadway (1)**
3:13
**brought (2)**
96:4;140:11
**Bryan (2)**
134:7,25
**building (1)**
207:11
**burden (1)**
170:19
**business (2)**
58:2;121:5
**buy (1)**
199:20

# C

**call (9)**
57:2;63:6;82:10;
131:22;132:6;134:2;
196:16;199:11;206:20
**called (4)**
6:3;86:25;107:18;
134:8
**calling (5)**
131:23,24;135:8;
137:2;196:12
**Calls (4)**
49:11;56:21;158:21;
167:4
**calm (2)**
210:25;211:24
**came (8)**
15:16;73:20;112:19;
117:3,14;150:24;179:7;
185:18
**Can (96)**
11:20;13:13;19:24;
20:9;23:7;28:4;32:16,
21;33:3,6;36:16,17;42:4,
5;44:20;50:13;51:6;
52:3;55:6;58:13;60:15;
61:13;66:7,14,18;67:3;
70:24;75:6;78:20;82:14;
83:19,20;84:13,21;
89:21;90:8;92:23;94:25;
96:4,15;98:24;105:13;
106:3;107:22;111:8;

118:14,24;119:4;
121:19;127:10,10;129:6,
7;131:4,5,10,18,19;
138:9;139:5,24;140:2;
143:2,4,18,21;149:6;
150:5;151:8;154:16;
156:8,9;157:5;167:8;
168:15;173:3;174:4;
176:11;180:2;183:17;
187:2,22;188:22;191:3,
18;192:7,21;195:21;
202:10,20;204:22;
208:10;212:13;214:17,
25;216:12
**candidate (1)**
179:8
**candidly (1)**
207:23
**candy (1)**
208:8
**capacity (4)**
16:16,19;18:3;91:12
**care (5)**
47:18;61:8,8;139:6;
141:3
**cares (1)**
61:10
**caring (1)**
181:7
**carpet (1)**
86:19
**carry (2)**
141:22;164:4
**case (16)**
25:14;56:16;85:4;
93:20,25;96:5,15,22;
114:3,25;115:2;123:13;
142:9;166:14;197:2;
222:7
**cases (2)**
35:23;80:13
**cause (3)**
130:6,7;179:12
**caused (1)**
182:15
**caveat (1)**
194:5
**certain (2)**
24:25;219:22
**Certainly (4)**
118:16;120:4;137:20;
194:16
**certify (1)**
223:7
**chambers (1)**
134:3
**chance (1)**
196:15
**change (4)**
13:18;128:20;154:6;
171:9
**changed (2)**
154:4,19

**changes (1)**
11:14
**charge (1)**
170:4
**charging (1)**
35:23
**check (8)**
35:22,22;205:24;
206:2,3,7,8,17
**checked (1)**
132:10
**children (20)**
148:5;150:10,16,18;
153:19;154:17;159:7;
170:19;171:2,10;172:6,
7,10;174:24;175:19,22;
176:4;177:17;180:23;
181:6
**children's (1)**
175:13
**chooses (1)**
126:23
**chose (4)**
56:16;165:14;166:13;
190:7
**circumstances (3)**
154:4,5,19
**claim (2)**
130:9,10
**claimed (1)**
217:22
**claiming (1)**
153:6
**claims (2)**
22:13;153:8
**clarify (1)**
30:21;189:17
**clean (1)**
203:5
**clear (13)**
14:5;17:24;31:16;
32:13;39:21;62:22;
79:15;104:7,12;113:4;
120:15;201:9;215:12
**client (5)**
14:4;85:3;101:9;
117:21;194:11
**client's (1)**
118:22
**cocounsel (1)**
136:17
**code (1)**
6:15
**Coleman (1)**
181:23
**collect (10)**
158:4,12,14;159:20;
167:2,20;172:2;178:10;
187:23;199:22
**collected (19)**
153:24;155:6,16,18;
156:13;157:9,13;
158:17;159:17,24;

164:2;168:4;172:5,12;
182:23;183:6,13,18,20
**collecting (1)**
195:24
**collude (1)**
101:17
**colluded (3)**
101:11,13,15
**collusion (2)**
101:17;115:6
**comfortable (1)**
48:5
**communications (5)**
67:22;134:5,20;
142:20;194:11
**company (4)**
24:2,5;148:14;171:10
**comparison (1)**
217:24
**compete (1)**
188:20
**complaint (17)**
8:18,21,24;9:2;25:14;
86:7;100:11,17,19;
102:5;105:20;106:18;
108:11;131:2,3,9;140:23
**complete (1)**
223:10
**completed (1)**
143:13
**complicated (1)**
169:9
**Compound (5)**
158:18;200:10;210:5;
215:17;219:6
**computer (4)**
73:21,22,23,25
**concentrate (1)**
101:22
**concern (5)**
21:11;139:11;140:5;
141:16;181:21
**concerned (2)**
204:20;210:19
**concerning (2)**
102:19;193:21
**concession (1)**
194:23
**concluded (2)**
142:17;191:17
**conclusion (1)**
50:11
**condition (1)**
206:18
**conduct (1)**
49:24
**conducting (1)**
93:3
**conference (1)**
142:17
**confident (1)**
47:23
**confidential (2)**

138:25;194:10
**conflict (8)**
21:12;50:7,19;54:13;
57:21;58:8;77:22;
117:23
**conflicts (1)**
77:23
**confusing (1)**
183:17
**connection (8)**
14:18;21:18;53:25;
56:11;65:22;81:6;89:16;
118:9
**consequence (1)**
49:24
**consequences (1)**
175:17
**consider (1)**
198:4
**consideration (4)**
97:20;98:17;111:22;
112:3
**considered (1)**
197:23
**considering (3)**
45:9;46:13;141:6
**conspiring (1)**
114:23
**constantly (1)**
62:12
**consult (2)**
125:5;190:6
**consulted (1)**
190:8
**consulting (2)**
190:9;217:11
**contained (2)**
100:10,17
**contains (1)**
194:10
**Cont'd (1)**
3:1
**contention (1)**
194:21
**contest (1)**
104:16
**continuation (2)**
137:13;166:2
**continue (6)**
33:10;109:24;121:22;
143:12;175:11,12
**contrary (1)**
137:4
**control (2)**
166:7;205:18
**conversation (12)**
59:11,16;67:7;132:13;
191:23;211:7;214:8,10,
11,12;217:6;218:8
**conversations (8)**
65:21;66:8,19;67:4,9;
193:13;194:13;196:5
**copies (4)**

8:22;19:17;122:9;
195:2
**copy (7)**
9:5;68:18;185:20,25;
186:9;193:12,13
**correction (4)**
189:21,23;190:4,5
**counsel (18)**
39:14;83:13;84:17,25;
85:6,9,17;86:6,19,21;
87:7;103:6;112:9;
124:13,25;125:6,25;
130:5
**counsel's (1)**
85:24
**count (5)**
34:6,11,12;86:6;87:4
**COUNTY (1)**
223:5
**couple (2)**
27:3,4
**course (7)**
10:21;44:2;135:8,18;
138:20,25;198:7
**court (55)**
36:19;52:23;83:18,24;
84:22;85:12;96:3;97:12;
117:9;119:19,22;
121:11;130:11,13,16;
131:23,23,24;132:6,17;
134:22;135:3,11,12,16,
19,21,22,24;136:5,10,21,
24;137:8,16,19,22;
138:6,15,21,24;139:8,
12,23;140:6,14;141:2,9;
142:3,15;162:18;170:9;
173:19;181:22;182:6
**courtesy (1)**
83:10
**covered (1)**
28:2
**covering (1)**
193:25
**CPLR (5)**
96:19;118:24;119:4;
133:6,10
**created (5)**
114:15,18,21,23,24
**creative (1)**
157:24
**cross (2)**
96:5;140:13
**crossed (1)**
85:2
**current (1)**
11:18
**currently (2)**
14:2;140:21
**cut (1)**
189:13

---

**D**

**D&K (51)**
30:10;81:23;82:8,9;
84:20;85:8;96:9;107:17,
17,18,21;108:7;148:13,
24,25;149:4,21;150:15;
151:5,13,22;152:4;
153:7,9,17;154:21;
157:21;162:3;167:2,14;
168:7,25;169:13,17;
183:8,13,15,18,25;
184:8;200:20;209:14;
212:18,20;219:4,10;
220:11,18,20;221:13,14
**Dalia (98)**
6:12;8:16,17,17,20,22,
25;9:4,5,8,8,12;17:9;
18:24;19:13,14;22:9,11;
24:7,20;25:9,13;26:9;
28:20;35:6;36:14;37:10,
11,15,23;42:19,20,23,
25;43:6;52:19;68:5,6,9,
10,13,14;69:21;73:17;
80:21;82:20;88:9;90:25;
92:14,15,19,21;93:2,12;
94:8,10,20,24;95:18,18;
97:9,9,22,22;98:20;
108:12;110:10;111:24;
112:9,16;135:10,12;
136:8,23;137:14;
138:14;140:23;149:7,9;
151:18;162:14;163:8;
168:16,17;173:10,11,12,
12;185:7;193:23;196:6,
7;202:24;204:4;209:16;
216:22;223:7,17
**Dalia's (2)**
86:8;221:25
**date (18)**
7:8;10:4,5;14:24;
25:23;41:2;70:8;90:10,
11;91:7;92:7;94:19;
104:20;139:6;141:24;
168:21;192:14;222:4
**dated (4)**
88:10;94:10;108:2;
193:24
**dates (3)**
38:23;162:19;194:14
**daughter (3)**
35:2;49:24;178:22
**David (15)**
152:15;159:15,21;
160:12;161:13,15;163:9,
22;166:3,5,10;171:19;
172:12,25;173:6
**day (19)**
9:20;11:7;26:12,21,
22,23,24;27:2;44:13,19,
21;95:24;108:9;125:15;
130:25;141:22;143:4;
205:6;223:21
**days (20)**
11:13,16;25:19;27:16,

22;28:7;29:2;30:7,15;
31:17;210:25;211:3,5,
16;212:22;213:2;
218:18,22;219:2,14
**de (1)**
119:9
**deal (2)**
115:3;157:22
**debt (3)**
154:11;164:4;169:24
**December (19)**
68:20,21;71:13;75:10;
77:20;79:6;80:20;82:25;
83:8,12;88:5,10,13;
92:21;93:2;94:14;
125:16;167:19;223:9
**decided (2)**
59:19;170:5
**decision (1)**
141:13
**default (4)**
168:20,24;184:17,20
**defeat (1)**
153:25
**defeated (1)**
197:2
**defendant (1)**
9:5
**defining (1)**
77:2
**Definitely (2)**
114:25;115:2
**definition (1)**
79:11
**Delaware (3)**
14:20;22:10,11
**delay (1)**
188:8
**dellajo@duanemorriscom (1)**
3:17
**DELLAPORTAS (74)**
3:15;34:14,21;39:7;
40:18;57:23;58:3;81:20;
82:2,6,11,16;83:4,9,13,
22;84:13;87:3;95:21;
96:2,11,25;97:13,23,25;
98:13;113:3;119:10;
120:20,24;121:11,14,23;
122:11;130:4,21;131:3,
8,13,21;133:17,23;
136:14;137:5,12;139:9,
10,23;140:4;141:20;
144:10;146:3;152:21;
155:23;156:5;158:21;
163:4;167:4,22;176:17,
21;179:15,18,21;182:19,
24;203:14,23;204:8;
210:6;215:19,22,25;
217:8
**demand (1)**
196:9
**denied (1)**
102:5

ORLY GENGER VS.
DALIA GENGER, et al

DALIA GENGER
December 13, 2012

**Denies (3)**
100:9,11,16
**Deny (1)**
100:8
**depend (1)**
115:8
**depends (1)**
115:10
**deponent (5)**
136:8,23;137:10;
222:5,13
**deponent's (1)**
222:5
**deposed (2)**
133:9;142:7
**deposition (43)**
7:21;10:14,16,18;
24:18,25;28:3,11;33:20;
82:8;85:2,7;86:8;87:8,
16;100:21;105:21,22;
112:11;113:6,8;116:14,
18;119:6;120:21;
124:17;130:23;134:10;
135:10,18;137:2,14;
139:7;141:17,21,23;
142:21;143:13;195:14;
205:13;221:25;222:10;
223:9
**depositions (1)**
143:15
**designated (1)**
38:9
**destroy (4)**
177:10;178:4;180:14;
213:14
**destroyed (2)**
181:16,18
**destruction (1)**
171:5
**determine (2)**
67:14;77:18
**determining (1)**
145:14
**deterred (1)**
142:5
**different (3)**
19:6;103:16;182:25
**difficult (2)**
46:5;113:25
**direct (2)**
86:5;151:21
**direction (1)**
98:4
**directly (4)**
22:18;57:11;212:20;
219:4
**disagree (1)**
153:16
**disagreed (4)**
152:18;153:3,10,15
**disagreement (1)**
57:3
**disappear (1)**

160:5
**disaster (1)**
174:20
**disconnected (2)**
142:18,21
**discovery (4)**
84:21;96:20;130:12,
22
**discuss (35)**
27:20;30:7,15;31:21;
44:25;45:11,21,22,22;
58:18,25,25;59:6;60:8;
66:3;87:8;89:9;147:6,
14;191:25;192:2,7;
193:3,10;195:8,18;
196:11,17,22;197:8,11,
18,21;201:22;202:5
**discussed (18)**
27:16,23;28:10;29:8,
14;30:12;31:17;48:9;
58:20;60:3;66:25;71:8;
89:9;147:4;174:11;
201:20;202:9;203:9
**discusses (1)**
151:22
**discussing (1)**
111:10
**discussion (4)**
85:18;90:2;132:3;
193:22
**dismiss (1)**
96:9
**dispute (2)**
139:4,5
**distinguish (1)**
20:13
**distribution (1)**
155:8
**divorce (9)**
17:8,11;150:24;151:6;
154:10;171:8,22;
173:21;177:4
**divorced (5)**
148:2;154:7,18,25;
168:10
**divorcing (1)**
159:4
**doctor (1)**
53:16
**document (61)**
10:10;11:12,15;27:23,
24;28:24;37:12;38:6;
43:5,21;44:8,23,24;45:8;
68:10,19;69:22,24;70:7,
9,23;74:10,14,23;76:3;
79:16;89:19,23;90:10;
91:23;92:9,15,18,19,21,
25;94:23;107:25;
108:15,17;109:9,15,16,
20,25;110:17;111:11,12,
18,24;113:22,24;114:8,
15,17,22,24;124:6;
168:17;185:17;194:8

**documentation (1)**
197:5
**documents (20)**
10:19,22,23;24:25;
25:5,7;67:13;70:2;
93:10,18,19,24;95:17;
97:8,21;114:2;129:13;
196:4;220:22,23
**dollars (2)**
151:6;217:23
**done (20)**
12:25;13:3,6,20;
15:22;75:21,25;76:4,9,
20;77:19;78:12;102:25;
110:4;111:3;118:17;
120:14;122:24;177:2;
204:25
**double (1)**
156:16
**doubt (1)**
120:11
**Dowd (2)**
220:6;221:9
**down (3)**
143:5;210:25;211:24
**draft (1)**
210:3
**drafted (5)**
71:13,18;72:2,6;
209:25
**dragged (1)**
130:12
**dry (1)**
208:9
**DUANE (1)**
3:11
**duly (2)**
6:1,4
**during (13)**
44:19,21;75:22;87:8;
112:11;119:6,23;128:3;
132:8;135:9;137:2;
170:11;189:10
**duty (4)**
145:10;198:8,10;
210:12
**dying (1)**
164:11

**E**

**early (1)**
139:12
**earthquake (1)**
207:11
**easier (1)**
160:5
**East (1)**
6:14
**eat (1)**
116:12
**Edward (1)**
221:10

**effect (6)**
114:7;176:10,16;
177:17;187:12,20
**either (3)**
96:22;126:25;141:17
**Elana (5)**
46:24;47:2,2,5;67:4
**election (1)**
109:5
**Ellman (1)**
134:25
**else (22)**
12:23;24:5;46:8;47:7;
59:10;60:12;62:7;63:15,
21;118:15;124:3;139:8;
155:25;158:9;161:9,10;
162:20;189:25;192:16;
200:5;201:16;205:11
**else's (1)**
49:12
**e-mail (1)**
57:15
**e-mails (1)**
196:4
**enable (1)**
195:10
**encouraging (1)**
29:18
**end (10)**
23:20;112:19;115:15,
19;140:10;143:7,8;
153:19;173:4;205:5
**ended (3)**
52:11;53:2,6
**ending (1)**
143:8
**ends (1)**
52:5
**enforce (1)**
218:22
**enforcing (6)**
210:24;212:22;213:5;
218:18,25;219:4
**Enriquez (6)**
64:25;65:3,7,14;69:6,
15
**entered (3)**
87:16;117:25;155:4
**entitled (4)**
34:2;127:16,17;216:7
**equal (1)**
155:8
**equally (5)**
148:10;150:19;171:7;
175:20,22
**especially (2)**
86:3;119:12
**Esq (2)**
3:3,15
**establish (1)**
150:8
**established (1)**
98:6

**estate (14)**
148:4;150:17,18;
153:18,25;176:3,10,16;
177:2,10,16,21;178:5;
213:14
**even (6)**
88:19,21;123:10;
140:14;207:23;214:14
**eventually (1)**
61:9
**everybody (2)**
120:12;143:14
**everyone (3)**
143:10;162:18;211:2
**everyone's (1)**
136:3
**evidence (1)**
170:16
**exact (1)**
94:19
**exactly (20)**
10:4;23:23;25:23;
38:23;52:3;54:23;66:2,
24;75:24;76:8;78:3;
87:24;114:20;121:12;
128:23;154:5;162:4;
184:21;211:6;212:11
**EXAMINATION (1)**
6:8
**examined (1)**
6:6
**example (1)**
88:4
**Excellent (1)**
32:20
**except (5)**
25:8;63:3;99:13,14;
100:11
**exception (1)**
138:22
**exchange (4)**
97:21;98:10;111:23;
219:15
**Excuse (9)**
32:24;35:6;36:9;
52:18;81:25;103:25;
112:15,16;115:17
**Exhibit (59)**
8:17,20,22,25;9:4,8,
12;11:2,3,25:10,11,13;
26:10;27:24;28:20;
37:10,11,15,23;42:19,
20;68:5,6,9,10;86:7;
88:9;92:15;94:24,25;
95:4,5,7,8;98:20,21;
99:7;100:20,21;105:20,
21;108:6,11,12;149:9,
14;151:16,18;162:13,14,
17;168:17;173:10,12;
184:14;185:7;209:13,14,
16
**exhibits (3)**
8:15,16;124:16

ORLY GENGER VS.
DALIA GENGER, et al

DALIA GENGER
December 13, 2012

existed (1)
190:6
exited (1)
116:18
exonerate (2)
78:23;87:24
exonerated (2)
78:11;111:18
exoneration (3)
77:19;92:22;93:2
expenses (1)
81:5
explain (2)
156:24;182:11
explicitly (1)
96:3
explore (1)
207:13
exposed (1)
46:7
expressing (1)
80:14
extent (7)
74:20,25;75:12,19;
78:16;88:23;191:10
extra (1)
206:23

**F**

fact (12)
39:25;59:7;61:9;
65:13;66:3;114:6;151:4;
170:2,16;178:7;183:7,21
facto (1)
119:9
facts (3)
98:5;102:8;194:13
factual (1)
118:18
failed (2)
168:25;169:13
fairness (1)
84:16
false (1)
130:22
familiar (1)
31:12
family (11)
46:3,21;47:6,8;55:16;
60:4;69:16;139:13;
142:4;158:16;171:6
Fang (60)
3:4;37:11;41:24;
43:17,18;47:5,5;50:7;
54:13;55:22;57:3,22;
58:9;64:12,16,19;65:6,
21;66:8,12,13,19;72:17,
19,24;73:8,11;96:8,9;
100:13;101:13,23;102:7,
8,12,16,19,22;105:2,7;
106:11;107:4;108:2,8;
111:11,12,18;114:23;

117:21;121:17;122:6,8,
10;123:16;129:4;
131:17;136:15,17;
144:17;147:17
Fang's (2)
93:12;102:9
far (11)
30:13;53:4;59:6;64:5;
72:25;102:12;109:19;
174:18;204:19;210:19;
219:12
faster (1)
137:21
father (1)
208:5
favor (1)
161:6
favors (1)
160:22
February (5)
187:9;193:25;194:2;
221:25;222:11
feels (1)
189:15
fees (5)
85:4,5,15;130:14;
140:10
Feinman (2)
22:10,12
felt (1)
211:22
FEMALE (2)
134:11,15
few (3)
25:19;69:10;141:24
fight (1)
16:24
fighting (1)
142:10
fights (1)
218:14
filed (1)
131:17
files (2)
93:15,23
filing (1)
19:25
fill (1)
66:4
final (2)
151:16,18
finance (1)
171:11
finances (1)
170:4
financial (1)
206:18
financing (1)
205:12
find (13)
15:8;46:5,8;50:4;57:2;
63:14,19,22;76:22;
77:24;188:7,14;207:3

finding (1)
78:4
fine (8)
83:17;84:23;132:15;
139:8;178:16;194:24;
200:2;207:7
finish (8)
76:15,16;83:5;98:22;
106:7;127:16;147:12;
214:5
finishes (6)
8:6;52:20;104:2,14;
111:15;113:22
fire (1)
207:12
firm (19)
14:15,23;15:21;17:21;
18:17;21:18;23:22,22;
35:17;61:7,7,24,25;
109:6;119:21;120:16,
18;200:18;201:17
first (16)
6:4;41:23;68:16;
88:21;101:7;109:7,11,
14;152:8;157:3;181:20,
20;184:22;186:20;
209:24;211:7
five (5)
134:9;189:5,6;205:23,
23
fix (1)
39:23
focus (2)
217:21;218:5
follow (5)
35:2;146:12,24,24;
182:14
followed (2)
199:23,25
following (2)
134:4,18
follows (2)
6:6;143:25
foreclose (4)
158:14;187:3;212:13,
17
foreclosed (3)
212:18,19;218:10
foreclosure (1)
30:9
foreseeing (1)
177:3
forever (2)
142:7;171:20
forgiven (1)
178:25
form (35)
13:10;20:22;32:7;
38:10,21;45:25;57:23;
58:3;60:24;94:17;97:23;
100:12;102:6,16,21;
103:8;107:19;122:11;
123:23;152:20,21;155:9,

23;156:5,14;157:14;
167:22;176:21,22;
179:21;203:3,14;204:8;
210:6;213:22
former (1)
147:25
forth (2)
85:11;124:16
found (5)
67:8;153:11,14;
171:24;221:17
foundation (4)
39:7;40:18;91:2;97:25
four (2)
110:9;113:23
frankly (2)
140:15;208:16
free (1)
118:21
fresh (1)
33:5
friend (2)
158:13;217:3
friends (2)
207:3,5
front (2)
100:22;170:9
frustrated (5)
49:7,10,20,21;50:17
fulfill (1)
66:4
full (1)
51:25
fully (2)
96:16;141:12
functioning (1)
53:25
funds (1)
22:21
funny (1)
218:16
further (1)
134:18
future (1)
177:3

**G**

gag (1)
87:12
gain (2)
176:2,6
gather (1)
84:22
gave (15)
10:23;25:7;120:21,23;
121:21;123:16;139:22;
159:15,23;160:14,16,19;
162:3;196:6;219:15
geared (1)
84:21
Gener (1)
196:8

general (21)
29:6,24;45:12,12,15;
109:6;114:2;146:12,21;
149:19,21;168:7;
169:17;174:23;175:6,7,
13;200:12,12;219:15;
221:11
Generally (1)
95:15
GENGER (363)
3:21;6:12,16;7:1,12,
19,23;8:1;9:1,8,12,24;
10:1;11:1,18,19,21,25;
12:1,4,18;13:1,8;14:1,6;
15:1;16:1;17:1,7,9,9;
18:1,18,24;19:1,13,14,
16,18,18;20:1,20;21:1,4,
6,9;22:1,2;23:1;24:1;
25:1;26:1;27:1;28:1,22;
29:1;30:1,25;31:1,23;
32:1;33:1,14,24;34:1,4,
8,9;35:1,6,8,12;36:1;
37:1,2,14;38:1;39:1,3,4,
21;40:1,14,15;41:1,17,
25;42:1;43:1;44:1;45:1,
10,17;46:1,12,14;47:1,5;
48:1;49:1;50:1;51:1;
52:1;53:1;54:1;55:1;
56:1;57:1;58:1,4;59:1;
60:1;61:1,8;62:1,15,25;
63:1;64:1;65:1,15;66:1;
67:1,5;68:1;69:1,5,16;
70:1;71:1;72:1;73:1,18;
74:1;75:1,23;76:1;77:1;
78:1;79:1;80:1;81:1;
82:1;83:1;84:1;85:1,10;
86:1,10;87:1,19,22;88:1,
12;89:1,20,24;90:1;
91:1;92:1;93:1;94:1;
95:1;96:1;97:1;98:1;
99:1;100:1;101:1;102:1;
103:1;104:1,13,19,20,
24;105:1,4;106:1,2;
107:1;108:1,9;109:1,7,
10;110:1,6;111:1,10;
112:1,10;113:1,20,22;
114:1,7,8,24;115:1,13;
116:1,3;117:1;118:1;
119:1;120:1,18;121:1;
122:1,5,9;123:1;124:1,
10,15;125:1,5;126:1;
127:1;128:1,5,12;129:1,
3;130:1;131:1;132:1,23;
133:1,2,5,19;134:1;
135:1,6,10;136:1,9,13,
23;137:1,14;138:1,14;
139:1,13,20;140:1,23;
141:1,17,21;142:1;
143:1;144:1,14;145:1;
146:1;147:1;148:1,2,13;
149:1;150:1;151:1;
152:1;153:1;154:1;
155:1;156:1;157:1;

Ellen Grauer Court Reporting Co. LLC

(6) existed - GENGER

ORLY GENGER VS.
DALIA GENGER, et al

DALIA GENGER
December 13, 2012

158:1,16;159:1;160:1;
161:1,13;162:1;163:1,
13;164:1,12;165:1;
166:1;167:1;168:1;
169:1;170:1;171:1,5;
172:1;173:1,11,12,15;
174:1;175:1,6;176:1;
177:1;178:1;179:1,18;
180:1;181:1;182:1;
183:1;184:1;185:1;
186:1;187:1;188:1,25;
189:1,11,21;190:1;
191:1;192:1;193:1;
194:1;195:1,15;196:1,7;
197:1;198:1;199:1;
200:1;201:1;202:1;
203:1;204:1;205:1;
206:1;207:1;208:1;
209:1,20;210:1;211:1;
212:1,4,8;213:1;214:1;
215:1;216:1,23,23,25;
217:1,3;218:1;219:1;
220:1;221:1,9;222:1,10;
223:7;17
**Genger's (6)**
8:17;9:5;33:6;85:16;
144:15;164:17
**gentlemen (2)**
39:13;40:2
**germane (4)**
140:20,22,25;141:4
**gets (1)**
161:7
**given (5)**
160:13,17;161:16;
175:23;223:12
**giving (5)**
69:25;98:11;158:8;
194:18;217:24
**God (2)**
121:21;142:7
**goes (1)**
153:22
**good (5)**
76:13;113:15;114:18;
123:2;134:24
**GP (5)**
168:7,25;169:13,17,23
**grammar (2)**
156:15;157:15
**Great (1)**
96:11
**GRIVER (422)**
6:9;8:8,13,22;9:4,11;
10:6;13:19;16:10,13,14;
17:2,18;18:10;19:15,21;
20:2,8,12,25;21:16,25;
22:9,16;23:14;24:23;
25:12;26:11;28:18,21;
29:15;32:4,5,15,18,20,
25;33:2,6,13,19,23,25;
34:3;35:4;36:6,7,16,21;
37:9,13,22;38:11,25;

39:10,17,20;40:21;41:6,
14,22;42:5,11,18,22;
43:10;44:12;45:7,20;
46:11,19;47:20;48:19;
49:2,9,14,18;50:12,15;
51:6,10,12,16,24;52:10,
18,20,25;53:11,22;54:5,
11,17;55:2,6,8,14;56:9,
23;57:14,19;58:6,17;
59:9,15,23;60:11;61:3,
13,22;62:18;63:4,5,20;
64:11,15,24;65:12,19;
66:6,13,16,17;67:2,19;
68:4,8,12,25;69:3,9,14;
70:14,20,24;71:6,17;
72:5,15,23;73:9,16;
74:12,18;75:9,17;76:11,
15,18;77:4,8,16;78:9,14,
19;79:14,25;80:8,17;
81:14,25;82:4,10,12,21,
23;83:7,11,16,20;84:5,8;
86:5,9,13,16,21,22,25;
87:6,18;89:4,15;90:6,14,
21;91:2,4,14,15,17,21;
92:4,13,17;94:4,6,18;
96:7,14,23;97:4,5,19;
98:9,18;99:5;101:2,8,12,
21;102:3,20;103:9,12,
20;104:3,5,8,18;105:12,
18,25;106:19,23;107:24;
108:5,14,22;109:2,12,
13;110:2,5,19,21,23;
111:2,5,9,16;113:7,13,
18;114:13;115:16,17,18;
116:2,5,8,13;117:2;
118:12;119:7,25;120:8,
14,17;121:6,20;122:4,
14,19;123:9,20;124:7,
23;125:3,4,12,24;
126:19;127:5,9,14,17,
20,21;128:21;129:7,16;
130:15,19,25;131:6,15,
25;132:21,24;133:21;
135:2;136:7,10,11,12,
18,22,25;137:9,20,25;
138:12;139:3;140:16,
17;141:8,14;142:13;
143:6,11,18;144:12,13,
24;145:9;146:4,11,19;
147:2,11,24;148:18,22;
149:6,12,20;150:23;
151:15,20;153:4;
155:13;156:2,7,17;
157:2,5,10,19;159:10;
160:6;161:24;162:12,16,
24;163:2,7;165:7,13,18;
167:9;168:2,19;169:6;
170:20;171:3,14,18;
172:19;173:5,9,14;
175:5,10;176:19;177:6,
23;180:6;182:4,22;
183:5;187:25;188:5,24;
189:3,20;191:4,5,14;

192:23;193:4,11,15,17;
194:7,15,24;195:6,13,
17;196:3,10;198:17;
200:16;201:4,11,14;
202:24;203:4,18;204:5,
10,13,24;205:2;206:21;
208:10,18;209:12,18;
210:13;213:23;214:7;
216:24;217:5,13;219:11,
25;220:15;221:21,24;
222:4
**Griver's (1)**
115:20
**ground (1)**
138:17
**grounds (2)**
91:25;138:18
**Group (2)**
22:15;35:10
**guess (16)**
7:11;44:18;55:17;
80:24;99:17;125:19;
126:6,12;163:25;173:8;
183:15;185:24;188:12;
189:2;204:15;221:17
**guessing (1)**
126:16
**guy (1)**
17:23
**guys (1)**
142:11

**H**

**Half (8)**
26:23;27:2;86:20;
116:6,11;169:25,25;
192:2
**hand (8)**
8:14;22:15;32:25;
112:18;126:19;127:3;
138:4;139:17
**handing (1)**
162:17
**hanging (1)**
105:11
**happen (4)**
137:22;171:12;
207:11;211:13
**happened (2)**
77:23;165:22
**happening (2)**
166:4;207:18
**happy (4)**
52:6;54:24;113:21
**harassed (5)**
49:23;53:19,23;54:7;
55:10
**harassing (1)**
33:17
**Harassment (3)**
53:13,14,15
**hard (2)**

34:25;219:9
**harm (2)**
115:6,12
**harmful (2)**
76:9,20
**harmless (2)**
74:24;78:11
**Harris (11)**
87:15;116:17;117:9,
15,17,20,24;118:3;
119:5;120:3;121:12
**Harris' (2)**
118:11,16
**head (1)**
18:12
**hear (3)**
111:8;191:6;218:19
**heard (4)**
107:16,17,25;216:2
**held (1)**
78:11
**Hello (2)**
134:7,22
**help (2)**
34:14;163:23
**helpful (1)**
142:14
**hereby (1)**
223:7
**herein (1)**
6:4
**Here's (1)**
40:11
**Hey (2)**
196:12;199:12
**hid (1)**
206:4
**highest (2)**
200:15,19
**himself (1)**
214:13
**hire (1)**
14:22
**hired (3)**
15:4;85:10;128:2
**history (1)**
63:11
**Hoffman (1)**
117:20
**Hold (1)**
134:15
**holding (1)**
127:2
**holds (1)**
74:24
**home (1)**
93:10
**Honor (17)**
134:25;135:15;
136:12,16;137:25;
138:12,13;139:3,9;
140:5,16,21;141:8,12,
13,14;142:13

**Honor's (1)**
141:15
**hope (2)**
111:4;131:2
**hoping (1)**
171:9
**hospital (4)**
50:18;52:6;53:3,6
**hospitalized (2)**
49:23;53:17
**hour (6)**
86:20;113:13;116:6,
12;191:25;192:2
**hours (3)**
27:3,5;139:18
**house (1)**
57:10
**household (1)**
170:4
**housekeeping (1)**
8:14
**hundreds (1)**
217:23
**husband (12)**
148:2;154:18;155:5;
168:10;169:25;170:3;
177:4;180:11;182:12;
205:12;207:17;208:20
**Hypothetical (2)**
146:7,10

**I**

**idea (8)**
44:17;48:10,13;75:21;
111:22;114:15;123:2;
132:15
**identified (2)**
61:23;220:16
**Identifies (1)**
74:17
**ignore (1)**
33:20
**imagine (2)**
110:15;168:5
**immediately (3)**
88:22;121:4;208:7
**implemented (2)**
176:4;177:16
**important (1)**
123:4
**impossible (1)**
46:5
**improper (1)**
152:20
**inactions (4)**
37:3;104:25;105:7;
106:11
**inadmissible (1)**
138:9
**Inc (2)**
3:12;212:3
**included (6)**

ORLY GENGER VS.
DALIA GENGER, et al

DALIA GENGER
December 13, 2012

initiative (1)
166:8
injury (1)
81:5
insist (1)
175:8
instead (4)
18:12;132:16;143:8;
205:8
Instruct (11)
16:7;33:16;36:16;
90:17,21;92:2;115:14;
137:3,17;162:19;208:25
instructed (6)
92:20;104:24;106:11;
126:22;138:19;162:18
instructing (3)
104:11;124:23;191:7
instructions (2)
142:14;182:14
instructs (1)
29:16
Instrument (3)
38:2;42:20,25
intend (2)
85:4;194:3
intended (2)
153:23;155:6,17;
158:17
intent (6)
148:9;164:8;166:25;
167:11,20;211:10
intention (3)
154:3;171:19;212:7
intentions (2)
163:23;188:18
interest (27)
12:22;20:19;21:5;
47:17,18;62:13;78:23;
87:23;129:2;144:15;
145:2;148:23;149:3;
175:14,15;181:21;199:9,
14,15,15,16,17;200:20;
205:16,17,17,18
interested (2)
62:24;140:3
interests (7)
12:11,12,15,18,19,22;
13:7,8;21:12,13;22:7;
175:14
interpleader (1)
22:14
interrogatories (2)
9:6,10
interrogatory (3)
11:11;27:12;185:9
interrupt (1)
82:11
interrupting (1)
82:12
interruption (1)
20:6
into (2)

219:5;220:21,25;
221:8,11,12
includes (1)
81:3
including (2)
46:21;81:4
incomprehensible (2)
32:8;219:7
inconsistent (3)
180:22;181:5,11
incorrect (1)
118:20
increasing (2)
85:15,19
incumbent (1)
110:3
incurred (2)
23:6;81:5
incurring (1)
85:3
indeed (1)
12:21
indemnification (6)
79:18;80:22;81:3,10;
94:14;98:12
indemnifications (2)
123:17;125:7
indemnified (3)
78:11,21;79:6
indemnify (4)
78:24,25;79:3,4
independent (3)
28:24;61:7,25
indicate (1)
112:19
Indicating (1)
173:23
indication (1)
73:20
individual (12)
15:22;16:5,16,16,19;
18:2,24;20:16;22:18;
24:13,15,20
individually (1)
21:5
indulgence (1)
143:14
influence (1)
187:2
inform (2)
135:25;190:7
information (15)
29:13;99:15;100:11;
102:6,15;103:22;
106:15;123:3,4,13;
124:9,14;129:4;133:14;
166:10
informed (3)
123:14;161:10,12
inherent (1)
117:23
initiated (2)
17:6;35:7

155:4;195:14
investigate (4)
102:10,11;104:25;
105:6
investigated (1)
106:10
investigation (9)
62:4;76:2,22;77:3,12;
93:4,11;103:15;106:12
Investment (3)
3:12;212:3;218:24
invisible (1)
118:17
invite (2)
120:25;121:25
invited (2)
120:20,22
invoices (1)
21:17
involved (13)
31:18;34:5,10;35:14,
24;56:7;95:12;139:12;
162:8;203:7;204:19;
205:14;208:17
involvement (1)
122:7
involving (1)
139:20
irrelevant (3)
137:6,11;138:9
issue (3)
19:25;153:11,15
issues (4)
84:22;132:7;135:9;
139:20

judge (7)
82:10;97:17;131:12;
132:11;134:3,21,22
judge's (3)
132:10,10;216:8
judgment (3)
131:17;140:20;141:5
June (1)
7:9
Justice (5)
134:9,14;151:10,17;
173:25

K

keep (14)
17:5;34:19;35:15;
36:2,3,8,12,22,24;83:13;
104:12;145:5;171:20,23
keeping (1)
162:11
kidding (1)
191:24
kids (5)
154:23;157:23;158:6;
159:5;160:5;168:5;
175:17
Kilmerman (1)
221:10
kind (8)
29:12;30:20;52:4;
61:7;67:6;79:24;80:15;
118:25
knew (11)
45:15;121:16,18;
124:3,5;166:3,14;193:8,
8;206:17;207:15
knowing (1)
87:24
knowledge (7)
97:7;100:11;102:6,15;
103:22;172:24;183:10
known (3)
55:17;207:24,25
knows (2)
121:12;166:15
Kortmansky (8)
17:22;126:2,3,10;
127:22;128:2,4,15
Krause (1)
135:2

L

Lack (3)
39:7;40:18;97:25
Lance (5)
87:15;116:17;117:9,
15,20
language (1)
176:5
last (13)
9:16,23;10:7,9;11:4,

10;20:9;30:20;70:6;
99:7;143:19;175:25;
181:4
later (5)
130:18;138:9;139:6;
165:25;171:23
laughing (1)
211:15
law (14)
14:15,23;15:21;21:18;
35:17;74:20,25;75:12,
20;78:17;88:24;96:21;
200:17;201:17
Lawrence (1)
221:10
lawsuit (5)
16:24;17:3,6;35:9;
36:6
lawsuits (16)
31:8,11,12,18,22;
33:24;34:4,7,9,19;35:5,
7,13;36:22,25;46:7
lawyer (59)
15:9,11,13,17,19;17:7,
22;25:2;31:15;43:16;
59:18;70:12,17;73:7,11,
25;74:4,5;77:11;89:6,10,
10,12;90:2,7,15;91:9,13,
22;93:21;95:19;97:16;
122:17,22;124:2;128:10,
11,13;129:14,18,22,24;
133:4;144:5,22;146:25;
165:23;166:16;190:7;
192:13;193:5;210:2,4,4,
8;214:2,3;217:11;
221:17
lawyers (8)
31:9;53:24;77:9,12;
136:7,19;165:21,24
lawyer's (2)
73:23,24
layperson (1)
114:2
Leah (104)
3:4;37:11;41:24;43:4;
45:16,22;46:22;47:5;
49:7,10,19,21;50:7,16,
19,20,24;51:18;52:11;
53:2,6,18;54:6,19,23;
55:9,19;57:3,22;58:9;
64:19;65:6;66:8,12,13,
19;67:22;69:25;72:11,
14,16,17,19,24;73:8,11,
15;74:17,19,24;75:11,
19,21;76:3,9,20;77:18,
25;78:2,4,6,10;88:2,6,
23;93:4,11;96:8,9;
98:11;100:13;101:13,14,
15,23;102:7,8,9,12,16,
19,22;105:2,7;106:11,
16;107:4;108:2,8;
111:11,12,17;114:23;
115:4,8;117:21;122:6;

J

Jaffe (3)
134:3,21,22
Jaffe's (1)
134:9
January (17)
11:25;13:22;37:6;
38:16,19,19;44:11;
62:16;68:20,21;88:16;
94:10;105:5;106:8;
125:16,17;209:15
job (11)
34:2;46:8;48:25;52:5;
62:11;123:21;126:25;
127:4,7;203:10;209:2
JOHN (3)
3:15;121:6;139:10
join (15)
16:9;19:19;32:10;
49:16;50:10;81:19;
85:20,24;121:23;
123:24;144:11;152:22;
167:6;204:12;209:8
Jonathan (4)
125:25;126:10;
127:22;136:14

ORLY GENGER VS.
DALIA GENGER, et al

DALIA GENGER
December 13, 2012

123:16;129:4;131:17;
136:15,17;144:17;
147:16
**Leah's (5)**
38:7;42:23;53:25;
67:10,11
**least (2)**
156:15;219:14
**leave (2)**
82:19;138:7
**led (1)**
61:9
**left (5)**
61:12;96:8;117:3;
211:23;214:16
**legal (12)**
50:11;79:13;80:15;
85:3,5;114:2;130:14;
139:21;171:25;188:14;
194:12;196:25
**legally (4)**
159:8,13;172:17;
195:23
**LEINBACH (30)**
96:19;112:8,21;113:7;
115:23;119:8,14,19;
121:9,19;132:5,19;
133:3,8,12,16;134:7,8,
12,17,24,25;135:5,17,22,
25;162:16;189:18;
195:3;216:7
**lent (1)**
24:2
**letter (6)**
57:20;94:14;162:14;
163:12;165:9,15
**letting (3)**
197:9,19;198:4
**liability (1)**
129:5
**life (2)**
47:19;160:4
**lifetime (1)**
12:4
**limit (2)**
98:23;137:17
**limited (5)**
108:6,7;210:25;
216:11;218:25
**line (12)**
35:19;75:5;86:2;90:5;
97:11;103:11;130:6;
137:6,9;143:25;144:2;
169:10
**list (2)**
36:2,3
**listen (3)**
39:17;201:15;216:25
**litigation (4)**
117:18;137:7,11;
142:5
**LLP (1)**
3:11

**loan (2)**
23:21;24:4
**loans (3)**
23:2,5,17
**location (1)**
44:6
**logic (1)**
174:22
**long (8)**
26:16;103:18;110:7;
114:5;126:21;191:22;
192:8;219:14
**look (39)**
9:23;10:13,18,24,25;
11:4;28:17,23;35:20;
37:16;63:25;64:6;68:13,
16;69:21;75:5;81:2;
88:9;93:14,14;94:7;
96:7;98:19;99:7;100:3,
15;105:19;116:3;
131:16;174:3;177:12;
178:13;181:3;184:24;
185:9;192:3;201:2,7;
218:21
**looked (4)**
31:9;64:19;93:23;
169:24
**looking (8)**
9:12;28:19,23;67:20;
106:5;108:15;163:8;
194:9
**looks (1)**
108:21
**lot (2)**
61:11;182:15
**LP (18)**
30:10;148:13,21,24,
25;149:21;183:8;184:8;
209:14;212:18,20;219:4,
10;220:11,18,20;221:13,
14
**ludicrous (1)**
103:6
**lunch (5)**
113:14,21;114:11;
116:6;119:23

**M**

**mail (2)**
185:2,18
**major (1)**
13:16
**makes (3)**
19:12;40:3;130:8
**making (2)**
36:19;118:23
**manage (1)**
29:5
**Manhattan (3)**
23:24;24:2,5
**many (30)**
17:4;31:13;33:24;

34:4,6,9,15,18,22;35:2,5,
5,7,11,13;46:7;80:13;
112:10;142:6,6;152:25;
166:12;199:19;203:20;
204:7;211:21;216:18;
218:13,13;219:13
**March (7)**
11:8;173:19;176:7,13;
177:17,25;193:24
**Marisa (1)**
135:14
**marital (12)**
151:9;152:9;156:4,11;
157:11;169:24;170:11;
173:24;193:7;197:5;
205:22;206:24
**Mark (4)**
55:6;108:5,22;168:16
**marked (46)**
8:21;9:3,10;11:2;
28:20;37:9,12,15;42:18,
21,23,25;43:5;68:4,7,8,
11;80:21;92:14,16;95:9,
11,25;94:7,20,24;95:17;
97:9,22;98:20;108:13;
110:9;111:24;149:6,11;
151:15,19;162:13,15;
168:18;173:10,13;
185:11;188:16;209:13,
17
**married (1)**
207:17
**Masyr (2)**
3:22;136:20
**matter (8)**
8:24;75:8;139:17;
140:12;146:12;159:13;
181:18,20
**matters (7)**
8:14;85:10;99:15;
139:14,15,19;141:23
**maximize (1)**
201:18
**maximum (9)**
74:20,25;75:11,19;
78:16;88:23;98:11;
123:16,23
**may (23)**
21:12,23;28:10;36:5;
40:7,7;58:5;78:12,12;
82:24;85:17;102:9;
104:8;113:5,23;119:16;
125:8;126:24;130:10;
143:20;166:16;185:21;
186:9
**Maybe (5)**
14:20;19:22;61:6,24;
112:5
**mean (45)**
13:18;17:8,11;26:6;
29:6;31:8,10;35:3,25;
47:2;58:23;77:23;81:11;
98:23;100:8;112:5;

123:7;130:3;138:22;
142:24;144:8;150:12;
153:3;154:18;159:13;
162:11;164:5;168:6;
169:23;171:24;174:21,
23;177:22;181:9,19;
183:16,16;184:5;
188:20;191:10;195:24;
196:2;213:9;219:13,17
**meaning (1)**
167:13
**means (8)**
18:7;78:25;79:2,3,5;
99:8;159:5;184:6
**meant (1)**
79:18
**mechanism (1)**
155:7
**meet (2)**
26:13,16
**meeting (3)**
209:14,17;218:21
**MEISTER (272)**
8:6;9:25;13:12;14:2,6,
22;15:4,5,8,21;16:4,6,
12,15,18,22;17:25;
18:16,23;19:21,23;20:3;
21:18,23;22:2,11,14;
23:7;24:11,12,17;25:5,9,
16;26:5,9,13,17;27:7,15,
19;28:7,15,25;29:16;
30:7,15;31:14,17;32:2,7,
12,17,19,24;33:4,4,10,16,
25;36:5,9,14;37:18;
39:14;45:25;49:11,17;
50:9,11;51:19,22;52:17,
23;57:4;60:15,19,24;
63:3;66:12;68:22;69:2;
70:3;71:16;75:6;76:13;
78:16;81:12,16;82:20;
83:2;84:2,11;85:21;
86:11,14,18,24;87:7,10;
88:25;89:8,13;90:17,25;
91:11,25;94:17;99:3,24;
100:23;101:6,8,19,25;
102:18,23;103:2,7,19,
25;104:5,10;105:24;
106:17;107:19,22;
109:11,23;110:17,21,24;
111:3,7,14;112:7,9,13,
16;113:11;114:11;
115:13,17,19;119:16,20;
120:15;123:5,18,24;
124:18,21;125:2,8,23;
126:13,16;127:4,7,12,
15,19;128:2,16;135:14,
14;138:13,14,16,23;
139:5;142:16,25;145:3;
146:7,14,17;147:10,18;
148:15,20;149:16;
150:21;152:19;155:9,22,
24;156:14,22;157:14;
158:18;159:25;161:20;

162:17,23,25;165:3,11,
16;166:20,24;169:4;
170:15,22;172:15;
173:3;174:25;175:8;
176:22;177:19;180:2;
182:2;185:20;188:11,13,
22;189:6;190:22;191:4,
7;192:9,21;193:11,16,
23;194:9,20,25;195:5,9,
19;196:11,17;197:4,8,
18;198:2,14;200:8,10,
17,21;201:6,9,16,22;
202:5,12,19,20;203:3,6,
12,21;204:3,12,22;
208:6,21,25;209:8;
210:5;213:22;214:5;
215:17;216:5,16,21;
219:6,24;220:8,12;222:3
**Meister's (3)**
20:14;35:17;191:8
**member (1)**
69:16
**memo (4)**
80:20;91:5;94:10;
108:12
**memoranda (1)**
196:3
**memory (2)**
109:18;195:16
**men's (1)**
87:11
**mental (3)**
7:17;8:3,9
**mention (6)**
130:8;131:21;220:24;
221:3,15,18
**mentioned (6)**
49:25;50:17,18;
139:24;220:19;221:4
**merely (1)**
194:12
**messages (1)**
56:25
**met (4)**
15:5;26:5,6,14
**middle (2)**
104:11;192:23
**midnight (1)**
44:18
**might (24)**
27:10;28:2;54:18;
60:13;61:7,8;62:24;
109:21;110:12;124:3;
127:24;131:16;151:2,2;
161:4;171:24;186:13,14,
20;187:7,13;189:12;
197:7;207:4
**million (7)**
150:13;164:5,11;
175:18;205:3,5,20
**millions (2)**
217:22,23
**Milonis (3)**

151:10,17;173:25

**mind (3)**
20:14;49:12;62:13

**minds (1)**
158:20

**minimum (2)**
123:3;140:23

**minute (4)**
14:20;20:4;37:16;
137:8

**minutes (8)**
81:22;84:19;113:12;
116:13;134:9;143:12;
189:5,6

**Mischaracterizes (2)**
179:22;182:20

**misrepresentation (2)**
85:6,15

**Missry (1)**
3:22

**mistake (3)**
189:12,14,15

**moment (4)**
19:24;36:14;119:18;
193:11

**Monday (1)**
25:22

**money (17)**
23:25;118:23;142:11;
163:25;169:19;172:10;
196:25;197:15,16;
205:15,21;206:4,20,23,
24;207:7,9

**month (1)**
34:20

**moot (1)**
96:17

**more (5)**
59:16;86:15;116:11;
150:9;207:9

**Moreover (1)**
117:19

**morning (1)**
44:15

**MORRIS (1)**
3:11

**most (3)**
78:5;197:15,16

**mother (6)**
47:19;55:21;180:24;
181:7,7,12

**motion (4)**
96:12;131:16;140:20;
141:5

**motions (2)**
118:23;138:10

**motivation (1)**
163:24

**mouth (3)**
104:12;121:21;208:9

**Move (8)**
51:22;81:16;85:17;
110:17,23;113:9;137:21,

24

**moved (2)**
96:9;111:5

**much (6)**
23:25;98:24;174:4,14;
207:7,16

**multiple (1)**
142:2

**must (2)**
29:17;40:8

**myself (1)**
133:20

### N

**name (11)**
6:10;15:10;17:20,21,
23;23:22;65:4;74:3;
117:7,11;221:16

**namely (1)**
177:4

**names (1)**
221:3

**natural (1)**
153:3

**near (1)**
90:11

**necessarily (1)**
140:8

**necessary (3)**
137:15;221:15,17

**need (8)**
37:16;45:18;66:4;
81:21;84:17;87:10;
116:11;188:25

**needed (3)**
93:21;161:19;211:5

**needs (1)**
47:18

**negative (2)**
156:16;215:18

**neither (2)**
154:14,19

**nervous (2)**
36:20;53:9

**New (12)**
3:6,6,14,14;6:5;113:4;
133:12,16;177:9;178:8,
23;223:24

**next (5)**
40:11;51:22;81:17;
98:23;181:4

**night (1)**
44:15

**nodding (1)**
18:12

**nominated (2)**
42:10,13

**nomination (1)**
46:9

**nonaction (3)**
30:4,8,11

**nonactions (2)**

30:5,6

**None (2)**
79:20;84:19

**nonspeaking (1)**
137:18

**nor (2)**
118:15;194:11

**normal (1)**
161:6

**Notary (4)**
6:5;43:17;44:2;223:24

**Note (145)**
13:9;17:16;20:21;
30:10;51:21;52:8;58:4;
71:24;87:6,10;90:4;
96:9;97:10;99:23;
106:20;108:10;117:2,
13;118:13;120:24;
121:24;123:22;135:18;
142:16;149:8,10,18;
150:3,6,12,14,15,24;
151:5,13,22;152:4,6;
153:7,9,17,23;154:12,
15,20,21,21;155:5,6,15,
18;156:12,25;157:13,21,
24,25;158:2,3,4,7,9,10,
10,12,15,17;159:5,8,9,9,
21,24;160:5,10,10,13,15,
17,17,23;161:16;162:3;
7;163:10,23;164:2;
167:2,14,17,21;168:6;
169:5;170:13,18,24,24;
171:2,4,11,12,20;172:3,
4,7,7,11;173:2,6;174:21;
177:5,22,25;178:10,17,
20,21;179:12,17;180:13,
14,19;181:9;182:23;
183:6,13,15,18,20;
185:11;187:3,23;195:23,
24;210:24;212:14,17,19,
22;213:5,8;218:18,22,
25;219:4

**noted (5)**
50:12;92:6;103:7,12;
108:23

**notes (3)**
168:24;169:14;172:24

**notice (24)**
84:18;96:6;113:12;
120:21,23;121:7;
139:16;168:20,24;
184:17,19,25;185:3,11,
11,13,20;186:2,8,9,12,
17;190:6;198:6

**noticed (4)**
82:7;85:2,12;86:4

**notify (3)**
165:20;198:7,8

**notifying (1)**
30:9

**notion (1)**
150:7

**notorious (2)**

119:15,17

**November (3)**
108:2,9;163:10

**number (7)**
100:25;130:7,8;
136:25;185:9;210:22,23

**numbered (1)**
100:24

### O

**oath (8)**
9:20;32:4;87:20;
99:10;102:5,14;176:8;
223:9

**object (33)**
36:17;38:10,21;49:16;
51:2;57:23;58:3;60:24;
68:22;91:25;97:23;
103:10;104:8;113:3,7;
122:11;130:5;141:20;
152:21;155:23;156:5,
14;167:22;175:9;
176:21,22;179:21,23;
203:3,14;204:8;210:6;
219:7

**objected (3)**
121:4;122:2;160:9

**objecting (4)**
32:7;40:2,3;104:11

**objection (210)**
13:9,13;16:6,9;17:16;
20:21;21:15;24:22;32:2,
11;33:11,16;39:6;40:17;
41:5,11,19;42:2,14;43:7;
44:9;45:3,13,24,25;
46:18;47:13;48:16,22;
49:5,11,13;50:9,10,12;
51:21;52:8;53:7,21;
54:4,9,14,21;55:11;56:5,
12,19;57:4,6,13,16,24;
58:10;59:4,12,20;60:6,
23;61:2;62:17;63:2,16;
64:7,14,21;65:11,16,24;
66:11,22;67:16,25;69:8,
11;70:10,18;71:15,24;
72:12,22;73:5,12;74:11,
15;75:14;76:5,24;77:7,
13;78:8,13,18;79:7,10,
21;80:4,11,14;81:12,13;
83:25;84:2;88:25;89:8;
90:4,8,17;91:11;94:17;
95:22;97:10,13,24;98:2,
13,14;99:3;103:5,7;
105:8;106:20;107:19;
110:17,25;118:2,8,14;
119:8;121:24;122:12;
123:5,6,8,10,18,22;
124:18;127:8,16,19;
128:16;131:14;137:23,
24;139:24;144:10,18;
145:3,5;146:3,7,8,14,22;
147:18,21;148:15;

**150:21;152:19;155:9,**
22;156:6,22;157:14;
158:18,21,23;159:25;
161:20;162:25;163:3;
165:3,11,16;167:4,23;
170:15,22;172:15;
176:17,18;177:19;
179:15,19;182:2,19,21,
24;183:4;191:6;198:14;
200:10;203:12,17,21,23;
204:9,12;206:14;208:6;
209:4,8;210:5,10;
213:21,22;215:17,20;
217:8,9

**objections (6)**
40:4;91:17;118:5;
137:18;138:17;216:8

**objective (1)**
205:10

**obligation (4)**
6:20;178:24;179:14;
180:19

**obtain (1)**
133:13

**obvious (1)**
154:14

**Obviously (22)**
12:13;13:15,16;38:15;
42:10;43:14;46:4;62:2;
112:22;124:3,5;154:4,
10;166:3;170:25;
172:17;181:8;19:190:11,
21;202:13;218:3

**occur (4)**
208:2,3,5,21

**occurred (2)**
132:8;208:23

**October (1)**
168:8

**Off (8)**
20:2;131:25;132:3;
135:7;189:13;192:21;
204:22;221:21

**officially (1)**
88:14

**Old (2)**
3:5;7:10

**once (5)**
85:4;120:7;134:8;
154:17;190:5

**one (36)**
10:15;17:21;22:15;
25:8;36:20;47:3;59:16;
70:2;71:20;72:4;83:4,
19,22;113:5,5,6,8;124:5;
130:25;134:15;139:11,
22;141:9,12;158:11,16;
170:5;171:25;172:2;
177:5;178:9;195:4,4;
203:19;204:6;210:2

**one-half (2)**
153:6,9

**only (10)**

ORLY GENGER VS.
DALIA GENGER, et al

DALIA GENGER
December 13, 2012

7:5;30:11;35:9;47:22;
61:12;83:18;113:5;
140:5;180:11;200:7
open (3)
83:21;119:14,16
opening (2)
48:24;49:3
operation (2)
49:12;158:19
operative (1)
86:6
opinion (1)
124:2
opportunity (1)
189:17
opposing (1)
84:16
option (5)
61:24;195:20;197:22,
25;201:21
options (7)
61:9,21;191:9,16;
195:7,18;214:2
Orchard (1)
3:5
order (9)
6:22;24:6;30:20;46:9;
62:6;67:14;87:12;91:23;
150:10
original (1)
175:21
originally (1)
171:9
Orly (160)
7:12,19,22,23;11:19,
21,25;12:4,18;13:8;
14:6;16:24;17:7;18:17;
19:16,18;20:19;21:4,6,9;
23:18;29:6;30:9,21,25,
25;34:8,9;35:8,12,24;
36:23;39:3,4;40:14,15,
23;41:4,7,17,25;45:10,
17;46:9,14;47:10,11,12,
15,23;49:24;50:5,7;
54:18,24;55:24,25;
56:11;57:2,21;58:4,9;
60:4;61:8,10;62:15,25;
65:15,23;66:5,10,21;
67:22;69:5;71:9;75:23;
76:10,20;77:5;85:16;
87:22;88:3,12;89:17,20,
24;95:13;104:20,24;
105:4;107:5,10;108:9;
111:23;114:8;115:6,12;
120:18;122:9,18;124:2,
10,14;128:4,12;129:3,3;
135:5;144:14,15;148:7,
9,12;149:3;154:15;
155:5,8;159:21,21;
160:9;161:15;162:6,10;
163:24;164:12,13,17,25;
165:20;171:6;177:8;
178:7;180:15,24;181:8,

14,16,25;183:12;186:16;
190:7;197:9,19;198:6;
199:8,205:8,11;207:19,
20,21,24;208:4,22,22;
209:20;212:4,8,20;
217:20,22
Orly's (30)
53:24;54:12;56:3,7;
57:10;62:13;77:9,11;
85:6,9;120:19;136:19;
174:22;181:21;182:16,
18;199:15,16;204:19;
205:4,5,16,19;211:12,
13;212:11;213:6;
214:13;218:15;219:10
otherwise (3)
19:14;21:7;122:17
out (15)
23:2,5;39:22;57:2;
75:6;76:23;78:4;86:24;
104:6;112:18;127:8;
162:17;180:17;182:16,
18
outrageous (1)
163:20
over (14)
25:8;26:7;28:2;30:2,5;
36:18;68:25;85:4;
127:19;141:25;205:19;
216:14,14,14
Overall (1)
29:5
owe (3)
163:25;164:11;172:10
own (4)
12:19;166:8;171:10;
184:7
owners (1)
22:7
ownership (3)
150:11,11,16
owns (3)
30:21,25;31:2

**P**

page (21)
9:16,23;11:4,4;99:7;
100:5,7,22,23,25;109:3;
110:6;143:25;144:2;
149:14,15,16;151:22;
169:10;173:16;185:8
pages (6)
109:8,11,14;110:9;
193:19,20
paid (18)
21:21;22:2,8;24:5,8;
46:7;62:2;154:21,22;
159:9,11,14;169:24,25;
170:25;172:18;205:11,
20
paper (6)
18:21;19:4,6,8;26:8;

42:16
papers (1)
97:17
paragraph (20)
100:3,10,17;101:4,9;
102:4,19;105:19;
106:17;116:4,9;131:4,9;
175:25;177:12,14;
180:8;219:5;220:17;
221:5
paragraphs (5)
140:22;152:3;174:5,7,
8
pardon (1)
193:16
parents (3)
153:25;154:11;159:6
Parnes (12)
152:15;159:15,24;
160:12;161:13,15,25;
163:9;171:20;172:12,
25;173:6
Parnes' (1)
164:13
part (15)
55:16;81:5,6;93:24;
96:14;151:6,25;153:18;
168:20,24;171:10;206:5,
24;220:22;221:13
partially (1)
183:15
participant (1)
202:10
participate (7)
188:19;199:22;201:7;
202:14;203:8;206:9;
207:4
participated (2)
200:2;207:6
participating (1)
202:15
particular (3)
151:25;157:18;166:14
particularly (1)
204:18
parties (13)
134:12;140:8;153:23;
155:17;164:8;167:2,12,
13,15;220:19,20;221:24;
222:9
partner (7)
17:22;149:21;
168:7;169:17;210:25;
219:2
partners (3)
209:14;220:10;221:14
partnership (3)
108:7,7;220:18
party (9)
113:6;133:2,3,17;
139:22;140:7;178:24;
179:14;219:17
passed (1)

141:24
past (4)
141:19,22;171:22;
189:12
Patricia (6)
64:25;65:3,7,14;69:6,
6
PAUL (2)
3:3;136:15
paul@zilberfeinlawcom (1)
3:8
pay (28)
22:21,23;23:2,5,17;
39:16;40:6;79:4;152:2;
154:15,20;157:23;
158:7;159:5;160:11;
164:11;168:5;170:5,6;
171:2,11;172:6,7;177:5;
181:9;205:3,4,23
paying (10)
21:17,20;22:17,19;
139:21;142:11;154:11;
170:3;175:17;205:8
payments (3)
168:25;169:13,20
peanuts (1)
217:24
Pedowitz (2)
21:18;22:13
pending (5)
37:18;82:17;96:13;
140:6;175:2
penny (2)
21:21,22
people (20)
115:3,10,11;182:13;
197:14,20;198:21;
199:19,22;200:7,13;
201:7,13;202:15,17;
203:7,9,20;204:7;219:22
people's (1)
158:20
percent (1)
85:25
perfect (1)
22:6
Period (5)
139:25;146:16;
153:19;180:24;193:25
permissible (5)
74:20,25;75:12,19;
88:23
permission (1)
215:4
permit (3)
119:5;214:24,24
permitted (2)
78:17;214:22
person (7)
46:6;52:4,6;61:12;
83:19;161:12;180:11
personal (2)
175:14;218:13

personally (6)
133:20,22,24;172:9;
176:2;207:16
persons (2)
220:16;221:9
philosophy (1)
175:16
phone (7)
55:24;56:17;62:23;
63:6;131:12;134:23;
142:18
physical (5)
7:18;8:3,10;18:20;
19:3
Physically (2)
43:24,25
pick (4)
55:24;56:17;62:23;
63:6
piece (2)
18:20;19:3
pieces (2)
19:6,8
place (3)
137:23;139:24;
187:22;215:23
places (1)
162:20
placing (1)
138:4
plaintiff (2)
119:24;136:8
plaintiff's (2)
9:6,9
plan (8)
148:4;150:18;176:3,
10,16;177:10,16;178:5
planning (8)
113:14;150:17;
153:18;154:2;171:6;
177:2,21;213:14
please (62)
6:11,23;23:8;27:6,18;
28:14;29:4;33:5,21;
36:15,20;42:6;51:7,13,
23;52:19;55:3;60:16;
61:4;67:3;69:21;70:25;
82:22;83:9;90:9;94:5;
98:19;100:4;101:8,20,
22;105:13,19;108:22;
115:14;122:3;131:7,20;
137:19;143:19;156:8;
171:15;174:3;175:11;
180:3;184:14;187:18;
188:2,23;196:13;
200:21;201:15;202:21;
208:11;209:24;214:5,
10;216:16,22,25;221:20;
222:3
pleased (1)
54:19
pledge (3)
149:8,10;150:3

Ellen Grauer Court Reporting Co. LLC

(11) open - pledge

ORLY GENGER VS.
DALIA GENGER, et al

DALIA GENGER
December 13, 2012

pm (12)
87:14,14;108:23;
116:15,16;133:25;
142:19;189:8,8;221:23,
23;222:8
point (21)
50:22;62:8,9;63:23;
75:6;81:17;95:12,21,25;
96:18,21;117:20;131:4,
8;143:11;147:25;148:3;
160:8;162:4;185:6;
186:6
points (4)
27:9,15,19;112:10
position (17)
65:15;66:4;118:7;
141:15;151:5,12;
155:20;156:3,12;157:12,
18,20,21;172:2;193:6;
194:7,17
possibilities (1)
207:10
possibility (7)
196:12,18,22;197:9,
19;207:8,14
possible (4)
95:10;199:20;200:15;
203:19,20;204:7
possibly (1)
49:17
potential (1)
58:25
potentially (1)
63:10
practice (6)
113:4;133:12,16;
137:4;139:13;141:19
preceding (1)
208:7
precise (1)
9:24
predicate (1)
169:4
premarked (1)
8:15
preparation (1)
25:18
prepare (2)
10:17;24:21
prepared (4)
10:15;24:17;194:5,23
preparing (3)
10:13;24:18,19
presence (8)
118:11,16;119:9,14;
121:2,3,8;122:2
PRESENT (3)
3:20;118:4;135:23
presentation (1)
119:10
preserve (3)
118:2,5,14
preserved (1)

118:8
presume (1)
198:6
pretty (1)
96:2
prevent (9)
7:18;8:3,10;33:21;
137:13;177:8;188:7;
196:23;213:12
prevented (1)
177:11
prevents (1)
96:20
previous (3)
92:19;132:8;144:17
Previously (4)
60:2;63:3;71:7;154:22
price (9)
198:11;199:17;
200:15,19;201:19;
203:11,19;204:6;209:2
prior (3)
58:19,20;186:8
privilege (7)
16:7;92:2;124:22;
138:18;191:11;194:4,19
privileged (6)
29:13;138:25;191:13;
194:3,8,16
probably (10)
25:15;26:2,19;31:15;
43:16;134:8;144:22;
145:20,23,25
problem (18)
7:18;8:3,10;45:15;
46:4,22;48:7,7;50:2,3,4,
19;60:9;67:7;157:22;
158:3,6;220:5
problems (1)
182:15
procedure (3)
6:25;199:23,24
procedures (1)
7:2
proceed (4)
58:5;122:3;214:22;
217:7
proceeding (6)
95:13;97:12;117:22;
130:11,13;151:17
proceedings (8)
87:17;116:19;117:22;
134:4,19;142:22;
150:25;151:7
process (1)
98:17
produce (3)
193:12;194:5,6,23
promise (2)
217:25;218:12
promised (2)
158:14;159:20
promissory (7)

149:7,9,18;150:2,6,14;
167:17
proper (1)
86:2
properly (1)
86:4
protect (5)
12:8;21:9;88:3;
181:24;182:6
protecting (1)
176:3
provide (7)
122:9;123:2;129:3;
144:17,20;147:16;
190:24
provided (4)
19:17;43:13;110:4;
166:10
providing (4)
22:20;93:16,19,24
provision (2)
118:24;119:5
Public (3)
6:5;43:17;223:24
purported (2)
91:5;122:7
purports (1)
74:10
purpose (3)
29:23;150:6;175:21
pursuant (1)
216:8
pursuing (1)
212:7
put (30)
12:10,17,21;13:7;
27:18;32:13;33:5;52:17;
81:21;83:16;84:15,17;
110:24;112:18;117:5,11,
16;119:13;120:6;121:7;
126:19;127:10,10,12;
131:5;141:2;143:21;
174:23;175:13;190:3
puts (1)
83:14
putting (8)
82:2,4,6;83:2,5;84:14;
177:8;196:9

**Q**

quiet (1)
127:2
quite (1)
140:15
quote (4)
74:24;100:9;153:17,
20

**R**

raised (6)
27:9;28:11;30:8;

96:21;141:16;197:25
raising (1)
28:15
rather (1)
130:21
react (2)
161:8,9
reacted (3)
161:5,16;164:6
reaction (2)
19:21,23
read (71)
11:12;20:9,10;23:7,9;
25:15;31:11;32:21,22;
33:6,8;42:7;51:8,12,14;
55:2,4;58:13,15;60:16,
20,21;61:18;70:25;71:2;
82:14,21;86:6;99:19;
101:7,9;102:8;105:13,
14;108:20;109:7,24;
110:9;114:2,4;129:7,9;
130:7;131:2,3,6,18;
143:19,23;156:17,20;
157:5;158:25;171:15,
16;174:4,14,19;180:3,4;
188:3;200:21,22;202:21,
25;208:10,12;210:12,14;
222:14;223:8
reading (8)
11:15;101:16;109:14;
155:24;169:5,5;174:18;
182:3
really (33)
13:25;31:5,9,11;
34:25;35:3;40:6;53:17;
58:2;62:20;72:4;76:7;
91:8;103:4,18;114:4;
126:4,7;127:24;128:6,
25;130:11;150:7,8;
152:6;159:12;163:5;
164:10;166:23;169:9;
183:16;196:24;210:8
reappears (1)
118:6
re-ask (1)
21:2
reason (8)
47:22,25;114:18,18,
20;140:18;159:23;166:6
reasonable (1)
189:19
reasons (2)
137:2;139:11
recall (18)
23:23;59:10;60:4;
66:18;67:4,20;71:10;
109:15,19,21,22;111:10;
151:4,12;152:17;153:5;
166:22;209:22
receive (5)
97:21;184:25;185:3,
10;186:7
received (5)

111:23;150:13;
185:20;186:21;187:7
receiving (4)
185:12,25;186:8,11
recess (4)
20:4;87:13;189:7;
221:22
recessed (1)
116:15
recision (3)
164:13,17;165:2
recognize (3)
37:14;69:22;150:2
recognized (1)
22:7
recollection (9)
28:24;29:3,9;43:20;
107:13;108:16;109:8;
110:10;163:9
recommend (1)
85:16
recommended (1)
15:9
record (97)
6:11;14:5;17:25;20:2,
8,10;21:24;23:9;27:18;
28:18;32:22;33:8;39:15,
16;40:4,5;42:7;51:8,14;
52:18;55:4;58:4,15;
60:21;61:18;62:22;71:2;
81:21;82:3,5,7;83:3,6,
14,17,21;84:14,16,17;
87:3,19;105:14;108:10;
110:25;112:8,22;113:4,
8;115:14;117:4,6,12,16,
18;118:13,19;119:13;
120:7,25;121:10,24;
127:8;129:9;132:2,4,18,
20;137:23;139:7,25;
141:3;142:16;143:3,5,
23;149:7;156:20;
158:25;171:16;173:10;
179:22;180:4;182:20;
188:3;189:9,17;190:4;
192:21;196:9;200:22;
202:25;204:22;208:12;
209:13;221:21;223:11,
12
recorded (1)
102:11
recreate (2)
178:23;179:13
redact (1)
140:2
redacted (1)
138:9
reduced (1)
34:20
Referring (3)
25:9;26:9;124:15
reflect (2)
28:18;112:9
reflecting (1)

193:13
reflects (1)
  194:13
reformation (1)
  17:12
Refrain (5)
  210:24;212:22;
  218:17,24;219:3
refresh (5)
  43:20;108:16;109:8;
  110:10;163:9
refreshes (1)
  109:17
regard (4)
  201:23;202:2,6,8
Regarding (6)
  23:18;66:8;97:11;
  125:7;195:19;196:6
regular (3)
  62:3;168:25;169:13
reimbursement (1)
  85:5
reiterating (1)
  94:13
relate (1)
  140:8
related (9)
  70:22;84:20;85:8;
  96:3;130:6;139:19;
  178:23;179:13;196:4
relates (2)
  139:15;140:6
relationship (2)
  127:25;128:3
release (23)
  68:6;69:25;74:17;
  75:19;79:24;80:3;88:22;
  98:11;124:4;130:8;
  131:22;139:22;219:16,
  18,19,20,22,23;220:2,4,
  7,21;221:11
released (3)
  80:24;129:4;221:6
releases (11)
  74:19,23;96:10;122:8,
  10;123:16;124:9,16;
  144:16,21;147:16
releasing (1)
  75:11
relevance (2)
  87:4;130:13
relevant (10)
  81:23;82:9;84:22;
  85:18;123:12,15,18,21;
  124:9;131:9
rely (1)
  145:24
remarks (2)
  39:13;40:3
remember (148)
  9:21;10:4,12;13:25;
  14:14,17,21,24,25;
  15:10,13,18,16:2;17:20,

21,23;25:17,23;26:2,5,6,
7;27:15,17;28:15;30:13;
31:6;35:10;38:23;39:24;
40:25;41:21;43:9;44:6,
14,16,20;47:9;57:18;
59:6;22,24;64:23;65:4,
20;66:2,7,24;67:18,23;
68:3;71:20;72:4;74:2,3;
75:24;76:7,77:15,17;
78:3;88:8;92:12;93:6,7,
8,17,19;94:2,2,19,22;
95:4,7,14;97:15;100:16;
102:12;103:14;105:3,
17;106:13;107:7,12;
108:4;111:13,13,17,20;
114:16;122:21;124:20;
125:11,22;126:4,7,14;
127:25;128:6,7,8,9,10,
22,25;129:23,25;130:2;
144:4,6,7;147:4,8,23;
151:2,14;152:24;
162:10;163:17;164:19,
24;166:23;178:11,19;
184:21,23,24;185:5,12,
15,16,25;186:4,10,11,
13;187:16,17;188:9;
189:25;192:11,12,13;
195:11;196:14;197:10;
201:20;203:9;209:10
remembers (1)
  10:2
remind (1)
  162:17
remove (1)
  40:24
removed (1)
  95:14
rendered (2)
  22:4;194:12
repeat (17)
  11:20;39:23;42:4,5;
  50:13;61:3,13;66:14;
  89:21;92:23;94:25;
  96:23;97:4;151:8;
  158:24;167:8;187:25
repeatedly (1)
  126:22
rephrase (1)
  201:15
reporter (34)
  20:11;23:10;32:23;
  33:9;36:19;42:8;51:9,
  15;52:23;55:5;58:16;
  60:22;61:19;71:3;83:18,
  24;105:15;117:9;
  119:19,22;129:10;
  132:17;135:11,19,22;
  143:24;156:21;159:2;
  171:17;180:5;188:4;
  200:23;203:2;208:13
represent (5)
  14:23;15:25;133:23;
  135:4,5

representation (1)
  130:5
representative (2)
  19:15;96:8
represented (3)
  117:21;190:13,15
representing (10)
  16:15,19;17:19;18:2;
  21:4;22:3;24:12,13;
  133:19,21
requested (23)
  20:11;23:10;32:23;
  33:9;42:8;51:9,15;55:5;
  58:16;60:22;61:19;71:3;
  105:15;129:10;143:24;
  156:21;159:2;171:17;
  180:5;188:4;200:23;
  203:2;208:13
requests (1)
  19:20
required (10)
  122:16,22,23;129:14,
  15;144:21,23;145:11,13,
  15
requires (1)
  158:19
rescinded (1)
  161:25
rescinding (1)
  166:11
resent (1)
  130:11
reserve (1)
  140:10
reserved (1)
  222:13
resign (5)
  45:16;49:8;50:21;
  51:18;85:11
resignation (2)
  38:2;42:24
resolve (2)
  46:23;50:2
resources (8)
  34:20;62:12;154:15,
  20;157:23;188:20;
  202:14,18
responded (1)
  185:12
response (1)
  102:4
responses (3)
  9:6,9;11:11
responsibilities (6)
  29:24,25;180:23;
  181:6;201:23;202:6
responsibility (10)
  13:15;45:6;198:19,20,
  24,25;199:21;200:7,18;
  201:18
responsible (1)
  13:17
rest (3)

33:20;109:24;130:22
restated (2)
  108:6,18
restrain (1)
  214:13
result (5)
  160:21;171:5;180:22;
  181:5,11
results (1)
  93:11
resumed (1)
  142:22
retained (4)
  14:9,13;15:24;16:5
retransfer (1)
  153:24
return (2)
  180:13;218:17
returned (10)
  163:10;170:14,21;
  172:25;173:6;177:25;
  178:20,21;179:13,17
returning (2)
  171:4;180:14
reveal (1)
  89:13
review (3)
  35:17,19;67:13
reviewing (1)
  113:22
rich (1)
  142:11
rid (5)
  157:24;158:8;159:8;
  163:23;174:21
ridiculous (1)
  112:25
right (78)
  9:21;11:9;12:3;17:11;
  23:18;28:9;37:8;39:24;
  40:6;43:3;55:23;56:11,
  14,18;81:7;86:7,25;
  88:18,20;91:7;94:16;
  96:23;100:21;101:16;
  104:10;110:13;112:6;
  118:12;119:12,25;
  121:17;125:17;126:3;
  130:2;131:25;134:13,
  14;135:3,3,7;136:10;
  140:10;141:4;144:7;
  148:6,8,17;149:23,25;
  150:20;151:11;159:16;
  163:16;167:18;168:23;
  169:11,15,18;174:11;
  178:6;180:16;183:8,24;
  184:2;186:15;187:21;
  190:19;195:7;196:9;
  209:21;211:23;214:16,
  21;217:16,18,19;219:2;
  222:13
ring (1)
  14:16
rings (1)

14:17
risk (1)
  62:11
Road (1)
  3:5
Robert (7)
  14:2;33:19;99:23;
  128:2;135:14;138:14;
  185:20
Rochelle (7)
  3:6;46:22;47:4;55:22;
  64:12,16;65:21
role (1)
  181:12
roles (1)
  62:3
room (7)
  87:11;117:25;119:15;
  132:22,25;136:23;216:2
Roth (2)
  95:16;97:8
ruling (1)
  118:25
run (1)
  70:16

S

sacrifices (1)
  61:11
safety (3)
  23:22,24;24:5
SAGI (71)
  3:21;15:19;46:21;
  47:4,25;48:4,6,10,13;
  55:20;58:18,20;59:2,7;
  63:25;64:3,9;114:24;
  132:22,25;136:12;
  141:17;148:5,9;152:12;
  154:14;155:5,8;161:2,4,
  13;163:12,17;171:6;
  183:3,8,21;184:3;186:4;
  187:4,6,11,17;189:24;
  191:18;192:18;193:3;
  195:21;196:12,18;
  199:23;205:3;207:7;
  208:22;211:11,13,18,21;
  212:7,10;213:4,6;214:4,
  9,12;217:6,18,25;218:6,
  11;219:9
Sagi's (4)
  47:2;198:19;200:6;
  210:4
sale (14)
  185:23;186:2,3;187:9,
  10,18;188:8,14;196:23;
  197:9;198:5,8;199:13;
  208:4
same (24)
  19:7;20:18;21:3;
  41:19;52:21;67:6;74:15;
  97:13;98:13;108:21;
  122:12;123:6;126:18;

ORLY GENGER VS.
DALIA GENGER, et al

DALIA GENGER
December 13, 2012

144:10;145:6;157:14;
170:22;199:14;205:7,
17;206:19;216:10,14,19
**satisfaction (1)**
180:18
**saw (6)**
10:7,9;11:10;70:6;
159:7;185:5
**saying (16)**
27:12;57:20;113:8;
121:7;122:21;160:7;
177:24;178:11;187:11,
16,18;189:24;194:21;
196:12;202:4;206:13
**scheme (1)**
153:18
**search (1)**
60:12
**second (14)**
8:18,21,23;9:2;10:8;
106:6;134:16;149:13,
15;163:12;168:21;
186:21;192:22;204:23
**secretary (2)**
132:10;135:8
**section (4)**
96:19;133:6,10,15
**secure (2)**
22:6;23:21
**seeing (5)**
108:15;109:15,19;
182:8;219:14
**seek (4)**
20:14,15;140:10;
178:22
**seeking (2)**
130:14;190:17
**seems (2)**
84:21;178:22
**sell (1)**
213:8
**selling (4)**
157:25;158:10,10;
198:20
**send (1)**
57:15
**sending (5)**
147:4,6,7,15,15
**sense (2)**
164:5,9
**sensible (2)**
142:8,10
**sent (9)**
22:18;77:19;122:17,
23;124:10,14;129:15;
144:22;182:5
**sentence (2)**
175:25;181:4
**separately (1)**
19:9
**September (7)**
9:20,21;102:13;
103:21;104:22,23;105:5

**seriously (1)**
95:22
**serve (7)**
46:6,9;47:17;48:8;
63:7;66:20;179:9
**service (1)**
81:6
**serving (3)**
48:11,14;62:24
**session (1)**
25:18
**sessions (1)**
27:8
**set (7)**
20:18;21:3;76:16;
91:2;124:16;136:19;
176:20
**sets (1)**
18:14
**settle (1)**
142:8
**Several (4)**
147:10,19;160:2;
203:13
**Seymour (2)**
43:17,18
**share (5)**
148:10;150:19;171:6;
175:19,22
**shares (27)**
22:7;30:21,22;31:2;
148:13,20,24,25;150:12;
183:22,23;184:3,4,7;
198:9,12,20;199:12,20;
217:22,24;218:2,4,4,6,7,
10
**sheets (1)**
67:21
**short (1)**
20:5
**shoulder (1)**
138:4
**show (9)**
10:21;25:5,13;141:17;
168:15;188:16;197:14;
200:7;209:12
**showed (2)**
24:25;70:3
**showing (1)**
93:11
**shut (1)**
104:12
**side (1)**
56:3
**sign (6)**
43:13;89:19;91:5,23;
210:12;222:14
**signature (11)**
9:15,18;11:5,6;38:4,7;
74:6;90:12;92:5;149:13;
173:15
**signed (37)**
9:19;43:21;44:7,23;

45:8;76:3;79:16;80:20;
88:5;89:3,5,23;90:12;
92:9,18,20,25;94:20,22,
23;95:4,7,11;99:18,23;
102:14;104:21;108:2,8;
111:12;167:17;176:7,
13;177:2,7;210:14;
223:20
**signing (3)**
44:24;111:24;209:19
**simple (5)**
46:13;106:24,25;
140:18;168:3
**simply (2)**
26:12;27:4
**single (2)**
82:9;141:22
**sister (3)**
211:12,25;214:14
**sit (19)**
17:25;24:11;26:4;
27:14;30:24;35:12;92:8;
95:10;98:24;106:14;
107:3,14;111:21;114:9,
14;122:25;147:3;
152:17;216:12
**sitting (2)**
103:17;119:15
**situation (1)**
164:23
**slow (1)**
127:14
**slowly (1)**
169:9
**small (2)**
22:4;221:10
**sold (5)**
158:13;183:21,25;
184:3,7
**sole (1)**
108:8
**solution (2)**
171:24,25
**somebody (13)**
48:8;60:9;61:10;
63:15;67:7;80:7;158:9;
161:6,9,10;164:10;
205:11;214:17
**somehow (1)**
159:8
**someone (15)**
43:13;45:17,18;49:12;
62:7;63:21;78:23;79:3;
87:24;120:2,2;124:3;
155:25;158:2;180:10
**son (1)**
115:4
**sooner (1)**
130:18
**sorry (10)**
20:23;31:23;62:14;
101:25;115:18;147:13;
173:3;179:20;196:21;

208:20
**sounds (1)**
189:18
**span (1)**
141:25
**speak (35)**
7:22;10:19,20;41:4,7,
10,13,15;46:15,20,21,
24;47:7,10,11,12,15,23;
48:3,6,83:19,23;89:16;
104:14;110:20;113:5;
134:13,14;164:13,16;
189:4,24;192:15,18;
213:4
**speaking (16)**
83:10,14;91:17;104:6,
16;110:22;111:17;
112:20;117:19;122:6;
126:24;130:16;163:3;
165:6;197:4;216:4
**speaks (1)**
127:11
**specific (1)**
29:7
**specifically (4)**
102:5;124:15;174:6;
220:25
**specifics (1)**
29:10
**speculate (1)**
187:15
**speculation (2)**
158:22;167:5
**spend (1)**
118:22
**spending (1)**
196:25
**split (1)**
205:22
**spoke (13)**
24:24;28:7;47:4;89:6,
10,12;91:9,12,22;132:9;
211:18,21;213:6
**ss (1)**
223:4
**stand (2)**
176:2,6
**standard (4)**
79:23;80:2,14,16
**stands (1)**
156:22
**start (11)**
8:13;34:21;40:24;
52:21;68:25;85:23;
104:14;116:9;127:15;
180:7;212:7
**started (7)**
14:4;83:2;125:22;
143:6;166:24;192:11,12
**STASIUK (1)**
3:22;136:20
**State (8)**
6:5,10;135:7;157:17;

179:19,19;223:3,24
**stated (6)**
71:25;103:14;129:14;
132:5;138:18;163:11
**statement (16)**
39:15;81:21;82:3,5,7;
83:3,5;85:24;117:6,12;
120:6;121:10;151:14;
-155:14;157:4;179:7
**statements (2)**
99:14;118:19
**stating (1)**
152:5
**stay (2)**
132:18;142:7
**stayed (2)**
22:10,12
**steamroll (1)**
120:12
**step (1)**
186:5
**stepping (1)**
86:24
**still (11)**
40:7;87:20;102:14;
106:14;119:18;174:16;
176:10,16;177:17;
180:8;185:14
**stipulation (1)**
17:13
**Stop (23)**
86:13;104:5;112:20;
126:20,25;127:5;131:23,
24;138:3;184:10,12;
186:22,24;187:2,10;
188:14;191:18,20;
195:21;196:13,18,20;
217:16
**stopped (2)**
127:25;170:3
**stopping (1)**
196:15
**story (3)**
56:4;166:2;170:2
**Street (1)**
6:14
**strike (13)**
18:15;59:24;95:11;
106:8;110:18,23;111:5;
113:9,20;170:10,11;
185:2;197:11
**striking (1)**
118:9
**strongly (1)**
85:16
**stuff (1)**
31:8
**subject (2)**
139:4;201:21
**subjected (1)**
139:14
**submitted (6)**
96:17;97:17;141:6,10,

ORLY GENGER VS.
DALIA GENGER, et al

DALIA GENGER
December 13, 2012

13;173:18
Subscribed (1)
   223:20
subsequently (1)
   107:9
subset (1)
   22:4
substance (6)
   58:7;77:18;87:8;
   189:14;213:16,19
successful (1)
   212:8
successor (4)
   38:3,24;42:24;69:7
sue (11)
   211:11,25;212:4,7,10,
   12,16;214:18,19;217:18;
   219:9
sued (22)
   34:15,22;35:2;49:22;
   62:12,15;80:24;159:21,
   21;160:14,21;161:7;
   162:6,10;163:24;166:3;
   183:8;211:13,23;
   214:15;218:9,15
sues (1)
   79:3
suffer (3)
   7:17;8:2,9
sufficient (5)
   100:12;102:6,15,21;
   106:15
suggested (2)
   113:15;132:14
suing (8)
   30:19;40:24;166:5;
   196:18,20,23;213:6;
   214:13
suit (1)
   161:16
suits (1)
   162:11
Sullivan (1)
   14:15
sum (4)
   58:7;77:17;213:16,19
summary (3)
   131:16;140:20;141:4
summons (2)
   8:23,25
supposed (13)
   12:8,10,14,17,21;
   122:10;133:8,13;
   144:25;179:8;199:25;
   206:19,24
sure (31)
   9:17;14:3;28:6;35:23;
   47:16;61:15;66:16;
   72:14;73:3;81:8;92:11;
   93:21;97:16;110:13;
   118:13;119:7,25;
   121:15;122:16,22;
   124:11;128:14;129:13;

143:13;153:2;158:11;
   167:10;176:12;180:12;
   195:3;207:2
surrogate (11)
   84:22;85:12;95:13,16;
   96:3;97:8,12;130:10,13;
   140:6;173:19
swore (1)
   99:12
sworn (5)
   6:2,4,17;11:5,7

T

table (1)
   112:25
tactic (1)
   137:13
tag (1)
   94:4
tainted (1)
   205:15
talk (22)
   36:18;37:2;52:21;
   57:10;59:18;62:23;77:5,
   9,11;78:5;95:24;102:9;
   111:7;150:9;152:7;
   186:23;189:22;207:22;
   211:10,25;213:25;218:6
talked (4)
   26:3;66:2;67:11;
   163:17
talking (24)
   7:23;15:16;17:3;
   71:21,22;106:4;124:4;
   126:21;130:9;136:6;
   138:3;146:18;154:9;
   165:17;183:7,8,22;
   189:23;195:15;209:10;
   213:2;214:3,4,8
talks (2)
   101:23;102:2
task (3)
   63:12,14;93:3
teach (1)
   204:2
technical (1)
   13:12
telephone (2)
   134:2;142:17
telephonic (3)
   134:5,20;142:20
telling (9)
   8:11;27:21;34:15,21;
   101:16;127:2;159:19;
   181:22;208:16
tells (1)
   146:25
ten (1)
   216:10
term (1)
   79:13
terminate (1)

109:5
terms (1)
   165:6
testified (6)
   6:6;49:19;60:2;63:4;
   70:15;71:7
testify (2)
   162:19,23
testifying (3)
   8:11;206:11,15
testimony (9)
   60:5;71:10;152:11,14;
   162:21;189:5,13;223:8,
   11
texts (1)
   56:22
Therefore (5)
   117:23,25;141:18;
   162:21;178:10
thinking (4)
   61:6,21;80:10;140:14
third (2)
   75:5;149:16
thoroughly (1)
   114:5
though (2)
   207:23;214:14
thought (14)
   47:25;62:5;70:15;
   79:23;80:6;132:7;
   154:16;162:5;164:7,9;
   177:9;189:14;207:3;
   214:25
threatened (1)
   119:2
three (3)
   8:15;113:23;152:3
throughout (1)
   47:19
Thursday (3)
   25:20;26:4;222:11
TI (4)
   31:2;218:2,6,7
times (12)
   34:15,22;35:2,5;
   147:10,19;160:2;
   162:20;194:14;203:13;
   211:21;216:10
tired (3)
   202:3;216:12,15
today (29)
   6:20;7:10;8:11;10:14;
   17:25;24:11;25:20;26:4;
   27:14;30:24;35:12;58:5;
   92:8;95:10;98:22;
   106:14;107:3,11,14;
   111:22;114:9,14,16;
   122:25;124:17;147:3;
   152:17;211:13;218:15
told (26)
   27:7;28:4;36:12,24;
   55:18,20,21;74:2;80:2,7;
   93:22;119:24;128:19;

132:11;135:8;147:23;
   164:25;187:14;200:9,
   25;207:15;208:3,22;
   211:20;213:16,19
took (5)
   23:17;52:15;151:4;
   156:3;157:21
tools (1)
   195:20
top (2)
   73:17;90:11
topic (2)
   16:10,11
topics (7)
   28:2;10,12,15,25;
   29:20;85:17
touch (5)
   112:14,18;115:21,25;
   138:7
touching (3)
   112:10;115:23,24
TPR (46)
   3:12;120:25;121:24;
   136:13;139:10;149:2;
   150:11,16,19;167:2,19,
   20;170:14,21;171:4,7;
   178:2,20,21;179:13;
   182:23;183:6,14,18,20,
   21,22,23,23;184:5,7;
   186:25;187:2;196:2,20;
   197:20;199:12;200:20;
   212:3,21;217:24;218:4,
   17,22,24;219:3
track (8)
   17:5;34:19;35:15;
   36:8,12,22,24;162:11
transcribing (1)
   135:20
transcript (4)
   143:21;222:14;223:8,
   10
transfer (2)
   153:19;154:17
transferring (1)
   150:16
treated (1)
   214:15
TRI (7)
   22:7,15;30:22,23;
   217:21;218:4,10
trial (2)
   138:10;139:25
Trickery (1)
   163:4
tried (6)
   56:14;63:19;157:25;
   160:4;211:24,25
true (21)
   10:16;18:4;28:12;
   153:21;155:12,12,14;
   169:13;172:23;174:18;
   178:3;180:20;181:13;
   185:14,22;199:10;

206:10;211:15;219:21;
   223:10,13
Trump (2)
   22:14;35:10
Trumps (2)
   30:19;35:9
trust (181)
   7:13,19,22,23,24;
   11:19,22,25;12:5,8,11,
   14,15,16,18;13:7,24;
   14:7,10,13,23;15:5,25;
   18:5,18;19:10,16,18;
   20:15,20;21:4,6,9,13,19;
   22:5,8,23,23;23;24:18;19;
   25:2,3;29:6;30:19,25;
   31:2,3,34:5,8,9;35:8,12,
   13,24;37:5,11;39:4;
   40:14;41:17,25;45:10,
   17;46:10,15;50:5;54:2;
   60:4;61:8;62:3;65:23;
   66:5,10,21;69:5;71:9;
   75:2,12,20,23;78:17;
   88:7,13,24;89:17,20,24;
   91:6,10,24;97:21;98:10;
   104:20,25;105:5;107:5,
   10;108:9;110:3;111:23;
   114:8;115:7;124:12,13,
   25;125:6,6,25;126:9,11;
   127:23;128:5,12;129:3,
   17,20;144:14;145:2,15,
   16;146:2,20;147:15;
   148:13,13;149:3;158:2;
   164:12,21,23;166:9;
   179:9;180:11,12,15,18,
   24;181:8,10,15,16,23,24,
   25;182:7,12,16,18;
   183:11;188:6;190:10,13,
   14,15,16,18,20;192:10,
   13;194:18,19;196:5;
   197:2;199:9;202:10;
   209:3,20;211:12,12,14;
   212:8,11,20;213:7;
   214:13,18,20;217:20;
   218:10,15;219:10
trustee (163)
   7:12,19;11:18,21,24;
   12:7,10,17;13:4,7,16,23;
   19:14,18;22:3,5;24:7,8,
   9,12,14,15,19;29:21,21;
   30:3,25;34:4;35:8,11;
   36:23;37:5,6;38:2,3,9,
   17,18,19,24;39:5;40:14,
   16,25;41:24;42:13,21;
   43:2;45:2,5,10,17,19;
   46:6,6,14;48:2,8,11,14;
   50:4,21;51:18;54:2,20;
   59:2,19;60:3,10,14;
   62:11,25;63:8;65:6,15,
   23;66:5,9,20,67:14,15;
   69:5,7;70:16;71:9;
   75:22,22;87:23;88:6,12,
   19,22;89:17,19,23;91:6,
   9,24;92:10;93:5,24;

ORLY GENGER VS.
DALIA GENGER, et al

DALIA GENGER
December 13, 2012

95:14;104:20,24;105:4,
7;106:16;107:4,10;
108:2,8;110:2;122:7;
123:2,21;124:12,25;
125:6;126:8;129:17,19,
20;140:24,25;144:14;
145:10,15;146:20;
148:12;161:18,21,23;
164:12,21,22;166:9;
177:9;178:8,23;179:9;
180:24;181:7,12,24;
182:18;183:11;188:6;
190:9,11,17;194:19;
196:7,8;198:11;199:2;
200:19;201:18,23;
202:6;203:11;207:13;
209:2;214:19
**trusteeship (5)**
39:3;41:4,8,16;58:23
**trusts (1)**
180:12
**trust's (2)**
78:23;87:23
**truth (6)**
6:17,20;8:11;99:13,
13;107:7
**try (16)**
56:3;58:8;63:21;
137:13;141:20;143:16;
158:12;163:5;187:10;
188:7;197:14;198:11;
200:19;201:18;207:23;
211:11
**trying (11)**
17:20;31:24,25;32:6,
12;33:14;50:2;63:14;
103:16;177:8;186:3
**Tuesday (8)**
25:21;26:14,17;28:8,
16;29:8;70:3;141:18
**two (23)**
11:13,16;18:14;19:6,
8;20:4;27:16,22;28:7;
29:2;30:7,15;31:16;
86:21;109:7,11,14;
121:14;122:10;139:18;
148:5;193:19,20
**type (1)**
43:12
**typed (1)**
43:11

**U**

**UCC (2)**
201:24,25
**unclear (1)**
68:18
**uncomfortable (2)**
48:2,5
**under (16)**
9:19;32:4;74:20,25;
75:12,20;87:20;88:23;

99:10;102:5,14;112:24;
152:3;176:8;180:19;
223:9
**understood (3)**
32:17;53:18;80:18
**unfortunately (2)**
171:8;207:18
**Unless (2)**
29:16;206:4
**unlike (1)**
181:23
**unquote (1)**
176:5
**up (23)**
43:11,12;52:5,11;
53:2,6;55:24;56:17;
57:2;62:23;63:6;66:4;
106:7;141:17;142:6;
150:24;176:20;196:12;
197:14;199:11;200:7;
203:5;217:24
**upon (12)**
11:15;99:15;109:5;
110:3;127:3;130:3;
138:4,5;144:9;159:18;
164:3;169:24
**urinate (1)**
86:18
**use (2)**
137:12;195:21
**using (1)**
22:23

**V**

**valid (1)**
177:22
**value (4)**
153:7,9;180:15;
181:15
**valued (2)**
151:5,13
**verification (2)**
99:6,18
**verified (4)**
8:23;9:2;98:25;99:8
**versus (1)**
17:9
**via (2)**
134:5,19
**VOICE (2)**
134:11,15
**volunteer (2)**
48:20;59:8
**volunteered (3)**
48:18,21,24
**volunteers (1)**
52:5

**W**

**Wachtel (2)**
3:22;136:20

**Wait (26)**
8:6;14:20;36:14;
52:19;60:19,19;101:19;
103:19,25;104:13;
105:23;111:14;114:6;
115:15;134:15;137:8;
142:25;163:12;168:21;
195:9;202:24;204:3;
216:6;219:24;220:12,13
**waiting (1)**
204:14
**waive (1)**
194:3
**Waiving (1)**
32:24
**walked (1)**
121:8
**walking (1)**
104:6
**WALTER (2)**
3:22;136:20
**wants (2)**
142:4;187:23
**Warren (3)**
135:15;189:9,23
**waste (1)**
84:4
**wasting (2)**
34:23;130:23
**way (33)**
21:9;79:24;80:2,14,
16;105:6;106:19;115:5,
6,22;124:6;150:15;
154:16;159:7;161:5,8,9,
11,13;164:6,15;165:20;
175:15;176:25;187:2;
188:7,14;202:10;
203:19;204:6,20;
211:22;214:15
**wealth (2)**
153:19,24
**Wednesday (3)**
25:21;70:3;141:18
**week (4)**
25:25;26:13;70:4;
98:23
**weeks (1)**
69:10
**weighed (2)**
191:9,16
**welcome (1)**
121:6
**welcomed (1)**
139:12
**weren't (3)**
88:19;200:4;220:25
**what's (18)**
10:25;28:19;37:18;
39:9;55:25;57:21;81:9;
94:7,20,23;98:19;110:9;
112:24;145:8;166:4;
168:21;188:16;207:18
**whatsoever (5)**

21:11;44:17;79:20;
96:20;101:17
**whenever (1)**
7:22;44:11;162:6
**WHEREUPON (36)**
6:1;20:5,10;23:9;
32:22;33:8;42:7;51:8;
14,55:4;58:15;60:21;
61:18;71:2;87:13,15;
129:9;132:3;133:25;
134:18;142:19;143:23;
156:20;158:25;171:16;
180:4;188:3;189:7;
200:22;202:25;208:12;
221:22;222:8
**Wherever (1)**
198:19
**whole (5)**
26:21,22,24;97:11;
103:10
**who's (3)**
136:5,6;139:21
**wife (1)**
47:2
**William (2)**
220:6;221:9
**willing (6)**
59:7;60:13;61:11;
63:7;114:6;159:22
**wipe (1)**
180:17
**wiped (2)**
182:16,18
**wish (5)**
18:19;39:4;40:15,23;
118:23
**wished (3)**
41:24;50:20;51:18
**wishes (1)**
85:9
**wit (3)**
134:6,21;142:22
**withdraw (2)**
106:25;131:13
**without (3)**
87:24;194:21,22
**witness (212)**
6:1,3;8:15;10:3;13:11,
14;16:7,11,20,23;18:9;
20:23;23:11;25:11;
28:19;29:12;33:17,21;
34:17,24;36:11;37:20;
38:22;39:8,18;40:19;
41:12,20;42:3,9,15;43:8;
44:10;45:4,14;46:2;
47:14;48:17,23;49:6;
50:13,23;51:4;52:22;
53:8;54:15,22;55:12;
56:6,13,15,20;57:7,9,17,
25;58:11;59:5,13,21;
60:7,17,25;61:5,17,20;
63:17;64:8,22;65:17,25;

66:14,23;67:17;68:2,24;
69:12;70:11;71:4;72:3,
13;73:6,13;74:16;75:7,
15;76:6,25;77:14;79:8,
12,22;80:5,12;82:13,18;
84:7,10;89:2,11;90:12,
19,23;91:19;92:2;95:23;
97:3,14;98:3,7,15;
100:25;101:7,10;103:3,
13,17;104:17;105:10,16;
106:21;107:20;108:24;
112:14,23;113:16;
115:21,24;116:7,11;
122:13,15;123:7,25;
124:19,24;125:10,20,21;
126:15,17,20,20;128:18;
129:11;131:19;132:21,
24;137:4;138:3,7,19;
142:23;143:20;144:19;
145:7;146:9,23;147:20,
22;148:16;149:17;
152:23;155:11;156:19,
23;157:7,16;159:3;
160:3;161:22;162:19;
165:5;167:7,24;170:17,
23;172:16;175:3;
176:24;177:20;179:16,
20,24;183:2;191:12;
192:25;193:21;198:15;
200:11,24;201:12;
202:22;203:15,25;
206:12,16;208:8,14;
209:6,9;210:7,11;216:4,
11,15,18;217:4,10;
219:8;220:9,14
**witness' (1)**
138:4
**witnesses (2)**
139:14;141:25
**Worcester (1)**
14:16
**word (3)**
108:25;113:8;137:24
**words (5)**
99:12;178:15,18;
187:11,20
**work (10)**
15:22;16:4;18:16,23;
19:10;21:19;22:3;54:19;
99:21;166:24
**worked (2)**
15:14;150:13
**worth (1)**
217:22
**write (6)**
57:20;70:13;72:8,21;
73:3;165:14
**writing (3)**
79:24;80:3,16
**written (3)**
70:8;109:5;165:8
**wrong (3)**
77:24;162:22;166:21

ORLY GENGER VS.
DALIA GENGER, et al

DALIA GENGER
December 13, 2012

**wrongdoing (1)**
 80:25
**wrote (4)**
 70:9;72:11;73:7,11

## Y

**year (1)**
 14:25
**years (5)**
 121:14;141:25;142:6;
 207:17;219:13
**yesterday (2)**
 25:21;26:15
**Yoav (9)**
 34:16,22;96:4;130:24;
 135:2;136:12;140:16;
 163:5;217:4
**York (8)**
 3:6,14,14;6:5;113:4;
 133:12,16;223:24

## Z

**Zeichner (1)**
 134:25
**zero (3)**
 151:6,13;152:6
**ZILBERFEIN (173)**
 3:3;13:9;16:9;17:16;
 18:7;19:19;20:21;21:15;
 24:22;32:10;36:18;
 38:10,21;39:6;40:17;
 41:5,11,19;42:2,14;43:7;
 44:9;45:3,13,24;46:18;
 47:13;48:16,22;49:5,13,
 16;50:10,22;51:2,21;
 52:8;53:7,21;54:4,9,14,
 21;55:11;56:5,12,19;
 57:6,13,16,24;58:10,13;
 59:4,12,20;60:6,23;
 62:17;63:2,16;64:7,14,
 21;65:11,16,24;66:11,
 22;67:16,25;69:8,11;
 70:10,18,22;71:15,24;
 72:12,22;73:5,12;74:11,
 15;75:14;76:5,24;77:7,
 13;78:8,13,18;79:7,10,
 21;80:4,11;81:13,19;
 85:20,23;87:12;90:4,8;
 96:12,16;97:10,24;98:5,
 14;102:24;103:5,10,13;
 105:8;106:20;117:5,10;
 119:4,12,22;120:5,10,
 22;121:16;122:12;
 123:6,22;130:17;131:5,
 11;133:6,10,15;136:3,
 15,16;141:11;143:2,9,
 17;144:11,18;145:5;
 146:8,15,22;147:21;
 152:22;156:6;158:23;
 167:6,23;176:18;
 179:23;182:21;183:4;

 191:10;193:19;203:17;
 204:9;206:11,14;209:4;
 210:10;213:21;215:20,
 24;216:3,9,13;217:9;
 221:19
**zip (1)**
 6:15