SURROGATE COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
-------------------------------------------------------------------X

In the Matter of

ORLY GENGER,

                Petitioner,

        -against-

LEAH FANG, DAVID A. PARNES, THE SAGI
GENGER TRUST, DALIA GENGER, JOEL
ISAACSON and MARTIN COLEMAN,

              Respondents.

-------------------------------------------------------------------X

Index No. 2008/0017

**AFFIDAVIT OF DALIA
GENGER**

I, Dalia Genger, being duly sworn hereby deposes and says:

1.     I am sole trustee of the Orly Genger 1993 Trust (the "Orly Trust"), a true and complete copy of which is attached hereto as Exhibit A. My daughter, Orly Genger, the Petitioner herein, is the lifetime beneficiary of the Orly Trust. My son, Sagi Genger, is the lifetime beneficiary of the Sagi Genger 1993 Trust (the "Sagi Trust"), which is a contingent remainderman of the Orly Trust. I submit this affidavit in opposition to the Orly Trust's Amended Petition To Designate Trustee Or, In The Alternative, To Appoint A Special Trustee, And To Compel Accounting Order (the "Petition").

**My Appointment as Successsor Trustee**

2.     I understand that Leah Fang had acted as trustee of the Orly Trust since approximately April 26, 2007, the date on which David Parnes resigned as trustee and appointed Fang as successor trustee. I understand that Parnes appointed Fang by executing a signed and acknowledged instrument of resignation and appointment of successor trustee, a copy of which is attached hereto as Exhibit B. I understand that Fang also executed a signed and acknowledged instrument of acceptance of trusteeship, a copy of which is attached hereto as Exhibit C. I further

understand that Parnes sent both documents to the grantor of the Trust, Arie Genger, by registered mail in full compliance with the terms of the Trust.

3.      On January 4, 2008, Leah Fang resigned as trustee of the Orly Trust and appointed me as successor trustee by executing an acknowledged Instrument of Resignation of Trustee and Appointment of Successor Trustee, a copy of which is attached hereto as Exhibit D.  On the same day, I executed an acknowledged Instrument of Acceptance of Trustee, a copy of which is attached hereto as Exhibit E.  In accordance with the requirements of the Orly Trust, I personally delivered both instruments to my daughter, the beneficiary, within the thirty (30) day time period.

**The Relief Sought by Petitioner**

4.      Orly and Sagi are my children and their best interest is my only concern.  I would never do anything as trustee of the Orly Trust (or in any other capacity) to harm my daughter's interests.

5.      Neither the Orly Trust nor the Sagi Trust owns any interest in TPR Investment Associates, Inc. ("TPR").  The Orly Trust and the Sagi Trust each own a 48% interest in D&K LP ("D&K"), which in turn owns approximately 50% of TPR's common shares.

6.      D&K's interest in TPR was purchased by D&K with a promissory note in the face amount of $8.95 million (with interest, approximately $10 million to date) that is secured by D&K's shares in TPR (the "Note").  The Note has not been current since 2001.

7.      Since D&K's assets are insufficient to cover its obligations, D&K represents a net liability to the trust, not an asset.  The only asset of the Orly Trust is a 20% interest in Trans-Resources, Inc., which interest is actually controlled by Arie Genger through an irrevocable proxy given by each Trust to Arie.

N0109654v

2

8.     After considering various options to mitigate harm to the Orly Trust and the Sagi Trust resulting from D&K's failure to keep current on the Note, the Note was exchanged with Parnes for the assumption of a contingent liability and nominal consideration. Based on tax advice, the purposes of the arrangement were forbearance and tax deferment. Under the agreement, Parnes agreed to terms of forbearance against D&K. I do not stand to gain anything personally by the agreement, other than protecting the estate plan implemented for the benefit of my children.

9.     If the Note is returned to TPR, which my daughter seems to seek through the appointment of a new trustee, it would re-create a related party obligation, and would have to be accelerated or forgiven. This would result in the destruction of the value of both the Orly Trust and the Sagi Trust by wiping out their assets in satisfaction of D&K's obligations either on the Note or to the IRS if the Note is forgiven by TPR. The Trust's shares of TRI, its only asset, would have to be sold, to the only available buyer, due to his irrevocable proxy: Arie. The destruction of the Orly Trust in this manner would therefore accrue directly to the benefit of Arie—in that he would gain a desired control of TRI—and to my benefit—in that I would acquire the D&K's interest in TPR. This result is inconsistent with my responsibilities to my children as their mother and as trustee of the Orly Trust. Regretfully, my daughter does not appear to understand the consequences of her demands.

10.     In addition, my daughter's claim that Sagi and I have been stripping TPR of its value by taking bogus compensation out of the company is wrong. I am a shareholder of TPR. In that capacity, I have been effectively redeeming my shares of TPR. This is consistent with an overall estate plan for the benefit of both Orly and Sagi, because it increases D&K's, and indirectly, the Trusts' interest in TPR. For his part, Sagi is an employee and officer of TPR, and

N0109654v

has received compensation in exchange for managing TPR's investments and functioning as its Chief Executive Officer. Neither my daughter nor her Trust is an employee, consultant, or shareholder of TPR and accordingly neither she nor her Trust is entitled to any compensation from the company.

## Petitioner's Request for a New Trustee

11.   I am trustee of the Orly Trust, and there is no basis for the appointment of a new trustee. To the extent the Court is considering the appointment of Martin Coleman, I object. Coleman is a former partner in, and may still be affiliated with, the law firm Sonnenschein, Nath & Rosenthal LLP, which is currently a defendant in a litigation with TPR in which TPR seeks over $100 million in damages. He also sat as a director of TRI during a period of time for which Sonnenschein and three TRI directors are being sued for malpractice and fraud. There is a distinct possibility that Coleman may be added as another defendant. Accordingly, he would not make an appropriate trustee.

12.   To the extent the Court is considering appointing Joel Isaacson, I object to his appointment as well. Isaacson, who is my daughter's paid accountant, was specifically informed of the reason for the assignment of the D&K Note from TPR to Parnes. Isaacson admitted that he understood and agreed with the reason for the exchange after sitting in on a two-hour briefing on the matter. He failed, however, to disclose this information to my daughter, even though her Trust's viability may rise or fall based on it. In sum, he has shown himself to be concerned with interests inconsistent with those of my daughter.

Dated: New York, New York
        March 11, 2008

_Dalia Genger_
Dalia Genger

KATARZYNA SCHWARTZ
Notary Public, State of New York
No. 01SC6158649
Qualified in Queens County
COMMISSION EXPIRES

SWORN TO BEFORE ME THIS
11th DAY OF MARCH 2008

N0109654v

4

P 3/3

ORLY GENGER 1993 TRUST

INSTRUMENT OF RESIGNATION OF TRUSTEE
AND APPOINTMENT OF SUCCESSOR TRUSTEE

The undersigned, DAVID A. PARNES, acting as Trustee since October 22, 2004, of the Orly Genger 1993 Trust under Trust Agreement dated December 13, 1993, between ARIE GENGER, as Grantor, and LAWRENCE M. SMALL and SASH A. SPENCER, as Trustees, does hereby, pursuant to the provisions of Section B of Article Seventh of said Trust Agreement, appoint LEAH FANG to act as Trustee under said Trust Agreement in the place and stead of the undersigned in the event of the resignation of the undersigned as such a Trustee, and the undersigned does hereby resign as such a Trustee as of the date hereof.

Dated: April 26, 2007

David A. Parnes

State of New York )
                 ) ss.
County of New York )

On the 26th day of April, 2007, before me, the undersigned, personally appeared David A. Parnes, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument, and acknowledged to me that he executed the same in his capacity as aforesaid, and that by his signature on the instrument, he executed the same in the City of New York, County of New York.

Notary Public

OGRIS CAPUTO
Notary Public, State of New York
No. 01CA4932032
Qualified in Richmond County
Commission Expires May 31, 2010

*I accept the position as trustee of the Orly Genger 1993 Trust.*

*4/26/07*
*Leah Fang*

To:
David A. Palmes
29 Elkoelli Street
Tel Aviv 69497
Israel

### RELEASE

Whereas, you served as Trustee, since October 22, 2004 ("Commencement Date") as trustee of the Orly Genger 1993 Trust (the "Orly Trust") and the Sagi Genger 1993 Trust (the "Sagi Trust") (jointly, the "Trusts"); and

Whereas, you have tendered your resignation from your position of trustee of both Trusts ("Resignation"); and

Whereas, you have appointed a general release from me, as the sole appointed successor trustee of the Trusts, in connection with your actions, or omissions, as trustee of the Trusts, from the Commencement Date through the date upon which your Resignation became effective ("Resignation Date");

NOW, THEREFORE, I HAVE AGREED AS FOLLOWS:

You are hereby released and discharged, to the fullest extent authorized by law or under the Trusts' documents, from the consequence of any action, or inaction that you might have taken, as trustee of either or both of the Trusts, from the Commencement Date through the Resignation Date. Nothing herein shall detract from the indemnification rights you are entitled to, from any third party, under the Trusts documents.

IN WITNESS WHEREOF, the undersigned have executed this Release as of April 26, 2007.

THE ORLY GENGER 1993 TRUST
By: _____
Name: Leah Fang
Title: Trustee

THE SAGI GENGER 1993 TRUST
By: _____
Name: Leah Fang
Title: Trustee

State of New York    )
                     ) ss.
County of New York   )

On the 26th day of April, 2007, before me, the undersigned, personally appeared LEAH FANG, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument, and acknowledged to me that he executed the same in his capacity as aforesaid, and that by his signature on the instrument, he executed the same in the City of New York, County of New York.

_____
Notary Public

DORI A. ECKELS
Notary Public, State of New York
No. 01CA00000002
Qualified in Richmond County
Commission Expires May 31, 2010

## ORLY GENGER 1993 TRUST

### INSTRUMENT OF RESIGNATION OF TRUSTEE
### AND APPOINTMENT OF SUCCESSOR TRUSTEE

The undersigned, LEAH FANG, to the extent currently the Trustee of the Orly Genger 1993 Trust under Trust Agreement dated December 13, 1993 between ARIE GENGER, as Grantor, and LAWRENCE M. SMALL and SASH A. SPENCER, as Trustees (the "Trust Agreement"), to vested with powers of appointment as Trustee under the Trust, the undersigned does hereby, pursuant to the provisions of Section B of Article SEVENTH of said Trust Agreement, appoint Dalia Genger to act as Trustee under said Trust Agreement in the place and stead of the undersigned in the event of the resignation of the undersigned as Trustee, and the undersigned does hereby resign as such Trustee as of the date hereof.

Dated:     January 4, 2008

_____
Leah Fang

STATE OF NEW YORK       )
                         ) ss.
COUNTY OF NEW YORK      )

On the 4th day of January, 2008, before me, the undersigned, personally appeared LEAH FANG, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument, and acknowledged to me that she executed the same in her capacity as aforesaid, and that by her signature on the instrument, she executed the same in the State and County set forth above and in the City of New York.

_____
Notary Public

CHRISTINE BERTI
Notary Public, State of New York
Registration # 01BE6137973
Qualified in Nassau County
My Commission Expires Dec. 5, 2009

ORLY GENGER 1993 TRUST

INSTRUMENT OF ACCEPTANCE OF TRUSTEE

The undersigned, DALIA GENGER, to the extent not already properly appointed Trustee of the Orly Genger 1993 Trust under Trust Agreement dated December 13, 1993 between ARIE GENGER, as Grantor, and LAWRENCE M. SMALL and SASH A. SPENCER, as Trustees (the "Trust Agreement"), hereby accepts the appointment as Trustee pursuant an Instrument of Appointment made by Leah Fang, dated January 4, 2008.

Dated:     January 4, 2008                    _____
                                               Dalia Genger

STATE OF NEW YORK        )
                         )  ss.
COUNTY OF NEW YORK       )

On the 4th day of January, 2008, before me, the undersigned, personally appeared Dalia Genger, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument, and acknowledged to me that she executed the same in her capacity as aforesaid, and that by her signature on the instrument, she executed the same in the State and County set forth above and in the City of New York.

                                               _____
                                               Notary Public

SEYMOUR H. FANG
Notary Public, State of New York
0 2. FA No. 01-6230900
Qualified in New York County
Commission Expires Sept. 30, 2010

*Index No.* 0017                    *Year* 2008

SURROGATE COURT OF THE STATE OF NEW
YORK COUNTY OF NEW YORK

ORLY GENGER,

                              Petitioner,

                    -against-

LEAH FANG, DAVID A. PARNES, THE
SAGI GENGER TRUST, DALIA GENGER,
JOEL ISAACSON and MARTIN COLEMAN

                              RESPONDENTS

**Affidavit of Dalia Genger**

SULLIVAN & WORCESTER LLP

*Attorneys for Respondent*

1290 AVENUE OF THE AMERICAS
NEW YORK, NEW YORK 10104
(212) 660-3000

*ORLY GENGER VS.*
*DALIA GENGER*

---

*DALIA GENGER*
*February 7, 2013*

---



**Ellen Grauer**
**COURT REPORTING**
Co. LLC

126 East 56th Street, Fifth Floor New York, New York 10022
PHONE: (212) 750-6434   FAX: (212) 750-1097
**www.ELLENGRAUER.com**

*Original File 102350.TXT*
Min-U-Script® with Word Index

Page 226

```
 1  SUPREME COURT OF THE STATE OF NEW YORK
 2  COUNTY OF NEW YORK
    ----------------------------------------X
 3  ORLY GENGER in her individual capacity
    and on behalf of the Orly Genger 1993
 4  Trust (both in its individual capacity
    and on behalf of D&K Limited Partnership),
 5
                              Plaintiff,
 6
       - against -
 7
    DALIA GENGER, SAGI GENGER, LEAH FANG,
 8  D&K GP LLC, and TPR INVESTMENT ASSOCIATES,
    INC.,
 9
                              Defendant
10
    Index No. 109749/09
11  ----------------------------------------X
12
13                    575 Lexington Avenue
                      New York, New York
14
                      February 7, 2013
15                    10:41 a.m.
16
17       RESUMED DEPOSITION of DALIA GENGER,
18  taken before Annette M. Montalvo, RMR, and a
19  Notary Public in and for the State of New York.
20
21
22
23       ELLEN GRAUER COURT REPORTING CO. LLC
         126 East 56th Street, Fifth Floor
24        New York, New York  10022
                  212-750-6434
25                Ref:  102350
```

Page 228

```
 1  ------------------ I N D E X ------------------
 2  WITNESS            EXAMINATION BY         PAGE
 3  DALIA GENGER       MR. GRIVER             230
 4
 5
 6  ---------------- E X H I B I T S ----------------
 7  DALIA       DESCRIPTION                 FOR I.D.
 8  Exhibit 16  Affirmation, signed           266
 9              11/19/2012
10  Exhibit 17  Amendment, dated               279
11              8/22/2008
12  Exhibit 18  Amendment, dated 11/2008       292
13  Exhibit 19  Memo, dated 8/2/2006           314
14  Exhibit 20  Undated memorandum,            326
15              Re: UCC sale
16  Exhibit 21, Document package sent          327
17              5/19/2009
18  Exhibit 22  Verified complaint in          339
19              Delaware action
20  Exhibit 23  New York complaint             341
21  Exhibit 24  Interpleader complaint         369
22  Exhibit 25  Letter and promissory          370
23              note dated 12/17/2007
24  Exhibit 26  Document                       399
25
```

Page 227

```
 1  A P P E A R A N C E S :
 2
 3  ZEICHNER ELLMAN & KRAUSE LLP
 4  On Behalf of the Plaintiff,
 5       575 Lexington Avenue
 6       New York, New York  10022
 7  BY:  YOAV GRIVER, Esq.
 8       BRYAN D. LEINBACH, Esq.
 9       212-223-0400
10       ygriver@zeklaw.com
11
12
13  PEDOWITZ & MEISTER LLP
14  On Behalf of the Witness,
15       570 Lexington Avenue
16       New York, New York  10022
17  BY:  ROBERT A. MEISTER, Esq.
18       212-403-7333
19       robert.meister@pedowitzmeister.com
20
21  ALSO PRESENT:
22       WALTER P. STASIUK, Wachtel Masyr & Missry
23
24
25
```

Page 229

```
 1  ------------ E X H I B I T S (Cont'd) ------------
 2  DALIA           DESCRIPTION              FOR I.D.
 3  Exhibit 27      Settlement agreement         405
 4
 5
 6       (EXHIBITS RETAINED BY MR. GRIVER)
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

ORLY GENGER VS.
DALIA GENGER

DALIA GENGER
February 7, 2013

Page 230

1   (WHEREUPON, the witness was duly
2   affirmed.)
3   DALIA GENGER,
4   called as a witness herein, having been
5   previously duly affirmed and having testified,
6   was examined and testified further as follows:
7
8   EXAMINATION (Resumed)
9   **BY MR. GRIVER:**
10  Q.  Mrs. Genger, you understand that you
11  have just been resworn in this deposition?
12  **A.  Uh-huh.**
13  Q.  Ms. Genger, I would ask that you
14  verbalize your answers.  Don't go "uh-huh."
15  **A.  I am sorry.  Yes.  Because I saw that**
16  **you did that in my deposition, so I thought it is**
17  **allowed.  But I will remember that.**
18  Q.  Okay.  So let me ask you again --
19  **A.  Yes.**
20  Q.  Just let me ask you again for the
21  record.  You understand --
22  **A.  Yes, I do understand.**
23      MR. MEISTER: Wait until he finishes
24  his questions before you give the answer.
25  Otherwise, the court reporter --

Page 231

1   GENGER
2   THE WITNESS: Okay, Bob.
3   BY MR. GRIVER:
4   Q.  Mrs. Genger, I place before you a copy
5   of your -- the original 15 exhibits to your
6   deposition, as well as the transcript of your
7   prior day of deposition on December 13, 2012.
8       Did you review your transcript before
9   today?
10  **A.  The transcript, you mean whatever that**
11  **I was deposed on?**
12  Q.  Yes.
13  **A.  I went through it.  Yes.**
14  Q.  You read it?
15  **A.  Briefly, but not like thoroughly,**
16  **because I notice that there are some mistakes**
17  **that has -- I mean, not substantial maybe, but**
18  **like somebody said something, it wasn't the**
19  **person that said it, but I don't know exactly**
20  **what it is over here.**
21  Q.  Do you have any answers that you would
22  like to amend based on your review of the
23  transcript?
24  **A.  I have to read it more thoroughly, you**
25  **know, in order to answer that.**

Page 232

1   GENGER
2   Q.  But as we sit here today, you did not
3   in your review identify any questions that you
4   misanswered?
5   **A.  I cannot answer it because I didn't**
6   **read it thoroughly.**
7   Q.  But in whatever review you did, you did
8   not identify any questions that you need to
9   re-answer?
10  **A.  No.**
11  Q.  And have you reviewed the exhibits 1
12  through 15 before today?
13  **A.  No, I didn't.  These are the exhibits?**
14  Q.  Yes.
15  **A.  No, I didn't.  I mean, maybe some of**
16  **them I did.**
17  Q.  Did you meet with Mr. Meister or any
18  other counsel to prepare for today's deposition?
19  **A.  Yes.  Yes, I did.**
20  Q.  Who did you meet with?
21  **A.  With Bob and his assistant.**
22  Q.  That's Marisa Warren?
23  **A.  What?  Yes.**
24  Q.  And when did you meet with them?
25  **A.  It was yesterday.  No.  The day before.**

Page 233

1   GENGER
2   Q.  And for how long did you meet?
3   **A.  I think it was like two hours or so.**
4   Q.  Did Mr. Meister or his assistant
5   provide you with any documents?
6   **A.  They provided me with documents that I**
7   **should have had before, I think.**
8   Q.  And which documents were those?
9   **A.  I don't remember.**
10  Q.  But these are documents that you did
11  not think you had before?
12  **A.  I might have had.  I don't remember.**
13      MR. GRIVER: Robert, to the extent that
14  you provided Mrs. Genger with new documents, I
15  would ask that they be produced.
16      MR. MEISTER: I don't know what you
17  mean by "new documents."
18      MR. GRIVER: She just said there are
19  documents that she had not seen before.  To the
20  extent any other documents you showed her have
21  not been produced in this action --
22      MR. MEISTER: Okay.
23      MR. GRIVER: -- I ask they be produced.
24      MR. MEISTER: For the record, I don't
25  think I showed her any documents that haven't

ORLY GENGER VS.
DALIA GENGER

DALIA GENGER
February 7, 2013

---

Page 234

1    GENGER
2  been produced to you.
3      THE WITNESS: No.  The point is that --
4  okay.
5      BY MR. GRIVER:
6  Q.  Mrs. Genger, if you can please look at
7  Dalia Exhibit 6.  Did Sagi Genger prepare --
8  A.  Let me just get through it and see what
9  it is.
10  Q.  Okay.
11  A.  It is to Leah from me --
12      MR. MEISTER: Don't.
13      THE WITNESS: I am just saying it
14  aloud.
15      MR. MEISTER: What you say aloud, the
16  court reporter has to write it down.
17      THE WITNESS: I'm sorry.  It is so much
18  work.  I'm sorry.
19      BY THE WITNESS:
20  A.  Okay.
21      BY MR. GRIVER:
22  Q.  Mrs. Genger, did Sagi Genger draft this
23  document that's been marked Exhibit 6?
24  A.  Not to my knowledge.
25  Q.  Did you draft it?

---

Page 235

1    GENGER
2  A.  No.
3      MR. MEISTER: Objection.  Asked and
4  answered.
5      BY THE WITNESS:
6  A.  I did not draft it.
7      BY MR. GRIVER:
8  Q.  Do you recall as we sit here today who
9  did?
10      MR. MEISTER: Objection.  Asked and
11  answered.
12      BY THE WITNESS:
13  A.  No.  As I said, the lawyer drafted it.
14  I don't know how to draft in a legal manner.
15      BY MR. GRIVER:
16  Q.  Was that lawyer David Parnes?
17  A.  I don't know.
18  Q.  You don't remember which lawyer?
19  A.  No.
20  Q.  You don't even remember if it was your
21  lawyer?
22  A.  I know it is a lawyer because I didn't
23  do it.
24  Q.  All right.  Look at Exhibit 8, please.
25  A.  Exhibit 8.

---

Page 236

1    GENGER
2  Q.  Wait a second.  One question.
3      You say that you know a lawyer did it
4  because?
5  A.  Because it is not my --
6  Q.  You didn't do it?
7  A.  It is not my style of writing.
8  Q.  How do you know that Sagi didn't
9  prepare this?
10  A.  How did I know that Sagi didn't prepare
11  it?
12  Q.  Yes.
13  A.  Because he is not a lawyer.
14  Q.  You think that only lawyers can prepare
15  a document like this?
16  A.  Yes.
17  Q.  Is that the only reason you don't
18  believe Sagi prepared the document marked as
19  Exhibit 6?
20  A.  Yes.
21  Q.  Look at Exhibit 8.
22  A.  Yeah.
23  Q.  Did Sagi Genger prepare this document?
24  A.  I have no idea.
25  Q.  Did Sagi Genger give you this document

---

Page 237

1    GENGER
2  for you to sign?
3  A.  I don't remember.
4  Q.  Look at Exhibit 6 again.  Did Sagi
5  Genger give you Exhibit 6 for you to sign?
6  A.  I don't remember.
7  Q.  Mrs. Genger, if you could look, please,
8  at page 207 of your transcript, from the first
9  day of your deposition.
10  A.  Yeah.  What do you want?
11  Q.  On page 207, at line 22, you call Orly
12  brainwashed already.  Do you see that?
13  A.  Right.
14  Q.  What did you mean by that?
15  A.  That she was talked about, certain
16  subjects, over and over, and she was convinced
17  that whoever talked to her is telling her the
18  truth, and she should believe in it.
19  Q.  And the person who was talking to her
20  is Arie Genger?
21  A.  "Because Orly at this time was
22  brainwashed already, so I couldn't talk to her,
23  candidly, even though I did try."
24      I didn't mention Arie's name here in
25  this answer.

---

ORLY GENGER VS.
DALIA GENGER

DALIA GENGER
February 7, 2013

---

Page 238

1    **GENGER**
2  Q.  But when you say that Orly was
3  brainwashed, brainwashed by whom?
4  **A.  By whoever talked to her.**
5  Q.  And who do you think that is?
6  **A.  Somebody that had interest in her**
7  **thinking whatever she was thinking.**
8  Q.  And who would that be?
9  **A.  Could be anyone.  I mean, anyone that**
10 **has interest in whatever she answered.**
11 Q.  Okay.  And when you said that she was
12 brainwashed, you did not mean that she was
13 brainwashed by Arie, is that what your testimony
14 is now?
15 **A.  No.  I didn't say that.**
16 Q.  Okay.  So who did you --
17 **A.  I said that it might be any person that**
18 **had interest for her to think a certain way or**
19 **believe in something that she believes in.**
20 Q.  So on that basis you could have been
21 brainwashed, for example, by Sagi Genger?
22 **A.  Might be.**
23 Q.  And is there any reason why you don't
24 want to identify Arie as a person who you
25 believed --

---

Page 239

1    **GENGER**
2  **A.  I didn't say I don't want to.**
3  Q.  Is that who you believed brainwashed
4  Orly?
5  **A.  That's the end of the question?**
6  Q.  Yes.  I would like you to answer.
7  **A.  I don't know if it was Arie, or it**
8  **might have been her lawyer, one of her lawyers,**
9  **for example.  I mean, there are certain people**
10 **that want her to believe in certain things.  And**
11 **that's why I cannot say if it was Sagi or Arie,**
12 **or one of her lawyers.**
13 Q.  Okay.  And what certain things did they
14 want her to believe?
15 **A.  I didn't read the whole thing, so I**
16 **don't know what we are talking about.**
17 Q.  Well, in this line of questioning, I
18 will represent to you, this is when you made the
19 decision not to let Arie Genger know about the
20 sale, about the UCC sale of the TPR shares, and
21 you decided not to let Orly know about the UCC
22 sale of the TPR shares?
23 **A.  I want to read this.**
24 **MR. MEISTER:  Wait, wait.**
25 **THE WITNESS:  I am not going to --**

---

Page 240

1    GENGER
2  **MR. MEISTER:  Wait, Dalia.  Let me put**
3  my objection.
4  I object that that mischaracterizes the
5  testimony.  I don't think this testimony that she
6  made a decision not to tell Arie --
7  **BY MR. GRIVER:**
8  Q.  Well, you did not tell Arie about the
9  UCC sale, did you?
10 **A.  That's true.  That's what I said.**
11 Q.  And why did you not tell Arie about the
12 UCC sale?
13 **A.  Because I had no interest to tell him.**
14 Q.  Why?
15 **A.  Because it is not my role to tell him**
16 **and inform him about the UCC sale.**
17 Q.  Why isn't it your role to tell him
18 about the UCC sale?
19 **A.  I have many things that are not my**
20 **role.  I mean, should I inform him about other**
21 **things that happened?  No.**
22 Q.  Did you know at the time that Arie
23 Genger had an interest in obtaining the TPR
24 shares?
25 **A.  No.**

---

Page 241

1    **GENGER**
2  Q.  You didn't think that at all?
3  **A.  How should I know?  He never**
4  **communicated with me.**
5  Q.  You didn't suspect that at all, that he
6  might be interested in obtaining shares of his
7  family company?
8  **MR. MEISTER:  Put it on the record.**
9  Mrs. Genger, please wait until
10 Mr. Griver finishes --
11 **THE WITNESS:  You are right.  You are**
12 right.  I am sorry.
13 **MR. GRIVER:  Can you read my question**
14 back, please.
15 (WHEREUPON, the record was read by
16 the reporter as requested.)
17 **BY THE WITNESS:**
18 **A.  That was the question?**
19 **BY MR. GRIVER:**
20 Q.  Yes.
21 **A.  No.**
22 Q.  That thought never crossed your mind?
23 **A.  No.**
24 Q.  What about Orly -- strike that.
25 Did you tell Orly about the UCC sale

---

ORLY GENGER VS.
DALIA GENGER

DALIA GENGER
February 7, 2013

Page 242

GENGER

1  before it happened?
2  A.  We went over it.  No, I didn't tell
3  her.
4  Q.  Okay.  Why didn't you tell Orly?
5  MR. MEISTER: Objection.  Asked and
6  answered.
7  BY THE WITNESS:
8  A.  Because you asked me that.
9  BY MR. GRIVER:
10  Q.  Yes.
11  A.  And I did answer, and I will give you
12  the same answer.
13  Q.  By all means.
14  A.  The answer is that there was no way
15  that the trust could fight any -- had no means to
16  buy or compete in the auction.  That's one of the
17  reasons that I didn't tell her.
18  And, secondly, I don't think it is one
19  of my roles to tell her about the auction.  The
20  thing is that TPR went through legal procedures
21  in order to go through the auction.  They did
22  follow the procedure, and, unfortunately, the
23  results were what they were, I mean, whatever
24  they were.

Page 243

GENGER

1  Q.  I am asking you, Mrs. Genger --
2  A.  Yes.
3  Q.  -- it never crossed your mind that this
4  might be something that Orly would be interested
5  in, that her shares --
6  A.  She never conveyed to me any desires or
7  things that she wants or doesn't want.  She
8  didn't communicate with me.  I mean, I am her
9  mother, and she knows that I am her trustee, too.
10  So she could have picked up the phone and tell
11  me, "Mommy, or my trustee, I am not interested
12  in," or "I want to participate in this auction."
13  She didn't do that.
14  Q.  Okay.  And you never thought to apprise
15  her?  You never thought to tell her about it?
16  A.  No.  Because if it would have been
17  important enough for her, she would pick up the
18  phone and tell me.
19  Q.  Okay.  And how would Orly know about
20  the auction in order to tell you?
21  A.  She -- there was a procedure.  She
22  should have been aware of the procedure.  Legal
23  procedure.
24  Q.  And what is the legal procedure?

Page 244

GENGER

1  A.  To advertise this in -- and I think
2  that was in the New York Post.
3  Q.  Right.  And there was no requirement
4  you believe for the -- for TPR to apprise you as
5  the trustee of the upcoming sale?
6  A.  Again, who do you -- repeat the
7  question.
8  Q.  You don't believe that there was a
9  requirement for TPR to apprise you as trustee of
10  the sale?
11  MR. MEISTER: Objection.  Calls for a
12  legal conclusion.
13  BY THE WITNESS:
14  A.  That TPR?
15  BY MR. GRIVER:
16  Q.  Yes.
17  A.  Requires me?  Why should TPR require me
18  to do anything?  What my role is in TPR?  I am
19  the trustee of Orly trust.
20  Q.  Do you believe that TPR had a
21  responsibility to tell you --
22  A.  I have no idea what TPR's
23  responsibilities are.
24  MR. MEISTER: Dalia, let him finish the

Page 245

GENGER

1  question.
2  BY THE WITNESS:
3  A.  I have no idea what the
4  responsibilities are.
5  BY MR. GRIVER:
6  Q.  Did it ever occur to you that perhaps
7  Orly might be able to find financing in order to
8  show up at the UCC sale?
9  A.  No, it never occurred to me.
10  Q.  Did you ever seek financing for the
11  trust?
12  A.  I said that I did entertain, I did --
13  no.  Actually, no.  That was another question
14  that you asked me.  Ask me again.  I am sorry.
15  Q.  Did you seek any financing in order to
16  be able to appear at the UCC sale and maintain
17  control of the TPR shares?
18  A.  No.
19  Q.  Did you talk to any bank?
20  MR. MEISTER: About that?
21  THE WITNESS: Yeah.
22  BY MR. GRIVER:
23  Q.  Did you talk to any bank about the fact
24  that there was a UCC sale and you would like to

Page 246

1    GENGER
2  show up to bid?
3  A.  No, I did not talk to any bank.
4  Q.  Any financing source of any kind?
5  A.  No. No. No.
6  Q.  Any friends?
7  A.  No. I didn't.
8  Q.  Okay.  So you just looked at how much
9    money the Orly Genger trust had on the account?
10 A.  Yes.
11 Q.  And said, "Well, that's less than 4
12   million so I am done;" is that correct?
13 A.  More or less.  Yes.
14 Q.  And you said, "I am not going to tell
15   Arie," correct?
16     MR. MEISTER:  Objection.
17     BY THE WITNESS:
18 A.  No, I didn't say that.
19     BY MR. GRIVER:
20 Q.  You decided that you were not going to
21   tell Arie; isn't that correct?
22     MR. MEISTER:  Objection.
23     BY THE WITNESS:
24 A.  I didn't think --
25     BY MR. GRIVER:

Page 248

1  then I will consider the deposition --
2     MR. GRIVER:  I most certainly do, and I
3  have a reason for asking it, and thank you very
4  much.  From now on, no speaking objections.  Just
5  make your objection and be done.
6     THE WITNESS:  Okay.
7     BY MR. GRIVER:
8  Q.  As for you, Mrs. Genger, did you talk
9    to a lawyer about trying to stop the sale; yes or
10   no?
11     MR. MEISTER:  Objection.  Asked and
12   answered.
13     BY THE WITNESS:
14 A.  What was the question again?
15     BY MR. GRIVER:
16 Q.  Did you talk to a lawyer about trying
17   to stop the UCC sale?
18 A.  I don't remember.
19 Q.  You are not -- are you relying on
20   advice of counsel to protect your actions as
21   trustee in not trying to stop the UCC sale?
22     MR. MEISTER:  Objection.  Calls for a
23   legal conclusion.  Let's move on.  You have
24   covered this.

Page 247

1    GENGER
2  Q.  Yes or no.
3  A.  -- it is my role.
4  Q.  So you decided it wasn't your role, so
5    you weren't going to tell Arie, correct?
6  A.  I decided that I don't have to notify
7    anyone about the auction, okay.
8  Q.  Did you --
9  A.  Including Arie.
10 Q.  Did you talk to a lawyer in your
11   capacity as trustee of the Orly Genger trust
12   about stopping the sale?
13     MR. MEISTER:  Objection.  This was all
14   gone over at the prior deposition.
15     Wait a minute, wait a minute, wait a
16   minute.
17     THE WITNESS:  I am not going to sit
18   here the whole day.  I can't.
19     MR. MEISTER:  Dalia, please.
20     THE WITNESS:  I am not 20 years old.  I
21   can't --
22     MR. MEISTER:  Dalia, please don't
23   interrupt me.
24     I object to you asking the same
25   questions.  If you don't have fresh questions,

Page 249

1    GENGER
2    Dalia, wait a minute.
3    You have covered all of this at the
4  beginning of the first session of the deposition.
5  We are not going to have this first session of
6  the deposition repeated.
7     THE WITNESS:  Again.
8     MR. MEISTER:  So if you would like to
9  move on to fresh material --
10     MR. GRIVER:  Bob, it is not being
11  repeated.  What I am doing is laying a foundation
12  in order to find out if she's relying on advice
13  of counsel.  If she is, then I will get that
14  advice.
15     MR. MEISTER:  You can put it --
16     MR. GRIVER:  I will get that advice
17  from her right now.
18     MR. MEISTER:  You had questions on
19  this.  She told you her answers.
20     MR. GRIVER:  And we had subsequent --
21     MR. MEISTER:  And you --
22     MR. GRIVER:  -- subsequent
23  communications where you said, you know, make
24  your case and bring it to the Court.  So I am
25  going --

ORLY GENGER VS.
DALIA GENGER

DALIA GENGER
February 7, 2013

Page 250

1 GENGER
2 MR. MEISTER: I don't understand what
3 you are talking about. Do you want me to find
4 the section where you asked this?
5 MR. GRIVER: I am not talking to you.
6 MR. MEISTER: No, no. I am sorry,
7 Mr. Griver.
8 MR. GRIVER: Find me the question where
9 I asked her this question, and you can do that,
10 but she is going to answer it in the meantime.
11 MR. MEISTER: No, she is not. Wait a
12 minute.
13 BY MR. GRIVER:
14 Q. Mrs. Genger, are you relying on advice
15 of counsel --
16 A. I am going to get up and walk away. I
17 can't take this. I can't take this.
18 Q. Mrs. Genger, it's a simple question.
19 Are you relying on advice of counsel --
20 A. Usually, I do.
21 Q. -- to shield your actions in not
22 attempting to stop the UCC sale?
23 A. Usually when I decide something, in
24 general, I take the advice and I consult with my
25 lawyer, okay.

Page 251

1 GENGER
2 Q. I am not talking about generally. I am
3 talking specifically with regard to your decision
4 not to attempt to stop the UCC sale.
5 A. So specifically I told you then that I
6 don't remember.
7 Q. Okay. So in that event you are not
8 relying on advice of counsel?
9 A. I didn't say that.
10 MR. MEISTER: Objection.
11 BY THE WITNESS:
12 A. I said I don't remember. I might have.
13 BY MR. GRIVER:
14 Q. Okay. But as we sit here today, you
15 don't remember what that advice was? As we sit
16 here today, you don't remember if you were given
17 advice?
18 A. No.
19 Q. Or you don't remember what that advice
20 was?
21 A. I didn't say that. I said I don't
22 remember if I asked for advice. I didn't say
23 that I didn't get any advice, or which advice did
24 I get.
25 MR. GRIVER: Read back her last answer.

Page 252

1 GENGER
2 (WHEREUPON, the record was read by
3 the reporter as requested.)
4 THE WITNESS: Thank you.
5 MR. GRIVER: Read that again, please.
6 (WHEREUPON, the record was read by
7 the reporter as requested.)
8 BY MR. GRIVER:
9 Q. Did you get advice regarding the UCC
10 sale?
11 MR. MEISTER: Objection. Asked and
12 answered.
13 BY THE WITNESS:
14 A. You just asked me. I mean, really, are
15 we going to -- I mean, this costs me money, you
16 know. This costs me money. If you are going to
17 ask me ten times the same question, I am giving
18 you ten times the same answer, I am not going to
19 pay my lawyer, and I am going to go to court. I
20 mean, this is -- you are harassing me.
21 BY MR. GRIVER:
22 Q. Mrs. Genger, calm down. If you
23 would --
24 A. I would like to calm down.
25 Q. If you would provide yes or no answers,

Page 253

1 GENGER
2 it will be helpful. If you quit changing your
3 answer, it would also be helpful.
4 A. I am not changing. If you read my
5 answers, you would see that I am very consistent
6 with my answers.
7 MR. MEISTER: Read her last answer.
8 And, Mrs. Genger, I would like you to
9 pay attention to where you stated something that
10 makes it unclear whether or not you actually got
11 advice.
12 (WHEREUPON, the record was read by
13 the reporter as requested.)
14 MR. MEISTER: And I'm going to note for
15 the record, the first session of the deposition,
16 at page 191, after Mr. Griver asked whether she
17 consulted with a lawyer, he asked the question at
18 line 2: "What was his advice." And then after
19 dialogue, there was an answer at line 16, quote:
20 "Okay. We weighed the options we had and we
21 concluded there's nothing I can do to stop Sagi
22 from, you know, doing whatever he did with the
23 auction."
24 And it goes on. So this topic was
25 covered in extenso.

Page 254

1    GENGER
2    BY MR. GRIVER:
3 Q. What options did you weigh?  If you are
4  going to go with that testimony, that you
5  actually did seek a lawyer's advice, then I will
6  ask you, what options did you weigh?
7 A. I don't remember.  I don't remember.
8 Q. Okay.  What actions did you take as a
9  result of that advice?
10 A. Of what?
11 Q. Did you speak to anyone about trying to
12  stop the sale after you spoke to your attorney?
13    THE WITNESS: Can you repeat the
14  question.
15    (WHEREUPON, the record was read by
16    the reporter as requested.)
17    BY THE WITNESS:
18 A. No.
19    BY MR. GRIVER:
20 Q. Okay.  On page 208 of your transcript,
21  if you could read, please, pages --
22    MR. MEISTER: Just a second.
23    BY THE WITNESS:
24 A. We have to get to the right page here.
25    BY MR. GRIVER:

Page 255

1    GENGER
2 Q. Page 208, lines 15 through 20.
3 A. Sorry, what line you said?
4    MR. MEISTER: 15.
5    BY MR. GRIVER:
6 Q. Lines 15 through 20.
7    MR. MEISTER: You have to go back to
8  the question, though.
9    BY THE WITNESS:
10 A. Question was, can you -- from where?
11  No, the question is --
12    MR. MEISTER: The question is in line
13  3.
14    BY THE WITNESS:
15 A. "Question: If you told Orly about the
16  sale, she would tell her father.  That didn't
17  occur to you at all?"
18    MR. MEISTER: And then the answer is at
19  line 15.
20    BY THE WITNESS:
21 A. "Answer: I didn't think about it at
22  the time, but I am telling you frankly, I didn't
23  want Arie to be involved in this auction."
24    Okay.
25    BY MR. GRIVER:

Page 256

1    GENGER
2 Q. And you continue on and say: "Because
3  I know my husband."  Do you see that?
4 A. Yes, I do know my husband.
5 Q. What did you mean by that?
6 A. My ex-husband.
7 Q. Okay.  Your ex-husband.  Yes.
8 A. His character.
9 Q. Okay.  What was it about your
10  ex-husband Arie Genger that made you not want him
11  to be involved in the auction?
12 A. He is a dishonest person.  That's my
13  conclusion.
14 Q. Okay.  And how did you believe that
15  that dishonesty might affect the auction?  What
16  was your --
17 A. It will affect the results of the
18  auction in a way that will not benefit Orly.
19 Q. By him buying the TPR shares?
20 A. I don't know if he would buy or not.
21  How should I know?  Hypothetically, I cannot
22  answer you.  It is a hypothetical question.
23 Q. Well, you said you didn't want him to
24  be involved.  So I am asking you, if Arie Genger
25  had bought the TPR shares --

Page 257

1    GENGER
2 A. If, if, if.  I don't know what
3  happened.
4 Q. One second.
5 A. If, if, if.
6 Q. If -- let's explore all the options.
7    Either Arie could show up and not buy
8  the TPR shares --
9 A. I am not answering hypothetical
10  questions, okay, because it is a hypothetical
11  answer.  So I don't know.  I don't know what
12  would happen.
13 Q. You considered what might happen if
14  Arie Genger bid in deciding not to tell him about
15  the UCC sale, so I am asking you --
16    MR. MEISTER: Objection.  That's not
17  her testimony.  The testimony that you just asked
18  her to read, was, quote: "I didn't think about
19  it at the time," closed quote.  Okay.  So don't
20  mischaracterize her prior testimony.
21    BY MR. GRIVER:
22 Q. Mrs. Genger, how could Arie's presence
23  at the UCC sale harm the Orly Genger trust?
24    MR. MEISTER: Objection.
25    BY MR. GRIVER:

ORLY GENGER VS.
DALIA GENGER

DALIA GENGER
February 7, 2013

---

Page 258

GENGER

2 Q. As trustee, please answer the question.
3 A. First of all, I said at the time I
4 didn't think about involvement.
5 Q. Please answer my question. Please just
6 answer my question.
7     MR. GRIVER: Read back the question,
8 please.
9     BY THE WITNESS:
10 A. I don't want my ex-husband to be
11 involved in finances that I am responsible for
12 being a trustee. I don't want him -- I didn't
13 want him to be involved in anything financial
14 that I am also responsible, things that has to do
15 with Orly, because I don't trust him. Okay?
16 Q. How would Arie's participation in
17 the --
18 A. He is a dishonest person. I am cutting
19 you short because I told you that already.
20 Q. Okay. Other than your belief in his
21 dishonesty, how is his buying the TPR shares for
22 more money --
23 A. No other ways.
24 Q. -- for more money than TPR was willing
25 to buy the TPR shares, how would that harm the

---

Page 259

GENGER

2 trust?
3     MR. MEISTER: Objection.
4     BY THE WITNESS:
5 A. As I said, we discussed it before,
6 okay. How would you know that I -- are you
7 assuming that Arie would buy the shares at a
8 higher price than whoever bought the shares?
9     BY MR. GRIVER:
10 Q. If he had --
11 A. If. If he.
12 Q. Yes.
13 A. If, if, if. But if. I don't know if.
14 Q. Mrs. Genger --
15 A. That's what happened.
16 Q. -- as trustee I am asking you --
17 A. Okay.
18 Q. -- if Arie Genger had paid more money
19 than TPR did for the TPR shares, how would that
20 have harmed the Orly Genger trust?
21 A. You're really trying my patience.
22 Q. I just want an answer to that question,
23 please.
24 A. I said before that I would stay away
25 from any financial involvement of Arie that has

---

Page 260

GENGER

2 to do with Orly's financial affairs. That's my
3 answer.
4 Q. Okay.
5 A. If he paid more or less or much more,
6 it doesn't matter. I just don't trust the guy.
7 And I am the trustee and I made this decision,
8 okay, because I happen to know the guy. It is
9 not a stranger. It is somebody that I lived with
10 like 35 years. So I know with whom I am dealing,
11 okay? Is this clear?
12 Q. And, again, I am going to ask you --
13 A. Again?
14 Q. Excuse me. I don't understand. How
15 does Arie Genger's honesty, how does that taint
16 any moneys that he would pay for shares?
17     MR. MEISTER: Objection.
18     BY MR. GRIVER:
19 Q. I am just --
20 A. Because that's not the end of the
21 story, you know. There's things that come after
22 buying the shares.
23 Q. Such as?
24 A. Consequences --
25 Q. Such as?

---

Page 261

GENGER

2 A. -- of something.
3 Q. Such as?
4 A. I don't know. We are talking if. I
5 don't know. If. If he would have paid. If he
6 would have paid, then I would discuss with you,
7 but --
8 Q. If he had paid $8 million for the TPR
9 shares, what future consequences would have been
10 negative for the trust?
11     MR. MEISTER: Objection.
12     BY MR. GRIVER:
13 Q. Mrs. Genger, you are trustee. You
14 swore that you would protect the trust. You
15 swore that you are able to protect the trust. I
16 am asking a simple question.
17     I am asking you what negative
18 consequences do you believe would have resulted
19 from Arie Genger paying more money for the TPR
20 shares than TPR did?
21     MR. MEISTER: Objection.
22     BY THE WITNESS:
23 A. You are very naive, you know. You only
24 just want to spend time, just spending time
25 asking questions around and around the same

---

Page 262

1    **GENGER**
2    subject, okay.
3        **BY MR. GRIVER:**
4    Q.  Please answer my question.
5    A.  And it is a fact that Arie was not able
6    to get his hand on Orly's shares, okay.  It is
7    very disappointing to him, and to you, who you
8    are being paid by Arie, okay.  So that's why I
9    think that your reputation is a little bit
10   tainted in objectivity, is tainted, when you ask
11   me this questions, okay.
12   Q.  Perhaps --
13       **MR. MEISTER:** Can we take a break for a
14   minute, please.
15       **BY MR. GRIVER:**
16   Q.  Perhaps I am brainwashed, too, but I
17   would ask that you --
18       **MR. MEISTER:** Mr. Griver, can we take a
19   break for a minute, please.
20       **MR. GRIVER:** I would ask that she
21   answer my question, and then she can take a
22   break.  Absolutely.
23       But please repeat my question for the
24   record.  Type it out in the record, please.
25       (WHEREUPON, the record was read by

Page 263

1        GENGER
2    the reporter as requested, pg 261,
3    lines 13-20, as follows:
4    "QUESTION: Mrs. Genger, you are
5    trustee.  You swore that you would
6    protect the trust.  You swore that
7    you are able to protect the trust.
8    I am asking a simple question.  I
9    am asking you what negative
10   consequences do you believe would
11   have resulted from Arie Genger
12   paying more money for the TPR
13   shares than TPR did?")
14       **MR. MEISTER:** Note my objection.
15       **BY THE WITNESS:**
16   A.  So where are we standing now?
17       **BY MR. GRIVER:**
18   Q.  I am waiting for you to answer the
19   question.
20   A.  What?  This is the question that you
21   asked like 20 minutes ago?
22   Q.  The one that you have not answered,
23   that she repeated for you, for your convenience.
24   Yes.  Would you like her to repeat it again?
25   A.  Yes.

Page 264

1        **GENGER**
2        **MR. GRIVER:** Madam Court Reporter,
3    please.
4        (WHEREUPON, the record was read by
5    the reporter as requested, page
6    261, lines 13-20.)
7        **MR. MEISTER:** Objection.
8        **BY THE WITNESS:**
9    A.  What negative consequences, you asked?
10       **BY MR. GRIVER:**
11   Q.  Yes.
12   A.  The negative consequences, I cannot
13   answer this question because I don't believe that
14   your question comes in good faith to protect
15   Orly's interest.  Because as we sit here, as we
16   sit here, your mind is also thinking about, I
17   mean, Arie's interest.  Specifically you are
18   asking about Arie's interest over and over and
19   over, okay.  So it is obvious that somebody is
20   pushing Arie's name here all the time, okay.
21       And that's why I don't feel comfortable
22   to answer you questions that are not objectively
23   being put forward as — I have to find the word.
24   As pushing Orly's benefit in this kind of auction
25   or sale.

Page 265

1        **GENGER**
2    Q.  As an attorney for Orly and the Orly
3    trust, I believe that if someone had come into
4    that auction and paid more money, it would have
5    benefited the trust because the trust would have
6    had more money.
7    A.  If somebody would have come.
8        **MR. MEISTER:** Objection.
9        **BY MR. GRIVER:**
10   Q.  That's why I am asking.  So I would ask
11   that you please answer the question.
12   A.  I am answering.
13   Q.  As trustee, what negative consequences
14   did you believe might result if Arie Genger had
15   paid more money for the TPR shares than TPR?
16       **MR. MEISTER:** Excuse me.  Objection.
17       **BY THE WITNESS:**
18   A.  Arie could have come if he wanted to.
19       **BY MR. GRIVER:**
20   Q.  He --
21   A.  He could have come if he wanted to.  If
22   he was so eager, he should have read the
23   newspapers every day and come.  But he didn't do
24   it.  So he didn't come.  So my role is to go and
25   call him and tell him?

Page 266

1   **GENGER**
2   Q.   Your role is not to call him --
3   A.   **I could have called also another**
4   **millionaire or billionaire and asked him to come**
5   **and participate, but I didn't do it, because I am**
6   **not going to sit here every day and make phone**
7   **calls to all the millionaires in the country.**
8   **MR. MEISTER:** Let the record reflect
9   that in part of her answer where she said, "so my
10   role is to call him and tell him to come here,"
11   she was -- her inflection indicated she was
12   asking a question.  It was not a declarative
13   statement.
14   Okay.  Can we take our break, please.
15   **MR. GRIVER:** Sure.  Let me have this
16   marked as Exhibit 16.
17   (Dalia Exhibit 16, affirmation,
18   signed 11/19/2012, marked.)
19   **MR. MEISTER:** Take a break.
20   (WHEREUPON, a recess was had from
21   11:19 a.m. to 11:24 a.m.)
22   **BY MR. GRIVER:**
23   Q.   You are aware that at the time that
24   Sagi Genger on behalf of TPR began taking steps
25   to foreclose on the note, that Orly was seeking

Page 268

1   GENGER
2   A.   **Concerned about protection of?**
3   Q.   Concerned about the protection of her
4   trust assets?
5   A.   **Concerned?  You mean -- did I hear that**
6   **right?**
7   Q.   Yes.
8   Did you think that Orly was concerned
9   about her trust assets?
10   A.   **No, I was not aware of that.**
11   Q.   So did you believe that Orly did not
12   care what happened to the assets of her trust?
13   A.   **I am sure she, like any normal person,**
14   **she is concerned about her assets.**
15   Q.   Okay.  So knowing that like any other
16   normal person she would be concerned about her
17   trust assets, why didn't you tell her, by phone,
18   by mail, by any means you chose --
19   A.   **Yeah.**
20   Q.   -- about the fact that those assets
21   were about to be sold?
22   A.   **Why --**
23   **MR. MEISTER:** Objection.  Assumes a
24   fact not in evidence.
25   **BY THE WITNESS:**

Page 267

1   GENGER
2   to have you removed as trustee?
3   A.   **Right.**
4   Q.   And you know that before you were
5   appointed as trustee, Orly had been in conflict
6   with Leah Fang, the previous trustee?
7   A.   **Yes.**
8   Q.   Okay.  And you testified, I believe
9   previously, that you never -- that you don't know
10   what exactly the conflict was, and you had not
11   sought to understand what that conflict was?
12   A.   **Right.**
13   Q.   But you knew, did you not, from the
14   conflict with Leah Fang and from Orly's actions
15   against you that Orly was, in fact, deeply
16   concerned about her trust and her trust assets?
17   **MR. MEISTER:** Object to the form of the
18   question.  I think you misspoke, Mr. Griver.
19   **BY THE WITNESS:**
20   A.   **Yes.  Can you repeat?  Did Orly what?**
21   **BY MR. GRIVER:**
22   Q.   Did you not understand from Orly's
23   actions with regard to Leah Fang and with regard
24   to you that Orly was concerned about protection
25   of the trust --

Page 269

1   GENGER
2   A.   **Is there a connection between the**
3   **question --**
4   **MR. MEISTER:** And objection to the
5   form.
6   **BY THE WITNESS:**
7   A.   **Is there -- I don't understand.  Is**
8   **there a connection between the question that you**
9   **asked me now to the question before that she's**
10   **concerned about her assets, and now you are**
11   **asking me what?**
12   **BY MR. GRIVER:**
13   Q.   If you assumed that Orly, like any
14   normal person, was concerned about her trust
15   assets, why did you not provide the courtesy of
16   calling up and letting her know that TPR was
17   foreclosing on some of those assets?
18   **MR. MEISTER:** Objection.  Assumes a
19   fact not in evidence.  Objection to form.  And
20   objection to this whole line has been gone over
21   and over and over.
22   **BY THE WITNESS:**
23   A.   **My answer is, if Orly was so concerned,**
24   **she could have given me a phone call.  I am her**
25   **mother, and she knows my number.**

Page 270

```
 1      GENGER
 2      BY MR. GRIVER:
 3 Q.  And as her mother you didn't think you
 4  should call up and let your daughter know?
 5      MR. MEISTER: Objection. Asked and
 6  answered numerous times.
 7      BY THE WITNESS:
 8 A.  How many times? I mean, really, you
 9  know.
10      BY MR. GRIVER:
11 Q.  Answer the question.
12 A.  So I told you, if she was so concerned
13  that I am doing something wrong, when she was
14  very concerned she did write me a letter, okay.
15  Apparently this time she didn't find the time or
16  the necessity to write me any letter concerning
17  me selling the shares to the Trump Group, for
18  example. Then she did, now she didn't. Why?
19  Because she was concerned less? Or she didn't
20  have the time? I have no idea.
21 Q.  As her mother, don't you think you
22  should have called on the phone and let her know
23  about the sale?
24      MR. MEISTER: Objection. Asked and
25  answered.
```

Page 271

```
 1      GENGER
 2      BY MR. GRIVER:
 3 Q.  Just yes or no.
 4 A.  What? The same question that we --
 5 Q.  Yes. Until you give me an answer, yes.
 6      As her mother, don't you think you
 7  should have picked up the phone and told her
 8  about the foreclosing on the TPR assets?
 9 A.  No.
10      MR. MEISTER: Objection. Asked and
11  answered.
12      BY MR. GRIVER:
13 Q.  Okay. Take a look at what's been
14  marked as Exhibit 16, please. For the record,
15  Exhibit 16 is an affirmation in support of the
16  motion to dismiss further amended petition signed
17  by Robert Meister on or about November 19, 2012.
18  Mrs. Genger, did you review this
19  document before it was submitted on behalf of --
20  purportedly on behalf of the Orly Genger trust
21  and you as trustee?
22      MR. MEISTER: First of all, I note that
23  this is a document submitted in a different
24  litigation. Secondly, it was not submitted on
25  behalf of the Orly Genger trust. So it is
```

Page 272

```
 1      GENGER
 2  mischaracterizing it. Submitted on behalf of
 3  Mrs. Genger, as trustee, in response to a
 4  petition, third amended petition to remove her as
 5  trustee.
 6      I further note that this is not a
 7  deposition in that action.
 8      MR. GRIVER: And I will simply note
 9  that one of the actions against Mrs. Genger in
10  this case is for fraud in her actions as trustee.
11      THE WITNESS: Fraud?
12      MR. GRIVER: Fraud. That's correct.
13      MR. MEISTER: Actually, I think --
14      THE WITNESS: Get to the point.
15      MR. MEISTER: Actually, it is not
16  interactions as trustee. What is left in this
17  case after the trustee claims were dismissed
18  by -- in the very first motion, is an allegation
19  that Mrs. Genger colluded and committed fraud
20  individually, colluded with Sagi Genger. I've
21  noted also that none of these questions seem to
22  relate to what is left in this case.
23      MR. GRIVER: That's not true at all,
24  but thank you for that, Robert.
25      BY MR. GRIVER:
```

Page 273

```
 1      GENGER
 2 Q.  If you could look at paragraph 8.
 3      Actually, paragraph 21 says it better. Paragraph
 4  21.
 5 A.  21. Okay.
 6      MR. MEISTER: Page 12.
 7      BY THE WITNESS:
 8 A.  Okay. So what part of 21?
 9      BY MR. GRIVER:
10 Q.  Yes. But first I will ask you, because
11  I don't believe I received an answer to my
12  question, did you review this document before it
13  was submitted in the --
14 A.  I don't remember.
15 Q.  -- action?
16      Okay. If you can look at paragraph 21,
17  particularly the second sentence.
18 A.  When you say "the note," which note do
19  you mean? The D&K note?
20 Q.  The D&K note, yes.
21 A.  (Witness reading document).
22      Yes, I remember that.
23 Q.  And --
24 A.  I was -- yeah.
25      MR. MEISTER: Wait until there's a
```

ORLY GENGER VS.
DALIA GENGER

DALIA GENGER
February 7, 2013

Page 274

1    GENGER
2    question.
3    BY MR. GRIVER:
4  Q.  So does it -- is it your position
5    that --
6  A.  I am sorry.  What is TAP?
7  Q.  Third amended petition.
8  A.  What?
9  Q.  Third amended petition.
10  A.  (Witness reading document).
11    Okay.  I read it.
12  Q.  Are you taking the position that you
13    could not tell Orly Genger about the notice of
14    default of the D&K note which was dated August
15    31, 2008 because you had been instructed by
16    Surrogate Roth to take no action?
17  A.  Actually, yes.  I remember that I
18    was -- I was notified that I shouldn't do
19    anything because Orly asked from the judge that I
20    shouldn't take any action.
21  Q.  And so because of Surrogate Roth's
22    order, you took no action --
23  A.  I don't remember it because of this or
24    because of that.  But I knew that I couldn't take
25    any action.  I don't remember.

Page 275

1    GENGER
2  Q.  You couldn't take any action because of
3    Surrogate Roth's order?
4  A.  It says so.
5  Q.  I know that's what Mr. Meister claims.
6    I am asking you as trustee, did you believe that
7    Surrogate Roth's order required you to take no
8    action --
9  A.  Yes.  I believe so.
10  Q.  Excuse me.  Let me finish.
11    So Surrogate Roth's order required you
12    to take no action of any kind as --
13  A.  I was not allowed --
14  Q.  -- as trustee?
15  A.  Yeah.
16  Q.  You were not allowed?
17  A.  Yeah.
18  Q.  You couldn't even call your daughter
19    and tell her because of that, is that your
20    position, because Surrogate Roth told you to take
21    no action to harm the shares of the trust?
22    MR. MEISTER: Objection.
23    Mischaracterizes what Surrogate Roth said.
24    BY THE WITNESS:
25  A.  So what's the question?

Page 276

1    GENGER
2    BY MR. GRIVER:
3  Q.  Well, I will rephrase it.
4    So what was your understanding of
5    Surrogate Roth's impact on your ability to act?
6  A.  That I don't have an ability to act.
7  Q.  In any way?
8  A.  She said not to act, so I would say in
9    any way.  She didn't say in any way, but I
10    assumed that that's what she meant.  Otherwise,
11    she would specify in which way I can take an
12    action.
13  Q.  Okay.
14  A.  I would assume.
15  Q.  I am not asking you to assume,
16    Mrs. Genger.
17  A.  I am not a lawyer.  I don't know the
18    way these things are written.
19  Q.  But as trustee, what was -- I'm asking
20    simply what your understanding was as trustee?
21  A.  That I shouldn't take any action.
22  Q.  And your understanding, did that
23    prevent you from even calling up your daughter
24    and letting her know about the sale?
25  A.  Yeah.

Page 277

1    GENGER
2  Q.  So your understanding is that Justice
3    Roth's order even prevented you from letting
4    people knowing about a sale?  It was that broad,
5    correct?
6  A.  I was instructed not to take any
7    action, and that's what I did.  I didn't take any
8    action.
9  Q.  And what was the basis for your
10    understanding that you could take no action?
11  A.  What's the basis?  Because the judge
12    said so.
13  Q.  Okay.  Any other basis?
14  A.  Maybe, but I don't remember at the
15    moment.
16  Q.  Did you discuss Justice Roth's --
17    excuse me.
18    Did you discuss Surrogate Roth's order
19    with Sagi Genger?
20  A.  No.
21  Q.  Now, Justice Roth issued the order we
22    have been discussing where you were not to take
23    any actions to affect the trust assets in March
24    of 2008; do you recall that?
25  A.  Is this regarding to the Trump Group?

ORLY GENGER VS.
DALIA GENGER

DALIA GENGER
February 7, 2013

Page 278

1    GENGER
2 Q. No. This is in -- the Trump Group --
3 this is regarding to you --
4 A. Yes.
5 Q. -- not taking any action as trustee
6 because at the time Orly was seeking to remove
7 you as trustee because she did not believe that
8 you --
9 A. Okay. That I'm fraudulent and so and
10 so forth?
11 Q. No, just that you would not be a good
12 trustee. Just that you would not --
13 Mrs. Genger --
14    MR. MEISTER: Don't make jokes,
15 Mrs. Genger. This is -- anything you say on the
16 record --
17    MR. GRIVER: I don't think she was
18 joking.
19    BY MR. GRIVER:
20 Q. Mrs. Genger, were you joking?
21 A. Of course I was joking. Would I say
22 about myself that I am --
23 Q. Mrs. Genger --
24 A. -- fraudulent?
25 Q. -- then I ask you to just simply answer

Page 279

1    GENGER
2 the question, okay --
3 A. Okay. What is the question?
4 Q. -- because you are under oath.
5    Do you recall Surrogate Roth's
6 direction that no actions were to be taken by you
7 in reference to the trust assets, that that order
8 was issued on or about March 4 of 2008; do you
9 recall that?
10 A. I recall that there was something like
11 that, but the date, I am not sure about.
12 Q. I will represent to you that it was
13 March 4, 2008, and it lasted until January 1 of
14 2009.
15 A. Okay.
16 Q. So during that time, you were not
17 allowed to take any actions whatsoever, correct?
18 A. Okay.
19    MR. GRIVER: Did she answer?
20    THE COURT REPORTER: She said "okay."
21    MR. GRIVER: Okay. Let's have this
22 marked as 17.
23    (Dalia Exhibit 17, amendment,
24    dated 8/22/2008, marked.)
25    BY MR. GRIVER:

Page 280

1    GENGER
2 Q. Is that your signature, Mrs. Genger?
3 A. All right. Yes. But I have to
4 familiarize myself because, you know, I am not --
5 Q. Go ahead and do that. But is that your
6 signature on Exhibit 17?
7 A. Yes. I know, I know. I said I know.
8 But I have now to --
9 Q. Now that you have identified you as
10 having signed this document, go ahead and read
11 it.
12 A. Yes. Now I am reading it. And I am
13 trying to see to what we are talking here about.
14 Amending something.
15 Q. Okay. For the --
16 A. Paragraph 32. What is paragraph 32?
17 Q. Mrs. Genger, you can read it. If you
18 look at Exhibit 9 of your -- Exhibit 9, that's
19 the D&K restated and amended partnership
20 agreement.
21 A. Okay. I am just -- okay.
22    MR. MEISTER: Everything you say,
23 including, "I am turning to this," the reporter
24 has to write down.
25    THE WITNESS: She has to write it down.

Page 281

1    GENGER
2 I'm sorry.
3    MR. MEISTER: So don't say anything
4 except when Mr. Griver asks you a question and
5 then you answer.
6    THE WITNESS: Okay. I'm fine. Okay.
7    BY MR. GRIVER:
8 Q. For the record, Exhibit 17 is an
9 amendment on or about August 22, 2008 to the
10 amended and restated limited partnership
11 agreement of D&K Limited Partnership.
12 A. Paragraph 22? With authority of
13 general partners, this is what you mean? Page
14 11?
15 Q. Yeah.
16 A. What is it?
17 Q. Mrs. Genger, this is an amendment to
18 the D&K Limited Partnership agreement, to which
19 the Orly Genger trust was a partner. And this is
20 a change that took place in August of 2008 --
21 A. Yeah.
22 Q. -- during the time of Surrogate Roth's
23 order.
24 A. Order that what? That I shouldn't --
25    MR. MEISTER: Just wait for the

---

**Page 282**

1   GENGER
2   question.
3   THE WITNESS: I don't -- no. I don't
4   get it. That's why I am talking.
5   MR. MEISTER: But don't talk -- if you
6   wait for the question, and then when the question
7   is over, and you can answer.
8   BY MR. MEISTER:
9   Q.  Mrs. Genger, who drafted this
10  amendment?
11  A.  I wouldn't know.
12  Q.  Did Sagi Genger draft this amendment?
13  A.  When I say I wouldn't know, it includes
14  Sagi, other lawyers. I wouldn't know. Somebody
15  drafted it. I didn't draft it.
16  Q.  Did you have --
17  A.  I did not draft it.
18  Q.  Do you recall anything related to your
19  signing of this amendment?
20  A.  I have to refresh my memory. I don't
21  remember.
22  Q.  Well, I have given you an opportunity
23  to read the amendment. Does that refresh your
24  recollection as to the circumstances?
25  A.  I need time to read it.

---

**Page 283**

1   GENGER
2   Q.  Take it.
3   A.  Okay. (Witness reading document).
4   MR. GRIVER: Let me have this marked as
5   18 while we're waiting.
6   MR. MEISTER: As far as the I know, the
7   only question is, have you signed Exhibit 17, and
8   you answered that, or he asked you if that's your
9   signature.
10  BY THE WITNESS:
11  A.  What is the question?
12  BY MR. GRIVER:
13  Q.  Do you recall the circumstances of you
14  signing this amendment?
15  A.  The circumstances? You mean about what
16  was it, you mean?
17  Q.  About what was it, when you signed it,
18  who was there when you signed it, anything.
19  A.  I want to make sure that I am looking
20  at the right paragraph, because it says paragraph
21  22 is corrected to read so and so, right.
22  Q.  Uh-huh.
23  A.  So paragraph 22 --
24  Q.  Is amended.
25  A.  Right. And it is at page 11, right, is

---

**Page 284**

1   GENGER
2   what you mean? I want to make sure we are
3   looking at the same document.
4   Q.  Page 11 through 12.
5   A.  Okay. I am just trying to find the
6   exact -- the correcting number here, right? The
7   number of shares, I am trying to see what it is,
8   and it is probably something that I was --
9   Q.  If you look at the end of 22-A, the
10  very first line, very last thing is --
11  A.  22-A?
12  Q.  Very last thing is 102.80.
13  A.  22-A. Okay. So there is a correction
14  to the percentage, I guess.
15  Q.  Okay.
16  A.  Because here it says percentage, and
17  here it says shares.
18  Q.  There's also a relaxing or termination
19  of restrictions, right, language was added at the
20  end, do you see that, in the amendment?
21  A.  At the end --
22  Q.  If you look at Exhibit 17, you will see
23  that additional language was added at its end; do
24  you see that?
25  A.  Certain restriction might be relaxed.

---

**Page 285**

1   GENGER
2   Okay.
3   Q.  Do you recall -- do you have any
4   recollection of the circumstances of the signing
5   of this amendment?
6   A.  No, I don't remember that.
7   Q.  Okay. Was this change in the
8   amendment, was this your idea or somebody else's
9   idea?
10  A.  I'm sorry, I didn't understand.
11  Q.  This amendment that's been marked as
12  Exhibit 17, was this your idea or somebody else's
13  idea?
14  A.  Idea, you said, you mean?
15  Q.  Yes.
16  A.  I don't know whose idea it was.
17  Q.  You don't even remember if it was your
18  idea; is that your testimony?
19  A.  I don't remember whose idea it was,
20  that's what I am saying.
21  Q.  Was it your idea?
22  A.  I said I don't remember so I -- it
23  might be mine, it might be somebody else. I
24  don't remember.
25  Q.  So at the time when you were -- at the

---

Page 286

1    GENGER
2    time that you were instructed by Surrogate Roth
3    not to take any action, it could have been your
4    idea to amend the D&K agreement?
5  A.  I said I don't remember.  I didn't say
6    that I did.
7  Q.   So it could have been?
8  A.  I said I don't remember.
9  Q.   So it is a possibility, correct?
10  A.  If you want to hang on possibilities,
11    hang on possibilities.
12    MR. MEISTER: Objection.  Calls for a
13  hypothetical.
14    THE WITNESS: Hypothetical.
15    BY MR. GRIVER:
16  Q.   If you can't remember whether or not it
17  was your idea, then it is possible it is your
18  idea, correct?
19    MR. MEISTER: Mr. Griver, stop
20  badgering the witness.  She said she doesn't
21  matter.
22    THE WITNESS: Really, I mean, why are
23  you being --
24    MR. MEISTER: Excuse me, Dalia.  Dalia,
25  let me get my objection on the record.

Page 287

1    GENGER
2    She said she answered your question.
3    Don't ask her hypothetical questions.  Let's not
4    have to get the judge on the phone again.
5    MR. GRIVER: Every time we get the
6    judge on the phone, it goes against you, Bob.
7    MR. MEISTER: It hasn't gone against me
8    once, Yoav.
9    BY MR. GRIVER:
10  Q.   Let me ask you, Mrs. Genger, you don't
11  remember if this was your idea or not, correct?
12  A.  I do not remember if it was my idea.
13    And that's my answer.
14  Q.   Okay.  It could have been your idea, it
15  could have been Rochelle Fang's idea, it could
16  have been Sagi Genger's idea, correct?
17  A.  Or my lawyer's idea.
18  Q.   And who was your lawyer at the time?
19  A.  (Indicating).  Sitting next to me.
20    MR. MEISTER: No.  Objection.
21    BY MR. GRIVER:
22  Q.   Mr. Kortmansky?
23  A.  Either Kortmansky -- okay.  So just
24    shows you how much I remember.
25  Q.   And this was an amendment that you

Page 288

1    GENGER
2    signed as trustee of the Orly Genger trust,
3    correct?
4    MR. MEISTER: Objection.  Asked and
5    answered.
6    BY THE WITNESS:
7  A.  Yes, you said that's when I was not
8    supposed to.  So I guess I was --
9    BY MR. GRIVER:
10  Q.   Okay.  Mrs. Genger, how would it be in
11  the Orly Genger trust's best interests to add the
12  language at the end that provided that the
13  restrictions of paragraph 22 of the D&K amended
14  and restated agreement could be relaxed or
15  terminated with the consent of the general
16  partner, which is Sagi Genger and TPR Investment
17  Associates Inc., where Sagi Genger was the CEO at
18  the time?
19  A.  I told you I don't remember.
20    MR. MEISTER: Objection.
21  Mischaracterization.
22    BY THE WITNESS:
23  A.  I told you I don't remember that I made
24    this correction, so how can I answer this
25    question now.

Page 289

1    GENGER
2    BY MR. GRIVER:
3  Q.   At the time that you signed this --
4    well, strike that.
5    Mrs. Genger, you are the trustee of the
6    trust now, okay?
7  A.  Right.
8  Q.   You are still charged with protecting
9    the trust.  So I am asking you --
10  A.  I am charged?
11  Q.   With protecting the trust.  It is your
12  responsibility to protect the trust, correct?
13  A.  Yeah.
14  Q.   So I am asking --
15  A.  It is my privilege.
16  Q.   -- as trustee of the trust, what
17  possible best interest could there be for the
18  Orly Genger trust for those restrictions to be
19  relaxed or terminated in a way set forth in the
20  amendment?
21    MR. MEISTER: Objection.
22    BY THE WITNESS:
23  A.  At the time, I am sure I had my
24    reasons, but now I don't remember what they were.
25    BY MR. GRIVER:

ORLY GENGER VS.
DALIA GENGER

DALIA GENGER
February 7, 2013

Page 290

GENGER

1    GENGER
2 Q. Okay. As trustee of the trust, on what
3 basis, as we sit here today, could you possibly
4 think --
5 A. **As I sit here today, I don't know what**
6 **I was thinking then.**
7 Q. Okay. At the time that you signed this
8 amendment, had you received a copy of the amended
9 and restated limited partnership agreement that
10 was being amended?
11 A. **I don't remember.**
12 Q. Had you read it?
13 A. **I don't remember.**
14 Q. Do you recall whether or not you
15 provided this amendment to an attorney to review
16 before you signed it?
17 A. **I don't remember.**
18 Q. Okay. Did Sagi Genger just give you
19 this document and ask you to sign it?
20 A. **I didn't say that Sagi Genger gave me**
21 **the document. Why you putting words in my mouth?**
22 Q. You don't remember how it came to be
23 given to you for signature?
24 A. **No, I don't remember.**
25 Q. All right. At any time did you let the

Page 291

GENGER

1    GENGER
2 surrogate court know that this amendment had been
3 made to the D&K amended and restated limited
4 partnership agreement?
5 A. **I don't remember.**
6 Q. Okay. At any time -- well, let me ask
7 you, as you sit here today, should you have -- I
8 will represent to you that there's nothing in the
9 files that indicate that you did.
10    As we sit here today, do you believe
11 that you should have let the surrogate court know
12 about this amendment?
13    MR. MEISTER: Objection. Calls --
14 first of all, objection to form. Secondly, it
15 calls for a legal conclusion, and it has nothing
16 whatsoever to do with this case.
17    BY THE WITNESS:
18 A. **I repeat what he is saying.**
19    BY MR. GRIVER:
20 Q. Okay. And as trustee, do you think you
21 should have apprised Surrogate Roth about this
22 amendment? Yes or no?
23 A. **I don't have any idea if I should or**
24 **shouldn't at the time.**
25 Q. Okay. As we sit here today, do you

Page 292

GENGER

1    GENGER
2 think it would have been appropriate for you to
3 do so?
4 A. **I don't remember what was it about, so**
5 **I can't tell you what I thought -- who should**
6 **have done.**
7    (Dalia Exhibit 18, amendment,
8    dated 11/2008, marked.)
9    BY MR. GRIVER:
10 Q. Let me show you what's been marked as
11 Exhibit 18. Mrs. Genger, this is another
12 document, for the record, called amendment to the
13 amended and restated limited partnership
14 agreement of D&K Limited Partnership. It is
15 dated as of November 2008.
16 A. **November? November 22. Yes. So what**
17 **is the question?**
18 Q. Is that your signature on the second
19 page?
20 A. **I didn't say it was my signature here.**
21 Q. Did you ever give anyone permission to
22 sign on your behalf this document?
23 A. **I don't see my name here, so.**
24 Q. Well, in November of 2008, you were
25 trustee of the trust, correct?

Page 293

GENGER

1    GENGER
2 A. **In November 2008, I was the trustee of**
3 **the trust. Right.**
4 Q. Okay. Do you recognize the signature
5 directly on top of yours?
6    MR. MEISTER: Objection. There is no
7 signature of hers.
8    BY MR. GRIVER:
9 Q. Directly on top of -- do you see the
10 signature --
11 A. **It doesn't spell my name anywhere so**
12 **where should I sign?**
13 Q. Did you see the signature for the 1993
14 Sagi Genger trust, do you recognize that
15 signature?
16 A. **No.**
17 Q. Do you recognize the signature for D&K
18 GP LLC --
19 A. **I don't recognize Orly's signature**
20 **here. I don't see if there is a line.**
21 Q. Do you recognize Sagi Genger's
22 signature?
23 A. **On the top I do.**
24 Q. But as we sit here today, you don't
25 believe that that's your signature on behalf of

Page 294

1    GENGER
2  the 1993 Orly Genger trust?
3  A.  No.
4  Q.  And as we sit here today you don't
5  recall ever giving anyone permission to sign on
6  your behalf this document that's been marked --
7  A.  I know that my son has some rights to
8  sign, but, no, I don't think in this case.
9  Q.  Well, that's not the question.
10 A.  Not as a trustee, for sure.
11 Q.  My question is, did you give anyone
12 permission to sign --
13 A.  No.
14 Q.  -- on your behalf this document that's
15 been marked as Exhibit 18?
16 A.  No.  No.
17 Q.  Okay.  Now, I note that you -- I note
18 that this document was produced by you.  It has
19 Bates stamps, DG 146 and 147.
20 A.  Where is this document?
21    MR. MEISTER: Wait for a question.
22    BY MR. GRIVER:
23 Q.  Do you see those exhibits, those Bates
24 numbers?
25 A.  I don't know who put the stamps on.

Page 295

1    GENGER
2  Q.  No, no.  Look at the bottom.  It says
3  DG 146 and 147.
4     MR. MEISTER: If the question is, does
5  this document have DG 146 and 147, I will
6  stipulate it does.
7     BY MR. GRIVER:
8  Q.  And that means, Mrs. Genger, that this
9  was produced by you in this litigation?
10 A.  That's what you said.  I don't know if
11 it is true.
12    MR. MEISTER: It means it was produced
13 by her, including her counsel, as to anything she
14 or her counsel had in their possession.
15    MR. GRIVER: Okay.
16    BY MR. GRIVER:
17 Q.  Mrs. Genger --
18 A.  What?  Something happened?
19    MR. MEISTER: That's the way you
20 requested the request for production.
21    BY MR. GRIVER:
22 Q.  Mrs. Genger --
23 A.  I don't understand.
24 Q.  Mrs. Genger, when did you receive this
25 document?

Page 296

1    GENGER
2  A.  I don't remember.
3  Q.  Did you ever seek to understand why
4  someone was purporting to sign on behalf of the
5  1993 Orly Genger trust when it was not your
6  signature on this document?
7  A.  No.  Because I don't remember when I
8  got it, and when I saw it, and when I read it.
9  Q.  I am not asking when.  I am asking do
10 you ever recall doing anything to understand who
11 signed --
12 A.  No, I don't recall.
13 Q.  Okay.  Do you recall any effort by you
14 to understand the meaning and effect of this
15 document?
16 A.  No, I don't recall.
17 Q.  How would this amendment be in the best
18 interest of the Orly Genger trust?
19    MR. MEISTER: This amendment that she
20 didn't sign, that she doesn't remember ever
21 seeing before?  No.  No.
22    MR. GRIVER: You know what?  It came
23 from --
24    MR. MEISTER: Objection.
25    MR. GRIVER: You know what?  It came

Page 297

1    GENGER
2  from her possession or from --
3     MR. MEISTER: It didn't come from her,
4  it came from her or her counsel because that's
5  the way you drafted your document.
6     BY MR. GRIVER:
7  Q.  Mrs. Genger, did it come from your
8  possession?
9  A.  I am saying that you are harassing me,
10 you know that.
11 Q.  No, I am asking you --
12 A.  You are harassing me.
13 Q.  Mrs. Genger, you are trustee.
14 A.  I know that I am trustee, and I am
15 doing the best that I can --
16 Q.  Okay.  As trustee --
17 A.  -- in order to protect my child,
18 okay --
19    MR. MEISTER: Dalia, wait.
20    BY THE WITNESS:
21 A.  -- thanks to you.
22    MR. MEISTER: Please don't make
23 speeches.  Wait for his question.  Listen to the
24 question.  If you can answer it, answer it.
25    BY MR. GRIVER:

ORLY GENGER VS.
DALIA GENGER

DALIA GENGER
February 7, 2013

Page 298

GENGER

1   GENGER
2  Q.  How does Exhibit 18 protect your child?
3  A.  I don't know.
4  Q.  Okay.  Did you ever task anyone with
5   investigating who purported to sign on behalf of
6   Orly Genger trust?
7  A.  I don't remember.
8  Q.  Did you ever --
9  A.  I don't remember if I ever.
10  Q.  Did you ever task anyone with
11   attempting to understand the effect of --
12  A.  I don't remember --
13  Q.  -- this amendment?
14  A.  -- if I ever did this.
15  Q.  Did you ever attempt to determine why
16   these changes were being made?
17  A.  I don't remember if I ever did.
18  Q.  Mrs. Genger, if you look at Exhibit
19   9 -- I will make this very simple.
20  A.  You promise?
21  Q.  I am only going to try.
22      MR. MEISTER:  Dalia, please don't do
23   this.
24      BY MR. GRIVER:
25  Q.  To your knowledge, was Exhibit 9 ever

Page 299

GENGER

1   GENGER
2   altered, amended, changed, revised, fixed,
3   superceded, in any way by you?
4  A.  I don't remember.
5      MR. MEISTER:  Objection.
6      BY MR. GRIVER:
7  Q.  Okay.  Are there any other alterations,
8   amendments, changes, revisions, fixes, or
9   supersessions of Exhibit 9 other than the one we
10   have discussed today?
11      MR. MEISTER:  Objection to the form of
12   the question.
13      BY THE WITNESS:
14  A.  I don't remember anyway.
15      BY MR. GRIVER:
16  Q.  If there were other changes to Exhibit
17   9, would they not be in your possession as
18   trustee?
19  A.  I don't remember if I have it or don't
20   have it.
21  Q.  Do you keep files as trustee?
22  A.  I do have some files.  Yes.
23  Q.  Did you produce all of those files to
24   your counsel for review and production?
25  A.  Yes.

Page 300

GENGER

1   GENGER
2  Q.  In November of 2008, who was your
3   counsel?
4  A.  I believe it was -- 2008?
5  Q.  Uh-huh.
6      MR. MEISTER:  You told her before it
7   was Mr. Kortmansky.  She says she didn't
8   remember, and you told her it was Mr. Kortmansky.
9      BY THE WITNESS:
10  A.  Yeah, right.  So you see, I don't
11   remember even for something that happened five
12   minutes ago.
13      BY MR. GRIVER:
14  Q.  And it was Mr. Kortmansky?
15  A.  I guess if you tell me so.
16  Q.  Mrs. Genger, I am asking you, do you
17   have any recollection as to who your attorney was
18   in November of 2008?
19  A.  I recall what you told me, that it was
20   Mr. Kortmansky.
21  Q.  In producing documents in this case,
22   did you go to Mr. Kortmansky and ask him to
23   review his files?
24  A.  I don't remember.
25  Q.  You don't remember seeking that?

Page 301

GENGER

1   GENGER
2  A.  No.  I don't remember.
3  Q.  Do you know if your production includes
4   files from Mr. Kortmansky?
5  A.  Whatever I had, I gave to my lawyer.
6  Q.  I am not asking for what you have, I am
7   asking did you make sure that Mr. Kortmansky
8   provided documents to Mr. Meister?
9  A.  To Mr. Meister?  I believe he did.
10  Q.  And on what do you base that belief?
11  A.  Because he is an honest lawyer who does
12   his job correctly, and that Mr. Meister received
13   it.
14  Q.  How do you know that Mr. Meister
15   received files from Mr. Kortmansky?
16      MR. MEISTER:  That wasn't the question.
17   Your question was did she believe.
18      THE WITNESS:  Which I do believe.
19      MR. MEISTER:  You are asking whether
20   she knows.
21      THE WITNESS:  Yeah.  I don't know for
22   fact.  I didn't go and check page by page.
23      MR. GRIVER:  Can I make my simple --
24      THE WITNESS:  But I believe that
25   lawyers behave honestly, and this is --

Page 302

1   GENGER
2   MR. MEISTER: Not off the record.
3   Instead of berating the witness, you can ask me
4   simply when I became successor counsel, did I ask
5   Kortmansky for his files in the firm, and the
6   answer would be yes. I have an envelope or
7   whatever the thing was that he turned over as his
8   files.
9   THE WITNESS: So why are you asking me
10  these kind of questions? I mean, I cannot
11  answer.
12  BY MR. GRIVER:
13  Q. Did this document that's been marked as
14  Exhibit 18, did this come from your file?
15  A. Why do you think I can see from over
16  here?
17  Q. You have a copy. This document --
18  MR. MEISTER: We are back on 18.
19  BY MR. GRIVER:
20  Q. This document marked as Exhibit 18, did
21  this come from your files or Mr. Kortmansky's
22  files?
23  MR. MEISTER: Objection. Form,
24  disjunctive compound.
25  BY THE WITNESS:

Page 303

1   GENGER
2   A. That's the one without the signature,
3   you mean?
4   BY MR. GRIVER:
5   Q. Well, it came from your files or it
6   came from Mr. Kortmansky's files.
7   MR. MEISTER: Objection to form.
8   Disjunctive compound.
9   BY THE WITNESS:
10  A. I don't remember.
11  BY MR. GRIVER:
12  Q. You don't remember this came from your
13  files?
14  A. I don't remember from which file it
15  came.
16  Q. Okay. You don't remember this came
17  from Mr. Kortmansky's files, correct?
18  A. What I said, I don't remember from
19  which, I mean also from Kortmansky.
20  Q. In producing documents in this case --
21  A. Yeah.
22  Q. -- other than yourself and
23  Mr. Kortmansky and Mr. Meister's files, was there
24  any other places that you went to in order to
25  produce documents in this case?

Page 304

1   GENGER
2   A. I don't think so.
3   MR. GRIVER: Before we go -- let's take
4   a two-minute break.
5   (WHEREUPON, a recess was had from
6   12:06 p.m. to 12:18 p.m.)
7   BY MR. GRIVER:
8   Q. Mrs. Genger, when you signed the
9   amendment to the D&K Limited Partnership
10  agreement that's been marked as Exhibit 17, were
11  you aware that TPR had entered into a side letter
12  agreement with the Trump Group as to the sale of
13  the Orly Genger trust shares of TRI?
14  A. A side letter agreement?
15  Q. Uh-huh.
16  MR. MEISTER: Read the question back,
17  please.
18  THE WITNESS: Yeah. I am not so sure.
19  MR. MEISTER: Listen to the question.
20  (WHEREUPON, the record was read by
21  the reporter as requested.)
22  BY THE WITNESS:
23  A. I have nothing to do with the TPR, so
24  they didn't notify me. I am not aware. I was
25  not aware.

Page 305

1   GENGER
2   BY MR. GRIVER:
3   Q. Okay. Did you seek to ascertain why
4   this document was presented to you as of August
5   22, 2008?
6   A. Can you ask this question again.
7   Q. Sure.
8   Did you seek to ascertain why this
9   document was presented to you as of August 22,
10  2008?
11  A. I did not seek to ascertain why.
12  Q. Mrs. Genger, if you can please look at
13  what's been previously marked as Exhibit 15.
14  Mrs. Genger, do you recall when you
15  found out about the August 2008 TPR TI
16  transactions?
17  MR. MEISTER: Can I have that read
18  back, please.
19  THE WITNESS: It is hard for me to --
20  all these names.
21  BY MR. GRIVER:
22  Q. Okay. Just listen to the question,
23  Mrs. Genger, and if you don't understand the
24  question, I will be happy to rephrase it.
25  A. Everything, and I don't -- I am getting

ORLY GENGER VS.
DALIA GENGER

DALIA GENGER
February 7, 2013

Page 306

1     **GENGER**
2  **confused.**
3  Q.  If you are confused, you don't
4  understand the question, as I instructed you
5  before, I will be happy to repeat it until you do
6  understand.
7  **A.  Okay.  So ask me, please.**
8  Q.  I will ask it again.
9        When did you find out about the August
10  2008 TPR TI transaction --
11  **A.  2008?**
12  Q.  August 2008, TPR TI transactions with
13  the Trump Group?
14  **A.  You are talking about something else**
15  **about 2008?**
16  Q.  Mrs. Genger, there were transactions
17  involving the TPR and TRI shares with the Trump
18  Group in August of 2008 involving your son Sagi
19  Genger --
20  **A.  Yes.**
21  Q.  -- and TPR and the Sagi Genger trust.
22        My question is, when did you find out
23  about these transactions?
24  **A.  I can't tell you.  I don't remember.**
25  Q.  Did you know about those transactions

Page 307

1     GENGER
2  when they were both happening?
3  **A.  I knew there was some transaction**
4  **between Sagi and the Trump Group, but I don't**
5  **remember the date.**
6  Q.  Okay.  When you found out about it,
7  were the transactions taking place or had they
8  already taken place?
9  **A.  I don't remember.**
10  Q.  So you may have known about it as they
11  were taking place?
12  **MR. MEISTER: Objection.**
13  **BY THE WITNESS:**
14  **A.  I may or may not.  I said I don't**
15  **remember.**
16  **BY MR. GRIVER:**
17  Q.  Can you think of anything that would
18  refresh your recollection as to when you did find
19  out about those transactions?
20  **A.  No.**
21  Q.  Look at Exhibit 15, please.
22  **A.  Okay.  Yes, if you want me -- I have to**
23  **read it carefully because -- and this is**
24  **completely -- I can't read it.  I mean, this is**
25  **the same here?  The two pages are the same as --**

Page 308

1     **GENGER**
2  Q.  We have discussed some of it in your
3  prior deposition.
4  **A.  Yeah.  I mean, these two pages are the**
5  **same?  1 and 2?**
6  Q.  1 and 2, and then there's --
7  **A.  I know.  But these two pages are the**
8  **same?  Because this one I cannot read.  And this**
9  **one is --**
10  Q.  Oh, is it -- it is the same document
11  with different signatures, right.
12  **A.  Different signature.  Okay.**
13  Q.  Signatures are a little better.
14  **A.  Okay, okay.  So what is the question**
15  **now?**
16  Q.  My question to you is, was this an
17  actual physical meeting?
18  **A.  You mean, if it was at the firm**
19  **physically?**
20  Q.  Yes.
21  **A.  I would say physically.**
22  Q.  And who was at the meeting?
23  **A.  First of all, I'm not -- I don't see**
24  **my -- the trust.  Yeah.  I see here, yes.  Sagi**
25  **Genger.**

Page 309

1     GENGER
2  **MR. MEISTER: Can you read back the**
3  question, please.
4  **THE WITNESS: Yes.  What's the question**
5  again?
6        (WHEREUPON, the record was read by
7        the reporter as requested.)
8  **BY THE WITNESS:**
9  **A.  Who was at the meeting?  Whoever signed**
10  **it, per the document.**
11  **BY MR. GRIVER:**
12  Q.  Okay.
13  **A.  Which is me.**
14  Q.  Okay.
15  **A.  Okay.  Which is Sagi, and document --**
16  **okay.  I would say TPR Investment Associates Inc.**
17  **I cannot recall who this person was because it is**
18  **hard also to read.**
19  Q.  Could it also have been Sagi in his
20  capacity?
21  **MR. MEISTER: Objection.  Hypothetical.**
22  **BY THE WITNESS:**
23  **A.  It could, I mean, but I don't know.**
24  **BY MR. GRIVER:**
25  Q.  All right.

Page 310

1    GENGER
2  A.  I really don't know.
3  Q.  And who represented the Sagi Genger
4    trust?
5  A.  Rochelle, probably at the time, I would
6    think.
7  Q.  Were there any lawyers there?
8  A.  Lawyers?
9  Q.  Yes.
10  A.  I don't remember.
11  Q.  Did you bring a lawyer to the meeting?
12  A.  Again?  I am sorry.
13  Q.  Did you bring a lawyer to the meeting?
14  A.  I would assume, yes, because I wouldn't
15    sign anything without a lawyer.
16      MR. MEISTER:  Objection.  Move to
17    strike because she --
18      BY MR. GRIVER:
19  Q.  Are you speculating?
20  A.  I am speculating.
21  Q.  Okay.  I am asking you please not to
22    speculate.
23  A.  Yeah.  No, I am assuming, that's why I
24    am saying.
25  Q.  I am asking you --

Page 311

1    GENGER
2  A.  So I don't know then.
3  Q.  You should --
4  A.  I don't remember.
5  Q.  You don't remember bringing a lawyer to
6    the meeting?
7  A.  I don't remember, yeah.  That's why I
8    said I assume because usually I would.
9  Q.  Now, we have discussed in your prior
10    deposition day what efforts you did or did not
11    make between the signing of this meeting and the
12    UCC sale.  And we also discussed, if you recall,
13    that you wanted the 30 days to try and convince
14    Sagi not to sue his sister?
15  A.  Right.
16  Q.  Correct?
17  A.  I mean --
18      MR. MEISTER:  There's no question.
19    Wait.
20      THE WITNESS:  For the trust.  I am
21    correcting him.  The trust.
22      MR. MEISTER:  Dalia, wait for the
23    question.
24      THE WITNESS:  Okay.
25      BY MR. GRIVER:

Page 312

1    GENGER
2  Q.  So you wanted to spend the 30 days to
3    convince Sagi not to sue the Orly Genger trust?
4  A.  I was hoping that that's what I am
5    going to achieve.
6  Q.  And it was a standstill for 30 days,
7    correct?
8  A.  It was a standstill until today.
9  Q.  No, but the meeting agreement provided
10    for --
11  A.  30 days.
12  Q.  Okay.  Did TPR actually wait for 30
13    days?
14  A.  Not to sue?
15  Q.  Not to enforce the note.  If you look
16    at --
17  A.  Not to sue Orly's trust.
18  Q.  Look at Exhibit -- look at paragraph 8
19    of Exhibit 15.
20  A.  "TPR Investments has agreed to refrain
21    from enforcing the note against each limited
22    partner for 30 days."
23  Q.  Now, the two limited partners were the
24    Orly Genger 1993 trust and the Sagi Genger 1993
25    trust, correct?

Page 313

1    GENGER
2  A.  Okay.  Yes.
3  Q.  Did TPR refrain from enforcing the note
4    against the Orly Genger trust for 30 days?
5  A.  Yes.
6  Q.  And on what do you base that answer?
7  A.  Because they didn't enforce the note.
8  Q.  Well --
9  A.  As far as I know.
10  Q.  Okay.  At the time that you signed
11    this, did you check to see whether there was an
12    actual risk of enforcement of the note against
13    the Sagi Genger trust?
14      MR. MEISTER:  Objection --
15      BY THE WITNESS:
16  A.  It is not my business.
17      MR. MEISTER:  -- to form.
18      BY THE WITNESS:
19  A.  I am Orly's trustee.  I am not Sagi's
20    trust trustee.  I am not trustee of Sagi's trust.
21    My concern is for Orly's trust.
22      BY MR. GRIVER:
23  Q.  Okay.  And as trustee you made sure
24    that TPR abided by its agreement not to enforce
25    the note for 30 days, correct?

ORLY GENGER VS.
DALIA GENGER

DALIA GENGER
February 7, 2013

Page 314

1    GENGER
2    MR. MEISTER: Objection.
3  Mischaracterizes.
4    MR. GRIVER: Well, let me --
5    MR. MEISTER: No, you are not going to
6  play that game, Yoav.
7    BY MR. GRIVER:
8  Q.  As trustee --
9  A.  Why are you harassing me?  Why are you
10  doing this?  We want to finish.  I mean, I told
11  you, he did not enforce.  He did not enforce
12  the -- he did not enforce the note on Orly's
13  trust.
14  Q.  Never?
15  A.  Not in this 30 days.
16  Q.  And you as trustee made sure that that
17  was -- that that happened, correct?
18  A.  That that did happen.
19  Q.  That the 30 days was honored by TPR?
20  A.  Right.
21    (Dalia Exhibit 19, memo, dated
22    8/2/2006, marked.)
23    MR. GRIVER: For the record, what's
24  been marked as Exhibit 19 is a memo from Sagi
25  Genger to David Parnes, cc-ing Dalia Genger, and

Page 315

1    GENGER
2  it's dated August 2, 2006.
3    BY MR. GRIVER:
4  Q.  Mrs. Genger, do you recall seeing this
5  memo before?
6    MR. MEISTER: Before her preparation
7  for this?
8    BY MR. GRIVER:
9  Q.  At anytime.
10  A.  I saw it today.  I saw it today,
11  actually.
12  Q.  You saw it today.
13    Did you see it two days ago in your
14  preparation for --
15  A.  No.  I saw it today, actually.
16  Q.  Is that the first time you recall
17  seeing this document?
18  A.  Yes.
19  Q.  Okay.  As far as you recall, you did
20  not actually receive this memorandum; is that
21  correct?
22  A.  I don't remember if I received this.
23  Q.  Okay.
24  A.  But today I did see it.
25  Q.  Okay.  You saw this -- you saw this

Page 316

1    GENGER
2  particular document before we began this
3  deposition?
4  A.  Yeah.  I didn't read it, but I saw it
5  today, and I noted to my lawyer that this paper I
6  didn't see before.
7  Q.  So if you look at paragraph 4, it says:
8  D&K LP and its partners have a variety of claims
9  against TPR and deny the enforceability of the
10  note.
11    And this is a memorandum that's signed
12  by Sagi, both as on behalf of D&K LP and behalf
13  of TPR investments?
14  A.  Yes, it says.
15  Q.  Okay.  So this is Mr. Sagi Genger on
16  behalf of D&K LP and TPR stating to Mr. Parnes
17  that D&K LP have a variety of claims against TPR
18  and deny the enforceability of the note, correct?
19    MR. MEISTER: Objection.  You are
20  asking her to construe a document which isn't
21  hers, and you are mischaracterizing what this
22  states.
23    MR. GRIVER: Well, she can certainly --
24    MR. MEISTER: Objection as to form.
25  Come on, Mr. Griver.  Your case can't be that

Page 317

1    GENGER
2  weak that you have to resort to trickery.
3    MR. GRIVER: You know, my case is very
4  strong, and I think that these two days of
5  depositions have demonstrated that.  But we will
6  move on.
7    MR. MEISTER: Then we don't need any
8  more.
9    MR. GRIVER: We're going to move on,
10  and I am going to ask you the question again and
11  ignore Mr. Meister for the rest of this
12  deposition.
13    THE WITNESS: What?
14    BY MR. GRIVER:
15  Q.  Okay.  When Sagi --
16  A.  What did you say?  To ignore my lawyer?
17  Q.  When Sagi stated that D&K denies the
18  enforceability of the note in paragraph 4 of this
19  memorandum, do you know why he was denying the
20  enforceability of the note?
21  A.  No, I have no idea.  Because I have
22  seen this like -- I told you.  I saw it today
23  before I saw you.
24    MR. MEISTER: Just answer the question.
25    BY THE WITNESS:

Page 318

1    GENGER
2  A.  No, I don't know what Sagi was
3  thinking.
4     BY MR. GRIVER:
5  Q.  Okay.  When you were trying to
6  determine whether or not to -- strike that.
7     Was there ever a time when you tried to
8  determine whether or not you could stop the UCC
9  sale of the D&K note?
10    MR. MEISTER:  Objection.  Asked and
11  answered, not only today, but also --
12    MR. GRIVER:  Withdrawn.  I will
13  withdraw it.
14    BY MR. GRIVER:
15  Q.  You testified there was a time when you
16  explored whether or not you could stop the UCC
17  sale, correct?
18  A.  I was contemplating whether it can be
19  stopped.  But there was no -- I couldn't find any
20  solution to this event from stopping.
21  Q.  Did you speak with Sagi Genger in
22  trying to stop it?  In trying to stop the UCC
23  sale, did you speak with Sagi Genger?
24  A.  I don't remember if I spoke with him.
25  Q.  Okay.  In trying to stop --

Page 319

1    GENGER
2  A.  At the time.
3  Q.  In trying to stop the sale, did you ask
4  Mr. Sagi Genger to provide you any documents that
5  might be relevant to the enforceability of the
6  note?
7  A.  I don't remember if I talked to him, so
8  how do I know if I asked him.
9  Q.  Did you seek to collect documents
10  relevant to the enforceability of the note?
11  A.  No, I didn't seek.
12  Q.  You did not ask Sagi, for example, to
13  provide you any documents he may have related to
14  the enforceability of the note; isn't that
15  correct?
16  A.  Can you ask me the question --
17  Q.  Sure, I will ask you again.
18  A.  Not this one, the one before you asked
19  me.  Not this one, the one before.
20  Q.  Did you ask Sagi Genger to provide you
21  with documents related to the enforceability of
22  the note so that you could determine whether or
23  not --
24  A.  I said no.  Now you are saying, "for
25  example, did you ask this."  So, obviously, it is

Page 320

1    GENGER
2  included in the answer that was before.
3  Q.  As a limited partner, did you ask D&K
4  for any documents it might have related to the
5  enforceability of the note?
6  A.  I don't remember.
7  Q.  Okay.  Did you ask TPR for any
8  documents it might have related to the
9  enforceability of the note?
10  A.  No, I don't remember.
11  Q.  Did you ask anybody --
12  A.  I don't remember.
13  Q.  Okay.  Well, come on, Mrs. Genger, you
14  would remember if you asked somebody for
15  documents?
16    MR. MEISTER:  Don't argue with the
17  witness.
18    BY THE WITNESS:
19  A.  No, no.
20    MR. MEISTER:  Don't argue with the
21  witness.  You have asked the question, she says
22  she doesn't remember.  Next question.
23    BY MR. GRIVER:
24  Q.  Mrs. Genger, do you really not recall
25  whether you asked anybody for documents?

Page 321

1    GENGER
2    MR. MEISTER:  Objection.  Asked and
3  answered.
4    BY THE WITNESS:
5  A.  If you said "really," it doesn't
6  change.  When I said I don't remember, I don't
7  remember.  Really or not really.
8    BY MR. GRIVER:
9  Q.  If you had asked for documents, don't
10  you think you would remember?
11    MR. MEISTER:  Objection.
12    BY THE WITNESS:
13  A.  No, I don't think I would remember.
14    BY MR. GRIVER:
15  Q.  Do you recall looking through stacks of
16  documents looking for any possibility to prevent
17  the sale of the TPR shares at the UCC sale?
18    THE WITNESS:  Can you repeat --
19    MR. GRIVER:  Read the question back.
20    THE WITNESS:  No, not the question.
21  Can you repeat the ten last questions that the
22  lawyer asked me?
23    BY MR. GRIVER:
24  Q.  Mrs. Genger --
25  A.  No, because it is the same question so

ORLY GENGER VS.
DALIA GENGER

DALIA GENGER
February 7, 2013

Page 322

1    GENGER
2  I have to concentrate now.
3  Q.  In paragraph 6 of the memorandum --
4  A.  Of this memorandum that I saw five
5  minutes ago?  Yes.
6  Q.  First of all, you saw it today this
7  morning?
8  A.  Yes.  Before I saw Bob, I saw that.
9  Q.  Who showed it to you?
10 A.  It was on the pile of some papers.
11 Q.  Where were these papers?
12 A.  On his desk.
13 Q.  On Mr. Meister's desk?
14 A.  Yes.  And I said I am not familiar with
15 it.
16 Q.  Did you meet with Mr. Meister today to
17 prepare for your deposition?
18 A.  I came to pick him up to come here.
19 Q.  And it was --
20 A.  It wasn't when we prepared for the
21 deposition.
22 Q.  You just saw this document for the
23 first time today?
24 A.  Yes, yes.
25 Q.  Okay.  Do you have any idea why in

Page 323

1    GENGER
2  paragraph 6 D&K was talking about making a
3  counterclaim against TPR upon any attempt --
4  A.  I can't -- don't talk too fast.  I am
5  getting tired.
6  Q.  In paragraph 6 D&K says that if
7  collection efforts are made, it could result in
8  D&K making a counterclaim against TPR.  Do you
9  know the basis for --
10 A.  Let me read this.  You know, let me
11 read this, okay.  Because you know that that's
12 not the easiest case, okay, for a layperson.
13     (Witness reading document).
14     I am really not familiar with this
15 document.  So if you ask me about number 6 or 5
16 or 4, my answer is that I do not understand the
17 circumstances of when this was born, was created.
18 Q.  Okay.  When you became trustee, you
19 knew that the collection of the D&K note was an
20 issue, correct?
21 A.  Yes.
22 Q.  Did you ever seek from D&K or TPR as a
23 result all documents related to the
24 enforceability of the note so that you could best
25 protect the trust?

Page 324

1    GENGER
2  A.  We had a settlement agreement.
3  Q.  From anytime when you became trustee on
4  or about January 4, 2008 --
5  A.  Yeah.
6  Q.  -- all the way until the UCC sale in
7  February 2009, did you at any time in that period
8  of time, did you seek to collect documents
9  related to the enforceability of the note so that
10 you could best protect the trust?
11 A.  No.
12     MR. MEISTER:  We are changing to a new
13 line?  Can we take our lunch break now, please?
14     MR. GRIVER:  Let's go off the record.
15     (WHEREUPON, the deposition was
16 recessed from 12:43 p.m. until
17 1:38 p.m.)
18 * * * * *
19
20
21
22
23
24
25

Page 325

1    GENGER
2     MR. GRIVER:  On the record.
3     BY MR. GRIVER:
4  Q.  Mrs. Genger, directing your attention
5  to Exhibit 13, this is the notice of enforcement.
6  When did you receive -- strike that.
7  Did you ever receive this document?
8  A.  No.
9  Q.  Let me have this --
10 A.  Maybe my lawyer did, but I don't
11 remember.
12 Q.  Did you or your lawyer receive this
13 document before the UCC sale?
14 A.  I personally did not receive it.
15 Q.  Did your lawyer receive this document
16 before the UCC sale?
17     THE WITNESS:  Did you?
18     MR. MEISTER:  I wasn't your lawyer
19 then.
20     THE WITNESS:  Oh, you weren't?  So we
21 have to ask the other lawyer.
22     BY MR. GRIVER:
23 Q.  Okay.  In the files of Mr. Kortmansky,
24 was there a copy of this notice in them?
25     MR. MEISTER:  There was not.

Page 326

1    GENGER
2    MR. GRIVER: Let me have this marked as
3  Exhibit 20.
4    (Dalia Exhibit 20, undated
5    memorandum, re: UCC sale, marked.)
6    MR. GRIVER: For the record, Exhibit 20
7  is an undated memorandum or notice to D&K Limited
8  Partnership from TPR Investment Associates Inc.,
9  informing D&K of the UCC sale.
10   THE WITNESS: So TPR --
11   MR. MEISTER: Wait for a question.
12   BY MR. GRIVER:
13 Q.  Mrs. Genger, have you seen this
14  document before?
15 A.  No.
16 Q.  Did you see this document anytime
17  before the UCC sale?
18 A.  No. I don't remember if I have seen
19  this before.
20 Q.  Was this document that's been marked as
21  Exhibit 20, was it in the files of
22  Mr. Kortmansky?
23 A.  Really, I don't know.
24   MR. GRIVER: Was it in the files of
25  Mr. Kortmansky?

Page 327

1    GENGER
2    MR. MEISTER: This document does not
3  look familiar to me. I am not sure that I have
4  seen it before. If it were in the files of
5  Mr. Kortmansky, I think I would have produced it
6  in response to your discovery request.
7    MR. GRIVER: Let me show you what I
8  will mark as Exhibit 21.
9    (Dalia Exhibit 21, document
10    package sent 5/19/2009, marked.)
11   BY MR. GRIVER:
12 Q.  For the record, Exhibit 21 are certain
13  documents sent to Robert Meister from David
14  Parnes on or about May 19, 2009. Included in
15  those documents is what's been previously marked
16  as Exhibit 20.
17 A.  Okay.
18 Q.  Mrs. Genger, what I am going to ask you
19  to do is look through those documents and
20  identify any documents in this package that you
21  received prior to the UCC sale.
22 A.  I will look quickly over it.
23   MR. MEISTER: Take your time.
24   BY MR. GRIVER:
25 Q.  Take your time. If there's any

Page 328

1    GENGER
2  document that you received prior to the UCC sale,
3  please let me know.
4 A.  This is something that you showed me
5  before, right?
6 Q.  That's correct. That's Exhibit 13. My
7  only question --
8 A.  No, I didn't see it before.
9 Q.  Okay.
10 A.  But it looked familiar because I saw --
11 Q.  Uh-huh.
12 A.  No.
13 Q.  Just to make it clear on the record,
14  you have -- strike that.
15   Just to make it clear on the record,
16  you did not receive any of the documents that
17  comprise Exhibit 21 to your affidavit before the
18  UCC sale; is that correct?
19   MR. MEISTER: Objection to the form. I
20  think you mean Exhibit 21.
21   MR. GRIVER: What did I say?
22   MR. MEISTER: You said Exhibit 21 to
23  your affidavit.
24   MR. GRIVER: Oh, okay. Strike that.
25   MR. MEISTER: But I think that was the

Page 329

1    GENGER
2  previous -- same as the previous question, and
3  she answered correct.
4    MR. GRIVER: Okay.
5    BY THE WITNESS:
6 A.  I did not.
7    BY MR. GRIVER:
8 Q.  You did not receive any of these
9  documents before the UCC sale; is that correct?
10 A.  Right.
11 Q.  You did not attend the UCC sale?
12 A.  No.
13 Q.  Did you send anyone --
14 A.  No.
15 Q.  You didn't send any lawyers or anybody
16  to represent the interests of the Orly Genger
17  trust?
18 A.  Right.
19 Q.  All right. Mrs. Genger, if you could
20  look at Exhibit 1 to your deposition. I will
21  remind you, since it has been a while, that on
22  the last page is your signature saying that you
23  have read the answer and know the con --
24 A.  Answer to what?
25 Q.  That you have read this document.

ORLY GENGER VS.
DALIA GENGER

DALIA GENGER
February 7, 2013

Page 330

1   GENGER
2  A.  Oh, that I read the document.
3  Q.  Exhibit 1 is your answer to the second
4   amended complaint in this action.  And it is
5   verified, which means --
6  A.  Wait a second.  You are saying that I
7   signed this as what?  As an answer to?
8  Q.  You signed this answer to the second
9   amended complaint.  If you look on the last page,
10  you verified its contents as being true?
11 A.  That I read it and whatever is in here
12  is true?  That's what it says?  Okay.  Okay,
13  yeah.  I am getting slower now because I am tired
14  already.  Okay.
15     MR. MEISTER:  So what's the question?
16     BY MR. GRIVER:
17 Q.  I am just setting the stage.  If you
18  look at paragraph 3 --
19 A.  3, okay.
20 Q.  You deny -- I will read it.
21     In paragraph 3 you, quote:  Deny
22  knowledge or information sufficient to form a
23  belief as to whether the default was improperly
24  noticed or whether the foreclosure was improper,
25  period, unquote.

Page 331

1   GENGER
2     Do you see that?
3  A.  Yes.  I want to read it aloud so I --
4   this is paragraph 3 what I am reading now, right?
5  Q.  Right.
6  A.  (Witness reading document).
7     Yeah.
8  Q.  Okay.  Mrs. Genger, my question to you
9   is quite simple.  As trustee, why did you not
10  obtain the knowledge or information sufficient
11  for you to determine whether the default was
12  improperly noticed before the UCC sale occurred?
13 A.  Can you ask me again?
14     MR. GRIVER:  Read it back.
15     (WHEREUPON, the record was read by
16     the reporter as requested.)
17     BY THE WITNESS:
18 A.  Because I knew that -- I mean, I knew
19  the procedures were the legal procedures that TPR
20  was supposed to follow, and I knew that they --
21  the note was in default.  So what's the question
22  then?
23     BY MR. GRIVER:
24 Q.  Well, in 2010, in verifying this
25  answer, you stated that you did not have

Page 332

1   GENGER
2   knowledge or information sufficient to form a
3   belief as to whether the default was improperly
4   noticed.
5  A.  But I noticed that nobody paid the
6   note.  So it's sufficient for me.
7  Q.  I'm talking about the notice.  The UCC
8   sale requires certain things to happen.
9     As trustee, why is it that --
10 A.  I don't know.  TPR should have sent me
11  a notice.
12 Q.  Okay.  Then TPR did not send you a
13  notice?
14 A.  They might have, but I didn't receive
15  it.  That's my answer.
16 Q.  But as of 2010 -- well, did you ever
17  ask TPR whether they sent it to you?
18 A.  How would I know that they are supposed
19  to send it to me?
20 Q.  In determining whether the UCC sale was
21  accurate, didn't you ask Sagi for all documents
22  that he sent to you, just to make sure?
23     MR. Meister:  Objection.  Assumes a
24  fact not in evidence.
25     BY THE WITNESS:

Page 333

1   GENGER
2  A.  I cannot determine ahead of time what
3   Sagi's supposed to do.  I don't know exactly what
4   he's supposed to do.
5     BY MR. GRIVER:
6  Q.  All right.  And you did not conduct an
7   investigation, did you?
8  A.  No.  I'm not in the investigation
9   business.
10 Q.  Why is it that you as trustee did not
11  obtain knowledge or information sufficient to
12  determine whether or not the foreclosure was
13  improper, either before the foreclosure or after
14  the foreclosure?
15 A.  But it was proper.
16 Q.  How do you know?
17 A.  Because it went ahead and it was
18  proper.  Somebody bought it.  Somebody bought the
19  stock.
20 Q.  Do you understand that one of the
21  things that Orly is seeking in this litigation is
22  to unwind that sale?
23 A.  Okay.  She can do that.  It is her
24  right.
25 Q.  Okay.  You as trustee, did you not have

ORLY GENGER VS.
DALIA GENGER

**DALIA GENGER**
February 7, 2013

---

Page 334

GENGER

1  GENGER
2  any responsibility to make sure that the
3  foreclosure was proper before it happened?
4  **A. But it was proper. I said, in my**
5  **opinion, it was proper.**
6  Q. And your opinion is based on what?
7  **A. Because the procedure was followed,**
8  **Sagi -- whatever requirements were -- he had to**
9  **meet in order to have the auction going on, he**
10 **fulfilled, and it looked to me that it was**
11 **proper.**
12 Q. So what procedures is it that you
13 believe were followed that made this sale proper?
14 **A. The procedure -- I knew that the**
15 **procedures were that he should put in the**
16 **newspaper some notice about the public auction,**
17 **and he did so, apparently.**
18 Q. And who is it that told you that that
19 was the procedure that was required to be done?
20 Was it Sagi or was it somebody else?
21 **A. No. Sagi.**
22 Q. Sagi told you?
23 **A. Yeah.**
24 Q. Anybody else?
25 **A. No.**

---

Page 335

GENGER

1  GENGER
2  Q. As we sit here today, have you done any
3  investigation since the UCC sale until today to
4  determine whether the foreclosure was proper or
5  improper?
6  **A. I didn't investigate if it was proper**
7  **or improper.**
8  Q. Have you asked any of your attorneys to
9  determine whether the foreclosure was proper or
10 improper?
11 **A. No, I didn't ask.**
12 Q. As trustee of the trust, don't you
13 think it is your responsibility to make sure that
14 the foreclosure was proper or improper?
15 **A. Can you ask this again.**
16      MR. MEISTER: Read it back, please.
17      (WHEREUPON, the record was read by
18      the reporter as requested.)
19      BY MR. GRIVER:
20 Q. Strike that. Let me ask the question
21 better.
22      As trustee of the trust, isn't it your
23 responsibility to determine whether the
24 foreclosure sale was proper?
25 **A. If I had doubts, I would have**

---

Page 336

GENGER

1  GENGER
2  **investigated, but I didn't have any doubts.**
3  Q. And that's based on --
4  **A. On what was proper.**
5  Q. And that's based on what Sagi told you?
6  **A. It is based on the fact that I have**
7  **trust in whatever Sagi told me.**
8  Q. Okay. Any other basis?
9  **A. And the fact that he told me what the**
10 **procedure is.**
11 Q. Okay. And any other basis?
12 **A. I don't remember if there were any**
13 **other bases.**
14 Q. Is there anything I can show you today
15 that would refresh your recollection?
16 **A. I am sure you do have.**
17 Q. I am asking you now is there -- do you
18 have -- other than Sagi explained to you what the
19 procedure is and you trusting Sagi, was there any
20 other basis for your determination that the sale
21 was proper?
22 **A. No. I don't remember any other.**
23 Q. And you have not charged your attorneys
24 with investigating to make sure that the sale was
25 proper?

---

Page 337

GENGER

1  GENGER
2  **A. I don't remember that I charged -- that**
3  **the attorney charged me for that. They might**
4  **have.**
5  Q. No. That you instructed your -- strike
6  that.
7      And you have never instructed your
8  attorneys to determine --
9  **A. I never say "never" because I don't**
10 **remember. Don't use this word even with me**
11 **because I don't remember.**
12 Q. Fine.
13      You don't remember ever instructing
14 your attorneys to determine whether the
15 foreclosure was proper; is that fair?
16 **A. I don't remember that I ever instructed**
17 **my lawyer to investigate if it is proper or**
18 **improper. I don't remember if I did that or not.**
19 Q. Okay. Mrs. Genger, I am really quite
20 curious. Why don't you just resign as trustee?
21 **A. Because I want to protect my daughter's**
22 **assets.**
23 Q. And why don't you agree to accept a
24 co-trustee acceptable to your daughter?
25      MR. MEISTER: Objection. Assumes a

---

ORLY GENGER VS.
DALIA GENGER

DALIA GENGER
February 7, 2013

Page 338

1   GENGER
2   fact not in evidence.
3       MR. GRIVER: All right.  I will clean
4   that up.
5       BY MR. GRIVER:
6   Q.  Would you accept a co-trustee
7   acceptable to your daughter?
8       MR. MEISTER: Objection.  This is not a
9   question relating to the litigation.
10      MR. GRIVER: That's not true.
11      BY THE WITNESS:
12  A.  It has never come up.
13      BY MR. GRIVER:
14  Q.  Well, I am asking you now.  As we sit
15  here today under oath as trustee would you --
16  A.  When Orly will sit with me and talk
17  with me, then I will discuss it with her.  If
18  Orly is willing to sit with me and talk with me,
19  then I will discuss it with her, with all
20  honesty.  Because I just want whatever is good
21  for her.  Yes.  And if you will show me --
22      MR. MEISTER: You have answered the
23  question.
24      THE WITNESS: Okay.
25      MR. MEISTER: Mr. Griver, can I ask

Page 339

1   GENGER
2   that you not grunt after the witness' answer.
3       (Dalia Exhibit 22, verified
4       complaint in Delaware action,
5       marked.)
6       BY MR. GRIVER:
7   Q.  Mrs. Genger, do you recall on or about
8   October 24 -- strike that.
9       Do you recall that on or about October
10  4, 2011 you filed an action in the chancery court
11  of the state of Delaware on behalf of the trust?
12  A.  Right.
13  Q.  And this is a copy of the verified
14  complaint in that --
15  A.  I believe you, yeah.
16  Q.  And that's your signature before the
17  exhibits, verifying the allegations --
18  A.  Yes, that's my signature, right.
19  Q.  So before this complaint was filed, you
20  read it, you considered what it said, and you
21  agreed with its --
22  A.  Yeah.
23  Q.  Okay.  And I take it that before
24  verifying it, you read this complaint carefully?
25  A.  Yeah.

Page 340

1   GENGER
2   Q.  Whose idea was it to bring a lawsuit in
3   the state of Delaware on behalf of the trust?
4   A.  It was my idea.
5   Q.  And did anyone -- did you discuss that
6   idea with anyone?
7   A.  I might discuss it with Bob.
8   Q.  Did you discuss it with -- did you
9   discuss it with Sagi?
10  A.  No.
11  Q.  Did you discuss it with anybody else?
12  A.  No.  Only with my lawyer.
13  Q.  Okay.  Do you know if your lawyer
14  discussed it with Sagi or anybody else?
15  A.  I have no idea what he discussed with
16  Sagi.  He doesn't tell me.
17  Q.  Okay.
18      MR. GRIVER: Robert, I've asked for
19  this before, but I would like to -- I think that
20  the actions of Mrs. Genger as trustee, there is
21  no privilege as to them.  And so on behalf of the
22  beneficiary, I would ask for all records,
23  communications, et cetera, in your possession
24  related to the Dalia Delaware action.  I put this
25  in writing after Mrs. Genger's first deposition,

Page 341

1   GENGER
2   and I reiterate it today.
3       BY MR. GRIVER:
4   Q.  How is it that you got the idea of
5   bringing a lawsuit in Delaware, Mrs. Genger?
6   A.  It was, I think, a quite simple
7   decision.  Because in Delaware, the courts were
8   familiar with the Genger case, so to speak, and
9   they spend a lot of time, and they are very
10  familiar with the case.  And I wanted the trust
11  to be represented and to solidify Orly's claim to
12  the TRI shares.
13      MR. GRIVER: Okay.  Let me mark this as
14  23.
15      (Dalia Exhibit 23, New York
16      complaint, marked.)
17      THE WITNESS: Let me get a chance to
18  read it.
19      BY MR. GRIVER:
20  Q.  Now, Mrs. Genger --
21  A.  What date was it, by the way?
22  Q.  Was what?  This is --
23  A.  What date was it?
24  Q.  The New York complaint, that's Exhibit
25  23?

ORLY GENGER VS.
DALIA GENGER

DALIA GENGER
February 7, 2013

Page 342

1      GENGER
2  A.  Yes.
3  Q.  If you look at the --
4  A.  The end?
5  Q.  -- very end, the summons is October 21,
6    2010.
7  A.  October 2, 2010.
8  Q.  Right.
9  A.  Okay.
10 Q.  So the year before?
11 A.  I just want to ask a question, that it
12   is a technical question.
13 Q.  Sure.
14 A.  That the addresses that are mentioned
15   here are current for this date?
16 Q.  The other --
17 A.  Like, for example, Arie Genger resided
18   at 2600 --
19     MR. MEISTER: He can't answer that.
20   This is not --
21     THE WITNESS: It's a document from the
22   court. Okay. I got it.
23     BY MR. GRIVER:
24 Q.  Mrs. Genger, this is a complaint
25   brought by you and your attorneys on behalf of

Page 343

1      GENGER
2    yourself and on behalf of the Orly Genger trust.
3  A.  Okay. Against Arie Genger.
4  Q.  Yes. Do you recall authorizing this
5    complaint?
6  A.  I am sure I did. But I have to read it
7    because I don't remember.
8  Q.  You don't remember bringing a
9    complaint --
10 A.  No, I remember that I did, but I have
11   to read it in order to remember exactly the
12   details, if this is -- you know, that's what I
13   mean. Because my capacity to remember all these
14   documents is getting really limited.
15 Q.  Mrs. Genger, my question to you is
16   this: Having already brought a lawsuit a year
17   before on behalf of the Orly trust, and with
18   regard to the Delaware action's effect upon the
19   trust, why did you bring a separate action in
20   Delaware a year later?
21     MR. MEISTER: I object. This is, first
22   of all --
23     MR. GRIVER: No. This is her actions
24   as trustee. You are working for her; she is not
25   working for you. I would ask that you limit

Page 344

1      GENGER
2    yourself to objections, just saying the word, and
3    asked and answered, objection to form --
4      THE WITNESS: Okay. So ask me again
5    the question.
6      MR. GRIVER: Read the question back,
7    please.
8      THE WITNESS: Why? It started "why"?
9      (WHEREUPON, the record was read by
10     the reporter as requested.)
11     MR. MEISTER: And now I will object --
12   wait a minute. I am putting my objection here on
13   the record.
14     Because, first of all, I object to the
15   form of the question. In part --
16     MR. GRIVER: No speaking objections.
17   Speaking objections are not allowed in New York.
18   Thank you. Objection to the form. That's fine.
19     MR. MEISTER: And because it
20   mischaracterizes --
21     MR. GRIVER: At the time of trial, that
22   will be up to a court of law.
23     BY MR. GRIVER:
24 Q.  Mrs. Genger, let me have the question
25   be re-read back to you so you can make sure that

Page 345

1      GENGER
2    you have it duly considered in your answer.
3      (WHEREUPON, the record was read by
4      the reporter as requested.)
5      BY THE WITNESS:
6  A.  So you mean why did I do it in New York
7    and then the Delaware?
8      BY MR. GRIVER:
9  Q.  Yes.
10 A.  That's what you meant?
11 Q.  Yes.
12 A.  There was some technical reason.
13 Q.  And that was?
14 A.  And at the moment I don't remember what
15   it was, but my lawyer told me at the time what
16   was it. But at the moment, I don't remember what
17   it was.
18 Q.  And that was Mr. Meister?
19 A.  Yes.
20 Q.  Okay.
21 A.  It was some technicality.
22     MR. GRIVER: Mr. Meister, I would ask
23   that you provide any information regarding why
24   the decision was made to bring a separate
25   Delaware action as opposed to bringing an action

ORLY GENGER VS.
DALIA GENGER

DALIA GENGER
February 7, 2013

Page 346

1     GENGER
2  in New York.
3     BY MR. GRIVER:
4  Q.  Mrs. Genger, you do understand that New
5  York courts are more than able to determine
6  whether someone is a holder in due course of
7  stock?
8  A.  Again, the question?
9  Q.  Mrs. Genger, do you know the basis for
10  your Delaware action?
11  A.  The basis?
12  Q.  Yes.
13  A.  No, you didn't ask me this question
14  before.
15  Q.  I am going to ask the question now.
16  A.  You asked me before, you asked me a
17  question, and I want --
18     MR. MEISTER: There's a new question.
19     MR. GRIVER: It is a new question.
20     THE WITNESS: It is a new question.
21  Okay.
22     BY MR. GRIVER:
23  Q.  Do you understand the basis for your
24  Delaware action?
25  A.  Yes.  I wanted the trust to be

Page 347

1     GENGER
2  represented in Delaware in order to solidify
3  Orly's claim for the TRI shares because they
4  discussed over there, and she went by herself to
5  represent herself in the trial that they had over
6  there, and I wanted to intervene for her benefit
7  as her trustee.  I mean, my motivations were only
8  good, not bad.
9  Q.  Well, so you said, but let me ask you
10  this.
11     MR. MEISTER: Object to the form of the
12  question.  Excuse me.  I am going to object to
13  the form of the question.  Now you can start a
14  new question.
15     BY MR. GRIVER:
16  Q.  Do you understand what is the legal
17  basis for your claim in Delaware that the Orly
18  trust still owns the shares?
19     MR. MEISTER: Objection.
20  Mischaracterizes evidence.  So, therefore, it is
21  an objection as to form.
22     BY THE WITNESS:
23  A.  The question is, if I understand the
24  legal basis?
25     BY MR. GRIVER:

Page 348

1     GENGER
2  Q.  Yes.
3  A.  On which I complained?
4  Q.  On which you claimed that the Orly
5  trust still owns the shares.
6  A.  Yeah.
7     MR. MEISTER: Same objection.
8     BY THE WITNESS:
9  A.  I am not a lawyer, but I believe that
10  Orly has the right to get her shares because she
11  is a victim of what -- her father did not follow
12  the procedures when he transferred or improperly
13  transferred supposedly Orly's shares from TPR to
14  her trust.
15     BY MR. GRIVER:
16  Q.  And is there any reason --
17  A.  And she is a victim, that she has to
18  get her shares.
19  Q.  Is there any reason you couldn't have
20  made that same claim in New York?
21  A.  I have no idea.  I have no idea.  I am
22  not a lawyer.  I have no idea.
23  Q.  Did you understand at the time that you
24  brought this action in Delaware, that the
25  chancery court had determined that the 3,000

Page 349

1     GENGER
2  shares of TRI stock, the Orly trust shares were
3  owned by TPR?  Did you understand that that is
4  what the chancery court in Delaware had
5  determined?
6     MR. MEISTER: Objection as to form, and
7  mischaracterizes the decision.
8     BY MR. GRIVER:
9  Q.  I am just asking yes or no,
10  Mrs. Genger.
11  A.  Ask me the question again, please.
12  Q.  Did you know when you brought the
13  Delaware action that the chancery court in
14  Delaware --
15  A.  Chancery is the supreme court or the
16  lower court?
17  Q.  The lower court.
18  A.  The lower court.  Okay.
19  Q.  Did you know that the Delaware chancery
20  court, which is the court in which you filed the
21  Delaware action --
22  A.  Yeah.
23  Q.  -- had determined that the 3,000 shares
24  of TRI stock in the Orly trust were owned by TPR?
25  A.  Well --

Page 350

1  **GENGER**
2  MR. MEISTER: Objection.
3  MR. GRIVER: Excuse me.  Strike that.
4  **BY MR. GRIVER:**
5  Q.  That all shares -- strike that.
6  That the --
7  MR. MEISTER: Can you put a fresh
8  question?
9  MR. GRIVER: I will do that.
10  **BY MR. GRIVER:**
11  Q.  Were you aware when you filed in the
12  Delaware court that the 1,102.8 shares of TRI
13  stock, that the Delaware court had already
14  determined that those shares and other shares of
15  TRI stock were owned by TPR?
16  MR. MEISTER: Objection.
17  **BY THE WITNESS:**
18  A.  Yeah.
19  **BY MR. GRIVER:**
20  Q.  Did you know that?
21  A.  I knew that there was a question of
22  owning a share or benefiting from the share.  I
23  knew that there was a question of owning or
24  benefiting, and that was the question that I
25  based my complaint on.  I know that there was a

Page 351

1  **GENGER**
2  question there that was not clear if owning the
3  shares means also benefiting from the shares.
4  There was something that was unclear.  I know it
5  was unclear by also my lawyer.  It was not clear.
6  Q.  But you understood, did you not, that
7  on August 18, 2010, the Delaware chancery court
8  issued a final judgment order in the TRI
9  Investors v. Arie Genger case, that found that
10  the 3,000 shares of TRI stock, including the
11  shares of the Orly trust, were, in fact, owned by
12  TPR? You knew that, correct?
13  MR. MEISTER: Can I have that read
14  back, please.
15  (WHEREUPON, the record was read by
16  the reporter as requested.)
17  **BY MR. GRIVER:**
18  Q.  I will refer you to paragraph 22 of
19  your New York complaint if you need to refresh
20  your recollection.
21  A.  No, no. I remember there was a
22  decision like that; however, this did not stop me
23  from challenging the court and looking in a fresh
24  way at the case of Orly.
25  Q.  But given the choice between filing in

Page 352

1  GENGER
2  New York state and filing your case in Delaware,
3  why did you choose to go to Delaware where the
4  chancery court had already determined that the
5  TRI stock were owned by TPR?  Why didn't you go
6  to New York where that determination had not yet
7  been made?
8  MR. MEISTER: Objection as to form.
9  **BY THE WITNESS:**
10  A.  That's what my lawyer suggested to do.
11  **BY MR. GRIVER:**
12  Q.  You're relying on --
13  A.  Yeah.
14  Q.  That would be Mr. Meister?
15  A.  Yeah. I rely on my lawyer's advice.
16  Q.  And Mr. Meister --
17  A.  You think that I know exactly what
18  court is better for me to win for Orly the
19  shares?  I am trying to do whatever is good for
20  her.
21  Q.  And this determination to bring a case
22  in Delaware as opposed to New York was a decision
23  made exclusively by yourself and your lawyer
24  Mr. Meister?
25  A.  The decision to sue --

Page 353

1  GENGER
2  Q.  In Delaware?
3  A.  -- the complaint in Delaware was
4  exclusivly made by us.
5  Q.  And by "us," you mean yourself and
6  Mr. Meister?
7  A.  Right.
8  Q.  Okay.  With no input from anybody else?
9  A.  Right.
10  Q.  No input from anyone else, be it a
11  lawyer or another member of the Genger family?
12  A.  No, no.
13  Q.  Or the Trump Group?
14  A.  It is my complaint.  It is not somebody
15  else's complaint.
16  Q.  And no one else -- was anyone else
17  apprised of the bringing of this lawsuit before
18  it was brought?
19  A.  What do you mean?  Did I check in the
20  street from one person to another?
21  Q.  Did you tell anybody?  Did you tell
22  anyone you were bringing this action before the
23  date of filing?
24  A.  I don't remember.
25  Q.  Did Mr. Meister tell anyone before the

ORLY GENGER VS.
DALIA GENGER

DALIA GENGER
February 7, 2013

Page 354

1     GENGER
2  date of filing?
3  A. Ask him. I don't know. I don't know.
4  Q. To your knowledge, did Mr. Meister tell
5  anybody?
6  A. I don't know. I don't remember if he
7  said. I have no knowledge.
8  Q. Did you tell Orly before you filed
9  this?
10 A. No.
11 Q. Did you tell anybody else, to your
12 memory?
13 A. You asked me this question. I said no.
14 No. This was a decision made by my lawyer and me
15 that it is the right thing to do.
16 Q. With no input from anybody?
17 A. Right.
18 Q. With no discussion with anybody?
19 A. Right. You are going to ask me again?
20 Q. Did you understand that the Delaware
21 chancery court was overturned as to its
22 determination that the Orly trust shares actually
23 belonged to TPR based on the fact that the Orly
24 trust was not in front of the Delaware courts?
25 Were you aware that that --

Page 356

1     GENGER
2  Q. As opposed to fighting for her in New
3  York?
4  A. I don't know why you are putting this
5  New York thing.
6  Q. Because --
7  A. The thing is that we want to win the
8  shares. What does it matter if it is in New York
9  or Delaware?
10 Q. Because you had already sued in New
11 York. Why didn't you just sue again in New York?
12 A. Because if you sue again, you have
13 another chance. As many times as you sue, your
14 chances are getting bigger and bigger. You
15 should know that by now.
16 Q. You had to sue again either in Delaware
17 or you had to sue again in New York. Why did you
18 choose Delaware? Was it based on Mr. Meister's
19 advice?
20    MR. MEISTER: Objection. Compound
21 objection. Asked and answered.
22    BY THE WITNESS:
23 A. I sued in Delaware. I told you why.
24    BY MR. GRIVER:
25 Q. But why not New York?

Page 355

1     GENGER
2  A. You have to repeat it again. It is
3  getting late.
4  Q. Okay. Please listen carefully.
5  Were you aware --
6  A. Yeah.
7  Q. -- when you filed your Delaware case --
8  A. Yeah, right.
9  Q. -- that the Delaware supreme court had
10 reversed the chancery court determination that
11 the Orly trust TRI shares belonged to TPR, were
12 owned by TPR, because the Orly trust was not --
13 A. Represented.
14 Q. -- in Delaware?
15 A. And that's why I went there, and I
16 represented as a trustee.
17 Q. And Mr. Meister --
18 A. And hoping that that will help Orly's
19 case, because I was a trustee. Before they said
20 that she was not represented, she couldn't
21 represent herself because she needed a trustee to
22 represent her.
23 Q. And that was --
24 A. That's how I came to the idea that I
25 should go there and fight for her.

Page 357

1     GENGER
2  A. Because I sued already in New York.
3  Q. And you didn't want to sue twice?
4     MR. MEISTER: Sue who twice?
5  Objection. No. Objection as to form.
6     THE WITNESS: You are getting me
7  confused.
8     MR. MEISTER: Dalia, wait until I get
9  my objection out, please.
10    THE WITNESS: He is confusing me. I
11 don't know. He confuses me.
12    MR. MEISTER: It'd confuse anyone
13 because the question is improper.
14    BY MR. GRIVER:
15 Q. You didn't -- you had sued -- strike
16 that.
17 Is it your testimony here today that
18 your decision to sue in the state of Delaware as
19 opposed to the state of New York or any other
20 state is based on the advice of Mr. Meister?
21 A. Yes.
22 Q. And that based on that advice, you as
23 trustee determined to sue in the state of
24 Delaware?
25 A. Right.

ORLY GENGER VS.
DALIA GENGER

DALIA GENGER
February 7, 2013

Page 358

GENGER

2 Q. And you did that with a full
3 understanding of what had happened in -- what the
4 chancery court decision was --
5 A. Yes.
6 Q. -- correct?
7    And with a full understanding of what
8 the Delaware Supreme Court had said, correct?
9 A. Yes.
10    MR. GRIVER: Okay. Mr. Meister, I
11 would like to see any information regarding that
12 decision. And I would like that as soon as
13 possible.
14    MR. MEISTER: I will note for the
15 record I don't see what that has to do with any
16 of the allegations in this action, or for that
17 matter, any other action.
18    MR. LEINBACH: The verified complaint
19 was filed after our complaint was filed, the
20 Delaware action. So, obviously, we couldn't --
21    THE WITNESS: What? What happened?
22    MR. LEINBACH: -- couldn't plead events
23 that didn't take place when the action was
24 brought.
25    MR. GRIVER: On behalf of the

Page 359

GENGER

2 beneficiary of the trust, I am asking the trustee
3 to provide the information related -- all
4 information, all conversations, all input
5 provided, all conversations had, related to the
6 bringing of a Delaware complaint.
7    THE WITNESS: Okay.
8    MR. MEISTER: I suggest you put that in
9 writing pursuant to the CPLR so that I can file
10 my formal response.
11    MR. GRIVER: I have put that -- I have
12 already written to you about that.
13    Can we take a break, please.
14    (WHEREUPON, a recess was had from
15 2:23 p.m. to 2:26 p.m.)
16    BY MR. GRIVER:
17 Q. The Orly Genger trust is paying for the
18 Delaware DJ action filed by you?
19 A. The Orly Genger trust is paying for the
20 Delaware action? At the time I told you that I
21 seek, and I don't know if that's the case, that
22 I -- at the time I told you that I was paying the
23 bills by myself at the point where I needed
24 financial help, and some of it came with a
25 settlement with TPR where we got $100,000, and

Page 360

GENGER

2 then there was the note from Manhattan Safety,
3 whatever name it is, Safety Manhattan.
4 Q. So to sum up, the Delaware action --
5 A. Might be, I guess, one of those
6 accounts.
7 Q. The Delaware action is being paid for
8 by the Orly trust, correct?
9    MR. MEISTER: I think this was covered
10 in the first session of deposition.
11    THE WITNESS: I told you, somebody --
12    MR. MEISTER: She testified --
13    THE WITNESS: Somebody has to pay it.
14    BY MR. GRIVER:
15 Q. And who's paying? That's my only
16 question.
17 A. Whoever is suing.
18 Q. Okay.
19 A. Who is suing? Orly's suing? The trust
20 is suing?
21    MR. MEISTER: This was asked and
22 answered.
23    BY MR. GRIVER:
24 Q. The trust is suing.
25 A. Obviously.

Page 361

GENGER

2 Q. Okay. In the New York action, the
3 complaint that's been marked as Exhibit 23, who
4 is paying?
5 A. The UCC, so to speak?
6 Q. No. This New York action, brought on
7 behalf of yourself individually and on behalf of
8 the Orly trust --
9 A. Whoever is suing, this is the one that
10 pays.
11 Q. So in this case you are suing both
12 individually and purportedly on behalf of the
13 trust?
14 A. Yeah.
15 Q. So my question is who is paying it?
16    MR. MEISTER: She answered the question
17 already.
18    BY THE WITNESS:
19 A. Financially, I do the proper thing.
20 When it is individually, me, I pay. When it is
21 the trust, the trust pays, from whatever finances
22 we can, you know, have available. In the
23 beginning I paid everything for the trust.
24    BY MR. GRIVER:
25 Q. In this case, you are suing both

Page 362

```
 1      GENGER
 2   individually and on --
 3   A.  So it is split?
 4   Q.  50/50?
 5      MR. MEISTER:  No.  Excuse me.  She
 6   answered this.  You got an answer on the record.
 7   I corrected the record the first time.  This is
 8   clear.
 9      MR. GRIVER:  Show me.
10      MR. MEISTER:  Show you?  All right.  We
11   are going to suspend.  We are going to suspend.
12   I am going to show him --
13      MR. GRIVER:  Okay.  Then I withdraw the
14   instruction that you show me.
15      BY MR. GRIVER:
16   Q.  I just want to know, was it a 50/50
17   split?
18      MR. MEISTER:  There was no 50/50 split.
19   She paid for the action against Arie, the trust
20   paid for the Delaware action, as this was stated
21   before.  If you'd either listen to her answers or
22   read the transcript, you'd know that.
23      BY MR. GRIVER:
24   Q.  As we sit here now, who's paying for
25   the Arie action in New York?  Is it you or is it
```

Page 363

```
 1      GENGER
 2   the trust?
 3   A.  Let me tell you something.
 4   Q.  I just want an answer to my question.
 5   A.  Whoever sues, that's the person who
 6   pays.  If I sue, I pay.  If the trust sues, the
 7   trust pays.  That's how it was.  So I don't know
 8   specifically if you ask me this or this or that.
 9   Q.  Okay.
10   A.  That's what it is.  That's the rule, I
11   think.
12   Q.  So the -- whose idea was it --
13   A.  I mean, can I collect now the money
14   that trust owes me, my money?
15      MR. MEISTER:  Don't ask questions.
16   Just wait for the next question, if he asks a
17   permissible question.  Especially if it's a fresh
18   question.
19      BY MR. GRIVER:
20   Q.  Are you aware at some point Pedowitz &
21   Meister brought an interpleader action in the
22   southern district of New York?
23   A.  Yes.  Right.
24   Q.  Whose idea was it to bring an
25   interpleader action?
```

Page 364

```
 1      GENGER
 2   A.  Okay.  This is an open issue, and it --
 3   I am glad that you brought it up, because it
 4   might be that the firm will have to pay for it
 5   because I did not initiate it.
 6   Q.  You did not okay this?
 7   A.  The interpleader, no.  So we will have
 8   a discussion about it.
 9   Q.  Okay.
10   A.  And we see who's going to pay.
11   Q.  Have they -- has Pedowitz & Meister
12   tried to bill you as trustee for the time spent
13   on the interpleader action?
14   A.  I don't remember that.  Truly, I don't
15   remember.
16      MR. GRIVER:  Mr. Meister, to the extent
17   that --
18      THE WITNESS:  This will be resolved.
19      MR. MEISTER:  As I stated on the record
20   at the first session, the first time you asked
21   these series of questions --
22      MR. GRIVER:  I never asked these
23   questions on this.
24      MR. MEISTER:  You want an answer or do
25   you just want to harass the witness?
```

Page 365

```
 1      GENGER
 2      MR. GRIVER:  No, I will take an answer
 3   from you.
 4      MR. MEISTER:  Okay.  The charges for
 5   bringing the interpleader action have not been
 6   billed to anyone.  The charges for the trust's
 7   answer and claim over against TPR, which resulted
 8   in TPR agreeing that the trust was the beneficial
 9   owner was billed to the trust.
10      BY MR. GRIVER:
11   Q.  Did Pedowitz & Meister consult with
12   you, Mrs. Genger, before bringing the
13   interpleader action?
14   A.  No, they did not consult with me.
15   Q.  To your knowledge, did Pedowitz &
16   Meister consult with anybody before bringing the
17   interpleader action?
18   A.  I have no idea.
19   Q.  You never asked them on what --
20   A.  No.  Why should I ask him?  I mean --
21   Q.  You never asked him why they were
22   bringing an interpleader?
23   A.  No, I have other things in my life.  I
24   don't pick up the phone and ask Bob, "Why did you
25   do the interpleader, the action," or -- I hardly
```

ORLY GENGER VS.
DALIA GENGER

DALIA GENGER
February 7, 2013

Page 366

GENGER

1   **GENGER**
2   **know what is an interpleader action even.**
3   Q. Did you ask him if they were doing it
4   on your behalf or on behalf of the trust since
5   they represent you in both capacities?
6   **A. I knew that there is some kind of legal**
7   **move that apparently Pedowitz & Meister decided**
8   **to do with the escrow account. And I thought to**
9   **myself, that that's the right thing to do. I**
10  **didn't ask him if it is a necessary thing. I am**
11  **not a lawyer. I mean, I am just the client. If**
12  **he thinks that that's the right thing to do, you**
13  **know, I follow him, whatever he says. And if it**
14  **is a mistake, or if he did it by his own**
15  **initiative and it was not correct, he should be**
16  **paying for it, or we should discuss this later**
17  **on. Nobody's trying to steal money from each**
18  **other. I mean, this is —**
19  Q. Did you think this was -- on what basis
20  did you think that this was a good thing to bring
21  the --
22  **A. I didn't think it is a good thing.**
23  Q. Did you ask Mr. Meister whether he was
24  bringing it on behalf of yourself as an
25  individual, or --

Page 367

GENGER

1   **GENGER**
2   **A. I didn't talk to him. I just knew that**
3   **he did it.**
4   Q. Okay. Do you think --
5   **A. I don't know even what is an**
6   **interpleader. I don't know. That's taking the**
7   **escrow account from his company to the court?**
8   **This is what it is?**
9   Q. Yes.
10  **A. Okay.**
11  Q. And on what basis would it be to the
12  benefit of the Orly trust to do that?
13  **A. I have no idea.**
14  Q. Well, as the trustee you are charged
15  with making sure the actions taken on your
16  behalf --
17  **A. I trusted that he has a good judgment**
18  **to do something for the benefit of Orly trust. I**
19  **am going to start suspecting my own lawyer for**
20  **the trust is going to do actions that would be**
21  **against the beneficiary of the trust?**
22  Q. Did you ask him to explain why he --
23  why Pedowitz & Meister did what it did?
24  **A. No.**
25  Q. Okay. Did you ask Pedowitz & Meister

Page 368

GENGER

1   **GENGER**
2   whether it took this action to benefit you as an
3   individual as opposed to you as trustee?
4   **A. An individual?**
5   Q. Sure. They represent -- Pedowitz &
6   Meister represents you as an individual, correct?
7   **A. Right. No, I never thought about this**
8   **as an individual. I thought about it as an**
9   **action that has to do with the trust, because it**
10  **is an account, it was an account for Orly.**
11  Q. As we sit here today, can you explain
12  to me why the Pedowitz & Meister interpleader
13  action would have benefited the Orly trust?
14  **A. I have no idea. That's -- it is**
15  **something technical that the lawyers decided to**
16  **do. And I don't know why.**
17  MR. GRIVER: Okay. Mr. Meister, to the
18  extent that you take the position that Pedowitz &
19  Meister did this to -- on behalf of Dalia Genger
20  as trustee on behalf of the Orly Genger trust, I
21  would ask for all records involving the
22  interpleader action, why it was taken, who you
23  discussed it with, what was the basis for doing
24  so, including, but not limited to, any
25  discussions that you had with co-defendants or

Page 369

GENGER

1   **GENGER**
2   co-defendant's counsel.
3   THE WITNESS: This is a long list of
4   requests. You want us to write it down? Because
5   I won't remember.
6   MR. MEISTER: Don't answer.
7   THE WITNESS: She is taking it. Okay.
8   MR. GRIVER: Let's have this marked as
9   Exhibit 24.
10  (Dalia Exhibit 24, interpleader
11  complaint, marked.)
12  MR. GRIVER: For the record, Exhibit 24
13  is the interpleader complaint, Pedowitz & Meister
14  LLP, the TPR Investment Associates Inc., et al.
15  THE WITNESS: Yeah.
16  BY MR. GRIVER:
17  Q. You are telling me, Mrs. Genger, that
18  you had no advance knowledge that this complaint
19  was going to be filed?
20  MR. MEISTER: Is that a new question or
21  is it -- the question is, whether or not she told
22  you before?
23  BY MR. GRIVER:
24  Q. Mrs. Genger, did you have advance
25  knowledge that this complaint was going to be

ORLY GENGER VS.
DALIA GENGER

Page 370

1    GENGER
2  filed by Pedowitz & Meister?
3  A.  I don't remember.  I don't remember.
4  There's so many papers.  I don't remember.
5     MR. MEISTER:  You have answered the
6  question.
7     MR. GRIVER:  Let me have this marked as
8  25.
9     (Dalia Exhibit 25, letter and
10    promissory note dated 12/17/2007,
11    marked.)
12    BY MR. GRIVER:
13  Q.  For the record, what's been marked as
14  Exhibit 25 is a letter dated December 17, 2007,
15  and a promissory note in connection with letter
16  agreement, 12-17-07.  It has been Bates stamped
17  DG 1 through 5.
18    Mrs. Genger, let me know when you are
19  ready to discuss what's been marked --
20  A.  Ask me the question.  Maybe it will be
21  easier for me to read it if I can focus more on
22  the answer.
23  Q.  Okay.  Why don't you also look at Dalia
24  3.  I think that's the easiest way to get at
25  this.  Look at Dalia 3, what's been previously

Page 372

1    GENGER
2  sale."
3     The response is:  "On December 17,
4  2007, I sold 250 shares of the common stock of
5  TPR to TPR for its $5 million note."
6     BY MR. GRIVER:
7  Q.  When you gave that interrogatory
8  response, were you referring to the documents
9  that have been marked as Exhibit 25?
10  A.  The question is, as I understand it, me
11  selling the shares, right, to TPR.
12  Q.  That's the thing.  What happened on
13  12-17-07 --
14  A.  Wait a second.
15  Q.  -- was a redemption --
16  A.  Okay.  12-17, yeah.  I said that I sold
17  it, 250 shares.
18  Q.  And when you said that, you were
19  referencing the documents that have been marked
20  as Exhibit 25, correct?
21  A.  Can you repeat that?  I'm sorry.
22  Q.  Here's my concern, Mrs. Genger, and it
23  is a small one.
24  A.  Yeah.  A small one?
25  Q.  What's been marked as Exhibit 25 is

Page 371

1    GENGER
2  marked as Dalia 3.  Those are your amended
3  responses to plaintiff's interrogatories, and
4  please look at interrogatory 30.
5     MR. MEISTER:  Is there a pending
6  question?
7     MR. GRIVER:  I am waiting for her to be
8  ready.
9     BY THE WITNESS:
10  A.  You told me to look at interrogatory --
11    BY MR. GRIVER:
12  Q.  Number 30 in your response.
13  A.  In the response.  Yeah.
14  Q.  Okay.  Interrogatory number 30 says --
15  well, Mrs. Genger, why don't you read into the
16  record interrogatory number 30.
17    MR. MEISTER:  Read aloud?
18    MR. GRIVER:  Yes.
19    BY THE WITNESS:
20  A.  "State each transfer, pledge, and/or
21  sale of your shares of TPR, including in your
22  answer the date of each transfer, pledge, or
23  sale; the recipient of the TPR share; the number
24  of shares transferred, pledged or sold; and the
25  consideration for each transfer, pledge, or

Page 373

1    GENGER
2  actually a redemption, it is not a sale.  Those
3  are different things.  When you redeem shares to
4  a company and they become -- and they go back to
5  the company, that's called a redemption, not a
6  sale.
7     So I just wanted to make sure that your
8  answer is based on these documents --
9  A.  I sold the shares.  I don't have the
10  shares to TPR.
11  Q.  To TPR?  Who did you sell the shares
12  to?
13  A.  To TPR.
14  Q.  You sold the shares to TPR?
15  A.  Yeah.
16  Q.  And what you call a sale, but what I
17  would characterize as redemption, is what's
18  marked as Exhibit 25, these are the documents
19  memorializing that redemption?
20  A.  Yes.  I sold all my shares to TPR.
21  Q.  Okay.  For $5 million?
22  A.  Right.
23  Q.  Did you -- okay.
24    And those were all the shares of TPR?
25  A.  All the shares.  All my shares.

Page 374

```
 1    GENGER
 2 Q.  And that took place on December 17,
 3    2007?
 4 A.  Yes.
 5 Q.  So as of December 17, 2007, you were no
 6    longer a shareholder?
 7    MR. MEISTER: As of December 18.
 8    BY THE WITNESS:
 9 A.  Yeah, I guess.
10    BY MR. GRIVER:
11 Q.  As of December 17 or 18, 2007, you were
12    no longer a shareholder?
13 A.  Yeah. 17 or 18. Yeah.
14 Q.  And why is it that you decided to sell
15    your shares on December 17?
16 A.  On that date?
17 Q.  Yes.
18 A.  I wouldn't know why on this specific
19    date.
20 Q.  Was it because Ms. Enriquez attempted
21    to make you the trustee of the trust on December
22    18?
23 A.  I don't think so.
24 Q.  Was it in preparation to become a
25    trustee?
```

Page 376

```
 1    GENGER
 2    difference is --
 3 Q.  Okay.
 4 A.  -- when you are saying that.
 5 Q.  Look at Exhibit 14, paragraph 10.
 6    Exhibit 14 is an affidavit of yours, sworn to on
 7    March 11, 2008. And look at paragraph 10, page 3
 8    to 4.
 9 A.  Okay.
10 Q.  Second sentence.
11 A.  Okay. You mean, this is what Orly's
12    writing?
13 Q.  This is what you wrote. You signed it.
14 A.  Where? Where does it say? Orly
15    Genger, petitioner, against me.
16 Q.  Dalia 14. Affidavit of Dalia Genger.
17    MR. MEISTER: Yes.
18    BY THE WITNESS:
19 A.  Okay. I got it. Affidavit of Dalia
20    Genger. Okay. I'm sorry. It is number 10, you
21    said?
22    BY MR. GRIVER:
23 Q.  Yes. Paragraph 10.
24 A.  Yeah.
25    Okay. So, what? So I guess "redeem"
```

Page 375

```
 1    GENGER
 2 A.  No, I knew that I am going to assume
 3    the -- I knew that potentially I will have to be
 4    Orly's trustee, and enjoy your company so many
 5    times here. So I prepared myself to be eligible
 6    to have this honor to be trustee of Orly's trust
 7    and be sued countless times.
 8 Q.  Don't --
 9 A.  I am just explaining to you what is --
10    MR. MEISTER: Adding additional things
11    to express your emotions don't help the record.
12    So just answer the question.
13    BY MR. GRIVER:
14 Q.  Now, why is it that you sold your
15    shares -- strike that.
16    Why is it that you allowed TPR to
17    redeem your shares for $5 million?
18 A.  Why? I can do whatever I want. What
19    do you mean?
20 Q.  Strike that.
21    Didn't you apply TPR to redeem the
22    shares of the company because that --
23 A.  You said redeem. Is that not sale? I
24    want to understand. What are you telling me?
25    Redeem or sell? I want to understand what the
```

Page 377

```
 1    GENGER
 2    means that I am kind of giving -- I am selling
 3    the shares to the company?
 4 Q.  Selling --
 5 A.  The shares --
 6 Q.  Letting the shares go back to the
 7    company --
 8 A.  I mean, going from me --
 9 Q.  To TPR?
10 A.  To TPR. Okay.
11 Q.  And --
12 A.  From my ownership to TPR ownership.
13 Q.  Right. And you did that because that
14    way both Orly and Sagi would share equally?
15 A.  Yeah.
16 Q.  And it was important to you that
17    happened because you wanted to treat both your
18    children equally?
19 A.  Obviously.
20 Q.  And it was important to you that you
21    let the court know that in its decision as to
22    whether or not you should be trustee?
23 A.  I don't know if that was the reason,
24    but, yeah, obviously, I want both my kids to be
25    treated equally.
```

ORLY GENGER VS.
DALIA GENGER

DALIA GENGER
February 7, 2013

Page 378

GENGER

1
2  Q.  And this was information that you chose
3  to share with the trustee in --
4  A.  With the trustee?
5  Q.  Excuse me.  This is information --
6  strike that.
7      The fact that you were redeeming your
8  shares back to TPR was information you wanted the
9  surrogate court to know in connection with the
10  surrogate court's determination as to whether you
11  should be trustee, correct?
12  A.  Yeah.
13  Q.  All right.  So now let's -- and now
14  let's look at what's known as Exhibit 25.
15  A.  Okay.
16  Q.  This is TPR's redemption of your 250
17  shares, correct?
18  A.  Right.  This is the same 250 that we
19  were talking before, right?
20  Q.  Yes.
21      Did the shares go back to TPR?
22  A.  Yes.
23  Q.  Did the -- has TPR been paying the
24  promissory note as agreed?
25  A.  Yes.

Page 379

GENGER

1
2  Q.  So as of January 15, 2013, you have
3  received $180,000 from TPR in exchange for your
4  250 shares?
5  A.  If you calculate it, correctly
6  calculate it, whatever it is, yeah, I did get
7  that.
8  Q.  That's -- okay.  So if we were to look
9  at your tax returns, it would show both the
10  redemption of your shares in exchange for the $5
11  million note and it would show these yearly
12  payments by TPR, correct?
13  A.  Again?
14      MR. MEISTER:  Objection.  I don't see
15  how the tax returns showed the redemption.  I
16  don't understand what --
17      MR. GRIVER:  Well, because she is
18  getting paid by TPR.
19      BY THE WITNESS:
20  A.  Yes.  I am getting paid by TPR.
21      BY MR. GRIVER:
22  Q.  Okay.  Is the agreement evidenced by
23  the documents that have been marked as Exhibit
24  25, that is the 12-17-07 letter and the
25  promissory note in connection with that letter --

Page 380

GENGER

1
2  A.  I have to stop you because you have to
3  start again.  Start at the beginning again.  I
4  didn't get it.
5  Q.  I will start over.
6  A.  I didn't get it.
7  Q.  Has the agreement memorialized by --
8  A.  Here --
9  Q.  -- by the documents attached as Exhibit
10  25 --
11  A.  Yeah.
12  Q.  -- that is the 12-17-07 letter and the
13  attached promissory note, was that agreement
14  later altered, amended, changed, revised, fixed,
15  or superceded in any way?
16  A.  I don't remember that it was.  I don't
17  remember that it was revised.
18  Q.  Okay.  Have you gotten only $180,000 in
19  exchange for your 250 shares or have you gotten
20  more than that?
21  A.  I got whatever I was supposed to get.
22  Q.  Pursuant to this agreement?
23  A.  Yeah.
24  Q.  There was --
25  A.  I mean, I gave the shares -- I sold the

Page 381

GENGER

1
2  shares.
3  Q.  So the shares are now with TPR?
4  A.  Yes.  100 percent over there.  I don't
5  have a single share at home.
6  Q.  No, but I am asking are those shares
7  still with TPR?
8      MR. MEISTER:  How would she know?
9      BY THE WITNESS:
10  A.  Ask TPR.  Do you know what TPR is
11  doing?  I'm not there.  I am not a director.  Do
12  I know where they are?
13      BY MR. GRIVER:
14  Q.  So you have no way of knowing what
15  happened, whether those shares are still with
16  TPR?
17  A.  I am not part of TPR.  I don't know.
18  Q.  Let me ask you this:  Is there any
19  board resolution approving the redemption of
20  these 250 shares back to TPR?
21  A.  I didn't understand the question.
22  Q.  Is there a board resolution --
23  A.  Board resolution of TPR?
24  Q.  Yes.
25      Is there a TPR board resolution

Page 382

1    GENGER
2  approving of the redemption to you -- excuse me.
3    Is there a TPR board resolution
4  approving of the redemption of these 250 shares
5  back to TPR in exchange for $5 million?
6  **A.  You mean if there is a paper that TPR**
7  **issued for my giving them the 250 -- selling them**
8  **or whatever, the 250 shares?**
9  Q.  Yes.
10 **A.  If they issued such a paper?**
11 Q.  Yes.
12 **A.  I don't know.  But I imagine that, yes,**
13 **I mean, it should be.**
14    MR. MEISTER: Just --
15    BY MR. GRIVER:
16 Q.  Mrs. Genger, at that time you were a
17 director of TPR, so I am asking you --
18 **A.  No, I was immediately not director**
19 **after that.**
20 Q.  And was there a --
21 **A.  Immediately as I gave my shares, I was**
22 **not a director.**
23 Q.  All I am simply asking, is there a TPR
24 resolution --
25 **A.  We have to check.  We have to check.**

Page 383

1    GENGER
2  **I'm not sure.**
3  Q.  I will represent to you that I have
4  received none in production in this case.
5  **A.  Okay.**
6  Q.  Do you recall there being one?
7  **A.  I don't recall.**
8  Q.  Who drafted these documents?
9  **A.  You know my answer.  I don't draft**
10 **these.  I am not a lawyer.  I don't know how to**
11 **draft it.  A lawyer drafted it, and who was the**
12 **lawyer, I do not know.**
13 Q.  Are you sure --
14 **A.  This is always the answer that I will**
15 **give you because I really don't know.**
16 Q.  Are you sure that a lawyer drafted it,
17 or do you think that Sagi drafted it?
18    MR. MEISTER: Objection.  Compound.
19 Calls for speculation.
20    BY MR. GRIVER:
21 Q.  Well --
22 **A.  If Sagi is a lawyer, then he might have**
23 **drafted it, but he is not a lawyer.**
24 Q.  The lawyer who drafted it, do you
25 know -- was the lawyer who drafted it, was it a

Page 384

1    GENGER
2  lawyer for Sagi or was it a lawyer for TPR?
3  **A.  I do not know.  I told you.**
4  Q.  If you don't know, you don't know.
5  **A.  I don't know this.**
6  Q.  How did the purchase price of -- how
7  was the purchase price of $5 million determined?
8  **A.  Sagi had an estimate of the value of**
9  **the company, and this is how it came about, the**
10 **number.**
11 Q.  He had a written estimate or he just
12 told you that he thought that was a fair price?
13 **A.  Maybe he had a written.  I don't**
14 **remember if he had it written or not.**
15 Q.  Okay.  And was there any --
16 **A.  This was close to my divorce, that's**
17 **why it was easy to calculate at the time.**
18 Q.  Did you have TPR stock certificates at
19 that time that you signed over to TPR?
20 **A.  I think I might have, yeah.  Yes.  Yes.**
21 **Yes, I did.**
22 Q.  Let's go back to the valuation.  This
23 was -- as we sit here today, do you know whether
24 it was a written valuation or not?
25 **A.  I don't know.**

Page 385

1    GENGER
2    MR. MEISTER: She answered that.
3    BY THE WITNESS:
4  **A.  I don't know.  I know that it was close**
5  **to my divorce so it was kind of easy because, you**
6  **know, we had mediation, and, you know, with my**
7  **husband.  And so it was quite easy to know how**
8  **much the value of my shares is.**
9    BY MR. GRIVER:
10 Q.  The valuation, was it a valuation done
11 by Sagi?
12 **A.  I don't know who did the valuation.**
13 Q.  You didn't do the valuation?
14 **A.  No.  I am not qualified to do that.**
15 Q.  Do you recall any third party company
16 or third party of any kind doing a valuation to
17 come up with the $5 million figure?
18 **A.  I don't recall that.**
19 Q.  Were there any negotiations whatsoever
20 with regard to this document?
21    MR. MEISTER: Referring to Exhibit 25?
22    BY THE WITNESS:
23 **A.  The $5 million you mean?**
24    BY MR. GRIVER:
25 Q.  Yes.

ORLY GENGER VS.
DALIA GENGER

DALIA GENGER
February 7, 2013

Page 386

1    GENGER
2    What do you mean by close to the
3    divorce?
4    A.  It was close to -- not the divorce, the
5    arbitration that we had.  We had arbitration
6    after the divorce.
7    Q.  And do you know when this arbitration
8    ended?
9    A.  I don't remember the date.
10       MR. MEISTER: We would like to take a
11   five-minute break while you are searching.
12       MR. GRIVER: I have it right here.
13       THE WITNESS: Okay.  So ask me.
14       BY MR. GRIVER:
15   Q.  The final arbitration award is dated
16   May 6, 2008.  It is Dalia Exhibit 11 to this
17   deposition.
18       So this was during the --
19   A.  During, yeah, yeah, I see.  It is here.
20       MR. MEISTER: Can we take a break now?
21       MR. GRIVER: Last question, then we
22   will take a break.
23       BY MR. GRIVER:
24   Q.  Was this agreement provided to the --
25   provided as part of the arbitration by you or by

Page 387

1    GENGER
2    Sagi?
3    A.  No.
4        MR. GRIVER: Okay.  We can take a
5    break.
6        (WHEREUPON, a recess was had from
7    3:04 p.m. to 3:10 p.m.)
8        MR. GRIVER: Back on the record.
9        BY MR. GRIVER:
10   Q.  Mrs. Genger, I am going to have to
11   correct one thing on the record.  If you look at
12   the December 17, 2007 --
13   A.  Wait a second.
14   Q.  -- letter, it says you will be paid not
15   $30,000 a year over the next 25 years, but
16   $30,000 a month --
17   A.  That's true.
18   Q.  -- over the next 25 years.
19       So my question to you is, has TPR been
20   paying that amount of money to you, $30,000 a
21   month --
22   A.  Yeah.
23   Q.  -- since January 15, 2008?
24   A.  That was actually the amount that the
25   judge awarded me when we had -- the beginning

Page 388

1    GENGER
2    when we were divorcing, that's the amount that
3    the judge awarded me monthly, by the way.
4    Q.  Okay.  I am just asking whether TPR has
5    been paying you $30,000 a month installments --
6    A.  They were paying me, yeah.
7    Q.  Before the redemption of the 250
8    shares?
9        MR. MEISTER: I'm sorry?
10       BY THE WITNESS:
11   A.  Before the redemption?
12       MR. MEISTER: New question.
13       BY THE WITNESS:
14   A.  No.  No.  They didn't pay me anything
15   before they got the shares.
16       BY MR. GRIVER:
17   Q.  Since January 15 of 2008, as provided
18   in this letter dated December 17, 2007.  That's
19   what I am looking at, Mrs. Genger.
20   A.  Yeah.
21   Q.  It says that you will receive $30,000 a
22   month starting on January 15, 2008.  So my
23   question to you is, has TPR been paying you
24   $30,000 a month since January 15, 2008?
25   A.  I have to check and come back to you.

Page 389

1    GENGER
2    Q.  You don't --
3    A.  I have to check and come back to you.
4    Q.  Well, let me ask you this:  Last month,
5    did you get a check from TPR on January 15, 2013?
6    A.  Yeah, I am getting checks from TPR.
7    Q.  Are you getting checks for these 250
8    shares?  That's what I am asking you.
9    A.  Yeah.  I am getting checks from TPR for
10   the shares.  I mean, what's -- it is a new
11   question?
12   Q.  And you have been receiving $30,000 a
13   month since January 15, 2008 for these 250
14   shares?
15   A.  I am receiving not exactly $30,000,
16   because I don't need exactly $30,000.  When I --
17   this is a document between TPR, right, and me.
18   Q.  Correct.
19   A.  Okay.  Now, whenever I need and I don't
20   need, whenever there is a necessity for me to get
21   money, I ask for the money.  If there's no need,
22   I don't ask for it.
23   Q.  And you ask for that money from Sagi?
24   A.  From TPR.
25   Q.  And through Sagi -- you let Sagi know

Page 390

1    GENGER
2  that you need money and he gives you?
3  A.  There's nobody else there.
4  Q.  And --
5  A.  I mean, who else?
6  Q.  And is it however much money you need
7  or is it limited to $30,000?
8  A.  It is limited to whatever they owe me.
9  Q.  And is there a subsequent document of
10  any kind memorializing that change in the terms
11  of the agreement?
12     MR. MEISTER:  Asked and answered.  So,
13  objection.
14     BY THE WITNESS:
15  A.  I don't recall if there is any
16  document.
17     BY MR. GRIVER:
18  Q.  When you gave your shares --
19  A.  You mean redeem, right?
20     MR. MEISTER:  Don't use that word
21  again.
22     THE WITNESS:  He said "redeem" so I
23  have to ask.
24     MR. MEISTER:  You don't have to ask.
25     BY MR. GRIVER:

Page 391

1    GENGER
2  Q.  When you signed over your stock
3  certificates to TPR as part of the redemption,
4  did you keep a copy for your records?
5  A.  I am sure there is a copy somewhere.
6  Q.  Okay.  I would ask for a copy of those.
7  A.  It is probably TPR has it.
8  Q.  No, I asked whether you kept a copy.
9     MR. MEISTER:  And she said she is sure
10  there is a copy.
11     BY THE WITNESS:
12  A.  I don't know.  If I had it, I gave it
13  to Sagi.  I don't know if I kept for my records
14  because I thought that Sagi wouldn't ask me again
15  for 250 shares.
16     BY MR. GRIVER:
17  Q.  Okay.  If TPR redeemed your 250 shares,
18  then D&K owned -- okay.
19     Did TPR give you anything when you gave
20  them the stock certificates?  Any document, did
21  they give you any document?
22  A.  When I give them the shares?
23  Q.  When you signed over the shares.
24  A.  If they gave me any document?
25  Q.  Yes.

Page 392

1    GENGER
2  A.  I don't remember if they did.
3     MR. GRIVER:  To the extent that
4  Mrs. Genger has a copy of that, I would
5  appreciate that.
6     THE WITNESS:  Okay.
7     BY MR. GRIVER:
8  Q.  Did TPR give you anything after you
9  signed over the stock certificates to it?
10     MR. MEISTER:  You mean anything other
11  than the checks?  Money?
12     BY MR. GRIVER:
13  Q.  Anything other than the checks?
14  A.  You mean like gold, jewelry?  What do
15  you mean?
16  Q.  Any kind of documentation.
17  A.  Again, after I gave them the 250
18  shares, if they gave me any additional some kind
19  of papers?
20  Q.  Yes.
21  A.  To establish that there is some kind of
22  an exchange, you mean?
23  Q.  Yes.
24  A.  I don't remember, but --
25  Q.  To the extent you have copies of these

Page 393

1    GENGER
2  checks from TPR memorializing these payments --
3  A.  Okay.
4  Q.  -- these monthly payments, I would --
5  A.  Appreciate.
6  Q.  -- appreciate a copy.
7     When you get these checks, are these
8  checks from TPR or are these checks from Sagi, or
9  is this from some other company?
10  A.  No.  They are not checks from Sagi.
11  Q.  Are they checks from TPR?
12  A.  I couldn't say.
13  Q.  Do you recall what entity's checks
14  these are?
15  A.  No, I cannot.
16  Q.  So as we sit here today, you are not
17  sure those checks are TPR checks?
18  A.  I didn't say that they are checks.  You
19  are assuming that they are checks.
20  Q.  Okay.  Do you get checks?
21  A.  No.
22  Q.  Do you get wire transfers?
23  A.  Yes.
24  Q.  Are these wire transfers from TPR
25  accounts?

Page 394

GENGER

1
2 A.  I don't know.
3 Q.  Are these wire --
4 A.  I think --
5 Q.  -- transfers from Sagi?
6 A.  No, not from Sagi.
7 Q.  How do you know they are not from Sagi,
8 but you don't know anything else?
9 A.  I know that it is not from Sagi.
10 Q.  How?
11 A.  Because Sagi is not supporting me.  He
12 cannot afford to support me.
13 Q.  Are these checks from -- are these
14 checks from E&G -- strike that.
15     Are these wire transfers from E&G?
16     MR. MEISTER: E&G?
17     MR. GRIVER: E&G.
18     BY THE WITNESS:
19 A.  What is E&G?
20     BY MR. GRIVER:
21 Q.  It is a company that's -- it's a
22 company that Sagi has.
23 A.  No.
24 Q.  Are these --
25 A.  I don't know what is E&G.

Page 395

GENGER

1
2 Q.  Are these wire transfers from Batzad?
3 A.  No.
4 Q.  B-a-t-z-a-d.
5 A.  I don't remember if they are.
6 Q.  Okay.  These wire transfers, do you
7 know what bank they are coming from?
8 A.  No.
9 Q.  Do you know what bank they are going
10 into?
11 A.  To my bank.
12 Q.  And which bank is that?
13 A.  Citibank.
14 Q.  Citibank?
15 A.  Yes.
16 Q.  Do you know which specific branch?
17     MR. MEISTER: Which specific branch the
18 wires go into?
19     MR. GRIVER: Yes.  It has been a long
20 day.
21     MR. MEISTER: Yes, it has.
22     BY MR. GRIVER:
23 Q.  Do you know the account, do you know
24 which account it goes into?
25 A.  If I know my account number by heart?

Page 396

GENGER

1
2 No, I don't.
3     MR. MEISTER: He doesn't want the
4 account.  He wants to know whether it is your
5 account --
6     BY THE WITNESS:
7 A.  My account.  My account.
8     BY MR. GRIVER:
9 Q.  It goes into your account?
10 A.  The -- yes.
11 Q.  The account for Dalia Genger?
12 A.  Yes.
13 Q.  Okay.  Upon redemption, D&K LP then
14 would have controlled approximately 96 percent of
15 TPR, is that your recollection?
16     MR. MEISTER: You are using the word
17 "redemption."  If you mean redemption or sale --
18     BY THE WITNESS:
19 A.  I am losing you now.  If it is D&K and
20 this -- I am losing.  I don't understand any more
21 what you are saying.
22     BY MR. GRIVER:
23 Q.  When shares are redeemed, they become
24 treasury shares, and they no longer count towards
25 the percentage of ownership.  So that means if

Page 397

GENGER

1
2 your 250 shares were redeemed by TPR, it made the
3 remaining shares more valuable, which is why
4 redeeming the shares allowed the Orly trust and
5 the Sagi trust to share equally.
6 A.  I have to consult an accountant.  I
7 don't know what you are --
8     MR. MEISTER: Wait for a question.
9     BY THE WITNESS:
10 A.  I don't know what you are talking
11 about.
12     MR. MEISTER: Wait until there's a
13 question.
14     BY MR. GRIVER:
15 Q.  To your knowledge, was there ever a
16 time when D&K LP owned 96 percent of TPR?
17 A.  96 percent of TPR?
18 Q.  Yes.
19 A.  I am getting confused.
20 Q.  Well, I will just repeat it again.  I
21 think it is a simple question.
22     Was there ever a time to your
23 understanding when D&K LP owned approximately 96
24 percent of TPR?
25 A.  In the beginning of history, before we

Page 398

1     GENGER
2   got divorced, when it was —
3 Q.  How about after December 17 of 2007,
4   did D&K LP own approximately 96 percent of TPR?
5 A.  Can you ask me again, what is the date?
6   What — can we schedule another date?  I am
7   getting --
8     MR. MEISTER: Read the question back.
9   He is referring to this date.
10     THE WITNESS: What are you saying now?
11     MR. GRIVER: Repeat the question,
12   please.
13     (WHEREUPON, the record was read by
14     the reporter as requested.)
15     BY THE WITNESS:
16 A.  I don't know.  That's my answer.
17     BY MR. GRIVER:
18 Q.  What was the effect on the Orly trust
19   of the redemption?
20     MR. MEISTER: I'm going to object to
21   the form of the question.
22     BY THE WITNESS:
23 A.  The whole exercise was for me to be
24   available for Orly to be a trustee.  I don't know
25   what you are asking me now.

Page 399

1     GENGER
2     BY MR. GRIVER:
3 Q.  All right.  Let me show you what I am
4   going to mark as Exhibit 26.
5     (Dalia Exhibit 26, document,
6     marked.)
7     MR. GRIVER: Did she answer the last
8   question?
9     (WHEREUPON, the record was read by
10     the reporter as requested.)
11     BY THE WITNESS:
12 A.  Now, can I read this quietly?  Because
13   it is hard for me to concentrate already.
14     BY MR. GRIVER:
15 Q.  Sure.
16 A.  (Witness reading document).
17     Okay.  Now, when you say security
18   agreement, you mean the note, that D&K note?
19 Q.  Yes, the D&K note.
20 A.  I am asking you so it will be clear to
21   me.
22 Q.  Yes.  This is from the sale of the --
23   from the UCC sale of the D&K note.
24     MR. MEISTER: Is there a pending
25   question?

Page 400

1     GENGER
2     BY MR. GRIVER:
3 Q.  Mrs. Genger, let me ask you the
4   question so when you go through it you will be
5   able to know.
6 A.  So this was an auction --
7 Q.  On the date of the auction --
8 A.  Yeah.
9 Q.  -- who else owned TPR shares, to your
10   knowledge?
11 A.  Except, I mean -- I mean, TPR,
12   obviously, and I guess the D&K Limited, right.
13 Q.  Uh-huh.  Rochelle Fang owned ten
14   shares, I believe.
15 A.  You know, all these little things, I am
16   not familiar with.
17 Q.  Anyone else that you know?
18     MR. MEISTER: Just so it is clear, she
19   says she is not familiar.  You are telling her
20   something and she says she is not familiar.
21     MR. GRIVER: Okay.
22     BY THE WITNESS:
23 A.  I am not familiar.  I just understand
24   that this is something that you showed me before,
25   and I told you it is part of this auction, and I

Page 401

1     GENGER
2   wasn't there, I don't know, and whatever you say.
3     BY MR. GRIVER:
4 Q.  On that date did Sagi own shares?
5 A.  What?
6 Q.  On that date did Sagi own shares?
7 A.  He -- if he owned shares?
8 Q.  In TPR.
9 A.  I don't remember when he bought the
10   shares from the group.  I don't remember what
11   date it was.  Because Sagi — no.  Sagi --
12   shares.  I mixing things around.  I'm sorry.
13 Q.  I am talking about TPR shares.
14 A.  Yes.  TPR shares.  Okay.
15 Q.  On this date, did Sagi own TPR shares?
16 A.  I don't know.
17 Q.  On this date did you own TPR shares?
18 A.  On this --
19 Q.  On February 27, 2009, did you own TPR
20   shares?
21 A.  When did I sell the shares?  I don't
22   remember any more the date.  December 17, '07,
23   and when this took place?  So, no, I didn't
24   because this happened in February '09.  So I
25   didn't.  I didn't because I sold my shares, so I

ORLY GENGER VS.
DALIA GENGER

DALIA GENGER
February 7, 2013

Page 402

1    **GENGER**
2    didn't.
3       MR. GRIVER: Okay. I am going to ask
4    that the redacted bank statements be provided
5    evidencing those wire transfers from TPR.
6       THE WITNESS: What?
7       MR. GRIVER: That was to Mr. Meister.
8       THE WITNESS: Oh, okay.
9       MR. GRIVER: Not to you.
10      So I am clear on the record, what I
11   would like is redacted bank statements showing
12   the wire transfers into Mrs. Genger's account
13   from whatever source those transfers come.
14      **BY MR. GRIVER:**
15   Q. Whose idea was it, Mrs. Genger, to try
16   and settle the D&K note case without Orly Genger?
17   A. Whose idea was it to sell?
18   Q. To settle --
19   A. To settle?
20   Q. -- the case without Orly Genger, yes.
21      Strike that. Let's create a record.
22      On or about October --
23   A. Show me the papers so I remember.
24      MR. MEISTER: Wait for the question.
25      **BY MR. GRIVER:**

Page 403

1    **GENGER**
2    Q. Do you recall entering into a
3    settlement agreement trying --
4    A. There was some kind of settlement
5    hoping that we would finish this nightmare, yes.
6    Q. Okay. And whose idea was it to try and
7    enter into the settlement agreement?
8    A. All the people that wanted peace and
9    not war.
10   Q. Well, I would like a name instead of a
11   description. Whose idea --
12   A. My idea, my son's idea, TPR's idea.
13   Q. The lawyer's idea?
14   A. Yes. People who want to finish with
15   the case.
16   Q. Okay. Mr. Meister's idea?
17   A. Right.
18   Q. Mr. Dellaportas' idea?
19   A. But not your idea, because you want to
20   continue and continue with this.
21      MR. MEISTER: Just answer the question.
22      **BY MR. GRIVER:**
23   Q. Just answer the question.
24   A. So that's part of my answer.
25   Q. Just answer the question I asked.

Page 404

1    **GENGER**
2    A. Somebody who doesn't want to settle.
3    Don't you understand that?
4    Q. Your idea, correct?
5    A. Yes. I want to settle.
6    Q. Sagi's idea?
7    A. I hope you also want to settle.
8       MR. MEISTER: Excuse me. Dalia, just
9    answer the question, otherwise we will be here
10   today until midnight and tomorrow.
11      THE WITNESS: That's really incentive.
12      MR. GRIVER: Do you need a break,
13   Mrs. Genger?
14      THE WITNESS: I might need a break
15   soon.
16      MR. GRIVER: Why don't we take just a
17   break so that --
18      THE WITNESS: No, I am getting
19   frustrated because, you know, we want to finish
20   this. We want to finish this.
21      MR. MEISTER: How much longer do you
22   have, Yoav?
23      MR. GRIVER: I have the eight
24   agreements that involve the Manhattan Safety
25   Company and their attempt at settlement.

Page 405

1    **GENGER**
2       MR. MEISTER: That's it?
3       MR. GRIVER: That's it, and then a few
4    additional questions.
5       THE WITNESS: And what?
6       MR. GRIVER: No, no, Dalia.
7    Let's take a five-minute break.
8       MR. GRIVER: That's the key area.
9       MR. MEISTER: And I am going to suggest
10   that you and I go outside and get some fresh air.
11      THE WITNESS: Okay. Let's go.
12      (WHEREUPON, a recess was had from
13   3:34 p.m. to 3:51 p.m.)
14      MR. GRIVER: Exhibit 27.
15      (Dalia Exhibit 27, settlement
16   agreement, marked.)
17      **BY MR. GRIVER:**
18   Q. Mrs. Genger, do you recognize this
19   document? For the record, this document is
20   titled settlement agreement, and it's Bates
21   ranges DG 1101 to 1110.
22      Mrs. Genger, do you recognize this
23   document?
24   A. Although, it looks familiar --
25      MR. MEISTER: The question is --

Page 406

1    GENGER
2    BY THE WITNESS:
3 A. Can I ask Bob something?  Because --
4    BY MR. GRIVER:
5 Q. Is it a privilege issue?
6 A. I'm not sure if this is the settlement
7    agreement because I thought there was something
8    else.
9 Q. Well, there are additional documents,
10   but I will note on page 7 of the document, which
11   is Bates stamped DG 107, is your signature?
12 A. Right.  Yes.
13 Q. But if you want to take a break and
14   ask --
15 A. I just want to look over it one more
16   time, okay.
17 Q. Yes.
18    MR. MEISTER: While she's doing that, I
19   will note for the record that I thought we had
20   produced a copy which also had the counterpart
21   signature of TPR.
22    MR. GRIVER: You anticipated one of my
23   questions.  Is there a counterpart signature of
24   TPR?
25    MR. MEISTER: Yes.

Page 407

1    GENGER
2    THE WITNESS: I'm not sure that that's
3   the exhibit I looked at.
4    MR. GRIVER: Do you know who signed it?
5    MR. MEISTER: I believe it was Yonite
6   Sternberg.
7    MR. GRIVER: She signed the amended and
8   restated.
9    MR. MEISTER: As far as I believe.
10    BY THE WITNESS:
11 A. So, in general, what is the question?
12   So I will read it --
13    BY MR. GRIVER:
14 Q. I have a bunch of questions.
15 A. A bunch?
16    MR. MEISTER: Start with the first one.
17   What's the pending question?
18    BY MR. GRIVER:
19 Q. Whether there were any drafts of this
20   settlement agreement.  That would be my first
21   question.  Electronic or otherwise.
22 A. I don't know if there are drafts.
23 Q. So let me ask --
24    MR. GRIVER: Is that on the record?
25    THE COURT REPORTER: Yes.

Page 408

1    GENGER
2    BY MR. GRIVER:
3 Q. As we sit here today, you don't recall
4   there being any drafts of this agreement?
5 A. I don't recall.
6    MR. GRIVER: Mr. Meister, I will
7   represent to you that we have not received any
8   drafts of the settlement agreement.  Are there
9   drafts that have not been provided?
10    MR. MEISTER: I don't think we have any
11   drafts.  I do know we have a copy which has -- or
12   signature page which has the signature for TPR.
13    BY MR. GRIVER:
14 Q. Mrs. Genger, do you know who took the
15   laboring hand in drafting this settlement
16   agreement?
17 A. Who drafted this?
18 Q. Yes.
19    Was it your lawyer, was it his lawyers?
20   Who took --
21 A. Whoever signed it, their lawyers
22   drafted this document.
23 Q. Did Mr. Meister discuss with you any
24   drafts of the settlement agreement?
25 A. I do not remember.

Page 409

1    GENGER
2 Q. Do you recall making any changes to the
3   settlement agreement?
4 A. No.
5 Q. Was it your lawyers who, you know, had
6   the major responsibility of issuing a draft of
7   the settlement agreement for all parties, or did
8   your lawyers receive the settlement agreement for
9   comment?
10 A. No.  It is -- it is a mutual --
11    (WHEREUPON, there was a short
12    interruption.)
13    MR. MEISTER: Let's go back.
14    BY MR. GRIVER:
15 Q. So we're clear, you did not make any
16   changes to the settlement agreement that --
17 A. I don't recall that there were any
18   changes.  But the lawyers worked together in
19   order to come to this settlement.
20 Q. Which law firm or lawyer took the hand
21   in drafting this agreement?
22    MR. MEISTER: Took the hand?
23    MR. GRIVER: Yes.
24    MR. MEISTER: Objection as to form.
25    BY MR. GRIVER:

ORLY GENGER VS.
DALIA GENGER

DALIA GENGER
February 7, 2013

Page 410

GENGER

1     GENGER
2 Q. Which lawyer --
3 A. Who participated --
4 Q. Someone had to be in charge of drafting
5   the settlement agreement and circulating it for
6   comments. Which lawyer or law firm did that?
7 A. It was -- this came as the lawyers came
8   together with ideas, and they put it in writing.
9   I don't think there was one single lawyer that
10   came with this and said "You sign, you sign, you
11   sign." It is a kind of cooperation between
12   parties that wanted to settle.
13     MR. GRIVER: Okay. Mr. Meister, to the
14   extent there are any drafts available, electronic
15   or otherwise, of the settlement agreement or the
16   amended and restated settlement agreement or any
17   of the other documents --
18     THE WITNESS: This I don't know.
19     MR. GRIVER: -- I would ask that they
20   be provided.
21     BY MR. GRIVER:
22 Q. How long did these discussions take to
23   reach the settlement agreement? Was it decided
24   in a day, in a week? How long?
25 A. I don't remember. I have no idea.

Page 411

1     GENGER
2 Q. Were these in-person discussions, were
3   they over the phone, were you involved in
4   these -- strike that.
5     Let's ask this: Were you involved in
6   any of these discussions?
7 A. Yes. I was there when it was
8   discussed.
9 Q. You were present?
10 A. Yeah.
11 Q. Where were you?
12 A. I think it was Bob's office. No?
13   Okay. I --
14 Q. Was it Duane Morris' offices? Sagi's
15   lawyer's office?
16 A. Sagi's office maybe.
17 Q. Sagi's lawyer's office?
18 A. Maybe, yeah, because I don't know, I
19   said something wrong, obviously.
20     MR. MEISTER: If you don't remember,
21   you don't remember.
22     BY THE WITNESS:
23 A. I thought it was there, but I was
24   wrong.
25     BY MR. GRIVER:

Page 412

1     GENGER
2 Q. Was there a lawyer there in these --
3 A. One of the lawyers.
4 Q. Okay. Was there a lawyer there in
5   these discussions representing you personally?
6 A. Representing me personally?
7 Q. Uh-huh.
8 A. You know that Bob represents me
9   personally and represents the trust.
10 Q. Okay.
11 A. So I didn't ask him at one moment, at a
12   certain moment if he's talking on this side of
13   his mouth or the other side of his mouth. I
14   don't know. I can't tell you.
15 Q. Mr. Meister was representing both the
16   trust and you personally in these settlement
17   negotiations?
18 A. No. This settlement is not between me.
19   It is between the trust.
20 Q. But it does release you from all
21   liability?
22     MR. MEISTER: Objection.
23     BY MR. GRIVER:
24 Q. Doesn't it?
25 A. Where does it say so?

Page 413

1     GENGER
2 Q. Let's take a look. Page 5, paragraph
3   4, mutual releases.
4 A. 1105?
5 Q. 1105, DG 1105, paragraph 4, mutual
6   releases.
7 A. Release one another. Including --
8   (Witness reading document).
9 Q. Okay.
10 A. Yeah. No. But I'm trying to see if
11   I'm part of this personally. I don't see
12   personally that I am represented here.
13 Q. You see that it --
14 A. I don't see personally, Dalia Genger.
15 Q. You see -- well, let me read it to you:
16   The parties to the settlement agreement hereby
17   irrevocably and fully release one another,
18   including all current directors, officers,
19   trustees, et cetera, et cetera.
20     You are the trustee, correct?
21 A. Right. As the trustee I am released,
22   but not personally.
23 Q. Okay. Well --
24     MR. MEISTER: Just so we are clear, it
25   releases the other parties. There's no release

ORLY GENGER VS.
DALIA GENGER

DALIA GENGER
February 7, 2013

Page 414

GENGER
1     GENGER
2  by the trust of the trustee.
3     MR. GRIVER: It says the parties to the
4  settlement agreement hereby irrevocably and fully
5  release one another.
6     MR. MEISTER: Right. One another.
7     MR. GRIVER: So the trust is released,
8  and the trustee is released.
9     MR. MEISTER: By TPR. I know you are
10  trying to mischaracterize this as the trust
11  releasing Dalia, but it is not there because the
12  trust didn't release Dalia.
13     THE WITNESS: You made sure it is not
14  there.
15     BY MR. GRIVER:
16 Q. D&K LP also released you as trustee,
17  correct?
18 A. If it says so. I don't remember.
19 Q. And motions for --
20 A. I was in the capacity as trustee, not
21  as Dalia Genger.
22 Q. Okay. Let's go -- why would it be in
23  the trust's best interest to release you as
24  trustee?
25     MR. MEISTER: Objection.

Page 415

1     GENGER
2     BY MR. GRIVER:
3 Q. From all claims?
4     MR. MEISTER: Objection. The trust
5  didn't release her, and I really don't like your
6  trying to confuse the witness, at 4:00, at the
7  end of a day, by misrepresenting a legal document
8  to a layperson.
9     BY THE WITNESS:
10 A. And I just said that I just went -- I
11  repeated. I repeated that we made sure that I
12  personally was not released.
13     BY MR. GRIVER:
14 Q. Okay.
15 A. Only as a trustee, not as an
16  individual. Please.
17 Q. Very good. Let's look at paragraph 8,
18  attorneys' fees.
19 A. What?
20 Q. Attorneys' fees. Do you understand
21  what paragraph 8 does?
22 A. Let me get to it first. Exhibit A, you
23  mean.
24 Q. Paragraph 8 on DG 1106.
25 A. I mean, it is not enumerated. Oh, I'm

Page 416

1     GENGER
2  sorry. Attorneys' fees.
3 Q. Do you understand what paragraph 8
4  does?
5 A. I have to read it. I am very slow.
6 Q. We will wait because it is important
7  you understand this document.
8 A. Yes. It takes me a long time. It is
9  hard for me.
10 Q. Let me know when I can ask you.
11 A. Okay. So ask me the question and then
12  I will read it again. Because it is difficult.
13 Q. This paragraph provides that if a
14  beneficiary of a party --
15 A. Of this agreement.
16 Q. Right. A beneficiary of a party of
17  this agreement. So a beneficiary of a party to
18  this agreement would be Orly?
19 A. Right. Orly trust you mean?
20 Q. No. It is because Orly is the
21  beneficiary --
22 A. Of the trust, okay.
23 Q. So if Orly either asserts a new claim
24  against TPR or D&K, or continues with an existing
25  claim against TPR and D&K and is unsuccessful,

Page 417

1     GENGER
2  then the trust is liable for the attorneys' fees
3  of D&K and TPR. That's what this paragraph does.
4     My question to you, Mrs. Genger, is how
5  is that in the benefit of the trust?
6 A. Okay. So what you are saying -- let me
7  see if I understand. Okay. That Orly here is a
8  beneficiary -- is a beneficiary, right?
9 Q. Correct.
10 A. Okay. Who else is a beneficiary except
11  Orly? I am asking you because I am not -- I
12  don't understand.
13 Q. The Orly Genger 1993 trust, who is the
14  beneficiary of the Orly Genger 1993 trust?
15 A. It is Orly. So who else is another
16  beneficiary?
17 Q. But Orly is a beneficiary?
18 A. Yes. I am saying yes. But are there
19  any other beneficiaries that we are talking here?
20 Q. Contingent beneficiaries, but a
21  beneficiary, Orly is the beneficiary.
22 A. Orly is beneficiary, yes, I agree.
23 Q. So if she either continues with her
24  claims or asserts a new claim against TPR or D&K
25  and is unsuccessful, the Orly trust is liable for

Page 418

1    GENGER
2  the attorneys' fees of D&K and/or TPR.
3       Did you understand that that was the
4  result of this paragraph when you signed it as
5  trustee on October 3, 2011?
6  A.  I just want to understand.  I want to
7  know if I understood.  That Orly is a
8  beneficiary, if she continues --
9  Q.  Yes.
10 A.  -- to sue, to sue --
11 Q.  Yes.
12 A.  -- the other parties that are involved
13 in this agreement --
14 Q.  Yes.
15 A.  -- she -- the trust will be liable for
16 the cost of her suing, right?
17 Q.  That's correct.
18     MR. MEISTER:  If the defendant wins.
19     THE WITNESS:  If the -- if she wins.
20     MR. MEISTER:  If she loses and
21 defendants win.
22     BY THE WITNESS:
23 A.  If she loses.  If she loses, usually it
24 is customary --
25     BY MR. GRIVER:

Page 419

1    GENGER
2  Q.  Not in America.  No.
3  A.  So what country is it?
4  Q.  Let me ask you this:  When you signed
5  this agreement --
6  A.  No.  The agreement is to make the
7  parties come to a point that they won't sue each
8  other, that they will come to a point when they
9  agree that we should come to terms where everyone
10 is satisfied with what it's getting and it is not
11 going to continue to sue.
12 Q.  How is it in the Orly -- strike that.
13     First of all, when you signed this
14 agreement, did you understand the settlement
15 agreement when you signed it?
16 A.  I thought I did.
17 Q.  Did you review it with your attorneys?
18 A.  Yes.
19 Q.  Did they explain it to you?
20 A.  Yeah.
21 Q.  Did you understand that you were --
22 that you are providing that the Orly trust would
23 be paying attorneys' fees?
24 A.  I don't want Orly to continue without
25 basis, I am saying, without basis.  If she has

Page 420

1    GENGER
2  basis to sue, she should sue.  But without basis,
3  she shouldn't sue any of the other participants
4  here because it cost money to the trust.  And she
5  owns the trust, and she's going to lose money.
6  Q.  And so --
7  A.  And that's why we want everybody to
8  stop suing each other, because it costs money.
9  This is the settlement.  That's why it is called
10 a settlement.  People want -- they will stop
11 suing each other.  That's the whole point.
12 Q.  Whose idea was it to have this
13 attorneys' fees provision?
14 A.  I don't know whose idea.
15 Q.  And you thought it was --
16 A.  We said that we --
17 Q.  Just answer my question.
18 A.  We work together.  So I don't know if
19 it was Bob or John, or his assistant or Bob's
20 assistant, I do not know.  I did not put it there
21 because I am not smart enough, okay, to write
22 this document.  But one of the lawyers put it
23 there because settlement is settlement.  We want
24 to finish with the story.
25 Q.  And this meeting where this agreement

Page 421

1    GENGER
2  was reached, how long did this agreement take
3  place?
4  A.  You asked me this.
5  Q.  No.  How long?
6  A.  I don't remember.
7  Q.  Half a day, one day, more than a day?
8  A.  I don't remember.  I really don't
9  remember.
10 Q.  When you got there were they still
11 drafting the agreement, or was it ready for
12 signature when you got there?
13 A.  I don't remember.  There were so many
14 papers written, who can remember.
15 Q.  In your previous answer you talked
16 about John.  Who is John?
17 A.  John Dellaportas.  That is Sagi's
18 lawyer, I think.  I think that's the one.
19 Q.  What other lawyers were there?
20 A.  I don't remember there was another
21 lawyer.
22 Q.  Is there anyone representing -- were
23 there any other lawyers there representing Sagi
24 other than Mr. Dellaportas?
25 A.  I don't believe so.

ORLY GENGER VS.
DALIA GENGER

DALIA GENGER
February 7, 2013

Page 422

1     **GENGER**
2  Q.  Do you remember what John said?
3  A.  **Are you kidding me?  No.  I don't**
4     **remember what he said.**
5  Q.  So --
6  A.  **This is the result of --**
7  Q.  And so you thought it would be a good
8     idea to put in an attorneys' fees provision that
9     would try and prevent Orly from suing on behalf
10    of her trust?
11 A.  **I think that what the product of the**
12    **work of the lawyers of the parties concerned**
13    **thought that this is a very good idea to settle**
14    **once and for all these arguments and fights that**
15    **we have about Orly's rights.**
16 Q.  When was this meeting?  Was this
17    meeting on October 3?
18 A.  **Whenever it says.  I don't know.**
19 Q.  This meeting was on the date that this
20    agreement was executed; is that correct?
21 A.  **If it says so.  You think I remember**
22    **what date it was?**
23 Q.  Well, it says --
24    MR. MEISTER: If you don't remember --
25    **BY MR. GRIVER:**

Page 423

1     **GENGER**
2  Q.  -- underneath your signature, October
3     3, 2011?
4  A.  **Whatever it says.  I don't remember.**
5     **If it was then, it was then.**
6  Q.  Well, the day after you signed this
7     agreement you brought suit in Delaware, didn't
8     you?
9  A.  **What?**
10 Q.  The day after you signed this agreement
11    to try and stop all these lawsuits from
12    proliferating, you brought a new lawsuit in
13    Delaware; isn't that correct?
14 A.  **But this --**
15 Q.  Correct?  It is correct, right?
16 A.  **But this --**
17 Q.  It's the day after?
18 A.  **Yeah, but in Orly's --**
19 Q.  That doesn't count?
20 A.  **It is for Orly's benefit.  I am not**
21    **suing --**
22 Q.  But if you lose, you have to pay?
23 A.  **But I am not going to lose.**
24 Q.  You are not going to lose?
25 A.  **I am not going to lose.**

Page 424

1     **GENGER**
2  Q.  I sec.
3     So Orly's got -- any lawsuit Orly
4     brings, she is going to lose; any lawsuit you
5     bring, you are going to win?
6     MR. MEISTER: Wait a minute.  Are you
7     arguing here with the witness?
8     MR. GRIVER: No.  I am just trying to
9     understand if that's her belief.
10    **BY THE WITNESS:**
11 A.  **No.  What I am saying is, first of all,**
12    **I am not sure if that was the day.  It says so,**
13    **but I'm not sure that that was exactly the date**
14    **that I signed was the date that really it**
15    **happened.  Because many times we know that things**
16    **are signed, and it is not the same -- exactly the**
17    **same date.**
18    **BY MR. GRIVER:**
19 Q.  Let me understand this.  Are you saying
20    it is possible you put an incorrect date as the
21    date of your signature?
22 A.  **What I am saying is, that many times by**
23    **the time the document is printed, it is not**
24    **exactly the date that it is signed.**
25 Q.  Okay.

Page 425

1     **GENGER**
2  A.  **It happens.**
3  Q.  Fine.
4     Well, on August 8 of 2011, your
5     lawyers --
6  A.  **I mean, aren't you --**
7     MR. MEISTER: Wait for the question.
8     Don't argue with him.
9     **BY MR. GRIVER:**
10 Q.  Now, on August 8, 2011 Pedowitz &
11    Meister brought this interpleader action, right?
12    That's an additional lawsuit, correct?
13 A.  **Ask him.  It is not my idea,**
14    **interpleader.**
15 Q.  All right.  And on October -- let's
16    look at paragraph 1, the consideration.
17    On behalf of the trust, you disclaimed
18    any --
19 A.  **Wait, wait, wait a second.  You are**
20    **looking at number 1, page 1104.**
21 Q.  Yes.
22 A.  **Consideration.**
23 Q.  Yes.  Subpart B, the OG trust.
24 A.  **Where is subpart B?  I don't know.**
25 Q.  It is after subpart A.  It is about 1,

Page 426

GENGER
1   GENGER
2   2, 3, 4 -- it is about six lines down.
3   A.  Okay, okay.  So what are you
4   complaining, that TPR --
5       MR. MEISTER: He is not complaining.
6   He may be asking you a question.  He hasn't yet.
7       BY MR. GRIVER:
8   Q.  You will agree with me that in this
9   paragraph 1, the OG trust disposed of its
10  interest in TPR and gave them to TPR?
11      MR. MEISTER: Objection.  That's not
12  what it says.
13      BY MR. GRIVER:
14  Q.  Well, let me put it this way.  What is
15  your understanding of what the OG trust did in
16  order to get into this settlement?  What was its
17  consideration that it provided?  As trustee, what
18  consideration did the OG trust provide?
19  A.  That the Orly Genger trust got from TPR
20  $100,000 for legal fees.  Okay?
21  Q.  So the lawyers got paid.  Good.
22      What else?
23  A.  Aren't you one of the lawyers?
24  Q.  What else?
25  A.  You should look for it.

Page 427

GENGER
1   GENGER
2   Q.  What else?
3   A.  (Witness reading document).
4       What are you asking me?  What is what?
5   Q.  I am asking, as trustee, what was
6   the -- what did the OG trust give up in order to
7   reach the settlement?
8   A.  Okay.  What I see here is that TPR
9   relinquished all economic interest in favor of
10  Orly Genger trust, okay.  It is a good thing,
11  right?
12  Q.  I am asking you what did the OG trust
13  give up?
14  A.  OG trust?
15  Q.  What did the Orly Genger trust give up
16  in order to reach settlement?
17  A.  Let me continue to read it because in
18  the meantime it just -- it is getting to
19  something.
20      (Witness reading document).
21      I don't see anything here that the Orly
22  Genger trust is giving up, actually.
23  Q.  At the time that you signed this
24  agreement, what was your understanding as to what
25  the OG trust gave up?

Page 428

GENGER
1   GENGER
2   A.  Orly Genger trust, my understanding was
3   that Orly Genger trust was getting things --
4   Q.  And giving up nothing?
5   A.  In this particular paragraph, I don't
6   see she is giving up anything.
7   Q.  Look at --
8   A.  She is getting economic benefits from
9   the shares, that we know that she should maybe
10  not get if TPR would not be generous enough to do
11  it.
12  Q.  So at the time that you signed this
13  agreement, you did not believe that the OG trust
14  was giving up anything?
15  A.  I am saying based on this.
16  Q.  Please answer my question.
17      At the time that you signed this
18  agreement, wasn't it your understanding that the
19  OG trust was giving up nothing?
20  A.  There would be some release.
21  Q.  Other than claims against the other
22  people --
23  A.  Yeah.
24  Q.  -- you did not believe the OG trust was
25  giving up anything else?

Page 429

GENGER
1   GENGER
2   A.  Is this a question --
3   Q.  It is.
4   A.  -- or a statement?
5       A question?  I have to read the whole
6   thing because I --
7   Q.  Read my question back.
8   A.  No, I have to read the whole thing
9   because I, so far, did not find anything.
10  Q.  I am just asking, at the time that you
11  signed the agreement, what did you believe that
12  the OG trust was giving up?
13  A.  At the time I believe that Orly Genger
14  trust, its debt was reduced to $4 million -- I
15  mean, the note was reduced to $4 million.
16  Q.  I am not talking about --
17  A.  To 4 and a half million.  What, it is
18  not true?
19  Q.  Go ahead and answer the question as you
20  see fit.
21  A.  You have $100,000 from TPR, okay.  You
22  got economic benefits for the shares of TRI,
23  okay.  And I am thinking what else.  There was
24  something else that they got.  What the trust
25  gave, I, at the moment, cannot see.  Maybe you

Page 430

GENGER

1   GENGER
2   can point it out to me.  I don't see it here.
3   Q.  Can I have that read back?
4   A.  And the release.
5   Q.  If you've finished, I will have the
6   court reporter read it back so that you can
7   listen to your answer and add anything that you
8   may have missed.
9        (WHEREUPON, the record was read by
10       the reporter as requested.)
11   THE WITNESS: Okay.  So tell me what --
12   BY MR. GRIVER:
13   Q.  Any other benefits that you believe the
14   trust got from this agreement?
15   A.  The release.
16   Q.  Anything else?
17   A.  I have to read it because I am really
18   tired, and I have to start reading it from the
19   beginning.
20   Q.  Look at paragraph 1-B to show what the
21   OG trust gave up.
22   A.  1-B.
23   Q.  1-B, page 4, DG 1104.
24   A.  Consideration.
25   Q.  Look at B.  The OG trust.

Page 431

GENGER

1   GENGER
2   A.  B, that's what we looked at before,
3   right?
4   Q.  Yes.
5   A.  The OG trust.
6        (Witness reading document).
7        If you mean that it is OG trust -- how
8   do you mean, that the transfer to TPR, it's
9   limited partnership interest in D&K, that's what
10   you meant?
11   Q.  Yes.
12       Did OG trust transfer to TPR its
13   limited partnership interest in D&K, the D&K
14   interest; do you see that?
15   A.  Yes.
16   Q.  So on that date you, as trustee,
17   transferred to TPR the trust's D&K interest,
18   correct?
19   A.  The trust's D&K interest.
20   Q.  Yes.  That's how it is defined here.
21   A.  Right.  I am trying to think on -- I am
22   getting confused already.
23   Q.  Well, I will start it simple.
24   A.  I am confused already.
25   Q.  On the date you signed this settlement

Page 432

GENGER

1   GENGER
2   agreement --
3   A.  Yeah.
4   Q.  -- did you know that the trust was
5   transferring to TPR its D&K interest; yes or no?
6   A.  It says so.  It says so.  But I just --
7   I just for my own thing, because I just -- I now
8   am getting confused.  What was the trust D&K
9   interest that was given up?
10   Q.  Well, my first question is, at the time
11   that you signed this agreement, did you know that
12   the Orly Genger trust was transferring to TPR its
13   D&K interest?  Did you know that?
14   A.  Can you repeat this?
15   Q.  Sure.
16       On the day that you signed the
17   settlement agreement, did you understand that the
18   Orly Genger trust was transferring to TPR its D&K
19   interest?
20   A.  Are you talking now about the sale of
21   the TPR shares?
22   Q.  No, I am talking about --
23   A.  I am getting completely confused now.
24   I, you know --
25   Q.  Mrs. Genger, it says in this document

Page 433

GENGER

1   GENGER
2   that the OG trust hereby transfers to TPR its D&K
3   interest.
4        At the time that you signed the
5   agreement, did you understand that the OG trust
6   was giving up its D&K interest?
7   A.  I don't know what's the D&K interest.
8   Q.  Okay.  Did you understand --
9   A.  I don't know.  Maybe at the time I
10   understood, but right now I can't understand it
11   any more.  I am confused completely.
12   Q.  Did you understand on or about October
13   3, 2011 when you signed this agreement that the
14   OG trust was a limited partner in D&K?
15   A.  I don't know how to answer this
16   question.
17   Q.  On the date that you signed this
18   agreement, what was the monetary value of the
19   Orly Genger trust's D&K interest?
20   A.  This is where I am getting confused.
21   Q.  Had you valued the D&K interest in any
22   way before --
23   A.  Whatever you are asking now, I don't
24   know how to answer because I am completely
25   confused.  Really.  I am confused.  Either I have

ORLY GENGER VS.
DALIA GENGER

DALIA GENGER
February 7, 2013

Page 434

1    **GENGER**
2    to come again or --
3        **MR. GRIVER:** Let's take a break.
4        **THE WITNESS:** I am confused already.
5        **MR. GRIVER:** Let's take a break.
6        Off the record.
7        (WHEREUPON, a recess was had from
8        4:31 p.m. to 4:35 p.m.)
9        **MR. GRIVER:** On the record.
10       The parties have agreed to continue
11   Mrs. Genger's deposition to Monday, the 11th of
12   February, commencing at 11:00 a.m., to take half
13   a day, which means three to four hours of
14   questioning.
15       (WHEREUPON, at 4:35 p.m., by
16       agreement of the parties, the
17       deposition of D. GENGER was
18       adjourned until Monday, February
19       11, 2013, at 11:00 a.m., and the
20       deponent reserved her right to
21       read and sign the transcript.)
22       * * * * *
23
24
25

Page 435

1    A C K N O W L E D G M E N T
2
3        I, DALIA GENGER, hereby certify that I
4    have read the entire transcript of my testimony
5    taken under oath in my deposition of February 7,
6    2013 in the captioned matter on the title page
7    hereof, or the same has been read to me, and the
8    same is true and accurate, save and except for
9    changes and/or corrections, if any, as indicated
10   by me on the ERRATA SHEET hereof, with the
11   understanding that I offer these changes as if
12   still under oath.
13   Signed this _____ day of_____, 20___.
14
15
16   _____
17   DALIA GENGER
18
19
20   SUBSCRIBED AND SWORN BEFORE ME
21   THIS _____ DAY OF _____ ___, 20___.
22
23   _____
24   Notary Public, State of _____
25   My Commission Expires: _____

Page 436

1                C E R T I F I C A T E
2
3    STATE OF NEW YORK  )
4                       )
5    COUNTY OF NEW YORK )
6
7        I, ANNETTE M. MONTALVO, Registered
8    Merit Reporter and Notary Public within and for
9    the State of New York, do hereby certify:
10       That DALIA GENGER, the witness whose
11   deposition is hereinbefore set forth, was duly
12   sworn by me and that such deposition is a true
13   record of the testimony given by such witness.
14       I further certify that I am not related
15   to any of the parties to this action by blood or
16   marriage and that I am in no way interested in
17   the outcome of this matter.
18       IN WITNESS WHEREOF, I have hereunto set
19   my hand this 20th day of February, 2013.
20
21
22
23
24   ------------------------
     Annette M. Montalvo, RMR
25   My commission expires:  January 31, 2015

Page 437

1                    ***ERRATA***
2        ELLEN GRAUER COURT REPORTING  CO. LLC
            126 East 56th Street, Fifth Floor
3             New York, New York 10022
                   212-750-6434
4
5    NAME OF CASE: GENGER vs. GENGER
     DATE OF DEPOSITION: FEBRUARY 7, 2013
6    NAME OF WITNESS: DALIA GENGER
7    PAGE  LINE   FROM      TO        REASON
8    ___|___|_____|_____|_____
9    ___|___|_____|_____|_____
10   ___|___|_____|_____|_____
11   ___|___|_____|_____|_____
12   ___|___|_____|_____|_____
13   ___|___|_____|_____|_____
14   ___|___|_____|_____|_____
15   ___|___|_____|_____|_____
16   ___|___|_____|_____|_____
17   ___|___|_____|_____|_____
18   ___|___|_____|_____|_____
19   ___|___|_____|_____|_____
20   ___|___|_____|_____|_____
21
22   Subscribed and sworn before me
23   this_____day of _____ , 20___.
24   _____        _____
25   (Notary Public)         My Commission Expires:

ORLY GENGER VS.
DALIA GENGER

DALIA GENGER
February 7, 2013

---

413:4,5,5
1106 (1)
415:24
1110 (1)
405:21
11th (1)
434:11
12 (2)
273:6;284:4
12/17/2007 (1)
370:10
12:06 (1)
304:6
12:18 (1)
304:6
12:43 (1)
324:16
12-17 (1)
372:16
12-17-07 (4)
370:16;372:13;
379:24;380:12
13 (3)
231:7;325:5;328:6
13-20 (2)
263:3;264:6
14 (3)
376:5,6,16
146 (3)
294:19;295:3,5
147 (3)
294:19;295:3,5
15 (16)
231:5;232:12;255:2,4,
6,19;305:13;307:21;
312:19;379:2;387:23;
388:17,22,24;389:5,13
16 (5)
253:19;266:16,17;
271:14,15
17 (19)
279:22,23;280:6;
281:8;283:7;284:22;
285:12;304:10;370:14;
372:3;374:2,5,11,13,15;
387:12;388:18;398:3;
401:22
18 (13)
283:5;292:7,11;
294:15;298:2;302:14,18,
20;351:7;374:7,11,13,22
19 (4)
271:17;314:21,24;
327:14
191 (1)
253:16
1993 (7)
293:13;294:2;296:5;
312:24,24;417:13,14
1-B (3)
430:20,22,23

---

## $

**$100,000 (3)**
359:25;426:20;429:21
**$180,000 (2)**
379:3;380:18
**$30,000 (10)**
387:15,16,20;388:5,
21,24;389:12,15,16;
390:7
**$4 (2)**
429:14,15
**$5 (8)**
372:5;373:21;375:17;
379:10;382:5;384:7;
385:17,23
**$8 (1)**
261:8

---

## 0

**07 (1)**
401:22
**09 (1)**
401:24

---

## 1

**1 (11)**
232:11;279:13;308:5,
6;329:20;330:3;370:17;
425:16,20,25;426:9
**1,102.8 (1)**
350:12
**1:38 (1)**
324:17
**10 (4)**
376:5,7,20,23
**100 (1)**
381:4
**102.80 (1)**
284:12
**107 (1)**
406:11
**11 (6)**
281:14;283:25;284:4;
376:7;386:16;434:19
**11/19/2012 (1)**
266:18
**11/2008 (1)**
292:8
**11:00 (2)**
434:12,19
**11:19 (1)**
266:21
**11:24 (1)**
266:21
**1101 (1)**
405:21
**1104 (2)**
425:20;430:23
**1105 (3)**

---

## 2

**2 (6)**
253:18;308:5,6;315:2;
342:7;426:2
**2:23 (1)**
359:15
**2:26 (1)**
359:15
**20 (9)**
247:20;255:2,6;
263:21;326:3,4,6,21;
327:16
**20_ (2)**
435:13,21
**2006 (1)**
315:2
**2007 (8)**
370:14;372:4;374:3,5,
11;387:12;388:18;398:3
**2008 (28)**
274:15;277:24;279:8,
13;281:9,20;292:15,24;
293:2;300:2,4,18;305:5,
10,15;306:10,11,12,15,
18;324:4;376:7;386:16;
387:23;388:17,22,24;
389:13
**2009 (4)**
279:14;324:7;327:14;
401:19
**2010 (5)**
331:24;332:16;342:6,
7;351:7
**2011 (6)**
339:10;418:5;423:3;
425:4,10;433:13
**2012 (2)**
231:7;271:17
**2013 (4)**
379:2;389:5;434:19;
435:6
**207 (2)**
237:8,11
**208 (2)**
254:20;255:2
**21 (12)**
273:3,4,5,8,16;327:8,
9,12;328:17,20,22;342:5
**22 (11)**
237:11;281:9,12;
283:21,23;288:13;
292:16;305:5,9;339:3;
351:18
**22-A (3)**
284:9,11,13
**23 (4)**
341:14,15,25;361:3
**24 (4)**
339:8;369:9,10,12
**25 (13)**
370:8,9,14;372:9,20,

---

## 3

**3 (14)**
255:13;330:18,19,21;
331:4;370:24,25;371:2;
376:7;418:5;422:17;
423:3;426:2;433:13
**3,000 (3)**
348:25;349:23;351:10
**3:04 (1)**
387:7
**3:10 (1)**
387:7
**3:34 (1)**
405:13
**3:51 (1)**
405:13
**30 (14)**
311:13;312:2,6,11,12,
22;313:4,25;314:15,19;
371:4,12,14,16
**31 (1)**
274:15
**32 (2)**
280:16,16
**35 (1)**
260:10

---

## 4

**4 (14)**
246:11;279:8,13;
316:7;317:18;323:16;
324:4;339:10;376:8;
413:3,5;426:2;429:17;
430:23
**4:00 (1)**
415:6
**4:31 (1)**
434:8
**4:35 (2)**
434:8,15

---

## 5

25;373:18;378:14;
379:24;380:10;385:21;
387:15,18
**250 (17)**
372:4,17;378:16,18;
379:4;380:19;381:20;
382:4,7,8;388:7;389:7,
13;391:15,17;392:17;
397:2
**26 (2)**
399:4,5
**2600 (1)**
342:18
**261 (2)**
263:2;264:6
**27 (3)**
401:19;405:14,15

---

**5 (3)**
323:15;370:17;413:2
**5/19/2009 (1)**
327:10
**50/50 (3)**
362:4,16,18

---

## 6

**6 (10)**
234:7,23;236:19;
237:4,5;322:3;323:2,6,
15;386:16

---

## 7

**7 (2)**
406:10;435:5

---

## 8

**8 (11)**
235:24,25;236:21;
273:2;312:18;415:17,21,
24;416:3;425:4,10
**8/2/2006 (1)**
314:22
**8/22/2008 (1)**
279:24

---

## 9

**9 (6)**
280:18,18;298:19,25;
299:9,17
**96 (5)**
396:14;397:16,17,23;
398:4

---

## A

**abided (1)**
313:24
**ability (2)**
276:5,6
**able (7)**
245:8,17;261:15;
262:5;263:7;346:5;
400:5
**Absolutely (1)**
262:22
**accept (2)**
337:23;338:6
**acceptable (2)**
337:24;338:7
**account (15)**
246:9;366:8;367:7;
368:10,10;395:23,24,25;
396:4,5,7,7,9,11;402:12
**accountant (1)**
397:6
**accounts (2)**
360:6;393:25

---

ORLY GENGER VS.
DALIA GENGER

DALIA GENGER
February 7, 2013

**accurate (2)**
332:21;435:8
**achieve (1)**
312:5
**act (3)**
276:5,6,8
**action (57)**
233:21;272:7;273:15;
274:16,20,22,25;275:2,
8,12,21;276:12,21;
277:7,8,10;278:5;286:3;
330:4;339:4,10;340:24;
343:19;345:25,25;
346:10,24;348:24;
349:13,21;353:22;
358:16,17,20,23;359:18,
20;360:4,7;361:2,6;
362:19,20,25;363:21,25;
364:13;365:5,13,17,25;
366:2;368:2,9,13,22;
425:11
**actions (14)**
248:21;250:21;254:8;
267:14,23;272:9,10;
277:23;279:6,17;
340:20;343:23;367:15,
20
**action's (1)**
343:18
**actual (2)**
308:17;313:12
**Actually (15)**
245:14;253:10;254:5;
272:13,15;273:3;
274:17;312:12;315:11,
15,20;354:22;373:2;
387:24;427:22
**add (2)**
288:11;430:7
**added (2)**
284:19,23
**Adding (1)**
375:10
**additional (6)**
284:23;375:10;
392:18;405:4;406:9;
425:12
**addresses (1)**
342:14
**adjourned (1)**
434:18
**advance (2)**
369:18,24
**advertise (1)**
244:2
**advice (23)**
248:21;249:12,14,16;
250:14,19,24;251:8,15,
17,19,22,23,23;252:9;
253:11,18;254:5,9;
352:15;356:19;357:20,
22
**affairs (1)**

260:2
**affect (3)**
256:15,17;277:23
**affidavit (5)**
328:17,23;376:6,16,19
**affirmation (2)**
266:17;271:15
**affirmed (2)**
230:2,5
**afford (1)**
394:12
**again (39)**
230:18,20;237:4;
244:7;245:15;248:15;
249:7;252:5;260:12,13;
263:24;287:4;305:6;
306:8;309:5;310:12;
317:10;319:17;331:13;
335:15;344:4;346:8;
349:11;354:19;355:2;
356:11,12,16,17;379:13;
380:3,3;390:21;391:14;
392:17;397:20;398:5;
416:12;434:2
**against (20)**
267:15;272:9;287:6,7;
312:21;313:4,12;316:9,
17;323:3,8;343:3;
362:19;365:7;367:21;
376:15;416:24,25;
417:24;428:21
**ago (4)**
263:21;300:12;
315:13;322:5
**agree (4)**
337:23;417:22;419:9;
426:8
**agreed (4)**
312:20;339:21;
378:24;434:10
**agreeing (1)**
365:8
**agreement (69)**
280:20;281:11,18;
286:4;288:14;290:9;
291:4;292:14;304:10,12,
14;312:9;313:24;324:2;
370:16;379:22;380:7,13,
22;386:24;390:11;
399:18;403:3,7;405:16,
20;406:7;407:20;408:4,
8,16,24;409:3,7,8,16,21;
410:5,15,16,23;413:16;
414:4;416:15,17,18;
418:13;419:5,6,14,15;
420:25;421:2,11;
422:20;423:7,10;
427:24;428:13,18;
429:11;430:14;432:2,11,
17;433:5,13,18;434:16
**agreements (1)**
404:24
**ahead (5)**

280:5,10;333:2,17;
429:19
**air (1)**
405:10
**ai (1)**
369:14
**allegation (1)**
272:18
**allegations (2)**
339:17;358:16
**allowed (7)**
230:17;275:13,16;
279:17;344:17;375:16;
397:4
**aloud (4)**
234:14,15;331:3;
371:17
**alterations (1)**
299:7
**altered (2)**
299:2;380:14
**Although (1)**
405:24
**always (1)**
383:14
**amend (2)**
231:22;286:4
**amended (19)**
271:16;272:4;274:7,9;
280:19;281:10;283:24;
288:13;290:8,10;291:3;
292:13;299:2;330:4,9;
371:2;380:14;407:7;
410:16
**Amending (1)**
280:14
**amendment (25)**
279:23;281:9,17;
282:10,12,19,23;283:14;
284:20;285:5,8,11;
287:25;289:20;290:8,
15;291:2,12,22;292:7,
12;296:17,19;298:13;
304:9
**amendments (1)**
299:8
**America (1)**
419:2
**amount (3)**
387:20,24;388:2
**and/or (3)**
371:20;418:2;435:9
**answered (25)**
235:4,11;238:10;
242:7;248:13;252:12;
263:22;270:6,25;
271:11;283:8;287:2;
288:5;318:11;321:3;
329:3;338:22;344:3;
356:21;360:22;361:16;
362:6;370:5;385:2;
390:12
**anticipated (1)**

406:22
**Apparently (3)**
270:15;334:17;366:7
**appear (1)**
245:17
**apply (1)**
375:21
**appointed (1)**
267:5
**appreciate (3)**
392:5;393:5,6
**apprise (3)**
243:15;244:5,10
**apprised (2)**
291:21;353:17
**appropriate (1)**
292:2
**approving (3)**
381:19;382:2,4
**approximately (3)**
396:14;397:23;398:4
**arbitration (5)**
386:5,5,7,15,25
**area (1)**
405:8
**argue (3)**
320:16,20;425:8
**arguing (1)**
424:7
**arguments (1)**
422:14
**Arie (34)**
237:20;238:13,24;
239:7,11,19;240:6,8,11,
22;246:15,21;247:5,9;
255:23;256:10,24;257:7,
14;259:7,18,25;260:15;
261:19;262:5,8;263:11;
265:14,18;342:17;
343:3;351:9;362:19,25
**Arie's (6)**
237:24;257:22;
258:16;264:17,18,20
**around (3)**
261:25,25;401:12
**ascertain (3)**
305:3,8,11
**asserts (2)**
416:23;417:24
**assets (14)**
267:16;268:4,9,12,14,
17,20;269:10,15,17;
271:8;277:23;279:7;
337:22
**assistant (4)**
232:21;233:4;420:19,
20
**Associates (4)**
288:17;309:16;326:8;
369:14
**assume (5)**
276:14,15;310:14;
311:8;375:2

**assumed (2)**
269:13;276:10
**Assumes (4)**
268:23;269:18;
332:23;337:25
**assuming (3)**
259:7;310:23;393:19
**attached (2)**
380:9,13
**attempt (4)**
251:4;298:15;323:3;
404:25
**attempted (1)**
374:20
**attempting (2)**
250:22;298:11
**attend (1)**
329:11
**attention (2)**
253:9;325:4
**attorney (5)**
254:12;265:2;290:15;
300:17;337:3
**attorneys (5)**
335:8;336:23;337:8,
14;342:25;419:17
**attorneys' (8)**
415:18,20;416:2;
417:2;418:2;419:23;
420:13;422:8
**auction (18)**
242:17,20,22;243:13,
21;247:7;253:23;
255:23;256:11,15,18;
264:24;265:4;334:9,16;
400:6,7,25
**August (13)**
274:14;281:9,20;
305:4,9,15;306:9,12,18;
315:2;351:7;425:4,10
**authority (1)**
281:12
**authorizing (1)**
343:4
**available (3)**
361:22;398:24;410:14
**award (1)**
386:15
**awarded (2)**
387:25;388:3
**aware (10)**
243:23;266:23;
268:10;304:11,24,25;
350:11;354:25;355:5;
363:20
**away (2)**
250:16;259:24

**B**

**back (29)**
241:14;251:25;255:7;
258:7;302:18;304:16;

ORLY GENGER VS.
DALIA GENGER

DALIA GENGER
February 7, 2013

305:18;309:2;321:19;
331:14;335:16;344:6,
25;351:14;373:4;377:6;
378:8,21;381:20;382:5;
384:22;387:8;388:25;
389:3;398:8;409:13;
429:7;430:3,6
bad (1)
347:8
badgering (1)
286:20
bank (9)
245:20,24;246:3;
395:7,9,11,12;402:4,11
base (2)
301:10;313:6
based (12)
231:22;334:6;336:3,5,
6;350:25;354:23;
356:18;357:20,22;
373:8;428:15
bases (1)
336:13
basis (21)
238:20;277:9,11,13;
290:3;323:9;336:8,11,
20;346:9,11,23;347:17,
24;366:19;367:11;
368:23;419:25,25;420:2,
2
Bates (5)
294:19,23;370:16;
405:20;406:11
Batzad (1)
395:2
B-a-t-z-a-d (1)
395:4
becamc (3)
302:4;323:18;324:3
become (3)
373:4;374:24;396:23
began (2)
266:24;316:2
beginning (6)
249:4;361:23;380:3;
387:25;397:25;430:19
behalf (32)
266:24;271:19,20,25;
272:2;292:22;293:25;
294:6,14;296:4;298:5;
316:12,12,16;339:11;
340:3,21;342:25;343:2,
17;358:25;361:7,7,12;
366:4,4,24;367:16;
368:19,20;422:9;425:17
behave (1)
301:25
belief (5)
258:20;301:10;
330:23;332:3;424:9
believes (1)
238:19
belonged (2)

354:23;355:11
beneficial (1)
365:8
beneficiaries (2)
417:19,20
beneficiary (17)
340:22;359:2;367:21;
416:14,16,17,21;417:8,
8,10,14,16,17,21,21,22;
418:8
benefit (8)
256:18;264:24;347:6;
367:12,18;368:2;417:5;
423:20
benefited (2)
265:5;368:13
benefiting (3)
350:22,24;351:3
benefits (3)
428:8;429:22;430:13
berating (1)
302:3
best (7)
288:11;289:17;
296:17;297:15;323:24;
324:10;414:23
better (4)
273:3;308:13;335:21;
352:18
bid (2)
246:2;257:14
bigger (2)
356:14,14
bill (1)
364:12
billed (2)
365:6,9
billionaire (1)
266:4
bills (1)
359:23
bit (1)
262:9
board (5)
381:19,22,23,25;382:3
Bob (10)
231:2;232:21;249:10;
287:6;322:8;340:7;
365:24;406:3;412:8;
420:19
Bob's (2)
411:12;420:19
born (1)
323:17
both (10)
307:2;316:12;361:11,
25;366:5;377:14,17,24;
379:9;412:15
bottom (1)
295:2
bought (5)
256:25;259:8;333:18,
18;401:9

brainwashed (9)
237:12,22;238:3,3,12,
13,21;239:3;262:16
branch (2)
395:16,17
break (19)
262:13,19,22;266:14,
19;304:4;324:13;
359:13;386:11,20,22;
387:5;404:12,14,17;
405:7;406:13;434:3,5
Briefly (1)
231:15
bring (10)
249:24;310:11,13;
340:2;343:19;345:24;
352:21;363:24;366:20;
424:5
bringing (1)
311:5;341:5;343:8;
345:25;353:17,22;
359:6;365:5,12,16,22;
366:24
brings (1)
424:4
broad (1)
277:4
brought (12)
342:25;343:16;
348:24;349:12;353:18;
358:24;361:6;363:21;
364:3;423:7,12;425:11
bunch (2)
407:14,15
business (2)
313:16;333:9
buy (5)
242:17;256:20;257:7;
258:25;259:7
buying (3)
256:19;258:21;260:22

## C

calculate (3)
379:5,6;384:17
call (8)
237:11;265:25;266:2,
10;269:24;270:4;
275:18;373:16
called (6)
230:4;266:3;270:22;
292:12;373:5;420:9
calling (2)
269:16;276:23
Calls (7)
244:12;248:23;266:7;
286:12;291:13,15;
383:19
calm (2)
252:22,24
came (16)
290:22;296:22,25;

297:4;303:5,6,12,15,16;
322:18;355:24;359:24;
384:9;410:7,7,10
can (63)
234:6;236:14;241:13;
249:15;250:9;253:21;
254:13;255:10;262:13,
18,21;266:14;267:20;
273:16;276:11;280:17;
282:7;288:24;297:15,
24;301:23;302:3,15;
305:6,12,17;307:17;
309:2;316:23;318:18;
319:16;321:18,21;
324:13;331:13;333:23;
335:15;336:14;338:25;
344:25;347:13;350:7;
351:13;359:9,13;
361:22;363:13;368:11;
370:21;372:21;375:18;
386:20;387:4;398:5,6;
399:12;406:3;416:10;
421:14;430:2,3,6;432:14
candidly (1)
237:23
capacities (1)
366:5
capacity (4)
247:11;309:20;
343:13;414:20
captioned (1)
435:6
care (1)
268:12
carefully (3)
307:23;339:24;355:4
case (27)
249:24;272:10,17,22;
291:16;294:8;300:21;
303:20,25;316:25;
317:3;323:12;341:8,10;
351:9,24;352:2,21;
355:7,19;359:21;361:11,
25;383:4;402:16,20;
403:15
cc-ing (1)
314:25
CEO (1)
288:17
certain (9)
237:15;238:18;239:9,
10,13;284:25;327:12;
332:8;412:12
certainly (2)
248:3;316:23
certificates (4)
384:18;391:3,20;
392:9
certify (1)
435:3
cetera (3)
340:23;413:19,19
challenging (1)

351:23
chance (2)
341:17;356:13
chancery (11)
339:10;348:25;349:4,
13,15,19;351:7;352:4;
354:21;355:10;358:4
chances (1)
356:14
change (4)
281:20;285:7;321:6;
390:10
changed (2)
299:2;380:14
changes (8)
298:16;299:8,16;
409:2,16,18;435:9,11
changing (3)
253:2,4;324:12
character (1)
256:8
characterize (1)
373:17
charge (1)
410:4
charged (6)
289:8,10;336:23;
337:2,3;367:14
charges (2)
365:4,6
check (8)
301:22;313:11;
353:19;382:25,25;
388:25;389:3,5
checks (19)
389:6,7,9;392:11,13;
393:2,7,8,8,10,11,13,17,
17,18,19,20;394:13,14
child (2)
297:17;298:2
children (1)
377:18
choice (1)
351:25
choose (2)
352:3;356:18
chose (2)
268:18;378:2
circulating (1)
410:5
circumstances (5)
282:24;283:13,15;
285:4;323:17
Citibank (2)
395:13,14
claim (8)
341:11;347:3,17;
348:20;365:7;416:23,
25;417:24
claimed (1)
348:4
claims (7)
272:17;275:5;316:8,

ORLY GENGER VS.
DALIA GENGER

DALIA GENGER
February 7, 2013

17;415:3;417:24;428:21
**clean (1)**
338:3
**clear (11)**
260:11;328:13,15;
351:2,5;362:8;399:20;
400:18;402:10;409:15;
413:24
**client (1)**
366:11
**close (4)**
384:16;385:4;386:2,4
**closed (1)**
257:19
**co-defendants (1)**
368:25
**co-defendant's (1)**
369:2
**collect (3)**
319:9;324:8;363:13
**collection (2)**
323:7,19
**colluded (2)**
272:19,20
**comfortable (1)**
264:21
**coming (1)**
395:7
**commencing (1)**
434:12
**comment (1)**
409:9
**comments (1)**
410:6
**Commission (1)**
435:25
**committed (1)**
272:19
**common (1)**
372:4
**communicate (1)**
243:9
**communicated (1)**
241:4
**communications (2)**
249:23;340:23
**company (14)**
241:7;367:7;373:4,5;
375:4,22;377:3,7;384:9;
385:15;393:9;394:21,
22;404:25
**compete (1)**
242:17
**complained (1)**
348:3
**complaining (2)**
426:4,5
**complaint (24)**
330:4,9;339:4,14,19,
24;341:16,24;342:24;
343:5,9;350:25;351:19;
353:3,14,15;358:18,19;
359:6;361:3;369:11,13,

18,25
**completely (4)**
307:24;432:23;
433:11,24
**compound (1)**
302:24;303:8;356:20;
383:18
**comprise (1)**
328:17
**con (1)**
329:23
**concentrate (2)**
322:2;399:13
**concern (2)**
313:21;372:22
**concerned (15)**
267:16,24;268:2,3,5,8,
14,16;269:10,14,23;
270:12,14,19;422:12
**concerning (1)**
270:16
**concluded (1)**
253:21
**conclusion (4)**
244:13;248:24;
256:13;291:15
**conduct (1)**
333:6
**conflict (4)**
267:5,10,11,14
**confuse (2)**
357:12;415:6
**confused (13)**
306:2,3;357:7;397:19;
431:22,24;432:8,23;
433:11,20,25,25;434:4
**confuses (1)**
357:11
**confusing (1)**
357:10
**connection (5)**
269:2,8;370:15;378:9;
379:25
**consent (1)**
288:15
**Consequences (7)**
260:24;261:9,18;
263:10;264:9,12;265:13
**consider (1)**
248:2
**consideration (6)**
371:25;425:16,22;
426:17,18;430:24
**considered (3)**
257:13;339:20;345:2
**consistent (1)**
253:5
**construe (1)**
316:20
**consult (5)**
250:24;365:11,14,16;
397:6
**consulted (1)**

253:17
**contemplating (1)**
318:18
**contents (1)**
330:10
**Contingent (1)**
417:20
**continue (7)**
256:2;403:20,20;
419:11,24;427:17;
434:10
**continues (3)**
416:24;417:23;418:8
**control (1)**
245:18
**controlled (1)**
396:14
**convenience (1)**
263:23
**conversations (2)**
359:4,5
**conveyed (1)**
243:7
**convince (2)**
311:13;312:3
**convinced (1)**
237:16
**cooperation (1)**
410:11
**copies (1)**
392:25
**copy (14)**
231:4;290:8;302:17;
325:24;339:13;391:4,5,
6,8,10;392:4;393:6;
406:20;408:11
**corrected (2)**
283:21;362:7
**correcting (2)**
284:6;311:21
**correction (2)**
284:13;288:24
**corrections (1)**
435:9
**correctly (2)**
301:12;379:5
**cost (2)**
418:16;420:4
**costs (3)**
252:15,16;420:8
**co-trustee (2)**
337:24;338:6
**counsel (13)**
232:18;248:21;
249:13;250:15,19;
251:8;295:13,14;297:4;
299:24;300:3;302:4;
369:2
**count (2)**
396:24;423:19
**counterclaim (2)**
323:3,8
**counterpart (2)**

406:20,23
**countless (1)**
375:7
**country (2)**
266:7;419:3
**course (2)**
278:21;346:6
**court (36)**
230:25;234:16;
249:24;252:19;264:2;
279:20;291:2,11;
339:10;342:22;344:22;
348:25;349:4,13,15,16,
17,18,20,20;350:12,13;
351:7,23;352:4,18;
354:21;355:9,10;358:4,
8;367:7;377:21;378:9;
407:25;430:6
**courtesy (1)**
269:15
**courts (3)**
341:7;346:5;354:24
**court's (1)**
378:10
**covered (4)**
248:25;249:3;253:25;
360:9
**CPLR (1)**
359:9
**create (1)**
402:21
**created (1)**
323:17
**crossed (2)**
241:22;243:4
**curious (1)**
337:20
**current (2)**
342:15;413:18
**customary (1)**
418:24
**cutting (1)**
258:18

**D**

**D&K (58)**
273:19,20;274:14;
280:19;281:11,18;
286:4;288:13;291:3;
292:14;293:17;304:9;
316:8,12,16,17;317:17;
318:9;320:3;323:2,6,8,
19,22;326:7,9;391:18;
396:13,19;397:16,23;
398:4;399:18,19,23;
400:12;402:16;414:16;
416:24,25;417:3,24;
418:2;431:9,13,13,17,
19;432:5,8,13,18;433:2,
6,7,14,19,21
**DALIA (44)**
230:3;234:7;240:2;

244:25;247:19,22;
249:2;266:17;279:23;
286:24;292:7;
297:19;298:22;311:22;
314:21,25;326:4;327:9;
339:3;340:24;341:15;
357:8;368:19;369:10;
370:9,23,25;371:2;
376:16,16,19;386:16;
396:11;399:5;404:8;
405:6,15;413:14;414:11,
12,21;435:3,17
**date (32)**
279:11;307:5;341:21,
23;342:15;353:23;
354:2;371:22;374:16,
19;386:9;398:5,6,9;
400:7;401:4,6,11,15,17,
22;422:19,22;424:13,14,
17,20,21,24;431:16,25;
433:17
**dated (10)**
274:14;279:24;292:8,
15;314:21;315:2;
370:10,14;386:15;
388:18
**daughter (5)**
270:4;275:18;276:23;
337:24;338:7
**daughter's (1)**
337:21
**David (3)**
235:16;314:25;327:13
**day (21)**
231:7;232:25;237:9;
247:18;265:23;266:6;
311:10;395:20;410:24;
415:7;421:7,7,7;423:6,
10,17;424:12;432:16;
434:13;435:13,21
**days (12)**
311:13;312:2,6,11,13,
22;313:4,25;314:15,19;
315:13;317:4
**dealing (1)**
260:10
**debt (1)**
429:14
**December (13)**
231:7;370:14;372:3;
374:2,5,7,11,15,21;
387:12;388:18;398:3;
401:22
**decide (1)**
250:23
**decided (8)**
239:21;246:20;247:4,
6;366:7;368:15;374:14;
410:23
**deciding (1)**
257:14
**decision (15)**
239:19;240:6;251:3;

260:7;341:7;345:24;
349:7;351:22;352:22,
25;354:14;357:18;
358:4,12;377:21
**declarative (1)**
266:12
**deeply (1)**
267:15
**default (5)**
274:14;330:23;
331:11,21;332:3
**defendant (1)**
418:18
**defendants (1)**
418:21
**defined (1)**
431:20
**Delaware (49)**
339:4,11;340:3,24;
341:5,7;343:18,20;
345:7,25;346:10,24;
347:2,17;348:24;349:4,
13,14,19,21;350:12,13;
351:7;352:2,3,22;353:2,
3;354:20,24;355:7,9,14;
356:9,16,18,23;357:18,
24;358:8,20;359:6,18,
20;360:4,7;362:20;
423:7,13
**Dellaportas (2)**
421:17,24
**Dellaportas' (1)**
403:18
**demonstrated (1)**
317:5
**denies (1)**
317:17
**deny (4)**
316:9,18;330:20,21
**denying (1)**
317:19
**deponent (1)**
434:20
**deposed (1)**
231:11
**deposition (26)**
230:11,16;231:6,7;
232:18;237:9;247:14;
248:2;249:4,6;253:15;
272:7;308:3;311:10;
316:3;317:12;322:17,
21;324:15;329:20;
340:25;360:10;386:17;
434:11,17;435:5
**depositions (1)**
317:5
**description (1)**
403:11
**desires (1)**
243:7
**desk (2)**
322:12,13
**details (1)**

343:12
**determination (6)**
336:20;352:6,21;
354:22;355:10;378:10
**determine (13)**
298:15;318:6,8;
319:22;331:11;333:2,
12;335:4,9,23;337:8,14;
346:5
**determined (7)**
348:25;349:5,23;
350:14;352:4;357:23;
384:7
**determining (1)**
332:20
**DG (9)**
294:19;295:3,5;
370:17;405:21;406:11;
413:5;415:24;430:23
**dialogue (1)**
253:19
**difference (1)**
376:2
**different (4)**
271:23;308:11,12;
373:3
**difficult (1)**
416:12
**directing (1)**
325:4
**direction (1)**
279:6
**directly (1)**
293:5,9
**director (4)**
381:11;382:17,18,22
**directors (1)**
413:18
**disappointing (1)**
262:7
**disclaimed (1)**
425:17
**discovery (1)**
327:6
**discuss (13)**
261:6;277:16,18;
338:17,19;340:5,7,8,9,
11;366:16;370:19;
408:23
**discussed (10)**
259:5;299:10;308:2;
311:9,12;340:14,15;
347:4;368:23;411:8
**discussing (1)**
277:22
**discussion (2)**
354:18;364:8
**discussions (5)**
368:25;410:22;411:2,
6;412:5
**dishonest (2)**
256:12;258:18
**dishonesty (2)**

256:15;258:21
**disjunctive (2)**
302:24;303:8
**dismiss (1)**
271:16
**dismissed (1)**
272:17
**disposed (1)**
426:9
**district (1)**
363:22
**divorce (5)**
384:16;385:5;386:3,4,
6
**divorced (1)**
398:2
**divorcing (1)**
388:2
**DJ (1)**
359:18
**document (76)**
234:23;236:15,18,23,
25;271:19,23;273:12,21;
274:10;280:10;283:3;
284:3;290:19,21;292:12,
22;294:6,14,18,20;
295:5,25;296:6,15;
297:5;302:13,17,20;
305:4,9;308:10;309:10,
15;315:17;316:2,20;
322:22;323:13,15;325:7,
13,15;326:14,16,20;
327:2,9;328:2;329:25;
330:2;331:6;342:21;
385:20;389:17;390:9,
16;391:20,21,24;399:5,
16;405:19,19,23;406:10;
408:22;413:8;415:7;
416:7;420:22;424:23;
427:3,20;431:6;432:25
**documentation (1)**
392:16
**documents (42)**
233:5,6,8,10,14,17,19,
20,25;300:21;301:8;
303:20,25;319:4,9,13,
21;320:4,8,15,25;321:9,
16;323:23;324:8;
327:13,15,19,20;328:16;
329:9;332:21;343:14;
372:8,19;373:8,18;
379:23;380:9;383:8;
406:9;410:17
**done (6)**
246:12;248:6;292:6;
334:19;335:2;385:10
**doubts (2)**
335:25;336:2
**down (7)**
234:16;252:22,24;
280:24,25;369:4;426:2
**draft (10)**
234:22,25;235:6,14;

282:12,15,17;383:9,11;
409:6
**drafted (13)**
235:13;282:9,15;
297:5;383:8,11,16,17,
23,24,25;408:17,22
**drafting (4)**
408:15;409:21;410:4;
421:11
**drafts (8)**
407:19,22;408:4,8,9,
11,24;410:14
**Duane (1)**
411:14
**due (1)**
346:6
**duly (3)**
230:1,5;345:2
**during (4)**
279:16;281:22;
386:18,19

## E

**E&G (6)**
394:14,15,16,17,19,25
**eager (1)**
265:22
**easier (1)**
370:21
**easiest (2)**
323:12;370:24
**easy (3)**
384:17;385:5,7
**economic (3)**
427:9;428:8;429:22
**effect (4)**
296:14;298:11;
343:18;398:18
**effort (1)**
296:13
**efforts (2)**
311:10;323:7
**eight (1)**
404:23
**Either (8)**
257:7;287:23;333:13;
356:16;362:21;416:23;
417:23;433:25
**Electronic (1)**
407:21;410:14
**eligible (1)**
375:5
**else (26)**
285:23;306:14;
334:20,24;340:11,14;
353:8,10,16,16;354:11;
390:3,5;394:8;400:9,17;
406:8;417:10,15;426:22,
24;427:2;428:25;
429:23,24;430:16
**else's (3)**
285:8,12;353:15

**emotions (1)**
375:11
**end (10)**
239:5;260:20;284:9,
20,21,23;288:12;342:4,
5;415:7
**ended (1)**
386:8
**enforce (6)**
312:15;313:7,24;
314:11,11,12
**enforceability (12)**
316:9,18;317:18,20;
319:5,10,14,21;320:5,9;
323:24;324:9
**enforcement (2)**
313:12;325:5
**enforcing (2)**
312:21;313:3
**enjoy (1)**
375:4
**enough (3)**
243:18;420:21;428:10
**Enriquez (1)**
374:20
**enter (1)**
403:7
**entered (1)**
304:11
**entering (1)**
403:2
**entertain (1)**
245:13
**entire (1)**
435:4
**entity's (1)**
393:13
**enumerated (1)**
415:25
**envelope (1)**
302:6
**equally (4)**
377:14,18,25;397:5
**ERRATA (1)**
435:10
**escrow (2)**
366:8;367:7
**Especially (1)**
363:17
**establish (1)**
392:21
**estimate (2)**
384:8,11
**et (4)**
340:23;369:14;
413:19,19
**even (10)**
235:20;237:23;
275:18;276:23;277:3;
285:17;300:11;337:10;
366:2;367:5
**event (2)**
251:7;318:20

**events (1)**
358:22
**everybody (1)**
420:7
**everyone (1)**
419:9
**evidence (5)**
268:24;269:19;
332:24;338:2;347:20
**evidenced (1)**
379:22
**evidencing (1)**
402:5
**exact (1)**
284:6
**exactly (10)**
231:19;267:10;333:3;
343:11;352:17;389:15,
16;424:13,16,24
**EXAMINATION (1)**
230:8
**examined (1)**
230:6
**example (6)**
238:21;239:9;270:18;
319:12,25;342:17
**except (4)**
281:4;400:11;417:10;
435:8
**exchange (5)**
379:3,10;380:19;
382:5;392:22
**exclusively (2)**
352:23;353:4
**Excuse (11)**
260:14;265:16;
275:10;277:17;286:24;
347:12;350:3;362:5;
378:5;382:2;404:8
**executed (1)**
422:20
**exercise (1)**
398:23
**Exhibit (78)**
234:7,23;235:24,25;
236:19,21;237:4,5;
266:16,17;271:14,15;
279:23;280:6,18,18;
281:8;283:7;284:22;
285:12;292:7,11;
294:15;298:2,18,25;
299:9,16;302:14,20;
304:10;305:13;307:21;
312:18,19;314:21,24;
325:5;326:3,4,6,21;
327:8,9,12,16;328:6,17,
20,22;329:20;330:3;
339:3;341:15,24;361:3;
369:9,10,12;370:9,14;
372:9,20,25;373:18;
376:5,6;378:14;379:23;
380:9;385:21;386:16;
399:4,5;405:14,15;

407:3;415:22
**exhibits (5)**
231:5;232:11,13;
294:23;339:17
**ex-husband (4)**
256:6,7,10;258:10
**existing (1)**
416:24
**Expires (1)**
435:25
**explain (3)**
367:22;368:11;419:19
**explained (1)**
336:18
**explaining (1)**
375:9
**explore (1)**
257:6
**explored (1)**
318:16
**express (1)**
375:11
**extenso (1)**
253:25
**extent (7)**
233:13,20;364:16;
368:18;392:3,25;410:14

**F**

**fact (14)**
245:24;262:5;267:15;
268:20,24;269:19;
301:22;332:24;336:6,9;
338:2;351:11;354:23;
378:7
**fair (2)**
337:15;384:12
**faith (1)**
264:14
**familiar (11)**
322:14;323:14;327:3;
328:10;341:8,10;400:16,
19,20,23;405:24
**familiarize (1)**
280:4
**family (2)**
241:7;353:11
**Fang (4)**
267:6,14,23;400:13
**Fang's (1)**
287:15
**far (5)**
283:6;313:9;315:19;
407:9;429:9
**fast (1)**
323:4
**father (2)**
255:16;348:11
**favor (1)**
427:9
**February (6)**
324:7;401:19,24;

434:12,18;435:5
**feel (1)**
264:21
**fees (9)**
415:18,20;416:2;
417:2;418:2;419:23;
420:13;422:8;426:20
**few (1)**
405:3
**fight (2)**
242:16;355:25
**fighting (1)**
356:2
**fights (1)**
422:14
**figure (1)**
385:17
**file (3)**
302:14;303:14;359:9
**filed (11)**
339:10,19;349:20;
350:11;354:8;355:7;
358:19,19;359:18;
369:19;370:2
**files (20)**
291:9;299:21,22,23;
300:23;301:4,15;302:5,
8,21,22;303:5,6,13,17,
23;325:23;326:21,24;
327:4
**filing (4)**
351:25;352:2;353:23;
354:2
**final (2)**
351:8;386:15
**finances (2)**
258:11;361:21
**financial (4)**
258:13;259:25;260:2;
359:24
**Financially (1)**
361:19
**financing (4)**
245:8,11,16;246:4
**find (12)**
245:8;249:12;250:3,8;
264:23;270:15;284:5;
306:9,22;307:18;
318:19;429:9
**fine (4)**
281:6;337:12;344:18;
425:3
**finish (8)**
244:25;275:10;
314:10;403:5,14;404:19,
20;420:24
**finished (1)**
430:5
**finishes (2)**
230:23;241:10
**firm (5)**
302:5;308:18;364:4;
409:20;410:6

**first (27)**
237:8;249:4,5;253:15;
258:3;271:22;272:18;
273:10;284:10;291:14;
308:23;315:16;322:6,
23;340:25;343:21;
344:14;360:10;362:7;
364:20,20;407:16,20;
415:22;419:13;424:11;
432:10
**fit (1)**
429:20
**five (2)**
300:11;322:4
**five-minute (2)**
386:11;405:7
**fixed (2)**
299:2;380:14
**fixes (1)**
299:8
**focus (1)**
370:21
**follow (4)**
242:23;331:20;
348:11;366:13
**followed (2)**
334:7,13
**follows (2)**
230:6;263:3
**foreclose (1)**
266:25
**foreclosing (2)**
269:17;271:8
**foreclosure (10)**
330:24;333:12,13,14;
334:3;335:4,9,14,24;
337:15
**form (23)**
267:17;269:5,19;
291:14;299:11;302:23;
303:7;313:17;316:24;
328:19;330:22;332:2;
344:3,15,18;347:11,13,
21;349:6;352:8;357:5;
398:21;409:24
**formal (1)**
359:10
**forth (2)**
278:10;289:19
**forward (1)**
264:23
**found (3)**
305:15;307:6;351:9
**foundation (1)**
249:11
**four (1)**
434:13
**frankly (1)**
255:22
**fraud (4)**
272:10,11,12,19
**fraudulent (2)**
278:9,24

**fresh (6)**
247:25;249:9;350:7;
351:23;363:17;405:10
**friends (1)**
246:6
**front (1)**
354:24
**frustrated (1)**
404:19
**fulfilled (1)**
334:10
**full (2)**
358:2,7
**fully (2)**
413:17;414:4
**further (3)**
230:6;271:16;272:6
**future (1)**
261:9

**G**

**game (1)**
314:6
**gave (15)**
290:20;301:5;372:7;
380:25;382:21;390:18;
391:12,19,24;392:17,18;
426:10;427:25;429:25;
430:21
**general (4)**
250:24;281:13;
288:15;407:11
**generally (1)**
251:2
**generous (1)**
428:10
**GENGER (382)**
230:3,10,13;231:1,4;
232:1;233:1,14;234:1,6,
7,22,22;235:1;236:1,23,
25;237:1,5,7,20;238:1;
241:9;239:19;240:1,23;
241:1,9;242:1;243:1,2;
244:1;245:1;246:1,9;
247:1,11;248:1,9;249:1;
250:1,14,18;251:1;
252:1,22;253:1,8;254:1;
255:1;256:1,10,24;
257:1,14,22,23;258:1;
259:1,14,18,20;260:1;
261:1,13,19;262:1;
263:1,4,11;264:1;265:1,
14;266:1,24;267:1;
268:1;269:1;270:1;
271:1,18,20,25;272:1,3,
9,19,20;273:1;274:1,13;
275:1;276:1,16;277:1,
19;278:1,13,15,20,23;
279:1;280:1,2,17;281:1,
17,19;282:1,9,12;283:1;
284:1;285:1;286:1;
287:1,10;288:1,2,10,11,

ORLY GENGER VS.
DALIA GENGER

DALIA GENGER
February 7, 2013

16,17;289:1,5,18;290:1,
18,20;291:1;292:1,11;
293:1,14;294:1,2;295:1,
8,17,22,24;296:1,5,18;
297:1,7,13;298:1,6,18;
299:1;300:1,16;301:1;
302:1;303:1;304:1,8,13;
305:1,12,14,23;306:1,
16,19,21;307:1;308:1,
25;309:1;310:1,3;311:1;
312:1,3,24,24;313:1,4,
13;314:1,25,25;315:1,4;
316:1,15;317:1;318:1,
21,23;319:1,4,20;320:1,
13,24;321:1,24;322:1;
323:1;324:1;325:1,4;
326:1,13;327:1,18;
328:1;329:1,16,19;
330:1;331:1,8;332:1;
333:1;334:1;335:1;
336:1;337:1,19;338:1;
339:1,7;340:1,20;341:1,
5,8,20;342:1,17,24;
343:1,2,3,15;344:1,24;
345:1;346:1,4,9;347:1;
348:1;349:1,10;350:1;
351:1,9;352:1;353:1,11;
354:1;355:1;356:1;
357:1;358:1;359:1,17,
19;360:1;361:1;362:1;
363:1;364:1;365:1,12;
366:1;367:1;368:1,19,
20;369:1,17,24;370:1,
18;371:1,15;372:1,22;
373:1;374:1;375:1;
376:1,15,16,20;377:1;
378:1;379:1;380:1;
381:1;382:1,16;383:1;
384:1;385:1;386:1;
387:1,10;388:1,19;
389:1;390:1;391:1;
392:1,4;393:1;394:1;
395:1;396:1,11;397:1;
398:1;399:1;400:1,3;
401:1;402:1,15,16,20;
403:1;404:1,13;405:1,
18,22;406:1;407:1;
408:1,14;409:1;410:1;
411:1;412:1;413:1,14;
414:1,21;415:1;416:1;
417:1,4,13,14;418:1;
419:1;420:1;421:1;
422:1;423:1;424:1;
425:1;426:1,19;427:1,
10,15,22;428:1,2,3;
429:1,13;430:1;431:1;
432:1,12,18,25;433:1,
19;434:1,17;435:3,17
Genger's (6)
260:15;287:16;
293:21;340:25;402:12;
434:11
given (6)

251:16;269:24;
282:22;290:23;351:25;
432:9
gives (1)
390:2
giving (12)
252:17;294:5;377:2;
382:7;427:22;428:4,6,
14,19,25;429:12;433:6
glad (1)
364:3
goes (4)
253:24;287:6;395:24;
396:9
gold (1)
392:14
good (13)
264:14;278:11;
338:20;347:8;352:19;
366:20,22;367:17;
415:17;422:7,13;
426:21;427:10
GP (1)
293:18
GRIVER (308)
230:9;231:3;233:13,
18,23;234:5,21;235:7,
15;240:7;241:10,13,19;
242:10;244:16;245:6,
23;246:19,25;248:3,8,
16;249:10,16,20,22;
250:5,7,8,13;251:13,25;
252:5,8,21;253:7,16;
254:2,19,25;255:5,25;
257:21,25;258:7;259:9;
260:18;261:12;262:3,15,
18,20;263:17;264:2,10;
265:9,19;266:15,22;
267:18,21;269:12;270:2,
10;271:2,12;272:8,12,
23,25;273:9;274:3;
276:2;278:17,19;279:19,
21,25;281:4,7;282:8;
283:4,12;286:15,19;
287:5,9,21;288:9;289:2,
25;291:19;292:9;293:8;
294:22;295:7,15,16,21;
296:22,25;297:6,25;
298:24;299:6,15;
300:13;301:23;302:12,
19;303:4,11;304:3,7;
305:2,21;307:16;309:11,
24;310:18;311:25;
313:22;314:4,7,23;
315:3,8;316:23,25;
317:3,9,14;318:4,12,14;
320:23;321:8,14,19,23;
324:14;325:2,3,22;
326:2,6,12,24;327:7,11,
24;328:21,24;329:4,7;
330:16;331:14,23;
333:5;335:19;338:3,5,
10,13,25;339:6;340:18;

341:3,13,19;342:23;
343:23;344:6,16,21,23;
345:8,22;346:3,19,22;
347:15,25;348:15;
349:8;350:3,4,9,10,19;
351:17;352:11;356:24;
357:14;358:10,25;
359:11,16;360:14,23;
361:24;362:9,13,15,23;
363:19;364:16,22;365:2,
10;368:17;369:8,12,16,
23;370:7,12;371:7,11,
18;372:6;374:10;
375:13;376:22;379:17,
21;381:13;382:15;
383:20;385:9,24;386:12,
14,21,23;387:4,8,9;
388:16;390:17,25;
391:16;392:3,7,12;
394:17,20;395:19,22;
396:8,22;397:14;398:11,
17;399:2,7,14;400:2,21;
401:3;402:3,7,9,14,25;
403:22;404:12,16,23;
405:3,8,14,17;406:4,22;
407:4,7,13,18,24;408:2,
6,13;409:13,14,23,25;
410:13,19,21;411:25;
412:23;414:3,7,15;
415:2,13;418:25;
422:25;424:8,18;425:9;
426:7,13;430:12;434:3,
5,9
Group (9)
270:17;277:25;278:2;
304:12;306:13,18;
307:4;353:13;401:10
grunt (1)
339:2
guess (7)
284:14;288:8;300:15;
360:5;374:9;376:25;
400:12
guy (2)
260:6,8

H

Half (3)
421:7;429:17;434:12
hand (4)
262:6;408:15;409:20,
22
hang (2)
286:10,11
happen (5)
257:12,13;260:8;
314:18;332:8
happened (16)
240:21;242:2;257:3;
259:15;268:12;295:18;
300:11;314:17;334:3;
358:3,21;372:12;

377:17;381:15;401:24;
424:15
happening (1)
307:2
happens (1)
425:2
happy (2)
305:24;306:5
harass (1)
364:25
harassing (4)
252:20;297:9,12;
314:9
hard (4)
305:19;309:18;
399:13;416:9
hardly (1)
365:25
harm (3)
257:23;258:25;275:21
harmed (1)
259:20
hear (1)
268:5
heart (1)
395:25
help (3)
355:18;359:24;375:11
helpful (2)
253:2,3
hereby (4)
413:16;414:4;433:2;
435:3
herein (1)
230:4
hereof (2)
435:7,10
Here's (1)
372:22
herself (3)
347:4,5;355:21
higher (1)
259:8
history (1)
397:25
holder (1)
346:6
home (1)
381:5
honest (1)
301:11
honestly (1)
301:25
honesty (2)
260:15;338:20
honor (1)
375:6
honored (1)
314:19
hope (1)
404:7
hoping (3)
312:4;355:18;403:5

hours (2)
233:3;434:13
husband (3)
256:3;4;385:7
hypothetical (7)
256:22;257:9,10;
286:13,14;287:3;309:21
Hypothetically (1)
256:21

I

idea (58)
236:24;244:23;245:4;
270:20;285:8,9,12,13,
14,16,18,19,21;286:4,17,
18;287:11,12,14,15,16,
17;291:23;317:21;
322:25;340:2,4,6,15;
341:4;348:21,21,22;
355:24;363:12,24;
365:18;367:13;368:14;
402:15,17;403:6,11,12,
12,12,13,16,18,19;404:4,
6;410:25;420:12,14;
422:8,13;425:13
ideas (1)
410:8
identified (1)
280:9
identify (4)
232:3,8;238:24;
327:20
ignore (2)
317:11,16
imagine (1)
382:12
immediately (2)
382:18,21
impact (1)
276:5
important (4)
243:18;377:16,20;
416:6
improper (8)
330:24;333:1;335:5,
7,10,14;337:18;357:13
improperly (4)
330:23;331:12;332:3;
348:12
Inc (4)
288:17;309:16;326:8;
369:14
incentive (1)
404:11
included (2)
320:2;327:14
includes (2)
282:13;301:3
Including (8)
247:9;280:23;295:13;
351:10;368:24;371:21;
413:7,18

ORLY GENGER VS.
DALIA GENGER

DALIA GENGER
February 7, 2013

incorrect (1)
424:20
indicate (1)
291:9
indicated (2)
266:11;435:9
Indicating (1)
287:19
individual (6)
366:25;368:3,4,6,8;
415:16
individually (5)
272:20;361:7,12,20;
362:2
inflection (1)
266:11
inform (2)
240:16,20
information (11)
330:22;331:10;332:2;
333:11;345:23;358:11;
359:3,4;378:2,5,8
informing (1)
326:9
initiate (1)
364:5
initiative (1)
366:15
in-person (1)
411:2
input (4)
353:8,10;354:16;
359:4
installments (1)
388:5
Instead (2)
302:3;403:10
instructed (7)
274:15;277:6;286:2;
306:4;337:5,7,16
instructing (1)
337:13
instruction (1)
362:14
interactions (1)
272:16
interest (27)
238:6,10,18;240:13,
23;264:15,17,18;289:17;
296:18;414:23;426:10;
427:9;431:9,13,14,17,
19;432:5,9,13,19;433:3,
6,7,19,21
interested (3)
241:6;243:5,12
interests (2)
288:11;329:16
interpleader (17)
363:21,25;364:7,13;
365:5,13,17,22,25;
366:2;367:6;368:12,22;
369:10,13;425:11,14
interrogatories (1)

371:3
interrogatory (5)
371:4,10,14,16;372:7
interrupt (1)
247:23
interruption (1)
409:12
intervene (1)
347:6
into (11)
265:3;304:11;371:15;
395:10,18,24;396:9;
402:12;403:2,7;426:16
investigate (1)
335:6;337:17
investigated (1)
336:2
investigating (2)
298:5;336:24
investigation (3)
333:7,8;335:3
Investment (4)
288:16;309:16;326:8;
369:14
Investments (2)
312:20;316:13
Investors (1)
351:9
involve (1)
404:24
involved (8)
255:23;256:11,24;
258:11,13;411:3,5;
418:12
involvement (2)
258:4;259:25
involving (3)
306:17,18;368:21
irrevocably (2)
413:17;414:4
issue (3)
323:20;364:2;406:5
issued (5)
277:21;279:8;351:8;
382:7,10
issuing (1)
409:6

J

January (9)
279:13;324:4;379:2;
387:23;388:17,22,24;
389:5,13
jewelry (1)
392:14
job (1)
301:12
John (5)
420:19;421:16,16,17;
422:2
jokes (1)
278:14

joking (3)
278:18,20,21
judge (6)
274:19;277:11;287:4,
6;387:25;388:3
judgment (2)
351:8;367:17
Justice (3)
277:2,16,21

K

keep (2)
299:21;391:4
kept (2)
391:8,13
key (1)
405:8
kidding (1)
422:3
kids (1)
377:24
kind (14)
246:4;264:24;275:12;
302:10;366:6;377:2;
385:5,16;390:10;392:16,
18,21;403:4;410:11
knew (15)
267:13;274:24;307:3;
323:19;331:18,18,20;
334:14;350:21,23;
351:12;366:6;367:2;
375:2,3
knowing (3)
268:15;277:4;381:14
knowledge (13)
234:24;298:25;
330:22;331:10;332:2;
333:11;354:4,7;365:15;
369:18,25;397:15;
400:10
known (2)
307:10;378:14
knows (3)
243:10;269:25;301:20
Kortmansky (17)
287:22,23;300:7,8,14,
20,22;301:4,7,15;302:5;
303:19,23;325:23;
326:22,25;327:5
Kortmansky's (3)
302:21;303:6,17

L

laboring (1)
408:15
language (3)
284:19,23;288:12
last (10)
251:25;253:7;284:10,
12;321:21;329:22;
330:9;386:21;389:4;

399:7
lasted (1)
279:13
late (1)
355:3
later (3)
343:20;366:16;380:14
law (3)
344:22;409:20;410:6
lawsuit (8)
340:2;341:5;343:16;
353:17;423:12;424:3,4;
425:12
lawsuits (1)
423:11
lawyer (62)
235:13,16,18,21,22;
236:3,13;239:8;247:10;
248:10,17;250:25;
252:19;253:17;276:17;
287:18;301:5,11;310:11,
13,15;311:5;316:5;
317:16;321:22;325:10,
12,15,18,21;337:17;
340:12,13;345:15;348:9,
22;351:5;352:10,23;
353:11;354:14;366:11;
367:19;383:10,11,12,16,
22,23,24,25;384:2,2;
408:19;409:20;410:2,6,
9;412:2,4;421:18,21
lawyers (23)
236:14;239:8,12;
282:14;301:25;310:7,8;
329:15;368:15;408:19,
21;409:5,8,18;410:7;
412:3;420:22;421:19,
23;422:12;425:5;
426:21,23
lawyer's (6)
254:5;287:17;352:15;
403:13;411:15,17
laying (1)
249:11
layperson (2)
323:12;415:8
Leah (4)
234:11;267:6,14,23
left (2)
272:16,22
legal (13)
235:14;242:21;
243:23,25;244:13;
248:24;291:15;331:19;
347:16,24;366:6;415:7;
426:20
LEINBACH (2)
358:18,22
less (4)
246:11,13;260:5;
270:19
letter (12)
270:14,16;304:11,14;

370:9,14,15;379:24,25;
380:12;387:14;388:18
letting (4)
269:16;276:24;277:3;
377:6
liability (1)
412:21
liable (3)
417:2,25;418:15
life (1)
365:23
limit (1)
343:25
limited (20)
281:10,11,18;290:9;
291:3;292:13,14;304:9;
312:21,23;320:3;326:7;
343:14;368:24;390:7,8;
400:12;431:9,13;433:14
line (11)
237:11;239:17;
253:18,19;255:3,12,19;
269:20;284:10;293:20;
324:13
lines (5)
255:2,6;263:3;264:6;
426:2
list (1)
369:3
Listen (6)
297:23;304:19;
305:22;355:4;362:21;
430:7
litigation (4)
271:24;295:9;333:21;
338:9
little (3)
262:9;308:13;400:15
lived (1)
260:9
LLC (1)
293:18
LLP (1)
369:14
long (8)
233:2;369:3;395:19;
410:22,24;416:8;421:2,5
longer (4)
374:6,12;396:24;
404:21
look (43)
234:6;235:24;236:21;
237:4,7;271:13;273:2,
16;280:18;284:9,22;
295:2;298:18;305:12;
307:21;312:15,18,18;
316:7;327:3,19,22;
329:20;330:9,18;342:3;
370:23,25;371:4,10;
376:5,7;378:14;379:8;
387:11;406:15;413:2;
415:17;425:16;426:25;
428:7;430:20,25

ORLY GENGER VS.
DALIA GENGER

**DALIA GENGER**
February 7, 2013

**looked (5)**
246:8;328:10;334:10;
407:3;431:2
**looking (7)**
283:19;284:3;321:15,
16;351:23;388:19;
425:20
**looks (1)**
405:24
**lose (6)**
420:5;423:22,23,24,
25;424:4
**loses (3)**
418:20,23,23
**losing (2)**
396:19,20
**lot (1)**
341:9
**lower (3)**
349:16,17,18
**LP (9)**
316:8,12,16,17;
396:13;397:16,23;
398:4;414:16
**lunch (1)**
324:13

**M**

**Madam (1)**
264:2
**mail (1)**
268:18
**maintain (1)**
245:17
**major (1)**
409:6
**makes (1)**
253:10
**making (4)**
323:2;4;367:15;409:2
**Manhattan (3)**
360:2,3;404:24
**manner (1)**
235:14
**many (8)**
240:19;270:8;356:13;
370:4;375:4;421:13;
424:15,22
**March (4)**
277:23;279:8,13;
376:7
**Marisa (1)**
232:22
**mark (3)**
327:8;341:13;399:4
**marked (41)**
234:23;236:18;
266:16,18;271:14;
279:22,24;283:4;
285:11;292:8,10;294:6,
15;302:13,20;304:10;
305:13;314:22,24;326:2,

5,20;327:10,15;339:5;
341:16;361:3;369:8,11;
370:7,11,13,19;371:2;
372:9,19,25;373:18;
379:23;399:6;405:16
**material (1)**
249:9
**matter (5)**
260:6;286:21;356:8;
358:17;435:6
**may (8)**
307:10,14,14;319:13;
327:14;386:16;426:6;
430:8
**maybe (11)**
231:17;232:15;
277:14;325:10;370:20;
384:13;411:16,18;
428:9;429:25;433:9
**mean (71)**
231:10,17;232:15;
233:17;237:14;238:9,
12;239:9;240:20;
242:24;243:9;252:14,15,
20;256:5;264:17;268:5;
270:8;273:19;281:13;
283:15,16;284:2;
285:14;286:22;302:10;
303:3,19;307:24;308:4,
18;309:23;311:17;
314:10;328:20;331:18;
343:13;345:6;347:7;
353:5,19;363:13;
365:20;366:11,18;
375:19;376:11;377:8;
380:25;382:6,13;
385:23;386:2;389:10;
390:5,19;392:10,14,15,
22;396:17;399:18;
400:11,11;415:23,25;
416:19;425:6;429:15;
431:7,8
**meaning (1)**
296:14
**means (10)**
242:14,16;268:18;
295:8,12;330:5;351:3;
377:2;396:25;434:13
**meant (3)**
276:10;345:10;431:10
**meantime (2)**
250:10;427:18
**mediation (1)**
385:6
**meet (6)**
232:17,20,24;233:2;
322:16;334:9
**meeting (12)**
308:17,22;309:9;
310:11,13;311:6,11;
312:9;420:25;422:16,17,
19
**MEISTER (276)**

230:23;232:17;233:4,
16,22,24;234:12,15;
235:3,10;239:24;240:2;
241:8;242:6;244:12,25;
245:21;246:16,22;
247:13,19,22;248:12,23;
249:8,15,18,21;250:2,6,
11;251:10;252:11;
253:14;254:22;255:4,7,
12,18;257:16,24;259:3;
260:17;261:11,21;
262:13,18;263:14;
264:7;265:8,16;266:8,
19;267:17;268:23;
269:4,18;270:5,24;
271:10,17,22;272:13,15;
273:6,25;275:5,22;
278:14;280:22;281:3,
25;282:5;283:6;286:12,
19,24;287:7,20;288:4,
20;289:21;291:13;
293:6;294:21;295:4,12,
19;296:19,24;297:3,19,
22;298:22;299:5,11;
300:6;301:8,9,12,14,16,
19;302:2,18,23;303:7;
304:16,19;305:17;
307:12;309:2,21;
310:16;311:18,22;
313:14,17;314:2,5;
315:6;316:19,24;317:7,
11,24;318:10;320:16,20;
321:2,11;322:16;
324:12;325:18,25;
326:11;327:2,13,23;
328:19,22,25;330:15;
332:23;335:16;337:25;
338:8,22,25;342:19;
343:21;344:11,19;
345:18,22;346:18;
347:11,19;348:7;349:6;
350:2,7,16;351:13;
352:8,14,16,24;353:6,
25;354:4;355:17;
356:20;357:4,8,12,20;
358:10,14;359:8;360:9,
12,21;361:16;362:5,10,
18;363:15,21;364:11,16,
19,24;365:4,11,16;
366:7,23;367:23,25;
368:6,12,17,19;369:6,
13,20;370:2,5;371:5,17;
374:7;375:10;376:17;
379:14;381:8;382:14;
383:18;385:2,21;386:10,
20;388:9,12;390:12,20,
24;391:9;392:10;
394:16;395:17,21;396:3,
16;397:8,12;398:8,20;
399:24;400:18;402:7,
24;403:21;404:8,21;
405:2,6,9,25;406:18,25;
407:5,9,16;408:6,10,23;

409:22,24;410:13;
411:20;412:15,22;
413:24;414:6,9,25;
415:4;418:18,20;
422:24;424:6;425:7,11;
426:5,11
**Meister's (4)**
303:23;322:13;
356:18;403:16
**member (1)**
353:11
**memo (3)**
314:21,24;315:5
**memorandum (7)**
315:20;316:11;
317:19;322:3,4;326:5,7
**memorialized (1)**
380:7
**memorializing (3)**
373:19;390:10;393:2
**memory (2)**
282:20;354:12
**mention (1)**
237:24
**mentioned (1)**
342:14
**midnight (1)**
404:10
**might (25)**
233:12;238:17,22;
239:8;241:6;243:5;
245:8;251:12;256:15;
257:13;265:14;284:25;
285:23,23;319:5;320:4,
8;332:14;337:3;340:7;
360:5;364:4;383:22;
384:20;404:14
**million (13)**
246:12;261:8;372:5;
373:21;375:17;379:11;
382:5;384:7;385:17,23;
429:14,15,17
**millionaire (1)**
266:4
**millionaires (1)**
266:7
**mind (3)**
241:22;243:4;264:16
**mine (1)**
285:23
**minute (9)**
247:15,15,16;249:2;
250:12;262:14,19;
344:12;424:6
**minutes (3)**
263:21;300:12;322:5
**misanswered (1)**
232:4
**Mischaracterization (1)**
288:21
**mischaracterize (2)**
257:20;414:10
**mischaracterizes (6)**

240:4;275:23;314:3;
344:20;347:20;349:7
**mischaracterizing (2)**
272:2;316:21
**misrepresenting (1)**
415:7
**missed (1)**
430:8
**misspoke (1)**
267:18
**mistake (1)**
366:14
**mistakes (1)**
231:16
**mixing (1)**
401:12
**moment (6)**
277:15;345:14,16;
412:11,12;429:25
**Mommy (1)**
243:12
**Monday (2)**
434:11,18
**monetary (1)**
433:18
**money (24)**
246:9;252:15,16;
258:22,24;259:18;
261:19;263:12;265:4,6,
15;363:13,14;366:17;
387:20;389:21,21,23;
390:2,6;392:11;420:4,5,
8
**moneys (1)**
260:16
**month (7)**
387:16,21;388:5,22,
24;389:4,13
**monthly (2)**
388:3;393:4
**more (22)**
231:24;246:13;
258:22,24;259:18;260:5,
5;261:19;263:12;265:4,
6,15;317:8;346:5;
370:21;380:20;396:20;
397:3;401:22;406:15;
421:7;433:11
**morning (1)**
322:7
**Morris' (1)**
411:14
**most (1)**
248:3
**mother (5)**
243:10;269:25;270:3,
21;271:6
**motion (2)**
271:16;272:18
**motions (1)**
414:19
**motivations (1)**
347:7

mouth (3)
290:21;412:13,13
move (6)
248:24;249:9;310:16;
317:6,9;366:7
Mrs (88)
230:10;231:4;233:14;
234:6,22;237:7;241:9;
243:2;248:9;250:14,18;
252:22;253:8;257:22;
259:14;261:13;263:4;
271:18;272:3,9,19;
276:16;278:13,15,20,23;
280:2,17;281:17;282:9;
287:10;288:10;289:5;
292:11;295:8,17,22,24;
297:7,13;298:18;
300:16;304:8;305:12,14,
23;306:16;315:4;
320:13,24;321:24;
325:4;326:13;327:18;
329:19;331:8;337:19;
339:7;340:20,25;341:5,
20;342:24;343:15;
344:24;346:4,9;349:10;
365:12;369:17,24;
370:18;371:15;372:22;
382:16;387:10;388:19;
392:4;400:3;402:12,15;
404:13;405:18,22;
408:14;417:4;432:25;
434:11
much (8)
234:17;246:8;248:5;
260:5;287:24;385:8;
390:6;404:21
mutual (3)
409:10;413:3,5
myself (5)
278:22;280:4;359:23;
366:9;375:5

## N

naive (1)
261:23
name (6)
237:24;264:20;
292:23;293:11;360:3;
403:10
names (1)
305:20
necessary (1)
366:10
necessity (2)
270:16;389:20
need (12)
232:8;282:25;317:7;
351:19;389:16,19,20,21;
390:2,6;404:12,14
needed (2)
355:21;359:23
negative (6)

261:10,17;263:9;
264:9,12;265:13
negotiations (2)
385:19;412:17
new (38)
233:14,17;244:3;
324:12;341:15,24;
344:17;345:6;346:2,4,
18,19,20;347:14;348:20;
351:19;352:2,6,22;
356:2,5,8,10,11,17,25;
357:2,19;361:2,6;
362:25;363:22;369:20;
388:12;389:10;416:23;
417:24;423:12
newspaper (1)
334:16
newspapers (1)
265:23
next (5)
287:19;320:22;
363:16;387:15,18
nightmare (1)
403:5
nobody (2)
332:5;390:3
Nobody's (1)
366:17
none (2)
272:21;383:4
normal (3)
268:13,16;269:14
Notary (1)
435:24
note (53)
253:14;263:14;
266:25;271:22;272:6,8;
273:18,18,19,20;274:14;
294:17,17;312:15,21;
313:3,7,12,25;314:12;
316:10,18;317:18,20;
318:9;319:6,10,14,22;
320:5,9;323:19,24;
324:9;331:21;332:6;
358:14;360:2;370:10,
15;372:5;378:24;
379:11,25;380:13;
399:18,18,19,23;402:16;
406:10,19;429:15
noted (2)
272:21;316:5
notice (9)
231:16;274:13;325:5,
24;326:7;332:7,11,13;
334:16
noticed (4)
330:24;331:12;332:4,
5
notified (1)
274:18
notify (2)
247:6;304:24
November (8)

271:17;292:15,16,16,
24;293:2;300:2,18
number (12)
269:25;284:6,7;
323:15;371:12,14,16,23;
376:20;384:10;395:25;
425:20
numbers (1)
294:24
numerous (1)
270:6

## O

oath (4)
279:4;338:15;435:5,
12
object (9)
240:4;247:24;267:17;
343:21;344:11,14;
347:11,12;398:20
Objection (83)
235:3,10;240:3;242:6;
244:12;246:16,22;
247:13;248:6,12,23;
251:10;252:11;257:16,
24;259:3;260:17;
261:11,21;263:14;
264:7;265:8,16;268:23;
269:4,18,19,20;270:5,
24;271:10;275:22;
286:12,25;287:20;288:4,
20;289:21;291:13,14;
293:6;296:24;299:5,11;
302:23;303:7;307:12;
309:21;310:16;313:14;
314:2;316:19,24;
318:10;321:2,11;
328:19;332:23;337:25;
338:8;344:3,12,18;
347:19,21;348:7;349:6;
350:2,16;352:8;356:20,
21;357:5,5,9;379:14;
383:18;390:13;409:24;
412:22;414:25;415:4;
426:11
objections (4)
248:5;344:2,16,17
objectively (1)
264:22
objectivity (1)
262:10
obtain (2)
331:10;333:11
obtaining (2)
240:23;241:6
obvious (1)
264:19
obviously (7)
319:25;358:20;
360:25;377:19,24;
400:12;411:19
occur (2)

245:7;255:17
occurred (2)
245:10;331:12
October (10)
339:8,9;342:5,7;
402:22;418:5;422:17;
423:2;425:15;433:12
of_ (1)
435:13
off (3)
302:2;324:14;434:6
offer (1)
435:11
office (1)
411:12,15,16,17
officers (1)
413:18
offices (1)
411:14
OG (20)
425:23;426:9,15,18;
427:6,12,14,25;428:13,
19,24;429:12;430:21,25;
431:5,7,12;433:2,5,14
old (1)
247:20
once (2)
287:8;422:14
One (39)
236:2;239:8,12;
242:17,19;257:4;
263:22;272:9;299:9;
303:2;308:8,9;319:18,
18,19,19;333:20;353:16,
20;360:5;361:9;372:23,
24;383:6;387:11;
406:15,22;407:16;
410:9;412:3,11;413:7,
17;414:5,6;420:22;
421:7,18;426:23
only (12)
236:14,17;261:23;
283:7;298:21;318:11;
328:7;340:12;347:7;
360:15;380:18;415:15
open (1)
364:2
opinion (2)
334:5,6
opportunity (1)
282:22
opposed (3)
345:25;352:22;356:2;
357:19;368:3
options (3)
253:20;254:3,6;257:6
order (26)
231:25;242:22;
243:21;245:8,16;
249:12;274:22;275:3,7,
11;277:3,18,21;279:7;
281:23,24;297:17;
303:24;334:9;343:11;

347:2;351:8;409:19;
426:16;427:6,16
original (1)
231:5
Orly (111)
237:11,21;238:2;
239:4,21;241:24,25;
242:5;243:5,20;244:20;
245:8;246:9;247:11;
255:15;256:18;257:23;
258:15;259:20;265:2,2;
266:25;267:5,15,20,24;
268:8,11;269:13,23;
271:20,25;274:13,19;
278:6;281:19;288:2,11;
289:18;294:2;296:5,18;
298:6;304:13;312:3,24;
313:4;329:16;333:21;
338:16,18;343:2,17;
347:17;348:4,10;349:2,
24;351:11,24;352:18;
354:8,22,23;355:11,12;
359:17,19;360:8;361:8;
367:12,18;368:10,13,20;
376:14;377:14;397:4;
398:18,24;402:16,20;
416:18,19,20,23;417:7,
11,13,14,15,17,21,22,25;
418:7;419:12,22,24;
422:9;424:3;426:19;
427:10,15,21;428:2,3;
429:13;432:12,18;
433:19
Orly's (23)
260:2;262:6;264:15,
24;267:14,22;293:19;
312:17;313:19,21;
314:12;341:11;347:3;
348:13;355:18;360:19;
375:4,6;376:11;422:15;
423:18,20;424:3
Otherwise (5)
230:25;276:10;404:9;
407:21;410:15
out (9)
249:12;262:24;
305:15;306:9,22;307:6,
19;357:9;430:2
outside (1)
405:10
over (28)
231:20;237:16,16;
242:3;247:14;264:18,18,
19;269:20,21,21;282:7;
302:7,15;327:22;347:4,
5;365:7;380:5;381:4;
384:19;387:15,18;391:2,
23;392:9;406:15;411:3
overturned (1)
354:21
owe (1)
390:8
owes (1)

ORLY GENGER VS.
DALIA GENGER

DALIA GENGER
February 7, 2013

363:14
own (9)
  366:14;367:19;398:4;
  401:4,6,15,17,19;432:7
owned (12)
  349:3,24;350:15;
  351:11;352:5;355:12;
  391:18;397:16,23;400:9,
  13;401:7
owner (1)
  365:9
ownership (3)
  377:12,12;396:25
owning (5)
  350:22,23;351:2
owns (3)
  347:18;348:5;420:5

**P**

package (2)
  327:10,20
page (23)
  237:8,11;253:16;
  254:20,24;255:2;264:5;
  273:6;281:13;283:25;
  284:4;292:19;301:22,
  22;329:22;330:9;376:7;
  406:10;408:12;413:2;
  425:20;430:23;435:6
pages (4)
  254:21;307:25;308:4,
  7
paid (17)
  259:18;260:5;261:5,6,
  8;262:8;265:4,15;332:5;
  360:7;361:23;362:19,
  20;379:18,20;387:14;
  426:21
paper (3)
  316:5;382:6,10
papers (6)
  322:10,11;370:4;
  392:19;402:23;421:14
paragraph (37)
  273:2,3,3,16;280:16,
  16;281:12;283:20,20,23;
  288:13;312:18;316:7;
  317:18;322:3;323:2,6;
  330:18,21;331:4;
  351:18;376:5,7,23;
  413:2,5;415:17,21,24;
  416:3,13;417:3;418:4;
  425:16;426:9;428:5;
  430:20
Parnes (4)
  235:16;314:25;
  316:16;327:14
part (9)
  266:9;273:8;344:15;
  381:17;386:25;391:3;
  400:25;403:24;413:11
participants (1)

420:3
participate (2)
  243:13;266:5
participated (1)
  410:3
participation (1)
  258:16
particular (2)
  316:2;428:5
particularly (1)
  273:17
parties (10)
  409:7;410:12;413:16,
  25;414:3;418:12;419:7;
  422:12;434:10,16
partner (5)
  281:19;288:16;
  312:22;320:3;433:14
partners (3)
  281:13;312:23;316:8
partnership (12)
  280:19;281:10,11,18;
  290:9;291:4;292:13,14;
  304:9;326:8;431:9,13
party (5)
  385:15,16;416:14,16,
  17
patience (1)
  259:21
pay (10)
  252:19;253:9;260:16;
  360:13;361:20;363:6;
  364:4,10;388:14;423:22
paying (16)
  261:19;263:12;
  359:17,19,22;360:15;
  361:4,15;362:24;
  366:16;378:23;387:20;
  388:5,6,23;419:23
payments (3)
  379:12;393:2,4
pays (4)
  361:10,21;363:6,7
peace (1)
  403:8
Pedowitz (13)
  363:20;364:11;
  365:11,15;366:7;367:23,
  25;368:5,12,18;369:13;
  370:2;425:10
pending (3)
  371:5;399:24;407:17
people (6)
  239:9;277:4;403:8,14;
  420:10;428:22
per (1)
  309:10
percent (6)
  381:4;396:14;397:16,
  17,24;398:4
percentage (3)
  284:14,16;396:25
perhaps (3)

245:7;262:12,16
period (2)
  324:7;330:25
permissible (1)
  363:17
permission (3)
  292:21;294:5,12
person (12)
  231:19;237:19;
  238:17,24;256:12;
  258:18;268:13,16;
  269:14;309:17;353:20;
  363:5
personally (10)
  325:14;412:5,6,9,16;
  413:11,12,14,22;415:12
petition (5)
  271:16;272:4,4;274:7,
  9
petitioner (1)
  376:15
pg (1)
  263:2
phone (11)
  243:11,19;266:6;
  268:17;269:24;270:22;
  271:7;287:4,6;365:24;
  411:3
physical (1)
  308:17
physically (2)
  308:19,21
pick (3)
  243:18;322:18;365:24
picked (2)
  243:11;271:7
pile (1)
  322:10
place (9)
  231:4;281:20;307:7,8,
  11;358:23;374:2;
  401:23;421:3
places (1)
  303:24
plaintiff's (1)
  371:3
play (1)
  314:6
plead (1)
  358:22
please (45)
  234:6;235:24;237:7;
  241:9,14;247:19,22;
  252:5;254:21;258:2,5,5,
  8;259:23;262:4,14,19,
  23,24;264:3;265:11;
  266:14;271:14;297:22;
  298:22;304:17;305:12,
  18;306:7;307:21;309:3;
  310:21;324:13;328:3;
  335:16;344:7;349:11;
  351:14;355:4;357:9;
  359:13;371:4;398:12;

415:16;428:16
pledge (3)
  371:20,22,25
pledged (1)
  371:24
pm (13)
  304:6,6;324:16,17;
  359:15,15;387:7,7;
  405:13,13;434:8,8,15
point (8)
  234:3;272:14;359:23;
  363:20;419:7,8;420:11;
  430:2
position (4)
  274:4,12;275:20;
  368:18
possession (5)
  295:14;297:2,8;
  299:17;340:23
possibilities (2)
  286:10,11
possibility (2)
  286:9;321:16
possible (4)
  286:17;289:17;
  313:3;424:20
possibly (1)
  290:3
Post (1)
  244:3
potentially (1)
  375:3
preparation (3)
  315:6,14;374:24
prepare (7)
  232:18;234:7;236:9,
  10,14,23;322:17
prepared (3)
  236:18;322:20;375:5
presence (1)
  257:22
present (1)
  411:9
presented (2)
  305:4,9
prevent (3)
  276:23;321:16;422:9
prevented (1)
  277:3
previous (4)
  267:6;329:2,2;421:15
previously (5)
  230:5;267:9;305:13;
  327:15;370:25
price (4)
  259:8;384:6,7,12
printed (1)
  424:23
prior (7)
  231:7;247:14;257:20;
  308:3;311:9;327:21;
  328:2
privilege (3)

289:15;340:21;406:5
probably (3)
  284:8;310:5;391:7
procedure (10)
  242:23;243:22,23,24,
  25;334:7,14,19;336:10,
  19
procedures (6)
  242:21;331:19,19;
  334:12,15;348:12
produce (3)
  299:23;303:25
produced (9)
  233:15,21,23;234:2;
  294:18;295:9,12;327:5;
  406:20
producing (2)
  300:21;303:20
product (1)
  422:11
production (4)
  295:20;299:24;301:3;
  383:4
proliferating (1)
  423:12
promise (1)
  298:20
promissory (5)
  370:10,15;378:24;
  379:25;380:13
proper (18)
  333:15,18;334:3,4,5,
  11,13;335:4,6,9,14,24;
  336:4,21,25;337:15,17;
  361:19
protect (12)
  248:21;261:14,15;
  263:6,7;264:14;289:12;
  297:17;298:2;323:25;
  324:10;337:21
protecting (1)
  289:8,11
protection (1)
  267:24;268:2,3
provide (9)
  233:5;252:25;269:15;
  319:4,13,20;345:23;
  359:3;426:18
provided (14)
  233:6,14;288:12;
  290:15;301:8;312:9;
  359:5;386:24,25;
  388:17;402:4;408:9;
  410:20;426:17
provides (1)
  416:13
providing (1)
  419:22
provision (2)
  420:13;422:8
public (2)
  334:16;435:24
purchase (2)

ORLY GENGER VS.
DALIA GENGER

DALIA GENGER
February 7, 2013

384:6,7
**purported (1)**
298:5
**purportedly (2)**
271:20;361:12
**purporting (1)**
296:4
**pursuant (2)**
359:9;380:22
**pushing (2)**
264:20,24
**put (16)**
240:2;241:8;249:15;
264:23;294:25;334:15;
340:24;350:7;359:8,11;
410:8;420:20,22;422:8;
424:20;426:14
**putting (3)**
290:21;344:12;356:4

## Q

**qualified (1)**
385:14
**quickly (1)**
327:22
**quietly (1)**
399:12
**quit (1)**
253:2
**quite (4)**
331:9;337:19;341:6;
385:7
**quote (4)**
253:19;257:18,19;
330:21

## R

**ranges (1)**
405:21
**re (1)**
326:5
**reach (3)**
410:23;427:7,16
**reached (1)**
421:2
**read (85)**
231:14,24;232:6;
239:15,23;241:13,15;
251:25;252:2,5,6;253:4,
7,12;254:15,21;257:18;
258:7;262:25;264:4;
265:22;274:11;280:10,
17;282:23,25;283:21;
290:12;296:8;304:16,
20;305:17;307:23,24;
308:8;309:2,6,18;316:4;
321:19;323:10,11;
329:23,25;330:2,11,20;
331:3,14,15;335:16,17;
339:20,24;341:18;343:6,
11;344:6,9;345:3;

351:13,15;362:22;
370:21;371:15,17;398:8,
13;399:9,12;407:12;
413:15;416:5,12;
427:17;429:5,7,8;430:3,
6,9,17;434:21;435:4,7
**reading (13)**
273:21;274:10;
280:12;283:3;323:13;
331:4,6;399:16;413:8;
427:3,20;430:18;431:6
**ready (3)**
370:19;371:8;421:11
**really (20)**
252:14;259:21;270:8;
286:22;310:2;320:24;
321:5,7,7;323:14;
326:23;337:19;343:14;
383:15;404:11;415:5;
421:8;424:14;430:17;
433:25
**re-answer (1)**
232:9
**reason (7)**
236:17;238:23;248:4;
345:12;348:16,19;
377:23
**reasons (2)**
242:18;289:24
**recall (37)**
235:8;277:24;279:5,9,
10;282:18;283:13;
285:3;290:14;294:5;
296:10,12,13,16;300:19;
305:14;309:17;311:12;
315:4,16,19;320:24;
321:15;339:7,9;343:4;
383:6,7;385:15,18;
390:15;393:13;403:2;
408:3,5;409:2,17
**receive (12)**
295:24;315:20;325:6,
7,12,14,15;328:16;
329:8;332:14;388:21;
409:8
**received (10)**
273:11;290:8;301:12,
15;315:22;327:21;
328:2;379:3;383:4;
408:7
**receiving (2)**
389:12,15
**recess (6)**
266:20;304:5;359:14;
387:6;405:12;434:7
**recessed (1)**
324:16
**recipient (1)**
371:23
**recognize (7)**
293:4,14,17,19,21;
405:18,22
**recollection (7)**

282:24;285:4;300:17;
307:18;336:15;351:20;
396:15
**record (55)**
230:21;233:24;241:8,
15;252:2,6;253:12,15;
254:15;262:24,24,25;
264:4;266:8;271:14;
278:16;281:8;286:25;
292:12;302:2;304:20;
309:6;314:23;324:14;
325:2;326:6;327:12;
328:13,15;331:15;
335:17;344:9,13;345:3;
351:15;358:15;362:6,7;
364:19;369:12;370:13;
371:16;375:11;387:8,
11;398:13;399:9;
402:10,21;405:19;
406:19;407:24;430:9;
434:6,9
**records (4)**
340:22;368:21;391:4,
13
**redacted (2)**
402:4,11
**redeem (8)**
373:3;375:17,21,23,
25;376:25;390:19,22
**redeemed (3)**
391:17;396:23;397:2
**redeeming (2)**
378:7;397:4
**redemption (18)**
372:15;373:2,5,17,19;
378:16;379:10,15;
381:19;382:2,4;388:7,
11;391:3;396:13,17,17;
398:19
**reduced (2)**
429:14,15
**refer (1)**
351:18
**reference (1)**
279:7
**referencing (1)**
372:19
**referring (3)**
372:8;385:21;398:9
**reflect (1)**
266:8
**refrain (2)**
312:20;313:3
**refresh (5)**
282:20,23;307:18;
336:15;351:19
**regard (5)**
251:3;267:23,23;
343:18;385:20
**regarding (5)**
252:9;277:25;278:3;
345:23;358:11
**reiterate (1)**

341:2
**relate (1)**
272:22
**related (10)**
282:18;319:13,21;
320:4,8;323:23;324:9;
340:24;359:3,5
**relating (1)**
338:9
**relaxed (3)**
284:25;288:14;289:19
**relaxing (1)**
284:18
**release (11)**
412:20;413:7,17,25;
414:5,12,23;415:5;
428:20;430:4,15
**released (5)**
413:21;414:7,8,16;
415:12
**releases (3)**
413:3,6,25
**releasing (1)**
414:11
**relevant (2)**
319:5,10
**relinquished (1)**
427:9
**rely (1)**
352:15
**relying (6)**
248:20;249:12;
250:14,19;251:8;352:12
**remaining (1)**
397:3
**remember (137)**
230:17;233:9,12;
235:18,20;237:3,6;
248:19;251:6,12,15,16,
19,22;254:7,7;273:14,
22;274:17,23,25;277:14;
282:21;285:6,17,19,22,
24;286:5,8,16;287:11,
12,24;288:19,23;289:24;
290:11,13,17,22,24;
291:5;292:4;296:2,7,20;
298:7,9,12,17;299:4,14,
19;300:8,11,24,25;
301:2;303:10,12,14,16,
18;306:24;307:5,9,15;
310:10;311:4,5,7;
315:22;318:24;319:7;
320:6,10,12,14,22;
321:6,7,10,13;325:11;
326:18;336:12,22;337:2,
10,11,13,16,18;343:7,8,
10,11,13;345:14,16;
351:21;353:24;354:6;
364:14,15;369:5;370:3,
3,4;380:16,17;384:14;
386:9;392:2,24;395:5;
401:9,10,22;402:23;
408:25;410:25;411:20,

21;414:18;421:6,8,9,13,
14,20;422:2,4,21,24;
423:4
**remind (1)**
329:21
**remove (2)**
272:4;278:6
**removed (1)**
267:2
**repeat (14)**
244:7;254:13;262:23;
263:24;267:20;291:18;
306:5;321:18,21;355:2;
372:21;397:20;398:11;
432:14
**repeated (5)**
249:6,11;263:23;
415:11,11
**rephrase (1)**
276:3;305:24
**reporter (24)**
230:25;234:16;
241:16;252:3,7;253:13;
254:16;263:2;264:3,5;
279:20;280:23;304:21;
309:7;331:16;335:18;
344:10;345:4;351:16;
398:14;399:10;407:25;
430:6,10
**represent (11)**
239:18;279:12;291:8;
329:16;347:5;355:21,
22;366:5;368:5;383:3;
408:7
**represented (7)**
310:3;341:11;347:2;
355:13,16,20;413:12
**representing (5)**
412:5,6,15;421:22,23
**represents (3)**
368:6;412:8,9
**reputation (1)**
262:9
**request (2)**
295:20;327:6
**requested (18)**
241:16;252:3,7;
253:13;254:16;263:2;
264:5;295:20;304:21;
309:7;331:16;335:18;
344:10;345:4;351:16;
398:14;399:10;430:10
**requests (1)**
369:4
**require (1)**
244:18
**required (5)**
275:7,11;334:19
**requirement (2)**
244:4,10
**requirements (1)**
334:8
**Requires (2)**

ORLY GENGER VS.
DALIA GENGER

DALIA GENGER
February 7, 2013

244:18;332:8
re-read (1)
  344:25
reserved (1)
  434:20
resided (1)
  342:17
resign (1)
  337:20
resolution (6)
  381:19,22,23,25;
  382:3,24
resolved (1)
  364:18
resort (1)
  317:2
response (7)
  272:3;327:6;359:10;
  371:12,13;372:3,8
responses (1)
  371:3
responsibilities (2)
  244:24;245:5
responsibility (6)
  244:22;289:12;334:2;
  335:13,23;409:6
responsible (2)
  258:11,14
rest (1)
  317:11
restated (8)
  280:19;281:10;
  288:14;290:9;291:3;
  292:13;407:8;410:16
restriction (1)
  284:25
restrictions (3)
  284:19;288:13;289:18
result (6)
  254:9;265:14;323:7,
  23;418:4;422:6
resulted (3)
  261:18;263:11;365:7
results (2)
  242:24;256:17
Resumed (1)
  230:8
resworn (1)
  230:11
returns (2)
  379:9,15
reversed (1)
  355:10
review (10)
  231:8,22;232:3,7;
  271:18;273:12;290:15;
  299:24;300:23;419:17
reviewed (1)
  232:11
revised (3)
  299:2;380:14,17
revisions (1)
  299:8

right (77)
  235:24;237:13;
  241:11,12;244:4;
  249:17;254:24;267:3,
  12;268:6;280:3;283:20,
  21,25,25;284:6,19;
  289:7;290:25;293:3;
  300:10;308:11;309:25;
  311:15;314:20;328:5;
  329:10,18,19;331:4,5;
  333:6,24;338:3;339:12,
  18;342:8;348:10;353:7,
  9;354:15,17,19;355:8;
  357:25;362:10;363:23;
  366:9,12;368:7;372:11;
  373:22;377:13;378:13,
  18,19;386:12;389:17;
  390:19;399:3;400:12;
  403:17;406:12;413:21;
  414:6;416:16,19;417:8;
  418:16;423:15;425:11,
  15;427:11;431:3,21;
  433:10;434:20
rights (2)
  294:7;422:15
risk (1)
  313:12
Robert (5)
  233:13;271:17;
  272:24;327:13;340:18
Rochelle (3)
  287:15;310:5;400:13
role (9)
  240:15,17,20;244:19;
  247:3,4;265:24;266:2,10
roles (1)
  242:20
Roth (6)
  274:16;275:20,23;
  277:21;286:2;291:21
Roth's (10)
  274:21;275:3,7,11;
  276:5;277:3,16,18;
  279:5;281:22
rule (1)
  363:10

S

Safety (3)
  360:2,3;404:24
Sagi (84)
  234:7,22;236:8,10,18,
  23,25;237:4;238:21;
  239:11;253:21;266:24;
  272:20;277:19;282:12,
  14;287:16;288:16,17;
  290:18,20;293:14,21;
  306:18,21;307:4;
  308:24;309:15,19;
  310:3;311:14;312:3,24;
  313:13;314:24;316:12,
  15;317:15,17;318:2,21,

23;319:4,12,20;332:21;
  334:8,20,21,22;336:5,7,
  18,19;340:9,14,16;
  377:14;383:17,22;384:2,
  8;385:11;387:2;389:23,
  25,25;391:13,14;393:8,
  10;394:5,6,7,9,11,12;
  397:5;401:4,6,11,11,15;
  421:23
Sagi's (8)
  313:19,20;333:3;
  404:6;411:14,16,17;
  421:17
sale (67)
  239:20,20,22;240:9,
  12,16,18;241:25;244:6,
  11;245:9,17,25;247:12;
  248:10,18,22;250:22;
  251:4;252:10;254:12;
  255:16;257:15,23;
  264:25;270:23;276:24;
  277:4;304:12;311:12;
  318:9,17,23;319:3;
  321:17,17;324:6;325:13,
  16;326:5,9,17;327:21;
  328:2,18;329:9,11;
  331:12;332:8,20;
  333:22;334:13;335:3,
  24;336:20,24;371:21,23;
  372:2;373:2,6,16;
  375:23;396:17;399:22,
  23;432:20
same (9)
  242:13;247:24;
  252:17,18;261:25;
  271:4;284:3;307:25,25;
  308:5,8,10;321:25;
  329:2;348:7,20;378:18;
  424:16,17;435:7,8
satisfied (1)
  419:10
save (1)
  435:8
saw (17)
  230:15;296:8;315:10,
  10,12,15,25,25;316:4;
  317:22,23;322:4,6,8,8,
  22;328:10
saying (19)
  234:13;285:20;
  291:18;297:9;310:24;
  319:24;329:22;330:6;
  344:2;376:4;396:21;
  398:10;417:6,18;
  419:25;424:11,19,22;
  428:15
schedule (1)
  398:6
searching (1)
  386:11
second (12)
  236:2;254:22;257:4;
  273:17;292:18;330:3,6,

8,372:14;376:10;
  387:13;425:19
secondly (3)
  242:19;271:24;291:14
section (1)
  250:4
security (1)
  399:17
seeing (3)
  296:21;315:4,17
seek (12)
  245:11,16;254:5;
  296:3;305:3,8,11;319:9,
  11;323:22;324:8;359:21
seeking (4)
  266:25;278:6;300:25;
  333:21
seem (4)
  272:21
sell (5)
  373:11;374:14;
  375:25;401:21;402:17
selling (5)
  270:17;372:11;377:2,
  4;382:7
send (4)
  329:13,15;332:12,19
sent (5)
  327:10,13;332:10,17,
  22
sentence (2)
  273:17;376:10
separate (2)
  343:19;345:24
series (1)
  364:21
session (5)
  249:4,5;253:15;
  360:10;364:20
set (1)
  289:19
setting (1)
  330:17
settle (8)
  402:16,18,19;404:2,5,
  7;410:12;422:13
settlement (36)
  324:2;359:25;403:3,4,
  7;404:25;405:15,20;
  406:6;407:20;408:8,15,
  24;409:3,7,8,16,19;
  410:5,15,16,23;412:16,
  18;413:16;414:4;
  419:14;420:9,10,23,23;
  426:16;427:7,16;
  431:25;432:17
share (7)
  350:22,22;371:23;
  377:14;378:3;381:5;
  397:5
shareholder (2)
  374:6,12
shares (120)

239:20,22;240:24;
  241:6;243:6;245:18;
  256:19,25;257:8;258:21,
  25;259:7,8,19;260:16,
  22;261:9,20;262:6;
  263:13;265:15;270:17;
  275:21;284:7,17;
  304:13;306:17;321:17;
  341:12;347:3,18;348:5,
  10,13,18;349:2,2,23;
  350:5,12,14,14;351:3,3,
  10,11;352:19;354:22;
  355:11;356:8;371:21,
  24;372:4,11,17;373:3,9,
  10,11,14,20,24,25,25;
  374:15;375:15,17,22;
  377:3,5,6;378:8,17,21;
  379:4,10;380:19,25;
  381:2,3,6,15,20;382:4,8,
  21;385:8;388:8,15;
  389:8,10,14;390:18;
  391:15,17,22,23;392:18;
  396:23,24;397:2,3,4;
  400:9,14;401:4,6,7,10,
  12,13,14,15,17,20,21,25;
  428:9;429:22;432:21
SHEET (1)
  435:10
shield (1)
  250:21
short (2)
  258:19;409:11
show (16)
  245:9;246:2;257:7;
  292:10;327:7;336:14;
  338:21;362:9,10,12,14;
  379:9,11;399:3;402:23;
  430:20
showed (6)
  233:20,25;322:9;
  328:4;379:15;400:24
showing (1)
  402:11
shows (1)
  287:24
side (4)
  304:11,14;412:12,13
sign (16)
  237:2,5;290:19;
  292:22;293:12;294:5,8,
  12;296:4,20;298:5;
  310:15;410:10,10,11;
  434:21
signature (29)
  280:2,6;283:9;290:23;
  292:18,20;293:4,7,10,
  13,15,17,19,22,25;
  296:6;303:2;308:12;
  329:22;339:16,18;
  406:11,21,23;408:12,12;
  421:12;423:2;424:21
signatures (2)
  308:11,13

ORLY GENGER VS.
DALIA GENGER

DALIA GENGER
February 7, 2013

signed (45)
266:18;271:16;
280:10;283:7,17,18;
288:2;289:3;290:7,16;
296:11;304:8;309:9;
313:10;316:11;330:7,8;
376:13;384:19;391:2,
23;392:9;407:4,7;
408:21;418:4;419:4,13,
15;423:6,10;424:14,16,
24;427:23;428:12,17;
429:11;431:25;432:11,
16;433:4,13,17;435:13
signing (4)
282:19;283:14;285:4;
311:11
simple (9)
250:18;261:16;263:8;
298:19;301:23;331:9;
341:6;397:21;431:23
simply (5)
272:8;276:20;278:25;
302:4;382:23
single (2)
381:5;410:9
sister (1)
311:14
sit (24)
232:2;235:8;247:17;
251:14,15;264:15,16;
266:6;290:3,5;291:7,10,
25;293:24;294:4;335:2;
338:14,16,18;362:24;
368:11;384:23;393:16;
408:3
Sitting (1)
287:19
six (1)
426:2
slow (1)
416:5
slower (1)
330:13
small (2)
372:23,24
smart (1)
420:21
sold (10)
268:21;371:24;372:4,
16;373:9,14,20;375:14;
380:25;401:25
solidify (1)
341:11;347:2
solution (1)
318:20
somebody (17)
231:18;238:6;260:9;
264:19;265:7;282:14;
285:8,12,23;320:14;
333:18,18;334:20;
353:14;360:11,13;404:2
someone (4)
265:3;296:4;346:6;

410:4
somewhere (1)
391:5
son (2)
294:7;306:18
son's (1)
403:12
soon (2)
358:12;404:15
sorry (16)
230:15;234:17,18;
241:12;245:15;250:6;
255:3;274:6;281:2;
285:10;310:12;372:21;
376:20;388:9;401:12;
416:2
sought (1)
267:11
source (2)
246:4;402:13
southern (1)
363:22
speak (5)
254:11;318:21,23;
341:8;361:5
speaking (3)
248:5;344:16,17
specific (3)
374:18;395:16,17
specifically (4)
251:3,5;264:17;363:8
specify (1)
276:11
speculate (1)
310:22
speculating (2)
310:19,20
speculation (1)
383:19
speeches (1)
297:23
spell (1)
293:11
spend (3)
261:24;312:2;341:9
spending (1)
261:24
spent (1)
364:12
split (3)
362:3,17,18
spoke (2)
254:12;318:24
stacks (1)
321:15
stage (1)
330:17
stamped (2)
370:16;406:11
stamps (2)
294:19,25
standing (1)
263:16

standstill (2)
312:6,8
start (8)
347:13;367:19;380:3,
3,5;407:16;430:18;
431:23
started (1)
344:8
starting (1)
388:22
state (9)
339:11;340:3;352:2;
357:18,19,20,23;371:20;
435:24
stated (5)
253:9;317:17;331:25;
362:20;364:19
statement (2)
266:13;429:4
statements (2)
402:4,11
states (1)
316:22
stating (1)
316:16
stay (1)
259:24
steal (1)
366:17
steps (1)
266:24
Sternberg (1)
407:6
still (7)
289:8;347:18;348:5;
381:7,15;421:10;435:12
stipulate (1)
295:6
stock (13)
333:19;346:7;349:2,
24;350:13,15;351:10;
352:5;372:4;384:18;
391:2,20;392:9
stop (19)
248:10,18,22;250:22;
251:4;253:21;254:12;
286:19;318:8,16,22,22,
25;319:3;351:22;380:2;
420:8,10;423:11
stopped (1)
318:19
stopping (2)
247:12;318:20
story (2)
260:21;420:24
stranger (1)
260:9
street (1)
353:20
strike (5)
241:24;289:4;310:17;
318:6;325:6;328:14,24;
335:20;337:5;339:8;

350:3,5;357:15;375:15,
20;378:6;394:14;
402:21;411:4;419:12
strong (1)
317:4
style (1)
236:7
subject (1)
262:2
subjects (1)
237:16
submitted (5)
271:19,23,24;272:2;
273:13
Subpart (3)
425:23,24,25
SUBSCRIBED (1)
435:20
subsequent (3)
249:20,22;390:9
substantial (1)
231:17
successor (1)
302:4
sue (22)
311:14;312:3,14,17;
352:25;356:11,12,13,16,
17;357:3,4,18,23;363:6;
418:10,10;419:7,11;
420:2,2,3
sued (5)
356:10,23;357:2,15;
375:7
sues (2)
363:5,6
sufficient (5)
330:22;331:10;332:2,
6;333:11
suggest (2)
359:8;405:9
suggested (1)
352:10
suing (13)
360:17,19,19,20,24;
361:9,11,25;418:16;
420:8,11;422:9;423:21
suit (1)
423:7
sum (1)
360:4
summons (1)
342:5
superceded (2)
299:3;380:15
supersessions (1)
299:9
support (2)
271:15;394:12
supporting (1)
394:11
supposed (6)
288:8;331:20;332:18;
333:3,4;380:21

supposedly (1)
348:13
supreme (3)
349:15;355:9;358:8
Sure (39)
266:15;268:13;
279:11;283:19;284:2;
289:23;294:10;301:7;
304:18;305:7;313:23;
314:16;319:17;327:3;
332:22;334:2;335:13;
336:16,24;342:13;
343:6;344:25;367:15;
368:5;373:7;383:2,13,
16;391:5,9;393:17;
399:15;406:6;407:2;
414:13;415:11;424:12,
13;432:15
Surrogate (17)
274:16,21;275:3,7,11,
20,23;276:5;277:18;
279:5;281:22;286:2;
291:2,11,21;378:9,10
suspect (1)
241:5
suspecting (1)
367:19
suspend (2)
362:11,11
swore (4)
261:14,15;263:5,6
sworn (2)
376:6;435:20

T

taint (1)
260:15
tainted (2)
262:10,10
talk (12)
237:22;245:20,24;
246:3;247:10;248:9,17;
282:5;323:4;338:16,18;
367:2
talked (5)
237:15,17;238:4;
319:7;421:15
talking (20)
237:19;239:16;250:3,
5;251:2,3;261:4;280:13;
282:4;306:14;323:2;
332:7;378:19;397:10;
401:13;412:12;417:19;
429:16;432:20,22
TAP (1)
274:6
task (2)
298:4,10
tax (2)
379:9,15
technical (3)
342:12;345:12;368:15

ORLY GENGER VS.
DALIA GENGER

DALIA GENGER
February 7, 2013

technicality (1)
345:21
telling (5)
237:17;255:22;
369:17;375:24;400:19
ten (4)
252:17,18;321:21;
400:13
terminated (2)
288:15;289:19
termination (1)
284:18
terms (2)
390:10;419:9
testified (5)
230:5,6;267:8;318:15;
360:12
testimony (10)
238:13;240:5,5;254:4;
257:17,17,20;285:18;
357:17;435:4
thanks (1)
297:21
therefore (1)
347:20
thinking (6)
238:7,7;264:16;290:6;
318:3;429:23
third (5)
272:4;274:7,9;385:15,
16
thoroughly (3)
231:15,24;232:6
though (2)
237:23;255:8
thought (17)
230:16;241:22;
243:15,16;292:5;366:8;
368:7,8;384:12;391:14;
406:7;19;411:23;
419:16;420:15;422:7,13
three (1)
434:13
TI (3)
305:15;306:10,12
times (9)
252:17,18;270:6,8;
356:13;375:5,7;424:15,
22
tired (3)
323:5;330:13;430:18
title (1)
435:6
titled (1)
405:20
today (37)
231:9;232:2,12;235:8;
251:14,16;290:3,5;
291:7,10,25;293:24;
294:4;299:10;312:8;
315:10,10,12,15,24;
316:5;317:22;318:11;
322:6,16,23;335:2,3;

336:14;338:15;341:2;
357:17;368:11;384:23;
393:16;404:10;408:3
today's (1)
232:18
together (3)
409:18;410:8;420:18
told (29)
249:19;251:5;255:15;
258:19;270:12;271:7;
275:20;288:19,23;300:6,
8,19;314:10;317:22;
334:18,22;336:5,7,9;
345:15;356:23;359:20,
22;360:11;369:21;
371:10;384:3,12;400:25
tomorrow (1)
404:10
took (9)
274:22;281:20;368:2;
374:2;401:23;408:14,
20;409:20,22
top (3)
293:5,9,23
topic (1)
253:24
towards (1)
396:24
TPR (168)
239:20,22;240:23;
242:21;244:5,10,15,18,
19,21;245:18;256:19,25;
257:8;258:21,24,25;
259:19,19;261:8,19,20;
263:12,13;265:15,15;
266:24;269:16;271:8;
288:16;304:11,23;
305:15;306:10,12,17,21;
309:16;312:12,20;313:3,
24;314:19;316:9,13,16,
17;320:7;321:17;323:3,
8,22;326:8,10;331:19;
332:10,12,17;348:13;
349:3,24;350:15;
351:12;352:5;354:23;
355:11,12;359:25;365:7,
8;369:14;371:21,23;
372:5,5,11;373:10,11,
13,14,20,24;375:16,21;
377:9,10,12;378:8,21,
23;379:3,12,18,20;
381:3,7,10,10,16,17,20,
23,25;382:3,5,6,17,23;
384:2,18,19;387:19;
388:4,23;389:5,6,9,17,
24;391:3,7,17,19;392:8;
393:2,8,11,17,24;
396:15;397:2,16,17,24;
398:4;400:9,11;401:8,
13,14,15,17,19;402:5;
406:21,24;408:12;
414:9;416:24,25;417:3,
24;418:2;426:4,10,10,

19;427:8;428:10;
429:21;431:8,12,17;
432:5,12,18,21;433:2
TPR's (3)
244:23;378:16;403:12
transaction (2)
306:10;307:3
transactions (7)
305:16;306:12,16,23,
25;307:7,19
transcript (9)
231:6,8,10,23;237:8;
254:20;362:22;434:21;
435:4
transfer (5)
371:20,22,25;431:8,12
transferred (4)
348:12,13;371:24;
431:17
transferring (3)
432:5,12,18
transfers (10)
393:22,24;394:5,15;
395:2,6;402:5,12,13;
433:2
treasury (1)
396:24
treat (1)
377:17
treated (1)
377:25
TRI (13)
304:13;306:17;
341:12;347:3;349:2,24;
350:12,15;351:8,10;
352:5;355:11;429:22
trial (2)
344:21;347:5
trickery (1)
317:2
tried (2)
318:7;364:12
true (9)
240:10;272:23;
295:11;330:10,12;
338:10;387:17;429:18;
435:8
Truly (1)
364:14
Trump (8)
270:17;277:25;278:2;
304:12;306:13,17;
307:4;353:13
trust (171)
242:16;244:20;
245:12;246:9;247:11;
257:23;258:15;259:2,
20;260:6;261:10,14,15;
263:6,7;265:3,5,5;
267:16,16,25;268:4,9,
12,17;269:14;271:20,25;
275:21;277:23;279:7;
281:19;288:2;289:6,9,

11,12,16,18;290:2;
292:25;293:3,14;294:2;
296:5,18;298:6;304:13;
306:21;308:24;310:4;
311:20,21;312:3,17,24,
25;313:4,13,20,20,21;
314:13;323:25;324:10;
329:17;335:12,22;
336:7;339:11;340:3;
341:10;343:2,17,19;
346:25;347:18;348:5,
14;349:2,24;351:11;
354:22,24;355:11,12;
359:2,17,19;360:8;369:8,
24;361:8,13,21,21,23;
362:19;363:2,6,7,14;
365:8,9;366:4;367:12,
18,20,21;368:9,13,20;
374:21;375:6;397:4,5;
398:18;412:9,16,19;
414:2,7,10,12;415:4,7;
416:19,22;417:2,5,13,
14,25;418:15;419:22;
420:4,5;422:10;425:17,
23;426:9,15,18,19;
427:6,10,12,14,15,22,25;
428:2,3,13,19,24;
429:12,14,24;430:14,21,
25;431:5,7,12;432:4,8,
12,18;433:2,5,14
trusted (1)
367:17
trustee (92)
243:10,12;244:6,10,
20;247:11;248:22;
258:2,12;259:16;260:7;
261:13;263:5;265:13;
267:2,5,6;271:21;272:3,
5,10,16,17;275:6,14;
276:19,20;278:5,7,12;
288:2;289:5,16;290:2;
291:20;292:25;293:2;
294:10;297:13,14,16;
299:18,21;313:19,20,20,
23;314:8,16;323:18;
324:3;331:9;332:9;
333:10,25;335:12,22;
337:20;338:15;340:20;
343:24;347:7;355:16,19,
21;357:23;359:2;
364:12;367:14;368:3,
20;374:21,25;375:4,6;
377:22;378:3,4,11;
398:24;413:20,21;414:2,
8,16,20,24;415:15;
418:5;426:17;427:5;
431:16
trustees (1)
413:19
trusting (1)
336:19
trust's (6)
288:11;365:6;414:23;

431:17,19;433:19
truth (1)
237:18
try (7)
237:23;298:21;
311:13;402:15;403:6;
422:9;423:11
trying (21)
248:10,17,22;254:11;
259:21;280:13;284:5,7;
318:5,22,22,25;319:3;
352:19;366:17;403:3;
413:10;414:10;415:6;
424:8;431:21
turned (1)
302:7
turning (1)
280:23
twice (2)
357:3,4
two (7)
233:3;307:25;308:4,7;
312:23;315:13;317:4
two-minute (1)
304:4
Type (1)
262:24

U

UCC (39)
239:20,21;240:9,12,
16,18;241:25;245:9,17,
25;248:18,22;250:22;
251:4;252:9;257:15,23;
311:12;318:8,16,22;
321:17;324:6;325:13,
16;326:5,9,17;327:21;
328:2,18;329:9,11;
331:12;332:7,20;335:3;
361:5;399:23
unclear (3)
253:10;351:4,5
undated (1)
326:4,7
under (3)
279:4;338:15;435:5,
12
underneath (1)
423:2
understood (3)
351:6;418:7;433:10
unfortunately (1)
242:23
unquote (1)
330:25
unsuccessful (2)
416:25;417:25
unwind (1)
333:22
up (32)
243:11,18;245:9;
246:2;250:16;257:7;

ORLY GENGER VS.
DALIA GENGER

DALIA GENGER
February 7, 2013

269:16;270:4;271:7;
276:23;322:18;338:4,
12;344:22;360:4;364:3;
365:24;385:17;427:6,13,
15,22,25;428:4,6,14,19,
25;429:12;430:21;
432:9;433:6
**upcoming (1)**
244:6
**upon (3)**
323:3;343:18;396:13
**use (2)**
337:10;390:20
**using (1)**
396:16
**Usually (4)**
250:20,23;311:8;
418:23

**V**

**valuable (1)**
397:3
**valuation (7)**
384:22,24;385:10,10,
12,13,16
**value (3)**
384:8;385:8;433:18
**valued (1)**
433:21
**variety (2)**
316:8,17
**verbalize (1)**
230:14
**verified (5)**
330:5,10;339:3,13;
358:18
**verifying (3)**
331:24;339:17,24
**victim (2)**
348:11,17

**W**

**Wait (36)**
230:23;236:2;239:24,
24;240:2;241:9;247:15,
15,15;249:2;250:11;
273:25;281:25;282:6;
294:21;297:19,23;
311:19,22;312:12;
326:11;330:6;344:12;
357:8;363:16;372:14;
387:13;397:8,12;
402:24;416:6;424:6;
425:7,19,19,19
**waiting (3)**
263:18;283:5;371:7
**walk (1)**
250:16
**wants (2)**
243:8;396:4
**war (1)**

403:9
**Warren (1)**
232:22
**way (22)**
238:13;242:15;
256:18;276:7,9,9,11,18;
289:19;295:19;297:5;
299:3;324:6;341:21;
351:24;370:24;377:14;
380:15;381:14;388:3;
426:14;433:22
**ways (1)**
258:23
**weak (1)**
317:2
**week (1)**
410:24
**weigh (2)**
254:3,6
**weighed (1)**
253:20
**weren't (2)**
247:5;325:20
**what's (19)**
271:13;275:25;
277:11;292:10;305:13;
309:4;314:23;327:15;
330:15;331:21;370:13,
19,25;372:25;373:17;
378:14;389:10;407:17;
433:7
**whatsoever (3)**
279:17;291:16;385:19
**whenever (3)**
389:19,20;422:18
**WHEREUPON (27)**
230:1;241:15;252:2,6;
253:12;254:15;262:25;
264:4;266:20;304:5,20;
309:6;324:15;331:15;
335:17;344:9;345:3;
351:15;359:14;387:6;
398:13;399:9;405:12;
409:11;430:9;434:7,15
**whole (7)**
239:15;247:18;
269:20;398:23;420:11;
429:5,8
**who's (3)**
360:15;362:24;364:10
**whose (11)**
285:16,19;340:2;
363:12,24;402:15,17;
403:6,11;420:12,14
**willing (2)**
258:24;338:18
**win (4)**
352:18;356:7;418:21;
424:5
**wins (2)**
418:18,19
**wire (8)**
393:22,24;394:3,15;

395:2,6;402:5,12
**wires (1)**
395:18
**withdraw (2)**
318:13;362:13
**Withdrawn (1)**
318:12
**without (7)**
303:2;310:15;402:16,
20;419:24,25;420:2
**witness (174)**
230:1,4;231:2;234:3,
13,17,19;235:5,12;
239:25;241:11,17;
242:8;244:14;245:3,22;
246:17,23;247:17,20;
248:7,14;249:7;251:11;
252:4,13;254:13,17,23;
255:9,14,20;258:9;
259:4;261:22;263:15;
264:8;265:17;267:19;
268:25;269:6,22;270:7;
272:11,14;273:7,21;
274:10;275:24;280:25;
281:6;282:3;283:3,10;
286:14,20,22;288:6,22;
289:22;291:17;297:20;
299:13;300:9;301:18,21,
24;302:3,9,25;303:9;
304:18,22;305:19;
307:13;309:4,8,22;
311:20,24;313:15,18;
317:13,25;320:17,18,21;
321:4,12,18,20;323:13;
325:17,20;326:10;
329:5;331:6,17;332:25;
338:11,24;341:17;
342:21;344:4,8;345:5;
346:20;347:22;348:8;
350:17;352:9;356:22;
357:6,10;358:21;359:7;
360:11,13;361:18;
364:18,25;369:3,7,15;
371:9,19;374:8;376:18;
379:19;381:9;385:3,22;
386:13;388:10,13;
390:14,22;391:11;
392:6;394:18;396:6,18;
397:9;398:10,15,22;
399:11,16;400:22;402:6,
8;404:11,14,18;405:5,
11;406:2;407:2,10;
410:18;411:22;413:8;
414:13;415:6,9;418:19,
22;424:7,10;427:3,20;
430:11;431:6;434:4
**witness' (1)**
339:2
**word (5)**
264:23;337:10;344:2;
390:20;396:16
**words (1)**
290:21

**work (3)**
234:18;420:18;422:12
**worked (1)**
409:18
**working (2)**
343:24,25
**write (7)**
234:16;270:14,16;
280:24,25;369:4;420:21
**writing (5)**
236:7;340:25;359:9;
376:12;410:8
**written (7)**
276:18;359:12;
384:11,13,14,24;421:14
**wrong (3)**
270:13;411:19,24
**wrote (1)**
376:13

**Y**

**year (4)**
342:10;343:16,20;
387:15
**yearly (1)**
379:11
**years (4)**
247:20;260:10;
387:15,18
**yesterday (1)**
232:25
**Yoav (3)**
287:8;314:6;404:22
**Yonite (1)**
407:5
**York (25)**
244:3;341:15,24;
344:17;345:6;346:2,5;
348:20;351:19;352:2,6,
22;356:3,5,8,11,11,17,
25;357:2,19;361:2,6;
362:25;363:22

IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| TR INVESTORS, LLC, GLENCLOVA INVESTMENT CO., NEW TR EQUITY I, LLC, NEW TR EQUITY II, LLC, and TRANS-RESOURCES, INC., | ) ) ) ) | |
| Plaintiffs, | ) ) ) | |
| v. | ) ) | C.A. No. 6697-CS |
| ARIE GENGER and TPR INVESTMENT ASSOCIATES, INC., | ) ) ) ) | |
| Defendants. | ) | |

MEMORANDUM OPINION

Date Submitted:  January 3, 2013
Date Decided:  February 18, 2013

Thomas J. Allingham II, Esquire, Anthony W. Clark, Esquire, Robert A. Weber, Esquire, Douglas D. Herrmann, Esquire, Amy C. Huffman, Esquire, Christopher M. Foulds, Esquire, SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP, Wilmington, Delaware, *Attorneys for Plaintiffs TR Investors, LLC, Glenclova Investment Co., New TR Equity I, LLC, New TR Equity II, LLC, and Trans-Resources, Inc.*

Stephen P. Lamb, Esquire, Meghan M. Dougherty, Esquire, Joseph L. Christensen, Esquire, Laura C. Bower, Esquire, Justin A. Shuler, Esquire, PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP, Wilmington, Delaware; Eric Alan Stone, Esquire, PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP, New York, New York, *Attorneys for Defendant Arie Genger*.

Matt Neiderman, Esquire, Gary W. Lipkin, Esquire, Benjamin A. Smyth, Esquire, DUANE MORRIS LLP, Wilmington, Delaware, *Attorneys for Defendant TPR Investment Associates, Inc.*

**STRINE, Chancellor.**

I. <u>Introduction</u>

This is a motion for summary judgment in a long-running dispute over the ownership of Trans-Resources, a Delaware corporation. The plaintiffs are the Trump Group, which took a 47% stake in Trans-Resources in 2001. The defendants are Arie Genger, the founder of Trans-Resources, and TPR Investment Associates, the holding company through which Genger owned Trans-Resources. After the Trump Group invested in Trans-Resources, Genger retained, through TPR, a majority 53% stake in the company. But, in 2004, Genger divorced his wife, Dalia, and as part of his divorce settlement, divided his 53% stake into three smaller blocks. Genger kept for himself one of these blocks, a 14% share in Trans-Resources (the "Genger Shares"). The other two blocks, each just under 20% of Trans-Resources, were given to trusts for his son, Sagi (the "Sagi Trust Shares"), and daughter, Orly (the "Orly Trust Shares"). Genger purported to retain a proxy over the Sagi Trust Shares and the Orly Trust Shares. Dalia took control of TPR, which no longer held any Trans-Resources stock, but had various other assets.

The transfer of the Trans-Resources stock out of TPR violated the terms of the Stockholders Agreement that TPR had signed with the Trump Group. Under the Agreement, Genger was not permitted to transfer the Trans-Resources stock without first giving the Trump Group notice and, in some cases, the option to buy the stock. The Agreement also provided that if Genger did transfer Trans-Resources stock in violation of the Agreement, the Trump Group had the right to buy the stock.

In 2008, the Trump Group discovered the transfers. The Trump Group then entered into a Stock Purchase Agreement with the Sagi Trust whereby it bought the 20% Sagi Trust Shares. TPR was also a party to the Stock Purchase Agreement, and the Agreement provided that, if the transfer of the Trans-Resources stock out of TPR to the Sagi Trust should prove void for any reason, the Trump Group would be considered to have purchased the Sagi Trust Shares from TPR directly. The Trump Group then filed a § 225 action to assert its right to elect a majority of the Trans-Resources board of directors, on the ground that it now owned two-thirds of Trans-Resources' stock.

Genger counterclaimed, asking this court to declare that he had the right to vote all of the Trans-Resources stock formerly held by TPR, on account of the proxy he claimed. He also asked this court to declare that he owned the Genger Shares, and that the Orly Trust owned the Orly Trust Shares. In July 2010, after a trial, I found that the 2004 transfers were void. Because the transfers were void, the Trans-Resources stock reverted to TPR. I then found that the Trump Group had the right to buy the Sagi Trust Shares from TPR. As to the Genger and the Orly Trust Shares, I made no findings beyond ruling that these shares were owned by TPR, and that Genger could cure the void transfer of shares to himself by signing on to the Stockholders Agreement. My ruling thus focused on those issues that were necessary to determining which party had the right to elect the members of the Trans-Resources board, which was the critical issue in the § 225 action.

When the parties could not agree how to implement my decision, I reconsidered my opinion, taking into account a Side Letter Agreement that the Trump Group had entered into with TPR at the same time as the Stock Purchase Agreement. Under the

2

Side Letter Agreement, the Trump Group had the right to purchase the Genger Shares and the Orly Trust Shares from TPR, in the event that the 2004 transfers were invalidated, and the Trans-Resources stock reverted to TPR. I issued a new opinion that gave effect to the Side Letter Agreement, and thus found that the Trump Group had the right to buy all of the shares improperly transferred from TPR, not just the Sagi Trust Shares. The Trump Group then purchased the Genger Shares from TPR and placed the money into escrow.

Genger appealed my decisions to the Supreme Court. In 2011, the Supreme Court upheld my July 2010 opinion in full, and my August 2010 decision in part. As to the July 2010 ruling, the Supreme Court upheld my determination that the Trump Group had the right to buy the Sagi Trust Shares, and that none of the Trans-Resources stock wrongfully transferred by TPR was covered by a proxy. As to the August 2010 ruling, the Supreme Court found that my determination that TPR could vote the Genger and the Orly Trust Shares "pose[d] no problem."[1] But, the Supreme Court ruled that I could not make a determination as to the ownership of the Genger Shares and the Orly Trust Shares, because two indispensable parties—TPR and the Orly Trust—had not been joined to the action. Therefore, the Supreme Court reversed my decision on the ultimate ownership of these shares. Nevertheless, the Supreme Court left undisturbed my findings that that the 2004 transfers were void, that the Trans-Resources stock reverted back to TPR, and that the Trump Group had the right to purchase the Trans-Resources stock held by TPR.

---

[1] *Genger v. TR Investors, LLC*, 26 A.3d 180, 201 (Del. 2011) [hereinafter Supr. Ct. Op.].

3

The Trump Group and Genger then negotiated a Revised Final Judgment Order, in which they agreed that the Trump Group owned 67% of Trans-Resources, consisting of its original 47% stake and the approximately 20% Sagi Trust Shares. The parties also stipulated that TPR had the right to vote the Genger and Orly Trust Shares, and that the Trump Group had the right to purchase these shares under the Stockholders Agreement. This flowed logically from my prior findings, affirmed on appeal, that Genger's proxy did not run with the Trans-Resources stock transferred out of TPR; that Genger's violation of the Stockholders Agreement caused the Trans-Resources stock to revert back to TPR; and that, because of this violation, the Trump Group had the right to buy the stock.

Immediately after the Supreme Court handed down its decision, the Trump Group filed this action against Genger and TPR. By joining TPR as a defendant, the Trump Group sought to correct for the absence of TPR in the prior action, which had caused this court's determination that the Trump Group owned the Genger Shares to be reversed. The Trump Group now moves for summary judgment on the ground that there are no genuine issues of fact as to its ownership of the Genger Shares. TPR cross-moves for summary judgment, seeking an order that the funds that the Trump Group paid for the Genger Shares should be released from escrow.

I find in favor of the Trump Group. The doctrine of issue preclusion prevents the relitigation of an issue that has been litigated and decided in a previous action, when the decision on that issue was essential to the previous action. The decisions that the 2004 transfers were void, that the Trans-Resources stock reverted to TPR, and that the Trump

4

Group had the right to buy this stock, were essential to the previous action. And, they were memorialized in the Revised Final Judgment Order, which Genger and the Trump Group negotiated. Therefore, my rulings on these issues have issue preclusive effect, and Genger does not have the right to relitigate them.

By joining TPR to this action, the Trump Group has corrected for the jurisdictional defect in the prior action that led my finding that it could purchase the Genger Shares to be reversed. The Trump Group has not attempted to join the Orly Trust as a party, and the Orly Trust Shares are not before the court.[2] Because it is settled that the Trump Group has the right to buy the Genger Shares, the only issue I must decide is whether it has actually done so.

The Trump Group has submitted an affidavit under Rule 56(e) attesting that it has placed the funds for the Genger Shares into escrow, and that it has taken possession of the shares. Because Genger has not shown that there is any triable issue of fact as to the Trump Group's purchase of the Genger Shares, I grant summary judgment to the Trump Group. Genger has raised a host of arguments why summary judgment may not be granted here, but because he is precluded from relitigating the issues that were decided in the prior action, I may not consider them. And, Genger acknowledges that if the Trump Group benefits from issue preclusion, it is entitled to summary judgment. Even so, I

---

[2] The ownership of the Orly Trust Shares is the subject of another action before this court, *Genger v. TR Investors, LLC*, C.A. No. 6906-CS. This action has been stayed by order of the New York Supreme Court.

address Genger's arguments, and explain why they would make no difference even if I were to take them into account.

But, I do not grant TPR's cross-motion to have the funds paid for the Genger Shares released from escrow. The Trump Group and TPR signed an escrow agreement that governs the release of the funds. TPR wants me to ignore the escrow agreement, which the parties bargained for, and order that the escrowed funds be released to it now. Because the parties have a contract that governs the release of the escrowed funds, and there is no equitable reason for me to override it, TPR's motion is denied.

## II. Background

Where the facts in this section are not referenced, they are taken from our Supreme Court's opinion in August 2011, and constitute those fact-findings of this court that the Supreme Court relied upon in its decision.[3]  Because the litigation in Delaware has proceeded in parallel with litigation in state and federal court in New York, I present the action in these three sets of cases together, in more or less chronological order.

### A. The Trump Group Gets Embroiled In Trans-Resources

In 1985, Arie Genger formed Trans-Resources, a Delaware corporation. Trans-Resources was entirely owned by TPR Investment Associates, Inc.  Genger owned a 51%

---

[3] *See* Supr. Ct. Op.  In this opinion, if a citation to a court document is identified by date but not jurisdiction, it refers to the previous action in this court, *TR Investors, LLC v. Genger*, C.A. No. 3994-CS.

majority interest in TPR. His wife Dalia, and beneficial trusts for his children Sagi and Orly, the Sagi Trust and the Orly Trust, held a 49% minority interest in TPR.[4]

Trans-Resources was initially successful, but by 2001 was nearly insolvent. Jules Trump, a friend of Genger, then offered to bail out Trans-Resources. Trump and his brother Eddie effected this bailout through two entities that they controlled, TR Investors, LLC, and Glenclova Investment Co., two of the plaintiffs in this action (collectively, the "Trump Group").[5] The Trump Group bought almost all of Trans-Resources' $230 million debt at a fraction of its face value. The Trump Group then converted this debt into a minority 47.15% stake in Trans-Resources. This left TPR with a 52.85% stake.[6]

The rights of the Trump Group and TPR were governed by a Stockholders Agreement. The parties to that Agreement were the Trump Group, TPR, and Trans-Resources, and the Agreement provided that the Trump Group and TPR "directly and

---

[4] This 49% interest was held by a limited partnership, D&K LP. Dalia was the general partner of D&K LP, with a 4% interest. The Sagi Trust and the Orly Trust were limited partners, with a 48% interest. *See* Pls.' Op. Br. Ex. A Schedule 3.2 ("Stockholders Agreement" (Mar. 30, 2001)) [hereinafter SA].

[5] TR Investors took a 25.18% stake in Trans-Resources, and Glenclova took a 21.97% stake. *See* SA Schedule A. The Trump Group includes the two other plaintiffs in this action, New TR Equity I, LLC, and New TR Equity II, LLC. These two entities did not take part in the 2001 bailout. Instead, they purchased shares from the Sagi Trust under the 2008 Stock Purchase Agreement. *See TR Investors, LLC v. Genger*, 2010 WL 2901704, at *11 (Del. Ch. July 23, 2010) [hereinafter July 2010 Op.]; *see also* Def's. Pre-Tr. Br. Ex. 2 (Dec. 3, 2009) ("Stock Purchase Agreement" (Aug. 22, 2008)) [hereinafter SPA].

[6] The parties bargained for a 51/49 split of the shares. The Trump Group permitted Genger to retain a 51.85% stake because Trans-Resources' lender, Bank Hapoalim, had an option over 1.85% of Trans-Resources' stock, known as the "Balance Shares." If Bank Hapoalim did not exercise its option, the Balance Shares were to be distributed to the non-TPR stockholders, in proportion to their stockholdings. July 2010 Op. *5; *see* SA § 1.6. It is undisputed that Bank Hapoalim did not exercise its option.

indirectly own[ed] 100% of the outstanding common stock" of Trans-Resources.[7]  The
Stockholders Agreement set out a formula determining who had the right to designate
directors to the Trans-Resources six-person board.[8]  The Agreement limited the ability of
all stockholders to transfer their shares without the consent of the other stockholders.
TPR was only permitted to transfer its holding in Trans-Resources freely to Genger,
entities controlled by Genger or TPR, Genger's estate, and (on Genger's death) Genger
family members and trusts.[9]  And, even in the case of such a permitted transfer, TPR still
had to give the Trump Group "written notice."[10]  If Genger wished to have TPR distribute
its Trans-Resources stock to non-permitted transferees, he had to give the Trump Group
both written notice and the right of first refusal.  If Genger attempted to distribute TPR's
Trans-Resources stock in violation of the Stockholders Agreement, such a distribution
was void, and the Trump Group would have the right to purchase those shares.

 In 2004, Genger divorced Dalia.  As part of the divorce settlement, Genger
transferred control of TPR to Dalia.[11]  He also caused TPR to transfer its 52.85% stake in

---

[7] SA pmbl.  Genger was not a party to the Stockholders Agreement, except as to one sentence in respect of Trans-Resources' key man life insurance. *Id.* at 40.

[8] *See id.* § 1.2. The Stockholders Agreement provided that, so long as the Trump Group, TPR, and their permitted transferees controlled a majority of Trans-Resources stock, these stockholders would vote in a bloc so that they designated all six members of the Trans-Resources board.  To simplify for the purposes of this opinion, the Agreement provided that the side with the larger holding (either the Trump Group or TPR) would designate four directors, and the side with the smaller holding would designate two directors.

[9] July 2010 Op. *3-4; *see* SA § 2.1.

[10] SA § 2.1.

[11] Dalia did not receive Trans-Resources stock.  In addition to the Trans-Resources stock, TPR held other assets, supposedly with a total equity value of about $20 million in October 2004. *See* Pls.' Post-Tr. Op. Br. Ex. A, Schedule III(i) (Jan. 15, 2010) (Marital Property (Dec. 31, 2003)) (TPR assets).

Trans-Resources, giving 13.99% to himself (the Genger Shares), 19.43% to the Sagi Trust (the Sagi Trust Shares), and 19.43% to the Orly Trust (the Orly Trust Shares). The trustees of the Sagi and Orly Trusts purported to give Genger irrevocable proxies allowing him to vote these shares for the rest of his life. In addition, the trustees and Genger signed voting trust agreements, under which, if the proxies were ever deemed invalid, the trustees would be obligated to vote their trusts' shares in accordance with Genger's wishes.[12] In his divorce settlement, Genger represented and warranted that *"the TRI Stock [owned by TPR] represents 52.85% of the issued and outstanding shares of common stock of TRI"* and that, apart from options held by Trans-Resources' lender, Bank Hapoalim, on 1.85% of Trans-Resources' stock, *"there exist no other direct or indirect ownership interests in TRI."*[13] But, Genger also represented in his divorce settlement that *"[e]xcept for the Consent of TPR . . . no consent, approval or similar action is required in connection with the transfer of TRI Stock."*[14] That representation was false, because the Stockholders Agreement required that Genger give the Trump Group "written notice" of the transfer to himself, and the right to buy the shares transferred to the Sagi Trust and the Orly Trust.[15] Genger did not give that written notice and right of first refusal, and thus violated the Stockholders Agreement in addition to making a false representation in his divorce agreement.

---

[12] *See* Def's. Pre-Tr. Br. Exx. 23-25 (Dec. 3, 2009) (voting trust agreements).
[13] Genger Br. in Opp'n Ex. 6 art. II § 9(a) (Marital Settlement Agreement (Oct. 2004)) (emphasis added) [hereinafter MSA].
[14] *Id.* (emphasis added).
[15] SA §§ 2.1, 3.1.

In 2008, Trans-Resources was again having financial difficulties, and the Trump Group agreed to bail out the company a second time. The Trump Group negotiated with Bank Hapoalim to reduce Trans-Resources' debt load.[16] And the Trumps and Genger negotiated an agreement whereby, in return for further investment, the Trump Group would take majority control. During their negotiations, the Trump Group discovered that Genger had transferred stock to himself and his children's trusts in violation of the 2001 Stockholders Agreement. Despite their shock at discovering this violation, the Trumps nevertheless finalized their agreement with Genger.[17] But, Genger then reneged on that agreement, because he had found a way of channeling funds from a subsidiary of Trans-Resources to the parent company, and no longer needed the Trumps' assistance. Genger also threatened to sue the Trumps if they challenged the propriety of the 2004 transfers.

### B.   The Trumps Sue In This Court And Federal Court In New York To Take Control Of Trans-Resources

The Trumps responded by informing TPR and Trans-Resources that they were exercising their right under the Stockholders Agreement to purchase the shares subject to the 2004 transfers, and filed suit in the United States District Court for the Southern District of New York to enforce the agreement.[18] At the same time as filing suit, the Trump Group adopted a more efficient method of obtaining control: it purchased the Sagi

---

[16] Bank Hapoalim was no longer willing to negotiate with Genger, because it had lost confidence in him. July 2010 Op. *8.

[17] *Id.* at *9.

[18] Compl., *Glenclova Inv. Co. v. Trans-Resources, Inc.*, 08-CV-7140(JFK) (S.D.N.Y. Aug. 11, 2008). The Stockholders Agreement had a forum selection clause providing that disputes would be resolved in the United States District Court for the Southern District of New York, or, if that court did not have jurisdiction, in New York state court in Manhattan. SA § 6.4.

Trust Shares from Sagi, who was hostile to Genger, under a Stock Purchase Agreement.

To cover its bases, the Trump Group negotiated that, if the 2004 transfers were found to

be void, and the Sagi Trust Shares were still held by TPR, then the purchase was to be

considered as between TPR and the Trump Group.[19]  This was possible because Sagi had

purchased control of TPR from his mother, Dalia, with whom he was aligned.[20]

Therefore, no matter what the outcome of the litigation, the Trump Group hoped to own[21]

two-thirds of the stock of Trans-Resources, including its original 47.15% stake and the

19.43% Sagi Trust Shares.[22]  The Trump Group would thereby control two-thirds of the

---

[19] *See* SPA § 10.

[20] The feuding Genger family was split between Genger and Orly, on the one hand, and Dalia and Sagi, on the other.

[21] Despite its best efforts, the Trump Group could not cover all its bases.  Genger advanced two theories at trial why he had the right to purchase the Sagi Trust Shares. *See* Def's. Post-Tr. Op. Br. 39-42 (Jan. 15, 2010) (arguing that the Trump Group had improperly pledged the Sagi Trust Shares, and that Genger had the right to buy them); Def's Post-Tr. Ans. Br. 24 n.18 (Feb. 5, 2010) (arguing that the Sagi Trust was not permitted to transfer its shares to the Trump Group, and that Genger could vote these shares).  Like many of Genger's other "ever-changing" arguments, I did not directly address these theories at trial. July 2010 Op. *12.  Instead, I focused on Genger's two fundamental and most plausible theories: first, that Genger notified the Trump Group of the 2004 transfers, or that the Trump Group ratified these transfers; and second, that the Trump Group took the Sagi Trust Shares subject to a proxy.  Because Genger did not bear his evidentiary burden as to those theories, there was no need to consider his alternative arguments. *Id.* at *13.  For example, even if the Trump Group had improperly pledged the Sagi Trust Shares in violation of the Stockholders Agreement, once I had found that the transfer of Trans-Resources stock to Genger was void, the immediate conclusion was that Genger was not a Trans-Resources stockholder and had no standing to claim rights under the Stockholders Agreement.  Likewise, once I found that the transfer of Trans-Resources stock to Genger was invalid, any rights that Genger might have been able to claim under the Stockholders Agreement to vote the shares transferred from TPR to the Sagi Trust would disappear.

Therefore, it was not necessary for me to address, individually, all of Genger's multifarious arguments, and I focused on the two key theories on which Genger relied for all his other theories.  Genger dropped most of these arguments on appeal, perhaps realizing that he had to prevail on one of his two key theories in order to win at all.

[22] In the Stock Purchase Agreement, the Trump Group also bargained to buy Genger's and the Orly Trust's pro rata allocations of the Balance Shares, constituting another 1.17% of Trans-

voting interest in Trans-Resources, unless a court found that the irrevocable proxy that Genger claimed to have over the Sagi Trust and Orly Trust Shares remained with those shares after they were sold. Concurrent with executing the Stock Purchase Agreement, the Trump Group entered into a Side Letter Agreement with TPR, giving it an option to purchase the Genger Shares and the Orly Trust Shares, in the event that the 2004 transfers were found to be void and those blocks of shares reverted to TPR.[23]

At the same time as filing suit in federal court in New York, the Trump Group sought a judicial determination in this court under 8 *Del. C.* § 225 that it had the right to elect a majority of the Trans-Resources board, on the ground that it held two-thirds of the company's voting stock. Genger sought to dismiss or stay the § 225 action, while simultaneously seeking to intervene in the federal action in order to protect his interests in Trans-Resources' stock.[24]

The Trump Group and Genger quickly settled the original Delaware lawsuit, stipulating, in September 2008, that the Trump Group had a right to elect a majority of Trans-Resources' board. But the following month, the Trump Group discovered that documents on Trans-Resources' computer systems had been destroyed, in violation of a Status Quo Order I had entered.[25] The Trump Group then sought to reopen the § 225 proceeding, and to hold Genger in contempt for despoiling evidence. Genger agreed to

---

Resources stock, in case the transfers of the Genger and Orly Trust Shares were found to be void. *See* July 2010 Op. *19 (quoting SPA § 11).

[23] *See* Pls.' Op. Br. Ex. C (Side Letter Agreement (Aug. 22, 2008)).

[24] Def's. Mot. To Dismiss or Stay Ex. C (Sept. 8, 2008) (Mem. of Law in Support of Arie Genger's Mot. To Intervene, No. 08-CV-7140(JFK) (S.D.N.Y. Sept. 5, 2008)).

[25] Stip. Status Quo Order (Aug. 29, 2008).

reopen the previous action, and filed a plenary counterclaim, asking this court to declare

that he was the "rightful owner" of the 13.99% Genger Shares, and that the Orly Trust

was the "rightful owner" of the 19.43% Orly Trust Shares.[26]  In Genger's own words, he

was willing to "reopen this matter for the litigation of all issues between the parties,

including the underlying issue of share ownership."[27]  Genger reiterated his request to

have this court adjudicate the question of the beneficial ownership of all the Trans-

Resources shares held by TPR at least another four times.[28]  Genger also asked this court

to find that he had the right to elect a majority of the Trans-Resources board.[29]

Furthermore, he asked this court to find that the transfer of shares from the Sagi Trust to

the Trump Group was void, or, if it was not void, that he retained a proxy over those

shares.[30]  Genger also successfully moved to stay the federal action—even though he had

---

[26] V. Cross-cl. & Countercl. ¶ 36(c) (Jan. 5, 2009).

[27] Mem. in Opp'n to Pls.' Mot. for a Contempt Order 4 (Oct. 31, 2008).

[28] Def's. Mot. to Reopen Case and for Entry of a Standstill Order 9 (Nov. 10, 2008) (". . . Mr. Genger was compelled to bring this Motion to preserve the status quo until this Court can resolve the parties' dispute over share ownership and voting rights."); V. Countercl. ¶ 36 (Mar. 30, 2009) (seeking identical relief to that requested in January 5, 2009 counterclaim); Stip. Pre-Tr. Order 6-7 (Dec. 4, 2009) (requesting that this court find that Genger, the Orly Trust, and the Sagi Trust respectively held 13.99%, 19.43%, and 19.43% of Trans-Resources' stock, and that the Sagi Trust could not transfer its stock to the Trump Group); Def's. Post-Tr. Op. Br. 9 (Jan. 15, 2010) (asking this court to find that Genger had "economic rights" to 13.99% of Trans-Resources' stock, that the Orly Trust had "economic rights" to 19.43% of Trans-Resources' stock, and that Genger had the right to purchase the Sagi Trust shares).

[29] V. Cross-cl. & Countercl. ¶ 36(a) (Jan. 5, 2009). In the alternative, Genger asked this court that, if the Stockholders Agreement was found to be unenforceable, he be permitted to elect all members of the board.

[30] Id. ¶ 36(b).

only just intervened in it—because he represented to the federal court that the Delaware proceedings would "likely resolve" the issues in that case.[31]

### C. This Court Finds That The Trump Group Is Entitled To Purchase All Of Trans-Resources' Stock

In September 2009, I held a trial on the question of whether Genger had despoiled evidence and violated the status quo order. After trial, I found that he had, and, as part of the remedy for his contempt, I increased the burden of proof that he would have to meet in order to prevail at the trial in the forthcoming § 225 action.[32] Thus, if Genger would have been able to prevail on an issue by a preponderance of the evidence without the sanction, he would now need to prove the matter by clear and convincing evidence.[33] I also ruled that, because his conduct had led to me have severe doubts about his credibility, his uncorroborated testimony would not be sufficient for him to prevail on any material factual issue at trial.[34]

In July 2010, after a trial, I found that Genger had violated the Stockholders Agreement by transferring the Trans-Resources stock out of TPR. First, Genger had violated the Agreement by transferring the Genger Shares to himself without giving the Trump Group written notice. Genger was a "permitted transferee" under the Stockholders Agreement, meaning that he could transfer Trans-Resources stock out of

---

[31] *Glenclova Inv. Co. v. Trans-Resources, Inc.*, 874 F. Supp. 2d 292, 297 (S.D.N.Y. 2012) [hereinafter S.D.N.Y. Op.].
[32] *T.R. Investors, LLC v. Genger*, 2009 WL 4696062, at *18-19 (Del. Ch. Dec. 9, 2009) [hereinafter Dec. 2009 Op.].
[33] *Id.*
[34] *Id.*

TPR to himself, but he still had to give the Trump Group written notice of this transfer.[35] Second, Genger had violated the Stockholders Agreement by transferring Trans-Resources stock to the Sagi and Orly Trusts without giving the Trump Group written notice or the right of first refusal, because the trusts were not permitted transferees under the Stockholders Agreement.[36]

I found that, because Genger had improperly transferred the Trans-Resources stock, these transfers were void and the stock reverted to TPR.[37] I then found that the Trump Group had the right to buy the Sagi Trust Shares from TPR, under the Stock Purchase Agreement that the parties had made.[38] Together, these determinations were essential to the § 225 action. The issue of whether the Trump Group had the right to buy the Sagi Trust Shares from TPR was directly relevant to the question of who could vote these shares, and thus who controlled Trans-Resources.[39] If the Trump Group had bought

---

[35] July 2010 Op. *3.

[36] Id. at *4.

[37] In making this finding, I rejected Genger's two main arguments, which were that the Trump Group had ratified the transfers, and that the Trump Group had had adequate notice of the transfers. Id. at *13-18.

[38] Id. at *19.

[39] In its original complaint, the Trump Group sought the right to designate four members of the six-member Trans-Resources board. V. Compl. 5 (Aug. 25, 2008). In its amended complaint, which was operative in the trial, the Trump Group again sought the right to "designate . . . a majority" of the Trans-Resources board, and also sought to determine that TPR, controlled by Sagi, had the right to designate the remaining two members of the board. Am. V. Compl. ¶ 46(i) (Mar. 11, 2009). The Supreme Court observed that the Trump Group initially only sought the right to designate a majority of the Trans-Resources board, not all of the board. Supr. Ct. Op. 200 & n.89. But, the Supreme Court also noted that, after my July 2010 opinion, "all parties agreed that the scope of the Section 225 action should be expanded to encompass which side had the right to designate and elect the two remaining Trans-Resources directors," and held that there was nothing improper with this court deciding which side could designate all six directors. Id. at

15

the Sagi Trust Shares under the Stock Purchase Agreement, as it claimed, it would be able to vote them, because they would no longer be covered by Genger's proxy.[40]  Thus, my July 2010 decision that the Trump Group could vote the Sagi Trust Shares, and had majority control of the Trans-Resources board, rested on three essential grounds: (1) that Genger had transferred the Trans-Resources stock out of TPR in violation of the Stockholders Agreement, (2) that this stock reverted to TPR, and (3) that the Trump Group had the right to buy the improperly transferred stock under the Purchase Agreement.

Importantly, these findings applied to all of the Trans-Resources stock held by TPR, as all the shares were identically situated and were *treated alike by Genger himself*. But, I initially did not grant the Trump Group the right to buy the Genger Shares and Orly Trust Shares.[41]  The reason was as follows. I placed weight on the fact that the Trump Group had entered into a Stock Purchase Agreement with TPR, whereby it obtained the right to buy the Sagi Trust Shares, and I thus considered that the Trump Group had "settle[d]" its rights as to TPR.[42]  This outcome appealed to my initial sense of equity, as it seemed to me that allowing the Trump Group to buy all of the Trans-Resources stock

200-01. Thus, the ultimate scope of the § 225 action, as affirmed by the Supreme Court, was the designation of the entire Trans-Resources board.

[40] July 2010 Op. *20-22 (finding that the proxy did not run with the Sagi Trust Shares after they were transferred out of the Sagi Trust, and therefore that the Trump Group did not buy the shares subject to the irrevocable proxy).

[41] *Id.* at *19. I noted that the Trump Group had bargained for the right to buy the 64% of the Balance Shares at the same time, *i.e.*, those Balance Shares that were part of the Genger Shares and the Orly Trust Shares. *Id.* Because the Balance Shares have been stripped out of the Genger Shares, the Genger Shares no longer represent 13.99% of the share capital of Trans-Resources. Rather, they represent approximately 13.5%.

[42] *Id.*

was a "disproportionate" remedy.[43] I thus ruled that Genger could cure the 2004 transfers

to himself by giving the Trump Group notice and signing on to the Stockholders

Agreement.[44] I also noted that the Orly Trust Shares were not before the court, and that

adjudicating the shares that were wrongfully transferred to the Orly Trust was not

necessary to deciding who controlled Trans-Resources.[45]

But, after my July decision, the parties brought more closely to my attention the

Side Letter Agreement, under which the Trump Group had contracted for the right to buy

the Genger Shares and the Orly Trust Shares from TPR, just as it had contracted to buy

the Sagi Trust Shares from TPR in its "base-covering" provision in the Stock Purchase

Agreement.[46] I also reflected on the fact that my initial instinct as to the equities was

wrong, because it rewarded the wrongdoer, Genger, and slighted the contractual

expectations of the Trump Group under the Stockholders Agreement.[47] I therefore issued

a new opinion, hewing to the contractual expectations of the parties, and holding that the

Trump Group had the right to buy the Genger and Orly Trust Shares.[48]

My August 2010 opinion followed logically from the essential findings of my July

opinion. The opinion sought to resolve both the § 225 action, and Genger's

counterclaim: the Trump Group, in the § 225 action, had asked me to declare who had the

right to elect the directors of Trans-Resources, and Genger had asked me to decide in his

---

[43] *Id.*

[44] *Id.*

[45] *Id.*

[46] *See TR Investors, LLC v. Genger*, 2010 WL 3279385 (Del. Ch. Aug. 9, 2010) [hereinafter Aug. 2010 Op.].

[47] *Id.* at *2.

[48] *Id.* at *3.

counterclaim who owned the Genger and Orly Trust Shares.[49]  And so, to recap, in

resolving these claims, I had reached three essential determinations: (1) that Genger had

transferred the Trans-Resources stock out of TPR in violation of the Stockholders

Agreement, (2) that this stock reverted to TPR, and (3) that the Trump Group had the

right to buy *all* the Trans-Resources stock from TPR.

### D.   Genger Opens A New Litigation Front In New York Supreme Court

Immediately after I issued this decision, Genger sought a TRO and preliminary

injunction in the New York Supreme Court to prevent the transfer of the Genger and Orly

Trust Shares to the Trump Group.[50]  That action (the "New York Action") is still

ongoing.[51]  Genger obtained the TRO, but moved to withdraw it, and his related motion

for a preliminary injunction, after TPR and Sagi agreed to be bound by this court's

existing Status Quo Order that required the Trump Group to give Genger five business

days' notice of certain business transactions.[52]  Shortly thereafter, as part of my final

order in the Delaware action, I issued an injunction against most further actions in New

---

[49] *Id.* at *2; *see also* Am. Compl. 17 (Mar. 11, 2009).

[50] *See* Order To Show Cause & TRO, *Genger v. Genger*, Index No. 651089/2010 (N.Y. Sup. Ct. July 25, 2010).  This case is referred to as the "N.Y. Action."  The affidavits in support of this action were dated on the same day as this court's July 2010 decision, and the summons was dated July 20, three days *before* the July 2010 decision, although it was filed later.

[51] Two other actions relating to the Trans-Resources shares are ongoing in New York Supreme Court, but are not relevant here.  The first action was originally filed by Orly against Dalia, Sagi, and TPR in 2009 for allegedly looting the Orly Trust.  *See* V. Compl., *Genger v. Genger*, Index No. 109749/2009 (N.Y. Sup. Ct. July 8, 2009).  The second action was originally filed by Dalia, in her individual capacity and as the trustee for the Orly Trust, against Arie, for allegedly violating their divorce agreement by failing to transfer the Trans-Resources shares to the Orly Trust.  *See* Compl., *Genger v. Genger*, Index No. 113862/2010 (N.Y. Sup. Ct. Oct. 21, 2010).

[52] Order, N.Y. Action (Aug. 4, 2010); *see* Letter to the Court from Jessica Zeldin, at 2 (Aug. 2, 2010); Second Am. Status Quo Order ¶ 2 (Dec. 30, 2008).

York state court while Genger appealed my decisions to the Delaware Supreme Court.[53] That order also provided that if the Trump Group did purchase the Genger and Orly Trust Shares from TPR, Genger was permitted to seek an order that the money for these shares should be placed in escrow.[54] In addition, I entered a Status Quo Order Pending Appeal, under which the Trump Group was required to give Genger ten days' notice of certain business transactions.[55]

The Trump Group and TPR entered into a First Escrow Agreement in September 2010, providing that $5.9 million of the proceeds from the Genger Shares—*i.e.*, all the proceeds apart from $1.5 million—would be held in escrow, and would be released after the Delaware Supreme Court affirmed the Final Judgment Order, or after Genger's time to appeal expired.[56] The remaining $1.5 million would be paid directly from the Trump Group to TPR.[57] After the Trump Group gave Genger notice of this proposed transfer, as required under the Status Quo Order Pending Appeal, Genger sought and obtained a TRO in New York Supreme Court requiring that *all* of the sale proceeds from the Genger Shares should be placed in escrow.[58] In November, the New York court extended the TRO, pending the decision on Genger's application for a preliminary injunction.[59] In

---

[53] Final J. Order ¶ 19 (Aug. 17, 2010).

[54] *Id.*

[55] Status Quo Order Pending Appeal (Aug. 17, 2010).

[56] TPR Op. Br. Ex. B. (Escrow Agreement (Sept. 2010)) [hereinafter First Escrow Agreement]. The Trump Group, TPR, the Orly Trust, and Orly also entered into an escrow agreement to hold the money for the Orly Trust Shares. The Orly Trust Shares are not before the court in this action.

[57] *Id.*

[58] Order To Show Cause & TRO, N.Y. Action (Oct. 5, 2010).

[59] Order, N.Y. Action (Nov. 12, 2010).

January 2011, the Trump Group and TPR entered into a Second Escrow Agreement, providing that the remaining $1.5 million would also be held in escrow.[60] In February 2011, the Trump Group purchased the Genger Shares from TPR, and the proceeds were placed in escrow according to the First and Second Escrow Agreements.[61] At the same time, the New York Supreme Court issued a preliminary injunction providing that TPR and Sagi could not take or use any of the proceeds from the Genger Shares "pending a determination by the Delaware Supreme Court of the Delaware Action and/or a resolution of this action."[62]

### E. The Delaware Supreme Court Upholds The Finding That Genger Improperly Transferred TPR's Trans-Resources Stock, And That The Stock Reverted To TPR

Genger appealed all three of my decisions in his case to our Supreme Court. These decisions were my December 2009 opinion, where I found that Genger had despoiled evidence and was guilty of contempt; my July 2010 opinion, where I found that the Trump Group had the right to purchase the Sagi Trust Shares; and my August 2010 opinion, where I found that the Trump Group had the right to purchase all the Trans-Resources stock transferred out of TPR.

*The December 2009 Opinion.* Genger appealed this opinion on the grounds that there was no factual or legal basis for holding him in contempt, and that the $3.2 million I

---

[60] Pls.' Br. in Opp'n Ex. 2 (Escrow Agreement (Jan. 2011)) [hereinafter Second Escrow Agreement].

[61] Hirsch Aff. ¶¶ 4-5, 7 (Dec. 12, 2012).

[62] Decision & Order, N.Y. Action, at 13 (Feb. 17, 2011).

awarded against him in fees was disproportionate and an abuse of discretion.[63]  The

Supreme Court rejected both of these contentions, and affirmed the decision in full.[64]

   *The July 2010 Opinion.*  Genger appealed this opinion on two grounds.  First, he

argued that the Trump Group had ratified the 2004 transfers.[65]  Second, he argued that the

Sagi Trust Shares were still covered by his proxy.[66]  The Supreme Court rejected both of

these arguments.[67]  The court wrote: "[W]e uphold the judgment of the Court of

Chancery insofar as it adjudicates the merits of the Trump Group's Section 225 claims."[68]

Because I had decided that the Trump Group had the right to vote the Sagi Trust Shares,

the Supreme Court necessarily affirmed the finding that the Trump Group had the right to

---

[63] Corrected Appellant's Op. Br. 29-35, No. 592, 2010 (Del. Nov. 16, 2010); Appellant's Reply Br. 16-20, No. 592, 2010 (Del. Dec. 23, 2010).

[64] Supr. Ct. Op. 191-94.  The court also noted that Genger was explicitly barred from arguing that the amount of the attorneys' fee award against him was disproportionate.  As the Supreme Court observed, Genger had agreed in the Final Judgment Order that he would not challenge the attorneys' fee award on these grounds.  Instead, he would only challenge the fee award on the ground that it was "improper to award *any* sanction" for the contempt finding against him.  *Id.* at 194 (emphasis added) (quoting Final J. Order ¶ 16 (Aug. 17, 2010)).  Therefore, the Supreme Court reviewed the fee award only for "plain error," and found none. *Id.*

[65] Corrected Appellant's Op. Br. 17-21, No. 592, 2010 (Del. Nov. 16, 2010); Appellant's Reply Br. 2-7, No. 592, 2010 (Del. Dec. 23, 2010).

[66] Corrected Appellant's Op. Br. 21-24, No. 592, 2010 (Del. Nov. 16, 2010); Appellant's Reply Br. 8-11, No. 592, 2010 (Del. Dec. 23, 2010).

[67] Supr. Ct. Op. 194.  Genger challenged each of the "three reasons" why I held his proxy did not cover the Sagi Trust Shares, namely (i) the proxy did not provide that it was to run with the shares if the shares were sold, (ii) public policy considerations prevented the separation of voting from control, and (iii) the proxy was not irrevocable under New York law. *Id.* at 196-97.  The Supreme Court rejected his arguments as to the first point, noting that the plain language of the proxy held that it did not run with the shares after sale. *Id.* at 197.  As to the second point, the Supreme Court eschewed arguments of public policy, simply noting that the proxy did not conform to the requirements of New York law. *Id.*  And, as to the third point, the court noted that Genger, by claiming that the proxy did conform to New York requirements, was improperly raising an argument on appeal that was never "fully and fairly presented to the trial court." *Id.* at 197.  Therefore, the Supreme Court did not consider Genger's new argument, although it noted that it was "unsupported by the record." *Id.*

[68] *Id.* at 198.

buy the Sagi Trust Shares. And, because it did not disturb the finding that the Trump Group did not ratify the transfer of the Sagi Trust Shares out of TPR, the Supreme Court also affirmed the essential determinations that the Sagi Trust shares were improperly transferred, and that they reverted to TPR.

*The August 2010 Opinion.* Genger appealed this opinion on two grounds. Genger claimed that, because he was a permitted transferee under the Stockholders Agreement, the transfer of shares to him should not have been deemed void, even if the transfers to the Sagi Trust and the Orly Trust were void.[69] And, Genger claimed that this court "exceeded its authority" in adjudicating the ownership of the Genger and Orly Trust Shares.[70] *As the Supreme Court noted, this second argument was an "about-face," because Genger had asked for this very question to be decided in his plenary counterclaim.*[71]

The Supreme Court rejected Genger's claim that, because he was a permitted transferee, the transfer of shares to him was not void.[72] But, it agreed that this court "exceeded its powers" as to the adjudication of the ownership of the Genger and Orly Trust Shares.[73] The court noted that a § 225 proceeding is an *in rem*, not a plenary, action, and "[o]nly in a plenary proceeding before a court that has *in personam*

---

[69] Corrected Appellant's Op. Br. 28, No. 592, 2010 (Del. Nov. 16, 2010); Appellant's Reply Br. 15, No. 592, 2010 (Del. Dec. 23, 2010).
[70] Corrected Appellant's Op. Br. 24, No. 592, 2010 (Del. Nov. 16, 2010); Appellant's Reply Br. 12-14, No. 592, 2010 (Del. Dec. 23, 2010).
[71] Supr. Ct. Op. 199.
[72] *Id.* at 201 (noting that this court's determination that "that TPR was the record owner [of] and entitled to vote" the Genger Shares "pose[d] no problem").
[73] *Id.*

22

jurisdiction over the litigants may the court adjudicate the litigants' property interest in disputed corporate shares."[74]  The Supreme Court held that this court had lacked personal jurisdiction over two indispensable parties.  First, TPR was absent from the action, but, because it had an interest in the Genger and Orly Trust Shares, its presence was required before the ownership of these shares could be determined.[75]  Second, the Orly Trust was also absent, and because it had an interest in the ownership of the Orly Trust Shares, its presence was also required.[76]  Therefore, the Supreme Court reversed my August 2010 opinion to the extent that these two indispensable parties were absent.[77]

But, the Supreme Court did not fully reject my August 2010 opinion.  The Supreme Court explicitly affirmed it insofar as it found that TPR was entitled to vote the Genger and Orly Trust Shares.  The court held:

---

[74] Id.

[75] Id. at 202.

[76] Id. at 202-03.

[77] The Supreme Court's opinion is, at first blush, confusing, but becomes clearer in light of the position taken by the new counsel Genger retained for his appeal.  Genger's counsel only argued that an indispensable party was missing as to the adjudication of ownership of the Genger Shares and the Orly Trust Shares.  Corrected Appellant's Op. Br. 24-27, No. 592, 2010 (Del. Nov. 16, 2010).  The Supreme Court agreed, and found that TPR and the Orly Trust should have been joined to the action.  But even though the Supreme Court found that TPR was an indispensable party, the court did *not* reverse my determination of ownership of the Sagi Trust Shares.  This is odd, because, if TPR was an indispensable party as to the sale of the Genger and Orly Trust Shares, surely it was an indispensable party as to the sale of the Sagi Trust Shares also.

The answer to this apparent inconsistency lies, I believe, in the fact that Genger's counsel never sought to have my determination of the ultimate ownership of the Sagi Trust Shares reversed on appeal.  What Genger wanted was for the Supreme Court to decide that he retained a proxy over the Sagi Trust Shares, so that he could still vote them. *Id.* at 21-23.  Therefore, the Supreme Court was faced with Genger's inconsistent argument that this court could decide the ownership of the Sagi Trust Shares, even though TPR was absent, but it could not decide the ownership of the Genger and Orly Trust Shares.

23

> If the only new issue decided [in the August 2010 opinion] was who
> constituted the lawful record owners of the Genger and Orly Trust shares,
> the Court of Chancery's Side Letter Opinion and subsequent Final
> Judgment Order would pose no problem. The trial court determined that
> TPR was the record owner and entitled to vote.[78]

The Supreme Court thus explicitly left undisturbed the findings in my July and

August 2010 opinions that the Genger Shares and the Orly Trust Shares had been

improperly transferred, and that they reverted back to TPR. Thus, the Supreme Court

treated these two blocks of shares in an identical manner to the Sagi Trust Shares. The

Supreme Court also noted that it was necessary to make these findings in order to decide

who had the right to vote the Genger and Orly Trust Shares, which the § 225 action was

intended to resolve.[79]

The Supreme Court observed that there was a logical connection between the

shares reverting to TPR, and the Trump Group having the right to buy them. The court

said:

> If the Trump Group was . . . entitled [to buy the Genger and Orly Trust
> Shares], then as a legal matter those shares would continue to be held by
> TPR, and Genger and the Orly Trust would have no Trans-Resources shares
> to vote to elect the remaining two directors. If, however, the Trump Group
> had no contractual right to purchase the Genger and the Orly Trust Shares,
> then under the Stockholders Agreement, Genger would be entitled to
> designate the remaining two Trans-Resources directors.[80]

---

[78] Supr. Ct. Op. 201.

[79] As I have said, the Supreme Court observed that the Trump Group had requested, in the § 225
action, a finding that it was entitled to elect the majority of the Trans-Resources board, *i.e.*, four
directors, not all six. *Id.* at 200 n.89. But, the Supreme Court held that the action could also
determine who had the right to elect the other two directors. *Id.* at 200.

[80] *Id.* This point was also noted by the federal district court in New York:
> All potential claimants acknowledge that if Arie and the Orly Trust are deemed to
> be the beneficial owners of the Arie Shares and Orly Trust Shares, then the Trump
> Group's purchase of shares from TPR would be rescinded and the interpleaded

The Supreme Court rejected Genger's claim that my finding that the Trump Group could purchase the Genger and Orly Trust Shares was not relevant to the § 225 action:

> Genger contends that adjudicating the validity of the 2004 Transfers under the Side Letter Agreement exceeded the Court of Chancery's jurisdiction, because the *Trump Group's right to buy, and TPR's right to sell*, the Genger Shares and the Orly Trust Shares were "collateral" issues, *i.e.*, unnecessary to resolve the merits of the Section 225 claims. We . . . reject [this contention].[81]

Therefore, in affirming my July 2010 opinion, which held that the Trump Group owned and could vote the Sagi Trust Shares, and in affirming my August 2010 opinion insofar as it held that TPR could vote the Genger and Orly Trust Shares, the Supreme Court explicitly and implicitly affirmed the three essential grounds on which my decisions had rested: (1) that Genger had transferred the Trans-Resources stock out of TPR in violation of the Stockholders Agreement, (2) that this stock reverted to TPR, and (3) that the Trump Group had the right to buy this stock from TPR.

After the Supreme Court's ruling, the parties negotiated, and I entered, a Revised Final Judgment Order, which provided that the Trump Group was the owner of 67.75% of Trans-Resources' stock, and that TPR could vote any shares that the Trump Group did not own.[82] The Revised Final Judgment Order explicitly memorialized the three determinations that were essential to my decisions:

---

> funds would go back to the Trump Group. But, if the 2004 transfer of shares to Arie and the Orly Trust is found to be invalid, then TPR had the right to sell the shares to the Trump Group . . . .

S.D.N.Y. Op. 303.
[81] Supr. Ct. Op. 199 (emphasis added).
[82] Rev. Final J. Order ¶¶ 7-8 (Aug. 19, 2011).

11. All of the transfers of shares of the authorized and issued stock of Trans-Resources that Arie Genger purported to cause TPR to make in 2004 (to himself, the Sagi Genger 1993 Trust, and the Orly Genger 1993 Trust) were in violation of the Stockholders Agreement.

12. As a result, the transfers were void, the purportedly transferred shares continued at all times to be owned of record by TPR, and Investors and Glenclova had the right under Section 3.2 of the Stockholders Agreement to buy all of the shares purportedly transferred by TPR.[83]

F.  The Trump Group Files A New Complaint In This Court, And The Federal Court Stays Its Action

Four days after the Supreme Court's decision, the Trump Group filed a new complaint in this court, naming Genger and TPR as defendants, in order to cure the jurisdictional defect that had led to the Supreme Court vacating my decision as to the beneficial ownership of the Genger Shares.[84] The Trump Group then moved for summary judgment against Genger.[85] That motion is before the court today.

In August 2011, Genger filed an order to show cause against Sagi in New York Supreme Court seeking to extend the preliminary injunction covering the use of the escrowed funds granted by that court in February 2011.[86] The New York Supreme Court entered the order,[87] and in December 2011 again issued an injunction providing that the escrowed funds should not be disturbed, "pending the determination by a court of competent jurisdiction the beneficial ownership of such shares."[88] Under the terms of the

---

[83] *Id.* ¶¶ 11-12.
[84] V. Compl., C.A. No. 6697-CS (July 22, 2011).
[85] Pls.' Mot. for Summary J., C.A. No. 6697-CS (Sept. 2, 2011).
[86] Order To Show Cause & TRO, N.Y. Action (Aug. 9, 2011).
[87] Order To Show Cause, N.Y. Action (Aug. 19, 2011).
[88] Decision & Order, N.Y. Action, at 14 (Dec. 28, 2011)) [hereinafter N.Y. 2011 Op.].

New York court's new injunction, the Trump Group was required to give Genger "ten business days' notice of future transactions that may impact" the Genger Shares.[89]

In an effort to try to reduce the multiforum morass in which the parties were stuck, I encouraged the parties to allow the United States District Court for the Southern District of New York a chance to decide the original case that had been filed before it.[90] This was the forum first invoked by the Trump Group, and in the state where Genger apparently wished to litigate, having lost his previous enthusiasm to have this court decide his claim. Our Supreme Court also suggested that this would be a suitable forum for the dispute, and the New York Supreme Court observed that the federal court should decide where the action would go forward.[91]

In June 2012, the federal district court issued a decision on the Trump Group's original claim, and on two related interpleader actions filed by the agents for the escrowed funds for the Genger and Orly Trust Shares.[92] The court noted that Genger's attempt to relitigate the question of share ownership in New York state court was "little more than a collateral attack on the Delaware Supreme Court ruling."[93] And, it observed that Genger's position was fundamentally inequitable:

> [E]ven though Arie is the party who made false representations in [his divorce settlement], his reformation claim does not seek to right that wrong.

---

[89] *Id.* at 15. About this time, in October 2011, Dalia Genger filed suit against the Trump Group in this court, seeking a declaration that the Orly Trust was the beneficial owner of the Orly Trust shares. V. Compl., *Genger v. TR Investors, LLC*, C.A. No. 6906-CS (Oct. 4, 2011). Orly obtained a TRO and injunction against this action. *See* Order, N.Y. Action (Apr. 9, 2012).

[90] *See* Tr. of Telephone Conf. 25, C.A. No. 6697-CS (Nov. 10, 2011).

[91] Supr. Ct. Op. 203 n.98; Decision & Order, N.Y. Action, at 7, 14 (Dec. 28, 2011).

[92] *See* S.D.N.Y. Op. 298-99.

[93] *Id.* at 297.

Instead, he wants to change the terms of the agreement in a manner designed to undo the Delaware Chancery Court's finding of liability against him, thereby allowing him to avoid the consequences of his own breach of the 2001 Stockholders Agreement—the Trump Group's right to purchase those invalidly transferred shares.[94]

The court dismissed the interpleader actions.[95] The court also resolved to stay the original action in favor of proceedings pending in the Delaware and New York state courts, while maintaining jurisdiction.[96]

### G. The New York Supreme Court Rejects Genger's Collateral Attacks On The Delaware Rulings, And The Trump Group's Action Here Continues

With the federal action stayed, the state court actions continued here and in New York. In January 2013, the New York Supreme Court issued a ruling on the defendants' motion to dismiss the complaint that Genger and Orly filed in the New York Action.[97] In that action, Genger advanced various arguments to recover ownership of Trans-Resources, which included recycled versions of arguments he had made, and failed to prevail upon, in the earlier Delaware case.[98] Genger sought to reform his divorce

---

[94] *Id.* at 311.

[95] *Id.* at 314.

[96] *Id.*

[97] Am. Decision & Order, N.Y. Action (Jan. 3, 2013) (appeal and cross-appeal pending) [hereinafter N.Y. 2013 Op.]. The first complaint in the action was dated July 25, 2010, immediately after this court handed down its July 2010 decision, and the operative complaint was filed on September 20, 2011. Third Am. & Suppl. Compl., N.Y. Action (Sept. 20, 2011). The defendants were Trans-Resources, Jules Trump, Eddie Trump, Mark Hirsch (an officer of Trans-Resources), the Trump Group, TPR, Dalia, Sagi, the Sagi Trust, and Rochelle Fang (the trustee for the Sagi Trust).

[98] For example, Genger argued vigorously in New York that he was now entitled to reform his divorce agreement in such a way that he would still control the Trans-Resources stock transferred from TPR. *See, e.g.,* Genger's Opp'n to the Trump Group Defs.' Mot. To Dismiss, N.Y. Action, at 17-19 (Nov. 22, 2011). Genger pointed to a provision of his divorce agreement that stated that, if the agreement was held invalid, "either party may seek reformation of the

agreement so that he could reassert control over the Trans-Resources stock that TPR had held.[99] Genger also sought to have TPR's 52.85% stake in Trans-Resources placed in a constructive trust for his benefit and for the agreement granting control of TPR to Dalia to be rescinded,[100] and alleged that the defendants had been unjustly enriched.[101] Genger moved for an injunction preventing the defendants from transferring or voting all of the Trans-Resources stock held by TPR, including the Sagi Trust Shares,[102] Genger also asserted various claims seeking monetary relief. These included claims for breach of contract, tortious interference with contract, aiding and abetting tortious interference with contract, breach of fiduciary duty, and aiding and abetting breach of fiduciary duty.[103]

The New York court dismissed the complaint in large part. The court gave preclusive effect to this court's rulings, and rejected Genger's claim that the decisions of this court and of the Delaware Supreme Court in the prior litigation were not binding on

---

affected provision." MSA art. XVI. Genger had argued this provision of his divorce agreement in this court, without success. *See* Def's Post-Tr. Op. Br. 33-34 (Jan. 15, 2010).

[99] Third Am. & Suppl. Compl., N.Y. Action, ¶¶ 174-89 (Sept. 20, 2011).

[100] *Id.* ¶¶ 190-207, 222-26.

[101] *Id.* ¶ 221. Genger alleged that he had no adequate remedy at law for the unjust enrichment.

[102] *Id.* ¶¶ 190-207, 227-31, 257-64.

[103] *Id.* ¶¶ 208-19, 221, 232-56. Two allegations underlay Genger's claims for monetary relief. The first was that the Trump Group had paid too low a price for Trans-Resources, because it claimed the right to buy the shares at 2004 prices. *Id.* ¶ 105. The second related to the allocation of the price that the Trump Group had paid. *Id.* ¶ 121. Under the Side Letter Agreement, the Trump Group contracted to buy the Genger Shares and the Orly Trust Shares "based upon an aggregate value for all the issued and outstanding shares of Common Stock of the Company of $55,000,000 (as determined in the arbitration proceedings between Arie Genger and Dalia Genger . . .)." Side Letter Agreement 1-2. But, the price paid for the Sagi Trust Shares was $26,715,416—valuing Trans-Resources at approximately $137 million. SPA § 2(a). In the Delaware action, the Trump Group argued that it had paid the Sagi Trust a control premium. *See* Tr. of Office Conference 12:14-17 (July 29, 2010).

him.[104]  Like the federal court, the New York Supreme Court held that to reform

Genger's divorce agreement in such a way that Genger controlled, and could vote, TPR's

52.85% Trans-Resources stock would constitute a collateral attack on the Delaware

Supreme Court's ruling.[105]  The court refused to rescind the transfer of TPR to Dalia.[106]

And, the court refused to grant Genger an injunction preventing the Trump Group from

transferring or voting the stock it had received from TPR, because this too would

constitute a collateral attack on the rulings of the Delaware courts.[107]

The court also dismissed Genger's claims for breach of contract, tortious

interference with contract, and aiding and abetting tortious interference with contract.[108]

But, the court did not dismiss Genger's claims against the Trump Group, TPR, and Sagi

for unjust enrichment, breach of fiduciary duty, and aiding and abetting breach of

fiduciary duty.[109]  Like this court, the New York Supreme Court acknowledged that

Genger might be able to object to the way in which TPR had divided the funds it had

received for TPR's Trans-Resources stock.[110]  That is, the New York Supreme Court

acknowledged that Genger might have a dollar fight within the Genger family (to include

---

[104] N.Y. 2013 Op. 10-14.

[105] *Id.* at 15, 24-25, 32-33.

[106] *Id.* at 34-35.

[107] *Id.* at 19-20, 31.

[108] *Id.* at 22-24, 29-31.

[109] *Id.* at 19 (finding that Genger had adequately pled a claim of unjust enrichment against the Trump Group); *id.* at 21 (finding that Genger had adequately pled a claim of breach of fiduciary duty against the Trump Group); *id.* at 22 (finding that Genger had adequately pled a claim of breach of fiduciary duty against Sagi, and a claim that the Trump Group had aided and abetted this breach of fiduciary duty); *id.* at 25, 27 (finding that Genger had adequately pled a claim of unjust enrichment against TPR and Sagi); *id.* at 28-29 (finding that Genger had adequately pled a claim of breach of fiduciary duty, and aiding and abetting breach of fiduciary duty, against Sagi).

[110] *Id.* at 18-19; *id.* at 25-26 (quoting Aug. 2010 Op. *3).

TPR, which his son Sagi controlled), but that this did not allow him to impede the Trump

Group's ownership, and control, of the Sagi Trust Shares, and hence of Trans-Resources.

This court also resumed proceedings after the federal action was stayed, and, in

September 2012, heard argument on Genger's motion to dismiss the action, or to stay it

in favor of the action in New York.[111] The motion to dismiss or stay was denied.[112] This

court also denied Genger's application for certification of the decision to our Supreme

Court,[113] and the Supreme Court denied interlocutory review.[114] This is the decision,

therefore, on the Trump Group's motion for summary judgment against Genger. It is also

a decision on TPR's cross-motion for summary judgment to obtain the escrowed money

paid for the Genger Shares.

### III. The Trump Group Is Entitled To Summary Judgment On Its Purchase Of The Genger Shares

In the analysis that follows, I explain why the Trump Group is entitled to summary

judgment. Under the doctrine of issue preclusion, Genger is not permitted to relitigate

the issue of whether the Trump Group had the right to purchase TPR's holding of Trans-

Resources stock. The fact that Genger was held to a higher burden of proof in the

previous litigation because of his own misconduct does not affect the issue-preclusive

---

[111] Genger sought to dismiss the action on the ground that this court had no jurisdiction over him, that service of process on him was ineffective, and that the court had no subject matter jurisdiction over the case. Def's. Br. in Support of Renewed Mot. To Dismiss or Stay, C.A. No. 6697-CS (July 9, 2012).

[112] Order, C.A. No. 6697-CS (Sept. 10, 2012).

[113] Order, C.A. No. 6697-CS (Oct. 5, 2012).

[114] *Genger v. TR Investors, LLC*, 54 A.3d 256 (Del. 2012) (TABLE).

nature of the previous action.  Therefore, the Trump Group has the right to purchase the Genger Shares.

The only remaining question is whether the Trump Group has purchased the shares from TPR.  Under Court of Chancery Rule 56(e), a party may support its motion for summary judgment with an affidavit "made on personal knowledge" and "set[ting] forth such facts as would be admissible in evidence."[115]  The Trump Group has submitted such an affidavit and other undisputed record evidence.  Genger has not rebutted these submissions.  Therefore, I grant summary judgment to the Trump Group.

Nevertheless, counsel for Genger has submitted an affidavit under Court of Chancery Rule 56(f), testifying that there are issues of fact that require discovery.[116] Genger has also put forth new arguments in his briefing.  It is not necessary for me to consider this affidavit or these arguments, because the determinations of the previous action have preclusive effect.  Genger himself acknowledges that if the rulings of the previous action are given preclusive effect, the Trump Group is entitled to summary judgment.[117]  But, in the interest of completeness, I consider Genger's arguments anyway, and explain why they do not defeat summary judgment.

---

[115] Del. Ct. Ch. R. 56(e).

[116] *Id.* 56(f) ("Should it appear from the affidavits of a party opposing the motion that the party cannot for reasons stated present by affidavit facts essential to justify the party's opposition, the Court may refuse the application for judgment . . . .").

[117] Genger Br. in Opp'n 25 ("The Trumps Are Not Entitled To Summary Judgment Absent Preclusion").

A. <u>The Trump Group Has The Right To Buy The Genger Shares</u>

1. <u>The Doctrine Of Issue Preclusion Prevents Genger From Challenging The Findings Of The Previous Action</u>[118]

The doctrine of issue preclusion provides that "[w]hen an issue of fact or law is actually litigated and determined by a valid and final judgment, and the determination is essential to the judgment, the determination is conclusive in a subsequent action between the parties, whether on the same or a different claim."[119]  The Supreme Court has adopted a four-prong test for issue preclusion.  Issue preclusion applies if "(1) the issue sought to be precluded [is] the same as that involved in the prior action; (2) that issue [was] actually litigated; (3) [the issue was] determined by a final and valid judgment; and (4) the determination [was] essential to the prior judgment."[120]

---

[118] The Trump Group has also suggested that it should also be able to prevail under the related doctrine of claim preclusion.  The doctrine of claim preclusion provides that "a judgment, once rendered, [is] the full measure of relief to be accorded between the same parties on the same 'claim' or 'cause of action.'" Charles Alan Wright et al., 18 *Federal Practice and Procedure* § 4402 (2d ed., updated 2012) (citation omitted).

Here, the doctrine of claim preclusion is not applicable.  Because two indispensable parties were missing from the previous action—TPR and the Orly Trust—our Supreme Court held that its decision was not the "full measure of relief" between the Trump Group and Genger as to the block in question in this case, the Genger Shares. Supr. Ct. Op. 202-03.  Instead, the Supreme Court suggested the Trump Group obtain relief in a court that had jurisdiction over all the relevant parties to determine the beneficial ownership of the shares. *Id.* at 203 n.98.  Thus, the Supreme Court held that the prior action did not have the effect of barring a future action to determine the beneficial ownership of the Genger Shares and the Orly Trust Shares.  The Revised Final Judgment Order, although it stated that it was a "final judgment," left open the question of the beneficial ownership of the Genger and Orly Trust shares. Rev. Final J. Order ¶¶ 15-16.

[119] Restatement (Second) of Judgments § 27 (1982).

[120] *Acierno v. New Castle Cnty.*, 679 A.2d 455, 459 (Del. 1996) (quoting *Graham v. IRS*, 973 F.2d 1089, 1097 (3d Cir. 1992)); *see also Technicorp Int'l II, Inc. v. Johnston*, 1997 WL 538671, at *4 (Del. Ch. Aug. 25, 1997) (applying the same test to determine if issue preclusive effect was to be given to determinations made in a § 225 action).

The three essential findings that underpin the Trump Group's motion—that the 2004 transfers were invalid, that the Trans-Resources shares reverted to TPR, and that the Trump Group had the right to buy these shares—are all subject to issue preclusion under the Supreme Court's test. As to the first prong of the test, deciding whether the Trump Group could vote the Sagi Trust Shares, which the Trump Group asked me to find in its complaint, necessarily involved the questions of whether the 2004 transfers were valid, whether the Sagi Trust Shares reverted to TPR, and whether the Trump Group had had the right to purchase the Sagi Trust Shares.[121] And, deciding that TPR had the right to vote the Genger Shares and Orly Trust Shares, which was the aspect of my August 2010 opinion that "pose[d] no problem," also involved the exact same questions.[122] Thus, the first prong of the test is satisfied.

As to the second prong of the issue preclusion test, there is no question that these issues were litigated. Much of the trial testimony revolved around the question whether the 2004 transfers were valid, or whether they had later been ratified by the Trump Group.[123] In their post-trial argument and briefing, counsel for each side focused on whether the shares reverted to TPR, and, if so, whether the Trump Group had the right to

---

[121] *See* Supr. Ct. Op. 194-97 (upholding this court's finding that the 2004 transfers were invalid); *id.* at 198 (upholding the judgment of this court "insofar as it adjudicate[d] the merits of the Trump Group's Section 225 claims").

[122] *Id.* at 201.

[123] In fact, *all* witnesses at trial testified on the supposed notice, validity, or ratification of the 2004 transfers, some at great length. *See, e.g.*, Tr. 74-78 (J. Trump – Direct), 281 (Hirsch – Cross), 476-77 (E. Trump – Direct), 555-57 (S. Genger – Direct), 571 (Small – Direct), 626-27 (Dowd – Direct), 785-87 (O. Genger – Direct), 855-60 (A. Genger – Direct), 970-1029 (Lentz – Direct) (Dec. 15-17, 2009).

buy them.[124] Between my July 2010 and August 2010 opinions, counsel renewed these

arguments, with a particular focus on the Genger and Orly Trust Shares.[125] Genger's

lawyers in particular produced a plethora of legal arguments why Genger should retain

control over Trans-Resources, including arguments on appeal by his new counsel

(retained post-trial) that directly contradicted the arguments made earlier by his trial

counsel.[126] The New York Supreme Court noted that Genger had a "full and fair"

---

[124] *E.g.*, Def's. Post-Tr. Op. Br. 15-38 (Jan. 15, 2010); Pls.' Post-Tr. Op. Br. 32-46 (Jan. 15, 2010).

[125] *See, e.g.*, Letter to the Court from Thomas J. Allingham II, Esq. (Aug. 2, 2010); Letter to the Court from Donald J. Wolfe, Jr., Esq. (Aug. 4, 2010). Although the parties focused more on the Trump Group's right to buy the Genger and Orly Trust Shares after my July 2010 opinion, the Side Letter Agreement, under which the Trump Group contracted to buy these shares from TPR, was the subject of briefing, argument, testimony, and even the pre-trial order. *E.g.*, Pls.' Post-Tr. Op. Br. 29-30 (Jan. 15, 2010); Def's. Pre-Tr. Op. Br. 22 n.10 (Dec. 3, 2009); Post-Tr. Oral Arg. 120-22 (Apr. 26, 2010); Tr. 401-02 (Hirsch – Cross) (Dec. 16, 2009); Stip. Pre-Tr. Order 9-10 (Dec. 4, 2009).

[126] At trial, Genger advanced "every conceivable exculpatory theory that ever crossed his lawyers' inventive minds." July 2010 Op. *12. I now summarize his post-trial arguments, many of which I have mentioned elsewhere in this opinion. First, Genger claimed that the Trump Group ratified the 2004 transfers, and the irrevocable proxies, by not objecting to Genger's voting the TPR Shares in a Trans-Resources stockholders meeting on June 25, 2008, twelve days after the Trump Group learned of the 2004 transfers. Def's. Post-Tr. Op. Br. 15-23 (Jan. 15, 2010). Second, Genger claimed that, by purchasing the Sagi Trust Shares from the Sagi Trust, the Trump Group again ratified the 2004 transfers. *Id.* at 23-26. Third, Genger argued that, in any case, the Trump Group had known about the 2004 transfers years before, and had ratified them, or acquiesced in them, in 2005. *Id.* at 26-30. Fourth, Genger claimed that the Trump Group's claims were barred under the statute of limitations, or laches. *Id.* at 30-32. Fifth, Genger claimed that undoing the 2004 transfers would require his divorce settlement to be reformed. *Id.* at 32-39. Sixth, Genger argued that the Trump Group itself violated the Stockholders Agreement when it purchased the Sagi Trust Shares, because it pledged these shares to a lender in return for funding. *Id.* at 39-42. Sixth, Genger argued that his irrevocable proxies over the Sagi Trust Shares and the Orly Trust Shares were valid and effective, and that even if they were deemed ineffective, he still controlled the Sagi and Orly Trust Shares through a backup voting trust agreement. *Id.* at 42-49.

In addition to his main arguments, Genger advanced various theories based on the allegedly inequitable nature of the Trump Group's conduct, claiming that Orly would be disinherited, and that the Trump Group had deliberately engineered a means of obtaining Trans-Resources on the

opportunity to litigate these issues.[127]  A rereading of the briefs filed by Genger suggests that the word "fulsome" would also be apt.

As to the third prong of the test, the three issues were decided in a "final and valid judgment."  As I have explained, the Supreme Court upheld this court's determination that the Trump Group was entitled to purchase the Sagi Trust Shares, because the transfers of those shares were invalid and they reverted to TPR.[128]  And, the Supreme Court also found that the Genger Shares and the Orly Trust Shares were invalidly transferred and reverted to TPR.  Even though the court only ruled that TPR had the right to vote these shares, it noted that, if the shares reverted to TPR, the Trump Group had the

---

cheap. *See id.* at 5, 7.  Genger also suggested that the transfer of the Genger Shares should not be void because the Trump Group had no right of refusal as to those shares. *Id.* at 17 n.5.  And, Genger suggested that the Trump Group had no right to buy the Sagi Trust Shares from TPR, because it was not a "permitted transferee." Def's. Post-Tr. Reply Br. 18 n.24 (Feb. 5, 2010).  None of these arguments was convincing and all were rejected.

On appeal, Genger changed counsel, and some of his arguments.  He pressed again his arguments that the Trump Group ratified the 2004 transfer of shares to the Sagi Trust, and that the Sagi Trust Shares were subject to the irrevocable proxy. Corrected Appellant's Op. Br. 17-23, No. 592, 2010 (Del. Nov. 16, 2010).  He also renewed the argument that, because Genger was a permitted transferee, the transfers should not be voided as to him. *Id.* at 28.

But, as the Supreme Court noted, he subtly altered his argument as to when the Sagi Trust executed a proxy in favor of Genger.  At trial, Genger represented that the Sagi Trust executed the proxy on the same day as the transfer of shares took place; on appeal, he argued that the Sagi Trust executed the proxy on the *following* day. Supr. Ct. Op. 197.  The Supreme Court therefore declined to consider Genger's new reason why the proxy should be considered valid under New York law.  And, more strikingly, Genger made an "about-face" on whether the court should have decided the question of the ownership of the Genger and Orly Trust Shares, and argued that the court had no right to do that, *even though he had asked the court to decide this in his counterclaim.* Supr. Ct. Op. 199; *see* Corrected Appellant's Op. Br. 24-28, No. 592, 2010 (Del. Nov. 16, 2010).

[127] N.Y. 2013 Op. 14.

[128] Supr. Ct. Op. 194-96 (upholding this court's finding that the Trump Group did not ratify the transfers of the Sagi Trust Shares); *id.* at 198 (upholding this court's finding that the Trump Group could vote the Sagi Trust Shares).

right to buy them.[129] And, the Revised Final Judgment Order, which the parties agreed on, provided explicitly that the Trump Group had a right to purchase TPR's stake in Trans-Resources.[130]

Nevertheless, Genger has suggested to this court that the Revised Final Judgment Order is not "final," because it provides that the Trump Group is "presently" the owner of its original 47.15% stake in Trans-Resources and the Sagi Trust Shares.[131] According to Genger, "presently" meant at that moment, and did not prevent him from relitigating the consequences of past events settled definitively by the Revised Final Judgment Order. The implication of this, in Genger's view, is that Genger retains the right to relitigate the ownership of the Sagi Trust Shares.[132] I have rejected this argument, as it would make a mockery of the finality of this court's and our Supreme Court's decisions.[133] After I rejected this argument, Genger offered to stipulate that the word "presently" does no work in the Revised Final Judgment Order,[134] but he nevertheless stressed it twice in his brief in opposition in this motion.[135] I reject this argument again. In any case, Genger

---

[129] *Id.* at 201.

[130] Rev. Final J. Order ¶ 12 ("As a result [of the violation of the Stockholders Agreement], the transfers were void, the purportedly transferred shares continued at all times to be owned of record by TPR, and Investors and Glenclova had the right under Section 3.2 of the Stockholders Agreement to buy all of the shares purportedly transferred by TPR.").

[131] Tr. of Oral Arg. 81:4-19 (Aug. 30, 2012).

[132] *See* Def's. Opp'n to Pls.' Second Mot. To Reopen Case 2-3 (Sept. 25, 2012).

[133] Tr. of Oral Arg. 81:15-82:3, 101:19-102:2 (Aug. 30, 2012).

[134] Def's. Opp'n to Pls.' Second Mot. To Reopen Case 2-3 (Sept. 25, 2012) ("Arie Genger hereby offers to stipulate that the inclusion of the word 'presently' does not change the meaning of the order as compared to its meaning excluding the word 'presently,' without prejudice to his ability otherwise to prosecute his remaining claims, in whatever court or courts ultimately hear them.").

[135] Genger Br. in Opp'n 17, 18.

has only claimed that the Trump Group's ownership of its original holding in Trans-Resources and the Sagi Trust Shares is ephemeral, not that its right to buy the Genger and Orly Trust Shares is likewise temporary.

Finally, as to the fourth prong of the test, I have explained why my resolution of the three issues I have identified was essential to the ruling. First, these issues were essential to the question of who owned, and could vote, the Sagi Trust Shares—which was central to the § 225 action. If the Trump Group did not have the right to buy these shares, it would not have been able to vote them or designate a majority of the Trans-Resources board.

Furthermore, the resolution of these issues was also essential to the question of who could vote the Genger and the Orly Trust Shares. It was necessary to find that the 2004 transfers were void, and that the shares reverted to TPR, to determine that TPR had the right to vote the Genger and Orly Trust Shares. The Supreme Court upheld this finding.[136] The Supreme Court also observed that the blocks of shares transferred out of TPR were identically situated: just as the Trump Group had the right to buy the Sagi Trust Shares, because these shares were transferred in violation of the Stockholders Agreement, the Trump Group also had the right to buy the improperly transferred Genger

---

[136] Supr. Ct. Op. 201 (holding that this court's determination "that TPR was the record owner [of] and entitled to vote" the Genger and Orly Trust Shares "pose[d] no problem").

and Orly Trust Shares.[137]  Therefore, the fourth prong of the Supreme Court's issue

preclusion test is satisfied.

Accordingly, the issues that were already decided by this court and the Supreme

Court—that Genger wrongly transferred the Trans-Resources shares from TPR, that these

shares reverted to TPR, and that the Trump Group has the right to purchase them—have

preclusive effect in this action.[138]

### 2. Genger May Not Avoid The Preclusive Effects Of The Prior Judgments By Arguing That He Was Held To A Higher Standard Of Proof

As I have noted, Genger's burden of proof in the prior litigation was raised from

the preponderance standard to the "clear and convincing" standard, as part of the

sanctions he received in the contempt action for despoiling evidence.  He argued to the

New York Supreme Court that, because he bore a higher burden of proof in the prior

Delaware action than in the New York Action, the Delaware action should not have issue

preclusive effect.[139]  The New York court rejected that argument.[140]

---

[137] *Id.* at 199 (rejecting the contention that "the Trump Group's right to buy, and TPR's right to sell, the Genger Shares and the Orly Trust Shares were 'collateral' issues").

[138] *See Technicorp Int'l II, Inc. v. Johnston*, 1997 WL 538671, at *8 (Del. Ch. Aug. 25, 1997) ("[F]indings made in a § 225 action may be accorded collateral estoppel effect where the relevant criteria are otherwise satisfied . . . .").

[139] N.Y. 2013 Op. 10.

[140] *Id.* 13-14.

39

In his brief to this court, Genger appears to waive that argument.[141] But, because Genger's waiver is ambiguously phrased,[142] I say why the heightened burden of proof that Genger bore in the prior action does not make any difference to this case.

Although it is true that relitigation of an issue may be precluded if "[t]he party against whom preclusion is sought had a significantly heavier burden of persuasion with respect to the issue in the initial action than in the subsequent action," this doctrine has no application in the circumstances here.[143] As the New York Supreme Court said: "[T]he Chancery Court imposed on Arie a higher burden of proof as a sanction for spoliating evidence and contempt of court. To permit him to relitigate his claims here would render the sanction nugatory."[144] Genger's own conduct is what changed the preponderance standard, which was the preexisting standard. The cure for his taint of the evidentiary record was to elevate the burden of persuasion, because he had made it impossible for the Trump Group to have a fair chance to litigate on a trustworthy evidentiary record.[145] It would defeat the equitable nature of the doctrine of issue preclusion if Genger, having

---

[141] Def's. Br. in Opp'n 22 ("Collateral estoppel does not determine the beneficial ownership of the Genger Shares not because of the standard by which this Court decided beneficial ownership, but because this Court's decisions as to beneficial ownership were reversed.").

[142] Id. at 21-22 ("There is ample authority that a party who fails to prove something by clear and convincing evidence, for example, is not collaterally estopped from attempting to prove it by a preponderance of the evidence. . . . The parties dispute whether those cases ought to apply where, as here, the heightened burden of proof derives not from the substantive legal claim but from a contempt sanction.").

[143] Restatement (Second) of Judgments § 28(4) (1982).

[144] N.Y. 2013 Op. 14.

[145] See Dec. 2009 Op. *19 (stating that the contempt sanction would "deprive Genger of the advantages of any evidentiary gaps that his own misbehavior might have . . . caused").

been held to a higher burden of proof because of his contempt, was able to *benefit* from this higher burden later by using it to deny preclusive effect to the prior judgment.[146]

This reasoning has been endorsed by the United States Court of Appeals for the Third Circuit. In *Wolstein v. Docteroff*, the court found that a default judgment for damages in a fraud action that had been imposed on a defendant as a sanction for his bad-faith refusal to comply with discovery requests precluded the defendant from arguing, in a later bankruptcy proceeding, that the debt was not the result of fraud (and was thus dischargeable).[147] The court "d[id] not hesitate" in holding that the sanction on the defendant had preclusive effect, and noted that "[t]o hold otherwise would encourage behavior similar to [the defendant's] and give litigants who abuse the processes and dignity of the court an undeserved second bite at the apple."[148] The logic of *Docteroff* applies to this case: Genger cannot avoid the preclusive effect of the prior rulings simply because he was given a more lenient contempt sanction than a default judgment.[149]

---

[146] *See, e.g., PenneCom B.V. v. Merrill Lynch & Co.*, 372 F.3d 488, 493 (2d Cir. 2004) ("[C]ollateral estoppel is an equitable doctrine . . . ."); *Nations v. Sun Oil Co. (Del.)*, 705 F.2d 742, 744 (5th Cir. 1983) (same).

[147] *Wolstein v. Docteroff (In re Docteroff)*, 133 F.3d 210 (3d Cir. 1997).

[148] *Id.* at 215.

[149] Dec. 2009 Op. 19 (declining to grant a default judgment against Genger). Other courts have applied the same reasoning as *Docteroff. See, e.g., Cmty. State Bank v. Strong*, 651 F.3d 1241, 1261-71 (11th Cir. 2011) (applying Georgia law, and granting preclusive effect to a state court's striking of arbitration defenses as a sanction for "repeated and flagrant discovery violations"); *Bush v. Balfour Beatty Bah., Ltd. (In re Bush)*, 62 F.3d 1319, 1323-25 (11th Cir. 1995) (noting that the "general rule" is that default judgments are not given issue preclusive effect, but holding that it was not an abuse of discretion for a trial court to give preclusive effect to a default judgment granted against the defendant because of the defendant's abuse of the discovery process).

In any event, I found in my post-trial decision that Genger would not have prevailed on the question of whether TPR had given proper notice to the Trump Group under the Stockholders

Therefore, Genger is precluded from relitigating the issues that were decided in the previous litigation.

### 3. Genger Is Not Entitled To Relitigate The Prior Action

The doctrine of issue preclusion "is designed to provide repose and put a definite end to litigation."[150] Therefore, "once a court has decided an issue of fact or law necessary to its judgment, that decision may preclude relitigation of the issue in a suit on a different cause of action involving a party to the first case."[151]

Accordingly, Genger may not now try to relitigate the 2004 transfers, or the Trump Group's right to purchase the Trans-Resources shares transferred from TPR. Genger himself acknowledges that he is not entitled to relitigate the transfers if my prior rulings are given preclusive effect.[152] Therefore, I now move on to the only remaining question in the case, which is whether the Trump Group has in fact exercised its right to purchase the Genger Shares.

### B. The Trump Group Has Purchased The Genger Shares From TPR

Under Court of Chancery Rule 56(e), a party may support its motion for summary judgment with an affidavit "made on personal knowledge" and "set[ting] forth such facts

---

Agreement "even if [the Trump Group] had the burden to show that they had not been given proper notice." July Op. 15. And Genger himself, in his briefing to the Supreme Court, represented that this court "stated in its July and August opinions that it would not have found in favor of Arie under any burden of proof." Corrected Appellant's Op. Br. 33, No. 592, 2010 (Del. Nov. 16, 2010).

[150] *Columbia Cas. Co. v. Playtex FP, Inc.*, 584 A.2d 1214, 1216 (Del. 1991) (citation omitted).

[151] *Allen v. McCurry*, 449 U.S. 90, 94 (1980) (citation omitted).

[152] Genger Br. in Opp'n 25 ("The Trumps Are Not Entitled To Summary Judgment Absent Preclusion").

42

as would be admissible in evidence."[153]  The party opposing summary judgment may not merely deny the facts in the affidavit, but "by affidavits or . . . otherwise" must "set forth specific facts showing that there is a genuine issue for trial."[154]  If the opposing party cannot provide an affidavit contesting the facts set forth in the moving party's affidavit, it may, under Rule 56(f), furnish an affidavit showing why discovery is required.[155]

The Trump Group has provided an affidavit from Mark Hirsch, an officer of Trans-Resources, attesting that the Trump Group has exercised its rights to buy the Genger Shares under its Side Letter Agreement with TPR, and that it has placed the funds for the shares in escrow.[156]  Genger has not challenged this with an affidavit of his own. Instead, counsel for Genger has submitted an affidavit under Rule 56(f) asserting that more discovery is required into certain factual issues.

But, Genger's counsel's Rule 56(f) affidavit does not actually challenge the fact that the Trump Group has exercised its rights to purchase the Genger Shares by placing the money for those shares into escrow.  Instead, Genger's counsel raises a variety of theories as to why the purchase was improper.  None of these theories sets forth any reason to believe that there is a "genuine issue for trial" as to the purchase of the Genger Shares.  Rather, the theories in the affidavit are an attempt to relitigate the issues that are precluded by my earlier decisions.  Nevertheless, in the interests of completeness, I now

---

[153] Del. Ct. Ch. R. 56(e).
[154] Id.
[155] Id. 56(f).
[156] Hirsch Aff. ¶¶ 4-5, 7, C.A. No. 6697-CS (Nov. 12, 2012).

43

show in more detail why Genger's arguments to avoid summary judgment, including those in his counsel's affidavit, are not effective.

### C. Genger's Arguments Cannot Defeat Summary Judgment

I first discuss the arguments that Genger puts forward, through his counsel's affidavit, in an attempt to raise a triable issue of fact to defeat summary judgment. Then, I consider his new argument that TPR did not originally have an economic ownership interest in Trans-Resources' stock.

### 1. The Theories In Genger's Counsel's Affidavit Do Not Set Forth Any Triable Issues Of Fact

In his affidavit, counsel for Genger asserts, on personal knowledge, that there are issues of fact that require discovery as to: (i) whether TPR was permitted to sell the Genger shares to the Trump Group;[157] (ii) whether Sagi breached his fiduciary and contractual duties in selling his shares;[158] (iii) whether the Trump Group was complicit in such a breach;[159] (iv) whether TPR sold the Genger Shares at an unfairly low price;[160] (v) whether the Trump Group improperly bought the Genger Shares outside of the Stockholders Agreement;[161] and (vi) whether the Trump Group lied to this court about its negotiations with Bank Hapoalim to refinance Trans-Resources.[162]

---

[157] Lamb Aff. ¶ 12(a).
[158] *Id.* ¶ 12(b).
[159] *Id.* ¶ 12(c).
[160] *Id.* ¶ 12(d).
[161] *Id.* ¶ 12(e).
[162] *Id.* ¶¶ 13-16.

As to Genger's first theory, I rejected Genger's argument that the alleged need to reform his divorce settlement should have any impact on this case, and the New York Supreme Court agreed.[163]  The Trump Group has also pointed to evidence demonstrating as a matter of fact that even without the 2004 transfers, Genger's marriage settlement would not be void for lack of consideration, and thus would not be annulled entirely under New York law.[164]

Genger's second and third theories—the claims that Sagi has breached his fiduciary and contractual duties, and that the Trump Group is complicit in this breach—are also irrelevant to this action.  Sagi was not a party to the divorce agreement, and counsel for Genger has not pointed to any other contract that Sagi may have breached.[165] The New York Supreme Court dismissed Genger's claim against the Sagi Trust and TPR for breach of contract, and also his claim against Sagi, the Sagi Trust, and the trustee of the Sagi Trust for aiding and abetting tortious interference with contract.[166]  As I stated in my August 2010 opinion, it may be that Genger and Orly have a claim against the TPR

---

[163] *See* July 2010 Op. *18 ("Genger only has himself to blame for whatever mess his decision to make the 2004 Transfers has caused for his divorce settlement. . . . [I]t is not the Trump Group's problem . . . ."); N.Y. 2013 Op. 16 ("[A]s Trump Group was not a party to the divorce stipulation, Arie's and Dalia's alleged 'mutual mistake' in effecting the 2004 Transfers is immaterial and may not be used as a defense in Arie's dispute with Trump Group.  Moreover, Arie seeks to undo the Delaware courts' adverse findings against him and Trump Group's right to buy the 'invalidly transferred shares,' notwithstanding that they were transferred as a result of his misrepresentation in the divorce stipulation . . . . In any event, any equitable or contractual right in favor of Arie to reform the divorce stipulation does not override the pre-existing contractual right of Trump Group to purchase the invalidly transferred shares . . . .").

[164] *See* MSA art. II § 2 (describing property Genger received under the divorce agreement); *see also Apfel v. Prudential-Bache Secs. Inc.*, 600 N.Y.S.2d 433, 435 (1993) (holding that courts will not avoid a contract on grounds of inadequacy of consideration alone).

[165] *See* MSA pmbl.; Lamb Aff. ¶ 12(b).

[166] N.Y. 2013 Op. 29-31.

and Sagi for some sort of breach of an implied equitable duty in the way in which the

proceeds from the sale of the TPR's stake in Trans-Resources were allocated.[167] But, this

has nothing to do with the question of whether the 2004 transfers were invalid, and

whether the Trump Group had the right to purchase the shares from TPR.[168] The New

York Supreme Court agreed with this analysis.[169] Genger has not disputed that he ceded

control of TPR to Dalia in his divorce settlement, that Dalia therefore had the right to

cede TPR to Sagi, and that Sagi thereafter had the right to, and continues to, control

TPR.[170] Genger is not a stockholder, officer, or director of TPR. He concedes that TPR

is directed and controlled by Sagi. Genger has thus raised no triable issue of fact over

TPR's actual or apparent authority to sell Trans-Resources' stock to the Trump Group.

The fourth issue, *i.e.* the adequacy of the price paid, is related to the second and

third issues. As I have said, Genger may have a claim a breach of fiduciary duty against

---

[167] Aug. 2010 Op. *3 ("[I]t may well be that the bargain that TPR—a company that Arie Genger allowed to pass out of his control—struck poses some equitable problem for TPR. That is, it may be that Genger and Orly Genger have claims against TPR and Sagi Genger over how the price paid by the Trump Group for the Arie and Orly Shares was allocated.").

[168] *Id.*

[169] *E.g.*, N.Y. 2013 Op. 25 (refusing to dismiss a claim of unjust enrichment against Sagi and TPR); *id.* at 28 (refusing to dismiss a claim of breach of fiduciary duty against Sagi).

[170] Genger has disputed Sagi's control of TPR in the New York action only by seeking to have his eight-year-old divorce reformed. That claim was rejected by the New York Supreme Court. *See* N.Y. 2013 Op. 34 (dismissing Genger's argument that his divorce should be reformed so that Dalia was not ceded 51% of TPR). In the previous Delaware litigation, Genger cast doubt on Sagi's right to control TPR, but did not seriously challenge this point. *See* Def's. Pre-Tr. Br. 3 (Dec. 3, 2009) ("If the transfer of shares to the Sagi Trust in October 2004 is void, then so too must be the transfer to Mr. Genger's ex-wife, Dalia Genger, of TPR; otherwise, Sagi Genger, who now controls TPR, would obtain direct control over the TRI shares returned to TPR—the very result that voiding the transfer to his trust was intended to prevent."); *see also* Def's. Post-Tr. Reply Br. 1 (Feb. 5, 2010) (same).

TPR and Sagi.[171]  The New York Supreme Court also found that a claim for unjust

enrichment may lie against the Trump Group.[172]  But, that claim does not affect the

validity of the Trump Group's purchase of Trans-Resources stock from TPR, and

ownership of that stock.

Genger's fifth theory is that TPR did not have the right to sell the Genger Shares

outside of the Stockholder Agreement.[173]  The Trump Group bought the Genger Shares

under the Side Letter Agreement.  Genger therefore argues that the Trump Group has not

purchased the Genger Shares in accordance with the Revised Final Judgment Order,

which provided that the Trump Group "had the right under Section 3.2 of the

Stockholders Agreement to buy all of the shares purportedly transferred by TPR."[174]

Genger's argument fails for two reasons.

First, in both the July and the August opinions, I found that the Trump Group was

permitted to negotiate, with TPR, its rights under § 3.2 of the Stockholders Agreement.[175]

In the August opinion, I held specifically that the Side Letter Agreement constituted a

compromise of the Trump Group's rights under § 3.2 of the Stockholders Agreement.[176]

The Supreme Court rejected Genger's assertion that this court lacked jurisdiction to make

such a holding.[177]  Therefore, because the Revised Final Judgment Order stated that the

Trump Group had the right to buy the Genger shares from TPR under the Stockholders

---

[171] Aug. 2010 Op. *3.

[172] N.Y. 2013 Op. 19.

[173] Lamb Aff. ¶ 12(e).

[174] Rev. Final J. Order ¶ 12.

[175] July 2010 Op. *17; Aug. 2010 Op. *2-3.

[176] Aug. 2010 Op. *2-3.

[177] Supr. Ct. Op. 199.

Agreement, it follows that the Trump Group had the right to buy the Genger Shares under the Side Letter Agreement, and that Genger cannot relitigate this issue now.

Second, and equally important, Genger is not permitted to raise TPR's rights under the Stockholders Agreement. Genger is not a party to the Stockholders Agreement.[178] Therefore, he has no standing to make an argument on behalf of TPR, a company in which he owns no shares and holds no office. In my previous rulings, I rejected Genger's attempt to claim rights under the Stockholders Agreement, because Genger never signed on to that Agreement.[179] Therefore, Genger's argument that the Trump Group improperly bought the Genger Shares under the Side Letter Agreement fails.

The final issue that Genger's counsel raises is regrettable. Genger's counsel suggests that the Trump Group may have lied to this court in the prior action about its negotiations with Bank Hapoalim.[180] This powerful and reputationally damaging suggestion is entirely speculative, and relies on an unsworn translation of a supposed indictment in Israel of a former Bank Hapoalim executive in connection with actions that appear to be unrelated to this case, and unrelated to the Trump Group. Genger's counsel does not suggest a rational basis for his contention that he is "personally familiar" with this indictment, as he swears, and he does nothing to connect the conduct underlying this

---

[178] *See* SA pmbl.

[179] *See* July 2010 Op. *22 n.147.

[180] Lamb Aff. ¶¶ 13-16.

indictment to Trans-Resources itself, the Trump Group, or the facts of this case.[181]

Therefore, Genger cannot rely on it in his attempt to defeat the Trump Group's motion.[182]

### 2. Genger's Argument That TPR Was A "Custodian" For Trans-Resources Stock Is Untenable

In his briefing, Genger advances the entirely novel argument that, after the Trans-Resources stock reverted to TPR following our Supreme Court's decision in 2011, TPR only became a "custodian" for this stock, and was not an economic owner of the Genger and Orly Trust Shares.[183] Under Genger's logic, TPR cannot have owned the Trans-Resources stock before the transfer if, after it reverted to TPR, TPR was merely a custodian for the stock.

Genger is judicially estopped from making this argument. The doctrine of judicial estoppel "acts to preclude a party from asserting a position inconsistent with a position previously taken in the same or earlier legal proceeding."[184] Genger's argument directly contradicts his position in the prior litigation, in which he argued that TPR had full

---

[181] *Id.* ¶ 1.

[182] *See Geier v. Meade*, 2004 WL 243033, at *8 (Del. Ch. Jan. 30, 2004) ("This Court's Rules require more than . . . speculation to defeat a motion for summary judgment.").

For completeness, I here note an allegation that Genger put forward in his brief, but which his counsel did *not* make in his affidavit. This allegation is that Sagi received the money from the sale of the Genger Shares improperly. Genger Br. in Opp'n 26. The Trump Group's affidavit attests that the money for the Genger Shares was paid into an escrow account, under the terms of the Escrow Agreements. Hirsch Aff. ¶¶ 4-5, C.A. No. 6697-CS (Nov. 12, 2012). Genger does not contradict this with an affidavit or record evidence. And, by making this unsupported suggestion in his brief, Genger has not shown that there is any genuine issue of fact relating to the payment of the funds.

[183] Genger Br. in Opp'n 16.

[184] *Motorola, Inc. v. Amkor Tech., Inc.*, 958 A.2d 852, 859 (Del. 2008).

ownership of the Trans-Resources stock, and not only record ownership.[185]  Genger

consistently argued to this court that, before 2004, TPR had full control of 52.85% of

Trans-Resources.  Under the 2004 transfers, according to Genger, the Trans-Resources

stock was distributed to Genger, the Sagi Trust, and the Orly Trust, and Genger retained

an irrevocable proxy over the Sagi Trust Shares and the Orly Trust Shares.[186]  Genger's

argument, therefore, was predicated on the fact that TPR had economic, as well as record,

ownership of the Trans-Resources shares.  And, when he argued that the Sagi Trust did

not have the right to sell the Sagi Trust Shares to the Trump Group, Genger raised many

arguments, but never claimed that the Sagi Trust and the Orly Trust did not own the

economic interest in their respective blocks of shares.  In fact, Genger attempted to make

an equitable argument out of the fact that the Orly Trust *did* own the economic interest in

the Orly Trust Shares.[187]  Because the Genger Shares are indistinguishable from the Orly

Trust Shares, Genger may not argue now that TPR did not hold the economic interest in

the Genger Shares.

   Genger's 180° spin is made plain by his main alternative argument in the prior

litigation.  That argument went like this: "Even if I caused TPR to violate the

---

[185] *See, e.g.*, Def's. Pre-Tr. Br. 8 (Dec. 3, 2009) ("Pursuant to the Stockholders Agreement, Mr.
Genger continued to control TRI through his majority interest in TPR, which still owned a
majority of TRI's outstanding stock."); Def's. Post-Tr. Op. Br. 3 (Jan. 15, 2010) ("[A]t best, the
Trumps would have been entitled to purchase only the economic rights associated with the
transferred shares . . . .").

[186] *E.g.*, Def's. Post-Tr. Op. Br. 47-48 (Jan. 15, 2010) (describing the distribution of the TPR
Shares and the functioning of the irrevocable proxies).

[187] *Id.* at 5 ("[O]f all the inequities that would result in this case if Plaintiffs were to have their
way, there is probably none greater than if Mr. Genger's daughter, Orly, were to be left
disinherited.").

Stockholders Agreement, and gave the Trump Group the right to buy the wrongfully

transferred Trans-Resources stock, the Trump Group could only obtain the economic

interest in these shares, because my irrevocable proxy gave me voting control over

them."[188]  The reason for that prior argument is simple.  Genger could not argue that

economic rights to the shares did not belong to TPR without committing intentional

fraud.  Why?  Because in both the Stockholders Agreement and his divorce settlement, he

said that TPR had full ownership over the Trans-Resources stock.  In the Stockholders

Agreement, TPR, controlled by Genger, represented and warranted that "TPR, [TR]

Investors and Glenclova directly and indirectly own 100% of the outstanding common

stock . . . of [Trans-Resources]."[189]  The Agreement later specified that "TPR owns

52.85% of the outstanding Shares," with no suggestion that this ownership might not be

complete.[190]  And, in his divorce agreement, Genger represented that, apart from the

Trump Group, TPR, and Bank Hapoalim, no party had any ownership interests in Trans-

Resources.[191]  Therefore, Genger cannot now argue that TPR only had record ownership

of its Trans-Resources stock without admitting that, through TPR, he made a

misrepresentation in the Stockholders Agreement, and that he made *two*

misrepresentations in his divorce agreement.[192]  Put bluntly, facing a properly supported

summary judgment motion, Genger has not filed an affidavit swearing that his former

---

[188] *See* Def's. Post-Tr. Op. Br. 15-23 (Jan. 15, 2010); *see also* Supr. Ct. Op. 196-98 (rejecting Genger's proxy argument).

[189] SA pmbl.

[190] *Id.* § 1.6.

[191] MSA art. II ¶ 9(a).

[192] Genger's other misrepresentation in his divorce agreement, as noted above, was that he did not need any consents for the 2004 transfers. *See* Supr. Ct. Op. 184.

binding legal representations that TPR had full ownership were false.  There is thus no material issue of fact for trial.

<div align="center">*   *   *</div>

In conclusion, I find that the Trump Group is entitled to summary judgment on the question of whether it has purchased the Genger Shares.  The Trump Group is the owner of these shares and may vote them as it sees fit.

## IV.   TPR Is Not Entitled To Summary Judgment On Its Cross-Motion To Have The Funds Paid For The Genger Shares Released From Escrow

TPR has filed a cross-motion seeking an order requiring the Trump Group to agree to release the escrowed sales proceeds from the Genger Shares.  I deny TPR's motion, because it is an attempt unilaterally to modify its bargain with the Trump Group.

The release of the escrow money is governed by the Escrow Agreements and the injunction of the New York Supreme Court.  The First Escrow Agreement, entered into in September 2010, provided that the Trump Group would put $5,928,994 of the purchase price for the Genger Shares into escrow—*i.e.*, all but $1.5 million of it.[193]  In October 2010, the New York Supreme Court entered a TRO providing that "the $1.5 million that is imminently to be paid by the Trump Entities to TPR pursuant to the purported 2010 TPR Sale of TRI Stock to the Trump Entities be placed in an escrow account."[194]  The

---

[193] First Escrow Agreement 2.
[194] Order To Show Cause & TRO, N.Y. Action, at 3 (Oct. 5, 2010).

Trump Group and TPR entered into a Second Escrow Agreement in January 2011, whereby the Trump Group agreed to place the $1.5 million in escrow also.[195]

The First Escrow Agreement provides that the Trump Group and TPR may jointly request to have the funds released from escrow.[196] If the Trump Group and TPR do not jointly submit a request to the escrow agent to release the funds, TPR may submit to the escrow agent a written request to disburse the funds, together with "a certified copy of a judgment of the Delaware Supreme Court affirming [this court's Final Judgment] Order in so far as it determined that (a) the 2004 Transfer of the Shares was void and (b) the Purchasers have a contractual right to purchase the Shares under the [Side] Letter Agreement" or other evidence that this court's judgment is final and unappealable.[197]

The Trump Group has refused to agree to the disbursement of the funds in the escrow agreement, and TPR now asks me to issue an order directing that the escrow proceeds be released. TPR ignores the fact that it and the Trump Group bargained for a mechanism by which TPR could obtain the funds without the Trump Group's consent. If this decision is affirmed on appeal, or if Genger chooses not to appeal it, TPR will have the right to get the funds released. It is not hard to see why the Trump Group and TPR struck this bargain: by waiting for the decision to become final and unappealable, the parties avoid the risk that they will have to waste time and money in reversing the disbursement of the escrowed funds if this decision is overturned. TPR has not offered

---

[195] Second Escrow Agreement 2.

[196] First Escrow Agreement § 2(b)(i).

[197] Id. § 2(b)(ii), (iv).

any reason why I should override the parties' bargain simply in order that it may get the proceeds from the Genger Shares more quickly, and I decline to do so.[198]

The Second Escrow Agreement, concerning the $1.5 million, operates differently from the First Escrow Agreement. Under this Agreement, TPR may submit an application to have funds released together with the Trump Group, or on its own.[199] If TPR submits an application on its own, the Trump Group has ten days in which to object to the disbursement.[200] Under this Agreement, any party seeking a disbursement of the escrowed funds must provide a "certification . . . of the Party seeking such disbursement that the NY [Temporary Restraining] Order has been vacated, reversed, dismissed, modified, amended or clarified in such a manner as to permit the Escrow Agent to make such a disbursement."[201]

TPR argues that the injunction entered by the New York Supreme Court will expire by its own terms once this court has determined the beneficial ownership of the Genger Shares, and therefore the escrow agent will be authorized to release the funds.[202] But, there is no need for me to enter an order adjudicating the Trump Group's and TPR's rights. Instead, TPR must follow the mechanism for releasing the proceeds laid out in the contract that it bargained for with the Trump Group. TPR must ask the escrow agent to accept its certification that the New York injunction has expired.

---

[198] *See, e.g.*, *Related Westpac LLC v. JER Snowmass LLC*, 2010 WL 2929708, at *10 (Del. Ch. July 23, 2010) ("Delaware law respects the freedom of parties in commerce to strike bargains and honors and enforces those bargains as plainly written.") (citations omitted).
[199] Second Escrow Agreement § 2(b).
[200] *Id.* § 2(b)(ii).
[201] *Id.* § 2(a).
[202] TPR Reply Br. 4-5.

To be sure, the escrow agent, which is the Skadden firm, counsel for the Trump Group, may well demand a formal vacating or modification of the injunction in the New York Supreme Court before it agrees to disburse the funds.[203]  And TPR may well be frustrated by having to go to court in New York to request that the injunction be lifted. But, this is the bargain that the parties struck.  Again, it is not hard to see why the Trump Group would have wanted the right to ensure that the New York injunction is lifted before the money was disbursed: otherwise it would risk being in contempt of court. TPR has given me no reasons to disturb the parties' bargain.  Therefore, TPR's cross-motion for summary judgment is denied.

## V.  Conclusion

I grant summary judgment in favor of the Trump Group on its claim that it is the owner of the Genger Shares.  I deny TPR's motion seeking an order to have the escrowed funds released.

I now add a postscript about the future course of this dispute.  Even if Genger chooses not to appeal this ruling, this is not necessarily the end of the litigation between him and the Trump Group in this court.  In November, I granted the Trump Group's motion to reopen the prior action and issued an order for Genger to show cause why he

---

[203] Second Escrow Agreement § 7(b) ("Escrow Agent as Counsel.  It is understood and acknowledged that the Escrow Agent is acting as counsel to (i) the Purchasers in connection with matters concerning the Delaware Action and related litigation . . . .  The Escrow Agent's acceptance of its appointment and performance of its duties hereunder shall not be deemed in any way to conflict with its professional obligations to the Purchasers . . . .").

should not be held in contempt for flouting the Revised Final Judgment Order.[204] I found that Genger was attempting to relitigate in New York Supreme Court the ownership of the Sagi Trust Shares, which was settled for good in the Revised Final Judgment Order.[205] I also noted that Genger had sought an injunction to prevent TPR from voting the Genger and Orly Trust Shares, even though the Revised Final Judgment Order states that TPR is the "record owner" of these shares. Although the New York Supreme Court denied this request, it entered an injunction requiring the Trump Group and TPR to give Genger ten business days' notice of any transactions that "impact" these shares.[206] The effect of this injunction, I observed, was to prevent the Trump Group from managing Trans-Resources as it had the right to under the Revised Final Judgment, and from realizing its wealth-creating potential as a Delaware corporation. The briefing for the Trump Group's contempt motion will be complete in about two months.

With the issuance of this opinion, there are now not one but two judicial decisions adverse to Genger's efforts to relitigate who has majority control of Trans-Resources.[207] This court rarely imposes the powerful sanction of contempt, and never does so with anything but regret.

Even at this late stage, one should not take action to prevent a *rational* end to this protracted struggle. Rather than proceed to decide the contempt motion immediately, I want the parties to confer with their clients, and consider the implications of these *two*

---

[204] *T.R. Investors, LLC v. Genger*, 2012 WL 5471062 (Del. Ch. Nov. 9, 2012).
[205] *Id.* at *2.
[206] *Id.* (quoting N.Y. 2011 Op. 15).
[207] *See* N.Y. 2013 Op.

judicial rulings. Perhaps, with the aid of learned counsel who bring dispassionate thinking to bear in pursuit of their clients' best interests, the parties can resolve the need for contempt proceedings, and perhaps even the need for further litigation anywhere, at least as between Genger and the Trump Group.

To that end, I will stay any further prosecution of the contempt action for thirty days.[208] At the end of that time, lead Delaware counsel for each of the parties will certify that they and their clients made a good faith effort to resolve the contempt motion. In that process, the court expects the direct involvement of lead counsel. If no accord is reached, I shall then have no option other than to consider the motions. But, at least, the parties will have been given time to attempt to reach a commonsense resolution.

The Trump Group is to submit a conforming order within five days, after approval as to form by the defendants.

---

[208] That is, both dates in the Third Revised Stipulated Scheduling Order, entered on February 15, 2013, will be postponed by thirty days. Thus, Genger is now to file his response to the Trump Group's motion on or before March 24. The Trump Group is now to file its reply in support of its motion on or before April 13.

At the Surrogate's Court held in and for the County
of New York, at the Courthouse, 31 Chambers
Street, New York, New York on the __1__ day of
~~June~~ 2009
*July*

New York County Surrogate's Court
DATA ENTRY DEPT.
Date: *July 1, 2009*

PRESENT: HON. *Troy K. Webber*
                           Surrogate

In the Matter of the Application of

ORLY GENGER, as a person interested,
for the removal of DALIA GENGER
as Trustee of the Orly Genger 1993 Trust
pursuant to SCPA §711 (11)

File No.: 0017/2008

ORDER TO SHOW CAUSE
WITH TEMPORARY
RESTRAINTS

On reading and filing the annexed Verified Petition of Petitioner, ORLY GENGER, and

the exhibits, verified on the 22nd day of June, 2009, and the memorandum of law in support of

Petitioner's Verified Petition dated June 22, 2009,

LET the Respondent, DALIA GENGER, the sole fiduciary of the Orly Genger 1993

Trust, show cause before Surrogate *Troy K. Webber* at the Surrogate's Court *Sitting at 60 Centre!* 31 Chambers

*Room 309* ~~Street,~~ New York, New York, on the *5th* day of ~~June~~ *August* 2009 at 10:00 o'clock in the forenoon of that

day or as soon thereafter as counsel may be heard why an order should not be entered:

(a)      Enjoining and restraining Respondent, her agents and all other persons

acting on her behalf from withdrawing, selling disposing, transferring, assigning, removing,

pledging, redeeming, mortgaging, encumbering, liening, hypothecating or secreting the Orly

Trust's 19.43% interest in Trans-Resources, Inc., ("TRI"), a closely held corporation, founded by

Arie Genger, Petitioner's father and Respondent's former husband of Respondent and any other

assets which may be remaining in the Orly Trust;

NYO_XFER\137033\1\1

(b)     Removing Respondent as Trustee of the Orly Trust for breaching her

fiduciary duties, wasting and dissipating the assets of the Orly Trust and imprudently managing

and injuring the property committed to her charge;

(c)     Surcharging Respondent in the amount of the loss of the value of Orly's

interest in TPR as determined by the Court and awarding Petitioner costs and attorneys' fees;

(d)     Appointing Michael D. Grohman, Esq. as successor trustee;

(e)     Waiving any requirement that Petitioner post an undertaking; and

(f)     Granting Petitioner such further relief deemed necessary or proper. *and/or her counsel*

ORDERED that, during the pendency of this proceeding, Respondent, ~~her agents and all~~ *are required to give notice by overnight mail to petitioners counsel of any 1) offer* ~~other persons acting on her behalf are temporarily restrained from withdrawing, selling~~ *to purchase the Orly Trust's 19.3% interest in TRI within 10 days of receiving* ~~disposing, transferring, assigning, removing, pledging, redeeming, mortgaging, encumbering~~ *such offer and 2) act by Respondent, her agents and all other persons* ~~licensing, hypothecating or securing the Orly Trust's 19.43% interest in TRI and other assets~~ *acting on her behalf to assign, mortgage, pledge, redeem, encumber, sell or* ~~remaining in the Orly Trust; and it is further~~ *otherwise alter the Orly Trust's interest in TRI at least 10 days prior to such act* and it is ~~further~~ ORDERED that service of a copy of this Order and the papers upon which it is based

shall be served on Respondent by personal service at either her residence, located at 200 East

65th Street, Apt. 32W, New York, New York 10021, or any other address at which she can be

located, on or before ~~June~~ *July 7*, 2009; *and it is further*

*ORDERED, that any responsive papers shall be filed by*
*July 29, 2009.*

~~ENTER~~

_____
Surrogate



<div style="background:black;color:white">Dalia Genger</div>

# Memo

**To:** Leah Fang
**From:** Dalia Genger
**Date:** December 29, 2007
**Re:** Exoneration

---

As trustee of the 1993 Orly Genger and 1993 Sagi Genger Trust, each trust separately exonerates, indemnifies, releases, and otherwise holds you harmless with respect to your actions or omissions in connection with each trust to the maximum extent permissible under the law and the Trust Agreements. The indemnification includes any actions by the beneficiaries' and their agents including any expenses or injury incurred on your part in connection with service.

This indemnification does not act to limit any protections you may enjoy under previous indemnifications, the Trust Agreements, the law, or otherwise with respect to the beneficiaries, the grantor, or any other party.

Please accept my thanks for undertaking this matter.

*Dalia Genger*
Dalia Genger

1



**Dalia Genger**

# Memo

To:     Leah Fang
From:   Dalia Genger
Date:   1/4/2008
Re:     Indemnification

_____

I reiterate my indemnification letter to you of December 29, 2007 as being in full force and effect.

*Dalia Genger*

SURROGATE'S COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

File No. 0017/2008

In the Matter of the Application of ORLY GENGER,
as a person interested, for the removal of DALIA
GENGER, as Trustee of the ORLY GENGER 1993          AFFIDAVIT OF SERVICE
TRUST pursuant to SCPA § 711(11)                     BY FEDERAL EXPRESS

---

STATE OF NEW YORK     )
                      ) ss.:
COUNTY OF NEW YORK    )

    Kishah Robinson, being duly sworn, deposes and says that deponent is not a party to the action, is over 18 years of age, and resides in Kings County, New York.

    That on February 1, 2013, deponent served a copy of the **THIRD AMENDED VERIFIED PETITION OF ORLY GENGER TO REMOVE DALIA GENGER AS TRUSTEE**, upon:

> David Parnes, Esq.
> as Trustee of the Sagi Genger Trust
> 29 Elkachi Street
> Tel Aviv, Israel 69497

to the address designated by said individual or entity for that purpose, by mailing a true copy of same via Federal Express Overnight International Mail.

                                  Kishah Robinson

Sworn to before me this
13th day of February, 2013

Notary Public

ANNA E. WIERZBICKA-TURNER
NOTARY PUBLIC - STATE OF NEW YORK
NO. 02WI6248463
QUALIFIED IN NEW YORK COUNTY
COMMISSION EXPIRES SEPT. 19, 2015