

New York County Surrogate's Court
MISCELLANEOUS DEPT.

MAR 0 1 2013
FILED
Clerk_____

STATE OF NEW YORK SURROGATE'S COURT:
COUNTY OF NEW YORK

In the Matter of the Application of ORLY GENGER, as a
person interested, for the removal of DALIA GENGER as
Trustee of the Orly Genger 1993 Trust pursuant to
SCPA §711(11)

File No. 0017/2008

**Affirmation of Robert A. Meister in Opposition to Orly Genger's Motion for Preliminary
Injunction Against Trustee Prosecuting Action to Declare Trust's Interest in
Trans-Resources, Inc. Shares**

Robert A. Meister, an attorney duly licensed to practice law in the State of New York,

affirms the following to be true under penalty of perjury:

1.      I am a member of Pedowitz & Meister, LLP, attorneys for respondent Dalia

Genger ("Dalia"), since January, 2008, the Trustee of the Orly Genger 1993 Trust ("Orly Trust").

I submit this affirmation in opposition to Orly Genger's ("Orly") motion for a preliminary

injunction seeking to enjoin Dalia as Trustee from (i) prosecuting an action to declare the Trust's

rights to various shares of Trans-Resources, Inc. ("TRI") stock currently pending in the

Delaware Chancery Court and (ii) prosecuting on behalf of the Orly Trust any future actions that

may arise.

2.      On January 3, 2013, the Supreme Court, New York County dismissed <u>all</u> of Arie

Genger (Orly's father) and Orly's claims asserted against Dalia (and most of the claims asserted

against other defendants) in *Arie Genger and Orly Genger v. Dalia Genger et al.*, Index No.

651089/2010 (N.Y. Co., Sup. Ct.).  The Court's opinion and order is attached as **Exhibit A.**

3.      Facts relevant to this motion are set forth in an affidavit signed by Dalia on

February 26, 2013, with exhibits, submitted to this Court in opposition to Orly's petition for an

accounting and which is attached as **Exhibit B.**

4.      Facts relevant to this motion are also set forth in Dalia's motion to dismiss Orly's Third Amended Petition to remove Dalia as Trustee of the Orly Trust, that is currently pending before this Court, and which is attached as **Exhibit C.**

5.      Orly has brought multiple petitions to remove Dalia as Trustee of the Orly Trust. Orly's first attempt to remove Dalia as Trustee was denied on the merits in a December 31, 2008 opinion issued by Surrogate Roth.  Surrogate Roth's opinion is attached as **Exhibit D**.  There has been no subsequent decision on the merits of any of Orly's later attempts.

6.      Rather than seeking a determination that the Orly Trust is the beneficial owner of the TRI Stock which was transferred to the Orly Trust, Orly and her father, Arie Genger, filed a Supreme Court Action (which was in large part dismissed) in which Arie sought that Arie - not the Orly Trust - "be declared . . . [through an entity dubbed TPR2], *ab initio*, the record and beneficial owner of all such 3000 TRI shares".  Relevant portions of the Third Amended Complaint in that action, *Orly Genger and Arie Genger v. Dalia Genger et al.* Index No. 651089/2010, are attached as **Exhibit E.**  The Third Amended Complaint is included in its entirety as Exhibit 9 to Dalia's Motion to Dismiss the Third Amended Petition, which is Exhibit C attached hereto.

7.      On October 4, 2011, in her capacity as Trustee and on behalf of the Orly Trust, Dalia commenced an action seeking a determination that the Orly Trust was the beneficial owner of the TRI shares that Arie purportedly transferred to the Orly Trust in 2004.  A copy of the Complaint in the Delaware Action, *Dalia Genger, as Trustee of the Orly Genger 1993 Trust v. TR Investors LLC, et al.*, C.A. No. 69006-CS is attached as **Exhibit F.**

2

8.    Aside from Dalia's Delaware Chancery Court Action (Exhibit F), the issue of beneficial ownership of the Orly Trust TR1 shares is not pending before any New York or other Court.

9.    Facts relevant to this motion are also found in *TR Investors, LLC et al. v. Arie Genger*, C.A. No. 3994-VCS (Del. Ch. July 23, 2010), a copy of which is **Exhibit G** hereto.

Dated: New York, New York
      March 1, 2013

Robert A. Meister

3

# EXHIBIT "A"

## SUPREME COURT OF THE STATE OF NEW YORK — NEW YORK COUNTY

PRESENT: _____ JAFFE _____          Amended Decision

_____          PART 12
                    Justice

Genger

                                        INDEX NO.    651089/2010

- v -                                   MOTION DATE  _____

                                        MOTION SEQ. NO.   006

Genger
                                        MOTION CAL. NO.  _____

The following papers, numbered 1 to _____ were read on this motion to/for _____

|  | PAPERS NUMBERED |
|---|---|
| Notice of Motion/ Order to Show Cause — Affidavits — Exhibits ... | 1,2,3, |
| Answering Affidavits — Exhibits _____ | 4,5 |
| Replying Affidavits _____ | 6 |

## Cross-Motion:  ☐ Yes  ☐ No

Upon the foregoing papers, it is ordered that this motion   is resolved by
the annexed Decision
and order

MOTION/CASE IS RESPECTFULLY REFERRED TO JUSTICE
FOR THE FOLLOWING REASON(S):

Dated: 1/2/13          _____
                                        J.S.C.

Check one:  ☐ FINAL DISPOSITION   ☑ NON-FINAL DISPOSITION

Check if appropriate:  ☐ DO NOT POST   ☐ REFERENCE

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK  :  PART 12
------------------------------------------------------------------------x
ARIE GENGER and ORLY GENGER, in her individual
capacity and on behalf of THE ORLY GENGER 1993
TRUST,

                               Plaintiffs,

           -against-

SAGI GENGER, TPR INVESTMENT ASSOCIATES,
INC., DALIA GENGER, THE SAGI GENGER 1993
TRUST, ROCHELLE FANG, individually and as trustee
of THE SAGI GENGER 1993 TRUST, GLENCLOVA
INVESTMENT COMPANY, TR INVESTORS, LLC,
NEW TR EQUITY I, LLC, NEW TR EQUITY II, LLC,
JULES TRUMP, EDDIE TRUMP and MARK HIRSCH,

                            Defendants.
------------------------------------------------------------------------x
BARBARA JAFFE, JSC:

Index No. 651089/2010

Argued:         3/13/12
Mot. seq. nos.:   006-007,
                  009-011, 015

**AMENDED DECISION
AND ORDER**

      By notices of motion dated October 14, 2011, defendants move pursuant to CPLR 3211

for an order dismissing various causes of action asserted in the third amended and supplemental

complaint of Arie Genger and his daughter Orly Genger, in her individual capacity and on behalf

of the Orly Genger 1993 Trust (complaint).  By order to show cause dated September 13, 2012,

defendants Glenclova Investment Company, TR Investors, LLC, New TR Equity I, LLC, New

TR Equity II, LLC, Jules Trump, Eddie Trump, and Mark Hirsch (Trump Group) move pursuant

to CPLR 2214(c) for an order permitting them to supplement the record of its motion (sequence

15) with a recent decision of the Delaware Chancery Court.  On or about October 17, 2012, I was

assigned to Part 12 where this action pends.

      In his complaint, Arie advances 10 causes of action including, as pertinent here, a

declaratory judgment authorizing him to reform the divorce settlement stipulation between him

and his ex-wife, Dalia Genger, the mother of Orly and Sagi Genger and trustee of the Orly Trust; constructive trust; breach of fiduciary duty, conspiracy and aiding and abetting breach of fiduciary duty; unjust enrichment and rescission; breach of contract; tortious interference with contract, and aiding and abetting tortious interference of contract; and preliminary and permanent injunctions.

## I. BACKGROUND

The history of this action is set out in opinions rendered by the justice previously assigned, the Surrogate's Court, the Delaware Chancery Court, the Delaware Supreme Court, and the United States District Court for the Southern District of New York (Southern District). Therefore, the only background provided here is for the purpose of addressing the instant motions.

In 1993, as part of a family estate plan for the benefit of his children Sagi and Orly, Arie established the Sagi Trust and the Orly Trust (the Trusts). In 2001, TPR Investment Associates (TPR), a Genger family-controlled corporation, entered into a stockholders agreement with Trump Group, whereby Trump Group obtained the right to purchase all of TPR's 3,000 shares in Trans-Resources, Inc. (TRI), another Genger family-controlled corporation. The agreement also provided that consent was required for any share transfers, except those to a "permitted transferee." (Stockholders Agreement, § 3.1).

### A.  The divorce stipulation

In 2004, Arie and Dalia settled their bitterly contested divorce by entering into a so-ordered stipulation distributing their marital assets, including their interests in TPR and TRI. At the time, Arie held 51 percent of TPR's stock with the remaining 49 percent held by D&K

Limited Partnership (D&K). Dalia held four percent of D&K; the Sagi Trust, and the Orly Trust held 48 percent each. TPR held 52.85 percent of TRI's common stock, and the remaining 47.15 percent was held by Trump Group.

Pursuant to the divorce stipulation and related documentation, Arie agreed to transfer his 51 percent interest in TPR to Dalia, with the proviso that TPR divest its 3,000 shares of TRI common stock on the following terms: (1) Sagi would become TPR's president and chief executive officer; (2) TPR would transfer to Arie 794.4 shares of TRI common stock (the Arie Shares), representing a 13.4 percent interest in TRI; (3) TPR would transfer to each of the Trusts 1,102.8 shares of TRI common stock (the Sagi Trust Shares and the Orly Trust Shares, each representing a 19.43 percent interest in TRI); and (4) each of the Trusts would execute agreements providing for, *inter alia*, Arie's irrevocable right to vote the Sagi Trust Shares and the Orly Trust Shares in TRI for the duration of his life. (2004 Transfers). The divorce stipulation includes a clause which provides, in effect, that in the event any of the terms therein are voided by a court of competent jurisdiction, the parties thereto may seek a court-ordered reformation of the affected terms to give effect to the parties' original intent. (Divorce Stipulation, Art. XVI, at 47-48).

In 2007, Dalia commenced an arbitration proceeding against Arie, contesting the distribution of marital assets under the divorce stipulation. In 2008, an arbitration award in the proximate amount of $3.85 million was entered in Dalia's favor.

### B. Trump Group's acquisition of TRI shares

In early 2008, when TRI faced financial difficulties, Arie, now in control of TRI by virtue of the 2004 Transfers, explored the possibility of obtaining capital funding for it from

3

Trump Group, in exchange for increasing Trump Group's equity position to become TRI's majority stockholder. While a funding plan was being negotiated and drafted, TRI's financial condition significantly improved. Arie then reneged on the funding agreement and threatened to sue Trump Group if it challenged the 2004 Transfers.

Subsequently, Trump Group asserted its right under the TRI stockholders agreement to purchase all of TPR's 3,000 TRI shares, and maintained that the 2004 Transfers under the divorce settlement and underlying transaction documents were invalid because Arie never sought its consent, as is required by the TRI stockholders agreement. Thus, on August 11, 2008, Trump Group filed an action in the Southern District against TPR and TRI, asserting that the 2004 Transfers were invalid as violative of the stockholders agreement. Arie intervened, and TPR interposed a third-party complaint against him, seeking a declaratory judgment that TPR is the true owner of all TRI shares, and that Arie had tortiously interfered with TPR's contractual and property rights in executing the divorce stipulation. In response, Arie asserted in his third-party answer various counterclaims substantially similar to those asserted in the instant action.

On or about August 22, 2008, Trump Group and TPR entered into a stock purchase agreement, whereby TPR agreed to sell the Sagi Trust's 1102.8 shares of TRI common stock to Trump Group for $26.7 million, which would result in Trump Group becoming TRI's majority stockholder. On the same day, the parties entered into a side letter agreement, whereby TPR agreed that, in the event that the 2004 Transfers of the TRI shares by TPR to the Orly Trust and Arie were determined to be invalid, Trump Group would be entitled to purchase directly from TPR the Orly Trust Shares and the Arie Shares at less than 60 percent of the per share price paid by Trump Group for the Sagi Trust Shares.

4

On August 25, 2008, after purchasing the Sagi Trust Shares from TPR, Trump Group commenced in the Delaware Chancery Court a "Section 225 proceeding" under Title 8 of the Delaware Code, asserting that it was in control of TRI via its purchase of the Sagi Trust Shares pursuant to the stock purchase agreement, and sought a judicial determination of the composition of TRI's board of directors. In an opinion dated July 23, 2010, the Chancery Court ruled, *inter alia*, that because the 2004 Transfers violated the TRI stockholders agreement, and because Trump Group never ratified the 2004 Transfers despite Arie's contrary allegation, by virtue of the stock purchase agreement, Trump Group owned the Sagi Trust Shares, giving it the majority voting control of TRI. (*TR Investors, LLC, v Genger*, 2010 WL 2901704 [Del. Ch. Ct. 2010]). The court concluded as follows:

> [T]he Trump Group controls the Trans-Resources board for the following reasons: (1) the Trump Group never received notice of the 2004 Transfers, which were made in violation of the Stockholders Agreement, until June 2008; and (2) the Trump Group did not ratify those Transfers when it bought the transferred shares from Sagi Genger and TPR. Because it never ratified the wrongful transaction, the Trump Group was free to deal with the relevant transferor, TPR, and its transferee, the Sagi Trust, and settle the matter by acquiring the wrongly transferred shares in an agreed upon negotiation. In doing so, the Trump Group clearly reserved its position that TPR made a void transfer, has proven that its position was correct, and is entitled, as a result, to be deemed to have taken the shares from TPR as a settlement of the improper Transfers. In the alternative, even if the Trump Group ratified the 2004 Transfers-which it did not-I find that the Trump Group did not purchase the shares from Sagi Genger subject to the proxy in favor of Arie Genger. Therefore, the Trump Group holds a majority equity and voting stake in Trans-Resources, and its ability to vote its shares is unaffected by the proxy.

(*TR Investors, LLC*, 2010 WL 2901704, *2).

Thereafter, in an opinion dated August 9, 2010, the Chancery Court expanded its ruling, holding that the Arie and Orly Trust Shares transferred in 2004 were also invalid, thereby entitling Trump Group to buy those shares from TPR pursuant to the side letter agreement if it

5

chose to do so. (*TR Investors, LLC v Genger*, 2010 WL 3279385 [Del. Ch. Ct. 2010]). Plaintiffs commenced the instant action promptly after the Chancery Court issued its July 2010 opinion.

While Arie was seeking relief in this court, he appealed the Chancery Court rulings. In an opinion dated July 19, 2011, the Delaware Supreme Court affirmed that part of the Chancery Court's findings and rulings that Trump Group had legally purchased the Sagi Trust Shares from TPR, giving it majority control of TRI, but it reversed the Chancery Court's August opinion as to the beneficial ownership of the Arie Shares and Orly Trust Shares absent personal jurisdiction over TPR and the Orly Trust which were not parties to the section 225 proceeding. (*Genger v TR Investors, LLC*, 26 A3d 180 [Del. Sup. Ct. 2011]). Promptly thereafter, Trump Group and Arie, which were parties to the Delaware court proceedings, negotiated a form of the Revised Final Judgment Order (Final Order) that reflected and implemented the various findings and rulings of the Delaware Chancery Court and the Delaware Supreme Court. It expressly provides that members of Trump Group are the "owners of . . . 67.7477 percent of the authorized and issued stock" of TRI, that TPR is the "record owner of all [TRI] shares not presently owned" by Trump Group, and that Arie and the Orly Trust "are not and have not been since at least the date of execution of the Stockholders Agreement the record owners of any [TRI] shares." (Final Order, ¶¶ 2-8). The Final Order was adopted and signed by the Chancery Court, and entered in the docket on or about August 19, 2011.

### C. Additional lawsuits arising from Trump Group's acquisition of TRI shares

On about July 22, 2011, in response to the Delaware Supreme Court's ruling, Trump Group commenced an action against Arie and TPR in the Delaware Chancery Court, seeking a declaration that it is both the record and beneficial owner of the Arie Shares. On October 4,

2011, Dalia, as trustee of the Orly Trust, also filed an action in the Delaware Chancery Court against Trump Group and TPR, seeking a declaration that the Orly Trust is the beneficial owner of the Orly Trust Shares.  Pursuant to two separate temporary restraining orders, dated October 26, 2011 and November 9, 2011, and issued by the previously assigned justice, Dalia, TPR and Trump Group were prohibited from proceeding with the Delaware declaratory judgment actions. In addition to the foregoing court actions, counsels for TPR and Trump Group, in their capacity as escrow agents with respect to the sales of the Orly Trust Shares and the Arie Shares to Trump Group, filed separate interpleader actions in the Southern District and deposited escrowed funds of approximately $10.3 million and $7.4 million, respectively, with the Southern District clerk. As a result, there were no less than six separate actions pending in three different jurisdictions relating to the issue of the beneficial ownership of the Arie Shares and the Orly Trust Shares.

D.  Instant motions

On March 13, 2012, oral argument on defendants' motions was heard by the previously assigned justice pending the Southern District's determination as to its jurisdiction to hear and adjudicate the primary issue of whether Arie and the Orly Trust each, respectively, has a beneficial interest in the Arie Shares and the Orly Trust Shares, which is at the heart of the parties' dispute.  In an opinion dated June 14, 2012, the Southern District observed that the parties had created "a headache-inducing jurisdictional conflict" in requesting that it "clean up the mess they made by determining which of the federal or state courts should decide the issue underpinning all their claims - that is, the beneficial ownership of the Arie Shares and Orly Trust Shares." (*Glenclova Investments Co. v Trans-Resources, Inc., et al.*, __ F Supp 2d __, 2012 WL 2196670, at *5 [SDNY 2012]).  While that court took "no position on the question of forum," in

7

light of the temporary restraining orders staying litigation in Delaware as to the issue of

beneficial ownership of the Orly Trust Shares and "the difficulty the Delaware Chancery Court

may have in obtaining personal jurisdiction over Arie and Orly," the Southern District concluded

that the foregoing "strongly suggests that the parties agree to litigate their claims in the New

York Supreme Court." (*Id.* at 19).

## II.  ANALYSIS

In considering a motion to dismiss pursuant to CPLR 3211(a)(7), the court must

determine whether the pleadings state a cause of action.  The motion must be denied if, from the

four corners of the pleadings, factual allegations are discerned which, taken together, manifest

any cause of action cognizable at law. (*Richbell Info. Servs. v Jupiter Partners*, 309 AD2d 288,

289 [1st Dept 2003], *quoting 511 W. 232nd Owners Corp. v Jennifer Realty Corp.*, 98 NY2d 144,

151-152 [2002]).  The pleadings are afforded a liberal construction, and the court is to accord

plaintiffs the benefit of every possible favorable inference. (*Simkin v Blank*, 19 NY3d 46, 52

[2012]).  However, while factual allegations in a complaint should be accorded every favorable

inference, bare legal conclusions and inherently incredible facts are insufficient. (*Matter of Sud v

Sud*, 211 AD2d 423, 424 [1st Dept 1995]).

Moreover, "[w]hen the moving party offers evidentiary material, the court is required to

determine whether the proponent of the [complaint] has a cause of action, not whether [he or] she

has stated one." (*Asgahar v Tringali Realty, Inc.*, 18 AD3d 408, 409 [2d Dept 2005]).  And, a

cause of action may not be maintained if it is barred by, *inter alia*, collateral estoppel, res judicata

or issue preclusion. (CPLR 3211[a][5]).

8

A. Trump Group's motion to dismiss (motion sequence number 011)

The complaint contains the following causes of action against Trump Group: declaratory judgment to reform the divorce stipulation (first cause of action); constructive trust, unjust enrichment, rescission, breach of fiduciary duty, aiding and abetting or conspiracy to commit a breach (second, third, fourth, and fifth causes of action); tortious interference with contract (ninth cause of action); and preliminary and permanent injunction (fifth and tenth causes of action). The gist of the complaint is that, because the 2004 Transfers effected by the divorce stipulation were held void and unenforceable by the Delaware courts, the divorce stipulation must be reformed in such a manner that Arie will resume beneficial ownership of the 3,000 shares of TRI stock that TPR owned before the 2004 Transfers. According to plaintiffs, any act of defendants that is inconsistent with Arie's beneficial ownership in such shares of stock is actionable and warrants the payment of damages.

1. Collateral estoppel

Seeking dismissal of the complaint, Trump Group argues that plaintiffs' claims are collaterally estopped by the Delaware courts' determination of factual and legal issues and even if plaintiffs are entitled to relitigate the issues underlying their claims, the complaint nonetheless does not state a cause of action. It identifies the following issues of fact and law that were decided by the Delaware courts: the invalidity of the 2004 Transfers that Arie caused TPR to make to himself and to the Orly and Sagi Trusts in violation of the TRI stockholders agreement, thereby entitling Trump Group to purchase all of TPR's 3,000 shares of stock in TRI; Trump Group's entitlement to control TRI as of 2004 when Arie caused TPR to breach the stockholders agreement; Arie's failure to provide notice of the 2004 Transfers and to obtain Trump Group's

9

consent to the Transfers, which violated the stockholders agreement; and Trump Group's

ownership of 67.7 percent of TRI shares upon its purchase of the Sagi Trust Shares from TPR

pursuant to the 2008 purchase agreement with TPR, which is now controlled by Sagi, as its

current president and chief executive officer.

Arie argues in opposition that because: (1) the issues listed by Trump Group were

decided in a statutorily limited section 225 *in rem* summary proceeding and not in a plenary

action; and (2) the Delaware Supreme Court held that an adjudication of the right to vote

corporate shares is not binding with respect to the beneficial ownership of such shares, the

section 225 proceeding in the Chancery Court did not result in a determination of the beneficial

ownership of all 3,000 TRI shares.  He also contends that the Delaware courts' findings do not

bind him because they neither conflict with the causes of action he advances in his complaint, nor

are they essential to the Delaware courts' determinations, and because the court imposed on him

a higher burden of proof. (Arie's Opposition Brief, at 11-13; Hearing Transcript, March 13,

2012, at 63).  He does not contend that he did not have a full and fair opportunity to litigate in the

Delaware courts.  Rather, he contends that "essential parties were missing." (Arie's opposition

brief, at 14).

Orly joins Arie's arguments and adds that, contrary to the position taken by TPR and

Sagi, as well as Trump Group, she has legal standing to represent the Orly Trust, per the holding

of the previously assigned justice. (*Genger v Genger*, NY County, June 28, 2010, Feinman, J.,

index no. 109749/2009).  Thus, both she and Dalia assert that they may act on behalf of the Orly

Trust unless and until the Surrogate's Court rules otherwise in an appropriate action there.  Orly

also denies that she is collaterally estopped by the Delaware decisions as she was not a party to

10

those proceedings and had no opportunity to litigate the issues there.

While a non-party may not be estopped from arguing a position previously litigated, many of the issues listed by Trump Group are closely related to the Delaware courts' invalidation of the 2004 Transfers and constitute the primary bases for the instant action, and Orly does not allege that her participation as a litigant or party in the Delaware proceedings would have altered the Delaware courts' findings and rulings that relate to the invalidation. In any event, the Delaware Supreme Court recognized that Delaware has no jurisdiction over the Orly Trust and TPR, and thus specifically left open the issue of the beneficial ownership of the Orly Trust Shares. Thus, that Orly did not litigate the 2004 Transfers issues in Delaware does not appear to have prejudiced her rights, and she does not argue otherwise. And, as Arie is estopped from arguing some of the issues (*infra*, at 12-16), and as Orly does not distinguish her arguments and issues from Arie's, instead fully adopting them, to the extent that the Delaware findings and rulings on the issues relating to such arguments apply to both Arie and Orly, and to which this court gives full faith and credit (US Const, art IV, § 1; *Ho v McCarthy,* 90 AD3d 710, 711 [2d Dept 2011]), they also bind Orly here. In this regard, I need not decide whether there is any merit to Trump Group's argument that, although Orly and the Orly Trust were not parties in the Delaware proceedings, their interest was fully represented by Arie, who acted as a fiduciary, was in privity with Orly, and actively litigated the issues raised in the Delaware proceedings on behalf of Orly and the Orly Trust.

Accordingly, where applicable, or unless otherwise specified or the context otherwise requires, all references hereinafter to "Arie" include "Orly" and the "Orly Trust." However, to avoid any possibility of risk or confusion, the decretal paragraphs set forth at the conclusion of

this decision and order will, where applicable, reflect the separate rulings with respect to Arie and Orly and/or the Orly Trust.

In claiming that he retains a beneficial interest in all 3,000 TRI shares including the Sagi Trust Shares purchased by Trump Group from TPR, Arie overlooks the Final Order which he himself negotiated and which gives neither Arie nor the Orly Trust record ownership of any TRI shares. And he identifies no clause or provision in the Delaware courts' opinions suggesting that he has a beneficial ownership interest in the Sagi Trust Shares. Therefore, any allegation or claim by Arie in opposition to Trump Group's motion that TPR's record ownership of all 3,000 TRI shares "remained subject to his beneficial ownership claims" has no factual or legal basis. (Arie's Opposition Brief, at 15-17). Indeed, Arie acknowledges that "[t]he Chancery Court also held that the Trumps owned the Sagi [Trust] shares under the 2008 Agreement and that the Sagi Trust Irrevocable Proxy [held by Arie] was not valid under New York or Delaware law." (*Id.* at 9).

Many of Arie's claims against Trump Group in this action are integrally related to the Delaware courts' invalidation of the 2004 Transfers, and the Delaware Supreme Court noted that Arie had "voluntarily asked the trial court to determine that he beneficially owned 13.99 percent" of TRI shares, and that Arie and Trump Group "were legally free to consent to the jurisdiction of the Court of Chancery exercising plenary *in personam* jurisdiction over themselves personally." (*Genger v TR Investors, LLC*, 26 A3d 180, 202 [Del. Sup. Ct. 2011]).

That a section 225 proceeding was *in rem* has no bearing on the preclusive effect of a decision on a subsequent action. (*Johnston v Arbitrium [Cayman Islands] Handels AG*, 198 F3d 342, 348 [2d Cir 1999] ["Under applicable Delaware law . . . the determination of an issue

12

actually litigated and decided against a defendant in an in rem case may have collateral estoppel effect in a subsequent in personam proceeding"]). In *Johnston*, the Second Circuit expressly rejected the argument that issues decided in a section 225 proceeding concerning disputed ownership and control of corporate shares could not collaterally estop claims raised in a subsequent *in personam* action involving findings and determinations made in the prior *in rem* action. And TPR and the Orly Trust's absence from Delaware was the basis for the Delaware Supreme Court's reversal of the Chancery Court's ruling with respect to the issue of beneficial ownership of the Arie Shares and the Orly Trust Shares, but not as to other findings and rulings of the Chancery Court.

The higher burden of proof imposed on Arie in the Chancery Court to prove the factual issues by clear and convincing evidence is immaterial. The Second Circuit in *Kosakow v New Rochelle Radiology Assoc.,* analyzed applicable New York law, as set forth by the Court of Appeals in *Schwartz* and followed in *Parker, supra,* and stated, in relevant part:

> The *Schwartz* opinion counsels that a functional approach should be taken in analyzing collateral estoppel in New York, and that it should not be applied rigidly . . . Notably, under this functional test, the court did not mention the burden of proof, let alone describe it as a dispositive factor. While there is a certain logical appeal to the decision in *Nesbitt* [that collateral estoppel may not apply if there is a difference in the burden of proof], *the value of collateral estoppel in fostering judicial economy and avoiding inconsistent results would be severely compromised if every shift in the burden of proof would make collateral estoppel unavailable.* . . . It follows that the New York Court of Appeals would similarly reject the proposition that collateral estoppel can never be applied where there is a difference in the burden of proof. *Schwartz's* practical approach to the issue dictates that parties not be permitted to relitigate the same issues, despite differing burdens of proof, where it is evident that burden of proof played little or no role in the prior factual determination.

13

(*Kosakow*, 274 F3d 706, 731-732 [2d Cir 2001][emphasis added]).  Absent any New York authority to the contrary offered by Arie, *Kosakow* is persuasive.  Moreover, the Chancery Court imposed on Arie a higher burden of proof as a sanction for spoliating evidence and contempt of court.  To permit him to relitigate his claims here would render the sanction nugatory.

And, following *Kosakow*, the Second Circuit recently held that where a plaintiff had a full and fair opportunity to litigate her claims in an earlier Article 78 proceeding under New York law, she was collaterally estopped from advancing those claims in the federal action notwithstanding the difference in the applicable burdens of proof between the proceeding and a subsequent action in the federal court. (*Constantine v Teachers Coll.*, 448 Fed Appx 92, 94-95, 2011 WL 4509542 [2d Cir 2011]).

Most importantly, the underlying facts and record clearly reflect that Arie had a full and fair opportunity in the Delaware courts to litigate the issues regarding invalidation of the 2004 Transfers. (*Schwartz v Public Adm'r of County of Bronx*, 24 NY2d 65, 73 [1969] [while burden of proving identity of issues rests on proponent of collateral estoppel, opponent bears burden of proving that he or she did not have full and fair opportunity to litigate issues in earlier action]); *accord Parker v Blauvelt Volunteer Fire Co.*, 93 NY2d 343, 349 [1999]).  Accordingly, to the extent that the allegations in support of the causes of action asserted in the complaint are contradicted by the findings and rulings of the Delaware courts, Arie is collaterally estopped from relitigating them. (CPLR 3211[a][5]).

### 2.  Declaratory judgment to reform the divorce stipulation (first cause of action)

Arie seeks a declaratory judgment against Trump Group and other defendants to reform the divorce stipulation based on: (1) the provision giving the parties the right to seek a

14

court-ordered reformation to reflect their original intent in the event that any portion of the stipulation is held to be invalid; (2) the Delaware courts' invalidation of the 2004 Transfers and the irrevocable proxies held by Arie to vote the Orly Trust Shares and the Sagi Trust Shares; and (3) his and Dalia's mutual mistake in believing that the 2004 Transfers and the irrevocable proxies were valid. In seeking reformation, Arie wants, *inter alia,* the 3,000 TRI shares held by TPR prior to the 2004 Transfers placed in a new entity to be controlled by him, and for him to retain all voting rights to such shares. (Complaint, ¶¶ 175-189). This is the only cause of action where Orly and the Orly Trust are not co-plaintiffs with Arie.

The Southern District observed not only that the instant action is "little more than a collateral attack on the Delaware Supreme Court ruling," but that authorizing Arie to reform the corporate ownership structure in TPR and TRI, including allowing him to retain his voting rights in all 3,000 shares of TRI stock, constitutes a collateral attack on the Delaware courts' determinations, whereby they unequivocally ruled, *inter alia,* that he has no right to vote any of the shares because the irrevocable voting proxies held by him pursuant to the 2004 Transfers are invalid. (*Glenclova Investments Co. v Trans-Resources, Inc., et al.,* __ F Supp 2d __, 2012 WL 2196670, at *5). It also noted that Arie's federal counterclaims, which are substantially similar to those advanced here, including the reformation claim, are directed against 13 counterclaiming defendants including Dalia, even though 12 of them were not parties to the divorce stipulation, and "the majority of the counterclaims do not name Dalia at all." (*Id.* at 17). Moreover, the Southern District observed that:

> even though Arie is the party who made false representations in the [Divorce] Stipulation of Settlement, his reformation claim does not seek to right that wrong. Instead, he wants to change the terms of

15

> the [Stipulation] in a manner designed to undo the Delaware
> Chancery Court's finding of liability against him, thereby allowing
> him to avoid the consequences of his own breach of the 2001 [TRI]
> Stockholders Agreement - Trump Group's right to purchase those
> invalidly transferred shares.

(*Id* at 17). Consequently, Arie is collaterally estopped from seeking a declaratory judgment to

reform the divorce stipulation, at least as asserted against Trump Group, as it is "little more than

a collateral attack on the Delaware Supreme Court ruling," and as Trump Group is not a party to

the divorce stipulation. Although Arie maintains that Trump Group is a necessary party because

it holds the 3,000 TRI shares needed to implement the reformation, the remedy of reformation or

rescission is unavailable against a nonparty to a contract. (*Baranek v Baranek*, 54 AD3d 789, 790

[2d Dept 2008]).

And, as Trump Group was not a party to the divorce stipulation, Arie's and Dalie's

alleged "mutual mistake" in effecting the 2004 Transfers is immaterial and may not be used as a

defense in Arie's dispute with Trump Group. Moreover, Arie seeks to undo the Delaware courts'

adverse findings against him and Trump Group's right to buy the "invalidly transferred shares,"

notwithstanding that they were transferred as a result of his misrepresentation in the divorce

stipulation that no consent, other than TPR's, was required for the 2004 Transfers. In any event,

any equitable or contractual right in favor of Arie to reform the divorce stipulation does not

override the pre-existing contractual right of Trump Group to purchase the invalidly transferred

shares, when it was Arie then in control of TPR who caused TPR to breach the TRI stockholders

agreement.

### 3. Constructive trust, unjust enrichment and rescission (second and fourth causes of action)

The elements of a cause of action for a constructive trust are: "(1) a confidential or

16

fiduciary relation; (2) a promise, express or implied; (3) a transfer made in reliance on that promise; and (4) unjust enrichment." (*Wachovia Sec., LLC v Joseph*, 56 AD3d 269, 271 [1st Dept 2008]). Arie asserts that New York courts frequently impose constructive trusts with "sufficient flexibility" to prevent enrichment and that the "constructive trust doctrine is not rigidly limited." (Arie's Opposition Brief, at 20).

Arie alleges that Trump Group is not a bona fide purchaser, and that a constructive trust should be imposed in his favor with respect to all 3,000 shares of TRI stock that reverted to TPR because Trump Group, as well as Sagi, TPR's current president, owe fiduciary and contractual duties to Arie and the Orly Trust. (*Id.* at 23). According to Trump Group, however, it had neither a confidential nor fiduciary relationship with Arie and/or the Orly Trust.

Courts have held that "a person wrongfully acquiring property can be treated as a constructive trustee notwithstanding the lack of a fiduciary relationship." (*See eg In re Koreag, Controle et Revision S.A. v Refco F/X Assoc.*, 961 F2d 341, 353 [2d Cir 1992]), citing *Simonds v Simonds*, 45 NY2d 233, 242 [1978]). Whether Trump Group was a bona fide purchaser or whether it owed a confidential or fiduciary relationship need not be decided for purposes of addressing Arie's claim for a constructive trust.

In an earlier decision in this action entered on January 3, 2012 (motion sequence numbers 004 and 005), the previously assigned justice denied plaintiffs' request for an order enjoining defendants from taking certain actions, including any act to sell or transfer the Arie and Orly Trust Shares pending a final adjudication of beneficial interest, finding that an injunction would interfere with TRI's management in which Trump Group holds majority control, that plaintiffs have alternative remedies even if they obtain a final judicial determination of beneficial interest,

17

and that requiring Trump Group and TPR to comply with the court's order in giving 10 business days' notice to plaintiffs of a proposed future transaction, except with respect to share dilution, is sufficient to maintain the status quo. (*Genger v Genger*, Dec. 28, 2011 [Sup Ct, NY County]).

The same considerations render unnecessary Arie's claim for a constructive trust as, *inter alia*, the notice requirement affords plaintiffs a sufficient opportunity to seek judicial relief in the event that defendants propose to enter into a transaction that may adversely affect plaintiffs' asserted interest in the Arie Shares and the Orly Trust Shares.

In order to plead a cause of action for unjust enrichment adequately, a plaintiff must allege "that (1) the other party was enriched, (2) at that party's expense, and (3) that it is against equity and good conscience to permit the other party to retain what is sought to be recovered." (*Georgia Malone, Inc. v Rieder*, 19 NY3d 511, 515 [2012], *citing Mandarin Trading Ltd. v Wildenstein*, 16 NY3d 173, 182 [2011]).

In his complaint, Arie alleges, *inter alia*, that: (1) TPR/Sagi had no authority to sell the 3,000 TRI shares to Trump Group when the Delaware courts had determined that the 2004 Transfers were void *ab initio* as the shares then reverted to TPR subject to Arie's interest by virtue of the divorce stipulation; (2) the purchase price paid by Trump Group for the 3,000 TRI shares under the purchase agreement for the Sagi Trust Shares and the side letter agreement for the Arie Shares and Orly Trust Shares was a fraction of the value of such shares; and (3) Trump Group was not a bona fide purchaser and would be unjustly enriched if allowed to benefit from TPR's sale of the TRI shares.

Trump Group does not specifically deny that the per share price paid for the Arie and the Orly Trust Shares was significantly lower than that for the Sagi Trust Shares, and its assertion

18

that the Delaware courts have held that it was "entitled to buy TPR's TRI shares at 2004 values, which were far less than the $26 million Trump Group paid TPR just for the Sagi Trust Shares" does not defeat a claim of unjust enrichment because that portion of the Chancery Court's opinion does not address the purchase price for the Arie Shares and Orly Trust Shares or the side letter agreement, nor does it compare the per share price difference. Moreover, Trump Group's contention that the claim for unjust enrichment requires a fiduciary or confidential relationship, and must be pleaded with specificity, is not supported by the opinions it cites in its moving papers. Rather, a fiduciary or confidential relation is an element of a constructive trust claim. (*Supra*, at 16-17). Consequently, Arie has sufficiently alleged, for the purpose of CPLR 3211(a)(7), a claim for unjust enrichment.

Rescission is a part of the fourth cause of action. As Trump Group was not a party to the divorce stipulation, and for the reasons fully discussed above in connection with the dismissal of the reformation claim (*supra*, at 16-18), rescission does not lie against Trump Group.

### 4. Permanent injunction (fifth cause of action) and preliminary injunction (tenth cause of action)

Plaintiffs seek to preliminarily and permanently enjoin Trump Group from transferring, selling, pledging, assigning, diluting, voting or otherwise disposing of all 3,000 shares of TRI stock that reverted to TPR as a result of the Delaware court rulings. The reasons set forth above for dismissing the constructive trust claim (*supra*, at 16-18) apply equally here. In addition, the Delaware courts held that Arie and the Orly Trust are not the record owners of any TRI shares, and that no TRI shares owned by Trump Group or owned of record by TPR are subject to any proxy of any kind in favor of Arie. (Final Order, ¶¶ 7-10). Thus, granting the requested injunctive relief in plaintiffs' favor to enjoin Trump Group and TPR from exercising their

19

respective voting rights in the TRI shares would constitute a collateral attack on the court rulings.

### 5. Breach of fiduciary duty, conspiracy, and aiding and abetting breach of fiduciary duty (third cause of action)

The elements of a cause of action for a breach of fiduciary duty are: "the existence of a fiduciary relationship . . . misconduct by the defendant, and . . . damages . . . caused by the defendant's misconduct." (*Rut v Young Adult Inst., Inc.*, 74 AD3d 776, 777 [2d Dept 2010]). Arie alleges, *inter alia*, that: (1) upon becoming the majority shareholder of TRI in 2008 after purchasing the Sagi Trust Shares from TPR, Trump Group owed a fiduciary duty to him and the Orly Trust as the "known beneficial owners" of the Arie Shares and Orly Trust Shares in TRI; and (2) as a majority shareholder, Trump Group breached its fiduciary duty by purchasing the Arie Shares and the Orly Trust Shares at a significant discount, thereby advancing its scheme to squeeze Arie out of TRI. (Complaint, ¶¶ 209-214).

Although Trump Group does not deny that it became a majority shareholder of TRI after it purchased the Sagi Trust Shares in 2008 and that as a majority shareholder, it owed a fiduciary duty to TRI minority shareholders (*Richbell Info. Servs.*, 309 AD2d at 300 ["(a) majority shareholder in a close corporation is in a fiduciary relationship with the minority"]), it denies knowing that plaintiffs were beneficial owners of any TRI shares, and thus could owe them no fiduciary duty.

Even assuming that Trump Group was unaware that plaintiffs were beneficial owners in 2008 when it entered into the side letter agreement to buy the Arie Shares and the Orly Trust Shares, it became aware of it by 2011 when it exercised its option to buy Arie's and the Orly Trust's shares, as since at least 2008, they asserted beneficial ownership in the shares, even if it

20

had not yet been judicially determined.

Trump Group also denies owing any duty because when it executed the side letter agreement it was not a majority shareholder, and that, even assuming it owed a fiduciary duty, the sole duty was to refrain from using its majority power to oppress the minority, and Arie does not allege that TPR, the minority shareholder, was oppressed.

Here, the fiduciary duty arose in 2008 after the Sagi Trust Shares were purchased, and the allegation is that the duty was breached in 2011 when Trump Group bought the Arie Shares and the Orly Trust Shares at a deep discount with the intent of removing plaintiffs, who have claimed, at least indirectly, to be putative minority shareholders of TRI through their interest in TPR, after the Delaware courts ruled that the 2004 Transfers were void and the transferred Arie Shares and Orly Trust Shares reverted to TPR. In any event, "whether such [fiduciary] obligation exists is necessarily fact-specific to the particular case," and it would be premature to dismiss the claim before discovery is undertaken to ascertain the facts. (*Weiner v Lazard Freres & Co.*, 241 AD2d 114, 122 [1st Dept 1998]). Consequently, for all of these reasons and for purposes of CPLR 3211(a)(7), the complaint adequately states a claim for breach of fiduciary duty against Trump Group.

It is also alleged, in addition to the direct breach of fiduciary duty, that Trump Group conspired with other defendants, and aided and abetted them in the breach of their fiduciary duty. To state a claim of aiding and abetting a breach of fiduciary duty, the complaint must contain facts to support "a fiduciary duty owed to plaintiff . . . a breach of that duty, and [the] defendant's substantial assistance in effecting the breach,'" which resulted in damages. (*Monaghan v Ford Motor Co.*, 71 AD3d 848, 850 [2d Dept 2010]). While an entity such as TPR owes no fiduciary

21

duty to its shareholders under New York and Delaware laws, as argued by Trump Group, the complaint is replete with allegations that Sagi, as TPR's president, breached fiduciary duties he owed to Arie, as well as other allegations that the 2008 purchase agreement and the side letter agreement constituted a $26.7 million bribe offered by Trump Group to Sagi, to betray and rob his father and sister of their interests in the relevant TRI shares, and to squeeze them out of TRI at unconscionably low prices. (Complaint, ¶¶ 123, 135).

The complaint thus contains sufficient factual allegations supporting a claim that Sagi breached his fiduciary duty to Arie (*infra*, at 27-28), as does the claim that Trump Group aided and abetted Sagi in breaching it. Moreover, "actual knowledge" of the alleged wrongdoing "need only be pleaded generally . . . particularly at the pre-discovery stage." (*Oster v Kirschner*, 77 AD3d 51, 55 [1st Dept 2010]).

However, the complaint is not only bereft of an explicit and independent allegation of conspiracy, but such a cause of action does not exist, as it is well settled that "a mere conspiracy to commit a [tort] is never of itself a cause of action," even though allegations of a conspiracy are permitted to connect defendants with an otherwise actionable tort. (*See Alexander & Alexander v Fritzen*, 68 NY2d 968, 969 [1986]).

### 6. Tortious interference with contract (eighth cause of action)

The elements of a cause of action for tortious interference of contract are: "(1) the existence of a valid contract between the plaintiff and a third party, (2) the defendant's knowledge of that contract, (3) the defendant's intentional procurement of the third party's breach of that contract, and (4) damages." (*Chung v Wang*, 79 AD3d 693, 694 [2d Dept 2010]).

The complaint contains allegations that Trump Group interfered with several contracts,

22

including the divorce stipulation, the 2004 Transfer documents between Arie and TPR, and the 2004 voting trust agreements between Arie and the Orly and Sagi Trusts. However, absent any allegation in the complaint that Dalia breached the divorce stipulation and the related documentation, there can be no finding that Trump Group tortiously interfered with the divorce stipulation and the related documentation.

Although the Delaware courts held that the 2004 Transfers are void, Arie argues that the Delaware Chancery Court held that the 2004 Transfers are unenforceable, whereas the 2004 Transfer documents and the 2004 voting trust agreements are void. (Arie's Opposition Brief, at 32). He also maintains, however, that "[on] July 23, 2010, the Delaware Chancery Court issued a lengthy written decision which held that the 2004 transfers of TPR's TRI shares to Arie, the Sagi Trust and the Orly Trust pursuant to the Divorce Decree were void . . . ." (*Id.* at 9). Arie then asks that instead of considering the illegal contract void in toto, the illegal provision be severed, thereby permitting the validation of the balance of the agreement. (*Id.* at 33). In his view, because the 2004 Transfer documents and voting trust agreements contained "valid and binding provisions" that required Sagi and TPR to take "all necessary actions . . . to complete or perfect the transactions contemplated hereby," a tortious interference claim may be alleged against Trump Group for causing the other defendants to breach these contractual provisions. (*Id.*).

Trump Group, however, rightly maintains that "because the 2001 Stockholders Agreement prohibited any transfers to the Trusts, any purported obligations on the part of TPR and Sagi to cooperate with such improper transfers cannot be enforced and cannot give rise to an interference claim [against Trump Group.]" (Trump Group's Reply Brief, at 19). And, as Arie failed to provide notice to Trump Group with respect to TPR's transfer of the Arie Shares to

23

himself, which notice was required by the stockholders agreement even though he was a permitted transferee, the transfer of the Arie Shares was also void, as determined by the Delaware court.

### B. Motion of TPR and Sagi Trust to dismiss (motion sequence number 010), motion of Rochelle Fang, individually and as trustee of Sagi Trust to dismiss (motion sequence number 009), and motion of Sagi to dismiss (motion sequence number 007)

The complaint contains various causes of action against TPR, Sagi Trust, Sagi and Rochelle Fang (Fang), trustee of the Sagi Trust, including: a declaratory judgment to reform the divorce stipulation (first cause of action); constructive trust (second cause of action); breach of fiduciary duty, conspiracy and aiding and abetting in the breach of fiduciary duty (third cause of action); unjust enrichment and rescission (fourth cause of action); breach of contract (sixth and seventh causes of action); aiding and abetting tortious interference with contract (ninth cause of action); as well as preliminary and permanent injunctions (fifth and tenth causes of action). These defendants seek the dismissal of all of these causes of action as asserted against each of them. They also contend that this court lacks jurisdiction over the Sagi Trust, but they do not refute the assertion that the Sagi Trust is a New York trust and that its beneficiary resides in New York.

### 1. Declaratory judgment for reformation (first cause of action)

It cannot be disputed that TPR, Sagi Trust, Sagi, and Fang are not parties to the divorce stipulation. Yet, Arie argues in opposition to these defendants' motions to dismiss that, because reformation of the divorce stipulation requires these defendants' participation, they are "necessary parties" to the reformation process and that complete relief cannot be obtained in their absence. (Arie's Opposition Brief, at 9-10). The reasons set forth above, in connection with

24

Trump Group's motion to dismiss the declaratory judgment for reformation against it (*supra*, at 14-16), apply equally to the instant claim against these defendants.

### 2.  Constructive trust, unjust enrichment and rescission (second and fourth causes of action)

The cause of action for a constructive trust claim against TPR, Sagi, the Sagi Trust and Fang fails for the same reasons set forth above in connection with dismissal of that cause of action against Trump Group. (*Supra*, at 16-18).  More specifically, as TPR and Sagi are required to give 10 days' notice to plaintiffs of a proposed transaction (except share dilution) involving the Arie and Orly Trust Shares (*Genger v Genger*, Dec. 28, 2011 [Sup Ct, NY County]), such notice is sufficient to afford them an opportunity to seek any necessary judicial relief.

Arie argues that allowing TPR to retain any benefit arising from its record ownership of the TRI shares that reverted to it as a result of invalidation of the 2004 Transfers constitutes unjust enrichment because TPR had divested itself of such TRI shares "in consideration for and as a condition of Arie giving up his 51 percent ownership interest in TRI." (Arie's Opposition Brief, at 10-12).  However, it was Arie who had control of TPR before the 2004 Transfers and it was he who caused TPR to enter into the 2004 Transfers, which were invalidated by the Delaware courts.

However, to the extent that Arie alleges in the complaint that TPR entered into the 2008 side letter agreement with Trump Group to sell the Arie Shares and the Orly Trust Shares at a discount and that TPR benefited from the transaction at his expense and that of Orly and the Orly Trust, there exists a viable claim of unjust enrichment, which the Chancery Court apparently noticed when it observed that "it may be that [Arie] Genger and Orly Genger have claims against TPR and Sagi Genger over how the price paid by Trump Group for the Arie and Orly Shares was

25

allocated . . . If those transferees [i.e., Arie and the Orly Trust] have any beef with TPR or Sagi

Genger, the transferees are free to file suit against them." (*TR Investors, LLC v Genger*, 2010 WL

3279385, *3 [Del. Ch. Ct. 2010]).

Arie also argues that an inference must be drawn that "Fang benefited at Arie's expense

from her involvement in the conspiracy designed to squeeze [him] out of TRI [and] her central

role and complicity in accepting the $26.7 million bribe paid to the Sagi Trust by Trump Group

for the purported sale of the Sagi Trust TRI shares." (Arie's Opposition Brief, at 12).  He fails to

allege, however, with any particularity, that Fang, individually or in her capacity as trustee of the

Sagi Trust, was unjustly enriched, and at oral argument, Arie's counsel stated, in relevant part

that the "claim is for aiding and abetting.  For some reason [Fang] was brought back for a very

short period of time . . . to execute the 2008 Stockholders [sic] Agreement, and we have alleged

that they aided and abetted each other . . . and that [Fang] was the alter ego and co-agent of Sagi

in his breaches of fiduciary duty.  That is why she's in the case." (Hearing Transcript, March 13,

2012, at 139).  Thus, the claim against Fang is based on her aiding and abetting Sagi in his

breach of fiduciary duty, rather than on the allegation that she was unjust enriched, either

individually or as trustee for the Sagi Trust.  Moreover, Arie does not explain in either the

complaint or his Opposition Brief how the Sagi Trust itself was unjustly enriched, and Arie failed

in the Delaware court proceedings to mount a successful challenge to Trump Group's purchase of

the Sagi Trust Shares.

Sagi contends that as unjust enrichment constitutes a "quasi-contract claim" and as there

are "written contracts dealing with the same subject matter," the cause of action for unjust

enrichment is not viable. (Sash Affirmation in Support of [Sagi] Motion to Dismiss, ¶ 12).

26

However, Arie, Orly and/or the Orly Trust were not parties to the 2008 side letter agreement and thus they have no standing to assert a breach of contract claim. Moreover, the side letter agreement was executed by Trump Group and TPR, by Sagi, and he knew or should have known that Arie and Orly have asserted beneficial interest claims in the Arie Shares and Orly Trust Shares since at least 2008, but he nonetheless caused TPR to sell the Shares in 2011 at an allegedly heavily discounted price. Indeed, Arie asserts that TPR is controlled by Sagi, and that Sagi, *inter alia,* breached his fiduciary duties and was unjustly enriched. In light of the foregoing, and given the position of the Delaware Chancery Court on the issue (*supra*, at 25-26), the unjust enrichment claim against Sagi is viable.

As TPR, Sagi, the Sagi Trust and Fang were not parties to the divorce stipulation, however, the cause of action seeking rescission has no factual or legal basis. (*Supra*, at 19).

### 3. Breach of fiduciary duty, conspiracy and aiding and abetting breach (third cause of action)

Arie fails to set forth any statutory or decisional law for the proposition that a corporation, such as TPR, takes on or otherwise assumes the fiduciary duties of its directors and officers such as Sagi, to its purported shareholders, such as Arie and the Orly Trust. Indeed, a corporation owes no fiduciary duties to its shareholders. (*See Gates v Bea Assoc., Inc.*, 1990 WL 180137, *6 [SD NY 1990] [to permit aiding and abetting claim against corporation would "completely undermine and negate the rule that a corporation does not have fiduciary duties to its shareholders."]).

The breach of fiduciary claim against the Sagi Trust and Fang is based, according to Arie, on their obligation, individually and as trustee under the divorce stipulation and the 2004 Transaction documents, to ensure that Arie would maintain voting control over the Sagi Trust

27

Shares for the duration of his life. (Arie's Opposition Brief, at 17). However, the voting trust agreements and the proxies held by Arie with respect to the Sagi Trust and Orly Trust Shares as well as the Arie Shares were invalidated by the Delaware courts, due to Arie's breach or violation of the stockholders agreement.

Arie also alleges that the Sagi Trust and Fang aided and abetted Sagi and Trump Group in breaching the respective fiduciary duties they owed to him. As the Delaware courts upheld the sale of the Sagi Trust Shares to Trump Group, and absent any allegation that the Sagi Trust and Fang owe Arie a fiduciary duty with respect to the Arie Shares and the Orly Trust Shares, the Sagi Trust and Fang could not have aided and abetted Trump Group or Sagi in breaching their fiduciary duties in such a transaction. Similarly, the complaint does not set forth facts as to why Orly can assert a breach of fiduciary duty claim against Fang, inasmuch as Orly does not allege that she is also a beneficiary of the Sagi Trust which Fang served as the trustee.

Sagi conclusorily denies owing a fiduciary duty to Arie, just as TPR owes no fiduciary duty to Arie. However, the complaint is replete with allegations of a fiduciary duty owed to Arie by Sagi, individually and as a TPR officer, which was breached by Sagi in causing TPR to enter into the stock purchase and side letter agreements, when he used his position as president of TPR and caused TPR to sell the Arie and Orly Trust Shares to Trump Group at a fraction of their fair market value. And, Sagi does not dispute that a director or officer of a corporation owes fiduciary duties to the corporation and its shareholders. Indeed, the Southern District observed that, even if Arie's reformation counterclaim constitutes a basis for abstaining from exercising jurisdiction, certain of his other counterclaims do not compel abstention, "particularly the claims for breach of fiduciary duty against Sagi and others (premised on Sagi's implementation of the

28

2008 side letter agreements on behalf of TPR) . . . ." (*Glenclova Investments Co. v Trans-Resources, Inc., et al.,* __ F Supp 2d __, 2012 WL 2196670, at *17 [SDNY 2012]).  The aiding and abetting breach of fiduciary duty claim against Sagi also survives Sagi's motion to dismiss, as discussed above relating to the survival of the breach of fiduciary duty claim against Trump Group (*supra*, at 20-22), and it is alleged that Sagi assisted or aided and abetted Trump Group in the breach of such duty.

### 4.  Breach of contract against TPR and Sagi Trust (sixth and seventh causes of action)

To state a claim for breach of contract, the complaint must allege the existence of a contract, plaintiff's performance, defendant's nonperformance, and resulting damages. (*Elisa Dreier Reporting Corp. v Global NAPS Networks, Inc.*, 84 AD3d 122, 127 [2d Dept 2011]).

Arie alleges that "TPR breached the 2004 Transfer Agreement by executing the 2008 Stock Purchase and Side Letter Agreements and purporting to sell the TRI shares to Trump Group in disregard of Arie's beneficial and voting rights, thereby failing to effectuate the express intent of the parties to the 2004 Transaction Documents and the [divorce stipulation.]" (Arie's Opposition Brief, at 22).  As discussed *supra*, at 25, Arie brought about his own loss of voting rights in the TRI shares, in spite of the voting trust agreements and the irrevocable proxies held by him, by causing TPR to enter into the 2004 Transfers without obtaining the required consent, as a result of which the Delaware courts found the proxies unenforceable.  Moreover, Arie was not a party to the 2008 side letter agreements which allegedly sought to deprive Arie and Orly of the asserted claims of beneficial interests in the Arie and Orly Trust Shares when such shares reverted to TRP, albeit such interests have not been judicially determined, and thus has no standing to assert a breach of contract claim as to these agreements.

29

Further, the breach of contract claim in the seventh cause of action against the Sagi Trust is not viable for the same reason that the breach of fiduciary duty claim against the Sagi Trust is not, as discussed above. (*Supra*, at 27).

Arie also observes that defendants "conveniently ignore the fact that the Delaware Courts made no determinations as to the validity of the Back-Up Voting Trust Agreements, the express intent of which was to ensure that Arie would maintain voting control . . . in the event the irrevocable proxies were determined to be invalid." (Arie's Opposition Brief, at 23). Having failed to raise this claim or issue in Delaware, the argument is precluded, and in any event, does not apply as to Orly as any voting right under the back-up voting trust agreements was held only by Arie. In the Delaware proceedings, voting right was clearly an important issue for Arie. Thus, his belated attempt to raise it now is untenable and a waste of judicial resources. (*Olawoyin v 520 W. 43rd St. Partners, LLC*, 34 Misc 3d 130 [A], 2011 NY Slip Op 52328 [U], *1 [App Term, 1st Dept 2011] [plaintiff's claim "properly dismissed under familiar principles of res judicata, since the claim could have been litigated in the prior . . . proceeding between the parties"]; *see also Landau, P.C. v LaRossa, Mitchell & Ross*, 11 NY3d 8, 12-13 [2008] ["once a claim is brought to a final conclusion, all other claims arising out of the same transaction or series of transactions are barred, even if based upon different theories or if seeking a different remedy."]).

### 5. Aiding and abetting tortious interference with contract (ninth cause of action)

In the complaint, Arie alleges that Sagi, Fang and the Sagi Trust "each had knowledge of [Trump Group's] tortious interference with the 2004 TPR Transaction Agreement and the [divorce stipulation]" as well as "the 2004 Voting Trust Agreements," and that each had aided

and abetted, and provided substantial assistance to Trump Group in committing tortious acts. (Complaint, ¶¶ 253-256). As the tortious interference of contract claim against Trump Group (eighth cause of action) is legally insufficient (*supra*, at 22-24), so too is the aiding and abetting claim against Sagi, Fang and the Sagi Trust as they cannot have aided and abetted Trump Group in committing a tort that could not have been committed. Moreover, no liability for tortious interference generally attaches when the defendant is a party to the subject contract (*UBS Sec. L.L.C. v Highland Capital Mgt., L.P.*, 86 AD3d 469, 476-477 [1st Dept 2011]), and Arie offers no proposition of law to the contrary.

In addition, Arie contends that the Sagi Trust "aided and abetted Trump Group's tortious interference with the Back-Up Voting Trust Agreement between Arie and the Orly Trusts." (Arie's Opposition Brief, at 24). However, as discussed *supra*, at 30, any claim made by Arie with respect to the back-up voting trust agreement is res judicata, and the allegation that the Sagi Trust aided and abetted Trump Group in violating the agreement has no legal basis as the agreement is longer legally enforceable.

### 6. Preliminary and permanent injunctions (fifth and tenth causes of action)

For the reasons set forth in conjunction with the dismissal of the fifth and tenth causes of action against Trump Group (*supra*, at 19-20), these causes of action against TPR, Sagi, Fang and the Sagi Trust are also not viable.

### C. Motion of Dalia Genger to dismiss (motion sequence number 006)

In his complaint, Arie asserts causes of action against Dalia for a declaratory judgment to reform the divorce stipulation (first cause of action), constructive trust (second cause of action), unjust enrichment and rescission (fourth cause of action), and permanent injunction (fifth cause

31

of action).

### 1. Declaratory judgment for reformation (first cause of action)

According to Arie, the reformation claim is based on: (1) the right set forth in the divorce stipulation entitling him to seek reformation when the 2004 Transfers were voided by the Delaware courts; and (2) mutual mistake in that both he and Dalia reasonably believed that the 2004 Transfers were valid when they signed the divorce stipulation.

Dalia argues that the reformation claim must be dismissed because: (1) the relevant provision in the divorce stipulation was not triggered by the Delaware court which held only that Arie failed to give notice or seek consent of the other shareholders, such as the Trump Group, for the 2004 Transfers and did not hold that the provision was void or unenforceable; (2) Arie is barred from altering the economics of the divorce stipulation because the $3.85 million 2007-2008 arbitration award in favor of Dalia effected a final resolution and conclusion of all disputes thereunder; and (3) there was no mutual mistake because Arie knew that the consent of other shareholders was required for the 2004 Transfers.

Although the Delaware courts' ruling voiding the 2004 Transfers arguably gives rise to a claim for contractual reformation, the scope of the reformation sought is precluded because Arie seeks, *inter alia*, full control of all 3,000 shares of TRI stock and the voting rights related thereto, and the Delaware courts ruled that Trump Group outright owns 67.7 percent of all TRI shares, including the 1,100 Sagi Trust Shares, and that TPR is the record owner and has voting rights as to those TRI shares that are not currently owned by Trump Group. Thus, the requested reformation constitutes an impermissible collateral attack on the Delaware court's decisions, which are entitled to full faith and credit. Moreover, as observed by the Southern District,

32

instead of seeking to right the wrong he had committed with respect to the divorce stipulation, Arie seeks a declaratory judgment to undo the Delaware rulings and avoid the consequences of his own breach of the TRI stockholders agreement. (*Supra*, at 15-16). Thus, any right to reformation Arie might have had pursuant to the divorce stipulation is vitiated by the Delaware court rulings and by his own acts.

As Arie's claim is brought after the 2004 Transfers were invalidated by the Delaware courts in 2010, it could not have been raised before or during the conclusion of the arbitration proceedings in 2008. (*See Indosuez Intl. Fin. v National Reserve Bank,* 304 AD2d 429, 430 [1st Dept 2003] [res judicata inapplicable if claim arose after conclusion of prior action]). Thus, the arbitration award has no impact on the instant reformation claim.

In the alternative, Arie contends that the divorce stipulation may be equitably, as opposed to contractually, reformed due to a "mutual mistake." Although he maintains that both he and Dalia "reasonably believed" that the 2004 Transfers were valid, he was discredited by the Delaware courts, and Dalia denies it. Moreover, the Delaware Supreme Court specifically stated that "[Arie's] misrepresentation was false. In fact, the prior consent of Trump Group signatories to the Stockholders Agreement . . . was required," and that "when [Arie] effectuated the 2004 Transfers, [he] knew that neither [the Orly or the Sagi] Trust was a 'Permitted Transferee' of the [TRI] shares under the Stockholders Agreement." (*Genger v TR Investors, LLC,* 26 A3d 180, 184, 185 [Del. Sup. Ct. 2011]). Therefore, crediting Arie's unsubstantiated or conclusory allegation of a "mutual mistake," would result in an improper end run around the Delaware courts' determinations.

And, the Court of Appeals recently rebuffed a husband's attempt to reopen a divorce

33

settlement based on alleged post-divorce changes in asset valuation. (*Simkin v Blank*, 19 NY3d 46 [2012]). There, the husband alleged that he and his wife were mutually mistaken about the value of an investment account as it had never actually existed due to Bernard Madoff's Ponzi scheme. First, the Court observed that "a claim predicated on mutual mistake must be pleaded with the requisite particularity necessitated under CPLR 3016 (b) . . . [and] that the mutual mistake must exist at the time the contract is entered into and must be substantial," and that any court-ordered relief of reformation is reserved only for "exceptional situations." (*Id.* at 52). The Court, moreover, analogized the circumstances with a dispute over marital assets that unexpectedly gained or lost value after the dissolution of the marriage. (*Id.* at 55). Here, it is apparent that the value of TRI shares increased subsequent to the execution of the divorce stipulation and that Arie did not expect that the economic scheme he had carefully devised under it would be invalidated by the court.

2. Constructive trust, unjust enrichment and rescission (second and fourth causes of action)

Arie alleges that Dalia has been unjustly enriched because (1) the 2004 Transfers were voided and the transferred shares reverted to TPR, and (2) if Dalia were permitted to retain the 51 percent interest in TPR she received under the divorce stipulation while Arie was divested of his 14 percent interest in TRI and his right to vote 52.25 percent of the TRI shares which he controlled prior to the voiding of those transfers, Dalia would be unjustly enriched at his expense. Thus, Dalia's alleged unjust enrichment stems from the voiding of the 2004 Transfers by the Delaware court. As the voiding of the 2004 Transfers was due to Arie's own acts in causing TPR to violate the shareholders agreement, as found by the Chancery Court, Arie cannot complain that Dalia was unjustly enriched by it. The same holds true for the cause of action for rescission.

In addition, as unjust enrichment is an element required for the imposition of a constructive trust, and as Arie has failed to show that Dalia was unjustly enriched, the constructive trust cause of action cannot stand as a matter of law. (*Simonds v Simonds*, 45 NY2d 233, 242 [1978] [purpose of constructive trust is to prevent unjust enrichment]). Alternatively, the constructive trust claim fails because the current facts do not warrant the relief requested, the reasons for which are set forth above (*supra*, at 16-18) in conjunction with Trump Group's motion to dismiss an identical claim against it.

### 3.  Permanent injunction (fifth cause of action)

Arie argues in opposition to Dalia's motion to dismiss that Dalia should be permanently enjoined from interfering with his asserted interest in the TRI shares because his claims of reformation/rescission, constructive trust and unjust enrichment will result in an unraveling of the 2004 Transaction documents and the divorce stipulation, and will likely result in Dalia holding interests in the TRI shares. Thus, Arie argues that an injunction will prevent her from interfering with his interests in those shares. (Arie's Opposition Brief, at 20-21). Because all of the above claims against Dalia have no merit, there is no basis for granting injunctive relief.

### D.  Motion of Trump Group to supplement the record (motion sequence number 015)

The Trump Group's motion to supplement the record on its motion is denied as, in light of the above findings, the documents it seeks to add are unnecessary.

### III. CONCLUSION

Based on all of the foregoing, it is hereby

ORDERED, that with respect to motion sequence number 006, the motion of defendant Dalia Genger seeking dismissal of all causes of action asserted in the complaint as against her is

granted in all respects, and the complaint is severed and dismissed as against said defendant with costs and disbursements as taxed by the Clerk of the Court, and the Clerk is directed to enter judgment accordingly; it is further

ORDERED, that with respect to motion sequence number 007, the motion of defendant Sagi Genger seeking dismissal of all causes of action asserted in the complaint as against him is granted to the extent of dismissing the first, second, fourth (rescission only), fifth, ninth and tenth causes of action, and is otherwise denied; it is further

ORDERED, that with respect to motion sequence number 009, the motion of defendant Rochelle Fang, individually and as trustee of the Sagi Genger 1993 Trust (the Sagi Trust), seeking dismissal of all causes of action asserted in the complaint as against her is granted in all respects, and the complaint is severed and dismissed as against said defendant with costs and disbursements as taxed by the Clerk of the Court, and the Clerk is directed to enter judgment accordingly; it is further

ORDERED, that with respect to motion sequence number 010, the motion of defendant TPR Investment Associates (TPR) seeking dismissal of all causes of action asserted in the complaint as against TPR is granted to the extent of dismissing the first, second, third, fourth (rescission only), fifth, sixth, and tenth causes of action, and is otherwise denied; it is further

ORDERED, that with respect to the motion sequence number 010, the motion of the Sagi Trust seeking dismissal of all causes of action asserted in the complaint as against the Sagi Trust is granted in all respects, and the complaint is severed and dismissed as against said defendant with costs and disbursements as taxed by the Clerk of the Court, and the Clerk is directed to enter judgment accordingly; it is further

ORDERED, that with respect to motion sequence number 011, the motion of defendants Glencova Invesment Company, TR Investors, LLC, New TR Equity I, LLC, New TR Equity II, LLC, Jules Trump, Eddie Trump and Mark Hirsch (collectively, Trump Group) seeking dismissal of all causes of action asserted in the complaint against Trump Group is granted to the extent of dismissing the first, second, third (conspiracy only), fourth (rescission only), fifth, eighth and tenth causes of action, and is otherwise denied; and it is further

ORDERED, that the conspiracy cause of action asserted against any of the defendants as part of the aiding and abetting causes of action sounding in tort is dismissed; it is further

ORDERED, that defendants Glenclova Investment Company, TR Investors, LLC, New TR Equity I, LLC, New TR Equity II, LLC, Jules Trump, Eddie Trump, and Mark Hirsch's motion for permission to supplement the record is denied.

ENTER:

Barbara Jaffe, JSC

DATED:      January 3, 2013
            New York, New York

37

# EXHIBIT "B"

STATE OF NEW YORK
SURROGATE'S COURT: COUNTY OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - x
In the Matter of the Application for a Compulsory
Accounting and Related Relief by ORLY GENGER,          File No. 0017/2008-A
as a person interested in the Orly Genger 1993 Trust,
                                    Petitioner,
                                                       AFFIDAVIT IN RESPONSE TO
                against                                 PETITION FOR A COMPULSORY
DALIA GENGER,                                           ACCOUNTING AND RELATED
                                    Respondent          RELIEF    SCPA 2205
- - - - - - - - - - - - - - - - - - - - - - - - - x
STATE OF NEW YORK    )
COUNTY OF NEW YORK   )ss.:

        DALIA GENGER, being duly sworn, deposes and says:

        1.      I am the Respondent, the successor Trustee of the Orly Genger 1993 Trust (the

"Orly Trust"), having duly qualified therefor in January, 2008. In Petitioner Orly Genger's first

proceeding to have me removed as Trustee, which was denied on December 31, 2008, Surrogate

Roth had directed me not to take any action until her decision. See **Exhibit A hereto.** As alleged

in the Petition, I have not filed an account of my proceedings as fiduciary, but I believe my

predecessor Trustee, Leah Fang, has filed one for her tenure.

        2.      Petitioner Orly Genger ("Orly") has brought lawsuits against me and others –

purportedly on behalf of the Orly Trust. In one of those actions, *Orly Genger in her individual*

*capacity and on behalf of the Orly Genger 1993 Trust v. Dalia Genger et al.,* Sup Ct., N. Y. Co.,

index no. 109749/09, the Supreme Court entered a Temporary Restraining Order on August 9,

2012 (the "TRO"), which was continued on August 15, 2012, pending further order of that court.

That TRO restrained me and the other defendants "from taking any action that encumbers the

[Orly] trust with debt and from liquidating, transferring or selling any stocks or other assets of

the [Orly] trust." A copy of those Orders is **Exhibit B hereto.** While in January, 2013, the

Supreme Court dismissed all claims against me in the other action Orly brought with her father

seeking to deprive the Orly Trust of an interest in shares of Trans-Resources, Inc., ("TRI"), *Arie*

*and Orly Genger v Sagi Genger et al.,* Sup. Ct., N.Y. Co., index no. 651089/2010, the motion

which led to the TRO in her first action remains undecided and thus the TRO is still in effect. As

the TRO restrains me from transferring any assets of the Orly Trust, the Trust does not have the

ability to hire a fiduciary accountant to prepare a formal accounting as sought in the instant

Petition. However, I will set forth in this affidavit what actions I have taken which I believe will

be sufficient to demonstrate to this Court that I have acted appropriately.

### There Was No Failure to Comply with This Court's Order
### Nor Encumbering of Trust Assets

3.      Contrary to the Petition's allegations of the reasons why an accounting is sought, I

have neither violated this Court's July 1, 2009 Order, nor schemed to do so, nor pledged,

encumbered, transferred or dissipated all, or indeed any, of the assets of the Orly Trust.

4.      I start with this Court's July 2009 Order, which required me, as Trustee:

to give notice by overnight mail to petitioner's [Orly's] counsel of any
1) offer to purchase the Orly Trust's 19.3% interest in TRI within 10 days
of receiving such offer and 2) act by Respondent [Dalia Genger], her
agents and all other persons acting on her behalf to assign, mortgage,
pledge, redeem, encumber, sell, or otherwise alter the Orly Trust's interest
in TRI at least 10 days prior to such act.

5.      I have not received any offer to purchase the Orly Trust's 19.3% interest in TRI.

In mid-December, 2012, my counsel received a communication from counsel representing

entities whom we call The Trump Group that they were *considering* making an offer to settle the

issue of what interest, if any, the Orly Trust has in TRI stock. However, almost immediately

thereafter counsel for the Trump Group to tell my counsel that they were not going to seek to

make the offer because of Justice Jaffe's decision in *Arie and Orly Genger v Sagi Genger et al.,*

2

Sup. Ct., N.Y. Co., index no. 651089/2010, dismissing all claims against me and several claims against the Trump Group and other defendants. Although these communications did not constitute an offer, as described in the July 2009 Order, my counsel never-the-less timely reported it by email to counsel for Petitioner Orly Genger in this Court and counsel for her in her Supreme Court actions. A copy of counsel's email, with the response of Orly's counsel in the Supreme Court actions, is **Exhibit C hereto**; I am informed that her counsel in this Court did not respond to the email.

### Assets and Liabilities of the Orly Trust

6.      When I first became Trustee of the Orly Trust, I believed it had only two assets, both highly illiquid: (a) a 48% limited partnership interest in D&K LP ("D&K"), and (b) shares representing 19.43% of TRI stock that my former husband, Arie Genger, had agreed to cause a family company, TPR Investment Associates, Inc. ("TPR") to sell to the Orly Trust (the "Orly Trust TRI Shares") as part of our 2004 divorce settlement.

### D&K LP

7.      D&K was created in 1993. On its creation, D&K purchased 240 shares of TPR stock paying $1,250,000, which my then husband and I contributed, and D&K's $8,950,000 interest-bearing, secured, ten-year Note (the "D&K Note"), which Note was <u>secured</u> by D&K's simultaneous pledge of those purchased 240 shares of TPR stock and guaranteed as to 48% by the Orly Trust. **See Exhibit D.** The Orly Trust's guarantee expressly provides "that the Holder <u>may enforce this Note</u>, to the extent of such liability, as if the [Orly Trust] were the Maker thereof." (Emphasis added.) That guarantee was signed in 1993 for the Orly Trust by its trustee at that time, not by me.

8.      D&K was a special purpose entity that had no assets other than the 240 TPR shares. Through dividends from TPR, D&K made payments on the D&K Note for several years

3

but then the dividends stopped. Those payments are listed on a schedule that my former husband produced in our divorce proceeding, showing that as of the end of 2006, D&K owed over $10.4 million on the D&K Note. A copy of that schedule and my former husband's testimony about it is **Exhibit E**. And in implementing the 2004 settlement of my divorce, I and my former husband each paid more than $477,000 half of the four percent of the then balance of the D&K Note represented by my four percent interest in D&K.[1]

9.     There is no question that after that 2004 payment by me and my former husband, the balance the Orly Trust owed on its guarantee of the D&K Note exceeded $4.5 million. In her first Petition to this Court that Orly verified on December 27, 2007 (¶ 7 a. (iii)), Orly admitted that with respect to the D&K Note "the Trust is indebted in the amount of approximately $4.5 million," and as recently as October 15, 2012, Orly's Third Amended Petition (¶29) admits that "as of mid-2006, the D&K Note 'had an approximate value of $11,000,000 as a result of accrued interest.'" Excerpts of her first Petition and her Third Amended Petition are **Exhibit F**.

10.     In August 31, 2008, while I was under Surrogate Roth's direction to take no action, TPR declared that the D&K Note was in default, and TPR subsequently foreclosed on D&K's TPR shares that D&K had pledged to secure the Note. I did not participate in the foreclosure; after consulting counsel, I did not see any way to prevent it. I am informed that TPR completed the foreclosure on D&K's pledged 240 TPR shares in February, 2009, and that after the proceeds of that foreclosure sale TPR stated that the D&K Note balance exceeded $9 million. See TPR's document which is **Exhibit G.**

---

[1] I paid $477,487.44 on May 31, 2005, while **Arie's** payment a week later was $478,049.24 due to additional interest.

11.    In her first Supreme Court action, *Orly Genger in her individual capacity and on behalf of the Orly Genger 1993 Trust v. Dalia Genger et al.,* Sup Ct. N. Y. Co., index no. 109749/09, and in her co-pending Third Amended Petition in this Court to remove me as trustee (the "TAP"), Orly Genger contends that the D&K Note was not supposed to be enforceable. There are several reasons why this makes no sense. First, the D&K Note says nothing of the kind. To the contrary, why would the D&K Note be secured by D&K's pledged TPR stock, if the D&K Note were intended to be unenforceable? And why would the D&K Note be guaranteed by both the Orly Trust and by the Sagi Genger 1993 Trust if it were intended to be unenforceable? And why would those written guarantees expressly provide "that the Holder may enforce this Note, to the extent of such liability, as if the [Orly Trust] were the Maker thereof"? **See Exhibit D,** emphasis added. And why would my former husband and I, in implementing the 2004 settlement of our divorce, pay $955,536.68 for the liability for the D&K Note owed due to my four percent interest in D&K?

12.    Moreover, Petitioner's October 15, 2012, admission in her verified Third Amended Petition (Ex. F, ¶ 29) that the Note had been paid in accordance with its terms until 1999 and her admission that "[a]s of mid-2006, the D&K Note 'had an approximate value of $11,000,000 as a result of accrued interest'" belies the contention that the note was uncollectable.

13.    Nor has Petitioner alleged that TPR ever renounced its rights under the Note and guarantee by destroying the Note or by delivering the Note or a signed writing cancelling or renouncing the Note, as required by NY UCC §3-605(1) for the Note to become unenforceable. I am informed that it is hornbook law that the enforceability of a Note is not affected by a mere statement by the maker or guarantor that the Note is unenforceable. As the court held in *Ber v. Johnson,* 163 A.D.2d 817, 818 (4th Dep't 1990):

5

Because defendants' original obligation constituted a note and guarantee, it was required to be in writing *(see,* Uniform Commercial Code § 3-104 [1], [2]; General Obligations Law § 5-701 [a] [2]) and the Statute of Frauds precludes an oral executory modification. '[W]here an original agreement comes within [the] provisions of the statute of frauds requiring certain agreements to be in writing, the statute of frauds renders invalid and ineffectual a subsequent oral agreement changing the terms of the written contract, no matter how slight the attempted variation or by whom it was made' ( 61 NY Jur 2d, Frauds, Statute of, §140, at 217-218; *see, M. H. Metal Prods. Corp. v April,* 251 NY 146, 150; *Van Iderstine Co. v Barnet Leather Co.,* 242 NY 425, 430; *Heroux v Page,* 107 AD2d 862, 863; *Awad & Co. v Pillsbury Mills,* 9 AD2d 870, *lv denied* 8 NY2d 705, *appeal dismissed* 8 NY2d 747; *cf.,* General Obligations Law §§ 5-1103, 15-301 [1], [2]).

14.     Thus the 2006 statement by Sagi Genger that D&K LP and its partners deny the enforceability of the Note would not constitute a defense to TPR's declaration of default and foreclosure, as a matter of law.  Nor would enforceability of the Note have been affected if I *had* subsequently stated "the Note was never intended to be foreclosed upon," as Petitioner claims in her Third Amended Petition (Ex. F, ¶33).  But I did not so state.  The document the Third Amended Petition cites as a basis for that assertion was my Pre-Judgment Divorce Mediation Memorandum, which merely stated that foreclosure "to take for myself an interest that Arie and I intended for the children" would undo our estate planning.  Based on the post-judgment marital Arbitrator's agreement that this was not an asset of mine, he found that Arie Genger should not have been awarded half the value of the D&K Note.

15.     Thus after the 2009 foreclosure, the Orly Trust owed TPR more than $4.5 million on its guarantee of the D&K Note, and D&K had no other assets.

**The Orly Trust TRI Shares**

16.     Pursuant to our 2004 Divorce Settlement Agreement, on October 29, 2004, my former husband, Arie Genger, caused TPR to *purport* to sell the Orly Trust TRI Shares to the Orly Trust, which agreed to the purchase, acting through its trustees at the time, not me.  A copy of the purchase and sale agreement is **Exhibit H hereto.**

6

17.    Unfortunately, in July and August, 2010, there was another development relating to the Orly Trust TRI Shares. In *TR Investors, LLC et al. v Arie Genger*, the Delaware Chancery Court held that the 2004 sale of TRI shares violated the TRI shareholders' agreement and was therefore void. **Exhibit I.** That decision raised the question as to whether the Orly Trust had acquired <u>any interest at all</u> in the Orly Trust TRI Shares in 2004 or whether they still belonged to TPR. And in 2008, TPR had agreed to sell the Orly Trust TRI Shares for $10.3 million to the Trump Group, at the Trump Group's option.

18.    Because of this question, after the Delaware Chancery Court decision, I entered into an escrow agreement, as Trustee of the Orly Trust, pursuant to which the Trump Group, TPR, the Orly Trust, and <u>Orly Genger herself</u> agreed that if the Trump Group did purport to purchase the Orly Trust TRI Shares from TPR, the purchase price would be held in escrow by my counsel pending a final determination by the Delaware Supreme Court of the ownership of those TRI shares or an agreement of all parties, including Orly. When the Trump Group did subsequently did purport to purchase the Orly Trust TRI Shares for $10.3 million, those funds were deposited into the escrow, where it remains today.

19.    And in October, 2010, also in response to the Delaware Chancery Court decision, I filed a breach of contract action against my former husband seeking damages *for the Orly Trust* arising from his failure to cause the transfer of the Orly Trust TRI Shares to the Orly Trust. *Dalia Genger, as Trustee on behalf of the Orly Genger 1993 Trust, and Dalia Genger, in her individual capacity v. Arie Genger*, Sup. Ct., N. Y. Co., index no. 113862/2010.

7

20.     In July, 2011, on appeal, the Delaware Supreme Court ruled that the 2004 sale did not transfer record or legal title to the TRI shares, but because the Orly Trust was not a party, the Court held that it lacked personal jurisdiction to decide who owned the beneficial interest in the Orly Trust TRI Shares. *Genger v. TR Investors et al.,* 26 A.3d 180 (De. 2011).

21.     After that decision, I acted to protect the Orly Trust's interest in the Orly Trust TRI Shares. In October, 2011, as Trustee of the Orly Trust, I entered into a Settlement Agreement with TPR and D&K. **Exhibit J.**[2] As Trustee, I have the legal authority to settle claims by and against the Trust. *See* N.Y. E.P.T.L. § 11-1.1(13) (A trustee has the power "[t]o contest, compromise or otherwise settle any claim in favor of the estate, trust or fiduciary or in favor of third persons and against the estate, trust or fiduciary."); see also Orly Genger 1993 Trust Agreement, Eleventh Article, Sec. 7 at page 26 (which states that "[i]n addition to and in amplification of the powers given by law to trustees," the trustee of the Orly Trust shall have the power "[t]o settle, adjust, compromise, or submit to arbitration any dispute, claim, or controversy in which any trust hereunder may be in any way interested.") **Exhibit K**.

22.     Of course, "'stipulations of settlement are judicially favored'" *IDT Corp. v. Tyco Group,* 13 N.Y.3d 209, 213-14 (2009) *citing Matter of Kanter,* 209 A.D.2d 365, 365 (1st Dep't 1994), and in exercising the authority to settle a claim for or against the Trust, a Trustee has a broad range of discretion. *See In re Cmty. Serv. Soc. of New York,* 275 A.D.2d 171, 181 (1st Dep't 2000) ("where a trustee has discretionary power, the exercise of that power is not to be the

---

[2] While the original Settlement Agreement provided it was controlled by Delaware Law and for exclusive Delaware jurisdiction over any disputes, subsequently the original settlement agreement was amended and restated to provide that it is controlled by New York law and that Delaware jurisdiction is non-exclusive.

subject of judicial interference, 'at least if exercised reasonably and in good faith'" (internal citation omitted)). *See also In re IBJ Schroder Bank & Trust Co.*, Index No. 101530/98, Supreme Ct., N.Y. Co., Op. at 5-6 (Aug. 16, 2000) **Exhibit L** (*held*: Settlement agreement entered into by trustee entitled to judicial deference and upheld <u>over beneficiaries' objection</u> as the trustee had made a "showing of the reasonableness of the proposed settlement" and the objecting beneficiaries "ha[d] not submitted any evidence to show that the trustee's actions may have been based on some ulterior motive or that the trustee is somehow itself interested in the transaction other than in its fiduciary capacity".)

23.     The Court will see that the settlement with TPR and D&K was objectively beneficial to the Orly Trust's interests.

a     Prior to the settlement the Orly Trust owed TPR approximately $4.5 million on its guarantee of the D&K Note. The settlement (i) cancelled that liability; (ii) instead the Orly Trust issued a new $4 million <u>unsecured</u> Note to TPR (the "Orly Trust Note")**(Exhibit J)**, <u>and</u> (iii) TPR paid the Orly Trust $100,000 for the Trust's legal fees, which provided moneys to pay for some of litigation expenses to establish the interest of the Orly Trust with respect to the Orly Trust TRI Shares. (**Exhibit J,** Settlement Agreement ¶1, pg. 4). Thus the Orly Trust gained $600,000.

b     In addition, in the settlement TPR relinquished to the Orly Trust any economic interest TPR had in the Orly Trust TRI Shares and assigned TPR's rights to any economic benefits of the TRI shares to the Orly Trust. This includes, but is not limited to, any proceeds from the sale thereof, *i.e.,* the $10.3 million otherwise owed to TPR pursuant to TPR's August 22, 2008 letter agreement with the Trump entities if a court determines that such sale conveyed the Orly Trust TRI Shares to the Trump Group. This is a benefit to

9

the Orly Trust of at least the $10.3 million that my counsel holds in escrow, and possibly more as Orly has contended in her November 5, 2008 letter to this Court, **Exhibit M.**

c       The settlement also ended the relationship between the Orly Trust and D&K and "cancel[s] and void[s]" the Amended D&K Partnership Agreement and the "Meeting Agreement" of which Orly complained in her Supreme Court action, eliminating any contention that the Orly Trust was damaged by those agreements, as she reluctantly conceded in her Third Amended Petition to this Court (Ex. F, ¶¶ 88-89).

d       Also, the settlement agreement should end the multiple contentious litigations which must cost Orly Genger, or whomever is paying her legal fees, substantial moneys. While the settlement agreement, of course, contains releases, there is no release in favor of me individually, nor any release by the Orly Trust of me as Trustee, nor did I, individually, receive any moneys from the settlement. Thus the settlement contains substantial benefits for the Orly Trust and no benefits for me as an individual or as Trustee.

### Expenditures

24.     Thereafter, I caused the Trust to pay $82,252.32 in legal fees for Delaware and New York counsel's efforts to litigate to establish the Orly Trust's right to the Orly Trust TRI Shares. I also caused the Trust to partially indemnify prior Trustee Leah Fang by paying $10,000 of the legal fees incurred in defending herself in *Orly Genger in her individual capacity and on behalf of the Orly Genger 1993 Trust v. Dalia Genger et al.*, Sup Ct., N. Y. Co., index no. 109749/09. Thus, of the $100,000 cash received from the TPR settlement, the Orly Trust has $7,747.68 remaining.

### Additional Receipts

25.     Several months later, TPR decided to sell the Orly Trust Note to Manhattan Safety Company, Ltd. ("Manhattan"), which agreed to loan an additional $200,000 to the Orly Trust. I

anticipated the need for additional funds for its litigation to establish the Orly Trust's right with respect to the Orly Trust TRI shares. Thus, as Trustee, I entered into a new Credit and Forbearance Agreement and Second Amendment and Restated Promissory Note with Manhattan together with new unsecured Notes (**Exhibit N**); the Orly Trust's Note to TPR was returned to the Orly Trust (**Exhibits O**) and on May 15, 2012, my lawyer's escrow account received the $200,000 for the benefit of the Orly Trust, where it remains. After this new agreement and Notes, the Orly Trust's debt was $4.2 million, still less that its prior $4.5 obligation to TPR as guarantor of the D&K Note, and the Trust has received a $100,000 payment from TPR and a $200,000 loan from Manhattan.

26.     This loan was prudent, as the Orly Trust will need funds to litigate its entitlement to the Orly Trust TRI Shares. While in *Arie and Orly Genger v Sagi Genger et al.,* Sup. Ct., N.Y. Co., index no. 651089/2010, Orly's and her father's action to take rights in the Orly Trust TRI Shares and reassign them to a new entity controlled by her father, Orly Genger had obtained a temporary restraining order staying me from prosecuting the Delaware action to declare the Trust's interest, in January 3, 2013, Justice Jaffe dismissed all claims against me in that action. **Exhibit P.**

27.     Contrary to the Third Amended Petition's assertion (¶76), the Orly Trust will be able to pay those Notes, either from TRI dividends if the Orly Trust is held to be the legal owner of the TRI shares[3], or from the $10.3 million held in escrow if the court finds otherwise.

---

3       Until final court determination of the ownership issues regarding the "Orly Trust TRI Shares," TRI's dividends attributable thereto (and to the shares TPR purported to sell to Arie Genger), are being held *in escrow* by Skadden, Arps, Slate, Meagher & Flom LLP. See **Exhibit Q**, April 23, 2012 email from Thomas Allingham, II, Esq., so confirming.

28. I personally have received no funds from the Settlement or the transaction with Manhattan. Indeed, I have received no funds from the Trust – the Trust Agreement provides that the Trustee shall receive no commissions. *See* **Exhibit K,** Orly Genger 1993 Trust Agreement, Eighth Article, at page 18. Nor has the Orly Trust paid my substantial legal fees for defense of the now three proceedings Orly brought against me in this Court or the two companion Supreme Court actions by Orly and by Arie and Orly, or the action I brought in Supreme Court against Arie seeking to recover for the Orly Trust damages for Arie's breach of his contract to cause the transfer to the Orly Genger Trust full title to the TRI shares. *Dalia Genger v. Arie Genger*, Index No. 113862/2010 (Sup. Ct. NY Co.).

29. WHEREFORE the Petition should be denied.

Sworn to before me this
26ᵗʰ day of February, 2013

_____
Notary Public

**ROBERT A. MEISTER**
**Notary Public, State of New York**
**No. 31-02ME2653350**
**Qualified in New York County**
**Commission Expires March 30, 2015**

_____
Dalia Genger

PEDOWITZ & MEISTER LLP

By _____
Robert A. Meister
570 Lexington Avenue – 18ᵗʰ Floor
New York, NY 10022
Attorneys for DALIA GENGER,
as Trustee of the Orly Genger 1993 Trust
212.403.7330

TO: Platzer, Swergold, Karlin, Levine,
Goldberg & Jaslow, LLP
1065 Avenue of the Americas – 18ᵗʰ Floor
New York, NY 10018
Attn. Ralph Hochberg, Esq.
Counsel for Petitioner

12

# EXHIBIT "A"

# MARKEWICH AND ROSENSTOCK LLP

8 East 41st Street • Fifth Floor • New York, New York 10017
tel: (212) 542-3156   fax: (212) 481 1761   lrosenstock@mrrlawllp.com

Lawrence M. Rosenstock
Eva Rachel Markewich

Robert Markewich
ol counsel

August 28, 2008

**BY HAND AND MAIL**

Dalia Genger
200 East 65th Street, 32W
New York, New York 10021

Re:   <u>1993 Orly Genger Trust</u>

Dear Ms. Genger:

It has come to our attention that you may be considering attempting to act on behalf of the Orly Genger Trust (the "Trust").

We remind you that you have no authority to act for the Trust and that on March 4, 2008 Surrogate Roth directed that no actions were to be taken with reference to the Trust assets. Should you violate the Court order, or in any way interfere with the ownership and/or value of the Trust assets or take any action with respect to Trust assets, we will hold you personally responsible for any loss or damage that may be incurred and seek to hold you in contempt.  To the extent others are involved in guiding or facilitating wrongful conduct on your part, we will also seek remedies against them.

We reserve any and all rights with respect to your conduct concerning the Trust.

Very truly yours,

Lawrence M. Rosenstock

LMR:js
cc:   Jonathan G. Kortmansky, Esq. (by hand)
      Sulllivan & Worcester LLP

      Orly Genger

Genger-letter dalia genger 8-28.doc

DG 00893

## MARKEWICH AND ROSENSTOCK LLP

8 East 41st Street • Fifth Floor • New York, New York 10017
tel: (212) 542-3156   fax: (212) 481 1761   lrosenstock@mrlawllp.com

Lawrence M. Rosenstock
Eve Rachel Markewich

Robert Markewich
of counsel

August 28, 2008

**BY HAND AND EMAIL**

Jonathan G. Kortmansky, Esq.
Sullivan & Worcester LLP
1290 Avenue of the Americas
New York, New York 10104

Re:   <u>1993 Orly Genger Trust</u>

Dear Mr. Kortmansky:

I am writing you on behalf of Orly Genger, the beneficiary of the Orly Genger Trust(the "Trust"). By letter dated August 28, 2008, a copy of which is enclosed, we advised Dalia Genger, among other things, that when we were before the court on this matter on March 4, 2008, Surrogate Roth directed that no actions were to be taken with respect to Trust assets. As attorneys for Dalia Genger we expect that you will so advise your client of this direction and to take all appropriate steps to see that she complies with Surrogate Roth's order.

Very truly yours,

Lawrence M. Rosenstock

LMR:js

cc:   Hon. Surrogate Renee R. Roth
Orly Genger

Genger-letter dalia genger 8-28.doc

DG 00894

# EXHIBIT "B"



At IAS Part 12 of the Supreme Court of the State of
New York, held in and for the County of New York at
the Courthouse at 60 Centre Street, New York, New
York on the 9 day of August, 2012

PRESENT:  **HON. PAUL G. FEINMAN**

---

ORLY GENGER in her individual capacity and on
behalf of the Orly Genger 1993 Trust (both in its
individual capacity and on behalf of D & K
Limited Partnership),

                                          Plaintiff,

          - against -

DALIA GENGER, SAGI GENGER, LEAH
FANG, D & K GP LLC, and TPR INVESTMENT
ASSOCIATES, INC.,

                                          Defendants.

Index No.:  109749/09

**ORDER TO SHOW CAUSE
AND TEMPORARY
RESTRAINING ORDER**

---

Upon reading and filing of the Attorney's Statement of Bryan D. Leinbach dated

August 7, 2012; the accompanying memorandum of law, dated August 7, 2012; the exhibits attached

thereto; and on all other proceedings had herein;

LET the defendants TPR Investment Associates, Inc., D & K GP LLC, Sagi Genger

and Dalia Genger (the "Note Defendants") or their attorneys show cause before this Court, to be held

at the Courthouse, 60 Centre Street, at IAS Part 12, Room ~~228~~, New York, New York, on the ~~~~

day of ~~August 2012~~, at ~~9:00~~ a.m., or as soon thereafter as counsel can be heard, why an Order should

_August at 2:15 pm_

not be granted returning the parties to the status quo ante by: (1) restraining the Note Defendants or

their agents and/or assigns and/or their counsel from participating in or permitting the enforcement of

1 of 2

any provision of the Notes until further Order from this Court; (2) requiring the Note Defendants to inform the plaintiff and the Court within 24 hours of the receipt of any attempt to notice a default or otherwise attempt to enforce the Notes (defined below) in any way; (3) provide Manhattan Safety Company, Ltd. and any other purported creditors under each of the Notes with copies of this Order to Show Cause and any subsequent Order of this Court relating to the Notes by overnight delivery within 24 hours of this Court's issuance of such an Order; and (4) requiring defendants Sagi Genger and Dalia Genger to pay the amount of $4,440,000. to the Court[1] as security for certain debts purportedly encumbering the Orly Genger 1993 Trust (the "Orly Trust") assets, including, without limitation, (i) a $4,000,000 Promissory Noted dated October 3, 2011, (ii) a Credit and Forbearance Agreement and Second Amendment and Restatement of Promissory Note executed on May 15, 2012; (iii) a $4,240,000 Amended and Restated Promissory Note dated May 15, 2012; (iv) a $200,000 Promissory Note dated May 15, 2012; and (v) any other instrument purporting to encumber any of the Orly Trust's interests in property (collectively, the "Notes") which security shall continue to be held until further Order from this Court; and it is hereby

ORDERED that pending the hearing of this application, ~~and until further order of this~~ ~~Court~~, the ~~Note~~ Defendants *to this action* their agents, employees, attorneys, ~~and the purported creditors under each~~ *taking any action that* **encumber** ~~of the Notes~~ are temporarily stayed from ~~enforcing or attempting to enforce any provision of the Notes~~ *the trust with debt and from liquidating, transferring or* ~~in any way and it is further~~ *selling any stocks or other assets of the trust*

---

[1] It is further ORDERED that defendants Sagi Genger and Dalia Genger may not furnish this security by borrowing, encumbering, or pledging the assets of any entity they control without first obtaining the express, prior, written consent of the Court.

ORDRED that pending the hearing of this application, and until further order of this ~~Court~~, the Note Defendants shall each inform the plaintiff ~~and the Court~~ within 24 hours of the receipt of any ~~past, present, or future attempt to~~ notice of default or ~~otherwise~~ attempt to enforce any provision of the Notes in any way; and it is further

*and/or her counsel*

~~ORDERED that each of the Note Defendants shall serve Manhattan Safety Company, Ltd. and any other purported creditors under each of the Notes with a copy of this signed Order to Show Cause along with all supporting papers accompanying the plaintiff's motion by overnight delivery on or before August __, 2012 and furnish proof of such service to plaintiff and the Court;~~

ORDERED, that a copy of this Order to Show Cause, together with copies of the papers upon which it was made, shall be served upon: (a) defendant Dalia Genger by service upon her counsel, Pedowitz & Meister LLP, 1501 Broadway, New York, New York 10036; (b) defendant Sagi Genger by service upon his counsel, McLaughlin & Stern, LLP, 260 Madison Avenue, New York, New York 10016; (c) defendant D & K GP LLC by service upon its counsel, Lyons McGovern, LLP, 399 Knollwood Road, Suite 216, White Plains, New York 10603; and (d) defendant TPR Investment Associates, Inc. by service upon its counsel, Duane Morris LLP, 1540 Broadway, New York, New York 10036, by overnight delivery by August 10, 2009, and that such service shall be deemed good and sufficient notice of this application.

**THIS IS AN E-FILED MATTER**          ENTER:

_____
J.S.C.

HON. PAUL G. FEINMAN

a N.Y. County protocol requires counsel to upload all supporting papers to the NYSCEF system. The failure to load any papers considered on an OSC/motion, including opposition and reply, may result in an incomplete official case file. Submission of courtesy copies is not necessary. Direct any questions to the E-Filing Dept., 646-386-3610 or wyorkef@courts.state.ny.us.

3 4 3

SUPREME COURT OF THE STATE OF NEW YORK — NEW YORK COUNTY

PRESENT: _____ Edmead _____ PART 12
                        Justice        INTERIM ORDER

_____, Oner                    INDEX NO. _____

                                                 MOTION DATE _____
            - v -
                                                 MOTION SEQ. NO. 15
_____ Delia Gevaer,
                    et al.                        MOTION CAL. NO. _____

The following papers, numbered 1 to _____ were read on this motion to/for _____

|  | PAPERS NUMBERED |
|--|--|
| Notice of Motion/ Order to Show Cause — Affidavits — Exhibits ... | |
| Answering Affidavits — Exhibits | |
| Replying Affidavits | |

Cross-Motion:  ☐ Yes   ☒ No

Upon the foregoing papers, it is ordered that this motion is adjourned to 9/5/2012
at 2:15 P.M. for the filing of reply papers. No sur-reply.
No appearance is required on 9/5/2012.
               The two signed orders to construe
... further order of this court except to ...
... to retrain only the "Noto Defendants" as
originally defined by the movants.
               Counsel for Delia Gevaer shall serve a copy
of the order to show cause and this order upon counsel
for Manhattan Safety Company, Ltd. or on behalf of
said company. It is further ordered that notice provision is
continued & be made via e-mail or written letter.
(The transcript of the 8/8/12
and further arguments shall        So ordered,
         be held judicially.)
Dated: 8/15/2012                              _____
                                                    J.S.C.

Check one:  ☐ FINAL DISPOSITION   ☒ NON-FINAL DISPOSITION

Check if appropriate:  ☐ DO NOT POST        ☐ REFERENCE
         ☐ SUBMIT ORDER/ JUDG.    ☐ SETTLE ORDER/ JUDG.

# EXHIBIT "C"

**Robert Meister**

| | |
|---|---|
| **From:** | Yoav M. Griver <YGriver@zeklaw.com> |
| **Sent:** | Saturday, December 29, 2012 10:24 AM |
| **To:** | robert.meister@pedowitzmeister.com |
| **Subject:** | RE: Orly Genger 1993 Trust |

Ok.

Sent from my Verizon Wireless 4G LTE Smartphone

-------- Original message --------
From: robert.meister@pedowitzmeister.com
Date:
To: Ralph Hochberg <rhochberg@platzerlaw.com>,"Yoav M. Griver" <YGriver@zeklaw.com>
Subject: Orly Genger 1993 Trust

As I told Yoav, I had been communicating with the Trump Group about a settlement of the issue of interest in the Orly Trust TRI shares. While the Trump Group believed one or more preliminary injunctions in the Arie and Orly Gerger Supreme Court action might be construed as prohibiting them from making an offer, they did send me a draft of an offer they might make if the PIs were modified to allow it. Unfortunately, the terms were markedly less favorable to the Orly Trust than those of which I had said the Trustee would be willing to seek approval and only hours later the same day Justice Jaffee's Decision was released which resulted in the Trump Group communicating that they were no longer interested in making the offer.
Bob Meister
Sent from my Verizon Wireless BlackBerry

# EXHIBIT "D"

<u>PROMISSORY NOTE</u>



$8,950,000

December 2/, 1993
New York, New York

FOR VALUE RECEIVED, the undersigned, D&K LIMITED
PARTNERSHIP, a Delaware limited partnership (the "Company"),
promises to pay to the order of TPR INVESTMENT ASSOCIATES, INC.,
a Delaware corporation (the "Holder") the principal sum of EIGHT
MILLION NINE HUNDRED FIFTY THOUSAND ($8,950,000) DOLLARS,
together with interest on the unpaid principal balance at 6.06%
per annum, as follows.

1.    Interest shall be payable annually in arrears on
the anniversary date of this Note.

2.    Installments of principal in the amount of
$447,500 each shall be payable annually beginning
on the fourth anniversary of this Note, and the
entire unpaid principal balance, together with all
accrued and unpaid interest, shall be payable on
the tenth (10th) anniversary of this Note.

Payments hereunder shall be made in lawful money of the
United States of America in same day or immediately available
funds to the account designated by the Holder in writing to the
Company from time to time.

This Note is the promissory note referred to in the
Agreement, dated as of September 30, 1992, as amended as of the
date hereof, between the Company and the Holder.

If the Company shall fail to make any payment on this
Note within 10 business days after the same shall become due and
payable, or in the event of a Bankruptcy Event (defined below),
then the Holder may, while such act or occurrence shall be
continuing, upon notice to the Company to such effect, declare
the entire unpaid principal amount of this Note to be forthwith
due and payable, whereupon this Note shall become immediately due
and payable without presentment, demand, protest or further
notice of any kind, all of which are hereby expressly waived by
the Company.  No remedy herein conferred upon or reserved to the
Holder or the Company is intended to be exclusive of any other
remedy, and such remedy shall be in addition to every other
remedy given hereunder or at law or in equity.

G:\IRP\MP\IRI\TPR21001.HGT                                12/13/93 7:47pm

The term "Bankruptcy Event" shall mean any of the following events or occurrences: (i) the Company admits in writing its inability to pay its debts as they become due, or makes a general assignment for the benefit of creditors; or (ii) any proceeding is instituted by or against the Company, seeking to adjudicate it a bankrupt or insolvent, or seeking any arrangement, adjustment composition of the Company, or its debts under any law relating to bankruptcy, insolvency or reorganization or relief of debtors, or seeking to dissolve, wind-up or liquidate the Company, or any substantial part of its assets, or seeking appointment of a receiver, trustee or other similar official for the Company, or for any substantial part of its property.

In the event of a declaration of acceleration of the principal amount of this Note as set forth above, the Company agrees to pay the cost of collection, including, without limitation, reasonable attorneys' fees and disbursements.

The Company consents to the jurisdiction of the Federal and State Courts sitting in New York City. With respect to any action or proceeding or enforce or collect this Note, the Company agrees that venue will be proper in such courts and hereby waives any objection based upon Forum Non Conveniens. The choice of forum as aforesaid shall not be deemed to preclude the enforcement of any judgment obtained in such forum or the taking of any action to enforce this Note in any other jurisdiction.

THIS NOTE HAS BEEN DELIVERED IN, AND SHALL BE DEEMED TO BE A CONTRACT MADE UNDER AND GOVERNED BY THE LAWS OF, THE STATE OF NEW YORK.

D&K LIMITED PARTNERSHIP

By: _____
    Dalia Genger, General Partner

Each of the undersigned hereby assumes and becomes liable for the percentage of this Note set forth opposite its respective name, and agrees that the Holder may enforce this Note, to the extent of such liability, as if the undersigned were the Maker thereof.

W:\SRF\WP\TRI\TPR11001.WPT                    12/13/93 7:47pm

DG 01092

Trust u/a 12/13/93 f/b/o          48%
Sagi Genger

By: _____
    Lawrence M. Small, Trustee

    _____
    Sash A. Spencer, Trustee


Trust u/a 12/13/93 f/b/o          48%
Orly Genger

By: _____
    Lawrence M. Small, Trustee

    _____
    Sash A. Spencer, Trustee

DG 01093

# EXHIBIT "E"

D&K Limited Partnership
TPR Promissory Note Analysis

| Date | | Note Principal | Interest Paid |
|---|---|---|---|
| 12/21/1993 | Note created | 8,950,000.00 | |
| 1994 | interest paid | | (542,370.00) |
| 1995 | interest paid | | (542,370.00) |
| 1996 | interest paid | | (542,370.00) |
| 1997 | principal & interest paid | (447,500.00) | (520,452.00) |
| 1998 | principal & interest paid | (447,500.00) | (515,252.00) |
| 1999 | principal & interest paid | (447,500.00) | (488,133.00) |
| | Note Balance due at 12/31/99 | 7,607,500.00 | |
| | Accrued interest 12/21/99-12/31/99 | 12,830.00 | |
| | 2000 accrued interest | 461,014.00 | |
| | 2001 accrued interest | 461,015.00 | |
| | 2002 accrued interest | 461,015.00 | |
| | 2003 accrued interest | 461,015.00 | |
| | 2004 accrued interest (thru 10/26) | 378,916.03 | |
| | | 9,843,105.03 | |
| | Additional amounts due to TPR | 37,280.00 (1) | |
| | Total amount due to TPR @ 10/26/04 | 9,880,385.03 | |

(1) This amount appears on the books of D&K, however, the underlying documentation is not included in the D&K file.

| | | | |
|---|---|---|---|
| | Total amount due to TPR @ 10/26/04 | 9,880,385.03 | |
| | Accrued interest 10/27/04-12/31/04 | 82,098.97 | |
| | 2005 accrued interest (thru 10/26) | 378,916.03 | |
| | Principal and interest paid | -419,149.12 (Prin. = $304,300, Int. = $114,849.12) | |
| | Accrued interest 10/27/05-12/31/05 | 78,814.53 | |
| | 2006 accrued interest | 442,573.92 | |
| | Total amount due to TPR @ 12/31/06 | 10,443,639.36 | |

AG 1912

GENGER_SW1_0007571

DALIA GENGER VS. ARIE GENGER

ARBITRATION - 11/2/07

CONCORDANCE AND CONDENSED TRANSCRIPT
PREPARED BY:



TOWER 56, 126 EAST 56TH STREET, FIFTH FLOOR, NEW YORK, NEW YORK 10022
PHONE: (212) 750-6434   FAX: (212) 750-1097
WWW.ELLENGRAUER.COM

### Page 1792

(1)         A. Genger - Direct
(2)    respected?
(3)        A.   Respected. I'm sorry.  The guy was
(4)    first class in terms of the business, well,
(5)    very rich in experience in business matter,
(6)    business dealings, requisitions and so on and
(7)    so forth.
(8)        Q.   Who is Larry Small?
(9)        A.   Larry Small is a ex-head of the
(10)   Citibank, later on Fannie Mae in Washington,
(11)   and later on the Smithsonian Institute. Also a
(12)   first-class citizen, terrific in community and
(13)   business, very responsible guy.
(14)       Q.   Did you personally ask them to serve
(15)   as trustee for the kids trust?
(16)       A.   Yes, I did.
(17)       Q.   What was your reasoning behind that?
(18)       A.   Well, they were very both very close
(19)   friends of our families. Sash knew my kids,
(20)   very, very early age.  He has been a close
(21)   business associate of mine.  As a matter of
(22)   fact, when Sagi finished school, I ask him to
(23)   employ Sagi for a while and he did.
(24)       Larry Small, who I met when he was
(25)   the vice chairman of Citi when I was then

### Page 1793

(1)         A. Genger - Direct
(2)    involved in the restructuring of Rapid
(3)    American, I got to know him as a creditor, and
(4)    he was not an easy guy to deal with but we
(5)    became friends, and he and his wife became
(6)    friends of the family and very trusted guy by
(7)    all of us.
(8)        Q.   If we continue looking at the D&K
(9)    Limited Partnership transaction with TPR, was
(10)   there a pledge agreement as well in connection
(11)   with D&K's purchase of TPR's interests?
(12)       A.   Yes.
(13)       Q.   You're looking at AG1893.  Is that
(14)   the pledge agreement?
(15)       A.   I believe it is, yes.
(16)       Q.   What is the date of the pledge
(17)   agreement?
(18)       A.   December 21, '93.
(19)       Q.   Do you remember what D&K pledged as
(20)   security for its purchase of the TPR shares?
(21)       A.   The shares of TPR are bought.
(22)       Q.   So basically a purchase money
(23)   security interest, the shares that it bought
(24)   were also the shares that served as security;
(25)   is that correct?

### Page 1794

(1)         A. Genger - Direct
(2)        A.   Correct.
(3)        Q.   Did Dalia sign that document as well
(4)    on page AG1904?
(5)        A.   Yes.
(6)        Q.   And next to that document are the
(7)    shares of TPR that were the security; do you
(8)    see that?
(9)        A.   Yes.
(10)       Q.   And that's at AG1905; is that right?
(11)       A.   Correct.
(12)       Q.   Now, I'm asking you to turn to page
(13)   AG1912.  It's still part of this exhibit.
(14)       MR. LENTZ:  Will your Honor please
(15)   turn to AG1912?
(16)       Q.   Arie, did you have an analysis
(17)   compiled of payments rendered by D&K over the
(18)   years to TPR in payment of this promissory
(19)   note?
(20)       A.   Yes.
(21)       Q.   Is that represented in AG1912?
(22)       A.   Yes, it does.
(23)       Q.   Were there payments rendered
(24)   annually during the first several years of this
(25)   note, at least on interest and then sometimes

### Page 1795

(1)         A. Genger - Direct
(2)    principal?
(3)        A.   Yes.
(4)        Q.   Can you guide the judge's attention
(5)    to show where it shows payments of interest
(6)    made and then where there are principal
(7)    payments made as well?
(8)        A.   Well, when you look at the columns,
(9)    we see a note principal which -- first of all,
(10)   the note is 8,950,000, and below it we see the
(11)   principal payments in '97, '98 and '99. Each
(12)   of them are 447,500.
(13)       Q.   That is $447,500?
(14)       A.   Correct.
(15)       Q.   Were there also interest payments
(16)   made before 1997 and after 1997?
(17)       A.   Interest payments were made in each
(18)   of the years 1994 to 1998, as indicated in the
(19)   column, "Interest Paid." Should I read the
(20)   numbers?
(21)       Q.   Just indicate to the Judge so he
(22)   sees where you're pointing to.
(23)       A.   The first interest payment is
(24)   54,200,370, and below that is the various
(25)   interest payments during the years.

DALIA GENGER

BSA X4AX(2b29)
ARBITRATION - 11/2/07

VS. ARIE GENGER

## Page 1796

(1)  A. Genger - Direct
(2)  Q. Can you tell from this chart what
(3)  was the balance of the note as of December 31,
(4)  1999?
(5)  A. Yes, on 12/31/99 the balance was
(6)  7,607,500.
(7)  Q. Approximately much had been paid off
(8)  by D&K on its obligation to TPR over the course
(9)  of those seven years?
(10)  A. Well, there was about 1.3 million of
(11)  interest -- I'm sorry -- of principal payments,
(12)  and about two and a half million dollars, a
(13)  little bit more --
(14)  THE ARBITRATOR: More?
(15)  THE WITNESS: More, yeah, of
(16)  interest payments.
(17)  Q. When you set this up, how did you
(18)  anticipate that D&K would have this kind of
(19)  money to pay off TPR on this note?
(20)  A. Well, we were in different era. We
(21)  were in an era when TRI was profitable, making
(22)  money, growing, and when things are good, you
(23)  believe they are going to continue like that
(24)  for the future.
(25)  At that time TRI was able to pay

## Page 1797

(1)  A. Genger - Direct
(2)  dividends. The idea was that TRI will pay
(3)  dividends to its shareholders, meaning TPR.
(4)  TPR then will pay dividends to its
(5)  shareholders, meaning D&K.
(6)  Q. And Arie Genger?
(7)  A. And Arie Genger and D&K would be
(8)  able to use the dividend it gets from TPR to
(9)  serve or to pay the -- to make a payment on its
(10)  debt back to TPR. Is that clear?
(11)  Q. That's, in fact, what happened
(12)  during the first seven years?
(13)  A. Yes.
(14)  Q. Now, let's talk about what happened
(15)  starting in the year 2000 and 2001.
(16)  Was TPR -- did TRI continue to
(17)  dividend monies so that this -- so that the
(18)  payment could work?
(19)  A. No, at the end of '99 and the
(20)  beginning of 2000 we kind of fell off the
(21)  cliff, TRI. It was an unbelievable quick
(22)  deterioration for a variety of reasons.
(23)  TRI almost -- not overnight, but in
(24)  a period of very short months encountered huge
(25)  amount of issues and clearly could not have

## Page 1798

(1)  A. Genger - Direct
(2)  dividended any money out, and no dividends were
(3)  made anymore from TRI.
(4)  Q. Let me ask you this: To your
(5)  knowledge, is there any provision in the D&K
(6)  promissory notes that makes its obligations
(7)  conditional on receiving money from TRI?
(8)  A. Not that I know.
(9)  Q. As a result, what happened to the
(10)  D&K note after TRI stopped issuing dividends?
(11)  A. Well, it stopped accruing the
(12)  interest.
(13)  Q. It stopped accruing interest?
(14)  A. It continued to accrue interest and
(15)  remain in -- interest grew on the note as time
(16)  passed by, and they were unable to pay it.
(17)  Q. Looking at Exhibit 67, and I'll
(18)  direct you to the page, did you have your
(19)  attorney send any kind of note or -- did you
(20)  have TPR's lawyers send any kind of notice to
(21)  D&K once D&K -- at some point when D&K is not
(22)  paying on the note anymore?
(23)  Let me first direct you to a letter
(24)  dated November 19, 2002. Take a moment and
(25)  look at it.

## Page 1799

(1)  A. Genger - Direct
(2)  THE ARBITRATOR: What is the Bates?
(3)  MR. LENTZ: AG1908.
(4)  A. Yes, this is a letter to Dalia
(5)  Genger as a general partner for D&K Partnership
(6)  whereby the secretary for TPR Investment
(7)  Associates informed Dalia, and copies to
(8)  trustees of the trust, reminding them of the
(9)  obligations they have to TPR.
(10)  Q. Did the payments start again at that
(11)  point?
(12)  A. No.
(13)  Q. Well, TRI was not issuing a dividend
(14)  in November of 2002, was it?
(15)  A. It was not.
(16)  Q. Again, turning back to AG1912, did
(17)  you have calculated what was the outstanding
(18)  balance of this D&K promissory note as of the
(19)  date of stipulation, and can you direct the
(20)  judge's attention where that appears on that
(21)  document?
(22)  THE ARBITRATOR: I'm sorry. What is
(23)  the Bates?
(24)  MR. LENTZ: 1912, Judge, back to the
(25)  chart.

# EXHIBIT "F"

SURROGATE'S COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

```
- - - - - - - - - - - - - - - - - - - - - - - - - - - - -  X
In the Matter of                                          :
                                                          :    Index No.
     ORLY GENGER,                                         :
                                                          :    **PETITION TO**
                           Petitioner,                    :    **COMPEL**
                                                          :    **ACCOUNTING AND**
            -against-                                     :    **FOR OTHER RELIEF**
                                                          :
LEAH FANG, DAVID A. PARNES and SAGI                       :
GENGER,                                                   :
                                                          :
                           Respondents.                   :
                                                          :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - -  X
```

TO THE SURROGATE'S COURT, COUNTY OF NEW YORK:

It is respectfully alleged that:

## Parties and Interested Persons

1.       Petitioner, Orly Genger ("Orly"), is the beneficiary of The Orly Genger 1993 Trust ("Trust"), a true and complete copy of which is annexed hereto as Exhibit 1.   Orly is a resident of the County of New York.

2.       Respondent David A. Parnes ("Parnes") is a former trustee of the Trust, and a resident of the State of Israel.  Parnes is also a member of the Bar of the State of New York.

3.       Respondent Leah Fang ("Fang") purported to act as trustee of the Trust from on or about April 26, 2007 until on or about December 13, 2007, although she was not properly authorized to do so.  Respondent Fang

-1-

is a resident of the County of New York. Fang is also a member of the Bar of the State of New York.

4.     Respondent Sagi Genger ("Sagi") is Orly's brother, and is married to Fang's sister. Upon information and belief, Sagi conspired with, and aided and abetted, Respondents Parnes and Fang in breaches of fiduciary duty and other tortious behavior to the detriment of Orly. Sagi is a resident of the County of New York.

5.     The Settlor of the Trust is Arie Genger ("Arie" or Grantor), Orly's father. Arie is a resident of the State of Florida.

6.     There are no persons other than those here named in paragraphs 1 through 5 of this Petition who are interested in this proceeding.

## Relief Requested

7.     By this Petition, Orly seeks an order:

    a.   Directing that:

        i.     Parnes be required to file a full and complete account of the 1993 Orly Genger Trust (the "Trust"), for the period October 22, 2004 through the present;

        ii.    Fang be required to file a full and complete account of the Trust for the period April 26, 2007 through the present;

-2-

    iii.   Parnes and Fang be required to turn over all documents relating to or concerning the Trust and/or its assets, in their custody, possession or control, including but not limited to documents concerning the assignment to Parnes of a note (the "Note") as to which the Trust is indebted in the amount of approximately $4.5 million;

    iv.   Sagi, as the person in control of the Trust's most substantial asset D & K LP ("D&K"), provide an accounting of D & K LP, II and of its largest asset TPR Investment Associates, Inc. ("TPR"), of which Sagi is also in control;

b.   Enjoining the respondents from any further interference with the Trust, and from selling, disposing of, encumbering, or pledging any of the Trust estate or effects in their hands, or making any transfer, or from selling, disposing, encumbering, or pledging any of the goods, effects, or assets of the said Trust, or from paying out any of the moneys or assets thereof, or disposing of, concealing, altering, mutilating, or otherwise interfering

h.    For such other and further relief as to this Court seems

just and proper.


Dated:   December 27, 2007
         New York, New York

MARKEWICH AND ROSENSTOCK LLP
*Attorneys for Petitioner*

By:

EVE RACHEL MARKEWICH
8 East 41st Street, Fifth Floor
New York, New York 10017
(212) 542-3156

-15-

## VERIFICATION

STATE OF _Florida_   )

                     : ss.:

COUNTY OF _Dade_   )

ORLY GENGER, being duly sworn, deposes and says:

I am the Petitioner in the within proceeding.  I am acquainted with the facts and circumstances set forth herein, have read the foregoing Petition, and know the contents thereof; that the same is true to my own knowledge except as to those matters therein stated to be alleged upon information and belief, and that as to those matters I believe them to be true.

                                            _____

                                             ORLY GENGER

Sworn to before me this ___ day of December, 2007

VALERIA SILLO
Notary Public - State of Florida
My Commission Expires Apr 21, 2009
Commission # DD 421456
Bonded By National Notary Assn.

SURROGATE'S COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

---

File No. 0017/2008

In the Matter of the Application of ORLY
GENGER, as a person interested, for the
removal of DALIA GENGER, as Trustee of the
Orly Genger 1993 Trust pursuant to SCPA § 711(11)

---

## THIRD AMENDED VERIFIED PETITION FOR REMOVAL
## OF DALIA GENGER AS TRUSTEE

TO THE SURROGATE'S COURT, STATE OF NEW YORK
COUNTY OF NEW YORK

Petitioner, Orly Genger ("Petitioner" or "Orly"), by her attorneys, Platzer, Swergold,

Karlin, Levine, Goldberg & Jaslow, LLP, respectfully alleges as her Third Amended Verified

Petition (the "Third Amended Petition") for Removal of Dalia Genger as Trustee as follows:

1.      Orly, domiciled at 780 Greenwich Street, Apartment #4P, New York, New

York 10014, is the current and sole beneficiary of the Orly Genger 1993 Trust dated December

13, 1993 (the "Orly Trust"). Annexed hereto as Exhibit "A" is a copy of the Orly Trust.

2.      Dalia Genger ("Dalia" or "Respondent"), residing at 200 East 65th Street,

Apartment #32W, New York, New York 10021 is Orly's mother and is the current sole Trustee

of the Orly Trust. Dalia was appointed successor Trustee in January, 2008.

3.      The Orly Trust provides for discretionary payments of income and principal

to Petitioner during her lifetime with the remainder to be distributed to her descendants, per

stirpes. If Petitioner dies leaving no descendants, the remainder of the trust property is to be

distributed to the Sagi Genger 1993 Trust (the "Sagi Trust"). Sagi Genger ("Sagi") is Orly's

brother.

TPR, writing off the entire D & K Note and declaring it as a loss in the approximate amount of $8,700,000.

29.     On August 2, 2006, Sagi, as part of his managerial role in D & K GP, D & K and TPR, assigned and sold the D & K Note, which then had an approximate value of $11,000,000 as a result of the accrued interest, to Mr. Parnes in his individual capacity for the sum of only $12,000 (a copy of the Memorandum dated August 2, 2006 (the "D & K Note Memorandum"), assigning and selling the D & K Note is annexed hereto as Exhibit "F"). The D & K Note Memorandum asserts unspecified claims by D & K against TPR and Sagi expressly memorialized that D & K "denies enforceability of the [D & K Note]". (See Exhibit "F")

30.     Sagi signed the D & K Note Memorandum on behalf of both TPR as the holder and D & K as the maker. Dalia was copied on the D & K Note Memorandum but Petitioner did not receive a copy of same.    At the time of the D & K Note Memorandum, Mr. Parnes was acting as trustee of both Trusts. Shortly after the D & K Note Memorandum, Mr. Parnes summarily resigned as Trustee of the Orly Trust without explanation.

### THE D & K NOTE WAS NEVER INTENDED TO BE ENFORCED

31.     Mr. Parnes testified in Arie and Dalia's matrimonial arbitration (See Exhibit "G", which contains the relevant portions of the transcript of Mr. Parnes' testimony from the arbitration) that:

(i)     As the Trustee of both Trusts, he was a "trusted" person to keep the D & K Note to make sure it would never be collected. (See Pages 460-461);

(ii)    D & K does not have to make payments to TPR; (Page 452)

(iii)   The D & K Note is uncollectible (Page 453); and,

(iv)    Sagi's job was to "bury the D & K Note in the woods" (Page 461)

32.     Sagi testified in the same arbitration (See Exhibit "H", which contains the relevant portions of the transcript of Sagi's testimony from the arbitration) that:

(i)    The purpose of the D & K Note was for estate planning (Pages 367-380);

(ii)    The D & K Note was never declared in default (Page 370);

(iii)    There was no intention of collecting the D & K Note (Page 370); and,

(iv)    The D & K Note is worth nothing (Pages 375-377)

33.    In addition, Dalia, who was copied on the D & K Note Memorandum, previously admitted in her Pre-Hearing Memorandum submitted to the Court in connection with the matrimonial arbitration that the D & K Note was never intended to be collected upon because the:

> "...collection by TPR of the D & K Note would simply transfer
> wealth from the children, Sagi and Orly, to their parents,
> Arie and Dalia, thus undoing the estate planning scheme which
> had transferred that wealth to the children.
> (See Exhibit "I", excerpt from Dalia's Pre-Trial Memorandum
> Page "26")

34.    Ultimately, the Gengers' matrimonial arbitrator, Judge I. Leo Milonas, specifically determined that the D & K Note was never intended to be collected from its inception.

> "The arbitrator finds for Dalia on this issue. The D & K [N]ote
> was part of the estate planning scheme to transfer wealth to the
> children. The parties never intended for this note to be collected
> and to do so would re-transfer wealth back to the parents and
> defeat their estate plan.
> (See Exhibit "J", Final Arbitration Award in Genger divorce
> proceeding, Page "15")

35.    Petitioner was well aware of, and relied upon, the agreement that the D & K Note would never be enforced. Petitioner was also aware of, and relied upon, Judge Milonas' award declaring the D & K Note worthless and uncollectible, and Dalia, Sagi and Mr. Parnes' sworn statements and/or written submissions to that effect.

or indirectly through DK (the "TPR Interest");... and (c) TPR agrees to pay $100,000 for the legal fees of the OG Trust.[12]
(See **Exhibit "GG"**, TPR Settlement Agreement, Paragraph "1")

88.     On March 16, 2012, Dalia (supposedly on behalf of the Orly Trust), TPR, and D & K GP (by Sagi Genger) entered into a purported Amended and Restated Settlement Agreement (the "Amended TPR Settlement Agreement"). Once again, Petitioner was not informed or consulted in any way. The purported "settlement" was restated, and then amended to purportedly cancel and void "the (i) the Amended and Restated Limited Partnership Agreement of D&K Limited Partnership dated as of October 30, 2004 and signed November 22, 2007, and/or (ii) the Meeting of Partners of D&K L.P. January 31, 2009 and Agreement." See **Exhibit "HH"**, March 16, 2012 Amended TPR Settlement Agreement, Paragraph "1").

89.     Importantly, though the Amended TPR Settlement Agreement purported to void these two agreements *ab* initio, the purported settlement did nothing to reverse or unwind the sham TPR Sale that these two agreements purported to enable, or to cancel the supposed deficiency resulting from the TPR Sale.[13]

90.     Demonstrably, these various actions and agreements (agreed to in secret and never revealed to the Court or Petitioner despite numerous Court appearances, filings and outstanding documents requests) in the New York TPR Action and New York TRI Action violated the protective restraints imposed by this Court and the other New York Courts in a

---

[12] Dalia, Sagi, TPR, and D & K also purported to require the Orly Trust to pay D & K and TPR's attorneys' fees, should Petitioner continue to advance claims on the Orly Trust's behalf (see **Exhibit "GG"**, Paragraph "8") and purported to release one another from all claims, causes of action, lawsuits, demands, liability of any kind, asserted or unasserted, known or unknown, suspected or unsuspected, direct or derivative, in connection with the 1993 Note [D & K Note], the [Orly Trust] TRI Shares, the Share Transfer, the DK Interest, the TPR Interest, the 2008 Letter Agreement, or any other matters, through the date of the Agreement Id. at Paragraph "4")

[13] The parties also made sure that the Release in the TPR Settlement Agreement did not cover anyone on Sagi and Dalia's "enemies list" (See **Exhibit "HH"**, Amended TPR Settlement Agreement, Paragraph "3"), changed the governing law to New York law (id. at Paragraph "6"), and made their agreement to Delaware jurisdiction non-exclusive (id.).

## VERIFICATION

STATE OF NEW YORK               )
                                     ) ss.:
COUNTY OF NEW YORK         )

       ORLY GENGER, the petitioner named in the foregoing Third Amended Verified

Petition, being duly sworn, deposes and says:

    1.     I am the Petitioner in this matter.

    2.     I have read the annexed Third Amended Verified Petition, know the contents thereof and the same are true to my knowledge, except those matters thereon which are stated to be alleged upon information and belief, and as to those matters I believe them to be true.

                                                   ORLY GENGER

Sworn to before me this
_15th_ day of October, 2012

Notary Public

**Daniel B Fix**
Notary Public State of New York
New York County, LIC# 02FI6239452
Comm Exp 04/18/2015

-32-

# EXHIBIT "G"

| | |
|---|---|
| Rate | 6.1% |
| | Owing |
| Tuesday, October 26, 2004 | 9,880,000 |
| Portion Not Assumed by Parents | 9,484,800 |
| | |
| Friday, October 31, 2008 | 1466 |
| Days in Year | 365 |
| | 4.02 |
| Interest rate for Period | 26.7% |
| | |
| Dollars of Interest | 2,528,289.02 |
| | |
| Amount Due | 12,013,089.02 |
| Payment | (960,000.00) |
| | |
| Net of Payment | 11,053,089.02 |
| | |
| | |
| Saturday, January 31, 2009 | 92 |
| Days in Year | 365 |
| | 0.25 |
| Interest rate for Period | 1.4% |
| Dollars of Interest | 151,595.73 |
| | |
| Current Amount Owed | 11,204,685 |
| | |
| | 5,602,342.38 |

DG 01100

# EXHIBIT "H"

**TPR INVESTMENT ASSOCIATES, INC.**
200 West 57th Street
New York, NY 10019

October *Of*, 2004

Mr. Arie Genger
2600 Island Blvd., Penthouse One
Williams Island, Aventura, FL 33160

Sagi Genger 1993 Trust
200 West 57th Street
New York, NY 10019

Orly Genger 1993 Trust
200 West 57th Street
New York, NY 10019

Ladies and Gentlemen:

This letter will set forth our agreement pursuant to which you will purchase the 3,000 shares of common stock ("the Shares") of Trans-Resources, Inc. ("TRI") owned by TPR Investment Associates, Inc. ("TPR"). TPR hereby sells, transfers and conveys the Shares to you as follows:

(i)      794.40 Shares to Arie Genger ;

(ii)     1,102.80 Shares to the Sagi Genger 1993 Trust , and

(iii)    1,102.80 Shares to the Orly Genger 1993 Trust.

The purchase price is $1.00 per share, receipt of which is hereby acknowledged.

The Shares represent 52.85% of the issued and outstanding shares of TRI. The Shares are being transferred hereunder free and clear of any liens, claims or encumbrances and such transfer does not violate the Certificate of Incorporation of TPR or any agreement to which TPR is subject.

The trustees of the Sagi Genger 1993 Trust and of the Orly Genger 1993 Trust ("Trusts") have agreed to execute on behalf of the Trusts (i) an Irrevocable Proxy to appoint Arie Genger to vote the Shares owned by the Trusts and (ii) a voting trust letter agreement, copies of which are annexed hereto.

In case, at any time hereinafter, any further action is necessary or desirable to carry out the purposes of this Letter Agreement, each of the parties hereto shall take or cause to be taken all necessary action, including, without limitation, the execution and delivery of such

DG 00884

Page 2
Mr. Arie Genger
Sagi Genger 1993 Trust
Orly Genger 1993 Trust

further instruments and documents as may be reasonably requested by any party for such purpose or otherwise to complete or perfect the transactions contemplated hereby.

This Letter Agreement shall be governed by the laws of the State of New York without regard to conflicts of law principles.

Very truly yours,

TPR INVESTMENT ASSOCIATES, INC.

By: _____
        Sagi Genger, President

AGREED TO AND ACCEPTED
THIS ___ DAY OF OCTOBER, 2004

_____
ARIE GENGER

SAGI GENGER 1993 TRUST

By: _____
        David A. Parnes, Trustee

_____
Eric Gribetz, Trustee

ORLY GENGER 1993 TRUST

By: _____
        David A. Parnes, Trustee

_____
Eric Gribetz, Trustee

DG 00885

# EXHIBIT "I"

IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | |
|---|---|
| TR INVESTORS, LLC, GLENCLOVA INVESTMENT CO., NEW TR EQUITY I, LLC, NEW TR EQUITY II, LLC, and TRANS-RESOURCES, INC., | ) ) ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) ) |
| ARIE GENGER, | ) ) |
| Defendant. | ) ) |

C.A. No. 3994-VCS

| | |
|---|---|
| ARIE GENGER, | ) ) |
| Counterclaim Plaintiff, | ) ) |
| v. | ) ) |
| TR INVESTORS, LLC, GLENCLOVA INVESTMENT CO., NEW TR EQUITY I, LLC, NEW TR EQUITY II, LLC, and TRANS-RESOURCES, INC., | ) ) ) ) ) |
| Counterclaim Defendants. | ) |

MEMORANDUM OPINION

Date Submitted: April 26, 2010
Date Decided: July 23, 2010

Thomas J. Allingham II, Esquire, Anthony W. Clark, Esquire, Robert A. Weber, Esquire, SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP, Wilmington, Delaware, *Attorneys for Plaintiffs*.

Donald J. Wolfe, Jr., Esquire, Brian C. Ralston, Esquire, Scott B. Czerwonka, Esquire, POTTER ANDERSON & CORROON LLP, Wilmington, Delaware; Michael P. Carroll, Esquire, Avi Gesser, Esquire, DAVIS POLK & WARDWELL LLP, New York, New York, *Attorneys for Defendant.*

**STRINE, Vice Chancellor.**

## I. Introduction

This dispute over the control of Trans-Resources, Inc. ("Trans-Resources") is between the company's founder and former chief executive officer, Arie Genger, and the plaintiffs, who provided capital to Trans-Resources when the company was in financial distress. The plaintiffs are all entities controlled by the Trump family, led by Jules Trump and his brother Eddie Trump (collectively, with the plaintiffs, the "Trump Group"). Jules Trump was a long-time friend of Arie Genger, and he was happy to help Genger when Trans-Resources neared insolvency in 2001.

In return for retiring nearly all of Trans-Resources' outstanding bonds, the Trump Group received a minority stake in the company and a number of protections in a stockholders agreement (the "Stockholders Agreement"). The Stockholders Agreement prohibited either party from transferring their shares in Trans-Resources to anyone other than a limited number of permitted transferees. That prohibition against transfer was particularly important to the Trump Group, which was concerned that Genger might transfer his shares that were held through an entity under his control, TPR Investment Associates, Inc. ("TPR"), to a member of his family. A bitter dispute had arisen between Genger and his son, Sagi Genger, during the time Genger's marriage unraveled in the early 2000s, and the Trump Group wanted no part of the family drama.

In 2004, Genger caused TPR to transfer its shares in Trans-Resources, subject to an irrevocable proxy in his favor, to his children's trusts (the "2004 Transfers"), under a settlement in the contentious divorce between him and his wife. Because those trusts were not permitted transferees, the 2004 Transfers violated the terms of the Stockholders

1

Agreement. Under the terms of the Stockholders Agreement, that violation rendered the transfers ineffective and gave the Trump Group the right to acquire the shares that were transferred.

But Genger did not notify the Trump Group of the transfers at that time, and thereby deprived the Trump Group of its right to declare the transfers void or exercise its right to acquire the shares in 2004. Genger claims that he mentioned the 2004 Transfers to Jules Trump during a private conversation in 2004, but his testimony did not convince me that this was true. The most convincing reading of the evidence is that the Trump Group did not receive notice of the 2004 Transfers until nearly four years later, when Genger once again asked Jules Trump for help when Trans-Resources was in financial distress. Moreover, informal notice to Jules Trump would not constitute the notice that was required to be given to the Trump Group entities under the Stockholders Agreement.

By 2008, Trans-Resources' bank was unwilling to negotiate with Genger, so Genger asked Jules Trump not only for money but also to negotiate a reduction in Trans-Resources' debt with the bank. The evidence shows that, while Genger and the Trump Group were negotiating the terms of the second round of funding, Genger disclosed for the first time that the 2004 Transfers had occurred.

Although shocked at Genger's failure to notify him of the 2004 Transfers, Jules Trump nevertheless negotiated a reduction in Trans-Resources' debt and agreed to pay that debt in return for voting control of the company. Genger initially agreed to those terms as a compromise for the Transfer violation, but, after securing an alternative source of financing, backed out of the deal. Angered that he had favorably renegotiated Trans-

Resources' debt obligations and that the Trump Group was left without their key part of the bargain, Jules Trump initiated litigation and also contacted Sagi Genger in order to negotiate a deal with both TPR and the trust controlled by Sagi Genger (the "Sagi Trust") whereby the Trump Group would buy all of the shares transferred to the Sagi Trust by TPR in the 2004 Transfers. Having made a bargain with both the wrongful transferor, TPR, and the transferee, the Sagi Trust, the Trump Group viewed itself as having covered all its bases in addressing Genger's violation of the Stockholders Agreement. With the shares wrongfully transferred to the Sagi Trust by TPR, the Trump Group held a majority of Trans-Resources' stock.

The Trump Group then purported to reconstitute the Trans-Resources board of directors and, when Genger challenged the reconstitution, filed this action pursuant to 8 *Del. C.* § 225 to determine who controlled the board. Making that determination largely turns upon interpreting how the Stockholders Agreement applies to both parties' often excessively sharp conduct. As explained fully below, I conclude that the Trump Group controls the Trans-Resources board for the following reasons: (1) the Trump Group never received notice of the 2004 Transfers, which were made in violation of the Stockholders Agreement, until June 2008; and (2) the Trump Group did not ratify those Transfers when it bought the transferred shares from Sagi Genger and TPR. Because it never ratified the wrongful transaction, the Trump Group was free to deal with the relevant transferor, TPR, and its transferee, the Sagi Trust, and settle the matter by acquiring the wrongly transferred shares in an agreed upon negotiation. In doing so, the Trump Group clearly reserved its position that TPR made a void transfer, has proven that its position

3

was correct, and is entitled, as a result, to be deemed to have taken the shares from TPR as a settlement of the improper Transfers. In the alternative, even if the Trump Group ratified the 2004 Transfers — which it did not — I find that the Trump Group did not purchase the shares from Sagi Genger subject to the proxy in favor of Arie Genger. Therefore, the Trump Group holds a majority equity and voting stake in Trans-Resources, and its ability to vote its shares is unaffected by the proxy.

## II. Factual Background

The following are the facts as I find them after trial.

### A. The Trump Group Saves Genger's Company, Trans-Resources, From Bankruptcy In 2001

In 1985, Genger formed Trans-Resources, a Delaware corporation that eventually became the parent of three specialty fertilizer and industrial chemical companies.[1] As mentioned before, Genger's majority stake in Trans-Resources was held through TPR, another Delaware corporation. By 2001, Trans-Resources was nearly insolvent as its subsidiaries struggled in the marketplace due to a strong euro, vigorous competition from South American rivals, and miscalculations in a recent decision to expand a key plant.[2] At that time, Trans-Resources' bonds had a notional value of $230 million, but their market value had plummeted.[3]

Because negotiations with the fractious group of investors that had invested in Trans-Resources' bonds were proving futile, Genger was delighted when Jules Trump

---

[1] Tr. 830 (A. Genger); Stipulated Pretrial Order at 3.
[2] Tr. 837-38 (A. Genger).
[3] *Id.* at 12 (J. Trump).

4

approached him with an offer to buy Trans-Resources' bonds.[4]  Genger and Jules Trump,

who both had residences on Williams Island in Miami, Florida, had been friends since at

least the late 1990s.[5]  From that time until very near the commencement of this litigation,

Genger and Jules Trump's families regularly socialized, dined, and vacationed together.[6]

Eventually, two entities controlled by Jules and Eddie Trump, plaintiff TR

Investors, LLC ("TR Investors") and plaintiff Glenclova Investment Co. ("Glenclova"),

bought all but $100,000 of Trans-Resources' debt.[7]  Shortly after buying Trans-

Resources' bonds, TR Investors and Glenclova converted their debt into equity.[8]  Under

an exchange agreement, TR Investors and Glenclova collectively received 2,676.4428

Trans-Resources shares, which amounted to a substantial stake equal to 47.15% of Trans-

Resources' equity.[9]

### B. Genger And The Trump Group Execute A Stockholders Agreement That Requires Notice To Be Given If Genger Transfers His Shares In Trans-Resources

Jules Trump's offer came with strings.  In exchange for bailing out Trans-

Resources and agreeing to take a minority interest in Trans-Resources, Trump insisted on

the Stockholders Agreement that gave the Trump Group strong representation and veto

rights.[10]  Importantly in light of the present dispute, the Stockholders Agreement

---

[4] *Id.* at 938 (A. Genger).
[5] J. Trump Dep. 27, 88; A. Genger Dep. 62-63.
[6] J. Trump Dep. 27-28; E. Trump Dep. 32; *see also* A. Genger Dep. 156-57 (indicating that Genger and Jules Trump also took regular strolls together around the walking path on Williams Island).
[7] Tr. 117 (J. Trump), 837 (A. Genger).
[8] *Id.* at 119 (J. Trump).
[9] JX-100 (Exchange Agreement (March 30, 2001)).
[10] Tr. 843 (A. Genger) ("[P]art of the deal was to reconstitute the board and to enable Trump family — to enable the Trump family to be on the board, to have — we created a balance of —

5

provided restrictions on, and in some instances prohibitions against, the transfer of stock.[11]

In particular, Section 2.1 of the Stockholders Agreement prevented a party from transferring or pledging Trans-Resources stock to any party other than a party expressly permitted to receive such a transfer (a "Permitted Transferee"). Section 2.1 provides in relevant part:

> From and after the date hereof, no Stockholder shall directly or indirectly, offer, *transfer*, sell, assign, *pledge*, encumber, hypothecate or otherwise dispose of any Shares (including any derivative transaction) (a) until after December 21, 2003, and, thereafter, only as provided in Articles 3, 4, and 5 of this Agreement, or (b) after *written notice* to the Company and the other Stockholders . . . to (i) in the case of either of the Initial Non-TPR Stockholders or their respective Permitted Transferees (A) to [certain Permitted Transferees], or (ii) in the case of TPR or a Permitted Transferee thereof, to (w) Arie Genger, (x) any entity or entities in which TPR or Arie Genger directly owns a majority of the equity interest and directly controls a majority of the voting power . . . (y) the estate o[f] Arie Genger or (z) any immediate family members or lineal descendants of Arie Genger, or trusts of which they are the sole beneficiaries-in-interest, who receive such Shares in consequence of the death of Arie Genger, which transferee(s) become a party to this Agreement. . . .[12]

That is, Permitted Transferees were: (1) in the case of transfers from any of the Trump Group entities, any entity in which either TR Investors or Glenclova had at least a 20% economic interest and a least a 30% voting interest; and (2) in the case of transfers from TPR, any of the following: (i) Arie Genger himself; (ii) any entity in which TPR or Genger directly owned a majority of the equity interest and a majority of the voting

---

so that I cannot do anything which is not unanimous. There were all kinds of provisions on that.").

[11] JX-101 (Stockholders Agreement (2001)) (the "Stockholders Agreement") §§ 2.1, 2.4, 3.1, 3.2, 3.3).

[12] *Id.* § 2.1 (emphasis added).

power at the time of the transfer, and Genger agreed to continue to maintain such ownership at all times thereafter; (iii) the estate of Arie Genger; or (iv) any of Genger's immediate family members or lineal descendants, or trusts of which they are the sole beneficiaries-in-interest, who receive the transfer of shares as a result of Genger's death.[13] If a party to the Stockholders Agreement intended to make a transfer to a non-Permitted Transferee, then the other party had a right of first refusal, under Section 3.1, which provides in relevant part:

> [I]f a Stockholder (the "Selling Stockholder") shall desire to sell, assign or transfer any Shares held by it to any person other than a Permitted Transferee (the "Offered Shares") and shall be in receipt of a bona fide written offer to purchase the Offered Shares (the "Offer"), [t]he Selling Stockholders shall give the Company and to each Covered Stockholder who is not the Selling Stockholder (the "Non-Selling Stockholders") written notice containing the terms and conditions of the Offer . . . provided that for purposes of this Section 3.1, if the Selling Stockholder is (x) a TPR Stockholder, then only the Non-TPR Stockholders shall be deemed to be Non-Selling Stockholders; and (y) a Non-TPR Stockholder, then only the TPR Stockholders shall be deemed to be Non-Selling Stockholders. . . .

> Until 30 days after receipt of such notice, the Non-Selling Stockholders shall have the right to elect to purchase all of the Offered Shares at the price offered by the prospective purchaser and specified in such notice.[14]

The purpose of expressly limiting transfers to an enumerated list of Permitted Transferees was to ensure that the Trump Group would be dealing only with Genger, or one of the entities he controlled, in the future, and not with anyone else.[15] Jules Trump was particularly concerned about limiting the Trump Group's exposure to the acrimony

---

[13] *Id.*
[14] *Id.* § 3.1.
[15] Tr. 121 (J. Trump), 842-44, 854, 891-92 (A. Genger).

TR Investors v Genger post trial opinion FINAL  download.aspx
Case 1:19-cv-09319-AKH  Document 1-50  Filed 10/08/19  Page 101 of 147
http://courts.delaware.gov/opinions/download.aspx?ID=14116

plaguing Genger's family,[16] but, after much pressure from Genger, reluctantly acceded to including Genger's family members as Permitted Transferees *only* as an estate planning consequence in the event of Genger's death.[17]

If a transfer was made in violation of Section 2.1, then the Stockholders Agreement provided two remedies. First, Section 2.4 provided that "[a]ny attempt by a Stockholder to transfer Shares in violation of this Agreement shall be void and the Company agrees that it will not effect such a transfer or treat any alleged transferee as the holder of such Shares."[18] Second, Section 3.2(a) of the Stockholders Agreement gave the Trump Group the right to purchase TPR's shares in Trans-Resources if Genger: (1) transferred shares to a non-Permitted Transferee; or (2) effected a change of control in TPR. Section 3.2(a) provides in relevant part:

> The Covered Stockholders other than the hereinafter defined Terminating Stockholder (the "Purchasing Stockholders") shall have the right to elect to purchase the Shares held by a Stockholder (the "Terminating Stockholder" . . ) at the Agreement Price (as defined in Section 3.4) and on the Agreement Terms upon the occurrence of any of the following events for a period ending on the later of 60 days after determination of the Agreement Price for the Terminating Shares and 90 days after the Company and the Purchasing Stockholders receive notice from any source of the occurrence of any of the following events (each Stockholder agreeing to give the others and the Company notice of any such event promptly after its knowledge of the occurrence thereof) . . . .
>
> (iv) the Terminating Stockholder sells, *pledges*, encumbers, hypothecates or *otherwise transfers* any interest in (including any derivative transaction), or

---

[16] *Id.* at 121 (J. Trump) ("I had confidence in Arie and we were willing to go forward with him. But I was not willing to go forward with a bunch of people who would be fighting with each other and ultimately end up greenmailing each other."); *see also id.* at 805-06 (O. Genger) (acknowledging the "nightmar[ish]" relations in the Genger family).
[17] *Id.* at 252 (Hirsch).
[18] Stockholders Agreement § 2.4.

8

2/25/2013 1:27 PM

*purports to* sell, *pledge*, encumber, hypothecate or otherwise transfer any
interest in (including any derivative transaction), any of its Shares, except
as permitted by and in full compliance with the terms of this
Agreement. . . .[19]

Therefore, Section 3.2(a) gave the Trump Group 90 days to elect to purchase TPR's

shares after it "receive[d] notice from any source" that a transfer had been made to a non-

Permitted Transferee, or that a change of control had occurred.[20]

Section 6.5 outlined the form of notice required under the various provisions of the

Stockholders Agreement:

All notices required to be delivered pursuant to this Agreement shall be
delivered in person or by telegraphic or other facsimile transmission or sent
by certified mail, return receipt requested, and shall be addressed to the
Company at its principal business office, to the attention of its Chief
Executive Officer, to a Non-TPR Stockholder, to the Representatives, and
any other Stockholders at the address of the Stockholder shown in the
Company's stock ledger or to such other address as such other Stockholder
may indicate by duly giving written notice to the Company.[21]

Thus, formal notice of an event such as a share transfer was to be given directly to the

Trump Group entities, *i.e.* TR Investors and Glenclova, who were parties to the

Agreement, and not to Jules Trump personally.[22] The Stockholders Agreement also

contained a non-waiver clause, which provided that "[n]o waiver or failure on the part of

a Company or a Stockholder in the exercise of any right, power or remedy shall operate

as a waiver thereof, nor shall any single or particular exercise by them of any right, power

---

[19] *Id.* § 3.2(a) (emphasis added).
[20] *Id.*
[21] *Id.* § 6.5.
[22] As to TR Investors, it appears that notice was to be given through Mark Hirsch at TR
Investors' official address, and as to Glenclova, notice was to be given through Robert Smith at
Glenclova's official address. *See id.* at 40. Jules Trump was not an officer or director of either
TR Investors or Glenclova. Tr. 117 (J. Trump).

9

or remedy preclude other or further exercise thereof, or the exercise of any other right, power or remedy."[23]

Finally, under Section 1.6 of the Stockholders Agreement, TR Investors and Glenclova were entitled to an addition 1.85% of TPR's shares in Trans-Resources (the "Balance Shares").[24] The Balance Shares refer to shares that Bank Hapoalim had the option to purchase, the exercise of which would reduce TPR's shareholding by 1.85%. Because of that option, the Trump Group allowed TPR to hold 52.85% of Trans-Resources' stock, even though the parties agreed to a 51%/49% split, on the condition that the Balance Shares would revert to TR Investors and Glenclova if the Bank's option should expire unexercised.[25]

## C. In 2004, As Part Of The Settlement Of His Acrimonious Divorce, Genger Transfers Trans-Resources Stock From TPR To The Sagi Trust, The Orly Trust, And To Himself

On October 26, 2004, after a drawn-out and contentious divorce proceeding, Genger entered into a final marital settlement agreement with his then-wife, Dalia Genger. Under that settlement agreement, Genger transferred his equity interest in TPR to Dalia Genger on October 29, 2004. On that same day, the Trans-Resources shares that TPR previously held were transferred as follows: approximately 13.9% of the shares were transferred to Genger himself, and separate trusts established for his two children, Orly and Sagi Genger (respectively, the "Orly Trust" and the "Sagi Trust"), were each transferred approximately 19.5% of the shares (collectively, the aforementioned "2004

---

[23] Stockholders Agreement § 6.8.
[24] *Id.* § 1.6.
[25] *Id.*; *see also* Tr. 255-57 (Hirsh).

10

Transfers"). According to the transfer agreements, the trustees of each Trust agreed to irrevocable lifetime proxies in favor of Genger (the "Proxies").[26]

At the time the 2004 Transfers were made, Genger did not notify TR Investors or Glenclova of the Transfers as required by the Stockholders Agreement. Genger admits that he never gave the written notice required by the Stockholders Agreement, provided the Trump Group with copies of the Proxies, or passed on a copy of the marital settlement agreement.[27] Nevertheless, Genger argues that TR Investors and Glenclova received notice because he orally told Jules Trump about the 2004 Transfers. In particular, Genger testified that he told Jules Trump about the 2004 Transfers "many times" from the "inception, [when] the idea germinated of how to resolve my divorce, to the execution [of the 2004 Transfers]."[28] Genger testified that he told Jules Trump of the 2004 Transfers during their regular strolls on Williams Island.[29]

For his part, however, Jules Trump categorically denied that Genger ever mentioned the 2004 Transfers.[30] The only other person who testified to hearing any conversations between Genger and Jules Trump relating to the 2004 Transfers was Genger's daughter, Orly. At trial, Orly Genger testified that her father "shared . . . everything" with the Trumps,[31] and that she was present during at least one discussion between Genger and Jules Trump about the 2004 Transfers. In particular, she testified

---

[26] JX-113 (Letter Agreement and Proxy (Oct. 29, 2004)) (the "Proxy").
[27] Pretrial Stipulation and Order 4; Tr. 936, 940 (A. Genger), 99 (J. Trump), 628 (Dowd).
[28] Tr. 856 (A. Genger).
[29] Id.
[30] Id. at 159 (J. Trump) ("Q. From the time that you became — TR Investors became a stockholder in 2001 to June 13th, 2008, did anyone give you any notice of the 2004 transfers, or the change in control of TPR? Trump. Never. Never, ever.").
[31] Id. at 783 (O. Genger).

11

about a discussion in "late '04 or early '05" at Jules Trump's residence on Williams

Island.[32] But, Orly Genger's testimony regarding that conversation was vague, at best:

> They talked about how TPR and [Trans-Resources] were split, how my —
> my dad spoke about how he split those two, how he hoped that now that my
> brother, since was sort of — it was now me, my mother, and my brother,
> and my brother was supposedly the financial guy supposed to take care of
> us in a sense, he was hoping that — that he would.[33]

When asked for further details, she only elaborated as follows:

> Q. And were there details? Was your father providing details to Mr.
> Trump —
>
> O. Genger. Yeah.
>
> Q. — in those discussions?
>
> O. Genger. The fact that my brother was in the middle of it, you know, and
> just the awful nature of it. Everything was told to Jules.[34]

On cross-examination, Orly Genger clarified that the discussion between her father and

Jules Trump some time in late 2004 or early 2005 definitely took place *after* the 2004

Transfers occurred,[35] and that she did not remember her father specifically discussing the

transfer of Trans-Resources shares to the Sagi Trust.[36] But she did not provide further

---

[32] *Id.* at 787. Orly Genger also briefly mentioned a conversation between Genger and Jules Trump sometime during 2007, when her brother brought a lawsuit against her father. *Id.* at 799. But the only details she provided regarding that discussion was that she remembered "them speaking specifically about th[e] lawsuit and how incredible it was that my father had given my brother TPR [Investment], [and] he was actually against him now." *Id.*

[33] *Id.* at 786.

[34] *Id.* at 789.

[35] *Id.* at 801 ("Q. And I want to make sure I understand. [The conversation between Genger and Jules Trump] — it definitely occurred after the 2004 transfers had occurred; is that right? O. Genger. Yes.").

[36] The precise colloquy was as follows:
> Q. Now, in this conversation the issue that you recall being discussed was the
> transfer of control of TPR [Investment] to your brother. He would be in charge.

12

details about the substance of the discussion between her father and Jules Trump other than to say that the "essence" of the discussion was "that [Sagi] was now sort of in charge."[37] The lack of specific details in her testimony undermines her credibility because of her personal interest in the outcome of this case and her obvious desire to protect her father in his feud with her brother,[38] and because Genger himself testified that no one else was present during his alleged conversations with Jules Trump, even his daughter Orly.[39]

---

O. Genger.  That was the essence, that he was now sort of in charge.

Q.  That was the essence of it.

O. Genger.  Right.

Q.  Yeah.  And the question of the transfer of TPR's shares of [Trans-Resources] to your trust and your brother's trust and your father, you don't recall that that was discussed during this conversation?

O. Genger.  I'm sorry.  Can you say it again?

Q.  Yes.  The question of the transfer by TPR [Investment] of its [Trans-Resources] shares —

O. Genger.  Right.

Q.  — to your trust, your brother's trust, and your father, that was not discussed in this conversation?

O. Genger.  Not that I remember.

Id. at 803-04.
[37] Id.
[38] Id. at 813 ("Q.  You stand to benefit if your father prevails in this litigation?  O. Genger:  I hope.  Yeah, I think.").
[39] Id. at 895 (A. Genger) ("The Court: It was just the two of you?  Genger:  Just the two of us.  The Court: Not your daughter?  Genger: Not my daughter.").

13

2/25/2013 1:27 PM

Besides his own testimony and the testimony of his daughter, the only other evidence to which Genger points as proof that he told the Trumps about the 2004 Transfers are two after-the-fact events. First, Genger points to a written consent that Trans-Resources' shareholders were required to sign in 2005 (the "2005 Written Consent") in order to resolve a dispute with Bank Hapoalim, with whom Trans-Resources had a long-term relationship, over Trans-Resources' outstanding debt. The signature page of the 2005 Written Consent included signature blocks for not only Arie Genger, but also the Orly Trust and the Sagi Trust, and identified Arie Genger as the proxy for the two Trusts.[40] That is, by including signature lines for the Orly Trust and the Sagi Trust as shareholders, the 2005 Written Consent disclosed that some sort of transfer had taken place. For their part, the Trumps credibly claim that they did not notice the additional signature lines in the 2005 Written Consent when they signed the page.[41]

Second, Genger claims that he mentioned the 2004 Transfers during a Trans-Resources board meeting in November 2007 at which Jules Trump was present (the "November 2007 Board Meeting").[42] For support, Genger points to the minutes of that meeting, which reflect that "Mr. Genger advised the directors that both he and Mr. Dowd had been sued by TPR Investment Associates, Inc. and other related entities with respect to their activities as officers and/or directors of TPR Investment Associates, Inc., *the former parent Company of [Trans-Resources]*."[43] Genger avers that this passing

---

[40] JX-125 (executed written consent (July 26, 2005)) (the "2005 Written Consent").
[41] Tr. 101-05 (J. Trump), 185-92 (Hirsch).
[42] JX-149 (Trans-Resources board meeting minutes (Nov. 19, 2007)).
[43] *Id.*

14

reference to TPR being the former parent of Trans-Resources should have tipped Trump

off that the 2004 Transfers were made. As we will see, that argument is undercut,

however, by the reality that Genger's loyal subordinate, Bill Dowd, appears to have

manipulated the corporate minutes on other occasions to suit Genger's interests.

### D.  Genger Finally Tells The Trumps About The 2004 Transfers During Negotiations To Restructure Trans-Resources' Debt

In the spring of 2008, Trans-Resources was once again having financial troubles,

now in a dispute with Bank Hapoalim, which was pressuring Trans-Resources to sell its

main subsidiary, Haifa Chemical, Inc., in order to avoid foreclosure.[44]  Genger turned to

the Trumps for help, asking Jules Trump if the Trump Group would provide the capital

necessary to retire Trans-Resources' bank debt in exchange for an increased equity

position that would give the Trump Group control of Trans-Resources.[45]  Genger relied

on Jules Trump in particular not only because of their past relationship but also because

Bank Hapoalim, which had indicated that it had lost confidence in Genger, was however

willing to negotiate with Trump in regard to Trans-Resources' debt.[46]  On May 31, 2008,

Genger and Jules Trump met to discuss the general contours of an agreement (the

"Funding Agreement"), which would provide for a capital infusion into Trans-

Resources.[47]  After that meeting, Trump negotiated with Bank Hapoalim to reduce Trans-

---

[44] Tr. 38-39 (J. Trump).
[45] Id. at 41-42 (J. Trump).
[46] Id. at 124-27, 146 (J. Trump).
[47] Id. at 872 (A. Genger); 43-44, 135-36 (J. Trump).

15

Resources' debt load, and asked Genger to meet with Eddie Trump and Mark Hirsch, the Trumps' lawyer, in New York to work out the details of the Funding Agreement.[48]

### 1. Genger, Eddie Trump, And Mark Hirsch Meet On June 13, 2008

Genger met with Eddie Trump and Hirsch in New York on June 13, 2008 (the "June 13 Meeting"). Early in the June 13 Meeting, Hirsch gave Genger a draft of the Funding Agreement. That draft listed TPR, Glenclova, and TR Investors as the company's sole shareholders, thereby strongly suggesting that the Trump Group was unaware at that time of the 2004 Transfers.[49] Upon reviewing the draft, Genger commented that TPR was no longer a Trans-Resources stockholder.[50] Both Eddie Trump and Hirsch expressed shock upon hearing that, and Hirsch reminded Genger that he was not permitted to transfer his stake in Trans-Resources without first providing notice and a right of first refusal to the Trump Group.[51]

Upon seeing their surprise, Genger did not stop and say what one would expect to be the first thing out of his mouth if Genger had already given repeated notice to Jules

---

[48] *Id.* at 868-69 (A. Genger).
[49] JX-170 (email from Mark Hirsch to Jules Trump with draft agreements attached (June 12, 2008)).
[50] Tr. 283 (Hirsch), 498-99 (E. Trump).
[51] *Id.* at 284-85 (Hirsch), 499 (E. Trump). Interestingly, the trial record includes an email from Hirsch to Jules Trump, dated June 11, 2008, in which Hirsch describes the transfer restrictions and the right of first refusal provisions in the Stockholders Agreement. JX-167 (email from Mark Hirsch to Jules Trump (June 11, 2008)). The timing of that email suggests that the Trumps might have known about the 2004 Transfers before the June 13, 2008 meeting. But I do not find this email to be proof that Genger had given the Trumps oral notice because: (1) the Trumps may have simply suspected on their own that something like the 2004 Transfers had taken place; or (2) the Trumps may have heard rumors from sources other than Genger that the 2004 Transfers had occurred. In either event, notice as required under Stockholders Agreement had not been given. Furthermore, even if the email did indicate that notice had been given, it still suggests that the timing of that notice was no earlier than June 2008.

Trump: "Why are you acting so surprised? I told Jules all about these Transfers years ago."[52] Rather, Genger acknowledged that he had not provided notice of the 2004 Transfers, but insisted that he had lived within the spirit of the Stockholders Agreement by maintaining control of the stock through the Proxies.[53] And, Genger spent the better part of that day explaining the 2004 Transfers to Eddie Trump and Hirsch,[54] which would have been unnecessary had they already known about the Transfers.

Finally, at the end of the meeting, Genger offered to arrange a meeting with his lawyer, David Lentz, who was most familiar with the details of the 2004 Transfers.[55] Eddie Trump and Hirsch met with Lentz three days later, on June 16, 2008, to discuss the details of the 2004 Transfers. It is also noteworthy that, before that meeting, Genger never told Lentz that he had given Jules Trump oral notice of the 2004 Transfers.[56] If notice of the 2004 Transfers had indeed been given, one would have expected Arie Genger to have at least mentioned that important detail to his own counsel. During that

---

[52] Tr. 501 (E. Trump) ("At any time during the meeting did Mr. Genger say, 'Well, I told your brother, Jules. Let's get him on the phone,' or words to that effect? E. Trump: No."). Genger's testimony on this important issue was vague at best. He only recalled telling Eddie Trump and Hirsh something to the effect of "Jules knows about it" at some point during the June 13 Meeting. *Id.* at 900 (A. Genger). But, Genger could give no further details, and he admitted that he never pressed the point or suggested that they get Jules Trump on the phone to clarify the issue. *Id.*

[53] *Id.* at 284 (Hirsch) ("I took out the agreement to show [Genger] specifically why he could not have transferred the shares, that this was not permitted under the agreement. And he said, 'All right. You know, so I didn't tell you about it, but I didn't think I had to. I mean, what's changed? I still – I still vote the shares.'").

[54] *Id.* at 893-94, 899 (A. Genger).

[55] *Id.* at 902-03 (A. Genger).

[56] *Id.* at 7 (Lentz) ("Q: And Mr. Genger didn't tell you [before the June 16th meeting] that he claimed to have given some sort of notice to Jules Trump. That's correct; right? . . Lentz: I believe your statement is correct.").

17

meeting, Lentz never suggested that Jules Trump had already known about the 2004

Transfers because Genger had told him about them years ago.[57]

2. Later Communications Between Genger, William Dowd, And David Lentz Admit
That Genger Never Gave The Trump Group Notice Of The 2004 Transfers

In a series of emails and memoranda produced over the two weeks following the

June 16 meeting, Lentz repeatedly acknowledged Genger's failure to provide any notice

of the 2004 Transfers. In a June 17, 2008 email, Lentz wrote that "[t]he Trumps *never*

*consented to* and don't want [the Sagi] Trust or [Orly] Trust . . . as minority partners

(shareholders) in [Trans-Resources]."[58]  And, in a June 26, 2008 email, Lentz wrote that

"no notice was given" to the Trumps about the 2004 Transfers.[59]  But, Lentz's most

telling admission came in a memorandum he wrote for Genger analyzing the parties'

various bargaining positions and how likely machinations by Sagi Genger would affect

the outcome of the dispute (the "Lentz Memo").  In that Memo, Lentz wrote:

> *While it is true the Trumps never got notice,* the entire intent of the
> Shareholder's agreement has been carried out anyway.  In other words, *why
> did AG not give them actual notice?*  Because, AG will testify, using the
> TPR shell was never the intention of the Trumps and AG — the real
> intention was to keep the ownership of [Trans-Resources] in the Genger
> family under the voting and operational control of AG and the Stipulation
> did just that.  So, AG becomes SG's best witness.  AG will not say I just
> forgot to tell the Trumps.  He will not say I tried to get away with
> something and thought the Trumps would not find out.  He will testify that

---

[57] *Id.* at 990 (Lentz) ("Q.  Nobody said at the meeting, then, that any notice had been given in
substance; right?  Lentz.  Correct."); *see also id.* at 994 (Lentz) ("Q.  [Y]ou went through an
entire meeting about the absence of notice and people asking what, in fact, occurred.  And no one
from your side of the discussion spoke a peep refuting that contention; right?  Lentz: Nobody
refuted it, that's correct.").

[58] JX-331 (email from David Lentz to Arie Genger, Bill Dowd, and Christopher Gengaro (June
17, 2008) (emphasis added).

[59] JX-337 (email from David Lentz to Arie Genger, Bill Dowd, and Christopher Gengaro (June
26, 2008)).

18

whether the corporate form of TPR or the kids' trusts w[as] used made no difference. The essence of these protections was to make sure the Genger family owned roughly 50% and that AG could vote all of those shares. That's what happened. So, *while there was a technical violation*, the Trumps got what they bargained for.[60]

Later in that same Memo, Lentz added: "AG does not have clean hands because like SG, *AG never told the Trumps*."[61] Thus, Genger's own attorney repeatedly acknowledged that Genger had never given the Trumps *any* type of notice.

### 3. At The June 25, 2008 Meeting Of Trans-Resources' Board And Stockholders, Genger Himself Indicates That Notice Of The 2004 Transfers Was Not Given To The Trumps

The Trans-Resources board met on June 25, 2008 (the "June 25 Board Meeting") and unanimously approved the Funding Agreement, which provided that the Trumps would invest an additional $57.5 million in the company in exchange for 50% of Trans-Resources' outstanding stock, which would give the Trumps clear voting control and by far the largest equity position in the company.[62] That is, the totality of the Funding Agreement would address the injury to the Trump Group from the 2004 Transfers by giving it voting control of Trans-Resources. Handwritten notes by Bill Dowd, a director and Trans-Resources' chief executive officer, recorded that "AG describe[d] [Trans-Resources] stock transfer *in violation of agreement*" during the meeting.[63] That is, Genger acknowledged that the 2004 Transfers were made without providing notice to the

---

[60] JX-332 (memorandum from David Lentz to Arie Genger, Bill Dowd, and Chris Gengaro) (the "Lentz Memo") (emphasis added).

[61] *Id.* (emphasis added).

[62] JX-181 (minutes of joint meeting of the board of directors and stockholders of Trans-Resources, Inc. (June 25, 2008)).

[63] JX-179 (handwritten notes of Bill Dowd (June 25, 2008)) (emphasis added).

Trumps. Tellingly, Dowd, who had worked for Genger for years, omitted that important admission from the formal minutes he drafted following the meeting.[64]

### E. Negotiations To Restructure Trans-Resources Break Down, And The Parties Eventually Commence This Litigation

Although the Funding Agreement solved the problem with Bank Hapoalim, Genger and the Trumps still had to sort out how to ensure that the Trumps were given control of the Trans-Resources board as required under the Funding Agreement. That was a problem because Genger and the Trumps anticipated that Sagi Genger, who now had a claim to be a Trans-Resources stockholder on account of the 2004 Transfers, would litigate any attempt to transfer control from Genger to the Trumps, if for no other reason than to spite his father.[65] During June and July of 2008, Genger and the Trumps discussed options for dealing with Sagi Genger. One of the options the Trumps suggested was confronting Sagi Genger with the argument that the 2004 Transfers violated the Stockholders Agreement, and that he was therefore not a beneficial owner of the Shares.[66] Importantly, Genger resisted this approach, likely because that would expose him to liability for representing falsely in the divorce settlement that the 2004 Transfers were not made in violation of any agreement.[67]

---

[64] *See* JX-179 (draft meeting minutes (June 25, 2008)) (omitting any reference to the 2004 Transfers being made in violation of the Stockholders Agreement).
[65] Tr. 318-19 (Hirsch).
[66] *Id.*
[67] *Id.* at 304 (Hirsch).

20

1. <u>Genger Reneges On The Funding Agreement, And The Trumps Respond With A Lawsuit</u>

Genger and the Trumps never reached common ground on how to approach Sagi, because Genger began to back-track on the draft terms of the Funding Agreement. Genger could afford to back out of the Funding Agreement because he had devised a way — albeit one of questionable propriety — to upstream funds from the Haifa Chemical, Inc. subsidiary to Trans-Resources, thus allowing Trans-Resources to fulfill its obligations to Bank Hapoalim, which Jules Trump had successfully reduced during his negotiations with the bank on behalf of Trans-Resources.[68] Because Genger had secured an alternative source of capital, the Funding Agreement with the Trumps was no longer the only mechanism for rescuing Trans-Resources. From that position of increased leverage, Genger began to disengage from the Funding Agreement deal. First, despite the fact that Bank Hapoalim required payment by late August, Genger requested that execution of the Funding Agreement be postponed upon the advice of counsel. Wielding a problem of his own creation, Genger asserted that Trans-Resources' Delaware lawyers had advised him that Trans-Resources needed to establish an independent committee to review the fairness of the Funding Agreement because the recipients of the 2004 Transfers might complain. Second, at an August 1, 2008 meeting, Genger's lawyers claimed, for the first time, that Genger had given Jules Trump oral notice of the 2004

---

[68] Dowd Dep. 281.

Transfers years ago, and threatened litigation if the Trumps chose to challenge the 2004 Transfers.[69]

The Trumps responded on August 8, 2008 with a letter to TPR and Trans-Resources indicating that Glenclova was exercising its right under Section 3.2 of the Stockholders Agreement to purchase all of the shares subject to the 2004 Transfers, and requesting that the Trans-Resources board begin the process of establishing their purchase price.[70] On August 11, 2008, Glenclova filed a suit in the United States District Court for the Southern District of New York seeking to enforce the Funding Agreement and its rights under the Stockholders Agreement.[71] On August 13, 2008, Genger responded through a letter from his attorneys, claiming that Glenclova had no right to purchase the shares because he had kept Jules Trump fully informed of the 2004 Transfers at the time they were made four years prior.[72]

### 2. The Trump Group Purchases The Sagi Trust's Shares And Reconstitutes Trans-Resources' Board Of Directors, Leading To This Section 225 Action

The lawsuit in federal court in New York was not the only course of action the Trumps took. On August 21, 2008, Jules Trump contacted Sagi Genger to explore the possibility of acquiring the 1,102.8 shares purportedly transferred to the Sagi Trust in 2004 (the "Sagi Shares").[73] And, on August 22, 2008, the Trumps purchased the Sagi Shares pursuant to a stock purchase agreement (the "Purchase Agreement") between the

---

[69] Tr. 65, 155-56 (J. Trump); 364 (Hirsch).
[70] JX-198 (letter from Glenclova to TPR and Trans-Resources (Aug. 8, 2008)).
[71] JX-204 (Complaint, *New TR Equity, LLC v. Trans-Resources, Inc.* (S.D.N.Y. Aug. 11, 2008)).
[72] JX-350 (letter from Charles Weissman to Barry Adelman (Aug. 13, 2008)).
[73] Tr. 111 (J. Trump).

22

Sagi Trust, TPR, and the Trumps' entities, TR Investors, Glenclova, New TR Equity I,

LLC ("Equity I"), and New TR Equity II, LLC ("Equity II").[74]  Importantly, the

transaction included not only the Sagi Trust as a party but also the wrongful transferor,

TPR.  Sagi Genger could act for TPR because, after making the 2004 Transfers, Genger

had ceded control of TPR to Dalia Genger, who subsequently sold her interest in TPR to

her son, Sagi.[75]  The Purchase Agreement contained a specific section addressing the

reality that the Trump Group viewed the 2004 Transfers as void and that TPR still owned

them and was obliged to sell them to the Trump Group at 2004 values.  To wit, the

Purchase Agreement provided that it would be considered consummated between the

Trump Group and *TPR* if the 2004 Transfers were to be found void:

> If at any time following the Closing Date, it is determined that Seller is not
> the record and beneficial owner of the Shares as of the date hereof, by
> virtue of the transfer of the Shares to it by TPR being deemed to have been
> void or for any other reason, and that all right, title and interest in and to the
> Shares is held by TPR, subject only to the plaintiff's asserted rights under
> the Stockholders Agreement asserted in the action styled Glenclova
> Investment Co. v. Trans-Resources, Inc. and TPR Investment Associates,
> Inc., Case No. 08-CIV-7140 (JFK), pending the United States District
> Court for the Southern District of New York, the parties hereby agree that
> (a) *this Agreement and the transactions contemplated hereby shall be
> deemed to have been entered into and consummated with TPR, (b) the
> Purchasers shall retain all right, title and interest in and to the Shares as if
> purchased from TPR pursuant to this Agreement, (c) TPR shall look only to
> Seller for any payments made by the Purchasers pursuant to this
> Agreement, (d) the Purchasers shall have no liability or obligation to TPR
> in respect of the Shares, and (e) all representations, warranties, covenants
> and agreements made by Seller herein, shall be deemed to have been made
> by TPR as of the date hereof.*[76]

---

[74] JX-225 (the "Purchase Agreement").

[75] Tr. 547 (S. Genger).

[76] Purchase Agreement § 10 (emphasis added).

2/25/2013 1:27 PM

Thus, by signing an agreement with both the Sagi Trust and TPR, the wrongful

transferee, the Trump Group dealt with the Genger-caused problem that Genger exploited

in order to derail the Funding Agreement.  By dealing directly with both the allegedly

innocent transferee — the Sagi Trust — and the wrongdoer — TPR — the Trump Group

covered all of its bases.

Having purchased the Sagi Shares, which gave them a majority equity position in

Trans-Resources, the Trump Group then executed a written consent on August 25, 2008

that removed Genger from the Trans-Resources board, elected Eddie Trump and Hirsch

to the board, and affirmed the election of Jules Trump and Robert Smith to the board.

The Trump Group delivered that written consent to Trans-Resources, but Genger rejected

it.[77]

In response, the Trump Group filed a single-count complaint pursuant to 8 *Del. C.*

§ 225 in order to determine the composition of the Trans-Resources board (the "Section

225 Action").  Consistent with their position throughout the summer of 2008, the Trump

Group's central claim was that the 2004 Transfers were made in violation of the

Stockholders Agreement, and that it therefore had the right to purchase all of TPR's

shares pursuant to Section 3 of the Stockholders Agreement.[78]  Genger responded with a

counterclaim, raising a number of arguments for why the 2004 Transfers were made

appropriately — chief among them his assertions that he told Jules Trump of the

Transfers at the time they were made, and that, in any event, the Trump Group's purchase

---

[77] Tr. 403-06 (Hirsch).
[78] Compl. ¶ 10.

24

of the Sagi Shares in 2008 ratified the 2004 Transfers — and claiming that, therefore, he still controlled Trans-Resources' board. Genger also argues that the Trump Group violated Section 2.1 of the Stockholders Agreement when Equity I and Equity II pledged Trans-Resources shares in return for financing to buy the Sagi Shares.

Soon after the Section 225 Action was filed, the parties promptly settled the matter, which resulted in a stipulated final judgment that declared that the Trump Group's designees constituted a majority of the board.[79] But, like any other moment of agreement between the parties in this case on anything, that settlement was short-lived. On October 10, 2008 — two weeks after the final judgment was entered — the Trump Group moved to re-open the Section 225 Action. They moved to reopen because they alleged that, after taking control of Trans-Resources, they discovered that Genger had destroyed documents relevant to the Section 225 Action in violation of a status quo order.

The issue of whether Genger should be held in contempt for destroying documents in violation of this court's status quo order was decided in 2009 in a separate trial.[80] It is unnecessary to recount here the facts or analysis involved in that trial, which are summarized in the opinion that resulted.[81] What matters for present purposes is the outcome: Genger was found to be in contempt, which raises Genger's evidentiary burden on any issue on which he has the burden of proof by one level and renders his uncorroborated testimony insufficient to establish material facts.[82]

---

[79] See *TR Investors, LLC v. Arie Genger*, C.A. No. 3994-VCS (Sept. 26, 2008) (ORDER).
[80] *TR Investors, LLC v. Genger*, 2009 WL 4696062 (Del. Ch. Dec. 9, 2009).
[81] *See id.* at *1-15.
[82] *See id.* at *18-19.

25

2/25/2013 1:27 PM

## III. Legal Analysis

Genger has proliferated a host of theories — including new ones after trial — as to why he retains voting control over Trans-Resources, and the Trump Group has accurately described its efforts to address Genger's ever-changing arguments as playing a game of "Whack-a-Mole."[83] It is possible, nevertheless, to sift through the heaping stew pot filled with every conceivable exculpatory theory that ever crossed his lawyers' inventive minds that Genger has cooked up and identify the chunkier ingredients. Genger's main theory is that the 2004 Transfers were made appropriately, either because he gave the Trump Group notice or because the Trump Group ratified the Transfers. Genger's primary alternative theory is that, even if the 2004 Transfers were not appropriate, the Trump Group took the Sagi Shares subject to the Proxy in his favor.

In the analysis that follows, I do not address all of the alternative theories Genger concocted, but rather focus on his two fundamental theories. Treating all of his secondary arguments is unnecessary because Genger has failed to bear his evidentiary burden as to those core theories on which the rest of his case depends. That is, Genger has failed to prove that he properly notified the Trump Group of the 2004 Transfers at any time before the June 13 Meeting, or that the Trump Group somehow ratified the 2004 Transfers after the fact. And, even if the Trump Group did ratify the 2004 Transfers —

---

[83] *See* Trump Post-Trial Ans. Br. 3. For example, Genger's counsel spent a great deal of time at post-trial oral argument in a befuddling exposition of a theory *introduced into the case as a footnote in its post-trial answering brief. Compare* Post-Trial Tr. 128-58 *with* Genger Post-Trial Ans. Br. 24, n. 18.

26

which it did not — Genger has failed to prove that it took the Sagi Shares subject to the Proxy.

### A. Standard Of Review

The standard of review I apply in analyzing the aforementioned issues is different in this case than what is typical. The party attempting to gain control of an entity in an action pursuant to 8 *Del. C.* § 225 bears the burden of proof on any issue, the outcome of which would affect the determination of the Trans-Resources' board.[84] Generally speaking, the burden of proof in civil cases is that the party with the burden must prove his position by a preponderance of the evidence.[85] But, because of this court's prior ruling in the contempt trial, Genger's burden is raised a level, meaning that he must prevail on any issue in which he bears the burden of proof by clear and convincing evidence. And, as mentioned before, Genger's own uncorroborated testimony will not be sufficient to establish any material fact.[86]

### B. Arie Genger Did Not Notify The Trump Group Of The 2004 Transfers Until June 13, 2008

The first issue I must address is Genger's argument that he gave the Trump Group notice of the 2004 Transfers during his conversations in late 2004 or early 2005 with Jules Trump about his divorce and that the Trump Group is chargeable with laches.[87]

---

[84] *See Agranoff v. Miller*, 1999 WL 219650, at *12 (Del. Ch. Apr. 12, 1999), *aff'd*, 737 A.2d 530 (Del. 1999). Genger conceded that he bears the burden of proof. Contempt Trial Tr. 355.
[85] *See SinoMab Bioscience Ltd. v. Immunomedics, Inc.*, 2009 WL 1707891, at *12 (Del. Ch. June 16, 2009).
[86] *See supra* page 25.
[87] Laches operates to bar a claim where "(a) [the] plaintiff knew (or should have known) of its rights or claim; (b) [the] plaintiff failed to assert its rights or claim; and (c) [the] defendant has materially changed its position or otherwise materially relied on plaintiff's failure to assert."

27

This argument is central to the case because the Stockholders Agreement provides that, upon receiving notice of an improper transfer from any source, the Trump Group has 90 days to elect to purchase the shares held by the stockholder making the transfer, *i.e.* TPR.[88] If the first time the Trumps heard about the 2004 Transfers was at the June 13 Meeting, then the Trump Group acted within the 90-day window provided in the contract because it elected to purchase TPR's shares on August 8, 2008, when it sent TPR a letter indicating that it elected to exercise its rights under Section 3.2 of the Stockholders Agreement.[89] But, if the Trumps received notice some time before May 8, 2008, then their demand to exercise their purchase rights under the Stockholders Agreement on August 8, 2008 would arguably be tardy.

Tellingly, Genger spent only one and a half pages in his post-trial briefing on this argument.[90] That is likely because he knew, as shown below, that he has failed to bear his evidentiary burden on this issue. There is no credible evidence indicating that Genger ever told Jules Trump about the 2004 Transfers in late 2004 or early 2005.

At trial, Genger offered little more than his unbelievable and uncorroborated testimony to support his claim that he notified the Trump Group. As discussed earlier, Genger testified that he told Jules Trump about the 2004 Transfers on a number of occasions in late 2004 or early 2005 while the two discussed developments in Genger's

---

*Gotham Partners, L.P. v. Hallwood Realty Partners, L.P.*, 714 A.2d 96, 104 (Del. Ch. 1998); *see also Fed. United Corp. v. Havender*, 11 A.2d 331, 344 (Del. 1940) ("Sitting by inactive and in what amounts to silence, when every consideration for the rights of others demanded prompt and vigorous action, and until affairs had become so complicated that a restoration of former status was difficult, if not impossible, is conduct amounting to laches.").
[88] Stockholders Agreement § 3.2(a).
[89] JX-198 (Letter from Glenclova to Trans-Resources and TPR (Aug. 8, 2008)).
[90] *See* Genger Post-Trial Op. Br. 28-30.

28

TR Investors v Genger post trial opinion FINAL - download.aspx                    http://courts.delaware.gov/opinions/download.aspx?ID=14116

divorce during their strolls on Williams Island.[91]  For his part, Jules Trump categorically

denied that Genger ever mentioned the 2004 Transfers in late 2004 or early 2005.[92]  The

only other person who testified to hearing Genger and Trump discuss the matter was Orly

Genger.  But her testimony gave little detail about what was actually said during those

alleged conversations, and it was contradicted by Genger himself, who said that she was

not present at the key conversation when he told Jules Trump about the Transfers.[93]

Therefore, I do not find her testimony of the alleged conversations between Genger and

Jules Trump credible, especially in light of her personal interest in this case.

Moreover, if Genger did in fact tell Jules Trump about the 2004 Transfers in late

2004 or early 2005, then why did he not press that point at the June 13 Meeting when

Eddie Trump and Hirsch appeared shocked to hear the news?  The natural thing to say in

that situation would have been to make the obvious point that he had told Jules about it

years ago.  But, at trial, Genger only testified vaguely, haltingly, and meekly that he told

them something along the lines of "Jules knows about it," and gave no other details of

what he said in that regard.[94]  Genger also admitted that he never pressed the point any

further, even though he became "[v]ery frustrated" with the repeated questions Eddie

Trump and Hirsch were asking.[95]  For example, Genger never said that they should get

Jules Trump on the phone to confirm that Genger had indeed told him about the

---

[91] *See supra* page 11.
[92] *See supra* page 11.
[93] *See supra* page 11-13.
[94] Tr. 900 (A. Genger).
[95] *Id.*

Transfers.[96] Rather, Genger attempted to justify the Transfers on the grounds that he still had voting control through the Proxies.[97]

Genger also failed to mention his alleged conversations with Jules Trump even when he spoke with his lawyer, David Lentz, after the June 13 Meeting.[98] Such an important detail would, if true, have been one of the first things Genger told his counsel. But, the evidence indicates Lentz believed at the time that Genger had never informed Jules Trump of the 2004 Transfers.[99] That fact is reflected most clearly in the Lentz Memo, which stated repeatedly that notice had never been provided to the Trump Group.[100]

Thus, the overwhelming thrust of the evidence indicates that everyone in Genger's camp knew full well that he had never told the Trump Group about the 2004 Transfers before the June 13 Meeting.[101] Indeed, Bill Dowd's notes of the June 25 Board Meeting indicate that Genger himself admitted that the Transfers were made in violation of the Stockholders Agreement.[102] The inescapable conclusion is that Genger did not provide the Trump Group with any form of notice before the June 13 Meeting, choosing rather to trust in his savvy to manage the Trumps if the issue ever arose.

Nor can Genger rely on the passing references to the possibility of a transfer in the 2005 Written Consents and the minutes of the November 2007 Board Meeting. As noted,

---

[96] *Id.*
[97] *See supra* page 17.
[98] *See supra* page 17.
[99] *See supra* page 17-19.
[100] *See supra* page 18-19.
[101] *See* Tr. 631 (Dowd), 1008 (Lentz).
[102] *See supra* page 19.

the accuracy of the minutes of the November 2007 Board Meeting appears to be suspect.[103] Furthermore, the Stockholders Agreement required a specific form of notice to be given to TR Investors and Glenclova.[104] Even if Genger told Jules Trump about the 2004 Transfers in late 2004 or early 2005, which I conclude he did not, that would not constitute notice to TR Investors or Glenclova. But more important is the fact that passing references in the 2005 Written Notices or the minutes of the November 2007 Board Meeting do not constitute proper notice of any kind or even put the Trump Group on effective inquiry notice. Business people can miss things. The idea that the Trump Group had to review every stray reference in the board minutes or to read between the lines on the signature page of the 2005 Written Consents for signs of a possible transfer is wrong. The notice provision in the Stockholders Agreement was specific and designed to ensure that the Trump Group did not have to police the world in this way, as was the Stockholders Agreement's strong anti-waiver provision.[105] Finally, I am persuaded by, among other things, the draft Funding Agreement the Trump Group proposed that indicated that the Trump Group did not know of the 2004 Transfers. Notably, I conclude that the Trump Group would prevail on this issue even if they had the burden to show that they had not been given proper notice. But, because Genger admits he did not give proper notice as required under the contract,[106] it was his burden to show that he should nevertheless be alleviated of his obligations under the Stockholders Agreement because

---

[103] *See supra* pages 19-20.
[104] *See* Stockholders Agreement § 6.5.
[105] *See id.* at §§ 6.5, 6.8.
[106] *See* Pretrial Stipulation and Order 4.

31

he gave Jules Trump oral notice and, certainly, it was his burden to prove a laches defense.

## C. The Trump Group Did Not Ratify The 2004 Transfers

Genger next argues that the Trump Group nevertheless ratified the 2004 Transfers. The defense of ratification is perhaps best understood by reference to its closest cousin, the doctrine of acquiescence.[107] Acquiescence occurs when a party "has knowledge of an improper act by another, yet stands by without objection and allows the other party to act in a manner inconsistent with the claimant's property rights."[108] Ratification differs primarily in timing: "[a]quiescence properly speaks of assent by words or conduct *during the progress* of a transaction, while ratification suggests an assent *after the fact*."[109] Thus, to find that a party ratified a prior act, it is first necessary to find that the ratifying party had "[k]nowledge, actual or imputed, of all material facts."[110] Second, ratification requires an affirmative act by the ratifying party. Assent can be "implied from conduct,

---

[107] *See Frank v. Wilson & Co.*, 32 A.2d 277, 283 (Del. 1943) ("Acquiescence and ratification are closely related.").

[108] *Brandywine Dev. Group, L.L.C. v. Alpha Trust*, 2003 WL 241727, at *4 (Del. Ch. Jan. 30, 2003).

[109] *Frank*, 32 A.2d at 283 (emphasis added); *see also* 1 DONALD J. WOLFE, JR. & MICHAEL A. PITTENGER, CORPORATE AND COMMERCIAL PRACTICE IN THE DELAWARE COURT OF CHANCERY, § 11.03[a], at 11-20 (2009) ("Acquiescence involves assent during the progress of a transaction, while ratification suggests assent after the fact.").

[110] *Frank*, 32 A.2d at 283; *see also Papaioanu v. Comm'rs of Rehoboth*, 186 A.2d 745, 749-50 (Del. Ch. 1962).

32

as well as expressed by words" but is always a "voluntary and positive act."[111] Accepting

the benefits of a transaction can be an indication of that assent.[112]

### 1. Genger Has Not Met His Burden Of Proof As To His Ratification Claim

Realizing that he had a very weak argument that he gave effective notice of the

2004 Transfers to the Trump Group, Genger spent most of his briefing attempting to

argue that the Trump Group ratified the 2004 Transfers. Because of his prior acts of

spoliation. Genger bears the burden to prove ratification by clear and convincing

evidence. He has not done so.

Genger argues that the Trump Group ratified the 2004 Transfers on two occasions:

(1) when it accepted shareholder approval of the Funding Agreement at the June 25

Board Meeting; and (2) when it purchased the Sagi Shares on August 22, 2008.[113]  As to

---

[111] *Frank*, 32 A.2d at 283; *see also* WOLFE & PITTENGER, § 11.03[a] at 11-19 to 11-20 (stating that ratification requires proof of a relinquishment of existing, known rights, and the "acceptance of new replacement rights or benefits").

[112] *See Kahn v. Household Acquisition Corp.*, 591 A.2d 166, 177 (Del. 1991) (stating that accepting the benefits of a transaction, even though the conduct in question is a breach of some duty owed to the shareholder, may bar the shareholder from obtaining equitable relief); *Frank*, 32 A.2d at 282 (finding that a shareholder "could not accept the benefit offered by the [transaction] and at the same time deny its validity"); *Giammalvo v. Sunshine Mining Co.*, 1994 WL 30547, at *10 (Del. Ch. Jan. 31, 1994), *aff'd*, 651 A.2d 787 (Del. 1994) ("The equitable defenses of ratification and acquiescence are closely related.  Under the proper circumstances, both doctrine prevent one who accepts the benefits of a transaction from thereafter attacking it."); *Dannley v. Murray*, 1980 WL 268061, at *4 (Del. Ch. July 3, 1980) ("The 'affirmance' required to create ratification . . . may arise by the retention of benefits with knowledge of the unauthorized acts.") (citations omitted); *Trounstine v. Remington Rand*, 194 A. 95, 99 (Del. Ch. 1937) ("[E]quity will not hear a complainant stultify himself by complaining against acts in which he participated or of which he has demonstrated his approval by sharing in their benefits.").

[113] Later in the briefing process, Genger recast his argument about the 2005 Written Consents and the minutes of the November 2007 Board Meeting in ratification terms.  That is, Genger argued that the 2005 Written Consents and the minutes of the November 2007 Board Meeting indicate that the Trump Group ratified the 2004 Transfers.  The argument fares no better presented within a ratification analysis.  As explained above, I find this argument unconvincing

33

the June 25 Board Meeting, Genger's theory is that the Trump Group accepted Genger's

vote on behalf of the Sagi and Orly Trusts at the June 25 Board Meeting when the Trans-

Resources stockholders approved the Funding Agreement. Genger argues that the Trump

Group benefited when Genger purportedly voted the Proxies at the June 25 Board

Meeting because approval of the Funding Agreement was a step towards giving them

control of the company. As to the second theory, Genger argues that the Trump Group

acknowledged the Sagi Trust as the transferee of the Sagi Shares, and benefited from

purchasing the Sagi Shares because buying directly from Sagi Genger allowed the Trump

Group to avoid the uncertainty and cost of enforcing their rights under Section 3.2 of the

Stockholders Agreement.

      Genger's ratification argument fails for two primary reasons. First, Genger's

argument that the Trump Group ratified the 2004 Transfers is belied by the fact that the

Trump Group repeatedly stated that the Transfers were made in violation of the

Stockholders Agreement. Eddie Trump and Hirsch made that point at the June 13

Meeting.[114] The fact that the Transfers were made in violation of the Agreement was

---

because, although representatives of the Trump Group received the 2005 Written Consent and
signed its signature pages, and approved the minutes of the November 2007 Board Meeting,
neither document involved the communication of a material amount of information about the
2004 Transfers to properly notify the Trump Group of the Transfers. Before a party can ratify
something, it must first have "sufficient notice or means of knowledge" of the transaction or act
in question. *Papaioanu*, 186 A.2d at 749-50. The 2005 Written Consent and the 2007 Board
Minutes made, at best, an oblique suggestion that some event might have changed the
shareholdings of Trans-Resources' stock. But neither the 2005 Written Consent nor the minutes
of the November 2007 Board Meeting indicate any particular information about the 2004
Transfers, and neither event even occurred in a context where the Trump Group would have been
alerted that something like the Transfers may have taken place. Therefore, Genger's ratification
argument based on those pieces of evidence fails.

[114] *See supra* page 16.

repeated at the June 25 Board Meeting.[115]  The letter the Trump Group sent to Trans-

Resources on August 8, 2008, whereby it expressed its intention to exercise its rights to

buy the 2004 Transfer shares, indicated that the 2004 Transfers were made in violation of

the Stockholders Agreement.[116]  And, the Trump Group's complaint in this matter

claimed that the 2004 Transfers violated the Stockholders Agreement.[117]  Thus, the clear

and consistent message from the Trump Group to Genger at all relevant times was that

the Stockholders Agreement had been violated.  At no point did the Trump Group tell

Genger that it accepted the 2004 Transfers.

Second, Genger has also failed to show that the Trump Group benefited in any

way that suggests ratification.  That is, Genger's argument that the Trump Group ratified

the 2004 Transfers at the June 25 Board Meeting must be rejected because Genger

reneged on the Funding Agreement.  Because the Agreement was never executed, the

Trump Group never received the benefit that was the condition upon which it might

actually not challenge the 2004 Transfers.  Without the Trump Group having received the

benefit that was to be given for relinquishing its claim that the 2004 Transfers were void,

there is no basis to conclude that the Trump Group assented to the 2004 Transfers by

accepting Genger's vote on behalf of the Sagi and Orly Trust in favor of the Funding

Agreement.[118]

---

[115] *See supra* page 19.

[116] *See supra* page 22.

[117] *See* Compl. ¶ 8.

[118] Genger argues that it was enough that the Trump Group "accepted for themselves as
shareholders the pecuniary benefits" of the Funding Agreement, even though they never actually
received those benefits because that deal was never consummated.  Genger's Post-Trial Op. Br.

Indeed, the Funding Agreement proves the point. The Trump Group was willing to consider a resolution of the violation of the Stockholders Agreement that remedied that violation by giving them voting control of Trans-Resources. In so doing, they were willing to accept some risk, based on Arie Genger's assurances that he did not face a problem from Sagi Genger if he voted the disputed shares. If that was so, and if the Trump Group was able to reach an accord that gave them voting control, all the parties affected by the 2004 Transfers would have been on board. But the lynchpin of the deal was the Genger would rectify the violation of the Stockholders Agreement by ensuring that the Trump Group had voting control. He then reneged on his assurances that the Transfers were a problem by claiming that Funding Agreement could not be

---

21. In other words, according to Genger's theory, not only is receiving a benefit an indication of ratification, but a step taken during a negotiation to receive a benefit is also. Tellingly, Genger cites no case law supporting his position.

I reject this argument for the following reason: acceptance of the benefit of a voidable transaction is an *alternative* basis upon which to ground a conclusion that a party ratified the transaction. It is a suitable alternative to an express affirmation of the transaction because acceptance of a benefit is a relatively concrete factual occurrence that inspires confidence in a conclusion that, even though the ratifying party did not expressly enunciate her assent to the voidable transaction, she has nonetheless done some "voluntary and positive act" to indicate that assent. *Frank*, 32 A.2d at 283. Negotiations relating to a potential benefit arising from a contractual breach are a less sure foundation upon which to base a finding of a ratification because, as sophisticated commercial parties know, discussions often range across a number of different options, many of which never come to pass. In other words, negotiations about the potential benefit arising from a voidable transaction are unreliable. For that reason they cannot reasonably be considered to induce the other party's reliance, and therefore there is no basis to conclude that the party who suffered the breach is estopped from enforcing the contract. *See Romer v. Porcelain Products, Inc.*, 2 A.2d 75, 76 (Del. Ch. July 28, 1938) (finding that a complaining stockholder was barred by "the estoppel of his acquiescence"); *see generally Frank*, 32 A.2d at 283 ("The defenses of laches, acquiescence, ratification and estoppel all have some element in common."). That is, until the ratifying party actually takes the benefit, there is no basis for the estoppel. For that additional reason, I reject Genger's claim that the Trump Group ratified the 2004 Transfers at the June 25 Board Meeting.

36

accomplished because Sagi Genger might challenge the substantive fairness of the required stock issuance to the Trump Group.

Of course, the Trump Group received a benefit when it purchased the Sagi Shares from the Sagi Trust and TPR, but that benefit is not an indication of the Trump Group's ratification of the 2004 Transfers. Rather it is consideration of a settlement that resolved the very problem Genger had created. In other words, Genger's argument confuses the benefits that come from compromising claims away in return for a settlement with taking a benefit from a voidable transaction that indicates ratification. A benefit that indicates ratification is one where the ratifying party would be getting something for nothing if she were allowed to enforce the contract.[119] Here, the Trump Group was not attempting to take advantage of the 2004 Transfers in a way that would have allowed it to obtain more than it was entitled to under the Stockholders Agreement.

By entering into the Purchase Agreement, the Trump Group dealt with the problem that Genger's misconduct had caused it. Genger had just reneged on the compromise Funding Agreement that would have rectified his wrongful behavior, in large measure by claiming that Sagi Genger, as an arguably innocent purchaser for value, would cause trouble and upset any deal. The Trumps reasonably suspected that Genger's resistance was also inspired by his desire to retain control. To address this problem, the Trump Group dealt with both the wrongful transferor, TPR, and the purported transferee, the Sagi Trust, so that it could cover all its bases. In doing so, the Trump Group never

---

[119] See, e.g., id. at 278-83 (finding that a stockholder who had benefitted for years from a recapitalization plan "could not accept the benefit offered by the plan and at the same time deny its validity").

37

accepted the legitimacy of the 2004 Transfers; indeed, its consistent position was that the

Transfers were void.[120] But by binding both TPR and the Sagi Trust, it could resolve the

issue of ownership and control over the bloc definitively. That is, under the deal with

TPR and the Sagi Trust, the Trump Group extinguished any claims it had against either

TPR or the Sagi Trust as to the Sagi Shares in return for a majority stake in the

company.[121] Thus, the Trump Group was only attempting to recapture from TPR what it

was owed under the Stockholders Agreement: control over Trans-Resources. Indeed, the

Trump Group was giving up its right to purchase the shares from TPR at 2004 prices,

which likely would have allowed the Trump Group to obtain the Shares for much less

than the approximately $26 million it paid to purchase the Sagi Shares.

The only difference between enforcing its rights under Section 3.2 of the

Stockholders Agreement against TPR and acquiring control directly through the purchase

of the Sagi Shares was speed. That is, negotiating directly with both TPR and the Sagi

Trust had the advantage of providing a quick and certain resolution to the problem, while

enforcing Section 3.2 would likely have involved lengthy litigation. Of course, a speedy

solution has value, but that value is the benefit of any settlement, and is one of the

primary reasons parties settle their disputes. Undermining that incentive cuts against the

public's well-established interest in promoting settlement.[122] At all times, the Trump

---

[120] *See supra* pages 16-25.

[121] *See supra* pages 22-24.

[122] *See Marie Raymond Revocable Trust v. MAT Five LLC*, 980 A.2d 388, 402 (Del. Ch. 2008)
("It is well established that Delaware law favors the voluntary settlement of contested issues.
Settlements are encouraged because they promote judicial economy and because the litigants are
generally in the best position to evaluate the strengths and weaknesses of their case." (internal

2/25/2013 1:27 PM

Group took the position that the 2004 Transfers were void, and mentioned that position to Genger and in litigation. All the Trump did by entering into the Purchase Agreement was ensure that, if the Trump Group were proven wrong in litigation about the 2004 Transfers, it had acquired whatever interests Sagi Genger held and, therefore, he was not a further obstacle. By making a deal directly with the wrongdoer whose shares it was entitled to receive under the Stockholders Agreement, the Trump Group settled TPR's violation of that Agreement by accepting the shares on the terms negotiated, rather than under the price setting process of Section 3.2. In this regard, it is also important to note that the Trump Group was entitled to control of Trans-Resources *as of 2004*, when Genger breached the Stockholders Agreement. Genger's secret transfers had deprived the Trump Group of the benefits of the Stockholders Agreement for four years, and it comes with little grace for Genger now to argue that the Trump Group had to wait even longer or else it would relinquish its rights to those benefits.

Finally, I note that finding that the Trump Group did not ratify the 2004 Transfers leads to, in my view, an equitable result, despite Genger's protestations to the contrary. The problem Genger created by his serious, secretive contractual breach — the insertion of Genger's dysfunctional family into the management of Trans-Resources — was precisely what the Stockholders Agreement was designed to avoid.[123] The Trump Group could only rectify that problem outside of litigation by negotiating with TPR and the Sagi Trust because, by effecting the Transfers, Genger made it impossible to deal with TPR

---

citations omitted)), *aff'd sub nom. Whitson v. Marie Raymond Revocable Trust*, 976 A.2d 172 (Del. 2009).
[123] *See supra* pages 5-8.

39

alone. Genger's argument that the Trump Group ratified the 2004 Transfers because it dealt with Sagi Genger rather than telling him that the Transfers were void is particularly cynical because Genger himself insisted that the Trump Group not challenge the Sagi Trust's ownership of its Trans-Resources shares.[124] Genger was the source of all of these problems, and to find that the Trump Group ratified Genger's behavior would only reward him for his own perfidy.[125] In that regard, Genger's argument that a finding that the Trump Group did not ratify the 2004 Transfers would work an inequity because it would require the unwinding of his divorce settlement is baseless. Genger only has himself to blame for whatever mess his decision to make the 2004 Transfers has caused for his divorce settlement. If Arie Genger's violation of the Stockholders Agreement has deepened the Genger family's internecine feud, that is unfortunate. But it is not the Trump Group's problem, nor is it a basis for an appeal to this court's sense of equity.

2. The Trump Group Holds A Majority Of Trans-Resources' Stock But Is Not Entitled To The Shares Transferred To Arie Genger Personally Or To The Orly Trust

That the purchase of the Sagi Shares was a bargain with TPR and the Sagi Trust that resolved Genger's violation of the Stockholders Agreement also has ramifications for the Trump Group's claims, which include a theory that it has a right to purchase all of the shares TPR transferred in the 2004 Transfers — including the shares transferred to Arie Genger personally and the Orly Trust — under the terms of the Stockholders Agreement. In the Purchase Agreement whereby the Trump Group bought the Sagi Shares, the parties

---

[124] See supra page 20.
[125] See 3 FARNSWORTH ON CONTRACTS § 12.20 (3d ed. 2004) ("A person is not permitted to profit by his own wrong at the expense of another.").

40

included a provision that ensured that, if the 2004 Transfers were found to be improper,

the Agreement would be deemed to have been consummated with TPR, not the Sagi

Trust.[126]  Thus, the Purchase Agreement was a broad settlement that gave the Trump

Group the assurance that it had all its bases covered in regard to the Sagi Shares, and that

it would retain control over Trans-Resources.  The Purchase Agreement also provided in

relation to the shares transferred to Arie Genger personally and the Orly Trust that:

> If at any time following the Closing Date, it is determined that Arie Genger
> is not the record and beneficial owner of the 794.40 shares of Common
> Stock of the Company purportedly transferred to him by TPR in October,
> 2004 and/or that the Orly Genger 1993 Trust is not the record and
> beneficial owner of the 1,102.80 shares of Common Stock of the Company
> purportedly transferred to such Trust by TPR in October, 2004, and that
> TPR is determined to be the record or beneficial owner of any such shares,
> in either or both cases by virtue of the transfer of such shares being deemed
> to have been void or for any other reason (the shares being so affected
> being referred to herein as the "Affected Shares") *then TPR shall promptly
> transfer 64% of the Balance Shares* (as such term is defined in the
> Stockholders Agreement dated March 30, 2001, among TPR, TR Investors,
> Glenclova and the Company (the "Stockholders Agreement")) to TR
> Investors and Glenclova in accordance with the terms of Section 1.6 of the
> Stockholders Agreement whether or not such agreement is then still in
> effect.[127]

Thus, the Purchase Agreement provided that, if the transfer of TPR shares to Arie Genger

and the Orly Trust was found to be improper, then 64% of the Balance Shares[128] would

be transferred from TPR to the Trump Group.

Although the 2004 Transfers violated the terms of the Stockholders Agreement,

which in Section 3.2 provides that the Trump Group can purchase all of TPR's shares, the

---

[126] *See supra* pages 23-24.
[127] Purchase Agreement § 11 (emphasis added).
[128] *See supra* page 10.

41

Trump Group cannot purchase the shares transferred to Arie Genger or the Orly Trust because the Trump Group must abide by the settlement terms to which it agreed in the Purchase Agreement. Because the 2004 Transfers violated the Stockholders Agreement, Arie Genger and the Orly Trust have been found to not be the record or beneficial owners of the shares transferred to them. Per Section 11 of the Purchase Agreement, that entitles the Trump Group to 64% of the Balance Shares, and nothing more beyond the Sagi Shares that it has already bought. As to the Transfer from TPR to Arie Genger himself, the major problem was the lack of notice. Under the Stockholders Agreement, Genger could receive shares from TPR so long as he: (1) gave proper notice to the Trump Group entities; and (2) signed on to the Stockholders Agreement.[129] He did neither and, as a result, cannot exercise any rights under the Stockholders Agreement. Although the Trump Group believes that Genger's violation should require him to transfer all of his Trans-Resources shares to the Trump Group, that remedy is disproportionate. That sort of relief is unnecessary to this control dispute and therefore this § 225 action. Nevertheless, Trans-Resources appears entitled, in any event, to deny Genger the right to vote his shares until he gives formal notice and signs on to the Stockholders Agreement. As to the Orly Trust, it is not before the court, and the shares it was wrongly transferred are also not necessary for the Trump Group to exercise control.. Therefore, I do not issue any ruling as to those shares, because that is unnecessary in this § 225 action.[130]

---

[129] Stockholders Agreement § 2.1.
[130] *See Arbitrium (Cayman Islands) Handels AG v. Johnston*, 1997 WL 589030, at *3 (Del. Ch. Sept. 17, 1997) (discussing that a § 225 proceeding should generally only resolve issues affecting

Obviously, my finding that the shares were wrongly transferred creates problems for Arie

Genger, but that exposure is a result of his own secretive contract breach.

### D. The Trump Group Did Not Take The Sagi Shares Subject To The Proxy

Even if the Trump Group ratified the 2004 Transfers — which it did not — it

would still have voting control over Trans-Resources because it did not take the Sagi

Shares subject to the Proxy. That conclusion is required for two reasons.

First, the language of the Proxy itself does not plainly indicate that the Proxy was

to run with the Shares if they are sold. The explicit terms of the Proxy establish that it

only applies so long as the Sagi Trust owns the Shares. For example, the Proxy states

that the Sagi Trust appoints Genger "to vote as *its* proxy, all shares of common stock of

TRI which are not or hereafter *owned by the Trust*."[131] Also, it permits Genger to vote

only "in the same manner and to the same extent as *the Trust* might, were *the Trust*

present at said meeting."[132] In this regard, the Proxy is different, for example, from the

proxy at issue in *Haft v. Dart Group. Corp.*, which gave the proxy holder the "right to

exercise all rights to vote *the Shares* on all matter on which *they* are entitled to vote."[133]

Here, the Proxy does not give Genger the right to vote on all matters in which the Sagi

Shares are entitled to vote; rather, the Proxy gives Genger the right to vote on all matters

in which the Sagi *Trust* is entitled to vote, suggesting that the Proxy does not extend to

subsequent owners of the Shares.

---

voting control of the corporation); *Bossier v. Connell*, 1986 WL 11534, at *2 (Del. Ch. Oct. 7, 1986) (same).
[131] Proxy at 1 (emphasis added).
[132] *Id.* (emphasis added).
[133] 1997 WL 154049, at *2 n.5 (Del. Ch. Mar. 14, 1997) (emphasis added).

43

Most importantly, the Proxy does not provide in any way for the reservation of voting powers to Genger after such a sale. The only language Genger points to as evidence that the Proxy is meant to run with the Sagi Shares is the phrase that the Proxy "shall continue for the duration of Arie Genger's life."[134] But, in the context of the entire document, that language only means that the Sagi Trust would be bound by the Proxy until Genger died, not that the Proxy would continue to bind later owners if the Shares were transferred. If Genger wanted to keep the Proxy after a transfer, he could have easily inserted clear language — such as "this Proxy shall bind any subsequent transferees" — into the Proxy to that effect. He did not, and thus there is no reason found in the text of the Proxy to indicate that it is binding upon the Trump Group.

Even if the language of the Proxy was ambiguous — which it is not — public policy concerns require that the Proxy be strictly construed. Historically, proxies have been interpreted narrowly and when there is an ambiguity, read as not restricting the right to vote the shares.[135] Recent market developments have only reinforced the utility of the presumption that irrevocable proxies should be narrowly construed. Separating voting control from stock ownership — which can result in "empty voting," where an investor votes stock without having an accompanying economic interest — raises important

---

[134] Proxy at 1.

[135] *See Eliason v. Englehart*, 733 A.2d 944 (Del. 1999) (finding a proxy to be revocable where the words expressly stating that it was an "Irrevocable Proxy" were only found in the authentication to the document, not in the language of the proxy itself); *Freeman v. Fabiniak*, 1985 WL 11583 (Del. Ch. Aug. 15, 1985) (narrowly interpreting the grant of authority made in a proxy instrument and holding that the instrument, which conveyed the right to vote at shareholder meetings, did not authorize other action by consent); *State ex rel. McKaig v. Bd. of Directors of H.F. Dangberg Land & Live Stock Co.*, 110 P.2d 212, 214 (Nev. 1941) ("The instrument granting the vote by proxy will be strictly construed.").

public policy concerns.[136]  For example, the decoupling of shareholder voting rights and economic interest, which is increasingly common and only loosely regulated by the securities laws,[137] is of concern because empty voting can theoretically allow investors with voting power but with an economic interest adverse to the firm to vote in ways that reduce the company's share price.[138]

Our Supreme Court's recent decision in *Crown EMAK Partners, LLC v. Kurz* underscores the importance of those public policy concerns.[139]  There, the Supreme Court affirmed this court's decision that third-party vote buying merits judicial review when it disenfranchises shareholders by affecting the outcome of a vote, and confirmed this court's conclusion that the voting arrangement at issue was proper.[140]  Its reason for so concluding is important: "[w]e hold that the Court of Chancery correctly concluded that there was no improper vote buying, *because the economic interests and the voting interests of the shares remained aligned* since both sets of interests were transferred from Boutros to Kurz by the Purchase Agreement."[141]  In other instances, the temptations for self-dealing that arise when persons with a relatively small economic interest in a

---

[136] *See* Henry T.C. Hu & Bernard Black, *Empty Voting and Hidden (Morphable) Ownership: Taxonomy, Implications, and Reforms*, 61 Bus. Law. 1011, 1014 (2006) ("*Empty Voting*"); *see also* Shaun Martin & Frank Partnoy, *Encumbered Shares*, 2005 U. Ill. L. Rev. 775.
[137] *See* Henry T.C. Hu & Bernard Black, *Equity and Debt Decoupling and Empty Voting II: Importance and Extensions*, 156 U. Pa. L. Rev. 625 (2008)
[138] *See Empty Voting* at 1014.
[139] 992 A.2d 377, 388 (Del. 2010) ("For many years, Delaware decisions have expressed consistent concerns about transactions that create a misalignment between the voting interest and the economic interest of shares.") (citations omitted).
[140] *Id.* at 388-90.
[141] *Id.* at 390 (emphasis added).

corporation has voting control have resulted in serious harm to the corporation and its other investors.[142]

In light of those concerns, a proxy purporting to irrevocably decouple voting rights from economic interest should be strictly construed. Because there is no such clear intent manifested in the Proxy here, prudent public policy requires the conclusion that the Proxy does not survive the sale of the Sagi Shares to the Trump Group.

Second, the Proxy is not irrevocable because it does not satisfy § 609 of the New York Business Corporation Law, which I conclude governs the Letter Agreement and the Proxy attached thereto in view of the lack of any policy conflict between it and the DGCL.[143] Section 609 provides that:

> A proxy which is entitled "irrevocable proxy" and which states that it is irrevocable, is irrevocable when it is held by any of the following or a nominee of any of the following: (1) A pledgee; (2) A person who has purchased or agreed to purchase the shares; (3) A creditor or creditors of the corporation who extend or continue credit to the corporation in consideration of the proxy if the proxy states that it was given in

---

[142] *See, e.g., Hollinger Intern., Inc. v. Black*, 844 A.2d 1022 (Del. Ch. 2004).
[143] Letter Agreement at 2 ("This Letter Agreement shall be governed by the laws of the State of New York without regard to conflicts of law principles."). Given Delaware's respect for contractual freedom, *see Abry Partners V, L.P. v. H&W Acquisition LLC*, 891 A.2d 1032, 1061 (Del. Ch. 2006) (noting that "there is also a strong American tradition of freedom of contract, and that tradition is especially strong in our State" and citing authorities), it respects choice of law agreements. *See J.S. Alberici Const. Co., Inc. v. Mid-W. Conveyor Co., Inc.*, 750 A.2d 518, 520 (Del. 2000) ("Delaware courts will generally honor a contractually-designated choice of law provision so long as the jurisdiction selected bears some material relationship to the transaction."). Although our law relating to the voting of corporate shares is of paramount interest to Delaware, there is no offense to Delaware of allowing parties to subject agreements about irrevocable proxies to a law that places different strictures on such proxies than does Delaware law, absent some reason that those strictures offend a fundamental protection by the DGCL. Section 609 of the N.Y. Bus. Corp. Law does not conflict with any fundamental Delaware corporate law policies or doctrines. Therefore, I find no reason to apply Delaware law in a situation where the parties have made a clear choice of law in favor of a sister state.

46

consideration of such extension or continuation of credit, the amount thereof, and the name of the person extending or continuing credit; (4) A person who has contracted to perform services as an officer of the corporation, if a proxy is required by the contract of employment, if the proxy states that it was given in consideration of such contract of employment, the name of the employee and the period of employment contracted for; (5) A person designated by or under paragraph (a) of section 620.[144]

Genger obviously does not qualify under sub-sections (1), (2), (3), or (4) — that is, he is not a pledgee, creditor, contract officer, or purchaser of the Shares sold to the Sagi Trust. And, he does not qualify under sub-section (5), because § 620 of the New York Business Corporation Law applies to an agreement "between two or more shareholders," and neither Genger nor the Sagi Trust were shareholders of Trans-Resources when the Letter Agreement and the Proxy were executed.[145] Thus, the Proxy is not irrevocable under New York Law, and was revoked by the sale of the Sagi Shares to the Trump Group.[146]

## IV. Conclusion

Genger violated the Stockholders Agreement when he made the 2004 Transfers, and the Trump Group did not ratify those Transfers after the fact. Furthermore, the

---

[144] *N.Y. Bus. Corp. Law* § 609; *cf.* 8 *Del. C.* § 212(e) (providing that a duly executed proxy will be deemed irrevocable where it: (1) states that it is irrevocable; and (2) is coupled with an interest sufficient in law to support an irrevocable power, regardless of whether the interest is in the stock itself or the corporation generally).

[145] *N.Y. Bus. Corp. Law* § 620.

[146] *See Tompers v. Bank of Am.*, 217 N.Y.S. 67, 75 (N.Y. App. Div. 1926) (holding that a revocable proxy terminated "through sale of . . . stock"). Even if the Proxy were irrevocable, Genger would still be bound to vote his shares for a majority of the Trump Group's directors because the Stockholders Agreement provides that "the group owning the greater number of shares as between the TPR Stockholders and the Non-TPR Stockholders shall designate four directors." Stockholders Agreement § 1.2. That is, Genger would have to vote the Proxy for the Trump Group's directors, because the Trump Group is indisputably the owner of a majority of Trans-Resources' shares. Economic ownership trumps, so to speak, any interest Genger has as an owner of the Proxy.

47

Trump Group did not take the Sagi Shares subject to the irrevocable Proxy. Therefore, the Trump Group retains the Sagi Shares,[147] is entitled to 64% of the Balance Shares, and can vote all of the Trans-Resources shares it holds as it wishes. The parties shall submit an implementing order by Wednesday, July 28, 2010.

---

[147] Genger's claim that he is entitled to purchase the Sagi Shares under § 3.2 of the Stockholders Agreement because the Trump Group pledged (a disputed amount of) those Shares to a party from which they obtained purchase financing fails because Genger never signed on to the Stockholders Agreement. Tr. 950 (A. Genger). Until he accepts the burdens of that contract, Genger cannot expect to enjoy its benefits. *See, e.g., Red Clay Educ. Ass'n v. Bd. of Educ. of Red Clay Consol. School Dist.,* 1992 WL 14965, at *10 (Del. Ch. Jan. 16, 1992) (holding that plaintiff could not "accept the benefits of a contract without also bearing the corresponding burdens"). Furthermore, Genger cannot now claim entitlements under a contract that he intentionally flaunted. *See PAMI-LEMB I Inc. v. EMB-NHC, L.L.C.,* 857 A.2d 998, 1014-15 (Del. Ch. 2004) (holding that a party that repudiates or breaches a contract cannot then claim the benefits of that contract).

48

COURT OF CHANCERY
OF THE
STATE OF DELAWARE

LEO E. STRINE, JR.
VICE CHANCELLOR

New Castle County Courthouse
Wilmington, Delaware 19801

Date Submitted: August 4, 2010
Date Decided: August 9, 2010

Thomas J. Allingham II, Esquire
Skadden, Arps, Slate, Meagher & Flom LLP
One Rodney Square
P.O. Box 636
Wilmington, DE 19899-0636

Donald J. Wolfe, Jr., Esquire
Potter Anderson & Corroon LLP
1313 North Market Street
P.O. Box 951
Wilmington, DE 19899-0951

RE:    *TR Investors, LLC, et al. v. Arie Genger*, C.A. No. 3994-VCS

Dear Counsel:

This letter addresses an issue raised by the Trump Group's[1] proposed order

implementing my July 23, 2010 memorandum opinion (the "Opinion"). That proposed

order included language determining that the Trump Group had the right to purchase

shares of Trans-Resources, Inc. ("Trans-Resources") that Arie Genger caused TPR

Investment Associates ("TPR") to transfer in 2004 to the trust for his daughter Orly (the

"Orly Trust") and to himself personally.[2] That language differed from my July 23, 2010

memorandum opinion (the "Opinion"), which only held that the Trump Group was

entitled to the Trans-Resources shares transferred in 2004 to the trust of Genger's son

---

[1] There are four named plaintiffs in this action: TR Investors, LLC, Glenclova Investment Co.,
New TR Equity I, LLC, and New TR Equity II, LLC (collectively, the "Trump Group").
[2] Letter from Thomas J. Allingham II to the Hon. Leo E. Strine, Jr. (July 27, 2010) (enclosing
proposed order).

DG 00164

*TR Investors, LLC, et al. v. Arie Genger*
C.A. No. 3994-VCS
August 9, 2010
Page 2 of 9

Sagi (the "Sagi Trust"). Implicit in the Trump Group's proposed order is the assertion

that I reached an incorrect — or, perhaps more accurately, an incomplete — conclusion

as to the Trump Group's ability to acquire all of Trans-Resources' shares.

A full blow-by-blow account of the complex series of share transfers and contracts

leading up to the issue at hand can be found in the Opinion. It suffices to say here that

my conclusion that the Trump Group was entitled only to the shares transferred to the

Sagi Trust (the "Sagi Shares") was based on the fact that the Trump Group had entered

into a Purchase Agreement in 2008 for the Sagi Shares. That Purchase Agreement

included a provision indicating that, if the share transfer to the Sagi Trust were found

void, then the share purchase would be between the Trump Group and TPR, which Sagi

Genger controlled by 2008. Thus, the Purchase Agreement appeared to be a broad

settlement of the dispute as to the Trans-Resources shares *held by the Sagi Trust*. For

that reason, I found the Trump Group to have appropriately purchased the shares

transferred to the Sagi Trust. But, I declined to address the control of the shares

improperly transferred to the Orly Trust or Genger himself. In so concluding, I was

motivated by the fact that determining whether the Trump Group was entitled to the

shares wrongly transferred to Genger and the Orly Trust was unnecessary to determine

control in this action pursuant to 8 *Del. C.* § 225.[3]

---

[3] My reasoning was as follows:

*TR Investors, LLC, et al. v. Arie Genger*
C.A. No. 3994-VCS
August 9, 2010
Page 3 of 9

What I overlooked was a side letter agreement (the "Letter Agreement") executed

contemporaneously with the Purchase Agreement. In that Letter Agreement, the Trump

Group contracted with TPR to purchase the shares that had purportedly been transferred

to Genger and the Orly Trust in 2004 if it were found that those transfers were improper.[4]

When read in conjunction with the Purchase Agreement, the Letter Agreement indicates

that the Trump Group contracted with TPR not only for the shares transferred to the Sagi

---

Although the 2004 Transfers violated the terms of the Stockholders Agreement, which in Section 3.2 provides that the Trump Group can purchase all of TPR's shares, the Trump Group cannot purchase the shares transferred to Arie Genger or the Orly Trust because the Trump Group must abide by the settlement terms to which it agreed in the Purchase Agreement. Because the 2004 Transfers violated the Stockholders Agreement, Arie Genger and the Orly Trust have been found to not be the record or beneficial owners of the shares transferred to them. Per Section 11 of the Purchase Agreement, that entitles the Trump Group to 64% of the Balance Shares, and nothing more beyond the Sagi Shares that it has already bought. As to the Transfer from TPR to Arie Genger himself, the major problem was the lack of notice. Under the Stockholders Agreement, Genger could receive shares from TPR so long as he: (1) gave proper notice to the Trump Group entities; and (2) signed on to the Stockholders Agreement. He did neither and, as a result, cannot exercise any rights under the Stockholders Agreement. Although the Trump Group believes that Genger's violation should require him to transfer all of his Trans-Resources shares to the Trump Group, that remedy is disproportionate. That sort of relief is unnecessary to this control dispute and therefore this § 225 action. Nevertheless, Trans-Resources appears entitled, in any event, to deny Genger the right to vote his shares until he gives formal notice and signs on to the Stockholders Agreement. As to the Orly Trust, it is not before the court, and the shares it was wrongly transferred are also not necessary for the Trump Group to exercise control. Therefore, I do not issue any ruling as to those shares, because that is unnecessary in this § 225 action. Obviously, my finding that the shares were wrongly transferred creates problems for Arie Genger, but that exposure is a result of his own secretive contract breach.

*TR Investors, LLC v. Genger*, 2010 WL 2901704, at *19 (Del. Ch. July 23, 2010).
[4] JX-226 (Letter Agreement (Aug. 22, 2008)) (the "Letter Agreement").

DG 00166

*TR Investors, LLC, et al. v. Arie Genger*
C.A. No. 3994-VCS
August 9, 2010
Page 4 of 9

Trust, but for all of the shares that TPR originally held before the wrongful transfers were effected.

Thus, it is clear that I issued my original decision in ignorance of a material fact, which is that there was a binding contract between TPR and the Trump Group as to the shares held by Genger and the Orly Trust (the "Arie and Orly Shares"). In addition, in determining that I need not reach the issue of who owned the Arie and Orly Shares, I overlooked at that point in my reasoning the fact that, under the Stockholders Agreement,[5] even though the Trump Group would have the right to appoint four of Trans-Resources' six directors as the holder of the Sagi Shares, the right to designate the remaining two directors could depend on who controls the Arie and Orly Shares.[6] Moreover, I also ignored the reality that Genger himself sought to have this court declare who was the rightful owner of the Arie and Orly Shares.[7] Although the Orly Trust was

---

[5] JX-101 (Stockholders Agreement (2001)) (the "Stockholders Agreement") at § 1.2(c).

[6] Thus, determining whether the Trump Group is entitled to purchase the Arie and Orly Shares is within the scope of a § 225 action. *See Levinhar v. MDG Med., Inc.*, 2009 WL 4253211, at *11 (Del. Ch. Nov. 24, 2009) ("Although Section 225 actions are summary proceedings, claims that bear on the appropriate composition of the board of directors may be brought in connection with a Section 225 action."); *Agranoff v. Miller*, 1999 WL 219650, at *17 (Del. Ch. Apr. 12, 1999), *aff'd*, 1999 WL 636634 (Del. July 28, 1999) (stating that in a § 225 action, "[t]he court can determine any legal or factual issue, the resolution of which can affect the outcome of a corporate election . . . or of any other stockholder vote").

[7] *See* Genger's Answer and Counterclaim, Claim for Relief ¶ (c) (requesting a declaration that "Mr. Genger is the rightful owner of 13.99% of TRI shares and the Orly Trust is the rightful owner of 19.43% of TRI shares, subject to the Irrevocable Proxy granted to Mr. Genger"); Stipulated Pre-Trial Order § III.A ¶ 3 (stating that an issue of fact remaining to be litigated was "[w]hether the October 2004 transfers of [Trans-Resources] common stock to Arie Genger and to the Orly Genger 1993 Trust (the "Orly Trust") and the Sagi Trust can and should be found void without also voiding or reforming the related transactions"). In light of those requests,

*TR Investors, LLC, et al. v. Arie Genger*
C.A. No. 3994-VCS
August 9, 2010
Page 8 of 9

Of course, it may well be that the bargain that TPR — a company that Arie Genger allowed to pass out of his control — struck poses some equitable problem for TPR. That is, it may be that Genger and Orly Genger have claims against TPR and Sagi Genger over how the price paid by the Trump Group for the Arie and Orly Shares was allocated. In that sense, the endgame of this struggle would be fitting if regrettable, in that the Gengers would find themselves fighting over a pot of money and who should get what. To that point, it may be that the Trump Group would be wise to pay the consideration for the Arie and Orly Shares into a court in New York, and allow the Gengers to have at it about who gets the proceeds. The resolution of any such dispute, however, is not relevant to the determination that both the Trump Group and Genger have asked me to make.

That determination is whether the Arie and Orly Shares are validly owned by Arie Genger and the Orly Trust. Again, the answer is no, they are not. The transfers were invalid. That left the Trump Group with the right to purchase the Shares from TPR, and thus TPR and the Trump Group were free to settle that dispute by a new bargain for sale. If the Trump Group exercises its rights under the Letter Agreement, it will own the shares improperly transferred to Genger and the Orly Trust, and neither of those transferees ever had a legitimate interest in the shares. If those transferees have any beef with TPR or Sagi Genger, the transferees are free to file suit against them. But the Trump Group may purchase the Arie and Orly Shares per the terms of the Letter Agreement, may vote those

DG 00168

*TR Investors, LLC, et al. v. Arie Genger*
C.A. No. 3994-VCS
August 9, 2010
Page 9 of 9

Shares, and Trans-Resources need not recognize Genger or the Orly Trust as

stockholders.

In revising my earlier decision to address this issue, I therefore correct my failure

to focus as closely as I should have on the control consequences of the transfers to

Genger and the Orly Trust, the primacy that should be given to the contractual remedy

provision, the bargain-destroying consequences of not according the Trump Group the

full benefit of the Stockholders Agreement, and the inequity of subjecting the Trump

Group to attempts by Genger to relitigate issues that he sought to litigate in this court.

For all these reasons, I treat the proposed order submission of the Trump Group as

a motion for reargument, a motion I hereby grant, and will issue a final judgment in favor

of the Trump Group in conformity with this decision.

Very truly yours,

*/s/ Leo E. Strine, Jr.*

Vice Chancellor

LESJr/eb

DG 00169