# Exhibit 9

FILED: NEW YORK COUNTY CLERK 09/20/2011

INDEX NO. 651089/2010
NYSCEF DOC. NO. 112                                                        RECEIVED NYSCEF: 09/20/2011

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

ARIE GENGER and ORLY GENGER, in her        | INDEX NO.  651089/2010
individual capacity and on behalf of the ORLY
GENGER 1993 Trust,

        Plaintiffs,                                       **THIRD AMENDED AND**
                                                                   **SUPPLEMENTAL COMPLAINT**

      -against-

SAGI GENGER, TPR INVESTMENT
ASSOCIATES, INC., DALIA GENGER, THE
SAGI GENGER 1993 TRUST, ROCHELLE
FANG, Individually and as Trustee of THE
SAGI GENGER 1993 TRUST, GLENCLOVA
INVESTMENT COMPANY, TR
INVESTORS, LLC, NEW TR EQUITY I,
LLC, NEW TR EQUITY II, LLC, JULES
TRUMP, EDDIE TRUMP, MARK HIRSCH,
and TRANS-RESOURCES, INC.

        Defendants.

      Plaintiffs Arie Genger and Orly Genger, in her individual capacity and on behalf of the

Orly Genger 1993 Trust, by their respective attorneys, for their Third Amended and

Supplemental Complaint against the defendants in this action allege, on information and belief,

as follows:

**I.    THE PARTIES**

    1.    Plaintiff Arie Genger ("Arie") is a resident of the State of Florida, and the father

of the Plaintiff Orly Genger ("Orly") and the defendant Sagi Genger ("Sagi").

    2.    Plaintiff Orly Genger is the adult daughter of Arie Genger and Dalia Genger, and

the beneficiary of the Orly Trust, and a resident of the State of New York and is the beneficiary

of the Orly Genger 1993 Trust (the "Orly Trust").  She brings this action on behalf of the Orly

Trust as the beneficiary of the Orly Trust to protect her interests thereunder.

3.     Defendant Sagi Genger ("Sagi") is the estranged adult son of plaintiff Arie Genger and Defendant Dalia Genger, and is a resident of the City, County, and State of New York, and maintains an office at 1211 Park Avenue, New York, NY 10128.

4.     Defendant TPR Investment Associates, Inc. ("TPR") is a Delaware Corporation with a principal office located at 1211 Park Avenue, New York, NY 10128.

5.     At all relevant times to this Complaint Sagi is the President of defendant TPR and continues to be a controlling member of TPR's Board of Directors.

6.     Defendant Dalia Genger ("Dalia") is the mother of Sagi Genger and Orly Genger and the former wife of the Plaintiff Arie Genger, and is a resident of the City, County and State of New York.  Dalia is the putative trustee of the Orly Trust and at relevant times to this Complaint is believed to have been a director of TPR.

7.     Defendant The Sagi Genger 1993 Trust ("Sagi Trust") is a trust entity, and the beneficiary of the Sagi Trust is Sagi.

8.     Defendant Rochelle Fang ("Fang") is the mother-in-law of the Defendant Sagi Genger and was the Trustee of the Sagi Trust during relevant periods in 2008, and is a resident of the City, County and State of New York.

9.     Defendant Glenclova Investment Company ("Glenclova") is a Cayman Islands company with a business address in the Bahamas, and an owner of common stock of Trans-Resources, Inc. ("TRI").  On information and belief Glenclova is in turn owned by other off-shore companies directly or indirectly controlled by the Trump Parties as defined below.

10.     Defendant TR Investors, LLC ("TR Investors") is a New Jersey Limited Liability Company and an owner of common stock of TRI.  On information and belief TR Investors is in

2

turn owned by other off-shore companies directly or indirectly controlled by the Trump Parties as defined below.

11.     Together Glenclova and TR Investors are controlled by the Trump Group of South Africa and are collectively referred to herein as the "Trump Group".

12.     Defendant New TR Equity I, LLC ("New TR I") is a Delaware Limited Liability Company, controlled by Jules Trump and/or Eddie Trump.

13.     Defendant New TR Equity II, LLC ("New TR II") is a Delaware Limited Liability Company, controlled by Jules Trump and/or Eddie Trump.

14.     Defendant Jules Trump is a resident of Florida, and an officer and director of Glenclova.

15.     Defendant Eddie Trump is a resident of Florida, and an officer and director of Glenclova.

16.     Defendant Mark Hirsch is a resident of New York, and an officer and director of Glenclova.

17.     The Trump Group, New TR I . New TR II, Jules Trump, Eddie Trump and Mark Hirsch are referred to herein as the "Trump Parties."

18.     Defendant Trans-Resources, Inc. ("TRI") is a Delaware Corporation which is doing business in the City, County and State of New York, with its principal place of business located in the City, County and State of New York.

19.     The claims set forth in this Complaint arise from the conduct of each of the defendants, or their respective agents and co-conspirators, who committed one or more (i) tortious acts within the state, (ii) tortious acts without New York State causing injury to the

3

Plaintiffs or their property within New York State, and (iii) breaches of contract or fiduciary duty arising from contractual obligations, transactions and fiduciary obligations performed or to be performed in New York State.

## II.   NATURE OF THE CASE

20.   In this case, Plaintiffs Arie and Orly, in her individual capacity and on behalf of the Orly Trust, are seeking declaratory, injunctive, and other equitable relief, as well as additional compensatory damages in an amount yet to be determined arising from, inter alia, the loss of Arie's voting control of TRI and the tortious conduct of the defendants as set forth herein, in connection with the Trump Parties' campaign to take over and dilute the value of plaintiffs' interests in TRI, a company founded by Arie nearly three decades ago, including the defendants' wrongful, concerted efforts to strip Arie of his ownership and control of 52.85% of the shares of TRI's common stock, including the Orly Trust's interest in a portion of this TRI stock, and to oust Arie from his management control of TRI—all in an audacious series of breaches of contractual, fiduciary and legal obligations giving rise to each of the causes of action alleged in this Complaint.

## III.   FACTS RELEVANT TO ALL CLAIMS

### A.   Background

21.   The Plaintiff Arie is the founder and former Chairman of TRI, a private corporation which, through its subsidiaries, is a leading distributor and manufacturer of agricultural fertilizer worldwide.

22.   Arie founded TRI in 1985. Until 2001, TRI was wholly-owned by TPR Investment Associates, Inc. ("TPR"), a Genger family corporation established by Arie.

4

23. Prior to October 30, 2004, TPR was controlled by Plaintiff Arie who owned 51% of TPR stock.

24. Prior to October 30, 2004, Arie maintained majority control of TRI through his 51% majority ownership and control of TPR.

25. The minority 49% interest in TPR, prior to October 30, 2004, was owned by D&K, Ltd. Partnership ("D&K"), also a Genger family company, which was in turn owned by Arie's wife, Dalia, (4%), the Sagi Trust and the Orly Trust (48% each).

26. The Sagi and Orly Trusts were established in 1993 by Arie as part of a family estate plan.

27. In 2001, defendants Glenclova and TR Investors became minority shareholders of TRI, acquiring approximately 47.15% of TRI common stock.

28. As a result of the Trump Group acquiring 47.15% of TRI common stock, TPR became the owner of 52.85% of TRI stock with Arie maintaining a 51% controlling interest in TPR. Through his 51% ownership of TPR, Arie maintained control of a majority 52.85% interest in TRI, the company he founded.

29. When the Trump Group became a minority shareholder of TRI, the Trump Group and TPR entered into the 2001 TRI Stockholders Agreement, dated March 30, 2001 (the "2001 TRI Stockholders Agreement") which, among other things, was intended to ensure that Arie (through his controlling interest in TPR) would continue to control the majority voting rights of TRI shares for the duration of his life.

30.     The 2001 TRI Stockholders Agreement specifically recognized that Arie was the 51% owner of TPR and that Dalia and the Orly Trust and the Sagi Trust through the D&K Limited Partnership together owned 49% of TPR.

31.     The 2001 TRI Stockholders Agreement contains certain provisions restricting the transfer of TPR's majority interest in TRI to someone other than Arie during his lifetime, except under certain enumerated conditions intended to ensure that Arie, as the majority shareholder of TPR, would maintain control over 52.85% of TRI shares during his life.  The 2001 Stockholders Agreement specifically provides that exclusive jurisdiction over disputes relating to this 2001 TRI Stockholders Agreement shall be in Federal courts or New York State courts sitting in the City, State, and County of New York.  The full terms and conditions of the 2001 TRI Stockholders Agreement are incorporated herein by reference.

**B.      The Genger Divorce and Court-Ordered Stipulation of Settlement**

32.     In 2002, Dalia and Arie became embroiled in a bitter divorce action venued in the Supreme Court, New York County, entitled *Dalia Genger v. Arie Genger*, Index No. 302436-2002 ("Genger Divorce Action").

33.     In October of 2004, Dalia and Arie agreed to a Stipulation of Settlement, which was incorporated into a Judgment of Divorce in the Genger Divorce Action on January 7, 2005 ("Stipulation of Settlement"), attached hereto as Exhibit A.  This Court-Ordered Stipulation of Settlement, among other things equitably distributed between Arie and Dalia various marital assets, including the ownership interests in the family holding company TPR which then held 52.85% of TRI common stock which was controlled by Arie through his control of TPR. Pursuant to the terms of the Judgment of Divorce, the New York State Supreme Court retained

6

jurisdiction over the parties with respect to the enforcement of the terms of the Stipulation of Settlement.

34.     Pursuant to the terms of the Stipulation of Settlement and certain 2004 TPR Transaction Documents (described below) implementing the Stipulation of Settlement, it was agreed by and among Arie, Dalia, Sagi, Orly, the Orly Trust, and the Sagi Trust that as part of the settlement of the Genger Divorce Action, that Arie would transfer his 51% interest in the TPR marital asset to Dalia, in consideration of TPR concurrently divesting itself of its 52.85% majority interest in TRI on the following terms and conditions, which were all part of a single integrated transaction:

    i.    The defendant Sagi would become the President of TPR;

    ii.    TPR, by Sagi as President of TPR, would transfer to the plaintiff Arie direct ownership of 794.40 shares of TRI common stock representing 13.99468% of the common stock of TRI;

    iii.    TPR, by Sagi as President of TPR, would transfer to each of the Sagi Trust and Orly Trust, record ownership of 1,102.80 shares (or 19.42766 % each) of TRI stock, subject to and on the further conditions that:

        (a) the Sagi Trust and the Orly Trust would each execute and deliver a 2004 Voting Trust Agreement to Arie which provides further that:

            (i) the Sagi Trust and the Orly Trust would immediately execute and deliver to Arie an irrevocable voting proxy ("Putative Irrevocable Proxies") intended to ensure that Arie would maintain voting control over the Sagi Trust TRI shares and the Orly Trust TRI Shares for the duration of Arie's life, and

            (ii) in the event that the Putative Irrevocable Proxies granted by the Sagi Trust and the Orly Trust to Arie were ever held to be invalid then:

                (1) a Back-up Voting Trust Agreement would be entered into promptly between each of the Sagi and Orly Trusts and Arie which:

> **(a) grants Arie the right to vote the Orly Trust and Sagi Trust TRI shares for the duration of Arie's life,**
>
> (b) provides that Arie is entitled to keep possession of the Sagi Trust and Orly Trust TRI Shares pursuant to a Voting Trust Agreement in a form attached to the 2004 Voting Trust Agreement, and
>
> (c) provides that the Orly and Sagi Trust TRI shares would not be sold without a prior Court order,

and the 2004 Voting Trust Agreement further provides that:

> **(2) pending the execution of the Back-up Voting Trust Agreement, the Orly and Sagi Trusts would be obligated to vote the Orly Trust and Sagi Trust Shares as directed by Arie during his lifetime.**

Id.(emphasis added)

35.     The Court-Ordered Stipulation of Settlement in the Genger Divorce Action is attached as Exhibit A hereto.

36.     Article II of the Stipulation of Settlement in the Divorce Action, entitled "Distribution of Assets," specifically provides, in pertinent part, as follows:

> [2. (a)] "(ii) [Dalia] shall receive . . . sole ownership of the husband's [Arie's] two hundred and fifty (250) shares of common stock of TPR Investment Associates, Inc. ("TPR"), . . . which represents fifty-one percent (51%) of the issued and outstanding shares of common stock of TPR (exclusive of the 1.96% ownership of TPR, which the wife [Dalia] owns indirectly through her general partnership interests in D&K [partnership].
>
> *  *  *
>
> "9. (a) TPR owns 3,000 shares of stock in Trans-Resources, Inc. ("TRI Stock") . . . . Concurrently with the execution of this agreement, the TRI Stock shall be distributed as follows:
>
> "(i) The husband [Arie], shall receive 794.40 shares of the TRI Stock, representing 13.99468% of the common stock of TRI;

8

(ii) Each of Sagi Genger and Orly Genger, will receive in trust 1,102.80 shares of TRI Stock representing 19.62766% of the common stock of TRI for each of Sagi and Orly, and such trusts will simultaneously therewith execute and deliver irrevocable proxies to the husband for all of the TRI Stock owned by the trusts; and

"(c)   Concurrently with the execution of this Agreement, each of the Husband and Wife will execute and deliver or cause TPR to execute and deliver (i) all documents reasonably necessary to effect the transfers required by subparagraph (a) of this Section 9, and (ii) duly executed stock powers to transfer the shares as required by subparagraph (a) of this Section 9.

\* \* \*

"(e) Following the foregoing transfers of the TRI Stock, the wife [Dalia] will have no ownership interest in TRI."

(Stipulation of Settlement,  Exhibit A hereto, Article II, paragraph 2(a) (ii), p.5, and paragraph 9 (a), (c) & (e) at pp. 13, 14) (emphasis added).

37.   The Stipulation of Settlement also provides that this TPR/TRI transaction was a fundamental part of the Stipulation of Settlement, and specifically states in pertinent part, in bold and capital letter type:

"A FUNDAMENTAL PART OF THIS AGREEMENT IS THE HUSBAND'S RELINQUISHMENT OF HIS OWNERSHIP OF SHARES OF COMMON STOCK IN TPR, AND THE TRANSFER OF SUCH OWNERSHIP TO THE WIFE."

Stipulation of Settlement,  Exhibit A hereto, Article 3, para. 1.

38.   The Stipulation of Settlement also included an express reformation clause which provides that in the event that any term of the Stipulation of Settlement were to be voided by a court of competent jurisdiction for any reason, then either Dalia or Arie would be entitled to seek court-ordered reformation of the Stipulation of Settlement in a New York Court to give effect to

9

the intent of the parties to the fullest extent permitted by the laws of the State of New York.  This

reformation clause of the Stipulation of Settlement provides:

### "ARTICLE XVI

### POSSIBLE INVALIDITY

"If any provision of this [Stipulation of Settlement], for any reason whatsoever, be declared . . . unenforceable by any Court of competent jurisdiction . . . the remainder of this Agreement and the application of such provision to any person or situations, other than those as to which such provision may have been invalid or unenforceable shall not be affected thereby and shall continue to be enforced to the fullest extent that such severance of the invalid portions is possible without vitiating the original intent and purposes and economic intentions of the parties (the "Original Intent"), as herein set forth.... **In the event a provision is superseded under this [Stipulation of Settlement], either party may seek reformation of the affected provision in any court of competent jurisdiction which shall be empowered to revise the provision to reflect the parties' Original Intent to the greatest extent possible, consistent with New York law. It is the intention of the parties hereto that this provision may be enforced in equity in addition to, and not to the exclusion of, any other remedies which may be available to the parties."**

(Stipulation of Settlement, ARTICLE XVI, Exhibit A at pages 47-48) (emphasis added)).

    39.   Dalia was represented by separate, independent legal counsel in connection with

the negotiation and her execution of the Stipulation of Settlement.

    40.   Dalia, through her counsel, received a complete copy of the 2001 TRI

Stockholders Agreement prior to the execution of the Stipulation of Settlement.

    41.   Sagi had full knowledge of the terms of the Stipulation of Settlement prior to, and

at the time that it was negotiated and executed, and was named as a fiduciary with regard to

certain marital property distributed or to be distributed under the Stipulation of Settlement.

42. Sagi and his own counsel were provided with a full and complete copy of the 2001 TRI Stockholders Agreement prior to the execution of the Stipulation of Settlement.

43. Edward Klimmerman, a partner at Sonnenschein, Nath & Rosenthal, LLP (now known as SNR Denton), represented Arie in the Genger Divorce Action, had full knowledge of the negotiation and terms of the Stipulation of Settlement at the time the Stipulation of Settlement was executed. Mr. Klimmerman signed the Stipulation of Settlement as a witness. Mr. Klimmerman was also legal counsel for TRI and TPR at the time the Stipulation of Settlement was executed.

44. As counsel for TRI and TPR, Mr. Klimmerman participated in the actual drafting of the 2001 TRI Stockholders Agreement. As Arie's counsel in the Genger Divorce Action, he did not advise Arie that anything in the Stipulation of Settlement violated any term of the 2001 TRI Stockholders Agreement between TPR and the Trump Group.

45. Arie reasonably believed that the transfers set forth in the 2004 Transfer Documents and Court-Ordered Stipulation of Settlement were valid and enforceable.

46. Dalia and her legal representatives reasonably believed that the 2004 Transfers provided for in the Stipulation of Settlement were valid and enforceable at the time Dalia entered into the Stipulation of Settlement.

47. Defendant Jules Trump, a representative of the Trump Group was aware of the Genger Divorce Action, and prior to the execution of the Stipulation of Settlement testified as a witness in the Genger Divorce Action in connection with the ownership of TRI shares.

11

**C.**   <u>The 2004 TPR Transfer of TRI Shares Pursuant to the Stipulation of Settlement</u>

48.   To implement the TPR and TRI share transfer provisions in the Stipulation of Settlement, Arie, the Sagi Trust, the Orly Trust and TPR, concurrently with the execution of the Stipulation of Settlement, entered into the following "2004 TPR Transaction Documents" in accordance with the express terms and intent set forth in the Stipulation of Settlement:

(i) a 2004 TPR Agreement to Transfer TRI Shares, dated October 29, 2004 (the "2004 TPR Transfer Agreement", attached hereto as Exhibit B); and

(ii) a 2004 Voting Trust Agreement, dated October 29, 2004 (the "2004 Voting Trust Agreement", attached hereto as Exhibit C), which attached:

(a) Executed Documents referred to as Putative Irrevocable Proxies, dated October 29, 2004, executed by the Sagi Trust and the Orly Trust ("Putative Irrevocable Proxies", attached hereto as Exhibit D) which by their specific terms purported to grant to the Plaintiff Arie the right to control and vote the Sagi Trust TRI shares and the Orly Trust TRI shares for the duration of his life, and

(b) a form Back-up Voting Trust Agreements ("Back up Voting Trust Agreements", attached here to Exhibit E), which were to be executed promptly by the Sagi Trust and the Orly Trust in the event that the Putative Irrevocable Proxies granted by the Sagi Trust and the Orly Trust to Arie were ever held to be invalid, and provided that:

(i) the Sagi Trust and the Orly Trust were required to vote the TRI shares in accordance with Arie's directions pending the execution of the Back-up Voting Trust Agreements in accordance with the express intent in the Stipulation of Settlement that Arie was to maintain voting control of the Sagi Trust and Orly Trust TRI shares for the duration of his life;

(ii) Arie would be entitled to keep possession of the Sagi Trust and Orly Trust TRI Shares pursuant to a Voting Trust Agreement in the form attached to the 2004 Voting Trust Agreement; and

12

> (iii) the Orly and Sagi Trust TRI shares would not be sold without a prior Court Order.

49.      Each of the 2004 Transaction Documents confirm the stated intention of the parties to the Stipulation of Settlement and 2004 Transaction Documents that Arie, for the duration of his life, would continue to have voting control over 52.85% of the outstanding shares of TRI that were previously owned by TPR and controlled in turn by Arie through his 51% ownership of TPR.

**D.**      **The 2004 TPR Transfer Agreement-Exhibit 8**

50.      The 2004 Transfer Agreement executed by Sagi himself on behalf of TPR, provides :

> "This letter will set forth our agreement pursuant to which you will purchase the 3,000 shares of common stock ("the Shares") of Trans-Resources, Inc. ("TRI") owned by TPR Investment Associates, Inc. ("TPR"). TPR hereby sells, transfers and conveys the Shares to you as follows:
>
> (i)      794.40 shares to Arie Genger;
>
> (ii)     1,102.80 Shares to the Sagi Genger 1993 Trust, and
>
> (iii)    1,102.80 Shares to the Orly Genger 1993 Trust.
>
> *   *   *
>
> "The Shares represent 52.85% of the issued and outstanding shares of TRI. The Shares are being transferred hereunder free and clear of any liens, claims or encumbrances and such transfer does not violate the Certificate of Incorporation of TPR or any agreement to which TPR is subject.
>
> "The trustees of the Sagi Genger 1993 Trust and of the Orly Genger 1993 Trust ("Trusts") have agreed to execute on behalf of the Trusts (i) an Irrevocable Proxy to appoint Arie Genger to vote the Shares owned by the Trusts and (ii) a voting trust letter agreement, copies of which are annexed hereto."

13

> "In case, at any time hereinafter, any further action is
> necessary or desirable to carry out the purposes of this Letter
> Agreement, each of the parties hereto shall take or cause to be
> taken all necessary action, including, without limitation, the
> execution and delivery of such further instruments and documents
> which may be reasonably requested by any party for such purpose
> or otherwise to complete or perfect the transactions
> contemplated hereby."

> This Letter Agreement shall be governed by the laws of the State
> of New York without regard to conflicts of law principles.

(2004 TPR Transfer Agreement, Exhibit B) (emphasis added)

### E.  The 2004 Voting Trust Agreements (Exhibit C hereto)

51.    In accordance with the terms of the Stipulation of Settlement (Exhibit A) and the

2004 TPR Transfer Agreement (Exhibit B), Arie and the Sagi and Orly Trusts, respectively,

entered into identical 2004 Voting Trust Letter Agreements in favor of Arie (Exhibit C) which

provide as follows:

> "In connection with the transfer to the [Sagi and Orly Trusts] of
> 1,102.80 shares [each] of common stock (the "Shares") of Trans-
> Resources, Inc. (TRI) pursuant to the terms and conditions of
> the Stipulation of Settlement of even date herewith, the [Sagi
> and Orly] trust is [each] granting to Arie Genger an irrevocable
> proxy ("the Proxy") for the shares, a copy of which is annexed
> hereto.

(Exhibit C)(emphasis added).

### F.  The 2004 Putative Irrevocable Proxies Executed By The Sagi and Orly Trusts (Exhibit D. hereto)

52.    In accordance with the 2004 TPR Transfer Agreement, the Stipulation of

Settlement, and the 2004 Voting Trust Agreement, the Sagi and Orly Trusts executed two

identical Putative Irrevocable Proxies, each of which states, in relevant part, that:

> "[The Sagi Trust and Orly Trust, each respectively], ("the Trust")
> being the current record and beneficial owner of 1,102.80 shares of
> common stock of [TRI] does hereby constitute and appoint Arie

14

> Genger, Chairman of the Board, Chief Executive Officer, and owner of approximately fourteen percent (14%) of the shares of common stock of TRI to vote as its proxy, all shares of common stock of TRI which are now or hereafter owned by the Trust, at any and all meetings of the stockholders of TRI, regular or special, or by consent in lieu of meeting or any adjournments thereof in the same manner and to the same extent that the Trust might were the Trust present at said meeting (or executing such consent), upon any issue or proposal which may be brought before such meeting or by such consent.
>
> "This Irrevocable Proxy shall be deemed coupled with an interest and be irrevocable from the date hereof, and shall continue for the duration of Arie Genger's life."

(Exhibit D)(emphasis added).

53.    The 2004 Voting Trust Agreement further provides that in the event that the Putative Irrevocable Proxies were ever declared invalid, the Orly and Sagi Trusts would be obligated to enter into a Back-up Voting Trust Agreement (Exhibit E) to assure that Arie would maintain voting control over a majority of TRI shares for the duration of his life.  This part of the 2004 Voting Trust Agreement, executed by the Sagi Trust and the Orly Trust, provides:

> "In the event that for any reason the Proxy is declared invalid and is no longer in effect, the Trust agrees, as promptly as practicable, to enter into a Voting Trust Agreement (the "Voting Agreement") with Arie Genger as the voting trustee, which shall be substantially in the form annexed hereto. During the time the Proxy is not in effect and prior to the time the Voting Agreement is entered into, the Sagi Trust agrees to vote the shares as directed in writing by Arie Genger."

(2004 Voting Trust Agreement, Exhibit C ) (emphasis added).

G.    Back-Up Voting Trust Agreement – (Exhibit E hereto)

54.    The Backup Voting Trust Agreement, which springs into effect upon the Putative Irrevocable Proxies being voided, provides:

15

> "The Trust Securities [the Sagi and Orly TRI Shares subject to the Voting Trust] shall be held by the Trustee [Arie Genger] for the purposes of and in accordance with this Agreement **and none of the Trust Securities shall be sold or otherwise disposed of by the Trustee except as herein expressly provided or in accordance with a final order of any Court or administrative agency with jurisdiction thereover.**"

*   *   *

> "This Agreement shall continue in effect for the duration of Arie Genger's Life"

Exhibit E. (emphasis added)

55.     In order to ensure that he maintained absolute control of the TRI shares for the duration of his life, Arie never delivered physical copies of TPR's TRI shares to the Orly or Sagi Trusts.

### H.    The Intent of the Parties

56.     The written 2004 Transaction Documents and the Stipulation of Settlement reflect the stated intention of all the parties to these collective documents, to wit, that in order to resolve the contested Genger Divorce Action, Arie agreed as part of the distribution of marital assets to transfer his 51% interest in the family holding company, TPR, to Dalia, in exchange for Dalia agreeing that TPR would concurrently divest itself of its 52.85% interest in the common stock of TRI by distributing TPR's 52.85% majority interest in TRI to Arie (14%), the Sagi Trust (19.425%), and the Orly Trust (19.425%) each, on the express further condition that Arie maintain voting rights for the Sagi Trust and Orly Trust TRI shares for the duration of his life.

57.     Arie, Dalia, Sagi and Orly each reasonably believed that the 2004 Transfers provided for in the Stipulation of Settlement were valid and enforceable.

16

58.     Arie, Dalia, Sagi and Orly each reasonably believed that the Putative Irrevocable Proxies and Voting Trust Agreements were valid and assured that Arie would be able to maintain 58.85% voting control for the duration of his life.

59.     Accordingly, the concurrently executed integrated 2004 Transfer Documents were intended to implement the terms of the Stipulation of Settlement which provided expressly that Arie was to retain his 52.85% voting control over TRI and concomitantly continue to control the management and Board of TRI during his lifetime.

60.     It was also the parties' stated intention, and all parties reasonably believed, that the terms of the court-ordered Stipulation of Settlement with Dalia would not violate the terms or intent of the 2001 TRI Stockholders Agreement because Arie would still control what had been TPR's voting majority of TRI shares.

61.     The Genger Divorce Action was not concealed from TRI, the Trump Group, or the Trump Parties at any time.

62.     The 2004 transfers of TRI shares to Arie, the Sagi Trust and the Orly Trust were reflected in the books and records of TRI.

63.     Prior to 2008, Jules Trump, and Mark Hirsch, each individually and on behalf of the Trump Group between 2004 and 2008 had access to the books and records of TRI.

64.     Between 2004 and 2008, as a Director of TRI, Jules Trump and Mark Hirsch, each had a fiduciary duty and legal duty of reasonable care to the record and beneficial owners, including TPR and TRI, to know the identity of all TRI shareholders of record as set forth in the books and records of TRI- a close corporation.

17

65.     As a Directors of TRI, Jules Trump, and Mark Hirsch, each individually and on behalf of TRI, had a fiduciary and legal duty of reasonable care to TPR and Arie to read all corporate Board minutes and other documents presented to the Directors and/or shareholders of TRI, in their entirety, prior to signing such documents.

66.     Prior to 2008, the books and records of TRI show that:

(i) Arie was record owner of 794.40 shares of TRI, representing 13.9946% of the common stock of TRI;

(ii) the Sagi Trust was the record owner of 1102.80 TRI shares, representing 19.42766% of the common stock of TRI; and

(iii) the Orly Trust was the record owner of 1102.80 TRI shares, representing 19.42766% of the common stock of TRI.

67.     Prior to 2008, the 2004 Transfers and the record ownership of TRI shares was known by:

(i) the officers and directors of TRI, in addition to Arie

(ii) TRI's legal counsel; and

(iii) TRI's Certified Public Accountant.

68.     Jules Trump, and Mark Hirsch, each individually and on behalf of the Trump Group executed corporate TRI documents as Director and/or on behalf of a shareholder of TRI which indicated that Arie, the Orly Trust and the Sagi Trust were the record owners of TRI shares.

69.     The terms of the Stipulation of Settlement relating to the distribution of TPR and TRI shares as marital assets in connection with the Genger Divorce Action were not in any way or at any time concealed from TRI, the Trump Group, or the Trump Parties.

70.     Prior to 2008, the Trump Group, through Jules Trump, who testified in the Genger Divorce Action, and otherwise knew, and was aware that the Genger Divorce Action could involve in some way the equitable distribution of TPR shares owned by Arie as part of the divorce action.

71.     Prior to 2008, the Trump Group, through Jules Trump, who testified in the Genger Divorce Action, knew, and was aware that the Genger Divorce Action involved in some way the value of TPR's ownership of TRI shares.

72.     Prior to 2008, the Trump Group, through Jules Trump, who testified in the Genger Divorce Action, knew, and was aware that the Genger Divorce Action involved in some way Arie's management and control over TRI, the company that he had founded and managed since 1985.

73.     Prior to 2008, Jules Trump knew that ownership of TPR, as a marital asset which owned 52.85% of TRI shares, was a major asset and was the subject of a claim by Dalia for equitable distribution in the Genger Divorce Action.

74.     Prior to 2008, the Trump Group, through Jules Trump, who testified in the Genger Divorce Action, knew, and was aware that the Genger Divorce Action would involve in some way the equitable distribution of TPR assets, including Arie's 51% majority ownership of TPR.

75.     Prior to 2008, the Trump Group, through Jules Trump who testified in the Genger Divorce Action, and otherwise knew, and was aware that the Genger Divorce Action could

involve D&K Limited Partnership, which was identified in the 2001 TRI Stockholders Agreement as an owner of 49% of TPR (the majority Shareholder of TRI) and further disclosed that in turn this 49% minority ownership of TPR by D&K was owned by Arie's wife Dalia (4%) the Sagi Trust (48%) and the Orly Trust (48%), and that these Trust interests could be effected by the equitable distribution of TPR assets as part of the Genger Divorce Action.

76.     The Trump Group knew that the 2001 TRI Stockholders Agreement did not contain an express provision setting forth the rights and obligations of TPR, Arie or the Trump Group in the event of a contested divorce involving Arie's ownership of TPR shares as marital property, including TPR's ownership of TRI shares under New York's equitable distribution laws or otherwise.

77.     Prior to 2008, Arie had reason to believe that The Trump Group, through Jules Trump, and otherwise, had notice of the 2004 Transfers.

78.     Prior to 2008, Arie had reason to believe that The Trump Group had notice of the 2004 Transfers which were reflected in TRI corporate documents.

79.     Prior to 2008, the Trump Group and Jules Trump, in particular, had knowledge of facts in 2002-2004 including, but not limited, to the fact that Arie was involved in a bitter contested divorce, and that the issue of Arie's ownership interests in TRI, through TPR or otherwise, was an issue raised in the Genger Divorce Action.

80.     Between 2004 and 2008, Directors of TRI, its legal counsel, Secretary, as well as its Controller, knew of the 2004 transfers.

20

81.     Between 2004 and 2008, TRI, under Arie's management, reported the new company ownership resulting from the 2004 transfers to its lead bank, the IRS, and TRI's insurance company.

82.     Between October 2004 and August of 2008 nothing prevented the Trump Group, Jules Trump, TRI or its officers or directors, or any of them, from making any inquiry whatsoever of Arie, Orly, TPR, TRI, TRI's general counsel, Dalia, Sagi, the Sagi Trust, the Orly Trust, or D&K, concerning the effect, if any, that the Genger Divorce Action, or any judgment or resolution of the Genger Divorce Action had, would or could have, on (i) the ownership of TPR, (ii) Arie's ownership of a majority interest of TPR, (iii) TPR's ownership of TRI, (iv) Dalia's interest in D&K minority ownership of TRI, or the rights of the Sagi Trust or the Orly Trust as limited partners of D&K which owned approximately 49% each of TPR -- which ownership was acknowledged by the Trump Group in the 2001 TRI Stockholders Agreement.

83.     Between October 2004 and August of 2008 nothing prevented the Trump Group, Jules Trump, TRI or its officers or directors, or any of them, from making any inquiry whatsoever of Arie, Orly, TPR, TRI, TRI's general counsel, Dalia, Sagi, the Sagi Trust, the Orly Trust, or D&K as to the identity of the record owners of TRI.

84.     Jules Trump, Eddie Trump and Mark Hirsch (an attorney) at all times relevant to this complaint were sophisticated business individuals, with special expertise in corporate governance and ownership.

85.     At all times relevant to this action the Trump Parties had access to independent legal counsel.

86.     Prior to 2008, the Trump Group, by Jules Trump, and otherwise, acted with willful blindness and indifference to facts which put The Trump Group on notice of (i) the 2004 Transfers, and (ii) that Arie, the Sagi Trust and the Orly Trust were record owners of their respective TRI shares.

87.     The Trump Group, by Jules Trump, and otherwise, waived any objection to the 2004 Transfers.

88.     Between 2004 and 2008, under Arie's management, TRI's business performance improved consistently without any complaint or objection by TRI's Board of Directors including but not limited to representatives of the Trump Group.

I.      **The Trump Parties' 2008 Scheme and Conspiracy to Seize Majority Control of TRI, Squeeze Out Arie as an Officer, Director and Shareholder of TRI and Dilute the Value of Arie's, Orly's and the Orly Trust's Interests in the Affected TRI Shares**

89.     There was no hint of any substantial disagreement between Arie and the Trump Group relating to the Genger Divorce Action, or otherwise, until June of 2008, when TRI's value increased substantially as a result of improved performance.

90.     In the early Spring of 2008, TRI was facing a threat of foreclosure of one of its major operating units by Bank Hapoalim, a long-time lender of TRI.

91.     To address this foreclosure threat, Arie and the Trump Group explored the possibility of a sale of assets and restructuring plan involving the spin-off of all of TRI's North American assets to a separate entity and a capital loan by the Trump Group into a residual TRI to retire the Bank Hapoalim debt in exchange for increasing the equity position of the Trump Group in the restructured TRI so that the Trump Group would obtain a majority position (the "Funding Plan").

22

92.    Had the Funding Plan been implemented, in return for providing funding Jules and Eddie Trump through TR-I and TR-II would, for the first time, have been permitted to obtain a direct ownership interest in TRI, and the Trump Parties, under the Funding Plan, would have obtained majority control over TRI, the company that Arie had founded and worked so hard to make succeed.

93.    TRI's legal counsel advised that it would be necessary for a special committee of the Board to be constituted in order for the Board to approve the Funding Plan without the vote of Jules Trump who was an interested Director with a conflict of interest.

94.    Despite requests from Arie to constitute such a committee, the Trump Group Directors failed to agree to the appointment of such committee.

95.    The Board of TRI never constituted a special committee in order for the Board to approve the Funding Plan.

96.    The implementation of the Funding Plan was also subject to other conditions relating to the value of the transaction which conditions were never met.

97.    While the proposed Funding Plan was being worked on, the financial condition of TRI began to improve substantially.  By late June 2004, TRI was generating positive cash flow of $15-20 million per month.  This represented a dramatic improvement in TRI's earnings within a matter of months in 2008, and rendered the Funding Plan unnecessary.

98.    As a result, there was no longer a need for TRI or Arie to move forward with the Trump Group Funding Plan that would have given the Trump Parties' majority control of TRI.

99.     To proceed with the Funding Agreement would have diluted the shares of existing shareholders and cause TRI to pay the Trump Group unreasonable fees for a loan that was not needed.

100.    Based on the advice of TRI's Delaware corporate counsel concerning the establishment of an independent committee of the Board to approve the Funding Plan, which the Trump Group refused to empanel, and the fact such a Funding Plan was no longer necessary because of improved performance of TRI which permitted the satisfaction of the Bank Hapoalim loan, the Funding Plan was rejected and the Bank Hapoalim loan satisfied with TRI's own substantially improved earnings without the need for funding from the Trump Parties or any other third-party.

101.    On information and belief, the Bank Haopolim's threat of foreclosure and the Funding Plan takeover proposed by the Trump Group were also engineered by Jules Trump, individually, and on behalf of the Trump Group with the aid, assistance and further illegal conduct of the Trump Group and a principal officer of Bank Haopolim with whom the Trump Group had other business entanglements.

102.    Thwarted in their effort to take over the controlling interest in TRI through the rejected Funding Plan, the Trump Group, Mark Hirsch, Eddie Trump, and Jules Trump formulated a further illegal scheme and plan to take over the then very profitable TRI, and oust Arie as its CEO, and steal the Genger family TRI shares at a fraction of their value.

103.    In furtherance of this plan, the Trump Group leveled an extortionate threat at Arie demanding that unless Arie agreed to turn over majority control of TRI to the Trump Group pursuant to the Funding Plan (which was no longer necessary ), the Trump Group would declare

24

that the 2004 TPR transfers of TRI shares to Arie, the Sagi Trust and the Orly Trust under the

Stipulation of Settlement were void under the 2001 TRI Stockholders Agreement even though

Arie as a permitted Transferee held 14% of TRI outright, and had received a Voting Trust

Agreement and Putative Irrevocable Proxies from the Sagi Trust and the Orly Trust which, on

their face, gave Arie the right during his lifetime to control the management of TRI, and vote the

same 52.85% shares of TRI stock that had been controlled by Arie through his 51% ownership of

TPR prior to the Stipulation of Settlement and the execution of the 2004 Transfer Documents.

Thus, there was virtually no effective difference in Arie's control of TRI Shares as between his

majority control of TPR prior to the execution of the Stipulation of Settlement, and the intended

control that Arie would exercise after the Stipulation of Settlement and 2004 Transfer

Documents were executed.

104.   At the time they made this threat in 2008, the Trump Parties, among other things,

knew that:

(i) the intent of the parties pursuant to the 2001 TRI Stockholders Agreement in

restricting certain transfers to Genger family members was to ensure that (a) Arie, personally,

would continue to have management and majority shareholder voting control over TPR's TRI

shares for the duration of his life, and (b) prevent any other Genger family member from having

any management or voting control over TRI during Arie's lifetime;

(ii) pursuant to the terms of the Stipulation of Settlement and the 2004 TPR-TRI

Transfer Documents Arie, Dalia, Orly and Sagi, specifically intended to preserve Arie's

management and voting control of TRI, in the context of resolving the equitable distribution of

marital property issues concerning TPR raised in the Genger Divorce Action;

25

(iii) that as a condition for Arie transferring his 51% interest in TPR to Dalia in the Genger Divorce Action, it was intended that pursuant to the Stipulation of Settlement and 2004 Transaction Documents Arie would receive valid Putative Irrevocable Proxies and Back-up Voting Trust Agreements from the Sagi Trust and the Orly Trust designed to ensure that Arie would retain voting control over a majority of TRI shares for the duration of his life even if the Putative Irrevocable Proxies were held to be invalid; and

(iv) that if the 2004 TPR transfer of TRI shares were voided, as threatened by the Trump Group, then:

(a) 52.85% of TRI shares would revert to TPR, which would be unjustly enriched because TPR, under the Stipulation of Settlement and implementing 2004 Transaction Documents, had already divested itself of those TRI shares in consideration of Arie relinquishing his 51% ownership of TPR to Dalia;

(b) that Arie would be the beneficial owners of such 3000 TRI Shares, and Arie would have the right to vote the 52.85% of TRI shares that were returned to TPR, subject to the Orly and Sagi Trust rights to receive certain of these shares upon Arie's death;

(c) Sagi was not authorized to act on behalf of TPR to sell any of the TRI shares without the consent of Arie as the beneficial owner of the Arie TRI Shares, and the beneficial holder of the voting rights to TPR's TRI Shares;

(d) Arie would be entitled to reform the Stipulation of Settlement, pursuant to the express terms of the Stipulation of Settlement, so that Arie would regain control of 51% of TPR's ownership and control of 52.85% of TRI's shares;

26

(e) that the New York Supreme Court under the Judgment of Divorce, had retained jurisdiction over Arie and Dalia in connection with enforcing the terms of the Stipulation of Settlement, including Arie's reformation claims; and

(f)     TPR, under Sagi's control, was not authorized to sell TRI shares to the Trump Group without the consent of Arie, as beneficial owner of TPR's record ownership of the TRI shares, in the event the 2004 Transfers were held to be invalid;

(v) that if the Putative Irrevocable Proxies (Exhibit D) were held to be invalid, that the Sagi and Orly Trust shares would be subject to the Back-Up Voting Trust Agreement Exhibit E) which was referred to in the 2004 Voting Trust Agreement (Exhibit C).

105.    Nevertheless, on August 8, 2008, the Trump Group, in furtherance of their plan to pressure Arie and take over a majority control of TRI, sent a letter to TPR asserting that it had the right under Section 3.2 of the 2001 TRI Stockholders Agreement to purchase all of the TRI shares that were the subject of the Stipulation of Settlement transfers in 2004, at 2004 prices – a small fraction of what is believed to have been a TRI value in excess of $1 billion in 2008, which had net after-tax income in excess of $150 million in that year.  The Trump Group provided no such letter or notice to Orly or the Orly Trust or the Sagi Trust.

106.    Three days later, on August 11, 2008, the Trump Parties, through Gjenclova, commenced an action in the Federal District Court of the Southern District of New York against TPR (the "Federal Action") claiming that the transfer of the TRI shares by TPR to Arie Genger, the Orly Trust and the Sagi Trust pursuant to the express terms of the Stipulation of Settlement and 2004 Transaction Documents, was void.

27

107.    Notwithstanding the Trump Parties' respective specific knowledge in 2008 of the existence and terms of the Court-ordered Stipulation of Settlement and the 2004 TPR Transfer Documents, the Trump Group did not name Arie, Dalia, the Sagi Trust or the Orly Trust as parties in the Federal Action.

108.    The Trump Parties knew at the time they commenced the Federal Action that Arie was a known third party beneficiary under the 2001 TRI Stockholders Agreement and that the 2004 Transfers were approved in a Court-Ordered Stipulation of Settlement in the Genger Divorce Action, but nevertheless opposed Arie's motion to intervene in the Federal Action.

109.    The Trump Parties also knew that Sagi, as a result of the Stipulation of Settlement and 2004 TPR Transfer Documents, became the president of TPR, but that he had since become estranged from his father, and that Sagi had installed his mother-in-law Rochelle Fang as the nominal trustee of the Sagi Trust and that he exercised total dominion and control over her.

110.    The Trump Parties also knew that if the 2004 TPR transfers of TRI shares to Arie, the Sagi Trust and the Orly Trust pursuant to the "So-Ordered" Stipulation of Settlement and 2004 Transfer Documents were voided, that Arie's transfer of his 51% ownership in TPR to Dalia would also have to be voided, and that as a consequence Dalia, or Sagi as her successor-in-interest, as a matter of New York law, would have to hold this 51% TPR interest in a constructive trust for the benefit of Arie with respect to TPR's ownership of the TRI Shares.

111.    The Trump Parties knew that neither TPR, nor Sagi as its President, would be authorized to sell any of TPR's shares of TRI to the Trump Group in the event that the 2004 TPR Transfers of TRI Shares to Arie, the Sagi Trust or the Orly Trust were voided because in that

28

event those TRI shares would be returned to TPR subject to a constructive trust for the benefit of Arie.

112.    Prior to August 22, 2008, the Trump Group also knew that in the event that the 2004 transfers by TPR of TRI Shares to Arie, the Sagi Trust or the Orly Trust were voided, Sagi, as the President of TPR, also owed a separate fiduciary duty to Arie and the Orly Trust with respect to the 3000 TRI shares that would revert to TPR.

113.    TPR and Sagi each had a fiduciary and contractual duty to Arie to hold any TRI shares that reverted to TPR in a constructive trust for their respective benefits as the beneficial owner of such shares, and also owed a fiduciary duty to Orly and the Orly Trust with respect to her interest in a portion of these shares.

114.    Nevertheless, in August, 2008, the Trump Group met, conspired and schemed with Sagi and/or his representatives to contrive a plan to offer Sagi approximately $26.7 million to induce Sagi to cause the Sagi Trust, through his mother-in-law Fang, to transfer to the Trump Parties the Sagi Trust's 19.425% of TRI shares that the Sagi Trust received pursuant to the Stipulation of Settlement and 2004 TPR Transaction Documents. This $26.7 million payment was a fraction of the value of those shares at that time given the performance of TRI which, in 2008 had after tax earnings of $150,000,000 of sales of approximately $1 billion.

115.    As part of this conspiracy and scheme, the purchase of the Sagi Trust Shares was to be conditioned on Sagi, purportedly as the President of TPR, further agreeing that if the Court in the Federal Action, or any other court, held that the 2004 TPR Transactions were void, then TPR would be "deemed" the Seller of the Sagi Shares, even though the Sagi Trust could keep the $26.7 million, and even though TPR had no right or authority to sell the Arie, the Sagi Trust and

29

Orly Trust Shares without the consent of Arie as beneficial owners of these respective shares, subject to Orly's interest to receive the Orly Trust TRI Shares upon Arie's death, and Arie's beneficial interest in the voting rights for the Sagi Trust, Orly Trust and Arie TRI Shares.

116.    The Trump Group defendants knew that if the $26.7 million purported purchase price of the Sagi Trust Shares was paid to the Sagi Trust that the money would need to be returned to TPR.

117.    The Trump Group defendants knew that Sagi, on behalf of TPR was not authorized to sell the Sagi Trust Shares, in the event the 2004 Transfers were declared invalid.

118.    The Trump Group defendants never sought or received a representation by TPR or Sagi that Sagi, on behalf of TPR was authorized to sell any TRI Shares to the Trump Group.

119.    The Trump Group defendants knew that Sagi on behalf of TPR was not authorized to sell any of TPR's TRI shares to the Trump Group in the event that the 2004 Shares reverted to TPR that Sagi and TPR had a fiduciary and contractual duty to protect Arie's control over the 52.85% of TRI Shares for the duration of his life.

120.    The Trump Group did not obtain a representation from Sagi or TPR as to whether any sale by the Sagi Trust or TPR would be subject to Arie's right to vote those Shares for the duration of his life in accordance with the terms of the Court-ordered Stipulation of Settlement and the 2004 Transaction Documents.

121.    As part of this conspiracy and scheme the Trump Parties also required that in order for Sagi to get the $26.7 million put in his Trust, Sagi purportedly as the President of TPR would have to further agree in a "side letter" that if the Court in the Federal Action, or any other court, held that the 2004 TPR Transactions were void, then TPR would also agree to sell the 14%

30

Arie TRI shares and the 19.425% Orly Trust Shares, which TPR had already sold to Arie and the Orly Trust pursuant to the Stipulation of Settlement and the 2004 Transaction Documents, to the Trump Parties at a price that was 60% less than the price per share to be paid to the Sagi Trust. Again, Sagi had no authority to make this sale on behalf of TPR.

122.    As part of the same conspiracy and scheme, the Trump Parties also insisted that neither the Sagi Trust nor TPR take any action to protect the voting rights of Arie that were granted to Arie by the Sagi Trust and the Orly Trust under the 2004 Voting Trust Agreements in accordance with the 2004 TPR Transfer Agreement.

123.    To induce Sagi to sell the Sagi Trust Shares to the Trump Parties, the Trump Group proposed a scheme and conspiracy that the Trump Parties knew would require Sagi to use his position as President of TPR to obtain a personal benefit by having $26.7 million paid to his Sagi Trust, while selling out Arie's and the Orly Trust's TRI shares for a fraction of their real value in an obvious breach of Sagi's fiduciary and contractual duties to Arie and the Orly Trust, which breaches of duty arose from, among other things, (i) Sagi's self-dealing transactions as an officer of TPR to get $26.7 million from the Trump Group for his Sagi Trust shares while at the same time and at the expense of Arie and the Orly Trust agreeing to sell their TRI shares at a price per share that was 60% lower than the deal Sagi was making for himself through the sale of the Sagi Trust shares to the Trump Parties, (ii) ignoring Arie's and the Orly Trust's beneficial interest in the value of TPR's ownership of specific TRI stock that TPR had already transferred to Arie and the Orly Trust for valuable consideration pursuant to the Stipulation of Settlement and the 2004 TPR Transaction documents; (iii) inducing Fang as the Trustee of the Sagi Trust to violate the 2004 Voting Trust Agreement with Arie; (iv) inducing the trustees of the Orly Trust

to violate their fiduciary obligations to the Orly Trust and Orly; (v) failing to protect Arie's

voting rights to 52.85% of TRI shares in accordance with the express intent and provisions of the

Stipulation of Settlement and the 2004 Transaction Documents; (vi) disposing of and

substantially devaluing the asset value of TPR's ownership of TRI shares, with knowledge that

such shares would be subject to Arie's claims for imposing a constructive trust on such shares,

reformation and/or rescission under the terms of the Stipulation of Settlement with respect to

restoring Arie's rights to a 51 % ownership of TPR insofar as TPR's ownership of TRI shares

was concerned; (vii) failing to disclose to Arie, Orly, or the Orly Trust the terms of the Trump

Parties' proposed scheme and plan to purchase the same TRI shares that TPR previously sold to

Arie and the Orly Trust under the Stipulation of Settlement and 2004 TPR Transfer Agreement,

(viii) failing to take all actions necessary to comply with the stated intentions of the parties to the

Stipulation of Settlement and 2004 Transaction Documents, and (ix) entering a self-interested,

unauthorized, ultra-vires agreement, ostensibly on behalf of TPR but in reality using his position

as President of TPR for his own personal gain to the detriment of Arie's and the Orly Trust's

legal and equitable interests in TPR's ownership of the TRI shares that were transferred to each

of them by TPR four years earlier, pursuant to the Stipulation of Settlement and 2004

Transaction Documents.

124.    In furtherance of this scheme and conspiracy, the Trump Parties, the Sagi Trust,

by Rochelle Fang, and Sagi, purportedly on behalf of TPR, executed a 2008 Stock Purchase

Agreement with the Sagi Trust without the knowledge or consent of Arie or the Orly Trust, to

sell the 1102.80 Sagi Trust Shares of TRI common stock representing 19.425% of the shares of

stock to the Trump Group and two new entities – TR I and TR II – for $26,715,416.00. ("2008 Stock Purchase Agreement", attached hereto as Exhibit F).

125.    When combined with the Trump Parties' minority share of 47.15 %, this Sagi Trust sale would give the Trump Parties a 66.575% majority and controlling voting interest in TRI, in direct derogation of the intent of the Court–Ordered Stipulation of Settlement and the Putative Irrevocable Proxies and 2004 Voting Trust Letter Agreement.

126.    The Trump Parties acknowledged the existence of the Putative Irrevocable Proxies and 2004 Voting Trust Letter Agreement in the 2008 Stock Purchase Agreement, representing and warranting that:

> "Such Purchaser hereby acknowledges receipt of copies of the
> irrevocable proxy dated as of October 29, 2004, issued by Seller
> ["Sagi Trust"] in favor of Arie Genger with respect to the shares
> (the "Proxy"), a backup form of voting trust agreement and voting
> trust certificate delivered in connection with the Proxy and the
> Letter Agreement dated October 29, 2004 [2004 Voting Trust
> Letter Agreement] with respect to the transfer of shares from TPR
> to Seller"

127.    The 2008 Stock Purchase Agreement also states that if the 2004 transfer of TRI shares by TPR to the Sagi Trust were determined to be void and the shares returned to TPR then TPR would be deemed the seller of the Sagi Trust Shares to the Trump Parties for $26.7 million, even though this $26.7 million would have already been paid to the Sagi Trust controlled by Sagi through his mother-in-law Fang. There was no provision with respect to the reallocation of the sales proceeds to TPR.

128.    The 2008 Stock Purchase Agreement violated the terms of the 2001 Stockholders Agreement, including, but not limited to, Section 3.2 of that Agreement.

33

129.   By entering into the 2008 Stock Purchase Agreement, the Trump Group voluntarily and intentionally waived any right to purchase the Sagi Trust Shares under the 2001 Stockholders Agreement.

130.   Also through its intentional conduct, including its violation of the 2001 Stockholders Agreement, the Trump Group is estopped from utilizing any purported right to purchase under the 2001 Stockholders Agreement.

131.   In addition, Sagi, ostensibly acting for TPR, but without authority and in violation of his contractual, legal and fiduciary duties owed to Arie and Orly, signed a side letter on the very same day as the 2008 Stock Purchase Agreement that provides that if the 2004 transfer by TPR of TRI Shares to Arie and the Orly Trust under the Stipulation of Settlement and 2004 Transaction Documents were declared void, then Sagi, purportedly on behalf of TPR, would transfer the Arie Shares and Orly Trust Shares to the Trump Parties at a price per share 60% per share lower than the Sagi Trust was to receive under the 2008 Stock Purchase Agreement, which would then be deemed a sale by TPR ("2008 Stock Purchase Side Letter Agreement", attached hereto as Exhibit G).

132.   The terms of both the 2008 Stock Purchase Agreement and the Side Letter violated the 2001 Stockholders Agreement, including, but not limited to Section 3.2 of the 2001 Stockholders Agreement.

133.   The Trump Group defendants waived, and are estopped from asserting, any right under the 2001 Stockholders Agreement to purchase the Arie and Orly Trust TRI Shares from TPR.

34

134.    Neither Arie on behalf of TRI or the Board of Directors of TRI approved the transaction set forth in the 2008 Stock Purchase Agreement and Side Letter.

135.  . This Side Letter was not only an insidious requirement mandated by the Trump Parties to get a majority interest in TRI for the first time, but was tantamount to a $26.7 million bribe offered by the Trump Parties to Sagi, the estranged son of Arie, to betray his father and rob his sister of the true value of their respective legal and equitable interests in the TRI stock previously owned by TPR in order for the Trump Group to completely squeeze out Arie and the Orly Trust at unconscionably low prices.

136.    At the time the Trump Parties, TR-I and TR II, the Sagi Trust and Sagi purportedly on behalf of TPR, executed the 2008 Stock Purchase Agreement, the Trump Parties also knew that if the 2004 transactions were voided, TPR, Sagi, the Sagi Trust and the Trump Parties would all be unjustly enriched by the 2008 Stock Purchase Agreement and Side Letter.

137.    The Trump Parties also knew that if the 2004 TPR Transfers of TRI shares to Arie, the Sagi Trust and the Orly Trust were voided, that these TRI shares recovered by TPR would be the subject of a constructive trust established for the benefit of Arie, the Orly Trust and the Sagi Trust.

138.  . The Trump Parties, Sagi, and the Sagi Trust knew that Sagi, as an officer and director of TPR, owed a fiduciary duty to Arie, the Orly Trust, and the Sagi Trust, not to devalue or alienate Arie's and the Orly Trust's beneficial ownership of TPR insofar as TPR's ownership of the TRI shares was concerned, and not to strip Arie of his voting rights with respect to these TRI Shares.

35

139.   The Trump Parties, Sagi and the Sagi Trust knew at the time they executed the 2008 Stock Purchase Agreement that pursuant to the Court –Ordered Stipulation of Settlement, Arie had a contractual right to seek to reform the terms of the Stipulation of Settlement in order to give full effect to the intent of the parties with respect to his relinquishment of control in TPR in exchange for Arie's continuing control of 52.85% of TRI shares and outright ownership of 14% of TRI's stock, as a permitted transferee.

140.   The Trump Parties, Sagi, and the Sagi Trust knew at the time they executed the 2008 Stock Purchase Agreement and Side Letter that Arie was entitled to rescission for failure of consideration of that part of the Stipulation of Settlement that transferred his 51% of TPR to Dalia, in exchange for Dalia's agreement to have TPR concurrently transfer 14% of TRI's shares to Arie outright, and  that Arie would maintain voting control, or 52.85% of TRI for the duration of his life.

141.   In connection with the 2008 Stock Purchase Agreement and in furtherance of the plan and scheme to wrest control of TRI from Arie's control, the Trump Parties aided and abetted the preparation of a sworn affidavit swearing that the Sagi Trust shares had been lost, when the Trump Parties knew that was not a true statement.

J.   **The Trump Parties Declare Themselves The Majority Owners Of TRI, and Commence An Action In The Delaware Chancery Court To Determine The Composition of TRI's Board of Directors**

142.   On August 25, 2008, only three days after the 2008 Stock Purchase Agreement and 2008 Stock Purchase Side Letter Agreement were executed, the Trump Group asserted that it was in control of TRI through the acquisition of 1102.80 shares that were purportedly transferred to them by the Sagi Trust.

143.   On August 25, 2008, the Trump Parties commenced a Chancery Court in rem summary proceeding in the State of Delaware pursuant to 8 Del.C § 225(a) to determine the composition of the Board of Directors of TRI ("The Delaware Action") and to declare, inter alia that:

    i.    the Trump Parties are the majority shareholders of TRI and have the right to vote all of its shares including the shares which were allegedly purchased pursuant to the Stock Purchase Agreement;

    ii.    the 2004 transfers to Arie Genger, the Sagi Trust and the Orly Trust are void and continue to belong to TPR; and

    iii.    that the Putative Irrevocable Proxies do not apply to the shares transferred pursuant to the Stock Purchase Agreement.

144.   Neither TPR, the Sagi Trust, nor the Orly Trust were a party to the Delaware Action, although TPR was given an opportunity to participate in that action, and refused to do so.

145.   The Trump Group as interested Directors in control of TRI had a fiduciary and legal duty to authorize the appointment of separate, independent counsel for TRI in connection with the Delaware proceeding and otherwise with respect to determining the beneficial and record ownership of the Arie, Orly Trust and Sagi Trust TRI shares.

### K.   The July 23, 2010 Opinion of the Delaware Chancery Court

146.   On July 23, 2010 the Delaware Chancery Court issued a lengthy written decision which held that the transfers of TPR's TRI shares to Arie, the Sagi Trust and the Orly Trust pursuant to the Stipulation of Settlement and 2004 Transaction Documents were void and ownership reverted to TPR and that TPR's sale of the Sagi Trust TRI Shares to the Trump Group pursuant to the 2008 Stockholders Agreement was valid.

147.    The Chancery Court also held that the Sagi Trust Irrevocable Proxy was not valid under New York or Delaware law. The Chancery Court in this § 225 proceeding held that the Trump Group was entitled to elect a majority of TRI Board members.

148.    While voiding the 2004 Transfers, however, the Chancery Court in this July 23 decision also held that because Arie was a "permitted transferee" under the 2001 TRI Stockholders Agreement, the transfer of the TRI shares to him did not warrant a forfeiture of Arie's TRI Shares.

149.    Because Arie was a permitted transferee of the TRI shares owned by TPR (a Genger family holding company that Arie had created) the Trump Group would have no right to stop the transfer of these TPR TRI shares to Arie once it received contractual notice and Arie agreed to be personally bound by the TRI Stockholders Agreement.

150.    Under the Delaware Chancery Court's July 23 decision, Arie would retain his TRI shares once he gave formal notice of TPR's 2004 transfer and agreed to be bound by the 2001 TRI Stockholders Agreement, which Arie promptly agreed to do shortly thereafter.

151.    In its July 23, 2010 decision, the Court of Chancery also held that because neither Orly nor the Orly Trust were parties to the Delaware Chancery Court action, the Delaware Court declined to issue any ruling with respect to the Orly Trust TRI Shares.

L.    **The July 26, 2010 TRO in this New York Action**

152.    Based on the July 23, 2010 Chancery Court decision, Arie and Orly sought and obtained a temporary restraining order from this Court, restraining Sagi and TPR from selling or encumbering the Arie and Orly Trust TRI shares. This temporary restraining order was granted on July 26, 2010 and extended by this Court on July 28, 2010.

38

M.  **The August Opinion of the Delaware Chancery Court**

153.    After being advised by the Trump Group of plaintiff being granted a TRO in this New York Action,  the Delaware Chancery Court indicated that it would reexamine its rulings with regard to the Arie and Orly Trust TRI shares, and expressed concern about whether the New York TRO was designed to undermine its ruling in the Delaware Court, which it was not.

154.    On August 3, 2010, to allay the Court of Chancery's concerns, Arie's counsel in this case wrote to this Court advising that because defendants Sagi and TPR had agreed to abide by a *status quo order* entered by the Delaware Chancery Court, which provided that Arie would be given notice in the event TPR or Sagi intended to sell the Arie and Orly TRI Shares to the Trump Group, it was agreed among counsel for TPR, Sagi, Dalia and the plaintiffs, that the temporary restraining order would be vacated and plaintiffs in this action would accordingly withdraw their application for a preliminary injunction, without prejudice.

155.    On August 9, 2010, the Chancery Court made an abrupt "about face" regarding its determination earlier relating to the Arie and Orly Trust TRI Shares.  In this second opinion, the Delaware Chancery reversed itself regarding the ownership of the Arie and Orly Trust Shares, and held that the Trump Group had the right to purchase the Arie and Orly Trust TRI shares from TPR under the 2008 Side Letter Agreement, even though the Court had held only two weeks earlier that Arie was a permitted transferee under the Stockholders Agreement and should be permitted to keep his shares, and that the Orly Trust was never a party to the § 225 proceeding. The Chancery Court also held that Arie and the Orly Trust had no beneficial interest in the Arie and Orly Trust TRI shares—even though TPR, Sagi, the Sagi Trust and the Orly Trust were never parties to the Delaware § 225 proceeding.

39

N.   **The Delaware Chancery Court's Final Judgment Order of August 18, 2010**

156.   On August 18, 2010, the Delaware Chancery Court entered a Final Judgment Order which found (i) that TPR's 2004 transfers of the Arie TRI Shares, and the Orly Trust TRI shares were void under the 2001 TRI Stockholders Agreement, (ii) that title to the Sagi Trust TRI Shares, the Orly Trust TRI Shares and the Arie TRI Shares, all reverted to TPR; (iii) that the Irrevocable Proxy for the Sagi Trust was not valid; (iv) that the sale of the Sagi Trust TRI shares by Sagi on behalf of TPR was valid; (v) that the Side Letter was a valid agreement; and (vi) that Arie and the Orly Trust had no beneficial or legal ownership interest in the Arie and Orly Trust TRI shares.

157.   There was no discussion or finding in the Chancery Court Decision as to whether Sagi was authorized to sell the Arie, Orly and Sagi Trust TRI Shares out of TPR.

158.   In addition to these holdings, the Chancery Court entered an anti-lawsuit injunction, which prohibited Arie from "commenc[ing] or prosecut[ing] any legal proceeding . . in any [state] court [including the action in this Court which had already been commenced] constituting a collateral attack on, attempt to prevent implementation of, or relitigation of any of the [Chancery] Court's holdings set out in paragraphs 2 through 16 inclusive (summarized above), of this final judgment order" pending a determination of an appeal to the Delaware Supreme Court, with certain limited exceptions, but even the Chancery Court specifically recognized Arie's right to apply to this Court to seek to escrow the proceeds from TPR's impending sale of the Arie TRI Shares to the Trump Group, as follows:

> "Arie Genger shall have the right to seek an order from a court of competent jurisdiction requiring TPR Investment Associates, Inc. and its officers and directors to place in escrow the proceeds of sale of the shares of TRI referenced in paragraph 14 of this Order. [the "Arie TRI Shares"]."

40

**O.**   **Arie Appeals From the Chancery Court's Final Judgment Order**

159.   Arie timely appealed from the Chancery Court's rulings, arguing, inter alia, that (i) the Trumps ratified the 2004 transfers, as a matter of law; (ii) the Irrevocable Proxy was valid under New York law; and (iii) the Delaware Chancery Court had no jurisdiction to determine the ownership of the Arie and Orly TRI shares or the validity of the Side Letter.

160.   Under threat of contempt, Arie agreed to stay this case pending a final determination by the Delaware Supreme Court.

**P.**   **The Purported Sale by TPR of the Arie and Orly Trust TRI Shares**

161.   While Arie's appeal was pending, Arie was informed that TPR, without Arie's consent or approval, intended to sell the Arie TRI shares to the Trump Group for $7,424,994.

162.   While the Trump Group and TPR agreed to hold $5,924,944 of these sale proceeds in escrow pending a determination by the Delaware Supreme Court relative to the ownership of the Arie and Orly Trust TRI shares, Sagi, as the CEO of TPR, insisted that TPR was entitled to keep and spend the $1.5 million of the proceeds from the sale of the Arie TRI shares, notwithstanding the pending appeal challenging the Chancery Court's rulings relating to the ownership of the Arie and Orly Trust TRI Shares.

163.   While the appeal to the Delaware Supreme Court was pending, TPR, without the consent or approval of Arie or Orly, also entered into an agreement to sell the Orly Trust TRI Shares to the Trump Group for $10,314,005, with the proceeds to be held in escrow by counsel for Dalia as the nominal trustee of the Orly Trust.

164.   The Trump Group as interested Directors in control of TRI had a fiduciary and legal duty to authorize the appointment of separate, independent counsel for TRI in connection with the Delaware proceeding and otherwise with respect to determining the beneficial and

41

record ownership of the Arie, Orly Trust and Sagi Trust TRI shares prior to TRI recording the

transfer of the Arie and Orly Trust Shares to the Trump Group in 2010.

165.   Neither Sagi nor TPR had any authority to sell the Arie or Orly Trust Shares to

the Trump Group.

**Q.   This Court Enjoins TPR and Sagi From Taking or Using the $1.5 million Sale Proceeds From the Purported TPR Sale of the Arie Shares to the Trump Group**

166.   Arie moved by Order to Show Cause to restrain and enjoin Sagi and TPR from

using or disposing of the $1.5 million sale proceeds that were about to be released to TPR, and

requested that these specifically identified funds be placed in an acceptable escrow account or

paid into Court.  This Court by its February 17, 2011 Decision and Order decreed as follows:

> "ORDERED that the defendants Sagi Genger and TPR
> Investment Associates, Inc., and their agents, servants, employees
> and all other persons acting under the jurisdiction, supervision
> and/or direction of the defendants, are enjoined and restrained,
> during the pendency of this action, from doing or suffering to be
> done, directly or through any attorney, agent, servant, or employee
> or other person under the supervision or control of the defendants,
> from taking, using, or spending or converting to their own use
> otherwise, the $1.5 million proceeds from the sale of certain
> common stock in Trans-Resources, Inc. in which plaintiff claims
> an interest"

**R.   The Decision of the Delaware Supreme Court**

167.   On July 18, 2011, the Delaware Supreme Court reversed that part of the Delaware

Chancery Court's Judgment that held that Arie and the Orly Trust were not the beneficial owners

of the Arie and Orly Trust TRI Shares.

168.   On Arie's appeal the Delaware Supreme Court described the limited nature of the

§225 proceeding as follows:

> A Section 225 proceeding is not an *in personam* action.
> Rather, it is "in the nature of an *in rem* proceeding," where the

42

"defendants" are before the court, not individually, but rather, as respondents being invited to litigate their claims to the *res* (here, the disputed corporate office) or forever barred from doing so.

* * *

[For example] in a Section 225 proceeding the court "cannot go further and actually rescind a transaction procured through such unlawful behavior or award money damages to those harmed by that behavior." That type of ultimate relief can only be obtained in a plenary action in a court that has *in personam* jurisdiction over any necessary or indispensable parties.

169.    Further explaining the limited holding of the Delaware Chancery Court, the Delaware Supreme Court held:

Given the jurisdictional limitations that inhere in a Section 225 action, we affirm the judgment of the Court of Chancery insofar as it determines the *record* [emphasis in original] ownership of the disputed Trans-Resources shares in the Side Letter Opinion and the Final Judgment Order.

* * *

An adjudication of who has the right to vote disputed corporate shares for Section 225 purposes cannot constitute a binding adjudication of who beneficially owns those shares, because a Section 225 action is by its nature an *in rem*, not a plenary, proceeding. **Only in a plenary proceeding before a court that has *in personam* jurisdiction over the litigants may the court adjudicate the litigants' property interest in disputed corporate shares.**

(Emphasis added)

170.    The Delaware Supreme Court also held that the issue of ultimate beneficial ownership of the Arie TRI Shares and the Orly Trust TRI Shares was beyond the equity jurisdiction of the Chancery Court in the summary § 225 *in rem* proceeding, and that the issue of the beneficial ownership of those shares needed to be adjudicated in a plenary action in a jurisdiction where the Court has *in personam* jurisdiction over all indispensible parties.  These

43

necessary parties -- Arie, TPR, Sagi, Orly, the Orly Trust and the Trump Group -- are all parties to this New York action , and have been served and have appeared in this case.

171.   The Delaware Chancery Court's holdings were limited to an in rem proceeding to determine who held the record ownership of the shares at a point in time in order to determine voting rights to elect members of the TRI Board based on the record owners of those shares at the time of the election.

172.   The Delaware Chancery Court was without jurisdiction to determine the ultimate ownership of the Arie and Orly Trust TRI shares or any of the tort claims asserted by Plaintiffs in this action.  Nor did the Delaware Chancery Court have jurisdiction to determine Arie's claims for rescission, unjust enrichment, constructive trust or reformation arising from and in connection with the Court-ordered Stipulation of Settlement, the 2004 Transaction Documents, or the authority of Sagi to act on behalf of TPR.

173.   The Delaware Supreme Court affirmed that portion of the Chancery Court ruling that held that TPR's 2004 transfers of TRI shares pursuant to the Stipulation of Settlement in the Genger divorce and implementing 2004 TPR Transaction Documents violated the 2001 TRI Stockholders Agreement and were void ab initio, for the purpose of the Delaware § 225 proceeding to determine composition of the TRI Board.

### FIRST CAUSE OF ACTION ON BEHALF OF PLAINTIFF ARIE GENGER

**(For a Declaratory Judgment Under CPLR 3001 that the
Stipulation of Settlement Entitles Plaintiff Arie to a
Court-Ordered Reformation of the Terms of the Stipulation
of Settlement as Against All Defendants)**

174.   Plaintiff repeats and re-alleges the allegations in paragraphs 1 through 173.

44

175.    Article XVI of the Stipulation of Settlement provides that the parties to the Stipulation of Settlement have a right to seek court-ordered reformation in a New York court in order to reflect the parties' original intent in the event a portion of the "So-Ordered" Stipulation of Settlement is held to be invalid for any reason.

176.    The concurrent transfer of Arie's ownership of his 51% interest in TPR in consideration of receiving a 14% interest in TRI and the right to control the voting rights of 52.85% of TRI Shares for the duration of Arie's life was an essential, fundamental condition of the transfers of TPR and TRI shares set forth in the Court-Ordered Stipulation of Settlement.

177.    The Delaware Chancery Court, as affirmed by the Delaware Supreme Court, held that TPR's 2004 transfers of 52.85% of the shares of TRI Stock under the Stipulation of Settlement and 2004 TPR Transfer Documents were invalid and void *ab initio*, and that the Putative Irrevocable Proxies were invalid.

178.    The provisions of the Court-Ordered Stipulation of Settlement relating to the transfer of ownership of TPR in consideration of the 2004 Transfers were based upon the mutual mistake of Dalia and Arie that the 2004 Transfers and Irrevocable Proxies were valid.

179.    The Court-Ordered Stipulation of Settlement specifically provides that the parties agree that if any of the terms of the Stipulation of Settlement is declared invalid by any court of competent jurisdiction for any reason, Arie is entitled to seek an Order from this Court to reform the Stipulation of Settlement, or obtain such other equitable or legal relief as is necessary to give full meaning and expression to the original intent of the parties to the Court-Ordered Stipulation of Settlement.

45

180.  Arie is entitled to an Order of the New York Supreme Court to reform the terms of the Court-Ordered Stipulation of Settlement to reflect the parties' original intent to the greatest extent possible.

181.  Accordingly, Arie seeks an Order and declaratory judgment to reform the Court-Ordered Stipulation of Settlement to provide as follows:

(i)      That the transfer by Arie of his 51% interest in TPR to Dalia and the concurrent transfer of the 3000 shares of TRI stock to Arie, the Orly Trust and the Sagi Trust, respectively, as originally set forth in the Stipulation of Settlement is voided *ab initio* as a result of the Delaware Court finding that the 2004 Transfers are invalid;

(ii)     that all the assets of TPR, other than the 3000 Arie, Orly Trust and Sagi Trust TRI shares, remain the property of TPR or any successor in interest to those assets;

(iii)    that pursuant to a further order of this Court the Court-Ordered Stipulation of Settlement is modified *ab initio* to provide that the 3000 shares of TRI common stock that were returned to TPR as a result of the Delaware Court Action voiding the original 2004 Transfers be placed in a newly formed single purpose entity controlled by Arie ("TPR2");

(iv)     that Arie be declared the 51% owner of TPR2, which in turn shall be declared, *ab initio* the record and beneficial owner of all of such 3000 TRI shares, as though no 2004 Transfers were consummated under the original terms of the Stipulation of Settlement;

(v)      that the Orly Trust and Sagi Trust each be declared the owner of 24.5% of TPR2 so that together they own the remaining 49% of TPR2;

46

(vi)   that TPR2 shall not sell or transfer the 3000 TRI shares prior to Arie's death, unless such sale would be otherwise permitted and would not violate the terms of the 2001 Stockholders Agreement including, but not limited to, Article 2 of such agreement;

(vii)   upon Arie's death, 1102.8 of TRI shares, plus any stock dividends relating thereto ("the Sagi Trust TRI Shares") will be transferred by TPR2 outright to the Sagi Trust, and 1102.8 of TRI shares plus any stock dividends relating thereto ("the Orly Trust TRI Shares") will be transferred outright to the Orly Trust;

(viii)   All cash dividends relating to the Sagi Trust and the Orly Trust TRI Shares received by TPR2 during Arie's lifetime will be distributed, after payment of taxes and expenses to the Shareholders of TPR2, as if (a) Arie owned 794.40 shares, representing 13.99468% of the common stock of TRI, and (b) the Sagi Trust and the Orly Trust each owned 1102.8 shares, representing 19.42766% of TRI common stock;

(ix)   Arie through his 51% control of TPR2 will retain all voting rights to the 3000 TRI shares and any additional TRI shares issued to TPR or TPR2 as stock dividends or otherwise for the duration of his life.

(x)   The Trump Group shall deliver to TPR2 the 1102.8 shares of TRI common stock purportedly purchased under the 2008 Stock Purchase Agreement.

182.   The $26,715,416.00 paid by the Trump Group to the Sagi Trust under the 2008 Stock Purchase Agreement will be returned to the Trump Group by TPR and the Sagi Trust.

183.   The Trump Group shall deliver to TPR2 the 794.40 Arie and the 1102.8 Orly Trust TRI shares purportedly sold to TPR under the Side Letter Agreement and 2010 Transaction.

184. The purported sales by TPR of the Arie and Orly Trust TRI shares to The Trump Group, while the Delaware Supreme Court appeal was pending, will be declared null and void, and the proceeds from these purported sales now held in escrow will be released to The Trump Group.

185. TRI shall record on its books that TPR2 is the record owner of 3000 shares of TRI Common Stock, representing 52.85% of the issued common stock of TRI.

186. TPR2 will consent to the terms of the 2001 Stockholders Agreement.

187. Arie, Orly, Dalia, Sagi, TPR and TRI shall be directed to take all other necessary action and to execute all documents necessary to give full meaning to the intention of the parties to the Court Ordered Stipulation of Settlement in light of the ruling of the Delaware court that the 2004 Transfers were invalid.

188. There is a justiciable controversy.

189. There is no adequate remedy at law.

## SECOND CAUSE OF ACTION ON BEHALF OF ARIE AND ORLY

**(For the Imposition of a Constructive Trust against Sagi, TPR, Dalia, the Sagi Trust, Fang, and the Trump Parties)**

190. Plaintiffs repeat and re-allege the allegations in paragraphs 1 through 189, and incorporate the allegations contained in paragraphs 209-219.

191. Upon the Delaware Court voiding TPR's 2004 transfer of 52.85% of TRI shares to Arie, the Sagi Trust and the Orly Trust, legal title to such TRI shares reverted to TPR subject to Arie's rights as a constructive beneficial owner of 51% of the shares of TPR with respect to TPR's ownership of 52.85% of TRI shares.

48

192.    TPR is not entitled, in equity or good conscience, to retain any direct or indirect benefit resulting from the record ownership of the 3000 shares of TRI stock reverting to TPR as a result of the ruling of the Delaware courts .

193.    TPR would be unjustly enriched at the expense of Arie if it were permitted to retain any direct or indirect ownership or benefit from the sale of the 3000 shares of TRI stock because record ownership of such TRI shares reverted to TPR as a result of the Delaware court rulings.

194.    Upon TPR becoming the record owner of Arie's 794.4 shares of TRI stock as a result of the Delaware Court rulings, such shares were immediately held in a constructive trust by TPR for the benefit of Arie as the beneficial owner of those shares.

195.    Upon TPR becoming the record owner of the 1102.8 shares of TRI stock comprising the Orly Trust TRI shares, a constructive trust was immediately created in favor of Arie with respect to the Orly Trust TRI Shares, including, but not limited to, the voting rights appurtenant to such shares, all of which were held by TPR for the benefit of Arie, subject to the Orly Trust's right to receive the Orly Trust TRI Shares upon Arie's death.

196.    Upon TPR becoming the record owner of the 1102.8 shares of TRI stock comprising the Sagi Trust TRI shares, a constructive trust was immediately created in favor of Arie with respect to the Sagi Trust TRI Shares, including, but not limited to, the voting rights appurtenant to such shares, all of which were held by TPR for the benefit of Arie, subject to the Sagi Trust's right to receive the Sagi Trust TRI Shares upon Arie's death.

197.    Upon TPR becoming the record owner of all 3000 shares of TRI stock comprising the Orly Trust Shares, the Sagi Trust Shares and the Arie Shares, TPR held the voting rights to such 3000 shares in a constructive trust for the benefit of Arie.

198.    Arie's beneficial ownership and voting rights with respect to the 3000 TRI shares, which were held by TPR in a constructive trust for his benefit, were protected from further transfer to The Trump Group from the moment record title reverted to TPR.

199.    TPR was not authorized to transfer any of the 3000 TRI shares as to which it became the record owner, without the consent of Arie as the beneficial owner of such TRI Shares.

200.    TPR is not authorized to vote any of the 3000 TRI shares that reverted to TPR as record owner as a result of the Delaware Court rulings, except at the direction of Arie.

201.    The Trump Group are not bona fide purchasers of any of the 3000 TRI shares that reverted to TPR.

202.    The Trump Group was on notice of Arie's ownership and voting right claims with respect to the 3000 TRI shares that reverted to TPR, as record owners.

203.    The Trump Group knew and were on notice that TPR was not authorized to sell TPR's TRI shares without the prior consent of Arie.

204.    The Trump Group knew and was on notice that Arie objected to the sale to The Trump Group of any of the 3000 TRI shares that reverted to TPR, as record owner under the 2008 Stock Purchase Agreement, the Side Letter Agreement or the 2010 purported sale of the Arie and Orly Trust TRI shares.

50

205.   The Constructive Trust in favor of Arie imposed upon the Arie, the Orly Trust and the Sagi Trust TRI shares existed at the moment record ownership reverted to TPR, and attaches to any purported sale of these shares to The Trump Group, who were not bona fide purchasers.

206.   The Trump Group, in addition to TPR, would be unjustly enriched if they were permitted to keep the benefit of the purported sale by TPR of the 3000 TRI shares to The Trump Group, which sale Sagi was not authorized to enter into on behalf of TPR without the prior consent of Arie because, inter alia,

(i) the Trump Group would become the owner of the Arie, Sagi Trust and Orly Trust Shares, over the objection of Arie and without Arie's required prior permission and consent;

(ii)   the Trump Group would obtain Arie's right to vote these shares for the duration of his lifetime, without Arie's required prior permission and consent; and

(iii)   these shares would be acquired substantially below their true value without Arie's required prior permission and consent;

(iv)   the purported transaction by TPR was in derogation of Arie's beneficial ownership and voting rights appurtenant to such shares; and

(v)   the Trump Group are not bona fide purchasers of such shares.

207.   Plaintiffs have no adequate remedy at law.

### THIRD CAUSE OF ACTION
### ON BEHALF OF ARIE AND ORLY

**(Claim for Breach of Fiduciary Duty, Aiding and Abetting Breach of Fiduciary Duty and Conspiracy to Breach Fiduciary Duty Against Sagi, TPR, the Sagi Trust, Fang, the Trump Parties and TRI)**

208.   Plaintiffs repeat and reallege the allegations in paragraphs 1 through 207.

209.   Sagi, individually and as an officer of TPR, owed a fiduciary duty of trust, confidence and loyalty to Arie and the Orly Trust because, among other things, (i) he was entrusted to manage TPR's ownership of the TRI shares for the benefit of Arie and the Orly Trust upon the Chancery Court voiding the 2004 TPR transfers of TRI shares to Arie, the Sagi Trust and the Orly Trust, and the resulting ownership of such 52.85 % of TRI shares by TPR; (ii) he was entrusted to manage TPR's record ownership of the TRI shares for the benefit of Arie and the Orly Trust upon the Delaware Chancery Court voiding the 2004 TPR transfer of TRI shares to Arie, the Sagi Trust and the Orly Trust; (iii) pursuant to the 2004 TPR Transfer Agreement, Sagi was entrusted to take all actions necessary to ensure that Arie would maintain voting control of 52.85% of the stock of TRI in accordance with the express intent of all parties to the Stipulation of Settlement and 2004 TPR Transaction Documents; (iv) through Fang and the Sagi Trust, as his co-agents and alter egos, Sagi owed a duty of trust and confidence to Arie under the 2004 Voting Trust Agreement; and (v) as the successor to the rights and liabilities of Dalia under the Stipulation of Settlement and the manager of TPR, as a family holding company, Sagi owed a fiduciary duty to protect the assets of the Orly Trust for the benefit of his sister Orly and his father, Arie, in connection with the ownership of TPR, TPR's ownership of the TRI shares and D&K's minority ownership of TPR.

210. As a fiduciary Sagi, individually, and as an officer of TPR, owed a duty of fidelity and undivided loyalty to Arie, Orly, and the Orly Trust regarding the TRI shares.

211. Fang, individually and as the trustee of the Sagi Trust, owed a fiduciary duty to Arie under the 2004 Voting Trust Agreement and Side Letter.

212. The Trump Group, on becoming the majority shareholder of record in TRI, owed a fiduciary duty of fidelity and loyalty to Arie as the known beneficial owner of record of the Arie TRI shares.

213. Jules Trump and Mark Hirsch, each individually and on behalf of the Trump Group, and as Directors of TRI owed a fiduciary duty to TPR, and Arie as the beneficial owner of TRI shares to read TRI corporate documents presented to him in their entirety and have knowledge of the shareholders of record of TRI, a close corporation.

214. Sagi, TPR, the Sagi Trust, Fang, the Trump Parties each breached their respective fiduciary duties as a result of the conduct set forth in the allegations of this complaint, including, but not limited to their respective conduct in connection with the negotiation, execution and implementation of the 2008 Stock Purchase Agreement and the Side Letters and the subsequent transfer of the Arie and Orly Trust TRI Shares.

215. Sagi, TPR, the Sagi Trust, Fang, and the Trump Parties also knowingly aided, abetted, induced, participated in, enabled and substantially assisted each other to breach each of the other's respective fiduciary duties to Arie, Orly and the Orly Trust by the conduct alleged herein, including but not limited to misrepresenting to the Delaware Chancery Court that the share certificates for the Sagi Trust TRI shares were lost despite having actual knowledge that

53

such share certificates were held by Arie, and had not been delivered to the Sagi Trust, Sagi or Fang.

216.    TRI also knowingly aided, abetted, induced, participated in, enabled and substantially assisted the respective breaches of fiduciary duties owed to Arie, Orly and the Orly Trust by Sagi, TPR, the Sagi Trust, Fang and the Trump Parties.

217.    Sagi, TPR, the Sagi Trust, Fang, and the Trump Parties, each acting in conspiracy with, and as the co-agent of one another, entered into an illegal scheme, agreement, plan, and artifice to breach each other's respective fiduciary duties owed to Arie, Orly, and the Orly Trust by the conduct alleged herein in furtherance of this conspiracy.

218.    As a result of such breaches of fiduciary duty, aiding and abetting of breaches of fiduciary duties and conspiracies to breach fiduciary duty, by Sagi, TPR, the Sagi Trust, Fang, the Trump Parties and TRI, and each of them, Arie suffered compensatory damages in an amount to be determined.

219.    As a result of such breaches of fiduciary duty, aiding and abetting of breaches of fiduciary duty and conspiracies to breach  fiduciary duty, by Sagi, TPR, the Sagi Trust, Fang, the Trump Parties and TRI, and each of them, Orly, individually and as the beneficiary of the Orly Trust, suffered compensatory damages in an amount  to be determined.

### FOURTH CAUSE OF ACTION
### ON BEHALF OF ARIE AND ORLY

**(Claim for Unjust Enrichment and Rescission Against Sagi, TPR, Dalia, the Sagi Trust, Fang, and the Trump Parties)**

220.    Plaintiffs repeat and reallege the allegations in paragraphs 1 through 219.

221.    As a result of the Delaware Chancery Court holding, Dalia, TPR, Sagi, the Sagi Trust and the Trump Parties would each be unjustly enriched at the expense of Arie and the Orly

Trust if each or any of them were allowed to retain any direct or indirect benefit or consideration received by each of them from TPR's ownership of TRI Shares, which none of them are entitled, in equity or good conscience, to retain.

222.   Plaintiff Arie is entitled to rescind the transfer of his 51% interest in TPR to Dalia pursuant to the Stipulation of Settlement and 2004 Transaction Documents based on failure of consideration because, as a result of the holding by the Delaware Chancery Court, Arie did not receive any of the consideration that was due to him pursuant to such Agreements, including and not limited to (a) his 14% interest in the Arie TRI Shares, and his right to vote 52.85% of the TRI Shares that he controlled prior to the Delaware Court voiding the 2004 Transfers.

223.   Plaintiff the Orly Trust, is entitled to rescind the 2004 Transaction Documents based on failure of consideration because as a result of the holding by the Delaware Court the Orly Trust did not receive any of the consideration due to the Orly Trust pursuant to the 2004 Transfers.

224.   Arie and the Orly Trust are each also entitled to rescission because of failure of consideration based on mutual mistake as to the enforceability of the 2004 TPR Transfers of TRI stock to Arie, the Sagi Trust and the Orly Trust pursuant to the Stipulation of Settlement and the 2004 Transaction Documents.

225.   Arie and the Orly Trust are each entitled to an accounting.

226.   Arie and the Orly Trust have no adequate remedy at law.

## FIFTH CAUSE OF ACTION

**(Claim for Permanent Injunction Against Sagi, TPR, Dalia, the Sagi Trust, Fang and the Trump Parties)**

227.   Plaintiffs repeat and re-allege the allegations in paragraphs 1 through 226.

55

228.    Plaintiffs are entitled to the issuance of a permanent injunction enjoining and restraining Sagi, TPR, Dalia, the Sagi Trust, Fang and the Trump Parties, and each of them, from directly or indirectly transferring, selling, acquiring, pledging, assigning, diluting, voting, valuing, replacing, conveying, using, removing from the jurisdiction, or otherwise disposing of, or encumbering the 3000 shares of TRI stock that reverted to TPR's control as a result of the Delaware Court rulings.

229.    The failure to grant such permanent injunction will result in irreparable injury to the Plaintiffs.

230.    There is no adequate remedy at law.

231.    The balance of equities favor the Plaintiffs.

## SIXTH CAUSE OF ACTION

### (Claim for Breach of Contract against TPR on Behalf of Arie and Orly)

232.    Plaintiffs repeat and reallege the allegations in paragraphs 1 through 231.

233.    TPR entered into the 2004 TPR Transfer Agreement with Arie.

234.    TPR entered into the 2004 TPR Transfer Agreement with the Orly Trust.

235.    TPR breached its express and implied covenants and representations thereunder in connection with the transfer of TRI shares to Arie.

236.    TPR breached its express and implied covenants and representations thereunder by purporting to agree to transfer the Arie, Sagi Trust and Orly Trust TRI Shares to the Trump Parties.

237.    Arie and the Orly Trust performed their respective obligations under the 2004 TPR Transfer Agreement.

238.   As a result of such breach of contract, Arie lost the benefit of his bargain and suffered damages in an amount yet to be determined.

239.   TPR breached its express and implied covenants and representations under the 2004 Transaction Documents in connection with the transfer of TRI shares to the Orly Trust.

240.   The Orly Trust performed its obligations under the 2004 TPR Transfer Agreement.

241.   As a result of such breach of contract, the Orly Trust lost the benefit of its bargain and suffered damages in an amount yet to be determined, but believed to be in an amount to be determined.

### SEVENTH CAUSE OF ACTION
### ON BEHALF OF ARIE

**(Claim for Breach of Contract against the Sagi Trust)**

242.   Plaintiffs repeat and reallege the allegations in paragraphs 1 through 241.

243.   The Sagi Trust entered into the 2004 Voting Trust Agreement with Arie.

244.   The Sagi Trust breached its express and implied covenants and representations thereunder in connection with Arie's voting rights and control of TRI shares.

245.   Arie performed his obligations under the 2004 Voting Trust Agreement.

246.   As a result of such breach of contract, Arie lost the benefit of his bargain and suffered damages in an amount yet to be determined.

### EIGHTH CAUSE OF ACTION
### ON BEHALF OF ARIE AND ORLY

**(Claim for Tortious Interference with Contract Against the Trump Parties)**

247.   Plaintiffs repeat and reallege the allegations in paragraphs 1 through 246.

57

248.    The Trump Parties, and each of them, tortiously interfered with, among other things, (i) the Stipulation of Settlement between Arie and Dalia, (ii) the 2004 TPR Transfer Documents between Arie and the Orly Trust and TPR, (iii) the 2004 Voting Trust Agreement between Arie and the Sagi Trust, and (iv) the 2004 Voting Trust Agreement between Arie and the Orly Trust.

249.    The Trump Parties, and each of them, intentionally caused such breaches of contract without justification, as a result of the conduct set forth herein.

250.    As a result of the Trump Parties' tortious interference with contract, Arie suffered damages in an amount yet to be determined.

251.    As a result of the Trump Parties' tortious interference with contract, Orly and the Orly Trust suffered damages in an amount yet to be determined.

## NINTH CAUSE OF ACTION ON BEHALF OF ARIE AND ORLY

### (Claim for Aiding and Abetting Tortious Interference with Contract Against Sagi, Fang, and the Sagi Trust)

252.    Plaintiffs repeat and reallege the allegations in paragraphs 1 through 251.

253.    Sagi, Fang, and the Sagi Trust each had knowledge of the Trump Parties' tortious interference with the 2004 TPR Transaction Agreement and the Stipulation of Settlement, and each such defendant caused, encouraged and substantially assisted the Trump Parties in the commission of the foregoing acts of tortious interference with 2004 TPR Transaction Agreement and the Stipulation of Settlement.

254.    Sagi, Fang, and TPR each had knowledge of the Trump Parties' tortious interference with the 2004 Voting Trust Agreement, and the Stipulation of Settlement, and each such defendant caused, encouraged and substantially assisted the Trump Parties in the

58

commission of the foregoing acts of tortious interference with the 2004 Voting Trust

Agreements.

255.   By reason of the foregoing, Arie has been damaged in an amount to be

determined.

256.   By reason of the foregoing, Orly, individually and as the beneficiary of the Orly

Trust has been damaged in an amount to be determined.

### TENTH CAUSE OF ACTION ON BEHALF OF ARIE AND ORLY

**(Claim for Preliminary Injunction Against the Trump Parties, Sagi Genger TPR and the
Sagi Trust Under CPLR 7109)**

257.   Plaintiffs repeat and reallege the allegations in paragraphs 1 through 256.

258.   The Arie and Orly Trust TRI shares are unique chattel.

259.   By virtue of the facts set forth above, Arie is the beneficial owner of the Arie TRI

shares.

260.   Sagi is not authorized to take any action on behalf of TPR to sell, transfer, pledge,

dilute, or take any action on behalf of TPR relating to or concerning the 3000 TRI shares that

reverted to TPR, without the prior written consent of Arie and Sagi is not authorized to exercise

any and all rights, including TPR's voting rights with respect to such 3000 TRI shares, except as

so directed by Arie as the beneficial owner of such shares and the voting rights appurtenant

thereto.

261.   Sagi is not authorized to take any action on behalf of TPR to sell, transfer, pledge,

dilute, or take any action on behalf of TPR relating to or concerning the Orly Trust TRI shares.

262.   By virtue of the facts set forth above, the Orly Trust is entitled to the benefits

provided to it under the Stipulation of Settlement.

263.    The Arie TRI shares, the Orly Trust TRI shares, and the Sagi Trust shares are wrongfully being held by the Trump Parties.

264.    Plaintiffs are entitled to a preliminary injunction, under CPLR 7109, that the Arie TRI shares, the Orly Trust TRI shares, and the Sagi Trust TRI shares shall be restrained and enjoined from transferring, selling, diluting, pledging, assigning or otherwise disposing of or removing such shares from the State until the further order of the Court.

WHEREFORE, Plaintiffs demand Judgment in favor of Plaintiffs against the Defendants as follows:

(a) on the **First Cause of Action against all Defendants**: that this Court find and declare that Arie is entitled to an Order from this Court to reform the terms of the Court-Ordered Stipulation of Settlement to provide as follows:

(i) that the transfer by Arie of his 51% interest in TPR to Dalia and the concurrent transfer of the 3000 shares of TRI stock to Arie, the Orly Trust and the Sagi Trust, respectively, as originally set forth in the Stipulation of Settlement is voided *ab initio* as a result of the Delaware Court finding that the 2004 Transfers are invalid;

(ii) that all the assets of TPR, other than the 3000 Arie, Orly Trust and Sagi Trust TRI shares, remain the property of TPR or any successor in interest to those assets;

(iii) that pursuant to a further order of this Court the Court-Ordered Stipulation of Settlement is modified *ab initio* to provide that the 3000 shares of TRI common stock that were returned to TPR as a result of the Delaware Court Action voiding the original 2004 Transfers be placed in a newly formed single purpose entity controlled by Arie (hereinafter, "TPR2");

(iv) that Arie be declared the 51% owner of TPR2 which in turn shall be declared, ab initio, the record and beneficial owner of all such 3000 TRI shares, as though no 2004 Transfers were consummated under the original terms of the Stipulation of Settlement;

(v) that the Orly Trust and Sagi Trust each be declared the owner of 24.5% of TPR2 so that together they own the remaining 49% of TPR2;

(vi) that TPR2 shall not sell or transfer the 3000 TRI shares prior to Arie's death, unless such sale would otherwise be permitted and would not violate the terms of the 2001 Stockholders Agreement, including, but not limited to, Article 2 of such Agreement;

(vii) upon Arie's death, 1102.8 of TRI shares, plus any stock dividends relating thereto ("the Sagi Trust TRI shares") will be transferred by TPR2 outright to the Sagi Trust, and 1102.8 of TRI shares, plus any stock dividends relating thereto ("the Orly Trust TRI Shares") will be transferred outright to the Orly Trust;

(viii) all cash dividends relating to the Sagi Trust and the Orly Trust TRI Shares received by TPR2 during Arie's lifetime will be distributed, after payment of taxes and expenses to the Shareholders of TPR2, as if (a) Arie owned 794.40 shares, representing 13.99468% of the common stock of TRI, and (b) the Sagi Trust and the Orly Trust each owned 1102.8 shares, representing 19.42766% of TRI common stock;

(ix) Arie through his 51% control of TPR2 will retain all voting rights to the 3000 TRI shares and any additional TRI shares issued to TPR or TPR2 as stock dividends or otherwise for the duration of his life.

(x) The Trump Group shall deliver to TPR2 the 1102.8 shares of TRI common stock purportedly purchased under the 2008 Stock Purchase Agreement.

(xi) The $26,715,416.00 paid by the Trump Group to the Sagi Trust under the 2008 Stock Purchase Agreement will be returned to the Trump Group by TPR and the Sagi Trust.

(xii) The Trump Group shall deliver to TPR2 the 794.40 Arie and the 1102.8 Orly Trust TRI shares purportedly sold to TPR under the Side Letter Agreement and 2010 Transaction.

(xiii) The purported sales by TPR of the Arie and Orly Trust TRI Shares to the Trump Group, while the Delaware Supreme Court appeal was pending, will be declared null and void and the proceeds from these purported sales now held in escrow will be released to the Trump Group.

(xiv) TRI shall record on its books that TPR2 is the record owner of 3000 shares of TRI Common Stock, representing 52.85% of the issued common stock of TRI.

(xv)    TPR2 will consent to the terms of the 2001 Stockholders Agreement.

(xvi) Arie, Orly, Dalia, Sagi, TPR and TRI shall be directed to take all other necessary action and to execute all documents necessary to give full meaning to the intention of the parties to the Court-Ordered Stipulation of Settlement in light of the rulings of the Delaware Court that the 2004 Transfers were invalid.

(xvii) Any other declaration as the Court may deem fair and reasonable to give effect to the Original Intent of the parties to the Stipulation of Settlement.

(b) on the Second Cause of Action against Defendants Sagi, TPR, Dalia, the Sagi Trust, Fang and the Trump Parties, that the Court find and declare that:

(i) upon the Delaware Court voiding TPR's 2004 transfer of 52.85% of TRI shares to Arie, the Sagi Trust and the Orly Trust, legal title to such TRI shares reverted to TPR subject to Arie's rights as a constructive beneficial owner of 51% of the shares of TPR with respect to TPR's ownership of 52.85% of TRI shares;

(ii) upon TPR becoming the record owner of Arie's 794.4 shares of TRI stock as a result of the Delaware Court rulings, such shares were immediately held in a constructive trust by TPR for the benefit of Arie as the beneficial owner of those shares;

(iii) upon TPR becoming the record owner of the 1102.8 shares of TRI stock comprising the Orly Trust TRI shares, a constructive trust was immediately created in favor of Arie with respect to the Orly Trust TRI Shares, including, but not limited to, the voting rights appurtenant to such shares, all of which were held by TPR for the benefit of Arie, subject to the Orly Trust's right to receive the Orly Trust TRI Shares upon Arie's death;

(iv) upon TPR becoming the record owner of the 1102.8 shares of TRI stock comprising the Sagi Trust TRI shares, a constructive trust was immediately created in favor of Arie with respect to the Sagi Trust TRI Shares, including, but not limited to, the voting rights appurtenant to such shares, all of which were held by TPR for the benefit of Arie, subject to the Sagi Trust's right to receive the Sagi Trust TRI Shares upon Arie's death;

(v) upon TPR becoming the record owner of all 3000 shares of TRI stock comprising the Orly Trust Shares, the Sagi Shares and the Arie Shares, TPR held the voting rights to such 3000 shares in a constructive trust for the benefit of Arie;

63

(vi) TPR was not authorized to transfer any of the 3000 TRI shares as to which it became the record owner, without the consent of Arie as the beneficial owner of such TRI Shares;

(vii) TPR is not authorized to vote any of the 3000 TRI shares that reverted to TPR as record owner as a result of the Delaware Court rulings, except at the direction of Arie;

(viii) The Constructive Trust in favor of Arie imposed upon Arie, the Orly Trust and the Sagi Trust TRI shares existed at the moment record ownership reverted to TPR, and attaches to any purported sale of these shares to the Trump Group, who were not and are not bona fide purchasers of any of the 3000 TRI shares that reverted to TPR.

(c) on the **Third Cause of Action against Defendants Sagi, TPR, the Sagi Trust, Fang, the Trump Parties and TRI, jointly and severally, as follows:**

(i) awarding compensatory damages to the Plaintiff Arie in an amount to be determined, plus an additional award of punitive damages in an amount to be determined, plus Plaintiff's attorneys fees and costs incurred in connection with this action;

(ii) awarding compensatory damages to the Plaintiff Orly Genger individually and as the beneficiary of the Orly Trust in an amount to be determined, plus an additional award of punitive damages in an amount to be determined, plus Plaintiff's attorneys fees and costs incurred in connection with this action;

(d) on the **Fourth Cause of Action against Defendants Sagi, TPR, Dalia, the Sagi Trust, Fang, and the Trump Parties:**

(i) rescinding Plaintiff Arie's transfer of his 51% interest in TPR to Dalia pursuant to the Stipulation of Settlement and 2004 Transaction Documents;

64

(ii) rescinding the 2004 Transaction Documents;

(iii) Defendants Sagi, TPR, Dalia, the Sagi Trust, Fang and the Trump Parties must account to Arie and Orly, individually and as the beneficiary of the Orly Trust, for 3000 TRI Shares and/or their respective value that are now or ever have been in their respective possession, custody or control; and

(iv) such other equitable relief as the Court may deem fair and reasonable;

(e) on the **Fifth Cause of Action against Defendants Sagi, TPR, Dalia, the Sagi Trust, Fang and the Trump Parties**, permanently enjoining and restraining these Defendants, and each of them, from directly or indirectly transferring, selling, acquiring, pledging, assigning, diluting, voting, valuing, replacing, conveying, using, removing from the jurisdiction, or otherwise disposing of, or encumbering the 3000 shares of TRI common stock that reverted to TPR as a result of the Delaware court rulings.

(f) on the **Sixth Cause of Action against Defendant TPR:**

(i) awarding compensatory damages to the Plaintiff Arie in an amount to be determined, plus Plaintiff's attorneys' fees and costs incurred in connection with this action; and

(ii) awarding compensatory damages to the Plaintiff Orly individually and as the beneficiary of the Orly Trust in an amount to be determined, plus Plaintiff's attorneys' fees and costs incurred in connection with this action.

(g) on the **Seventh Cause of Action against Defendant Sagi Trust**, a money judgment awarding compensatory damages to the Plaintiff Arie in an amount to be determined, plus Plainitiff's attorneys' fees and costs incurred in connection with this action;

65

(h) on the **Eighth Cause of Action Against the Defendant Trump Parties, jointly and** severally:

(i) awarding compensatory damages to the Plaintiff Arie in an amount to be determined, plus an additional award of punitive damages in an amount to be determined, plus Plaintiff's attorneys' fees and costs incurred in connection with this action;

(ii) awarding compensatory damages to the Plaintiff Orly individually and as the beneficiary of the Orly Trust in an amount to be determined, plus an additional award of punitive damages in an amount to be determined, plus Plaintiff's attorneys' fees and costs incurred in connection with this action;

(I) on the **Ninth Cause of Action Against Sagi, Yang, and the Sagi Trust**:

(i) awarding compensatory damages to the Plaintiff Arie in an amount to be determined, plus an additional award of punitive damages in an amount to be determined, plus Plaintiff's attorneys' fees and costs incurred in connection with this action;

(ii) awarding compensatory damages to the Plaintiff Orly, individually and as the beneficiary of the Orly Trust, in an amount to be determined, plus an additional award of punitive damages in an amount to be determined, plus Plaintiff's attorneys' fees and costs incurred in connection with this action;

(j) on the **Tenth Cause of Action for a Preliminary Injunction Against the Trump Parties, Sagi Genger, TPR and the Sagi Trust Under CPLR 7109**, and each of them for an injunction or temporary restraining order under CPLR 7109, restraining and enjoining each of them from transferring, selling, diluting, pledging, assigning or otherwise disposing of or

66

removing the Arie TRI Shares, the Orly Trust TRI shares, and the Sagi Trust TRI shares from the State until the further Order of the Court.

     (k)     On all causes of action set forth in this Complaint, such other relief as this court may deem just, together with the costs and disbursements incurred by plaintiffs in this action, including the recovery of plaintiffs' reasonable attorneys' fees.

DATED: New York, New York
September 20, 2011

MITCHELL SILBERBERG & KNUPP LLP

By: _____
Paul D. Montclare (PM 4454)
Lauren J. Wachtler (LW 4205)
12 E. 49th Street, 30th Floor
New York, New York 10017
(212) 509-3900

Attorneys for Plaintiff ARIE GENGER

ZEICHNER ELLMAN & KRAUSE LLP

By: _____
Yoav M. Griver
Bryan D. Leinbach
575 Lexington Avenue
New York, New York 10022
Telephone: (212) 223-0400
Facsimile: (212) 753-0396

Attorneys for Plaintiff ORLY GENGER, in
her individual capacity and on behalf of the
ORLY GENGER 1993 Trust

# Exhibit 10



At the Surrogate's Court held in and for the County of New York, at the Courthouse, 31 Chambers Street, New York, New York on the __ day of June 2009
July

New York County Surrogate's Court
DATA ENTRY DEPT.
Date: July 1, 2009

PRESENT: HON. _Troy K. Webber_
Surrogate

In the Matter of the Application of

ORLY GENGER, as a person interested, for the removal of DALIA GENGER as Trustee of the Orly Gengar 1993 Trust pursuant to SCPA §711 (11)

File No.: 0017/2009

ORDER TO SHOW CAUSE WITH TEMPORARY RESTRAINTS

On reading and filing the annexed Verified Petition of Petitioner, ORLY GENGER, and the exhibits, verified on the 22nd day of June, 2009, and the memorandum of law in support of Petitioner's Verified Petition dated June 22, 2009,

LET the Respondent, DALIA GENGER, the sole fiduciary of the Orly Gengar 1993 Trust, show cause before Surrogate _Troy K. Webber_ at the Surrogate's Court, 31 Chambers Street, New York, New York, on the 6th day of June 2009 at 10:00 o'clock in the forenoon of that day or as soon thereafter as counsel may be heard why an order should not be entered:

sitting at 60 Centre Room 309 in August

    (a)    Enjoining and restraining Respondent, her agents and all other persons acting on her behalf from withdrawing, selling disposing, transferring, assigning, removing, pledging, redeeming, mortgaging, encumbering, liening, hypothecating or securing the Orly Trust's 19.43% interest in Trans-Resources, Inc., ("TRI"), a closely held corporation, founded by Arie Genger, Petitioner's father and Respondent's former husband of Respondent and any other assets which may be remaining in the Orly Trust;

NYC_XXXXXXXXXXXX

(b)     Removing Respondent as Trustee of the Oriy Trust for breaching her

fiduciary duties, wasting and dissipating the assets of the Oriy Trust and imprudently managing

and injuring the property committed to her charge;

(c)     Surcharging Respondent in the amount of the loss of the value of Oriy's

interest in TPR as determined by the Court and awarding Petitioner costs and attorneys' fees;

(d)     Appointing Michael D. Grohman, Esq. as successor trustee;

(e)     Waiving any requirement that Petitioner post an undertaking; and

(f)     Granting Petitioner such further relief deemed necessary or proper.

ORDERED that, during the pendency of this proceeding, Respondent *her agents and all* [and/or her counsel]
are required to give notice by overnight mail to petitioners counsel of any 1) offer
to purchase the Orly Trust's 19.5% interest in TRI within 10 days of receiving
such offer and 2) act by Respondent, her agents and all other persons
acting on her behalf to assign, mortgage, pledge, redeem, encumber, sell or
otherwise alter the Orly Trust's interest in TRI at least 10 days prin to such act
*and it* ORDERED *that further* that service of a copy of this Order and the papers upon which it is based

shall be served on Respondent by personal service at either her residence, located at 200 East

65th Street, Apt. 32W, New York, New York 10021, or any other address at which she can be

located, on or before July 7, 2009; and it is further

ORDERED, that any responsive papers shall be filed by
July 29, 2009.

ENTER

                                                                Surrogate

Exhibit 11

SUPREME COURT OF THE STATE OF NEW YORK — NEW YORK COUNTY

PRESENT: Hon. Beatrice Shainswit                    PART 10

                                     *Justice*

In Re IBJ Schroder Bank +                 INDEX NO. __101530/98__
Trust

                                          MOTION DATE _____

              v                  MOTION SEQ. NO. __001__

                                           MOTION CAL. NO. _____

The following papers, numbered 1 to _____ were read on this motion to/for _____

|                                                                          | PAPERS NUMBERED |
|--------------------------------------------------------------------------|-----------------|
| Notice of Motion/ Order to Show Cause — Affidavits — Exhibits ...         |                 |
| Answering Affidavits — Exhibits                                           |                 |
| Replying Affidavits                                                       |                 |

Cross-Motion: ☐ Yes  ☒ No

Upon the foregoing papers, it is ordered that this motion

On remand, pursuant to the order of
the Appellate division, First department,
dated April 20 2000.

MOTION IS DECIDED IN ACCORDANCE WITH
ACCOMPANYING MEMORANDUM DECISION

**FILED**

OCT 03 2000

COUNTY CLERK'S OFFICE
NEW YORK

MOTION/CASE IS RESPECTFULLY REFERRED TO
JUSTICE

Dated: 8/16/00

Check one: ☒ FINAL DISPOSITION  ☐ NON-FINAL DISPOSITION

CDISPS

SUPREME COURT OF THE STATE OF NEW YORK
NEW YORK COUNTY : IAS PART 10
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

In the Matter of the Application of                         Index No. 101530/98

IBJ SCHRODER BANK & TRUST COMPANY (not
in its individual capacity but in its capacity as Trustee
under a Trust Agreement dated as of December 21, 1985
among Resources Satellite Corp., J. Henry Schroder
Bank & Trust Company and the Beneficiaries thereunder),
                                        Petitioner,

for an order, pursuant to CPLR § 7701, for a Construction
of an Indenture and Approval of a Settlement.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

SHAINSWIT, J.:

        In this special proceeding, brought pursuant to CPLR Article 77,

petitioner-trustee seeks a declaratory judgment concerning the construction of an

investor Trust Agreement, together with approval of the trustee's proposed settlement

of another action presently pending in this Court, involving assets of the Trust, entitled

IBJ Schroder Bank & Trust Co. v GE Capital Spacenet Services, Inc., Index No.

601299/96 (the "Spacenet" action).

        The Trust was established in 1985 to facilitate investments by more than

400 beneficiaries in a project involving the launching and operation of a

communications satellite during the years 1985 through 1994.  The Trust involved a

complex series of financial transactions involving the development and placement in

space of the communications satellite.

        The Spacenet action involves a certain master lease relating to the lease

of 24 satellite transponders carried on a satellite which was launched into orbit in 1985.

The satellite earned money for the Trust through receipt of sums from television and radio broadcasters for the use of electronic signals transmitted for television and radio broadcasting by the satellite's "transponders." A transponder automatically transmits a broadcasting signal upon reception of such a signal from another transmitter.

Because adequate supply of fuel was crucial to the operation of the satellite, the trustee and the satellite owner executed the Agreement Regarding Fuel ("Fuel Agreement"), whereby the satellite owner agreed to make certain stipulated fuel shortfall payments, entitled "Stipulated Loss Value" payments, in the event of a fuel shortage. It is alleged that such a fuel shortage occurred, thereby triggering the trustee's rights to demand payment from the satellite owner under the terms of the Fuel Agreement. Accordingly, in the Spacenet action, the trustee seeks to recover from the satellite owner the sum of $40,785,455, representing a "Stipulated Loss Value" payment set forth for in the Fuel Agreement.

The satellite owner served its answer in the Spacenet action, denying all liability and pleading defenses and counterclaims, including, among other things, that: (a) the provision in the Fuel Agreement as to Stipulated Loss Value was an unenforceable penalty under New York law; (b) the satellite's failure resulted from a catastrophic event or mechanical failure and not from a lack of fuel; and (c) the satellite in fact had sufficient fuel on the applicable date.

In September 1997, the trustee and the defendants in the Spacenet litigation conditionally agreed to a proposed settlement which provides for the satellite owner to pay $8.5 million, of which $6.97 million would be paid to the Trust.

2



The trustee thereupon commenced this action by "Verified Petition For Construction of Trust and Approval of Proposed Settlement," seeking, among other things: (a) a declaration that it had the authority to commence the Spacenet action; (b) a declaration that it had the authority to settle the Spacenet action; and (c) judicial approval of the proposed settlement of the Spacenet action.  186 trust beneficiaries, jointly represented by one law firm, have submitted opposition to the trustee's application for a declaratory judgment and approval of the proposed settlement.

The trustee predicates his commencement of the Spacenet action, vis-a-vis the beneficiaries of the Trust, upon section 5.02 of the Investor Trust Agreement. That section provides that, in the event of an event of a default under the master lease:

> the Trustee shall give prompt written notice of such event of default to the Lessee, the Grantor and the Beneficiaries by certified mail, postage prepaid. In the event that such event of default has not been cured within 30 days after mailing of such notice, the Trustee shall take such action or shall refrain from taking such action, not inconsistent with the provisions of the Agreements, with respect to such event of default as the Trustee shall be directed in writing by all of the Beneficiaries, or, _if no such direction has been received from all of the Beneficiaries within 30 days after the mailing of such notice to the Beneficiaries, the Trustee shall, in its sole discretion ... take such action as shall be necessary to terminate the Master Lease, to obtain the benefits of the Master Collateral Assignment Agreement and to cause the Lessee thereunder to perform all of its obligations upon such termination._

(emphasis supplied).

Prior to commencing the Spacenet action, the trustee sent the requisite notice under Section 5.02 of the Investor Trust Agreement to the proper parties, including the beneficiaries, and did not, in return, receive any "directions" from the beneficiaries.

By decision and judgment dated October 21, 1998, this Court held that the Trust Agreement did not confer upon the trustee authority to settle the action in question.[1] Having decided that such authority to settle the Spacenet action was lacking, the Court never reached the trustee's further request for judicial approval of the proposed settlement. The trustee appealed from the October 21 1998 decision and judgment.

The Appellate Division reversed (__ AD2d __, 706 NYS2d 114 [First Dept 2000]). The Appellate Division held that the trustee was, in fact, vested with the authority to settle the Spacenet action, stating that:

> It is settled that the duties and powers of a trustee are defined by the terms of the trust agreement and are tempered only by the fiduciary obligation of loyalty to the beneficiaries (see, United States Trust Co. of N. Y. v First Nat. City Bank, 57 AD2d 285, 295-296 affd 45 NY2d 869; Restatement [Second] of Trusts § 186, comments a, d). In this matter, the same provision of the trust agreement which, the parties do not dispute, gave the trustee the power to commence the underlying action, also vests the trustee with the power to "take such action as shall be necessary" with respect to the subject matter of the underlying action. We now find that this provision includes the power to settle that action. We take no position on whether the settlement agreement, in its present form, should be approved and remand the matter to the IAS court to consider all relevant factors in determining whether such approval is warranted.

(Id.).

Thus, this matter is now before this Court on remand to determine

---

[1] On a motion seeking, inter alia, reargument and clarification of the October 21, 1998 decision and judgment, this Court held that the trustee had the authority, pursuant to section 5.02 of the Investor Trust Agreement, to "take such action" as might be necessary under the circumstances, including commencing the Spacenet action (Decision and Order dated April 12, 1999).

4

whether or not approval of the proposed settlement is warranted.

As set forth in the Petition, the trustee maintains that the proposed settlement of the Spacenet action is reasonable and prudent, and the best way to conserve and protect the Trust's assets. In support, the trustee argues that: (a) there is a serious risk that the Spacenet defendants may prevail on one or more of the defenses asserted by them in the Spacenet action, thereby precluding any recovery by the trustee in the Spacenet action; and (b) prosecution of the Spacenet action would be very costly and time consuming, because such cases are extremely expert-intensive and technically complex.

The opposition offered by the 186 trust beneficiaries goes primarily to their belief that the settlement amount is too low. They claim that the proposed settlement is unreasonable and contrary to their best interests, arguing that: (a) the plain terms of the Fuel Agreement require payment of the "Stipulated Loss Value" of approximately $40 million (now over $60 million with interest); (b) the proposed settlement would substantially compromise that amount to $8.5 million; and (c) the trustee has not in any way tested any of the defenses raised in the Spacenet litigation, but rather agreed to that substantial compromise despite having failed to take any discovery or to file any dispositive motions in the Spacenet litigation.

Since the objecting beneficiaries have not submitted any evidence to show that the trustee's actions may have been based on some ulterior motive or that the trustee is somehow itself interested in the transaction other than in its fiduciary capacity, the trustee submits that the dispute comes down to whose view as to the

5

wisdom of the proposed settlement should prevail -- that of the trustee or that of the objecting beneficiaries.

Here, the trustee is the entity to whom the Investor Trust Agreement gives sole power to "take such action as shall be necessary" with respect to the subject matter of the underlying action.  While there is some question as to whether the applicable standard of review here is the business judgment rule or the prudent man standard, the conclusion is the same under either standard -- the trustee's decision to compromise the Spacenet action is within the scope of the trustee's powers, is reasonable and prudent, and is entitled to judicial deference.  Thus, in view of the trustee's showing of the reasonableness of the proposed settlement herein, and in the absence of any evidence tending to show a breach by the trustee of its fiduciary duties, the trustee's view must prevail.  The Court will not invalidate the proposed settlement merely because certain beneficiaries believe a greater recovery might be obtained if the Spacenet action is submitted to an expensive and unpredictable litigation.

## CONCLUSION

Accordingly, on remand, the Court holds that approval of the proposed settlement of the Spacenet action is warranted, and grants the trustee's motion to that extent.  Settle order/judgment.

Dated: August 16 , 2000

ENTER:

_____

J.S.C.

6

# Exhibit 12

**David Parnes**

# Memo

To:     Robert Meister
From:   David Parnes
CC:     Robert Brighton
Date:   5/15/2012
Re:     Original Note of $4mm in Favor of TPR

---

Attached is the original note of $4,000,000 made by the Orly Genger 1993 Trust in favor of TPR Investment Associates, Inc.   The note is being purchased by the Manhattan Safety Company ("Manhattan").  We understand, that you are swapping this note for a different instrument in favor of Manhattan.  At their request, we are delivering you this instrument to be held until they receive physical possession of the original new instrument.  At that time, you may return this original to the Orly Genger 1993 Trust.

## PROMISSORY NOTE

$4,000,000

October 3, 2011

FOR VALUE RECEIVED, the undersigned, the Orly Genger 1993 Trust ("Borrower"), by way of its current sole trustee, Dalia Genger, promises to pay to TPR Investment Associates, Inc., a Delaware corporation ("Lender") the sum of $4,000,000 ("Principal") together with interest thereon at the rate of three percent (3%) percent per annum, payable as follows, and further covenants, to Lender, as follows:

The Principal together with all interest accrued thereon shall be due and payable to, or to the order of, Lender on the earliest of:

    (i)    November 1, 2012;

    (ii)    Immediately upon Borrower's receipt of the proceeds from the sale of TRI shares either pursuant to the interpleader action pending in the United States District Court for the Southern District of New York (the "Court") in *Pedowitz v. TPR*, 11 Civ. 5602, or otherwise.

Notwithstanding anything to the contrary herein or in the parties' accompanying Settlement Agreement, to the extent that the Court awards Lender any of the interpleaded funds, Lender shall first retain such funds to the extent necessary to pay down this Note in full, and then transfer any remaining funds to Borrower.

This occurrence and continuation of any one or more of the following events shall constitute an event of default under this New Note ("Event of Default"):

    (a)    _Payment Default_. Borrower shall fail to make any required payment due in connection with this New Note.

    (b)    _Third Party Lien or Caveat_. The creation of a lien on Borrower's property, or the entry of a caveat (which Lender deems material), that has not been removed ten (10) days of its creation.

    (c)    _Change of Trustee_. The resignation, removal, or otherwise change of trustee of Borrower.

    (d)    _Bankruptcy Default_. The Borrower shall (i) commence any case, proceeding or other action under any existing or future law of any jurisdiction relating to seeking to have an order for relief entered with respect to it or its debts, or seeking reorganization, arrangement, adjustment, winding-up, liquidation, dissolution, composition or other such relief with respect to it or its debts, or seeking appointment of a receiver, trustee, custodian or other similar official for it or for all or substantially all of its assets (each of

the foregoing, a "Bankruptcy Action"); (ii) become the debtor named in any Bankruptcy Action which results in the entry of an order for relief or any such adjudication or appointment described in the immediately preceding clause (i), or remains undismissed, undischarged or unbonded for a period of sixty (60) days; or (iii) make a general assignment for the benefit of its creditors.

In each and every Event of Default, the Lender may, without limiting any other rights it may have at law or in equity, by written notice to the Borrower, declare the unpaid Principal of and Interest on this New Note due and payable, whereupon the same shall be immediately due and payable, without presentment, demand, protest or other notice of any kind, all of which the Borrower hereby expressly waives, and the Lender may proceed to enforce payment of such Principal and Interest or any part thereof in such manner as it may elect in its discretion.

This Note may be prepaid in whole or in part at any time without premium or penalty.

All prepayments shall be applied first to Interest, then to principal payments in the order of their maturity.

The undersigned agrees to pay all costs and expenses, including all reasonable attorneys' fees, for the collection of this Note upon default.  All payments shall be made at 1211 Park Avenue, New York, NY, 10128, or at such other place as the holder hereof may from time to time designate in writing.

Upon default, whether pursuant to an Event of Default or otherwise, the interest rate shall be increased to an amount ("Overdue Rate") equal to the maximum legal rate of interest permitted by applicable law.

If this New Note is not paid when due, Borrower promises to pay all costs and expenses of collection and attorneys' fees incurred by the holder hereof on account of such collection, whether or not suit is filed thereon. Borrower consents to renewals, replacements and extensions of time for payment hereof, before, at, or after maturity; consents to the acceptance, release or substitution of security for this note, and waives protest, presentment, demand for payment, notice of default or nonpayment and notice of dishonor and the right to assert any statute of limitations. The indebtedness evidenced hereby shall be payable in lawful money of the United States.

This New Note shall be governed by, and shall be construed and enforced in accordance with, the laws of the state of Delaware without giving effect to the conflict of law rules thereof, and shall be adjudicated before the appropriate Courts of the State of Delaware.

_Dalia Genger_
THE ORLY GENGER 4993 TRUST

# Exhibit 13

Robert Meister

| | |
|---|---|
| **From:** | Allingham II, Thomas J <Thomas.Allingham@skadden.com> |
| **Sent:** | Monday, April 23, 2012 6:19 PM |
| **To:** | 'Yoav M. Griver' |
| **Cc:** | ljw@msk.com; pdm@msk.com; Dellajo@duanemorris.com; emichailidis@duanemorris.com; robert.meister@pedowitzmeister.com; Bryan D. Leinbach; asash@mclaughlinstern.com; dcavanaugh@lyons-mcgovern.com; esilverman@wmllp.com; William Wachtel; robert.meister@pedowitzmeister.com; Frank, William P; Clark, Anthony W |
| **Subject:** | TRI Dividends |

Dear Yoav:

In response to your letter of April 17, 2012, without acknowledging any obligation to respond to this or any other requests regarding TRI business, please note the following (numbered items correspond to your numbered questions):

1. An aggregate amount of $27,000,000 of dividends were paid during calendar 2011.

2. 2. Yes, 32.5% of those dividends were escrowed with Skadden ($8,707,500) and, as of today, that amount plus interest accrued remains escrowed with Skadden.

3. 3. TRI's Board of Directors has authorized dividends during 2012 aggregating $25,618,968 and as with the above, 32.25% of such dividends is being escrowed with Skadden under the escrow arrangement previously discussed among all the parties.

Tom

---

**From:** Yoav M. Griver [mailto:YGriver@zeklaw.com]
**Sent:** Tuesday, April 17, 2012 4:55 PM
**To:** Allingham II, Thomas J (WIL)
**Cc:** ljw@msk.com; pdm@msk.com; Dellajo@duanemorris.com; emichailidis@duanemorris.com; robert.meister@pedowitzmeister.com; Bryan D. Leinbach; asash@mclaughlinstern.com; dcavanaugh@lyons-mcgovern.com; esilverman@wmllp.com; William Wachtel; robert.meister@pedowitzmeister.com; Frank, William P (NYC); Clark, Anthony W (WIL)
**Subject:** Genger -- Letter

Letter to your attention.  Thank you.

Yoav M. Griver, Esq.
Partner
Zeichner Ellman & Krause LLP

**ZEK**

575 Lexington Avenue
New York, New York 10022
Tel. (212) 826-5338
Fax (212) 763-0396
ygriver@zeklaw.com

1

www.tekslaw.com

<u>NEW YORK</u> | <u>NEW JERSEY</u> | <u>CONNECTICUT</u>

This transmission may contain sensitive and/or privileged information. The sender does not waive any privilege or confidentiality in the event of an inadvertent transmission to an unauthorized recipient. In the event of such a transmission, kindly contact the sender to arrange retrieval. IRS Circular 230 Disclosure: To ensure compliance with requirements imposed by the IRS, we inform you that any U.S. federal tax advice contained in this communication (including any attachments) is not intended or written to be used, for the purpose of (i) avoiding penalties under the Internal Revenue Code or (ii) promoting, marketing, or recommending to another party any transaction or matter addressed herein.

---

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

To ensure compliance with Treasury Department regulations, we advise you that, unless otherwise expressly indicated, any federal tax advice contained in this message was not intended or written to be used, and cannot be used, for the purpose of (i) avoiding tax-related penalties under the Internal Revenue Code or applicable state or local tax law provisions or (ii) promoting, marketing or recommending to another party any tax-related matters addressed herein.
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

This email (and any attachments thereto) is intended only for use by the addressee(s) named herein and may contain legally privileged and/or confidential information. If you are not the intended recipient of this email, you are hereby notified that any dissemination, distribution or copying of this email (and any attachments thereto) is strictly prohibited. If you receive this email in error please immediately notify me at (212) 735-3000 and permanently delete the original email (and any copy of any email) and any printout thereof.

Further information about the firm, a list of the Partners and their professional qualifications will be provided upon request.
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

# EXHIBIT "D"

SURROGATE'S COURT : NEW YORK COUNTY

JAN 0 2 2009

------------------------------------- X

In the Matter of the Trust Established
on December 13, 1993, by ARIE GENGER          File No. 0017/2008
for the Benefit of ORLY GENGER.

------------------------------------- X

R O T H , S .

This is a contested application by the primary beneficiary

(Orly Genger) of an irrevocable inter vivos trust established by

her father, Arie Genger, seeking the appointment of a successor

trustee or, alternatively, the appointment of a "special trustee"

to investigate alleged wrongdoing concerning the trust.

Petitioner's mother, Dalia Genger (grantor's former wife),

contends that she is the duly appointed successor trustee and

that there is no basis to appoint another fiduciary for any

purpose.

The trust agreement, dated December 13, 1993, provides for

discretionary income and principal distributions to Orly for life

with remainder to her descendants or, if none, to the grantor's

descendants in trust.

Article SEVENTH (B), (D), (E), and (G) of the trust

instrument sets forth the following procedure for the resignation

of trustees and the appointment of their successors.

A trustee may resign by delivering a signed and acknowledged

instrument of resignation in person or by certified or registered

mail to the other trustee and to either the grantor or the income

beneficiary.  Such resignation is effective upon the receipt of

the acknowledged instrument by the other trustee (if there is

one) and the grantor or the income beneficiary or at such later date as may be specified in the instrument.

A trustee may appoint his or her successor by delivering a signed and acknowledged instrument in the same manner as described above for resignation. Any such appointment, however, is valid only if the appointee qualifies by delivering a signed and acknowledged instrument of acceptance in person or by certified or registered mail to each trustee and the grantor or the income beneficiary within 30 days after the later of 1) the date on which a copy of the appointment instrument is delivered to him or her, and 2) the effective date of the appointment as set forth in the appointment instrument. It is observed that there is no provision that requires a resigning trustee to appoint a successor or that there always be two trustees in office.

The original two trustees served until October 2004, when they resigned and appointed David Parnes and Eric Gribitz as their successors. On February 12, 2007, Mr. Gribitz resigned without appointing a successor. On April 26, 2007, Mr. Parnes resigned and appointed as his successor Leah Fang in a signed and acknowledged instrument. Although Ms. Fang noted her acceptance at the bottom of such instrument, her signature was not acknowledged. However, in another document entitled "Release" executed and acknowledged by Ms. Fang the same day, she, as

2

DG 01193

trustee, purported to discharge Mr. Parnes from liability.  It is undisputed that thereafter Ms. Fang acted as trustee.  Indeed, Ms. Fang's contention that she received a number of requests for information from petitioner and that petitioner referred to her in writing and orally as trustee is not disputed by petitioner.

On December 12, 2007, Ms. Fang, without resigning in accordance with the trust agreement, attempted to appoint Patricia Enriquez, as successor trustee.  Her designation of Ms. Enriquez, however, was by an unacknowledged letter in which she referred to her own resignation as taking effect upon Ms. Enriquez's acceptance of the appointment.  Ms. Enriquez accepted by signing the letter, but such acceptance was not acknowledged and, in any event, there is nothing in the record to suggest that such "acceptance" was delivered in accordance with the trust instrument.  Two weeks later, an attorney for Ms. Enriquez notified petitioner's counsel by email that her client had advised that she had no intention to overcome the procedural omissions.

On January 3, 2008, Ms. Fang and Dalia Genger signed before a notary a memorandum in which Ms. Fang stated that "to the extent that I am still vested with any powers to appoint trustees of the [trust], I confirm your appointment."  The next day, Ms. Fang executed an acknowledged instrument of resignation and appointment of successor trustee naming Dalia as her successor

3

and Dalia, on the same day, executed an acknowledged instrument

of acceptance. It is undisputed that such documents were

delivered in accordance with the trust requirements.

We address first that portion of the instant application

which seeks the appointment of a successor trustee on the ground

that Dalia was not validly appointed. In such connection,

petitioner argues first that, because Ms. Fang's signature on the

bottom of Mr. Parnes's appointment instrument was not

acknowledged, she never accepted the position in accordance with

the trust agreement (and thus could not appoint Dalia her

successor). However, such argument ignores the "Release"

mentioned above that Ms. Fang executed the same day. Such

instrument, which was signed and duly acknowledged, unequivocally

establishes Ms. Fang's acceptance of the position. Since

petitioner does not challenge the authenticity of such instrument

or Mr. Parnes' contention, supported by the record, that it was

delivered in accordance with the trust instrument and, as noted

above, petitioner thereafter communicated with Ms. Fang as

trustee, Ms. Fang properly qualified as successor trustee.

Petitioner's second argument that, in any event, Ms. Fang's

appointment of Dalia was ineffective because Ms. Fang had

previously resigned as trustee is also without merit. Simply

put, Ms. Fang had not previously resigned because her letter to

Ms. Enriquez did not contain the formalities (i.e., an

4

acknowledgment) required by the trust agreement. Moreover, although not a model of clarity, the letter makes clear that Ms. Fang did not intend to leave the trust without a trustee in the event that Ms. Enriquez failed to qualify, which is exactly what happened. Thus, Ms. Fang had authority to appoint Dalia as her successor.

Since there is no dispute that the instrument of resignation and appointment executed by Ms. Fang on January 4, 2008, and Dalia's instrument of acceptance of the same date were executed and delivered in accordance with the trust agreement, Dalia is the duly appointed successor trustee of the trust. To find otherwise would be to ignore the chronology of events and the purpose of the provisions at issue, namely to ensure that the trust always has a fiduciary ready, willing and able to act. The fact that petitioner does not wish her mother to be the fiduciary because she considers her an adversary in a broader intra-family dispute does not provide a basis to ignore the grantor's intent, as reflected in the trust instrument, that an acting trustee, and not the beneficiary, decides who shall become a successor trustee. Accordingly, petitioner's application to appoint a successor trustee is denied.

We next turn to petitioner's alternate request for relief, namely that a "special trustee" be appointed for the "purpose of investigation and taking discovery with respect to the wrongful

5

DG 01196

dealings concerning the assets and income of the trust."

It is noted initially that petitioner's only allegations of "wrongful dealings" concern a close corporation, TPR Investment Associates, Inc.   She contends that her brother Sagi, who is an officer of TPR, and Dalia, who was a shareholder at the time this proceeding was commenced, are engaged in a "wrongful scheme" to divert assets to themselves and, as a result, Dalia "could not possibly" investigate wrongdoing at TPR, which the petition describes as the "greatest" asset of the trust.

However, the premise of the application, namely that the trust's interest in TPR would enable the trustee to investigate or seek relief from TPR, does not appear to be correct. Petitioner does not dispute Dalia's assertion, supported in the record, that the trust is not a shareholder of TPR at all. Rather, D&K LP, an entity in which the trust owns a 48 percent interest, in turn owns approximately 50 percent of TPR. Petitioner does not explain what appears to be a material misstatement concerning TPR's relationship to the trust.   Nor does she identify how a trustee under such circumstances might be in a position to "investigate and address the TPR issues".

In any event, assuming arguendo that a trustee would somehow be able to investigate alleged misconduct at TPR, petitioner's vague and speculative allegations of "wrongful conduct" at TPR from which Dalia purportedly benefitted do not warrant the

6

DG 01197

appointment of a "special trustee". Similarly, petitioner's

allegations (made upon information and belief) that Dalia had

knowledge of alleged improper acts by former trustee, David

Parnes, in relation to TPR are patently insufficient to warrant

the remedy of a "special trustee". In such connection, it is

noted that Mr. Parnes and Ms. Fang have been directed to account

for their proceedings as trustees (<u>Matter of Genger</u>, NYLJ, Feb.

25, 2008, at 29, col 3), giving petitioner a forum to seek relief

for most of the conduct about which she complains.

Finally, it is observed that petitioner has not alleged that

Dalia has refused a request for information, which would warrant

relief (SCPA 2102), or has failed as trustee to protect trust

assets. Indeed, it appears that Dalia (who states that she is

ready and able to act as fiduciary) has yet to assume the duties

of trustee in deference to her daughter's position in this

litigation. As a validly appointed trustee, she should be given

the opportunity to do what she deems necessary to manage and

protect the trust's assets.

Based upon the foregoing, the appointment of a "special

trustee" is unwarranted at this time and, accordingly, the

application is denied, without prejudice to renewal if future

7

DG 01198

circumstances warrant such relief.

This decision constitutes the order of the court.

S U R R O G A T E

Dated: December 31, 2008

8

# EXHIBIT "E"

Case 1:19-cv-09319-AKH Document 5-31 Filed 10/08/19 Page 98 of 174

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

ARIE GENGER and ORLY GENGER, in her
individual capacity and on behalf of the ORLY
GENGER 1993 Trust,

        Plaintiffs,

    -against-

SAGI GENGER, TPR INVESTMENT
ASSOCIATES, INC., DALIA GENGER, THE
SAGI GENGER 1993 TRUST, ROCHELLE
FANG, Individually and as Trustee of THE
SAGI GENGER 1993 TRUST, GLENCLOVA
INVESTMENT COMPANY, TR
INVESTORS, LLC, NEW TR EQUITY I,
LLC, NEW TR EQUITY II, LLC, JULES
TRUMP, EDDIE TRUMP, MARK HIRSCH,
and TRANS-RESOURCES, INC.

        Defendants.

INDEX NO.  651089/2010

**THIRD AMENDED AND
SUPPLEMENTAL COMPLAINT**

Plaintiffs Arie Genger and Orly Genger, in her individual capacity and on behalf of the

Orly Genger 1993 Trust, by their respective attorneys, for their Third Amended and

Supplemental Complaint against the defendants in this action allege, on information and belief,

as follows:

## I.    THE PARTIES

1.    Plaintiff Arie Genger ("Arie") is a resident of the State of Florida, and the father

of the Plaintiff Orly Genger ("Orly") and the defendant Sagi Genger ("Sagi").

2.    Plaintiff Orly Genger is the adult daughter of Arie Genger and Dalia Genger, and

the beneficiary of the Orly Trust, and a resident of the State of New York and is the beneficiary

of the Orly Genger 1993 Trust (the "Orly Trust"). She brings this action on behalf of the Orly

Trust as the beneficiary of the Orly Trust to protect her interests thereunder.

180. Arie is entitled to an Order of the New York Supreme Court to reform the terms of the Court-Ordered Stipulation of Settlement to reflect the parties' original intent to the greatest extent possible.

181. Accordingly, Arie seeks an Order and declaratory judgment to reform the Court-Ordered Stipulation of Settlement to provide as follows:

(i) That the transfer by Arie of his 51% interest in TPR to Dalia and the concurrent transfer of the 3000 shares of TRI stock to Arie, the Orly Trust and the Sagi Trust, respectively, as originally set forth in the Stipulation of Settlement is voided *ab initio* as a result of the Delaware Court finding that the 2004 Transfers are invalid;

(ii) that all the assets of TPR, other than the 3000 Arie, Orly Trust and Sagi Trust TRI shares, remain the property of TPR or any successor in interest to those assets;

(iii) that pursuant to a further order of this Court the Court-Ordered Stipulation of Settlement is modified *ab initio* to provide that the 3000 shares of TRI common stock that were returned to TPR as a result of the Delaware Court Action voiding the original 2004 Transfers be placed in a newly formed single purpose entity controlled by Arie ("TPR2");

(iv) that Arie be declared the 51% owner of TPR2, which in turn shall be declared, *ab initio* the record and beneficial owner of all of such 3000 TRI shares, as though no 2004 Transfers were consummated under the original terms of the Stipulation of Settlement;

(v) that the Orly Trust and Sagi Trust each be declared the owner of 24.5% of TPR2 so that together they own the remaining 49% of TPR2;

46

197.    Upon TPR becoming the record owner of all 3000 shares of TRI stock comprising the Orly Trust Shares, the Sagi Trust Shares and the Arie Shares, TPR held the voting rights to such 3000 shares in a constructive trust for the benefit of Arie.

198.    Arie's beneficial ownership and voting rights with respect to the 3000 TRI shares, which were held by TPR in a constructive trust for his benefit, were protected from further transfer to The Trump Group from the moment record title reverted to TPR.

199.    TPR was not authorized to transfer any of the 3000 TRI shares as to which it became the record owner, without the consent of Arie as the beneficial owner of such TRI Shares.

200.    TPR is not authorized to vote any of the 3000 TRI shares that reverted to TPR as record owner as a result of the Delaware Court rulings, except at the direction of Arie.

201.    The Trump Group are not bona fide purchasers of any of the 3000 TRI shares that reverted to TPR.

202.    The Trump Group was on notice of Arie's ownership and voting right claims with respect to the 3000 TRI shares that reverted to TPR, as record owners.

203.    The Trump Group knew and were on notice that TPR was not authorized to sell TPR's TRI shares without the prior consent of Arie.

204.    The Trump Group knew and was on notice that Arie objected to the sale to The Trump Group of any of the 3000 TRI shares that reverted to TPR, as record owner under the 2008 Stock Purchase Agreement, the Side Letter Agreement or the 2010 purported sale of the Arie and Orly Trust TRI shares.

50

263. The Arie TRI shares, the Orly Trust TRI shares, and the Sagi Trust shares are wrongfully being held by the Trump Parties.

264. Plaintiffs are entitled to a preliminary injunction, under CPLR 7109, that the Arie TRI shares, the Orly Trust TRI shares, and the Sagi Trust TRI shares shall be restrained and enjoined from transferring, selling, diluting, pledging, assigning or otherwise disposing of or removing such shares from the State until the further order of the Court.

**WHEREFORE**, Plaintiffs demand Judgment in favor of Plaintiffs against the Defendants as follows:

(a) on the **First Cause of Action against all Defendants**: that this Court find and declare that Arie is entitled to an Order from this Court to reform the terms of the Court-Ordered Stipulation of Settlement to provide as follows:

(i) that the transfer by Arie of his 51% interest in TPR to Dalia and the concurrent transfer of the 3000 shares of TRI stock to Arie, the Orly Trust and the Sagi Trust, respectively, as originally set forth in the Stipulation of Settlement is voided *ab initio* as a result of the Delaware Court finding that the 2004 Transfers are invalid;

(ii) that all the assets of TPR, other than the 3000 Arie, Orly Trust and Sagi Trust TRI shares, remain the property of TPR or any successor in interest to those assets;

(iii) that pursuant to a further order of this Court the Court-Ordered Stipulation of Settlement is modified *ab initio* to provide that the 3000 shares of TRI common stock that were returned to TPR as a result of the Delaware Court Action voiding the original 2004 Transfers be placed in a newly formed single purpose entity controlled by Arie (hereinafter, "TPR2");

60

(iv) that Arie be declared the 51% owner of TPR2 which in turn shall be declared, ab initio, the record and beneficial owner of all such 3000 TRI shares, as though no 2004 Transfers were consummated under the original terms of the Stipulation of Settlement;

(v) that the Orly Trust and Sagi Trust each be declared the owner of 24.5% of TPR2 so that together they own the remaining 49% of TPR2;

(vi) that TPR2 shall not sell or transfer the 3000 TRI shares prior to Arie's death, unless such sale would otherwise be permitted and would not violate the terms of the 2001 Stockholders Agreement, including, but not limited to, Article 2 of such Agreement;

(vii) upon Arie's death, 1102.8 of TRI shares, plus any stock dividends relating thereto ("the Sagi Trust TRI shares") will be transferred by TPR2 outright to the Sagi Trust, and 1102.8 of TRI shares, plus any stock dividends relating thereto ("the Orly Trust TRI Shares") will be transferred outright to the Orly Trust;

(viii) all cash dividends relating to the Sagi Trust and the Orly Trust TRI Shares received by TPR2 during Arie's lifetime will be distributed, after payment of taxes and expenses to the Shareholders of TPR2, as if (a) Arie owned 794.40 shares, representing 13.99468% of the common stock of TRI, and (b) the Sagi Trust and the Orly Trust each owned 1102.8 shares, representing 19.42766% of TRI common stock;

(ix) Arie through his 51% control of TPR2 will retain all voting rights to the 3000 TRI shares and any additional TRI shares issued to TPR or TPR2 as stock dividends or otherwise for the duration of his life.

(x) The Trump Group shall deliver to TPR2 the 1102.8 shares of TRI common stock purportedly purchased under the 2008 Stock Purchase Agreement.

(i) upon the Delaware Court voiding TPR's 2004 transfer of 52.85% of TRI shares to Arie, the Sagi Trust and the Orly Trust, legal title to such TRI shares reverted to TPR subject to Arie's rights as a constructive beneficial owner of 51% of the shares of TPR with respect to TPR's ownership of 52.85% of TRI shares;

(ii) upon TPR becoming the record owner of Arie's 794.4 shares of TRI stock as a result of the Delaware Court rulings, such shares were immediately held in a constructive trust by TPR for the benefit of Arie as the beneficial owner of those shares;

(iii) upon TPR becoming the record owner of the 1102.8 shares of TRI stock comprising the Orly Trust TRI shares, a constructive trust was immediately created in favor of Arie with respect to the Orly Trust TRI Shares, including, but not limited to, the voting rights appurtenant to such shares, all of which were held by TPR for the benefit of Arie, subject to the Orly Trust's right to receive the Orly Trust TRI Shares upon Arie's death;

(iv) upon TPR becoming the record owner of the 1102.8 shares of TRI stock comprising the Sagi Trust TRI shares, a constructive trust was immediately created in favor of Arie with respect to the Sagi Trust TRI Shares, including, but not limited to, the voting rights appurtenant to such shares, all of which were held by TPR for the benefit of Arie, subject to the Sagi Trust's right to receive the Sagi Trust TRI Shares upon Arie's death;

(v)  upon TPR becoming the record owner of all 3000 shares of TRI stock comprising the Orly Trust Shares, the Sagi Shares and the Arie Shares, TPR held the voting rights to such 3000 shares in a constructive trust for the benefit of Arie;

63

(vi) TPR was not authorized to transfer any of the 3000 TRI shares as to which it became the record owner, without the consent of Arie as the beneficial owner of such TRI Shares;

(vii) TPR is not authorized to vote any of the 3000 TRI shares that reverted to TPR as record owner as a result of the Delaware Court rulings, except at the direction of Arie;

(viii) The Constructive Trust in favor of Arie imposed upon Arie, the Orly Trust and the Sagi Trust TRI shares existed at the moment record ownership reverted to TPR, and attaches to any purported sale of these shares to the Trump Group, who were not and are not bona fide purchasers of any of the 3000 TRI shares that reverted to TPR.

(c) on the **Third Cause of Action against Defendants Sagi, TPR, the Sagi Trust, Fang, the Trump Parties and TRI, jointly and severally**, as follows:

(i) awarding compensatory damages to the Plaintiff Arie in an amount to be determined, plus an additional award of punitive damages in an amount to be determined, plus Plaintiff's attorneys fees and costs incurred in connection with this action;

(ii) awarding compensatory damages to the Plaintiff Orly Genger individually and as the beneficiary of the Orly Trust in an amount to be determined, plus an additional award of punitive damages in an amount to be determined, plus Plaintiff's attorneys fees and costs incurred in connection with this action;

(d) on the **Fourth Cause of Action against Defendants Sagi, TPR, Dalia, the Sagi Trust, Fang, and the Trump Parties**:

(i) rescinding Plaintiff Arie's transfer of his 51% interest in TPR to Dalia pursuant to the Stipulation of Settlement and 2004 Transaction Documents;

64

DATED: New York, New York
      September 20, 2011

MITCHELL SILBERBERG & KNUPP LLP

By: _____
    Paul D. Montclare (PM 4454)
    Lauren J. Wachtler (LW 4205)
    12 E. 49th Street, 30th Floor
    New York, New York 10017
    (212) 509-3900

    Attorneys for Plaintiff ARIE GENGER

ZEICHNER ELLMAN & KRAUSE LLP

By: _____
    Yoav M. Griver
    Bryan D. Leinbach
    575 Lexington Avenue
    New York, New York 10022
    Telephone: (212) 223-0400
    Facsimile: (212) 753-0396

    Attorneys for Plaintiff ORLY GENGER, in
    her individual capacity and on behalf of the
    ORLY GENGER 1993 Trust

# EXHIBIT "F"

## IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | |
|---|---|
| DALIA GENGER, as Trustee of the Orly Genger 1993 Trust,       )<br>      )<br>      )<br>Plaintiff,       )<br>      )<br>v.       )<br>      )<br>TR INVESTORS, LLC, GLENCLOVA INVESTMENT CO., NEW TR EQUITY I, LLC, NEW TR EQUITY II, LLC, TRANS-RESOURCES, INC. and TPR INVESTMENT ASSOCIATES, INC.,       )<br>      )<br>      )<br>      )<br>      )<br>      )<br>Defendants.       ) | Civil Action No. _____ |

### VERIFIED COMPLAINT

Plaintiff Dalia Genger ("Dalia"), as Trustee of the Orly Genger 1993 Trust (the "Orly Trust"), by her undersigned attorneys, for her Verified Complaint against Defendants TR Investors, LLC ("Investors"), Glenclova Investment Co. ("Glenclova"), TR Equity I, LLC ("Equity I"), TR Equity I, LLC ("Equity II" and together with Investors, Glenclova and Equity I, "The Trump Group"), TPR Investment Associates, Inc. ("TPR") and Trans-Resources, Inc. ("Trans-Resources") alleges upon knowledge, information and belief as follows:

### NATURE OF THE ACTION

1.      On October 29, 2004, as part of a wider multi-million dollar divorce settlement agreement between Arie Genger ("Arie") and Dalia, Arie caused TPR to transfer 794.40 shares (13.99%) of Trans-Resource's stock to himself, and 1,102.80 shares (19.43%) of Trans-Resources stock to each of the 1993 Sagi and Orly Trusts.

1

2.      In reliance upon (i) Arie's representation that no consent or approval was required for TPR to transfer the shares to her children and (ii) the representation that Arie caused TPR to make that the shares being transferred to the Orly Trust were "free and clear of any liens, claims or encumbrances" and that the transfer "does not violate the certificate of Incorporation of TPR or *any agreement to which TPR is subject*" (emphasis added), Dalia gave up valuable claims in the divorce settlement to ensure that her children's trusts would be well funded.  The Orly Trust also relied on those representations in purchasing the Trans-Resources shares.

3.      On October 30, 2004, Trans-Resource issued a share certificate in the name of the Orly Trust for 1,102.80 shares of Trans-Resources common stock.  The share certificate was signed by Arie, as President of Trans-Resources, and Edward Klimerman, Assistant Secretary of Trans-Resources and outside counsel to the company.

4.      Trans-Resources delivered the Orly Trust's share certificate to Arie, who was contractually obligated to act as the Orly Trust's proxy for voting the Trans-Resources shares.  Arie maintained possession of the Orly Trusts' original share certificate and sent a copy of it to both Dalia and the Orly Trust.

5.      Thus, the Orly Trust is a bona fide and protected purchaser of the Trans-Resources stock because (i) value was given for the Orly Trust's shares of Trans-Resources stock, (ii) the Orly Trust did not have notice of any adverse claim to the shares represented by its share certificate, and (iii) the Orly Trust obtained control of its Trans-Resources share certificate by way of its delivery to Arie, who held the certificate on the Orly Trust's behalf.

2

6. Consequently, the Orly Trust seeks a declaratory judgment that it is the beneficial owner of the 1,102.80 shares of Trans-Resources stock represented by the share certificate.

## PARTIES

7. The Plaintiff Dalia Genger ("Dalia") is the mother of Sagi Genger ("Sagi") and Orly Genger ("Orly") and the former wife of Arie Genger ("Arie"). Dalia is the trustee of the 1993 Orly Genger Trust.

8. Defendant Trans-Resources, a privately-held Delaware Corporation, is a manufacturer and worldwide distributor of agricultural fertilizer.

9. Defendant TPR, a Delaware corporation, is the record holder of the 1,102.80 shares that the Orly Trust purchased in 2004.

10. Defendant Investors, a New Jersey Limited Liability Company, purportedly exercised its rights under the 2008 Side Letter Agreement to purchase from TPR the Trans-Resources common stock that was previously purchased by the Orly Trust.

11. Defendant Glenclova, a Cayman Islands company, purportedly exercised its rights under the 2008 Side Letter Agreement to purchase from TPR the Trans-Resources common stock that was previously purchased by the Orly Trust.

12. Defendant Equity I, a Delaware limited liability company, purportedly exercised its rights under the 2008 Side Letter Agreement to purchase from TPR the Trans-Resources common stock that was previously purchased by the Orly Trust.

13. Defendant Equity II, a Delaware limited liability company, purportedly exercised its rights under the 2008 Side Letter Agreement to purchase from TPR the Trans-Resources common stock that was previously purchased by the Orly Trust.

3

## JURISDICTION

14.     This Court has jurisdiction over this action pursuant to 8 *Del. C.* § 111 and 10 *Del. C.* § 6501, *et. seq.*

## FACTUAL BACKGROUND

**The 2001 Stockholders Agreement**

15.     In 1985, Arie formed Trans-Resources.

16.     Until 2001, TPR held Arie's 100% stake in Trans-Resources. TPR was owned by Arie, Dalia and their two children, Sagi and Orly. As TPR's majority (51%) shareholder, Arie controlled Trans-Resources.

17.     Dalia, Sagi and Orly, through the Sagi and Orly Trusts (which were established by Arie in 1993 as part of a Genger family estate plan), held a minority (49%) interest in TPR.

18.     In 2001, Glenclova and Investors entered into an agreement with Trans-Resources and TPR to convert their bond holdings into an equity interest in Trans-Resources (the "Stockholders Agreement"). Under the Stockholders Agreement, Glenclova and Investors acquired 47.15% of Trans-Resources common stock from Arie (through TPR), thereby reducing Arie's ownership interest in Trans-Resources to 52.85%.

19.     The Stockholders Agreement restricted the transfer of Trans-Resources stock to any persons or entities except those who were designated as "Permitted Transferees." If a party to the Stockholders Agreement wished to transfer or sell its shares to a non-Permitted Transferee, the selling party was required to give written notice to the other Trans-Resources shareholders, who would have a right of first refusal. A transfer that failed to comply with those restrictions and the prior notice requirement

4

would be deemed invalid and void, and would trigger the non-selling shareholders' right to purchase the invalidly-transferred shares.

**The Orly Trust Receives Trans-Resources Stock, for Valuable Consideration, Without Notice of Any Adverse Claim**

20.     After years of litigation regarding their divorce, on October 30, 2004, Arie and Dalia executed a stipulation of settlement (the "Divorce Agreement").

21.     The Divorce Agreement equitably divided Arie and Dalia's marriage assets and provided for certain assets to be transferred to the Sagi and Orly Trusts, assets in which they already had an equitable stake through their minority ownership in TPR.

22.     Thus, simultaneously with the Divorce Agreement, TPR entered into an agreement (the "Letter Agreement") with the Sagi and Orly trusts to sell, transfer and convey 1,102.80 shares of Trans-Resources stock to each of those entities. *See* Letter Agreement dated October 29, 2004, attached hereto as Exhibit A.

23.     Arie, as CEO of Trans-Resources, represented in the Divorce Agreement that "[e]xcept for the Consent of TPR . . . no consent, approval or similar action of any person is required in connection with the transfer of [Trans-Resources] Stock as contemplated hereby . . . ."

24.     Moreover, in the Letter Agreement, which transferred the Trans-Resources stock from TPR to the Orly Trust, Arie caused TPR to represent that "the shares are being transferred hereunder free and clear of any liens, claims or encumbrances and such transfer does not violate the certificate of Incorporation of TPR or any agreement to which TPR is subject." Ex. A.

25.     Dalia relied on those representations in giving up certain claims in the divorce so as to financially benefit her children's trusts and provide for their inheritance.

The Orly Trust also relied on those representations in purchasing the Trans-Resources shares from TPR.

**Trans-Resources Delivers a Stock Certificate to the Orly Trust**

26.     On October 30, 2004, Trans-Resources issued a stock certificate to the Orly Trust for 1,102.80 shares of its common stock.

27.     The stock certificate was signed by Arie as President of Trans-Resources, and Edward Klimerman, as Assistant Secretary of Trans-Resources.

28.     The transfer of the Trans-Resources stock to the Orly Trust in October 2004 was registered in the books and records of Trans-Resources.

29.     Trans-Resources delivered the Orly Trust's share certificate to Arie, the Orly Trust's proxy for voting the Trans-Resources shares.

30.     Arie maintained physical possession of the Orly Trust's stock certificate, and forwarded a copy of the certificate to both Dalia and the Orly Trust.

**The Trump Group Exercises an Option to Purchase the Orly Trust Shares**

31.     On August 22, 2008, TPR entered into an agreement with the Trump Group to sell the Trump Group an option to purchase the Trans-Resources shares transferred to the Orly Trust in 2004 if a court found that the transfers of the Trans-Resources shares were void (the "Side Letter Agreement").

32.     The Side Letter Agreement expressly provides that if a court determines "that the Orly Genger 1993 Trust is not the record and beneficial owner of the 1,102.80 shares of Common Stock of the of the Company purportedly transferred to such Trust by TPR in October, 2004," then Trump Group could exercise an option to purchase those shares.

6

33.     In February 2011, the Trump Group exercised its option to purchase the Trans-Resources stock held by the Orly Trust.

**The Supreme Court Reverses this Court's Holding Regarding Beneficial Ownership of the Shares Held in the Orly Trust**

34.     On July 18, 2011, the Delaware Supreme Court affirmed, among other things, this Court's finding in its August 9, 2010 Side Letter Opinion (the "Side Letter Opinion") that TPR was the record owner of the shares transferred to Arie pursuant to the 2004 Letter Agreement.

35.     The Delaware Supreme Court reversed this Court's determinations in the Side Letter Opinion and August 18, 2010 Final Judgment Order to the extent that it adjudicated "the beneficial ownership of the Orly Trust Shares." (Op. at 44)

36.     This action addresses one of the issues that the Delaware Supreme Court held that this Court did not have jurisdiction to decide: the Orly Trust's beneficial ownership of the Trans-Resources shares.

**COUNT I**
**(Declaratory Judgment that the Orly Trust is the Beneficial Owner**
**of 1,102.80 of Trans-Resources Common Stock)**

37.     Plaintiff repeats, re-alleges and incorporates by reference the allegations set forth above in the preceding paragraphs.

38.     Based upon representations that Arie made or caused to be made that the restrictions in the Stock Purchase Agreement did not apply or were waived, the Trustee for the Orly Trust, Dalia (the eventual Trustee) and Orly had no knowledge, either actual or constructive, of any current or potential adverse claim against those shares.

39.     In reliance upon those representations, Dalia provided valuable consideration for the Trans-Resources shares that TPR transferred to the Orly Trust by

7

relinquishing significant claims in the divorce. In further reliance upon those representations, the Orly Trust purchased the 1,102.80 shares of Trans-Resources stock.

40.     The share certificate issued to the Orly Trust was signed by authorized officers of Trans-Resources.

41.     Trans-Resources delivered the Orly Trust's share certificate to Arie, who held possession of it as the Orly Trust's proxy for voting the shares. Arie delivered a copy of the share certificate to the Orly Trust and Dalia.

42.     Because the Orly Trust acquired the legal rights to the Trans-Resources shares for value, with no knowledge of any adverse claim, it is a "bona fide purchaser" or protected purchaser whose rights to the Trans-Resources shares may not be nullified by the Trump Group.

43.     The Orly Trust is entitled to a declaratory judgment that it is the beneficial owner of Trans-Resources shares that it purchased from TPR in October 2004.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court enter an order:

a)     Declaring that the Orly Trust is the beneficial owner of the 1,102.80 Trans-Resources shares that it purchased in 2004, for all purposes;

b)     Requiring Trans-Resources to pay to the Orly Trust any dividends that have been issued on the Trans-Resources shares since the Orly Trust acquired them on October 29, 2004.

c)     Granting the Orly Trust such other and further relief as the Court deems just and proper.

8

Dated: October 4, 2011

CONNOLLY BOVE LODGE & HUTZ LLP

*/s/ Jeremy D. Anderson*
Jeremy D. Anderson (No. 4515)
The Nemours Building
1007 N. Orange Street
P. O. Box 2207
Wilmington, DE  19899
Tel:  (302) 658-9141
Fax:  (302) 658-5614
*Attorneys for Plaintiff*

4493617_1.DOC

9

# EXHIBIT A

**TPR INVESTMENT ASSOCIATES, INC.**
200 West 57th Street
New York, NY 10019

October 2?, 2004

Mr. Arie Genger
2600 Island Blvd., Penthouse One
Williams Island, Aventura, FL 33160

Sagi Genger 1993 Trust
200 West 57th Street
New York, NY 10019

Orly Genger 1993 Trust
200 West 57th Street
New York, NY 10019

Ladies and Gentlemen:

This letter will set forth our agreement pursuant to which you will purchase the 3,000 shares of common stock ("the Shares") of Trans-Resources, Inc. ("TRI") owned by TPR Investment Associates, Inc. ("TPR"). TPR hereby sells, transfers and conveys the Shares to you as follows:

    (i)     794.40 Shares to Arie Genger ;

    (ii)    1,102.80 Shares to the Sagi Genger 1993 Trust , and

    (iii)   1,102.80 Shares to the Orly Genger 1993 Trust.

The purchase price is $1.00 per share, receipt of which is hereby acknowledged.

The Shares represent 52.85% of the issued and outstanding shares of TRI. The Shares are being transferred hereunder free and clear of any liens, claims or encumbrances and such transfer does not violate the Certificate of Incorporation of TPR or any agreement to which TPR is subject.

The trustees of the Sagi Genger 1993 Trust and of the Orly Genger 1993 Trust ("Trusts") have agreed to execute on behalf of the Trusts (i) an irrevocable Proxy to appoint Arie Genger to vote the Shares owned by the Trusts and (ii) a voting trust letter agreement, copies of which are annexed hereto.

In case, at any time hereinafter, any further action is necessary or desirable to carry out the purposes of this Letter Agreement, each of the parties hereto shall take or cause to be taken all necessary action, including, without limitation, the execution and delivery of such

Defendant's

Page 2
Mr. Arie Genger
Sagi Genger 1993 Trust
Orly Genger 1993 Trust

further instruments and documents as may be reasonably requested by any party for such purpose or otherwise to complete or perfect the transactions contemplated hereby.

This Letter Agreement shall be governed by the laws of the State of New York without regard to conflicts of law principles.

Very truly yours,

TPR INVESTMENT ASSOCIATES, INC.

By: _____
Sagi Genger, President

AGREED TO AND ACCEPTED
THIS ___ DAY OF OCTOBER, 2004

_____
ARIE GENGER

SAGI GENGER 1993 TRUST

By: _____
David A. Parnes, Trustee

_____
Eric Gribetz, Trustee

ORLY GENGER 1993 TRUST

By: _____
David A. Parnes, Trustee

_____
Eric Gribetz, Trustee

Irrevocable Proxy

The Sagi Genger 1993 Trust (the "Trust"), being the current record and beneficial owner of 1,102.80 shares of common stock of Trans-Resource, Inc.; a corporation organized and existing under the laws of the State of Delaware ("TRI"), with its principal place of business at 200 West 57th Street, New York, New York, 10019, does hereby constitute and appoint Arie Genger, Chairman of the Board, Chief Executive Officer, and the owner of approximately fourteen percent (14%) of the shares of common stock of TRI, to vote as its proxy, all shares of common stock of TRI which are now or hereafter owned by the Trust, at any and all meetings of the stockholders of TRI, regular or special (or by consent in lieu of a meeting) or any adjournments thereof, in the same manner and to the same extent that the Trust might, were the Trust present at said meeting (or executing such consent), upon any issue or proposal which may be brought before such meeting or by such consent.

This Irrevocable Proxy shall be deemed coupled with an interest and be irrevocable from the date hereof, and shall continue for the duration of Arie Genger's life.

Dated: October 29, 2004

The Sagi Genger 1993 Trust

By _____
Edc Gribetz, Trustee

By _____
David A. Parnes, Trustee

STATE OF NEW YORK      )
                       )ss.:
COUNTY OF NEW YORK     )

On the 21 day of October in the year 2004 before me, the undersigned, a Notary Public in and for the State of New York, personally appeared ERIC GRIBETZ, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that she executed the same in her capacity, and that by her signature on the instrument, the individual, or the person upon behalf of whom the individual acted, executed the instrument.

_____
Notary Public

STEPHEN M. BALDINI
Notary Public, State of New York
No. 4996896
Qualified in New York County
Commission Expires July 19, 1994 2004

STATE OF NEW YORK      )
                       )ss.:
COUNTY OF NEW YORK     )

On the 30 day of October in the year 2004 before me, the undersigned, a Notary Public in and for the State of New York, personally appeared DAVID A. PARNES, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that she executed the same in her capacity, and that by her signature on the instrument, the individual, or the person upon behalf of whom the individual acted, executed the instrument.

_____
Deborah Kempf
Notary Public

DEBORAH KEMPF
Notary Public, State of New York
No. 31-CKE 4995804
Qualified in New York County
Commission Expires August 8, 200-6

- 2 -

### Irrevocable Proxy

The Orly Genger 1993 Trust (the "Trust"), being the current record and beneficial owner of 1,102.80 shares of common stock of Trans-Resource, Inc., a corporation organized and existing under the laws of the State of Delaware ("TRI"), with its principal place of business at 200 West 57th Street, New York, New York, 10019, does hereby constitute and appoint Arie Genger, Chairman of the Board, Chief Executive Officer, and the owner of approximately fourteen percent (14%) of the shares of common stock of TRI, to vote as its proxy, all shares of common stock of TRI which are now or hereafter owned by the Trust, at any and all meetings of the stockholders of TRI, regular or special (or by consent in lieu of a meeting) or any adjournments thereof, in the same manner and to the same extent that the Trust might, were the Trust present at said meeting (or executing such consent), upon any issue or proposal which may be brought before such meeting or by such consent.

This Irrevocable Proxy shall be deemed coupled with an interest and be irrevocable from the date hereof, and shall continue for the duration of Arie Genger's life.

Dated: October 29, 2004

The Orly Genger 1993 Trust

By_____
Eric Gribetz, Trustee

By_____
David A. Parnes, Trustee

STATE OF NEW YORK  )
                   )ss.:
COUNTY OF NEW YORK )

On the _29_ day of _October_ in the year 2004 before me, the undersigned, a Notary Public in and for the State of New York, personally appeared ERIC GRIBBIZ, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that she executed the same in her capacity, and that by her signature on the instrument, the individual, or the person upon behalf of whom the individual acted, executed the instrument.

Notary Public
STEPHEN M. BALDWI
Notary Public, State of New York
No. 4995888
Qualified in New York County
Commission Expires July 13, 1994 2006


STATE OF NEW YORK  )
                   )ss.:
COUNTY OF NEW YORK )

On the _30_ day of _October_ in the year 2004 before me, the undersigned, a Notary Public in and for the State of New York, personally appeared DAVID A. PARNES, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that she executed the same in her capacity, and that by her signature on the instrument, the individual, or the person upon behalf of whom the individual acted, executed the instrument.

Notary Public
DEBORAH KEMPF
Notary Public, State of New York
No. 01-KRE 4895094
Qualified in New York County
Commission Expires August 8, 2006

-2-

# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

DALIA GENGER, as Trustee of the Orly ) 
Genger 1993 Trust, )
)
Plaintiff, )
)
v. )
) Civil Action No. _____
TR INVESTORS, LLC, GLENCLOVA )
INVESTMENT CO., NEW TR EQUITY I, )
LLC, NEW TR EQUITY II, LLC, TRANS- )
RESOURCES, INC. and TPR )
INVESTMENT ASSOCIATES, INC., )
)
Defendants. )

## VERIFICATION

STATE OF NEW YORK ) ss:
COUNTY OF NEW YORK )

Dalia Genger, being duly sworn, deposes and states as follows:

I am the trustee of the Orly Genger 1993 Trust. I know the allegations contained in the Complaint to be true and correct of my own knowledge, except as to matters alleged upon information and belief. As to those matters, I believe them to be true.

_____
Name: Dalia Genger
Trustee of the Orly Genger 1993 Trust

SWORN to and SUBSCRIBED before 
me this 3rd day of _____, 2011

_____
Notary Public

ROBERT A. MEISTER
Notary Public, State of New York
No. 31-02ME2653350
Qualified in New York County
Commission Expires March 30, 201_

# EXHIBIT "G"

EFiled: Jul 23 2010 3:21PM EDT
Transaction ID 32302253
Case No. 3994-VCS

## IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | |
|---|---|
| TR INVESTORS, LLC, GLENCLOVA INVESTMENT CO., NEW TR EQUITY I, LLC, NEW TR EQUITY II, LLC, and TRANS-RESOURCES, INC., <br><br> Plaintiffs, <br><br> v. <br><br> ARIE GENGER, <br><br> Defendant. | ) ) ) ) ) ) ) ) ) ) ) ) |

C.A. No. 3994-VCS

| | |
|---|---|
| ARIE GENGER, <br><br> Counterclaim Plaintiff, <br><br> v. <br><br> TR INVESTORS, LLC, GLENCLOVA INVESTMENT CO., NEW TR EQUITY I, LLC, NEW TR EQUITY II, LLC, and TRANS-RESOURCES, INC., <br><br> Counterclaim Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) |

## MEMORANDUM OPINION

Date Submitted: April 26, 2010
Date Decided: July 23, 2010

Thomas J. Allingham II, Esquire, Anthony W. Clark, Esquire, Robert A. Weber, Esquire, SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP, Wilmington, Delaware, *Attorneys for Plaintiffs.*

Donald J. Wolfe, Jr., Esquire, Brian C. Ralston, Esquire, Scott B. Czerwonka, Esquire, POTTER ANDERSON & CORROON LLP, Wilmington, Delaware; Michael P. Carroll, Esquire, Avi Gesser, Esquire, DAVIS POLK & WARDWELL LLP, New York, New York, *Attorneys for Defendant.*

**STRINE, Vice Chancellor.**

## I. Introduction

This dispute over the control of Trans-Resources, Inc. ("Trans-Resources") is between the company's founder and former chief executive officer, Arie Genger, and the plaintiffs, who provided capital to Trans-Resources when the company was in financial distress. The plaintiffs are all entities controlled by the Trump family, led by Jules Trump and his brother Eddie Trump (collectively, with the plaintiffs, the "Trump Group"). Jules Trump was a long-time friend of Arie Genger, and he was happy to help Genger when Trans-Resources neared insolvency in 2001.

In return for retiring nearly all of Trans-Resources' outstanding bonds, the Trump Group received a minority stake in the company and a number of protections in a stockholders agreement (the "Stockholders Agreement"). The Stockholders Agreement prohibited either party from transferring their shares in Trans-Resources to anyone other than a limited number of permitted transferees. That prohibition against transfer was particularly important to the Trump Group, which was concerned that Genger might transfer his shares that were held through an entity under his control, TPR Investment Associates, Inc. ("TPR"), to a member of his family. A bitter dispute had arisen between Genger and his son, Sagi Genger, during the time Genger's marriage unraveled in the early 2000s, and the Trump Group wanted no part of the family drama.

In 2004, Genger caused TPR to transfer its shares in Trans-Resources, subject to an irrevocable proxy in his favor, to his children's trusts (the "2004 Transfers"), under a settlement in the contentious divorce between him and his wife. Because those trusts were not permitted transferees, the 2004 Transfers violated the terms of the Stockholders

1

Agreement.  Under the terms of the Stockholders Agreement, that violation rendered the transfers ineffective and gave the Trump Group the right to acquire the shares that were transferred.

But Genger did not notify the Trump Group of the transfers at that time, and thereby deprived the Trump Group of its right to declare the transfers void or exercise its right to acquire the shares in 2004.  Genger claims that he mentioned the 2004 Transfers to Jules Trump during a private conversation in 2004, but his testimony did not convince me that this was true.  The most convincing reading of the evidence is that the Trump Group did not receive notice of the 2004 Transfers until nearly four years later, when Genger once again asked Jules Trump for help when Trans-Resources was in financial distress.  Moreover, informal notice to Jules Trump would not constitute the notice that was required to be given to the Trump Group entities under the Stockholders Agreement.

By 2008, Trans-Resources' bank was unwilling to negotiate with Genger, so Genger asked Jules Trump not only for money but also to negotiate a reduction in Trans-Resources' debt with the bank.  The evidence shows that, while Genger and the Trump Group were negotiating the terms of the second round of funding, Genger disclosed for the first time that the 2004 Transfers had occurred.

Although shocked at Genger's failure to notify him of the 2004 Transfers, Jules Trump nevertheless negotiated a reduction in Trans-Resources' debt and agreed to pay that debt in return for voting control of the company.  Genger initially agreed to those terms as a compromise for the Transfer violation, but, after securing an alternative source of financing, backed out of the deal.  Angered that he had favorably renegotiated Trans-

2

Resources' debt obligations and that the Trump Group was left without their key part of

the bargain, Jules Trump initiated litigation and also contacted Sagi Genger in order to

negotiate a deal with both TPR and the trust controlled by Sagi Genger (the "Sagi Trust")

whereby the Trump Group would buy all of the shares transferred to the Sagi Trust by

TPR in the 2004 Transfers. Having made a bargain with both the wrongful transferor,

TPR, and the transferee, the Sagi Trust, the Trump Group viewed itself as having covered

all its bases in addressing Genger's violation of the Stockholders Agreement. With the

shares wrongfully transferred to the Sagi Trust by TPR, the Trump Group held a majority

of Trans-Resources' stock.

The Trump Group then purported to reconstitute the Trans-Resources board of

directors and, when Genger challenged the reconstitution, filed this action pursuant to 8

*Del. C.* § 225 to determine who controlled the board. Making that determination largely

turns upon interpreting how the Stockholders Agreement applies to both parties' often

excessively sharp conduct. As explained fully below, I conclude that the Trump Group

controls the Trans-Resources board for the following reasons: (1) the Trump Group never

received notice of the 2004 Transfers, which were made in violation of the Stockholders

Agreement, until June 2008; and (2) the Trump Group did not ratify those Transfers

when it bought the transferred shares from Sagi Genger and TPR. Because it never

ratified the wrongful transaction, the Trump Group was free to deal with the relevant

transferor, TPR, and its transferee, the Sagi Trust, and settle the matter by acquiring the

wrongly transferred shares in an agreed upon negotiation. In doing so, the Trump Group

clearly reserved its position that TPR made a void transfer, has proven that its position

3

was correct, and is entitled, as a result, to be deemed to have taken the shares from TPR

as a settlement of the improper Transfers. In the alternative, even if the Trump Group

ratified the 2004 Transfers — which it did not — I find that the Trump Group did not

purchase the shares from Sagi Genger subject to the proxy in favor of Arie Genger.

Therefore, the Trump Group holds a majority equity and voting stake in Trans-Resources,

and its ability to vote its shares is unaffected by the proxy.

## II. Factual Background

The following are the facts as I find them after trial.

## A. The Trump Group Saves Genger's Company, Trans-Resources, From Bankruptcy In 2001

In 1985, Genger formed Trans-Resources, a Delaware corporation that eventually

became the parent of three specialty fertilizer and industrial chemical companies.[1] As

mentioned before, Genger's majority stake in Trans-Resources was held through TPR,

another Delaware corporation. By 2001, Trans-Resources was nearly insolvent as its

subsidiaries struggled in the marketplace due to a strong euro, vigorous competition from

South American rivals, and miscalculations in a recent decision to expand a key plant.[2]

At that time, Trans-Resources' bonds had a notional value of $230 million, but their

market value had plummeted.[3]

Because negotiations with the fractious group of investors that had invested in

Trans-Resources' bonds were proving futile, Genger was delighted when Jules Trump

---

[1] Tr. 830 (A. Genger); Stipulated Pretrial Order at 3.
[2] Tr. 837-38 (A. Genger).
[3] *Id.* at 12 (J. Trump).

4

approached him with an offer to buy Trans-Resources' bonds.[4]  Genger and Jules Trump,

who both had residences on Williams Island in Miami, Florida, had been friends since at

least the late 1990s.[5]  From that time until very near the commencement of this litigation,

Genger and Jules Trump's families regularly socialized, dined, and vacationed together.[6]

Eventually, two entities controlled by Jules and Eddie Trump, plaintiff TR

Investors, LLC ("TR Investors") and plaintiff Glenclova Investment Co. ("Glenclova"),

bought all but $100,000 of Trans-Resources' debt.[7]  Shortly after buying Trans-

Resources' bonds, TR Investors and Glenclova converted their debt into equity.[8]  Under

an exchange agreement, TR Investors and Glenclova collectively received 2,676.4428

Trans-Resources shares, which amounted to a substantial stake equal to 47.15% of Trans-

Resources' equity.[9]

B.  Genger And The Trump Group Execute A Stockholders Agreement That Requires
    Notice To Be Given If Genger Transfers His Shares In Trans-Resources

Jules Trump's offer came with strings.  In exchange for bailing out Trans-

Resources and agreeing to take a minority interest in Trans-Resources, Trump insisted on

the Stockholders Agreement that gave the Trump Group strong representation and veto

rights.[10]  Importantly in light of the present dispute, the Stockholders Agreement

---

[4] *Id.* at 938 (A. Genger).

[5] J. Trump Dep. 27, 88; A. Genger Dep. 62-63.

[6] J. Trump Dep. 27-28; E. Trump Dep. 32; *see also* A. Genger Dep. 156-57 (indicating that Genger and Jules Trump also took regular strolls together around the walking path on Williams Island).

[7] Tr. 117 (J. Trump), 837 (A. Genger).

[8] *Id.* at 119 (J. Trump).

[9] JX-100 (Exchange Agreement (March 30, 2001)).

[10] Tr. 843 (A. Genger) ("[P]art of the deal was to reconstitute the board and to enable Trump family — to enable the Trump family to be on the board, to have — we created a balance of —

provided restrictions on, and in some instances prohibitions against, the transfer of

stock.[11]

In particular, Section 2.1 of the Stockholders Agreement prevented a party from

transferring or pledging Trans-Resources stock to any party other than a party expressly

permitted to receive such a transfer (a "Permitted Transferee"). Section 2.1 provides in

relevant part:

> From and after the date hereof, no Stockholder shall directly or indirectly,
> offer, *transfer*, sell, assign, *pledge*, encumber, hypothecate or otherwise
> dispose of any Shares (including any derivative transaction) (a) until after
> December 21, 2003, and, thereafter, only as provided in Articles 3, 4, and 5
> of this Agreement, or (b) after *written notice* to the Company and the other
> Stockholders . . . to (i) in the case of either of the Initial Non-TPR
> Stockholders or their respective Permitted Transferees (A) to [certain
> Permitted Transferees], or (ii) in the case of TPR or a Permitted Transferee
> thereof, to (w) Arie Genger, (x) any entity or entities in which TPR or Arie
> Genger directly owns a majority of the equity interest and directly controls
> a majority of the voting power . . . (y) the estate o[f] Arie Genger or (z) any
> immediate family members or lineal descendants of Arie Genger, or trusts
> of which they are the sole beneficiaries-in-interest, who receive such Shares
> in consequence of the death of Arie Genger, which transferee(s) become a
> party to this Agreement. . . .[12]

That is, Permitted Transferees were: (1) in the case of transfers from any of the Trump

Group entities, any entity in which either TR Investors or Glenclova had at least a 20%

economic interest and a least a 30% voting interest; and (2) in the case of transfers from

TPR, any of the following: (i) Arie Genger himself; (ii) any entity in which TPR or

Genger directly owned a majority of the equity interest and a majority of the voting

---

so that I cannot do anything which is not unanimous. There were all kinds of provisions on
that.").

[11] JX-101 (Stockholders Agreement (2001)) (the "Stockholders Agreement") §§ 2.1, 2.4, 3.1,
3.2, 3.3).

[12] *Id.* § 2.1 (emphasis added).

power at the time of the transfer, and Genger agreed to continue to maintain such

ownership at all times thereafter; (iii) the estate of Arie Genger; or (iv) any of Genger's

immediate family members or lineal descendants, or trusts of which they are the sole

beneficiaries-in-interest, who receive the transfer of shares as a result of Genger's

death.[13] If a party to the Stockholders Agreement intended to make a transfer to a non-

Permitted Transferee, then the other party had a right of first refusal, under Section 3.1,

which provides in relevant part:

> [I]f a Stockholder (the "Selling Stockholder") shall desire to sell, assign or
> transfer any Shares held by it to any person other than a Permitted
> Transferee (the "Offered Shares") and shall be in receipt of a bona fide
> written offer to purchase the Offered Shares (the "Offer"), [t]he Selling
> Stockholders shall give the Company and to each Covered Stockholder who
> is not the Selling Stockholder (the "Non-Selling Stockholders") written
> notice containing the terms and conditions of the Offer . . . provided that for
> purposes of this Section 3.1, if the Selling Stockholder is (x) a TPR
> Stockholder, then only the Non-TPR Stockholders shall be deemed to be
> Non-Selling Stockholders; and (y) a Non-TPR Stockholder, then only the
> TPR Stockholders shall be deemed to be Non-Selling Stockholders. . . .
>
> Until 30 days after receipt of such notice, the Non-Selling Stockholders
> shall have the right to elect to purchase all of the Offered Shares at the price
> offered by the prospective purchaser and specified in such notice.[14]

The purpose of expressly limiting transfers to an enumerated list of Permitted

Transferees was to ensure that the Trump Group would be dealing only with Genger, or

one of the entities he controlled, in the future, and not with anyone else.[15]  Jules Trump

was particularly concerned about limiting the Trump Group's exposure to the acrimony

---

[13] *Id.*

[14] *Id.* § 3.1.

[15] Tr. 121 (J. Trump), 842-44, 854, 891-92 (A. Genger).

plaguing Genger's family,[16] but, after much pressure from Genger, reluctantly acceded to including Genger's family members as Permitted Transferees *only* as an estate planning consequence in the event of Genger's death.[17]

If a transfer was made in violation of Section 2.1, then the Stockholders Agreement provided two remedies. First, Section 2.4 provided that "[a]ny attempt by a Stockholder to transfer Shares in violation of this Agreement shall be void and the Company agrees that it will not effect such a transfer or treat any alleged transferee as the holder of such Shares."[18] Second, Section 3.2(a) of the Stockholders Agreement gave the Trump Group the right to purchase TPR's shares in Trans-Resources if Genger: (1) transferred shares to a non-Permitted Transferee; or (2) effected a change of control in TPR. Section 3.2(a) provides in relevant part:

> The Covered Stockholders other than the hereinafter defined Terminating Stockholder (the "Purchasing Stockholders") shall have the right to elect to purchase the Shares held by a Stockholder (the "Terminating Stockholder" . . . ) at the Agreement Price (as defined in Section 3.4) and on the Agreement Terms upon the occurrence of any of the following events for a period ending on the later of 60 days after determination of the Agreement Price for the Terminating Shares and 90 days after the Company and the Purchasing Stockholders receive notice from any source of the occurrence of any of the following events (each Stockholder agreeing to give the others and the Company notice of any such event promptly after its knowledge of the occurrence thereof) . . . .
>
> (iv) the Terminating Stockholder sells, *pledges*, encumbers, hypothecates or *otherwise transfers* any interest in (including any derivative transaction), or

---

[16] *Id.* at 121 (J. Trump) ("I had confidence in Arie and we were willing to go forward with him. But I was not willing to go forward with a bunch of people who would be fighting with each other and ultimately end up greenmailing each other."); *see also id.* at 805-06 (O. Genger) (acknowledging the "nightmar[ish]" relations in the Genger family).

[17] *Id.* at 252 (Hirsch).

[18] Stockholders Agreement § 2.4.

> *purports to* sell, *pledge*, encumber, hypothecate or otherwise transfer any
> interest in (including any derivative transaction), any of its Shares, except
> as permitted by and in full compliance with the terms of this
> Agreement. . . .[19]

Therefore, Section 3.2(a) gave the Trump Group 90 days to elect to purchase TPR's

shares after it "receive[d] notice from any source" that a transfer had been made to a non-

Permitted Transferee, or that a change of control had occurred.[20]

Section 6.5 outlined the form of notice required under the various provisions of the

Stockholders Agreement:

> All notices required to be delivered pursuant to this Agreement shall be
> delivered in person or by telegraphic or other facsimile transmission or sent
> by certified mail, return receipt requested, and shall by addressed to the
> Company at its principal business office, to the attention of its Chief
> Executive Officer, to a Non-TPR Stockholder, to the Representatives, and
> any other Stockholders at the address of the Stockholder shown in the
> Company's stock ledger or to such other address as such other Stockholder
> may indicate by duly giving written notice to the Company.[21]

Thus, formal notice of an event such as a share transfer was to be given directly to the

Trump Group entities, *i.e.* TR Investors and Glenclova, who were parties to the

Agreement, and not to Jules Trump personally.[22]  The Stockholders Agreement also

contained a non-waiver clause, which provided that "[n]o waiver or failure on the part of

a Company or a Stockholder in the exercise of any right, power or remedy shall operate

as a waiver thereof, nor shall any single or particular exercise by them of any right, power

---

[19] *Id.* § 3.2(a) (emphasis added).

[20] *Id.*

[21] *Id.* § 6.5.

[22] As to TR Investors, it appears that notice was to be given through Mark Hirsch at TR
Investors' official address, and as to Glenclova, notice was to be given through Robert Smith at
Glenclova's official address. *See id.* at 40.  Jules Trump was not an officer or director of either
TR Investors or Glenclova.  Tr. 117 (J. Trump).

or remedy preclude other or further exercise thereof, or the exercise of any other right, power or remedy."[23]

Finally, under Section 1.6 of the Stockholders Agreement, TR Investors and Glenclova were entitled to an addition 1.85% of TPR's shares in Trans-Resources (the "Balance Shares").[24] The Balance Shares refer to shares that Bank Hapoalim had the option to purchase, the exercise of which would reduce TPR's shareholding by 1.85%. Because of that option, the Trump Group allowed TPR to hold 52.85% of Trans-Resources' stock, even though the parties agreed to a 51%/49% split, on the condition that the Balance Shares would revert to TR Investors and Glenclova if the Bank's option should expire unexercised.[25]

## C. In 2004, As Part Of The Settlement Of His Acrimonious Divorce, Genger Transfers Trans-Resources Stock From TPR To The Sagi Trust, The Orly Trust, And To Himself

On October 26, 2004, after a drawn-out and contentious divorce proceeding, Genger entered into a final marital settlement agreement with his then-wife, Dalia Genger. Under that settlement agreement, Genger transferred his equity interest in TPR to Dalia Genger on October 29, 2004. On that same day, the Trans-Resources shares that TPR previously held were transferred as follows: approximately 13.9% of the shares were transferred to Genger himself, and separate trusts established for his two children, Orly and Sagi Genger (respectively, the "Orly Trust" and the "Sagi Trust"), were each transferred approximately 19.5% of the shares (collectively, the aforementioned "2004

---

[23] Stockholders Agreement § 6.8.
[24] *Id.* § 1.6.
[25] *Id.*; *see also* Tr. 255-57 (Hirsh).

10

Transfers"). According to the transfer agreements, the trustees of each Trust agreed to irrevocable lifetime proxies in favor of Genger (the "Proxies").[26]

At the time the 2004 Transfers were made, Genger did not notify TR Investors or Glenclova of the Transfers as required by the Stockholders Agreement. Genger admits that he never gave the written notice required by the Stockholders Agreement, provided the Trump Group with copies of the Proxies, or passed on a copy of the marital settlement agreement.[27] Nevertheless, Genger argues that TR Investors and Glenclova received notice because he orally told Jules Trump about the 2004 Transfers. In particular, Genger testified that he told Jules Trump about the 2004 Transfers "many times" from the "inception, [when] the idea germinated of how to resolve my divorce, to the execution [of the 2004 Transfers]."[28] Genger testified that he told Jules Trump of the 2004 Transfers during their regular strolls on Williams Island.[29]

For his part, however, Jules Trump categorically denied that Genger ever mentioned the 2004 Transfers.[30] The only other person who testified to hearing any conversations between Genger and Jules Trump relating to the 2004 Transfers was Genger's daughter, Orly. At trial, Orly Genger testified that her father "shared . . . everything" with the Trumps,[31] and that she was present during at least one discussion between Genger and Jules Trump about the 2004 Transfers. In particular, she testified

---

[26] JX-113 (Letter Agreement and Proxy (Oct. 29, 2004)) (the "Proxy").

[27] Pretrial Stipulation and Order 4; Tr. 936, 940 (A. Genger), 99 (J. Trump), 628 (Dowd).

[28] Tr. 856 (A. Genger).

[29] *Id.*

[30] *Id.* at 159 (J. Trump) ("Q. From the time that you became — TR Investors became a stockholder in 2001 to June 13th, 2008, did anyone give you any notice of the 2004 transfers, or the change in control of TPR? Trump. Never. Never, ever.").

[31] *Id.* at 783 (O. Genger).

11

about a discussion in "late '04 or early '05" at Jules Trump's residence on Williams

Island.[32]  But, Orly Genger's testimony regarding that conversation was vague, at best:

> They talked about how TPR and [Trans-Resources] were split, how my —
> my dad spoke about how he split those two, how he hoped that now that my
> brother, since was sort of — it was now me, my mother, and my brother,
> and my brother was supposedly the financial guy supposed to take care of
> us in a sense, he was hoping that — that he would.[33]

When asked for further details, she only elaborated as follows:

> Q. And were there details?  Was your father providing details to Mr.
> Trump —
>
> O. Genger. Yeah.
>
> Q. — in those discussions?
>
> O. Genger.  The fact that my brother was in the middle of it, you know, and
> just the awful nature of it.  Everything was told to Jules.[34]

On cross-examination, Orly Genger clarified that the discussion between her father and

Jules Trump some time in late 2004 or early 2005 definitely took place *after* the 2004

Transfers occurred,[35] and that she did not remember her father specifically discussing the

transfer of Trans-Resources shares to the Sagi Trust.[36]  But she did not provide further

---

[32] *Id.* at 787.  Orly Genger also briefly mentioned a conversation between Genger and Jules
Trump sometime during 2007, when her brother brought a lawsuit against her father.  *Id.* at 799.
But the only details she provided regarding that discussion was that she remembered "them
speaking specifically about th[e] lawsuit and how incredible it was that my father had given my
brother TPR [Investment], [and] he was actually against him now."  *Id.*

[33] *Id.* at 786.

[34] *Id.* at 789.

[35] *Id.* at 801 ("Q.  And I want to make sure I understand.  [The conversation between Genger and
Jules Trump] — it definitely occurred after the 2004 transfers had occurred; is that right?  O.
Genger.  Yes.").

[36] The precise colloquy was as follows:
> Q.  Now, in this conversation the issue that you recall being discussed was the
> transfer of control of TPR [Investment] to your brother.  He would be in charge.

12

details about the substance of the discussion between her father and Jules Trump other than to say that the "essence" of the discussion was "that [Sagi] was now sort of in charge."[37] The lack of specific details in her testimony undermines her credibility because of her personal interest in the outcome of this case and her obvious desire to protect her father in his feud with her brother,[38] and because Genger himself testified that no one else was present during his alleged conversations with Jules Trump, even his daughter Orly.[39]

---

O. Genger.  That was the essence, that he was now sort of in charge.

Q.  That was the essence of it.

O. Genger.  Right.

Q.  Yeah.  And the question of the transfer of TPR's shares of [Trans-Resources] to your trust and your brother's trust and your father, you don't recall that that was discussed during this conversation?

O. Genger.  I'm sorry.  Can you say it again?

Q.  Yes.  The question of the transfer by TPR [Investment] of its [Trans-Resources] shares —

O. Genger.  Right.

Q.  — to your trust, your brother's trust, and your father, that was not discussed in this conversation?

O. Genger.  Not that I remember.

*Id.* at 803-04.

[37] *Id.*

[38] *Id.* at 813 ("Q.  You stand to benefit if your father prevails in this litigation?  O. Genger:  I hope.  Yeah, I think.").

[39] *Id.* at 895 (A. Genger) ("The Court: It was just the two of you?  Genger:  Just the two of us. The Court: Not your daughter?  Genger:  Not my daughter.").

Besides his own testimony and the testimony of his daughter, the only other evidence to which Genger points as proof that he told the Trumps about the 2004 Transfers are two after-the-fact events. First, Genger points to a written consent that Trans-Resources' shareholders were required to sign in 2005 (the "2005 Written Consent") in order to resolve a dispute with Bank Hapoalim, with whom Trans-Resources had a long-term relationship, over Trans-Resources' outstanding debt. The signature page of the 2005 Written Consent included signature blocks for not only Arie Genger, but also the Orly Trust and the Sagi Trust, and identified Arie Genger as the proxy for the two Trusts.[40] That is, by including signature lines for the Orly Trust and the Sagi Trust as shareholders, the 2005 Written Consent disclosed that some sort of transfer had taken place. For their part, the Trumps credibly claim that they did not notice the additional signature lines in the 2005 Written Consent when they signed the page.[41]

Second, Genger claims that he mentioned the 2004 Transfers during a Trans-Resources board meeting in November 2007 at which Jules Trump was present (the "November 2007 Board Meeting").[42] For support, Genger points to the minutes of that meeting, which reflect that "Mr. Genger advised the directors that both he and Mr. Dowd had been sued by TPR Investment Associates, Inc. and other related entities with respect to their activities as officers and/or directors of TPR Investment Associates, Inc., *the former parent Company of [Trans-Resources]*."[43] Genger avers that this passing

---

[40] JX-125 (executed written consent (July 26, 2005)) (the "2005 Written Consent").
[41] Tr. 101-05 (J. Trump), 185-92 (Hirsch)
[42] JX-149 (Trans-Resources board meeting minutes (Nov. 19, 2007)).
[43] *Id.*

14

reference to TPR being the former parent of Trans-Resources should have tipped Trump

off that the 2004 Transfers were made.  As we will see, that argument is undercut,

however, by the reality that Genger's loyal subordinate, Bill Dowd, appears to have

manipulated the corporate minutes on other occasions to suit Genger's interests.

### D.  Genger Finally Tells The Trumps About The 2004 Transfers During Negotiations To Restructure Trans-Resources' Debt

In the spring of 2008, Trans-Resources was once again having financial troubles,

now in a dispute with Bank Hapoalim, which was pressuring Trans-Resources to sell its

main subsidiary, Haifa Chemical, Inc., in order to avoid foreclosure.[44]  Genger turned to

the Trumps for help, asking Jules Trump if the Trump Group would provide the capital

necessary to retire Trans-Resources' bank debt in exchange for an increased equity

position that would give the Trump Group control of Trans-Resources.[45]  Genger relied

on Jules Trump in particular not only because of their past relationship but also because

Bank Hapoalim, which had indicated that it had lost confidence in Genger, was however

willing to negotiate with Trump in regard to Trans-Resources' debt.[46]  On May 31, 2008,

Genger and Jules Trump met to discuss the general contours of an agreement (the

"Funding Agreement"), which would provide for a capital infusion into Trans-

Resources.[47]  After that meeting, Trump negotiated with Bank Hapoalim to reduce Trans-

---

[44] Tr. 38-39 (J. Trump).
[45] *Id*. at 41-42 (J. Trump).
[46] *Id*. at 124-27, 146 (J. Trump).
[47] *Id*. at 872 (A. Genger); 43-44, 135-36 (J. Trump).

Resources' debt load, and asked Genger to meet with Eddie Trump and Mark Hirsch, the Trumps' lawyer, in New York to work out the details of the Funding Agreement.[48]

### 1. Genger, Eddie Trump, And Mark Hirsch Meet On June 13, 2008

Genger met with Eddie Trump and Hirsch in New York on June 13, 2008 (the "June 13 Meeting"). Early in the June 13 Meeting, Hirsch gave Genger a draft of the Funding Agreement. That draft listed TPR, Glenclova, and TR Investors as the company's sole shareholders, thereby strongly suggesting that the Trump Group was unaware at that time of the 2004 Transfers.[49] Upon reviewing the draft, Genger commented that TPR was no longer a Trans-Resources stockholder.[50] Both Eddie Trump and Hirsch expressed shock upon hearing that, and Hirsch reminded Genger that he was not permitted to transfer his stake in Trans-Resources without first providing notice and a right of first refusal to the Trump Group.[51]

Upon seeing their surprise, Genger did not stop and say what one would expect to be the first thing out of his mouth if Genger had already given repeated notice to Jules

---

[48] *Id.* at 868-69 (A. Genger).

[49] JX-170 (email from Mark Hirsch to Jules Trump with draft agreements attached (June 12, 2008)).

[50] Tr. 283 (Hirsch), 498-99 (E. Trump).

[51] *Id.* at 284-85 (Hirsch), 499 (E. Trump). Interestingly, the trial record includes an email from Hirsch to Jules Trump, dated June 11, 2008, in which Hirsch describes the transfer restrictions and the right of first refusal provisions in the Stockholders Agreement. JX-167 (email from Mark Hirsch to Jules Trump (June 11, 2008)). The timing of that email suggests that the Trumps might have known about the 2004 Transfers before the June 13, 2008 meeting. But I do not find this email to be proof that Genger had given the Trumps oral notice because: (1) the Trumps may have simply suspected on their own that something like the 2004 Transfers had taken place; or (2) the Trumps may have heard rumors from sources other than Genger that the 2004 Transfers had occurred. In either event, notice as required under Stockholders Agreement had not been given. Furthermore, even if the email did indicate that notice had been given, it still suggests that the timing of that notice was no earlier than June 2008.

Trump: "Why are you acting so surprised?  I told Jules all about these Transfers years ago."[52]  Rather, Genger acknowledged that he had not provided notice of the 2004 Transfers, but insisted that he had lived within the spirit of the Stockholders Agreement by maintaining control of the stock through the Proxies.[53]  And, Genger spent the better part of that day explaining the 2004 Transfers to Eddie Trump and Hirsch,[54] which would have been unnecessary had they already known about the Transfers.

Finally, at the end of the meeting, Genger offered to arrange a meeting with his lawyer, David Lentz, who was most familiar with the details of the 2004 Transfers.[55] Eddie Trump and Hirsch met with Lentz three days later, on June 16, 2008, to discuss the details of the 2004 Transfers.  It is also noteworthy that, before that meeting, Genger never told Lentz that he had given Jules Trump oral notice of the 2004 Transfers.[56]  If notice of the 2004 Transfers had indeed been given, one would have expected Arie Genger to have at least mentioned that important detail to his own counsel.  During that

---

[52] Tr. 501 (E. Trump) ("At any time during the meeting did Mr. Genger say, 'Well, I told your brother, Jules.  Let's get him on the phone,' or words to that effect?  E. Trump: No.").  Genger's testimony on this important issue was vague at best.  He only recalled telling Eddie Trump and Hirsh something to the effect of "Jules knows about it" at some point during the June 13 Meeting.  *Id.* at 900 (A. Genger).  But, Genger could give no further details, and he admitted that he never pressed the point or suggested that they get Jules Trump on the phone to clarify the issue.  *Id.*

[53] *Id.* at 284 (Hirsch) ("I took out the agreement to show [Genger] specifically why he could not have transferred the shares, that this was not permitted under the agreement.  And he said, 'All right.  You know, so I didn't tell you about it, but I didn't think I had to.  I mean, what's changed?  I still – I still vote the shares.'").

[54] *Id.* at 893-94, 899 (A. Genger).

[55] *Id.* at 902-03 (A. Genger).

[56] *Id.* at 7 (Lentz) ("Q: And Mr. Genger didn't tell you [before the June 16th meeting] that he claimed to have given some sort of notice to Jules Trump.  That's correct; right?  . . .  Lentz: I believe your statement is correct.").

meeting, Lentz never suggested that Jules Trump had already known about the 2004

Transfers because Genger had told him about them years ago.[57]

## 2. Later Communications Between Genger, William Dowd, And David Lentz Admit That Genger Never Gave The Trump Group Notice Of The 2004 Transfers

In a series of emails and memoranda produced over the two weeks following the

June 16 meeting, Lentz repeatedly acknowledged Genger's failure to provide any notice

of the 2004 Transfers. In a June 17, 2008 email, Lentz wrote that "[t]he Trumps *never*

*consented to* and don't want [the Sagi] Trust or [Orly] Trust . . . as minority partners

(shareholders) in [Trans-Resources]."[58] And, in a June 26, 2008 email, Lentz wrote that

"no notice was given" to the Trumps about the 2004 Transfers.[59] But, Lentz's most

telling admission came in a memorandum he wrote for Genger analyzing the parties'

various bargaining positions and how likely machinations by Sagi Genger would affect

the outcome of the dispute (the "Lentz Memo"). In that Memo, Lentz wrote:

> *While it is true the Trumps never got notice*, the entire intent of the
> Shareholder's agreement has been carried out anyway. In other words, *why
> did AG not give them actual notice?* Because, AG will testify, using the
> TPR shell was never the intention of the Trumps and AG — the real
> intention was to keep the ownership of [Trans-Resources] in the Genger
> family under the voting and operational control of AG and the Stipulation
> did just that. So, AG becomes SG's best witness. AG will not say I just
> forgot to tell the Trumps. He will not say I tried to get away with
> something and thought the Trumps would not find out. He will testify that

---

[57] *Id.* at 990 (Lentz) ("Q. Nobody said at the meeting, then, that any notice had been given in substance; right? Lentz. Correct."); *see also id.* at 994 (Lentz) ("Q. [Y]ou went through an entire meeting about the absence of notice and people asking what, in fact, occurred. And no one from your side of the discussion spoke a peep refuting that contention; right? Lentz: Nobody refuted it, that's correct.").

[58] JX-331 (email from David Lentz to Arie Genger, Bill Dowd, and Christopher Gengaro (June 17, 2008)) (emphasis added).

[59] JX-337 (email from David Lentz to Arie Genger, Bill Dowd, and Christopher Gengaro (June 26, 2008)).

18

whether the corporate form of TPR or the kids' trusts w[as] used made no difference. The essence of these protections was to make sure the Genger family owned roughly 50% and that AG could vote all of those shares. That's what happened. So, *while there was a technical violation*, the Trumps got what they bargained for.[60]

Later in that same Memo, Lentz added: "AG does not have clean hands because like SG, *AG never told the Trumps*."[61] Thus, Genger's own attorney repeatedly acknowledged that Genger had never given the Trumps *any* type of notice.

### 3. At The June 25, 2008 Meeting Of Trans-Resources' Board And Stockholders, Genger Himself Indicates That Notice Of The 2004 Transfers Was Not Given To The Trumps

The Trans-Resources board met on June 25, 2008 (the "June 25 Board Meeting") and unanimously approved the Funding Agreement, which provided that the Trumps would invest an additional $57.5 million in the company in exchange for 50% of Trans-Resources' outstanding stock, which would give the Trumps clear voting control and by far the largest equity position in the company.[62] That is, the totality of the Funding Agreement would address the injury to the Trump Group from the 2004 Transfers by giving it voting control of Trans-Resources. Handwritten notes by Bill Dowd, a director and Trans-Resources' chief executive officer, recorded that "AG describe[d] [Trans-Resources] stock transfer *in violation of agreement*" during the meeting.[63] That is, Genger acknowledged that the 2004 Transfers were made without providing notice to the

---

[60] JX-332 (memorandum from David Lentz to Arie Genger, Bill Dowd, and Chris Gengaro) (the "Lentz Memo") (emphasis added).

[61] *Id.* (emphasis added).

[62] JX-181 (minutes of joint meeting of the board of directors and stockholders of Trans-Resources, Inc. (June 25, 2008)).

[63] JX-179 (handwritten notes of Bill Dowd (June 25, 2008)) (emphasis added).

19

Trumps. Tellingly, Dowd, who had worked for Genger for years, omitted that important admission from the formal minutes he drafted following the meeting.[64]

### E. Negotiations To Restructure Trans-Resources Break Down, And The Parties Eventually Commence This Litigation

Although the Funding Agreement solved the problem with Bank Hapoalim, Genger and the Trumps still had to sort out how to ensure that the Trumps were given control of the Trans-Resources board as required under the Funding Agreement. That was a problem because Genger and the Trumps anticipated that Sagi Genger, who now had a claim to be a Trans-Resources stockholder on account of the 2004 Transfers, would litigate any attempt to transfer control from Genger to the Trumps, if for no other reason than to spite his father.[65] During June and July of 2008, Genger and the Trumps discussed options for dealing with Sagi Genger. One of the options the Trumps suggested was confronting Sagi Genger with the argument that the 2004 Transfers violated the Stockholders Agreement, and that he was therefore not a beneficial owner of the Shares.[66] Importantly, Genger resisted this approach, likely because that would expose him to liability for representing falsely in the divorce settlement that the 2004 Transfers were not made in violation of any agreement.[67]

---

[64] *See* JX-179 (draft meeting minutes (June 25, 2008)) (omitting any reference to the 2004 Transfers being made in violation of the Stockholders Agreement).

[65] Tr. 318-19 (Hirsch).

[66] *Id.*

[67] *Id.* at 304 (Hirsch).

1. Genger Reneges On The Funding Agreement, And The Trumps Respond With A Lawsuit

Genger and the Trumps never reached common ground on how to approach Sagi, because Genger began to back-track on the draft terms of the Funding Agreement. Genger could afford to back out of the Funding Agreement because he had devised a way — albeit one of questionable propriety — to upstream funds from the Haifa Chemical, Inc. subsidiary to Trans-Resources, thus allowing Trans-Resources to fulfill its obligations to Bank Hapoalim, which Jules Trump had successfully reduced during his negotiations with the bank on behalf of Trans-Resources.[68]  Because Genger had secured an alternative source of capital, the Funding Agreement with the Trumps was no longer the only mechanism for rescuing Trans-Resources.  From that position of increased leverage, Genger began to disengage from the Funding Agreement deal.  First, despite the fact that Bank Hapoalim required payment by late August, Genger requested that execution of the Funding Agreement be postponed upon the advice of counsel.  Wielding a problem of his own creation, Genger asserted that Trans-Resources' Delaware lawyers had advised him that Trans-Resources needed to establish an independent committee to review the fairness of the Funding Agreement because the recipients of the 2004 Transfers might complain.  Second, at an August 1, 2008 meeting, Genger's lawyers claimed, for the first time, that Genger had given Jules Trump oral notice of the 2004

---

[68] Dowd Dep. 281.

Transfers years ago, and threatened litigation if the Trumps chose to challenge the 2004 Transfers.[69]

The Trumps responded on August 8, 2008 with a letter to TPR and Trans-Resources indicating that Glenclova was exercising its right under Section 3.2 of the Stockholders Agreement to purchase all of the shares subject to the 2004 Transfers, and requesting that the Trans-Resources board begin the process of establishing their purchase price.[70] On August 11, 2008, Glenclova filed a suit in the United States District Court for the Southern District of New York seeking to enforce the Funding Agreement and its rights under the Stockholders Agreement.[71] On August 13, 2008, Genger responded through a letter from his attorneys, claiming that Glenclova had no right to purchase the shares because he had kept Jules Trump fully informed of the 2004 Transfers at the time they were made four years prior.[72]

2.  The Trump Group Purchases The Sagi Trust's Shares And Reconstitutes Trans-Resources' Board Of Directors, Leading To This Section 225 Action

The lawsuit in federal court in New York was not the only course of action the Trumps took. On August 21, 2008, Jules Trump contacted Sagi Genger to explore the possibility of acquiring the 1,102.8 shares purportedly transferred to the Sagi Trust in 2004 (the "Sagi Shares").[73] And, on August 22, 2008, the Trumps purchased the Sagi Shares pursuant to a stock purchase agreement (the "Purchase Agreement") between the

---

[69] Tr. 65, 155-56 (J. Trump), 364 (Hirsch).
[70] JX-198 (letter from Glenclova to TPR and Trans-Resources (Aug. 8, 2008)).
[71] JX-204 (Complaint, *New TR Equity, LLC v. Trans-Resources, Inc.* (S.D.N.Y. Aug. 11, 2008)).
[72] JX-350 (letter from Charles Weissman to Barry Adelman (Aug. 13, 2008)).
[73] Tr. 111 (J. Trump).

Sagi Trust, TPR, and the Trumps' entities, TR Investors, Glenclova, New TR Equity I,

LLC ("Equity I"), and New TR Equity II, LLC ("Equity II").[74]  Importantly, the

transaction included not only the Sagi Trust as a party but also the wrongful transferor,

TPR.  Sagi Genger could act for TPR because, after making the 2004 Transfers, Genger

had ceded control of TPR to Dalia Genger, who subsequently sold her interest in TPR to

her son, Sagi.[75]  The Purchase Agreement contained a specific section addressing the

reality that the Trump Group viewed the 2004 Transfers as void and that TPR still owned

them and was obliged to sell them to the Trump Group at 2004 values.  To wit, the

Purchase Agreement provided that it would be considered consummated between the

Trump Group and *TPR* if the 2004 Transfers were to be found void:

> If at any time following the Closing Date, it is determined that Seller is not
> the record and beneficial owner of the Shares as of the date hereof, by
> virtue of the transfer of the Shares to it by TPR being deemed to have been
> void or for any other reason, and that all right, title and interest in and to the
> Shares is held by TPR, subject only to the plaintiff's asserted rights under
> the Stockholders Agreement asserted in the action styled Glenclova
> Investment Co. v. Trans-Resources, Inc. and TPR Investment Associates,
> Inc., Case No. 08-CIV-7140 (JFK), pending the United States District
> Court for the Southern District of New York, the parties hereby agree that
> (a) *this Agreement and the transactions contemplated hereby shall be
> deemed to have been entered into and consummated with TPR, (b) the
> Purchasers shall retain all right, title and interest in and to the Shares as if
> purchased from TPR pursuant to this Agreement, (c) TPR shall look only to
> Seller for any payments made by the Purchasers pursuant to this
> Agreement, (d) the Purchasers shall have no liability or obligation to TPR
> in respect of the Shares, and (e) all representations, warranties, covenants
> and agreements made by Seller herein, shall be deemed to have been made
> by TPR as of the date hereof.*[76]

---

[74] JX-225 (the "Purchase Agreement").
[75] Tr. 547 (S. Genger).
[76] Purchase Agreement § 10 (emphasis added).

23

Thus, by signing an agreement with both the Sagi Trust and TPR, the wrongful

transferee, the Trump Group dealt with the Genger-caused problem that Genger exploited

in order to derail the Funding Agreement.  By dealing directly with both the allegedly

innocent transferee — the Sagi Trust — and the wrongdoer — TPR — the Trump Group

covered all of its bases.

Having purchased the Sagi Shares, which gave them a majority equity position in

Trans-Resources, the Trump Group then executed a written consent on August 25, 2008

that removed Genger from the Trans-Resources board, elected Eddie Trump and Hirsch

to the board, and affirmed the election of Jules Trump and Robert Smith to the board.

The Trump Group delivered that written consent to Trans-Resources, but Genger rejected

it.[77]

In response, the Trump Group filed a single-count complaint pursuant to 8 *Del. C.*

§ 225 in order to determine the composition of the Trans-Resources board (the "Section

225 Action").  Consistent with their position throughout the summer of 2008, the Trump

Group's central claim was that the 2004 Transfers were made in violation of the

Stockholders Agreement, and that it therefore had the right to purchase all of TPR's

shares pursuant to Section 3 of the Stockholders Agreement.[78]  Genger responded with a

counterclaim, raising a number of arguments for why the 2004 Transfers were made

appropriately — chief among them his assertions that he told Jules Trump of the

Transfers at the time they were made, and that, in any event, the Trump Group's purchase

---

[77] Tr. 403-06 (Hirsch).
[78] Compl. ¶ 10.

24

of the Sagi Shares in 2008 ratified the 2004 Transfers — and claiming that, therefore, he still controlled Trans-Resources' board. Genger also argues that the Trump Group violated Section 2.1 of the Stockholders Agreement when Equity I and Equity II pledged Trans-Resources shares in return for financing to buy the Sagi Shares.

Soon after the Section 225 Action was filed, the parties promptly settled the matter, which resulted in a stipulated final judgment that declared that the Trump Group's designees constituted a majority of the board.[79] But, like any other moment of agreement between the parties in this case on anything, that settlement was short-lived. On October 10, 2008 — two weeks after the final judgment was entered — the Trump Group moved to re-open the Section 225 Action. They moved to reopen because they alleged that, after taking control of Trans-Resources, they discovered that Genger had destroyed documents relevant to the Section 225 Action in violation of a status quo order.

The issue of whether Genger should be held in contempt for destroying documents in violation of this court's status quo order was decided in 2009 in a separate trial.[80] It is unnecessary to recount here the facts or analysis involved in that trial, which are summarized in the opinion that resulted.[81] What matters for present purposes is the outcome: Genger was found to be in contempt, which raises Genger's evidentiary burden on any issue on which he has the burden of proof by one level and renders his uncorroborated testimony insufficient to establish material facts.[82]

---

[79] *See TR Investors, LLC v. Arie Genger*, C.A. No. 3994-VCS (Sept. 26, 2008) (ORDER).
[80] *TR Investors, LLC v. Genger*, 2009 WL 4696062 (Del. Ch. Dec. 9, 2009).
[81] *See id.* at *1-15.
[82] *See id.* at *18-19.

25

III. Legal Analysis

Genger has proliferated a host of theories — including new ones after trial — as to why he retains voting control over Trans-Resources, and the Trump Group has accurately described its efforts to address Genger's ever-changing arguments as playing a game of "Whack-a-Mole."[83]  It is possible, nevertheless, to sift through the heaping stew pot filled with every conceivable exculpatory theory that ever crossed his lawyers' inventive minds that Genger has cooked up and identify the chunkier ingredients.  Genger's main theory is that the 2004 Transfers were made appropriately, either because he gave the Trump Group notice or because the Trump Group ratified the Transfers.  Genger's primary alternative theory is that, even if the 2004 Transfers were not appropriate, the Trump Group took the Sagi Shares subject to the Proxy in his favor.

In the analysis that follows, I do not address all of the alternative theories Genger concocted, but rather focus on his two fundamental theories.  Treating all of his secondary arguments is unnecessary because Genger has failed to bear his evidentiary burden as to those core theories on which the rest of his case depends.  That is, Genger has failed to prove that he properly notified the Trump Group of the 2004 Transfers at any time before the June 13 Meeting, or that the Trump Group somehow ratified the 2004 Transfers after the fact.  And, even if the Trump Group did ratify the 2004 Transfers —

---

[83] *See* Trump Post-Trial Ans. Br. 3.  For example, Genger's counsel spent a great deal of time at post-trial oral argument in a befuddling exposition of a theory *introduced into the case as a footnote in its post-trial answering brief.  Compare* Post-Trial Tr. 128-58 *with* Genger Post-Trial Ans. Br. 24, n. 18.

which it did not — Genger has failed to prove that it took the Sagi Shares subject to the Proxy.

## A. Standard Of Review

The standard of review I apply in analyzing the aforementioned issues is different in this case than what is typical. The party attempting to gain control of an entity in an action pursuant to 8 *Del. C.* § 225 bears the burden of proof on any issue, the outcome of which would affect the determination of the Trans-Resources' board.[84] Generally speaking, the burden of proof in civil cases is that the party with the burden must prove his position by a preponderance of the evidence.[85] But, because of this court's prior ruling in the contempt trial, Genger's burden is raised a level, meaning that he must prevail on any issue in which he bears the burden of proof by clear and convincing evidence. And, as mentioned before, Genger's own uncorroborated testimony will not be sufficient to establish any material fact.[86]

## B. Arie Genger Did Not Notify The Trump Group Of The 2004 Transfers Until June 13, 2008

The first issue I must address is Genger's argument that he gave the Trump Group notice of the 2004 Transfers during his conversations in late 2004 or early 2005 with Jules Trump about his divorce and that the Trump Group is chargeable with laches.[87]

---

[84] *See Agranoff v. Miller*, 1999 WL 219650, at *12 (Del. Ch. Apr. 12, 1999), *aff'd*, 737 A.2d 530 (Del. 1999). Genger conceded that he bears the burden of proof. Contempt Trial Tr. 355.
[85] *See SinoMab Bioscience Ltd. v. Immunomedics, Inc.*, 2009 WL 1707891, at *12 (Del. Ch. June 16, 2009).
[86] *See supra* page 25.
[87] Laches operates to bar a claim where "(a) [the] plaintiff knew (or should have known) of its rights or claim; (b) [the] plaintiff failed to assert its rights or claim; and (c) [the] defendant has materially changed its position or otherwise materially relied on plaintiff's failure to assert."

27

This argument is central to the case because the Stockholders Agreement provides that, upon receiving notice of an improper transfer from any source, the Trump Group has 90 days to elect to purchase the shares held by the stockholder making the transfer, *i.e.* TPR.[88] If the first time the Trumps heard about the 2004 Transfers was at the June 13 Meeting, then the Trump Group acted within the 90-day window provided in the contract because it elected to purchase TPR's shares on August 8, 2008, when it sent TPR a letter indicating that it elected to exercise its rights under Section 3.2 of the Stockholders Agreement.[89] But, if the Trumps received notice some time before May 8, 2008, then their demand to exercise their purchase rights under the Stockholders Agreement on August 8, 2008 would arguably be tardy.

Tellingly, Genger spent only one and a half pages in his post-trial briefing on this argument.[90] That is likely because he knew, as shown below, that he has failed to bear his evidentiary burden on this issue. There is no credible evidence indicating that Genger ever told Jules Trump about the 2004 Transfers in late 2004 or early 2005.

At trial, Genger offered little more than his unbelievable and uncorroborated testimony to support his claim that he notified the Trump Group. As discussed earlier, Genger testified that he told Jules Trump about the 2004 Transfers on a number of occasions in late 2004 or early 2005 while the two discussed developments in Genger's

---

*Gotham Partners, L.P. v. Hallwood Realty Partners, L.P.*, 714 A.2d 96, 104 (Del. Ch. 1998); *see also Fed. United Corp. v. Havender*, 11 A.2d 331, 344 (Del. 1940) ("Sitting by inactive and in what amounts to silence, when every consideration for the rights of others demanded prompt and vigorous action, and until affairs had become so complicated that a restoration of former status was difficult, if not impossible, is conduct amounting to laches.").
[88] Stockholders Agreement § 3.2(a).
[89] JX-198 (Letter from Glenclova to Trans-Resources and TPR (Aug. 8, 2008)).
[90] *See* Genger Post-Trial Op. Br. 28-30.

divorce during their strolls on Williams Island.[91]  For his part, Jules Trump categorically

denied that Genger ever mentioned the 2004 Transfers in late 2004 or early 2005.[92]  The

only other person who testified to hearing Genger and Trump discuss the matter was Orly

Genger.  But her testimony gave little detail about what was actually said during those

alleged conversations, and it was contradicted by Genger himself, who said that she was

not present at the key conversation when he told Jules Trump about the Transfers.[93]

Therefore, I do not find her testimony of the alleged conversations between Genger and

Jules Trump credible, especially in light of her personal interest in this case.

Moreover, if Genger did in fact tell Jules Trump about the 2004 Transfers in late

2004 or early 2005, then why did he not press that point at the June 13 Meeting when

Eddie Trump and Hirsch appeared shocked to hear the news?  The natural thing to say in

that situation would have been to make the obvious point that he had told Jules about it

years ago.  But, at trial, Genger only testified vaguely, haltingly, and meekly that he told

them something along the lines of "Jules knows about it," and gave no other details of

what he said in that regard.[94]  Genger also admitted that he never pressed the point any

further, even though he became "[v]ery frustrated" with the repeated questions Eddie

Trump and Hirsch were asking.[95]  For example, Genger never said that they should get

Jules Trump on the phone to confirm that Genger had indeed told him about the

---

[91] *See supra* page 11.

[92] *See supra* page 11.

[93] *See supra* page 11-13.

[94] Tr. 900 (A. Genger).

[95] *Id.*

29

Transfers.[96] Rather, Genger attempted to justify the Transfers on the grounds that he still had voting control through the Proxies.[97]

Genger also failed to mention his alleged conversations with Jules Trump even when he spoke with his lawyer, David Lentz, after the June 13 Meeting.[98] Such an important detail would, if true, have been one of the first things Genger told his counsel. But, the evidence indicates Lentz believed at the time that Genger had never informed Jules Trump of the 2004 Transfers.[99] That fact is reflected most clearly in the Lentz Memo, which stated repeatedly that notice had never been provided to the Trump Group.[100]

Thus, the overwhelming thrust of the evidence indicates that everyone in Genger's camp knew full well that he had never told the Trump Group about the 2004 Transfers before the June 13 Meeting.[101] Indeed, Bill Dowd's notes of the June 25 Board Meeting indicate that Genger himself admitted that the Transfers were made in violation of the Stockholders Agreement.[102] The inescapable conclusion is that Genger did not provide the Trump Group with any form of notice before the June 13 Meeting, choosing rather to trust in his savvy to manage the Trumps if the issue ever arose.

Nor can Genger rely on the passing references to the possibility of a transfer in the 2005 Written Consents and the minutes of the November 2007 Board Meeting. As noted,

---

[96] *Id.*

[97] *See supra* page 17.

[98] *See supra* page 17.

[99] *See supra* page 17-19.

[100] *See supra* page 18-19.

[101] *See* Tr. 631 (Dowd), 1008 (Lentz).

[102] *See supra* page 19.

the accuracy of the minutes of the November 2007 Board Meeting appears to be suspect.[103] Furthermore, the Stockholders Agreement required a specific form of notice to be given to TR Investors and Glenclova.[104] Even if Genger told Jules Trump about the 2004 Transfers in late 2004 or early 2005, which I conclude he did not, that would not constitute notice to TR Investors or Glenclova. But more important is the fact that passing references in the 2005 Written Notices or the minutes of the November 2007 Board Meeting do not constitute proper notice of any kind or even put the Trump Group on effective inquiry notice. Business people can miss things. The idea that the Trump Group had to review every stray reference in the board minutes or to read between the lines on the signature page of the 2005 Written Consents for signs of a possible transfer is wrong. The notice provision in the Stockholders Agreement was specific and designed to ensure that the Trump Group did not have to police the world in this way, as was the Stockholders Agreement's strong anti-waiver provision.[105] Finally, I am persuaded by, among other things, the draft Funding Agreement the Trump Group proposed that indicated that the Trump Group did not know of the 2004 Transfers. Notably, I conclude that the Trump Group would prevail on this issue even if they had the burden to show that they had not been given proper notice. But, because Genger admits he did not give proper notice as required under the contract,[106] it was his burden to show that he should nevertheless be alleviated of his obligations under the Stockholders Agreement because

---

[103] *See supra* pages 19-20.
[104] *See* Stockholders Agreement § 6.5.
[105] *See id.* at §§ 6.5, 6.8.
[106] *See* Pretrial Stipulation and Order 4.

he gave Jules Trump oral notice and, certainly, it was his burden to prove a laches defense.

## C.  The Trump Group Did Not Ratify The 2004 Transfers

Genger next argues that the Trump Group nevertheless ratified the 2004 Transfers. The defense of ratification is perhaps best understood by reference to its closest cousin, the doctrine of acquiescence.[107]  Acquiescence occurs when a party "has knowledge of an improper act by another, yet stands by without objection and allows the other party to act in a manner inconsistent with the claimant's property rights."[108]  Ratification differs primarily in timing: "[a]quiescence properly speaks of assent by words or conduct *during the progress* of a transaction, while ratification suggests an assent *after the fact*."[109]  Thus, to find that a party ratified a prior act, it is first necessary to find that the ratifying party had "[k]knowledge, actual or imputed, of all material facts."[110]  Second, ratification requires an affirmative act by the ratifying party.  Assent can be "implied from conduct,

---

[107] *See Frank v. Wilson & Co.*, 32 A.2d 277, 283 (Del. 1943) ("Acquiescence and ratification are closely related.").

[108] *Brandywine Dev. Group, L.L.C. v. Alpha Trust*, 2003 WL 241727, at *4 (Del. Ch. Jan. 30, 2003).

[109] *Frank*, 32 A.2d at 283 (emphasis added); *see also* 1 DONALD J. WOLFE, JR. & MICHAEL A. PITTENGER, CORPORATE AND COMMERCIAL PRACTICE IN THE DELAWARE COURT OF CHANCERY, § 11.03[a], at 11-20 (2009) ("Acquiescence involves assent during the progress of a transaction, while ratification suggests assent after the fact.").

[110] *Frank*, 32 A.2d at 283; *see also Papaioanu v. Comm'rs of Rehoboth*, 186 A.2d 745, 749-50 (Del. Ch. 1962).

as well as expressed by words" but is always a "voluntary and positive act."[111]  Accepting

the benefits of a transaction can be an indication of that assent.[112]

    1.  Genger Has Not Met His Burden Of Proof As To His Ratification Claim

Realizing that he had a very weak argument that he gave effective notice of the

2004 Transfers to the Trump Group, Genger spent most of his briefing attempting to

argue that the Trump Group ratified the 2004 Transfers.  Because of his prior acts of

spoliation, Genger bears the burden to prove ratification by clear and convincing

evidence.  He has not done so.

Genger argues that the Trump Group ratified the 2004 Transfers on two occasions:

(1) when it accepted shareholder approval of the Funding Agreement at the June 25

Board Meeting; and (2) when it purchased the Sagi Shares on August 22, 2008.[113]  As to

---

[111] *Frank*, 32 A.2d at 283; *see also* WOLFE & PITTENGER, § 11.03[a] at 11-19 to 11-20 (stating that ratification requires proof of a relinquishment of existing, known rights, and the "acceptance of new replacement rights or benefits").

[112] *See Kahn v. Household Acquisition Corp.*, 591 A.2d 166, 177 (Del. 1991) (stating that accepting the benefits of a transaction, even though the conduct in question is a breach of some duty owed to the shareholder, may bar the shareholder from obtaining equitable relief); *Frank*, 32 A.2d at 282 (finding that a shareholder "could not accept the benefit offered by the [transaction] and at the same time deny its validity"); *Giammalvo v. Sunshine Mining Co.*, 1994 WL 30547, at *10 (Del. Ch. Jan. 31, 1994), *aff'd*, 651 A.2d 787 (Del. 1994) ("The equitable defenses of ratification and acquiescence are closely related.  Under the proper circumstances, both doctrine prevent one who accepts the benefits of a transaction from thereafter attacking it."); *Dannley v. Murray*, 1980 WL 268061, at *4 (Del. Ch. July 3, 1980) ("The 'affirmance' required to create ratification . . . may arise by the retention of benefits with knowledge of the unauthorized acts.") (citations omitted); *Trounstine v. Remington Rand*, 194 A. 95, 99 (Del. Ch. 1937) ("[E]quity will not hear a complainant stultify himself by complaining against acts in which he participated or of which he has demonstrated his approval by sharing in their benefits.").

[113] Later in the briefing process, Genger recast his argument about the 2005 Written Consents and the minutes of the November 2007 Board Meeting in ratification terms.  That is, Genger argued that the 2005 Written Consents and the minutes of the November 2007 Board Meeting indicate that the Trump Group ratified the 2004 Transfers.  The argument fares no better presented within a ratification analysis.  As explained above, I find this argument unconvincing

the June 25 Board Meeting, Genger's theory is that the Trump Group accepted Genger's

vote on behalf of the Sagi and Orly Trusts at the June 25 Board Meeting when the Trans-

Resources stockholders approved the Funding Agreement.  Genger argues that the Trump

Group benefited when Genger purportedly voted the Proxies at the June 25 Board

Meeting because approval of the Funding Agreement was a step towards giving them

control of the company.  As to the second theory, Genger argues that the Trump Group

acknowledged the Sagi Trust as the transferee of the Sagi Shares, and benefited from

purchasing the Sagi Shares because buying directly from Sagi Genger allowed the Trump

Group to avoid the uncertainty and cost of enforcing their rights under Section 3.2 of the

Stockholders Agreement.

Genger's ratification argument fails for two primary reasons.  First, Genger's

argument that the Trump Group ratified the 2004 Transfers is belied by the fact that the

Trump Group repeatedly stated that the Transfers were made in violation of the

Stockholders Agreement.  Eddie Trump and Hirsch made that point at the June 13

Meeting.[114]  The fact that the Transfers were made in violation of the Agreement was

---

because, although representatives of the Trump Group received the 2005 Written Consent and
signed its signature pages, and approved the minutes of the November 2007 Board Meeting,
neither document involved the communication of a material amount of information about the
2004 Transfers to properly notify the Trump Group of the Transfers.  Before a party can ratify
something, it must first have "sufficient notice or means of knowledge" of the transaction or act
in question. *Papaioanu*, 186 A.2d at 749-50.  The 2005 Written Consent and the 2007 Board
Minutes made, at best, an oblique suggestion that some event might have changed the
shareholdings of Trans-Resources' stock.  But neither the 2005 Written Consent nor the minutes
of the November 2007 Board Meeting indicate any particular information about the 2004
Transfers, and neither event even occurred in a context where the Trump Group would have been
alerted that something like the Transfers may have taken place.  Therefore, Genger's ratification
argument based on those pieces of evidence fails.
[114] *See supra* page 16.

repeated at the June 25 Board Meeting.[115] The letter the Trump Group sent to Trans-Resources on August 8, 2008, whereby it expressed its intention to exercise its rights to buy the 2004 Transfer shares, indicated that the 2004 Transfers were made in violation of the Stockholders Agreement.[116] And, the Trump Group's complaint in this matter claimed that the 2004 Transfers violated the Stockholders Agreement.[117] Thus, the clear and consistent message from the Trump Group to Genger at all relevant times was that the Stockholders Agreement had been violated. At no point did the Trump Group tell Genger that it accepted the 2004 Transfers.

Second, Genger has also failed to show that the Trump Group benefited in any way that suggests ratification. That is, Genger's argument that the Trump Group ratified the 2004 Transfers at the June 25 Board Meeting must be rejected because Genger reneged on the Funding Agreement. Because the Agreement was never executed, the Trump Group never received the benefit that was the condition upon which it might actually not challenge the 2004 Transfers. Without the Trump Group having received the benefit that was to be given for relinquishing its claim that the 2004 Transfers were void, there is no basis to conclude that the Trump Group assented to the 2004 Transfers by accepting Genger's vote on behalf of the Sagi and Orly Trust in favor of the Funding Agreement.[118]

---

[115] *See supra* page 19.

[116] *See supra* page 22.

[117] *See* Compl. ¶ 8.

[118] Genger argues that it was enough that the Trump Group "accepted for themselves as shareholders the pecuniary benefits" of the Funding Agreement, even though they never actually received those benefits because that deal was never consummated. Genger's Post-Trial Op. Br.

Indeed, the Funding Agreement proves the point. The Trump Group was willing to consider a resolution of the violation of the Stockholders Agreement that remedied that violation by giving them voting control of Trans-Resources. In so doing, they were willing to accept some risk, based on Arie Genger's assurances that he did not face a problem from Sagi Genger if he voted the disputed shares. If that was so, and if the Trump Group was able to reach an accord that gave them voting control, all the parties affected by the 2004 Transfers would have been on board. But the lynchpin of the deal was the Genger would rectify the violation of the Stockholders Agreement by ensuring that the Trump Group had voting control. He then reneged on his assurances that the Transfers were a problem by claiming that Funding Agreement could not be

---

21. In other words, according to Genger's theory, not only is receiving a benefit an indication of ratification, but a step taken during a negotiation to receive a benefit is also. Tellingly, Genger cites no case law supporting his position.

I reject this argument for the following reason: acceptance of the benefit of a voidable transaction is an *alternative* basis upon which to ground a conclusion that a party ratified the transaction. It is a suitable alternative to an express affirmation of the transaction because acceptance of a benefit is a relatively concrete factual occurrence that inspires confidence in a conclusion that, even though the ratifying party did not expressly enunciate her assent to the voidable transaction, she has nonetheless done some "voluntary and positive act" to indicate that assent. *Frank*, 32 A.2d at 283. Negotiations relating to a potential benefit arising from a contractual breach are a less sure foundation upon which to base a finding of a ratification because, as sophisticated commercial parties know, discussions often range across a number of different options, many of which never come to pass. In other words, negotiations about the potential benefit arising from a voidable transaction are unreliable. For that reason they cannot reasonably be considered to induce the other party's reliance, and therefore there is no basis to conclude that the party who suffered the breach is estopped from enforcing the contract. *See Romer v. Porcelain Products, Inc.*, 2 A.2d 75, 76 (Del. Ch. July 28, 1938) (finding that a complaining stockholder was barred by "the estoppel of his acquiescence"); *see generally Frank*, 32 A.2d at 283 ("The defenses of laches, acquiescence, ratification and estoppel all have some element in common."). That is, until the ratifying party actually takes the benefit, there is no basis for the estoppel. For that additional reason, I reject Genger's claim that the Trump Group ratified the 2004 Transfers at the June 25 Board Meeting.

accomplished because Sagi Genger might challenge the substantive fairness of the required stock issuance to the Trump Group.

Of course, the Trump Group received a benefit when it purchased the Sagi Shares from the Sagi Trust and TPR, but that benefit is not an indication of the Trump Group's ratification of the 2004 Transfers. Rather it is consideration of a settlement that resolved the very problem Genger had created. In other words, Genger's argument confuses the benefits that come from compromising claims away in return for a settlement with taking a benefit from a voidable transaction that indicates ratification. A benefit that indicates ratification is one where the ratifying party would be getting something for nothing if she were allowed to enforce the contract.[119] Here, the Trump Group was not attempting to take advantage of the 2004 Transfers in a way that would have allowed it to obtain more than it was entitled to under the Stockholders Agreement.

By entering into the Purchase Agreement, the Trump Group dealt with the problem that Genger's misconduct had caused it. Genger had just reneged on the compromise Funding Agreement that would have rectified his wrongful behavior, in large measure by claiming that Sagi Genger, as an arguably innocent purchaser for value, would cause trouble and upset any deal. The Trumps reasonably suspected that Genger's resistance was also inspired by his desire to retain control. To address this problem, the Trump Group dealt with both the wrongful transferor, TPR, and the purported transferee, the Sagi Trust, so that it could cover all its bases. In doing so, the Trump Group never

---

[119] *See, e.g., id.* at 278-83 (finding that a stockholder who had benefitted for years from a recapitalization plan "could not accept the benefit offered by the plan and at the same time deny its validity").

accepted the legitimacy of the 2004 Transfers; indeed, its consistent position was that the Transfers were void.[120] But by binding both TPR and the Sagi Trust, it could resolve the issue of ownership and control over the bloc definitively. That is, under the deal with TPR and the Sagi Trust, the Trump Group extinguished any claims it had against either TPR or the Sagi Trust as to the Sagi Shares in return for a majority stake in the company.[121] Thus, the Trump Group was only attempting to recapture from TPR what it was owed under the Stockholders Agreement: control over Trans-Resources. Indeed, the Trump Group was giving up its right to purchase the shares from TPR at 2004 prices, which likely would have allowed the Trump Group to obtain the Shares for much less than the approximately $26 million it paid to purchase the Sagi Shares.

The only difference between enforcing its rights under Section 3.2 of the Stockholders Agreement against TPR and acquiring control directly through the purchase of the Sagi Shares was speed. That is, negotiating directly with both TPR and the Sagi Trust had the advantage of providing a quick and certain resolution to the problem, while enforcing Section 3.2 would likely have involved lengthy litigation. Of course, a speedy solution has value, but that value is the benefit of any settlement, and is one of the primary reasons parties settle their disputes. Undermining that incentive cuts against the public's well-established interest in promoting settlement.[122] At all times, the Trump

---

[120] *See supra* pages 16-25.

[121] *See supra* pages 22-24.

[122] *See Marie Raymond Revocable Trust v. MAT Five LLC*, 980 A.2d 388, 402 (Del. Ch. 2008) ("It is well established that Delaware law favors the voluntary settlement of contested issues. Settlements are encouraged because they promote judicial economy and because the litigants are generally in the best position to evaluate the strengths and weaknesses of their case." (internal

Group took the position that the 2004 Transfers were void, and mentioned that position to Genger and in litigation. All the Trump did by entering into the Purchase Agreement was ensure that, if the Trump Group were proven wrong in litigation about the 2004 Transfers, it had acquired whatever interests Sagi Genger held and, therefore, he was not a further obstacle. By making a deal directly with the wrongdoer whose shares it was entitled to receive under the Stockholders Agreement, the Trump Group settled TPR's violation of that Agreement by accepting the shares on the terms negotiated, rather than under the price setting process of Section 3.2. In this regard, it is also important to note that the Trump Group was entitled to control of Trans-Resources *as of 2004*, when Genger breached the Stockholders Agreement. Genger's secret transfers had deprived the Trump Group of the benefits of the Stockholders Agreement for four years, and it comes with little grace for Genger now to argue that the Trump Group had to wait even longer or else it would relinquish its rights to those benefits.

Finally, I note that finding that the Trump Group did not ratify the 2004 Transfers leads to, in my view, an equitable result, despite Genger's protestations to the contrary. The problem Genger created by his serious, secretive contractual breach — the insertion of Genger's dysfunctional family into the management of Trans-Resources — was precisely what the Stockholders Agreement was designed to avoid.[123] The Trump Group could only rectify that problem outside of litigation by negotiating with TPR and the Sagi Trust because, by effecting the Transfers, Genger made it impossible to deal with TPR

citations omitted)), *aff'd sub nom. Whitson v. Marie Raymond Revocable Trust*, 976 A.2d 172 (Del. 2009).
[123] *See supra* pages 5-8.

39

alone. Genger's argument that the Trump Group ratified the 2004 Transfers because it dealt with Sagi Genger rather than telling him that the Transfers were void is particularly cynical because Genger himself insisted that the Trump Group not challenge the Sagi Trust's ownership of its Trans-Resources shares.[124] Genger was the source of all of these problems, and to find that the Trump Group ratified Genger's behavior would only reward him for his own perfidy.[125] In that regard, Genger's argument that a finding that the Trump Group did not ratify the 2004 Transfers would work an inequity because it would require the unwinding of his divorce settlement is baseless. Genger only has himself to blame for whatever mess his decision to make the 2004 Transfers has caused for his divorce settlement. If Arie Genger's violation of the Stockholders Agreement has deepened the Genger family's internecine feud, that is unfortunate. But it is not the Trump Group's problem, nor is it a basis for an appeal to this court's sense of equity.

2. The Trump Group Holds A Majority Of Trans-Resources' Stock But Is Not Entitled To The Shares Transferred To Arie Genger Personally Or To The Orly Trust

That the purchase of the Sagi Shares was a bargain with TPR and the Sagi Trust that resolved Genger's violation of the Stockholders Agreement also has ramifications for the Trump Group's claims, which include a theory that it has a right to purchase all of the shares TPR transferred in the 2004 Transfers — including the shares transferred to Arie Genger personally and the Orly Trust — under the terms of the Stockholders Agreement. In the Purchase Agreement whereby the Trump Group bought the Sagi Shares, the parties

---

[124] *See supra* page 20.

[125] *See* 3 FARNSWORTH ON CONTRACTS § 12.20 (3d ed. 2004) ("A person is not permitted to profit by his own wrong at the expense of another.").

included a provision that ensured that, if the 2004 Transfers were found to be improper, the Agreement would be deemed to have been consummated with TPR, not the Sagi Trust.[126] Thus, the Purchase Agreement was a broad settlement that gave the Trump Group the assurance that it had all its bases covered in regard to the Sagi Shares, and that it would retain control over Trans-Resources. The Purchase Agreement also provided in relation to the shares transferred to Arie Genger personally and the Orly Trust that:

> If at any time following the Closing Date, it is determined that Arie Genger is not the record and beneficial owner of the 794.40 shares of Common Stock of the Company purportedly transferred to him by TPR in October, 2004 and/or that the Orly Genger 1993 Trust is not the record and beneficial owner of the 1,102.80 shares of Common Stock of the Company purportedly transferred to such Trust by TPR in October, 2004, and that TPR is determined to be the record or beneficial owner of any such shares, in either or both cases by virtue of the transfer of such shares being deemed to have been void or for any other reason (the shares being so affected being referred to herein as the "Affected Shares") *then TPR shall promptly transfer 64% of the Balance Shares* (as such term is defined in the Stockholders Agreement dated March 30, 2001, among TPR, TR Investors, Glenclova and the Company (the "Stockholders Agreement")) to TR Investors and Glenclova in accordance with the terms of Section 1.6 of the Stockholders Agreement whether or not such agreement is then still in effect.[127]

Thus, the Purchase Agreement provided that, if the transfer of TPR shares to Arie Genger and the Orly Trust was found to be improper, then 64% of the Balance Shares[128] would be transferred from TPR to the Trump Group.

Although the 2004 Transfers violated the terms of the Stockholders Agreement, which in Section 3.2 provides that the Trump Group can purchase all of TPR's shares, the

---

[126] *See supra* pages 23-24.
[127] Purchase Agreement § 11 (emphasis added).
[128] *See supra* page 10.

Trump Group cannot purchase the shares transferred to Arie Genger or the Orly Trust because the Trump Group must abide by the settlement terms to which it agreed in the Purchase Agreement. Because the 2004 Transfers violated the Stockholders Agreement, Arie Genger and the Orly Trust have been found to not be the record or beneficial owners of the shares transferred to them. Per Section 11 of the Purchase Agreement, that entitles the Trump Group to 64% of the Balance Shares, and nothing more beyond the Sagi Shares that it has already bought. As to the Transfer from TPR to Arie Genger himself, the major problem was the lack of notice. Under the Stockholders Agreement, Genger could receive shares from TPR so long as he: (1) gave proper notice to the Trump Group entities; and (2) signed on to the Stockholders Agreement.[129] He did neither and, as a result, cannot exercise any rights under the Stockholders Agreement. Although the Trump Group believes that Genger's violation should require him to transfer all of his Trans-Resources shares to the Trump Group, that remedy is disproportionate. That sort of relief is unnecessary to this control dispute and therefore this § 225 action. Nevertheless, Trans-Resources appears entitled, in any event, to deny Genger the right to vote his shares until he gives formal notice and signs on to the Stockholders Agreement. As to the Orly Trust, it is not before the court, and the shares it was wrongly transferred are also not necessary for the Trump Group to exercise control. Therefore, I do not issue any ruling as to those shares, because that is unnecessary in this § 225 action.[130]

---

[129] Stockholders Agreement § 2.1.

[130] *See Arbitrium (Cayman Islands) Handels AG v. Johnston*, 1997 WL 589030, at *3 (Del. Ch. Sept. 17, 1997) (discussing that a § 225 proceeding should generally only resolve issues affecting

42

Obviously, my finding that the shares were wrongly transferred creates problems for Arie

Genger, but that exposure is a result of his own secretive contract breach.

D. <u>The Trump Group Did Not Take The Sagi Shares Subject To The Proxy</u>

Even if the Trump Group ratified the 2004 Transfers — which it did not — it

would still have voting control over Trans-Resources because it did not take the Sagi

Shares subject to the Proxy. That conclusion is required for two reasons.

First, the language of the Proxy itself does not plainly indicate that the Proxy was

to run with the Shares if they are sold. The explicit terms of the Proxy establish that it

only applies so long as the Sagi Trust owns the Shares. For example, the Proxy states

that the Sagi Trust appoints Genger "to vote as *its* proxy, all shares of common stock of

TRI which are not or hereafter *owned by the Trust*."[131]  Also, it permits Genger to vote

only "in the same manner and to the same extent as *the Trust* might, were *the Trust*

present at said meeting."[132]  In this regard, the Proxy is different, for example, from the

proxy at issue in *Haft v. Dart Group. Corp.*, which gave the proxy holder the "right to

exercise all rights to vote *the Shares* on all matter on which *they* are entitled to vote."[133]

Here, the Proxy does not give Genger the right to vote on all matters in which the Sagi

Shares are entitled to vote; rather, the Proxy gives Genger the right to vote on all matters

in which the Sagi *Trust* is entitled to vote, suggesting that the Proxy does not extend to

subsequent owners of the Shares.

---

voting control of the corporation); *Bossier v. Connell*, 1986 WL 11534, at *2 (Del. Ch. Oct. 7, 1986) (same).

[131] Proxy at 1 (emphasis added).

[132] *Id.* (emphasis added).

[133] 1997 WL 154049, at *2 n.5 (Del. Ch. Mar. 14, 1997) (emphasis added).

Most importantly, the Proxy does not provide in any way for the reservation of voting powers to Genger after such a sale. The only language Genger points to as evidence that the Proxy is meant to run with the Sagi Shares is the phrase that the Proxy "shall continue for the duration of Arie Genger's life."[134] But, in the context of the entire document, that language only means that the Sagi Trust would be bound by the Proxy until Genger died, not that the Proxy would continue to bind later owners if the Shares were transferred. If Genger wanted to keep the Proxy after a transfer, he could have easily inserted clear language — such as "this Proxy shall bind any subsequent transferees" — into the Proxy to that effect. He did not, and thus there is no reason found in the text of the Proxy to indicate that it is binding upon the Trump Group.

Even if the language of the Proxy was ambiguous — which it is not — public policy concerns require that the Proxy be strictly construed. Historically, proxies have been interpreted narrowly and when there is an ambiguity, read as not restricting the right to vote the shares.[135] Recent market developments have only reinforced the utility of the presumption that irrevocable proxies should be narrowly construed. Separating voting control from stock ownership — which can result in "empty voting," where an investor votes stock without having an accompanying economic interest — raises important

---

[134] Proxy at 1.

[135] *See Eliason v. Englehart*, 733 A.2d 944 (Del. 1999) (finding a proxy to be revocable where the words expressly stating that it was an "Irrevocable Proxy" were only found in the authentication to the document, not in the language of the proxy itself); *Freeman v. Fabiniak*, 1985 WL 11583 (Del. Ch. Aug. 15, 1985) (narrowly interpreting the grant of authority made in a proxy instrument and holding that the instrument, which conveyed the right to vote at shareholder meetings, did not authorize other action by consent); *State ex rel. McKaig v. Bd. of Directors of H.F. Dangberg Land & Live Stock Co.*, 110 P.2d 212, 214 (Nev. 1941) ("The instrument granting the vote by proxy will be strictly construed.").

public policy concerns.[136] For example, the decoupling of shareholder voting rights and economic interest, which is increasingly common and only loosely regulated by the securities laws,[137] is of concern because empty voting can theoretically allow investors with voting power but with an economic interest adverse to the firm to vote in ways that reduce the company's share price.[138]

Our Supreme Court's recent decision in *Crown EMAK Partners, LLC v. Kurz* underscores the importance of those public policy concerns.[139] There, the Supreme Court affirmed this court's decision that third-party vote buying merits judicial review when it disenfranchises shareholders by affecting the outcome of a vote, and confirmed this court's conclusion that the voting arrangement at issue was proper.[140] Its reason for so concluding is important: "[w]e hold that the Court of Chancery correctly concluded that there was no improper vote buying, *because the economic interests and the voting interests of the shares remained aligned* since both sets of interests were transferred from Boutros to Kurz by the Purchase Agreement."[141] In other instances, the temptations for self-dealing that arise when persons with a relatively small economic interest in a

---

[136] *See* Henry T.C. Hu & Bernard Black, *Empty Voting and Hidden (Morphable) Ownership: Taxonomy, Implications, and Reforms*, 61 BUS. LAW. 1011, 1014 (2006) ("*Empty Voting*"); *see also* Shaun Martin & Frank Partnoy, *Encumbered Shares*, 2005 U. ILL. L. REV. 775.

[137] *See* Henry T.C. Hu & Bernard Black, *Equity and Debt Decoupling and Empty Voting II: Importance and Extensions*, 156 U. PA. L. REV. 625 (2008)

[138] *See Empty Voting* at 1014.

[139] 992 A.2d 377, 388 (Del. 2010) ("For many years, Delaware decisions have expressed consistent concerns about transactions that create a misalignment between the voting interest and the economic interest of shares.") (citations omitted).

[140] *Id.* at 388-90.

[141] *Id.* at 390 (emphasis added).

corporation has voting control have resulted in serious harm to the corporation and its other investors.[142]

In light of those concerns, a proxy purporting to irrevocably decouple voting rights from economic interest should be strictly construed. Because there is no such clear intent manifested in the Proxy here, prudent public policy requires the conclusion that the Proxy does not survive the sale of the Sagi Shares to the Trump Group.

Second, the Proxy is not irrevocable because it does not satisfy § 609 of the New York Business Corporation Law, which I conclude governs the Letter Agreement and the Proxy attached thereto in view of the lack of any policy conflict between it and the DGCL.[143] Section 609 provides that:

> A proxy which is entitled "irrevocable proxy" and which states that it is irrevocable, is irrevocable when it is held by any of the following or a nominee of any of the following: (1) A pledgee; (2) A person who has purchased or agreed to purchase the shares; (3) A creditor or creditors of the corporation who extend or continue credit to the corporation in consideration of the proxy if the proxy states that it was given in

---

[142] *See, e.g., Hollinger Intern., Inc. v. Black*, 844 A.2d 1022 (Del. Ch. 2004).

[143] Letter Agreement at 2 ("This Letter Agreement shall be governed by the laws of the State of New York without regard to conflicts of law principles."). Given Delaware's respect for contractual freedom, *see Abry Partners V, L.P. v. H&W Acquisition LLC*, 891 A.2d 1032, 1061 (Del. Ch. 2006) (noting that "there is also a strong American tradition of freedom of contract, and that tradition is especially strong in our State" and citing authorities), it respects choice of law agreements. *See J.S. Alberici Const. Co., Inc. v. Mid-W. Conveyor Co., Inc.*, 750 A.2d 518, 520 (Del. 2000) ("Delaware courts will generally honor a contractually-designated choice of law provision so long as the jurisdiction selected bears some material relationship to the transaction."). Although our law relating to the voting of corporate shares is of paramount interest to Delaware, there is no offense to Delaware of allowing parties to subject agreements about irrevocable proxies to a law that places different strictures on such proxies than does Delaware law, absent some reason that those strictures offend a fundamental protection by the DGCL. Section 609 of the N.Y. Bus. Corp. Law does not conflict with any fundamental Delaware corporate law policies or doctrines. Therefore, I find no reason to apply Delaware law in a situation where the parties have made a clear choice of law in favor of a sister state.

consideration of such extension or continuation of credit, the amount thereof, and the name of the person extending or continuing credit; (4) A person who has contracted to perform services as an officer of the corporation, if a proxy is required by the contract of employment, if the proxy states that it was given in consideration of such contract of employment, the name of the employee and the period of employment contracted for; (5) A person designated by or under paragraph (a) of section 620.[144]

Genger obviously does not qualify under sub-sections (1), (2), (3), or (4) — that is, he is not a pledgee, creditor, contract officer, or purchaser of the Shares sold to the Sagi Trust. And, he does not qualify under sub-section (5), because § 620 of the New York Business Corporation Law applies to an agreement "between two or more shareholders," and neither Genger nor the Sagi Trust were shareholders of Trans-Resources when the Letter Agreement and the Proxy were executed.[145]  Thus, the Proxy is not irrevocable under New York Law, and was revoked by the sale of the Sagi Shares to the Trump Group.[146]

## IV.  Conclusion

Genger violated the Stockholders Agreement when he made the 2004 Transfers, and the Trump Group did not ratify those Transfers after the fact.  Furthermore, the

---

[144] *N.Y. Bus. Corp. Law* § 609; *cf.* 8 *Del. C.* § 212(e) (providing that a duly executed proxy will be deemed irrevocable where it: (1) states that it is irrevocable; and (2) is coupled with an interest sufficient in law to support an irrevocable power, regardless of whether the interest is in the stock itself or the corporation generally).

[145] *N.Y. Bus. Corp. Law* § 620.

[146] *See Tompers v. Bank of Am.*, 217 N.Y.S. 67, 75 (N.Y. App. Div. 1926) (holding that a revocable proxy terminated "through sale of . . . stock").  Even if the Proxy were irrevocable, Genger would still be bound to vote his shares for a majority of the Trump Group's directors because the Stockholders Agreement provides that "the group owning the greater number of shares as between the TPR Stockholders and the Non-TPR Stockholders shall designate four directors."  Stockholders Agreement § 1.2.  That is, Genger would have to vote the Proxy for the Trump Group's directors, because the Trump Group is indisputably the owner of a majority of Trans-Resources' shares.  Economic ownership trumps, so to speak, any interest Genger has as an owner of the Proxy.

47

Trump Group did not take the Sagi Shares subject to the irrevocable Proxy. Therefore, the Trump Group retains the Sagi Shares,[147] is entitled to 64% of the Balance Shares, and can vote all of the Trans-Resources shares it holds as it wishes. The parties shall submit an implementing order by Wednesday, July 28, 2010.

---

[147] Genger's claim that he is entitled to purchase the Sagi Shares under § 3.2 of the Stockholders Agreement because the Trump Group pledged (a disputed amount of) those Shares to a party from which they obtained purchase financing fails because Genger never signed on to the Stockholders Agreement. Tr. 950 (A. Genger). Until he accepts the burdens of that contract, Genger cannot expect to enjoy its benefits. *See, e.g., Red Clay Educ. Ass'n v. Bd. of Educ. of Red Clay Consol. School Dist.*, 1992 WL 14965, at *10 (Del. Ch. Jan. 16, 1992) (holding that plaintiff could not "accept the benefits of a contract without also bearing the corresponding burdens"). Furthermore, Genger cannot now claim entitlements under a contract that he intentionally flaunted. *See PAMI-LEMB I Inc. v. EMB-NHC, L.L.C.*, 857 A.2d 998, 1014-15 (Del. Ch. 2004) (holding that a party that repudiates or breaches a contract cannot then claim the benefits of that contract).