TRUST AGREEMENT

BETWEEN

ARIE GENGER

AS GRANTOR

AND

LAWRENCE M. SMALL AND SASH A. SPENCER

AS TRUSTEES

CREATING

THE ORLY GENGER 1993 TRUST

*ACCOUNTING — og. Leah.*

Dated: December *13*, 1993

Copy 3 of 4

RUBIN BAUM LEVIN CONSTANT & FRIEDMAN

30 ROCKEFELLER PLAZA   ·   NEW YORK, N Y 10112

Index to the Orly Genger 1993 Trust Agreement

| Article | Contents | Page |
|---------|----------|------|
| FIRST: | Disposition of Principal and Income During the Life of the Grantor's Daughter, ORLY GENGER | 1 |
| SECOND: | Continuing Trust for Descendants of the Grantor's Daughter, ORLY GENGER | 5 |
| THIRD: | Disposition of Property if No Descendant of the Grantor is Living | 9 |
| FOURTH: | Additions to the Trusts | 13 |
| FIFTH: | Irrevocability | 13 |
| SIXTH: | Governing Law | 13 |
| SEVENTH: | Trustees | 13 |
| EIGHTH: | Compensation of Trustees | 18 |
| NINTH: | Settlement of Trustees' Accounts; Exoneration of Trustees | 18 |
| TENTH: | Definitions | 21 |
| ELEVENTH: | Administrative Powers | 22 |
| TWELFTH: | Provisions Relating to the GST | 32 |
| THIRTEENTH: | Release of Powers | 37 |
| FOURTEENTH: | Provision with Respect to Closely Held Businesses | 38 |
| FIFTEENTH: | Headings | 39 |
| SIXTEENTH: | Severability | 39 |

TRUST AGREEMENT dated December _13_ , 1993, between ARIE GENGER (now residing at 1067 Fifth Avenue, New York, New York), as Grantor, and LAWRENCE M. SMALL (now residing at 2804 Woodland Drive, Washington, D.C. 20008) and SASH A. SPENCER (now residing at 251 Crandon Boulevard, Townhouse 164, Key Biscayne, Florida 33149), as Trustees.

The Grantor hereby transfers to the Trustees, and the Trustees hereby acknowledge receipt of, the sum of Six Hundred Thousand Dollars ($600,000.00), to be held, administered and disposed of in accordance with the provisions of Article FIRST hereof. Said sum and any other property that may be received by the Trustees pursuant to the provisions of Article FOURTH hereof, and all investments and reinvestments thereof, and all proceeds thereof which constitute principal, are hereinafter collectively called "principal."

This Trust Agreement shall be known as the "Orly Genger 1993 Trust Agreement" and the trust created by Article FIRST hereof shall be known as the "Orly Genger 1993 Trust."

FIRST:     Disposition of Principal and Income
           During the Life of the Grantor's Daughter,
           ORLY GENGER.

A.     The Trustees shall hold, manage, invest and rein-vest the principal of the trust created by this Article, IN TRUST, and, so long as the Grantor's daughter, ORLY GENGER, shall live, the Trustees are authorized and empowered to pay such part, parts or all, if any, of the net income of the trust

created by this Article (hereinafter referred to in this Article as "Orly's Trust") to, or apply such part, parts or all, if any, of such net income for the use or benefit of, such one or more of the following individuals living from time to time in such equal or unequal amounts or proportions, and at such time or times, as the Trustees, in their discretion, shall determine:

  1. The Grantor's daughter, ORLY GENGER.

  2. Each descendant of ORLY GENGER.

The Trustees shall accumulate all income of Orly's Trust not so paid to or applied and, at least annually, add such net income to the principal of Orly's Trust.

  In making such distributions, the Trustees are requested (but they are not directed) to limit the total amount of the distributions made to any descendant of ORLY GENGER with respect to any calendar year to the amount necessary to increase such descendant's taxable income for United States income tax purposes for such year to the greatest amount that shall still result in such descendant not being subject to United States income taxes at the highest marginal rate in effect for such year, after taking into account all of such descendant's other income and deductions for such year.

  B. The Trustees are authorized and empowered to pay to, or apply for the use or benefit of, the Grantor's said daughter such part, parts or all, if any, of the principal of Orly's Trust, and at such time or times, as said Trustees, in

-2-

their discretion, shall determine, without regard to the interest in the trust of any other person and without regard to the fact that any such payment or application may result in the termination of Orly's Trust.

C.   Upon the death of the Grantor's said daughter, the Trustees shall pay the then principal of Orly's Trust, together with all net income thereof then accrued but not yet collected, and collected but not yet disposed of, as follows:

1.   The Trustees shall pay one-half (1/2) of such income and principal, in such equal or unequal amounts or proportions, to or for the use or benefit of such one or more of the descendants of the Grantor's said daughter, and upon such terms, conditions and trusts, if any, as the Grantor's said daughter, by a provision in her Will expressly referring to this Article of this Trust Agreement, shall validly direct and appoint. If, or to the extent that, the Grantor's said daughter shall fail so validly to direct and appoint such principal and income, the Trustees, at the death of the Grantor's said daughter, shall pay the same, per stirpes, to such of the descendants of the Grantor's said daughter as shall survive her, subject, however, to the provisions of Article SECOND hereof, or, if no descendant of the Grantor's said daughter shall survive her, per stirpes, to such of the Grantor's descendants as shall so survive, or, if no descendant of the Grantor shall so survive, in accordance with the provisions of Article THIRD hereof.

-3-

2.   The Trustees shall pay one-half (1/2) of such income and principal, per stirpes, to such of the descendants of the Grantor's said daughter as shall survive her, subject, however, to the provisions of Article SECOND hereof, or, if no descendant of the Grantor's said daughter shall survive her, per stirpes, to such of the Grantor's descendants as shall so survive, or, if no descendant of the Grantor shall so survive, in accordance with the provisions of Article THIRD hereof

3.   If, pursuant to the provisions of paragraph 1 or paragraph 2 of this Section C, the Trustees are directed to pay a per stirpital share of such income and principal to a descendant of the Grantor, and if at the time the Trustees are so directed there shall be in existence a trust for such descendant under a trust agreement between Arie Genger, as grantor, and Lawrence M. Small and Sash A. Spencer, as trustees, executed on the date hereof and known as the "Sagi Genger 1993 Trust Agreement," the Trustees shall not pay such per stirpital share to such descendant but shall instead pay such per stirpital share to the trustees then acting under said trust agreement, to be disposed of by them pursuant to the provisions of the trust for such descendant under said trust agreement.

D.   Notwithstanding anything herein to the contrary, if any Trustee hereunder shall be one of the potential income beneficiaries of Orly's Trust, such Trustee shall not, in his or her capacity as such a Trustee, have any voice or vote or other-

-4-

wise participate in any decision pertaining to the payment or application of the income or principal of Orly's Trust to or for the use or benefit of him or her in his or her capacity as a beneficiary of such trust or to or for the use or benefit of any person whom he or she has an obligation to support, and, in each such event, the other Trustee or Trustees shall make all decisions relating to such trust that pertain to such matters.

SECOND:   Continuing Trusts for Descendants of the Grantor's Daughter, ORLY GENGER.

A.    If, under any provision of this Trust Agreement, any property is directed to be paid to a descendant of the Grantor's daughter, ORLY GENGER, subject to the provisions of this Article, such property shall not be distributed or paid to such descendant. Instead, the Trustees shall continue to hold such property, IN TRUST (in a separate trust for each such descendant which is referred to in this Article as "such descendant's trust"; provided, however, that if there shall be property so directed to be paid on more than one occasion to any such descendant, all such property shall be held in a single trust for such descendant), and, so long as such descendant shall live before attaining the age of twenty-one (21) years, the Trustees, other than such descendant if he or she shall be a Trustee hereunder, are authorized and empowered to pay to, or apply for the use or benefit of, such descendant, such part, parts or all, if any, of the net income of such descendant's

-5-

trust, and at such time or times, as said Trustees, in their discretion, shall determine, and the Trustees shall accumulate the balance of such net income, if any, and, at least annually, add it to the principal of such descendant's trust; and, so long as such descendant shall live after attaining the age of twenty-one (21) years, the Trustees shall pay to such descendant all of the net income of such descendant's trust in at least quarterly installments.

B.   The Trustees, other than such descendant if he or she shall be a Trustee hereunder, are authorized and empowered to pay to, or apply for the use or benefit of, such descendant, such part, parts or all, if any, of the principal of such descendant's trust, and at such time or times, as said Trustees, in their discretion, shall determine, without regard to the interest in the trust of any other person and without regard to the fact that any such payment or application may result in the termination of the trust.

C.   Upon the death of such descendant (hereinafter referred to in this Article as "such deceased descendant"), the Trustees shall pay the then principal of such deceased descendant's trust, together with all net income thereof accrued but not yet collected, and collected but not yet disposed of, as follows:

-6-

1.   The Trustees shall pay one-half (1/2) of such income and principal, in such equal or unequal amounts or proportions, to or for the use or benefit of such one or more of the descendants of such deceased descendant, and upon such terms, conditions and trusts, if any, as such deceased descendant, by a provision in his or her Will expressly referring to this Article of this Trust Agreement, shall validly direct and appoint.  If, or to the extent that, such deceased descendant shall fail so expressly and so validly to direct and appoint such principal and income, the Trustees shall, at the death of such deceased descendant, pay the same, per stirpes, to such of the descendants of such deceased descendant as shall survive such deceased descendant, subject, however, to the provisions of this Article, or, if no such descendant shall so survive, per stirpes, to such of the descendants as shall so survive of the ancestor of such deceased descendant closest in degree of relationship to such deceased descendant who (i) shall have descendants who shall so survive and (ii) shall have been a descendant of the Grantor or shall have been the Grantor, subject, however, to the provisions of this Article, or, if no such descendant shall so survive, in accordance with the provisions of Article THIRD hereof.

2.   The Trustees shall pay one-half (1/2) of such income and principal, per stirpes, to such of the descendants of such deceased descendant as shall survive such deceased

-7-

descendant, subject, however, to the provisions of this Article, or, if no such descendant shall so survive, per stirpes, to such of the descendants as shall so survive of the ancestor of such deceased descendant closest in degree of relationship to such deceased descendant who (i) shall have descendants who shall so survive and (ii) shall have been a descendant of the Grantor or shall have been the Grantor, subject, however, to the provisions of this Article, or, if no such descendant shall so survive, in accordance with the provisions of Article THIRD hereof.

3.    If, pursuant to the provisions of paragraph 1 or paragraph 2 of this Section C, the Trustees are directed to pay a per stirpital share of such income and principal to a descendant of the Grantor subject to the provisions of this Article, and if at the time the Trustees are so directed there shall be in existence a trust for such descendant under a trust agreement between Arie Genger, as grantor, and Lawrence M. Small and Sash A. Spencer, as trustees, executed on the date hereof and known as the "Sagi Genger 1993 Trust Agreement," the Trustees shall not pay such per stirpital share to such descendant subject to the provisions of this Article but shall instead pay such per stirpital share to the trustees then acting under said trust agreement, to be disposed of by them pursuant to the provisions of the trust for such descendant under said trust agreement.

D.   Notwithstanding anything herein to the contrary, each trust created by the terms of this Article shall terminate, if not sooner terminated, upon the expiration of twenty-one (21) years after the death of the last surviving descendant of the Grantor's parents, SHARGA GENGER and DORA GENGER, who shall have been in being on the date hereof; and the Trustees shall thereupon pay the then principal of any trust terminated in accordance with the provisions of this Section, together with all net income thereof accrued but not yet collected and collected but not yet disposed of, to the descendant of the Grantor with respect to whom such trust is being held.

THIRD:   Disposition of Property if No Descendant of the Grantor is Living.

A.   As used in this Article:

1.   The words "such time" shall mean the time as of which any property is directed to be paid in accordance with the provisions of this Article.

2.   The term "Qualified Charitable Organization" shall mean an organization that shall be qualified as an organization to which contributions and bequests are deductible for both United States income tax, gift tax and estate tax purposes under the provisions of Section 170, Section 2522 and Section 2055 of the Internal Revenue Code.

-9-

B.   If, under any provision of this Trust Agreement, any property is directed to be paid in accordance with the provisions of this Article, the Trustees shall pay such property as follows:

1. . If the Grantor, the Grantor's spouse and/or any one or more descendants of the Grantor shall have caused there to be created a foundation known as The Genger Foundation, and if at such time said Foundation shall be in existence and shall be a Qualified Charitable Organization, then, in such event, the Trustees shall pay such property to said Foundation.

2.   If at such time either The Genger Foundation created as aforesaid shall not be in existence or said Foundation shall be in existence but shall not be a Qualified Charitable Organization, and if at such time the Trustees are authorized under applicable law to cause to be organized a corporation under and in accordance with the laws of any state of the United States which the Trustees, in their discretion, shall select, which corporation (i) shall be known by the name of The Genger Foundation (or by such other name as the Trustees, in their discretion, shall select if the name of The Genger Foundation shall not be available to be utilized as the name of said corporation), (ii) shall have as its purposes the encouragement, promotion, support and enhancement of non-orthodox study and education for children in the State of Israel pertaining to the customs, practices and ancient and modern history of the Jewish

-10-

people and shall maintain all of the property held by it, and use all of the net income thereof received from time to time, for the encouragement, promotion, support and enhancement of such study and education for children, (iii) shall be required to maintain all of the property held by it, and use all of the net income thereof received from time to time, for such purposes, with such property and income to be expended for such purposes in such amounts, at such time or times and to or for the use or benefit of such recipient or recipients as the directors, trustees and/or the officers of such corporation shall, in their discretion, determine from time to time, subject, however, to the other provisions of this paragraph 2, (iv) shall have as its initial directors or trustees the Trustees hereunder, the Grantor's cousin, JEREMIAH WOHLBERG (now residing at 2325 Lindenmere Drive, Merrick, New York), if he shall not then be a Trustee hereunder, and also such other individual or individuals, if any, as may be designated by the Trustees, and thereafter to have as directors or trustees such individuals as shall from time to time be determined as provided for in the certificate of incorporation and/or by-laws of said corporation, and (v) shall be organized and maintained in such manner as to be and continue to be a Qualified Charitable Organization, then, in such event, the Trustees shall organize such a corporation, and the Trustees shall pay such property to such corporation.

-11-

3.   If at such time (i) either The Genger Foundation created as aforesaid shall not be in existence or said Foundation shall be in existence but shall not be a Qualified Charitable Organization, and (ii) the Trustees are not authorized under applicable law to cause to be organized a corporation of the nature referred to in paragraph 2 of this Section B, then, in such event, the Trustees shall pay such property to the JEWISH COMMUNAL FUND OF NEW YORK, New York, New York, to be held, administered and disposed of pursuant to the rules and regulations thereof as an Undesignated Philanthropic Fund to be known as the Genger Philanthropic Fund and with the privilege of making advisory recommendations with respect thereto to be held in the first instance by the Trustees, said JEREMIAH WOHLBERG, if he shall not then be a Trustee hereunder, and also by such other individual or individuals, if any, as the Trustees may designate, and thereafter by such other individual or individuals as such designees and their successors acting in such capacity may from time to time designate, and it is requested (but not directed) that the principal and income of such Fund shall be utilized to encourage, promote, support and enhance non-orthodox study and education for children in the State of Israel pertaining to the customs, practices and ancient and modern history of the Jewish people.

-12-

FOURTH:   _Additions to the Trusts._

Any person, including the Grantor, by a transfer to take effect during the life of such person or upon the death of such person, may, at any time or times, add to the principal of any trust hereunder any property of any kind or nature acceptable to the Trustees, and any such additional property so received by the Trustees pursuant to the provisions of this Article shall thereafter be deemed to be part of the principal of such trust subject to all of the terms, provisions and conditions of this Trust Agreement.

FIFTH:   _Irrevocability._

This Trust Agreement and the trusts hereby created are irrevocable and not subject to amendment or change.

SIXTH:   _Governing Law._

This Trust Agreement and the trusts hereby created shall be governed by the laws of the State of New York.

SEVENTH:   _Trustees._

A.   The initial Trustees acting hereunder shall be LAWRENCE M. SMALL and SASH A. SPENCER.

B.   Each individual acting as a Trustee hereunder (whether such Trustee is initially a party to this Trust Agreement or a successor Trustee named in Section C of this Article

-13-

or appointed pursuant to the provisions of this Section B) is authorized and empowered to appoint another individual (other than the Grantor) to act in his or her place and stead as a Trustee hereunder. Each appointment of a successor Trustee hereunder shall be made by the execution of an instrument of appointment signed and acknowledged by the individual who shall have made such appointment and by delivering such instrument in accordance with the provisions of Section G of this Article; and any such appointment may be revoked in the same manner by the individual Trustee who shall have made it at any time before the occurrence of the event or events as of which such appointment shall, by its provisions, become effective. Any appointment made in accordance with the provisions of this Section B shall be valid only if the individual so appointed shall, within thirty (30) days after the later of (i) the date on which a copy of such instrument of appointment is so delivered to him or her, and (ii) the occurrence of the event or events as of which such appointment shall, by its provisions, become effective, qualify as a successor Trustee under this Trust Agreement in accordance with the provisions of Section D of this Article. Each successor Trustee named in Section C of this Article or appointed in accordance with the provisions of this Section B shall be vested with the same powers and authority as the initial Trustees who are parties to this Trust Agreement; provided, however, that no such Trustee shall be permitted to exercise any authority or

-14-

power which such Trustee shall be prohibited from exercising by an express provision of this Trust Agreement.

C.  1.  If either LAWRENCE M. SMALL or SASH A. SPENCER shall cease to act as a Trustee hereunder, and no successor Trustee appointed by him pursuant to the provisions of Section B of this Article shall qualify and act as a Trustee hereunder, MARTIN A. COLEMAN (now residing at 51 Cambridge Road, Great Neck, New York 11023) shall act as Trustee hereunder.

2.  If MARTIN A. COLEMAN shall fail or cease cease to act as a Trustee hereunder, and no successor Trustee appointed by him pursuant to the provisions of Section B of this Article shall qualify and act as a Trustee hereunder, THOMAS G. HARDY (now residing at 935 Park Avenue, New York, New York 10028) shall act as a Trustee hereunder.

D.  Each successor Trustee hereunder shall qualify as such by accepting the trusteeship by the execution of a signed and acknowledged instrument of acceptance and by delivering such instrument in accordance with the provisions of Section G of this Article.

E.  Any individual Trustee hereunder may resign as such a Trustee by the execution of a signed and acknowledged instrument of resignation and by delivering such instrument in accordance with the provisions of Section G of this Article.

-15-

Any such resignation shall become effective upon the receipt of such instrument of resignation by each individual to whom it is delivered or mailed as aforesaid or at such later date as may be specified therein.

F.   If any individual while acting as a Trustee hereunder shall become incapable of discharging his or her responsibilities and duties as such a Trustee by reason of a physical, emotional or intellectual incapacity and such incapacity shall be confirmed by each of two medical doctors in written statements, copies of which shall be delivered or mailed as hereinafter provided, the individual who is so incapacitated shall be deemed for the purposes of construing and applying all of the provisions of this Trust Agreement to have effectively resigned as such Trustee in compliance with the provisions of Section B of this Article, such resignation to be deemed to be effective upon the delivery or mailing of the aforesaid statements as hereinafter provided.  Each of the aforesaid statements shall be signed and acknowledged by the medical doctor making the same and copies of the same shall be delivered or mailed by registered or certified mail to the individual, if any, who will become the successor Trustee hereunder in the place and stead of the incapacitated Trustee to whom such statement pertains, to each Trustee, if any, then acting hereunder (other than the incapacitated Trustee to whom such statement pertains), and also to either (i) the Grantor (or, if the Grantor shall not then be

-16-

living, to the executors, administrators or personal representatives of the Grantor's estate), or (ii) any one or more of the adult individuals to whom or for whose use or benefit the income of any trust hereunder may then be paid or applied.

G.  Each instrument directed to be delivered in accordance with the provisions of this Section G shall be delivered in person or by mailing a copy of the same by registered or certified mail to each Trustee, if any, then acting hereunder (other than the Trustee, if any, who shall have executed such instrument), and to either (i) the Grantor (or, if the Grantor is not then living, to the executors, personal representatives or administrators of the Grantor's estate), or (ii) any one or more of the adult individuals to whom or for whose use or benefit the income of any trust hereunder may then be paid or applied.

H.  No bond or other security shall be given by or required in any jurisdiction (whether in the State of New York or elsewhere) of any Trustee at any time acting hereunder (whether such Trustee is named herein or appointed pursuant to the provisions hereof) for the faithful performance of such Trustee's fiduciary duties in any capacity hereunder regardless of whether such Trustee is or may become a non-resident of the State of New York or elsewhere.

-17-

EIGHTH:    Compensation of Trustees.

No Trustee hereunder, whether such Trustee is herein-
above named or appointed pursuant to the provisions hereof,
shall be entitled to any compensation (other than reimbursement
for out-of-pocket expenses) for services rendered as a Trustee
hereunder; and each Trustee who is a party to this Trust Agree-
ment or who qualifies as a successor Trustee hereunder as pro-
vided herein shall be deemed to have agreed to serve as such
Trustee without receiving any such compensation.

NINTH:    Settlement of Trustees' Accounts;
Exoneration of Trustees.

A.   To the fullest extent permitted by law, the
Trustees shall not be required to file with or render to, and
the Grantor waives and excuses the filing with or rendering to,
any Court an account of their transactions or inventories, ac-
counts, statements or reports of principal and/or income with
respect to any trust created hereunder.   Nevertheless, the
Trustees may at any time have their accounts judicially settled
with respect to any trust created hereunder, and in any such
proceeding it shall not be necessary to serve any person who is
under a disability if there is another party to the proceeding
who is not under any disability and who has the same interest as
the person who is under a disability, and, in such event, it
shall not be necessary to appoint a guardian ad litem for any
such party who is under a disability.   The expenses of any such

-18-

account shall be a proper administration expense of the trust to which such account relates.

B.   If any Trustee shall resign as a Trustee hereunder, the continuing Trustee, if any, or, if there is no continuing Trustee, any successor Trustee who shall have qualified to act in accordance with the provisions of Section D of Article SEVENTH hereof, may deliver to the Trustee so resigning an instrument whereby such resigning Trustee shall be released and discharged, to the extent stated therein, ~~or and~~ ~~██████████~~ ~~██████████████████████████████████████████~~ ~~██████████~~ny such release and discharge shall be binding upon all persons, whether or not then in being, then or thereafter interested in either the income or the principal of any trust hereunder and shall have the force and effect of a final decree, judgment or order of a court of competent jurisdiction rendered in an appropriate action or proceeding for the judicial settlement of the account of such Trustee in which jurisdiction was obtained of all necessary and proper parties. The foregoing provision, however, shall not preclude any Trustee so resigning from having his or her account judicially settled, and in any such proceeding it shall not be necessary to serve any person who is under a disability if there is another party to the proceeding who is not under any disability and who has the same interest as the person who is under a disability, and, in such event, it shall not be necessary to appoint a guardian

-19-

ad litem for any such party who is under a disability.  The expenses of any judicial account rendered by a Trustee who shall resign shall be a proper administration expense of the trust to which such account relates.

C.  In addition to the foregoing, the Trustees are hereby authorized, at any time and from time to time, with respect to any trust hereunder, to settle the account of the Trustees by agreement between the Trustees and the then adult individual or individuals to whom or for whose use or benefit the income of such trust may then be paid or applied and the adult or adults who would be entitled to the principal in case such trust were to terminate at the time of such agreement, excluding any such individual who is under a disability if there is a party to the agreement who is not under any disability and who has the same interest as the individual who is under a disability, which agreement shall bind all persons, whether or not then in being, then or thereafter interested in either the income or the principal of such trust.  Any such settlement shall have the same force and effect as a final decree, judgment or order of a court of competent jurisdiction rendered in an appropriate action or proceeding for the judicial settlement of such account in which jurisdiction was obtained of all necessary and proper parties.  The expenses of any such account shall be a proper administration expense of such trust.

-20-

D.   To the extent permitted by law, no Trustee shall be accountable, liable or responsible for any act, default, negligence, or omission of any other Trustee.

TENTH:   Definitions.

Wherever used in this Trust Agreement:

1.   The word "Trustees" and all references to the Trustees shall mean and refer to the Trustees and successor Trustees hereinabove named, any successor Trustee appointed pursuant to the provisions hereof, any substitute Trustee appointed by a court of competent jurisdiction, the survivors or survivor of them, and their and each of their successors or successor, as may be acting hereunder from time to time.

2.   The words "IN TRUST" shall mean "in trust, nevertheless, to hold, manage, invest and reinvest, and, until payment thereof as hereinafter directed, to receive the income thereof."

3.   The word "pay" shall, where applicable, mean "convey, transfer and pay" and the word "payment" shall, where applicable, mean "conveyance, transfer and payment."

4.   The words "descendant" and "descendants," when used with respect to any person, shall be deemed to include (i) every individual who is born to such person, (ii) every individual who is lawfully adopted by such person, and (iii)

-21-

every individual who is otherwise descended from such person, whether by birth, or by lawful adoption, or by a combination thereof.

5.    The words "Internal Revenue Code" shall mean and refer to "the United States Internal Revenue Code of 1986 (as amended from time to time)," and any reference to a specific section, chapter or other provision of the Internal Revenue Code shall mean and refer to said section, chapter or other provision and any successor statute thereto pertaining to the same subject matter as said section, chapter or other provision.

ELEVENTH: Administrative Powers.

A.    In addition to and in amplification of the powers given by law to trustees, the Trustees, but solely in their fiduciary capacities, are hereby authorized and empowered, in their discretion:

1.    To sell, exchange, make contracts with respect to, grant options on or otherwise dispose of, at public or private sale, at such prices, on such terms (including sales on credit with or without security) and at such time or times as the Trustees shall determine, any property, real or personal, which may at any time form part of any trust hereunder.

2.    To lease, for such periods (whether or not any such period shall extend beyond the period prescribed by law

-22-

or the probable term of any trust hereunder), on such terms and conditions and at such time or times as the Trustees shall determine, the whole or any portion or portions of any property, real or personal, which may at any time form part of any trust hereunder, whether the same be held in severalty or as tenant-in-common with others or in a partnership, syndicate or joint venture or otherwise, and release and convey any undivided interest in any such property for the purpose of effecting partition of the whole or any part thereof; and make, place, extend or renew mortgages, pledges, building loan agreements or building loan mortgages upon or affecting any and all such property; and make, execute and deliver such mortgages, pledges and agreements, together with proper bonds, notes or other instruments of indebtedness to accompany the same, and such extension or renewal agreements, as to the Trustees shall seem necessary, advisable or proper; and also to repair, alter, reconstruct, build upon or improve any such property and on such terms and at such time or times as the Trustees shall determine, give and grant to others the right so to do, or agree in, or so modify any lease affecting any such property that the lessee may alter, repair, reconstruct, build upon, improve, mortgage and pledge any such property; and generally to make, alter and modify all agreements, leases, mortgages, pledges, building loans, sales, exchanges, transfers and conveyances of or affecting any such property which the Trustees shall determine to be necessary, advisable or proper for the preservation, improvement, enhance-

-23-

ment in value of, or betterment of or addition to, such prop-
erty.

        3.    To hold any part or all of the assets of any
trust hereunder invested in the same form of property in which
the same shall be invested when received by the Trustees, and
invest and reinvest the assets of any such trust, or any portion
thereof, in any form of investment which the Trustees may deter-
mine (including, without limitation, mutual funds, common trust
funds, investment trusts, general partnerships and limited part-
nerships), whether or not such investment is of the nature pre-
scribed by law as a legal investment for fiduciaries or is spec-
ulative in nature, and without regard to the percentage of the
assets of such trust which such investment or similar invest-
ments may constitute.

        4.    To vote in person or by proxy all stocks and
other securities held by any trust hereunder; grant, exercise,
sell or otherwise turn to account rights to subscribe for stock
and securities and options of any nature; amortize or refrain
from amortizing premiums on bonds or other securities which the
Trustees may purchase or receive; participate in reorganiza-
tions, mergers, liquidations or dissolutions, and contribute to
the expenses of, and deposit securities with, protective commit-
tees in connection therewith; participate in voting trusts; and
generally exercise, in respect of said stock and securities, all

-24-

rights, powers or privileges which may be lawfully exercised by any person owning similar property in his or her own right.

    5.   To employ any investment counsel, corporate custodians, agents, accountants, brokers and attorneys which the Trustees may select and pay the charges thereof (including charges for preparation of trust tax returns, the Trustees' accounts and any other necessary trust records); and the Trustees, or a partnership, corporation or other entity in which any Trustee shall be interested, or by which any Trustee may be employed, may be retained in any such capacity, and, in such event, the charges which shall be payable to such Trustee, or to any such partnership, corporation or other entity, shall be in addition to compensation otherwise allowable to such Trustee and may be paid without prior judicial approval.

    6.   In any case in which the Trustees are authorized or required to pay or distribute any share of any trust hereunder, to make such payment or distribution in kind, or partly in kind and partly in money and, in connection therewith, to allocate equal or unequal interests in, or amounts of, specific property in satisfaction of such payment or distribution; provided, however, that any property distributed in kind shall be valued, for purposes of such distribution, at its fair market value on the date of distribution.

-25-

7.   To settle, adjust, compromise or submit to arbitration any dispute, claim or controversy in which any trust hereunder may be in any way interested.

8.   To borrow money from any person, partnership, corporation or other entity, who may be any Trustee or a partnership, corporation or other entity in which any Trustee may be interested, or by which any Trustee may be employed, for the purpose of meeting any and all charges against any trust hereunder or for any other purpose connected with the administration, preservation, improvement or enhancement in value of any such trust, and, in connection with any such borrowing, to pledge, hypothecate or mortgage any part or all of the assets of any such trust.

9.   To keep any or all of the securities at any time forming a part of any trust hereunder in the name of one or more nominees.

10.  In any case where doubt or uncertainty exists under applicable law or this Trust Agreement, to credit receipts and charge expenses to principal or income, or partly to each.

11.  By instrument or instruments signed by all of the Trustees qualified and acting as such at any time with respect to any trust hereunder, to delegate, in whole or in part, to any person or persons (including any one or more of the

-26-

Trustees) the authority and power to (i) sign checks, drafts or orders for the payment or withdrawal of funds from any bank account or other depository in which funds of such trust shall be held, (ii) endorse for sale, transfer or delivery, or sell, transfer or deliver, or purchase or otherwise acquire, any and all stocks, stock warrants, stock rights, bonds or other securities whatsoever with respect to such trust, and (iii) gain access to any safe deposit box which may be in the names of the Trustees and remove part or all of the contents of any such safe deposit box and release and surrender the same.

12.   To pay or deliver to either parent or to the guardian of the property of any minor or to an adult with whom such minor resides, and, with respect to any person for whom it is permissible to do so under applicable law, to a custodian for such person under a Uniform Gifts to Minors Act or Uniform Transfers to Minors Act of any state until the age of eighteen (18) years (or until such age in excess of eighteen (18) years as shall be permissible under applicable law and which the Trustees, in their discretion, shall select) any sum or property, including income, which such minor or such person shall either be entitled to receive or to have applied for his or her use or benefit under any of the provisions hereof, without requiring that such parent, adult or custodian obtain letters of guardianship or that such parent, guardian, adult or custodian give any bond or other security for any such payment or delivery

-27-

so made; and the receipt of such parent, guardian, adult or custodian for the amount of such payment, or for the property so delivered, shall be an absolute protection to the Trustees and a complete release and discharge from all further accountability in respect of any such payment or delivery.

13.   If any beneficiary of any trust hereunder shall, in the opinion of the Trustees, be or become incapacitated (whether by reason of illness, age or other causes) the Trustees may, in their discretion, wholly or partly in lieu of paying net income or principal of such trust to such beneficiary as authorized or directed by this Trust Agreement, dispose of the same in one or more of the following ways:

(a)   by making payment of such net income or principal to a legally appointed guardian or other fiduciary of such beneficiary;

(b)   by making payment of such net income or principal, on behalf of such beneficiary, to any person with whom such beneficiary resides or who has charge of his or her care; and/or

(c)   by applying such net income or principal directly for the use or benefit of such beneficiary.

-28-

14.   To remove the assets of, hold and administer any such assets in, and/or move the situs of the administration of any trust hereunder to, such location or locations (which may be in a state or other jurisdiction other than the State of New York) as the Trustees, in their discretion, shall select.   If the Trustees, in their discretion, shall determine it advisable to move the situs of the administration of any trust hereunder to a location where the judicial administration of trusts is required or permitted, the Trustees are authorized to select and request a court in such location having jurisdiction over the administration of trusts to accept jurisdiction over the administration of such trust, and it is requested that such court accept, and that it be permitted to accept, jurisdiction over the administration of such trust; and it is directed that the administration of such trust shall be governed from time to time by the laws of the jurisdiction in which the administration of such trust is then located.

15.   To make, or refrain from making, elections or allocations permitted under any applicable tax law without regard to the effect of any such election or allocation on the interest of any beneficiary of any trust hereunder and, if any such election or allocation shall be made, to apportion, or refrain from apportioning, any benefits thereof among the respective interests of the beneficiaries of such trust, all in such manner as the Trustees shall deem appropriate.

-29-

16.  To retain or invest in solido the property held in any trust hereunder with the property held in one or more of the other trusts hereunder or with the property held in any other trust created by the Grantor or by any other person for purposes of convenience or for the better investment thereof.

17.  To exercise all authority, powers, privileges and discretion conferred in this Article after the termination of any trust created hereunder and until all of the assets of such trust are fully distributed.

B.  No person or party dealing with the Trustees shall be bound to see to the application of any money or other consideration paid by him or her to the Trustees.

C.  Neither the principal nor the income of any trust hereunder, or any part thereof, shall or may at any time be liable or subject in any manner whatsoever to the debts or liabilities of any beneficiary entitled to receive any principal or income therefrom; nor shall the principal or income of any trust hereunder be liable to attachment by garnishment proceedings or other legal process issued by any creditor of any beneficiary of such trust for debts heretofore or hereafter contracted by such beneficiary; nor shall any assignment, conveyance, charge, encumbrance or order, either of principal or income, given by any such beneficiary be valid.

-30-

D.    Wherever in this Trust Agreement it is provided that an instrument is to be "acknowledged," such instrument shall be acknowledged in such manner as would be required if the same were a conveyance of real property entitled to be recorded in the State of New York.

E.    1.    To the fullest extent permitted by law, no transaction or decision involving any trust hereunder shall be deemed invalidated in any way by reason of any personal, beneficial or other interest which any Trustee may have with respect to such transaction or decision, including, without limitation, any transaction or decision with respect to any corporation, company, partnership, association, estate, trust or other entity in which any Trustee may have an interest in a capacity other than as a Trustee hereunder, regardless of any conflict of interest as to any such transaction or decision, and any such transaction or decision shall be lawful and proper and shall not be questioned unless such Trustee is guilty of fraud with respect thereto.  Without limiting the foregoing, no Trustee shall be disqualified or barred from acting as such or have any liability hereunder in exercising any power, authority or discretion conferred upon the Trustees by reason of the fact that such Trustee may be a stockholder, officer, director, partner, executor, administrator, personal representative, trustee, beneficiary, or in any other way interested in the corporation, company, partnership, association, estate, trust or other entity

-31-

whose securities or property are the subject matter of the exercise of such power, authority or discretion.

2.   The Trustees hereunder shall be entitled to compensation as officers, directors, fiduciaries or other participants in any such entity notwithstanding the fact that they are Trustees hereunder and are also entitled to receive reimbursement for their out-of-pocket expenses as such Trustees.

F.   The Trustees shall be under no duty or obligation and shall not be liable to any trust hereunder or to any person or persons interested in any trust hereunder or be surcharged for failure to buy, sell or engage in any transaction directly or indirectly involving securities issued or to be issued by any corporation or other business organization concerning which any of the Trustees, in a capacity other than as a Trustee hereunder, may have acquired any information which has not been disclosed to the public.

TWELFTH:   Provisions Relating to the GST.

A.   As used in this Article:

1.   "GST" shall mean and refer to "the United States generation-skipping transfer tax imposed by Chapter 13 of the Internal Revenue Code."

-32-

2.   The words "inclusion ratio" shall have the same meaning as those words are given in Section 2642 of the Internal Revenue Code.

3.   The words "Net Death Taxes" shall mean and refer to "the aggregate death taxes (including, without limitation, United States, state, local and other estate taxes and inheritance taxes but not including any interest and penalties thereon), after taking into account all applicable credits, payable with respect to the estate of such beneficiary."

B.   1.   Notwithstanding any other provision in this Trust Agreement to the contrary, and in addition to any other power of appointment hereinabove given by the previous provisions of this Trust Agreement to any individual at whose death the inclusion ratio with respect to any trust under this Trust Agreement would, but for the provisions of this Section B, be more than zero (such individual being referred to in this Article as "such beneficiary"), the Trustees of such trust are authorized and empowered, by an acknowledged instrument in writing (with such instrument to be filed with the court, if any, then having jurisdiction over such trust, if such court shall accept such instrument for filing), (i) to create in such beneficiary a power (hereinafter referred to in this Section B as "such power"), to be exercised by a provision in his or her Will expressly referring to this Article of this Trust Agreement, to appoint to the creditors of his or her estate any portion of the

-33-

property held in such trust at the death of such beneficiary, and (ii) to limit such power, by formula or otherwise, to less than all of the property held in such trust at the death of such beneficiary; provided, however, that with respect to each such trust, the maximum amount of property over which such power may be created shall not, after taking into account the property, if any, over which any other such power is created in such beneficiary, exceed the amount, if any, above which any further addition to the amount subject to such power would increase the Net Death Taxes determined with respect to such beneficiary's estate by an amount equal to or greater than the net decrease in the aggregate of (x) the GST and (y) any state and/or local tax on generation-skipping transfers imposed as a result of the death of such beneficiary that would result from such further addition.  Unless such beneficiary's Will otherwise provides by express reference to this Trust Agreement and such power, the increase in the Net Death Taxes on such beneficiary's estate resulting from such power shall be paid from that part of the principal of such trust over which such power is exercisable. If, or to the extent that, such beneficiary shall fail so expressly and so validly to exercise any power created in such beneficiary by the Trustees pursuant to the provisions of this paragraph, the unappointed portion (or, as the case may be, all) of the property subject to such power shall pass pursuant to the provisions of this Trust Agreement otherwise applicable to such property.

-34-

2.    The Trustees are further authorized and empowered, by an acknowledged instrument in writing (with such instrument to be filed with the court, if any, then having jurisdiction over the trust to which such power relates, if such court shall accept such instrument for filing), to revoke any power created by the Trustees pursuant to the provisions of paragraph 1 of this Section B at any time prior to the death of the beneficiary in whom such power was created, and to release, in the manner set forth in Article THIRTEENTH hereof, the right to create such a power. The Trustees shall not be liable for any exercise, release or failure to exercise the authority and power granted to them by the provisions of said paragraph 1 or for the revocation of any power created by them pursuant to the provisions of said paragraph 1, provided they utilize good faith in considering whether or not to exercise or release such power or to cause such revocation, whether such consideration be at their own instance or at the request of an individual who is a beneficiary of a trust hereunder, the guardian or other fiduciary of such an individual, or a member of his or her family.

C.   1.    Notwithstanding any other provision in this Trust Agreement to the contrary, if at any time any property is to be placed in a trust under the provisions of any Article of this Trust Agreement, the Trustees shall, if need be, and if it is possible to do so, divide such property and place the same in separate trusts to the end that one such trust shall have an

-35-

inclusion ratio of zero, and if any property which is directed to be added to a trust hereunder shall have an inclusion ratio which is different than the inclusion ratio of such trust, the Trustees shall not make such addition but shall instead administer such property in a separate trust under this Trust Agreement; and, in each such instance, the property to be placed or held in such a separate trust shall be held, administered and disposed of by the Trustees pursuant to provisions identical to the provisions of the trust to which, but for the provisions of this paragraph 1, such property would have been placed or added.

2.   If, pursuant to the provisions of paragraph 1 of this Section C, any property that would otherwise be held in a single trust hereunder is instead held in separate trusts hereunder, the Trustees of such trusts may, at any time or from time to time, (i) make different tax elections and allocations with respect to each such trust, (ii) expend principal and income and exercise any discretionary power differently with respect to each such trust, (iii) invest each such trust differently, and/or (iv) take all other actions consistent with such trusts being separate entities.   Furthermore, the donee of any power of appointment with respect to such trusts may exercise such power differently with respect to each such trust.

D.   Notwithstanding the provisions of the foregoing Sections of this Article to the contrary, if any Trustee hereunder is a current beneficiary of the income of any trust here-

-36-

under, or may, in the discretion of the Trustees, be a current income beneficiary of any such trust, then, in such event, such Trustee shall not, in his or her capacity as a Trustee of such trust, have any voice or vote or otherwise participate in any decision pertaining to the matters relating to such trust that are addressed in the foregoing Sections of this Article, and, in each such event, the other Trustee or Trustees of such trust shall make all decisions relating to such trust that pertain to such matters.

THIRTEENTH:    Release of Powers.

Any beneficiary and any Trustee hereunder may at any time or times release any discretionary power of appointment or discretionary power to distribute principal or income or any other discretionary power hereby given to such beneficiary or Trustee, either with or without consideration, with respect to the whole or any part of the property subject to such power and also in such manner as to reduce or limit the persons or objects or classes of persons or objects in whose favor such power would otherwise be exercisable, by an instrument signed and acknowledged by the beneficiary or Trustee releasing such power and delivered to (i) each Trustee then acting hereunder (other than the Trustee, if any, who shall have executed such instrument), (ii) the Grantor (or, if the Grantor is not then living, to the executors, administrators or personal representatives of the

-37-

Grantor's estate), or (iii) any one or more of the adult individuals to whom or for whose use or benefit the income of any trust hereunder may then be paid or applied.  In the event of the release of any such power by any Trustee, the remaining Trustee or Trustees hereunder, if any, may thereafter exercise such power, other than any discretionary power which was not initially vested in such remaining Trustee or Trustees.  The release of any power by any Trustee hereunder pursuant to the provisions of this Article shall not be binding upon any Trustee who may thereafter act as a Trustee hereunder unless such power shall have been released by all of the Trustees then in office who are vested with such power by their execution of a signed and acknowledged instrument specifically providing that such release is to be binding upon all successor Trustees hereunder.

FOURTEENTH:   Provision With Respect To
                Closely Held Businesses.

Without limiting the powers and authority conferred upon the Trustees by Article ELEVENTH hereof but in extension thereof, the Trustees are specifically authorized and empowered, in their discretion, to retain for as long as they, in their discretion, shall deem advisable, any or all shares of stock in any closely held corporation, or any indebtedness owing by any such corporation, or any or all interests in any proprietorship, unincorporated business, partnership, joint venture, realty or

any other asset, whether owned individually, as tenant-in-common, partner or otherwise, regardless of whether such asset or assets shall be producing profits or losses through ownership or operation thereof, and regardless of the percentage of the trusts hereunder which such assets or similar assets may constitute; and their decision to retain and hold any such asset or liability shall be binding and conclusive upon and shall not be subject to question by any person interested, or who may become interested, in any of the trusts hereunder, and the Trustees shall not incur any liability by reason thereof.

FIFTEENTH:    Headings.

The Article headings contained herein are inserted only as a matter of convenience and in no way define, limit, extend or describe the scope hereof or the intent of any provision hereof.

SIXTEENTH:    Severability.

Should any part, clause, provision or condition hereof be held to be void or invalid, then such invalidity shall not affect any other part, clause, provision or condition hereof, but the remainder hereof shall be effective as though such void

-39-

part, clause, provision or condition had not been contained herein.

WITNESS the due execution hereof by the Grantor and Trustees on the day and year first above written.

ARIE GENGER,
as Grantor

LAWRENCE M. SMALL,
as Trustee

SASH A. SPENCER,
as Trustee

-40-

Case 1:19-cv-09319-AKH   Document 1-55   Filed 10/08/19   Page 43 of 287

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
-------------------------------------------------------------x

ORLY GENGER in her individual capacity and
on behalf of the Orly Genger 1993 Trust (both in
its individual capacity and on behalf of D & K
Limited Partnership),

                Plaintiff,

    -against-

DALIA GENGER, SAGI GENGER, LEAH
FANG, D & K GP LLC, and TPR INVESTMENT
ASSOCIATES, INC.,

                Defendants.

-------------------------------------------------------------x

Index No. 109749/09

Hon. Paul G. Feinman

**AFFIDAVIT OF SAGI GENGER
IN FURTHER OPPOSITION TO
ORLY GENGER'S MOTION FOR
A TEMPORARY RECEIVER**

STATE OF NEW YORK   )
                     ) ss.:
COUNTY OF NEW YORK  )

      SAGI GENGER, being duly sworn, deposes and says:

      1.     Since October 2004, I have served as President of TPR Investment Associates,

Inc. ("TPR"). The company is overseen by an independent Board of Directors, currently made

up of Eleanor Parnes and Yonit Sternberg. I respectfully submit this affidavit in opposition to

the motion of my sister, Orly Genger, to replace the company's independent Board of Directors

and myself with a Court-appointed receiver of her choosing. In particular, I wish to respond to

the allegations my sister raises in her recently submitted affidavit.

      2.     The instant motion is only the latest in a seemingly-endless string of lawsuits and

motions that my father Arie has brought and/or instigated in recent years against me personally

and the company I run, TPR, since perceiving that I sided with my mother Dalia in their divorce.

I have repeatedly proposed to my father and sister that we mediate our family disputes, rather

than burden the Courts with them, but they have rejected all offers.

3.      At this point, I believe that Arie's and Orly's extreme litigiousness is an end in and of itself. Indeed, testimony in the Delaware trial revealed that Arie's attorney had threatened to "drag ... through the New York courts for four or five years" a party whom he thought would challenge Arie's scheme to maintain corporate control. *See* Exh. A at 364. This strategy has, to some degree, already borne fruit, in that TPR has had to focus its resources and energies on the mortal threat of receivership, rather than on its core business.

4.      I am not an attorney; however, I understand that Orly is moving pursuant to CPLR 6401, which requires the movant to establish, by clear and convincing evidence, "a danger that the property will be removed from the state, or lost, materially injured or destroyed." Here, I see no allegation that either I or TPR's Board plan to cause company property to be removed from the state, lost, injured or destroyed. In fact, we do not now, and have never had, such plans. Rather, Orly only complains about events that happened several years ago, and appears to parrot fallacious arguments that her teams of lawyers have recently thought up.

5.      I address each of Orly's latest arguments in turn. First, however, I believe it useful to provide the Court with some relevant background facts – most of which are drawn from relevant judicial decisions, and all of which should be beyond dispute.

### Background

6.      Prior to October 30, 2004, TPR owned 3,000 shares of the stock of Trans-Resources, Inc. ("TRI"), or 52.85% of the company. The Trump Group owned the remaining 47.15% of TRI's stock. On that date, as part of a resolution to his divorce case, Arie caused TPR, which he then controlled, to transfer 794.40 shares of TRI stock to himself, and another 1,102.80 shares of TRI stock to each of the Sagi Genger 1993 Trust (the "Sagi Trust") and the Orly Genger 1993 Trust (the "Orly Trust"), for consideration of $1.00 per share. Both Trusts, at Arie's behest, also signed lifetime proxies in Arie's favor.

-2-

7.      In 2008, Justice Milonas, serving as post-divorce arbitrator, found that these transfers were made pursuant to a "significantly misleading" representation by Arie Genger that TRI bore a liability rendering the shares worthless (the so-called "Bogalusa liability"), when in fact the equity value of TRI was actually in the "$53-67 million range." Thus, the circumstances that the Court presently confronts are a direct result of Dalia, my mother, being duped by Arie into allowing TPR to rely on a gross misrepresentation of TRI's value.

8.      Later in 2008, the Trump Group learned of the TRI stock transfers. The Trump Group took the position that the conveyances violated TRI's Stockholder Agreement, rendering them void, and giving the Trump Group the right to purchase the shares from TPR at their 2004 fair market value. As revealed by evidence in the Delaware trial, Arie and Orly's response was to try to exploit Arie's own breach of the TRI's Stockholder Agreement as a means to force the Sagi Trust to sell its shares on the cheap and thereby further enrich themselves.

9.      Later in 2008, the Trump Group reached a compromise with Arie whereby the entire Genger family would have been able to retain their TRI shares despite the breach. Arie then reneged on the deal. The Trump Group, in turn, responded by suing Arie in Delaware Chancery Court and TPR in the United States District Court for the Southern District of New York. *See TR Investors, LLC, et al v. Arie Genger,* C.A. No. 3994-VCS (Del. Chanc. Ct.); *Glenclova Inv. Co. v. Trans-Resources, Inc.,* Docket No. 08-CIV-7140 (JFK) (S.D.N.Y.).

10.     By this time, I was President of TPR, and came to understand the difficult legal situation into which Arie's and Orly's actions had placed TPR. If successful, the Trump Group would have had the right to buy the transferred shares at 2004 fair market value (a lower value than in 2008, as TRI was losing money in 2004). Rather than litigate, the Sagi Trust decided to sell its 1,102.80 TRI shares to the Trump Group and share the proceeds with TPR.

11.     The Delaware Chancery Court subsequently ruled that "the Trump Group ...

appropriately purchased the shares transferred to the Sagi Trust." The Delaware Supreme Court affirmed this aspect of the Chancery Court's ruling. *See* Exhs. B at 1, C at 33.

12.     It was very important to me at that time that my father and sister be offered a similar opportunity with respect to the shares which were purportedly transferred to them. Thus, TPR conditioned its deal with the Trump Group upon their agreeing to a one-week standstill of the litigations, in order to afford Arie and Orly the chance to sell based on comparable terms. *See* Exh. D at 1 ("In connection with certain disputes and litigations between one or more of the Purchasers (and their related parties) and the Company, TPR and Arie Genger (and their related parties), you have asked us to agree not to proceed with the litigations or to bring any further litigations until Thursday, September 4, 2008, at 9:00 a.m. Eastern Standard Time, while the parties attempt to negotiate a resolution of their disputes.").

13.     For the ensuing week, I shuttled back and forth between Arie and the Trump Group, in an effort to broker a business resolution between them that would resolve all of the litigation between the Trump Group and the Genger family. Out of these discussions that I facilitated, the Trump Group offered to waive their objections to the 2004 purported transfers to Arie and Orly. Thus, they would have been allowed to retain the TRI shares that TPR had contracted to transfer to them (shares which Arie and Orly claim, to this day, are worth hundreds of millions of dollars), merely in exchange for Arie recognizing the Trump Group's majority interest of TPR. Arie and Orly refused these offers.

14.     For his part, Arie decided to continue litigating against the Trump Group in the Delaware Chancery Court. Against my advice, Orly followed Arie's lead. Indeed, so confident was Orly that my father would win his litigation against the Trump Group that she commanded the trustee of the Orly Trust not to sell the Trust's 1,102.80 shares of TRI, claiming the shares were worth "in excess of $150,000,000." In order to ensure that the trustee complied with her

-4-

directive, Orly procured an Order from the Surrogate's Court which prohibited the trustee (our mother Dalia) from selling the TRI shares. *See* Exhs. E, F.

15.     In sum, Arie and Orly decided to reject my advice and instead roll the dice in litigation. As a result, there are now judicial findings that Arie engaged in "wrongful behavior" and "perfidy," and that Orly gave trial testimony in support of Arie that was "vague, at best" and "undermine[d] her credibility." By contrast, the same court found that the Sagi Trust was "an arguably innocent purchaser for value," and that the transaction by which the Sagi Trust and TPR sold their TRI shares to the Trump Group was final. *See* Exh. G at 12-13, 37, 40.

16.     In return for my efforts to bring this family out of this spiral of endless litigation, my father and sister have brought venomous and false charges against me and the company I run, TPR. While it remains my hope that we may someday be able to resolve our issues as a family, I am compelled to respond to Orly's latest charges. As set forth below, TPR has acted properly in all respects, and should be allowed to continue its business undisturbed.

### The Proceeds From the Sale of
### the Sagi Trust's TPR Shares

17.     Here, Orly takes completely inconsistent positions. In the instant motion, Orly contends that a Court-appointed receiver should be appointed because I allegedly "dissipated" the sale proceeds from the Sagi Trust's TRI shares, and that instead: "TPR should have received the $27 million paid for the Sagi Trust TRI Shares ...." (Emphasis added.) However, Orly is currently pursuing another suit before this Court, in which she has recently obtained two TROs on the ground that the Orly Trust, as opposed to TPR, has beneficial ownership of its TRI shares. In other words, Orly simultaneously claims both: (a) that her own Trust should obtain all of the economic benefit from its 1,102.80 shares of TRI stock; but that (b) TPR, and not the Sagi Trust, whose current beneficiaries include my children, should receive all of the economic benefit for

its 1,102.80 shares of TRI stock. Orly offers no explanation for this inconsistency.

18. Unlike my sister, I have endeavored, as President of TPR, to treat the Orly and Sagi Trust equivalently. Namely, to the extent either Trust owes money to TPR, it should pay that first. When the Sagi Trust settled with the Trump Group, it turned over millions in proceeds to TPR, which exceeded what it then owed TPR under the D&K Note. By contrast, Orly has prevented the Orly Trust from selling its TRI shares like the Sagi Trust did, and so continues to owe TPR over $4 million. Subject to repayment of that indebtedness, however, TPR has relinquished any claim to the proceeds from the sale of the Orly Trust's TRI shares. This follows the original arrangement by which TPR was to receive full payment of the D&K Note, with the future excess to go to the two Trusts. Orly, by contrast, is seeking a windfall by taking exact opposite positions in related cases.

19. Orly also alleges "improper self-dealing" in connection with the August 22, 2008 letter agreement that TPR entered into with the Trump Group. That agreement only provides that, if TPR is found by a Court to be the record and beneficial owner of the TRI shares at issue, then it shall sell them at their 2004 fair market value as determined by Justice Milonas. *See* Exh. H. TPR, however, has never taken a position as to who has beneficial ownership of the Orly Trust's TRI shares, nor interfered with the Trust's ability to obtain such a determination. Only Orly has obstructed her own trustee's efforts in that regard.

## TPR's Bad Debt Deduction
## For The D&K Note

20. Next, Orly claims that I have caused "TPR to violate the laws of the United States and Canada," by allowing TPR's tax accountants (who, upon information and belief, remain as Orly's personal accountants) to take a bad deduction in 2002 and 2003 for the amounts owing under the D&K Note. The only basis Orly offers is a letter from Anthony P. Valenti, a licensed

-6-

private investigator who is neither a tax attorney nor a CPA Mr. Valenti, in turn, alleges that TPR should not have taken a deduction for the unpaid D&K Note in 2002 and 2003, but eschews the balance of Orly's claims against me, stating that: "I have not received sufficient information or documents to render findings or opinions."

21.     TPR's 2002 and 2003 amended tax returns containing the deduction in question were prepared, executed and filed by qualified tax accountants, and have never been challenged by the I.R.S. or Canadian tax authorities. Nor should they have been. As CPA Samuel Gunther explains in his accompanying Expert Report (*see* Exh. I), the tax deduction: (a) was entirely proper; and (b) in any event, did not cause TPR to pay less taxes. As Mr. Gunther further points out, Mr. Valenti misunderstands or misrepresents the applicable IRS rules, which expressly permit, not prohibit, bad debt deductions by corporations. And Mr. Valenti also concludes that "the parties never intended to collect the [D&K Note]," even though TPR collected $1.3 million in principal and $3 million in interest on that Note (*see* Exh. J) – facts which, under IRS rules, make the D&K Note a valid debt.[1]

22.     In short, Mr. Gunther concludes that the deduction was proper. In a separate, accompanying affidavit, Brian Glasberg, the accountant who prepared the Canadian tax filings, attests that such filings were also compliant with Canadian law. *See* Exh. K.

23.     I am very troubled that my own sister, in her malice towards me, would falsely

---

[1]     Mr. Valenti distorts not only the tax rules but also my own testimony in the divorce arbitration, false claiming that I testified that the D&K Note was "never" intended to be collected. In my cited testimony, I actually stated that "there were payments through the year 2000," but that the parties, in my opinion, did not intend to collect the note in connection with the 2002 default notice. *See* Valenti Exh. 2a at 369-70. Nowhere did I state that the D&K Note was not a legally enforceable debt. To the contrary, the parties were then operating under the belief that D&K did not have sufficient assets at that time to pay the Note. That understanding changed with Judge Milonas' decision in early 2008. The decision revealed that D&K, TPR and TRI were not subject to the massive Bogalusa liability, as had been misrepresented by Arie Genger.

-7-

and frivolously accuse me of "criminal" actions for allowing TPR's tax accountants to take tax deductions which, as Mr. Gunther concludes, were lawful and proper.

## TPR's Board of Directors

24.     Lastly, Orly characterizes TPR's independent Board of Directors as my "cronies." As a small, family-owned company, TPR will naturally seek Board members who are known and trusted within the Genger family. However, that does not make them cronies. Ms. Parnes is a professional fiduciary in Israel. The fact that she is married to David Parnes, a trusted, long-time attorney for Genger-family entities from well before the intra-family litigation, does not render her dishonest or incompetent. As for Ms. Sternberg, Orly's main charge against her is that she is "Sagi's cousin." That is true. That also makes her Orly's cousin. She is also an honest person and a fine Board member who does not deserve this sort of bile.

## TPR's Corporate Funds

25.     Lastly, Orly alleges, without any evidentiary basis, that I have "misappropriated" and "commingled" TPR funds. I have not. Further, I would have hoped that, before swearing under penalty of perjury to a charge that serious, Orly would put forward evidence to substantiate her claims. Instead, she annexes only a deposition transcript in which my testimony contradicts her own characterization of it. At all times as TPR's President, I have sought to husband TPR's resources, and I plan to continue in that role for as long as the company's Board wishes. A receivership, by contrast, would irreparably disrupt TPR's ongoing business and damage its investments. Unfortunately, I believe that is indeed Orly's intent.

## Conclusion

26.     Orly's efforts to destroy TPR have gone on long enough.  On behalf of TPR, I

respectfully request that the instant motion be denied, and TPR be permitted to return to its real

estate business.  I thank the Court for its consideration.

_____
SAGI GENGER

Sworn to before me this
14th day of November, 2011

_____
Notary Public

JOHN DELLAPORTAS
Notary Public, State of New York
No. 02DE5054932
Qualified in New York County
COMMISSION EXPIRES 01/29/2014

At the Surrogate's Court held in and for the County
of New York, at the Courthouse, 31 Chambers
Street, New York, New York on the ⌐1⌐ day of
~~June~~ 2009
July

New York County Surrogate's Court
DATA ENTRY DEPT.
Date: July 1, 2009

PRESENT: HON. Troy K. Webber
                              Surrogate

In the Matter of the Application of

ORLY GENGER, as a person interested,
for the removal of DALIA GENGER
as Trustee of the Orly Genger 1993 Trust
pursuant to SCPA §711 (11)

File No.: 0017/2008

ORDER TO SHOW CAUSE
WITH TEMPORARY
RESTRAINTS

On reading and filing the annexed Verified Petition of Petitioner, ORLY GENGER, and

the exhibits, verified on the 22nd day of June, 2009, and the memorandum of law in support of

Petitioner's Verified Petition dated June 22, 2009,

LET the Respondent, DALIA GENGER, the sole fiduciary of the Orly Genger 1993
                                                                                      sitting at 60 Centre!
Trust, show cause before Surrogate ___Troy K. Webber___ at the Surrogate's Court ~~31 Chambers~~
    room 309
Street, New York, New York, on the 5th day of ~~June~~ August 2009 at 10:00 o'clock in the forenoon of that

day or as soon thereafter as counsel may be heard why an order should not be entered:

(a)       Enjoining and restraining Respondent, her agents and all other persons

acting on her behalf from withdrawing, selling disposing, transferring, assigning, removing,

pledging, redeeming, mortgaging, encumbering, liening, hypothecating or secreting the Orly

Trust's 19.43% interest in Trans-Resources, Inc., ("TRI"), a closely held corporation, founded by

Arie Genger, Petitioner's father and Respondent's former husband of Respondent and any other

assets which may be remaining in the Orly Trust;

NYO_XFER\137033\1\1

(b)     Removing Respondent as Trustee of the Orly Trust for breaching her

fiduciary duties, wasting and dissipating the assets of the Orly Trust and imprudently managing

and injuring the property committed to her charge;

(c)     Surcharging Respondent in the amount of the loss of the value of Orly's

interest in TPR as determined by the Court and awarding Petitioner costs and attorneys' fees;

(d)     Appointing Michael D. Grohman, Esq. as successor trustee;

(e)     Waiving any requirement that Petitioner post an undertaking; and

(f)     Granting Petitioner such further relief deemed necessary or proper.

ORDERED that, during the pendency of this proceeding, Respondent ~~her agents and all~~ _[and/or her counsel_

~~other persons acting on her behalf are temporarily restrained from withdrawing, selling,~~ are required to give notice by overnight mail to petitioners council of any 1) offer

~~disposing, transferring, assigning, removing, pledging, redeeming, mortgaging, encumbering,~~ to purchase the Orly Trusts 19.3% interest in TRI within 10 days of receiving

~~liening, hypothecating or securing the Orly Trust's 19.43% interest in TRI and other assets~~ such offer and 2) act by Respondent, her agents and all other persons

~~remaining in the Orly Trust; and it is further~~ acting on her behalf to assign, mortgage, pledge, redeem, encumber, sell or

~~otherwise alter~~ the Orly Trust's interest in TRI at least 10 days prior to such act

and it is further ORDERED that service of a copy of this Order and the papers upon which it is based

shall be served on Respondent by personal service at either her residence, located at 200 East

65th Street, Apt. 32W, New York, New York 10021, or any other address at which she can be

located, on or before ~~June~~ July 7, 2009; and it is further

ORDERED, that any responsive papers shall be filed by

July 29, 2009.                        ~~ENTER:~~

Surrogate

EFiled: Jul 23 2010 3:21PM EDT
Transaction ID 32302253
Case No. 3994-VCS

IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | |
|---|---|
| TR INVESTORS, LLC, GLENCLOVA INVESTMENT CO., NEW TR EQUITY I, LLC, NEW TR EQUITY II, LLC, and TRANS-RESOURCES, INC., <br><br> Plaintiffs, <br><br> v. <br><br> ARIE GENGER, <br><br> Defendant. | ) ) ) ) ) ) ) ) ) ) ) ) |

C.A. No. 3994-VCS

| | |
|---|---|
| ARIE GENGER, <br><br> Counterclaim Plaintiff, <br><br> v. <br><br> TR INVESTORS, LLC, GLENCLOVA INVESTMENT CO., NEW TR EQUITY I, LLC, NEW TR EQUITY II, LLC, and TRANS-RESOURCES, INC., <br><br> Counterclaim Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) ) |

MEMORANDUM OPINION

Date Submitted: April 26, 2010
Date Decided: July 23, 2010

Thomas J. Allingham II, Esquire, Anthony W. Clark, Esquire, Robert A. Weber, Esquire, SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP, Wilmington, Delaware, *Attorneys for Plaintiffs.*

Donald J. Wolfe, Jr., Esquire, Brian C. Ralston, Esquire, Scott B. Czerwonka, Esquire, POTTER ANDERSON & CORROON LLP, Wilmington, Delaware; Michael P. Carroll, Esquire, Avi Gesser, Esquire, DAVIS POLK & WARDWELL LLP, New York, New York, *Attorneys for Defendant.*

**STRINE, Vice Chancellor.**

## I. Introduction

This dispute over the control of Trans-Resources, Inc. ("Trans-Resources") is between the company's founder and former chief executive officer, Arie Genger, and the plaintiffs, who provided capital to Trans-Resources when the company was in financial distress. The plaintiffs are all entities controlled by the Trump family, led by Jules Trump and his brother Eddie Trump (collectively, with the plaintiffs, the "Trump Group"). Jules Trump was a long-time friend of Arie Genger, and he was happy to help Genger when Trans-Resources neared insolvency in 2001.

In return for retiring nearly all of Trans-Resources' outstanding bonds, the Trump Group received a minority stake in the company and a number of protections in a stockholders agreement (the "Stockholders Agreement"). The Stockholders Agreement prohibited either party from transferring their shares in Trans-Resources to anyone other than a limited number of permitted transferees. That prohibition against transfer was particularly important to the Trump Group, which was concerned that Genger might transfer his shares that were held through an entity under his control, TPR Investment Associates, Inc. ("TPR"), to a member of his family. A bitter dispute had arisen between Genger and his son, Sagi Genger, during the time Genger's marriage unraveled in the early 2000s, and the Trump Group wanted no part of the family drama.

In 2004, Genger caused TPR to transfer its shares in Trans-Resources, subject to an irrevocable proxy in his favor, to his children's trusts (the "2004 Transfers"), under a settlement in the contentious divorce between him and his wife. Because those trusts were not permitted transferees, the 2004 Transfers violated the terms of the Stockholders

1

Agreement. Under the terms of the Stockholders Agreement, that violation rendered the transfers ineffective and gave the Trump Group the right to acquire the shares that were transferred.

But Genger did not notify the Trump Group of the transfers at that time, and thereby deprived the Trump Group of its right to declare the transfers void or exercise its right to acquire the shares in 2004. Genger claims that he mentioned the 2004 Transfers to Jules Trump during a private conversation in 2004, but his testimony did not convince me that this was true. The most convincing reading of the evidence is that the Trump Group did not receive notice of the 2004 Transfers until nearly four years later, when Genger once again asked Jules Trump for help when Trans-Resources was in financial distress. Moreover, informal notice to Jules Trump would not constitute the notice that was required to be given to the Trump Group entities under the Stockholders Agreement.

By 2008, Trans-Resources' bank was unwilling to negotiate with Genger, so Genger asked Jules Trump not only for money but also to negotiate a reduction in Trans-Resources' debt with the bank. The evidence shows that, while Genger and the Trump Group were negotiating the terms of the second round of funding, Genger disclosed for the first time that the 2004 Transfers had occurred.

Although shocked at Genger's failure to notify him of the 2004 Transfers, Jules Trump nevertheless negotiated a reduction in Trans-Resources' debt and agreed to pay that debt in return for voting control of the company. Genger initially agreed to those terms as a compromise for the Transfer violation, but, after securing an alternative source of financing, backed out of the deal. Angered that he had favorably renegotiated Trans-

Resources' debt obligations and that the Trump Group was left without their key part of the bargain, Jules Trump initiated litigation and also contacted Sagi Genger in order to negotiate a deal with both TPR and the trust controlled by Sagi Genger (the "Sagi Trust") whereby the Trump Group would buy all of the shares transferred to the Sagi Trust by TPR in the 2004 Transfers. Having made a bargain with both the wrongful transferor, TPR, and the transferee, the Sagi Trust, the Trump Group viewed itself as having covered all its bases in addressing Genger's violation of the Stockholders Agreement. With the shares wrongfully transferred to the Sagi Trust by TPR, the Trump Group held a majority of Trans-Resources' stock.

The Trump Group then purported to reconstitute the Trans-Resources board of directors and, when Genger challenged the reconstitution, filed this action pursuant to 8 *Del. C.* § 225 to determine who controlled the board. Making that determination largely turns upon interpreting how the Stockholders Agreement applies to both parties' often excessively sharp conduct. As explained fully below, I conclude that the Trump Group controls the Trans-Resources board for the following reasons: (1) the Trump Group never received notice of the 2004 Transfers, which were made in violation of the Stockholders Agreement, until June 2008; and (2) the Trump Group did not ratify those Transfers when it bought the transferred shares from Sagi Genger and TPR. Because it never ratified the wrongful transaction, the Trump Group was free to deal with the relevant transferor, TPR, and its transferee, the Sagi Trust, and settle the matter by acquiring the wrongly transferred shares in an agreed upon negotiation. In doing so, the Trump Group clearly reserved its position that TPR made a void transfer, has proven that its position

3

was correct, and is entitled, as a result, to be deemed to have taken the shares from TPR as a settlement of the improper Transfers. In the alternative, even if the Trump Group ratified the 2004 Transfers — which it did not — I find that the Trump Group did not purchase the shares from Sagi Genger subject to the proxy in favor of Arie Genger. Therefore, the Trump Group holds a majority equity and voting stake in Trans-Resources, and its ability to vote its shares is unaffected by the proxy.

## II.  Factual Background

The following are the facts as I find them after trial.

### A.  The Trump Group Saves Genger's Company, Trans-Resources, From Bankruptcy In 2001

In 1985, Genger formed Trans-Resources, a Delaware corporation that eventually became the parent of three specialty fertilizer and industrial chemical companies.[1] As mentioned before, Genger's majority stake in Trans-Resources was held through TPR, another Delaware corporation. By 2001, Trans-Resources was nearly insolvent as its subsidiaries struggled in the marketplace due to a strong euro, vigorous competition from South American rivals, and miscalculations in a recent decision to expand a key plant.[2] At that time, Trans-Resources' bonds had a notional value of $230 million, but their market value had plummeted.[3]

Because negotiations with the fractious group of investors that had invested in Trans-Resources' bonds were proving futile, Genger was delighted when Jules Trump

---

[1] Tr. 830 (A. Genger); Stipulated Pretrial Order at 3.
[2] Tr. 837-38 (A. Genger).
[3] *Id.* at 12 (J. Trump).

4

approached him with an offer to buy Trans-Resources' bonds.[4]  Genger and Jules Trump, who both had residences on Williams Island in Miami, Florida, had been friends since at least the late 1990s.[5]  From that time until very near the commencement of this litigation, Genger and Jules Trump's families regularly socialized, dined, and vacationed together.[6]

Eventually, two entities controlled by Jules and Eddie Trump, plaintiff TR Investors, LLC ("TR Investors") and plaintiff Glenclova Investment Co. ("Glenclova"), bought all but $100,000 of Trans-Resources' debt.[7]  Shortly after buying Trans-Resources' bonds, TR Investors and Glenclova converted their debt into equity.[8]  Under an exchange agreement, TR Investors and Glenclova collectively received 2,676.4428 Trans-Resources shares, which amounted to a substantial stake equal to 47.15% of Trans-Resources' equity.[9]

### B. Genger And The Trump Group Execute A Stockholders Agreement That Requires Notice To Be Given If Genger Transfers His Shares In Trans-Resources

Jules Trump's offer came with strings.  In exchange for bailing out Trans-Resources and agreeing to take a minority interest in Trans-Resources, Trump insisted on the Stockholders Agreement that gave the Trump Group strong representation and veto rights.[10]  Importantly in light of the present dispute, the Stockholders Agreement

---

[4] *Id.* at 938 (A. Genger).

[5] J. Trump Dep. 27, 88; A. Genger Dep. 62-63.

[6] J. Trump Dep. 27-28; E. Trump Dep. 32; *see also* A. Genger Dep. 156-57 (indicating that Genger and Jules Trump also took regular strolls together around the walking path on Williams Island).

[7] Tr. 117 (J. Trump), 837 (A. Genger).

[8] *Id.* at 119 (J. Trump).

[9] JX-100 (Exchange Agreement (March 30, 2001)).

[10] Tr. 843 (A. Genger) ("[P]art of the deal was to reconstitute the board and to enable Trump family — to enable the Trump family to be on the board, to have — we created a balance of —

5

provided restrictions on, and in some instances prohibitions against, the transfer of

stock.[11]

In particular, Section 2.1 of the Stockholders Agreement prevented a party from

transferring or pledging Trans-Resources stock to any party other than a party expressly

permitted to receive such a transfer (a "Permitted Transferee"). Section 2.1 provides in

relevant part:

> From and after the date hereof, no Stockholder shall directly or indirectly, offer, *transfer*, sell, assign, *pledge*, encumber, hypothecate or otherwise dispose of any Shares (including any derivative transaction) (a) until after December 21, 2003, and, thereafter, only as provided in Articles 3, 4, and 5 of this Agreement, or (b) after *written notice* to the Company and the other Stockholders . . . to (i) in the case of either of the Initial Non-TPR Stockholders or their respective Permitted Transferees (A) to [certain Permitted Transferees], or (ii) in the case of TPR or a Permitted Transferee thereof, to (w) Arie Genger, (x) any entity or entities in which TPR or Arie Genger directly owns a majority of the equity interest and directly controls a majority of the voting power . . . (y) the estate o[f] Arie Genger or (z) any immediate family members or lineal descendants of Arie Genger, or trusts of which they are the sole beneficiaries-in-interest, who receive such Shares in consequence of the death of Arie Genger, which transferee(s) become a party to this Agreement. . . .[12]

That is, Permitted Transferees were: (1) in the case of transfers from any of the Trump

Group entities, any entity in which either TR Investors or Glenclova had at least a 20%

economic interest and a least a 30% voting interest; and (2) in the case of transfers from

TPR, any of the following: (i) Arie Genger himself; (ii) any entity in which TPR or

Genger directly owned a majority of the equity interest and a majority of the voting

---

so that I cannot do anything which is not unanimous. There were all kinds of provisions on that.").

[11] JX-101 (Stockholders Agreement (2001)) (the "Stockholders Agreement") §§ 2.1, 2.4, 3.1, 3.2, 3.3).

[12] *Id.* § 2.1 (emphasis added).

power at the time of the transfer, and Genger agreed to continue to maintain such

ownership at all times thereafter; (iii) the estate of Arie Genger; or (iv) any of Genger's

immediate family members or lineal descendants, or trusts of which they are the sole

beneficiaries-in-interest, who receive the transfer of shares as a result of Genger's

death.[13] If a party to the Stockholders Agreement intended to make a transfer to a non-

Permitted Transferee, then the other party had a right of first refusal, under Section 3.1,

which provides in relevant part:

> [I]f a Stockholder (the "Selling Stockholder") shall desire to sell, assign or
> transfer any Shares held by it to any person other than a Permitted
> Transferee (the "Offered Shares") and shall be in receipt of a bona fide
> written offer to purchase the Offered Shares (the "Offer"), [t]he Selling
> Stockholders shall give the Company and to each Covered Stockholder who
> is not the Selling Stockholder (the "Non-Selling Stockholders") written
> notice containing the terms and conditions of the Offer . . . provided that for
> purposes of this Section 3.1, if the Selling Stockholder is (x) a TPR
> Stockholder, then only the Non-TPR Stockholders shall be deemed to be
> Non-Selling Stockholders; and (y) a Non-TPR Stockholder, then only the
> TPR Stockholders shall be deemed to be Non-Selling Stockholders. . . .
>
> Until 30 days after receipt of such notice, the Non-Selling Stockholders
> shall have the right to elect to purchase all of the Offered Shares at the price
> offered by the prospective purchaser and specified in such notice.[14]

The purpose of expressly limiting transfers to an enumerated list of Permitted

Transferees was to ensure that the Trump Group would be dealing only with Genger, or

one of the entities he controlled, in the future, and not with anyone else.[15] Jules Trump

was particularly concerned about limiting the Trump Group's exposure to the acrimony

---

[13] *Id.*
[14] *Id.* § 3.1.
[15] Tr. 121 (J. Trump), 842-44, 854, 891-92 (A. Genger).

plaguing Genger's family,[16] but, after much pressure from Genger, reluctantly acceded to including Genger's family members as Permitted Transferees *only* as an estate planning consequence in the event of Genger's death.[17]

If a transfer was made in violation of Section 2.1, then the Stockholders Agreement provided two remedies. First, Section 2.4 provided that "[a]ny attempt by a Stockholder to transfer Shares in violation of this Agreement shall be void and the Company agrees that it will not effect such a transfer or treat any alleged transferee as the holder of such Shares."[18] Second, Section 3.2(a) of the Stockholders Agreement gave the Trump Group the right to purchase TPR's shares in Trans-Resources if Genger: (1) transferred shares to a non-Permitted Transferee; or (2) effected a change of control in TPR. Section 3.2(a) provides in relevant part:

> The Covered Stockholders other than the hereinafter defined Terminating Stockholder (the "Purchasing Stockholders") shall have the right to elect to purchase the Shares held by a Stockholder (the "Terminating Stockholder" . . . ) at the Agreement Price (as defined in Section 3.4) and on the Agreement Terms upon the occurrence of any of the following events for a period ending on the later of 60 days after determination of the Agreement Price for the Terminating Shares and 90 days after the Company and the Purchasing Stockholders receive notice from any source of the occurrence of any of the following events (each Stockholder agreeing to give the others and the Company notice of any such event promptly after its knowledge of the occurrence thereof) . . . .
>
> (iv) the Terminating Stockholder sells, *pledges*, encumbers, hypothecates or *otherwise transfers* any interest in (including any derivative transaction), or

---

[16] *Id.* at 121 (J. Trump) ("I had confidence in Arie and we were willing to go forward with him. But I was not willing to go forward with a bunch of people who would be fighting with each other and ultimately end up greenmailing each other."); *see also id.* at 805-06 (O. Genger) (acknowledging the "nightmar[ish]" relations in the Genger family).

[17] *Id.* at 252 (Hirsch).

[18] Stockholders Agreement § 2.4.

> *purports to* sell, *pledge*, encumber, hypothecate or otherwise transfer any
> interest in (including any derivative transaction), any of its Shares, except
> as permitted by and in full compliance with the terms of this
> Agreement. . . .[19]

Therefore, Section 3.2(a) gave the Trump Group 90 days to elect to purchase TPR's

shares after it "receive[d] notice from any source" that a transfer had been made to a non-

Permitted Transferee, or that a change of control had occurred.[20]

Section 6.5 outlined the form of notice required under the various provisions of the

Stockholders Agreement:

> All notices required to be delivered pursuant to this Agreement shall be
> delivered in person or by telegraphic or other facsimile transmission or sent
> by certified mail, return receipt requested, and shall by addressed to the
> Company at its principal business office, to the attention of its Chief
> Executive Officer, to a Non-TPR Stockholder, to the Representatives, and
> any other Stockholders at the address of the Stockholder shown in the
> Company's stock ledger or to such other address as such other Stockholder
> may indicate by duly giving written notice to the Company.[21]

Thus, formal notice of an event such as a share transfer was to be given directly to the

Trump Group entities, *i.e.* TR Investors and Glenclova, who were parties to the

Agreement, and not to Jules Trump personally.[22] The Stockholders Agreement also

contained a non-waiver clause, which provided that "[n]o waiver or failure on the part of

a Company or a Stockholder in the exercise of any right, power or remedy shall operate

as a waiver thereof, nor shall any single or particular exercise by them of any right, power

---

[19] *Id.* § 3.2(a) (emphasis added).
[20] *Id.*
[21] *Id.* § 6.5.
[22] As to TR Investors, it appears that notice was to be given through Mark Hirsch at TR
Investors' official address, and as to Glenclova, notice was to be given through Robert Smith at
Glenclova's official address. *See id.* at 40. Jules Trump was not an officer or director of either
TR Investors or Glenclova. Tr. 117 (J. Trump).

9

or remedy preclude other or further exercise thereof, or the exercise of any other right, power or remedy."[23]

Finally, under Section 1.6 of the Stockholders Agreement, TR Investors and Glenclova were entitled to an addition 1.85% of TPR's shares in Trans-Resources (the "Balance Shares").[24]  The Balance Shares refer to shares that Bank Hapoalim had the option to purchase, the exercise of which would reduce TPR's shareholding by 1.85%. Because of that option, the Trump Group allowed TPR to hold 52.85% of Trans-Resources' stock, even though the parties agreed to a 51%/49% split, on the condition that the Balance Shares would revert to TR Investors and Glenclova if the Bank's option should expire unexercised.[25]

C. <u>In 2004, As Part Of The Settlement Of His Acrimonious Divorce, Genger Transfers Trans-Resources Stock From TPR To The Sagi Trust, The Orly Trust, And To Himself</u>

On October 26, 2004, after a drawn-out and contentious divorce proceeding, Genger entered into a final marital settlement agreement with his then-wife, Dalia Genger.  Under that settlement agreement, Genger transferred his equity interest in TPR to Dalia Genger on October 29, 2004.  On that same day, the Trans-Resources shares that TPR previously held were transferred as follows: approximately 13.9% of the shares were transferred to Genger himself, and separate trusts established for his two children, Orly and Sagi Genger (respectively, the "Orly Trust" and the "Sagi Trust"), were each transferred approximately 19.5% of the shares (collectively, the aforementioned "2004

---

[23] Stockholders Agreement § 6.8.
[24] *Id.* § 1.6.
[25] *Id.*; *see also* Tr. 255-57 (Hirsh).

10

Transfers"). According to the transfer agreements, the trustees of each Trust agreed to irrevocable lifetime proxies in favor of Genger (the "Proxies").[26]

At the time the 2004 Transfers were made, Genger did not notify TR Investors or Glenclova of the Transfers as required by the Stockholders Agreement. Genger admits that he never gave the written notice required by the Stockholders Agreement, provided the Trump Group with copies of the Proxies, or passed on a copy of the marital settlement agreement.[27] Nevertheless, Genger argues that TR Investors and Glenclova received notice because he orally told Jules Trump about the 2004 Transfers. In particular, Genger testified that he told Jules Trump about the 2004 Transfers "many times" from the "inception, [when] the idea germinated of how to resolve my divorce, to the execution [of the 2004 Transfers]."[28] Genger testified that he told Jules Trump of the 2004 Transfers during their regular strolls on Williams Island.[29]

For his part, however, Jules Trump categorically denied that Genger ever mentioned the 2004 Transfers.[30] The only other person who testified to hearing any conversations between Genger and Jules Trump relating to the 2004 Transfers was Genger's daughter, Orly. At trial, Orly Genger testified that her father "shared . . . everything" with the Trumps,[31] and that she was present during at least one discussion between Genger and Jules Trump about the 2004 Transfers. In particular, she testified

---

[26] JX-113 (Letter Agreement and Proxy (Oct. 29, 2004)) (the "Proxy").

[27] Pretrial Stipulation and Order 4; Tr. 936, 940 (A. Genger), 99 (J. Trump), 628 (Dowd).

[28] Tr. 856 (A. Genger).

[29] *Id.*

[30] *Id.* at 159 (J. Trump) ("Q. From the time that you became — TR Investors became a stockholder in 2001 to June 13th, 2008, did anyone give you any notice of the 2004 transfers, or the change in control of TPR? Trump. Never. Never, ever.").

[31] *Id.* at 783 (O. Genger).

11

about a discussion in "late '04 or early '05" at Jules Trump's residence on Williams

Island.[32]  But, Orly Genger's testimony regarding that conversation was vague, at best:

> They talked about how TPR and [Trans-Resources] were split, how my —
> my dad spoke about how he split those two, how he hoped that now that my
> brother, since was sort of — it was now me, my mother, and my brother,
> and my brother was supposedly the financial guy supposed to take care of
> us in a sense, he was hoping that — that he would.[33]

When asked for further details, she only elaborated as follows:

> Q.  And were there details?  Was your father providing details to Mr.
> Trump —
>
> O. Genger.  Yeah.
>
> Q.  — in those discussions?
>
> O. Genger.  The fact that my brother was in the middle of it, you know, and
> just the awful nature of it.  Everything was told to Jules.[34]

On cross-examination, Orly Genger clarified that the discussion between her father and

Jules Trump some time in late 2004 or early 2005 definitely took place *after* the 2004

Transfers occurred,[35] and that she did not remember her father specifically discussing the

transfer of Trans-Resources shares to the Sagi Trust.[36]  But she did not provide further

---

[32] *Id.* at 787.  Orly Genger also briefly mentioned a conversation between Genger and Jules Trump sometime during 2007, when her brother brought a lawsuit against her father.  *Id.* at 799. But the only details she provided regarding that discussion was that she remembered "them speaking specifically about th[e] lawsuit and how incredible it was that my father had given my brother TPR [Investment], [and] he was actually against him now."  *Id.*

[33] *Id.* at 786.

[34] *Id.* at 789.

[35] *Id.* at 801 ("Q.  And I want to make sure I understand.  [The conversation between Genger and Jules Trump] — it definitely occurred after the 2004 transfers had occurred; is that right?  O. Genger.  Yes.").

[36] The precise colloquy was as follows:
> Q.  Now, in this conversation the issue that you recall being discussed was the
> transfer of control of TPR [Investment] to your brother.  He would be in charge.

details about the substance of the discussion between her father and Jules Trump other than to say that the "essence" of the discussion was "that [Sagi] was now sort of in charge."[37] The lack of specific details in her testimony undermines her credibility because of her personal interest in the outcome of this case and her obvious desire to protect her father in his feud with her brother,[38] and because Genger himself testified that no one else was present during his alleged conversations with Jules Trump, even his daughter Orly.[39]

---

O. Genger. That was the essence, that he was now sort of in charge.

Q. That was the essence of it.

O. Genger. Right.

Q. Yeah. And the question of the transfer of TPR's shares of [Trans-Resources] to your trust and your brother's trust and your father, you don't recall that that was discussed during this conversation?

O. Genger. I'm sorry. Can you say it again?

Q. Yes. The question of the transfer by TPR [Investment] of its [Trans-Resources] shares —

O. Genger. Right.

Q. — to your trust, your brother's trust, and your father, that was not discussed in this conversation?

O. Genger. Not that I remember.

*Id.* at 803-04.

[37] *Id.*

[38] *Id.* at 813 ("Q. You stand to benefit if your father prevails in this litigation? O. Genger: I hope. Yeah, I think.").

[39] *Id.* at 895 (A. Genger) ("The Court: It was just the two of you? Genger: Just the two of us. The Court: Not your daughter? Genger: Not my daughter.").

Besides his own testimony and the testimony of his daughter, the only other evidence to which Genger points as proof that he told the Trumps about the 2004 Transfers are two after-the-fact events. First, Genger points to a written consent that Trans-Resources' shareholders were required to sign in 2005 (the "2005 Written Consent") in order to resolve a dispute with Bank Hapoalim, with whom Trans-Resources had a long-term relationship, over Trans-Resources' outstanding debt. The signature page of the 2005 Written Consent included signature blocks for not only Arie Genger, but also the Orly Trust and the Sagi Trust, and identified Arie Genger as the proxy for the two Trusts.[40] That is, by including signature lines for the Orly Trust and the Sagi Trust as shareholders, the 2005 Written Consent disclosed that some sort of transfer had taken place. For their part, the Trumps credibly claim that they did not notice the additional signature lines in the 2005 Written Consent when they signed the page.[41]

Second, Genger claims that he mentioned the 2004 Transfers during a Trans-Resources board meeting in November 2007 at which Jules Trump was present (the "November 2007 Board Meeting").[42] For support, Genger points to the minutes of that meeting, which reflect that "Mr. Genger advised the directors that both he and Mr. Dowd had been sued by TPR Investment Associates, Inc. and other related entities with respect to their activities as officers and/or directors of TPR Investment Associates, Inc., *the former parent Company of [Trans-Resources]*."[43] Genger avers that this passing

---

[40] JX-125 (executed written consent (July 26, 2005)) (the "2005 Written Consent").

[41] Tr. 101-05 (J. Trump), 185-92 (Hirsch)

[42] JX-149 (Trans-Resources board meeting minutes (Nov. 19, 2007)).

[43] *Id.*

14

reference to TPR being the former parent of Trans-Resources should have tipped Trump

off that the 2004 Transfers were made. As we will see, that argument is undercut,

however, by the reality that Genger's loyal subordinate, Bill Dowd, appears to have

manipulated the corporate minutes on other occasions to suit Genger's interests.

D. Genger Finally Tells The Trumps About The 2004 Transfers During Negotiations To
Restructure Trans-Resources' Debt

In the spring of 2008, Trans-Resources was once again having financial troubles,

now in a dispute with Bank Hapoalim, which was pressuring Trans-Resources to sell its

main subsidiary, Haifa Chemical, Inc., in order to avoid foreclosure.[44] Genger turned to

the Trumps for help, asking Jules Trump if the Trump Group would provide the capital

necessary to retire Trans-Resources' bank debt in exchange for an increased equity

position that would give the Trump Group control of Trans-Resources.[45] Genger relied

on Jules Trump in particular not only because of their past relationship but also because

Bank Hapoalim, which had indicated that it had lost confidence in Genger, was however

willing to negotiate with Trump in regard to Trans-Resources' debt.[46] On May 31, 2008,

Genger and Jules Trump met to discuss the general contours of an agreement (the

"Funding Agreement"), which would provide for a capital infusion into Trans-

Resources.[47] After that meeting, Trump negotiated with Bank Hapoalim to reduce Trans-

---

[44] Tr. 38-39 (J. Trump).

[45] *Id.* at 41-42 (J. Trump).

[46] *Id.* at 124-27, 146 (J. Trump).

[47] *Id.* at 872 (A. Genger); 43-44, 135-36 (J. Trump).

Resources' debt load, and asked Genger to meet with Eddie Trump and Mark Hirsch, the Trumps' lawyer, in New York to work out the details of the Funding Agreement.[48]

### 1. Genger, Eddie Trump, And Mark Hirsch Meet On June 13, 2008

Genger met with Eddie Trump and Hirsch in New York on June 13, 2008 (the "June 13 Meeting"). Early in the June 13 Meeting, Hirsch gave Genger a draft of the Funding Agreement. That draft listed TPR, Glenclova, and TR Investors as the company's sole shareholders, thereby strongly suggesting that the Trump Group was unaware at that time of the 2004 Transfers.[49] Upon reviewing the draft, Genger commented that TPR was no longer a Trans-Resources stockholder.[50] Both Eddie Trump and Hirsch expressed shock upon hearing that, and Hirsch reminded Genger that he was not permitted to transfer his stake in Trans-Resources without first providing notice and a right of first refusal to the Trump Group.[51]

Upon seeing their surprise, Genger did not stop and say what one would expect to be the first thing out of his mouth if Genger had already given repeated notice to Jules

---

[48] *Id.* at 868-69 (A. Genger).

[49] JX-170 (email from Mark Hirsch to Jules Trump with draft agreements attached (June 12, 2008)).

[50] Tr. 283 (Hirsch), 498-99 (E. Trump).

[51] *Id.* at 284-85 (Hirsch), 499 (E. Trump). Interestingly, the trial record includes an email from Hirsch to Jules Trump, dated June 11, 2008, in which Hirsch describes the transfer restrictions and the right of first refusal provisions in the Stockholders Agreement. JX-167 (email from Mark Hirsch to Jules Trump (June 11, 2008)). The timing of that email suggests that the Trumps might have known about the 2004 Transfers before the June 13, 2008 meeting. But I do not find this email to be proof that Genger had given the Trumps oral notice because: (1) the Trumps may have simply suspected on their own that something like the 2004 Transfers had taken place; or (2) the Trumps may have heard rumors from sources other than Genger that the 2004 Transfers had occurred. In either event, notice as required under Stockholders Agreement had not been given. Furthermore, even if the email did indicate that notice had been given, it still suggests that the timing of that notice was no earlier than June 2008.

Trump: "Why are you acting so surprised?  I told Jules all about these Transfers years ago."[52]  Rather, Genger acknowledged that he had not provided notice of the 2004 Transfers, but insisted that he had lived within the spirit of the Stockholders Agreement by maintaining control of the stock through the Proxies.[53]  And, Genger spent the better part of that day explaining the 2004 Transfers to Eddie Trump and Hirsch,[54] which would have been unnecessary had they already known about the Transfers.

Finally, at the end of the meeting, Genger offered to arrange a meeting with his lawyer, David Lentz, who was most familiar with the details of the 2004 Transfers.[55] Eddie Trump and Hirsch met with Lentz three days later, on June 16, 2008, to discuss the details of the 2004 Transfers.  It is also noteworthy that, before that meeting, Genger never told Lentz that he had given Jules Trump oral notice of the 2004 Transfers.[56]  If notice of the 2004 Transfers had indeed been given, one would have expected Arie Genger to have at least mentioned that important detail to his own counsel.  During that

---

[52] Tr. 501 (E. Trump) ("At any time during the meeting did Mr. Genger say, 'Well, I told your brother, Jules.  Let's get him on the phone,' or words to that effect?  E. Trump: No.").  Genger's testimony on this important issue was vague at best.  He only recalled telling Eddie Trump and Hirsh something to the effect of "Jules knows about it" at some point during the June 13 Meeting.  Id. at 900 (A. Genger).  But, Genger could give no further details, and he admitted that he never pressed the point or suggested that they get Jules Trump on the phone to clarify the issue.  Id.

[53] Id. at 284 (Hirsch) ("I took out the agreement to show [Genger] specifically why he could not have transferred the shares, that this was not permitted under the agreement.  And he said, 'All right.  You know, so I didn't tell you about it, but I didn't think I had to.  I mean, what's changed?  I still – I still vote the shares.'").

[54] Id. at 893-94, 899 (A. Genger).

[55] Id. at 902-03 (A. Genger).

[56] Id. at 7 (Lentz) ("Q: And Mr. Genger didn't tell you [before the June 16th meeting] that he claimed to have given some sort of notice to Jules Trump.  That's correct; right?  . . . Lentz: I believe your statement is correct.").

meeting, Lentz never suggested that Jules Trump had already known about the 2004

Transfers because Genger had told him about them years ago.[57]

2. Later Communications Between Genger, William Dowd, And David Lentz Admit
   That Genger Never Gave The Trump Group Notice Of The 2004 Transfers

In a series of emails and memoranda produced over the two weeks following the

June 16 meeting, Lentz repeatedly acknowledged Genger's failure to provide any notice

of the 2004 Transfers. In a June 17, 2008 email, Lentz wrote that "[t]he Trumps *never*

*consented to* and don't want [the Sagi] Trust or [Orly] Trust . . . as minority partners

(shareholders) in [Trans-Resources]."[58] And, in a June 26, 2008 email, Lentz wrote that

"no notice was given" to the Trumps about the 2004 Transfers.[59] But, Lentz's most

telling admission came in a memorandum he wrote for Genger analyzing the parties'

various bargaining positions and how likely machinations by Sagi Genger would affect

the outcome of the dispute (the "Lentz Memo"). In that Memo, Lentz wrote:

> *While it is true the Trumps never got notice*, the entire intent of the
> Shareholder's agreement has been carried out anyway. In other words, *why
> did AG not give them actual notice?* Because, AG will testify, using the
> TPR shell was never the intention of the Trumps and AG — the real
> intention was to keep the ownership of [Trans-Resources] in the Genger
> family under the voting and operational control of AG and the Stipulation
> did just that. So, AG becomes SG's best witness. AG will not say I just
> forgot to tell the Trumps. He will not say I tried to get away with
> something and thought the Trumps would not find out. He will testify that

---

[57] *Id.* at 990 (Lentz) ("Q. Nobody said at the meeting, then, that any notice had been given in substance; right? Lentz. Correct."); *see also id.* at 994 (Lentz) ("Q. [Y]ou went through an entire meeting about the absence of notice and people asking what, in fact, occurred. And no one from your side of the discussion spoke a peep refuting that contention; right? Lentz: Nobody refuted it, that's correct.").

[58] JX-331 (email from David Lentz to Arie Genger, Bill Dowd, and Christopher Gengaro (June 17, 2008)) (emphasis added).

[59] JX-337 (email from David Lentz to Arie Genger, Bill Dowd, and Christopher Gengaro (June 26, 2008)).

18

whether the corporate form of TPR or the kids' trusts w[as] used made no difference. The essence of these protections was to make sure the Genger family owned roughly 50% and that AG could vote all of those shares. That's what happened. So, *while there was a technical violation*, the Trumps got what they bargained for.[60]

Later in that same Memo, Lentz added: "AG does not have clean hands because like SG, *AG never told the Trumps*."[61] Thus, Genger's own attorney repeatedly acknowledged that Genger had never given the Trumps *any* type of notice.

3.  At The June 25, 2008 Meeting Of Trans-Resources' Board And Stockholders, Genger Himself Indicates That Notice Of The 2004 Transfers Was Not Given To The Trumps

The Trans-Resources board met on June 25, 2008 (the "June 25 Board Meeting") and unanimously approved the Funding Agreement, which provided that the Trumps would invest an additional $57.5 million in the company in exchange for 50% of Trans-Resources' outstanding stock, which would give the Trumps clear voting control and by far the largest equity position in the company.[62] That is, the totality of the Funding Agreement would address the injury to the Trump Group from the 2004 Transfers by giving it voting control of Trans-Resources. Handwritten notes by Bill Dowd, a director and Trans-Resources' chief executive officer, recorded that "AG describe[d] [Trans-Resources] stock transfer *in violation of agreement*" during the meeting.[63] That is, Genger acknowledged that the 2004 Transfers were made without providing notice to the

---

[60] JX-332 (memorandum from David Lentz to Arie Genger, Bill Dowd, and Chris Gengaro) (the "Lentz Memo") (emphasis added).

[61] *Id.* (emphasis added).

[62] JX-181 (minutes of joint meeting of the board of directors and stockholders of Trans-Resources, Inc. (June 25, 2008)).

[63] JX-179 (handwritten notes of Bill Dowd (June 25, 2008)) (emphasis added).

Trumps. Tellingly, Dowd, who had worked for Genger for years, omitted that important admission from the formal minutes he drafted following the meeting.[64]

### E. Negotiations To Restructure Trans-Resources Break Down, And The Parties Eventually Commence This Litigation

Although the Funding Agreement solved the problem with Bank Hapoalim, Genger and the Trumps still had to sort out how to ensure that the Trumps were given control of the Trans-Resources board as required under the Funding Agreement. That was a problem because Genger and the Trumps anticipated that Sagi Genger, who now had a claim to be a Trans-Resources stockholder on account of the 2004 Transfers, would litigate any attempt to transfer control from Genger to the Trumps, if for no other reason than to spite his father.[65] During June and July of 2008, Genger and the Trumps discussed options for dealing with Sagi Genger. One of the options the Trumps suggested was confronting Sagi Genger with the argument that the 2004 Transfers violated the Stockholders Agreement, and that he was therefore not a beneficial owner of the Shares.[66] Importantly, Genger resisted this approach, likely because that would expose him to liability for representing falsely in the divorce settlement that the 2004 Transfers were not made in violation of any agreement.[67]

---

[64] *See* JX-179 (draft meeting minutes (June 25, 2008)) (omitting any reference to the 2004 Transfers being made in violation of the Stockholders Agreement).
[65] Tr. 318-19 (Hirsch).
[66] *Id.*
[67] *Id.* at 304 (Hirsch).

1. Genger Reneges On The Funding Agreement, And The Trumps Respond With A
   Lawsuit

Genger and the Trumps never reached common ground on how to approach Sagi,

because Genger began to back-track on the draft terms of the Funding Agreement.

Genger could afford to back out of the Funding Agreement because he had devised a way

— albeit one of questionable propriety — to upstream funds from the Haifa Chemical,

Inc. subsidiary to Trans-Resources, thus allowing Trans-Resources to fulfill its

obligations to Bank Hapoalim, which Jules Trump had successfully reduced during his

negotiations with the bank on behalf of Trans-Resources.[68]  Because Genger had secured

an alternative source of capital, the Funding Agreement with the Trumps was no longer

the only mechanism for rescuing Trans-Resources.  From that position of increased

leverage, Genger began to disengage from the Funding Agreement deal.  First, despite the

fact that Bank Hapoalim required payment by late August, Genger requested that

execution of the Funding Agreement be postponed upon the advice of counsel.  Wielding

a problem of his own creation, Genger asserted that Trans-Resources' Delaware lawyers

had advised him that Trans-Resources needed to establish an independent committee to

review the fairness of the Funding Agreement because the recipients of the 2004

Transfers might complain.  Second, at an August 1, 2008 meeting, Genger's lawyers

claimed, for the first time, that Genger had given Jules Trump oral notice of the 2004

---

[68] Dowd Dep. 281.

21

Transfers years ago, and threatened litigation if the Trumps chose to challenge the 2004 Transfers.[69]

The Trumps responded on August 8, 2008 with a letter to TPR and Trans-Resources indicating that Glenclova was exercising its right under Section 3.2 of the Stockholders Agreement to purchase all of the shares subject to the 2004 Transfers, and requesting that the Trans-Resources board begin the process of establishing their purchase price.[70] On August 11, 2008, Glenclova filed a suit in the United States District Court for the Southern District of New York seeking to enforce the Funding Agreement and its rights under the Stockholders Agreement.[71] On August 13, 2008, Genger responded through a letter from his attorneys, claiming that Glenclova had no right to purchase the shares because he had kept Jules Trump fully informed of the 2004 Transfers at the time they were made four years prior.[72]

### 2. The Trump Group Purchases The Sagi Trust's Shares And Reconstitutes Trans-Resources' Board Of Directors, Leading To This Section 225 Action

The lawsuit in federal court in New York was not the only course of action the Trumps took. On August 21, 2008, Jules Trump contacted Sagi Genger to explore the possibility of acquiring the 1,102.8 shares purportedly transferred to the Sagi Trust in 2004 (the "Sagi Shares").[73] And, on August 22, 2008, the Trumps purchased the Sagi Shares pursuant to a stock purchase agreement (the "Purchase Agreement") between the

---

[69] Tr. 65, 155-56 (J. Trump), 364 (Hirsch).

[70] JX-198 (letter from Glenclova to TPR and Trans-Resources (Aug. 8, 2008)).

[71] JX-204 (Complaint, *New TR Equity, LLC v. Trans-Resources, Inc.* (S.D.N.Y. Aug. 11, 2008)).

[72] JX-350 (letter from Charles Weissman to Barry Adelman (Aug. 13, 2008)).

[73] Tr. 111 (J. Trump).

Sagi Trust, TPR, and the Trumps' entities, TR Investors, Glenclova, New TR Equity I, LLC ("Equity I"), and New TR Equity II, LLC ("Equity II").[74] Importantly, the transaction included not only the Sagi Trust as a party but also the wrongful transferor, TPR. Sagi Genger could act for TPR because, after making the 2004 Transfers, Genger had ceded control of TPR to Dalia Genger, who subsequently sold her interest in TPR to her son, Sagi.[75] The Purchase Agreement contained a specific section addressing the reality that the Trump Group viewed the 2004 Transfers as void and that TPR still owned them and was obliged to sell them to the Trump Group at 2004 values. To wit, the Purchase Agreement provided that it would be considered consummated between the Trump Group and *TPR* if the 2004 Transfers were to be found void:

> If at any time following the Closing Date, it is determined that Seller is not the record and beneficial owner of the Shares as of the date hereof, by virtue of the transfer of the Shares to it by TPR being deemed to have been void or for any other reason, and that all right, title and interest in and to the Shares is held by TPR, subject only to the plaintiff's asserted rights under the Stockholders Agreement asserted in the action styled Glenclova Investment Co. v. Trans-Resources, Inc. and TPR Investment Associates, Inc., Case No. 08-CIV-7140 (JFK), pending the United States District Court for the Southern District of New York, the parties hereby agree that (a) *this Agreement and the transactions contemplated hereby shall be deemed to have been entered into and consummated with TPR, (b) the Purchasers shall retain all right, title and interest in and to the Shares as if purchased from TPR pursuant to this Agreement, (c) TPR shall look only to Seller for any payments made by the Purchasers pursuant to this Agreement, (d) the Purchasers shall have no liability or obligation to TPR in respect of the Shares, and (e) all representations, warranties, covenants and agreements made by Seller herein, shall be deemed to have been made by TPR as of the date hereof.*[76]

---

[74] JX-225 (the "Purchase Agreement").
[75] Tr. 547 (S. Genger).
[76] Purchase Agreement § 10 (emphasis added).

23

Thus, by signing an agreement with both the Sagi Trust and TPR, the wrongful

transferee, the Trump Group dealt with the Genger-caused problem that Genger exploited

in order to derail the Funding Agreement.  By dealing directly with both the allegedly

innocent transferee — the Sagi Trust — and the wrongdoer — TPR — the Trump Group

covered all of its bases.

Having purchased the Sagi Shares, which gave them a majority equity position in

Trans-Resources, the Trump Group then executed a written consent on August 25, 2008

that removed Genger from the Trans-Resources board, elected Eddie Trump and Hirsch

to the board, and affirmed the election of Jules Trump and Robert Smith to the board.

The Trump Group delivered that written consent to Trans-Resources, but Genger rejected

it.[77]

In response, the Trump Group filed a single-count complaint pursuant to 8 *Del. C.*

§ 225 in order to determine the composition of the Trans-Resources board (the "Section

225 Action").  Consistent with their position throughout the summer of 2008, the Trump

Group's central claim was that the 2004 Transfers were made in violation of the

Stockholders Agreement, and that it therefore had the right to purchase all of TPR's

shares pursuant to Section 3 of the Stockholders Agreement.[78]  Genger responded with a

counterclaim, raising a number of arguments for why the 2004 Transfers were made

appropriately — chief among them his assertions that he told Jules Trump of the

Transfers at the time they were made, and that, in any event, the Trump Group's purchase

---

[77] Tr. 403-06 (Hirsch).
[78] Compl. ¶ 10.

24

of the Sagi Shares in 2008 ratified the 2004 Transfers — and claiming that, therefore, he still controlled Trans-Resources' board. Genger also argues that the Trump Group violated Section 2.1 of the Stockholders Agreement when Equity I and Equity II pledged Trans-Resources shares in return for financing to buy the Sagi Shares.

Soon after the Section 225 Action was filed, the parties promptly settled the matter, which resulted in a stipulated final judgment that declared that the Trump Group's designees constituted a majority of the board.[79] But, like any other moment of agreement between the parties in this case on anything, that settlement was short-lived. On October 10, 2008 — two weeks after the final judgment was entered — the Trump Group moved to re-open the Section 225 Action. They moved to reopen because they alleged that, after taking control of Trans-Resources, they discovered that Genger had destroyed documents relevant to the Section 225 Action in violation of a status quo order.

The issue of whether Genger should be held in contempt for destroying documents in violation of this court's status quo order was decided in 2009 in a separate trial.[80] It is unnecessary to recount here the facts or analysis involved in that trial, which are summarized in the opinion that resulted.[81] What matters for present purposes is the outcome: Genger was found to be in contempt, which raises Genger's evidentiary burden on any issue on which he has the burden of proof by one level and renders his uncorroborated testimony insufficient to establish material facts.[82]

---

[79] *See TR Investors, LLC v. Arie Genger*, C.A. No. 3994-VCS (Sept. 26, 2008) (ORDER).
[80] *TR Investors, LLC v. Genger*, 2009 WL 4696062 (Del. Ch. Dec. 9, 2009).
[81] *See id.* at *1-15.
[82] *See id.* at *18-19.

25

### III. Legal Analysis

Genger has proliferated a host of theories — including new ones after trial — as to

why he retains voting control over Trans-Resources, and the Trump Group has accurately

described its efforts to address Genger's ever-changing arguments as playing a game of

"Whack-a-Mole."[83] It is possible, nevertheless, to sift through the heaping stew pot filled

with every conceivable exculpatory theory that ever crossed his lawyers' inventive minds

that Genger has cooked up and identify the chunkier ingredients. Genger's main theory

is that the 2004 Transfers were made appropriately, either because he gave the Trump

Group notice or because the Trump Group ratified the Transfers. Genger's primary

alternative theory is that, even if the 2004 Transfers were not appropriate, the Trump

Group took the Sagi Shares subject to the Proxy in his favor.

In the analysis that follows, I do not address all of the alternative theories Genger

concocted, but rather focus on his two fundamental theories. Treating all of his

secondary arguments is unnecessary because Genger has failed to bear his evidentiary

burden as to those core theories on which the rest of his case depends. That is, Genger

has failed to prove that he properly notified the Trump Group of the 2004 Transfers at

any time before the June 13 Meeting, or that the Trump Group somehow ratified the 2004

Transfers after the fact. And, even if the Trump Group did ratify the 2004 Transfers —

---

[83] *See* Trump Post-Trial Ans. Br. 3. For example, Genger's counsel spent a great deal of time at post-trial oral argument in a befuddling exposition of a theory *introduced into the case as a footnote in its post-trial answering brief. Compare* Post-Trial Tr. 128-58 *with* Genger Post-Trial Ans. Br. 24, n. 18.

which it did not — Genger has failed to prove that it took the Sagi Shares subject to the
Proxy.

### A. Standard Of Review

The standard of review I apply in analyzing the aforementioned issues is different
in this case than what is typical. The party attempting to gain control of an entity in an
action pursuant to 8 *Del. C.* § 225 bears the burden of proof on any issue, the outcome of
which would affect the determination of the Trans-Resources' board.[84] Generally
speaking, the burden of proof in civil cases is that the party with the burden must prove
his position by a preponderance of the evidence.[85] But, because of this court's prior
ruling in the contempt trial, Genger's burden is raised a level, meaning that he must
prevail on any issue in which he bears the burden of proof by clear and convincing
evidence. And, as mentioned before, Genger's own uncorroborated testimony will not be
sufficient to establish any material fact.[86]

### B. Arie Genger Did Not Notify The Trump Group Of The 2004 Transfers Until June 13, 2008

The first issue I must address is Genger's argument that he gave the Trump Group
notice of the 2004 Transfers during his conversations in late 2004 or early 2005 with
Jules Trump about his divorce and that the Trump Group is chargeable with laches.[87]

---

[84] *See Agranoff v. Miller*, 1999 WL 219650, at *12 (Del. Ch. Apr. 12, 1999), *aff'd*, 737 A.2d 530 (Del. 1999). Genger conceded that he bears the burden of proof. Contempt Trial Tr. 355.
[85] *See SinoMab Bioscience Ltd. v. Immunomedics, Inc.*, 2009 WL 1707891, at *12 (Del. Ch. June 16, 2009).
[86] *See supra* page 25.
[87] Laches operates to bar a claim where "(a) [the] plaintiff knew (or should have known) of its rights or claim; (b) [the] plaintiff failed to assert its rights or claim; and (c) [the] defendant has materially changed its position or otherwise materially relied on plaintiff's failure to assert."

This argument is central to the case because the Stockholders Agreement provides that, upon receiving notice of an improper transfer from any source, the Trump Group has 90 days to elect to purchase the shares held by the stockholder making the transfer, *i.e.* TPR.[88] If the first time the Trumps heard about the 2004 Transfers was at the June 13 Meeting, then the Trump Group acted within the 90-day window provided in the contract because it elected to purchase TPR's shares on August 8, 2008, when it sent TPR a letter indicating that it elected to exercise its rights under Section 3.2 of the Stockholders Agreement.[89] But, if the Trumps received notice some time before May 8, 2008, then their demand to exercise their purchase rights under the Stockholders Agreement on August 8, 2008 would arguably be tardy.

Tellingly, Genger spent only one and a half pages in his post-trial briefing on this argument.[90] That is likely because he knew, as shown below, that he has failed to bear his evidentiary burden on this issue. There is no credible evidence indicating that Genger ever told Jules Trump about the 2004 Transfers in late 2004 or early 2005.

At trial, Genger offered little more than his unbelievable and uncorroborated testimony to support his claim that he notified the Trump Group. As discussed earlier, Genger testified that he told Jules Trump about the 2004 Transfers on a number of occasions in late 2004 or early 2005 while the two discussed developments in Genger's

---

*Gotham Partners, L.P. v. Hallwood Realty Partners, L.P.*, 714 A.2d 96, 104 (Del. Ch. 1998); *see also Fed. United Corp. v. Havender*, 11 A.2d 331, 344 (Del. 1940) ("Sitting by inactive and in what amounts to silence, when every consideration for the rights of others demanded prompt and vigorous action, and until affairs had become so complicated that a restoration of former status was difficult, if not impossible, is conduct amounting to laches.").

[88] Stockholders Agreement § 3.2(a).

[89] JX-198 (Letter from Glenclova to Trans-Resources and TPR (Aug. 8, 2008)).

[90] *See* Genger Post-Trial Op. Br. 28-30.

28

divorce during their strolls on Williams Island.[91] For his part, Jules Trump categorically denied that Genger ever mentioned the 2004 Transfers in late 2004 or early 2005.[92] The only other person who testified to hearing Genger and Trump discuss the matter was Orly Genger. But her testimony gave little detail about what was actually said during those alleged conversations, and it was contradicted by Genger himself, who said that she was not present at the key conversation when he told Jules Trump about the Transfers.[93] Therefore, I do not find her testimony of the alleged conversations between Genger and Jules Trump credible, especially in light of her personal interest in this case.

Moreover, if Genger did in fact tell Jules Trump about the 2004 Transfers in late 2004 or early 2005, then why did he not press that point at the June 13 Meeting when Eddie Trump and Hirsch appeared shocked to hear the news? The natural thing to say in that situation would have been to make the obvious point that he had told Jules about it years ago. But, at trial, Genger only testified vaguely, haltingly, and meekly that he told them something along the lines of "Jules knows about it," and gave no other details of what he said in that regard.[94] Genger also admitted that he never pressed the point any further, even though he became "[v]ery frustrated" with the repeated questions Eddie Trump and Hirsch were asking.[95] For example, Genger never said that they should get Jules Trump on the phone to confirm that Genger had indeed told him about the

---

[91] *See supra* page 11.
[92] *See supra* page 11.
[93] *See supra* page 11-13.
[94] Tr. 900 (A. Genger).
[95] *Id.*

Transfers.[96] Rather, Genger attempted to justify the Transfers on the grounds that he still had voting control through the Proxies.[97]

Genger also failed to mention his alleged conversations with Jules Trump even when he spoke with his lawyer, David Lentz, after the June 13 Meeting.[98] Such an important detail would, if true, have been one of the first things Genger told his counsel. But, the evidence indicates Lentz believed at the time that Genger had never informed Jules Trump of the 2004 Transfers.[99] That fact is reflected most clearly in the Lentz Memo, which stated repeatedly that notice had never been provided to the Trump Group.[100]

Thus, the overwhelming thrust of the evidence indicates that everyone in Genger's camp knew full well that he had never told the Trump Group about the 2004 Transfers before the June 13 Meeting.[101] Indeed, Bill Dowd's notes of the June 25 Board Meeting indicate that Genger himself admitted that the Transfers were made in violation of the Stockholders Agreement.[102] The inescapable conclusion is that Genger did not provide the Trump Group with any form of notice before the June 13 Meeting, choosing rather to trust in his savvy to manage the Trumps if the issue ever arose.

Nor can Genger rely on the passing references to the possibility of a transfer in the 2005 Written Consents and the minutes of the November 2007 Board Meeting. As noted,

---

[96] *Id.*
[97] *See supra* page 17.
[98] *See supra* page 17.
[99] *See supra* page 17-19.
[100] *See supra* page 18-19.
[101] *See* Tr. 631 (Dowd), 1008 (Lentz).
[102] *See supra* page 19.

the accuracy of the minutes of the November 2007 Board Meeting appears to be suspect.[103]  Furthermore, the Stockholders Agreement required a specific form of notice to be given to TR Investors and Glenclova.[104]  Even if Genger told Jules Trump about the 2004 Transfers in late 2004 or early 2005, which I conclude he did not, that would not constitute notice to TR Investors or Glenclova.  But more important is the fact that passing references in the 2005 Written Notices or the minutes of the November 2007 Board Meeting do not constitute proper notice of any kind or even put the Trump Group on effective inquiry notice.  Business people can miss things.  The idea that the Trump Group had to review every stray reference in the board minutes or to read between the lines on the signature page of the 2005 Written Consents for signs of a possible transfer is wrong.  The notice provision in the Stockholders Agreement was specific and designed to ensure that the Trump Group did not have to police the world in this way, as was the Stockholders Agreement's strong anti-waiver provision.[105]  Finally, I am persuaded by, among other things, the draft Funding Agreement the Trump Group proposed that indicated that the Trump Group did not know of the 2004 Transfers.  Notably, I conclude that the Trump Group would prevail on this issue even if they had the burden to show that they had not been given proper notice.  But, because Genger admits he did not give proper notice as required under the contract,[106] it was his burden to show that he should nevertheless be alleviated of his obligations under the Stockholders Agreement because

---

[103] *See supra* pages 19-20.

[104] *See* Stockholders Agreement § 6.5.

[105] *See id.* at §§ 6.5, 6.8.

[106] *See* Pretrial Stipulation and Order 4.

31

he gave Jules Trump oral notice and, certainly, it was his burden to prove a laches defense.

## C. The Trump Group Did Not Ratify The 2004 Transfers

Genger next argues that the Trump Group nevertheless ratified the 2004 Transfers. The defense of ratification is perhaps best understood by reference to its closest cousin, the doctrine of acquiescence.[107] Acquiescence occurs when a party "has knowledge of an improper act by another, yet stands by without objection and allows the other party to act in a manner inconsistent with the claimant's property rights."[108] Ratification differs primarily in timing: "[a]quiescence properly speaks of assent by words or conduct *during the progress* of a transaction, while ratification suggests an assent *after the fact*."[109] Thus, to find that a party ratified a prior act, it is first necessary to find that the ratifying party had "[k]knowledge, actual or imputed, of all material facts."[110] Second, ratification requires an affirmative act by the ratifying party. Assent can be "implied from conduct,

---

[107] *See Frank v. Wilson & Co.*, 32 A.2d 277, 283 (Del. 1943) ("Acquiescence and ratification are closely related.").

[108] *Brandywine Dev. Group, L.L.C. v. Alpha Trust*, 2003 WL 241727, at *4 (Del. Ch. Jan. 30, 2003).

[109] *Frank*, 32 A.2d at 283 (emphasis added); *see also* 1 DONALD J. WOLFE, JR. & MICHAEL A. PITTENGER, CORPORATE AND COMMERCIAL PRACTICE IN THE DELAWARE COURT OF CHANCERY, § 11.03[a], at 11-20 (2009) ("Acquiescence involves assent during the progress of a transaction, while ratification suggests assent after the fact.").

[110] *Frank*, 32 A.2d at 283; *see also Papaioanu v. Comm'rs of Rehoboth*, 186 A.2d 745, 749-50 (Del. Ch. 1962).

as well as expressed by words" but is always a "voluntary and positive act."[111] Accepting

the benefits of a transaction can be an indication of that assent.[112]

### 1. Genger Has Not Met His Burden Of Proof As To His Ratification Claim

Realizing that he had a very weak argument that he gave effective notice of the

2004 Transfers to the Trump Group, Genger spent most of his briefing attempting to

argue that the Trump Group ratified the 2004 Transfers.  Because of his prior acts of

spoliation, Genger bears the burden to prove ratification by clear and convincing

evidence.  He has not done so.

Genger argues that the Trump Group ratified the 2004 Transfers on two occasions:

(1) when it accepted shareholder approval of the Funding Agreement at the June 25

Board Meeting; and (2) when it purchased the Sagi Shares on August 22, 2008.[113]  As to

---

[111] *Frank*, 32 A.2d at 283; *see also* WOLFE & PITTENGER, § 11.03[a] at 11-19 to 11-20 (stating that ratification requires proof of a relinquishment of existing, known rights, and the "acceptance of new replacement rights or benefits").

[112] *See Kahn v. Household Acquisition Corp.*, 591 A.2d 166, 177 (Del. 1991) (stating that accepting the benefits of a transaction, even though the conduct in question is a breach of some duty owed to the shareholder, may bar the shareholder from obtaining equitable relief); *Frank*, 32 A.2d at 282 (finding that a shareholder "could not accept the benefit offered by the [transaction] and at the same time deny its validity"); *Giammalvo v. Sunshine Mining Co.*, 1994 WL 30547, at *10 (Del. Ch. Jan. 31, 1994), *aff'd*, 651 A.2d 787 (Del. 1994) ("The equitable defenses of ratification and acquiescence are closely related.  Under the proper circumstances, both doctrine prevent one who accepts the benefits of a transaction from thereafter attacking it."); *Dannley v. Murray*, 1980 WL 268061, at *4 (Del. Ch. July 3, 1980) ("The 'affirmance' required to create ratification . . . may arise by the retention of benefits with knowledge of the unauthorized acts.") (citations omitted); *Trounstine v. Remington Rand*, 194 A. 95, 99 (Del. Ch. 1937) ("[E]quity will not hear a complainant stultify himself by complaining against acts in which he participated or of which he has demonstrated his approval by sharing in their benefits.").

[113] Later in the briefing process, Genger recast his argument about the 2005 Written Consents and the minutes of the November 2007 Board Meeting in ratification terms.  That is, Genger argued that the 2005 Written Consents and the minutes of the November 2007 Board Meeting indicate that the Trump Group ratified the 2004 Transfers.  The argument fares no better presented within a ratification analysis.  As explained above, I find this argument unconvincing

the June 25 Board Meeting, Genger's theory is that the Trump Group accepted Genger's

vote on behalf of the Sagi and Orly Trusts at the June 25 Board Meeting when the Trans-

Resources stockholders approved the Funding Agreement. Genger argues that the Trump

Group benefited when Genger purportedly voted the Proxies at the June 25 Board

Meeting because approval of the Funding Agreement was a step towards giving them

control of the company. As to the second theory, Genger argues that the Trump Group

acknowledged the Sagi Trust as the transferee of the Sagi Shares, and benefited from

purchasing the Sagi Shares because buying directly from Sagi Genger allowed the Trump

Group to avoid the uncertainty and cost of enforcing their rights under Section 3.2 of the

Stockholders Agreement.

Genger's ratification argument fails for two primary reasons. First, Genger's

argument that the Trump Group ratified the 2004 Transfers is belied by the fact that the

Trump Group repeatedly stated that the Transfers were made in violation of the

Stockholders Agreement. Eddie Trump and Hirsch made that point at the June 13

Meeting.[114]  The fact that the Transfers were made in violation of the Agreement was

---

because, although representatives of the Trump Group received the 2005 Written Consent and
signed its signature pages, and approved the minutes of the November 2007 Board Meeting,
neither document involved the communication of a material amount of information about the
2004 Transfers to properly notify the Trump Group of the Transfers. Before a party can ratify
something, it must first have "sufficient notice or means of knowledge" of the transaction or act
in question. *Papaioanu*, 186 A.2d at 749-50. The 2005 Written Consent and the 2007 Board
Minutes made, at best, an oblique suggestion that some event might have changed the
shareholdings of Trans-Resources' stock. But neither the 2005 Written Consent nor the minutes
of the November 2007 Board Meeting indicate any particular information about the 2004
Transfers, and neither event even occurred in a context where the Trump Group would have been
alerted that something like the Transfers may have taken place. Therefore, Genger's ratification
argument based on those pieces of evidence fails.
[114] *See supra* page 16.

repeated at the June 25 Board Meeting.[115] The letter the Trump Group sent to Trans-Resources on August 8, 2008, whereby it expressed its intention to exercise its rights to buy the 2004 Transfer shares, indicated that the 2004 Transfers were made in violation of the Stockholders Agreement.[116] And, the Trump Group's complaint in this matter claimed that the 2004 Transfers violated the Stockholders Agreement.[117] Thus, the clear and consistent message from the Trump Group to Genger at all relevant times was that the Stockholders Agreement had been violated. At no point did the Trump Group tell Genger that it accepted the 2004 Transfers.

Second, Genger has also failed to show that the Trump Group benefited in any way that suggests ratification. That is, Genger's argument that the Trump Group ratified the 2004 Transfers at the June 25 Board Meeting must be rejected because Genger reneged on the Funding Agreement. Because the Agreement was never executed, the Trump Group never received the benefit that was the condition upon which it might actually not challenge the 2004 Transfers. Without the Trump Group having received the benefit that was to be given for relinquishing its claim that the 2004 Transfers were void, there is no basis to conclude that the Trump Group assented to the 2004 Transfers by accepting Genger's vote on behalf of the Sagi and Orly Trust in favor of the Funding Agreement.[118]

---

[115] *See supra* page 19.

[116] *See supra* page 22.

[117] *See* Compl. ¶ 8.

[118] Genger argues that it was enough that the Trump Group "accepted for themselves as shareholders the pecuniary benefits" of the Funding Agreement, even though they never actually received those benefits because that deal was never consummated. Genger's Post-Trial Op. Br.

Indeed, the Funding Agreement proves the point. The Trump Group was willing to consider a resolution of the violation of the Stockholders Agreement that remedied that violation by giving them voting control of Trans-Resources. In so doing, they were willing to accept some risk, based on Arie Genger's assurances that he did not face a problem from Sagi Genger if he voted the disputed shares. If that was so, and if the Trump Group was able to reach an accord that gave them voting control, all the parties affected by the 2004 Transfers would have been on board. But the lynchpin of the deal was the Genger would rectify the violation of the Stockholders Agreement by ensuring that the Trump Group had voting control. He then reneged on his assurances that the Transfers were a problem by claiming that Funding Agreement could not be

---

21. In other words, according to Genger's theory, not only is receiving a benefit an indication of ratification, but a step taken during a negotiation to receive a benefit is also. Tellingly, Genger cites no case law supporting his position.

I reject this argument for the following reason: acceptance of the benefit of a voidable transaction is an *alternative* basis upon which to ground a conclusion that a party ratified the transaction. It is a suitable alternative to an express affirmation of the transaction because acceptance of a benefit is a relatively concrete factual occurrence that inspires confidence in a conclusion that, even though the ratifying party did not expressly enunciate her assent to the voidable transaction, she has nonetheless done some "voluntary and positive act" to indicate that assent. *Frank*, 32 A.2d at 283. Negotiations relating to a potential benefit arising from a contractual breach are a less sure foundation upon which to base a finding of a ratification because, as sophisticated commercial parties know, discussions often range across a number of different options, many of which never come to pass. In other words, negotiations about the potential benefit arising from a voidable transaction are unreliable. For that reason they cannot reasonably be considered to induce the other party's reliance, and therefore there is no basis to conclude that the party who suffered the breach is estopped from enforcing the contract. *See Romer v. Porcelain Products, Inc.*, 2 A.2d 75, 76 (Del. Ch. July 28, 1938) (finding that a complaining stockholder was barred by "the estoppel of his acquiescence"); *see generally Frank*, 32 A.2d at 283 ("The defenses of laches, acquiescence, ratification and estoppel all have some element in common."). That is, until the ratifying party actually takes the benefit, there is no basis for the estoppel. For that additional reason, I reject Genger's claim that the Trump Group ratified the 2004 Transfers at the June 25 Board Meeting.

36

accomplished because Sagi Genger might challenge the substantive fairness of the required stock issuance to the Trump Group.

Of course, the Trump Group received a benefit when it purchased the Sagi Shares from the Sagi Trust and TPR, but that benefit is not an indication of the Trump Group's ratification of the 2004 Transfers. Rather it is consideration of a settlement that resolved the very problem Genger had created. In other words, Genger's argument confuses the benefits that come from compromising claims away in return for a settlement with taking a benefit from a voidable transaction that indicates ratification. A benefit that indicates ratification is one where the ratifying party would be getting something for nothing if she were allowed to enforce the contract.[119] Here, the Trump Group was not attempting to take advantage of the 2004 Transfers in a way that would have allowed it to obtain more than it was entitled to under the Stockholders Agreement.

By entering into the Purchase Agreement, the Trump Group dealt with the problem that Genger's misconduct had caused it. Genger had just reneged on the compromise Funding Agreement that would have rectified his wrongful behavior, in large measure by claiming that Sagi Genger, as an arguably innocent purchaser for value, would cause trouble and upset any deal. The Trumps reasonably suspected that Genger's resistance was also inspired by his desire to retain control. To address this problem, the Trump Group dealt with both the wrongful transferor, TPR, and the purported transferee, the Sagi Trust, so that it could cover all its bases. In doing so, the Trump Group never

---

[119] *See, e.g., id.* at 278-83 (finding that a stockholder who had benefitted for years from a recapitalization plan "could not accept the benefit offered by the plan and at the same time deny its validity").

accepted the legitimacy of the 2004 Transfers; indeed, its consistent position was that the Transfers were void.[120] But by binding both TPR and the Sagi Trust, it could resolve the issue of ownership and control over the bloc definitively. That is, under the deal with TPR and the Sagi Trust, the Trump Group extinguished any claims it had against either TPR or the Sagi Trust as to the Sagi Shares in return for a majority stake in the company.[121] Thus, the Trump Group was only attempting to recapture from TPR what it was owed under the Stockholders Agreement: control over Trans-Resources. Indeed, the Trump Group was giving up its right to purchase the shares from TPR at 2004 prices, which likely would have allowed the Trump Group to obtain the Shares for much less than the approximately $26 million it paid to purchase the Sagi Shares.

The only difference between enforcing its rights under Section 3.2 of the Stockholders Agreement against TPR and acquiring control directly through the purchase of the Sagi Shares was speed. That is, negotiating directly with both TPR and the Sagi Trust had the advantage of providing a quick and certain resolution to the problem, while enforcing Section 3.2 would likely have involved lengthy litigation. Of course, a speedy solution has value, but that value is the benefit of any settlement, and is one of the primary reasons parties settle their disputes. Undermining that incentive cuts against the public's well-established interest in promoting settlement.[122] At all times, the Trump

---

[120] *See supra* pages 16-25.

[121] *See supra* pages 22-24.

[122] *See Marie Raymond Revocable Trust v. MAT Five LLC*, 980 A.2d 388, 402 (Del. Ch. 2008) ("It is well established that Delaware law favors the voluntary settlement of contested issues. Settlements are encouraged because they promote judicial economy and because the litigants are generally in the best position to evaluate the strengths and weaknesses of their case." (internal

Group took the position that the 2004 Transfers were void, and mentioned that position to Genger and in litigation. All the Trump did by entering into the Purchase Agreement was ensure that, if the Trump Group were proven wrong in litigation about the 2004 Transfers, it had acquired whatever interests Sagi Genger held and, therefore, he was not a further obstacle. By making a deal directly with the wrongdoer whose shares it was entitled to receive under the Stockholders Agreement, the Trump Group settled TPR's violation of that Agreement by accepting the shares on the terms negotiated, rather than under the price setting process of Section 3.2. In this regard, it is also important to note that the Trump Group was entitled to control of Trans-Resources *as of 2004*, when Genger breached the Stockholders Agreement. Genger's secret transfers had deprived the Trump Group of the benefits of the Stockholders Agreement for four years, and it comes with little grace for Genger now to argue that the Trump Group had to wait even longer or else it would relinquish its rights to those benefits.

Finally, I note that finding that the Trump Group did not ratify the 2004 Transfers leads to, in my view, an equitable result, despite Genger's protestations to the contrary. The problem Genger created by his serious, secretive contractual breach — the insertion of Genger's dysfunctional family into the management of Trans-Resources — was precisely what the Stockholders Agreement was designed to avoid.[123] The Trump Group could only rectify that problem outside of litigation by negotiating with TPR and the Sagi Trust because, by effecting the Transfers, Genger made it impossible to deal with TPR

---

citations omitted)), *aff'd sub nom. Whitson v. Marie Raymond Revocable Trust*, 976 A.2d 172 (Del. 2009).

[123] *See supra* pages 5-8.

alone. Genger's argument that the Trump Group ratified the 2004 Transfers because it dealt with Sagi Genger rather than telling him that the Transfers were void is particularly cynical because Genger himself insisted that the Trump Group not challenge the Sagi Trust's ownership of its Trans-Resources shares.[124] Genger was the source of all of these problems, and to find that the Trump Group ratified Genger's behavior would only reward him for his own perfidy.[125] In that regard, Genger's argument that a finding that the Trump Group did not ratify the 2004 Transfers would work an inequity because it would require the unwinding of his divorce settlement is baseless. Genger only has himself to blame for whatever mess his decision to make the 2004 Transfers has caused for his divorce settlement. If Arie Genger's violation of the Stockholders Agreement has deepened the Genger family's internecine feud, that is unfortunate. But it is not the Trump Group's problem, nor is it a basis for an appeal to this court's sense of equity.

2. The Trump Group Holds A Majority Of Trans-Resources' Stock But Is Not Entitled To The Shares Transferred To Arie Genger Personally Or To The Orly Trust

That the purchase of the Sagi Shares was a bargain with TPR and the Sagi Trust that resolved Genger's violation of the Stockholders Agreement also has ramifications for the Trump Group's claims, which include a theory that it has a right to purchase all of the shares TPR transferred in the 2004 Transfers — including the shares transferred to Arie Genger personally and the Orly Trust — under the terms of the Stockholders Agreement. In the Purchase Agreement whereby the Trump Group bought the Sagi Shares, the parties

---

[124] *See supra* page 20.

[125] *See* 3 FARNSWORTH ON CONTRACTS § 12.20 (3d ed. 2004) ("A person is not permitted to profit by his own wrong at the expense of another.").

included a provision that ensured that, if the 2004 Transfers were found to be improper,

the Agreement would be deemed to have been consummated with TPR, not the Sagi

Trust.[126]  Thus, the Purchase Agreement was a broad settlement that gave the Trump

Group the assurance that it had all its bases covered in regard to the Sagi Shares, and that

it would retain control over Trans-Resources.  The Purchase Agreement also provided in

relation to the shares transferred to Arie Genger personally and the Orly Trust that:

> If at any time following the Closing Date, it is determined that Arie Genger
> is not the record and beneficial owner of the 794.40 shares of Common
> Stock of the Company purportedly transferred to him by TPR in October,
> 2004 and/or that the Orly Genger 1993 Trust is not the record and
> beneficial owner of the 1,102.80 shares of Common Stock of the Company
> purportedly transferred to such Trust by TPR in October, 2004, and that
> TPR is determined to be the record or beneficial owner of any such shares,
> in either or both cases by virtue of the transfer of such shares being deemed
> to have been void or for any other reason (the shares being so affected
> being referred to herein as the "Affected Shares") *then TPR shall promptly
> transfer 64% of the Balance Shares* (as such term is defined in the
> Stockholders Agreement dated March 30, 2001, among TPR, TR Investors,
> Glenclova and the Company (the "Stockholders Agreement")) to TR
> Investors and Glenclova in accordance with the terms of Section 1.6 of the
> Stockholders Agreement whether or not such agreement is then still in
> effect.[127]

Thus, the Purchase Agreement provided that, if the transfer of TPR shares to Arie Genger

and the Orly Trust was found to be improper, then 64% of the Balance Shares[128] would

be transferred from TPR to the Trump Group.

Although the 2004 Transfers violated the terms of the Stockholders Agreement,

which in Section 3.2 provides that the Trump Group can purchase all of TPR's shares, the

---

[126] *See supra* pages 23-24.

[127] Purchase Agreement § 11 (emphasis added).

[128] *See supra* page 10.

Trump Group cannot purchase the shares transferred to Arie Genger or the Orly Trust

because the Trump Group must abide by the settlement terms to which it agreed in the

Purchase Agreement. Because the 2004 Transfers violated the Stockholders Agreement,

Arie Genger and the Orly Trust have been found to not be the record or beneficial owners

of the shares transferred to them. Per Section 11 of the Purchase Agreement, that entitles

the Trump Group to 64% of the Balance Shares, and nothing more beyond the Sagi

Shares that it has already bought. As to the Transfer from TPR to Arie Genger himself,

the major problem was the lack of notice. Under the Stockholders Agreement, Genger

could receive shares from TPR so long as he: (1) gave proper notice to the Trump Group

entities; and (2) signed on to the Stockholders Agreement.[129] He did neither and, as a

result, cannot exercise any rights under the Stockholders Agreement. Although the

Trump Group believes that Genger's violation should require him to transfer all of his

Trans-Resources shares to the Trump Group, that remedy is disproportionate. That sort

of relief is unnecessary to this control dispute and therefore this § 225 action.

Nevertheless, Trans-Resources appears entitled, in any event, to deny Genger the right to

vote his shares until he gives formal notice and signs on to the Stockholders Agreement.

As to the Orly Trust, it is not before the court, and the shares it was wrongly transferred

are also not necessary for the Trump Group to exercise control. Therefore, I do not issue

any ruling as to those shares, because that is unnecessary in this § 225 action.[130]

---

[129] Stockholders Agreement § 2.1.

[130] *See Arbitrium (Cayman Islands) Handels AG v. Johnston*, 1997 WL 589030, at *3 (Del. Ch. Sept. 17, 1997) (discussing that a § 225 proceeding should generally only resolve issues affecting

Obviously, my finding that the shares were wrongly transferred creates problems for Arie Genger, but that exposure is a result of his own secretive contract breach.

D.  The Trump Group Did Not Take The Sagi Shares Subject To The Proxy

Even if the Trump Group ratified the 2004 Transfers — which it did not — it would still have voting control over Trans-Resources because it did not take the Sagi Shares subject to the Proxy.  That conclusion is required for two reasons.

First, the language of the Proxy itself does not plainly indicate that the Proxy was to run with the Shares if they are sold.  The explicit terms of the Proxy establish that it only applies so long as the Sagi Trust owns the Shares.  For example, the Proxy states that the Sagi Trust appoints Genger "to vote as *its* proxy, all shares of common stock of TRI which are not or hereafter *owned by the Trust*."[131]  Also, it permits Genger to vote only "in the same manner and to the same extent as *the Trust* might, were *the Trust* present at said meeting."[132]  In this regard, the Proxy is different, for example, from the proxy at issue in *Haft v. Dart Group. Corp.*, which gave the proxy holder the "right to exercise all rights to vote *the Shares* on all matter on which *they* are entitled to vote."[133]  Here, the Proxy does not give Genger the right to vote on all matters in which the Sagi Shares are entitled to vote; rather, the Proxy gives Genger the right to vote on all matters in which the Sagi *Trust* is entitled to vote, suggesting that the Proxy does not extend to subsequent owners of the Shares.

---

voting control of the corporation); *Bossier v. Connell*, 1986 WL 11534, at *2 (Del. Ch. Oct. 7, 1986) (same).

[131] Proxy at 1 (emphasis added).

[132] *Id.* (emphasis added).

[133] 1997 WL 154049, at *2 n.5 (Del. Ch. Mar. 14, 1997) (emphasis added).

Most importantly, the Proxy does not provide in any way for the reservation of voting powers to Genger after such a sale. The only language Genger points to as evidence that the Proxy is meant to run with the Sagi Shares is the phrase that the Proxy "shall continue for the duration of Arie Genger's life."[134] But, in the context of the entire document, that language only means that the Sagi Trust would be bound by the Proxy until Genger died, not that the Proxy would continue to bind later owners if the Shares were transferred. If Genger wanted to keep the Proxy after a transfer, he could have easily inserted clear language — such as "this Proxy shall bind any subsequent transferees" — into the Proxy to that effect. He did not, and thus there is no reason found in the text of the Proxy to indicate that it is binding upon the Trump Group.

Even if the language of the Proxy was ambiguous — which it is not — public policy concerns require that the Proxy be strictly construed. Historically, proxies have been interpreted narrowly and when there is an ambiguity, read as not restricting the right to vote the shares.[135] Recent market developments have only reinforced the utility of the presumption that irrevocable proxies should be narrowly construed. Separating voting control from stock ownership — which can result in "empty voting," where an investor votes stock without having an accompanying economic interest — raises important

---

[134] Proxy at 1.

[135] *See Eliason v. Englehart*, 733 A.2d 944 (Del. 1999) (finding a proxy to be revocable where the words expressly stating that it was an "Irrevocable Proxy" were only found in the authentication to the document, not in the language of the proxy itself); *Freeman v. Fabiniak*, 1985 WL 11583 (Del. Ch. Aug. 15, 1985) (narrowly interpreting the grant of authority made in a proxy instrument and holding that the instrument, which conveyed the right to vote at shareholder meetings, did not authorize other action by consent); *State ex rel. McKaig v. Bd. of Directors of H.F. Dangberg Land & Live Stock Co.*, 110 P.2d 212, 214 (Nev. 1941) ("The instrument granting the vote by proxy will be strictly construed.").

public policy concerns.[136] For example, the decoupling of shareholder voting rights and economic interest, which is increasingly common and only loosely regulated by the securities laws,[137] is of concern because empty voting can theoretically allow investors with voting power but with an economic interest adverse to the firm to vote in ways that reduce the company's share price.[138]

Our Supreme Court's recent decision in *Crown EMAK Partners, LLC v. Kurz* underscores the importance of those public policy concerns.[139] There, the Supreme Court affirmed this court's decision that third-party vote buying merits judicial review when it disenfranchises shareholders by affecting the outcome of a vote, and confirmed this court's conclusion that the voting arrangement at issue was proper.[140] Its reason for so concluding is important: "[w]e hold that the Court of Chancery correctly concluded that there was no improper vote buying, *because the economic interests and the voting interests of the shares remained aligned* since both sets of interests were transferred from Boutros to Kurz by the Purchase Agreement."[141] In other instances, the temptations for self-dealing that arise when persons with a relatively small economic interest in a

---

[136] *See* Henry T.C. Hu & Bernard Black, *Empty Voting and Hidden (Morphable) Ownership: Taxonomy, Implications, and Reforms,* 61 BUS. LAW. 1011, 1014 (2006) ("*Empty Voting*"); *see also* Shaun Martin & Frank Partnoy, *Encumbered Shares,* 2005 U. ILL. L. REV. 775.

[137] *See* Henry T.C. Hu & Bernard Black, *Equity and Debt Decoupling and Empty Voting II: Importance and Extensions,* 156 U. PA. L. REV. 625 (2008)

[138] *See Empty Voting* at 1014.

[139] 992 A.2d 377, 388 (Del. 2010) ("For many years, Delaware decisions have expressed consistent concerns about transactions that create a misalignment between the voting interest and the economic interest of shares.") (citations omitted).

[140] *Id.* at 388-90.

[141] *Id.* at 390 (emphasis added).

45

corporation has voting control have resulted in serious harm to the corporation and its

other investors.[142]

In light of those concerns, a proxy purporting to irrevocably decouple voting rights

from economic interest should be strictly construed.  Because there is no such clear intent

manifested in the Proxy here, prudent public policy requires the conclusion that the Proxy

does not survive the sale of the Sagi Shares to the Trump Group.

Second, the Proxy is not irrevocable because it does not satisfy § 609 of the New

York Business Corporation Law, which I conclude governs the Letter Agreement and the

Proxy attached thereto in view of the lack of any policy conflict between it and the

DGCL.[143]  Section 609 provides that:

> A proxy which is entitled "irrevocable proxy" and which states that it is
> irrevocable, is irrevocable when it is held by any of the following or a
> nominee of any of the following: (1) A pledgee; (2) A person who has
> purchased or agreed to purchase the shares; (3) A creditor or creditors of
> the corporation who extend or continue credit to the corporation in
> consideration of the proxy if the proxy states that it was given in

---

[142] *See, e.g., Hollinger Intern., Inc. v. Black*, 844 A.2d 1022 (Del. Ch. 2004).

[143] Letter Agreement at 2 ("This Letter Agreement shall be governed by the laws of the State of New York without regard to conflicts of law principles.").  Given Delaware's respect for contractual freedom, *see Abry Partners V, L.P. v. H&W Acquisition LLC*, 891 A.2d 1032, 1061 (Del. Ch. 2006) (noting that "there is also a strong American tradition of freedom of contract, and that tradition is especially strong in our State" and citing authorities), it respects choice of law agreements. *See J.S. Alberici Const. Co., Inc. v. Mid-W. Conveyor Co., Inc.*, 750 A.2d 518, 520 (Del. 2000) ("Delaware courts will generally honor a contractually-designated choice of law provision so long as the jurisdiction selected bears some material relationship to the transaction.").  Although our law relating to the voting of corporate shares is of paramount interest to Delaware, there is no offense to Delaware of allowing parties to subject agreements about irrevocable proxies to a law that places different strictures on such proxies than does Delaware law, absent some reason that those strictures offend a fundamental protection by the DGCL.  Section 609 of the N.Y. Bus. Corp. Law does not conflict with any fundamental Delaware corporate law policies or doctrines.  Therefore, I find no reason to apply Delaware law in a situation where the parties have made a clear choice of law in favor of a sister state.

consideration of such extension or continuation of credit, the amount thereof, and the name of the person extending or continuing credit; (4) A person who has contracted to perform services as an officer of the corporation, if a proxy is required by the contract of employment, if the proxy states that it was given in consideration of such contract of employment, the name of the employee and the period of employment contracted for; (5) A person designated by or under paragraph (a) of section 620.[144]

Genger obviously does not qualify under sub-sections (1), (2), (3), or (4) — that is, he is

not a pledgee, creditor, contract officer, or purchaser of the Shares sold to the Sagi Trust.

And, he does not qualify under sub-section (5), because § 620 of the New York Business

Corporation Law applies to an agreement "between two or more shareholders," and

neither Genger nor the Sagi Trust were shareholders of Trans-Resources when the Letter

Agreement and the Proxy were executed.[145]  Thus, the Proxy is not irrevocable under

New York Law, and was revoked by the sale of the Sagi Shares to the Trump Group.[146]

### IV. Conclusion

Genger violated the Stockholders Agreement when he made the 2004 Transfers,

and the Trump Group did not ratify those Transfers after the fact.  Furthermore, the

---

[144] *N.Y. Bus. Corp. Law* § 609; *cf.* 8 *Del. C.* § 212(e) (providing that a duly executed proxy will be deemed irrevocable where it: (1) states that it is irrevocable; and (2) is coupled with an interest sufficient in law to support an irrevocable power, regardless of whether the interest is in the stock itself or the corporation generally).

[145] *N.Y. Bus. Corp. Law* § 620.

[146] *See Tompers v. Bank of Am.*, 217 N.Y.S. 67, 75 (N.Y. App. Div. 1926) (holding that a revocable proxy terminated "through sale of . . . stock").  Even if the Proxy were irrevocable, Genger would still be bound to vote his shares for a majority of the Trump Group's directors because the Stockholders Agreement provides that "the group owning the greater number of shares as between the TPR Stockholders and the Non-TPR Stockholders shall designate four directors."  Stockholders Agreement § 1.2.  That is, Genger would have to vote the Proxy for the Trump Group's directors, because the Trump Group is indisputably the owner of a majority of Trans-Resources' shares.  Economic ownership trumps, so to speak, any interest Genger has as an owner of the Proxy.

47

Trump Group did not take the Sagi Shares subject to the irrevocable Proxy. Therefore, the Trump Group retains the Sagi Shares,[147] is entitled to 64% of the Balance Shares, and can vote all of the Trans-Resources shares it holds as it wishes. The parties shall submit an implementing order by Wednesday, July 28, 2010.

---

[147] Genger's claim that he is entitled to purchase the Sagi Shares under § 3.2 of the Stockholders Agreement because the Trump Group pledged (a disputed amount of) those Shares to a party from which they obtained purchase financing fails because Genger never signed on to the Stockholders Agreement. Tr. 950 (A. Genger). Until he accepts the burdens of that contract, Genger cannot expect to enjoy its benefits. *See, e.g., Red Clay Educ. Ass'n v. Bd. of Educ. of Red Clay Consol. School Dist.*, 1992 WL 14965, at *10 (Del. Ch. Jan. 16, 1992) (holding that plaintiff could not "accept the benefits of a contract without also bearing the corresponding burdens"). Furthermore, Genger cannot now claim entitlements under a contract that he intentionally flaunted. *See PAMI-LEMB I Inc. v. EMB-NHC, L.L.C.*, 857 A.2d 998, 1014-15 (Del. Ch. 2004) (holding that a party that repudiates or breaches a contract cannot then claim the benefits of that contract).

48

JAN 02 2009

SURROGATE'S COURT : NEW YORK COUNTY
---------------------------------------- X
In the Matter of the Trust Established
on December 13, 1993, by ARIE GENGER          File No. 0017/2008
for the Benefit of ORLY GENGER.
---------------------------------------- X

ROTH, S.

        This is a contested application by the primary beneficiary

(Orly Genger) of an irrevocable inter vivos trust established by

her father, Arie Genger, seeking the appointment of a successor

trustee or, alternatively, the appointment of a "special trustee"

to investigate alleged wrongdoing concerning the trust.

Petitioner's mother, Dalia Genger (grantor's former wife),

contends that she is the duly appointed successor trustee and

that there is no basis to appoint another fiduciary for any

purpose.

        The trust agreement, dated December 13, 1993, provides for

discretionary income and principal distributions to Orly for life

with remainder to her descendants or, if none, to the grantor's

descendants in trust.

        Article SEVENTH (B), (D), (E), and (G) of the trust

instrument sets forth the following procedure for the resignation

of trustees and the appointment of their successors.

        A trustee may resign by delivering a signed and acknowledged

instrument of resignation in person or by certified or registered

mail to the other trustee and to either the grantor or the income

beneficiary.  Such resignation is effective upon the receipt of

the acknowledged instrument by the other trustee (if there is

one) and the grantor or the income beneficiary or at such later
date as may be specified in the instrument.

A trustee may appoint his or her successor by delivering a
signed and acknowledged instrument in the same manner as
described above for resignation. Any such appointment, however,
is valid only if the appointee qualifies by delivering a signed
and acknowledged instrument of acceptance in person or by
certified or registered mail to each trustee and the grantor or
the income beneficiary within 30 days after the later of 1) the
date on which a copy of the appointment instrument is delivered
to him or her, and 2) the effective date of the appointment as
set forth in the appointment instrument. It is observed that
there is no provision that requires a resigning trustee to
appoint a successor or that there always be two trustees in
office.

The original two trustees served until October 2004, when
they resigned and appointed David Parnes and Eric Gribitz as
their successors. On February 12, 2007, Mr. Gribitz resigned
without appointing a successor. On April 26, 2007, Mr. Parnes
resigned and appointed as his successor Leah Fang in a signed and
acknowledged instrument. Although Ms. Fang noted her acceptance
at the bottom of such instrument, her signature was not
acknowledged. However, in another document entitled "Release"
executed and acknowledged by Ms. Fang the same day, she, as

2

trustee, purported to discharge Mr. Parnes from liability.  It is undisputed that thereafter Ms. Fang acted as trustee.  Indeed, Ms. Fang's contention that she received a number of requests for information from petitioner and that petitioner referred to her in writing and orally as trustee is not disputed by petitioner.

On December 12, 2007, Ms. Fang, without resigning in accordance with the trust agreement, attempted to appoint Patricia Enriquez, as successor trustee.  Her designation of Ms. Enriquez, however, was by an unacknowledged letter in which she referred to her own resignation as taking effect upon Ms. Enriquez's acceptance of the appointment.  Ms. Enriquez accepted by signing the letter, but such acceptance was not acknowledged and, in any event, there is nothing in the record to suggest that such "acceptance" was delivered in accordance with the trust instrument.  Two weeks later, an attorney for Ms. Enriquez notified petitioner's counsel by email that her client had advised that she had no intention to overcome the procedural omissions.

On January 3, 2008, Ms. Fang and Dalia Genger signed before a notary a memorandum in which Ms. Fang stated that "to the extent that I am still vested with any powers to appoint trustees of the [trust], I confirm your appointment."  The next day, Ms. Fang executed an acknowledged instrument of resignation and appointment of successor trustee naming Dalia as her successor

3

and Dalia, on the same day, executed an acknowledged instrument of acceptance. It is undisputed that such documents were delivered in accordance with the trust requirements.

We address first that portion of the instant application which seeks the appointment of a successor trustee on the ground that Dalia was not validly appointed. In such connection, petitioner argues first that, because Ms. Fang's signature on the bottom of Mr. Parnes's appointment instrument was not acknowledged, she never accepted the position in accordance with the trust agreement (and thus could not appoint Dalia her successor). However, such argument ignores the "Release" mentioned above that Ms. Fang executed the same day. Such instrument, which was signed and duly acknowledged, unequivocally establishes Ms. Fang's acceptance of the position. Since petitioner does not challenge the authenticity of such instrument or Mr. Parnes' contention, supported by the record, that it was delivered in accordance with the trust instrument and, as noted above, petitioner thereafter communicated with Ms. Fang as trustee, Ms. Fang properly qualified as successor trustee.

Petitioner's second argument that, in any event, Ms. Fang's appointment of Dalia was ineffective because Ms. Fang had previously resigned as trustee is also without merit. Simply put, Ms. Fang had not previously resigned because her letter to Ms. Enriquez did not contain the formalities (i.e., an

acknowledgment) required by the trust agreement.  Moreover, although not a model of clarity, the letter makes clear that Ms. Fang did not intend to leave the trust without a trustee in the event that Ms. Enriquez failed to qualify, which is exactly what happened.  Thus, Ms. Fang had authority to appoint Dalia as her successor.

Since there is no dispute that the instrument of resignation and appointment executed by Ms. Fang on January 4, 2008, and Dalia's instrument of acceptance of the same date were executed and delivered in accordance with the trust agreement, Dalia is the duly appointed successor trustee of the trust.  To find otherwise would be to ignore the chronology of events and the purpose of the provisions at issue, namely to ensure that the trust always has a fiduciary ready, willing and able to act.  The fact that petitioner does not wish her mother to be the fiduciary because she considers her an adversary in a broader intra-family dispute does not provide a basis to ignore the grantor's intent, as reflected in the trust instrument, that an acting trustee, and not the beneficiary, decides who shall become a successor trustee.  Accordingly, petitioner's application to appoint a successor trustee is denied.

We next turn to petitioner's alternate request for relief, namely that a "special trustee" be appointed for the "purpose of investigation and taking discovery with respect to the wrongful

5

dealings concerning the assets and income of the trust."

It is noted initially that petitioner's only allegations of "wrongful dealings" concern a close corporation, TPR Investment Associates, Inc. She contends that her brother Sagi, who is an officer of TPR, and Dalia, who was a shareholder at the time this proceeding was commenced, are engaged in a "wrongful scheme" to divert assets to themselves and, as a result, Dalia "could not possibly" investigate wrongdoing at TPR, which the petition describes as the "greatest" asset of the trust.

However, the premise of the application, namely that the trust's interest in TPR would enable the trustee to investigate or seek relief from TPR, does not appear to be correct. Petitioner does not dispute Dalia's assertion, supported in the record, that the trust is not a shareholder of TPR at all. Rather, D&K LP, an entity in which the trust owns a 48 percent interest, in turn owns approximately 50 percent of TPR. Petitioner does not explain what appears to be a material misstatement concerning TPR's relationship to the trust. Nor does she identify how a trustee under such circumstances might be in a position to "investigate and address the TPR issues".

In any event, assuming arguendo that a trustee would somehow be able to investigate alleged misconduct at TPR, petitioner's vague and speculative allegations of "wrongful conduct" at TPR from which Dalia purportedly benefitted do not warrant the

6

appointment of a "special trustee". Similarly, petitioner's allegations (made upon information and belief) that Dalia had knowledge of alleged improper acts by former trustee, David Parnes, in relation to TPR are patently insufficient to warrant the remedy of a "special trustee". In such connection, it is noted that Mr. Parnes and Ms. Fang have been directed to account for their proceedings as trustees (<u>Matter of Genger</u>, NYLJ, Feb. 25, 2008, at 29, col 3), giving petitioner a forum to seek relief for most of the conduct about which she complains.

Finally, it is observed that petitioner has not alleged that Dalia has refused a request for information, which would warrant relief (SCPA 2102), or has failed as trustee to protect trust assets. Indeed, it appears that Dalia (who states that she is ready and able to act as fiduciary) has yet to assume the duties of trustee in deference to her daughter's position in this litigation. As a validly appointed trustee, she should be given the opportunity to do what she deems necessary to manage and protect the trust's assets.

Based upon the foregoing, the appointment of a "special trustee" is unwarranted at this time and, accordingly, the application is denied, without prejudice to renewal if future

circumstances warrant such relief.

This decision constitutes the order of the court.

_____
S U R R O G A T E

Dated: December 31, 2008

SUPREME COURT OF THE STATE OF NEW YORK

COUNTY OF NEW YORK : TRIAL TERM:  PART 12
- - - - - - - - -  - - - - - - - - - - - - - - - - X
ARIE GENGER and ORLY GENGER, in her
individual capacity and on behalf of
THE ORLY GENGER 1993 TRUST,

                         Plaintiffs,

                      - against -

SAGI GENGER, TPR INVESTMENT ASSOCIATES,
INC., DALIA GENGER, THE SAGI GENGER 1993
TRUST, ROCHELLE FANG, individually and
as trustee of THE SAGI GENGER 1993
TRUST, GLENCLOVA INVESTMENT COMPANY,
TR INVESTORS, LLC, NEW TR EQUITY I, LLC,
NEW TR EQUITY II, LLC, JULES TRUMP,
EDDIE TRUMP and MARK HIRSCH,

                         Defendants.
- - - - - - - - - - - - - - - - - - - - - - - - X

Index No. 651089/2010

                         October 26, 2011
                         60 Centre Street
                         New York, New York 10007

B E F O R E:   HON.   PAUL G. FEINMAN, Justice


A P P E A R A N C E S:

MITCHELL SILBERBERG & KNUPP, LLP
Attorneys for Arie Genger
12 East 49th Street
New York, New York 10017
BY:  LAUREN J. WACHTLER, ESQ.
     PAUL D. MONTCLARE, ESQ.

ZEICHNER ELLMAN & KRAUSE, LLP
Attorneys for Orly Genger
575 Lexington Avenue
New York, New York 10022
BY:  YOAV M. GRIVER, ESQ.

```
2   A P P E A R A N C E S:   (Cont'd)

3

4

5   PEDOWITZ & MEISTER, LLP
    Attorneys for Dalia Genger
6   1501 Broadway
    New York, New York 10036
7   BY:  ROBERT A. MEISTER, ESQ.
         MARISA H. WARREN, ESQ.
8

9

10

11                             Debra Salzman, RMR
                               Official Court Reporter
12

13

14

15

16

17

18

19

20

21

22

23

24

25

26
```

```
 1                      Proceedings
 2              A F T E R N O O N   S E S S I O N
 3              THE COURT:  Back so soon.
 4              MS. WACHTLER:  Apologize for that.
 5              THE COURT:  So what's happening?
 6              Dalia has gone to court.
 7              MR. GRIVER:  Dalia has gone to court, but not
 8     here; she's gone to court in Delaware.  And we are asking
 9     the Court to put in a temporary restraining order and to
10     enjoin Dalia from continuing to prosecute her duplicative
11     action.
12              In my papers I cite cases and it's is clear that
13     the Court has the equitable power to enjoin Dalia in order
14     to protect Orly, protect the court and preserve this
15     court's jurisdiction.  And so I think I'm going to spend a
16     little time talking to you about why the Court should
17     impose a TRO.
18              First, there's no question that the case that
19     Dalia started is duplicative.  It has the exact same legal
20     issue as what's before the Court in the 2010 matter, the
21     beneficial ownership of the TRI shares.  That's it.  If you
22     compare the first count of the third amended complaint
23     before your Honor and the first count of Dalia's case in
24     Delaware, they're the same.  They both make claims as to
25     who owns the beneficial ownership of the exact same shares.
26              More importantly, there's no reason that the case
```

1                            Proceedings

2    should be in Delaware.  Everything is in New York and this

3    is where this issue should be decided.  Dalia isn't a

4    resident of Delaware.  She lives in New York.  Orly lives

5    in New York.  The Orly Trust is a New York trust.

6              THE COURT:  There aren't too many places in

7    Delaware -- I shouldn't say this on the record -- there are

8    a couple of beautiful places in Delaware along the shore,

9    Bethany, I think, is the name of the town, and Rehoboth,

10   Delaware and some of the towns up along that coastline are

11   beautiful.  And other than the credit cards, you like to be

12   in Wilmington, there's not too many places to --

13             MS. WACHTLER:  You're not convincing me.

14             THE COURT:  The shoreline is beautiful.  But any

15   way, you're right, they don't live in Delaware.

16             MR. GRIVER:  They don't.  The Orly Trust, it

17   calls for the application of New York law.  TPR is located

18   in New York.  All the contracts at issue are located in New

19   York.  The stipulation and divorce decree is New York.  The

20   divorce is a New York divorce.  The marriage was a New York

21   marriage.  All the parties necessary for determination of

22   this issue are before this Court.

23             THE COURT:  If they had gone to a bet din in

24   Israel then maybe we wouldn't have had all these problems.

25             MR. GRIVER:  Maybe.  But Orly chose to be here.

26   All kidding aside, Orly chose to be here and she chose to

| 1 | Proceedings |
|---|---|

2    be here 15 months ago.  She asked this court to decide

3    this.  Dalia is in this court.  The Orly Genger Trust is in

4    this court.  There are parties that should be part of this

5    decision, a part of this adjudication that are not in

6    Delaware.  Orly, for example, is not part of that suit.

7    Arie is not part of that suit.

8              You know, I made a list of all of the reasons

9    that this case should be in New York and then I made a list

10   of why this case is now in Delaware and I came up with one,

11   and that's Chancellor Strine.  Delaware should be the last

12   place that the Orly Trust would want to be because

13   Chancellor Strine, as you know from the papers, or perhaps

14   you don't, already ruled on this issue and ruled against

15   the Orly Trust.

16             The Orly Trust actually has that as part of her

17   complaint in the action that she's brought.  She actually

18   talks about the fact that the court that she chooses to be

19   in front of has already ruled against her.  That's

20   paragraph 34 of her complaint.  And she's absolutely right,

21   because this court ruled in paragraph 8 of its final

22   judgment that TPR owned the trust, not -- that TPR owned

23   the TRI shares, not the Orly Trust.  And what this case is

24   designed to do, your Honor, is get this case in front of a

25   judge that has already decided this issue against the

26   trust.

| | |
|---|---|
| 1 | Proceedings |
| 2 | Now, granted, it should not have made that |
| 3 | decision.  It made that decision as part of an in rem |
| 4 | proceeding.  It had no right to make that decision.  The |
| 5 | Delaware Supreme Court reversed it and they reversed it |
| 6 | saying, look, you don't have, among other things, |
| 7 | jurisdiction over the Orly Trust. |
| 8 | So Dalia did that.  And just last night, your |
| 9 | Honor, the Trump Group filed an answer to a motion to |
| 10 | dismiss.  And on page 31 of their brief -- |
| 11 | THE COURT:  Motion to dismiss in Delaware. |
| 12 | MR. GRIVER:  Yes, the motion to dismiss the |
| 13 | Delaware action.  They tried to bring a plenary proceeding |
| 14 | and that's being opposed because -- |
| 15 | MR. MEISTER:  Excuse me.  That's not the Orly |
| 16 | action. |
| 17 | MR. GRIVER:  This is another case in Delaware. |
| 18 | THE COURT:  Okay. |
| 19 | MR. GRIVER:  That involves the Trump Group and |
| 20 | the attempt to sue TPR and Arie Genger over the Arie Genger |
| 21 | portion of the TRI shares. |
| 22 | THE COURT:  Okay. Arie Genger. |
| 23 | MR. GRIVER:  Yes.  And Arie Genger has moved to |
| 24 | dismiss saying, among other things, "You don't have |
| 25 | jurisdiction over me.  You don't have personal jurisdiction |
| 26 | over me." |

Debra Salzman, Official Court Reporter

```
 1                           Proceedings
 2                   But the Trump Group filed papers there and they
 3           said -- and this is on page 31.  I'll give a copy to you
 4           and your Honor, if you'd like -- they say the Orly Trust is
 5           now before this court.  And they drop a footnote and they
 6           say, "On October 4, 2011, Dalia Genger, as trustee, filed
 7           an action in this court on the Orly Trust behalf seeking a
 8           determination as to beneficial ownership and, accordingly,
 9           this court now has the power to make these decisions."
10                   This could not have been an accident.  This has
11           to have been the intent.  And, your Honor, the cases are
12           clear that in a situation like this, the first filed
13           authority, that is you, protects its authority and the
14           desire --
15                   THE COURT:  It's about time I won something,
16           right?
17                   MR. GRIVER:  And the desire of Orly Genger.
18                   And, finally, you have to ask yourself, why is
19           Dalia doing this?  And more importantly, is Dalia really
20           going to protect the Orly Trust?
21                   THE COURT:  Better going into it having the judge
22           on your side, right?  She knows that.
23                   MR. GRIVER:  I think the Court has to ask itself
24           who is more likely to protect the assets of the Orly Genger
25           Trust; is it Orly Genger, the beneficiary, or is it Dalia
26           Genger as trustee?
```

1                          Proceedings

2              And the Court knows because we've put it out

3      before you --

4              THE COURT:  Well, let me ask you.  I haven't

5      asked this before.  But if you are so convinced that Dalia

6      is set about ruining her daughter financially or helping

7      the brother ruin the daughter financially, why not go back

8      to the Surrogate's Court and renew your application to

9      remove her?

10             MR. GRIVER:  You know, we thought about that, but

11     there's differences between the two actions.  There's a

12     reason why there are two actions.  We are seeking to remove

13     Dalia.  What Dalia has done is going to be placed on top of

14     everything else she has done as a reason that she needs to

15     be removed.  But the issue of the beneficial ownership of

16     the shares is before this Court and the issue of the

17     beneficial ownership of the shares Dalia is now trying to

18     place in front of the Delaware court.

19             THE COURT:  I understand the issue.  I was just

20     wondering.

21             MR. GRIVER:  We will make this known to the

22     Surrogate Court.  The Surrogate Court is in the midst of

23     its application.  It is moving at its own speed.  What we

24     need is we need a TRO to protect --

25             MS. WACHTLER:  December.

26             MR. GRIVER:  -- there's been a motion to dismiss

| | |
|---|---|
| 1 | Proceedings |
| 2 | pending since, I believe, December 12th of 2010, with all |
| 3 | deliberate speed. |
| 4 | THE COURT:  The 60-day rule doesn't apply there. |
| 5 | MS. WACHTLER:  I don't think any rules apply in |
| 6 | the Surrogate's Court. |
| 7 | MR. GRIVER:  Mr. Meister practices there more |
| 8 | than I do. |
| 9 | THE COURT:  120 is on the outside. |
| 10 | MR. MONTCLARE:  That court is very overworked, |
| 11 | Judge, really, truthfully. |
| 12 | MR. GRIVER:  There are only two surrogates. |
| 13 | THE COURT:  They have a staff that I tell you is |
| 14 | unrivaled.  It is what it is.  Okay. |
| 15 | MR. GRIVER:  It is what it is. |
| 16 | THE COURT:  The bottom line is you have the |
| 17 | application pending.  I didn't remember that or maybe I |
| 18 | didn't know that and that's why I didn't remember that. |
| 19 | MR. GRIVER:  Right.  We do have an application |
| 20 | pending and we actually put in an affidavit from Judith |
| 21 | Seigel-Baum, who is Orly's lawyer in the surrogate |
| 22 | proceeding, to explain the difference between the two |
| 23 | actions and why this is the only court who can protect Orly |
| 24 | in this case.  She can't go to Delaware without placing |
| 25 | herself under the jurisdiction of that court, which she |
| 26 | does not want to do. |

Debra Salzman, Official Court Reporter

| | |
|---|---|
| 1 | Proceedings |

1                       Proceedings

2               THE COURT:  She doesn't want to do it for the

3      same reason they want to do it.  I understand that.

4               MR. GRIVER:  But she's faced with a Hobson's

5      choice.

6               THE COURT:  Who was it who said, you know, the

7      goal here is to get everything in one court with

8      jurisdiction.  Was that the Southern District who dropped

9      that footnote?

10              MR. GRIVER:  That was the Delaware Supreme Court

11     suggested New York.

12              THE COURT:  Right.

13              MR. GRIVER:  Justice Solomon a few weeks ago --

14              THE COURT:  I think they actually suggested the

15     Southern District.

16              MR. MONTCLARE:  Like a court in New York like the

17     Southern District.  And the reason for that, Judge, just so

18     you know, is that in the briefing that was brought up by

19     the other side that there's already a case in the Southern

20     District.

21              MR. GRIVER:  Right.  But all of the cases that I

22     cite stand for the proposition that a court has equitable

23     power to do this and must do this because it should not

24     permit another court proceeding to interfere with its

25     determination of issues that are already before it.

26              THE COURT:  The question is, whether it would

1          Proceedings

2    render any order that I might issue ineffectual.

3              So what say you?

4              MR. MEISTER:  Let me answer in similar aspects.

5              First, just to apprise the Court, this morning,

6    in the Delaware action, the Trump Group and TRI filed an

7    answer and counterclaim seeking a determination from that

8    court.  The Orly Trust does not beneficially own the

9    shares.  So issue is joined, addressed to the question of

10   the stay, which would prohibit Dalia from prosecuting the

11   Delaware action.  If that stay were granted, presumably she

12   wouldn't respond to the counterclaim.

13             So I think starting with a balance of harms --

14             THE COURT:  Well, wait a minute.

15             There's a stay in effect.  It's not like she's

16   going to lose her right to reply if and when such stay is

17   vacated.  I mean I'm not expert on Delaware civil

18   procedure, but I can't imagine a code that would --

19   Delaware is a great court of equity, the chancellor's

20   court, that's going to say you lose your right to reply to

21   a counterclaim because you were stayed.

22             MR. MEISTER:  I don't know, your Honor.  We just

23   found out about it literally this morning.

24             THE COURT:  That may not be your strongest

25   argument, that she's going to lose her right to respond to

26   the counterclaim because I find that hard to believe.

| | |
|---|---|
| 1 | Proceedings |
| 2 | MR. MEISTER:  Let me then answer on the |
| 3 | question -- |
| 4 | THE COURT:  If necessary, you could always |
| 5 | fashion a stay such that "but for her right to file her |
| 6 | reply to a counterclaim," you know. |
| 7 | MR. MEISTER:  Let me answer then on, if you will, |
| 8 | the points under the heading of probability of success of |
| 9 | this motion. |
| 10 | First, my colleague says that this action before |
| 11 | your Honor seeks the determination of the beneficial |
| 12 | ownership and cites the first count in the complaint.  The |
| 13 | first count -- I have it in front of me -- Orly is not a |
| 14 | party to.  It's a claim by Arie that seeks, in effect, to |
| 15 | undo the whole kit and caboodle from the divorce. |
| 16 | Arie and Orly are parties on the second count. |
| 17 | The second count, even more tellingly, doesn't seek to |
| 18 | recover the TRI shares for the Orly Trust any more than the |
| 19 | first does.  The second count seeks to recover the TRI |
| 20 | shares, if you will, for Arie.  They seek a constructive |
| 21 | trust against the Orly Trust in favor of Arie. |
| 22 | And what that seeks in those two counts is that |
| 23 | the TRI shares go back to TPR and that TPR shares go back |
| 24 | to Arie for his life.  In other words, this is an attempt |
| 25 | to renegotiate the seven-year-old divorce settlement |
| 26 | agreement. |

| 1 | Proceedings |

2        But what it isn't is, it isn't a claim seeking to

3   recover for the Orly Trust the TRI shares, as Orly in her

4   affidavit in support of the motion here says.  Those

5   issues, with much respect, are not before your Honor.  They

6   haven't been brought before your Honor.  In fact, the Orly

7   Trust is not before your Honor.

8        Dalia Genger is a defendant in the action in her

9   capacity as, if you will, former wife and party to the

10  separation stipulation and the attempt to undo seven years

11  of whatever, due to Arie's concealing the fact that there

12  was a consent needed from the Trumps.

13        I would add as further evidence of this that TRI,

14  the issuer of the shares in question, was not even added to

15  this action as a party until the supplemental summons was

16  filed on September 20th of this year.

17        Now, as to Orly Trust not being a party, I

18  emphasize that Dalia is a party in her individual capacity

19  and, respectfully, Orly, although she is a beneficiary, she

20  is not the sole beneficiary, as one of the affidavits says,

21  I think it's Ms. Seigel-Baum, who should know better

22  because my first motion to dismiss her complaint --

23  petitioner, I should say -- in the Surrogate Court, was the

24  failure to join the other beneficiary, which is a

25  contingent beneficiary coming into existence if she doesn't

26  have children during her life.

| | |
|---|---|
| 1 | Proceedings |
| 2 | But it's a basic question of trust law.  The |
| 3 | trustee has discretion to do things with the corpus of the |
| 4 | trust of which the attempts to get these shares declared |
| 5 | beneficially owned by the trust is quintessentially a right |
| 6 | of the trustee.  It's not the beneficiary. |
| 7 | The fact that the trust agreement says it's |
| 8 | governed by New York law is interesting but irrelevant.  It |
| 9 | doesn't affect who owns the shares.  The fact that the |
| 10 | beneficiary happens to live here and in fact the trustee |
| 11 | happens to live here is also irrelevant. |
| 12 | In essence -- oh, the last thing I should say is |
| 13 | to the degree that there are claims asserted in this action |
| 14 | before your Honor, all of the defendants have moved to |
| 15 | dismiss those claims.  And at the request of counsel for |
| 16 | Arie, the briefing on that was extended so that those |
| 17 | motions won't be fully briefed until December 9th. |
| 18 | Respectfully, I can't speak for the other ones. |
| 19 | We feel pretty confident about our motion to dismiss the |
| 20 | motion to, in effect, undo the divorce, which is what Dalia |
| 21 | is being sued for in this action. |
| 22 | Some of the moving affidavits, particularly |
| 23 | Ms. Seigel-Baum's, talks about the other action -- |
| 24 | THE COURT:  Why the rush in Delaware? |
| 25 | MR. MEISTER:  Why the rush? |
| 26 | THE COURT:  Yes. |

| | |
|---|---|
| 1 | Proceedings |
| 2 | MR. MEISTER:  I don't know -- |
| 3 | THE COURT:  Why not let this work its way through |
| 4 | and why, at the end of the day, if Delaware needs to rule, |
| 5 | let them. |
| 6 | MR. MEISTER:  Well, the end of what day, your |
| 7 | Honor?  The issues aren't before your Honor. |
| 8 | THE COURT:  The end of the case -- well, so say |
| 9 | you, not so say them. |
| 10 | MR. MEISTER:  Well, that's true.  They don't say |
| 11 | that but their pleading does.  Your Honor, respectfully, is |
| 12 | bound by the pleading, not by what my colleague across the |
| 13 | way suddenly says is before your Honor and is not before |
| 14 | your Honor.  It is before Judge Keenan in the Southern |
| 15 | District of New York where they have made an application |
| 16 | for permission to make a motion to dismiss or stay.  That |
| 17 | will be discussed with Judge Keenan November 3rd. |
| 18 | MR. MONTCLARE:  That's a motion to stay based on |
| 19 | abstention. |
| 20 | MR. MEISTER:  Among other grounds -- that's |
| 21 | solely?  Okay.  I haven't seen your motion yet. |
| 22 | MR. GRIVER:  It's abstention based on the fact |
| 23 | that this is a New York divorce proceeding and federal |
| 24 | courts generally give deference to a New York court. |
| 25 | MR. MONTCLARE:  And even under Colorado River |
| 26 | abstention, Judge, which is basically there's two exact set |

1        Proceedings

2    of motions filed in both courts on the same day with the

3    same return dates, you're going to have two courts -- and

4    they're very complicated motions -- it's just senseless to

5    proceed in two courts.

6            THE COURT:  What if the other judge is smarter

7    than I am, should I let him do it or her?

8            MR. MEISTER:  He's probably wondering the same

9    question in the obverse.

10           MR. MONTCLARE:  We're sitting with Judge Keenan

11   on, I think, next Thursday.

12           MS. WACHTLER:  On November 3rd.

13           MR. MONTCLARE:  And he's going to address our

14   abstention motion and a briefing schedule generally on the

15   motions to dismiss.

16           MR. MEISTER:  So returning to the question you

17   put to me.  Frankly, the reason to get this decided is to

18   get it decided, you know, this has been hanging around now

19   since 2008 when the Trumps first filed their first action.

20   I think the federal case has been pending since 2008.

21           If we can defeat the Trumps' argument that the

22   Orly Trust is precluded by collateral estoppel or

23   res judicata from contending that the shares belong to the

24   trust, and we hope we can, it puts us in a position to

25   negotiate with them because, when all is said and done,

26   there are two ways this can wind up.

```
1                        Proceedings
2              The shares can wind up --
3              THE COURT:  Now Dalia is going to stand up to the
4      Trumps on behalf of Orly's beneficial interest?
5              MR. MEISTER:  Yes.
6              THE COURT:  Okay.
7              MR. MEISTER:  I mean the action down there is not
8      to find out who owns the shares as they characterize it.
9      It seeks a declaration that the Dalia -- that the Orly
10     Trust is the beneficial owner of the shares.
11             Now, that may be a tough argument, even apart
12     from the collateral estoppel issues, which we feel a little
13     bit better about, and it may be a tough argument, but we're
14     entitled to try to make it.
15             If we make it, then the Trumps Group beneficially
16     own the shares and the trust does, which I think would
17     strengthen any hand in negotiation.  If for some reason it
18     loses, then we have an action, an interpleader action, as
19     your Honor knows, dealing with the $10.3 million which was
20     paid by the Trump Group, assuming they had the right to
21     purchase the shares.  And that would put at least
22     $10.3 million to the benefit of the trust, which at the
23     moment is sitting, you know, with a corpus solely of this
24     possible right, which we hope it is a right, to the TRI
25     shares.
26             If it gets the TRI shares, they will be sitting
```

Debra Salzman, Official Court Reporter

| 1 | Proceedings |

2  with shares which don't pay a significant dividend.  Any

3  dividends that have been paid have been held in escrow, I'm

4  told, shares that can't be sold to anyone, shares that are

5  pieces of paper, if in fact they're pieces of paper now as

6  opposed to bookkeeping, which would only have value to the

7  organization, the trust, if someone buys them and as a

8  practical matter, there ain't nobody going to buy these

9  things but the Trumps.

10           So the name of the game seems to be either to

11  increase our leverage with the Trumps, on the one hand, or

12  to get the shares and sit there and hold them in the hopes

13  that the Trumps, in fact, do what counsel have represented

14  in court is their hidden intention, not the Trumps' counsel

15  mind you, of taking the company public for a billion

16  dollars $2 billion.  I've heard various figures thrown out.

17           But sitting around here and litigating in -- I

18  can't think of how many courts -- one, two, three, four,

19  five courts is not in anyone's interest and the Delaware

20  court seems able to move the case quickly and hopefully

21  with a favorable result.  Either way the trust will

22  benefit.

23           MR. MONTCLARE:  Just on behalf of Arie, and it's

24  very important that just --

25           MR. MEISTER:  Can I just object here because

26  Arie, with much respect, shouldn't be a party to this

1                              Proceedings

2    argument.  Arie is trying to take the shares away from --

3              MR. MONTCLARE:  We have an interest in these

4    shares as well.  We have a voting interest in these shares

5    and I do have an interest and I have to correct absolute

6    mistakes you've just made.

7              The caption in this case is Orly individually in

8    her capacity as a beneficiary of the Orly Trust.  She's a

9    plaintiff in this case.  She's not a defendant in this case

10   and Dalia is in this case for the reasons that Mr. Meister

11   mentioned, but the main target here is the Trumps.  And the

12   idea is that in this constructive trust we believe that

13   Arie has a beneficial interest in the voting rights to

14   these shares.  He has a beneficial interest in his own

15   shares obviously.

16             In terms of the matrimonial case, again it's

17   skewed.  If you take a look at the relief we're requesting

18   in the first claim, in the reformation cases, we want to

19   put everything back to status quo ante, with the trust

20   having its percentages that it had indirectly before

21   through D & K, which the Court is aware, and that there be

22   distributions during the lifetime of Mr. Genger equal to

23   the exact percentage of the Orly Trust shares as they exist

24   now 19 percent and that only on death it's going to go to

25   Orly, and TPR is going to go back to being unowned by a

26   majority by Mr. Genger without any other assets in it but

             Debra Salzman, Official Court Reporter

|    |                                                                      |
|----|----------------------------------------------------------------------|
| 1  | Proceedings                                                          |
| 2  | TRI.                                                                 |
| 3  | It's a little complicated, Judge, but the reality                   |
| 4  | is, is that the issue of beneficial ownership is going to           |
| 5  | be determined here.  The constructive trust issues are              |
| 6  | going to be determined here.  To suggest that it's a smart          |
| 7  | move because it's quicker to go to Delaware and that                |
| 8  | they're going to defeat a collateral estoppel decision by           |
| 9  | the judge who is reversed by the Delaware Supreme Court is          |
| 10 | unlikely.                                                           |
| 11 | And what concerns me is -- and we can't prove                       |
| 12 | this here and I'm not blaming Mr. Meister -- but we think           |
| 13 | that Sagi is behind all this with his little puppeteer              |
| 14 | strings saying, "Okay, I'll fix all these problems.  We'll          |
| 15 | get back to Delaware by, one, having TPR, who I control,            |
| 16 | bringing a separate action in Delaware."  The Trump say,            |
| 17 | "Oh yeah, and we'll sue Arie in Delaware."  And now                 |
| 18 | Mr. Meister's client Dalia, all of a sudden, says the trust         |
| 19 | is going to go into Delaware.                                       |
| 20 | And now all of a sudden they push everything back                   |
| 21 | to Delaware in a court which is an equity court.  It's not          |
| 22 | dealing with issues relating to reformation.  It's not              |
| 23 | dealing with the constructive issues that we're bringing            |
| 24 | up.  And now we have this pleading where they're claiming           |
| 25 | on the other side collateral estoppel.  And you know what           |
| 26 | it sounds like to me, Judge.  It sounds like to me that             |

```
 1                          Proceedings
 2    there is no adversary proceeding here.
 3            And you know -- and then what -- and the question
 4    arises to me -- I'll be quiet -- is to why anybody
 5    representing the Orly Trust interest or Orly's interests as
 6    a beneficiary would intentionally select the court, the
 7    only court in the world that has already formed an opinion
 8    that she was not truthful in some way or another in her
 9    testimony, which he rejected in the case there down in
10    Delaware, and who's made specific rulings adverse to her,
11    which have been reversed by the Delaware Supreme Court.
12            It's just very confusing to me.
13            MR. MEISTER:  Your Honor, may I just respond to
14    that?
15            THE COURT:  In a moment.  Let me hear Mr. Griver.
16            MR. GRIVER:  Let me just address some of the
17    things that Mr. Meister said so that Mr. Meister can
18    respond to both of us at once.
19            The reason I pointed out the first cause of
20    action in the third amended complaint before your Honor,
21    there's a second cause of action where Orly is asking for a
22    constructive trust on behalf of her trust, but if you look
23    at paragraph 181(5), it asks that Orly Trust and Sagi Trust
24    each be declared the owner of 24.5 percent of TPR, so
25    together they own the remaining 49 percent of TPR.
26            The reformation that they're seeking will protect
```

1              Proceedings

2    the Orly Trust because the TRI shares will be put back into

3    TPR and then the Orly Trust and the Sagi Trust will be

4    given the equivalent shares of TPR so that they will own

5    the same amount of TRI shares.

6              In a different way, they are asking that the Orly

7    Trust be given the TRI shares back.  So it is the exact

8    same lawsuit except we have more people and we have more

9    issues and we actually have context in New York.

10             As for the Orly Trust not being here because

11   Dalia is the trustee, this court already decided in the

12   2009 action before your Honor that Orly has the right to

13   bring an action on behalf of her trust as the sole actual

14   non-contingent beneficiary.

15             And Mr. Meister says that this is a situation of

16   trust law.  I would say it's simpler than that.  It's a

17   question of who do you trust.  And is Dalia really going to

18   be in Delaware fighting tooth and nail the way Orly is

19   fighting here to protect the Orly Trust?  I would suggest

20   to you that based on past is prologue, the answer is

21   absolutely not, not just in her choice to go to the worst

22   jurisdiction and get this case before the worst possible

23   judge in the United States of America, but if you think

24   about it look about what happened --

25             THE COURT:  Be careful what you say.  These

26   transcripts are put up on the Web.

Debra Salzman, Official Court Reporter

| | |
|---|---|
| 1 | Proceedings |
| 2 | MR. GRIVER:  They're going up on the Web and |
| 3 | they're being sent directly to Judge Strine. |
| 4 | MR. MONTCLARE:  They've already been sent to |
| 5 | Judge Strine. |
| 6 | MS. WACHTLER:  Everything we say in this court on |
| 7 | the record is put before Judge Strine too. |
| 8 | THE COURT:  Well, let him know that I actually |
| 9 | have vacationed many times in Delaware and think it's a |
| 10 | beautiful state on the coastline. |
| 11 | MS. WACHTLER:  Thank you for that help. |
| 12 | MR. GRIVER:  Mr. Meister said that the trust |
| 13 | doesn't really have anything except these potential |
| 14 | interests.  That's true.  But when Dalia became the trustee |
| 15 | of the trust, the trust had a corpus, it had assets.  Those |
| 16 | have been given away.  And the lawsuits about that where |
| 17 | the court has held that there are issues of fact as to |
| 18 | whether Dalia is acting with fraudulent intent in the |
| 19 | things that she do, you denied motions for summary judgment |
| 20 | brought by the defendants in the 2009 case.  Dalia has |
| 21 | acted to dissipate those assets and povertize Orly. |
| 22 | With regard to the TPI shares, she allowed Sagi |
| 23 | to enforce a D & K note that she had successfully argued to |
| 24 | another judge was never to be enforced.  With the TRI |
| 25 | shares she signed a piece of paper.  And what fiduciary |
| 26 | does this?  She signs a piece of paper that says the |

1                          Proceedings

2       following:  You, Sagi -- who, by this time, is already in

3       litigation with Orly -- you, Sagi, may sell the TRI shares

4       to whomever you want, whenever you want, for whatever price

5       you want.  You don't have to tell me about it.  And I also

6       hereby absolve you of all liability.  I give you a full and

7       complete release for whatever you may do with this power,

8       with this unfettered power.  And I'm doing this as a

9       trustee of the trust.

10              If Dalia is successful in Delaware and the shares

11      go back into the trust, she signed a piece of paper that

12      says sell it, sell it for a penny to the beggar outside in

13      the street and it won't matter to me and I absolve you.

14              This is not the type of person that you want to

15      have deciding and fighting and clawing about this issue.

16      You want Orly here with Orly's counsel, the way Orly

17      intended 15 months ago when you were placed in charge of

18      this legal issue and you should not as a matter of equity,

19      as a matter of fairness, allow Dalia to do this and then go

20      into the Delaware court and be done with it.

21              There is no legitimate reason why Delaware is

22      chosen except to allow the Trump Group to win.  That is the

23      only possible answer for why they did this.  And because of

24      that, your Honor, because just as a general matter someone

25      should not be allowed to remove the jurisdiction of this

26      court in this way.

1        Proceedings

2            The general principle that says there should be

3    no duplicative litigation, because what the heck is the

4    Orly Trust doing spending money for another set of lawyers,

5    spending money on another litigation?  Why are they not

6    here with Mr. Meister, who is a capable and fantastic

7    attorney, fighting for the Orly Trust along with Orly?

8    That's the way it should be, that's the way it must be and

9    that's why this Court must grant the TRO.

10           And I hope Chancellor Strine reads that.

11           MR. MEISTER:  Okay.

12           THE COURT:  Careful what you wish for.

13           MR. MEISTER:  Two points I'd like to make.

14           First, let me quote, because my friend

15   Mr. Genger --

16           MR. GRIVER:  Griver.

17           Are you talking about me?

18           MR. MEISTER:  To you.

19           MR. GRIVER:  Okay.  Griver.

20           THE COURT:  Genger is his client.

21           MR. MEISTER:  I'm sorry.

22           He says in the second count in this complaint

23   before your Honor seeks a constructive trust for the Orly

24   Trust.  Let me read you from page 63, the claim for relief,

25   subparagraph 3:  "Upon TPR becoming the record owner of the

26   11,002 shares of TRI stock comprising the Orly Trust TRI

1                              Proceedings

2       shares, a constructive trust was immediately created in

3       favor of Arie with respect to the Orly Trust shares."

4                  MR. MONTCLARE:  Subject to the rights.  You have

5       to read the whole sentence.  It's unfair not to read the

6       whole sentence.

7                  MR. MEISTER:  "Including but not limited to the

8       voting rights appertinent to such shares, all of which were

9       held by TPR for the benefit of Arie subject to the Orly

10      Trust's right to receive the Orly Trust TRI shares upon

11      Arie's death."

12                 So it's not merely my paraphrasing.  Those are

13      the words and it seeks not a constructive trust in favor of

14      the Orly Trust.  It seeks a constructive trust imposed on

15      the Orly Trust in favor of Arie who is going to keep these

16      shares for life.  So as long as we're going to be factual.

17                 Secondly, the question of being in a court which

18      found Orly to be untruthful, I would say two things about

19      that.  It's not my fault that she made up testimony which

20      was contradicted by her father when she testified that she

21      was at a meeting which her father said she wasn't at and

22      that her father told the Trumps things that were

23      contradicted.

24                 But more importantly, her testimony is totally

25      irrelevant and wouldn't be admissible on the issue here of

26      the beneficial ownership of these shares.  This is a

                    Debra Salzman, Official Court Reporter

1                            Proceedings

2      question of interpretation of a contract which is an issue

3      of law.   It's a question, if you will, of whether notices

4      were given, and a question of the arguments which the Trump

5      Group made in their motion to dismiss this claim against

6      them, this question of collateral estoppel and res

7      judicata, and now we find ourselves on what I assume is

8      Orly's side of this because we don't think collateral

9      estoppel applies.

10             I don't know if that was quite what Mr. Montclare

11     was saying, but we don't think we're collaterally estopped

12     and we researched to show and to argue that we're not

13     collaterally estopped to argue that these shares belonged

14     to the Orly Trust beneficially.

15             As to the voting, that's already been decided by

16     the Supreme Court of Delaware.   So I don't know what all

17     this stuff is, but that's not my issue.

18             MS. WACHTLER:   Your Honor, just one thing.   I

19     think we're running far afield and I'm not exactly sure

20     where Mr. Meister is going with this.   But this is for a

21     TRO to prevent extraordinary litigation which this trust

22     has started for no apparent reason.   No one has ever said

23     why this action was brought in Delaware other than what

24     Mr. Griver has shown is the real reason, because

25     Mr. Meister never says it, and to say that things can be

26     adjudicated more quickly in Delaware is just not the case.

Debra Salzman, Official Court Reporter

```
 1                        Proceedings

 2           And the fact of the matter is we have been trying

 3      to get the issue of beneficial ownership determined by this

 4      court in the jurisdiction which the trust has chosen, which

 5      Orly has chosen, which Arie has chosen, and every time we

 6      take a step forward, we're drawn back to somehow them

 7      trying to get this court back to Delaware to deprive this

 8      court of its jurisdiction and that simply should not be.

 9      And that's what this TRO is all about and what this

10      injunctive relief is about, so that we can proceed here

11      where we were told to proceed by the Delaware Supreme Court

12      and where the plaintiffs in this case want to proceed.

13           And to say that he's protecting the interests or

14      Dalia is somehow protecting the interests of the trust by

15      wasting these assets, by starting an interpleader action

16      when the money was safe in an escrow account, by bringing

17      an action in Delaware, by trying to dismiss to our case

18      here for no reason and then taking a contrary position in

19      Delaware, it just seems to me that this really needs to be

20      stopped.

21           MR. GRIVER:  Let me just read your Honor a case

22      by the First Department in 2006.  It was a unanimous

23      decision and I nothing that Mr. Meister has said takes this

24      case away from this Franco case.

25           It said:  "In the interests of preventing

26      duplicative litigation that might lead to conflicting
```

1                              Proceedings

2      results, and to prevent the waste of judicial resources and

3      unnecessary legal expenses, the court did not improvidently

4      exercise its discretion by invoking its equity power to

5      enjoin defendants from prosecuting the California action."

6      All you have to do is substitute California for Delaware

7      and this is the situation that we are in.

8                   And again, your Honor, the only person who has a

9      real interest in protecting the Orly Trust is Orly, the

10     beneficiary.  And even if you don't believe me, fine.  New

11     York is the only jurisdiction where both Orly is here to

12     protect herself and Dalia is here to protect herself.  Orly

13     is not in Delaware.  Orly does not want to be in Delaware.

14     Dalia is here.  This is where Dalia lives.  Let us have

15     that determination from this judge.  Let the judge protect

16     itself.  If Dalia is the one who ends up protecting the

17     trust, God bless.  If Arie and Orly are the ones who end up

18     protecting the trust, well, God bless us.

19                   But if the opposite -- if what I am saying is

20     true, and the fix is in, and there's at least a possibility

21     of that, then this Court is the only one who can stop that.

22     Put in a TRO.  Stop them from doing this.  Decide the case.

23     If Mr. Meister wants us to go along as quickly as possible,

24     if the other defendants want this case to move along, you

25     know what?  I will clear my schedule.

26                   THE COURT:  Well, I certainly don't think that if

                  Debra Salzman, Official Court Reporter

| | |
|---|---|
| 1 | Proceedings |
| 2 | I were to grant the TRO that it is meant to impugn the |
| 3 | integrity of the Delaware Chancery Court, the fix is in. |
| 4 | So, again, I just urge you to be careful with your |
| 5 | language. |
| 6 | MR. GRIVER:  Not with the judge, your Honor, not |
| 7 | with the judge.  I'm talking about -- |
| 8 | THE COURT:  You're talking about the cooperation. |
| 9 | MR. GRIVER:  I'm talking about the cooperation. |
| 10 | I'm talking about the interests of the parties. |
| 11 | MR. MEISTER:  May I speak to that, because I did |
| 12 | receive this afternoon, or maybe it was late morning, a |
| 13 | call from Skadden Arps, who found somewhere in these papers |
| 14 | a reference impugning the integrity of the lawyer in |
| 15 | Delaware who's representing the Orly Trust, saying that he |
| 16 | used to be associated with Skadden, which is true.  But he |
| 17 | and his firm were on Arie's side in two peripheral matters |
| 18 | against the Trumps in the main litigation. |
| 19 | MR. MONTCLARE:  Maybe they should be |
| 20 | disqualified.  I didn't know that. |
| 21 | MR. MEISTER:  Well, you probably should.  He |
| 22 | represented a witness and they apparently filed some |
| 23 | affidavit saying Arie was in such pure heart that he |
| 24 | couldn't possibly have spoliated the documents which he was |
| 25 | found to have spoliated. |
| 26 | So they're going to be bringing that to the |

```
1                            Proceedings
2     Court's attention.  Frankly, there's no fix in.
3               THE COURT:  All right.  What type of schedule are
4     you looking for?
5               MR. GRIVER:  Well, the opposition papers would
6     have to be filed by when?
7               MR. MEISTER:  Where are we?  We're in end of
8     October.
9               MR. GRIVER:  Yes.
10              MR. MEISTER:  November 18th, your Honor.
11              THE COURT:  Okay.  And reply.
12              MR. GRIVER:  We hit Thanksgiving, don't we?
13              THE COURT:  We certainly do.
14              MR. MEISTER:  We do.
15              THE COURT:  I'm not here the Wednesday before
16    Thanksgiving.  It basically looks to me like you're looking
17    for an early December.
18              MR. GRIVER:  Either Friday the --
19              THE COURT:  Maybe the surrogate will rule at the
20    one-year mark.
21              MR. GRIVER:  How about December 7th?  That's
22    always a historical date.
23              THE COURT:  Let me get the calendar.
24              (A discussion was held off the record.)
25              THE COURT:  That was going to be for the
26    argument.  I was going to give you 11/18 and start with the
```

| 1 | Proceedings |

2    date to come in for the argument and work backwards.

3    Change the date to the 14th for the hearing and the papers

4    in on the 7th.  Hearing date December 14, 2:15.

5              MR. GRIVER:  The 14th.  Papers then due on the

6    5th.

7              THE COURT:  I will give you to the 21st.

8              MR. MEISTER:  November 21st?

9              THE COURT:  Yes.

10             MR. MEISTER:  Thank you.

11             THE COURT:  And reply December -- file them by

12   the 9th.  Can you do that?

13             MR. GRIVER:  Yes.  Thank you.

14             THE COURT:  I granted the TRO and we will see you

15   at 2:15.

16             MR. MEISTER:  As written?

17             THE COURT:  I was about to bring myself to that

18   point.

19             So I'm signing the proposed order to show cause

20   and we've worked out a schedule for briefing papers of

21   opposition by the 21st of November.  Reply papers by the

22   9th of December and oral argument at 2:15 on the 14th of

23   December.

24             I'm inclined to grant the temporary restraining

25   order.  It doesn't necessarily mean that it will get

26   continued in the form of a preliminary injunction and

Debra Salzman, Official Court Reporter

| | Proceedings |
|---|---|
| 1 | |
| 2 | obviously one issue that you need to address is whether it |
| 3 | would be appropriate to require any sort of undertaking or |
| 4 | a bond pursuant to Article 63, should I actually grant the |
| 5 | injunction, Article 63 or 62, anyway, whichever. |
| 6 | MR. MONTCLARE:  It's 63. |
| 7 | THE COURT:  It's been a lot of, how shall I put |
| 8 | it, concern expressed out in the bar about courts |
| 9 | overlooking the mandatory undertaking.  So I'm not |
| 10 | overlooking it, but I leave it to you to address. |
| 11 | Sometimes it gets overlooked because nobody raises it.  So |
| 12 | that's one issue I just want to put out there. |
| 13 | Now, to the extent of the wording, the way it's |
| 14 | currently worded, it says:  "That until further order of |
| 15 | this court, Dalia, along with Dalia's agents, assigns, |
| 16 | attorneys and/or anyone acting on Dalia's behalf shall be |
| 17 | prohibited from prosecuting the Delaware action," which, I |
| 18 | guess, is previously defined in the order as "Genger as |
| 19 | Trustee of the Orly Genger 1993 Trust v. TR Investors LLC, |
| 20 | et al." |
| 21 | You don't actually have an index number there |
| 22 | from Delaware. |
| 23 | MR. GRIVER:  I didn't have an index number. |
| 24 | THE COURT:  All right. |
| 25 | "Or commencing any new actions as trustee of the |
| 26 | Orly Trust concerning the matter of the operative complaint |

```
 1                              Proceedings
 2       in this action."
 3                 Now, I know what my concerns are about that
 4       language, but I'm curious about what your concerns are,
 5       because I'll tell you what I'm trying to do.  I have no
 6       intention of stopping Judge Keenan from doing as much as
 7       he'd like in this case and having them resolve these issues
 8       here in New York.  But I am concerned that that Delaware
 9       action just sort of be put on hold until I can have a
10       reasoned reconsideration of the points.  I don't need any
11       second, third, fourth actions there.
12                 MR. MEISTER:  I don't envision any second, third,
13       fourth actions.  But my question would be, your Honor
14       talked about carving out an ability to respond to the
15       counterclaim that the Trumps filed.  The other party TPR
16       filed an answer before which does not have a counterclaim,
17       a cross-claim, so we don't have to worry about them, in
18       Delaware.
19                 MS. WACHTLER:  Well, wouldn't your remedy be in
20       Delaware then to say that you're stayed and that you need
21       to have some sort of --
22                 MR. MEISTER:  I don't know Delaware procedure,
23       your Honor.  I never practiced in their courts.  I would
24       think that if your Honor allows the Delaware counsel to
25       answer --
26                 THE COURT:  It seems to me that if you become
```

| | Proceedings |
|---|---|
| 1 | |
| 2 | aware after consulting with your Delaware counsel that |
| 3 | there's an issue of being precluded, that you come back and |
| 4 | ask me for the carve out at that point. |
| 5 | I mean at this point -- |
| 6 | MR. MEISTER:  How are they harmed? |
| 7 | THE COURT:  I don't know that they are, I don't |
| 8 | know that you are.  That's the whole point.  I mean we're |
| 9 | all sort of imagining a harm. |
| 10 | MR. MEISTER:  The harm I imagine is if it were |
| 11 | here, I don't know what would happen if counterclaim were |
| 12 | unanswered.  I would think there's the possibility of a |
| 13 | default.  I would think there's the possibility that the |
| 14 | Trumps can move either for a default judgment or possibly |
| 15 | for summary judgment. |
| 16 | I would think that if we filed a reply, I guess |
| 17 | it's called, to the counterclaim denying their request for |
| 18 | relief, et cetera, then everyone's interests would be |
| 19 | protected and I would assume once the pleading was over, |
| 20 | the next step -- this I know because I've been following |
| 21 | peripherally the other action down there -- the next step |
| 22 | in Delaware is one goes to the court and askings for a |
| 23 | scheduling order, and at that time I presume Mr. Anderson, |
| 24 | the Delaware counsel, could apprise the court that the |
| 25 | action is stayed. |
| 26 | MS. WACHTLER:  Wouldn't the Trumps -- wouldn't |

```
1                         Proceedings

2    you ask the Trumps' consent?

3              THE COURT:  My gut reaction is that this is in

4    effect a stay of that action and so that you have the

5    benefit of a stay until such time that it's vacated.

6              MR. GRIVER:  When this happened in this case,

7    what the parties did was they got together, they informed

8    this Court about it and put together a stipulation staying

9    the case until procedures in Delaware were completed.

10             I don't see any reason why, although I've never

11   done this in Delaware, I've done this in other

12   jurisdictions and other court systems, there's no reason

13   why the --

14             THE COURT:  You don't go to Delaware.

15             MR. GRIVER:  I would be happy to provide advice

16   on the issue.

17             MR. MEISTER:  Your Honor, I feel confident that

18   if Skadden would agree to a stay, I can't imagine that the

19   court there is eager to hear the case, but I don't know if

20   Skadden is going to agree to a stay.  I don't know.

21   They're adversaries.  If they have us at a disadvantage,

22   which you've now put us, they may take advantage of it.

23             MS. WACHTLER:  Then you have to come back here.

24             MR. MONTCLARE:  They have to come back here in

25   with the Trumps.

26             THE COURT:  Why don't you talk to them and tell
```

Debra Salzman, Official Court Reporter

| | |
|---|---|
| 1 | Proceedings |
| 2 | them what I've done.  And if you need to, we'll give you |
| 3 | the carve out. |
| 4 | (Proceedings concluded.) |
| 5 | *       *       * |
| 6 | C E R T I F I C A T E |
| 7 | I, Debra Lynn Salzman, an Official Court |
| 8 | Reporter of the State of New York, do hereby certify |
| 9 | that the foregoing is a true and accurate transcript |
| 10 | of my stenographic notes. |
| 11 | |
| 12 | _____ |
| 13 | Debra Lynn Salzman, RMR |
| 14 | Official Court Reporter |
| 15 | |
| 16 | |
| 17 | |
| 18 | |
| 19 | |
| 20 | |
| 21 | |
| 22 | |
| 23 | |
| 24 | |
| 25 | |
| 26 | |

1

IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

TR INVESTORS, LLC, GLENCLOVA           :
INVESTMENT CO., NEW TR EQUITY I, LLC,  :
NEW TR EQUITY II, LLC, and TRANS-      :
RESOURCES, INC.,                       :
                                       :
            Plaintiffs,                :
                                       :
        v                              :   Civil Action
                                       :   No. 6697-CS
ARIE GENGER and TPR INVESTMENT         :
ASSOCIATES, INC.,                      :
                                       :
            Defendants.                :

                   - - -

                    Chancery Court Chambers
                    New Castle County Courthouse
                    500 North King Street
                    Wilmington, Delaware
                    Thursday, November 10, 2011
                    1 p.m.

                   - - -

BEFORE:  HON. LEO E. STRINE, JR., Chancellor.

                   - - -

            TELEPHONE CONFERENCE

                   - - -

------------------------------------------------------------
            CHANCERY COURT REPORTERS
           New Castle County Courthouse
        500 North King Street - Suite 11400
            Wilmington, Delaware 19801
                (302) 255-0524

2

1    APPEARANCES:   (via speakerphone)

2        THOMAS J. ALLINGHAM, II, ESQ.
         ANTHONY W. CLARK, ESQ.
3        Skadden, Arps, Slate, Meagher & Flom LLP
            for Plaintiffs
4
         STEPHEN P. LAMB, ESQ.
5        JOSEPH L. CHRISTENSEN, ESQ.
         Paul, Weiss, Rifkind, Wharton & Garrison LLP
6           for Defendants

7                        -  -  -

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

CHANCERY COURT REPORTERS

3

1         THE COURT:  Good afternoon.  May we

2    have appearances for the record.

3         MR. ALLINGHAM:  Yes.  This is Tom

4    Allingham at Skadden Arps, Your Honor.  And with me,

5    if it's acceptable to the Court, is Tony Clark and

6    some members of my team.

7         THE COURT:  Sure.

8         MR. LAMB:  Your Honor, this is Stephen

9    Lamb from Paul Weiss, and on the phone with us is my

10   associate, Joseph Christensen.

11        THE COURT:  Well, the reason I'm

12   calling is, I got a flurry of correspondence.  And,

13   you know, I want to figure out how to -- a sensible

14   way of moving forward, which has been rather difficult

15   to achieve over a number of years in this matter.

16        I regret the fact that this family is

17   so riven -- and I'm talking about the Genger family --

18   is so riven that the time of three court systems is

19   taken up with them.  I -- I found the transcript that

20   was cited to me rather dismaying.  And I feel the need

21   to say something on the record that I am going to

22   order be sent to the judges involved, which is the

23   following about the Court of Chancery:

24        I have been a member of the Court of

CHANCERY COURT REPORTERS

4

1   Chancery since 1998.   If there was an occasion on

2   which I ordered action in the absence of a party who

3   was affected, I, frankly -- I can't even recall it.

4   It is a historic practice of this Court to match its

5   willingness to act with speed with a deep commitment

6   to due process.

7           The first thing that this Court, and

8   this judge in particular, makes sure, is that all

9   interested parties always have an opportunity to

10  appear before the Court and that the Court does not

11  act on an ex parte basis.   That is a tradition in

12  Chancery.   Other courts have different traditions, but

13  the tradition of proceeding with all parties

14  represented and only employing an ex parte proceeding

15  in the most exigent of circumstances is the one that

16  persists in Chancery.

17          So nonimpulsive is my involvement in

18  this matter, that the intricacies of the separate

19  action involving Orly and her mother are simply not

20  complications which have burdened my simple mind.

21  There is no impulse on my part to take action in any

22  of these matters that is not properly briefed up, with

23  every party with an interest having a full and fair

24  opportunity to participate.   In fact, I believe I made

CHANCERY COURT REPORTERS

5

that clear earlier in this very litigation when I set,
I believe at Arie Genger's instance, a more relaxed
briefing schedule than the Trump parties wished.

It is dismaying to see words like --
and I'm going to quote -- "fix," end quote, be used in
any way that is suggestive that this Court would
facilitate a nonadversarial resolution to the
detriment of a party with a legitimate interest.  If
someone wants to engage in loose talk about gamblers
or boxers, that's fine.  It's pretty shocking to be
used about the Delaware Court of Chancery.

One of the other historic traditions
of this Court is that we do not lightly cause train
wrecks.  To the extent that there are reckless,
irresponsible folks who are willing to play games of
chicken with important things, we don't tend to
contribute to the brinkmanship.  It's not our style.
It's not mine.

In terms of how we're going to proceed
with this case, I'm going to ask Mr. Lamb a very
specific question in a minute.  But if the answer to
that question is no, that his client has no intention
to do something in particular, then my inclination is
going to be to put off the oral argument in this case

CHANCERY COURT REPORTERS

6

1   to allow the federal court to issue the ruling it said

2   it was willing to issue in early December and to see

3   what light that might shed for folks on a murky and

4   confusing situation that is motivated by family and

5   personal dynamics that I, frankly, don't grasp.

6             I have no skin in this fight other

7   than the normal skin of a judge assigned a case.  The

8   idea that this Court has any other interest is,

9   frankly, wrong.  The idea that, to the extent that

10  this Court is worried that there was part of its

11  ruling that was reversed by the Supreme Court, as both

12  of the excellent lead litigators on the phone have

13  experienced in different roles, that's just a reality

14  of the judicial system.  We all move on.  And it's

15  just really interesting for anyone to suggest to

16  another court that there's some sort of fix on.  And I

17  understand one can read the transcript to suggest that

18  that's really something involving Genger family

19  dynamics; but it was a lot of loose language, a lot of

20  it.

21            And so, again, I want to reiterate,

22  the one court that you can most rely upon anywhere not

23  to act on an ex parte basis when that would not be

24  appropriate would be the Delaware Court of Chancery.

CHANCERY COURT REPORTERS

7

1   There is no example in handling this matter over the

2   years of this Court impulsively doing that, no example

3   of any party with a legitimate right to be heard being

4   denied that opportunity.  None.  I'm not sure why one

5   can confidently say that that's always -- that the

6   courtesies of similar notice were always extended in

7   other jurisdictions, but in Delaware, they universally

8   have been.  And I don't consider anything about the

9   present fight to be an emergency that would impel me

10  in any way to deny any party their opportunity to be

11  heard.

12            So my inclination is, honestly, to the

13  extent that my good federal colleague was willing to

14  actually take on the consideration of his thoughts

15  about a knotty jurisdictional matter, recognizing the

16  supremacy of the federal courts and as -- and the

17  inability of this Court to enjoin, if it wanted to --

18  and I rarely want to.  I don't go around enjoining

19  litigants.  I think you'll find a very limited use of

20  that technique by me.  And to the extent it was used

21  in the present case in any way brought on by rather

22  extraordinary circumstances, it seems to me it would

23  be useful for all to hear from the good federal judge.

24  And if it is really true that Arie Genger has no

CHANCERY COURT REPORTERS

8

1  intention of trying to seek an injunction from a state

2  judge about the procession of this action, then I

3  don't see any reason why we can't get a ruling from

4  the federal court.

5          And since I have probably had to do

6  more work on these cases than any of my good federal

7  colleagues or my good state colleagues in whom I have

8  a lot of confidence, I'm perfectly happy to approach

9  the Macy's Thanksgiving Day parade and the Christmas

10  season free of worrying about the Trump Group or the

11  Genger family and concentrate on my other judicial

12  matters and seeing what new float will fly above the

13  streets of New York and then to hear what a wise

14  federal judge thinks early in next year and then take

15  up the action from there.

16          But if Mr. Genger is going to run in

17  to court in New York and seek to enjoin the Trump

18  Group or in any way interfere with the governance of a

19  Delaware entity and to do it, you know, in the

20  meantime, then, I can't proceed in that way.  And the

21  way I will proceed is the way the Trump Group has

22  suggested, which is I will simultaneously hear their

23  application for an injunction, along with the

24  dismissal motions.  That seems to me to be an

9

1    inefficient and unnecessary thing; but unless

2    Mr. Genger is willing to make a binding commitment not

3    to seek to -- a judicial ruling interfering with this

4    action, I don't really see how I can deny the Trump

5    Group the opportunity to present their injunction

6    application.  It's not my preference that I add to my

7    burden, but I need something binding.

8              It would also be helpful to know a

9    little bit more from Mr. Lamb about the extent to

10   which he and Mr. Christensen are involved in the

11   strategy in New York.  It's -- you know, frankly,

12   there was no secret that Orly and her father are

13   close.  The judge in New York seems to recognize a

14   sort of divide in which mother and son are against

15   father and daughter.  It's sad.  It's genuinely sad to

16   see a family riven like this.  And it's obviously

17   difficult, though, you know, when you have a situation

18   where other people's interests are caught up in a

19   family fight.

20             But the idea that Arie Genger is not

21   communicating with Orly Genger is not immediately

22   apparent.  And it is kind of dismaying, this notion

23   of, for example, that some -- that counsel for Arie

24   Genger would sit before the Court in New York and be a

1  party to this kind of colloquy that suggests that

2  actually action could have been taken somehow.  I

3  mean, really, there's absolutely no way that any

4  action would be taken in this Court that would affect

5  either of these cases without incredibly rapid action

6  by Mr. Lamb and Mr. Christensen.  They're just too

7  good a lawyers.  And there's also no way it would

8  happen because there's no way they wouldn't get notice

9  from Mr. Allingham.

10              So, you know -- but when you see -- I

11  take very seriously the reputation of this Court and

12  the perception about its fairness.  And it was good to

13  see my judicial colleague in New York resist this kind

14  of inflammatory -- I think was the word used aptly by

15  Mr. Lamb.  But it's not just inflammatory.  It really

16  went a long way to being misleading and insulting.

17  And -- and I don't mean personally.  I don't really

18  care when they mean -- when they talk about the worst

19  judge in the world.  I took that actually to mean if,

20  on the merits of the economic ownership, you have a

21  judge who's already ruled one way and that way is

22  adverse to your interests, you probably don't want

23  that judge to decide it.  I mean, I -- I'm a very

24  thick-skinned person who's lived in a much more

11

1   intensive world than any litigation.

2                   So -- but it's more the insinuation

3   that this Court would somehow be acting impulsively

4   and without regard to the due process rights of the

5   litigants.  And for people to be suggesting that,

6   frankly, in counsel for Arie Genger's presence, I just

7   have a hard time believing, frankly, that the -- the

8   distinguished lawyers who are representing Arie Genger

9   here were really quite involved in that.

10                  So I'm going to finish with that.  I

11  know it's -- it's extensive, but it's important that

12  this be on the record.  And I want it transmitted to

13  my judicial colleagues, and I want it transmitted

14  jointly without commentary.

15                  Mr. Lamb, what I'm asking you is:  Is

16  your client committing to this Court that he's not

17  going to seek an injunction against the procession of

18  this action in the New York state courts?

19                  MR. LAMB:  Your Honor, I am -- don't

20  have any authority from my client to say that in so

21  many words, but I'm sure it's true.  As I said in my

22  letters, we have never done anything to interfere with

23  the procession of this Court -- of this case in New

24  York or anywhere.  As Your Honor knows, what we've

12

1   done instead is moved to dismiss and to stay and,

2   quite frankly, devoted very substantial resources to

3   briefing the issue without any thought of interfering

4   with Your Honor's ability to hear it.

5              I feel confident, confident, Your

6   Honor, that I can commit that there is no intention to

7   do that, no plan to do that, and that we will not do

8   that.

9              As to the other matters Your Honor has

10  raised, I, of course, also -- I mean, let me say I --

11  I have some involvement in -- in the New York matters,

12  as Mr. Allingham knows.  I have -- I've seen him at

13  least on two occasions, once in the New York state

14  Supreme Court, not on the day of the transcript that

15  was sent to Your Honor, and once in the federal

16  District Court.

17              I -- I have no -- I take no -- I

18  certainly eschew any responsibility for the things

19  that were said.  Your Honor, I believe that the way

20  you are interpreting them is how they were meant.  It

21  was no commentary on Your Honor's fitness as a judge

22  or the fitness of the Court, of any Delaware Court

23  but, rather -- rather, that a question of why a

24  fiduciary such as Orly's mother would choose to bring

CHANCERY COURT REPORTERS

13

1   a case in a court that had already ruled against her.

2                   And as to the comment about the fix

3   being in, I believe that also -- I understand that

4   also was directed at understandings between

5   Mr. Allingham's clients and TPR and Dalia Genger or

6   whomever but not the Court. It is, I think, as

7   Justice Feinman pointed out, it was a very poor choice

8   of phrase. And when that is, I think quite honestly,

9   by Your Honor taken, as taken in the wrong way, and I

10  think it should be.

11                  But leaving that aside, I mean, I -- I

12  have involvement in the strategy of litigating this

13  case in New York where the Delaware Supreme Court said

14  it should be litigated. You will recall, Your Honor,

15  that when the mandate issued, there were already in

16  different courts in New York two matters -- two

17  litigations that raised all these problems. It is

18  Mr. Allingham and his clients who have chosen to

19  embroil the Court of Chancery in this again by filing

20  this case that we've moved to dismiss.

21                  So I -- I'm confident, as I said, that

22  between Justice Feinman and Judge Keenan, they will

23  work out where the matter will progress, whether it's

24  going to be in state court or in federal court. I

CHANCERY COURT REPORTERS

14

1  think it is just unfortunate that Your Honor has been

2  brought -- dragged back into this matter by the

3  Trumps' filing this complaint they filed that.  And

4  for all the reasons I've already said, we've stated in

5  our briefs, you know, they lack jurisdiction over

6  Mr. Genger.  You lack -- or your Court lacks

7  jurisdiction over the matter, and so on and so forth.

8  In any event, it's the third-filed action and it

9  shouldn't proceed.

10                 Your Honor, I --

11                 THE COURT:  No.  And, Mr. Lamb, I

12  appreciate that.  And you -- and I just want to say on

13  the record again, I think one of the things that was a

14  bit dismaying about the transcript was that there was

15  nothing in my reaction to this new lawsuit which

16  suggests that I'm not totally impartial in hearing

17  your perspective on the prior-pending litigations.  In

18  fact, that's why I set the schedule the way I did.

19                 MR. LAMB:  I appreciate --

20                 THE COURT:  And -- and what I'm --

21  where I am now, though, is I actually, having been

22  involved in this -- you know, we're back where we

23  were; right?  We were at one point in three courts,

24  but it was a -- a matter involving, you know, who

15

```
 1   controlled a Delaware corporation.  I ended up going

 2   first.  I think there would be substantial utility to

 3   hear from my distinguished federal judicial colleague.

 4   And to the extent that the Trump Group is willing to

 5   complete the briefing on that and hear from the

 6   federal court, you could all provide me with short

 7   letters after what -- after, I believe it's Judge

 8   Keenan; right?

 9               MR. LAMB:  It is Judge Keenan, Your

10   Honor.  I wouldn't expect that any of this will be

11   decided before Christmas.

12               THE COURT:  Yeah.  I understand.

13               MR. LAMB:  It may be substantially

14   later than that.  The briefing schedules are just now

15   being set and will require filing briefs and argument,

16   and so forth.  I'm sure it will be sometime next year

17   before any of that's decided by Judge Keenan.

18               THE COURT:  Well, all I'm suggesting

19   is -- you know, I had seen a suggestion that Judge

20   Keenan was willing to step in, make a determination

21   that would provide -- shed some important light.  I

22   think that would be very useful and it might provide a

23   way forward.

24               MR. LAMB:  Well, in any event, Your
```

16

1    Honor, the issue of -- that we've raised in our motion
2    will have to be -- unless this action that we're
3    addressing today is simply stayed, which we could do,
4    the issue is going to have to be resolved.
5                    THE COURT:  No.  I understand.  But
6    what I'm -- what I heard -- and what I read -- and
7    maybe Mr. Allingham -- and I cannot spend too much
8    more time with you gentlemen, which you're probably
9    glad of, for -- but the -- I -- what I read the Trump
10   Group to be saying is that if Judge Keenan were to
11   determine that he would decide all the issues, that
12   your preference -- again -- and I don't take this
13   personally -- your legitimate preference to be in New
14   York, right?
15                    MR. LAMB:  Oh, I think it's our
16   preference to be in state Supreme Court.
17                    THE COURT:  Oh, no, no.  I understand
18   that.  But --
19                    MR. LAMB:  In any event, it seems,
20   Your Honor, what you're -- what you're getting at is
21   that Mr. -- that the Trumps, with their sort of
22   offering to Your Honor is to trade this case that
23   should be dismissed for some -- some --
24                    THE COURT:  I'm not offering to trade

CHANCERY COURT REPORTERS

17

1  anything.  I'm saying --

2              MR. LAMB:  Not you, Your Honor; the

3  Trumps.

4              THE COURT:  I'm saying the objective

5  reality is this:  There are cases in three courts.  We

6  went down to two courts for awhile.  We're now back to

7  three courts.  Even if I dismiss this case, we're back

8  to two courts.  It just might be -- I'm not ruling out

9  anything.  But I do take very seriously that if a

10 federal judge determines that he is going to go and do

11 something that has effect on the shape of things -- if

12 he decides, for example, Mr. Lamb, that he's deferring

13 to the New York state court or to the Delaware courts,

14 I'll go next.  It's just your clients, frankly, don't

15 want me to go at all.

16              So the answer that they want me to go

17 before Judge Keenan, I'm sorry, that doesn't move me.

18              MR. LAMB:  Well, that's fine, Your

19 Honor.

20              THE COURT:  What I'm saying is I

21 believe we're handling this in a way that doesn't put

22 any -- you know, I mean, you can make an argument --

23 I'm sure the Trumps can make an argument that the

24 nonprocession of the lawsuits actually hurts them most

CHANCERY COURT REPORTERS

18

1   of all because it is them who are continuing to be

2   inmeshed in a Genger family dispute.  And --

3                    MR. LAMB:  Well, Your Honor ---

4                    THE COURT:  -- and all I'm saying --

5   and I'll be real candid about this.  I have often

6   seen -- one of the great things we know about this

7   Court is that people are happy to watch us go ahead

8   and do a lot of work.  And I'm not saying that the

9   federal judge -- I saw a federal judge, from what I

10  saw, was willing to step up and give useful guidance

11  to people.  Federal judges have some power that those

12  of us in state courts don't.

13                    And so what I'm suggesting is if

14  Mr. Genger will make the commitment in a formal way so

15  it's -- I have no doubt we're trusting your word; but,

16  honestly, Mr. Lamb, respected counsel in these cases

17  before has had situations occur where -- without their

18  knowledge.  And so if we can get that binding

19  commitment from Mr. Genger, what I'm suggesting is

20  that you-all get back before Judge Keenan, get it on

21  his schedule.  Nobody's going to enjoin anybody from

22  going forward with this case, but I have no intention

23  to do anything in this case until we hear from Judge

24  Keenan.  You can all put in short letters about how

CHANCERY COURT REPORTERS

19

1  that affects what you've already written and we'll go

2  from there.

3                    MR. LAMB:   That's fine, Your Honor.

4  We're happy to take the -- take the matter off Your

5  Honor's plate.   And I will provide the Court with a

6  letter to the effect that you're asking, hopefully by

7  the end of the day, if not tomorrow.

8                    THE COURT:   Mr. Lamb -- I mean

9  Mr. Allingham, does that work for you?

10                    MR. ALLINGHAM:   Your Honor, I -- I've

11  managed not to say anything at all to this point.

12                    Last -- yesterday afternoon, Justice

13  Feinman issued another TRO enjoining us from taking

14  any action at all in the Orly Trust declaratory

15  judgment matter in which the trust seeks a declaration

16  that it is the beneficial owner of the Orly Trust

17  shares.

18                    I -- I think that what Your Honor has

19  proposed, notwithstanding that we are now the subject

20  of at least two TROs plus a pending preliminary

21  injunction application brought by both the Orly Genger

22  Trust and the -- and Arie Genger in Judge Feinman's

23  court --

24                    THE COURT:   Where -- what --

20

1              MR. LAMB:  Which has nothing to do

2    with this action, Your Honor.

3              MR. ALLINGHAM:  Well, yes, Your Honor,

4    it does; but Mr. Lamb and I can -- can -- can contest

5    that later on.

6              THE COURT:  Does this have to do with

7    the other action before me?

8              MR. ALLINGHAM:  One of --

9              MR. LAMB:  Yes.

10             MR. ALLINGHAM:  The one entered

11   yesterday afternoon does.  The one pending before

12   Justice Feinman imposes extraordinary constraints on

13   what the Trump -- Trump Group can do with respect to

14   TRI, including it would enjoin us from issuing any

15   shares of the company in any context because that

16   would dilute the so-called Arie and Orly Trust shares.

17             MR. LAMB:  Your Honor, that

18   preliminary injunction application has been argued and

19   is, as I -- tell me, Mr. Allingham, has it been argued

20   or is it just a TRO at this point?  There's a PI

21   coming up and --

22             MR. ALLINGHAM:  It has been argued on

23   a preliminary injunction basis and it is sub judice.

24             MR. LAMB:  Sub judice, Your Honor.

CHANCERY COURT REPORTERS

21

1          MR. ALLINGHAM:   And Justice Feinman
2   indicated yesterday that he was working on an opinion.
3   So --
4          THE COURT:   See, and this is the
5   thing.   My simple mind doesn't really divide among
6   these actions.   As I said before, I really know
7   nothing about the Orly action or the Dalia action,
8   however you wish to call it, because nothing has been
9   done.
10          MR. ALLINGHAM:   Your Honor, if I
11   may -- and I know the Court is -- is pressed for
12   time -- we -- we -- I -- I lack authority as well.
13   I -- I would like to talk to my clients.   I think that
14   what Your Honor has proposed is extraordinarily
15   sensible; but we do have some complicating --
16   complicating factors, including this preliminary
17   injunction application pending before Justice Feinman.
18   One possibility might be that the parties simply agree
19   to stay the state court proceeding voluntarily
20   throughout to permit Judge Keenan to act.   But let
21   me --
22          THE COURT:   Yeah.   Why don't --
23          MR. ALLINGHAM:   If you would permit,
24   let me consult with my clients, and I will commit to

22

```
 1   provide the Court with a response by the end of the
 2   day.
 3                THE COURT:  Yeah.  Well, why don't you
 4   do this:  Why don't you -- before anybody sends me
 5   anything, make sure you and Mr. Lamb speak directly.
 6                And let me again reiterate.  I'm not
 7   doing anything impulsive.  The idea that people are
 8   running around taking a busy judge and getting TRO
 9   applications -- you know, one of the easiest TRO
10   applications that ever would have been granted to Orly
11   Genger would have been one in the Orly Genger action
12   pending before me, to say, "Your Honor, I just want a
13   clarification that until my counsel are heard, you're
14   not going to do anything."  I would have found it
15   humorous because I would have said "I'm happy to
16   provide this obvious answer to you for insurance"
17   because I never the heck would have done it.
18                So I -- I understand when we're --
19   when we talk about "this action," just limited to a
20   civil action number --
21                MR. LAMB:  Yes, sir.
22                THE COURT:  -- that's a little --
23   everybody's -- there's a big kind of family dispute
24   that's tying up both the family, the Trump Group, and
```

23

1   the underlying business.  And I think what people need

2   to get clear with each other is how are they going to

3   spend their time?  Is there going to be coordination

4   among counsel so that the people don't say "Oh, well,

5   that's just the Orly action"?  Because I don't really

6   intend -- I mean, again, I was -- I'm not even sure

7   what the Orly action is, I'll confess.  I don't go

8   around reading every complaint that's filed with me

9   because I would never get to do the actual motions

10  that are pending.

11              But I think what -- it sounds like --

12  I think the two of you, if you discuss this with a

13  cool head and a warm heart -- and, honestly, I even

14  thought about bringing in Orly and what's counsel.  I

15  think you ought to talk to them, and you ought to

16  figure out what's going on so that we stop this.  I

17  mean, I -- you know, I, frankly, am -- I do find some

18  of the proceedings disorienting.  And, Mr. Allingham,

19  can I make a suggestion to you and your team?

20              MR. ALLINGHAM:  Of course, Your Honor.

21              THE COURT:  Do not skip any proceeding

22  in New York that you know anything about.

23              MR. ALLINGHAM:  I take the point, Your

24  Honor.

CHANCERY COURT REPORTERS

24

1          THE COURT:  If you need to occupy the
2    doorstep to the courthouse, to pick a term of the
3    moment, occupy it.
4          MR. ALLINGHAM:  Understood, Your
5    Honor.
6          MR. LAMB:  Your Honor, just for
7    clarity, I'm not aware -- I -- I'm quite sure that any
8    application that's been made since the summer of 2010
9    has been on notice to Mr. Allingham.  And --
10         THE COURT:  Oh, no, no.  And that was
11   my point.  I believe there was something about this
12   one transcript where they had been told it really
13   didn't affect Arie and they didn't show up.
14         MR. ALLINGHAM:  It didn't affect the
15   Trump Group, Your Honor.
16         THE COURT:  Okay.  And I just think --
17         MR. ALLINGHAM:  Yes, I understand.
18         THE COURT:  -- it's such a complicated
19   web of family and business relationships, that it's
20   just not wise.  And I don't think it helps Judge
21   Feinman.  None of us want unnecessary party -- that's
22   why I said.  I thought about Orly and whatever, but
23   it's not this case.  And I urge you to share this
24   immediately with both their counsel and to share it

CHANCERY COURT REPORTERS

25

1   with the world.

2           I'm going to finish with this:  I

3   appreciate the prompt getting-together.  I'm not going

4   to do anything impulsive.  I'm not going to do

5   anything without full participation of all interested

6   parties.  We just don't do that in Chancery.  I'm also

7   happy to talk to any of my judicial colleagues, if

8   anybody thinks that's sensible.  But I do think

9   getting a ruling from Judge Keenan has got to be a

10  useful thing even if you assume this Court wasn't even

11  in the mix.

12          And so to the extent that he's willing

13  to step up, that's something that I am extremely

14  grateful for as a judicial colleague.  I've spent an

15  awful lot of time on this case.  And if somebody wants

16  to take a crack at something that will help all the

17  parties move forward, I applaud that and I applaud the

18  cooperative spirit of your -- the participation by

19  counsel today.  And I will see you-all soon.  Some of

20  you sooner than later, I think.

21          MR. LAMB:  Yes.  Sooner than later

22  here.

23          THE COURT:  Okay.

24          MR. ALLINGHAM:  Thank you, Your Honor.

CHANCERY COURT REPORTERS

26

1                    THE COURT:    Take care.

2                    MR. LAMB:    Thank you.

3              (The proceedings concluded at 1:31 p.m.)

4                            -  -  -

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

CHANCERY COURT REPORTERS

27

1                        CERTIFICATE

2

3             I, NEITH D. ECKER, Official Court

4    Reporter for the Court of Chancery of the State of

5    Delaware, do hereby certify that the foregoing pages

6    numbered 3 through 26 contain a true and correct

7    transcription of the proceedings as stenographically

8    reported by me at the hearing in the above cause

9    before the Chancellor of the State of Delaware, on the

10   date therein indicated.

11             IN WITNESS WHEREOF I have hereunto set

12   my hand at Wilmington, this 11th day of November 2011.

13

14

15                          /s/ Neith D. Ecker

16             - - - - - - - - - - - - - - - - - - - - - - - - - - -
                          Official Court Reporter
17                         of the Chancery Court
                            State of Delaware
18

19

20   Certificate Number:   113-PS
     Expiration:   Permanent
21

22

23

24

                    CHANCERY COURT REPORTERS

EFiled: Dec 9 2009 3:48PM EST
Transaction ID 28427867
Case No. 3994-VCS

IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | |
|---|---|
| TR INVESTORS, LLC, GLENCLOVA INVESTMENT CO., NEW TR EQUITY I, LLC, NEW TR EQUITY II, LLC, and TRANS-RESOURCES, INC., | ) ) ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) ) |
| ARIE GENGER, | ) ) |
| Defendant. | ) ) |

Civil Action No. 3994-VCS

| | |
|---|---|
| ARIE GENGER, | ) ) |
| Counterclaim Plaintiff, | ) ) |
| v. | ) ) |
| TR INVESTORS, LLC, GLENCLOVA INVESTMENT CO., NEW TR EQUITY I, LLC, NEW TR EQUITY II, LLC, and TRANS-RESOURCES, INC., | ) ) ) ) ) |
| Counterclaim Defendants. | ) |

MEMORANDUM OPINION

Date Submitted: October 30, 2009
Date Decided: December 9, 2009

Thomas J. Allingham II, Esquire, Anthony W. Clark, Esquire, Robert A. Weber, Esquire, SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP, Wilmington, Delaware, *Attorneys for Plaintiffs.*

Donald J. Wolfe, Jr., Esquire, Brian C. Ralston, Esquire, Scott B. Czerwonka, Esquire, POTTER ANDERSON & CORROON LLP, Wilmington, Delaware; Michael P. Carroll, Esquire, Avi Gesser, Esquire, DAVIS POLK & WARDWELL LLP, New York, New York, *Attorneys for Defendant.*


**STRINE, Vice Chancellor.**

## I. Introduction

Plaintiffs TR Investors, LLC, Glenclova Investment Co., New TR Equity I, LLC, New TR Equity II, LLC, and Trans-Resources, Inc. (collectively, the "Trump Group") seek sanctions against defendant Arie Genger for causing computer "wiping" software to be employed to destroy all the information on the unallocated space of TRI's computer database. Genger's conduct occurred in the midst of expedited litigation over the control of Trans-Resources, Inc. (or "TRI"). In connection with that litigation under 8 *Del. C.* § 225, attorneys for TRI worked with Genger throughout the weekend of September 5-7, 2008 to identify and segregate documents on TRI's computer system that were personal to Genger and not related to the business or affairs of TRI. This work was in anticipation of Genger's potential involuntary relinquishment of control over TRI to the Trump Group.

After the attorneys for TRI had left on September 7, 2008, Genger had a conversation with Oren Ohana — the computer consultant he had long employed to assist both TRI and himself personally — about the computer work the attorneys (and their technology consultants) had performed throughout the weekend. As a result of that discussion, Ohana was authorized by Genger to take measures to destroy information on TRI's computer system. That conduct was a violation of a status quo order entered on August 29, 2008 (the "August Status Quo Order") in connection with the § 225 dispute, which provided in relevant part that "the parties to the [§ 225 dispute] . . . are hereby restrained and enjoined from,

1

directly or indirectly . . . tampering with, destroying or in any way disposing of any Company-related documents."[1]  Before embarking on that course of document destruction, Genger did not consult with counsel for TRI despite his awareness of the terms of the August Status Quo Order, and the fact that counsel had been working with him throughout the weekend of September 5, 2008.  Consistent with Genger's failure to consult counsel before acting, Ohana acted in the dead of night to wipe the unallocated portions of the TRI server clean.  Like people who do things in the dark that they do not wish others to know about, neither Genger nor Ohana later informed TRI, its counsel, or the Trump Group about the use of the wiping software.  In other words, Genger and Ohana tried to keep their activities secret.

But, once the Trump Group gained control over TRI, the wiping activity came to light.  The revelation of this misconduct coincided with the unraveling of a settlement of the § 225 action, and has resulted in an expensive case within a case.  While the parties dueled over whether the Trump Group properly exercised consents to replace the TRI board, they also spent enormous resources on whether Genger's actions constituted contempt of court and spoliation of evidence and, if so, what the appropriate consequences were.

In this opinion, I resolve the parties' feud regarding Genger's destruction of information.  Although I reject the Trump Group's preferred remedy of entering a default judgment against Genger in the § 225 action, I conclude that a potent

---

[1] JX-2 (Status Quo Order (Aug. 28, 2009)).

2

remedy is justified by Genger's intentional violation of a clear judicial order and contempt of this court. Moreover, I conclude that Genger intentionally sought to reduce the base of information available to the Trump Group in the § 225 action, and that, even more indisputably, his conduct was reckless — both findings that render him accountable for spoliation.

In the § 225 action, Genger contends, through a variety of legal and equitable theories, that the Trump Group does not have majority voting power despite ownership of a majority of the equity of TRI. Because Genger's destructive conduct had the effect of preventing the Trump Group's access to the full array of information that should have been available in the § 225 action, I conclude that a proportionate and fitting remedy is to require Genger, as to any affirmative defense or counterclaim raised by him in the § 225 action, to meet his burden of persuasion by meeting an evidentiary burden one level higher than would otherwise be applicable. Thus, if Genger would otherwise have to meet a mere preponderance standard, he will now have to prevail by producing clear and convincing evidence. Additionally, because his secretive conduct has left me with serious doubts about his credibility and because that conduct rendered the documentary record incomplete, Genger will be unable to meet his burden of persuasion if the only evidence on a contested matter is his own testimony. Rather, he will need to present corroborating evidence, either in the form of documents or another person's testimony, to meet his burden. To supplement this relief and directly address Genger's shrinking of the evidentiary record, I order

3

Genger to turn over certain relevant documents to which he had made a claim of privilege.

Having found Genger to be in contempt and to have destroyed relevant evidence, I must also balance his actions against some disconcerting actions of the Trump Group following Genger's violations. In rejecting a more extreme order, I give weight to conduct by the Trump Group after they took over control of TRI. That conduct, while in a grayer area than Genger's, also showed disrespect for stipulated court orders, illustrating the high stakes the Trump Group and Genger place on their dispute over control of TRI and both side's willingness to employ sharp elbows. Although not a factor that disentitles it from any relief at all, the Trump Group's behavior convinces me that justice requires that an adjudication resolve this ownership disagreement, if, as seems likely, the Trump Group and Genger are unable to settle their differences in a rational, consensual manner.

Finally, because Genger violated an important order of this court and failed to own up for his misconduct in a timely way, an award of attorneys' fees is warranted. In that connection, I suggest an amount that strikes me as reasonable in light of what was at stake, and that is consistent with my impression that both sides have engaged in overkill.

## II. Factual Background

These are the facts as I find them after trial.

4

A.  The Trump Group Purports To Remove Genger From The TRI Board Of
Directors

As of June 2008, defendant Arie Genger was the Chief Executive Officer of

TRI, a company that he founded.  At that time, the Trump Group owned a large,

but non-majority, bloc of the outstanding TRI stock.[2]  The Trump Group brought

large amounts of financial capital to the table that helped TRI out of an earlier

credit crunch, and that resulted in its ownership of its initial 47% interest in TRI.

From the record, one senses that Genger and the Trump Group bring a similar

mindset to business.  Although they seemed to work together cooperatively to

advance TRI's interests, Genger and the Trump Group viewed business as

business, and neither would hesitate to seize an advantage, even if that advantage

meant causing commercial injury to someone else, regardless of whether one had

served with that someone else on a board for several years.

In 2007 and 2008, TRI fell behind in making payments to its largest lender,

Bank Hapoalim.[3]  In the spring and summer of 2008, the Trump Group and

Genger began to work together to re-finance TRI's debt to Bank Hapoalim.[4]  One

difficulty that both Genger and the Trump Group were interested in avoiding was

putting in place a change in ownership structure that might inspire a legal

challenge from Sagi Genger, Genger's son.[5]  Arie Genger had a bitter divorce

from Sagi's mother, and has been estranged from his son for several years.  It

---

[2] Tr. at 140:15-17 (Hirsch).
[3] *Id.* at 142:4-24.
[4] *Id.* at 147:6-149:6.
[5] *Id.* at 152:9-153:15.

5

seems that as of this time, the Trump Group favored continuing Genger as CEO and working together with him to determine TRI's fate. But the effort to consummate a Genger/Trump Group-sponsored refinancing deal began to unwind in late June 2008 and, ultimately, the parties abandoned these efforts.[6]

With a refinancing out of reach and TRI facing the potential for its creditors to take adverse action, the Trump Group shifted course in a major way. Litigation in this court and another forum broke out in early August 2008 between the Trump Group and Genger over TRI. Then, without any advance notice to Genger, on August 22, 2008, the Trump Group purchased an additional 19% bloc of TRI shares from a trust to benefit Sagi, called the Sagi Genger Trust, for $26.7 million.[7] This bloc of shares will feature prominently in the upcoming § 225 trial, because it was transferred by Arie Genger to the trust in connection with his divorce from Sagi's mother, Dalia Barshishat. Arie Genger and the Trump Group have sharply differing views about who gets to vote this bloc. For now, suffice it to say that the Trump Group believed that the purchase of this bloc, along with other shares they own, gave it sufficient voting control of TRI to remove the TRI board and install a new board.[8] As of August 25, 2008, the original board consisted of five members: Genger and his trusted business associates William Dowd and Avi Pelossof, as well as Robert Smith and Jules Trump, both appointees of the Trump Group.

---

[6] *Id.* at 162:2-163:20.
[7] *Id.* at 140:18-141:4, 163:21-164:10.
[8] *Id.* at 164:12-165:14.

At a board of directors meeting held on August 25, 2008, the Trump Group delivered written consents of its shares, including those acquired from the Sagi Genger Trust, and proposed to reconstitute TRI's board as follows:  first, the Trump proposed to increase the number of directors on the board from five to six; second, the Trump Group proposed to remove Arie Genger from the board and from his position as CEO; and third, the Trump Group proposed that Eddie Trump and Mark Hirsch would take the two new seats on the TRI board.[9]  Because Eddie Trump and Mark Hirsch were Trump Group appointees, the practical effect of this proposal was to eliminate Genger's control over TRI.  At the August 28, 2008 meeting, Genger, Pessolof, and Dowd rejected the proposal, believing that the Trump Group did not have the voting power to reconstitute the board.

B. <u>The Section 225 Action Is Filed And A Status Quo Order Is Implemented</u>

TR Investors, LLC, Glenclova Investment Co., New TR Equity I, LLC, and New TR Equity II, LLC promptly filed the § 225 action on August 25, 2008, asking, among other things, for this court to: (a) declare the Trump Group the majority stockholder of TRI; (b) enjoin TRI from recognizing Genger as a director; (c) declare them entitled, as the majority shareholders, to designate and elect two more of their designees to the TRI board, and to continue the terms of Jules Trump and Robert Smith; (d) declare the TRI board to be composed of their four designees — Jules Trump, Robert Smith, Mark Hirsch, and Eddie Trump —

---

[9] Pl. Compl. at Ex. A (Action by Written Consent of the Stockholders of [TRI] (Aug. 25, 2008)).

plus William Dowd and Avi Pelossof; and (e) declare invalid any actions taken by

a board not comprised of their designees from and after the August 25, 2008

delivery of their written consents.  On August 26, 2008, the Trump Group also

filed an action under 8 *Del. C.* § 220 asking, among other things, for this court to

order TRI to permit it to inspect and copy books and records from TRI.

On August 28, 2008, the parties to the § 225 action entered into a Standstill

Agreement, which was scheduled to terminate on September 4, 2008, for the

purpose of giving the disputing parties time to try to settle their dispute and, until

such settlement was reached or the § 225 action completed, to sort out how TRI

would be managed.  This Standstill Agreement provided, among other things,

"[e]xcept as otherwise provided herein, no action will be taken to prosecute or

defend any of the Litigations during the Term of this Agreement."[10]  The next day,

the parties submitted a stipulated status quo order (the aforementioned "August

Status Quo Order").  Importantly, the August Status Quo Order had a provision

that is standard when parties are disputing the control of a business and where

there exists a motive for the destruction of unfavorable information.  That

provision states in relevant part:

> Unless and until otherwise ordered by the Court or agreed to in
> writing by each of the parties to the above action, the plaintiffs and
> the defendants, and their respective officers, directors, agents,
> servants, subsidiaries, affiliates, employees, attorneys, advisors and
> all persons acting in concert or participation with any of them, and
> each of their successors and assigns, are hereby restrained and
> enjoined from, directly or indirectly . . . tampering with, destroying

---

[10] JX-1 (Standstill Agreement (Aug. 28, 2009)).

8

or in any way disposing of any Company-related documents, books or records . . . .[11]

Because neither settlement nor a favorable verdict in the § 225 action were guaranteed, Genger faced the possibility that he might lose control of the company he founded twenty-five years ago.  Relatedly, Genger faced the prospect that the Trump Group, if it assumed control, would review the documents and files he had accumulated over the twenty-five years he had spent at TRI, not to mention the chance that they would get to see those documents as a result of discovery in the pending litigations.  Therefore, at the direction of TRI's outside counsel, Friedman Kaplan Seiler & Adelman LLP ("Friedman Kaplan"), on the weekend of September 5-7, 2008, the entire contents of Genger's TRI office — both physical and electronic — were packaged, sealed, and sent to the office of Genger's personal counsel, Dechert LLP pending the outcome of the lawsuits.  The goal of Friedman Kaplan's efforts was not only to segregate the non-TRI documents and to protect Genger's interest in keeping those documents confidential, but also to ensure that all of the documents relevant to TRI's business and affairs were preserved and available both for those managing the corporation and for possible use as evidence by the parties in the pending litigation.

---

[11] August Status Quo Order at ¶ 1.

C. Genger Allows Files To Be Erased From His Computer At TRI In Violation Of
The August Status Quo Order

1. Genger Has Unusual Concerns About His Personal Documents At TRI

Aside from the usual motivations that pertain in these situations, Genger

had special concerns that made him reluctant to permit the Trump Group to

control TRI because the Trump Group would have access to personal electronic

documents that Genger had generated while at TRI. Although Mike Myers may

have made millions by bringing to the big screen his take on what it is like to be an

"international man of mystery," Arie Genger, as it turns out, is such a man. Aside

from his business interests, Genger apparently has high level contacts within the

Israeli government for whom he performed sensitive tasks relating to Israel's

national security. It seems that these tasks involved work by Genger within the

United States — apparently on a secret basis — although there is no indication in

the record that Genger has openly identified his work to anyone of authority in the

United States or has diplomatic or other official credentials. What this work

involved is unknown to me, but what is known is that Genger used TRI's

computer system to create and receive documents implicating Israel's national

security.

Genger also had personal documents relating to his family finances and

divorce dispute on the TRI system. Although Genger's use of TRI's computer

system for these personal purposes was a violation of TRI's policies for computer

use as articulated by Genger himself, Genger had breached these policies

10

pervasively. He was worried that the Trump Group would gain access to his personal documents, and, through his lawyers, Genger voiced concern about the security of these documents in view of the Trump Group's possible impending control of TRI.

### 2. Steps Were Taken To Preserve Relevant Information

Because of the ongoing dispute and his possible departure from TRI, Genger needed to gather his personal effects and desired to protect his personal documents, including those that involved his work for the Israeli government. At the same time, safeguards were needed to ensure that Genger did not leave with documents relevant to TRI's business and affairs. To help protect the integrity of this process of information segregation, attorneys from Friedman Kaplan were charged with supervising the process by which Genger would remove his personal materials from TRI's offices. Most pertinent to the current dispute, Friedman Kaplan reviewed TRI's electronic files with the goal of identifying those of Genger's documents that were purely personal. Those personal documents were then to be encrypted in a manner that ensured that the confidentiality of those documents would be protected. As to non-personal documents, it was Friedman Kaplan's task to preserve those documents for use by TRI in its business and to ensure they were available if relevant in the pending litigations. To do that,

attorneys opened documents and e-mails that were potential targets for encryption to review their contents.[12]

This process was a hurried one that was largely accomplished during the weekend of Friday, September 5, 2008 through Sunday, September 7, 2008, with Friedman Kaplan endeavoring to complete the review and encryption process before Monday, September 8, 2008, when the Trump Group's purportedly reconstituted board was scheduled to meet. To assist in its efforts, Friedman Kaplan employed an outside technology firm, Kraft & Kennedy, Inc. ("K & K"), to preserve Genger's electronic files and e-mails and, where necessary, to separate and encrypt Genger's personal files from his TRI-related files.[13]

As part of the preservation process, K & K "imaged"[14] parts of TRI's computer system on September 7, 2008 in order to have a "snapshot" of everything on the system as of that date.[15] Specifically, K & K imaged hard drives of various computers at TRI, including Genger's computer's hard drive and the TRI server's hard drive.[16] But K & K did not do a complete job, as will soon be

---

[12] JX-5 at ¶¶ 8-10 (Ohana Aff. (Oct. 20, 2008)).

[13] JX-7 at ¶¶ 1-4 (Leicht Aff. (Oct. 31, 2008)); Tr. at 251:6-252:11 (Genger).

[14] The "images" taken were digital pictures of the computers' hard drives. These digital pictures are essentially exact copies of the computers' hard drives, which computer technicians can then use to reconstruct and examine the data stored on the drives.

[15] JX-7 at ¶¶ 2-3 (Leicht Aff. (Oct. 31, 2008)).

[16] A computer server is a computer with a large amount of memory that runs the operating system and other software programs for individual computers. These individual computers are often linked to one another by an electronic network. The server often stores the data for the entire network and for all users. Thus, for example, saving a file to the network from Genger's computer would allow another user to access that saved data from another computer linked to the same server.

discussed, perhaps in part because it did not have a deep understanding of how TRI maintained its computer records.

The person who did fully understand how TRI maintained its computer records was Oren Ohana, who had served for years as a technology consultant for both TRI and Genger personally. Genger trusted Ohana, and Ohana had established protocols for Genger to use in his own handling of important documents. Genger was in contact with Ohana throughout the document review process on the weekend of September 5, 2008.[17]

### 3. Temporary Files Were Stored On The Unallocated Space Of Genger's Hard Drive

To understand the present dispute's origins — the events of the weekend of September 5, 2008 — one must grasp the key point that the deletion of a document or e-mail from the active space of a computer's hard drive or from a server does not mean that that the deleted file or e-mail is no longer retrievable from the computer system.

By way of a directly relevant example, if the Friedman Kaplan attorneys opened a document on Genger's computer from his files that weekend to review whether it was confidential and kept it open long enough for the program's autosave feature to function, the computer system would create a temporary copy of that file on Genger's computer. These temporary copies are different than

---

[17] *See* JX-22 (e-mail between Arie Genger and Oren Ohana (Sept. 4, 2008)) (asking Genger, "[c]an I call you[?]"); JX-23 (e-mail between Arie Genger and Amir Shvetz, an Ohana employee (Sept. 5, 2008)); JX-25 (e-mails between Arie Genger and Amir Shvetz, an Ohana employee (Sept. 5-6, 2008)).

normal user-created files, such as word-processing documents. A user-created document is stored on the active, or allocated, space, of a computer or server where it is visible to a user. A temporary file, however, is only in the active, or allocated, space so long as the file is open. When the file is closed by the user, the recently created temporary copy (or its contents) physically, or digitally, remains in the inactive, or unallocated, space of the machine's hard drive where it stays, invisible to the user, until the computer needs that space to run a process or store another file. When the computer needs this space, it overwrites the previous data that had been stored on that portion of the unallocated space, and this process starts anew. Additionally, when a user deletes a file from his or her computer or a server (*e.g.*, deletes a file from the "trash bin"), the data from that file remains — as it was — in what is now the unallocated space. Data in the unallocated space is not visible to normal users, but can be recovered with the aid of technology consultants like Ohana or K & K.

Although e-mails and e-mail attachments also create temporary files, they are contained within a smaller, segregated segment of the computer's hard drive dedicated to the computer's e-mail program. The e-mail programs themselves create files for different e-mail users or e-mail accounts, but these files (and their unallocated space) are much smaller than the computer's main unallocated space section. Therefore, files in the smaller, unallocated space on the computer's hard drive reserved for e-mails, such as deleted e-mail messages, get overwritten much faster as a result of normal usage.

To narrow the factual disputes between the parties about technological issues, I directed the parties to identify a neutral, independent IT consultant — ultimately, Protiviti, Inc., a risk and business consulting firm — to facilitate the exchange of electronic information between the parties.[18] In its expert report, Protiviti concluded that non-encrypted copies of Genger's documents could have been created during the encryption process.[19] This inadvertent creation of temporary copies would have defeated the point of the encryption process because, as discussed above, trained computer technicians would be able to obtain access to these confidential files even without the encryption key.

The possibility of extra, or unintentional, copies of various files — temporary or deleted files, for example — also applies to Genger's TRI-related work. During the September 5-7 review process, temporary copies of TRI-related files (*i.e.*, not personal Genger documents) would have been created. These temporary copies would have remained on the computer's unallocated space at the conclusion of the weekend.

Even more importantly, Genger and others at TRI would almost certainly have created many such TRI-related documents *before* the August Status Quo Order had been entered, simply by their normal computer usage.[20] The information on the unallocated space of the TRI system therefore acted somewhat

---

[18] Stipulation and Confidentiality Order Governing the Exchange of Certain Information (Mar. 3, 2009) at ¶ 5.
[19] JX-19 (expert report of Kevin Faulkner) at 13.
[20] Tr. at 54:14-55:6 (Faulkner).

as a back-stop reservoir of documents that had been deleted from the active files of

TRI users. Although users may have believed that their deletion activity rendered

the affected documents irretrievable, that was not so — as long as the unallocated

space had sufficient room to store them. The unallocated space on the TRI server

was likely filled with several months of TRI-related data as of September 7, 2008.

4. Ohana Removes The Temporary Files Stored On Genger's Hard Drive

Genger's advisor Ohana was keenly aware of how and where TRI stores its

electronic files and e-mails. And, on Sunday, September 7, 2008, Ohana actually

joined Genger, Friedman Kaplan, and K & K for parts of the review process.

During the time that Friedman Kaplan and K & K were there, Ohana did not

express any concerns to them about the possibility that unencrypted versions of

Genger's files were being created during the review process.

But after the attorneys and K & K had left TRI's offices, Genger claims

that Ohana informed him that non-encrypted copies of Genger's personal files

may have been created and left on the unallocated space of his computer and the

TRI server.[21] Ohana recommended that he "take care of" the problem by "wiping"

the unallocated space on both machines, and Genger agreed with Ohana's

suggested course of action.[22] At around 1:00 a.m. on September 8, 2008, Ohana

ran a wiping software program called "SecureClean," and selected the

---

[21] JX-5 at ¶ 13 (Ohana Aff. (Oct. 20, 2008)); JX-20 at ¶¶ 12-14 (Genger Aff. (Oct. 31, 2008)); Tr. at 256:4-13 (Genger).
[22] JX-5 at ¶ 13 (Ohana Aff. (Oct. 20, 2008)); JX-20 at ¶¶ 12-14 (Genger Aff. (Oct. 31, 2008)); Tr. at 257:4-258:2 (Genger).

"DeepClean" option (the most thorough) for use on the hard drive of Genger's computer.[23]  Ohana then ran SecureClean on the hard drive of TRI's server on September 10, 2008.[24]  This option permanently overwrites — or, effectively erases — data on the unallocated space of a hard drive by saving new strings of unintelligible data on that unallocated space.[25]

Neither Ohana nor Genger spoke with Friedman Kaplan, K & K, or even Genger's own lawyers before Ohana ran SecureClean on September 8 and 10, 2008.  Genger did not seek advice from Friedman Kaplan about whether getting rid of files, even copies, was permissible under the terms of the August Status Quo Order, despite knowing that Friedman Kaplan had been charged with ensuring compliance with the August Status Quo Order and the preservation of documents.

Notably, neither Ohana nor Genger disclosed their conduct after the fact.  That is, they did not leave a note saying "oh by the way, we wiped clean the unallocated space during the dead of night."  Rather, they kept their furtive conduct secret.

Their destructive conduct was especially harmful because K & K had not preserved an image of the entire TRI hard drive.  K & K had only preserved an image of the active files on the TRI system, and the information on the unallocated space had not been imaged or reviewed.  Furthermore, the review process did not

---

[23] JX-5 at ¶ 6 (Ohana Aff. (Oct. 20, 2008)); JX-19 at 15-16 (expert report of Kevin Faulkner).
[24] JX-19 at 15-16 (expert report of Kevin Faulkner); *see* JX-5 at ¶ 15 (Ohana Aff. (Oct. 20, 2008)).
[25] Tr. at 8:21-9:10 (Faulkner).

17

include the information on TRI's e-mail server, because, unknown to K & K and

Friedman Kaplan — but known to Ohana and therefore likely his client, Genger

— the e-mail server was maintained at an off-site facility controlled by Ohana.

It is difficult to determine whether Genger and Ohana knew before running

SecureClean that K & K had not imaged the unallocated space of Genger's

computer or the TRI server.  For his part, Genger pleads computer ignorance,

claiming only to have thought that Ohana was getting rid of "copies" of

information that was encrypted, and that the underlying originals were preserved.

Genger's lawyers even tried to convince me that Genger was unaware that Ohana

would be using a form of deletion software, suggesting that he believed Ohana had

somehow engaged in a more targeted deletion effort.  In support of their argument

that Genger had no intent to destroy evidence relevant to the § 225 dispute, his

lawyers point to the lack of any evidence that Genger deleted a large amount of

documents before his departure from TRI.  Such a pattern, of course, would have

provided support for a motive for the use of SecureClean as it would have

completed the job of eradicating traces of documents Genger had deleted from the

active files of TRI.  Ohana claims that he simply intended to erase the temporary

versions of the encrypted files that may have been created during the review

process.[26]

Although I am not free from all doubt on the point, I do not, in the end,

embrace Genger's version of events.  He is a very sophisticated man who operates

---

[26] JX-5 at ¶ 13 (Ohana Aff. (Oct. 20, 2008)).

in the national security field. Precisely because he recognizes the importance of computer security, he has employed Ohana as an advisor for many years. The fact that Genger is not a computer expert does not mean that he does not understand that there are products that can erase documents; he has someone like Ohana at his disposal precisely to bring to bear the specific skills that Genger himself lacks.

Genger and Ohana were both involved in the document review process, but Ohana was not continuously involved. It therefore makes no sense that Ohana could easily find and delete simply those copies of the documents that were encrypted. If that were the case, there was no reason for them not to have called Friedman Kaplan and K & K, asked them to come back in the office, and done it in an above-board way. Certainly, that could have been done on September 9, before the final wiping on September 10. The idea that Genger was reluctant (because of the sensitivities about the work strain it would impose) to burden them further with a discussion of whether the wiping was proper makes no sense and has no credible basis. Likewise, if (as I find) Genger knew that Ohana would run a computer program that deleted all the information on the unallocated space and believed (as I do not find) that there was nothing wrong with doing that, Genger had no reason not to engage the lawyers and K & K. He could have pointed out the problem and sought permission to proceed.

The most natural inference that arises when sophisticated people act secretively in a process that is governed by a court order and that has been placed under the purview of counsel to ensure compliance is that they have something to

hide. In this case, I believe that Genger, with Ohana's advice, felt that there was a chance not only to reduce the risk that his personal information would be misused but also to narrow the information available to TRI in the § 225 action and the other pending cases. In so finding, I am influenced by the incompleteness of the work done by K & K, which did not include imaging the unallocated space. Ohana was involved in the document review process and, while he and Genger were present, none of the review involved the unallocated space. Moreover, Ohana did not reveal to K & K or Friedman Kaplan that TRI's e-mail server was located off of TRI's premises.

I believe it more likely than not that Ohana (and therefore his client, Genger) knew the unallocated space had not been imaged and knew that it was likely to contain a large amount of information that had not been reviewed that weekend. By having Ohana run SecureClean secretly, Genger would never have to worry about the files contained on the unallocated space. By contrast, if Ohana and Genger raised this issue with Friedman Kaplan and K & K, they would have signaled the existence of the unallocated space and the information on it, thereby providing another source of documents for the Trump Group and perhaps triggering a deeper inquiry into other sources of TRI information that were available, including the off-site e-mail server.

Given that the only downside of proceeding in an open manner was that Friedman Kaplan and K & K would have been in on the process used to protect any documents made during the encryption process, Genger's behavior is more

consistent with a darker intent of getting rid of what he and Ohana thought the lawyers and their consultant did not need to know about. Admittedly, this was a clumsy effort. But tricksters are often ham-handed, and they are not absolved of wrongdoing simply because their improper conduct was not completely effective.

Put simply, I conclude that Genger, upon the advice of Ohana, authorized Ohana to run wiping software with the purpose not only of protecting his non-TRI documents but also of narrowing the information base available to the Trump Group. I cannot and do not conclude that he had any particular piece of information in mind when he made this hurried and ill-advised decision. But I do conclude that he intended to limit the ability of the Trump Group to find additional documents that might aid it in its litigation battles with him.

D. A Status Conference Is Held To Address, Among Other Things, Genger's Concern About His Personal Documents

On September 12, 2008, this court held a status conference regarding the § 220 and § 225 actions. One concern raised by the Trump Group was that TRI, under Genger's instructions, was not permitting the Trump Group to inspect all of TRI's books and records, some of which Friedman Kaplan had gathered during the September 5 weekend and sent to Dechert's offices for safe-keeping. Another concern the Trump Group raised was that Genger was still acting as a manager, that Genger had "the keys" to TRI, even though the Trump Group purported to have control over TRI. This court responded to both of these concerns by

21

suggesting the parties file an amended status quo order addressing these and other issues.

Additionally, to accommodate Genger's concerns about his personal documents, it was agreed that attorneys from Morris, Nichols, Arsht & Tunnell LLP ("Morris Nichols"), on behalf of TRI, would review both the electronic and hard copies of documents that Friedman Kaplan had gathered during the September 5-7, 2008 weekend, some of which were being held at Dechert's office. Morris Nichols was to segregate Genger's personal and national security documents from those of his documents that related to TRI's business.

Following the September 12, 2008 status conference, the parties submitted an amended status quo order on September 23, 2008 in which they agreed that Avi Pessolof, William Dowd, Arie Genger, Jules Trump, and Robert Smith would constitute the board of TRI until the § 225 action was resolved. The amended status quo order also provided that the senior management team who was running TRI as of August 25, 2008 would stay in place.

At the September 12, 2008 status conference, Genger's lawyers did not inform the court and the Trump Group about their client's use of wiping software just days before.[27] After the conference, K & K discovered, on its own, that TRI's e-mails were handled by the off-site third-party server maintained by Ohana.[28] On

---

[27] I do not imply that any of Genger's lawyers had been told of the wiping. Of course, if that was the case, it again illustrates Genger's sense of shame over the conduct.
[28] JX-7 at ¶ 10 (Leicht Aff. (Oct. 31, 2008)).

22

September 23, 2008, K & K made an image of the active files of that third-party e-mail server's hard drive.[29]

E. Genger's Misconduct Is Discovered And An Expensive Process To Determine
What Information Went Missing Is Undertaken

   1. The Trump Group Discovers That Files Have Been Erased From TRI's
Computers

Because K & K did not image the unallocated space on the TRI's computers, it is impossible to tell exactly what was erased from the unallocated space.[30]  We will never know, to a certainty, what exactly was erased — precisely because of the use of SecureClean.[31]

The use of SecureClean was discovered by the Trump Group in early October 2008 — just days after Genger had settled the § 225 action by stipulating to a final judgment that provided for the TRI board of directors to be composed of Eddie Trump, Mark Hirsch, Jules Trump, Robert Smith, William Dowd, and Avi Pelossof, and that effectively ended Genger's managerial role in TRI.  After it assumed control of TRI's offices, the Trump Group employed a computer consultant of its own, FTI Consulting, Inc. ("FTI").  FTI discovered that on

---

[29] *Id.* at ¶ 11.
[30] When SecureClean is run on any computer or file, it leaves an electronic "trace," or a type of marker, that the program had been run — even after using the DeepClean option. FTI found these markers of SecureClean activity on Genger's computer and the TRI server.
[31] *See* Tr. at 8:21-9:10 (Faulkner).

September 8 and 10, 2008, SecureClean had been used to "wipe," or permanently overwrite, the unallocated space on a TRI computer and server.[32]

Within days of discovering the use of SecureClean, on October 10, 2008 the Trump Group filed a motion to reopen the § 225 case and for an order to show cause as to why Genger should not be held in contempt.[33]  In the same general time period, the settlement in the § 225 action unwound and Genger began to again challenge his removal from the TRI board.  Eventually, the § 225 action was reopened, and Genger and the Trump Group agreed to seek a determination of who controlled the economic and voting interests in the bloc of shares the Trump Group had bought from the Sagi Genger Trust.  The § 225 action was to proceed before other litigation pending among Genger, the Trump Group, and certain other parties in New York, which touched on several of the same issues.

Genger's destruction of documents, however, created a question about the adequacy of the factual record and what, if any, consequences, should result from his conduct.  A great deal of discovery was taken to determine whether any evidence was lost because of Genger's conduct.  That discovery included the performance of an analysis by Protiviti Inc., the neutral IT consultant selected by the parties.

---

[32] Tr. at 70:11-22; *see* JX-10 at ¶ 7; JX-11 at ¶¶ 6-8.
[33] *See* Pl.'s Motion To Reopen Case And For Order To Show Cause Why Arie Genger Should Not Be Held In Contempt (Oct. 10, 2008).

### 2. An Important Memorandum Is Not Found On Genger's Computer

Despite these efforts, neither party could definitively answer the question of whether any evidence was lost because no record existed of what was on the unallocated space before the wiping occurred.  At trial, one document, known in this case as the "Lentz Memo,"[34] took on special importance.  That document was authored by David Lentz, of the law firm Lentz & Gengaro LLP, and was sent to Arie Genger, Bill Dowd, and Christopher Gengaro.  The memorandum addresses matters directly relevant to the issue of control over certain TRI shares and thus the § 225 action.  The document was important to Genger, as evidenced by the fact that he reacted to it by asking Lentz and the other two memo recipients to convene a meeting the following Monday to discuss the issues covered by the memo.[35]

Under the protocol established by Ohana for Genger's use and storage of information, Genger should have placed that document on the TRI server in either a personal file, called "P," or a TRI-related file, called "T."  In either event, that would have resulted in a copy of the Lenz Memo being saved on the TRI server.  When discovery was conducted in this case and when the TRI server was reviewed by FTI and Protiviti, no copy of the version of the Lentz Memo sent to Genger — or the e-mail to which it was attached — was found on the TRI server, on Genger's TRI computer, or in Genger's e-mail inbox.  Thus, contrary to what was his typical practice, Genger must have deleted this e-mail and the attached

---

[34] JX-9 (memorandum from David Lentz to Arie Genger, William Dowd, and Christopher Gengaro (June 6, 2008)) ("Lentz Memo").
[35] JX-17 (e-mail from Arie Genger to David Lentz and William Dowd (June 20, 2008)).

document. Had he, however, followed his protocol and saved a copy of the memo to the T file on the TRI server, a copy of that document would have been on the allocated space of the TRI server. Alternatively, had he opened and reviewed but not saved the file, it most likely would have been stored on the unallocated space of the TRI server or Genger's computer.

Although one cannot say with certainty what happened to Genger's copy of the Lentz Memo, other than that Genger must have at some point deleted it from his e-mail inbox, it does illustrate the grave doubts that Genger's destructive conduct creates about the integrity of the evidentiary record. At trial, Genger proffered no explanation about what happened to his copy of the Lentz Memo, and whether he deleted it or not. He did not explain whether he followed his typical protocol. All that is known is that his copy is gone from his TRI computer and the TRI server. In his defense, Genger notes that a copy of the Lentz Memo was found on the TRI system in the active files of TRI's then-president, Bill Dowd. But Genger presented no convincing evidence about what happened to his copy of the Lentz Memo, leading me to conclude that he, at some point, deleted it from his work computer at TRI. Even if Genger had deleted the memo from another computer, it would have remained in the "deleted items" folder on his TRI computer unless Genger chose to empty that file, or until it was overwritten by the computer's natural operating process.

The fact that Genger's copy cannot be found remains important. Different versions of documents or e-mail chains can take on material importance if there

are alterations or additions to them. And who received what and when can be crucial. The bottom line is that Genger himself viewed the Lentz Memo as important and yet apparently deleted it from the TRI system at a time when he and the Trump Group were involved in contentious discussions.

The Lentz Memo is not the only document missing from the image of TRI's and Genger's hard drives. After trial, Lentz finally produced documents in connection with his deposition in the § 225 action.[36] In those documents were

---

[36] The Trump Group has moved to supplement the trial record with these documents. The decision whether to allow this evidence is entrusted to my discretion. *In re Transamerica Airlines, Inc.*, 2008 WL 509817, at *4 (Del. Ch. Feb, 25, 2008) ("A motion to supplement the record is addressed to the discretion of the trial court."). For sensible reasons, the admission of late-submitted evidence is not favored, but this is an unusual context. The documents were just produced by Lentz on November 23, 2009, a day before a deposition he gave for the § 225 action. Although Genger claims that the Trump Group could and therefore should have obtained these documents before the contempt trial, the record shows that Genger himself successfully moved to narrow discovery in the contempt action, including raising concerns about the Trump Group's desire to depose and obtain documents from Lentz. *See* Letter from Brian C. Ralston to the Honorable Leo E. Strine, Jr. (Mar. 31, 2009) at 3 (requesting that the court limit discovery of documents to Genger, Ohana, a representative of Friedman Kaplan, and the parties' experts and "opposing [the Trump Group's] motions for commissions to all other witnesses on the grounds that [the Trump Group] is abusing the discovery process"); *TR Investors, LLC, et al. v. Arie Genger, et al.*, C.A. No. 3994-VCS, at 26 (Del. Ch. Apr. 29, 2009) (TRANSCRIPT) (limiting the number of depositions). That is, Genger discouraged the pre-trial discovery of documents from Lentz that had been sought by the Trump Group. Admittedly, very shortly before trial, Genger changed course and decided to call Lentz as a witness, but that was at a time when the parties were in the last days of preparing for trial. Although Lentz's deposition was taken, he did not produce documents at that time. Only after trial did Lentz, through Genger's own counsel, finally produce documents. Among those documents were communications to Genger that are clearly relevant to the § 225 action and that bear directly on the effect of Genger's destructive conduct

On balance, I find that the interests of justice are best served by allowing supplementation of the record. Having resisted the broader discovery plan for the contempt action proposed by the Trump Group that would have encompassed discovery of Lentz's documents — including documents that involved communications between Lentz and Genger himself — it comes with ill grace for Genger to complain that he is

27

eight e-mails, some with attachments, that discussed the same subject matter as the

Lentz Memo.[37] None of these eight relevant documents were found on Genger's

hard drive, even though opening an e-mail and its attachment would have typically

created a copy of the documents in the unallocated space on the computer's hard

drive. Therefore, it is likely that the wiping of Genger's hard drive also eliminated

these documents.

Neither the Trump Group nor the court can do anything but speculate what

other documents Genger may have deleted during this critical time. The absence

of large volumes of deletions is, I suppose, of some comfort, but the quality rather

---

now confronted with additional documents relevant to the § 225 action that were sent to
him by Lentz at TRI and that also cannot be found on the image of the hard drive taken
by K & K. Moreover, Genger is well-positioned to show that his copies of these
documents are present on the image of his hard drive or TRI's server. There is therefore
no prejudice to Genger. That Genger cannot rebut the fact that the documents sent to him
are not on either the hard drive or the server does not constitute unfair prejudice
justifying keeping this evidence out. Rather, Genger's inability to rebut that fact just
demonstrates that additional relevant documents were likely destroyed by his conduct.
[37] Pl's Motion to Supplement the Record at Ex. A (e-mail between David Lentz, Arie
Genger, William Dowd, and Christopher Gengaro (June 17, 2008)) (discussing the legal
restrictions on all Genger trusts and the options available to avoid a legal challenge by
Sagi Genger to any sale by one of the trusts to the Trump Group and Genger); *id.* at Ex. B
(e-mail between David Lentz, Arie Genger, William Dowd, and Christopher Gengaro
(June 26, 2008) (discussing developments in the discussions with the Trump Group and
implications for control of TRI); *id.* at Ex. C (e-mail between David Lentz, Arie Genger,
William Dowd, and Christopher Gengaro (July 2, 2008)); *id.* at Ex. D (notes of Chris
Gengaro (July 2, 2008)) (describing the termination provisions of a proposed
stockholders agreement that was being negotiated); *id.* at Ex. E (e-mail between David
Lentz, Arie Genger, and William Dowd (July 9, 2008)) (discussing edits to the language
in the proposed stockholders agreement ); *id.* at Ex. F (e-mail between David Lentz,
William Dowd, Arie Genger, and Christopher Gengaro (June 30, 2008)) (discussing
developments in the discussions with the Trump Group and implications for control of
TRI); *id.* at Ex. G (notes of meeting between Arie Genger, William Dowd, David Lentz,
and Christopher Gengaro (June 19, 2008)) (discussing financing for TRI and Sagi
Genger's strategy ); *id.* at Ex. H (notes of meeting between Arie Genger, William Dowd,
and Eddie Trump (June 16, 2008)) (discussing strategy for dealing with Sagi Genger
Trust in light of proposed financing deal for TRI).

than the quantity of deletions matters more. This is particularly the case because Genger was not a routine "deleter" — he had accumulated thousands of e-mails in his in-box.[38]

There is no real doubt that the unallocated space of the TRI server contained a large mass of TRI-related information from the months immediately preceding the use of SecureClean which would have included copies of information that had been deleted from the active files of TRI. That large mass would likely have included Genger's copy of the Lentz Memo, the newly discovered documents sent to Genger that addressed the same general subject matter, and other versions of documents Genger had used that involved TRI's business and affairs. Therefore, I conclude that Genger's behavior had the effect of destroying evidence that was likely relevant to the § 225 action in the sense used in the discovery rules.

In reaching that conclusion, I do not wish to overstate the point. The reality is that K & K did image all of the active files available at TRI. And, as will be discussed, the Trump Group located a back-up tape for TRI that was current as of July 2007, a period fourteen months before SecureClean was run. From those available data sources, the Trump Group has had sufficient information to operate TRI as a business and has been able to collect a very large amount of evidence for trial.

---

[38] See TR Investors, LLC v. Arie Genger, C.A. No. 3994, at 4-8 (Del. Ch. Oct. 26, 2009) (TRANSCRIPT) at 86:6-87:1; JX-19 (expert report of Kevin Faulkner) at 22.

But the reality remains that Genger caused a large data source to be entirely deleted, a data source that would have acted as a back-stop in case relevant evidence had been deleted in the months when the motivation to delete would have been at a zenith. Genger argues that the loss of any data he deleted from the active files before the August Status Quo Order formally went into effect is irrelevant. That is nonsense. By his improper destruction of the unallocated space, Genger likely destroyed relevant evidence — including evidence that he deleted during July and August, at times when he realized that litigation was likely and, indeed, when it had already commenced.

### F. The Trump Group Assumes Control And Uses TRI's Records

Almost as soon as the Trump Group assumed control of TRI, it began reviewing documents both for purposes of running TRI and for purposes of litigating against Genger. To both ends, the Trump Group had its consultant, FTI, preserve its own image of Genger's computer and the TRI server.[39] The Trump Group then had another computer consultant, i365, Inc., use that image along with data-building software called MetaLINCS, to create a user-friendly and searchable database, which was designed to help the Trump Group prepare for the § 225 action.[40] But the MetaLINCS database was also used by the Trump Group in their day-to-day operations of TRI.[41]

---

[39] *Id.* at 166:14-24 (Hirsch).
[40] *See TR Investors, LLC v. Arie Genger*, C.A. No. 3994, at 4-8 (Del. Ch. Oct. 26, 2009) (TRANSCRIPT) at 131:12-132:1.
[41] Tr. at 169:5-16 (Hirsch).

In itself, these activities were not problematic. But yet another amended status quo order, created after an argument before this court on December 29, 2008 (the "December Status Quo Order") also contained a provision that stated:

> Unless and until otherwise ordered by the Court or agreed to in writing by the parties to the above action, Plaintiffs and their respective officers, directors, [and] agents . . . shall not cause TRI, Inc. and/or its subsidiaries and affiliates . . . to take any material action that is out of the ordinary course of business, including but not limited to those actions enumerated in subparagraphs 2(i)-2(xii) below, without having first provided to Defendant Arie Genger not less than five (5) business days notice of the proposed action: . . . (xii) accessing or attempting to access any Genger documents, except in accordance with the protocols outlined by the Court at the December 29 . . . . At the December 29 hearing, the Court outlined the protocols that the parties should follow for reviewing Genger documents at TRI's offices or in electronic files that the Company has sought to access.[42]

In the Standstill Agreement, "Genger documents" had been defined as "[t]he documents, objects, and electronic files stored at [TRI] that Arie Genger contends are solely personal in nature and do not belong to the Company . . . ."[43]

Inspired in part by a zealous desire to find out exactly what information had been lost by Genger's use of SecureClean, the Trump Group's general counsel, Mark Hirsch, began working with Sagi Genger to develop information that would be useful to the Trump Group's contempt motion and, more generally, in the litigations involving Genger. To that end, Sagi Genger provided Hirsch with information in Sagi's own possession that Sagi thought would be on the TRI system. That included a document with valuations of some of his father's

---

[42] JX-4 (Second Amended Status Quo Order (Dec. 30, 2008)) at ¶¶ 2, 8.
[43] *See* Standstill Agreement.

31

financial holdings, which did not relate to TRI.[44]  On its face, the document appears to have been of the kind that Genger legitimately sought to protect through the encryption process.  The parties had agreed in the December Status Quo Order that documents personal to Genger were only to be reviewed in accord with the protocols laid out by this court at the December 29, 2008 hearing.

Hirsch took a see no evil, hear no evil approach to his dealings with Sagi.  Hirsh did not ask Sagi how he had come into possession of the documents he was turning over to Hirsch and whether Sagi had a legitimate right to their use.[45]  Hirsch then took the documents he received from Sagi and searched the MetaLINCS database to see if he could find copies of them.  When he found a different e-mail copy of the document relating to Genger's financial holdings, Hirsch sent it on to Sagi, who used the version from TRI's database in other, unrelated family litigation against his father.[46]  Hirsch says he now "regrets" this action.[47]

Moreover, when the Trump Group located the TRI Server July 2007 back-up tape in September 2008, it did not disclose that discovery to Genger.  This back-up tape was loaded on to the MetaLINCS system in early October 2008.  Because the back-up tape was comprehensive, it likely included personal information of Genger's that was unrelated to TRI.  But the 2007 back-up tape

---

[44] JX-34 (e-mail from Arie Genger to Dalia Barshishat (Aug. 27, 2004)).
[45] Tr. at 220:9-221:17 (Hirsch).
[46] *Id.* at 183:5-184:19, 186:2-8.
[47] *Id.* at 186:13-18.

32

was not reviewed to segregate (or encrypt) such information and was placed in searchable form on the MetaLINCS system. It was not until May 2009 that a copy of the back-up tape was turned over to Genger's counsel. The production of the tape followed a long period of wrangling between the parties over a host of issues, including whether the Trump Group was being scrupulous in protecting Genger's confidentiality interests in his personal documents.

Although Genger does not accuse the Trump Group's litigation counsel of recognizing that the 2007 back-up tape could have Genger's confidential, personal information on it, he does accuse the Trump Group of realizing that possibility. In that regard, I do find it likely that Hirsch was aware of the existence of the 2007 back-up tape for months before it was disclosed to Genger's counsel and did not undertake to protect Genger's personal information. In so finding, I do not conclude that Hirsch affirmatively sought to review information personal to Genger. Indeed, I believe it was Hirsch's obsessive focus on finding information relevant to the Trump Group's feud with Genger over TRI and finding information supportive of the Trump Group's contempt motion that led Hirsch to gather as much data as he could.

Nonetheless, Hirsch displayed no concern about whether there was information on the MetaLINCS system that was personal to Genger. Hirsch gave TRI's comptroller, Gail Glazebrook, unfettered access to the MetaLINCS system, including access to the unencrypted information on the July 2008 backup tapes, therefore giving her what she needed if she wished to obtain access to Genger's

33

Israeli national security (and personal) e-mails.[48] Although the Trump Group claims that it "self-policed,"[49] and I have no reason to believe that Glazebrook had any motive to be interested in Genger's personal affairs, granting someone like Glazebrook unfettered access is not in keeping with protocols discussed during the December hearing and memorialized in the December Status Quo Order, which prohibited "accessing or attempting to access any Genger documents" except in accordance with these protocols.[50]

Genger has asked me to consider, in determining what sanctions, if any, to award, that the Trump Group was less than assiduous in honoring the provisions of the December Status Quo Order that protected his confidentiality interests. I will give appropriate weight to the Trump Group's behavior in fashioning a remedy for Genger's violation of the August Status Quo Order.

### III. Legal Analysis

Two claims by the Trump Group were the focus of trial: one alleging contempt of court by Genger; the other alleging spoliation of evidence by Genger. I analyze each claim separately, but I award one set of sanctions based on my finding that Genger violated the August Status Quo Order because the two separate theories are so closely related.

---

[48] Tr. at 228:18-230:13 (Hirsch); Glazebrook Dep. at 158:4-160:14.
[49] Tr. at 300:23-301:15.
[50] *See* Amended Status Quo Order (Sept. 23, 2008).

A.  Contempt Of Court

1.  This Court Has Broad Power To Sanction For Violation Of Its Orders

"To establish civil contempt, [the petitioning party] must demonstrate that the [contemnors] violated an order of this Court of which they had notice and by which they were bound."[51] Court of Chancery Rule 70(b) supplies this court with the power — and broad latitude — to remedy violations of its orders.[52] A party petitioning for a finding of contempt bears the burden to show contempt by clear and convincing evidence; the burden then shifts to the contemnors to show why they were unable to comply with the order.[53]

In *Gallagher v. Long*, the Delaware Supreme Court stated, "[a] trial judge has broad discretion to impose sanctions for failure to abide by its orders," so long as the sanctions are "just and reasonable."[54] *Gallagher* affirmed this court's entry of final judgment on all claims for the plaintiffs after the defendants' continued failure to respond and "willful[ ] and conscious disregard for the Court of

---

[51] *Arbitrium v. Johnston*, 1997 WL 589030, at *3 (Del. Ch. Sept. 17, 2009); *see City of Wilmington v. Gen. Teamsters Local Union 326*, 321 A.2d 123,125 (Del. 1974) (explaining that civil contempt actions are "instituted to preserve and enforce the rights of private parties to suits, and to compel obedience to orders and decrees made to enforce the rights and administer the remedies to which the court has found them to be entitled").
[52] Ct. Ch. R. 70(b).
[53] *State ex rel. Oberly v. Atlas Sanitation Co. Inc.*, 1988 WL 88494, at *2 (Del. Ch. Aug. 17, 1988) ("[O]nce the party with the burden of proof has introduced evidence from which a fact finder could conclude that he has established a *prima facie* case, then the burden of going forward with the evidence shifts to the alleged contemnor to . . . [show] it was impossible to comply with the court order."); *see Rolex Watch U.S.A., Inc. v. Crowley*, 74 F.3d 716, 720 (6th Cir. 1996); *F.T.C. v. Affordable Media*, 179 F.3d 1228, 1239 (9th Cir. 1999); *see also* AM. JUR. 2D *Injunctions* § 321.
[54] 940 A.2d 945, 2007 WL 3262150, at *2 (Del. 2007).

Chancery's orders."[55] *Gallagher* did note that the entry of judgment as a consequence is appropriate only where there is "an element of willfulness or conscious disregard of a court order" by a party.[56]

Finally, the purpose of a civil, as opposed to criminal, contempt determination must be "coercive or remedial."[57] Therefore, an aggrieved party must also show that the sanction desired is coercive or remedial, as opposed to punitive.[58]

### 2. Genger Acted In Contempt Of Court By Directing His Agent To Delete Company-Related Documents

The Trump Group has shown, by clear and convincing evidence, that Genger consciously violated the August Status Quo Order, which prohibited him from tampering with or destroying any TRI-related files. Genger was keenly aware of that order, because the presence of Friedman Kaplan during the crucial weekend served as a constant reminder of it. But, once Friedman Kaplan left the scene, Genger and his agent Ohana engaged in a secretive scheme of document destruction.

By the clear terms of the August Status Quo Order, Genger had no right to make any unilateral decision about the disposition of information belonging to

---

[55] *Id.*

[56] *Id.*

[57] *Del. State Bar Ass'n v. Alexander*, 386 A.2d 652, 665 (Del. 1978); *see Mother African Union First Colored Methodist Protestant Church v. Conference of African Union First Colored Methodist Protestant*, 1992 WL 83518, at *6 (Del. Ch. Apr. 22, 1992) ("[F]or the plaintiffs to establish a civil contempt, they must show that the defendants violated an order of this court, and that the sanction they seek is coercive or remedial in nature.").

[58] *See Del. State Bar Ass'n*, 386 A.2d at 665.

TRI. The order plainly stated that "the parties to the [§ 225 dispute] . . . are hereby restrained and enjoined from, directly or indirectly . . . tampering with, destroying or in any way disposing of any Company-related documents." Rather than ask permission from counsel for TRI (or even his own litigation counsel) to destroy the information on TRI's computers, Genger conspired with Ohana to do it secretly, in the dead of night.

Genger's defense to the contempt motion largely involves the notion that he was an innocent who thought he was just disposing of copies. But he did not behave like an innocent. An innocent would have called all the relevant players together and fashioned a legitimate solution to the problem that supposedly inspired Genger and Ohana. Instead, Genger and Ohana acted like sharpies, hoping to take advantage of the incomplete job done by Friedman Kaplan and K & K.

Genger also argues that there is no evidence that any particular documents were lost. But, even if that were true, "no harm, no foul" is not a cognizable defense to a contempt allegation.[59] Earlier this year, in *Triton v. Eastern Shore Electrical Services*, the defendant — despite a preliminary injunction to refrain from soliciting bids for projects identified in the injunction — solicited a bid on a project listed in the preliminary injunction and also did not inform the bidder of

---

[59] *Triton v. Eastern Shore Electrical Services, Inc.*, 2009 WL 1387115, at *6-7 (Del. Ch. May 18, 2009).

the injunction.[60]  Vice Chancellor Parsons sanctioned the defendants and noted it was irrelevant that the defendant's solicitation efforts were unsuccessful; contrary to the defendants' assertions that this conduct was just a "comedy of unfortunate circumstances," Vice Chancellor Parsons held that violating a court order is a serious matter and one worthy of appropriate sanctions.[61]  Therefore, Vice Chancellor Parsons made a finding that the defendant's attempts to circumvent the preliminary injunction undermined his credibility as a witness.[62]

For a party to intentionally violate an order not to destroy or tamper with information and then to claim that he did little harm because no one can prove how much information he eradicated takes immense chutzpah.  For a court to accept such a defense would render the court unable to govern situations like this in the future, as parties would know that they could argue extenuation using the very uncertainty their own misconduct had created.

Moreover, there is evidence that relevant documents have been lost due to Genger's misconduct.  It is troubling that the Lentz Memo was not found in Genger's TRI files.  And the recently produced documents from Lentz show that Genger likely deleted several other documents relevant to the § 225 action from TRI's hard drive.  Copies of those documents would likely have been on the unallocated space if they had not been erased.

---

[60] 2009 WL 1387115, at *6-7.
[61] *Id.*
[62] *Id.* at *7.

Although I have little doubt that Genger and Ohana did not think out their document destruction scheme very well, I have no doubt that Genger knew he was violating this court's order and limiting the Trump Group's ability to obtain access to all the information that would have otherwise been available both as managers of TRI and as litigants in this court and others. Therefore, I find that Genger acted in contempt of court.

## B. Spoliation of Evidence

### 1. An Adverse Inference Sanction For Spoliation Requires A Finding Of Reckless Or Intentional Spoliation Of Evidence

"A party in litigation or who has reason to anticipate litigation has an affirmative duty to preserve evidence that might be relevant to the issues in the lawsuit."[63]  Often, this duty attaches even before litigation has been commenced "when a party should have known that the evidence may be relevant to future litigation."[64]  A party does not, however, have a duty to "preserve every shred of paper, every e-mail or electronic document," but instead must "preserve what it knows, or reasonably should know, is relevant in the action, is reasonably calculated to lead to the discovery of admissible evidence, is reasonably likely to

---

[63] *Beard Research v. Kates*, 981 A.2d 1175, 1185 (Del. Ch. May 29, 2009).
[64] *Acierno v. Goldstein*, 2005 WL 3111993, at *6 (Del. Ch. 2005) (quoting *Zubulake v. UBS Warburg*, 220 F.R.D. 212, 216 (S.D.N.Y. 2003)); *see also Triton*, 2009 WL 1387115, at *8 ("An affirmative duty to preserve evidence attaches upon discovery of facts and circumstances that would lead to a conclusion that litigation is imminent or should be otherwise expected.").

be requested during discovery and/or is the subject of a pending discovery request."[65]

Dispositive sanctions, including dismissal of claims or imposition of an adverse inference, are only appropriate where a party acts to "intentionally or recklessly destroy evidence, when it knows that the item in question is relevant to a legal dispute *or it was otherwise under a legal duty to preserve the item*."[66] Delaware courts have defined recklessness in the spoliation context as a conscious awareness of the risk that one's action or inaction may cause evidence to be despoiled.[67] Intentional destruction simply means that the spoliator acted "with purpose."[68]

Additionally, to obtain an adverse inference, the aggrieved party must make some showing that the allegedly destroyed evidence existed and supported the aggrieved party's position.[69] If a party intentionally destroys evidence, then a

---

[65] *Zubulake*, 220 F.R.D. at 217; *see also In re Wechsler*, 121 F. Supp. 2d 404, 420 (D. Del. 2000) ("[T]he scope of the duty to preserve evidence is not boundless. However, . . . a party still must act reasonably under the circumstances.").

[66] *Sears, Roebuck & Co. v. Midcap*, 893 A.2d 542, 552 (Del. 2006) (emphasis added); *see also Beard Research*, 981 A.2d at 1192 ("[D]rawing an adverse inference is appropriate when an actor is under a duty to preserve evidence and takes part in the destruction of evidence while being consciously aware of a risk that he or she will cause or allow evidence to be spoiled by action or inaction . . . .").

[67] *Beard Research*, 981 A.2d at 1192 ("Reckless conduct reflects a *knowing disregard* of a substantial and unjustifiable risk. It amounts to an 'I don't care attitude.'").

[68] *Id.* at 1191 (citing BLACK'S LAW DICTIONARY 826 (8th ed. 2004) (defining "intentional" as "[d]one with the aim of carrying out the act")).

[69] *Beard Research*, 981 A.2d at 1193 ("[A] party must offer more than mere speculation and conjecture that a particular document existed."); *cf.* AM. JUR. 2D *Trial* § 1100 ("A [party] must show that the lost or destroyed evidence would have played a significant role in his or her [case] and that comparable evidence could not be obtained elsewhere.").

court must "adopt a view of the facts as unfavorable to the wrongdoer as the known circumstances will reasonably admit."[70]

## 2. Genger Committed Spoliation Of Evidence

Here, a finding of intentional spoliation is made easier by the reality that Genger was under a clear duty to preserve evidence because of: (1) the ongoing litigation between Genger and the Trump Group, and (2) the clear language of the August Status Quo Order. This is not a situation where a party is accused of having committed spoliation by destroying business records before there was any hint that litigation would arise that may implicate the affected records.[71] Rather, in this case, Genger was clearly aware of his affirmative duty to preserve evidence that might be relevant to the issues in the § 225 action and other pending cases.[72] Moreover, as indicated earlier, I find that Genger and Ohana believed that their conduct would limit the information base the Trump Group would have to use in the pending litigation. Therefore, I conclude that Genger intentionally despoiled evidence.

---

[70] *Equitable Trust Co. v. Gallagher*, 102 A.2d 538, 541 (Del. 1954).

[71] In *Midcap v. Sears, Roebuck and Co.*, for example, Sears was unable to produce documents about who had delivered and installed a gas range in 1994, which was claimed to have caused a gas explosion in 1999. 2004 WL 1588329, at *1 (Del. Super. May 26, 2004), *rev'd*, 893 A.2d 542 (Del. 2006). Although Sears had disposed of the documents five years before it had any reason to anticipate litigation, the jury was improperly instructed that it may draw an adverse inference from Sears' loss of the documents without any finding that Sears had acted intentionally or recklessly to despoil evidence. *Sears*, 809 A.2d at 547 (describing the adverse jury instruction, which did not require the jury to find that Sears had acted intentionally or recklessly in failing to retain documents, and finding the instruction to be reversible error).

[72] *See* JX-2 (Status Quo Order (Aug. 29, 2008)).

41

In any event, at the very least Genger acted recklessly. If it was not

reckless for Genger secretly to cause Ohana to wipe the unallocated space of

TRI's server clean when he could have called Friedman Kaplan and gotten their

view of whether that was permissible, it is hard to say what would be reckless.

Even if Genger did not act with a malevolent intent to limit the universe of

evidence available to the Trump Group, he was certainly reckless in charging

Ohana to erase all the information of the unallocated space of TRI's computer

system in the face of pending litigation and a judicial order not to destroy or

tamper with TRI's information. If Genger believes that running wiping software

without advice of counsel or court permission in this context does not constitute

recklessness, he has an unusual dictionary. The law uses a more traditional

lexicon.

Of course, the Trump Group as the moving party is required to point to

specific documents that existed and would have supported its position but for

Genger's actions.[73] As discussed previously, the Trump Group has shown that,

but for Genger's destructive conduct, Genger's copies of the Lentz Memo and

other recently identified documents also relevant to the § 225 action would have

been on the unallocated space of TRI's computer system. Anyone experienced in

---

[73] *See In re DaimlerChrysler AG*, 2003 WL 22951696, at * 2 (D. Del. Nov. 25, 2003) (explaining that, to support an adverse inference sanction for spoliation, the aggrieved party "must show 'a reasonable possibility, based on concrete evidence rather than a fertile imagination' that access to the lost material would have produced evidence favorable to his cause") (quoting *Gates Rubber Co. v. Bando Chem. Indus., Ltd.*, 167 F.R.D. 90, 104 (D. Colo. 1996)).

42

litigation realizes that different versions of the same document can affect a case materially, and Genger has left the Trump Group without versions of important documents. These are just the *known* effects of Genger's wholesale deletion. It is likely that other relevant information was also lost. Therefore, the Trump Group has met its burden to show that Genger destroyed information that would have helped it in the § 225 action.

VI.  Stringent, But Not Ultimate, Sanctions Are Appropriate
And Provide A Fair Remedy

The remedial inquiries relevant to the contempt and spoliation claims are similar. A court has inherent power to fashion a remedy for contempt that is proportionate to the level of harm committed so long as the court exercises restraint.[74] In determining what remedy to award for spoliation, the court should consider: (1) the culpability of the spoliating party; (2) the degree of prejudice suffered by the aggrieved party; and (3) the availability of lesser sanctions that could both avoid unfairness to the aggrieved party and serve as an adequate penalty to deter such future conduct.[75]

---

[74] *See Gallagher*, 940 A.2d at 945 (explaining that a trial judge must only impose sanctions for civil contempt that are "just and reasonable"); *see also* Am. JUR. 2D *Contempt* § 195 ("Courts have the inherent power to enforce compliance with their lawful orders . . . [but ] . . . [i]n selecting contempt sanctions, a court is obligated to use the least possible power adequate to the end proposed."); *cf. State ex rel. Oberly v. Atlas Sanitation Co., Inc.*, 1988 WL 88494, at *3 (Del. Ch. Aug. 17, 1988) (explaining that "the inadvertence of the violation [of a court order] may be taken into account in fashioning a remedy").
[75] *Beard Research*, 981 A.2d at 1189 (citing *Positran Mfg., Inc. v. Diebold, Inc.*, 2003 WL 21104954, at *2 (D. Del. May 15, 2003)).

Here, these standards guide my determination to put in place a stringent remedy, but one that is short of a default judgment. First, although I believe that Genger was improperly motivated and intended to limit the Trump Group's ability to gather evidence in its disputes with him, I also accept that part of his motivation was to protect his confidentiality interests in his personal information. In accepting this as part of his motivation, I do not retract my finding that Genger acted intentionally and was motivated by a desire to limit the Trump Group's access to a valuable source of additional information in the § 225 action.

Second, I find that the Trump Group did not suffer a high degree of prejudice because Genger's misconduct only affected the unallocated space on his computer and TRI's server, while the active files, which were not deleted, contained a good deal of relevant information. Additionally, I give weight to the Trump Group's own conduct in failing to take reasonable steps to protect Genger's personal information once it assumed control of TRI. Although that conduct is not sufficiently egregious to warrant denying TRI any relief, I do believe it is relevant in deciding to deny it a default judgment.

Third, I find that the extreme remedy of a default judgment is not appropriate to remedy any unfairness to the Trump Group because lesser available sanctions provide an adequate remedy. Given the law's preference for an adjudication on the merits where possible,[76] I think a stringent remedy that directly

---

[76] *See id.* at *10 (holding that entering a default judgment "should be regarded as a last resort") (internal citations omitted); *see also Beckett v. Beebe Med. Ctr., Inc.*, 897 A.2d

44

relates to the effects of Genger's misconduct is most fitting. Such a remedy will deprive Genger of the advantages of any evidentiary gaps that his own misbehavior might have been caused.

That remedy will have the following elements. First, because Genger has diminished the evidence base that would otherwise be available to the Trump Group, I conclude that he must produce relevant documents to which he may have otherwise made a claim of privilege.[77] I have previously held that Genger waived his attorney-client privilege with respect to the Lentz Memorandum because TRI paid Lentz to prepare the memorandum, which was shared with TRI's then-president, Dowd.[78] As a partial remedy for Genger's conduct, I hereby hold that Genger must allow the Trump Group access to ten of the remaining "disputed documents" discussed in the parties' briefs in support of, and opposing, the Trump Group's motion for a protective order.[79]

---

753, 757-58 (Del. 2006) ("Courts should apply rules with a liberal construction because of the underlying public policy that favors a trial on the merits, as distinguished from a judgment based on a default.") (internal citations omitted).

[77] I specifically do not waive Genger's privilege claims with respect to a document described in Genger's Privilege Log as a "Handwritten markup of draft complaint regarding Genger matrimonial dispute." This document is irrelevant to this dispute. This document was identified in the parties' briefs on the Motion for Protective Order as Document No. 13, bearing Bates No. TRI INV 00017686–17701.

[78] *TR Investors, LLC v. Arie Genger*, C.A. No. 3994, at 4-8 (Del. Ch. Sept. 18, 2009) (TRANSCRIPT).

[79] *See* Pl.'s Op. Br. in Supp. of Motion for Protective Order at 26-33; Def.'s Ans. Br. in Opp. to Pl.'s Motion for Protective Order at 7–14. The disputed documents are identified as Document Nos. 3 through 10, No. 12, and No. 14. These documents were identified in both parties' briefs as those documents bearing Bates numbers: TR INV 00022041-22043; TRI INV 00017721; TRI INV 00048830-48832; TRI INV 00048833-48834; TRI INV 0004890-48909; TRI INV 00048917; TRI INV 00048930; TRI INV 00048974; TRI INV 00049062; and TR INV 00017702-17708. Genger has withdrawn his claim of

45

Second, I elevate by one level the burden of persuasion upon Genger to prevail on any affirmative defense or counter-claim that he has raised in the § 225 action.[80] By way of example, if Genger would have to prevail only by a preponderance of the evidence, he will have to prevail at trial by producing clear and convincing evidence. Additionally, because Genger's conduct leaves me with severe doubts about his credibility, Genger will be unable to prevail on any material factual issue if the only evidence in support of his position is his own testimony. Absent corroborating testimony or documents, his mere word will be insufficient to meet his burden of persuasion.

Finally, because Genger's misconduct has occasioned great expense, I award the Trump Group their reasonable attorneys' fees and expenses related to the motions for contempt and spoliation. Because the parties have shown a propensity to fight about everything and because there is reason to believe that the Trump Group (and Genger himself) engaged in a bit of overkill in litigating these motions, I suggest an award of $750,000 to be reasonable in the first instance and in the hopes that the parties can live with that figure and avoid additional litigation costs. If the parties decide to haggle over that amount, the parties shall exchange information about their respective attorneys' fees and costs in connection with the contempt and spoliation motions and attempt to reach accord in good faith. If no

---

privilege on Document Nos. 1 (Bates No. TR INV 00049045), 11 (Bates No. TR INV 00048941), and a single page of notes related to the September 2008 board letter (Bates No. TR INV 00048944). Therefore, I do not address these documents.

46

accord is reached, I shall appoint a special master who will address the fee dispute, with the costs of the master being charged in full against the party whose position as to the amount deviates the most from the final amount awarded by the court.

## V. Conclusion

For all these reasons, the Trump Group's motion for contempt and motion for spoliation is hereby granted and the Trump Group shall file an implementing order, upon notice as to form, within five days.

SUPREME COURT: NEW YORK COUNTY

| | |
|---|---|
| ORLY GENGER in her individual capacity and on behalf of the Orly Genger 1993 Trust (both in its individual capacity and on behalf of D & K Limited Partnership), | Index No.: |
| Plaintiff, | **SUMMONS** |
| - against - | Plaintiff designates New York County as the place of trial based on plaintiff's place of residence, located at 1965 Broadway, Apt. 22G, New York, New York |
| DALIA GENGER, SAGI GENGER, D & K GP LLC, and TPR INVESTMENT ASSOCIATES, INC., | |
| Defendants. | |

**FILED**

JUL 0 9 2009

COUNTY CLERK'S OFFICE
NEW YORK

09109749

TO THE ABOVE NAMED DEFENDANTS:

YOU ARE HEREBY SUMMONED to answer the complaint in this action and to serve a copy of your answer, or if the complaint is not served with this summons, to serve a notice of appearance, on the plaintiff's attorneys within twenty (20) days after the service of this summons, exclusive of the day of service (or within thirty (30) days after the service is complete if this summons is not personally delivered to you within the State of New York); and in case of your failure to appear or answer, judgment will be taken against you by default for the relief demanded in the complaint.

Dated:   New York, New York
         July 8, 2009

ZEICHNER ELLMAN & KRAUSE LLP

By: _____
Stephen F. Ellman, Esq.
Yoav M. Griver, Esq.
Bryan D. Leinbach, Esq.
Attorneys for Plaintiff
575 Lexington Avenue
New York, New York 10022
(212) 223-0400

TO:    DALIA GENGER
200 East 65th Street, Apt. 32W
New York, New York 10021

SAGI GENGER
1211 Park Avenue
New York, New York 10128

D & K GP LLC
c/o Sagi Genger
1211 Park Avenue
New York, New York 10128

TPR INVESTMENT ASSOCIATES, INC.
c/o Sagi Genger
1211 Park Avenue
New York, New York 10128

SUPREME COURT: NEW YORK COUNTY

| | |
|---|---|
| ORLY GENGER in her individual capacity and on behalf of the Orly Genger 1993 Trust (both in its individual capacity and on behalf of D & K Limited Partnership), | Index No.: |
| Plaintiff, | **VERIFIED COMPLAINT** |
| - against - | |
| DALIA GENGER, SAGI GENGER, D & K GP LLC, and TPR INVESTMENT ASSOCIATES, INC., | |
| Defendants. | |

**FILED**

**JUL 0 9 2009**

**COUNTY CLERK'S OFFICE NEW YORK**

09103749

Plaintiff Orly Genger in her individual capacity and on behalf of the Orly Genger 1993 Trust (both in its individual capacity and on behalf of D & K Limited Partnership), by her attorneys, Zeichner Ellman & Krause LLP, alleges, upon information and belief, for her Verified Complaint against Defendants in this action as follows:

## NATURE OF THE ACTION

1.    As described below, Dalia and Sagi Genger, together with various business entities controlled by them, engaged in a fraud and conspiracy designed to loot the Orly Genger 1993 Trust of its value. Defendants' various acts of self-dealing, material misrepresentations, and material omissions, in breach of their respective fiduciary duties and in violation of New York law, injured Orly Genger, the Orly Genger 1993 Trust, and D & K Limited Partnership.

2.    Specifically, Dalia and Sagi Genger used various closely held family corporations, limited partnerships, and other entities as instrumentalities to improperly foreclose

upon, and conduct a sham sale of, the Orly Genger 1993 Trust's ownership interest in valuable and unique stock of defendant TPR Investment Associates, Inc. ("TPR").  The TPR stock is unique because TPR is a closely held Genger family corporation, and because the value of the TPR stock at issue is largely dependent upon the outcome of a litigation currently pending in Delaware Chancery Court (discussed below, *infra* ¶¶ 60-62).  Based upon the ultimate outcome of that litigation, TPR may increase many fold in value.

## THE PARTIES

3.      Plaintiff Orly Genger ("Plaintiff" or "Orly") resides at 1965 Broadway, Apt. 22G, New York, New York 10024.  She is the beneficiary of the Orly Genger 1993 Trust dated December 13, 1993 (the "Orly Trust").  The Orly Trust is a limited partner of D & K Limited Partnership ("D&K"), a Delaware limited partnership with a principal office at 1211 Park Avenue, New York, New York 10128.  The Orly Trust and the Sagi Genger 1993 Trust (the "Sagi Trust"), each hold a 48% interest in D&K.

4.      Defendant Dalia Genger ("Dalia"), Orly's mother, resides at 200 East 65th Street, Apt. 32W, New York, New York 10021.  Dalia is the current sole Trustee of the Orly Trust, being appointed successor Trustee in January 2008.  She also holds a 99% interest in defendant D & K GP LLC.

5.      Defendant Sagi Genger ("Sagi"), Orly's brother, maintains an office at 1211 Park Avenue, New York, New York 10128.  Sagi is the Chief Executive Officer of TPR and a member of TPR's Board of Directors.  Sagi also is the manager of D & K GP LLC ("D&K GP"), holding a 1% interest in D&K GP.  Sagi also is a board member of Trans-Resources, Inc.  Sagi also is the beneficiary of the Sagi Trust, which holds a 48% interest in D&K.

2

6.      Defendant D&K GP is a Delaware limited liability company with a principal office located at 1211 Park Avenue, New York, New York 10128. D&K GP is the general partner of D&K, holding a 4% interest in D&K. As manager of D&K GP, Sagi controls and acts on behalf of D&K.

7.      Defendant TPR is a Delaware corporation with a principal office located at 1211 Park Avenue, New York, New York 10128. As Chief Executive Officer of TPR, Sagi controls and acts on behalf of TPR. Upon information and belief, Sagi and Dalia serve as directors on TPR's two-member board of directors.

## JURISDICTION AND VENUE

8.      This Court has jurisdiction over Defendants pursuant to Sections 301 and 302 of the New York Civil Practice Law and Rules ("CPLR").

9.      Venue is proper in this county pursuant to CPLR 503.

## FACTS COMMON TO ALL COUNTS

### A.      The Genger Family, TPR, and TRI

10.     Orly is an accomplished artist and sculptor, who has had little schooling or experience in business or finance. Her brother, defendant Sagi, has an MBA from the Wharton School of Business and years of practical experience as a businessman. In the past, Sagi often provided business advice to Orly, and Orly reposed in Sagi her trust, confidence and reliance as to those matters. In the past, Orly also reposed such trust, confidence and reliance in her mother, Dalia.

3

11.     Orly's and Sagi's father, Arie Genger ("Arie"), and mother, defendant Dalia, were married in Israel on July 23, 1967, and remained so until they divorced in New York in October 2004.

12.     Arie, an accomplished entrepreneur, founded Trans-Resources, Inc. ("TRI"), a closely held private corporation, in 1985.  TRI is the parent company of several subsidiaries that provide growers with specialty fertilizer and industrial chemicals, including Haifa Chemicals Ltd., Na-Churs Alpine Solutions and Plant Products Co. Ltd.  Arie served as TRI's CEO from 1985 until 2007, and was chairman of TRI's Board of Directors until late September 2008.  Under Arie's direction, TRI became one of the two largest producers of potassium nitrate in the world, controlling approximately 40% of the global market, and, in recent years, generated record sales and profits.  In 2008, TRI had sales of over $1 billion, with over $230 million in earnings before interest, tax, depreciation, and amortization, and over $150 million in net income.

13.     Prior to 1993, Arie also was the sole shareholder of defendant TPR, a closely held corporation also founded by Arie as a holding company for the family's interests, which, among other things, held a controlling interest in TRI.  As of March 30, 2001, TPR held a 52.85% interest in TRI, with the remaining minority interest in TRI (47.15%) owned by various entities controlled directly and indirectly by Jules and Eddie Trump (the "Trump Group").

**B.     The Orly Trust and the Sagi Trust**

14.     In December 1993, Arie and Dalia established two identical irrevocable *inter vivos* trusts for the benefit of each of their children:  the Orly Trust and the Sagi Trust (together, the "Trusts").  The Trusts were created, in part, as estate planning tools of Arie and Dalia and as a means of ensuring that each child received property of equal value.  To this end, Dalia and

4

Arie funded each trust with a $600,000 gift. Sash A. Spencer and Lawrence M. Small were named Co-Trustees of the Trusts and remained Co-Trustees until Arie and Dalia were divorced in 2004.

15.     After the Trusts were funded, each was assigned a 48% interest in D&K, a family-owned limited partnership formed sometime prior to 1993. D&K is shorthand for "Dalia and Kids." As a result of the assignment, the Orly Trust and the Sagi Trust became D&K's sole limited partners. Arie's wife, Dalia, held the remaining 4% interest of D&K and served as the partnership's general manager.

16.     Around the same time that the Trusts were funded, D&K purchased 240 shares of common stock (constituting 49% of the outstanding shares) in TPR for $10,200,000. The purchase price of the TPR shares was satisfied as follows: (a) the Orly Trust and the Sagi Trust each paid $600,000; (b) Dalia paid $50,000; and (c) Dalia, as general partner of D&K, executed a recourse $8,950,000 Promissory Note dated December 21, 1993 (the "Note") in satisfaction of the balance. A copy of the Note is attached hereto as **Exhibit 1.**

17.     The Note provided that D&K was required to repay principal, together with accrued interest, in annual installments over a ten-year period. In addition, each of the Trusts and Dalia assumed liability for repayment of the Note in proportion to its/her ownership interest in D&K.

18.     The Note was secured by a Pledge Agreement dated December 21, 1993 (the "Pledge Agreement"), pursuant to which D&K pledged its 240 TPR shares as collateral for repayment of the Note. A copy of the Pledge Agreement also is attached hereto as **Exhibit 1.**

19.     As a result of D&K's purchase of TPR stock, the Orly Trust and the Sagi

5

Trust each acquired an equal 23.52% indirect interest in TPR, and Dalia acquired a 1.96% indirect interest in TPR. Arie retained his ownership in the remaining 51% of TPR, which held investments in various securities, including TRI common stock, as well as its interest in the Note.

20.     In keeping with the desire to ensure equal wealth transfer to Sagi and Orly and with the estate-planning purposes underlying the creation of the Trusts and D&K's purchase of the TPR shares, every member of the Genger family understood and agreed before the time of their execution that the Note and Pledge Agreement would never be enforced by any of them. Indeed, as described below, Sagi was charged with ensuring that the Note and Pledge Agreement would never be enforced, and, prior to the fraud at issue, he took specific steps to fulfill that charge.

## C.     Arie and Dalia's Divorce and Property Settlement

21.     Dalia and Arie were divorced in October 2004.

22.     On October 26, 2004, Dalia and Arie entered into a Stipulation and Agreement of Settlement as a final settlement of their divorce (the "Settlement Agreement") (attached hereto as **Exhibit 2**). The Settlement Agreement was structured around the understanding and condition that Dalia would obtain control over TPR and, in exchange, Arie and the children would directly hold their interests in TRI while Arie retained control over TRI during his lifetime. To that end, pursuant to the Settlement Agreement, Dalia received, *inter alia,* Arie's 51% interest in TPR and retained her 4% interest in D&K. TPR's 52.85% interest in TRI was transferred to Arie and the Trusts as follows: (i) 13.99% of TRI stock to Arie, (ii) 19.43% of TRI stock to the Orly Trust, and (iii) 19.43% of TRI stock to the Sagi Trust. At the same time, in consideration of the transfer, the Orly Trust and the Sagi Trust each granted Arie an irrevocable lifetime voting proxy over their TRI shares (attached hereto as **Exhibit 3**) so that Arie would continue to control TRI as

6

he always had. Thus, after October 29, 2004, Arie and the two Trusts held a majority interest in TRI, Arie controlled TRI, and TPR no longer owned any TRI common stock.

23.    Below is a side-by-side summary of Arie's, Dalia's, the Orly Trust's, and the Sagi Trust's interests in TPR before and after Arie's and Dalia's divorce.

### TPR OWNERSHIP
### BEFORE AND AFTER DIVORCE

| Person | PERCENTAGE | |
| --- | --- | --- |
| | TPR Before | TPR After |
| Arie Genger | 51.00% | 0% |
| Dalia Genger | 1.96% | 52.96% |
| Orly Trust (through D&K) | 23.52% | 23.52% |
| Sagi Trust (through D&K) | 23.52% | 23.52% |
| **TOTAL** | **100%** | **100%** |

After the divorce, in keeping with the understanding of the parties that the children, Orly and Sagi, would be treated equally, both the Orly Trust and the Sagi Trust continued to have equal ownership interests in the TRI shares (which were owned by the Trusts directly) and in the TPR shares (through the Trusts' interest in D&K).

24.    The chart annexed hereto as **Exhibit 4,** and incorporated into the body of this Verified Complaint by reference, provides a summary of Arie's, Dalia's, the Orly Trust's, and the Sagi Trust's respective ownership interests in TPR, TRI, and D&K as of October 26, 2004 – *i.e.*, the date that Arie and Dalia executed the Settlement Agreement.

## D.    Dalia Gives Sagi Complete Control of D&K

25.    Unfortunately, the Genger divorce was extremely bitter, and has split the

7

Genger family.  Dalia, in her anger and hatred of Arie, and in collusion with Sagi, decided to destroy Arie financially.  To achieve this goal, Dalia and Sagi are also willing, and have taken action, to financially destroy Orly.

26.     On October 21, 2004, days before signing the Settlement Agreement, Dalia and Sagi formed D&K GP with the sole business purpose of acting as D&K's general partner. Pursuant to D&K GP's Limited Liability Agreement (attached hereto as **Exhibit 5**), Dalia exchanged her 4% interest in D&K and $1.00 for a 99% membership interest in D&K GP.  Sagi purchased a 1% membership interest in D&K GP for $1.00.  Under D&K GP's Limited Liability Agreement, Sagi was given the power to appoint himself as D&K GP's manager, and he did so.  As D&K GP's manager, Sagi obtained complete control over D&K.

27.     Thus, Dalia effectively ceded complete control over D&K and its assets to Sagi.  By forming D&K GP, Dalia and Sagi also attempted to shield themselves from any personal liability stemming from their interests in D&K, while leaving the Orly Trust and the Sagi Trust potentially liable to TPR on the Note.

28.     As manager of D&K GP (which, in turn, was general partner of D&K), Sagi owes an undiluted fiduciary duty to the partnership's limited partners, including the Orly Trust, to monitor, manage, maintain, and protect D&K's assets, including its ownership interest in TPR, from challenge or diminution in value.

29.     In the same way, D&K GP, as general partner of D&K, also owes an undiluted fiduciary duty to the partnership's limited partners, including the Orly Trust, to monitor, manage, maintain, and protect D&K's assets, including its ownership interest in TPR, from challenge or diminution in value.

8

30.     In addition, Sagi owes fiduciary duties to Orly arising from the close familial relationship between him and his sister.  Orly reposed complete trust, confidence and reliance upon her brother Sagi to protect both her interests and her Trust's interests, including her Trust's ownership interests in TPR and TRI, and to alert her to anything that may adversely affect her or her Trust's assets.

**E.     Dalia Gives Sagi Complete Control of TPR**

31.     On October 30, 2004, Dalia, as 52.96% owner of TPR, entered into a shareholder agreement with TPR, concerning the future management of the company.  Pursuant to this shareholder agreement (attached hereto as **Exhibit 6**), Dalia gave D&K, which owned 49% of TPR, the authority to appoint one board member to TPR's two-member board of directors.  Sagi used his managerial control over D&K to appoint himself as D&K's representative on TPR's board. In addition, the shareholder agreement appointed Sagi as CEO of TPR.  As TPR's majority shareholder, Dalia named herself as TPR's remaining board member.

32.     Sometime in 2007, Sagi stripped Dalia of her majority interest in TPR by selling a 2% interest in TPR to Rochelle Fang, his mother-in-law.  At the time of the sale, TPR's assets were worth between approximately $11,000,000 and $12,000,000, plus the value of the Note.

33.     Around the time of her appointment as successor trustee to the Orly Trust in January 2008, Dalia divested herself of the balance of her TPR shares.

34.     Through the above-mentioned transactions, Sagi obtained direct control over TPR and its interest in the Note.  Notably, Sagi's role as CEO of TPR (the creditor on the Note) is in direct conflict with his role as manager of D&K (the debtor on the Note), whose role was to

9

repay the Note or to contest the Note's enforceability.

35.     Moreover, Sagi's dual control over both TPR and D&K directly conflicts with Sagi's and D&K GP's undiluted fiduciary duties to D&K's limited partners, including the Orly Trust, to manage, maintain and protect D&K's assets from challenge or diminution in value.  Sagi would later use his dual positions at TPR and D&K to engage in self-dealing in connection with the Note and to damage the Orly Trust and Orly, in violation of his fiduciary duties.

36.     Notably, other New York courts have recognized Sagi's willingness to engage in self-dealing, ignore clear conflicts of interest, and collude with his mother, Dalia, to the detriment of the other Genger family members.  See Orders and Transcripts attached hereto as **Exhibit 7**.

## F.     Dalia Gains Control over the Orly Trust

37.     In connection with the Settlement Agreement, Dalia required that the Trustees of the Orly Trust and the Sagi Trust (Sash A. Spencer and Lawrence M. Small) resign and be replaced with friends of Sagi.

38.     Numerous successor trustees were appointed to the Orly Trust and the Sagi Trust, all of whom were affiliated with Sagi in one way or another.  David Parnes and Eric Gribetz (Sagi's longtime friends) and Leah Fang (Sagi's sister-in-law) were appointed as successor trustees to the Orly Trust.  Likewise, Mr. Parnes, Mr. Gribetz, and Rochelle Fang (Sagi's mother-in-law) were each appointed successor trustees of the Sagi Trust.

39.     In January 2008, Dalia was appointed successor Trustee of the Orly Trust.  Orly objected to Dalia's appointment and sought her removal before the New York County

10

Surrogate's Court out of fear that Dalia would not protect Orly's interests while serving as Trustee. Indeed, by that time, it had become apparent that Dalia and Sagi were colluding together in an effort to damage Arie and Orly.

40.     In response to Orly's objection to her mother's appointment as Trustee, the Surrogate's Court held that Orly's motion was premature, in that Dalia should be given an opportunity to act as Trustee. As a result, Dalia remained Trustee of the Orly Trust. Of course, as detailed herein, Orly's concerns regarding Dalia were entirely justified, and Orly has now renewed her request to the Surrogate's Court that Dalia be removed as Trustee of the Orly Trust.

41.     As a result of her appointment as Trustee of the Orly Trust, Dalia obtained complete control over the assets of the Orly Trust, including its ownership interests in TPR (through D&K) and TRI.

42.     As Trustee of the Orly Trust, Dalia owes an undiluted fiduciary duty to the Trust's beneficiary, Orly, to monitor, manage, maintain, and protect the Orly Trust's assets, including the Orly Trust's ownership interests in TPR and TRI, from challenge or diminution in value. Indeed, in becoming Trustee, and then fighting to maintain that status, Dalia represented to Orly and to the Surrogate's Court that she was capable and committed to fulfilling her fiduciary duties to the Orly Trust and to Orly.

43.     In addition, Dalia owes fiduciary duties to Orly arising from the familial relationship between herself and her daughter. Orly reasonably relied upon her mother to protect her interests, including her Trust's ownership interests in TPR and TRI and to alert her of any developments that may adversely affect her or her Trust's assets, particularly where Dalia assured Orly and the Surrogate's Court that she would fulfill her duties loyally.

11

### G.    The Non-Enforceability of the Note

44.    Payments were made on the Note until 1999, at which time D&K stopped making payments. In keeping with the parties' understanding at the time the Note was made, no attempt was made to enforce the Note during the near decade from when payments ceased to when Sagi sought to enforce the Note on TPR's behalf.

45.    During the divorce proceedings, Sagi and Dalia again confirmed to Orly and to others that the estate planning would not be changed or reversed, and that TPR would never seek to enforce the Note. Indeed, Sagi has testified under oath that the changes to the ownership of TPR and TRI that occurred in connection with the divorce proceedings were designed, at least in part, for estate-planning purposes and to ensure that the Note would not be enforced by TPR. Indeed, Sagi and Dalia claimed that to allow collection of the Note would reverse the estate planning that caused Arie and Dalia to create the Orly and Sagi Trusts and execute the Note in the first place.

46.    David Parnes is the former trustee of the Orly Trust, the present trustee of the Sagi Trust, an officer of TPR, and a director of TRI (allegedly representing TPR). Mr. Parnes has testified under oath that Orly, Dalia, and Arie tasked Sagi with ensuring that the Note would not be enforced. In fulfillment of that task, on August 2, 2006, Sagi, as part of his managerial role in D&K GP, assigned the Note to David Parnes for $12,000, it being agreed that, as trustee of both Trusts and as an officer of TPR, Parnes would be the person best suited to prevent collection of the Note. The very purpose of Sagi's transfer of the Note to Parnes, and Parnes' acceptance of the Note, was to ensure that the Note remained uncollectible, as previously agreed by all parties.

47.    To this end, in the August 2, 2006 Memorandum assigning the Note to Parnes (attached hereto as **Exhibit 8**), Sagi expressly memorialized that D&K "denied

12

enforceability of the Note." Dalia was copied on the Memorandum.

48.     Likewise, in a February 17, 2007 affidavit,[1] Dalia affirmed that the Genger family had agreed "that I [Dalia] not be in a position to foreclose on the [] Note, and to take for myself an interest that Arie and I intended for the children." (Dalia Genger Feb. 17, 2007 Aff. ¶ 3 (attached hereto as **Exhibit 9**)). Dalia further affirmed that Sagi assigned the Note to Mr. Parnes as part of an effort to implement the understanding and agreement among the members of the Genger family that the Note was never to be enforced. (*Id.* at ¶ 4.)

49.     Orly was well aware of, and relied upon, the agreement that the Note would never be enforced. She also was aware of, and relied upon, Defendants' various statements and averments, including those set forth above, disclaiming enforceability of the Note.

**H.     Dalia and Sagi Collude to Divest D&K of the TPR Shares**

50.     Despite the clear and consistent agreement that the Note would not be enforced, after they had obtained direct control over D&K, TPR and the Orly Trust, Dalia and Sagi engaged in a scheme – using TPR, D&K, and D&K GP as their instrumentalities – to completely divest the Orly Trust of its ownership interest in TPR, to Orly's direct detriment.

51.     Pursuant to Defendants' scheme, Sagi caused TPR to reclaim the Note from Parnes. On August 31, 2008, Sagi, acting as CEO of TPR, sent a Notice (the "8/31/08 Notice") to himself as the general manager of D&K purporting to declare a default under the Note:

> Please be advised that you are in default in the payment amounts due under [the Note] due to the failure to pay any principal or interest

---

[1]   This affidavit was submitted to the court in connection with proceedings related to Arie's and Dalia's divorce.

due since 2005 and failing to make regular payments since 2000. Such default has continued for more than ten (10) business days. Please be advised that pursuant to the Note we hereby declare that the entire unpaid principal amount of the Note immediately due and payable.

The shares of [TPR] pledged to TPR as collateral will be liquidated at a public auction if the full Note is not satisfied.

(A copy of the 8/31/08 Notice, is annexed hereto as **Exhibit 10**.)

52.     Thereafter, Sagi, again acting as CEO of TPR, purported to notify D&K (of which he remained the managing partner) that D&K's 240 shares of TPR stock would be publicly auctioned to the highest bidder on February 27, 2009, and that the money received from the sale would be used to reduce the outstanding debt (the "Sale Notice," attached hereto as **Exhibit 11**). Notably, the 8/31/08 Notice and the Sale Notice are both addressed only from Sagi, on behalf of TPR, to Sagi, on behalf of D&K.  Besides specifically providing notice to himself by way of the Sale Notice, Sagi arranged for notice of the sale to be published in the *New York Post* in October 2008 and February 2009 (*see* **Exhibit 12**).

53.     Sagi did not provide notice to the other parties holding interests in D&K – in particular, Sagi did not provide notice to Orly so that she could make an effort to protect her Trust's interests.  Sagi's failure to inform Orly of the purported default and proposed sale was deliberate and intended to prevent Orly from intervening in Sagi's and Dalia's plot to strip the Orly Trust of its interest in TPR (and any interest that Orly may have in the $27 million that may have been paid to TPR in August 2008, *see infra* ¶¶ 60-62).

54.     Although D&K previously had denied enforceability of the Note, Sagi, as the manager of D&K GP (and thereby a managing agent of D&K), never objected to the 8/31/08

14

Notice or took any action to prevent the declaration of default or the subsequent sale. Nor did Sagi, as the manager of D&K GP and D&K, ever attempt to make payments under the Note or cure the default. Through his actions and inactions, Sagi breached his fiduciary duties as manager of D&K GP and D&K, and his duty of care and loyalty owed directly to Orly as a result of their familial relationship.

55.     Likewise, though aware of the 8/31/08 Notice and the subsequent "auction," Dalia neither objected to the Notice nor took any action to prevent the declaration of default or the subsequent sale. Nor did Dalia ever attempt to ensure that D&K made payments under the Note or otherwise seek to cure the default. Through her actions and inactions, Dalia breached her fiduciary duties as trustee of the Orly Trust and her duty of care and loyalty as Orly's mother.

56.     Orly never received the 8/31/08 Notice or the Sale Notice. Further, Defendants never informed Orly of the material fact that TPR, despite multiple promises, agreements, and prior acts to the contrary, was seeking to enforce the Note. Of course, Defendants all knew that the Orly Trust and its beneficiary, Orly herself, had financial interests in the Note. Additionally, at all relevant times, Defendants knew Orly's address and other contact information, but never notified her of the impending foreclosure and auction, leaving Orly without any opportunity to protect herself and her Trust's interests.

57.     In consummation of the above-mentioned scheme, on February 27, 2009, TPR (still controlled by Sagi) foreclosed on the Note and purported to conduct an "auction" of the 240 TPR shares previously pledged in connection with the Note (the "Pledged Shares") at the office of Sagi's attorneys, McLaughlin & Stern LLP. Not coincidentally, the Sagi-controlled TPR purchased the Pledged Shares at this "auction" for $2,200,000. (*See* **Exhibit 13**). The proceeds of

15

the sale allegedly were used to decrease D&K's obligations under the Note, leaving a balance of approximately $8,800,000 that, purportedly, continues to be guaranteed by the Orly Trust and the Sagi Trust.

58.    As a result of Sagi's self-dealing and Dalia's failure to act in the best interests of the Orly Trust, D&K's only asset – its ownership interest in TPR – was transferred to TPR, which is controlled by Sagi. The foregoing scheme injured Orly and the Orly Trust, and benefited Sagi and Dalia, in a number of ways. The Orly Trust's interest in D&K is now worthless, as it purportedly no longer owns any interest in TPR, while Sagi now has direct control over all of the TPR shares. The scheme also destroyed Arie's and Dalia's tax and estate-planning intent that both children have equal shares in the family's wealth.

59.    Upon information and belief, if not restrained from further meddling, Dalia and Sagi will inflict additional harm upon Orly by divesting the Orly Trust of its one remaining asset – its ownership interest in the TRI shares.

I.    **Orly's Discovery of Sagi's and Dalia's Scheme**

60.    On or about August 22, 2008, and unbeknownst to Orly, Rochelle Fang, as Trustee of the Sagi Trust, and Sagi, as President/CEO of TPR, attempted to sell the Sagi Trust's 19.43% interest in TRI to the Trump Group, who already owned 47.15% of TRI's outstanding shares, for $26,715,416. This sale purportedly transferred control of TRI from Arie to the Trump Group who thereafter purported to hold 66.58% of TRI's outstanding common stock. A copy of the Stock Purchase Agreement is attached hereto as **Exhibit 14**.

61.    The validity of this approximately $27 million sale of TRI stock currently is

16

being disputed in litigation in Delaware Chancery Court. The parties to the action are Arie, TRI, and various entities affiliated with the Trump Group. The Orly Trust has not appeared in that action.[2]

62.     In that action, the Trump Group claims to have bought the shares either from the Sagi Trust or from TPR – thus, the approximately $27 million purportedly paid by the Trump Group either belongs to the Sagi Trust or to TPR, depending on the outcome of the litigation in Delaware. Notably, both Sagi and David Parnes maintain seats on TRI's Board of Directors on behalf of TPR. By, among other things, maintaining those seats on TPR's behalf, Sagi has taken the position that TPR owned the TRI stock, and is entitled to the $27 million. Upon information and belief, TPR is in possession of the $27 million, where it is at risk of dissipation by Sagi. Indeed, that dissipation already has begun: The Stock Purchase Agreement provided that $500,000 would be given to charity (in Sagi's name and at his choosing), and, upon information and belief, large sums from the $27 million have been given by Sagi to his niece, Yonit Sternberg.[3]

63.     After learning of the Sagi Trust's purported sale of its TRI shares and out of fear that Dalia would not protect the TRI shares held in her Trust, Orly instructed Dalia to protect the Orly Trust's interest in its TRI shares. Specifically, by letter dated January 10, 2009, Orly requested that "for now, and until further notice, it is my strong desire to retain all of the shares of TRI that are currently in the Orly Trust, and I direct you not to sell them." Letter from Orly Genger to Dalia Genger (Jan. 10, 2009) (a copy of which is attached hereto as **Exhibit 15**). Dalia refused to

---

[2]  Orly continues to reserve her right to bring an action related to this attempted sale of TRI shares and the resulting loss of her Trust's control premium, but she has not yet done so.

[3]  Orly continues to reserve her right to bring an shareholder derivative action on behalf of D&K related to Sagi's (and Dalia's) improper management and dissipation of TPR's assets, but she has not yet done so.

17

agree to retain the TRI shares in the Orly Trust.

64.     As detailed previously, the Surrogate's Court previously had declined to grant Orly's application to remove Dalia as Trustee of the Orly Trust.   Instead, the Surrogate's Court suggested that Orly commence an SCPA § 2201 proceeding to obtain evidence necessary to support a future application to have Dalia removed.   Pursuant to the Surrogate Court's suggestion, Orly's counsel sent Dalia a letter dated May 14, 2009 (attached hereto as **Exhibit 16**) requesting documents related to the Orly Trust's assets.   A copy of this May 14th letter was forwarded to Dalia's counsel, Robert A. Meister, Esq., once Orly's counsel learned of Mr. Meister's retention.

65.     On June 1, 2009, Mr. Meister responded to Orly's document demand by informing Orly's counsel that the Orly Trust no longer owned any interest in TPR.   Letter from Robert A. Meister, Esq., to Judith E. Siegel-Baum, Esq. (June 1, 2009) (a copy of which is attached hereto as **Exhibit 17**).   It was at this time that Orly first learned that TPR purportedly had foreclosed on the Note and sold the Pledged Shares back to TPR for $2,220,000.

66.     By letter dated June 11, 2009, Orly's counsel specifically requested that Dalia stipulate in writing that she would refrain from selling, transferring, or removing the Orly Trust's remaining asset – its TRI shares – until all issues between Orly and Dalia were resolved. Letter from Judith E. Siegel-Baum, Esq., to Robert A. Meister, Esq. (June 11, 2009) (a copy of which is attached hereto as **Exhibit 18**).   Dalia failed even to respond to this request, let alone agree to refrain from divesting the Orly Trust of its TRI shares until the issues between the Trustee and the Trust's beneficiary were resolved.

18

**J.     The June 22, 2009 Surrogate Court Application**

67.     Based, in part, upon Dalia's failure to respond to Orly's request, Orly made a second application to the New York County Surrogate's Court on June 22, 2009, by order to show cause seeking, among other things: a) to immediately enjoin and restrain Dalia or her agents from withdrawing, transferring, assigning, removing, pledging, redeeming, mortgaging, encumbering, liening, hypothecating or secreting the Orly Trust's TRI shares; b) removing Dalia as Trustee of the Orly Trust; c) seeking to surcharge Dalia for damages; and d) appointing Michael D. Grohman, Esq., as successor Trustee (the "Removal Application"), on the grounds that Dalia has intentionally and blatantly breached her fiduciary duties as Trustee of the Orly Trust, as set forth in this Verified Complaint.

68.     Given the urgency of Orly's request and the possibility for immediate and irreparable harm, the Surrogate's Court scheduled a July 1, 2009 hearing on Orly's Removal Application. At the July 1 hearing (which Dalia declined to attend), the Surrogate's Court ordered that Dalia would be required to give Orly at least ten days' notice before in any way disposing of the Orly Trust's TRI shares, to allow Orly sufficient time to seek relief from the Surrogate's Court. The Court's decision is attached hereto as **Exhibit 19**.

69.     On July 2, 2009, Orly, on behalf of herself, her Trust, and D&K, made written demand upon TPR to return the Pledged Shares to D&K by July 7, 2009. A copy of that written demand is attached hereto as **Exhibit 20**. To date, TPR has declined to do comply with this demand.

19

**FIRST CAUSE OF ACTION**
**(Claim for Breach of Fiduciary Duty On Behalf of Orly Against Dalia)**

70.     Plaintiff repeats and realleges the allegations in paragraphs 1 through 69.

71.     As Trustee of the Orly Trust, Dalia owes an undiluted fiduciary duty to the Trust's beneficiary, Orly, to monitor, manage, maintain, and protect the Orly Trust's assets, including the Orly Trust's ownership interests in TPR and TRI, from challenge or diminution in value.

72.     In addition, Dalia also owes duties of care and loyalty to Orly arising from the close familial relationship between herself and her daughter.  Orly relied upon her mother to protect her interests, including her Trust's ownership interests in TPR and TRI, and alert her to anything that may adversely affect her or her Trust's assets.

73.     Dalia breached her fiduciary duties to Orly by: (a) failing to inform Orly of TPR's foreclosure on the Note and the sale of the Pledged Shares, which completely divested the Orly Trust of its 23.52% indirect interest in TPR; (b) failing to take any action to protect or defend the Orly Trust's interest in TPR, in the face of Sagi's purported enforcement of the Note; and (c) failing to defend the Orly Trust's ownership interest in the Pledged Shares despite Orly's repeated requests that Dalia protect her interests.

74.     As stated above, Dalia understood and agreed before signing the Note and the Pledge Agreement that the Note would never be enforced by her or by any of the interested parties and, therefore, that TPR would never seek to foreclose on the Note or repossess the Pledged Shares.

20

75.     Thereafter, Dalia made sworn statements affirming that all interested parties to the Note (Arie, Sagi, Orly, TPR and D&K) had agreed that TPR would never seek to enforce the Note, and Sagi (acting through TPR) assigned the Note to his longtime friend David Parnes (then acting as Trustee of the Orly and Sagi Trusts and as an officer of TPR) in order to prevent anyone from enforcing the Note.

76.     Dalia's sworn statements and assertions of material fact were intended to be accepted as true and relied upon by interested parties to the Note, including Orly.  Orly was aware of Dalia's repeated statements and assertions that the Note would never be enforced, and she relied upon those statements and assertions.  Furthermore, Orly reasonably believed, based upon Dalia's statements and assertions, that Dalia would not allow anyone to enforce the Note against D&K. Additionally, Orly relied on Dalia, as Trustee of the Orly Trust and as her mother, to protect both her individual interests and the interests of the Orly Trust, of which she is the beneficiary.

77.     However, at the time that Dalia made these sworn statements and factual assertions, she never intended to abide by or honor the parties' agreement that the Note would not be enforced, and she never intended to protect the Orly Trust's interest in D&K's Pledged Shares.

78.     Upon information and belief, Dalia knew but deliberately and intentionally failed to notify Orly that Sagi: (a) was not making payments on the Note as manager of D&K GP; (b) intended to and eventually purported to declare a default under the Note on behalf of TPR; (c) sent the Sale Notice supposedly notifying D&K that its shares of TPR stock were to be auctioned as a result of the purported default under the Note; and (d) conducted a sham "auction" where Sagi (on behalf of TPR) "bought" the Pledged Shares at a significant discount to their actual value.

21

79.     Dalia's intentional failure to notify Orly about the foreclosure on the Note and sale of D&K's Pledged Shares were material omissions of fact that were intended to be, and in fact were, relied upon by Orly.  As Trustee, at a minimum Dalia had a fiduciary duty to speak, and she could not properly remain silent regarding these material facts.  She also had a duty to act with the utmost of loyalty on behalf of the Trust, which required her to take action to protect the Orly Trust's interests, particularly, its financial interests.

80.     As a direct and proximate result of Dalia's material misrepresentations, failure to inform Orly of the foreclosure and sale, and failure to take action as Trustee to protect the Orly Trust's interests, Orly has suffered damages, including the total loss of the Orly Trust's interest in TPR, the Orly Trust's potential liability for the outstanding indebtedness under the Note (which, by failing to contest the foreclosure and sale, Dalia failed to challenge as unenforceable), as well as attorneys' fees incurred by Orly in connection with her attempts to ensure that her rights and interests are protected, including her rights and interests stemming from her position as beneficiary of the Orly Trust.

81.     Upon information and belief, Dalia's material misstatements, material omissions, acts and failures to act, were malicious, wanton and intentionally or recklessly designed to cause harm to Orly and, as such, Orly is entitled to an award of punitive damages.

### SECOND CAUSE OF ACTION
**(Claim for Breach of Fiduciary Duty On Behalf of the Orly Trust and D&K Against Sagi and D&K GP)**

82.     Plaintiff repeats and realleges the allegations in paragraphs 1 through 81.

22

83.     Orly, as beneficiary of the Orly Trust, has the right to assert causes of action on behalf of the Orly Trust. Further, given Dalia's involvement in the fraud and Orly's renewed attempt to remove Dalia as Trustee, it would be futile for Orly to demand that Dalia commence legal action on behalf of the Orly Trust.

84.     The Orly Trust, as limited partner of D&K, has the right to assert causes of action on behalf of D&K against both D&K GP and Sagi. Moreover, it would be futile for the Orly Trust to demand that Sagi and D&K GP, as general partner of D&K, commence a legal action against themselves.

85.     Alternatively, the Orly Trust has the right to assert claims against Sagi directly because D&K GP is a mere instrumentality or alter ego of Sagi that should be ignored in its entirety, in the interests of justice. D&K GP was formed for the sole purpose of attempting to shield Sagi (and Dalia) from personal liability arising from their planned fraudulent acts. Thus, D&K GP was created for a fraudulent purpose, and, as a result, should be treated as a mere alter ego or instrumentality of Sagi.

86.     As manager of D&K GP (which, in turn, is general partner of D&K), Sagi owes an undiluted fiduciary duty to the partnership's limited partners, including the Orly Trust, to manage, maintain and protect D&K's assets, including its ownership interest in TPR, from challenge or diminution in value.

87.     In the same way, D&K GP, as general partner of D&K, owes an undiluted fiduciary duty to D&K to monitor, manage, maintain, and protect D&K's assets, including its ownership interest in TPR, from challenge or diminution in value.

23

88.   Sagi breached these fiduciary duties by engaging in blatant self-dealing and willful fraud using D&K GP, D&K and TPR as instrumentalities to orchestrate a sham transaction which stripped D&K of its ownership in TPR while simultaneously inuring to Sagi's benefit, and to the detriment of the Orly Trust and his sister, Orly.

89.   Specifically, Sagi (purportedly acting on behalf of TPR):

    a)   sent the 8/31/08 Notice only to himself as manager of D&K's assets, purporting to declare a default under the Note;

    b)   then sent the Sale Notice only to himself as manager of D&K's assets, purporting to notify D&K that its shares of TPR stock were to be auctioned off as a result of the purported default under the Note; and

    c)   orchestrated a sham auction at the offices of his attorneys, McLaughlin & Stern LLP, where Sagi purported to foreclose upon the Note, and purchase D&K's TPR shares for a fraction of the shares' actual value.

90.   At the same time, Sagi and D&K GP (purportedly acting on behalf of D&K):

    a)   Failed to make payments on the Note;

    b)   failed to challenge or defend D&K's principle asset – the Pledged Shares – in the face of Sagi's own use of TPR to foreclose upon the Note; and

    c)   failed to notify Orly of Sagi's intent and attempt to enforce the Note through TPR.

91.   Sagi and D&K GP failed to honor their fiduciary duties to manage and protect D&K's assets with knowledge that the interested parties to the Note (Arie, Dalia, Sagi, Orly, TPR, and D&K) had expressly disavowed enforceability of the Note.

24

92.     As stated above, all parties understood and agreed before the time of their signing that the Note and Pledge Agreement would never be enforced by any of them.

93.     Thereafter, Sagi, on behalf of both himself and D&K GP, made statements and assertions of material fact, including during the divorce proceedings, intended to induce all interested parties to the Note, including Orly, to rely upon the promise that the Note and Pledge Agreement would never be enforced against the Note's debtors.

94.     Orly was aware of Sagi's repeated assertions, on behalf of both himself and D&K GP, that the Note and Pledge Agreement would never be enforced, and she justifiably relied upon Sagi's assertions.  Further, Orly was aware that Sagi had been tasked with ensuring the non-enforcement of the Note, and that Sagi had acted to prevent enforcement of the Note by assigning it to Parnes.  Given all these facts, Orly reasonably believed and justifiably relied on Sagi, as manager of D&K's assets and as her brother, to protect both her and the Orly Trust's interests in D&K and D&K's interest in TPR.

95.     However, at the time Sagi made these statements, on behalf of both himself and D&K GP, he never intended to abide by or honor the agreement not to enforce the Note and never intended to protect the Orly Trust's interest in D&K's Pledged Shares.  Indeed, Sagi knew his statements materially misrepresented and hid his true intentions – to convert D&K's assets for his own benefit and to the detriment of Orly, the Orly Trust, and D&K.

96.     As a direct and proximate result of Sagi's and D&K GP's material misrepresentations and material omissions, the Orly Trust has suffered damages, including the total loss of the Orly Trust's interest in TPR, the Orly Trust's potential liability for the outstanding indebtedness under the Note (which, despite his previous statements, Sagi sought to enforce on

25

behalf of TPR), as well as extensive attorneys' fees that have been incurred in connection with Orly's efforts to protect the Orly Trust's rights and interests.

97.    As a direct and proximate result of Sagi's and D&K GP's material misrepresentations and material omissions, D&K has suffered damages, including the total loss of D&K's interest in TPR.

98.    Upon information and belief, both Sagi's and D&K GP's actions were malicious, wanton and intentionally or recklessly designed to cause harm to D&K and to the Orly Trust, and, as such, D&K and the Orly Trust are entitled to an award of punitive damages.

### THIRD CAUSE OF ACTION
**(Claim for Aiding and Abetting Breach of Fiduciary Duty On Behalf of Orly, the Orly Trust, and D&K Against Sagi and D&K GP)**

99.    Plaintiff repeats and realleges the allegations in paragraphs 1 through 98.

100.    Sagi knowingly participated and assisted Dalia's breaches of the fiduciary duties owed to Orly by, among other things: (a) seeking to enforce the Note on behalf of TPR despite repeated assurances that the Note would never be enforced; (b) purporting to foreclose on the Note on behalf of TPR; (c) purporting to sell the Pledged Shares at "auction" and purporting to purchase those shares on behalf of TPR; (d) failing to provide notice to Orly of the purported enforcement of the Note and foreclosure thereon; (e) failing to provide notice to Orly of the purported sale of the Pledged Shares; and (f) failing to monitor, manage and protect D&K's (and, thereby, the Orly Trust's) interests in the Pledged Shares.

101.    D&K GP knowingly participated and assisted Dalia's breaches of the fiduciary duties owed to Orly by, among other things:  (a) failing to make payments on the Note if

26

such payments were required; (b) failing to defend against TPR's attempt to enforce the Note, foreclose thereon, and sell the Pledged Shares for a mere fraction of their actual value; (c) failing to provide notice to Orly of the purported enforcement of the Note and the purported foreclosure thereon; (d) failing to provide notice to Orly of the purported sale of the Pledged Shares; and (e) failing to monitor, manage and protect D&K's interest in the Pledged Shares.

102.    As a direct and proximate result of Sagi's and D&K GP's aiding and abetting, Orly has suffered damages, including the total loss of the Orly Trust's interest in TPR, the Orly Trust's potential liability for the outstanding indebtedness under the Note, as well as extensive attorneys' fees that have been incurred in connection with Orly's efforts to protect the Orly Trust's rights and interests.

103.    As a direct and proximate result of Sagi's and D&K GP's aiding and abetting, the Orly Trust has suffered damages, including the total loss of the Orly Trust's interest in TPR, the Orly Trust's potential liability for the outstanding indebtedness under the Note, as well as extensive attorneys' fees that have been incurred in connection with Orly's efforts to protect the Orly Trust's rights and interests.

104.    As a direct and proximate result of Sagi's and D&K GP's aiding and abetting, D&K has suffered damages, including the total loss of D&K's interest in TPR, D&K's potential liability for the outstanding indebtedness under the Note, as well as extensive attorneys' fees incurred in connection with Orly's efforts to protect D&K's rights and interests.

105.    Upon information and belief, Sagi's and D&K GP's actions were malicious, wanton and intentionally or recklessly designed to cause harm to Orly, the Orly Trust, and D&K, and, as such, Orly, the Orly Trust, and D&K are entitled to an award of punitive damages.

27

## FOURTH CAUSE OF ACTION
### (Claim for Tortious Interference with Contract On Behalf of the Orly Trust and D&K Against Sagi and D&K GP)

106.    Plaintiff repeats and realleges the allegations in paragraphs 1 through 105.

107.    Sagi and D&K GP tortiously interfered with D&K's contractual obligations under the Note by preventing D&K from honoring its obligations under the Note, without any justification.

108.    Under the Note, D&K was required to repay principal, together with accrued interest, in annual installments over a ten-year period.  Though the Note was disavowed by Sagi, when he chose to seek its enforcement on behalf of TPR, he implicitly acknowledged that D&K had obligations under the Note.

109.    Sagi and D&K GP were well aware of D&K's rights and obligations under the Note.

110.    As a direct and proximate result of Sagi and D&K GP's interference with D&K's payment obligations under the Note, both D&K, and its limited partners, including the Orly Trust, have suffered damages, including the total loss of D&K's interest in TPR.

111.    Upon information and belief, Sagi and D&K GP actions were malicious, wanton and intentionally or recklessly designed to cause harm to D&K and the Orly Trust.  As such, D&K and the Orly Trust are entitled to an award of punitive damages.

28

## FIFTH CAUSE OF ACTION
### (Claim for Fraud On Behalf of Orly Against Dalia)

112.    Plaintiff repeats and realleges the allegations in paragraphs 1 through 111.

113.    As stated above, every member of the Genger family, including Dalia, understood and agreed before the time of their signing that the Note and Pledge Agreement would never be enforced by any of them.

114.    Thereafter, Dalia made statements, including sworn statements, affirming that all interested parties to the Note (Arie, Sagi, Orly, TPR and D&K) had agreed that TPR would never seek to enforce the Note, and Sagi (acting through TPR) assigned the Note to his longtime friend David Parnes (then acting as Trustee of the Orly and Sagi Trusts and an officer of TPR) in an attempt to prevent anyone from enforcing the Note.

115.    Dalia's sworn statements and assertions of material fact were intended to be accepted as true and relied upon by interested parties to the Note, including Orly.

116.    Orly was aware of Dalia's repeated assertions that the Note would never be enforced, and she relied upon Dalia's assertions that the Note would never be enforced. Further, Orly reasonably believed, based upon Dalia's assertions, that Dalia would not allow anyone to enforce the Note against D&K. Further, Orly justifiably relied on Dalia, as Trustee of the Orly Trust and as her mother, to protect both her and the Orly Trust's interests.

117.    However, at the time Dalia made these statements and factual assertions, she never intended to abide by or honor the agreement not to enforce the Note and never intended to protect the Orly Trust's interest in D&K's Pledged Shares.

29

118.  Upon information and belief, Dalia knew but deliberately and intentionally failed to notify Orly that Sagi: (a) was not making payments on the Note as manager of D&K GP; (b) was purporting to declare a default under the Note on behalf of TPR; (c) sent notice of the sale to himself as manager of D&K, but did not intend to inform Orly of the sale; and (d) conducted a sham "auction" during which Sagi "bought" D&K's Pledged Shares on behalf of TPR at a fraction of their actual value.

119.  Dalia's intentional failure to notify Orly about the foreclosure on the Note and sale of the Pledged Shares were material omissions of fact that were intended to be, and in fact were, relied upon by Orly.  As Trustee, at a minimum Dalia had a fiduciary duty to speak, and she could not properly remain silent regarding these material facts.  She also had a duty to act with the utmost of loyalty on behalf of the Trust, which required her to take action to protect the Orly Trust's interests, particularly, its financial interests.

120.  As a direct and proximate result of Dalia's material misrepresentations and material failure to inform Orly of the foreclosure and the sale of the Orly Trust's indirect interest in TPR, Orly has suffered damages, including the total loss of the Orly Trust's interest in TPR, the Orly Trust's potential liability for the outstanding indebtedness under the Note, as well as extensive attorneys' fees that have been incurred in connection with Orly's efforts to protect the Orly Trust's rights and interests.

121.  Upon information and belief, Dalia's material misstatements, material omissions, acts and failures to act were malicious, wanton and intentionally or recklessly designed to cause harm to Orly, and, as such, Orly is entitled to an award of punitive damages.

30

**SIXTH CAUSE OF ACTION**
**(Claim for Fraud On Behalf of the Orly Trust and D&K Against Sagi**
**and D&K GP)**

122. Plaintiff repeats and realleges the allegations in paragraphs 1 through 121.

123. As stated above, every interested party understood and agreed before the time of their signing that the Note and Pledge Agreement would never be enforced by any of them.

124. Thereafter, Sagi, on behalf of both himself and D&K GP, made statements and assertions of material fact, including during the divorce proceeding, that the Note and Pledge Agreement were not intended to be, and would not be, enforced.

125. Orly was aware of Sagi's repeated assertions, on behalf of both himself and D&K GP, that the Note and Pledge Agreement would never be enforced, and she relied upon Sagi's assertions. Further, Orly reasonably believed that Sagi would not allow anyone to enforce the Note against D&K. Further, Orly justifiably relied on Sagi, as manager of D&K's assets and as her brother, to protect both her and the Orly Trust's interests in D&K.

126. However, at the time Sagi made these statements, on behalf of both himself and D&K GP, he never intended to abide by or honor the agreement not to enforce the Note and never intended to protect the Orly Trust's interest in the TPR shares which D&K owned. Indeed, Sagi knew his statements materially misrepresented and hid his true intentions – to take D&K assets for his own benefit, to the detriment of both D&K and the Orly Trust.

127. As a direct and proximate result of Sagi's and D&K GP's material misrepresentations and material silence, the Orly Trust has suffered damages, including the total loss of the Orly Trust's interest in TPR, the Orly Trust's potential liability for the outstanding

31

indebtedness under the Note, as well as extensive attorneys' fees that have been incurred in connection with Orly's efforts to protect the Orly Trust's rights and interests.

128. As a direct and proximate result of Sagi's and D&K GP's material misrepresentations and material silence, D&K has suffered damages, including the total loss of D&K's interest in TPR, D&K's potential liability for the outstanding indebtedness under the Note, as well as extensive attorneys' fees incurred in connection with Orly's efforts to protect D&K's rights and interests.

129. Upon information and belief, both Sagi's and D&K GP's actions were malicious, wanton and intentionally or recklessly designed to cause harm to D&K and the Orly Trust and, as such, D&K and the Orly Trust are entitled to an award of punitive damages.

### SEVENTH CAUSE OF ACTION
(Claim for Aiding and Abetting Fraud On Behalf of the Orly Trust and
D&K Against Sagi and D&K GP)

130. Plaintiff repeats and realleges the allegations in paragraphs 1 through 129.

131. Sagi and D&K GP knowingly participated and assisted Dalia in committing fraud against Orly by, among other things, assisting in the sham sale of the Pledged Shares, making misrepresentations regarding the Note, and failing properly to notify D&K's members of the purported foreclosure and sale.

132. As a direct and proximate result of Sagi's and D&K GP's aiding and abetting of Dalia's fraud, the Orly Trust has suffered damages, including the total loss of the Orly Trust's interest in TPR, the Orly Trust's potential liability for the outstanding indebtedness under

32

the Note, as well as extensive attorneys' fees that have been incurred in connection with Orly's efforts to protect the Orly Trust's rights and interests.

133.   As a direct and proximate result of Sagi's and D&K GP's aiding and abetting of Dalia's fraud, D&K has suffered damages, including the total loss of D&K's interest in TPR, D&K's potential liability for the outstanding indebtedness under the Note, as well as extensive attorneys' fees that have been incurred in connection with Orly's efforts to protect D&K's rights and interests.

134.   Upon information and belief, Sagi's and D&K GP's actions were malicious, wanton and intentionally or recklessly designed to cause harm to the Orly Trust and D&K, and, as such, the Orly Trust and D&K are entitled to an award of punitive damages.

## EIGHTH CAUSE OF ACTION
### (Claim for Conspiracy to Commit Fraud On Behalf of Orly, the Orly Trust, and D&K Against Sagi, Dalia, D&K GP and TPR)

135.   Plaintiff repeats and realleges the allegations in paragraphs 1 through 134.

136.   As set forth above, Dalia and Sagi agreed upon and engaged in a scheme, using TPR and D&K GP as their instrumentalities (collectively, the "Conspirators"), to fraudulently divest D&K of its ownership interest in TPR, thereby depriving the Orly Trust of its ownership interest in TPR, to Orly's direct detriment.

137.   By himself or through the instrumentalities, Sagi furthered the conspiracy by, among other things:

  a)   failing to make payment on the Note, if such payments were required;

33

b)  sending the 8/31/08 Notice – purporting to declare a default under the Note – only to himself as manager of D&K's assets;

c)  sending the Sale Notice – purporting to notify D&K that its Pledged Shares were to be auctioned as a result of the purported default under the Note – only to himself as manager of D&K's assets;

d)  orchestrating a sham auction at the offices of his attorneys, McLaughlin & Stern LLP, where Sagi purported to foreclose upon the Note, and simultaneously sell and purchase the Pledged Shares for a fraction of their actual value; and

e)  failing to notify or inform Orly about the foreclosure and the sale of the Pledged Shares.

138.   Likewise, by herself or through the instrumentalities, Dalia furthered the conspiracy by, among other things:

a)  failing to notify or inform Orly about the foreclosure and the sale of the Pledged Shares; and

b)  failing to challenge the foreclosure and the sale or otherwise defend the Orly Trust's interests in the Pledged Shares.

139.   As a direct and proximate result of the above-mentioned conspiracy to commit fraud, Orly, the Orly Trust, and D&K have suffered damages, including the total loss of D&K's and the Orly Trust's interest in TPR, D&K's and the Orly Trust's potential liability for the outstanding indebtedness under the Note, as well as extensive attorneys' fees that have been incurred in connection with Orly's efforts to protect D&K's, the Orly Trust's, and her own rights and interests.

140.   Upon information and belief, the Conspirators' actions were malicious, wanton, and intentionally or recklessly designed to harm D&K, the Orly Trust, and Orly, and, as such, D&K, the Orly Trust, and Orly are entitled to an award of punitive damages.

34

## NINTH CAUSE OF ACTION
### (Claim for Declaratory Relief and Damages Pursuant to NY UCC §§ 9-627, 610, 611-614 On Behalf of the Orly Trust Against TPR)

141.    Plaintiff repeats and realleges the allegations in paragraphs 1 through 140.

142.    TPR orchestrated a sham sale that purported to dispose of D&K's Pledged Shares. However, the sale of these Pledged Shares was not "commercially reasonable" within the meaning of NY UCC Article 9.

143.    Upon information and belief, TPR failed to send timely authenticated notification of disposition of the Pledged Shares to the Orly Trust, or its beneficiary Orly, in violation of NY UCC §§9-611(c)(2) and 9-612(b).  Although aware of her financial interest in D&K and the TPR shares, TPR made no attempt to contact Orly to inform her of the UCC sale.

144.    As a secondary obligor under the Note, the Orly Trust had a right to be given notice of the sale of the Pledged Shares.  TPR's failure to send proper authenticated notification to either the Orly Trust or Orly is commercially unreasonable.

145.    In addition, the 8/31/08 Notice fails to satisfy the requirements for a proper notification before disposition of collateral.  Specifically, the 8/31/08 Notice: (a) fails to state that D&K is entitled to an accounting of the unpaid indebtedness, in violation of NY UCC § 9-613(a)(4); and (b) fails to state the time and place of Sagi's purported disposition of collateral, in violation of NY UCC § 9-613(a)(5).

146.    Further, the purported sale price for D&K's Pledged Shares ($2,200,000) was only a fraction of the original purchase price for the shares ($10,200,000).  Moreover, the sale price did not take into account the $27 million potentially received by TPR from the purported sale

35

of TRI stock to the Trump Group, or the substantial dollar value of TRI. Similarly, the sale price did not take into account TPR's limited partnership interest in Riverside Properties (Canada) LP, an entity which owns extremely valuable residential real estate complexes in Canada.

147.    Due to TPR's and Sagi's failure to proceed in accordance with UCC Article 9, Part 6, the Orly Trust is entitled, under NY UCC §9-625(b), to the recovery of the loss caused by such noncompliance.

### TENTH CAUSE OF ACTION
**(Claim for Conversion and Replevin On Behalf of D&K Against TPR)**

148.    Plaintiff repeats and realleges the allegations in paragraphs 1 through 147.

149.    Around December 1993, D&K purchased the Pledged Shares.

150.    Pursuant to this purchase, D&K had a possessory right and interest in the Pledged Shares at the time when TPR (controlled by Sagi) conducted the "auction" of those shares and took possession of those shares through an unlawful act of conversion.

151.    Although TPR currently has possession of the Pledged Shares, TPR has no lawful right to possess or control those shares.

152.    On July 2, 2009, Orly, acting on behalf of the Orly Trust, in turn acting on behalf of D&K, made a demand to TPR for recovery of the Pledged Shares. A copy of the July 2, 2009 demand letter is attached hereto as **Exhibit 20**.

153.    TPR failed to return the Pledged Shares in response to the above-mentioned request for their return.

36

154.   The Pledged Shares are unique because TPR is a closely held Genger family corporation, and because the value of the TPR stock at issue is largely dependent on the outcome of an action currently pending in Delaware Chancery Court concerning the ownership of TRI. Based upon the outcome of this litigation, the value of TPR's shares may increase by $250 to $350 million.

155.   As a direct and proximate result of the conversion of D&K's Pledged Shares by TPR, D&K has suffered damages in the amount of the value of the TPR shares on February 27, 2009, the date of the purported auction.

156.   Further, D&K is entitled to an order directing TPR to return the Pledged Shares at issue to D&K.

## ELEVENTH CAUSE OF ACTION
### (Claim for Declaratory Judgment of D&K's Superior Right to Possess Chattel Under CPLR 7101 On Behalf of D&K Against TPR)

157.   Plaintiff repeats and realleges the allegations in paragraphs 1 through 156.

158.   As set forth above, D&K had a possessory right and interest in the Pledged Shares at the time when TPR (controlled by Sagi) conducted the sham sale of those shares and took possession of these shares through an unlawful act of conversion.

159.   Although TPR currently has possession of the Pledged Shares, TPR has no lawful right to possess or control those shares.

160.   In addition, TPR has refused Orly's demand for the return of D&K's Pledged Shares.

37

161.    As a direct and proximate result of TPR's conversion of the Pledged Shares, D&K has suffered damages, including the total loss of its interest in TPR.

162.    The Pledged Shares are unique because TPR is a closely-held Genger family corporation, and because the value of the TPR stock at issue is largely dependent on the outcome of an action currently pending in Delaware Chancery Court concerning the ownership of TRI. Based upon the outcome of this litigation, the value of TPR's shares may increase by $250 to $350 million.

163.    As a result, D&K is entitled to a declaratory judgment pursuant to CPLR 7101 which, in turn, would allow this Court to enter an Order of Seizure pursuant to CPLR 7102, directing the sheriff to seize the Pledged Shares for return to D&K.

### TWELFTH CAUSE OF ACTION
**(Claim for Preliminary Injunction to Recover Chattel Under
CPLR 7109 On Behalf of D&K Against TPR)**

164.    Plaintiff repeats and realleges the allegations in paragraphs 1 through 163.

165.    As set forth above, D&K has a possessory interest in the Pledged Shares that is superior to TPR's purported possessory interest in those shares. Indeed, TPR has no legal right to the possession of the Pledged Shares.

166.    Due to D&K's superior possessory interest in the Pledged Shares, this Court should grant D&K a temporary restraining order preventing TPR from removing those shares from the state or otherwise transferring, selling, pledging, assigning or otherwise disposing of those shares until further order from this Court, pending a final determination of D&K's request for declaratory judgment for right to possession of the Pledged Shares.

38

167.    Without action by this Court, there is a strong chance that TPR will attempt to assign or dispose of the property in order to prevent D&K from recovering the Pledged Shares, causing irreparable harm to D&K and its limited partners, including the Orly Trust.

168.    The speculative and contingent value of TPR, a closely held family corporation, makes TPR's shares unique. Indeed, based upon the outcome of the litigation over TRI, TPR may increase many fold in value.

### THIRTEENTH CAUSE OF ACTION
**(Claim for Constructive Trust On Behalf of D&K Against TPR)**

169.    Plaintiff repeats and realleges the allegations in paragraphs 1 through 168.

170.    A constructive trust is appropriate because this case involves fraud and self-dealing. Specifically, TPR participated in a fraudulent scheme to defraud D&K of its shares in TPR.

### FOURTEENTH CAUSE OF ACTION
**(Claim for Constructive Fraudulent Conveyance Under NY Debtor &
Creditor Law Sections 273 and 277 On Behalf of the Orly Trust
Against TPR)**

171.    Plaintiff repeats and realleges the allegations in paragraphs 1 through 170.

172.    As secondary obligor under the Note, the Orly Trust is a contingent creditor of D&K. In addition, the Orly Trust is a future creditor of TPR arising from their tort liability to the Orly Trust, as set forth in this Verified Complaint.

173.    Sagi, acting in his capacity as manager of D&K GP, caused D&K to convey D&K's Pledged Shares to TPR by purposely and intentionally failing to act to prevent the

39

foreclosure and the sale of those shares to TPR for $2,200,000, far less than fair consideration as defined in Section 272 of the New York Debtor and Creditor Law.

174.    Sagi, acting on behalf of D&K GP, caused the above-mentioned conveyance of the Pledged Shares to TPR to occur at a time when D&K was insolvent, or at a time when D&K became insolvent as a result of the transfer, as defined in Section 271 of the New York Debtor and Creditor Law.

175.    Based upon the above, the transfer of the Pledged Shares to TPR constitutes a fraudulent conveyance under to Sections 273 and 277 of the New York Debtor and Creditor Law.

176.    As a result, the transfer of the Pledged Shares to TPR shall be set aside pursuant to Section 278 and 279 of the New York Debtor and Creditor Law.

### FIFTEENTH CAUSE OF ACTION
**(Claim for Actual Fraudulent Conveyance Under Section 276 of the New York Debtor and Creditor Law On Behalf of the Orly Trust Against TPR)**

177.    Plaintiff repeats and realleges the allegations in paragraphs 1 through 176.

178.    As a secondary obligor under the Note, the Orly Trust is a contingent creditor of D&K.  In addition, the Orly Trust is a future creditor of TPR arising from their tort liability to the Orly Trust, as set forth in this Verified Complaint.

179.    At the direction of Sagi, acting in his capacity as manager of D&K GP, D&K transferred its Pledged Shares to TPR as part of a sham sale specifically designed to divest the Orly Trust of its ownership interest in TPR and to benefit TPR, and Sagi himself.

40

180.    As set forth above, Sagi used both D&K GP and TPR as his instrumentalities to effectuate a transfer of the Pledged Shares to TPR with the actual intent of hindering, delaying or defrauding the Orly Trust and its beneficiary, Orly, constituting a violation of Section 276 of the New York Debtor and Creditor Law.

181.    As a result, the transfer of the Pledged Shares shall be set aside pursuant to Sections 278 and 279 of the New York Debtor and Creditor Law.

182.    In addition, the Orly Trust is entitled to a judgment against TPR in the amount of the reasonable attorneys' fees incurred in connection with its efforts to protect its interests, as fixed by this Court pursuant to Section 276-a of the New York Debtor and Creditor Law.

## SIXTEENTH CAUSE OF ACTION
### (Claim for Promissory Estoppel On Behalf of D&K and the Orly Trust Against Sagi and TPR)

183.    Plaintiff repeats and realleges the allegations in paragraphs 1 through 182.

184.    As stated above, every interested party, including Sagi and TPR, understood and agreed before the time of their signing that the Note and Pledge Agreement would never be enforced by any of them.

185.    Thereafter, both Sagi and TPR made statements and took actions that were intended to, and did induce, D&K and the Orly Trust to reasonably rely upon the fact that the Note and Pledge Agreement would not be enforced against D&K.

41

186.    As a direct and proximate result of Sagi's and TPR's statements and actions, and D&K's and the Orly Trust's reliance upon them, D&K and the Orly Trust have suffered damages, including the total loss of their interest in TPR, their potential liability for the outstanding indebtedness under the Note, as well as extensive attorneys' fees incurred in connection with Orly's efforts to protect their rights and interests.

## DEMAND FOR RELIEF

WHEREFORE, Orly Genger, in her individual capacity, and on behalf of the Orly Genger 1993 Trust both in its individual capacity and on behalf of D&K Limited Partnership, demands judgment as follows:

(a)    on the first cause of action, against Dalia in an amount equal to Orly's compensatory and punitive damages to be determined at trial with interest accruing from February 27, 2009;

(b)    on the second cause of action, against Sagi and D&K GP, in an amount equal to the Orly Trust's and/or D&K's compensatory and punitive damages to be determined at trial with interest accruing from February 27, 2009;

(c)    on the third cause of action, against Sagi and D&K GP in an amount equal to Orly's compensatory and punitive damages to be determined at trial with interest accruing from February 27, 2009;

(d)    on the fourth cause of action, against Sagi and D&K GP in an amount equal to the Orly Trust's and/or D&K's compensatory and punitive damages to be determined at trial with interest accruing from February 27, 2009;

(e)    on the fifth cause of action, against Dalia in an amount equal to Orly's compensatory and punitive damages to be determined at trial with interest accruing from February 27, 2009;

(f)    on the sixth cause of action, against Sagi and D&K GP in an amount equal to the Orly Trust's and/or D&K's compensatory and punitive damages to be determined at trial with interest accruing from February 27, 2009;

42

(g)     on the seventh cause of action, against Sagi and D&K GP in an amount equal to Orly's compensatory and punitive damages to be determined at trial with interest accruing from February 27, 2009;

(h)     on the eighth cause of action, against Sagi, Dalia, D&K GP and TPR in an amount equal to Orly's, the Orly Trust's, and/or D&K's compensatory and punitive damages to be determined at trial with interest accruing from February 27, 2009;

(i)     on the ninth cause of action, declaring that TPR's purported sale of the Pledged Shares was "commercially unreasonable" pursuant to Article 9 of the New York Uniform Commercial Code and awarding damages to the Orly Trust pursuant to N.Y. U.C.C. § 9-625(b);

(j)     on the tenth cause of action, against TPR in an amount equal to the value of the Pledged Shares as of February 27, 2009, and an order directing TPR to return the Pledged Shares to D&K;

(k)     on the eleventh cause of action, declaring that D&K, and not TPR, has the superior right to possess the Pledged Shares;

(l)     on the twelfth cause of action, enjoining TPR from removing the Pledged Shares from the state or otherwise transferring, selling, pledging, assigning or otherwise disposing of those TPR shares until further Order from this Court;

(m)     on the thirteenth cause of action, establishing a constructive trust in favor of D&K over Pledged Shares;

(n)     on the fourteenth cause of action, against TPR to set aside the constructive fraudulent conveyance of the Pledged Shares orchestrated by Sagi in his capacity as manager of D&K GP;

(o)     on the fifteenth cause of action, against TPR to set aside the actual fraudulent conveyance of the Pledged Shares orchestrated by Sagi in his capacity as manager of D&K GP and awarding the Orly Trust its reasonable attorneys' fees;

(p)     on the sixteenth cause of action, awarding damages to the Orly Trust and/or D&K arising from Sagi's and TPR's breach of promise, in an amount to be determined at trial with interest accruing from February 27, 2009;

(q)     for costs, fees and disbursements; and

43

(r)     such further and other relief as the Court deems just and proper.

Dated:     New York, New York
           July 8, 2009

ZEICHNER ELLMAN & KRAUSE LLP

By: _____
     Stephen F. Ellman
     Yoav M. Griver
     Bryan D. Leinbach
     Attorneys for Plaintiff
     575 Lexington Avenue
     New York, New York 10022
     (212) 223-0400

## VERIFICATION

STATE OF NEW YORK,
COUNTY OF NEW YORK.

      ORLY GENGER, being duly sworn, says that she is the plaintiff named in the

foregoing complaint; that she has read the foregoing complaint, and that the complaint is true to her

own knowledge except as to those matters therein stated to be alleged upon information and belief,

and that as to those matters she believes them to be true.

                         ORLY GENGER

Sworn to before me this
8th day of July, 2009

                  Notary Public

MICHAEL W. ANTONIVICH
Notary Public, State of New York
No. 01AN4762190
Qualified in Nassau County
Commission Expires June 30, 2010

SUPREME COURT: NEW YORK COUNTY                    Index No.:

ORLY GENGER in her individual capacity
and on behalf of the Orly Genger 1993 Trust
(both in its individual capacity and on behalf
of D & K Limited Partnership),

                                    Plaintiff,

        - against -

DALIA GENGER, SAGI GENGER, D & K
GP LLC, and TPR INVESTMENT
ASSOCIATES, INC.,

                                    Defendants.

## SUMMONS AND
## VERIFIED COMPLAINT

ZEICHNER ELLMAN & KRAUSE LLP

575 LEXINGTON AVENUE
NEW YORK, NEW YORK 10022
TEL.: (212) 223-0400
FAX: (212) 753-0396
www.zeklaw.com

# MARKEWICH AND ROSENSTOCK LLP

8 East 41st Street • Fifth Floor • New York, New York 10017

tel: (212) 542-3156   fax: (212) 481 1761   emarkewich@mrlawllp.com

Lawrence M. Rosenstock
Eve Rachel Markewich

Robert Markewich
of counsel

November 5, 2008

Hon. Renee R. Roth
Surrogate's Court, New York County
31 Chambers Street, 5th Floor
New York, New York 10007

Re:    In the Matter of Orly Genger
       File No. 0017/2008

Dear Surrogate Roth:

We write on behalf of the Petitioner, Orly Genger, with reference to her *sub judice* Petition as beneficiary of the Orly Genger Trust ("Orly Trust"). Recent events require that we, again, urge you to appoint Martin Coleman as Trustee. As set forth in detail below, there are several litigations in process that will impact the value of Trust assets, and the Orly Trust needs to have a Trustee who can participate in those litigations without conflict. There is also an outstanding matter regarding possession of a stock certificate belonging to the Orly Trust, but which is currently being held captive by another party.

Our Amended Petition sought the immediate appointment of a Trustee to administer the Orly Trust and safeguard its assets. We were thwarted in that request by objections from Sagi Genger ("Sagi"), the remote contingent remainderman of the Orly Trust, who manipulated various friends and relatives of his (his friend, David Parnes ("Parnes"); his sister-in-law Leah Fang; his sister-in-law's romantic partner, Patricia Enriquez; and his mother Dalia Genger ("Dalia")) to, seriatim, name one another Trustee and to take control of the Orly Trust, to the detriment of Orly.

Since our last contact with the Court, we believe Sagi and Dalia have acted in concert to devalue the Trust's most valuable asset, shares of a privately-held company called Trans Resources Inc. ("TRI"), a company founded by Orly's and Sagi's father, Arie Genger ("Arie").

The Orly Trust and a trust for the benefit of Sagi, (the "Sagi Trust"), were created by Arie in 1993. In 2004, when Arie and Dalia divorced, the two Trusts purchased TRI stock that at one time was marital property. This stock previously had been held by TPR[1], an entity in which Arie and Dalia held their family resources. As part of the marital settlement, the TRI stock held by TPR was sold to the Orly Trust, the Sagi Trust and Arie. As a result of the sales, the Sagi Trust and the Orly Trust each owned to approximately 19% of the outstanding TRI stock, and Arie owned approximately 15% of the TRI stock. The Trusts also executed irrevocable proxies granting to Arie the right to vote their shares of TRI stock. As a result, Arie continued to control TRI through the Genger family holdings of approximately 53% of the stock.

The remaining 47% TRI stock is held by third parties unrelated to the Gengers but related to each other ("Third Parties"). Last month, the Third Parties attempted a coup, by convincing Sagi to arrange the sale to them of the Sagi Trust's shares ("Sagi TRI Shares"). The purported sale was effected by a document signed by Rochelle Fang, Sagi's mother-in-law, who was then Trustee of the Sagi Trust. As soon as Rochelle, as Trustee, signed the purchase and sale agreement (the "PSA") regarding the Sagi TRI Shares, Rochelle – presumably at Sagi's request – resigned as Trustee. In Rochelle's place, David Parnes became Trustee of the Sagi Trust. Of course, this musical chairs game with the Trustee to the Sagi Trust is the same game played by the same people – Parnes, Sagi and Sagi's in-laws, the Fangs – regarding the trusteeship of the Orly Trust.

The PSA reflected a price for the Sagi TRI–Shares that is merely a fractional amount of their worth. Based on the 2008 earnings of TRI, the value of the Sagi TRI Shares is in excess of $150,000,000. Nonetheless, under the PSA, the Third Parties purport to purchase the Sagi TRI Shares for $26,715,416 – ie. at a discount of approximately $125,000,000 or more.

In the meantime, the Third Parties also have filed suit seeking to void the original transfer of the TRI shares from TPR to the two Trusts, claiming the sale was improper under the TRI shareholders agreement. Since the Third Parties claim that the stock owned by the Sagi Trust was never rightfully transferred to the Sagi Trust, the Third Parties insisted that the PSA be approved and executed not only by the Sagi Trust, but also by TPR. Upon information and belief, Dalia, as the controlling shareholder of TPR, consented to the sales

---

[1] In the Amended Petition, Orly requested limited letters to investigate the operations of TPR. TPR originally was owned 49%, indirectly, and equally, by the Sagi Trust and the Orly Trust, and 51% by Dalia. Recently, Dalia sold 2% of her shares to Sagi's mother-in-law, Rochelle Fang. Of particular concern to Orly is the fact that TPR has paid out well over a million dollars in compensation and other funds to Sagi and Dalia, without making comparable payments to Orly.

document affirming that if the Sagi Trust's TRI shares are, in fact, still owned by TPR, then TPR agrees to the sale to the Third Parties. By consenting to the sale, Dalia, simultaneously: (i) agreed to a share price for TRI at significantly below its actual value; (ii) conceded the possibility that the Orly Trust is not the owner of its most valuable asset – the TRI shares that had been transferred to it by TPR; (iii) agreed to cede control of TRI to the Third Parties; (iv) potentially caused a de-valuation of the Orly Trust's TRI shares; and (v) potentially caused a de-valuation of the Orly Trust's interest in TPR.

There are currently several litigations involving TPR and/or TRI, which directly affect the Orly Trust, including:

- GLENCLOVA INVESTMENT CO. v. TRANS-RESOURCES, INC. and TPR INVESTMENT ASSOCIATES INC. pending in the United States District Court, Southern District of New York;

- ROBERT SMITH, TR INVESTORS, LLC AND GLENCLOVA INVESTMENT CO. v. TRANS-RESOURCES, INC. pending in the Delaware Chancery Court;

- TR INVESTORS, LLC, GLENCLOVA INVESTMENT CO., NEW TR EQUITY I, LLC, and NEW TR EQUITY II, LLC v. ARIE GENGER and TRANS-RESOURCES, INC. pending in the Delaware Chancery Court.

- NEW TR EQUITY, LLC v. TRANS-RESOURCES, INC., pending in the Delaware Chancery Court.

These actions will have a direct impact on the Orly Trust's holdings, and the control and value of such holdings. It is, therefore, essential that a trustee immediately be appointed for the Orly Trust, so that decisions can be made to determine what steps to take with respect to these litigations and, in particular, whether the Orly Trust should seek to intervene in these lawsuits. It is likely that the only way to preserve the value of the TRI shares in the Orly Trust will be to intervene in some if not all of the litigations.

Sagi and Dalia are acting on their own accounts in the litigations. There is no one acting on behalf of Orly or the Orly Trust. The Orly Trust must have representation in the litigations that is independent from the Sagi Trust and TPR, as controlled by Dalia. Clearly, Dalia would not be independent. She is obviously in a position of conflict, having already approved a severely depressed valuation of the TRI stock. This conflict is separate and apart from the conflict that already existed, as set forth in the Amended Petition, as a result of Dalia taking money out of TPR, to the exclusion of the Orly Trust,

which has an independent significant ownership interest in TPR, albeit indirectly through another entity controlled by Dalia.

In addition to our concerns about the extant litigations, we are also concerned that Dalia and Sagi will attempt to sell the Orly Trust's TRI shares to the Third Parties – again, at a depressed value. In fact, we have sought to obtain the share certificate evidencing the Orly Trust's ownership of the TRI shares and have been thwarted by TRI's counsel. The need to take possession of that share certificate is yet another, separate, reason, why there is immediate need for the appointment of a Trustee other than Dalia.

For these reasons we respectfully request that the Court immediately resolve the outstanding application and appoint Martin Coleman as Trustee. (Although the Trustee must serve without commission, pursuant to the Trust instrument, Mr. Coleman has agreed to take on this job.)

Respectfully yours,

Eve Rachel Markewich

ERM:js

cc:  Jonathan G. Kortmansky, Esq.
     Steven Hyman, Esq.
     Matthew Hoffman, Esq.
     Seth Rubenstein, Esq.
     Mary Santamarina, Esq.

SURROGATE'S COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
-----------------------------------------------------------------------x
                              :

In the Matter of the Application of ORLY     :      File No. 0017/2008
GENGER, as a person interested, for the      :
removal of DALIA GENGER, as Trustee of the  :
Orly Genger 1993 Trust pursuant to SCPA § 711(11)  :
                              :
-----------------------------------------------------------------------x

## RESPONDENT SAGI TRUST'S OPPOSITION TO ORLY GENGER'S MOTION FOR TEMPORARY RESTRAINTS

John Dellaportas
Evan Michailidis
DUANE MORRIS LLP
1540 Broadway
New York, New York 10036
(212) 692-1000
*Attorneys for Defendant*
  *The Sagi Genger 1993 Trust*

Defendant the Sagi Genger 1993 Trust (the "Sagi Trust") respectfully submits this response in opposition to plaintiff Orly Genger's motion to enjoin defendant Dalia Genger, the trustee of the Orly Genger 1993 trust (the "Orly Trust"), *et al.* from proceeding in Delaware Chancery Court with respect to the 1,102.80 shares of Trans-Resources, Inc. ("TRI") stock in which the Orly Trust claims an interest.[1]

By this motion, Orly seeks to enjoin the Orly Trust from suing in Delaware Chancery Court for a declaratory judgment affirming the Trust's beneficial ownership of the TRI shares. Orly's motion is premised on her claim that the Delaware case is "duplicative." *See* Orly Br. at 10. It is not. The Chancery Court action seeks "a declaratory judgment that [the Orly Trust] is the beneficial owner of Trans-Resources shares that it purchased from TPR in October 2004" pursuant to a "purchaser for fair value" theory previously adopted by Chancellor Strine. *See* Exh. A ¶ 43. Arie and Orly Genger's shared "Third Amended and Supplemental Complaint," by contrast, seeks to reform Arie's 2004 divorce decree so those shares be "placed in a newly formed single purpose entity controlled by Arie ("TPR2") ... [and] that Arie be declared the 51% owner of TPR2 ...." *See* Exh. B ¶ 181(iii)-(iv). The Orly Trust, in turn, would be granted a 24.5% interest in TPR2, effectively reducing her equity interest in TRI from 19.4% to 12.9%. *Id.* ¶ 181(v). (The TRI shares of the Sagi Trust would suffer an equal dilution in its TRI equity interest. *Id.*) The Supreme Court has already dismissed it. *See* Exh C.

The upside would all go to Arie Genger – who is Orly's father but who is not a beneficiary of the Orly Trust. His equity interest in TRI would increase from 14.0% to 27.0%, at the expense of the Orly Trust. *Id.* ¶ 181(iv). This chart summarizes the relief sought:

---

[1]     The Sagi Trust appears herein for the limited purpose of opposing petitioner's motion, without waiver of any jurisdictional objections to this proceeding it may have. *See Town of Clarkstown v. Howe*, 206 A.D.2d 377 (2d Dept. 1994) (holding that appearance in opposition to preliminary injunction motion does not waive jurisdictional objection, where defendant raised lack of personal jurisdiction in timely motion to dismiss).

**% EQUITY INTERESTS IN TRI**

|  | Under 2004 Divorce Decree: | Under Count I, Third Amended and Supplemental Complaint: |
|---|---|---|
| Arie Genger: | 14.0% (794.40 of 3,000 TRI shares, which represented 52.85% of the company's equity) | 27.0% (51% of TPR2, which would hold 52.85% of TRI) |
| The Orly Trust: | 19.4% (1,102.80 of 3,000 TRI shares, which represented 52.85% of the company's equity) | 12.9% (24.5% of TPR2, which would hold 52.85% of TRI) |

In other words, <u>Orly is seeking the Court's assistance to give away TRI shares to Arie, rather than try to procure them for the Orly Trust</u>. The Orly Trust only would inherit the TRI shares "upon Arie's death." *See* Exh. B ¶ 181(vii). All economic advantage from those shares, including the right to sell them, would be denied the Trust during Arie's life.

Orly claims the right to do this on behalf of the Orly Trust because she is, in her words, "its beneficiary." *See* Orly Br. at 3. Even if this were completely accurate, it is *per se* improper for a beneficiary to try to direct assets out of a trust. But the statement is also inaccurate and misleading, as it conveniently omits the fact that the Sagi Trust is a contingent beneficiary of the Orly Trust. If Orly continues to have no descendants (she has none yet), then the Trust's assets will all go to the Sagi Trust. *See* Exh. D at 3. Yet, notwithstanding the Sagi Trust's interest, Orly procured a TRO from the Supreme Court without notifying the Sagi Trust of the hearing, at which she falsely represented to the Supreme Court that she was the "sole beneficiary" of the Trust. Now that her lies have been exposed and the Court has lifted the fraudulently obtained TRO, Orly runs to this Court seeking the same relief on the same false grounds. This is an attempted theft, plain and simple. Orly is seeking to rob the Orly Trust of its assets in order to hand over to her father, whose misconduct is the source of all this mess.

Unfortunately, since her parents' divorce, Orly has been hard at work wrecking trust assets. First, Orly helped her dad torpedo deals with the Trump Group that would have enabled the Orly Trust to either retain its TRI shares or sell them for a value similar to that obtained by the Sagi Trust. *See* Exh. E ¶¶ 6-15. Then, she came over to this Court and got a TRO keeping the Orly Trust from selling its TRI shares. *See* Exh. F. Next, she went to Delaware and gave false trial testimony which helped sink Arie's claims. *See* Exh. G at 11-13. She also tried to have her mother replaced as trustee, only to have this Court reject her application on the ground, *inter alia*, that it was based on a "material misstatement." *See* Exh. H at 6.

More recently, Arie and Orly have cavalierly disregarded the burdens on the Court's docket, plaguing this Court with repeated motions and submissions seeking various forms of questionable "emergency relief." This practice reached its nadir at an October 26, 2011 hearing at which then-Supreme Court Justice Feinman asked: "why not go back to the Surrogate's Court and renew your application to remove [Dalia]?" *See* Exh. I at 8. Orly's counsel – Mr. Griver, who also is one of the counsel of record in this proceeding – responded by disparaging this Court for supposedly having a slow docket. *Id.* at 8.

As a subject of Orly's criticism, the Surrogate's Court is in good company. At the very same October 26, 2011 hearing, Orly Genger's counsel also chose to impugn the integrity of the Delaware Chancery Court for daring to rule against Orly's father, Arie Genger. Counsel called Chancellor Strine "the worst possible judge in the United States of America" and claimed "the fix is in." *See* Exh. I at 22, 29. Justice Feinman repeatedly cautioned to: "Be careful what you say" and "again, I just urge you to be careful with your language" (*id.* at 22, 30), all to no effect. Orly's counsel responded: "I hope Chancellor Strine reads that." *Id.* at 25. Chancellor Strine did so, and needless to say he did not take it well. *See* Exh. J.

-3-

The underlying flaw in Orly's motion is that she conflates the interests of Arie Genger –

who, by all accounts, is responsible for this mess – with those of the Orly Trust. The fact that

Orly is merely acting as a stalking horse for her father is apparent not from her pleading, which

she filed jointly with her father, seeking identical relief.  In reality, there are crucial distinctions

between those two parties' legal positions, ones that – assuming "the fix is not in" – the

Chancery Court is perfectly equipped to deal with.  One might start with the fact that Chancellor

Strine has no particular affinity for the Trumps.  *E.g.*, the Chancery Court, in its December 9,

2009 Memorandum Opinion, observes that:

> From the record, one senses that Genger and the Trump Group bring a
> similar mindset to business. Although they seemed to work together cooperatively
> to advance TRI's interests, Genger and the Trump Group viewed business as
> business, and neither would hesitate to seize an advantage, even if that advantage
> meant causing commercial injury to someone else, regardless of whether one
> had served with that someone else on a board for several years.

*See* Exh. K at 5.  Arie lost due not to any judicial bias, but rather to Arie's "own perfidy," and

the Court's conclusion that Arie "only has himself to blame for whatever mess his decision to

make the 2004 Transfers has caused for his divorce settlement." *See* Exh. G at 40.

While Orly gave false testimony in Chancery Court, her Trustee, Dalia Genger, is

blameless.  We trust that Chancellor Strine can distinguish between the blameless Trustee and

Orly.  If anything, the Chancery Court's decisions should provide a basis for optimism.  Most

significantly, in his July 23, 2010 Memorandum Opinion, Chancellor Strine called the Sagi Trust

"an arguably innocent purchaser for value." *See* Exh. G at 37.  Since the Sagi and Orly Trusts

obtained their shares in the same manner, this finding should apply equally to the Orly Trust.  If

it does, then the Orly Trust has an argument that, as an innocent purchaser for fair value, it gets

to retain beneficial ownership of the TRI shares. That argument would not require relitigating the

Chancery Court's prior factual findings, but rather would flow from the Court's finding that Arie

-4-

lied. The argument was not made in the prior Delaware trial, as the Orly Trust did not appear in the case, and Arie could not plausibly claim to be an "innocent" purchaser.

And so we return to the basic falsehood upon which rests this entire, rotten motion: namely, Orly's claim that "Orly - not Dalia - is the only person truly interested in protecting her Orly Trust." *See* Orly Br. at 9. *The pleadings, as opposed to the rhetoric, reveal the opposite to be the case.* Orly is not even trying to obtain ownership of the TRI shares on behalf of the Trust, but rather to give them away for free to Arie. Dalia, by contrast, has taken decisive action to win beneficial ownership of the TRI shares on behalf of the Orly Trust. This is Dalia Genger's right and responsibility as trustee, and Orly has set forth no basis to upset it.

Given the foregoing, the Sagi Trust respectfully submits that Orly has fallen woefully short of satisfying the standard necessary to obtain a preliminary injunction. "Where the facts are in sharp dispute, a temporary injunction will not be granted." *Matter of Related Props., Inc. v. Town Bd. of Town/Village of Harrison*, 22 A.D.3d 587, 590 (2d Dep't 2005); *accord T & N West Galla Pizzeria, Inc. v. CF White Plains Assoc.*, 185 A.D.2d 270, 272 (2d Dep't 1992) (since parties sharply disputed terms of lease, preliminary injunction was not warranted); *Eklund v. Pinkey*, 31 A.D.3d 908, 909 (3d Dep't 2006) (reversing preliminary injunction where there were "sharp factual disputes obscuring the likelihood of success"). Here, underlinedeverything Orly says is in dispute, none of it can be proven, and most of it is just plain false.

Lastly, should this Court grant Orly any relief, than a stiff undertaking is needed to cure the harm such relief will surely inflict upon the Sagi Trust. Under CPLR 6312, an undertaking would be required. *See, e.g., Gerstner v. Katz*, 38 A.D.3d 835, 836 (2d Dep't 2007) (reversing court order which "granted the plaintiff's request for a preliminary injunction without requiring him to give an undertaking which would 'reimburse the defendant for damages sustained if it

[were] later finally determined that the preliminary injunction was erroneously granted'") (citations omitted). The only issue would be as to the correct amount.

Under New York law, the undertaking amount should be "rationally related to the damages the nonmoving party might suffer if the court later determines that the relief should not have been granted." *1523 Real Estate, Inc. v. East Atl. Props., LLC*, 41 A.D.3d 567, 567 (2d Dep't 2007) (citation omitted); *accord Clover St. Assocs. v. Nilsson*, 244 A.D.2d 312, 313 (2d Dep't 1997). Here, the harm is the lost value of the TRI shares to the Sagi Trust, should Orly prevent the Orly Trust from winning beneficial ownership of the TRI shares for the Trust, in favor of her lawsuit which seeks to give away those same shares to Arie.

On the issue of share value, Orly should be taken at her word. In a Complaint in a related case, Orly personally verified that if the Delaware litigation resulted in a determination that the 3,000 TRI shares were not validly transferred but remained with TPR, then the value of D&K's 240 shares of TPR stock (representing 49% of TPR's total equity) would increase by $250 to $350 million. *See* Exh. L ¶¶ 154, 162. If correct, that would mean TPR's entire 3,000 TRI shares are worth roughly twice that amount, or $500 to $700 million, and the Orly Trust's proportionate beneficial ownership of 1,102.80 TRI shares is worth approximately $185-260 million. This is no math error. In a November 8, 2008 letter to this Court, Orly's counsel represented that the TRI shares TPR had contracted in 2004 to sell to the Sagi Genger 1993 Trust (the same number of shares TPR had contracted to sell to the Orly Trust) were worth "in excess of $150,000,000." *See* Exh. M at 2. That is the harm to the Sagi Trust.

Accordingly, the Sagi Trust respectfully requests that the preliminary injunction be denied. If granted, it should be conditioned upon an undertaking of no less than $150 million. Orly is not the only beneficiary and so should not be permitted to destroy the Trust.

Dated:    New York, New York
          March 1, 2013

                                    DUANE MORRIS LLP

                                    By: _/s/ John Dellaportas_____
                                        John Dellaportas
                                        Evan Michailidis
                                    1540 Broadway
                                    New York, New York 10036
                                    (212) 692-1000
                                    *Attorneys for Respondent*
                                      *The Sagi Genger 1993 Trust*

-7-

SURROGATE'S COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
------------------------------------------------------------------------x
                              :
In the Matter of the Application of ORLY     :     File No. 0017/2008
GENGER, as a person interested, for the      :
removal of DALIA GENGER, as Trustee of the  :
Orly Genger 1993 Trust pursuant to SCPA § 711(11)  :
                              :
------------------------------------------------------------------------x

## NOTICE OF APPEARANCE

PLEASE TAKE NOTICE that the undersigned attorney is appearing on behalf of

respondent The Sagi Genger 1993 Trust in the above-captioned proceeding and requests that all

papers in connection with the above-captioned proceeding be served upon the undersigned at the

address listed below.

Dated:     New York, New York
          March 1, 2013

                                   DUANE MORRIS LLP

                                   By:  */s/ John Dellaportas*
                                      John Dellaportas
                                      Evan Michailidis
                                   1540 Broadway
                                 New York, New York 10036
                                 (212) 692-1000
                                 *Attorneys for Respondent*
                                   *The Sagi Genger 1993 Trust*

SURROGATE'S COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

In the Matter of the Application of ORLY
GENGER, as a person interested, for the
removal of DALIA GENGER, as Trustee of the
Orly Genger 1993 Trust pursuant to SCPA §
711(11)

**Index No. 0017/2008**

**AFFIDAVIT OF SERVICE**

STATE OF NEW YORK       )
                        : ss.:
COUNTY OF NEW YORK      )

GRACE GIAMPIETRO, being duly sworn, deposes and says:

1.      I am employed by the firm of Duane Morris LLP.

2.      I am over 18 years of age, reside in Queens, New York and am not a party to this
action.

3.      On March 1, 2013, I caused service by mailing a copy of a **NOTICE OF
APPEARANCE, RESPONDENT SAGI TRUST'S OPPOSITION TO ORLY GENGER'S
MOTION FOR TEMPORARY RESTRAINTS and AFFIRMATION OF JOHN
DELLAPORTAS ON BEHALF OF RESPONDENT SAGI TRUST** by depositing same in the
official depository maintained and exclusively controlled by the United States Government, true and
correct copies of the same, properly enclosed in a postpaid wrapper addressed to counsel at the
following address designated by them for that purpose upon and via e-mail upon:

Ralph R. Hochberg
Mitchell L. Kaplan
PLATZER, SWERGOLD, KARLIN, LEVINE,
GOLDBERG, & JASLOW, LLP
1065 Avenue of the Americas - 18th Floor
New York, New York 10018
(212) 593-3000

Yoav Griver, Esq.
Bryan Leinbach, Esq.
Zeichner Ellman & Krause LLP

DM1\3748818.1

575 Lexington Avenue
New York, New York 10022
(212) 223-0400

Robert Meister, Esq.
Pedowitz & Meister, LLP
570 Lexington Avenue, 18th Floor
New York, NY 10022
(212) 403-7365

_____
Grace Giampietro

Sworn to before me this
1st day of March, 2013

_____
Notary Public

2