3/23/2015  Genger -v- Genger Proceeding 032315

1        O. Genger - by Plaintiff - Direct/by Mr. Herschmann

2     Q    Looking at the exhibit, does it refresh your

3 recollection as to what dollar amount your brother was being

4 questioned about regarding how much money your mother was

5 receiving?

6     A    Yes.

7     Q    What number did you question your brother about?

8     A    $30,000 a month.

9     Q    Per month?

10    A    Yes.

11    Q    Do you recall then discussing with your brother how

12 could distributions be evened out between you, your mother and

13 your brother?

14    A    Yes.

15    Q    Did your brother at that time indicate his willingness

16 to even out the distribution between you, and your mother and

17 himself?

18    A    No, he didn't.

19    Q    Did your brother answer any questions about what are

20 the assets of TPR?

21    A    Whatever answers he gave were so complicated and he

22 gave answers that  confused everyone.

23    Q    Well, did the Isaacson representatives say to your

24 brother during the course of the meeting that they were

25 satisfied with his answers?

26    A    No.

2843

3/23/2015  Genger -v- Genger Proceeding 032315

```
1              O. Genger - by Plaintiff - Direct/by Mr. Herschmann
2       Q    What did they say generally about the answers your
3  brother was giving?
4                 MR. DELLAPORTAS:  Objection.   Hearsay.
5                 THE COURT:   Sustained.
6       Q    Did you then cover what receivables were due TPR, just
7  generally?
8       A    I don't remember.
9       Q    Okay.  If you look at exhibit 234, the agenda in front
10 of you, does that refresh your recollection as to what questions
11 were asked about the receivables due TPR?
12      A    Yes.
13      Q    And looking at that , does it refresh your recollection
14 about asking what happened to the $1.9 million that your brother
15 owed TPR?
16                MR. DELLAPORTAS:  Objection.   Lack of foundation
17    and leading.
18                THE COURT:   How about a foundation?
19      Q    Okay.  Well, does exhibit 234 refresh your recollection
20 as to whether the subject matters of how much money your brother
21 owed TPR was discussed on November 8, 2007?
22      A    Yes.
23      Q    Okay.  Looking at exhibit 234 does it refresh your
24 recollection about the specific amount of money that was
25 discussed with your brother regarding how much money he owed
26 TPR?
```

3/23/2015  Genger -v- Genger Proceeding 032315

```
 1          O. Genger - by Plaintiff - Direct/by Mr. Herschmann
 2      A    Yes.
 3      Q    What was the amount of money that your brother was
 4   asked about that he owed TPR?
 5              MR. DELLAPORTAS:  Just objection, your Honor.
 6              This doesn't feel like a refreshed recollection.
 7      It just fees like reading a document.
 8              MR. HERSCHMANN:  It's the only way to do it.
 9              If Mr. Dellaportas wants me to go down --
10              THE COURT:  You know, she was there.  So, I do
11      believe there is a --
12              MR. DELLAPORTAS:  Okay.
13      Q    What is the amount?
14      A    $1.9 million.
15      Q    Do you recall then having other discussions about other
16   monies that were owed TPR or owed by other officers to TPR?
17      A    Yes.
18      Q    Do you recall what was next discussed independent of
19   looking at the exhibit?
20      A    No.
21      Q    Looking at the exhibit, does it refresh your
22   recollection as to the next item that you discussed with your
23   brother?
24      A    Yes.
25      Q    Okay.  What was the next item that you discussed with
26   your brother?
```

3/23/2015  Genger -v- Genger Proceeding 032315

1          O. Genger - by Plaintiff - Direct/by Mr. Herschmann

2      A    The annual expense of TPR and then after that there was

3   trust administration.

4      Q    I think you have to speak a little louder.

5      A    Sorry.

6          Right after that there was what are the annual expenses

7   of TPR exclusive of above distributions to Sagi and Ariel Orly.

8      Q    Did your brother answer what was the annual expense to

9   TPR when Isaacson & Company posed the question to him?

10     A    Again, his answers were really convoluted and --

11     Q    How about, was there a discussion about the amount of

12  lawsuits that TPR was involved with as either a plaintiff or a

13  defendant?

14     A    Were there discussions?

15     Q    Yes?

16     A    Yes.

17     Q    After that was there a discussion about potentially

18  buying out your interests?

19     A    Yes.

20     Q    And looking at exhibit 234 does it refresh your

21  recollection, specifically, about what you asked of your

22  brother?

23     A    Yes.

24     Q    What was asked?

25     A    Was TPR, meaning Sagi, consider buying out Orly's

26  interest in TPR.  -- Or D&K now giving proper discounts to the

```
 1          O. Genger - by Plaintiff - Direct/by Mr. Herschmann
 2    D&K note and credit for the losses.
 3               THE COURT:  Well --
 4               MR. HERSCHMANN:  Those were the subject matters
 5    that were discussed.
 6               THE COURT:  She is reading from it, though.
 7    Q    Now --
 8               THE COURT:  You're kind of abusing it now.  She
 9    cannot read from it.
10    Q    All right.
11         So, the document is not in evidence, so you cannot read
12    from it.  You can only look at it to refresh your recollection
13    and then answer the question.  So.
14               THE COURT:  And if you cannot answer the question,
15    then you cannot answer the question.
16    Q    Now, was there a discussion about capital contributions
17    made to White Box?
18    A    Yes.
19    Q    After that do you recall what was discussed about TPR
20    and its relationship to White Box?
21    A    Yes.
22    Q    And do you recall at some point asking could you have
23    control of the tax filings of White Box?
24    A    Yes.
25    Q    Now, did you then move on to discuss your trustees and
26    administration of your trust?
```

3/23/2015  Genger -v- Genger Proceeding 032315

```
1           O. Genger - by Plaintiff - Direct/by Mr. Herschmann
2      A    Yes.
3      Q    Who were the trustees back in 2007?
4      A    It was Lea Fang.
5      Q    Did you discuss wanting someone else to become the
6    trustee of your trust?
7      A    Yes.
8               MR. DELLAPORTAS:  Objection, relevance.
9               THE COURT:  Sustained.
10     Q    In the course of this meeting was the agenda dealing
11   with your parents' divorce?
12     A    No.
13     Q    If you look at the agenda does it refresh your
14   recollection as to whether or not you had raised TRI or had
15   intended to raise TRI in any way?
16     A    Does it refresh?
17     Q    Yes?
18     A    Yes, it does.
19     Q    And is TRI something that was on your agenda to cover?
20     A    No.
21     Q    Now, did you then cover the Canadian ventures?
22     A    Yes.
23     Q    And do you recall, approximately, when you learned
24   about Riverside related entities?
25     A    It was some time prior in '07, prior to this meeting.
26     Q    And when you say some time prior to '07, was that in
```

3/23/2015  Genger -v- Genger Proceeding 032315

```
 1           O. Genger - by Plaintiff - Direct/by Mr. Herschmann
 2     relationship with your trying to get a better understanding of
 3     finances?
 4           A     Yes.
 5           Q     And prior to having this meeting in November of 2007
 6     had you met personally with Isaacson and Company
 7     representatives?
 8           A     Before this meeting?
 9           Q     Yes?
10           A     Yes.
11           Q     If you go now to the issues, let's focus now on the
12     Canadian ventures.
13           Do you recall specifically what you first or what was
14     first asked of your brother in the November 8, 2007 meeting
15     regarding the Canadian ventures?
16           A     Without -- Without looking at it?  No.
17           Q     Okay.  Looking at exhibit 234 can you tell us if that
18     refreshes your recollection as to what was, what was the first
19     thing that you discussed in relationship to the Canadian
20     ventures?
21           A     Yes.
22           Q     What was the first thing that was discussed?
23                 THE COURT:  Without reading from this.
24           Q     Without reading?
25           A     What did I sell to my brother?
26           Q     Was that a question that the representatives of
```

3/23/2015  Genger -v- Genger Proceeding 032315

```
1              O. Genger - by Plaintiff - Direct/by Mr. Herschmann

2    Isaacson & Company asked your brother even in November of 2007?

3                   MR. DELLAPORTAS:  Objection, hearsay.

4                   THE COURT:  Sustained.

5         Q    How did your brother respond to the question of what

6    you had sold to him?

7         A    To that particular question, I don't remember what his

8    response was.

9         Q    Without looking at the agenda do you recall what was

10   discussed in connection with your brother about it?

11                  THE COURT:  About?

12        Q    About the Canadian ventures?

13                  THE COURT:  Okay the Canadian ventures.

14        Q    Yes?

15        A    I mean, I have a specific --

16        Q    Tell us what you recall being discussed about the

17   Canadian ventures, of the transfer.  And then we can get into

18   the specifics.  Tell us generally first what you recall?

19        A    About the Canadian ventures what was discussed?

20        Q    Yes?

21        A    Specifically, I specifically asked my brother if we

22   could now transfer back my shares to me like he said he would

23   do.  And I specifically remember my brother looking at me and

24   laughing and said, I don't know why you would want to do that,

25   it is valueless.

26        Q    Did you believe him when he said that?
```

3/23/2015  Genger -v- Genger Proceeding 032315

```
 1          O. Genger - by Plaintiff - Direct/by Mr. Herschmann
 2     A    Did I believe what, that it was valueless?
 3     Q    Yes?
 4     A    What I believed is that, is that my brother tricked me.
 5     Q    And after that conversation did you still try to get
 6   more information about the Canadian ventures from your brother
 7   in that meeting?
 8     A    I don't remember what happened specifically right after
 9   that.  I know there was other, there was more conversation about
10   it.  But, I cannot tell you specifically.
11     Q    Looking at exhibit 234 did you have a discussion to
12   refresh your recollection specifically about the dollar values?
13     A    Yes.
14     Q    Okay.  And does exhibit 234 refresh your recollection?
15     A    Yes.
16     Q    And what do you recall about discussing with your
17   brother in that meeting dealing with the valuations?
18     A    That I had, I had sold my interest to him for 100,000
19   when I bought it for 150.
20     Q    And then do you recall any discussions about the
21   valuations of the businesses currently?
22     A    I am sorry, what was the question?
23     Q    Could we read it back, please?
24          THE COURT:  Yes, please.
25          (Record read)
26     Q    I meant, generally.  I mean the Canadian business?
```

1           O. Genger - by Plaintiff - Direct/by Mr. Herschmann
2       A    Yes.
3       Q    Did your brother in the course of that meeting provide
4   you with any financial information as to where the money had
5   gone from the Canadian ventures?
6       A    No.
7       Q    Let me show you what you has been marked as exhibit
8   266-71, which is admitted into evidence.
9            And do you see on the bottom portion of the exhibit
10  266-71 that there is a reference that the White Paper -- I am
11  sorry, that the White Box papers were supposed to transfer to
12  Jonah from Bill Fischer and then Jonah can be reached at (212)
13  758-0000.
14           Do you see that ?
15      A    Yes.
16      Q    Does that refresh your recollection as to who were the
17  accountants for White Box in 2007?
18      A    Yes.
19      Q    Is that Jonah Gayer and Associates?
20      A    I mean, it was supposed to be, it wasn't.
21      Q    Do you know at some point whether Gayer and Associates
22  became the accountants for White Box?  And I'm focused on the
23  2007 time period.
24      A    I don't know that it ever actually switched to Jonah
25  Gayer.
26      Q    Now, going back to the meeting in November, 2007, do

3/23/2015  Genger -v- Genger Proceeding 032315

1          O. Genger - by Plaintiff - Direct/by Mr. Herschmann
2    you recall that at the conclusion of the agenda there was an
3    over all subject matter that you wanted to address with your
4    brother?
5         A    Yes.
6              (Continued on the next page)
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

3/23/2015  Genger -v- Genger Proceeding 032315

```
 1                 O. Genger - Plaintiff - Direct/Herschmann
 2         Q    And what was the general tenure for what you were
 3    looking to get from your brother in the November 2007 meeting?
 4         A    Information.  Information about my finances.
 5         Q    And did you get information that was satisfactory to
 6    you from your brother in that meeting?
 7         A    No.
 8         Q    Let me show you what's been previously received in
 9    evidence as Exhibit 230.
10              MR. HERSCHMANN:  Again, I'm providing an extra
11         copy to defense counsel.
12              (Handing to defense counsel.)
13              (Handing to witness.)
14              (Handing to the Court.)
15         Q    Do you recall that after the meeting Isaacson &
16    Associates sent a letter to your brother?
17              THE COURT:  Yeah, this is very leading.
18              MR. HERSCHMANN:  I'm sorry?
19              THE COURT:  Ask a question.
20              MR. HERSCHMANN:  I'm trying to lay a foundation
21         for the exhibit.
22              THE COURT:  It's too leading.
23         Q    First, have you seen Exhibit 230 beforehand?
24         A    Yes.
25         Q    Did you have discussions with Isaacson & Associates
26    before Exhibit 230 was sent to your brother?
```

# Exhibit C

## 3/23/2015  Genger -v- Genger Proceeding 032315

```
1
2      SUPREME COURT OF THE STATE OF NEW YORK
       COUNTY OF NEW YORK:    CIVIL TERM: PART - 12
3      ----------------------------------------------X
       ORLY GENGER,
4
                             Plaintiff
5                                     INDEX NUMBER:
                                        100697/08
6              -against-
7      SAGI GENGER,
8                              Defendant
       ----------------------------------------------X
9                      80 Centre Street
                       New York, New York 10013
10                     March 23, 2015
11     BEFORE:
                 HONORABLE:  Barbara Jaffe, JSC
12
13     APPEARANCES:
14             Zeichner Ellman & Krause, LLP
               Attorneys for Plaintiff
15             1211 Avenue of the Americas
               New York, New York 10036
16             By:  Bryan D. Leinbach, Esq.
                    -and-
17             Kasowitz Benson Torres & Friedman, LLP
               1633 Broadway
18             New York,  New York 10019
               By:  Eric D. Herschmann, Esq.
19                  Michael Paul Bowen, Esq.
20             Morgan, Lewis & Bockius, LLP
               Attorneys for the Defendant
21             101 Park Avenue
               New York, New York 10178-0060
22             By:  John Dellaportas, Esq.
                    Mary Pennisi, Esq.
23
24
25                              Delores Hilliard
                                Vicki K. Glover
26                            Official Court Reporters
                    - OFFICIAL COURT REPORTER
```

```
1               O. Genger - Plaintiff - Direct/Herschmann
2    accounting firm?
3        A    Yes.
4        Q    What was the reason that you obtained a different
5    accounting firm?
6        A    Well, around this time in 2007, I was trying to get
7    information about my finances from my brother.  He did not want
8    to deal with Bill Fischer and told me that, you know, if I
9    wanted to have any conversations with him about it, I'd have
10   to --
11       Q    I think you have to slow down.
12       A    Sorry.
13            If I wanted to have any conversations with him
14   about my finances, I would have to work with an accountant that
15   was a new accountant, someone who was independent.  So I hired a
16   new accountant.
17       Q    Who did you hire?
18       A    Joel Isaacson.
19       Q    Did Joel Isaacson have anything to do with Raines &
20   Fischer?
21       A    No.
22       Q    Did Joel Isaacson & Associates have anything to do with
23   your father?
24       A    No.
25       Q    How did you come to hire Joel Isaacson?
26       A    A friend of mine referred me to them.
```

2826

3/23/2015  Genger -v- Genger Proceeding 032315

```
1                 O. Genger - Plaintiff - Direct/Herschmann
2        Q    And a friend that was independent of Raines & Fischer
3    or your parents?
4        A    Yes.
5        Q    And after you hired Joel Isaacson & Company, then what
6    happened regarding your finances?
7        A    They started trying to help me gather information, and
8    I know they contacted Sagi and tried to get information from
9    him.  We tried to set up a meeting, and we finally were able to
10   set up a meeting with Sagi.
11       Q    Do you recall, approximately, when you were able to set
12   up that meeting with your brother?
13       A    I believe it was in November of 2007.
14       Q    Do you recall whether or not your brother had sent
15   information to your new accountants Isaacson & Associates prior
16   to your having a meeting together with your brother?
17       A    No, I know that he didn't.
18       Q    Now, as far as the actual time period of the meeting,
19   do you recall how that actually got set or what transpired?
20       A    How the meeting transpired?
21       Q    Yes.
22       A    Well, as I said, I was trying to get information from
23   my brother.  I hired these new accountants, Joel Isaacson, and I
24   knew that my brother had all this information, and we contacted
25   him several times to try to set it up, and we finally --
26       Q    I think you have to slow down.
```

3/23/2015  Genger -v- Genger Proceeding 032315

```
1               O. Genger - Plaintiff - Direct/Herschmann
2        A    We finally were able to set up a meeting.
3        Q    Let me show you what's been marked as Exhibit 234 for
4   identification, and it's been previously discussed in this
5   matter.
6                (Handing to defense counsel.)
7                MR. HERSCHMANN:  I'm providing a copy again to
8        defense counsel.
9                (Handing to witness.)
10               (Handing to the Court.)
11       Q    I'm going to hand you an exhibit, what's been
12   previously marked as Exhibit 228 for identification, which is
13   Bates stamped JI 429.  I'm providing again a copy to defense
14   counsel.
15               (Handing to defense counsel.)
16               (Handing to witness.)
17       Q    Will you take a look at Exhibit 228 as well?
18               (Handing to the Court.)
19       Q    I'm going to hand you also what's been marked as
20   266-135 as well.  I'm providing a copy to defense counsel.
21               (Handing to defense counsel.)
22               (Handing to witness.)
23       Q    Let me start with Exhibit 266-135.
24               (Handing to the Court.)
25       Q    Do you see that this is an e-mail from Stan Altmark to
26   your brother?
```

3/23/2015  Genger -v- Genger Proceeding 032315

```
1                    O. Genger - Plaintiff - Direct/Herschmann
2        A     Yes.
3        Q     And you've seen this e-mail before today, correct?
4        A     Yes.
5        Q     Now, looking at the e-mail, does it refresh your
6    recollection as to whether or not you had requested via Isaacson
7    & Company certain information in June of 2007 from your brother?
8        A     Yes, I did.
9        Q     And is it accurate that after making requests from your
10   brother in June of 2007, you had not received specific
11   information that you wanted prior to meeting with him?
12       A     Yes.
13       Q     Now, looking at Exhibit 228, if you could, for a
14   moment, have you seen Exhibit 228 previously?
15       A     Yes.
16       Q     And do you recognize this as an e-mail from Joel
17   Isaacson to your brother dated November 6th of 2007?
18       A     Yes.
19             MR. HERSCHMANN:  Your Honor, at this time I would
20       offer Exhibit 228 for identification into evidence.
21             MR. DELLAPORTAS:  Objection.  Hearsay.
22             MR. HERSCHMANN:  Your Honor, we're offering it as
23       a communication that was sent as a representative from Orly
24       Genger to her brother.  The actual content is irrelevant,
25       except for the fact that he actually received it.
26             MR. DELLAPORTAS:  It's definitely being offered
```

```
 1              O. Genger - Plaintiff - Direct/Herschmann
 2       for the truth of the matter, and it's hearsay, and it
 3       hasn't been authenticated.  It's from Joel Isaacson's
 4       files.
 5              THE COURT:  Yeah, sustained.
 6       Q    Well, Ms. Genger, looking at Exhibit 228, do you recall
 7   whether or not your brother was advised that Isaacson & Company
 8   had no affiliation with Raines & Fischer?
 9       A    Yes.
10       Q    And did you believe at the time Isaacson & Company was
11   making requests from your brother for certain documents, that
12   you were actually entitled to those documents?
13       A    Yes.
14       Q    Did you retain Isaacson & Company to help advise you on
15   the state of affair of your assets?
16       A    Yes.
17       Q    Who was the accountant handling the tax returns for
18   White Box in the 2007 time period?  Was it Jonas Gayer, to your
19   knowledge, or was it Raines & Fischer, if you recall?
20       A    Raines & Fischer.
21       Q    Now, can you look at Exhibit 234, please?  Do you have
22   the exhibit in front of you?
23       A    Yes.
24       Q    And you mentioned earlier that there was an agenda that
25   was put together for the November 8th, 2007 meeting.
26              Does this exhibit refresh your recollection as to
```

3/23/2015 Genger -v- Genger Proceeding 032315

```
1                O. Genger - Plaintiff - Direct/Herschmann
2     what was covered during the course of the meeting, as far as
3     your side was concerned?
4                MR. DELLAPORTAS:  Objection.  There's been no
5        testimony that she lacks recollection subject that it needs
6        to be refreshed.
7        Q    Do you recall everything that happened at the November
8     8, 2007 meeting?
9        A    I don't know if I recall everything, but I --
10       Q    Is there a document that would help refresh your
11    recollection as to what was the agenda covered at the November
12    8, 2007 meeting?
13       A    Yes.
14       Q    Is the actual agenda the document that would help you
15    refresh your recollection?
16       A    Yes.
17       Q    So, now looking at Exhibit 234, does that refresh your
18    recollection as to what was expected to be covered by your
19    representatives with your brother on November 8, 2007?
20       A    Yes.
21       Q    So, can you first tell us how long did it take for you,
22    for your representatives, to arrange a meeting with your brother
23    to discuss your finances?  Was it a week?  Was it more than
24    that?  And if the prior documents that I've handed you, Exhibit
25    266-135, refresh your recollection, please let us know.
26               MR. DELLAPORTAS:  It's kind of leading.
```

3/23/2015  Genger -v- Genger Proceeding 032315

```
1              O. Genger - Plaintiff - Direct/Herschmann
2              THE COURT:  You're putting the cart before the
3         horse.
4              MR. HERSCHMANN:  Okay.  Well, let me ask it.
5         Q    Do you recall how long it took you to set up a meeting
6    with your brother?
7         A    I know it was months.
8         Q    Now, can you describe for us the general tenure of the
9    meeting; where it occurred, if you recall, what happened when
10   you got there?
11        A    The meeting happened at Joel Isaacson's office, and the
12   people who were there who attended the meeting were Joel
13   Isaacson, Stan Altmark, Don Mullen, my mother, myself and my
14   brother.  And the tenure was, I was trying to get information,
15   which is in this agenda.  I had a lot of questions that I wanted
16   answered.
17        Q    I want you to leave the agenda aside.  If you can give
18   us the general -- was it in a conference room?  What happened?
19        A    It was in one of the conference rooms at Isaacson's
20   office.
21        Q    And was Don Mullen the person who referred you to
22   Isaacson & Company?
23        A    Yes, he was.
24        Q    Now, just tell us generally what happened, and then
25   we'll cover the specifics in the course of the meeting.
26        A    Generally, what happened was, all these people were
```

**3/23/2015  Genger -v- Genger Proceeding 032315**

1                   O. Genger - Plaintiff - Direct/Herschmann

2     sitting in a room together.  Joel Isaacson and Stan Altmark were

3     asking certain questions of Sagi.  Sagi was not happy with the

4     fact that we were asking questions.  He did most of the talking.

5     Stan or Joel would ask him a question and he would give a

6     five-minute speech on something and run -- I mean, just run

7     circles around everyone.  He was not really answering questions.

8     And we were getting nowhere.  And he became very upset by the

9     fact that we were asking him questions.

10                   (Continued on next page.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

3/23/2015  Genger -v- Genger Proceeding 032315

```
 1           O. Genger - by Plaintiff - Direct/by Mr. Herschmann
 2      Q    And did you attempt to go through the agenda that  is
 3   contained in exhibit 234?
 4      A    Yes, we did.
 5      Q    Now, was the meeting to discuss your getting access to
 6   financial information and to take control of your financial
 7   life?
 8      A    Yes.
 9      Q    Was that expressed to your brother?
10      A    Yes.
11      Q    Did you address in anything -- well, withdrawn.
12           Do you recall specifically what you addressed regarding
13   your 1993 trust?
14           Just a foundational question that I have to ask before
15   I present the exhibit.
16           Do you recall specifically what was addressed?
17      A    Without looking at it?
18      Q    Without looking at it?
19      A    Okay.  I mean, generally, I know.
20      Q    Would the agenda refresh your recollection as to
21   specifically what you were asking about your trust?
22      A    Yes.
23           MR. HERSCHMANN:  I would offer it in as a past
24   recollection refreshed and make the process easier or I can
25   do it this way.
26           THE COURT:  Mr. Dellaportas, what do you say?
```

3/23/2015  Genger -v- Genger Proceeding 032315

```
1          O. Genger - by Plaintiff - Direct/by Mr. Herschmann
2               MR. DELLAPORTAS:  This agenda, do you mean?
3               THE COURT:  Yes.
4               MR. DELLAPORTAS:  It is hearsay.
5               MR. HERSCHMANN:  Well, the past recollection
6      recorded, the present recollection refreshed.
7               THE COURT:  I don't know that she recorded it.
8               MR. HERSCHMANN:  She doesn't have to have recorded
9      it.  She has to be able to articulate that this was an
10     accurate document of what was discussed at the meeting.  She
11     doesn't have to be the actual person who sat down and
12     recorded it.
13              THE COURT:  Is that your understanding, Mr.
14     Dellaportas?
15              MR. DELLAPORTAS:  No.
16              THE COURT:  I'm not sure either.
17              MR. HERSCHMANN:  We can pull it up.
18              THE COURT:  Just to refresh my own recollection.
19              Who has The Richardson?
20              MR. HERSCHMANN:  I don't have it.  And I think the
21     rule, and I can articulate it this way, if your secretary
22     sat there and took copious notes of the entire process and
23     said this accurately reflects what happened at the
24     meeting --
25              THE COURT:  We don't know when it was prepared.  I
26     don't know.  Let's just get the rule.
```

3/23/2015  Genger -v- Genger Proceeding 032315

```
 1        O. Genger - by Plaintiff - Direct/by Mr. Herschmann
 2              MR. HERSCHMANN:  Okay.
 3          (Short pause)
 4              MR. DELLAPORTAS:  There is a Judge Friedman's
 5    section on it.  It says, under the past recollection
 6    recorded doctrine the memoranda of a fact known for an event
 7    offered in the past for which the witness lacks sufficient
 8    present recollection may be received in evidence to the
 9    witness' oral testimony.
10              THE COURT:  It doesn't say anything about having to
11    be prepared by the witness.
12              MR. DELLAPORTAS:  There is a whole section in here.
13              THE COURT:  I don't know, Mr. Herschmann.
14              MR. HERSCHMANN:  If you want testimony, take a
15    moment, we can look at it.  I have no problem.
16              But, I'm pretty confident the rule is exactly as
17    Mr. Dellaportas just read it.
18              It is not necessary that the witness be the one
19    that actually recorded it as much as they can say that
20    recording is accurate.
21              THE COURT:  I'm pleased that you're confident.  I
22    am not.
23              It didn't say anything about it, but that doesn't
24    mean --
25              MR. DELLAPORTAS:  As I understand it this is the
26    agenda prepared before the meeting and thus isn't --
```

3/23/2015  Genger -v- Genger Proceeding 032315

```
 1          O. Genger - by Plaintiff - Direct/by Mr. Herschmann
 2              THE COURT:  That is what I mean, also.  It is not
 3      contemporaneous.
 4              MR. DELLAPORTAS:  It is not notes from the meeting.
 5      It is agenda in advance of the meeting.
 6              MR. HERSCHMANN:  Your Honor, the rule is as I
 7      understand it, and Mr. Dellaportas if he wants to share that
 8      with us and we can take a 5 minute recess.
 9              THE COURT:  I can go in the back and look at it.
10              MR. HERSCHMANN:  If you would do that, your Honor,
11      that would be great.
12              Thank you, very much.
13              (Short recess; time is now 2:42 PM)
14              (2:45 PM)
15              THE COURT:  I don't think so, Mr. Herschmann.  Not
16      according to Richardson under the old book, which I'm sure
17      hasn't been changed too much, 66213, I don't know what it is
18      in the next edition.  But, while the memorandum, any
19      memorandum made by anybody can be used to refresh, if you
20      want it in evidence when a witness has so far forgotten
21      facts that he cannot recall them even after looking at a
22      memorandum of them and he testified that he once knew them
23      and made a memorandum of them at the time or soon after,
24      which he intended to make correctly and which he believes to
25      be correct, such memorandum in his own handwriting may be
26      received as evidence of the facts contained although the
```

3/23/2015  Genger -v- Genger Proceeding 032315

```
1          O. Genger - by Plaintiff - Direct/by Mr. Herschmann
2      witness has no present recollection of them.
3              MR. HERSCHMANN:  Your Honor, I think that's why I
4      raised the issue of past recollection refreshed or present
5      recollection recorded.
6              As I said, there are two ways to address.  I can
7      address it with the witness as present recollection
8      refreshed, which is the process that the witness looks at
9      it.
10             THE COURT:  Right.  Then, this doesn't come into
11     evidence.  But, you want it in evidence.
12             MR. HERSCHMANN:  That's correct.
13             The reason I had it the way I did is that there are
14     two ways of dealing with it.
15             There is what I call the simpler process.
16             THE COURT:  It is not coming into evidence.
17             MR. HERSCHMANN:  Okay.
18             THE COURT: She can use it to refresh her
19     recollection if it indeed refreshes her recollection.
20             As I recall this whole exercise is because you
21     wanted to offer it into evidence.
22             MR. HERSCHMANN:  That's correct.  And the reason
23     doesn't matters.
24             THE COURT:  Okay.
25     Q    So, Ms. Genger, let me, I'm going to walk you through
26  the process.
```

3/23/2015  Genger -v- Genger Proceeding 032315

```
 1          O. Genger - by Plaintiff - Direct/by Mr. Herschmann
 2          I'm going to ask you specific questions.  If you recall
 3     something specifically you should answer it.  If you don't
 4     recall specifically, then I'm going to ask you is there
 5     something that would refresh your recollection.  And the process
 6     is then you can look at it and then say the document refreshes
 7     my recollection and then answer it.  Okay?
 8          So, I'm going to go back to the November 8, 2007
 9     meeting.
10          And do you recall specifically what was discussed in
11     the first topic dealing with Orly Genger 1993 Trust?
12     A     Specifically, no.
13     Q     Would the agenda refresh your recollection as to what
14     was discussed?
15     A     Yes.
16     Q     Can you take a moment to look at the agenda and tell us
17     after looking at it does it refresh your recollection as to what
18     was the first topic discussed as it related to the Orly Genger
19     1993 Trust?
20     A     Yes.
21     Q     Okay.  What was of the first topic discussed?
22     A     D&K.
23     Q     And what was discussed after D&K was raised?
24     A     Who was the general partner.  Did Sagi have a copy of
25     the partnership agreement, the note.
26          Then, there is  a topic of the note, who owns the note.
```

```
 1            O. Genger - by Plaintiff - Direct/by Mr. Herschmann
 2        Q    When you say who is the general partner do you recall
 3    the specific discussions as to percentages about your mother and
 4    whether she remained the general partner, without looking at
 5    document first?
 6        A    No.
 7        Q    If you look at the document does that  refresh your
 8    recollection?
 9        A    Yes.
10        Q    And what was the first thing that was discussed after
11    you asked who were the general partners of D&K?
12            MR. DELLAPORTAS:  I object on relevance grounds as
13        to this line of testimony.
14            MR. HERSCHMANN:  I'm doing this as a general
15        proposition as to the subject matters that were discussed.
16            I can offer the agenda in and make it simple and go
17        through it or I can only do it this way, your Honor.  That
18        is why I raised it in the first place.
19            I'm not saying it is proof.  I'll do it any way Mr.
20        Dellaportas prefers.
21            THE COURT:  He doesn't prefer anything.  It is not
22        depending upon what he prefers.  It is what you want to
23        prove.
24            He says it is not relevant.
25            Why is it relevant?
26        Q    Well, did you generally discuss your trust and
```

3/23/2015 Genger -v- Genger Proceeding 032315

```
1              O. Genger - by Plaintiff - Direct/by Mr. Herschmann
2    associations with the D&K note?
3         A    Yes.
4         Q    Okay.  After discussing your trust and the D&K note did
5    you then have discussions about TPR?
6         A    Yes.
7         Q    Okay.  Do you recall specifically about what was
8    discussed in relationship to TPR and what percentages were not
9    owned by D&K, first, without looking at the document?
10        A    No.
11        Q    Looking at the document, does it refresh your
12   recollection as to what was the first thing you discussed about
13   TPR?
14        A    Yes.
15        Q    And what was that ?
16        A    Who owns and what percentages the 49 percent not owned
17   by D&K.
18        Q    And do you recall whether there was any discussion
19   about Rochell, R-O-C-H-E-L-L, Fang and your mother's interest?
20        A    Yes.
21        Q    After that did you have a discussion about whether or
22   not you can get copies of the minutes of meetings from TPR?
23        A    Yes.
24        Q    Did your brother agree to give you copies of the
25   minutes of meetings with TPR?
26        A    No.
```

**3/23/2015  Genger -v- Genger Proceeding 032315**

1           O. Genger - by Plaintiff - Direct/by Mr. Herschmann

2      Q    Did you then discuss with your brother what is the

3    distribution he was receiving from TPR?

4           MR. DELLAPORTAS:  Objection.  Relevance.

5           THE COURT:  Overruled.

6      A    Yes.

7      Q    Okay.  And do you recall raising the amount of his

8    getting $45,000 per month?

9      A    Yes.

10     Q    And did your brother ever answer as to why he was

11   getting $45,000 from TPR per month and how it was being

12   categorized?

13          MR. DELLAPORTAS:  Objection, compound.

14          THE COURT:  Let's take it one at a time.

15     Q    Okay.  Did your brother ascribe for you why he was

16   receiving $45,000 per month?

17     A    He may have and I don't remember.

18          His answers were long winded.  So, I just don't

19   remember them.

20     Q    Was there a  discussion about why your mother was

21   receiving $30,000 per month?

22          MR. DELLAPORTAS:  Objection, lack of foundation.

23          THE COURT:  Yes.  Sustained.

24     Q    Well, do you recall a discussion about what

25   distributions your mother was getting from TPR?

26     A    Generally, yes.

2842

3/23/2015  Genger -v- Genger Proceeding 032315

```
1              O. Genger - by Plaintiff - Direct/by Mr. Herschmann
2        Q     Looking at the exhibit, does it refresh your
3     recollection as to what dollar amount your brother was being
4     questioned about regarding how much money your mother was
5     receiving?
6        A     Yes.
7        Q     What number did you question your brother about?
8        A     $30,000 a month.
9        Q     Per month?
10       A     Yes.
11       Q     Do you recall then discussing with your brother how
12    could distributions be evened out between you, your mother and
13    your brother?
14       A     Yes.
15       Q     Did your brother at that time indicate his willingness
16    to even out the distribution between you, and your mother and
17    himself?
18       A     No, he didn't.
19       Q     Did your brother answer any questions about what are
20    the assets of TPR?
21       A     Whatever answers he gave were so complicated and he
22    gave answers that  confused everyone.
23       Q     Well, did the Isaacson representatives say to your
24    brother during the course of the meeting that they were
25    satisfied with his answers?
26       A     No.
```

3/23/2015  Genger -v- Genger Proceeding 032315

```
 1          O. Genger - by Plaintiff - Direct/by Mr. Herschmann
 2      Q    What did they say generally about the answers your
 3   brother was giving?
 4              MR. DELLAPORTAS:  Objection.  Hearsay.
 5              THE COURT:  Sustained.
 6      Q    Did you then cover what receivables were due TPR, just
 7   generally?
 8      A    I don't remember.
 9      Q    Okay.  If you look at exhibit 234, the agenda in front
10   of you, does that refresh your recollection as to what questions
11   were asked about the receivables due TPR.
12      A    Yes.
13      Q    And looking at that , does it refresh your recollection
14   about asking what happened to the $1.9 million that your brother
15   owed TPR?
16              MR. DELLAPORTAS:  Objection.  Lack of foundation
17      and leading.
18              THE COURT:  How about a foundation?
19      Q    Okay.  Well, does exhibit 234 refresh your recollection
20   as to whether the subject matters of how much money your brother
21   owed TPR was discussed on November 8, 2007?
22      A    Yes.
23      Q    Okay.  Looking at exhibit 234 does it refresh your
24   recollection about the specific amount of money that was
25   discussed with your brother regarding how much money he owed
26   TPR?
```

3/23/2015  Genger -v- Genger Proceeding 032315

```
1              O. Genger - by Plaintiff - Direct/by Mr. Herschmann
2      A    Yes.
3      Q    What was the amount of money that your brother was
4   asked about that he owed TPR?
5              MR. DELLAPORTAS:  Just objection, your Honor.
6              This doesn't feel like a refreshed recollection.
7   It just fees like reading a document.
8              MR. HERSCHMANN:  It's the only way to do it.
9              If Mr. Dellaportas wants me to go down --
10             THE COURT:  You know, she was there.  So, I do
11  believe there is a --
12             MR. DELLAPORTAS:  Okay.
13     Q    What is the amount?
14     A    $1.9 million.
15     Q    Do you recall then having other discussions about other
16  monies that were owed TPR or owed by other officers to TPR?
17     A    Yes.
18     Q    Do you recall what was next discussed independent of
19  looking at the exhibit?
20     A    No.
21     Q    Looking at the exhibit, does it refresh your
22  recollection as to the next item that you discussed with your
23  brother?
24     A    Yes.
25     Q    Okay.  What was the next item that you discussed with
26  your brother?
```

3/23/2015  Genger -v- Genger Proceeding 032315

```
1              O. Genger - by Plaintiff - Direct/by Mr. Herschmann
2       A    The annual expense of TPR and then after that there was
3    trust administration.
4       Q    I think you have to speak a little louder.
5       A    Sorry.
6            Right after that there was what are the annual expenses
7    of TPR exclusive of above distributions to Sagi and Ariel Orly.
8       Q    Did your brother answer what was the annual expense to
9    TPR when Isaacson & Company posed the question to him?
10      A    Again, his answers were really convoluted and --
11      Q    How about, was there a discussion about the amount of
12   lawsuits that TPR was involved with as either a plaintiff or a
13   defendant?
14      A    Were there discussions?
15      Q    Yes?
16      A    Yes.
17      Q    After that was there a discussion about potentially
18   buying out your interests?
19      A    Yes.
20      Q    And looking at exhibit 234 does it refresh your
21   recollection, specifically, about what you asked of your
22   brother?
23      A    Yes.
24      Q    What was asked?
25      A    Was TPR, meaning Sagi, consider buying out Orly's
26   interest in TPR.  -- Or D&K now giving proper discounts to the
```

3/23/2015  Genger -v- Genger Proceeding 032315

```
1          O. Genger - by Plaintiff - Direct/by Mr. Herschmann

2     D&K note and credit for the losses.

3               THE COURT:  Well --

4               MR. HERSCHMANN:  Those were the subject matters

5      that were discussed.

6               THE COURT:  She is reading from it, though.

7     Q    Now --

8               THE COURT:  You're kind of abusing it now.  She

9      cannot read from it.

10    Q    All right.

11         So, the document is not in evidence, so you cannot read

12     from it.  You can only look at it to refresh your recollection

13     and then answer the question.  So.

14              THE COURT:  And if you cannot answer the question,

15      then you cannot answer the question.

16    Q    Now, was there a discussion about capital contributions

17     made to White Box?

18    A    Yes.

19    Q    After that do you recall what was discussed about TPR

20     and its relationship to White Box?

21    A    Yes.

22    Q    And do you recall at some point asking could you have

23     control of the tax filings of White Box?

24    A    Yes.

25    Q    Now, did you then move on to discuss your trustees and

26     administration of your trust?
```

3/23/2015  Genger -v- Genger Proceeding 032315

```
 1          O. Genger - by Plaintiff - Direct/by Mr. Herschmann
 2      A    Yes.
 3      Q    Who were the trustees back in 2007?
 4      A    It was Lea Fang.
 5      Q    Did you discuss wanting someone else to become the
 6   trustee of your trust?
 7      A    Yes.
 8               MR. DELLAPORTAS:  Objection, relevance.
 9               THE COURT:  Sustained.
10      Q    In the course of this meeting was the agenda dealing
11   with your parents' divorce?
12      A    No.
13      Q    If you look at the agenda does it refresh your
14   recollection as to whether or not you had raised TRI or had
15   intended to raise TRI in any way?
16      A    Does it refresh?
17      Q    Yes?
18      A    Yes, it does.
19      Q    And is TRI something that was on your agenda to cover?
20      A    No.
21      Q    Now, did you then cover the Canadian ventures?
22      A    Yes.
23      Q    And do you recall, approximately, when you learned
24   about Riverside related entities?
25      A    It was some time prior in '07, prior to this meeting.
26      Q    And when you say some time prior to '07, was that in
```

```
1          O. Genger - by Plaintiff - Direct/by Mr. Herschmann

2     relationship with your trying to get a better understanding of

3     finances?

4          A    Yes.

5          Q    And prior to having this meeting in November of 2007

6     had you met personally with Isaacson and Company

7     representatives?

8          A    Before this meeting?

9          Q    Yes?

10         A    Yes.

11         Q    If you go now to the issues, let's focus now on the

12    Canadian ventures.

13              Do you recall specifically what you first or what was

14    first asked of your brother in the November 8, 2007 meeting

15    regarding the Canadian ventures?

16         A    Without -- Without looking at it?  No.

17         Q    Okay.  Looking at exhibit 234 can you tell us if that

18    refreshes your recollection as to what was, what was the first

19    thing that you discussed in relationship to the Canadian

20    ventures?

21         A    Yes.

22         Q    What was the first thing that was discussed?

23              THE COURT:  Without reading from this.

24         Q    Without reading?

25         A    What did I sell to my brother?

26         Q    Was that a question that the representatives of
```

3/23/2015  Genger -v- Genger Proceeding 032315

1          O. Genger - by Plaintiff - Direct/by Mr. Herschmann

2   Isaacson & Company asked your brother even in November of 2007?

3              MR. DELLAPORTAS:  Objection, hearsay.

4              THE COURT:  Sustained.

5      Q    How did your brother respond to the question of what

6   you had sold to him?

7      A    To that particular question, I don't remember what his

8   response was.

9      Q    Without looking at the agenda do you recall what was

10  discussed in connection with your brother about it?

11             THE COURT:  About?

12     Q    About the Canadian ventures?

13             THE COURT:  Okay the Canadian ventures.

14     Q    Yes?

15     A    I mean, I have a specific --

16     Q    Tell us what you recall being discussed about the

17  Canadian ventures, of the transfer.  And then we can get into

18  the specifics.  Tell us generally first what you recall?

19     A    About the Canadian ventures what was discussed?

20     Q    Yes?

21     A    Specifically, I specifically asked my brother if we

22  could now transfer back my shares to me like he said he would

23  do.  And I specifically remember my brother looking at me and

24  laughing and said, I don't know why you would want to do that,

25  it is valueless.

26     Q    Did you believe him when he said that?

2850

3/23/2015  Genger -v- Genger Proceeding 032315

```
 1          O. Genger - by Plaintiff - Direct/by Mr. Herschmann
 2     A    Did I believe what, that it was valueless?
 3     Q    Yes?
 4     A    What I believed is that, is that my brother tricked me.
 5     Q    And after that conversation did you still try to get
 6  more information about the Canadian ventures from your brother
 7  in that meeting?
 8     A    I don't remember what happened specifically right after
 9  that.  I know there was other, there was more conversation about
10  it.  But, I cannot tell you specifically.
11     Q    Looking at exhibit 234 did you have a discussion to
12  refresh your recollection specifically about the dollar values?
13     A    Yes.
14     Q    Okay.  And does exhibit 234 refresh your recollection?
15     A    Yes.
16     Q    And what do you recall about discussing with your
17  brother in that meeting dealing with the valuations?
18     A    That I had, I had sold my interest to him for 100,000
19  when I bought it for 150.
20     Q    And then do you recall any discussions about the
21  valuations of the businesses currently?
22     A    I am sorry, what was the question?
23     Q    Could we read it back, please?
24          THE COURT:  Yes, please.
25          (Record read)
26     Q    I meant, generally.  I mean the Canadian business?
```

3/23/2015  Genger -v- Genger Proceeding 032315

```
 1          O. Genger - by Plaintiff - Direct/by Mr. Herschmann
 2      A    Yes.
 3      Q    Did your brother in the course of that meeting provide
 4  you with any financial information as to where the money had
 5  gone from the Canadian ventures?
 6      A    No.
 7      Q    Let me show you what you has been marked as exhibit
 8  266-71, which is admitted into evidence.
 9           And do you see on the bottom portion of the exhibit
10  266-71 that there is a reference that the White Paper -- I am
11  sorry, that the White Box papers were supposed to transfer to
12  Jonah from Bill Fischer and then Jonah can be reached at (212)
13  758-0000.
14           Do you see that ?
15      A    Yes.
16      Q    Does that refresh your recollection as to who were the
17  accountants for White Box in 2007?
18      A    Yes.
19      Q    Is that Jonah Gayer and Associates?
20      A    I mean, it was supposed to be, it wasn't.
21      Q    Do you know at some point whether Gayer and Associates
22  became the accountants for White Box?  And I'm focused on the
23  2007 time period.
24      A    I don't know that it ever actually switched to Jonah
25  Gayer.
26      Q    Now, going back to the meeting in November, 2007, do
```

**3/23/2015  Genger -v- Genger Proceeding 032315**

```
1           O. Genger - by Plaintiff - Direct/by Mr. Herschmann
2      you recall that at the conclusion of the agenda there was an
3      over all subject matter that you wanted to address with your
4      brother?
5           A    Yes.
6                (Continued on the next page)
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
```

3/23/2015  Genger -v- Genger Proceeding 032315

```
 1              O. Genger - Plaintiff - Direct/Herschmann
 2      Q    And what was the general tenure for what you were
 3   looking to get from your brother in the November 2007 meeting?
 4      A    Information.  Information about my finances.
 5      Q    And did you get information that was satisfactory to
 6   you from your brother in that meeting?
 7      A    No.
 8      Q    Let me show you what's been previously received in
 9   evidence as Exhibit 230.
10              MR. HERSCHMANN:  Again, I'm providing an extra
11       copy to defense counsel.
12              (Handing to defense counsel.)
13              (Handing to witness.)
14              (Handing to the Court.)
15      Q    Do you recall that after the meeting Isaacson &
16   Associates sent a letter to your brother?
17              THE COURT:  Yeah, this is very leading.
18              MR. HERSCHMANN:  I'm sorry?
19              THE COURT:  Ask a question.
20              MR. HERSCHMANN:  I'm trying to lay a foundation
21       for the exhibit.
22              THE COURT:  It's too leading.
23      Q    First, have you seen Exhibit 230 beforehand?
24      A    Yes.
25      Q    Did you have discussions with Isaacson & Associates
26   before Exhibit 230 was sent to your brother?
```

## SETTLEMENT AGREEMENT AND RELEASE

This settlement agreement and release (this "Agreement") is entered into as of June 16, 2013, by and between Arie Genger and Orly Genger (in her individual capacity and in her capacity as beneficiary of the Orly Genger 1993 Trust), Arnold Broser, David Broser, (in their individual capacity and on behalf of all entities managed, owned or controlled in any way by Arnold Broser or David Broser and which are in any way related to the subject matter hereof ("Broser Entities" and collectively with Arie Genger and Orly Genger in all capacities referenced above, the "AG Group"), and TR Investors, LLC ("TR Investors"), Glenclova Investment Co. ("Glenclova"), New TR Equity I, LLC ("New TR I"), New TR Equity II, LLC ("New TR II" and, together with TR Investors, Glenclova and New TR I, the "Trump Entities"), Trans-Resources, LLC (the successor to Trans-Resources, Inc. and together with its predecessor entities referred to herein as, "Trans-Resources"), Jules Trump, Eddie Trump and Mark Hirsch (collectively, with the Trump Entities and Trans-Resources, the "Trump Group"). The members of the AG Group and the Trump Group are each referred to herein individually as a "Party" and together as the "Parties".

WHEREAS, in March 2001, TR Investors, Glenclova, Trans-Resources and TPR Investment Associates, Inc. ("TPR") entered into a stockholders agreement with respect the common stock of Trans-Resources (the "Stockholders Agreement");

1

WHEREAS, since August 2008, Arie Genger, Orly Genger, the Trump Group and others have been engaged in various litigations (described below) concerning the ownership and control of Trans-Resources; and

WHEREAS, the Parties wish to resolve all issues, disputes and disagreements between them, including but not limited to the issue of ownership of all Trans-Resources shares;

NOW, THEREFORE, in consideration of the promises and representations contained herein and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties, intending to be legally bound, hereby agree as follows:

1.   **Recitals.**   The above recitals are incorporated into and made a part of this Agreement and are binding on all Parties hereto.

2.   **Initial Consideration from the Trump Group.**   Upon dismissal with prejudice of the claims, counterclaims, cross-claims, third-party claims, issues and matters as provided in Paragraph 4 below, the Trump Group shall promptly:

(a)   release all claims they may have to the (i) $7,428,994.00 plus interest held by Skadden, Arps, Slate, Meagher & Flom LLP as escrow agent (the "Skadden Escrow") and (ii) $10,314,005.00 plus interest held by with Pedowitz & Meister as escrow agent (the "P&M Escrow");

(b)   pay to Wachtel, Masyr & Missry, LLP as attorneys for the AG Group ("Wachtel") an amount in cash equal to $35,000,000.00 minus (i) the amount held in the Skadden Escrow, and (ii) the amount held in the P&M Escrow.

2

      3.     **Further Consideration from the Trump Group.**  Trans-Resources on behalf of the Trump Group shall pay: (i) $7,500,000 to Wachtel on the third anniversary of the Effective Date (defined below), and (ii) $7,500,000 to Wachtel 364 days following the third anniversary of the Effective Date The payments provided under this paragraph shall be (a) subject to the terms and conditions herein and (b) evidenced by two (2) promissory notes that are substantially in the form attached as Exhibit A hereto (the "Notes"). Notwithstanding anything else herein, the maturity of the two $7,500,000 Notes shall be delayed beyond their due date until the earlier (the "Extended Maturity Date") of (A) such time as all pending claims, cross-claims and counter-claims brought by any of TPR, Sagi Genger, the Sagi Genger 1993 Trust, the Orly Genger 1993 Trust (other than the Orly Trust Action (as defined below)), D&K Limited Partnership, D&K GP LLC, Rochelle Fang, and/or David Parnes (collectively, the "Sagi Group") against any member of the Trump Group have been dismissed with prejudice and the statute of limitations shall have run with respect to any other potential claims of the Sagi Group that might be the subject of the Indemnification provided for by Paragraph 5 below or (B) such time as each member of the Sagi Group shall have provided the Trump Group with a release of the Trump Group Released Parties (as defined below) and covenant not to sue in form and substance that is the same as the AG release and covenant not to sue contained in Paragraph 6(a) below (the "Sagi Group Release").

Subject to the foregoing, the Notes shall become immediately due and payable upon the occurrence of any transaction or series of transactions which shall result in the Trump Group owning or controlling neither (i) a majority of the voting stock of Trans-Resources or its successors or each of its two principal subsidiaries, Haifa Chemicals, Ltd. and Na-Churs Plant

Food Company or their successors, nor (ii) directly or indirectly, a majority of the assets currently owned by Trans-Resources and its subsidiaries; provided, however, that in such event, at the request of the Trump Group, the amounts then payable on the Notes shall be placed in escrow for the duration of their original term or until the Extended Maturity Date (if applicable) under the provisions of an escrow agreement on reasonable terms to be negotiated at such time in good faith between Trans-Resources, the payee and an escrow agent selected by their mutual consent, which shall provide for their release to the Trump Group in payment of Indemnification Amounts, AG Group Release Amounts and Discovery Costs (as such terms are defined below), if any, and payment to the payee of such amounts after reduction for Indemnification Amounts, AG Group Release Amounts and Discovery Costs, if any, upon their original maturity date or the Extended Maturity Date (if applicable). If Trans-Resources is unable to pay the Notes as and when they mature, the Trump Group will be obligated to make payment thereon in an amount equal to the lesser of (x) the outstanding amounts not paid by the obligor thereunder and (y) any amount by which cash payments received by members of the Trump Group (other than Trans-Resources) from Trans-Resources and its subsidiaries since the Effective Date (whether in the form of dividends, distributions, compensation or otherwise) exceeds reasonable compensation for services rendered plus payments for goods, services and assets provided by such persons in amounts that would have been paid for such goods, services and assets in arms' length transactions with unaffiliated third parties; provided, however, that in neither case shall the Trump Group be obligated to pay any amount that exceeds the outstanding amounts not paid by Trans-Resources on the Notes (subject to any Indemnification Amounts, AG Group Release Amounts or Discovery Costs).

4

4.     **Dismissal of Claims with Prejudice.**  Within two (2) business days of the

Effective Date (defined below), the AG Group and the Trump Group shall take all actions

necessary or desirable to:  (i) effect the dismissal with prejudice of all claims, counterclaims,

cross-claims, third-party claims, issues and matters between them, and to vacate all court orders

which restrain, enjoin or in any way limit actions by any members of the Trump Group, in each

pending action in which members of the AG Group and the Trump Group are parties (whether or

not service of process with respect thereto has been effected), including, without limitation, each

of the following pending actions (collectively, the "Litigation"):  *Genger v. TR Investors, LLC*,

No. 168, 2013 (Del.); *TR Investors, LLC v. Genger*, C.A. No. 6697-CS (Del. Ch.); *Trans-*

*Resources, Inc. v. Genger*, C.A. No. 4391-CS (Del. Ch.) (with respect to Arie Genger only); *TR*

*Investors, LLC, et al. v. Genger*, C.A. No. 3994-CS (Del. Ch.); *Glenclova Investment Co. v.*

*Trans-Resources, Inc., at al.*, No. 08 Civ. 7140 (JFK) (S.D.N.Y.); *Arie Genger and Orly Genger*

*v. Sagi Genger, et al.*, Index No. 651089/2010 (N.Y. Supr.); and (ii) have the New York State

Supreme Court enter a definitive non-appealable order declaring that members of the Trump

Group own all right, title and interest (beneficially, of record and otherwise) to the shares of

Trans-Resources purportedly transferred by TPR in October 2004 to Arie Genger (the ("Arie

Shares") and to the Orly Genger 1993 Trust (the "Orly Trust Shares"),  with the understanding

and agreement that should the request for the entry of such an order with respect to the "Orly

Trust Shares" be denied or not entered in a reasonably timely fashion,  then the AG Group and

the Trump Group shall take all action necessary or desirable to have the New York State

Supreme Court vacate all court orders which restrain, enjoin or in any way limit actions by the

5

parties to the pending action captioned *Dalia Genger, as Trustee of the Orly Genger 1993 Trust*

*v. TR Investors, LLC, et al.*, C.A. No. 6906-CS (Del. Ch.) (the "Orly Trust Action"), to prosecute,

defend, compromise, settle and otherwise deal with all claims, counterclaims, cross-claims, third-

party claims, issues and matters asserted therein; provided, however, that nothing in this

Agreement is intended to require or permit the dismissal of any claims, counterclaims, cross-

claims, third-party claims, issues and matters, (i) in *Trans-Resources, Inc. v. Genger*, C.A. No.

4391-CS (Del. Ch.) (the "Breach of Fiduciary Duty Case"), as between the Trump Group and

Avi Pelossof and/or William Dowd (subject to the exchange of general releases between the

members of the Trump Group and William Dowd as contemplated below) and (b) against TPR,

the Sagi Genger 1993 Trust, the Orly Genger 1993 Trust, D&K Limited Partnership, D&K GP

LLC, Sagi Genger or Dalia Genger.  Any member of the AG Group  including, without

limitation, Orly Genger, who is called to testify in the Litigation or the Orly Trust Action, agrees

to testify that he, she (in her individual capacity, ~~on behalf of the Orly Genger 1993 Trust~~, and as

beneficiary of the Orly Genger 1993 Trust) or it has waived all claims he, she (in her individual

capacity, ~~on behalf of the Orly Genger 1993 Trust~~, and as beneficiary of the Orly Genger 1993

Trust) or it had or may have to ownership (record, beneficial or otherwise) of any shares of

Trans-Resources and that he, she (in her individual capacity, ~~on behalf of the Orly Genger 1993~~

~~Trust~~, and as beneficiary of the Orly Genger 1993 Trust) or it is opposed to the Orly Genger

1993 Trust seeking any remedy of any kind against any member of the Trump Group.

Notwithstanding the foregoing, upon receipt by the Trump Group of a general release in form

and substance reasonably satisfactory to it, the Trump Group shall provide the same general

release to William Dowd and cause the dismissal of the Breach of Fiduciary Duty Case as
between the Trump Group and him.

        5.    **Indemnification.**

        (a)    Upon closing of this Agreement, each of the members of the AG
Group with the exception of Arnold Broser and David Broser and the Broser Entities, jointly
and severally, agrees to indemnify and hold harmless (i) each of the members of the Trump
Group, and their respective past and present affiliates and direct and indirect subsidiaries, and (ii)
each of the past and present agents, representatives, officers, directors, advisors, employees,
general partners, limited partners, shareholders, members, predecessors, successors, heirs,
executors, administrators and assigns of each person and entity referenced in clause (i), from all
reasonable costs, expenses, attorneys' fees of counsel selected by the Trump Group (it being
agreed that the Trump Group will cooperate with the AG Group in all reasonable respects to
cause the amount of such costs, expenses and its attorneys' fees to be minimized), settlements
and/or judgments (whether direct or related to joint and several liability) (the "Indemnification
Amounts") incurred as a result of, in connection with, or relating in any way to any (x) claims,
counterclaims, cross-claims or third-party claims raised or that could have been raised in the
Litigation, and (y) claims that are pending, have been brought, or that may in the future be
brought by or on behalf of any of TPR, the Sagi Genger 1993 Trust, the Orly Genger 1993 Trust
(other than those claims currently pending in the Orly Trust Action), D&K Limited Partnership,
D&K GP LLC, Sagi Genger, David Parnes or Dalia Genger, regardless of whether they were or
could have been raised in the Litigation or the Orly Trust Action, relating in any way, whether
directly or indirectly, to (A) the Shareholders Agreement entered into by Trans-Resources

shareholders and Trans-Resources on March 30, 2001, (B) the transfer of interests in TPR or the purported transfer of shares of Trans-Resources by TPR in October 2004, (C) any activities or developments relating to or conducted by Trans-Resources or any of its direct or indirect subsidiaries that occurred prior to September 26, 2008, (D) the acquisition by the Trump Group of all interests (record, beneficial or otherwise) of the so called "Arie Shares", "Orly Trust Shares" and the shares of Trans-Resources purportedly transferred by TPR in October 2004 to the Sagi Genger 1993 Trust (the "Sagi Trust Shares") (including, without limitation, the negotiations for the ownership or acquisition of such shares), (E) the control of Trans-Resources or any of its direct or indirect subsidiaries by the Trump Group through its acquisition of the aforementioned shares, (F) records and documents (including but not limited to electronic files) in the possession, custody or control of Trans-Resources or any of its direct or indirect subsidiaries, (G) misrepresentations made or improper acts conducted prior to September 26, 2008 by any officer or director of Trans-Resources, (H) this Agreement,  (I) the business or operations of Trans-Resources or any of its direct or indirect subsidiaries conducted prior to September 26, 2008 arising from or in any way related to the conduct of any member of the AG Group, Avi Pelossof or William Dowd, or (J) the conduct of any other individual to the extent Arie Genger is aware, or should have been aware, thereof. Notwithstanding the foregoing, the indemnity provided for above shall not apply to any claims which may be brought subsequent to the Effective Date (and which are entirely unrelated to any claim brought prior to such date) by any of Sagi Genger, the Sagi Genger 1993 Trust or TPR and which arise solely out of actions taken or not taken by members of the Trump Group which actions or inactions no member of the AG Group was aware of or should have been aware of; provided, however, that such claim was

8

not encouraged or solicited by any member of the AG Group and no member thereof cooperates in asserting, instituting or prosecuting such claim. Notwithstanding anything herein to the contrary, the undertaking of William Wachtel hereunder shall not exceed under any circumstance an amount greater than $5,000,000.

(b)    The Trump Group may request payment or reimbursement of the Indemnification Amounts at any time by providing a written statement or copy of an underlying invoice or expense documentation to any member of the AG Group at the addresses set forth in Paragraph 16 below, and the AG Group shall pay such indemnified expenses in full and in cash within five (5) business days of the date such request is made.  The supporting documentation submitted with any payment or reimbursement request hereunder may be redacted as necessary to preserve attorney-client privilege, attorney work product, or confidential information the Trump Group may, in its reasonable determination, need to protect.  The Trump Group will provide the AG Group with reasonable notice prior to making any motion or taking any appeal with respect to, or in, any past, present or future action or claim for which the Trump Group is seeking indemnification, and such notice will be accompanied by a non-binding estimate of the legal fees and costs associated with such motion or appeal. The Trump Group authorizes the AG Group and their respective counsel to discuss directly with the Trump Group's appointed counsel the amount and scope of any invoice for which the Trump Group is seeking indemnification. The AG Group in its sole discretion may settle any indemnified claim so long as there is no monetary contribution to be paid by the Trump Group, and the Trump Group is released, in form and substance reasonably satisfactory to it, from any liability relating to any such indemnified

9

claim. The Trump Group shall not enter into any settlement of any indemnified claim, or discussions with respect thereto, without the express written consent of the AG Group.

        (c)    With respect to each Indemnification Amount, until such time as it has been paid over to the Trump Group, the members of the AG Group shall remain jointly and severally liable for such Indemnification Amount and, the Trump Group may at its option pursue all legal remedies available to it and/or withhold an amount equal to such unreimbursed Indemnification Amount from any payments by Trans-Resources to be made pursuant to the Notes.

      6.    **Releases.**

        (a)    **The AG Group Release.**  Effective on the Effective Date, each of the members of the AG Group, for itself, himself or herself, and in all capacities, and on behalf of its (and its respective affiliates' and direct and indirect subsidiaries'), his or her respective agents, representatives, officers, directors, advisors, employees, general partners, limited partners, shareholders, members, subsidiaries and affiliates, and each of their respective predecessors, successors, heirs, executors, administrators and assigns, and any other persons or entities acting in concert with any of them including, without limitation, any member of the Sagi Group which he, she or it shall at any time directly or indirectly control or be deemed authorized to act on behalf of (individually, an "AG Group Releasing Party" and collectively, the "AG Group Releasing Parties"): (i) fully, finally, irrevocably and unconditionally waives, releases and discharges each of the members of the Trump Group and its (and its respective past and present affiliates' and direct and indirect subsidiaries'), his or her respective past and present agents

10

(including Skadden, Arps, Slate, Meagher & Flom LLP in any capacity, including as Escrow
Agent for the Skadden Escrow or for any escrow in which it held, holds, or may hold, any
dividends or distributions from Trans-Resources), representatives, officers, directors, advisors,
employees, general partners, limited partners, shareholders, members, subsidiaries and affiliates,
and each of their respective predecessors, successors, heirs, executors, administrators and assigns
(collectively, the "Trump Group Released Parties"), from any and all claims, counterclaims,
demands, proceedings, actions, causes of action, orders, obligations, damages, debts, costs,
expenses and other liabilities whatsoever and however arising, whether known or unknown, past,
present or future, suspected or unsuspected, contingent or actual, both at law and in equity,
including without limitation, claims for fraud or fraud in the inducement (collectively, "Claims"),
which such AG Group Releasing Party now has, has ever had or may hereafter claim to have
against any Trump Group Released Party or its, his or her assets, liabilities or operations from
the beginning of the world through the Effective Date (individually, an "AG Group Released
Claim" and collectively, the "AG Group Released Claims"); and (ii) agrees not to assert, institute
or prosecute, or encourage, solicit or cooperate with any other person or entity in asserting,
instituting or prosecuting, any proceeding against any of the Trump Group Released Parties in
any jurisdiction (domestic or foreign, including, without limitation, the State of Israel) with
respect to any AG Group Released Claim or any other Claim relating in any way, directly or
indirectly, to Trans-Resources or any of its direct or indirect subsidiaries, the ownership or
acquisition of Trans-Resources shares (including any dividends or distributions relating thereto
or any escrow in which such dividends or distributions may currently be or in the past have been
held), the Litigation, the Orly Trust Action, control of Trans-Resources or any of its direct or

11

indirect subsidiaries, the business or operations of Trans-Resources or any of its direct or indirect subsidiaries, or arising out of this Agreement including, without limitation, the negotiation and execution of this Agreement or the AG Group Releases provided hereunder; provided, however, that this AG Group Release shall not apply to any Claims (x) seeking equitable relief to enforce the terms of this Agreement or claims seeking payment of the Notes or any indemnification payments required to be paid hereunder, (y) relating solely to events that transpired in their entirety subsequent to the Effective Date and that could not, under any circumstances, have possibly been pursued prior to the Effective Date whether or not then known, and (z) between any of the AG Group Releasing Parties and TPR, and/or any other member of the Sagi Group.

If an AG Releasing Party brings an AG Group Released Claim or other Claim in violation of the immediately preceding paragraph, the AG Group, jointly and severally, agrees to indemnify the Trump Group for any and all settlements, judgments, costs and fees, including legal fees and disbursements of counsel chosen by the Trump Group, incurred in working on, preparing for or defending such claim ("AG Group Release Amounts"). With respect to each AG Group Release Amount, until such time as such AG Group Release Amount has been paid over to the Trump Group, the members of the AG Group shall remain jointly and severally liable for such AG Group Release Amount, and the Trump Group may at its option pursue all legal remedies available to it and/or withhold an amount equal to such unreimbursed AG Group Release Amount from any payments to be made by Trans-Resources pursuant to the Notes. For purposes of the removal of all doubt, it is the parties' intention that no claims shall be brought or pursued by any member of the AG Group against any member of the Trump Group for any

reason whatsoever (other than claims permitted under clause (x), (y) and (z) of the immediately preceding paragraph).

            (b)      **The Trump Group Release.** Effective on the Effective Date, each of the members of the Trump Group, for itself or himself, and in all capacities, and on behalf of its (and its respective affiliates' and direct and indirect subsidiaries'), or his respective agents, representatives, officers, directors, advisors, employees, general partners, limited partners, shareholders, members, subsidiaries and affiliates, and each of their respective predecessors, successors, heirs, executors, administrators and assigns, and any other persons or entities acting in concert with any of them (individually, a "Trump Group Releasing Party" and collectively, the "Trump Group Releasing Parties"): (i) fully, finally, irrevocably and unconditionally waives, releases and discharges each of the members of the AG Group and its (and its respective past and present affiliates' and direct and indirect subsidiaries'), his or her respective past and present agents, representatives, officers, directors, advisors, employees, general partners, limited partners, shareholders, members, subsidiaries and affiliates, and each of their respective predecessors, successors, heirs, executors, administrators and assigns (collectively, the "AG Group Released Parties"), from any and all claims, counterclaims, demands, proceedings, actions, causes of action, orders, obligations, damages, debts, costs, expenses and other liabilities whatsoever and however arising, whether known or unknown, past, present or future, suspected or unsuspected, contingent or actual, both at law and in equity including, without limitation, claims for fraud or fraud in inducement, ("Claims"), which such Trump Group Releasing Party now has, has ever had or may hereafter claim to have against any AG Group Released Party or its, his or her assets, liabilities or operations from the beginning of the world through the Effective Date (individually,

13

a "Trump Group Released Claim" and collectively, the "Trump Group Released Claims"); and (ii) agrees not to assert, institute or prosecute, or encourage, solicit or cooperate with any other person or entity in asserting, instituting or prosecuting, any proceeding against any member of the AG Group Released Parties with respect to any Trump Group Released Claim or any other Claim relating in any way, directly or indirectly, to Trans-Resources or any of its direct or indirect subsidiaries, the ownership or acquisition of Trans-Resources shares, control of Trans-Resources or any of its direct or indirect subsidiaries, the business or operations of Trans-Resources or any of its direct or indirect subsidiaries, or the negotiation and execution of this Agreement or the Trump Group Releases provided hereunder; provided, however, that this Trump Group Release shall not apply to any Claims (x) seeking equitable relief to enforce  the terms of this Agreement or claims seeking payment of any indemnification payments required to be paid hereunder, (y) relating solely to events that transpired in their entirety subsequent to the Effective Date and that could not, under any circumstances, have possibly been pursued prior to the Effective Date whether or not then known, and (z) between any of the Trump Group Releasing Parties and Avi Pelossof, William Dowd (unless and until the exchange of mutual general releases between the Trump Group and William Dowd referred to above) and/or TPR.

If a Trump Group Releasing Party brings a Trump Group Released Claim or other Claim in violation of the immediately preceding paragraph, the Trump Group, jointly and severally, agrees to indemnify the AG Group for any and all settlements, judgments, costs and fees, including legal fees and disbursements of counsel chosen by the AG Group, incurred in working on, preparing for or defending such claim ("Trump Group Release Amounts").  With respect to each Trump Group Release Amount, until such time as such Trump Group Release Amount has

14

been paid over to the AG Group, the members of the Trump Group shall remain jointly and severally liable for such Trump Group Release Amount, and the AG Group may at its option pursue all legal remedies available to it. For purposes of the removal of all doubt, it is the parties intention that no claims shall be brought or pursued by any member of the Trump Group against any member of the AG Group for any reason whatsoever (other than claims permitted under clause (x), (y) and (z) of the immediately preceding paragraph).

> 7. **Discovery Obligations.** Effective on the Effective Date (defined below), to the extent that a member of the AG Group or the Orly Genger 1993 Trust seeks discovery or testimony from any member of the Trump Group, or if any member of the Trump Group is subpoenaed by any party to an action in which any member of the AG Group or the Orly Genger 1993 Trust is a party, each of the members of the AG Group, jointly and severally, agrees that to the extent indemnities of the Trump Group provided for elsewhere in this Agreement do not apply, they shall indemnify the Trump Group for any and all costs and fees, including reasonable legal fees and disbursements of counsel to be chosen by the Trump Group (it being understood that for the purposes of this Discovery Obligation indemnity only, the indemnification for legal fees shall be limited to $750 per hour of legal services), incurred in working on, preparing for or defending such claim, it being agreed that the Trump Group will cooperate with the AG Group in all reasonable respects to cause the amount of such costs and fees, including its attorneys' fees and disbursements to be minimized ("Discovery Costs"). With respect to each Discovery Cost, until such time as such Discovery Cost has been paid over to the Trump Group, the members of the AG Group shall remain jointly and severally liable for such Discovery Cost, and the Trump Group may at its option pursue all legal remedies available to it

and/or withhold an amount equal to such unreimbursed Discovery Cost from any payments to be made by Trans-Resources pursuant to the Notes.

**8.   Cooperation.**

(a)    Each member of the AG Group shall take all actions necessary or desirable, as promptly as practicable and as may be requested by the Trump Group from time to time including, without limitation, testifying in the Orly Trust Action, to (i) effectuate the release of the AG Group Released Claims and to prevent or preclude any other person or entity from asserting, instituting or prosecuting, or encouraging, soliciting or cooperating with any other person or entity in asserting, instituting or prosecuting, any proceeding or claims against any of the Trump Group Released Parties with respect to any AG Group Released Claim or any other Claim relating in any way, directly or indirectly, to Trans-Resources or any of its direct or indirect subsidiaries, the ownership or acquisition of Trans-Resources shares, the control of Trans-Resources or any of its direct or indirect subsidiaries, records and documents (including but not limited to electronic files) in the possession, custody or control of Trans-Resources or any of its direct or indirect subsidiaries or the business or operations of Trans-Resources or any of its direct or indirect subsidiaries brought by any party without regard to whether such party is a signatory hereto and (ii) cause the Orly Genger 1993 Trust to release any and all claims against the Trump Group Released Parties, including, without limitation, any claims pending in the Orly Trust Action.

(b)    As a condition to any settlement that any member of the AG Group shall enter into with any member of the Sagi Group, the AG Group parties to such settlement shall cause each Sagi Group party to such settlement to (i) dismiss with prejudice all pending claims, cross-claims and counter claims against any of the Trump Group Released Parties (as defined below)

16

and to provide the Sagi Group Release, and (ii) if the Orly Genger 1993 Trust is a party to such

settlement, cause it to agree in writing to become an AG Group member for purposes of

providing the indemnity contained in Paragraph 5.  Likewise, as a condition to any agreement by

the AG Group to a replacement trustee for the Orly Genger 1993 Trust, the AG Group shall use

its best efforts to cause such trustee to agree in writing on behalf of the Orly Genger 1993 Trust

that it shall be a member of the AG Group for purposes of providing the indemnity contained in

Paragraph 5.

> (c)    Each member of the AG Group covenants that for so long as the indemnity

contained in Paragraph 5 remains in effect, he, she or it shall not contribute or deposit any

amounts, or permit to be contributed or deposited any amounts (including, without limitation,

any payments made under Paragraphs 2 and 3), to or with the Orly Genger 1993 Trust or to any

other trust or entity that any of them directly or indirectly controls or is or was established at

their direction, or that is or was established or exists for any of their direct or indirect benefit,

unless such trust or entity has agreed in writing to being a member of the AG Group for purposes

of providing the indemnity contained in Paragraph 5.  The foregoing shall not restrict members

of the AG Group from investing in or with such entities provided that that such investment may

be liquidated, without restriction, by such member of the AG Group from time to time as may be

necessary to comply with the terms of the indemnity contained in Paragraph 5.

> (d)    The AG Group covenants that, subject to any confidentiality orders of any court

or other restrictions imposed by law (i) with respect to any court filing made or received by it

concerning the Orly Genger 1993 Trust, it shall contemporaneously provide a copy thereof to the

Trump Group, and (ii) contemporaneously with its becoming aware of any changes or

17

contemplated material changes to the Orly Genger 1993 Trust including, without limitation, the resignation of its trustee and/or the appointment of a replacement trustee, it shall provide written notice thereof to the Trump Group.

        9. **Confidentiality.** The Parties and their counsel shall not disclose the terms of this Agreement, except if, upon written advice of counsel, it is required to do so by law. Notwithstanding the foregoing, disclosure may be made by the Parties: (i) to their respective accountants, financial advisors or attorneys (collectively, "Advisors") as required to obtain tax or legal advice, it being agreed that each Party shall apprise its Advisors of the obligation to maintain such confidentiality and that each Party shall be accountable for any breach of this provision by its respective Advisors, and (ii) notwithstanding anything to the contrary in this Agreement, the Parties may disclose the terms of this Agreement if necessary in any action to enforce this Agreement or as may be required to respond to a valid subpoena, court order or other legal process.  Each Party agrees that he, she or it will promptly give notice of any attempt to compel disclosure of the terms of this Agreement to each of the other Parties, at least five (5) days before compliance is required.

        10.    **Third Party Beneficiaries.**  This Agreement shall have no third party beneficiaries except for those persons and entities that are not Parties hereto but are covered by the releases set forth in Paragraph 6 above, who may enforce those releases.

        11.    **Binding Effect**

This Agreement shall be binding upon and inure to the benefit of each of the Parties hereto and (where applicable) their respective current and former agents, representatives, officers, directors, advisors, employees, general partners, limited partners, shareholders, members, subsidiaries and

18

affiliates, and each of their respective predecessors, successors, heirs, executors, administrators and assigns.

12.     **Representations and Warranties.**

(a)     Each Party represents that it, he or she is authorized to enter into this Agreement and to grant the rights granted by it, him or her in this Agreement.  Each Party further represents that, to the extent any non-party consents are required for the performance of any of its, his or her obligations under this Agreement (including, without limitation, with any entity controlled by any Party, including any of its partners or equity holders), it, he or she has obtained such consents.

(b)     Each Party has the benefit of the advice of counsel chosen and employed by it, him or her concerning this Agreement.

(c)     Each Party is the sole owner and holder of the Claims it is releasing under this Agreement, and represents that none of the Claims released herein have been assigned, pledged, encumbered, or otherwise transferred in whole or in part, to any other person or entity.

(d)     Each member of the AG Group represents that he, she or it is knowledgeable, sophisticated and experienced in business, financial and other matters relevant to his, her or its entry into this Agreement and the transactions contemplated hereby, and has engaged advisors, experienced in the matters contemplated by this Agreement.  Each member of the AG Group has undertaken such investigation and has been provided with and has evaluated such documents and information as he, she or it has deemed necessary to enable him, her or it to make an informed decision with respect to the execution, delivery and performance of this Agreement and the transactions contemplated hereby.  Each member of the AG Group is

consummating the transactions contemplated hereby without reliance upon any express or implied representations or warranties of any nature, whether in writing, orally or otherwise, made by or on behalf of or imputed to any of the Trump Group Released Parties, except as expressly set forth in this Agreement, and no member of the AG Group shall make any Claim with respect thereto. Each member of the AG Group acknowledges that he, she or it is taking full responsibility for making his, her or its own evaluation of the adequacy and accuracy of all documents or information that may have been furnished to him, her or it, and that no member of the AG Group shall have any Claim against any of the Trump Group Released Parties with respect thereto, including for Claims relating to the accuracy or completeness of the information that may have been furnished to him her or it. Each member of the AG Group acknowledges and understands that each member of the Trump Group Released Parties expressly disclaims any and all liability that may be based on any of the documents and information that may have been furnished to any member of the AG Group and all liability based on such documents or information or errors therein or omissions therefrom. Accordingly, each member of the AG Group acknowledges that none of the Trump Group Released Parties has made any representation or warranty with respect to (i) any historical information, financial or otherwise, including without limitation results of operations (or any component thereof), cash flows, or financial condition (or any component thereof), of Trans-Resources and/or any of its subsidiaries, (ii) any valuations or projections or estimates of future revenues, future results of operations (or any component thereof), future cash flows or future financial condition (or any component thereof) of Trans-Resources and/or any of its subsidiaries or the future business and operations of Trans-Resources and/or any of its subsidiaries, (iii) any Claims any member of the AG Group

20

may have against any of the Trump Group Released Parties or (iv) any other information or documents that may have been made available to any member of the AG Group or their respective counsel, accountants or advisors with respect to any of the Trump Group Released Parties any of their respective businesses, assets, liabilities or operations, except as expressly set forth in this Agreement.  In addition to the foregoing, each member of the AG Group acknowledges that his, her or its entry into this Agreement and the transactions contemplated hereby is based solely on his, her or its respective assessment and valuation of all Claims that he, she or it may have against any of the Trump Group Released Parties and the likelihood of success of such Claims in a court of competent jurisdiction.  Each member of the AG Group acknowledges that the consideration to be received by the AG Group pursuant to this Agreement constitutes full and fair consideration for the release of all Claims contemplated hereunder.

(e)      Each member of the Trump Group represents that he, she or it is knowledgeable, sophisticated and experienced in business, financial and other matters relevant to his, her or its entry into this Agreement and the transactions contemplated hereby, and has engaged advisors, experienced in the matters contemplated by this Agreement.  Each member of the Trump Group has undertaken such investigation and has been provided with and has evaluated such documents and information as he, she or it has deemed necessary to enable him, her or it to make an informed decision with respect to the execution, delivery and performance of this Agreement and the transactions contemplated hereby.  Each member of the Trump Group is consummating the transactions contemplated hereby without reliance upon any express or implied representations or warranties of any nature, whether in writing, orally or otherwise, made by or on behalf of or imputed to any of the AG Group Released Parties, except as expressly set forth in this

21

Agreement, and no member of the Trump Group shall make any Claim with respect

thereto. Each member of the Trump Group acknowledges that he, she or it is taking full

responsibility for making his, her or its own evaluation of the adequacy and accuracy of all

information that may have been furnished to him, her or it, and that no member of the Trump

Group shall have any Claim against any of the AG Group Released Parties with respect thereto,

including for Claims relating to the accuracy or completeness of the information that may have

been furnished to him her or it. Each member of the Trump Group acknowledges and

understands that each member of the AG Group Released Parties expressly disclaims any and all

liability that may be based on any of the documents and information that may have been

furnished to any member of the Trump Group and all liability based on such documents or

information or errors therein or omissions therefrom. Accordingly, each member of the Trump

Group acknowledges that none of the AG Group Released Parties has made any representation or

warranty with respect to (i) any historical information, financial or otherwise, including without

limitation results of operations (or any component thereof), cash flows, or financial condition (or

any component thereof), of Trans-Resources and/or any of its subsidiaries, (ii) any valuations or

projections or estimates of future revenues, future results of operations (or any component

thereof), future cash flows or future financial condition (or any component thereof) of Trans-

Resources and/or any of its subsidiaries or the future business and operations of Trans-Resources

and/or any of its subsidiaries, (iii) any claims any member of the Trump Group may have against

any of the AG Group Released Parties or (iv) any other information or documents that may have

been made available to any member of the Trump Group or their respective counsel, accountants

or advisors with respect to any of the AG Group Released Parties any of their respective

22

businesses, assets, liabilities or operations, except as expressly set forth in this Agreement. In addition to the foregoing, each member of the Trump Group acknowledges that his, her or its entry into this Agreement and the transactions contemplated hereby is based solely on his, her or its respective assessment and valuation of all Claims that he, she or it may have against any of the AG Group Released Parties and the likelihood of success of such Claims in a court of competent jurisdiction. Each member of the Trump Group acknowledges that the consideration to be received by the Trump Group pursuant to this Agreement constitutes full and fair consideration for the release of all claims contemplated hereunder.

13. **Attorneys' Fees.** The Parties agree to be responsible for their own attorneys' fees and costs incurred in connection with this Agreement and negotiations related to and preparation of this Agreement and not to seek from each other reimbursement of any such costs, expenses or attorneys' fees.

14. **Governing Law.**

This Agreement, and all disputes arising under this Agreement or related thereto, shall be governed by, construed and interpreted in accordance with the laws of the State of Delaware, applicable to instruments made, delivered and performed entirely in such state, without regard to the choice of law provisions thereof.

15. **Arbitration.** UNLESS THIS AGREEMENT SPECIFICALLY PROVIDES FOR ANOTHER TYPE OF DISPUTE RESOLUTION WITH RESPECT TO A PARTICULAR KIND OF DISPUTE, ANY AND ALL CONTROVERSIES AND CLAIMS ARISING OUT OF OR RELATING TO THIS AGREEMENT, OR THE BREACH, TERMINATION OR VALIDITY THEREOF, SHALL BE EXCLUSIVELY SETTLED BY FINAL AND BINDING

ARBITRATION IN ACCORDANCE WITH THE PROCEDURES SET FORTH IN THIS
SECTION.

       (a)    The arbitration shall be conducted in accordance with the Commercial
Arbitration Rules of the American Arbitration Association ("AAA") then in effect (the "Rules"),
except as set forth herein.  Any member of the Trump Group on behalf of the Trump Group, on
the one hand, and any member of the AG Group on behalf of the AG Group, on the other hand,
may demand arbitration by giving the other written notice to such effect in accordance with the
Rules.

       (b)    The arbitration will be held before one neutral arbitrator.  Within thirty (30)
days after the other Party's receipt of the demand for arbitration, the Party seeking arbitration
will invite the other Party to join it in approaching the following list of individuals about serving
as arbitrator and will approach such individuals with such other Party (if its invitation is accepted)
or without such other Party (if its invitation is rejected or not responded to within five (5)
business days): The Honorable William B. Chandler III, David A. Jenkins, Esq., Stephen E.
Jenkins, Esq., Robert J. Katzenstein, Esq., and Andre G. Bouchard, Esq.  If only one such
individual is available and willing, he shall serve as the arbitrator.  If more than one such
individual is available and willing, the Parties will mutually determine which of those so
available and willing will serve as the arbitrator.  If the Parties are unable to agree, the arbitrator
will be selected by the AAA from the foregoing list in accordance with the listing, striking and
ranking procedure in the Rules, with each Party being given a limited number of strikes, except
for cause.  If none of the foregoing individuals is available, the arbitrator will be selected by the
AAA in accordance with the listing, striking and ranking procedure in the Rules, with each Party

being given a limited number of strikes, except for cause. Any arbitrator appointed by the AAA shall be a retired judge that presided over a state or federal court located in Delaware or a practicing attorney licensed in Delaware with no less than fifteen years of experience with large commercial cases. Any such arbitration proceedings shall be and remain confidential. The place of arbitration shall be in Manhattan, New York or elsewhere if otherwise agreed to.

        (c)     Discovery will be limited to the request for and production of documents, directly related to the issues in dispute, limited depositions of limited duration, and interrogatories. Interrogatories will be allowed only as follows: a Party may request the other Party to identify by name, last known address and telephone number (i) all persons having knowledge of facts relevant to the dispute and a brief description of that person's knowledge, and (ii) any experts who may be called as an expert witness, the subject matter about which the expert is expected to testify, the mental impressions and opinions held by the expert and the facts known by the expert. All issues concerning discovery upon which the parties cannot agree will be submitted to the arbitrator for determination.

        (d)     Each of the Parties agrees that it will use commercially reasonable efforts to join (and will allow the other party to join) any third party that the Parties have agreed is indispensable to the arbitration. If any such third party does not agree to be joined, the arbitration will proceed nonetheless.

        (e)     The arbitrators are not empowered to award damages not permitted by the terms of this Agreement and if so permitted, then not in excess of compensatory damages, except with respect to indemnification obligations for punitive damages as provided hereunder, and

each Party irrevocably waives the right to recover punitive, exemplary or multiple damages with respect to any dispute other than with respect to indemnification obligations for such punitive damages as provided hereunder. The decision of, and award rendered by, the arbitrator will be final and binding on the Parties, will be in writing and will include the findings of fact and conclusions of law upon which it is based, if any.

(f)     The Parties specifically acknowledge that this Agreement evidences a transaction involving, affecting, affected by, and a part of, interstate commerce and that this agreement to arbitrate is governed by and enforceable under the Federal Arbitration Act, 9 U.S.C. §§ 1 et seq.

(g)     Except to the extent that any of the indemnification provisions contained herein shall be applicable (i) the Parties shall each be responsible for their own costs and expenses (including legal fees and disbursements) incurred in any arbitration, and (ii) the AG Group on the one hand and the Trump Group on the other shall each be responsible for 50% of the fees and disbursements of the arbitrator and of any costs and expenses payable to the AAA.

(h)     With respect to the enforcement, modification or vacating of any arbitration award (it being reconfirmed hereby that the arbitration award shall itself be final and binding on the Parties), the Parties submit to the exclusive jurisdiction of one or the other of (i) the United Stated District Court of the Southern District of New York sitting in the Borough of Manhattan in the City of New York and (ii) the Commercial Division of the New York State Supreme Court sitting in the Borough of Manhattan in the City of New York.

16.     **Notice.** If any Party is required to give notice to any other Party under this Agreement, such notice shall be in writing and shall be deemed to have been duly given upon receipt of hand delivery, one business day following its being sent to the recipient via Federal Express or another

26

nationally recognized over-night courier, or by e-mail with confirmation of receipt to the

following individuals or to such other address or person as such Parties may from time to time

specify by written notice given in the manner provided above:

**If to the Trump Group:**

> Mark S. Hirsch, Esq.
>
> The Trump Group
>
> 41 Madison Avenue, Suite 4101
>
> New York, NY 10010
>
> Phone: (212) 838-1000
>
> E-mail: mhirsch@trumpgroup.com

**With Copy to:**

> Thomas J. Allingham II, Esq.
>
> Anthony W. Clark, Esq.
>
> Douglas D. Herrmann, Esq.
>
> Skadden, Arps, Slate, Meagher & Flom LLP
>
> One Rodney Square
>
> P.O. Box 636
>
> Wilmington, DE 19899
>
> Phone: (302) 651-3000
>
> E-mail: thomas.allingham@skadden.com

27

E-mail: anthony.clark@skadden.com

E-mail: douglas.herrmann@skadden.com

**If to Arie Genger:**

Arie Genger

104 West 40th Street, 19th Floor

New York, NY 10018

E-mail: wachtel@wmllp.com

**With Copy to:**

Stephen P. Lamb, Esq.

Paul Weiss

500 Delaware Avenue, Suite 200

Wilmington, DE 19889

**If to Orly Genger:**

Orly Genger

104 West 40th Street, 19th Floor

New York, NY 10018

E-mail: wachtel@wmllp.com

**With Copy to:**

28

William Wachtel

Wachtel Masyr & Missry LLP

885 second ave.

New York, NY 10017


[]


**If to Arnold Broser or David Broser:**

David Broser

104 West 40th, 19th FloorNew York, NY 10018

E-mail:  wachtel@wmll.com

**With Copy to:**

William Wachtel

Wachtel Masyr & Missry LLP

885 second ave.
New York, NY 10017

29

17.    **Entire Agreement.** This Agreement contains the entire agreement between the Parties concerning the subject matter hereof. Neither this Agreement nor any of its terms or provisions shall be binding on any Party until all the Parties hereto have signed. The Parties agree that all drafts of this Agreement are strictly confidential and shall supplement and complement any protection, which may attach to the exchange of confidential information in settlement discussions, whether by common law or statute including, but not limited to, Federal Rule of Evidence 408 and comparable state laws. Any and all prior discussions and agreements between the Parties concerning the subject matter of this Agreement are merged into this Agreement when signed. This Agreement may not be modified or amended, nor any of its provisions waived, except by an instrument in writing signed by all Parties. No Party has made any warranty or representation to the other Parties that is not set forth expressly herein. In entering into this Agreement, no Party has relied on any statement or representation made by or on behalf of any other Party, by or on behalf of any affiliate of such other Party, or by counsel for such other Party that is not set forth expressly in this Agreement.

18.    **No Drafting Presumption.** This Agreement shall be interpreted or construed without any presumption that the provisions hereof should be strictly construed against the drafter, it being agreed that the Parties and their respective counsel and other agents have fully and equally participated in the preparation, negotiation, review and approval of all provisions of this Agreement.

19.    **No Admissions.** The Parties have executed this Agreement for the sole purpose of settling and disposing of all Claims between them, and it is expressly understood and agreed that no Party hereto admits any wrongdoing on its, his or her part by executing this Agreement.

20.    **Binding Effect.** It is the intention of the parties to extinguish all AG Group Released Claims and all Trump Group Released Claims and, consistent with such intention, each of the Parties hereby waives any and all rights, to the extent permitted by law, to assert that the Release provided by it in Paragraph 6 hereunder is unenforceable as to any claim whatsoever and for any reason including, without limitation, any and all rights under section 1542 of the California Civil Code, if applicable, or any other applicable similar law or principle of common law, which may have the effect of limiting the Releases herein.  Section 1542 of the California Civil Code provides:

> A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM OR HER MUST HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR.

21.    **Headings.**  The section headings contained in this Agreement are for reference purposes only and shall not in any way effect or control the meaning or interpretation of this Agreement.

22.    **Execution in Counterparts and by PDF e-mail.**  This Agreement may be executed in multiple counterparts and by fax or PDF e-mail, each of which, when so executed and delivered, shall be an original, but such counterparts shall together constitute one and the same instrument and agreement.

23.    **Effective Date.**  This Agreement shall be effective immediately upon execution and delivery by all Parties hereto (the "Effective Date").

**IN WITNESS WHEREOF**, the Parties have caused this Agreement to be duly executed as follows:

TR Investors, LLC                        Arie Genger

By: _____

Print: _____          Date: _____ 6/15/13 _____

Title: _____

Date: _____


Glenclova Investment Co.             Orly Genger (in her individual capacity and

                                     in her capacity as beneficiary of the

By: _____       Orly Genger 1993 Trust)

Print: _____

Title: _____             Date: _____ 6/15/13 _____

Date: _____

32

IN WITNESS WHEREOF, the Parties have caused this Agreement to be duly executed as follows:

**TR Investors, LLC**                                    **Arie Genger**

By: _Mark S. Hirsch_____                    _____

Print: _MARK J. HIRSCH_____                    Date: _____

Title: _Executive VP/General Counsel_

Date: _June 16, 2013_____

**Glenclova Investment Co.**                      **Orly Genger (in her individual capacity and**
                                                                   **in her capacity as beneficiary of the**

By: _Mark S. Hirsch_____                    **Orly Genger 1993 Trust)**

Print: _MARK S. HIRSCH_____

Title: _Executive VP/General Counsel_          _____

Date: _June 16, 2013_____                        Date: _____

32

**New TR Equity I, LLC**

By: _____

Print: _____

Title: _____

Date: _____

**Arnold Broser**

Date: ____ 6/11/13 ____

**New TR Equity II, LLC**

By: _____

Print: _____

Title: _____

Date: _____

**David Broser**

Date: ____ 6/16/13 ____

33

New TR Equity I, LLC                Arnold Broser

By: _____        _____

Print: MARK S. Hirsch          Date: _____

Title: Executive VP/General Counsel

Date: June 16, 2013


New TR Equity II, LLC          David Broser

By: _____        _____

Print: MARK S. Hirsch          Date: _____

Title: Executive VP/General Counsel

Date: June 16, 2013

33

**Trans-Resources, LLC**

By: _Mark S. Hirsch_

Print: _MARK S. HIRSCH_

Title: _Executive VP/General Counsel_

Date: _June 16, 2013_

34

**Jules Trump**

Date: 6/16/2013

**Eddie Trump**

Date: _____

**Mark Hirsch**

Date: _____

**Jules Trump**

_____

Date: _____

**Eddie Trump**

_____

Date: June 16, 2013

**Mark Hirsch**

_____

Date: _____

35

**Jules Trump**

_____

Date: _____


**Eddie Trump**

_____

Date: _____


**Mark Hirsch**

_Mark Hirsch_

Date: June 16, 2013

EXHIBIT A

*6/16/13*
*Draft - Confidential*

## [FORM OF SUBORDINATED NOTE]

**THIS NOTE HAS NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR ANY APPLICABLE STATE SECURITIES LAWS AND MAY NOT BE SOLD OR TRANSFERRED WITHOUT COMPLIANCE WITH THE REGISTRATION OR QUALIFICATION PROVISIONS OF APPLICABLE FEDERAL AND STATE SECURITIES LAWS OR APPLICABLE EXEMPTIONS THEREFROM.**

TRANS-RESOURCES

<u>**SUBORDINATED NOTE**</u>

$7,500,000.00                                                                 June __, 2013

        **FOR VALUE RECEIVED,** Trans-Resources, LLC a Delaware entity (the successor to Trans-Resources, Inc. and referred to herein as the "<u>Maker</u>"), hereby promises to pay to the order of [_____] (the "<u>Payee</u>"), the principal sum of Seven Million, Five-Hundred Thousand Dollars ($7,500,000.00) pursuant to the terms and conditions of and at the times provided in the Settlement Agreement (as defined below).

        1.      <u>Notes</u>. This Subordinated Note (this "<u>Note</u>") is issued pursuant to, and is subject to the terms and conditions of, the Settlement Agreement and Release, dated as of June __, 2013 by and among the AG Group and the Trump Group, as amended, restated, supplemented or otherwise modified from time to time (the "<u>Settlement Agreement</u>"). Terms used herein and not otherwise defined herein shall have the respective meanings ascribed thereto in the Settlement Agreement.

        2.      <u>No Interest</u>. This Note will not accrue interest, pursuant to the terms of the Settlement Agreement.

        3.      <u>Maturity</u>. Subject to the terms and conditions of the Settlement Agreement and this Paragraph 3, this Note shall mature and be redeemed or satisfied in full by the Maker in one installment, which shall be paid by the Maker no later than the ___ anniversary of the Effective Date (the "<u>Maturity Date</u>"). Notwithstanding the foregoing, the Maturity Date shall automatically be extended until the earlier (the "<u>Extended Maturity Date</u>") of (i) such time as all pending claims, cross-claims and counter-claims brought by any of TPR, Sagi Genger, the Sagi Genger 1993 Trust, the Orly Genger 1993 Trust (other than the Orly Trust Action), D&K Limited Partnership, D&K GP LLC, Rochelle Fang, and/or David Parnes (collectively, the "<u>Sagi Group</u>") against any member of the Trump Group have been dismissed with prejudice and the statute of limitations shall have run with respect to any other potential claims of the Sagi Group that might be the subject of the indemnification obligations provided for by Paragraph 5 of the Settlement Agreement and (ii) such time as each member of the Sagi Group shall have provided the Trump Group with a release of the Trump Group Released Parties and covenant not to sue in form and substance that is the same as the AG Group Release and covenant not to sue contained in Paragraph 6(a) of the Settlement Agreement. Subject to the foregoing, this Note shall become immediately due and payable upon the occurrence of any transaction or series of transactions which shall result in the Trump Group owning or controlling neither (i) a majority of the voting stock of Trans-Resources or its successors or each of its two principal subsidiaries, Haifa

Chemicals, Ltd. and Na-Churs Plant Food Company or their successors, nor (ii) directly or indirectly, a majority of the assets currently owned by Trans-Resources and its subsidiaries; provided, however, that in such event, at the request of the Trump Group, the amounts then payable on this Note shall be placed in escrow until the Maturity Date or until the Extended Maturity Date (if applicable) under the provisions of an escrow agreement on reasonable terms to be negotiated at such time in good faith between the Maker, the Payee and an escrow agent selected by mutual consent of the Maker and the Payee (such consent, not to be unreasonably withheld, conditioned or delayed), which shall provide for the release of funds from such escrow to the Maker in satisfaction of any and all Indemnification Amounts, AG Group Release Amounts and Discovery Costs owing to Maker, if any, and payment to the Payee of any amounts remaining in escrow after payment to Maker of all Indemnification Amounts, AG Group Release Amounts and Discovery Costs, if any, upon the Maturity Date hereunder or the Extended Maturity Date (if applicable).

4.      Optional Prepayments.  The Maker may voluntarily prepay this Note prior to the Maturity Date, in whole or in part, at any time, without premium or penalty.

5.      Adjustment.  In accordance with the terms of the Settlement Agreement, in the event that at any time Indemnification Amounts, Discovery Costs, AG Group Release Amounts, or other amounts due and payable by the AG Group to the Trump Group pursuant to the Settlement Agreement (the "Costs") have not been paid to the Trump Group in accordance with the terms of the Settlement Agreement, the Maker may, upon written notice to the Payee, set off and apply as a credit against the amount due under this Note any and all due, unpaid and outstanding Costs.  The rights and remedies described herein are in addition to any other rights and remedies the Parties may have under the Settlement Agreement or other applicable law.

6.      Subordination.  Pursuant to the terms of the Settlement Agreement, this Note is unsecured and shall be fully subordinated to any obligation of Trans-Resources, including, but not limited to, outstanding credit facilities, bonds, loans, tax obligations and payables.

7.      Enforcement.  The Maker hereby agrees to pay on demand all reasonable costs and expenses, including without limitation attorneys' fees and costs of collection, incurred or paid by the Payee in enforcing this Note in accordance with the Settlement Agreement.

8.      Amendments.  No failure or delay on the part of the Maker or the Payee in exercising any right, power, privilege or remedy shall operate as a waiver thereof, nor shall any single or partial exercise of any such right, power, privilege or remedy preclude any other or further exercise thereof or the exercise of any other right, power, privilege or remedy.  This Note may not be amended and the provisions hereof may not be waived, except in accordance with the terms of the Settlement Agreement.

9.      Lost Notes, etc.  If this Note is mutilated, destroyed, lost or stolen, upon receipt of evidence satisfactory to the Maker of such loss, theft, destruction or mutilation of this Note and, if requested in the case of any such loss, theft or destruction, upon delivery of an indemnity agreement reasonably satisfactory to the Maker, or, in the case of any such mutilation, upon surrender and cancellation of this Note, the Maker shall issue a new Note of like tenor and amount, in lieu of this Note.

- 2 -

10.     ASSIGNMENT.  THIS NOTE, INCLUDING THE RESPECTIVE RIGHTS AND OBLIGATIONS OF THE MAKER AND THE PAYEE PURSUANT THIS NOTE, MAY NOT BE ASSIGNED, TRANSFERRED, SOLD OR OTHERWISE DISPOSED OF BY EITHER THE MAKER OR THE PAYEE WITHOUT THE PRIOR WRITTEN CONSENT OF THE OTHER WHICH CONSENT MAY BE WITHHELD IN SUCH PARTY'S SOLE DISCRETION.

11.     Binding Effect.  The provisions of this Note shall be binding upon and inure to the benefit of the parties hereto and their successors and assigns permitted hereby.

*[signature page follows]*

Error! Unknown document property name.

**IN WITNESS WHEREOF**, the Maker has caused this Subordinated Note to be duly executed under seal on the date set forth above by a duly authorized representative of the Maker.

TRANS-RESOURCES, LLC

By:_____
     Name:
     Title:

4

# Exhibit E

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: JAN 05 2015
```

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------- X

SAGI GENGER,

      Plaintiff,

     -v-           14-cv-5683 (KBF)

ORLY GENGER,         OPINION & ORDER

       Defendant.

-------------------------------------------------------- X

KATHERINE B. FORREST, District Judge:

   As Tolstoy famously wrote, "Happy families are all alike; every unhappy family is unhappy in its own way." Leo Tolstoy, Anna Karenina 1 (Constance Garnett trans., 1978). In the case of the wealthy Genger family, that unhappiness has taken the form of a seemingly never-ending series of lawsuits stemming from the divorce of Arie Genger and Dalia Genger, the family patriarch and matriarch, respectively. Together, Arie, Dalia, their son Sagi, and their daughter Orly[1] have employed a small army of lawyers to fight over the pieces of the family pie and, it seems, to make each other's lives as miserable as possible.

   This latest installment in the Genger family's litigation saga concerns a straightforward contract dispute between Sagi and Orly. Sagi alleges that he and Orly entered into a tri-party agreement with Dalia, under which Sagi and Orly would receive shares of stock in exchange for providing Dalia with financial support

---

[1] For the sake of clarity, in this Opinion the Court will refer to the members of the Genger family by their given names.

derived from the economic value obtained from that stock. Sagi contends that Orly has breached the agreement, and now seeks damages from her. Orly, for her part, denies the agreement's validity and enforceability, primarily because she claims she never actually received the promised shares of stock, which means that the agreement is not supported by consideration. But, as it turns out, Orly has effectively monetized an interest in the very shares she claims not to have received to the tune of $32.3 million.

Orly contends that this case is "an attempt to push the camel's nose under the tent flaps," and that Sagi and Dalia "hope to create a pipeline allowing them to siphon money from Orly for the rest of her life." (ECF No. 92 at 1.) The Court sees things differently: this case is a simple breach of contract action. Nothing more, nothing less.

Because there is no triable issue as to whether there was a valid and enforceable agreement supported by consideration, and for the reasons that follow, the Court GRANTS Sagi's motion for summary judgment, DENIES Orly's motion for summary judgment, and DENIES AS MOOT Orly's motion to disqualify and all pending motions in limine.

2

I.   BACKGROUND

A.   Factual Background[2]

The Genger family consists of father Arie, mother Dalia, son Sagi, and daughter Orly.  (DSOF ¶ 5.)  Sagi is currently the President and CEO of TPR Investment Associates, Inc. ("TPR").  (DSOF ¶ 4.)  In 2004, Arie and Dalia divorced.[3]  (DSOF ¶ 5; PRSOF ¶ 5.)  As part of the divorce, Dalia agreed to convey her marital rights to 794.40 shares of TRI to trusts benefiting Sagi and Orly (the "Sagi Trust" and the "Orly Trust,"[4] respectively) in exchange for a commitment by Sagi and Orly to financially support her.  This arrangement was effectuated via three documents.

First, Dalia and Arie signed a stipulation of settlement finalizing the terms of their divorce settlement (the "2004 Divorce Stipulation"), which was fully executed

---

[2] The following facts are taken from the Local Rule 56.1 statements submitted by the parties in connection with this motion for summary judgment and their supporting materials (ECF No. 34 ("PSOF"), 37 ("DSOF"), 51 ("DRSOF"), 52 ("DCMUF"), 55 ("PRSOF")), the factual materials submitted with the parties' letters dated November 25, 2014 (ECF Nos. 84-85), and public records of the parties' prior judicial proceedings.  The Court cites to the parties' factual submissions only when they support a factual proposition, cite relevant material, and are not contradicted in pertinent part by a counter-statement supported by citation to evidence that would be admissible.  See Local Civil Rule 56.1(d); Chimarev v. TD Waterhouse Investor Servs., Inc., 280 F. Supp. 2d 208, 223 (S.D.N.Y. 2003) (material facts set forth in a Rule 56.1 statement "are uncontested and may be accepted as true" where a Rule 56.1 counter-statement was "deficient" because it consisted solely of "blanket denials" and was "not supported by citation to any evidence"), aff'd, 99 Fed. App'x 259 (2d Cir. 2004).  The Court recites only those facts relevant to the claims and defenses currently at issue, but also includes some factual allegations that are not material to the claims asserted but that are important to understanding the context for this case.  Some of defendant's responses fail to directly address straightforward factual allegations, and these failures are considered admissions as a matter of law.  See Local Civil Rule 56.1(c); Gubitosi v. Kapica, 154 F.3d 30, 31 n.1 (2d Cir. 1998); NAS Elecs., Inc. v. Transtech Elecs. PTE Ltd., 262 F.Supp.2d 134, 139 (S.D.N.Y. 2003).

[3] The divorce was finalized by a 2005 judgment.  (PRSOF ¶ 5.)

[4] The trusts are officially named the "Sagi Genger 1993 Trust" and the "Orly Genger 1993 Trust." (DSOF ¶ 26.)

on October 30, 2004.[5]  (PSOF ¶ 1; DSOF ¶ 7.)  In the 2004 Divorce Stipulation, Dalia promised to convey equal interests in a total of 794.40 shares of TRI to the Orly Trust and the Sagi Trust.  (PSOF ¶ 1; DSOF ¶ 27.)  The 2004 Divorce Stipulation contains an "entire understanding" clause, which is subject to a carve-out for other agreements expressly incorporated by reference and those "entered into concurrently herewith."  (DSOF ¶ 24.)

The second was a letter signed by Sagi and Dalia dated October 30, 2004 (the "2004 Promise").  (PSOF ¶ 3; DRSOF ¶ 51.)  In the 2004 Promise, Sagi agreed to pay Dalia up to an amount equal to all dividends, distributions, proceeds or other payments attributable to the TRI shares, upon Dalia's demand.  (PSOF ¶ 3.)  The 2004 Promise also states that the agreement is made "in consideration of" the following: "Orly and [Sagi] are benefiting by the receipt of a total of 794.40 shares of [TRI], or beneficial[6] interests in those shares, by trusts for [their] benefit."  (DSOF ¶ 52.)  The parties dispute whether the 2004 Promise was intended to be integrated with the 2004 Divorce Stipulation.  (See DRSOF ¶ 3.)

At the time the 2004 Promise was signed, Orly was vacationing in Fiji, and thus could not contemporaneously sign the 2004 Promise.  (PSOF ¶ 4.)  However,

---

[5] The 2004 Divorce Stipulation states that it is "made as of October 26, 2004."  (DSOF ¶ 7.)

[6] Beneficial ownership is "[a] corporate shareholder's power to buy or sell the shares, though the shareholder is not registered on the corporation's books as the owner."  Ownership, Black's Law Dictionary (9th ed. 2009); see also Cartica Mgmt. v. CorpBanca, S.A., No. 14–CV–2258 PKC, 2014 WL 4804491, at *15 (S.D.N.Y. Sept. 25, 2014) (explaining the definition of beneficial ownership under federal securities law).  Record ownership is determined based on who is "listed in the issuer's books as the owner of stock on the record date."  Stockholder of Record, Black's Law Dictionary (9th ed. 2009).

before Sagi signed the 2004 Promise, Orly verbally agreed to indemnify Sagi for 50% of the payments he would have to make under the 2004 Promise.[7]  (PSOF ¶ 4.)

The third agreement was a letter signed by Sagi and Orly dated November 10, 2004 (the "2004 Indemnity").[8]  (PSOF ¶ 5.)  In the 2004 Indemnity, Orly agreed to indemnify Sagi "for and against one-half (1/2) of any and all payments, liabilities, damages, claims, actions, losses, settlements, penalties, judgments or obligations . . . , including [Sagi's] reasonable counsel and other professional fees, expenses and costs, which arise from [Sagi's] undertakings in the [2004 Promise]."  (PSOF ¶ 5.)

On August 22, 2008, Sagi-controlled TPR entered an agreement with the Trump Group to sell the Sagi Trust's shares of TRI to the Trump Group for $26.7 million.  (DSOF ¶ 34.)  Sagi also sold the Orly Trust's TRI shares to the Trump Group for approximately $10.3 million, subject to the condition that TPR was determined to be an owner of the shares.[9]  (DSOF ¶ 35.)

---

[7] In response to this factual allegation by Sagi, Orly counters that she does not remember a phone call with Sagi on the day of the divorce, and makes several non-responsive statements concerning the drafting and execution 2004 Promise and the 2004 Divorce Stipulation.  (See DRSOF ¶ 4.)  But she does not actually deny making this oral promise.

[8] At the initial case conference in the prior action, Orly's counsel stated that they believed the 2004 Indemnity was a forgery, and they would investigate this theory by, inter alia, using the services of an ink expert.  (DRSOF ¶ 11.)  The ink expert's examination of the 2004 Indemnity was also discussed at the October 31, 2014 status conference in the instant action; the Court ordered the parties to meet and confer regarding any outstanding issues with respect to expert discovery (ECF No. 48), and no such issues were subsequently raised with the Court.

Despite the considerable amount of discovery in this case, and her retention of an ink expert, Orly is unable to point to any admissible evidence suggesting that the 2004 Indemnity is a forgery.  Further, in her briefing on this motion, Orly did not advance the argument that the 2004 Indemnity is a forgery or is otherwise inauthentic.  Most importantly, in her Rule 56.1 responses, Orly does not affirmatively deny the existence of the 2004 Indemnity, or that she signed it.  (See DRSOF ¶¶ 5, 11.)  A party cannot create a genuine issue of material disputed fact through mere say-so and the hiring of an expert.  There is accordingly no genuine issue of material disputed fact as to the authenticity of the 2004 Indemnity or as to whether Orly signed it.

[9] The parties dispute exactly what ownership interest was required by the condition.  (See PRSOF ¶ 35.)

In 2011, the Supreme Court of Delaware affirmed a judgment invalidating the 2004 transfer of the TRI shares to the Orly Trust as to record ownership. Genger v. TR Investors, LLC, 26 A.3d 180, 198-200 (Del. 2011). As a result of this invalidation, record ownership of the TRI shares reverted to Sagi-controlled TPR. In that same decision, the Supreme Court of Delaware held that because the trial court lacked personal jurisdiction over the Orly Trust and TPR, it lacked the power to declare who beneficially owned the TRI shares, and therefore reversed the beneficial ownership determinations flowing from the trial court's orders. Id. at 203.

On June 16, 2013, Orly entered into a settlement agreement (the "2013 Settlement Agreement") with the Trump Group and others regarding her claims to ownership of the TRI shares. (ECF No. 84 ex. A ("2013 S.A.").) The agreement provides that Orly, Arie, and their litigation funders[10] will receive $32.3 million[11] in exchange for a declaration that the Trump Group owns "all right, title and interest (beneficially, of record, and otherwise)" to the TRI shares, and that Orly waives all of her claims to the TRI shares, both as a trust beneficiary[12] and individually. (2013 S.A. ¶¶ 2-4.) The 2013 Settlement Agreement does not waive any of the Orly Trust's claims. (See 2013 S.A. ¶ 4.) However, in the agreement Orly agreed to cause the Orly Trust to do the same. (2013 S.A. ¶ 8(a)(ii).)

---

[10] The 2013 Settlement Agreement refers to these parties collectively as the "AG Group." (2013 S.A. at 1.)

[11] The $32.3 million consists of $17.3 million in cash upfront, plus two additional $7.5 million payments to be made over four years. (2013 S.A. ¶¶ 2-3.)

[12] Specifically, as a beneficiary of the Orly Trust. (2013 S.A. ¶ 4.)

6

Then, on August 30, 2013, the Orly Trust (by Dalia), TPR, and the Trump

Group agreed that "the Trump Group owns, for all purposes, all right, title and

interest (beneficially, of record and otherwise) to all authorized and issued shares of

[TRI]." (ECF No. 85 ex. 5 ¶ 2.)  This stipulated agreement was so-ordered by the

Delaware Court of Chancery.  (ECF No. 85 ex. 5 at 7.)  Subsequently, a court in this

District and New York's First Department both concluded that this so-ordered

stipulation determined the Trump Group to be the beneficial owner of the TRI

shares.  TPR Inv. Assocs., Inc. v. Pedowitz & Meister LLP, No. 13 Civ. 8243 (JFK),

2014 U.S. Dist. LEXIS 67116, *5-6 (S.D.N.Y. May 15, 2014); Genger v. Genger, 121

A.D.3d 270, 280 (N.Y. App. Div. 2014).

On or about January 22, 2014, Dalia demanded $200,000 from Sagi under the

2004 Promise, which Sagi paid.  (PSOF ¶¶ 6, 9.)  On January 23, 2014, Sagi

informed Orly of Dalia's demand.[13]  (PSOF ¶ 7.)  On February 17, 2014, Sagi

demanded $100,000 from Orly under the 2004 Indemnity.  (PSOF ¶ 10.)  Orly

refused to pay.  (PSOF ¶ 11.)  This lawsuit for breach of contract followed.

B.      Procedural Background[14]

1.      General procedural background.

Sagi initially filed a breach of contract action against Orly in this Court on

February 18, 2014.  (No. 14-cv-1006, ECF Nos. 1-2.)  Orly filed a motion to dismiss

under Federal Rule of Civil Procedure 12(b)(6) on May 2, 2014.  (No. 14-cv-1006,

---

[13] Sagi first provided Orly's counsel with a written copy of Dalia's demand on January 29, 2014. (DSOF ¶ 60.)

[14] The Court recounts only the procedural history immediately relevant to the disposition of this motion.

ECF No. 9.) Orly then filed a motion to dismiss for lack of subject-matter jurisdiction under Rules 12(b)(1) and 12(h)(3) on May 29, 2014. (No. 14-cv-1006, ECF No. 24.) That same day, Sagi filed a motion for summary judgment. (No. 14-cv-1006, ECF No. 18.)

On July 22, 2014, the Court granted Orly's Rule 12(b)(1) motion[15] and dismissed the action without prejudice, after finding that diversity jurisdiction was inappropriate because both Sagi and Orly were domiciled in New York on the date the action was filed. (No. 14-cv-1006, ECF No. 52.) Two days later, on July 24, 2014, Sagi commenced the instant proceeding, which was initially assigned to Judge Caproni. (ECF No. 1.) On August 5, 2014, the case was reassigned to this Court, which set an accelerated schedule for discovery, briefing, and trial owing to the material similarity between this action and the previous one. (ECF No. 9.)

Orly filed a motion to dismiss under Rule 12 on August 27, 2014. (ECF No. 10.) The motion became fully briefed on September 18, 2014. (ECF No. 19.) The Court denied the motion on September 19, 2014, finding that (1) subject-matter jurisdiction over this action was appropriate; (2) Sagi had sufficiently alleged the elements of the causes of action; and (3) the parties' briefing revealed a host of factual issues outside the four corners of the complaint. (ECF No. 20.)

Both Sagi and Orly moved for summary judgment on October 20, 2014. (ECF Nos. 32, 35.) Sagi filed motions in limine on November 17, 2014. (ECF No. 59.) The following day, Orly filed motions in limine, (ECF No. 68), as well as a motion to

---

[15] The Court also denied as moot Orly's Rule 12(b)(6) motion to dismiss and Sagi's motion for summary judgment.

disqualify Sagi's counsel John Dellaportas from acting as counsel at trial on November 18, 2014, (ECF No. 65). Sagi and Orly submitted their oppositions to each others' motions in limine on November 24, 2014. (ECF Nos. 79, 81.)

Sagi then submitted his opposition to Orly's motion to disqualify on November 26, 2014. (ECF No. 89.) That same day, the Court issued an order stating its intention to decide the case on summary judgment, and adjourning the trial date and all other dates. (ECF No. 90.) The parties submitted reply briefs on December 5 and 6, 2014. (ECF Nos. 91, 92.)

   2.   Motion to compel production of the 2013 Settlement Agreement.

On September 30, 2014,[16] Sagi filed a letter-motion to compel production of the 2013 Settlement Agreement. (ECF Nos. 22-23.) Orly filed her opposition to the letter-motion on October 3, 2014, (ECF No. 25), the same day she filed her Answer, (ECF No. 24). On October 7, 2014, the Court denied Sagi's letter-motion, based on its mistaken belief that the 2013 Settlement Agreement was irrelevant to the claims at issue. (ECF No. 26.)

Upon reviewing the parties' summary judgment briefing, the Court realized its mistake, and on November 18, 2014 the Court vacated the October 7, 2014 order and granted Sagi's letter-motion to compel.[17] (ECF No. 64.) In the November 18, 2014 order, the Court ordered the parties to submit three-page letters regarding the potential impact of the 2010 Settlement Agreement on the claims and defenses at

---

[16] Sagi filed the same letter twice; once on September 30, 2014, and again on October 1, 2014. (ECF Nos. 22-23.) An additional exhibit is attached to the October 1, 2014 version.

[17] This order refers to the 2013 Settlement Agreement as the "2010 Settlement Agreement."

issue not later than November 25, 2014. (ECF No. 64.) The parties submitted their letters on November 25, 2014. (ECF Nos. 84-85.)

## II. SUMMARY JUDGMENT STANDARD

Summary judgment may not be granted unless the movant shows, based on admissible evidence in the record placed before the court, "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the burden of demonstrating "the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). When the moving party does not bear the ultimate burden on a particular claim or issue, it need only make a showing that the non-moving party lacks evidence from which a reasonable jury could find in the non-moving party's favor at trial. Id. at 322-23. In making a determination on summary judgment, the court must "construe all evidence in the light most favorable to the nonmoving party, drawing all inferences and resolving all ambiguities in its favor." Dickerson v. Napolitano, 604 F.3d 732, 740 (2d Cir. 2010).

Once the moving party has asserted facts showing that the non-movant's claims cannot be sustained, the opposing party must set out specific facts showing a genuine issue of material fact for trial. Price v. Cushman & Wakefield, Inc., 808 F. Supp. 2d 670, 685 (S.D.N.Y. 2011); see also Wright v. Goord, 554 F.3d 255, 266 (2d Cir. 2009). "[A] party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment," as "[m]ere conclusory allegations or denials . . . cannot by themselves create a genuine issue of material fact where none would otherwise exist." Hicks v. Baines, 593 F.3d 159,

166 (2d Cir. 2010) (citations omitted); see also Price, 808 F. Supp. 2d at 685 ("In

seeking to show that there is a genuine issue of material fact for trial, the non-

moving party cannot rely on mere allegations, denials, conjectures or conclusory

statements, but must present affirmative and specific evidence showing that there

is a genuine issue for trial.").

Only disputes relating to material facts—"facts that might affect the outcome

of the suit under the governing law"—will properly preclude the entry of summary

judgment. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); see also

Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986)

(the non-moving party "must do more than simply show that there is some

metaphysical doubt as to the material facts").

III.    DISCUSSION

Under New York law, to recover for breach of contract, a plaintiff must prove

"(1) the existence of a contract between [plaintiff] and that defendant; (2)

performance of the plaintiff's obligations under the contract; (3) breach of the

contract by that defendant; and (4) damages to the plaintiff caused by that

defendant's breach." Diesel Props. S.r.l. v. Greystone Bus. Credit II LLC, 631 F.3d

42, 52 (2d Cir. 2011) (citation omitted); see also Flomenbaum v. N.Y. Univ., 71

A.D.3d 80, 91 (N.Y. App. Div. 2009); Clearmont Prop., LLC v. Eisner, 58 A.D.3d

1052, 1055 (N.Y. App. Div. 2009).  There is no triable issue as to whether all four

elements are satisfied in this case.  Accordingly, the Court grants Sagi summary

judgment as to his breach of contract claim.  There is also no triable issue as to

11

Sagi's promissory estoppel cause action, and so the Court grants him summary
judgment on that alternative basis.

A.   Enforceability

    1.   Integrated agreement.

Under New York law, "all writings which form part of a single transaction
and are designed to effectuate the same purpose [must] be read together, even
though they were executed on different dates and were not all between the same
parties." This Is Me, Inc. v. Taylor, 157 F.3d 139, 143 (2d Cir. 1998); accord
Madeleine, L.L.C. v. Casden, 950 F. Supp. 2d 685, 695-96 (S.D.N.Y. 2013).
Contracts that are executed at different times "should be interpreted together if 'the
parties assented to all the promises as a whole so that there would have been no
bargain whatever if any promise or set of promises had been stricken.'"
Commander Oil Corp. v. Advance Food Serv. Equip., 991 F.2d 49, 53 (2d Cir. 1993)
(quoting 6 Samuel Williston & Richard A. Lord, A Treatise on the Law of Contracts,
§ 863:275 (3d ed. 1970)).  Whether multiple documents should be read as
constituting a single agreement depends on the intent of the parties.  TVT Records
v. Island Def Jam Music Grp., 412 F.3d 82, 89 (2d Cir. 2005); accord Commander
Oil, 991 F.2d at 52-53; Madeleine, 950 F. Supp. 2d at 696.  The intent of the parties
is "typically a question of fact for the jury, . . . [b]ut if the documents in question
reflect no ambiguity as to whether they should be read as a single contract, the
question is a matter of law for the court."  TVT Records, 412 F.3d at 89 (citation
omitted).

In TVT Records, the Second Circuit determined two agreements to be integrated based, inter alia, on the fact that the documents were intended to effectuate the same result. Id. As the parties under the later agreement were obligated to honor all of the terms and conditions of the earlier agreement, the later agreement was "meaningless" without the first. Id. The fact that the documents were "negotiated and signed at different times, memorialized in different documents and involved different parties" did not dictate a contrary result, because these facts did not address "the legally operative question: whether the contracts were part of a single transaction intended to effectuate the same purpose." Id. at 90 (citations omitted).

Similarly, in This Is Me, the Second Circuit held that a jury was justified in reading two contracts together where they were executed "more or less" (but not exactly) concurrently, and where one of the two contracts stated that the two contracts were intended to be executed together, but the other contract did not. 157 F.3d at 145. The Court also noted that counsel for a defendant conceded in a letter that the two contracts were intended to be read together. Id.

The 2004 Promise and the 2004 Indemnity are sufficiently unambiguous such that there is no triable issue as to whether they form an integrated agreement, even though they were executed on different dates and were not all between the same parties, and in this sense no different than the agreements at issue in TVT Records. Indeed, neither agreement makes any sense without the promises expressed in the other. Without the 2004 Indemnity, Sagi could be obligated under the 2004 Promise

13

to pay Dalia double the economic benefit he received from his shares of TRI, and Orly would effectively have received the shares as a gift. Further, the 2004 Indemnity explicitly attaches and cross-references the 2004 Promise, which makes the situation here directly analogous to that in TVT Records, where the later agreement was "meaningless" without the earlier one. Id. at 89.

There is accordingly no triable issue as to whether the documents were "designed to effectuate the same purpose" and to "be read together." This Is Me, 157 F.3d at 143. For this reason, the Court will refer to the integrated agreement in the rest of this Opinion as the "2004 Integrated Agreement.[18]

     2.   Consideration.

Under New York law, to be valid, a contract must be supported by consideration. Murray v. Northrop Grumman Info. Tech., Inc., 444 F.3d 169, 178 (2d Cir. 2006). Consideration to support an agreement exists where there is "either a benefit to the promisor or a detriment to the promisee." Hollander v. Lipman, 65 A.D.3d 1086, 1087 (N.Y. App. Div. 2009) (quoting Weiner v. McGraw-Hill, Inc., 443 N.E.2 441, 445 (N.Y. 1982)).

As a general matter, "[a] promise to perform a pre-existing legal obligation does not amount to consideration." Murray, 444 F.3d at 178 (citing Goncalves v. Regent Int'l Hotels, Ltd., 447 N.E.2d 693, 700 (N.Y. 1983)). However, § 5-1105 of New York's General Obligations Law provides:

---

[18] Orly vigorously disputes whether the 2004 Divorce Stipulation is integrated with the 2004 Promise and the 2004 Indemnity. However, Sagi does not contend that the 2004 Divorce Stipulation is integrated with the 2004 Promise and the 2004 Indemnity (ECF No. 57 at 10), and so the Court need not reach this issue.

> A promise in writing and signed by the promisor or by his agent shall not be denied effect as a valid contractual obligation on the ground that consideration for the promise is past or executed, if the consideration is expressed in the writing and is proved to have been given or performed and would be a valid consideration but for the time when it was given or performed.

N.Y. Gen. Oblig. Law § 5-1105.

To meet § 5-1105's requirement that the consideration be "expressed" in the writing, the recitation of consideration must not be vague or imprecise.[19] See United Res. Recovery Corp. v. Ramo Venture Mgmt., Inc., 584 F. Supp. 2d 645, 656 (S.D.N.Y. 2008); Movado Grp., Inc. v. Presberg, 259 A.D.2d 371, 371 (N.Y. App. Div. 1999); Umscheid v. Simnacher, 482 N.Y.S.2d 295, 297 (N.Y. App. Div. 1984). For example, courts have held that the statements "past work on the Company's behalf" and "services rendered on the respondent's behalf" are too vague and imprecise to meet the expression requirement. United Res. Recovery, 584 F. Supp. 2d at 656;

---

[19] In several cases, courts have stated that in order to recover under § 5-1105, "the writing must contain an unequivocal promise to pay a sum certain, at a date certain, and must express consideration for the promise." E.g., United Res. Recovery Corp. v. Ramo Venture Mgmt., Inc., 584 F. Supp. 2d 645, 656 (S.D.N.Y. 2008) (quoting Umscheid v. Simnacher, 482 N.Y.S.2d 295, 297 (N.Y. App. Div. 1984)); In re Maxwell Commc'n Corp., 198 B.R. 63, 69 (S.D.N.Y. 1996) (same); Kreuter v. Tsucalas, 734 N.Y.S.2d 185, 188 (N.Y. App. Div. 2001) (same). The citation provided for this statement of law is typically the Second Department's decision Umscheid v. Simnacher, 482 N.Y.S.2d 295 (N.Y. App. Div. 1984), which in turn cited as support Sarama v. John Mee, Inc., 102 Misc. 2d 132 (N.Y. Civ. Ct. 1979), and Citibank National Ass'n v. London, 526 F. Supp. 793 (S.D. Tex. 1981), the latter of which cited only Sarama as support for this proposition.

However, Sarama in fact states that "[i]n order for plaintiff to recover for breach of contract, defendant's letter must contain an unequivocal promise to pay a sum certain, at a date certain, and, further, it must conform with General Obligations Law [§] 5-1105, by expressing in the letter the consideration for the promise." Sarama, 102 Misc. 2d at 133 (emphasis added). Sarama thus states that the requirement of "an unequivocal promise to pay a sum certain, at a date certain" is a general requirement for recovery for breach of contract under the facts of that case, not a requirement for recovery under § 5-1105. The Court further notes that the "sum certain" and "date certain" requirements are found nowhere in the text of § 5-1105, nor can they be implied from that text, and that New York's Court of Appeals has never embraced an interpretation of § 5-1105 encompassing those requirements.

Umscheid, 482 N.Y.S.2d at 297.  By contrast, in Movado Group, Inc. v. Presberg, the Appellate Division of New York's First Judicial Department held that a commitment to pay all of a company's debts to a party on an "absolute, unconditional, and continuing" basis was sufficient to establish past consideration under § 5-1105, despite its being "a broad commitment, certainly not limited to one opening transaction."  259 A.D.2d at 371.

The 2004 Integrated Agreement clearly purports to provide each party with a benefit in exchange for a legal obligation: Dalia receives financial support in exchange for the transfer of the TRI shares to the Sagi Trust and the Orly Trust; Sagi receives an ownership interest in the TRI shares[20] in exchange for a commitment to financially support Dalia; and Orly receives an ownership interest in TRI shares in exchange for a commitment to indemnify Sagi.

Orly contends that the 2004 Integrated Agreement is not supported by consideration for two reasons.  First, Orly contends that the 2004 Integrated is not supported by consideration because the Orly Trust never received the TRI shares. But the 2004 Promise states that Orly and Sagi are benefiting from receipt of either the TRI shares or "beneficial interests in those shares," by their respective trusts. (ECF No. 1 ex. A.)  Thus, the question becomes whether Orly has benefited from the

---

[20] Sagi contends that the contract is supported by two forms of consideration: (1) the Orly Trust's receipt of the TRI shares as part of the divorce stipulation; (2) love, affection, and the end to parental strife. (Compl. ¶ 8.)  The Court rejects Sagi's argument that the 2004 Integrated Agreement is supported by consideration because Orly received an emotional and psychological benefit in helping to bring about an end to her parents' bitter divorce. Affection, love, and feelings cannot constitute consideration under New York law. See, e.g., McRay v. Citrin, 706 N.Y.S. 2d 27, 28 (N.Y. App. Div. 2000); Rose v. Elias, 576 N.Y.S.2d 257, 258 (N.Y. App. Div. 1991); see also 22 N.Y. Jur. 2d Contracts §§ 116-17.

Orly Trust's receipt of beneficial interests in the TRI shares.  There is no genuine dispute as to whether she has so benefited: Orly's claims to beneficial ownership of the TRI shares individually and as a trust beneficiary enabled her to obtain $32.3 million from the Trump Group under the 2013 Settlement Agreement.  Further, no court has issued a binding final judgment that the Orly Trust did not receive a beneficial interest in the TRI shares.[21]

Second, Orly contends that the TRI shares cannot serve as valid consideration because they had already been transferred when the 2004 Indemnity was signed, and they were transferred pursuant to the 2004 Divorce Stipulation, which is a separate agreement.  This argument fails because the 2004 Integrated Agreement satisfies § 5-1105 of New York's General Obligations Law.  The past consideration is precisely and unambiguously stated in the 2004 Promise, which states that "Orly and [Sagi] are benefiting by the receipt of a total of 794.40 shares of Trans-Resources, Inc. ("TRI"), or beneficial interests in those shares, by trusts for [their] benefit."  (ECF No. 1 ex. A.)  This statement is sufficiently precise and unambiguous so as to satisfy § 1105's expression requirement—indeed, this statement is considerably more exact than a promise to pay all of a company's debts on an ongoing basis, which was found to be sufficient in Movado Group.  And as established above, there is no triable issue as to whether Orly was for all intents and purposes given a beneficial interest in the TRI shares.

---

[21] The Delaware Court of Chancery's beneficial ownership determinations were reversed by the Supreme Court of Delaware's July 18, 2011 decision.  Genger v. TR Investors, LLC, 26 A.3d 180, 203 (Del. 2011).

Accordingly, there is no triable issue as to whether the 2004 Integrated Agreement was supported by valid consideration.[22]

B.     Defenses

There is no triable issue as to whether Orly has a viable defense to the 2004 Integrated Agreement.

1.     Judicial estoppel.

The doctrine of judicial estoppel "protect[s] the integrity of the judicial process by prohibiting parties from deliberately changing positions according to the exigencies of the moment." New Hampshire v. Maine, 532 U.S. 742, 749-50 (2001) (citation and internal quotation marks omitted). The decision whether judicial estoppel should bar a litigant from making a particular argument is highly fact-specific. See id. at 751. Several considerations counsel in favor of applying the doctrine in a particular case: (1) the party's later position is clearly inconsistent with its earlier position; (2) the party has succeeded in persuading a court to accept its earlier position, so that judicial acceptance of an inconsistent position in a later proceeding would create the perception that either the first or the second court was misled; (3) the party asserting the inconsistent position would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped. Adelphia Recovery Trust v. Goldman Sachs & Co., 748 F.3d 110, 116 (2d Cir. 2014) (citing New Hampshire, 532 U.S. at 750-51). However, "[b]ecause the doctrine is

---

[22] Orly makes much of the fact that the 2013 Settlement Agreement did not release the Orly Trust's claims to the TRI shares. But this fact does nothing to disprove that Orly benefited from her claim to beneficial ownership of the TRI shares, and to the extent that it is relevant, it just provides further evidence that the Orly Trust had a legitimate claim to beneficial ownership of the TRI shares.

primarily concerned with protecting the judicial process, relief is granted only when the risk of inconsistent results with its impact on judicial integrity is certain." Id. (alteration in original) (quoting Republic of Ecuador v. Chevron Corp., 638 F.3d 384, 397 (2d Cir. 2011)).

Orly argues that Sagi should be judicially estopped from arguing that the Orly Trust received a beneficial interest in the TRI shares. However, in this case embracing Sagi's position runs no risk of endangering judicial integrity, as no court has issued a binding final judgment that the Orly Trust did not receive a beneficial interest in the TRI shares. Further, there is no reason to believe that permitting Sagi to argue that the Orly Trust received the beneficial interest in the TRI shares would give Sagi an unfair advantage or impose an unfair detriment on Orly— indeed, embracing Orly's argument here would effectively allow her to avoid paying hundreds of thousands of dollars due under an otherwise valid agreement for a technical and formalistic reason unrelated to the equities of the situation. Accordingly, even assuming that Sagi has taken an inconsistent litigation position,[23] judicial estoppel does not bar Sagi from arguing that the Orly Trust received beneficial ownership of the TRI shares.

    2.    Mutual mistake.

"A contract is voidable under the equitable remedy of rescission if both parties entered into the contract under a mutual mistake of fact." Schultz v. Hourihan, 656 N.Y.S.2d 526, 528 (N.Y. App. Div. 1997). In order to obtain

---

[23] Given the strong rationale for not applying the doctrine of judicial estoppel here, the Court need not delve into the specific arguments advanced by Sagi or TPR in the course of their numerous years of prior litigation involving Orly and/or the TRI shares.

rescission of a contract due to mutual mistake, "it must be shown that the mistake in question is mutual, substantial, material and exists at the time the contract is entered." Rodriguez v. Mower, 56 A.D.3d 857, 858 (3d Dep't 2008) (citation omitted). In New York, a mutual mistake must be established by "clear and convincing" evidence. E.g., Carney v. Carozza, 792 N.Y.S.2d 642, 644 (N.Y. App. Div. 2005); Silver v. Gilbert, 776 N.Y.S.2d 867, 867 (N.Y. App. Div. 2004).

Orly first argues that if the 2004 Integrated Agreement is valid, it should nevertheless be rescinded because there was a mutual mistake as to whether Sagi and Orly were being treated equally in their parents' divorce. This argument fails because there was no mistake of fact here—the 2004 Divorce Stipulation and the 2004 Integrated Agreement explicitly provide for equal treatment of Orly and Sagi.

Orly further argues that the parties were mutually mistaken with regard to whether the interests in the TRI shares could be validly transferred to their trusts, such that they would receive equal interests in the TRI shares. This argument too fails, because as established above, the parties were in fact only mistaken as to their ability to receive and/or monetize record ownership in the TRI shares, and this mistake was not substantial or material because the money was clearly in the beneficial interest—Orly monetized her beneficial interest in the Orly Trust shares for $32.3 million, while Sagi sold his interests in the TRI shares for $37.0 million.

In any event, rescission due to mutual mistake is an equitable remedy, and it would not serve the interests of equity to rescind the 2004 Integrated Agreement here, as doing so would enable Orly to obtain her benefit from the agreement (the

20

$32.3 million she received for the beneficial interest in the TRI shares) while escaping her obligations under it (her commitment to financially support her mother). Accordingly, the Court declines to rescind the contract under the doctrine of mutual mistake.

        3.   <u>Lack of opportunity to defend.</u>

     Orly argues that as an indemnitor she has no contractual duty to indemnify Sagi without first receiving notice and a chance to defend. Under New York law, an indemnitee cannot seek reimbursement from an indemnitor unless the indemnitee first notifies the indemnitor of a potentially covered claim and gives them an opportunity to defend against it. <u>See Chase Manhattan Bank v. 264 Water St. Assocs.</u>, 634 N.Y.S.2d 687, 689 (N.Y. App. Div. 1995). However, notice to the indemnitor is not required if an indemnitee can "establish that [it] would have been liable and that there was no good defense to that liability." <u>Deutsche Bank Trust Co. of Ams. v. Tri-Links Inv. Trust</u>, 900 N.Y.S.2d 246, 253 (N.Y. App. Div. 2010).

     Although the parties do not dispute that Sagi twice informed Orly and her counsel of Dalia's demand prior to paying Dalia, they do dispute whether Sagi informed Orly of his intention actually to honor Dalia's demand. (See DRSOF ¶ 7; PRSOF ¶ 61.) Ultimately, however, even if Sagi did fail to properly notify Orly, notice was not required as a matter of law because Sagi had no good defense against Dalia's demand—the 2004 Integrated Agreement expressly gives Dalia the right to make such a demand and clearly obligates Sagi to pay it, and as established above there is no valid argument against the agreement's enforceability or validity. Accordingly, the parties' dispute over whether Sagi properly provided Orly with

notice does not preclude this Court from granting Sagi summary judgment as to the validity of the indemnification obligation as a matter of law.

C.   Performance, Breach, and Damages

The parties do not dispute that Sagi performed his obligations under the 2004 Integrated Agreement, as it is undisputed that Sagi paid Dalia $200,000. There is also no dispute as to whether Orly breached the 2004 Indemnity by refusing to pay Sagi, and nor is there a dispute that Sagi suffered damages of at least $100,000 as a result. Accordingly, because the 2004 Integrated Agreement is valid and enforceable, there is no triable issue as to whether all of the elements of Sagi's breach of contract claim are satisfied, and summary judgment is thus granted in Sagi's favor as to his breach of contract claim.

D.   Promissory Estoppel

Even if the 2004 Integrated Agreement were not valid and enforceable, Sagi is also entitled to equitable relief under the doctrine of promissory estoppel. "A cause of action for promissory estoppel under New York law requires the plaintiff to prove three elements: 1) a clear and unambiguous promise; 2) reasonable and foreseeable reliance on that promise; and 3) injury to the relying party as a result of the reliance."[24] Kaye v. Grossman, 202 F.3d 611, 615 (2d Cir. 2000) (citing Readco, Inc. v. Marine Midland Bank, 81 F.3d 295, 301 (2d Cir. 1996)).

---

[24] "New York courts limit promissory estoppel claims to instances of unconscionable injury only where promissory estoppel is invoked as a defense to the Statute of Frauds. . . . But New York courts generally do not require a showing of unconscionability where promissory estoppel is invoked to prevent injustice stemming from reliance on a gratuitous promise." Pearce v. Manhattan Ensemble Theatre, Inc., 528 F. Supp. 2d 175, 181 (S.D.N.Y. 2007) (collecting cases).

In the 2004 Indemnity, Orly made a clear and unambiguous promise to indemnify Sagi for "one-half (1/2) of any and all payments, liabilities, damages, claims, actions, losses, settlements, penalties, judgments or obligations . . . , including [Sagi's] reasonable counsel and other professional fees, expenses and costs, which arise from [Sagi's] undertakings in the [2004 Promise]." (PSOF ¶ 5.) There is no material dispute as to whether Sagi relied on this promise in paying Dalia, or that he sustained injury as a result of this reliance.

However, Orly argues that Sagi's reliance was not reasonable or foreseeable, because when he paid Dalia he was already aware that Orly disputed the validity and enforceability of the 2004 Integrated Agreement. This argument is unpersuasive. First, the time from which foreseeability is determined is when the promise is made, not the time of performance, and there is no genuine dispute as to whether it was foreseeable that Sagi would rely on the promise when it was made. Second, there is no genuine dispute as to whether Sagi's reliance was reasonable, because as explained above, Orly's position that the 2004 Integrated Agreement was invalid and unenforceable objectively lacked merit.

Orly argues that Sagi should be barred from recovering under a theory of promissory estoppel due to unclean hands. "The doctrine of unclean hands applies when the complaining party shows that the offending party is guilty of immoral, unconscionable conduct and even then only when the conduct relied on is directly related to the subject matter in litigation and the party seeking to invoke the doctrine was injured by such conduct." Kopsidas v. Krokos, 742 N.Y.S.2d 342, 344

23

(N.Y. App. Div. 2002) (quoting Nat'l Distillers & Chem. Corp. v. Seyopp Corp., 17 N.Y.2d 12, 15-16 (N.Y. 1966)) (internal quotation marks omitted).  Orly argues that Sagi's hands are unclean because under his Presidency, TPR was obligated to effectuate the transfer of the TRI shares to her, and failed to do so.  However, on July 24, 2014, the Appellate Division of New York's First Judicial Department held that as an officer of TPR, Sagi's fiduciary duty was to the corporation and its stockholders, and that Sagi had not breached any duty to Orly in failing to honor the agreement to transfer the TRI shares to her trust.  Genger v. Genger, 121 A.D.3d 270, 278-79 (N.Y. App. Div. 2014).  Sagi's behavior here is consistent with his duty to TPR and its shareholders, and does not rise to the immoral or unconscionable level required to bar him from relief under the doctrine of unclean hands.

    Accordingly, there is no triable issue as to Sagi's promissory estoppel claim, and Sagi is granted summary judgment on that cause of action in addition to his breach of contract cause of action.

IV.    CONCLUSION

    For the above reasons, the Court GRANTS Sagi's motion for summary judgment, DENIES Orly's motion for summary judgment, and DENIES AS MOOT Orly's motion to disqualify and all pending motions in limine.

The Clerk of Court is directed to close the motions at ECF Nos. 32, 35, 59, 65, and 68 and to terminate this action.

SO ORDERED.

Dated:      New York, New York
            January 5, 2015

_____
KATHERINE B. FORREST
United States District Judge

25

# Exhibit F

FILED: NEW YORK COUNTY CLERK 08/11/2014 10:36 AM

NYSCEF DOC. NO. 1099

INDEX NO. 651089/2010

RECEIVED NYSCEF: 08/11/2014

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
----------------------------------------------------------------x
ARIE GENGER and ORLY GENGER, in her       :
individual capacity and on behalf of
THE ORLY GENGER 1993 TRUST,               :        Index No. 651089/2010
                                                   (Jaffe, B. JSC)
                                          :

                Plaintiffs,               :


                -against-                 :

SAGI GENGER, TPR INVESTMENT               :
ASSOCIATES, INC., DALIA GENGER, THE
SAGI GENGER 1993 TRUST, ROCHELLE          :
FANG, individually and as trustee of THE SAGI
GENGER 1993 TRUST, GLENCLOVA              :
INVESTMENT COMPANY, TR INVESTORS,
LLC, NEW TR EQUITY I, LLC, NEW TR         :
EQUITY II, LLC, JULES TRUMP, EDDIE
TRUMP AND MARK HIRSCH,                    :        NOTICE OF MOTION

                Defendants.               :
----------------------------------------------------------------x
SAGI GENGER, individually and as assignee of  :
THE SAGI GENGER 1993 TRUST, and TPR
INVESTMENT ASSOCIATES, INC.               :

        Cross-Claimants, Counterclaimants, and  :
        Third-Party Claimants,

                                          :

                -against-                 :

                                          :

ARIE GENGER, ORLY GENGER,
GLENCLOVA INVESTMENT COMPANY,             :
TR INVESTORS, LLC, NEW TR EQUITY I, LLC,
NEW TR EQUITY II, LLC, JULES TRUMP,       :
EDDIE TRUMP, MARK HIRSCH,
TRANS-RESOURCES, INC., WILLIAM            :
DOWD, and THE ORLY GENGER 1993 TRUST,

                                          :

        Cross-Claim, Counterclaim and/or
        Third-Party Defendants.           :
----------------------------------------------------------------x

PLEASE TAKE NOTICE THAT, upon the accompanying Affirmation of Judith Bachman, dated August 11, 2014, and the exhibits attached thereto, and upon all the pleadings and proceedings heretofore had herein, Defendant Dalia Genger, through her undersigned counsel will move this Court returnable at 60 Centre St., Motion Submission Part, Room 130 on September 30, 2014, at 9:30 a.m. or as soon thereafter as counsel can be heard for an order substituting Dalia Genger, as trustee, as plaintiff on Orly Genger's Trump Group claims and for an order pursuant to CPLR 2701 directing that the Trump Group settlement fund be paid into Court, and such further and other relief as the Court may deem just and proper.

PLEASE TAKE FURTHER NOTICE that pursuant to CPLR 2214(b), answering papers, if any, must be served at least seven days prior to the return date of this motion.

Dated:  August 11, 2014, 2014
        New City, New York

                                        _____/s/_____
                                        Judith Lisa Bachman, Esq.
                                        Counsel for Defendant
                                        Dalia Genger, Trustee
                                        254 South Main Street, Suite 306
                                        New City, New York 10956
                                        845-639-3210

FILED: NEW YORK COUNTY CLERK 08/11/2014 10:36 AM

NYSCEF DOC. NO. 1108

INDEX NO. 651089/2010

RECEIVED NYSCEF: 08/11/2014

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
-------------------------------------------------------------------x
ARIE GENGER and ORLY GENGER, in her : 
individual capacity and on behalf of
THE ORLY GENGER 1993 TRUST,                           :        Index No. 651089/2010
                                                                                    (Jaffe, B. JSC)
                                                                   :

                    Plaintiffs,                                  :

                    -against-                                     :

SAGI GENGER, TPR INVESTMENT                       :
ASSOCIATES, INC., DALIA GENGER, THE
SAGI GENGER 1993 TRUST, ROCHELLE          :
FANG, individually and as trustee of THE SAGI
GENGER 1993 TRUST, GLENCLOVA               :
INVESTMENT COMPANY, TR INVESTORS,
LLC, NEW TR EQUITY I, LLC, NEW TR            :
EQUITY II, LLC, JULES TRUMP, EDDIE
TRUMP AND MARK HIRSCH,                             :

                    Defendants.                                 :
-------------------------------------------------------------------x
SAGI GENGER, individually and as assignee of  :
THE SAGI GENGER 1993 TRUST, and TPR
INVESTMENT ASSOCIATES, INC.                      :

          Cross-Claimants, Counterclaimants, and   :
          Third-Party Claimants,

                    -against-                                     :

                                                                   :
ARIE GENGER, ORLY GENGER,
GLENCLOVA INVESTMENT COMPANY,           :
TR INVESTORS, LLC, NEW TR EQUITY I, LLC,
NEW TR EQUITY II, LLC, JULES TRUMP,         :
EDDIE TRUMP, MARK HIRSCH,
TRANS-RESOURCES, INC., WILLIAM               :
DOWD, and THE ORLY GENGER 1993 TRUST,
                                                                   :
          Cross-Claim, Counterclaim and/or
          Third-Party Defendants.                          :
-------------------------------------------------------------------x

MEMORANDUM OF LAW IN SUPPORT
OF TRUSTEE DALIA GENGER'S MOTION
TO SUBSTITUTE FOR PLAINTIFF ORLY GENGER
ON HER DERIVATIVE CLAIMS AGAINST THE TRUMP GROUP
AND FOR AN ORDER DIRECTING
SETTLEMENT PROCEEDS TO
BE PAID INTO COURT

Judith Lisa Bachman, Esq.
254 S. Main Street, Suite 306
New City, New York 10956
845-639-3210

Table of Contents

Table of Authorities                                                                i

Preliminary Statement                                                          1

Statement of Facts                                                                1

Argument

    Point I

        Substitution of Derivative Plaintiff Orly Genger
        Is Necessary Because She No Longer
        Represents the Orly Trust on the
        Trump Group Claims And She Has Suggested the Trustee
        "Pick Up the Cudgel" on those Claims                         4

    Point II

        The Proceeds of the Settlement
        Should be Paid into Court
        To Protect the Fund                                                5

Conclusion                                                                          10

Table of Authorities

Cases

<u>Bonham v Coe</u>, 249 A.D. 428, 292 N.Y.S. 423 (4th Dep't 1937)               9

<u>Clarke v. Greenberg</u>, 71 N.E.2d 443, 296 N.Y. 146 (1947)               6

<u>Conforti v. Goradia</u>, 234 A.D.2d 237, 651 N.Y.S.2d 506  (1st Dep't 1996)               6

<u>Gusinsky v. Bailey</u>, 21 Misc.3d 1107(A), 873 N.Y.S.2d 234 (Table)
(Sup. Ct. N.Y. County 2008), <u>rev'd on other grounds</u>,
66 A.D.3d 614, 887 N.Y.S.2d 585 (1st Dep't 2008)               6

<u>In re Carroll's Estate</u>, 153 Misc. 649, 275 N.Y.S. 911 (Sur. Ct. 1934)               9

<u>In re Martin's Estate</u>, 96 N.Y.S.2d 842 (Surr. Ct. 1950)               9

<u>In re Roosevelt's Estate</u>, 131 Misc. 800, 228 N.Y.S. 323 (Sup. Ct. 1928)               9

<u>James v. Bernhard</u>, 106 A.D.3d 435, 965 N.Y.S.2d 56 (1st Dep't 2013)               4, 5

<u>Lade v. Levitt</u>, 33 A.D.2d 956, 306 N.Y.S.2d 704 (3d Dep't 1970)               6, 9

<u>Rice v. DiNapoli</u>, 23 Misc.3d 1128(A), 889 N.Y.S.2d 507 (Table)
(Sup. Ct. Albany County 2009)               6, 9

<u>Titus v. Empire Mink Corp.</u>, 17 N.Y.S.2d 909  (Sup. Ct. 1939)               9

<u>Werner v. Werner</u>, 70 Misc.2d 1051, 334 N.Y.S.2d 966 (Sup. Ct. Albany County 1982)   6

Statutes and Rules

CPLR 2701               6, 9

2

## Preliminary Statement

Dalia Genger, as trustee for the Orly Trust, moves to be substituted in for derivative plaintiff Orly Genger on the claims Orly brought on behalf of the Orly Trust against the Trump Group since "Orly no longer represents the Orly Trust as to the Trump Group".

As the substituted plaintiff, Dalia Genger, as trustee for the Orly Trust, respectfully requests an order pursuant to CPLR 2701 directing that the settlement fund from the Trump Group be paid into court since the Court "cannot determine whether <u>some or all</u> of the settlement proceeds with the Trump Group belong to <u>Orly or the Orly Trust</u>."   Order of the Court, Filed May 13, 2014, Doc. 925 at 4 (emphasis added).

## Statement of Facts

Dalia Genger is the trustee of the Orly Genger 1993 Trust ("Orly Trust").  In this action, Orly Genger ("Orly") instituted direct and derivative claims on behalf of the Orly Trust against various defendants, including the so-called Trump Group.

Orly settled with the Trump Group defendants.  Memorandum of Law of Orly Genger, Doc. 775 at 2, attached as Exhibit 1 to the Affirmation of Judith Bachman, dated August 11, 2014 ("Bachman Aff.').

"A material term of the agreement among the settling parties was the dismissal of *all* claims presently pending against one another, in whatever capacity they were brought. [If the settlement stipulation was drafted so as to] have the effect of *not* dismissing Orly Genger's derivative claims against the Trump Group, contrary to the agreement of the settling parties. Excluding such claims from the claims that are to be dismissed is not what the Trump Group bargained and paid for in the settlement . . ."  Letter to the Court from Thomas J. Allingham II, dated June 28, 2010, Doc. 728 at 2, attached as Exhibit 2 to the Bachman Aff. (emphasis added).

The Trump Group later reaffirmed this aspect of the settlement:

> "[any suggestion] that the confidential settlement agreement *might* only dismiss Orly's individual claims against the Trump Group, but not resolve the Orly Trust's claims against the Trump Group and the TPR Group. (Opp'n Br. at 28) . . . is counterfactual. This Court has already held that certain of Orly's claims in this action, including the remaining claims, are derivative in nature, and may be maintained by Orly on behalf of the Orly Genger 1993 Trust. *See Genger v. Genger,* 966 N.Y.S.2d 346, 2013 WL 221485, at *6 (N.Y. Sup. Ct. Jan. 3, 2013) (TABLE) (citing *Genger v. Genger,* No. 109749/2009 (N.Y. Sup. Ct. June 28, 2010)). In settling the claims among them, the Trump Group, Trans-Resources, Orly and Arie agreed to the dismissal of all claims presently pending against one another. This agreement is memorialized in the Second Amended Stipulation of Discontinuance.

Reply Memorandum of Law of Trump Group, Filed April 17, 2014, Doc. 888 at 22-23, attached as Exhibit 3 to the Bachman Aff.

Evidencing this intent, in paragraph 8 of her settlement agreement, Orly agreed to "cooperate" and "cause" the Orly Trust to release any and all claims against the Trump Group." Order of the Court, Filed May 13, 2014, Doc. 925 at 4, attached as Exhibit 4 to the Bachman Aff.

Pursuant to that duty, Orly not only settled all her claims in this case; she also caused the Orly Trust to release claims against the Trump Group in a parallel Delaware case. Specifically, at the time of the Trump Group settlement, the Orly Trust was maintaining a proceeding in Delaware Chancery Court. Following her Trump Group settlement, Orly's counsel twice wrote to Chancellor Strine urging "the dismissal of the last remaining Genger related case in Delaware" and "acknowledg[ing] individually and in her capacity as the beneficiary of her trust that the Trump Group are the record and beneficial owners of the TRI shares which had been distributed to the Orly Trust." Exhibit M, Filed June 2, 2014, Doc. 1034, attached as Exhibit 5 to the Bachman Aff. Satisfied that Orly no longer wanted the Orly Trust to pursue its claims, the

Chancery Court dismissed the Orly Trust's claims in that case with prejudice. Exhibit N, Filed June 2, 2014, Doc. 1034, attached as Exhibit 6 to the Bachman Aff.

Notwithstanding the provisions of her own Trump Group settlement agreement and her representations to the Delaware Chancery Court, Orly told this Court that her Trump Group settlement "only dismisses Orly's individual claims against the Trump Group, but does not resolve or dismiss any claims of the Orly Trust against the Trump Group". Memorandum of Law of Orly Genger, Doc. 775 at 2, attached as Exhibit 1 to the Bachman Aff. Moreover, Orly stated that she "no longer represents the Orly Trust as to the Trump Group (while allowing Dalia Genger to pick up the cudgel if she so chooses) . . ." Id. (emphasis added).

In light of these conflicting statements, this Court "invite[d] the parties to the settlement agreement to set forth the claims given up by Orly in her individual and beneficial capacities, and to explain why any derivative claims advanced in the complaint are not released in the agreement." Order of the Court, Filed May 13, 2014, Doc. 925 at 4, attached as Exhibit 4 to the Bachman Aff.

Conveniently for them, none of the parties to the settlement agreement complied with the Court's request to "set forth the claims given up by Orly in her individual and beneficial capacities, and to explain why any derivative claims advanced in the complaint are not released in the agreement." Id. In fact, Orly's counsel explicitly refused to comply with that request. Email Correspondence dated May 26, 2014, attached as Exhibit 7 to the Bachman Aff.

Accordingly, this Court held that "[u]nless and until the issue of [the status of the] derivative claims is resolved, I cannot determine whether some or all of the settlement proceeds with the Trump Group belong to Orly or the Orly Trust . . ." Order of the Court, Filed May 13, 2014, Doc. 925 at 4 (emphasis added), attached as Exhibit 4 to the Bachman Aff.

3

Even in the presence of this conveniently self-manufactured uncertainty by Orly as to whom the settlement proceeds belong to, *i.e.,* Orly or the Orly Trust, counsel for both Orly and the Trump Group have represented in Court that cash payments were made and will be made only to Orly. Exhibit N, Filed June 2, 2014, Doc. 1034, attached as Exhibit 6 to the Bachman Aff. ("Orly did sign the settlement agreement, and that's a settlement in which real money is changing hands and will continue to change hands."). Upon information and belief, Orly used the proceeds to pay her own debts, and those of her father, acts which are explicitly prohibited by the Orly Trust agreement.

To protect the interests of the Orly Trust, Dalia Genger, as trustee of the Orly Trust, now moves this Court for an order of substitution for derivative plaintiff Orly Genger on the Orly Trust Trump Group claims and for an order directing that the settlement fund with the Trump Group be deposited into Court.

Point I

Substitution of Derivative Plaintiff Orly Genger
Is Necessary Because She No Longer
Represents the Orly Trust on the
Trump Group Claims And She Has Suggested the Trustee
"Pick Up the Cudgel" on those Claims

Pursuant to CPLR 1021, "a motion for substitution may be made by the successors or representatives of a party or by any party."

Such substitution is appropriate, and indeed necessary, when a derivative plaintiff is no longer an appropriate representative plaintiff. James v. Bernhard, 106 A.D.3d 435, 965 N.Y.S.2d 56 (1st Dep't 2013).

4

In James, the Court found that the substitution of independent directors in place of a club member derivative plaintiff was necessary where the derivative plaintiff club member no longer represented the club's interests.

Here too, substitution for derivative plaintiff Orly Genger is necessary because Orly Genger no longer represents the Orly Trust on those claims, and indeed she has suggested that the Trustee should "pick up the cudgel". Memorandum of Law of Orly Genger, Doc. 775 at 2, attached as Exhibit 1 to the Bachman Aff. Orly Genger, the party to be substituted, has expressly acknowledged that such substitution is appropriate: "Orly no longer represents the Orly Trust as to the Trump Group (while allowing Dalia Genger to pick up the cudgel if she so chooses) . . ." Memorandum of Law of Orly Genger, Doc. 775 at 2, attached as Exhibit 1 to the Bachman Aff. (emphasis added).

Since, by her own admission and, in fact urging, Orly has said that Dalia Genger has standing to make this motion and "pick up the cudgel" on the Orly Trust Trump Claims, Dalia Genger, as Trustee, must be substituted for Orly as to the Orly Trust Trump Group claims. Memorandum of Law of Orly Genger, Doc. 775 at 2, attached as Exhibit 1 to the Bachman Aff. This substitution will, as described more fully below, protect the Orly Trust's interest in the settlement with the Trump Group.

Point II

The Proceeds of the Settlement
Should be Paid into Court
To Protect the Fund

A court may direct that funds should be paid into court if

> 1. a party has such property in his possession, custody or control as
> trustee for another party or where it belongs or is due to another
> party; or

5

> 2. a party has such property in his possession, custody or control and it belongs or is due to another party, where special circumstances make it desirable that payment or delivery to such other party should be withheld;
>
> 3. the ownership of such property will depend on the outcome of a pending action and no party is willing to accept possession or custody of it during the pendency of the action.

CPLR 2701. See, e.g., Conforti v. Goradia, 234 A.D.2d 237, 651 N.Y.S.2d 506 (1st Dep't 1996).

Where two parties dispute entitlement to a settlement fund of money, a court should direct payment of the fund into court under CPLR 2701, rather than allow payment to one party, to protect that fund and the mutual interests of the parties. Lade v. Levitt, 33 A.D.2d 956, 306 N.Y.S.2d 704 (3d Dep't 1970); Rice v. DiNapoli, 23 Misc.3d 1128(A), 889 N.Y.S.2d 507 (Table) (Sup. Ct. Albany County 2009); Werner v. Werner, 70 Misc.2d 1051, 334 N.Y.S.2d 966 (Sup. Ct. Albany County 1982)

In the instant action, this Court has held "[u]nless and until the issue of [the status of the] derivative claims is resolved, I cannot determine whether some or all of the settlement proceeds with the Trump Group belong to Orly or the Orly Trust . . ." ." Order of the Court, Field May 13, 2014, Doc. 925 at 4 (emphasis added), attached as Exhibit 4 to the Bachman Aff.

This difficulty flows from the fact that any settlement of Orly's derivative claims on behalf of the Orly Trust belongs to the Orly Trust and not to Orly, individually. See Gusinsky v. Bailey, 21 Misc.3d 1107(A), 873 N.Y.S.2d 234 (Table) (Sup. Ct. N.Y. County 2008), rev'd on other grounds, 66 A.D.3d 614, 887 N.Y.S.2d 585 (1st Dep't 2008); Clarke v. Greenberg, 71 N.E.2d 443, 296 N.Y. 146 (1947). Any payment of the settlement funds to Orly or any other person which belong to the Orly Trust, is improper.

6

It appears that Orly has deliberately manufactured confusion as to whether or not she settled the Orly Trust derivative claims against the Trump Group so that she can take all of the settlement funds for herself rather than have them paid to the Orly Trust. Counsel for both Orly and the Trump Group have represented in Court that cash payments were made and will be made only to Orly. Exhibit N, Filed June 2, 2014, Doc. 1034, attached as Exhibit 6 to the Bachman Aff. ("Orly did sign the settlement agreement, and that's a settlement in which real money is changing hands and will continue to change hands.")

Such payment only to Orly, and not the Orly Trust, is improper, since there is compelling evidence that some, if not all, of the settlement funds belong to the Orly Trust as the result of the settlement of derivative claims against the Trump Group.

The Trump Group, one of the settling parties, believes the derivative Orly Trust claims have been settled: "A material term of the agreement among the settling parties was the dismissal of *all* claims presently pending against one another, in whatever capacity they were brought. [If the settlement stipulation was drafted so as to] have the effect of *not* dismissing Orly Genger's derivative claims against the Trump Group, contrary to the agreement of the settling parties. Excluding such claims from the claims that are to be dismissed is not what the Trump Group bargained and paid for in the settlement . . ." Letter to the Court from Thomas J. Allingham II, dated June 28, 2010, Doc. 728 at 2, attached as Exhibit 2 to the Bachman Aff. (emphasis added). The Trump Group reaffirmed this aspect of the settlement:

> [any suggestion] that the confidential settlement agreement *might* only dis-miss Orly's individual claims against the Trump Group, but not resolve the Orly Trust's claims against the Trump Group and the TPR Group. (Opp'n Br. at 28) . . . is counterfactual. This Court has already held that certain of Or-ly's claims in this action, including the remaining claims, are derivative in nature, and may be maintained by Orly on behalf of the Orly Genger 1993 Trust. *See Genger v. Genger*, 966 N.Y.S.2d 346, 2013 WL 221485, at *6 (N.Y. Sup. Ct. Jan. 3, 2013) (TABLE) (citing *Genger v. Genger*, No. 109749/2009 (N.Y.

7

> Sup. Ct. June 28, 2010)). In settling the claims among them, the
> Trump Group, Trans-Resources, Orly and Arie agreed to the
> dismissal of all claims presently pending against one another. This
> agreement is memorialized in the Second Amended Stipulation of
> Discontinuance.

Reply Memorandum of Law of Trump Group, Filed April 17, 2014, Doc. 888 at 22-23, attached as

Exhibit 3 to the Bachman Aff.

Further, in paragraph 8 of her settlement agreement, Orly agreed to "cooperate" and

"cause" the Orly Trust to release any and all claims against the Trump Group." Order of the

Court, Filed May 13, 2014, Doc. 925 at 4, attached as Exhibit 4 to the Bachman Aff. Pursuant

to that duty, Orly not only settled all her claims in this case; she also caused the Orly Trust to

release claims against the Trump Group in a parallel Delaware case, when she twice had her

counsel urge (and later obtain) for "the dismissal of the last remaining Genger related case in

Delaware" and "acknowledg[ing] individually and in her capacity as the beneficiary of her trust

that the Trump Group are the record and beneficial owners of the TRI shares which had been

distributed to the Orly Trust." Exhibit M, Filed June 2, 2014, Doc. 1034, attached as Exhibit 5 to

the Bachman Aff.

All of these facts compel the conclusion that Orly's Trump Group settlement in this

action resulted in the dismissal of both her individual and derivative claims, and that some, if not

all, of the settlement fund belongs to the Orly Trust.

Yet, in self-manufactured confusion, notwithstanding the provisions of her own Trump

Group settlement agreement and her representations to the Delaware Chancery Court, Orly told

this Court that she "only dismisses Orly's individual claims against the Trump Group, but does

not resolve or dismiss any claims of the Orly Trust against the Trump Group". Memorandum of

Law of Orly Genger, Doc. 775 at 2, attached as Exhibit 1 to the Bachman Aff.

8

In light of the conflicting statements, this Court "invite[d] the parties to the settlement agreement to set forth the claims given up by Orly in her individual and beneficial capacities, and to explain why any derivative claims advanced in the complaint are not released in the agreement." Order of the Court, Filed May 13, 2014, Doc. 925 at 4, attached as Exhibit 4 to the Bachman Aff.   Conveniently for them, none of the parties to the settlement agreement complied with the Court's request.   Email Correspondence dated May 26, 2014, attached as Exhibit 7 to the Bachman Aff.

With these efforts, Orly succeeded in clouding the question of to whom the settlement proceeds belong: the Court "cannot determine whether some or all of the settlement proceeds with the Trump Group belong to Orly or the Orly Trust . . .".

Such self-manufactured confusion, though, is the very reason why the settlement proceeds must be paid into Court[1] - - to protect that fund and the mutual interest of the parties. Lade v. Levitt, 33 A.D.2d 956, 306 N.Y.S.2d 704 (3d Dep't 1970); Rice v. DiNapoli, 23 Misc.3d 1128(A), 889 N.Y.S.2d 507 (Table) (Sup. Ct. Albany County 2009).   Without such an order, the Orly Trust will be denied the opportunity to obtain any of the settlement proceeds paid as the result of settling claims belonging to the Orly Trust.

---

[1] Such an order must be made against all of the settling parties since it is undisclosed who is holding the settlement proceeds.  If such payment has already been made, then the recipient stands in relation as a quasi trustee of the Orly Trust and/or is in possession of funds which belong to the Orly Trust.  Bonham v Coe, 249 A.D. 428, 292 N.Y.S. 423 (4th Dep't 1937); In re Martin's Estate, 96 N.Y.S.2d 842 (Surr. Ct. 1950); In re Roosevelt's Estate, 131 Misc. 800, 228 N.Y.S. 323 (Sup. Ct. 1928); Titus v. Empire Mink Corp., 17 N.Y.S.2d 909 (Sup. Ct. 1939); In re Carroll's Estate, 153 Misc. 649, 275 N.Y.S. 911 (Sur. Ct. 1934).  This state of facts fits squarely within CPLR 2701.

Conclusion

Dalia Genger as Trustee must be substituted in for derivative plaintiff Orly Genger since "Orly no longer represents the Orly Trust as to the Trump Group" and the settlement proceeds must be paid into Court since the Court "cannot determine whether <u>some or all</u> of the settlement proceeds with the Trump Group belong to <u>Orly or the Orly Trust</u> . . ."

Dated: New City, New York
        August 11, 2014

                                    _____/s/_____
                                    Judith Lisa Bachman, Esq.
                                    254 S. Main Street, Suite 306
                                    New City, New York 10956
                                    845-639-3210