FILED: NEW YORK COUNTY CLERK 08/11/2014 10:36 AM
NYSCEF DOC. NO. 1100

INDEX NO. 651089/2010
RECEIVED NYSCEF: 08/11/2014

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

-----------------------------------------------------------------x

ARIE GENGER and ORLY GENGER, in her              :
individual capacity and on behalf of
THE ORLY GENGER 1993 TRUST,                       :        Index No. 651089/2010
                                                           (Jaffe, B. JSC)
                                                  :

              Plaintiffs,                          :

                                                  :

              -against-                            :

SAGI GENGER, TPR INVESTMENT                       :
ASSOCIATES, INC., DALIA GENGER, THE
SAGI GENGER 1993 TRUST, ROCHELLE                  :
FANG, individually and as trustee of THE SAGI
GENGER 1993 TRUST, GLENCLOVA                      :
INVESTMENT COMPANY, TR INVESTORS,
LLC, NEW TR EQUITY I, LLC, NEW TR                 :
EQUITY II, LLC, JULES TRUMP, EDDIE
TRUMP AND MARK HIRSCH,                            :        AFFIRMATION IN SUPPORT
                                                           OF MOTION FOR
              Defendants.                          :        SUBSTITUTION AND
-----------------------------------------------------------------x        SETTLEMENT FUND
SAGI GENGER, individually and as assignee of     :        PAID INTO COURT
THE SAGI GENGER 1993 TRUST, and TPR
INVESTMENT ASSOCIATES, INC.                       :

              Cross-Claimants, Counterclaimants, and   :
              Third-Party Claimants,

                                                  :

              -against-                            :

ARIE GENGER, ORLY GENGER,                         :
GLENCLOVA INVESTMENT COMPANY,
TR INVESTORS, LLC, NEW TR EQUITY I, LLC,          :
NEW TR EQUITY II, LLC, JULES TRUMP,
EDDIE TRUMP, MARK HIRSCH,                         :
TRANS-RESOURCES, INC., WILLIAM
DOWD, and THE ORLY GENGER 1993 TRUST,             :

              Cross-Claim, Counterclaim and/or    :
              Third-Party Defendants.             :
-----------------------------------------------------------------x

Judith Bachman, an attorney duly admitted to practice law in the State of New York, hereby affirms under penalty of perjury pursuant to CPLR 2106 as follows:

1. I am counsel to Defendant Dalia Genger, as trustee, and I am familiar with the facts and circumstances of this matter as they pertain to the instant motion.

2. I submit this affirmation in support of Dalia's motion for an order substituting Dalia Genger, as trustee, as plaintiff on Orly Genger's Trump Group claims and for an order pursuant to CPLR 2701 directing that the Trump Group settlement fund be paid into Court.

3. I attach as Exhibit 1 a true and correct copy of the Memorandum of Law of Orly Genger, Doc. 775.

4. I attach as Exhibit 2 a true and correct copy of the  Letter to the Court from Thomas J. Allingham II, dated June 28, 2010, Doc. 728.

5. I attach as Exhibit 3 a true and correct copy of the Reply Memorandum of Law of Trump Group, Filed April 17, 2014, Doc. 888.

6. I attach as Exhibit 4 a true and correct copy of the Order of the Court, Filed May 13, 2014, Doc. 925.

7. I attach as Exhibit 5 a true and correct copy of the Exhibit M, Filed June 2, 2014, Doc. 1034

8. I attach as Exhibit 6 a true and correct copy of the Exhibit N, Filed June 2, 2014, Doc. 1034.

9. I attach as Exhibit 7 a true and correct copy of Email Correspondence dated May 26,

2014.

Dated:  August 11, 2014
        New City, New York

                                        /s/
                                _____
                                Judith Lisa Bachman, Esq.
                                Attorney for Non-Party, Rochelle Dalia
                                254 South Main Street, Suite 306
                                New City, New York 10956
                                845-639-3210

# Exhibit G

FILED: NEW YORK COUNTY CLERK 05/07/2015 03:07 PM   INDEX NO. 651089/2010
NYSCEF DOC. NO. 1279                                  RECEIVED NYSCEF: 05/07/2015

## SUPREME COURT OF THE STATE OF NEW YORK — NEW YORK COUNTY

PRESENT:  Hon. BARBARA JAFFE                                PART 12
                        *Justice*

| | |
|---|---|
| ARIE GENGER and ORLY GENGER, in her individual capacity and on behalf of THE ORLY GENGER 1993 TRUST, | INDEX NO. 651089/2010 |
| Plaintiffs, | MOTION DATE<br>MOTION SEQ. NO. 42<br>CALENDAR NO. |
| - v - | |
| SAGI GENGER, TPR INVESTMENT ASSOCIATES, INC., DALIA GENGER, *et al.,* | INTERIM ORDER |
| Defendants. | |

The following paper, numbered 1, was read on this motion.

| | PAPERS NUMBERED |
|---|---|
| Notice of Motion/ Order to Show Cause — Affidavits — Exhibits ... | |
| Answer —  Affidavits — Exhibits | |
| Replying Affidavits | |

Cross-Motion:  ☐ Yes   ☐ No

MOTION/CASE IS RESPECTFULLY REFERRED TO JUSTICE _____ J.S.C.

Defendant Dalia Genger's motion for an order substituting her, as trustee, as plaintiff for Orly Genger's Trump Group claims, and for an order pursuant to CPLR 2701 directing that the Trump Group settlement fund be paid into Court is held in abeyance pending the Surrogate's Court's resolution of Orly Genger's petition to remove Dalia Genger as trustee of Orly Trust. (*See Genger v Genger*, interim order dated Apr. 1, 2015, index No. 113862/2010 [mot. seq. no. 2]).

DATED:  Dated:  5/7/15                                    _____
                                                                              J.S.C. BARBARA JAFFE
                                                                                        J.S.C.

Check one:  ☐ FINAL DISPOSITION   ☐ NON-FINAL DISPOSITION
Check if appropriate:  ☐ DO NOT POST   ☐ REFERENCE

New York County Surrogate's Court
MISCELLANEOUS DEPT.

DEC 0 5 2012

FILED
Clerk

STATE OF NEW YORK
SURROGATE'S COURT: COUNTY OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - x
In the Matter of the Application of
ORLY GENGER, as a person interested, for the
removal of DALIA GENGER as Trustee of the
Orly Genger 1993 Trust pursuant to SCPA §711(11)
- - - - - - - - - - - - - - - - - - - - - - - - x

NOTICE OF MOTION
TO DISMISS THIRD
AMENDED PETITION

File No. 0017/2008

PLEASE TAKE NOTICE that upon the annexed affirmation of Robert A. Meister, the Third Amended Petition on file, the November 7, 2012 stipulation of the parties, and all prior proceedings had herein, DALIA GENGER, as Trustee of the Orly Genger 1993 Trust, will move this Court sitting, at 31 Chambers Street, Room 509, New York, New York, at 10:00 a.m. in the forenoon of January 15, 2013, or as soon as counsel can be heard, for an Order dismissing the Third Amended Petition on the grounds that the Petition (1) fails to state a valid claim for removal of Dalia Genger as Trustee of the Orly Genger 1993 Trust, and (2) fails to name, join and serve all persons interested.

Pursuant to CPLR §2214(b), any answering papers must be served so as to be received by January 8, 2013.

TO:
Platzer, Swergold, Karlin, Levine,
Goldberg & Jaslow, LLP
1065 Avenue of the Americas – 18th Floor
New York, NY 10018
212.593.3000
Attn. Ralph Hochberg, Esq.
Counsel for Petitioner

PEDOWITZ & MEISTER LLP

By
Robert A. Meister
570 Lexington Avenue – 18th Floor
New York, NY 10022
212.403.7330
Attorneys for DALIA GENGER,
as Trustee of the Orly Genger 1993 Trust

STATE OF NEW YORK
SURROGATE'S COURT:  COUNTY OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - x
In the Matter of the Application of
ORLY GENGER, as a person interested, for the
removal of DALIA GENGER as Trustee of the
Orly Genger 1993 Trust pursuant to SCPA §711(11)
- - - - - - - - - - - - - - - - - - - - - - - - - x

AFFIRMATION IN SUPPORT OF
MOTION TO DISMISS THIRD
AMENDED PETITION
File No. 0017/2008

     ROBERT A. MEISTER, a member of the New York Bar, hereby affirms under the

penalties of perjury:

     1     I am a member of the Bar and of the firm of Pedowitz & Meister LLP, counsel for

Respondent Dalia Genger, as Trustee of the Orly Genger 1993 Trust (the "Orly Trust"). I make

this affirmation in support of her motion to dismiss the Third Amended Petition ( the "TAP") of

beneficiary Orly Genger ("Orly") on the grounds that the TAP (1) fails to state a valid claim for

removal of Dalia Genger as Trustee of the Orly Trust, and (2) fails to name, join, and serve all

persons interested. I must note at the outset that Orly is *not* "the sole beneficiary of the Orly

Trust" as she alleges in TAP ¶5; rather she is a lifetime discretionary beneficiary, with the

remainder to her children (of which she now has none) and then to the beneficiaries of the Sagi

Genger 1993 Trust, as correctly alleged in TAP ¶3, just two paragraphs earlier, and as proven by

the Trust Agreement, TAP Ex.A, Orly Trust Agreement, pp. 7-8, Article 2(c)(2)(3).

     2     This is Orly's <u>fifth</u> attempt to gain control of the Orly Trust. Her first attempt (the

Prior Proceeding) was denied by Surrogate Roth on December 31, 2008, Decision and Order,

*Orly Genger v. Fang*, et al., Surrg. Ct., N. Y. Co., file 17/2008 (the "Prior Decision"). (**Exhibit**

**1 hereto**) Contrary to the TAP's contention (¶42), Surrogate Roth's Prior Decision did not say

Orly's first attempt was "premature". Rather, this Court held that Orly's "vague and speculative

allegations of 'wrongful conduct' at TPR Investment Associates, Inc. (TPR) from

which Dalia purportedly benefitted do not warrant the appointment of a Trustee other than Dalia Genger as Trustee or appointment of a 'special trustee'", alternative relief that Orly then sought. (Ex. 1, Prior Decision, at 5-7)

3       Significantly, Surrogate Roth's Prior Decision shows that the Court was then aware of allegations that the TAP claims are newly discovered (a) "alleged improper acts by former trustee, David Parnes" as to which the Prior Decision noted that the prior Trustees "Mr. Parnes and Ms. Fang have been directed to account for their proceedings as trustees" (Prior Decision 7), and (b) Orly's "allegations of 'wrongful dealings' concern[ing] a close corporation, TPR Investment Associates, Inc." which involved Orly's allegations "that her brother, Sagi, who is an officer of TPR, and Dalia, who was a shareholder at the time this proceeding was commenced, are engaged in a 'wrongful scheme to divert assets to themselves" (Prior Decision 6). Indeed, Orly had complained to Surrogate Roth of the very same claim asserted in the TAP ¶¶ 46-47: the alleged wrongful scheme that Dalia Genger had acted in concert with Sagi Genger to aid the Sagi Genger 1993 Trust's sale of its own interest in shares of shares of Trans-Resources, Inc. (TRI) stock.  See Orly's then counsel's November 5, 2008, letter to Surrogate Roth (Exhibit 2 hereto).

4       Orly appealed the Prior Decision, but she never perfected the appeal.  Instead, when she saw that Surrogate Roth had retired, Orly began to judge shop.  First, she filed the first of her Petitions in this proceeding that would be heard by a new Surrogate.  And, almost immediately thereafter, Orly filed an action in Supreme Court containing the same averments, *Orly Genger in her individual capacity and on behalf of the Orly Genger 1993 Trust (both in its individual capacity and on behalf of D & K Limited Partnership) v. Dalia Genger, Sagi Genger,*

*Leah Fang, D & K GP LLC, and TPR Investment Associates, Inc.,* Sup. Ct., N.Y. Co. 109749/09.

Dalia Genger filed motions asking this Court to dismiss the original Petition in this proceeding, as well as the First and Second Amended Petitions herein, but none of those motions was decided, each being mooted by another amended petition.

### The *Status Quo* When Dalia Genger Became Trustee of the Orly Trust

5       Because the TAP contains a string of complaints about what other persons did *before* Dalia Genger became Trustee and the Court needs to appreciate what little has occurred since the Prior Decision, it is necessary to note the *status quo* on January 4, 2008, when, as the Prior Decision (Ex. 1, p. 3) found, Dalia Genger first became Trustee:

A       Since December, 2007, Dalia Genger was no longer a shareholder, officer or director of TPR Investors, Inc. (TPR). ¶39 of Second Amended Verified Complaint in *Orly Genger in her individual capacity and on behalf of the Orly Genger 1993 Trust (both in its individual capacity and on behalf of D & K Limited Partnership) v. Dalia Genger et al.,* Sup. Ct., N.Y. Co. Index No. 109749/09, a copy of the relevant part of which is **Exhibit 3** hereto; TAP pg. 12, n. 3.

B       Since 2004, Dalia Genger was no longer a member of D&K LP; she had a 99% membership in its general partner, D&K GP LLC, which Sagi Genger managed.  TAP ¶23.

C       Since 1993, D&K has been the obligor under its. <u>with recourse</u> $8,950,000 interest-bearing, secured, ten-year Note (the D&K Note) that D&K issued to TPR as part of D&K's purchase of 240 shares of TPR stock and which Note was <u>secured</u> by D&K's 1993 pledge of those purchased 240 shares of TPR.  (TAP ¶¶ 16, 18, Ex. B)

4

D      Since 1993, the Orly Trust was the guarantor of 48% of the D&K Note, with the

balance guaranteed by the Sagi Genger 1993 Trust (Sagi Trust) (48%) and Dalia Genger,

individually (4%). TAP ¶ 18, Ex. B.  The Orly Trust's guarantee expressly provided "that

the Holder may enforce this Note, to the extent of such liability, as if the [Orly Trust] were

the Maker thereof." (Emphasis added.) That guarantee was signed in 1993 for the Orly

Trust by its trustee at that time, who was not Dalia Genger.  TAP ¶18, Ex. B

E      D&K made payments on the D&K Note from 1993 until 1999, when it stopped.

TAP ¶ 20.

F      As of mid-2006, D&K owed TPR millions of dollars under the D&K Note, which

then "had an approximate value of $11,000,000 as a result of accrued interest".  TAP ¶ 29

G      Since November 23, 2007, when D&K's Partnership Agreement had been

amended by persons other than Dalia Genger, D&K had the authority to mortgage, pledge

or otherwise encumber the Limited Partners' (the Sagi and Orly Trusts') interests in Trans-

Resources, Inc. (TRI) common stock (LP TRI Interest), but that was subject to each Limited

Partner's "right to redeem its LP TRI Interest to the full extent of such LP's pro-rated

participation, responsibility or liability for the unpaid amount of the [D&K] Note."

(Emphasis added.) TAP Ex. K, ¶ 22 at p. 11

That was the *status quo* when Dalia Genger first became the Trustee of the Orly Trust on January

4, 2008, as Surrogate Roth decided the Prior Decision.

**As the Prior Decision held, Dalia Genger Should Not Be Removed as Trustee Based on
Events that Occurred before She Became Trustee.**

6      Like its predecessors, the Third Amended Petition is legally defective.  As the

5

Prior Decision held, Dalia Genger should not be removed on the basis of events that occurred before she became Trustee.

7       Yet many of the events of which the TAP so turgidly complains preceded Dalia Genger becoming Trustee in January, 2008. Most are ancient history. The latest of those was on November 23, 2007, when the Amended D&K Partnership Agreement which was signed by a prior Trustee and by Sagi Genger and not by Dalia Genger. TAP Ex. K, ¶ 22 at p. 11

### Dalia Genger Should Not Be Removed as Trustee Based on Events that Occurred During the Period before the Prior Decision when Surrogate Roth Had Directed Her Not to Take Any Action

8       Other events of which the TAP complains occurred in 2008 before Surrogate Roth issued the Prior Decision and during which time Dalia Genger had been directed to take no action by Surrogate Roth, who was considering Orly's prior petition to remove Dalia Genger as Trustee. See August 28, 2008 letters from Orly's prior counsel, Exhibit 4. Moreover these events the TAP complained of were events over which Dalia Genger, as the Orly Trust's Trustee, had and could have had no control, such as the Sagi Trust's August 2008 sale of its own interest in the common stock of Trans-Resources, Inc. ("TRI") and TPR Investment Associates, Inc.'s declaring a default on D&K's Note in 2008 and foreclosing on the collateral D&K had pledged.

### Dalia Genger Should Not Be Removed as Trustee of the Orly Trust based on the Sagi Trust's Sale of its Own Interest in TRI Shares

9       Dalia Genger is not and never was trustee of the Sagi Trust, and neither the Orly Trust nor Dalia Genger was a party to the Sagi Trust sale of TRI stock. As the TAP alleges and as is confirmed by the Stock Purchase Agreement, of which I obtained a copy in other Genger

family litigations and attach as **Exhibit 5**, that sale was made in August, 2008 by the Sagi Trust, acting through its Trustee, Rochelle Fang, during the period when Dalia Genger was under Surrogate Roth's direction not to take any action as Orly Trust's Trustee.

10      Further, to understand the vacuity of Orly's tenuous claim of injury from the Sagi Trust's sale of its own interest in TRI stock – Orly's contention that the Orly Trust owns shares of TRI stock which supposedly lost value as a result of the Sagi Trust's sale of its shares – it is necessary to understand the history of the TRI transactions. In October, 2004, when Dalia Genger was divorcing her husband, Arie Genger, TPR owned 52.85% of the shares of TRI. (The other 47.15% of the TRI shares was owned by entities controlled by Jules and Eddie Trump (the "Trump Group"). TAP ¶19. As part of the divorce settlement, Arie agreed to cause TPR to sell all of its shares of TRI stock to the Orly Trust, the Sagi Trust and to Arie himself. The Orly Trust purportedly bought 19.43% of TRI's stock, and the Sagi Trust purportedly bought another 19.43% of TRI's stock. TAP ¶22. If those shares were to have been required to be kept together, the transaction could have been structured so all those shares were purchased by a new trust for the benefit of the Orly Trust and the Sagi Trust or their the beneficiaries, but that was not what Arie Genger caused to occur. Nor was there any agreement between the Trusts to hold the shares and act in unison, if such would have been permitted under the respective trustees' obligations.

11      Thus there is no basis for the TAP's contention that the Sagi Trust's sale caused a cognizable injury to the Orly Trust. Nor is there any basis for asserting that Dalia Genger, who was not the trustee of the Sagi Trust, caused that sale or should have or could have prevented it. And the Sagi Trust's sale occurred in August, 2008, during the period when Dalia Genger was under Surrogate Roth's instruction to take no action.

12      Moreover, Orly's contention that the Sagi Trust's sale of its own interest in TRI

7

stock damaged the Orly Trust's interest in TRI shares it had purchased is undercut by the Delaware Supreme Court's determination that the 2004 sale of TRI shares violated the TRI's shareholders' agreement and thus did not convey record and legal ownership, ruling that TPR remained the record owner. *Genger v. TR Investors et al.*, 26 A.3d 180 (De. 2011). As the Orly Trust was not a party in that case, the Delaware court did not determine the economic ownership of the TRI shares purportedly transferred to the Orly Trust.[1] Accordingly Dalia Genger, as Trustee of the Orly Trust, commenced litigation against the Trump Group and TRI to establish that the Orly Trust is a protected purchaser and beneficial and economic owner of the 1,102.80 shares of common stock of TRI stock it bought from TPR (the "Orly Trust TRI Shares") and that the Orly Trust is entitled to all dividends declared or paid attributable to such shares since October 29, 2004.[2] TAP ¶47 n. 5. Also, Dalia Genger individually and as Trustee sued Arie

---

[1] The TAP's vague unspecific allegations that Dalia Genger failed to adequately protect the assets of the Orly Trust in the Delaware Court are not a valid basis to remove her as Trustee. The Delaware courts held that the purported transfers of TRI shares violated a TRI shareholder's agreement because required consent of other shareholders was not obtained, but Dalia Genger was not a party to the TRI Shareholders Agreement or to that transaction and the TAP does not and cannot claim that the Trust's interests were not adequately represented in that Delaware litigation. The TAP neglects to note that 1) the Settlor of the Orly Trust himself, Arie Genger, testified in that action in favor of the validity of the transfers and employed competent representation (Davis Polk) to defend his rights <u>as well as the rights of the Orly Trust</u>, and 2) Orly Genger herself testified in that proceeding, although the Delaware Chancery Court found her testimony to be not credible, as she testified to what her father supposedly said at a meeting that everyone else, including her father, testified she did not even attend. *TR Investors, LLC v. Genger*, 2010 WL 2901704 (Del.Ch. July 23, 2010) at pp. 7-8 (**Exhibit 6**) Dalia Genger's decision not to intervene in that litigation spared the Orly Trust substantial legal fees, certainly was within her discretion as Trustee and does not raise a valid ground for her removal.

[2] *Dalia Genger, as Trustee of the Orly Genger 1993 Trust v. TR Investors LLC, et al.*, (Del. Ch. 6906-CS. filed Oct. 4, 2011), seeks a declaratory judgment that the Orly Genger Trust is a protected purchaser and owner of the 1,102.80 shares of common stock of TRI sold to it by TPR (Orly Genger Trust Shares) and that the Orly Genger Trust is entitled to all dividends declared or paid attributable to such shares since October 29, 2004. (**Exhibit 7**)

8

Genger for breach of his divorce settlement agreement to cause the transfer of the TRI shares to the Orly Trust, seeking damages for the Orly Trust.[3]

13      Conversely, Orly herself has sought to *diminish* the interest of the Orly Trust in the TRI shares. Immediately after the Delaware Chancery Court decision and without this Court's permission to act for the Orly Trust, Petitioner Orly Genger joined her father as plaintiff in an action to reform the divorce settlement (and other relief) that seeks to recover the TRI shares for Arie, at the expense of the Orly Trust, with the Orly Trust relegated to dividends during Arie's life and a remainder interest after Arie's death. *Arie Genger and Orly Genger, in her individual capacity and on behalf of the Orly Genger 1993 Trust, v. Sagi Genger. et al., Sup. Ct. N. Y. Co., Index No 651089/2010.* (A copy of the Third Amended Complaint without the voluminous exhibits is **Exhibit 9** hereto) And then Orly obtained a preliminary injunction from the court in that case restraining Dalia, *pendent lite,* from prosecuting the action she had brought, as Trustee, for a declaratory judgment that the Orly Trust is a protected purchaser and owner of the 1,102.80 shares of TRI sold stock and is entitled to all dividends declared or paid attributable to such shares since October 29, 2004.

14      Thus the objective facts and the public record belie the TAP's captioned statement – unsupported by factual allegations – that Dalia Genger helped try to strip the Orly Trust of the Orly Trust TRI Shares. (TAP caption preceding ¶ 46) And the Sagi Trust's sale of its own TRI shares during 2008 – when Dalia was under Surrogate Roth's instructions not to take any action – is not a basis on which to remove Dalia Genger as Trustee of the Orly Trust, and neither are

---

[3] *Dalia Genger, as Trustee on behalf of the Orly Genger 1993 Trust, and Dalia Genger, in her individual capacity v. Arie Genger,* Sup. Ct., N.Y. Co., Index No. 113862/2010. (**Exhibit 8**)

Dalia's efforts to obtain the economic benefit of the TRI shares for the Orly Trust.

### TPR's 2008 Foreclosure on the Collateral for the D&K Note

15     Nor can Dalia Genger be removed as Trustee on the basis of TPR's August 31,
2008, declaration that the D&K Note was in default (TAP Ex. S) and TPR's subsequent
foreclosure on D&K's TPR shares that D&K had pledged to secure the Note.  Despite its use of
emotional and conclusory words, the TAP alleges no act that Dalia Genger did to participate in
the foreclosure.  And, importantly, Dalia Genger, as Trustee of the Orly Trust, could not prevent
TPR from declaring a default and foreclosing on the promissory Note made by D&K LP that the
Orly Trust had guaranteed.

16     Plaintiff cannot dispute, as the Prior Decision found, that Orly Trust is not a
shareholder of TPR (Prior Decision, at 6) and neither was Dalia Genger individually a
shareholder of TPR after 2007. (*Supra* ¶4(a))

17     Also unavailing is the argument that D&K's Note was not supposed to be
enforceable.  First, the Note says nothing of the kind.  To the contrary, why would the Note be
secured by D&K's pledged TPR stock, if the Note were intended to be unenforceable?  And why
would the Note be guaranteed by the Orly Trust and by the Sagi Trust if it were intended to be
unenforceable?  And if intended to be unenforceable, why would those written guarantees
expressly provide "that the Holder <u>may enforce this Note</u>, to the extent of such liability, as if the
[Orly Trust] were the Maker thereof." TAP ¶ 18, Ex. B, emphasis added.

18     Moreover, by admitting that the Note had been paid in accordance with its terms
until 1999 and admitting that "[a]s of mid-2006, the D&K Note 'had an approximate value of
$11,000,000 as a result of accrued interest'" (TAP ¶ 29), TAP belies its contention that the note
was uncollectable.

10

19    Nor does or could the TAP allege that TPR ever renounced its rights under the Note and guarantee by destroying the Note or by delivering the Note or a signed writing cancelling or renouncing the Note, as required by NY UCC §3-605(1) for the Note to become unenforceable. It is hornbook law that the enforceability of a Note is not affected by a mere statement by the maker or guarantor that the Note is unenforceable. As the court held in *Ber v. Johnson*, 163 A.D.2d 817, 818 (4th Dep't 1990):

> Because defendants' original obligation constituted a note and guarantee, it was required to be in writing *(see,* Uniform Commercial Code § 3-104 [1], [2]; General Obligations Law § 5-701 [a] [2]) and the Statute of Frauds precludes an oral executory modification. '[W]here an original agreement comes within [the] provisions of the statute of frauds requiring certain agreements to be in writing, the statute of frauds renders invalid and ineffectual a subsequent oral agreement changing the terms of the written contract, no matter how slight the attempted variation or by whom it was made' ( 61 NY Jur 2d, Frauds, Statute of, §140, at 217-218; *see,* M. H. Metal Prods. Corp. v April. 251 NY 146, 150; Van Iderstine Co. v Barnet Leather Co.. 242 NY 425, 430; Heroux v Page. 107 AD2d 862, 863; Awad & Co. v Pillsbury Mills, 9 AD2d 870, lv denied 8 NY2d 705, appeal dismissed 8 NY2d 747; *cf.,* General Obligations Law §§ 5-1103, 15-301 [1], [2]). Thus, defendants may not rely on plaintiff's alleged oral acceptance of the stock as the basis for their defense of modification.

20    Thus the 2006 statement by Sagi Genger that D&K LP and its partners deny the enforceability of the Note would not constitute a defense to TPR's declaration of default and foreclosure, as a matter of law.[4]  Nor would enforceability of the Note have been affected if Dalia Genger *had* stated "the Note was never intended to be foreclosed upon," as the TAP ¶33 claims. But she did not so state; in the document cited basis for that assertion Dalia Genger in a Pre-Judgment Divorce Mediation merely stated that foreclosure by Dalia Genger "to take for myself an interest that Arie and I intended for the children" would undo estate planning, and thus

---

[4] Equally irrelevant is testimony by David Parnes (TAP ¶31), who was *functous officio*.

11

the Arbitrator found that Arie Genger should not have been awarded half the value of the D&K Note (TAP Exs. I & J, emphasis added.)

21       Thus as a matter of law, the Note and guarantee were enforceable in accordance with their terms.   Moreover, TPR's declaration of default of the D&K Note also occurred during the period when Dalia Genger had been instructed by Surrogate Roth to take no action.  And the TAP alleges no fact to support its generalized rhetoric that Dalia Genger participated in TPR's foreclosure. Thus Dalia Genger's failure to take some unspecified action which could not have prevented the foreclosure could not be a basis to remover her as trustee.

**The Events that Occurred After this Court Recognized Dalia Genger as Trustee**

**The January 2009 D&K LP Meeting Agreement**

22       The Meeting of Partners of D&K LP – Jan. 31, 2009 & Agreement, TAP Exhibit O, belies TAP's allegation (TAP ¶48) that it granted Sagi "unfettered authority to encumber the Orly Trust TRI Shares." As shown above (¶ 4(G)), on November 23, 2007 - before Dalia Genger became Trustee – D&K had amended its Partnership Agreement (by action of the Orly Trust's Trustee then: not by Dalia Genger) to give D&K authority to mortgage, pledge or otherwise encumber D&K's Limited Partners' (the Sagi and Orly Trusts') interests in Trans-Resources, Inc. (TRI) common stock (LP TRI Interest), subject to each Limited Partner's "right to redeem its LP TRI Interest to the full extent of such LP's pro-rated participation, responsibility or liability for the unpaid amount of the [D&K] Note." (Emphasis added.) TAP Ex. K, ¶ 22 at p. 11. The complained of section of the January 31, 2009, D&K LP Partnership Meeting and Agreement (TAP Ex. P) expressly stated "to clarify" that the prior authority was only to be

12

exercised "in substantially the same manner in which TPR Investment Associates, Inc. shares were pledged in connection with the aforementioned [D&K] note." Thus the January 21, 2009 agreement did not grant "unfettered authority to dispose of the Orly Trust TRI Shares" or indeed grant any authority; rather it clarified and if anything *limited* the prior grant of authority. Therefore it did not harm the Orly Trust. Moreover, the TAP does not and cannot allege that D&K ever purported to pledge the Orly Trust's interest in TRI stock.

23     And since the TAP can point to nothing improper that had previously been done, there was no harm from D&K LP's 2009 pro forma indemnification and release of D&K LP's former general partner.[5]

### The Orly Trust's Interest in the Orly Trust TRI Shares

24     The TAP's allegation (¶53) that Dalia Genger violated her fiduciary obligations by refusing to agree not to dispose of the Orly Trust TRI Shares is unsupported by any document or specific factual allegation. Moreover, in light of Orly joining Arie Genger a plaintiff in a Supreme Court action purportedly on behalf of the Orly Trust to have such shares become the property not of the Orly Trust but of Arie Genger, such allegation appears to be from Lewis Carroll's "*Through the Looking Glass and What Alice Found There*", a complete reversal of fact. However, even assuming the allegation were true, a trustee's refusal at the behest of a life time beneficiary to keep the entire trust corpus in a single, illiquid security of a closely-held entity which the Delaware Supreme Court has held is controlled by others, Genger *v. TR Investors et al.*, 26 A.3d 180 (De. 2011), would not be a violation of a Trustee's fiduciary duty, but rather would

---

[5] It should also be noted that the release only extends "to the fullest extent permitted" thus, on its face, is limited in scope to avoid any potential breach of fiduciary duty.

be an act of prudence.  Especially where that Delaware court's findings raise most serious questions as to whether the Orly Trust has any interest in TRI shares at all. *Ibid.*

### The Settlement and the Court Orders

25    While the TAP claims that Dalia Genger's actions to settle certain claims of the Orly Trust were in violation of the July 1, 2009 Order of this Court, it does not attach a copy of that Order, relying instead a copy of Orly's June 22, 2009 First Amended Petition in this proceeding (TAP Ex. W) and a snippet of the transcript of the court proceedings on the return date (TAP Ex. X).  Perhaps the reason the TAP does not attach or quote that Order is that Dalia Genger has been in full compliance with it.  That Order (a copy of which is **Exhibit 10** hereto) required Dalia Genger, as Trustee:

> to give notice by overnight mail to petitioner's [Orly's] counsel of any
> 1) offer to purchase the Orly Trust's 19.3% interest in TRI within 10 days
> of receiving such offer and 2) act by Respondent [Dalia Genger], her
> agents and all other persons acting on her behalf to assign, mortgage,
> pledge, redeem, encumber. sell, or otherwise alter the Orly Trust's interest
> in TRI at least 10 days prior to such act.[6]

(Note that the July 1, 2009 Order does not require notice of "any transaction that impacted the Orly Trust TRI Shares", as the TAP mischaracterized it in TAP ¶90 (a)).  The TAP does not and cannot not allege that Dalia Genger received any "offer to purchase the Orly Trust's 19.3% interest in TRI" or that she did anything that constitutes a "purchase, assignment, mortgage, pledge, redemption, encumbrance, sale, or other alteration of the Orly Trust's interest in TRI".

---

6      Contrary to the TAP's allegation, ¶47 n. 5, that Order did not require prior notice of Dalia Genger's filing a lawsuit against the Trumps, TPR, and TRI for a declaratory judgment that the Orly Trust is the owner of the TRI shares it bought in 2004.

14

26      Of course, the fact that the Orly Trust's transactions did not violate the July 1, 2009 Order does not end the question of whether the TAP properly alleges a claim that they are reasons why Dalia Genger should be removed as Trustee. But to appreciate why the TAP does not allege such a legally cognizable claim, this Court must examine the context of the acts, as well as what was done.

### The Context of the Settlement

27      Three facts constitute the *status quo ante* before the settlement of which the TAP complains:

a.      Although Plaintiff does not like it, Dalia Genger is the Trustee of the Orly Trust, as was confirmed by the Prior Decision.

b.      The Orly Trust was the guarantor of 48% of the D&K 1993 Note in favor of TPR, secured by D&K's pledge of its TPR shares. Not only does the pledge establish that the D&K Note was to be paid, as shown discussed *supra*, but the TAP recognizes that D&K made millions of dollars of payments thereon through 1999. And the TAP does not contend (and Petitioner Orly Genger has never contended and cannot contend) that D&K did not owe the D&K Note or that the Orly Trust was not liable for its guaranteed share of the unpaid portion of the D&K Note. (Any such contention would amount to an allegation the Arie Genger committed tax fraud by making a disguised transfer without paying gift tax.) Thus, even after TPR foreclosed on the pledged TPR shares, the Orly Trust owed approximately $4.5 million on its guarantee for its share of the balance of the D&K Note.

c.      The Delaware Supreme Court ruled that Arie Genger's acts to cause TPR to transfer TRI Shares to the Orly Genger Trust (and to Arie Genger and the Sagi Genger Trust) did <u>not</u> transfer legal or record ownership (without deciding whether it transferred beneficial ownership) *Genger v. TR Investors et al.*, 26 A.3d 180 (De. 2011) , thus leaving TPR as the continued legal and record owner of the TRI shares purportedly transferred to the Orly Trust or to the proceeds of those shares if TPR's purported August 2008 sale of them to the Trump Group was valid.  The Trump Group agreed to pay TPR $10.3 million for TPR's August 2008 purported sale of the "Orly Trust TRI Shares", which sum is being held by my law firm in escrow, pursuant to an agreement executed by Dalia Genger, as Trustee, TPR, the Trump Group, <u>and Orly Genger herself</u>, pending a final determination of the ownership of those TRI shares by a competent court with full jurisdiction over Dalia Genger, as Trustee, TPR, the Trump Group.  Conversely, based on Orly Genger's representation to Surrogate Roth in a November 5, 2008 letter (Exhibit 2 hereto, page 2), if TPR's purported August 2008 sale was not valid, the value of the "Orly Trust" Shares of TRI that TPR purported to sell would be "in excess of $150,000."

**The Settlement that Secured Millions for the Orly Trust**

28      In October, 2011, Dalia Genger, as Trustee of the Orly Trust, entered into a Settlement Agreement with TPR and D&K.  As Trustee, Dalia Genger has the legal authority to settle claims by and against the Trust.  *See* N.Y. E.P.T.L. § 11-1.1(13) (A trustee has the power "[t]o contest, compromise or otherwise settle any claim in favor of the estate, trust or fiduciary or in favor of third persons and against the estate, trust or fiduciary."); Orly Genger 1993 Trust Agreement, Eleventh Article, Sec. 7 at page 26 (which states that "[i]n addition to and in amplification of the powers given by law to trustees" the trustee of the Orly Trust shall have the

16

power "[t]o settle, adjust, compromise, or submit to arbitration any dispute, claim, or controversy

in which any trust hereunder may be in any way interested.") TAP Ex. A.

29      Of course, "'stipulations of settlement are judicially favored'" *IDT Corp. v. Tyco

Group*, 13 N.Y.3d 209, 213-14 (N.Y. 2009) *citing Matter of Kanter*, 209 A.D.2d 365, 365 (1st

Dep't 1994), and in exercising the authority to settle a claim of or against the Trust, a Trustee has

a broad range of discretion. *See In re Cmty. Serv. Soc. of New York*, 275 A.D.2d 171, 181 (1st

Dep't 2000) ("where a trustee has discretionary power, the exercise of that power is not to be the

subject of judicial interference, 'at least if exercised reasonably and in good faith'" (internal

citation omitted)). *See also In re IBJ Schroder Bank & Trust Co.*, Index No. 101530/98,

Supreme Ct., N.Y. Co., Op. at 5-6 (Aug. 16, 2000) **Exhibit 11** (*held*: Settlement agreement

entered into by trustee entitled to judicial deference and upheld over beneficiaries' objection as

the trustee had made a "showing of the reasonableness of the proposed settlement" and the

objecting beneficiaries "ha[d] not submitted any evidence to show that the trustee's actions may

have been based on some ulterior motive or that the trustee is somehow itself interested in the

transaction other than in its fiduciary capacity".)

30      Here this Court will see that the settlement with TPR and D&K was objectively

beneficial to the Orly Trust's interests.

a       Prior to the settlement the Orly Trust owed TPR approximately $4.5 million on its

guarantee of the D&K Note. The settlement changed that to a $4 million unsecured Note

to TPR (TAP Ex. BB), and TPR paid the Orly Trust $100,000 for the Trust's legal fees,

providing moneys to pay for litigation to establish the interest of the Orly Trust with

respect to the TRI shares that Arie Genger purported to have transferred to the Orly Trust.

(TAP Ex. GG, Settlement Agreement ¶1,  3-4). Thus the Orly Trust gained $600,000.

17

b       Also, in the settlement TPR relinquished to the Orly Trust any economic interest TPR had in the TRI Shares and assigned to the Orly Trust TPR's rights to any economic benefits of the TRI shares. This includes, but not limited to, any proceeds from the sale thereof, *i.e.*, the $10.3 million otherwise owed to TPR pursuant to the terms of the August 22, 2008 letter agreement with the Trump entities if a court determines that such sale conveyed the Orly Trust TRI Shares to the Trump Group. This is a benefit to the Orly Trust of at least the $10.3 million that my firm holds in escrow and possibly substantial multiples thereof as Orly has contended in her November 5, 2008 letter to this Court, Exhibit 2.

c       Also, the settlement ends the relationship between the Orly Trust and D&K and "cancel[s] and void[s]" (TAP ¶88) the Amended D&K Partnership Agreement and the "Meeting Agreement" of which Orly complains in this action, eliminating any contention that the Orly Trust was damaged by those agreements, as the TAP reluctantly concedes (TAP ¶88) and thus removing a source of continued friction with Sagi Genger.[7]

d       Also, the settlement agreement should end the multiple contentious litigations which must cost Orly Genger, or whosoever is paying her legal fees, substantial moneys. While the settlement agreement, of course, contains releases, there is no release in favor of Dalia Genger, nor did Dalia Genger, individually, receive any moneys from the settlement. Thus the settlement contains substantial benefits for the Orly Trust and no benefits for Dalia Genger.

---

[7] The TAP again misleads the Court when it contends "that these two agreements purported to enable" TPR's foreclosure. TAP ¶ 89. The foreclosure was pursuant to the D&K Note and Pledge Agreement that were executed in 1993, TAP Ex. B, and had nothing to do with these later agreements.

31      While the original Settlement Agreement provided it was controlled by Delaware Law and for exclusive Delaware jurisdiction over any disputes, subsequently the original settlement agreement was amended and restated to provide that it is controlled by New York law and that Delaware jurisdiction is non-exclusive.

32      Several months later, TPR agreed to sell the Orly Trust Note to Manhattan Safety Company, Ltd. ("Manhattan"), which agreed to loan an additional $200,000 to the Orly Trust. Dalia Genger, as Trustee, anticipated the need for additional funds for its litigation to establish the Orly Trust's right with respect to the TRI shares. Thus as Trustee she entered into a new Credit and Forbearance Agreement and Second Amendment and Restated Promissory Note with Manhattan together with new unsecured Notes; the Orly Trust's Note to TPR was returned to the Orly Trust (See **Exhibit 12**) and on May 15, 2012, my firm's escrow account received the $200,000 for the benefit of the Orly Trust. These Notes are neither due nor in default[8], and there has been no notice to the contrary nor any attempt by Manhattan to compel payment.[9] Nor do the Credit and Forbearance Agreement or the Notes pledge anything as security or otherwise "allow the potential foreclosure against valuable collateral" as alleged in TAP ¶8. Thus, after this new agreement and Notes, the Orly Trust's debt was still less that its prior obligation to TPR as

---

[8] Contrary to TAP's assertion, the federal court's dismissal of the *Pedowitz & Meister, LLP v. TPR Investment Associates, Inc.,* interpleader action for lack of jurisdiction is not an event of default nor an event of maturity of the Note to Manhattan, as it did not resolve the issues of beneficial ownership of the TRI shares.

[9] On Monday, August 13, 2012, I spoke by telephone with Manhattan's President, Greg Gilpon-Payne, who confirmed that Manhattan has not sent the Orly Trust any purported notice of default or otherwise demanded payment of the Note. And Dalia Genger, as Trustee of the Orly Trust, agreed to notify Orly Genger, through her counsel, of any purported notice of default or attempt to collect the Note within two business days of receipt thereof.

guarantor of the D&K Note and the Trust has received a $100,000 payment from TPR and a $200,000 loan from Manhattan.

33      Contrary to the *ipse dixit* assertion in TAP ¶76, the Orly Trust will be able to pay those Notes, either from TRI dividends if the Orly Trust is held to be the legal owner of the TRI shares[10], or from the $10.3 million held in escrow if the court finds otherwise.

34      Equally significantly, Dalia Genger has received no funds from the Settlement or the transaction with Manhattan. Indeed, Dalia Genger has received no funds from the Trust – the Trust Agreement provides that the Trustee shall no receive commissions. *See* Orly Genger 1993 Trust Agreement, Eighth Article, at page 18, Ex. A. Nor has the Orly Trust paid Dalia Genger's substantial legal fees for her defense of this action or the two companion Supreme Court actions by Orly Genger and by Arie Genger and Orly Genger, or the action Dalia Genger brought in Supreme Court against Arie Genger seeking to recover for the Orly Trust damages for Arie Genger's breach of his contract to cause the transfer to the Orly Genger Trust full title to the TRI shares. *Dalia Genger v. Arie Genger*, Index No. 113862/2010 (Sup. Ct. NY Co.)

35      Contrary to the allegation of the TAP, the settlement and the Orly Trust's issuance of the various notes did not violate any court order. I discuss them in chronological order.

### This Court's July 1, 2009 Order Was Not Violated

36      On July 1, 2009, this Court ordered Dalia Genger, as Trustee:

to give notice by overnight mail to petitioner's [Orly's] counsel of any 1) offer to purchase the Orly Trust's 19.3% interest in TRI within 10 days of receiving

---

10      Until final court determination of the ownership issues regarding the "Orly Trust TRI Shares" and those TPR purported to sell to Arie Genger, TRI's dividends attributable to those shares are being held *in escrow* by Skadden, Arps, Slate, Meagher & Flom LLP. **Exhibit 13**, April 23, 2012 email from Thomas Allingham, II, Esq. so confirming.

20

such offer and 2) act by Respondent [Dalia Genger], her agents and all other persons acting on her behalf to assign, mortgage, pledge, redeem, encumber, sell, or otherwise alter the Orly Trust's interest in TRI at least 10 days prior to such act. (Ex. 10)

(Note that the July 1, 2009 Order does not require notice of any transaction that "*impacted the Orly Trust TRI Shares*", as the TAP mischaracterized it in TAP ¶90 (a)(emphasis added)). Nothing in the Settlement Agreement, the Manhattan Agreement or the Notes is a purchase, assignment, mortgage, pledge, redemption, encumbrance, sale, or other alteration of the Orly Trust's interest in TRI which was not pledged to secure any of the notes. To the contrary, in the Settlement Agreement TPR relinquished to the Orly Trust any economic interest TPR had in the TRI Shares and assigns to the Orly Trust TPR's rights to any economic benefits of the TRI shares including any proceeds from the sale thereof, including but not limited to the $10.3 million in proceeds otherwise owing to TPR in the future pursuant to the terms of the August 22, 2008 letter agreement with the Trump entities. This is in sharp contrast to Orly Genger's position supporting Arie Genger's attempt in the companion action, *Arie and Orly Genger v Sagi Genger et al.*, index no. 651089/2010, which seeks to take from the Orly Trust rights to the TRI Shares, the settlement fortifies the Orly Trust's position that it is entitled to the TRI shares. Thus there was no violation of the Surrogate's Court July 1, 2009 Order.

### The September 8, 2010 Stipulation in this Proceeding Was Not Violated

37    By Stipulation on September 2, 2010, Orly and Dalia and their counsel, Orly's July 16, 2010 Order to Show Cause was withdrawn and Dalia agreed to give Orly's counsel notice "of any attempt to vote any TRI Shares held by the Orly Trust." TAP, Ex. Y. The TAP does not and cannot not allege that Dalia Genger made any attempt to vote any TRI Shares held by the Orly Trust. Thus there was no violation of the September 10, 2010 Stipulation.

21

### The Supreme Court's June 28, 2010 Order Was Not Violated

38    In its June 28, 2010, Decision and Order in *Orly Genger in her individual capacity and on behalf of the Orly Genger 1993 Trust (both in its individual capacity and on behalf of D & K Limited Partnership) v. Dalia Genger et al.*, Sup. Ct., N.Y. Co. Index No. 109749/09, which the TAP curiously calls "the New York TPR action", at pp. 31-32, the Supreme Court enjoined and restrained Defendants in that action:

> during the pendency of this action from doing or suffering to be done, directly or through any attorney, agent, servant, employee or other person under the supervision or control of defendant or otherwise, any of the following acts: removing the [D& K Limited Partnership's 48% ownership interest in the common stock of TPR Investment Associates ("TPR")] from the state, or otherwise transferring, selling, pledging assigning, or otherwise disposing of the [Orly Trust TPR] Shares. (TAP Ex. X at p. 32)

Nothing in the Settlement Agreement, the Manhattan Agreement or the Notes removed the [D& K Limited Partnership's 48% ownership interest in the common stock of TPR Investment Associates ("TPR")] from the state, or otherwise transferred, sold, pledged, assigned, or otherwise disposed of the [Orly Trust TPR] Shares, which in fact the Orly Trust no longer owned and were owned by TPR by virtue of the foreclosure. Thus, contrary to the TAP's assertions (*e.g.*, ¶90 (b)), there was no violation of the Supreme Court's June 28, 2010 Order.

### The Supreme Court's December 28, 2011 Order Was Not Violated

39    On December 28, 2011, in *Arie Genger and Orly Genger, in her individual capacity and on behalf of the Orly Genger 1993 Trust, v. Sagi Genger, et al.*, Sup. Ct. N. Y. Co., Index No. 651089/2010, the Supreme Court ordered that defendants TPR and The Trump Group shall give Plaintiffs "ten business days notice for future tractions that may impact the subject [TRI] shares". TAP Ex. AA at p. 15. That Order did not impose any restrictions on Dalia Genger, and nothing in the Settlement Agreement, the Manhattan Agreement or the Notes

22

adversely impacts the Orly Trust's interest in TRI. Thus there was no violation of the Supreme Court's December 28, 2011 Order.

40      Therefore, the Third Amended Petition fails to set forth any plausible grounds that would give adequate grounds to remove Dalia Genger as Trustee.

### The TAP Fails to Join an Indispensable Party

41      The Orly Genger Trust provides that its remainder, should Orly Genger die without issue[11], goes to the Sagi Trust. Thus the Sagi Trust is an interested party that should be joined and served with the Third Amended Petition.

### CONCLUSION

42      The TAP asks this Court to appoint Joel Isaacson as Trustee of the Orly Trust, and her prior Petitions asked for the appointment of other named persons. As the Orly Trust requires the Trustee to serve without commissions, the Court can be sure that if it appointed Orly's designee, he would use his discretion to distribute the corpus to Orly, whose actions demonstrate that she still is in thrall of her father, even to the extent of joining him as plaintiff in the Supreme Court action to have the TRI shares go to Arie rather than the Orly Trust. Undoubtedly, he has loaned her the very substantial funds she used to wage the legal warfare in so many courts, and thus cash that should go to Orly for her living expenses and then to her issue, should she have children and if not to the Sagi Trust would likely go instead to Arie Genger. It is to prevent this perversion of the original intent that Dalia Genger remains as Trustee, knowing that Orly's paternal bias will undoubtedly result in continued lawsuits against Dalia and stress.

---

[11] Orly Genger is unmarried and has no children.

43      As the TAP is legally sufficient to remove Dalia Genger as Trustee, the TAP

should be dismissed without leave to replead.

November 19, 2012                              Robert A. Meister

24

# Exhibit 1

SURROGATE'S COURT : NEW YORK COUNTY

JAN 02 2009

------------------------------------------- X

In the Matter of the Trust Established
on December 13, 1993, by ARIE GENGER
for the Benefit of ORLY GENGER.

File No. 0017/2008

------------------------------------------- X

R O T H ,  S .

    This is a contested application by the primary beneficiary
(Orly Genger) of an irrevocable inter vivos trust established by
her father, Arie Genger, seeking the appointment of a successor
trustee or, alternatively, the appointment of a "special trustee"
to investigate alleged wrongdoing concerning the trust.
Petitioner's mother, Dalia Genger (grantor's former wife),
contends that she is the duly appointed successor trustee and
that there is no basis to appoint another fiduciary for any
purpose.

    The trust agreement, dated December 13, 1993, provides for
discretionary income and principal distributions to Orly for life
with remainder to her descendants or, if none, to the grantor's
descendants in trust.

    Article SEVENTH (B), (D), (E), and (G) of the trust
instrument sets forth the following procedure for the resignation
of trustees and the appointment of their successors.

    A trustee may resign by delivering a signed and acknowledged
instrument of resignation in person or by certified or registered
mail to the other trustee and to either the grantor or the income
beneficiary.  Such resignation is effective upon the receipt of
the acknowledged instrument by the other trustee (if there is

one) and the grantor or the income beneficiary or at such later
date as may be specified in the instrument.

A trustee may appoint his or her successor by delivering a
signed and acknowledged instrument in the same manner as
described above for resignation.  Any such appointment, however,
is valid only if the appointee qualifies by delivering a signed
and acknowledged instrument of acceptance in person or by
certified or registered mail to each trustee and the grantor or
the income beneficiary within 30 days after the later of 1) the
date on which a copy of the appointment instrument is delivered
to him or her, and 2) the effective date of the appointment as
set forth in the appointment instrument.  It is observed that
there is no provision that requires a resigning trustee to
appoint a successor or that there always be two trustees in
office.

The original two trustees served until October 2004, when
they resigned and appointed David Parnes and Eric Gribitz as
their successors.  On February 12, 2007, Mr. Gribitz resigned
without appointing a successor.  On April 26, 2007, Mr. Parnes
resigned and appointed as his successor Leah Fang in a signed and
acknowledged instrument.  Although Ms. Fang noted her acceptance
at the bottom of such instrument, her signature was not
acknowledged.  However, in another document entitled "Release"
executed and acknowledged by Ms. Fang the same day, she, as

2

trustee, purported to discharge Mr. Parnes from liability.  It is undisputed that thereafter Ms. Fang acted as trustee.  Indeed, Ms. Fang's contention that she received a number of requests for information from petitioner and that petitioner referred to her in writing and orally as trustee is not disputed by petitioner.

On December 12, 2007, Ms. Fang, without resigning in accordance with the trust agreement, attempted to appoint Patricia Enriquez, as successor trustee.  Her designation of Ms. Enriquez, however, was by an unacknowledged letter in which she referred to her own resignation as taking effect upon Ms. Enriquez's acceptance of the appointment.  Ms. Enriquez accepted by signing the letter, but such acceptance was not acknowledged and, in any event, there is nothing in the record to suggest that such "acceptance" was delivered in accordance with the trust instrument.  Two weeks later, an attorney for Ms. Enriquez notified petitioner's counsel by email that her client had advised that she had no intention to overcome the procedural omissions.

On January 3, 2008, Ms. Fang and Dalia Genger signed before a notary a memorandum in which Ms. Fang stated that "to the extent that I am still vested with any powers to appoint trustees of the [trust], I confirm your appointment."  The next day, Ms. Fang executed an acknowledged instrument of resignation and appointment of successor trustee naming Dalia as her successor

3

and Dalia, on the same day, executed an acknowledged instrument of acceptance. It is undisputed that such documents were delivered in accordance with the trust requirements.

We address first that portion of the instant application which seeks the appointment of a successor trustee on the ground that Dalia was not validly appointed. In such connection, petitioner argues first that, because Ms. Fang's signature on the bottom of Mr. Parnes's appointment instrument was not acknowledged, she never accepted the position in accordance with the trust agreement (and thus could not appoint Dalia her successor). However, such argument ignores the "Release" mentioned above that Ms. Fang executed the same day. Such instrument, which was signed and duly acknowledged, unequivocally establishes Ms. Fang's acceptance of the position. Since petitioner does not challenge the authenticity of such instrument or Mr. Parnes' contention, supported by the record, that it was delivered in accordance with the trust instrument and, as noted above, petitioner thereafter communicated with Ms. Fang as trustee, Ms. Fang properly qualified as successor trustee.

Petitioner's second argument that, in any event, Ms. Fang's appointment of Dalia was ineffective because Ms. Fang had previously resigned as trustee is also without merit. Simply put, Ms. Fang had not previously resigned because her letter to Ms. Enriquez did not contain the formalities (i.e., an

4

acknowledgment) required by the trust agreement. Moreover, although not a model of clarity, the letter makes clear that Ms. Fang did not intend to leave the trust without a trustee in the event that Ms. Enriquez failed to qualify, which is exactly what happened. Thus, Ms. Fang had authority to appoint Dalia as her successor.

Since there is no dispute that the instrument of resignation and appointment executed by Ms. Fang on January 4, 2008, and Dalia's instrument of acceptance of the same date were executed and delivered in accordance with the trust agreement, Dalia is the duly appointed successor trustee of the trust. To find otherwise would be to ignore the chronology of events and the purpose of the provisions at issue, namely to ensure that the trust always has a fiduciary ready, willing and able to act. The fact that petitioner does not wish her mother to be the fiduciary because she considers her an adversary in a broader intra-family dispute does not provide a basis to ignore the grantor's intent, as reflected in the trust instrument, that an acting trustee, and not the beneficiary, decides who shall become a successor trustee. Accordingly, petitioner's application to appoint a successor trustee is denied.

We next turn to petitioner's alternate request for relief, namely that a "special trustee" be appointed for the "purpose of investigation and taking discovery with respect to the wrongful

5

dealings concerning the assets and income of the trust."

It is noted initially that petitioner's only allegations of "wrongful dealings" concern a close corporation, TPR Investment Associates, Inc.   She contends that her brother Sagi, who is an officer of TPR, and Dalia, who was a shareholder at the time this proceeding was commenced, are engaged in a "wrongful scheme" to divert assets to themselves and, as a result, Dalia "could not possibly" investigate wrongdoing at TPR, which the petition describes as the "greatest" asset of the trust.

However, the premise of the application, namely that the trust's interest in TPR would enable the trustee to investigate or seek relief from TPR, does not appear to be correct. Petitioner does not dispute Dalia's assertion, supported in the record, that the trust is not a shareholder of TPR at all. Rather, D&K LP, an entity in which the trust owns a 48 percent interest, in turn owns approximately 50 percent of TPR. Petitioner does not explain what appears to be a material misstatement concerning TPR's relationship to the trust.   Nor does she identify how a trustee under such circumstances might be in a position to "investigate and address the TPR issues".

In any event, assuming arguendo that a trustee would somehow be able to investigate alleged misconduct at TPR, petitioner's vague and speculative allegations of "wrongful conduct" at TPR from which Dalia purportedly benefitted do not warrant the

6

appointment of a "special trustee".  Similarly, petitioner's
allegations (made upon information and belief) that Dalia had
knowledge of alleged improper acts by former trustee, David
Parnes, in relation to TPR are patently insufficient to warrant
the remedy of a "special trustee".  In such connection, it is
noted that Mr. Parnes and Ms. Fang have been directed to account
for their proceedings as trustees (Matter of Genger, NYLJ, Feb.
25, 2008, at 29, col 3), giving petitioner a forum to seek relief
for most of the conduct about which she complains.

Finally, it is observed that petitioner has not alleged that
Dalia has refused a request for information, which would warrant
relief (SCPA 2102), or has failed as trustee to protect trust
assets.  Indeed, it appears that Dalia (who states that she is
ready and able to act as fiduciary) has yet to assume the duties
of trustee in deference to her daughter's position in this
litigation.  As a validly appointed trustee, she should be given
the opportunity to do what she deems necessary to manage and
protect the trust's assets.

Based upon the foregoing, the appointment of a "special
trustee" is unwarranted at this time and, accordingly, the
application is denied, without prejudice to renewal if future

7

circumstances warrant such relief.

This decision constitutes the order of the court.

S U R R O G A T E

Dated: December 31, 2008

8

# Exhibit 2

# MARKEWICH AND ROSENSTOCK LLP

8 East 41st Street • Fifth Floor • New York, New York 10017
tel: (212) 542-3156  fax: (212) 481 1761  emarkewich@nrialollp.com

Lawrence M. Rosenstock
Eve Rachel Markewich

Robert Markewich
of counsel

November 5, 2008

Hon. Renee R. Roth
Surrogate's Court, New York County
31 Chambers Street, 5th Floor
New York, New York 10007

Re:  In the Matter of Orly Genger
     File No. 0017/2008

Dear Surrogate Roth:

We write on behalf of the Petitioner, Orly Genger, with reference to her *sub judice* Petition as beneficiary of the Orly Genger Trust ("Orly Trust"). Recent events require that we, again, urge you to appoint Martin Coleman as Trustee. As set forth in detail below, there are several litigations in process that will impact the value of Trust assets, and the Orly Trust needs to have a Trustee who can participate in those litigations without conflict. There is also an outstanding matter regarding possession of a stock certificate belonging to the Orly Trust, but which is currently being held captive by another party.

Our Amended Petition sought the immediate appointment of a Trustee to administer the Orly Trust and safeguard its assets. We were thwarted in that request by objections from Sagi Genger ("Sagi"), the remote contingent remainderman of the Orly Trust, who manipulated various friends and relatives of his (his friend, David Parnes ("Parnes"); his sister-in-law Leah Fang; his sister-in-law's romantic partner, Patricia Enriquez; and his mother Dalia Genger ("Dalia")) to, seriatim, name one another Trustee and to take control of the Orly Trust, to the detriment of Orly.

Since our last contact with the Court, we believe Sagi and Dalia have acted in concert to devalue the Trust's most valuable asset, shares of a privately-held company called Trans Resources Inc. ("TRI"), a company founded by Orly's and Sagi's father, Arie Genger ("Arie").

The Orly Trust and a trust for the benefit of Sagi, (the "Sagi Trust"), were created by Arie in 1993. In 2004, when Arie and Dalia divorced, the two Trusts purchased TRI stock that at one time was marital property. This stock previously had been held by TPR[1], an entity in which Arie and Dalia held their family resources. As part of the marital settlement, the TRI stock held by TPR was sold to the Orly Trust, the Sagi Trust and Arie. As a result of the sales, the Sagi Trust and the Orly Trust each owned to approximately 19% of the outstanding TRI stock, and Arie owned approximately 15% of the TRI stock. The Trusts also executed irrevocable proxies granting to Arie the right to vote their shares of TRI stock. As a result, Arie continued to control TRI through the Genger family holdings of approximately 53% of the stock.

The remaining 47% TRI stock is held by third parties unrelated to the Gengers but related to each other ("Third Parties"). Last month, the Third Parties attempted a coup, by convincing Sagi to arrange the sale to them of the Sagi Trust's shares ("Sagi TRI Shares"). The purported sale was effected by a document signed by Rochelle Fang, Sagi's mother-in-law, who was then Trustee of the Sagi Trust. As soon as Rochelle, as Trustee, signed the purchase and sale agreement (the "PSA") regarding the Sagi TRI Shares, Rochelle – presumably at Sagi's request – resigned as Trustee. In Rochelle's place, David Parnes became Trustee of the Sagi Trust. Of course, this musical chairs game with the Trustee to the Sagi Trust is the same game played by the same people – Parnes, Sagi and Sagi's in-laws, the Fangs – regarding the trusteeship of the Orly Trust.

The PSA reflected a price for the Sagi TRI–Shares that is merely a fractional amount of their worth. Based on the 2008 earnings of TRI, the value of the Sagi TRI Shares is in excess of $150,000,000. Nonetheless, under the PSA, the Third Parties purport to purchase the Sagi TRI Shares for $26,715,416 – ie. at a discount of approximately $125,000,000 or more.

In the meantime, the Third Parties also have filed suit seeking to void the original transfer of the TRI shares from TPR to the two Trusts, claiming the sale was improper under the TRI shareholders agreement. Since the Third Parties claim that the stock owned by the Sagi Trust was never rightfully transferred to the Sagi Trust, the Third Parties insisted that the PSA be approved and executed not only by the Sagi Trust, but also by TPR. Upon information and belief, Dalia, as the controlling shareholder of TPR, consented to the sales

---

[1] In the Amended Petition, Orly requested limited letters to investigate the operations of TPR. TPR originally was owned 49%, indirectly, and equally, by the Sagi Trust and the Orly Trust, and 51% by Dalia. Recently, Dalia sold 2% of her shares to Sagi's mother-in-law, Rochelle Fang. Of particular concern to Orly is the fact that TPR has paid out well over a million dollars in compensation and other funds to Sagi and Dalia, without making comparable payments to Orly.

document affirming that if the Sagi Trust's TRI shares are, in fact, still owned by TPR, then TPR agrees to the sale to the Third Parties. By consenting to the sale, Dalia, simultaneously: (i) agreed to a share price for TRI at significantly below its actual value; (ii) conceded the possibility that the Orly Trust is not the owner of its most valuable asset – the TRI shares that had been transferred to it by TPR; (iii) agreed to cede control of TRI to the Third Parties; (iv) potentially caused a de-valuation of the Orly Trust's TRI shares; and (v) potentially caused a de-valuation of the Orly Trust's interest in TPR.

There are currently several litigations involving TPR and/or TRI, which directly affect the Orly Trust, including:

- GLENCLOVA INVESTMENT CO. v. TRANS-RESOURCES, INC. and TPR INVESTMENT ASSOCIATES INC. pending in the United States District Court, Southern District of New York;

- ROBERT SMITH, TR INVESTORS, LLC AND GLENCLOVA INVESTMENT CO. v. TRANS-RESOURCES, INC. pending in the Delaware Chancery Court;

- TR INVESTORS, LLC, GLENCLOVA INVESTMENT CO., NEW TR EQUITY I, LLC, and NEW TR EQUITY II, LLC v. ARIE GENGER and TRANS-RESOURCES, INC. pending in the Delaware Chancery Court.

- NEW TR EQUITY, LLC v. TRANS-RESOURCES, INC., pending in the Delaware Chancery Court.

These actions will have a direct impact on the Orly Trust's holdings, and the control and value of such holdings. It is, therefore, essential that a trustee immediately be appointed for the Orly Trust, so that decisions can be made to determine what steps to take with respect to these litigations and, in particular, whether the Orly Trust should seek to intervene in these lawsuits. It is likely that the only way to preserve the value of the TRI shares in the Orly Trust will be to intervene in some if not all of the litigations.

Sagi and Dalia are acting on their own accounts in the litigations. There is no one acting on behalf of Orly or the Orly Trust. The Orly Trust must have representation in the litigations that is independent from the Sagi Trust and TPR, as controlled by Dalia. Clearly, Dalia would not be independent. She is obviously in a position of conflict, having already approved a severely depressed valuation of the TRI stock. This conflict is separate and apart from the conflict that already existed, as set forth in the Amended Petition, as a result of Dalia taking money out of TPR, to the exclusion of the Orly Trust,

which has an independent significant ownership interest in TPR, albeit indirectly through another entity controlled by Dalia.

In addition to our concerns about the extant litigations, we are also concerned that Dalia and Sagi will attempt to sell the Orly Trust's TRI shares to the Third Parties – again, at a depressed value. In fact, we have sought to obtain the share certificate evidencing the Orly Trust's ownership of the TRI shares and have been thwarted by TRI's counsel. The need to take possession of that share certificate is yet another, separate, reason, why there is immediate need for the appointment of a Trustee other than Dalia.

For these reasons we respectfully request that the Court immediately resolve the outstanding application and appoint Martin Coleman as Trustee. (Although the Trustee must serve without commission, pursuant to the Trust Instrument, Mr. Coleman has agreed to take on this job.)

Respectfully yours,

Eve Rachel Markewich

ERM:js

cc:   Jonathan G. Kortmansky, Esq.
      Steven Hyman, Esq.
      Matthew Hoffman, Esq.
      Seth Rubenstein, Esq.
      Mary Santamarina, Esq.

# Exhibit 3

INDEX NO. 109749/2009

RECEIVED NYSCEF: 08/11/2010

FILED: NEW YORK COUNTY CLERK 08/11/2010

NYSCEF DOC. NO. 83

SUPREME COURT: NEW YORK COUNTY

| | |
|---|---|
| ORLY GENGER in her individual capacity and on behalf of the Orly Genger 1993 Trust (both in its individual capacity and on behalf of D & K Limited Partnership),<br><br>                                        Plaintiff,<br><br>                    - against -<br><br>DALIA GENGER, SAGI GENGER, LEAH FANG, D & K GP LLC, and TPR INVESTMENT ASSOCIATES, INC.,<br><br>                                        Defendants. | Index No.:  109749/09<br><br>**SECOND AMENDED VERIFIED COMPLAINT** |

Plaintiff Orly Genger in her individual capacity and on behalf of the Orly Genger 1993 Trust (both in its individual capacity and on behalf of D & K Limited Partnership), by her attorneys, Zeichner Ellman & Krause LLP, alleges, upon information and belief, for her Second Amended Verified Complaint against the defendants in this action as follows:

## NATURE OF THE ACTION

1.      As described below, Dalia and Sagi Genger, together with various business entities controlled by them and Leah Fang, engaged in a fraud and conspiracy designed to completely loot the Orly Genger 1993 Trust (the "Orly Trust") of its value. The defendants' various acts of self-dealing, material misrepresentations, and material omissions, in breach of their respective fiduciary duties and in violation of New York law, injured Orly Genger, the Orly Trust, and D & K Limited Partnership.

in TPR, from challenge or diminution in value.

36.    In addition, Sagi owes fiduciary duties to Orly arising from the close relationship of trust and confidence between him and his sister. Orly reposed complete trust, confidence and reliance upon her brother Sagi to protect both her interests and her Trust's interests, including her Trust's ownership interests in TPR and the TRI Shares, and to alert her to anything that may adversely affect her or her Trust's assets.

**E.    Dalia Gives Sagi Complete Control of TPR**

37.    On October 30, 2004, Dalia, as 52.96% owner of TPR, entered into a shareholder agreement with TPR, concerning the future management of the company. Pursuant to this shareholder agreement (attached hereto as **Exhibit 6**), Dalia gave D&K, which owned 49% of TPR, the authority to appoint one board member to TPR's two-member board of directors. Sagi used his managerial control over D&K to appoint himself as D&K's representative on TPR's board. In addition, the shareholder agreement appointed Sagi as CEO of TPR. As TPR's majority shareholder, Dalia named herself as TPR's remaining board member.

38.    Sometime in 2007, Sagi stripped Dalia of her majority interest in TPR by selling a 2% interest in TPR to Rochelle Fang, his mother-in-law. At the time of the sale, TPR's assets were worth between approximately $11,000,000 and $12,000,000, plus the value of the Note.

39.    Around the time of her appointment as successor trustee to the Orly

Trust in January 2008, Dalia divested herself of the balance of her TPR shares.

40.     Through the above-mentioned transactions, Sagi obtained direct control over TPR and its interest in the Note. Notably, Sagi's role as CEO of TPR (the creditor on the Note) is in direct conflict with his role as manager of D&K (the debtor on the Note), whose role was to repay the Note or to contest the Note's enforceability.

41.     Moreover, Sagi's dual control over both TPR and D&K directly conflicts with Sagi's and D&K GP's undiluted fiduciary duties to D&K's limited partners, including the Orly Trust, to manage, maintain and protect D&K's assets from challenge or diminution in value. Sagi would later use his dual positions at TPR and D&K to engage in self-dealing in connection with the Note and to damage the Orly Trust and Orly, in violation of his fiduciary duties.

42.     Notably, other New York courts have recognized Sagi's willingness to engage in self-dealing, ignore clear conflicts of interest, and collude with his mother, Dalia, to the detriment of the other Genger family members. See Orders and Transcripts attached hereto as Exhibit 7.

F.     Fang and then Dalia Gain Control over the Orly Trust

43.     In connection with the Settlement Agreement, Dalia required that the Trustees of the Orly Trust and the Sagi Trust (Sash A. Spencer and Lawrence M. Small) resign and be replaced with Sagi's longtime friends, David Parnes and Eric Gribetz. Mr. Gribetz, subsequently retired as trustee without appointing a successor in

**VERIFICATION**

STATE OF NEW YORK,
COUNTY OF NEW YORK.

ORLY GENGER, being duly sworn, says that she is the plaintiff named in the foregoing second amended verified complaint; that she has read the foregoing second amended verified complaint, and that the complaint is true to her own knowledge except as to those matters therein stated to be alleged upon information and belief, and that as to those matters she believes them to be true.

_____
ORLY GENGER

Sworn to before me this
4th day of August, 2010

_____
Notary Public

ANTHONY ROSARIO
Notary Public, State of New York
No. 01RO6212071
Qualified in Bronx County
Commission Expires 10/05/2013

# Exhibit 4

## MARKEWICH AND ROSENSTOCK LLP

8 East 41ˢᵗ Street • Fifth Floor • New York, New York 10017
*tel:* (212) 542-3156  *fax:* (212) 481 1761   *lrosenstock@mrlawllp.com*

Lawrence M. Rosenstock
Eva Rachel Markewich

Robert Markewich
of counsel

August 28, 2008

**BY HAND AND MAIL**

Dalia Genger
200 East 65ᵗʰ Street, 32W
New York, New York 10021

Re:   <u>1993 Orly Genger Trust</u>

Dear Ms. Genger:

It has come to our attention that you may be considering attempting to act on behalf of the Orly Genger Trust (the "Trust").

We remind you that you have no authority to act for the Trust and that on March 4, 2008 Surrogate Roth directed that no actions were to be taken with reference to the Trust assets. Should you violate the Court order, or in any way interfere with the ownership and/or value of the Trust assets or take any action with respect to Trust assets, we will hold you personally responsible for any loss or damage that may be incurred and seek to hold you in contempt. To the extent others are involved in guiding or facilitating wrongful conduct on your part, we will also seek remedies against them.

We reserve any and all rights with respect to your conduct concerning the Trust.

Very truly yours,

Lawrence M. Rosenstock

LMR:js

cc:   Jonathan G. Kortmansky, Esq. (by hand)
      Sulllivan & Worcester LLP

      Orly Genger

*Genger-letter dalia genger 8-28.doc*

# MARKEWICH AND ROSENSTOCK LLP
### 8 East 41ˢᵗ Street • Fifth Floor • New York, New York 10017
#### tel: (212) 542-3156  fax: (212) 481 1761   lrosenstock@mrklawllp.com

Lawrence M. Rosenstock
Eve Rachel Markewich

Robert Markewich
of counsel

August 28, 2008

**BY HAND AND EMAIL**

Jonathan G. Kortmansky, Esq.
Sullivan & Worcester LLP
1290 Avenue of the Americas
New York, New York 10104

Re:   <u>1993 Orly Genger Trust</u>

Dear Mr. Kortmansky:

    I am writing you on behalf of Orly Genger, the beneficiary of the Orly Genger Trust(the "Trust").  By letter dated August 28, 2008, a copy of which is enclosed, we advised Dalia Genger, among other things, that when we were before the court on this matter on March 4, 2008, Surrogate Roth directed that no actions were to be taken with respect to Trust assets.  As attorneys for Dalia Genger we expect that you will so advise your client of this direction and to take all appropriate steps to see that she complies with Surrogate Roth's order.

Very truly yours,

Lawrence M. Rosenstock

LMR:js

cc:   Hon. Surrogate Renee R. Roth
      Orly Genger

Genger-letter dalia genger 8-28.doc

# Exhibit 5

# STOCK PURCHASE AGREEMENT

by and among

**TR INVESTORS, LLC,**

**GLENCLOVA INVESTMENT CO.,**

**NEW TR EQUITY I, LLC**

and

**NEW TR EQUITY II, LLC**

as Purchasers,

**SAGI GENGER 1993 TRUST**

as Seller

and

**TPR INVESTMENT ASSOCIATES, INC.**

Dated as of August 22, 2008

## STOCK PURCHASE AGREEMENT

THIS STOCK PURCHASE AGREEMENT ("Agreement"), dated as of the 22nd day of August, 2008, by and among TR Investors, LLC, a Delaware limited liability company ("TR Investors"), Glenclova Investment Co., a Cayman Islands corporation, ("Glenclova"), New TR Equity I, LLC, a Delaware limited liability company ("Equity I") and New TR Equity II, LLC, a Delaware limited liability company ("Equity II" and collectively with TR Investors, Glenclova and Equity I, the "Purchasers"), the Sagi Genger 1993 Trust ( "Seller"), and TPR Investment Associates, Inc., a Delaware corporation ("TPR").

### WITNESSETH:

WHEREAS, Seller is the record and beneficial owner of an aggregate of one thousand one hundred two and eight-tenths (1,102.80) shares of common stock (the "Common Stock"), par value $.01 per share, of Trans-Resources, Inc., a Delaware corporation (the "Company");

WHEREAS, Seller desires to sell to TR Investors, and TR Investors desires to purchase from Seller, two hundred seventy five and seven-tenths (275.70) shares of Common Stock (the "TR Investors Shares");

WHEREAS, Seller desires to sell to Glenclova, and Glenclova desires to purchase from Seller, two hundred seventy five and seven-tenths (275.70) shares of Common Stock (the "Glenclova Shares");

WHEREAS, Seller desires to sell to Equity I, and Equity I desires to purchase from Seller, two hundred seventy five and seven-tenths (275.70) shares of Common Stock (the "Equity I Shares"); and

WHEREAS, Seller desires to sell to Equity II, and Equity II desires to purchase from Seller, two hundred seventy five and seven-tenths (275.70) shares of Common Stock (the "Equity II Shares" together with the TR Investors Shares, the Glenclova Shares and the Equity I Shares, the "Shares").

NOW, THEREFORE, in consideration of the mutual promises and covenants set forth herein, the parties hereto, intending to be legally bound hereby, agree as follows:

1. **Sale of Shares.** Upon the terms of this Agreement, the Purchasers, severally and not jointly, hereby purchase, acquire and accept from Seller, and the Seller hereby sells, conveys assigns, transfers and delivers to the Purchasers, all right, title and interest in and to the Shares as follows:

(a)   TR Investors hereby purchases, acquires and accepts from Seller, and the Seller hereby sells, conveys assigns, transfers and delivers to TR Investors, all right, title and interest in and to the TR Investors Shares, free and clear of any and all liens, obligations or encumbrances;

(b)   Glenclova hereby purchases, acquires and accepts from Seller, and the Seller hereby sells, conveys assigns, transfers and delivers to Glenclova, all right, title and interest in and to the Glenclova Shares, free and clear of any and all liens, obligations or encumbrances; and

(c)   Equity I hereby purchases, acquires and accepts from Seller, and the Seller hereby sells, conveys assigns, transfers and delivers to Equity I, all right, title and interest in and to the Equity I Shares, free and clear of any and all liens, obligations or encumbrances.

(d)   Equity II hereby purchases, acquires and accepts from Seller, and the Seller hereby sells, conveys assigns, transfers and delivers to Equity II, all right, title and interest in and to the Equity II Shares, free and clear of any and all liens, obligations or encumbrances.

2.   Consideration and Closing Deliveries.

(a)   Upon the terms of this Agreement, in consideration of the sale of the Shares to the Purchasers and the other agreements of the Seller contained herein, the Purchasers, herewith cause to be delivered to the Seller through and pursuant to the Escrow Agreement (as defined below), in full payment for the aforesaid sale of the Shares, an aggregate amount equal to twenty six million seven hundred fifteen thousand four hundred sixteen dollars ($26,715,416) (the "Purchase Price") as follows:

(i)   in respect of the TR Investors Shares, (a) by wire transfer of a portion of the Purchase Price equal to $1,718,750 in immediately available funds to the Escrow Agent (as hereinafter defined) and then by the Escrow Agent to a bank account designated in writing by the Seller, and (b) a portion of the Purchase Price equal to $4,960,104 by wire transfer to the Escrow Agent to be held by the Escrow Agent pursuant to Section 2(b) hereof;

(ii)   in respect of the Glenclova Shares, (a) by wire transfer of a portion of the Purchase Price equal to $1,718,750 in immediately available funds to the Escrow Agent (as hereinafter defined) and then by the Escrow Agent to a bank account designated in writing by the Seller, and (b) a portion of the Purchase Price equal to $4,960,104 by wire transfer to the Escrow Agent to be held pursuant to Section 2(b) hereof; and

(iii)   in respect of the Equity I Shares, (a) by wire transfer of a portion of the Purchase Price equal to $1,718,750 in immediately available funds to the Escrow Agent (as hereinafter defined) and then by the Escrow Agent to a bank account designated in writing by the Seller, and (b) a portion of the Purchase Price equal to

3

$4,960,104 by wire transfer to the Escrow Agent to be held pursuant to Section 2(b) hereof.

(iv)   in respect of the Equity II Shares, (a) by wire transfer of a portion of the Purchase Price equal to $1,718,750 in immediately available funds to the Escrow Agent (as hereinafter defined) and then by the Escrow Agent to a bank account designated in writing by the Seller, and (b) a portion of the Purchase Price equal to $4,960,104 by wire transfer to the Escrow Agent to be held pursuant to Section 2(b) hereof.

(b)   The parties are herewith entering into an Escrow Agreement (the "Escrow Agreement"), among the Purchasers Seller and Troutman Sanders LLP, as escrow agent (the "Escrow Agent"), pursuant to which the Purchasers, severally and not jointly, are depositing the amounts set forth in Sections 2(a)(i)(b), 2(a)(ii)(b), 2(a)(iii)(b) and 2(a)(iv)(b) hereof (collectively, the "Escrow Amount") to be held pursuant to this Agreement and the Escrow Agreement.

(c)   As promptly as practicable, Seller shall deliver to the Escrow Agent, either (i) stock certificates representing the Shares issued in the name of Seller, accompanied by stock powers duly executed in blank with appropriate transfer stamps, if any, affixed, and any other documents that are necessary to transfer title to the shares to the Purchasers (or any designee of the Purchasers), free and clear of any and all liens, obligations or encumbrances, or (ii) stock certificates issued in the names of TR Investors, Glenclova, Equity I and Equity II for the TR Investor Shares, the Glenclova Shares, the Equity I Shares and the Equity II Shares, respectively, in each case free and clear of any and all liens, obligations or encumbrances.

(d)   Subject to Section 2(e) hereof, upon the delivery of stock certificates required by Section 2(c), the Escrow Agent shall release the Escrow Amount to the Seller in accordance with the terms and conditions of the Escrow Agreement.

(e)   Notwithstanding the foregoing, Seller may at any time following the date hereof, direct the Escrow Agent to release up to an aggregate of $500,000 of the Escrow Amount, provided such amounts are held in escrow at such time, to a charity or charities of its choice pursuant to the terms and conditions of the Escrow Agreement.

3.   Closing.  The closing of the transactions contemplated in this Agreement (the "Closing") is taking place at the offices of The Trump Group at 3:00 p.m., Eastern Daylight Time, on the date hereof (the "Closing Date").

4.   Representations and Warranties of Seller.  In connection with the purchase and sale of the Shares referred to in Section 1 hereof and the execution and performance of this Agreement, Seller represents and warrants to the Purchasers as follows:

(a)   Seller is the record and beneficial owner of all right, title and interest in and to all of the Shares and had good and transferable title thereto, free and clear of all liens, obligations, encumbrances, restrictions, pledges, charges, options, preemptive rights, subscription rights, warrants, calls, security interests, and claims of every kind.



4

(b)    Seller has the full right, power, and authority to sell and deliver the Shares in accordance with this Agreement.

(c)    The delivery of the Shares delivered pursuant to Sections 1 and 2 hereof will transfer valid title thereto, free and clear of all liens, obligations, encumbrances, restrictions, pledges, charges, options, preemptive rights, subscription rights, warrants, calls, security interests, and claims of every kind.

(d)    The execution, delivery, and performance of this Agreement, the consummation of the transactions contemplated hereby, and the compliance with or fulfillment of the terms and provisions of this Agreement or of any other agreement or instrument contemplated by this Agreement, do not and will not (i) contravene any law, rule, or regulation of any state or of the United States; (ii) contravene any order, writ, award, judgment, decree, or other determination that affects or binds Seller or the Company, or any of their respective properties; (iii) conflict with, result in a breach of, constitute a default under, or give rise to a right of termination under any contract, agreement, note, deed of trust, mortgage, trust, lease, governmental or other license, permit, or other authorization, or any other instrument or restriction to which Seller or the Company is a party; or (iv) require Seller to obtain the approval, consent, or authorization of, or to make any declaration, filing, or registration with, any third party or any foreign, federal, state, county, or local court, governmental authority, or regulatory body.

(e)    Seller is not subject to any order, writ, award, judgment, decree, or determination, is not a party to or bound by any contract, agreement, note, deed of trust, mortgage, trust, lease, governmental or other license, permit, or other authorization, or other instrument or restriction that could conflict with, impair, impose restrictions or otherwise prevent or delay the execution, delivery, or performance of this Agreement or the consummation of the transactions contemplated by this Agreement.

(f)    This Agreement is the legal, valid, and binding agreement of Seller and is enforceable in accordance with its terms, subject to (i) bankruptcy, insolvency, fraudulent conveyance, reorganization, moratorium, or other laws or equitable principles relating to or affecting the enforcement of creditors' rights generally, and (ii) the effect of general principles of equity, including, without limitation, concepts of materiality, reasonableness, good faith and fair dealing (regardless of whether considered in a proceeding in equity or at law),.

(g)    None of the representations and warranties of Seller contained herein and none of the written information or written documents furnished to the Purchasers or any of their respective representatives by Seller or its representatives is false or misleading in any material respect or omits to state a fact herein or therein necessary to make the statements made herein not misleading in any material respect.

(h)    Seller has made an independent decision to sell the Shares based on the information available to it and that it has determined is adequate for that purpose, Seller has had the opportunity to review all information which it deems relevant to its decision to sell

5

the Shares, and Seller has not relied on any information (in any form, whether written or oral) furnished by or on behalf of the Purchasers or the Company in making that decision.

(i)   Neither the Purchasers, nor the Company has given any investment advice or rendered any opinion to Seller as to whether the sale of the Shares is prudent or suitable, and Seller is not relying on any representation or warranty other than those made by the Purchasers expressly in this Agreement.

(j)   Seller is a sophisticated investor with respect to the Shares and has adequate information concerning the Shares. Seller believes, by reason of its and its beneficiary's business and financial experience and the information and knowledge that its beneficiary holds with respect to the Company and its business, that it is capable of evaluating the merits and risks of the sale and of protecting its own interest and the interest of its beneficiary in connection with the transactions contemplated by this Agreement. Seller has had the opportunity to have legal counsel review and advise it with respect to the terms of this Agreement.

(k)   Seller acknowledges that (i) the Purchasers currently may have material information regarding the condition (financial or otherwise), results of operations, businesses, properties, plans, and prospects of the Company that may be material to a decision to sell the Shares ("Excluded Information") and that such Excluded Information may affect the value of the Shares. Seller further acknowledges that it has determined to sell the Shares notwithstanding its lack of knowledge of the Excluded Information. Seller represents that it has adequate information concerning the business and financial condition of the Company and its affiliates to make an informed decision regarding the sale of the Shares pursuant hereto and has independently and without reliance upon the Purchasers made its own analysis and decision to sell the Shares pursuant hereto. Seller acknowledges that the sale of the Shares is the result of independent arm's-length negotiations between Seller and the Purchasers.

5.   <u>Representations and Warranties of the Purchasers</u>.  In connection with the purchase and sale of the Shares referred to in Section 1 hereof and the execution and performance of this Agreement, each Purchaser represents and warrants, severally and not jointly, to Seller as follows:

(a)   Such Purchaser has the full right, capacity, power, and authority to execute and deliver this Agreement, to consummate the transactions contemplated by this Agreement, and to comply with the terms, conditions, and provisions of this Agreement.

(b)   The execution, delivery, and performance of this Agreement, the consummation of the transactions contemplated hereby and the compliance with or fulfillment of the terms and provisions of this Agreement or of any other agreement or instrument contemplated by this Agreement, do not and will not (i) contravene any law, rule, or regulation of any state or of the United States; (ii) contravene any order, writ, award, judgment, decree, or other determination that affects or binds such Purchaser or any of its properties; (iii) conflict with, result in a breach of, constitute a default under, or give rise to a right of termination under any contract, agreement, note, deed of trust, mortgage, trust, lease, governmental or other license, permit, or other authorization, or any other instrument or restriction to which such

6

Purchaser is a party or by which any of its properties may be affected or bound; or (iv) require such Purchaser to obtain the approval, consent, or authorization of, or to make any declaration, filing, or registration with, any third party or any foreign, federal, state, county, or local court, governmental authority, or regulatory body that has not been obtained in writing prior to the date of this Agreement.

(c)     Such Purchaser is not subject to any order, writ, award, judgment, decree, or determination nor a party to nor bound by any deed of trust, mortgage, trust, lease, governmental or other license, permit, or other authorization, contract, agreement, note, or other instrument or restriction that could conflict with or prevent the execution, delivery, or performance of this Agreement or the consummation of the transactions contemplated hereby.

(d)     This Agreement is the legal, valid, and binding agreement of such Purchaser and is enforceable in accordance with its terms, subject to (i) bankruptcy, insolvency, fraudulent conveyance, reorganization, moratorium, or other laws or equitable principles relating to or affecting the enforcement of creditors' rights generally and, (ii) the effect of general principles of equity, including, without limitation, concepts of materiality, reasonableness, good faith and fair dealing (regardless of whether considered in a proceeding in equity or at law).

(e)     Such Purchaser hereby acknowledges receipt of copies of the Irrevocable Proxy, dated as of October 29, 2004, issued by Seller in favor of Arie Genger with respect to the Shares (the "Proxy"), a back-up form of voting trust agreement and voting trust certificate delivered in connection with the Proxy and the letter agreement dated October 29, 2004 with respect to the transfer of the Shares from TPR to Seller.

(f)     Such Purchaser has no actual knowledge of any contract, agreement, note, or other instrument or restriction to which the Seller is subject that could conflict with or prevent the execution, delivery, or performance of this Agreement or the consummation of the transactions contemplated hereby.

6.    Covenants.  Promptly following the execution hereof, Seller shall use all best efforts to cause the Company to recognize Seller as the record and beneficial owner of the Shares in the Company's stock registry.  In furtherance of the foregoing, Seller shall use all best efforts to promptly submit through the Escrow Agent or directly as instructed by the Purchasers a lost certificate affidavit in respect of the Shares to the Company, substantially in the form attached hereto as Exhibit A, and cause the Company to deliver to it (or the Escrow Agent as instructed by the Purchasers) a validly issued stock certificate in respect of the Shares to Seller in Seller's name.  To the extent that Seller is asked by the Purchasers to commence a lawsuit or other proceeding in furtherance of the foregoing, the Purchasers shall select legal counsel for such matters, and shall pay the legal expenses and fees in connection therewith on Seller's behalf.

7.    Indemnification.  Seller agrees to indemnify, defend and hold harmless each Purchaser and its affiliates and controlling persons, and its and their respective directors, officers, employees and agents (collectively, the "Indemnified Group"), at any time after the Closing Date, from and against all demands, claims, actions, or causes of action, assessments,

7

losses, damages, deficiencies, liabilities (including strict liability), costs, and expenses of investigation, including, without limitation, interest, penalties and reasonably attorney's fees and expenses and consultants fees (collectively, "Damages") asserted against, resulting to, imposed upon, or incurred by any member of the Indemnified Group, directly or indirectly, by reason of or resulting from:

    (a) a breach of any representation, warranty, covenant, or agreement of the Seller contained in or made pursuant to this Agreement or any related agreement;

    (b) any failure of the Company to recognize the Seller as the record and beneficial owner of the Shares; and

    (c) any Shares that are subject to any liens, obligations or encumbrances.

    8. <u>Survival of Representations, Warranties, Covenants, and Agreements</u>. All representations, warranties, covenants, and agreements made in this Agreement shall survive the execution of this Agreement, the closing of the transactions contemplated hereby, and the delivery of the certificates or other evidence of the Shares sold hereunder for a period of three (3) years after the Closing.

    9. <u>Rescission</u>. Each of the Purchasers and Seller hereby agree, that in the event that any member of the Indemnified Group makes a claim for indemnification pursuant to Section 7(b) or 7(c), the Purchasers, may in their sole and absolute discretion, elect to void the transactions contemplated hereby and promptly receive a full refund by Seller of the Purchase Price.

    10. <u>Valid Transfer</u>. If at any time following the Closing Date, it is determined that Seller is not the record and beneficial owner of the Shares as of the date hereof by virtue of the transfer of the Shares to it by TPR being deemed to have been void or for any other reason, and that all right, title and interest in and to the Shares is held by TPR, subject only to the plaintiff's asserted rights under the Stockholders Agreement asserted in the action styled Glenclova Investment Co. v. Trans-Resources, Inc. and TPR Investment Associates, Inc., Case No. 08-CIV-7140 (JFK), pending in the United States District Court for the Southern District of New York, the parties hereby agree that (a) this Agreement and the transactions contemplated hereby shall be deemed to have been entered into and consummated with TPR, (b) the Purchasers shall retain all right, title and interest in and to the Shares as if purchased from TPR pursuant to this Agreement, (c) TPR shall look only to Seller for any payments made by the Purchasers pursuant to this Agreement, (d) the Purchasers shall have no liability or obligation to TPR in respect of the Shares, and (e) all representations, warranties, covenants and agreements made by Seller herein, shall be deemed to have been made by TPR as of the date hereof.

    11. <u>Other Shares</u>. If at any time following the Closing Date, it is determined that Arie Genger is not the record and beneficial owner of the 794.40 shares of Common Stock of the Company purportedly transferred to him by TPR in October, 2004 and/or that Orly Genger 1993 Trust is not the record and beneficial owner of the 1,102.80 shares of Common

8

Stock of the Company purportedly transferred to such Trust by TPR in October, 2004, and that TPR is determined to be the record or beneficial owner of any such shares, in either or both cases by virtue of the transfer of such shares being deemed to have been void or for any other reason (the shares being so effected being referred to herein as the "Affected Shares") then TPR shall promptly transfer 64% of the Balance Shares (as such term is defined in the Stockholders Agreement dated March 30, 2001, among TPR, TR Investors, Glenclova and the Company (the "Stockholders Agreement")) to TR Investors and Glenclova in accordance with the terms of Section 1.6 of the Stockholders Agreement whether or not such agreement is then still in effect.

12. Entire Agreement. This Agreement and the Letter Agreement set forth the entire agreement between the parties hereto with respect to the purchase and sale of the Shares contemplated herein and supersedes all prior written or oral agreements or understandings between the parties hereto relating to the subject matter hereof.

13. Benefit. This Agreement shall be binding upon and inure to the benefit of the respective legal representatives, heirs, successors, and assigns of the parties. This Agreement may not be assigned by the Purchasers or Seller.

14. Notices. All notices and other communications, whether required or otherwise, made under this Agreement shall be in writing and shall be deemed to have been given if personally delivered or mailed by registered, certified, or first-class mail, postage prepaid, or sent by overnight delivery, telex, telegram, or facsimile transmission:

if to Seller, to it at:

Sagi Genger 1993 Trust
1211 Park Avenue
New York, New York 10128
Attention: Mr. Sagi Genger
Fax: (802) 375-2949

if to Purchasers, to the appropriate Purchaser at:

TR Investors, LLC
c/o The Trump Group
4 Stage Coach Run
East Brunswick, New Jersey 08816
Attention: James M. Lieb, Esq.
Fax: (732) 390-3319

New TR Equity I, LLC
c/o The Trump Group
4000 Island Blvd
Williams Island, Florida 33160
Attention: Mr. Jules Trump

9

New TR Equity II, LLC
c/o The Trump Group
4000 Island Blvd
Williams Island, Florida 33160
Attention: Mr. Eddie Trump
Fax: (305) 933-9514

Glenclova Investment Co.
c/o Carmel Investment Fund
TK House
Bayside Executive Park
West Bay Street and Blake Road
Nassau, Bahamas
Attention: Mr. Robert Smith
Fax: (242) 327-2289

with copy, in each instance, to:

Mark S. Hirsch, Esq.
404 Park Avenue South, 6th Floor
New York, New York 10019
Fax:(917) 546-7009

or to such other address or to such other person as one party shall have last designated by notice to the other party hereto. Notices delivered personally or by overnight delivery shall be effective upon delivery. Notices properly addressed and delivered by mail, return receipt requested, shall be effective upon deposit with the United States Postal Service. Notices sent by telex, telecopier, or facsimile transmission shall be effective upon confirmation of transmission.

15. Paragraph Headings. The headings of paragraphs contained in this Agreement are provided for convenience only. They form no part of this Agreement and shall not affect its construction or interpretation. All references to paragraphs in this Agreement refer to the corresponding paragraphs of this Agreement.

16. Amendment. Neither this Agreement nor any terms or provisions hereof may be changed, waived, discharged, or terminated orally, or in any manner other than by an instrument in writing signed by the party against whom the enforcement of the change, waiver, discharge, or termination is sought.

17. Counterparts. This Agreement may be executed simultaneously in counterparts, each of which shall be deemed to be an original, but all of which together shall constitute one and the same instrument. It shall not be necessary that any single counterpart be executed by all parties provided that each party shall have executed at least one counterpart.

18. Further Assurances. Each of the parties hereto shall use all best efforts to do all things necessary or advisable to make effective the transactions contemplated hereby and

10

shall cooperate and take such action as may be reasonably requested by the other party in order to carry out fully the provisions and purposes of this Agreement and the transactions contemplated hereby and to vest in the Purchasers all rights in respect of the Shares, including, but not limited to, the right to vote, exercise rights under the Stockholders Agreement and transfer the Shares. From and after the Closing Date, the parties hereto agree to execute or cause to be executed such further agreements, documents or instruments as may be reasonably requested by one of the parties hereto in order to effect the transactions contemplated hereunder or to exercise any and all rights in respect of the Shares, including, but not limited to, the right to vote, exercise rights under the Stockholders Agreement and transfer the Shares.

19. <u>Jurisdiction</u>. Each party hereby consents to the exclusive jurisdiction of the courts of the State of Delaware as to all matters relating to the enforcement, interpretation, or validity of this Agreement, and if such party is a non-resident of the State of Delaware, appoints the Secretary of State of the State of Delaware as its agent for service of process.

20. <u>Specific Performance</u>. The parties agree that this Agreement may be enforced in equity, and that specific performance or other equitable relief would be an appropriate remedy in any such action, in addition to any monetary or other damages which may be proved. It is accordingly agreed that the Purchasers, in addition to any other remedy to which they may be entitled in law or in equity, shall be entitled to an injunction or injunctions to prevent breaches of this Agreement and to compel specific performance of this Agreement, without the need for proof of actual damages. Seller agrees to waive, and to cause its affiliates to waive, any requirements for the securing or posting of any bond in connection with such remedy. Seller also agrees to reimburse the Purchasers for all costs and expenses, including attorneys' fees, incurred by it in successfully enforcing Seller's or its affiliates' obligations hereunder.

21. <u>Governing Law</u>. This Agreement shall be governed by the laws of the State of Delaware, without regard to any conflicts of law principles.

22. <u>Severability</u>. If any provision of this Agreement or the application thereof to any person or circumstance shall be invalid or unenforceable to any extent, the remainder of this Agreement and the application of such provisions to other persons or circumstances shall not be affected thereby and shall be enforced to the greatest extent permitted by law.

23. <u>No Presumption Against the Drafter</u>. Each of the parties to this Agreement participated in the drafting of this Agreement and the interpretation of any ambiguity contained in the Agreement will not be affected by the claim that a particular party drafted any provision hereof.

[SIGNATURE PAGE FOLLOWS]

11

IN WITNESS WHEREOF, the parties have duly executed this Agreement effective as of the date and year first above-written.

TR INVESTORS, LLC

By: _____
    Name: Jim Lieb
    Title: Executive Vice-President

GLENCLOVA INVESTMENT CO.

By: _____
    Name: Robert Smith
    Title: Chairman

NEW TR EQUITY I, LLC

By: _____
    Name: MARK S. HIRSCH
    Title: EXECUTIVE VP / GEN'L COUNSEL

NEW TR EQUITY II, LLC

By: _____
    Name:
    Title:

SAGI GENGER 1993 TRUST

By: _____
    Name: Rochelle Fang
    Title: Trustee

TPR INVESTMENT ASSOCIATES, INC.

By: _____
    Name: Sagi Genger
    Title: President

12

# Exhibit 6

Westlaw

Page 1

Not Reported in A.2d, 2010 WL 2901704 (Del.Ch.)
(Cite as: 2010 WL 2901704 (Del.Ch.))

H
Only the Westlaw citation is currently available.

UNPUBLISHED OPINION. CHECK COURT
RULES BEFORE CITING.

Court of Chancery of Delaware.
TR INVESTORS, LLC, Glenclova Investment Co.,
New TR Equity I, LLC, New TR Equity II, LLC,
and Trans-Resources, Inc., Plaintiffs,
v.
Arie GENGER, Defendant.
Arie Genger, Counterclaim Plaintiff,
v.
TR Investors, LLC, Glenclova Investment Co.,
New TR Equity I, LLC, New TR Equity II, LLC,
and Trans-Resources. Inc., Counterclaim Defend-
ants.

C.A. No. 3994-VCS.
Submitted: April 26, 2010.
Decided: July 23, 2010.

West KeySummaryCorporations and Business
Organizations 101 ____||1409

101 Corporations and Business Organizations
   101V Capital and Stock
      101V(D) Transfer of Shares
         101k1404 Restrictions and Agreements on
Right to Transfer
            101k1409 k. Actions to enforce restric-
tion or right of first refusal. Most Cited Cases
   (Formerly 101k82)
   Founder of corporation did not give the major-
ity stockholder notice that he transferred his shares
to his son's trust shortly after the transfer, and thus
the transfer had not been made appropriately for the
majority to be expected to exercise its rights under
a stockholder agreement within the required time
frame for the majority to be chargeable with laches.
The founder testified that he told the majority
stockholder's agent about the transfers on a number
of occasions within a year of the transfer while the

two discussed developments in the founder's di-
vorce. The agent denied that the founder ever men-
tioned the transfers during this period. The only
other person who testified to hearing the two dis-
cuss the matter was the founder's daughter, but her
testimony gave little detail about what was said
during those alleged conversations, and it was con-
tradicted by the founder himself, who said that she
was not present at the key conversation when he
told the agent about the transfers.

Thomas J. Allingham II, Esquire, Anthony W.
Clark, Esquire, Robert A. Weber, Esquire, Skadden,
Arps, Slate, Meagher & Flom LLP, Wilmington,
Delaware, Attorneys for Plaintiffs.

Donald J. Wolfe, Jr., Esquire, Brian C. Ralston, Es-
quire, Scott B. Czerwonka, Esquire, Potter Ander-
son & Corroon LLP, Wilmington, Delaware; Mi-
chael P. Carroll, Esquire, Avi Gesser, Esquire, Dav-
is Polk & Wardwell LLP, New York, New York.
Attorneys for Defendant.

MEMORANDUM OPINION
STRINE, Vice Chancellor.
   I. Introduction
   *1 This dispute over the control of Trans-
Resources, Inc. ("Trans-Resources") is between the
company's founder and former chief executive of-
ficer, Arie Genger, and the plaintiffs, who provided
capital to Trans-Resources when the company was
in financial distress. The plaintiffs are all entities
controlled by the Trump family, led by Jules Trump
and his brother Eddie Trump (collectively, with the
plaintiffs, the "Trump Group"). Jules Trump was a
long-time friend of Arie Genger, and he was happy
to help Genger when Trans-Resources neared in-
solvency in 2001.

   In return for retiring nearly all of Trans-
Resources' outstanding bonds, the Trump Group re-
ceived a minority stake in the company and a num-
ber of protections in a stockholders agreement (the

Not Reported in A.2d, 2010 WL 2901704 (Del.Ch.)
(Cite as: 2010 WL 2901704 (Del.Ch.))

"Stockholders Agreement"). The Stockholders Agreement prohibited either party from transferring their shares in Trans-Resources to anyone other than a limited number of permitted transferees. That prohibition against transfer was particularly important to the Trump Group, which was concerned that Genger might transfer his shares that were held through an entity under his control, TPR Investment Associates, Inc. ("TPR"), to a member of his family. A bitter dispute had arisen between Genger and his son, Sagi Genger, during the time Genger's marriage unraveled in the early 2000s, and the Trump Group wanted no part of the family drama.

In 2004, Genger caused TPR to transfer its shares in Trans-Resources, subject to an irrevocable proxy in his favor, to his children's trusts (the "2004 Transfers"), under a settlement in the contentious divorce between him and his wife. Because those trusts were not permitted transferees, the 2004 Transfers violated the terms of the Stockholders Agreement. Under the terms of the Stockholders Agreement, that violation rendered the transfers ineffective and gave the Trump Group the right to acquire the shares that were transferred.

But Genger did not notify the Trump Group of the transfers at that time, and thereby deprived the Trump Group of its right to declare the transfers void or exercise its right to acquire the shares in 2004. Genger claims that he mentioned the 2004 Transfers to Jules Trump during a private conversation in 2004, but his testimony did not convince me that this was true. The most convincing reading of the evidence is that the Trump Group did not receive notice of the 2004 Transfers until nearly four years later, when Genger once again asked Jules Trump for help when Trans-Resources was in financial distress. Moreover, informal notice to Jules Trump would not constitute the notice that was required to be given to the Trump Group entities under the Stockholders Agreement.

By 2008, Trans-Resources' bank was unwilling to negotiate with Genger, so Genger asked Jules

Trump not only for money but also to negotiate a reduction in Trans-Resources' debt with the bank. The evidence shows that, while Genger and the Trump Group were negotiating the terms of the second round of funding, Genger disclosed for the first time that the 2004 Transfers had occurred.

*2 Although shocked at Genger's failure to notify him of the 2004 Transfers, Jules Trump nevertheless negotiated a reduction in Trans-Resources' debt and agreed to pay that debt in return for voting control of the company. Genger initially agreed to those terms as a compromise for the Transfer violation, but, after securing an alternative source of financing, backed out of the deal. Angered that he had favorably renegotiated Trans-Resources' debt obligations and that the Trump Group was left without their key part of the bargain, Jules Trump initiated litigation and also contacted Sagi Genger in order to negotiate a deal with both TPR and the trust controlled by Sagi Genger (the "Sagi Trust") whereby the Trump Group would buy all of the shares transferred to the Sagi Trust by TPR in the 2004 Transfers. Having made a bargain with both the wrongful transferor, TPR, and the transferee, the Sagi Trust, the Trump Group viewed itself as having covered all its bases in addressing Genger's violation of the Stockholders Agreement. With the shares wrongfully transferred to the Sagi Trust by TPR, the Trump Group held a majority of Trans-Resources' stock.

The Trump Group then purported to reconstitute the Trans-Resources board of directors and, when Genger challenged the reconstitution, filed this action pursuant to 8 Del. C. § 225 to determine who controlled the board. Making that determination largely turns upon interpreting how the Stockholders Agreement applies to both parties' often excessively sharp conduct. As explained fully below, I conclude that the Trump Group controls the Trans-Resources board for the following reasons: (1) the Trump Group never received notice of the 2004 Transfers, which were made in violation of the Stockholders Agreement, until June 2008; and

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in A.2d, 2010 WL 2901704 (Del.Ch.)
(Cite as: 2010 WL 2901704 (Del.Ch.))

(2) the Trump Group did not ratify those Transfers when it bought the transferred shares from Sagi Genger and TPR. Because it never ratified the wrongful transaction, the Trump Group was free to deal with the relevant transferor, TPR, and its transferee, the Sagi Trust, and settle the matter by acquiring the wrongly transferred shares in an agreed upon negotiation. In doing so, the Trump Group clearly reserved its position that TPR made a void transfer, has proven that its position was correct, and is entitled, as a result, to be deemed to have taken the shares from TPR as a settlement of the improper Transfers. In the alternative, even if the Trump Group ratified the 2004 Transfers–which it did not–I find that the Trump Group did not purchase the shares from Sagi Genger subject to the proxy in favor of Arie Genger. Therefore, the Trump Group holds a majority equity and voting stake in Trans-Resources, and its ability to vote its shares is unaffected by the proxy.

**II. *Factual Background***

The following are the facts as I find them after trial.

*A. The Trump Group Saves Genger's Company, Trans-Resources, From Bankruptcy In 2001*

In 1985, Genger formed Trans-Resources, a Delaware corporation that eventually became the parent of three specialty fertilizer and industrial chemical companies.[FN1] As mentioned before, Genger's majority stake in Trans-Resources was held through TPR, another Delaware corporation. By 2001, Trans-Resources was nearly insolvent as its subsidiaries struggled in the marketplace due to a strong euro, vigorous competition from South American rivals, and miscalculations in a recent decision to expand a key plant.[FN2] At that time, Trans-Resources' bonds had a notional value of $230 million, but their market value had plummeted.[FN3]

FN1. Tr. 830 (A.Genger); Stipulated Pretrial Order at 3.

FN2. Tr. 837-38 (A.Genger).

FN3. *Id.* at 12 (J. Trump).

*3 Because negotiations with the fractious group of investors that had invested in Trans-Resources' bonds were proving futile, Genger was delighted when Jules Trump approached him with an offer to buy Trans-Resources' bonds.[FN4] Genger and Jules Trump, who both had residences on Williams Island in Miami, Florida, had been friends since at least the late 1990s.[FN5] From that time until very near the commencement of this litigation, Genger and Jules Trump's families regularly socialized, dined, and vacationed together.[FN6]

FN4. *Id.* at 938 (A.Genger).

FN5. J. Trump Dep. 27, 88; A. Genger Dep. 62-63.

FN6. J. Trump Dep. 27-28; E. Trump Dep. 32; *see also* A. Genger Dep. 156-57 (indicating that Genger and Jules Trump also took regular strolls together around the walking path on Williams Island).

Eventually, two entities controlled by Jules and Eddie Trump, plaintiff TR Investors, LLC ("TR Investors") and plaintiff Glenclova Investment Co. ("Glenclova"), bought all but $100,000 of Trans-Resources' debt.[FN7] Shortly after buying Trans-Resources' bonds, TR Investors and Glenclova converted their debt into equity.[FN8] Under an exchange agreement, TR Investors and Glenclova collectively received 2,676.4428 Trans-Resources shares, which amounted to a substantial stake equal to 47.15% of Trans-Resources' equity.[FN9]

FN7. Tr. 117 (J. Trump), 837 (A.Genger).

FN8. *Id.* at 119 (J. Trump).

FN9. JX-100 (Exchange Agreement (March 30, 2001)).

*B. Genger And The Trump Group Execute A Stockholders Agreement That Requires Notice To Be*

Not Reported in A.2d, 2010 WL 2901704 (Del.Ch.)
(Cite as: 2010 WL 2901704 (Del.Ch.))

*Given If Genger Transfers His Shares In Trans-Resources*

Jules Trump's offer came with strings. In ex-change for bailing out Trans-Resources and agree-ing to take a minority interest in Trans-Resources, Trump insisted on the Stockholders Agreement that gave the Trump Group strong representation and veto rights.[FN10] Importantly in light of the present dispute, the Stockholders Agreement provided re-strictions on, and in some instances prohibitions against, the transfer of stock.[FN11]

> FN10. Tr. 843 (A.Genger) ("[P]art of the deal was to reconstitute the board and to enable Trump family-to enable the Trump family to be on the board, to have-we cre-ated a balance of-so that I cannot do any-thing which is not unanimous. There were all kinds of provisions on that.").

> FN11. JX-101 (Stockholders Agreement (2001)) (the "Stockholders Agreement") §§ 2.1, 2.4, 3.1, 3.2, 3.3).

In particular, Section 2.1 of the Stockholders Agreement prevented a party from transferring or pledging Trans-Resources stock to any party other than a party expressly permitted to receive such a transfer (a "Permitted Transferee"). Section 2.1 provides in relevant part:

> From and after the date hereof, no Stockholder shall directly or indirectly, offer, *transfer,* sell, assign, *pledge,* encumber, hypothecate or other-wise dispose of any Shares (including any deriv-ative transaction) (a) until after December 21, 2003, and, thereafter, only as provided in Articles 3, 4, and 5 of this Agreement, or (b) after *written notice* to the Company and the other Stockhold-ers ... to (i) in the case of either of the Initial Non-TPR Stockholders or their respective Per-mitted Transferees (A) to [certain Permitted Transferees], or (ii) in the case of TPR or a Per-mitted Transferee thereof, to (w) Arie Genger, (x) any entity or entities in which TPR or Arie Genger directly owns a majority of the equity in-

terest and directly controls a majority of the vot-ing power ... (y) the estate o[f] Arie Genger or (z) any immediate family members or lineal des-cendants of Arie Genger, or trusts of which they are the sole beneficiaries-in-interest, who receive such Shares in consequence of the death of Arie Genger, which transferee(s) become a party to this Agreement....[FN12]

> FN12. *Id.* § 2.1 (emphasis added).

*4 That is, Permitted Transferees were: (1) in the case of transfers from any of the Trump Group entities, any entity in which either TR Investors or Glenclova had at least a 20% economic interest and a least a 30% voting interest; and (2) in the case of transfers from TPR, any of the following: (i) Arie Genger himself; (ii) any entity in which TPR or Genger directly owned a majority of the equity in-terest and a majority of the voting power at the time of the transfer, and Genger agreed to continue to maintain such ownership at all times thereafter; (iii) the estate of Arie Genger; or (iv) any of Genger's immediate family members or lineal descendants, or trusts of which they are the sole beneficiaries-in-interest, who receive the transfer of shares as a result of Genger's death.[FN13] If a party to the Stockholders Agreement intended to make a trans-fer to a non-Permitted Transferee, then the other party had a right of first refusal, under Section 3.1, which provides in relevant part:

> FN13. *Id.*

> [I]f a Stockholder (the "Selling Stockholder") shall desire to sell, assign or transfer any Shares held by it to any person other than a Permitted Transferee (the "Offered Shares") and shall be in receipt of a bona fide written offer to purchase the Offered Shares (the "Offer"), [t]he Selling Stockholders shall give the Company and to each Covered Stockholder who is not the Selling Stockholder (the "Non-Selling Stockholders") written notice containing the terms and condi-tions of the Offer ... provided that for purposes of

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in A.2d, 2010 WL 2901704 (Del.Ch.)
(Cite as: 2010 WL 2901704 (Del.Ch.))

this Section 3.1, if the Selling Stockholder is (x) a TPR Stockholder, then only the Non-TPR Stockholders shall be deemed to be Non-Selling Stockholders; and (y) a Non-TPR Stockholder, then only the TPR Stockholders shall be deemed to be Non-Selling Stockholders....

Until 30 days after receipt of such notice, the Non-Selling Stockholders shall have the right to elect to purchase all of the Offered Shares at the price offered by the prospective purchaser and specified in such notice.[FN14]

FN14. *Id.* § 3.1.

The purpose of expressly limiting transfers to an enumerated list of Permitted Transferees was to ensure that the Trump Group would be dealing only with Genger, or one of the entities he controlled, in the future, and not with anyone else.[FN15] Jules Trump was particularly concerned about limiting the Trump Group's exposure to the acrimony plaguing Genger's family,[FN16] but, after much pressure from Genger, reluctantly acceded to including Genger's family members as Permitted Transferees *only* as an estate planning consequence in the event of Genger's death.[FN17]

FN15. Tr. 121 (J. Trump), 842-44, 854, 891-92 (A.Genger).

FN16. *Id.* at 121 (J. Trump) ("I had confidence in Arie and we were willing to go forward with him. But I was not willing to go forward with a bunch of people who would be fighting with each other and ultimately end up greenmailing each other."); *see also id.* at 805-06 (O.Genger) (acknowledging the "nightmar[ish]" relations in the Genger family).

FN17. *Id.* at 252 (Hirsch).

If a transfer was made in violation of Section 2.1, then the Stockholders Agreement provided two remedies. First, Section 2.4 provided that "[a]ny attempt by a Stockholder to transfer Shares in violation of this Agreement shall be void and the Company agrees that it will not effect such a transfer or treat any alleged transferee as the holder of such Shares."[FN18] Second, Section 3.2(a) of the Stockholders Agreement gave the Trump Group the right to purchase TPR's shares in Trans-Resources if Genger: (1) transferred shares to a non-Permitted Transferee; or (2) effected a change of control in TPR. Section 3.2(a) provides in relevant part:

FN18. Stockholders Agreement § 2.4.

*5 The Covered Stockholders other than the hereinafter defined Terminating Stockholder (the "Purchasing Stockholders") shall have the right to elect to purchase the Shares held by a Stockholder (the "Terminating Stockholder" ... ) at the Agreement Price (as defined in Section 3.4) and on the Agreement Terms upon the occurrence of any of the following events for a period ending on the later of 60 days after determination of the Agreement Price for the Terminating Shares and 90 days after the Company and the Purchasing Stockholders receive notice from any source of the occurrence of any of the following events (each Stockholder agreeing to give the others and the Company notice of any such event promptly after its knowledge of the occurrence thereof)....

(iv) the Terminating Stockholder sells, *pledges,* encumbers, hypothecates or *otherwise transfers* any interest in (including any derivative transaction), or *purports to* sell, *pledge,* encumber, hypothecate or otherwise transfer any interest in (including any derivative transaction), any of its Shares, except as permitted by and in full compliance with the terms of this Agreement....[FN19]

FN19. *Id.* § 3.2(a) (emphasis added).

Therefore, Section 3.2(a) gave the Trump Group 90 days to elect to purchase TPR's shares after it "receive[d] notice from any source" that a transfer had been made to a non-Permitted Trans-

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in A.2d, 2010 WL 2901704 (Del.Ch.)
(Cite as: 2010 WL 2901704 (Del.Ch.))

feree, or that a change of control had occurred.
FN20

FN20. *Id.*

Section 6.5 outlined the form of notice required under the various provisions of the Stockholders Agreement:

All notices required to be delivered pursuant to this Agreement shall be delivered in person or by telegraphic or other facsimile transmission or sent by certified mail, return receipt requested, and shall by addressed to the Company at its principal business office, to the attention of its Chief Executive Officer, to a Non-TPR Stockholder, to the Representatives, and any other Stockholders at the address of the Stockholder shown in the Company's stock ledger or to such other address as such other Stockholder may indicate by duly giving written notice to the Company.FN21

FN21. *Id.* § 6.5.

Thus, formal notice of an event such as a share transfer was to be given directly to the Trump Group entities, *i.e.* TR Investors and Glenclova, who were parties to the Agreement, and not to Jules Trump personally.FN22 The Stockholders Agreement also contained a non-waiver clause, which provided that "[n]o waiver or failure on the part of a Company or a Stockholder in the exercise of any right, power or remedy shall operate as a waiver thereof, nor shall any single or particular exercise by them of any right, power or remedy preclude other or further exercise thereof, or the exercise of any other right, power or remedy."FN23

FN22. As to TR Investors, it appears that notice was to be given through Mark Hirsch at TR Investors' official address, and as to Glenclova, notice was to be given through Robert Smith at Glenclova's official address. *See id.* at 40. Jules Trump was not an officer or director of either TR In-

vestors or Glenclova. Tr. 117 (J. Trump).

FN23. Stockholders Agreement § 6.8.

Finally, under Section 1.6 of the Stockholders Agreement, TR Investors and Glenclova were entitled to an addition 1.85% of TPR's shares in Trans-Resources (the "Balance Shares").FN24 The Balance Shares refer to shares that Bank Hapoalim had the option to purchase, the exercise of which would reduce TPR's shareholding by 1 .85%. Because of that option, the Trump Group allowed TPR to hold 52.85% of Trans-Resources' stock, even though the parties agreed to a 51%/49% split, on the condition that the Balance Shares would revert to TR Investors and Glenclova if the Bank's option should expire unexercised.FN25

FN24. *Id.* § 1.6.

FN25. *Id.; see also* Tr. 255-57 (Hirsh).

C. *In 2004, As Part Of The Settlement Of His Acrimonious Divorce, Genger Transfers Trans-Resources Stock From TPR To The Sagi Trust, The Orly Trust, And To Himself*

*6 On October 26, 2004, after a drawn-out and contentious divorce proceeding, Genger entered into a final marital settlement agreement with his then-wife, Dalia Genger. Under that settlement agreement, Genger transferred his equity interest in TPR to Dalia Genger on October 29, 2004. On that same day, the Trans-Resources shares that TPR previously held were transferred as follows: approximately 13.9% of the shares were transferred to Genger himself, and separate trusts established for his two children, Orly and Sagi Genger (respectively, the "Orly Trust" and the "Sagi Trust"), were each transferred approximately 19.5% of the shares (collectively, the aforementioned "2004 Transfers"). According to the transfer agreements, the trustees of each Trust agreed to irrevocable lifetime proxies in favor of Genger (the "Proxies").FN26

FN26. JX-113 (Letter Agreement and

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in A.2d, 2010 WL 2901704 (Del.Ch.)
(Cite as: 2010 WL 2901704 (Del.Ch.))

Proxy (Oct. 29, 2004)) (the "Proxy").

At the time the 2004 Transfers were made, Genger did not notify TR Investors or Glenclova of the Transfers as required by the Stockholders Agreement. Genger admits that he never gave the written notice required by the Stockholders Agreement, provided the Trump Group with copies of the Proxies, or passed on a copy of the marital settlement agreement.[FN27] Nevertheless, Genger argues that TR Investors and Glenclova received notice because he orally told Jules Trump about the 2004 Transfers. In particular, Genger testified that he told Jules Trump about the 2004 Transfers "many times" from the "inception, [when] the idea germinated of how to resolve my divorce, to the execution [of the 2004 Transfers]."[FN28] Genger testified that he told Jules Trump of the 2004 Transfers during their regular strolls on Williams Island.[FN29]

FN27. Pretrial Stipulation and Order 4; Tr. 936, 940 (A.Genger), 99 (J. Trump), 628 (Dowd).

FN28. Tr. 856 (A.Genger).

FN29. *Id.*

For his part, however, Jules Trump categorically denied that Genger ever mentioned the 2004 Transfers.[FN30] The only other person who testified to hearing any conversations between Genger and Jules Trump relating to the 2004 Transfers was Genger's daughter, Orly. At trial, Orly Genger testified that her father "shared ... everything" with the Trumps,[FN31] and that she was present during at least one discussion between Genger and Jules Trump about the 2004 Transfers. In particular, she testified about a discussion in "late '04 or early '05" at Jules Trump's residence on Williams Island.[FN32] But, Orly Genger's testimony regarding that conversation was vague, at best:

FN30. *Id.* at 159 (J. Trump) ("Q. From the time that you became-TR Investors became a stockholder in 2001 to June 13th, 2008,

did anyone give you any notice of the 2004 transfers, or the change in control of TPR? Trump. Never. Never, ever.").

FN31. *Id.* at 783 (O.Genger).

FN32. *Id.* at 787. Orly Genger also briefly mentioned a conversation between Genger and Jules Trump sometime during 2007, when her brother brought a lawsuit against her father. *Id.* at 799. But the only details she provided regarding that discussion was that she remembered "them speaking specifically about th[e] lawsuit and how incredible it was that my father had given my brother TPR [Investment], [and] he was actually against him now." *Id.*

They talked about how TPR and [Trans-Resources] were split, how my-my dad spoke about how he split those two, how he hoped that now that my brother, since was sort of-it was now me, my mother, and my brother, and my brother was supposedly the financial guy supposed to take care of-us in a sense, he was hoping that-that he would.[FN33]

FN33. *Id.* at 786.

When asked for further details, she only elaborated as follows:

Q. And were there details? Was your father providing details to Mr. Trump-

O. Genger. Yeah.

Q. -in those discussions?

O. Genger. The fact that my brother was in the middle of it, you know, and just the awful nature of it. Everything was told to Jules.[FN34]

FN34. *Id.* at 789.

*7 On cross-examination, Orly Genger clarified that the discussion between her father and Jules

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in A.2d. 2010 WL 2901704 (Del.Ch.)
(Cite as: 2010 WL 2901704 (Del.Ch.))

Trump some time in late 2004 or early 2005 definitely took place *after* the 2004 Transfers occurred,[FN35] and that she did not remember her father specifically discussing the transfer of Trans-Resources shares to the Sagi Trust.[FN36] But she did not provide further details about the substance of the discussion between her father and Jules Trump other than to say that the "essence" of the discussion was "that [Sagi] was now sort of in charge."[FN37] The lack of specific details in her testimony undermines her credibility because of her personal interest in the outcome of this case and her obvious desire to protect her father in his feud with her brother,[FN38] and because Genger himself testified that no one else was present during his alleged conversations with Jules Trump, even his daughter Orly.[FN39]

FN35. *Id.* at 801 ("Q. And I want to make sure I understand. [The conversation between Genger and Jules Trump]-it definitely occurred after the 2004 transfers had occurred; is that right? O. Genger. Yes.").

FN36. The precise colloquy was as follows:

Q. Now, in this conversation the issue that you recall being discussed was the transfer of control of TPR [Investment] to your brother. He would be in charge.

O. Genger. That was the essence, that he was now sort of in charge.

Q. That was the essence of it.

O. Genger. Right.

Q. Yeah. And the question of the transfer of TPR's shares of [Trans-Resources] to your trust and your brother's trust and your father, you don't recall that that was discussed during this conversation?

O. Genger. I'm sorry. Can you say it again?

Q. Yes. The question of the transfer by TPR [Investment] of its [Trans-Resources] shares-

O. Genger. Right.

Q. -to your trust, your brother's trust, and your father, that was not discussed in this conversation?

O. Genger. Not that I remember.

*Id.* at 803-04.

FN37. *Id.*

FN38. *Id.* at 813 ("Q. You stand to benefit if your father prevails in this litigation? O. Genger: I hope. Yeah, I think.").

FN39. *Id.* at 895 (A.Genger) ("The Court: It was just the two of you? Genger: Just the two of us. The Court: Not your daughter? Genger: Not my daughter.").

Besides his own testimony and the testimony of his daughter, the only other evidence to which Genger points as proof that he told the Trumps about the 2004 Transfers are two after-the-fact events. First, Genger points to a written consent that Trans-Resources' shareholders were required to sign in 2005 (the "2005 Written Consent") in order to resolve a dispute with Bank Hapoalim, with whom Trans-Resources had a long-term relationship, over Trans-Resources' outstanding debt. The signature page of the 2005 Written Consent included signature blocks for not only Arie Genger, but also the Orly Trust and the Sagi Trust, and identified Arie Genger as the proxy for the two Trusts.[FN40] That is, by including signature lines for the Orly Trust and the Sagi Trust as shareholders, the 2005 Written Consent disclosed that some sort of transfer had taken place. For their part, the Trumps credibly claim that they did not notice the additional signature lines in the 2005 Written Consent when they signed the page.[FN41]

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in A.2d, 2010 WL 2901704 (Del.Ch.)
(Cite as: 2010 WL 2901704 (Del.Ch.))

FN40. JX-125 (executed written consent (July 26, 2005)) (the "2005 Written Consent").

FN41. Tr. 101-05 (J. Trump), 185-92 (Hirsch)

Second, Genger claims that he mentioned the 2004 Transfers during a Trans-Resources board meeting in November 2007 at which Jules Trump was present (the "November 2007 Board Meeting").[FN42] For support, Genger points to the minutes of that meeting, which reflect that "Mr. Genger advised the directors that both he and Mr. Dowd had been sued by TPR Investment Associates, Inc. and other related entities with respect to their activities as officers and/or directors of TPR Investment Associates, Inc., *the former parent Company of [Trans-Resources ].*"[FN43] Genger avers that this passing reference to TPR being the former parent of Trans-Resources should have tipped Trump off that the 2004 Transfers were made. As we will see, that argument is undercut, however, by the reality that Genger's loyal subordinate, Bill Dowd, appears to have manipulated the corporate minutes on other occasions to suit Genger's interests.

FN42. JX-149 (Trans-Resources board meeting minutes (Nov. 19, 2007)).

FN43. *Id.*

D. *Genger Finally Tells The Trumps About The 2004 Transfers During Negotiations To Restructure Trans-Resources' Debt*

*8 In the spring of 2008, Trans-Resources was once again having financial troubles, now in a dispute with Bank Hapoalim, which was pressuring Trans-Resources to sell its main subsidiary, Haifa Chemical, Inc.. in order to avoid foreclosure.[FN44] Genger turned to the Trumps for help, asking Jules Trump if the Trump Group would provide the capital necessary to retire Trans-Resources' bank debt in exchange for an increased equity position that would give the Trump Group control of Trans-

Resources.[FN45] Genger relied on Jules Trump in particular not only because of their past relationship but also because Bank Hapoalim, which had indicated that it had lost confidence in Genger, was however willing to negotiate with Trump in regard to Trans-Resources' debt.[FN46] On May 31, 2008, Genger and Jules Trump met to discuss the general contours of an agreement (the "Funding Agreement"), which would provide for a capital infusion into Trans-Resources.[FN47] After that meeting, Trump negotiated with Bank Hapoalim to reduce Trans-Resources' debt load, and asked Genger to meet with Eddie Trump and Mark Hirsch, the Trumps' lawyer, in New York to work out the details of the Funding Agreement.[FN48]

FN44. Tr. 38-39 (J. Trump).

FN45. *Id.* at 41-42 (J. Trump).

FN46. *Id.* at 124-27, 146 (J. Trump).

FN47. *Id.* at 872 (A.Genger); 43-44, 135-36 (J. Trump).

FN48. *Id.* at 868-69 (A.Genger).

I. *Genger, Eddie Trump, And Mark Hirsch Meet On June 13, 2008*

Genger met with Eddie Trump and Hirsch in New York on June 13, 2008 (the "June 13 Meeting"). Early in the June 13 Meeting, Hirsch gave Genger a draft of the Funding Agreement. That draft listed TPR, Glenclova, and TR Investors as the company's sole shareholders, thereby strongly suggesting that the Trump Group was unaware at that time of the 2004 Transfers.[FN49] Upon reviewing the draft, Genger commented that TPR was no longer a Trans-Resources stockholder.[FN50] Both Eddie Trump and Hirsch expressed shock upon hearing that, and Hirsch reminded Genger that he was not permitted to transfer his stake in Trans-Resources without first providing notice and a right of first refusal to the Trump Group.[FN51]

FN49. JX-170 (email from Mark Hirsch to Jules Trump with draft agreements at-

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in A.2d, 2010 WL 2901704 (Del.Ch.)
(Cite as: 2010 WL 2901704 (Del.Ch.))

tached (June 12, 2008)).

FN50. Tr. 283 (Hirsch), 498-99 (E.Trump).

FN51. *Id.* at 284-85 (Hirsch), 499 (E.Trump). Interestingly, the trial record includes an email from Hirsch to Jules Trump, dated June 11, 2008, in which Hirsch describes the transfer restrictions and the right of first refusal provisions in the Stockholders Agreement. JX-167 (email from Mark Hirsch to Jules Trump (June 11, 2008)). The timing of that email suggests that the Trumps might have known about the 2004 Transfers before the June 13, 2008 meeting. But I do not find this email to be proof that Genger had given the Trumps oral notice because: (1) the Trumps may have simply suspected on their own that something like the 2004 Transfers had taken place; or (2) the Trumps may have heard rumors from sources other than Genger that the 2004 Transfers had occurred. In either event, notice as required under Stockholders Agreement had not been given. Furthermore, even if the email did indicate that notice had been given, it still suggests that the timing of that notice was no earlier than June 2008.

Upon seeing their surprise, Genger did not stop and say what one would expect to be the first thing out of his mouth if Genger had already given repeated notice to Jules Trump: "Why are you acting so surprised? I told Jules all about these Transfers years ago." FN52 Rather, Genger acknowledged that he had not provided notice of the 2004 Transfers, but insisted that he had lived within the spirit of the Stockholders Agreement by maintaining control of the stock through the Proxies. FN53 And, Genger spent the better part of that day explaining the 2004 Transfers to Eddie Trump and Hirsch, FN54 which would have been unnecessary had they already known about the Transfers.

FN52. Tr. 501 (E.Trump) ("At any time during the meeting did Mr. Genger say, 'Well, I told your brother, Jules. Let's get him on the phone,' or words to that effect? E. Trump: No."). Genger's testimony on this important issue was vague at best. He only recalled telling Eddie Trump and Hirsh something to the effect of "Jules knows about it" at some point during the June 13 Meeting. *Id.* at 900 (A.Genger). But, Genger could give no further details, and he admitted that he never pressed the point or suggested that they get Jules Trump on the phone to clarify the issue. *Id.*

FN53. *Id.* at 284 (Hirsch) ("I took out the agreement to show [Genger] specifically why he could not have transferred the shares, that this was not permitted under the agreement. And he said, 'All right. You know, so I didn't tell you about it, but I didn't think I had to. I mean, what's changed? I still-I still vote the shares .' ").

FN54. *Id.* at 893-94, 899 (A.Genger).

Finally, at the end of the meeting, Genger offered to arrange a meeting with his lawyer, David Lentz, who was most familiar with the details of the 2004 Transfers. FN55 Eddie Trump and Hirsch met with Lentz three days later, on June 16, 2008, to discuss the details of the 2004 Transfers. It is also noteworthy that, before that meeting, Genger never told Lentz that he had given Jules Trump oral notice of the 2004 Transfers. FN56 If notice of the 2004 Transfers had indeed been given, one would have expected Arie Genger to have at least mentioned that important detail to his own counsel. During that meeting, Lentz never suggested that Jules Trump had already known about the 2004 Transfers because Genger had told him about them years ago. FN57

FN55. *Id.* at 902-03 (A.Genger).

FN56. *Id.* at 7 (Lentz) ("Q: And Mr.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in A.2d, 2010 WL 2901704 (Del.Ch.)
(Cite as: 2010 WL 2901704 (Del.Ch.))

Genger didn't tell you [before the June 16th meeting] that he claimed to have given some sort of notice to Jules Trump. That's correct; right? ... Lentz: I believe your statement is correct").

FN57. *Id.* at 990 (Lentz) ("Q. Nobody said at the meeting, then, that any notice had been given in substance; right? Lentz. Correct."); *see also id.* at 994 (Lentz) ("Q. [Y]ou went through an entire meeting about the absence of notice and people asking what, in fact, occurred. And no one from your side of the discussion spoke a peep refuting that contention; right? Lentz: Nobody refuted it, that's correct.").

2. *Later Communications Between Genger. William Dowd, And David Lentz Admit That Genger Never Gave The Trump Group Notice Of The 2004 Transfers*

*9 In a series of emails and memoranda produced over the two weeks following the June 16 meeting, Lentz repeatedly acknowledged Genger's failure to provide any notice of the 2004 Transfers. In a June 17, 2008 email, Lentz wrote that "[t]he Trumps *never consented to* and don't want [the Sagi] Trust or [Orly] Trust ... as minority partners (shareholders) in [Trans-Resources]."[FN58] And, in a June 26, 2008 email, Lentz wrote that "no notice was given" to the Trumps about the 2004 Transfers.[FN59] But, Lentz's most telling admission came in a memorandum he wrote for Genger analyzing the parties' various bargaining positions and how likely machinations by Sagi Genger would affect the outcome of the dispute (the "Lentz Memo"). In that Memo, Lentz wrote:

FN58. JX-331 (email from David Lentz to Arie Genger, Bill Dowd, and Christopher Gengaro (June 17, 2008)) (emphasis added).

FN59. JX-337 (email from David Lentz to Arie Genger, Bill Dowd, and Christopher Gengaro (June 26, 2008)).

*While it is true the Trumps never got notice,* the entire intent of the Shareholder's agreement has been carried out anyway. In other words, *why did AG not give them actual notice?* Because, AG will testify, using the TPR shell was never the intention of the Trumps and AG-the real intention was to keep the ownership of [Trans-Resources] in the Genger family under the voting and operational control of AG and the Stipulation did just that. So, AG becomes SG's best witness. AG will not say I just forgot to tell the Trumps. He will not say I tried to get away with something and thought the Trumps would not find out. He will testify that whether the corporate form of TPR or the kids' trusts w[as] used made no difference. The essence of these protections was to make sure the Genger family owned roughly 50% and that AG could vote all of those shares. That's what happened. So, *while there was a technical violation,* the Trumps got what they bargained for.[FN60]

FN60. JX-332 (memorandum from David Lentz to Arie Genger, Bill Dowd, and Chris Gengaro) (the "Lentz Memo") (emphasis added).

Later in that same Memo, Lentz added: "AG does not have clean hands because like SG, *AG never told the Trumps.*"[FN61] Thus, Genger's own attorney repeatedly acknowledged that Genger had never given the Trumps *any type* of notice.

FN61. *Id.*(emphasis added).

3. *At The June 25, 2008 Meeting Of Trans-Resources' Board And Stockholders. Genger Himself Indicates That Notice Of The 2004 Transfers Was Not Given To The Trumps*

The Trans-Resources board met on June 25, 2008 (the "June 25 Board Meeting") and unanimously approved the Funding Agreement, which provided that the Trumps would invest an additional $57.5 million in the company in exchange for 50% of Trans-Resources' outstanding stock, which would give the Trumps clear voting control and by

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in A.2d, 2010 WL 2901704 (Del.Ch.)
(Cite as: 2010 WL 2901704 (Del.Ch.))

far the largest equity position in the company.[FN62] That is, the totality of the Funding Agreement would address the injury to the Trump Group from the 2004 Transfers by giving it voting control of Trans-Resources. Handwritten notes by Bill Dowd, a director and Trans-Resources' chief executive officer, recorded that "AG describe[d] [Trans-Resources] stock transfer *in violation of agreement*" during the meeting.[FN63] That is, Genger acknowledged that the 2004 Transfers were made without providing notice to the Trumps. Tellingly, Dowd, who had worked for Genger for years, omitted that important admission from the formal minutes he drafted following the meeting.[FN64]

> FN62. JX-181 (minutes of joint meeting of the board of directors and stockholders of Trans-Resources, Inc. (June 25, 2008)).

> FN63. JX-179 (handwritten notes of Bill Dowd (June 25, 2008)) (emphasis added).

> FN64. *See* JX-179 (draft meeting minutes (June 25, 2008)) (omitting any reference to the 2004 Transfers being made in violation of the Stockholders Agreement).

### E. *Negotiations To Restructure Trans-Resources Break Down, And The Parties Eventually Commence This Litigation*

*10 Although the Funding Agreement solved the problem with Bank Hapoalim, Genger and the Trumps still had to sort out how to ensure that the Trumps were given control of the Trans-Resources board as required under the Funding Agreement. That was a problem because Genger and the Trumps anticipated that Sagi Genger, who now had a claim to be a Trans-Resources stockholder on account of the 2004 Transfers, would litigate any attempt to transfer control from Genger to the Trumps, if for no other reason than to spite his father.[FN65] During June and July of 2008, Genger and the Trumps discussed options for dealing with Sagi Genger. One of the options the Trumps suggested was confronting Sagi Genger with the argument

that the 2004 Transfers violated the Stockholders Agreement, and that he was therefore not a beneficial owner of the Shares.[FN66] Importantly, Genger resisted this approach, likely because that would expose him to liability for representing falsely in the divorce settlement that the 2004 Transfers were not made in violation of any agreement.[FN67]

> FN65. Tr. 318-19 (Hirsch).

> FN66. *Id.*

> FN67. *Id.* at 304 (Hirsch).

### 1. *Genger Reneges On The Funding Agreement, And The Trumps Respond With A Lawsuit*

Genger and the Trumps never reached common ground on how to approach Sagi, because Genger began to back-track on the draft terms of the Funding Agreement. Genger could afford to back out of the Funding Agreement because he had devised a way-albeit one of questionable propriety-to upstream funds from the Haifa Chemical, Inc. subsidiary to Trans-Resources. This upstreaming allowing Trans-Resources to fulfill its obligations to Bank Hapoalim, which Jules Trump had successfully reduced during his negotiations with the bank on behalf of Trans-Resources.[FN68] Because Genger had secured an alternative source of capital, the Funding Agreement with the Trumps was no longer the only mechanism for rescuing Trans-Resources. From that position of increased leverage, Genger began to disengage from the Funding Agreement deal. First, despite the fact that Bank Hapoalim required payment by late August, Genger requested that execution of the Funding Agreement be postponed upon the advice of counsel. Wielding a problem of his own creation, Genger asserted that Trans-Resources' Delaware lawyers had advised him that Trans-Resources needed to establish an independent committee to review the fairness of the Funding Agreement because the recipients of the 2004 Transfers might complain. Second, at an August 1, 2008 meeting, Genger's lawyers claimed, for the first time, that Genger had given Jules Trump oral notice of the 2004 Transfers years ago, and

Not Reported in A.2d, 2010 WL 2901704 (Del.Ch.)
(Cite as: 2010 WL 2901704 (Del.Ch.))

threatened litigation if the Trumps chose to challenge the 2004 Transfers.[FN69]

FN68. Dowd Dep. 281.

FN69. Tr. 65, 155-56 (J. Trump), 364 (Hirsch).

The Trumps responded on August 8, 2008 with a letter to TPR and Trans-Resources indicating that Glenclova was exercising its right under Section 3.2 of the Stockholders Agreement to purchase all of the shares subject to the 2004 Transfers, and requesting that the Trans-Resources board begin the process of establishing their purchase price.[FN70] On August 11, 2008, Glenclova filed a suit in the United States District Court for the Southern District of New York seeking to enforce the Funding Agreement and its rights under the Stockholders Agreement.[FN71] On August 13, 2008, Genger responded through a letter from his attorneys, claiming that Glenclova had no right to purchase the shares because he had kept Jules Trump fully informed of the 2004 Transfers at the time they were made four years prior.[FN72]

FN70. JX-198 (letter from Glenclova to TPR and Trans-Resources (Aug. 8, 2008)).

FN71. JX-204 (Complaint, *New TR Equity, LLC v. Trans-Resources, Inc.* (S.D.N.Y. Aug. 11, 2008)).

FN72. JX-350 (letter from Charles Weissman to Barry Adelman (Aug. 13, 2008)).

*2. The Trump Group Purchases The Sagi Trust's Shares And Reconstitutes Trans-Resources' Board Of Directors, Leading To This Section 225 Action*

*11 The lawsuit in federal court in New York was not the only course of action the Trumps took. On August 21, 2008, Jules Trump contacted Sagi Genger to explore the possibility of acquiring the 1,102.8 shares purportedly transferred to the Sagi Trust in 2004 (the "Sagi Shares").[FN73] And, on August 22, 2008, the Trumps purchased the Sagi Shares pursuant to a stock purchase agreement (the

"Purchase Agreement") between the Sagi Trust, TPR, and the Trumps' entities, TR Investors, Glenclova, New TR Equity I, LLC ("Equity I"), and New TR Equity II, LLC ("Equity II").[FN74] Importantly, the transaction included not only the Sagi Trust as a party but also the wrongful transferor, TPR. Sagi Genger could act for TPR because, after making the 2004 Transfers, Genger had ceded control of TPR to Dalia Genger, who subsequently sold her interest in TPR to her son, Sagi.[FN75] The Purchase Agreement contained a specific section addressing the reality that the Trump Group viewed the 2004 Transfers as void and that TPR still owned them and was obliged to sell them to the Trump Group at 2004 values. To wit, the Purchase Agreement provided that it would be considered consummated between the Trump Group and *TPR* if the 2004 Transfers were to be found void:

FN73. Tr. 111 (J. Trump).

FN74. JX-225 (the "Purchase Agreement").

FN75. Tr. 547 (S.Genger).

If at any time following the Closing Date, it is determined that Seller is not the record and beneficial owner of the Shares as of the date hereof, by virtue of the transfer of the Shares to it by TPR being deemed to have been void or for any other reason, and that all right, title and interest in and to the Shares is held by TPR, subject only to the plaintiffs asserted rights under the Stockholders Agreement asserted in the action styled *Glenclova Investment Co. v. Trans-Resources, Inc. and TPR Investment Associates, Inc.*, Case No. 08-CIV-7140 (JFK), pending the United States District Court for the Southern District of New York, the parties hereby agree that (a) *this Agreement and the transactions contemplated hereby shall be deemed to have been entered into and consummated with TPR, (b) the Purchasers shall retain all right, title and interest in and to the Shares as if purchased from TPR pursuant to this Agreement, (c) TPR shall look only to Seller*

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in A.2d, 2010 WL 2901704 (Del.Ch.)
(Cite as: 2010 WL 2901704 (Del.Ch.))

*for any payments made by the Purchasers pursuant to this Agreement. (d) the Purchasers shall have no liability or obligation to TPR in respect of the Shares, and (e) all representations, warranties, covenants and agreements made by Seller herein, shall be deemed to have been made by TPR as of the date hereof.*[FN76]

> FN76. Purchase Agreement § 10 (emphasis added).

Thus, by signing an agreement with both the Sagi Trust and TPR, the wrongful transferee, the Trump Group dealt with the Genger-caused problem that Genger exploited in order to derail the Funding Agreement. By dealing directly with both the allegedly innocent transferee-the Sagi Trust-and the wrongdoer TPR-the Trump Group covered all of its bases.

Having purchased the Sagi Shares, which gave them a majority equity position in Trans-Resources, the Trump Group then executed a written consent on August 25, 2008 that removed Genger from the Trans-Resources board, elected Eddie Trump and Hirsch to the board, and affirmed the election of Jules Trump and Robert Smith to the board. The Trump Group delivered that written consent to Trans-Resources, but Genger rejected it.[FN77]

> FN77. Tr. 403-06 (Hirsch).

*12 In response, the Trump Group filed a single-count complaint pursuant to 8 *Del. C.* § 225 in order to determine the composition of the Trans-Resources board (the "Section 225 Action"). Consistent with their position throughout the summer of 2008, the Trump Group's central claim was that the 2004 Transfers were made in violation of the Stockholders Agreement, and that it therefore had the right to purchase all of TPR's shares pursuant to Section 3 of the Stockholders Agreement.[FN78] Genger responded with a counterclaim, raising a number of arguments for why the 2004 Transfers were made appropriately-chief among them his assertions that he told Jules Trump of the Transfers at

the time they were made, and that, in any event, the Trump Group's purchase of the Sagi Shares in 2008 ratified the 2004 Transfers-and claiming that, therefore, he still controlled Trans-Resources' board. Genger also argues that the Trump Group violated Section 2.1 of the Stockholders Agreement when Equity I and Equity II pledged Trans-Resources shares in return for financing to buy the Sagi Shares.

> FN78. Compl.¶ 10.

Soon after the Section 225 Action was filed, the parties promptly settled the matter, which resulted in a stipulated final judgment that declared that the Trump Group's designees constituted a majority of the board.[FN79] But, like any other moment of agreement between the parties in this case on anything, that settlement was short-lived. On October 10, 2008-two weeks after the final judgment was entered-the Trump Group moved to re-open the Section 225 Action. They moved to reopen because they alleged that, after taking control of Trans-Resources, they discovered that Genger had destroyed documents relevant to the Section 225 Action in violation of a status quo order.

> FN79. *See TR Investors, LLC v. Arie Genger,* C.A. No. 3994-VCS (Sept. 26, 2008) (ORDER).

The issue of whether Genger should be held in contempt for destroying documents in violation of this court's status quo order was decided in 2009 in a separate trial.[FN80] It is unnecessary to recount here the facts or analysis involved in that trial, which are summarized in the opinion that resulted.[FN81] What matters for present purposes is the outcome: Genger was found to be in contempt, which raises Genger's evidentiary burden on any issue on which he has the burden of proof by one level and renders his uncorroborated testimony insufficient to establish material facts.[FN82]

> FN80. *TR Investors, LLC v. Genger,* 2009 WL 4696062 (Del.Ch. Dec.9, 2009).

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in A.2d, 2010 WL 2901704 (Del.Ch.)
(Cite as: 2010 WL 2901704 (Del.Ch.))

FN81. *See id.* at *1-15.

FN82. *See id.* at *18-19.

### III. *Legal Analysis*

Genger has proliferated a host of theories-including new ones after trial-as to why he retains voting control over Trans-Resources, and the Trump Group has accurately described its efforts to address Genger's ever-changing arguments as playing a game of "Whack-a-Mole." [FN83] It is possible, nevertheless, to sift through the heaping stew pot filled with every conceivable exculpatory theory that ever crossed his lawyers' inventive minds that Genger has cooked up and identify the chunkier ingredients. Genger's main theory is that the 2004 Transfers were made appropriately, either because he gave the Trump Group notice or because the Trump Group ratified the Transfers. Genger's primary alternative theory is that, even if the 2004 Transfers were not appropriate, the Trump Group took the Sagi Shares subject to the Proxy in his favor.

> FN83. *See* Trump Post-Trial Ans. Br. 3. For example, Genger's counsel spent a great deal of time at post-trial oral argument in a befuddling exposition of a theory *introduced into the case as a footnote in its post-trial answering brief. Compare* Post-Trial Tr. 128-58 *with* Genger Post-Trial Ans. Br. 24, n. 18.

*13 In the analysis that follows, I do not address all of the alternative theories Genger concocted, but rather focus on his two fundamental theories. Treating all of his secondary arguments is unnecessary because Genger has failed to bear his evidentiary burden as to those core theories on which the rest of his case depends. That is, Genger has failed to prove that he properly notified the Trump Group of the 2004 Transfers at any time before the June 13 Meeting, or that the Trump Group somehow ratified the 2004 Transfers after the fact. And, even if the Trump Group did ratify the 2004 Transfers-which it did not-Genger has failed to

prove that it took the Sagi Shares subject to the Proxy.

#### A. *Standard Of Review*

The standard of review I apply in analyzing the aforementioned issues is different in this case than what is typical. The party attempting to gain control of an entity in an action pursuant to 8 *Del C.* § 225 bears the burden of proof on any issue, the outcome of which would affect the determination of the Trans-Resources' board. [FN84] Generally speaking, the burden of proof in civil cases is that the party with the burden must prove his position by a preponderance of the evidence. [FN85] But, because of this court's prior ruling in the contempt trial, Genger's burden is raised a level, meaning that he must prevail on any issue in which he bears the burden of proof by clear and convincing evidence. And, as mentioned before, Genger's own uncorroborated testimony will not be sufficient to establish any material fact. [FN86]

> FN84. *See Agranoff v. Miller,* 1999 WL 219650, at *12 (Del.Ch. Apr.12, 1999), *aff'd,* 737 A.2d 530 (Del.1999). Genger conceded that he bears the burden of proof. Contempt Trial Tr. 355.

> FN85. *See SinaMab Bioscience Ltd. v. Immunamedics, Inc.,* 2009 WL 1707891, at *12 (Del.Ch. June 16,2009).

> FN86. *See supra* page 25.

#### B. *Arie Genger Did Not Notify The Trump Group Of The 2004 Transfers Until June 13, 2008*

The first issue I must address is Genger's argument that he gave the Trump Group notice of the 2004 Transfers during his conversations in late 2004 or early 2005 with Jules Trump about his divorce and that the Trump Group is chargeable with laches. [FN87] This argument is central to the case because the Stockholders Agreement provides that, upon receiving notice of an improper transfer from any source, the Trump Group has 90 days to elect to purchase the shares held by the stockholder mak-

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in A.2d, 2010 WL 2901704 (Del.Ch.)
(Cite as: 2010 WL 2901704 (Del.Ch.))

ing the transfer, i .e. TPR.[FN88] If the first time the Trumps heard about the 2004 Transfers was at the June 13 Meeting, then the Trump Group acted within the 90-day window provided in the contract because it elected to purchase TPR's shares on August 8, 2008, when it sent TPR a letter indicating that it elected to exercise its rights under Section 3.2 of the Stockholders Agreement.[FN89] But, if the Trumps received notice some time before May 8, 2008, then their demand to exercise their purchase rights under the Stockholders Agreement on August 8, 2008 would arguably be tardy.

> FN87. Laches operates to bar a claim where "(a) [the] plaintiff knew (or should have known) of its rights or claim; (b) [the] plaintiff failed to assert its rights or claim; and (c) [the] defendant has materially changed its position or otherwise materially relied on plaintiff's failure to assert." Gotham Partners, LP. v. Hallwood Realty Partners, L.P., 714 A.2d 96, 104 (Del.Ch.1998); see also Fed. United Corp. v. Havender, 11 A.2d 331, 344 (Del.1940) ("Sitting by inactive and in what amounts to silence, when every consideration for the rights of others demanded prompt and vigorous action, and until affairs had become so complicated that a restoration of former status was difficult, if not impossible, is conduct amounting to laches.").

> FN88. Stockholders Agreement § 3.2(a).

> FN89. JX-198 (Letter from Glenclova to Trans-Resources and TPR (Aug. 8, 2008)).

Tellingly, Genger spent only one and a half pages in his post-trial briefing on this argument.[FN90] That is likely because he knew, as shown below, that he has failed to bear his evidentiary burden on this issue. There is no credible evidence indicating that Genger ever told Jules Trump about the 2004 Transfers in late 2004 or early 2005.

> FN90. See Genger Post-Trial Op. Br. 28-30.

*14 At trial, Genger offered little more than his unbelievable and uncorroborated testimony to support his claim that he notified the Trump Group. As discussed earlier, Genger testified that he told Jules Trump about the 2004 Transfers on a number of occasions in late 2004 or early 2005 while the two discussed developments in Genger's divorce during their strolls on Williams Island.[FN91] For his part, Jules Trump categorically denied that Genger ever mentioned the 2004 Transfers in late 2004 or early 2005.[FN92] The only other person who testified to hearing Genger and Trump discuss the matter was Orly Genger. But her testimony gave little detail about what was actually said during those alleged conversations, and it was contradicted by Genger himself, who said that she was not present at the key conversation when he told Jules Trump about the Transfers.[FN93] Therefore, I do not find her testimony of the alleged conversations between Genger and Jules Trump credible, especially in light of her personal interest in this case.

> FN91. See supra page 11.

> FN92. See supra page 11.

> FN93. See supra page 11-13.

Moreover, if Genger did in fact tell Jules Trump about the 2004 Transfers in late 2004 or early 2005, then why did he not press that point at the June 13 Meeting when Eddie Trump and Hirsch appeared shocked to hear the news? The natural thing to say in that situation would have been to make the obvious point that he had told Jules about it years ago. But, at trial, Genger only testified vaguely, haltingly, and meekly that he told them something along the lines of "Jules knows about it," and gave no other details of what he said in that regard.[FN94] Genger also admitted that he never pressed the point any further, even though he became "[v]ery frustrated" with the repeated questions Eddie Trump and Hirsch were asking.[FN95]

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in A.2d, 2010 WL 2901704 (Del.Ch.)
(Cite as: 2010 WL 2901704 (Del.Ch.))

For example, Genger never said that they should get Jules Trump on the phone to confirm that Genger had indeed told him about the Transfers.[FN96] Rather, Genger attempted to justify the Transfers on the grounds that he still had voting control through the Proxies.[FN97]

> FN94. Tr. 900 (A.Genger).

> FN95. *Id.*

> FN96. *Id.*

> FN97. *See supra* page 17.

Genger also failed to mention his alleged conversations with Jules Trump even when he spoke with his lawyer, David Lentz, after the June 13 Meeting.[FN98] Such an important detail would, if true, have been one of the first things Genger told his counsel. But, the evidence indicates Lentz believed at the time that Genger had never informed Jules Trump of the 2004 Transfers.[FN99] That fact is reflected most clearly in the Lentz Memo, which stated repeatedly that notice had never been provided to the Trump Group.[FN100]

> FN98. *See supra* page 17.

> FN99. *See supra* page 17-19.

> FN100. *See supra* page 18-19.

Thus, the overwhelming thrust of the evidence indicates that everyone in Genger's camp knew full well that he had never told the Trump Group about the 2004 Transfers before the June 13 Meeting.[FN101] Indeed, Bill Dowd's notes of the June 25 Board Meeting indicate that Genger himself admitted that the Transfers were made in violation of the Stockholders Agreement.[FN102] The inescapable conclusion is that Genger did not provide the Trump Group with any form of notice before the June 13 Meeting, choosing rather to trust in his savvy to manage the Trumps if the issue ever arose.

> FN101. *See Tr.* 631 (Dowd), 1008 (Lentz).

> FN102. *See supra* page 19.

*15 Nor can Genger rely on the passing references to the possibility of a transfer in the 2005 Written Consents and the minutes of the November 2007 Board Meeting. As noted, the accuracy of the minutes of the November 2007 Board Meeting appears to be suspect.[FN103] Furthermore, the Stockholders Agreement required a specific form of notice to be given to TR Investors and Glenclova.[FN104] Even if Genger told Jules Trump about the 2004 Transfers in late 2004 or early 2005, which I conclude he did not, that would not constitute notice to TR Investors or Glenclova. But more important is the fact that passing references in the 2005 Written Notices or the minutes of the November 2007 Board Meeting do not constitute proper notice of any kind or even put the Trump Group on effective inquiry notice. Business people can miss things. The idea that the Trump Group had to review every stray reference in the board minutes or to read between the lines on the signature page of the 2005 Written Consents for signs of a possible transfer is wrong. The notice provision in the Stockholders Agreement was specific and designed to ensure that the Trump Group did not have to police the world in this way, as was the Stockholders Agreement's strong anti-waiver provision.[FN105] Finally, I am persuaded by, among other things, the draft Funding Agreement the Trump Group proposed that indicated that the Trump Group did not know of the 2004 Transfers. Notably, I conclude that the Trump Group would prevail on this issue even if they had the burden to show that they had not been given proper notice. But, because Genger admits he did not give proper notice as required under the contract,[FN106] it was his burden to show that he should nevertheless be alleviated of his obligations under the Stockholders Agreement because he gave Jules Trump oral notice and, certainly, it was his burden to prove a laches defense.

> FN103. *See supra* pages 19-20.

> FN104. *See* Stockholders Agreement § 6.5.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in A.2d, 2010 WL 2901704 (Del.Ch.)
(Cite as: 2010 WL 2901704 (Del.Ch.))

FN105. *See id.* at §§ 6.5, 6.8.

FN106. *See* Pretrial Stipulation and Order 4.

### C. The Trump Group Did Not Ratify The 2004 Transfers

Genger next argues that the Trump Group nevertheless ratified the 2004 Transfers. The defense of ratification is perhaps best understood by reference to its closest cousin, the doctrine of acquiescence.[FN107] Acquiescence occurs when a party "has knowledge of an improper act by another, yet stands by without objection and allows the other party to act in a manner inconsistent with the claimant's property rights."[FN108] Ratification differs primarily in timing: "[a]quiescence properly speaks of assent by words or conduct *during the progress* of a transaction, while ratification suggests an assent *after the fact.*"[FN109] Thus, to find that a party ratified a prior act, it is first necessary to find that the ratifying party had "[k]nowledge, actual or imputed, of all material facts."[FN110] Second, ratification requires an affirmative act by the ratifying party. Assent can be "implied from conduct, as well as expressed by words" but is always a "voluntary and positive act."[FN111] Accepting the benefits of a transaction can be an indication of that assent.[FN112]

FN107. *See Frank v. Wilson & Co.,* 32 A.2d 277, 283 (Del.1943) ( "Acquiescence and ratification are closely related.").

FN108. *Brandywine Dev. Group, L.L.C v. Alpha Trust,* 2003 WL 241727, at *4 (Del.Ch. Jan.30, 2003).

FN109. *Frank,* 32 A.2d at 283 (emphasis added); *see also* 1 DONALD J. WOLFE, JR. & MICHAEL A. PITTENGER, CORPORATE AND COMMERCIAL PRACTICE IN THE DELAWARE COURT OF CHANCERY, § 11.03[a], at 11-20 (2009) ("Acquiescence involves assent during the progress of a transaction, while ratification

suggests assent after the fact.").

FN110. *Frank,* 32 A.2d at 283; *see also Papaioanu v. Comm'rs of Rehoboth.* 186 A.2d 745, 749-50 (Del.Ch.1962).

FN111. *Frank,* 32 A.2d at 283; *see also* WOLFE & PITTENGER, § 11.03 [a] at 11-19 to 11-20 (stating that ratification requires proof of a relinquishment of existing, known rights, and the "acceptance of new replacement rights or benefits").

FN112. *See Kahn v. Household Acquisition Corp.,* 591 A.2d 166, 177 (Del.1991) (stating that accepting the benefits of a transaction, even though the conduct in question is a breach of some duty owed to the shareholder, may bar the shareholder from obtaining equitable relief); *Frank,* 32 A.2d at 282 (finding that a shareholder "could not accept the benefit offered by the [transaction] and at the same time deny its validity"); *Giammalvo v. Sunshine Mining Co.,* 1994 WL 30547, at *10 (Del.Ch. Jan.31, 1994), *aff'd,* 651 A.2d 787 (Del.1994) ("The equitable defenses of ratification and acquiescence are closely related. Under the proper circumstances, both doctrine prevent one who accepts the benefits of a transaction from thereafter attacking it."); *Dannley v. Murray.* 1980 WL 268061, at *4 (Del.Ch. July 3, 1980) ("The 'affirmance' required to create ratification ... may arise by the retention of benefits with knowledge of the unauthorized acts.") (citations omitted); *Trounstine v. Remington Rand.* 194 A. 95. 99 (Del.Ch.1937) ("[E]quity will not hear a complainant stultify himself by complaining against acts in which he participated or of which he has demonstrated his approval by sharing in their benefits.").

### i. Genger Has Not Met His Burden Of Proof As To His Ratification Claim

Not Reported in A.2d, 2010 WL 2901704 (Del.Ch.)
(Cite as: 2010 WL 2901704 (Del.Ch.))

*16 Realizing that he had a very weak argument that he gave effective notice of the 2004 Transfers to the Trump Group, Genger spent most of his briefing attempting to argue that the Trump Group ratified the 2004 Transfers. Because of his prior acts of spoliation, Genger bears the burden to prove ratification by clear and convincing evidence. He has not done so.

Genger argues that the Trump Group ratified the 2004 Transfers on two occasions: (1) when it accepted shareholder approval of the Funding Agreement at the June 25 Board Meeting; and (2) when it purchased the Sagi Shares on August 22, 2008.[FN113] As to the June 25 Board Meeting, Genger's theory is that the Trump Group accepted Genger's vote on behalf of the Sagi and Orly Trusts at the June 25 Board Meeting when the Trans-Resources stockholders approved the Funding Agreement. Genger argues that the Trump Group benefited when Genger purportedly voted the Proxies at the June 25 Board Meeting because approval of the Funding Agreement was a step towards giving them control of the company. As to the second theory, Genger argues that the Trump Group acknowledged the Sagi Trust as the transferee of the Sagi Shares, and benefited from purchasing the Sagi Shares because buying directly from Sagi Genger allowed the Trump Group to avoid the uncertainty and cost of enforcing their rights under Section 3.2 of the Stockholders Agreement.

FN113. Later in the briefing process, Genger recast his argument about the 2005 Written Consents and the minutes of the November 2007 Board Meeting in ratification terms. That is, Genger argued that the 2005 Written Consents and the minutes of the November 2007 Board Meeting indicate that the Trump Group ratified the 2004 Transfers. The argument fares no better presented within a ratification analysis. As explained above, I find this argument unconvincing because, although representatives of the Trump Group received the 2005

Written Consent and signed its signature pages, and approved the minutes of the November 2007 Board Meeting, neither document involved the communication of a material amount of information about the 2004 Transfers to properly notify the Trump Group of the Transfers. Before a party can ratify something, it must first have "sufficient notice or means of knowledge" of the transaction or act in question. *Papaioannu,* 186 A.2d at 749-50. The 2005 Written Consent and the 2007 Board Minutes made, at best, an oblique suggestion that some event might have changed the shareholdings of Trans-Resources' stock. But neither the 2005 Written Consent nor the minutes of the November 2007 Board Meeting indicate any particular information about the 2004 Transfers, and neither event even occurred in a context where the Trump Group would have been alerted that something like the Transfers may have taken place. Therefore, Genger's ratification argument based on those pieces of evidence fails.

Genger's ratification argument fails for two primary reasons. First, Genger's argument that the Trump Group ratified the 2004 Transfers is belied by the fact that the Trump Group repeatedly stated that the Transfers were made in violation of the Stockholders Agreement. Eddie Trump and Hirsch made that point at the June 13 Meeting.[FN114] The fact that the Transfers were made in violation of the Agreement was repeated at the June 25 Board Meeting.[FN115] The letter the Trump Group sent to Trans-Resources on August 8, 2008, whereby it expressed its intention to exercise its rights to buy the 2004 Transfer shares, indicated that the 2004 Transfers were made in violation of the Stockholders Agreement.[FN116] And, the Trump Group's complaint in this matter claimed that the 2004 Transfers violated the Stockholders Agreement.[FN117] Thus, the clear and consistent message from the Trump Group to Genger at all relevant times

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in A.2d, 2010 WL 2901704 (Del.Ch.)
(Cite as: 2010 WL 2901704 (Del.Ch.))

was that the Stockholders Agreement had been vi-
olated. At no point did the Trump Group tell
Genger that it accepted the 2004 Transfers.

> FN114. *See supra* page 16.
>
> FN115. *See supra* page 19.
>
> FN116. *See supra* page 22.
>
> FN117. *See* Compl. ¶ 8.

Second, Genger has also failed to show that the
Trump Group benefited in any way that suggests
ratification. That is, Genger's argument that the
Trump Group ratified the 2004 Transfers at the
June 25 Board Meeting must be rejected because
Genger reneged on the Funding Agreement. Be-
cause the Agreement was never executed, the
Trump Group never received the benefit that was
the condition upon which it might actually not chal-
lenge the 2004 Transfers. Without the Trump
Group having received the benefit that was to be
given for relinquishing its claim that the 2004
Transfers were void, there is no basis to conclude
that the Trump Group assented to the 2004 Trans-
fers by accepting Genger's vote on behalf of the
Sagi and Orly Trust in favor of the Funding Agree-
ment.[FN118]

> FN118. Genger argues that it was enough
> that the Trump Group "accepted for them-
> selves as shareholders the pecuniary bene-
> fits" of the Funding Agreement, even
> though they never actually received those
> benefits because that deal was never con-
> summated. Genger's Post-Trial Op. Br. 21.
> In other words, according to Genger's the-
> ory, not only is receiving a benefit an in-
> dication of ratification, but a step taken
> during a negotiation to receive a benefit is
> also. Tellingly, Genger cites no case law
> supporting his position.
>
> I reject this argument for the following
> reason: acceptance of the benefit of a
> voidable transaction is an *alternative*

basis upon which to ground a conclusion
that a party ratified the transaction. It is
a suitable alternative to an express af-
firmation of the transaction because ac-
ceptance of a benefit is a relatively con-
crete factual occurrence that inspires
confidence in a conclusion that, even
though the ratifying party did not ex-
pressly enunciate her assent to the void-
able transaction, she has nonetheless
done some "voluntary and positive act"
to indicate that assent. *Frank*, 32 A.2d at
283. Negotiations relating to a potential
benefit arising from a contractual breach
are a less sure foundation upon which to
base a finding of a ratification because,
as sophisticated commercial parties
know, discussions often range across a
number of different options, many of
which never come to pass. In other
words, negotiations about the potential
benefit arising from a voidable transac-
tion are unreliable. For that reason they
cannot reasonably be considered to in-
duce the other party's reliance, and there-
fore there is no basis to conclude that the
party who suffered the breach is es-
topped from enforcing the contract. *See
Romer v. Porcelain Products, Inc.*, 2
A.2d 75, 76 (Del.Ch. July 28, 1938)
(finding that a complaining stockholder
was barred by "the estoppel of his acqui-
escence"); *see generally Frank*, 32 A.2d
at 283 ("The defenses of laches, acquies-
cence, ratification and estoppel all have
some element in common."). That is, un-
til the ratifying party actually takes the
benefit, there is no basis for the estoppel.
For that additional reason, I reject
Genger's claim that the Trump Group
ratified the 2004 Transfers at the June 25
Board Meeting.

*17 Indeed, the Funding Agreement proves the
point. The Trump Group was willing to consider a

Page 21

Not Reported in A.2d. 2010 WL 2901704 (Del.Ch.)
(Cite as: 2010 WL 2901704 (Del.Ch.))

resolution of the violation of the Stockholders Agreement that remedied that violation by giving them voting control of Trans-Resources. In so doing, they were willing to accept some risk, based on Arie Genger's assurances that he did not face a problem from Sagi Genger if he voted the disputed shares. If that was so, and if the Trump Group was able to reach an accord that gave them voting control, all the parties affected by the 2004 Transfers would have been on board. But the lynchpin of the deal was the Genger would rectify the violation of the Stockholders Agreement by ensuring that the Trump Group had voting control. He then reneged on his assurances that the Transfers were a problem by claiming that Funding Agreement could not be accomplished because Sagi Genger might challenge the substantive fairness of the required stock issuance to the Trump Group.

Of course, the Trump Group received a benefit when it purchased the Sagi Shares from the Sagi Trust and TPR, but that benefit is not an indication of the Trump Group's ratification of the 2004 Transfers. Rather it is consideration of a settlement that resolved the very problem Genger had created. In other words, Genger's argument confuses the benefits that come from compromising claims away in return for a settlement with taking a benefit from a voidable transaction that indicates ratification. A benefit that indicates ratification is one where the ratifying party would be getting something for nothing if she were allowed to enforce the contract.[FN119] Here, the Trump Group was not attempting to take advantage of the 2004 Transfers in a way that would have allowed it to obtain more than it was entitled to under the Stockholders Agreement.

> FN119. *See, e.g. Id.* at 278-83 (finding that a stockholder who had benefitted for years from a recapitalization plan "could not accept the benefit offered by the plan and at the same time deny its validity").

By entering into the Purchase Agreement, the Trump Group dealt with the problem that Genger's misconduct had caused it. Genger had just reneged

on the compromise Funding Agreement that would have rectified his wrongful behavior, in large measure by claiming that Sagi Genger, as an arguably innocent purchaser for value, would cause trouble and upset any deal. The Trumps reasonably suspected that Genger's resistance was also inspired by his desire to retain control. To address this problem, the Trump Group dealt with both the wrongful transferor, TPR, and the purported transferee, the Sagi Trust, so that it could cover all its bases. In doing so, the Trump Group never accepted the legitimacy of the 2004 Transfers; indeed, its consistent position was that the Transfers were void.[FN120] But by binding both TPR and the Sagi Trust, it could resolve the issue of ownership and control over the bloc definitively. That is, under the deal with TPR and the Sagi Trust, the Trump Group extinguished any claims it had against either TPR or the Sagi Trust as to the Sagi Shares in return for a majority stake in the company.[FN121] Thus, the Trump Group was only attempting to recapture from TPR what it was owed under the Stockholders Agreement: control over Trans-Resources. Indeed, the Trump Group was giving up its right to purchase the shares from TPR at 2004 prices, which likely would have allowed the Trump Group to obtain the Shares for much less than the approximately $26 million it paid to purchase the Sagi Shares.

> FN120. *See supra* pages 16-25.

> FN121. *See supra* pages 22-24.

**\*18** The only difference between enforcing its rights under Section 3.2 of the Stockholders Agreement against TPR and acquiring control directly through the purchase of the Sagi Shares was speed. That is, negotiating directly with both TPR and the Sagi Trust had the advantage of providing a quick and certain resolution to the problem, while enforcing Section 3.2 would likely have involved lengthy litigation. Of course, a speedy solution has value, but that value is the benefit of any settlement, and is one of the primary reasons parties settle their disputes. Undermining that incentive

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in A.2d, 2010 WL 2901704 (Del.Ch.)
(Cite as: 2010 WL 2901704 (Del.Ch.))

cuts against the public's well-established interest in promoting settlement.[FN122] At all times, the Trump Group took the position that the 2004 Transfers were void, and mentioned that position to Genger and in litigation. All the Trump did by entering into the Purchase Agreement was ensure that, if the Trump Group were proven wrong in litigation about the 2004 Transfers, it had acquired whatever interests Sagi Genger held and, therefore, he was not a further obstacle. By making a deal directly with the wrongdoer whose shares it was entitled to receive under the Stockholders Agreement, the Trump Group settled TPR's violation of that Agreement by accepting the shares on the terms negotiated, rather than under the price setting process of Section 3.2. In this regard, it is also important to note that the Trump Group was entitled to control of Trans-Resources *as of 2004*, when Genger breached the Stockholders Agreement. Genger's secret transfers had deprived the Trump Group of the benefits of the Stockholders Agreement for four years, and it comes with little grace for Genger now to argue that the Trump Group had to wait even longer or else it would relinquish its rights to those benefits.

Finally, I note that finding that the Trump Group did not ratify the 2004 Transfers leads to, in my view, an equitable result, despite Genger's protestations to the contrary. The problem Genger created by his serious, secretive contractual breach-the insertion of Genger's dysfunctional family into the management of Trans-Resources-was precisely what the Stockholders Agreement was designed to avoid.[FN123] The Trump Group could only rectify that problem outside of litigation by negotiating with TPR and the Sagi Trust because, by effecting the Transfers, Genger made it impossible to deal with TPR alone. Genger's argument that the Trump Group ratified the 2004 Transfers because it dealt with Sagi Genger rather than telling him that the Transfers were void is particularly cynical because Genger himself insisted that the Trump Group not challenge the Sagi Trust's ownership of its Trans-Resources shares.[FN124] Genger was the source of all of these problems, and to find that the Trump Group ratified Genger's behavior would only reward him for his own partidy.[FN125] In that regard, Genger's argument that a finding that the Trump Group did not ratify the 2004 Transfers would work an inequity because it would require the unwinding of his divorce settlement is baseless. Genger only has himself to blame for whatever mess his decision to make the 2004 Transfers has caused for his divorce settlement. If Arie Genger's violation of the Stockholders Agreement has deepened the Genger family's internecine feud, that is unfortunate. But it is not the Trump Group's problem, nor is it a basis for an appeal to this court's sense of equity.

FN122. *See Marie Raymond Revocable Trust v. MAT Five LLC,* 980 A.2d 388, 402 (Del.Ch.2008) ("It is well established that Delaware law favors the voluntary settlement of contested issues. Settlements are encouraged because they promote judicial economy and because the litigants are generally in the best position to evaluate the strengths and weaknesses of their case." (internal citations omitted)), *aff'd sub nom. Whitson v. Marie Raymond Revocable Trust,* 976 A.2d 172 (Del.2009).

FN123. *See supra* pages 5-8.

FN124. *See supra* page 20.

FN125. *See* 3 FARNSWORTH ON CONTRACTS § 12.20 (3d ed. 2004) ("A person is not permitted to profit by his own wrong at the expense of another.").

**2. *The Trump Group Holds A Majority Of Trans-Resources' Stock But Is Not Entitled To The Shares Transferred To Arie Genger Personally Or To The Orly Trust***

*19 That the purchase of the Sagi Shares was a bargain with TPR and the Sagi Trust that resolved Genger's violation of the Stockholders Agreement also has ramifications for the Trump Group's

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in A.2d, 2010 WL 2901704 (Del.Ch.)
(Cite as: 2010 WL 2901704 (Del.Ch.))

claims, which include a theory that it has a right to purchase all of the shares TPR transferred in the 2004 Transfers-including the shares transferred to Arie Genger personally and the Orly Trust-under the terms of the Stockholders Agreement. In the Purchase Agreement whereby the Trump Group bought the Sagi Shares, the parties included a provision that ensured that, if the 2004 Transfers were found to be improper, the Agreement would be deemed to have been consummated with TPR, not the Sagi Trust.[FN126] Thus, the Purchase Agreement was a broad settlement that gave the Trump Group the assurance that it had all its bases covered in regard to the Sagi Shares, and that it would retain control over Trans-Resources. The Purchase Agreement also provided in relation to the shares transferred to Arie Genger personally and the Orly Trust that:

FN126. See supra pages 23-24.

If at any time following the Closing Date, it is determined that Arie Genger is not the record and beneficial owner of the 794.40 shares of Common Stock of the Company purportedly transferred to him by TPR in October, 2004 and/or that the Orly Genger 1993 Trust is not the record and beneficial owner of the 1,102.80 shares of Common Stock of the Company purportedly transferred to such Trust by TPR in October, 2004, and that TPR is determined to be the record or beneficial owner of any such shares, in either or both cases by virtue of the transfer of such shares being deemed to have been void or for any other reason (the shares being so affected being referred to herein as the "Affected Shares") then TPR shall promptly transfer 64% of the Balance Shares (as such term is defined in the Stockholders Agreement dated March 30, 2001, among TPR, TR Investors, Glenclova and the Company (the "Stockholders Agreement")) to TR Investors and Glenclova in accordance with the terms of Section 1.6 of the Stockholders Agreement whether or not such agreement is then still in effect.[FN127]

FN127. Purchase Agreement § 11 (emphasis added).

Thus, the Purchase Agreement provided that, if the transfer of TPR shares to Arie Genger and the Orly Trust was found to be improper, then 64% of the Balance Shares[FN128] would be transferred from TPR to the Trump Group.

FN128. See supra page 10.

Although the 2004 Transfers violated the terms of the Stockholders Agreement, which in Section 3.2 provides that the Trump Group can purchase all of TPR's shares, the Trump Group cannot purchase the shares transferred to Arie Genger or the Orly Trust because the Trump Group must abide by the settlement terms to which it agreed in the Purchase Agreement. Because the 2004 Transfers violated the Stockholders Agreement, Arie Genger and the Orly Trust have been found to not be the record or beneficial owners of the shares transferred to them. Per Section 11 of the Purchase Agreement, that entitles the Trump Group to 64% of the Balance Shares, and nothing more beyond the Sagi Shares that it has already bought. As to the Transfer from TPR to Arie Genger himself, the major problem was the lack of notice. Under the Stockholders Agreement, Genger could receive shares from TPR so long as he: (1) gave proper notice to the Trump Group entities; and (2) signed on to the Stockholders Agreement.[FN129] He did neither and, as a result, cannot exercise any rights under the Stockholders Agreement. Although the Trump Group believes that Genger's violation should require him to transfer all of his Trans-Resources shares to the Trump Group, that remedy is disproportionate. That sort of relief is unnecessary to this control dispute and therefore this § 225 action. Nevertheless, Trans-Resources appears entitled, in any event, to deny Genger the right to vote his shares until he gives formal notice and signs on to the Stockholders Agreement. As to the Orly Trust, it is not before the court, and the shares it was wrongly transferred are also not necessary for the Trump Group to exercise control. Therefore, I do not issue any ruling as to

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in A.2d, 2010 WL 2901704 (Del.Ch.)
(Cite as: 2010 WL 2901704 (Del.Ch.))

those shares, because that is unnecessary in this §
225 action.[FN130] Obviously, my finding that the
shares were wrongly transferred creates problems
for Arie Genger, but that exposure is a result of his
own secretive contract breach.

  FN129. Stockholders Agreement § 2.1.

  FN130. *See Arbitrium (Cayman Islands)
  Handels AG v. Johnston.* 1997 WL
  589030, at *3 (Del.Ch. Sept.17, 1997)
  (discussing that a § 225 proceeding should
  generally only resolve issues affecting vot-
  ing control of the corporation): *Bossier v.
  Connell,* 1986 WL 11534, at *2 (Del.Ch.
  Oct.7, 1986) (same).

**D. *The Trump Group Did Not Take The Sagi Shares
Subject To The Proxy***

  *20 Even if the Trump Group ratified the 2004
Transfers-which it did not-it would still have voting
control over Trans-Resources because it did not
take the Sagi Shares subject to the Proxy. That con-
clusion is required for two reasons.

  First, the language of the Proxy itself does not
plainly indicate that the Proxy was to run with the
Shares if they are sold. The explicit terms of the
Proxy establish that it only applies so long as the
Sagi Trust owns the Shares. For example, the Proxy
states that the Sagi Trust appoints Genger "to vote
as *its* proxy, all shares of common stock of TRI
which are not or hereafter *owned by the Trust."*
[FN131] Also, it permits Genger to vote only "in the
same manner and to the same extent as *the Trust
might* were *the Trust* present at said meeting."
[FN132] In this regard, the Proxy is different, for ex-
ample, from the proxy at issue in *Hoft v. Dart
Group. Corp.,* which gave the proxy holder the
"right to exercise all rights to vote *the Shares on all
matter on which they are* entitled to vote." [FN133]
Here, the Proxy does not give Genger the right to
vote on all matters in which the Sagi Shares are en-
titled to vote; rather, the Proxy gives Genger the
right to vote on all matters in which the Sagi *Trust*
is entitled to vote, suggesting that the Proxy does

not extend to subsequent owners of the Shares.

  FN131. Proxy at 1 (emphasis added).

  FN132. *Id.* (emphasis added).

  FN133. 1997 WL 154049, at *2 n. 5
  (Del.Ch. Mar.14, 1997) (emphasis added).

  Most importantly, the Proxy does not provide
in any way for the reservation of voting powers to
Genger after such a sale. The only language Genger
points to as evidence that the Proxy is meant to run
with the Sagi Shares is the phrase that the Proxy
"shall continue for the duration of Arie Genger's
life." [FN134] But, in the context of the entire docu-
ment, that language only means that the Sagi Trust
would be bound by the Proxy until Genger died, not
that the Proxy would continue to bind later owners
if the Shares were transferred. If Genger wanted to
keep the Proxy after a transfer, he could have easily
inserted clear language-such as "this Proxy shall
bind any subsequent transferees"-into the Proxy to
that effect. He did not, and thus there is no reason
found in the text of the Proxy to indicate that it is
binding upon the Trump Group.

  FN134. Proxy at 1.

  Even if the language of the Proxy was ambigu-
ous-which it is not-public policy concerns require
that the Proxy be strictly construed. Historically,
proxies have been interpreted narrowly and when
there is an ambiguity, read as not restricting the
right to vote the shares. [FN135] Recent market de-
velopments have only reinforced the utility of the
presumption that irrevocable proxies should be nar-
rowly construed. Separating voting control from
stock ownership-which can result in "empty vot-
ing," where an investor votes stock without having
an accompanying economic interest-raises import-
ant public policy concerns. [FN136] For example, the
decoupling of shareholder voting rights and eco-
nomic interest, which is increasingly common and
only loosely regulated by the securities laws, [FN137]
is of concern because empty voting can theoretic-

Not Reported in A.2d, 2010 WL 2901704 (Del.Ch.)
(Cite as: 2010 WL 2901704 (Del.Ch.))

those shares, because that is unnecessary in this § 225 action.[FN130] Obviously, my finding that the shares were wrongly transferred creates problems for Arie Genger, but that exposure is a result of his own secretive contract breach.

FN129. Stockholders Agreement § 2.1.

FN130. *See Arbitrium (Cayman Islands) Handels AG v. Johnston.* 1997 WL 589030, at *3 (Del.Ch. Sept.17, 1997) (discussing that a § 225 proceeding should generally only resolve issues affecting voting control of the corporation): *Bossier v. Connell,* 1986 WL 11534, at *2 (Del.Ch. Oct.7, 1986) (same).

**D.** *The Trump Group Did Not Take The Sagi Shares Subject To The Proxy*

*20 Even if the Trump Group ratified the 2004 Transfers-which it did not-it would still have voting control over Trans-Resources because it did not take the Sagi Shares subject to the Proxy. That conclusion is required for two reasons.

First, the language of the Proxy itself does not plainly indicate that the Proxy was to run with the Shares if they are sold. The explicit terms of the Proxy establish that it only applies so long as the Sagi Trust owns the Shares. For example, the Proxy states that the Sagi Trust appoints Genger "to vote as *its* proxy, all shares of common stock of TRI which are not or hereafter *owned by the Trust.*"[FN131] Also, it permits Genger to vote only "in the same manner and to the same extent as *the Trust might* were *the Trust* present at said meeting."[FN132] In this regard, the Proxy is different, for example, from the proxy at issue in *Haft v. Dart Group. Corp.,* which gave the proxy holder the "right to exercise all rights to vote *the Shares* on all matter on which *they* are entitled to vote."[FN133] Here, the Proxy does not give Genger the right to vote on all matters in which the Sagi Shares are entitled to vote; rather, the Proxy gives Genger the right to vote on all matters in which the Sagi *Trust* is entitled to vote, suggesting that the Proxy does

not extend to subsequent owners of the Shares.

FN131. Proxy at 1 (emphasis added).

FN132. *Id.* (emphasis added).

FN133. 1997 WL 154049, at *2 n. 5 (Del.Ch. Mar.14, 1997) (emphasis added).

Most importantly, the Proxy does not provide in any way for the reservation of voting powers to Genger after such a sale. The only language Genger points to as evidence that the Proxy is meant to run with the Sagi Shares is the phrase that the Proxy "shall continue for the duration of Arie Genger's life."[FN134] But, in the context of the entire document, that language only means that the Sagi Trust would be bound by the Proxy until Genger died, not that the Proxy would continue to bind later owners if the Shares were transferred. If Genger wanted to keep the Proxy after a transfer, he could have easily inserted clear language-such as "this Proxy shall bind any subsequent transferees"-into the Proxy to that effect. He did not, and thus there is no reason found in the text of the Proxy to indicate that it is binding upon the Trump Group.

FN134. Proxy at 1.

Even if the language of the Proxy was ambiguous-which it is not-public policy concerns require that the Proxy be strictly construed. Historically, proxies have been interpreted narrowly and when there is an ambiguity, read as not restricting the right to vote the shares.[FN135] Recent market developments have only reinforced the utility of the presumption that irrevocable proxies should be narrowly construed. Separating voting control from stock ownership-which can result in "empty voting," where an investor votes stock without having an accompanying economic interest-raises important public policy concerns.[FN136] For example, the decoupling of shareholder voting rights and economic interest, which is increasingly common and only loosely regulated by the securities laws,[FN137] is of concern because empty voting can theoretic-

Not Reported in A.2d, 2010 WL 2901704 (Del.Ch.)
(Cite as: 2010 WL 2901704 (Del.Ch.))

ally allow investors with voting power but with an economic interest adverse to the firm to vote in ways that reduce the company's share price.[FN138]

> FN135. *See Eliason v. Englehart,* 733 A.2d 944 (Del.1999) (finding a proxy to be revocable where the words expressly stating that it was an "Irrevocable Proxy" were only found in the authentication to the document, not in the language of the proxy itself; *Freeman v. Fabiniak,* 1985 WL 11583 (Del.Ch. Aug.15, 1985) (narrowly interpreting the grant of authority made in a proxy instrument and holding that the instrument, which conveyed the right to vote at shareholder meetings, did not authorize other action by consent); *State ex rel. McKaig v. Bd. of Directors of H.F. Dangberg Land & Live Stock Co.,* 60 Nev. 382, 110 P.2d 212, 214 (Nev.1941) ("The instrument granting the vote by proxy will be strictly construed.").

> FN136. *See* Henry T.C. Hu & Bernard Black, *Empty Voting and Hidden (Morphable) Ownership: Taxonomy, Implications, and Reforms,* 61 BUS. LAW. 1011, 1014 (2006) (*"Empty Voting "*); *see also* Shaun Martin & Frank Partnoy, *Encumbered Shares,* 2005 U. ILL. L.REV.. 775.

> FN137. *See* Henry T.C. Hu & Bernard Black, *Equity and Debt Decoupling and Empty Voting II: Importance and Extensions,* 156 U. PA. L.REV. 625 (2008)

> FN138. *See Empty Voting* at 1014.

*21 Our Supreme Court's recent decision in *Crown EMAK Partners, LLC v. Kurz* underscores the importance of those public policy concerns .[FN139] There, the Supreme Court affirmed this court's decision that third-party vote buying merits judicial review when it disenfranchises shareholders by affecting the outcome of a vote, and con-

firmed this court's conclusion that the voting arrangement at issue was proper.[FN140] Its reason for so concluding is important: "[w]e hold that the Court of Chancery correctly concluded that there was no improper vote buying, *because the economic interests and the voting interests of the shares remained aligned* since both sets of interests were transferred from Boutros to Kurz by the Purchase Agreement."[FN141] In other instances, the temptations for self-dealing that arise when persons with a relatively small economic interest in a corporation has voting control have resulted in serious harm to the corporation and its other investors.[FN142]

> FN139. 992 A.2d 377, 388 (Del.2010) ("For many years, Delaware decisions have expressed consistent concerns about transactions that create a misalignment between the voting interest and the economic interest of shares.") (citations omitted).

> FN140. *Id.* at 388-90.

> FN141. *Id.* at 390 (emphasis added).

> FN142. *See, e.g., Hollinger Intern., Inc. v. Black,* 844 A.2d 1022 (Del.Ch.2004).

In light of those concerns, a proxy purporting to irrevocably decouple voting rights from economic interest should be strictly construed. Because there is no such clear intent manifested in the Proxy here, prudent public policy requires the conclusion that the Proxy does not survive the sale of the Sagi Shares to the Trump Group.

Second, the Proxy is not irrevocable because it does not satisfy § 609 of the New York Business Corporation Law, which I conclude governs the Letter Agreement and the Proxy attached thereto in view of the lack of any policy conflict between it and the DGCL.[FN143] Section 609 provides that:

> FN143. Letter Agreement at 2 ("This Letter Agreement shall be governed by the laws of the State of New York without re-

Not Reported in A.2d, 2010 WL 2901704 (Del.Ch.)
(Cite as: 2010 WL 2901704 (Del.Ch.))

gard to conflicts of law principles."). Given Delaware's respect for contractual freedom, *see Abry Partners V, L.P. v. H & W Acquisition LLC*, 891 A.2d 1032, 1061 (Del.Ch.2006) (noting that "there is also a strong American tradition of freedom of contract, and that tradition is especially strong in our State" and citing authorities), it respects choice of law agreements. *See J.S. Alherici Const. Co., Inc. v. Mid-W. Conveyor Co., Inc.*, 750 A.2d 518, 520 (Del.2000) ("Delaware courts will generally honor a contractually-designated choice of law provision so long as the jurisdiction selected bears some material relationship to the transaction."). Although our law relating to the voting of corporate shares is of paramount interest to Delaware, there is no offense to Delaware of allowing parties to subject agreements about irrevocable proxies to a law that places different strictures on such proxies than does Delaware law, absent some reason that those strictures offend a fundamental protection by the DGCL. Section 609 of the N.Y. Bus. Corp. Law does not conflict with any fundamental Delaware corporate law policies or doctrines. Therefore, I find no reason to apply Delaware law in a situation where the parties have made a clear choice of law in favor of a sister state.

A proxy which is entitled "irrevocable proxy" and which states that it is irrevocable, is irrevocable when it is held by any of the following or a nominee of any of the following: (1) A pledgee; (2) A person who has purchased or agreed to purchase the shares; (3) A creditor or creditors of the corporation who extend or continue credit to the corporation in consideration of the proxy if the proxy states that it was given in consideration of such extension or continuation of credit, the amount thereof, and the name of the person extending or continuing credit; (4) A person who

has contracted to perform services as an officer of the corporation, if a proxy is required by the contract of employment, if the proxy states that it was given in consideration of such contract of employment, the name of the employee and the period of employment contracted for; (5) A person designated by or under paragraph (a) of section 620.
FN144

> FN144. *N.Y. Bus. Corp. Law* § 609; *cf.* 8 *Del. C.* § 212(e) (providing that a duly executed proxy will be deemed irrevocable where it: (1) states that it is irrevocable; and (2) is coupled with an interest sufficient in law to support an irrevocable power, regardless of whether the interest is in the stock itself or the corporation generally).

Genger obviously does not qualify under subsections (1), (2), (3), or (4)-that is, he is not a pledgee, creditor, contract officer, or purchaser of the Shares sold to the Sagi Trust. And, he does not qualify under sub-section (5), because § 620 of the New York Business Corporation Law applies to an agreement "between two or more shareholders." and neither Genger nor the Sagi Trust were shareholders of Trans-Resources when the Letter Agreement and the Proxy were executed.FN145 Thus, the Proxy is not irrevocable under New York Law, and was revoked by the sale of the Sagi Shares to the Trump Group.FN146

> FN145. *N.Y. Bus. Corp. Law* § 620.

> FN146. *See Tompers v. Bank of Am.*, 217 A.D. 691, 217 N.Y.S. 67, 75 (N.Y.App.Div.1926) (holding that a revocable proxy terminated "through sale of ... stock"). Even if the Proxy were irrevocable, Genger would still be bound to vote his shares for a majority of the Trump Group's directors because the Stockholders Agreement provides that "the group owning the greater number of shares as between the TPR Stockholders and the

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in A.2d, 2010 WL 2901704 (Del.Ch.)
(Cite as: 2010 WL 2901704 (Del.Ch.))

Non-TPR Stockholders shall designate four directors." Stockholders Agreement § 1.2. That is, Genger would have to vote the Proxy for the Trump Group's directors, because the Trump Group is indisputably the owner of a majority of Trans-Resources' shares. Economic ownership trumps, so to speak, any interest Genger has as an owner of the Proxy.

### IV. *Conclusion*

*22 Genger violated the Stockholders Agreement when he made the 2004 Transfers, and the Trump Group did not ratify those Transfers after the fact. Furthermore, the Trump Group did not take the Sagi Shares subject to the irrevocable Proxy. Therefore, the Trump Group retains the Sagi Shares, [FN147] is entitled to 64% of the Balance Shares, and can vote all of the Trans-Resources shares it holds as it wishes. The parties shall submit an implementing order by Wednesday, July 28, 2010.

> FN147. Genger's claim that he is entitled to purchase the Sagi Shares under § 3.2 of the Stockholders Agreement because the Trump Group pledged (a disputed amount of) those Shares to a party from which they obtained purchase financing fails because Genger never signed on to the Stockholders Agreement. Tr. 950 (A.Genger). Until he accepts the burdens of that contract, Genger cannot expect to enjoy its benefits. *See, e.g., Red Clay Educ. Ass'n v. Bd. of Educ. of Red Clay Consol. School Dist.,* 1992 WL 14965, at *10 (Del.Ch. Jan.16, 1992) (holding that plaintiff could not "accept the benefits of a contract without also bearing the corresponding burdens"). Furthermore, Genger cannot now claim entitlements under a contract that he intentionally flaunted. *See PAMI-LEMB I Inc. v. EMB-NHC, L.L.C.,* 857 A.2d 998, 1014-15 (Del.Ch.2004) (holding that a party that repudiates or breaches a contract cannot then

claim the benefits of that contract).

Del.Ch.,2010.
TR Investors, LLC v. Genger
Not Reported in A.2d, 2010 WL 2901704 (Del.Ch.)

END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.



# Exhibit 7

## IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| DALIA GENGER, as Trustee of the Orly Genger 1993 Trust,<br><br>                Plaintiff,<br><br>    v.<br><br>TR INVESTORS, LLC, GLENCLOVA INVESTMENT CO., NEW TR EQUITY I, LLC, NEW TR EQUITY II, LLC, TRANS-RESOURCES, INC. and TPR INVESTMENT ASSOCIATES, INC.,<br><br>                Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | Civil Action No. _____ |

### VERIFIED COMPLAINT

Plaintiff Dalia Genger ("Dalia"), as Trustee of the Orly Genger 1993 Trust (the "Orly Trust"), by her undersigned attorneys, for her Verified Complaint against Defendants TR Investors, LLC ("Investors"), Glenclova Investment Co. ("Glenclova"), TR Equity I, LLC ("Equity I"), TR Equity I, LLC ("Equity II" and together with Investors, Glenclova and Equity I, "The Trump Group"), TPR Investment Associates, Inc. ("TPR") and Trans-Resources, Inc. ("Trans-Resources") alleges upon knowledge, information and belief as follows:

### NATURE OF THE ACTION

1.    On October 29, 2004, as part of a wider multi-million dollar divorce settlement agreement between Arie Genger ("Arie") and Dalia, Arie caused TPR to transfer 794.40 shares (13.99%) of Trans-Resource's stock to himself, and 1,102.80 shares (19.43%) of Trans-Resources stock to each of the 1993 Sagi and Orly Trusts.

2.     In reliance upon (i) Arie's representation that no consent or approval was required for TPR to transfer the shares to her children and (ii) the representation that Arie caused TPR to make that the shares being transferred to the Orly Trust were "free and clear of any liens, claims or encumbrances" and that the transfer "does not violate the certificate of Incorporation of TPR or *any agreement to which TPR is subject*" (emphasis added), Dalia gave up valuable claims in the divorce settlement to ensure that her children's trusts would be well funded. The Orly Trust also relied on those representations in purchasing the Trans-Resources shares.

3.     On October 30, 2004, Trans-Resource issued a share certificate in the name of the Orly Trust for 1,102.80 shares of Trans-Resources common stock. The share certificate was signed by Arie, as President of Trans-Resources, and Edward Klimerman, Assistant Secretary of Trans-Resources and outside counsel to the company.

4.     Trans-Resources delivered the Orly Trust's share certificate to Arie, who was contractually obligated to act as the Orly Trust's proxy for voting the Trans-Resources shares. Arie maintained possession of the Orly Trusts' original share certificate and sent a copy of it to both Dalia and the Orly Trust.

5.     Thus, the Orly Trust is a bona fide and protected purchaser of the Trans-Resources stock because (i) value was given for the Orly Trust's shares of Trans-Resources stock, (ii) the Orly Trust did not have notice of any adverse claim to the shares represented by its share certificate, and (iii) the Orly Trust obtained control of its Trans-Resources share certificate by way of its delivery to Arie, who held the certificate on the Orly Trust's behalf.

2

6.      Consequently, the Orly Trust seeks a declaratory judgment that it is the beneficial owner of the 1,102.80 shares of Trans-Resources stock represented by the share certificate.

**PARTIES**

7.      The Plaintiff Dalia Genger ("Dalia") is the mother of Sagi Genger ("Sagi") and Orly Genger ("Orly") and the former wife of Arie Genger ("Arie"). Dalia is the trustee of the 1993 Orly Genger Trust.

8.      Defendant Trans-Resources, a privately-held Delaware Corporation, is a manufacturer and worldwide distributor of agricultural fertilizer.

9.      Defendant TPR, a Delaware corporation, is the record holder of the 1,102.80 shares that the Orly Trust purchased in 2004.

10.     Defendant Investors, a New Jersey Limited Liability Company, purportedly exercised its rights under the 2008 Side Letter Agreement to purchase from TPR the Trans-Resources common stock that was previously purchased by the Orly Trust.

11.     Defendant Glenclova, a Cayman Islands company, purportedly exercised its rights under the 2008 Side Letter Agreement to purchase from TPR the Trans-Resources common stock that was previously purchased by the Orly Trust.

12.     Defendant Equity I, a Delaware limited liability company, purportedly exercised its rights under the 2008 Side Letter Agreement to purchase from TPR the Trans-Resources common stock that was previously purchased by the Orly Trust.

13.     Defendant Equity II, a Delaware limited liability company, purportedly exercised its rights under the 2008 Side Letter Agreement to purchase from TPR the Trans-Resources common stock that was previously purchased by the Orly Trust.

3

## JURISDICTION

14.     This Court has jurisdiction over this action pursuant to 8 *Del. C.* § 111 and
10 *Del. C.* § 6501, *et. seq.*

## FACTUAL BACKGROUND

### The 2001 Stockholders Agreement

15.     In 1985, Arie formed Trans-Resources.

16.     Until 2001, TPR held Arie's 100% stake in Trans-Resources. TPR was
owned by Arie, Dalia and their two children, Sagi and Orly.  As TPR's majority (51%)
shareholder, Arie controlled Trans-Resources.

17.     Dalia, Sagi and Orly, through the Sagi and Orly Trusts (which were
established by Arie in 1993 as part of a Genger family estate plan), held a minority (49%)
interest in TPR.

18.     In 2001, Glenclova and Investors entered into an agreement with Trans-
Resources and TPR to convert their bond holdings into an equity interest in Trans-
Resources (the "Stockholders Agreement").  Under the Stockholders Agreement,
Glenclova and Investors acquired 47.15% of Trans-Resources common stock from Arie
(through TPR), thereby reducing Arie's ownership interest in Trans-Resources to 52.85%.

19.     The Stockholders Agreement restricted the transfer of Trans-Resources
stock to any persons or entities except those who were designated as "Permitted
Transferees."  If a party to the Stockholders Agreement wished to transfer or sell its
shares to a non-Permitted Transferee, the selling party was required to give written notice
to the other Trans-Resources shareholders, who would have a right of first refusal.  A
transfer that failed to comply with those restrictions and the prior notice requirement

4

would be deemed invalid and void, and would trigger the non-selling shareholders' right to purchase the invalidly-transferred shares.

**The Orly Trust Receives Trans-Resources Stock, for Valuable Consideration, Without Notice of Any Adverse Claim**

20.   After years of litigation regarding their divorce, on October 30, 2004, Arie and Dalia executed a stipulation of settlement (the "Divorce Agreement").

21.   The Divorce Agreement equitably divided Arie and Dalia's marriage assets and provided for certain assets to be transferred to the Sagi and Orly Trusts, assets in which they already had an equitable stake through their minority ownership in TPR.

22.   Thus, simultaneously with the Divorce Agreement, TPR entered into an agreement (the "Letter Agreement") with the Sagi and Orly trusts to sell, transfer and convey 1,102.80 shares of Trans-Resources stock to each of those entities. *See* Letter Agreement dated October 29, 2004, attached hereto as Exhibit A.

23.   Arie, as CEO of Trans-Resources, represented in the Divorce Agreement that "[e]xcept for the Consent of TPR . . . no consent, approval or similar action of any person is required in connection with the transfer of [Trans-Resources] Stock as contemplated hereby . . . ."

24.   Moreover, in the Letter Agreement, which transferred the Trans-Resources stock from TPR to the Orly Trust, Arie caused TPR to represent that "the shares are being transferred hereunder free and clear of any liens, claims or encumbrances and such transfer does not violate the certificate of Incorporation of TPR or any agreement to which TPR is subject." Ex. A.

25.   Dalia relied on those representations in giving up certain claims in the divorce so as to financially benefit her children's trusts and provide for their inheritance.

5

The Orly Trust also relied on those representations in purchasing the Trans-Resources shares from TPR.

**Trans-Resources Delivers a Stock Certificate to the Orly Trust**

26.     On October 30, 2004, Trans-Resources issued a stock certificate to the Orly Trust for 1,102.80 shares of its common stock.

27.     The stock certificate was signed by Arie as President of Trans-Resources, and Edward Klimerman, as Assistant Secretary of Trans-Resources.

28.     The transfer of the Trans-Resources stock to the Orly Trust in October 2004 was registered in the books and records of Trans-Resources.

29.     Trans-Resources delivered the Orly Trust's share certificate to Arie, the Orly Trust's proxy for voting the Trans-Resources shares.

30.     Arie maintained physical possession of the Orly Trust's stock certificate, and forwarded a copy of the certificate to both Dalia and the Orly Trust.

**The Trump Group Exercises an Option to Purchase the Orly Trust Shares**

31.     On August 22, 2008, TPR entered into an agreement with the Trump Group to sell the Trump Group an option to purchase the Trans-Resources shares transferred to the Orly Trust in 2004 if a court found that the transfers of the Trans-Resources shares were void (the "Side Letter Agreement").

32.     The Side Letter Agreement expressly provides that if a court determines "that the Orly Genger 1993 Trust is not the record and beneficial owner of the 1,102.80 shares of Common Stock of the of the Company purportedly transferred to such Trust by TPR in October, 2004," then Trump Group could exercise an option to purchase those shares.

6

33.     In February 2011, the Trump Group exercised its option to purchase the Trans-Resources stock held by the Orly Trust.

**The Supreme Court Reverses this Court's Holding Regarding Beneficial Ownership of the Shares Held in the Orly Trust**

34.     On July 18, 2011, the Delaware Supreme Court affirmed, among other things, this Court's finding in its August 9, 2010 Side Letter Opinion (the "Side Letter Opinion") that TPR was the record owner of the shares transferred to Arie pursuant to the 2004 Letter Agreement.

35.     The Delaware Supreme Court reversed this Court's determinations in the Side Letter Opinion and August 18, 2010 Final Judgment Order to the extent that it adjudicated "the beneficial ownership of the Orly Trust Shares." (Op. at 44)

36.     This action addresses one of the issues that the Delaware Supreme Court held that this Court did not have jurisdiction to decide: the Orly Trust's beneficial ownership of the Trans-Resources shares.

**COUNT I**
**(Declaratory Judgment that the Orly Trust is the Beneficial Owner of 1,102.80 of Trans-Resources Common Stock)**

37.     Plaintiff repeats, re-alleges and incorporates by reference the allegations set forth above in the preceding paragraphs.

38.     Based upon representations that Arie made or caused to be made that the restrictions in the Stock Purchase Agreement did not apply or were waived, the Trustee for the Orly Trust, Dalia (the eventual Trustee) and Orly had no knowledge, either actual or constructive, of any current or potential adverse claim against those shares.

39.     In reliance upon those representations, Dalia provided valuable consideration for the Trans-Resources shares that TPR transferred to the Orly Trust by

7

relinquishing significant claims in the divorce. In further reliance upon those representations, the Orly Trust purchased the 1,102.80 shares of Trans-Resources stock.

40.     The share certificate issued to the Orly Trust was signed by authorized officers of Trans-Resources.

41.     Trans-Resources delivered the Orly Trust's share certificate to Arie, who held possession of it as the Orly Trust's proxy for voting the shares. Arie delivered a copy of the share certificate to the Orly Trust and Dalia.

42.     Because the Orly Trust acquired the legal rights to the Trans-Resources shares for value, with no knowledge of any adverse claim, it is a "bona fide purchaser" or protected purchaser whose rights to the Trans-Resources shares may not be nullified by the Trump Group.

43.     The Orly Trust is entitled to a declaratory judgment that it is the beneficial owner of Trans-Resources shares that it purchased from TPR in October 2004.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court enter an order:

a)     Declaring that the Orly Trust is the beneficial owner of the 1,102.80 Trans-Resources shares that it purchased in 2004, for all purposes;

b)     Requiring Trans-Resources to pay to the Orly Trust any dividends that have been issued on the Trans-Resources shares since the Orly Trust acquired them on October 29, 2004.

c)     Granting the Orly Trust such other and further relief as the Court deems just and proper.

Dated: October 4, 2011

CONNOLLY BOVE LODGE & HUTZ LLP

/s/ Jeremy D. Anderson
Jeremy D. Anderson (No. 4515)
The Nemours Building
1007 N. Orange Street
P. O. Box 2207
Wilmington, DE 19899
Tel: (302) 658-9141
Fax: (302) 658-5614
*Attorneys for Plaintiff*

4493617_1.DOC

9

# EXHIBIT A

**TPR INVESTMENT ASSOCIATES, INC.**
200 West 57th Street
New York, NY 10019

October 29, 2004

Mr. Arie Genger
2600 Island Blvd., Penthouse One
Williams Island, Aventura, FL 33160

Sagi Genger 1993 Trust
200 West 57th Street
New York, NY 10019

Orly Genger 1993 Trust
200 West 57th Street
New York, NY 10019

Ladies and Gentlemen:

This letter will set forth our agreement pursuant to which you will purchase the 3,000 shares of common stock ("the Shares") of Trans-Resources, Inc. ("TRI") owned by TPR Investment Associates, Inc. ("TPR"). TPR hereby sells, transfers and conveys the Shares to you as follows:

(i)    794.40 Shares to Arie Genger ;

(ii)   1,102.80 Shares to the Sagi Genger 1993 Trust , and

(iii)  1,102.80 Shares to the Orly Genger 1993 Trust.

The purchase price is $1.00 per share, receipt of which is hereby acknowledged.

The Shares represent 52.85% of the issued and outstanding shares of TRI. The Shares are being transferred hereunder free and clear of any liens, claims or encumbrances and such transfer does not violate the Certificate of Incorporation of TPR or any agreement to which TPR is subject.

The trustees of the Sagi Genger 1993 Trust and of the Orly Genger 1993 Trust ("Trusts") have agreed to execute on behalf of the Trusts (i) an Irrevocable Proxy to appoint Arie Genger to vote the Shares owned by the Trusts and (ii) a voting trust letter agreement, copies of which are annexed hereto.

In case, at any time hereinafter, any further action is necessary or desirable to carry out the purposes of this Letter Agreement, each of the parties hereto shall take or cause to be taken all necessary action, including, without limitation, the execution and delivery of such

Page 2
Mr. Arie Genger
Sagi Genger 1993 Trust
Orly Genger 1993 Trust

further instruments and documents as may be reasonably requested by any party for such purpose or otherwise to complete or perfect the transactions contemplated hereby.

This Letter Agreement shall be governed by the laws of the State of New York without regard to conflicts of law principles.

Very truly yours,

TPR INVESTMENT ASSOCIATES, INC.

By: _____
Sagi Genger, President

AGREED TO AND ACCEPTED
THIS ___ DAY OF OCTOBER, 2004

_____
ARIE GENGER

SAGI GENGER 1993 TRUST

By: _____
David A. Parnes, Trustee

_____
Eric Gribetz, Trustee

ORLY GENGER 1993 TRUST

By: _____
David A. Parnes, Trustee

_____
Eric Gribetz, Trustee

## Irrevocable Proxy

The Sagi Genger 1993 Trust (the "Trust"), being the current record and beneficial owner of 1,102.80 shares of common stock of Trans-Resource, Inc., a corporation organized and existing under the laws of the State of Delaware ("TRI"), with its principal place of business at 200 West 57th Street, New York, New York, 10019, does hereby constitute and appoint Arie Genger, Chairman of the Board, Chief Executive Officer, and the owner of approximately fourteen percent (14%) of the shares of common stock of TRI, to vote as its proxy, all shares of common stock of TRI which are now or hereafter owned by the Trust, at any and all meetings of the stockholders of TRI, regular or special (or by consent in lieu of a meeting) or any adjournments thereof, in the same manner and to the same extent that the Trust might, were the Trust present at said meeting (or executing such consent), upon any issue or proposal which may be brought before such meeting or by such consent.

This Irrevocable Proxy shall be deemed coupled with an interest and be irrevocable from the date hereof, and shall continue for the duration of Arie Genger's life.

Dated: October __, 2004

The Sagi Genger 1993 Trust
By _____
Edo Gilbett, Trustee

By _____
David A. Parnes, Trustee

STATE OF NEW YORK )
)ss.:
COUNTY OF NEW YORK )

On the 21 day of October, in the year 2004 before me, the undersigned, a Notary Public in and for the State of New York, personally appeared ERIC GRIBETZ, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that she executed the same in her capacity, and that by her signature on the instrument, the individual, or the person upon behalf of whom the individual acted, executed the instrument.

_____
Notary Public

STEPHEN M. BALDINI
Notary Public, State of New York
No. 4888266
Qualified in New York County
Commission Expires July 12, 2004 2006

STATE OF NEW YORK )
)ss.:
COUNTY OF NEW YORK )

On the 20th day of October, in the year 2004 before me, the undersigned, a Notary Public in and for the State of New York, personally appeared DAVID A. PARNES, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that she executed the same in her capacity, and that by her signature on the instrument, the individual, or the person upon behalf of whom the individual acted, executed the instrument.

*Deborah Hampel*
Notary Public

DEBORAH HAMPEL
Notary Public, State of New York
No. 31-4848 4886667
Qualified in New York County
Commission Expires August 2, 2006

- 2 -

## Irrevocable Proxy

The Orly Genger 1993 Trust (the "Trust"), being the current record and beneficial owner of 1,102.80 shares of common stock of Trans-Resource, Inc., a corporation organized and existing under the laws of the State of Delaware ("TRI"), with its principal place of business at 200 West 57th Street, New York, New York, 10019, does hereby constitute and appoint Arie Genger, Chairman of the Board, Chief Executive Officer, and the owner of approximately fourteen percent (14%) of the shares of common stock of TRI, to vote as its proxy, all shares of common stock of TRI which are now or hereafter owned by the Trust, at any and all meetings of the stockholders of TRI, regular or special (or by consent in lieu of a meeting) or any adjournments thereof, in the same manner and to the same extent that the Trust might, were the Trust present at said meeting (or executing such consent), upon any issue or proposal which may be brought before such meeting or by such consent.

This Irrevocable Proxy shall be deemed coupled with an interest and be irrevocable from the date hereof, and shall continue for the duration of Arie Genger's life.

Dated: October 2 9, 2004

The Orly Genger 1993 Trust

By _____
Eric Gribetz, Trustee

By _____
David A. Parnes, Trustee

STATE OF NEW YORK       )
                        )ss.:
COUNTY OF NEW YORK      )

On the 29 day of October, in the year 2004 before me, the undersigned, a Notary Public in and for the State of New York, personally appeared ERIC GRIBETZ, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that she executed the same in her capacity, and that by her signature on the instrument, the individual, or the person upon behalf of whom the individual acted, executed the instrument.

_____
Notary Public
KENNETH M. GAMMILL
Notary Public, State of New York
No. 4973535
Qualified in New York County
Commission Expires July 12, 2006

STATE OF NEW YORK       )
                        )ss.:
COUNTY OF NEW YORK      )

On the 30 day of October, in the year 2004 before me, the undersigned, a Notary Public in and for the State of New York, personally appeared DAVID A. PARNES, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that she executed the same in her capacity, and that by her signature on the instrument, the individual, or the person upon behalf of whom the individual acted, executed the instrument.

Deborah Kempf
Notary Public

DEBORAH KEMPF
Notary Public, State of New York
No. 01KE6086093
Qualified in New York County
Commission Expires August 3, 2016

- 2 -

IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

DALIA GENGER, as Trustee of the Orly           )
Genger 1993 Trust,                             )
                                               )
                Plaintiff,                     )
                                               )
        v.                                     )
                                               )        Civil Action No. _____
TR INVESTORS, LLC, GLENCLOVA                    )
INVESTMENT CO., NEW TR EQUITY I,               )
LLC, NEW TR EQUITY II, LLC, TRANS-             )
RESOURCES, INC. and TPR                        )
INVESTMENT ASSOCIATES, INC.,                   )
                                               )
                Defendants.                    )
                                               )

## VERIFICATION

STATE OF NEW YORK          )
                           )   ss:
COUNTY OF NEW YORK         )

Dalia Genger, being duly sworn, deposes and states as follows:

I am the trustee of the Orly Genger 1993 Trust. I know the allegations contained

in the Complaint to be true and correct of my own knowledge, except as to matters

alleged upon information and belief. As to those matters, I believe them to be true.

        _____
        Name: Dalia Genger
        Trustee of the Orly Genger 1993 Trust

SWORN to and SUBSCRIBED before
me this ___ day of _____, 2011

_____
Notary Public

        ROBERT A. MEISTER
   Notary Public, State of New York
        No. 31-02ME2653350
    Qualified in New York County
Commission Expires March 30, 201_

# Exhibit 8

[FILED: NEW YORK COUNTY CLERK 11/29/2011]
NYSCEF DOC. NO. 2

INDEX NO. 113862/2010
RECEIVED NYSCEF: 11/29/2011

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

------------------------------------------------ X   Date Filed: October 21, 2009
                                                   :
DALIA GENGER, as Trustee on behalf of              :
the Orly Genger 1993 Trust, and                    :   Index No.      10113862
DALIA GENGER, in her individual capacity,          :
                                                   :   SUMMONS
                        Plaintiff,                 :
        -against-                                  :   Basis of venue is
                                                   :   Plaintiff's Residency in New York
ARIE GENGER                                        :   County
                                                   :
                        Defendant.                 :   Plaintiff resides at:
                                                   :   200 East 65th Street, # 32W
                                                   :   New York, NY 10021
------------------------------------------------ X

To the Above-named Defendant:

      **YOU ARE HEREBY SUMMONED** and required to serve upon plaintiff's
attorney an answer to the complaint in this action within twenty (20) days after the service
of this summons, exclusive of the day of service, or within 30 days after service is complete
if this summons is not personally delivered to you within the State of New York.   In case
of your failure to answer, judgment will be taken against you by default for the relief
demanded in the complaint.

      The basis of the venue designated is the county of plaintiff's place of residence,
namely New York County.

Dated: New York, New York
       October 21, 2010

FILED
OCT 2 1 2010
COUNTY CLERK'S OFFICE
NEW YORK

PEDOWITZ & MEISTER, LLP

ROBERT A. MEISTER
Attorneys for Plaintiff
1501 Broadway, Suite 800
New York, New York 10036
(212) 403-7330

Defendant's Addresses:
Arie Genger
2600 Island Boulevard, Penthouse One
Williams Island
Aventura, Florida 33160

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
---------------------------------------------------------------------X

DALIA GENGER, as Trustee on behalf of the Orly    :
Genger 1993 Trust, and DALIA GENGER, in her
individual capacity,                              :
                                    Plaintiff,    :       Index No.   16113862

        -against-                                 :

ARIE GENGER,                                      :       COMPLAINT

                                    Defendant.    :
---------------------------------------------------------------------X

      Plaintiff, Dalia Genger, by her attorneys, Pedowitz & Meister, LLP, for her Complaint

alleges:

## THE PARTIES

1.    Plaintiff Dalia Genger ("Dalia") resides in New York County, New York, New York.

2.    Dalia Genger is the trustee of the Orly Genger 1993 Trust (the "Orly Trust") created by a

Trust Agreement executed on December 13, 1993, between Arie Genger, as Grantor, and Lawrence

M. Small and Sash A. Spencer, as Trustees.

3.    Defendant Arie Genger ("Arie") resides at 2600 Island Boulevard, Penthouse One, Williams

Island, Aventura, Florida 33160.

4.    In 1985, Arie founded Trans-Resources, Inc. ("TRI"), a closely held private corporation.

5.    Prior to October, 2004, Arie was the controlling shareholder of defendant TPR, a closely

held corporation.

6.    Prior to October, 2004, TPR owned 3,000 shares of the common stock of TRI, which

comprised approximately 52.85 percent of TRI's outstanding shares.

7.    On March 30, 2001, TRI, the other shareholders of TRI, TR Investors, LLC and Glencova

Investment Co. (collectively, the "Trump Group") and TPR and Arie executed a Stockholders

FILED

OCT 2 1 2010

COUNTY CLERK'S OFFICE
NEW YORK

1

Agreement (the "TRI Stockholders Agreement"). Exhibit 1 hereto is a true copy of the TRI Stockholders Agreement.

8.     The TRI Stockholders Agreement was in full force and effect in October, 2006, and it remains in full force and effect.

9.     Section 2.1 of the Stockholders Agreement prevented TPR from transferring or pledging TRI stock to any party other than a party expressly permitted to receive such a transfer (a "Permitted Transferee"). Section 2.1 provides in relevant part:

> From and after the date hereof, no Stockholder shall directly or indirectly, offer, transfer, sell, assign, pledge, encumber, hypothecate or otherwise dispose of any Shares (including any derivative transaction) (a) until after December 21, 2003, and, thereafter, only as provided in Articles 3, 4, and 5 of this Agreement, or (b) after written notice to the Company and the other Stockholders ... to (i) in the case of either of the Initial Non-TPR Stockholders or their respective Permitted Transferees (A) to [certain Permitted Transferees], or (ii) in the case of TPR or a Permitted Transferee thereof, to (w) Arie Genger, (x) any entity or entities in which TPR or Arie Genger directly owns a majority of the equity interest and directly controls a majority of the voting power ... (y) the estate o[f] Arie Genger or (z) any immediate family members or lineal descendants of Arie Genger, or trusts of which they are the sole beneficiaries-in-interest, who receive such Shares in consequence of the death of Arie Genger, which transferee(s) become a party to this Agreement....

10.    Therefore the TRI Stockholders Agreement specified that the only Permitted Transferees to whom TPR could transfer TPR's TRI stock were: (i) Arie Genger himself; (ii) any entity in which TPR or Arie directly owned a majority of the equity interest and a majority of the voting power at the time of the transfer; (iii) the estate of Arie Genger; or (iv) any of Arie's immediate family members or lineal descendants, or trusts of which they are the sole beneficiaries-in-trust, who receive the transfer of shares as a result of Arie's death. And, even as to these Permitted Transferees, written notice of the transfers was required to be given to the Trump Group.

2

11.     Article 3 of the TRI Stockholder Agreement requires that in the event a transfer was being made to a party who was not a Permitted Transferee, "[t]he Selling Stockholders shall give [TRI] and to each Covered Stockholder who is not the Selling Stockholder (the "Non-Selling Stockholders") written notice containing the terms and conditions of the Offer." Section 3.1 the stated that:

> Until 30 days after receipt of such notice, the Non-Selling Stockholders shall have the right to elect to purchase all of the Offered Shares at the price offered by the prospective purchaser and specified in such notice.

12.     The TRI Stockholders Agreement specified two remedies for transfers made in violation of the agreement. First, section 2.4 states that "[a]ny attempt by a Stockholder to transfer Shares in violation of this Agreement shall be void and the Company agrees that it will not effect such a transfer or treat any alleged transferee as the holder of such Shares." Second, section 3.2(a) provides that the Trump Group 90 days to exercise the right to repurchase TPR's shares of TRI if the shares were transferred to a non-Permitted Transferee.

13.     On or about October 28, 2004, Arie and Dalia Genger entered into a contract in connection the settlement of their divorce ("Stipulation Agreement").

14.     In the Stipulation Agreement, Arie agreed to cause TPR to transfer 1,102.80 shares of TRI Stock to the Orly Trust, which would give it 19.42766% of the common stock of TRI.

15.     In the Stipulation Agreement, Arie also agreed to cause TPR to transfer 1,102.80 shares of TRI Stock to the Sagi Genger 1993 Trust, which would give it 19.42766% of the common stock of TRI, and to cause TPR to transfer to Arie and 794.40 shares of TRI stock, which would give Arie 13.99468% of the common stock of TRI.

16.     In the Stipulation Agreement, Arie warranted that

> Except for the consent of TPR...no consent, approval or similar action of any person is required in connection with the transfer of TRI Stock as contemplated hereby and

3

that such transfer will not conflict with any agreement to which Husband [Arie] is [a] party or by which he is bound.

17.    On October 29, 2004, TPR and Arie entered into an agreement ("Letter Agreement") with the Orly and Sagi Trusts.  Exhibit 2 is a true copy of the Letter Agreement.

18.    By the Letter Agreement, TPR purported to sell to the Orly Trust and the Orly Trust bought 1,102.80 shares of TRI stock.

19.    By the Letter Agreement, TPR purported to sell to the Sagi Trust and to Arie and the Sagi Trust and Arie bought 1,102.80 and 794.40 shares of TRI stock, respectively.

20.    Neither Arie nor TPR gave the Trump Group written notice of the transfers of TRI stock by TPR provided for the Stipulation Agreement.

21.    The Trump Group did not consent to the transfers of TRI stock by TPR provided for the Stipulation Agreement.

22.    On August 18, 2010, the Delaware Chancery Court issued a Final Judgment Order in TRI Investors, et. al. v. Arie Genger, Civil Court Action Number 3994-VCS, which held that the October 29, 2004, transfers of TRI stock to the Orly Trust, the Sagi Trust and to Arie violated the TRI Stockholders Agreement and were void because the Trump Group was not given written notice of the transfers and the Orly Trust and the Sagi Trust were non-permitted transferees.  Thus, the Court determined that therefore those 3,000 shares of TRI stock were owned by TPR.

23.    Arie's failure to cause TPR to validly transfer 1,102.80 shares of TRI Stock to the Orly Trust was a breach of the Stipulation Agreement with Dalia Genger.

24.    Arie's failure to cause TPR to validly transfer 1,102.80 shares of TRI Stock to the Orly Trust damaged the Orly Trust in the amount of the value of those shares.

4

WHEREFORE, plaintiff respectfully requests that this Court enter Judgment against Arie Genger and in favor of the Orly Genger 1993 Trust for the value of 1,102.80 shares of TRI Stock, plus interest from October 29, 2004, and awarding plaintiff her costs and attorneys fees and such other and further relief as this Court deems just and proper.

PEDOWITZ & MEISTER, LLP

By:_____
Robert A. Meister
1501 Broadway
New York, NY 10036
Attorneys for Plaintiff
212-403-7330

5