SURROGATE'S COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

---------------------------------------------------------------x

In the Matter of the Application of ORLY
GENGER, as a person interested, for the removal
of DALIA GENGER as Trustee of the Orly
Genger 1993 Trust pursuant to SCPA § 711(11)

File No.: 0017/2008

**SECOND
SUPPLEMENTAL NOTICE OF
MOTION  TO DISMISS THIRD
VERIFIED AMENDED PETITION
OF ORLY GENGER**

---------------------------------------------------------------x

    PLEASE TAKE NOTICE that upon the annexed verified affirmation of John Dellaportas,

the Supplemental Citation to Show Cause issued by the Honorable Nora S. Anderson on May 6,

2015, and all prior proceedings had herein, the Sagi Genger 1993 Trust ("the Sagi Trust"), which

is the contingent remainderman beneficiary of the Orly Genger 1993 Trust, by its attorneys,

Morgan, Lewis & Bockius LLP, will move this Court sitting, at 31 Chambers Street, New York

City, in the courtroom of the Honorable Nora S. Anderson in Room 509, at 10:00 a.m.,

September 4, 2015, or as soon as counsel can be heard, for an Order dismissing the Third

Amended Verified Petition for Removal of Dalia Genger as Trustee filed by Orly Genger on

October 15, 2012.

    Pursuant to CPLR 2214(b), any answering papers must be served so as to be received no

later than seven days before the return date.

Dated:      New York, New York          Respectfully submitted,
            July 8, 2015


                                        MORGAN, LEWIS & BOCKIUS LLP

                                        By: _____
                                            John Dellaportas
                                            101 Park Avenue
                                            New York, New York 10178
                                            (212) 309-6690
                                            *Attorneys for the Sagi Genger 1993 Trust*

TO:

Robert A. Meister
Pedowitz & Meister LLP
570 Lexington Avenue – 18th Floor
New York, NY 10022
212.403.7330
*Attorneys for Dalia Genger,*
*as Trustee of the Orly Genger 1993 Trust*

Yoav Griver
Zeichner Elliman & Krause LLP
1211 Avenue of the Americas, 40th Floor
New York, New York 10036
212.223.0400
*Attorneys for Orly Genger*

Steven Riker, Esq.
Law Office of Steven Riker
110 E. 59th Street, 23rd Floor
New York, New York 10022
212.661.6410

*Guardian At Litem*

SURROGATE'S COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

-------------------------------------------------------------------x
                                                    :    File No.: 0017/2008
                                                    :
In the Matter of the Application of ORLY            :    **VERIFIED AFFIRMATION**
GENGER, as a person interested, for the removal     :    **OF JOHN DELLAPORTAS**
of DALIA GENGER as Trustee of the Orly              :    **IN SUPPORT OF MOTION TO**
Genger 1993 Trust pursuant to SCPA § 711(11)        :    **DISMISS THIRD AMENDED**
                                                    :    **VERIFIED PETITION OF**
                                                    :    **ORLY GENGER**
-------------------------------------------------------------------x

        JOHN DELLAPORTAS, an attorney duly admitted to practice law before the Courts of

the State of New York, hereby affirms pursuant to CPLR § 2106, as follows:

        1.      I am admitted to the Bar of the State of New York and a member of the law firm

of Morgan, Lewis & Bockius LLP, which represents the Sagi Genger 1993 Trust (the "Sagi

Trust"), the contingent remainderman beneficiary of the Orly Genger 1993 Trust (the "Orly

Trust"), in the above-referenced action.  Pursuant to the Supplemental Citation to Show Cause

issued by the Honorable Nora S. Anderson on May 6, 2015 (the "Citation"), I respectfully submit

this verified affirmation in support of the Sagi Trust's motion for an Order dismissing the Third

Amended Verified Petition for Removal of Dalia Genger (the "Trustee") as Trustee of petitioner

Orly Genger ("Orly") dated October 15, 2012 (the "Petition"). (A copy of the Citation is annexed

as Exhibit A.  A copy of the Petition is annexed as Exhibit B.)

        2.      As set forth below, the Petition should be dismissed on three separate grounds.

First, it is premised upon a false statement, made by Orly under penalty of perjury, concerning

her proposed successor trustee.  Second, Orly is exploiting this proceeding, and the pendency of

her petition, to delay a determination on the Trustee's application for the return of $32.3 million

that Orly monetized and retained from claims she brought on behalf of the Orly Trust.  Third,

Orly's Petition fails to state a valid claim for the removal of the Trustee.

**Dismissal Basis #1:**
**Orly's Fraud on the Court**

3.       In her Petition, Orly demands that the current Trustee, Dalia Genger, be replaced with Joel Isaacson, an accountant at the firm of Joel Isaacson & Co. LLC. Orly suggests that Mr. Isaacson would be suitable successor trustee because, most significantly, "**Mr. Isaacson is not acquainted with any members of the Genger family ....**" Exh. B, p. 31 ¶ 96. At the end of her Petition, Orly verifies under penalty of perjury that she has "read the annexed Third Amended Verified Petition, knows the contents thereof and the same are true to [her] knowledge, except those matters thereon which are stated to be alleged upon information and belief, and as to those matters [she] believe[s] them to be true." Exh. B, p. 32. ¶ 2.

4.       There is one problem with this statement. It is not true, and Orly knows it is not true. At a recent trial in another, unrelated matter in New York State Supreme Court, Orly took the stand and proceeded to admit on the stand that Mr. Isaacson was actually Orly's personal accountant whom she had retained for various matters, including a meeting with her brother and her mother. (A relevant excerpt of Orly's March 23, 2015 trial testimony is annexed hereto as Exhibit C.) In other words, Mr. Isaacson is not some sort of neutral independent nominee. He is a persona who is very well acquainted with the Gengers.

5.       It is difficult to believe Orly simply innocently *forgot* that Mr. Isaacson was her personal accountant. In her trial testimony, which was just a few months ago, Orly provided some 55 pages of highly detailed recollections about her interactions with Mr. Isaacson and their meeting with her family members. Nor can this merely be written off as some sort of attorney's error. The law firm representing Orly in this case also represented Orly in the case at which she gave the aforementioned trial testimony. Rather, the Sagi Trust believes that this was a willful attempt to mislead the Court as to her proposed successor trustee.

6.      Given that Orly's false statement was made under oath, and relates to a central aspect of this case, this is particularly serious matter.  In *CDR Creances S.A.S. v. Cohen*, 23 N.Y.3d 307, 321 (2014), the Court of Appeals reinforced that the courts of this state should not be exploited and misused as Orly has done here.  "[W]hen a party lies to the court and [its] adversary intentionally, repeatedly, and about issues central to the truth-finding process, it can fairly be said that [the party] has forfeited [the] right to have [the] claim decided on the merits." (Citation omitted.)  That is because fraud on the court "strikes a discordant chord and threatens the integrity of the legal system as a whole, constituting 'a wrong against the institutions set up to protect and safeguard the public.'" *Id.* at 318 (quoting *Hazel-Atlas Glass Co. v. Hartford-Empire*, 322 U.S. 238, 246 (1944)).  "Fraud on the court warrants heavy sanctions, including the striking of an offending party's pleadings and dismissal of the action." *Id.* at 319.

7.      When Orly swore to this Court that her proposed successor trustee Mr. Isaacson "is not acquainted with any members of the Genger family" that was plainly false, and there is no reason to believe she thought it to be true.  That Mr. Isaacson was actually her personal accountant, and well acquainted with the Gengers, were important facts about which she should have told the Court.  Her failure to do so warrants dismissal of her Petition.

### Dismissal Basis #2: ### Orly's Misuse of Trust Assets

8.      In 2010, Orly and her father Arie filed a Third Amended and Supplemental Complaint (the "Complaint") in a Supreme Court action entitled *Arie Genger et al. v. Sagi Genger et al.,* Index No. 651089/2010.  In her Complaint, Orly asserted claims against, *inter alia*, a group of defendants collectively known as the "Trump Parties."  As stated in paragraph 2 of her pleading, Orly Genger "brings this action on behalf of the Orly Trust as the beneficiary of the Orly Trust to protect her interests thereunder."  In the section of the Complaint entitled

-3-

"NATURE OF THE CASE" in her Complaint, Orly made clear her claims against the Trump Parties were based on her accusation that they **misappropriated from the Orly Trust** "the Orly Trust's interest in a portion of [its] TRI stock," that being the Trust's main asset. (A copy of the Complaint is annexed hereto as Exhibit J.)

9.      Thereafter, Orly moved to restrain the Trustee from seeking a declaratory judgment in Delaware Chancery Court that the Orly Trust was the beneficial owner of the TRI shares. In an affidavit in support of that motion, Orly urged the Court to enjoin Dalia because the Delaware declaratory judgment action was "duplicative" of this action. According to Orly: "In the instant action ..., I seek, among other things, the return of those TRI Shares to the Orly Trust." In further support of her motion, Orly submitted a brief advocating the Court's authority to enjoin "duplicative" suits. According to Orly, "Dalia's contention that the Orly Trust is not a party to this action ... is meritless. Orly is prosecuting this action on behalf of the Orly Trust." Over the Sagi Trust's objection, this Court adopted Orly's position and granted her motion to enjoin the Trustee from prosecuting the Delaware action.

10.      In June 2013, Orly settled her claims on behalf of the Orly Trust, pursuant to a settlement agreement (the "Settlement Agreement") which she refused to produce to either the Sagi Trust or the Trustee, *claiming confidentiality*. More significantly, Orly did not turn over a single dollar of the proceeds from the settlement to the Orly Trust. Indeed, Orly refused even to identify for how much she settled the case. We now know it to be $32.3 million.

11.      Under New York law, when a derivative plaintiff such as Orly brings derivative claims on behalf of a direct plaintiff like the Orly Trust, she is required to turn over any settlement proceeds to the Trust. In *Steinberg v. Steinberg*, 106 Misc. 2d 720, 722 (Sup. Ct. N.Y. Cnty. 1980), for example, the derivative plaintiff merely offered to discontinue her derivative claims "on the condition that she be paid a premium of approximately one million dollars above

market value for her outstanding shares." Even that mere offer was too much for the Court, which flatly condemned such conduct, explaining that it "evinces a possibility, and indeed, a likelihood, that the instant action would be discontinued with prejudice before its conclusion" as well as "a strong financial inducement for her to settle on terms advantageous to her as an individual, rather than as a fiduciary...." *Id.* Yet here, Orly did not merely *offer* to cash in on the Orly Trust's claims; she actually *cashed* in, and turned over nothing to the Trust.

12.    Late last year, the Settlement Agreement was ordered to be produced – without confidentiality restriction – in another proceeding, *Sagi Genger v. Orly Genger,* 14-cv-5683 (KBF).  After reviewing the document, the federal court described it as follows: **"Orly [has] monetized her beneficial interest in the Orly Trust shares for $32.3 million ...."** (A copy of the Settlement Agreement is annexed hereto as Exhibit D.  A copy of the federal court decision concerning that Agreement is annexed hereto as Exhibit E.)

13.    Specifically, on page 2, the Settlement Agreement sets forth as its purpose "to resolve all issues, disputes and disagreements between [Orly and the other Settling Parties], including but not limited to the issue of ownership of all [TRI] shares." Consistent with this purpose, Orly signed the Agreement both "in her individual capacity and in her capacity as beneficiary of the Orly Genger 1993 Trust" (*id.* at 1, emphasis added) – the latter being the very capacity by which this Court permitted Orly to assert derivative claims.

14.    In Section 6(a) of the Settlement Agreement, Orly expressly agreed to release her claims against the Trump Parties "in all capacities" (*i.e.*, including her derivative capacity).  (*Id.* at 10.)  In Section 8(a), in turn, Orly agreed to cooperate with the Trump Parties *against* the Orly Trust by, *inter alia,* "caus[ing] the Orly Genger 1993 Trust to release any and all claims against the Trump Group Released Parties ...." (*Id.* at 16.)

15.    In exchange for the extinguishment of the Orly Trust's claim to the TRI shares,

the Trump Parties agreed, in Sections 2 and 3, to pay Orly, Arie and the Brosers $32.3 million. Orly, in turn, agreed to indemnify the Trump Parties for TPR's and the Sagi Trust's claims, and "covenants that for so long as the indemnity … remains in effect, … she … shall not contribute or deposit any amounts, or permit to be contributed or deposited any amounts (including, without limitation, any payments made under Paragraphs 2 and 3), to or with the Orly [] Trust …." (*Id.* at 17.)  In other words, the Trust gets nothing.

16.     Of particular significance to this motion, under Section 8(b) of the Settlement Agreement, Orly agreed that, "as a condition to any agreement by the AG Group to a replacement trustee for the Orly Genger 1993 Trust, [Orly *et al.*] shall use [their] best efforts to cause such trustee to agree in writing on behalf of the Orly Genger 1993 Trust that it shall be a member of the AG Group for purposes of providing the indemnity contained in Paragraph 5."

17.     In other words, although the Orly Trust is contractually barred from receiving even one red cent of the $32.3 million in settlement payments received in consideration for the extinguishment of the Trust's claims against the Trump Parties, Orly agreed to cause the new trustee she wishes to install in place of Dalia (*i.e.*, Mr. Isaacson) to cause the Orly Trust to indemnify the Trump Parties for potentially significant liabilities.

18.     Notably, Orly continued to try to conceal the Settlement Agreement from the Sagi Trust (and the Trustee) even after Your Honor ruled in this case, on July 24, 2014, that this Court could not consider the Petition because "Orly failed to join the Sagi Trust as contingent remainder beneficiary and to serve it with the third amended petition."  (A copy of the Court's July 24, 2014 Decision and Order is annexed hereto as Exhibit I.)  The Sagi Trust submits that Orly has demonstrated her lack of fitness to weigh in on the Trustee.

19.     In the 2010 Action, the Trustee has brought a motion to recover, for the Orly Trust, the $32.3 million in Trust assets which Orly misappropriated for her own benefit and that

-6-

TO:

Robert A. Meister
Pedowitz & Meister LLP
570 Lexington Avenue – 18th Floor
New York, NY 10022
212.403.7330
*Attorneys for Dalia Genger,*
*as Trustee of the Orly Genger 1993 Trust*

Yoav Griver
Zeichner Elliman & Krause LLP
1211 Avenue of the Americas, 40th Floor
New York, New York 10036
212.223.0400
*Attorneys for Orly Genger*

Steven Riker, Esq.
Law Office of Steven Riker
110 E. 59th Street, 23rd Floor
New York, New York 10022
212.661.6410

*Guardian At Litem*

of her father and the hedge fund investors who fund his lawsuits, Arnold and David Broser. (A copy of the Trustee's motion papers, without exhibits, is attached as Exhibit F.) Orly opposed the motion on the ground, *inter alia*, that she was seeking to remove the Trustee in this action, and therefore the Trustee should not be permitted to pursue the motion. Unfortunately, the Supreme Court accepted this position, and by Interim Order dated May 7, 2015, held the Trustee's motion in abeyance pending this Court's resolution of the Petition. (A copy of the Supreme Court's Interim Order is annexed hereto as Exhibit G.)

20.    In the meantime, there is no judicial restraint upon the use of the Orly Trust's settlement proceeds, which are in danger of being dissipated. Accordingly, the Sagi Trust beseeches Your Honor to promptly dismiss the Petition, so that Dalia's motion to recover these assets for the Orly Trust may proceed without further delay.

### Dismissal Basis #3:
### Orly's Failure to State a Claim

21.    Lastly, the Sagi Trust has reviewed the Motion to Dismiss Third Amended Petition filed by the Trustee on December 5, 2012, and shares its position. In order to spare the Court duplicative submissions, the Sagi Trust hereby adopts the arguments set forth in the Trustee's motion with respect to Orly's failure to state a valid claim for the removal of Dalia Genger as trustee of the Orly Trust. (A copy of those motion papers is annexed hereto as Exhibit H, and is incorporated by reference as if fully set forth herein.)

### CONCLUSION

22.    Accordingly, the Petition should be dismissed with prejudice.

Dated: New York, New York
       July 7, 2015

                                    _____
                                    JOHN DELLAPORTAS

VERIFICATION

STATE OF NEW YORK      )
                       )
COUNTY OF NEW YORK  )

I, John Dellaportas, state that I am an attorney for the Sagi Genger 1993 Trust (the "Sagi

Trust") in this action.  I have read my attached affirmation in support of the Sagi Trust's motion

for an Order dismissing the Third Amended Verified Petition for Removal of Dalia Genger as

Trustee filed by Orly Genger on October 15, 2012, and all the contents thereof are true to the

best of my knowledge, except as to matters therein stated to be alleged on information and belief,

and that, as to those matters, I believe them to be true.  Pursuant to CPLR 3020(d)(3), I am

making this verification on behalf of the Sagi Trust because the trustee of the Sagi Genger 1993

Trust is a foreign non-domiciliary residing abroad.


Dated: New York, New York
       July 7, 2015


                                            _____
                                            JOHN DELLAPORTAS


Sworn to before me this
7th day of July, 2015

_____
Notary Public


          MARY C. PENNISI
     Notary Public, State of New York
          No. 02PE6266530
       Qualified in Kings County
    Commission Expires on 08/06/2016

# Exhibit A



SUPPLEMENTAL CITATION

SURROGATE'S COURT, NEW YORK COUNTY

THE PEOPLE OF THE STATE OF NEW YORK

File No. 2008-0017/B

TO:   Assaf Sternberg, as Trustee of the Sagi Genger 1993 Trust

A petition having been duly filed by Orly Genger, domiciled at 780 Greenwich Street, Apt. 4P, New York, New York 10014. **YOU ARE HEREBY CITED TO SHOW CAUSE** before the Surrogate's Court, New York County, at 31 Chambers Street, New York, New York 10007, Room 509 on ___July 8___, 2015, at 10:00 o'clock in the forenoon of that day, why a decree should not be issued (i) removing Dalia Genger as trustee of the Orly Genger 1993 Trust created under agreement dated December 13, 1993; (ii) suspending Dalia Genger as trustee pending determination of her fitness to serve; (iii) appointing Joel Isaacson as successor trustee of the Orly Genger 1993 Trust; and (iv) awarding to Petitioner such other and further relief as the Court deems equitable and proper.

*IN TESTIMONY WHEREOF,* we have cause the seal of the Surrogate's Court of our said County of New York to be hereunto affixed.

Dated, Attested and Sealed,  May 6, 2015
     (L.S.)

HON. _____ **NORA S. ANDERSON**
                  Surrogate, New York County

                  _Diana Sanabria_
                       Chief Clerk

Attorneys for Petitioner:

**ZEICHNER ELLMAN & KRAUSE LLP**
1211 Avenue of the Americas
New York, NY   10036
(212) 223-0400
     Attn:  Yoav M. Griver, Esq.
                Bryan D. Leinbach, Esq.

This citation is served upon you as required by law.   You are not obliged to appear in person.   If you fail to appear, it will be assumed that you consent to the proceedings, unless you file written verified objections thereto.   You have a right to have an attorney-at-law appear for you.

Proof of Service shall be filed with the Clerk of the Court at least two (2) days before the return date.

# Exhibit B

SURROGATE'S COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

-------------------------------------------------

File No. 0017/2008

In the Matter of the Application of ORLY
GENGER, as a person interested, for the
removal of DALIA GENGER, as Trustee of the
Orly Genger 1993 Trust pursuant to SCPA § 711(11)

-------------------------------------------------

## THIRD AMENDED VERIFIED PETITION FOR REMOVAL
## OF DALIA GENGER AS TRUSTEE

TO THE SURROGATE'S COURT, STATE OF NEW YORK
COUNTY OF NEW YORK

Petitioner, Orly Genger ("Petitioner" or "Orly"), by her attorneys, Platzer, Swergold,

Karlin, Levine, Goldberg & Jaslow, LLP, respectfully alleges as her Third Amended Verified

Petition (the "Third Amended Petition") for Removal of Dalia Genger as Trustee as follows:

        1.    Orly, domiciled at 780 Greenwich Street, Apartment #4P, New York, New

York 10014, is the current and sole beneficiary of the Orly Genger 1993 Trust dated December

13, 1993 (the "Orly Trust"). Annexed hereto as **Exhibit "A"** is a copy of the Orly Trust.

        2.    Dalia Genger ("Dalia" or "Respondent"), residing at 200 East 65th Street,

Apartment #32W, New York, New York 10021 is Orly's mother and is the current sole Trustee

of the Orly Trust. Dalia was appointed successor Trustee in January, 2008.

        3.    The Orly Trust provides for discretionary payments of income and principal

to Petitioner during her lifetime with the remainder to be distributed to her descendants, per

stirpes. If Petitioner dies leaving no descendants, the remainder of the trust property is to be

distributed to the Sagi Genger 1993 Trust (the "Sagi Trust"). Sagi Genger ("Sagi") is Orly's

brother.

4.      For the reasons set forth herein, Petitioner respectfully requests that this Court enter an order:

(a)      Pursuant to Surrogate Court's Procedure Act ("SCPA") § 711(2)(3)(7) and/or (8) providing for the immediate removal of Dalia as Trustee of the Orly Trust as a result of her: (i) numerous and continuous breaches of her fiduciary duties to the Orly Trust and Petitioner as its sole beneficiary; (ii) waste and dissipation of the Orly Trust's assets; (iii) repeated and willful engagement in an ongoing fraudulent scheme with Sagi to loot, encumber, pledge and transfer the assets of the Orly Trust; (iv) deliberate and willful violation and contempt of the prior Order of this Court dated July 1, 2009 (the "July 2009 Order") (as well as her deliberate and willful violation and contempt of prior restraining Orders imposed upon her by other New York Courts in related proceedings) as set forth herein; and, (v) imprudent management and injury to the assets of the Orly Trust committed to her charge, all as set forth in this Third Amended Petition;

(b)      Suspending the Letters of Appointment heretofore issued to Dalia;

(c)      Appointing Joel Isaacson as successor trustee; and,

(d)      Granting such other and further relief as this Court deems to be just equitable and proper.

## PRELIMINARY STATEMENT

5.      Petitioner is the sole beneficiary of the Orly Trust.  Dalia is Petitioner's mother and is the sole Trustee of the Orly Trust.  Petitioner is filing this Third Amended Petition as a result of Dalia's egregious, willful, malicious, deliberate and surreptitious scheme to pledge, encumber, transfer and dissipate all of the assets of the Orly Trust in violation of her fiduciary duties as Trustee and in violation of the July 2009 Order.

6.      As will be set forth further below in this Third Amended Petition, Dalia

and Sagi have continuously engaged in a secretive and machiavellian scheme to loot, encumber, pledge, waste, dissipate and transfer the assets of the Orly Trust for personal gain and/or as punishment of Orly for her maintaining her relationship with her father, Arie Genger ("Arie"), during and after acrimonious divorce proceedings between Arie and Dalia.

7.      In addition to this scheme being an egregious breach of Dalia's fiduciary duties to the Orly Trust, Dalia's actions in this regard also constitute a blatant and willful disobedience of the July 2009 Order by pledging and encumbering the assets of the Orly Trust and completely dissipating their value without any prior notice to Petitioner as required under the July 2009 Order, all in breach of Dalia's fiduciary obligations.

8.      Most recently, the Petitioner discovered that Dalia and Sagi entered into various secretive agreements (as will be set forth in this Third Amended Petition) to loot, dissipate, pledge, encumber and transfer the assets of the Orly Trust by agreeing to allow the potential foreclosure against valuable assets of the Orly Trust by Manhattan Safety Company ("MSCo"), a recently created entity in St. Kitts, which upon information and belief is controlled by a professional gambler. All of these recent secret agreements were entered into by Dalia and Sagi without prior notice to Petitioner as required under the July 2009 Order.

9.      As further set forth below, Dalia and Sagi's secretive scheme to loot, pledge, encumber and transfer the assets of the Orly Trust is so brazen in its nature, constitutes such an egregious breach of Dalia's fiduciary duties as Trustee and Dalia's contempt of the July 2009 Order is so clear, that her immediate removal as Trustee of the Orly Trust is both warranted and necessary in order to prevent any further irreparable harm from occurring to the assets of the Orly Trust and Petitioner, as its sole beneficiary.

10.     Dalia's immediate removal as Trustee is necessary because it is clear that

the prior Orders and warnings of this Court (and as will be shown in this Third Amended Petition, the prior Orders of other courts as well) mean absolutely nothing to her and Sagi. Thus, as long as Dalia is Trustee, any assets of the Orly Trust will remain vulnerable and subject to immediate irreparable harm as a result of her ongoing scheme with Sagi.

11.     Dalia's ongoing conspiracy and scheme with Sagi in this regard is akin to Dalia "thumbing her nose" at this Court and Petitioner, as sole beneficiary of the Orly Trust.

12.     A summary of the timeline of critical factual and procedural events surrounding this matter as well as the events which precipitated the filing of this Third Amended Petition appears immediately below and will provide the Court with the proper context in which to appreciate the severity of Dalia's misconduct. As set forth below, the lengthy summarization of the factual history is necessary in order to show that Dalia's actions cannot be viewed in a "vacuum" and constitute a pattern of ongoing conduct for approximately the past four (4) years which is specifically intended to harm Petitioner and the Orly Trust.

### THE FORMATION OF D & K LP AND THE FORMATION AND INITIAL FUNDING OF THE ORLY TRUST FOR PETITIONER'S BENEFIT, AS SOLE BENEFICIARY

13.     Dalia and Arie were married in 1967 and their marriage subsequently ended in divorce in 2004.

14.     Prior to 1993, Dalia and Arie formed D & K LP ("D & K") a family owned limited partnership, whose name was shorthand for "Dalia and Kids". At the time of its formation, Dalia was the general partner and held a 4% interest. Petitioner and her brother, Sagi, were the limited partners who each held a 48% interest.

15.     In December, 1993, Dalia and Arie established identical irrevocable inter vivos trusts for the benefit of Petitioner and Sagi, the Orly Trust and the Sagi Trust (jointly, the Orly Trust and the Sagi Trust shall be referred to hereinafter as the "Trusts"). For estate-

-4-

planning purposes, Dalia and Arie funded each trust with a $600,000 gift. <u>The intent behind the Trusts was to ensure that both Petitioner and her brother received property of equal value.</u> Sash A. Spencer and Lawrence M. Small were named Co-Trustees of both Trusts and remained Co-Trustees until Petitioner's parents' divorce in 2004. After the Trusts were funded, Sagi and Petitioner each assigned their 48% interests in D & K to their respective Trusts.

## THE CREATION OF THE D & K NOTE

16.     At the same time in December 1993, D & K purchased 240 shares of common stock (constituting 49% of the outstanding shares) of TPR Investment Associates, Inc. ("TPR"), a closely held family corporation for the sum of $10,200,000. The shares were purchased with $600,000 from each of the Orly Trust and the Sagi Trust and $50,000 from Dalia, totaling $1,250,000. The balance was satisfied with a recourse $8,950,000 Promissory Note (the "D & K Note"). Annexed hereto as **Exhibit "B"** is a copy of the D & K Note.

17.     As set forth further below in this Third Amended Petition, there was never any intention by Arie, Dalia, Sagi and Orly for TPR to collect upon the D & K Note.

18.     Pursuant to the D & K Note, principal, together with accrued interest, was to be repaid by D & K in annual installments over ten years. The D & K Note was secured by a pledge of the 240 TPR shares owned by D & K. (See **Exhibit "B"- Pledge Agreement**) Each of the Trusts and Dalia assumed liability on the D & K Note in proportion to its/her direct interest in D & K. Accordingly, each of the Trusts, assumed a 48% liability on the D & K Note and acquired a 23.52% indirect interest in TPR. Dalia assumed a 4% liability on the D & K Note and acquired a 1.96% indirect interest in TPR.

19.     At the time of the above-described transaction, Arie owned the remaining 51% of TPR, which held investments in various securities including common stock in Trans-Resources, Inc ("TRI"), as well as its interest in the D & K Note. TRI was a successful and

valuable company which was engaged in the business of manufacturing specialty chemical products for agricultural and industrial end uses.

20.    Payments were made on the D & K Note out of dividends paid by TRI until 1999. Thereafter, when TRI stopped paying dividends, D & K stopped making payments under the D & K Note with the consent of the interested parties.

21.    As of March 20, 2001, TPR held a 52.85% interest in TRI. The remaining minority interest in TRI (47.15%) was owned by various entities controlled directly and indirectly by Jules and Eddie Trump (the "Trump Group").

## ARIE AND DALIA'S DIVORCE IN 2004 AND ITS EFFECT ON THE TRUSTS' ASSETS

22.    On October 26, 2004, Dalia and Arie entered into a Stipulation and Agreement of Settlement as a final settlement of their divorce (the "Settlement Agreement"). Pursuant to the Settlement Agreement, Dalia received, *inter alia,* Arie's 51% interest in TPR and retained her 4% interest in D & K. TPR's 52.85% interest in TRI was transferred to Arie and the Trusts as follows: (i) 13.99% to Arie, (ii) 19.43% to the Orly Trust (the "Orly Trust TRI Shares") and (iii) 19.43% to the Sagi Trust. The Orly Trust and the Sagi Trust each granted Arie an irrevocable lifetime voting proxy over their TRI shares (annexed hereto as **Exhibit "C"**). Therefore, after October 29, 2004, Arie and the Trusts held a controlling interest in TRI and TPR no longer owned any TRI common stock.

## DALIA CEDES CONTROL OF D & K AND TPR TO SAGI AND THE FORMATION OF D & K GP LLC

23.    In connection with the divorce settlement, Dalia took measures to cede management of D & K to Sagi. On October 21, 2004, days before signing the Settlement Agreement, Dalia and Sagi formed D & K GP LLC ("D & K GP"). Dalia exchanged her 4% interest in D & K and $1.00 for a 99% membership interest in D & K GP. Sagi purchased a 1%

-6-

membership interest in D & K GP for $1.00. Pursuant to D & K GP's Limited Liability Agreement (annexed hereto as **Exhibit "D"**), Sagi was given the power to select a manager of D & K GP whose function would be to control D & K's assets. Sagi selected himself to act as manager; thus, Dalia effectively handed Sagi the authority to control D & K and its assets. Also, by forming D & K GP, Dalia and Sagi shielded themselves from any personal liability stemming from D & K, <u>including any personal liability related to the D & K Note</u>. This left the Trusts solely liable for any obligations due under the D & K Note.

24.     On October 30, 2004, Dalia entered into a shareholder's agreement with TPR that provided for the management of TPR. Specifically, pursuant to the TPR shareholder's agreement (annexed hereto as **Exhibit "E"**), D & K, which owned 49% of TPR, was given authority to appoint one board member to the TPR board. Sagi, as the managing partner of D & K appointed himself as a board member of TPR. As the majority owner of TPR, Dalia was named as the other board member. In addition, the shareholder agreement appointed Sagi as Chief Executive Officer ("<u>CEO</u>") of TPR. Accordingly, Dalia essentially ceded control of TPR to Sagi, just as she had done with D & K.

25.     For the Court's convenience, below is a summary of Arie, Dalia, and the Trusts' interests in TPR both before and after the divorce and Settlement Agreement:

| Person | TPR Interest Before | TPR Interest After |
|---|---|---|
| Arie Genger | 51.00% | 0% |
| Dalia Genger | 1.96% | 52.96%[1] |
| Orly Trust (indirectly through D & K) | 23.52% | 23.52% |
| Sagi Trust (indirectly through D & K) | 23.52% | 23.52% |
| Total | __100%__ | __100%__ |

26.     In connection with the Settlement Agreement, Dalia required that the Trustees of the Orly Trust and the Sagi Trust (Messrs. Sash and Small) resign and be replaced with friends of Sagi. Numerous successor trustees were appointed to the Orly Trust and the Sagi Trust, all of whom were affiliated with Sagi in one way or another and were controlled by him. David Parnes and Eric Gribetz (Sagi's longtime friends) and Leah Fang (Sagi's sister-in-law) were appointed as successor trustees to the Orly Trust, and Messrs. Parnes and Gribetz, Rochelle Fang (Sagi's mother-in-law), and Mr. Parnes again, were appointed successor trustees of the Sagi Trust.

## THE SHAM ASSIGNMENT AND SALE OF THE D & K NOTE

27.     On or about October 31, 2004, the TPR Board (consisting of Dalia and Sagi) passed a resolution to sell the D & K Note.  Sagi was charged with the responsibility of selling the D & K Note to a "third party".

28.     In December, 2005, Sagi filed amended 2002 and 2003 tax returns for

---

[1] Dalia held a 1.96% indirect interest in TPR prior to the divorce as a result of her 4% interest in D & K. Pursuant to the Settlement Agreement, Dalia received an additional 51% direct interest in TPR from Arie. Just prior to the Settlement Agreement, as stated above, Dalia transferred her 4% interest in D & K (and thus, her 1.96% indirect interest in TPR) to D & K GP.

-8-

TPR, writing off the entire D & K Note and declaring it as a loss in the approximate amount of $8,700,000.

29.    On August 2, 2006, Sagi, as part of his managerial role in D & K GP, D & K and TPR, assigned and sold the D & K Note, which then had an approximate value of $11,000,000 as a result of the accrued interest, to Mr. Parnes in his individual capacity for the sum of only $12,000 (a copy of the Memorandum dated August 2, 2006 (the "D & K Note Memorandum"), assigning and selling the D & K Note is annexed hereto as Exhibit "F"). The D & K Note Memorandum asserts unspecified claims by D & K against TPR and Sagi expressly memorialized that D & K "denies enforceability of the [D & K Note]". (See Exhibit "F")

30.    Sagi signed the D & K Note Memorandum on behalf of both TPR as the holder and D & K as the maker. Dalia was copied on the D & K Note Memorandum but Petitioner did not receive a copy of same.    At the time of the D & K Note Memorandum, Mr. Parnes was acting as trustee of both Trusts. Shortly after the D & K Note Memorandum, Mr. Parnes summarily resigned as Trustee of the Orly Trust without explanation.

**THE D & K NOTE WAS NEVER INTENDED TO BE ENFORCED**

31.    Mr. Parnes testified in Arie and Dalia's matrimonial arbitration (See Exhibit "G", which contains the relevant portions of the transcript of Mr. Parnes' testimony from the arbitration) that:

(i)    As the Trustee of both Trusts, he was a "trusted" person to keep the D & K Note to make sure it would never be collected. (See Pages 460-461);

(ii)    D & K does not have to make payments to TPR; (Page 452)

(iii)    The D & K Note is uncollectible (Page 453); and,

(iv)    Sagi's job was to "bury the D & K Note in the woods" (Page 461)

32.    Sagi testified in the same arbitration (See Exhibit "H", which contains the relevant portions of the transcript of Sagi's testimony from the arbitration) that:

(i)     The purpose of the D & K Note was for estate planning (Pages 367-380);

(ii)    The D & K Note was never declared in default (Page 370);

(iii)   There was no intention of collecting the D & K Note (Page 370); and,

(iv)    The D & K Note is worth nothing (Pages 375-377)

33.     In addition, Dalia, who was copied on the D & K Note Memorandum,
previously admitted in her Pre-Hearing Memorandum submitted to the Court in connection with
the matrimonial arbitration that the D & K Note was never intended to be collected upon because
the:

> "...collection by TPR of the D & K Note would simply transfer
> wealth from the children, Sagi and Orly, to their parents,
> Arie and Dalia, thus undoing the estate planning scheme which
> had transferred that wealth to the children.
> (See **Exhibit "I"**, excerpt from Dalia's Pre-Trial Memorandum
> Page "26")

34.     Ultimately, the Gengers' matrimonial arbitrator, Judge I. Leo Milonas,
specifically determined that the D & K Note was never intended to be collected from its
inception.

> "The arbitrator finds for Dalia on this issue. The D & K [N]ote
> was part of the estate planning scheme to transfer wealth to the
> children. The parties never intended for this note to be collected
> and to do so would re-transfer wealth back to the parents and
> defeat their estate plan.
> (See **Exhibit "J"**, Final Arbitration Award in Genger divorce
> proceeding, Page "15")

35.     Petitioner was well aware of, and relied upon, the agreement that the D &
K Note would never be enforced. Petitioner was also aware of, and relied upon, Judge Milonas'
award declaring the D & K Note worthless and uncollectible, and Dalia, Sagi and Mr. Parnes'
sworn statements and/or written submissions to that effect.

## THE D & K AGREEMENT IS ENTERED INTO WITHOUT PETITIONER'S KNOWLEDGE AND PURPORTEDLY AUTHORIZES D & K TO PLEDGE AND ENCUMBER THE ORLY TRUST TRI SHARES

36.     On or about November 23, 2007, Leah Fang (Sagi's sister-in-law), the then sole Trustee of both Trusts[2], and Sagi, acting in his capacity as manager of D & K GP, executed an "Amended and Restated Limited Partnership Agreement of D & K Limited Partnership (the "D & K Agreement"). Among other things, the D & K Agreement purported to grant D & K GP authority to "mortgage, hypothecate, pledge, create, a security interest in or lien upon, or otherwise encumber [the Orly Trust TRI Shares] for the benefit of [D & K] or that of third parties, in connection with the [D & K Note]". (See a copy of the D & K Agreement attached hereto as **Exhibit "K"**, Page "11"). There was no legitimate need or purpose for the amendment. It was a preliminary step in Sagi and Dalia's scheme to punish Petitioner and attempt to loot the Orly Trust of this valuable asset.

37.     By its terms, the D & K Agreement, does not require D & K GP (i.e. Sagi) to give notice to anyone, including Petitioner or the Orly Trust, if a decision is made to encumber the Orly Trust TRI Shares in any way.

38.     Upon information and belief, the Orly Trust received no consideration and no direct or indirect benefit in exchange for the substantial concession it gave to D & K GP under the D & K Agreement. Indeed, the D & K Agreement was merely an instrument created for the specific purpose of encumbering the Orly Trust and Petitioner as its beneficiary, with debt.

39.     Leah Fang never informed Petitioner of the existence of the D & K

---

[2] In 2007, Mr. Gribetz resigned as the trustee of both Trusts, without appointing a successor, thereby leaving Mr. Parnes as the sole remaining trustee. Thereafter, as set forth above, Mr. Parnes resigned as trustee of the Orly Trust appointing Leah Fang as successor Trustee.

Agreement. In January, 2008, Dalia was appointed successor trustee of the Orly Trust, despite Petitioner's objections. At that time, Dalia, notwithstanding her knowledge that the D & K Note was not intended to be collected, did nothing to attempt to rescind or nullify the D & K Agreement, nor did she do anything to advise Petitioner as beneficiary that the prior trustee had granted D & K GP authority to encumber the Orly Trust TRI shares. By that time, as a result of Dalia's granting Sagi control of TPR and D & K through the appointment of his friends and relatives as successor trustee of the Trusts, Sagi had effectively obtained control over all of the assets held by D & K, TPR, the Sagi Trust and the Orly Trust.[3]

40.     Through the above-mentioned transactions, Dalia allowed Sagi to obtain direct control over TPR and its interest in the D & K Note to the detriment of Petitioner and the Orly Trust. Notably, Sagi's role as CEO of TPR, (the creditor on the D & K Note) is in direct conflict with his role as manager of D & K (the debtor on the D & K Note), whose role was to repay the D & K Note or contest its enforceability.

## ORLY'S INITIAL APPLICATION TO REMOVE DALIA AS TRUSTEE

41.     In February, 2008, Petitioner filed an initial application with this Court (the "Initial Application") to remove Dalia as Trustee of the Orly Trust on the grounds that she feared Dalia would not protect her interests while serving as Trustee because of Dalia's animosity towards Arie, and her collusion with Sagi.

42.     Surrogate Roth denied the Initial Application as premature, believing

---

[3] In addition, by stock purchase agreement dated January 18, 2007, Sagi as CEO of TPR sold 2% of TPR's shares to his mother-in-law, Rochelle Fang, thereby eliminating Dalia's majority ownership interest of TPR by diluting it to 49%. Around the time that she became sole Trustee to the Orly Trust in January 2008, Dalia purportedly divested herself of the balance of her TPR shares. Thus, in addition to being CEO, Sagi effectively controlled TPR through the 49% owned by D & K, which Sagi controlled and the 2% owned by Rochelle Fang, also controlled by Sagi. (See Exhibit "L", Transcript of Hearing before the Honorable Jane S. Solomon dated August 22, 2011 in the action entitled Orly Genger v. Sagi Genger, Supreme Court of the State of New York, County of New York, Index No. 100697/2008) (Pages "53" to "55" for example)

-12-

Dalia should be given the chance to demonstrate whether she intended to act in Orly's interests or against Orly's interests. Surrogate Roth gave Dalia the benefit of the doubt based, in part, on sworn statements by Dalia to the Surrogate Court that she intended to protect the Orly Trust and its assets.

> "[I]t appears that Dalia (who states that she is ready and able to act as fiduciary) has yet to assume the duties of trustee in deference to her daughter's position in this litigation. As a validly appointed trustee, she should be given the opportunity to do what she deems necessary to manage and protect the trust's assets.
>
> Based upon the foregoing, the appointment of a "special trustee" is unwarranted at this time and, accordingly, the application is denied, <u>without prejudice to renewal if future circumstances warrant such relief.</u>
> (See copy of Surrogate Court Decision dated December 31, 2008 annexed hereto as **Exhibit "M"**, Pages 7-8) (emphasis added).

43.    At the time of the Surrogate's decision, the extent of Dalia's complicity in the conspiracy with Sagi was not fully understood.

<u>WITHIN WEEKS OF SURROGATE ROTH'S DECISION, RATHER THAN PROTECT THE ORLY TRUST, DALIA HELPED SAGI STRIP THE ORLY TRUST OF ITS ONLY ASSETS</u>

44.    Sadly, Dalia's every action since Surrogate Roth's decision has proven Petitioner's fears were well grounded and the benefit of the doubt given to Dalia by Surrogate Roth was unjustified. As described below, rather than protecting the Orly Trust, Dalia has used her position as Trustee to help Sagi Genger strip the Orly Trust of its two assets: (1) 1,102.80 shares of common stock in TRI; and (2) a 23.52% indirect interest in TPR.

45.    As set forth below, Dalia was an active and willing participant in Sagi's scheme to strip the Orly Trust of its assets, thereby causing harm to Petitioner as the Orly Trust's sole beneficiary.

-13-

## DALIA HELPS SAGI TRY TO STRIP THE ORLY TRUST OF THE
## ORLY TRUST TRI SHARES

46.     Dalia has always understood the true value and importance of the Orly

Trust TRI Shares to Petitioner and to the Orly Trust. Indeed, during the Initial Application to

remove Dalia as Trustee, Dalia's attorney sent Surrogate Roth a letter stating that "the most

valuable asset in the Orly Genger Trust is the shares of TRI'" and "the TRI Shares held by the

Orly Trust are potentially worth tens of millions of dollars." See November 11, 2008 Letter to

Hon. Renee R. Roth from J.G. Kortmansky, Esq. annexed hereto as **Exhibit "N"**.  (emphasis

supplied)

47.     On August 22, 2008, unbeknownst to Petitioner, Rochelle Fang, (Sagi's

mother-in-law) who had been appointed Trustee of the Sagi Trust, attempted to sell the Sagi

Trust's 19.43% in TRI to the Trump Group who thereafter purported to hold 66.58% of TRI's

outstanding common stock.[4]  In connection with the supposed sale, Sagi and David Parnes were

given seats on TRI's board of directors.  This sale, which was consummated after Dalia was

appointed successor trustee of the Orly Trust, has diluted and diminished the value of the Orly

Trust's interest in TRI since Arie will no longer have a controlling interest in TRI (which he

previously had by virtue of his voting proxy over the Trust's shares, see **Exhibit "C"**) and thus,

the Orly Trust would no longer own a portion of the controlling block of TRI shares.[5]

---

[4] In response to Dalia and Sagi's collusive efforts to sell the TRI shares to the Trump Group, Petitioner, on behalf of herself, individually and the Orly Trust, commenced an action in the Supreme Court for New York County seeking to determine, among other things, the ownership of the Orly Trust TRI Shares.  See Arie Genger and Orly Genger, in her individual capacity and on behalf of The Orly Genger 1993 Trust v. Sagi Genger, TPR Investment Associates, Inc., Dalia Genger, The Sagi Genger 1993 Trust, Glenclova Investment Company, TR Investors, LLC, New TR Equity I, LLC, Jules Trump, Eddie Trump and Mark Hirsch, Index No. 651089/2010 (the "New York TRI Action"). The New York TRI Action is still pending before Justice Feinman.

[5] In 2011, without prior notice to Petitioner as required under the July 2009 Order, Dalia, as Trustee of the Orly Trust and in a transparent forum shopping move, commenced an action in the Delaware Chancery Court seeking a declaration that the Orly Trust is the beneficial owner of the Orly Trust TRI Shares. Dalia has been restrained from pursuing this action pursuant to a prior Order of the Court issued in the New York TRI Action.

48.     On or about January 31, 2009, only weeks after making sworn statements to the Surrogate Court that she intended to protect the Orly Trust and its assets, Dalia executed a document entitled "Meeting of Partners of D & K LP- Jan. 31, 2009 & Agreement (the "Meeting Agreement"). Annexed hereto as **Exhibit "O"** is a copy of the Meeting Agreement. Like the D & K Agreement, the Meeting Agreement purported to grant D & K GP (i.e., Sagi) unfettered authority to encumber the Orly Trust TRI Shares:

> "The partners wish to clarify that the authority vested in the General Partner to make limited partners' assets subject to a pledge shall be done in substantially the same manner in which TPR Investment Associates, Inc. shares were pledged in conjunction with the aforementioned note [the D & K Note]. However, the General Partner shall be authorized to sign for the partnership and/or each individual partner."
> (See **Exhibit "O"**, Paragraph "3")

49.     In another naked act of self-dealing in violation of Dalia's fiduciary duties as Trustee, the Meeting Agreement also purports to:

> "Indemnify and provide a general release from any claim or right at equity, law, or contract or otherwise the current and former general partner, its officers, the partnership's holdings (including TPR Investment Associates, inc.) and the officers of its holdings to fullest extent permitted in connection with any claim by the partnership and/or its partners. Irrespective of the above, nothing herein shall serve to release or indemnify Arie Genger, William Dowd, Lawrence Small or Edward Klimerman." (See **Exhibit "O"**, Paragraph "1")

50.     Upon information and belief, the Orly Trust received no consideration and no direct or indirect benefit in exchange for the substantial concession, Dalia, acting as trustee, gave to D & K GP under the Meeting Agreement. Indeed, the Meeting Agreement, like the D & K Agreement, was merely another instrument created for the specific purpose of depleting the Orly Trust of its assets.

51.     Both the D & K Agreement and the Meeting Agreement were negotiated

-15-

and executed without ever informing Petitioner.  Moreover, Dalia never subsequently informed Petitioner of the existence of either agreement, even though Petitioner made repeated requests to Dalia for information about the Orly Trust and its assets during her tenure as Trustee.  The Meeting Agreement was only disclosed on or about October 2009 in connection with the New York TPR Action (defined and discussed below) which was commenced by Petitioner in the Supreme Court for New York County.

52.     Notably on January 10, 2009, just days before Dalia signed the Meeting Agreement granting Sagi unfettered authority to dispose of the Orly Trust TRI Shares (and purporting to indemnify Sagi regardless of any actions he took in connection with same), Petitioner sent Dalia a letter reminding her (once again) that the Orly Trust TRI Shares needed to be protected and retained.

> "For now, and until further notice, <u>it is my strong desire to retain all of the shares of Trans-Resources., Inc. ("TRI") that are currently in the Trust</u>, and I direct you not to sell them. If you are approached, or have been approached, with an offer to purchase any of the TRI shares in the Trust, please notify me immediately. If, despite my wishes, you consider accepting an offer, do not sell any shares until I have a reasonable period of time to maximize the benefit to the Trust, including possible alternative transactions."
> (See January 10, 2009 letter from Petitioner to Dalia (emphasis added), a copy of which is annexed hereto as **Exhibit "P"**)

53.     Dalia, in violation of her fiduciary obligations refused to agree not to dispose of the Orly Trust TRI Shares.  To do so would be contrary to the fraudulent scheme in which Dalia was a willing participant.

54.     Likewise, although Dalia has given sworn statements to the Surrogate Court regarding the Orly Trust, she never disclosed the existence of the D & K Agreement or the Meeting Agreement to either Surrogate Roth or her successor Surrogate Webb.  Basically, through the D & K Agreement, the Meeting Agreement and by ceding management of D & K

-16-

and TPR to Sagi, Dalia gave Sagi total control to pilfer the Orly Trust assets for his own use and benefit.

## DALIA HELPS SAGI TRY TO STRIP THE ORLY TRUST OF ITS INDIRECT INTEREST IN TPR

55.    In Surrogate Roth's decision, she noted that in the Initial Application, "...petitioner has not alleged that Dalia has refused a request for information, which would warrant relief (SCPA 2102), or has failed as trustee to protect trust assets" (see Exhibit "M", Page "7").

56.    On May 14, 2009, Petitioner's then counsel, Judith Siegel-Baum, sent Dalia's attorney, Robert Meister, a document demand relating to the Orly Trust's assets. (annexed hereto as **Exhibit "Q"**).

57.    On June 1, 2009, Mr. Meister responded to Ms. Sigel-Baum's document demand by advising her that the Orly Trust no longer owned any interest in TPR. According to the letter, Sagi, acting as CEO for TPR, had foreclosed on the D & K Note and sold D & K's 240 shares of TPR for $2,200,000. A copy of the letter is annexed hereto as **Exhibit "R"**. Before that time, Dalia had neither advised nor notified Petitioner that Sagi had foreclosed on the D & K Note, nor advised Petitioner that Sagi had sold the TPR shares at auction. This news came as a complete and utter shock to Petitioner.

58.    Despite the clear and consistent agreement among the Genger family members that the D & K Note was never to be collected upon or enforced, the sworn testimony and/or Court submissions of Dalia, Sagi and Mr. Parnes, the assignee and purchaser of the D & K Note, and Judge Milonas' award and specific determination to this effect, upon receipt of Mr. Meister's letter, Petitioner learned for the first time that:

(a)     Sagi caused TPR to reclaim the D & K Note from Mr. Parnes.[6]  Then, on August 31, 2008, Sagi, acting as CEO of TPR, notified himself as the general manager of D & K, that D & K was in default under the D & K Note and declared that unless the entire unpaid principal amount of the D & K Note was paid immediately, TPR would sell, at auction, the 240 shares pledged as collateral.  A copy of this purported Notification dated August 31, 2008 is annexed hereto as **Exhibit "S"**.  Dalia, who knew that the D & K Note was never intended to be enforced and who previously had sworn to as such, in violation of her fiduciary duties as Trustee, never sought to block Sagi from foreclosing on the D & K Note and selling the TPR shares. Notwithstanding her knowledge and her previous sworn statement, Dalia failed to make any effort to stop Sagi when he engaged in this clear act of self-dealing, even though the Orly Trust had a clear interest in the TPR shares at issue.

(b)     Thereafter, Sagi, again acting as CEO of TPR, purported to notify D & K (of which he remained managing partner) that D & K's 240 shares of TPR stock would be auctioned to the highest bidder on February 27, 2009, and that the money received from the sale would be used to reduce the outstanding debt under the D & K Note.  A copy of this purported Notification is annexed hereto as **Exhibit "T"**.  Sagi purported to notify the interested parties of the sale by publishing notice of the sale in the New York Post in October 2008 and February 2009.  At all relevant times, Sagi had Petitioner and Dalia's contact information.  Despite this, Petitioner was never informed of the impending sale.  At the time that Sagi secretly schemed with the connivance of Dalia to structure the bogus sale, it was clear that the value of the TPR shares was significantly higher than any purported value of the D & K Note (although as previously stated the D & K Note had no value).

---

[6] On or about May 25, 2008, Mr. Parnes rescinded, *ab initio*, the assignment of the D & K Note.  Petitioner was also not notified of that action.

(c)     On February 27, 2009, TPR (still controlled by Sagi) foreclosed on the 240 shares of TPR and "auctioned" the shares (the "TPR Sale"). Not coincidentally, TPR purchased the shares at auction for $2,200,000, which was substantially less than their estimated value, making no effort to collect on the D & K Note from the Sagi Trust. (See **Exhibit "U"**). The $2,200,000 proceeds of the TPR Sale were purportedly used to decrease D & K's obligations under the D & K Note. The deficiency under the D & K Note was deliberately manufactured by this sham auction in order to provide Sagi and TPR with a future basis to foreclose upon the Orly Trust's only remaining principal asset, the Orly Trust TRI Shares.

59.     TPR and Sagi, with the connivance of Dalia in breach of her fiduciary duty, effectively stripped the Orly Trust of its indirect interest in the TPR shares by improperly foreclosing on the D & K Note and conducting the TPR Sale notwithstanding the fact that the Genger family never intended the D & K Note to be enforced. Notably, this alleged and purported notification process and sham TPR Sale took place without Dalia objecting in any way, taking preventive action of any kind, or notifying Petitioner in any way. In short, Dalia, allowed the sham TPR Sale to transpire, did not notify Petitioner of same and clearly violated her duties as a fiduciary to the Orly Trust and Petitioner, as sole beneficiary by failing to protect the valuable trust asset.

60.     The forgoing scheme injured Petitioner and the Orly Trust in a number of ways. The Orly Trust's interest in D & K is now worthless, as it purportedly no longer owns any interest in TPR, while Sagi now has control over the foreclosed TPR shares. The scheme also destroyed Arie and Dalia's tax and estate planning intent that both children have equal shares in the family wealth.

61.     Dalia, who knew that the D & K Note was never intended to be enforced, should have immediately sought to block Sagi from foreclosing on the D & K Note and selling

the TPR shares.   Certainly, she should have informed Petitioner so Petitioner could make her own efforts to block the sham TPR sale or, at the least, arrange for other bidders to be at the sale. Notwithstanding her knowledge and her previous sworn statement, Dalia failed to make any effort to stop Sagi when he engaged in this clear act of self-dealing, even though the Orly Trust has a clear interest in the TPR shares at issue.

62.     As if this was not an egregious enough breach of Dalia's fiduciary duties to the Orly Trust, Dalia has made no effort whatsoever to date to seek any contribution from the Sagi Trust for its share of purported amounts due under the D & K Note (although as previously stated at length herein, no such purported sums are due under the D & K Note because it was never intended to be enforced).  In other words, if the D & K Note was truly a "liability" of both Trusts, in theory, TPR should have foreclosed on the Sagi Trust's interests as well.  Of course, this will never happen as long as Sagi is still the CEO of TPR (the holder of the D & K Note) and the manager of D & K, (the maker of the D & K Note).  By ceding management authority of TPR and D & K to Sagi, Dalia deliberately created Sagi's clear and unequivocal conflict of interest and "paved the road" for his self-dealing.  This has resulted in Sagi looting the Orly Trust for his own benefit with the tacit or express approval of Dalia.

63.     As a fiduciary of the Orly Trust with prior, as well as continued knowledge, of the TPR foreclosure, Dalia had a duty to protect the Orly Trust's indirect ownership of the TPR shares. Instead of taking proactive measures required of a fiduciary, Dalia did nothing and allowed Sagi to obtain the TPR shares for himself to the detriment of the Orly Trust.  Moreover, in connection with her appointment as successor trustee of the Orly Trust in January, 2008, as previously stated above, Dalia purportedly divested herself of her TPR shares for the sum of $5,000,000 (without informing the Court or Petitioner as to when she transferred her interest) in a further attempt to distance herself from any attributable wrongdoing.

-20-

64.     Dalia knew of Sagi's plan to foreclose on the D & K Note as early as August, 2008, thus she withheld information from Petitioner concerning the TPR Sale for almost 10 months. Even then, she only provided the information until she received a demand letter from Petitioner's counsel and realized that legal action was imminent.

65.     In fact, the notice of the TPR Sale in the New York Post was specifically designed by Dalia and Sagi not to provide Petitioner with notice and an opportunity to object to same. Dalia and Sagi were both aware of Petitioner's address at this time but instead of notifying Petitioner, they chose to deceive her by publishing notice in the newspaper.

66.     As a result of the sham TPR Sale, on or about June 9, 2009, Petitioner commenced an action which is pending before the Supreme Court for New York County entitled, Orly Genger et al v. Dalia Genger, Sagi Genger, D & K GP LLC, TPR Investment Associates, Inc. and Leah Fang, Index No. 109749/2009 (the "New York TPR Action"). In the New York TPR Action, Petitioner is seeking, *inter alia,* monetary damages and the return of the TPR shares.[7]

## THE JULY 2009 ORDER AND INJUNCTION AND PETITIONER'S RENEWED APPLICATION WITH THIS COURT TO REMOVE DALIA AS TRUSTEE

67.     Upon learning of the sham TPR Sale, which stripped the Orly Trust of its indirect interest in its shares of TPR, Petitioner renewed her petition with this Court to remove Dalia as Trustee of the Orly Trust by filing same on or about June 22, 2009. Petitioner also filed a Motion with this Court and sought a temporary restraining order which enjoined and prohibited

---

[7] By Decision and Order of the Honorable Paul G. Feinman dated June 28, 2010 in the New York TPR Action, Justice Feinman determined that the Petitioner's claim with respect to Dalia's breach of her fiduciary duty as sole Trustee of the Orly Trust should be decided by the Surrogate's Court. Further, in the same Decision and Order, Justice Feinman denied Dalia's Motion for Summary Judgment and determined that there is a "...question of fact as to whether Dalia Genger acted with intent to commit fraud against plaintiff's trust [the Orly Trust], and to lull plaintiff [Orly] into a false sense of security as to the status of her trust." (See Exhibit "V", Decision and Order of Justice Feinman dated June 28, 2010, Pages "17" and 19")

Dalia, *inter alia,* and anyone acting on her behalf from attempting to sell, transfer, pledge and encumber or take any act with respect to the Orly Trust TRI Shares without providing Petitioner with at least 10 days prior notice.  A copy of the June 22, 2009 Petition (without the exhibits attached to it which are duplicative) is annexed hereto as **Exhibit "W"**.

68.     As a result of the Petitioner's forgoing motion for a restraining order, the July 1, 2009 Order was entered pending the outcome of this proceeding and which imposed certain protective restraints (the "Restraints") upon Dalia as previously set forth above.  Dalia declined to attend the hearing.

69.     During counsel's oral argument of Petitioner's motion for a restraining order, Surrogate Webber noted to Dalia's counsel that:

> "They [Dalia and Sagi] are on notice of all of your fears
> [with respect to the dissipation of the Orly Trust's assets].
> So for them now to do something which would obviously
> be against their duties and responsibilities would be
> somewhat glaring in terms of what the surcharge [to be
> imposed against Dalia] would be." (emphasis supplied)
> (See excerpt from transcript from July 1, 2009
> hearing annexed hereto as **Exhibit "X"**, Page "23")

70.     The Restraints were later confirmed by this Court on August 18, 2009, reconfirmed and supplemented with additional restraints by this Court on July 16, 2010 and made a part of a stipulation between Petitioner and Dalia which was entered on September 8, 2010 (see **Exhibit "Y"**).

71.     On or about September 21, 2010, Petitioner filed the Second Amended Verified Petition (the "Second Amended Petition") to remove Dalia as Trustee.  Dalia has filed a Motion to Dismiss the Second Amended Petition and the decision on the Motion to Dismiss still remains *sub judice.*

**THE ADDITIONAL RESTRAINTS PLACED UPON DALIA AND
SAGI BY THE NEW YORK COURTS IN THE NEW YORK TRI ACTION
AND THE NEW YORK TPR ACTION**

72.     In addition to the Restraints imposed upon Dalia by the July 2009 Order,
on or about July 28, 2010, the Court in the New York TPR Action also restrained Dalia, Sagi and
the co-defendants to that action from transferring, selling, pledging, assigning, or otherwise
disposing of D & K's 48% ownership interest in TPR. (the "TPR Action Restraints") (See
Exhibit "Z" at page "32")

73.     The Court in the New York TRI Action also entered certain restraints
against Dalia, Sagi and the other co-defendants to that action with respect to the Orly Trust TRI
Shares.[8] (the "TRI Action Restraints") (See Exhibit "AA", December 28, 2011 Order in New
York TRI Action, Pages "14" through "15").

**DALIA HAS WILLFULLY AND REPEATEDLY DISOBEYED
THE JULY 2009 ORDER BY ENTERING INTO A FURTHER
SCHEME TO ENCUMBER AND DISSIPATE THE ORLY TRUST'S ASSETS**

74.     Petitioner submits that it could not be any more clear to Dalia, her counsel,
Sagi and the other co-defendants to the New York TPR Action and the New York TRI Action
that Dalia was forbidden from transferring, pledging, encumbering, assigning, selling and/or
dissipating any assets of the Orly Trust without prior notice to Petitioner as a result of: (i) the
Restraints set forth in the July 1, 2009 Order; (ii) Surrogate Webb's statement to Dalia's counsel
on the return date that Dalia and Sagi are on notice of Petitioner's fears that the Orly Trust's
assets will be dissipated (and therefore, any actions taken by Dalia against her duties and
responsibilities would obviously be "glaring") (See Exhibit "X", Page "23"); (iii) the Stipulation
entered into between Petitioner and Orly further confirming the Restraints (See Exhibit "Y";

---

[8] Both the New York TRI Action and the New York TPR Action are before Justice Paul Feinman.

-23-

and, (iv) the restraints imposed by Justice Feinman in the New York TRI Action and New York TPR Action (collectively, the "Supreme NY Restraints"). All these restraints were specifically and expressly intended to preserve the "status quo" until the Courts rendered a final decision.

75.     Notwithstanding the forgoing, rather than honor <u>any</u> of these restraints, subsequent to the Petitioner's filing of the Second Amended Petition, Dalia, Sagi and their cohorts, have continued to conspire together and in secret to render all of these restraints a nullity.

76.     Instead of treating this Court's July 2009 Order and the Supreme NY Restraints as Orders to be obeyed and boundaries to be honored, Dalia, Sagi and their cohorts saw them as obstacles to be hurdled. To that end, Dalia, D & K (through D & K GP), and/or TPR (in other words, Dalia and Sagi) secretly executed eight (8) agreements[9] encumbering the Orly Trust with $4.44 million in new debt, which the Orly Trust has no hope of paying off.

77.     In breach of Dalia's fiduciary duties as Trustee, the Secret Agreements were specifically designed and intended as part of Dalia and Sagi's scheme to encumber the Orly Trust with debt but not to similarly encumber the Sagi Trust with any debt whatsoever.

78.     Petitioner discovered the existence of the Secret Agreements on or about July 6, 2012 solely in response to discovery requests made by Petitioner's counsel in the New York TPR Action. These documents were only first produced on or about July 6, 2012 notwithstanding the fact that: (i) the initial Secret Agreements, namely, the $4,000,000

---

[9] These eight secret agreements (collectively, the "Secret Agreements") will be further described immediately below and are: (i) the $4,000,000 Promissory Note dated October 3, 2011 (See Exhibit "BB"); (ii) the Credit and Forbearance Agreement and Second Amendment and Restatement of Promissory Note executed on May 15, 2012 (See Exhibit "CC"); (iii) the $4,240,000 Amended and Restated Promissory Note dated May 15, 2012 (See Exhibit "DD"); (iv) the $200,000 Promissory Note dated May 15, 2012 (See Exhibit "EE"); (v) the Agreement Amending Terms of Promissory Note dated March, 2012 (See Exhibit "FF"); (vi) the purported TPR Settlement Agreement dated October 3, 2011 (See Exhibit "GG"); (vii) the purported Amended and Restated TPR Settlement Agreement dated March 16, 2012 (See Exhibit "HH"); and, (viii) the Bill of Sale and Note Assignment dated May 15, 2012 (See Exhibit "II").

Promissory Note and the TPR Settlement Agreement were both executed approximately nine (9) months earlier on October 3, 2011; (ii) the July 2009 Order expressly required that Dalia provide Petitioner with prior notice of any and all acts which would affect the Orly Trust TRI Shares; and, (iii) the Supreme NY Restraining Orders expressly required that Dalia provide prior notice of any and all acts which would affect the Orly Trust's respective interests in the Orly Trust TRI Shares and TPR.

### THE 2011 PROMISSORY NOTE

79.    Unbeknownst to Petitioner, on October 3, 2011, Dalia and TPR purported to cancel the $4,500,000 deficiency remaining on the D & K Note after the disputed TPR Sale and replace it with a $4,000,000 promissory note that directly obligated the Orly Trust to pay TPR (the "2011 Promissory Note").  (See **Exhibit "BB"**, copy of 2011 Promissory Note and the TPR Settlement Agreement (defined below), **Exhibit "GG"**).

80.    By so doing, Dalia wrongly attempted to: (i) transfer $4 million dollars of liability from D & K to the Orly Trust (See **Exhibit "GG"**, TPR Settlement Agreement at 5); (ii) replace the unenforceable D & K Note with a putatively enforceable one (id); (iii) acknowledge the legality of the sham TPR Sale and the resulting deficiency (id. at 2-3); and, (iv) ensure that this $4 million dollar liability would not fall within the release that was part of the purported TPR Settlement Agreement reached that same day between Dalia, Sagi and the other defendants to the New York TPR Action, but would continue to burden the Orly Trust (id. at 5).

81.    The 2011 Promissory Note was payable to TPR the earlier of: (a) November 1, 2012; or, (b) the receipt of any proceeds from the sale of the Orly Trust TRI Shares, "notwithstanding anything to the contrary herein or in the parties' accompanying [TPR] Settlement Agreement".  See **Exhibit "BB"** at 1.

-25-

82.     By executing the 2011 Promissory Note on behalf of the Orly Trust, Dalia (i) obligated the Orly Trust to pay all of TPR's legal fees (See **Exhibit "BB"** at 2); (ii) **made her removal as Trustee an "Event of Default" making the 2011 Promissory Note immediately due and payable** (id. at 1, emphasis added); and, (iii) agreed to the law and jurisdiction of the State of Delaware (id at 2)[10]

## THE 200K PROMISSORY NOTE AND THE CREDIT AGREEMENT

83.     In May, 2012, TPR assigned the 2011 Promissory Note to MSCo, a St. Kitts entity. In exchange for an alleged $400,000 received from MSCo, Dalia had the Orly Trust sign another promissory note for $200,000 (the "200K Note") (See **Exhibit "EE"**) and increased the 2011 Promissory Note to $4,240,000.[11] (See **Exhibit "CC"**, Credit and Forbearance Agreement and Second Amendment and Restatement of Promissory Note (the "Credit Agreement" and **Exhibit "EE"**, (the 200K Note).

84.     Further, Dalia, purporting to act as Trustee wrongfully attempted to: (i) waive any defenses the Orly Trust would have to payment, including any defenses with respect to MSCo., TPR, or any prior holder of the 2011 Promissory Note (See **Exhibit "CC"**, Credit Agreement, §6.1(c)); (ii) have the Orly Trust broadly indemnify MSCo., should Orly or any future Trustee legally attack the 2011 Promissory Note, the Amended Promissory Note, or the Credit Agreement (id., §7); (iii) make the Orly Trust liable for all costs of collection, including attorneys' fees (See **Exhibit "DD"**, Amended and Restated Promissory Note (the "Amended 2011 Note") § 6); (iv) **make Dalia's replacement as the Orly Trust Trustee an "Event of**

---

[10] In March, 2012, unbeknownst to Petitioner, TPR, D & K and the Orly Trust (i.e. Dalia and Sagi) purported to enter into an "Agreement Amending Terms of Promissory Note" to provide for New York law and jurisdiction in any competent court (See **Exhibit "FF"**). This Agreement also gave Dalia and Sagi the power to amend the 2011 Promissory Note at will.

[11] In other words, Dalia pledged $440,000 of Orly Trust assets in exchange for a purported $400,000.

Default" making the Amended 2011 Note and the 200K Note (jointly, the "Notes") immediately due and payable (See Exhibit "CC", Credit Agreement, § 6.2, emphasis added); (v) agree to pay the 200K Note from the sale of the Orly Trust TRI Shares "notwithstanding anything to the contrary" (Exhibit "EE", 200K Note, §1.3); and, (vi) make the Credit Agreement and Notes fully assignable without the consent of, or notice to, the Orly Trust (See Exhibit "CC", Credit Agreement, § 10).

## THE PURPORTED SETTLEMENT AND AMENDED SETTLEMENT

85.     On October 3, 2011, Dalia (supposedly on behalf of the Orly Trust), TPR and D & K (by Sagi Genger) purported to settle the New York TPR Action.

86.     Petitioner and her counsel in the New York TPR Action were not informed of this purported settlement nor was Petitioner consulted in any way regarding its terms.

87.     In violation of the July 2009 Order, the Supreme NY Restraints, Surrogate Webb's admonishment to Dalia concerning the dissipation of the Orly Trust's Assets, and the Stipulation entered into between Petitioner and Dalia, the purported settlement agreement (the "TPR Settlement Agreement", which incorporates the 2011 Promissory Note by reference) purports to have the Orly Trust transfer all its interests in D & K and disclaim all interest in TPR. The settlement agreement also has TPR relinquish its claims to the Orly Trust TRI Shares:

> (a) TPR hereby relinquishes in favor of the OG Trust [the Orly Trust] any economic interest in the TRI Shares [the Orly Trust TRI Shares] and assigns to the OG Trust its right to any economic benefits of the TRI Shares including any proceeds from the sale thereof, including but not limited to the $10.3 million in proceeds otherwise owing to TPR in the future pursuant to the terms of the August 22, 2008 letter agreement; (b) the OG Trust - irrespective of any claim made or asserted on its behalf by Orly Genger – hereby transfers to TPR its limited partnership interest in DK (the "DK Interest"), and disclaims any interest in, any shares of or TPR, either directly

or indirectly through DK (the "TPR Interest");... . and (c) TPR agrees to pay $100,000 for the legal fees of the OG Trust.[12]
(See **Exhibit "GG"**, TPR Settlement Agreement, Paragraph "1")

88.     On March 16, 2012, Dalia (supposedly on behalf of the Orly Trust), TPR, and D & K GP (by Sagi Genger) entered into a purported Amended and Restated Settlement Agreement (the "Amended TPR Settlement Agreement"). Once again, Petitioner was not informed or consulted in any way. The purported "settlement" was restated, and then amended to purportedly cancel and void "the (i) the Amended and Restated Limited Partnership Agreement of D&K Limited Partnership dated as of October 30, 2004 and signed November 22, 2007, and/or (ii) the Meeting of Partners of D&K L.P. January 31, 2009 and Agreement." See **Exhibit "HH"**, March 16, 2012 Amended TPR Settlement Agreement, Paragraph "1").

89.     Importantly, though the Amended TPR Settlement Agreement purported to void these two agreements *ab* initio, the purported settlement did nothing to reverse or unwind the sham TPR Sale that these two agreements purported to enable, or to cancel the supposed deficiency resulting from the TPR Sale.[13]

90.     Demonstrably, these various actions and agreements (agreed to in secret and never revealed to the Court or Petitioner despite numerous Court appearances, filings and outstanding documents requests) in the New York TPR Action and New York TRI Action violated the protective restraints imposed by this Court and the other New York Courts in a

---

[12] Dalia, Sagi, TPR, and D & K also purported to require the Orly Trust to pay D & K and TPR's attorneys' fees, should Petitioner continue to advance claims on the Orly Trust's behalf (see **Exhibit "GG"**, Paragraph "8") and purported to release one another from all claims, causes of action, lawsuits, demands, liability of any kind, asserted or unasserted, known or unknown, suspected or unsuspected, direct or derivative, in connection with the 1993 Note [D & K Note], the [Orly Trust] TRI Shares, the Share Transfer, the DK Interest, the TPR Interest, the 2008 Letter Agreement, or any other matters, through the date of the Agreement Id. at Paragraph "4")

[13] The parties also made sure that the Release in the TPR Settlement Agreement did not cover anyone on Sagi and Dalia's "enemies list" (See **Exhibit "HH"**, Amended TPR Settlement Agreement, Paragraph "3"), changed the governing law to New York law (id. at Paragraph "6"), and made their agreement to Delaware jurisdiction non-exclusive (id.).

number of independent ways. As to the TPR Settlement Agreement and the Amended TPR Settlement Agreement:

     (a)    Pursuant to the July 2009 Order, Dalia and her counsel were required to give Petitioner 10 days advance notice of any transaction that impacted the Orly Trust TRI Shares, but failed to provide notice of either the TPR Settlement Agreement or the Amended TPR Settlement Agreement;

     (b)    By agreeing in the TPR Settlement Agreement and the Amended TPR Settlement Agreement to have the Orly Trust relinquish its interest in TPR and transfer its interest in D & K to TPR, Dalia, Sagi, D & K GP, and TPR jointly and severally violated the TPR Action Restraints which forbade each of them from "transferring, pledging, assigning or otherwise disposing of the [Orly Trust TPR] Shares." (See **Exhibit "Z"** at 31-32)

91.    As to the Notes and the Credit Agreement, TPR's assignment of the 2011 Promissory Note to MSCo was an "...act by Respondent, her agents and all other persons acting on her behalf to assign, mortgage, pledge, redeem, encumber, sell or otherwise alter the Orly Trust's interest in TRI..." Accordingly, pursuant to the July 2009 Order, Dalia was required to give Petitioner at least 10 days notice of the transaction but completely failed to do so. This failure to notify Petitioner also violated various provisions of the Supreme NY Restraining Orders.

<u>**THE EVENT OF DEFAULT UNDER THE NOTES HAS BEEN TRIGGERED AS A RESULT OF THE DISMISSAL OF DALIA'S COUNSEL'S FEDERAL INTERPLEADER ACTION**</u>

92.    As a result of Dalia, TPR, D & K (through D & K GP) (i.e, Dalia and Sagi's) actions, the $4.44 million dollars in new debt to MSCo is immediately due and payable because of one of the poison pills that litter the Secret Agreements (in addition to the one that provides an event of default if Dalia is removed as Trustee of the Orly Trust) has already been triggered[14], and thus, MSCo is able to immediately proceed against the Orly Trust's assets in any

---

[14] The resolution of an interpleader action commenced by Dalia's counsel, Pedowitz & Meister LLP ("<u>Pedowitz & Meister</u>") is a triggering Event of Default under the Secret Agreements. Pedowitz & Meister was the

jurisdiction in the world (Delaware, St. Kitts, etc.) without notice or warning to the Orly Trust or to anyone.

93.     Thus, by her actions Dalia has created a situation where the assets of the Orly Trust could be in immediate peril of dissipation.

### DALIA NEEDS TO BE REMOVED AS TRUSTEE IMMEDIATELY

94.     As a result of all of Dalia's forgoing actions and inactions described in this Third Amended Verified Petition, her breach of her fiduciary duties to Petitioner as beneficiary of the Orly Trust, her violation of the terms and conditions of this Court's July 2009 Order and the Supreme NY Restraints, her ongoing conspiracy and scheme with Sagi to loot, transfer, pledge, encumber and dissipate the Orly Trust's assets and the immediate peril to those assets, Petitioner submits that Dalia's should be immediately removed as Trustee of the Orly Trust.

### JOEL ISAACSON SHOULD BE APPOINTED AS
### SUCCESSOR TRUSTEE

95.     As a result of Dalia's forgoing actions and inactions described in this Third Amended Verified Petition, her breach of her fiduciary duties to Petitioner as beneficiary

---

Escrow Agent with respect to the proceeds of the disputed sale of the Orly Trust TRI Shares and commenced an interpleader action against Petitioner, Dalia as Trustee of the Orly Trust and other parties in the United States District Court for the Southern District of New York, Pedowitz & Meister LLP v. TPR Investment Associates, Inc. Orly Genger, et al (Case No. 11 Civ. 5602) (the "Pedowitz & Meister Interpleader Action") whereby it sought, *inter alia,* a judgment from the Court determining who was entitled to the proceeds of the disputed sale of the Orly Trust TRI Shares.  Petitioner's counsel moved to dismiss the Pedowitz & Meister Interpleader Action on the grounds, *inter alia,* that the District Court lacked subject matter jurisdiction and in any event, all the parties and claims involved in the Pedowitz & Meister Interpleader Action were already pending before Justice Feinman in the New York TRI Action. The Pedowitz & Meister Interpleader Action was recently dismissed by Judge John F. Keenan in the United States District Court for the Southern District of New York by Opinion and Order dated June 14, 2012, due to lack of subject matter jurisdiction and described by him as a "sham". See Case No.'s 08 Civ. 7140 (JFK), 11 Civ. 5602 (JFK), et al), Docket No. 64). Thus, the resolution of this sham action has triggered an Event of Default under the Secret Agreements. It is worth noting that Pedowitz & Meister represents both Dalia in her individual capacity and as Trustee of the Orly Trust.

of the Orly Trust and her violation of the terms and conditions of this Court's July 2009 Order, Dalia should be immediately removed as Trustee and replaced with Joel Isaacson.

96.    Mr. Isaacson is the founder and CEO of Joel Isaacson & Co. LLC, which has been a leading independent wealth management firm in New York City for almost 20 years, and which is located at 546 Fifth Avenue, 20th Floor, New York, NY 10036. Mr. Isaacson specializes in financial services and tax planning and has acted as trustee for more than 100 trusts. He holds a Bachelors of Science Degree in accounting and a Masters of Business Administration degree in financial planning. Mr. Isaacson is not acquainted with any members of the Genger family, does not have any interest in TRI, TPR or D & K, is willing and prepared to succeed Dalia as Trustee immediately and has an understanding of the current status of the Orly Trust.

WHEREFORE, respectfully requests that an Order be entered: (i) immediately removing Dalia Genger as Trustee of the Orly Trust; (ii) suspending the Letters of Appointment heretofore issued to Dalia; (iii) appointing Joel Isaacson as successor trustee; and, (iv) granting such other and further relief as this Court deems to be just equitable and proper.

Dated: New York, New York
        October 15, 2012

_____
ORLY GENGER

-31-

# VERIFICATION

STATE OF NEW YORK      )
               ) ss.:
COUNTY OF NEW YORK     )

    ORLY GENGER, the petitioner named in the foregoing Third Amended Verified

Petition, being duly sworn, deposes and says:

    1.   I am the Petitioner in this matter.

    2.   I have read the annexed Third Amended Verified Petition, know the contents thereof and the same are true to my knowledge, except those matters thereon which are stated to be alleged upon information and belief, and as to those matters I believe them to be true.


            _____
                ORLY GENGER


Sworn to before me this
15th day of October, 2012

_____
Notary Public

**Daniel B Fix**
Notary Public State of New York
New York County, LIC# 02F16239452
Comm Exp 04/18/2015

-32-

# Exhibit C

3/23/2015  Genger -v- Genger Proceeding 032315

```
 1
 2      SUPREME COURT OF THE STATE OF NEW YORK
        COUNTY OF NEW YORK:   CIVIL TERM: PART - 12
 3      ---------------------------------------------X
        ORLY GENGER,
 4
                              Plaintiff
 5                                       INDEX NUMBER:
                                           100697/08
 6              -against-
 7      SAGI GENGER,
 8                            Defendant
        ---------------------------------------------X
 9                      80 Centre Street
                        New York, New York 10013
10                      March 23, 2015
11      BEFORE:
                 HONORABLE:  Barbara Jaffe, JSC
12
13      APPEARANCES:
14              Zeichner Ellman & Krause, LLP
                Attorneys for Plaintiff
15              1211 Avenue of the Americas
                New York, New York 10036
16              By:  Bryan D. Leinbach, Esq.
                     -and-
17              Kasowitz Benson Torres & Friedman, LLP
                1633 Broadway
18              New York,  New York 10019
                By:  Eric D. Herschmann, Esq.
19                   Michael Paul Bowen, Esq.
20              Morgan, Lewis & Bockius, LLP
                Attorneys for the Defendant
21              101 Park Avenue
                New York, New York 10178-0060
22              By:  John Dellaportas, Esq.
                     Mary Pennisi, Esq.
23
24
25                           Delores Hilliard
                             Vicki K. Glover
26                        Official Court Reporters
                   - OFFICIAL COURT REPORTER
```

```
1                 O. Genger - Plaintiff - Direct/Herschmann
2    accounting firm?
3         A    Yes.
4         Q    What was the reason that you obtained a different
5    accounting firm?
6         A    Well, around this time in 2007, I was trying to get
7    information about my finances from my brother.  He did not want
8    to deal with Bill Fischer and told me that, you know, if I
9    wanted to have any conversations with him about it, I'd have
10   to --
11        Q    I think you have to slow down.
12        A    Sorry.
13             If I wanted to have any conversations with him
14   about my finances, I would have to work with an accountant that
15   was a new accountant, someone who was independent.  So I hired a
16   new accountant.
17        Q    Who did you hire?
18        A    Joel Isaacson.
19        Q    Did Joel Isaacson have anything to do with Raines &
20   Fischer?
21        A    No.
22        Q    Did Joel Isaacson & Associates have anything to do with
23   your father?
24        A    No.
25        Q    How did you come to hire Joel Isaacson?
26        A    A friend of mine referred me to them.
```

3/23/2015  Genger -v- Genger Proceeding 032315

```
 1                  O. Genger - Plaintiff - Direct/Herschmann
 2         Q    And a friend that was independent of Raines & Fischer
 3    or your parents?
 4         A    Yes.
 5         Q    And after you hired Joel Isaacson & Company, then what
 6    happened regarding your finances?
 7         A    They started trying to help me gather information, and
 8    I know they contacted Sagi and tried to get information from
 9    him.  We tried to set up a meeting, and we finally were able to
10    set up a meeting with Sagi.
11         Q    Do you recall, approximately, when you were able to set
12    up that meeting with your brother?
13         A    I believe it was in November of 2007.
14         Q    Do you recall whether or not your brother had sent
15    information to your new accountants Isaacson & Associates prior
16    to your having a meeting together with your brother?
17         A    No, I know that he didn't.
18         Q    Now, as far as the actual time period of the meeting,
19    do you recall how that actually got set or what transpired?
20         A    How the meeting transpired?
21         Q    Yes.
22         A    Well, as I said, I was trying to get information from
23    my brother.  I hired these new accountants, Joel Isaacson, and I
24    knew that my brother had all this information, and we contacted
25    him several times to try to set it up, and we finally --
26         Q    I think you have to slow down.
```

3/23/2015  Genger -v- Genger Proceeding 032315

```
 1              O. Genger - Plaintiff - Direct/Herschmann
 2        A    We finally were able to set up a meeting.
 3        Q    Let me show you what's been marked as Exhibit 234 for
 4   identification, and it's been previously discussed in this
 5   matter.
 6              (Handing to defense counsel.)
 7              MR. HERSCHMANN:  I'm providing a copy again to
 8   defense counsel.
 9              (Handing to witness.)
10              (Handing to the Court.)
11        Q    I'm going to hand you an exhibit, what's been
12   previously marked as Exhibit 228 for identification, which is
13   Bates stamped JI 429.  I'm providing again a copy to defense
14   counsel.
15              (Handing to defense counsel.)
16              (Handing to witness.)
17        Q    Will you take a look at Exhibit 228 as well?
18              (Handing to the Court.)
19        Q    I'm going to hand you also what's been marked as
20   266-135 as well.  I'm providing a copy to defense counsel.
21              (Handing to defense counsel.)
22              (Handing to witness.)
23        Q    Let me start with Exhibit 266-135.
24              (Handing to the Court.)
25        Q    Do you see that this is an e-mail from Stan Altmark to
26   your brother?
```

3/23/2015  Genger -v- Genger Proceeding 032315

```
 1              O. Genger - Plaintiff - Direct/Herschmann
 2        A    Yes.
 3        Q    And you've seen this e-mail before today, correct?
 4        A    Yes.
 5        Q    Now, looking at the e-mail, does it refresh your
 6   recollection as to whether or not you had requested via Isaacson
 7   & Company certain information in June of 2007 from your brother?
 8        A    Yes, I did.
 9        Q    And is it accurate that after making requests from your
10   brother in June of 2007, you had not received specific
11   information that you wanted prior to meeting with him?
12        A    Yes.
13        Q    Now, looking at Exhibit 228, if you could, for a
14   moment, have you seen Exhibit 228 previously?
15        A    Yes.
16        Q    And do you recognize this as an e-mail from Joel
17   Isaacson to your brother dated November 6th of 2007?
18        A    Yes.
19             MR. HERSCHMANN:  Your Honor, at this time I would
20   offer Exhibit 228 for identification into evidence.
21             MR. DELLAPORTAS:  Objection.  Hearsay.
22             MR. HERSCHMANN:  Your Honor, we're offering it as
23   a communication that was sent as a representative from Orly
24   Genger to her brother.  The actual content is irrelevant,
25   except for the fact that he actually received it.
26             MR. DELLAPORTAS:  It's definitely being offered
```

3/23/2015  Genger -v- Genger Proceeding 032315

```
 1                O. Genger - Plaintiff - Direct/Herschmann
 2         for the truth of the matter, and it's hearsay, and it
 3         hasn't been authenticated.  It's from Joel Isaacson's
 4         files.
 5                THE COURT:  Yeah, sustained.
 6         Q    Well, Ms. Genger, looking at Exhibit 228, do you recall
 7    whether or not your brother was advised that Isaacson & Company
 8    had no affiliation with Raines & Fischer?
 9         A    Yes.
10         Q    And did you believe at the time Isaacson & Company was
11    making requests from your brother for certain documents, that
12    you were actually entitled to those documents?
13         A    Yes.
14         Q    Did you retain Isaacson & Company to help advise you on
15    the state of affair of your assets?
16         A    Yes.
17         Q    Who was the accountant handling the tax returns for
18    White Box in the 2007 time period?  Was it Jonas Gayer, to your
19    knowledge, or was it Raines & Fischer, if you recall?
20         A    Raines & Fischer.
21         Q    Now, can you look at Exhibit 234, please?  Do you have
22    the exhibit in front of you?
23         A    Yes.
24         Q    And you mentioned earlier that there was an agenda that
25    was put together for the November 8th, 2007 meeting.
26                Does this exhibit refresh your recollection as to
```

3/23/2015  Genger -v- Genger Proceeding 032315

```
 1              O. Genger - Plaintiff - Direct/Herschmann
 2     what was covered during the course of the meeting, as far as
 3     your side was concerned?
 4              MR. DELLAPORTAS:  Objection.  There's been no
 5         testimony that she lacks recollection subject that it needs
 6         to be refreshed.
 7     Q    Do you recall everything that happened at the November
 8     8, 2007 meeting?
 9     A    I don't know if I recall everything, but I --
10     Q    Is there a document that would help refresh your
11     recollection as to what was the agenda covered at the November
12     8, 2007 meeting?
13     A    Yes.
14     Q    Is the actual agenda the document that would help you
15     refresh your recollection?
16     A    Yes.
17     Q    So, now looking at Exhibit 234, does that refresh your
18     recollection as to what was expected to be covered by your
19     representatives with your brother on November 8, 2007?
20     A    Yes.
21     Q    So, can you first tell us how long did it take for you,
22     for your representatives, to arrange a meeting with your brother
23     to discuss your finances?  Was it a week?  Was it more than
24     that?  And if the prior documents that I've handed you, Exhibit
25     266-135, refresh your recollection, please let us know.
26              MR. DELLAPORTAS:  It's kind of leading.
```

```
1              O. Genger - Plaintiff - Direct/Herschmann
2              THE COURT:  You're putting the cart before the
3       horse.
4              MR. HERSCHMANN:  Okay.  Well, let me ask it.
5       Q    Do you recall how long it took you to set up a meeting
6    with your brother?
7       A    I know it was months.
8       Q    Now, can you describe for us the general tenure of the
9    meeting; where it occurred, if you recall, what happened when
10   you got there?
11      A    The meeting happened at Joel Isaacson's office, and the
12   people who were there who attended the meeting were Joel
13   Isaacson, Stan Altmark, Don Mullen, my mother, myself and my
14   brother.  And the tenure was, I was trying to get information,
15   which is in this agenda.  I had a lot of questions that I wanted
16   answered.
17      Q    I want you to leave the agenda aside.  If you can give
18   us the general -- was it in a conference room?  What happened?
19      A    It was in one of the conference rooms at Isaacson's
20   office.
21      Q    And was Don Mullen the person who referred you to
22   Isaacson & Company?
23      A    Yes, he was.
24      Q    Now, just tell us generally what happened, and then
25   we'll cover the specifics in the course of the meeting.
26      A    Generally, what happened was, all these people were
```

```
 1                O. Genger - Plaintiff - Direct/Herschmann
 2       sitting in a room together.  Joel Isaacson and Stan Altmark were
 3       asking certain questions of Sagi.  Sagi was not happy with the
 4       fact that we were asking questions.  He did most of the talking.
 5       Stan or Joel would ask him a question and he would give a
 6       five-minute speech on something and run -- I mean, just run
 7       circles around everyone.  He was not really answering questions.
 8       And we were getting nowhere.  And he became very upset by the
 9       fact that we were asking him questions.
10                (Continued on next page.)
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
```

2833

3/23/2015  Genger -v- Genger Proceeding 032315

1              O. Genger - by Plaintiff - Direct/by Mr. Herschmann
2        Q    And did you attempt to go through the agenda that  is
3    contained in exhibit 234?
4        A    Yes, we did.
5        Q    Now, was the meeting to discuss your getting access to
6    financial information and to take control of your financial
7    life?
8        A    Yes.
9        Q    Was that expressed to your brother?
10       A    Yes.
11       Q    Did you address in anything -- well, withdrawn.
12            Do you recall specifically what you addressed regarding
13    your 1993 trust?
14            Just a foundational question that I have to ask before
15    I present the exhibit.
16            Do you recall specifically what was addressed?
17       A    Without looking at it?
18       Q    Without looking at it?
19       A    Okay.  I mean, generally, I know.
20       Q    Would the agenda refresh your recollection as to
21    specifically what you were asking about your trust?
22       A    Yes.
23            MR. HERSCHMANN:  I would offer it in as a past
24    recollection refreshed and make the process easier or I can
25    do it this way.
26            THE COURT:  Mr. Dellaportas, what do you say?

```
 1          O. Genger - by Plaintiff - Direct/by Mr. Herschmann
 2               MR. DELLAPORTAS:  This agenda, do you mean?
 3               THE COURT:  Yes.
 4               MR. DELLAPORTAS:  It is hearsay.
 5               MR. HERSCHMANN:  Well, the past recollection
 6     recorded, the present recollection refreshed.
 7               THE COURT:  I don't know that she recorded it.
 8               MR. HERSCHMANN:  She doesn't have to have recorded
 9     it.  She has to be able to articulate that this was an
10     accurate document of what was discussed at the meeting.  She
11     doesn't have to be the actual person who sat down and
12     recorded it.
13               THE COURT:  Is that your understanding, Mr.
14     Dellaportas?
15               MR. DELLAPORTAS:  No.
16               THE COURT:  I'm not sure either.
17               MR. HERSCHMANN:  We can pull it up.
18               THE COURT:  Just to refresh my own recollection.
19               Who has The Richardson?
20               MR. HERSCHMANN:  I don't have it.  And I think the
21     rule, and I can articulate it this way, if your secretary
22     sat there and took copious notes of the entire process and
23     said this accurately reflects what happened at the
24     meeting --
25               THE COURT:  We don't know when it was prepared.  I
26     don't know.  Let's just get the rule.
```

1    O. Genger - by Plaintiff - Direct/by Mr. Herschmann

2    MR. HERSCHMANN:  Okay.

3    (Short pause)

4    MR. DELLAPORTAS:  There is a Judge Friedman's

5  section on it.  It says, under the past recollection

6  recorded doctrine the memoranda of a fact known for an event

7  offered in the past for which the witness lacks sufficient

8  present recollection may be received in evidence to the

9  witness' oral testimony.

10    THE COURT:  It doesn't say anything about having to

11  be prepared by the witness.

12    MR. DELLAPORTAS:  There is a whole section in here.

13    THE COURT:  I don't know, Mr. Herschmann.

14    MR. HERSCHMANN:  If you want testimony, take a

15  moment, we can look at it.  I have no problem.

16    But, I'm pretty confident the rule is exactly as

17  Mr. Dellaportas just read it.

18    It is not necessary that the witness be the one

19  that actually recorded it as much as they can say that

20  recording is accurate.

21    THE COURT:  I'm pleased that you're confident.  I

22  am not.

23    It didn't say anything about it, but that doesn't

24  mean --

25    MR. DELLAPORTAS:  As I understand it this is the

26  agenda prepared before the meeting and thus isn't --

3/23/2015  Genger -v- Genger Proceeding 032315

```
 1          O. Genger - by Plaintiff - Direct/by Mr. Herschmann
 2              THE COURT:  That is what I mean, also.  It is not
 3     contemporaneous.
 4              MR. DELLAPORTAS:  It is not notes from the meeting.
 5     It is agenda in advance of the meeting.
 6              MR. HERSCHMANN:  Your Honor, the rule is as I
 7     understand it, and Mr. Dellaportas if he wants to share that
 8     with us and we can take a 5 minute recess.
 9              THE COURT:  I can go in the back and look at it.
10              MR. HERSCHMANN:  If you would do that, your Honor,
11     that would be great.
12              Thank you, very much.
13              (Short recess; time is now 2:42 PM)
14              (2:45 PM)
15              THE COURT:  I don't think so, Mr. Herschmann.  Not
16     according to Richardson under the old book, which I'm sure
17     hasn't been changed too much, 66213, I don't know what it is
18     in the next edition.  But, while the memorandum, any
19     memorandum made by anybody can be used to refresh, if you
20     want it in evidence when a witness has so far forgotten
21     facts that he cannot recall them even after looking at a
22     memorandum of them and he testified that he once knew them
23     and made a memorandum of them at the time or soon after,
24     which he intended to make correctly and which he believes to
25     be correct, such memorandum in his own handwriting may be
26     received as evidence of the facts contained although the
```

3/23/2015  Genger -v- Genger Proceeding 032315

1       O. Genger - by Plaintiff - Direct/by Mr. Herschmann

2    witness has no present recollection of them.

3          MR. HERSCHMANN:  Your Honor, I think that's why I

4    raised the issue of past recollection refreshed or present

5    recollection recorded.

6          As I said, there are two ways to address.  I can

7    address it with the witness as present recollection

8    refreshed, which is the process that the witness looks at

9    it.

10         THE COURT:  Right.  Then, this doesn't come into

11   evidence.  But, you want it in evidence.

12         MR. HERSCHMANN:  That's correct.

13         The reason I had it the way I did is that there are

14   two ways of dealing with it.

15         There is what I call the simpler process.

16         THE COURT:  It is not coming into evidence.

17         MR. HERSCHMANN:  Okay.

18         THE COURT: She can use it to refresh her

19   recollection if it indeed refreshes her recollection.

20         As I recall this whole exercise is because you

21   wanted to offer it into evidence.

22         MR. HERSCHMANN:  That's correct.  And the reason

23   doesn't matters.

24         THE COURT:  Okay.

25   Q    So, Ms. Genger, let me, I'm going to walk you through

26   the process.

```
 1          O. Genger - by Plaintiff - Direct/by Mr. Herschmann
 2              I'm going to ask you specific questions.  If you recall
 3     something specifically you should answer it.  If you don't
 4     recall specifically, then I'm going to ask you is there
 5     something that would refresh your recollection.  And the process
 6     is then you can look at it and then say the document refreshes
 7     my recollection and then answer it.  Okay?
 8              So, I'm going to go back to the November 8, 2007
 9     meeting.
10              And do you recall specifically what was discussed in
11     the first topic dealing with Orly Genger 1993 Trust?
12     A      Specifically, no.
13     Q      Would the agenda refresh your recollection as to what
14     was discussed?
15     A      Yes.
16     Q      Can you take a moment to look at the agenda and tell us
17     after looking at it does it refresh your recollection as to what
18     was the first topic discussed as it related to the Orly Genger
19     1993 Trust?
20     A      Yes.
21     Q      Okay.  What was of the first topic discussed?
22     A      D&K.
23     Q      And what was discussed after D&K was raised?
24     A      Who was the general partner.  Did Sagi have a copy of
25     the partnership agreement, the note.
26              Then, there is  a topic of the note, who owns the note.
```

3/23/2015  Genger -v- Genger Proceeding 032315

1          O. Genger - by Plaintiff - Direct/by Mr. Herschmann

2      Q    When you say who is the general partner do you recall

3  the specific discussions as to percentages about your mother and

4  whether she remained the general partner, without looking at

5  document first?

6      A    No.

7      Q    If you look at the document does that  refresh your

8  recollection?

9      A    Yes.

10      Q    And what was the first thing that was discussed after

11  you asked who were the general partners of D&K?

12          MR. DELLAPORTAS:  I object on relevance grounds as

13      to this line of testimony.

14          MR. HERSCHMANN:  I'm doing this as a general

15      proposition as to the subject matters that were discussed.

16          I can offer the agenda in and make it simple and go

17      through it or I can only do it this way, your Honor.  That

18      is why I raised it in the first place.

19          I'm not saying it is proof.  I'll do it any way Mr.

20      Dellaportas prefers.

21          THE COURT:  He doesn't prefer anything.  It is not

22      depending upon what he prefers.  It is what you want to

23      prove.

24          He says it is not relevant.

25          Why is it relevant?

26      Q    Well, did you generally discuss your trust and

3/23/2015  Genger -v- Genger Proceeding 032315

```
1              O. Genger - by Plaintiff - Direct/by Mr. Herschmann
2      associations with the D&K note?
3          A    Yes.
4          Q    Okay.  After discussing your trust and the D&K note did
5      you then have discussions about TPR?
6          A    Yes.
7          Q    Okay.  Do you recall specifically about what was
8      discussed in relationship to TPR and what percentages were not
9      owned by D&K, first, without looking at the document?
10         A    No.
11         Q    Looking at the document, does it refresh your
12     recollection as to what was the first thing you discussed about
13     TPR?
14         A    Yes.
15         Q    And what was that ?
16         A    Who owns and what percentages the 49 percent not owned
17     by D&K.
18         Q    And do you recall whether there was any discussion
19     about Rochell, R-O-C-H-E-L-L, Fang and your mother's interest?
20         A    Yes.
21         Q    After that did you have a discussion about whether or
22     not you can get copies of the minutes of meetings from TPR?
23         A    Yes.
24         Q    Did your brother agree to give you copies of the
25     minutes of meetings with TPR?
26         A    No.
```

3/23/2015  Genger -v- Genger Proceeding 032315

```
 1              O. Genger - by Plaintiff - Direct/by Mr. Herschmann
 2        Q     Did you then discuss with your brother what is the
 3    distribution he was receiving from TPR?
 4                    MR. DELLAPORTAS:  Objection.  Relevance.
 5                    THE COURT:  Overruled.
 6        A     Yes.
 7        Q     Okay.  And do you recall raising the amount of his
 8    getting $45,000 per month?
 9        A     Yes.
10        Q     And did your brother ever answer as to why he was
11    getting $45,000 from TPR per month and how it was being
12    categorized?
13                    MR. DELLAPORTAS:  Objection, compound.
14                    THE COURT:  Let's take it one at a time.
15        Q     Okay.  Did your brother ascribe for you why he was
16    receiving $45,000 per month?
17        A     He may have and I don't remember.
18              His answers were long winded.  So, I just don't
19    remember them.
20        Q     Was there a  discussion about why your mother was
21    receiving $30,000 per month?
22                    MR. DELLAPORTAS:  Objection, lack of foundation.
23                    THE COURT:  Yes.  Sustained.
24        Q     Well, do you recall a discussion about what
25    distributions your mother was getting from TPR?
26        A     Generally, yes.
```

3/23/2015  Genger -v- Genger Proceeding 032315

```
1              O. Genger - by Plaintiff - Direct/by Mr. Herschmann
2        Q      Looking at the exhibit, does it refresh your
3    recollection as to what dollar amount your brother was being
4    questioned about regarding how much money your mother was
5    receiving?
6        A      Yes.
7        Q      What number did you question your brother about?
8        A      $30,000 a month.
9        Q      Per month?
10       A      Yes.
11       Q      Do you recall then discussing with your brother how
12   could distributions be evened out between you, your mother and
13   your brother?
14       A      Yes.
15       Q      Did your brother at that time indicate his willingness
16   to even out the distribution between you, and your mother and
17   himself?
18       A      No, he didn't.
19       Q      Did your brother answer any questions about what are
20   the assets of TPR?
21       A      Whatever answers he gave were so complicated and he
22   gave answers that  confused everyone.
23       Q      Well, did the Isaacson representatives say to your
24   brother during the course of the meeting that they were
25   satisfied with his answers?
26       A      No.
```

3/23/2015  Genger -v- Genger Proceeding 032315

1         O. Genger - by Plaintiff - Direct/by Mr. Herschmann

2         Q    What did they say generally about the answers your

3    brother was giving?

4              MR. DELLAPORTAS:  Objection.  Hearsay.

5              THE COURT:  Sustained.

6         Q    Did you then cover what receivables were due TPR, just

7    generally?

8         A    I don't remember.

9         Q    Okay.  If you look at exhibit 234, the agenda in front

10   of you, does that refresh your recollection as to what questions

11   were asked about the receivables due TPR?

12        A    Yes.

13        Q    And looking at that , does it refresh your recollection

14   about asking what happened to the $1.9 million that your brother

15   owed TPR?

16             MR. DELLAPORTAS:  Objection.  Lack of foundation

17        and leading.

18             THE COURT:  How about a foundation?

19        Q    Okay.  Well, does exhibit 234 refresh your recollection

20   as to whether the subject matters of how much money your brother

21   owed TPR was discussed on November 8, 2007?

22        A    Yes.

23        Q    Okay.  Looking at exhibit 234 does it refresh your

24   recollection about the specific amount of money that was

25   discussed with your brother regarding how much money he owed

26   TPR?

```
1              O. Genger - by Plaintiff - Direct/by Mr. Herschmann
2         A    Yes.
3         Q    What was the amount of money that your brother was
4    asked about that he owed TPR?
5              MR. DELLAPORTAS:  Just objection, your Honor.
6              This doesn't feel like a refreshed recollection.
7    It just fees like reading a document.
8              MR. HERSCHMANN:  It's the only way to do it.
9              If Mr. Dellaportas wants me to go down --
10             THE COURT:  You know, she was there.  So, I do
11   believe there is a --
12             MR. DELLAPORTAS:  Okay.
13        Q    What is the amount?
14        A    $1.9 million.
15        Q    Do you recall then having other discussions about other
16   monies that were owed TPR or owed by other officers to TPR?
17        A    Yes.
18        Q    Do you recall what was next discussed independent of
19   looking at the exhibit?
20        A    No.
21        Q    Looking at the exhibit, does it refresh your
22   recollection as to the next item that you discussed with your
23   brother?
24        A    Yes.
25        Q    Okay.  What was the next item that you discussed with
26   your brother?
```

2845

1              O. Genger - by Plaintiff - Direct/by Mr. Herschmann
2        A    The annual expense of TPR and then after that there was
3   trust administration.
4        Q    I think you have to speak a little louder.
5        A    Sorry.
6              Right after that there was what are the annual expenses
7   of TPR exclusive of above distributions to Sagi and Ariel Orly.
8        Q    Did your brother answer what was the annual expense to
9   TPR when Isaacson & Company posed the question to him?
10       A    Again, his answers were really convoluted and --
11       Q    How about, was there a discussion about the amount of
12  lawsuits that TPR was involved with as either a plaintiff or a
13  defendant?
14       A    Were there discussions?
15       Q    Yes?
16       A    Yes.
17       Q    After that was there a discussion about potentially
18  buying out your interests?
19       A    Yes.
20       Q    And looking at exhibit 234 does it refresh your
21  recollection, specifically, about what you asked of your
22  brother?
23       A    Yes.
24       Q    What was asked?
25       A    Was TPR, meaning Sagi, consider buying out Orly's
26  interest in TPR.  -- Or D&K now giving proper discounts to the

2846

3/23/2015  Genger -v- Genger Proceeding 032315

1          O. Genger - by Plaintiff - Direct/by Mr. Herschmann
2     D&K note and credit for the losses.
3               THE COURT:  Well --
4               MR. HERSCHMANN:  Those were the subject matters
5     that were discussed.
6               THE COURT:  She is reading from it, though.
7     Q    Now --
8               THE COURT:  You're kind of abusing it now.  She
9     cannot read from it.
10    Q    All right.
11         So, the document is not in evidence, so you cannot read
12    from it.  You can only look at it to refresh your recollection
13    and then answer the question.  So.
14              THE COURT:  And if you cannot answer the question,
15    then you cannot answer the question.
16    Q    Now, was there a discussion about capital contributions
17    made to White Box?
18    A    Yes.
19    Q    After that do you recall what was discussed about TPR
20    and its relationship to White Box?
21    A    Yes.
22    Q    And do you recall at some point asking could you have
23    control of the tax filings of White Box?
24    A    Yes.
25    Q    Now, did you then move on to discuss your trustees and
26    administration of your trust?

2847

3/23/2015  Genger -v- Genger Proceeding 032315

```
1              O. Genger - by Plaintiff - Direct/by Mr. Herschmann
2       A    Yes.
3       Q    Who were the trustees back in 2007?
4       A    It was Lea Fang.
5       Q    Did you discuss wanting someone else to become the
6    trustee of your trust?
7       A    Yes.
8              MR. DELLAPORTAS:  Objection, relevance.
9              THE COURT:  Sustained.
10      Q    In the course of this meeting was the agenda dealing
11   with your parents' divorce?
12      A    No.
13      Q    If you look at the agenda does it refresh your
14   recollection as to whether or not you had raised TRI or had
15   intended to raise TRI in any way?
16      A    Does it refresh?
17      Q    Yes?
18      A    Yes, it does.
19      Q    And is TRI something that was on your agenda to cover?
20      A    No.
21      Q    Now, did you then cover the Canadian ventures?
22      A    Yes.
23      Q    And do you recall, approximately, when you learned
24   about Riverside related entities?
25      A    It was some time prior in '07, prior to this meeting.
26      Q    And when you say some time prior to '07, was that in
```

2848

```
 1              O. Genger - by Plaintiff - Direct/by Mr. Herschmann
 2      relationship with your trying to get a better understanding of
 3      finances?
 4          A    Yes.
 5          Q    And prior to having this meeting in November of 2007
 6      had you met personally with Isaacson and Company
 7      representatives?
 8          A    Before this meeting?
 9          Q    Yes?
10          A    Yes.
11          Q    If you go now to the issues, let's focus now on the
12      Canadian ventures.
13              Do you recall specifically what you first or what was
14      first asked of your brother in the November 8, 2007 meeting
15      regarding the Canadian ventures?
16          A    Without -- Without looking at it?  No.
17          Q    Okay.  Looking at exhibit 234 can you tell us if that
18      refreshes your recollection as to what was, what was the first
19      thing that you discussed in relationship to the Canadian
20      ventures?
21          A    Yes.
22          Q    What was the first thing that was discussed?
23              THE COURT:  Without reading from this.
24          Q    Without reading?
25          A    What did I sell to my brother?
26          Q    Was that a question that the representatives of
```

3/23/2015  Genger -v- Genger Proceeding 032315

```
 1          O. Genger - by Plaintiff - Direct/by Mr. Herschmann
 2     Isaacson & Company asked your brother even in November of 2007?
 3                    MR. DELLAPORTAS:  Objection, hearsay.
 4                    THE COURT:  Sustained.
 5          Q    How did your brother respond to the question of what
 6     you had sold to him?
 7          A    To that particular question, I don't remember what his
 8     response was.
 9          Q    Without looking at the agenda do you recall what was
10     discussed in connection with your brother about it?
11                    THE COURT:  About?
12          Q    About the Canadian ventures?
13                    THE COURT:  Okay the Canadian ventures.
14          Q    Yes?
15          A    I mean, I have a specific --
16          Q    Tell us what you recall being discussed about the
17     Canadian ventures, of the transfer.  And then we can get into
18     the specifics.  Tell us generally first what you recall?
19          A    About the Canadian ventures what was discussed?
20          Q    Yes?
21          A    Specifically, I specifically asked my brother if we
22     could now transfer back my shares to me like he said he would
23     do.  And I specifically remember my brother looking at me and
24     laughing and said, I don't know why you would want to do that,
25     it is valueless.
26          Q    Did you believe him when he said that?
```

3/23/2015  Genger -v- Genger Proceeding 032315

```
 1          O. Genger - by Plaintiff - Direct/by Mr. Herschmann
 2      A    Did I believe what, that it was valueless?
 3      Q    Yes?
 4      A    What I believed is that, is that my brother tricked me.
 5      Q    And after that conversation did you still try to get
 6   more information about the Canadian ventures from your brother
 7   in that meeting?
 8      A    I don't remember what happened specifically right after
 9   that.  I know there was other, there was more conversation about
10   it.  But, I cannot tell you specifically.
11      Q    Looking at exhibit 234 did you have a discussion to
12   refresh your recollection specifically about the dollar values?
13      A    Yes.
14      Q    Okay.  And does exhibit 234 refresh your recollection?
15      A    Yes.
16      Q    And what do you recall about discussing with your
17   brother in that meeting dealing with the valuations?
18      A    That I had, I had sold my interest to him for 100,000
19   when I bought it for 150.
20      Q    And then do you recall any discussions about the
21   valuations of the businesses currently?
22      A    I am sorry, what was the question?
23      Q    Could we read it back, please?
24           THE COURT:  Yes, please.
25           (Record read)
26      Q    I meant, generally.  I mean the Canadian business?
```

3/23/2015  Genger -v- Genger Proceeding 032315

```
1              O. Genger - by Plaintiff - Direct/by Mr. Herschmann
2         A    Yes.
3         Q    Did your brother in the course of that meeting provide
4    you with any financial information as to where the money had
5    gone from the Canadian ventures?
6         A    No.
7         Q    Let me show you what you has been marked as exhibit
8    266-71, which is admitted into evidence.
9              And do you see on the bottom portion of the exhibit
10   266-71 that there is a reference that the White Paper -- I am
11   sorry, that the White Box papers were supposed to transfer to
12   Jonah from Bill Fischer and then Jonah can be reached at (212)
13   758-0000.
14             Do you see that ?
15        A    Yes.
16        Q    Does that refresh your recollection as to who were the
17   accountants for White Box in 2007?
18        A    Yes.
19        Q    Is that Jonah Gayer and Associates?
20        A    I mean, it was supposed to be, it wasn't.
21        Q    Do you know at some point whether Gayer and Associates
22   became the accountants for White Box?  And I'm focused on the
23   2007 time period.
24        A    I don't know that it ever actually switched to Jonah
25   Gayer.
26        Q    Now, going back to the meeting in November, 2007, do
```

3/23/2015  Genger -v- Genger Proceeding 032315

```
1            O. Genger - by Plaintiff - Direct/by Mr. Herschmann
2    you recall that at the conclusion of the agenda there was an
3    over all subject matter that you wanted to address with your
4    brother?
5        A    Yes.
6            (Continued on the next page)
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
```

```
1                  O. Genger - Plaintiff - Direct/Herschmann
2         Q     And what was the general tenure for what you were
3    looking to get from your brother in the November 2007 meeting?
4         A     Information.  Information about my finances.
5         Q     And did you get information that was satisfactory to
6    you from your brother in that meeting?
7         A     No.
8         Q     Let me show you what's been previously received in
9    evidence as Exhibit 230.
10                  MR. HERSCHMANN:  Again, I'm providing an extra
11        copy to defense counsel.
12                  (Handing to defense counsel.)
13                  (Handing to witness.)
14                  (Handing to the Court.)
15        Q     Do you recall that after the meeting Isaacson &
16    Associates sent a letter to your brother?
17                  THE COURT:  Yeah, this is very leading.
18                  MR. HERSCHMANN:  I'm sorry?
19                  THE COURT:  Ask a question.
20                  MR. HERSCHMANN:  I'm trying to lay a foundation
21        for the exhibit.
22                  THE COURT:  It's too leading.
23        Q     First, have you seen Exhibit 230 beforehand?
24        A     Yes.
25        Q     Did you have discussions with Isaacson & Associates
26    before Exhibit 230 was sent to your brother?
```

# Exhibit C

3/23/2015  Genger -v- Genger Proceeding 032315

```
1
2     SUPREME COURT OF THE STATE OF NEW YORK
      COUNTY OF NEW YORK:   CIVIL TERM: PART - 12
3     ----------------------------------------------X
      ORLY GENGER,
4
                           Plaintiff
5                                    INDEX NUMBER:
                                       100697/08
6              -against-
7     SAGI GENGER,
8                           Defendant
      ----------------------------------------------X
9                      80 Centre Street
                       New York, New York 10013
10                     March 23, 2015
11    BEFORE:
               HONORABLE:  Barbara Jaffe, JSC
12
13    APPEARANCES:
14             Zeichner Ellman & Krause, LLP
               Attorneys for Plaintiff
15             1211 Avenue of the Americas
               New York, New York 10036
16             By:  Bryan D. Leinbach, Esq.
                      -and-
17             Kasowitz Benson Torres & Friedman, LLP
               1633 Broadway
18             New York,  New York 10019
               By:  Eric D. Herschmann, Esq.
19                   Michael Paul Bowen, Esq.
20             Morgan, Lewis & Bockius, LLP
               Attorneys for the Defendant
21             101 Park Avenue
               New York, New York 10178-0060
22             By:  John Dellaportas, Esq.
                    Mary Pennisi, Esq.
23
24
25                          Delores Hilliard
                            Vicki K. Glover
26                          Official Court Reporters
                   - OFFICIAL COURT REPORTER
```

3/23/2015  Genger -v- Genger Proceeding 032315

```
 1              O. Genger - Plaintiff - Direct/Herschmann
 2    accounting firm?
 3         A    Yes.
 4         Q    What was the reason that you obtained a different
 5    accounting firm?
 6         A    Well, around this time in 2007, I was trying to get
 7    information about my finances from my brother.  He did not want
 8    to deal with Bill Fischer and told me that, you know, if I
 9    wanted to have any conversations with him about it, I'd have
10    to --
11         Q    I think you have to slow down.
12         A    Sorry.
13              If I wanted to have any conversations with him
14    about my finances, I would have to work with an accountant that
15    was a new accountant, someone who was independent.  So I hired a
16    new accountant.
17         Q    Who did you hire?
18         A    Joel Isaacson.
19         Q    Did Joel Isaacson have anything to do with Raines &
20    Fischer?
21         A    No.
22         Q    Did Joel Isaacson & Associates have anything to do with
23    your father?
24         A    No.
25         Q    How did you come to hire Joel Isaacson?
26         A    A friend of mine referred me to them.
```

3/23/2015  Genger -v- Genger Proceeding 032315

                    O. Genger - Plaintiff - Direct/Herschmann

1

2        Q    And a friend that was independent of Raines & Fischer

3    or your parents?

4        A    Yes.

5        Q    And after you hired Joel Isaacson & Company, then what

6    happened regarding your finances?

7        A    They started trying to help me gather information, and

8    I know they contacted Sagi and tried to get information from

9    him.  We tried to set up a meeting, and we finally were able to

10   set up a meeting with Sagi.

11       Q    Do you recall, approximately, when you were able to set

12   up that meeting with your brother?

13       A    I believe it was in November of 2007.

14       Q    Do you recall whether or not your brother had sent

15   information to your new accountants Isaacson & Associates prior

16   to your having a meeting together with your brother?

17       A    No, I know that he didn't.

18       Q    Now, as far as the actual time period of the meeting,

19   do you recall how that actually got set or what transpired?

20       A    How the meeting transpired?

21       Q    Yes.

22       A    Well, as I said, I was trying to get information from

23   my brother.  I hired these new accountants, Joel Isaacson, and I

24   knew that my brother had all this information, and we contacted

25   him several times to try to set it up, and we finally --

26       Q    I think you have to slow down.

3/23/2015  Genger -v- Genger Proceeding 032315

```
1                    O. Genger - Plaintiff - Direct/Herschmann
2         A    We finally were able to set up a meeting.
3         Q    Let me show you what's been marked as Exhibit 234 for
4    identification, and it's been previously discussed in this
5    matter.
6                    (Handing to defense counsel.)
7                    MR. HERSCHMANN:  I'm providing a copy again to
8    defense counsel.
9                    (Handing to witness.)
10                   (Handing to the Court.)
11        Q    I'm going to hand you an exhibit, what's been
12   previously marked as Exhibit 228 for identification, which is
13   Bates stamped JI 429.  I'm providing again a copy to defense
14   counsel.
15                   (Handing to defense counsel.)
16                   (Handing to witness.)
17        Q    Will you take a look at Exhibit 228 as well?
18                   (Handing to the Court.)
19        Q    I'm going to hand you also what's been marked as
20   266-135 as well.  I'm providing a copy to defense counsel.
21                   (Handing to defense counsel.)
22                   (Handing to witness.)
23        Q    Let me start with Exhibit 266-135.
24                   (Handing to the Court.)
25        Q    Do you see that this is an e-mail from Stan Altmark to
26   your brother?
```

3/23/2015  Genger -v- Genger Proceeding 032315

```
 1                O. Genger - Plaintiff - Direct/Herschmann

 2       A    Yes.

 3       Q    And you've seen this e-mail before today, correct?

 4       A    Yes.

 5       Q    Now, looking at the e-mail, does it refresh your

 6    recollection as to whether or not you had requested via Isaacson

 7    & Company certain information in June of 2007 from your brother?

 8       A    Yes, I did.

 9       Q    And is it accurate that after making requests from your

10    brother in June of 2007, you had not received specific

11    information that you wanted prior to meeting with him?

12       A    Yes.

13       Q    Now, looking at Exhibit 228, if you could, for a

14    moment, have you seen Exhibit 228 previously?

15       A    Yes.

16       Q    And do you recognize this as an e-mail from Joel

17    Isaacson to your brother dated November 6th of 2007?

18       A    Yes.

19            MR. HERSCHMANN:  Your Honor, at this time I would

20       offer Exhibit 228 for identification into evidence.

21            MR. DELLAPORTAS:  Objection.  Hearsay.

22            MR. HERSCHMANN:  Your Honor, we're offering it as

23       a communication that was sent as a representative from Orly

24       Genger to her brother.  The actual content is irrelevant,

25       except for the fact that he actually received it.

26            MR. DELLAPORTAS:  It's definitely being offered
```

2829

```
 1              O. Genger - Plaintiff - Direct/Herschmann
 2        for the truth of the matter, and it's hearsay, and it
 3        hasn't been authenticated.  It's from Joel Isaacson's
 4        files.
 5              THE COURT:  Yeah, sustained.
 6        Q    Well, Ms. Genger, looking at Exhibit 228, do you recall
 7        whether or not your brother was advised that Isaacson & Company
 8        had no affiliation with Raines & Fischer?
 9        A    Yes.
10        Q    And did you believe at the time Isaacson & Company was
11        making requests from your brother for certain documents, that
12        you were actually entitled to those documents?
13        A    Yes.
14        Q    Did you retain Isaacson & Company to help advise you on
15        the state of affair of your assets?
16        A    Yes.
17        Q    Who was the accountant handling the tax returns for
18        White Box in the 2007 time period?  Was it Jonas Gayer, to your
19        knowledge, or was it Raines & Fischer, if you recall?
20        A    Raines & Fischer.
21        Q    Now, can you look at Exhibit 234, please?  Do you have
22        the exhibit in front of you?
23        A    Yes.
24        Q    And you mentioned earlier that there was an agenda that
25        was put together for the November 8th, 2007 meeting.
26              Does this exhibit refresh your recollection as to
```

3/23/2015 Genger -v- Genger Proceeding 032315

```
 1              O. Genger - Plaintiff - Direct/Herschmann
 2   what was covered during the course of the meeting, as far as
 3   your side was concerned?
 4              MR. DELLAPORTAS:  Objection.  There's been no
 5        testimony that she lacks recollection subject that it needs
 6        to be refreshed.
 7        Q    Do you recall everything that happened at the November
 8   8, 2007 meeting?
 9        A    I don't know if I recall everything, but I --
10        Q    Is there a document that would help refresh your
11   recollection as to what was the agenda covered at the November
12   8, 2007 meeting?
13        A    Yes.
14        Q    Is the actual agenda the document that would help you
15   refresh your recollection?
16        A    Yes.
17        Q    So, now looking at Exhibit 234, does that refresh your
18   recollection as to what was expected to be covered by your
19   representatives with your brother on November 8, 2007?
20        A    Yes.
21        Q    So, can you first tell us how long did it take for you,
22   for your representatives, to arrange a meeting with your brother
23   to discuss your finances?  Was it a week?  Was it more than
24   that?  And if the prior documents that I've handed you, Exhibit
25   266-135, refresh your recollection, please let us know.
26              MR. DELLAPORTAS:  It's kind of leading.
```

2831

3/23/2015  Genger -v- Genger Proceeding 032315

```
1              O. Genger - Plaintiff - Direct/Herschmann
2              THE COURT:  You're putting the cart before the
3       horse.
4              MR. HERSCHMANN:  Okay.  Well, let me ask it.
5       Q    Do you recall how long it took you to set up a meeting
6  with your brother?
7       A    I know it was months.
8       Q    Now, can you describe for us the general tenure of the
9  meeting; where it occurred, if you recall, what happened when
10 you got there?
11      A    The meeting happened at Joel Isaacson's office, and the
12 people who were there who attended the meeting were Joel
13 Isaacson, Stan Altmark, Don Mullen, my mother, myself and my
14 brother.  And the tenure was, I was trying to get information,
15 which is in this agenda.  I had a lot of questions that I wanted
16 answered.
17      Q    I want you to leave the agenda aside.  If you can give
18 us the general -- was it in a conference room?  What happened?
19      A    It was in one of the conference rooms at Isaacson's
20 office.
21      Q    And was Don Mullen the person who referred you to
22 Isaacson & Company?
23      A    Yes, he was.
24      Q    Now, just tell us generally what happened, and then
25 we'll cover the specifics in the course of the meeting.
26      A    Generally, what happened was, all these people were
```

3/23/2015  Genger -v- Genger Proceeding 032315

```
 1              O. Genger - Plaintiff - Direct/Herschmann
 2    sitting in a room together.  Joel Isaacson and Stan Altmark were
 3    asking certain questions of Sagi.  Sagi was not happy with the
 4    fact that we were asking questions.  He did most of the talking.
 5    Stan or Joel would ask him a question and he would give a
 6    five-minute speech on something and run -- I mean, just run
 7    circles around everyone.  He was not really answering questions.
 8    And we were getting nowhere.  And he became very upset by the
 9    fact that we were asking him questions.
10              (Continued on next page.)
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
```

2833

```
 1              O. Genger - by Plaintiff - Direct/by Mr. Herschmann
 2        Q    And did you attempt to go through the agenda that  is
 3   contained in exhibit 234?
 4        A    Yes, we did.
 5        Q    Now, was the meeting to discuss your getting access to
 6   financial information and to take control of your financial
 7   life?
 8        A    Yes.
 9        Q    Was that expressed to your brother?
10        A    Yes.
11        Q    Did you address in anything -- well, withdrawn.
12             Do you recall specifically what you addressed regarding
13   your 1993 trust?
14             Just a foundational question that I have to ask before
15   I present the exhibit.
16             Do you recall specifically what was addressed?
17        A    Without looking at it?
18        Q    Without looking at it?
19        A    Okay.  I mean, generally, I know.
20        Q    Would the agenda refresh your recollection as to
21   specifically what you were asking about your trust?
22        A    Yes.
23             MR. HERSCHMANN:  I would offer it in as a past
24        recollection refreshed and make the process easier or I can
25        do it this way.
26             THE COURT:  Mr. Dellaportas, what do you say?
```

```
1          O. Genger - by Plaintiff - Direct/by Mr. Herschmann
2               MR. DELLAPORTAS:  This agenda, do you mean?
3               THE COURT:  Yes.
4               MR. DELLAPORTAS:  It is hearsay.
5               MR. HERSCHMANN:  Well, the past recollection
6      recorded, the present recollection refreshed.
7               THE COURT:  I don't know that she recorded it.
8               MR. HERSCHMANN:  She doesn't have to have recorded
9      it.  She has to be able to articulate that this was an
10     accurate document of what was discussed at the meeting.  She
11     doesn't have to be the actual person who sat down and
12     recorded it.
13              THE COURT:  Is that your understanding, Mr.
14     Dellaportas?
15              MR. DELLAPORTAS:  No.
16              THE COURT:  I'm not sure either.
17              MR. HERSCHMANN:  We can pull it up.
18              THE COURT:  Just to refresh my own recollection.
19              Who has The Richardson?
20              MR. HERSCHMANN:  I don't have it.  And I think the
21     rule, and I can articulate it this way, if your secretary
22     sat there and took copious notes of the entire process and
23     said this accurately reflects what happened at the
24     meeting --
25              THE COURT:  We don't know when it was prepared.  I
26     don't know.  Let's just get the rule.
```

```
 1          O. Genger - by Plaintiff - Direct/by Mr. Herschmann
 2              MR. HERSCHMANN:  Okay.
 3          (Short pause)
 4              MR. DELLAPORTAS:  There is a Judge Friedman's
 5      section on it.  It says, under the past recollection
 6      recorded doctrine the memoranda of a fact known for an event
 7      offered in the past for which the witness lacks sufficient
 8      present recollection may be received in evidence to the
 9      witness' oral testimony.
10              THE COURT:  It doesn't say anything about having to
11      be prepared by the witness.
12              MR. DELLAPORTAS:  There is a whole section in here.
13              THE COURT:  I don't know, Mr. Herschmann.
14              MR. HERSCHMANN:  If you want testimony, take a
15      moment, we can look at it.  I have no problem.
16              But, I'm pretty confident the rule is exactly as
17      Mr. Dellaportas just read it.
18              It is not necessary that the witness be the one
19      that actually recorded it as much as they can say that
20      recording is accurate.
21              THE COURT:  I'm pleased that you're confident.  I
22      am not.
23              It didn't say anything about it, but that doesn't
24      mean --
25              MR. DELLAPORTAS:  As I understand it this is the
26      agenda prepared before the meeting and thus isn't --
```

3/23/2015 Genger -v- Genger Proceeding 032315

```
1           O. Genger - by Plaintiff - Direct/by Mr. Herschmann
2               THE COURT:  That is what I mean, also.  It is not
3       contemporaneous.
4               MR. DELLAPORTAS:  It is not notes from the meeting.
5       It is agenda in advance of the meeting.
6               MR. HERSCHMANN:  Your Honor, the rule is as I
7       understand it, and Mr. Dellaportas if he wants to share that
8       with us and we can take a 5 minute recess.
9               THE COURT:  I can go in the back and look at it.
10              MR. HERSCHMANN:  If you would do that, your Honor,
11      that would be great.
12              Thank you, very much.
13              (Short recess; time is now 2:42 PM)
14              (2:45 PM)
15              THE COURT:  I don't think so, Mr. Herschmann.  Not
16      according to Richardson under the old book, which I'm sure
17      hasn't been changed too much, 66213, I don't know what it is
18      in the next edition.  But, while the memorandum, any
19      memorandum made by anybody can be used to refresh, if you
20      want it in evidence when a witness has so far forgotten
21      facts that he cannot recall them even after looking at a
22      memorandum of them and he testified that he once knew them
23      and made a memorandum of them at the time or soon after,
24      which he intended to make correctly and which he believes to
25      be correct, such memorandum in his own handwriting may be
26      received as evidence of the facts contained although the
```

3/23/2015  Genger -v- Genger Proceeding 032315

1      O. Genger - by Plaintiff - Direct/by Mr. Herschmann

2      witness has no present recollection of them.

3           MR. HERSCHMANN:  Your Honor, I think that's why I

4      raised the issue of past recollection refreshed or present

5      recollection recorded.

6           As I said, there are two ways to address.  I can

7      address it with the witness as present recollection

8      refreshed, which is the process that the witness looks at

9      it.

10          THE COURT:  Right.  Then, this doesn't come into

11     evidence.  But, you want it in evidence.

12          MR. HERSCHMANN:  That's correct.

13          The reason I had it the way I did is that there are

14     two ways of dealing with it.

15          There is what I call the simpler process.

16          THE COURT:  It is not coming into evidence.

17          MR. HERSCHMANN:  Okay.

18          THE COURT:  She can use it to refresh her

19     recollection if it indeed refreshes her recollection.

20          As I recall this whole exercise is because you

21     wanted to offer it into evidence.

22          MR. HERSCHMANN:  That's correct.  And the reason

23     doesn't matters.

24          THE COURT:  Okay.

25     Q    So, Ms. Genger, let me, I'm going to walk you through

26     the process.

3/23/2015  Genger -v- Genger Proceeding 032315

```
1              O. Genger - by Plaintiff - Direct/by Mr. Herschmann
2              I'm going to ask you specific questions.  If you recall
3    something specifically you should answer it.  If you don't
4    recall specifically, then I'm going to ask you is there
5    something that would refresh your recollection.  And the process
6    is then you can look at it and then say the document refreshes
7    my recollection and then answer it.  Okay?
8              So, I'm going to go back to the November 8, 2007
9    meeting.
10             And do you recall specifically what was discussed in
11   the first topic dealing with Orly Genger 1993 Trust?
12        A    Specifically, no.
13        Q    Would the agenda refresh your recollection as to what
14   was discussed?
15        A    Yes.
16        Q    Can you take a moment to look at the agenda and tell us
17   after looking at it does it refresh your recollection as to what
18   was the first topic discussed as it related to the Orly Genger
19   1993 Trust?
20        A    Yes.
21        Q    Okay.  What was of the first topic discussed?
22        A    D&K.
23        Q    And what was discussed after D&K was raised?
24        A    Who was the general partner.  Did Sagi have a copy of
25   the partnership agreement, the note.
26             Then, there is  a topic of the note, who owns the note.
```

1              O. Genger - by Plaintiff - Direct/by Mr. Herschmann

2         Q    When you say who is the general partner do you recall

3    the specific discussions as to percentages about your mother and

4    whether she remained the general partner, without looking at

5    document first?

6         A    No.

7         Q    If you look at the document does that  refresh your

8    recollection?

9         A    Yes.

10        Q    And what was the first thing that was discussed after

11   you asked who were the general partners of D&K?

12             MR. DELLAPORTAS:  I object on relevance grounds as

13        to this line of testimony.

14             MR. HERSCHMANN:  I'm doing this as a general

15        proposition as to the subject matters that were discussed.

16             I can offer the agenda in and make it simple and go

17        through it or I can only do it this way, your Honor.  That

18        is why I raised it in the first place.

19             I'm not saying it is proof.  I'll do it any way Mr.

20        Dellaportas prefers.

21             THE COURT:  He doesn't prefer anything.  It is not

22        depending upon what he prefers.  It is what you want to

23        prove.

24             He says it is not relevant.

25             Why is it relevant?

26        Q    Well, did you generally discuss your trust and

2840

3/23/2015  Genger -v- Genger Proceeding 032315

```
1              O. Genger - by Plaintiff - Direct/by Mr. Herschmann
2     associations with the D&K note?
3         A    Yes.
4         Q    Okay.  After discussing your trust and the D&K note did
5     you then have discussions about TPR?
6         A    Yes.
7         Q    Okay.  Do you recall specifically about what was
8     discussed in relationship to TPR and what percentages were not
9     owned by D&K, first, without looking at the document?
10        A    No.
11        Q    Looking at the document, does it refresh your
12    recollection as to what was the first thing you discussed about
13    TPR?
14        A    Yes.
15        Q    And what was that ?
16        A    Who owns and what percentages the 49 percent not owned
17    by D&K.
18        Q    And do you recall whether there was any discussion
19    about Rochell, R-O-C-H-E-L-L, Fang and your mother's interest?
20        A    Yes.
21        Q    After that did you have a discussion about whether or
22    not you can get copies of the minutes of meetings from TPR?
23        A    Yes.
24        Q    Did your brother agree to give you copies of the
25    minutes of meetings with TPR?
26        A    No.
```

3/23/2015  Genger -v- Genger Proceeding 032315

1             O. Genger - by Plaintiff - Direct/by Mr. Herschmann
2         Q    Did you then discuss with your brother what is the
3    distribution he was receiving from TPR?
4             MR. DELLAPORTAS:  Objection.  Relevance.
5             THE COURT:  Overruled.
6         A    Yes.
7         Q    Okay.  And do you recall raising the amount of his
8    getting $45,000 per month?
9         A    Yes.
10        Q    And did your brother ever answer as to why he was
11   getting $45,000 from TPR per month and how it was being
12   categorized?
13            MR. DELLAPORTAS:  Objection, compound.
14            THE COURT:  Let's take it one at a time.
15        Q    Okay.  Did your brother ascribe for you why he was
16   receiving $45,000 per month?
17        A    He may have and I don't remember.
18            His answers were long winded.  So, I just don't
19   remember them.
20        Q    Was there a  discussion about why your mother was
21   receiving $30,000 per month?
22            MR. DELLAPORTAS:  Objection, lack of foundation.
23            THE COURT:  Yes.  Sustained.
24        Q    Well, do you recall a discussion about what
25   distributions your mother was getting from TPR?
26        A    Generally, yes.

2842

3/23/2015  Genger -v- Genger Proceeding 032315

```
1              O. Genger - by Plaintiff - Direct/by Mr. Herschmann
2        Q     Looking at the exhibit, does it refresh your
3    recollection as to what dollar amount your brother was being
4    questioned about regarding how much money your mother was
5    receiving?
6        A     Yes.
7        Q     What number did you question your brother about?
8        A     $30,000 a month.
9        Q     Per month?
10       A     Yes.
11       Q     Do you recall then discussing with your brother how
12   could distributions be evened out between you, your mother and
13   your brother?
14       A     Yes.
15       Q     Did your brother at that time indicate his willingness
16   to even out the distribution between you, and your mother and
17   himself?
18       A     No, he didn't.
19       Q     Did your brother answer any questions about what are
20   the assets of TPR?
21       A     Whatever answers he gave were so complicated and he
22   gave answers that  confused everyone.
23       Q     Well, did the Isaacson representatives say to your
24   brother during the course of the meeting that they were
25   satisfied with his answers?
26       A     No.
```

2843

3/23/2015  Genger -v- Genger Proceeding 032315

```
1           O. Genger - by Plaintiff - Direct/by Mr. Herschmann
2      Q    What did they say generally about the answers your
3   brother was giving?
4           MR. DELLAPORTAS:  Objection.  Hearsay.
5           THE COURT:  Sustained.
6      Q    Did you then cover what receivables were due TPR, just
7   generally?
8      A    I don't remember.
9      Q    Okay.  If you look at exhibit 234, the agenda in front
10  of you, does that refresh your recollection as to what questions
11  were asked about the receivables due TPR?
12     A    Yes.
13     Q    And looking at that , does it refresh your recollection
14  about asking what happened to the $1.9 million that your brother
15  owed TPR?
16          MR. DELLAPORTAS:  Objection.  Lack of foundation
17     and leading.
18          THE COURT:  How about a foundation?
19     Q    Okay.  Well, does exhibit 234 refresh your recollection
20  as to whether the subject matters of how much money your brother
21  owed TPR was discussed on November 8, 2007?
22     A    Yes.
23     Q    Okay.  Looking at exhibit 234 does it refresh your
24  recollection about the specific amount of money that was
25  discussed with your brother regarding how much money he owed
26  TPR?
```

```
1              O. Genger - by Plaintiff - Direct/by Mr. Herschmann
2         A    Yes.
3         Q    What was the amount of money that your brother was
4    asked about that he owed TPR?
5              MR. DELLAPORTAS:  Just objection, your Honor.
6              This doesn't feel like a refreshed recollection.
7    It just fees like reading a document.
8              MR. HERSCHMANN:  It's the only way to do it.
9              If Mr. Dellaportas wants me to go down --
10             THE COURT:  You know, she was there.  So, I do
11   believe there is a --
12             MR. DELLAPORTAS:  Okay.
13        Q    What is the amount?
14        A    $1.9 million.
15        Q    Do you recall then having other discussions about other
16   monies that were owed TPR or owed by other officers to TPR?
17        A    Yes.
18        Q    Do you recall what was next discussed independent of
19   looking at the exhibit?
20        A    No.
21        Q    Looking at the exhibit, does it refresh your
22   recollection as to the next item that you discussed with your
23   brother?
24        A    Yes.
25        Q    Okay.  What was the next item that you discussed with
26   your brother?
```

3/23/2015  Genger -v- Genger Proceeding 032315

```
1              O. Genger - by Plaintiff - Direct/by Mr. Herschmann
2        A    The annual expense of TPR and then after that there was
3    trust administration.
4        Q    I think you have to speak a little louder.
5        A    Sorry.
6             Right after that there was what are the annual expenses
7    of TPR exclusive of above distributions to Sagi and Ariel Orly.
8        Q    Did your brother answer what was the annual expense to
9    TPR when Isaacson & Company posed the question to him?
10       A    Again, his answers were really convoluted and --
11       Q    How about, was there a discussion about the amount of
12   lawsuits that TPR was involved with as either a plaintiff or a
13   defendant?
14       A    Were there discussions?
15       Q    Yes?
16       A    Yes.
17       Q    After that was there a discussion about potentially
18   buying out your interests?
19       A    Yes.
20       Q    And looking at exhibit 234 does it refresh your
21   recollection, specifically, about what you asked of your
22   brother?
23       A    Yes.
24       Q    What was asked?
25       A    Was TPR, meaning Sagi, consider buying out Orly's
26   interest in TPR.   -- Or D&K now giving proper discounts to the
```

2846

3/23/2015  Genger -v- Genger Proceeding 032315

```
1              O. Genger - by Plaintiff - Direct/by Mr. Herschmann
2      D&K note and credit for the losses.
3                  THE COURT:  Well --
4                  MR. HERSCHMANN:  Those were the subject matters
5          that were discussed.
6                  THE COURT:  She is reading from it, though.
7      Q    Now --
8                  THE COURT:  You're kind of abusing it now.  She
9          cannot read from it.
10     Q    All right.
11             So, the document is not in evidence, so you cannot read
12     from it.  You can only look at it to refresh your recollection
13     and then answer the question.  So.
14                 THE COURT:  And if you cannot answer the question,
15         then you cannot answer the question.
16     Q    Now, was there a discussion about capital contributions
17     made to White Box?
18     A    Yes.
19     Q    After that do you recall what was discussed about TPR
20     and its relationship to White Box?
21     A    Yes.
22     Q    And do you recall at some point asking could you have
23     control of the tax filings of White Box?
24     A    Yes.
25     Q    Now, did you then move on to discuss your trustees and
26     administration of your trust?
```

3/23/2015  Genger -v- Genger Proceeding 032315

```
 1            O. Genger - by Plaintiff - Direct/by Mr. Herschmann
 2       A    Yes.
 3       Q    Who were the trustees back in 2007?
 4       A    It was Lea Fang.
 5       Q    Did you discuss wanting someone else to become the
 6   trustee of your trust?
 7       A    Yes.
 8            MR. DELLAPORTAS:  Objection, relevance.
 9            THE COURT:  Sustained.
10       Q    In the course of this meeting was the agenda dealing
11   with your parents' divorce?
12       A    No.
13       Q    If you look at the agenda does it refresh your
14   recollection as to whether or not you had raised TRI or had
15   intended to raise TRI in any way?
16       A    Does it refresh?
17       Q    Yes?
18       A    Yes, it does.
19       Q    And is TRI something that was on your agenda to cover?
20       A    No.
21       Q    Now, did you then cover the Canadian ventures?
22       A    Yes.
23       Q    And do you recall, approximately, when you learned
24   about Riverside related entities?
25       A    It was some time prior in '07, prior to this meeting.
26       Q    And when you say some time prior to '07, was that in
```

3/23/2015  Genger -v- Genger Proceeding 032315

```
1           O. Genger - by Plaintiff - Direct/by Mr. Herschmann
2    relationship with your trying to get a better understanding of
3    finances?
4         A    Yes.
5         Q    And prior to having this meeting in November of 2007
6    had you met personally with Isaacson and Company
7    representatives?
8         A    Before this meeting?
9         Q    Yes?
10        A    Yes.
11        Q    If you go now to the issues, let's focus now on the
12   Canadian ventures.
13             Do you recall specifically what you first or what was
14   first asked of your brother in the November 8, 2007 meeting
15   regarding the Canadian ventures?
16        A    Without -- Without looking at it?  No.
17        Q    Okay.  Looking at exhibit 234 can you tell us if that
18   refreshes your recollection as to what was, what was the first
19   thing that you discussed in relationship to the Canadian
20   ventures?
21        A    Yes.
22        Q    What was the first thing that was discussed?
23             THE COURT:  Without reading from this.
24        Q    Without reading?
25        A    What did I sell to my brother?
26        Q    Was that a question that the representatives of
```

2849

3/23/2015 Genger -v- Genger Proceeding 032315

```
1           O. Genger - by Plaintiff - Direct/by Mr. Herschmann
2    Isaacson & Company asked your brother even in November of 2007?
3              MR. DELLAPORTAS:  Objection, hearsay.
4              THE COURT:  Sustained.
5       Q    How did your brother respond to the question of what
6    you had sold to him?
7       A    To that particular question, I don't remember what his
8    response was.
9       Q    Without looking at the agenda do you recall what was
10   discussed in connection with your brother about it?
11             THE COURT:  About?
12      Q    About the Canadian ventures?
13             THE COURT:  Okay the Canadian ventures.
14      Q    Yes?
15      A    I mean, I have a specific --
16      Q    Tell us what you recall being discussed about the
17   Canadian ventures, of the transfer.  And then we can get into
18   the specifics.  Tell us generally first what you recall?
19      A    About the Canadian ventures what was discussed?
20      Q    Yes?
21      A    Specifically, I specifically asked my brother if we
22   could now transfer back my shares to me like he said he would
23   do.  And I specifically remember my brother looking at me and
24   laughing and said, I don't know why you would want to do that,
25   it is valueless.
26      Q    Did you believe him when he said that?
```

2850

3/23/2015  Genger -v- Genger Proceeding 032315

```
 1          O. Genger - by Plaintiff - Direct/by Mr. Herschmann
 2     A    Did I believe what, that it was valueless?
 3     Q    Yes?
 4     A    What I believed is that, is that my brother tricked me.
 5     Q    And after that conversation did you still try to get
 6   more information about the Canadian ventures from your brother
 7   in that meeting?
 8     A    I don't remember what happened specifically right after
 9   that.  I know there was other, there was more conversation about
10   it.  But, I cannot tell you specifically.
11     Q    Looking at exhibit 234 did you have a discussion to
12   refresh your recollection specifically about the dollar values?
13     A    Yes.
14     Q    Okay.  And does exhibit 234 refresh your recollection?
15     A    Yes.
16     Q    And what do you recall about discussing with your
17   brother in that meeting dealing with the valuations?
18     A    That I had, I had sold my interest to him for 100,000
19   when I bought it for 150.
20     Q    And then do you recall any discussions about the
21   valuations of the businesses currently?
22     A    I am sorry, what was the question?
23     Q    Could we read it back, please?
24          THE COURT:  Yes, please.
25          (Record read)
26     Q    I meant, generally.  I mean the Canadian business?
```

3/23/2015  Genger -v- Genger Proceeding 032315

```
1              O. Genger - by Plaintiff - Direct/by Mr. Herschmann
2        A    Yes.
3        Q    Did your brother in the course of that meeting provide
4   you with any financial information as to where the money had
5   gone from the Canadian ventures?
6        A    No.
7        Q    Let me show you what you has been marked as exhibit
8   266-71, which is admitted into evidence.
9             And do you see on the bottom portion of the exhibit
10  266-71 that there is a reference that the White Paper -- I am
11  sorry, that the White Box papers were supposed to transfer to
12  Jonah from Bill Fischer and then Jonah can be reached at (212)
13  758-0000.
14            Do you see that ?
15       A    Yes.
16       Q    Does that refresh your recollection as to who were the
17  accountants for White Box in 2007?
18       A    Yes.
19       Q    Is that Jonah Gayer and Associates?
20       A    I mean, it was supposed to be, it wasn't.
21       Q    Do you know at some point whether Gayer and Associates
22  became the accountants for White Box?  And I'm focused on the
23  2007 time period.
24       A    I don't know that it ever actually switched to Jonah
25  Gayer.
26       Q    Now, going back to the meeting in November, 2007, do
```

**3/23/2015  Genger -v- Genger Proceeding 032315**

```
1            O. Genger - by Plaintiff - Direct/by Mr. Herschmann
2    you recall that at the conclusion of the agenda there was an
3    over all subject matter that you wanted to address with your
4    brother?
5        A    Yes.
6            (Continued on the next page)
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
```

3/23/2015  Genger -v- Genger Proceeding 032315

```
 1              O. Genger - Plaintiff - Direct/Herschmann
 2      Q    And what was the general tenure for what you were
 3  looking to get from your brother in the November 2007 meeting?
 4      A    Information.  Information about my finances.
 5      Q    And did you get information that was satisfactory to
 6  you from your brother in that meeting?
 7      A    No.
 8      Q    Let me show you what's been previously received in
 9  evidence as Exhibit 230.
10              MR. HERSCHMANN:  Again, I'm providing an extra
11        copy to defense counsel.
12              (Handing to defense counsel.)
13              (Handing to witness.)
14              (Handing to the Court.)
15      Q    Do you recall that after the meeting Isaacson &
16  Associates sent a letter to your brother?
17              THE COURT:  Yeah, this is very leading.
18              MR. HERSCHMANN:  I'm sorry?
19              THE COURT:  Ask a question.
20              MR. HERSCHMANN:  I'm trying to lay a foundation
21        for the exhibit.
22              THE COURT:  It's too leading.
23      Q    First, have you seen Exhibit 230 beforehand?
24      A    Yes.
25      Q    Did you have discussions with Isaacson & Associates
26  before Exhibit 230 was sent to your brother?
```

2854