# Exhibit C

3/23/2015  Genger -v- Genger Proceeding 032315

```
1
2     SUPREME COURT OF THE STATE OF NEW YORK
      COUNTY OF NEW YORK:   CIVIL TERM: PART - 12
3     -----------------------------------------------X
      ORLY GENGER,
4
                              Plaintiff
5                                      INDEX NUMBER:
                                         100697/08
6              -against-
7     SAGI GENGER,
8                             Defendant
      -----------------------------------------------X
9                       80 Centre Street
                        New York, New York 10013
10                      March 23, 2015
11    BEFORE:
               HONORABLE:  Barbara Jaffe, JSC
12
13    APPEARANCES:
14             Zeichner Ellman & Krause, LLP
               Attorneys for Plaintiff
15             1211 Avenue of the Americas
               New York, New York 10036
16             By:  Bryan D. Leinbach, Esq.
                    -and-
17             Kasowitz Benson Torres & Friedman, LLP
               1633 Broadway
18             New York,  New York 10019
               By:  Eric D. Herschmann, Esq.
19                   Michael Paul Bowen, Esq.
20             Morgan, Lewis & Bockius, LLP
               Attorneys for the Defendant
21             101 Park Avenue
               New York, New York 10178-0060
22             By:  John Dellaportas, Esq.
                    Mary Pennisi, Esq.
23
24
25                            Delores Hilliard
                              Vicki K. Glover
                           Official Court Reporters
26
                  - OFFICIAL COURT REPORTER
```

3/23/2015  Genger -v- Genger Proceeding 032315

1            O. Genger - Plaintiff - Direct/Herschmann

2    accounting firm?

3        A    Yes.

4        Q    What was the reason that you obtained a different

5    accounting firm?

6        A    Well, around this time in 2007, I was trying to get

7    information about my finances from my brother.  He did not want

8    to deal with Bill Fischer and told me that, you know, if I

9    wanted to have any conversations with him about it, I'd have

10   to --

11       Q    I think you have to slow down.

12       A    Sorry.

13            If I wanted to have any conversations with him

14   about my finances, I would have to work with an accountant that

15   was a new accountant, someone who was independent.  So I hired a

16   new accountant.

17       Q    Who did you hire?

18       A    Joel Isaacson.

19       Q    Did Joel Isaacson have anything to do with Raines &

20   Fischer?

21       A    No.

22       Q    Did Joel Isaacson & Associates have anything to do with

23   your father?

24       A    No.

25       Q    How did you come to hire Joel Isaacson?

26       A    A friend of mine referred me to them.

2826

```
1                O. Genger - Plaintiff - Direct/Herschmann
2         Q    And a friend that was independent of Raines & Fischer
3    or your parents?
4         A    Yes.
5         Q    And after you hired Joel Isaacson & Company, then what
6    happened regarding your finances?
7         A    They started trying to help me gather information, and
8    I know they contacted Sagi and tried to get information from
9    him.  We tried to set up a meeting, and we finally were able to
10   set up a meeting with Sagi.
11        Q    Do you recall, approximately, when you were able to set
12   up that meeting with your brother?
13        A    I believe it was in November of 2007.
14        Q    Do you recall whether or not your brother had sent
15   information to your new accountants Isaacson & Associates prior
16   to your having a meeting together with your brother?
17        A    No, I know that he didn't.
18        Q    Now, as far as the actual time period of the meeting,
19   do you recall how that actually got set or what transpired?
20        A    How the meeting transpired?
21        Q    Yes.
22        A    Well, as I said, I was trying to get information from
23   my brother.  I hired these new accountants, Joel Isaacson, and I
24   knew that my brother had all this information, and we contacted
25   him several times to try to set it up, and we finally --
26        Q    I think you have to slow down.
```

3/23/2015  Genger -v- Genger Proceeding 032315

```
 1              O. Genger - Plaintiff - Direct/Herschmann
 2       A    We finally were able to set up a meeting.
 3       Q    Let me show you what's been marked as Exhibit 234 for
 4  identification, and it's been previously discussed in this
 5  matter.
 6              (Handing to defense counsel.)
 7              MR. HERSCHMANN:  I'm providing a copy again to
 8  defense counsel.
 9              (Handing to witness.)
10              (Handing to the Court.)
11       Q    I'm going to hand you an exhibit, what's been
12  previously marked as Exhibit 228 for identification, which is
13  Bates stamped JI 429.  I'm providing again a copy to defense
14  counsel.
15              (Handing to defense counsel.)
16              (Handing to witness.)
17       Q    Will you take a look at Exhibit 228 as well?
18              (Handing to the Court.)
19       Q    I'm going to hand you also what's been marked as
20  266-135 as well.  I'm providing a copy to defense counsel.
21              (Handing to defense counsel.)
22              (Handing to witness.)
23       Q    Let me start with Exhibit 266-135.
24              (Handing to the Court.)
25       Q    Do you see that this is an e-mail from Stan Altmark to
26  your brother?
```

3/23/2015  Genger -v- Genger Proceeding 032315

```
 1              O. Genger - Plaintiff - Direct/Herschmann
 2        A    Yes.
 3        Q    And you've seen this e-mail before today, correct?
 4        A    Yes.
 5        Q    Now, looking at the e-mail, does it refresh your
 6   recollection as to whether or not you had requested via Isaacson
 7   & Company certain information in June of 2007 from your brother?
 8        A    Yes, I did.
 9        Q    And is it accurate that after making requests from your
10   brother in June of 2007, you had not received specific
11   information that you wanted prior to meeting with him?
12        A    Yes.
13        Q    Now, looking at Exhibit 228, if you could, for a
14   moment, have you seen Exhibit 228 previously?
15        A    Yes.
16        Q    And do you recognize this as an e-mail from Joel
17   Isaacson to your brother dated November 6th of 2007?
18        A    Yes.
19              MR. HERSCHMANN:  Your Honor, at this time I would
20        offer Exhibit 228 for identification into evidence.
21              MR. DELLAPORTAS:  Objection.  Hearsay.
22              MR. HERSCHMANN:  Your Honor, we're offering it as
23        a communication that was sent as a representative from Orly
24        Genger to her brother.  The actual content is irrelevant,
25        except for the fact that he actually received it.
26              MR. DELLAPORTAS:  It's definitely being offered
```

3/23/2015  Genger -v- Genger Proceeding 032315

```
 1              O. Genger - Plaintiff - Direct/Herschmann
 2        for the truth of the matter, and it's hearsay, and it
 3        hasn't been authenticated.  It's from Joel Isaacson's
 4        files.
 5              THE COURT:  Yeah, sustained.
 6        Q    Well, Ms. Genger, looking at Exhibit 228, do you recall
 7   whether or not your brother was advised that Isaacson & Company
 8   had no affiliation with Raines & Fischer?
 9        A    Yes.
10        Q    And did you believe at the time Isaacson & Company was
11   making requests from your brother for certain documents, that
12   you were actually entitled to those documents?
13        A    Yes.
14        Q    Did you retain Isaacson & Company to help advise you on
15   the state of affair of your assets?
16        A    Yes.
17        Q    Who was the accountant handling the tax returns for
18   White Box in the 2007 time period?  Was it Jonas Gayer, to your
19   knowledge, or was it Raines & Fischer, if you recall?
20        A    Raines & Fischer.
21        Q    Now, can you look at Exhibit 234, please?  Do you have
22   the exhibit in front of you?
23        A    Yes.
24        Q    And you mentioned earlier that there was an agenda that
25   was put together for the November 8th, 2007 meeting.
26              Does this exhibit refresh your recollection as to
```

3/23/2015  Genger -v- Genger Proceeding 032315

1                    O. Genger - Plaintiff - Direct/Herschmann
2       what was covered during the course of the meeting, as far as
3       your side was concerned?
4                    MR. DELLAPORTAS:  Objection.  There's been no
5            testimony that she lacks recollection subject that it needs
6            to be refreshed.
7            Q    Do you recall everything that happened at the November
8       8, 2007 meeting?
9            A    I don't know if I recall everything, but I --
10           Q    Is there a document that would help refresh your
11      recollection as to what was the agenda covered at the November
12      8, 2007 meeting?
13           A    Yes.
14           Q    Is the actual agenda the document that would help you
15      refresh your recollection?
16           A    Yes.
17           Q    So, now looking at Exhibit 234, does that refresh your
18      recollection as to what was expected to be covered by your
19      representatives with your brother on November 8, 2007?
20           A    Yes.
21           Q    So, can you first tell us how long did it take for you,
22      for your representatives, to arrange a meeting with your brother
23      to discuss your finances?  Was it a week?  Was it more than
24      that?  And if the prior documents that I've handed you, Exhibit
25      266-135, refresh your recollection, please let us know.
26                   MR. DELLAPORTAS:  It's kind of leading.

```
 1              O. Genger - Plaintiff - Direct/Herschmann
 2              THE COURT:  You're putting the cart before the
 3      horse.
 4              MR. HERSCHMANN:  Okay.  Well, let me ask it.
 5      Q    Do you recall how long it took you to set up a meeting
 6      with your brother?
 7      A    I know it was months.
 8      Q    Now, can you describe for us the general tenure of the
 9      meeting; where it occurred, if you recall, what happened when
10      you got there?
11      A    The meeting happened at Joel Isaacson's office, and the
12      people who were there who attended the meeting were Joel
13      Isaacson, Stan Altmark, Don Mullen, my mother, myself and my
14      brother.  And the tenure was, I was trying to get information,
15      which is in this agenda.  I had a lot of questions that I wanted
16      answered.
17      Q    I want you to leave the agenda aside.  If you can give
18      us the general -- was it in a conference room?  What happened?
19      A    It was in one of the conference rooms at Isaacson's
20      office.
21      Q    And was Don Mullen the person who referred you to
22      Isaacson & Company?
23      A    Yes, he was.
24      Q    Now, just tell us generally what happened, and then
25      we'll cover the specifics in the course of the meeting.
26      A    Generally, what happened was, all these people were
```

3/23/2015  Genger -v- Genger Proceeding 032315

'

```
 1              O. Genger - Plaintiff - Direct/Herschmann
 2    sitting in a room together.  Joel Isaacson and Stan Altmark were
 3    asking certain questions of Sagi.  Sagi was not happy with the
 4    fact that we were asking questions.  He did most of the talking.
 5    Stan or Joel would ask him a question and he would give a
 6    five-minute speech on something and run -- I mean, just run
 7    circles around everyone.  He was not really answering questions.
 8    And we were getting nowhere.  And he became very upset by the
 9    fact that we were asking him questions.
10              (Continued on next page.)
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
```

3/23/2015  Genger -v- Genger Proceeding 032315

```
 1          O. Genger - by Plaintiff - Direct/by Mr. Herschmann
 2      Q    And did you attempt to go through the agenda that  is
 3   contained in exhibit 234?
 4      A    Yes, we did.
 5      Q    Now, was the meeting to discuss your getting access to
 6   financial information and to take control of your financial
 7   life?
 8      A    Yes.
 9      Q    Was that expressed to your brother?
10      A    Yes.
11      Q    Did you address in anything -- well, withdrawn.
12          Do you recall specifically what you addressed regarding
13   your 1993 trust?
14          Just a foundational question that I have to ask before
15   I present the exhibit.
16          Do you recall specifically what was addressed?
17      A    Without looking at it?
18      Q    Without looking at it?
19      A    Okay.  I mean, generally, I know.
20      Q    Would the agenda refresh your recollection as to
21   specifically what you were asking about your trust?
22      A    Yes.
23          MR. HERSCHMANN:  I would offer it in as a past
24   recollection refreshed and make the process easier or I can
25   do it this way.
26          THE COURT:  Mr. Dellaportas, what do you say?
```

3/23/2015  Genger -v- Genger Proceeding 032315

```
1          O. Genger - by Plaintiff - Direct/by Mr. Herschmann
2              MR. DELLAPORTAS:  This agenda, do you mean?
3              THE COURT:  Yes.
4              MR. DELLAPORTAS:  It is hearsay.
5              MR. HERSCHMANN:  Well, the past recollection
6      recorded, the present recollection refreshed.
7              THE COURT:  I don't know that she recorded it.
8              MR. HERSCHMANN:  She doesn't have to have recorded
9      it.  She has to be able to articulate that this was an
10     accurate document of what was discussed at the meeting.  She
11     doesn't have to be the actual person who sat down and
12     recorded it.
13             THE COURT:  Is that your understanding, Mr.
14     Dellaportas?
15             MR. DELLAPORTAS:  No.
16             THE COURT:  I'm not sure either.
17             MR. HERSCHMANN:  We can pull it up.
18             THE COURT:  Just to refresh my own recollection.
19             Who has The Richardson?
20             MR. HERSCHMANN:  I don't have it.  And I think the
21     rule, and I can articulate it this way, if your secretary
22     sat there and took copious notes of the entire process and
23     said this accurately reflects what happened at the
24     meeting --
25             THE COURT:  We don't know when it was prepared.  I
26     don't know.  Let's just get the rule.
```

3/23/2015  Genger -v- Genger Proceeding 032315

```
 1          O. Genger - by Plaintiff - Direct/by Mr. Herschmann
 2              MR. HERSCHMANN:  Okay.
 3              (Short pause)
 4              MR. DELLAPORTAS:  There is a Judge Friedman's
 5      section on it.  It says, under the past recollection
 6      recorded doctrine the memoranda of a fact known for an event
 7      offered in the past for which the witness lacks sufficient
 8      present recollection may be received in evidence to the
 9      witness' oral testimony.
10              THE COURT:  It doesn't say anything about having to
11      be prepared by the witness.
12              MR. DELLAPORTAS:  There is a whole section in here.
13              THE COURT:  I don't know, Mr. Herschmann.
14              MR. HERSCHMANN:  If you want testimony, take a
15      moment, we can look at it.  I have no problem.
16              But, I'm pretty confident the rule is exactly as
17      Mr. Dellaportas just read it.
18              It is not necessary that the witness be the one
19      that actually recorded it as much as they can say that
20      recording is accurate.
21              THE COURT:  I'm pleased that you're confident.  I
22      am not.
23              It didn't say anything about it, but that doesn't
24      mean --
25              MR. DELLAPORTAS:  As I understand it this is the
26      agenda prepared before the meeting and thus isn't --
```

3/23/2015  Genger -v- Genger Proceeding 032315

```
1        O. Genger - by Plaintiff - Direct/by Mr. Herschmann
2             THE COURT:  That is what I mean, also.  It is not
3    contemporaneous.
4             MR. DELLAPORTAS:  It is not notes from the meeting.
5    It is agenda in advance of the meeting.
6             MR. HERSCHMANN:  Your Honor, the rule is as I
7    understand it, and Mr. Dellaportas if he wants to share that
8    with us and we can take a 5 minute recess.
9             THE COURT:  I can go in the back and look at it.
10            MR. HERSCHMANN:  If you would do that, your Honor,
11   that would be great.
12            Thank you, very much.
13            (Short recess; time is now 2:42 PM)
14            (2:45 PM)
15            THE COURT:  I don't think so, Mr. Herschmann.  Not
16   according to Richardson under the old book, which I'm sure
17   hasn't been changed too much, 66213, I don't know what it is
18   in the next edition.  But, while the memorandum, any
19   memorandum made by anybody can be used to refresh, if you
20   want it in evidence when a witness has so far forgotten
21   facts that he cannot recall them even after looking at a
22   memorandum of them and he testified that he once knew them
23   and made a memorandum of them at the time or soon after,
24   which he intended to make correctly and which he believes to
25   be correct, such memorandum in his own handwriting may be
26   received as evidence of the facts contained although the
```

```
1            O. Genger - by Plaintiff - Direct/by Mr. Herschmann
2       witness has no present recollection of them.
3               MR. HERSCHMANN:  Your Honor, I think that's why I
4       raised the issue of past recollection refreshed or present
5       recollection recorded.
6               As I said, there are two ways to address.  I can
7       address it with the witness as present recollection
8       refreshed, which is the process that the witness looks at
9       it.
10              THE COURT:  Right.  Then, this doesn't come into
11      evidence.  But, you want it in evidence.
12              MR. HERSCHMANN:  That's correct.
13              The reason I had it the way I did is that there are
14      two ways of dealing with it.
15              There is what I call the simpler process.
16              THE COURT:  It is not coming into evidence.
17              MR. HERSCHMANN:  Okay.
18              THE COURT: She can use it to refresh her
19      recollection if it indeed refreshes her recollection.
20              As I recall this whole exercise is because you
21      wanted to offer it into evidence.
22              MR. HERSCHMANN:  That's correct.  And the reason
23      doesn't matters.
24              THE COURT:  Okay.
25          Q   So, Ms. Genger, let me, I'm going to walk you through
26      the process.
```

3/23/2015  Genger -v- Genger Proceeding 032315

1          O. Genger - by Plaintiff - Direct/by Mr. Herschmann

2              I'm going to ask you specific questions.  If you recall

3     something specifically you should answer it.  If you don't

4     recall specifically, then I'm going to ask you is there

5     something that would refresh your recollection.  And the process

6     is then you can look at it and then say the document refreshes

7     my recollection and then answer it.  Okay?

8              So, I'm going to go back to the November 8, 2007

9     meeting.

10             And do you recall specifically what was discussed in

11    the first topic dealing with Orly Genger 1993 Trust?

12       A    Specifically, no.

13       Q    Would the agenda refresh your recollection as to what

14    was discussed?

15       A    Yes.

16       Q    Can you take a moment to look at the agenda and tell us

17    after looking at it does it refresh your recollection as to what

18    was the first topic discussed as it related to the Orly Genger

19    1993 Trust?

20       A    Yes.

21       Q    Okay.  What was of the first topic discussed?

22       A    D&K.

23       Q    And what was discussed after D&K was raised?

24       A    Who was the general partner.  Did Sagi have a copy of

25    the partnership agreement, the note.

26             Then, there is  a topic of the note, who owns the note.

3/23/2015  Genger -v- Genger Proceeding 032315

```
1          O. Genger - by Plaintiff - Direct/by Mr. Herschmann
2      Q    When you say who is the general partner do you recall
3   the specific discussions as to percentages about your mother and
4   whether she remained the general partner, without looking at
5   document first?
6      A    No.
7      Q    If you look at the document does that  refresh your
8   recollection?
9      A    Yes.
10      Q    And what was the first thing that was discussed after
11   you asked who were the general partners of D&K?
12          MR. DELLAPORTAS:  I object on relevance grounds as
13      to this line of testimony.
14          MR. HERSCHMANN:  I'm doing this as a general
15      proposition as to the subject matters that were discussed.
16          I can offer the agenda in and make it simple and go
17      through it or I can only do it this way, your Honor.  That
18      is why I raised it in the first place.
19          I'm not saying it is proof.  I'll do it any way Mr.
20      Dellaportas prefers.
21          THE COURT:  He doesn't prefer anything.  It is not
22      depending upon what he prefers.  It is what you want to
23      prove.
24          He says it is not relevant.
25          Why is it relevant?
26      Q    Well, did you generally discuss your trust and
```

3/23/2015  Genger -v- Genger Proceeding 032315

```
1            O. Genger - by Plaintiff - Direct/by Mr. Herschmann
2      associations with the D&K note?
3           A    Yes.
4           Q    Okay.  After discussing your trust and the D&K note did
5      you then have discussions about TPR?
6           A    Yes.
7           Q    Okay.  Do you recall specifically about what was
8      discussed in relationship to TPR and what percentages were not
9      owned by D&K, first, without looking at the document?
10          A    No.
11          Q    Looking at the document, does it refresh your
12     recollection as to what was the first thing you discussed about
13     TPR?
14          A    Yes.
15          Q    And what was that ?
16          A    Who owns and what percentages the 49 percent not owned
17     by D&K.
18          Q    And do you recall whether there was any discussion
19     about Rochell, R-O-C-H-E-L-L, Fang and your mother's interest?
20          A    Yes.
21          Q    After that did you have a discussion about whether or
22     not you can get copies of the minutes of meetings from TPR?
23          A    Yes.
24          Q    Did your brother agree to give you copies of the
25     minutes of meetings with TPR?
26          A    No.
```

3/23/2015  Genger -v- Genger Proceeding 032315

```
1          O. Genger - by Plaintiff - Direct/by Mr. Herschmann
2      Q    Did you then discuss with your brother what is the
3  distribution he was receiving from TPR?
4          MR. DELLAPORTAS:  Objection.  Relevance.
5          THE COURT:  Overruled.
6      A    Yes.
7      Q    Okay.  And do you recall raising the amount of his
8  getting $45,000 per month?
9      A    Yes.
10     Q    And did your brother ever answer as to why he was
11 getting $45,000 from TPR per month and how it was being
12 categorized?
13         MR. DELLAPORTAS:  Objection, compound.
14         THE COURT:  Let's take it one at a time.
15     Q    Okay.  Did your brother ascribe for you why he was
16 receiving $45,000 per month?
17     A    He may have and I don't remember.
18         His answers were long winded.  So, I just don't
19 remember them.
20     Q    Was there a  discussion about why your mother was
21 receiving $30,000 per month?
22         MR. DELLAPORTAS:  Objection, lack of foundation.
23         THE COURT:  Yes.  Sustained.
24     Q    Well, do you recall a discussion about what
25 distributions your mother was getting from TPR?
26     A    Generally, yes.
```

```
 1           O. Genger - by Plaintiff - Direct/by Mr. Herschmann
 2      Q    Looking at the exhibit, does it refresh your
 3   recollection as to what dollar amount your brother was being
 4   questioned about regarding how much money your mother was
 5   receiving?
 6      A    Yes.
 7      Q    What number did you question your brother about?
 8      A    $30,000 a month.
 9      Q    Per month?
10      A    Yes.
11      Q    Do you recall then discussing with your brother how
12   could distributions be evened out between you, your mother and
13   your brother?
14      A    Yes.
15      Q    Did your brother at that time indicate his willingness
16   to even out the distribution between you, and your mother and
17   himself?
18      A    No, he didn't.
19      Q    Did your brother answer any questions about what are
20   the assets of TPR?
21      A    Whatever answers he gave were so complicated and he
22   gave answers that  confused everyone.
23      Q    Well, did the Isaacson representatives say to your
24   brother during the course of the meeting that they were
25   satisfied with his answers?
26      A    No.
```

3/23/2015  Genger -v- Genger Proceeding 032315

```
1              O. Genger - by Plaintiff - Direct/by Mr. Herschmann
2       Q    What did they say generally about the answers your
3    brother was giving?
4              MR. DELLAPORTAS:  Objection.  Hearsay.
5              THE COURT:  Sustained.
6       Q    Did you then cover what receivables were due TPR, just
7    generally?
8       A    I don't remember.
9       Q    Okay.  If you look at exhibit 234, the agenda in front
10   of you, does that refresh your recollection as to what questions
11   were asked about the receivables due TPR?
12      A    Yes.
13      Q    And looking at that , does it refresh your recollection
14   about asking what happened to the $1.9 million that your brother
15   owed TPR?
16             MR. DELLAPORTAS:  Objection.  Lack of foundation
17      and leading.
18             THE COURT:  How about a foundation?
19      Q    Okay.  Well, does exhibit 234 refresh your recollection
20   as to whether the subject matters of how much money your brother
21   owed TPR was discussed on November 8, 2007?
22      A    Yes.
23      Q    Okay.  Looking at exhibit 234 does it refresh your
24   recollection about the specific amount of money that was
25   discussed with your brother regarding how much money he owed
26   TPR?
```

3/23/2015  Genger -v- Genger Proceeding 032315

```
 1            O. Genger - by Plaintiff - Direct/by Mr. Herschmann
 2      A    Yes.
 3      Q    What was the amount of money that your brother was
 4   asked about that he owed TPR?
 5                 MR. DELLAPORTAS:  Just objection, your Honor.
 6                 This doesn't feel like a refreshed recollection.
 7      It just fees like reading a document.
 8                 MR. HERSCHMANN:  It's the only way to do it.
 9                 If Mr. Dellaportas wants me to go down --
10                 THE COURT:  You know, she was there.  So, I do
11   believe there is a --
12                 MR. DELLAPORTAS:  Okay.
13      Q    What is the amount?
14      A    $1.9 million.
15      Q    Do you recall then having other discussions about other
16   monies that were owed TPR or owed by other officers to TPR?
17      A    Yes.
18      Q    Do you recall what was next discussed independent of
19   looking at the exhibit?
20      A    No.
21      Q    Looking at the exhibit, does it refresh your
22   recollection as to the next item that you discussed with your
23   brother?
24      A    Yes.
25      Q    Okay.  What was the next item that you discussed with
26   your brother?
```

3/23/2015  Genger -v- Genger Proceeding 032315

```
 1            O. Genger - by Plaintiff - Direct/by Mr. Herschmann
 2       A    The annual expense of TPR and then after that there was
 3    trust administration.
 4       Q    I think you have to speak a little louder.
 5       A    Sorry.
 6            Right after that there was what are the annual expenses
 7    of TPR exclusive of above distributions to Sagi and Ariel Orly.
 8       Q    Did your brother answer what was the annual expense to
 9    TPR when Isaacson & Company posed the question to him?
10       A    Again, his answers were really convoluted and --
11       Q    How about, was there a discussion about the amount of
12    lawsuits that TPR was involved with as either a plaintiff or a
13    defendant?
14       A    Were there discussions?
15       Q    Yes?
16       A    Yes.
17       Q    After that was there a discussion about potentially
18    buying out your interests?
19       A    Yes.
20       Q    And looking at exhibit 234 does it refresh your
21    recollection, specifically, about what you asked of your
22    brother?
23       A    Yes.
24       Q    What was asked?
25       A    Was TPR, meaning Sagi, consider buying out Orly's
26    interest in TPR.  -- Or D&K now giving proper discounts to the
```

3/23/2015  Genger -v- Genger Proceeding 032315

```
 1            O. Genger - by Plaintiff - Direct/by Mr. Herschmann
 2       D&K note and credit for the losses.
 3                  THE COURT:  Well --
 4                  MR. HERSCHMANN:  Those were the subject matters
 5       that were discussed.
 6                  THE COURT:  She is reading from it, though.
 7       Q    Now --
 8                  THE COURT:  You're kind of abusing it now.  She
 9       cannot read from it.
10       Q    All right.
11            So, the document is not in evidence, so you cannot read
12       from it.  You can only look at it to refresh your recollection
13       and then answer the question.  So.
14                  THE COURT:  And if you cannot answer the question,
15       then you cannot answer the question.
16       Q    Now, was there a discussion about capital contributions
17       made to White Box?
18       A    Yes.
19       Q    After that do you recall what was discussed about TPR
20       and its relationship to White Box?
21       A    Yes.
22       Q    And do you recall at some point asking could you have
23       control of the tax filings of White Box?
24       A    Yes.
25       Q    Now, did you then move on to discuss your trustees and
26       administration of your trust?
```

3/23/2015  Genger -v- Genger Proceeding 032315

```
 1              O. Genger - by Plaintiff - Direct/by Mr. Herschmann
 2      A    Yes.
 3      Q    Who were the trustees back in 2007?
 4      A    It was Lea Fang.
 5      Q    Did you discuss wanting someone else to become the
 6   trustee of your trust?
 7      A    Yes.
 8              MR. DELLAPORTAS:  Objection, relevance.
 9              THE COURT:  Sustained.
10      Q    In the course of this meeting was the agenda dealing
11   with your parents' divorce?
12      A    No.
13      Q    If you look at the agenda does it refresh your
14   recollection as to whether or not you had raised TRI or had
15   intended to raise TRI in any way?
16      A    Does it refresh?
17      Q    Yes?
18      A    Yes, it does.
19      Q    And is TRI something that was on your agenda to cover?
20      A    No.
21      Q    Now, did you then cover the Canadian ventures?
22      A    Yes.
23      Q    And do you recall, approximately, when you learned
24   about Riverside related entities?
25      A    It was some time prior in '07, prior to this meeting.
26      Q    And when you say some time prior to '07, was that in
```

3/23/2015  Genger -v- Genger Proceeding 032315

```
1          O. Genger - by Plaintiff - Direct/by Mr. Herschmann
2    relationship with your trying to get a better understanding of
3    finances?
4          A    Yes.
5          Q    And prior to having this meeting in November of 2007
6    had you met personally with Isaacson and Company
7    representatives?
8          A    Before this meeting?
9          Q    Yes?
10         A    Yes.
11         Q    If you go now to the issues, let's focus now on the
12   Canadian ventures.
13              Do you recall specifically what you first or what was
14   first asked of your brother in the November 8, 2007 meeting
15   regarding the Canadian ventures?
16         A    Without -- Without looking at it?  No.
17         Q    Okay.  Looking at exhibit 234 can you tell us if that
18   refreshes your recollection as to what was, what was the first
19   thing that you discussed in relationship to the Canadian
20   ventures?
21         A    Yes.
22         Q    What was the first thing that was discussed?
23              THE COURT:  Without reading from this.
24         Q    Without reading?
25         A    What did I sell to my brother?
26         Q    Was that a question that the representatives of
```

3/23/2015  Genger -v- Genger Proceeding 032315

```
 1          O. Genger - by Plaintiff - Direct/by Mr. Herschmann
 2     Isaacson & Company asked your brother even in November of 2007?
 3               MR. DELLAPORTAS:  Objection, hearsay.
 4               THE COURT:  Sustained.
 5      Q    How did your brother respond to the question of what
 6     you had sold to him?
 7      A    To that particular question, I don't remember what his
 8     response was.
 9      Q    Without looking at the agenda do you recall what was
10     discussed in connection with your brother about it?
11               THE COURT:  About?
12      Q    About the Canadian ventures?
13               THE COURT:  Okay the Canadian ventures.
14      Q    Yes?
15      A    I mean, I have a specific --
16      Q    Tell us what you recall being discussed about the
17     Canadian ventures, of the transfer.  And then we can get into
18     the specifics.  Tell us generally first what you recall?
19      A    About the Canadian ventures what was discussed?
20      Q    Yes?
21      A    Specifically, I specifically asked my brother if we
22     could now transfer back my shares to me like he said he would
23     do.  And I specifically remember my brother looking at me and
24     laughing and said, I don't know why you would want to do that,
25     it is valueless.
26      Q    Did you believe him when he said that?
```

```
 1            O. Genger - by Plaintiff - Direct/by Mr. Herschmann
 2       A    Did I believe what, that it was valueless?
 3       Q    Yes?
 4       A    What I believed is that, is that my brother tricked me.
 5       Q    And after that conversation did you still try to get
 6  more information about the Canadian ventures from your brother
 7  in that meeting?
 8       A    I don't remember what happened specifically right after
 9  that.  I know there was other, there was more conversation about
10  it.  But, I cannot tell you specifically.
11       Q    Looking at exhibit 234 did you have a discussion to
12  refresh your recollection specifically about the dollar values?
13       A    Yes.
14       Q    Okay.  And does exhibit 234 refresh your recollection?
15       A    Yes.
16       Q    And what do you recall about discussing with your
17  brother in that meeting dealing with the valuations?
18       A    That I had, I had sold my interest to him for 100,000
19  when I bought it for 150.
20       Q    And then do you recall any discussions about the
21  valuations of the businesses currently?
22       A    I am sorry, what was the question?
23       Q    Could we read it back, please?
24            THE COURT:  Yes, please.
25            (Record read)
26       Q    I meant, generally.  I mean the Canadian business?
```

3/23/2015  Genger -v- Genger Proceeding 032315

```
1              O. Genger - by Plaintiff - Direct/by Mr. Herschmann
2         A    Yes.
3         Q    Did your brother in the course of that meeting provide
4    you with any financial information as to where the money had
5    gone from the Canadian ventures?
6         A    No.
7         Q    Let me show you what you has been marked as exhibit
8    266-71, which is admitted into evidence.
9              And do you see on the bottom portion of the exhibit
10   266-71 that there is a reference that the White Paper -- I am
11   sorry, that the White Box papers were supposed to transfer to
12   Jonah from Bill Fischer and then Jonah can be reached at (212)
13   758-0000.
14             Do you see that ?
15        A    Yes.
16        Q    Does that refresh your recollection as to who were the
17   accountants for White Box in 2007?
18        A    Yes.
19        Q    Is that Jonah Gayer and Associates?
20        A    I mean, it was supposed to be, it wasn't.
21        Q    Do you know at some point whether Gayer and Associates
22   became the accountants for White Box?  And I'm focused on the
23   2007 time period.
24        A    I don't know that it ever actually switched to Jonah
25   Gayer.
26        Q    Now, going back to the meeting in November, 2007, do
```

**3/23/2015  Genger -v- Genger Proceeding 032315**

1          O. Genger - by Plaintiff - Direct/by Mr. Herschmann

2     you recall that at the conclusion of the agenda there was an

3     over all subject matter that you wanted to address with your

4     brother?

5          A     Yes.

6               (Continued on the next page)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

3/23/2015  Genger -v- Genger Proceeding 032315

1                    O. Genger - Plaintiff - Direct/Herschmann

2          Q    And what was the general tenure for what you were

3    looking to get from your brother in the November 2007 meeting?

4          A    Information.  Information about my finances.

5          Q    And did you get information that was satisfactory to

6    you from your brother in that meeting?

7          A    No.

8          Q    Let me show you what's been previously received in

9    evidence as Exhibit 230.

10                   MR. HERSCHMANN:  Again, I'm providing an extra

11        copy to defense counsel.

12                   (Handing to defense counsel.)

13                   (Handing to witness.)

14                   (Handing to the Court.)

15         Q    Do you recall that after the meeting Isaacson &

16   Associates sent a letter to your brother?

17                   THE COURT:  Yeah, this is very leading.

18                   MR. HERSCHMANN:  I'm sorry?

19                   THE COURT:  Ask a question.

20                   MR. HERSCHMANN:  I'm trying to lay a foundation

21        for the exhibit.

22                   THE COURT:  It's too leading.

23         Q    First, have you seen Exhibit 230 beforehand?

24         A    Yes.

25         Q    Did you have discussions with Isaacson & Associates

26   before Exhibit 230 was sent to your brother?

# Exhibit C

3/23/2015  Genger -v- Genger Proceeding 032315

```
 1
 2      SUPREME COURT OF THE STATE OF NEW YORK
        COUNTY OF NEW YORK:    CIVIL TERM: PART - 12
 3      ----------------------------------------------X
        ORLY GENGER,
 4
                              Plaintiff
 5                                    INDEX NUMBER:
                                         100697/08
 6              -against-
 7      SAGI GENGER,
 8                            Defendant
        ----------------------------------------------X
 9                        80 Centre Street
                          New York, New York 10013
10                        March 23, 2015
11      BEFORE:
                  HONORABLE:  Barbara Jaffe, JSC
12
13      APPEARANCES:
14              Zeichner Ellman & Krause, LLP
                Attorneys for Plaintiff
15              1211 Avenue of the Americas
                New York, New York 10036
16              By:  Bryan D. Leinbach, Esq.
                     -and-
17              Kasowitz Benson Torres & Friedman, LLP
                1633 Broadway
18              New York,  New York 10019
                By:  Eric D. Herschmann, Esq.
19                   Michael Paul Bowen, Esq.
20              Morgan, Lewis & Bockius, LLP
                Attorneys for the Defendant
21              101 Park Avenue
                New York, New York 10178-0060
22              By:  John Dellaportas, Esq.
                     Mary Pennisi, Esq.
23
24
25                            Delores Hilliard
                              Vicki K. Glover
26                          Official Court Reporters
                    - OFFICIAL COURT REPORTER
```

3/23/2015  Genger -v- Genger Proceeding 032315

```
 1                O. Genger - Plaintiff - Direct/Herschmann
 2    accounting firm?
 3         A    Yes.
 4         Q    What was the reason that you obtained a different
 5    accounting firm?
 6         A    Well, around this time in 2007, I was trying to get
 7    information about my finances from my brother.  He did not want
 8    to deal with Bill Fischer and told me that, you know, if I
 9    wanted to have any conversations with him about it, I'd have
10    to --
11         Q    I think you have to slow down.
12         A    Sorry.
13              If I wanted to have any conversations with him
14    about my finances, I would have to work with an accountant that
15    was a new accountant, someone who was independent.  So I hired a
16    new accountant.
17         Q    Who did you hire?
18         A    Joel Isaacson.
19         Q    Did Joel Isaacson have anything to do with Raines &
20    Fischer?
21         A    No.
22         Q    Did Joel Isaacson & Associates have anything to do with
23    your father?
24         A    No.
25         Q    How did you come to hire Joel Isaacson?
26         A    A friend of mine referred me to them.
```

3/23/2015  Genger -v- Genger Proceeding 032315

```
1                    O. Genger - Plaintiff - Direct/Herschmann

2        Q    And a friend that was independent of Raines & Fischer

3    or your parents?

4        A    Yes.

5        Q    And after you hired Joel Isaacson & Company, then what

6    happened regarding your finances?

7        A    They started trying to help me gather information, and

8    I know they contacted Sagi and tried to get information from

9    him.  We tried to set up a meeting, and we finally were able to

10   set up a meeting with Sagi.

11       Q    Do you recall, approximately, when you were able to set

12   up that meeting with your brother?

13       A    I believe it was in November of 2007.

14       Q    Do you recall whether or not your brother had sent

15   information to your new accountants Isaacson & Associates prior

16   to your having a meeting together with your brother?

17       A    No, I know that he didn't.

18       Q    Now, as far as the actual time period of the meeting,

19   do you recall how that actually got set or what transpired?

20       A    How the meeting transpired?

21       Q    Yes.

22       A    Well, as I said, I was trying to get information from

23   my brother.  I hired these new accountants, Joel Isaacson, and I

24   knew that my brother had all this information, and we contacted

25   him several times to try to set it up, and we finally --

26       Q    I think you have to slow down.
```

3/23/2015  Genger -v- Genger Proceeding 032315

```
 1                O. Genger - Plaintiff - Direct/Herschmann

 2        A    We finally were able to set up a meeting.

 3        Q    Let me show you what's been marked as Exhibit 234 for

 4    identification, and it's been previously discussed in this

 5    matter.

 6                (Handing to defense counsel.)

 7                MR. HERSCHMANN:  I'm providing a copy again to

 8    defense counsel.

 9                (Handing to witness.)

10                (Handing to the Court.)

11        Q    I'm going to hand you an exhibit, what's been

12    previously marked as Exhibit 228 for identification, which is

13    Bates stamped JI 429.  I'm providing again a copy to defense

14    counsel.

15                (Handing to defense counsel.)

16                (Handing to witness.)

17        Q    Will you take a look at Exhibit 228 as well?

18                (Handing to the Court.)

19        Q    I'm going to hand you also what's been marked as

20    266-135 as well.  I'm providing a copy to defense counsel.

21                (Handing to defense counsel.)

22                (Handing to witness.)

23        Q    Let me start with Exhibit 266-135.

24                (Handing to the Court.)

25        Q    Do you see that this is an e-mail from Stan Altmark to

26    your brother?
```

3/23/2015  Genger -v- Genger Proceeding 032315

```
1                 O. Genger - Plaintiff - Direct/Herschmann

2       A    Yes.

3       Q    And you've seen this e-mail before today, correct?

4       A    Yes.

5       Q    Now, looking at the e-mail, does it refresh your

6  recollection as to whether or not you had requested via Isaacson

7  & Company certain information in June of 2007 from your brother?

8       A    Yes, I did.

9       Q    And is it accurate that after making requests from your

10 brother in June of 2007, you had not received specific

11 information that you wanted prior to meeting with him?

12      A    Yes.

13      Q    Now, looking at Exhibit 228, if you could, for a

14 moment, have you seen Exhibit 228 previously?

15      A    Yes.

16      Q    And do you recognize this as an e-mail from Joel

17 Isaacson to your brother dated November 6th of 2007?

18      A    Yes.

19           MR. HERSCHMANN:  Your Honor, at this time I would

20      offer Exhibit 228 for identification into evidence.

21           MR. DELLAPORTAS:  Objection.  Hearsay.

22           MR. HERSCHMANN:  Your Honor, we're offering it as

23      a communication that was sent as a representative from Orly

24      Genger to her brother.  The actual content is irrelevant,

25      except for the fact that he actually received it.

26           MR. DELLAPORTAS:  It's definitely being offered
```

3/23/2015  Genger -v- Genger Proceeding 032315

```
 1                 O. Genger - Plaintiff - Direct/Herschmann
 2          for the truth of the matter, and it's hearsay, and it
 3          hasn't been authenticated.  It's from Joel Isaacson's
 4          files.
 5                 THE COURT:  Yeah, sustained.
 6          Q    Well, Ms. Genger, looking at Exhibit 228, do you recall
 7     whether or not your brother was advised that Isaacson & Company
 8     had no affiliation with Raines & Fischer?
 9          A    Yes.
10          Q    And did you believe at the time Isaacson & Company was
11     making requests from your brother for certain documents, that
12     you were actually entitled to those documents?
13          A    Yes.
14          Q    Did you retain Isaacson & Company to help advise you on
15     the state of affair of your assets?
16          A    Yes.
17          Q    Who was the accountant handling the tax returns for
18     White Box in the 2007 time period?  Was it Jonas Gayer, to your
19     knowledge, or was it Raines & Fischer, if you recall?
20          A    Raines & Fischer.
21          Q    Now, can you look at Exhibit 234, please?  Do you have
22     the exhibit in front of you?
23          A    Yes.
24          Q    And you mentioned earlier that there was an agenda that
25     was put together for the November 8th, 2007 meeting.
26                 Does this exhibit refresh your recollection as to
```

3/23/2015  Genger -v- Genger Proceeding 032315

```
1                    O. Genger - Plaintiff - Direct/Herschmann
2        what was covered during the course of the meeting, as far as
3        your side was concerned?
4                    MR. DELLAPORTAS:  Objection.  There's been no
5             testimony that she lacks recollection subject that it needs
6             to be refreshed.
7             Q    Do you recall everything that happened at the November
8        8, 2007 meeting?
9             A    I don't know if I recall everything, but I --
10            Q    Is there a document that would help refresh your
11       recollection as to what was the agenda covered at the November
12       8, 2007 meeting?
13            A    Yes.
14            Q    Is the actual agenda the document that would help you
15       refresh your recollection?
16            A    Yes.
17            Q    So, now looking at Exhibit 234, does that refresh your
18       recollection as to what was expected to be covered by your
19       representatives with your brother on November 8, 2007?
20            A    Yes.
21            Q    So, can you first tell us how long did it take for you,
22       for your representatives, to arrange a meeting with your brother
23       to discuss your finances?  Was it a week?  Was it more than
24       that?  And if the prior documents that I've handed you, Exhibit
25       266-135, refresh your recollection, please let us know.
26                   MR. DELLAPORTAS:  It's kind of leading.
```

2831

3/23/2015  Genger -v- Genger Proceeding 032315

```
 1              O. Genger - Plaintiff - Direct/Herschmann
 2              THE COURT:  You're putting the cart before the
 3      horse.
 4              MR. HERSCHMANN:  Okay.  Well, let me ask it.
 5       Q    Do you recall how long it took you to set up a meeting
 6      with your brother?
 7       A    I know it was months.
 8       Q    Now, can you describe for us the general tenure of the
 9      meeting; where it occurred, if you recall, what happened when
10      you got there?
11       A    The meeting happened at Joel Isaacson's office, and the
12      people who were there who attended the meeting were Joel
13      Isaacson, Stan Altmark, Don Mullen, my mother, myself and my
14      brother.  And the tenure was, I was trying to get information,
15      which is in this agenda.  I had a lot of questions that I wanted
16      answered.
17       Q    I want you to leave the agenda aside.  If you can give
18      us the general -- was it in a conference room?  What happened?
19       A    It was in one of the conference rooms at Isaacson's
20      office.
21       Q    And was Don Mullen the person who referred you to
22      Isaacson & Company?
23       A    Yes, he was.
24       Q    Now, just tell us generally what happened, and then
25      we'll cover the specifics in the course of the meeting.
26       A    Generally, what happened was, all these people were
```

3/23/2015  Genger -v- Genger Proceeding 032315

```
 1                O. Genger - Plaintiff - Direct/Herschmann
 2     sitting in a room together.  Joel Isaacson and Stan Altmark were
 3     asking certain questions of Sagi.  Sagi was not happy with the
 4     fact that we were asking questions.  He did most of the talking.
 5     Stan or Joel would ask him a question and he would give a
 6     five-minute speech on something and run -- I mean, just run
 7     circles around everyone.  He was not really answering questions.
 8     And we were getting nowhere.  And he became very upset by the
 9     fact that we were asking him questions.
10                (Continued on next page.)
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
```

3/23/2015  Genger -v- Genger Proceeding 032315

```
 1          O. Genger - by Plaintiff - Direct/by Mr. Herschmann
 2     Q    And did you attempt to go through the agenda that  is
 3   contained in exhibit 234?
 4     A    Yes, we did.
 5     Q    Now, was the meeting to discuss your getting access to
 6   financial information and to take control of your financial
 7   life?
 8     A    Yes.
 9     Q    Was that expressed to your brother?
10     A    Yes.
11     Q    Did you address in anything -- well, withdrawn.
12          Do you recall specifically what you addressed regarding
13   your 1993 trust?
14          Just a foundational question that I have to ask before
15   I present the exhibit.
16          Do you recall specifically what was addressed?
17     A    Without looking at it?
18     Q    Without looking at it?
19     A    Okay.  I mean, generally, I know.
20     Q    Would the agenda refresh your recollection as to
21   specifically what you were asking about your trust?
22     A    Yes.
23          MR. HERSCHMANN:  I would offer it in as a past
24   recollection refreshed and make the process easier or I can
25   do it this way.
26          THE COURT:  Mr. Dellaportas, what do you say?
```

```
 1          O. Genger - by Plaintiff - Direct/by Mr. Herschmann
 2               MR. DELLAPORTAS:  This agenda, do you mean?
 3               THE COURT:  Yes.
 4               MR. DELLAPORTAS:  It is hearsay.
 5               MR. HERSCHMANN:  Well, the past recollection
 6     recorded, the present recollection refreshed.
 7               THE COURT:  I don't know that she recorded it.
 8               MR. HERSCHMANN:  She doesn't have to have recorded
 9     it.  She has to be able to articulate that this was an
10     accurate document of what was discussed at the meeting.  She
11     doesn't have to be the actual person who sat down and
12     recorded it.
13               THE COURT:  Is that your understanding, Mr.
14     Dellaportas?
15               MR. DELLAPORTAS:  No.
16               THE COURT:  I'm not sure either.
17               MR. HERSCHMANN:  We can pull it up.
18               THE COURT:  Just to refresh my own recollection.
19               Who has The Richardson?
20               MR. HERSCHMANN:  I don't have it.  And I think the
21     rule, and I can articulate it this way, if your secretary
22     sat there and took copious notes of the entire process and
23     said this accurately reflects what happened at the
24     meeting --
25               THE COURT:  We don't know when it was prepared.  I
26     don't know.  Let's just get the rule.
```

```
 1          O. Genger - by Plaintiff - Direct/by Mr. Herschmann
 2              MR. HERSCHMANN:  Okay.
 3              (Short pause)
 4              MR. DELLAPORTAS:  There is a Judge Friedman's
 5     section on it.  It says, under the past recollection
 6     recorded doctrine the memoranda of a fact known for an event
 7     offered in the past for which the witness lacks sufficient
 8     present recollection may be received in evidence to the
 9     witness' oral testimony.
10              THE COURT:  It doesn't say anything about having to
11     be prepared by the witness.
12              MR. DELLAPORTAS:  There is a whole section in here.
13              THE COURT:  I don't know, Mr. Herschmann.
14              MR. HERSCHMANN:  If you want testimony, take a
15     moment, we can look at it.  I have no problem.
16              But, I'm pretty confident the rule is exactly as
17     Mr. Dellaportas just read it.
18              It is not necessary that the witness be the one
19     that actually recorded it as much as they can say that
20     recording is accurate.
21              THE COURT:  I'm pleased that you're confident.  I
22     am not.
23              It didn't say anything about it, but that doesn't
24     mean --
25              MR. DELLAPORTAS:  As I understand it this is the
26     agenda prepared before the meeting and thus isn't --
```

3/23/2015  Genger -v- Genger Proceeding 032315

```
1          O. Genger - by Plaintiff - Direct/by Mr. Herschmann
2              THE COURT:  That is what I mean, also.  It is not
3     contemporaneous.
4              MR. DELLAPORTAS:  It is not notes from the meeting.
5     It is agenda in advance of the meeting.
6              MR. HERSCHMANN:  Your Honor, the rule is as I
7     understand it, and Mr. Dellaportas if he wants to share that
8     with us and we can take a 5 minute recess.
9              THE COURT:  I can go in the back and look at it.
10             MR. HERSCHMANN:  If you would do that, your Honor,
11    that would be great.
12             Thank you, very much.
13             (Short recess; time is now 2:42 PM)
14             (2:45 PM)
15             THE COURT:  I don't think so, Mr. Herschmann.  Not
16    according to Richardson under the old book, which I'm sure
17    hasn't been changed too much, 66213, I don't know what it is
18    in the next edition.  But, while the memorandum, any
19    memorandum made by anybody can be used to refresh, if you
20    want it in evidence when a witness has so far forgotten
21    facts that he cannot recall them even after looking at a
22    memorandum of them and he testified that he once knew them
23    and made a memorandum of them at the time or soon after,
24    which he intended to make correctly and which he believes to
25    be correct, such memorandum in his own handwriting may be
26    received as evidence of the facts contained although the
```

3/23/2015  Genger -v- Genger Proceeding 032315

```
1          O. Genger - by Plaintiff - Direct/by Mr. Herschmann
2     witness has no present recollection of them.
3               MR. HERSCHMANN:  Your Honor, I think that's why I
4     raised the issue of past recollection refreshed or present
5     recollection recorded.
6               As I said, there are two ways to address.  I can
7     address it with the witness as present recollection
8     refreshed, which is the process that the witness looks at
9     it.
10              THE COURT:  Right.  Then, this doesn't come into
11    evidence.  But, you want it in evidence.
12              MR. HERSCHMANN:  That's correct.
13              The reason I had it the way I did is that there are
14    two ways of dealing with it.
15              There is what I call the simpler process.
16              THE COURT:  It is not coming into evidence.
17              MR. HERSCHMANN:  Okay.
18              THE COURT: She can use it to refresh her
19    recollection if it indeed refreshes her recollection.
20              As I recall this whole exercise is because you
21    wanted to offer it into evidence.
22              MR. HERSCHMANN:  That's correct.  And the reason
23    doesn't matters.
24              THE COURT:  Okay.
25         Q    So, Ms. Genger, let me, I'm going to walk you through
26    the process.
```

1         O. Genger - by Plaintiff - Direct/by Mr. Herschmann

2             I'm going to ask you specific questions.  If you recall

3     something specifically you should answer it.  If you don't

4     recall specifically, then I'm going to ask you is there

5     something that would refresh your recollection.  And the process

6     is then you can look at it and then say the document refreshes

7     my recollection and then answer it.  Okay?

8             So, I'm going to go back to the November 8, 2007

9     meeting.

10            And do you recall specifically what was discussed in

11    the first topic dealing with Orly Genger 1993 Trust?

12        A    Specifically, no.

13        Q    Would the agenda refresh your recollection as to what

14    was discussed?

15        A    Yes.

16        Q    Can you take a moment to look at the agenda and tell us

17    after looking at it does it refresh your recollection as to what

18    was the first topic discussed as it related to the Orly Genger

19    1993 Trust?

20        A    Yes.

21        Q    Okay.  What was of the first topic discussed?

22        A    D&K.

23        Q    And what was discussed after D&K was raised?

24        A    Who was the general partner.  Did Sagi have a copy of

25    the partnership agreement, the note.

26            Then, there is  a topic of the note, who owns the note.

```
 1           O. Genger - by Plaintiff - Direct/by Mr. Herschmann
 2      Q    When you say who is the general partner do you recall
 3   the specific discussions as to percentages about your mother and
 4   whether she remained the general partner, without looking at
 5   document first?
 6      A    No.
 7      Q    If you look at the document does that  refresh your
 8   recollection?
 9      A    Yes.
10      Q    And what was the first thing that was discussed after
11   you asked who were the general partners of D&K?
12           MR. DELLAPORTAS:  I object on relevance grounds as
13      to this line of testimony.
14           MR. HERSCHMANN:  I'm doing this as a general
15      proposition as to the subject matters that were discussed.
16           I can offer the agenda in and make it simple and go
17      through it or I can only do it this way, your Honor.  That
18      is why I raised it in the first place.
19           I'm not saying it is proof.  I'll do it any way Mr.
20      Dellaportas prefers.
21           THE COURT:  He doesn't prefer anything.  It is not
22      depending upon what he prefers.  It is what you want to
23      prove.
24           He says it is not relevant.
25           Why is it relevant?
26      Q    Well, did you generally discuss your trust and
```

3/23/2015  Genger -v- Genger Proceeding 032315

```
1          O. Genger - by Plaintiff - Direct/by Mr. Herschmann
2    associations with the D&K note?
3        A   Yes.
4        Q   Okay.  After discussing your trust and the D&K note did
5    you then have discussions about TPR?
6        A   Yes.
7        Q   Okay.  Do you recall specifically about what was
8    discussed in relationship to TPR and what percentages were not
9    owned by D&K, first, without looking at the document?
10       A   No.
11       Q   Looking at the document, does it refresh your
12   recollection as to what was the first thing you discussed about
13   TPR?
14       A   Yes.
15       Q   And what was that ?
16       A   Who owns and what percentages the 49 percent not owned
17   by D&K.
18       Q   And do you recall whether there was any discussion
19   about Rochell, R-O-C-H-E-L-L, Fang and your mother's interest?
20       A   Yes.
21       Q   After that did you have a discussion about whether or
22   not you can get copies of the minutes of meetings from TPR?
23       A   Yes.
24       Q   Did your brother agree to give you copies of the
25   minutes of meetings with TPR?
26       A   No.
```

```
1              O. Genger - by Plaintiff - Direct/by Mr. Herschmann
2         Q    Did you then discuss with your brother what is the
3    distribution he was receiving from TPR?
4              MR. DELLAPORTAS:  Objection.  Relevance.
5              THE COURT:  Overruled.
6         A    Yes.
7         Q    Okay.  And do you recall raising the amount of his
8    getting $45,000 per month?
9         A    Yes.
10        Q    And did your brother ever answer as to why he was
11   getting $45,000 from TPR per month and how it was being
12   categorized?
13             MR. DELLAPORTAS:  Objection, compound.
14             THE COURT:  Let's take it one at a time.
15        Q    Okay.  Did your brother ascribe for you why he was
16   receiving $45,000 per month?
17        A    He may have and I don't remember.
18             His answers were long winded.  So, I just don't
19   remember them.
20        Q    Was there a  discussion about why your mother was
21   receiving $30,000 per month?
22             MR. DELLAPORTAS:  Objection, lack of foundation.
23             THE COURT:  Yes.  Sustained.
24        Q    Well, do you recall a discussion about what
25   distributions your mother was getting from TPR?
26        A    Generally, yes.
```

3/23/2015  Genger -v- Genger Proceeding 032315

```
 1              O. Genger - by Plaintiff - Direct/by Mr. Herschmann
 2        Q    Looking at the exhibit, does it refresh your
 3   recollection as to what dollar amount your brother was being
 4   questioned about regarding how much money your mother was
 5   receiving?
 6        A    Yes.
 7        Q    What number did you question your brother about?
 8        A    $30,000 a month.
 9        Q    Per month?
10        A    Yes.
11        Q    Do you recall then discussing with your brother how
12   could distributions be evened out between you, your mother and
13   your brother?
14        A    Yes.
15        Q    Did your brother at that time indicate his willingness
16   to even out the distribution between you, and your mother and
17   himself?
18        A    No, he didn't.
19        Q    Did your brother answer any questions about what are
20   the assets of TPR?
21        A    Whatever answers he gave were so complicated and he
22   gave answers that  confused everyone.
23        Q    Well, did the Isaacson representatives say to your
24   brother during the course of the meeting that they were
25   satisfied with his answers?
26        A    No.
```

3/23/2015  Genger -v- Genger Proceeding 032315

```
1          O. Genger - by Plaintiff - Direct/by Mr. Herschmann
2      Q    What did they say generally about the answers your
3   brother was giving?
4          MR. DELLAPORTAS:  Objection.  Hearsay.
5          THE COURT:  Sustained.
6      Q    Did you then cover what receivables were due TPR, just
7   generally?
8      A    I don't remember.
9      Q    Okay.  If you look at exhibit 234, the agenda in front
10  of you, does that refresh your recollection as to what questions
11  were asked about the receivables due TPR?
12     A    Yes.
13     Q    And looking at that , does it refresh your recollection
14  about asking what happened to the $1.9 million that your brother
15  owed TPR?
16         MR. DELLAPORTAS:  Objection.  Lack of foundation
17     and leading.
18         THE COURT:  How about a foundation?
19     Q    Okay.  Well, does exhibit 234 refresh your recollection
20  as to whether the subject matters of how much money your brother
21  owed TPR was discussed on November 8, 2007?
22     A    Yes.
23     Q    Okay.  Looking at exhibit 234 does it refresh your
24  recollection about the specific amount of money that was
25  discussed with your brother regarding how much money he owed
26  TPR?
```

3/23/2015  Genger -v- Genger Proceeding 032315

```
1              O. Genger - by Plaintiff - Direct/by Mr. Herschmann
2         A    Yes.
3         Q    What was the amount of money that your brother was
4    asked about that he owed TPR?
5              MR. DELLAPORTAS:  Just objection, your Honor.
6              This doesn't feel like a refreshed recollection.
7    It just fees like reading a document.
8              MR. HERSCHMANN:  It's the only way to do it.
9              If Mr. Dellaportas wants me to go down --
10             THE COURT:  You know, she was there.  So, I do
11   believe there is a --
12             MR. DELLAPORTAS:  Okay.
13        Q    What is the amount?
14        A    $1.9 million.
15        Q    Do you recall then having other discussions about other
16   monies that were owed TPR or owed by other officers to TPR?
17        A    Yes.
18        Q    Do you recall what was next discussed independent of
19   looking at the exhibit?
20        A    No.
21        Q    Looking at the exhibit, does it refresh your
22   recollection as to the next item that you discussed with your
23   brother?
24        A    Yes.
25        Q    Okay.  What was the next item that you discussed with
26   your brother?
```

3/23/2015  Genger -v- Genger Proceeding 032315

1        O. Genger - by Plaintiff - Direct/by Mr. Herschmann

2      A   The annual expense of TPR and then after that there was

3   trust administration.

4      Q   I think you have to speak a little louder.

5      A   Sorry.

6      Right after that there was what are the annual expenses

7   of TPR exclusive of above distributions to Sagi and Ariel Orly.

8      Q   Did your brother answer what was the annual expense to

9   TPR when Isaacson & Company posed the question to him?

10     A   Again, his answers were really convoluted and --

11     Q   How about, was there a discussion about the amount of

12   lawsuits that TPR was involved with as either a plaintiff or a

13   defendant?

14     A   Were there discussions?

15     Q   Yes?

16     A   Yes.

17     Q   After that was there a discussion about potentially

18   buying out your interests?

19     A   Yes.

20     Q   And looking at exhibit 234 does it refresh your

21   recollection, specifically, about what you asked of your

22   brother?

23     A   Yes.

24     Q   What was asked?

25     A   Was TPR, meaning Sagi, consider buying out Orly's

26   interest in TPR.  -- Or D&K now giving proper discounts to the

3/23/2015  Genger -v- Genger Proceeding 032315

```
 1          O. Genger - by Plaintiff - Direct/by Mr. Herschmann
 2     D&K note and credit for the losses.
 3               THE COURT:  Well --
 4               MR. HERSCHMANN:  Those were the subject matters
 5     that were discussed.
 6               THE COURT:  She is reading from it, though.
 7     Q    Now --
 8               THE COURT:  You're kind of abusing it now.  She
 9     cannot read from it.
10     Q    All right.
11          So, the document is not in evidence, so you cannot read
12     from it.  You can only look at it to refresh your recollection
13     and then answer the question.  So.
14               THE COURT:  And if you cannot answer the question,
15     then you cannot answer the question.
16     Q    Now, was there a discussion about capital contributions
17     made to White Box?
18     A    Yes.
19     Q    After that do you recall what was discussed about TPR
20     and its relationship to White Box?
21     A    Yes.
22     Q    And do you recall at some point asking could you have
23     control of the tax filings of White Box?
24     A    Yes.
25     Q    Now, did you then move on to discuss your trustees and
26     administration of your trust?
```

3/23/2015  Genger -v- Genger Proceeding 032315

```
 1          O. Genger - by Plaintiff - Direct/by Mr. Herschmann
 2     A    Yes.
 3     Q    Who were the trustees back in 2007?
 4     A    It was Lea Fang.
 5     Q    Did you discuss wanting someone else to become the
 6   trustee of your trust?
 7     A    Yes.
 8          MR. DELLAPORTAS:  Objection, relevance.
 9          THE COURT:  Sustained.
10     Q    In the course of this meeting was the agenda dealing
11   with your parents' divorce?
12     A    No.
13     Q    If you look at the agenda does it refresh your
14   recollection as to whether or not you had raised TRI or had
15   intended to raise TRI in any way?
16     A    Does it refresh?
17     Q    Yes?
18     A    Yes, it does.
19     Q    And is TRI something that was on your agenda to cover?
20     A    No.
21     Q    Now, did you then cover the Canadian ventures?
22     A    Yes.
23     Q    And do you recall, approximately, when you learned
24   about Riverside related entities?
25     A    It was some time prior in '07, prior to this meeting.
26     Q    And when you say some time prior to '07, was that in
```

3/23/2015 Genger -v- Genger Proceeding 032315

```
1              O. Genger - by Plaintiff - Direct/by Mr. Herschmann
2    relationship with your trying to get a better understanding of
3    finances?
4         A    Yes.
5         Q    And prior to having this meeting in November of 2007
6    had you met personally with Isaacson and Company
7    representatives?
8         A    Before this meeting?
9         Q    Yes?
10        A    Yes.
11        Q    If you go now to the issues, let's focus now on the
12   Canadian ventures.
13             Do you recall specifically what you first or what was
14   first asked of your brother in the November 8, 2007 meeting
15   regarding the Canadian ventures?
16        A    Without -- Without looking at it?  No.
17        Q    Okay.  Looking at exhibit 234 can you tell us if that
18   refreshes your recollection as to what was, what was the first
19   thing that you discussed in relationship to the Canadian
20   ventures?
21        A    Yes.
22        Q    What was the first thing that was discussed?
23             THE COURT:  Without reading from this.
24        Q    Without reading?
25        A    What did I sell to my brother?
26        Q    Was that a question that the representatives of
```

2849

3/23/2015  Genger -v- Genger Proceeding 032315

```
1              O. Genger - by Plaintiff - Direct/by Mr. Herschmann
2    Isaacson & Company asked your brother even in November of 2007?
3                MR. DELLAPORTAS:  Objection, hearsay.
4                THE COURT:  Sustained.
5        Q    How did your brother respond to the question of what
6    you had sold to him?
7        A    To that particular question, I don't remember what his
8    response was.
9        Q    Without looking at the agenda do you recall what was
10   discussed in connection with your brother about it?
11               THE COURT:  About?
12       Q    About the Canadian ventures?
13               THE COURT:  Okay the Canadian ventures.
14       Q    Yes?
15       A    I mean, I have a specific --
16       Q    Tell us what you recall being discussed about the
17   Canadian ventures, of the transfer.  And then we can get into
18   the specifics.  Tell us generally first what you recall?
19       A    About the Canadian ventures what was discussed?
20       Q    Yes?
21       A    Specifically, I specifically asked my brother if we
22   could now transfer back my shares to me like he said he would
23   do.  And I specifically remember my brother looking at me and
24   laughing and said, I don't know why you would want to do that,
25   it is valueless.
26       Q    Did you believe him when he said that?
```

3/23/2015  Genger -v- Genger Proceeding 032315

```
 1          O. Genger - by Plaintiff - Direct/by Mr. Herschmann
 2      A    Did I believe what, that it was valueless?
 3      Q    Yes?
 4      A    What I believed is that, is that my brother tricked me.
 5      Q    And after that conversation did you still try to get
 6  more information about the Canadian ventures from your brother
 7  in that meeting?
 8      A    I don't remember what happened specifically right after
 9  that.  I know there was other, there was more conversation about
10  it.  But, I cannot tell you specifically.
11      Q    Looking at exhibit 234 did you have a discussion to
12  refresh your recollection specifically about the dollar values?
13      A    Yes.
14      Q    Okay.  And does exhibit 234 refresh your recollection?
15      A    Yes.
16      Q    And what do you recall about discussing with your
17  brother in that meeting dealing with the valuations?
18      A    That I had, I had sold my interest to him for 100,000
19  when I bought it for 150.
20      Q    And then do you recall any discussions about the
21  valuations of the businesses currently?
22      A    I am sorry, what was the question?
23      Q    Could we read it back, please?
24          THE COURT:  Yes, please.
25          (Record read)
26      Q    I meant, generally.  I mean the Canadian business?
```

3/23/2015  Genger -v- Genger Proceeding 032315

```
1            O. Genger - by Plaintiff - Direct/by Mr. Herschmann
2       A    Yes.
3       Q    Did your brother in the course of that meeting provide
4  you with any financial information as to where the money had
5  gone from the Canadian ventures?
6       A    No.
7       Q    Let me show you what you has been marked as exhibit
8  266-71, which is admitted into evidence.
9            And do you see on the bottom portion of the exhibit
10 266-71 that there is a reference that the White Paper -- I am
11 sorry, that the White Box papers were supposed to transfer to
12 Jonah from Bill Fischer and then Jonah can be reached at (212)
13 758-0000.
14           Do you see that ?
15      A    Yes.
16      Q    Does that refresh your recollection as to who were the
17 accountants for White Box in 2007?
18      A    Yes.
19      Q    Is that Jonah Gayer and Associates?
20      A    I mean, it was supposed to be, it wasn't.
21      Q    Do you know at some point whether Gayer and Associates
22 became the accountants for White Box?  And I'm focused on the
23 2007 time period.
24      A    I don't know that it ever actually switched to Jonah
25 Gayer.
26      Q    Now, going back to the meeting in November, 2007, do
```

3/23/2015  Genger -v- Genger Proceeding 032315

```
 1          O. Genger - by Plaintiff - Direct/by Mr. Herschmann
 2     you recall that at the conclusion of the agenda there was an
 3     over all subject matter that you wanted to address with your
 4     brother?
 5          A    Yes.
 6               (Continued on the next page)
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
```

3/23/2015  Genger -v- Genger Proceeding 032315

```
 1              O. Genger - Plaintiff - Direct/Herschmann
 2      Q    And what was the general tenure for what you were
 3   looking to get from your brother in the November 2007 meeting?
 4      A    Information.  Information about my finances.
 5      Q    And did you get information that was satisfactory to
 6   you from your brother in that meeting?
 7      A    No.
 8      Q    Let me show you what's been previously received in
 9   evidence as Exhibit 230.
10              MR. HERSCHMANN:  Again, I'm providing an extra
11      copy to defense counsel.
12              (Handing to defense counsel.)
13              (Handing to witness.)
14              (Handing to the Court.)
15      Q    Do you recall that after the meeting Isaacson &
16   Associates sent a letter to your brother?
17              THE COURT:  Yeah, this is very leading.
18              MR. HERSCHMANN:  I'm sorry?
19              THE COURT:  Ask a question.
20              MR. HERSCHMANN:  I'm trying to lay a foundation
21      for the exhibit.
22              THE COURT:  It's too leading.
23      Q    First, have you seen Exhibit 230 beforehand?
24      A    Yes.
25      Q    Did you have discussions with Isaacson & Associates
26   before Exhibit 230 was sent to your brother?
```

### SETTLEMENT AGREEMENT AND RELEASE

This settlement agreement and release (this "Agreement") is entered into as of June 16, 2013, by and between Arie Genger and Orly Genger (in her individual capacity and in her capacity as beneficiary of the Orly Genger 1993 Trust), Arnold Broser, David Broser, (in their individual capacity and on behalf of all entities managed, owned or controlled in any way by Arnold Broser or David Broser and which are in any way related to the subject matter hereof ("Broser Entities" and collectively with Arie Genger and Orly Genger in all capacities referenced above, the "AG Group"), and TR Investors, LLC ("TR Investors"), Glenclova Investment Co. ("Glenclova"), New TR Equity I, LLC ("New TR I"), New TR Equity II, LLC ("New TR II" and, together with TR Investors, Glenclova and New TR I, the "Trump Entities"), Trans-Resources, LLC (the successor to Trans-Resources, Inc. and together with its predecessor entities referred to herein as, "Trans-Resources"), Jules Trump, Eddie Trump and Mark Hirsch (collectively, with the Trump Entities and Trans-Resources, the "Trump Group").  The members of the AG Group and the Trump Group are each referred to herein individually as a "Party" and together as the "Parties".

WHEREAS, in March 2001, TR Investors, Glenclova, Trans-Resources and TPR Investment Associates, Inc. ("TPR") entered into a stockholders agreement with respect the common stock of Trans-Resources (the "Stockholders Agreement");

1

WHEREAS, since August 2008, Arie Genger, Orly Genger, the Trump Group and others have been engaged in various litigations (described below) concerning the ownership and control of Trans-Resources; and

WHEREAS, the Parties wish to resolve all issues, disputes and disagreements between them, including but not limited to the issue of ownership of all Trans-Resources shares;

NOW, THEREFORE, in consideration of the promises and representations contained herein and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties, intending to be legally bound, hereby agree as follows:

1.   **Recitals.**   The above recitals are incorporated into and made a part of this Agreement and are binding on all Parties hereto.

2.   **Initial Consideration from the Trump Group.**   Upon dismissal with prejudice of the claims, counterclaims, cross-claims, third-party claims, issues and matters as provided in Paragraph 4 below, the Trump Group shall promptly:

(a)   release all claims they may have to the (i) $7,428,994.00 plus interest held by Skadden, Arps, Slate, Meagher & Flom LLP as escrow agent (the "Skadden Escrow") and (ii) $10,314,005.00 plus interest held by with Pedowitz & Meister as escrow agent (the "P&M Escrow");

(b)   pay to Wachtel, Masyr & Missry, LLP as attorneys for the AG Group ("Wachtel") an amount in cash equal to $35,000,000.00 minus (i) the amount held in the Skadden Escrow, and (ii) the amount held in the P&M Escrow.

3.     **Further Consideration from the Trump Group.**   Trans-Resources on behalf of the Trump Group shall pay: (i) $7,500,000 to Wachtel on the third  anniversary of the Effective Date (defined below), and (ii) $7,500,000 to Wachtel 364 days following the third anniversary of the Effective Date The payments provided under this paragraph shall be (a) subject to the terms and conditions herein and (b) evidenced by two (2) promissory notes that are substantially in the form attached as Exhibit A hereto (the "Notes").  Notwithstanding anything else herein, the maturity of the two $7,500,000 Notes shall be delayed beyond their due date until the earlier (the "Extended Maturity Date") of  (A) such time as all pending claims, cross-claims and counter-claims brought by any of TPR, Sagi Genger, the Sagi Genger 1993 Trust, the Orly Genger 1993 Trust (other than the Orly Trust Action (as defined below)), D&K Limited Partnership, D&K GP LLC, Rochelle Fang, and/or David Parnes (collectively, the "Sagi Group") against any member of the Trump Group have been dismissed with prejudice and the statute of limitations shall have run with respect to any other potential claims of the Sagi Group that might be the subject of the Indemnification provided for by Paragraph 5 below or (B) such time as each member of the Sagi Group shall have provided the Trump Group with a release of the Trump Group Released Parties (as defined below) and covenant not to sue in form and substance that is the same as the AG release and covenant not to sue contained in Paragraph 6(a) below (the "Sagi Group Release").

Subject to the foregoing, the Notes shall become immediately due and payable upon the occurrence of any transaction or series of transactions which shall result in the Trump Group owning or controlling neither (i) a majority of the voting stock of Trans-Resources or its successors or each of its two principal subsidiaries, Haifa Chemicals, Ltd. and Na-Churs Plant

3

Food Company or their successors, nor (ii) directly or indirectly, a majority of the assets currently owned by Trans-Resources and its subsidiaries; provided, however, that in such event, at the request of the Trump Group, the amounts then payable on the Notes shall be placed in escrow for the duration of their original term or until the Extended Maturity Date (if applicable) under the provisions of an escrow agreement on reasonable terms to be negotiated at such time in good faith between Trans-Resources, the payee and an escrow agent selected by their mutual consent, which shall provide for their release to the Trump Group in payment of Indemnification Amounts, AG Group Release Amounts and Discovery Costs (as such terms are defined below), if any, and payment to the payee of such amounts after reduction for Indemnification Amounts, AG Group Release Amounts and Discovery Costs, if any, upon their original maturity date or the Extended Maturity Date (if applicable).  If Trans-Resources is unable to pay the Notes as and when they mature, the Trump Group will be obligated to make payment thereon in an amount equal to the lesser of (x) the outstanding amounts not paid by the obligor thereunder and (y) any amount by which cash payments received by members of the Trump Group (other than Trans-Resources) from Trans-Resources and its subsidiaries since the Effective Date (whether in the form of dividends, distributions, compensation or otherwise) exceeds reasonable compensation for services rendered plus payments for goods, services and assets provided by such persons in amounts that would have been paid for such goods, services and assets in arms' length transactions with unaffiliated third parties; provided, however, that in neither case shall the Trump Group be obligated to pay any amount that exceeds the outstanding amounts not paid by Trans-Resources on the Notes (subject to any Indemnification Amounts, AG Group Release Amounts or Discovery Costs).

4

    4.    **Dismissal of Claims with Prejudice.** Within two (2) business days of the Effective Date (defined below), the AG Group and the Trump Group shall take all actions necessary or desirable to:  (i) effect the dismissal with prejudice of all claims, counterclaims, cross-claims, third-party claims, issues and matters between them, and to vacate all court orders which restrain, enjoin or in any way limit actions by any members of the Trump Group, in each pending action in which members of the AG Group and the Trump Group are parties (whether or not service of process with respect thereto has been effected), including, without limitation, each of the following pending actions (collectively, the "Litigation"): *Genger v. TR Investors, LLC*, No. 168, 2013 (Del.); *TR Investors, LLC v. Genger*, C.A. No. 6697-CS (Del. Ch.); *Trans-Resources, Inc. v. Genger*, C.A. No. 4391-CS (Del. Ch.) (with respect to Arie Genger only); *TR Investors, LLC, et al. v. Genger*, C.A. No. 3994-CS (Del. Ch.); *Glenclova Investment Co. v. Trans-Resources, Inc., at al.*, No. 08 Civ. 7140 (JFK) (S.D.N.Y.); *Arie Genger and Orly Genger v. Sagi Genger, et al.*, Index No. 651089/2010 (N.Y. Supr.); and (ii) have the New York State Supreme Court enter a definitive non-appealable order declaring that members of the Trump Group own all right, title and interest (beneficially, of record and otherwise) to the shares of Trans-Resources purportedly transferred by TPR in October 2004 to Arie Genger (the ("Arie Shares") and to the Orly Genger 1993 Trust (the "Orly Trust Shares"), with the understanding and agreement that should the request for the entry of such an order with respect to the "Orly Trust Shares" be denied or not entered in a reasonably timely fashion, then the AG Group and the Trump Group shall take all action necessary or desirable to have the New York State Supreme Court vacate all court orders which restrain, enjoin or in any way limit actions by the

parties to the pending action captioned *Dalia Genger, as Trustee of the Orly Genger 1993 Trust v. TR Investors, LLC, et al.,* C.A. No. 6906-CS (Del. Ch.) (the "Orly Trust Action"), to prosecute, defend, compromise, settle and otherwise deal with all claims, counterclaims, cross-claims, third-party claims, issues and matters asserted therein; provided, however, that nothing in this Agreement is intended to require or permit the dismissal of any claims, counterclaims, cross-claims, third-party claims, issues and matters, (i) in *Trans-Resources, Inc. v. Genger,* C.A. No. 4391-CS (Del. Ch.) (the "Breach of Fiduciary Duty Case"), as between the Trump Group and Avi Pelossof and/or William Dowd (subject to the exchange of general releases between the members of the Trump Group and William Dowd as contemplated below) and (b) against TPR, the Sagi Genger 1993 Trust, the Orly Genger 1993 Trust, D&K Limited Partnership, D&K GP LLC, Sagi Genger or Dalia Genger. Any member of the AG Group including, without limitation, Orly Genger, who is called to testify in the Litigation or the Orly Trust Action, agrees to testify that he, she (in her individual capacity, ~~on behalf of the Orly Genger 1993 Trust,~~ and as beneficiary of the Orly Genger 1993 Trust) or it has waived all claims he, she (in her individual capacity, ~~on behalf of the Orly Genger 1993 Trust,~~ and as beneficiary of the Orly Genger 1993 Trust) or it had or may have to ownership (record, beneficial or otherwise) of any shares of Trans-Resources and that he, she (in her individual capacity, ~~on behalf of the Orly Genger 1993 Trust,~~ and as beneficiary of the Orly Genger 1993 Trust) or it is opposed to the Orly Genger 1993 Trust seeking any remedy of any kind against any member of the Trump Group. Notwithstanding the foregoing, upon receipt by the Trump Group of a general release in form and substance reasonably satisfactory to it, the Trump Group shall provide the same general

6

release to William Dowd and cause the dismissal of the Breach of Fiduciary Duty Case as between the Trump Group and him.

5.     **Indemnification.**

(a)     Upon closing of this Agreement, each of the members of the AG Group with the exception of Arnold Broser and David Broser and the Broser Entities, jointly and severally, agrees to indemnify and hold harmless (i) each of the members of the Trump Group, and their respective past and present affiliates and direct and indirect subsidiaries, and (ii) each of the past and present agents, representatives, officers, directors, advisors, employees, general partners, limited partners, shareholders, members, predecessors, successors, heirs, executors, administrators and assigns of each person and entity referenced in clause (i), from all reasonable costs, expenses, attorneys' fees of counsel selected by the Trump Group (it being agreed that the Trump Group will cooperate with the AG Group in all reasonable respects to cause the amount of such costs, expenses and its attorneys' fees to be minimized), settlements and/or judgments (whether direct or related to joint and several liability) (the "Indemnification Amounts") incurred as a result of, in connection with, or relating in any way to any (x) claims, counterclaims, cross-claims or third-party claims raised or that could have been raised in the Litigation, and (y) claims that are pending, have been brought, or that may in the future be brought by or on behalf of any of TPR, the Sagi Genger 1993 Trust, the Orly Genger 1993 Trust (other than those claims currently pending in the Orly Trust Action), D&K Limited Partnership, D&K GP LLC, Sagi Genger, David Parnes or Dalia Genger, regardless of whether they were or could have been raised in the Litigation or the Orly Trust Action, relating in any way, whether directly or indirectly, to (A) the Shareholders Agreement entered into by Trans-Resources

7

shareholders and Trans-Resources on March 30, 2001, (B) the transfer of interests in TPR or the

purported transfer of shares of Trans-Resources by TPR in October 2004, (C) any activities or

developments relating to or conducted by Trans-Resources or any of its direct or indirect

subsidiaries that occurred prior to September 26, 2008, (D) the acquisition by the Trump Group

of all interests (record, beneficial or otherwise) of the so called "Arie Shares", "Orly Trust

Shares" and the shares of Trans-Resources purportedly transferred by TPR in October 2004 to

the Sagi Genger 1993 Trust (the "Sagi Trust Shares") (including, without limitation, the

negotiations for the ownership or acquisition of such shares), (E) the control of Trans-Resources

or any of its direct or indirect subsidiaries by the Trump Group through its acquisition of the

aforementioned shares, (F) records and documents (including but not limited to electronic files)

in the possession, custody or control of Trans-Resources or any of its direct or indirect

subsidiaries, (G) misrepresentations made or improper acts conducted prior to September 26,

2008 by any officer or director of Trans-Resources, (H) this Agreement,  (I) the business or

operations of Trans-Resources or any of its direct or indirect subsidiaries conducted prior to

September 26, 2008 arising from or in any way related to the conduct of any member of the AG

Group, Avi Pelossof or William Dowd, or (J) the conduct of any other individual to the extent

Arie Genger is aware, or should have been aware, thereof. Notwithstanding the foregoing, the

indemnity provided for above shall not apply to any claims which may be brought subsequent to

the Effective Date (and which are entirely unrelated to any claim brought prior to such date) by

any of Sagi Genger, the Sagi Genger 1993 Trust or TPR and which arise solely out of actions

taken or not taken by members of the Trump Group which actions or inactions no member of the

AG Group was aware of or should have been aware of; provided, however, that such claim was

8

not encouraged or solicited by any member of the AG Group and no member thereof cooperates in asserting, instituting or prosecuting such claim. Notwithstanding anything herein to the contrary, the undertaking of William Wachtel hereunder shall not exceed under any circumstance an amount greater than $5,000,000.

           (b)   The Trump Group may request payment or reimbursement of the Indemnification Amounts at any time by providing a written statement or copy of an underlying invoice or expense documentation to any member of the AG Group at the addresses set forth in Paragraph 16 below, and the AG Group shall pay such indemnified expenses in full and in cash within five (5) business days of the date such request is made. The supporting documentation submitted with any payment or reimbursement request hereunder may be redacted as necessary to preserve attorney-client privilege, attorney work product, or confidential information the Trump Group may, in its reasonable determination, need to protect. The Trump Group will provide the AG Group with reasonable notice prior to making any motion or taking any appeal with respect to, or in, any past, present or future action or claim for which the Trump Group is seeking indemnification, and such notice will be accompanied by a non-binding estimate of the legal fees and costs associated with such motion or appeal. The Trump Group authorizes the AG Group and their respective counsel to discuss directly with the Trump Group's appointed counsel the amount and scope of any invoice for which the Trump Group is seeking indemnification. The AG Group in its sole discretion may settle any indemnified claim so long as there is no monetary contribution to be paid by the Trump Group, and the Trump Group is released, in form and substance reasonably satisfactory to it, from any liability relating to any such indemnified

claim. The Trump Group shall not enter into any settlement of any indemnified claim, or

discussions with respect thereto, without the express written consent of the AG Group.

      (c)    With respect to each Indemnification Amount, until such time as it

has been paid over to the Trump Group, the members of the AG Group shall remain jointly and

severally liable for such Indemnification Amount and, the Trump Group may at its option pursue

all legal remedies available to it and/or withhold an amount equal to such unreimbursed

Indemnification Amount from any payments by Trans-Resources to be made pursuant to the

Notes.

      6.    **Releases**.

      (a)    **The AG Group Release.**  Effective on the Effective Date, each of

the members of the AG Group, for itself, himself or herself, and in all capacities, and on behalf

of its (and its respective affiliates' and direct and indirect subsidiaries'), his or her respective

agents, representatives, officers, directors, advisors, employees, general partners, limited partners,

shareholders, members, subsidiaries and affiliates, and each of their respective predecessors,

successors, heirs, executors, administrators and assigns, and any other persons or entities acting

in concert with any of them including, without limitation, any member of the Sagi Group which

he, she or it shall at any time directly or indirectly control or be deemed authorized to act on

behalf of (individually, an "AG Group Releasing Party" and collectively, the "AG Group

Releasing Parties"): (i) fully, finally, irrevocably and unconditionally waives, releases and

discharges each of the members of the Trump Group and its (and its respective past and present

affiliates' and direct and indirect subsidiaries'), his or her respective past and present agents

(including Skadden, Arps, Slate, Meagher & Flom LLP in any capacity, including as Escrow

Agent for the Skadden Escrow or for any escrow in which it held, holds, or may hold, any

dividends or distributions from Trans-Resources), representatives, officers, directors, advisors,

employees, general partners, limited partners, shareholders, members, subsidiaries and affiliates,

and each of their respective predecessors, successors, heirs, executors, administrators and assigns

(collectively, the "Trump Group Released Parties"), from any and all claims, counterclaims,

demands, proceedings, actions, causes of action, orders, obligations, damages, debts, costs,

expenses and other liabilities whatsoever and however arising, whether known or unknown, past,

present or future, suspected or unsuspected, contingent or actual, both at law and in equity,

including without limitation, claims for fraud or fraud in the inducement (collectively, "Claims"),

which such AG Group Releasing Party now has, has ever had or may hereafter claim to have

against any Trump Group Released Party or its, his or her assets, liabilities or operations from

the beginning of the world through the Effective Date (individually, an "AG Group Released

Claim" and collectively, the "AG Group Released Claims"); and (ii) agrees not to assert, institute

or prosecute, or encourage, solicit or cooperate with any other person or entity in asserting,

instituting or prosecuting, any proceeding against any of the Trump Group Released Parties in

any jurisdiction (domestic or foreign, including, without limitation, the State of Israel) with

respect to any AG Group Released Claim or any other Claim relating in any way, directly or

indirectly, to Trans-Resources or any of its direct or indirect subsidiaries, the ownership or

acquisition of Trans-Resources shares (including any dividends or distributions relating thereto

or any escrow in which such dividends or distributions may currently be or in the past have been

held), the Litigation, the Orly Trust Action, control of Trans-Resources or any of its direct or

indirect subsidiaries, the business or operations of Trans-Resources or any of its direct or indirect subsidiaries, or arising out of this Agreement including, without limitation, the negotiation and execution of this Agreement or the AG Group Releases provided hereunder; provided, however, that this AG Group Release shall not apply to any Claims (x) seeking equitable relief to enforce the terms of this Agreement or claims seeking payment of the Notes or any indemnification payments required to be paid hereunder, (y) relating solely to events that transpired in their entirety subsequent to the Effective Date and that could not, under any circumstances, have possibly been pursued prior to the Effective Date whether or not then known, and (z) between any of the AG Group Releasing Parties and TPR, and/or any other member of the Sagi Group.

If an AG Releasing Party brings an AG Group Released Claim or other Claim in violation of the immediately preceding paragraph, the AG Group, jointly and severally, agrees to indemnify the Trump Group for any and all settlements, judgments, costs and fees, including legal fees and disbursements of counsel chosen by the Trump Group, incurred in working on, preparing for or defending such claim ("AG Group Release Amounts"). With respect to each AG Group Release Amount, until such time as such AG Group Release Amount has been paid over to the Trump Group, the members of the AG Group shall remain jointly and severally liable for such AG Group Release Amount, and the Trump Group may at its option pursue all legal remedies available to it and/or withhold an amount equal to such unreimbursed AG Group Release Amount from any payments to be made by Trans-Resources pursuant to the Notes. For purposes of the removal of all doubt, it is the parties' intention that no claims shall be brought or pursued by any member of the AG Group against any member of the Trump Group for any

12

reason whatsoever (other than claims permitted under clause (x), (y) and (z) of the immediately preceding paragraph).

        (b)    **The Trump Group Release.**  Effective on the Effective Date, each of the members of the Trump Group, for itself or himself, and in all capacities, and on behalf of its (and its respective affiliates' and direct and indirect subsidiaries'), or his respective agents, representatives, officers, directors, advisors, employees, general partners, limited partners, shareholders, members, subsidiaries and affiliates, and each of their respective predecessors, successors, heirs, executors, administrators and assigns, and any other persons or entities acting in concert with any of them (individually, a "Trump Group Releasing Party" and collectively, the "Trump Group Releasing Parties"):  (i) fully, finally, irrevocably and unconditionally waives, releases and discharges each of the members of the AG Group and its (and its respective past and present affiliates' and direct and indirect subsidiaries'), his or her respective past and present agents, representatives, officers, directors, advisors, employees, general partners, limited partners, shareholders, members, subsidiaries and affiliates, and each of their respective predecessors, successors, heirs, executors, administrators and assigns (collectively, the "AG Group Released Parties"), from any and all claims, counterclaims, demands, proceedings, actions, causes of action, orders, obligations, damages, debts, costs, expenses and other liabilities whatsoever and however arising, whether known or unknown, past, present or future, suspected or unsuspected, contingent or actual, both at law and in equity including, without limitation, claims for fraud or fraud in inducement, ("Claims"), which such Trump Group Releasing Party now has, has ever had or may hereafter claim to have against any AG Group Released Party or its, his or her assets, liabilities or operations from the beginning of the world through the Effective Date (individually,

a "Trump Group Released Claim" and collectively, the "Trump Group Released Claims"); and (ii)

agrees not to assert, institute or prosecute, or encourage, solicit or cooperate with any other

person or entity in asserting, instituting or prosecuting, any proceeding against any member of

the AG Group Released Parties with respect to any Trump Group Released Claim or any other

Claim relating in any way, directly or indirectly, to Trans-Resources or any of its direct or

indirect subsidiaries, the ownership or acquisition of Trans-Resources shares, control of Trans-

Resources or any of its direct or indirect subsidiaries, the business or operations of Trans-

Resources or any of its direct or indirect subsidiaries, or the negotiation and execution of this

Agreement or the Trump Group Releases provided hereunder; provided, however, that this

Trump Group Release shall not apply to any Claims (x) seeking equitable relief to enforce  the

terms of this Agreement or claims seeking payment of any indemnification payments required to

be paid hereunder, (y) relating solely to events that transpired in their entirety subsequent to the

Effective Date and that could not, under any circumstances, have possibly been pursued prior to

the Effective Date whether or not then known, and (z) between any of the Trump Group

Releasing Parties and Avi Pelossof, William Dowd (unless and until the exchange of mutual

general releases between the Trump Group and William Dowd referred to above) and/or TPR.

If a Trump Group Releasing Party brings a Trump Group Released Claim or other Claim

in violation of the immediately preceding paragraph, the Trump Group, jointly and severally,

agrees to indemnify the AG Group for any and all settlements, judgments, costs and fees,

including legal fees and disbursements of counsel chosen by the AG Group, incurred in working

on, preparing for or defending such claim ("Trump Group Release Amounts").  With respect to

each Trump Group Release Amount, until such time as such Trump Group Release Amount has

been paid over to the AG Group, the members of the Trump Group shall remain jointly and severally liable for such Trump Group Release Amount, and the AG Group may at its option pursue all legal remedies available to it.  For purposes of the removal of all doubt, it is the parties intention that no claims shall be brought or pursued by any member of the Trump Group against any member of the AG Group for any reason whatsoever (other than claims permitted under clause (x), (y) and (z) of the immediately preceding paragraph).

       7.    **Discovery Obligations**.    Effective on the Effective Date (defined below), to the extent that a member of the AG Group or the Orly Genger 1993 Trust seeks discovery or testimony from any member of the Trump Group, or if any member of the Trump Group is subpoenaed by any party to an action in which any member of the AG Group or the Orly Genger 1993 Trust is a party, each of the members of the AG Group, jointly and severally, agrees that to the extent indemnities of the Trump Group provided for elsewhere in this Agreement do not apply, they shall indemnify the Trump Group for any and all costs and fees, including reasonable legal fees and disbursements of counsel to be chosen by the Trump Group (it being understood that for the purposes of this Discovery Obligation indemnity only, the indemnification for legal fees shall be limited to $750 per hour of legal services), incurred in working on, preparing for or defending such claim, it being agreed that the Trump Group will cooperate with the AG Group in all reasonable respects to cause the amount of such costs and fees, including its attorneys' fees and disbursements to be minimized ("Discovery Costs").  With respect to each Discovery Cost, until such time as such Discovery Cost has been paid over to the Trump Group, the members of the AG Group shall remain jointly and severally liable for such Discovery Cost, and the Trump Group may at its option pursue all legal remedies available to it

and/or withhold an amount equal to such unreimbursed Discovery Cost from any payments to be made by Trans-Resources pursuant to the Notes.

    8.    **Cooperation.**

(a)    Each member of the AG Group shall take all actions necessary or desirable, as promptly as practicable and as may be requested by the Trump Group from time to time including, without limitation, testifying in the Orly Trust Action, to (i) effectuate the release of the AG Group Released Claims and to prevent or preclude any other person or entity from asserting, instituting or prosecuting, or encouraging, soliciting or cooperating with any other person or entity in asserting, instituting or prosecuting, any proceeding or claims against any of the Trump Group Released Parties with respect to any AG Group Released Claim or any other Claim relating in any way, directly or indirectly, to Trans-Resources or any of its direct or indirect subsidiaries, the ownership or acquisition of Trans-Resources shares, the control of Trans-Resources or any of its direct or indirect subsidiaries, records and documents (including but not limited to electronic files) in the possession, custody or control of Trans-Resources or any of its direct or indirect subsidiaries or the business or operations of Trans-Resources or any of its direct or indirect subsidiaries brought by any party without regard to whether such party is a signatory hereto and (ii) cause the Orly Genger 1993 Trust to release any and all claims against the Trump Group Released Parties, including, without limitation, any claims pending in the Orly Trust Action.

    (b)    As a condition to any settlement that any member of the AG Group shall enter into with any member of the Sagi Group, the AG Group parties to such settlement shall cause each Sagi Group party to such settlement to (i) dismiss with prejudice all pending claims, cross-claims and counter claims against any of the Trump Group Released Parties (as defined below)

16

and to provide the Sagi Group Release, and (ii) if the Orly Genger 1993 Trust is a party to such settlement, cause it to agree in writing to become an AG Group member for purposes of providing the indemnity contained in Paragraph 5.  Likewise, as a condition to any agreement by the AG Group to a replacement trustee for the Orly Genger 1993 Trust, the AG Group shall use its best efforts to cause such trustee to agree in writing on behalf of the Orly Genger 1993 Trust that it shall be a member of the AG Group for purposes of providing the indemnity contained in Paragraph 5.

     (c)    Each member of the AG Group covenants that for so long as the indemnity contained in Paragraph 5 remains in effect, he, she or it shall not contribute or deposit any amounts, or permit to be contributed or deposited any amounts (including, without limitation, any payments made under Paragraphs 2 and 3), to or with the Orly Genger 1993 Trust or to any other trust or entity that any of them directly or indirectly controls or is or was established at their direction, or that is or was established or exists for any of their direct or indirect benefit, unless such trust or entity has agreed in writing to being a member of the AG Group for purposes of providing the indemnity contained in Paragraph 5.  The foregoing shall not restrict members of the AG Group from investing in or with such entities provided that that such investment may be liquidated, without restriction, by such member of the AG Group from time to time as may be necessary to comply with the terms of the indemnity contained in Paragraph 5.

     (d)    The AG Group covenants that, subject to any confidentiality orders of any court or other restrictions imposed by law (i) with respect to any court filing made or received by it concerning the Orly Genger 1993 Trust, it shall contemporaneously provide a copy thereof to the Trump Group, and (ii) contemporaneously with its becoming aware of any changes or

17

contemplated material changes to the Orly Genger 1993 Trust including, without limitation, the resignation of its trustee and/or the appointment of a replacement trustee, it shall provide written notice thereof to the Trump Group.

9. **Confidentiality.** The Parties and their counsel shall not disclose the terms of this Agreement, except if, upon written advice of counsel, it is required to do so by law. Notwithstanding the foregoing, disclosure may be made by the Parties: (i) to their respective accountants, financial advisors or attorneys (collectively, "Advisors") as required to obtain tax or legal advice, it being agreed that each Party shall apprise its Advisors of the obligation to maintain such confidentiality and that each Party shall be accountable for any breach of this provision by its respective Advisors, and (ii) notwithstanding anything to the contrary in this Agreement, the Parties may disclose the terms of this Agreement if necessary in any action to enforce this Agreement or as may be required to respond to a valid subpoena, court order or other legal process. Each Party agrees that he, she or it will promptly give notice of any attempt to compel disclosure of the terms of this Agreement to each of the other Parties, at least five (5) days before compliance is required.

10.    **Third Party Beneficiaries.** This Agreement shall have no third party beneficiaries except for those persons and entities that are not Parties hereto but are covered by the releases set forth in Paragraph 6 above, who may enforce those releases.

11.    **Binding Effect**

This Agreement shall be binding upon and inure to the benefit of each of the Parties hereto and (where applicable) their respective current and former agents, representatives, officers, directors, advisors, employees, general partners, limited partners, shareholders, members, subsidiaries and

18

affiliates, and each of their respective predecessors, successors, heirs, executors, administrators
and assigns.

12.     **Representations and Warranties.**

        (a)     Each Party represents that it, he or she is authorized to enter into
this Agreement and to grant the rights granted by it, him or her in this Agreement. Each Party
further represents that, to the extent any non-party consents are required for the performance of
any of its, his or her obligations under this Agreement (including, without limitation, with any
entity controlled by any Party, including any of its partners or equity holders), it, he or she has
obtained such consents.

        (b)     Each Party has the benefit of the advice of counsel chosen and
employed by it, him or her concerning this Agreement.

        (c)     Each Party is the sole owner and holder of the Claims it is releasing
under this Agreement, and represents that none of the Claims released herein have been assigned,
pledged, encumbered, or otherwise transferred in whole or in part, to any other person or entity.

        (d)     Each member of the AG Group represents that he, she or it is
knowledgeable, sophisticated and experienced in business, financial and other matters relevant to
his, her or its entry into this Agreement and the transactions contemplated hereby, and has
engaged advisors, experienced in the matters contemplated by this Agreement. Each member of
the AG Group has undertaken such investigation and has been provided with and has evaluated
such documents and information as he, she or it has deemed necessary to enable him, her or it to
make an informed decision with respect to the execution, delivery and performance of this
Agreement and the transactions contemplated hereby. Each member of the AG Group is

consummating the transactions contemplated hereby without reliance upon any express or

implied representations or warranties of any nature, whether in writing, orally or otherwise, made

by or on behalf of or imputed to any of the Trump Group Released Parties, except as expressly

set forth in this Agreement, and no member of the AG Group shall make any Claim with respect

thereto. Each member of the AG Group acknowledges that he, she or it is taking full

responsibility for making his, her or its own evaluation of the adequacy and accuracy of all

documents or information that may have been furnished to him, her or it, and that no member of

the AG Group shall have any Claim against any of the Trump Group Released Parties with

respect thereto, including for Claims relating to the accuracy or completeness of the information

that may have been furnished to him her or it. Each member of the AG Group acknowledges and

understands that each member of the Trump Group Released Parties expressly disclaims any and

all liability that may be based on any of the documents and information that may have been

furnished to any member of the AG Group and all liability based on such documents or

information or errors therein or omissions therefrom. Accordingly, each member of the AG

Group acknowledges that none of the Trump Group Released Parties has made any

representation or warranty with respect to (i) any historical information, financial or otherwise,

including without limitation results of operations (or any component thereof), cash flows, or

financial condition (or any component thereof), of Trans-Resources and/or any of its subsidiaries,

(ii) any valuations or projections or estimates of future revenues, future results of operations (or

any component thereof), future cash flows or future financial condition (or any component

thereof) of Trans-Resources and/or any of its subsidiaries or the future business and operations of

Trans-Resources and/or any of its subsidiaries, (iii) any Claims any member of the AG Group

20

may have against any of the Trump Group Released Parties or (iv) any other information or documents that may have been made available to any member of the AG Group or their respective counsel, accountants or advisors with respect to any of the Trump Group Released Parties any of their respective businesses, assets, liabilities or operations, except as expressly set forth in this Agreement. In addition to the foregoing, each member of the AG Group acknowledges that his, her or its entry into this Agreement and the transactions contemplated hereby is based solely on his, her or its respective assessment and valuation of all Claims that he, she or it may have against any of the Trump Group Released Parties and the likelihood of success of such Claims in a court of competent jurisdiction. Each member of the AG Group acknowledges that the consideration to be received by the AG Group pursuant to this Agreement constitutes full and fair consideration for the release of all Claims contemplated hereunder.

(e)     Each member of the Trump Group represents that he, she or it is knowledgeable, sophisticated and experienced in business, financial and other matters relevant to his, her or its entry into this Agreement and the transactions contemplated hereby, and has engaged advisors, experienced in the matters contemplated by this Agreement. Each member of the Trump Group has undertaken such investigation and has been provided with and has evaluated such documents and information as he, she or it has deemed necessary to enable him, her or it to make an informed decision with respect to the execution, delivery and performance of this Agreement and the transactions contemplated hereby. Each member of the Trump Group is consummating the transactions contemplated hereby without reliance upon any express or implied representations or warranties of any nature, whether in writing, orally or otherwise, made by or on behalf of or imputed to any of the AG Group Released Parties, except as expressly set forth in this

21

Agreement, and no member of the Trump Group shall make any Claim with respect

thereto. Each member of the Trump Group acknowledges that he, she or it is taking full

responsibility for making his, her or its own evaluation of the adequacy and accuracy of all

information that may have been furnished to him, her or it, and that no member of the Trump

Group shall have any Claim against any of the AG Group Released Parties with respect thereto,

including for Claims relating to the accuracy or completeness of the information that may have

been furnished to him her or it. Each member of the Trump Group acknowledges and

understands that each member of the AG Group Released Parties expressly disclaims any and all

liability that may be based on any of the documents and information that may have been

furnished to any member of the Trump Group and all liability based on such documents or

information or errors therein or omissions therefrom. Accordingly, each member of the Trump

Group acknowledges that none of the AG Group Released Parties has made any representation or

warranty with respect to (i) any historical information, financial or otherwise, including without

limitation results of operations (or any component thereof), cash flows, or financial condition (or

any component thereof), of Trans-Resources and/or any of its subsidiaries, (ii) any valuations or

projections or estimates of future revenues, future results of operations (or any component

thereof), future cash flows or future financial condition (or any component thereof) of Trans-

Resources and/or any of its subsidiaries or the future business and operations of Trans-Resources

and/or any of its subsidiaries, (iii) any claims any member of the Trump Group may have against

any of the AG Group Released Parties or (iv) any other information or documents that may have

been made available to any member of the Trump Group or their respective counsel, accountants

or advisors with respect to any of the AG Group Released Parties any of their respective

22

businesses, assets, liabilities or operations, except as expressly set forth in this Agreement. In

addition to the foregoing, each member of the Trump Group acknowledges that his, her or its

entry into this Agreement and the transactions contemplated hereby is based solely on his, her or

its respective assessment and valuation of all Claims that he, she or it may have against any of

the AG Group Released Parties and the likelihood of success of such Claims in a court of

competent jurisdiction. Each member of the Trump Group acknowledges that the consideration

to be received by the Trump Group pursuant to this Agreement constitutes full and fair

consideration for the release of all claims contemplated hereunder.

13.     **Attorneys' Fees.**  The Parties agree to be responsible for their own attorneys' fees and

costs incurred in connection with this Agreement and negotiations related to and preparation of

this Agreement and not to seek from each other reimbursement of any such costs, expenses or

attorneys' fees.

14.     **Governing Law.**

This Agreement, and all disputes arising under this Agreement or related thereto, shall be

governed by, construed and interpreted in accordance with the laws of the State of Delaware,

applicable to instruments made, delivered and performed entirely in such state, without regard to

the choice of law provisions thereof.

15.     **Arbitration.**  UNLESS THIS AGREEMENT SPECIFICALLY PROVIDES FOR

ANOTHER TYPE OF DISPUTE RESOLUTION WITH RESPECT TO A PARTICULAR

KIND OF DISPUTE, ANY AND ALL CONTROVERSIES AND CLAIMS ARISING OUT OF

OR RELATING TO THIS AGREEMENT, OR THE BREACH, TERMINATION OR

VALIDITY THEREOF, SHALL BE EXCLUSIVELY SETTLED BY FINAL AND BINDING

ARBITRATION IN ACCORDANCE WITH THE PROCEDURES SET FORTH IN THIS SECTION.

      (a)    The arbitration shall be conducted in accordance with the Commercial Arbitration Rules of the American Arbitration Association ("AAA") then in effect (the "Rules"), except as set forth herein.  Any member of the Trump Group on behalf of the Trump Group, on the one hand, and any member of the AG Group on behalf of the AG Group, on the other hand, may demand arbitration by giving the other written notice to such effect in accordance with the Rules.

      (b)    The arbitration will be held before one neutral arbitrator.  Within thirty (30) days after the other Party's receipt of the demand for arbitration, the Party seeking arbitration will invite the other Party to join it in approaching the following list of individuals about serving as arbitrator and will approach such individuals with such other Party (if its invitation is accepted) or without such other Party (if its invitation is rejected or not responded to within five (5) business days): The Honorable William B. Chandler III, David A. Jenkins, Esq., Stephen E. Jenkins, Esq., Robert J. Katzenstein, Esq., and Andre G. Bouchard, Esq.  If only one such individual is available and willing, he shall serve as the arbitrator.  If more than one such individual is available and willing, the Parties will mutually determine which of those so available and willing will serve as the arbitrator.  If the Parties are unable to agree, the arbitrator will be selected by the AAA from the foregoing list in accordance with the listing, striking and ranking procedure in the Rules, with each Party being given a limited number of strikes, except for cause.  If none of the foregoing individuals is available, the arbitrator will be selected by the AAA in accordance with the listing, striking and ranking procedure in the Rules, with each Party

being given a limited number of strikes, except for cause. Any arbitrator appointed by the AAA shall be a retired judge that presided over a state or federal court located in Delaware or a practicing attorney licensed in Delaware with no less than fifteen years of experience with large commercial cases. Any such arbitration proceedings shall be and remain confidential. The place of arbitration shall be in Manhattan, New York or elsewhere if otherwise agreed to.

(c)     Discovery will be limited to the request for and production of documents, directly related to the issues in dispute, limited depositions of limited duration, and interrogatories. Interrogatories will be allowed only as follows: a Party may request the other Party to identify by name, last known address and telephone number (i) all persons having knowledge of facts relevant to the dispute and a brief description of that person's knowledge, and (ii) any experts who may be called as an expert witness, the subject matter about which the expert is expected to testify, the mental impressions and opinions held by the expert and the facts known by the expert. All issues concerning discovery upon which the parties cannot agree will be submitted to the arbitrator for determination.

(d)     Each of the Parties agrees that it will use commercially reasonable efforts to join (and will allow the other party to join) any third party that the Parties have agreed is indispensable to the arbitration. If any such third party does not agree to be joined, the arbitration will proceed nonetheless.

(e)     The arbitrators are not empowered to award damages not permitted by the terms of this Agreement and if so permitted, then not in excess of compensatory damages, except with respect to indemnification obligations for punitive damages as provided hereunder, and

each Party irrevocably waives the right to recover punitive, exemplary or multiple damages with respect to any dispute other than with respect to indemnification obligations for such punitive damages as provided hereunder. The decision of, and award rendered by, the arbitrator will be final and binding on the Parties, will be in writing and will include the findings of fact and conclusions of law upon which it is based, if any.

(f)     The Parties specifically acknowledge that this Agreement evidences a transaction involving, affecting, affected by, and a part of, interstate commerce and that this agreement to arbitrate is governed by and enforceable under the Federal Arbitration Act, 9 U.S.C. §§ 1 et seq.

(g)     Except to the extent that any of the indemnification provisions contained herein shall be applicable (i) the Parties shall each be responsible for their own costs and expenses (including legal fees and disbursements) incurred in any arbitration, and (ii) the AG Group on the one hand and the Trump Group on the other shall each be responsible for 50% of the fees and disbursements of the arbitrator and of any costs and expenses payable to the AAA.

(h)     With respect to the enforcement, modification or vacating of any arbitration award (it being reconfirmed hereby that the arbitration award shall itself be final and binding on the Parties), the Parties submit to the exclusive jurisdiction of one or the other of (i) the United Stated District Court of the Southern District of New York sitting in the Borough of Manhattan in the City of New York and (ii) the Commercial Division of the New York State Supreme Court sitting in the Borough of Manhattan in the City of New York.

16.     **Notice.** If any Party is required to give notice to any other Party under this Agreement, such notice shall be in writing and shall be deemed to have been duly given upon receipt of hand delivery, one business day following its being sent to the recipient via Federal Express or another

26

nationally recognized over-night courier, or by e-mail with confirmation of receipt to the

following individuals or to such other address or person as such Parties may from time to time

specify by written notice given in the manner provided above:

**If to the Trump Group:**

Mark S. Hirsch, Esq.

The Trump Group

41 Madison Avenue, Suite 4101

New York, NY 10010

Phone: (212) 838-1000

E-mail: mhirsch@trumpgroup.com

**With Copy to:**

Thomas J. Allingham II, Esq.

Anthony W. Clark, Esq.

Douglas D. Herrmann, Esq.

Skadden, Arps, Slate, Meagher & Flom LLP

One Rodney Square

P.O. Box 636

Wilmington, DE 19899

Phone: (302) 651-3000

E-mail: thomas.allingham@skadden.com

27

E-mail:  anthony.clark@skadden.com

E-mail:  douglas.herrmann@skadden.com

**If to Arie Genger:**

Arie Genger

104 West 40th Street, 19th Floor

New York, NY 10018

E-mail:  wachtel@wmllp.com

**With Copy to:**

Stephen P. Lamb, Esq.

Paul Weiss

500 Delaware Avenue, Suite 200

Wilmington, DE 19889

**If to Orly Genger:**

Orly Genger

104 West 40th Street, 19th Floor

New York, NY 10018

E-mail: wachtel@wmllp.com

**With Copy to:**

28

William Wachtel

Wachtel Masyr & Missry LLP

885 second ave.

New York, NY 10017


[]


**If to Arnold Broser or David Broser:**

David Broser

104 West 40th, 19th FloorNew York, NY 10018

E-mail:  wachtel@wmll.com

**With Copy to:**

William Wachtel

Wachtel Masyr & Missry LLP

885 second ave.
New York, NY 10017

29

17.     **Entire Agreement.** This Agreement contains the entire agreement between the Parties concerning the subject matter hereof. Neither this Agreement nor any of its terms or provisions shall be binding on any Party until all the Parties hereto have signed. The Parties agree that all drafts of this Agreement are strictly confidential and shall supplement and complement any protection, which may attach to the exchange of confidential information in settlement discussions, whether by common law or statute including, but not limited to, Federal Rule of Evidence 408 and comparable state laws. Any and all prior discussions and agreements between the Parties concerning the subject matter of this Agreement are merged into this Agreement when signed. This Agreement may not be modified or amended, nor any of its provisions waived, except by an instrument in writing signed by all Parties. No Party has made any warranty or representation to the other Parties that is not set forth expressly herein. In entering into this Agreement, no Party has relied on any statement or representation made by or on behalf of any other Party, by or on behalf of any affiliate of such other Party, or by counsel for such other Party that is not set forth expressly in this Agreement.

18.     **No Drafting Presumption.** This Agreement shall be interpreted or construed without any presumption that the provisions hereof should be strictly construed against the drafter, it being agreed that the Parties and their respective counsel and other agents have fully and equally participated in the preparation, negotiation, review and approval of all provisions of this Agreement.

19.     **No Admissions.** The Parties have executed this Agreement for the sole purpose of settling and disposing of all Claims between them, and it is expressly understood and agreed that no Party hereto admits any wrongdoing on its, his or her part by executing this Agreement.

20.     **Binding Effect.**  It is the intention of the parties to extinguish all AG Group Released

Claims and all Trump Group Released Claims and, consistent with such intention, each of the

Parties hereby waives any and all rights, to the extent permitted by law, to assert that the Release

provided by it in Paragraph 6 hereunder is unenforceable as to any claim whatsoever and for any

reason including, without limitation, any and all rights under section 1542 of the California Civil

Code, if applicable, or any other applicable similar law or principle of common law, which may

have the effect of limiting the Releases herein.  Section 1542 of the California Civil Code

provides:

> A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE
> CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER
> FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF
> KNOWN BY HIM OR HER MUST HAVE MATERIALLY AFFECTED HIS
> OR HER SETTLEMENT WITH THE DEBTOR.

21.     **Headings.**  The section headings contained in this Agreement are for reference purposes

only and shall not in any way effect or control the meaning or interpretation of this Agreement.

22.     **Execution in Counterparts and by PDF e-mail.**  This Agreement may be executed in

multiple counterparts and by fax or PDF e-mail, each of which, when so executed and delivered,

shall be an original, but such counterparts shall together constitute one and the same instrument

and agreement.

23.     **Effective Date.**  This Agreement shall be effective immediately upon execution and

delivery by all Parties hereto (the "Effective Date").

31

**IN WITNESS WHEREOF,** the Parties have caused this Agreement to be duly executed as follows:

**TR Investors, LLC**                    **Arie Genger**

By: _____

Print: _____          Date: ___6/15/13___

Title: _____

Date: _____


**Glenclova Investment Co.**              **Orly Genger (in her individual capacity and**
                                          **in her capacity as beneficiary of the**
By: _____            **Orly Genger 1993 Trust)**

Print: _____

Title: _____           Date: ___6/15/13___

Date: _____

32

**IN WITNESS WHEREOF**, the Parties have caused this Agreement to be duly executed as follows:

**TR Investors, LLC**                              **Arie Genger**

By: _Mark S. Hirsch_____          _____

Print: _MARK J. HIRICH_____          Date: _____

Title: _Executive VP/General Counsel_____

Date: _June 16, 2013_____

**Glenclova Investment Co.**                    **Orly Genger (in her individual capacity and in her capacity as beneficiary of the Orly Genger 1993 Trust)**

By: _Mark S. Hirsch_____

Print: _MARK S. HIRICH_____

Title: _Executive VP/General Counsel_____          _____

Date: _June 16, 2013_____          Date: _____

32

New TR Equity I, LLC

By: _____

Print: _____

Title: _____

Date: _____

Arnold Broser

_____

Date: ____ 6/11/13 ____

New TR Equity II, LLC

By: _____

Print: _____

Title: _____

Date: _____

David Broser

_____

Date: ____ 6/16/13 ____

33

**New TR Equity I, LLC**                    **Arnold Broser**

By: _Mark S Hirsch_                         _____

Print: _MARK S. HIRSCH_                     Date: _____

Title: _Executive VP / General Counsel_

Date: _June 16, 2013_


**New TR Equity II, LLC**                   **David Broser**

By: _Mark S Hirsch_                         _____

Print: _MARK S. HIRSCH_                     Date: _____

Title: _Executive VP / General Counsel_

Date: _June 16, 2013_

33

**Trans-Resources, LLC**

By: _Mark S. Hirsch_

Print: _MARK S. HIRSCH_

Title: _Executive VP / General Counsel_

Date: _June 16, 2013_

**Jules Trump**

Date: 6/16/2013

**Eddie Trump**

Date: _____

**Mark Hirsch**

Date: _____

**Jules Trump**

_____

Date: _____

**Eddie Trump**

_____

Date: June 16, 2013

**Mark Hirsch**

_____

Date: _____

35

**Jules Trump**

_____

Date: _____


**Eddie Trump**

_____

Date: _____


**Mark Hirsch**

_Mark Hirsch_ _____

Date: _June 16, 2013_ _____


35