EXHIBIT A

*6/16/13*
*Draft - Confidential*

## [FORM OF SUBORDINATED NOTE]

**THIS NOTE HAS NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR ANY APPLICABLE STATE SECURITIES LAWS AND MAY NOT BE SOLD OR TRANSFERRED WITHOUT COMPLIANCE WITH THE REGISTRATION OR QUALIFICATION PROVISIONS OF APPLICABLE FEDERAL AND STATE SECURITIES LAWS OR APPLICABLE EXEMPTIONS THEREFROM.**

### TRANS-RESOURCES

### <u>SUBORDINATED NOTE</u>

$7,500,000.00                                                                    June __, 2013

     **FOR VALUE RECEIVED**, Trans-Resources, LLC a Delaware entity (the successor to Trans-Resources, Inc. and referred to herein as the "<u>Maker</u>"), hereby promises to pay to the order of [_____] (the "<u>Payee</u>"), the principal sum of Seven Million, Five-Hundred Thousand Dollars ($7,500,000.00) pursuant to the terms and conditions of and at the times provided in the Settlement Agreement (as defined below).

    1.   <u>Notes</u>. This Subordinated Note (this "<u>Note</u>") is issued pursuant to, and is subject to the terms and conditions of, the Settlement Agreement and Release, dated as of June __, 2013 by and among the AG Group and the Trump Group, as amended, restated, supplemented or otherwise modified from time to time (the "<u>Settlement Agreement</u>"). Terms used herein and not otherwise defined herein shall have the respective meanings ascribed thereto in the Settlement Agreement.

    2.   <u>No Interest</u>. This Note will not accrue interest, pursuant to the terms of the Settlement Agreement.

    3.   <u>Maturity</u>. Subject to the terms and conditions of the Settlement Agreement and this Paragraph 3, this Note shall mature and be redeemed or satisfied in full by the Maker in one installment, which shall be paid by the Maker no later than the ___ anniversary of the Effective Date (the "<u>Maturity Date</u>"). Notwithstanding the foregoing, the Maturity Date shall automatically be extended until the earlier (the "<u>Extended Maturity Date</u>") of (i) such time as all pending claims, cross-claims and counter-claims brought by any of TPR, Sagi Genger, the Sagi Genger 1993 Trust, the Orly Genger 1993 Trust (other than the Orly Trust Action), D&K Limited Partnership, D&K GP LLC, Rochelle Fang, and/or David Parnes (collectively, the "<u>Sagi Group</u>") against any member of the Trump Group have been dismissed with prejudice and the statute of limitations shall have run with respect to any other potential claims of the Sagi Group that might be the subject of the indemnification obligations provided for by Paragraph 5 of the Settlement Agreement and (ii) such time as each member of the Sagi Group shall have provided the Trump Group with a release of the Trump Group Released Parties and covenant not to sue in form and substance that is the same as the AG Group Release and covenant not to sue contained in Paragraph 6(a) of the Settlement Agreement. Subject to the foregoing, this Note shall become immediately due and payable upon the occurrence of any transaction or series of transactions which shall result in the Trump Group owning or controlling neither (i) a majority of the voting stock of Trans-Resources or its successors or each of its two principal subsidiaries, Haifa

Chemicals, Ltd. and Na-Churs Plant Food Company or their successors, nor (ii) directly or indirectly, a majority of the assets currently owned by Trans-Resources and its subsidiaries; provided, however, that in such event, at the request of the Trump Group, the amounts then payable on this Note shall be placed in escrow until the Maturity Date or until the Extended Maturity Date (if applicable) under the provisions of an escrow agreement on reasonable terms to be negotiated at such time in good faith between the Maker, the Payee and an escrow agent selected by mutual consent of the Maker and the Payee (such consent, not to be unreasonably withheld, conditioned or delayed), which shall provide for the release of funds from such escrow to the Maker in satisfaction of any and all Indemnification Amounts, AG Group Release Amounts and Discovery Costs owing to Maker, if any, and payment to the Payee of any amounts remaining in escrow after payment to Maker of all Indemnification Amounts, AG Group Release Amounts and Discovery Costs, if any, upon the Maturity Date hereunder or the Extended Maturity Date (if applicable).

4.      Optional Prepayments.  The Maker may voluntarily prepay this Note prior to the Maturity Date, in whole or in part, at any time, without premium or penalty.

5.      Adjustment.  In accordance with the terms of the Settlement Agreement, in the event that at any time Indemnification Amounts, Discovery Costs, AG Group Release Amounts, or other amounts due and payable by the AG Group to the Trump Group pursuant to the Settlement Agreement (the "Costs") have not been paid to the Trump Group in accordance with the terms of the Settlement Agreement, the Maker may, upon written notice to the Payee, set off and apply as a credit against the amount due under this Note any and all due, unpaid and outstanding Costs.  The rights and remedies described herein are in addition to any other rights and remedies the Parties may have under the Settlement Agreement or other applicable law.

6.      Subordination.  Pursuant to the terms of the Settlement Agreement, this Note is unsecured and shall be fully subordinated to any obligation of Trans-Resources, including, but not limited to, outstanding credit facilities, bonds, loans, tax obligations and payables.

7.      Enforcement.  The Maker hereby agrees to pay on demand all reasonable costs and expenses, including without limitation attorneys' fees and costs of collection, incurred or paid by the Payee in enforcing this Note in accordance with the Settlement Agreement.

8.      Amendments.  No failure or delay on the part of the Maker or the Payee in exercising any right, power, privilege or remedy shall operate as a waiver thereof, nor shall any single or partial exercise of any such right, power, privilege or remedy preclude any other or further exercise thereof or the exercise of any other right, power, privilege or remedy.  This Note may not be amended and the provisions hereof may not be waived, except in accordance with the terms of the Settlement Agreement.

9.      Lost Notes, etc.  If this Note is mutilated, destroyed, lost or stolen, upon receipt of evidence satisfactory to the Maker of such loss, theft, destruction or mutilation of this Note and, if requested in the case of any such loss, theft or destruction, upon delivery of an indemnity agreement reasonably satisfactory to the Maker, or, in the case of any such mutilation, upon surrender and cancellation of this Note, the Maker shall issue a new Note of like tenor and amount, in lieu of this Note.

- 2 -

Error! Unknown document property name.

   10.   ASSIGNMENT.  THIS NOTE, INCLUDING THE RESPECTIVE RIGHTS AND OBLIGATIONS OF THE MAKER AND THE PAYEE PURSUANT THIS NOTE, MAY NOT BE ASSIGNED, TRANSFERRED, SOLD OR OTHERWISE DISPOSED OF BY EITHER THE MAKER OR THE PAYEE WITHOUT THE PRIOR WRITTEN CONSENT OF THE OTHER WHICH CONSENT MAY BE WITHHELD IN SUCH PARTY'S SOLE DISCRETION.

   11.   Binding Effect.  The provisions of this Note shall be binding upon and inure to the benefit of the parties hereto and their successors and assigns permitted hereby.

*[signature page follows]*

Error! Unknown document property name.

**IN WITNESS WHEREOF,** the Maker has caused this Subordinated Note to be duly executed under seal on the date set forth above by a duly authorized representative of the Maker.

TRANS-RESOURCES, LLC

By:_____
     Name:
     Title:

# Exhibit E

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: JAN 05 2015
```

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------ X

SAGI GENGER,                                    :
                                                :
                          Plaintiff,            :
                                                :
              -v-                               :        14-cv-5683 (KBF)
                                                :
ORLY GENGER,                                    :        OPINION & ORDER
                                                :
                          Defendant.            :
                                                :
------------------------------------------------------------------ X

KATHERINE B. FORREST, District Judge:

   As Tolstoy famously wrote, "Happy families are all alike; every unhappy family is unhappy in its own way." Leo Tolstoy, Anna Karenina 1 (Constance Garnett trans., 1978). In the case of the wealthy Genger family, that unhappiness has taken the form of a seemingly never-ending series of lawsuits stemming from the divorce of Arie Genger and Dalia Genger, the family patriarch and matriarch, respectively. Together, Arie, Dalia, their son Sagi, and their daughter Orly[1] have employed a small army of lawyers to fight over the pieces of the family pie and, it seems, to make each other's lives as miserable as possible.

   This latest installment in the Genger family's litigation saga concerns a straightforward contract dispute between Sagi and Orly. Sagi alleges that he and Orly entered into a tri-party agreement with Dalia, under which Sagi and Orly would receive shares of stock in exchange for providing Dalia with financial support

---

[1] For the sake of clarity, in this Opinion the Court will refer to the members of the Genger family by their given names.

derived from the economic value obtained from that stock.  Sagi contends that Orly has breached the agreement, and now seeks damages from her.  Orly, for her part, denies the agreement's validity and enforceability, primarily because she claims she never actually received the promised shares of stock, which means that the agreement is not supported by consideration.  But, as it turns out, Orly has effectively monetized an interest in the very shares she claims not to have received to the tune of $32.3 million.

Orly contends that this case is "an attempt to push the camel's nose under the tent flaps," and that Sagi and Dalia "hope to create a pipeline allowing them to siphon money from Orly for the rest of her life."  (ECF No. 92 at 1.)  The Court sees things differently: this case is a simple breach of contract action.  Nothing more, nothing less.

Because there is no triable issue as to whether there was a valid and enforceable agreement supported by consideration, and for the reasons that follow, the Court GRANTS Sagi's motion for summary judgment, DENIES Orly's motion for summary judgment, and DENIES AS MOOT Orly's motion to disqualify and all pending motions in limine.

2

I.    BACKGROUND

    A.    Factual Background[2]

The Genger family consists of father Arie, mother Dalia, son Sagi, and

daughter Orly. (DSOF ¶ 5.) Sagi is currently the President and CEO of TPR

Investment Associates, Inc. ("TPR"). (DSOF ¶ 4.) In 2004, Arie and Dalia

divorced.[3] (DSOF ¶ 5; PRSOF ¶ 5.) As part of the divorce, Dalia agreed to convey

her marital rights to 794.40 shares of TRI to trusts benefiting Sagi and Orly (the

"Sagi Trust" and the "Orly Trust,"[4] respectively) in exchange for a commitment by

Sagi and Orly to financially support her. This arrangement was effectuated via

three documents.

First, Dalia and Arie signed a stipulation of settlement finalizing the terms of

their divorce settlement (the "2004 Divorce Stipulation"), which was fully executed

---

[2] The following facts are taken from the Local Rule 56.1 statements submitted by the parties in connection with this motion for summary judgment and their supporting materials (ECF No. 34 ("PSOF"), 37 ("DSOF"), 51 ("DRSOF"), 52 ("DCMUF"), 55 ("PRSOF")), the factual materials submitted with the parties' letters dated November 25, 2014 (ECF Nos. 84-85), and public records of the parties' prior judicial proceedings. The Court cites to the parties' factual submissions only when they support a factual proposition, cite relevant material, and are not contradicted in pertinent part by a counter-statement supported by citation to evidence that would be admissible. See Local Civil Rule 56.1(d); Chimarev v. TD Waterhouse Investor Servs., Inc., 280 F. Supp. 2d 208, 223 (S.D.N.Y. 2003) (material facts set forth in a Rule 56.1 statement "are uncontested and may be accepted as true" where a Rule 56.1 counter-statement was "deficient" because it consisted solely of "blanket denials" and was "not supported by citation to any evidence"), aff'd, 99 Fed. App'x 259 (2d Cir. 2004). The Court recites only those facts relevant to the claims and defenses currently at issue, but also includes some factual allegations that are not material to the claims asserted but that are important to understanding the context for this case. Some of defendant's responses fail to directly address straightforward factual allegations, and these failures are considered admissions as a matter of law. See Local Civil Rule 56.1(c); Gubitosi v. Kapica, 154 F.3d 30, 31 n.1 (2d Cir. 1998); NAS Elecs., Inc. v. Transtech Elecs. PTE Ltd., 262 F.Supp.2d 134, 139 (S.D.N.Y. 2003).

[3] The divorce was finalized by a 2005 judgment. (PRSOF ¶ 5.)

[4] The trusts are officially named the "Sagi Genger 1993 Trust" and the "Orly Genger 1993 Trust." (DSOF ¶ 26.)

on October 30, 2004.[5]  (PSOF ¶ 1; DSOF ¶ 7.)  In the 2004 Divorce Stipulation,

Dalia promised to convey equal interests in a total of 794.40 shares of TRI to the

Orly Trust and the Sagi Trust.  (PSOF ¶ 1; DSOF ¶ 27.)  The 2004 Divorce

Stipulation contains an "entire understanding" clause, which is subject to a carve-

out for other agreements expressly incorporated by reference and those "entered

into concurrently herewith."  (DSOF ¶ 24.)

    The second was a letter signed by Sagi and Dalia dated October 30, 2004 (the

"2004 Promise").  (PSOF ¶ 3; DRSOF ¶ 51.)  In the 2004 Promise, Sagi agreed to

pay Dalia up to an amount equal to all dividends, distributions, proceeds or other

payments attributable to the TRI shares, upon Dalia's demand.  (PSOF ¶ 3.)  The

2004 Promise also states that the agreement is made "in consideration of" the

following: "Orly and [Sagi] are benefiting by the receipt of a total of 794.40 shares of

[TRI], or beneficial[6] interests in those shares, by trusts for [their] benefit."  (DSOF

¶ 52.)  The parties dispute whether the 2004 Promise was intended to be integrated

with the 2004 Divorce Stipulation.  (See DRSOF ¶ 3.)

    At the time the 2004 Promise was signed, Orly was vacationing in Fiji, and

thus could not contemporaneously sign the 2004 Promise.  (PSOF ¶ 4.)  However,

---

[5] The 2004 Divorce Stipulation states that it is "made as of October 26, 2004."  (DSOF ¶ 7.)

[6] Beneficial ownership is "[a] corporate shareholder's power to buy or sell the shares, though the shareholder is not registered on the corporation's books as the owner."  Ownership, Black's Law Dictionary (9th ed. 2009); see also Cartica Mgmt. v. CorpBanca, S.A., No. 14–CV–2258 PKC, 2014 WL 4804491, at *15 (S.D.N.Y. Sept. 25, 2014) (explaining the definition of beneficial ownership under federal securities law).  Record ownership is determined based on who is "listed in the issuer's books as the owner of stock on the record date."  Stockholder of Record, Black's Law Dictionary (9th ed. 2009).

4

before Sagi signed the 2004 Promise, Orly verbally agreed to indemnify Sagi for

50% of the payments he would have to make under the 2004 Promise.[7] (PSOF ¶ 4.)

The third agreement was a letter signed by Sagi and Orly dated November

10, 2004 (the "2004 Indemnity").[8] (PSOF ¶ 5.) In the 2004 Indemnity, Orly agreed

to indemnify Sagi "for and against one-half (1/2) of any and all payments, liabilities,

damages, claims, actions, losses, settlements, penalties, judgments or obligations

. . . , including [Sagi's] reasonable counsel and other professional fees, expenses and

costs, which arise from [Sagi's] undertakings in the [2004 Promise]." (PSOF ¶ 5.)

On August 22, 2008, Sagi-controlled TPR entered an agreement with the

Trump Group to sell the Sagi Trust's shares of TRI to the Trump Group for $26.7

million. (DSOF ¶ 34.) Sagi also sold the Orly Trust's TRI shares to the Trump

Group for approximately $10.3 million, subject to the condition that TPR was

determined to be an owner of the shares.[9] (DSOF ¶ 35.)

---

[7] In response to this factual allegation by Sagi, Orly counters that she does not remember a phone call with Sagi on the day of the divorce, and makes several non-responsive statements concerning the drafting and execution 2004 Promise and the 2004 Divorce Stipulation. (See DRSOF ¶ 4.) But she does not actually deny making this oral promise.

[8] At the initial case conference in the prior action, Orly's counsel stated that they believed the 2004 Indemnity was a forgery, and they would investigate this theory by, inter alia, using the services of an ink expert. (DRSOF ¶ 11.) The ink expert's examination of the 2004 Indemnity was also discussed at the October 31, 2014 status conference in the instant action; the Court ordered the parties to meet and confer regarding any outstanding issues with respect to expert discovery (ECF No. 48), and no such issues were subsequently raised with the Court.

Despite the considerable amount of discovery in this case, and her retention of an ink expert, Orly is unable to point to any admissible evidence suggesting that the 2004 Indemnity is a forgery. Further, in her briefing on this motion, Orly did not advance the argument that the 2004 Indemnity is a forgery or is otherwise inauthentic. Most importantly, in her Rule 56.1 responses, Orly does not affirmatively deny the existence of the 2004 Indemnity, or that she signed it. (See DRSOF ¶¶ 5, 11.) A party cannot create a genuine issue of material disputed fact through mere say-so and the hiring of an expert. There is accordingly no genuine issue of material disputed fact as to the authenticity of the 2004 Indemnity or as to whether Orly signed it.

[9] The parties dispute exactly what ownership interest was required by the condition. (See PRSOF ¶ 35.)

In 2011, the Supreme Court of Delaware affirmed a judgment invalidating the 2004 transfer of the TRI shares to the Orly Trust as to record ownership. Genger v. TR Investors, LLC, 26 A.3d 180, 198-200 (Del. 2011). As a result of this invalidation, record ownership of the TRI shares reverted to Sagi-controlled TPR. In that same decision, the Supreme Court of Delaware held that because the trial court lacked personal jurisdiction over the Orly Trust and TPR, it lacked the power to declare who beneficially owned the TRI shares, and therefore reversed the beneficial ownership determinations flowing from the trial court's orders. Id. at 203.

On June 16, 2013, Orly entered into a settlement agreement (the "2013 Settlement Agreement") with the Trump Group and others regarding her claims to ownership of the TRI shares. (ECF No. 84 ex. A ("2013 S.A.").) The agreement provides that Orly, Arie, and their litigation funders[10] will receive $32.3 million[11] in exchange for a declaration that the Trump Group owns "all right, title and interest (beneficially, of record, and otherwise)" to the TRI shares, and that Orly waives all of her claims to the TRI shares, both as a trust beneficiary[12] and individually. (2013 S.A. ¶¶ 2-4.) The 2013 Settlement Agreement does not waive any of the Orly Trust's claims. (See 2013 S.A. ¶ 4.) However, in the agreement Orly agreed to cause the Orly Trust to do the same. (2013 S.A. ¶ 8(a)(ii).)

---

[10] The 2013 Settlement Agreement refers to these parties collectively as the "AG Group." (2013 S.A. at 1.)

[11] The $32.3 million consists of $17.3 million in cash upfront, plus two additional $7.5 million payments to be made over four years. (2013 S.A. ¶¶ 2-3.)

[12] Specifically, as a beneficiary of the Orly Trust. (2013 S.A. ¶ 4.)

Then, on August 30, 2013, the Orly Trust (by Dalia), TPR, and the Trump

Group agreed that "the Trump Group owns, for all purposes, all right, title and

interest (beneficially, of record and otherwise) to all authorized and issued shares of

[TRI]." (ECF No. 85 ex. 5 ¶ 2.) This stipulated agreement was so-ordered by the

Delaware Court of Chancery. (ECF No. 85 ex. 5 at 7.) Subsequently, a court in this

District and New York's First Department both concluded that this so-ordered

stipulation determined the Trump Group to be the beneficial owner of the TRI

shares. TPR Inv. Assocs., Inc. v. Pedowitz & Meister LLP, No. 13 Civ. 8243 (JFK),

2014 U.S. Dist. LEXIS 67116, *5-6 (S.D.N.Y. May 15, 2014); Genger v. Genger, 121

A.D.3d 270, 280 (N.Y. App. Div. 2014).

On or about January 22, 2014, Dalia demanded $200,000 from Sagi under the

2004 Promise, which Sagi paid. (PSOF ¶¶ 6, 9.) On January 23, 2014, Sagi

informed Orly of Dalia's demand.[13] (PSOF ¶ 7.) On February 17, 2014, Sagi

demanded $100,000 from Orly under the 2004 Indemnity. (PSOF ¶ 10.) Orly

refused to pay. (PSOF ¶ 11.) This lawsuit for breach of contract followed.

B.      Procedural Background[14]

1.      General procedural background.

Sagi initially filed a breach of contract action against Orly in this Court on

February 18, 2014. (No. 14-cv-1006, ECF Nos. 1-2.) Orly filed a motion to dismiss

under Federal Rule of Civil Procedure 12(b)(6) on May 2, 2014. (No. 14-cv-1006,

---

[13] Sagi first provided Orly's counsel with a written copy of Dalia's demand on January 29, 2014.
(DSOF ¶ 60.)

[14] The Court recounts only the procedural history immediately relevant to the disposition of this
motion.

ECF No. 9.) Orly then filed a motion to dismiss for lack of subject-matter
jurisdiction under Rules 12(b)(1) and 12(h)(3) on May 29, 2014. (No. 14-cv-1006,
ECF No. 24.) That same day, Sagi filed a motion for summary judgment. (No. 14-
cv-1006, ECF No. 18.)

On July 22, 2014, the Court granted Orly's Rule 12(b)(1) motion[15] and
dismissed the action without prejudice, after finding that diversity jurisdiction was
inappropriate because both Sagi and Orly were domiciled in New York on the date
the action was filed. (No. 14-cv-1006, ECF No. 52.) Two days later, on July 24,
2014, Sagi commenced the instant proceeding, which was initially assigned to Judge
Caproni. (ECF No. 1.) On August 5, 2014, the case was reassigned to this Court,
which set an accelerated schedule for discovery, briefing, and trial owing to the
material similarity between this action and the previous one. (ECF No. 9.)

Orly filed a motion to dismiss under Rule 12 on August 27, 2014. (ECF No.
10.) The motion became fully briefed on September 18, 2014. (ECF No. 19.) The
Court denied the motion on September 19, 2014, finding that (1) subject-matter
jurisdiction over this action was appropriate; (2) Sagi had sufficiently alleged the
elements of the causes of action; and (3) the parties' briefing revealed a host of
factual issues outside the four corners of the complaint. (ECF No. 20.)

Both Sagi and Orly moved for summary judgment on October 20, 2014. (ECF
Nos. 32, 35.) Sagi filed motions in limine on November 17, 2014. (ECF No. 59.)
The following day, Orly filed motions in limine, (ECF No. 68), as well as a motion to

---

[15] The Court also denied as moot Orly's Rule 12(b)(6) motion to dismiss and Sagi's motion for
summary judgment.

disqualify Sagi's counsel John Dellaportas from acting as counsel at trial on November 18, 2014, (ECF No. 65).  Sagi and Orly submitted their oppositions to each others' motions in limine on November 24, 2014.  (ECF Nos. 79, 81.)

Sagi then submitted his opposition to Orly's motion to disqualify on November 26, 2014.  (ECF No. 89.)  That same day, the Court issued an order stating its intention to decide the case on summary judgment, and adjourning the trial date and all other dates.  (ECF No. 90.)  The parties submitted reply briefs on December 5 and 6, 2014.  (ECF Nos. 91, 92.)

      2.    Motion to compel production of the 2013 Settlement Agreement.

On September 30, 2014,[16] Sagi filed a letter-motion to compel production of the 2013 Settlement Agreement.  (ECF Nos. 22-23.)  Orly filed her opposition to the letter-motion on October 3, 2014, (ECF No. 25), the same day she filed her Answer, (ECF No. 24).  On October 7, 2014, the Court denied Sagi's letter-motion, based on its mistaken belief that the 2013 Settlement Agreement was irrelevant to the claims at issue.  (ECF No. 26.)

Upon reviewing the parties' summary judgment briefing, the Court realized its mistake, and on November 18, 2014 the Court vacated the October 7, 2014 order and granted Sagi's letter-motion to compel.[17]  (ECF No. 64.)  In the November 18, 2014 order, the Court ordered the parties to submit three-page letters regarding the potential impact of the 2010 Settlement Agreement on the claims and defenses at

---

[16] Sagi filed the same letter twice; once on September 30, 2014, and again on October 1, 2014.  (ECF Nos. 22-23.)  An additional exhibit is attached to the October 1, 2014 version.

[17] This order refers to the 2013 Settlement Agreement as the "2010 Settlement Agreement."

issue not later than November 25, 2014. (ECF No. 64.) The parties submitted their letters on November 25, 2014. (ECF Nos. 84-85.)

## II.   SUMMARY JUDGMENT STANDARD

Summary judgment may not be granted unless the movant shows, based on admissible evidence in the record placed before the court, "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the burden of demonstrating "the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). When the moving party does not bear the ultimate burden on a particular claim or issue, it need only make a showing that the non-moving party lacks evidence from which a reasonable jury could find in the non-moving party's favor at trial. Id. at 322-23. In making a determination on summary judgment, the court must "construe all evidence in the light most favorable to the nonmoving party, drawing all inferences and resolving all ambiguities in its favor." Dickerson v. Napolitano, 604 F.3d 732, 740 (2d Cir. 2010).

Once the moving party has asserted facts showing that the non-movant's claims cannot be sustained, the opposing party must set out specific facts showing a genuine issue of material fact for trial. Price v. Cushman & Wakefield, Inc., 808 F. Supp. 2d 670, 685 (S.D.N.Y. 2011); see also Wright v. Goord, 554 F.3d 255, 266 (2d Cir. 2009). "[A] party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment," as "[m]ere conclusory allegations or denials . . . cannot by themselves create a genuine issue of material fact where none would otherwise exist." Hicks v. Baines, 593 F.3d 159,

Sagi's promissory estoppel cause action, and so the Court grants him summary

judgment on that alternative basis.

    A.    <u>Enforceability</u>

        1.    <u>Integrated agreement.</u>

Under New York law, "all writings which form part of a single transaction

and are designed to effectuate the same purpose [must] be read together, even

though they were executed on different dates and were not all between the same

parties." <u>This Is Me, Inc. v. Taylor</u>, 157 F.3d 139, 143 (2d Cir. 1998); <u>accord</u>

<u>Madeleine, L.L.C. v. Casden</u>, 950 F. Supp. 2d 685, 695-96 (S.D.N.Y. 2013).

Contracts that are executed at different times "should be interpreted together if 'the

parties assented to all the promises as a whole so that there would have been no

bargain whatever if any promise or set of promises had been stricken.'"

<u>Commander Oil Corp. v. Advance Food Serv. Equip.</u>, 991 F.2d 49, 53 (2d Cir. 1993)

(quoting 6 Samuel Williston & Richard A. Lord, <u>A Treatise on the Law of Contracts</u>,

§ 863:275 (3d ed. 1970)). Whether multiple documents should be read as

constituting a single agreement depends on the intent of the parties. <u>TVT Records</u>

<u>v. Island Def Jam Music Grp.</u>, 412 F.3d 82, 89 (2d Cir. 2005); <u>accord</u> <u>Commander</u>

<u>Oil</u>, 991 F.2d at 52-53; <u>Madeleine</u>, 950 F. Supp. 2d at 696. The intent of the parties

is "typically a question of fact for the jury, . . . [b]ut if the documents in question

reflect no ambiguity as to whether they should be read as a single contract, the

question is a matter of law for the court." <u>TVT Records</u>, 412 F.3d at 89 (citation

omitted).

In <u>TVT Records</u>, the Second Circuit determined two agreements to be integrated based, <u>inter alia</u>, on the fact that the documents were intended to effectuate the same result. <u>Id.</u> As the parties under the later agreement were obligated to honor all of the terms and conditions of the earlier agreement, the later agreement was "meaningless" without the first. <u>Id.</u> The fact that the documents were "negotiated and signed at different times, memorialized in different documents and involved different parties" did not dictate a contrary result, because these facts did not address "the legally operative question: whether the contracts were part of a single transaction intended to effectuate the same purpose." <u>Id.</u> at 90 (citations omitted).

Similarly, in <u>This Is Me</u>, the Second Circuit held that a jury was justified in reading two contracts together where they were executed "more or less" (but not exactly) concurrently, and where one of the two contracts stated that the two contracts were intended to be executed together, but the other contract did not. 157 F.3d at 145. The Court also noted that counsel for a defendant conceded in a letter that the two contracts were intended to be read together. <u>Id.</u>

The 2004 Promise and the 2004 Indemnity are sufficiently unambiguous such that there is no triable issue as to whether they form an integrated agreement, even though they were executed on different dates and were not all between the same parties, and in this sense no different than the agreements at issue in <u>TVT Records</u>. Indeed, neither agreement makes any sense without the promises expressed in the other. Without the 2004 Indemnity, Sagi could be obligated under the 2004 Promise

to pay Dalia double the economic benefit he received from his shares of TRI, and Orly would effectively have received the shares as a gift.  Further, the 2004 Indemnity explicitly attaches and cross-references the 2004 Promise, which makes the situation here directly analogous to that in TVT Records, where the later agreement was "meaningless" without the earlier one.  Id. at 89.

There is accordingly no triable issue as to whether the documents were "designed to effectuate the same purpose" and to "be read together."  This Is Me, 157 F.3d at 143.  For this reason, the Court will refer to the integrated agreement in the rest of this Opinion as the "2004 Integrated Agreement.[18]

2.   Consideration.

Under New York law, to be valid, a contract must be supported by consideration.  Murray v. Northrop Grumman Info. Tech., Inc., 444 F.3d 169, 178 (2d Cir. 2006).  Consideration to support an agreement exists where there is "either a benefit to the promisor or a detriment to the promisee."  Hollander v. Lipman, 65 A.D.3d 1086, 1087 (N.Y. App. Div. 2009) (quoting Weiner v. McGraw-Hill, Inc., 443 N.E.2 441, 445 (N.Y. 1982)).

As a general matter, "[a] promise to perform a pre-existing legal obligation does not amount to consideration."  Murray, 444 F.3d at 178 (citing Goncalves v. Regent Int'l Hotels, Ltd., 447 N.E.2d 693, 700 (N.Y. 1983)).  However, § 5-1105 of New York's General Obligations Law provides:

---

[18] Orly vigorously disputes whether the 2004 Divorce Stipulation is integrated with the 2004 Promise and the 2004 Indemnity.  However, Sagi does not contend that the 2004 Divorce Stipulation is integrated with the 2004 Promise and the 2004 Indemnity (ECF No. 57 at 10), and so the Court need not reach this issue.

> A promise in writing and signed by the promisor or by his agent shall not be denied effect as a valid contractual obligation on the ground that consideration for the promise is past or executed, if the consideration is expressed in the writing and is proved to have been given or performed and would be a valid consideration but for the time when it was given or performed.

N.Y. Gen. Oblig. Law § 5-1105.

To meet § 5-1105's requirement that the consideration be "expressed" in the writing, the recitation of consideration must not be vague or imprecise.[19]  See United Res. Recovery Corp. v. Ramo Venture Mgmt., Inc., 584 F. Supp. 2d 645, 656 (S.D.N.Y. 2008); Movado Grp., Inc. v. Presberg, 259 A.D.2d 371, 371 (N.Y. App. Div. 1999); Umscheid v. Simnacher, 482 N.Y.S.2d 295, 297 (N.Y. App. Div. 1984).  For example, courts have held that the statements "past work on the Company's behalf" and "services rendered on the respondent's behalf" are too vague and imprecise to meet the expression requirement.  United Res. Recovery, 584 F. Supp. 2d at 656;

---

[19] In several cases, courts have stated that in order to recover under § 5-1105, "the writing must contain an unequivocal promise to pay a sum certain, at a date certain, and must express consideration for the promise." E.g., United Res. Recovery Corp. v. Ramo Venture Mgmt., Inc., 584 F. Supp. 2d 645, 656 (S.D.N.Y. 2008) (quoting Umscheid v. Simnacher, 482 N.Y.S.2d 295, 297 (N.Y. App. Div. 1984)); In re Maxwell Commc'n Corp., 198 B.R. 63, 69 (S.D.N.Y. 1996) (same); Kreuter v. Tsucalas, 734 N.Y.S.2d 185, 188 (N.Y. App. Div. 2001) (same).  The citation provided for this statement of law is typically the Second Department's decision Umscheid v. Simnacher, 482 N.Y.S.2d 295 (N.Y. App. Div. 1984), which in turn cited as support Sarama v. John Mee, Inc., 102 Misc. 2d 132 (N.Y. Civ. Ct. 1979), and Citibank National Ass'n v. London, 526 F. Supp. 793 (S.D. Tex. 1981), the latter of which cited only Sarama as support for this proposition.

However, Sarama in fact states that "[i]n order for plaintiff to recover for breach of contract, defendant's letter must contain an unequivocal promise to pay a sum certain, at a date certain, and, further, it must conform with General Obligations Law [§] 5-1105, by expressing in the letter the consideration for the promise." Sarama, 102 Misc. 2d at 133 (emphasis added).  Sarama thus states that the requirement of "an unequivocal promise to pay a sum certain, at a date certain" is a general requirement for recovery for breach of contract under the facts of that case, not a requirement for recovery under § 5-1105. The Court further notes that the "sum certain" and "date certain" requirements are found nowhere in the text of § 5-1105, nor can they be implied from that text, and that New York's Court of Appeals has never embraced an interpretation of § 5-1105 encompassing those requirements.

Umscheid, 482 N.Y.S.2d at 297.  By contrast, in Movado Group, Inc. v. Presberg, the Appellate Division of New York's First Judicial Department held that a commitment to pay all of a company's debts to a party on an "absolute, unconditional, and continuing" basis was sufficient to establish past consideration under § 5-1105, despite its being "a broad commitment, certainly not limited to one opening transaction."  259 A.D.2d at 371.

The 2004 Integrated Agreement clearly purports to provide each party with a benefit in exchange for a legal obligation: Dalia receives financial support in exchange for the transfer of the TRI shares to the Sagi Trust and the Orly Trust; Sagi receives an ownership interest in the TRI shares[20] in exchange for a commitment to financially support Dalia; and Orly receives an ownership interest in TRI shares in exchange for a commitment to indemnify Sagi.

Orly contends that the 2004 Integrated Agreement is not supported by consideration for two reasons.  First, Orly contends that the 2004 Integrated is not supported by consideration because the Orly Trust never received the TRI shares. But the 2004 Promise states that Orly and Sagi are benefiting from receipt of either the TRI shares or "beneficial interests in those shares," by their respective trusts. (ECF No. 1 ex. A.)  Thus, the question becomes whether Orly has benefited from the

---

[20] Sagi contends that the contract is supported by two forms of consideration: (1) the Orly Trust's receipt of the TRI shares as part of the divorce stipulation; (2) love, affection, and the end to parental strife.  (Compl. ¶ 8.)  The Court rejects Sagi's argument that the 2004 Integrated Agreement is supported by consideration because Orly received an emotional and psychological benefit in helping to bring about an end to her parents' bitter divorce.  Affection, love, and feelings cannot constitute consideration under New York law.  See, e.g., McRay v. Citrin, 706 N.Y.S. 2d 27, 28 (N.Y. App. Div. 2000); Rose v. Elias, 576 N.Y.S.2d 257, 258 (N.Y. App. Div. 1991); see also 22 N.Y. Jur. 2d Contracts §§ 116-17.

Orly Trust's receipt of beneficial interests in the TRI shares. There is no genuine dispute as to whether she has so benefited: Orly's claims to beneficial ownership of the TRI shares individually and as a trust beneficiary enabled her to obtain $32.3 million from the Trump Group under the 2013 Settlement Agreement. Further, no court has issued a binding final judgment that the Orly Trust did not receive a beneficial interest in the TRI shares.[21]

Second, Orly contends that the TRI shares cannot serve as valid consideration because they had already been transferred when the 2004 Indemnity was signed, and they were transferred pursuant to the 2004 Divorce Stipulation, which is a separate agreement. This argument fails because the 2004 Integrated Agreement satisfies § 5-1105 of New York's General Obligations Law. The past consideration is precisely and unambiguously stated in the 2004 Promise, which states that "Orly and [Sagi] are benefiting by the receipt of a total of 794.40 shares of Trans-Resources, Inc. ("TRI"), or beneficial interests in those shares, by trusts for [their] benefit." (ECF No. 1 ex. A.) This statement is sufficiently precise and unambiguous so as to satisfy § 1105's expression requirement—indeed, this statement is considerably more exact than a promise to pay all of a company's debts on an ongoing basis, which was found to be sufficient in Movado Group. And as established above, there is no triable issue as to whether Orly was for all intents and purposes given a beneficial interest in the TRI shares.

---

[21] The Delaware Court of Chancery's beneficial ownership determinations were reversed by the Supreme Court of Delaware's July 18, 2011 decision. Genger v. TR Investors, LLC, 26 A.3d 180, 203 (Del. 2011).

Accordingly, there is no triable issue as to whether the 2004 Integrated Agreement was supported by valid consideration.[22]

B.     Defenses

There is no triable issue as to whether Orly has a viable defense to the 2004 Integrated Agreement.

       1.     Judicial estoppel.

The doctrine of judicial estoppel "protect[s] the integrity of the judicial process by prohibiting parties from deliberately changing positions according to the exigencies of the moment." New Hampshire v. Maine, 532 U.S. 742, 749-50 (2001) (citation and internal quotation marks omitted). The decision whether judicial estoppel should bar a litigant from making a particular argument is highly fact-specific. See id. at 751. Several considerations counsel in favor of applying the doctrine in a particular case: (1) the party's later position is clearly inconsistent with its earlier position; (2) the party has succeeded in persuading a court to accept its earlier position, so that judicial acceptance of an inconsistent position in a later proceeding would create the perception that either the first or the second court was misled; (3) the party asserting the inconsistent position would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped. Adelphia Recovery Trust v. Goldman Sachs & Co., 748 F.3d 110, 116 (2d Cir. 2014) (citing New Hampshire, 532 U.S. at 750-51). However, "[b]ecause the doctrine is

---

[22] Orly makes much of the fact that the 2013 Settlement Agreement did not release the Orly Trust's claims to the TRI shares. But this fact does nothing to disprove that Orly benefited from her claim to beneficial ownership of the TRI shares, and to the extent that it is relevant, it just provides further evidence that the Orly Trust had a legitimate claim to beneficial ownership of the TRI shares.

primarily concerned with protecting the judicial process, relief is granted only when the risk of inconsistent results with its impact on judicial integrity is certain." Id. (alteration in original) (quoting Republic of Ecuador v. Chevron Corp., 638 F.3d 384, 397 (2d Cir. 2011)).

Orly argues that Sagi should be judicially estopped from arguing that the Orly Trust received a beneficial interest in the TRI shares. However, in this case embracing Sagi's position runs no risk of endangering judicial integrity, as no court has issued a binding final judgment that the Orly Trust did not receive a beneficial interest in the TRI shares. Further, there is no reason to believe that permitting Sagi to argue that the Orly Trust received the beneficial interest in the TRI shares would give Sagi an unfair advantage or impose an unfair detriment on Orly—indeed, embracing Orly's argument here would effectively allow her to avoid paying hundreds of thousands of dollars due under an otherwise valid agreement for a technical and formalistic reason unrelated to the equities of the situation. Accordingly, even assuming that Sagi has taken an inconsistent litigation position,[23] judicial estoppel does not bar Sagi from arguing that the Orly Trust received beneficial ownership of the TRI shares.

2.    Mutual mistake.

"A contract is voidable under the equitable remedy of rescission if both parties entered into the contract under a mutual mistake of fact." Schultz v. Hourihan, 656 N.Y.S.2d 526, 528 (N.Y. App. Div. 1997). In order to obtain

---

[23] Given the strong rationale for not applying the doctrine of judicial estoppel here, the Court need not delve into the specific arguments advanced by Sagi or TPR in the course of their numerous years of prior litigation involving Orly and/or the TRI shares.

rescission of a contract due to mutual mistake, "it must be shown that the mistake in question is mutual, substantial, material and exists at the time the contract is entered." Rodriguez v. Mower, 56 A.D.3d 857, 858 (3d Dep't 2008) (citation omitted). In New York, a mutual mistake must be established by "clear and convincing" evidence. E.g., Carney v. Carozza, 792 N.Y.S.2d 642, 644 (N.Y. App. Div. 2005); Silver v. Gilbert, 776 N.Y.S.2d 867, 867 (N.Y. App. Div. 2004).

Orly first argues that if the 2004 Integrated Agreement is valid, it should nevertheless be rescinded because there was a mutual mistake as to whether Sagi and Orly were being treated equally in their parents' divorce. This argument fails because there was no mistake of fact here—the 2004 Divorce Stipulation and the 2004 Integrated Agreement explicitly provide for equal treatment of Orly and Sagi.

Orly further argues that the parties were mutually mistaken with regard to whether the interests in the TRI shares could be validly transferred to their trusts, such that they would receive equal interests in the TRI shares. This argument too fails, because as established above, the parties were in fact only mistaken as to their ability to receive and/or monetize record ownership in the TRI shares, and this mistake was not substantial or material because the money was clearly in the beneficial interest—Orly monetized her beneficial interest in the Orly Trust shares for $32.3 million, while Sagi sold his interests in the TRI shares for $37.0 million.

In any event, rescission due to mutual mistake is an equitable remedy, and it would not serve the interests of equity to rescind the 2004 Integrated Agreement here, as doing so would enable Orly to obtain her benefit from the agreement (the

$32.3 million she received for the beneficial interest in the TRI shares) while

escaping her obligations under it (her commitment to financially support her

mother). Accordingly, the Court declines to rescind the contract under the doctrine

of mutual mistake.

        3.     <u>Lack of opportunity to defend.</u>

      Orly argues that as an indemnitor she has no contractual duty to indemnify

Sagi without first receiving notice and a chance to defend. Under New York law, an

indemnitee cannot seek reimbursement from an indemnitor unless the indemnitee

first notifies the indemnitor of a potentially covered claim and gives them an

opportunity to defend against it. See <u>Chase Manhattan Bank v. 264 Water St.</u>

<u>Assocs.</u>, 634 N.Y.S.2d 687, 689 (N.Y. App. Div. 1995). However, notice to the

indemnitor is not required if an indemnitee can "establish that [it] would have been

liable and that there was no good defense to that liability." <u>Deutsche Bank Trust</u>

<u>Co. of Ams. v. Tri-Links Inv. Trust</u>, 900 N.Y.S.2d 246, 253 (N.Y. App. Div. 2010).

      Although the parties do not dispute that Sagi twice informed Orly and her

counsel of Dalia's demand prior to paying Dalia, they do dispute whether Sagi

informed Orly of his intention actually to honor Dalia's demand. (See DRSOF ¶ 7;

PRSOF ¶ 61.) Ultimately, however, even if Sagi did fail to properly notify Orly,

notice was not required as a matter of law because Sagi had no good defense against

Dalia's demand—the 2004 Integrated Agreement expressly gives Dalia the right to

make such a demand and clearly obligates Sagi to pay it, and as established above

there is no valid argument against the agreement's enforceability or validity.

Accordingly, the parties' dispute over whether Sagi properly provided Orly with

21

notice does not preclude this Court from granting Sagi summary judgment as to the validity of the indemnification obligation as a matter of law.

C.   Performance, Breach, and Damages

The parties do not dispute that Sagi performed his obligations under the 2004 Integrated Agreement, as it is undisputed that Sagi paid Dalia $200,000. There is also no dispute as to whether Orly breached the 2004 Indemnity by refusing to pay Sagi, and nor is there a dispute that Sagi suffered damages of at least $100,000 as a result. Accordingly, because the 2004 Integrated Agreement is valid and enforceable, there is no triable issue as to whether all of the elements of Sagi's breach of contract claim are satisfied, and summary judgment is thus granted in Sagi's favor as to his breach of contract claim.

D.   Promissory Estoppel

Even if the 2004 Integrated Agreement were not valid and enforceable, Sagi is also entitled to equitable relief under the doctrine of promissory estoppel. "A cause of action for promissory estoppel under New York law requires the plaintiff to prove three elements: 1) a clear and unambiguous promise; 2) reasonable and foreseeable reliance on that promise; and 3) injury to the relying party as a result of the reliance."[24] Kaye v. Grossman, 202 F.3d 611, 615 (2d Cir. 2000) (citing Readco, Inc. v. Marine Midland Bank, 81 F.3d 295, 301 (2d Cir. 1996)).

---

[24] "New York courts limit promissory estoppel claims to instances of unconscionable injury only where promissory estoppel is invoked as a defense to the Statute of Frauds. . . . But New York courts generally do not require a showing of unconscionability where promissory estoppel is invoked to prevent injustice stemming from reliance on a gratuitous promise." Pearce v. Manhattan Ensemble Theatre, Inc., 528 F. Supp. 2d 175, 181 (S.D.N.Y. 2007) (collecting cases).

In the 2004 Indemnity, Orly made a clear and unambiguous promise to indemnify Sagi for "one-half (1/2) of any and all payments, liabilities, damages, claims, actions, losses, settlements, penalties, judgments or obligations . . . , including [Sagi's] reasonable counsel and other professional fees, expenses and costs, which arise from [Sagi's] undertakings in the [2004 Promise]." (PSOF ¶ 5.) There is no material dispute as to whether Sagi relied on this promise in paying Dalia, or that he sustained injury as a result of this reliance.

However, Orly argues that Sagi's reliance was not reasonable or foreseeable, because when he paid Dalia he was already aware that Orly disputed the validity and enforceability of the 2004 Integrated Agreement.  This argument is unpersuasive.  First, the time from which foreseeability is determined is when the promise is made, not the time of performance, and there is no genuine dispute as to whether it was foreseeable that Sagi would rely on the promise when it was made.  Second, there is no genuine dispute as to whether Sagi's reliance was reasonable, because as explained above, Orly's position that the 2004 Integrated Agreement was invalid and unenforceable objectively lacked merit.

Orly argues that Sagi should be barred from recovering under a theory of promissory estoppel due to unclean hands.  "The doctrine of unclean hands applies when the complaining party shows that the offending party is guilty of immoral, unconscionable conduct and even then only when the conduct relied on is directly related to the subject matter in litigation and the party seeking to invoke the doctrine was injured by such conduct."  Kopsidas v. Krokos, 742 N.Y.S.2d 342, 344

(N.Y. App. Div. 2002) (quoting Nat'l Distillers & Chem. Corp. v. Seyopp Corp., 17 N.Y.2d 12, 15-16 (N.Y. 1966)) (internal quotation marks omitted). Orly argues that Sagi's hands are unclean because under his Presidency, TPR was obligated to effectuate the transfer of the TRI shares to her, and failed to do so. However, on July 24, 2014, the Appellate Division of New York's First Judicial Department held that as an officer of TPR, Sagi's fiduciary duty was to the corporation and its stockholders, and that Sagi had not breached any duty to Orly in failing to honor the agreement to transfer the TRI shares to her trust. Genger v. Genger, 121 A.D.3d 270, 278-79 (N.Y. App. Div. 2014). Sagi's behavior here is consistent with his duty to TPR and its shareholders, and does not rise to the immoral or unconscionable level required to bar him from relief under the doctrine of unclean hands.

Accordingly, there is no triable issue as to Sagi's promissory estoppel claim, and Sagi is granted summary judgment on that cause of action in addition to his breach of contract cause of action.

IV.    CONCLUSION

For the above reasons, the Court GRANTS Sagi's motion for summary judgment, DENIES Orly's motion for summary judgment, and DENIES AS MOOT Orly's motion to disqualify and all pending motions in limine.

The Clerk of Court is directed to close the motions at ECF Nos. 32, 35, 59, 65, and 68 and to terminate this action.

SO ORDERED.

Dated:      New York, New York
            January 5, 2015


                                        KATHERINE B. FORREST
                                        United States District Judge

# Exhibit F

**FILED: NEW YORK COUNTY CLERK 08/11/2014 10:36 AM**

NYSCEF DOC. NO. 1099

INDEX NO. 651089/2010

RECEIVED NYSCEF: 08/11/2014

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

-------------------------------------------------------------x

ARIE GENGER and ORLY GENGER, in her
individual capacity and on behalf of
THE ORLY GENGER 1993 TRUST,

                                Plaintiffs,

                                -against-

SAGI GENGER, TPR INVESTMENT
ASSOCIATES, INC., DALIA GENGER, THE
SAGI GENGER 1993 TRUST, ROCHELLE
FANG, individually and as trustee of THE SAGI
GENGER 1993 TRUST, GLENCLOVA
INVESTMENT COMPANY, TR INVESTORS,
LLC, NEW TR EQUITY I, LLC, NEW TR
EQUITY II, LLC, JULES TRUMP, EDDIE
TRUMP AND MARK HIRSCH,

                                Defendants.

-------------------------------------------------------------x

SAGI GENGER, individually and as assignee of
THE SAGI GENGER 1993 TRUST, and TPR
INVESTMENT ASSOCIATES, INC.

        Cross-Claimants, Counterclaimants, and
        Third-Party Claimants,

                                -against-

ARIE GENGER, ORLY GENGER,
GLENCLOVA INVESTMENT COMPANY,
TR INVESTORS, LLC, NEW TR EQUITY I, LLC,
NEW TR EQUITY II, LLC, JULES TRUMP,
EDDIE TRUMP, MARK HIRSCH,
TRANS-RESOURCES, INC., WILLIAM
DOWD, and THE ORLY GENGER 1993 TRUST,

        Cross-Claim, Counterclaim and/or
        Third-Party Defendants.

-------------------------------------------------------------x

Index No. 651089/2010
(Jaffe, B. JSC)

NOTICE OF MOTION

PLEASE TAKE NOTICE THAT, upon the accompanying Affirmation of Judith Bachman, dated August 11, 2014, and the exhibits attached thereto, and upon all the pleadings and proceedings heretofore had herein, Defendant Dalia Genger, through her undersigned counsel will move this Court returnable at 60 Centre St., Motion Submission Part, Room 130 on September 30, 2014, at 9:30 a.m. or as soon thereafter as counsel can be heard for an order substituting Dalia Genger, as trustee, as plaintiff on Orly Genger's Trump Group claims and for an order pursuant to CPLR 2701 directing that the Trump Group settlement fund be paid into Court, and such further and other relief as the Court may deem just and proper.

PLEASE TAKE FURTHER NOTICE that pursuant to CPLR 2214(b), answering papers, if any, must be served at least seven days prior to the return date of this motion.

Dated:  August 11, 2014, 2014
        New City, New York

                                    _____/s/_____
                                    Judith Lisa Bachman, Esq.
                                    Counsel for Defendant
                                    Dalia Genger, Trustee
                                    254 South Main Street, Suite 306
                                    New City, New York 10956
                                    845-639-3210

FILED: NEW YORK COUNTY CLERK 08/11/2014 10:36 AM   INDEX NO. 651089/2010

NYSCEF DOC. NO. 1108   RECEIVED NYSCEF: 08/11/2014

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

---------------------------------------------------------------x

ARIE GENGER and ORLY GENGER, in her       :
individual capacity and on behalf of
THE ORLY GENGER 1993 TRUST,               :      Index No. 651089/2010
                                                 (Jaffe, B. JSC)
                                          :

                    Plaintiffs,           :


                    -against-             :

SAGI GENGER, TPR INVESTMENT               :
ASSOCIATES, INC., DALIA GENGER, THE
SAGI GENGER 1993 TRUST, ROCHELLE          :
FANG, individually and as trustee of THE SAGI
GENGER 1993 TRUST, GLENCLOVA              :
INVESTMENT COMPANY, TR INVESTORS,
LLC, NEW TR EQUITY I, LLC, NEW TR         :
EQUITY II, LLC, JULES TRUMP, EDDIE
TRUMP AND MARK HIRSCH,                    :

                    Defendants.           :
---------------------------------------------------------------x

SAGI GENGER, individually and as assignee of   :
THE SAGI GENGER 1993 TRUST, and TPR
INVESTMENT ASSOCIATES, INC.               :


        Cross-Claimants, Counterclaimants, and   :
        Third-Party Claimants,

                                          :

                    -against-             :

ARIE GENGER, ORLY GENGER,                 :
GLENCLOVA INVESTMENT COMPANY,             :
TR INVESTORS, LLC, NEW TR EQUITY I, LLC,
NEW TR EQUITY II, LLC, JULES TRUMP,       :
EDDIE TRUMP, MARK HIRSCH,
TRANS-RESOURCES, INC., WILLIAM            :
DOWD, and THE ORLY GENGER 1993 TRUST,

                                          :

        Cross-Claim, Counterclaim and/or   :
        Third-Party Defendants.           :
---------------------------------------------------------------x

MEMORANDUM OF LAW IN SUPPORT
OF TRUSTEE DALIA GENGER'S MOTION
TO SUBSTITUTE FOR PLAINTIFF ORLY GENGER
ON HER DERIVATIVE CLAIMS AGAINST THE TRUMP GROUP
AND FOR AN ORDER DIRECTING
SETTLEMENT PROCEEDS TO
BE PAID INTO COURT

Judith Lisa Bachman, Esq.
254 S. Main Street, Suite 306
New City, New York 10956
845-639-3210

Table of Contents

Table of Authorities                                                              i

Preliminary Statement                                                            1

Statement of Facts                                                               1

Argument

    Point I

        Substitution of Derivative Plaintiff Orly Genger
        Is Necessary Because She No Longer
        Represents the Orly Trust on the
        Trump Group Claims And She Has Suggested the Trustee
        "Pick Up the Cudgel" on those Claims                         4

    Point II

        The Proceeds of the Settlement
        Should be Paid into Court
        To Protect the Fund                                          5

Conclusion                                                                      10

Table of Authorities

Cases

<u>Bonham v Coe</u>, 249 A.D. 428, 292 N.Y.S. 423 (4th Dep't 1937)    9

<u>Clarke v. Greenberg</u>, 71 N.E.2d 443, 296 N.Y. 146 (1947)    6

<u>Conforti v. Goradia</u>, 234 A.D.2d 237, 651 N.Y.S.2d 506  (1st Dep't 1996)    6

<u>Gusinsky v. Bailey</u>, 21 Misc.3d 1107(A), 873 N.Y.S.2d 234 (Table)
(Sup. Ct. N.Y. County 2008), <u>rev'd on other grounds,</u>
66 A.D.3d 614, 887 N.Y.S.2d 585 (1st Dep't 2008)    6

<u>In re Carroll's Estate</u>, 153 Misc. 649, 275 N.Y.S. 911 (Sur. Ct. 1934)    9

<u>In re Martin's Estate</u>, 96 N.Y.S.2d 842 (Surr. Ct. 1950)    9

<u>In re Roosevelt's Estate</u>, 131 Misc. 800, 228 N.Y.S. 323 (Sup. Ct. 1928)    9

<u>James v. Bernhard</u>, 106 A.D.3d 435, 965 N.Y.S.2d 56 (1st Dep't 2013)    4, 5

<u>Lade v. Levitt</u>, 33 A.D.2d 956, 306 N.Y.S.2d 704 (3d Dep't 1970)    6, 9

<u>Rice v. DiNapoli</u>, 23 Misc.3d 1128(A), 889 N.Y.S.2d 507 (Table)
(Sup. Ct. Albany County 2009)    6, 9

<u>Titus v. Empire Mink Corp.</u>, 17 N.Y.S.2d 909  (Sup. Ct. 1939)    9

<u>Werner v. Werner</u>, 70 Misc.2d 1051, 334 N.Y.S.2d 966 (Sup. Ct. Albany County 1982)    6

Statutes and Rules

CPLR 2701    6, 9

Preliminary Statement

Dalia Genger, as trustee for the Orly Trust, moves to be substituted in for derivative plaintiff Orly Genger on the claims Orly brought on behalf of the Orly Trust against the Trump Group since "Orly no longer represents the Orly Trust as to the Trump Group".

As the substituted plaintiff, Dalia Genger, as trustee for the Orly Trust, respectfully requests an order pursuant to CPLR 2701 directing that the settlement fund from the Trump Group be paid into court since the Court "cannot determine whether some or all of the settlement proceeds with the Trump Group belong to Orly or the Orly Trust." Order of the Court, Filed May 13, 2014, Doc. 925 at 4 (emphasis added).

Statement of Facts

Dalia Genger is the trustee of the Orly Genger 1993 Trust ("Orly Trust"). In this action, Orly Genger ("Orly") instituted direct and derivative claims on behalf of the Orly Trust against various defendants, including the so-called Trump Group.

Orly settled with the Trump Group defendants. Memorandum of Law of Orly Genger, Doc. 775 at 2, attached as Exhibit 1 to the Affirmation of Judith Bachman, dated August 11, 2014 ("Bachman Aff.').

"A material term of the agreement among the settling parties was the dismissal of *all* claims presently pending against one another, in whatever capacity they were brought. [If the settlement stipulation was drafted so as to] have the effect of *not* dismissing Orly Genger's derivative claims against the Trump Group, contrary to the agreement of the settling parties. Excluding such claims from the claims that are to be dismissed is not what the Trump Group bargained and paid for in the settlement . . ." Letter to the Court from Thomas J. Allingham II, dated June 28, 2010, Doc. 728 at 2, attached as Exhibit 2 to the Bachman Aff. (emphasis added).

The Trump Group later reaffirmed this aspect of the settlement:

> "[any suggestion] that the confidential settlement agreement *might* only dismiss Orly's individual claims against the Trump Group, but not resolve the Orly Trust's claims against the Trump Group and the TPR Group. (Opp'n Br. at 28) . . . is counterfactual. This Court has already held that certain of Orly's claims in this action, including the remaining claims, are derivative in nature, and may be maintained by Orly on behalf of the Orly Genger 1993 Trust. *See Genger v. Genger*, 966 N.Y.S.2d 346, 2013 WL 221485, at *6 (N.Y. Sup. Ct. Jan. 3, 2013) (TABLE) (citing *Genger v. Genger,* No. 109749/2009 (N.Y. Sup. Ct. June 28, 2010)). In settling the claims among them, the Trump Group, Trans-Resources, Orly and Arie agreed to the dismissal of all claims presently pending against one another. This agreement is memorialized in the Second Amended Stipulation of Discontinuance.

Reply Memorandum of Law of Trump Group, Filed April 17, 2014, Doc. 888 at 22-23, attached as Exhibit 3 to the Bachman Aff.

Evidencing this intent, in paragraph 8 of her settlement agreement, Orly agreed to "cooperate" and "cause" the Orly Trust to release any and all claims against the Trump Group." Order of the Court, Filed May 13, 2014, Doc. 925 at 4, attached as Exhibit 4 to the Bachman Aff.

Pursuant to that duty, Orly not only settled all her claims in this case; she also caused the Orly Trust to release claims against the Trump Group in a parallel Delaware case. Specifically, at the time of the Trump Group settlement, the Orly Trust was maintaining a proceeding in Delaware Chancery Court. Following her Trump Group settlement, Orly's counsel twice wrote to Chancellor Strine urging "the dismissal of the last remaining Genger related case in Delaware" and "acknowledg[ing] individually and in her capacity as the beneficiary of her trust that the Trump Group are the record and beneficial owners of the TRI shares which had been distributed to the Orly Trust." Exhibit M, Filed June 2, 2014, Doc. 1034, attached as Exhibit 5 to the Bachman Aff. Satisfied that Orly no longer wanted the Orly Trust to pursue its claims, the

Chancery Court dismissed the Orly Trust's claims in that case with prejudice. Exhibit N, Filed June 2, 2014, Doc. 1034, attached as Exhibit 6 to the Bachman Aff.

Notwithstanding the provisions of her own Trump Group settlement agreement and her representations to the Delaware Chancery Court, Orly told this Court that her Trump Group settlement "only dismisses Orly's individual claims against the Trump Group, but does not resolve or dismiss any claims of the Orly Trust against the Trump Group". Memorandum of Law of Orly Genger, Doc. 775 at 2, attached as Exhibit 1 to the Bachman Aff. Moreover, Orly stated that she "no longer represents the Orly Trust as to the Trump Group (while allowing Dalia Genger to pick up the cudgel if she so chooses) . . ." Id. (emphasis added).

In light of these conflicting statements, this Court "invite[d] the parties to the settlement agreement to set forth the claims given up by Orly in her individual and beneficial capacities, and to explain why any derivative claims advanced in the complaint are not released in the agreement." Order of the Court, Filed May 13, 2014, Doc. 925 at 4, attached as Exhibit 4 to the Bachman Aff.

Conveniently for them, none of the parties to the settlement agreement complied with the Court's request to "set forth the claims given up by Orly in her individual and beneficial capacities, and to explain why any derivative claims advanced in the complaint are not released in the agreement." Id. In fact, Orly's counsel explicitly refused to comply with that request. Email Correspondence dated May 26, 2014, attached as Exhibit 7 to the Bachman Aff.

Accordingly, this Court held that "[u]nless and until the issue of [the status of the] derivative claims is resolved, I cannot determine whether some or all of the settlement proceeds with the Trump Group belong to Orly or the Orly Trust . . ." Order of the Court, Filed May 13, 2014, Doc. 925 at 4 (emphasis added), attached as Exhibit 4 to the Bachman Aff.

Even in the presence of this conveniently self-manufactured uncertainty by Orly as to whom the settlement proceeds belong to, *i.e.,* Orly or the Orly Trust, counsel for both Orly and the Trump Group have represented in Court that cash payments <u>were made and will be made only to Orly</u>. Exhibit N, Filed June 2, 2014, Doc. 1034, attached as Exhibit 6 to the Bachman Aff. ("Orly did sign the settlement agreement, and that's a settlement in which real money is changing hands and will continue to change hands.").  Upon information and belief, Orly used the proceeds to pay her own debts, and those of her father, acts which are explicitly prohibited by the Orly Trust agreement.

To protect the interests of the Orly Trust, Dalia Genger, as trustee of the Orly Trust, now moves this Court for an order of substitution for derivative plaintiff Orly Genger on the Orly Trust Trump Group claims and for an order directing that the settlement fund with the Trump Group be deposited into Court.

Point I

Substitution of Derivative Plaintiff Orly Genger
Is Necessary Because She No Longer
Represents the Orly Trust on the
Trump Group Claims And She Has Suggested the Trustee
"Pick Up the Cudgel" on those Claims

Pursuant to CPLR 1021, "a motion for substitution may be made by the successors or representatives of a party or by any party."

Such substitution is appropriate, and indeed necessary, when a derivative plaintiff is no longer an appropriate representative plaintiff. <u>James v. Bernhard</u>, 106 A.D.3d 435, 965 N.Y.S.2d 56 (1st Dep't 2013).

In James, the Court found that the substitution of independent directors in place of a club member derivative plaintiff was necessary where the derivative plaintiff club member no longer represented the club's interests.

Here too, substitution for derivative plaintiff Orly Genger is necessary because Orly Genger no longer represents the Orly Trust on those claims, and indeed she has suggested that the Trustee should "pick up the cudgel". Memorandum of Law of Orly Genger, Doc. 775 at 2, attached as Exhibit 1 to the Bachman Aff. Orly Genger, the party to be substituted, has expressly acknowledged that such substitution is appropriate: "Orly no longer represents the Orly Trust as to the Trump Group (while allowing Dalia Genger to pick up the cudgel if she so chooses) . . ." Memorandum of Law of Orly Genger, Doc. 775 at 2, attached as Exhibit 1 to the Bachman Aff. (emphasis added).

Since, by her own admission and, in fact urging, Orly has said that Dalia Genger has standing to make this motion and "pick up the cudgel" on the Orly Trust Trump Claims, Dalia Genger, as Trustee, must be substituted for Orly as to the Orly Trust Trump Group claims. Memorandum of Law of Orly Genger, Doc. 775 at 2, attached as Exhibit 1 to the Bachman Aff. This substitution will, as described more fully below, protect the Orly Trust's interest in the settlement with the Trump Group.

Point II

The Proceeds of the Settlement
Should be Paid into Court
To Protect the Fund

A court may direct that funds should be paid into court if

1. a party has such property in his possession, custody or control as trustee for another party or where it belongs or is due to another party; or

5

> 2. a party has such property in his possession, custody or control
> and it belongs or is due to another party, where special
> circumstances make it desirable that payment or delivery to such
> other party should be withheld;
>
> 3. the ownership of such property will depend on the outcome of a
> pending action and no party is willing to accept possession or
> custody of it during the pendency of the action.

CPLR 2701. See, e.g., Conforti v. Goradia, 234 A.D.2d 237, 651 N.Y.S.2d 506  (1st Dep't

1996).

Where two parties dispute entitlement to a settlement fund of money, a court should

direct payment of the fund into court under CPLR 2701, rather than allow payment to one party,

to protect that fund and the mutual interests of the parties.  Lade v. Levitt, 33 A.D.2d 956, 306

N.Y.S.2d 704 (3d Dep't 1970); Rice v. DiNapoli, 23 Misc.3d 1128(A), 889 N.Y.S.2d 507

(Table) (Sup. Ct. Albany County 2009); Werner v. Werner, 70 Misc.2d 1051, 334 N.Y.S.2d 966

(Sup. Ct. Albany County 1982)

In the instant action, this Court has held "[u]nless and until the issue of [the status of the]

derivative claims is resolved, I cannot determine whether some or all of the settlement proceeds

with the Trump Group belong to Orly or the Orly Trust . . ." ."  Order of the Court, Field May

13, 2014, Doc. 925 at 4 (emphasis added), attached as Exhibit 4 to the Bachman Aff.

This difficulty flows from the fact that any settlement of Orly's derivative claims on

behalf of the Orly Trust belongs to the Orly Trust and not to Orly, individually.  See Gusinsky v.

Bailey, 21 Misc.3d 1107(A), 873 N.Y.S.2d 234 (Table) (Sup. Ct. N.Y. County 2008), rev'd on

other grounds, 66 A.D.3d 614, 887 N.Y.S.2d 585 (1st Dep't 2008); Clarke v. Greenberg, 71

N.E.2d 443, 296 N.Y. 146 (1947).   Any payment of the settlement funds to Orly or any other

person which belong to the Orly Trust, is improper.

6

It appears that Orly has deliberately manufactured confusion as to whether or not she settled the Orly Trust derivative claims against the Trump Group so that she can take all of the settlement funds for herself rather than have them paid to the Orly Trust. Counsel for both Orly and the Trump Group have represented in Court that cash payments were made and will be made only to Orly. Exhibit N, Filed June 2, 2014, Doc. 1034, attached as Exhibit 6 to the Bachman Aff. ("Orly did sign the settlement agreement, and that's a settlement in which real money is changing hands and will continue to change hands.")

Such payment only to Orly, and not the Orly Trust, is improper, since there is compelling evidence that some, if not all, of the settlement funds belong to the Orly Trust as the result of the settlement of derivative claims against the Trump Group.

The Trump Group, one of the settling parties, believes the derivative Orly Trust claims have been settled: "A material term of the agreement among the settling parties was the dismissal of *all* claims presently pending against one another, in whatever capacity they were brought. [If the settlement stipulation was drafted so as to] have the effect of *not* dismissing Orly Genger's derivative claims against the Trump Group, contrary to the agreement of the settling parties. Excluding such claims from the claims that are to be dismissed is not what the Trump Group bargained and paid for in the settlement . . ." Letter to the Court from Thomas J. Allingham II, dated June 28, 2010, Doc. 728 at 2, attached as Exhibit 2 to the Bachman Aff. (emphasis added). The Trump Group reaffirmed this aspect of the settlement:

> [any suggestion] that the confidential settlement agreement *might* only dis-miss Orly's individual claims against the Trump Group, but not resolve the Orly Trust's claims against the Trump Group and the TPR Group. (Opp'n Br. at 28) . . . is counterfactual. This Court has already held that certain of Or-ly's claims in this action, including the remaining claims, are derivative in nature, and may be maintained by Orly on behalf of the Orly Genger 1993 Trust. *See Genger v. Genger*, 966 N.Y.S.2d 346, 2013 WL 221485, at *6 (N.Y. Sup. Ct. Jan. 3, 2013) (TABLE) (citing *Genger v. Genger*, No. 109749/2009 (N.Y.

7

> Sup. Ct. June 28, 2010)). In settling the claims among them, the
> Trump Group, Trans-Resources, Orly and Arie agreed to the
> dismissal of all claims presently pending against one another. This
> agreement is memorialized in the Second Amended Stipulation of
> Discontinuance.

Reply Memorandum of Law of Trump Group, Filed April 17, 2014, Doc. 888 at 22-23, attached as

Exhibit 3 to the Bachman Aff.

Further, in paragraph 8 of her settlement agreement, Orly agreed to "cooperate" and

"cause" the Orly Trust to release any and all claims against the Trump Group." Order of the

Court, Filed May 13, 2014, Doc. 925 at 4, attached as Exhibit 4 to the Bachman Aff.  Pursuant

to that duty, Orly not only settled all her claims in this case; she also caused the Orly Trust to

release claims against the Trump Group in a parallel Delaware case, when she twice had her

counsel urge (and later obtain) for "the dismissal of the last remaining Genger related case in

Delaware" and "acknowledg[ing] individually and in her capacity as the beneficiary of her trust

that the Trump Group are the record and beneficial owners of the TRI shares which had been

distributed to the Orly Trust." Exhibit M, Filed June 2, 2014, Doc. 1034, attached as Exhibit 5 to

the Bachman Aff.

All of these facts compel the conclusion that Orly's Trump Group settlement in this

action resulted in the dismissal of both her individual and derivative claims, and that some, if not

all, of the settlement fund belongs to the Orly Trust.

Yet, in self-manufactured confusion, notwithstanding the provisions of her own Trump

Group settlement agreement and her representations to the Delaware Chancery Court, Orly told

this Court that she "only dismisses Orly's individual claims against the Trump Group, but does

not resolve or dismiss any claims of the Orly Trust against the Trump Group". Memorandum of

Law of Orly Genger, Doc. 775 at 2, attached as Exhibit 1 to the Bachman Aff.

8

In light of the conflicting statements, this Court "invite[d] the parties to the settlement agreement to set forth the claims given up by Orly in her individual and beneficial capacities, and to explain why any derivative claims advanced in the complaint are not released in the agreement." Order of the Court, Filed May 13, 2014, Doc. 925 at 4, attached as Exhibit 4 to the Bachman Aff.   Conveniently for them, none of the parties to the settlement agreement complied with the Court's request.   Email Correspondence dated May 26, 2014, attached as Exhibit 7 to the Bachman Aff.

With these efforts, Orly succeeded in clouding the question of to whom the settlement proceeds belong: the Court "cannot determine whether <u>some or all</u> of the settlement proceeds with the Trump Group belong to <u>Orly or the Orly Trust</u> . . .".

Such self-manufactured confusion, though, is the very reason why the settlement proceeds must be paid into Court[1] - - to protect that fund and the mutual interest of the parties. <u>Lade v. Levitt</u>, 33 A.D.2d 956, 306 N.Y.S.2d 704 (3d Dep't 1970); <u>Rice v. DiNapoli</u>, 23 Misc.3d 1128(A), 889 N.Y.S.2d 507 (Table) (Sup. Ct. Albany County 2009).   Without such an order, the Orly Trust will be denied the opportunity to obtain any of the settlement proceeds paid as the result of settling claims belonging to the Orly Trust.

---

[1] Such an order must be made against all of the settling parties since it is undisclosed who is holding the settlement proceeds.  If such payment has already been made, then the recipient stands in relation as a quasi trustee of the Orly Trust and/or is in possession of funds which belong to the Orly Trust.  <u>Bonham v Coe</u>, 249 A.D. 428, 292 N.Y.S. 423 (4th Dep't 1937); <u>In re Martin's Estate</u>, 96 N.Y.S.2d 842 (Surr. Ct. 1950); <u>In re Roosevelt's Estate</u>, 131 Misc. 800, 228 N.Y.S. 323 (Sup. Ct. 1928); <u>Titus v. Empire Mink Corp.</u>, 17 N.Y.S.2d 909 (Sup. Ct. 1939); <u>In re Carroll's Estate</u>, 153 Misc. 649, 275 N.Y.S. 911 (Sur. Ct. 1934).  This state of facts fits squarely within CPLR 2701.

Conclusion

Dalia Genger as Trustee must be substituted in for derivative plaintiff Orly Genger since

"Orly no longer represents the Orly Trust as to the Trump Group" and the settlement proceeds

must be paid into Court since the Court "cannot determine whether some or all of the settlement

proceeds with the Trump Group belong to Orly or the Orly Trust . . ."

Dated: New City, New York
       August 11, 2014

                                 /s/
                        Judith Lisa Bachman, Esq.
                        254 S. Main Street, Suite 306
                        New City, New York 10956
                        845-639-3210

FILED: NEW YORK COUNTY CLERK 08/11/2014 10:36 AM
NYSCEF DOC. NO. 1100

INDEX NO. 651089/2010
RECEIVED NYSCEF: 08/11/2014

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
-----------------------------------------------------------------x
ARIE GENGER and ORLY GENGER, in her            :
individual capacity and on behalf of
THE ORLY GENGER 1993 TRUST,                     :          Index No. 651089/2010
                                                           (Jaffe, B. JSC)
                                                :
                        Plaintiffs,

                                                :

                        -against-               :

SAGI GENGER, TPR INVESTMENT                     :
ASSOCIATES, INC., DALIA GENGER, THE
SAGI GENGER 1993 TRUST, ROCHELLE                :
FANG, individually and as trustee of THE SAGI
GENGER 1993 TRUST, GLENCLOVA                     :
INVESTMENT COMPANY, TR INVESTORS,
LLC, NEW TR EQUITY I, LLC, NEW TR               :
EQUITY II, LLC, JULES TRUMP, EDDIE
TRUMP AND MARK HIRSCH,                          :          AFFIRMATION IN SUPPORT
                                                           OF MOTION FOR
                        Defendants.                        SUBSTITUTION AND
-----------------------------------------------------------------x          SETTLEMENT FUND
SAGI GENGER, individually and as assignee of    :          PAID INTO COURT
THE SAGI GENGER 1993 TRUST, and TPR
INVESTMENT ASSOCIATES, INC.                     :

           Cross-Claimants, Counterclaimants, and :
           Third-Party Claimants,

                                                :

                        -against-               :

                                                :

ARIE GENGER, ORLY GENGER,                       :
GLENCLOVA INVESTMENT COMPANY,                   :
TR INVESTORS, LLC, NEW TR EQUITY I, LLC,
NEW TR EQUITY II, LLC, JULES TRUMP,             :
EDDIE TRUMP, MARK HIRSCH,
TRANS-RESOURCES, INC., WILLIAM                   :
DOWD, and THE ORLY GENGER 1993 TRUST,

                                                :

           Cross-Claim, Counterclaim and/or
           Third-Party Defendants.              :
-----------------------------------------------------------------x

Judith Bachman, an attorney duly admitted to practice law in the State of New York, hereby affirms under penalty of perjury pursuant to CPLR 2106 as follows:

1. I am counsel to Defendant Dalia Genger, as trustee, and I am familiar with the facts and circumstances of this matter as they pertain to the instant motion.

2. I submit this affirmation in support of Dalia's motion for an order substituting Dalia Genger, as trustee, as plaintiff on Orly Genger's Trump Group claims and for an order pursuant to CPLR 2701 directing that the Trump Group settlement fund be paid into Court.

3. I attach as Exhibit 1 a true and correct copy of the Memorandum of Law of Orly Genger, Doc. 775.

4. I attach as Exhibit 2 a true and correct copy of the Letter to the Court from Thomas J. Allingham II, dated June 28, 2010, Doc. 728.

5. I attach as Exhibit 3 a true and correct copy of the Reply Memorandum of Law of Trump Group, Filed April 17, 2014, Doc. 888.

6. I attach as Exhibit 4 a true and correct copy of the Order of the Court, Filed May 13, 2014, Doc. 925.

7. I attach as Exhibit 5 a true and correct copy of the Exhibit M, Filed June 2, 2014, Doc. 1034

8. I attach as Exhibit 6 a true and correct copy of the Exhibit N, Filed June 2, 2014, Doc. 1034.

9. I attach as Exhibit 7 a true and correct copy of Email Correspondence dated May 26,

2014.

Dated:  August 11, 2014
       New City, New York

                                                         /s/
                                        Judith Lisa Bachman, Esq.
                                        Attorney for Non-Party, Rochelle Dalia
                                        254 South Main Street, Suite 306
                                        New City, New York 10956
                                        845-639-3210

# Exhibit G

FILED: NEW YORK COUNTY CLERK 05/07/2015 03:07 PM

INDEX NO. 651089/2010

NYSCEF DOC. NO. 1279

RECEIVED NYSCEF: 05/07/2015

## SUPREME COURT OF THE STATE OF NEW YORK — NEW YORK COUNTY

PRESENT:  Hon. BARBARA JAFFE                              PART 12

*Justice*

---

ARIE GENGER and ORLY GENGER, in her individual capacity
and on behalf of THE ORLY GENGER 1993 TRUST,

INDEX NO.  651089/2010
MOTION DATE

Plaintiffs,

MOTION SEQ. NO.   42
CALENDAR NO.

- v -

INTERIM ORDER

SAGI GENGER, TPR INVESTMENT ASSOCIATES, INC.,
DALIA GENGER, *et al.,*

Defendants.

---

The following paper, numbered 1, was read on this motion.

| | PAPERS NUMBERED |
|---|---|
| Notice of Motion/ Order to Show Cause — Affidavits — Exhibits ... | |
| Answer —  Affidavits — Exhibits | |
| Replying Affidavits | |

Cross-Motion:  ☐ Yes   ☐ No

MOTION/CASE IS RESPECTFULLY REFERRED TO JUSTICE  _____ J.S.C.

DATED:

        Defendant Dalia Genger's motion for an order substituting her, as trustee, as plaintiff for
Orly Genger's Trump Group claims, and for an order pursuant to CPLR 2701 directing that the
Trump Group settlement fund be paid into Court is held in abeyance pending the Surrogate's
Court's resolution of Orly Genger's petition to remove Dalia Genger as trustee of Orly Trust.
(*See Genger v Genger*, interim order dated Apr. 1, 2015, index No. 113862/2010 [mot. seq. no.
2]).

Dated:    5/7/15                    _____

J.S. BARBARA JAFFE
                                                                    J.S.C.

Check one:  ☐ FINAL DISPOSITION    ☐ NON-FINAL DISPOSITION
Check if appropriate:  ☐ DO NOT POST   ☐ REFERENCE



New York County Surrogate's Court
MISCELLANEOUS DEPT.

DEC 05 2012

FILED
Clerk

STATE OF NEW YORK
SURROGATE'S COURT: COUNTY OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - x

In the Matter of the Application of
ORLY GENGER, as a person interested, for the
removal of DALIA GENGER as Trustee of the
Orly Genger 1993 Trust pursuant to SCPA §711(11)
- - - - - - - - - - - - - - - - - - - - - - - x

NOTICE OF MOTION
TO DISMISS THIRD
AMENDED PETITION

File No. 0017/2008

PLEASE TAKE NOTICE that upon the annexed affirmation of Robert A. Meister, the

Third Amended Petition on file, the November 7, 2012 stipulation of the parties, and all prior

proceedings had herein, DALIA GENGER, as Trustee of the Orly Genger 1993 Trust, will move

this Court sitting, at 31 Chambers Street, Room 509, New York, New York, at 10:00 a.m. in the

forenoon of January 15, 2013, or as soon as counsel can be heard, for an Order dismissing the

Third Amended Petition on the grounds that the Petition (1) fails to state a valid claim for

removal of Dalia Genger as Trustee of the Orly Genger 1993 Trust, and (2) fails to name, join

and serve all persons interested.

Pursuant to CPLR §2214(b), any answering papers must be served so as to be received by

January 8, 2013.

TO:
Platzer, Swergold, Karlin, Levine,
Goldberg & Jaslow, LLP
1065 Avenue of the Americas – 18th Floor
New York, NY 10018
212.593.3000
Attn. Ralph Hochberg, Esq.
Counsel for Petitioner

PEDOWITZ & MEISTER LLP

By _____
Robert A. Meister
570 Lexington Avenue – 18th Floor
New York, NY 10022
212.403.7330
Attorneys for DALIA GENGER,
as Trustee of the Orly Genger 1993 Trust

STATE OF NEW YORK
SURROGATE'S COURT: COUNTY OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - x
In the Matter of the Application of
ORLY GENGER, as a person interested, for the
removal of DALIA GENGER as Trustee of the
Orly Genger 1993 Trust pursuant to SCPA §711(11)
- - - - - - - - - - - - - - - - - - - - - - - x

AFFIRMATION IN SUPPORT OF
MOTION TO DISMISS THIRD
AMENDED PETITION
File No. 0017/2008

ROBERT A. MEISTER, a member of the New York Bar, hereby affirms under the

penalties of perjury:

1        I am a member of the Bar and of the firm of Pedowitz & Meister LLP, counsel for

Respondent Dalia Genger, as Trustee of the Orly Genger 1993 Trust (the "Orly Trust"). I make

this affirmation in support of her motion to dismiss the Third Amended Petition ( the "TAP") of

beneficiary Orly Genger ("Orly") on the grounds that the TAP (1) fails to state a valid claim for

removal of Dalia Genger as Trustee of the Orly Trust, and (2) fails to name, join, and serve all

persons interested. I must note at the outset that Orly is *not* "the sole beneficiary of the Orly

Trust" as she alleges in TAP ¶5; rather she is a lifetime discretionary beneficiary, with the

remainder to her children (of which she now has none) and then to the beneficiaries of the Sagi

Genger 1993 Trust, as correctly alleged in TAP ¶3, just two paragraphs earlier, and as proven by

the Trust Agreement, TAP Ex.A, Orly Trust Agreement, pp. 7-8, Article 2(c)(2)(3).

2        This is Orly's fifth attempt to gain control of the Orly Trust. Her first attempt (the

Prior Proceeding) was denied by Surrogate Roth on December 31, 2008, Decision and Order,

*Orly Genger v. Fang*, et al., Surrg. Ct., N. Y. Co., file 17/2008 (the "Prior Decision"). (**Exhibit

1 hereto**) Contrary to the TAP's contention (¶42), Surrogate Roth's Prior Decision did not say

Orly's first attempt was "premature". Rather, this Court held that Orly's "vague and speculative

allegations of 'wrongful conduct' at TPR Investment Associates, Inc. (TPR) from

2

which Dalia purportedly benefitted do not warrant the appointment of a Trustee other than Dalia Genger as Trustee or appointment of a 'special trustee'", alternative relief that Orly then sought. (Ex. 1, Prior Decision, at 5-7)

3       Significantly, Surrogate Roth's Prior Decision shows that the Court <u>was</u> then aware of allegations that the TAP claims are newly discovered (a) "alleged improper acts by former trustee, David Parnes" as to which the Prior Decision noted that the prior Trustees "Mr. Parnes and Ms. Fang have been directed to account for their proceedings as trustees" (Prior Decision 7), and (b) Orly's "allegations of 'wrongful dealings' concern[ing] a close corporation, TPR Investment Associates, Inc." which involved Orly's allegations "that her brother, Sagi, who is an officer of TPR, and Dalia, who was a shareholder at the time this proceeding was commenced, are engaged in a 'wrongful scheme to divert assets to themselves'" (Prior Decision 6). Indeed, Orly had complained to Surrogate Roth of the very the same claim asserted in the TAP ¶¶ 46-47: the alleged wrongful scheme that Dalia Genger had acted in concert with Sagi Genger to aid the Sagi Genger 1993 Trust's sale of <u>its own</u> interest in shares of shares of Trans-Resources, Inc. (TRI) stock. See Orly's then counsel's November 5, 2008, letter to Surrogate Roth (**Exhibit 2** hereto).

4       Orly appealed the Prior Decision, but she never perfected the appeal. Instead, when she saw that Surrogate Roth had retired, Orly began to judge shop. First, she filed the first of her Petitions in this proceeding that would be heard by a new Surrogate. And, almost immediately thereafter, Orly filed an action in Supreme Court containing the same averments, *Orly Genger in her individual capacity and on behalf of the Orly Genger 1993 Trust (both in its individual capacity and on behalf of D & K Limited Partnership) v. Dalia Genger, Sagi Genger,*

3

*Leah Fang, D & K GP LLC, and TPR Investment Associates, Inc.,* Sup. Ct., N.Y. Co. 109749/09. Dalia Genger filed motions asking this Court to dismiss the original Petition in this proceeding, as well as the First and Second Amended Petitions herein, but none of those motions was decided, each being mooted by another amended petition.

### The *Status Quo* When Dalia Genger Became Trustee of the Orly Trust

5      Because the TAP contains a string of complaints about what other persons did *before* Dalia Genger became Trustee and the Court needs to appreciate what little has occurred since the Prior Decision, it is necessary to note the *status quo* on January 4, 2008, when, as the Prior Decision (Ex. 1, p. 3) found, Dalia Genger first became Trustee:

A      Since December, 2007, Dalia Genger was no longer a shareholder, officer or director of TPR Investors, Inc. (TPR). ¶39 of Second Amended Verified Complaint in *Orly Genger in her individual capacity and on behalf of the Orly Genger 1993 Trust (both in its individual capacity and on behalf of D & K Limited Partnership) v. Dalia Genger et al.,* Sup. Ct., N.Y. Co. Index No. 109749/09. a copy of the relevant part of which is **Exhibit 3** hereto; TAP pg. 12, n. 3.

B      Since 2004, Dalia Genger was no longer a member of D&K LP; she had a 99% membership in its general partner, D&K GP LLC, which Sagi Genger managed. TAP ¶23.

C      Since 1993, D&K has been the obligor under its. with recourse $8,950,000 interest-bearing, secured, ten-year Note (the D&K Note) that D&K issued to TPR as part of D&K's purchase of 240 shares of TPR stock and which Note was secured by D&K's 1993 pledge of those purchased 240 shares of TPR. (TAP ¶¶ 16, 18, Ex. B)

4

D        Since 1993, the Orly Trust was the guarantor of 48% of the D&K Note, with the

balance guaranteed by the Sagi Genger 1993 Trust (Sagi Trust) (48%) and Dalia Genger,

individually (4%). TAP ¶ 18, Ex. B.  The Orly Trust's guarantee expressly provided "that

the Holder <u>may enforce this Note</u>, to the extent of such liability, as if the [Orly Trust] were

the Maker thereof." (Emphasis added.) That guarantee was signed in 1993 for the Orly

Trust by its trustee at that time, who was not Dalia Genger.  TAP ¶18, Ex. B

E        D&K made payments on the D&K Note from 1993 until 1999, when it stopped.

TAP ¶ 20.

F        As of mid-2006, D&K owed TPR millions of dollars under the D&K Note, which

then "had an approximate value of $11,000,000 as a result of accrued interest".  TAP ¶ 29

G        Since November 23, 2007, when D&K's Partnership Agreement had been

amended by persons other than Dalia Genger, D&K had the authority to mortgage, pledge

or otherwise encumber the Limited Partners' (the Sagi and Orly Trusts') interests in Trans-

Resources, Inc. (TRI) common stock (LP TRI Interest), <u>but that was subject to each Limited

Partner's "right to redeem its LP TRI Interest to the full extent of such LP's pro-rated

participation, responsibility or liability for the unpaid amount of the [D&K] Note."</u>

(Emphasis added.) TAP Ex. K, ¶ 22 at p. 11

That was the *status quo* when Dalia Genger first became the Trustee of the Orly Trust on January

4, 2008, as Surrogate Roth decided the Prior Decision.

### As the Prior Decision held, Dalia Genger Should Not Be Removed as Trustee Based on Events that Occurred before She Became Trustee.

6        Like its predecessors, the Third Amended Petition is legally defective.  As the

5

Prior Decision held, Dalia Genger should not be removed on the basis of events that occurred before she became Trustee.

7        Yet many of the events of which the TAP so turgidly complains preceded Dalia Genger becoming Trustee in January, 2008. Most are ancient history. The latest of those was on November 23, 2007, when the Amended D&K Partnership Agreement which was signed by a prior Trustee and by Sagi Genger and not by Dalia Genger. TAP Ex. K, ¶ 22 at p. 11

### Dalia Genger Should Not Be Removed as Trustee Based on Events that Occurred During the Period before the Prior Decision when Surrogate Roth Had Directed Her Not to Take Any Action

8        Other events of which the TAP complains occurred in 2008 before Surrogate Roth issued the Prior Decision and during which time Dalia Genger had been directed to take no action by Surrogate Roth, who was considering Orly's prior petition to remove Dalia Genger as Trustee. See August 28, 2008 letters from Orly's prior counsel, Exhibit 4. Moreover these events the TAP complained of were events over which Dalia Genger, as the Orly Trust's Trustee, had and could have had no control, such as the Sagi Trust's August 2008 sale of its own interest in the common stock of Trans-Resources, Inc. ("TRI") and TPR Investment Associates, Inc.'s declaring a default on D&K's Note in 2008 and foreclosing on the collateral D&K had pledged.

### Dalia Genger Should Not Be Removed as Trustee of the Orly Trust based on the Sagi Trust's Sale of its Own Interest in TRI Shares

9        Dalia Genger is not and never was trustee of the Sagi Trust, and neither the Orly Trust nor Dalia Genger was a party to the Sagi Trust sale of TRI stock. As the TAP alleges and as is confirmed by the Stock Purchase Agreement, of which I obtained a copy in other Genger

6

family litigations and attach as **Exhibit 5**, that sale was made in August, 2008 by the Sagi Trust, acting through its Trustee, Rochelle Fang, during the period when Dalia Genger was under Surrogate Roth's direction not to take any action as Orly Trust's Trustee.

10      Further, to understand the vacuity of Orly's tenuous claim of injury from the Sagi Trust's sale of its own interest in TRI stock – Orly's contention that the Orly Trust owns shares of TRI stock which supposedly lost value as a result of the Sagi Trust's sale of its shares – it is necessary to understand the history of the TRI transactions. In October, 2004, when Dalia Genger was divorcing her husband, Arie Genger, TPR owned 52.85% of the shares of TRI. (The other 47.15% of the TRI shares was owned by entities controlled by Jules and Eddie Trump (the "Trump Group"). TAP ¶19. As part of the divorce settlement, Arie agreed to cause TPR to sell all of its shares of TRI stock to the Orly Trust, the Sagi Trust and to Arie himself. The Orly Trust purportedly bought 19.43% of TRI's stock, and the Sagi Trust purportedly bought another 19.43% of TRI's stock. TAP ¶22. If those shares were to have been required to be kept together, the transaction could have been structured so all those shares were purchased by a new trust for the benefit of the Orly Trust and the Sagi Trust or their beneficiaries, but that was not what Arie Genger caused to occur. Nor was there any agreement between the Trusts to hold the shares and act in unison, if such would have been permitted under the respective trustees' obligations.

11      Thus there is no basis for the TAP's contention that the Sagi Trust's sale caused a cognizable injury to the Orly Trust. Nor is there any basis for asserting that Dalia Genger, who was not the trustee of the Sagi Trust, caused that sale or should have or could have prevented it. And the Sagi Trust's sale occurred in August, 2008, during the period when Dalia Genger was under Surrogate Roth's instruction to take no action.

12      Moreover, Orly's contention that the Sagi Trust's sale of its own interest in TRI

7

stock damaged the Orly Trust's interest in TRI shares it had purchased is undercut by the Delaware Supreme Court's determination that the 2004 sale of TRI shares violated the TRI's shareholders' agreement and thus did not convey record and legal ownership, ruling that TPR remained the record owner. *Genger v. TR Investors et al.*, 26 A.3d 180 (De. 2011). As the Orly Trust was not a party in that case, the Delaware court did not determine the economic ownership of the TRI shares purportedly transferred to the Orly Trust.[1] Accordingly Dalia Genger, as Trustee of the Orly Trust, commenced litigation against the Trump Group and TRI to establish that the Orly Trust is a protected purchaser and beneficial and economic owner of the 1,102.80 shares of common stock of TRI stock it bought from TPR (the "Orly Trust TRI Shares") and that the Orly Trust is entitled to all dividends declared or paid attributable to such shares since October 29, 2004.[2] TAP ¶47 n. 5. Also, Dalia Genger individually and as Trustee sued Arie

_____

[1] The TAP's vague unspecific allegations that Dalia Genger failed to adequately protect the assets of the Orly Trust in the Delaware Court are not a valid basis to remove her as Trustee. The Delaware courts held that the purported transfers of TRI shares violated a TRI shareholder's agreement because required consent of other shareholders was not obtained, but Dalia Genger was not a party to the TRI Shareholders Agreement or to that transaction and the TAP does not and cannot claim that the Trust's interests were not adequately represented in that Delaware litigation. The TAP neglects to note that 1) the Settlor of the Orly Trust himself, Arie Genger, testified in that action in favor of the validity of the transfers and employed competent representation (Davis Polk) to defend his rights <u>as well as the rights of the Orly Trust</u>, and 2) Orly Genger herself testified in that proceeding, although the Delaware Chancery Court found her testimony to be not credible, as she testified to what her father supposedly said at a meeting that everyone else, including her father, testified she did not even attend. *TR Investors, LLC v. Genger*, 2010 WL 2901704 (Del.Ch. July 23, 2010) at pp. 7-8 (**Exhibit 6**) Dalia Genger's decision not to intervene in that litigation spared the Orly Trust substantial legal fees, certainly was within her discretion as Trustee and does not raise a valid ground for her removal.

[2] *Dalia Genger, as Trustee of the Orly Genger 1993 Trust v. TR Investors LLC, et al.*, (Del. Ch. 6906-CS, filed Oct. 4, 2011), seeks a declaratory judgment that the Orly Genger Trust is a protected purchaser and owner of the 1,102.80 shares of common stock of TRI sold to it by TPR (Orly Genger Trust Shares) and that the Orly Genger Trust is entitled to all dividends declared or paid attributable to such shares since October 29, 2004. (**Exhibit 7**)

8

Genger for breach of his divorce settlement agreement to cause the transfer of the TRI shares to the Orly Trust, <u>seeking damages for the Orly Trust</u>.[3]

13      Conversely, Orly herself has sought to *diminish* the interest of the Orly Trust in the TRI shares. Immediately after the Delaware Chancery Court decision and without this Court's permission to act for the Orly Trust, Petitioner Orly Genger joined her father as plaintiff in an action to reform the divorce settlement (and other relief) <u>that seeks to recover the TRI</u> <u>shares for Arie, at the expense of the Orly Trust</u>, with the Orly Trust relegated to dividends during Arie's life and a remainder interest after Arie's death. *Arie Genger and Orly Genger, in her individual capacity and on behalf of the Orly Genger 1993 Trust, v. Sagi Genger, et al., Sup. Ct. N. Y. Co., Index No 651089/2010.* (A copy of the Third Amended Complaint without the voluminous exhibits is **Exhibit 9** hereto) And then Orly obtained a preliminary injunction from the court in that case restraining Dalia, *pendent lite,* from prosecuting the action she had brought, as Trustee, for a declaratory judgment that the Orly Trust is a protected purchaser and owner of the 1,102.80 shares of TRI sold stock and is entitled to all dividends declared or paid attributable to such shares since October 29, 2004.

14      Thus the objective facts and the public record belie the TAP's captioned statement – unsupported by factual allegations – that Dalia Genger helped try to strip the Orly Trust of the Orly Trust TRI Shares. (TAP caption preceding ¶ 46) And the Sagi Trust's sale of its own TRI shares during 2008 – when Dalia was under Surrogate Roth's instructions not to take any action – is not a basis on which to remove Dalia Genger as Trustee of the Orly Trust, and neither are

---

[3] *Dalia Genger, as Trustee on behalf of the Orly Genger 1993 Trust, and Dalia Genger, in her individual capacity v. Arie Genger, Sup. Ct., N.Y. Co., Index No. 113862/2010.* (Exhibit 8)

Dalia's efforts to obtain the economic benefit of the TRI shares for the Orly Trust.

### TPR's 2008 Foreclosure on the Collateral for the D&K Note

15     Nor can Dalia Genger be removed as Trustee on the basis of TPR's August 31, 2008, declaration that the D&K Note was in default (TAP Ex. S) and TPR's subsequent foreclosure on D&K's TPR shares that D&K had pledged to secure the Note.  Despite its use of emotional and conclusory words, the TAP alleges no act that Dalia Genger did to participate in the foreclosure.  And, importantly, Dalia Genger, as Trustee of the Orly Trust, could not prevent TPR from declaring a default and foreclosing on the promissory Note made by D&K LP that the Orly Trust had guaranteed.

16     Plaintiff cannot dispute, as the Prior Decision found, that Orly Trust is not a shareholder of TPR (Prior Decision, at 6) and neither was Dalia Genger individually a shareholder of TPR after 2007. (*Supra* ¶4(a))

17     Also unavailing is the argument that D&K's Note was not supposed to be enforceable.  First, the Note says nothing of the kind.  To the contrary, why would the Note be secured by D&K's pledged TPR stock, if the Note were intended to be unenforceable?  And why would the Note be guaranteed by the Orly Trust and by the Sagi Trust if it were intended to be unenforceable?  And if intended to be unenforceable, why would those written guarantees expressly provide "that the Holder may enforce this Note, to the extent of such liability, as if the [Orly Trust] were the Maker thereof." TAP ¶ 18, Ex. B, emphasis added.

18     Moreover, by admitting that the Note had been paid in accordance with its terms until 1999 and admitting that "[a]s of mid-2006, the D&K Note `had an approximate value of $11,000,000 as a result of accrued interest'" (TAP ¶ 29), TAP belies its contention that the note was uncollectable.

19      Nor does or could the TAP allege that TPR ever renounced its rights under the Note and guarantee by destroying the Note or by delivering the Note or a signed writing cancelling or renouncing the Note, as required by NY UCC §3-605(1) for the Note to become unenforceable. It is hornbook law that the enforceability of a Note is not affected by a mere statement by the maker or guarantor that the Note is unenforceable. As the court held in *Ber v. Johnson*, 163 A.D.2d 817, 818 (4th Dep't 1990):

> Because defendants' original obligation constituted a note and guarantee, it was required to be in writing *(see,* Uniform Commercial Code § 3-104 [1], [2]; General Obligations Law § 5-701 [a] [2]) and the Statute of Frauds precludes an oral executory modification. '[W]here an original agreement comes within [the] provisions of the statute of frauds requiring certain agreements to be in writing, the statute of frauds renders invalid and ineffectual a subsequent oral agreement changing the terms of the written contract, no matter how slight the attempted variation or by whom it was made' ( 61 NY Jur 2d, Frauds, Statute of, §140, at 217-218; *see, M. H. Metal Prods. Corp. v April,* 251 NY 146, 150; *Van Iderstine Co. v Barnet Leather Co.,* 242 NY 425, 430; *Heroux v Page,* 107 AD2d 862, 863; *Awad & Co. v Pillsbury Mills,* 9 AD2d 870, lv denied 8 NY2d 705, *appeal dismissed* 8 NY2d 747; *cf.,* General Obligations Law §§ 5-1103, 15-301 [1], [2]). Thus, defendants may not rely on plaintiff's alleged oral acceptance of the stock as the basis for their defense of modification.

20      Thus the 2006 statement by Sagi Genger that D&K LP and its partners deny the enforceability of the Note would not constitute a defense to TPR's declaration of default and foreclosure, as a matter of law.[4]  Nor would enforceability of the Note have been affected if Dalia Genger *had* stated "the Note was never intended to be foreclosed upon," as the TAP ¶33 claims. But she did not so state; in the document cited basis for that assertion Dalia Genger in a Pre-Judgment Divorce Mediation merely stated that foreclosure by Dalia Genger "to take for myself an interest that Arie and I intended for the children" would undo estate planning, and thus

---

[4] Equally irrelevant is testimony by David Parnes (TAP ¶31), who was *functous officio*.

11

the Arbitrator found that Arie Genger should not have been awarded half the value of the D&K Note (TAP Exs. I & J, emphasis added.)

21     Thus as a matter of law, the Note and guarantee were enforceable in accordance with their terms.   Moreover, TPR's declaration of default of the D&K Note also occurred during the period when Dalia Genger had been instructed by Surrogate Roth to take no action.   And the TAP alleges no fact to support its generalized rhetoric that Dalia Genger participated in TPR's foreclosure. Thus Dalia Genger's failure to take some unspecified action which could not have prevented the foreclosure could not be a basis to remover her as trustee.

### The Events that Occurred After this Court Recognized Dalia Genger as Trustee

### The January 2009 D&K LP Meeting Agreement

22     The Meeting of Partners of D&K LP – Jan. 31, 2009 & Agreement, TAP Exhibit O, belies TAP's allegation (TAP ¶48) that it granted Sagi "unfettered authority to encumber the Orly Trust TRI Shares." As shown above (¶ 4(G)), on November 23, 2007 - before Dalia Genger became Trustee - D&K had amended its Partnership Agreement (by action of the Orly Trust's Trustee then: not by Dalia Genger) to give D&K authority to mortgage, pledge or otherwise encumber D&K's Limited Partners' (the Sagi and Orly Trusts') interests in Trans-Resources, Inc. (TRI) common stock (LP TRI Interest), subject to each Limited Partner's "right to redeem its LP TRI Interest to the full extent of such LP's pro-rated participation, responsibility or liability for the unpaid amount of the [D&K] Note." (Emphasis added.) TAP Ex. K, ¶ 22 at p. 11. The complained of section of the January 31, 2009, D&K LP Partnership Meeting and Agreement (TAP Ex. P) expressly stated "to clarify" that the prior authority was only to be

exercised "in substantially the same manner in which TPR Investment Associates, Inc. shares were pledged in connection with the aforementioned [D&K] note." Thus the January 21, 2009 agreement did not grant "unfettered authority to dispose of the Orly Trust TRI Shares" or indeed grant any authority; rather it clarified and if anything *limited* the prior grant of authority. Therefore it did not harm the Orly Trust. Moreover, the TAP does not and cannot allege that D&K ever purported to pledge the Orly Trust's interest in TRI stock.

23      And since the TAP can point to nothing improper that had previously been done, there was no harm from D&K LP's 2009 pro forma indemnification and release of D&K LP's former general partner.[5]

### The Orly Trust's Interest in the Orly Trust TRI Shares

24      The TAP's allegation (¶53) that Dalia Genger violated her fiduciary obligations by refusing to agree not to dispose of the Orly Trust TRI Shares is unsupported by any document or specific factual allegation. Moreover, in light of Orly joining Arie Genger a plaintiff in a Supreme Court action <u>purportedly on behalf of the Orly Trust</u> to have such shares become the property not of the Orly Trust but of Arie Genger, such allegation appears to be from Lewis Carroll's "*Through the Looking Glass and What Alice Found There*", a complete reversal of fact. However, even assuming the allegation were true, a trustee's refusal at the behest of a life time beneficiary to keep the entire trust corpus in a single, illiquid security of a closely-held entity which the Delaware Supreme Court has held is controlled by others, *Genger v. TR Investors et al.*, 26 A.3d 180 (De. 2011), would not be a violation of a Trustee's fiduciary duty, but rather would

---

[5] It should also be noted that the release only extends "to the fullest extent permitted" thus, on its face, is limited in scope to avoid any potential breach of fiduciary duty.

be an act of prudence. Especially where that Delaware court's findings raise most serious questions as to whether the Orly Trust has any interest in TRI shares at all. *Ibid.*

### The Settlement and the Court Orders

25      While the TAP claims that Dalia Genger's actions to settle certain claims of the Orly Trust were in violation of the July 1, 2009 Order of this Court, it does not attach a copy of that Order, relying instead a copy of Orly's June 22, 2009 First Amended Petition in this proceeding (TAP Ex. W) and a snippet of the transcript of the court proceedings on the return date (TAP Ex. X). Perhaps the reason the TAP does not attach or quote that Order is that Dalia Genger has been in full compliance with it. That Order (a copy of which is **Exhibit 10** hereto) required Dalia Genger, as Trustee:

> to give notice by overnight mail to petitioner's [Orly's] counsel of any 1) offer to purchase the Orly Trust's 19.3% interest in TRI within 10 days of receiving such offer and 2) act by Respondent [Dalia Genger], her agents and all other persons acting on her behalf to assign, mortgage, pledge, redeem, encumber, sell, or otherwise alter the Orly Trust's interest in TRI at least 10 days prior to such act.[6]

(Note that the July 1, 2009 Order does not require notice of "any transaction that impacted the Orly Trust TRI Shares", as the TAP mischaracterized it in TAP ¶90 (a)). The TAP does not and cannot not allege that Dalia Genger received any "offer to purchase the Orly Trust's 19.3% interest in TRI" or that she did anything that constitutes a "purchase, assignment, mortgage, pledge, redemption, encumbrance, sale, or other alteration of the Orly Trust's interest in TRI".

---

[6]      Contrary to the TAP's allegation, ¶47 n. 5, that Order did not require prior notice of Dalia Genger's filing a lawsuit against the Trumps, TPR, and TRI for a declaratory judgment that the Orly Trust is the owner of the TRI shares it bought in 2004.

26      Of course, the fact that the Orly Trust's transactions did not violate the July 1, 2009 Order does not end the question of whether the TAP properly alleges a claim that they are reasons why Dalia Genger should be removed as Trustee.  But to appreciate why the TAP does not allege such a legally cognizable claim, this Court must examine the context of the acts, as well as what was done.

## The Context of the Settlement

27      Three facts constitute the *status quo ante* before the settlement of which the TAP complains:

a.      Although Plaintiff does not like it, Dalia Genger is the Trustee of the Orly Trust, as was confirmed by the Prior Decision.

b.      The Orly Trust was the guarantor of 48% of the D&K 1993 Note in favor of TPR, secured by D&K's pledge of its TPR shares.  Not only does the pledge establish that the D&K Note was to be paid, as shown discussed *supra*, but the TAP recognizes that D&K made millions of dollars of payments thereon through 1999.  And the TAP does not contend (and Petitioner Orly Genger has never contended and cannot contend) that D&K did not owe the D&K Note or that the Orly Trust was not liable for its guaranteed share of the unpaid portion of the D&K Note.  (Any such contention would amount to an allegation the Arie Genger committed tax fraud by making a disguised transfer without paying gift tax.)  Thus, even after TPR foreclosed on the pledged TPR shares, the Orly Trust owed approximately $4.5 million on its guarantee for its share of the balance of the D&K Note.

15

c.    The Delaware Supreme Court ruled that Arie Genger's acts to cause TPR to transfer TRI Shares to the Orly Genger Trust (and to Arie Genger and the Sagi Genger Trust) did not transfer legal or record ownership (without deciding whether it transferred beneficial ownership) *Genger v. TR Investors et al.*, 26 A.3d 180 (De. 2011) , thus leaving TPR as the continued legal and record owner of the TRI shares purportedly transferred to the Orly Trust or to the proceeds of those shares if TPR's purported August 2008 sale of them to the Trump Group was valid. The Trump Group agreed to pay TPR $10.3 million for TPR's August 2008 purported sale of the "Orly Trust TRI Shares", which sum is being held by my law firm in escrow, pursuant to an agreement executed by Dalia Genger, as Trustee, TPR, the Trump Group, and Orly Genger herself, pending a final determination of the ownership of those TRI shares by a competent court with full jurisdiction over Dalia Genger, as Trustee, TPR, the Trump Group. Conversely, based on Orly Genger's representation to Surrogate Roth in a November 5, 2008 letter (Exhibit 2 hereto, page 2), if TPR's purported August 2008 sale was not valid, the value of the "Orly Trust" Shares of TRI that TPR purported to sell would be "in excess of $150,000."

### The Settlement that Secured Millions for the Orly Trust

28      In October, 2011, Dalia Genger, as Trustee of the Orly Trust, entered into a Settlement Agreement with TPR and D&K. As Trustee, Dalia Genger has the legal authority to settle claims by and against the Trust. *See* N.Y. E.P.T.L. § 11-1.1(13) (A trustee has the power "[t]o contest, compromise or otherwise settle any claim in favor of the estate, trust or fiduciary or in favor of third persons and against the estate, trust or fiduciary."); Orly Genger 1993 Trust Agreement, Eleventh Article, Sec. 7 at page 26 (which states that "[i]n addition to and in amplification of the powers given by law to trustees" the trustee of the Orly Trust shall have the

power "[t]o settle, adjust, compromise, or submit to arbitration any dispute, claim, or controversy in which any trust hereunder may be in any way interested.") TAP Ex. A.

     29    Of course, "'stipulations of settlement are judicially favored'" *IDT Corp. v. Tyco Group*, 13 N.Y.3d 209, 213-14 (N.Y. 2009) *citing Matter of Kanter*, 209 A.D.2d 365, 365 (1st Dep't 1994), and in exercising the authority to settle a claim of or against the Trust, a Trustee has a broad range of discretion. *See In re Cmty. Serv. Soc. of New York*, 275 A.D.2d 171, 181 (1st Dep't 2000) ("where a trustee has discretionary power, the exercise of that power is not to be the subject of judicial interference, 'at least if exercised reasonably and in good faith'" (internal citation omitted)). *See also In re IBJ Schroder Bank & Trust Co.*, Index No. 101530/98, Supreme Ct., N.Y. Co., Op. at 5-6 (Aug. 16, 2000) **Exhibit 11** (*held*: Settlement agreement entered into by trustee entitled to judicial deference and upheld <u>over beneficiaries' objection</u> as the trustee had made a "showing of the reasonableness of the proposed settlement" and the objecting beneficiaries "ha[d] not submitted any evidence to show that the trustee's actions may have been based on some ulterior motive or that the trustee is somehow itself interested in the transaction other than in its fiduciary capacity".)

     30    Here this Court will see that the settlement with TPR and D&K was objectively beneficial to the Orly Trust's interests.

     a    Prior to the settlement the Orly Trust owed TPR approximately $4.5 million on its guarantee of the D&K Note. The settlement changed that to a $4 million <u>unsecured</u> Note to TPR (TAP Ex. BB), <u>and</u> TPR paid the Orly Trust $100,000 for the Trust's legal fees, providing moneys to pay for litigation to establish the interest of the Orly Trust with respect to the TRI shares that Arie Genger purported to have transferred to the Orly Trust. (TAP Ex. GG, Settlement Agreement ¶1, 3-4). Thus the Orly Trust gained $600,000.

b    Also, in the settlement TPR relinquished to the Orly Trust any economic interest

TPR had in the TRI Shares and assigned to the Orly Trust TPR's rights to any economic

benefits of the TRI shares. This includes, but not limited to, any proceeds from the sale

thereof, *i.e.*, the $10.3 million otherwise owed to TPR pursuant to the terms of the August

22, 2008 letter agreement with the Trump entities if a court determines that such sale

conveyed the Orly Trust TRI Shares to the Trump Group. This is a benefit to the Orly

Trust of at least the $10.3 million that my firm holds in escrow and possibly substantial

multiples thereof as Orly has contended in her November 5, 2008 letter to this Court,

Exhibit 2.

c    Also, the settlement ends the relationship between the Orly Trust and D&K and

"cancel[s] and void[s]" (TAP ¶88) the Amended D&K Partnership Agreement and the

"Meeting Agreement" of which Orly complains in this action, eliminating any contention

that the Orly Trust was damaged by those agreements, as the TAP reluctantly concedes

(TAP ¶88) and thus removing a source of continued friction with Sagi Genger.[7]

d    Also, the settlement agreement should end the multiple contentious litigations

which must cost Orly Genger, or whosoever is paying her legal fees, substantial moneys.

While the settlement agreement, of course, contains releases, there is no release in favor of Dalia

Genger, nor did Dalia Genger, individually, receive any moneys from the settlement. Thus the

settlement contains substantial benefits for the Orly Trust and no benefits for Dalia Genger.

---

[7] The TAP again misleads the Court when it contends "that these two agreements purported to enable" TPR's
foreclosure. TAP ¶ 89. The foreclosure was pursuant to the D&K Note and Pledge Agreement that were executed
in 1993. TAP Ex. B, and had nothing to do with these later agreements.

31      While the original Settlement Agreement provided it was controlled by Delaware Law and for exclusive Delaware jurisdiction over any disputes, subsequently the original settlement agreement was amended and restated to provide that it is controlled by New York law and that Delaware jurisdiction is non-exclusive.

32      Several months later, TPR agreed to sell the Orly Trust Note to Manhattan Safety Company, Ltd. ("Manhattan"), which agreed to loan an additional $200.000 to the Orly Trust. Dalia Genger, as Trustee, anticipated the need for additional funds for its litigation to establish the Orly Trust's right with respect to the TRI shares. Thus as Trustee she entered into a new Credit and Forbearance Agreement and Second Amendment and Restated Promissory Note with Manhattan together with new unsecured Notes; the Orly Trust's Note to TPR was returned to the Orly Trust (See Exhibit 12) and on May 15, 2012, my firm's escrow account received the $200,000 for the benefit of the Orly Trust. These Notes are neither due nor in default[8], and there has been no notice to the contrary nor any attempt by Manhattan to compel payment.[9] Nor do the Credit and Forbearance Agreement or the Notes pledge anything as security or otherwise "allow the potential foreclosure against valuable collateral" as alleged in TAP ¶8. Thus, after this new agreement and Notes, the Orly Trust's debt was still less that its prior obligation to TPR as

---

[8] Contrary to TAP's assertion, the federal court's dismissal of the *Pedowitz & Meister, LLP v. TPR Investment Associates, Inc.*, interpleader action for lack of jurisdiction is not an event of default nor an event of maturity of the Note to Manhattan, as it did not resolve the issues of beneficial ownership of the TRI shares.

[9] On Monday, August 13, 2012, I spoke by telephone with Manhattan's President, Greg Gilpon-Payne, who confirmed that Manhattan has not sent the Orly Trust any purported notice of default or otherwise demanded payment of the Note. And Dalia Genger, as Trustee of the Orly Trust, agreed to notify Orly Genger, through her counsel, of any purported notice of default or attempt to collect the Note within two business days of receipt thereof.

guarantor of the D&K Note and the Trust has received a $100,000 payment from TPR and a $200,000 loan from Manhattan.

33     Contrary to the *ipse dixit* assertion in TAP ¶76, the Orly Trust <u>will</u> be able to pay those Notes, either from TRI dividends if the Orly Trust is held to be the legal owner of the TRI shares[10], or from the $10.3 million held in escrow if the court finds otherwise.

34     Equally significantly, Dalia Genger has received no funds from the Settlement or the transaction with Manhattan. Indeed, Dalia Genger has received no funds from the Trust – the Trust Agreement provides that the Trustee shall no receive commissions. *See* Orly Genger 1993 Trust Agreement, Eighth Article, at page 18, Ex. A. Nor has the Orly Trust paid Dalia Genger's substantial legal fees for her defense of this action or the two companion Supreme Court actions by Orly Genger and by Arie Genger and Orly Genger, or the action Dalia Genger brought in Supreme Court against Arie Genger seeking to recover for the Orly Trust damages for Arie Genger's breach of his contract to cause the transfer to the Orly Genger Trust full title to the TRI shares. *Dalia Genger v. Arie Genger*, Index No. 113862/2010 (Sup. Ct. NY Co.)

35     Contrary to the allegation of the TAP, the settlement and the Orly Trust's issuance of the various notes did not violate any court order. I discuss them in chronological order.

### This Court's July 1, 2009 Order Was Not Violated

36     On July 1, 2009, this Court ordered Dalia Genger, as Trustee:

> to give notice by overnight mail to petitioner's [Orly's] counsel of any 1) offer to purchase the Orly Trust's 19.3% interest in TRI within 10 days of receiving

---

[10]    Until final court determination of the ownership issues regarding the "Orly Trust TRI Shares" and those TPR purported to sell to Arie Genger, TRI's dividends attributable to those shares are being held *in escrow* by Skadden, Arps, Slate, Meagher & Flom LLP. Exhibit 13, April 23, 2012 email from Thomas Allingham, II, Esq. so confirming.

such offer and 2) act by Respondent [Dalia Genger], her agents and all other persons acting on her behalf to assign, mortgage, pledge, redeem, encumber, sell, or otherwise alter the Orly Trust's interest in TRI at least 10 days prior to such act. (Ex. 10)

(Note that the July 1, 2009 Order does not require notice of any transaction that "*impacted* the Orly Trust TRI Shares", as the TAP mischaracterized it in TAP ¶90 (a)(emphasis added)). Nothing in the Settlement Agreement, the Manhattan Agreement or the Notes is a purchase, assignment, mortgage, pledge, redemption, encumbrance, sale, or other alteration of the Orly Trust's interest in TRI which was not pledged to secure any of the notes. To the contrary, in the Settlement Agreement TPR relinquished to the Orly Trust any economic interest TPR had in the TRI Shares and assigns to the Orly Trust TPR's rights to any economic benefits of the TRI shares including any proceeds from the sale thereof, including but not limited to the $10.3 million in proceeds otherwise owing to TPR in the future pursuant to the terms of the August 22, 2008 letter agreement with the Trump entities. This is in sharp contrast to Orly Genger's position supporting Arie Genger's attempt in the companion action, *Arie and Orly Genger v Sagi Genger et al.,* index no. 651089/2010, which seeks to take from the Orly Trust rights to the TRI Shares, the settlement fortifies the Orly Trust's position that it is entitled to the TRI shares. Thus there was no violation of the Surrogate's Court July 1, 2009 Order.

### The September 8, 2010 Stipulation in this Proceeding Was Not Violated

37     By Stipulation on September 2, 2010, Orly and Dalia and their counsel, Orly's July 16, 2010 Order to Show Cause was withdrawn and Dalia agreed to give Orly's counsel notice "of any attempt to vote any TRI Shares held by the Orly Trust." TAP, Ex. Y. The TAP does not and cannot not allege that Dalia Genger made any attempt to vote any TRI Shares held by the Orly Trust. Thus there was no violation of the September 10, 2010 Stipulation.

**The Supreme Court's June 28, 2010 Order Was Not Violated**

38      In its June 28, 2010, Decision and Order in *Orly Genger in her individual capacity and on behalf of the Orly Genger 1993 Trust (both in its individual capacity and on behalf of D & K Limited Partnership) v. Dalia Genger et al.,* Sup. Ct., N.Y. Co. Index No. 109749/09, which the TAP curiously calls "the New York TPR action", at pp. 31-32, the Supreme Court enjoined and restrained Defendants in that action:

> during the pendency of this action from doing or suffering to be done, directly or through any attorney, agent, servant, employee or other person under the supervision or control of defendant or otherwise, any of the following acts: removing the [D& K Limited Partnership's 48% ownership interest in the common stock of TPR Investment Associates ("TPR")] from the state, or otherwise transferring, selling, pledging assigning, or otherwise disposing of the [Orly Trust TPR] Shares. (TAP Ex. X at p. 32)

Nothing in the Settlement Agreement, the Manhattan Agreement or the Notes removed the [D& K Limited Partnership's 48% ownership interest in the common stock of TPR Investment Associates ("TPR")] from the state, or otherwise transferred, sold, pledged, assigned, or otherwise disposed of the [Orly Trust TPR] Shares, which in fact the Orly Trust no longer owned and were owned by TPR by virtue of the foreclosure. Thus, contrary to the TAP's assertions (*e.g.,* ¶90 (b)), there was no violation of the Supreme Court's June 28, 2010 Order.

**The Supreme Court's December 28, 2011 Order Was Not Violated**

39      On December 28, 2011, in *Arie Genger and Orly Genger, in her individual capacity and on behalf of the Orly Genger 1993 Trust, v. Sagi Genger, et al.,* Sup. Ct. N. Y. Co., Index No. 651089/2010, the Supreme Court ordered that defendants TPR and The Trump Group shall give Plaintiffs "ten business days notice for future tractions that may impact the subject [TRI] shares". TAP Ex. AA at p. 15. That Order did not impose any restrictions on Dalia Genger, and nothing in the Settlement Agreement, the Manhattan Agreement or the Notes

22

adversely impacts the Orly Trust's interest in TRI. Thus there was no violation of the Supreme Court's December 28, 2011 Order.

40     Therefore, the Third Amended Petition fails to set forth any plausible grounds that would give adequate grounds to remove Dalia Genger as Trustee.

### The TAP Fails to Join an Indispensable Party

41     The Orly Genger Trust provides that its remainder, should Orly Genger die without issue[11], goes to the Sagi Trust. Thus the Sagi Trust is an interested party that should be joined and served with the Third Amended Petition.

### CONCLUSION

42     The TAP asks this Court to appoint Joel Isaacson as Trustee of the Orly Trust, and her prior Petitions asked for the appointment of other named persons. As the Orly Trust requires the Trustee to serve without commissions, the Court can be sure that if it appointed Orly's designee, he would use his discretion to distribute the corpus to Orly, whose actions demonstrate that she still is in thrall of her father, even to the extent of joining him as plaintiff in the Supreme Court action to have the TRI shares go to Arie rather than the Orly Trust. Undoubtedly, he has loaned her the very substantial funds she used to wage the legal warfare in so many courts, and thus cash that should go to Orly for her living expenses and then to her issue, should she have children and if not to the Sagi Trust would likely go instead to Arie Genger. It is to prevent this perversion of the original intent that Dalia Genger remains as Trustee, knowing that Orly's paternal bias will undoubtedly result in continued lawsuits against Dalia and stress.

---

[11] Orly Genger is unmarried and has no children.

43    As the TAP is legally sufficient to remove Dalia Genger as Trustee, the TAP

should be dismissed without leave to replead.

November 19, 2012                          Robert A. Meister

# Exhibit 1

SURROGATE'S COURT : NEW YORK COUNTY        JAN 0 2 2009
------------------------------------------ X
In the Matter of the Trust Established
on December 13, 1993, by ARIE GENGER        File No. 0017/2008
for the Benefit of ORLY GENGER.
------------------------------------------ X

R O T H ,  S .

     This is a contested application by the primary beneficiary
(Orly Genger) of an irrevocable inter vivos trust established by
her father, Arie Genger, seeking the appointment of a successor
trustee or, alternatively, the appointment of a "special trustee"
to investigate alleged wrongdoing concerning the trust.
Petitioner's mother, Dalia Genger (grantor's former wife),
contends that she is the duly appointed successor trustee and
that there is no basis to appoint another fiduciary for any
purpose.

     The trust agreement, dated December 13, 1993, provides for
discretionary income and principal distributions to Orly for life
with remainder to her descendants or, if none, to the grantor's
descendants in trust.

     Article SEVENTH (B), (D), (E), and (G) of the trust
instrument sets forth the following procedure for the resignation
of trustees and the appointment of their successors.

     A trustee may resign by delivering a signed and acknowledged
instrument of resignation in person or by certified or registered
mail to the other trustee and to either the grantor or the income
beneficiary.  Such resignation is effective upon the receipt of
the acknowledged instrument by the other trustee (if there is

one) and the grantor or the income beneficiary or at such later date as may be specified in the instrument.

A trustee may appoint his or her successor by delivering a signed and acknowledged instrument in the same manner as described above for resignation. Any such appointment, however, is valid only if the appointee qualifies by delivering a signed and acknowledged instrument of acceptance in person or by certified or registered mail to each trustee and the grantor or the income beneficiary within 30 days after the later of 1) the date on which a copy of the appointment instrument is delivered to him or her, and 2) the effective date of the appointment as set forth in the appointment instrument. It is observed that there is no provision that requires a resigning trustee to appoint a successor or that there always be two trustees in office.

The original two trustees served until October 2004, when they resigned and appointed David Parnes and Eric Gribitz as their successors. On February 12, 2007, Mr. Gribitz resigned without appointing a successor. On April 26, 2007, Mr. Parnes resigned and appointed as his successor Leah Fang in a signed and acknowledged instrument. Although Ms. Fang noted her acceptance at the bottom of such instrument, her signature was not acknowledged. However, in another document entitled "Release" executed and acknowledged by Ms. Fang the same day, she, as

2

trustee, purported to discharge Mr. Parnes from liability. It is undisputed that thereafter Ms. Fang acted as trustee. Indeed, Ms. Fang's contention that she received a number of requests for information from petitioner and that petitioner referred to her in writing and orally as trustee is not disputed by petitioner.

On December 12, 2007, Ms. Fang, without resigning in accordance with the trust agreement, attempted to appoint Patricia Enriquez, as successor trustee. Her designation of Ms. Enriquez, however, was by an unacknowledged letter in which she referred to her own resignation as taking effect upon Ms. Enriquez's acceptance of the appointment. Ms. Enriquez accepted by signing the letter, but such acceptance was not acknowledged and, in any event, there is nothing in the record to suggest that such "acceptance" was delivered in accordance with the trust instrument. Two weeks later, an attorney for Ms. Enriquez notified petitioner's counsel by email that her client had advised that she had no intention to overcome the procedural omissions.

On January 3, 2008, Ms. Fang and Dalia Genger signed before a notary a memorandum in which Ms. Fang stated that "to the extent that I am still vested with any powers to appoint trustees of the [trust], I confirm your appointment." The next day, Ms. Fang executed an acknowledged instrument of resignation and appointment of successor trustee naming Dalia as her successor

3

and Dalia, on the same day, executed an acknowledged instrument of acceptance.  It is undisputed that such documents were delivered in accordance with the trust requirements.

We address first that portion of the instant application which seeks the appointment of a successor trustee on the ground that Dalia was not validly appointed.  In such connection, petitioner argues first that, because Ms. Fang's signature on the bottom of Mr. Parnes's appointment instrument was not acknowledged, she never accepted the position in accordance with the trust agreement (and thus could not appoint Dalia her successor).  However, such argument ignores the "Release" mentioned above that Ms. Fang executed the same day.  Such instrument, which was signed and duly acknowledged, unequivocally establishes Ms. Fang's acceptance of the position.  Since petitioner does not challenge the authenticity of such instrument or Mr. Parnes' contention, supported by the record, that it was delivered in accordance with the trust instrument and, as noted above, petitioner thereafter communicated with Ms. Fang as trustee, Ms. Fang properly qualified as successor trustee.

Petitioner's second argument that, in any event, Ms. Fang's appointment of Dalia was ineffective because Ms. Fang had previously resigned as trustee is also without merit.  Simply put, Ms. Fang had not previously resigned because her letter to Ms. Enriquez did not contain the formalities (i.e., an

4

acknowledgment) required by the trust agreement. Moreover, although not a model of clarity, the letter makes clear that Ms. Fang did not intend to leave the trust without a trustee in the event that Ms. Enriquez failed to qualify, which is exactly what happened. Thus, Ms. Fang had authority to appoint Dalia as her successor.

Since there is no dispute that the instrument of resignation and appointment executed by Ms. Fang on January 4, 2008, and Dalia's instrument of acceptance of the same date were executed and delivered in accordance with the trust agreement, Dalia is the duly appointed successor trustee of the trust. To find otherwise would be to ignore the chronology of events and the purpose of the provisions at issue, namely to ensure that the trust always has a fiduciary ready, willing and able to act. The fact that petitioner does not wish her mother to be the fiduciary because she considers her an adversary in a broader intra-family dispute does not provide a basis to ignore the grantor's intent, as reflected in the trust instrument, that an acting trustee, and not the beneficiary, decides who shall become a successor trustee. Accordingly, petitioner's application to appoint a successor trustee is denied.

We next turn to petitioner's alternate request for relief, namely that a "special trustee" be appointed for the "purpose of investigation and taking discovery with respect to the wrongful

5

dealings concerning the assets and income of the trust."

It is noted initially that petitioner's only allegations of "wrongful dealings" concern a close corporation, TPR Investment Associates, Inc.   She contends that her brother Sagi, who is an officer of TPR, and Dalia, who was a shareholder at the time this proceeding was commenced, are engaged in a "wrongful scheme" to divert assets to themselves and, as a result, Dalia "could not possibly" investigate wrongdoing at TPR, which the petition describes as the "greatest" asset of the trust.

However, the premise of the application, namely that the trust's interest in TPR would enable the trustee to investigate or seek relief from TPR, does not appear to be correct. Petitioner does not dispute Dalia's assertion, supported in the record, that the trust is not a shareholder of TPR at all. Rather, D&K LP, an entity in which the trust owns a 48 percent interest, in turn owns approximately 50 percent of TPR. Petitioner does not explain what appears to be a material misstatement concerning TPR's relationship to the trust.   Nor does she identify how a trustee under such circumstances might be in a position to "investigate and address the TPR issues".

In any event, assuming arguendo that a trustee would somehow be able to investigate alleged misconduct at TPR, petitioner's vague and speculative allegations of "wrongful conduct" at TPR from which Dalia purportedly benefitted do not warrant the

appointment of a "special trustee".  Similarly, petitioner's
allegations (made upon information and belief) that Dalia had
knowledge of alleged improper acts by former trustee, David
Parnes, in relation to TPR are patently insufficient to warrant
the remedy of a "special trustee".  In such connection, it is
noted that Mr. Parnes and Ms. Fang have been directed to account
for their proceedings as trustees (<u>Matter of Genger</u>, NYLJ, Feb.
25, 2008, at 29, col 3), giving petitioner a forum to seek relief
for most of the conduct about which she complains.

Finally, it is observed that petitioner has not alleged that
Dalia has refused a request for information, which would warrant
relief (SCPA 2102), or has failed as trustee to protect trust
assets.  Indeed, it appears that Dalia (who states that she is
ready and able to act as fiduciary) has yet to assume the duties
of trustee in deference to her daughter's position in this
litigation.  As a validly appointed trustee, she should be given
the opportunity to do what she deems necessary to manage and
protect the trust's assets.

Based upon the foregoing, the appointment of a "special
trustee" is unwarranted at this time and, accordingly, the
application is denied, without prejudice to renewal if future

circumstances warrant such relief.

This decision constitutes the order of the court.

_____
S U R R O G A T E

Dated: December 31, 2008

# Exhibit 2

i

# MARKEWICH AND ROSENSTOCK LLP

8 East 41st Street ▪ Fifth Floor ▪ New York, New York 10017

*tel:* (212) 542-3156  *fax:* (212) 481 1761  *emarkewich@mrlawllp.com*

Lawrence M. Rosenlock                                                                                 Robert Markewich
Eva Rachel Markewich                                                                                 of counsel

November 5, 2008

Hon. Renee R. Roth
Surrogate's Court, New York County
31 Chambers Street, 5th Floor
New York, New York 10007

Re:     In the Matter of Orly Genger
        File No. 0017/2008

Dear Surrogate Roth:

We write on behalf of the Petitioner, Orly Genger, with reference to her *sub judice* Petition as beneficiary of the Orly Genger Trust ("Orly Trust"). Recent events require that we, again, urge you to appoint Martin Coleman as Trustee. As set forth in detail below, there are several litigations in process that will impact the value of Trust assets, and the Orly Trust needs to have a Trustee who can participate in those litigations without conflict. There is also an outstanding matter regarding possession of a stock certificate belonging to the Orly Trust, but which is currently being held captive by another party.

Our Amended Petition sought the immediate appointment of a Trustee to administer the Orly Trust and safeguard its assets. We were thwarted in that request by objections from Sagi Genger ("Sagi"), the remote contingent remainderman of the Orly Trust, who manipulated various friends and relatives of his (his friend, David Parnes ("Parnes"); his sister-in-law Leah Fang; his sister-in-law's romantic partner, Patricia Enriquez; and his mother Dalia Genger ("Dalia")) to, seriatim, name one another Trustee and to take control of the Orly Trust, to the detriment of Orly.

Since our last contact with the Court, we believe Sagi and Dalia have acted in concert to devalue the Trust's most valuable asset, shares of a privately-held company called Trans Resources Inc. ("TRI"), a company founded by Orly's and Sagi's father, Arie Genger ("Arie").

The Orly Trust and a trust for the benefit of Sagi, (the "Sagi Trust"), were created by Arie in 1993. In 2004, when Arie and Dalia divorced, the two Trusts purchased TRI stock that at one time was marital property. This stock previously had been held by TPR[1], an entity in which Arie and Dalia held their family resources. As part of the marital settlement, the TRI stock held by TPR was sold to the Orly Trust, the Sagi Trust and Arie. As a result of the sales, the Sagi Trust and the Orly Trust each owned to approximately 19% of the outstanding TRI stock, and Arie owned approximately 15% of the TRI stock. The Trusts also executed irrevocable proxies granting to Arie the right to vote their shares of TRI stock. As a result, Arie continued to control TRI through the Genger family holdings of approximately 53% of the stock.

The remaining 47% TRI stock is held by third parties unrelated to the Gengers but related to each other ("Third Parties"). Last month, the Third Parties attempted a coup, by convincing Sagi to arrange the sale to them of the Sagi Trust's shares ("Sagi TRI Shares"). The purported sale was effected by a document signed by Rochelle Fang, Sagi's mother-in-law, who was then Trustee of the Sagi Trust. As soon as Rochelle, as Trustee, signed the purchase and sale agreement (the "PSA") regarding the Sagi TRI Shares, Rochelle -- presumably at Sagi's request -- resigned as Trustee. In Rochelle's place, David Parnes became Trustee of the Sagi Trust. Of course, this musical chairs game with the Trustee to the Sagi Trust is the same game played by the same people -- Parnes, Sagi and Sagi's in-laws, the Fangs -- regarding the trusteeship of the Orly Trust.

The PSA reflected a price for the Sagi TRI-Shares that is merely a fractional amount of their worth. Based on the 2008 earnings of TRI, the value of the Sagi TRI Shares is in excess of $150,000,000. Nonetheless, under the PSA, the Third Parties purport to purchase the Sagi TRI Shares for $26,715,416 -- ie. at a discount of approximately $125,000,000 or more.

In the meantime, the Third Parties also have filed suit seeking to void the original transfer of the TRI shares from TPR to the two Trusts, claiming the sale was improper under the TRI shareholders agreement. Since the Third Parties claim that the stock owned by the Sagi Trust was never rightfully transferred to the Sagi Trust, the Third Parties insisted that the PSA be approved and executed not only by the Sagi Trust, but also by TPR. Upon information and belief, Dalia, as the controlling shareholder of TPR, consented to the sales

---

[1] In the Amended Petition, Orly requested limited letters to investigate the operations of TPR. TPR originally was owned 49%, indirectly, and equally, by the Sagi Trust and the Orly Trust, and 51% by Dalia. Recently, Dalia sold 2% of her shares to Sagi's mother-in-law, Rochelle Fang. Of particular concern to Orly is the fact that TPR has paid out well over a million dollars in compensation and other funds to Sagi and Dalia, without making comparable payments to Orly.

document affirming that if the Sagi Trust's TRI shares are, in fact, still owned by TPR, then TPR agrees to the sale to the Third Parties. By consenting to the sale, Dalia, simultaneously: (i) agreed to a share price for TRI at significantly below its actual value; (ii) conceded the possibility that the Orly Trust is not the owner of its most valuable asset – the TRI shares that had been transferred to it by TPR; (iii) agreed to cede control of TRI to the Third Parties; (iv) potentially caused a de-valuation of the Orly Trust's TRI shares; and (v) potentially caused a de-valuation of the Orly Trust's interest in TPR.

There are currently several litigations involving TPR and/or TRI, which directly affect the Orly Trust, including:

- GLENCLOVA INVESTMENT CO. v. TRANS-RESOURCES, INC. and TPR INVESTMENT ASSOCIATES INC. pending in the United States District Court, Southern District of New York;

- ROBERT SMITH, TR INVESTORS, LLC AND GLENCLOVA INVESTMENT CO. v. TRANS-RESOURCES, INC. pending in the Delaware Chancery Court;

- TR INVESTORS, LLC, GLENCLOVA INVESTMENT CO., NEW TR EQUITY I, LLC, and NEW TR EQUITY II, LLC v. ARIE GENGER and TRANS-RESOURCES, INC. pending in the Delaware Chancery Court.

- NEW TR EQUITY, LLC v. TRANS-RESOURCES, INC., pending in the Delaware Chancery Court.

These actions will have a direct impact on the Orly Trust's holdings, and the control and value of such holdings. It is, therefore, essential that a trustee immediately be appointed for the Orly Trust, so that decisions can be made to determine what steps to take with respect to these litigations and, in particular, whether the Orly Trust should seek to intervene in these lawsuits. It is likely that the only way to preserve the value of the TRI shares in the Orly Trust will be to intervene in some if not all of the litigations.

Sagi and Dalia are acting on their own accounts in the litigations. There is no one acting on behalf of Orly or the Orly Trust. The Orly Trust must have representation in the litigations that is independent from the Sagi Trust and TPR, as controlled by Dalia. Clearly, Dalia would not be independent. She is obviously in a position of conflict, having already approved a severely depressed valuation of the TRI stock. This conflict is separate and apart from the conflict that already existed, as set forth in the Amended Petition, as a result of Dalia taking money out of TPR, to the exclusion of the Orly Trust,

which has an independent significant ownership interest in TPR, albeit indirectly through another entity controlled by Dalia.

In addition to our concerns about the extant litigations, we are also concerned that Dalia and Sagi will attempt to sell the Orly Trust's TRI shares to the Third Parties – again, at a depressed value. In fact, we have sought to obtain the share certificate evidencing the Orly Trust's ownership of the TRI shares and have been thwarted by TRI's counsel. The need to take possession of that share certificate is yet another, separate, reason, why there is immediate need for the appointment of a Trustee other than Dalia.

For these reasons we respectfully request that the Court immediately resolve the outstanding application and appoint Martin Coleman as Trustee. (Although the Trustee must serve without commission, pursuant to the Trust Instrument, Mr. Coleman has agreed to take on this job.)

Respectfully yours,

Eve Rachel Markewich

ERM:js

cc:   Jonathan G. Kortmansky, Esq.
      Steven Hyman, Esq.
      Matthew Hoffman, Esq.
      Seth Rubenstein, Esq.
      Mary Santamarina, Esq.

# Exhibit 3

FILED: NEW YORK COUNTY CLERK 08/11/2010
NYSCEF DOC. NO. 83

INDEX NO. 109749/2009
RECEIVED NYSCEF: 08/11/2010

SUPREME COURT: NEW YORK COUNTY

| |
|---|
| ORLY GENGER in her individual capacity and on behalf of the Orly Genger 1993 Trust (both in its individual capacity and on behalf of D & K Limited Partnership), |
| Plaintiff, |
| - against - |
| DALIA GENGER, SAGI GENGER, LEAH FANG, D & K GP LLC, and TPR INVESTMENT ASSOCIATES, INC., |
| Defendants. |

Index No.: 109749/09

**SECOND AMENDED VERIFIED COMPLAINT**

Plaintiff Orly Genger in her individual capacity and on behalf of the Orly Genger 1993 Trust (both in its individual capacity and on behalf of D & K Limited Partnership), by her attorneys, Zeichner Ellman & Krause LLP, alleges, upon information and belief, for her Second Amended Verified Complaint against the defendants in this action as follows:

## NATURE OF THE ACTION

1.      As described below, Dalia and Sagi Genger, together with various business entities controlled by them and Leah Fang, engaged in a fraud and conspiracy designed to completely loot the Orly Genger 1993 Trust (the "Orly Trust") of its value. The defendants' various acts of self-dealing, material misrepresentations, and material omissions, in breach of their respective fiduciary duties and in violation of New York law, injured Orly Genger, the Orly Trust, and D & K Limited Partnership.

in TPR, from challenge or diminution in value.

36. In addition, Sagi owes fiduciary duties to Orly arising from the close relationship of trust and confidence between him and his sister. Orly reposed complete trust, confidence and reliance upon her brother Sagi to protect both her interests and her Trust's interests, including her Trust's ownership interests in TPR and the TRI Shares, and to alert her to anything that may adversely affect her or her Trust's assets.

**E.    Dalia Gives Sagi Complete Control of TPR**

37. On October 30, 2004, Dalia, as 52.96% owner of TPR, entered into a shareholder agreement with TPR, concerning the future management of the company. Pursuant to this shareholder agreement (attached hereto as Exhibit 6), Dalia gave D&K, which owned 49% of TPR, the authority to appoint one board member to TPR's two-member board of directors. Sagi used his managerial control over D&K to appoint himself as D&K's representative on TPR's board. In addition, the shareholder agreement appointed Sagi as CEO of TPR. As TPR's majority shareholder, Dalia named herself as TPR's remaining board member.

38. Sometime in 2007, Sagi stripped Dalia of her majority interest in TPR by selling a 2% interest in TPR to Rochelle Fang, his mother-in-law. At the time of the sale, TPR's assets were worth between approximately $11,000,000 and $12,000,000, plus the value of the Note.

39. Around the time of her appointment as successor trustee to the Orly

Trust in January 2008, Dalia divested herself of the balance of her TPR shares.

      40.    Through the above-mentioned transactions, Sagi obtained direct control over TPR and its interest in the Note. Notably, Sagi's role as CEO of TPR (the creditor on the Note) is in direct conflict with his role as manager of D&K (the debtor on the Note), whose role was to repay the Note or to contest the Note's enforceability.

      41.    Moreover, Sagi's dual control over both TPR and D&K directly conflicts with Sagi's and D&K GP's undiluted fiduciary duties to D&K's limited partners, including the Orly Trust, to manage, maintain and protect D&K's assets from challenge or diminution in value. Sagi would later use his dual positions at TPR and D&K to engage in self-dealing in connection with the Note and to damage the Orly Trust and Orly, in violation of his fiduciary duties.

      42.    Notably, other New York courts have recognized Sagi's willingness to engage in self-dealing, ignore clear conflicts of interest, and collude with his mother, Dalia, to the detriment of the other Genger family members. See Orders and Transcripts attached hereto as Exhibit 7.

F.    **Fang and then Dalia Gain Control over the Orly Trust**

      43.    In connection with the Settlement Agreement, Dalia required that the Trustees of the Orly Trust and the Sagi Trust (Sash A. Spencer and Lawrence M. Small) resign and be replaced with Sagi's longtime friends, David Parnes and Eric Gribetz. Mr. Gribetz, subsequently retired as trustee without appointing a successor in

## VERIFICATION

STATE OF NEW YORK,
COUNTY OF NEW YORK.

ORLY GENGER, being duly sworn, says that she is the plaintiff named in the foregoing second amended verified complaint; that she has read the foregoing second amended verified complaint, and that the complaint is true to her own knowledge except as to those matters therein stated to be alleged upon information and belief, and that as to those matters she believes them to be true.

                                                    _____
                                                      ORLY GENGER

Sworn to before me this
4th day of August, 2010

_____
       Notary Public

ANTHONY ROSARIO
Notary Public, State of New York
No. 01RO6212071
Qualified in Bronx County
Commission Expires 10/05/2023

Exhibit 4

# MARKEWICH AND ROSENSTOCK LLP

8 East 41st Street ● Fifth Floor ● New York, New York 10017

*tel:* (212) 542-3156  *fax:* (212) 481 1761   *lrosenstock@mrlawllp.com*

Lawrence M. Rosenstock
Eve Rachel Markewich

Robert Markewich
of counsel

August 28, 2008

**BY HAND AND MAIL**

Dalia Genger
200 East 65th Street, 32W
New York, New York 10021

Re:   1993 Orly Genger Trust

Dear Ms. Genger:

It has come to our attention that you may be considering attempting to act on behalf of the Orly Genger Trust (the "Trust").

We remind you that you have no authority to act for the Trust and that on March 4, 2008 Surrogate Roth directed that no actions were to be taken with reference to the Trust assets. Should you violate the Court order, or in any way interfere with the ownership and/or value of the Trust assets or take any action with respect to Trust assets, we will hold you personally responsible for any loss or damage that may be incurred and seek to hold you in contempt. To the extent others are involved in guiding or facilitating wrongful conduct on your part, we will also seek remedies against them.

We reserve any and all rights with respect to your conduct concerning the Trust.

Very truly yours,

Lawrence M. Rosenstock

LMR:js

cc:  Jonathan G. Kortmansky, Esq. (by hand)
     Sullivan & Worcester LLP

     Orly Genger

*Genger-letter dalia genger 8-28.doc*

**MARKEWICH AND ROSENSTOCK LLP**
8 East 41st Street • Fifth Floor • New York, New York 10017
tel: (212) 542-3156  fax: (212) 481 1761  lrosenstock@mrlawllp.com

Lawrence M. Rosenstock
Eve Rachel Markewich

Robert Markewich
of counsel

August 28, 2008

**BY HAND AND EMAIL**

Jonathan G. Kortmansky, Esq.
Sullivan & Worcester LLP
1290 Avenue of the Americas
New York, New York 10104

Re:   <u>1993 Orly Genger Trust</u>

Dear Mr. Kortmansky:

I am writing you on behalf of Orly Genger, the beneficiary of the Orly Genger Trust(the "Trust"). By letter dated August 28, 2008, a copy of which is enclosed, we advised Dalia Genger, among other things, that when we were before the court on this matter on March 4, 2008, Surrogate Roth directed that no actions were to be taken with respect to Trust assets. As attorneys for Dalia Genger we expect that you will so advise your client of this direction and to take all appropriate steps to see that she complies with Surrogate Roth's order.

Very truly yours,

Lawrence M. Rosenstock

LMR:js

cc:   Hon. Surrogate Renee R. Roth
       Orly Genger

Genger-letter dalia genger 8-28.doc

# Exhibit 5

# STOCK PURCHASE AGREEMENT

by and among

TR INVESTORS, LLC,

GLENCLOVA INVESTMENT CO.,

NEW TR EQUITY I, LLC

and

NEW TR EQUITY II, LLC

as Purchasers,

SAGI GENGER 1993 TRUST

as Seller

and

TPR INVESTMENT ASSOCIATES, INC.

Dated as of August 22, 2008

## STOCK PURCHASE AGREEMENT

THIS STOCK PURCHASE AGREEMENT ("Agreement"), dated as of the 22nd day of August, 2008, by and among TR Investors, LLC, a Delaware limited liability company ("TR Investors"), Glenclova Investment Co., a Cayman Islands corporation, ("Glenclova"), New TR Equity I, LLC, a Delaware limited liability company ("Equity I") and New TR Equity II, LLC, a Delaware limited liability company ("Equity II" and collectively with TR Investors, Glenclova and Equity I, the "Purchasers"), the Sagi Genger 1993 Trust ( "Seller"), and TPR Investment Associates, Inc., a Delaware corporation ("TPR").

### WITNESSETH:

WHEREAS, Seller is the record and beneficial owner of an aggregate of one thousand one hundred two and eight-tenths (1,102.80) shares of common stock (the "Common Stock"), par value $.01 per share, of Trans-Resources, Inc., a Delaware corporation (the "Company");

WHEREAS, Seller desires to sell to TR Investors, and TR Investors desires to purchase from Seller, two hundred seventy five and seven-tenths (275.70) shares of Common Stock (the "TR Investors Shares");

WHEREAS, Seller desires to sell to Glenclova, and Glenclova desires to purchase from Seller, two hundred seventy five and seven-tenths (275.70) shares of Common Stock (the "Glenclova Shares");

WHEREAS, Seller desires to sell to Equity I, and Equity I desires to purchase from Seller, two hundred seventy five and seven-tenths (275.70) shares of Common Stock (the "Equity I Shares"); and

WHEREAS, Seller desires to sell to Equity II, and Equity II desires to purchase from Seller, two hundred seventy five and seven-tenths (275.70) shares of Common Stock (the "Equity II Shares" together with the TR Investors Shares, the Glenclova Shares and the Equity I Shares, the "Shares").

NOW, THEREFORE, in consideration of the mutual promises and covenants set forth herein, the parties hereto, intending to be legally bound hereby, agree as follows:

1. Sale of Shares. Upon the terms of this Agreement, the Purchasers, severally and not jointly, hereby purchase, acquire and accept from Seller, and the Seller hereby sells, conveys assigns, transfers and delivers to the Purchasers, all right, title and interest in and to the Shares as follows:

(a) TR Investors hereby purchases, acquires and accepts from Seller, and the Seller hereby sells, conveys assigns, transfers and delivers to TR Investors, all right, title and interest in and to the TR Investors Shares, free and clear of any and all liens, obligations or encumbrances;

(b) Glenclova hereby purchases, acquires and accepts from Seller, and the Seller hereby sells, conveys assigns, transfers and delivers to Glenclova, all right, title and interest in and to the Glenclova Shares, free and clear of any and all liens, obligations or encumbrances; and

(c) Equity I hereby purchases, acquires and accepts from Seller, and the Seller hereby sells, conveys assigns, transfers and delivers to Equity I, all right, title and interest in and to the Equity I Shares, free and clear of any and all liens, obligations or encumbrances.

(d) Equity II hereby purchases, acquires and accepts from Seller, and the Seller hereby sells, conveys assigns, transfers and delivers to Equity II, all right, title and interest in and to the Equity II Shares, free and clear of any and all liens, obligations or encumbrances.

2. **Consideration and Closing Deliveries.**

(a) Upon the terms of this Agreement, in consideration of the sale of the Shares to the Purchasers and the other agreements of the Seller contained herein, the Purchasers, herewith cause to be delivered to the Seller through and pursuant to the Escrow Agreement (as defined below), in full payment for the aforesaid sale of the Shares, an aggregate amount equal to twenty six million seven hundred fifteen thousand four hundred sixteen dollars ($26,715,416) (the "Purchase Price") as follows:

(i) in respect of the TR Investors Shares, (a) by wire transfer of a portion of the Purchase Price equal to $1,718,750 in immediately available funds to the Escrow Agent (as hereinafter defined) and then by the Escrow Agent to a bank account designated in writing by the Seller, and (b) a portion of the Purchase Price equal to $4,960,104 by wire transfer to the Escrow Agent to be held by the Escrow Agent pursuant to Section 2(b) hereof;

(ii) in respect of the Glenclova Shares, (a) by wire transfer of a portion of the Purchase Price equal to $1,718,750 in immediately available funds to the Escrow Agent (as hereinafter defined) and then by the Escrow Agent to a bank account designated in writing by the Seller, and (b) a portion of the Purchase Price equal to $4,960,104 by wire transfer to the Escrow Agent to be held pursuant to Section 2(b) hereof; and

(iii) in respect of the Equity I Shares, (a) by wire transfer of a portion of the Purchase Price equal to $1,718,750 in immediately available funds to the Escrow Agent (as hereinafter defined) and then by the Escrow Agent to a bank account designated in writing by the Seller, and (b) a portion of the Purchase Price equal to

3

$4,960,104 by wire transfer to the Escrow Agent to be held pursuant to Section 2(b) hereof.

(iv)   in respect of the Equity II Shares, (a) by wire transfer of a portion of the Purchase Price equal to $1,718,750 in immediately available funds to the Escrow Agent (as hereinafter defined) and then by the Escrow Agent to a bank account designated in writing by the Seller, and (b) a portion of the Purchase Price equal to $4,960,104 by wire transfer to the Escrow Agent to be held pursuant to Section 2(b) hereof.

(b)   The parties are herewith entering into an Escrow Agreement (the "Escrow Agreement"), among the Purchasers Seller and Troutman Sanders LLP, as escrow agent (the "Escrow Agent"), pursuant to which the Purchasers, severally and not jointly, are depositing the amounts set forth in Sections 2(a)(i)(b), 2(a)(ii)(b), 2(a)(iii)(b) and 2(a)(iv)(b) hereof (collectively, the "Escrow Amount") to be held pursuant to this Agreement and the Escrow Agreement.

(c)   As promptly as practicable, Seller shall deliver to the Escrow Agent, either (i) stock certificates representing the Shares issued in the name of Seller, accompanied by stock powers duly executed in blank with appropriate transfer stamps, if any, affixed, and any other documents that are necessary to transfer title to the shares to the Purchasers (or any designee of the Purchasers), free and clear of any and all liens, obligations or encumbrances, or (ii) stock certificates issued in the names of TR Investors, Glenclova, Equity I and Equity II for the TR Investor Shares, the Glenclova Shares, the Equity I Shares and the Equity II Shares, respectively, in each case free and clear of any and all liens, obligations or encumbrances.

(d)   Subject to Section 2(e) hereof, upon the delivery of stock certificates required by Section 2(c), the Escrow Agent shall release the Escrow Amount to the Seller in accordance with the terms and conditions of the Escrow Agreement.

(e)   Notwithstanding the foregoing, Seller may at any time following the date hereof, direct the Escrow Agent to release up to an aggregate of $500,000 of the Escrow Amount, provided such amounts are held in escrow at such time, to a charity or charities of its choice pursuant to the terms and conditions of the Escrow Agreement.

3.   Closing.  The closing of the transactions contemplated in this Agreement (the "Closing") is taking place at the offices of The Trump Group at 3:00 p.m., Eastern Daylight Time, on the date hereof (the "Closing Date").

4.   Representations and Warranties of Seller.  In connection with the purchase and sale of the Shares referred to in Section 1 hereof and the execution and performance of this Agreement, Seller represents and warrants to the Purchasers as follows:

(a)   Seller is the record and beneficial owner of all right, title and interest in and to all of the Shares and had good and transferable title thereto, free and clear of all liens, obligations, encumbrances, restrictions, pledges, charges, options, preemptive rights, subscription rights, warrants, calls, security interests, and claims of every kind.



4

(b)   Seller has the full right, power, and authority to sell and deliver the Shares in accordance with this Agreement.

(c)   The delivery of the Shares delivered pursuant to Sections 1 and 2 hereof will transfer valid title thereto, free and clear of all liens, obligations, encumbrances, restrictions, pledges, charges, options, preemptive rights, subscription rights, warrants, calls, security interests, and claims of every kind.

(d)   The execution, delivery, and performance of this Agreement, the consummation of the transactions contemplated hereby, and the compliance with or fulfillment of the terms and provisions of this Agreement or of any other agreement or instrument contemplated by this Agreement, do not and will not (i) contravene any law, rule, or regulation of any state or of the United States; (ii) contravene any order, writ, award, judgment, decree, or other determination that affects or binds Seller or the Company, or any of their respective properties; (iii) conflict with, result in a breach of, constitute a default under, or give rise to a right of termination under any contract, agreement, note, deed of trust, mortgage, trust, lease, governmental or other license, permit, or other authorization, or any other instrument or restriction to which Seller or the Company is a party; or (iv) require Seller to obtain the approval, consent, or authorization of, or to make any declaration, filing, or registration with, any third party or any foreign, federal, state, county, or local court, governmental authority, or regulatory body.

(e)   Seller is not subject to any order, writ, award, judgment, decree, or determination, is not a party to or bound by any contract, agreement, note, deed of trust, mortgage, trust, lease, governmental or other license, permit, or other authorization, or other instrument or restriction that could conflict with, impair, impose restrictions or otherwise prevent or delay the execution, delivery, or performance of this Agreement or the consummation of the transactions contemplated by this Agreement.

(f)   This Agreement is the legal, valid, and binding agreement of Seller and is enforceable in accordance with its terms, subject to (i) bankruptcy, insolvency, fraudulent conveyance, reorganization, moratorium, or other laws or equitable principles relating to or affecting the enforcement of creditors' rights generally, and (ii) the effect of general principles of equity, including, without limitation, concepts of materiality, reasonableness, good faith and fair dealing (regardless of whether considered in a proceeding in equity or at law).

(g)   None of the representations and warranties of Seller contained herein and none of the written information or written documents furnished to the Purchasers or any of their respective representatives by Seller or its representatives is false or misleading in any material respect or omits to state a fact herein or therein necessary to make the statements made herein not misleading in any material respect.

(h)   Seller has made an independent decision to sell the Shares based on the information available to it and that it has determined is adequate for that purpose. Seller has had the opportunity to review all information which it deems relevant to its decision to sell

5

the Shares, and Seller has not relied on any information (in any form, whether written or oral) furnished by or on behalf of the Purchasers or the Company in making that decision.

(i)    Neither the Purchasers, nor the Company has given any investment advice or rendered any opinion to Seller as to whether the sale of the Shares is prudent or suitable, and Seller is not relying on any representation or warranty other than those made by the Purchasers expressly in this Agreement.

(j)    Seller is a sophisticated investor with respect to the Shares and has adequate information concerning the Shares. Seller believes, by reason of its and its beneficiary's business and financial experience and the information and knowledge that its beneficiary holds with respect to the Company and its business, that it is capable of evaluating the merits and risks of the sale and of protecting its own interest and the interest of its beneficiary in connection with the transactions contemplated by this Agreement. Seller has had the opportunity to have legal counsel review and advise it with respect to the terms of this Agreement.

(k)    Seller acknowledges that (i) the Purchasers currently may have material information regarding the condition (financial or otherwise), results of operations, businesses, properties, plans, and prospects of the Company that may be material to a decision to sell the Shares ("Excluded Information") and that such Excluded Information may affect the value of the Shares. Seller further acknowledges that it has determined to sell the Shares notwithstanding its lack of knowledge of the Excluded Information. Seller represents that it has adequate information concerning the business and financial condition of the Company and its affiliates to make an informed decision regarding the sale of the Shares pursuant hereto and has independently and without reliance upon the Purchasers made its own analysis and decision to sell the Shares pursuant hereto. Seller acknowledges that the sale of the Shares is the result of independent arm's-length negotiations between Seller and the Purchasers.

5.    Representations and Warranties of the Purchasers. In connection with the purchase and sale of the Shares referred to in Section 1 hereof and the execution and performance of this Agreement, each Purchaser represents and warrants, severally and not jointly, to Seller as follows:

(a)    Such Purchaser has the full right, capacity, power, and authority to execute and deliver this Agreement, to consummate the transactions contemplated by this Agreement, and to comply with the terms, conditions, and provisions of this Agreement.

(b)    The execution, delivery, and performance of this Agreement, the consummation of the transactions contemplated hereby and the compliance with or fulfillment of the terms and provisions of this Agreement or of any other agreement or instrument contemplated by this Agreement, do not and will not (i) contravene any law, rule, or regulation of any state or of the United States; (ii) contravene any order, writ, award, judgment, decree, or other determination that affects or binds such Purchaser or any of its properties; (iii) conflict with, result in a breach of, constitute a default under, or give rise to a right of termination under any contract, agreement, note, deed of trust, mortgage, trust, lease, governmental or other license, permit, or other authorization, or any other instrument or restriction to which such

6

Purchaser is a party or by which any of its properties may be affected or bound; or (iv) require such Purchaser to obtain the approval, consent, or authorization of, or to make any declaration, filing, or registration with, any third party or any foreign, federal, state, county, or local court, governmental authority, or regulatory body that has not been obtained in writing prior to the date of this Agreement.

(c)     Such Purchaser is not subject to any order, writ, award, judgment, decree, or determination nor a party to nor bound by any deed of trust, mortgage, trust, lease, governmental or other license, permit, or other authorization, contract, agreement, note, or other instrument or restriction that could conflict with or prevent the execution, delivery, or performance of this Agreement or the consummation of the transactions contemplated hereby.

(d)     This Agreement is the legal, valid, and binding agreement of such Purchaser and is enforceable in accordance with its terms, subject to (i) bankruptcy, insolvency, fraudulent conveyance, reorganization, moratorium, or other laws or equitable principles relating to or affecting the enforcement of creditors' rights generally and, (ii) the effect of general principles of equity, including, without limitation, concepts of materiality, reasonableness, good faith and fair dealing (regardless of whether considered in a proceeding in equity or at law).

(e)     Such Purchaser hereby acknowledges receipt of copies of the Irrevocable Proxy, dated as of October 29, 2004, issued by Seller in favor of Arie Genger with respect to the Shares (the "Proxy"), a back-up form of voting trust agreement and voting trust certificate delivered in connection with the Proxy and the letter agreement dated October 29, 2004 with respect to the transfer of the Shares from TPR to Seller.

(f)     Such Purchaser has no actual knowledge of any contract, agreement, note, or other instrument or restriction to which the Seller is subject that could conflict with or prevent the execution, delivery, or performance of this Agreement or the consummation of the transactions contemplated hereby.

6.   Covenants.  Promptly following the execution hereof, Seller shall use all best efforts to cause the Company to recognize Seller as the record and beneficial owner of the Shares in the Company's stock registry.  In furtherance of the foregoing, Seller shall use all best efforts to promptly submit through the Escrow Agent or directly as instructed by the Purchasers a lost certificate affidavit in respect of the Shares to the Company, substantially in the form attached hereto as Exhibit A, and cause the Company to deliver to it (or the Escrow Agent as instructed by the Purchasers) a validly issued stock certificate in respect of the Shares to Seller in Seller's name.  To the extent that Seller is asked by the Purchasers to commence a lawsuit or other proceeding in furtherance of the foregoing, the Purchasers shall select legal counsel for such matters, and shall pay the legal expenses and fees in connection therewith on Seller's behalf.

7.   Indemnification.  Seller agrees to indemnify, defend and hold harmless each Purchaser and its affiliates and controlling persons, and its and their respective directors, officers, employees and agents (collectively, the "Indemnified Group"), at any time after the Closing Date, from and against all demands, claims, actions, or causes of action, assessments,

7

losses, damages, deficiencies, liabilities (including strict liability), costs, and expenses of investigation, including, without limitation, interest, penalties and reasonably attorney's fees and expenses and consultants fees (collectively, "Damages") asserted against, resulting to, imposed upon, or incurred by any member of the Indemnified Group, directly or indirectly, by reason of or resulting from:

        (a)    a breach of any representation, warranty, covenant, or agreement of the Seller contained in or made pursuant to this Agreement or any related agreement;

        (b)    any failure of the Company to recognize the Seller as the record and beneficial owner of the Shares; and

        (c)    any Shares that are subject to any liens, obligations or encumbrances.

    3.   Survival of Representations, Warranties, Covenants, and Agreements.  All representations, warranties, covenants, and agreements made in this Agreement shall survive the execution of this Agreement, the closing of the transactions contemplated hereby, and the delivery of the certificates or other evidence of the Shares sold hereunder for a period of three (3) years after the Closing.

    9.   Rescission.  Each of the Purchasers and Seller hereby agree, that in the event that any member of the Indemnified Group makes a claim for indemnification pursuant to Section 7(b) or 7(c), the Purchasers, may in their sole and absolute discretion, elect to void the transactions contemplated hereby and promptly receive a full refund by Seller of the Purchase Price.

    10.   Valid Transfer.  If at any time following the Closing Date, it is determined that Seller is not the record and beneficial owner of the Shares as of the date hereof by virtue of the transfer of the Shares to it by TPR being deemed to have been void or for any other reason, and that all right, title and interest in and to the Shares is held by TPR, subject only to the plaintiff's asserted rights under the Stockholders Agreement asserted in the action styled Glenclova Investment Co. v. Trans-Resources, Inc. and TPR Investment Associates, Inc., Case No. 08-CIV-7140 (JFK), pending in the United States District Court for the Southern District of New York, the parties hereby agree that (a) this Agreement and the transactions contemplated hereby shall be deemed to have been entered into and consummated with TPR, (b) the Purchasers shall retain all right, title and interest in and to the Shares as if purchased from TPR pursuant to this Agreement, (c) TPR shall look only to Seller for any payments made by the Purchasers pursuant to this Agreement, (d) the Purchasers shall have no liability or obligation to TPR in respect of the Shares, and (e) all representations, warranties, covenants and agreements made by Seller herein, shall be deemed to have been made by TPR as of the date hereof.

    11.   Other Shares.  If at any time following the Closing Date, it is determined that Arie Genger is not the record and beneficial owner of the 794.40 shares of Common Stock of the Company purportedly transferred to him by TPR in October, 2004 and/or that Orly Genger 1993 Trust is not the record and beneficial owner of the 1,102.80 shares of Common

8

Stock of the Company purportedly transferred to such Trust by TPR in October, 2004, and that TPR is determined to be the record or beneficial owner of any such shares, in either or both cases by virtue of the transfer of such shares being deemed to have been void or for any other reason (the shares being so effected being referred to herein as the "Affected Shares") then TPR shall promptly transfer 64% of the Balance Shares (as such term is defined in the Stockholders Agreement dated March 30, 2001, among TPR, TR Investors, Glenclova and the Company (the "Stockholders Agreement")) to TR Investors and Glenclova in accordance with the terms of Section 1.6 of the Stockholders Agreement whether or not such agreement is then still in effect.

12. Entire Agreement.  This Agreement and the Letter Agreement set forth the entire agreement between the parties hereto with respect to the purchase and sale of the Shares contemplated herein and supersedes all prior written or oral agreements or understandings between the parties hereto relating to the subject matter hereof.

13. Benefit.  This Agreement shall be binding upon and inure to the benefit of the respective legal representatives, heirs, successors, and assigns of the parties.  This Agreement may not be assigned by the Purchasers or Seller.

14. Notices.  All notices and other communications, whether required or otherwise, made under this Agreement shall be in writing and shall be deemed to have been given if personally delivered or mailed by registered, certified, or first-class mail, postage prepaid, or sent by overnight delivery, telex, telegram, or facsimile transmission:

if to Seller, to it at:

> Sagi Genger 1993 Trust
> 1211 Park Avenue
> New York, New York 10128
> Attention:  Mr. Sagi Genger
> Fax:  (802) 375-2949

if to Purchasers, to the appropriate Purchaser at:

> TR Investors, LLC
> c/o The Trump Group
> 4 Stage Coach Run
> East Brunswick, New Jersey  08816
> Attention:  James M. Lieb, Esq.
> Fax: (732) 390-3319

> New TR Equity I, LLC
> c/o The Trump Group
> 4000 Island Blvd
> Williams Island, Florida 33160
> Attention: Mr. Jules Trump

9

New TR Equity II, LLC
c/o The Trump Group
4000 Island Blvd
Williams Island, Florida 33160
Attention: Mr. Eddie Trump
Fax: (305) 933-9514

Glenclova Investment Co.
c/o Carmel Investment Fund
TK House
Bayside Executive Park
West Bay Street and Blake Road
Nassau, Bahamas
Attention: Mr. Robert Smith
Fax: (242) 327-2289

with copy, in each instance, to:

Mark S. Hirsch, Esq.
404 Park Avenue South, 6th Floor
New York, New York 10019
Fax:(917) 546-7009

or to such other address or to such other person as one party shall have last designated by notice to the other party hereto. Notices delivered personally or by overnight delivery shall be effective upon delivery. Notices properly addressed and delivered by mail, return receipt requested, shall be effective upon deposit with the United States Postal Service. Notices sent by telex, telecopier, or facsimile transmission shall be effective upon confirmation of transmission.

15. <u>Paragraph Headings</u>. The headings of paragraphs contained in this Agreement are provided for convenience only. They form no part of this Agreement and shall not affect its construction or interpretation. All references to paragraphs in this Agreement refer to the corresponding paragraphs of this Agreement.

16. <u>Amendment</u>. Neither this Agreement nor any terms or provisions hereof may be changed, waived, discharged, or terminated orally, or in any manner other than by an instrument in writing signed by the party against whom the enforcement of the change, waiver, discharge, or termination is sought.

17. <u>Counterparts</u>. This Agreement may be executed simultaneously in counterparts, each of which shall be deemed to be an original, but all of which together shall constitute one and the same instrument. It shall not be necessary that any single counterpart be executed by all parties provided that each party shall have executed at least one counterpart.

18. <u>Further Assurances</u>. Each of the parties hereto shall use all best efforts to do all things necessary or advisable to make effective the transactions contemplated hereby and

10



shall cooperate and take such action as may be reasonably requested by the other party in order to carry out fully the provisions and purposes of this Agreement and the transactions contemplated hereby and to vest in the Purchasers all rights in respect of the Shares, including, but not limited to, the right to vote, exercise rights under the Stockholders Agreement and transfer the Shares.  From and after the Closing Date, the parties hereto agree to execute or cause to be executed such further agreements, documents or instruments as may be reasonably requested by one of the parties hereto in order to effect the transactions contemplated hereunder or to exercise any and all rights in respect of the Shares, including, but not limited to, the right to vote, exercise rights under the Stockholders Agreement and transfer the Shares.

19. <u>Jurisdiction</u>.  Each party hereby consents to the exclusive jurisdiction of the courts of the State of Delaware as to all matters relating to the enforcement, interpretation, or validity of this Agreement, and if such party is a non-resident of the State of Delaware, appoints the Secretary of State of the State of Delaware as its agent for service of process.

20. <u>Specific Performance</u>.  The parties agree that this Agreement may be enforced in equity, and that specific performance or other equitable relief would be an appropriate remedy in any such action, in addition to any monetary or other damages which may be proved.  It is accordingly agreed that the Purchasers, in addition to any other remedy to which they may be entitled in law or in equity, shall be entitled to an injunction or injunctions to prevent breaches of this Agreement and to compel specific performance of this Agreement, without the need for proof of actual damages.  Seller agrees to waive, and to cause its affiliates to waive, any requirements for the securing or posting of any bond in connection with such remedy.  Seller also agrees to reimburse the Purchasers for all costs and expenses, including attorneys' fees, incurred by it in successfully enforcing Seller's or its affiliates' obligations hereunder.

21. <u>Governing Law</u>.  This Agreement shall be governed by the laws of the State of Delaware, without regard to any conflicts of law principles.

22. <u>Severability</u>.  If any provision of this Agreement or the application thereof to any person or circumstance shall be invalid or unenforceable to any extent, the remainder of this Agreement and the application of such provisions to other persons or circumstances shall not be affected thereby and shall be enforced to the greatest extent permitted by law.

23. <u>No Presumption Against the Drafter</u>.  Each of the parties to this Agreement participated in the drafting of this Agreement and the interpretation of any ambiguity contained in the Agreement will not be affected by the claim that a particular party drafted any provision hereof.

[SIGNATURE PAGE FOLLOWS]

11

IN WITNESS WHEREOF, the parties have duly executed this Agreement effective as of the date and year first above-written.

TR INVESTORS, LLC

By: _____
Name: Jim Lieb
Title: Executive Vice-President

GLENCLOVA INVESTMENT CO.

By: _____
Name: Robert Smith
Title: Chairman

NEW TR EQUITY I, LLC

By: _____
Name: MARK S. HIRSCH
Title: EXECUTIVE VP / GENL COUNSEL

NEW TR EQUITY II, LLC

By: _____
Name:
Title:

SAGI GENGER 1993 TRUST

By: _____
Name: Rochelle Fang
Title: Trustee

TPR INVESTMENT ASSOCIATES, INC.

By: _____
Name: Sagi Genger
Title: President

12