# In The Matter Of:
*ORLY GENGER v.*
*SAGI GENGER*

---

*March 10, 2015*

---

*Delores Hilliard*

Original File March 10_2015.txt
Min-U-Script® with Word Index

1587

1

2   SUPREME COURT OF THE STATE OF NEW YORK
    COUNTY OF NEW YORK:   CIVIL TERM: PART - 12
3   ----------------------------------------------X
    ORLY GENGER,
4
                        Plaintiff
5                                       INDEX NUMBER:
                                        100697/08
6              -against-

7   SAGI GENGER,

8                       Defendant
    ----------------------------------------------X
9                       80 Centre Street
                        New York, New York 10013
10                      March 10, 2015

11  BEFORE:
              HONORABLE:  Barbara Jaffe, JSC
12

13  APPEARANCES:

14            Zeichner Ellman & Krause, LLP
              Attorneys for Plaintiff
15            1211 Avenue of the Americas
              New York, New York 10036
16            By:  Bryan D. Leinbach, Esq.
                   -and-
17            Kasowitz Benson Torres & Friedman, LLP
              1633 Broadway
18            New York,  New York 10019
              By:  Eric D. Herschmann, Esq.
19                 Michael Paul Bowen, Esq.

20            Morgan, Lewis & Bockius, LLP
              Attorneys for the Defendant
21            101 Park Avenue
              New York, New York 10178-0060
22            By:  John Dellaportas, Esq.
                   Mary Pennisi, Esq.
23

24

25                              Delores Hilliard
                                Vicki K. Glover
26                              Official Court Reporters

- OFFICIAL COURT REPORTER

1          S. Genger - by Plaintiff - Direct/Herschmann

2                    THE COURT:  Sustained.

3                    MR. HERSCHMANN:  I asked if he was aware of it.

4                    THE COURT:  Were you aware that she hired a

5          financial advisor?

6                    THE WITNESS:  Yes.  Yes, as a prelude to the

7          lawsuit.

8                    MR. HERSCHMANN:  I move to strike the last part of

9          the answer as not responsive.

10                   THE COURT:  Yes, stricken.

11    Q     And that financial advisor was Joel Isaacson & Company,

12    correct?

13    A     Yes.

14    Q     And you had meetings with Joel Isaacson's

15    representatives, correct?

16    A     I don't remember if it's one or -- I don't remember if

17    it's multiple meetings or one meeting, but I certainly met with

18    them.

19    Q     And you provided certain documents to them, correct?

20    A     Honestly, I've seen documents that he said that I

21    provided to them.  I gave him documents.  I gave them documents,

22    yes.

23    Q     And there was a follow-up request for more documents,

24    correct?

25    A     There probably was.  If we have it, it's probably going

26    to be in an e-mail.

1            O. Genger - Plaintiff - Direct/Herschmann

2    parents' separation agreement took effect, that your brother

3    would be involved in a review of the financial information later

4    on?

5        A    I'm sorry.  Could you repeat it, please?

6        Q    Sure.  I'm trying to give you points in time.

7        A    Yes.

8        Q    So your parents' separation agreement is effective

9    October 30th of 2004.  After that date, do you know that there

10   was an arbitration between your parents?

11       A    Yes.

12       Q    To your knowledge, was your brother involved in

13   reviewing information before the arbitration commenced?

14       A    Yes.

15       Q    Now, had Bill Fischer, or Raines & Fischer, been your

16   accountants for as long as you can remember in your life up

17   until the time period that your brother told you he no longer

18   trusted them?

19            MR. DELLAPORTAS:  Objection.  Leading.

20            THE COURT:  Yes, try to not do that.  It's really

21       inappropriate.

22       Q    Who were your accountants that you used up until 2007?

23       A    Bill Fischer.

24       Q    Had you ever used any other accountants?

25       A    No.

26       Q    Did there come a time when you retained a different

1              O. Genger - Plaintiff - Direct/Herschmann

2    accounting firm?

3         A    Yes.

4         Q    What was the reason that you obtained a different

5    accounting firm?

6         A    Well, around this time in 2007, I was trying to get

7    information about my finances from my brother.  He did not want

8    to deal with Bill Fischer and told me that, you know, if I

9    wanted to have any conversations with him about it, I'd have

10   to --

11        Q    I think you have to slow down.

12        A    Sorry.

13             If I wanted to have any conversations with him

14   about my finances, I would have to work with an accountant that

15   was a new accountant, someone who was independent.  So I hired a

16   new accountant.

17        Q    Who did you hire?

18        A    Joel Isaacson.

19        Q    Did Joel Isaacson have anything to do with Raines &

20   Fischer?

21        A    No.

22        Q    Did Joel Isaacson & Associates have anything to do with

23   your father?

24        A    No.

25        Q    How did you come to hire Joel Isaacson?

26        A    A friend of mine referred me to them.

2827

1            O. Genger - Plaintiff - Direct/Herschmann

2     Q   And a friend that was independent of Raines & Fischer

3 or your parents?

4     A   Yes.

5     Q   And after you hired Joel Isaacson & Company, then what

6 happened regarding your finances?

7     A   They started trying to help me gather information, and

8 I know they contacted Sagi and tried to get information from

9 him.  We tried to set up a meeting, and we finally were able to

10 set up a meeting with Sagi.

11    Q   Do you recall, approximately, when you were able to set

12 up that meeting with your brother?

13    A   I believe it was in November of 2007.

14    Q   Do you recall whether or not your brother had sent

15 information to your new accountants Isaacson & Associates prior

16 to your having a meeting together with your brother?

17    A   No, I know that he didn't.

18    Q   Now, as far as the actual time period of the meeting,

19 do you recall how that actually got set or what transpired?

20    A   How the meeting transpired?

21    Q   Yes.

22    A   Well, as I said, I was trying to get information from

23 my brother.  I hired these new accountants, Joel Isaacson, and I

24 knew that my brother had all this information, and we contacted

25 him several times to try to set it up, and we finally --

26    Q   I think you have to slow down.

2828

1                O. Genger - Plaintiff - Direct/Herschmann

2      A    We finally were able to set up a meeting.

3      Q    Let me show you what's been marked as Exhibit 234 for

4  identification, and it's been previously discussed in this

5  matter.

6                (Handing to defense counsel.)

7                MR. HERSCHMANN:  I'm providing a copy again to

8  defense counsel.

9                (Handing to witness.)

10               (Handing to the Court.)

11     Q    I'm going to hand you an exhibit, what's been

12  previously marked as Exhibit 228 for identification, which is

13  Bates stamped JI 429.  I'm providing again a copy to defense

14  counsel.

15               (Handing to defense counsel.)

16               (Handing to witness.)

17     Q    Will you take a look at Exhibit 228 as well?

18               (Handing to the Court.)

19     Q    I'm going to hand you also what's been marked as

20  266-135 as well.  I'm providing a copy to defense counsel.

21               (Handing to defense counsel.)

22               (Handing to witness.)

23     Q    Let me start with Exhibit 266-135.

24               (Handing to the Court.)

25     Q    Do you see that this is an e-mail from Stan Altmark to

26  your brother?

2829

1                    O. Genger - Plaintiff - Direct/Herschmann

2        A     Yes.

3        Q     And you've seen this e-mail before today, correct?

4        A     Yes.

5        Q     Now, looking at the e-mail, does it refresh your

6    recollection as to whether or not you had requested via Isaacson

7    & Company certain information in June of 2007 from your brother?

8        A     Yes, I did.

9        Q     And is it accurate that after making requests from your

10   brother in June of 2007, you had not received specific

11   information that you wanted prior to meeting with him?

12       A     Yes.

13       Q     Now, looking at Exhibit 228, if you could, for a

14   moment, have you seen Exhibit 228 previously?

15       A     Yes.

16       Q     And do you recognize this as an e-mail from Joel

17   Isaacson to your brother dated November 6th of 2007?

18       A     Yes.

19                   MR. HERSCHMANN:  Your Honor, at this time I would

20          offer Exhibit 228 for identification into evidence.

21                   MR. DELLAPORTAS:  Objection.  Hearsay.

22                   MR. HERSCHMANN:  Your Honor, we're offering it as

23          a communication that was sent as a representative from Orly

24          Genger to her brother.  The actual content is irrelevant,

25          except for the fact that he actually received it.

26                   MR. DELLAPORTAS:  It's definitely being offered

2852

1          O. Genger - by Plaintiff - Direct/by Mr. Herschmann

2     A     Yes.

3     Q     Did your brother in the course of that meeting provide

4     you with any financial information as to where the money had

5     gone from the Canadian ventures?

6     A     No.

7     Q     Let me show you what you has been marked as exhibit

8     266-71, which is admitted into evidence.

9           And do you see on the bottom portion of the exhibit

10    266-71 that there is a reference that the White Paper -- I am

11    sorry, that the White Box papers were supposed to transfer to

12    Jonah from Bill Fischer and then Jonah can be reached at (212)

13    758-0000.

14          Do you see that ?

15    A     Yes.

16    Q     Does that refresh your recollection as to who were the

17    accountants for White Box in 2007?

18    A     Yes.

19    Q     Is that Jonah Gayer and Associates?

20    A     I mean, it was supposed to be, it wasn't.

21    Q     Do you know at some point whether Gayer and Associates

22    became the accountants for White Box?  And I'm focused on the

23    2007 time period.

24    A     I don't know that it ever actually switched to Jonah

25    Gayer.

26    Q     Now, going back to the meeting in November, 2007, do

2854

```
 1              O. Genger - Plaintiff - Direct/Herschmann
 2        Q    And what was the general tenure for what you were
 3   looking to get from your brother in the November 2007 meeting?
 4        A    Information.  Information about my finances.
 5        Q    And did you get information that was satisfactory to
 6   you from your brother in that meeting?
 7        A    No.
 8        Q    Let me show you what's been previously received in
 9   evidence as Exhibit 230.
10              MR. HERSCHMANN:  Again, I'm providing an extra
11        copy to defense counsel.
12              (Handing to defense counsel.)
13              (Handing to witness.)
14              (Handing to the Court.)
15        Q    Do you recall that after the meeting Isaacson &
16   Associates sent a letter to your brother?
17              THE COURT:  Yeah, this is very leading.
18              MR. HERSCHMANN:  I'm sorry?
19              THE COURT:  Ask a question.
20              MR. HERSCHMANN:  I'm trying to lay a foundation
21        for the exhibit.
22              THE COURT:  It's too leading.
23        Q    First, have you seen Exhibit 230 beforehand?
24        A    Yes.
25        Q    Did you have discussions with Isaacson & Associates
26   before Exhibit 230 was sent to your brother?
```

VICKI K. GLOVER, OFFICIAL COURT REPORTER

1              O. Genger - Plaintiff - Direct/Herschmann

2      A    Yes.

3      Q    Directing your attention to Exhibit 230, to the

4  sentence that begins "I appreciate," could you take a look at

5  that?

6      A    Yes.

7      Q    What do you recall being discussed by your brother in

8  relationship to TRI in the November 2007 meeting?

9      A    He wanted to talk about TRI.  That's not what I wanted

10  to talk about.

11      Q    And what did he discuss about TRI in the November 2007

12  meeting?

13      A    I don't remember.

14      Q    Looking at the second page of Exhibit 230, direct your

15  attention to the second paragraph.

16      A    Yeah.

17      Q    It begins, "I do not evaluate your situation to be

18  analogous"...

19      A    Yes.

20      Q    Did you discuss with your brother, in the November 2007

21  meeting, that he's the one that had all the information?

22      A    Yes.

23      Q    And did your brother, after this letter was sent to

24  him, provide you all the information you wanted in relationship

25  to the Canadian ventures?

26      A    No, he didn't.

1          O. Genger - Plaintiff - Direct/Herschmann

2               MR. HERSCHMANN:  Let me see if I can do this

3      again.  I apologize, your Honor.

4      Q     You see where your brother says, "I cannot see how I

5      can productively assist you"?

6      A     Yes.

7      Q     Looking at that sentence, how did you interpret that

8      statement from your brother?

9      A     Well, I mean, I know what was going on.  I mean, he

10     didn't want to assist me.

11     Q     And why do you say that?

12     A     Because he didn't want to.  He just didn't.

13     Q     Did he ever give you the information that you

14     requested, even after this November 15th, 2007 e-mail?

15     A     No.

16     Q     Can you take a look at Exhibit 390 for a moment -

17     that's a check register - again?

18     A     Yes.

19     Q     After your brother sent you this e-mail on November

20     15th of 2007, can you tell us the last date that you received

21     any money from TPR?  Look at page 3 of 3.

22     A     It was November 15th of 2007.

23     Q     And after November 15th of 2007, did you ever receive

24     any more distributions from TPR?

25     A     No.

26     Q     Did you ever receive any of the financial information

2861

                    O. Genger - Plaintiff - Direct/Herschmann

1

2   dealing with the movement of money from the Canadian ventures?

3        A    No.

4        Q    Did you receive any information about monies that went

5   to TPR?

6        A    No.

7        Q    Did you receive any information about how much money

8   your brother got from TPR?

9        A    No.

10       Q    Did your brother ever discuss with you how much money

11  his wife was getting from TPR?

12       A    No, he didn't.

13       Q    After you asked your brother for the information in

14  November of 2007, did he ever give you any money from TPR, any

15  money individually or any financial information regarding the

16  businesses in which your family was involved?

17       A    After this?

18       Q    Yes.

19       A    No.

20       Q    And then there would come a time, in January of 2008,

21  when you had to file this lawsuit?

22       A    Yes.

23            MR. HERSCHMANN:  Your Honor, can we have a

24       five-minute recess?  I may be done.

25            THE COURT:  Okay.

26            (Witness excused.)

1             Isaacson - by Plaintiff - Direct/Bowen

2     Q    Had a question come up from Mr. Genger about whether or

3 not your firm and you were working for somebody else other than

4 Orly Genger prior to the November 8th meeting?

5     A    I'm not sure.

6     Q    Did your firm have any affiliation with Raines &

7 Fischer?

8     A    No.

9     Q    Do you know who Raines & Fischer are?

10     A    I know them now.  I had no idea who they were before.

11     Q    Did you communicate that to Mr. Genger in advance of

12 the November 8th meeting that your firm had no affiliation with

13 Raines & Fischer?

14     A    I believe it's the first line in this e-mail.

15     Q    Does that refresh your recollection that you did say

16 that to him?

17     A    Sure.

18     Q    Do you recall why you told him that?

19     A    I assume he had thought we had an affiliation with

20 them.

21     Q    Do you remember anything about that inquiry by Mr. Sagi

22 Genger about whether or not you were affiliated with Raines &

23 Fischer?

24     A    No.

25     Q    What was the purpose of the meeting on November 8,

26 2007?

1        Isaacson - by Plaintiff - Direct/Bowen

2        A     I think the purpose was, we had been retained by Orly

3    to try to get a handle on her finances and tax situation.  And

4    the meeting was trying to get documents and information so we

5    could understand better some of the transactions that happened

6    and try and kind of guide Orly as to what her financial life was

7    like, how she could budget, how she could live and, you know,

8    try and give her -- I think she was looking for someone to help

9    guide her as to her finances.  She wasn't sophisticated and, you

10   know, trying to understand transactions that had happened that

11   affected her.

12       Q     Prior to the November 8th meeting, did you obtain any

13   documents related to Orly Genger's financial situation?

14       A     Yes.

15       Q     Where did you get those documents from?

16       A     I believe some came from Sagi and some came from the

17   accounting firm and some, probably, from Orly.

18       Q     When you say the accounting firm, you mean Raines &

19   Fischer?

20       A     Yes.

21       Q     In this communication you had with Mr. Genger on

22   November 6th, 2007, did you ask him for additional documents or

23   additional information?

24       A     Can I read the e-mail?

25       Q     If you don't recall, you can look at the e-mail to

26   refresh your recollection.

1          Isaacson - by Plaintiff - Direct/Bowen

2      A    Let me just recall it.  Thank you.

3      Q    Okay.

4           (Pause in proceedings.)

5      A    Yes.  I think there was also -- it reiterated asking

6  for documents.  It seems like there's a line that she's entitled

7  to them, documents, that weren't being sent.

8      Q    Weren't being sent by whom?

9      A    Sagi.

10     Q    And what was -- I mean, what kinds of documents were

11 you asking for that you weren't getting from Sagi Genger in this

12 timeframe?

13     A    Again, you know, I don't have it in front of me, but I

14 believe we're asking for documents related to tax returns and

15 financial statements and, you know, probably, you know,

16 entities.

17     Q    Business entities?

18     A    (Witness nodding.)

19     Q    You got to answer out loud for the record instead of

20 nodding your head.

21     A    Yes.

22     Q    So business entities, the answer was yes?

23     A    Yes.

24     Q    Do you remember what business entities you were asking

25 for information from Sagi Genger about?

26     A    I mean, to the best of my recollection now, I know

1          Isaacson - by Plaintiff - Direct/Bowen
2    things that he wanted to discuss.  I can't say, you know,
3    specifically right now seven years after the meeting.
4         Q    Well, how did the meeting end?  Do you recall?
5         A    No.
6         Q    After the meeting was over, what was your general
7    impression how the meeting went?
8         A    I think, again, you know, there was a sense of
9    evasiveness from Sagi on a lot of the questions, and there was a
10   sense that a lot of the things we were asking weren't being
11   answered, indirect, and that there were a lot of documents that
12   were still missing, at that standpoint, and a lot of information
13   still missing.
14        Q    By the way, did Dalia Genger speak at the meeting?
15        A    I believe so.
16        Q    Was she able to speak freely?
17        A    Sure.
18        Q    Did Sagi Genger ever direct her not to speak?
19        A    I don't know.
20        Q    Did you get information out of Dalia Genger that you
21   thought was useful or helpful?
22        A    I don't know.
23        Q    After having that general impression at the end of the
24   meeting, what steps, if any, did you take next with respect to
25   your work relationship with Orly Genger?
26        A    I believe there was a follow-up e-mail after the

1          J. Isaacson - by Plaintiff - Direct/by Mr.Bowen

2     Q    Did you get more documents and more information out of

3    Sagi Genger?

4     A    I don't believe so.

5     Q    Were you asking for more documents and more information

6    from him?

7     A    Yes.

8     Q    Let me show you what has been marked for identification

9    as exhibit 229.  And we are almost done.

10          I'm providing a copy to counsel.

11          If you look at this document, Mr. Isaacson, you will

12   see it is a covered e-mail and attachment.

13          Do you recognize this document?

14    A    Yes.

15    Q    Just, generally, what do you recognize it to be?

16    A    It looks like an e-mail and an attachment of a memo.

17    Q    And the e-mail is a communication to Mr. Sagi Genger,

18   correct?

19    A    Yes.

20    Q    This is dated after the meeting in '07?

21    A    It was dated Monday the 12th.

22    Q    2007?

23    A    Yes.

24    Q    And the attachment is a two page memorandum referring

25   your attention to a document.

26          Is that  memorandum created in the ordinary course of

1            J. Isaacson - by Plaintiff - Direct/by Mr.Bowen

2                I don't think I admitted, 228, I did --

3                MR. DELLAPORTAS:  No, 228 was not in evidence.

4        Exhibit 229 was admitted.

5                THE COURT:  Not 228.

6                MR. HERSCHMANN:  Exhibit 228 was previously

7        admitted, but the reporter marked it on the sticker as 229.

8                Exhibit 229 is the thing we just covered just now.

9                THE COURT:  This says 3/27, which is today's  date.

10               MR. BOWEN:  I think I know what happened.  May I

11       see it for a second, please?

12               Yes.  This is the one we offered and Mr.

13       Dellaportas objected to it.  And I didn't reoffer it, so it

14       should not be in evidence.

15               Exhibit 228 is not in evidence.

16               MR. BOWEN:  If I may, Judge?

17               THE COURT:  Yes.

18       Q    So, Mr. Isaacson, I don't want to spend a lot of time

19       on this, but if you look at the memorandum page, the second page

20       of the exhibit of the memo that was communicated to Sagi Genger.

21       And it reads, quote, "Thank you for the documents you have

22       provided us at the meeting on November 8, 2007."

23               Were some documents provided by Sagi Genger at that

24       meeting?

25       A    I believe so.

26       Q    Do you remember what they were?

3240

1        J. Isaacson - by Plaintiff - Direct/by Mr.Bowen

2    A    No.

3    Q    Then, this goes on to say, we have reviewed the

4  documents and determined that we were not provided with all of

5  the information asked for by Joel in 2007.

6        Joel is a reference to you?

7    A    Yes.

8    Q    The e-mail that that is referring to is what we marked

9  as 228, which is not in evidence, but that you looked at earlier

10 this morning?

11   A    Yes.

12   Q    Then, this goes on to say, we continue to request the

13 following.

14        And then there are some items that are listed there.

15        This was the information that you were still continuing

16 to try to get from Sagi Genger?

17   A    Yes.

18   Q    Did you ever get this information from him?

19   A    I don't believe so.

20   Q    If you go to the last page, there is a paragraph that

21 reads, as discussed we are planning to meet again on Monday,

22 November 19th, at my office.  Please confirm that 3 PM will work

23 for you and your mother.

24        Did that meeting occur?

25   A    No.  I believe there was some confusion where it was

26 canceled by Sagi.  And then I think he actually showed up at our



Orly Genger, etc., Plaintiff-Respondent, v Dalia Genger, et al., Defendants-Appellants.

11871, 109749/09

## SUPREME COURT OF NEW YORK, APPELLATE DIVISION, FIRST DEPARTMENT

*120 A.D.3d 1102; 993 N.Y.S.2d 297; 2014 N.Y. App. Div. LEXIS 6204; 2014 NY Slip Op 06248*

September 23, 2014, Decided
September 23, 2014, Entered

**NOTICE:**

THE LEXIS PAGINATION OF THIS DOCUMENT IS SUBJECT TO CHANGE PENDING RELEASE OF THE FINAL PUBLISHED VERSION. THIS OPINION IS UNCORRECTED AND SUBJECT TO REVISION BEFORE PUBLICATION IN THE OFFICIAL REPORTS.

**PRIOR HISTORY:** *Genger v. Genger, 115 A.D.3d 421, 982 N.Y.S.2d 11, 2014 N.Y. App. Div. LEXIS 1386 (N.Y. App. Div. 1st Dep't, 2014)*
*Genger v. Genger, 39 Misc. 3d 1235(A), 972 N.Y.S.2d 143, 2013 N.Y. Misc. LEXIS 2304 (2013)*

**COUNSEL:** [***1] Pedowitz & Meister, L.L.P., New York (Robert A. Meister of counsel), for Dalia Genger, appellant.

Morgan, Lewis & Bockius LLP, New York (John Dellaportas of counsel), for Sagi Genger and TPR Investment Associates, Inc., appellants.

Ira Daniel Tokayer, New York, for D & K GP LLC, appellant.

Zeichner Ellman & Krause LLP, New York (Brian D. Leinbach of counsel), for respondent.

**JUDGES:** Tom, J.P., Friedman, Acosta, Andrias, Richter, JJ.

**OPINION**

[*1102] [**298]   Order, Supreme Court, New York County (Barbara Jaffe, J.), entered May 31, 2013, which, insofar as appealed from, denied the motions of defendants TPR Investment Associates, Inc. (TPR) and D & K GP LLC (D & K GP) to amend their answers and for summary judgment dismissing the claims against them, granted plaintiff's cross motion for sanctions against TPR, D & K [*1103] GP, defendant Dalia Genger (Dalia), and defendant Sagi Genger (Sagi), sanctioned defendant Leah Fang (Fang), and denied Fang's motion for summary judgment dismissing the claims against her, unanimously modified, on the law and the facts, to delete the sanctions against Dalia, Sagi, and Fang, and to grant Fang's motion for summary judgment dismissing the claims against her, and otherwise affirmed, without costs. [***2]

Contrary to the motion court's statement, plaintiff did not cross-move for [**299] sanctions against Fang. Furthermore, Fang did not disobey the 2010 and 2011 injunctions -- she resigned as trustee of indirect plaintiff the Orly Genger 1993 Trust (Orly Trust) in January 2008 and had nothing to do with the 2011 and 2012 settlements challenged by plaintiff. Hence, there was no basis for sanctioning Fang.

Plaintiff's *cross* motion for sanctions was improper as against Dalia and Sagi, who were not movants (*see e.g. Kershaw v Hospital for Special Surgery, 114 AD3d 75, 978 N.Y.S.2d 13 [1st Dept 2013]*).

TPR and D & K GP contend that they should not have been sanctioned because they did not violate the 2010 and 2011 injunctions. This argument is unavailing.

120 A.D.3d 1102, *; 993 N.Y.S.2d 297, **;
2014 N.Y. App. Div. LEXIS 6204, ***; 2014 NY Slip Op 06248

Assuming, arguendo, that the 2010 order merely enjoined transfers, sales, pledges, assignments, or other dispositions of TPR shares (as opposed to transfers, etc., of the Orly Trust's interest in double-derivative plaintiff D & K LP), Orly Trust disclaimed any interest in any shares of TPR via the settlement agreements.

It is true that the October 2011 settlement predated the December 2011 injunction; however, the parties to the settlement amended and restated their agreement in March 2012, i.e., after the injunction. The 2011 order [***3] enjoined Sagi, TPR, and Dalia "from making demands upon and using or spending the proceeds derived from the purported sale by TPR . . . to [nonparty] Trump Group . . . of . . . the Orly Trust['s shares of non-party Trans-Resources, Inc. (TRI)] . . ., pending the determination by a court of competent jurisdiction [of] the beneficial ownership of such shares." The promissory note which is a part of both settlement agreements -- and which replaced a note that D & K LP had given in 1993 (the 1993 Note) -- provides that the principal and accrued interest shall be due "[i]mmediately upon [Orly Trust]'s receipt of the proceeds from the sale of [its] TRI shares."

In sum, the motion court properly found that TPR and D & K GP had disobeyed "a lawful mandate of the court" (*Judiciary Law § 753[A][3]*) and properly ordered them to pay plaintiff's attorneys' fees (*see Davey v Kelly, 57 AD3d 230, 869 N.Y.S.2d 37 [1st Dept 2008]*).

For the reasons discussed in the following paragraph, it was a [*1104] provident exercise of the IAS court's discretion to deny TPR's and D & K GP's motions to amend their answers to add the defense of release, based on the release contained in the October 2011 and March 2012 settlement agreements, because the proposed amendment lacked merit and would be futile (*see Eighth Ave. Garage Corp. v H.K.L. Realty Corp., 60 AD3d 404, 405, 875 N.Y.S.2d 8 [1st Dept 2009], lv dismissed [***4] 12 NY3d 880, 910 N.E.2d 1003, 883 N.Y.S.2d 174 [2009]*). For the same reasons, the court correctly denied the motions by TPR and D & K GP for summary judgment dismissing the claims against them based on the same release.

When a fiduciary has a conflict of interest in entering a transaction and does not disclose that conflict to his/her principal, the transaction is "voidable at the option of" the principal (*Wendt v Fischer, 243 NY 439, 443, 154 N.E. 303 [1926]*). Moreover, "an agent cannot bind his principal . . . where he is known to be acting for himself, or to have an adverse interest" (*Manhattan Life Ins.*

*Co. v Forty-Second St. & Grand St. Ferry R.R. Co., 139 NY 146, 151, 34 N.E. 776 [1893]*). In entering into the aforementioned October 2011 and March 2012 settlement agreements with TPR and D & K LP on behalf of Orly Trust, of which she was sole trustee, Dalia [**300] had a conflict of interest. The new promissory notes executed by Dalia on behalf of Orly Trust pursuant to the settlement agreements contained provisions that were plainly intended to entrench her as sole trustee of Orly Trust, notwithstanding the ongoing disputes and litigation between herself and plaintiff, the trust's beneficiary. Specifically, the replacement notes provided that Dalia's resignation or removal as trustee of Orly Trust, or the appointment of any additional trustee, would constitute an event of default rendering the notes [***5] immediately due and payable by Orly Trust. Further, the purported settlement of the derivative claims that plaintiff asserts on behalf of Orly Trust in this action -- which was already pending at the time the settlement agreements were executed -- required the court's approval, which was never sought. Moreover, as previously discussed, the settlements were entered into in violation of the aforementioned 2010 and 2011 injunctions. For these reasons, the settlements are voidable and, given the expressed intention of plaintiff (the beneficiary of Orly Trust) to void them, the purported releases they contain are not enforceable.

Fang moved for summary judgment based on additional releases given to her by Dalia (as trustee of Orly Trust) in December 2007 and January 2008. As no infirmity has been demonstrated in the December 2007 and January 2008 releases, the IAS court should have granted Fang summary judgment [*1105] based on these instruments.

This determination renders moot the portion of Fang's motion that sought summary judgment based on the infirm releases in the 2011 and 2012 settlement agreements.

The Decision and Order of this Court entered herein on March 4, 2014 is hereby recalled and vacated [***6] (*see* M-1592 and M-1606 decided simultaneously herewith).

THIS CONSTITUTES THE DECISION AND ORDER OF THE SUPREME COURT, APPELLATE DIVISION, FIRST DEPARTMENT.

ENTERED: SEPTEMBER 23, 2014

# SUPREME COURT OF THE STATE OF NEW YORK
# NEW YORK COUNTY

PRESENT: **BARBARA JAFFE**
_J.S.C._

_Justice_

PART 12

Index Number : 109749/2009
GENGER, ORLY
vs.
GENGER, DALIA
SEQUENCE NUMBER : 034
COMPEL DISCLOSURE

INDEX NO. 109749/0c

MOTION DATE _____

MOTION SEQ. NO. 034

The following papers, numbered 1 to _____, were read on this motion to/for   Compel

Notice of Motion/Order to Show Cause — Affidavits — Exhibits _____ | No(s). _____

Answering Affidavits — Exhibits _____ | No(s). _____

Replying Affidavits _____ | No(s). _____

Upon the foregoing papers, it is ordered that this motion is

DECIDED IN ACCORDANCE WITH
ACCOMPANYING DECISION / ORDER

MOTION/CASE IS RESPECTFULLY REFERRED TO JUSTICE
FOR THE FOLLOWING REASON(S):

Dated: 7/3/14

_____, J.S.C.
**BARBARA JAFFE**
_J.S.C._

1. CHECK ONE: .................................... ☐ CASE DISPOSED ☑ NON-FINAL DISPOSITION

2. CHECK AS APPROPRIATE: ...................MOTION IS: ☐ GRANTED ☑ DENIED ☐ GRANTED IN PART ☐ OTHER

3. CHECK IF APPROPRIATE: .................................... ☐ SETTLE ORDER ☐ SUBMIT ORDER
☐ DO NOT POST ☐ FIDUCIARY APPOINTMENT ☐ REFERENCE

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK  :  IAS PART 12
------------------------------------------------------------------x
ORLY GENGER, in her individual capacity and on
behalf of the Orly Genger 1993 Trust (both in its
individual capacity and on behalf of D & K Limited
Partnership),

                                 Plaintiff,

-against-


DALIA GENGER, SAGI GENGER, LEAH FANG,
D & K GP LLC, and TPR INVESTMENT
ASSOCIATES, INC.,

                                 Defendants.
------------------------------------------------------------------x

Index No. 109749/2009

Motion seq. nos. 034, 035

**DECISION AND ORDER**

BARBARA JAFFE, JSC:

**For plaintiff:**
Yoav M. Griver, Esq.
Brian Leinbach, Esq.
Zeichner, Ellman & Krause, LLP
1211 Avenue of the Americas
New York, NY 10036
212-223-0400

William Wachtel, Esq.
Wachtel, Missry LLP
885 Second Ave.
New York, NY 10017
212-909-9595

**For TPR/Sagi:**
John Dellaportas, Esq.
Nicholas Schretzman, Esq.
Morgan, Lewis & Bockius LLP
101 Park Ave.
New York, NY 10178
212-309-6000

In motion sequence number 034, defendants TPR Investment Associates, Inc. (TPR) and

Sagi Genger (collectively, TPR/Sagi) seek an order compelling plaintiff Orly Genger and

nonparties Arie Genger and Mark Hirsch to attend additional depositions and answer questions

about the settlement agreement entered into by Orly, Arie and the so-called Trump Group in or

about June 2013. (NYSCEF 539).  In motion sequence number 035, Arie seeks a protective order

preventing further deposition of him by TPR/Sagi. (NYSCEF 550).  These motions are

consolidated for disposition.

## I. BACKGROUND

The background pertinent to these motions is set forth in several opinions of this court and others, including my decision dated December 23, 2013, rendered in the related action, *Genger v Genger*, Index No. 651089/2010. (NYSCEF 700). In that decision, I denied TPR/Sagi's motion for an order compelling Arie and Orly to disclose the terms of the June 2013 settlement. TPR/Sagi filed this motion seeking essentially the same relief, and before I issued the December decision. And, in another decision in that action, dated March 20, 2014, I denied TPR/Sagi's motion for an order enjoining Orly from implementing or accepting the benefits of the settlement, thereby rejecting their contention that Orly should be restrained from enjoying or using the proceeds for her own benefit as the  proceeds belong to the Orly Trust. (NYSCEF 925).

In light of the foregoing, and given the protracted history of these litigations, familiarity with the factual background, rulings, and rationales set forth in the December and March decisions is presumed.

## II. DISCUSSION

TPR/Sagi allege that as the Orly Trust receives no consideration for releasing its claims against the Trump Group, the party that funded the settlement, and that Orly has pocketed the proceeds for her own benefit, there is "a clear conflict of interest between Orly and the Orly Trust, which would militate for dismissal of Orly's derivative claims against Sagi and TPR on the grounds that she is no longer an adequate representative." They thus argue that the settlement agreement is relevant to their defenses in this action, as opposed to the 2010 action addressed in my December 2013 decision, and that Orly, as a derivative plaintiff, has no standing to bring claims on behalf of the Orly Trust given the conflict of interest and her inadequate representation

2

of the Trust's interests. (NYSCEF 547).

Having settled claims against the Trump Group in her individual capacity and as beneficiary of the Orly Trust, and absent anything prohibiting the Orly Trust from prosecuting claims against the Trump Group, there is no conflict between Orly and the Trust. And, it is undisputed that TPR/Sagi sought to obtain proceeds of the sale of the Orly Trust shares to the Trump Group, which proceeds are also claimed by the Orly Trust. Moreover, in a recent opinion issued by the Southern District of New York in *TPR Inv. Assoc., Inc. v Pedowitz & Meister LLP*, 2014 WL 1979932, *6 (SD NY, May 15, 2014), although TPR was found to be entitled to the proceeds, the court also observed that nothing therein "should be construed as resolving any question other than whether TPR is the next (but not necessarily last) beneficiary of the sale of the Orly Trust Shares." Consequently, given TPR/Sagi's struggle with the Trust over the proceeds, their bona fides in expressing concern for the Trust is questionable at best.

Additionally, Dalia, trustee of the Orly Trust, has often sided with her son Sagi in these actions, and if Orly is deemed to be an inadequate representative of the Orly Trust, and Dalia declines to pursue the Orly Trust claims against TPR/Sagi, TPR/Sagi could be insulated from the prosecution of such claims. However, after TPR/Sagi filed this motion, the Appellate Division, First Department, held that Dalia had a conflict of interest in releasing herself, as part of settlement agreements entered into in 2011 and 2012 between TPR/Sagi and herself, as trustee. It also adjudged the settlements, which were against Orly's interests, as void and/or voidable. (*Genger v Genger*, 115 AD3d 421, 423 [1st Dept 2014]). Thus, Dalia may no longer be able to serve as trustee, having failed to disclose the conflict to her principal, Orly. And, as noted by the First Department, Orly had petitioned the Surrogate's Court to remove Dalia as trustee and to

3

surcharge her. (*Id.*).

To the extent that there exist any issues as to which claims filed by Orly against the Trump Group belong to Orly individually or are derivative claims of the Orly Trust, and whether the derivative claims were released pursuant to the settlement agreement, as I observed in my March 2014 decision, those are matters for the parties to the settlement agreement.

This action does not involve the Trump Group, the party that is released under the settlement agreement. Rather, this action concerns Orly's allegation of "a sham UCC sale" orchestrated by Dalia and Sagi in 2009 with respect to the so-called 1993 Note that was never intended to be collected or enforced. Thus, TPR/Sagi have not demonstrated that the settlement agreement is relevant to their defenses. (NYSCEF 549 at 1). And it is undisputed that the settlement agreement settles no claims asserted by Orly in this action. Thus, there is no need to depose Orly about the settlement agreement.

As it is also undisputed that neither Arie nor Hirsch, an officer of the Trump Group, are parties to this action, there is no basis for deposing them about the settlement agreement.

TPR/Sagi also rely on a recent pleading filed by the Trump Group in the 2010 action (NYSCEF 888) whereby it raises a defense pursuant to General Obligations Law § 15-108 (b) to the cross claim for contribution asserted against it by TPR/Sagi. They argue that the pleading reflects the divergent positions taken by Orly and the Trump Group as to whether the settlement agreement settled derivative claims and, thus, according to TPR/Sagi, "one of these parties is lying to the Court." (NYSCEF 638 at 2). Per my holding in the December decision, the settlement agreement "has no bearing on anything other than a possible offset at the end of the trial," and that even though the settlement terms may be useful in assessing maximum exposure

4

under §15-108, "such strategizing [to obtain the settlement terms] has no bearing on the underlying issues of fault and damages." (NYSCEF 700 at 1). I thus found that "other than trial strategy, TPR/Sagi fail[ed] to advance a sufficient reason supporting its request for pre-verdict disclosure of the settlement agreement." (*Id.*). The same holds true here.

### III. CONCLUSION

Accordingly, it is hereby

ORDERED, that the relief requested in motion sequence number 034 by TPR Investment Associates, Inc. and Sagi Genger (TPR/Sagi) seeking to compel additional depositions of the named deponents is denied; and it is further

ORDERED, that the relief requested in motion sequence number 035 by nonparty Arie Genger for a protective order to prevent further depositions of him by TPR/Sagi is denied as moot.

ENTER:

_____
Barbara Jaffe, JSC

Dated:       July 3, 2014
             New York, New York

5

# SUPREME COURT OF THE STATE OF NEW YORK
## NEW YORK COUNTY

PRESENT: **BARBARA JAFFE**
_J.S.C._
_Justice_

PART _12_

Index Number : 651089/2010
GENGER, ARIE
vs.
GENGER, SAGI
SEQUENCE NUMBER : 023
OTHER RELIEFS

INDEX NO. _651089/10_

MOTION DATE _____

MOTION SEQ. NO. _023_

The following papers, numbered 1 to _____ , were read on this motion to/for _other reliefs_

Notice of Motion/Order to Show Cause — Affidavits — Exhibits _____ | No(s). _____

Answering Affidavits — Exhibits _____ | No(s). _____

Replying Affidavits _____ | No(s). _____

Upon the foregoing papers, it is ordered that this motion is

**DECIDED IN ACCORDANCE WITH
ACCOMPANYING DECISION / ORDER**

Scanned to New York EF on 3/21/14

Dated: **MAR 2 1 2014**

_____, J.S.C.

MOTION/CASE IS RESPECTFULLY REFERRED TO JUSTICE
FOR THE FOLLOWING REASON(S):

1. CHECK ONE: ............................................. ☐ CASE DISPOSED    ☑ NON-FINAL DISPOSITION

2. CHECK AS APPROPRIATE: ...................MOTION IS: ☐ GRANTED  ☑ DENIED  ☐ GRANTED IN PART  ☐ OTHER

3. CHECK IF APPROPRIATE: ................................. ☐ SETTLE ORDER    ☐ SUBMIT ORDER

   ☐ DO NOT POST    ☐ FIDUCIARY APPOINTMENT    ☐ REFERENCE

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK : PART 12

-------------------------------------------------------------------------------x

ARIE GENGER and ORLY GENGER, in her individual
capacity and on behalf of THE ORLY GENGER 1993 TRUST,

                                          Index No. 651089/10

                Plaintiffs,

                                          Motion Seq. No. 023

                -against-

SAGI GENGER, TPR INVESTMENT ASSOCIATES, INC.,     **DECISION AND ORDER**
DALIA GENGER, THE SAGI GENGER 1993 TRUST,
ROCHELLE FANG, individually and as trustee of
THE SAGI GENGER 1993 TRUST, GLENCLOVA
INVESTMENT COMPANY, TR INVESTORS, LLC,
NEW TR EQUITY I, LLC, NEW TR EQUITY II, LLC,
JULES TRUMP, EDDIE TRUMP AND MARK HIRSCH,

                      Defendants.

-------------------------------------------------------------------------------x

SAGI GENGER, individually and as assignee of
THE SAGI GENGER 1993 TRUST, and TPR INVESTMENT
ASSOCIATES, INC.,

                        Cross-Claimants, Counterclaimants,
                        and Third-Party Claimants,

                -against-

ARIE GENGER, ORLY GENGER, GLENCLOVA
INVESTMENT COMPANY, TR INVESTORS, LLC, NEW TR
EQUITY I, LLC, NEW TR EQUITY II, LLC, JULES TRUMP,
EDDIE TRUMP, MARK HIRSCH, TRANS-RESOURCES, INC.,
and WILLIAM DOWD,

                      Cross-Claim, Counterclaim and/or
                      Third-Party Claim Defendants.

-------------------------------------------------------------------------------x

BARBARA JAFFE, JSC:

      Sagi Genger (Sagi), The Sagi Genger 1993 Trust (Sagi Trust) and TPR Investment

Associates, Inc. (TPR) ask that I 1) decline to "so-order" a stipulation of settlement, unless and

until the settlement and all settlement-related documents have been produced to all interested

parties; and 2) enjoin and restrain plaintiff Orly Genger from implementing, accepting

consideration from, or in any way enjoying the benefits of the settlement, unless and until

movants' arguments about the settlement have been heard.  Orly opposes the motion.

## I.  BACKGROUND

The parties to the settlement referenced in the stipulation are, primarily, Arie Genger,

Orly Genger and the Trump Group, composed of Glenclova Investment Company, TR Investors,

LLC, New TR Equity I, LLC, New TR Equity II, LLC, Jules Trump, Eddie Trump, and Mark

Hirsch.  Movants ask that I not so-order the stipulation because 1) Orly settled derivative claims

belonging to the Orly Trust; and 2) the Sagi Trust, the remainderman beneficiary of the Orly

Trust, will be harmed if Orly is not enjoined from taking the settlement proceeds for herself, as

such proceeds belong to the Orly Trust, not to Orly personally.

After being provided with a copy of the settlement agreement for *in camera* review, a

conference call was held with me on June 27, 2013 and all the parties in interest, including

counsel. (NYSCEF 487).  As a result of the conference call, a statement was inserted into the

stipulation reflecting that Orly had settled her claims against the Trump Group "in her individual

capacity and as beneficiary of" the Orly Trust.  The statement was initialed by counsel for Orly,

Arie, and the Trump Group.  Because the stipulation was so-ordered, the request that I decline to

do so is moot, as is the request for the production or disclosure of the settlement agreement and

related documents, which I denied by order dated December 18, 2013, rendered in a closely

related, if not substantially identical, matter. (NYSCEF 700).

The remaining issues raised in this motion are whether Orly settled derivative claims of

the Orly Trust, and if so, whether she should be enjoined from taking and using proceeds of the

2

settlement for her sole benefit. Movants allege that, although the stipulation specifies that Orly

settled claims against the Trump Group in her individual capacity and as beneficiary of the Orly

Trust, she actually settled derivative claims belonging to the Orly Trust. Thus, they argue that

the settlement proceeds belong to the Orly Trust. They rely in large part on a letter to me dated

June 28, 2013 in which counsel for the Trump Group states, in relevant part, that "[c]ertain of

Orly Genger's claims against the Trump Group in this action have been held by Justice Feinman

to be derivative in nature," and that "[e]xcluding such claim from the claims that are to be

dismissed is not what the Trump Group bargained and paid for in the settlement . . . ." (NYSCEF

485). At oral argument, counsel for the Trump Group explained that the stipulation submitted to

me for approval indicated that "Orly was signing in whatever capacities she has," and that the so-

ordered stipulation "supersedes" the arguments advanced in the June 28 letter. (NYSCEF 651 at

6, 8). In essence, the parties to the settlement agreement concur that the only claims released by

Orly against the Trump Group were those "that Orly made on her own behalf and as a beneficiary

of the [Orly Trust]" (NYSCEF 651 at 11), and that the Trump Group agreed to the language

inserted in the so-ordered stipulation (NYSCEF 651 at 12 ["Your Honor, my colleague, Mr.

Allingham, signed the interlineated order as you entered it. We agree to whatever that order

is."]).

     Dalia Genger, trustee of the Orly Trust, neither filed nor joined in the instant motion.

Instead, she signed an affidavit, dated June 28, 2013, asserting that "an analysis of the claims

[filed by Orly against the Trump Group] shows that they are entirely claims of the Orly Trust and

that she has no individual rights separate therefrom." (NYSCEF 483, ¶ 2). Dalia's assertion is

not supported or accompanied by any analysis of the subject claims, and is fatally conclusory.

Similarly, movants only "suspected" that "derivative Orly Trust claims" were settled in the settlement agreement, and now allege that their suspicion is bolstered by the June 28 letter. (NYSCEF 577, ¶ 6). And, having found that "Dalia - as trustee of Orly's Trust - had a conflict of interest in releasing herself as part of the October 2011 and March 2012 settlement agreements [embodying the proposed transactions]" (*Genger v Genger*, -- AD3d --, 2014 NY Slip Op 01421 *2 (1st Dept 2014), the Appellate Division throws doubt on Dalia's standing to complain.

In the settlement agreement, Orly stops short of releasing derivative claims. Rather, in paragraph 8 of the agreement, she only agrees to "cooperate" and "cause" the Orly Trust to release any and all claims against he Trump Group. At any rate, and to the extent that there remain issues of fact and law as to which claims filed by Orly against the Trump Group belong to Orly individually and/or are derivative claims belonging to the Orly Trust, I invite the parties to the settlement agreement to set forth the claims given up by Orly in her individual and beneficial capacities, and to explain why any derivative claims advanced in the complaint are not released by the agreement. Unless and until the issue of derivative claims is resolved, I cannot determine whether some or all of the settlement proceeds with the Trump Group belong to Orly or the Orly Trust, particularly when the Sagi Trust has asserted a contingent remainderman interest in the Orly Trust.

Orly's counsel also challenges the legal standing of the Sagi Trust in making this motion, as it is undisputed that TPR has no interest in the Orly Trust. At oral argument, counsel contended that given Orly's youth and good health, the Sagi Trust's interest "is only contingent, and if [Orly] does have issue, it is destroyed forever," and thus such interest "is speculative at best." (NYSCEF 651 at 13; NYSCEF 548 at 3). Counsel also noted that even though a

4

contingent remainderman has "limited standing," movants cite no authority "allow[ing] them to highjack [sic] a settlement based upon contingent remainderman status." (NYSCEF 651, at 14). As movants seek injunctive relief against Orly, they must establish their standing to pursue such relief, which they have failed to do.  Hence, the requested relief is denied without prejudice.

Although I have reviewed the settlement agreement and so-ordered the related stipulation, in accordance with *Mahoney v Turner Constr. Co.* (61 AD3d 101 [1st Dept 2009]), signing the stipulation only resolves the parties' dispute regarding whether the terms and related documents should be produced or disclosed.

Accordingly, based on the foregoing, it is hereby

ORDERED, that the branch of the instant motion seeking an order declining to "so-order" that certain "Second Amended Stipulation of Discontinuance with Prejudice," dated as of June 20, 2013 (the Stipulation), is denied as moot; it is further

ORDERED, that the branch of the instant motion seeking, in effect, an order requiring the disclosure or production of that certain settlement agreement referenced in the Stipulation is denied as moot; and it is further

ORDERED, that the branch of the instant motion seeking to enjoin or restrain plaintiff from implementing, accepting consideration from, or in any way enjoying the benefits of the settlement agreement is denied without prejudice.

ENTER:

Barbara Jaffe, JSC.

Dated:    March 20, 2014
          New York, NY

5

1

SUPREME COURT OF THE STATE OF NEW YORK
NEW YORK COUNTY - CIVIL BRANCH - PART: 12
-----------------------------------------------X
ORLY GENGER, in her Individual capacity and on
behalf of the Orly Genger 1993 Trust (both in its
individual capacity and on behalf of D & K
Limited Partnership,

                                Plaintiffs,
                                                    INDEX NO.
            -against-                               109749/09

DALIA GENGER, SAGI GENGER, LEAH FANG, D & K
GP, LLC, and TPR INVESTMENT ASSOCIATES, INC.,

                                Defendants.
-----------------------------------------------X
                    60 Centre Street
                    New York, New York  10007

                    August 15, 2012

B E F O R E:

        HONORABLE PAUL G. FEINMAN, Justice


A P P E A R A N C E S:

        ZEICHNER, ELLMAN & KRAUSE, LLP
        Attorneys for Orly Genger
            575 Lexington Avenue
            New York, New York  10022
        BY:  YOAV M. GRIVER, ESQ.,
             BRYAN D. LEINBACH, ESQ. and
             WILLIAM WACHTEL, ESQ.

        DUANE MORRIS, LLP
        Attorneys for TPR
            1540 Broadway
            New York, New York  10036
        BY:  EVANGELOS MICHALIDIS, ESQ., and
             JOHN DELLAPORTAS, ESQ.

        PEDOWITZ & MEISTER, LLP
        Attorneys for D & K, GP, LLC
            570 Lexington Avenue - 8th Floor
            New York, New York  10022
        BY:  ROBERT A. MEISTER, ESQ., and
             MARISA H. WARREN, ESQ.


                        AT

2

```
 1                    Proceedings
 2                                            Continued
 3   APPEARANCES CONTINUED:
 4        LYONS McGOVERN, LLP
          Attorneys for Leah Fang
 5            399 Knollwood Road - Suite 216
              White Plains, New York  10603
 6        BY:  DESMOND C.B. LYONS, ESQ.
 7        BARTON, LLP
          Attorneys for Dalia Genger
 8            420 Lexington Avenue
              New York, New York  10170
 9        BY:  MATHEW E. HOFFMAN, ESQ.
10        McLAUGHLIN & STERN, LLP
          Attorneys for Sagi Genger
11            260 Madison Avenue
              New York, New York  10016
12        BY:  ALAN E. SASH, ESQ.
13        SKADDEN ARPS
          Attorneys for the Trump Group
14        BY:  TONY ARDEN, ESQ.
15        ALSO PRESENT:
          Attorneys who did not note their appearances
16
                              ANGELA TOLAS, CSR
17                            OFFICIAL COURT REPORTER
18                 *       *       *
19             THE COURT:  When I looked yesterday I haven't seen
20   anything in opposition.  Has opposition since been filed, or
21   what's the story on that?
22             MR. DELLAPORTAS:  John Dellaportas for TPR.  TPR
23   has filed opposition, submitted courtesy copies, and I have
24   an extra copy for your Honor.
25             THE COURT:  One copy is enough, thanks.
26             MR. MEISTER:  Dalia Genger e-filed this morning
```

AT

3

1                          Proceedings

2        opposition papers about 10:00 o'clock, and we also submitted

3        a working copy for your Honor.

4              MR. HOFFMAN:  Mathew Hoffman for Leah Genger.  We

5        filed opposition papers this morning.

6              THE COURT:  All right, I haven't read any of your

7        opposition papers because I looked at it yesterday.

8        Actually three of us looked at it yesterday because we were

9        also working on the papers in the related action.

10              Okay, so let's hear what you have to say in

11        opposition, Orly, then, and I'm familiar with what the

12        movant's arguments are.  Why don't you go first since you

13        have Dalia.

14              MR. MEISTER:  I will, your Honor.  Robert Meister,

15        representing Dalia Genger, your Honor.  I'll try to

16        summarize what's in our papers.  We start by pointing out

17        that the claims that are asserted in this action largely are

18        claims that belong to Dalia Genger as trustee of the Orly

19        Genger trust.  We point out that although the plaintiff

20        obviously doesn't like the fact that Dalia Genger is the

21        trustee, her service as trustee was confirmed by the

22        Surrogate's Court by express quarter including --

23              THE COURT:  The Surrogate said, you know,

24        basically she should be given a chance to try out, in

25        essence.  That's when I reread Judge Roth's decision that at

26        the time of the original objection to her, or the challenge

AT

4

Proceedings

1
2   to her, she hasn't been given a chance to serve.

3       I just don't understand why somebody would want to

4   continue to serve as the trustee of her daughter's trust

5   when the daughter doesn't want her.  Why not just say:

6   Okay.  I'm out of this.  You want to have a fight with your

7   brother, have a fight with your brother.  If you want to

8   have a fight with your father, have a fight with your

9   father.

10      I mean, unless there is some truth to the

11  conspiracy theories asserted by the plaintiffs, why is she

12  continuing to serve?  Why doesn't she resign?  Who needs

13  this aggravation?

14      MR. MEISTER:  Your Honor, I'm not the trustee.  I

15  do --

16      THE COURT:  No, but you represent her, so I'm

17  assuming you've discussed these possibilities.  You know,

18  you want to get yourself out of this litigation, resign as

19  trustee.

20      MR. MEISTER:  One might assume that when I first

21  came in to handle the appeal that Orly took from the

22  Surrogate's order, that would have been one of the first

23  questions that I would have asked.  But I don't think it's

24  appropriate for me to testify as to --

25      THE COURT:  No, I'm not asking you, I'm just

26  throwing it out there as something that crosses my mind.

AT

5

Proceedings

1

2      MR. MEISTER:  It's been thrown out also by the law

3 department in Surrogate's Court, why would a mother want to

4 insist on protecting her daughter from the machinations of

5 her husband, ex-husband, to whom the daughter is enthralled,

6 and seems intent to do everything he can to disadvantage the

7 daughter, who is not very sophisticated.  I can only say

8 that --

9      THE COURT:  That's one way of putting it.  Another

10 way is protecting her from the machinations of her brother

11 who seems to be obsessed with some issue with the father.

12 Trust me, there are no saints in this.

13      MR. MEISTER:  Respectfully, your Honor, may I

14 point out that as trustee under the terms of the trust, the

15 trustee draws no commissions.  That Dalia Genger has had to

16 reach in her pocket deeply to pay legal fees, both my

17 predecessor in the Surrogate's Court, and my firm in this

18 action, and in other actions, and it's costly.

19      And all I can say is my mother, who's no longer

20 with us, had a great love for her children.  And I think

21 Dalia Genger is demonstrating her love for her daughter who

22 doesn't respect her, who refuses to speak with her, and

23 makes the most unfounded allegations.  And I trust that the

24 Court is noting the allegations without necessarily

25 crediting them where there is no evidence.  In any event--

26      THE COURT:  My point is, you know, if no good deed

AT

6

1                        Proceedings

2     goes unpunished, you know, why not resign and let the

3     Surrogate Court appoint a complete outsider to this family,

4     and that way that outsider supposedly operates as a

5     neutralizing force.

6             MR. MEISTER:  It certainly would be an option,

7     your Honor, assuming that a true outsider would step into

8     this hornet's nest where by the terms of the trust the

9     outsider is not going to get compensated.  I wouldn't do it.

10    My guess is JP Morgan Chase wouldn't do it.  US Trust

11    wouldn't do it.  But in any event it hasn't happened.

12            As to what the Surrogate's Court did decide, the

13    Surrogate's Court did expressly reject the argument that

14    there should be a special trustee for the purpose of

15    investigating discovering the alleged wrongful dealings.

16    The wrongful dealings then were conspiracy between Dalia,

17    and I take it this is all from the Surrogate Court opinion,

18    conspiracy between Dalia and Sagi to take money for Dalia.

19    Thus far there has been not one shred of evidence that Dalia

20    has received a single benefit from anything here.  But

21    insofar as this motion is concerned, the fact remains that

22    Orly did not perfect her appeal from Surrogate Roth's

23    decision, and that's the law.  That she, Dahlia, is the

24    trustee.

25            The second thing that's pertinent to this motion

26    is the status quo ante, ante all the various things of which

                              AT

```
                                                              7
 1                          Proceedings
 2      Orly is now complaining.  And the status quo ante was that
 3      the trust owed over four-and-a-half million dollars by the
 4      D & K note which the trusted guaranteed which was 48 percent
 5      of.
 6              What's happened here is, first, the Delaware
 7      Supreme Court handed down its decision stating that record
 8      ownership was not transferred to the TRI shares, but leaving
 9      open the question of economic beneficial ownership to the
10      TRI shares.  And in that context, the trustee reached a
11      settlement.  The settlement is outlined extensively in a
12      settlement agreement.  It resulted in the trust owing less
13      money.  It resulted in the trust receiving $100,000 payment.
14      It resulted in the cutting, if you will, of the trust ties
15      to D & K which had the effects of, in effect, canceling the
16      two agreements that the amended complaint complains of the
17      so-called meeting agreement and the second amended restated
18      D & K partnership agreement.
19              And so there was substantial benefits to the trust
20      for this.  Perhaps the biggest benefit was that as part of
21      the settlement TPR relinquished in writing to the trust all
22      economic interest in the TRI shares.  Now that's a benefit
23      that was left open by the Supreme Court of Delaware.  It's a
24      benefit which is worth at least the $10.3 million dollars
25      that's in escrow, it's a benefit which if Orly's
26      representations to this Court, among others, are to be
```

AT

8

Proceedings

1
2   believed, the last figure I heard from my colleagues on the
3   other side was $150 million, and TPR transferred that, in
4   effect, to the trust, the Orly trust.
5           So it seems to be the type of settlement that
6   courts should support.  Of course we cited some cases in our
7   papers that settlements are favored by courts that will not
8   be any surprise to your Honor, and we also point out that
9   although it is indeed possible that Orly, if she plows
10   through this won't like this because she doesn't seem to
11   like anything, she can sue in the Surrogate's Court for a
12   surcharge action.  But most importantly here the settlement
13   is one supported by a very substantial consideration.
14           After the settlement, your Honor, which resulted
15   in the debt being codified by a $4 million note to TPR which
16   paid, in addition to the other consideration, I think I
17   mentioned, gave $100,000 cash to the trust so the trust
18   could pay legal fees.  Subsequent to that, TPR informed us
19   that it was in the process of selling that note to this
20   company called Manhattan, and making a long story short
21   there was an agreement with Manhattan to have a new note.
22   Manhattan loaned $200,000 to the trust and agreed to loan an
23   additional $200,000 if the trust requests it.  And there was
24   a new note, or actually two knew notes, one existing and one
25   to cover the possibility of the second one as well.
26           If you add up all those notes, the trust owes less

AT

9

Proceedings

2  than it did to D & K before all this.  Plus the trust has

3  thus far $200,000 in the bank and has received, as a loan,

4  and has received $100,000 from TPR.  None of this has gone

5  to Dalia Genger.  Dalia Genger didn't get any fees from

6  this.  Dalia Genger's fees for her defense of this action,

7  the companion action before your Honor, for her defense of

8  the Surrogate's Court action, and indeed her affirmative

9  fees for the action she brought against Aria to recover for

10  the benefit of the trust, to recover damages for Aria's

11  breach of contract to transfer full title.  All those fees

12  Dalia Genger have been billed to and paid for by Dalia

13  Genger out of Dalia Genger's pocket.  So there is no

14  diversion of trust assets to Dalia Genger.

15           Now Dalia Genger is trustee, as a matter of law

16  has authority to settle on behalf of the trust.  The trust

17  makes that even more explicit on page 26, I think, of the

18  trust agreement.  She settled.  So the question that seemed

19  to be teed up by the order to show cause was did these

20  settlements or notes or anything violate either this Court's

21  action, this Court's injunction --

22           THE COURT:  Restraining order.

23           MR. MEISTER:  Or this Court, in the other cases,

24  restraining notice.  Or the temporary injunction which I

25  consented to in the Surrogate's Court.  And, respectfully,

26  it's spelled out in my papers.  And as I read Mr.


AT

10

Proceedings

1
2    Dellaportas' papers this morning, chapter and verse, nothing
3    that has transpired has violated any of those three orders.
4    So, respectfully, the application ought to be denied.

5              What it seems to me, your Honor, is that this is
6    an attempt to avoid all the strictures in CPLR 6201 when a
7    Court can order attachment.  None of those fit and
8    plaintiff's papers don't purport to rely on 6201 for the
9    obvious reason they can't.  So instead they come in here on
10   an emergency basis, although there is no emergency, and seek
11   to compel Dalia Genger, also Sagi Genger, to post
12   four-and-a-half million dollars of their own money which is
13   not only unprecedented but it's also not supported by law
14   and seems contrary to the cases we cite in our opposition
15   here.

16             Respectfully, your Honor, the motion should be
17   denied.  The one thing that I didn't say which I should is
18   it's in my affidavit here, the trust has received no
19   notification by Manhattan, the holder of the new note, of
20   any demand for payment, no notification of any purported
21   event of default to confirm because the mails are lousy of
22   late, to confirm that it wasn't something that's off in the
23   mail.  I spoke with the President of Manhattan on Monday.

24             THE COURT:  How is the weather in St. Kitts?

25             MR. MEISTER:  It must be nicer than it is up here,
26   your Honor.  And he said that he has not made any demands

AT

Proceedings

1
2   and has not noticed any purported notice of default.  So

3   there is no emergency here.  In light of that, respectfully,

4   the relief requested by the order to show cause is totally

5   unwarranted.

6           And, indeed, if I may point out the language of

7   the stay which, among other things, enjoins the trust from

8   transferring any assets, would prevent the trust even from

9   paying legal fees.  So it's overly broad.  In my papers,

10  your Honor, I do state that Dalia Genger as trustees is

11  prepared to give two business days' notice if the trust

12  receives any attempt by Manhattan to either notice of

13  purported default or attempt to collect upon that, we'll

14  give that notice Orly's counsel.  I say two business days,

15  although the order to show cause is 24 hours because

16  respectfully 24 hours could be impossible in the sense

17  that--

18          THE COURT:  In this day of email, you can send an

19  email, you can send somebody notice instantly.

20          MR. MEISTER:  Your Honor, first of all we're

21  dealing with people who come from Israel.

22          THE COURT:  It still comes instantly.

23          MR. MEISTER:  They are not allowed to send emails.

24  Secondly, I don't understand why two business days couldn't

25  be --

26          THE COURT:  Right assuming that there is a Chodesh

AT

12

Proceedings

or a holiday, then, you know, it's going to be 24 hours, we
can make it 25 because the prohibition is only going to be
for a 24-hour period, sunset to sunset.

MR. MEISTER:  Your Honor, I don't mean to make
light of it, but my partner who is more orthodox and
observant than I, however reformed Judaism, have a debate
each year as to whether the office should be closed for one
or two days for Rosh Hashana.  He insists it's a two-day
holiday, I say the way we celebrate it it's a one day
holiday.  I think it's certainly possible.  I don't see the
nickel and diming about the amount of notice when as a
practical matter --

THE COURT:  If all the Genger's were really so
observant and so religious, this case wouldn't be here.
Let's be truthful about that, you know, you're going to
invoke that as a basis for extending the notice provision,
all right, they would be in some, you know, they wouldn't
have ever have been here with their divorce, so it's a bunch
of nonsense.

MR. MEISTER:  Your Honor, respectfully, I was
referring to counsel.

THE COURT:  That's a different issue.  If it's an
issue for counsel, that's a different issue.  That is just
not an issue for the Gengers.  Let's call it the way it is.

MR. MEISTER:  For a number of years

AT

13

Proceedings

1

2      notwithstanding the allegations in the second amended

3      complaint, the plaintiff relied on her mother.  For a number

4      of years she refused to take any telephone calls or

5      otherwise communicate with her mother.  So clearly any

6      notice is going to be coming from counsel.  It's going to be

7      coming from my firm to counsel representing Orly.

8              I think as John W. Davis said, when you say what

9      you have to say sit down and shut up.

10             THE COURT:  You'll get a chance, Mr. Dellaportas.

11     I want to here what Leah Fang who had the good sense to

12     resign as trustee has to say.

13             MR. HOFFMAN:  Mathew Hoffman, representing the

14     defendant.  I'm tempted to use the Yiddish expression which

15     means it doesn't help anyway, but I wouldn't know how to

16     spell it in Yiddish.  So we resigned, your Honor, and all it

17     did was result in a lawsuit against Leah Feng anyway.  So

18     your question as to why Dalia's didn't resign wouldn't help

19     anyway, your Honor.  Putting that aside Leah Feng is here to

20     say she had nothing to do with any of this.  And she didn't

21     sign any of these agreements, as far as I know she didn't

22     know about any of these agreements, there is no allegations

23     against her, and there was no request for an injunction.

24             But with all due respect, your Honor, you enjoined

25     her, because they asked for an injunction against the note

26     defendants.  And at one point, your Honor, you struck the

AT

14

Proceedings

1

2     word "note", which if the note defendants was defined not to

3     include --

4              THE COURT:  If she's not doing anything, she

5     doesn't need to do anything.

6              MR. HOFFMAN:  That's correct, and she should, your

7     Honor, we do not, with all due respect, enjoin people who

8     are not going to do anything and haven't done anything.  And

9     she's a lawyer.  I don't want an injunction out there

10    against a lawyer who didn't do anything, who is not alleged

11    to do anything.

12             Orly's firm has not even sought an injunction

13    against her in the papers.  She's not one of the defined

14    defendants for purposes of the papers.

15             THE COURT:  What the Court was trying to do was

16    freeze the status quo, all right.  And the Court's concern

17    is that you know things have happened unbeknownst to the

18    Court, unbeknownst to the plaintiff, that did not maintain

19    the status quo.  So I understand that.  But that was the

20    Court's motivation.

21             MR. HOFFMAN:  I'm not objecting to the Court's

22    motivation, I appreciate it.  What I am saying is

23    particularly when the plaintiffs have not sought it I'm

24    asking that the Court not issue any relief against Leah Feng

25    because she didn't do anything, doesn't intend to do

26    anything, she resigned from doing anything in, you know,

AT

Proceedings

1
2     we're talking well over four years ago, I think we're almost
3     at five.

4              And, therefore, she wants out of this in every
5     way.  And particularly with the issues in front of the Court
6     now, I see no reason whatsoever she should be governed by
7     any ruling since nobody's alleged she's done anything wrong
8     with respect to this, or that she intends to.

9              THE COURT:  Mr. Dellaportas.

10             MR. DELLAPORTAS:  Yes, your Honor.  John
11    Dellaportas for TPR.  Your Honor, as I said we submitted I
12    think a 20-page brief last night we appreciate your Honor
13    hasn't had a chance to read it yet but I can boil it down in
14    two or three minutes, it's very straightforward.

15             Essentially what we've been confronted with is
16    Orly for years has come before the Court and said that there
17    are these TRI shares that she says are worth a couple of
18    hundred million dollars we're all conspiring to deprive them
19    of her.  So we tried to meet with her to settle, she didn't
20    want to settle.  So we figured what do we have to do.  So we
21    worked out this deal whereby we basically relinquish the
22    shares to her.  Maybe the trust will win the suit and they
23    will be worth two hundred million dollars.

24             Let's assume the worst and the trust loses its
25    suit.  In that case the trust gets $10.3 million dollars of
26    sales proceeds which are owing to TPR.  He can walk away on

AT

16
Proceedings

1    a minimum of $10.3 million dollars in order to resolve this
2    matter.  As we set forth through our papers we're entitled
3    to do it.

4        Orly is not bringing her own claims.  If she
5    brought her own claims she could do whatever she wants and
6    she could not settle and she can take everyone to a jury
7    trial.  She brought derivative claims on behalf of the trust
8    and on behalf of DNK.  The law as we set forth on our
9    summary judgment motion which predated this preliminary
10   injunction by several weeks, it's still working its way
11   through, is that it's very clear when you have a derivative
12   claim, if you're suing on behalf of someone else, that
13   somebody else has the right to resolve it.

14        It's like if I had a hundred shares of General
15   Electric and I start suing everyone General Electric does
16   business with on behalf of general electric on the grounds
17   that I don't like the way they are doing business, General
18   Electric has a right to resolve it.  They don't have to
19   consult me, and I can't go cry to the courts that they
20   didn't consult me.  The courts would think I'm a lunatic if
21   I tried that.

22        The same thing here.  The trust and DNK have the
23   right to resolve it without the derivative plaintiff.  The
24   law on that is perfectly clear.  There is no dispute as to
25   that fact.  That's the resolution.  But that's not why we're

AT

17
1                          Proceedings

2    here today.  You have our summary judgment motion and the

3    Court will get to it whenever the Court gets to it.

4              There is a far more serious allegation here and

5    one that really troubles us because this was done on advice

6    of counsel, and we've been accused of violating three

7    orders.  And frankly in 18 years I've never seen anything

8    like this.  But they changed the wording of your Honor's

9    order.

10             So, your Honor, in June 28, 2010 said we're

11   restrained from transferring, selling, pledging, or

12   otherwise disposing of the shares.  And your Honor defined

13   the shares as the shares of DNK Limited Partnerships 48

14   percent ownership interest in the common stock of TPR.

15             My colleague said none of this makes any sense and

16   I should draw a diagram.  I apologize for this, your Honor.

17   This is essentially what we're talking about.  Here's TPR.

18   DNK owns 48 percent of TPR, and that's restrained.  No one

19   can transfer these shares.  Nobody has transferred these

20   shares.

21             THE COURT:  That's D & K, LP?

22             MR. DELLAPORTAS:  Yes, there is a GP on top of

23   this, I left it out of there.

24             THE COURT:  See if your diagram matches mine.

25             MR. DELLAPORTAS:  So if DNK itself has

26   shareholders there, Orly trust and some others, so the

AT

18

Proceedings

1
2   settlement agreement relates to these shares.  It doesn't
3   relate to the shares that are restrained.  This is very
4   carefully tailored to honor your Honor's orders.  And there
5   is no violation of the restraint.
6           Now they may not like the agreement and they have
7   a remedy.  They don't have a remedy against TPR because your
8   Honor ruled she's not our shareholder.  We don't care if she
9   likes our settlement agreements or doesn't like our
10  settlement agreements.  We think it's a fantastic result for
11  her because we gave up $10.3 million dollars and frankly got
12  nothing other than a release, and this release so far seems
13  pretty worthless.  Our legal bills have tripled since we got
14  our alleged release.
15          If she doesn't like it she can sue the trustee in
16  Surrogate's Court, that's her remedy.  And from TPR's
17  perspective, we've entered into a settlement agreement with
18  the trustee of the trust.  We had a decision from Surrogate
19  Roth saying she's the validly appointed trustee.  We have
20  the right to settle with her.  She has the right under the
21  law and trust agreement to settle these things.  We have the
22  right to settle our own claims.
23          The law is absolutely clear that we don't need to
24  involve a derivative plaintiff, and so we didn't involve
25  her.  We produced, the first day of document production, we
26  produced it to her and we promptly moved for summary

AT

19

Proceedings

judgment on it, there has never been a secret about it at
all.  We moved for it and we moved for summary judgment, and
we think it's an absolute defense, certainly they put in
their opposition papers, and we haven't seen anything that's
not the defense.

From our standpoint, number one we haven't
violated your orders.  Let me clarify, we violated the
orders as they have been rewritten in Orly's briefs, but we
haven't violated the orders as your Honor actually ordered
them.  I think that's really the material test here.  And so
we haven't violated any orders.  What we've done is
completely comporting with the law, and we should not be
subject to any further restraints.

What the Court should do in our opinion,
respectfully, is it should proceed to consider our summary
judgment motion.  Because the only consideration we really
got out of this deal in exchange for giving them at least
$10.3 million dollars, and maybe two hundred million if they
win their suit, is we got a release.  And the release really
isn't any good if all we do is get sued more and more.  That
was our consideration.  Walk away from this $10.3 million
pool of cash that's waiting for us, but at least we get to
disentangle ourselves.

And that's what this is really about.  We really
would like to find a way to disentangle ourselves from

AT

20

Proceedings

litigations brought by people who, with all due respect,
don't want to disentangle, don't want to settle, really want
this to go on and on and on.  This is a war of attrition
here and we don't want a part of it.  And the law doesn't
say we have to be a part of it.  Orly has some individuals
claims, she has the right to bring those, she can take them
all to a jury if she can plead a cause of action.  But these
aren't her claims, these are derivative claims.

The parties we settle with has a right to settle
it.  The settlement does not violate any of your Honor's
orders, we lay that out in our opposition papers.  And,
therefore, from our standpoint, the Court should proceed to
summary judgment and we should get this wrapped up.

And with that I'm here to answer any questions
that your Honor has.

THE COURT:  Before I turn to you as the movant,
anybody else have anything in opposition?

MR. SASH:  My name's Alan Sash, I represent
defendant Sagi Genger.  We don't want to go unheard, but we
also didn't want to spend our clients money and time and
everyone else by just repeating what TPR and Dalia Genger
said, so we just join in their arguments, your Honor.

MR. LYONS:  Desmond Lyons on behalf of D & K, GP.
I echo Mr. Sash's statement with respect to D & K, GP.  I
think the arguments are pretty well set forth in TPR's

AT

```
                                                           21
1                            Proceedings
2       papers as well as Mr. Meister's papers.
3                  THE COURT:  All right.  Does Trump counsel have
4       anything to say?
5                  MR. ARDEN:  We do not, no.
6                  THE COURT:  You have to tell the Reporter who you
7       are.
8                  MR. ARDEN:  I'm sorry, Tony Arden from Skadden
9       Arps for the Trump Group.  We have nothing to add.
10                 THE COURT:  Now are you in the New York office or
11      are you in the Bloomington office that was one of the things
12      we were wondering.
13                 MR. ARDEN:  I was in the New York office today,
14      your Honor, but I'm normally in the Wilmington office.
15                 THE COURT:  Okay, so I'm glad to see that all
16      three of you aren't here.
17                 MR. ARDEN:  The New York office has a better lunch
18      I can tell you that.
19                 THE COURT:  I had an interesting experience in one
20      of my capacities at the State Bar.  I was in a meeting
21      yesterday at Proskauer up on the 27th Floor, you can see all
22      the way into New Jersey and here, there, and everywhere, but
23      I didn't see any lawyers.  I'm like where do you hide the
24      lawyers?  There is a beautiful conference room, beautiful
25      reception areas, escorted here, escorted there.  I don't
26      think I saw a single law, I was on three different floors.
```

AT

```
                                                          22
 1                         Proceedings
 2              MR. ARDEN:  They were all over at Skadden Arps,
 3    your Honor.
 4              THE COURT:  Any way, getting back to this, Mr.
 5    Griver, what say you.
 6              MR. GRIVER:  My name is Yoav Griver, I represent
 7    the plaintiffs in the action, Orly Genger individually, Orly
 8    Genger representing the Orly Trust, and Orly Genger
 9    representing D & K, LP.
10              At some future date, your Honor, we will talk at
11    length about summary judgment and our motion for sanctions
12    and even a motion for contempt that we are bringing for
13    violation of the injunction.  But right now Orly, the Orly
14    trust and D & K, LP, stand before you seeking what they have
15    always sought, which is preservation of the status quo until
16    Orly, the trust, and D & K, LP, and their rights can be
17    determined by this court.  That's all that we've always
18    sought, and I think it is humorous for the defendants to
19    come up here after entering into eight agreements in the
20    face of three injunctions and complain about Orly's
21    machinations.
22              But I think, your Honor, for purses of today, it's
23    really quite simple.  Because the Court has already provided
24    us with the relief that we seek, and the Court granted it to
25    us on July 28, 2010.  I'll explain to you what I mean.
26              THE COURT:  If that's true, what are we doing
```

AT

23

Proceedings

1
2  here?  And that comes back to my original question when you
3  came in with the order to show cause.  Go ahead and move for
4  contempt.

5           MR. GRIVER:  Because, your Honor, because of what
6  the defense have done, we are here for triage, we are here
7  for prophylactic purposes to make sure that it is worth
8  continuing to litigate this case.  And that Orly and her
9  trusts and D & K, LP's rights are protected until this case
10  is determined, which is what the Court gave us on August 17,
11  2009.

12           In August of 2009, and this is from the very first
13  paragraph of the memo of law asking for preliminary
14  injunction.  "The relief requested is narrow in scope.
15  Plaintiff seeks an order preserving the status quo while she
16  prosecutes the current action against the defendants."

17           And why did we run into Court and seek a
18  preliminary injunction?  Well, this is from paragraph 81 of
19  our complaint.  "If not restrained, Dalia and Sagi will
20  inflict additional harm upon Orly by pledging the Orly trust
21  TRI shares as security for the manufactured deficiency under
22  the note declaring a further default against the Orly trust
23  for nonpayment of the note and conduct conducting a further
24  sham auction of the Orly trust TRI shares", Tom, River, Ivy,
25  TRI.

26           THE COURT:  When you're reading, you're looking

AT

24

1                          Proceedings

2      down.   It's hard for her.  We're familiar with this, she's

3      not.

4               MR. GRIVER:   Right.   "Thereby completely divesting

5      the Orly trust of its remaining principal asset."  That's

6      why they ran into Court, and this is what the Court did

7      after briefing the argument.  And by the way, many of the

8      arguments that are made again today, you know, in some ways,

9      your Honor, this is like litigating against rain man, many

10     of these arguments are the same.  That somehow the Surrogate

11     Court blessed Dalia for life as the trustee, even though all

12     of the acts complained of happened after the decision of the

13     Surrogate Court.  That these are somehow routine business

14     transactions.  That the only recourse is in accounting in

15     Surrogate Court, which would be a surprise to the Surrogate

16     Court who also imposed an injunction.

17              How dare Orly accuse us of fraud.  We've already

18     released each other, and there are certain releases entered

19     into by the defendants together.  All of this is moot.  Your

20     Honor rejected all of that and denied the summary judgment

21     motions.  But at the same time, your Honor --

22              THE COURT:   I thought it was a pre answer motion

23     to dismiss.

24              MR. GRIVER:   It was, which your Honor converted to

25     a summary judgment and invited --

26              THE COURT:   I didn't remember that aspect of it,

                                  AT

25

1                       Proceedings

2      it's been a couple of years.

3           MR. GRIVER:  Right, it has been a couple of years.

4      That was motion sequence number three, I believe.  Motion

5      two, three, et cetera.  Motion sequence number one, which is

6      the preliminary injunction, look at what the Court said in

7      its order.

8           "As to motion sequence number one, due

9      deliberation having been had, and it appearing to this Court

10     that a cause of action exists in favor of the plaintiff and

11     against the defendants, and that the plaintiff is entitled

12     to a preliminary injunction on the ground that the subject

13     of the action is unique.  And that the defendants threatened

14     to do an act in violation of the plaintiff's rights

15     respecting the subject of the action tending to render the

16     judgment ineffectual."

17           That's why the Court issued the injunction.

18     That's why we came to the Court and sought an injunction.

19     Now whether they violated the order I think is crystal

20     clear.  But that can be decided by the Court through

21     sanctions or contempt.  What we are talking about now is

22     prophylactic.  We were in the Court then because per our

23     complaint there is no enforceable note, there is no valid

24     UCC sale, and there is no deficiency.  That's our complaint.

25     All two hundred plus paragraphs of it, which this Court said

26     raised issues.


                              AT

```
                                                                   26
 1                              Proceedings
 2              So we came in then to prevent the defendants from
 3       acting as if there was no complaint and no issues of fact.
 4       And once again we're here seeking the same relief because
 5       they have changed the circumstances.  And the reason why the
 6       Court granted an injunction, and that is to make sure that
 7       any judgment is not ineffectual, has been destroyed by them.
 8              All of the agreements that they talk about are
 9       predicated on the fact that there are no issues of fact,
10       that is this Court's opinion it says as to the complaint
11       never existed.  That's why we need the additional relief
12       because this is what they do, okay, and your Honor I'm going
13       to go through some select versions of the agreements and
14       show you exactly what they are doing, then your Honor can
15       decide if this is a fabulous unprecedentedly wonderful
16       settlement agreement, or if this is actually something that
17       insures that at the end of the day any decision by this
18       Court means nothing, and that whatever else happens Orly
19       gets nothing.  And then you can decide why it is that Dalia
20       is hanging on by her fingertips to being the trustee.
21              Our Exhibit H, your Honor, which is the May, 2012,
22       amended note, okay.  In May 12 of 2012, the Orly trust
23       signed an agreement with this mysterious St. Kitts entity,
24       Mr. Meister last week said he didn't know anything about it,
25       now suddenly he has phone numbers and he knows all about
26       them, or certainly knows a lot more than he professed
```

AT

1                              Proceedings

2        beforehand.

3                MR. MEISTER:   I object, your Honor, because your

4        Honor was here.   I didn't say I didn't know anything about

5        it.

6                MR. GRIVER:   You said, "I don't know and if I did

7        know I wouldn't tell you."   That's in the transcript.   But

8        in any event, your Honor, please the let me continue.   They

9        signed an amended and restated promissory note for

10       $4,240,000.   And the principal is due on that $4 million

11       plus dollars on November 1, 2012, which is two months from

12       now and about six months from the date they signed it, or,

13       and this is the earliest November 1, 2012, or the receipt of

14       the TI proceeds which is then going to the first $4.4

15       million dollars or so will have to be paid, first things

16       first notwithstanding anything to the contrary, to

17       Manhattan.

18               Of course there can also be events of default such

19       as Dalia moving, your Honor asked why can Dalia not remove

20       herself as trustee.   Well, maybe one reason is because it

21       will now accelerate a note.   In any event, your Honor, upon

22       the occurrence of an event of default, the holder may

23       declare the unpaid principal due and owed along with

24       interest, and may proceed to enforce payment."

25               So at the latest by November 1, 2012, $4 million

26       will be due.   And, by the way, Mr. Meister said, well, we

                                   AT

28

Proceedings

haven't been given any notice.  Well, in paragraph five of

that note, the Orly trust waives any notice of any kind

whatsoever at any time in these proceedings.  More

importantly, your Honor, the $4.240 and the other $200K

note, on the note is part of a credit and forbearance

agreement and second amendment and restatement of the

promissory note.

And here, your Honor, is something interesting.

Under the credit agreement, again the Manhattan safety, the

St. Kitts entity which is outside of this Court's

jurisdiction, can collect on all of the assets of the Orly

trust at the earliest of the date that Dalia no longer so

exists trustee of the trust.  So Dalia's removal or her

resignation accelerates a $4 million dollar note, $4.44

million dollar note.

The final resolution of the Pedowitz and Meister

interpleader action, now Mr. Meister in his papers you will

see says:  Oh, well, the interpleader action isn't over yet.

That may be his interpretation.  I think the interpleader

action is resolved, it is over Judge Keenan labeled it a

sham and dismissed it.  In any event, concerning the fact

that in the amended promissory note, another thing that

Dalia Genger did as trustee of the trust purportedly is to

waive all defenses whatsoever.

It really doesn't matter what Dahlia or Mr.

AT

1    Proceedings

2    Meister may think because it's entirely up to Manhattan

3    Safety to determine if there has been a violation, or what

4    the resolution of the interpleader action is because the

5    Orly trust has no defenses.

6         And then finally it has agreed to forbear for

7    additional amounts of money owed kicking up the principal of

8    the notes until November 1, 2014.  "Except notwithstanding

9    the foregoing, Manhattan may take any action reasonably

10   necessary to insure the payment of any amounts payable under

11   the note and commencement of enforcement actions to collect

12   amounts owing under the note or the new note upon the

13   occurrence of", and this your Honor is the hole that you can

14   drive the truck through, "any action by an individual or

15   entity which Manhattan believes may adversely affect the

16   trust's ability to fully perform all of its obligations

17   under this agreement, the note, the Manhattan loan, or the

18   new note."

19        So whatever Manhattan believes may somehow

20   adversely affect the trust's ability to perform allows it to

21   accelerate and allows it to try to collect with no notice

22   whatsoever.  That's why on a prophylactic basis, because if

23   Manhattan does that to the trust, then what happens is all

24   of the TRI shares all the proceeds can be collected, they

25   will have a claim on it.

26        We will have other fights and other litigations

AT

1                                 Proceedings

2       and we will have under the plain language of these

3       agreements that they insist are above board, which I think

4       is hallucinatory, they have no defenses.  This is something

5       that could happen now.  It could happen now simply because

6       Manhattan believes something, or because the interpleader

7       action doesn't exist.

8               So we need, your Honor, protections that will

9       allow this Court to do what it has already ruled Orly's

10      entitled to which is a preliminary injunction that prevents

11      the defendants from acting in a way that would tend to

12      render the judgment ineffectual.

13              So, your Honor, given the situation that the

14      defendants have placed themselves in, we have come up with,

15      and your Honor's welcomed to amend this and add additional

16      protections based on what it believes will help, but at this

17      point, your Honor, we have the order to show cause.  And

18      what we're trying to do here, your Honor, is require them to

19      let us know as soon as possible about any attempt to collect

20      on these new notes and on this credit agreement.  We want

21      Manhattan Safety Company to be provided with copies of this

22      order to show cause and any subsequent order, because these

23      notes, by the way, are freely assignable which means we have

24      problems with our arguments about who is a holder in due

25      course.  Arguments that we cannot raise because the trust

26      has waived all defenses.


                                    AT

31

Proceedings

THE COURT: But the issue becomes how to get
Manhattan Safety in here. Who has that responsibility,
because they are not a party to this action obviously.

MR. GRIVER: Right, they are in St. Kitts. And
your Honor can come to its own conclusions about why they
chose an entity to borrow money from for the space of only
six months before it's due that happens to be outside this
Court's jurisdiction.

However, what we can do is have the money
available. Maybe Mr. Meister will get up here and to my
great shock and happiness will say: Oh, well, the Orly
trust just happens to have $4.5 million sitting around, and
I knew that when I and the trustees, in quotes, trustee
Dalia Genger went ahead and agreed to owe $4.4 million
dollars, $4 million dollars of which, your Honor, is based
on the manufactured deficiency that doesn't really exist.

And at that point that's great. There is money
available. Let's put that money into the Court so it's
available. Let Manhattan Safety know that $4.4 million
dollars is here ready for collection. And you know what if
there is no attempt to collect, well that money will just
sit there like the $10 million in proceeds is sitting in an
escrow account.

And, your Honor, it has to come from Dalia and
Sagi. Why? Because otherwise it will come from some entity

AT

Proceedings

which Orly has a potential interest in.  It will come from

TPR.  It will come from someplace else.  The Orly trust will

sign an agreement with the Trump Group, who the heck knows

where it will come from.  It needs to come from Sagi and

Dalia Genger, the two individuals who control all of these

entities, and the people who have been conspiring against

Orly to do all of these things.  And that's, your Honor, why

we need the additional relief.  It's simply additional

relief.

THE COURT:  Would you agree with Mr. Hoffman that

the Court drew the TRO too broadly to the extent it included

Leah Feng?

MR. GRIVER:  Not the TRO, I believe that the

preliminary injunction can release Ms. Fang, except perhaps

for the notification provision.  If Ms. Fang for some reason

is a tertiary Sagi Genger family member gets to know this

information, there is no reason why she should not be bound

to provide that notice.  But Mr. Hoffman is correct, Ms.

Fang is no longer trustee.  As far as I can tell the only

thing she did as trustee is sign an agreement that

affirmatively harmed Orly and the Orly trust, but thereafter

she resigned.  And we're not suing Leah because she

resigned, we did not sue Dalia because she resigned, we're

suing Leah and Dalia because of what they did while they

controlled the trust.

AT

33

Proceedings

 I've responded to most of the arguments already, your Honor, but the idea that there is some wonderful money or reason or consideration to the Orly trust, the idea that all TPR did was magnanimously gave away $10 million.  In return the Orly trust gave up it's D & K interest and its TPR interest.  That means that D & K, LP, who is a plaintiff here, has no more claims.  It means it has no more right to anything.  What TPR did -- TPR itself has value.  Mr. Dellaportas was here in a previous argument and said that TPR can't be restrained, and there can't be another, there would have to be someone put in charge of TPR other than Sagi, because on its day-to-day business it runs 30 odd properties around the world, it's worth million dollars, all of that went whoosh to TPR, and Orly lost TRI as well.

 What this has done is it has completed exactly the scenario that was set forth in paragraph 81 of our complaint except we did not know about Manhattan Safety Company.  We did not know that TPR, who we named in paragraph 81 would assign its rights over to whatever this company is, and then they would do the enforcement based on the manufactured deficiency.  This, your Honor, is fraud.  Mr. Dellaportas likes to say, well, it's not fraud, it's just carefully tailored, it's a carefully tailored response to try to work around your Honor's injunctions.

 Well, one, I think they failed.  I don't think

AT

34

Proceedings

1
2    that's carefully tailored.  I don't think it's clever.  I
3    think it's transparent.  But beyond that, your Honor, we
4    cite cases in our briefs that say that you're not supposed
5    to try to figure out how to work around, you're supposed to
6    honor both the letter and the spirit and not try to
7    circumvent the injunctions.  And that is what Mr.
8    Dellaportas, and that is what these defendants have admitted
9    to doing.  They looked at your Honor's words and they tried
10   to do their best to figure out a way to accomplish what this
11   Court was trying to avoid which is rendering this judgment
12   ineffectual any way that they can.  Your Honor, it is fraud.
13   The fact that Dalia again is trustee doesn't matter.  The
14   paragraph Mr. Dellaportas cites says except for fraud.  The
15   cases that we cite say except for fraud.  Except for
16   instances where you have some kind of crippling conflict of
17   interest which is exactly what this situation is.
18           The defendants released themselves, dissipated all
19   of the trust, and have completed the scheme that we came in
20   here three years ago to try and prevent.  Your Honor has to
21   increase the injunction to make sure that the $4.44 million
22   dollars is available to pay Manhattan Safety during the
23   pendency of this action so that Orly and D & K, LP, and the
24   Orly trust can have its rights vindicated.
25           The idea that this Court does not need to have any
26   oversight over this the fact the Court does not have to

AT

35
Proceedings

1

2       insure there is no fraud or self dealing is ludicrous based

3       on common sense, and based on the cases that we have cited

4       to you.  Mr. Dellaportas says:  Hey, wait a second, this is

5       the Orly trust is a Delaware trust, it's not a New York

6       trust.  Well, respectfully, your Honor, as a matter of

7       procedure I think that he is wrong.  I still think you'll

8       find the New York partnerships law that even so Mr.

9       Dellaportas should look at Chancery Court Rule 23.1 in the

10      case of Orr v. Ross.  In the Chancery Court 2008 Westlaw

11      7957723 in the Delaware Chancery Court that says that, and

12      I'm sure your Honor it's this way for every state.  In a

13      situation like this one, the Court has to exercise its

14      oversight statutory and before that under common-law to make

15      sure that everything is on the up and up.

16              And for them to come in and say:  Hey, you know

17      what, guess what, we did this a year ago.  And, hey, guess

18      what, we also did some stuff in May, and we did some stuff

19      in March.  All of that stuff is not only is it okay but it

20      gives you a mechanism to get rid of this case and grant

21      summary judgment just on the plain language of these

22      agreements is contrary to law, contrary to common sense,

23      contrary to this Court's preliminary injunction.  I'd love

24      to hear the responses, I think it's always at least

25      educational.

26              THE COURT:  I think your colleague wants to add

AT

36

Proceedings

1   something so they can respond all at once.

2

3          MR. WACHTEL:   My name is William Wachtel.   On

4   September 13 last year we appeared before your Honor, and I

5   said to your Honor, quote, "I truly hope that whoever thinks

6   they are acting on behalf of TPR truly understands that TPR

7   isn't an entity owned solely for the benefit of Sagi

8   Genger."   And your Honor said, "I agree with you on that,

9   there is no doubt about that."

10          For reasons that remain a mystery to this moment,

11   I don't know why these gentlemen, lawyers, secretly engaged

12   in a settlement creating an obligation against the Orly

13   trust and then selling that obligation to St. Kitts.   It is

14   more than a fraud on this Court.

15          Your Honor may remember that the D & K note, which

16   started all of this, is that famous note that even Sagi

17   Genger said it was never intended to be enforced.   In 2005

18   Sagi Genger decided to at least tell the Internal Revenue

19   Service that it was worthless.   Took a $9 million loss on

20   the tax return.   So by 2005 this note, if it was ever

21   enforceable, was worthless.   What they have now done is

22   taken a worthless obligation, used it to foreclose Orly out

23   of her interest in TPR, because they credit bid this

24   worthless note.

25          This is what they walked into that conference room

26   and said:   Okay, we'll credit bid $2.2 million dollars of a

AT

37

Proceedings

2  worthless obligation to take Orly's interest of TPR and

3  extinguish it.  Now this worthless note has somehow been

4  sold to St. Kitts.  But realizing that you can't expect a

5  worthless note to be transferred, they created a new

6  obligation.  Because the D & K trust and the Orly trust,

7  despite what Mr. Meister says about bad math, owes nothing

8  because the note was never intended to be enforced, is

9  worthless.  So they have created a new $4 million dollar

10  obligation, saddled the Orly trust with it, and they have

11  assigned it or sold it.

12          THE COURT:  See that's the part that I still never

13  get past is this notion of a worthiness note that everybody

14  is going to have a secret agreement not to enforce because,

15  you know, we want to be able to satisfy the IRS.  That's the

16  part that just sticks in my cross at the beginning of this

17  case.  But, okay.

18          MR. WACHTEL:  You couldn't be more correct.  And

19  interestingly enough at least in 2005 when they filed

20  amended tax returns they finally say to the Internal Revenue

21  Service it's worthless, it can't be collected.  In order to

22  take that position they have to say it can't be collected.

23          They have now used that worthless note to

24  foreclose out Orly, and they have now sold in essence that

25  worthless note to a St. Kitts organization for a value that

26  they have not disclosed.  And I truly hope the Trumps have

AT

38

Proceedings

1

2       nothing to do with that St. Kitts entity.

3               And then ultimately now they are asking this Court

4       to say to your Honor:  No, we don't need a neutralizing

5       force.  The words you used, your Honor, I don't think could

6       be more apt.  There is nobody watching out over TPR.  Dalia

7       Genger can't do it, Sagi Genger can't to it, none of the

8       Gengers can do it.  And your Honor thought that a new

9       trustee for the Orly trust is certainly an approach.  As Mr.

10      Griver points it out, that's now become its mouse trap.  You

11      will be receiving from us next week under seal --

12              THE COURT:  I won't receive anything from you next

13      week because I won't be in the city.

14              MR. WACHTEL:  But you will understand more fully

15      when we make our submission.

16              THE COURT:  Upon my return perhaps.

17              MR. WACHTEL:  The neutralizing force that's needed

18      is a receiver, someone who can faithfully help the Court

19      understand what happened, faithfully respond to subpoenas,

20      faithfully answer questions.  And when that neutralizing

21      force is in place, maybe then this case could move itself

22      along.  And you never know, it could still resolve itself.

23      And we hope that the Court will at least maintain the status

24      quo long enough so that Orly will have that ultimate day in

25      Court.

26              MR. GRIVER:  Your Honor, that's really why we're

AT

39
Proceedings

1    here so that any judgment will not be --

2    THE COURT:  We're repeating ourselves.  All right,

3    Mr. Meister.

4    MR. MEISTER:  Thank you, your Honor.  I'd like to

5    respond to a couple of points that counsel for Orly had

6    made.  First there was a reference to the whole point of

7    this was to pledge TRI's shares.  The problem with that

8    argument when your Honor studies through the papers, there

9    is no pledge of the TRI shares.  None of these agreements

10   pledged or encumbered or did anything with TRI's shares.

11   Nor with the trust's entitlement vis-a-vis the TRI shares.

12   The only thing that these papers did vis-a-vis the

13   TRI shares was to obtain for the Orly trust whatever

14   entitlement TPR may have claimed to those shares.  Now

15   that's important because the first of the orders that they

16   claimed we violated is the Surrogate's Court order.  I don't

17   know why they are in this Court complaining about the

18   Surrogate's Court order, but that was an order which

19   required the trustee to give notice of any offer to purchase

20   the TRI shares, or any pledge, encumbrance, assignment, or

21   other ways affecting the interest in TRI.  And clearly when

22   your Honor reads the papers, you'll see that had nothing,

23   they had nothing to do with that injunction.  The TRI shares

24   are unaffected by this.

25   Second is the injunction which your Honor entered

AT

40

Proceedings

1

2     on one of the initial motions, and since Mr. Griver goes

3     back to day one, I would remind the Court that your Honor

4     granted part of our motion to dismiss, the part that was

5     duplicative of the Surrogate's Court proceeding they had

6     brought, not the original one, but the new one when they

7     decided to judge shop, because Judge Surrogate Roth had

8     retired and they might get a different bite at the apple

9     with a new judge.  And your Honor properly deferred that to

10    the Surrogate's Court.  So all this issue about whether

11    Dalia is acting properly as trustee, et cetera, is before

12    the Surrogate's Court, it's not before this Court.

13            In candor I have to say I've made three motions to

14    dismiss those proceedings in Surrogate Court on various

15    legal points.  It's three because every time I make the

16    motion they amend, that motion is now pending.  And I've

17    been informed by the Surrogate's Court, as has Orly Ganger's

18    other counsel that it's about to decide that.

19            The second point is the injunction which your

20    Honor issued in June 2010, which as Mr. Dellaportas points

21    out, refers to removing the D & K partnership's interest in

22    the stock of TPR.  It's the TPR stock in the settlement

23    papers, and the notes have nothing to do with the TPR stock.

24            And the third injunction is the injunction which

25    your Honor issued in another case.  Again, I don't know why

26    there is a motion in this case about an injunction to the

AT

41

Proceedings

other case, which enjoined TPR and the Trump Group to give

ten days of business, ten business days' notice for future

transactions that may impact the subject TRI shares.  Again

the settlement doesn't have anything to do with that.

A couple of other points briefly, there is a

reference Mr. Wachtel suddenly brings this up to somehow

this note is worthless.  The trust does not agree the note

was worthless.  If the note was worthless, why was there a

pledge agreement entered into in 1993 pledging shares in

support of the note?  If the note is worthless, why were

millions of dollars of payments made up through 1999 to

reduce the principal and pay the interest of the notes?

I don't know what tax position TPR took, nor do I

much care.  I know Mr. Wachtel is an expert on tax law, but

it doesn't really relate to this note which couldn't have

been worthless because if it was worthless then Harry Genger

would have engaged in tax fraud.  He would have given away

stuff without paying gift tax on it.  And even Orly has

never contended or committed gift tax fraud.  Nor has Orly

ever contended that the note didn't, for instance, the D & K

note didn't obligate it, that is the trust, to pay its

guaranteed portion.  The dispute until now has been whether

that could be enforced against the trust if the trust

doesn't pay it.  We disagree on that.

But there has never been any question that the

AT

42

Proceedings

1
2   note is a note, the guarantee is a guarantee, and the pledge
3   is a pledge.  And all of that flies in the face of counsel
4   suddenly stating that the note was worthless and was never
5   intended to be paid.  Millions of dollars were paid on that
6   note.
7           A couple of other points I should make, it's in my
8   papers, but the Court should be aware that the settlement
9   agreement does not purport to contain any release of Dalia
10  Genger which remains.  Dalia Genger has not moved for
11  summary judgment.  If Orly Genger wants to continue to
12  litigate against Dalia claiming there is this alleged fraud
13  and claiming that she relied on Dalia Genger, when for years
14  she wasn't speaking to Dalia Genger, and when for years she
15  had been suing Dalia Genger, would we would have to continue
16  to litigate that.
17          And finally, your Honor, this reference to St.
18  Kitts.  It's funny because I had another case before Supreme
19  Court which was governed by the law of Curacao.
20          THE COURT:  They make the funny blue stuff.
21          MR. MEISTER:  Apparently it's a very beautiful
22  item.  The justice who did the trial said do we all have to
23  go down there?  Unfortunately we do not.  St. Kitts happens
24  to be the domicile of where Manhattan is organized.  There
25  is no consent to St. Kitts' jurisdiction in any of these
26  papers.  So if there were any attempt to enforce the note,

AT

43
Proceedings

1

2     Manhattan would have to come to where the trust is.   These

3     papers were negotiated here in New York.   They would have to

4     come here.   The papers provide that the governing law is New

5     York law.   So I don't think all the smoke and mirror about

6     St. Kitts makes any difference.

7            And while we're talking about this hypothetical

8     enforcement of which they purport to be concerned, although

9     there is no ripple of it on the horizon, how does one

10    enforce a note?   Well, first of all notes always say there

11    is no defense, the standard note language.   But one enforces

12    a note by suing the maker of the note.   So presumably they

13    can sue the maker here.   That doesn't give them a right to

14    grab TRI shares.   In fact, at the moment it is the

15    contention as to what interest, if any, the trust has in the

16    TRI's shares.

17           We contend the trust has an interest in the other

18    action, Orly is contending that the trust shouldn't have an

19    interest to the action, the interest should go to Harry A.

20    Genger, nor would it have the right to grant the $10.3

21    million dollars which are in my firm's escrow account

22    because that's governed by an escrow agreement which doesn't

23    give anyone any rights until a Court of competent

24    jurisdiction determines who was entitled to what interest on

25    the TRI shares.

26           So like so many other note holders, they'd be

AT

44
Proceedings

1
2   sitting, suing, conceivably getting a judgment.  But at the
3   moment there are no assets to grab.  So this fix that
4   somehow some $4 million dollars is going to be grabbed and
5   sucked away to St. Kitts leaving Dalia, leaving the trust
6   with nothing is nothing more than a fiction.  Even if the
7   trust winds up with only the 10.3 million dollars, it
8   wouldn't be nothing after the note was paid there would
9   still be six million bucks left over.  Which maybe is
10  nothing to Orly's counsel, but it's a very substantial sum
11  of money.
12          In short, your Honor, these transactions that
13  don't violate any of the three Court orders, your Honor's,
14  the Surrogate's Court, or your Honor's in the other case,
15  and there is nothing improper when all of this, and all this
16  smoke and mirrors and claims of tax fraud and receivership
17  and that sort of stuff, is nothing more than that, smoke and
18  mirrors.
19          THE COURT:  Mr. Dellaportas.
20          MR. DELLAPORTAS:  Your Honor, I'll be very brief
21  because I see your Honor is writing out the order, and I
22  think my powers are persuasion are diminishing as the space
23  on the order is shrinking.  So a couple of points very
24  briefly, your Honor.
25          THE COURT:  Mr. Hoffman actually won, that's why I
26  didn't go back to him.

AT

45

Proceedings

1
2          MR. HOFFMAN:   Thank you, your Honor.

3          MR. DELLAPORTAS:   Number one, I just want to point

4     out we were brought here under one pretense that we violated

5     orders, I heard 15 minutes from Mr. Griver, another ten

6     minutes from Mr. Wachtel.  Mr. Griver quoted his own

7     preliminary injunction brief.  Mr. Wachtel quoted his own

8     wise words he gave in oral argument.  I don't think your

9     Honor ordered their submission.

10          I thought we were here today on orders.  We didn't

11     hear any language from the orders.  The only language quoted

12     from the orders in their brief is quoted with interest which

13     changed the meaning of the brief, very creative use of

14     bracketing.  So to the extent we're here today on one

15     pretense, another pretense has been argued and that's that

16     it's a bad deal for the trust, Mr. Meister expressed that.

17          More specifically to the extent there is going to

18     be a continuation, we would ask very strongly, your Honor,

19     that there has to be a bond.  They do request a bond.  They

20     request a bond on the enjoined parties.  That would be, from

21     what we could tell, that would be the first instance in the

22     history of New York jurisprudence where the party being

23     enjoined had to post a bond.

24          The correct, under the New York statute CPLR,

25     what's correct is that the party seeking the Court's relief

26     posts the bond.  It's discretionary under the TPR, it's

AT

46

Proceedings

1   mandatory under the TRI.

2           THE COURT:   It's mandatory for a preliminary

3   injunction, discretionary on a TRO.

4           MR. DELLAPORTAS:   I'm obviously not saying

5   anything the Court does not realize, but here it's very

6   significant because what we gave up are our rights to

7   collect on this $10.3 million dollars.   What we got is this

8   release which apparently is now going to have a third

9   motion.   They made a cross motion for sanctions to try to

10  get released out of this case, then a motion for violating

11  orders, apparently now it's something different.   And

12  apparently there is going to be a third motion for contempt

13  next week for Mr. Griver, and the fourth motion for

14  receivership filing or something, I don't know what

15  nonsense.

16          So we've got apparently four motions out of this.

17  We're being deprived of the benefit of our bargain.   And

18  what we paid was $10.3 million dollars, which if you add up

19  all the things that they say we got out of this and you take

20  them at their word that the note was worthless, this and

21  that, it's worth a lot less than $10.3, the bond has to be

22  $10.3.   They need to post that.   That's what we're

23  jeopardizing by losing our release, that's what we gave up,

24  that was our consideration.   If we can't get that, then

25  we've got all bargain and no benefit, or all whatever.

AT

47
Proceedings

So, your Honor, we think it's very important that
a bond be posted here.  We've seen a series of motions made
on unsworn attorney statements.  We hear another attorney
making statements about alleged confidential proceedings
which would be a violation of the law.  We had all sorts of
irregularities going on here.  We don't have any kind of
evidentiary burden.  The only evidence put forward is your
Honor's prior orders which were misquoted.

So from our standpoint it's very important that if
there be any injunctive relief, it absolutely has to be a
bond, and the bond has to be for $10.3 million dollars.
That's what TPR is giving up.  Mr. Wachtel says who is
looking out for TPR.  Well, it's not them.  They are looking
to destroy TPR because they associate it with Sagi.  I'm
looking out for TPR, your Honor, and I'm looking out for
TPR, and TPR shareholders, none of whom is Orly.

TPR is being destroyed by this litigation.  And we
got something out of this, and that was a release.  And to
the extent it's going to be held up and we're going to have
four or five or six motions challenging this with
duplicative pleadings, we need a bond.  And the
consideration was $10.3 million dollars.  That's our injury
if this all turns out to be a lot of hooey which we believe
it is.  So we would ask the bond be posted in that amount.
Thank you, your Honor.

AT

```
 1                          Proceedings

 2              MR. GRIVER:  Your Honor, five quick points.  One,

 3      your Honor may notice the only person actually quoting the

 4      agreements that they entered into is myself.

 5              THE COURT:  I'm really most interested in just

 6      responding to his request for the bond.

 7              MR. GRIVER:  I'll get there, your Honor.  They

 8      keep--

 9              THE COURT:  Sooner rather than later.

10              MR. GRIVER:  They keep mentioning an injunction,

11      that's the injunction where they were ordered not to use,

12      spend or make demands upon the proceeds, which was the

13      consideration for all of the agreements.  But, your Honor,

14      as to the release, as I said before, this is a continuation

15      of the Judge's granted July 28, 2010 injunction.  At that

16      point you ordered the posting of $150,000 as an undertaking.

17      That is still there.  Your Honor has already ordered the

18      posting of an undertaking.

19              The fact that they have acted so as to require

20      additional relief should not require plaintiff to go ahead

21      and put up more money, which is exactly what they are asking

22      for.  And the basis for Mr. Dellaportas saying we gave up

23      the right to $10 million dollars so she should post a $10

24      million dollar bond.  If we're right about this, your Honor,

25      he gets back $10 million dollars.  He doesn't lose anything.

26      The only thing he loses is a release that this Court will
```

AT

Proceedings

determine is fraudulent.  That's what he'll lose through
this injunction.  The rest of it is purely prophylactic
because of things that they did.  So the Court should not
increase the undertaking it's already entered into.

Your Honor, Mr. Meister's completely wrong about
jurisdiction, about assets, and about the release.
Manhattan Safety is entitled to enforce its rights against
all of its assets, all of its assets can be collected at any
jurisdiction, including Delaware.  And it's not just the
trust itself, but its assets are subject to jurisdiction
anywhere in the world.

And finally the release which Mr. Meister says
does not cover Dalia individually, read paragraph three on
page five of the amended release.  "The parties to the
settlement release one another including all current and
former trustees in their fiduciary or individual
capacities."  So Dalia is released.  Dalia is intentionally
released.  I don't know what Mr. Meister is talking about
there.

And finally, your Honor, before Judge Malones,
Dalia and Sagi took the position that the note was
uncollectible.  Judge Malones ruled in Dalia's favor.  It's
paragraph 51 in exhibit eight of our complaint.  So when Mr.
Meister says how can they possibly say it's uncollectible,
well, my answer is because your client testified to that,

AT

50

Proceedings

1

2    your client put in papers to that fact.  And Sagi and David

3    Parness also testified to that fact.  And you got a Judge to

4    say:  I agree with you.  It's uncollectible.  So on that

5    basis at least it's uncollectible.  And then you can throw

6    in the rest of the stuff about taxes, et cetera.

7            Your Honor, we have taken your time.  I understand

8    you are going on vacation.  I appreciate it.  But please

9    realize that you have to protect Orly during the pendency of

10   this action.  What they have done is created a mechanism to

11   insure that any decision by you is worth exactly the paper

12   it's printed on.

13           THE COURT:  All right.  The motion's adjourned to

14   9/5 at 2:15 for the filing of your reply papers.  I'm

15   assuming you wanted reply papers?

16           SPEAKER:  We would like some, your Honor.

17           THE COURT:  So you have until 9/5 to get those in.

18   No sur-replies.

19           MR. MEISTER:  Is that a date for submission?

20           THE COURT:  Let me read the order.  "The motion is

21   adjourned to 9/5/2012 at 2:15 for the filing of reply

22   papers, no sur-reply."  That's underscored in the original.

23   "No appearance is required on 9/5/2012."  That's the next

24   sentence.  That answers your point.  "The TRO signed

25   8/9/2012 is continued pending further order of this Court,

26   except it is modified to restrain only the "note defendants"

AT

51

1                           Proceedings

2          as originally defined by the movants.  Counsel for Dalia

3          Genger shall serve a copy of the order to show cause and

4          this order upon counsel for Manhattan Safety Company

5          Limited."

6                   MR. MEISTER:  Can you read that again?

7                   THE COURT:  "Shall serve a copy of the order to

8          show cause upon counsel for Manhattan Safety Limited."  I

9          haven't restrained them or anything.  At least this way they

10         can't say they didn't know what was going on, so get it to

11         their counsel.

12                  MR. MEISTER:  Can we get it to them?

13                  THE COURT:  Or the entity itself, sure.  I thought

14         you said earlier on the record you knew you had spoken to

15         counsel.

16                  MR. MEISTER:  I had spoken to the President, your

17         Honor, at the time of the transaction.

18                  THE COURT:  Or an officer of such said entity.

19         Okay, that's fine.

20                  "It is further ordered that the notice provision

21         is continued and may be made via email or written letter,

22         all right.  And I need you to file the transcript from 8/8

23         and 8/15, all right.

24                  SPEAKER:  We received it today.

25                        *       *       *
           CERTIFIED TO BE A TRUE AND CORRECT
26         TRANSCRIPT OF THE FOREGOING PROCEEDINGS.
           ANGELA TOLAS, OFFICIAL COURT REPORTER

                                            AT

**$**

$10 [5] 31/23 33/5 48/23 48/23 48/25
$10.3 [13] 7/24 15/25 16/2 18/11 19/19
19/22 43/20 46/8 46/19 46/22 46/23
47/12 47/23
$100,000 [3] 7/13 8/17 9/4
$150 [1] 8/3
$150,000 [1] 48/16
$2.2 [1] 36/26
$200,000 [3] 8/22 8/23 9/3
$200K [1] 28/5
$4 [7] 8/15 27/10 27/25 28/15 31/16
37/9 44/4
$4,240,000 [1] 27/10
$4.240 [1] 28/5
$4.4 [3] 27/14 31/15 31/20
$4.44 [2] 28/15 34/21
$4.5 [1] 31/13
$9 [1] 36/19

**-**

-----------------------------------X [2]
1/3 1/10
-against [1] 1/7

**0**

09 [1] 1/7

**1**

10.3 [1] 44/7
10007 [1] 1/11
10016 [1] 2/11
10022 [2] 1/18 1/25
10036 [1] 1/22
10170 [1] 2/8
10603 [1] 2/5
109749/09 [1] 1/7
10:00 [1] 3/2
12 [2] 1/2 26/22
13 [1] 36/4
15 [3] 1/12 45/5 51/23
1540 [1] 1/21
17 [1] 23/10
18 [1] 17/7
1993 [2] 1/4 41/10
1999 [1] 41/12

**2**

20-page [1] 15/12
2005 [3] 36/17 36/20 37/19
2008 [1] 35/10
2009 [2] 23/11 23/12
2010 [4] 17/10 22/25 40/20 48/15
2012 [9] 1/12 26/21 26/22 27/11 27/13
27/25 50/21 50/23 50/25
2014 [1] 29/8
216 [1] 2/5
23.1 [1] 35/9
24 [3] 11/15 11/16 12/2
24-hour [1] 12/4
25 [1] 12/3
26 [1] 9/17
260 [1] 2/11
27th [1] 21/21
28 [3] 17/10 22/25 48/15
2:15 [2] 50/14 50/21

**3**

30 [1] 33/13
399 [1] 2/5

**4**

420 [1] 2/8

48 [3] 7/4 17/13 17/18

**5**

51 [1] 49/24
570 [1] 1/25
575 [1] 1/17

**6**

60 [1] 1/10
6201 [2] 10/6 10/8

**7**

7957723 [1] 35/11

**8**

8/15 [1] 51/23
8/8 [1] 51/22
8/9/2012 [1] 50/25
81 [3] 23/18 33/17 33/19
8th [1] 1/25

**9**

9/5 [2] 50/14 50/17
9/5/2012 [2] 50/21 50/23

**A**

ability [2] 29/16 29/20
able [1] 37/15
about [34] 3/2 12/12 12/16 13/22 17/17
19/2 19/25 22/11 22/20 25/21 26/8
26/24 26/25 27/4 27/12 30/19 30/24
31/6 33/18 36/9 37/7 39/18 40/10 40/18
40/26 43/5 43/7 47/5 48/24 49/6 49/7
49/7 49/19 50/6
above [1] 30/3
absolute [1] 19/4
absolutely [2] 18/23 47/11
accelerate [2] 27/21 29/21
accelerates [1] 28/15
accomplish [1] 34/10
account [2] 31/24 43/21
accounting [1] 24/14
accuse [1] 24/17
accused [1] 17/6
act [1] 25/14
acted [1] 48/19
acting [4] 26/3 30/11 36/6 40/11
action [27] 3/9 3/17 5/18 8/12 9/6 9/7
9/8 9/9 9/21 20/8 22/7 23/16 25/10
25/13 25/15 28/18 28/19 28/21 29/4
29/9 29/14 30/7 31/4 34/23 43/18 43/19
50/10
actions [2] 5/18 29/11
acts [1] 24/12
actually [6] 3/8 8/24 19/10 26/16 44/25
48/3
add [5] 8/26 21/9 30/15 35/26 46/19
addition [1] 8/16
additional [8] 8/23 23/20 26/11 29/7
30/15 32/9 32/9 48/20
adjourned [2] 50/13 50/21
admitted [1] 34/8
adversely [2] 29/15 29/20
advice [1] 17/5
affect [2] 29/15 29/20
affecting [1] 39/22
affidavit [1] 10/18
affirmative [1] 9/8
affirmatively [1] 32/22
after [5] 8/14 22/19 24/7 24/12 44/8
again [7] 24/8 26/4 28/10 34/13 40/25
41/4 51/6
against [18] 1/7 9/9 13/17 13/23 13/25
14/10 14/13 14/24 18/7 23/16 23/22

24/9 25/11 32/7 36/12 41/24 42/12 49/8
aggravation [1] 4/13
ago [3] 15/2 34/20 35/17
agree [4] 32/11 36/8 41/8 50/4
agreed [3] 8/22 29/6 31/15
agreement [21] 7/12 7/17 7/18 8/21
9/18 18/2 18/6 18/17 18/21 26/16 26/23
28/7 28/10 29/17 30/20 32/4 32/21
37/14 41/10 42/9 43/22
agreements [13] 7/16 13/21 13/22 18/9
18/10 22/19 26/8 26/13 30/3 35/22
39/10 48/4 48/13
ahead [3] 23/3 31/15 48/20
ALAN [2] 2/12 20/19
all [66]
allegation [1] 17/4
allegations [4] 5/23 5/24 13/2 13/22
alleged [6] 6/15 14/10 15/7 18/14 42/12
47/5
allow [1] 30/9
allowed [1] 11/23
allows [2] 29/20 29/21
almost [1] 15/2
along [2] 27/23 38/22
already [6] 22/23 24/17 30/9 33/2 48/17
49/5
also [12] 2/15 3/2 3/9 5/2 8/8 10/11
10/13 20/21 24/16 27/18 35/18 50/3
although [5] 3/19 8/9 10/10 11/15 43/8
always [4] 22/15 22/17 35/24 43/10
am [1] 14/22
amend [2] 30/15 40/16
amended [8] 7/16 17/17 13/2 26/22 27/9
28/23 37/20 49/15
amendment [1] 28/7
among [2] 7/26 11/7
amount [2] 12/12 47/25
amounts [3] 29/7 29/10 29/12
ANGELA [2] 2/16 51/26
another [9] 5/9 28/23 33/11 40/25 42/18
45/5 45/15 47/4 49/16
answer [4] 20/15 24/22 38/20 49/26
answers [1] 50/24
ante [3] 6/26 6/26 7/2
any [59]
anybody [1] 20/18
anyone [1] 43/23
anything [28] 2/20 6/20 8/11 9/20 14/4
14/5 14/8 14/8 14/10 14/11 14/25 14/26
14/26 15/7 17/7 19/5 20/18 21/4 26/24
27/4 27/16 33/9 38/12 39/11 41/5 46/6
48/25 51/9
anyway [3] 13/15 13/17 13/19
anywhere [1] 49/12
apologize [1] 17/16
apparently [5] 42/21 46/9 46/12 46/13
46/17
appeal [2] 4/21 6/22
appearance [1] 50/23
appearances [2] 2/3 2/15
appeared [1] 36/4
appearing [1] 25/9
apple [1] 40/8
application [1] 10/4
appoint [1] 6/3
appointed [1] 18/19
appreciate [3] 14/22 15/12 50/8
approach [1] 38/9
appropriate [1] 4/24
apt [1] 38/6
ARDEN [2] 2/14 21/8
are [49] 3/12 3/17 3/17 5/12 7/26 8/7
10/21 11/23 14/8 15/17 15/17 15/26

**A**

are... [37] 16/18 18/3 20/9 20/26 21/7
21/10 21/11 22/12 22/26 23/6 23/6 23/9
24/8 24/10 24/13 24/18 25/21 26/8 26/9
26/14 30/3 30/23 31/4 31/5 36/6 38/3
39/18 39/25 43/21 44/3 44/22 44/22
46/7 47/14 48/21 49/11 50/8
areas [1] 21/25
aren't [2] 20/9 21/16
argued [1] 45/15
argument [5] 6/13 24/7 33/10 39/9 45/8
arguments [8] 3/12 20/23 20/26 24/8
24/10 30/24 30/25 33/2
Aria [1] 9/9
Aria's [1] 9/10
around [4] 31/13 33/14 33/25 34/5
ARPS [3] 2/13 21/9 22/2
as [60]
aside [1] 13/19
ask [2] 45/18 47/25
asked [3] 4/23 13/25 27/19
asking [5] 4/25 14/24 23/13 38/3 48/21
aspect [1] 24/26
asserted [2] 3/17 4/11
asset [1] 24/5
assets [8] 9/14 11/8 28/12 44/3 49/7
49/9 49/9 49/11
assign [1] 33/20
assignable [1] 30/23
assigned [1] 37/11
assignment [1] 39/21
associate [1] 47/15
ASSOCIATES [1] 1/8
assume [2] 4/20 15/24
assuming [4] 4/17 6/7 11/26 50/15
attachment [1] 10/7
attempt [6] 10/6 11/12 11/13 30/19
31/22 42/26
attorney [2] 47/4 47/4
Attorneys [8] 1/17 1/21 1/24 2/4 2/7
2/10 2/13 2/15
attrition [1] 20/4
auction [1] 23/24
August [3] 1/12 23/10 23/12
authority [1] 9/16
available [4] 31/11 31/19 31/20 34/22
Avenue [4] 1/17 1/25 2/8 2/11
avoid [2] 10/6 34/11
aware [1] 42/8
away [5] 15/26 19/22 33/5 41/18 44/5

**B**

back [5] 22/4 23/2 40/3 44/26 48/25
bad [2] 37/7 45/16
bank [1] 9/3
Bar [1] 21/20
bargain [2] 46/18 46/26
BARTON [1] 2/7
based [5] 30/16 31/16 33/21 35/2 35/3
basically [2] 3/24 15/21
basis [5] 10/10 12/17 29/22 48/22 50/5
be [77]
beautiful [3] 21/24 21/24 42/21
because [49] 3/7 3/8 8/10 10/21 11/15
12/3 13/25 14/25 17/5 18/7 18/11 19/17
22/23 23/5 23/5 25/22 26/4 26/12 27/3
27/20 29/2 29/4 29/22 30/5 30/6 30/22
30/25 31/4 31/26 32/23 32/24 32/25
33/13 36/23 37/6 37/8 37/14 38/13
39/16 40/7 40/15 41/17 42/18 43/22
44/21 46/7 47/15 49/4 49/26
become [1] 38/10

becomes [1] 31/2
been [25] 2/20 4/2 4/22 5/2 6/19 9/12
12/19 15/15 17/6 19/2 19/9 25/2 25/3
25/9 26/7 28/2 29/3 32/7 37/3 40/17
41/17 41/23 41/26 42/15 45/15
before [13] 9/2 9/7 15/16 20/17 22/14
31/8 35/14 36/4 40/11 40/12 42/18
48/14 49/21
beforehand [1] 27/2
beginning [1] 37/16
behalf [9] 1/4 1/4 9/16 16/8 16/9 16/13
16/17 20/24 36/6
being [5] 8/15 26/20 45/22 46/18 47/18
believe [3] 25/4 32/14 47/24
believed [1] 8/2
believes [4] 29/15 29/19 30/6 30/16
belong [1] 3/18
beneficial [1] 7/9
benefit [9] 6/20 7/20 7/22 7/24 7/25
9/10 36/7 46/18 46/26
benefits [1] 7/19
best [1] 34/10
better [1] 21/17
between [2] 6/16 6/18
beyond [1] 34/3
bid [2] 36/23 36/26
biggest [1] 7/20
billed [1] 9/12
bills [1] 18/13
bite [1] 40/8
blessed [1] 24/11
Bloomington [1] 21/11
blue [1] 42/20
board [1] 30/3
boil [1] 15/13
bond [13] 45/19 45/19 45/20 45/23
45/26 46/22 47/3 47/12 47/12 47/22
47/25 48/6 48/24
borrow [1] 31/7
both [3] 1/4 5/16 34/6
bound [1] 32/18
bracketing [1] 45/14
BRANCH [1] 1/2
breach [1] 9/11
brief [5] 15/12 44/20 45/7 45/12 45/13
briefing [1] 24/7
briefly [2] 41/6 44/24
briefs [2] 19/9 34/4
bring [1] 20/7
bringing [2] 16/5 22/12
brings [1] 41/7
broad [1] 11/9
broadly [1] 32/12
Broadway [1] 1/21
brother [3] 4/7 4/7 5/10
brought [6] 9/9 16/6 16/8 20/2 40/6 45/4
BRYAN [1] 1/19
bucks [1] 44/9
bunch [1] 12/19
burden [1] 47/8
business [9] 11/11 11/14 11/24 16/17
16/18 24/13 33/13 41/3 41/3

**C**

C.B [1] 2/6
call [1] 12/25
called [2] 7/17 8/20
calls [1] 13/4
came [5] 4/21 23/3 25/18 26/2 34/19
can [41] 5/6 5/7 5/19 8/11 10/7 11/18
11/19 12/3 15/13 15/26 16/7 17/19
18/15 20/7 20/8 21/18 21/21 22/16
25/20 26/14 26/19 27/18 27/19 28/12

29/13 29/24 31/6 31/10 32/15 32/20
34/12 34/24 36/2 38/8 38/18 43/13 49/9
49/25 50/5 51/6 51/12
can't [11] 10/9 16/20 33/11 33/11 37/4
37/21 37/22 38/7 38/7 46/25 51/10
canceling [1] 7/15
candor [1] 40/13
cannot [1] 30/25
capacities [2] 21/20 49/18
capacity [2] 1/3 1/4
care [2] 18/8 41/15
carefully [4] 18/4 33/23 33/24 34/2
case [14] 12/15 15/25 23/8 23/9 35/10
35/20 37/17 38/21 40/25 40/26 41/2
42/18 44/14 46/11
cases [6] 8/6 9/23 10/14 34/4 34/15
35/3
cash [2] 8/17 19/23
cause [10] 9/19 11/4 11/15 20/8 23/3
25/10 30/17 30/22 51/3 51/8
celebrate [1] 12/10
Centre [1] 1/10
certain [1] 24/18
certainly [5] 6/6 12/11 19/4 26/26 38/9
CERTIFIED [1] 51/25
cetera [3] 25/5 40/11 50/6
challenge [1] 3/26
challenging [1] 47/21
chance [4] 3/24 4/2 13/10 15/13
Chancery [3] 35/9 35/10 35/11
changed [3] 17/8 26/5 45/13
chapter [1] 10/2
charge [1] 33/12
Chase [1] 6/10
children [1] 5/20
Chodesh [1] 11/26
chose [1] 31/7
circumstances [1] 26/5
circumvent [1] 34/7
cite [3] 10/14 34/4 34/15
cited [2] 8/6 35/3
cites [1] 34/14
city [1] 38/13
CIVIL [1] 1/2
claim [2] 16/13 29/25
claimed [2] 39/15 39/17
claiming [2] 42/12 42/13
claims [11] 3/17 3/18 16/5 16/6 16/8
18/22 20/7 20/9 20/9 33/8 44/16
clarify [1] 19/8
clear [4] 16/12 16/25 18/23 25/20
clearly [2] 13/5 39/22
clever [1] 34/2
client [2] 49/26 50/2
clients [1] 20/21
closed [1] 12/8
codified [1] 8/15
colleague [2] 17/15 35/26
colleagues [1] 8/2
collect [7] 11/13 28/12 29/11 29/21
30/19 31/22 46/8
collected [4] 29/24 37/21 37/22 49/9
collection [1] 31/21
come [15] 10/9 11/21 15/16 22/19
30/14 31/6 31/25 31/26 32/2 32/3 32/5
32/5 35/16 43/2 43/4
comes [2] 11/22 23/2
coming [2] 13/6 13/7
commencement [1] 29/11
commissions [1] 5/15
committed [1] 41/20
common [4] 17/14 35/3 35/14 35/22
common-law [1] 35/14

# C

communicate [1]  13/5
companion [1]  9/7
company [5]  8/20 30/21 33/18 33/20
  51/4
compel [1]  10/11
compensated [1]  6/9
competent [1]  43/23
complain [1]  22/20
complained [1]  24/12
complaining [2]  7/2 39/18
complains [1]  7/16
complaint [9]  7/16 13/3 23/19 25/23
  25/24 26/3 26/10 33/17 49/24
complete [1]  6/3
completed [3]  33/16 34/19
completely [3]  19/13 24/4 49/6
comporting [1]  19/13
conceivably [1]  44/2
concern [1]  14/16
concerned [2]  6/21 43/8
concerning [1]  28/22
conclusions [1]  31/6
conduct [1]  23/23
conducting [1]  23/23
conference [2]  21/24 36/25
confidential [1]  47/5
confirm [2]  10/21 10/22
confirmed [1]  3/21
conflict [1]  34/16
confronted [1]  15/15
consent [1]  42/25
consented [1]  9/25
consider [1]  19/16
consideration [8]  8/13 8/16 19/17 19/22
  33/4 46/25 47/23 48/13
conspiracy [3]  4/11 6/16 6/18
conspiring [2]  15/18 32/7
consult [2]  16/20 16/21
contain [1]  42/9
contempt [4]  22/12 23/4 25/21 46/13
contend [1]  43/17
contended [2]  41/20 41/21
contending [1]  43/18
contention [1]  43/15
context [1]  7/10
continuation [2]  45/18 48/14
continue [4]  4/4 27/8 42/11 42/15
continued [4]  2/2 2/3 50/25 51/21
continuing [2]  4/12 23/8
contract [1]  9/11
contrary [5]  10/14 27/16 35/22 35/22
  35/23
control [1]  32/6
controlled [1]  32/26
converted [1]  24/24
copies [2]  2/23 30/21
copy [5]  2/24 2/25 3/3 51/3 51/7
correct [6]  14/6 32/19 37/18 45/24
  45/25 51/25
costly [1]  5/18
could [11]  8/18 11/16 16/6 16/7 30/5
  30/5 38/5 38/21 38/22 41/24 45/21
couldn't [3]  11/24 37/18 41/16
counsel [16]  11/14 12/22 12/24 13/6
  13/7 17/6 21/3 39/6 40/18 42/3 44/10
  51/2 51/4 51/8 51/11 51/15
COUNTY [1]  1/2
couple [7]  15/17 25/2 25/3 39/6 41/6
  42/7 44/23
course [3]  8/6 27/18 30/25
court [83]

Court's [10]  9/20 9/21 14/16 14/20
  14/21 26/10 28/11 31/9 35/23 45/25
courtesy [1]  2/23
courts [4]  8/6 8/7 16/20 16/21
cover [2]  8/25 49/14
CPLR [2]  10/6 45/24
created [3]  37/5 37/9 50/10
creating [1]  36/12
creative [1]  45/13
credit [5]  28/6 28/10 30/20 36/23 36/26
crediting [1]  5/25
crippling [1]  34/16
cross [2]  37/16 46/10
crosses [1]  4/26
cry [1]  16/20
crystal [1]  25/19
CSR [1]  2/16
Curacao [1]  42/19
current [2]  23/16 49/16
cutting [1]  7/14

# D

Dahlia [2]  6/23 28/26
DALIA [51]  1/8 2/7 2/26 3/13 3/15 3/18
  3/20 5/15 5/21 6/16 6/18 6/18 6/19 9/5
  9/5 9/6 9/12 9/12 9/13 9/14 9/15 10/11
  11/10 20/22 23/19 24/11 26/19 27/19
  27/19 28/13 28/24 31/15 31/25 32/6
  32/24 32/25 34/13 38/6 40/11 42/9
  42/10 42/12 42/13 42/14 42/15 44/5
  49/14 49/18 49/18 49/22 51/2
Dalia's [3]  13/18 28/14 49/23
damages [1]  9/10
dare [1]  24/17
date [4]  22/10 27/12 28/13 50/19
daughter [5]  4/5 5/4 5/5 5/7 5/21
daughter's [1]  4/4
David [1]  50/2
Davis [1]  13/8
day [9]  11/18 12/9 12/10 18/25 26/17
  33/13 33/13 38/24 40/3
day-to-day [1]  33/13
days [4]  11/14 11/24 12/9 41/3
days' [2]  11/11 41/3
deal [3]  15/21 19/18 45/16
dealing [2]  11/21 35/2
dealings [2]  6/15 6/16
debate [1]  12/7
debt [1]  8/15
decide [4]  6/12 26/15 26/19 40/18
decided [3]  25/20 36/18 40/7
decision [7]  3/25 6/23 7/7 18/18 24/12
  26/17 50/11
declare [1]  27/23
declaring [1]  23/22
deed [1]  5/26
deeply [1]  12/12
default [6]  10/21 11/2 11/13 23/22
  27/18 27/22
defendant [2]  13/14 20/20
defendants [15]  1/9 13/26 14/2 14/14
  22/18 23/16 24/19 25/11 25/13 26/2
  30/11 30/14 34/8 34/18 50/26
defense [6]  9/6 9/7 19/4 19/6 23/6
  43/11
defenses [4]  28/25 29/5 30/4 30/26
deferred [1]  40/9
deficiency [4]  23/21 25/24 31/17 33/22
defined [4]  14/2 14/13 17/12 51/2
Delaware [6]  7/6 7/23 35/5 35/11 49/10
deliberation [1]  25/9
DELLAPORTAS [14]  1/23 2/22 13/10
  15/9 15/11 33/10 33/22 34/8 34/14 35/4

35/9 40/20 44/19 48/22
Dellaportas' [1]  10/2
demand [1]  10/20
demands [2]  10/26 48/12
demonstrating [1]  5/21
denied [3]  10/4 10/17 24/20
department [1]  5/3
deprive [1]  15/18
deprived [1]  46/18
derivative [5]  16/8 16/12 16/24 18/24
  20/9
DESMOND [2]  2/6 20/24
despite [1]  37/7
destroy [1]  47/15
destroyed [2]  26/7 47/18
determine [2]  29/3 49/2
determined [2]  22/17 23/10
determines [1]  43/24
diagram [2]  17/16 17/24
did [26]  2/15 6/12 6/13 6/22 9/2 9/19
  13/17 14/18 23/17 24/6 27/6 28/24
  32/21 32/24 32/25 33/5 33/9 33/18
  33/19 35/17 35/18 35/18 39/11 39/13
  42/22 49/4
didn't [21]  9/5 10/17 13/18 13/20 13/21
  14/10 14/25 14/7 14/8 14/10 14/11 14/15
  14/25 14/25 15/20 15/20 16/4 16/6
  19/15 19/21 21/5 21/23 25/14 26/12
  30/9 30/18 31/10 32/8 33/21 34/10 38/2
  38/7 38/8 39/24 40/23 41/5 41/14 42/22
  42/23 45/19
difference [1]  43/6
different [5]  12/23 12/24 21/26 40/8
  46/12
diming [1]  12/12
diminishing [1]  44/22
disadvantage [1]  5/6
disagree [1]  41/25
disclosed [1]  37/26
discovering [1]  6/15
discretionary [2]  45/26 46/4
discussed [1]  4/17
disentangle [3]  19/24 19/26 20/3
dismiss [3]  24/23 40/4 40/14
dismissed [1]  28/22
disposing [1]  17/12
dispute [2]  16/25 41/23
dissipated [1]  34/18
diversion [1]  9/14
divesting [1]  24/4
divorce [1]  12/19
DNK [5]  16/9 16/23 17/13 17/18 17/25
do [41]  4/15 5/6 6/9 6/10 6/11 11/10
  13/20 14/5 14/7 14/8 14/10 14/11 14/15
  14/25 14/25 15/20 15/20 16/4 16/6
  19/15 19/21 21/5 21/23 25/14 26/12
  30/9 30/18 31/10 32/8 33/21 34/10 38/2
  38/7 38/8 39/24 40/23 41/5 41/14 42/22
  42/23 45/19
document [1]  18/25
does [11]  16/16 20/11 21/3 29/23 34/25
  34/26 41/8 42/9 43/9 46/6 49/14
doesn't [22]  3/20 4/5 4/12 5/22 8/10
  13/15 14/5 14/25 18/2 18/9 18/15 20/5
  28/26 30/7 31/17 34/13 41/5 41/16
  41/25 43/13 43/22 48/25
doing [6]  14/4 14/26 16/18 22/26 26/14
  34/9
dollar [4]  28/15 28/16 37/9 48/24
dollars [28]  7/3 7/24 10/12 15/18 15/23
  15/25 16/21 18/11 19/19 27/11 27/15
  31/16 31/16 31/21 33/14 34/22 36/26
  41/12 47/12 47/23 48/23 48/25
domicile [1]  42/24
don't [33]  3/12 4/3 4/23 10/8 11/24 12/5

## D

don't... [27] 12/11 14/9 16/18 16/19
  18/7 18/8 18/23 20/3 20/3 20/5 20/20
  21/25 27/6 33/26 34/2 36/11 38/4 38/5
  39/17 40/25 41/14 43/5 44/13 45/8
  46/15 47/7 49/19
done [8] 14/8 15/7 17/5 19/12 23/6
  33/16 36/21 50/10
doubt [1] 36/9
down [5] 7/7 13/9 15/13 24/2 42/23
draw [1] 17/16
draws [1] 5/15
drew [1] 32/12
drive [1] 29/14
DUANE [1] 1/20
due [9] 13/24 14/7 20/2 25/8 27/10
  27/23 27/26 30/24 31/8
duplicative [2] 40/5 47/22
during [2] 34/22 50/9

## E

e-filed [1] 2/26
each [2] 12/8 24/18
earlier [1] 51/14
earliest [2] 27/13 28/13
echo [1] 20/25
economic [2] 7/9 7/22
educational [1] 35/25
effect [2] 7/15 8/4
effects [1] 7/15
eight [2] 22/19 49/24
either [2] 9/20 11/12
electric [4] 16/16 16/16 16/17 16/19
ELLMAN [1] 1/16
else [6] 16/13 16/14 20/18 20/22 26/18
  32/3
email [3] 11/18 11/19 51/21
emails [1] 11/23
emergency [3] 10/10 10/10 11/3
encumbered [1] 39/11
encumbrance [1] 39/21
end [1] 26/17
enforce [5] 27/24 37/14 42/26 43/10
  49/8
enforceable [2] 25/23 36/21
enforced [3] 36/17 37/8 41/24
enforcement [3] 29/11 33/21 43/8
enforces [1] 43/11
engaged [2] 36/11 41/18
enjoin [1] 14/7
enjoined [4] 13/24 41/2 45/20 45/23
enjoins [1] 11/7
enough [3] 2/25 37/19 38/24
entered [6] 18/17 24/18 39/26 41/10
  48/4 49/5
entering [1] 22/19
enthralled [1] 5/5
entirely [1] 29/2
entities [1] 32/7
entitled [5] 16/3 25/11 30/10 43/24 49/8
entitlement [2] 39/12 39/15
entity [9] 26/23 28/11 29/15 31/7 31/26
  36/7 38/2 51/13 51/18
escorted [2] 21/25 21/25
escrow [4] 7/25 31/24 43/21 43/22
ESQ [11] 1/18 1/19 1/19 1/22 1/23 1/26
  1/26 2/6 2/9 2/12 2/14
essence [2] 3/25 37/24
essentially [2] 15/15 17/17
et [3] 25/5 40/11 50/6
EVANGELOS [1] 1/22
even [9] 9/17 11/8 14/12 22/12 24/11

35/8 36/16 41/19 44/6
event [7] 5/25 6/11 10/21 27/8 27/21
  27/22 28/22
events [1] 27/18
ever [3] 12/19 36/20 41/21
every [3] 15/4 35/12 40/15
everybody [1] 37/13
everyone [3] 16/7 16/16 20/22
everything [2] 5/6 35/15
everywhere [1] 21/22
evidence [3] 5/25 6/19 47/8
evidentiary [1] 47/8
ex [1] 5/5
ex-husband [1] 5/5
exactly [5] 26/14 33/16 34/17 48/21
  50/11
except [7] 29/8 32/15 33/18 34/14
  34/15 34/15 50/26
exchange [1] 19/18
exercise [1] 35/13
exhibit [2] 26/21 49/24
exist [2] 30/7 31/17
existed [1] 26/11
existing [1] 8/24
exists [2] 25/10 28/14
expect [1] 37/4
experience [1] 21/19
expert [1] 41/15
explain [1] 22/25
explicit [1] 9/17
express [1] 3/22
expressed [1] 45/16
expression [1] 13/14
expressly [1] 6/13
extending [1] 12/17
extensively [1] 7/11
extent [4] 32/12 45/14 45/17 47/20
extinguish [1] 37/3
extra [1] 2/24

## F

fabulous [1] 26/15
face [2] 22/20 42/3
fact [13] 3/20 6/21 16/26 26/3 26/9 26/9
  28/22 34/13 34/26 43/14 48/19 50/2
  50/3
failed [1] 33/26
faithfully [3] 38/18 38/19 38/20
familiar [2] 3/11 24/2
family [2] 6/3 32/17
famous [1] 36/16
FANG [6] 1/8 2/4 13/11 32/15 32/16
  32/20
far [6] 6/19 9/3 13/21 17/4 18/12 32/20
father [3] 4/8 4/9 5/11
favor [2] 25/10 49/23
favored [1] 8/7
fees [7] 5/16 8/18 9/5 9/6 9/9 9/11 11/9
FEINMAN [1] 1/14
Feng [4] 13/17 13/19 14/24 32/13
fiction [1] 44/6
fiduciary [1] 49/17
fight [4] 4/6 4/7 4/8 4/8
fights [1] 29/26
figure [3] 8/2 34/5 34/10
figured [1] 15/20
file [1] 51/22
filed [5] 2/20 2/23 2/26 3/5 37/19
filing [3] 46/15 50/14 50/21
final [1] 28/17
finally [5] 29/6 37/20 42/17 49/13 49/21
find [2] 19/26 35/8

fine [1] 51/19
fingertips [1] 26/20
firm [3] 5/17 13/7 14/12
firm's [1] 43/21
first [14] 3/12 4/20 4/22 7/6 11/20 18/25
  23/12 27/14 27/15 27/16 39/7 39/16
  43/10 45/21
fit [1] 10/7
five [5] 15/3 28/2 47/21 48/2 49/15
fix [1] 44/3
flies [1] 42/3
Floor [2] 1/25 21/21
floors [1] 21/26
forbear [1] 29/6
forbearance [1] 28/6
force [4] 6/5 38/5 38/17 38/21
foreclose [2] 36/22 37/24
foregoing [2] 29/9 51/26
former [1] 49/17
forth [4] 16/3 16/9 20/26 33/17
forward [1] 47/8
four [5] 7/3 10/12 15/2 46/17 47/21
four-and-a-half [2] 7/3 10/12
fourth [1] 46/14
frankly [2] 17/7 18/11
fraud [12] 24/17 33/22 33/23 34/12
  34/14 34/15 35/2 36/14 41/18 41/20
  42/12 44/16
fraudulent [1] 49/2
freely [1] 30/23
freeze [1] 14/16
front [1] 15/5
full [1] 9/11
fully [2] 29/16 38/14
funny [2] 42/18 42/20
further [5] 19/14 23/22 23/23 50/25
  51/20
future [2] 22/10 41/3

## G

Ganger's [1] 40/17
gave [9] 8/17 18/11 23/10 33/5 33/6
  45/8 46/7 46/24 48/22
general [4] 16/15 16/16 16/17 16/18
GENGER [47] 1/3 1/4 1/8 1/8 1/17 2/7
  2/10 2/26 3/4 3/15 3/18 3/19 3/20 5/15
  5/21 5/5 9/5 9/12 9/13 9/14 9/15 10/11
  10/11 11/10 20/20 20/22 22/7 22/8 22/8
  28/24 31/15 32/6 32/17 36/8 36/17
  36/18 38/7 38/7 41/17 42/10 42/10
  42/11 42/13 42/14 42/15 43/20 51/3
Genger's [3] 9/6 9/13 12/14
Gengers [2] 12/25 38/8
gentlemen [1] 36/11
get [19] 4/18 6/9 9/5 13/10 17/3 19/21
  19/23 20/14 31/2 31/11 35/20 37/13
  40/8 46/11 46/25 48/7 50/17 51/10
  51/12
gets [5] 15/25 17/3 26/19 32/17 48/25
getting [2] 22/4 44/2
gift [2] 41/19 41/20
give [6] 11/11 11/14 39/20 41/2 43/13
  43/23
given [5] 3/24 4/2 28/2 30/13 41/18
gives [1] 35/20
giving [2] 19/18 47/13
glad [1] 21/15
go [10] 3/12 16/20 20/4 20/20 23/3
  26/13 42/23 43/19 44/26 48/20
goes [2] 6/4 40/2
going [19] 6/9 12/2 12/3 12/16 13/6
  13/6 14/8 26/12 27/14 37/14 44/4 45/17
  46/9 46/13 47/7 47/20 47/20 50/8 51/10

**G**

gone [1] 9/4
good [3] 5/26 13/11 19/21
got [10] 18/11 18/13 19/18 19/20 46/8
46/17 46/20 46/26 47/19 50/3
governed [3] 15/6 42/19 43/22
governing [1] 43/4
GP [5] 1/8 1/24 17/22 20/24 20/25
grab [2] 43/14 44/3
grabbed [1] 44/4
grant [2] 35/20 43/20
granted [4] 22/24 26/6 40/4 48/15
great [3] 5/20 31/12 31/18
GRIVER [8] 1/18 22/5 22/6 38/10 40/2
45/5 45/6 46/14
ground [1] 25/12
grounds [1] 16/17
Group [4] 2/13 21/9 32/4 41/2
guarantee [2] 42/2 42/2
guaranteed [2] 7/4 41/23
guess [3] 6/10 35/17 35/17

**H**

had [21] 5/15 5/20 7/15 13/11 13/20
15/13 16/15 18/18 21/19 25/9 39/6
39/23 39/24 40/5 40/7 42/15 42/18
45/23 47/6 51/14 51/16
half [2] 7/3 10/12
hallucinatory [1] 30/4
handed [1] 7/7
handle [1] 4/21
hanging [1] 26/20
happen [2] 30/5 30/5
happened [6] 6/11 7/6 14/17 24/12
38/19
happens [5] 26/18 29/23 31/8 31/13
42/23
happiness [1] 31/12
hard [1] 24/2
harm [1] 23/20
harmed [1] 32/22
Harry [2] 41/17 43/19
has [63]
Hashana [1] 12/9
hasn't [3] 4/2 6/11 15/13
have [87]
haven't [9] 2/19 3/6 14/8 19/5 19/7
19/10 19/12 28/2 51/9
having [1] 25/9
he [15] 5/6 10/26 10/26 12/9 15/26
26/24 26/25 26/25 26/26 35/7 41/18
45/8 48/25 48/25 48/26
he'll [1] 49/2
hear [4] 3/10 35/24 45/11 47/4
heard [2] 8/2 45/5
heck [1] 32/4
held [1] 47/20
help [4] 13/15 13/18 30/16 38/18
her [42] 1/3 3/21 3/26 4/2 4/4 4/5 4/16
5/4 5/5 5/10 5/10 5/16 5/20 5/21 5/21
5/22 5/22 6/22 9/6 9/7 9/8 13/3 13/5
13/23 13/25 14/13 15/19 15/19 15/22
16/5 16/6 18/11 18/16 18/20 18/25
18/26 20/9 23/8 24/2 26/20 28/14 36/23
here [45] 6/20 7/6 8/12 10/9 10/15
10/18 10/25 11/3 12/15 12/19 13/11
13/19 16/23 17/2 17/4 19/11 20/5 20/15
21/16 21/22 21/25 22/19 23/2 23/6 23/6
26/4 27/4 28/9 30/18 31/3 31/11 31/21
33/8 33/10 34/20 39/2 43/3 43/4 43/13
45/4 45/10 45/14 46/6 47/3 47/7
Here's [1] 17/17

herself [1] 27/20
hey [3] 35/4 35/16 35/17
hide [1] 21/23
him [1] 44/26
his [5] 28/18 28/20 45/6 45/7 48/6
history [1] 45/22
HOFFMAN [6] 2/9 3/4 13/13 32/11
32/19 44/25
holder [3] 10/19 27/22 30/24
holders [1] 43/26
hole [1] 29/13
holiday [3] 12/2 12/10 12/11
honor [107]
Honor's [9] 17/8 18/4 20/11 30/15 33/25
34/9 44/13 44/14 47/9
HONORABLE [1] 1/14
hooey [1] 47/24
hope [3] 36/5 37/26 38/23
horizon [1] 43/9
hornet's [1] 6/8
hour [1] 12/4
hours [3] 11/15 11/16 12/2
how [7] 10/24 13/15 24/17 31/2 34/5
43/9 49/25
however [2] 12/7 31/10
humorous [1] 22/18
hundred [5] 15/18 15/23 16/15 19/19
25/25
husband [2] 5/5 5/5
hypothetical [1] 43/7

**I**

I'd [2] 35/23 39/5
I'll [4] 3/15 22/25 44/20 48/7
I'm [22] 3/11 4/6 4/14 4/16 4/25 4/25
13/14 14/21 14/23 16/21 20/15 21/8
21/14 21/15 21/23 26/12 35/12 46/5
47/15 47/16 48/5 50/14
I've [4] 17/7 33/2 40/13 40/16
idea [3] 33/3 33/4 34/25
impact [1] 41/4
important [3] 39/16 47/2 47/10
importantly [2] 8/12 28/5
imposed [1] 24/16
impossible [1] 11/16
improper [1] 44/15
INC [1] 1/8
include [1] 14/3
included [1] 32/12
including [3] 3/22 49/10 49/16
increase [2] 34/21 49/5
indeed [3] 8/9 9/8 11/6
INDEX [1] 1/6
individual [4] 1/3 1/4 29/14 49/17
individually [2] 22/7 49/14
individuals [2] 20/6 32/6
ineffectual [4] 25/16 26/7 30/12 34/12
inflict [1] 23/20
information [1] 32/18
informed [2] 8/18 40/17
initial [1] 40/2
injunction [32] 9/21 9/24 13/23 13/25
14/9 14/12 16/11 22/13 23/14 23/18
24/16 25/6 25/12 25/17 25/18 26/6
30/10 32/15 34/21 35/23 39/24 39/26
40/19 40/24 40/24 40/26 45/7 46/4
48/10 48/11 48/15 49/3
injunctions [3] 22/20 33/25 34/7
injunctive [1] 47/11
injury [1] 47/23
insist [2] 5/4 30/3
insists [1] 12/9
insofar [1] 6/21

instance [2] 41/21 45/21
instances [1] 34/16
instantly [2] 11/19 11/22
instead [1] 10/9
insure [3] 29/10 35/2 50/11
insures [1] 26/17
intend [1] 14/25
intended [3] 36/17 37/8 42/5
intends [1] 15/8
intent [1] 5/6
intentionally [1] 49/18
interest [18] 7/22 17/14 27/24 32/2 33/6
33/7 34/17 36/23 37/2 39/22 40/21
45/12
interested [1] 48/5
interesting [2] 21/19 28/9
interestingly [1] 37/19
Internal [2] 36/18 37/20
interpleader [5] 28/18 28/19 28/20 29/4
30/6
interpretation [1] 28/20
investigating [1] 6/15
INVESTMENT [1] 1/8
invited [1] 24/25
invoke [1] 12/17
involve [2] 18/24 18/24
irregularities [1] 47/7
IRS [1] 37/15
is [227]
isn't [3] 19/21 28/19 36/7
Israel [1] 11/21
issue [8] 5/11 12/23 12/24 12/24 12/25
14/24 31/2 40/10
issued [3] 25/17 40/20 40/25
issues [4] 15/5 25/26 26/3 26/9
it [127]
it's [66]
item [1] 42/22
its [19] 1/4 7/7 15/24 16/11 24/5 25/7
29/16 31/6 33/6 33/13 33/20 34/24
35/13 38/10 41/22 49/8 49/9 49/9 49/11
itself [6] 17/25 33/9 38/21 38/22 49/11
51/13
Ivy [1] 23/24

**J**

jeopardizing [1] 46/24
Jersey [1] 21/22
JOHN [4] 1/23 2/22 13/8 15/10
join [1] 20/23
JP [1] 6/10
Judaism [1] 12/7
judge [8] 3/25 28/21 40/7 40/7 40/9
49/21 49/23 50/3
Judge's [1] 48/15
judgment [17] 16/10 17/2 19/2 19/3
19/17 20/14 22/11 24/20 24/25 25/16
26/7 30/12 34/11 35/21 39/2 42/11 44/2
July [2] 22/25 48/15
June [2] 17/10 40/20
jurisdiction [7] 28/12 31/9 42/25 43/24
49/7 49/10 49/11
jurisprudence [1] 45/22
jury [2] 16/7 20/8
just [14] 4/3 4/5 4/25 12/24 20/22 20/23
31/13 31/22 33/23 35/21 37/16 45/3
48/5 49/10
justice [2] 1/14 42/22

**K**

Keenan [1] 28/21
keep [2] 48/8 48/10

## K

kicking [1] 29/7
kind [3] 28/3 34/16 47/7
Kitts [12] 10/24 26/23 28/11 31/5 36/13
37/4 37/25 38/2 42/18 42/23 43/6 44/5
Kitts' [1] 42/25
knew [3] 8/24 31/14 51/14
Knollwood [1] 2/5
know [34] 3/23 4/17 5/26 6/2 12/2 12/16
12/18 13/15 13/21 13/22 14/17 14/26
24/8 26/24 27/4 27/6 27/7 30/19 31/20
31/21 32/17 33/18 33/19 35/16 36/11
37/15 38/22 39/18 40/25 41/14 41/15
46/15 49/19 51/10
knows [3] 26/25 26/26 32/4
KRAUSE [1] 1/16

## L

labeled [1] 28/21
language [6] 11/6 30/2 35/21 43/11
45/11 45/11
largely [1] 3/17
last [4] 8/2 15/12 26/24 36/4
late [1] 10/22
later [1] 48/9
latest [1] 27/25
law [20] 5/2 6/23 9/15 10/13 16/9 16/25
18/21 18/23 19/13 20/5 21/26 23/13
35/8 35/14 35/22 41/15 42/19 43/4 43/5
47/6
lawsuit [1] 13/17
lawyer [2] 14/9 14/10
lawyers [3] 21/23 21/24 36/11
lay [1] 20/12
LEAH [10] 1/8 2/4 3/4 13/11 13/17
13/19 14/24 32/13 32/23 32/25
least [9] 7/24 19/18 19/23 35/24 36/18
37/19 38/23 50/5 51/9
leaving [3] 7/8 44/5 44/5
left [3] 7/23 17/23 44/9
legal [5] 5/16 8/18 11/9 18/13 40/15
LEINBACH [1] 1/19
length [1] 22/11
less [3] 7/12 8/26 46/22
let [6] 6/2 19/8 27/8 30/19 31/20 50/20
let's [5] 3/10 12/16 12/25 15/24 31/19
letter [2] 34/6 51/21
Lexington [3] 1/17 1/25 2/8
life [1] 24/11
light [2] 11/3 12/6
like [17] 3/20 8/10 8/11 16/15 16/18
17/8 18/6 18/9 18/15 19/26 21/23 24/9
31/23 35/13 39/5 43/26 50/16
likes [2] 18/9 33/23
Limited [4] 1/5 17/13 51/5 51/8
litigate [3] 23/8 42/12 42/16
litigating [1] 24/9
litigation [2] 4/18 47/18
litigations [2] 20/2 29/26
LLC [2] 1/8 1/24
LLP [6] 1/16 1/20 1/24 2/4 2/7 2/10
loan [3] 8/22 9/3 29/17
loaned [1] 8/22
long [2] 8/20 38/24
longer [3] 5/19 28/13 32/20
look [2] 25/6 35/9
looked [4] 2/19 3/7 3/8 34/9
looking [5] 23/26 47/14 47/14 47/16
47/16
lose [2] 48/25 49/2
loses [2] 15/24 48/26
losing [1] 46/24

loss [1] 36/19
lost [1] 33/15
lot [3] 26/26 46/22 47/24
lousy [1] 10/21
love [3] 5/20 5/21 35/23
LP [6] 17/21 22/9 22/14 22/16 33/7
34/23
LP's [1] 23/9
LP's [1] 23/9
ludicrous [1] 35/2
lunatic [1] 16/21
lunch [1] 21/17
LYONS [3] 2/4 2/6 20/24

## M

machinations [3] 5/4 5/10 22/21
made [8] 10/26 24/8 39/7 40/13 41/12
46/10 47/3 51/21
Madison [1] 2/11
magnanimously [1] 33/5
mail [1] 10/23
mails [1] 10/21
maintain [2] 14/18 38/23
make [11] 12/3 12/5 23/7 26/6 34/21
35/14 38/15 40/15 42/7 42/20 48/12
maker [2] 43/12 43/13
makes [4] 5/23 9/17 17/15 43/6
making [2] 8/20 47/5
Malones [2] 49/21 49/23
man [1] 24/9
Manhattan [25] 8/20 8/21 8/22 10/19
10/23 11/12 27/17 28/10 29/2 29/9
29/15 29/17 29/19 29/23 30/6 30/21
31/3 31/20 33/18 34/22 42/24 43/2 49/8
51/4 51/8
manufactured [3] 23/21 31/17 33/21
many [3] 24/7 24/9 43/26
March [1] 35/19
MARISA [1] 1/26
matches [1] 17/24
material [1] 19/11
math [1] 37/7
MATHEW [3] 2/9 3/4 13/13
matter [6] 9/15 12/13 16/3 28/26 34/13
35/6
may [18] 5/13 11/6 18/6 26/21 26/22
27/22 27/24 28/20 29/2 29/9 29/15
29/19 35/18 36/15 39/15 41/4 48/3
51/21
maybe [6] 15/22 19/19 27/20 31/11
38/21 44/9
McGOVERN [1] 2/4
McLAUGHLIN [1] 2/10
me [8] 4/24 5/12 10/5 16/20 16/21 19/8
27/8 50/20
mean [3] 4/10 12/5 22/25
meaning [1] 45/13
means [5] 13/15 26/18 30/23 33/7 33/8
mechanism [2] 35/20 50/10
meet [1] 15/19
meeting [2] 7/17 21/20
MEISTER [15] 1/24 1/26 3/14 26/24
27/26 28/17 28/18 29/2 31/11 37/7 39/4
45/16 49/13 49/19 49/25
Meister's [2] 21/2 49/6
member [1] 32/17
memo [1] 23/13
mentioned [1] 8/17
mentioning [1] 48/10
MICHALIDIS [1] 1/22
might [2] 4/20 40/8
million [40] 7/3 7/24 8/3 8/15 10/12
15/15 15/23 15/25 16/2 18/11 19/19

19/19 19/22 27/10 27/15 27/25 28/15
28/16 31/13 31/15 31/16 31/20 31/23
33/5 33/14 34/21 36/19 36/26 37/9
43/21 44/4 44/7 44/9 46/8 46/19 47/12
47/23 48/23 48/24 48/25
millions [2] 41/12 42/5
mind [1] 4/26
mine [1] 17/24
minimum [1] 16/2
minutes [3] 15/14 45/5 45/6
mirror [1] 43/5
mirrors [2] 44/16 44/18
misquoted [1] 47/9
modified [1] 50/26
moment [3] 36/10 43/14 44/3
Monday [1] 10/23
money [13] 6/18 7/13 10/12 20/21 29/7
31/7 31/10 31/18 31/19 31/22 33/3
44/11 48/21
months [3] 27/11 27/12 31/8
moot [1] 24/19
more [17] 9/17 12/6 17/4 19/21 19/21
26/26 28/4 33/8 33/8 36/14 37/18 38/6
38/14 44/6 44/17 45/17 48/21
Morgan [1] 6/10
morning [3] 2/26 3/5 10/2
MORRIS [1] 1/20
most [4] 5/23 8/12 33/2 48/5
mother [4] 5/3 5/19 13/3 13/5
motion [23] 6/21 6/25 10/16 16/10 17/2
19/17 22/11 22/12 24/22 25/4 25/4 25/5
25/8 40/4 40/16 40/16 40/26 46/10
46/10 46/11 46/13 46/14 50/20
motion's [1] 50/13
motions [6] 24/21 40/2 40/13 46/17
47/3 47/21
motivation [2] 14/20 14/22
mouse [1] 38/10
movant [1] 20/17
movant's [1] 3/12
movants [1] 51/2
move [2] 23/3 38/21
moved [4] 18/26 19/3 19/3 42/10
moving [1] 27/19
Mr [40] 9/26 13/10 15/9 20/25 21/2 22/4
26/24 27/26 28/18 28/26 31/11 32/11
32/19 33/9 33/22 34/7 34/14 35/4 35/8
37/7 38/9 39/4 40/2 40/20 41/7 41/15
44/19 44/25 45/5 45/6 45/6 45/7 45/16
46/14 47/13 48/22 49/6 49/13 49/19
49/24
Ms [3] 32/15 32/16 32/19
much [1] 41/15
must [1] 10/25
my [25] 4/26 5/16 5/17 5/19 5/26 6/10
8/2 9/26 10/18 11/9 12/6 13/7 17/15
20/19 21/20 22/6 23/2 31/11 36/3 37/16
38/16 42/7 43/21 44/22 49/26
myself [1] 48/4
mysterious [1] 26/23
mystery [1] 36/10

## N

name [2] 22/6 36/3
name's [1] 20/19
named [1] 33/19
narrow [1] 23/14
necessarily [1] 5/24
necessary [1] 29/10
need [10] 14/5 16/23 26/11 30/8 32/9
34/25 38/4 46/23 47/22 51/22
needed [1] 38/17
needs [2] 4/12 32/5

**N**

negotiated [1] 43/3
nest [1] 6/8
neutralizing [4] 6/5 38/4 38/17 38/20
never [10] 17/7 19/2 26/11 36/17 37/8
37/12 38/22 41/20 41/26 42/4
new [36] 1/2 1/2 1/11 1/11 1/18 1/18
1/22 1/22 1/25 1/25 2/5 2/8 2/8 2/11
2/11 8/21 8/24 10/19 21/10 21/13 21/17
21/22 29/12 29/18 30/20 35/5 35/8 37/5
37/9 38/8 40/6 40/9 43/3 43/4 45/22
45/24
next [4] 38/11 38/12 46/14 50/23
nicer [1] 10/25
nickel [1] 12/12
night [1] 15/12
no [47] 1/6 4/16 4/25 5/12 5/15 5/19
5/25 5/26 9/13 10/10 10/18 10/20 11/3
13/22 13/23 15/6 16/25 17/18 18/5 21/5
25/23 25/23 25/24 26/3 26/3 26/9 28/13
29/5 29/21 30/4 31/22 32/18 32/20 33/8
33/8 35/2 36/9 38/4 39/10 42/25 43/9
43/11 44/3 46/26 50/18 50/22 50/23
nobody [2] 17/19 38/6
nobody's [1] 15/7
none [6] 9/4 10/7 17/15 38/7 39/10
47/17
nonpayment [1] 23/23
nonsense [2] 12/20 46/16
normally [1] 21/14
not [72]
note [60]
notes [9] 8/24 8/26 9/20 29/8 30/20
30/23 40/23 41/13 43/10
nothing [17] 10/2 13/20 18/12 21/9
26/18 26/19 37/7 38/2 39/23 39/24
40/23 44/6 44/6 44/8 44/10 44/15 44/17
notice [17] 9/24 11/2 11/11 11/12 11/14
11/19 12/12 12/17 13/6 28/2 28/3 29/21
32/19 39/20 41/3 48/3 51/20
noticed [1] 11/2
notification [3] 10/19 10/20 32/16
noting [1] 5/24
notion [1] 37/13
notwithstanding [3] 13/2 27/16 29/8
November [4] 27/11 27/13 27/25 29/8
now [26] 7/2 7/22 9/15 15/6 18/6 21/10
22/13 25/19 25/21 26/25 27/12 27/21
28/18 30/5 30/5 36/21 37/3 37/23 37/24
38/3 38/10 39/15 40/16 41/23 46/9
46/12
number [7] 12/26 13/3 19/7 25/4 25/5
25/8 45/3
numbers [1] 26/25

**O**

o'clock [1] 3/2
object [1] 27/3
objecting [1] 14/21
objection [1] 3/26
obligate [1] 41/22
obligation [6] 36/12 36/13 36/22 37/2
37/6 37/10
obligations [1] 29/16
observant [2] 12/7 12/15
obsessed [1] 5/11
obtain [1] 39/14
obvious [1] 10/9
obviously [3] 3/20 31/4 46/5
occurrence [2] 27/22 29/13
odd [1] 33/13
off [1] 10/22

offer [1] 39/20
office [6] 12/8 21/10 21/11 21/13 21/14
21/17
officer [1] 51/18
OFFICIAL [2] 2/17 51/26
Oh [2] 28/19 31/12
okay [9] 3/10 4/6 21/15 26/12 26/22
35/19 36/26 37/17 51/19
once [2] 26/4 36/2
one [35] 2/25 4/20 4/22 5/9 6/19 8/13
8/24 8/24 8/25 10/17 12/8 12/10 13/26
14/13 17/5 17/18 19/7 21/11 21/19 25/5
25/8 27/20 33/26 35/13 40/2 40/3 40/6
40/6 43/9 43/11 45/3 45/4 45/14 48/2
49/16
only [15] 5/7 10/13 12/3 19/17 24/14
31/7 32/20 35/19 39/13 44/7 45/11 47/8
48/3 48/26 50/26
open [2] 7/9 7/23
operates [1] 6/4
opinion [3] 6/17 19/15 26/10
opposition [11] 2/20 2/20 2/23 3/2 3/5
3/7 3/11 10/14 19/5 20/12 20/18
option [1] 6/6
oral [1] 45/8
order [26] 4/22 9/19 9/22 10/7 11/4
11/15 16/2 17/9 23/3 23/15 25/7 25/19
30/17 30/22 30/22 37/21 39/17 39/19
39/19 44/21 44/23 50/20 50/25 51/3
51/4 51/7
ordered [6] 19/10 45/9 48/11 48/16
48/17 51/20
orders [16] 10/3 17/7 18/4 19/8 19/9
19/10 19/12 20/12 39/16 44/13 45/5
45/10 45/11 45/12 46/12 47/9
organization [1] 37/25
organized [1] 42/24
original [4] 3/26 23/2 40/6 50/22
originally [1] 51/2
ORLY [62]
Orly's [8] 7/25 11/14 14/12 19/9 22/20
30/9 37/2 44/10
Orr [1] 35/10
orthodox [1] 12/6
other [19] 5/18 8/3 8/16 9/23 11/7 18/12
24/18 28/5 29/26 29/26 33/12 39/22
40/18 41/2 41/6 42/7 43/17 43/26 44/14
others [7] 7/26 17/26
otherwise [3] 13/5 17/12 31/26
ought [1] 10/4
our [36] 3/16 8/6 10/14 16/3 16/9 17/2
18/8 18/9 18/9 18/13 18/14 18/22 19/7
19/15 19/16 19/22 20/12 20/13 20/21
22/11 23/19 25/22 25/24 26/21 30/24
33/17 34/4 38/15 40/4 46/7 46/18 46/24
46/25 47/10 47/23 49/24
ourselves [3] 19/24 19/26 39/3
out [35] 3/16 3/19 3/24 4/6 4/18 4/26
5/2 5/14 8/8 9/13 9/26 11/6 14/9 15/4
15/21 17/23 19/18 20/12 34/5 34/10
36/22 37/24 38/6 38/10 40/21 44/21
45/4 46/11 46/17 46/20 47/14 47/16
47/16 47/19 47/24
outlined [1] 7/11
outside [2] 28/11 31/8
outsider [4] 6/3 6/4 6/7 6/9
over [9] 7/3 15/2 22/2 28/19 28/21
33/20 34/26 38/6 44/9
overly [1] 11/9
oversight [2] 34/26 35/14
owe [1] 31/15
owed [3] 7/3 27/23 29/7
owes [2] 8/26 37/7

owing [3] 7/12 15/26 29/12
own [7] 10/12 16/5 16/6 18/22 31/6
45/6 45/7
owned [1] 36/7
ownership [3] 7/8 7/9 17/14
owns [1] 17/18

**P**

page [3] 9/17 15/12 49/15
paid [7] 8/16 9/12 27/15 42/5 42/5 44/8
46/19
paper [1] 50/11
papers [30] 3/2 3/5 3/7 3/9 3/16 8/7
9/26 10/2 10/8 11/9 14/13 14/14 16/3
19/5 20/12 21/2 21/2 28/18 39/9 39/13
39/23 40/23 42/8 42/26 43/3 43/4 50/2
50/14 50/15 50/22
paragraph [8] 23/13 23/18 28/2 33/17
33/19 34/14 49/14 49/24
paragraphs [1] 25/25
Parness [1] 50/3
part [9] 1/2 7/22 20/5 20/6 28/6 37/12
37/16 40/4 40/4
particularly [2] 14/23 15/5
parties [3] 20/10 45/20 49/15
partner [1] 12/6
partnership [2] 1/5 7/18
partnership's [1] 40/21
partnerships [2] 17/13 35/8
party [3] 31/4 45/22 45/25
past [1] 37/13
PAUL [1] 1/14
pay [6] 5/16 8/18 34/22 41/13 41/22
41/25
payable [1] 29/10
paying [1] 11/9 41/19
payment [4] 7/13 10/20 27/24 29/10
payments [1] 41/12
PEDOWITZ [2] 1/24 28/17
pendency [2] 34/23 50/9
pending [2] 40/16 50/25
people [4] 11/21 14/7 20/2 32/7
per [1] 25/22
percent [3] 7/4 17/14 17/18
perfect [1] 6/22
perfectly [1] 16/25
perform [2] 29/16 29/20
perhaps [3] 7/20 32/15 38/16
period [1] 12/4
person [1] 48/3
perspective [1] 18/17
persuasion [1] 44/22
pertinent [1] 6/25
phone [1] 26/25
place [1] 38/21
placed [1] 30/14
plain [2] 30/2 35/21
Plains [1] 2/5
plaintiff [10] 3/19 13/3 14/18 16/24
18/24 23/15 25/10 25/11 33/7 48/20
plaintiff's [2] 10/8 25/14
plaintiffs [4] 1/6 4/11 14/23 22/7
plead [1] 20/8
pleadings [1] 47/22
please [2] 27/8 50/8
pledge [6] 39/8 39/10 39/21 41/10 42/2
42/3
pledged [1] 39/11
pledging [3] 17/11 23/20 41/10
plows [1] 8/9
plus [3] 9/2 25/25 27/11
pocket [2] 5/16 9/13
point [13] 3/19 5/14 5/26 8/8 11/6 13/26

**P**

point... [7] 30/17 31/18 39/7 40/19 45/3
  48/16 50/24
pointing [1] 3/16
points [8] 38/10 39/6 40/15 40/20 41/6
  42/7 44/23 48/2
pool [1] 19/23
portion [1] 41/23
position [3] 37/22 41/14 49/22
possibilities [1] 4/17
possibility [1] 8/25
possible [3] 8/9 12/11 30/19
possibly [1] 49/25
post [4] 10/11 45/23 46/23 48/23
posted [2] 47/3 47/25
posting [2] 48/16 48/18
posts [1] 45/26
potential [1] 32/22
powers [1] 44/22
practical [1] 12/13
pre [1] 24/22
predated [1] 16/10
predecessor [1] 5/17
predicated [1] 26/9
preliminary [10] 16/10 23/13 23/18 25/6
  25/12 30/10 32/15 35/23 45/7 46/3
prepared [1] 11/11
PRESENT [1] 2/15
preservation [1] 22/15
preserving [1] 23/15
President [2] 10/23 51/16
presumably [1] 43/12
pretense [3] 45/4 45/15 45/15
pretty [2] 18/13 20/26
prevent [3] 11/8 26/2 34/20
prevents [1] 30/10
previous [1] 33/10
principal [5] 24/5 27/10 27/23 29/7
  41/13
printed [1] 50/12
prior [1] 47/9
problem [1] 39/8
problems [1] 30/24
procedure [1] 35/7
proceed [3] 19/16 20/13 27/24
proceeding [1] 40/5
proceedings [4] 28/4 40/14 47/5 51/26
proceeds [5] 15/26 27/14 29/24 31/23
  48/12
process [1] 8/19
produced [2] 18/25 18/26
production [1] 18/25
professed [1] 26/26
prohibition [1] 12/3
promissory [3] 27/9 28/8 28/23
promptly [1] 18/26
properly [2] 40/9 40/11
properties [1] 33/14
prophylactic [4] 23/7 25/22 29/22 49/3
prosecutes [1] 23/16
Proskauer [1] 21/21
protect [1] 50/9
protected [1] 23/9
protecting [1] 5/4 5/10
protections [2] 30/8 30/16
provide [2] 32/19 43/4
provided [2] 22/23 30/21
provision [3] 12/17 32/16 51/20
purchase [1] 39/20
purely [1] 49/3
purport [3] 10/8 42/9 43/8
purported [3] 10/20 11/2 11/13

purportedly [1] 28/24
purpose [1] 6/14
purposes [2] 14/14 23/7
purses [1] 22/22
put [6] 19/4 31/19 33/12 47/8 48/21
  50/2
putting [2] 5/9 13/19

**Q**

quarter [1] 3/22
question [5] 7/9 9/18 13/18 23/2 41/26
questions [3] 4/23 20/15 38/20
quick [1] 48/2
quite [1] 22/23
quo [7] 6/26 7/2 14/16 14/19 22/15
  23/15 38/24
quote [1] 36/5
quoted [4] 45/6 45/7 45/11 45/12
quotes [1] 31/14
quoting [1] 48/3

**R**

rain [1] 24/9
raise [1] 30/25
raised [1] 25/26
ran [1] 24/6
rather [1] 48/9
reach [1] 5/16
reached [1] 7/10
read [6] 3/6 9/26 15/13 49/14 50/20
  51/6
reading [1] 23/26
reads [1] 39/23
ready [1] 31/21
realize [2] 46/6 50/9
realizing [1] 37/4
really [14] 12/14 17/5 19/11 19/17
  19/20 19/25 19/25 20/3 22/23 28/26
  31/17 38/26 41/16 48/5
reason [7] 10/9 15/6 26/5 27/20 32/16
  32/18 33/4
reasonably [1] 29/9
reasons [1] 36/10
receipt [1] 27/13
receive [1] 28/14
received [5] 6/20 9/3 9/4 10/18 51/24
receiver [1] 38/18
receivership [2] 44/16 46/15
receives [1] 11/12
receiving [2] 7/13 38/11
reception [1] 21/25
record [2] 7/7 51/14
recourse [1] 24/14
recover [2] 9/9 9/10
reduce [1] 41/13
reference [3] 39/7 41/7 42/17
referring [1] 12/22
refers [1] 40/21
reformed [1] 12/7
refused [1] 13/4
refuses [1] 5/22
reject [1] 6/13
rejected [1] 24/20
relate [2] 18/3 41/16
related [1] 3/9
relates [1] 18/2
release [16] 18/12 18/12 18/14 19/20
  19/20 32/15 42/9 46/9 46/24 47/19
  48/14 48/26 49/7 49/13 49/15 49/16
released [5] 24/18 34/18 46/11 49/18
  49/19
releases [1] 24/18
relied [2] 13/3 42/13

relief [11] 11/4 14/24 22/24 23/14 26/4
  26/11 32/9 32/10 45/25 47/11 48/20
religious [1] 12/15
relinquish [1] 15/21
relinquished [1] 7/21
rely [1] 10/8
remain [1] 36/10
remaining [1] 24/5
remains [2] 6/21 42/10
remedy [3] 18/7 18/7 18/16
remember [2] 24/26 36/15
remind [1] 40/3
removal [1] 28/14
remove [1] 27/19
removing [1] 40/21
render [2] 25/15 30/12
rendering [1] 34/11
repeating [2] 20/22 39/3
replies [1] 50/18
reply [4] 50/14 50/15 50/21 50/22
REPORTER [3] 2/17 21/6 51/26
represent [3] 4/16 20/19 22/6
representations [1] 7/26
representing [5] 3/15 13/7 13/13 22/8
  22/9
request [4] 13/23 45/19 45/20 48/6
requested [2] 11/4 23/14
requests [1] 8/23
require [3] 30/18 48/19 48/20
required [2] 39/20 50/23
reread [1] 3/25
resign [5] 4/12 4/18 6/2 13/12 13/18
resignation [1] 28/15
resigned [5] 13/16 14/26 32/23 32/24
  32/24
resolution [3] 16/26 28/17 29/4
resolve [5] 16/2 16/14 16/19 16/24
  38/22
resolved [1] 28/21
respect [6] 5/22 13/24 14/7 15/8 20/2
  20/25
respectfully [9] 5/13 9/25 10/4 10/16
  11/3 11/16 12/21 19/16 35/6
respecting [1] 25/15
respond [3] 36/2 38/19 39/6
responded [1] 33/2
responding [1] 48/6
response [1] 33/24
responses [1] 35/24
responsibility [1] 31/3
rest [2] 49/3 50/6
restated [2] 7/17 27/9
restatement [1] 28/7
restrain [1] 50/26
restrained [6] 17/11 17/18 18/3 23/19
  33/11 51/9
restraining [2] 9/22 9/24
restraint [1] 18/5
restraints [1] 19/14
result [2] 13/17 18/10
resulted [4] 7/12 7/13 7/14 8/14
retired [1] 40/8
return [3] 33/6 36/20 38/16
returns [1] 37/20
Revenue [2] 36/18 37/20
rewritten [1] 19/9
rid [1] 35/20
right [26] 3/6 11/26 12/18 14/16 16/14
  16/19 16/24 18/20 18/20 18/22 20/7
  20/10 21/3 22/13 24/4 25/3 31/5 33/8
  39/3 43/13 43/20 48/23 48/24 50/13
  51/22 51/23
rights [8] 22/16 23/9 25/14 33/20 34/24

**R**

rights... [3] 43/23 46/7 49/8
ripple [1] 43/9
River [1] 23/24
Road [1] 2/5
ROBERT [2] 1/26 3/14
room [2] 21/24 36/25
Rosh [1] 12/9
Ross [1] 35/10
Roth [2] 18/19 40/7
Roth's [2] 3/25 6/22
routine [1] 24/13
Rule [1] 35/9
ruled [3] 18/8 30/9 49/23
ruling [1] 15/7
run [1] 23/17
runs [1] 33/13

**S**

saddled [1] 37/10
safety [10] 28/10 29/3 30/21 31/3 31/20
 33/18 34/22 49/8 51/4 51/8
SAGI [17] 1/8 2/10 6/18 10/11 20/20
 23/19 31/26 32/5 32/17 33/13 36/7
 36/16 36/18 38/7 47/15 49/22 50/2
said [22] 3/23 10/26 13/8 15/11 15/16
 17/10 17/15 20/23 25/6 25/25 26/24
 27/6 27/26 33/10 36/5 36/8 36/17 36/26
 42/22 48/14 51/14 51/18
saints [1] 5/12
sale [1] 25/24
sales [1] 15/26
same [4] 16/23 24/10 24/21 26/4
sanctions [3] 22/11 25/21 46/10
SASH [2] 2/12 20/19
Sash's [1] 20/25
satisfy [1] 37/15
saw [1] 21/26
say [29] 3/10 4/5 5/7 5/19 10/17 11/14
 12/10 13/8 13/9 13/12 13/20 20/6 21/4
 22/5 27/4 31/12 33/23 34/4 34/15 35/16
 37/20 37/22 38/4 40/13 43/10 46/20
 49/25 50/4 51/10
saying [4] 14/22 18/19 46/5 48/22
says [10] 15/17 26/10 28/19 34/14 35/4
 35/11 37/7 47/13 49/13 49/25
scenario [1] 33/17
scheme [1] 34/19
scope [1] 23/14
seal [1] 38/11
second [8] 6/25 7/17 8/25 13/2 28/7
 35/4 39/26 40/19
Secondly [1] 11/24
secret [2] 19/2 37/14
secretly [1] 36/11
security [1] 23/21
see [10] 12/11 15/6 17/24 21/15 21/21
 21/23 28/19 37/12 39/23 44/21
seek [3] 10/10 22/24 23/17
seeking [3] 22/14 26/4 45/25
seeks [1] 23/15
seem [1] 8/10
seemed [1] 9/18
seems [6] 5/6 5/11 8/5 10/5 10/14
 18/12
seen [4] 2/19 17/7 19/5 47/3
select [1] 26/13
self [1] 35/2
selling [3] 8/19 17/11 36/13
send [3] 11/18 11/19 11/23
sense [5] 11/16 13/11 17/15 35/3 35/22
sentence [1] 50/24

September [1] 36/4
sequence [3] 25/4 25/5 25/8
series [1] 47/3
serious [1] 17/4
serve [5] 4/2 4/4 4/12 51/3 51/7
service [3] 3/21 36/19 37/21
set [4] 16/3 16/9 20/26 33/17
settle [10] 9/16 15/19 15/20 16/7 18/20
 18/21 18/22 20/3 20/10 20/10
settled [1] 9/18
settlement [18] 7/11 7/11 7/12 7/21 8/5
 8/12 8/14 18/2 18/9 18/10 18/17 20/11
 26/16 36/12 40/22 41/5 42/8 49/16
settlements [2] 8/7 9/20
several [1] 16/11
shall [2] 51/3 51/7
sham [2] 23/24 28/22
shareholder [1] 18/8
shareholders [2] 17/26 47/17
shares [29] 7/8 7/10 7/22 15/17 15/22
 16/15 17/12 17/13 17/13 17/19 17/20
 18/2 18/3 23/21 23/24 29/24 39/8 39/10
 39/11 39/12 39/14 39/15 39/21 39/24
 41/4 41/10 43/14 43/16 43/25
she [46] 3/24 4/2 4/11 4/12 6/23 8/9
 8/10 8/11 9/9 9/18 13/4 13/20 13/20
 13/21 14/4 14/6 14/25 14/26 15/4 15/6
 15/8 15/17 15/19 16/5 16/6 16/6 16/7
 16/7 16/8 18/8 18/15 18/15 18/20 20/7
 20/7 20/8 23/15 32/18 32/21 32/23
 32/23 32/24 42/13 42/14 42/14 48/23
she's [7] 14/4 14/9 14/13 15/7 18/8
 18/19 24/2
shock [1] 31/12
shop [1] 40/7
short [2] 8/20 44/12
should [22] 3/24 6/14 8/6 10/16 10/17
 12/8 14/6 15/6 17/16 19/13 19/15 19/16
 20/13 20/14 32/18 35/9 42/7 42/8 43/19
 48/20 48/23 49/4
shouldn't [1] 43/18
show [9] 9/19 11/4 11/15 23/3 26/14
 30/17 30/22 51/3 51/8
shred [1] 6/19
shrinking [1] 44/23
shut [1] 13/9
side [1] 8/3
sign [3] 13/21 32/4 32/21
signed [4] 26/23 27/9 27/12 50/24
significant [1] 46/7
simple [1] 22/23
simply [2] 30/5 32/9
since [5] 2/20 3/12 15/7 18/13 40/2
single [2] 6/20 21/26
sit [2] 13/9 31/23
sitting [3] 31/13 31/23 44/2
situation [3] 30/13 34/17 35/13
six [4] 27/12 31/8 44/9 47/21
SKADDEN [3] 2/13 21/8 22/2
smoke [3] 43/5 44/16 44/17
so [67]
so-called [1] 7/17
sold [3] 37/4 37/11 37/24
solely [1] 36/7
some [17] 4/10 5/11 8/6 12/18 17/26
 20/6 22/10 24/8 26/13 31/26 32/16 33/3
 34/16 35/18 35/18 44/4 50/16
somebody [3] 4/3 11/19 16/14
somehow [6] 24/10 24/13 29/19 37/3
 41/7 44/4
someone [3] 16/13 33/12 38/18
someplace [1] 32/3
something [10] 4/26 10/22 26/16 28/9

30/4 30/6 36/2 46/12 46/15 47/19
soon [1] 30/19
Sooner [1] 48/9
sophisticated [1] 5/7
sorry [1] 21/8
sort [1] 44/17
sorts [1] 47/6
sought [5] 14/12 14/23 22/15 22/18
 25/18
space [2] 31/7 44/22
speak [1] 5/22
SPEAKER [2] 50/16 51/24
speaking [1] 42/14
special [1] 6/14
specifically [1] 45/17
spell [1] 13/16
spelled [1] 9/26
spend [2] 20/21 48/12
spirit [1] 34/6
spoke [1] 10/23
spoken [2] 51/14 51/16
St [13] 10/24 26/23 28/11 31/5 36/13
 37/4 37/25 38/2 42/17 42/23 42/25 43/6
 44/5
stand [1] 22/14
standard [1] 43/11
standpoint [3] 19/7 20/13 47/10
start [2] 3/16 16/16
started [1] 36/16
state [4] 1/2 11/10 21/20 35/12
statement [1] 20/25
statements [2] 47/4 47/5
stating [2] 7/7 42/4
status [7] 6/26 7/2 14/16 14/19 22/15
 23/15 38/23
statute [1] 45/24
statutory [1] 35/14
stay [1] 11/7
step [1] 6/7
STERN [1] 2/10
sticks [1] 37/16
still [7] 11/22 16/11 35/7 37/12 38/22
 44/9 48/17
stock [4] 17/14 40/22 40/22 40/23
story [2] 2/21 8/20
straightforward [1] 15/14
Street [1] 1/13
strictures [1] 10/6
strongly [1] 45/18
struck [1] 13/26
studies [1] 39/9
stuff [7] 35/18 35/18 35/19 41/19 42/20
 44/17 50/6
subject [5] 19/14 25/12 25/15 41/4
 49/11
submission [3] 38/15 45/9 50/19
submitted [3] 2/23 3/2 15/11
subpoenas [1] 38/19
subsequent [2] 8/18 30/22
substantial [3] 7/19 8/13 44/10
such [2] 27/18 51/18
sucked [1] 44/5
suddenly [3] 26/25 41/7 42/4
sue [4] 8/11 18/15 32/24 43/13
sued [1] 19/21
suing [7] 16/13 16/16 32/23 32/25
 42/15 43/12 44/2
suit [3] 15/22 15/25 19/20
Suite [1] 2/5
sum [1] 44/10
summarize [1] 3/16
summary [11] 16/10 17/2 18/26 19/3
 19/16 20/14 22/11 24/20 24/25 35/21

**S**

summary... [1] 42/11
sunset [2] 12/4 12/4
support [2] 8/6 41/11
supported [2] 8/13 10/13
supposed [2] 34/4 34/5
supposedly [1] 6/4
SUPREME [4] 1/2 7/7 7/23 42/18
sur [2] 50/18 50/22
sur-replies [1] 50/18
sur-reply [1] 50/22
surcharge [1] 8/12
sure [6] 23/7 26/6 34/21 35/12 35/15
 51/13
surprise [2] 8/8 24/15
Surrogate [11] 3/23 6/3 6/17 6/22 18/18
 24/10 24/13 24/15 24/15 40/7 40/14
Surrogate's [17] 3/22 4/22 5/3 5/17 6/12
 6/13 8/11 9/8 9/25 18/16 39/17 39/19
 40/5 40/10 40/12 40/17 44/14

**T**

tailored [4] 18/4 33/24 33/24 34/2
take [9] 6/17 6/18 13/4 16/7 20/7 29/9
 37/2 37/22 46/20
taken [2] 36/22 50/7
talk [2] 22/10 26/8
talking [5] 15/2 17/17 25/21 43/7 49/19
tax [8] 36/20 37/20 41/14 41/15 41/18
 41/19 41/20 44/16
taxes [1] 50/6
teed [1] 9/19
telephone [1] 13/4
tell [6] 21/6 21/18 27/7 32/20 36/18
 45/21
temporary [1] 9/24
tempted [1] 13/14
ten [3] 41/3 41/3 45/5
tend [1] 30/11
tending [1] 25/15
terms [2] 5/14 6/8
tertiary [1] 32/17
test [1] 19/11
testified [2] 49/26 50/3
testify [1] 4/24
than [11] 9/2 10/25 12/7 18/12 26/26
 33/12 36/14 44/6 44/17 46/22 48/9
Thank [3] 39/5 45/2 47/26
thanks [1] 2/25
that [256]
that's [49] 3/25 5/9 6/23 6/25 7/22 7/25
 10/22 12/23 12/24 14/6 16/26 16/26
 17/18 17/21 18/16 19/5 19/11 19/23
 19/25 22/17 22/26 24/5 25/17 25/18
 25/24 26/11 27/7 29/22 31/18 32/8 34/2
 37/12 37/15 38/10 38/17 38/26 39/16
 43/22 44/25 45/15 46/23 46/24 47/13
 47/23 48/11 49/2 50/22 50/23 51/19
their [13] 2/15 10/12 12/19 19/5 19/20
 20/23 22/16 34/10 45/9 45/12 46/21
 49/17 51/11
them [14] 5/25 15/18 19/11 19/18 20/7
 26/7 26/26 30/18 35/16 43/13 46/21
 47/14 51/9 51/12
themselves [2] 30/14 34/18
then [18] 3/11 6/16 12/2 25/22 26/2
 26/14 26/19 27/14 29/6 29/23 33/20
 36/13 38/3 38/21 41/17 46/11 46/25
 50/5
theories [1] 4/11
there [67]
thereafter [1] 32/22

Thereby [1] 24/4
therefore [2] 15/4 20/13
these [27] 4/17 9/19 13/21 13/22 15/17
 17/19 17/19 18/2 18/21 20/8 20/9 24/10
 24/13 28/4 30/2 30/20 30/22 32/6 32/8
 34/8 35/21 36/11 39/10 39/13 42/25
 43/2 44/12
they [84]
they'd [1] 43/26
thing [7] 6/25 10/17 16/23 28/23 32/21
 39/13 48/26
things [9] 6/26 11/7 14/17 18/21 21/11
 27/15 32/8 46/20 49/4
think [33] 4/23 5/20 8/16 9/17 12/11
 13/8 15/2 15/12 16/21 18/10 19/4 19/11
 20/26 21/26 22/18 22/22 25/19 28/20
 29/2 30/3 33/26 33/26 34/2 34/3 35/7
 35/7 35/24 35/26 38/5 43/5 44/22 45/8
 47/2
thinks [1] 36/5
third [3] 40/24 46/9 46/13
this [139]
those [8] 8/26 9/11 10/3 10/7 20/7
 39/15 40/14 50/17
though [1] 24/11
thought [4] 24/22 38/8 45/10 51/13
threatened [1] 25/13
three [14] 3/8 10/3 15/14 17/6 21/16
 21/26 22/20 25/4 25/5 34/20 40/13
 40/15 44/13 49/14
through [9] 8/10 16/3 16/12 25/20 26/13
 29/14 39/9 41/12 49/2
throw [1] 50/5
throwing [1] 4/26
thrown [1] 5/2
thus [2] 6/19 9/3
TI [1] 27/14
ties [1] 7/14
time [7] 3/26 20/21 24/21 28/4 40/15
 50/7 51/17
title [1] 9/11
today [7] 17/2 21/13 22/22 24/8 45/10
 45/14 51/24
together [1] 24/19
TOLAS [2] 2/16 51/26
Tom [1] 23/24
TONY [2] 2/14 21/8
too [1] 32/12
took [4] 4/21 36/19 41/14 49/22
top [1] 17/22
totally [1] 11/4
TPR [44] 1/8 1/21 2/22 2/22 7/21 8/3
 8/15 8/18 9/4 15/11 15/26 17/14 17/17
 17/18 18/7 20/22 32/3 33/5 33/7 33/9
 33/9 33/11 33/12 33/15 33/19 36/6 36/6
 36/23 37/2 38/6 39/15 40/22 40/22
 40/23 41/2 41/14 45/26 47/13 47/14
 47/15 47/16 47/17 47/17 47/18
TPR's [2] 18/16 20/26
transaction [1] 51/17
transactions [3] 24/14 41/4 44/12
transcript [3] 27/7 51/22 51/26
transfer [2] 9/11 17/19
transferred [4] 7/8 8/3 17/19 37/5
transferring [2] 11/8 17/11
transparent [1] 34/3
transpired [1] 10/3
trap [1] 38/10
TRI [19] 7/8 7/10 7/22 15/17 23/21
 23/24 23/25 29/24 33/15 39/10 39/12
 39/14 39/21 39/22 39/24 41/4 43/14
 43/25 46/2
TRI's [3] 39/8 39/11 43/16

triage [1] 23/6
trial [2] 16/8 42/22
tried [3] 15/19 16/22 34/9
tripled [1] 18/13
TRO [4] 32/12 32/14 46/4 50/24
troubles [1] 17/5
truck [1] 29/14
true [3] 6/7 22/26 51/25
truly [3] 36/5 36/6 37/26
Trump [5] 2/13 21/3 21/9 32/4 41/2
Trumps [1] 37/26
trust [83]
trust's [3] 29/16 29/20 39/12
trusted [1] 7/4
trustee [28] 3/18 3/21 3/21 4/4 4/14
 4/19 5/14 5/15 6/14 6/24 7/10 9/15
 13/12 18/15 18/18 18/19 24/11 26/20
 27/20 28/14 28/24 31/14 32/20 32/21
 34/13 38/9 39/20 40/11
trustees [3] 11/10 31/14 49/17
trusts [1] 23/9
truth [1] 4/10
truthful [1] 12/16
try [8] 3/15 3/24 29/21 33/24 34/5 34/6
 34/20 46/10
trying [3] 14/15 30/18 34/11
turn [1] 20/17
turns [1] 47/24
two [14] 7/16 8/24 11/11 11/14 11/24
 12/9 12/9 15/14 15/23 19/19 25/5 25/25
 27/11 32/6
two-day [1] 12/9
type [1] 8/5

**U**

UCC [1] 25/24
ultimate [1] 38/24
ultimately [1] 38/3
unaffected [1] 39/25
unbeknownst [2] 14/17 14/18
uncollectible [4] 49/23 49/25 50/4 50/5
under [14] 5/14 18/20 23/21 28/10
 29/10 29/12 29/17 30/2 35/14 38/11
 45/4 45/24 45/26 46/2
underscored [1] 50/22
understand [6] 4/3 11/24 14/19 38/14
 38/19 50/7
understands [1] 36/6
undertaking [3] 48/16 48/18 49/5
Unfortunately [1] 42/23
unfounded [1] 5/23
unheard [1] 20/20
unique [1] 25/13
unless [1] 4/10
unpaid [1] 27/23
unprecedented [1] 10/13
unprecedentedly [1] 26/15
unpunished [1] 6/2
unsworn [1] 47/4
until [6] 22/15 23/9 29/8 41/23 43/23
 50/17
unwarranted [1] 11/5
up [25] 8/26 9/19 10/25 13/9 18/11
 20/14 21/21 22/19 29/2 29/7 30/14
 31/11 33/6 35/15 35/15 41/7 41/12 44/7
 46/7 46/19 46/24 47/13 47/20 48/21
 48/22
upon [8] 11/13 23/20 27/21 29/12 38/16
 48/12 51/4 51/8
us [12] 3/8 5/20 6/10 8/18 17/5 19/23
 22/24 22/25 23/10 24/17 30/19 38/11
use [3] 13/14 45/13 48/11
used [3] 36/22 37/23 38/5

## V

vacation [1]  50/8
valid [1]  25/23
validly [1]  18/19
value [2]  33/9 37/25
various [2]  6/26 40/14
verse [1]  10/2
versions [1]  26/13
very [15]  5/7 8/13 15/14 16/12 18/3
23/12 42/21 44/10 44/20 44/23 45/13
45/16 46/6 47/2 47/10
via [1]  51/21
vindicated [1]  34/24
violate [3]  9/20 20/11 44/13
violated [8]  10/3 19/8 19/8 19/10 19/12
25/19 39/17 45/4
violating [2]  17/6 46/11
violation [5]  18/5 22/13 25/14 29/3 47/6
vis [4]  39/12 39/12 39/13 39/13
vis-a-vis [2]  39/12 39/13

## W

WACHTEL [7]  1/19 36/3 41/7 41/15
45/6 45/7 47/13
wait [1]  35/4
waiting [1]  19/23
waive [1]  28/25
waived [1]  30/26
waives [1]  28/3
walk [2]  15/26 19/22
walked [1]  36/25
want [18]  4/3 4/5 4/6 4/7 4/18 5/3 13/11
14/9 15/20 20/3 20/3 20/3 20/5 20/20
20/21 30/20 37/15 45/3
wanted [1]  50/15
wants [4]  15/4 16/6 35/26 42/11
war [1]  20/4
WARREN [1]  1/26
was [61]
wasn't [2]  10/22 42/14
watching [1]  38/6
way [19]  5/9 5/10 6/4 12/10 12/25 15/5
16/11 16/18 19/26 21/22 22/4 24/7
27/26 30/11 30/23 34/10 34/12 35/12
51/9
ways [2]  24/8 39/22
we [128]
we'll [2]  11/13 36/26
we're [21]  11/20 15/2 15/2 15/18 16/3
16/26 17/10 17/17 24/2 26/4 30/18
32/23 32/24 38/26 39/3 43/7 45/14
46/18 46/23 47/20 48/24
we've [9]  15/15 17/6 18/17 19/12 22/17
24/17 46/17 46/26 47/3
weather [1]  10/24
week [4]  26/24 38/11 38/13 46/14
weeks [1]  16/11
welcomed [1]  30/15
well [18]  8/25 15/2 20/26 21/2 23/18
27/20 27/26 28/2 28/19 31/12 31/22
33/15 33/23 33/26 35/6 43/10 47/14
49/26
went [2]  31/15 33/15
were [14]  3/8 6/16 12/14 21/12 22/2
25/22 41/11 42/5 42/26 43/3 45/4 45/10
47/9 48/11
Westlaw [1]  35/10
what [64]
what's [4]  2/21 3/16 7/6 45/25
whatever [6]  16/6 26/18 29/19 33/20
39/14 46/26
whatsoever [4]  15/6 28/4 28/25 29/22

when [22]  2/19 3/25 4/5 4/20 10/6
12/12 13/8 14/23 16/12 23/2 23/26
31/14 37/19 38/15 38/20 39/9 39/22
40/6 42/13 42/14 44/15 49/24
whenever [1]  17/3
where [9]  5/25 6/8 21/23 32/5 34/16
42/24 43/2 45/22 48/11
whereby [1]  15/21
whether [4]  12/8 25/19 40/10 41/23
which [57]
while [3]  23/15 32/25 43/7
White [1]  2/5
who [26]  2/15 4/12 5/7 5/11 5/21 5/22
11/21 12/6 13/11 14/7 14/10 14/10 20/2
21/6 24/16 30/24 31/3 32/4 32/6 32/7
33/7 33/19 38/18 42/22 43/24 47/13
who's [1]  5/19
whoever [1]  36/5
whole [1]  39/7
whom [2]  5/5 47/17
whoosh [1]  33/15
why [30]  3/12 4/3 4/5 4/11 4/12 5/3 6/2
11/24 13/18 16/26 23/17 24/6 25/17
25/18 26/5 26/11 26/19 27/19 29/22
31/6 31/26 32/8 32/18 36/11 38/26
39/18 40/25 41/9 41/11 44/25
will [31]  3/14 7/14 8/7 15/22 15/23 17/3
22/10 23/19 27/15 27/21 27/26 28/18
29/25 29/26 30/2 30/8 30/16 31/11
31/12 31/22 31/26 32/2 32/3 32/3 32/5
38/11 38/14 38/23 38/24 39/2 48/26
WILLIAM [2]  1/19 36/3
Wilmington [1]  21/14
win [2]  15/22 19/20
winds [1]  44/7
wise [1]  45/8
without [3]  5/24 16/24 41/19
won [1]  44/25
won't [3]  8/10 38/12 38/13
wonderful [2]  26/15 33/3
wondering [1]  21/12
word [2]  14/2 46/21
wording [1]  17/8
words [3]  34/9 38/5 45/8
work [2]  33/24 34/5
worked [1]  15/21
working [3]  3/3 3/9 16/11
world [2]  33/14 49/12
worst [1]  15/24
worth [7]  7/24 15/17 15/23 23/7 33/14
46/22 50/11
worthiness [1]  37/13
worthless [20]  18/13 36/19 36/21 36/22
36/24 37/2 37/3 37/5 37/9 37/21 37/23
37/25 41/8 41/9 41/9 41/11 41/17 41/17
42/4 46/21
would [31]  4/3 4/22 4/23 5/3 6/6 6/7
11/8 12/18 16/21 19/26 24/15 30/11
32/11 33/12 33/19 33/21 40/3 41/18
41/18 42/15 42/15 43/2 43/3 43/20 44/8
45/18 45/20 45/21 47/6 47/25 50/16
wouldn't [9]  6/9 6/10 6/11 12/15 12/18
13/15 13/18 27/7 44/8
wrapped [1]  20/14
writing [2]  7/21 44/21
written [1]  51/21
wrong [3]  15/7 35/7 49/6
wrongful [2]  6/15 6/16

## Y

year [3]  12/8 35/17 36/4
years [10]  12/26 13/4 15/2 15/16 17/7
25/2 25/3 34/20 42/13 42/14

Yes [2]  15/10 17/22
yesterday [4]  2/19 3/7 3/8 21/21
yet [2]  15/13 28/19
Yiddish [2]  13/14 13/16
YOAV [2]  1/18 22/6
YORK [24]  1/2 1/2 1/11 1/11 1/18 1/18
1/22 1/22 1/25 1/25 2/5 2/8 2/8 2/11
2/11 21/10 21/13 21/17 35/5 35/8 43/3
43/5 45/22 45/24
you [81]
you'll [3]  13/10 35/7 39/23
you're [6]  12/16 16/13 23/26 23/26 34/4
34/5
you've [1]  4/17
your [128]
yourself [1]  4/18

## Z

ZEICHNER [1]  1/16

E4TATPRA

1

E4TATPRAps
1  UNITED STATES DISTRICT COURT
1  SOUTHERN DISTRICT OF NEW YORK
2  ------------------------------x
2
3  TPR INVESTMENT ASSOCIATES, INC.,
3
4
4              Plaintiff,
5
5         v.                          13-cv-8243 (JFK)
6
6  PEDOWITZ & MEISTER LLP,
7  as escrow agent,
7  et al.,
8
8              Defendants.
9
9  ------------------------------x
10
10                                   New York, N.Y.
11                                   April 29, 2014
11                                   3:00 p.m.
12
12
13  Before:
13
14                    HON. JOHN F. KEENAN
14
15                                   District Judge
15
16
16                    APPEARANCES
17
17  MORGAN, LEWIS & BOCKIUS, LLP
18       Attorneys for Plaintiff
18  BY:  JOHN DELLAPORTAS, ESQ.
19       MARY C. PENNISI, ESQ.
19
20  ZEICHNER, ELLMAN & KRAUSE, LLP
20       Attorneys for Defendant Orly Genger
21  BY:  YOAV M. GRIVER, ESQ.
21       BRYAN LEINBACH, ESQ.
22
22  PEDOWITZ & MEISTER, LLP
23       Defendant Pro Se
23  BY:  ROBERT A. MEISTER, ESQ.
24
24  JUDITH BACHMAN, ESQ.
25       Attorney for Defendant Dalia Genger
                   SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

2

E4TATPRAps
1          (In open court)
2          THE COURT:  Good afternoon.
3          Before we get to the argument on the three motions, I
4  wanted to find out something.  Mr. Meister?
5          MR. MEISTER:  Yes, your Honor.
6          THE COURT:  How are you?  All right.  Now, you
7  represent your firm as Pedowitz & Meister, right?
8          MR. MEISTER:  Yes, your Honor.
                        Page 1

E4TATPRA
```
 9              THE COURT:  Do you any longer represent the Orly
10   Trust?
11              MR. MEISTER:  Not in this action.  I do in other
12   actions.
13              THE COURT:  OK.  Because I was concerned about the
14   possibility of a conflict.
15              MR. MEISTER:  We did get waiver letters at the very
16   outset, your Honor.
17              THE COURT:  All right.  You did.  But in this action,
18   Ms. Bachman, you're representing --
19              MS. BACHMAN:  Ms. Genger, Dalia Genger, correct, as a
20   trustee of the Orly Trust.
21              THE COURT:  You're representing Dalia Genger as
22   trustee of the Orly Trust?
23              MS. BACHMAN:  That's correct, your Honor.
24              THE COURT:  All right.  Fine.  I just wanted to make
25   sure I understood you.
```
                     SOUTHERN DISTRICT REPORTERS, P.C.
                              (212) 805-0300

                                                                 3

E4TATPRAps
```
 1         But you filed the briefs in this, Mr. Meister.
 2              MR. MEISTER:  I did, your Honor.
 3              THE COURT:  You did.  All right.  I just wanted to
 4   make sure I knew who was where.
 5         All right.  So first we're going to have argument on
 6   behalf of the motion that is being made to dismiss the action.
 7   And that's by Orly.  And, Mr. Leinbach, you're going to argue
 8   that, or Mr. Griver?
 9              MR. GRIVER:  Mr. Griver, your Honor.
10              THE COURT:  All right.  I'll hear you.
11              MR. GRIVER:  Thank you, your Honor.  And I'll be
12   seeking today to dismiss the action of TPR as well as the
13   crossclaims and interpleader action filed by Dalia Genger and
14   by Pedowitz & Meister as escrow agent.
15         Your Honor, on June 14th, 2012, you told the parties
16   before you in no uncertain terms that this Court would not
17   allow itself to be strongarmed into haling Orly into federal
18   court.  You reiterated that message on November 12, 2013, where
19   you stated, "It is inaccurate for TPR to suggest that the issue
20   of beneficial ownership is conclusively resolved."  Yet, only
21   six days later, on November 18th, TPR came in and brought an
22   action, followed by the actions and claims of the other
23   respondents.
24         So we are here again despite your instruction.  And we
25   are here on the flimsiest of grounds.  There is a specific
```
                     SOUTHERN DISTRICT REPORTERS, P.C.
                              (212) 805-0300

                                                                 4

E4TATPRAps
```
 1   September 1 escrow agreement that expressly sets forth five and
 2   only five enumerated rights in which proceeds -- and that's --
 3              THE COURT:  How do you fit this under subdivision 2 of
 4   that escrow agreement?  I don't see how you fit under that.
 5              MR. GRIVER:  Section 2 of the escrow agreement, your
 6   Honor, there is no way that TPR fits within section 2 of that
 7   escrow agreement.  I absolutely agree with you.
 8              THE COURT:  All right.
 9              MR. GRIVER:  And that's a whole point.  They come to
10   this Court and they ask you to direct the escrow agent to
11   disburse the escrow funds to it, $10.6 million.  But section 2
12   says, "No funds shall be disposed from escrow, from the escrow
13   account except in accordance with section 2."  And there is no
```
                              Page 2

E4TATPRA
14   question that TPR --
15           THE COURT:  Their argument is section 2, and you say
16   it doesn't apply.
17           MR. GRIVER:  It does not apply.  But that's not really
18   the argument, your Honor, because in their opposition brief,
19   they say, well, we kind of almost sort of applied.  But "kind
20   of almost sort of" is not what you look for in escrow
21   agreements.  You have to scrupulously adhere to the specific
22   terms.  This was a negotiated agreement.  Every one counts, and
23   section 2 has to be met, and they don't do it.
24           So instead they say to you this:  TPR asks you not to
25   enforce the escrow agreement but to help them breach it.  They
                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300
                                                            5

E4TATPRAps
1    ask you to ignore it.  Respectfully, your Honor, this is not
2    what courts do.  Courts do not amend or ignore agreements.
3    They enforce them.
4            TPR's argument is that there are final judicial
5    findings which conclusively established TPR's entitlement to
6    those funds.  TPR is gone.  One of those findings that they
7    claim exists is something that you said.  "TPR takes one
8    statement out of this Court's 52-page opinion."
9            THE COURT:  That's what all of you do.
10           MR. GRIVER:  Excuse me?
11           THE COURT:  I say, that's what all of you do in this
12   litigation, not just TPR.  Everybody does it in this
13   litigation.  I read the minutes.  What was it?  75 pages or 77
14   pages from the Delaware Chancery Court by the Judge who now, as
15   I understand it, is the Chief Judge of Delaware.  And he points
16   out that everybody picks words here.
17           Let me ask you a couple of questions.  All right.  The
18   state action claim, you're asserting an unjust enrichment claim
19   against TPR arising from a sale of the Orly Trust shares to the
20   Trump Group.  Am I right so far?
21           MR. GRIVER:  That's correct.
22           THE COURT:  All right.  Is that claim still viable, or
23   did Justice Jaffe dismiss it?
24           MR. GRIVER:  No, Justice Jaffe did not dismiss it.  It
25   is viable.
                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300
                                                            6

E4TATPRAps
1            THE COURT:  Now.  As I understand it, you have an
2    interlocutory appeal of certain rulings by the New York Supreme
3    Court.  There are two New York cases, right?
4            MR. GRIVER:  The two New York cases involving the
5    trust.
6            THE COURT:  OK.  One is on its way to the Court of
7    Appeals, I'm told?
8            MR. GRIVER:  No.  There is a motion seeking a leave to
9    appeal the unanimous decision of the Fourth Department.
10           THE COURT:  In other words, you would like to get to
11   the Court of Appeal.
12           MR. GRIVER:  TPR would like to get to the Court of
13   Appeal, Dalia Genger --
14           THE COURT:  It's not a done deal yet.
15           Now, the second thing that's in the state court, as I
16   understand it, that's your interlocutory appeal.  Right?
17           MR. GRIVER:  That's correct.
18           THE COURT:  All right.  Now, is that still extant?
                        Page 3

E4TATPRA
```
19          MR. GRIVER:  It is still extant.  We are going to be
20  arguing that shortly, your Honor, in about a month.
21          THE COURT:  Should I defer ruling on the motions here
22  until after the First Department rules?  Did the First
23  Department case ever have anything to do with this situation
24  here?
25          MR. GRIVER:  What Justice Jaffe did was, she dismissed
```
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

                                                                7

E4TATPRAps
```
1   some of our claims, but not others, including unjust enrichment
2   claims against Sagi Genger and TPR.  TPR has cross-moved to
3   dismiss everything.  So we have that the Court, in the
4   alternative, stay, and that is certainly something that the
5   Court can do, and that is to stay matters until the end of the
6   appeal process.
7           THE COURT:  OK.  Why does it matter whether I direct
8   the escrow agent, in other words, Pedowitz & Meister, to
9   release the 10.3 million to TPR?  Even if I do that, don't you
10  still have your claims for money damages?
11          MR. GRIVER:  We do have our claims for money damages,
12  your Honor, but --
13          THE COURT:  Well, what difference does it make?
14          MR. GRIVER:  Well, for one thing it would be violating
15  the escrow agreement.  For another thing, there's no basis for
16  the Court to take that action.  There has been no finding that
17  would permit the Court to do that.  TPR has moved for summary
18  judgment, but there are issues of fact as to whether TPR has
19  the right to those moneys.
20          I'll give you one example.  TPR is in the First
21  Department right now seeking leave to appeal to argue that they
22  have absolutely no right to those proceeds because they entered
23  into a settlement agreement in 2011 that gave all those
24  proceeds to the Orly Trust.
25          I'll give you another example.  We have a special
```
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

                                                                8

E4TATPRAps
```
1   proceeding before Justice Jaffe right now where we claim that,
2   under the escrow agreement, because of the failure to timely
3   object under the specific express terms of the escrow
4   agreement, the escrow agent shall disburse those moneys to
5   Orly.
6           THE COURT:  You've been litigating in New York State
7   Supreme for years, right?
8           MR. GRIVER:  Correct.
9           THE COURT:  Does the escrow agreement even mention New
10  York Supreme?
11          MR. MEISTER:  It does not, your Honor.
12          THE COURT:  I know it doesn't.  That's why I asked the
13  question.
14          MR. GRIVER:  Right.  It does not, your Honor.
15          THE COURT:  Yes.  But you're saying to me that I can't
16  rewrite the escrow agreement, that I should read it strictly.
17  And it's your position that -- is it your position that New
18  York doesn't have the power to litigate the dispute over the
19  money?
20          MR. GRIVER:  No, your Honor.  This is not the first
21  time that we've been in front of you saying that the New York
22  State Court should be the one to decide it.  There is no
23  question that it is a court of competent jurisdiction.  The
```
                                Page 4

E4TATPRA

```
24    interpleader before your Honor, which was another attempt by
25    Pedowitz & Meister to give this Court jurisdiction, if you look
                SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300
```
                                                                    9
E4TATPRAps
```
 1    at section 2.C.3 of the escrow agreement, it says that the only
 2    thing that the escrow agent can do is to interplead the funds
 3    in a court of competent jurisdiction in order to, quote, obtain
 4    an order from such court requiring the other parties hereto to
 5    commence an arbitration proceeding pursuant to the purchase
 6    agreement to resolve all issues arising pursuant to this escrow
 7    agreement, period, end quote.
 8            Pedowitz & Meister cannot come in here and interplead
 9    and ask you to decide who gets the proceeds.  That's not what
10    the interpleader is for.  That's the specific language of this
11    agreement.  Nor can they come in and ask you to release them as
12    escrow agents.  They can, under 2.C.2, resign.  But the relief
13    that they seek is outside the specific language of the escrow
14    agreement.  They simply can't do that under the escrow
15    agreement.
16            And, your Honor, I helped negotiated this escrow
17    agreement.  This was a hard-fought document.  And for them to
18    just say, well, now that we don't like the terms of that
19    agreement, why don't you, your Honor, ignore them, that's
20    unacceptable.  That's not correct.  That's not what this Court
21    should do.
22            And look, your Honor, they talk about your opinion as
23    giving TPR the right to the proceeds.  Now, certainly your
24    Honor didn't think so when it issued its decision on November
25    12th, 2013, when you said that the issue of who beneficially
                SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300
```
                                                                   10
E4TATPRAps
```
 1    owns the Orly Trust shares has not been decided.  But look what
 2    you said about the escrow agreement, in the opinion that they
 3    cite as you having determined that they have the right to the
 4    proceeds.  On page 24, you note the fact that in the state
 5    court the plaintiffs have, quote, privately contracted with the
 6    potential plaintiffs in the form of an escrow agreement which
 7    specifies the circumstances under which and to whom the escrow
 8    funds are to be released.  And then you go on to say, "Once a
 9    court enters judgment on this issue, the escrow agent can
10    disburse the escrow funds to the prevailing plaintiffs in
11    accordance with guidance set forth in the escrow agreement."
12            So this opinion, the Delaware stipulation, none of
13    that gives TPR or Dalia or the escrow agent the authority to
14    ignore the escrow agreement, which is exactly what they do.
15            So TPR argues that dicta in your opinion somehow was a
16    determination of beneficial ownership.  That's simply not true.
17    If you look at page 50 to 51 of your decision, you say exactly
18    what your finding is.  And that is that the claims, the
19    Pedowitz interpleader is dismissed for lack of subject matter
20    jurisdiction or pursuant to the Court's discretion to abstain.
21    And then you say, the pending action is stayed pending
22    resolution of the beneficial ownership of the Arie shares and
23    Orly Trust shares in the state courts.  Your Honor, the state
24    courts have not decided that.  If you look at the Delaware
25    stipulation, which is their attempt to say that that happened,
                SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300
```
                                                                   11
                           Page 5

E4TATPRA
E4TATPRAps
1  you'll see that that's not true at all.  First of all, the
2  stipulation proposed an order of dismissal involved a case that
3  did not involve Orly Genger, and she was not a party to this
4  stipulation.  Second of all, if you look at paragraph 5 of that
5  stipulation -- and that's Exhibit B to the TPR complaint -- TPR
6  claims that this Delaware stipulation conclusively establishes
7  TPR's rights to the proceeds.  But look what Section 5 says.
8  "The claims brought by TPR for the sale of proceeds against the
9  trustee of the Orly Trust and the Trump Group have already been
10 dismissed without prejudice."  As a matter of simple logic,
11 your Honor, this stipulation cannot determine TPR's rights to
12 the proceeds, when TPR's claims were previously dismissed.
13         We go on to say how paragraph 1 only talks about
14 findings that were actually canceled as to the Orly shares by
15 the Delaware Supreme Court.  Paragraph 2 does not answer the
16 question who has the right to the proceeds or who was the
17 appropriate seller of those TRI shares.  There's no question
18 now, because of the settlement between Orly as beneficiary and
19 the Trump Group, that the fact that they had the right to buy,
20 we no longer have any claims as to that.  But we certainly are
21 claiming that TPR had no right to sell.  That's what our unjust
22 enrichment claims are, your Honor.  That's why we have a 2010
23 action that has been there for four years.
24         Unless the Court has --
25         THE COURT:  You reserve how much time for rebuttal?
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

                                                              12

E4TATPRAps
1         MR. GRIVER:  Five minutes.
2         THE COURT:  All right.  Thank you.
3         MR. GRIVER:  Thank you.
4         THE COURT:  All right.  So next, we'll hear from,
5  Mr. Dellaportas is going to argue, right?
6         DELLAPORTAS:  Thank, your Honor.
7         THE COURT:  Would you use the lectern.  That way the
8  people behind you can hear you.  Thank you.
9         DELLAPORTAS:  Hopefully I'll be able to balance all
10 this.
11        THE COURT:  Put it on the rail there.
12        DELLAPORTAS:  Thank you, your Honor.
13        And this is essentially my opposition to the motion to
14 dismiss, and also my -- in support of the cross-motion for
15 summary judgment.
16        THE COURT:  Maybe I ought to take something up with
17 you right at the beginning before you get into your argument.
18 Not as long as you people but for some while I've had something
19 to do with this, and as I understood it, back when some of
20 these other cases were filed, TPR admitted that its principal
21 place of business was in New York City.  Now, nobody has raised
22 this, not anybody before me here has raised it.  But
23 jurisdiction is always something that's before me.
24        Now, as I read part of the 08 Civil 7140, that the
25 address for notice to TPR is care of Sagi Genger at 1211 Park
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

                                                              13

E4TATPRAps
1  Avenue.  Also, in the decision at 910 F.Supp.2d 657 -- I got
2  this from the papers, I didn't make it up -- Sagi Genger is a
3  joint United States and Israeli resident residing at 1211 Park
4  Avenue.
                              Page 6

E4TATPRA

```
 5              Now, at this point, you're saying that the reason that
 6  I have jurisdiction is because there is diversity and that
 7  TPR's principal place of business is in Connecticut, right?
 8              DELLAPORTAS:  Yes, your Honor.  And I can explain.
 9              THE COURT:  What?
10              DELLAPORTAS:  I can explain, if you'd like.
11              THE COURT:  All right.  Because we did a little
12  checking ourselves, and as I understand it -- and if I'm wrong
13  you correct me, and I'll certainly give you an opportunity to
14  say anything you want here -- as I understand it, Mr. Sagi
15  Genger put his house up, or the house, on Juniper Hill Road up
16  in Connecticut, in Greenwich, he put it up for sale.  Where is
17  he living?
18              DELLAPORTAS:  Connecticut, your Honor.
19              THE COURT:  What?
20              DELLAPORTAS:  Connecticut, your Honor.
21              THE COURT:  Is he still at Juniper Hill, or is he
22  somewhere else?
23              DELLAPORTAS:  I believe he's still at Juniper Hill.
24  This was never a home owner.  That was a rental.  Essentially
25  TPR has always been a Delaware corporation.
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

14

E4TATPRAps

```
 1              THE COURT:  I know that.  The question I'm asking you
 2  about is the principal place of business.
 3              DELLAPORTAS:  Until last summer his principal place of
 4  business was 1211 Park Avenue, in New York.  Now TPR, the
 5  president is Mr. Genger and he maintains a home office, which
 6  is the principal place of business.  Last summer, Mr. Genger,
 7  who has five children, two of his children have special needs.
 8  And so they found a special school in Connecticut.  And so the
 9  entire family moved there.  Over the last summer they moved
10  their house there and they moved the home office there.  And
11  all the correct filings were made with the state of Connecticut
12  to make sure that's right.  Now, we're still registered to do
13  business in New York.  But the principal place of business is
14  now Connecticut.  And before filing this we researched it, and
15  the case law says that you look to diversity questions and
16  citizenship at the time of the onset of the complaint.
17              THE COURT:  OK.  Go ahead.  That's fine.
18              DELLAPORTAS:  And the move has nothing to do with this
19  complaint or anything else.  It had to do with the special
20  needs.  We're happy to put in an affidavit to that effect.
21              As far as Mr. Genger being -- you asked something
22  about him being a joint U.S.-Israeli citizen?
23              THE COURT:  Yes -- joint New York or U.S. and Israeli
24  citizenship is not what concerns me.  It's the question of the
25  place of business.
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

15

E4TATPRAps

```
 1              DELLAPORTAS:  So we're satisfied that we have proper
 2  diversity jurisdiction and we're properly before this Court,
 3  your Honor.
 4              If I can proceed to the substance.
 5              THE COURT:  Go ahead.
 6              DELLAPORTAS:  So essentially, your Honor, we're here
 7  to enforce and implement the June 14th, 2012 order on its
 8  terms.  And I've read that it's dicta.  We don't believe that
 9  it's dicta.  Your Honor, we were all before your Honor some
```

Page 7

E4TATPRA
10  time ago.  And at the time, it was right after the Delaware
11  Supreme Court had ruled, somewhat ambiguously.  And Mr. Meister
12  came at that time and said, there are adverse claimants, there
13  is vexation litigation.  And your Honor said no.  And I think,
14  you know, it wasn't the position we took, but in retrospect we
15  didn't appeal it.  We think it was pretty common sense and the
16  legally correct decision, which is, there is no real adversity
17  here and thus no subject matter jurisdiction here under 28
18  U.S.C. 1335 because, as your Honor wrote, "All potential
19  claimants acknowledge that if Arie and the Orly Trust are
20  deemed -- if the 2004 transfer of shares to Arie and the Orly
21  Trust is found to be invalid, then TPR had the right to sell
22  the shares to the Trump Group and TPR would be entitled to the
23  interpleader funds".
24        Now, what's significant about this ruling is, this was
25  after the Delaware Supreme Court ruled how it did, because
                SOUTHERN DISTRICT REPORTERS, P.C.
                       (212) 805-0300

                                                              16

E4TATPRAps
1  they're taking the position that once the Delaware Supreme
2  Court didn't affirm under the escrow agreement all bets are
3  off.  Section 2.B.3 which talks about -- 2.B.2 -- which talks
4  about affirming, that doesn't count any more.  But that's not
5  what your Honor ruled.  What your Honor said is that any court
6  of competent jurisdiction can decide the beneficial ownership
7  and that will automatically determine who gets the shares.  And
8  your Honor said that the New York courts are well equipped to
9  do so and the Delaware courts are well equipped to do so and
10  probably New York is better, but you're going to leave that to
11  the parties to figure it out.  And you sent us all on our way.
12        So what happened next?  Well, TPR didn't file any
13  suits.  But this being it the Gengers, TPR didn't get sued just
14  in New York and didn't get sued just in Delaware.  We got sued
15  in both.  And I just heard that no court has made a finding of
16  beneficial ownership of the shares.  Absolutely incorrect.
17  Both courts have made a finding of beneficial ownership of the
18  shares.  Both are conclusive and final.
19        So let me just very briefly go through what happened
20  after your Honor made that ruling.  Your Honor knows some of it
21  from one of the prior skirmishes, but let me take you all the
22  way through it just again.
23        First, there was only one claim about beneficial
24  ownership of the shares -- that's what we're talking about
25  here -- in the 2010 action.
                SOUTHERN DISTRICT REPORTERS, P.C.
                       (212) 805-0300

                                                              17

E4TATPRAps
1        It's important to note, by the way, that the 2010
2  action that they're asking you to stay for, that was filed
3  before the escrow agreement was signed.  So Orly understood and
4  contracted that the determination of beneficial ownership of
5  the shares wasn't going to be determined by the 2010 action; it
6  was going to be determined by Delaware.  The 2010 action
7  already existed when she signed that agreement.
8        THE COURT:  Well, you were down in Delaware, right?
9        DELLAPORTAS:  I was, your Honor.
10        THE COURT:  Didn't the chancellor down there,
11  Chancellor Strine, didn't he tell you that once the stipulation
12  was signed in Delaware, that the place to go was New York
13  Supreme, not -- he didn't say anything about filing a new
14  action before me.  Isn't that why the stipulation in Delaware
                        Page 8

E4TATPRA
15  reads, quote, a court in New York, close quote?
16          DELLAPORTAS:  Chancellor Strine said a court in New
17  York.  It did not say a state court in New York or a federal
18  court in New York.
19          THE COURT:  He knows the difference between a federal
20  court and a state court.  Come on.  He referred twice in that
21  proceeding specifically to me.  And I read the minutes.  I read
22  them yesterday and I read them again this morning.  And both
23  place -- he talks about federal court and me, and he even
24  mentions something about the Constitution.  If he meant federal
25  court, he would have said federal court.
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300
                                                            18

E4TATPRAps
1           DELLAPORTAS:  He expressed the concern that perhaps
2   there wouldn't be diversity jurisdiction.  There is.  And even
3   if he meant state court, Chancellor Strine is a great judge but
4   he doesn't have the authority to tell us which court to go to.
5   He kicked us all out of his court and after that --
6           THE COURT:  He certainly did.
7           DELLAPORTAS:  After that it's up to us.
8           THE COURT:  He didn't express a great deal of pleasure
9   with any of you that I read.
10          DELLAPORTAS:  Yes.  And I think he's had his fill of
11  the Gengers, as have many judges.  But before he did, he
12  entered a final order saying that beneficial ownership of the
13  shares was TPR's and TPR properly sold them.
14          Let's compare what your Honor ruled versus what he
15  then ruled.  Your Honor said, "If the 2004 transfer of shares
16  to Arie Genger to the Orly trust is found to be invalid, then
17  TPR has the right to sell the shares to the Trump Group and TPR
18  would be entitled to the interpleader funds."
19          Now we did to what Chancellor Strine ruled.  He ruled
20  that the shares were invalid.  He used the term "void" but it's
21  the same thing.  The transfers were void and the stock reverted
22  to TPR and the Trump Group had the right to buy all of the
23  improperly transferred Trans-Resources stock from TPR.  And
24  then he said, it's now -- that transaction is complete.  These
25  are paragraphs 1 and 26 his ruling.
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300
                                                            19

E4TATPRAps
1           So his ruling gave exactly the ruling that your Honor
2   said we would need to obtain in order to satisfy the
3   interpleader the last time around.
4           Now, he didn't rule that we're entitled to the money.
5   He didn't want to rule that.  He said go to New York to figure
6   out who's entitled to the money.  But that doesn't stop the res
7   judicata or collateral estoppel effect on which the Court
8   ruled, on which your Honor ruled.
9           Just to be clear, we don't say Chancellor Strine said
10  we're entitled to the money.  We say this Court said under
11  express conditions we would be entitled to the money.
12          THE COURT:  You make a big point here, as I understand
13  it, as I read this, that Orly filed a state court action last
14  December and that she never claimed the funds in the original
15  Supreme Court action.  Right?  You make a point about that,
16  don't you?
17          DELLAPORTAS:  She never claimed ownership of them.
18  What she claimed was that by our obtaining them --
19          THE COURT:  Isn't that what the unjust enrichment
                            Page 9

E4TATPRA
20  claim is?
21          DELLAPORTAS:  Your Honor said exactly the opposite.
22  With respect to Arie's shares, which is the same shares, when
23  this was before your Honor last time -- and this is on page 24
24  of your Honor's decision -- your Honor noted the difference.
25  You said, "Well" -- and this is about Arie but it's the same
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

                                                              20
E4TATPRAps
1  shares -- "Well, Arie asserts a beneficial ownership in the
2  underlying Trans-Resources shares.  In no case does he have a
3  claim against the interpleaded funds themselves.  Instead,
4  Arie's numerous counterclaims seek money damages for a breach
5  of fiduciary duties that are ancillary to and beyond the scope
6  of the Skadden interpleader."
7          That is the same thing here.  They have money damages
8  claims.  Your Honor asked exactly the right question:  If they
9  give us the money, do they still have money damages claims?
10 Absolutely.  Absolutely they still have money damages claims.
11 And maybe they'll win and maybe they will be worth more than
12 10.3, maybe they will be less than 10.3.  But what's been
13 noted, that the first element of a claim for unjust enrichment
14 is that we were enriched.  And so far we're being sued for
15 unjust enrichment and we haven't been enriched.  So our point
16 is, at least allow us to be enriched.  And then we can have a
17 trial over whether it was just or unjust.
18          THE COURT:  Let me ask you one more question and I'll
19 wrap it up.  Are you saving time for rebuttal too?
20          DELLAPORTAS:  I will save a couple minutes.  But I
21 have a couple of great points, your Honor.
22          THE COURT:  Let me ask you this.  You're arguing that
23 the Delaware stipulation satisfies section 2.B.2 of the escrow
24 agreement, right?
25          DELLAPORTAS:  It does, your Honor.
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

                                                              21
E4TATPRAps
1          THE COURT:  OK.  Well, I don't know whether that's
2  technically true.  Aren't you really making a different
3  argument?  Aren't you really making an argument that there's a
4  drafting error here and that it would be consistent with the
5  spirit of the agreement, not with the verbiage?  Isn't that
6  what you're preliminarily saying?
7          DELLAPORTAS:  We're arguing two things, your Honor.
8  We make both points it our papers.  Number one is that this has
9  been litigated.  And once it's been litigated it doesn't matter
10 that somebody comes up with a clever argument after the fact.
11 They had an obligation.  If they thought it could only be the
12 Delaware Supreme Court, they had to speak up again, because if
13 that were the case, then we should have been before your Honor
14 two years ago and had this resolved.  But they said no.  They
15 took the opposite position.  They said it's impossibly to be
16 vexatious because everybody agrees how this thing should be
17 read.  Now they are saying, never mind, it actually should be
18 read some other way.
19          In the courts we only get to litigate things once,
20 your Honor.  And whether it's res judicata or collateral
21 estoppel --
22          THE COURT:  Not in this case.
23          DELLAPORTAS:  Well, there's a first time for
24 everything, your Honor.  And that's how it was interpreted by
                              Page 10

E4TATPRA
25    the Court.  And it was absolutely a necessary finding to the
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

                                                              22
E4TATPRAps
1     decision, but it's on what the Court pinned its finding of lack
2     of diversity.  That's where lack of subject matter jurisdiction
3     came from.  If they had said then that, oh, you can only have
4     the Delaware Supreme Court -- the Delaware Supreme Court had
5     already dismissed the case at that point.  But your Honor
6     said -- and they agreed, they urged this result -- that any
7     court of competent jurisdiction can decide it.
8            So now we haven't had one, we've had two courts, your
9     Honor, who have ruled on beneficial ownership.  And that's, I
10    think, something we're missing here.
11           Justice Jaffe, on January 3rd, 2012, issued her
12    decision where they only had one count of beneficial ownership.
13    If you look at the third amended supplemental complaint, Count
14    One is their count seeking beneficial ownership of the shares,
15    which is what we're talking about here.  And in it they sought
16    the following relief:  The 2004 transfer should be undone.  All
17    the shares should come back to TPR.  TPR should give them to
18    TPR2, a new company.  Arie should be put in control of TPR2.
19    And then 50 other ridiculous events.
20           This goes before Justice Jaffe, and Justice Jaffe
21    dismisses it.  Justice Jaffe rules, quote, Arie seeks to undo
22    the Delaware court's adverse findings against him and the Trump
23    Group's right to buy the invalidly transferred shares
24    notwithstanding the fact that they were transferred as a result
25    of his misrepresentation in the divorce.  In any event, any
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

                                                              23
E4TATPRAps
1     equitable or contractual right in favor of Arie to reform the
2     diverse stipulation does not override the preexisting
3     contractual right of the Trump Group to purchase the invalidly
4     transferred shares."  So she threw out their only claims of
5     beneficial ownership.
6            It goes up on appeal, your Honor -- and your Honor
7     asked before it.  It doesn't go up on appeal on that issue.
8     I'd like to read to you, because this is very important -- and
9     this happened after the last time we were here before your
10    Honor.  Last time your Honor said the beneficial ownership
11    claim is on life support or almost dead but not quite dead.
12    Since your Honor made that ruling, both Arie and Orly have
13    pulled the plug on that.  And so this is from her suit, this is
14    from her brief.  She says, "In June 2013, Orly and Arie entered
15    into a settlement agreement with the Trump Group that resolved
16    all issues between them in this case.  By this settlement, Orly
17    settled her individual claims and, as a result, is no longer
18    seeking beneficial ownership of the Orly Trust GRI shares."
19           Now, she says she still wants the money.  Good for
20    her.  But the shares, that's no longer pending in any court.
21    It was conclusively decided by Justice Jaffe.  It was
22    conclusively decided by Chancellor Strine.
23           Now, Chancellor Strine read a decision.  He thinks
24    she's got -- Orly's got a good unjust enrichment claim.  Maybe
25    he'll come and testify for her.  I don't know.  But that's not
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

                                                              24
E4TATPRAps

E4TATPRA

1   what we're here for today.  We're not here on Orly's money
2   damages claims.  Your Honor said time and again, this Court is
3   not going to hear money damages claims again.  Those are in the
4   state court for better, for worse.  We respect that decision.
5   We're not seeking to challenge it.  All we're seeking to do is
6   implement the very strict ruling of this Court on June 12th
7   that if we satisfied certain conditions, that we would be
8   entitled to the funds.  We have satisfied those conditions.
9              THE COURT:  OK.  You saved time for rebuttal.
10             DELLAPORTAS:  Very briefly, your Honor?
11             THE COURT:  Very briefly, if you're going to do
12   rebuttal.
13             DELLAPORTAS:  You asked if we proceed under 2.B.2.
14   And we do proceed under 2.B.2.  We don't think it's a drafting
15   error.  We think that, inconsistent with the case we cited in
16   our brief, that it needs to be read that every provision of an
17   escrow agreement needs to be read to fulfill the overall
18   purpose.  And the overall purpose of this agreement was, if we
19   owned the shares and we sold the shares, to give us our
20   proceeds from selling the shares.  It's not complicated.
21             We also proceed under 2.B.5.  We made a written
22   request under 2.B.5.  We said, why don't we all just agree, why
23   don't we all not be Gengers for once in our life and agree just
24   to release this, subject to all your money damages claims.  And
25   we made that on November 18th.  That's Exhibit C to our papers.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

25

E4TATPRAps

1   They responded, no, we object.  That's Exhibit D to their
2   papers.
3              When you get a written letter --
4              THE COURT:  All right.  Come on.
5              DELLAPORTAS:  Yes.  When you get a written request and
6   you have an objection --
7              THE COURT:  Thank you.  Save your time for rebuttal.
8              DELLAPORTAS:  -- the only way for the escrow agent to
9   release the funds is by order of the court.  So at this point
10  we need an order of some court, and we believe this court is
11  the correct court.  Thank you, your Honor.
12             THE COURT:  Thank you.
13             All right.  Now, who is going to argue here on behalf
14  of Pedowitz & Meister?
15             MR. MEISTER:  I would, your Honor, but I think it may
16  make sense that Ms. Bachman argue briefly on behalf of
17  Ms. Genger.
18             THE COURT:  All right.
19             MS. BACHMAN:  Good afternoon, your Honor.
20             THE COURT:  Good afternoon.
21             MS. BACHMAN:  I do not believe I'll need any time for
22  rebuttal because I'll be very brief.
23             As I understand it, Ms. Genger's crossclaim,
24  counterclaim here was pursuant to the settlement agreement that
25  the parties have made that the Orly Trust was entitled to the

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

26

E4TATPRAps

1   proceeds, which are currently being held in escrow.  As this
2   Court is aware from the numerous papers that have been filed,
3   Justice Jaffe tells us that settlement agreement was either
4   void or voidable, and subsequently on appeal to the First
5   Department, the First Department affirmed that decision.

Page 12

E4TATPRA
6      Accordingly, it seems that the logic behind
7  Ms. Genger's claims is now in jeopardy and therefore we don't
8  object if this Court would direct that the escrow be given to
9  TPR.  TPR has represented to the Court and there is an oral
10  understanding, to my knowledge, that if on further appeal of
11  the First Department decision the settlement agreement is
12  deemed to be valid, then TPR will act in accordance with the
13  settlement agreement and return the money to the trust.
14      THE COURT:  Let me ask you this question.  You
15  represent Dalia now, right?
16      MS. BACHMAN:  That is correct, your Honor.
17      THE COURT:  Personally, right?
18      MS. BACHMAN:  As the trust -- her role here, I
19  believe, is as the trustee of the trust.
20      THE COURT:  Well, how can she do both?  She is the
21  trustee for the Orly Trust.  Right?
22      MS. BACHMAN:  That is correct.
23      THE COURT:  And as I read Chancellor Strine's -- now
24  he's chief justice down there, chief judge.  As I read his
25  remarks, he kept suggesting that she no longer should be
                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

                                                    27

E4TATPRAps
1  trustee, didn't he?  Did you read that?
2      MS. BACHMAN:  I am familiar with that.  To my
3  knowledge, your Honor, the surrogate court in New York has, at
4  least to date, deemed that Dalia is an appropriate
5  representative of the trust.
6      THE COURT:  Aren't she and Arie estranged?
7      MS. BACHMAN:  They are clearly at odds, your Honor.
8  But that does not -- that's not, if you will -- in the
9  structure that we have of trusts, I believe that a beneficiary
10  does not necessarily have the discretion to choose the trustee.
11  It's the trust document itself that determines who should be
12  the trustee and how that trustee is appointed.  And until the
13  surrogates court rules otherwise, I believe that she is the
14  appropriate representative of the trust.
15      THE COURT:  All right.
16      Anything else you want to say?
17      MS. BACHMAN:  That's all, your Honor.
18      THE COURT:  Thank you.
19      MS. BACHMAN:  Thank you.
20      THE COURT:  I'll hear from you, Mr. Meister, briefly.
21      MR. MEISTER:  Your Honor, Robert Meister for Pedowitz
22  & Meister, pro se.
23      I also will be brief.  I don't think I will need any
24  time for rebuttal.
25      First, as trustee -- escrow agent, I should say -- we
                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

                                                    28

E4TATPRAps
1  received multiple claims for the same proceeds.  We didn't
2  commence an interpleader action.  Rather, we filed an answer
3  using rule interpleader, defense of interpleader.
4      I heard my colleague, Mr. Griver, say that the escrow
5  agreement says we can't do that.  But I've read the escrow
6  agreement many times.  In fact, I blush to say I drafted it.
7  And it doesn't say that.  It says that if there are conflicting
8  claims, the escrow agent can, among other things, do nothing.
9  It also says other things that it may do.  It doesn't say
10  anything that it can't do, in terms of the interpleader.
                        Page 13

E4TATPRA

11        So while the escrow agent could have started an
12  interpleader seeking arbitration, we didn't.  We didn't start
13  any interpleader.  And I don't believe that even if the
14  agreement purported to prevent the escrow agent from taking
15  advantage of federal law, that that would be lawful.  But we
16  don't have to worry about that.  It didn't.
17        Why do we like interpleader as opposed to your Honor
18  just saying, here's judgment, here's the proceeds where the
19  proceeds go, the way any normal case would be decided?  The
20  interpleader gives the parties who have -- whoever the Court
21  determines has the right to the money -- gives them the same
22  thing.  It gives the interpleader, as escrow agent, a
23  discharge.  And since my colleague, Mr. Griver, has come up
24  with numerous creative theories in the course of these
25  litigations, in particular his December action, which seeks
                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

                                                          29
E4TATPRAps
1   damages against the escrow agent for not turning all the funds
2   over to Orly, we think that discharge by this Court would
3   surely be something good to have, something we're entitled to
4   as a matter of law.
5         The only other thing I would say to the Court is, I
6   did check the account.  The current balance in the escrow is
7   $10,376,163.20.  That's going to change on April 30.  So I take
8   it that when the Court decides this, if the Court decides that
9   the money should go to someone or the other --
10        THE COURT:  It can be tomorrow.
11        MR. MEISTER:  If it's tomorrow --
12        THE COURT:  Tomorrow's April 30th.
13        MR. MEISTER:  It is.  It is.  The way Chase credits
14  things, I send out a notice to all the parties every month.
15  The credit comes in on April 30th.  Not in a huge amount of
16  money.  It's now earning 0.15 percent interest.
17        THE COURT:  Yes.  I'm aware of the bank statements.
18        MR. MEISTER:  The only thing that I would say apropos
19  of the claim against the escrow agent is that there was an
20  objection to the Orly claim.  It's attached to my papers.  The
21  notice went out.  Mr. Griver says he doesn't remember receiving
22  it.  His client doesn't open her mail, so it's not a problem
23  there.  But the point is, the escrow agreement does not require
24  the escrow agent to send out notices of objection.  It does
25  require notices of claims.  There's no argument that notices of
                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

                                                          30
E4TATPRAps
1   claims weren't sent out.  So I don't see how the escrow agent
2   can be faulted in that case.
3         And with that I'll just remind your Honor of the old
4   Russian proverb, which I should have borne in mind when
5   agreeing to become here, as escrow agent, that no good deed
6   remains unpunished.
7         THE COURT:  Thank you.
8         All right.  So first we're going to have Mr. Griver's
9   rebuttal.  Go ahead.
10        MR. GRIVER:  Thank you, you, your Honor.  As
11  demonstrated, TPR's plea is that you allow it to ignore the
12  escrow agreement because it's as if they had met its
13  requirements.  Orly gave up fundamental rights to reach the
14  specific language of the escrow agreement.  They admit they
15  don't need it.
                        Page 14

E4TATPRA

16    They say instead that beneficial ownership has been
17  decided.  Well, look at what the New York court said on May 29,
18  2013.  And this was at page 3 of our memo.  It says, "Nor can
19  TPR's unilateral declaration of ownership be reconciled with
20  the undisputed fact that the issues of ultimate beneficial
21  ownership in such shares and the related proceeds have not yet
22  been judicially determined by a court of competent
23  jurisdiction."  Look at what you said just one week before they
24  came in and said, oh, it's been determined.  You said,
25  "Therefore, it is inaccurate for TPR to suggest that the issue

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

31

E4TATPRAps
1  of beneficial ownership is conclusively resolved."
2        What Mr. Dellaportas does is, he mixes and matches the
3  arguments of Arie Genger and Orly Genger.  I am in front of you
4  have representing Orly Genger and the Orly proceeds and the
5  Orly shares.  Arie Genger is completely and entirely different.
6  Look at what your Honor said about what Orly was seeking to do.
7  "Orly moves to dismiss the federal action, to which they are
8  party, and asks the Court to stay the Delaware court chancery
9  action so the merits of their claim can proceed in New York
10  Supreme Court."  That's what Orly asked for.  That's on page 15
11  of your decision dated June 14, 2012.  Orly didn't say, I don't
12  care where it's being decided.  She said it should be in front
13  of the New York State court.
14        And your Honor went on to say that the decision on
15  beneficial ownership does not void or amend the escrow
16  agreement.  You have said that the proceeds will be provided
17  pursuant to the escrow agreement that all of the parties
18  contracted to.
19        As far as the Delaware stipulation is concerned, your
20  Honor, which, Orly has no part in that proceeding or in the
21  stipulation, paragraph 1 just references -- it said "in an
22  action styled TR Investments, LLC, the Court found that" -- it
23  isn't making new findings.  It is just memorializing what
24  happened before.  It does not go on to say, but those findings
25  as to the Orly Trust and the Orly Trust shares and the Orly

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

32

E4TATPRAps
1  proceeds have been voided by the Delaware Supreme Court --
2  which is exactly what happened.
3        Paragraph 2 does not say -- and Mr. Dellaportas said
4  this but it's not true.  It does not say TPR had beneficial
5  ownership.  All paragraph 2 says is that the Trump Group owns
6  those shares.  It talks about the buyer.  It does not talk
7  about the seller.
8        In paragraph 3, Dalia and TPR get together and try and
9  amend the escrow agreement to say, well, you can go to a court
10  of competent jurisdiction.  But paragraph 9 of the escrow
11  agreement, in two places, says everybody has to agree.  And
12  they keep forgetting about Orly and they keep forgetting about
13  the fact that Orly is a party to this.
14        And finally, your Honor, it can't be a decision of
15  TPR's right to the sale of proceeds because --
16        THE COURT:  Hold it.  Slowly.  Slowly.
17        MR. GRIVER:  OK.  It cannot be, your Honor, a decision
18  of TPR's right to the sale of proceeds, because it specifically
19  memorializes the fact that those claims were dismissed prior to
20  this stipulation.  That was language that acknowledged the fact

Page 15

E4TATPRA

21  TPR chose to dismiss its claims and as a result the stipulation
22  has nothing do with its rights to those proceeds.
23        Your Honor, I think that they're ignoring Orly at
24  every stage of the proceeding and ignoring the agreement that
25  they reached with Orly in the escrow agreement.  It runs

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

33

E4TATPRAps

1  through this entire case.  The escrow agent, right, had a clear
2  conflict of interest.  We raised it.  We've raised it in the
3  New York State action.  The waiver that he says he obtained, he
4  never obtained it from the beneficiary of the trust.  He went
5  to his client Dalia and said, is it OK if I represent you and
6  somebody else.  But he never went and say, hey, how can I do
7  this.  For Dalia to stand up as trustee and say, oh, give it to
8  TPR, is exactly why we have been trying through Dalia for years
9  now, why we objected to appointment in the first place, and why
10  Dalia was recently found to have violated her fiduciary duties
11  in one of the secret agreements that she entered into with TPR.
12        THE COURT:  You said "finally" about five minutes ago.
13        MR. GRIVER:  Well, your Honor, then I'm pleased to say
14  that I am finally done.
15        DELLAPORTAS:  One minute?
16        THE COURT:  Yes.  There is a little time.  Go ahead.
17        DELLAPORTAS:  I just wanted to respond to a couple
18  things that were said.  It was alleged that we've mixed Arie
19  and Orly.  Exhibit N to our papers, page 26, is Orly's
20  appellate brief, which was filed with the Appellate Division
21  after your Honor ruled that the beneficial ownership of the
22  shares was on life support but not yet dead.  And then Orly
23  says she settled with the Trumps and, quote, Orly is no longer
24  seeking beneficial ownership of the Orly Trust PRI shares.
25        Beneficial ownership is over, your Honor, of the

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

34

E4TATPRAps

1  shares.  Now they say, now we want the money.  Great.  But
2  that's not what the ruling is, your Honor.
3        They also said that Chancellor Strine's ruling,
4  paragraph 2, speaks only as the buyer and not the seller.
5  Absolutely incorrect.  What Chancellor Strine ruled in
6  paragraph 2 was, "The Trump Group, having closed on the
7  purchase of the so-called Orly Trust shares" -- here's the
8  important part -- "pursuant to and under the terms of the side
9  letter agreement between TPR and the Trump Group."  That's the
10  ruling.  The side letter agreement is in the record.  That's a
11  contract whereby we sold those shares to them.  Exactly the
12  ruling your Honor said we needed to get in order to get our
13  proceeds.
14        We've gotten the ruling that the Court asked us to
15  get.  We would now like our proceeds.  Thank you very much,
16  your Honor.
17        THE COURT:  Thank you.  All right.  Decision is
18  reserved.  Thanks very much.
19        MR. GRIVER:  Thank you, your Honor.
20                oOo
21
22
23
24
25

Page 16

E4TATPRA
SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300