1

```
    IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE
DALIA GENGER, as Trustee of the
Orly Genger 1993 Trust,                 :
                                        :
               Plaintiff,               :
                                        :
        v                               :     Civil Action
                                        :     No. 6906-CS
TR INVESTORS, LLC. GLENCLOVA INVESTMENT :
CO., NEW TR EQUITY I, LLC, NEW TR       :
EQUITY II, LLC, TRANS-RESOURCES, INC.,  :
and TPR INVESTMENT ASSOCIATES, INC.,    :
                                        :
               Defendants.              :
_____     :
TR INVESTORS, LLC, GLENCLOVA INVESTMENT :
CO., NEW TR EQUITY I, LLC, NEW TR       :
EQUITY II, LLC, and TRANS-RESOURCES,    :
INC.,                                   :
                                        :
        Counterclaim and Crossclaim     :
        Plaintiffs,                     :
                                        :
        v                               :
                                        :
DALIA GENGER, as Trustee of the         :
Orly Genger 1993 Trust,                 :
                                        :
        Counterclaim Defendant,         :
                                        :
        and                             :
                                        :
TPR INVESTMENT ASSOCIATES, INC.,        :
                                        :
        Crossclaim Defendant.           :
                        - - -
                        Thursday, August 1, 2013
                        10:05 a.m.
                        - - -
BEFORE:  HON. LEO E. STRINE, JR., Chancellor.
                        - - -
        STATUS CONFERENCE AND RULINGS OF THE COURT
```

----------------------------------------------------------------

CHANCERY COURT REPORTERS
New Castle County Courthouse
500 North King Street - Suite 11400
Wilmington, Delaware 19801
(302) 255-0523

2

```
1   HELD AT:

2         Chancery Court Conference Room
          New Castle County Courthouse
3         500 North King Street
          Wilmington, Delaware
4

5                   - - -

6   APPEARANCES:

7
          JEREMY D. ANDERSON, ESQ. (Telephonically)
8         JOSEPH B. WARDEN, ESQ.
          Fish & Richardson P.C.
9             for Plaintiff/Counterclaim Defendant Dalia
              Genger
10
          THOMAS J. ALLINGHAM, II, ESQ.
11        DOUGLAS D. HERRMANN, ESQ.
          Skadden, Arps, Slate, Meagher & Flom LLP
12            for Defendants/Counterclaim and Crossclaim
              Plaintiffs TR Investors, LLC, Glenclova
13            Investment Co., New TR Equity I, LLC, New TR
              Equity II, LLC and Trans-Resources, Inc.
14
          AMY M. DUDASH, ESQ.
15        Morgan, Lewis & Bockius LLP
                   -and-
16        JOHN DELLAPORTAS, ESQ.
          of the New York Bar
17        Morgan, Lewis & Bockius LLP
              for Defendant/Crossclaim Defendant TPR
18            Investment Associates, Inc.

19

20                  - - -

21

22

23

24
```

CHANCERY COURT REPORTERS

1           THE COURT:  I appreciate everybody
2   being here on this beautiful morning.  I am trying to
3   understand the remaining mysteries of the Genger
4   family that relate to state of Delaware.  I have
5   absolutely no interest -- I'm not saying that in a
6   cold way, but I have no professional or personal
7   interest in other mysteries of the Genger family.
8           I'm not getting it.  And what I mean
9   is, there's something behind the curtain here that's
10  going on.  And part of what I need to understand, for
11  example, with the Orly Trust, is whether the mother
12  has some residual interest economically in the trust.
13  I understood the adversity before of -- to the extent
14  that Orly was aligned with her father, and I thought
15  one of the concerns about the suit brought by Dalia
16  was that Dalia was -- I think Dalia is the mother, as
17  I recall -- that Dalia was essentially aligned with
18  Sagi; was, in fact, not really bringing the lawsuit in
19  good faith on behalf of the beneficiary of the trust,
20  who was her daughter, but because the mother and the
21  son were in a sad rift with the father and daughter.
22          So that was perhaps my confusion, but
23  if I could understand what's going on.  Because I had
24  some modest hope, to be honest, that when Arie Genger

4

1    and Orly Genger resolved their disputes with the Trump
2    Group, that this would all go away.

3                    Now, it may be that the Genger family
4    are united in their love of our profession, and what
5    they wish to do is simply pay lawyers to the end of
6    time.  But we will be done with this case and it will
7    be done rapidly.  But before we get going on a case, I
8    want to know what's going on.

9                    And I don't mean -- don't tell me
10   technical terms.  Tell me who, flesh and blood, wants
11   money from someone else in their family.

12                   MR. ALLINGHAM:  Why don't I start,
13   because I think I actually can start and then step
14   back.  I think our position -- Tom Allingham for the
15   Trump Group.  Our position -- and this is actually
16   pretty simple.  When Dalia, on behalf of the Orly
17   Trust, filed the declaratory judgment in this court
18   seeking an order that she owned, beneficially owned
19   the Orly Trust shares, we counterclaimed saying that
20   the Trump Group beneficially owned the Orly Trust
21   shares, record ownership having already been decided.

22                   And from our perspective, no Court has
23   ever issued an order saying that the Trump Group has
24   beneficial ownership of the Orly Trust shares.  I

CHANCERY COURT REPORTERS

5

1   think it flows as the night to day from other orders,
2   but that's the position that we're in.
3                   And so we currently --
4                   THE COURT:  But is it your
5   understanding -- and I want to get everybody's
6   understanding -- that when Dalia filed this on behalf
7   of the Orly Trust --
8                   MR. ALLINGHAM:  Correct.
9                   THE COURT:  She was -- she is the
10  trustee of the Orly Trust?
11                  MR. ALLINGHAM:  She's currently the
12  trustee of the Orly Trust.  I think one complicating
13  factor, Your Honor, is that there is -- and I'll let
14  Mr. Dellaportas speak to this -- but there is an
15  argument that the Sagi Trust or some members of Sagi's
16  family have a residual interest in the Orly Trust.
17                  THE COURT:  Well, has anybody -- have
18  you seen the Orly Trust?
19                  MR. ALLINGHAM:  I'm sorry?
20                  THE COURT:  Have you seen the terms of
21  the Orly Trust?
22                  MR. ALLINGHAM:  No.
23                  THE COURT:  Okay.  Tomorrow, everybody
24  will see the terms of the Orly Trust.  So this is like

CHANCERY COURT REPORTERS

6

1    Dalia wasn't really representing Orly -- or as --
2                    MR. ALLINGHAM:  No.  I think Dalia was
3    representing the Orly Trust, and I think Dalia -- I'll
4    talk about flesh and blood people.  It is my
5    understanding that Dalia was concerned that Orly was
6    being dominated by her father.
7                    THE COURT:  Okay.
8                    MR. ALLINGHAM:  And so Dalia was
9    trying to protect the interests of the Orly Trust and
10   its primary beneficiary, Orly Genger.
11                   THE COURT:  But the argument in the
12   papers, as I reread the thing, was I gave up stuff in
13   the divorce so my child could have an inheritance.
14                   MR. ALLINGHAM:  That is one of the
15   claims, yes.
16                   THE COURT:  And that -- you know, this
17   is all part of the redo the divorce thing.  But that's
18   a strange -- I mean if the child of hers was
19   benefiting from that trust, for example, if the
20   idea -- I don't know when the trust terminated.
21   Again, everybody's doing, you know, their little --
22   nobody knows what's going on.
23                   It seems a little strange that it
24   was -- it maybe was Dalia was genuinely inspired by a

7

1   loyalty to Orly.  As I recall, Orly, through counsel,

2   expressed the idea that this was not a lawsuit that

3   she was all that hep on, and I believe argued that it

4   was -- yeah.  I think there was even concerns about

5   collusion at some point; that it was really a

6   collusive move with Sagi -- and in fact, your

7   clients -- to get a lay-down judgment by, you know,

8   putting into a court that had already ruled on the key

9   issue the question, and then getting essentially

10   another decision.

11            MR. ALLINGHAM:  That argument was

12   made.

13            THE COURT:  Have your clients -- I

14   mean who has spoken to who?  Have you spoken --

15            MR. ALLINGHAM:  We've all spoken, and

16   I -- it may be that John Dellaportas, who is here

17   representing the Sagi Trust, might --

18            THE COURT:  Well, who's

19   representing --

20            MR. ALLINGHAM:  I'm sorry.  TPR.

21            MR. DELLAPORTAS:  I'm here, Your

22   Honor, pro hac vice for TPR.  Mr. Connolly is out of

23   the country this week, so I'm --

24            THE COURT:  And TPR is controlled by

8

1   Sagi?

2              MR. DELLAPORTAS:  Yes, sir.  He's the

3   president, yeah.

4              THE COURT:  Well, does anybody else

5   own any stock in it?

6              MR. DELLAPORTAS:  The company is 99

7   percent owned by the Sagi Genger 1993 Trust, of which

8   Sagi Genger is one of several beneficiaries.

9              THE COURT:  Who are the others?

10             MR. DELLAPORTAS:  His five children.

11             THE COURT:  Okay.  That's basically

12  his line?

13             MR. DELLAPORTAS:  Uh-huh.  Yes, Your

14  Honor.

15             THE COURT:  Okay.

16             MR. DELLAPORTAS:  There's an

17  independent trustee.

18             THE COURT:  So what's going on with

19  the family?

20             MR. DELLAPORTAS:  Okay.  Your Honor, I

21  mean we're here today -- not to speak in legal terms.

22  As you asked, just cut to the chase.  And I've been

23  with these litigations for about -- the litigations

24  have gone on for about 12 years, Your Honor.  I've

9

1   only been for the last three years, so I can't say

2   that I've captured everything.

3                    THE COURT:  The litigations within the

4   Genger family?

5                    MR. DELLAPORTAS:  Yes.  Yes, Your

6   Honor.  But I think I have insight into a lot of

7   what's going on.

8                    So from our standpoint, we're a

9   corporate entity, TPR.  We sold 1100 shares to -- of

10  TRI to the Trump Group conditioned on there being a

11  finding that the Orly Trust is not the beneficial

12  owner.

13                   At a certain point, we made a demand

14  for the $11 million.  The escrow agent, who is another

15  law firm in New York, got a competing demand from

16  someone else and deposited it in an interpleader with

17  Judge Keenan in the Southern District of New York.

18                   Judge Keenan said there's no

19  interpleader jurisdiction because there's no real

20  competing claims on the funds.  This case is very

21  simple.  There's only one of two possibilities:

22  Either, number 1, the transfer of those shares -- the

23  original transfer of those shares to the Orly Trust is

24  valid, in which case the Orly Trust keeps the shares

CHANCERY COURT REPORTERS

1  and the Trumps get their money back; or the transfer

2  is invalid, in which case TPR had the right to sell

3  it, and did sell it, to the Trump Group, and TPR gets

4  their money.

5           But then Judge Keenan said, "But it's

6  not for me to decide who has beneficial ownership and

7  whether the original transfer was valid or invalid."

8  A state court should do that.  And so he basically

9  dismissed the interpleader case.

10           So where we are now is we need a

11  finding of beneficial ownership, whether it be the

12  Orly Trust or whether it be the Trump Group.  So --

13           THE COURT:  Now, I -- you know, I kind

14  of get that.

15           MR. DELLAPORTAS:  Yeah.

16           THE COURT:  You need -- as in this is

17  a law school hypothetical, and this is compelling redo

18  of something that's already done?  I'm talking about

19  human flesh and blood.  What is going on?  Orly

20  stepped out of this; right?

21           MR. DELLAPORTAS:  Yes.  Orly has

22  settled with the Trump Group and is still suing her

23  brother and her mother in various forms, and TPR.

24           THE COURT:  And so the mother, as

11

1   you -- I want to get your understanding.

2                     MR. DELLAPORTAS:  Okay.

3                     THE COURT:  The mother is suing on

4   Orly's behalf while the mother is suing Orly

5   elsewhere, and vice versa?  But she's suing on behalf

6   of Orly's trust even though Orly has definitively

7   renounced her interest to any assets of the trust?

8                     MR. DELLAPORTAS:  I don't think that

9   Orly -- Orly has definitively renounced her interest

10  to any claims against the Trump Group.  And I

11  believe -- although she has not shown the settlement

12  agreement, that's one of the things we're trying to

13  get to the bottom of.  But there's been allusions in

14  some of the pleadings filed in New York that Orly has

15  also renounced her claim to the beneficial ownership

16  of the shares, and she did that in the context of a

17  derivative suit she brought on behalf of the Orly

18  Trust.

19                    So one of the things we were hoping to

20  see is that settlement agreement, because if she took

21  actions derivatively on behalf of the trust which have

22  been approved by the Court, we think that resolves

23  this case automatically.

24                    THE COURT:  And is Mr. Anderson on the

12

1   phone?

2                   MR. ANDERSON:  Yes, Your Honor.  I'm
3   on the phone.

4                   THE COURT:  You purport to represent
5   Ms. Dalia Genger?

6                   MR. ANDERSON:  I don't purport to
7   represent her, Your Honor.  I do represent Dalia
8   Genger.

9                   THE COURT:  Okay.  Dalia Genger
10  purports to represent her daughter's best interest in
11  this?

12                  MR. ANDERSON:  Yes, Your Honor.

13                  THE COURT:  She claims her daughter is
14  incompetent?

15                  MR. ANDERSON:  No.  Not at all, Your
16  Honor.  Actually --

17                  THE COURT:  So, Mr. Anderson, explain
18  what's going on.  Because it's -- again, something's
19  got to start making sense to me.

20                  MR. ANDERSON:  Sure.  I spoke with my
21  client, Your Honor, yesterday in anticipation of this
22  phone call, and as Mr. Allingham said -- first of all,
23  I'll speak in terms of flesh and blood.  My client
24  Dalia really is acting as the trustee and wants to act

13

1    in the best interests of her daughter here.  She wants
2    her daughter, Orly, to get the best deal possible for
3    the price of her shares, and she's trying to do
4    everything she can in her power, you know, to act in
5    Orly's best interest here.
6                    THE COURT:  So she --
7                    MR. ANDERSON:  We don't know --
8                    THE COURT:  Okay.  Pause for a second.
9    She is now -- so she is now in a position adverse to
10   her son?
11                   MR. ANDERSON:  In this action?
12                   THE COURT:  Well, and in general;
13   right?
14                   MR. ANDERSON:  I -- yes, Your Honor.
15                   THE COURT:  So this is a change of her
16   alignment?
17                   MR. ANDERSON:  I don't understand, you
18   know, all of the history of the case as well as
19   Mr. Allingham and Mr. Dellaportas understand it, but
20   she's seeking to act in the best interests of her
21   daughter here.
22                   THE COURT:  Well, right.  But this
23   isn't -- I'm not sure that you've been -- I mean,
24   look.  If you're a magic man we're all going to be

1  happy, because if you can turn this into something
2  where the Trump Group gets what it wants, Sagi gets
3  what he wants, and your client gets what she wants on
4  behalf of her daughter, then you've found a way to
5  have money reproduce itself.
6              MR. DELLAPORTAS:  Your Honor --
7              THE COURT:  This is a zero sum game.
8  The Trump Group is not going to -- they paid for
9  something.  They -- they're going to -- you know,
10 they're going to get money back or they're going to
11 get control of the shares.  And there's proceeds, and
12 they're either going to go to TPR or they're going to
13 go to the Orly Trust.
14             You know, if she wants to -- your
15 client wants to have, Mr. Anderson, a family
16 meeting -- because she's been betwixt and between and
17 her loyalties within the family are constantly
18 shifting -- that's one thing.  But you got to
19 understand, this is a profoundly strange context to be
20 in here.  That's why I'm confused.
21             MR. DELLAPORTAS:  I can --
22             THE COURT:  Because I thought this
23 action would go away as soon as Orly and everybody
24 worked out.  Because if Sagi -- I assume what you're

15

1    saying, Mr. Dellaportas, is if there's no claim from

2    the Orly Trust, this all is kind of worked out.  But

3    the only holdup here is certainty, right?  That the

4    Trumps don't want to relinquish -- there's a claim on

5    the money until somebody knows who gets it, because --

6    and nobody wants to play chase the money.  Is that

7    correct?

8                     MR. DELLAPORTAS:  Well, Your Honor, I

9    think that the sale isn't complete until there's a

10   finding of beneficial ownership in favor of the

11   Trumps.

12                     THE COURT:  Yeah.  It's either a

13   finding or people agree on something; right?

14                     MR. DELLAPORTAS:  And that's what I'd

15   like to address, Your Honor.  Because you asked about

16   the alignment.  Sagi and his mother are still

17   friendly.  There's been no non-alignment.

18                     At a certain point in time after a

19   settlement with Orly directly proved unfeasible, after

20   talks and talks and talks, TPR and the Orly Trust did

21   enter into a settlement agreement which provided that

22   TPR would get releases, and TPR actually was going to

23   assign over the proceeds, the $10.3 million under the

24   settlement agreement, to the Orly Trust.  And we

16

1  thought that was going to be the end of things.

2                    Orly objected and moved to the Supreme

3  Court to void it on the ground that it violated a

4  preliminary injunction that had been issued.  We

5  disagreed.

6                    The New York Supreme Court, somewhat

7  surprisingly, in our view, found in favor of Orly and

8  voided the settlement agreement by which TPR had

9  agreed to assign the $10.3 million of proceeds to the

10 Orly Trust.

11                   We've now appealed that to the New

12 York Appellate Division.  We asked for a stay pending

13 appeal, which was denied.  And the Orly Trust -- and

14 Orly personally is opposing that.

15                   THE COURT:  On what ground?

16                   MR. DELLAPORTAS:  Well, it's a bit --

17                   THE COURT:  On the fact that people

18 have been so hurtful to each other and have hardened

19 into alliances for so long that common sense entirely

20 goes out the window?

21                   MR. DELLAPORTAS:  We --

22                   THE COURT:  I mean because the point

23 is -- Mr. Anderson, is that true?  Is your client

24 still willing to do this?

17

1          Are TPR and Dalia Genger still willing

2 to do this?

3          MR. DELLAPORTAS:  Yes, Your Honor,

4 except that we were -- just to be clear, not only was

5 the settlement agreement voided, but we were

6 sanctioned by -- for entering into a settlement

7 agreement.  And so now we're in a position where --

8          THE COURT:  Well, but here's the

9 reason why -- I don't have to waste the judicial

10 resources of the State of Delaware or the Trump Group

11 on people who want to hurt each other irrationally

12 before there's been process.  One of the things that

13 never has occurred here -- which I think everyone

14 understands to probably be an indisputable reality but

15 is not a matter of record -- is that Orly Genger was

16 fully a part of all the proceedings here before.

17          She was a trial witness.  She was

18 represented by her father and his lawyers.  They

19 sought relief affirmatively on her behalf.  She is a

20 very intelligent person.  She is a gifted artist.  She

21 knows her own mind.  And that may be one of the things

22 that is legitimately hacking her off, is that people

23 are treating her like she's three.

24          But the idea that the people of

CHANCERY COURT REPORTERS

18

1 Delaware have to waste precious resources, like our

2 court reporters, law clerks, court clerks, register's

3 time, because a New York-based family is engaged in

4 nihilistic, hateful behavior towards each other --

5 which is undoubtedly personally painful, and it's

6 regrettable to see -- I don't get that.

7      One of the things, has anybody gone

8 back -- now that Orly has dropped her things, has

9 anybody gone back since the recent things and seen

10 whether you can get the New York thing undone?

11 Whether, if Orly signs on -- who is Orly's counsel

12 now?

13      MR. DELLAPORTAS:  She has four

14 separate law firms, but --

15      THE COURT:  Is Mr. Alan Stone still

16 involved?

17      MR. ALLINGHAM:  No.

18      THE COURT:  Didn't he used to be?

19      MR. ALLINGHAM:  Yes.  Briefly.

20      MR. DELLAPORTAS:  That predates me.

21      THE COURT:  Well, Allen is a person

22 that members of this court respect.  He was a lawyer

23 for many years at Morris Nichols, and joined the New

24 York bar.

CHANCERY COURT REPORTERS

19

1              Who is lead counsel for Orly now?

2              MR. DELLAPORTAS:  She has two New York

3    firms, one is called Zeichner Ellman and the other is

4    Wachtel Missry.  Not the Wachtell Lipton firm.

5    Another Wachtel firm.

6              THE COURT:  That's not just a nickname

7    that litigants gave it?  I direct that this transcript

8    be sent directly to Marty, and "Wachtell Misery" is

9    the new name.

10             Okay.  Because I'm not really getting

11   it.  Like -- okay.  So she's hacked off enough that

12   she wouldn't want $10.6 million in her trust, or is it

13   the following:  She doesn't want Mommy as her trustee

14   anymore?

15             MR. ALLINGHAM:  It's a little hard to

16   speak for Orly, but --

17             THE COURT:  Well, but what I'm saying

18   is -- you know, you all are going to have me write

19   another opinion; right?  I got this wonderful news

20   that you're all going to do summary judgment and get

21   it all briefed up over the next five months or

22   something so that my aging mind can come at this fresh

23   again.

24             MR. ALLINGHAM:  Your Honor --

1            THE COURT:  And over something -- this
2   is ridiculous.  It is -- listening to this transcript,
3   if anybody reads it -- I just want to say, if you're
4   some third party reading this transcript and you're
5   thinking this is ridiculous and you can't understand
6   it, you got it.  You've got exactly it.
7            So what I'm trying to figure out is
8   people sanctioned -- there was a point in time where
9   the concern was, obviously, it was somehow collusive;
10  right?  Wasn't that the concern, Mr. Dellaportas, at
11  that point?
12            MR. DELLAPORTAS:  That allegation was
13  raised, yeah.  It's not true, but it was raised.
14            THE COURT:  Okay.  I'm not -- can we
15  just drop it?  I understand nobody is waiving any
16  argument that any client has ever made.  The fact was,
17  Orly didn't trust any deal that was done between Sagi
18  and his mother; right?
19            And one of the issues about the $10.6
20  million is that -- who is the trustee of the Orly
21  Trust?  Mr. Anderson, is it your client?
22            MR. ANDERSON:  Yes, Your Honor.
23            THE COURT:  Is your client the sole
24  trustee of the Orly Trust?

21

```
 1                    MR. ANDERSON:  Yes.
 2                    THE COURT:  Okay.  Has anybody gone
 3    back to Orly and suggested, "Would you do this
 4    deal" -- is there any other assets in the Orly Trust?
 5                    MR. DELLAPORTAS:  Other than the
 6    various -- no.  No.
 7                    THE COURT:  Okay.
 8                    MR. DELLAPORTAS:  But I --
 9                    THE COURT:  No, no.  Let --
10                    MR. DELLAPORTAS:  Okay.  Sorry.
11                    THE COURT:  -- let me finish my
12    thought.
13                    MR. DELLAPORTAS:  Sure.
14                    THE COURT:  See, because one of the
15    wonderful things about this court is we get to
16    experience the full range of human behavior; in the
17    business world, and also in the world in which the
18    money made from the business world becomes family
19    money.  See, we do trusts and estates, we do
20    guardianships, we do all that stuff.  You mentioned
21    the word misery.  Seen a lot of human misery, by
22    people who have money that could clean up an entire
23    favela in Rio, but they're miserable.
24                    Had fights by people who had a quarter
```

22

1  of a billion dollar trust, but their brothers and

2  sisters had access to a billion dollar trust.  And

3  that hurts, believe it or not.  So we're pretty

4  experienced here.

5              Could part of -- and I'm going to ask

6  Dalia's counsel and I'm going to ask Sagi's counsel.

7  Could part of the thing be that the settlement would

8  put the funds back in a trust where the trustee is a

9  parent who has an extremely strained relationship with

10 the beneficiary of the trust, and where the solution

11 to this might be that if Dalia would resign as the

12 trustee of the trust, that Orly might be treated as an

13 adult and substituted as her own trustee, or someone

14 that she has a better relationship with would be the

15 trustee?  Then the mother and daughter can go about

16 repairing their relationship, when one doesn't have

17 economic power over the other.

18              Sound like something that might

19 have -- might bridge a gap?

20              MR. DELLAPORTAS:  Well, I don't

21 represent the trustee.  There have been extensive

22 talks with Orly's counsel about finding an independent

23 person to put in Dalia's place.

24              THE COURT:  Okay.  Mr. Anderson, is

23

1    your client prepared to resign as part of a Solomonic

2    settlement to get her daughter, whose best interests

3    she is supposedly representing, the proceeds of this

4    sale?

5                    MR. ANDERSON:  Your Honor, my -- me

6    and my client Mrs. Genger haven't discussed her

7    desire --

8                    THE COURT:  Okay.  You will talk to

9    her today, and you will report back to this Court and

10   the parties about whether she would agree to a

11   settlement of this litigation -- I'm assuming TPR is

12   still willing to do that; right?

13                   MR. DELLAPORTAS:  Under all the terms.

14   Now, just to be clear, the terms included releases.

15   We don't want to -- we --

16                   THE COURT:  You don't want to fight

17   each other anymore.

18                   MR. DELLAPORTAS:  Yes.

19                   THE COURT:  Okay.  What I'm saying is

20   it seems very critically -- if I were Orly -- and I'm

21   not, but if I were in Orly's position, it would be

22   very different for me to agree to a settlement in

23   which I were able to select an independent trustee of

24   my own; not to be beholden to a parent who I've had a

24

1   disputatious relationship with and been on the other

2   side of a family divide for.  And it's an entirely

3   different settlement.

4              One settlement involves getting $10.6

5   million and freedom and economic independence and an

6   end to hurtful emotional ties being wrapped up in

7   money.  And the other is I'm now beholden to a mother

8   who has been aligned with my brother against me and my

9   dad in this tremendously drawn-out and hurtful human

10  drama.

11             So, Mr. Anderson, you will report

12  back.  Have you had this discussion before?

13             MR. ANDERSON:  About my client's

14  willingness to resign as the trustee?

15             THE COURT:  Yes.

16             MR. ANDERSON:  No, Your Honor.  We

17  have not.

18             THE COURT:  What is your understanding

19  of why Orly wouldn't go along with this deal?  Was it

20  partly based on that?

21             MR. ANDERSON:  Well, there's a lot

22  going on in New York, including the fact that Orly has

23  sued my client.  We know there's been a settlement

24  agreement reached up there, but we haven't seen the

25

1   terms of that.  So that's part of it.

2               THE COURT:  Okay.  Guys -- come on,

3   Mr. Anderson.  All of you.

4               MR. DELLAPORTAS:  I --

5               THE COURT:  None of you -- no.  Listen

6   to me.  And I have the right to say this on behalf of

7   all the judges who have been involved in this in

8   various states:  Not one of you is living up to your

9   obligations to your client or the Court if you don't

10  have the full window into this.  That is outrageous,

11  if there's anybody in this room who is representing

12  somebody who is party to relevant litigation that

13  bears on this dispute, if you don't know about it.

14  And vice versa with the other counsel.  You're not

15  going to come before this Court without being fully

16  prepared.  And, honestly, the Trump Group deserves to

17  be able to move on.

18               It's painful enough that a family

19  hurts itself this much, but the collateral injuries to

20  others -- and, frankly, to the societal resources of

21  tying up court systems at a time when budgets are

22  under constraint -- I don't find it humorous.

23               So get with your client.  You're going

24  to file weekly reports in this.  The Trump Group is

1    alleviated from those.  They will receive them.

2    Dalia's counsel and TPR will file weekly reports.  You

3    will engage with Orly's counsel after we hear the

4    answer to whether Dalia is willing to step out of the

5    trust.

6                    And the terms of the trust will be

7    produced for everybody to see by tomorrow.  The

8    terms -- if there are settlement agreements of

9    relevant related litigation, those will be produced to

10   everybody tomorrow, so we know what's going on.

11                   There was a wonderful State Senator

12   who was a treasure to our state, and she chaired our

13   budget committee for probably a generation.  She told

14   governors of both parties regularly to take their

15   smart pills.  Start taking your smart pills.

16                   Mr. Anderson, are you lead counsel for

17   Dalia?

18                   MR. ANDERSON:  I am in the Delaware

19   action, but not in all of the New York actions.

20                   THE COURT:  Who is the majordomo?  Who

21   is --

22                   MR. ANDERSON:  Dalia's counsel up in

23   New York is Robert Meister.

24                   THE COURT:  Well, you ought to get

1  ahold of Mr. Meister right away.  Who is the majordomo

2  for Orly, to everyone's knowledge?

3                    MR. DELLAPORTAS:  It's hard to say.

4                    MR. ALLINGHAM:  It's hard to say.

5  Either Yoav Grinever or William Wachtel, or maybe

6  both.  We can't tell.

7                    THE COURT:  Well, I would get both or

8  one of them this transcript as soon as it's available.

9  And I would encourage -- if Sagi and his mother -- I

10  mean maybe you need to have a family meeting between

11  Sagi and his mom.

12                    MR. DELLAPORTAS:  Your Honor, I'm

13  fully informed of my client's position.  I can tell

14  you right now, my client would jump for joy if we

15  could reinstitute the prior settlement agreement with

16  the added term that his mother be replaced as trustee.

17  We have no objection to that whatsoever.

18                    THE COURT:  Is Arie involved at all

19  anymore?

20                    MR. ALLINGHAM:  Yes.  There's still

21  litigation among -- not with us, but there's still

22  plenty of litigation among Sagi and Arie and Dalia.

23                    THE COURT:  About the proceeds, or how

24  they were cut up, or --

CHANCERY COURT REPORTERS

28

1            MR. ALLINGHAM:  Yes.  Breach of
2   fiduciary duty claims.  I don't even know all of them.
3   I --
4            MR. DELLAPORTAS:  I mean that was
5   Orly's objection, is that we obtained, as part of that
6   settlement agreement, releases which were going to
7   free us of Orly's claims which were being brought on
8   behalf of the trust.
9            And Orly apparently thinks those
10  claims were worth more than the settlement -- than she
11  was going to get in the settlements.  We think her
12  claims were worth less, and we did it for family
13  peace.  But I -- but again, Your Honor, we're happy to
14  adopt that prior settlement.
15           THE COURT:  What you're saying is her
16  idea is that the claims are worth more because she
17  would have gotten more if -- I mean under the
18  settlement, is she treated pro rata with Sagi for the
19  sale proceeds?
20           MR. DELLAPORTAS:  I'm under the --
21  well, her view of the world is that TPR sold what
22  people call the Orly Trust shares for too little money
23  to the Trump Group.
24           THE COURT:  Okay.

29

```
 1                    MR. DELLAPORTAS:  And --
 2                    THE COURT:  That's not what I asked.
 3                    MR. DELLAPORTAS:  Oh.
 4                    THE COURT:  The question is not
 5      whether Sagi is Warren Buffett or, as I like to say,
 6      even Jimmy Buffett, who was probably a better business
 7      person than any of the Trumps or the Gengers.  Dude's
 8      a really good business person.
 9                    The question is, did she get her pro
10      rata cut of the total pie?  Or did Sagi -- is there a
11      question about a premium that Sagi received?
12                    MR. ALLINGHAM:  I think I understand
13      the question.  TPR, for the Sagi shares -- which is
14      what Your Honor's opinion was earlier -- got 27
15      million.  The proceeds that would go to the Orly Trust
16      in the settlement would be 10.7.
17                    THE COURT:  Were they an identical
18      block of shares and terms?
19                    MR. ALLINGHAM:  Yes, yes.
20                    MR. DELLAPORTAS:  And that's when sued
21      by the Trump Group, TPR immediately settled, within
22      weeks, did not litigate with the Trumps up to the
23      Delaware Supreme Court, back and forth, and so, did
24      not roll the dice on winning in a Delaware litigation
```

30

1   and put this Court through multiple trials, but simply
2   settled early on.
3                   THE COURT:   This is -- the 27 was
4   something paid when?
5                   MR. ALLINGHAM:   2008.   August of 2008.
6                   THE COURT:   That was the control
7   thing?
8                   MR. ALLINGHAM:   Correct.   That was the
9   block that gave the Trump Group control.
10                  THE COURT:   But then Sagi also
11  negotiated this contingent thing for the other trust?
12                  MR. ALLINGHAM:   That's correct.   Which
13  was determined --
14                  THE COURT:   Yeah.   See --
15  Mr. Dellaportas, come on.   Look, I had to live through
16  all this crap.   So I mean so Sagi is like projecting
17  the -- the point is, when he bargained and did all
18  these shares on behalf of TPR --
19                  MR. DELLAPORTAS:   Uh-huh.
20                  THE COURT:   -- he didn't allocate the
21  purchase price ratably over all the shares he was
22  wielding control over.
23                  MR. DELLAPORTAS:   That's right.
24  Because he was delivering two different things.   For

1   the Sagi Trust shares he was delivering clear title,
2   because that settlement was on behalf of both
3   claimants, the Sagi Trust and TPR.  For the Orly Trust
4   all he was giving the Trump Group was a right to go
5   sue and try to win a beneficial ownership.  So it was
6   two very different things that were being sold.
7                MR. ALLINGHAM:  And I don't want to be
8   on either side of this, but I think that the record is
9   clear that Sagi did try to sell the same deal to the
10  other -- for the other -- on behalf of the other
11  blocks.
12               MR. DELLAPORTAS:  That's absolutely
13  true.  Sagi went to his father and his sister and said
14  "I can get you the same deal or I can get you
15  something even better.  Which is, you think your
16  shares are worth more than this.  The Trump Group will
17  actually let you keep your shares if you just sign
18  onto this thing and agree with the funding agreement,"
19  and so forth.
20               And they said, "No.  We're going to
21  litigate this."  So, you know, they went for broke.
22               THE COURT:  I understand that.  But in
23  a representative capacity; right?  I mean, the point
24  is, I guess you would argue that the Orly Trust never

CHANCERY COURT REPORTERS

1   had anything and that TPR should just claim
2   everything?

3           MR. DELLAPORTAS:   That's why it was a
4   contingent sale.  It was contingent on the Orly Trust
5   not having it.  If the Orly Trust had it then there's
6   no sale, and if TPR has it then TPR got the best price
7   it could from the Trumps for that particular block,
8   knowing that it couldn't deliver clear title, but only
9   a right for the Trumps to go sue over it.

10          THE COURT:   Okay.  Yeah, I mean that's
11  your client's view of the world.  There's other ways
12  of looking at it.  And I think one of the other ways
13  of looking at it is, remember, you've got two distinct
14  questions, which is the whole issue -- and this is one
15  of the things -- the distinct issue of what were the
16  rights of the Trumps, to the extent that those
17  rights -- you know, that proper notice wasn't given.
18  And, therefore, what right did they have to acquire
19  the shares from TPR in those circumstances.

20          The reality is that the family
21  proceeded in resolving some fairly important dynamics,
22  and this was -- the Trump Group could have said we're
23  not into the divorce and how you all cut the pie
24  within the family; right?  And the New York courts, I

1    think, are still doing that, which this was -- I mean
2    there wasn't allocation of wealth within the family
3    that was premised upon these prior transfers.

4              It's nifty to say they had the chance
5    to like go in with your client, and they should have
6    used him as their investment banker and all this kind
7    of stuff and they didn't.  All I'm saying is I
8    understand a little bit more why Orly might be saying
9    10.6, that's not near pro rata.  27 million would have
10   been pro rata.  Okay.  There's been a lot of costs and
11   other sorts of things, but you're not offering to even
12   top up at all.

13             And it was very convenient for you,
14   who wanted to sell the business, to take the position
15   that you did and to take the premium for yourself.
16   But the reality is, you've left me with a lot less
17   money, right?

18             MR. DELLAPORTAS:  That's not true at
19   all.  We didn't leave her with a lot less money.  She
20   could have taken the same price we had or she could
21   have kept her shares.

22             THE COURT:  You didn't listen to a
23   word I said.

24             MR. DELLAPORTAS:  No; I understood it,

34

1   Your Honor.

2                    THE COURT:  Do you understand that she

3   did not wish for her father to lose control of the

4   business that he helped to build?

5                    MR. DELLAPORTAS:  Yes.

6                    THE COURT:  You may not understand

7   that.  I actually don't have parents who ever built a

8   multi-million-dollar business but, you know, I have

9   enough sense of human empathy that I kind of get it.

10                    I also am not insensitive to the

11  potential that part of Sagi's motivation was that he

12  and dad weren't in a good relationship, and that doing

13  something that was emotionally injurious to his

14  father -- that's the sad thing about these family

15  disputes.  People -- you know, I don't think in the

16  end anybody gains from this kind of stuff.

17                    The other side -- you won't win, and

18  you might lose, but you're probably not going to gain

19  in the long run.  But they don't necessarily see it

20  that way, and sometimes they -- you know, causing some

21  hurt -- I want you to hurt like I do kind of thing.

22                    So, I'm getting a little bit,

23  Mr. Dellaportas, where I understand a little bit more

24  of what you're saying.  You want a release where any

35

1   of that overage claim -- that's not really that

2   generous.  I mean I get what you're doing, but it's

3   not really generous.  You basically offered the

4   bottom --

5                    MR. DELLAPORTAS:  Your Honor, I --

6                    THE COURT:  I mean my understanding is

7   there's no way that TPR gets to keep the 10.6 million,

8   is there?

9                    MR. DELLAPORTAS:  The Court, Judge

10  Keenan has ruled that if the transfer to the Orly

11  Trust was void, in a case where Orly and the Orly

12  Trust was found void, that TPR is entitled to the

13  proceeds.

14                    THE COURT:  Right.  But that

15  doesn't -- that has -- that may be you're entitled to

16  something.  That doesn't mean that it doesn't have

17  collateral consequences for whether people get to

18  reopen allocations of wealth that were made in the

19  divorce proceeding.

20                    MR. DELLAPORTAS:  That was -- that was

21  a claim that was brought in the New York State Court.

22                    THE COURT:  Is it over?

23                    MR. DELLAPORTAS:  That portion of it

24  is.  The New York State Court ruled that the divorce

36

1  allocation is final and can't be reopened.  The New

2  York Court also said that you can have breach of

3  fiduciary duty or unjust enrichment claims, money

4  damages claims.

5              THE COURT:  Yeah.  Against your

6  client.

7              MR. DELLAPORTAS:  Yes.

8              THE COURT:  Which you've valued at

9  zero?

10             MR. DELLAPORTAS:  No.  That's not

11 correct, Your Honor.

12             THE COURT:  Well, because you're

13 saying you gave the 10.6 that he originally

14 negotiated.

15             MR. DELLAPORTAS:  Well, because

16 otherwise that's a TPR entitlement.  And I don't think

17 Your Honor's characterization is necessarily fair

18 about TPR selling -- the initial bid as intending to

19 injure --

20             THE COURT:  I'm sure -- I'm not

21 saying -- I'm being observational.  To the extent that

22 your client happened to end up in control of TPR and

23 then turns it into a Powerball award for himself,

24 leaving his sister -- apparently you believe -- in a

CHANCERY COURT REPORTERS

37

1    cold, ruthless way, out of the family settlement.
2    Orly would be entitled to bupkis. That's your
3    client's ruthless belief; and that he, by virtue of
4    the father having not given the prior notices of the
5    transfers, that -- you know, "Heck, life's tough, Sis.
6    Hope your art sells well."
7                    MR. DELLAPORTAS: Your Honor, it's not
8    that at all.
9                    THE COURT: Well, then, don't put it
10   that way.
11                   MR. DELLAPORTAS: Can I put it this
12   way, Your Honor?
13                   THE COURT: No. I don't even need to
14   know any more.
15                   MR. DELLAPORTAS: Okay.
16                   THE COURT: What I'm saying is this:
17   You go back to your client, too, because you also
18   ought to be pricing the following: There's no fee
19   shifting here; right? Because -- you're at Morgan
20   Lewis?
21                   MR. DELLAPORTAS: Yes.
22                   THE COURT: Have your rates changed in
23   some way, where it not pricy for you to write summary
24   judgment briefs?

 1                      MR. DELLAPORTAS:  None of this -- none
 2      of these litigations are in any way cost-effective for
 3      any of the parties, I will say, Your Honor.
 4                      THE COURT:  Okay.  Which means $10.6
 5      million, you know, can't be like your -- the only
 6      thing that you could potentially think about.  Unless
 7      your client is really not at all -- is not even like
 8      capable of pricing a Denny's buffet.  Because if it's
 9      going to cost hundreds of thousands or millions of
10      dollars just to litigate, and you have the uncertainty
11      of it, that needs to be factored in.
12                      So I want you -- and you don't need to
13      tell me.  I want you to report back in a week that
14      you've gone over litigation budgets through appeal in
15      this case and through appeal in New York; that you've
16      also talked about the realities that I indicated just
17      as a division of courtroom equity, that there's a
18      fairly large gap between 27 million and 10.6.  No
19      doubt the world has to be taken into account, in terms
20      of the fact that there was all this litigation and
21      Orly took her chances.  But that, from a fundamental
22      equitable basis, the idea that -- again, that the
23      world -- that this was just a Powerball ticket handed
24      to Sagi Genger; that this lack of notice gave him all

39

1  the family wealth -- it's not, certainly, something

2  that strikes a Delaware judge, and it's not going to

3  be my ultimate opinion, it doesn't strike me as why

4  courts of equity were ever founded.  It seems

5  capricious.

6           MR. DELLAPORTAS:  Your Honor, if I

7  could just address one point.  TPR has now -- and

8  Sagi, have been sued in seven separate forums.  TPR --

9  all out of the original act of settling with the Trump

10 Group.  And so for the past five years we've been

11 enduring litigation -- we haven't filed any suits.

12 All we've been doing is being sued.  And it's been a

13 real torment, and it's not something we wanted.

14           And we -- at least in the three years

15 I've been involved -- I've been involved in nonstop

16 settlement negotiations with anyone and everyone who

17 would listen.  I've been involved in formal

18 mediations, informal mediations, but there are

19 feelings on the other side driving this.

20           And it is absolutely not some sort of

21 ruthlessness or coldheartedness.  We have tried again

22 and again to resolve this, and the most hurtful,

23 hateful things have been said about my client.

24           THE COURT:  I understand that.  This

1   family is not nice to each other.  And every day that

2   they hire expensive lawyers to engage in economic

3   warfare against each other is another day where they

4   won't heal.  It's another day of emotional pain.  And

5   as I said, I don't believe any of them are going to be

6   pulling an Ochocinco in the end zone of life about

7   this.  You don't win in cases like this.  You don't.

8   Because there's no way doing a touchdown celebration

9   at the expense of someone who is your flesh and blood.

10                  Anyway, put it this way:  I don't like

11  to think that anybody can ultimately do a pure

12  expression of celebratory joy at the defeat of their

13  father, their mother, their ex-wife, their sister or

14  their brother.  I just don't like to think about

15  people being that ruthless and soulless.

16                  So I get you say that Sagi just got

17  sued everywhere, he was just a passive dude.  Well,

18  no, he wasn't.  Because, you know, in a lot of

19  families, you know what would have happened?  In a

20  normal family?  Even normal families that fight,

21  brother and sister would have stood behind dad and

22  said, "Ain't no way you're taking our business."

23                  This family was already so torn apart

24  that your client cut a deal, and cut a deal in which

41

1    he didn't give ratable treatment on behalf of the
2    other family members.  And now, in your view, what
3    you're saying is, as a cold, ruthless legal matter he
4    claims to have won some sort of life's Powerball
5    because he ended up with control of TPR.

6                    So what you need to effectively
7    represent your client is for you and Mr. Connolly, who
8    is a really very fine lawyer, to do what I'm saying
9    Mr. Anderson needs to do with his client and what
10   Mr. Wachtel and the other lawyer need to do with their
11   client.  You need to look at the way the world looks
12   from the other perspective and from the perspective of
13   Sagi's family members.

14                   Let's put aside -- this happened.  The
15   pie wasn't cut up equally.  10.6 doesn't come close --
16   nobody's saying -- there's a big difference between
17   cutting it up equally pro rata and no movement.
18   There's a big difference between an offer in which not
19   only is there no movement, but Dalia Genger remains
20   Orly's trustee.  I don't -- again, we're going to see
21   the terms of the trust tomorrow, but trustees can have
22   very important power, like determining how much you
23   get out of the trust or not.  Right?
24                   MR. DELLAPORTAS:  And, Your Honor, the

42

1    trust agreement has been an exhibit in multiple

2    filings in various states, so it's not a secret.

3                THE COURT:  Then people should have

4    been able to tell me who the residual beneficiaries

5    are and stuff like that.

6                MR. DELLAPORTAS:  I can speak to that,

7    Your Honor.  There is a sole beneficiary, Orly Genger.

8    If she has children, they will become additional

9    beneficiaries.  And then there's what's called a

10   remainderman beneficiary, which is if she dies without

11   issue, as they say, then the Sagi Trust becomes the

12   remainderman beneficiary of the Orly Trust.  And vice

13   versa.

14               THE COURT:  Right.  So there's no

15   beneficiary interest for Dalia in any way, shape or

16   form in this?

17               MR. DELLAPORTAS:  No, Your Honor.

18               THE COURT:  Which, again, makes this a

19   very weird lawsuit.

20               MR. DELLAPORTAS:  I --

21               THE COURT:  But, look.  Is this also

22   why Orly -- right?  Orly is not aligned with Dalia.

23               MR. DELLAPORTAS:  No doubt.

24               THE COURT:  So when Dalia brings a

1    lawsuit that Orly doesn't want, and when Dalia's

2    aligned with Sagi and Sagi and Dalia are willing to

3    settle it, but on terms that Orly gives up any claim

4    that she has; that Sagi didn't exactly cut the pie

5    fairly -- you know, it doesn't sound strange to me

6    that now, because you're saying that you want to cut

7    off her pie cutting claims, you weren't willing to

8    just settle this litigation.  You want to continue to

9    defend those.  So it makes sense to me why this isn't

10   resolved.

11              MR. DELLAPORTAS:  Well, I --

12              THE COURT:  And guess what?  There

13   will be process.  And one of the first things we will

14   do, there will be discovery into Orly's position on

15   this.  I'm not going to proceed without knowing Orly's

16   position.  I'm also going to need to know -- I'm not

17   going to have a case where a trustee is proceeding on

18   behalf of an adult beneficiary where there's the

19   potential that the very procession of the

20   litigation -- you know, I mean why is this litigation

21   even going on?  Is it because the Trump Group -- I

22   guess you don't get your -- you don't get free and

23   clear things of your share?

24              MR. ALLINGHAM:  We have proposed that

44

1    we stipulate that the Trump Group has beneficial and
2    record ownership of the shares, and that however the
3    proceeds get parceled out is not our problem.
4                    THE COURT:  And has that been proposed
5    to Orly?  And just let everybody fight about the pot
6    of money in New York in the existing litigation?
7                    MR. ALLINGHAM:  Well, Orly is not a
8    party to this case.  And so --
9                    THE COURT:  No, no, no.  But Orly was
10   a party to a settlement over there.
11                   MR. ALLINGHAM:  Yes.  Orly is a party
12   to the settlement up there.  Orly did sign the
13   settlement agreement, and that's a settlement in which
14   real money is changing hands and will continue to
15   change hands.
16                   So I don't believe that Orly has ever
17   been asked to take a position.  Since the settlement,
18   I don't think Orly has been asked to take a position
19   in this case.
20                   With respect to something that may be
21   of considerable importance in these status reports --
22   and I raise this with some trepidation -- the
23   settlement agreement itself has a confidentiality
24   stipulation.  It obviously says you can't produce it

45

1   unless you're required to by law. Your Honor has just

2   said I have to produce it tomorrow. It does --

3                   THE COURT: No. I thought there was

4   some other derivative litigation that was settled.

5                   MR. DELLAPORTAS: That's the one.

6                   THE COURT: Okay.

7                   MR. DELLAPORTAS: And legally, it's

8   critically important to understand the dynamic between

9   Orly and the Orly Trust.

10                  MR. ALLINGHAM: And I have said to

11  everyone who will listen, I'm happy to produce the

12  settlement agreement, but I've got this

13  confidentiality provision. Required by law, I think,

14  is if a court order tells me to do it, I'll do it.

15                  THE COURT: Well, I don't want to jump

16  to -- you know, but what you're saying here -- what

17  I'm not going to have -- and I really don't care if I

18  ruin the vacations of these clients -- I will do

19  process. I will require process out the wazoo, as an

20  aid to the world.

21                  You are almost to a goal line. Get

22  across it. You ought to look at yourself in the

23  mirror as professionals and say, "We need to get this

24  to the goal line."

1                For example, if the Trump Group

2    already, you know, essentially topped up Arie -- and I

3    don't want to put it that way -- topped up Arie and

4    Orly to some extent; which is, they had to essentially

5    pay twice, you know, that's obviously a relevant

6    factor.  It shouldn't make Sagi think that life is

7    cost-free.

8                MR. DELLAPORTAS:  I don't want to

9    reveal settlement communications, but that was exactly

10   one of the things we said when we had settlement,

11   which is -- I won't reveal what they said, but what I

12   said is, "You're saying there's an inequity here.  I

13   don't know how much you got.  You may have gotten more

14   than -- you may have gotten nothing, you may have

15   gotten more.  I have no idea."  They won't tell us.

16               And it's relevant -- it's not the

17   Trump Group which is objecting.  It's, I guess, Orly.

18   Orly objects to the production of this settlement

19   agreement, which we think is discoverable for a number

20   of different --

21               THE COURT:  Is Arie still suing Sagi?

22               MR. DELLAPORTAS:  Yes.

23               MR. ALLINGHAM:  And what I started to

24   say, Your Honor, is --

47

1            THE COURT:  No.  I'm not going to
2  spontaneously roll grenades without pins in them.  So
3  I'm not going to have you produce that until it's
4  thought about more.  What I am suggesting,
5  Mr. Allingham, is that perhaps it might be useful for
6  you all to talk to Mr. Wachtel, and to talk to Arie's
7  people in light of the conference today.
8            And I'm not sure -- I'm not sure how
9  productive it is for these other parties to do so in
10  the first instance, because I'm not -- I'm not really
11  getting that there's any change in alignment.  What I
12  am getting is that there's a very bizarre litigation
13  that's going to go on in which a trustee who is not
14  really a champion of the beneficiary is litigating
15  against someone who she's aligned with.
16            MR. DELLAPORTAS:  Well, I don't know
17  that that's totally accurate.  It's a claim for
18  declaratory judgment, first and foremost, against the
19  Trump Group for the ownership of the shares.
20            What we are seeking is the proceeds
21  from the sale which if the Trump Group owns it is
22  ours.  If the Orly Trust owns it we get nothing.  So I
23  think that the adversity is first and foremost between
24  the Orly Trust and the Trump Group.  I'm just

1    curious --

2                    THE COURT:  But, again, Dalia Genger

3    has no residual interest in the trust.  The

4    beneficiary of the trust has not sought to have her

5    bring this action.  And the beneficiary of the trust,

6    by all objective evidence, seems to not believe that

7    the trustee really is her best representative.

8                    So, yeah, Mr. Dellaportas.  I'm sorry.

9    You can formally say what you say.  There is a

10   concern, a long-standing tradition in Anglo-American

11   jurisprudence of being very careful about having

12   actual real adversity, rather than something like

13   this.

14                    And, Mr. Anderson, you're going to

15   need to be attentive to this and you're going to give

16   the report that I talked about.  Because I'm not

17   getting it.  As I said, it appears that the Trump

18   Group has agreed.

19                    You know, one of the things is -- you

20   can do the same thing.  You can be in the same

21   posture, but reduce transactional costs for all, by

22   the Trump Group's suggestion, which is that the

23   settlement can be -- everybody agrees that the issue

24   of beneficial ownership is settled; that the $10.6

49

1  million is interpled up in New York where the

2  litigation is, and you go fight about it.

3             MR. DELLAPORTAS:  Your Honor, that's

4  what happened two years ago, which is the 10.6 was

5  interpled.

6             THE COURT:  It was interpled into a

7  federal court.  I believe Judge Keenan's decision had

8  everything to do with -- and I respect this.

9  Remember, I was hoping -- the only reason I burdened

10  my distinguished colleague Judge Keenan was I do

11  believe in hierarchy, and I respect the Constitutional

12  hierarchy.  And there was a fight about where the case

13  would go.

14             And in an attempt to save the family

15  money and to save society's resources, it struck me as

16  the place where the Court with the most Eric Cartman

17  "authoritah" might have been the U.S. District Court,

18  and that if the District Court could have decided

19  everything then perhaps everybody would have respected

20  that.

21             I think the interpleading the funds

22  into a state court -- which is currently actually

23  hearing the substantive claims between the parties,

24  and there was a state settlement of this action about

50

1   this state question of beneficial ownership -- is a

2   little different situation.   Right?

3                    MR. DELLAPORTAS:   Well, I'm not the

4   custodian of the funds.

5                    THE COURT:   Well, I know.   And we have

6   to have another painstaking discussion if everybody's

7   like -- the custodian is -- is a custodian; right?

8                    MR. DELLAPORTAS:   Uh-huh.

9                    THE COURT:   The custodian doesn't

10  care.   Custodians, like indenture trustees, care about

11  one thing:   I don't want to be sued and incur costs in

12  excess of the administerial fees that I am paid to do

13  this role.   Right?

14                   MR. DELLAPORTAS:   Uh-huh.

15                   THE COURT:   Isn't that -- does anybody

16  have a different -- do we have an unusual custodian

17  here who has a bolder understanding of her duties?

18                   MR. DELLAPORTAS:   No.

19                   THE COURT:   No.   So that's another

20  possible form of settlement.

21                   Mr. Anderson, would your client have

22  some problem with that kind of settlement?

23  Mr. Anderson?

24                   MR. ANDERSON:   Sorry, Your Honor.   I

51

1  was on mute.  I'm in the airport right now.  I just

2  wanted to cut out the background noise.  That

3  certainly is the discussion that we will have.

4                    THE COURT:  Because I mean I can't

5  believe that -- that Dalia Genger has a strong feeling

6  on the beneficial ownership question.  Because she

7  really has gotten Sagi, then; right?

8                    MR. DELLAPORTAS:  I'm sorry?

9                    THE COURT:  She's gotten your boy.

10                    MR. DELLAPORTAS:  Meaning if the Orly

11  Trust obtains its --

12                    THE COURT:  Meaning, put it this way:

13  If there is no beneficial ownership in the Trump Group

14  of these shares, how's her son and how's TPR have

15  anything?

16                    MR. DELLAPORTAS:  That's correct.

17  That's what Judge Keenan ruled.  Or that if the

18  Orly --

19                    THE COURT:  No.  It's not just that.

20  It's totally inconsistent with your client's position,

21  which Dalia supported.

22                    MR. DELLAPORTAS:  Well, just to be

23  clear, we disagree that the Orly Trust has beneficial

24  ownership of the shares.

CHANCERY COURT REPORTERS

1                    THE COURT:   I agree --

2                 MR. DELLAPORTAS:   Okay.

3                    THE COURT:   -- you disagree on the

4     same ground that would support TPR's ability to sell,

5     and the shares sold on behalf of the Arie Genger

6     Trust -- is that dealt with separately or was --

7                 MR. DELLAPORTAS:   Separate, yeah.

8     It's just Arie Genger.   It's not a trust.

9                    THE COURT:   Right.   But there was the

10    Sagi Trust; right?

11                MR. DELLAPORTAS:   Uh-huh.   Yeah.   The

12    Sagi Trust, the Orly Trust, and then Arie personally.

13                   THE COURT:   Yeah.   I mean, you know,

14    and I believe, what I mean is there's the formal legal

15    position Dalia took here -- that was why it was argued

16    by Orly that it was collusive -- is that all the other

17    transfers she was ducky with because she supported her

18    son Sagi and his position.   Am I wrong in thinking

19    there's not really meaningful distinctions here?

20                MR. DELLAPORTAS:   I don't know that

21    Dalia or the Orly Trust took a position with respect

22    to the other two transfers.   She didn't -- it wasn't

23    really her issue.   They're on a personal level

24    friendly, mother and son.

53

1           THE COURT:  My point is this:  My

2    reasoning, if the Dalia trust succeeds in this case,

3    then it will mean that I was -- that I've now

4    concluded I was incorrect in my previous rulings.

5           MR. ALLINGHAM:  I believe that's

6    correct.  And I --

7           MR. DELLAPORTAS:  We --

8           THE COURT:  And I believe during the

9    previous litigation Dalia was aligned with Sagi; that

10   Orly and Arie did not believe the bringing of this

11   lawsuit was designed to aid Orly's cause; that Orly

12   objected.  Right?  Did Sagi and you-all talk with

13   Dalia before this lawsuit was brought?

14           MR. DELLAPORTAS:  I'm sorry.  Did we

15   talk with Dalia about the bringing of this lawsuit?

16   No.

17           THE COURT:  Yeah.

18           MR. DELLAPORTAS:  Did not.

19           THE COURT:  And you were representing

20   Sagi at the time?

21           MR. DELLAPORTAS:  I represent TPR and

22   Sagi in various litigations, yes.

23           THE COURT:  You had at the time this

24   was brought?

CHANCERY COURT REPORTERS

1                MR. DELLAPORTAS:  Yes, yes.

2                THE COURT:  And, Mr. Anderson, have

3     you been counsel for Dalia the whole time?

4                MR. WARDEN:  Your Honor, in the

5     Delaware action -- Mr. Anderson has been involved the

6     whole time in the Delaware action, yes.

7                THE COURT:  Okay.  And the same

8     counsel in New York has been involved?

9                MR. HERRMANN:  That's correct.

10               MR. ALLINGHAM:  Yes.

11               MR. WARDEN:  I don't know the answer

12    to that.

13               THE COURT:  Okay.  Well, I'm not going

14    to go round and round anymore, but I want weekly

15    reports from -- I'm calling it Sagi, you can call it

16    TPR or whatever you want, and Dalia.  Because I have a

17    more human understanding of this.  I think the formal

18    roles are actually quite confused here.

19               MR. DELLAPORTAS:  And, Your Honor,

20    just to be clear, the weekly reports should be on my

21    client's position and his client's position?

22               THE COURT:  Yes.  And what they're

23    doing.  And I expect that you're going to engage with

24    counsel for Orly, and I expect that you're going to

1   share this transcript.  And I think that, at the very

2   least, you ought to consider what Mr. Allingham's

3   clients suggested.

4              And I would not confuse what Judge

5   Keenan did in a very disciplined opinion, recognizing

6   the limits of federal jurisdiction, with the more

7   propitious jurisdiction afforded to the New York

8   courts.  And it would seem to me to be a great

9   reduction of transaction costs, at the very least, to

10  put the funds before the Court up there, stipulate to

11  the beneficial ownership interest, and move on.

12             Because I'm also going to -- look.

13  I'm going to need to know, Mr. Anderson -- or you're

14  Mr. Anderson's colleague; right?

15             MR. WARDEN:  Yes.

16             THE COURT:  I'm going to need to know

17  that there is a good faith basis for your client's

18  contentions.  Discovery will go into her motivations,

19  her position on this.  Because I got to know that I

20  have an adversary proceeding that's just not made up.

21             I also -- you know, we got the whole

22  issue of whether Orly was here before, right, and all

23  this kind of stuff.  But, you know, to be -- trustees

24  are usually not bold.  I mean they're like custodians.

56

1  And the idea that trustees are going to go on

2  behalf -- a trustee of a trust where the trustee has

3  no beneficial ownership interest herself is going to

4  proceed with a litigation, with the sole beneficiary

5  of the trust -- well, I mean what's even more -- the

6  sole beneficiary of the trust is Orly and her issue,

7  and if she has no issue, then Sagi.

8            MR. DELLAPORTAS:  Well, then the Sagi

9  Trust, yeah, which has the grandchildren.

10            THE COURT:  Yeah.  Sagi.  And I don't

11  think -- does the Sagi Trust, Mr. Dellaportas, wish to

12  align with the Dalia Trust in this litigation?

13            MR. DELLAPORTAS:  I'm sorry.  With the

14  Orly Trust?

15            THE COURT:  With the Orly Trust.

16            MR. DELLAPORTAS:  I don't think the

17  Sagi Trust has taken a position.

18            THE COURT:  What do you think?  Do you

19  suspect it will be taking a position?

20            MR. DELLAPORTAS:  Well the Sagi Trust

21  is a 99 percent shareholder of TPR.

22            THE COURT:  See.  Do we suspect they

23  won't be?

24            MR. DELLAPORTAS:  Well, as of now they

57

1   haven't, and I would suspect they would share TPR's
2   position, because they're the 99 percent shareholder.
3                    THE COURT:  You suspect that, huh?  So
4   do I.  That's why I was kind of making this
5   observation.  I -- from a third-party perspective, do
6   you get me about Dalia's position being a little odd,
7   that the singular beneficiary, the most likely
8   beneficiary of the trust, is Orly, any issue she has.
9   And Orly is -- you know, last I saw her, looked fit,
10  young, many decades of life to come.  So she really
11  should be the focus, and then the remainder should be
12  the Sagi Trust.
13                   So as I get it, Orly, the principal
14  beneficiary, she doesn't support the suit.  It's not
15  her fight.  Doesn't really want to fight about
16  beneficial ownership.
17                   She thinks it should be more than 10.6
18  million.  She thinks 10.6 million for sure should be
19  coming to her.  She thinks it should be more, but
20  she's not really in a fight with the Trumps anymore
21  about beneficial ownership.  She hasn't taken that
22  position.  That fight has been done, she respects
23  that.  Or may not respects it, but has learned to live
24  with it.  Perhaps because she got paid some money to

58

1    learn to live with it.

2                 Then, as I understand it, if Orly

3    leaves this earth without having children, the Sagi

4    Trust will be the beneficiary.  And the Sagi Trust

5    opposes the suit.  So the only beneficiaries on whose

6    behalf the suit is brought don't support it.  That's

7    what you-all who represent Dalia have to confront.

8    Because it also sounds like a very odd thing for me to

9    have to decide -- like I said, it gets back to is this

10   just a law school moot court?  Or like there's "Ground

11   Hog Day."  You know, "Ground Hog Day," the movie.

12                 MR. DELLAPORTAS:  Uh-huh.

13                 THE COURT:  Is this like the most evil

14   "Ground Hog Day" that was ever invented?  And I have

15   always wanted in some ways to be like Bill Murray, but

16   I get to be Bill Murray in the Genger beneficial

17   ownership "Ground Hog Day," where I wake up and I have

18   to again determine whether proper notice was given and

19   what the implications are.

20                 Do you see my point, Mr. Dellaportas?

21                 MR. DELLAPORTAS:  Uh-huh.

22                 THE COURT:  I mean you're a very smart

23   guy.  I could tell that in a second.  Get a little

24   less boxy.  I'm sorry, but you represent Sagi.

59

1              MR. DELLAPORTAS:  Your Honor --

2              THE COURT:  His children are -- how

3    old are his children?

4              MR. DELLAPORTAS:  They run from -- I'd

5    say zero, just a newborn, to 13.

6              THE COURT:  Right.  So I'm not saying

7    Sagi doesn't have representative duties to others.

8    Part of that's what this lawsuit is about with his

9    sister.  What I'm saying is you basically -- when you

10   have client meetings, nothing -- there's no picture of

11   a trust.  There's no picture of TPR.  There's a human

12   being named Sagi Genger who shows up, and that -- and

13   you talk to him.  Now, he's supposed to honor his

14   duties to other people, but that's who you're talking

15   to.

16             And you-all are talking to Dalia.  And

17   then there are people talking to Orly, and Arie's

18   still on the scene.

19             So I am going to think about it this

20   way as we go forward, because I need to know who's

21   trying to do what to whom, and why.

22             Mr. Anderson, can you hear me?  Well,

23   you need to report back to him.

24             MR. ANDERSON:  Yes, Your Honor.

CHANCERY COURT REPORTERS

60

1   Sorry.  I can hear you.

2                    THE COURT:  Take this seriously.

3   Because, you know, I don't understand -- and you can

4   always have releases, too.  Because to the extent

5   Dalia is worried about her liability as a trustee,

6   that's really easy to solve when the two principal

7   beneficiaries can do a release.  Most trustees -- you

8   know what most trustees would want to do?  Want a vote

9   in the room?  I want any lawyer who believes that most

10  corporate trustees in this wouldn't be glad to be out

11  of the middle of this.

12                   MR. DELLAPORTAS:  Your Honor --

13                   THE COURT:  Anybody disagree with

14  that?

15                   MR. DELLAPORTAS:  Your Honor, there

16  were extensive discussions about replacing Dalia -- my

17  clients were in favor of it -- with an independent

18  trustee.  The one holdup was that Dalia did want a

19  release as trustee and Orly said she could not have a

20  release as trustee.  Orly wanted to retain the right

21  to continue to sue Dalia after Dalia resigned.  And

22  that's what killed the deal, essentially.

23                   THE COURT:  Well, I assume it's more

24  than just that.

1              MR. DELLAPORTAS:  It is more than just
2    that.  Orly objects to various actions that Dalia took
3    as trustee.  And so, you know, everyone -- everyone
4    objects to everything everybody's done in this family
5    over the past 12 years.  It's a very difficult dynamic
6    to get over.

7              The one thing, Your Honor, that I
8    think is absolutely essential is --

9              THE COURT:  Yeah.  But what I'm saying
10   about this is there's a long distance between, for
11   example, the suits -- I don't know what the suits are
12   about the trustee, because the only asset of the trust
13   were the shares; right?

14             MR. DELLAPORTAS:  Yes.

15             THE COURT:  And so I don't know what
16   she's suing about her actions as a trustee.  It may be
17   more issues of aligning with Sagi about the selling of
18   the shares; right?

19             MR. DELLAPORTAS:  Uh-huh.

20             THE COURT:  I mean if that's what
21   you're talking about, Mr. Dellaportas, which is she
22   wasn't too hep to Mommy being in alignment with Sagi
23   on selling the shares, and if Mommy knew that Sagi was
24   selling the shares for $10.6 million when he was

62

1   selling his own for 27, that, as a trustee, she may

2   have had some duties to do something; right?  That's a

3   different kind of situation.  And again, what I'm

4   talking about here is I'm not sure how fighting about

5   beneficial ownership provides any protection to Dalia

6   Genger in any way.

7                   MR. DELLAPORTAS:  I can't speak for

8   Dalia but, Your Honor, from my client's perspective --

9   whether you call it TPR, Sagi, whatever -- to have a

10  frank talk with my client, the whole -- what Your

11  Honor called the topping off issue, it can't remain a

12  secret.  Otherwise -- it could be they could have

13  topped off for $1, it could have topped off for $100

14  million.  We have no conception one way or the other.

15                  And so --

16                  THE COURT:  But what I'm -- again, I'm

17  saying here, because your client is going to be

18  talking to his mom, because he's been talking to his

19  mom all along.

20                  And when I'm talking to counsel for

21  Dalia, all I'm saying is, you know, having a

22  collateral war over beneficial ownership, where does

23  that get you?  You know, I -- I don't know that it

24  gets you anywhere, even if you win.  Does it gets the

63

1   shares back, and that's what she wants?  I guess.  I
2   mean how -- does she even believe it?
3              What I mean by "believe it" is, you
4   know, you're really not supposed to come before a
5   Court and argue a position that you don't believe in.
6   That's actually kind of uncool.  There's a Rule
7   between 10 and 12.  You're not really supposed to be
8   doing that stuff.
9              So, I mean, I get that -- you know,
10  Dalia wanted a release, but to the extent that the
11  theory against her was that she was complicit in what
12  Sagi did, that's a different -- that's a lot different
13  than haggling -- has nothing to do with haggling over
14  beneficial ownership.
15             And if you can get past the beneficial
16  ownership thing, I don't understand how Dalia is in a
17  worse position and she won't be spending -- and
18  there's also going to be the issue here, too, is Dalia
19  paying her own fees, Mr. Anderson, or is this
20  litigation going to be funded by the Orly Trust?
21             MR. WARDEN:  Your Honor, I don't know
22  the answer to that question.  I'm sorry.
23             THE COURT:  Well, I think it's kind of
24  an important question to ask.

```
 1                    MR. DELLAPORTAS:  I can speak to it
 2    tangentially, Your Honor.  There is a TRO in place
 3    prohibiting any movement of assets of the Orly Trust
 4    pending the outcome of that litigation in New York.
 5                    THE COURT:  Well, so how do we even
 6    proceed here?  Dalia's going to pay her own funds to
 7    you guys to litigate?
 8                    MR. WARDEN:  Again, Your Honor, I
 9    apologize.  Mr. Anderson is not available and I don't
10    know the answer to that.  He'd have to address that.
11                    THE COURT:  Well, it ain't going to be
12    cheap.  And if you think -- I mean since Mr. Allingham
13    and Mr. Herrmann face the really unusual situation
14    that I did, to have an amazingly distinguished set of
15    lawyers from an extremely distinguished firm, Davis
16    Polk, be then replaced by another distinguished set of
17    lawyers from an extremely distinguished firm, Paul
18    Weiss, you know, there is a fairly deep history here.
19                    So I don't know what you're going to
20    discover that's new.  But, you know, it is a new --
21    I'm going to have to look at collateral and all that
22    kind of stuff, but it's going to be expensive.
23                    And Dalia's going to want to go out of
24    pocket?  Because I think the TRO kind of puts it -- I
```

1  mean Orly's not going to be happy to have hundreds of
2  thousands of dollars -- if not millions -- spent by
3  her mother in a suit where neither she nor the
4  contingent beneficiary supports the lawsuit. The one
5  thing Sagi, the contingent beneficiary, and Orly agree
6  on, as I understand it, is that there was -- this suit
7  should not have been filed.
8              MR. DELLAPORTAS:  From TPR's
9  perspective, if we could have a stipulation that has
10  the force of judgment, or whatever, that the
11  beneficial ownership is vested in the Trump Group, we
12  would be very happy.
13              THE COURT:  And the funds could be
14  placed into the court in New York and everybody could
15  fight about the remaining claims, win or lose?
16              MR. DELLAPORTAS:  From our
17  perspective, we believe that we would be entitled to
18  the funds under those circumstances.  But where
19  they --
20              THE COURT:  That's not what I asked.
21              MR. DELLAPORTAS:  Yeah.
22              THE COURT:  If you're sure of victory
23  then you should have no hesitance going into the ring.
24              MR. DELLAPORTAS:  Well, there's

66

1   already an escrow agreement by all the parties to this

2   case, including Orly, which provides that the funds

3   stay in escrow until all objections are resolved.

4                    THE COURT:  Okay.

5                    MR. DELLAPORTAS:  So I don't know that

6   there needs to --

7                    THE COURT:  So we need to hear from

8   Dalia about that; right?  Because that would be fine

9   with the Trump Group; right?

10                    MR. ALLINGHAM:  All the Trump Group

11   wants is an order for beneficial ownership.  That's

12   all we've ever wanted.  Yes.  That would be fine with

13   the Trump Group.

14                    THE COURT:  Okay.  I expect to hear

15   from counsel for Dalia.

16                    MR. WARDEN:  Yes, Your Honor.

17                    THE COURT:  After reading this

18   transcript, I want you to get up -- I need you to --

19   this is not going anywhere productive.  This will be

20   an extremely cost-effective use of all your time and

21   your clients' money if you listen to the discussion

22   today.  If all you do is do this minimal thing and

23   stipulate to beneficial ownership and then go fight in

24   New York, you will have undoubtedly saved your clients

1    hundreds of thousands of dollars.

2              You may also be on the road to

3    something, too, if you listen -- by listening I mean

4    is really take -- from the perspective I said of

5    looking how it is.  I respect Mr. Allingham's

6    reluctance to -- and that's why I'm not going to force

7    disclosure of the settlement agreement, because I

8    don't know enough about the dynamic to know whether

9    that's productive or not.

10              I can understand Sagi's desire to see

11   it.  I also think this is another situation of

12   alignment with Dalia, not with Orly, because I think

13   Sagi and Dalia want to see it and say, "Well, wait a

14   minute.  How much was Arie and Orly -- how much were

15   they able to essentially claw back and force the

16   Trumps, by this legal battle, to top them up to

17   something close to what we got out of the deal?"

18   Right?  "Before we -- we don't want to close a gap

19   where they end up with more than we got.  And we're

20   not even sure we want to close the entire gap.  We

21   might understand closing it to some extent, but we did

22   go through a lot.  They sued it."

23              I get that, right?  But I think you

24   need to get to a point where there's some

1   understanding, where you're close enough to some basic

2   things that maybe Orly has some reason -- and her

3   father on her behalf, right, because Arie is still

4   suing your client.  Right?

5                    MR. DELLAPORTAS:  Uh-huh.

6                    THE COURT:  You know, and part of why

7   he may be suing them is because he cares about his

8   daughter, too.  I mean there's all the other hate

9   stuff which, again, I think is really -- I think any

10  of them who are doing it for those reasons really are

11  going to regret it.  And that's a human dynamic.

12                   But he also, if you're talking more

13  human -- one of the things he may be concerned about

14  is that his daughter got shorted; that he built wealth

15  up over time, he was hoping for his children to

16  benefit from, and that one of them is coming out --

17  now maybe he knows that she got now twice as much as

18  Sagi.  That doesn't seem -- I understand there could

19  be substantial amounts of money, but "substantial"

20  doesn't mean that that's necessarily so.

21                   But I think you got to get to -- you

22  got to start, all of you.  And, you know, there's no

23  mail-in representations here.  Don't act like I'm --

24  because I'm not going to leave you alone.  Because

1    you're not leaving me alone.  You keep coming back

2    with these memory tests about the same darned thing.

3              And the thing about Orly getting out

4    from under Dalia probably has some real value.  You

5    know?  I mean -- and again, I don't know whether she

6    wanted an independent trustee, but I don't really

7    think, given the structure of this, that the Sagi

8    Trust ought to be whining if Orly wants to be her own

9    trustee, if that's possible.  I'm sure Orly wants to

10   go her own way, just like Sagi does.

11             And so if your client, Dalia -- you

12   know, she's got to recognize that human dynamic.  And

13   really, long-term, if what her motivation is is to

14   somehow repair her relationship with her daughter,

15   then sometimes it takes that act of grace to actually

16   step back and make the first move.

17             But part of why I'm asking you,

18   Mr. Dellaportas, to go through the litigation budget,

19   and part of why I'm asking counsel for Dalia to do the

20   same thing, is it's irrational not to put any price at

21   all on that.

22             And, look.  I do, frankly, put a low

23   probability on the notion that a judge in New York is

24   going to conclude that Sagi won the Powerball.

70

1  Because who was going to get the 10.6 million? It was
2  going to be TPR?

3              MR. DELLAPORTAS: TPR is the seller of
4  the shares. I will say, just to be --

5              THE COURT: No, no, no. Actually, I
6  don't want you to go over and make a probably
7  technically very precise but equitably insensate
8  argument.

9              I -- again, there's like Woolley's
10 over on that shelf, and there are decisions by
11 Marvell, and cites and all. The idea that TPR could
12 sell that block, get 10.6 million, and be controlled
13 by Sagi, and that Sagi gets it all and Orly gets
14 zero --

15             MR. DELLAPORTAS: But, Your Honor,
16 that's the opposite of our intent. Our intent is to
17 stop being sued.

18             THE COURT: No, no, no.

19             MR. DELLAPORTAS: So we don't want to
20 be sued for the next five years, Your Honor, and incur
21 millions and millions. And at the same time, if we're
22 going to give up the 10.7 -- which we absolutely have
23 a legal entitlement to -- then in that case we'd like
24 to stop being sued. And it's not unreasonable for my

71

1   client not to have to be put through this.

2                 THE COURT:  Mr. Dellaportas, you just

3   went back -- what I just said, you just confirmed.

4   You just made an argument, a legally precise argument,

5   and what did I say it was going to be?  Equitably

6   insensate.

7                 MR. DELLAPORTAS:  Your Honor, it's not

8   a legal argument.

9                 THE COURT:  No, no.  Equitably

10  insensate.  Do you understand what that means?

11                MR. DELLAPORTAS:  Your Honor, Latin

12  was never my thing.

13                THE COURT:  No?  Well, I don't think

14  it's Latin so much, but maybe --

15                MR. DELLAPORTAS:  But I think I

16  understand Your Honor's concept.

17                THE COURT:  Here is the point.  That

18  transaction in which those shares went to the Orly

19  Trust might have been void.  I think I found it was

20  void.  I think I found it was void more than once.  I

21  agreed with -- you know, I don't always go back and

22  read myself and I agree with it, but usually I do.

23  And, actually, I'm kind of like, "Man, that sounds

24  pretty good."  I must have been smarter when I wrote

72

1   that or something.

2          But I agree with your position.  See,

3   here's a -- we're a court of equity.  The fact that

4   something's legally void and, therefore, ownership

5   returned to somebody doesn't mean that that someone

6   has the authority to deal with that property, sell it,

7   get proceeds, and keep it for itself.  That is what

8   equity is about.  The term "beneficial ownership" is a

9   term that comes out of the equitable concept of for

10  whose benefit are the shares held.

11         So what I'm saying about being

12  equitably insensate is you may have the world's

13  greatest technical/legal argument, but the English

14  Court of Chancery was created a long time ago.  One of

15  the reasons I know that, Mr. Dellaportas, is that the

16  jurisdiction of this court was originally to exercise

17  all the jurisdiction of the English Court of Chancery

18  as of the time of the separation, and whatever

19  jurisdiction we're given since.  So you wouldn't have

20  won on this purely legal argument in 1743 in my law

21  clerk's home country.

22         So when you keep saying, you know,

23  they should be grateful, what Orly's contention would

24  be -- and it's one that I'm telling you is a colorable

73

1    argument to someone grounded in the traditional

2    concepts of equity, which have acted as an overlay to

3    the purely legal for at least 500 -- it's probably 500

4    years -- is the minimum that the Orly Trust gets is

5    the price that Sagi negotiated for it.  That's the

6    minimum.

7                    The question that Orly raises, is that

8    what a faithful person would do when they were

9    exercising fiduciary power over property whose

10   equitable ownership was in someone else?

11                   Now, you can check with Mr. Connolly.

12   Now, he's spent a lot of his career in criminal law,

13   but he's an extremely gifted lawyer, and I think he

14   will tell you that what I'm saying about equitable

15   principles is by no means something I just made up.

16                   And so you need to focus on -- and

17   again, everybody should always come into something and

18   try to look at it a little bit from another's

19   perspective.  That is, I believe, what Orly is going

20   to argue.  Irrespective of whether the -- frankly, we

21   tried to beat the Trump Group and say that he

22   shouldn't have been able to sell this at all.  Hey, we

23   lost on that.

24                   But the one thing that's been clear,

74

and the Delaware judge -- I was clear on this from the
beginning:  Dividing up the pie claims, whether your
client was a faithful -- whether what he did with
those proceeds was fair to others who may have had an
equitable entitlement to them, that was for the New
York courts.  And so you want to keep that in mind,
because this idea, again, this free lunch concept that
this was just Sagi's greatest day, I --

        MR. DELLAPORTAS:  It's not a free
lunch, Your Honor.  We just want some peace in
exchange for it.

        THE COURT:  No, no.  Wait a minute.
Again, you're not -- you need to listen.  When I first
heard what you were saying I kind of thought it was
reasonable.  Then, when I realized what you were
trying to do was to require Orly to release anything
involving any lack of pro rata treatment or anything
like that, then it's not so immediately appealing.

        That's also true in terms of Dalia.
Which is, to the extent that Orly has a reason to
believe that Dalia and Sagi were in regular contact
when all these transactions with the Trumps happened,
and Dalia was the trustee of Orly's trust and didn't
reflect Orly's view of the matter, I think you're back

75

1  to the same situation.  I'm being very -- I agree with

2  you.  I understand exactly why you want to look at

3  their settlement agreement, but I think you also have

4  got to get to a place where there might be a reason

5  for them to show it.

6           And if you're -- I'm just encouraging

7  everybody to be a little bit supple.  I think Orly

8  would be being not very supple if she didn't realize

9  that she is in a different position than Sagi.  She

10  put the Trumps through a lot, she put everybody

11  through a lot, and there's a price being paid for not

12  being certain.

13           On the other hand, the difference

14  between 27 million and 10.6 -- it's pretty big.  And

15  you're giving no weight to that, that I can tell.  And

16  maybe you're negotiating, but don't -- you know,

17  you're in front of a judge.  And so, if you want to

18  take a -- I mean put it this way:  You haven't gotten

19  even a whelming to me on the point of arguing that

20  there's no plausibility to the argument that Sagi had

21  a gesture of good faith to try to maximize the sale

22  proceeds for the beneficiaries of all the things,

23  regardless of whether the sales -- the original

24  transactions were void.

CHANCERY COURT REPORTERS

76

1                    But I really am going to cut this off.
2    I appreciate, Mr. Dellaportas.  I have a much better
3    understanding.
4                    Mr. Anderson, I gave you guys the
5    chance, you know, to be here by phone.  Let's next
6    time be here by phone.
7                    And I want to hear back.
8                    MR. ANDERSON:  Thank you, Your Honor.
9                    THE COURT:  Thank you.
10                   (Hearing concluded at 11:45 a.m.)
11
12                        -  -  -
13
14
15
16
17
18
19
20
21
22
23
24

1

2                    REPORTER'S CERTIFICATE

3

4        I, JULIANNE LaBADIA, Official Court Reporter for

5    the Court of Chancery of the State of Delaware,

6    Registered Diplomate Reporter, Certified Realtime

7    Reporter, and Delaware Notary Public, do hereby

8    certify the foregoing pages numbered 3 through 76,

9    contain a true and correct transcription of the

10   proceedings as stenographically reported by me at the

11   hearing before the Chancelor of the State of Delaware,

12   on the date therein indicated.

13       IN WITNESS WHEREOF, I have hereunto set my hand

14   this 5th day of August, 2013, at Wilmington.

15

16

17

18                    /s/ Julianne LaBadia
                 -----------------------------
19                    Julianne LaBadia
                    Official Court Reporter
20               Registered Diplomate Reporter
                  Certified Realtime Reporter
21                  Delaware Notary Public

22

23

24

CHANCERY COURT REPORTERS

263

SUPREME COURT OF THE STATE OF NEW YORK

COUNTY OF NEW YORK

------------------------------------------------x

ORLY GENGER,

       Plaintiff,

                              Index No.

                              100697/2008

   -against-

SAGI A. GENGER,

       Defendants.


------------------------------------------------x


        CONTINUED EXAMINATION BEFORE TRIAL of the

Defendant, SAGI A. GENGER, taken by the Plaintiff,

pursuant to, Order, held at the offices of Zeichner,

Ellman & Krause, LLP, 575 Lexington Avenue, New York,

New York, on July 27th, 2012 at 10:16 a.m., before a

Notary Public of the State of New York.

*********************************************

        BARRISTER REPORTING SERVICE, INC.

             120 Broadway

          New York, N.Y. 10271

            212-732-8066

264

```
 1   A P P E A R A N C E S:
 2
 3            ZEICHNER, ELLMAN & KRAUSE
                  Attorneys for Plaintiff
 4                575 Lexington Avenue
                  New York, New York 10022
 5
         BY:   YOAV M. GRIVER, ESQ.
 6             BRYAN D. LEINBACH, ESQ.
 7
 8
           DUANE MORRIS, LLP
 9                Attorneys for Defendant
                  1540 Broadway
10                New York, New York 10036
11        BY:   JOHN DELLAPORTAS, ESQ.
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

432

```
1                    S. Genger
2    be Orly.  I just don't know.
3    Q.   Anyone else?
4    A.   I don't remember that I've prepared it
5    so it's purely theoretical.  I mean, she's
6    the one who signed it so I just don't
7    remember.
8    Q.   This issue that led to the
9    clarification, this was an issue that
10   involved you, Orly and Raines & Fischer.
11   And anybody else?
12   A.   Could have involved David.
13   Q.   Other than David Parnes, who else?
14   A.   I mean, it's pure speculation.  I just
15   don't remember.
16   Q.   Well, at some point, you began to be
17   contacted by people from Joel Isaacson &
18   Associates; do you recall that?
19   A.   Yes.
20   Q.   Do you remember who began contacting
21   you?
22   A.   I remember the names there.  I don't
23   remember who it is that contacted me.
24   Q.   Did Mr. Isaacson contact you?
25   A.   It's possible.  I don't remember.  It
```

```
1                    S. Genger
2    was Stan Altmark and Joel Isaacson.  There
3    could be another person.  They're all
4    interchangeable inside my head.  I don't
5    know.
6    Q.   When they contacted you, what did they
7    tell you?
8    A.   That they were working with my sister
9    and they wanted to understand what was going
10   on with her finances.
11   Q.   Did they tell you why your sister
12   wanted to know what was going on with her
13   finances?
14   A.   They may have.  I don't remember.
15   Q.   Do you remember anything else about the
16   first contact with you?
17   A.   Or I'm not sure if that's even the
18   first contact that I just described.
19   Q.   Okay.  What was their first contact
20   between you and --
21   A.   I don't remember.  I just don't
22   remember.
23   Q.   The first contact that you remember,
24   was that by phone, by e-mail, by letter, by
25   in person?  How?
```

434

```
 1                    S. Genger
 2    A.    We've had an in-person meeting and
 3    there was a correspondence, but I don't
 4    remember.  I don't remember.  I don't
 5    remember the order of things.
 6    Q.    How many meetings did you have with
 7    anyone from Joel Isaacson & Associates?
 8    A.    Well, at least one.  There may have
 9    been more, but I remember at least one.
10    Q.    How many telephone conversations did
11    you have with anyone from Joel Isaacson &
12    Associates?
13    A.    I'm not sure there was ever a telephone
14    conversation.
15    Q.    How many e-mails between you and anyone
16    from Joel Isaacson & Associates?
17    A.    It's whatever we have there in the
18    record and I think there's two or something
19    like that.
20    Q.    Any letters or memoranda?
21    A.    The e-mails and the memoranda is all,
22    in my mind is all same so I don't remember.
23    Q.    And you don't recall why Joel Isaacson
24    was contacting you for an understanding of
25    your sister's finances?
```

436

1                    S. Genger

2    course, in the context of my parents'

3    arbitration.  My father was claiming that

4    TRI was worthless a few months before he and

5    she claims it was worth a billion dollars,

6    so that was the -- that was a backdrop to

7    the conversation, basically to convince me

8    that my mother's position that TRI had any

9    value was ridiculous.

10   Q.   That was your belief at the time of

11   these meetings and communications with Joel

12   Isaacson?

13   A.   That was the purpose of the meeting?

14   Q.   Yes.

15   A.   At some point, I came to that

16   conclusion.

17   Q.   Now, let's talk about the face-to-face

18   meeting that you had, that was in Joel

19   Isaacson's offices?

20   A.   Their offices, I presume they're his

21   offices.  I don't know.

22   Q.   That was on or about November 8, 2007;

23   do you recall?

24   A.   It could be.  I don't remember.

25   Q.   Did you bring any document with you to

437

```
1                    S. Genger
2    the meeting?
3    A.   Could be.  I don't remember.  It could
4    be that they had documents.  I just don't
5    remember.
6    Q.   Let me show a memorandum dated November
7    8, 2007, to you from Stan Altmark, ray items
8    needed.
9              (Whereupon Document Bates stamped
10             OG17-OG17 was marked as Plaintiff's
11             Exhibit 15 for identification as of
12             this date.)
13             MR. GRIVER:  For the record, what
14             we've marked is Bates stamped numbers
15             OG16 through 17.
16   Q.   Let me know when you're finished
17   reading that memorandum, Mr. Genger.
18   A.   Okay.
19   Q.   Do you recall receiving this memoranda?
20   A.   No.
21   Q.   Does this memoranda refresh your
22   recollection that you provided documents at
23   the meeting on November 8th?
24   A.   Not really.
25   Q.   Let me show you what's been marked,
```

438

```
 1                      S. Genger
 2    what's been Bates stamped as OG11 through
 3    14.   Is that documentation that you provided
 4    at the meeting?
 5            MR. DELLAPORTAS:  What's the exhibit
 6            on this?
 7            MR. GRIVER:  We haven't.  If he
 8            recognizes it, then I'll mark it as
 9            an exhibit.
10    A.    You're asking me if I provided this at
11    the meeting?
12    Q.    Yeah.  Is this a documentation you
13    provided at the meeting, if you recall?
14    A.    I don't recall, no.
15    Q.    Do you recall Joel Isaacson sending you
16    an e-mail on November 6th, 2007?
17    A.    No.
18    Q.    Did you ever produce a November 6, 2007
19    e-mail?
20    A.    I don't remember the existence of the
21    e-mail.  I know there is an e-mail between
22    me him and me in which he apologizes for
23    asking to set up a meeting and not being
24    there when my mother and I showed up, so I
25    remember that was there's.  I've seen that
```

439

1                    S. Genger

2    somewhere.

3    Q.    There was only one meeting?

4    A.    I don't remember.  I remember there was

5    one meeting we set a time and he forgot to

6    show up.  And then there was another meeting

7    that we actually had, and I don't remember

8    if there was an additional meeting.

9    Q.    Now, at the meeting at Joel Isaacson's

10   offices, who was there, if you recall?

11   A.    Orly was there, my mother was there, I

12   was there.  I think her latest boyfriend was

13   there, that's it.

14   Q.    Joel Isaacson was there?

15   A.    Honestly, because if Joel Isaacson was

16   sitting in the room, I wouldn't have known

17   it was him so I just don't remember who's

18   who.  Someone from that accounting firm.  I

19   don't know if it was him or Stan or someone

20   else or both of them.

21   Q.    So we're clear, Orly was there, you

22   were there, correct?

23   A.    Yes.

24   Q.    Your mother Dalia Genger was there?

25   A.    Yep.

# SUPREME COURT OF THE STATE OF NEW YORK
## NEW YORK COUNTY

PRESENT:  _JAFFE_       PART _12_
        _Justice_

Ceenger,
      -v-

Ceenger,

INDEX NO. _109749/09_

MOTION DATE _____

MOTION SEQ. NO. _42_

The following papers, numbered 1 to _____ , were read on this motion to/for _Confirm / Reject Ref_

| | |
|---|---|
| Notice of Motion/Order to Show Cause — Affidavits — Exhibits | No(s). _____ |
| Answering Affidavits — Exhibits | No(s). _____ |
| Replying Affidavits | No(s). _____ |

Upon the foregoing papers, it is ordered that this motion is

**DECIDED IN ACCORDANCE WITH ACCOMPANYING DECISION / ORDER**

MOTION/CASE IS RESPECTFULLY REFERRED TO JUSTICE _____
FOR THE FOLLOWING REASON(S):

**BARBARA JAFFE**
        J.S.C.
, J.S.C.

Dated: _3/18/15_

1. CHECK ONE: ............................... ☐ CASE DISPOSED    ☒ NON-FINAL DISPOSITION
2. CHECK AS APPROPRIATE: ...................MOTION IS: ☐ GRANTED   ☐ DENIED   ☒ GRANTED IN PART   ☐ OTHER
3. CHECK IF APPROPRIATE: ........................ ☐ SETTLE ORDER     ☐ SUBMIT ORDER
                       ☐ DO NOT POST    ☐ FIDUCIARY APPOINTMENT    ☐ REFERENCE

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK  :  PART 12
------------------------------------------------------------------------x

ORLY GENGER, in her individual capacity and on behalf
of the Orly Genger 1993 Trust (both in its individual
capacity and on behalf of D & K Limited Partnership),

                              Plaintiff,

                 -against-

DALIA GENGER, SAGI GENGER, LEAH FANG,
D & K GP LLC, and TPR INVESTMENT ASSOCIATES,
INC.,

                          Defendants.

------------------------------------------------------------------------x

Index No. 109749/09
Motion seq. no. 042

**DECISION AND
JUDGMENT**

BARBARA JAFFE, JSC:

    By decision and order dated June 9, 2014, I granted plaintiff's request for fees and costs

incurred in connection with motion sequence 30.  In that decision, I resolved several issues raised

by defendants, and found that given the appellate affirmance of my holdings that TPR and D&K

GP were properly ordered to pay plaintiff's fees and costs, and that the releases under the

settlement agreements were voidable at plaintiff's option, "the fees and costs related to the appeal

are properly awarded to plaintiff, to the extent that they are reasonable."  I also held that the

original amount of $139,541.38 should be reduced by the matters attributable to plaintiff's

motion for a pre-judgment order of attachment which I had denied, plaintiff's motion for

sanctions against Sagi, Dalia, and Fang, and plaintiff's opposition to Fang's motion for summary

judgment; and "other unrelated matters" filed under NYSCEF 464-466.

    Given the parties' litigiousness and inability to settle their voluminous motions, I

appointed a Special Referee to hear and report to recommend the reasonable fees and costs to be awarded to plaintiff.

On October 8, 2014, the referee held a telephone conference with the parties during which he discussed his recommendation as follows:

(1)    The referee stated that in my order, "the sanction that [I] imposed is the attorney's fees that were incurred in connection with the motion, that resulted in the order finding contempt . . ."

(2)    He also observed that plaintiff's attorneys requested additional fees, "which, in [his] judgment, are not covered" by my order, and he therefore limited his recommendation to the fees that he believed fell within the terms of my order, by eliminating "fees relating to an appeal and fees relating to the contempt or the alleged contempt of the defendants who the Appellate Division determined were not guilty of contempt";

(3)    The referee found that the hourly rates requested by plaintiff's attorneys were not exorbitant and thus did not reduce them; and

(4)    The referee found that there was "substantial" block billing, which he reduced by 20 percent.

The referee thus recommended an award of $104,735, and indicated that he did not include any costs that had been redacted from the billing statements. (NYSCEF 719).

By motion, plaintiff seeks an order confirming in part and rejecting in part the referee's report and recommendation. By cross-motion, defendants TPR Investment Associates, Inc. and D&K GP LLC (collectively, defendants) move for an order rejecting the report.

Plaintiff argues that the referee erred in excluding the legal fees she incurred related to the appeal of my sanctions order, as I granted her the right to recover such fees in my June 2014 order. She submits proof that the fees incurred for the appeal totaled $80,240.34 and, applying the referee's 20 percent reduction for the block billing, requests that I grant her $64,192.27 in

2

fees. Plaintiff therefore requests that I confirm the referee's report to the extent of directing entry of judgment in her favor in the amount of $168,927.27. (NYSCEF 718).

Defendants object to the award of appellate costs, arguing that the referee properly determined that the reasonable fee to be awarded did not include such costs, and observe that I found that the costs may, rather than must, be awarded. They also argue that an award of appellate costs is unwarranted as the Appellate Division did not award costs on the appeal. They otherwise agree with the referee's recommendation. However, they also maintain that no fee award is reasonable given events post-dating my order, specifically, that the lawsuit "has now been revealed to be brought on by false pretenses." (NYSCEF 776).

As I specifically directed that fees and costs related to the appeal may be awarded to the extent that they are reasonable, the referee erred in excluding them on the ground that they were not covered in my order. And, as both parties agree with the referee's reduction of the billing by 20 percent, plaintiff has established her entitlement to the additional $64,192.27. Defendants' current argument that no fees should be awarded based on plaintiff's alleged fraud on the court is fatally conclusory and has no bearing on her entitlement to costs here. Moreover, their argument regarding the Appellate Division's decision not to award appeal costs is untimely.

Accordingly, it is hereby

ADJUDGED and ORDERED, that plaintiff's motion is granted and the referee's report of October 8, 2014 is confirmed to the extent of directing judgment in favor of plaintiff and against defendants TPR Investment Associates, Inc. and D&K GP LLC, jointly and severally, in the sum of $168,927.27, and the clerk is directed to enter judgment accordingly; and it is further

ORDERED, that defendants TPR Investment Associates, Inc.'s and D&K GP LLC's

3

cross motion is denied.

ENTER:

Barbara Jaffe, J.S.C.

**BARBARA J.**

Dated:      March 18, 2015
            New York, New York

4

# SUPREME COURT OF THE STATE OF NEW YORK
## NEW YORK COUNTY

**BARBARA JAFFE**
J.S.C.

PRESENT: _____

_____
*Justice*

PART __12__

Genger, Orly
-v-
Genger, Dalia

INDEX NO. __109749/200__

MOTION DATE _____

MOTION SEQ. NO. __041__

The following papers, numbered 1 to _____ , were read on this motion to/for __Prelim Inj /TRO__

| | |
|---|---|
| Notice of Motion/Order to Show Cause — Affidavits — Exhibits _____ | No(s). _____ |
| Answering Affidavits — Exhibits _____ | No(s). _____ |
| Replying Affidavits _____ | No(s). _____ |

Upon the foregoing papers, it is ordered that this motion is

**DECIDED IN ACCORDANCE WITH ACCOMPANYING DECISION / ORDER**

MOTION/CASE IS RESPECTFULLY REFERRED TO JUSTICE _____

FOR THE FOLLOWING REASON(S):

Dated: __MAY 0 4 2015__

_____, J.S.C.

**BARBARA JAFFE**
J.S.C.

1. CHECK ONE: ............................................. ☐ CASE DISPOSED   *Motion*   ☑ NON-FINAL DISPOSITION

2. CHECK AS APPROPRIATE: .........................MOTION IS: ☐ GRANTED   ☑ DENIED   *X motion*   ☑ GRANTED IN PART   ☐ OTHER

3. CHECK IF APPROPRIATE: ............................................. ☐ SETTLE ORDER    ☐ SUBMIT ORDER

       ☐ DO NOT POST    ☐ FIDUCIARY APPOINTMENT    ☐ REFERENCE

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK  : IAS PART 12
-----------------------------------------------------------------x
ORLY GENGER, in her individual capacity and on
behalf of the Orly Genger 1993 Trust (both in its
individual capacity and on behalf of D & K Limited
Partnership),

                                    Plaintiff,

-against-

DALIA GENGER, SAGI GENGER, LEAH FANG,
D & K GP LLC, and TPR INVESTMENT
ASSOCIATES, INC.,

                              Defendants.
-----------------------------------------------------------------x

Index No. 109749/09

Mot. seq. no. 041

**DECISION AND ORDER**

BARBARA JAFFE, JSC:

        Defendant TPR Investment Associates, Inc. (TPR) seeks an order dissolving or lifting the

preliminary injunction issued by this court on May 29, 2013 (NYSCEF 418) in favor of plaintiff.

(NYSCEF 686). Plaintiff opposes and cross-moves for an order restricting TPR from filing

further motions without prior leave of this court. (NYSCEF 701).

<div align="center">

I. TPR'S MOTION

A. Background

</div>

        The background for this motion was set forth in an opinion in which I determined, among

other things, that the transactions and settlements entered into by defendants were voidable

because they violated prior injunctions. (*Genger v Genger*, 39 Misc 3d 1235 [A], 2013 NY Slip

Op 50886 [U] [Sup Ct, NY County 2013]). That determination was affirmed on appeal, and

modified in certain respects that are irrelevant to the disposition of this motion. (*Genger v*

*Genger*, 120 AD3d 1102 [1ˢᵗ Dept 2014]). The court upheld my finding that TPR and D&K GP

LLP (D&K GP), the general partner of D&K Limited Partnership (D&K LP), had disobeyed "a

lawful mandate of the court" for which sanctions were appropriate, and that defendant Dalia

Genger, trustee of the Orly Trust, had a conflict of interest in entering into the transactions and

settlements, including issuing a D&K LP note in 2011 to TPR in place of a note issued by D&K

in 1993 which "contained provisions that were plainly intended to entrench [Dalia] as sole trustee

of the Orly Trust." (*Id.* at 1103-1104).  The Orly Trust guaranteed the 2011 note while the Sagi

Trust was released from liability pursuant to the same voidable transactions and settlements.  The

note was then sold or assigned by TPR to Manhattan Safety Company, a foreign company located

in St. Kitts.

## B. Contentions

TPR alleges that following the issuance of the May 2013 injunction, it discovered new

facts that "directly contradict" the original basis of the injunction, and that the new facts

constitute "changed circumstances" that, pursuant to CPLR 6314, warrant dissolution of the

injunction. (NYSCEF 687 at 2).  The new facts are plaintiff's April 2014 opposition to a cross

motion TPR brought to add certain affirmative defenses (NYSCEF 637 at 2), wherein plaintiff

stated that "[t]he undisputed contemporaneous documentary evidence and testimony shows,

however, the [1993] Note was always intended to be repaid by the family," and a memorandum

prepared in 1994 by William Fischer, the Genger family accountant, in which he wrote that, "[a]t

some point it will be necessary to refinance [the 1993] D&K's debt.  It may be possible to find a

third party lender who will lend D&K sufficient amounts to allow D&K to repay both TPR and

Arie Genger." (NYSCEF 687 at 3, quoting NYSCEF 631 [filed under seal] at 3).

TPR argues that because the statements made by plaintiff are contrary to the assertions

advanced in her second amended complaint (NYSCEF 83 at 8), namely, that the 1993 note was

2

"worthless and uncollectible," the circumstances supporting the May 2013 injunction no longer

exist and, thus, it should be dissolved. (NYSCEF 687 at 3). In other words, TPR contends that

because Orly "recently admitted" that the 1993 note was not worthless and that it was intended to

be repaid by the family, TPR's sale of the 2011 note to Manhattan Safety, the third party lender,

did not encumber the Orly Trust with new debt, and thus the original premise of the injunction is

no longer applicable or has otherwise evaporated. (NYSCEF 709 at 1-2).

In her April 2014 opposition, however, plaintiff also asserted that "Sagi improperly

conflates the family agreement not to forcibly collect the 1993 note, with a nonexistent

agreement that the note was never meant to be voluntarily repaid by the family," and that the note

"was in fact repaid by Arie for many years. Indeed, it was Sagi who chose not to pay the Note

from 2004-2009, although he had the means to do so." (NYSCEF 637 at 2). And, in the second

amended complaint, she explains that the assertion that the note was "worthless and

uncollectible" was derived from the findings of the arbitrator in the course of Arie's and Dalia's

post-divorce arbitration, which findings were based on Sagi's testimony. (NYSCEF 83 at 8-9,

noting that every Genger family member understood and agreed that the 1993 note was a "tax

planning mechanism" to facilitate the family's estate planning, and that "Sagi was charged with

ensuring that the Note . . . would never be enforced . . . ." (*Id.*). Plaintiff thereby denies that she

has advanced contradictory positions regarding the 1993 note.

The voidable transactions and settlements, as the appellate division pointed out, include,

among other things, that the removal of Dalia, as trustee of the Orly Trust, would constitute an

event of default rendering the new D&K note due and payable by the Orly Trust. (*Genger*, 120

AD3d at 1104). After issuance of the appellate opinion, plaintiff's petition to remove Dalia as

trustee remains pending before the Surrogate's Court notwithstanding the conflict of interest recognized by the appellate division. (*Id.*)

<center>C.  Discussion</center>

CPLR 6314 provides that "[a] defendant enjoined by a preliminary injunction may move at any time, on notice to the plaintiff, to vacate or modify it."  Moreover, "[a] motion to vacate a preliminary injunction is addressed to the sound discretion of the court and may be granted either upon compelling or changed circumstances that render continuation of the injunction inequitable." (*Wellbilt Equip. Corp. v Red Eye Grill,* 308 AD2d 411, 411 [1st Dept 2003]).

Defendant improperly relies on selected portions of plaintiff's pleadings, and ignores other relevant portions which permit the reasonable inference that any assertion to the effect that the Genger family members had agreed that the 1993 note was not to be forcibly enforced, means that the family had agreed that no legal action would be taken to enforce the note even though the family did not intend to repay it.  Thus, TPR has not demonstrated that plaintiff has taken a position contrary to that taken in the second amended complaint, and consequently, shows no compelling or changed circumstances sufficient to render the continuation of the injunction inequitable.

And, until the Surrogate's Court resolves the issue of the Orly Trust trustee, the transactions and any refinancing of the new D&K note cannot proceed because they require a trustee's participation on behalf of the Orly Trust.  Also, because the proposed refinancing, as evidenced by the D&K note that was purportedly sold by TPR to Manhattan Safety, would be an integral part of the voided transactions, Fischer's memorandum, prepared more than 20 years ago, is of no legal significance.

<center>4</center>

## II.  PLAINTIFF'S CROSS MOTION

In her cross motion, Orly asks that the court require that TPR obtain my permission before filing motions, arguing that it has been engaging in delaying tactics in this case and filing frivolous motions.  In opposition, TPR contends that it is Orly who has been stalling the progression of this case.

In motions filed by the parties in this case and in the several companion cases, some of the relief sought has been duplicative and/or based on substantially similar facts, thereby monopolizing judicial resources and placing an inordinately heavy burden on an already crowded docket. (*See eg* 651089/2010, seq. no. 31, and 109749/2009, seq. no. 34; 109749/2009, seq. nos. 39 and 41).  To reduce similar practice in the future, the parties are hereby directed to comply with Rule 24 of the Commercial Division (Advance Notice of Motions) before filing motions.

## III. CONCLUSION

Based on all of the foregoing reasons, it is hereby

ORDERED, that the relief requested in motion sequence number 041 by defendant TPR Investment Associates, Inc. is denied; and it is further

ORDERED, that the relief requested by plaintiff Orly Genger in her cross motion to motion sequence number 041 is granted to the extent that the parties are directed to comply with Rule 24 of the Commercial Division before filing any future motions.

ENTER:

Barbara Jaffe, JSC

Dated:          May    , 2015
               New York, New York

5

## II.  PLAINTIFF'S CROSS MOTION

In her cross motion, Orly asks that the court require that TPR obtain my permission before filing motions, arguing that it has been engaging in delaying tactics in this case and filing frivolous motions.  In opposition, TPR contends that it is Orly who has been stalling the progression of this case.

In motions filed by the parties in this case and in the several companion cases, some of the relief sought has been duplicative and/or based on substantially similar facts, thereby monopolizing judicial resources and placing an inordinately heavy burden on an already crowded docket. (*See eg* 651089/2010, seq. no. 31, and 109749/2009, seq. no. 34; 109749/2009, seq. nos. 39 and 41).  To reduce similar practice in the future, the parties are hereby directed to comply with Rule 24 of the Commercial Division (Advance Notice of Motions) before filing motions.

## III. CONCLUSION

Based on all of the foregoing reasons, it is hereby

ORDERED, that the relief requested in motion sequence number 041 by defendant TPR Investment Associates, Inc. is denied; and it is further

ORDERED, that the relief requested by plaintiff Orly Genger in her cross motion to motion sequence number 041 is granted to the extent that the parties are directed to comply with Rule 24 of the Commercial Division before filing any future motions.

ENTER:

_____
Barbara Jaffe, JSC

Dated:      May 4, 2015
            New York, New York

5

# SUPREME COURT OF THE STATE OF NEW YORK
# NEW YORK COUNTY

PRESENT: _JAFFE_____       PART _12_

_____
Justice

Zenger, Orly in her individual
capacity + on behalf of the Orly Zenger
1993 Trust ...)
Zenger, Dalia, et. al

INDEX NO. _109749/09_

MOTION DATE _____

MOTION SEQ. NO. _39_

The following papers, numbered _642_ to _712_, were read on this motion to/for _an order striking the complaint_
Notice of Motion/Order to Show Cause — Affidavits — Exhibits _+ cross motion_ ┃ No(s). _____
Answering Affidavits — Exhibits _____ ┃ No(s). _____
Replying Affidavits _____ ┃ No(s). _____

Upon the foregoing papers, it is ordered that this motion _+ cross motion are
denied._

_Motion denied for reasons set forth in
decision + order dated May 4, 2015, seq. 41.
Cross motion for sanctions is denied._

<div style="writing-mode: vertical">MOTION/CASE IS RESPECTFULLY REFERRED TO JUSTICE
FOR THE FOLLOWING REASON(S):</div>

Dated: _5/5/15_

_Barbara Jaffe_ J.S.C.
**BARBARA JAFFE**
J.S.C.

1. CHECK ONE: ....................................................... ☐ CASE DISPOSED   ☑ NON-FINAL DISPOSITION
2. CHECK AS APPROPRIATE: ...........................MOTION IS: ☐ GRANTED   ☑ DENIED   ☐ GRANTED IN PART   ☐ OTHER
3. CHECK IF APPROPRIATE: ................................................ ☐ SETTLE ORDER   ☐ SUBMIT ORDER
   ☐ DO NOT POST   ☐ FIDUCIARY APPOINTMENT   ☐ REFERENCE

# FILED UNDER SEAL