SURROGATE'S COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

| | |
|---|---|
| In the Matter of the Application of Orly Genger to Remove Dalia Genger as Trustee of The Orly Genger 1993 Trust Established on December 13, 1993, by<br><br>    ARIE GENGER,<br><br>                        Grantor | File No.:  0017/2008 |

> New York County Surrogate's Court
> MISCELLANEOUS DEPT.
> OCT 1 3 2015
> **FILED**
> Clerk_____

# ORLY GENGER'S RESPONSE TO DALIA'S UNAUTHORIZED SUPPLEMENTAL FILING ON HER ALREADY FULLY SUBMITTED MOTION TO DISMISS

ZEICHNER ELLMAN & KRAUSE LLP
1211 Avenue of the Americas
New York, New York 10036
Telephone: (212) 223-0400

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................ ii

PRELIMINARY STATEMENT ...................................................................... 1

STATEMENT OF FACTS .............................................................................. 2

A.  The Orly Trust And Its Interests In TPR And TRI ...................................... 2

B.  Orly's February 2008 Petition To Remove Dalia As Trustee..................... 3

C.  Dalia's Material Misrepresentations To Surrogate Roth Regarding TPR .................................................................................................................... 4

D.  Dalia's Material Omission To Surrogate Roth Regarding Dalia's Continued Personal Interest In, And Conflict Of Interest Over, The Orly Trust's TRI Interests ............................................................................. 6

E.  Once She Became Trustee, Dalia Violated Her Fiduciary Duties As Trustee By Helping Sagi Loot The Orly Trust Of Its TPR Interests ........... 8

F.  Once She Became Trustee, Dalia Violated Her Fiduciary Duties As Trustee By Secretly Entering Into Secret Agreements Designed To Entrench Herself As Trustee And Otherwise Favoring Her Interests Over Orly And The Orly Trust ................................................................... 9

G.  Once She Became Trustee, Dalia Violated Her Fiduciary Duties As Trustee By Helping Sagi Loot The Orly Trust Of Its TRI Interests .......... 12

ARGUMENT:

DALIA'S MOTION TO DISMISS ORLY'S THIRD AMENDED PETITION SHOULD BE DISMISSED BECAUSE THE THIRD AMENDED PETITION CONTNUES TO SET FACTS SUPPORTING DALIA'S JUDICIAL REMOVAL AS TRUSTEE OF THE ORLY TRUST .......................................................................... 20

CONCLUSION............................................................................................. 22

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

Birnbaum v. Birnbaum,
 73 N.Y.2d 461 (1989) ...........................................................................................9, 21

Genger v. Genger,
 120 A.D. 3d 1102 (1st Dept. 2014)...............................................................9, 10, 11

Genger v. Genger,
 121 A.D.3d 270 (1st Dept. 2014).............................................................................19

Genger v. Genger,
 2015 U.S. Dist. LEXIS 649 (S.D.N.Y. Jan. 5, 2015)..............................................15

Greystone Funding Corp. v Kutner,
 121 A.D.3d 581 (1st Dept. 2014)..............................................................................21

In re Estate of Brandt,
 81 A.D.2d 268 (1st Dept. 1981)................................................................................21

In re Estate of Saxton,
 179 Misc.2d 681 (Sur. Ct. Broome Cty. 1998)........................................................21

In re Van Deusen's Estate,
 37 A.D.2d 131 (1st Dept. 1971).................................................................................21

Landon v Kroll Lab. Specialists, Inc.,
 22 N.Y.3d 1 (2013) ...................................................................................................21

Matter of the Estate of Helen Thompson,
 232 A.D.2d 219 (1st Dept. 1996)..............................................................................22

Matter of the Estate of Manny E. Duell, Deceased,
 258 A.D.2d 382 (1st Dept. 1999)..............................................................................22

Matter of Hall,
 275 A.D.2d 979 (4th Dept. 2000) .............................................................................21

Matter of the Proceeding to Remove David M. Mergenhagen as Trustee,
 50 A.D.3d 1486 (4th Dept. 2008) .............................................................................22

Matter of Stewart,
 2011 N.Y. Misc. LEXIS 6504 (Sur. Ct. N.Y. Cty. Dec. 1, 2011) (Anderson, J.)....21

<u>Matter of Wood</u>,
    177 A.D.2d 161 (2d Dept. 1992) ..................................................................5, 9, 21

<u>Meinhard v. Salmon</u>,
    249 N.Y. 458 (1928) ............................................................................................21

<u>Sagi Genger v. Orly Genger</u>,
    Case No. 14-8653 (KBF) ......................................................................................7

<u>Tap Holdings, LLC v Orix Fin. Corp.</u>,
    109 A.D.3d 167 (1st Dept. 2013)........................................................................21

<u>TPR Investment Associates, Inc. v. Pedowitz & Meister, LLP</u>,
    2014 U.S. Dist. LEXIS 67116 (S.D.N.Y. May 15, 2014).......................................19

## PRELIMINARY STATEMENT

Petitioner/Beneficiary Orly Genger ("Orly") has filed a 96 paragraph, 35 exhibit Third Amended Petition ("TAP") seeking the judicial removal of Dalia Genger ("Dalia") as trustee of the Orly Genger 1993 Trust ("Orly Trust"). Orly seeks Dalia's removal because, as detailed in the TAP, Dalia is hostile to Orly, and has used, and continues to use, her position as trustee to harm Orly and the Orly Trust in breach of her fiduciary duties.

On or about August 25, 2015, the Surrogate Court ordered the parties to reset the September 9 return date of Dalia's fully submitted motion to dismiss the TAP. Dalia improperly used this ministerial act to submit an unauthorized supplemental filing on her motion to dismiss (the "Unauthorized Filing"). Because the filing is unauthorized, the Court should ignore it. If the Court considers the Unauthorized Filing, it should consider the instant Orly response.

The instant response makes two points. *First*, the contents of the Unauthorized Filing are irrelevant to Dalia's motion to dismiss. The Unauthorized Filing addresses none of the operative facts in the TAP, which facts must be taken as true on a motion to dismiss and plainly support Dalia's removal as trustee of the Orly Trust. If anything, the Unauthorized Filing – which is nothing more than a personal attack by Dalia against Orly – is additional evidence of Dalia's hostility toward Orly, hostility which further supports Dalia's removal as trustee.

*Second*, the assertions in the Unauthorized Filing are false. Orly is not trying to remove Dalia to enhance her position "at the expense of the Trust" (Unauthorized Filing ¶ 3), as falsely alleged by Dalia. Rather, Orly seeks to remove Dalia because she is an improper trustee. As shown below and in the TAP: (i) Dalia is only a trustee now because she deliberately lied to and misled this Court; (ii) Dalia has spent her time as trustee helping her favored son, Sagi Genger ("Sagi") loot the Orly Trust; and (iii) Dalia has deliberately hidden from this Court that

she has a claim against Orly for every TRI-related dollar in the Trust.  This personal interest constitutes a continuing conflict of interest that again makes Dalia an improper trustee.

Dalia's Unauthorized Filing boils down to the false premise that Orly – a 36 year old adult – must be protected from herself.  This is simply not the case.  And, in any event, there is no reason why another trustee – one who does not suffer from Dalia's past failures, past omissions, past lies, past violations of fiduciary duty, and current incurable conflicts of interest, as detailed here and in the TAP – cannot properly function as a trustee of the Orly Trust, and make decisions that, unlike Dalia's decisions, are not tainted by self-interest.  Dalia, however, refuses to step down as trustee until she is shielded from any and all liability for her past actions.  In that refusal, Dalia once again improperly places herself and her own interests ahead of the interests of the Orly Trust and its beneficiary, Orly Genger.

Dalia's motion to dismiss should be denied.  Dalia should be removed and accountant/financial manager Joel Isaacson appointed in her place.

## STATEMENT OF FACTS

### A.    The Orly Trust And Its Interests In TPR And TRI

In 1993, grantor Arie Genger ("Arie") established the Orly Trust, for the benefit of his daughter Orly, and the Sagi Genger 1993 Trust ("Sagi Trust") for the benefit of his son Sagi.  See TAP ¶ 15 (Leinbach Affirmation, **Exhibit 1**).  Orly is the Orly Trust's sole non-contingent beneficiary.  Id. ¶¶ 1, 3.

The Orly Trust and the Sagi Trust were estate planning tools ensuring each child received equal portions of the Genger family's wealth.  TAP ¶ 15.  Specifically, Arie and Dalia wanted their two children to receive: (i) equal shares in Trans-Resources, Inc. ("TRI"), a closely held private corporation Arie founded; and (ii) equal indirect ownership interests in TPR

2

Investment Associates, Inc. ("TPR"), a closely held family corporation which held a controlling interest in TRI. See id. ¶¶ 16-19, 22.

**B.**   **Orly's February 2008 Petition To Remove Dalia As Trustee**

The original two trustees of the Orly Trust were Lawrence Small and Sash Spencer. At Sagi and Dalia's behest, they resigned and were replaced by two long-time friends of Sagi, David Parnes and Eric Gribitz. See TAP ¶ 26; December 31, 2008 Decision of Surrogate Court Justice Roth ("Roth Decision") at 2 (Leinbach Aff., **Exhibit 2**). Gribitz and Parnes both resigned, with Parnes appointing Sagi's sister-in-law, Leah Fang, as sole successor trustee. See TAP ¶ 26, 36 n.2; Roth Decision at 2. On January 3, 2008, over Orly's objections, Leah Fang appointed Dalia as trustee of the Orly Trust. TAP ¶ 36 n.2, 39.

In February 2008, Orly petitioned this Court to remove Dalia as trustee of the Orly Trust (the "First Petition"), asserting that Dalia was acting, and would act, contrary to Orly and the Orly Trust's interests. See TAP ¶ 41; Roth Decision at 5. Surrogate Roth denied the First Petition as premature "without prejudice to renewal if future circumstances warrant such relief" (Roth Decision at 8), believing Dalia should be given the chance to demonstrate whether she intended to act for or against Orly's interests. Roth Decision at 7-8; TAP ¶¶ 42-43. Surrogate Roth gave Dalia the benefit of the doubt because Dalia swore to the Surrogate Court that Dalia treated her children equally, had no conflicts of interest, and intended to protect the Orly Trust and its assets:

> [I]t appears that Dalia (who states that she is ready and able to act as fiduciary) has yet to assume the duties of trustee in deference to her daughter's position in this litigation. As a validly appointed trustee, she should be given the opportunity to do what she deems necessary to manage and protect the trust's assets.

Roth Decision at 7-8; TAP ¶¶ 42-43.

As set forth below, the sworn Dalia statements upon which Surrogate Roth relied

3

(and upon which Dalia intended Surrogate Roth to rely) were lies – both direct lies and lies by omission. It is respectfully suggested that had Surrogate Roth known the truth – that Dalia favored Sagi over Orly, continued to suffer from irremediable conflicts of interest, and intended to work with Sagi to benefit herself to the detriment of Orly and the Orly Trust – the First Petition to remove Dalia would have been granted.

C.    **Dalia's Material Misrepresentations To Surrogate Roth Regarding TPR**

The sworn Dalia statements upon which Justice Roth relied are contained in the March 11, 2008 Affidavit of Dalia Genger (annexed as Leinbach Aff., **Exhibit 3**). In it, Dalia made several sworn representations (and material omissions) designed to justify and reassure the Surrogate Court that she would be a proper trustee.

For example, to demonstrate that she did not favor Sagi over Orly (as Orly alleged), that she would maintain the overall estate plan of benefitting Orly and Sagi and their trusts equally, and that she was ready to serve as trustee without conflict of interest, Dalia swore to the Surrogate's Court *she was selling her TPR shares back to TPR so as to equally benefit both Orly and her son, Sagi*:

> I am a shareholder of TPR. In that capacity, I have been effectively redeeming my shares of TPR. This is consistent with an overall estate plan for the benefit of both Orly and Sagi, because it increases D&K's, and indirectly, the Trust's interest in TPR.

3/11/08 Dalia Aff. ¶ 10 (Leinbach Aff., Ex. 3). This is not what happened, and the redemption referred to by Dalia was a sham.

Never disclosed to Surrogate Roth (or to Orly) was the fact that, in August 2008, Dalia actually assigned all her TPR shares to Sagi:

> A. Assignor [Dalia], previously a shareholder of Company [TPR], sold her entire beneficial and record ownership in Company, to Company pursuant to an undated letter agreement and legal instrument (entitled "Promissory Note in Connection with Letter

4

Agreement 12/17/2007") evidencing a debtor of Company towards Assignor in the principal amount of Five Million dollars ("$5,000,000) ("Assigned Loan") attached hereto as Exhibit A ("Sale Documents").

...

D.   *Assignee [Sagi Genger] contemplates rescinding the Sale Document pursuant to the terms thereof, whereby all Assignor's previous entitlement to shares of the Company shall vest in Assignee, as beneficial and record holder of two hundred and twenty (220) shares of common stock of the Company.* Alternatively, Assignor might maintain the loan to the Company outstanding, and / or negotiated [sic] other terms in connection therewith with the Company.

The parties agree as follows:

1.   Assignment.  Subject to the terms and conditions set forth herein, *the Assignor hereby sells and assigns to Assignee, and the Assignee hereby purchases and assumes from the Assignor*, without recourse to the Assignor, on the date set forth above (the "Assignment Date")(a) all right, title, and interest of the Assignor to the Assigned Loan and (b) *all obligations of the Assignor under the Sale Documents with respect to the Assigned Loan.*  As full consideration for the sale of the Assigned Loan, the Assignee shall pay to the Assignor on the Assignment Date such amount as shall have been agreed between the Assignee and the Assignor (the "Purchase Price").

8/8/08 Assignment and Assumption Agreement at 1 (emphases added) (Leinbach Aff., **Exhibit 4**).   This secret agreement entirely contradicts Dalia's sworn assurances to the Surrogate's Court.   The assignment (i) demonstrated Dalia's favoritism toward Sagi – the assignment exclusively benefited Sagi (who became majority owner of TPR) to Orly's detriment; (ii) destroyed the "overall estate plan" of seeing the two children shared equally in the Genger family wealth; (iii) demonstrated Dalia's willingness to lie to the Court and to Orly; and (iv) demonstrated Dalia's willingness to keep material information hidden from beneficiary Orly.[1]

---

[1]   A trustee has "the duty of communicating all the material facts to the beneficiary." Matter of Wood, 177 A.D.2d 161, 167 (2d Dept. 1992).  As set forth in the TAP and the various decisions documenting Dalia's conflicts of interest as against Orly and failures as trustee, Dalia's failure to inform Orly of any material facts or events has

Dalia's failure to inform Orly or the Surrogate's Court of her secret assignment of her TPR shares to Sagi must have been intentional. Her secret $5 million transaction shows Dalia's clear favoritism of Sagi and unfitness to be Orly's trustee, and puts the lie to Dalia's earlier March 11, 2008 sworn assurances to Surrogate Roth. Remarkably, Dalia never produced the Assignment and Assumption Agreement in discovery, and maintained her material lie in sworn interrogatory responses to Orly, apparently hoping to continue hiding her secret sale to Sagi of her TPR shares from Orly and the courts. See Dalia Deposition Tr. at 468:13-474:4; 501:5-503:7 (Leinbach Aff., **Exhibit 6**); March 29, 2012 Dalia Genger Interrogatory Responses, Response to Interrogatory No. 30 (Leinbach Aff., **Exhibit 5**).

**D.    Dalia's Material Omission To Surrogate Roth Regarding Dalia's Continued Personal Interest In, And Conflict Of Interest Over, The Orly Trust's TRI Interests**

Dalia also failed to tell the Surrogate's Court that she had a personal interest in the TRI assets in the Orly Trust. Specifically, for every dollar attributable to the Sagi or Orly Trust TRI Shares, Dalia obtains a claim against Orly for half that amount.

Dalia and her ex-husband Arie Genger divorced in October 2004. As part of their divorce, Arie and Dalia executed a Stipulation of Settlement (the "Divorce Stipulation"). See Divorce Stipulation (without exhibits) (Leinbach Aff., **Exhibit 7**). The Divorce Stipulation provides that TPR's 52.85% ownership interest in TRI[2] be transferred (19.43% each) to the Orly Trust and Sagi Trust, with the remainder (13.99%) going to Arie. Id., pp. 12-14. The Divorce

---

been a constant of Dalia's tenure as trustee. For example, Dalia refused to inform Orly that the Orly Trust's indirect ownership interests in TPR were being improperly auctioned by Sagi to Sagi (TAP ¶¶ 27-35, 55-66), and likewise refused to inform Orly (or the New York Supreme Court) that – in violation of various injunctions designed to protect the Orly Trust – Dalia had entered into eight secret agreements improperly designed to entrench Dalia as trustee of the Orly Trust, and otherwise benefit Dalia at the expense of Orly and the Orly Trust (TAP ¶¶ 67-70, 72-91).

[2] The remaining 47.15% was owned by Glenclova Investment Company and TR Investors, LLC, who were controlled by Jules Trump, Eddie Trump, and Mark Hirsch (collectively, the "Trump Group").

Stipulation expressly states "[f]ollowing the foregoing transfers of the TRI Stock, the Wife will have no ownership interest in TRI." Id., p. 14.

Despite this, Dalia and Sagi apparently entered into a side agreement dated October 30, 2004 (the "Promise Document"), giving Dalia the right to demand payment from Sagi equal to the value of 794.40 of the TRI shares that were transferred to the Orly and Sagi Trusts pursuant to the Divorce Stipulation:

> *If you [Dalia], in your sole and absolute discretion, from time to time desire funds to support your lifestyle*, you may request in writing that I make payment to you as provided in this letter. Promptly upon receipt of the request, *I will pay to you (1) an amount equal to all dividends, distributions, proceeds or other payments attributable to 794.40 shares of TRI (adjusted for any splits or similar action) that have previously been paid to Orly, me or any trust for the benefit of either of us,* less any amounts previously paid to you pursuant to this letter, or (2) any lesser amount indicated in your request.

Promise Document (emphases added) (Leinbach Aff., **Exhibit 8**). Pursuant to a subsequent "November Document," Orly is allegedly required to reimburse Sagi for 50% of any payment Sagi makes to Dalia pursuant to the Promise Document. See November Document (Leinbach Aff., **Exhibit 9**).

Dalia and Sagi already have used the Promise Document to demand $200,000 and obtain a judgment against Orly. See Judgment in Sagi Genger v. Orly Genger, Case No. 14-8653 (KBF) (Leinbach Aff., **Exhibit 44**).[3] *Now, Dalia is spending Orly Trust monies trying to grab monies received by Orly in settlement of her individual claims and place them in the Trust, so Dalia can make a claim for those monies under the Promise Document* (see Statement of Facts, Point G).

Moreover, at the time of the First Petition, *Dalia never informed the Surrogate's*

---

[3] Orly has appealed the decision and judgment of the Southern District Court in the matter. The appeal is pending.

*Court of her continuing interest in the TRI Shares.* Dalia's deliberate decision not to inform the

Surrogate's Court hid from the Court Dalia's irremediable and continuing conflict of interest in

serving as trustee. Dalia's undiluted fiduciary duty to act in Orly's best interests, by necessity,

conflicts with her personal interest in using the Promise Document and control over the Orly

Trust to extract money from Orly. Dalia's decision to mislead this Court, and her continuing and

incurable conflict of interest, are two additional reasons why Dalia must be removed as trustee of

the Orly Trust.

**E.    Once She Became Trustee, Dalia Violated Her Fiduciary Duties
As Trustee By Helping Sagi Loot The Orly Trust Of Its TPR Interests**

Dalia has used the "opportunity to...manage and protect the trust's assets," given

her by Surrogate Roth (Roth Decision at 7-8) to collude with Sagi and loot the Orly Trust of its

TPR and TRI assets.

The scheme by which Dalia and Sagi looted the Orly Trust of its TPR interests

through a sham UCC sale is set forth in detail in the TAP, and those facts are incorporated herein

by reference.  See TAP ¶¶ 14-21, 23-35, 44-45, 55-66 (and incorporated exhibits).  Some key

points, however, are worth stressing:

- To obtain additional millions from her ex-husband Arie in a 2007 Martial
Arbitration, Dalia (with supporting testimony from Sagi and TPR Officer and
Sagi friend David Parnes) successfully argued that a promissory note held by
TPR and guaranteed by the Orly Trust's indirect ownership interest in TPR
was "never intended ... to be collected" because doing so would "defeat their
estate plan."  Final Arbitration Award at 15 (attached as TAP, Ex. J); see also
TAP ¶¶ 31-35 (and attached statements and testimony of Dalia, Sagi, and
Parnes).

- Less than a year later, Dalia did nothing as Sagi purportedly foreclosed on that
same note – even though "the parties never intended for this note to be
collected."  Final Arbitration Award at 15 (TAP, Ex. J).

- Though she was aware of the scheduled auction in advance, Dalia did not tell
Orly (or anyone else) of the foreclosure or auction.  See TAP ¶¶ 61, 64.  This
was no accident: Dalia testified under oath that she decided not to tell Orly

about the auction. See Dalia Dep. Tr. at 186:16-22; 189:9-190:7, 207:20-23 (Leinbach Aff., **Exhibit 10**). By hiding the foreclosure and sale from Orly, Dalia allowed her favored son Sagi to strip the Orly Trust of its TPR interests and give them to TPR (an entity he owned and controlled because of Dalia's earlier secret sale of her interests in TPR to Sagi just before the purported foreclosure and sham UCC auction).

- Dalia's decision not to tell Orly about the UCC auction violated her fiduciary "duty of communicating all the material facts to the beneficiary." Matter of Wood, 177 A.D.2d 161, 167 (2d Dept. 1992); Birnbaum v. Birnbaum, 73 N.Y.2d 461, 466 (1989).

- Had Orly been informed about the UCC auction she – unlike Dalia – would have acted to protect the Orly Trust. See TAP ¶ 35; 7/27/15 Affidavit of Orly Genger ((Leinbach Aff., **Exhibit 11**).

**F.      Once She Became Trustee, Dalia Violated Her Fiduciary Duties As Trustee By Secretly Entering Into Secret Agreements Designed To Entrench Herself As Trustee And Otherwise Favoring Her Interests Over Orly And The Orly Trust**

As detailed in the TAP (TAP ¶¶ 67-91) and various court decisions referenced herein, Dalia also violated her fiduciary duties when she (supposedly on behalf of the Orly Trust) and Sagi (through TPR and D&K GP, entities he controls) secretly executed "defendants-only" settlements and related agreements (collectively, the "Secret Agreements") which purported to settle the New York TPR Action amongst the defendants. See TAP ¶¶ 67-91. The New York Supreme Court and First Department already have held these Secret Agreements were improper, voidable, and deserved imposing sanctions upon the defendants.[4] See 5/29/13 Decision and Order at 3-4 (Leinbach Aff., **Exhibit 12**); Genger v. Genger, 120 A.D. 3d 1102, 1103 (1st Dept. 2014) (Leinbach Aff. **Exhibit 13**).

Among other things, Dalia and Sagi's Secret Agreements tried to (i) foist

---

[4]   As sanction, the New York Supreme Court ordered Dalia, Sagi, and the entities they controlled to pay the fees Orly spent in opposing defendants' motions to enforce their purported "defendants-only" settlement agreement and related Secret Agreements. See 5/29/13 Decision and Order at 3-4. The First Department held that Dalia and Sagi did not have to pay the sanction as individuals, because the motions to enforce had been brought by the entities they controlled – TPR and D&K GP – and not them individually. Importantly, however, the First Department agreed that the scheme itself fully deserved the sanctions imposed, and upheld those sanctions against TPR and D&K GP. Genger v. Genger, 120 A.D. 3d 1102, 1103 (1st Dept. 2014) (Leinbach Aff., Ex. 13).

approximately $4.4 million in new promissory notes upon the Orly Trust, payable to a shadowy St. Kitts entity set up days before execution of the defendants-only settlements with an address on a golf course; (ii) have the Orly Trust "disclaim any interest in, any shares of or TPR, either directly or indirectly through DK (the "TPR Interest")"; (iii) insulate Dalia and Sagi from any liability for their past and future actions against Orly or the Orly Trust; and (iv) included various poison pills designed to permanently entrench Dalia as trustee of the Orly Trust, and further immunize Dalia from any liability related to the sham UCC sale or her other improper actions as trustee. See TAP ¶¶ 79-91; 5/29/13 Decision and Order at 4; Genger, 120 A.D.3d at 1104; "Defendants Only" Settlement Agreement ¶¶ 1, 2, 3, 7 (Leinbach Aff., **Exhibit 14**).

*Importantly, many of these poison pills approved by Dalia are directed squarely against the Orly Trust.* For example, if Dalia is removed as trustee or made a co-trustee, the *Orly Trust* becomes immediately liable for $4.4 million to the shadowy St. Kitts entity. Similarly, the Secret Agreements make the *Orly Trust* responsible for paying the legal fees and costs of every party, should Orly continue her various current actions on behalf of the Trust, or try to prevent any future Dalia/Sagi scheme directed against Orly or the Orly Trust. See, e.g., TAP ¶¶ 82, 84; Credit Agreement, §§ 6.2, 7 (Leinbach Aff., **Exhibit 15**); "Defendants Only" Settlement Agreement ¶ 7 (Leinbach Aff., Ex. 14).

In further violation of her fiduciary duties as trustee, Dalia disclosed none of this to Orly for over eight months. Dalia also hid these "secret agreements" from this Court and the New York Supreme Court for over eight months, in direct, intentional violation of protective injunctions requiring such disclosure and preventing the transfers attempted in the Secret Agreements. See 5/29/13 Decision and Order at 4-5 (describing Dalia and Sagi's violation of the Supreme Court injunctions); see also Surrogate Ct. Injunction (requiring ten days notice before

10

taking any action affecting in any way the Orly Trust TRI assets) (Leinbach Aff., **Exhibit 16**).

In June 2012, Dalia and Sagi were compelled to produce documents by the New York Supreme Court, which led to the disclosure of the Secret Agreements. Since then, every single Court and every single Justice to consider them have (i) found Dalia's actions improper; (ii) found that Dalia placed her interests above that of Orly and the Orly Trust; (iii) found that Dalia deliberately failed to, but should have, disclosed the Secret Agreements to Orly; (iv) found Dalia deliberately violated the court injunctions *designed to protect the Orly Trust*; (v) found the Secret Agreements voidable[5]; and (v) found Dalia/Sagi's Secret Agreements scheme deserved the imposition of sanctions. See 5/29/13 Order at 4-5 (Leinbach Aff., Ex. 12); Genger, 120 A.D.3d at 1104. As unanimously stated by the First Department:

> In entering into the aforementioned October 2011 and March 2012 settlement agreements with TPR and D&K LP on behalf of the Orly Trust, of which she was sole trustee, Dalia had a conflict of interest. The new promissory notes executed by Dalia on behalf of the Orly Trust pursuant to the settlement agreements contained provisions that were plainly intended to entrench her as sole trustee of Orly Trust, notwithstanding the ongoing disputes and litigation between herself and plaintiff, the trust's beneficiary. Specifically, the replacement notes provided that Dalia's resignation or removal as trustee of Orly Trust, or the appointment of any additional trustee, would constitute an event of default rendering the notes immediately due and payable by Orly Trust. Further, the purported settlement of the derivative claims that plaintiff asserts on behalf of Orly Trust in this action – which was already pending at the time the settlement agreements were executed – required the court's approval, which was never sought. Moreover, as previously discussed, the settlements were entered into in violation of the aforementioned 2010 and 2011 injunctions. For these reasons, the settlements are voidable and, given the expressed intention of plaintiff (the beneficiary of Orly Trust) to void them, the purported releases they contain are not enforceable.

Genger, 120 A.D.3d at 1104 (Leinbach Aff., Ex. 13).

---

[5]   Orly has voided the Secret Agreements.

**G.   Once She Became Trustee, Dalia Violated Her Fiduciary Duties
      As Trustee By Helping Sagi Loot The Orly Trust Of Its TRI Interests**

On October 4, 2011 – one day after executing the first of the Secret Agreements –
Dalia commenced a derivative action on behalf of the Orly Trust in Delaware Chancery Court
(the "Dalia Delaware Action").   By the Dalia Delaware Action, Dalia purportedly sought a
Declaratory Judgment that the Orly Trust (and not TPR or the Trump Group entities) was the
beneficial owner of the Orly Trust TRI Shares.  See TAP ¶ 47, n.5; Dalia Delaware Complaint ¶¶
37-43 (Leinbach Aff., **Exhibit 17**).  Orly was not made a party to the Dalia Delaware Action.  Id.

Dalia's Delaware Action has always been nothing more than another transparent
attempt to harm Orly and the Orly Trust.  Its purpose was to give the Delaware Chancery Court
the jurisdiction to apply previous adverse decisions to the Orly Trust, and find that $10.3 million
– the proceeds from Sagi/TPR's sale of the Orly Trust TRI Shares to the Trump Group –
belonged to Sagi-controlled TPR, and not the Orly Trust. [6]

Beneficial ownership of the Orly Trust TRI Shares and disposition of the proceeds
from the sale already were at issue in the "New York TRI Action" previously commenced by
Orly on behalf of herself and the Orly Trust (Index No. 651089/10). [7]  To protect herself and the
Orly Trust from Dalia, Orly (successfully) sought a temporary restraining order and/or
preliminary injunction preventing Dalia from prosecuting her duplicative Dalia Delaware Action,
setting before the New York Supreme Court Dalia's bad faith:

> In filing the Delaware DJ Action, Dalia deliberately seeks to have
> her case placed before a Court and Judge (Chancellor Strine) who
> already has determined the Orly Trust does not own the TRI

---

[6]   Sagi (on behalf of TPR) entered into an August 22, 2008 Side Letter Agreement, in which TPR agreed to sell the
TRI shares intended for the Orly Trust for $10.3 million to the Trump Group, in the event a Court ruled the Orly
Trust shares were owned by TPR and not the Orly Trust.

[7]   For the Court's convenience, copy of the operative complaint in the New York TRI Action, without exhibits, is
attached as Leinbach Aff., **Exhibit 19**.

Shares (a determination reversed by the Delaware Supreme Court on jurisdictional grounds). Orly Aff. ¶¶ 9-13 and Exs. D and E.

...

Rather than follow the Delaware Supreme Court's advice and bring an action in New York, or conserve its resources by litigating the matter in the existing New York TRI Action, Dalia deliberately chose the worst possible option – to bring a plenary action in Delaware Chancery Court where the matter already has been decided adverse to the Orly Trust. Orly Aff. ¶ 12. By bringing her Delaware DJ Action, Dalia is attempting to cure the jurisdictional defect that protected the Orly Trust, plainly intending to obtain from Chancellor Strine the same erroneous findings adverse to the Orly Trust he had made previously (even though Orly, the Orly Trust, and TPR were not parties to that prior proceeding). Id. Little wonder then that, at a recent hearing before this Court, Mr. Allingham II, the Trump Group's attorney, welcomed Dalia's filing of her new Delaware DJ Action. See October 11, 2011 Hearing Transcript at 28:3-8 (Leinbach Decl., Ex. V).

10/25/11 Orly Memo Supporting Injunction (Leinbach Aff., **Exhibit 18**).

[G]iven every opportunity to explain, and even while submitting an affidavit in opposition, defendant Dalia remains conspicuously silent about why she has spent time and Orly Trust assets retaining Delaware counsel and bringing a duplicative Delaware DJ Action, instead of filing a simple cross-claim in this action (if a cross-claim is even needed). Nor does she respond in any way to the fact that, in bringing the Delaware DJ Action, Dalia ignored Orly's express wishes and an Order from the Surrogate Court requiring her to provide Orly with ten days notice before doing anything to affect the Orly Trust's interest in its TRI shares. Dalia's silence on these matters underscores what is already apparent on its face – the Delaware DJ Action is nothing more than Dalia and the other defendants' transparent attempt to rob Orly of her chosen forum, so they may complete fraudulently dissipating the Orly Trust's assets.

12/9/11 Orly Memo Supporting Injunction (Leinbach Aff., **Exhibit 20**).

In response, Dalia contended (i) that her action and the New York TRI Action

commenced by Sagi was not duplicative because Dalia Delaware Action was the only action that

sought to recover the economic value of the beneficial interest in the TRI Shares in trust for

Orly[8]; (ii) that Dalia had brought her action to obtain many valuable and immediate rights for the Orly Trust and "maximize the Orly Trust's recovery of the TRI Shares"; and (iii) her action was not a sham, as would be demonstrated by Dalia's vigorous litigation of the matter. See Dalia Opp. to Injunction Br. at 4-6 (Leinbach Aff., **Exhibit 21**); see also 10/26/11 Hearing Tr. at 17:3-5 ("THE COURT: Now Dalia is going to stand up to the Trumps on behalf of Orly's beneficial interest? MR. MEISTER: Yes") (Leinbach Aff., **Exhibit 22**).[9]

The New York Supreme Court was unimpressed by Dalia's contentions and self-serving protests of good-faith. On October 26, 2011 and November 9, 2011, it entered two temporary restraining orders (later continued by an April 10, 2012 Interim Decision) preventing Dalia, TPR and the Trump Group from prosecuting the Dalia Delaware Action. See 10.26.11 Order To Show Cause; 11.9.11 Order To Show Cause; 4.10.12 Interim Decision (Leinbach Aff., **Exhibits 23, 24, 25**).[10]

On June 16, 2013, plaintiffs Arie and Orly (individually and as beneficiary of the Orly Trust) and the Trump Group defendants entered into a confidential settlement agreement, resolving the settling parties' respective claims and counterclaims against one another (the "Confidential Settlement Agreement" or "CSA"). See CSA (Leinbach Aff., **Exhibit 27**) (FILED UNDER SEAL).[11]

---

[8] This contention, repeated here (Unauthorized Filing at ¶ 7), is demonstrably untrue and was properly rejected by the New York Supreme Court. The New York TRI Action brought claims that would have led to the Orly Trust recovering the TRI Shares as intended by the Genger family estate plan. See New York TRI Action Complaint (Leinbach Aff., Ex. 19); 10/25/11 Orly Memo Supporting Injunction (Leinbach Aff., Ex. 18) at 4-6; 12/9/11 Orly Memo Supporting Injunction (Leinbach Aff., Ex. 20) at 10 fn.7.

[9] Dalia never did provide a plausible, good-faith reason for why she chose Delaware instead of New York to bring her duplicative action.

[10] In January 2013, Dalia again spent Orly Trust monies in an unsuccessful attempt to get these injunctions lifted. See 1/16/13 Griver Letter to New York Supreme Court (Leinbach Aff., **Exhibit 26**).

[11] Dalia tries to draw a false equivalency between her numerous deliberate acts of hiding her agreements and actions from Orly and the Courts and Orly keeping the terms of the CSA confidential, as required by the CSA.

The CSA is executed by the "AG Group," which includes Orly Genger, but only as an individual and Orly Trust beneficiary. See CSA at 1 (Leinbach Aff, Ex. 27). In turn, the Orly Trust is specifically defined in the CSA as a "Sagi Group" member that is *not* a settling party. Id. at 3. The Sagi Trust, which includes the Orly Trust, is *not* included in any release of claims. Id.

In these many ways (pp. 1, 3, 5-6), the CSA makes clear that it does not settle any Orly Trust claims. Further emphasizing this fact, the CSA directs the AG Group to take necessary actions to "cause the Orly Genger 1993 Trust to release any and all claims against the Trump Group Released Parties" in the future. See CSA at 16. *A fortiori*, had the Orly Trust's claims been released in the CSA there would be no reason to include language about "causing" the release of Orly Trust claims in the future.

Both the United States District Court and the New York County Supreme Court have recognized that the CSA does not settle the Orly Trust claims:

> The 2013 Settlement Agreement does not waive any of the Orly Trust's claims.

Genger v. Genger, 2015 U.S. Dist. LEXIS 649, *9-10 (S.D.N.Y. Jan. 5, 2015).

> [I]n the settlement agreement, Orly stops short of releasing derivative claims.

---

Unauthorized Filing at ¶ 10. There is no equivalency. Unlike Dalia, who told no one (and even lied under oath and violated court injunctions to keep her various agreements hidden), Orly never hid the fact she had entered the CSA from anyone. As to the CSA's terms, most settlements keep their terms confidential from non-parties to the settlement – and Sagi and Dalia are non-parties (and specifically defined as non-parties in the CSA). Moreover, in this case, the parties to the CSA required confidentiality because they were properly concerned that Sagi/Dalia would try to interfere with the CSA (as they have). Finally, Dalia fails to inform the Court that Orly obtained multiple determinations from the New York Supreme Court and the Appellate Division, First Department agreeing with Orly that the CSA did not have to be disclosed to Sagi or his controlled entities. See Leinbach Aff., **Exhibit 28** (decisions). As Dalia concedes (Unauthorized Filing at ¶ 10), once Orly was ordered to produce the CSA by District Judge Forrest, she immediately did so. Plainly, there is no comparison between Dalia's serial, deliberate violations of her fiduciary duty to inform, and Orly's honoring of a contractual requirement of confidentiality.

3/21/14 Decision and Order at 4 (Leinbach Aff., **Exhibit 29**).[12]

Finally, the 2013 CSA lifts the pre-existing injunction preventing Dalia from prosecuting, as trustee of the Orly Trust, her Dalia Delaware Action regarding beneficial ownership of the TRI shares against TPR and the Trump Group. See CSA at 5-6 (Leinbach Aff., Ex. 27).

Based upon the language of the CSA, on July 1, 2013, the New York County Supreme Court signed a Second Amended Stipulation of Discontinuance. See Second Amended Stipulation of Discontinuance at 2 (Leinbach Aff., **Exhibit 30**). Like the CSA before it, the Second Amended Stipulation of Discontinuance carefully and expressly limited the claims discontinued by Orly to those brought by Orly "individually and as beneficiary of the Orly Trust." See generally id. It did not discontinue any Orly Trust claims. Id. Because the Orly Trust claims still existed and were not discontinued, the Second Amended Stipulation of

---

[12] Similarly, Orly repeatedly testified that she did not settle Orly Trust claims:

> Q: And you since settled your claims against the Trump Group; is that correct?
>
> A: I settled with the Trump Group.
>
> Q: And you settled your claims that you brought on your own behalf and on behalf of the trust, correct?
>
> A: I settled on behalf of myself as an individual.
>
> Q: You did not settle the claims that were brought on behalf of the trust?
>
> A: Well, if there – if the trustee of my trust decides to file a complaint with the Trumps regarding this matter they can.
>
> ...
>
> Q: Your testimony today is that when you settled your claims against the Trumps you did not settle those claims on behalf of the trust, is that right?
>
> A: I settled with the Trumps on my behalf as an individual. Not – I am not the trustee of my trust. So I couldn't settle with them as a trustee of my trust.
>
> If the trustee decides to pursue this matter with the Trumps they can.

10/25/13 Orly Dep. Tr. at 93:25-95:10 (Leinbach Aff., **Exhibit 31**); see also 2/14/14 Orly Dep. Tr. at 70:12-14 ("I settled with the Trumps other than with regards to my trust. So I settled with them as an individual.") (Leinbach Aff., **Exhibit 32**).

Discontinuance also released Dalia to prosecute her previously stayed Dalia Delaware Action. See id.[13]

Sadly, when the restraints were lifted, Dalia did exactly what Orly feared, and what Dalia had always intended: Dalia used her Dalia Delaware Action to help Sagi loot the Orly Trust of its TRI interests.

Rather than "maximize the Orly Trust's recovery of the TRI Shares" (Dalia Opp. to Injunction Br. at 5 (Leinbach Aff., Ex. 21)) and/or "stand up to the Trumps" (10/26/11 Hearing Tr. at 17:3-5 (Meister) (Leinbach Aff., Ex. 22)), Dalia, TPR/Sagi, and the Trump Group immediately drafted an August 13 stipulation of discontinuance that was "So Ordered" by the Delaware Chancery Court (the "Delaware Stipulation").   In the Delaware Stipulation, *for no money or consideration of any kind*, Dalia stipulated and agreed, on behalf of the Orly Trust, to (i) the validity of the TPR sale of the Orly Trust TRI Shares to the Trump Group; (ii) the Trump Group's ownership "(beneficially, of record, and otherwise)" of the Orly Trust TRI Shares; and (iii) dismiss with prejudice the Orly Trust's claims to beneficial ownership of the Orly Trust TRI Shares. See Delaware Stipulation at ¶¶ 1-4 (Leinbach Aff., **Exhibit 34**).

Importantly, Dalia entered into the Delaware Stipulation against Orly's express direction.  Specifically, prior to its execution, Dalia's counsel wrote an August 9, 2013 letter to the Chancery Court representing that Dalia would not sign the Delaware Stipulation unless Orly consented to its execution.  See 8/9/13 Dalia Letter to Chancery Court (Leinbcah Aff., **Exhibit 35**); 8/13/13 Meister Letter to Orly Counsel with draft stipulation (Leinbach Aff., **Exhibit 36**).

---

[13] Recently, the Trump Group has mistakenly claimed that the CSA releases Orly Trust claims.  Of course, that mistaken assertion conflicts with, among other things, the plain language of the CSA, the plain language of the New York Supreme Court's Second Amended Stipulation of Dismissal, findings by the New York Supreme Court and federal District Court that the CSA did not release Orly Trust claims, and the subsequent actions of Dalia, Sagi, and the Trump Group in Delaware described herein.  Orly has warned the Trump Group about this mistaken claim, and notified them that if they continue to try to somehow amend the CSA in this manner, they are risking litigation for their breach of the CSA.  See Warning Letters attached as Leinbach Aff., **Exhibit 33**.

On August 16, 2013, Orly counsel informed Dalia counsel that the Delaware Stipulation in its current form was unacceptable to Orly, and sought Dalia's representation that she would not sign it without Orly's consent, as Dalia represented to the Delaware Chancery Court.  See 8/16/13 Letter (Leinbach Aff., **Exhibit 37**).  Orly also submitted her proposed changes to the Delaware Stipulation to the Delaware Chancery Court and to Dalia, who had represented she would not sign it on behalf of the Orly Trust without Orly's consent.  See 8/26/13 Letter (Leinbach Aff., **Exhibit 38**).

Despite Dalia's representations to the Court and her fiduciary duties to Orly as trustee of the Orly Trust, *Dalia ignored Orly's wishes and signed the Delaware Stipulation without Orly's proposed changes, without Orly's consent, and against Orly's instructions.*

As intended by Dalia and Sagi, Sagi immediately used the Delaware Stipulation to seize what remained of the Orly Trust TRI assets.  Specifically, in November 2013, Sagi-controlled TPR commenced an action in the United States District Court for the Southern District of New York seeking the $10.3 million in proceeds from the prior sale of the Orly Trust TPR Shares (the "Proceeds").  TPR claimed the Delaware Stipulation constituted a ruling that TPR – and not the Orly Trust – owned the TRI shares at issue, and, as a result, TPR was entitled to the Proceeds.  TPR Complaint ¶¶ 9-11, 15 (Leinbach Aff., **Exhibit 39**).

Instead of protecting the Orly Trust's interests in the $10.3 million in Proceeds, Dalia expressly supported Sagi's claim that TPR – and not the Orly Trust – should receive all the Proceeds:

> [Dalia Counsel] Ms. Bachman: …we [Dalia as Trustee] don't object if this Court would direct that the [$10.3 million in] escrow be given to TPR.

4/29/14 Hearing Tr. at 27 (Leinbach Aff., **Exhibit 40**).

On May 15, 2014, the federal District Court ruled that the Delaware Stipulation –

not the June 2014 CSA – settled the Orly Trust's claims and required that the $10.3 million in Proceeds go to TPR:

> As part of a stipulation dismissing the action in Delaware Chancery Court, the parties to that action -- TPR/Sagi, the Trump Group, and Dalia, but not Arie or Orly -- agreed that the Trump Group is the rightful owner of the Orly Trust Shares. (Dellaportas Dec. Ex. B ¶ 2.)

TPR Investment Associates, Inc. v. Pedowitz & Meister, LLP, 2014 U.S. Dist. LEXIS 67116, *5-6 (S.D.N.Y. May 15, 2014).

The Appellate Division, First Department, similarly recognized that it was the Delaware Stipulation – not the June 2013 CSA – that that settled the Orly Trust's claims and determined beneficial ownership and ended Orly's claims to the $10.3 million in proceeds from Sagi/TPR's sale of those shares to the Trump Group:

> Moreover, under the 2008 agreement between TPR and the Trump Group, the sale could only take place after a judicial determination that TPR is the record and beneficial owner of the Orly Trust's TRI shares.  When the complaint was filed, it had only been determined that TPR was the shares' record owner, but the Delaware Chancery Court has now also ruled that TPR is the shares' beneficial owner (Stipulation & Proposed Order of Dismissal, Dalia Genger v TR Invs., LLC [Del Ch Ct, Aug. 30, 2013] [C.A. No. 6906-CS]).

Genger v. Genger, 121 A.D.3d 270, 280 (1st Dept. 2014).

After giving up Orly Trust claims against TPR and the Trump Group by settling the Dalia Delaware Action *for no money at all*, and assuring that TPR – and not the Orly Trust – received the $10.3 million in proceeds, Dalia then changed her position.  Ignoring the Dalia Delaware Action and August 2013 Delaware Stipulation completely, Dalia now asserts the Orly Trust claims were settled in June 2013 by the CSA, and that she has a right as trustee to claw monies from beneficiary Orly.  In other words, Dalia is now using her position as trustee (and spending Orly Trust monies) to try and take more money from beneficiary Orly.  Notably, under

the Promise Document (see Statement of Facts, Point D), if Dalia is successful, she will not only have clawed monies away from Orly, but Dalia also will have created for herself a personal claim against Orly for half this amount.

On August 11, 2014, Dalia brought a motion in New York Supreme Court seeking to take from Orly any money Orly received for settling her *individual* claims under the CSA. See Dalia Substitution Memo at 6-9 (Leinbach Aff. **Exhibit 41**).[14] By Interim Decision, the Supreme Court held Dalia's motion in abeyance pending the resolution of this proceeding to remove Dalia. See 5/7/15 Interim Order (Leinbach Aff., **Exhibit 42**).

Dalia's actions provide yet another showcase of her misuse of her position as the Orly Trust trustee. Dalia and Sagi used Dalia's position as trustee to commence a litigation in Delaware so she could give away all Orly Trust claims to the Orly Trust TRI Shares and dissipate $10.3 million to Sagi (via TPR). Not satisfied with that (and her other harmful actions against beneficiary Orly), Dalia is now fighting to remain trustee so she can try to take more monies from beneficiary Orly, to Orly's detriment and to the benefit of Sagi and herself. Dalia's current actions are not a reason to dismiss the TAP, but another reason to deny the motion to dismiss and proceed with this case.

## ARGUMENT

### DALIA'S MOTION TO DISMISS ORLY'S THIRD AMENDED PETITION SHOULD BE DISMISSED BECAUSE THE THIRD AMENDED PETITION CONTNUES TO STATE FACTS SUPPORTING DALIA'S JUDICIAL REMOVAL AS TRUSTEE OF THE ORLY TRUST

On a motion to dismiss, the Court tests the sufficiency of the TAP, taking all factual allegations in the TAP as true, and affording Orly the benefit of every possible inference.

---

[14] Orly has opposed Dalia's attempt to take Orly's money. See Orly Opp. Memo to Dalia Substitution at 18-21 (Leinbach Aff., **Exhibit 43**).

See, e.g., <u>Greystone Funding Corp. v Kutner</u>, 121 A.D.3d 581, 583 (1st Dept. 2014); <u>Landon v Kroll Lab. Specialists, Inc.</u>, 22 N.Y.3d 1, 5 (2013); <u>Tap Holdings, LLC v Orix Fin. Corp.</u>, 109 A.D.3d 167, 174 (1st Dept. 2013).  Under this liberal pleading standard, the TAP more than adequately states a legal and equitable basis for Dalia's removal as trustee.  <u>See</u> TAP ¶¶ 13-94.

   As set forth in the TAP, and pursuant to well-settled case law, Dalia has violated her fiduciary duties by (i) acting against the interests of beneficiary Orly and the Orly Trust; (ii) misleading this Court through sworn misstatements and material omissions;  (iii) putting Dalia's own interests against the interests of beneficiary Orly and the Orly Trust; (iv) hiding material facts from beneficiary Orly (and also the courts) on numerous occasions; and (v) acting, and continuing to act, under conflicts of interest that disqualify Dalia from being trustee.  <u>See</u> TAP ¶¶ 13-91; Statement of Facts, <u>supra</u>; <u>Matter of Stewart</u>, 2011 N.Y. Misc. LEXIS 6504, *4 (Sur. Ct. N.Y. Cty. Dec. 1, 2011) (Anderson, J.) (confirming referee's report to remove trustee based on "repeated instances in which [Trustee] put her own personal interests before her fiduciary duty"); <u>Matter of Hall</u>, 275 A.D.2d 979, 980 (4th Dept. 2000) ("If the personal interests of a trustee conflict with her interest as a trustee, the Court may remove her as a trustee.").[15]

   The Unauthorized Filing does not even address the allegations of the TAP; its false and spurious allegations merely attack Orly personally, not her TAP.  Hence, the Unauthorized Filing is irrelevant to Dalia's motion to dismiss.  If anything, the hostility toward

---

[15]  <u>See also</u> <u>In re Estate of Saxton</u>, 179 Misc.2d 681, 693 (Sur. Ct. Broome Cty. 1998) (a trustee is obligated to "be as a watchman in the night, ever vigilant and always dedicated to the best interest of the *cestui que trust*."); <u>Matter of Wood</u>, 177 A.D.2d at 167 (a trustee has the fiduciary "duty of communicating all the material facts to the beneficiary"; rejecting trustee bank's contention that it had no duty to inform the trust beneficiary of its intent to liquidate the stock and bond portfolio of the trust); <u>Birnbaum v. Birnbaum</u>, 73 N.Y.2d 461, 466 (1989) (fiduciary "is bound to single-mindedly pursue the interests of those to whom a duty of loyalty is owed"); <u>Meinhard v. Salmon</u>, 249 N.Y. 458, 464 (1928) (trustee bound to standard "stricter than the morals of the market place.  Not honesty alone, but the punctilio of an honor the most sensitive"); <u>In re Van Deusen's Estate</u>, 37 A.D.2d 131, 133 (1st Dept. 1971) (same); <u>In re Estate of Brandt</u>, 81 A.D.2d 268, 273-274 (1st Dept. 1981) ("acts of self-dealing and other breaches of fiduciary duty alleged would, of course, if established, warrant the trustees' removal, irrespective of whether petitioners' beneficial interests were affected").

Orly reflected in the Unauthorized Filing further supports Dalia's removal as trustee of the Orly Trust. A trustee's removal is warranted where the trustee exhibits open hostility to the beneficiary and interferes with the administration of the trust for the beneficiary's benefit. See Matter of the Proceeding to Remove David M. Mergenhagen as Trustee, 50 A.D.3d 1486, 1488 (4th Dept. 2008); Matter of the Estate of Manny E. Duell, Deceased, 258 A.D.2d 382, 383 (1st Dept. 1999); Matter of the Estate of Helen Thompson, 232 A.D.2d 219, 219-220 (1st Dept. 1996). This is precisely the situation here.

**CONCLUSION**

For each of the foregoing reasons, and those set forth in Orly's prior opposition papers to Dalia's already fully-submitted motion to dismiss, the Court should (i) ignore Dalia's Unauthorized Filing; (ii) deny Dalia's motion to dismiss so the case may proceed; and (ii) grant Orly such other and further relief as the Court deems just and proper.

Dated:    New York, New York
          October 6, 2015

                              ZEICHNER ELLMAN & KRAUSE LLP


                              By: _____
                                  Yoav M. Griver
                                  Bryan D. Leinbach
                                  Attorneys for Petitioner Orly Genger
                                  1211 Avenue of the Americas
                                  New York, New York 10036
                                  (212) 223-0400

STATE OF NEW YORK,                                        AFFIDAVIT OF SERVICE
COUNTY OF NEW YORK.                          BY UPS GROUND COMMERCIAL DELIVERY

        JOHN D. DELANEY, being duly sworn, says:  that I am over the age of eighteen years, and am not a party herein, and reside in Jersey City, New Jersey and that on the 6th day of October, 2015, I served a true copy of the within:

        **ORLY GENGER'S RESPONSE TO DALIA'S UNAUTHORIZED SUPPLEMENTAL FILING ON HER ALREADY FULLY SUBMITTED MOTION TO DISMISS**

        **AFFIRMATION OF BRYAN D. LEINBACH with Exhibits;**

by delivering into the exclusive care and custody of a representative of United Parcel Service for ground commercial delivery a true copy of the papers to the attorneys hereinafter named at the places hereinafter stated, which was properly enclosed in a pre-paid addressed wrapper of United Parcel Service and left in the custody of a representative of UPS to be sent by ground commercial delivery, directed to said attorneys at their last known addresses given below:

    Steven Riker, Esq.
    *Guardian Ad Litem*
    LAW OFFICE OF STEVEN RIKER
    110 East 59th Street, 23rd Floor
    New York, New York 10022

    John G. Dellaportas, Esq.
    MORGAN, LEWIS & BOCKIUS LLP
    101 Park Avenue
    New York, New York 10178

    Robert Meister, Esq.
    PEDOWITZ & MEISTER, LLP
    570 Lexington Avenue, 18th Floor
    New York, New York 10022

                                                         JOHN D. DELANEY

Sworn to before me this
_____ day of October, 2015

        NOTARY PUBLIC

        ANTHONY ROSARIO
      Notary Public, State of New York
        No. 01RO6212071
       Qualified in Bronx County
    Commission Expires 10/05/20___

#829899

SURROGATE'S COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

---

In the Matter of the Application of Orly Genger to Remove
Dalia Genger as Trustee of The Orly Genger 1993 Trust
Established on December 13, 1993, by

ARIE GENGER,

Grantor

File No.:  0017/2008

---

## AFFIRMATION OF BRYAN D. LEINBACH

STATE OF NEW YORK,
COUNTY OF NEW YORK.

BRYAN D. LEINBACH, pursuant to CPLR 2106 and under the penalties of
perjury, affirms:

1.      I am associated with the firm of Zeichner Ellman & Krause LLP, attorneys
for petitioner Orly Genger ("Orly").  Orly is the sole non-contingent beneficiary of The Orly Genger
1993 Trust (the "Orly Trust").  I make this affirmation in opposition to Dalia Genger's ("Dalia")
unauthorized filing in further support of her motion to dismiss Orly's Third Amended Petition.  By
that petition, Orly seeks to remove Dalia Genger as trustee of the Orly Trust and replace her with a
different trustee.

2.      Attached as **Exhibit 1** is a copy of Orly's Third Amended Petition (without
exhibits) in this proceeding.

3.      Attached as **Exhibit 2** is a copy of a December 31, 2008 Decision and Order
in this proceeding.

4.      Attached as **Exhibit 3** is a copy of Dalia's March 11, 2008 Affidavit in this proceeding.

5.      Attached as **Exhibit 4** is a copy of an August 2008 Assignment and Assumption Agreement signed by Dalia.

6.      Attached as **Exhibit 5** is a copy of Dalia's March 29, 2012 Amended Responses to Plaintiff's Interrogatories in a case currently pending in New York County Supreme Court titled *Orly Genger et al v. Dalia Genger et al.*, Index No. 109749/2009 (the "New York TPR Action").

7.      Attached as **Exhibit 6** is a copy of excerpts from Dalia's April 19, 2013 deposition transcript in the New York TPR Action.

8.      Attached as **Exhibit 7** is a copy of the Stipulation of Settlement dated as of October 26, 2004 (the "Divorce Stipulation") between Dalia and Arie Genger ("Arie").

9.      Attached as **Exhibit 8** is a copy of an October 30, 2004 letter agreement allegedly executed between Sagi Genger ("Sagi") and Dalia.

10.     Attached as **Exhibit 9** is a copy of a November 10, 2004 letter agreement allegedly executed between Sagi and Orly.

11.     Attached as **Exhibit 10** is a copy of excerpts from Dalia's December 13, 2012 deposition in the New York TPR Action.

12.     Attached as **Exhibit 11** is a copy of Orly's July 27, 2015 Affidavit in the New York TPR Action.

2

13.     Attached as **Exhibit 12** is a copy of a May 29, 2013 Decision and Order in the New York TPR Action.

14.     Attached as **Exhibit 13** is a copy of the Appellate Division, First Department's September 23, 2014 Decision and Order in the New York TPR Action.

15.     Attached as **Exhibit 14** is a copy of a "defendants only" March 16, 2012 Amended and Restated Settlement Agreement signed by Dalia.

16.     Attached as **Exhibit 15** is a copy of a May 2012 Credit Agreement signed by Dalia with a shadowy St. Kitts entity located on a golf course.

17.     Attached as **Exhibit 16** is a copy of a July 1, 2009 Order to Show Cause in this proceeding.

18.     Attached as **Exhibit 17** is a copy of an October 4, 2011 Verified Complaint that Dalia filed as trustee to commence an action in Delaware Chancery Court (the "Dalia Delaware Action").

19.     Attached as **Exhibit 18** is a copy of Orly's October 25, 2011 memorandum of law seeking a temporary restraining order and preliminary injunction over Dalia's prosecution of the Dalia Delaware Action.

20.     Attached as **Exhibit 19** is a copy of Orly's Third Amended and Supplemental Complaint in a case currently pending in New York Supreme Court titled *Arie Genger et al v. Sagi Genger et al.*, Index No. 651089/2010 (the "New York TRI Action").

21.     Attached as **Exhibit 20** is a copy of Orly's December 9, 2011 memorandum

3

of law in further support of her motion seeking a temporary restraining order and preliminary injunction over Dalia's prosecution of the Dalia Delaware Action.

22.    Attached as **Exhibit 21** is a copy of Dalia's November 21, 2011 memorandum in opposition to Orly's motion for a temporary restraining order and preliminary injunction over the Dalia Delaware Action.

23.    Attached as **Exhibit 22** is a copy of an October 26, 2011 hearing transcript in the New York TRI Action.

24.    Attached as **Exhibit 23** is a copy of an October 26, 2011 Order to Show Cause in the New York TRI Action.

25.    Attached as **Exhibit 24** is a copy of an November 9, 2011 Order to Show Cause in the New York TRI Action.

26.    Attached as **Exhibit 25** is a copy of an April 10, 2012 Interim Order in the New York TRI Action.

27.    Attached as **Exhibit 26** is a copy of a January 16, 2013 letter Orly's counsel submitted to the New York County Supreme Court in the New York TRI Action.

28.    Attached as **Exhibit 27** is a copy of a confidential settlement agreement between Orly, individually and as beneficiary of the Orly Genger 1993 Trust, and various individuals and entities known as the "Trump Group" (FILED UNDER SEAL).

29.    Attached as **Exhibit 28** is are copies of: (i) a December 23, 2013 Decision and Order in the New York TRI Action; (ii) a March 11, 2014 Decision and Order of the Appellate

Division, First Department in the New York TRI Action; (iii) a July 3, 2014 Decision and Order in the New York TPR Action; and (iv) a September 16, 2014 Order in the New York TRI Action. All of the attached orders denied attempts by Sagi to obtain the confidential settlement agreement attached as Exhibit 27.

30.    Attached as **Exhibit 29** is a copy of a March 21, 2014 Decision and Order in the New York TRI Action.

31.    Attached as **Exhibit 30** is a copy of the So-Ordered Second Amended Stipulation of Discontinuance With Prejudice dismissing claims between Arie Genger, Orly Genger (individually and as beneficiary of the Orly Trust) and the Trump Group. This stipulation did not dismiss Orly Trust claims.

32.    Attached as **Exhibit 31** is a copy of an excerpt from Orly's October 25, 2013 deposition transcript in the New York TPR Action.

33.    Attached as **Exhibit 32** is a copy of an excerpt from Orly's February 14, 2014 deposition transcript in the New York TRI Action.

34.    Attached as **Exhibit 33** are copies of August 17, 2015 and September 22, 2015 letters to the Trump Group regarding the confidential settlement agreement attached as Exhibit 27.

35.    Attached as **Exhibit 34** is a copy of an August 30, 2013 So-Ordered Stipulation and Order of Dismissal in the Dalia Delaware Action executed by Dalia's counsel, Sagi/TPR/Sagi Trust's counsel, and the Trump Group's counsel.

36.     Attached as **Exhibit 35** is a copy of an August 9, 2013 letter from Dalia's counsel in the Delaware Dalia Action to the Delaware Chancery Court.

37.     Attached as **Exhibit 36** is a copy of an August 13, 2013 letter from Dalia's counsel in this case, Robert Meister, to Orly's counsel.

38.     Attached as **Exhibit 37** is a copy of an August 16, 2015 letter from Orly's counsel to Dalia's counsel.

39.     Attached as **Exhibit 38** is a copy of an August 26, 2013 letter from Orly's counsel to the Delaware Chancery Court and Dalia's counsel.

40.     Attached as **Exhibit 39** is a copy of a complaint filed in an action in the United States District Court for the Southern District of New York titled *TPR Investment Associates, Inc. v. Pedowitz & Meister, LLP et al.*, Civ. Act. No. 13-8243 (JFK) (the "Proceeds Action").

41.     Attached as **Exhibit 40** is a copy of an April 29, 2014 hearing transcript in the Proceeds Action.

42.     Attached as **Exhibit 41** is a copy of Dalia's memorandum of law in support of her motion to, among other things, take from Orly the proceeds of Orly's individual settlement with the Trump Group (Exhibit 27).

43.     Attached as **Exhibit 42** is a copy of a May 7, 2015 Interim Order in the New York TRI Action.

44.     Attached as **Exhibit 43** is a copy of Orly's memorandum of opposition to

6

Dalia's motion (Exhibit 41).

45.     Attached as **Exhibit 44** is a copy of a March 17, 2015 Judgment against Orly in the amount of $258,041.01 in a case in the United States District Court for the Southern District of New York titled *Sagi Genger v. Orly Genger*, Civ. Act. No. 14-5683 (KBF).

Dated:   New York, New York
         October 6, 2015

_____
BRYAN D. LEINBACH

7

SURROGATE'S COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

_____

In the Matter of the Application of ORLY                    File No. 0017/2008
GENGER, as a person interested, for the
removal of DALIA GENGER, as Trustee of the
Orly Genger 1993 Trust pursuant to SCPA § 711(11)

_____

## THIRD AMENDED VERIFIED PETITION FOR REMOVAL
## OF DALIA GENGER AS TRUSTEE

TO THE SURROGATE'S COURT, STATE OF NEW YORK
COUNTY OF NEW YORK

Petitioner, Orly Genger ("Petitioner" or "Orly"), by her attorneys, Platzer, Swergold,

Karlin, Levine, Goldberg & Jaslow, LLP, respectfully alleges as her Third Amended Verified

Petition (the "Third Amended Petition") for Removal of Dalia Genger as Trustee as follows:

       1.    Orly, domiciled at 780 Greenwich Street, Apartment #4P, New York, New

York 10014, is the current and sole beneficiary of the Orly Genger 1993 Trust dated December

13, 1993 (the "Orly Trust"). Annexed hereto as **Exhibit "A"** is a copy of the Orly Trust.

       2.    Dalia Genger ("Dalia" or "Respondent"), residing at 200 East 65th Street,

Apartment #32W, New York, New York 10021 is Orly's mother and is the current sole Trustee

of the Orly Trust. Dalia was appointed successor Trustee in January, 2008.

       3.    The Orly Trust provides for discretionary payments of income and principal

to Petitioner during her lifetime with the remainder to be distributed to her descendants, per

stirpes. If Petitioner dies leaving no descendants, the remainder of the trust property is to be

distributed to the Sagi Genger 1993 Trust (the "Sagi Trust"). Sagi Genger ("Sagi") is Orly's

brother.

4.      For the reasons set forth herein, Petitioner respectfully requests that this Court enter an order:

(a)      Pursuant to Surrogate Court's Procedure Act ("SCPA") § 711(2)(3)(7) and/or (8) providing for the immediate removal of Dalia as Trustee of the Orly Trust as a result of her: (i) numerous and continuous breaches of her fiduciary duties to the Orly Trust and Petitioner as its sole beneficiary; (ii) waste and dissipation of the Orly Trust's assets; (iii) repeated and willful engagement in an ongoing fraudulent scheme with Sagi to loot, encumber, pledge and transfer the assets of the Orly Trust; (iv) deliberate and willful violation and contempt of the prior Order of this Court dated July 1, 2009 (the "July 2009 Order") (as well as her deliberate and willful violation and contempt of prior restraining Orders imposed upon her by other New York Courts in related proceedings) as set forth herein; and, (v) imprudent management and injury to the assets of the Orly Trust committed to her charge, all as set forth in this Third Amended Petition;

(b)      Suspending the Letters of Appointment heretofore issued to Dalia;

(c)      Appointing Joel Isaacson as successor trustee; and,

(d)      Granting such other and further relief as this Court deems to be just equitable and proper.

## PRELIMINARY STATEMENT

5.      Petitioner is the sole beneficiary of the Orly Trust. Dalia is Petitioner's mother and is the sole Trustee of the Orly Trust. Petitioner is filing this Third Amended Petition as a result of Dalia's egregious, willful, malicious, deliberate and surreptitious scheme to pledge, encumber, transfer and dissipate all of the assets of the Orly Trust in violation of her fiduciary duties as Trustee and in violation of the July 2009 Order.

6.      As will be set forth further below in this Third Amended Petition, Dalia

and Sagi have continuously engaged in a secretive and machiavellian scheme to loot, encumber, pledge, waste, dissipate and transfer the assets of the Orly Trust for personal gain and/or as punishment of Orly for her maintaining her relationship with her father, Arie Genger ("Arie"), during and after acrimonious divorce proceedings between Arie and Dalia.

7.     In addition to this scheme being an egregious breach of Dalia's fiduciary duties to the Orly Trust, Dalia's actions in this regard also constitute a blatant and willful disobedience of the July 2009 Order by pledging and encumbering the assets of the Orly Trust and completely dissipating their value without any prior notice to Petitioner as required under the July 2009 Order, all in breach of Dalia's fiduciary obligations.

8.     Most recently, the Petitioner discovered that Dalia and Sagi entered into various secretive agreements (as will be set forth in this Third Amended Petition) to loot, dissipate, pledge, encumber and transfer the assets of the Orly Trust by agreeing to allow the potential foreclosure against valuable assets of the Orly Trust by Manhattan Safety Company ("MSCo"), a recently created entity in St. Kitts, which upon information and belief is controlled by a professional gambler. All of these recent secret agreements were entered into by Dalia and Sagi without prior notice to Petitioner as required under the July 2009 Order.

9.     As further set forth below, Dalia and Sagi's secretive scheme to loot, pledge, encumber and transfer the assets of the Orly Trust is so brazen in its nature, constitutes such an egregious breach of Dalia's fiduciary duties as Trustee and Dalia's contempt of the July 2009 Order is so clear, that her immediate removal as Trustee of the Orly Trust is both warranted and necessary in order to prevent any further irreparable harm from occurring to the assets of the Orly Trust and Petitioner, as its sole beneficiary.

10.    Dalia's immediate removal as Trustee is necessary because it is clear that

the prior Orders and warnings of this Court (and as will be shown in this Third Amended Petition, the prior Orders of other courts as well) mean absolutely nothing to her and Sagi. Thus, as long as Dalia is Trustee, any assets of the Orly Trust will remain vulnerable and subject to immediate irreparable harm as a result of her ongoing scheme with Sagi.

11.     Dalia's ongoing conspiracy and scheme with Sagi in this regard is akin to Dalia "thumbing her nose" at this Court and Petitioner, as sole beneficiary of the Orly Trust.

12.     A summary of the timeline of critical factual and procedural events surrounding this matter as well as the events which precipitated the filing of this Third Amended Petition appears immediately below and will provide the Court with the proper context in which to appreciate the severity of Dalia's misconduct.  As set forth below, the lengthy summarization of the factual history is necessary in order to show that Dalia's actions cannot be viewed in a "vacuum" and constitute a pattern of ongoing conduct for approximately the past four (4) years which is specifically intended to harm Petitioner and the Orly Trust.

### THE FORMATION OF D & K LP AND THE FORMATION AND INITIAL FUNDING OF THE ORLY TRUST FOR PETITIONER'S BENEFIT, AS SOLE BENEFICIARY

13.     Dalia and Arie were married in 1967 and their marriage subsequently ended in divorce in 2004.

14.     Prior to 1993, Dalia and Arie formed D & K LP ("D & K") a family owned limited partnership, whose name was shorthand for "Dalia and Kids".  At the time of its formation, Dalia was the general partner and held a 4% interest.  Petitioner and her brother, Sagi, were the limited partners who each held a 48% interest.

15.     In December, 1993, Dalia and Arie established identical irrevocable inter vivos trusts for the benefit of Petitioner and Sagi, the Orly Trust and the Sagi Trust (jointly, the Orly Trust and the Sagi Trust shall be referred to hereinafter as the "Trusts").   For estate-

planning purposes, Dalia and Arie funded each trust with a $600,000 gift. The intent behind the Trusts was to ensure that both Petitioner and her brother received property of equal value. Sash A. Spencer and Lawrence M. Small were named Co-Trustees of both Trusts and remained Co-Trustees until Petitioner's parents' divorce in 2004. After the Trusts were funded, Sagi and Petitioner each assigned their 48% interests in D & K to their respective Trusts.

## THE CREATION OF THE D & K NOTE

16.     At the same time in December 1993, D & K purchased 240 shares of common stock (constituting 49% of the outstanding shares) of TPR Investment Associates, Inc. ("TPR"), a closely held family corporation for the sum of $10,200,000. The shares were purchased with $600,000 from each of the Orly Trust and the Sagi Trust and $50,000 from Dalia, totaling $1,250,000. The balance was satisfied with a recourse $8,950,000 Promissory Note (the "D & K Note"). Annexed hereto as **Exhibit "B"** is a copy of the D & K Note.

17.     As set forth further below in this Third Amended Petition, there was never any intention by Arie, Dalia, Sagi and Orly for TPR to collect upon the D & K Note.

18.     Pursuant to the D & K Note, principal, together with accrued interest, was to be repaid by D & K in annual installments over ten years. The D & K Note was secured by a pledge of the 240 TPR shares owned by D & K. (See **Exhibit "B"- Pledge Agreement**) Each of the Trusts and Dalia assumed liability on the D & K Note in proportion to its/her direct interest in D & K. Accordingly, each of the Trusts, assumed a 48% liability on the D & K Note and acquired a 23.52% indirect interest in TPR. Dalia assumed a 4% liability on the D & K Note and acquired a 1.96% indirect interest in TPR.

19.     At the time of the above-described transaction, Arie owned the remaining 51% of TPR, which held investments in various securities including common stock in Trans-Resources, Inc ("TRI"), as well as its interest in the D & K Note. TRI was a successful and

valuable company which was engaged in the business of manufacturing specialty chemical products for agricultural and industrial end uses.

      20.    Payments were made on the D & K Note out of dividends paid by TRI until 1999. Thereafter, when TRI stopped paying dividends, D & K stopped making payments under the D & K Note with the consent of the interested parties.

      21.    As of March 20, 2001, TPR held a 52.85% interest in TRI. The remaining minority interest in TRI (47.15%) was owned by various entities controlled directly and indirectly by Jules and Eddie Trump (the "Trump Group").

## ARIE AND DALIA'S DIVORCE IN 2004 AND ITS EFFECT ON THE TRUSTS' ASSETS

      22.    On October 26, 2004, Dalia and Arie entered into a Stipulation and Agreement of Settlement as a final settlement of their divorce (the "Settlement Agreement"). Pursuant to the Settlement Agreement, Dalia received, *inter alia,* Arie's 51% interest in TPR and retained her 4% interest in D & K. TPR's 52.85% interest in TRI was transferred to Arie and the Trusts as follows: (i) 13.99% to Arie, (ii) 19.43% to the Orly Trust (the "Orly Trust TRI Shares") and (iii) 19.43% to the Sagi Trust. The Orly Trust and the Sagi Trust each granted Arie an irrevocable lifetime voting proxy over their TRI shares (annexed hereto as **Exhibit "C"**). Therefore, after October 29, 2004, Arie and the Trusts held a controlling interest in TRI and TPR no longer owned any TRI common stock.

## DALIA CEDES CONTROL OF D & K AND TPR TO SAGI AND THE FORMATION OF D & K GP LLC

      23.    In connection with the divorce settlement, Dalia took measures to cede management of D & K to Sagi. On October 21, 2004, days before signing the Settlement Agreement, Dalia and Sagi formed D & K GP LLC ("D & K GP"). Dalia exchanged her 4% interest in D & K and $1.00 for a 99% membership interest in D & K GP. Sagi purchased a 1%

membership interest in D & K GP for $1.00.  Pursuant to D & K GP's Limited Liability Agreement (annexed hereto as **Exhibit "D"**), Sagi was given the power to select a manager of D & K GP whose function would be to control D & K's assets.  Sagi selected himself to act as manager; thus, Dalia effectively handed Sagi the authority to control D & K and its assets.  Also, by forming D & K GP, Dalia and Sagi shielded themselves from any personal liability stemming from D & K, including any personal liability related to the D & K Note.  This left the Trusts solely liable for any obligations due under the D & K Note.

     24.    On October 30, 2004, Dalia entered into a shareholder's agreement with TPR that provided for the management of TPR. Specifically, pursuant to the TPR shareholder's agreement (annexed hereto as **Exhibit "E"**), D & K, which owned 49% of TPR, was given authority to appoint one board member to the TPR board.  Sagi, as the managing partner of D & K appointed himself as a board member of TPR. As the majority owner of TPR, Dalia was named as the other board member. In addition, the shareholder agreement appointed Sagi as Chief Executive Officer ("CEO") of TPR.  Accordingly, Dalia essentially ceded control of TPR to Sagi, just as she had done with D & K.

     25.    For the Court's convenience, below is a summary of Arie, Dalia, and the Trusts' interests in TPR both before and after the divorce and Settlement Agreement:

| Person | TPR Interest Before | TPR Interest After |
|---|---|---|
| Arie Genger | 51.00% | 0% |
| Dalia Genger | 1.96% | 52.96%[1] |
| Orly Trust (indirectly through D & K) | 23.52% | 23.52% |
| Sagi Trust (indirectly through D & K) | 23.52% | 23.52% |
| **Total** | **100%** | **100%** |

26.    In connection with the Settlement Agreement, Dalia required that the Trustees of the Orly Trust and the Sagi Trust (Messrs. Sash and Small) resign and be replaced with friends of Sagi. Numerous successor trustees were appointed to the Orly Trust and the Sagi Trust, all of whom were affiliated with Sagi in one way or another and were controlled by him. David Parnes and Eric Gribetz (Sagi's longtime friends) and Leah Fang (Sagi's sister-in-law) were appointed as successor trustees to the Orly Trust, and Messrs. Parnes and Gribetz, Rochelle Fang (Sagi's mother-in-law), and Mr. Parnes again, were appointed successor trustees of the Sagi Trust.

## THE SHAM ASSIGNMENT AND SALE OF THE D & K NOTE

27.    On or about October 31, 2004, the TPR Board (consisting of Dalia and Sagi) passed a resolution to sell the D & K Note.  Sagi was charged with the responsibility of selling the D & K Note to a "third party".

28.    In December, 2005, Sagi filed amended 2002 and 2003 tax returns for

---

[1] Dalia held a 1.96% indirect interest in TPR prior to the divorce as a result of her 4% interest in D & K. Pursuant to the Settlement Agreement, Dalia received an additional 51% direct interest in TPR from Arie. Just prior to the Settlement Agreement, as stated above, Dalia transferred her 4% interest in D & K (and thus, her 1.96% indirect interest in TPR) to D & K GP.

-8-

TPR, writing off the entire D & K Note and declaring it as a loss in the approximate amount of $8,700,000.

29.    On August 2, 2006, Sagi, as part of his managerial role in D & K GP, D & K and TPR, assigned and sold the D & K Note, which then had an approximate value of $11,000,000 as a result of the accrued interest, to Mr. Parnes in his individual capacity for the sum of only $12,000 (a copy of the Memorandum dated August 2, 2006 (the "D & K Note Memorandum"), assigning and selling the D & K Note is annexed hereto as **Exhibit "F"**). The D & K Note Memorandum asserts unspecified claims by D & K against TPR and Sagi expressly memorialized that D & K "denies enforceability of the [D & K Note]". **(See Exhibit "F")**

30.    Sagi signed the D & K Note Memorandum on behalf of both TPR as the holder and D & K as the maker. Dalia was copied on the D & K Note Memorandum but Petitioner did not receive a copy of same.   At the time of the D & K Note Memorandum, Mr. Parnes was acting as trustee of both Trusts. Shortly after the D & K Note Memorandum, Mr. Parnes summarily resigned as Trustee of the Orly Trust without explanation.

## THE D & K NOTE WAS NEVER INTENDED TO BE ENFORCED

31.    Mr. Parnes testified in Arie and Dalia's matrimonial arbitration (See **Exhibit "G"**, which contains the relevant portions of the transcript of Mr. Parnes' testimony from the arbitration) that:

     (i)    As the Trustee of both Trusts, he was a "trusted" person to keep the D & K Note to make sure it would never be collected. (See Pages 460-461);

     (ii)   D & K does not have to make payments to TPR; (Page 452)

     (iii)  The D & K Note is uncollectible (Page 453); and,

     (iv)  Sagi's job was to "bury the D & K Note in the woods" (Page 461)

32.    Sagi testified in the same arbitration (See **Exhibit "H"**, which contains the relevant portions of the transcript of Sagi's testimony from the arbitration) that:

(i)      The purpose of the D & K Note was for estate planning (Pages 367-380);

(ii)     The D & K Note was never declared in default (Page 370);

(iii)    There was no intention of collecting the D & K Note (Page 370); and,

(iv)    The D & K Note is worth nothing (Pages 375-377)

33.    In addition, Dalia, who was copied on the D & K Note Memorandum,

previously admitted in her Pre-Hearing Memorandum submitted to the Court in connection with

the matrimonial arbitration that the D & K Note was never intended to be collected upon because

the:

> "...collection by TPR of the D & K Note would simply transfer
> wealth from the children, Sagi and Orly, to their parents,
> Arie and Dalia, thus undoing the estate planning scheme which
> had transferred that wealth to the children.
> (See **Exhibit "I"**, excerpt from Dalia's Pre-Trial Memorandum
> Page "26")

34.    Ultimately, the Gengers' matrimonial arbitrator, Judge I. Leo Milonas,

specifically determined that the D & K Note was never intended to be collected from its

inception.

> "The arbitrator finds for Dalia on this issue. The D & K [N]ote
> was part of the estate planning scheme to transfer wealth to the
> children. The parties never intended for this note to be collected
> and to do so would re-transfer wealth back to the parents and
> defeat their estate plan.
> (See **Exhibit "J"**, Final Arbitration Award in Genger divorce
> proceeding, Page "15")

35.    Petitioner was well aware of, and relied upon, the agreement that the D &

K Note would never be enforced. Petitioner was also aware of, and relied upon, Judge Milonas'

award declaring the D & K Note worthless and uncollectible, and Dalia, Sagi and Mr. Parnes'

sworn statements and/or written submissions to that effect.

## THE D & K AGREEMENT IS ENTERED INTO WITHOUT PETITIONER'S KNOWLEDGE AND PURPORTEDLY AUTHORIZES D & K TO PLEDGE AND ENCUMBER THE ORLY TRUST TRI SHARES

36.     On or about November 23, 2007, Leah Fang (Sagi's sister-in-law), the then sole Trustee of both Trusts[2], and Sagi, acting in his capacity as manager of D & K GP, executed an "Amended and Restated Limited Partnership Agreement of D & K Limited Partnership (the "D & K Agreement"). Among other things, the D & K Agreement purported to grant D & K GP authority to "mortgage, hypothecate, pledge, create, a security interest in or lien upon, or otherwise encumber [the Orly Trust TRI Shares] for the benefit of [D & K] or that of third parties, in connection with the [D & K Note]". (See a copy of the D & K Agreement attached hereto as **Exhibit "K"**, Page "11"). There was no legitimate need or purpose for the amendment.  It was a preliminary step in Sagi and Dalia's scheme to punish Petitioner and attempt to loot the Orly Trust of this valuable asset.

37.     By its terms, the D & K Agreement, does not require D & K GP (i.e. Sagi) to give notice to anyone, including Petitioner or the Orly Trust, if a decision is made to encumber the Orly Trust TRI Shares in any way.

38.     Upon information and belief, the Orly Trust received no consideration and no direct or indirect benefit in exchange for the substantial concession it gave to D & K GP under the D & K Agreement. Indeed, the D & K Agreement was merely an instrument created for the specific purpose of encumbering the Orly Trust and Petitioner as its beneficiary, with debt.

39.     Leah Fang never informed Petitioner of the existence of the D & K

---

[2] In 2007, Mr. Gribetz resigned as the trustee of both Trusts, without appointing a successor, thereby leaving Mr. Parnes as the sole remaining trustee.  Thereafter, as set forth above, Mr. Parnes resigned as trustee of the Orly Trust appointing Leah Fang as successor Trustee.

Agreement. In January, 2008, Dalia was appointed successor trustee of the Orly Trust, despite Petitioner's objections. At that time, Dalia, notwithstanding her knowledge that the D & K Note was not intended to be collected, did nothing to attempt to rescind or nullify the D & K Agreement, nor did she do anything to advise Petitioner as beneficiary that the prior trustee had granted D & K GP authority to encumber the Orly Trust TRI shares. By that time, as a result of Dalia's granting Sagi control of TPR and D & K through the appointment of his friends and relatives as successor trustee of the Trusts, Sagi had effectively obtained control over all of the assets held by D & K, TPR, the Sagi Trust and the Orly Trust.[3]

40.      Through the above-mentioned transactions, Dalia allowed Sagi to obtain direct control over TPR and its interest in the D & K Note to the detriment of Petitioner and the Orly Trust. Notably, Sagi's role as CEO of TPR, (the creditor on the D & K Note) is in direct conflict with his role as manager of D & K (the debtor on the D & K Note), whose role was to repay the D & K Note or contest its enforceability.

## ORLY'S INITIAL APPLICATION TO REMOVE DALIA AS TRUSTEE

41.      In February, 2008, Petitioner filed an initial application with this Court (the "Initial Application") to remove Dalia as Trustee of the Orly Trust on the grounds that she feared Dalia would not protect her interests while serving as Trustee because of Dalia's animosity towards Arie, and her collusion with Sagi.

42.      Surrogate Roth denied the Initial Application as premature, believing

---

[3] In addition, by stock purchase agreement dated January 18, 2007, Sagi as CEO of TPR sold 2% of TPR's shares to his mother-in-law, Rochelle Fang, thereby eliminating Dalia's majority ownership interest of TPR by diluting it to 49%. Around the time that she became sole Trustee to the Orly Trust in January 2008, Dalia purportedly divested herself of the balance of her TPR shares. Thus, in addition to being CEO, Sagi effectively controlled TPR through the 49% owned by D & K, which Sagi controlled and the 2% owned by Rochelle Fang, also controlled by Sagi. (See Exhibit "L", Transcript of Hearing before the Honorable Jane S. Solomon dated August 22, 2011 in the action entitled Orly Genger v. Sagi Genger, Supreme Court of the State of New York, County of New York, Index No. 100697/2008) (Pages "53" to "55" for example)

Dalia should be given the chance to demonstrate whether she intended to act in Orly's interests or against Orly's interests. Surrogate Roth gave Dalia the benefit of the doubt based, in part, on sworn statements by Dalia to the Surrogate Court that she intended to protect the Orly Trust and its assets.

> "[I]t appears that Dalia (who states that she is ready and able to act as fiduciary) has yet to assume the duties of trustee in deference to her daughter's position in this litigation. As a validly appointed trustee, she should be given the opportunity to do what she deems necessary to manage and protect the trust's assets.
>
> Based upon the foregoing, the appointment of a "special trustee" is unwarranted at this time and, accordingly, the application is denied, <u>without prejudice to renewal if future circumstances warrant such relief.</u>
> (See copy of Surrogate Court Decision dated December 31, 2008 annexed hereto as **Exhibit "M"**, Pages 7-8) (emphasis added).

43.    At the time of the Surrogate's decision, the extent of Dalia's complicity in the conspiracy with Sagi was not fully understood.

<u>**WITHIN WEEKS OF SURROGATE ROTH'S DECISION, RATHER THAN PROTECT THE ORLY TRUST, DALIA HELPED SAGI STRIP THE ORLY TRUST OF ITS ONLY ASSETS**</u>

44.    Sadly, Dalia's every action since Surrogate Roth's decision has proven Petitioner's fears were well grounded and the benefit of the doubt given to Dalia by Surrogate Roth was unjustified. As described below, rather than protecting the Orly Trust, Dalia has used her position as Trustee to help Sagi Genger strip the Orly Trust of its two assets: (1) 1,102.80 shares of common stock in TRI; and (2) a 23.52% indirect interest in TPR.

45.    As set forth below, Dalia was an active and willing participant in Sagi's scheme to strip the Orly Trust of its assets, thereby causing harm to Petitioner as the Orly Trust's sole beneficiary.

## DALIA HELPS SAGI TRY TO STRIP THE ORLY TRUST OF THE ORLY TRUST TRI SHARES

46.    Dalia has always understood the true value and importance of the Orly

Trust TRI Shares to Petitioner and to the Orly Trust. Indeed, during the Initial Application to

remove Dalia as Trustee, Dalia's attorney sent Surrogate Roth a letter stating that "the most

valuable asset in the Orly Genger Trust is the shares of TRI'" and "the TRI Shares held by the

Orly Trust are potentially worth tens of millions of dollars." See November 11, 2008 Letter to

Hon. Renee R. Roth from J.G. Kortmansky, Esq. annexed hereto as **Exhibit "N"**. (emphasis

supplied)

47.    On August 22, 2008, unbeknownst to Petitioner, Rochelle Fang, (Sagi's

mother-in-law) who had been appointed Trustee of the Sagi Trust, attempted to sell the Sagi

Trust's 19.43% in TRI to the Trump Group who thereafter purported to hold 66.58% of TRI's

outstanding common stock.[4]  In connection with the supposed sale, Sagi and David Parnes were

given seats on TRI's board of directors.  This sale, which was consummated after Dalia was

appointed successor trustee of the Orly Trust, has diluted and diminished the value of the Orly

Trust's interest in TRI since Arie will no longer have a controlling interest in TRI (which he

previously had by virtue of his voting proxy over the Trust's shares, see **Exhibit "C"**) and thus,

the Orly Trust would no longer own a portion of the controlling block of TRI shares. [5]

---

[4] In response to Dalia and Sagi's collusive efforts to sell the TRI shares to the Trump Group, Petitioner, on behalf of herself, individually and the Orly Trust, commenced an action in the Supreme Court for New York County seeking to determine, among other things, the ownership of the Orly Trust TRI Shares.  See Arie Genger and Orly Genger, in her individual capacity and on behalf of The Orly Genger 1993 Trust v. Sagi Genger, TPR Investment Associates, Inc., Dalia Genger, The Sagi Genger 1993 Trust, Glenclova Investment Company, TR Investors, LLC, New TR Equity I, LLC, Jules Trump, Eddie Trump and Mark Hirsch, Index No. 651089/2010 (the "New York TRI Action"). The New York TRI Action is still pending before Justice Feinman.
[5] In 2011, without prior notice to Petitioner as required under the July 2009 Order, Dalia, as Trustee of the Orly Trust and in a transparent forum shopping move, commenced an action in the Delaware Chancery Court seeking a declaration that the Orly Trust is the beneficial owner of the Orly Trust TRI Shares. Dalia has been restrained from pursuing this action pursuant to a prior Order of the Court issued in the New York TRI Action.

48.     On or about January 31, 2009, only weeks after making sworn statements to the Surrogate Court that she intended to protect the Orly Trust and its assets, Dalia executed a document entitled "Meeting of Partners of D & K LP- Jan. 31, 2009 & Agreement (the "Meeting Agreement"). Annexed hereto as **Exhibit "O"** is a copy of the Meeting Agreement. Like the D & K Agreement, the Meeting Agreement purported to grant D & K GP (i.e., Sagi) unfettered authority to encumber the Orly Trust TRI Shares:

> "The partners wish to clarify that the authority vested in the General Partner to make limited partners' assets subject to a pledge shall be done in substantially the same manner in which TPR Investment Associates, Inc. shares were pledged in conjunction with the aforementioned note [the D & K Note]. However, the General Partner shall be authorized to sign for the partnership and/or each individual partner."
> (See **Exhibit "O"**, Paragraph "3")

49.     In another naked act of self-dealing in violation of Dalia's fiduciary duties as Trustee, the Meeting Agreement also purports to:

> "Indemnify and provide a general release from any claim or right at equity, law, or contract or otherwise the current and former general partner, its officers, the partnership's holdings (including TPR Investment Associates, inc.) and the officers of its holdings to fullest extent permitted in connection with any claim by the partnership and/or its partners. Irrespective of the above, nothing herein shall serve to release or indemnify Arie Genger, William Dowd, Lawrence Small or Edward Klimerman." (See **Exhibit "O"**, Paragraph "1")

50.     Upon information and belief, the Orly Trust received no consideration and no direct or indirect benefit in exchange for the substantial concession, Dalia, acting as trustee, gave to D & K GP under the Meeting Agreement. Indeed, the Meeting Agreement, like the D & K Agreement, was merely another instrument created for the specific purpose of depleting the Orly Trust of its assets.

51.     Both the D & K Agreement and the Meeting Agreement were negotiated

-15-

and executed without ever informing Petitioner.  Moreover, Dalia never subsequently informed

Petitioner of the existence of either agreement, even though Petitioner made repeated requests to

Dalia for information about the Orly Trust and its assets during her tenure as Trustee.  The

Meeting Agreement was only disclosed on or about October 2009 in connection with the New

York TPR Action (defined and discussed below) which was commenced by Petitioner in the

Supreme Court for New York County.

52.     Notably on January 10, 2009, just days before Dalia signed the Meeting

Agreement granting Sagi unfettered authority to dispose of the Orly Trust TRI Shares (and

purporting to indemnify Sagi regardless of any actions he took in connection with same),

Petitioner sent Dalia a letter reminding her (once again) that the Orly Trust TRI Shares needed to

be protected and retained.

> "For now, and until further notice, it is my strong desire to retain all
> of the shares of Trans-Resources., Inc. ("TRI") that are currently in
> the Trust, and I direct you not to sell them. If you are approached,
> or have been approached, with an offer to purchase any of the TRI
> shares in the Trust, please notify me immediately. If, despite my
> wishes, you consider accepting an offer, do not sell any shares until
> I have a reasonable period of time to maximize the benefit to the
> Trust, including possible alternative transactions."
> (See January 10, 2009 letter from Petitioner to Dalia (emphasis
> added), a copy of which is annexed hereto as **Exhibit "P"**)

53.     Dalia, in violation of her fiduciary obligations refused to agree not to

dispose of the Orly Trust TRI Shares.  To do so would be contrary to the fraudulent scheme

in which Dalia was a willing participant.

54.     Likewise, although Dalia has given sworn statements to the Surrogate

Court regarding the Orly Trust, she never disclosed the existence of the D & K Agreement or the

Meeting Agreement to either Surrogate Roth or her successor Surrogate Webb.  Basically,

through the D & K Agreement, the Meeting Agreement and by ceding management of D & K

-16-

and TPR to Sagi, Dalia gave Sagi total control to pilfer the Orly Trust assets for his own use and benefit.

## DALIA HELPS SAGI TRY TO STRIP THE ORLY TRUST OF ITS INDIRECT INTEREST IN TPR

55.    In Surrogate Roth's decision, she noted that in the Initial Application, "...petitioner has not alleged that Dalia has refused a request for information, which would warrant relief (SCPA 2102), or has failed as trustee to protect trust assets" (see **Exhibit "M"**, Page "7").

56.    On May 14, 2009, Petitioner's then counsel, Judith Siegel-Baum, sent Dalia's attorney, Robert Meister, a document demand relating to the Orly Trust's assets. (annexed hereto as **Exhibit "Q"**).

57.    On June 1, 2009, Mr. Meister responded to Ms. Sigel-Baum's document demand by advising her that the Orly Trust no longer owned any interest in TPR. According to the letter, Sagi, acting as CEO for TPR, had foreclosed on the D & K Note and sold D & K's 240 shares of TPR for $2,200,000. A copy of the letter is annexed hereto as **Exhibit "R"**. Before that time, Dalia had neither advised nor notified Petitioner that Sagi had foreclosed on the D & K Note, nor advised Petitioner that Sagi had sold the TPR shares at auction. This news came as a complete and utter shock to Petitioner.

58.    Despite the clear and consistent agreement among the Genger family members that the D & K Note was never to be collected upon or enforced, the sworn testimony and/or Court submissions of Dalia, Sagi and Mr. Parnes, the assignee and purchaser of the D & K Note, and Judge Milonas' award and specific determination to this effect, upon receipt of Mr. Meister's letter, Petitioner learned for the first time that:

(a)      Sagi caused TPR to reclaim the D & K Note from Mr. Parnes.[6]  Then, on August 31, 2008, Sagi, acting as CEO of TPR, notified himself as the general manager of D & K, that D & K was in default under the D & K Note and declared that unless the entire unpaid principal amount of the D & K Note was paid immediately, TPR would sell, at auction, the 240 shares pledged as collateral.  A copy of this purported Notification dated August 31, 2008 is annexed hereto as **Exhibit "S"**. Dalia, who knew that the D & K Note was never intended to be enforced and who previously had sworn to as such, in violation of her fiduciary duties as Trustee, never sought to block Sagi from foreclosing on the D & K Note and selling the TPR shares. Notwithstanding her knowledge and her previous sworn statement, Dalia failed to make any effort to stop Sagi when he engaged in this clear act of self-dealing, even though the Orly Trust had a clear interest in the TPR shares at issue.

(b)      Thereafter, Sagi, again acting as CEO of TPR, purported to notify D & K (of which he remained managing partner) that D & K's 240 shares of TPR stock would be auctioned to the highest bidder on February 27, 2009, and that the money received from the sale would be used to reduce the outstanding debt under the D & K Note.  A copy of this purported Notification is annexed hereto as **Exhibit "T"**.  Sagi purported to notify the interested parties of the sale by publishing notice of the sale in the New York Post in October 2008 and February 2009.  At all relevant times, Sagi had Petitioner and Dalia's contact information.  Despite this, Petitioner was never informed of the impending sale.  At the time that Sagi secretly schemed with the connivance of Dalia to structure the bogus sale, it was clear that the value of the TPR shares was significantly higher than any purported value of the D & K Note (although as previously stated the D & K Note had no value).

---

[6] On or about May 25, 2008, Mr. Parnes rescinded, *ab initio*, the assignment of the D & K Note.  Petitioner was also not notified of that action.

-18-

(c)      On February 27, 2009, TPR (still controlled by Sagi) foreclosed on the 240 shares of TPR and "auctioned" the shares (the "TPR Sale"). Not coincidentally, TPR purchased the shares at auction for $2,200,000, which was substantially less than their estimated value, making no effort to collect on the D & K Note from the Sagi Trust. (See **Exhibit "U"**). The $2,200,000 proceeds of the TPR Sale were purportedly used to decrease D & K's obligations under the D & K Note. The deficiency under the D & K Note was deliberately manufactured by this sham auction in order to provide Sagi and TPR with a future basis to foreclose upon the Orly Trust's only remaining principal asset, the Orly Trust TRI Shares.

59.      TPR and Sagi, with the connivance of Dalia in breach of her fiduciary duty, effectively stripped the Orly Trust of its indirect interest in the TPR shares by improperly foreclosing on the D & K Note and conducting the TPR Sale notwithstanding the fact that the Genger family never intended the D & K Note to be enforced. Notably, this alleged and purported notification process and sham TPR Sale took place without Dalia objecting in any way, taking preventive action of any kind, or notifying Petitioner in any way.      In short, Dalia, allowed the sham TPR Sale to transpire, did not notify Petitioner of same and clearly violated her duties as a fiduciary to the Orly Trust and Petitioner, as sole beneficiary by failing to protect the valuable trust asset.

60.      The forgoing scheme injured Petitioner and the Orly Trust in a number of ways. The Orly Trust's interest in D & K is now worthless, as it purportedly no longer owns any interest in TPR, while Sagi now has control over the foreclosed TPR shares. The scheme also destroyed Arie and Dalia's tax and estate planning intent that both children have equal shares in the family wealth.

61.      Dalia, who knew that the D & K Note was never intended to be enforced, should have immediately sought to block Sagi from foreclosing on the D & K Note and selling

the TPR shares. Certainly, she should have informed Petitioner so Petitioner could make her own efforts to block the sham TPR sale or, at the least, arrange for other bidders to be at the sale. Notwithstanding her knowledge and her previous sworn statement, Dalia failed to make any effort to stop Sagi when he engaged in this clear act of self-dealing, even though the Orly Trust has a clear interest in the TPR shares at issue.

62.     As if this was not an egregious enough breach of Dalia's fiduciary duties to the Orly Trust, Dalia has made no effort whatsoever to date to seek any contribution from the Sagi Trust for its share of purported amounts due under the D & K Note (although as previously stated at length herein, no such purported sums are due under the D & K Note because it was never intended to be enforced). In other words, if the D & K Note was truly a "liability" of both Trusts, in theory, TPR should have foreclosed on the Sagi Trust's interests as well. Of course, this will never happen as long as Sagi is still the CEO of TPR (the holder of the D & K Note) and the manager of D & K, (the maker of the D & K Note). By ceding management authority of TPR and D & K to Sagi, Dalia deliberately created Sagi's clear and unequivocal conflict of interest and "paved the road" for his self-dealing. This has resulted in Sagi looting the Orly Trust for his own benefit with the tacit or express approval of Dalia.

63.     As a fiduciary of the Orly Trust with prior, as well as continued knowledge, of the TPR foreclosure, Dalia had a duty to protect the Orly Trust's indirect ownership of the TPR shares. Instead of taking proactive measures required of a fiduciary, Dalia did nothing and allowed Sagi to obtain the TPR shares for himself to the detriment of the Orly Trust. Moreover, in connection with her appointment as successor trustee of the Orly Trust in January, 2008, as previously stated above, Dalia purportedly divested herself of her TPR shares for the sum of $5,000,000 (without informing the Court or Petitioner as to when she transferred her interest) in a further attempt to distance herself from any attributable wrongdoing.

-20-

64. Dalia knew of Sagi's plan to foreclose on the D & K Note as early as August, 2008, thus she withheld information from Petitioner concerning the TPR Sale for almost 10 months. Even then, she only provided the information until she received a demand letter from Petitioner's counsel and realized that legal action was imminent.

65. In fact, the notice of the TPR Sale in the New York Post was specifically designed by Dalia and Sagi not to provide Petitioner with notice and an opportunity to object to same. Dalia and Sagi were both aware of Petitioner's address at this time but instead of notifying Petitioner, they chose to deceive her by publishing notice in the newspaper.

66. As a result of the sham TPR Sale, on or about June 9, 2009, Petitioner commenced an action which is pending before the Supreme Court for New York County entitled, Orly Genger et al v. Dalia Genger, Sagi Genger, D & K GP LLC, TPR Investment Associates, Inc. and Leah Fang, Index No. 109749/2009 (the "New York TPR Action"). In the New York TPR Action, Petitioner is seeking, *inter alia*, monetary damages and the return of the TPR shares.[7]

## THE JULY 2009 ORDER AND INJUNCTION AND PETITIONER'S RENEWED APPLICATION WITH THIS COURT TO REMOVE DALIA AS TRUSTEE

67. Upon learning of the sham TPR Sale, which stripped the Orly Trust of its indirect interest in its shares of TPR, Petitioner renewed her petition with this Court to remove Dalia as Trustee of the Orly Trust by filing same on or about June 22, 2009. Petitioner also filed a Motion with this Court and sought a temporary restraining order which enjoined and prohibited

---

[7] By Decision and Order of the Honorable Paul G. Feinman dated June 28, 2010 in the New York TPR Action, Justice Feinman determined that the Petitioner's claim with respect to Dalia's breach of her fiduciary duty as sole Trustee of the Orly Trust should be decided by the Surrogate's Court. Further, in the same Decision and Order, Justice Feinman denied Dalia's Motion for Summary Judgment and determined that there is a "...question of fact as to whether Dalia Genger acted with intent to commit fraud against plaintiff's trust [the Orly Trust], and to lull plaintiff [Orly] into a false sense of security as to the status of her trust." (See **Exhibit "V"**, Decision and Order of Justice Feinman dated June 28, 2010, Pages "17" and 19")

-21-

Dalia, *inter alia,* and anyone acting on her behalf from attempting to sell, transfer, pledge and encumber or take any act with respect to the Orly Trust TRI Shares without providing Petitioner with at least 10 days prior notice. A copy of the June 22, 2009 Petition (without the exhibits attached to it which are duplicative) is annexed hereto as **Exhibit "W"**.

68.     As a result of the Petitioner's forgoing motion for a restraining order, the July 1, 2009 Order was entered pending the outcome of this proceeding and which imposed certain protective restraints (the "Restraints") upon Dalia as previously set forth above. Dalia declined to attend the hearing.

69.     During counsel's oral argument of Petitioner's motion for a restraining order, Surrogate Webber noted to Dalia's counsel that:

> "They [Dalia and Sagi] are on notice of all of your fears
> [with respect to the dissipation of the Orly Trust's assets].
> So for them now to do something which would obviously
> be against their duties and responsibilities would be
> somewhat glaring in terms of what the surcharge [to be
> imposed against Dalia] would be." (emphasis supplied)
> (See excerpt from transcript from July 1, 2009
> hearing annexed hereto as **Exhibit "X"**, Page "23")

70.     The Restraints were later confirmed by this Court on August 18, 2009, reconfirmed and supplemented with additional restraints by this Court on July 16, 2010 and made a part of a stipulation between Petitioner and Dalia which was entered on September 8, 2010 (see **Exhibit "Y"**).

71.     On or about September 21, 2010, Petitioner filed the Second Amended Verified Petition (the "Second Amended Petition") to remove Dalia as Trustee. Dalia has filed a Motion to Dismiss the Second Amended Petition and the decision on the Motion to Dismiss still remains *sub judice*.

## THE ADDITIONAL RESTRAINTS PLACED UPON DALIA AND SAGI BY THE NEW YORK COURTS IN THE NEW YORK TRI ACTION AND THE NEW YORK TPR ACTION

72.     In addition to the Restraints imposed upon Dalia by the July 2009 Order, on or about July 28, 2010, the Court in the New York TPR Action also restrained Dalia, Sagi and the co-defendants to that action from transferring, selling, pledging, assigning, or otherwise disposing of D & K's 48% ownership interest in TPR. (the "TPR Action Restraints") (See Exhibit "Z" at page "32")

73.     The Court in the New York TRI Action also entered certain restraints against Dalia, Sagi and the other co-defendants to that action with respect to the Orly Trust TRI Shares.[8] (the "TRI Action Restraints") (See Exhibit "AA", December 28, 2011 Order in New York TRI Action, Pages "14" through "15").

## DALIA HAS WILLFULLY AND REPEATEDLY DISOBEYED THE JULY 2009 ORDER BY ENTERING INTO A FURTHER SCHEME TO ENCUMBER AND DISSIPATE THE ORLY TRUST'S ASSETS

74.     Petitioner submits that it could not be any more clear to Dalia, her counsel, Sagi and the other co-defendants to the New York TPR Action and the New York TRI Action that Dalia was forbidden from transferring, pledging, encumbering, assigning, selling and/or dissipating any assets of the Orly Trust without prior notice to Petitioner as a result of: (i) the Restraints set forth in the July 1, 2009 Order; (ii) Surrogate Webb's statement to Dalia's counsel on the return date that Dalia and Sagi are on notice of Petitioner's fears that the Orly Trust's assets will be dissipated (and therefore, any actions taken by Dalia against her duties and responsibilities would obviously be "glaring") (See Exhibit "X", Page "23"); (iii) the Stipulation entered into between Petitioner and Orly further confirming the Restraints (See Exhibit "Y";

---

[8] Both the New York TRI Action and the New York TPR Action are before Justice Paul Feinman.

and, (iv) the restraints imposed by Justice Feinman in the New York TRI Action and New York

TPR Action (collectively, the "Supreme NY Restraints"). All these restraints were specifically

and expressly intended to preserve the "status quo" until the Courts rendered a final decision.

75.    Notwithstanding the forgoing, rather than honor any of these restraints,

subsequent to the Petitioner's filing of the Second Amended Petition, Dalia, Sagi and their

cohorts, have continued to conspire together and in secret to render all of these restraints a

nullity.

76.    Instead of treating this Court's July 2009 Order and the Supreme NY

Restraints as Orders to be obeyed and boundaries to be honored, Dalia, Sagi and their cohorts

saw them as obstacles to be hurdled.  To that end, Dalia, D & K (through D & K GP), and/or

TPR (in other words, Dalia and Sagi) secretly executed eight (8) agreements[9] encumbering the

Orly Trust with $4.44 million in new debt, which the Orly Trust has no hope of paying off.

77.    In breach of Dalia's fiduciary duties as Trustee, the Secret Agreements

were specifically designed and intended as part of Dalia and Sagi's scheme to encumber the Orly

Trust with debt but not to similarly encumber the Sagi Trust with any debt whatsoever.

78.    Petitioner discovered the existence of the Secret Agreements on or about

July 6, 2012 solely in response to discovery requests made by Petitioner's counsel in the New

York TPR Action.  These documents were only first produced on or about July 6, 2012

notwithstanding the fact that: (i) the initial Secret Agreements, namely, the $4,000,000

---

[9] These eight secret agreements (collectively, the "Secret Agreements") will be further described immediately below and are: (i) the $4,000,000 Promissory Note dated October 3, 2011 (See Exhibit "BB"); (ii) the Credit and Forbearance Agreement and Second Amendment and Restatement of Promissory Note executed on May 15, 2012 (See Exhibit "CC"); (iii) the $4,240,000 Amended and Restated Promissory Note dated May 15, 2012 (See Exhibit "DD"); (iv) the $200,000 Promissory Note dated May 15, 2012 (See Exhibit "EE"); (v) the Agreement Amending Terms of Promissory Note dated March, 2012 (See Exhibit "FF"); (vi) the purported TPR Settlement Agreement dated October 3, 2011 (See Exhibit "GG"); (vii) the purported Amended and Restated TPR Settlement Agreement dated March 16, 2012 (See Exhibit "HH"); and, (viii) the Bill of Sale and Note Assignment dated May 15, 2012 (See Exhibit "II").

Promissory Note and the TPR Settlement Agreement were both executed approximately nine (9) months earlier on October 3, 2011; (ii) the July 2009 Order expressly required that Dalia provide Petitioner with prior notice of any and all acts which would affect the Orly Trust TRI Shares; and, (iii) the Supreme NY Restraining Orders expressly required that Dalia provide prior notice of any and all acts which would affect the Orly Trust's respective interests in the Orly Trust TRI Shares and TPR.

## THE 2011 PROMISSORY NOTE

79.     Unbeknownst to Petitioner, on October 3, 2011, Dalia and TPR purported to cancel the $4,500,000 deficiency remaining on the D & K Note after the disputed TPR Sale and replace it with a $4,000,000 promissory note that directly obligated the Orly Trust to pay TPR (the "2011 Promissory Note"). (See **Exhibit "BB"**, copy of 2011 Promissory Note and the TPR Settlement Agreement (defined below), **Exhibit "GG"**).

80.     By so doing, Dalia wrongly attempted to: (i) transfer $4 million dollars of liability from D & K to the Orly Trust (See **Exhibit "GG"**, TPR Settlement Agreement at 5); (ii) replace the unenforceable D & K Note with a putatively enforceable one (id.); (iii) acknowledge the legality of the sham TPR Sale and the resulting deficiency (id. at 2-3); and, (iv) ensure that this $4 million dollar liability would not fall within the release that was part of the purported TPR Settlement Agreement reached that same day between Dalia, Sagi and the other defendants to the New York TPR Action, but would continue to burden the Orly Trust (id. at 5).

81.     The 2011 Promissory Note was payable to TPR the earlier of: (a) November 1, 2012; or, (b) the receipt of any proceeds from the sale of the Orly Trust TRI Shares, "notwithstanding anything to the contrary herein or in the parties' accompanying [TPR] Settlement Agreement". See **Exhibit "BB"** at 1.

82.    By executing the 2011 Promissory Note on behalf of the Orly Trust, Dalia (i) obligated the Orly Trust to pay all of TPR's legal fees (See **Exhibit "BB"** at 2); (ii) **made her removal as Trustee an "Event of Default" making the 2011 Promissory Note immediately due and payable** (id. at 1, emphasis added); and, (iii) agreed to the law and jurisdiction of the State of Delaware (id at 2)[10]

## THE 200K PROMISSORY NOTE AND THE CREDIT AGREEMENT

83.    In May, 2012, TPR assigned the 2011 Promissory Note to MSCo, a St. Kitts entity. In exchange for an alleged $400,000 received from MSCo, Dalia had the Orly Trust sign another promissory note for $200,000 (the "200K Note") (See **Exhibit "EE"**) and increased the 2011 Promissory Note to $4,240,000.[11] (See **Exhibit "CC"**, Credit and Forbearance Agreement and Second Amendment and Restatement of Promissory Note (the "Credit Agreement" and **Exhibit "EE"**, (the 200K Note).

84.    Further, Dalia, purporting to act as Trustee wrongfully attempted to: (i) waive any defenses the Orly Trust would have to payment, including any defenses with respect to MSCo., TPR, or any prior holder of the 2011 Promissory Note (See **Exhibit "CC"**, Credit Agreement, §6.1(c)); (ii) have the Orly Trust broadly indemnify MSCo., should Orly or any future Trustee legally attack the 2011 Promissory Note, the Amended Promissory Note, or the Credit Agreement (id., §7); (iii) make the Orly Trust liable for all costs of collection, including attorneys' fees (See **Exhibit "DD"**, Amended and Restated Promissory Note (the "Amended 2011 Note") § 6); (iv) **make Dalia's replacement as the Orly Trust Trustee an "Event of**

---

[10] In March, 2012, unbeknownst to Petitioner, TPR, D & K and the Orly Trust (i.e. Dalia and Sagi) purported to enter into an "Agreement Amending Terms of Promissory Note" to provide for New York law and jurisdiction in any competent court (See **Exhibit "FF"**). This Agreement also gave Dalia and Sagi the power to amend the 2011 Promissory Note at will.

[11] In other words, Dalia pledged $440,000 of Orly Trust assets in exchange for a purported $400,000.

Default" making the Amended 2011 Note and the 200K Note (jointly, the "Notes") immediately due and payable (See Exhibit "CC", Credit Agreement, § 6.2, emphasis added); (v) agree to pay the 200K Note from the sale of the Orly Trust TRI Shares "notwithstanding anything to the contrary" (Exhibit "EE", 200K Note, §1.3); and, (vi) make the Credit Agreement and Notes fully assignable without the consent of, or notice to, the Orly Trust (See Exhibit "CC", Credit Agreement, § 10).

## THE PURPORTED SETTLEMENT AND AMENDED SETTLEMENT

85.    On October 3, 2011, Dalia (supposedly on behalf of the Orly Trust), TPR and D & K (by Sagi Genger) purported to settle the New York TPR Action.

86.    Petitioner and her counsel in the New York TPR Action were not informed of this purported settlement nor was Petitioner consulted in any way regarding its terms.

87.    In violation of the July 2009 Order, the Supreme NY Restraints, Surrogate Webb's admonishment to Dalia concerning the dissipation of the Orly Trust's Assets, and the Stipulation entered into between Petitioner and Dalia, the purported settlement agreement (the "TPR Settlement Agreement", which incorporates the 2011 Promissory Note by reference) purports to have the Orly Trust transfer all its interests in D & K and disclaim all interest in TPR. The settlement agreement also has TPR relinquish its claims to the Orly Trust TRI Shares:

> (a) TPR hereby relinquishes in favor of the OG Trust [the Orly Trust] any economic interest in the TRI Shares [the Orly Trust TRI Shares] and assigns to the OG Trust its right to any economic benefits of the TRI Shares including any proceeds from the sale thereof, including but not limited to the $10.3 million in proceeds otherwise owing to TPR in the future pursuant to the terms of the August 22, 2008 letter agreement; (b) the OG Trust - irrespective of any claim made or asserted on its behalf by Orly Genger -- hereby transfers to TPR its limited partnership interest in DK (the "DK Interest"), and disclaims any interest in, any shares of or TPR, either directly

-27-

or indirectly through DK (the "TPR Interest");... and (c) TPR agrees to pay $100,000 for the legal fees of the OG Trust.[12]
(See **Exhibit "GG"**, TPR Settlement Agreement, Paragraph "1")

88.     On March 16, 2012, Dalia (supposedly on behalf of the Orly Trust), TPR, and D & K GP (by Sagi Genger) entered into a purported Amended and Restated Settlement Agreement (the "Amended TPR Settlement Agreement"). Once again, Petitioner was not informed or consulted in any way. The purported "settlement" was restated, and then amended to purportedly cancel and void "the (i) the Amended and Restated Limited Partnership Agreement of D&K Limited Partnership dated as of October 30, 2004 and signed November 22, 2007, and/or (ii) the Meeting of Partners of D&K L.P. January 31, 2009 and Agreement." See **Exhibit "HH"**, March 16, 2012 Amended TPR Settlement Agreement, Paragraph "1").

89.     Importantly, though the Amended TPR Settlement Agreement purported to void these two agreements *ab* initio, the purported settlement did nothing to reverse or unwind the sham TPR Sale that these two agreements purported to enable, or to cancel the supposed deficiency resulting from the TPR Sale.[13]

90.     Demonstrably, these various actions and agreements (agreed to in secret and never revealed to the Court or Petitioner despite numerous Court appearances, filings and outstanding documents requests) in the New York TPR Action and New York TRI Action violated the protective restraints imposed by this Court and the other New York Courts in a

---

[12] Dalia, Sagi, TPR, and D & K also purported to require the Orly Trust to pay D & K and TPR's attorneys' fees, should Petitioner continue to advance claims on the Orly Trust's behalf (see **Exhibit "GG"**, Paragraph "8") and purported to release one another from all claims, causes of action, lawsuits, demands, liability of any kind, asserted or unasserted, known or unknown, suspected or unsuspected, direct or derivative, in connection with the 1993 Note [D & K Note], the [Orly Trust] TRI Shares, the Share Transfer, the DK Interest, the TPR Interest, the 2008 Letter Agreement, or any other matters, through the date of the Agreement Id. at Paragraph "4")
[13] The parties also made sure that the Release in the TPR Settlement Agreement did not cover anyone on Sagi and Dalia's "enemies list" (See **Exhibit "HH"**, Amended TPR Settlement Agreement, Paragraph "3"), changed the governing law to New York law (id. at Paragraph "6"), and made their agreement to Delaware jurisdiction non-exclusive (id.).

number of independent ways. As to the TPR Settlement Agreement and the Amended TPR Settlement Agreement:

    (a)    Pursuant to the July 2009 Order, Dalia and her counsel were required to give Petitioner 10 days advance notice of any transaction that impacted the Orly Trust TRI Shares, but failed to provide notice of either the TPR Settlement Agreement or the Amended TPR Settlement Agreement;

    (b)    By agreeing in the TPR Settlement Agreement and the Amended TPR Settlement Agreement to have the Orly Trust relinquish its interest in TPR and transfer its interest in D & K to TPR, Dalia, Sagi, D & K GP, and TPR jointly and severally violated the TPR Action Restraints which forbade each of them from "transferring, pledging, assigning or otherwise disposing of the [Orly Trust TPR] Shares." (See **Exhibit "Z"** at 31-32)

91.    As to the Notes and the Credit Agreement, TPR's assignment of the 2011 Promissory Note to MSCo was an "...act by Respondent, her agents and all other persons acting on her behalf to assign, mortgage, pledge, redeem, encumber, sell or otherwise alter the Orly Trust's interest in TRI..." Accordingly, pursuant to the July 2009 Order, Dalia was required to give Petitioner at least 10 days notice of the transaction but completely failed to do so. This failure to notify Petitioner also violated various provisions of the Supreme NY Restraining Orders.

## THE EVENT OF DEFAULT UNDER THE NOTES HAS BEEN TRIGGERED AS A RESULT OF THE DISMISSAL OF DALIA'S COUNSEL'S FEDERAL INTERPLEADER ACTION

92.    As a result of Dalia, TPR, D & K (through D & K GP) (i.e, Dalia and Sagi's) actions, the $4.44 million dollars in new debt to MSCo is immediately due and payable because of one of the poison pills that litter the Secret Agreements (in addition to the one that provides an event of default if Dalia is removed as Trustee of the Orly Trust) has already been triggered[14], and thus, MSCo is able to immediately proceed against the Orly Trust's assets in any

---

[14]The resolution of an interpleader action commenced by Dalia's counsel, Pedowitz & Meister LLP ("Pedowitz & Meister") is a triggering Event of Default under the Secret Agreements. Pedowitz & Meister was the

jurisdiction in the world (Delaware, St. Kitts, etc.) without notice or warning to the Orly Trust or to anyone.

93.     Thus, by her actions Dalia has created a situation where the assets of the Orly Trust could be in immediate peril of dissipation.

## DALIA NEEDS TO BE REMOVED AS TRUSTEE IMMEDIATELY

94.     As a result of all of Dalia's forgoing actions and inactions described in this Third Amended Verified Petition, her breach of her fiduciary duties to Petitioner as beneficiary of the Orly Trust, her violation of the terms and conditions of this Court's July 2009 Order and the Supreme NY Restraints, her ongoing conspiracy and scheme with Sagi to loot, transfer, pledge, encumber and dissipate the Orly Trust's assets and the immediate peril to those assets, Petitioner submits that Dalia's should be immediately removed as Trustee of the Orly Trust.

## JOEL ISAACSON SHOULD BE APPOINTED AS SUCCESSOR TRUSTEE

95.     As a result of Dalia's forgoing actions and inactions described in this Third Amended Verified Petition, her breach of her fiduciary duties to Petitioner as beneficiary

---

Escrow Agent with respect to the proceeds of the disputed sale of the Orly Trust TRI Shares and commenced an interpleader action against Petitioner, Dalia as Trustee of the Orly Trust and other parties in the United States District Court for the Southern District of New York, Pedowitz & Meister LLP v. TPR Investment Associates, Inc. Orly Genger, et al (Case No. 11 Civ. 5602) (the "Pedowitz & Meister Interpleader Action") whereby it sought, *inter alia,* a judgment from the Court determining who was entitled to the proceeds of the disputed sale of the Orly Trust TRI Shares.   Petitioner's counsel moved to dismiss the Pedowitz & Meister Interpleader Action on the grounds, *inter alia,* that the District Court lacked subject matter jurisdiction and in any event, all the parties and claims involved in the Pedowitz & Meister Interpleader Action were already pending before Justice Feinman in the New York TRI Action. The Pedowitz & Meister Interpleader Action was recently dismissed by Judge John F. Keenan in the United States District Court for the Southern District of New York by Opinion and Order dated June 14, 2012, due to lack of subject matter jurisdiction and described by him as a "sham".   See Case No.'s 08 Civ. 7140 (JFK), 11 Civ. 5602 (JFK), et al), Docket No. 64). Thus, the resolution of this sham action has triggered an Event of Default under the Secret Agreements. It is worth noting that Pedowitz & Meister represents both Dalia in her individual capacity and as Trustee of the Orly Trust.

of the Orly Trust and her violation of the terms and conditions of this Court's July 2009 Order, Dalia should be immediately removed as Trustee and replaced with Joel Isaacson.

96.     Mr. Isaacson is the founder and CEO of Joel Isaacson & Co. LLC, which has been a leading independent wealth management firm in New York City for almost 20 years, and which is located at 546 Fifth Avenue, 20th Floor, New York, NY  10036.  Mr. Isaacson specializes in financial services and tax planning and has acted as trustee for more than 100 trusts.  He holds a Bachelors of Science Degree in accounting and a Masters of Business Administration degree in financial planning.  Mr. Isaacson is not acquainted with any members of the Genger family, does not have any interest in TRI, TPR or D & K, is willing and prepared to succeed Dalia as Trustee immediately and has an understanding of the current status of the Orly Trust.


**WHEREFORE,** respectfully requests that an Order be entered: (i) immediately removing Dalia Genger as Trustee of the Orly Trust; (ii) suspending the Letters of Appointment heretofore issued to Dalia; (iii) appointing Joel Isaacson as successor trustee; and, (iv) granting such other and further relief as this Court deems to be just equitable and proper.

Dated: New York, New York
          October 15, 2012

_____
ORLY GENGER

## VERIFICATION

STATE OF NEW YORK            )
                                    ) ss.:

COUNTY OF NEW YORK      )

          ORLY GENGER, the petitioner named in the foregoing Third Amended Verified

Petition, being duly sworn, deposes and says:

          1.       I am the Petitioner in this matter.

          2.       I have read the annexed Third Amended Verified Petition, know the contents
thereof and the same are true to my knowledge, except those matters thereon which are stated to
be alleged upon information and belief, and as to those matters I believe them to be true.

                                            _____
                                               ORLY GENGER

Sworn to before me this
_15th_ day of October, 2012

_____
Notary Public

**Daniel B Fix**
Notary Public State of New York
New York County, LIC# 02FI6239452
Comm Exp 04/18/2015

-32-

SURROGATE'S COURT : NEW YORK COUNTY

JAN 02 2009

------------------------------------------ X
In the Matter of the Trust Established
on December 13, 1993, by ARIE GENGER          File No. 0017/2008
for the Benefit of ORLY GENGER.
------------------------------------------ X

R O T H , S .

        This is a contested application by the primary beneficiary

(Orly Genger) of an irrevocable inter vivos trust established by

her father, Arie Genger, seeking the appointment of a successor

trustee or, alternatively, the appointment of a "special trustee"

to investigate alleged wrongdoing concerning the trust.

Petitioner's mother, Dalia Genger (grantor's former wife),

contends that she is the duly appointed successor trustee and

that there is no basis to appoint another fiduciary for any

purpose.

        The trust agreement, dated December 13, 1993, provides for

discretionary income and principal distributions to Orly for life

with remainder to her descendants or, if none, to the grantor's

descendants in trust.

        Article SEVENTH (B), (D), (E), and (G) of the trust

instrument sets forth the following procedure for the resignation

of trustees and the appointment of their successors.

        A trustee may resign by delivering a signed and acknowledged

instrument of resignation in person or by certified or registered

mail to the other trustee and to either the grantor or the income

beneficiary.  Such resignation is effective upon the receipt of

the acknowledged instrument by the other trustee (if there is

one) and the grantor or the income beneficiary or at such later date as may be specified in the instrument.

A trustee may appoint his or her successor by delivering a signed and acknowledged instrument in the same manner as described above for resignation. Any such appointment, however, is valid only if the appointee qualifies by delivering a signed and acknowledged instrument of acceptance in person or by certified or registered mail to each trustee and the grantor or the income beneficiary within 30 days after the later of 1) the date on which a copy of the appointment instrument is delivered to him or her, and 2) the effective date of the appointment as set forth in the appointment instrument. It is observed that there is no provision that requires a resigning trustee to appoint a successor or that there always be two trustees in office.

The original two trustees served until October 2004, when they resigned and appointed David Parnes and Eric Gribitz as their successors. On February 12, 2007, Mr. Gribitz resigned without appointing a successor. On April 26, 2007, Mr. Parnes resigned and appointed as his successor Leah Fang in a signed and acknowledged instrument. Although Ms. Fang noted her acceptance at the bottom of such instrument, her signature was not acknowledged. However, in another document entitled "Release" executed and acknowledged by Ms. Fang the same day, she, as

2

trustee, purported to discharge Mr. Parnes from liability. It is undisputed that thereafter Ms. Fang acted as trustee. Indeed, Ms. Fang's contention that she received a number of requests for information from petitioner and that petitioner referred to her in writing and orally as trustee is not disputed by petitioner.

On December 12, 2007, Ms. Fang, without resigning in accordance with the trust agreement, attempted to appoint Patricia Enriquez, as successor trustee. Her designation of Ms. Enriquez, however, was by an unacknowledged letter in which she referred to her own resignation as taking effect upon Ms. Enriquez's acceptance of the appointment. Ms. Enriquez accepted by signing the letter, but such acceptance was not acknowledged and, in any event, there is nothing in the record to suggest that such "acceptance" was delivered in accordance with the trust instrument. Two weeks later, an attorney for Ms. Enriquez notified petitioner's counsel by email that her client had advised that she had no intention to overcome the procedural omissions.

On January 3, 2008, Ms. Fang and Dalia Genger signed before a notary a memorandum in which Ms. Fang stated that "to the extent that I am still vested with any powers to appoint trustees of the [trust], I confirm your appointment." The next day, Ms. Fang executed an acknowledged instrument of resignation and appointment of successor trustee naming Dalia as her successor

3

and Dalia, on the same day, executed an acknowledged instrument of acceptance. It is undisputed that such documents were delivered in accordance with the trust requirements.

We address first that portion of the instant application which seeks the appointment of a successor trustee on the ground that Dalia was not validly appointed. In such connection, petitioner argues first that, because Ms. Fang's signature on the bottom of Mr. Parnes's appointment instrument was not acknowledged, she never accepted the position in accordance with the trust agreement (and thus could not appoint Dalia her successor). However, such argument ignores the "Release" mentioned above that Ms. Fang executed the same day. Such instrument, which was signed and duly acknowledged, unequivocally establishes Ms. Fang's acceptance of the position. Since petitioner does not challenge the authenticity of such instrument or Mr. Parnes' contention, supported by the record, that it was delivered in accordance with the trust instrument and, as noted above, petitioner thereafter communicated with Ms. Fang as trustee, Ms. Fang properly qualified as successor trustee.

Petitioner's second argument that, in any event, Ms. Fang's appointment of Dalia was ineffective because Ms. Fang had previously resigned as trustee is also without merit. Simply put, Ms. Fang had not previously resigned because her letter to Ms. Enriquez did not contain the formalities (i.e., an

4

acknowledgment) required by the trust agreement.  Moreover, although not a model of clarity, the letter makes clear that Ms. Fang did not intend to leave the trust without a trustee in the event that Ms. Enriquez failed to qualify, which is exactly what happened.  Thus, Ms. Fang had authority to appoint Dalia as her successor.

Since there is no dispute that the instrument of resignation and appointment executed by Ms. Fang on January 4, 2008, and Dalia's instrument of acceptance of the same date were executed and delivered in accordance with the trust agreement, Dalia is the duly appointed successor trustee of the trust.  To find otherwise would be to ignore the chronology of events and the purpose of the provisions at issue, namely to ensure that the trust always has a fiduciary ready, willing and able to act.  The fact that petitioner does not wish her mother to be the fiduciary because she considers her an adversary in a broader intra-family dispute does not provide a basis to ignore the grantor's intent, as reflected in the trust instrument, that an acting trustee, and not the beneficiary, decides who shall become a successor trustee.  Accordingly, petitioner's application to appoint a successor trustee is denied.

We next turn to petitioner's alternate request for relief, namely that a "special trustee" be appointed for the "purpose of investigation and taking discovery with respect to the wrongful

5

dealings concerning the assets and income of the trust."

It is noted initially that petitioner's only allegations of "wrongful dealings" concern a close corporation, TPR Investment Associates, Inc.   She contends that her brother Sagi, who is an officer of TPR, and Dalia, who was a shareholder at the time this proceeding was commenced, are engaged in a "wrongful scheme" to divert assets to themselves and, as a result, Dalia "could not possibly" investigate wrongdoing at TPR, which the petition describes as the "greatest" asset of the trust.

However, the premise of the application, namely that the trust's interest in TPR would enable the trustee to investigate or seek relief from TPR, does not appear to be correct. Petitioner does not dispute Dalia's assertion, supported in the record, that the trust is not a shareholder of TPR at all. Rather, D&K LP, an entity in which the trust owns a 48 percent interest, in turn owns approximately 50 percent of TPR. Petitioner does not explain what appears to be a material misstatement concerning TPR's relationship to the trust.   Nor does she identify how a trustee under such circumstances might be in a position to "investigate and address the TPR issues".

In any event, assuming arguendo that a trustee would somehow be able to investigate alleged misconduct at TPR, petitioner's vague and speculative allegations of "wrongful conduct" at TPR from which Dalia purportedly benefitted do not warrant the

6

appointment of a "special trustee". Similarly, petitioner's allegations (made upon information and belief) that Dalia had knowledge of alleged improper acts by former trustee, David Parnes, in relation to TPR are patently insufficient to warrant the remedy of a "special trustee". In such connection, it is noted that Mr. Parnes and Ms. Fang have been directed to account for their proceedings as trustees (<u>Matter of Genger</u>, NYLJ, Feb. 25, 2008, at 29, col 3), giving petitioner a forum to seek relief for most of the conduct about which she complains.

Finally, it is observed that petitioner has not alleged that Dalia has refused a request for information, which would warrant relief (SCPA 2102), or has failed as trustee to protect trust assets. Indeed, it appears that Dalia (who states that she is ready and able to act as fiduciary) has yet to assume the duties of trustee in deference to her daughter's position in this litigation. As a validly appointed trustee, she should be given the opportunity to do what she deems necessary to manage and protect the trust's assets.

Based upon the foregoing, the appointment of a "special trustee" is unwarranted at this time and, accordingly, the application is denied, without prejudice to renewal if future

7

circumstances warrant such relief.

This decision constitutes the order of the court.

S U R R O G A T E

Dated: December 31, 2008

8



EXHIBIT 14
DALIA
12/3/12
PENGAD 800-631-6989

SURROGATE COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

-------------------------------------------------------------X

In the Matter of

ORLY GENGER,

                    Petitioner,

        -against-

LEAH FANG, DAVID A. PARNES, THE SAGI
GENGER TRUST, DALIA GENGER, JOEL
ISAACSON and MARTIN COLEMAN,

                Respondents.

-------------------------------------------------------------X

Index No. 2008/0017

**AFFIDAVIT OF DALIA
GENGER**

I, Dalia Genger, being duly sworn hereby deposes and says:

1.     I am sole trustee of the Orly Genger 1993 Trust (the "Orly Trust"), a true and complete copy of which is attached hereto as Exhibit A. My daughter, Orly Genger, the Petitioner herein, is the lifetime beneficiary of the Orly Trust. My son, Sagi Genger, is the lifetime beneficiary of the Sagi Genger 1993 Trust (the "Sagi Trust"), which is a contingent remainderman of the Orly Trust. I submit this affidavit in opposition to the Orly Trust's Amended Petition To Designate Trustee Or, In The Alternative, To Appoint A Special Trustee, And To Compel Accounting Order (the "Petition").

**My Appointment as Successsor Trustee**

2.     I understand that Leah Fang had acted as trustee of the Orly Trust since approximately April 26, 2007, the date on which David Parnes resigned as trustee and appointed Fang as successor trustee. I understand that Parnes appointed Fang by executing a signed and acknowledged instrument of resignation and appointment of successor trustee, a copy of which is attached hereto as Exhibit B. I understand that Fang also executed a signed and acknowledged instrument of acceptance of trusteeship, a copy of which is attached hereto as Exhibit C. I further

N0109654v

understand that Parnes sent both documents to the grantor of the Trust, Arie Genger, by registered mail in full compliance with the terms of the Trust.

      3.     On January 4, 2008, Leah Fang resigned as trustee of the Orly Trust and appointed me as successor trustee by executing an acknowledged Instrument of Resignation of Trustee and Appointment of Successor Trustee, a copy of which is attached hereto as Exhibit D. On the same day, I executed an acknowledged Instrument of Acceptance of Trustee, a copy of which is attached hereto as Exhibit E. In accordance with the requirements of the Orly Trust, I personally delivered both instruments to my daughter, the beneficiary, within the thirty (30) day time period.

**The Relief Sought by Petitioner**

      4.     Orly and Sagi are my children and their best interest is my only concern. I would never do anything as trustee of the Orly Trust (or in any other capacity) to harm my daughter's interests.

      5.     Neither the Orly Trust nor the Sagi Trust owns any interest in TPR Investment Associates, Inc. ("TPR"). The Orly Trust and the Sagi Trust each own a 48% interest in D&K LP ("D&K"), which in turn owns approximately 50% of TPR's common shares.

      6.     D&K's interest in TPR was purchased by D&K with a promissory note in the face amount of $8.95 million (with interest, approximately $10 million to date) that is secured by D&K's shares in TPR (the "Note"). The Note has not been current since 2001.

      7.     Since D&K's assets are insufficient to cover its obligations, D&K represents a net liability to the trust, not an asset. The only asset of the Orly Trust is a 20% interest in Trans-Resources, Inc., which interest is actually controlled by Arie Genger through an irrevocable proxy given by each Trust to Arie.

2

N0109654v

8.      After considering various options to mitigate harm to the Orly Trust and the Sagi Trust resulting from D&K's failure to keep current on the Note, the Note was exchanged with Parnes for the assumption of a contingent liability and nominal consideration. Based on tax advice, the purposes of the arrangement were forbearance and tax deferment. Under the agreement, Parnes agreed to terms of forbearance against D&K. I do not stand to gain anything personally by the agreement, other than protecting the estate plan implemented for the benefit of my children.

9.      If the Note is returned to TPR, which my daughter seems to seek through the appointment of a new trustee, it would re-create a related party obligation, and would have to be accelerated or forgiven. This would result in the destruction of the value of both the Orly Trust and the Sagi Trust by wiping out their assets in satisfaction of D&K's obligations either on the Note or to the IRS if the Note is forgiven by TPR. The Trust's shares of TRI, its only asset, would have to be sold, to the only available buyer, due to his irrevocable proxy: Arie. The destruction of the Orly Trust in this manner would therefore accrue directly to the benefit of Arie—in that he would gain a desired control of TRI—and to my benefit—in that I would acquire the D&K's interest in TPR. This result is inconsistent with my responsibilities to my children as their mother and as trustee of the Orly Trust. Regretfully, my daughter does not appear to understand the consequences of her demands.

10.     In addition, my daughter's claim that Sagi and I have been stripping TPR of its value by taking bogus compensation out of the company is wrong. I am a shareholder of TPR. In that capacity, I have been effectively redeeming my shares of TPR. This is consistent with an overall estate plan for the benefit of both Orly and Sagi, because it increases D&K's, and indirectly, the Trusts' interest in TPR. For his part, Sagi is an employee and officer of TPR, and

3

has received compensation in exchange for managing TPR's investments and functioning as its Chief Executive Officer. Neither my daughter nor her Trust is an employee, consultant, or shareholder of TPR and accordingly neither she nor her Trust is entitled to any compensation from the company.

## Petitioner's Request for a New Trustee

11.     I am trustee of the Orly Trust, and there is no basis for the appointment of a new trustee. To the extent the Court is considering the appointment of Martin Coleman, I object. Coleman is a former partner in, and may still be affiliated with, the law firm Sonnenschein, Nath & Rosenthal LLP, which is currently a defendant in a litigation with TPR in which TPR seeks over $100 million in damages. He also sat as a director of TRI during a period of time for which Sonnenschein and three TRI directors are being sued for malpractice and fraud. There is a distinct possibility that Coleman may be added as another defendant. Accordingly, he would not make an appropriate trustee.

12.     To the extent the Court is considering appointing Joel Isaacson, I object to his appointment as well. Isaacson, who is my daughter's paid accountant, was specifically informed of the reason for the assignment of the D&K Note from TPR to Parnes. Isaacson admitted that he understood and agreed with the reason for the exchange after sitting in on a two-hour briefing on the matter. He failed, however, to disclose this information to my daughter, even though her Trust's viability may rise or fall based on it. In sum, he has shown himself to be concerned with interests inconsistent with those of my daughter.

Dated: New York, New York
       March 11, 2008

_Dalia Genger_
Dalia Genger

KATARZYNA SCHWARTZ
Notary Public, State of New York
No. 01SC8158649
Qualified in Queens County
COMMISSION EXPIRES 01/00/2011

SWORN TO BEFORE ME THIS
11TH DAY OF MARCH 2008

## ORLY GENGER 1993 TRUST

### INSTRUMENT OF RESIGNATION OF TRUSTEE
### AND APPOINTMENT OF SUCCESSOR TRUSTEE

The undersigned, DAVID A. PARNES, acting as Trustee, since October 22, 2004, of the Orly Genger 1993 Trust under Trust Agreement dated December 13, 1993, between ARIE GENGER, as Grantor, and LAWRENCE M. SMALL and SASH A. SPENCER, as Trustees, does hereby, pursuant to the provision of Section B of Article Seventh of said Trust Agreement, appoints LEAH FANG to act as Trustee under said Trust Agreement in the place and stead of the undersigned in the event of the resignation of the undersigned as such a Trustee, and the undersigned does hereby resign as such a Trustee as of the date hereof.

Dated: April 26, 2007

David A. Parnes

State of New York )
                  ) ss.
County of New York)

On the 26th day of April, 2007, before me, the undersigned, personally appeared David A. Parnes, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument, and acknowledged to me that he executed the same in his capacity as aforesaid, and that by his signature on the instrument, he executed the same in the City of New York, County of New York.

Notary Public

DORIS CAPUTO
Notary Public, State of New York
No. 01CA4892002
Qualified in Richmond County
Commission Expires May 31, 2010

I accept the position as trustee
of the Orly Genger 1993 Trust.

4/26/07
Leah Fang

To:
David A. Painter
29 Elkachi Street
Tel Aviv 69497
Israel

## RELEASE

Whereas, you served as Trustee, since October 22, 2004 ("Commencement Date") as trustee of the Orly Genger 1993 Trust (the "Orly Trust") and the Sagi Genger 1993 Trust (the "Sagi Trust") (jointly, the "Trusts"); and

Whereas, you have tendered your resignation from your position of trustee of both Trusts ("Resignation"); and

Whereas, you have requested a general release from me, as the sole appointed successor trustee of the Trusts, in connection with your actions, or omissions, as trustee of the Trusts, from the Commencement Date through the date upon which your Resignation became effective ("Resignation Date");

### NOW, THEREFORE, I HAVE AGREED AS FOLLOWS:

You are hereby released and discharged, to the fullest extent authorized by law or under the Trusts documents, from the consequences of any action or inaction that you might have taken, as trustee of either or both of the Trusts, from the Commencement Date through the Resignation Date. Nothing herein shall derogate from the indemnification rights you are entitled to, from any third party, under the Trusts documents.

IN WITNESS WHEREOF, the undersigned have executed this Release as of April 26, 2007.

THE ORLY GENGER 1993 TRUST
By: _____
Name: Leah Fang
Title: Trustee

THE SAGI GENGER 1993 TRUST
By: _____
Name: Leah Fang
Title: Trustee

State of New York   )
                    ) ss.
County of New York  )

On the 26th day of April, 2007, before me, the undersigned, personally appeared LEAH FANG, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument, and acknowledged to me that he executed the same in his capacity as aforesaid, and that by his signature on the instrument, he executed the same in the City of New York, County of New York.

_____
Notary Public

Notary Public, State of New York
No. 01OA6232002
Qualified in Richmond County
Commission Expires May 31, 2010

## ORLY GENGER 1993 TRUST

### INSTRUMENT OF RESIGNATION OF TRUSTEE
### AND APPOINTMENT OF SUCCESSOR TRUSTEE

The undersigned, LEAH FANG, to the extent currently the Trustee of the Orly Genger 1993 Trust under Trust Agreement dated December 13, 1993 between ARIE GENGER, as Grantor, and LAWRENCE M. SMALL and SASH A. SPENCER, as Trustees (the "Trust Agreement"), to vested with powers of appointment as Trustee under the Trust, the undersigned does hereby, pursuant to the provisions of Section B of Article SEVENTH of said Trust Agreement, appoint Dalia Genger to act as Trustee under said Trust Agreement in the place and stead of the undersigned in the event of the resignation of the undersigned as Trustee, and the undersigned does hereby resign as such Trustee as of the date hereof.

Dated:      January 4, 2008

_____
Leah Fang

STATE OF NEW YORK    )
                        ) ss.
COUNTY OF NEW YORK  )

On the 4th day of January, 2008, before me, the undersigned, personally appeared LEAH FANG, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument, and acknowledged to me that she executed the same in her capacity as aforesaid, and that by her signature on the instrument, she executed the same in the State and County set forth above and in the City of New York.

_____
Notary Public

**CHRISTINE BERTI**
Notary Public, State of New York
Registration # 01BE6137973
Qualified in Nassau County
My Commission Expires Dec. 5, 2009

ORLY GENGER 1993 TRUST

<u>INSTRUMENT OF ACCEPTANCE OF TRUSTEE</u>

The undersigned, DALIA GENGER, to the extent not already properly appointed Trustee of the Orly Genger 1993 Trust under Trust Agreement dated December 13, 1993 between ARIE GENGER, as Grantor, and LAWRENCE M. SMALL and SASH A. SPENCER, as Trustees (the "Trust Agreement"), hereby accepts the appointment as Trustee pursuant an Instrument of Appointment made by Leah Fang, dated January 4, 2008.

Dated:     January 4, 2008          _____
                                            Dalia Genger

STATE OF NEW YORK       )
                                  ) ss.
COUNTY OF NEW YORK    )

On the 4th day of January, 2008, before me, the undersigned, personally appeared Dalia Genger, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument, and acknowledged to me that she executed the same in her capacity as aforesaid, and that by her signature on the instrument, she executed the same in the State and County set forth above and in the City of New York.

                                          _____
                                                 Notary Public

SEYMOUR H. FANG
Notary Public, State of New York
No. 31-6230900
Qualified in New York County
Commission Expires Sept. 30, 2010

Index No. 0017    Year 2008

SURROGATE COURT OF THE STATE OF NEW YORK COUNTY OF NEW YORK

ORLY GENGER,

Petitioner,

-against-

LEAH FANG, DAVID A. PARNES, THE SAGI GENGER TRUST, DALIA GENGER, JOEL ISAACSON and MARTIN COLEMAN

RESPONDENTS

**Affidavit of Dalia Genger**

SULLIVAN & WORCESTER LLP

*Attorneys for Respondent*

1290 AVENUE OF THE AMERICAS
NEW YORK, NEW YORK 10104
(212) 660-3000

SULLIVAN & WORCESTER LLP

ASSIGNMENT AND ASSUMPTION AGREEMENT

This Assignment and Assumption Agreement is made and entered into as of August 1, 2008, by and among DALIA GENGER, an individual residing at 200 East 65th Street, New York, NY (the "Assignor"), and SAGI GENGER, an individual residing at 1211 Park Avenue, New York, NY 10128 (the "Assignee"), and TPR Investment Associates, Inc., a Delaware corporation (the "Company").

Recitals

A.    Assignor, previously a shareholder of Company, sold her entire beneficial and record ownership in Company, to Company pursuant to an undated letter agreement and legal instrument (entitled "Promissory Note in Connection with Letter Agreement 12/17/2007") evidencing a debt of Company towards Assignor in the principal amount of Five Million dollars ("$5,000,000) ("Assigned Loan") attached hereto as **Exhibit A** ("Sale Documents").

B.    Following the transaction contemplated by the Sale Documents, Assignor ceased to maintain an equity interest in Company, and became a debt holder thereof.

C.    Assignor wishes to sell and assign to the Assignee, and the Assignee wishes to purchase and assume from the Assignor, (i) the Assignor's Loan, and (ii) all rights attached to Assigned Loan.

D.    Assignee contemplates rescinding the Sale Document, pursuant to the terms thereof, whereby all Assignor's previous entitlement to shares of the Company shall vest in Assignee, as beneficificial and record holder of two hundred and twenty (220) shares of common stock of the Company. Alternatively, Assignor might maintain the loan to the Company outstanding, and / or negotiated other terms in connection therewith with the Company.

   The parties agree as follows:

1.    Assignment.  Subject to the terms and conditions set forth herein, the Assignor hereby sells and assigns to the Assignee, and the Assignee hereby purchases and assumes from the Assignor, without recourse to the Assignor, on the date set forth above (the "Assignment Date") (a) all right, title, and interest of the Assignor to the Assigned Loan, and (b) all obligations of the Assignor under the Sale Documents with respect to the Assigned Loan.  As full consideration for the sale of the Assigned Loan, the Assignee shall pay to the Assignor on the Assignment Date such amount as shall have been agreed between the Assignee and the Assignor (the "Purchase Price").

2.    Representations and Warranties.  Each of the Assignor and the Assignee represents and warrants to the other, and to the Company that (a) it has full power and legal right to execute and deliver this Agreement and to perform the provisions of this Agreement; (b) the execution, delivery, and performance of this Agreement on its part do not violate any contractual obligations or requirement of law binding on it; and (c) this Agreement constitutes a legal, valid and binding obligation, enforceable



SAGI PER 000894

against it in accordance with its terms, subject, as to enforcement of remedies, to the following qualifications: (i) an order of specific performance and an injunction are discretionary remedies and, in particular, may not be available where damages are considered an adequate remedy at law, (ii) enforcement may be limited by bankruptcy, insolvency, liquidation, reorganization, reconstruction and other similar laws affecting enforcement of creditors' rights generally (insofar as any such law relates to the bankruptcy, insolvency or similar event of the Assignor and the Assignee) and (iii) enforcement may be subject to general principles of equity (regardless of whether such enforcement is considered in a proceeding in equity or at law) and may be limited by public policies which may affect the enforcement of certain rights or remedies provided for in this Agreement.

3.    Condition Precedent.  The obligations of the Assignor and the Assignee hereunder shall be subject to the fulfillment of the condition that the Assignor shall have received payment in full of the Purchase Price.

4.    Notice of Assignment.  The Assignor hereby gives notice to the Company of the assignment and assumption of the Assigned Loan and hereby instructs the Company to make payments with respect to the Assigned Loan directly for the benefit of the Assignee as provided in the Sale Documents; provided, however, that the Company shall be entitled to continue to deal solely and directly with the Assignor in connection with the interests so assigned until: The date hereof shall be deemed the "Effective Date", and (a) all interest, principal, fees, and other amounts that would otherwise be payable to the Assignor in respect of the Assigned Loan shall be paid to the Assignee, and (b) if the Assignor receives any payment on account of the Assigned Loan, the Assignor shall promptly deliver such payment to the Assignee.

5.    Independent Investigation.  The Assignee acknowledges that it is purchasing the Assigned Loan from the Assignor without recourse and, except as provided in Section 2 hereof, without representation or warranty.  The Assignee further acknowledges that it has made its own independent investigation and credit evaluation of the Company in connection with its purchase of the Assigned Loan, and has received copies of all Loan Documents that it has requested and has (by way of being the executive officer of the Company) full access to all relevant information. Except for the representations or warranties set forth in Section 2 hereof, the Assignee acknowledges that it is not relying on any representation or warranty of the Assignor, expressed or implied, including, without limitation, any representation or warranty relating to the legality, validity, genuineness, enforceability, collectibility, interest rate, repayment schedule, or accrual status of the Assigned Loan, the legality, validity, genuineness, or enforceability of the Sale Documents, the related Notes, or any other loan document, or the financial condition or creditworthiness of the Company.  The Assignor has not acted and will not be acting as either the representative, agent or trustee of the Assignee with respect to matters arising out of or relating to the Credit Agreement or this Agreement. From and after the Effective Date, the Assignor shall have no rights or obligations with respect to the Assigned Loan.

6.    Method of Payment.  All payments to be made by Assignor hereunder shall be by way of a Promissory Note, bearing an interest rate of five percent (5%) per annum, and payable in annual installments of five hundred thousand dollars ($500,000), starting in 2009. Such payment shall be made by wire transfer to the account designated by Assignor.

SAGI PER 000895

parties as to the subject matter hereof.

8.    Assignment. This Agreement shall be assignable, without the prior written consent of the other parties hereto, by Assignee to (i) an entity wholly owned and controlled by Assignee, or (ii) an entity existing for the benefit of Assignee and ￼or of Assignee and his immediate family. This Agreement shall be binding upon, and shall inure to the benefit of, the parties hereto and their respective successors and permitted assigns.

9.    Counterparts. This Agreement may be executed in any number of counterparts, each of which shall be deemed to be an original and shall be binding upon the parties, their successors and assigns.

10.    Governing Law.  This Agreement shall be governed by and construed in accordance with the internal laws of the State of New York applicable to contracts made and to be performed in the State of New York.

DALIA GENGER (Assignor)

_____

SAGI GENGER (Assignee)

_____

Agreed and Accepted:

TPR INVESTMENT ASSOCIATES, INC.,
a Delaware corporation

By:_____
          Name:
          Title:

SAGI PER 000896

Ms. Dalia Genger
200 E. 65st
New York, NY
December 17, 2007


Mr. Sagi Genger
Chief Executive Officer
TPR Investment Associates, Inc.
1211 Park Avenue
New York, NY


Dear Sagi:

This letter serves to memorialize a decision by TPR Investment Associates, Inc.'s
("TPR") Board and a resulting agreement as follows:

TPR will purchase 250 shares of the Company.  The purchase price will be paid in
$30,000.00 installments paid monthly over the next 25 years starting on January 15,
2008.  A promissory note is attached outlining terms.

Following execution of this letter I resign all positions at the Company.

It is understood that my health insurance coverage by the Company will continue until
full payment is made.



Sincerely,



Dalia Genger
For herself and as a Director of TPR



Agreed:



Sagi Genger
Director and CEO


SAGI PER 000897

# PROMISSORY NOTE IN CONNECTION WITH LETTER AGREEMENT 12/17/07

$5,000,000.00

1211 Park Avenue
New York, NY

WHEREAS, TPR Investment Associates, Inc. a Delaware Corporation with offices at 1211 Park Avenue, (the "Borrower")

NOW, THEREFORE, in connection with the letter stock purchase agreement and for other good and valuable consideration, the parties hereby agree as follows:

FOR VALUE RECEIVED, the undersigned Borrower hereby promises to pay to the order of Dalia Genger, Inc. (the "Lender"), at the Lender's home 200 E. 65th Street New York, NY (or such other place as the Lender may designate in writing to the Borrower), the aggregate principal sum of two hundred thousand dollars ($5,000,000) (the "Principal), together with interest from the date hereof on the unpaid Principal at the rate of five and a 26/100 percent (5.26%) per year, in lawful money of the United States, upon the terms and subject to the conditions set forth herein.

## 1. Payment and Prepayment.

(a) Repayment of Principal. The Borrower shall repay the principal amount of this Note with interest accrued thereon in equal installments of $30,000 monthly starting on January 15, 2008 through January 15, 2032. Any prepayment will act to reduce the amount owed monthly.

(c) Additional Interest. If payment of any amount due under this Note shall be overdue by more than fifteen business days and written notice shall be given thereof, the interest rate, payable with respect to all unpaid Principal, shall be increased to an amount equal to the maximum legal rate of interest permitted by applicable law ("Overdue Rate").

(d) Prepayment. Any amounts due under this Note may be prepaid in whole or in part at any time. Notwithstanding any prepayment made by Borrower, Lender shall be entitled to the full and complete amount due as Lender otherwise described in Note.

(e) Manner of Payment And Prepayment. Payments and prepayments under this Note shall be applied first to interest accrued but unpaid and then to Principal. Payments and prepayments shall be made by certified or official bank check payable to the order of the Lender, or in cash by wire transfer of immediately available funds to an account designated in writing by the Lender to the Borrower. If the due date of any required payment under this Note is not a "business day" (for this purpose, any day other

1

SAGI PER 000898

than a Saturday, Sunday or legal holiday observed in the State of New York), such required payment shall be due and payable on the immediately succeeding business day.

## 2. Collateral

The Borrower is the owner of two hundred (250) shares in TPR Investment Associates, Inc. (the "Collateral") purchased from Lender in connection with this Note.   It is understood that borrower's obligations are limited to the Collateral, without further recourse to it.

3. **Events of Default**. The occurrence and continuation of any one or more of the following events shall constitute an event of default under this Note ("Event of Default"):

(a) Payment Default. The Borrower shall fail to make any required payment of Principal of or Interest on this Note and such failure shall continue for more than fifteen (15) business days after written notice from Lender.

(b) Bankruptcy Default. The Borrower shall (i) commence any case, proceeding or other action under any existing or future law of any jurisdiction relating to seeking to have an order for relief entered with respect to him or his debts, or seeking reorganization, arrangement, adjustment, winding-up, liquidation, dissolution, composition or other such relief with respect to him or his debts, or seeking appointment of a receiver, trustee, custodian or other similar official for him or for all or substantially all of his assets (each of the foregoing, a "Bankruptcy Action"); (ii) become the debtor named in any Bankruptcy Action which results in the entry of an order for relief or any such adjudication or appointment described in the immediately preceding clause (i), or remains undismissed, undischarged or unbonded for a period of sixty (60) days; or (iii) make a general assignment for the benefit of his creditors; or (iv) admit in writing to Lender its inability to pay.

(c) Failure of Undertaking The Borrowers failure to undertake actions contemplated by the note after written request to do so, and with fourteen days notice, or any misrepresentation on her part will constitute an event of default.

In each and every Event of Default under clause (a) of this Section 2, the Lender may, without limiting any other rights it may have at law or in equity, by written notice to the Borrower, declare the unpaid Principal of and interest on this Note due and payable, whereupon the same shall be immediately due and payable, without presentment, demand, protest or other notice of any kind, all of which the Borrower hereby expressly waives, and the Lender may proceed to enforce payment of such Principal and interest or any part thereof in such manner as it may elect in its discretion. In each and every Event of Default under clause (b) of this Section 2, the unpaid Principal and interest on this Note shall be immediately due and payable without presentment, demand, protest or notice of any kind, all of which the Borrower hereby expressly waives, and the Lender may proceed to enforce payment of such Principal and interest or any part thereof in such manner as it may elect in its discretion.

4. **Notices**. All notices, demands and other communications provided for or permitted hereunder shall be made in writing and shall be by registered or certified first-class mail, return receipt requested, telecopier (with receipt confirmed), bona fides email (with receipt confirmed), courier service or personal delivery, if to the Lender, at the address indicated in the preamble above, and if to Borrower:

SAGI PER 000899

**TPR Investment Associates, Inc.**
1211 Park Avenue
New York, NY 10128
Email Address: sgenger@tprinvestments.com

All such notices and communications shall be deemed to have been duly given: when delivered by hand, if personally delivered; when delivered by courier, if delivered by commercial overnight courier service; if mailed, five business days after being deposited in the mail, postage prepaid; or if telecopier or email, when receipt is acknowledged.

### 4. Waivers; Rights and Remedies.

a) Waivers. No failure, delay or course of dealing on the part of the Lender in exercising any right, power or privilege under this Note shall operate as a waiver thereof, nor shall any single or partial exercise of any right, power or privilege hereunder preclude the simultaneous or later exercise of any other right, power or privilege hereunder.

The Borrower hereby waives to the extent not prohibited by applicable law (i) all presentments, demands for performance or notices of nonperformance (except to the extent specifically required under Section 2); (ii) any requirement of diligence or promptness on the part of the Lender to enforce its rights under this Note; (iii) any and all notices of every kind and description which may be required to be given by any law; and (iv) any defense of any kind (other than payment) which it may now or hereafter have with respect to its obligations under this Note.

(b) Rights And Remedies. The rights and remedies herein expressly provided are cumulative and not exclusive of any rights or remedies which the Lender may otherwise have.

5. **Indemnification.** The Borrower shall pay and shall indemnify and hold the Lender harmless against any and all costs and expenses, including reasonable attorneys' fees and disbursements, actually incurred by the Lender for the collection of this Note upon an Event of Default.

6. **Amendment**. No amendment or other modification of this Note may be made without the written consent of the Lender.

### 7. **Preamble**

(a) The Preamble to this promissory note, are an integral part of one another, and together form the promissory note in its entirety (the "Note").

8. **Governing Law**. This Note shall be governed by the laws of the District of Columbia. Borrower hereby (i) submits to the exclusive jurisdiction of the courts of the State of New York and the Federal courts of the United States sitting in the State of New York for the purpose of any action or proceeding arising out of or relating to this Note, without limiting lenders rights to enforce judgment in any other court of competent jurisdiction, (ii) agrees that all claims in respect of any such action or proceeding may be heard and determined in such courts, (iii) irrevocably waives (to the extent permitted by applicable law) any objection which he now or hereafter may have to the laying of venue of any such

3

SAGI PER 000900

action or proceeding brought in any of the foregoing courts in and of the State of New York, and any objection on the ground that any such action or proceeding in any such court has been brought in an inconvenient forum, and (iv) agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner permitted by law.

Sagi Genger for TPR

SAGI PER 000901

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

| | |
|---|---|
| ORLY GENGER in her individual capacity and on behalf of the Orly Genger 1993 Trust (both in its individual capacity and on behalf of D & K Limited Partnership),<br><br>                    Plaintiff,<br><br>             - against -<br><br>DALIA GENGER, SAGI GENGER, LEAH FANG, D & K GP LLC, and TPR INVESTMENT ASSOCIATES, INC.,<br><br>                    Defendants. | Index No.:  109749/09 |

## DEFENDANT DALIA GENGER'S AMENDED RESPONSES TO PLAINTIFF'S INTERROGTAORIES

      Defendant, Dalia Genger, hereby objects and responds to Plaintiff Orly Genger's (hereinafter referred to as "Orly" or "Plaintiff") Interrogatories, as set forth below.

      Defendant asserts the following General Objections which are incorporated in each individual response:

### General Objection No. 1:

      Defendant objects to these Interrogatories to the extent they call for identification of documents served in this action or other actions or proceedings in which Plaintiff was a party or correspondence with plaintiff's counsel in any such as these documents are equally available to plaintiff, and to respond to the demands by producing them would be unduly burdensome for all parties involved and are neither material or necessary to the prosecution or defense of this action.

### General Objection No. 2:

      Defendant objects to the extent that these Interrogatories call for identification of communications or documents comprising communications

1

between or among Defendant and her attorneys after December 27, 2007, the date on which Plaintiff initiated her first Surrogate Court Proceedings as these communications are protected by attorney client privilege and attorney work product and material prepared for and in anticipation of litigation and are not material or necessary to the prosecution or defense of this action.

### General Objection No. 3:

Defendant objects to the extent that these Interrogatories call for identification of communications or documents comprising communications between or among Defendant and her attorneys between or among Defendants and their attorneys after the commencement of this action as these communications are protected by joint defense attorney-client privilege and attorney work product and material prepared for and in anticipation of litigation and are not material or necessary to the prosecution or defense of this action.

### Interrogatory No. 1:
Did You receive the 8/31/08 Notice?

### Response:
I do not remember receiving the 8/31/08 Notice.

I am informed by my attorney, Robert A. Meister, that he received a copy of the 8/31/08 Notice on May 19, 2009.

### Interrogatory No. 2:
If Your answer to Interrogatory No. 1 is anything other than an unqualified "no", state the date and time that You received the 8/31/08 Notice, how You received the 8/31/08 Notice (e.g., by hand, Fedex, e-mail, etc.), from whom You received the 8/31/08 Notice, and the substance of that communication. In addition, identify all documents concerning Your receipt of the 8/31/08 Notice.

### Response:
I do not remember if I received the 8/31/08 Notice.

I am informed by my attorney, Robert A. Meister, that he received a copy of the 8/31/08 Notice on May 19, 2009, by an email from David Parnes, Esq.

**Interrogatory No. 3:**
Did You inform Orly of the 8/31/08 Notice?

**Response:**
No.
I am informed by my attorney, Robert A. Meister, that he sent a copy of the 8/31/08 Notice to counsel for Orly by letter emailed and mailed on June 1, 2009.

**Interrogatory No. 4:**
If Your answer to Interrogatory No. 3 is anything other than an unqualified "no", state the date and time that You informed Orly of the 8/31/08 Notice, how You informed Orly of the 8/31/08 Notice (e.g., by hand, Fedex, e-mail, etc.), and the substance of that communication. In addition, identify all documents concerning each communication.

**Response:**
I am informed by my attorney, Robert A. Meister, that he sent a copy of the 8/31/08 Notice to Judith Ellen Siegel-Baum, Cozen O'Connor PC, 277 Park Avenue, New York, New York 10172, telephone (212) 883-4902, who is counsel for Orly, by letter emailed and mailed on June 1, 2009.

**Interrogatory No. 5:**
If Your answer to Interrogatory No. 1 is anything other than an unqualified "no", state each action You took as trustee of the Orly Trust in response to Your receiving the 8/31/08 Notice. In addition, identify all documents concerning each action.

**Response:**
I am informed by my attorney, Robert A. Meister, that he sent a copy of the 8/31/08 Notice to Judith Ellen Siegel-Baum, Cozen O'Connor PC, 277 Park Avenue, New York, New York 10172, telephone (212) 883-4902, who is counsel for Orly, by letter emailed and mailed on June 1, 2009.

3

**Interrogatory No. 6:**

If Your answer to Interrogatory No. 1 is anything other than an unqualified "no", identify each person You informed of the 8/31/08 Notice, including in Your answer the date and time You informed each person, by what means (e.g., by hand, FedEx, e-mail, etc.) You informed each person and the substance of each communication. In addition, identify all documents concerning each communication.

**Response:**

I am informed by my attorney, Robert A. Meister, that he sent a copy of the 8/31/08 Notice to Judith Ellen Siegel-Baum, Cozen O'Connor PC, 277 Park Avenue, New York, New York 10172, telephone (212) 883-4902, who is counsel for Orly, by letter emailed and mailed on June 1, 2009, which letter is being produced.

**Interrogatory No. 7:**

Identify each Document or Communication between You and each of the following persons concerning the 8/31/08 Notice:
(a) Arie Genger
(b) Sagi
(c) Orly
(d) Fang
(e) Rochelle Fang
(f) David Parnes
(g) Alan Sash or any other person at McLaughlin & Stern LLP

**Response:**

I do not remember any such communication with the above listed individuals.

I am informed by my attorney, Robert A. Meister, that in late May, 2009, he ask Sagi Genger for copies of documents relating to the foreclosure and that he then received an email with the 8/31/08 Notice from David Parnes, Esq. on May 19, 2009.

I am informed by my attorney, Robert A. Meister, that he sent a copy of the 8/31/08 Notice to Judith Ellen Siegel-Baum, Cozen O'Connor PC, 277 Park Avenue, New York, New York 10172, telephone (212) 883-4902, who is counsel for Orly, by letter emailed and mailed on June 1, 2009.

4

**Interrogatory No. 8:**
Did You receive the Sale Notice?

**Response:**
I do not remember receiving the Sale Notice.

I am informed by my attorney, Robert A. Meister, that he received a copy of the Sale Notice on May 19, 2009, by an email from David Parnes, Esq.

**Interrogatory No. 9:**
If Your answer to Interrogatory No. 8 is anything other than an unqualified "no", state the date and time that You received the Sale Notice, how You received the Sale Notice (e.g., by hand, Fedex, e-mail, etc.), and from whom You received the Sale Notice, and the substance of that communication. In addition, identify all documents concerning Your receipt of the Sale Notice.

**Response:**
I do not remember receiving the Sale Notice.

I am informed by my attorney, Robert A. Meister, that he received a copy of the Sale Notice on May 19, 2009, by an email from David Parnes, Esq.

**Interrogatory No. 10:**
If Your answer to Interrogatory No. 8 is anything other than an unqualified "no", state each action You took as trustee of the Orly Trust in response to Your receiving the Sale Notice. In addition, identify all documents concerning each action.

**Response:**
I do not remember receiving the Sale Notice.

I am informed by my attorney, Robert A. Meister, that he sent a copy of the Sale Notice to Judith Ellen Siegel-Baum, Cozen O'Connor PC, 277 Park Avenue, New York, New York 10172, telephone (212) 883-4902, who is counsel for Orly, by letter emailed and mailed on June 1, 2009, which letter is being produced.

**Interrogatory No. 11:**
If Your answer to Interrogatory No. 8 is anything other than an unqualified "no", identify each person You informed of the Sale Notice, including in Your answer the date and time You informed each person, by what means (e.g., by hand,

Fedex, e-mail, etc.) You informed each person, and the substance of each communication. In addition, identify all documents concerning each communication.

**Response:**
I do not remember receiving the Sale Notice.
I am informed by my attorney, Robert A. Meister, that he sent a copy of the 8/31/08 Notice to Judith Ellen Siegel-Baum, Cozen O'Connor PC, 277 Park Avenue, New York, New York 10172, telephone (212) 883-4902, who is counsel for Orly, by letter emailed and mailed on June 1, 2009.

**Interrogatory No. 12:**
Did You inform Orly of the Sale Notice?

**Response:**
No.
I am informed by my attorney, Robert A. Meister, that he sent a copy of the 8/31/08 Notice to Judith Ellen Siegel-Baum, Cozen O'Connor PC, 277 Park Avenue, New York, New York 10172, telephone (212) 883-4902, who is counsel for Orly, by letter emailed and mailed on June 1, 2009.

**Interrogatory No. 13:**
If Your answer to Interrogatory No. 12 is anything other than an unqualified "no", state the date and time that You informed Orly of the Sale Notice, how You informed Orly of the Sale Notice (e.g., by hand, Fedex, e-mail, etc.), and the substance of that communication. In addition, identify all documents concerning each communication.

**Response:**
I am informed by my attorney, Robert A. Meister, that he sent a copy of the 8/31/08 Notice to Judith Ellen Siegel-Baum, Cozen O'Connor PC, 277 Park Avenue, New York, New York 10172, telephone (212) 883-4902, who is counsel for Orly, by letter emailed and mailed on June 1, 2009.

**Interrogatory No. 14:**
Identify each Document or Communication between You and each of the following persons concerning the Sale Notice:
(a) Arie Genger
(b) Sagi
(c) Orly

6

(d) Fang
(e) Rochelle Fang
(f) David Parnes
(g) Alan Sash or any other person at McLaughlin & Stern LLP

**Response:**
I do not remember any such communication with the above listed individuals except Sagi Genger.

I remember discussing the Sale Notice in person with Sagi Genger, and while I do not remember the exact date, it was before the date of the sale.  No one else was present.
I am informed by my attorney, Robert A. Meister, that in late May, 2009, he ask Sagi Genger for copies of documents relating to the foreclosure and that he then received an email with the Sale Notice from David Parnes, Esq. on May 19, 2009.
I am informed by my attorney, Robert A. Meister, that he sent a copy of the Sale Notice to Judith Ellen Siegel-Baum, Cozen O'Connor PC, 277 Park Avenue, New York, New York 10172, telephone (212) 883-4902, who is counsel for Orly, by letter emailed and mailed on June 1, 2009.

**Interrogatory No. 15:**
State the date and time You became aware of the D&K Agreement, identify the person(s) who informed You of the D&K Agreement's existence and the substance of that communication. In addition, identify all documents concerning each communication.

**Response:**
I do not remember.

**Interrogatory No. 16:**
Did You inform Orly of the D&K Agreement?

**Response:**
No.

**Interrogatory No. 17:**

If Your answer to Interrogatory No. 16 is anything other than an unqualified "no", state the date and time that You informed Orly of the D&K Agreement, how You informed Orly of the D&K Agreement (e.g., by hand, Fedex, e-mail, etc.), and the substance of that communication. In addition, identify all documents concerning each communication.

**Response:**
Not Applicable

**Interrogatory No. 18:**

Identify each Document or Communication between You and each of the following persons concerning the D&K Agreement:

(a) Arie Genger
(b) Sagi
(c) Orly
(d) Fang
(e) Rochelle Fang
(f) David Parnes
(g) Alan Sash or any other person at McLaughlin & Stern LLP

**Response:**
I do not remember any such communication with the above listed individuals.

**Interrogatory No. 19:**

Identify each person who asked You to execute the Meeting Agreement.

**Response:**
I do not remember anyone asking me.

**Interrogatory No. 20:**

Identify each person who negotiated the Meeting Agreement.

**Response:**
I do not remember any negotiation.

8

**Interrogatory No. 21:**
Identify each person who drafted the Meeting Agreement.

**Response:**
I didn't and I do not know who did.

**Interrogatory No. 22:**
Identify each draft of the Meeting Agreement.

**Response:**
I do not remember any drafts of the Meeting Agreement.

**Interrogatory No. 23:**
State what consideration, if any, You received in exchange for executing the Meeting Agreement.

**Response:**
None.

**Interrogatory No. 24:**
State what consideration, if any, the Orly Trust received in exchange for executing the Meeting Agreement.

**Response:**
D&K's agreement to forebear for a time from enforcing the D&K Note, which the Trust had guaranteed.

**Interrogatory No. 25:**
Did You inform Orly about the Meeting Agreement?

**Response:**
No.

9