**Interrogatory No. 26:**
If Your answer to Interrogatory No. 25 is anything other than an unqualified "no", state the date and time that You informed Orly of the Meeting Agreement, how You informed Orly about the Meeting Agreement, and the substance of that communication. In addition, identify all documents concerning each communication.

**Response:**
Not Applicable

**Interrogatory No. 27:**
Identify each Document or Communication between You and each of the following persons concerning the Meeting Agreement:
(a) Arie Genger
(b) Sagi
(c) Orly
(d) Fang
(e) Rochelle Fang
(f) David Parnes
(g) Alan Sash or any other person at McLaughlin & Stern LLP

**Response:**
I do not remember any such communication with the above listed individuals except Sagi Genger.

I remember discussing the Meeting Agreement in person with Sagi Genger; I do not remember the exact date.  No one else was present.

**Interrogatory No. 28:**
State each director or officer position You hold or held within TPR, including the start and end dates of each position.

**Response:**
I was but no longer am Vice President and Director of TPR.
I began holding those positions in about October, 2004.
I resigned both positions December 17, 2007.

10

**Interrogatory No. 29:**
State the length of Your tenure(s) as a member of TPR's board of directors, including the start and end date(s).

**Response:**
Starting approximately October 2004 until I resigned December 17, 2007.

**Interrogatory No. 30:**
State each transfer, pledge, and/or sale of Your shares of TPR, including in Your answer: the date of each transfer, pledge, or sale; the recipient of the TPR shares; the number of shares transferred, pledged or sold; and the consideration for each transfer, pledge, or sale.

**Response:**
On December 17, 2007, I sold 250 shares of the common stock of TPR to TPR for its $5 million Note.

**Interrogatory No. 31:**
Identify each computer You have owned or leased from December 1993 to the present, including each computer's present location and the date a Litigation Hold was placed over this computer.

**Response:**
I own a Toshiba Qosmio serial number 668691189G, which I acquired several years ago, the exact date for which I do not recall, but it certainly was before 2008.

Prior to that time I had a SONY computer, but I do not remember its model or serial number, and when it broke I threw it out and I acquired the Toshiba.

At the end of 2011 or the beginning of 2012 I purchase another Toshiba Qosmio computer Serial 3B110110W that I had originally intended to give to someone else, but did not, and which I use on rare occassion.

I had no normal process to dispose of documents or records.

11

**Interrogatory No. 32:**
Identify each server or external electronic storage device (e.g. external hard drive, CD Rom, and flashdrive) You have owned or leased from December 1993 to the present, including each device's present location and the date a Litigation Hold was placed on this device.

**Response:**
I had none.

**Interrogatory No. 33:**
State each email address You have used from December 1993 to the present.

**Response:**
I used the following email addresses:
dgenger@tprinvestments.com;
dalia1946@live.com;  and
dgenger@1211park.com.

**Interrogatory No. 34:**
Identify each person who provided information in responding to these Interrogatories, and for each person, identify the specific Interrogatory(ies) for which he or she provided information.

**Response:**
I provided the information used to respond to these Interrogatories.

As to answers:

*Dalia   Genger*
Dalia Genger

Sworn to before me this ___ day
of March, 2012

Notary Public

As to objections:
PEDOWITZ & MEISTER, LLP

By: _____
    Robert A. Meister
    1501 Broadway, Suite 800
    New York, New York 10036
    robert.meister@pedowizmeister.com
    marisa.warren@pedowitzmeister.com
    *Attorneys for Defendant Dalia Genger*

JAIANTIE DINDAYAL
Notary Public - State of New York
NO. 01DI6135350
Qualified in Queens County
My Commission Expires _____

12

*ORLY GENGER VS.*
*DALIA GENGER, et al*

---

*DALIA GENGER*
*April 19, 2013*

---



**Ellen Grauer**
**COURT REPORTING**
Co. LLC

**126 East 56th Street, Fifth Floor New York, New York 10022**
**PHONE: (212) 750-6434   FAX: (212) 750-1097**
**www.ELLENGRAUER.com**

*Original File 103555.TXT*
**Min-U-Script® with Word Index**

438

1   SUPREME COURT OF THE STATE OF NEW YORK

2   COUNTY OF NEW YORK
    ----------------------------------------x
3   ORLY GENGER, in her individual capacity
    And on behalf of the Orly Genger 1993
4   Trust (both in its individual capacity
    and on behalf of D & K Limited
5   Partnership),

6                           Plaintiff,

      -against-
7

8   DALIA GENGER, SAGI GENGER, LEAH FANG,
    D & K GP, LLC, and TPR INVESTMENT
9   ASSOCIATES, INC.,

10                          Defendants.

11  Index No.:  109749/09
    ----------------------------------------x
12

13                          575 Lexington Avenue
                            New York, New York
14
                            April 19, 2013
15                          10:29 a.m.

16

17          RESUMED deposition of DALIA GENGER,

18  Pursuant to Notice, before Charlene Anci, a

19  Notary Public of the State of New York.

20

21

22

23        ELLEN GRAUER COURT REPORTING CO. LLC
            126 East 56th Street, Fifth Floor
24              New York, New York   10022
                      212-750-6434
25                    Ref:   103555

```
 1    A P P E A R A N C E S:

 2

 3    ZEICHNER ELLMAN & KRAUSE, LLP

 4    Attorneys for Plaintiff

 5           575 Lexington Avenue

 6           New York, New York 10022

 7    BY:   YOAV GRIVER, ESQ.

 8           BRYAN D. LEINBACH, ESQ.

 9           PHONE     212-223-0400

10           FAX       212-826-5313

11           E-MAIL    ygriver@zeklaw.com

12

13    PEDOWITZ & MEISTER

14    Attorneys for Defendant Dalia Genger

15           1501 Broadway

16           New York, New York 10036

17    BY:   ROBERT A. MEISTER, ESQ.

18           PHONE     212-403-7330

19           FAX       212-354-6614

20           E-MAIL    robert.meister@pedowitzmeister.com

21

22

23

24    ALSO PRESENT:

25           Walter P. Stasiuk, Esq.
```

```
1                    DALIA GENGER
2    involving your shares of TPR, correct, in
3    interrogatory 30?
4              MR. MEISTER:  Are you asking her
5         what her response is to interrogatory 30?
6         A.    I don't remember.  Whatever I
7    responded that's what it is.
8         Q.    Well read it and tell me is that
9    response correct?
10        A.    Where on the response?
11             MR. MEISTER:   (Indicating).
12        A.    Yeah, it is correct.
13             MR. MEISTER:  Are you finished with
14        that?
15        Q.    So for the record, your response to
16   interrogatory 30 is, quote, "On December 17,
17   2007 I sold 250 shares of the common stock of
18   TPR to TPR for its $5 million note," unquote?
19        A.    Yeah --
20             MR. MEISTER:  Wait for the
21        question.
22             MR. GRIVER:  Let's have this marked
23        as Dalia 28.
24             (Dalia Exhibit 28, Assignment and
25        Assumption Agreement, was marked for
```

DALIA GENGER

1

2          identification.)

3          A.    What is this, I'm sorry?

4          Q.    Well, look at this.  This is an

5    agreement you entered into with Sagi Genger?

6          A.    Ya.

7          Q.    On or about August 1, 2008.

8          A.    On August, 2008.

9          Q.    That's correct.  That is your

10   signature on the last, on the third page of the

11   document that's been marked as Exhibit 28?

12         A.    Wait a second, where is my

13   signature?  I can't see.

14         Q.    Page three.  No, the page before.

15         A.    It says --

16         Q.    No, that's the exhibit, page before

17   that, third one.

18         A.    It's the second page.

19         Q.    And then the next page.

20         A.    Oh, okay.  Okay.

21         Q.    Is that your signature on the third

22   page?

23         A.    Yeah.

24         Q.    Okay.  Ms. Genger, this document

25   has you selling and assigning to Sagi Genger

```
1                        DALIA GENGER
2    the 220 shares of common stock of the company
3    in exchange for his assumption of the $5
4    million loan, do you see that?
5         A.    I'm reading it.  It's from 2008, I
6    can't remember.
7              MR. MEISTER:  Could you point out
8         where it is, sir, selling shares of
9         stocks to Sagi?
10             MR. GRIVER:  She's assigning the
11        note.  If you look at C and D on the
12        first page.
13             MR. MEISTER:  Yes.
14        A.    Can I read this?
15        Q.    Sure.
16        A.    Completely because, you know, 2008
17   I don't remember this.
18             MR. GRIVER:  She also might look,
19        Mr. Meister, at Paragraph 1, headed
20        "Assignment."
21             MR. MEISTER:  Right.
22        A.    Okay -- I can't concentrate.  I'm
23   sorry.  It's the assignor is me or Sagi?  I
24   don't know.  Assignor it means me and assignee
25   is Sagi?
```

```
1                        DALIA GENGER
2           Q.    If you look at the very top
3      paragraph, that is correct.
4           A.    Okay.
5                 MR. GRIVER:  Could you note the
6           time she's taking to read?
7           A.    It's not easy for me to read this,
8      okay?
9                 MR. LEINBACH:  It's fine.
10          A.    Obviously, it's a legal document.
11     Obviously, I did not --
12                MR. MEISTER:  Wait for a question.
13          Q.    Okay.
14                MR. MEISTER:  Is there a question?
15          Q.    Do you understand what this
16     amendment -- excuse me, do you understand what
17     this Assignment and Assumption Agreement does?
18          A.    I'm sure at the time when I signed
19     it I, I did understand it, but now I have to,
20     um -- refresh my memory, so --
21          Q.    Take as much time as you need to
22     read this document.
23          A.    Ya, but it's a legal document.
24     It's a little difficult for me, so.  Actually,
25     it is another thing like we had before, right?
```

```
 1              DALIA GENGER

 2              (Pause.)

 3              MR. MEISTER:  Well, then don't --

 4      A.    Okay.

 5      Q.    Having read the document --

 6      A.    Yeah.

 7      Q.    -- do you understand what it does?

 8      A.    What I understand now is that, ah,

 9   that I signed the, the shares, I guess 220

10   shares to, ah, um, to Sagi, I guess.

11              MR. MEISTER:  Objection, move to

12         strike when she says she guesses.

13      Q.    Had you rescinded the letter

14   agreement of December 17, 2007?

15              MR. MEISTER:  Would you show me

16         that, please, counselor?

17      A.    What is --

18              MR. MEISTER:  Wait a second, I'd

19         like to see his good faith -- no, just

20         wait a minute.  I'd like his good-faith

21         basis for that statement.

22              MR. GRIVER:  Okay, well --

23              MR. MEISTER:  I mean, it seems to

24         me Mr. Griver, this is despicable.

25         You're trying to confuse her.  This is an
```

| | |
|---|---|
| 1 | DALIA GENGER |
| 2 | agreement which talks about the sale and |
| 3 | transfer -- |
| 4 | MR. GRIVER:  I'm giving you an |
| 5 | answer, D, and you have speaking |
| 6 | objections, do them or we'll call the |
| 7 | court right now. |
| 8 | MR. MEISTER:  You want to call the |
| 9 | court right now? |
| 10 | MR. GRIVER:  I'm asking you right |
| 11 | now to follow the rules. |
| 12 | A.    I'm asking you what is -- |
| 13 | Q.    It's true that Sagi got 220 of TPR, |
| 14 | correct? |
| 15 | A.    I assigned to him, yeah. |
| 16 | Q.    Okay, and instead of TPR paying you |
| 17 | Sagi would pay you? |
| 18 | A.    It seems so. |
| 19 | Q.    Did you ever tell the attorneys |
| 20 | that were representing you as trustee of the |
| 21 | Orly Genger Trust before the Surrogate Court |
| 22 | that you had entered into this Assignment and |
| 23 | Assumption Agreement? |
| 24 | A.    I don't remember if I did it. |
| 25 | Q.    Now, you did tell the attorneys |

```
 1                  DALIA GENGER
 2   that were representing you that you were
 3   redeeming the shares back to TPR because they
 4   included that as part of your March affidavit?
 5          A.    You're talking about the
 6   previous --
 7          Q.    Talking about the March affidavit.
 8          A.    Yeah, the previous one, right?
 9          Q.    Right, right.
10          A.    The $5 million.
11          Q.    Right.
12          A.    Yeah.
13          Q.    Okay.  You told the Surrogate Court
14   that you were redeeming the shares back to TPR,
15   correct, that was also part of your --
16          A.    Yeah, it was true at the time,
17   yeah.
18          Q.    Okay.  Did you tell the Surrogate
19   Court about the Assignment and Assumption
20   Agreement that we've marked as Exhibit 28?
21          A.    I don't remember because really I'm
22   not, I don't go there.  My daughter goes to --
23          Q.    Did you tell your -- again, did you
24   tell your lawyer about the assignment of the
25   Assignment and Assumption Agreement so he could
```

```
 1                    DALIA GENGER
 2    tell the Surrogate Court?
 3          A.    I don't remember if I did.
 4          Q.    Okay.  Did you ever tell
 5    Mr. Meister about the Assignment and Assumption
 6    Agreement?
 7                MR. MEISTER:  Objection.
 8          A.    I don't --
 9                MR. MEISTER:  Attorney-client
10          privilege and instruct the witness not to
11          answer.
12          Q.    As in his representation of you as
13    the trustee of the Orly Genger Trust, did you
14    ever tell Mr. Meister about the Assignment and
15    Assumption Agreement we've marked as Exhibit
16    28?
17                MR. MEISTER:  Objection,
18          attorney/client privilege.  Instruct the
19          witness not to answer.
20          Q.    Ms. Genger, I will represent to you
21    that the Assignment and Assumption Agreement
22    that we've marked as Exhibit 28 was not
23    included in your document production in this
24    case.  May I ask you why not?
25          A.    Ask my lawyer.  I don't know why.
```

```
 1                    DALIA GENGER
 2        Q.    Okay.  Who looked for documents in
 3   this case, you or your lawyer?
 4        A.    I don't know.
 5        Q.    Well, who looked for documents?  Do
 6   you remember yourself looking for documents?
 7        A.    If he ask me to look I look, but --
 8        Q.    Did he ask you to look?
 9        A.    I don't remember.
10        Q.    Do you remember looking?
11        A.    I don't remember.
12        Q.    Do you remember Mr. Meister coming
13   over to your house or to your office and
14   looking for documents in response --
15        A.    I don't have an office.
16        Q.    Okay, do you remember him coming to
17   wherever you keep documents and collecting
18   documents, either he or someone else from his
19   law firm?
20        A.    No, I don't remember such a thing.
21        Q.    Okay.  Was a collection made by
22   anyone other than yourself or Mr. Meister or
23   someone from his office, for example, Sagi?
24             MR. MEISTER:  Could I have that
25        read back, please?
```

```
1                        DALIA GENGER
2           Q.    What was your answer?
3                 MR. MEISTER:  No, have it read back
4           because I didn't understand the question.
5                 (The requested portion of the
6           record was read back by the reporter.)
7                 MR. MEISTER:  Objection to the
8           form.
9           A.    If I collect -- somebody else came
10   to collect any documents?
11          Q.    Uh-huh.
12          A.    I don't remember.
13          Q.    So as we sit here today, you have
14   no idea if any documents were ever collected
15   from your --
16          A.    I don't remember.
17          Q.    -- files?
18          A.    If they were collected or not, or
19   by whom, who would have collected.
20          Q.    Okay.  Do you, do you recall ever
21   looking through your computer for responsive
22   information and documents?
23          A.    No.
24          Q.    Okay, now, according to your
25   amended responses you own a computer, correct?
```

```
1                     DALIA GENGER
2          A.    I do.
3          Q.    It's a Toshiba?
4          A.    Right.
5          Q.    Okay, did you ever look through
6     that in response to the document requests in
7     this case?
8          A.    No, I don't look.
9          Q.    Do you recall anyone looking
10    through your computer for documents in this
11    case?
12         A.    No.
13         Q.    Do you recall Mr. Meister, anyone
14    from his law firm?
15         A.    I don't recall such a thing.
16         Q.    Do you remember taking the computer
17    and providing it to Mr. Meister or someone from
18    his law firm in order to look to see if there
19    was a response to documentation?
20         A.    You mean did I schlep my computer
21    to his office?
22         Q.    Do you remember schlepping your
23    computer to his office?
24         A.    No.
25         Q.    Do you remember anyone from
```

DALIA GENGER

1
2  Mr. Meister schlepping themselves to your
3  computer?
4        A.    No, I don't remember such a thing.
5        Q.    Well, Ms. Genger, why is it in
6  response to interrogatories which you signed
7  under oath and for which you provided the
8  information, why is it that in response to
9  interrogatory number 30 you did not --
10        A.    Thirty?
11        Q.    -- identify the Assignment and
12  Assumption Agreement?
13        A.    Which document?
14        Q.    Interrogatory 30 of Exhibit 14 --
15  excuse me, Exhibit 3.  If you look at
16  interrogatory 30, which is part of Dalia
17  Exhibit 3.
18        A.    Yeah, so what you're talking, 30?
19        Q.    In interrogatory 30 you identified
20  the December 17, 2007 sale.  You did not
21  identify the cancellation of that sale through
22  the Assignment and Assumption Agreement?
23              MR. MEISTER:  Excuse me, I object
24        to the form of the question.
25              MR. GRIVER:  You have your

```
 1                       DALIA GENGER
 2               MR. MEISTER:  Could you --
 3          Q.   As we sit here today, Ms. Genger --
 4          A.   Yeah.
 5          Q.   -- do you consider this Assignment
 6     and Assumption Agreement to treat your son and
 7     your daughter equally?
 8               MR. MEISTER:  Same objections.
 9          A.   I don't know.  I really do not
10     know.
11          Q.   All right.  How many shares of TPR
12     did your son get from this Assignment and
13     Assumption Agreement?
14          A.   Whatever it says here.
15          Q.   Okay.  At that time did you, at
16     that time, okay, if you can look at D --
17               MR. GRIVER:  What was her last
18          answer?
19               (The requested portion of the
20          record was read back by the reporter.)
21          Q.   As trustee of the Orly Genger
22     Trust, did you let Orly know about the
23     Assignment and Assumption Agreement?
24          A.   I don't remember.
25          Q.   As trustee of the Orly Genger Trust
```

DALIA GENGER

1
2      did you let Orly's attorneys know about the
3      Assignment and Assumption Agreement when you --
4      on or about the time that you signed it?
5           A.    I really don't remember.
6           Q.    Okay.  At any time between August 1
7      of 2008 and the time that the Surrogate Court
8      rendered its decision, did you let either Orly
9      Genger or Orly Genger's attorneys know about
10     the Assignment and Assumption Agreement?
11          A.    I do not recall that.
12          Q.    Okay.  In part of any proceeding in
13     front of the Surrogate Court involving yourself
14     and Orly Genger and your fitness to act as
15     trustee of the Orly Genger Trust, have you let
16     the Surrogate Court know about this Assignment
17     and Assumption Agreement?
18                MR. MEISTER:  Objection, first on
19          the grounds of form, and secondly, on the
20          grounds this has nothing to do with the
21          issues in this case, so it's irrelevant.
22          The issues in this case --
23                MR. GRIVER:  Do we have to call the
24          court again?  You have your objection.
25                Could you repeat the question for

```
1                        DALIA GENGER
2              the witness?
3                   MR. MEISTER:  Aren't we being
4              macho.
5                   (The requested portion of the
6              record was read back by the reporter.)
7         A.    And I answer that I don't remember.
8         Q.    In assessing your fitness to be
9    trustee of the Orly Genger Trust, do you
10   believe that this Assignment and Assumption
11   Agreement is something that the Surrogate Court
12   should know about?
13                  MR. MEISTER:  Objection, relevance.
14             Objection, calls for speculation.
15             Objection, calls for a legal conclusion.
16        Q.    I'm asking for your opinion as
17   trustee of the Orly Genger Trust.  Do you think
18   this is something the Surrogate Court should
19   know about?
20        A.    I'm not a lawyer.  I don't know if
21   they should know.  I don't know.
22        Q.    Okay, have you provided this
23   document to any of your attorneys for their
24   legal opinion to be provided to you?
25        A.    I --
```

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

– – – – – – – – – – – – – – – – – – – – – – – – – – – – – – X

DALIA GENGER,

Index No. 302436/02

                         Plaintiff,

        -against-

**<u>STIPULATION</u>**

ARIE GENGER,

                        Defendant.

– – – – – – – – – – – – – – – – – – – – – – – – – – – – – – X

        Stipulation of Settlement ("Stipulation" or Agreement") made as of

October 26, 2004, by and between Dalia Genger (the "Wife"), residing at 210 East 65th

Street, Apt. 11J, New York, NY 10021, (Soc. Sec. No. 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), and Arie Genger

(the "Husband), residing at 2600 Island Blvd., Penthouse One, Williams Island,

Aventura, FL 33160, (Soc. Sec. No. 114-42-294).

                     W I T N E S S E T H:

        WHEREAS, the parties were duly married to each other on July 23, 1967

in a religious ceremony held in Israel; and

        WHEREAS, the children of the marriage, Sagi Genger and Orly Genger,

are all emancipated and there are no expected additional children of the marriage; and

        WHEREAS, the Wife has commenced the above-captioned action against

the Husband seeking a divorce (the "Divorce Action") and the parties desire to resolve

and settle all issues in that action except the entitlement of either party to a divorce; and

        WHEREAS, except as otherwise provided or reflected herein, it is the

intention of the parties that upon completion of implementation of this Agreement, each

party will have received distributions equal to approximately 50% of the aggregate value of the Husband and the Wife's net marital assets.

NOW THEREFORE, it is agreed as follows:

## ARTICLE I

## ARTICLE HEADINGS, RECITALS AND DRAFTING

1.      The headings at the beginning of each Article of this Agreement are for reference purposes only and shall not in any manner, constitute terms or conditions of this Agreement; nor shall they be applicable to any interpretation of the intention or meaning of the parties or of any part of this Agreement.

2.      The "Whereas" clauses at the beginning of this Agreement are an integral part of this Agreement and shall be considered in any interpretation of the intention or meaning of the parties or of any part of this Agreement.

3.      This Agreement is entered into after negotiation and comments by each party and by counsel for both parties.  The fact that the following have participated in the  drafting shall not be a consideration in the interpretation of this Agreement: Blank Rome LLP, David Parnes, Esq., Sonnenschein Nath & Rosenthal LLP, Carter Ledyard & Milburn LLP, Goldman & Greenbaum, P.C., and Philip Greenhaus, Esq.

1270083.3
1745188NY-2

# ARTICLE II

## DISTRIBUTION OF ASSETS

1. The parties' marital property shall be divided and disposed of as is set forth in this Article and Articles III and IV, with the exception of the parties' debts and other obligations to third parties (provisions for which are set forth in Article V). Schedule II(1), annexed hereto and made part hereof, sets forth an itemized list of all of the marital property of the Husband and the Wife, as of January 31, 2002 and as of the date of this Agreement with the values as of the dates indicated on such Schedule. The Husband and the Wife (to her knowledge) each represent to the other that such Schedule completely and correctly sets forth all such marital property as of such dates and to the best of each of his/her knowledge with the values of such property as of the dates indicated in such Schedule; the Husband and the Wife represent to the other party that he/she has no knowledge of any marital property not set forth on such Schedule.

2. <u>Distributions Upon Execution of this Agreement</u>.

(a)    *Cash and Other Distributions*.  The Husband and the Wife shall each receive concurrently with the execution of this Agreement certain distributions (for each party, the "Immediate Payment(s)"). The Immediate Payments will be made from cash accounts maintained in the Husband and Wife's joint or individual names, investments made jointly or individually, as well as from an escrow account maintained by Blank Rome LLP for the parties' benefit, with approximately $2,504,537.00 dollars ("BR Escrow"), as of the date of this Agreement, all as more fully detailed, and the sources of which specifically identified, in Schedule II(2)(a) annexed hereto and made

3

part hereof. The Husband's and the Wife's Immediate Payments, upon execution of this Agreement, shall be as follows:

> (i)    Husband:  The Husband shall receive (A) the sole
> ownership of all life insurance policies (set forth on Schedule
> II(2)(a)(i), annexed hereto and made part hereof) which as of January
> 15, 2004 had an aggregate cash surrender value of $2,447,782;
> provided, however, that (w) the life insurance policy (Equitable
> Single Life Split Dollar #150224782) in the face amount of
> $1,950,000 and with a cash surrender value to the Husband of
> $147,833 and with a total death benefit of $2,097,833 shall provide
> from the date hereof that the net death benefit payable to the Wife
> shall be at least $2,000,000, (x) if for any reason the total net death
> benefit payable to the Wife shall be less than $2,000,000 during the
> first year of this Agreement, the Husband shall immediately notify
> the Wife and deposit $50,000 in escrow with David A. Parnes, Esq.
> to be paid to the Wife upon the Husband's death prior to the first
> anniversary of this Agreement, (y) the amount of the net death
> benefit payable to the Wife may be reduced at every anniversary
> hereof by $200,000, and (z) the Husband has directly authorized the
> insurance broker to provide the Wife all information regarding such
> policy and hereby agrees not to revoke such authorization prior to
> the tenth anniversary hereof;  (B) all of the Husband and Wife's
> investment in Conservation Securities, which has an estimated value

4

of $2,128,000;  (C) a cash distribution from several cash accounts, including the BR Escrow, of $1,345,000; and (D) 79,045 shares of common stock of Lumenis Ltd.  ("Lumenis") held in certain retirement accounts.

(ii)     <u>Wife</u>:  The Wife shall receive (A) sole ownership of the Husband's two hundred and fifty (250) shares of common stock of TPR Investment Associates Inc. ("TPR"), free and clear of any liens or other encumbrances initially valued as set forth on Schedule II(1), annexed hereto and made part hereof, which represents fifty one percent (51%) of the issued and outstanding shares of common stock of TPR (exclusive of the 1.96% ownership of TPR which the Wife owns indirectly through her general partnership interest in D&K defined below), together with a duly executed stock power transferring said shares to the Wife and all documents in the Husband's possession, custody or control relating to TPR, including the adjusted tax basis thereof, (accordingly, the marital asset consists of 52.96% of the outstanding shares of common stock of TPR (the "Marital TPR Percentage") and (B) a cash distribution from several cash accounts, including the BR Escrow, of $1,345,000.

(b) *Marketable Securities*.  All securities in the Smith Barney account referenced as Item F. 1 on Schedule II(1) will, to the extent possible, be divided between

I270083.3
I7451888bV-2

the Husband and the Wife in kind, so that the Husband and the Wife shall each have sole ownership of fifty percent (50%) of such securities.

(c) *Retirement Accounts.* With the exception of 79,045 shares of common stock of Lumenis allocated to the Husband from various IRA accounts per paragraph (a) above, all IRA accounts, pension plans, retirement accounts and the like (the "Pension Accounts"), whether in the name of the Husband or in the name of the Wife, shall be divided equally as follows: each party shall cause fifty percent (50%) of the amount accrued and existing in each Pension Account of such party, to be transferred to the other party and shall use his reasonable best efforts to cause such transfer to be made to a Pension Account of the other party, as more fully described in Article IV of this Agreement.

(d) *Disposition of TRI Stock.* See Article II(9)(b) below.

3.    Residual Cash.  To the extent not distributed pursuant to Section 2 of this Article II, any cash available at the time of execution of this Agreement, and at any time thereafter until distribution thereof ("Residual Cash"), shall be placed in escrow ("RC Escrow Account") with David A. Parnes, Esq., ("RC Escrow Agent") or with any other individual or entity designated for such purpose by Sagi Genger (and if Sagi Genger does not promptly make such designation, Orly Genger) pursuant to an Escrow Agreement substantially in the form of Exhibit II(3), annexed hereto.

4.    Non-Liquid Assets.

(a)    All of the parties' other marital assets which are not distributed pursuant to Section 2 of this Article II, including, but not limited to, personal and real property, and securities and investment accounts that cannot be divided in kind (the "Non

1270083.3
f7548b84RV-2

Liquid Assets"), shall be sold as promptly as practicable on terms determined by agreement of the parties; provided, however, that if the parties cannot agree on such terms within six (6) months of the date of execution of this Agreement (the "Initial Period"), the Husband and the Wife agree that thereafter authority and control over any then unsold Non Liquid Assets as to which the terms of sale have not been agreed on by the parties shall be vested in Sagi Genger pursuant to a power of attorney substantially in the form of Exhibit II(4)(a) (the "P/A"). Sagi Genger shall have full and complete authority to sell any and all Non-Liquid Assets at such prices and upon such terms and to distribute the proceeds of such sales as he, in his sole discretion, sees fit, subject however to paragraph (b) of this Section 4 of this Article II below, the terms of the P/A and his fiduciary duties to effectuate the intent of the parties in entering into this Agreement. Concurrently with the execution of this Agreement, each of the parties will execute the P/A and deliver it to Sagi Genger. After the Initial Period and during such time as there exist any unsold Non-Liquid Assets as to which the parties have not agreed on sale terms during the Initial Period, each of the parties will promptly execute and deliver to Sagi Genger any and all additional documents requested by Sagi Genger to effectuate the provisions of this paragraph (a) of this Section 4. At any time, the Husband and the Wife may mutually revoke the authority and control vested in Sagi Genger over such Non-Liquid Assets by providing him with written notice signed by the Husband and the Wife to that effect ("Revocation Notice"), in which case Sagi Genger will immediately surrender the P/A, the other documents and the Non Liquid Assets, to a party designated in the written notice by the Husband and the Wife in his stead (the "Successor Attorney in Fact"). If no Successor Attorney in Fact is designated in the Revocation Notice, David

1270083.3
1745148RV-2

A. Parnes, Esq. is designated as Successor Attorney in Fact. If Mr. Parnes is unwilling to act in such capacity or the parties revoke the authority and control vested in him by providing him with written notice signed by both of them to that effect and fail to designate a Successor Attorney in Fact in such notice, Eric Gribetz is designated as Successor Attorney in Fact. If Mr. Gribetz is unwilling to act in such capacity or the parties revoke the authority and control vested in him by providing him with written notice signed by both of them to that effect and fail to designate a Successor Attorney in Fact in such notice, Orly Genger is designated as Successor Attorney in Fact. If Sagi Genger is unable to act and the Husband and Wife do not promptly send the Revocation Notice, then Elana Genger (the spouse of Sagi Genger) together with either the Husband or the Wife may send the Revocation Notice to Sagi Genger, and in such event David A. Parnes, Esq. shall be designated as Successor Attorney-in-Fact.

(b)      The net proceeds of the sales of the Non-Liquid Assets, whether effectuated within the Initial Period or thereafter, shall be distributed as follows: (i) such amount as would be required to cause the balance in the RC Escrow Amount to equal Twenty Five Thousand dollars ($25,000) ("Basic Escrow Amount") to the RC Escrow Account; and (ii) all amounts in excess of the Basic Escrow Amount to TPR in satisfaction of the parties' indebtedness to TPR as set forth in Article V hereof. Upon payment in full of such indebtedness to TPR, subject to the provisions of this Article II, Sagi Genger (or a Successor Attorney in Fact) shall, subject to his fiduciary duties to effectuate the intent of the parties in entering into this Agreement, have the complete authority, in his sole discretion, to determine the equitable distribution of the remaining net proceeds of the sales of the Non-Liquid Assets, whether to the Husband, the Wife or

1270083.3
1745188RV-2

to the RC Escrow Account.  The Husband and the Wife shall each be obligated to pay any Federal, state or local taxes due by them upon the sale of the Non-Liquid Assets.

5.    First Anniversary Distributions.  Within twenty (20) days of the first anniversary of this Agreement ("First Anniversary"), Sagi Genger (or a Successor Attorney in Fact) will provide the Husband and the Wife with a reasonably detailed written summary of the proceeds of the sale of the assets, and the distributions received by each party or deposited into the RC Escrow Account and any related expenses from and including the date of execution of this Agreement through the First Anniversary.  The parties agree that, should there be an imbalance in the distributions received by either party ("Imbalance") in favor of either the Husband or the Wife (the "Overpaid Party") Sagi Genger will cause the RC Escrow Agent to pay to the other party ("Underpaid Party") promptly a sum in cash equal to the Imbalance.  In determining any Imbalance with regard to the assets of TPR, the parties will adjust the value attributed to the assets of TPR, as set forth on Schedule III(1) annexed hereto and made a part hereof, based on the net proceeds from the sales of such assets from the execution of this Agreement through the First Anniversary.

6.    Second Anniversary Distributions.

(a)    Within twenty (20) days of the second anniversary of this Agreement ("Second Anniversary"), Sagi Genger (or a Successor Attorney in Fact) will provide the Husband and the Wife with a reasonably detailed written cumulative summary of the proceeds of sale or the Assets, and the distributions received by each party from and including the date of this Agreement through the Second Anniversary or deposited in the RC Escrow Account and any related expenses.  Should an Imbalance

9

exist, at the election of Sagi Genger (or a Successor Attorney in Fact), either (i) the Overpaid Party shall promptly pay the Underpaid Party a portion of such Imbalance in cash, as instructed by Sagi Genger and/or (ii) Sagi Genger shall instruct the RC Escrow Agent to distribute the balance of the RC Escrow Account, in each case, to redress the Imbalance as of the Second Anniversary.  With regard to TPR, the parties will adjust the value attributed to the assets of TPR, as set forth on Schedule II(1) annexed hereto and made a part hereof, based on the net proceeds from the sales of such assets from the execution of this Agreement through the Second Anniversary.

(b)     Any Non-Liquid Asset that has not been sold by the Second Anniversary shall be valued and distributed as the Husband and the Wife mutually agree. If there are any assets as to which such agreement has not been reached (the "Remaining Assets") by the 45th day after the Second Anniversary, the Husband and the Wife agree to purchase from, or to sell to, the other party the Remaining Assets, in accordance with the following procedure:

(i) a coin will be tossed in the air, by Orly Genger or in her absence by a person mutually acceptable to the Husband and the Wife;

(ii) the Husband will be designated as "Head" (i.e. – the side of the coin where the profile of a person is impressed) and the Wife will be designated as "Tail" (i.e. – the other side of the coin);

(iii) if the Head side of the coin shall lay face up, the Husband will become the Evaluating Party for the first Remaining Asset selected by the person tossing the coin, and if the Tail side of the coin shall lay face up, the Wife shall become the

1270083.3
f7548b84056fb64b-2

Evaluating Party for the first Remaining Asset selected by the person tossing the coin;

(iv) the Evaluating Party shall value and indicate in writing by five business days following the coin toss to the other party, the sum at which he or she values such Remaining Asset ("Evaluated RA Value");

(v) by the fifth business day following receipt of the Evaluated RA Value from the Evaluating Party ("Determination Date"), the other party shall notify the Evaluating Party in writing whether he or she intends to acquire from, or to sell to, the Evaluating Party his or her fifty percent (50%) interest in such Remaining Asset, in which case the other party shall either remit to the Evaluating Party fifty percent (50%) of the Evaluated RA Value or receive from the Evaluating Party fifty percent (50%) of the Evaluated RA Value in cash, within thirty (30) business days following the Determination Date, against receipt of such Remaining Asset. If the Evaluating Party does not deliver to the other party the Evaluated RA Value within 30 days of the Determination Date, the other party shall be entitled to take the Remaining Asset in question free of any payment or obligation.

In the event that there is more than one Remaining Asset, the party who was not the Evaluating Party for the prior Remaining Asset, shall be entitled to select the next Remaining Asset to be evaluated and shall be the Evaluating Party for such Remaining Asset and the procedures in paragraphs (iv) and (v) above shall be followed. The parties shall thereafter alternate selection of the Remaining Asset for evaluation and acting as Evaluating Party as provided above, until all Remaining Assets have been evaluated and disposed of, as provided above.

7.   Notwithstanding anything to the contrary contained herein, with a view to avoid the need for direct payments between the Husband and the Wife, when distributing proceeds from the sales of Non-Liquid Assets from time to time, Sagi Genger (or a Successor Attorney in Fact) will take into consideration anticipated changes caused by the sales of assets of TPR.

8.   (a)   Sagi Genger shall be entitled, in his sole discretion and subject to his fiduciary duty to implement the intent of the parties, to incur reasonable expenses necessary for the maintenance of the marital property (with the exception of the apartment (the "Apartment") at 2600 Island Boulevard, Penthouse One, Williams Island, Aventura, Florida 33160), where all maintenance and other ordinary monthly expenses (including, without limitation, taxes and insurance) shall be borne solely by the Husband, in accordance with paragraph (b) below), the expenses of selling the Non-Liquid Assets and other related activities, and to pay such expenses from the RC Escrow Account.

(b)   Concurrently with the execution of this Agreement, the Wife hereby acknowledges the Husband's sole occupation and use of the Apartment until such time as the apartment is sold. The Husband will assume and promptly pay all maintenance and other ordinary monthly expenses incurred in connection with the Apartment until the time of sale of Apartment. The Husband and the Wife agree to cooperate in the sale of the Apartment during the Initial Period and to cooperate and not to interfere in any way with the sale of the Apartment by Sagi Genger (or a Successor Attorney in Fact) as part of the sale of the Non-Liquid Assets, after the Initial Period.

9.   (a) TPR owns three thousand (3,000) shares of common stock in Trans - Resources, Inc. ("TRI Stock"). The Husband represents and warrants to the Wife that the

12

TRI Stock represents 52.85% of the issued and outstanding shares of common stock of TRI, and that the balance of 47.15% of the common stock of TRI is owned beneficially and of record, pursuant to an arm's length transaction with TRI, by (i) Glencova Investment Co., and (ii) TR Investors LLC, subject to a Shareholders Agreement, dated as of March 30, 2001, a complete and correct copy of which has been delivered to the Wife (the "TRI Shareholders Agreement"). The Husband further represents and warrants to Wife that he has no interest in Glencova Investment Co. or in TR Investors LLC and except for the options provided to Bank Hapoalim B.M. (a copy of the agreement granting an option to Bank Hapoalim has been delivered to the Wife), there exist no other direct or indirect ownership interests in TRI, whether by way of issuance of additional shares of any other class of stock, share options, warrants, convertible debt or the like and there is no agreement or understanding among the parties to the TRI Shareholders Agreement except as provided therein. Except for the Consent of TPR, the Husband further represents and warrants that no consent, approval or similar action of any person is required in connection with the transfer of TRI Stock as contemplated hereby and that such transfer will not conflict with any agreement to which the Husband is party or by which he is bound. The Husband further represents and warrants to the Wife that TRI equity may reasonably be considered to be a distressed private security. Concurrently with the execution of this Agreement, the TRI Stock shall be distributed as follows:

(i)     The Husband will receive 794.40 shares of the TRI Stock representing 13.99468% of the common stock of TRI;

(ii)    Each of Sagi Genger and Orly Genger, will receive in trust 1,102.80 shares of the TRI Stock representing 19.42766% of the common stock of

·13

TRI for each of Sagi and Orly and such trusts will simultaneously therewith execute and deliver irrevocable proxies to Husband for all of the TRI stock owned by the trusts; and

(c)      Concurrently with the execution of this Agreement, each of the Husband and Wife will execute and deliver or cause TPR to execute and deliver (i) all documents reasonably necessary to effect the transfers required by subparagraph (a) of this Section 9, and (ii) duly executed stock powers to transfer the shares as required by subparagraph (a) of this Section 9.

(d)      The parties will cause TRI to provide the Husband, Sagi Genger and Orly Genger with all documents in TRI's possession, custody and control relating to the adjusted tax basis of the TRI Stock.

(e)      Following the foregoing transfers of the TRI Stock, the Wife will have no ownership interest in TRI.

10.    <u>Lumenis Stock Options</u>.  The Husband is the owner of 1,400,000 stock options to purchase shares of Lumenis common stock ("Options") as set forth on Schedule II(10) annexed hereto and made part hereof, of which (i) 100,000 Options were granted to the Husband after the Commencement Date, (ii) prior to the Commencement Date the Husband transferred the economic interest in 250,000 Options to a third party (the options specified in (i) and (ii) are not marital property, and (iii) 1,050,000 options which are marital property (hereinafter referred to "Marital Options"); such Schedule II(10) will include the exercise prices of the Options.

(a)      The parties agree that the Wife shall be the beneficial owner of and receive the economic benefits of 525,000 Options as set forth on Schedule 11(10),

J270083.3
17-51618-V-2

representing 50% of Marital Options hereinafter referred to as the "Wife's Options"); the remaining 525,000 Marital Options are referred to herein as the "Husband's Options." Pursuant to the Options' governing documents, the Husband is not allowed to transfer any of the Options. Accordingly, the Wife can not receive an actual transfer or assignment of the Wife's Options and the Wife has no claim directly or indirectly against Lumenis with respect to the Wife's Options.

(b)   The Husband agrees to notify Lumenis of the exercise of Wife's Options, at her written direction, as promptly as practicable and no later then the fifth (5th) business day following the date on which the Husband shall receive "actual notice" (as defined below) in writing from the Wife requesting the exercise, provided that the Wife simultaneously with such notice remits payment of the appropriate exercise price by wire transfer to the Husband or, if directed by the Husband, directly to Lumenis, with respect to those of the Wife's Options that she wishes to exercise, and, further provided that there are no legal impediments to such exercise, including, without limitation, any restrictions as set forth in the applicable agreements covering such Options, any "blackout periods" imposed by Lumenis on its officers and directors, or restrictions under the Federal Securities Laws or the rules and regulations of any applicable stock exchange. "Actual notice" shall mean the Husband's actual receipt of the written notice, which shall include the number of Wife's Options of each Class of Options she directs him to exercise, and, if required, appropriate payment from the Wife. In addition, the Wife also agrees to give written notice of any exercise of the Wife's Options to the person then designated to receive copies of notices to the Husband (see Article XX) concurrently with any notice to the Husband. The Husband shall not be liable with regard to any diminution in value or

15

1270083.3
17431888/V-2

divestiture of option rights between the Wife's sending of notice and either (x) the
Husband's receipt of the same and (y) the Husband's exercise of the Wife's Options on
the Wife's behalf, provided that the Husband provides actual notice to Lumenis as
promptly as practicable and no later than the 3rd business day following his receipt of
notice from the Wife  Upon any exercise of the Wife's Options, the Husband will deliver
or cause to be delivered to the Wife the shares of Lumenis stock received upon such
exercise as promptly as practicable.

(c)      The parties recognize the possibility that the Husband's interest in the
Options may terminate for reasons specified in applicable agreements or otherwise, and
the Husband may thereby lose his rights to the Options.  As long as the Wife's Options
are outstanding, the Husband will use his best efforts to maintain his rights to such
Options.  If there is nonetheless a forfeiture or loss of all or any portion of the Options
while Wife's Options remain outstanding, the Husband shall give the Wife notice of such
forfeiture or loss and the Husband and the Wife shall each sustain a fifty percent (50%)
share in the loss of his and her outstanding share in the Marital Options.

11.    (a)      It is the intention and agreement of the parties that, pursuant to the
provisions of Section 1041 of the Internal Revenue Code, the transfers and payments
between them pursuant to this Article are not taxable transactions to either party.
Moreover it is the intention and agreement of the parties that such transfers and payments
between them are not includible in the income of either the Wife or Husband pursuant to
Sections 61 or 71(a) of the Code, and shall not be deductible by either the Wife or
Husband pursuant to Section 215 of the Code.  Both parties further agree that they shall
not henceforth assert a position (in filing future tax returns) inconsistent with this

.16

Agreement or with this undertaking, and each will be liable to the other for damages, including taxes, penalties and interest, as well as reasonable attorneys' and accountants' and other professional fees, expenses and court costs, occasioned by breach of this covenant.

(b)    In the event that the tax assumptions set forth in paragraph (a) of this paragraph should ever prove to be incorrect, the relevant provisions of this Agreement will be modified by the parties so as to approximate as closely as possible the after-tax effects to the parties anticipated by paragraph (a).  If the parties have not so agreed within 30 days, one or both parties shall give notice of the failure to agree to Sagi Genger (or in his absence David A. Parnes, Esq.) who shall promptly appoint tax counsel in his discretion, subject to his fiduciary obligations to the parties, and such tax counsel shall have full authority to resolve the matter.

## ARTICLE III

## VALUATION OF TPR ASSETS FOLLOWING EXECUTION OF THIS AGREEMENT

1.  TPR has agreed, by resolutions of its Board of Directors (substantially in the form attached hereto as Exhibit III(1)), to be bound by the provisions of this Article III and the other provisions that contemplate action by it, and will cooperate with the Husband and the Wife in order to fulfill the provisions hereof.

**A FUNDAMENTAL PART OF THIS AGREEMENT IS THE HUSBAND'S RELINQUISHMENT OF HIS OWNERSHIP OF SHARES OF COMMON STOCK IN TPR, AND THE TRANSFER OF SUCH OWNERSHIP TO THE WIFE.  THE PARTIES ARE UNABLE TO DETERMINE THE PRECISE VALUE OF TPR UPON EXECUTION OF THIS AGREEMENT AND ARE RELYING AT THE TIME OF EXECUTION OF THIS AGREEMENT ON TPR'S BOOK VALUE, AS SET FORTH ON SCHEDULE III(1).**

17

I270083.3
I7451828IV-2

2. The parties agree that the assets of TPR as listed on Schedule III(1) are divided into three (3) categories;

      (i) Cash and marketable securities, designated as (Category A) on Schedule III(1).

      (ii) Assets valued designated as (Category B) on Schedule III(1).

      (iii) Assets as to which neither party accepts the valuation, designated as (Category C) on Schedule III(1).

The parties accept the value of the assets in Category A as binding upon them (subject to updating due to the passage of time).

      (a)      The Husband represents to the Wife that TPR's total liabilities are no more than $10,000.

      (b)      TPR, by its Chief Executive Officer or Vice President, within one hundred twenty (120) days of the date of execution of this Agreement must notify the Husband, in writing, whether it accepts the value of the assets in Category B. Should TPR either (x) fail to notify its acceptance in writing or (y) express disagreement with the valuations of the assets in Category B, TPR will be obligated to sell the assets in its discretion, but subject to its duties to its shareholders, and the sales price will be definitive and binding upon the parties as the value of the assets in Category B.

      (c)      All of the assets in Category C will either be (x) sold or (y) appraised, by an appraiser selected by Sagi Genger or David A. Parnes, Esq., as determined by TPR in its discretion, but subject to its duties to its shareholders. The sale or appraised value of each asset will be definitive and binding upon the parties as the value of the assets in Category C.

1270083.3
1745188V-2

(d)      In the event that by the Second Anniversary there remains disagreement as to the valuation of assets in Category B, or if any assets in Category B or Category C have not been sold (the "Non Sold Assets"), the Husband and TPR agree to purchase or to sell, from or to, the other party such Non Sold Assets, in accordance with the following procedure:

(i) a coin will be tossed in the air, by Orly Genger or in her absence by a person mutually acceptable to the Husband and TPR;

(ii) the Husband will be designated as "Head" (i.e. – the side of the coin where the profile of a person is impressed) and TPR will be designated as "Tail" (i.e. – the other side of the coin);

(iii) if the Head side of the coin shall lay face up, the Husband will become the Evaluating Party for the first Non Sold Asset selected by the person tossing the coin, and if the Tail side of the coin shall lay face up, TPR shall become the Evaluating Party for the first Non Sold Asset selected by the person tossing the coin;

(iv) the Evaluating Party shall value and indicate in writing by the fifth business day following the coin toss to the other party,  the sum at which it values such Non Sold Asset ("Evaluated NSA Value");

(v) by the fifth business day, following receipt of the Evaluated NSA Value from the Evaluating Party ("TPR Determination Date"), the other party shall notify the Evaluating Party in writing whether it intends to acquire from, or to sell to, the Evaluating Party its part of such Non Sold Asset, in which case the other party shall either remit to the Evaluating Party its Obligated

1270083.3
17451666V-2

Share (as defined below) of the Evaluated NSA Value or receive from the Evaluating Party its Obligated Share of the Evaluated NSA Value, within 30 business days following the TPR Determination Date against receipt of such Non Sold Asset. If the Evaluating Party does not deliver to the other party the Evaluated NSA Value, within 30 days of the TPR Determination Date, the other party shall be entitled to take the Non Sold Asset in question free of any payment or obligation.

In the event that there is more than one Non Sold Asset, the party who was not the Evaluation Party for the prior Non Sold Asset shall be entitled to select the next Non Sold Asset to be evaluated and shall be the Evaluating Party for such Non Sold Asset; and the procedures in paragraphs (iv) and (v) above shall be followed. The parties shall thereafter alternate selection of the Non Sold Asset for evaluation and acting as Evaluating Party as provided above, until all Non Sold Assets have been evaluated. "Obligated Share" shall mean (a) for TPR, 26.48% and (b) for the Husband, 73.52%.

## ARTICLE IV

## PENSION RIGHTS

1.      The parties shall divide all of their IRA's and other retirement vehicles as provided in this Article and Article II. All such IRA's and retirement vehicles are included in Schedule II(1).

2. The Husband's IRA's and retirement vehicles included in Schedule II(1) contain 79,045 shares of Lumenis which were purchased after the commencement of the parties' divorce action; such shares shall be the Husband's separate property. The

1270083.3
17451868v-2

remainder of the assets contained in such IRA's, as of the date of execution of this

Agreement shall be divided into two equal portions and one of those portions will be

transferred by direct transfer into an IRA owned by the Wife as promptly as practicable

after the entry of the Judgment of Divorce.

3.    One half (1/2) of any other IRA's owned by either party, as of the

date of execution of this Agreement will be transferred to the other party by direct

transfer to an IRA owned by the other party as promptly as practicable after the entry of

the Judgment of Divorce.

4.    One-half (1/2) of the assets (other than Lumenis shares referred to

in paragraph IV(2) above) in each of the parties' other pension plans and retirement plans

(including but not limited to any plan qualified under § 401 of the Internal Revenue Code

to which Section 401(a)(11)(B) of the Code or Section 205(b) (1) of ERISA shall apply)

(hereafter a "Qualified Plan") shall be transferred to the other party pursuant to a

Qualified Domestic Relations Order ("QDRO") as promptly as practicable and in any

event within ninety (90) days after service by one party or the other of notice of entry of a

judgment of divorce between the parties.  With respect to the portion of the electing

party's Qualified Plans as described in this paragraph 4 which the electing party is to

retain, the other party consents to the electing party's current and future designation of

beneficiaries under any of such Qualified Plans other than the consenting party (and to

any and all revocations and/or modifications of such designations), including any of such

plans referred to in Section 401(a)(11)(B)(iii) of the Code or Section 205(b)(1)(C) of

ERISA.

21

5.      Except as is specifically provided to the contrary in the prior
provisions of this Article and Article II, each party forever waives any interest that he or
she may have to any IRA, Keogh plan, pension plan, profit sharing plan, 401(k) plan,
individual retirement plan, employee stock ownership plan or stock bonuses or other
employee benefit or other retirement plan of any description whatsoever (including,
without limitation, any life insurance benefits contained therein), in the future held in the
other's name or associated with any employer of the other or with any entity owned, now
or previously, by the other.

6.      Each party has simultaneously executed and delivered to the other
(and in the future will, without further consideration or remuneration, promptly execute
and deliver to the other) all documents that are presented to him or her and that are
reasonably required in order to effectuate the intentions and provisions of this Article.

## ARTICLE V

## RESPONSIBILITY FOR DEBTS

1.      Except for certain obligations (provisions for which are set forth in
paragraph 3 of this Article), the Wife represents that she has not heretofore incurred or
contracted, or caused to be incurred or contracted, for herself, any debt, charge,
obligations or liability whatsoever (contingent or otherwise) for which the Husband or his
estate is or may become liable.  The Wife shall not hereafter incur or contract or cause to
be incurred or contracted any debt, charge, obligation or liability whatsoever, for
necessaries or otherwise, upon the credit of the Husband for which the Husband or his
estate may become liable.  Except as provided otherwise in paragraph 3 of this Article,
the Wife shall satisfy and shall indemnify the Husband against all debts, charges,

22

1270083.3
1745188RV-2

obligations or liabilities of every kind and nature whatsoever (including reasonable fees of attorneys and other professionals and costs of litigation) which were heretofore or may hereafter be incurred or contracted solely by her.

2.    Except for certain obligations (provisions for which are set forth in paragraph 3 of this Article), the Husband represents that he has not heretofore incurred or contracted, or caused to be incurred or contracted, for himself, any debt, charge, obligations or liability whatsoever (contingent or otherwise) for which the Wife or her estate is or may become liable. The Husband shall not hereafter incur or contract or cause to be incurred or contracted any debt, charge, obligation or liability whatsoever, for necessaries or otherwise, upon the credit of the Wife for which the Wife or her estate may become liable. Except as provided otherwise in paragraph 3 of this Article, the Husband shall satisfy and shall indemnify the Wife against all debts, charges, obligations or liabilities of every kind and nature whatsoever (including reasonable fees of attorneys and other professionals and costs of litigation) which were heretofore or may hereafter be incurred or contracted solely by him.

3.    (a) The Husband shall indemnify, defend, and hold harmless the Wife, from and against 100% of any and all liabilities, damages, claims, actions, losses, settlements, penalties, judgments or obligations, (each a "Claim") including her reasonable counsel and other professional fees, expenses and costs, including but not limited to or arising from, existing, threatened and/or future actions, or proceedings naming the Wife (either solely or jointly with other parties) as a party, arising out of, or due to, events that occurred on or before the date of this Agreement. In addition, the Husband shall indemnify, defend and hold harmless the Wife from and against 100% of

any and all Claims which arise by reason of any transaction made hereunder between the Wife or any affiliate of the Wife and any third party without sufficient consideration.

(b) (i)  The Husband shall indemnify, defend, and hold harmless the Wife, from and against 100% of the Marital TPR Percentage of any and all Claims, including her reasonable counsel and other professional fees, expenses and costs (except as otherwise specified in sub-paragraph (ii) below), naming TPR as a party arising out of, or due to, events that occurred on or before the date of this Agreement.

(ii)    The Husband shall indemnify, defend, and hold harmless the Wife, from and against 50% of the Marital TPR Percentage of any and all existing or threatened Claims, including her reasonable counsel and other professional fees, expenses and costs arising from the action against TRI pending in Louisiana and Mississippi referred to as the Bogalusa Litigation.  Schedule V(3)(ii) attached to this Agreement contains an update of the status of the Bogalusa litigation.  Husband represents and warrants to Wife that to the best of his knowledge there is no other Claim naming TPR as a party, arising out of, or due to, events that occurred on or before the date of this Agreement.

(c) Husband further represents and warrants to Wife she has no liability with respect to the promissory note, dated December 31, 2001 made by the Husband in favor of Sash A. Spencer in the principal amount of one hundred twenty thousand dollars ($120,274.20), a copy of which is annexed hereto as Exhibit V(3)(c) .  In any event, the Husband shall indemnify, defend, and hold harmless the Wife from and against 100% of any and all liabilities, damages, claims, actions, losses, settlements, penalties, judgments

24

or obligations, including her reasonable counsel and other professional fees, expenses and costs in connection with such note.

4.      The Husband or the Wife may each, prior to the Second Anniversary, submit a request to an Arbitrator (as such term is defined Article XIII, and upon the terms detailed therein), with notice to the other party, to prevent distribution to the indemnifying party, by Sagi Genger (or his successor Attorney in Fact) of Non Liquid Assets, and Arbitrator shall be entitled to prevent the distribution of Non Liquid Assets to the indemnifying party provided Arbitrator has reasonable grounds to believe that on the preponderance of evidence submitted to him by the parties (i) an actual liability exists, and (ii) the indemnifying party has not provided reasonably satisfactory assurances that assets are available to cover such liability pursuant to indemnities made hereunder. The Arbitrator may order the non-distribution of Non Liquid Assets to the indemnifying party only in the amount and to the extent necessary to cover the Arbitrator's expected value of such liability; a notice to that effect will be promptly delivered to Sagi Genger (or to his successor Attorney in Fact).

5.  Concurrently with the execution of this Agreement, the Husband and the Wife shall each assume two percent (2%) of the amount due (as of the date hereof, approximately $9,880,000, inclusive of interest) under the promissory note to TPR, dated December 21, 1993, in the original principal amount of $8,950,000 made by D&K Limited Partnership ("D&K") of which the Wife is general partner (the "D&K Note"). A copy of the D&K Note, together with the form of the Instrument of Assumption by Husband and Wife and the Acknowledgment and Consent by TPR is annexed hereto as

1270083.3
1754188W-2

Exhibit V(5). The Husband's and the Wife's aggregate liability of four percent (4%) represents the entire marital obligation and indebtedness under the D&K Note.

6. Concurrently with the execution of this Agreement, each of the parties will assume one half (1/2) of the liability under certain promissory notes (the "TPR Notes") made by the Husband in favor of TPR in the aggregate amount including outstanding principal and interest of $920,143.36 as of the date of this Agreement. Husband represents and warrants that as of the date of this Agreement the TPR Notes are legal, valid and binding obligations of Husband. Copies of the TPR Notes, together with the form of the Instrument of Assumption by Husband and Wife and the Acknowledgment and Consent by TPR are annexed hereto as Exhibit V(6).

7. Concurrently with the execution of this Agreement, the Husband will forgive all obligations owed to him by D&K in the aggregate amount including outstanding principal and interest of $772,880.16 as of the date of this Agreement ("D&K Obligations to Husband"). A copy of a schedule of the D&K Obligations is annexed hereto as Exhibit V(7). Husband hereby forgives the D&K Obligations to Husband and hereby acknowledges that they are cancelled.

8. The Husband represents and warrants that to the best of his actual knowledge, the obligations set forth in Schedule II(1) and as specifically described above in this Article represent a complete and accurate list of all marital obligations and liabilities in excess of $10,000 that he has entered into, or has caused the Wife to enter into or become responsible for, prior to the date of this Agreement and to the best of his knowledge all material contingent liabilities to which he or she or D&K may be subject arising from any events, actions or omissions prior to the date of this Agreement. The

26

Wife represents and warrants, to the best of her actual knowledge, that the obligations set forth in Schedule II(1) and as specifically described above in this Article represent a complete and accurate list of all marital obligations and liabilities in excess of $10,000 that she has entered into, or has caused D&K to enter into, prior to the date of this Agreement and all material contingent liabilities to which she or D&K may be subject as a result of her actions or omissions prior to the date of this Agreement.

      9. Except as specifically stated to the contrary in this Agreement, each party will be solely responsible for the payment of all debts in his or her own name, whether incurred previously or in the future.

## ARTICLE VI

### INCOME TAX RETURNS

1.      The parties have previously filed joint, federal, state and local

income tax returns for all tax years through the year ended December 31, 2003 for the

following jurisdictions:

> US Federal Income Tax
>
> New York State
>
> New York City

(the "Joint Tax Returns"). The Husband represents and warrants that there are not any

pending or threatened investigations or audits of any of the Joint Tax Returns.

2.      With respect to any tax return either party filed separately for any

tax year, any refunds received or liabilities incurred in connection with such return shall

be for the account of the party filing such return. With respect to the parties' joint tax

returns for the years 2002 and 2003, any refunds received or liabilities incurred in

connection with such returns shall be for the benefit of the Husband.

3.      Promptly after either party receives notice of any investigations or

audit after the date hereof, he or she shall give prompt written notice to the other party.

The parties shall endeavor in good faith to agree on the handling of the investigation or

audit. If the parties have not so agreed within 30 days of notice to the other party, one or

both parties shall give notice of the failure to agree to Sagi Genger (or in his absence

David Parnes), who shall promptly appoint tax counsel in his discretion, subject to his

fiduciary obligations to the parties, and such tax counsel shall  have full authority to

determine handling of the investigation or audit, including without limitation settling with

the investigatory or auditing authority and apportioning liability for any deficiency . (including penalties and interest), entitlement to any refund and costs of the investigation or audit including reasonable attorneys', accountants' and other professional fees in accordance with relative responsibility therefor. Husband and Wife may at any time by joint written notice to Sagi Genger (or David A. Parnes, Esq.) and tax counsel appointed as described above revoke the authority of tax counsel and proceed according to mutual agreement. In any such case, liability for any deficiency (including penalty and interest), entitlement to any refund and costs of the investigation or audit including reasonable attorneys', accountants' and other professional fees shall be apportioned in accordance with relative responsibility therefor. In the event that either the Husband or the Wife pays more than his or her share (as determined by this Article) of any deficiency, tax, penalty, or interest relating to a previously filed Joint Tax Return, the Husband or Wife, as the case may be, shall reimburse the other for 50% of the same, together with any reasonable expenses the other party may incur in connection with payment of the excess, including without limitation the other's reasonable attorneys', accountants' and other professional fees and costs of litigation.

4. Husband and Wife shall cooperate in the handling of the investigation or audit, including without limitation execution of such powers of attorney as may be required to enable Sagi Genger (or David A. Parnes, Esq.) and tax counsel to act as contemplated by this Article, execution of amended tax returns or other documents as may be reasonably appropriate in connection with such investigation or audit (provided that the execution of any such other document would not adversely affect the party's financial interest) and promptly and without any charge or other consideration making

I270083.3
I7451MBNV-2

available such papers, records, documents and information as may be reasonably appropriate in connection with such investigation or audit.

## ARTICLE VII

## MEDICAL INSURANCE AND RELATED
## EXPENSES FOR THE PARTIES

1. The Husband will maintain his own medical insurance for his own benefit without contribution by the Wife to the cost thereof. He shall be responsible for all of his own unreimbursed medical expenses (whether incurred before or after the date of execution of this Agreement), including, but not limited to, doctors, dentists, orthodontists, pharmacists, psychiatrists, psychologists or other mental health professionals. Such unreimbursed medical expenses include, but are not limited to, insurance deductibles, co-payments and uninsured medical expenses.

2. If the Wife may lawfully choose to do so, she may elect at her expense to obtain coverage through the Husband's plan of medical insurance under the Consolidated Omnibus Budget Reconciliation Act of 1985 (commonly referred to as "COBRA") or other similar laws (or if such coverage is not available for any reason she may obtain other substantially equivalent coverage reasonably satisfactory to her) for a period of 36 months. The Wife shall be responsible for all of her own medical expenses (whether incurred before or after the date of execution of this Agreement) unreimbursed by such COBRA or other coverage, including, but not limited to, doctors, dentists, orthodontists, pharmacists, psychiatrists, psychologists or other mental health professionals. Such unreimbursed medical expenses include, but are not limited to, insurance deductibles, co-payments and uninsured medical expenses.

1270083.3
1745188BV-2

## ARTICLE VIII

### EQUITABLE DISTRIBUTION

1.       The parties acknowledge and agree that the resources of the parties
and the provisions of this Agreement, including the transactions contemplated hereby, are
intended, except as otherwise provided or reflected herein, , to effect approximately a 50-
50 distribution of their net marital assets and represent and set forth a fair, reasonable and
equitable distribution of each of their maintenance, necessaries, property and other rights
arising from their marital relationship or otherwise and that the payments, property
transfers and releases, whether past, present or due in the future ("Distribution") represent
an agreeable and equitable division of such rights.  Henceforth all such rights shall be
governed solely by this Agreement.

2.       Without limiting paragraph 1 of this Article, but subject to
paragraph 5 of this Article, Wife's audit rights as provided in Article XII, the Wife
further acknowledges and agrees that:

(a) she is accepting any and all Distributions and other rights under or
contemplated by this Agreement in full satisfaction of any claim for equitable distribution
or maintenance or spousal support from the Husband, all payments due pursuant to the
*pendente lite* order of Judge Judith Gische made on December 3, 2002 and of any claim
to any property of the Husband whether owned directly or beneficially by  him
individually or jointly with the Wife or any third party or parties, that she may have, or
may have asserted, including any claim under Section 236(B)(5) of the Domestic
Relations Law of New York commonly known as the Equitable Distribution Law, or any
applicable law of the United States, the State of New York, or any other state, nation,

31

territory or province now or hereafter having jurisdiction over the parties, or over any of their marital assets; and

(b) in accepting the said Distributions and rights, she is waiving any and all rights, either under the Equitable Distribution Law or any other provision of law to any property of the Husband which she has heretofore claimed or may hereafter claim, constitutes "marital property" as defined by Section 236 Part B(1)(c) of the Domestic Relations Law, as well as to all Husband's separate property disclosed to her.

3. Without limiting paragraph 1 of this Article, but subject to paragraph 5 of this Article, the Husband further acknowledges and agrees that:

(a) he is accepting any and all Distributions and other rights under or contemplated by this Agreement in full satisfaction of any claim for equitable distribution or maintenance or spousal support from the Wife, and of any claim to any property of the Wife whether owned directly or beneficially by her individually or jointly with the Husband or any third party or parties, that he may have, or may have asserted, including any claim under Section 236(B)(5) of the Domestic Relations Law of New York commonly known as the Equitable Distribution Law, or any applicable law of the United States, the State of New York, or any other state, nation, territory or province now or hereafter having jurisdiction over the parties, or over any of their marital assets; and

(b) in accepting the said Distributions and rights, he is waiving any and all rights, either under the Equitable Distribution Law or any other provision of law to any property of the Wife which he has heretofore claimed or may hereafter claim, constitutes "marital property" as defined by Section 236 Part B(1)(c) of the Domestic Relations Law, as well as to all Wife's separate property.

1270083.3
I7451888NV-2

4. Subject to paragraph 5 of this Article, each of the parties forever waives, releases, renounces and relinquishes any and all rights or claims to the other's licenses and certificates, degrees, professional practices, business, anticipated income, career, goodwill, earned but as yet undistributed income, enhanced earning capacity, bank accounts, retirement vehicles (including, without limitation, IRAs, 401(k) plans and insurance policies), constructive trusts, equitable liens, pensions, automobiles, claims to intangible assets of the other party, any and all rights or claims based upon the active or passive role of either party in the management of a particular asset, as well as any other rights or claims against the past, present or future property of the other, whether such rights or claims arise at law, in equity or by virtue of the marital relationship.

5.      Notwithstanding any other provision of this Agreement, the parties agree that neither party is waiving any rights, claims, liabilities, causes of action or other obligations that may arise from a breach of any representation or any other term of this Agreement, including, without limitation, the representation contained in Article II(9)(a).

## ARTICLE IX

## MUTUAL RELEASE AND DISCHARGE OF CLAIMS
## AND CLAIMS TO ESTATES

Subject to paragraph 5 of Article VIII:

1. The Husband hereby remises, releases and forever discharges the Wife, the Wife's heirs, executors, administrators, successors and assigns from all actions, causes of action, suits, debts including without limitation the D&K Obligations to Husband, dues, sums of money, accounts, reckonings, bonds, bills, specialties, covenants, contracts, controversies, agreements, promises, variances, trespasses, damages,

1270083.3
17451888NV-2

judgments, expenses, executions, claims, and demands whatsoever, in law, admiralty or equity, known or unknown, which the Husband, the Husband's heirs, executors, administrators, successors and assigns ever had or now has against the Wife, for, upon, or by reason of any matter, cause or thing whatsoever from the beginning of the world to the day of the date of this Agreement, including (without limitation) claims with respect to all "separate property" and all "marital property" as those terms are defined in Section 236(B) of the Domestic Relations Law or arising out of the marital relationship, except for any cause of action for Divorce, Annulment or Separation and any defenses thereto.

2.    The Wife hereby remises, releases and forever discharges the Husband, the Husband's heirs, executors, administrators, successors and assigns from all actions, causes of action, suits, debts, dues, sums of money, accounts, reckonings, bonds, bills, specialties, covenants, contracts, controversies, agreements, promises, variances, trespasses, damages, judgments, expenses, executions, claims, and demands whatsoever, in law, admiralty or equity, known or unknown, which the Husband, the Husband's heirs, executors, administrators, successors and assigns ever had or now has against the Wife, for, upon, or by reason of any matter, cause or thing whatsoever from the beginning of the world to the day of the date of this Agreement, including (without limitation) claims with respect to all "separate property" and all "marital property" as those terms are defined in Section 236(B) of the Domestic Relations Law or arising out of the marital relationship, except for (a) any amounts that may be due pursuant to the audits referred to in Article XII and (b) any cause of action for Divorce, Annulment or Separation and any defenses thereto.

34

3. Each of the parties recognizes the existence of certain imbalances, resulting from (a) inequality of distribution of marital assets prior to the date of this Agreement; (b) the unequal bearing of marital expenses prior to the date of this Agreement; and (c) the misuse by the Husband of marital IRA or other retirement funds for the purchase of Lumenis stock. Each party agrees to disregard such past imbalances, and to release the other, forever and for all purposes whatsoever from, any and all rights and claims arising from such past imbalances.

4.      Each party waives, renounces, grants, remises and releases to the other, forever and for all purposes whatsoever any and all rights and claims against the other's estate including dower, curtesy and community property rights and interests, any right of election under the relevant provisions of the Estates, Powers and Trusts Law of the State of New York ("EPTL") or similar laws of other States or jurisdictions, domestic or foreign, including, without limitation, EPTL Sections 5-1.1-A and 5-3.1 or under the laws of testacy or intestacy (including, without limitation, EPTL Sections 4-1.1) in any jurisdiction whatsoever, which he or she ever had, now has or may hereafter acquire in the real or personal property or estate of the other, wherever situated and whether acquired before or subsequent to the date of this Agreement, by reason of inheritance or descent or by virtue of any decedent estate law or any other statute or custom, or arising of the marital relationship, or for any other reason whatsoever.

5. (a) Each of the parties expressly revokes his or her Last Will and Testament ("Will") insofar as the same makes any disposition (whether outright or in trust) to or for the benefit of the other party and further expressly revokes any nomination

12700833
17451088W-2

of the other party as an estate representative or in any other representative or fiduciary capacity thereunder.

(b) It is furthermore the intent of the parties that all Wills made and executed by either of them prior to the execution of this Agreement shall be read and administered as if the other party had predeceased him or her for purposes of distribution of his or her respective estate and of the property interests otherwise passing thereunder.

6. Where a party may be designated a beneficiary or survivor in a testamentary substitute (as defined in Section 5-1.1-A of the EPTL) or any other interest in property passing outside of the Will by operation of law (including but not limited to life insurance but excluding any life insurance specifically required to be maintained by one party for the benefit of the other pursuant to the terms of this Agreement) pursuant to which any interest in property does not pass under a Will, each of the parties will be irrevocably and permanently deemed to have renounced any such designation.

7.    Each of the parties irrevocably and irrebuttably renounces any right of administration upon the estate of the other or nomination by the other as estate representative, contained in the other party's Will.

8.    Neither party shall object to the probate of the other's Will, and in the event that either party dies intestate, the surviving party shall allow administration upon the estate and personal effects of the deceased party to be taken and received by any person who would have been entitled thereto had the surviving party predeceased the deceased party unmarried.

9.    Each party shall, upon request by the executors, administrators or other legal representatives of the other party and receipt of the relevant instruments,

promptly execute, acknowledge and deliver (without charge or other consideration) any instrument which in the opinion of said executors, administrators or other legal representatives is reasonably necessary to effectuate the waivers and other provisions of this Article.

10.     Notwithstanding the foregoing, nothing contained in this Agreement shall bar a claim on the part of either party for any cause arising out of a breach of any representation or other term of this Agreement arising or accruing during the lifetime of the deceased party against whose estate such a claim may be made, and such claim shall be in addition to any other remedies which may be available.

## ARTICLE X

### SEPARATE OWNERSHIP

Except as specifically provided to the contrary in this Agreement, each party shall own, as his or her separate property, free of any claim or right of the other, all of the items of property, real, personal and mixed, of any kind, nature or description and wherever situate, which are now or hereafter in his or her name, control or possession, with full power to dispose of the same as fully and effectually in all respects and for all purposes as if unmarried, provided that this provision shall not in any way limit the ability of the Husband or the Wife to enforce his or her rights with respect to breach of any representation or any other breach of the terms of this Agreement by the other party.

37

## ARTICLE XI

### RESIDENCE AND NONINTERFERENCE

1. It is, and shall be, lawful for the Husband and Wife at all times to reside from time at such places as each may see fit and to contract, carry on and engage in any employment, profession, business or trade, which either may deem fit, free from control, restraint or interference, direct or indirect, by the other in all respects as if and she were single and unmarried.

2. Neither the Husband nor the Wife shall in any way molest, disturb, trouble, or interfere with the peace and comfort of the other or compel or seek to compel the other to associate, cohabit or dwell with him or her by any action or proceeding for restoration of conjugal rights or by any means whatsoever.

3. The foregoing provisions of this Article shall not in any way limit the ability of the Husband or the Wife to enforce his or her rights with respect to breach of any representation or any other breach of the terms of this Agreement by the other party, as provided in Article XIII.

## ARTICLE XII

### THE WIFE'S RIGHT TO CERTAIN AUDITS OF THE HUSBAND'S ASSETS

1. On the Wife's request, upon not less than ten (10) business days' written notice, the Husband shall allow the Wife to audit his assets and liabilities as of the date of commencement of the parties' matrimonial action, i.e. January 31, 2002, as set forth on Schedule II(1) annexed hereto and made part hereof and as of the date of this Agreement in order to test the correctness and completeness of the items included on such Schedules

38

1270X83.3
i7q1888v.2

(including contingent liabilities) and the values assigned to each such item based on all information available at the time of audit.

(a)     The Wife shall be entitled to conduct a total of five (5) such audits during the Husband's lifetime.

(b)     Each such audit is to be conducted by a reputable accounting firm.

(i)     Within two (2) weeks of the date of execution of this Agreement, the Husband will provide the Wife with the names of two accounting firms and the principals thereof who will be acceptable to the Husband to perform all of the audits.  If the Wife chooses one of those accounting firms and principals, that firm and principal will conduct the audits when requested by the Wife in accordance with the guidelines set forth herein.

(ii)     If the Wife does not choose one of those two firms and principals, the Husband shall have the right on one occasion and only one occasion prior to the commencement of an audit to reject the Wife's selection of any other accounting firm to conduct the audits.  Provided that the Husband has not previously exercised that right, he may do so on any of the remaining audits.  If the Husband elects to exercise that right, the Wife may not utilize the rejected firm in that or any other audit.

(c)     The Husband will cooperate, and will cause persons under his control to cooperate, with the auditors and will promptly furnish such documents as the auditors may request from time to time.  It is expressly understood that the auditors' document requests may relate to matters up to and including the date of the audit.

39

1270083.3
1745188RV-2

(d)       Such audits shall be at the Wife's sole expense, except that if the

audits find assets not previously disclosed by the Husband on Schedule II(1) with a

cumulative value greater than two hundred fifty thousand dollars ($250,000), the

Husband will be responsible for the entire reasonable cost of all audits which may have

been performed.

2.     (a)       If the audits, individually or cumulatively, find that the Husband

owned any property on January 31, 2002, which is not listed on Schedule II(1), the

Husband will pay to the Wife one-half (1/2) of the value of that property.

(b)       In addition, if the audits, individually or cumulatively, find assets

not listed on Schedule II(1) with a cumulative value greater than two hundred fifty

thousand dollars ($250,000), then (i) such error will be presumed willful on the

Husband's part, and (ii) the Husband will pay to the Wife one-half (1/2) of three (3) times

of that value (in addition to paying audit expenses as provided above).  However, the

Husband will have the opportunity to rebut the presumption of willful error at an

arbitration conducted in accordance with Article XIII and at his expense by a

"preponderance of evidence" test.  If the Husband has previously made payments

pursuant to subparagraph 2 (a) of this Article, in respect of those assets, he shall receive a

credit therefor against the amounts owed pursuant to this subparagraph (b).

(c)       If the Wife conducts a third audit, (i) after two consecutive audits

have failed to find assets not listed on Schedule II(1) or have failed to find a difference in

assets between the first and second  of such consecutive audits of more than twenty five

thousand dollars ($25,000), and (ii) the third audit fails to find assets not listed on such

Schedule or finds a difference of less than twenty five thousand dollars ($25,000) from

the previous two audits, then the Wife will be liable to the Husband for his reasonable expenses incurred as a consequence of cooperating with the third consecutive audit.

(d)     If the Husband disputes the results of any audits or asserts that the cumulative errors (if greater than two hundred fifty thousand dollars ($250,000)) were not willful, the dispute will be determined by arbitration as is provided in Article XIII of this Agreement.

(e)     Any payments due under paragraphs 2 (a) and (b) above shall be made in cash within 60 days of the later of the completion of the audit or the receipt of the arbitration decision.

## ARTICLE XIII

## GOVERNING LAW AND ARBITRATION

1.     This Agreement will be governed and interpreted in accordance with laws of the State of New York, without application of its conflicts of law provisions. This provision for arbitration shall be specifically enforceable by the parties. Any controversy, claim or dispute between the parties directly or indirectly arising out of this Agreement shall be finally settled by arbitration as provided herein.  Either party may give written notification to the other party requesting arbitration to resolve any controversy, claim or dispute arising out of this Agreement between the parties.

2.     Subject to the provisions of paragraph 5 of this Article, any award rendered by the Arbitrator (as defined below) may be confirmed in any court having jurisdiction thereof.  Notwithstanding the foregoing paragraphs of this Article, either party may file a claim for temporary emergency relief  or other temporary remedies not otherwise available through arbitration, in a court of competent jurisdiction, without first

41

having to arbitrate the dispute, provided that such claim for injunctive relief arises from an alleged breach of a specific term of this Agreement.

3.      In the event that a dispute is submitted to arbitration, there shall be one (1) arbitrator (the "Arbitrator") selected (x) by the parties or (y) if the parties fail to select an Arbitrator within twenty (20) days following receipt of a list of potential arbitrators from the American Arbitration Association ("AAA"), the Arbitrator shall be selected by the AAA.  The Arbitration shall be conducted as promptly as practicable after the selection of the Arbitrator in accordance with the Commercial Arbitration Rules and Mediation Procedures.  The Arbitrator shall be someone who has at least fifteen (15) years of commercial law experience or who was a judge of a court of general jurisdiction.

(a)      The arbitration hearing shall be held in Manhattan, New York, pursuant to the Commercial Arbitration Rules and Mediation Procedures, except where those rules conflict with the provisions of this Article, in which case the provisions of this Article shall control.

(b)      The Arbitrator shall arrange a hearing at a mutually agreeable time and location in Manhattan, New York, which hearing shall be not less than thirty (30) calendar days, and not more than sixty (60) calendar days, after the date on which the Arbitrator was appointed.

(c)      The parties shall each have the right to submit documents, testimony, information, data and memoranda to the Arbitrator in support of their respective positions.

(d)      Within sixty (60) calendar days after such hearing, the Arbitrator shall render a decision with respect to the dispute.

1270083.3
I74518MV-2

(e)    The party against whom the Arbitrator found shall bear the total costs, Arbitrator's fees and other expenses of the arbitration between the parties, including the legal fees borne by the other party in bringing or defending the action.

4.    The Arbitrator shall have the authority to require the submission (at hearing or otherwise) of such documents, information, testimony, and other items as the Arbitrator may deem necessary to make a fair and reasonable decision, including the authority to issue subpoenas and similar process to compel production of such documents, information, testimony and other items.

5.    Subject to the remaining provisions of this paragraph 5, any award rendered by the Arbitrator shall be conclusive and binding upon the parties hereto; provided, however, that any such award shall be accompanied by a written opinion of the Arbitrator giving the reasons for the award.

(a)    The findings of the Arbitrator may not change the express terms of this Agreement and shall be consistent with the Arbitrator's belief as to what findings a court of proper jurisdiction would have made in applying the applicable law to the facts underlying the dispute.

(b)    There shall be no right of appeal from the Arbitrator's determination unless the Arbitrator shall not have complied with the provisions of this Article.

(c)    The Arbitrator shall have no authority to award relief in excess of what this Agreement provides.  Moreover, the Arbitrator shall have no authority to award non-monetary or equitable relief.

## ARTICLE XIV

43

## LEGAL AND EXPERT FEES

1.    (a) The Wife has previously been represented in the parties' matrimonial litigation and/or in the negotiation, preparation and execution of this Agreement by Dominic Barbara and Marilyn B. Chinitz, of the Law Offices of Dominic Barbara, 1100 Stewart Avenue, Garden City, NY 11530; Sheldon M. Greenbaum of Goldman & Greenbaum, P.C., 60 East 42nd Street, New York, NY 10165; Philip Greenhaus, 50 East 42nd Street, New York, NY 10017; and, as to certain commercial aspects of this Agreement, Carol Robinson Schepp of Carter Ledyard & Milburn LLP, 2 Wall Street, New York, New York  10005.

(b) The Husband has been represented in the parties' matrimonial litigation and in the negotiation, preparation and execution of this Agreement by Stanford G. Lotwin and Jay D. Silverstein of Blank Rome LLP, 405 Lexington Avenue, New York, New York 10174, and Edward Klimerman of Sonnenschein Nath & Rosenthal LLP, 1221 Avenue of the Americas, New York, NY 10020.

2.    (a) Except as otherwise provided in sub-paragraph (b) of this Section 2, each party will be solely responsible for the payment of all legal fees, expert fees and expenses incurred by him or her for services in connection with their matrimonial litigation and with the negotiation, preparation and execution of this Agreement (or in connection with any subsequent divorce) and each shall indemnify the other from all loss and/or expense arising from any claims for counsel fees and disbursements made by any attorney (or claims for fees and disbursements by any other professional or expert) in reference to the negotiation and preparation of this Agreement, and in reference to any other matters related to the matrimonial difficulties existing

44

between the Husband and the Wife including the procurement of an undefended judgment of divorce.

(b) The following legal fees (i) approximately $200,000 prepaid by the Wife to the Law Offices of Dominic Barbara, prior to May 24, 2004, for which legal services are in dispute, and (ii) all legal fees, owed to the lawyers enumerated in Section 3 of Article I and in Section 1(b) of this Article XIV and their respective firms, and incurred by the Husband and the Wife in connection with the negotiations of this Agreement from May 24, 2004 until the date of execution of this Agreement, shall be paid by Sagi Genger (or David A. Parnes, Esq.), or reimbursed to the parties, from the assets made available to him pursuant to Article II, as soon as practicable.

(c) In consideration for sharing the expense of legal fees, and their payment from assets made available pursuant to Article II, the Wife will pursue in good faith (personally, or – at her election – appoint Sagi Genger to pursue in her stead) the Law Offices of Dominic Barbara, to reclaim the approximately $200,000 prepaid by the Wife which shall be equally shared by the parties.

## ARTICLE XV

## FULL DISCLOSURE

1. Each party acknowledges that:

(a) he or she understands, and has been advised of, his or her right: (i) to obtain full and complete financial disclosure from the other with respect to all assets and income owned by the other party whether titularly or beneficially, and (ii) to obtain appraisals from independent appraisers of his or her own choosing of any property owned

45

by the parties' collectively, or either party individually, including, without limitation, appraisals of tangible and intangible assets;

(b)     he or she has utilized the rights specified in paragraph 1(a) of this Article to the fullest extent that he or she wishes to do so both in the parties' litigation, including depositions and appraisals, and in earlier extensive voluntary document discovery;

(c) that he or she is satisfied with the disclosure that he or she has received from the other; and

(d) that he or she has knowingly and intentionally directed his or her counsel not to seek further disclosure from the other party or to cause appraisals to be made.

2. (a)   The Wife acknowledges that she has made inquiry into the financial circumstances of the Husband to the extent that she wishes to do so at this time;

(b)     The Wife has had a full opportunity to consult with, and has consulted at length with, her attorneys identified or referenced in Article XIV regarding all of the circumstances hereof to the extent that she wishes to do so at this time;

(c)     The Wife acknowledges that this Agreement has not knowingly been the result of any fraud, duress or undue influence exercised upon her by the Husband or by any other person or persons; and

(d) The Wife acknowledges that she is fully satisfied with the services rendered on her behalf by her attorneys identified or referenced in Article XIV.

46

3.     The Wife's acknowledgments in paragraphs (1) and (2) above are based on her ability to seek remedies in the event of a breach of any representation in this Agreement and to exercise her audit rights as provided in Article XII.

4.     The Husband acknowledges that (x) he has made inquiry into the financial circumstances of the Wife to the extent that he wishes to do so, and (y) that he cannot appropriately make a claim against the Wife by reason of her non-willful failure to disclose or his failure of knowledge of the financial circumstances of the Wife;

(a)  The Husband has had a full opportunity to consult with, and has consulted at length with, his attorneys, to wit: Blank Rome LLP and Sonnenschein Nath & Rosenthal LLP regarding all of the circumstances hereof;

(b)  The Husband acknowledges that this Agreement has not knowingly been the result of any fraud, duress or undue influence exercised upon him by the Wife or by any other person or persons; and

(c) The Husband acknowledges that he is fully satisfied with the services rendered on his behalf by Blank Rome LLP and by Stanford G. Lotwin and Jay D. Silverstein in particular.

## ARTICLE XVI

### POSSIBLE INVALIDITY

If any provision of this Agreement, for any reason whatsoever, be declared invalid or unenforceable by any Court of competent jurisdiction, by statute or governmental regulation, the remainder of this Agreement and the application of such provision to any person or situations, other than those as to which such provision may have been held invalid or unenforceable shall not be affected thereby and shall continue

47

1270083.3
1745168W-2

to be enforced to the fullest extent that such severance of the invalid portions is possible without vitiating the original intent and purposes and economic intentions of the parties (the "Original Intent"), as herein set forth. If it shall appear impossible or impracticable to continue this Agreement in force after such severance, then and in such event, the parties hereto each undertake and agree that they will, upon request of the other party, make, execute, acknowledge and deliver any and all instruments which may be lawfully effective to again reflect the parties Original Intent, without diminishing the rights of the parties or increasing their obligations, financial or otherwise, herein. In the event a provision is superseded under this Article XVI, either party may seek reformation of the affected provision in any court of competent jurisdiction, which shall be empowered to revise the provision to reflect the parties' Original Intent to the greatest extent possible, consistent with New York law. It is the intention of the parties hereto that this provision may be enforced in equity in addition to, and not to the exclusion of, any other remedies which may be available to the parties. The parties do not intend by this paragraph to imply the illegality, invalidity and/or unenforceability of any term, provision, article or paragraph of this Agreement.

## ARTICLE XVII

## RECONCILIATION AND MATRIMONIAL DECREES

1.    Simultaneously with the execution of this Agreement, each of the parties will execute and deliver to the other, and in the future will promptly execute and deliver (without further consideration) to the other:

(a)(i)    All documents reasonably necessary to vacate any and all restraining orders and injunctions that have been issued in any action between the parties

48

including, but not limited to, their Divorce Action. A listing of the said restraining orders and injunctions is annexed as Schedule XVII(1)(a).

(ii)     Notwithstanding the provisions of paragraph 1(a)(i), the Husband will pay the Wife maintenance of thirty thousand dollars ($30,000) for the month during which this Agreement is executed and for one month thereafter, and his obligation to pay maintenance under prior orders in the Divorce Action will cease upon the thirtieth (30th) day of the month following the month during which this Agreement is executed, provided all maintenance for prior months has been paid in full.

(b)     All documents reasonably necessary to effect the immediate withdrawal of any and all motions now pending in any Court in any litigation between the parties. A listing of the said motions is annexed as Schedule XVII(1)(b) hereto and made part hereof.

(c)     All documents appropriate to immediately notify the Court before whom the parties' Divorce Action is being prosecuted of the parties' having reached a settlement of all of their rights and claims excepting the right to a divorce.

(d)     All documents reasonably necessary to facilitate the immediate grant to the Wife, on papers, of an undefended divorce on the grounds of the Husband's constructive abandonment of the Wife.

2.     This Agreement shall not be invalidated or otherwise affected by a reconciliation or a resumption of marital relations between the parties unless they have executed and acknowledged (with the same formality as this Agreement) a written statement expressly setting forth that they are canceling this Agreement. Accordingly, this Agreement will not be terminated, annulled or modified by (a) the parties'

49

resumption of cohabitation and/or sexual relationships even if on a permanent basis or (b) the parties' actual remarriage (irrespective of whether or not that marriage ever ends).

3.    This Agreement shall not be invalidated or otherwise affected by any decree or judgment made in any Court in any pending or future action or proceeding between the parties.

4.    Each party agrees that the provisions of this Agreement shall be submitted to any court in which either party may seek a judgment, order or decree in a matrimonial action or any other action or proceeding affecting the marital status of the parties and that the provisions of this Agreement shall be incorporated in said judgment, order or decree with such specificity as the Court shall deem permissible and by reference as may be appropriate under law and under the rules of the Court. However, notwithstanding said incorporation, the provisions of this Agreement shall survive any decree, order or judgment and shall not merge therein, and this Agreement may be independently enforced.

5.    Both parties will fully cooperate with each other in obtaining a religious divorce or annulment and each will promptly execute and deliver (without further consideration) all documents reasonably required therefor by the religious court, tribunal or body. In addition, each party will, if requested, appear (at any reasonable time and location) before any religious court, tribunal or body in order to effectuate the purposes of this paragraph. All the costs of such religious divorce or annulment shall be borne equally by the parties.

1770083.3
17451888.V-2

## ARTICLE XVIII

## IMPLEMENTATION

The Husband and Wife shall, at any and all times, upon request by the other party or his or her legal representatives, promptly make, execute and deliver (without charge or other consideration) any and all other and further instruments as may be reasonably required for the purpose of giving full force and effect to the provisions of this Agreement.

## ARTICLE XIX

## GENERAL PROVISIONS

1.      No failure by either party to exercise any right hereunder or to insist upon strict compliance by the other party with any obligation hereunder and no custom or practice of the parties at variance with the terms hereof shall constitute a waiver of either party's right to demand exact compliance with the terms hereof.  Any waiver by either party (whether formal or informal) nonetheless found to exist by an Arbitrator with respect to any particular default by the other party shall not affect or impair the waiving party's rights in respect of any subsequent default of the same or of a different nature, nor shall any delay or omission of either party to exercise any right arising from such a default affect or impair his or her rights as to such default or any subsequent default.

2.      This Agreement shall inure to the benefit of and shall be binding and obligatory upon the heirs, personal representatives, administrators, executors and assignees of the parties herein.

1270083.3
I7451838W-2

3.      Neither this Agreement nor any provision hereof shall be terminated, amended or modified in any respect except by an agreement in writing duly subscribed and acknowledged by both parties with the same formality as this Agreement. Any asserted termination, annulment or modification not so subscribed and acknowledged shall be without effect even if it was substantially and detrimentally relied upon.

4.      The parties may at any time amend, modify or annul this Agreement (in the manner set forth in paragraph 3 of this Article) without the consent of any third person and no third person shall be deemed to have been given any interest or right hereunder.

5.      This Agreement may be executed in counterpart copies and shall become effective when copies executed by both parties have been exchanged. The parties intend to execute in all eight (8) counterpart copies hereof.

## ARTICLE XX

### NOTICES

Any notice required by this Agreement shall be in writing and shall be made to the addresses first listed above (or to any address changed by like notice) or to the facsimile numbers listed below:

Arie Genger
2600 Island Boulevard
Penthouse One
Williams Island
Aventura, Florida   33160

With a copy to:

52

12700833
I74S1888NV-2

Edward Klimerman, Esq.
Sonnenschein Nath & Rosenthal LLP
1221 Ave. of the Americas,
New York, NY 10010-1089
Fax: (212) 768 6800

Dalia Genger
210 East 65th Street
New York, NY  10021
Fax  (212) 735-9021

With a copy to

Carol Robinson Schepp, Esq.
Carter Ledyard & Milburn LLP
2 Wall Street
New York, NY 10005
Fax  (212) 732-3200

Any such notice shall be delivered by certified mail, return receipt

requested or by personal (receipted) delivery or by confirmed facsimile.  Unless

otherwise provided, such notice shall be effective one (1) day after actual receipt of

personal or faxed delivery or ten (10) days after mailing, whichever is applicable.


### ARTICLE XXI

### ENTIRE UNDERSTANDING

This Agreement contains the entire understanding of the parties who

hereby acknowledge that between them there have been and are no representations,

warranties, covenants or undertakings (whether written or oral, express or implied) with

respect to the subject matter hereof including, without limitation, all rights or claims

arising at law, in equity or pursuant to the parties' marital relationship other than those

expressly set forth herein or in the transactions contemplated hereby or entered into

concurrently herewith.

1270083.3
1745188NV-2

# ARTICLE XXII

## REPRESENTATIONS AS TO UNDERSTANDING OF THE TERMS OF THIS AGREEMENT

1.      Each party represents that:

(a)      He or she has had independent legal counsel of his or her own selection;

(b)      His or her legal counsel has advised him or her fully (i) with respect to his or her rights in and to the property and income and estate of the other party if they were divorced in the absence of an agreement such as this one and (ii) with respect to the effect of this Agreement on those rights and (iii) with respect to the rights and obligations set forth in this Agreement.  Each party additionally acknowledges that he or she understands such advice from counsel and the terms of this Agreement;

(c)      He or she has given due consideration to all the facts and circumstances likely to influence his or her judgment with respect to matters embodied in this Agreement;

(d)      He or she has no educational, medical (including the use of medications, whether prescription or otherwise), psychological, addictive, sociological, language or cultural disability which would prevent him or her from understanding each and every aspect of this Agreement and the legal and economic and personal consequences of executing this Agreement; and

(e)      He or she believes that the provisions of this Agreement are fair and reasonable as of the date of execution of this Agreement, and that he or she believes

54.

that the provisions of this Agreement are not unconscionable now will not be unconscionable in the future.

      2.     After time to reflect upon the significance and terms of this Agreement, he or she makes this Agreement freely and voluntarily by him or her and acknowledges that this Agreement has not knowingly been the result of any fraud, duress, coercion or undue influence exercised by either party upon the other or by any other person or persons upon such party.

1270083.3
f7548b88v-2

EACH OF THE PARTIES ACKNOWLEDGES:

THAT HE OR SHE HAS CAREFULLY READ THIS AGREEMENT ;

THAT HE OR SHE UNDERSTANDS THE TERMS OF THIS AGREEMENT;

INCLUDING ARTICLE XXII OF THIS AGREEMENT;

THAT HE OR SHE UNDERSTANDS THAT THIS AGREEMENT WILL BE

BINDING ON HIM OR HER IN ALL CIRCUMSTANCES; AND

THAT HE OR SHE HAS HAD A FULL OPPORTUNITY TO CONSULT WITH

(AND HAS CONSULTED WITH) COUNSEL OF HIS OR HER OWN

SELECTION WITH RESPECT THERETO.

IN WITNESS WHEREOF, the parties have hereunto set their respective

hands and seals as of the day and year first above written to eight (8) counterparts hereof,

each of which shall constitute an original.

Witness for the Wife
Carol Robinson Schepp, Esq.

DALIA GENGER

Witness for the Husband
Edward Klimerman, Esq.

ARIE GENGER

56

STATE OF NEW YORK      )
                       ) ss.:
COUNTY OF NEW YORK  )

     On this 30 day of _Oct_ 2004, before me, the undersigned, a Notary Public in and for the State, personally appeared DALIA GENGER, personally known to me known or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that she executed the same in her capacity, and that by her signature on the instrument, the individual executed the instrument.

_Deborah Kempf_
Notary Public

DEBORAH KEMPF
Notary Public, State of New York
No. 31-OIKE 4999904
Qualified in New York County
Commission Expires August 3, 200_6_

STATE OF NEW YORK      )
                       ) ss.:
COUNTY OF NEW YORK  )

     On this 28 day of _Oct_ 2004, before me, the undersigned, a Notary Public in and for said State, personally appeared ARIE GENGER, personally known to me known or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that his executed the same in his capacity, and that by his signature on the instrument, the individual executed the instrument.

_Deborah Kempf_
Notary Public

DEBORAH KEMPF
Notary Public, State of New York
No. 31-OIKE 4999904
Qualified in New York County
Commission Expires August 3, 2006

57

1268492-3
1745168NV-2

## CERTIFICATE OF SUBSCRIBING WITNESS

State of New York )
                ) ss.
County of New York )

On the _30_ day of _Oct_ in the year 2004 before me, the undersigned, a Notary Public in and for said State, personally appeared CAROL ROBINSON SCHEPP, the subscribing witness to the foregoing instrument, with whom I am personally acquainted, who, being by me duly sworn, did depose and say that she resides at _165 Circle Drive, Manhasset NY 11030_ ; that she knows DALIA GENGER to be the individual described in and who executed the foregoing instrument;  that said subscribing witness was present and saw said DALIA GENGER execute the same; and that said witness at the same time subscribed her name as a witness thereto.

_Deborah Kempf_
Notary Public

DEBORAH KEMPF
Notary Public, State of New York
No. 31-OIKE 4999904
Qualified in New York County
Commission Expires August 3, 2006

## CERTIFICATE OF SUBSCRIBING WITNESS

State of New York )
                ) ss.:
County of New York )

On the _28th_ day of _OCT_ in the year 2004 before me, the undersigned, a Notary Public in and for said State, personally appeared EDWARD KLIMERMAN, the subscribing witness to the foregoing instrument, with whom I am personally acquainted, who, being by me duly sworn, did depose and say that he resides at _14 EAST 75th STREET   NEW YORK, NY 10021_ ; that he knows ARIE GENGER to be the individual described in and who executed the foregoing instrument;  that said subscribing witness was present and saw said ARIE GENGER execute the same; and that said witness at the same time subscribed his name as a witness thereto.

_Deborah Kempf_
Notary Public

DEBORAH KEMPF
Notary Public, State of New York
No. 31-OIKE 4999904
Qualified in New York County
Commission Expires August 3, 2006

1268492.3
17451888V-2

11/11/2004 THU 15:59  FAX                                                          ☑001/001

**Sagi Genger**
**1121 Park Avenue,**
**New York, NY 10028**

October 30, 2004

Dalia Genger
210 East 65th St.
New York, NY 10021

**Promise**

Dear Mom,

    This letter confirms our understanding with respect to certain payments that I am prepared to make to you in consideration of the following. My sister Orly and I are benefiting by the receipt of a total of 794.40 shares of Trans-Resources, Inc. ("TRI"), or beneficial interests in those shares, by trusts for our benefit. In reliance on this letter and in consideration of the trusts' receipt of these shares and other consideration, you are giving up valuable marital rights, and you desire further assurance that you will have sufficient funds to support your lifestyle.

    If you, in your sole and absolute discretion, from time to time desire funds to support your lifestyle, you may request in writing that I make payment to you as provided in this letter. Promptly upon receipt of the request, I will pay to you (1) an amount equal to all dividends, distributions, proceeds or other payments attributable to 794.40 shares of TRI (adjusted for any splits or similar action) that have previously been paid to Orly, me or any trust for the benefit of either of us, less any amounts previously paid to you pursuant to this letter, or (2) any lesser amount indicated in your request.

    We intend for this letter to be a binding agreement under New York law. Please confirm that this letter correctly reflects your understanding by signing below.

Sincerely,

Sagi Genger

Agreed

Dalia Genger

1268584.3

**Sagi Genger**
**1121 Park Avenue**
**New York, NY 10028**

November 10, 2004

Orly Genger
1965 Broadway
New York, NY

Dear Orly:

In connection with the attached letter (the "Promise") from me to our mother, Dalia Genger, dated October 30, 2004, you agree to indemnify, defend, and hold me harmless, for and against one-half (1/2) of any and all payments, liabilities, damages, claims, actions, losses, settlements, penalties, judgments or obligations (each a "Claim"), including my reasonable counsel and other professional fees, expenses and costs, which arise from my undertakings in the Promise.

I will notify you promptly of any Claims.

Very truly yours,

Sagi Genger

AGREED TO AND ACCEPTED
THIS      DAY OF NOVEMBER, 2004

Orly Genger

*ORLY GENGER VS.*
*DALIA GENGER, et al*

---

*DALIA GENGER*
*December 13, 2012*

---



**COURT REPORTING**
Co. LLC

**126 East 56th Street, Fifth Floor New York, New York 10022**
**PHONE: (212) 750-6434   FAX: (212) 750-1097**
**www.ELLENGRAUER.com**

*Original File 102224.TXT*
**Min-U-Script® with Word Index**

```
 1   SUPREME COURT OF THE STATE OF NEW YORK

 2   COUNTY OF NEW YORK
     -------------------------------------------X
 3   ORLY GENGER in her individual capacity
     and on behalf of the Orly Genger 1993
 4   Trust (both in its individual capacity
     and on behalf of D&K Limited Partnership),
 5
                              Plaintiff,
 6
          - against -
 7
     DALIA GENGER, SAGI GENGER, LEAH FANG,
 8   D&K GP LLC, and TPR INVESTMENT ASSOCIATES,
     INC.,
 9
                              Defendant
10
     Index No. 100697/08
11   -------------------------------------------X

12

13                             575 Lexington Avenue
                               New York, New York
14
                               December 13, 2012
15                             10:37 a.m.

16

17             DEPOSITION of DALIA GENGER, taken

18   before Annette M. Montalvo, RMR, and a Notary

19   Public in and for the State of New York.

20

21

22

23          ELLEN GRAUER COURT REPORTING CO. LLC
              126 East 56th Street, Fifth Floor
24                New York, New York  10022
                       212-750-6434
25                     REF:  102224
```

```
 1   A P P E A R A N C E S:

 2

 3   ZEICHNER ELLMAN & KRAUSE LLP

 4   On Behalf of the Plaintiff,

 5        575 Lexington Avenue

 6        New York, New York  10022

 7   BY:  YOAV GRIVER, Esq.

 8        BRYAN D. LEINBACH, Esq.

 9        212-223-0400

10        ygriver@zeklaw.com

11

12

13   PEDOWITZ & MEISTER LLP

14   On Behalf of the Witness,

15        570 Lexington Avenue

16        New York, New York  10022

17   BY:  ROBERT A. MEISTER, Esq.

18        MARISA H. WARREN, Esq.

19        212-403-7333

20        robert.meister@pedowitzmeister.com

21

22

23

24

25
```

```
 1   A P P E A R A N C E S: (Cont'd)
 2
 3   PAUL S. ZILBERFEIN, Esq.
 4   On Behalf of Leah Fang,
 5        78 Old Orchard Road
 6        New Rochelle, New York  10804
 7        914-297-0110
 8        paul@zilberfeinlaw.com
 9
10
11   DUANE MORRIS LLP
12   On Behalf of TPR Investment Associates, Inc.,
13        1540 Broadway
14        New York, New York  10036
15   BY:  JOHN DELLAPORTAS, Esq.
16        212-692-1012
17        dellajo@duanemorris.com
18
19
20   ALSO PRESENT:
21   SAGI GENGER
22   WALTER P. STASIUK, Wachtel Masyr & Missry
23
24
25
```

1                          **GENGER**
2     notice before the sale?
3          A.    Before the sale?  I am trying to
4     remember.  Yeah.  I was aware that Sagi is going
5     to take the step --
6          Q.    I understand that at some point you
7     became aware.  I am asking did you receive the
8     8-31-08 notice prior to your attorney receiving a
9     copy of the notice on May 19?
10         A.    That's the answer.  I don't remember.
11         Q.    Okay.  And you don't remember receiving
12    such a notice then?
13         A.    I don't remember.  I might have.
14         Q.    Or you might not have?
15         A.    Right.
16         Q.    Did you ever tell Orly about the
17    8-31-08 notice?
18         A.    No.
19         Q.    Why not?
20         A.    Because, first of all, I might have not
21    received it, so I didn't tell her.  And, second,
22    this was something that I could not stop.
23         Q.    Okay.  We will -- let's talk about
24    that.  Why could you not stop it?
25         A.    Because TPR -- I didn't have any

```
 1                    GENGER
 2     A.    I guess so.  Yeah.
 3              MR. GRIVER:  Okay.  Let's take a break.
 4     I ask that you not speak to anyone about your
 5     testimony.  Five minutes?
 6              MR. MEISTER:  Five minutes.
 7                   (WHEREUPON, a recess was had from
 8                   3:34 p.m. to 3:42 p.m.)
 9              MS. WARREN:  Are we on the record?
10              During the break, I was in the bathroom
11     with Ms. Genger, who approached me and said that
12     she might have made a mistake in her past
13     testimony.  I cut her off before she could tell
14     me the substance of any mistake that she thought
15     that she made.  But if she feels that a mistake
16     is made, I would like to just ask that we give
17     her an opportunity to clarify the record.
18              MR. LEINBACH:  That sounds absolutely
19     reasonable.
20     BY MR. GRIVER:
21     Q.    Ms. Genger, this correction that you
22     made, did anyone talk to you about this
23     correction?  I am not talking about Ms. Warren.
24     I am saying did you speak with Sagi or anyone
25     else, and that's why you remember this?
```

GENGER

1

2     A.     No, no.

3     Q.     Okay.  Why don't you put your

4  correction on the record.

5     A.     Okay.  The correction is that once I

6  was aware that this notice existed, I did consult

7  with my lawyer, and I chose not to inform Orly.

8     Q.     When you say that you consulted with

9  your attorney, you were consulting as trustee of

10  the trust?

11    A.     As a trustee, obviously.

12    Q.     And you were going to this attorney

13  understanding that he represented the trust?

14    A.     The trust.

15    Q.     He represented the trust?

16    A.     The trust.

17    Q.     And you were seeking advice as trustee

18  for what is best for the trust?

19    A.     Right.

20    Q.     And the beneficiary of the trust?

21    A.     Obviously.

22    Q.     And that was Mr. Meister?

23    A.     Uh-huh.

24    Q.     And did he provide you advice?

25    A.     Yes.

1                         GENGER

2                  the reporter as requested.)

3            MR. MEISTER:  Object to the form.

4   BY MR. GRIVER:

5        Q.    Let me clean that up.

6              You never asked Mr. Meister about

7   getting other people involved in the auction?

8        A.    Participate in the auction.  I don't

9   remember that we discussed other people.

10       Q.    Do you understand that it is your job

11  as trustee to get the best price at the auction?

12            MR. MEISTER:  Objection.  Asked and

13  answered several times now.

14            MR. DELLAPORTAS:  Object to form.

15  BY THE WITNESS:

16       A.    Yes, you did ask me.

17            MR. ZILBERFEIN:  Objection.

18  BY MR. GRIVER:

19       Q.    One way to get the best price possible

20  is to get as many people bidding as possible.

21            MR. MEISTER:  Objection.  That's not a

22  question.

23            MR. DELLAPORTAS:  Objection.  That's

24  not a question.

25  BY THE WITNESS:

```
 1                      GENGER
 2      A.    Do you want to teach me?
 3            MR. MEISTER:  No, no.  Wait until
 4   there's a question, Dalia.
 5   BY MR. GRIVER:
 6      Q.    One way to get the best price is to get
 7   as many people bidding as possible?
 8            MR. DELLAPORTAS:  Object to form.
 9            MR. ZILBERFEIN:  Objection.
10   BY MR. GRIVER:
11      Q.    Correct?
12            MR. MEISTER:  Join the objection.
13   BY MR. GRIVER:
14      Q.    I am waiting.
15      A.    Yeah, I guess it is correct.  Yeah.
16      Q.    Why did you then did you not let Arie
17   know that --
18      A.    Yeah, because I particularly did not
19   want Arie to be involved as far as Orly's assets
20   are concerned in any way.
21      Q.    Okay.
22            MR. MEISTER:  Can we go off the record
23   for a second?
24            MR. GRIVER:  No.  Well, I'm almost
25   done.
```

```
1                          GENGER
2    BY MR. GRIVER:
3         Q.    If Sagi was going to pay $2 million for
4    Orly's assets, and Arie was going to pay $3
5    million for Orly's assets, at the end of the
6    day --
7         A.    At the same time, Arie is doing other
8    things, like paying your bills instead of Orly.
9    You understand?  That's my -- that's where I am
10   going, because you are not objective.  You are
11   being paid not by Orly, but by somebody else,
12   like my husband.  It is financing this
13   deposition.  And that's why I didn't want Arie to
14   be involved in this auction.
15        Q.    Because his money is tainted?
16        A.    No.  Because his interest -- Orly's
17   interest is not the same as Arie's interest.
18   That's why.  Airy's interest is to have control
19   over Orly's assets, I believe.
20        Q.    And if Arie had paid $5 million --
21        A.    He wouldn't.  He didn't have any money
22   because we just split our marital assets, and he
23   got five and I got five.  So how could he pay?
24        Q.    Did you check to see if he could, or
25   did you let --
```

GENGER

1
2      A.      I didn't check because I know.

3      Q.      You didn't check because --

4      A.      Unless he hid some money that I don't

5   know about because then I have to get part of it.

6   I don't know.

7      Q.      You didn't check because -- you didn't

8   check because you didn't want Arie to

9   participate?

10      A.      No, that not true.

11              MR. ZILBERFEIN:  Are you testifying?

12   BY THE WITNESS:

13      A.      I'm just saying --

14              MR. ZILBERFEIN:  Objection.  The

15   attorney is testifying.

16   BY THE WITNESS:

17      A.      -- that I didn't check because I knew

18   what his financial condition is at that time,

19   because we were supposed to have the same amount

20   of assets or money or whatever you call it, okay.

21   BY MR. GRIVER:

22      Q.      And you don't think --

23      A.      And if he had some extra money, then it

24   was marital money that I was supposed to get part

25   of it.

GENGER

1

2    Q.    And you are not sure that he -- and you

3    thought that Arie couldn't find some friends of

4    his who might participate in the auction?

5    A.    I don't know if he has friends.

6    Q.    But if Arie participated and didn't

7    have as much money as Sagi, that's fine.  But

8    isn't it a possibility that he would have been

9    able to get more money?

10   A.    There's always possibilities of

11   anything to happen.  The earthquake, the building

12   going on fire, I don't know.

13   Q.    So as trustee, why didn't you explore

14   that possibility?

15   A.    I told you already.  Because I knew how

16   much Arie has.  And, personally, I know my

17   husband.  I was married 33 years.  And I know

18   what's happening between Arie, unfortunately, and

19   Orly.

20   Q.    And why didn't you tell Orly?

21   A.    What?  Because Orly at this time was

22   brainwashed already, so I couldn't talk to her,

23   candidly, even though I did try.

24   Q.    And if Orly had known, then Arie would

25   have known, correct?

SUPREME COURT: NEW YORK COUNTY

ORLY GENGER in her individual capacity and on
behalf of the Orly Genger 1993 Trust (both in its
individual capacity and on behalf of D & K Limited
Partnership),

Index No.:   109749/09

Plaintiff,

**AFFIDAVIT OF ORLY GENGER**

- against -

DALIA GENGER, SAGI GENGER, D & K GP
LLC, TPR INVESTMENT ASSOCIATES, INC.,
and LEAH FANG,

Defendants.

STATE OF NEW YORK,
COUNTY OF NEW YORK.

ORLY GENGER, being duly sworn, states as follows:

1.      I make this affidavit in connection with Orly Genger's ("Orly") motion for
partial summary judgment and Sagi Genger ("Sagi"), D & K GP LLC ("D&K GP"), and
TPR Investment Associates, Inc.'s ("TPR") (together, "Defendants") cross-motions for
summary judgment.  Specifically, I respond to Defendants' contention that, even if they had
provided me with actual notice of the purported foreclosure and February 2009 auction of
D&K Limited Partnership's ("D&K LP") shares in TPR, I still would not have appeared to
bid on the TPR shares at the auction.

**The Genger Family Plan and the D&K Note**

2.      The promissory note at issue in this case between D&K LP and TPR (the

"D&K Note") was originally set up as part of the Genger family plan to ensure that I and my older brother Sagi shared equally in the Genger family wealth.  Though the D&K Note was to be voluntarily paid, it was never intended to be forcibly collected in a way that would extinguish our equal indirect interests in TPR, because to do so would have destroyed the Genger family plan.   Sagi and I both knew about the Genger family estate plan and the D&K Note's role in that plan.

3.     I sat in and attended David Parnes' April/May 2015 deposition testimony before Justice Stephen Crane.   Parnes confirmed again the D&K Note was part of the Genger family plan to have me and my brother share equally in the Genger family wealth, that it was not to be forcibly collected upon, and was not improper.   Mr. Parnes' 2015 deposition testimony matches his and Sagi's 2007 testimony on this issue in a marital arbitration between my parents.

4.     After sitting through Parnes' deposition, and all the trial testimony in *Orly Genger v. Sagi Genger*, Index No. 10697/2008, it is clear to me that the purported foreclosure and sale of the D&K Note was part of my older brother's overarching scheme to deprive me of every asset or financial benefit my parents ever gave me and take it for himself.

**The Challenged Auction of D&K LP's TPR Shares**

5.     I did not know about the auction of D&K LP's shares of TPR until after it had occurred.  Had I known about the above-mentioned auction before it took place, I would

have done at least the following.

6. First, I would have told my father, Arie Genger, what was happening, and consulted with my legal counsel.

7. Second, I would have taken whatever steps were necessary to make sure the auction never occurred. Indeed, as previously stated, Sagi well-knows, and even has testified, that no one was supposed to forcibly collect on the D&K Note.

8. Third, if I was unable to stop the auction from occurring, I would have consulted with my father, and approached my friends and business acquaintances to organize a competing bid for D&K LP's TPR shares at the auction. This bid would have been more than the $2.2 million TPR bid at the auction for the TPR shares. This is particularly true as TPR had recently increased its potential assets by between $27 and $44 million by selling the Genger family shares in Trans-Resources, Inc. ("TRI"), including my Orly Trust TRI Shares. I also would have sought to have TPR open its books and records in advance of any attempted default and sale to encourage bidding at the auction.

9. In short, had Sagi or D&K GP told me about the auction, I would have stopped the auction, or arranged to have TPR outbid at the auction. I believe this is the real reason they did not tell me about the auction.

_Orly Genger_
ORLY GENGER

Sworn to before me
7 / 27 , 2015

3

Notary Public

DANIEL ALBINO
Notary Public, State of New York
No. 01AL6290023
My Commission Expires 10-07-2017

4

 LexisNexis®

4 of 6 DOCUMENTS

**Orly Genger, in her individual capacity and on behalf of the Orly Genger 1993
Trust (both in its individual capacity and on behalf of D & K Limited Partnership),
Plaintiff, against Dalia Genger, SAGI GENGER, LEAH FANG, D & K GP LLC,
and TPR INVESTMENT ASSOCIATES, INC., Defendants.**

**109749/09**

**SUPREME COURT OF NEW YORK, NEW YORK COUNTY**

*39 Misc. 3d 1235(A); 972 N.Y.S.2d 143; 2013 N.Y. Misc. LEXIS 2304; 2013 NY Slip Op
50886(U)*

**May 29, 2013, Decided**

**NOTICE:**     THIS OPINION IS UNCORRECTED
AND WILL NOT BE PUBLISHED IN THE PRINTED
OFFICIAL REPORTS.

    PUBLISHED IN TABLE FORMAT IN THE NEW
YORK SUPPLEMENT.

**SUBSEQUENT HISTORY:** Motion granted by, in part,
Motion denied by, in part, Motion withdrawn by, As
moot, Reserved by, in part *Genger v. Genger, 2013 N.Y.
Misc. LEXIS 6088 (N.Y. Sup. Ct., Dec. 23, 2013)*
Affirmed in part and modified in part by *Genger v.
Genger, 115 A.D.3d 421, 982 N.Y.S.2d 11, 2014 N.Y.
App. Div. LEXIS 1386 (N.Y. App. Div. 1st Dep't, 2014)*

**PRIOR HISTORY:** *Genger v. Genger, 38 Misc. 3d
1213(A), 966 N.Y.S.2d 346, 2013 N.Y. Misc. LEXIS 185
(2013)*

**HEADNOTES**

    [*1235A]         [**143]         Plead-
ing--Amendment--Answer--Prejudice.         Injunc-
tions--Preliminary Injunction--Prohibiting Foreclosure or
Execution upon Trust without Requiring Posting of Ad-
ditional Undertaking.

**COUNSEL:**  [***1] For plaintiff Orly Genger and Orly
Genger 1993 Trust: Yoav M. Griver, Bryan D. Leinbach,
ZEICHNER ELLMAN & KRAUSE, NEW YORK,
NEW YORK.

For defendant Dalia Genger: Robert A. Meister, Marisa
Warren, PEDOWITZ & MEISTER LLP, New York,
New York.

For defendant TPR Investment Associates, Sagi Genger
and Sagi Genger 1993 Trust: John Dellaportas, Evan
Michailidis, DUANE MORRIS LLP, NEW YORK, NY.

For defendant Leah Fang: JUDITH LISA BACHMAN,
ESQ., NEW YORK, NY.

For defendants: YANKWITT & MCGUIRE, LLP,
WHITE PLAINS, N.Y.

For defendant Rochelle Fang and as Trustee for Sagi
Genger 1993 Trust: Desmond C.B. Lyons, LYONS
MCGOVERN LLP, White Plains, New York.

**JUDGES:** Barbara Jaffe, J.

**OPINION BY:** Barbara Jaffe

**OPINION**

    Barbara Jaffe, J.

    This decision and order addresses motion sequence
numbers 013, 014, 015, and 016. In motion sequence
number 013, defendant TPR Investment Associates, Inc.
(TPR) seeks an order granting it leave to amend its an-
swer to add an affirmative defense of release, and grant-
ing it summary judgment dismissing the second amended
complaint (complaint) of Orly Genger, in her individual

39 Misc. 3d 1235(A), *; 972 N.Y.S.2d 143, **;
2013 N.Y. Misc. LEXIS 2304, ***; 2013 NY Slip Op 50886(U)

capacity and on behalf of the Orly Genger 1993 Trust (Orly Trust) and on behalf of D & K Limited Partnership (D & K LP) (collectively, [***2] plaintiff). Plaintiff opposes and, by motion sequence number 014, cross moves for an order lifting the stay of discovery and for sanctions against defendants Dalia Genger, Sagi Genger, Leah Fang, D & K GP, LLC (D & K GP), and TPR.

In motion sequence number 015, brought on by order to show cause, plaintiff seeks, *inter alia*, to enjoin defendants preliminarily from foreclosing on the Orly Trust's interests in TPR and Trans Resources Inc. (TRI, a subsidiary of TPR), and to require Sagi and Dalia to post $4.44 million as security for certain debts that encumbered the Orly Trust's assets in a series of transactions whereby nonparty Manhattan Safety Company Ltd. (Manhattan Safety) was assigned a restated promissory note issued in 1993 by D & K LP in favor of TPR, the assignor.

In motion sequence number 016, Fang, the former trustee of the Orly Trust, seeks an order granting her summary judgment dismissing the complaint as against her.

The motions are consolidated for disposition.

*I. BACKGROUND*

The background of this action is set forth in several opinions and decisions of this court and the Delaware courts, among others. Additional background is furnished here to address the instant motions.

Arie [***3] Genger is Orly and Sagi's father, and Dalia's husband before their 2004 divorce. Arie founded TPR and TRI, and in 1993, he established the Orly Trust and the 1993 Sagi Genger Trust (Sagi Trust) (collectively, the Trusts) for his children as part of a family estate plan. He funded each Trust with a $600,000 gift and assigned each a 48 percent interest in D & K LP (Complaint, ¶ 19). The remaining 4 percent of D & K LP was held by Dalia, who also later held a 99 percent interest in D & K GP, the general partner of D & K LP. As a result, each Trust became a limited partner of D & K LP. (*Id.*, ¶ 20).

After the Trusts were funded, D & K LP purchased 240 shares of TPR's common stock for $10,200,000, a 49 percent interest. The purchase price was satisfied as follows: (1) the Trusts each paid $600,000; (2) Dalia paid $50,000, and (3) Dalia, as the general partner of D & K LP acting on its behalf, executed a promissory note in favor of TPR for $8,950,000 (1993 Note). The 1993 Note required that D & K LP repay principal and interest in annual installments over ten years, and the Trusts and Dalia assumed liability for repayment in proportion to their respective ownership interests in D & K LP. (*Id.*,

[***4] ¶¶ 21-22). The 1993 Note was secured by D & K LP's pledge of its 240 shares in TPR (pledge). (*Id.*, ¶ 23). As a result, each of the Trusts held a 23.52 percent indirect interest in TPR, Dalia held a 1.96 percent indirect interest in TPR, and Arie held a 51 percent direct interest in TPR. (*Id.*, ¶ 24).

In the complaint, it is alleged that all of the Genger family members, including those who manage or control TPR, understood that the 1993 Note and Pledge were created solely for tax and estate planning purposes, and that they were not to be collected and enforced. (*Id.*, ¶ 25). It is also alleged that in the course of the arbitration proceedings conducted in connection with the 2004 Genger divorce, the 1993 Note was adjudicated as "worthless and uncollectible," based on the submissions and testimony of Dalia, as TPR's board member, Sagi, as TPR's president and CEO, and David Parnes, as TPR's vice president, that the 1993 Note and Pledge were "never intended to be enforced."(*Id.*, ¶ 26).

Pursuant to Arie's and Dalia's 2004 divorce settlement, Dalia obtained control of TPR, and in exchange, Arie and the trusts would directly hold their interests in TRI. The divorce stipulation provides that: [***5] (1) Dalia receive Arie's 51 percent interest in TPR and retain her 4 percent interest in D & K LP via D & K GP; and (2) TPR's 52.85 percent interest in TRI be transferred to Arie and the Trusts such that Arie would hold 13.99 percent of the TRI shares and each Trust would hold 19.43 percent of the TRI shares; with the remaining 47.15 percent of the TRI shares to be held by the "Trump Group," a TRI minority shareholder in 2004. (*Id.*, ¶ 28).

Dalia and Arie's bitter divorce spawned the allegations that Dalia and Sagi had colluded to destroy Arie financially, and that their actions threatened Orly's destruction as well. (*Id.*, ¶ 31). Soon after the divorce, Dalia ceded to Sagi control of TPR and D & K LP, and it is alleged that by forming D & K GP, Dalia and Sagi attempted to shield themselves from personal liability stemming from their interests in D & K LP, while exposing the Trusts to potential liability to TPR on the 1993 Note. (*Id.*, ¶¶ 32-33). After Sagi obtained control from Dalia over TPR and its interest as payee on the 1993 Note, it is also alleged that he used his position as CEO of TPR and as manager of D & K LP to engage in self-dealing with respect to the 1993 Note in order [***6] to disadvantage Orly and the Orly Trust financially. (*Id.*, ¶¶ 37-41).

In 2007, Sagi's sister-in-law, defendant Fang, was appointed trustee of the Orly Trust. Orly alleges that Fang colluded with Sagi to diminish the value of the Orly Trust by entering into agreements that would allow the Orly Trust's interest in the TPR shares and the TRI shares to be pledged or encumbered by Sagi and/or TPR

without notice to Orly. (*Id.*, ¶¶ 43-44). Specifically, in November 2007, Fang as trustee and Sagi as manager of D & K GP, the general partner of D & K LP, signed the "Amended and Restated Limited Partnership Agreement" of D & K LP (D & K Agreement), which granted D & K GP the authority to pledge or otherwise encumber Orly Trust's interest in the TRI shares for the benefit of the partnership, without providing any notice or benefit to Orly and the Orly Trust. (*Id.*, ¶¶ 72-75). In January 2008, upon Fang's resignation, Dalia was appointed as successor trustee to the Orly Trust, and then divested herself of her interest in the TPR shares. (*Id.*, ¶ 39).

In January 2009, Dalia, as successor trustee to the Orly Trust, and Sagi, on behalf of D & K GP, along with TPR, then under Sagi's control, entered into [***7] an agreement entitled "Meeting of Partners of D & K LP," in which it was agreed that D & K GP would sign for D & K LP and its limited partners when making their assets subject to a pledge in the same manner that the TPR shares were pledged in conjunction with the 1993 Note (Meeting Agreement). (*Id.*, ¶ 76). The D & K Agreement and the Meeting Agreement were prepared and executed without Orly's knowledge, even though Orly requested information about the Orly Trust's assets during Fang's and Dalia's respective tenures as trustee. (*Id.*, ¶ 79).

Repayments on the 1993 Note were made by D & K LP until 1999, and in keeping with the parties' understanding that the 1993 Note obligation would not be enforced, no attempt was made to collect on it for almost 10 years until August 2008 when Sagi sought to enforce it on behalf of TPR by causing TPR to send a notice of default to himself as the manager of D & K LP. (*Id.*, ¶¶ 50, 64). In February 2009, the 1993 Note was foreclosed upon at an auction at which the 240 shares of TPR stock pledged by D & K LP as collateral were purchased by TPR for $2.2 million, thereby decreasing D & K LP's obligation, but leaving a "deficiency" of approximately $8.8 million [***8] guaranteed by the Trusts. (*Id.*, ¶¶ 65-70). Orly Trust's interest in D & K LP's interest in TPR, the Orly Trust's sole asset, was thereby transferred to TPR, resulting in a serious financial loss to Orly and the Orly Trust. (*Id.*, ¶ 71). Plaintiff alleges that the deficiency "manufactured by this sham auction" gave Sagi and TPR a potential basis upon which to foreclose on the Orly Trust's remaining principal asset, its interest in the TRI shares. (*Id.*, ¶ 70).

On August 22, 2008, the Trump Group and TPR entered into a stock purchase agreement whereby TPR agreed to sell the Sagi Trust's shares of TRI stock to the Trump Group for $26.7 million, which would result in the Trump Group becoming TRI's majority stockholder. (*Id.*,

¶¶ 82-84). Moreover, that same day, the parties entered into a side letter agreement whereby TPR agreed that if the transfers made by TPR of the TRI shares to the Orly Trust and to Arie in the Divorce Stipulation were determined to be invalid, the Trump Group would be entitled to purchase directly from TPR the Orly Trust's TRI shares and Arie's TRI shares at less than 60 percent of the per share price paid by the Trump Group for the Sagi Trust TRI shares. These agreements, [***9] and the transactions contemplated thereunder, engendered significant litigation in various jurisdictions, including Delaware, the Southern District of New York (SDNY), as well as this court and the Surrogate's Court.

In an amended decision dated July 28, 2010, which replaced the June 28, 2010 decision addressing motion sequence numbers 001 through 006, the justice previously assigned to this Part denied defendants' motions to dismiss Orly's first amended complaint, granted Orly's request for leave to file the complaint to add Fang as a defendant, and issued certain injunctive relief against defendants in Orly's favor. (*See Genger v Genger*, New York County, July 28, 2010, Feinman, J., index number 109749/2009) (July 28 decision).

The complaint contains 16 causes of action, including: breach of fiduciary duty, aiding and abetting a breach of fiduciary duty, tortious interference with contract, fraud, aiding and abetting fraud, constructive trust, conversion, replevin, and promissory estoppel, as well as requests for various declaratory judgments and injunctive reliefs. In sum, plaintiff alleges that the defendants acted in concert to defraud Orly and loot the Orly Trust of its assets.

*II.* [***10] *TPR'S MOTION AND PLAINTIFF'S CROSS MOTION*

*A. TPR's motion for leave to amend its answer*

TPR filed its answer to the complaint on October 7, 2010, and by motion dated July 12, 2012 (sequence number 013), seeks leave to amend its answer to plead release as an additional affirmative defense, asserting that after filing its answer, it entered into a settlement on March 16, 2012 (2012 Settlement) with the Orly Trust, acting through Dalia, and D & K LP, acting through D & K GP, that restates and amends an earlier settlement dated October 3, 2011 among the same parties (2011 Settlement), pursuant to which they agreed, *inter alia*, to release each other.

Pursuant to the 2011 Settlement, TPR agreed to relinquish in favor of the Orly Trust any economic interest in the Orly Trust's TRI shares and sale proceeds, including the $10.3 million resulting from TPR's sale to the Trump Group of those shares under the 2008 side letter