39 Misc. 3d 1235(A), *; 972 N.Y.S.2d 143, **;
2013 N.Y. Misc. LEXIS 2304, ***; 2013 NY Slip Op 50886(U)

any shares of TPR, either directly or indirectly through DK (the TPR Interest')" (2011 Settlement Agreement, ¶ 1[b]). Therefore, the Orly Trust's direct interest in D & K LP and its indirect interest in TPR (through D & K LP) were adversely affected by the settlement, inasmuch as the Orly Trust was required to disclaim any and all interest in the TPR shares. The 2012 Settlement retained this language. (2012 Settlement  Agreement, ¶ 1[b]).

Thus, it is undisputed that any transfer to TPR of the Orly Trust's interest in TPR would involve a transfer through and by D & K LP, because the Orly Trust is a partner of D & K LP which, in turn, is a TPR shareholder. Also, the Orly Trust and D & K LP are parties to the settlements and are purportedly required to exchange mutual releases with TPR which, among other things, release all claims and causes of action in connection with [***16] the DK Interest and the TPR Interest. (*See* 2011 and 2012 Settlement Agreements, ¶ 4). The settlements thus affect or otherwise dispose of the Orly Trust's and D & K LP's interests in TPR.

Moreover, TPR ignores the fact that Orly is suing on behalf of D & K LP, whose interest in TPR is explicitly addressed in the injunctive provision of the July 28 decision. Indeed, TPR admits that Orly Trust's interest in TPR is affected by the settlements, stating that, "even were [defendants] not so released, all of Orly's claims brought on behalf of D & K' would still be barred because, under Section 1 of the Settlement Agreement, the [Orly] Trust has transferred to TPR its limited partnership interest in D & K." (TPR Brief at 9).

TPR also ignores the injunctive relief granted in favor of plaintiff because the court state that "the family shares at issue are intertwined among various family [corporate] entities, [and] defendants have not offered sufficient evidence to show that the shares of either TPR or [TRI] owned by the Orly Trust are not unique' and should not be protected from transfer, sale, or assignment until this litigation is ultimately decided." (July 28 decision, at 14). Yet, TPR and  [***17] other defendants entered into settlements that impacted the Orly Trust's interests in the TPR shares and/or the TRI shares before any judicial determination of their ownership. Hence, the settlements violate the letter and spirit of the injunctive provision of the decision.

## C. Plaintiff's cross motion

On December 28, 2011, in the related action under index number 651089/2010, the previously assigned justice enjoined defendants Dalia, Sagi, and TPR from using or spending the proceeds derived from TPR's purported sale to the Trump Group of the Orly Trust shares and the Arie shares in TRI, pending a judicial determination of their beneficial ownership. TPR and the Trump

Group were also directed to give plaintiffs Arie and Orly 10 business days' notice of any future transactions that may impact such shares. In her cross motion (sequence number 014) filed in this action, Orly opposes TPR's motion and seeks sanctions against defendants for violating the restraint and injunction set forth in the July 28 and December 28 decisions.

TPR denies that the settlements violate the December 28 decision and the notice requirement set forth therein because TPR was not required to "notify [Orly] before  [***18] selling its own promissory note [i.e., the 2011 Note] to a third party [i.e. Manhattan Safety]." (TPR's Brief In Opposition to Plaintiff Cross Motion for Sanctions, filed Aug. 10, 2012 at 4). Notably, in connection with the 2012 Settlement and the May 2012 assignment of the 2011 Note to Manhattan Safety, Dalia, on behalf of the Orly Trust, and TPR agreed to use the proceeds derived from TPR's purported sale of the Orly Trust TRI shares to the Trump Group to pay the 2011 Note and/or New Note. Even though no payment has yet been made, the above arrangement impacts the Orly Trust TRI shares to the extent it seeks to "use" or "spend" the sale proceeds to pay the 2011 Note or New Note, which, according to plaintiff, is a "sham transaction" in that TPR/Sagi tries to revive the worthless 1993 Note, and replace it with a purportedly valid 2011 Note that is assigned to an off-shore entity located outside of this court's jurisdiction.

Accordingly, the transactions under the settlements, as agreed to by defendants including TPR, impact Orly Trust's interest in the TRI shares, and thus defendants should have given Orly 10 days' notice pursuant to the December 28 decision. The failure to do so  [***19] violates the court's order and subjects defendants to sanctions, namely, plaintiff's costs in preparing and filing these motions, and in answering defendants' motions.

Plaintiff's request to lift the automatic stay of discovery is mooted by compliance conference order dated September 19, 2012, which lifted the stay in connection with TPR's summary judgment motion. In any event, because TPR's summary judgment motion is denied (supra, II.B.), the stay is unwarranted.

As the settlement agreements are contracts entered into in violation of court orders, they are either void or voidable. (*Crane v New York Council 66 of Am. Fed. of State, County & Mun. Empls., 101 AD2d 682, 475 N.Y.S.2d 165 [3d Dept 1984]; see also Skiff-Murray v Murray, 17 AD3d 807, 793 N.Y.S.2d 243 [3d Dept 2005]* [transfer of subject real property in violation of restraining order would make new deed void or voidable]). At a minimum, the settlements and releases are subject to judicial review and approval, notwithstanding TPR's contention that they are valid and enforceable and that

39 Misc. 3d 1235(A), *; 972 N.Y.S.2d 143, **;
2013 N.Y. Misc. LEXIS 2304, ***; 2013 NY Slip Op 50886(U)

the claims of Orly and the Orly Trust against TPR have been settled and released.

Moreover, TPR's asserted claim to the $10.3 million proceeds, held in escrow in connection with [***20] its sale to the Trump Group of the Orly Trust's interest in the TRI shares, is an untenable attempt to bypass a judicial determination as to the beneficial ownership of the shares and proceeds thereof. In its opposition brief (docket no. 266), TPR asserts that, "[p]ursuant to the Settlement Agreement, TPR does relinquish its economic interest in certain TRI shares to the Orly Trust, of which Orly is the main beneficiary," and that by "relinquishing its right to the aforementioned TRI shares[, TPR obtained] in exchange [] a general release of liability." (TPR Opposition Brief at 1, 10-11). TPR's assertion of ownership interest in the TRI shares and the escrowed $10.3 million cannot be reconciled with its acknowledgment that "Orly is the main beneficiary." Nor can TPR's unilateral declaration of ownership be reconciled with the undisputed fact that the issue of ultimate beneficial ownership in such shares and the related proceeds has not yet been judicially determined by a court of competent jurisdiction. (Dec. 28 decision, at 14). That the Delaware court has determined that TPR is the record owner of the TRI shares is immaterial absent a judicial determination as to their beneficial [***21] ownership.

The complaint also raises significant issues of fact as to whether defendants, including TPR, have breached their fiduciary duties and engaged in collusion and self-dealing.

### III. FANG'S MOTION

Fang, the former trustee of the Orly Trust, seeks dismissal of the complaint against her, contending that: (1) she was given a full release by Dalia, the successor trustee, after she served as trustee for only nine months; (2) the Orly Trust instrument granted the trustee the power to settle any claims, and Dalia was empowered to grant her the release; (3) under the settlement agreements, she was also released of any and all liability; and (4) under New York trust law, a trustee, such as Dalia, is authorized to settle any claim in favor of the trust estate or in favor of third persons against the estate. (*Estates, Powers and Trusts Law [EPTL] § 11-1.1[b][13]*).

As discussed *supra*, II.C., the releases under the settlements are void or voidable because they violate the injunctive and notice provisions of prior court orders. Also, Fang has never explained why she, on behalf of the Orly Trust, signed the D & K Agreement, which granted D & K GP the authority to pledge the Orly Trust's interest [***22] in the TRI shares for the benefit of D & K LP, waived the Orly Trust's right to bring action against D & K GP, and never informed Orly of this arrangement despite her request. Because of Fang's involvement in this arrangement, Orly was granted leave in the July 28 decision to add Fang as a defendant and asserts claims of breach of fiduciary duty and fraud against Fang.

While exculpatory clauses in a trust agreement may be valid and enforceable, the trustee nevertheless remains liable "if he commits a breach of trust in bad faith or intentionally or with reckless indifference to the interests of the beneficiaries, or if he has personally profited through a breach of trust because the trustee must be accountable for acts committed while in a fiduciary relationship." (*Matter of Jastrzebski, 97 AD3d 819, 948 N.Y.S.2d 689 [2d Dept 2012]*; *see also Matter of Tydings, 32 Misc 3d 1204[A], 932 N.Y.S.2d 763, 2011 NY Slip Op 51177[U] [Sur Ct, Bronx County 2011]*). Similarly, New York's trust law prohibits the inclusion in a trust instrument of a provision exculpating a trustee of liability, as an exculpation for failure to uphold one's fiduciary duty and exercise reasonable care is against public policy. (*EPTL § 11-1.7*).

Here, that the release was signed by [***23] Dalia, the successor trustee, does not vitiate the public policy consideration that a former trustee should not be exculpated for a breach of fiduciary duty simply because a successor trustee has signed a release. And, even if the release was arguably binding on the beneficiary, as Fang urges, without first obtaining Orly's consent or providing her with notice, the complaint contains sufficient allegations of breach of fiduciary duty, fraud, and collusion against defendants Sagi, Dalia and Fang, which raise factual issues.

### IV. PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

Plaintiff seeks, *inter alia*, a temporary restraining order (TRO) and preliminary injunction to restrain and enjoin defendants from encumbering the Orly Trust with debts or selling the trust assets in connection with the settlements and Manhattan Safety transactions. On August 9, 2012, the previously assigned justice issued a TRO (docket no. 242) restraining defendants "from taking any action that encumbers the trust with debt and from liquidating, transferring or selling any stocks or other assets of the trust," and directing them to inform Orly "within 24 hours of the receipt of any notice of default or other attempt [***24] to enforce any provision of the notes in any way." The TRO was continued and modified by interim order dated August 15, 2012 (docket no. 311).

In support of the instant motion, which constitutes an extension of her cross motion to lift the automatic stay and for sanctions (sequence no. 014), Orly argues that

39 Misc. 3d 1235(A), *; 972 N.Y.S.2d 143, **;
2013 N.Y. Misc. LEXIS 2304, ***; 2013 NY Slip Op 50886(U)

additional injunctive relief is necessary to protect the Orly Trust's assets in the Manhattan Safety transactions because defendants have disregarded and violated prior status quo orders of this court. She seeks a preliminary injunction: (1) enjoining the defendants from participating in or allowing any party such as Manhattan Safety to foreclose or otherwise execute upon the Orly Trust's interest in the TRI shares; and (2) requiring Sagi and Dalia to deposit $4.44 million with the court, as security for the debts that were purportedly incurred by the Orly Trust in connection with the Manhattan Safety transactions, including the New Note ($4.24 million), an additional $200,000 promissory note, and any other debt instrument (Notes).

TPR opposes the motion, and argues that the injunctive relief sought by plaintiff should be denied based on the settlements and the releases.

For the reasons   [***25] stated above (II.C.), the settlements and releases are void or voidable because they violate the status quo orders of the court and public policy. The request to enjoin defendants including TPR from participating in any attempt by Manhattan Safety or allowing Manhattan Safety to foreclose or otherwise execute upon the Orly Trust's interest in the TRI shares is appropriate under the circumstances, especially as Manhattan Safety is an off-shore entity located outside of this court's jurisdiction and may try to enforce the Notes against the Orly Trust without notice.

Moreover, under the Settlements and related transactions, Manhattan Safety may enforce and collect on the Notes at the earliest of the following events: (a) Dalia no longer serving as the trustee of the Orly Trust; (b) the resolution of the federal interpleader action; or (c) November 1, 2014. As it appears that the interpleader action has been resolved, Manhattan Safety may accelerate the Notes and make them immediately due and payable. This court has also granted specific injunctive relief in plaintiff's favor in the July 28 decision. (Id. at 32). Therefore, the requested injunctive relief is warranted.

TPR argues that if   [***26] a preliminary injunction is granted, Orly should be required to post a $10.3 million bond pursuant to CPLR 6312 (b), which requires a plaintiff to give "an undertaking in an amount to be fixed by the court." TPR argues that $10.3 million is necessary because it was "the principal consideration TPR paid for the release pursuant to the Settlement Agreement." (TPR Opposition Brief, at 19). As the release is void or voidable, whatever amount TPR had purportedly paid for it is irrelevant.

And, in the July 28 decision, the undertaking first posted by plaintiff in the amount of $150,000 for its original application was continued. (Id. at 32). This amount remains appropriate, and need not be increased

under present circumstances, particularly in light of the fact that TPR has no absolute right to $10.3 million, having conceded that Orly is the main beneficiary.

However, to require Sagi and Dalia to post $4.44 million in personal assets in connection with the settlements and the Manhattan Safety transactions, is unwarranted, and Orly cites no applicable law in support.

Article 62 of the CPLR sets forth the grounds for seeking an order of attachment, a provisional remedy, but Orly articulates no   [***27] basis for her request, which is akin to a prejudgment attachment. She merely asserts that "[t]he only way to restore and protect the status quo is for defendants Sagi and Dalia pay $4.44 million into the Court, so funds are available to pay [Manhattan Safety,] if and when it seeks to collect [on the Notes.]" (Pl. Reply Brief, at 2).

Orly has failed, however, to demonstrate that a money judgment in her favor will be insufficient to remedy the alleged harm or that she will suffer irreparable injury so as to justify the granting of injunctive relief under CPLR 6311. Consequently, the requested injunctive or provisional relief is inappropriate. (See Zodkevitch v Feibush, 49 AD3d 424, 425, 854 N.Y.S.2d 373 [1st Dept 2008] ["Supreme Court erred in directing appellant to place into an escrow account the funds he allegedly misappropriated since plaintiffs failed to make a clear showing that they would suffer irreparable injury unless that relief were granted, a necessary element on a motion for a preliminary injunction"]).

V. CONCLUSION

Accordingly, it is hereby

ORDERED, that with respect to motion sequence number 013, defendant TPR  Investment Associates, Inc.'s motion for an order seeking leave of the court to   [***28] amend its answer is denied, and its motion for an order granting it summary judgment dismissing the second amended complaint is also denied; it is further

ORDERED, that with respect to motion sequence number 014, the branch of plaintiff's cross motion seeking an order lifting the automatic stay of discovery is denied as moot, and the branch of the cross motion seeking sanctions against defendants is granted to the extent of plaintiff's costs in preparing and filing the cross motions and opposing defendants' motions; it is further

ORDERED, that with respect to motion sequence number 015, defendants named in this action, except defendant Leah Fang, as well as their agents, assigns, and counsel, are preliminarily enjoined from participating in the foreclosure or execution of or permitting any assignee of the notes that were issued in connection with the settlements and the related transactions to foreclose

39 Misc. 3d 1235(A), \*; 972 N.Y.S.2d 143, \*\*;
2013 N.Y. Misc. LEXIS 2304, \*\*\*; 2013 NY Slip Op 50886(U)

or execute upon the Orly Genger 1993 Trust's interest in the shares of Trans Resources Inc. until further order of this Court, and that plaintiff is not required to post any additional undertaking for the relief granted herein; and it is further

ORDERED, that with respect to motion sequence [\*\*\*29] number 016, defendant Leah Fang's motion for

an order granting summary judgment dismissing the second amended complaint as against her is denied.

ENTER:

Barbara Jaffe, JSC

DATED: May 29, 2013

New York, New York



**Orly Genger, etc., Plaintiff-Respondent, v Dalia Genger, et al., Defendants-Appellants.**

**11871, 109749/09**

**SUPREME COURT OF NEW YORK, APPELLATE DIVISION, FIRST DEPARTMENT**

*120 A.D.3d 1102; 993 N.Y.S.2d 297; 2014 N.Y. App. Div. LEXIS 6204; 2014 NY Slip Op 06248*

**September 23, 2014, Decided**
**September 23, 2014, Entered**

**NOTICE:**

THE LEXIS PAGINATION OF THIS DOCUMENT IS SUBJECT TO CHANGE PENDING RELEASE OF THE FINAL PUBLISHED VERSION. THIS OPINION IS UNCORRECTED AND SUBJECT TO REVISION BEFORE PUBLICATION IN THE OFFICIAL REPORTS.

**PRIOR HISTORY:** *Genger v. Genger, 115 A.D.3d 421, 982 N.Y.S.2d 11, 2014 N.Y. App. Div. LEXIS 1386 (N.Y. App. Div. 1st Dep't, 2014)*
*Genger v. Genger, 39 Misc. 3d 1235(A), 972 N.Y.S.2d 143, 2013 N.Y. Misc. LEXIS 2304 (2013)*

**COUNSEL:** [***1] Pedowitz & Meister, L.L.P., New York (Robert A. Meister of counsel), for Dalia Genger, appellant.

Morgan, Lewis & Bockius LLP, New York (John Dellaportas of counsel), for Sagi Genger and TPR Investment Associates, Inc., appellants.

Ira Daniel Tokayer, New York, for D & K GP LLC, appellant.

Zeichner Ellman & Krause LLP, New York (Brian D. Leinbach of counsel), for respondent.

**JUDGES:** Tom, J.P., Friedman, Acosta, Andrias, Richter, JJ.

**OPINION**

[*1102] [**298] Order, Supreme Court, New York County (Barbara Jaffe, J.), entered May 31, 2013, which, insofar as appealed from, denied the motions of defendants TPR Investment Associates, Inc. (TPR) and D & K GP LLC (D & K GP) to amend their answers and for summary judgment dismissing the claims against them, granted plaintiff's cross motion for sanctions against TPR, D & K [*1103] GP, defendant Dalia Genger (Dalia), and defendant Sagi Genger (Sagi), sanctioned defendant Leah Fang (Fang), and denied Fang's motion for summary judgment dismissing the claims against her, unanimously modified, on the law and the facts, to delete the sanctions against Dalia, Sagi, and Fang, and to grant Fang's motion for summary judgment dismissing the claims against her, and otherwise affirmed, without costs. [***2]

Contrary to the motion court's statement, plaintiff did not cross-move for [**299] sanctions against Fang. Furthermore, Fang did not disobey the 2010 and 2011 injunctions -- she resigned as trustee of indirect plaintiff the Orly Genger 1993 Trust (Orly Trust) in January 2008 and had nothing to do with the 2011 and 2012 settlements challenged by plaintiff. Hence, there was no basis for sanctioning Fang.

Plaintiff's *cross* motion for sanctions was improper as against Dalia and Sagi, who were not movants (*see e.g. Kershaw v Hospital for Special Surgery, 114 AD3d 75, 978 N.Y.S.2d 13 [1st Dept 2013]*).

TPR and D & K GP contend that they should not have been sanctioned because they did not violate the 2010 and 2011 injunctions. This argument is unavailing.

120 A.D.3d 1102, *; 993 N.Y.S.2d 297, **;
2014 N.Y. App. Div. LEXIS 6204, ***; 2014 NY Slip Op 06248

Assuming, arguendo, that the 2010 order merely enjoined transfers, sales, pledges, assignments, or other dispositions of TPR shares (as opposed to transfers, etc., of the Orly Trust's interest in double-derivative plaintiff D & K LP), Orly Trust disclaimed any interest in any shares of TPR via the settlement agreements.

It is true that the October 2011 settlement predated the December 2011 injunction; however, the parties to the settlement amended and restated their agreement in March 2012, i.e., after the injunction. The 2011 order [***3] enjoined Sagi, TPR, and Dalia "from making demands upon and using or spending the proceeds derived from the purported sale by TPR . . . to [nonparty] Trump Group . . . of . . . the Orly Trust['s shares of non-party Trans-Resources, Inc. (TRI)] . . ., pending the determination by a court of competent jurisdiction [of] the beneficial ownership of such shares." The promissory note which is a part of both settlement agreements -- and which replaced a note that D & K LP had given in 1993 (the 1993 Note) -- provides that the principal and accrued interest shall be due "[i]mmediately upon [Orly Trust]'s receipt of the proceeds from the sale of [its] TRI shares."

In sum, the motion court properly found that TPR and D & K GP had disobeyed "a lawful mandate of the court" (*Judiciary Law § 753[A][3]*) and properly ordered them to pay plaintiff's attorneys' fees (*see Davey v Kelly, 57 AD3d 230, 869 N.Y.S.2d 37 [1st Dept 2008]*).

For the reasons discussed in the following paragraph, it was a [*1104] provident exercise of the IAS court's discretion to deny TPR's and D & K GP's motions to amend their answers to add the defense of release, based on the release contained in the October 2011 and March 2012 settlement agreements, because the proposed amendment lacked merit and would be futile (*see Eighth Ave. Garage Corp. v H.K.L. Realty Corp., 60 AD3d 404, 405, 875 N.Y.S.2d 8 [1st Dept 2009], lv dismissed* [***4] *12 NY3d 880, 910 N.E.2d 1003, 883 N.Y.S.2d 174 [2009]*). For the same reasons, the court correctly denied the motions by TPR and D & K GP for summary judgment dismissing the claims against them based on the same release.

When a fiduciary has a conflict of interest in entering a transaction and does not disclose that conflict to his/her principal, the transaction is "voidable at the option of" the principal (*Wendt v Fischer, 243 NY 439, 443, 154 N.E. 303 [1926]*). Moreover, "an agent cannot bind his principal . . . where he is known to be acting for himself, or to have an adverse interest" (*Manhattan Life Ins.*

*Co. v Forty-Second St. & Grand St. Ferry R.R. Co., 139 NY 146, 151, 34 N.E. 776 [1893]*). In entering into the aforementioned October 2011 and March 2012 settlement agreements with TPR and D & K LP on behalf of Orly Trust, of which she was sole trustee, Dalia [**300] had a conflict of interest. The new promissory notes executed by Dalia on behalf of Orly Trust pursuant to the settlement agreements contained provisions that were plainly intended to entrench her as sole trustee of Orly Trust, notwithstanding the ongoing disputes and litigation between herself and plaintiff, the trust's beneficiary. Specifically, the replacement notes provided that Dalia's resignation or removal as trustee of Orly Trust, or the appointment of any additional trustee, would constitute an event of default rendering the notes [***5] immediately due and payable by Orly Trust. Further, the purported settlement of the derivative claims that plaintiff asserts on behalf of Orly Trust in this action -- which was already pending at the time the settlement agreements were executed -- required the court's approval, which was never sought. Moreover, as previously discussed, the settlements were entered into in violation of the aforementioned 2010 and 2011 injunctions. For these reasons, the settlements are voidable and, given the expressed intention of plaintiff (the beneficiary of Orly Trust) to void them, the purported releases they contain are not enforceable.

Fang moved for summary judgment based on additional releases given to her by Dalia (as trustee of Orly Trust) in December 2007 and January 2008. As no infirmity has been demonstrated in the December 2007 and January 2008 releases, the IAS court should have granted Fang summary judgment [*1105] based on these instruments.

This determination renders moot the portion of Fang's motion that sought summary judgment based on the infirm releases in the 2011 and 2012 settlement agreements.

The Decision and Order of this Court entered herein on March 4, 2014 is hereby recalled and vacated [***6] (*see M-1592 and M-1606 decided simultaneously herewith*).

THIS CONSTITUTES THE DECISION AND ORDER OF THE SUPREME COURT, APPELLATE DIVISION, FIRST DEPARTMENT.

ENTERED: SEPTEMBER 23, 2014

Case 1:19-cv-09319-AKH Document 1-122 Filed 10/08/19 Page 7 of 100

## AMENDED AND RESTATED SETTLEMENT AGREEMENT

This AMENDED AND RESTATED SETTLEMENT AGREEMENT (the "Agreement") is entered into as of March 16, 2012, by and among TPR Investment Associates, Inc., a Delaware corporation ("TPR"), the Orly Genger 1993 Trust, a trust settled on December 13, 1993, with Dalia Genger currently serving as trustee (the "OG Trust"), and D&K LP, a limited partnership ("DK") (collectively, the "Parties"; each, a "Party").

WHEREAS, this Agreement amends and restates the Settlement Agreement entered into by the same parties on October 3, 2011 and sets forth all current understandings and replaces all former understandings between the OG Trust, on the one hand, and any other Party or Parties hereto, on the other hand;

WHEREAS, TPR and OG Trust entered into an agreement on or about October 29, 2004 (the "Share Transfer"), whereby TPR contracted to sell to the OG Trust 1,102.8 shares of Trans Resources, Inc., a Delaware corporation ("TRI" and the "TRI Shares"); and

WHEREAS, TPR relied on representations by Arie Genger that the liabilities stemming from the "Bogolusa Lawsuit" against TPR, TRI and Arie Genger personally exceeded the combined assets of TRI and TPR by at least $30 million, implying that TRI was worthless (the "Bogolusa Representation"); and

WHEREAS, Arie Genger further represented that the Share Transfer only required the consent of TPR, and that no further consents were required by any third party (the "Transferability Representation"); and

WHEREAS, in reliance on both the Bogolusa Representation and the

**CONFIDENTIAL**                                    **TPR 0014107**

Transferability Representation, TPR and the OG Trust agreed that OG Trust would pay TPR, for the Share Transfer, a consideration in the amount of one dollar per share; and

WHEREAS, the Bogolusa Representation was subsequently deemed false, as determined by Judge Leo Milonas in arbitration proceeding between Arie Genger and Dalia Genger in her personal capacity; and whereas in said arbitration proceeding Judge Milonas concluded that the value of the net assets of TRI as of October 2004 was approximately $55 million ("Milonas Value"), implying a possible value for the 1,102.8 TRI Shares of $10.3 million as of that same date (without discount to reflect a minority interest); and

WHEREAS, the Supreme Court of Delaware has recently affirmed the findings of the Delaware Chancery Court that the Transferability Representation was false, that pursuant to a Shareholder Agreement of TRI, which was entered into as of March 30, 2001, while Arie Genger controlled both TPR and TRI (the "TRI Shareholders Agreement"), the consent of other TRI shareholders (collectively, the "Trump Group") was required, that Arie Genger failed to provide such notice as required; and that TPR therefore remained the lawful record owner of the TRI Shares; and

WHEREAS, the Trump Group is claiming that beneficial ownership of the TRI Shares was not lawfully transferred to the OG Trust, a claim the Courts have not yet finally resolved; and

WHEREAS, the OG Trust is a guarantor of a certain Promissory Note in favor of TPR dated as of December 21, 1993, made by D&K Limited Partnership in the face value of $8,950,000 (the "1993 Note"); and

WHEREAS, following a partial foreclosure, approximately $4.5 million of the

-2-

amount currently due and owing under the 1993 Note remains guaranteed by the OG Trust; and

WHEREAS Orly Genger, as beneficiary of the OG Trust, filed a Complaint in the New York State Supreme Court, which she personally verified on July 8, 2009 as truthful to her own knowledge, alleging that if the Delaware litigation resulted in a determination that the TRI shares were not transferred but remained with TPR the value of TPR's shares would increase by $250 to $350 million, so that the OG Trust's claimed beneficial ownership interest in the TRI Shares could be over $200 million; and

WHEREAS Orly Genger, as beneficiary of the OG Trust, earlier submitted a letter to the Surrogate's Court on November 8, 2008, stating that the TRI shares that TPR had contracted in 2004 to sell to the Sagi Genger 1993 Trust (the same number of shares that TPR had simultaneously contracted to sell to the OG Trust) were worth "in excess of $150,000,000"; and

WHEREAS, the OG Trust seeks to secure the economic benefit of its claimed beneficial ownership interest in the TRI Shares, which Orly Genger, as set forth above, has previously valued at $150-200 million; and

WHEREAS, pursuant to a letter agreement dated August 22, 2008 (the "2008 Letter Agreement"), TPR executed documents to transfer the TRI Shares to the Trump Group at the Milonas Value; and

WHEREAS, TPR believes that the transfer pursuant to the 2008 Letter Agreement is final, but the OG Trust reserves the right to challenge the Trump Group's title to the TRI Shares or alternatively claim the proceeds of the sale from the TRI Shares to the Trump Group, net of amounts due under the 2011 Note (as defined hereunder); and

-3-

CONFIDENTIAL

TPR 0014109

WHEREAS, at a hearing before the New York State Supreme Court on September 13, 2011, counsel for Orly Genger in her personal capacity expressed to the Court his client's concern that the value of the OG Trust's claimed beneficial ownership interest in the TRI Shares would be "diminished" by litigation positions to be taken by TPR before the Delaware Chancery Court;

WHEREAS, TPR, the OG Trust, and DK now seek to finally settle all other disputes and controversies that exist among them, in such a manner as to: (a) resolve Orly Genger's concern by having TPR relinquish any interest in the TRI Shares and thereby enable the OG Trust to fully pursue the economic value of its claimed beneficial ownership interest in the TRI Shares; and (b) eliminate, or at least reduce, the drain on all sides' resources from the endless litigation of these issues in multiple forums;

NOW, THEREFORE, in consideration of the promises and commitments set forth herein, and other good and valuable consideration the receipt and sufficiency of which are hereby acknowledged, the Parties hereby agree as follows:

1.  <u>Consideration</u>.  In exchange for the consideration set forth herein: (a) TPR hereby relinquishes in favor of the OG Trust any economic interest in the TRI Shares and assigns to the OG Trust its right to any economic benefits of the TRI shares including any proceeds from the sale thereof, including but not limited to the $10.3 million in proceeds otherwise owing to TPR in the future pursuant to the terms of the August 22, 2008 letter agreement; (b) the OG Trust – irrespective of any claim made or asserted on its behalf by Orly Genger – hereby transfers to TPR its limited partnership interest in DK (the "DK Interest"), and disclaims any interest in, any shares of or TPR, either directly or indirectly through DK (the "TPR Interest"); (c) TPR has paid $100,000 for the legal fees of the OG

-4-

**CONFIDENTIAL**                    **TPR 0014110**

Trust; and (d) DK and TPR agree that all rights of DK and/or TPR vis-à-vis the OG Trust created by (i) the Amended and Restated Limited Partnership Agreement of D&K Limited Partnership dated as of October 30, 2004 and signed November 22, 2007, and/or (ii) the Meeting of Partners of D&K L.P. January 31, 2009 & Agreement, are canceled and void *ab initio*.

2.  2011 Note. The OG Trust is hereby released from any obligation under or as guarantor of the 1993 Note currently payable and owing in the amount of $4.5 million or the D&K Partnership Agreement, and the 1993 Note is hereby cancelled and replaced by an updated new promissory note, from the OG Trust in favor of TPR, substantially in the form attached hereto as Exhibit A, in the amount of $4.0 million (the "2011 Note"). TPR hereby relinquishes its claim to the remaining approximately $500,000 due under the 1993 Note. The terms of the 2011 Note are incorporated by reference as if fully set forth herein.

3.  Mutual Releases.   The parties to this Settlement Agreement hereby irrevocably and fully release one another, including all current and former directors, officers, trustees, fiduciaries, agents, advisors and other representatives of each of the parties, as well as their shareholders, their partners, and/or their subsidiaries, who have served at any time from November 1, 2004 to the present day, whether for acts in their fiduciary or individual capacities, and their respective successors and assigns, from all claims, causes of action, lawsuits, demands, liability of any kind, asserted or unasserted, known or unknown, suspected or unsuspected, direct or derivative, in connection with the 1993 Note, the TRI Shares, the Share Transfer, the DK Interest, the TPR Interest, the 2008 Letter Agreement, or any other matters,

-5-

      TPR 0014111

through the date of this Agreement. Nothing herein shall release any rights under this Agreement. Nothing herein shall release any claim or defense that any Party hereto has or may have as against any of the following persons and entities: Glenclova Investment Co., TR Investors, LLC, New TR Equity I, LLC, New TR Equity II, LLC, Jules Trump, Eddie Trump, Mark Hirsch, Trans-Resources, Inc., Avi Pelossof, William Dowd, Lawrence Small, Robert Smith, Arie Genger, Edward Klimerman, SNR Denton (along with its predecessor firms and all current and former partners thereof), and/or any other non-Party person who currently is litigating claims against any of the parties hereto.

4.    Binding Nature.  This Agreement shall be binding upon and inure to the benefit of the Parties and their respective successors and assigns.

5.    Titles.  Titles and headings to articles, sections or paragraphs in this Agreement are inserted for convenience of reference only and are not intended to affect the interpretation or construction of the Agreement.

6.    Choice of Law and Forum.  This Agreement shall be governed by and construed in accordance with the laws of the State of New York, without reference to its conflicts of laws principles.  The parties hereto hereby irrevocably and unconditionally submit, for themselves and their respective property, to the non-exclusive jurisdiction of the state and federal courts located in Wilmington, Delaware.

7.    Attorney's Fees.  In the event that, following execution of this Agreement, a Party hereto, or a beneficiary of a Party hereto for the benefit of that Party, either asserts a new claim or continues to pursue an existing claim (including, without limitation, any claim asserted in an arbitral proceeding, proceeding for the obtaining of

**CONFIDENTIAL**                                           **TPR 0014112**

provisional remedies, trial, appeal or enforcement proceeding) against another Party hereto concerning, arising out of, or relating to this Agreement, the 1993 Note, the TRI Shares, the Share Transfer, the DK Interest, the TPR Interest, the 2008 Letter Agreement, or any matters, through the date of this Agreement and such claim is unsuccessful, then the prevailing defendant, cross-claim defendant, counterclaim-defendant or arbitration respondent shall be entitled to recover its post-Agreement costs, expenses (including, without limitation, the reasonable costs of retaining experts or professional consultants) and reasonable attorneys' fees, in addition to all other remedies available to such Party.

8.    Interpretation.  Whenever possible, each provision of this Agreement shall be interpreted in such a manner as to be effective and valid under applicable law.  No term shall be construed against any Party as drafter.

9.    Further Assurances. Each of the Parties agrees to execute and deliver, or to cause to be executed and delivered, all such instruments, and to take all such action as the other Party may reasonably request, in order to effectuate the intent and purposes of, and to carry out the terms of, this Agreement.

10.    Modification and Waiver.  This Agreement may be amended or modified only by a written instrument signed by each of the Parties.  No waiver of any provision of this Agreement by a Party shall be effective unless embodied in a written instrument signed by such Party.  The waiver by any of the Parties of any breach of this Agreement shall not be deemed a waiver of any prior or subsequent breach of this Agreement.

11.    Entire Agreement.  This Agreement constitutes the entire agreement between the Parties regarding the subject matter herein, superseding all prior oral or written representations, negotiations, understandings and agreements, on the subject

CONFIDENTIAL                                    TPR 0014113

matter herein.

12.   Counterparts.   This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all of which shall be considered one instrument and shall become binding when one or more counterparts have been signed by each of the Parties and delivered to the other.

13.   Confidentiality. This Agreement and its terms are confidential.

14.   Additional Covenant.  DK covenants that it has received authorization from the Sagi Genger 1993 Trust to enter into this Agreement, to the extent such authority is required.

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the date indicated below.

TPR Investment Associates, Inc.

By: _Yont Sternberg_
Date: _16.3.12_

The Orly Genger 1993 Trust

_Dalia Genger_, Trustee
By: _March 16, 2012_
Date: _____

D&K LP

By: _Manager of GP_
Date: _March 16, 2012_

-8-

CONFIDENTIAL                    TPR 0014114

# PROMISSORY NOTE

$4,000,000                                                                     October 3, 2011

FOR VALUE RECEIVED, the undersigned, the Orly Genger 1993 Trust ("Borrower"),
by way of its current sole trustee, Dalia Genger, promises to pay to TPR Investment
Associates, Inc., a Delaware corporation ("Lender") the sum of $4,000,000 ("Principal")
together with interest thereon at the rate of three percent (3%) percent per annum,
payable as follows, and further covenants, to Lender, as follows:

The Principal together with all interest accrued thereon shall be due and payable to, or to
the order of, Lender on the earliest of:

> (i)    November 1, 2012;

> (ii)   Immediately upon Borrower's receipt of the proceeds from the sale
>        of TRI shares either pursuant to the interpleader action pending in
>        the United States District Court for the Southern District of New
>        York (the "Court") in *Pedowitz v. TPR*, 11 Civ. 5602, or otherwise.

Notwithstanding anything to the contrary herein or in the parties' accompanying
Settlement Agreement, to the extent that the Court awards Lender any of the interpleaded
funds, Lender shall first retain such funds to the extent necessary to pay down this Note
in full, and then transfer any remaining funds to Borrower.

The occurrence and continuation of any one or more of the following events shall
constitute an event of default under this New Note ("Event of Default"):

> (a)    <u>Payment Default</u>. Borrower shall fail to make any required payment due in
connection with this New Note.

> (b)    <u>Third Party Lien or Caveat</u>. The creation of a lien on Borrower's property,
or the entry of a caveat (which Lender deems material), that has not been removed ten (10)
days of its creation.

> (c)    <u>Change of Trustee</u>.  The resignation, removal, or otherwise change of trustee
of Borrower.

> (d)    <u>Bankruptcy Default</u>. The Borrower shall (i) commence any case, proceeding
or other action under any existing or future law of any jurisdiction relating to seeking to
have an order for relief entered with respect to it or its debts, or seeking reorganization,
arrangement, adjustment, winding-up, liquidation, dissolution, composition or other such
relief with respect to it or its debts, or seeking appointment of a receiver, trustee, custodian
or other similar official for it or for all or substantially all of its assets (each of

**CONFIDENTIAL**                                                          **TPR 0014115**

the foregoing, a "Bankruptcy Action"); (ii) become the debtor named in any Bankruptcy Action which results in the entry of an order for relief or any such adjudication or appointment described in the immediately preceding clause (i), or remains undismissed, undischarged or unbonded for a period of sixty (60) days; or (iii) make a general assignment for the benefit of its creditors.

In each and every Event of Default, the Lender may, without limiting any other rights it may have at law or in equity, by written notice to the Borrower, declare the unpaid Principal of and Interest on this New Note due and payable, whereupon the same shall be immediately due and payable, without presentment, demand, protest or other notice of any kind, all of which the Borrower hereby expressly waives, and the Lender may proceed to enforce payment of such Principal and Interest or any part thereof in such manner as it may elect in its discretion.

This Note may be prepaid in whole or in part at any time without premium or penalty.

All prepayments shall be applied first to interest, then to principal payments in the order of their maturity.

The undersigned agrees to pay all costs and expenses, including all reasonable attorneys' fees, for the collection of this Note upon default. All payments shall be made at 1211 Park Avenue, New York, NY, 10128, or at such other place as the holder hereof may from time to time designate in writing.

Upon default, whether pursuant to an Event of Default or otherwise, the interest rate shall be increased to an amount ("Overdue Rate") equal to the maximum legal rate of interest permitted by applicable law.

If this New Note is not paid when due, Borrower promises to pay all costs and expenses of collection and attorneys' fees incurred by the holder hereof on account of such collection, whether or not suit is filed thereon. Borrower consents to renewals, replacements and extensions of time for payment hereof, before, at, or after maturity; consents to the acceptance, release or substitution of security for this note, and waives protest, presentment, demand for payment, notice of default or nonpayment and notice of dishonor and the right to assert any statute of limitations. The indebtedness evidenced hereby shall be payable in lawful money of the United States.

This New Note shall be governed by, and shall be construed and enforced in accordance with, the laws of the state of Delaware without giving effect to the conflict of law rules thereof, and shall be adjudicated before the appropriate Courts of the State of Delaware.

_Dalia Genger_

THE ORLY GENGER 1993 TRUST

**TPR 0014116**

### AGREEMENT AMENDING TERMS OF PROMISSORY NOTE

THIS AMENDMENT AGREEMENT (the "Agreement") is entered into by and among TPR Investment Associates, Inc., a Delaware corporation ("TPR"), the Orly Genger 1993 Trust, a trust settled on December 13, 1993, with Dalia Genger currently serving as trustee (the "OG Trust") and D&K LP, a Delaware limited partnership ("DK"). (collectively, the "Parties;" each, a "Party"), as of October 3, 2011.

WHEREAS, The Parties entered into a Settlement Agreement dated October 3, 2011, as was subsequently amended and restated in an Amended and Restated Settlement Agreement dated March 16, 2012 (the "Restated Settlement"); and

WHEREAS, per Section 2 of the Restated Settlement a new enforceable promissory note in the amount of $4,000,000 was made by the OG Trust in favour of TPR - substantially in the form of Exhibit A attached to the Restated Settlement (the "2011 Note", or as referred interchangeably elsewhere as the "New Note"); and

WHEREAS, the Parties seek to amend the terms of the 2011 Note with respect to the governing laws, the choice of courts, and the procedures necessary to amend the 2011 Note;

NOW, THEREFORE, for good and valuable consideration, and intending to be legally bound, the Parties hereto agree as follows:

1.  The last paragraph of the 2011 Note which reads as follows:

> "This New Note shall be governed by, and shall be construed and enforced in accordance with the laws of the State of Delaware without giving effect to the conflict of law rules thereof, and shall be adjudicated before the appropriate Courts of the State of Delaware"

is hereby rendered null and void, deemed deleted in its entirety and replaced by the following paragraph:

> "This Note shall be governed by, and shall be construed and enforced in accordance with the laws of the State of New York, without giving effect

to the conflict of law rules thereof. This Note may be enforced  against Borrower in any court of competent jurisdiction."

2.  The following paragraph shall be deemed to be added to the 2011 Note, and the Parties agree that any amendment to the 2011 Note shall be done in the following manner:

" This Note may be amended, altered  or modified at any time or from time to time, solely in writing executed by Borrower and Lender[1]. Any such amendment may be executed in one or more counterparts, all of which shall be considered one and the same instrument."

3.  The 2011 Note remains fully enforceable.  Except as otherwise provided herein, all other terms and conditions of the  2011 Note remain unchanged.

This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all of which shall be considered one instrument.

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the date indicated below.

TPR Investment Associates, Inc.

By: _____
Date: _____

The Orly Genger 1993 Trust

By: Dalia  Genger  Trustee
Date: 3/29/2012

D&K LP

By: Sagi  Genger, Manager
Date: 3/21/2012

_____

[1] As such terms are defined in the original promissory note dated October 3, 2011.

## CREDIT AND FORBEARANCE AGREEMENT AND
## SECOND AMENDMENT AND RESTATEMENT OF PROMISSORY NOTE

THIS CREDIT AND FORBEARANCE AGREEMENT AND SECOND AMENDMENT AND RESTATEMENT OF PROMISSORY NOTE is made effective as of May __, 2012 (this "**Agreement**") by and between the ORLY GENGER 1993 TRUST, a trust settled on December 13, 1993 (the "**Trust**") pursuant to that certain Trust Agreement dated December 13, 1993 (the "**Trust Agreement**") between Arie Genger as grantor and Lawrence M. Small and Sash A. Spenser as original Trustees, acting through Dalia Genger, its current Trustee ("**Dalia**" or "**Trustee**"), and MANHATTAN SAFETY COMPANY, LTD., a corporation organized under the laws of St. Kitts, W.I. ("**Manhattan**"). Capitalized terms not otherwise defined herein have the meanings ascribed to them in Section 1.2 below.

## RECITALS

**A.**      The Trust wishes to obtain additional financing and the forbearance in the enforcement of the 2011 Note so as to improve its ability to assert and defend its rights in the TRI Proceedings to the TRI Shares.

**B.**      Manhattan wishes to obtain certain representations and warranties in consideration for providing additional financing in the amount of up to Four Hundred Thousand Dollars and No Cents ($400,000.00) (the "**Manhattan Financing**") and its agreement to forbear in the enforcement of the 2011 Note.

**C.**      TPR Investment Associates, Inc., a Delaware corporation ("**TPR**"), and the Trust entered into an agreement on or about October 29, 2004 (the "**Share Transfer**") whereby TPR contracted to sell to the Trust 1,102.8 shares (the "**TRI Shares**") of Trans Resources, Inc., a Delaware corporation ("**TRI**"), for a nominal consideration.

**D.**      Certain former indirect shareholders of TRI have challenged the validity of the Share Transfer in various legal proceedings and other parties have engaged in litigation and arbitration proceedings relating to various issues concerning TRI, its shares and the appropriate consideration for the purchase and sale of shares of TRI, as well as the appointment of, and validity of actions taken by, the Trustee (collectively the "**TRI Proceedings**").

**E.**      The Trust, TPR, and D&K LP, a Delaware limited partnership ("**D&K**"), entered into a Settlement Agreement dated October 2, 2011 as subsequently amended and restated in an Amended and Restated Settlement Agreement dated March 16, 2012 (the "**Settlement**").

**F.**      Pursuant to the Settlement, (i) TPR relinquished in favor of the Trust any economic interest held by it in the TRI Shares and assigned to the Trust its right to any economic benefit of the TRI Shares, including any proceeds from the sale thereof, including the approximately Ten Million Three Hundred Thousand Dollars ($10,300,000) (the "**Minimum Payment**") in proceeds from the sale of the TRI Shares to TR Investors, LLC, Glencova Investment Co., New TR Equity I, LLC and New TR Equity II, LLC

(collectively, the "**Trump Group**") pursuant to the terms of a letter agreement dated August 22, 2008 (the "**Trump Sale Agreement**") between TPR and the Trump Group and (ii) an obligation of approximately Four Million Five Hundred Thousand Dollars of D&K to TPR, guaranteed by the Trust, representing the net amount following the partial foreclosure of an Eight Million Nine Hundred and Fifty Thousand Dollars ($8,950,000) obligation evidenced by a promissory note in the original principal amount, was cancelled and replaced by a new promissory note of the Trust in the original principal amount of Four Million Dollars ($4,000,000) payable to TPR (the "**2011 Note**").

      **G.**    In connection with the TRI Proceedings, Pedowitz & Meister, the escrow agent holding funds approximating the Minimum Amount (the "**Escrowed Amount**") pursuant to a certain Escrow Agreement dated as of September 1, 2010 (the "**Escrow Agreement**"), filed an interpleader action (the "**Interpleader Action**") currently pending in the United States District Court for the Southern District of the State of New York (the "**Court**") in *Pedowitz v. TPR*, 11 Civ. 5602 and deposited the Escrowed Amount with the Court to hold pending its determination as to which party is entitled to the Escrowed Amount.

      **H.**    Pursuant to that certain Agreement Amending Terms of Promissory Note dated as of October 3, 2011, certain provisions of the 2011 Note were amended (as so amended, the "**Amended Note**").

      **I.**    TPR has agreed to sell and assign the Note to Manhattan as evidenced by that certain Bill of Sale and Note Assignment of even date herewith.

      **J.**    Manhattan has agreed to make the Manhattan Loan in two installments: (1) an initial advance (the "**Initial Advance**") of Two Hundred Thousand Dollars and No Cents ($200,000.00), as evidenced by a promissory note in the principal amount of Two Hundred Thousand Dollars and No Cents ($200,000.00) (the "**New Note**"), payable as provided herein, and (2) an additional advance (the "**Additional Advance**") of Two Hundred Thousand Dollars and No Cents ($200,000.00) to be made upon request by the Trust, and evidenced by the note as amended and restated to provide for a face amount of Four Million Two Hundred Forty Thousand Dollars and No Cents ($4,240,000.00) (the "**Amended and Restated Note**" or the "**Note**") (inclusive of the Forbearance Fee if paid as provided herein), with the Additional Advance to bear interest from the date made on the terms of this Agreement and the Note. The Manhattan Loan, including both the Initial Advance and the Additional Advance, shall be subject to certain conditions, including the Trust's agreement to amend and restate the 2011 Note and enter into this Agreement.

      **NOW, THEREFORE**, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto, each intending to be legally bound, agree as follows:

**1.**    **Definitions.**

      1.1    <u>General</u>.  Capitalized terms used in this Agreement shall have the respective meanings ascribed thereto in Section 1 of this Agreement or as otherwise may be provided in other provisions of this Agreement. Terms defined in the Note, the

Settlement or the New Note and not otherwise defined in this Agreement shall have the same meanings in this Agreement as in the Note, Settlement or New Note, as the case may be. Except as otherwise expressly set forth herein, each reference herein to "the Agreement," "this Agreement," "herein," "hereunder" or "hereof" shall be deemed a reference to this Agreement. If there is any inconsistency between this Agreement, the Note, the Settlement or the New Note, this Agreement shall govern and control.

    1.2     <u>Definitions</u>. In this Agreement:

**"Additional Advance"** has the meaning set forth in Recital J.

**"Affiliate"** or **"Affiliates"** means "affiliate" as defined in either (a) Bankruptcy Code §101(2) or (b) Rule 144 of the Securities Act.

**"Agreement"** means this Credit and Forbearance Agreement and Second Amended and Restated Promissory Note.

**"Amended Note"** has the meaning set forth in Recital H.

**"Amended and Restated Note"** has the meaning set forth in Recital J.

**"Bankruptcy Code"** means the Bankruptcy Reform Act of 1978, 11 U.S.C. §§101 <u>et seq.</u>, as amended.

**"Bill of Sale"** means the bill of sale and note assignment relating to the assignment of the 2011 Note.

**"Business Day"** means any day that is not (a) a Saturday, (b) a Sunday or (c) any other day on which the Federal Reserve Bank of New York is closed.

**"Claim"** has the meaning specified in Section 7.1.

**"Claimant"** means any person or entity claiming, or having a right to claim, a mechanic's lien against the Minimum Payment or the TRI Shares, or any portion thereof, or who is delivered, or has the right to deliver, a stop notice in connection with the payment by Trust of its obligations under the Note.

**"Code"** means the Internal Revenue Code of 1986, as amended, and the rules and regulations promulgated under it.

**"Court"** has the meaning set forth in Recital G.

**"Dalia"** means Dalia Genger, the current Trustee of the Trust.

**"D&K"** means D&K LP, a Delaware limited partnership.

**"Debtor Relief Law"** means the Bankruptcy Code, and together with any other bankruptcy or insolvency law, assignments for the benefit of creditors, formal or informal moratoria, compositions, or extensions generally with creditors, or proceedings seeking reorganization, arrangement, liquidation, receivership, or other similar relief.

"**Distribution**" means any payment of principal, interest, penalty or costs paid by or on behalf of the Trust in connection with the Note or the Transferred Rights.

"**Encumbrance**" or, if used as a verb, "**Encumber,**" means any (a) mortgage, pledge, lien, security interest, charge, hypothecation, security agreement, security arrangement or encumbrance or other adverse claim against title of any kind; (b) purchase, option, call or put agreement or arrangement; (c) subordination agreement or arrangement; or (d) agreement or arrangement to create or effect any of the foregoing.

"**Entity**" means any individual, partnership, corporation, limited liability company, association, estate, trust, business trust, Governmental Authority, fund, investment account or other entity.

"**Escrow Agreement**" has the meaning set forth in Recital G.

"**Escrowed Amount**" has the meaning set forth in Recital G.

"**Forbearance Fee**" means a fee of Forty Thousand Dollars and No Cents ($40,000), being equal to one percent (1%) of Four Million Dollars and No Cents ($4,000,000.00), the face amount of the 2011 Note, paid in consideration of Manhattan's agreement to forbear as provided in this Agreement.

"**Governmental Authority**" means any federal, state, or other governmental department, agency, institution, authority, regulatory body, court or tribunal, foreign or domestic, and includes arbitration bodies, whether governmental, private or otherwise.

"**Indemnified Party**" has the meaning specified in Section 7.2.

"**Indemnifying Party**" has the meaning specified in Section 7.2.

"**Initial Advance**" has the meaning set forth in Recital J.

"**Insolvent**" has the meaning set forth in Section 4(h).

"**Interpleader Action**" has the meaning set forth in Recital G.

"**Liability**" or "**Liabilities**" shall mean all debts, obligations and other liabilities of any kind or nature (whether known, unknown, accrued, or not accrued, absolute or contingent, liquidated or unliquidated, due or to become due, asserted or unasserted or otherwise).

"**Knowledge**" means the actual knowledge of Trustee.

"**Manhattan**" means Manhattan Safety Company, Ltd., a corporation organized under the laws of St. Kitts, W.I.

"**Manhattan Indemnitees**" has the meaning specified in Section 7.1.

"**Manhattan Loan**" has the meaning set forth in Recital B.

DG 00193

"**Minimum Payment**" means Ten Million Three Hundred Thousand Dollars and No Cents ($10,300,000.00).

"**New Note**" means the promissory note in the face principal amount of Two Hundred Thousand Dollars and No Cents ($200,000.00), comprising the Initial Advance of the Manhattan Loan and having the Trust as maker and Manhattan as payee, which evidences the Manhattan Loan.

"**Note**" has the meaning set forth in Recital J.

"**Party**" means the Trust, Trustee or Manhattan, as applicable, and their respective successors and permitted assigns.

"**Reimbursement Claims**" means any claim of TPR or the Trust arising in connection with the return to, disgorgement by, or reimbursement of, TPR or the Trust, or any other Entity, of all or any portion of any payment or transfer received by TPR or Trust on account of the Transferred Rights, including any claims arising under Bankruptcy Code §502(h).

"**Sagi**" means Sagi Genger, the President and the sole primary beneficiary (together with his children) of the Sagi Genger 1993 Trust, the owner of a majority of the shares of TPR.

"**Securities Act**" means the Securities Act of 1933, 15 U.S.C. §§77a et seq., as amended, and the rules and regulations promulgated under it.

"**Settlement**" means that certain amended and restated settlement agreement dated as of March 16, 2012 by and among TPR, the Trust and D&K.

"**Share Proceeds**" means any proceeds in cash or kind paid or payable to the Trust relating to the TRI Shares.

"**Share Transfer**" has the meaning set forth in Recital D.

"**TPR**" means TPR Investment Associates, Inc., a Delaware corporation.

"**TRI**" means Trans Resources, Inc., a Delaware corporation.

"**TRI Shares**" means the 1,102.8 shares of TRI transferred to the Trust pursuant to the Share Transfer.

"**TRI Proceedings**" has the meaning set forth in Recital D.

"**Transferred Rights**" means any and all of Manhattan's right, title, and interest in, to and under the Note and the Settlement (solely to the extent those rights of TPR in the Settlement which have been transferred by TPR to Manhattan relate to amounts payable under the Note), including:

> (a)   all amounts funded by or payable to TPR under the Settlement relating to the Note, and all obligations owed to TPR in connection

DG 00194

with the Note, including but not limited to, accrued and unpaid interest;

(b) any proof of claim;

(c) all claims (including "claims" as defined in Bankruptcy Code §101(5)), suits, causes of action, and any other right of TPR, whether known or unknown, against Trust, the Trustee or any of their respective Affiliates, agents, representatives, contractors, advisors, or any other Entity that in any way is based upon, arises out of or is related to any of the foregoing, including, to the extent permitted to be assigned under applicable law, all claims (including contract claims, tort claims, malpractice claims, and claims under any law governing the purchase and sale of, or indentures for, securities), suits, causes of action, and any other right of TPR against any attorney, accountant, financial advisor, or other Entity arising under or in connection with the Note and the Transferee Rights or the transactions related thereto or contemplated thereby;

(d) all cash, securities, or other property, and all setoffs and recoupments, received, applied, or effected by or for the account of TPR under the Note (whether for principal, interest, fees, reimbursement obligations, or otherwise) from and after the date of this Agreement, and all cash, securities, interest, dividends, and other property that may be exchanged for, or distributed or collected with respect to, any of the foregoing;

(e) the economic benefit received by TPR relating to the Note transferred to Manhattan; and

(f) all proceeds of the foregoing.

"**Trump Group**" has the meaning set forth in Recital F.

"**Trump Sale Agreement**" has the meaning set forth in Recital F.

"**Trust**" has the meaning set forth in the heading of this Agreement.

"**Trustee**" has the meaning set forth in the heading of this Agreement.

"**2011 Note**" has the meaning set forth in Recital F.

DG 00195

2.     **Recitals True.**  The Recitals are hereby incorporated into this Agreement and made a part hereof.  The Trust and the Trustee, jointly and severally, represent and warrant that the Recitals are true and correct in all material respects and do not fail to state a fact necessary to make them not misleading.

3.     **Amendment and Restatement of Note; Agreement to Make the Manhattan Loan.**

3.1     The Trust as maker agrees to amend and restate the 2011 Note, in the form attached as **Exhibit A** hereto (the "**Amended and Restated Note**"), including but not limited to amendments to (i) add covenants with respect to (A) the waiver of defenses to payment of amounts payable under the Note and (B) prohibitions on (1) any Encumbrance on (x) the TRI Shares or (y) the Minimum Payment or any other payment the Trust may receive or be entitled to receive from (a) the Court or (b) any other party, in connection with the TRI Shares or otherwise, and (2) (x) any (a) borrowing or any agreement to borrow money, or (b) guaranty, agreement to indemnify or other agreement to create any contingent monetary obligation, or (y) the incurrence of any material Liability, other than costs for legal services relating to the TRI Proceedings, which in no event, without the prior consent of Manhattan, shall exceed in aggregate Five Hundred Thousand Dollars and No Cents ($500,000.00), and (ii) amend the face amount of the Note to Four Million Two Hundred Forty Thousand Dollars and No Cents ($4,240,000.00) to reflect the Additional Advance of the Manhattan Loan and the Forbearance Fee, in the event such are made and payable under the terms of this Agreement and the Note.

3.2     On the terms set forth in the Amended and Restated Note, in the form attached as **Exhibit A** hereto, and the New Note, in the form attached as **Exhibit B** hereto, and subject to the conditions set forth in this Agreement and in the Amended and Restated Note and the New Note, Manhattan agrees to make, and the Trust agrees to accept, the Manhattan Loan.

4.     **Representations and Warranties of the Trust and Trustee.**  Trust and Trustee, each jointly and severally, represents and warrants to Manhattan as of the date of this Agreement that:

(a)     Trust (i) is duly organized and validly existing under the laws of its jurisdiction of organization or incorporation, (ii) is in good standing under such laws and (iii) has full power and authority to execute, deliver and perform its obligations under this Agreement, the Note and the New Note.

(b)     Trust's execution, delivery, and performance of this Agreement, , the Note and the New Note will not result in a breach or violation of any provision of (i) Trust's organizational documents, (ii) any statute, law, writ, order, rule or regulation of any Governmental Authority applicable to Trust, (iii) any judgment, injunction, decree or determination of any Governmental Authority applicable to Trust or (iv) any contract, indenture, mortgage, loan agreement, note, lease or other agreement, document or instrument to which

DG 00196

Trust may be a party, by which Trust may be bound or to which any of the assets of Trust is subject.

(c)    (i)    This Agreement, the Note and the New Note each (A) has been duly and validly authorized by Trustee on behalf of Trust, executed and delivered by Trust and (B) are the legal, valid and binding obligations of Trust, enforceable against Trust in accordance with their respective terms, except that such enforceability against Trust may be limited by bankruptcy, insolvency, or other similar laws of general applicability affecting the enforcement of creditors' rights generally and by a court's discretion in relation to equitable remedies; and

     (ii)    no notice to, registration with, consent or approval of or any other action by any relevant Governmental Authority or other Entity is or will be required for Trust to execute, deliver, and perform its obligations under, this Agreement, the Note and the New Note.

(d)    Trust is a good faith claimant to the Share Proceeds or the TRI Shares, as the case may be, and its claim thereto is free and clear of any Encumbrance.

(e)    Other than the TRI Proceedings and any other proceedings disclosed in writing by Trust to Manhattan, no proceedings are pending against the Trust, the Trustee or any of their respective Affiliates or, to the best of Trust's and Trustee's Knowledge, threatened against the Trust, the Trustee or any of their respective Affiliates before any relevant Governmental Authority that, individually or in aggregate, may materially and adversely affect any action taken or to be taken by Trust under this Agreement, including the sale and assignment of the Note by TPR to Manhattan and the Transferred Rights to Manhattan, or the Manhattan Loan as evidenced by the New Note.

(f)    Trust has no (A) payment obligation, including any contingent payment obligation in the nature of a guarantee or indemnification or similar obligation, to any individual, Entity or Governmental Authority, and has entered into no agreement that could reasonably result in a payment obligation to any party for any amount that individually or together with other payment obligation of the Trust is equal to or greater than Five Hundred Thousand Dollars and No Cents ($500,000.00) and (B) Liability to any individual, Entity or Governmental Authority that individually or together with any other Liability may adversely affect repayment of the Note or the New Note or the value of Trust's interest in the Minimum Payment or TRI Shares, as the case may be.

DG 00197

(g)    To the best of Trust's and Trustee's Knowledge, neither the Trust nor the Trustee or any other party to the TRI Proceedings has received any notice or has any reasonable basis to believe that the Trust will not be entitled to receive one or the other of (A) an amount not less than the Minimum Payment or (B) the TRI Shares upon final determination and exhaustion of all appeals or challenges to such final determination, of all the material matters at issue in the TRI Proceedings.

(h)    Trust is not now insolvent and will not be rendered insolvent by any of the transactions contemplated by this Agreement. As used herein, "**insolvent**" means that the sum of the debts and probable Liabilities of Trust exceeds the fair saleable value of its assets. Trust is not in receivership, nor is an application for receivership pending. No proceedings are pending by or against Trust in bankruptcy or reorganization in any state or federal court under any Debtor Relief Law, nor has it committed any act of bankruptcy as such terms are used in the Bankruptcy Code. Immediately after giving effect to the consummation of the transactions contemplated by this Agreement, (i) Trust will be able to pay its Liabilities as they become due in the usual course of its business; (ii) Trust will not have assets (calculated at fair market value) that exceed its Liabilities; and (iii) taking into account all pending and threatened litigation, final judgments against Trust for money damages are not reasonably anticipated to be rendered at a time when, or in amounts such that, Trust will be unable to satisfy any such judgments promptly in accordance with their terms (taking into account the maximum probable amount of such judgments in any such actions and the earliest reasonable time at which such judgments might be rendered) as well as all other obligations of Trust. The cash available to Trust, taking into account all other anticipated uses of cash, as well as taking into account reasonably anticipated payments on insurance covering such actions and Liabilities, will be sufficient to pay all such debts and judgments promptly in accordance with their terms.

(i)    No broker, finder or other Entity acting under the authority of the Trust, the Trustee or any of their respective Affiliates is entitled to any broker's commission or other fee in connection with the transactions contemplated by this Agreement, including but not limited to the Manhattan Loan and New Note, for which Manhattan could be responsible.

5.    **Manhattan's Representations and Warranties.**    Manhattan represents and warrants to Trustee as of the date of this Agreement that:

(a)    Manhattan (i) is duly organized and validly existing under the laws of its jurisdiction of organization or incorporation, (ii) is in good

standing under such laws and (iii) has full power and authority to execute, deliver and perform its obligations under, this Agreement.

(b)     Manhattan's execution, delivery, and performance of this Agreement have not resulted and will not result in a breach or violation of any provision of (i) Manhattan's organizational documents, (ii) any statute, law, writ, order, rule or regulation of any Governmental Authority applicable to Manhattan, (iii) any judgment, injunction, decree or determination of any Governmental Authority applicable to Manhattan or (iv) any contract, indenture, mortgage, loan agreement, note, lease or other agreement, document or instrument by which Manhattan may be a party, by which Manhattan may be bound or to which any of the assets of Manhattan is subject.

(c)             (i)     This Agreement and the Manhattan Loan each (A) has been duly and validly authorized by Manhattan's board of directors or authorized committee thereof or other party which must approve the same pursuant to Manhattan's organizational documents, executed and delivered by Manhattan and (B) are the legal, valid and binding obligations of Manhattan, enforceable against Manhattan in accordance with their respective terms, except that such enforceability may be limited by bankruptcy, insolvency, or other similar laws of general applicability affecting the enforcement of creditors' rights generally and by a court's discretion in relation to equitable remedies; and

        (ii)    no notice to, registration with, consent or approval of or any other action by any relevant Governmental Authority or other Entity is or will be required for Manhattan to execute, deliver, and perform its obligations this Agreement and the Manhattan Loan.

(d)     No broker, finder or other Entity acting under the authority of Manhattan or any of its Affiliates is entitled to any broker's commission or other fee in connection with the transactions contemplated by this Agreement, including the Manhattan Loan, for which the Trust could be responsible.

(e)     Manhattan is an "accredited investor" as defined in Rule 501 under the Securities Act.  Without characterizing the Manhattan Loan and New Note as a "security" within the meaning of applicable securities laws, Manhattan has not made any offers to sell, or solicitations of any offers to buy, all or any portion of the Manhattan Loan or the New Note in violation of any applicable securities laws.

DG 00199

6.     **Covenants.**

6.1     The Trust hereby covenants and agrees as follows:

    (a)     Trust shall not Encumber the TRI Shares, its interest in the TRI Shares or any proceeds of the TRI Shares or any material amount of its assets for so long as any amount is owed under this Note.

    (b)     Trust acknowledges the sale and assignment of the 2011 Note and the Transferred Rights to Manhattan and agrees to deliver all amounts payable with respect to the Note and the Transferred Rights to Manhattan at the address provided to Trust in writing by Manhattan.

    (c)     Trust hereby waives any defenses it may have to payment of amounts payable under the Note, including all defenses it may have with respect to Manhattan, TPR or any other prior holder of the Note.

    (d)     Trust agrees that it shall not borrow or enter into any agreement to borrow an aggregate amount greater than Four Hundred Thousand Dollars and No Cents ($400,000.00), including amounts borrowed as part of the Manhattan Loan; provided, however, that this shall not prevent Trust from engaging in agreements for services with attorneys and others in connection with the TRI Proceedings; and provided, further, that Trust may borrow such additional sums as may be subordinated to the Manhattan Loan, on terms and subject to conditions satisfactory to Manhattan.

6.2     Manhattan hereby covenants and agrees that notwithstanding any payment default under the Note or the New Note, but subject to the Trust's compliance with all other terms and conditions of the Note and the New Note, Manhattan agrees to forbear from collection of amounts due and owing on the Note, and not take any action, including the commencement of any proceeding, to collect amounts due under the Note or the New Note, until the earliest to occur of (i) the date on which Dalia no longer serves as Trustee of the Trust, (ii) the final resolution of the Interpleader Action or (iii) November 1, 2014; provided, however, that notwithstanding the foregoing, Manhattan may take any action reasonably necessary to ensure the payment of all amounts payable under the Note or the New Note, including, but not limited to, the acceleration of the obligations under the Note or the New Note and the commencement of enforcement actions to collect amounts owing under the Note and or the New Note upon the occurrence of (x) any event of default under the Note or the New Note, other than a payment default or (y) any action by an individual or Entity which Manhattan believes may adversely affect the Trust's ability to fully perform all of its obligations under this Agreement, the Note, the Manhattan Loan or the New Note.

6.3     The Forbearance Fee shall be payable by increasing the amount outstanding under the Note by the amount of the Forbearance Fee effective November 1, 2012 if the Note is not previously paid in full by such date.

7.      **Indemnification.**

7.1      Trust and the Trustee, jointly and severally, shall indemnify, defend, and hold Manhattan and its officers, directors, agents, partners, members, controlling Entities and employees (collectively, **"Manhattan Indemnitees"**) harmless from and against any liability, claim, cost, loss, judgment, damage or expense, including reasonable attorneys' fees and expenses (collectively, a **"Claim"**) that any Manhattan Indemnitee incurs or suffers as a result of, or arising out of (i) a breach of any of Trust representations, warranties, covenants or agreements in this Agreement, (ii)  any legal or arbitral proceeding, any investigation or any actions preliminary or related to any of the foregoing, which relates to, or arises from, the same factual basis as, the TRI Proceedings, (iii) compliance with any subpoena or other demand to be deposed, testify or produce documents in a proceeding before a Governmental Authority or an arbitrator or (iv) otherwise resulting from any action taken by any Claimant; provided, however, that the indemnification obligations of the Trustee under this Agreement (x) shall not include Claims made after Dalia no longer serves as Trustee of the Trust and (y) are in the nature of a surety for the obligations of the Trust and are conditional upon demand first being made upon, and a good faith attempt made to collect from, the Trust as provided in Section 7.3 below; and provided, further, that the foregoing proviso shall not be construed in any way to limit the indemnification obligations of the Trust under this Agreement.

7.2      If a third party commences any action or makes any demand against Manhattan Indemnities for which any Manhattan Indemnitees (**"Indemnified Party"**) is entitled to indemnification under this Agreement, such Indemnified Party shall promptly notify Trust and Dalia (collectively and individually **"Indemnifying Party"**) in writing of such action or demand; provided, however, that if the Indemnified Party assumes the defense of the action and fails to provide prompt notice to the Indemnifying Party, such failure shall not limit in any way the Indemnifying Party's obligation to indemnify the Indemnified Party except to the extent that such failure materially prejudices the Indemnified Party's ability to defend the action.  The Indemnifying Party may, at its own expense and without limiting its obligation to indemnify the Indemnified Party, participate in the defense of such action with counsel reasonably satisfactory to the Indemnified Party, or the Indemnifying Party may, at its own expense and without limiting its obligation to indemnify the Indemnified Party, assume the defense of such action with counsel reasonably acceptable to the Indemnified Party.  In any event, the Indemnified Party that has assumed the defense of such action shall provide the Trust and Dalia with copies of all notices, pleadings, and other papers filed or served in such action. Neither Party shall make any settlement or adjustment without prior written consent, which consent (a) in the case of the Indemnifying Party will not be unreasonably withheld if the settlement or adjustment involves only the payment of money damages by the Indemnifying Party and (b) in the case of the Indemnified Party may be withheld for any reason if the settlement or adjustment involves performance or admission by the Indemnified Party.

7.3      In the event of the occurrence of a Claim for which an Indemnified Party is entitled to indemnification hereunder, the Indemnified Party shall first make demand upon, and seek payment and performance from, the Trust, and then, and only if, after such demand the Trust fails to pay or perform as required by this Agreement, shall the

Indemnified Party seek payment and performance from the Trustee. Amounts payable by the Indemnifying Party, to the extent not paid by an Indemnifying Party, may be added to the principal amount Note and shall accrue interest from the date of the incurrence of such expense by the Indemnified Party at the prevailing rate of interest as provided under the Note.

7.4     Each indemnity in this Agreement is a continuing obligation, separate and independent from the other obligations of the Trust and Dalia and survives termination of this Agreement or any transfer pursuant to Section 10 of this Agreement.  It is not necessary for a Party to incur expense or make payment before enforcing a right of indemnity conferred by this Agreement.

**8.     Costs and Expenses.**  Trust and Manhattan each agrees to bear its own, legal and other costs and expenses for preparing, negotiating, executing and delivering this Agreement and any related documents and consummating the transaction contemplated by this Agreement, including legal and other costs and expenses relating to the amendment of the Amended Note, the Manhattan Loan and the New Note.

**9.     Notices.**

9.1     All communications between the Parties in respect of, or notices, requests, directions, consents or other information sent under, this Agreement shall be in writing, hand delivered or sent by overnight courier, electronic transmission or telecopier, addressed to the relevant Party at its address, electronic mail or facsimile number specified in **Schedule 9.1** to this Agreement at such other address, electronic mail or facsimile number as such Party may subsequently request in writing.   All such communications and notices shall be effective upon receipt.

9.2     If Trust receives any notices, correspondence or other documents in respect of the Transferred Rights, the Note or the Settlement that, to the best of Trust's Knowledge, were not sent to Manhattan, Trust shall promptly forward them to Manhattan.

**10.     Further Transfers.**

10.1     Manhattan may sell, assign, grant a participation in, or otherwise transfer all or any portion of the Note or Transferred Rights, this Agreement, its rights under this Agreement, the Manhattan Loan or the New Note, or any interest in any of the foregoing without the consent of or notice to Trust.

10.2     Trust may assign its rights under this Agreement without the prior written consent of Manhattan; provided, however, that Trust may not delegate its obligations under this Agreement without the prior written consent of Manhattan.

**11.     Exercise of Rights and Remedies.**

11.1     No amendment of any provision of this Agreement shall be effective unless it is in writing and signed by the Parties, and no waiver of any provision of this Agreement, nor consent to any departure by either Party from it, shall be effective unless

it is in writing and signed by the affected Party, and then such waiver or consent shall be effective only in the specific instance and for the specific purpose for which given.

11.2    No failure on the part of a party to exercise, and no delay in exercising, any right or remedy under this Agreement shall operate as a waiver by such Party, nor shall any single or partial exercise of any right or remedy under this Agreement preclude any other or further exercise thereof or the exercise of any other right or remedy. The rights and remedies of each Party provided herein (a) are cumulative and are in addition to, and are not exclusive of, any rights or remedies provided by law (except as otherwise expressly set forth in this Agreement) and (b) are not conditional or contingent on any attempt by such Party to exercise any of its rights or remedies under any other related document or against the other Party or any other Entity. In no event may either Party recover from the other Party any special, consequential or punitive damages.

## 12.    Survival; Successors and Assigns.

12.1    All representations, warranties, covenants, indemnities and other provisions made by the Parties shall be considered to have been relied upon by the Parties, shall (as to representations and warranties) be true and correct as of the date of this Agreement and any other date set forth in Sections 4 or 5, as the case may be, and shall survive the execution, delivery and performance of this Agreement.

12.2    This Agreement, including the representations, warranties, covenants and indemnities contained in this Agreement, shall inure to the benefit of, be binding upon and be enforceable by and against the Parties and their respective successors and permitted assigns.

## 13.    Further Assurances.

Each Party agrees to (i) execute and deliver, or cause to be executed and delivered, all such other and further agreements, instruments and other documents and (ii) take or cause to be taken all such other and further actions as the other Party may reasonably request to effectuate the intent and purposes, and carry out the terms, of this Agreement.

## 14.    Disclosure.

14.1    Each Party agrees that, without the prior consent of the other Party, it shall not disclose the contents of this Agreement to any individual or Entity, except that any Party may make any such disclosure (a) as required to implement or enforce this Agreement, (b) if required to do so by any law, court, regulation, subpoena or other legal process, (c) to any Governmental Authority or self-regulatory Entity having or asserting jurisdiction over it, (d) if its attorneys advise it that it has a legal obligation to do so or that failure to do so may  result in it incurring a liability to any other Entity or sanctions that may be imposed by any Governmental Authority, (e) to its Affiliates, professional advisors and auditors or (f) as set forth in Section 14.2.

14.2    Manhattan may disclose the contents of this Agreement to any proposed transferee, assignee, participant, or other Entity proposing to enter into contractual relations with Manhattan in respect of the Note or Transferred Rights, the Manhattan Loan or the New Note or any part of them.

**15.    Entire Agreement; Conflict.**

15.1    This Agreement constitutes the entire agreement of the Parties with respect to the transactions contemplated here by and supersedes all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, representations and warranties in respect thereof, all of which have become merged and finally integrated into this Agreement.

15.2    As between Manhattan and the Trust, if there is any inconsistency or conflict between this Agreement and any other document, the provisions of this Agreement shall govern and control.

**16.    Counterparts; Telecopies.** This Agreement may be executed in multiple counterparts and all of such counterparts taken together shall be deemed to constitute one and the same instrument.  Transmission by telecopier, facsimile or other form of electronic transmission of an executed counterpart of this Agreement shall be deemed to constitute due and sufficient delivery of such counterpart, and shall have the same force and effect as a manually executed original.  Each fully executed counterpart of this Agreement shall be deemed to be a duplicate original.

**17.    Relationship Between Manhattan and the Trust.** The relationship between Manhattan and the Trust shall be that of lender and borrower.  Neither is a trustee or agent for the other, nor does either have any fiduciary obligations to the other.  This Agreement shall not be construed to create a partnership or joint venture between the Parties.

**18.    Severability.** The illegality, invalidity or unenforceability of any provision of this Agreement under the law of any jurisdiction shall not affect its legality, validity or enforceability under the law of any other jurisdiction nor the legality, validity or enforceability of any other provision.

**19.    Governing Law.** THIS AGREEMENT, THE RIGHTS AND OBLIGATIONS OF THE PARTIES UNDER THIS AGREEMENT AND ANY CLAIM OR CONTROVERSY DIRECTLY OR INDIRECTLY BASED UPON OR ARISING OUT OF THIS AGREEMENT OR THE TRANSACTION (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY), INCLUDING ALL MATTERS OF CONSTRUCTION, VALIDITY AND PERFORMANCE, SHALL IN ALL RESPECTS BE GOVERNED BY AND INTERPRETED, CONSTRUED AND DETERMINED IN ACCORDANCE WITH, THE INTERNAL LAWS OF THE STATE OF NEW YORK (WITHOUT REGARD TO ANY CONFLICTS OF LAW PROVISION THEREOF THAT WOULD REQUIRE THE APPLICATION OF THE LAWS OF ANY OTHER JURISDICTION).

**20.    Waiver of Trial by Jury.** THE PARTIES HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVE, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT THAT THEY MAY HAVE TO TRIAL BY JURY OF ANY CLAIM OR CAUSE OF ACTION, OR IN ANY LEGAL PROCEEDING, DIRECTLY OR INDIRECTLY BASED UPON OR ARISING OUT OF THIS AGREEMENT OR THE TRANSACTION (WHETHER BASED ON CONTRACT,

TORT OR ANY OTHER THEORY). EACH PARTY (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF THE OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTY HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.

**21.     Jurisdiction.** The Parties irrevocably agree that, should either Party institute any legal action or proceeding in any jurisdiction (whether for an injunction, specific performance, damages or otherwise) in relation to this Agreement or the transactions contemplated by this Agreement, no immunity (to the extent that it may at any time exist, whether on the grounds of sovereignty or otherwise) from such action or proceeding shall be claimed by it or on its behalf, any such immunity being hereby irrevocably waived, and each Party irrevocably agrees that it and its assets are, and shall be, subject to such legal action or proceeding in respect of its obligations under this Agreement.

**22.     Interpretation.**

22.1     This Agreement and any annexes, schedules or other documents attached to or incorporated by reference into the Agreement.

22.2     Terms used in the singular or the plural include the plural and the singular, respectively; "includes" and "including" are not limiting; and "or" is not exclusive.

22.3     Any reference to a Party includes such Party's successors and permitted assigns.

22.4     Unless otherwise indicated, any reference to:

(a)     this Agreement or any other agreement, document or instrument shall be construed as a reference to this date of this Agreement or, as the case may be, such other agreement, document or instrument as the same may have been, or may at any time before the date of this Agreement be, in effect as modified, amended or supplemented as of the date of this Agreement Date; and

(b)     a statute, law, order, rule or regulation shall be construed as a reference to such statute, law, order, rule or regulation as it may have been, or may at any time before the date of this Agreement be, in effect as modified, amended or supplemented as of the date of this Agreement.

22.5     Section and other headings and captions are included solely for convenience of reference and are not intended to affect the interpretation of any provision of this Agreement.

22.6   This Agreement shall be deemed to have been jointly drafted by the Parties and no provision of it shall be interpreted or construed for or against either Party because such Party actually or purportedly prepared or requested such provision, any other provision or the Agreement as a whole.

**23.     Legal Counsel.** Each Party acknowledges that it or she has been represented by its own legal counsel in connection with the negotiation and drafting of this Agreement. Accordingly, this document shall not be construed against the draftsman. Any rule of construction to the contrary shall be ignored.

[SIGNATURE PAGE FOLLOWS]

DG 00206

**IN WITNESS WHEREOF**, the parties have caused this Agreement to be duly executed as of the date first written above.

TRUST:

ORLY GENGER 1993 TRUST

By: _____*Dalia Genger*_____
     Dalia Genger, Sole Trustee

STATE OF _*New York*_ )
                              )SS:
COUNTY OF _*New York*_ )

The foregoing was sworn to, subscribed and acknowledged before me this 15TH day of *May* 2012, by Dalia Genger, as Sole Trustee of The Orly Genger 1993 Trust. She is personally known to me or has produced a driver's license as identification.

_____
Print or Stamp Name: _____
Notary Public: _____
Commission No.: _____
My Commission Expires: _____

MAGDALENA CHARLOTTEN
NOTARY PUBLIC, State of New York
No. 01CH6059474
Qualified in New York County
Certificate Filed in Kings, Queens,
Westchester, Bronx Counties
Commission Expires May 29, 20_15_

**DALIA:**

By: _____*Dalia Genger*_____
     Dalia Genger, Individually

STATE OF _*New York*_ )
                              )SS:
COUNTY OF _*New York*_ )

The foregoing was sworn to, subscribed and acknowledged before me this 15TH day of *May* 2012, by Dalia Genger. She is personally known to me or has produced a driver's license as identification.

_____
Print or Stamp Name: _____
Notary Public: _____
Commission No.: _____
My Commission Expires: _____

MAGDALENA CHARLOTTEN
NOTARY PUBLIC, State of New York
No. 01CH6059474
Qualified in New York County
Certificate Filed in Kings, Queens,
Westchester, Bronx Counties
Commission Expires May 29, 20_15_

**MANHATTAN:**

MANHATTAN SAFETY COMPANY, LTD.,
a corporation organized under the laws of St. Kitts, W.I.

By: _____           _____
    Greg Gilpin-Payne, President          Witness: Leah Crag-Chaderton


                                          _____
                                          Witness:  Yulanda Vanterpool

DG 00208

<u>**SCHEDULE 9.1**</u>

**NOTICES**

**Trust:**

Pedowitz & Meister
1501 Broadway, Suite 800
New York NY 10036-5505
Attention: Robert Meister

**Dalia:**
200 East 65th - apt 32w
New York, NY
Attention: Trustee

**Manhattan:**

858 Zenway Blvd
Frigate Bay
St Kitts, W.I.

DG 00209

At the Surrogate's Court held in and for the County
of New York, at the Courthouse, 31 Chambers
Street, New York, New York on the ⎯1⎯ day of
~~June~~ 2009
July

New York County Surrogate's Court
DATA ENTRY DEPT.
Date: July 1, 2009

PRESENT: HON.  Troy K. Webber
                                Surrogate

---

In the Matter of the Application of

ORLY GENGER, as a person interested,
for the removal of DALIA GENGER
as Trustee of the Orly Genger 1993 Trust
pursuant to SCPA §711 (11)

File No.: 0017/2008

ORDER TO SHOW CAUSE
WITH TEMPORARY
RESTRAINTS

---

On reading and filing the annexed Verified Petition of Petitioner, ORLY GENGER, and

the exhibits, verified on the 22nd day of June, 2009, and the memorandum of law in support of

Petitioner's Verified Petition dated June 22, 2009,

LET the Respondent, DALIA GENGER, the sole fiduciary of the Orly Genger 1993
                                         ⎡Sitting at 60 Centre
Trust, show cause before Surrogate  Troy K. Webber  at the Surrogate's Court ~~31 Chambers~~

⎡Room 300
~~Street~~ New York, New York, on the 5th day of ~~June~~ August 2009 at 10:00 o'clock in the forenoon of that

day or as soon thereafter as counsel may be heard why an order should not be entered:

        (a)       Enjoining and restraining Respondent, her agents and all other persons

acting on her behalf from withdrawing, selling disposing, transferring, assigning, removing,

pledging, redeeming, mortgaging, encumbering, liening, hypothecating or secreting the Orly

Trust's 19.43% interest in Trans-Resources, Inc., ("TRI"), a closely held corporation, founded by

Arie Genger, Petitioner's father and Respondent's former husband of Respondent and any other

assets which may be remaining in the Orly Trust;

NYO_XFER\137033\1\

(b)     Removing Respondent as Trustee of the Orly Trust for breaching her

fiduciary duties, wasting and dissipating the assets of the Orly Trust and imprudently managing

and injuring the property committed to her charge;

(c)     Surcharging Respondent in the amount of the loss of the value of Orly's

interest in TPR as determined by the Court and awarding Petitioner costs and attorneys' fees;

(d)     Appointing Michael D. Grohman, Esq. as successor trustee;

(e)     Waiving any requirement that Petitioner post an undertaking; and

(f)     Granting Petitioner such further relief deemed necessary or proper.

ORDERED that, during the pendency of this proceeding, Respondent ~~her agents and all~~ *and/or her counsel*
*are required to give notice by overnight mail to Petitioners counsel of any 1) offer*
~~other persons acting on her behalf are temporarily restrained from withdrawing, selling,~~
*to purchase the Orly Trust's 19.3% interest in TRI within 10 days of receiving*
~~disposing, transferring, assigning, removing, pledging, redeeming, mortgaging, encumbering,~~
*such offer and 2) act by Respondent, her agents and all other persons*
~~licing, hypothecating or secreting the Orly Trust's 19.43% interest in TRI and other assets~~
*acting on her behalf to assign, mortgage, pledge, redeem, encumber, sell or*
~~remaining in the Orly Trust; and it is further~~
*otherwise alter the Orly Trust's interest in TRI at least 10 days prior to such act*
*and it is further* ORDERED that service of a copy of this Order and the papers upon which it is based

shall be served on Respondent by personal service at either her residence, located at 200 East

65th Street, Apt. 32W, New York, New York 10021, or any other address at which she can be

located, on or before ~~June~~ *July 7*, 2009; *and it is further*

*ORDERED, that any responsive papers shall be filed by*
*July 29, 2009.*

~~ENTER:~~

Surrogate

EFiled: Oct 4 2011 12:39PM EDT
Transaction ID 40170462
Case No. 6906-

## IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

DALIA GENGER, as Trustee of the Orly )
Genger 1993 Trust, )
                             )
            Plaintiff, )
                             )
      v. )               Civil Action No. _____
                             )
TR INVESTORS, LLC, GLENCLOVA )
INVESTMENT CO., NEW TR EQUITY I, )
LLC, NEW TR EQUITY II, LLC, TRANS- )
RESOURCES, INC. and TPR )
INVESTMENT ASSOCIATES, INC., )
                             )
            Defendants. )

### VERIFIED COMPLAINT

Plaintiff Dalia Genger ("Dalia"), as Trustee of the Orly Genger 1993 Trust (the "Orly Trust"), by her undersigned attorneys, for her Verified Complaint against Defendants TR Investors, LLC ("Investors"), Glenclova Investment Co. ("Glenclova"), TR Equity I, LLC ("Equity I"), TR Equity I, LLC ("Equity II" and together with Investors, Glenclova and Equity I, "The Trump Group"), TPR Investment Associates, Inc. ("TPR") and Trans-Resources, Inc. ("Trans-Resources") alleges upon knowledge, information and belief as follows:

### NATURE OF THE ACTION

1.     On October 29, 2004, as part of a wider multi-million dollar divorce settlement agreement between Arie Genger ("Arie") and Dalia, Arie caused TPR to transfer 794.40 shares (13.99%) of Trans-Resource's stock to himself, and 1,102.80 shares (19.43%) of Trans-Resources stock to each of the 1993 Sagi and Orly Trusts.

2.     In reliance upon (i) Arie's representation that no consent or approval was required for TPR to transfer the shares to her children and (ii) the representation that Arie caused TPR to make that the shares being transferred to the Orly Trust were "free and clear of any liens, claims or encumbrances" and that the transfer "does not violate the certificate of Incorporation of TPR or *any agreement to which TPR is subject*" (emphasis added), Dalia gave up valuable claims in the divorce settlement to ensure that her children's trusts would be well funded. The Orly Trust also relied on those representations in purchasing the Trans-Resources shares.

3.     On October 30, 2004, Trans-Resource issued a share certificate in the name of the Orly Trust for 1,102.80 shares of Trans-Resources common stock. The share certificate was signed by Arie, as President of Trans-Resources, and Edward Klimerman, Assistant Secretary of Trans-Resources and outside counsel to the company.

4.     Trans-Resources delivered the Orly Trust's share certificate to Arie, who was contractually obligated to act as the Orly Trust's proxy for voting the Trans-Resources shares. Arie maintained possession of the Orly Trusts' original share certificate and sent a copy of it to both Dalia and the Orly Trust.

5.     Thus, the Orly Trust is a bona fide and protected purchaser of the Trans-Resources stock because (i) value was given for the Orly Trust's shares of Trans-Resources stock, (ii) the Orly Trust did not have notice of any adverse claim to the shares represented by its share certificate, and (iii) the Orly Trust obtained control of its Trans-Resources share certificate by way of its delivery to Arie, who held the certificate on the Orly Trust's behalf.

2

6.     Consequently, the Orly Trust seeks a declaratory judgment that it is the beneficial owner of the 1,102.80 shares of Trans-Resources stock represented by the share certificate.

## PARTIES

7.     The Plaintiff Dalia Genger ("Dalia") is the mother of Sagi Genger ("Sagi") and Orly Genger ("Orly") and the former wife of Arie Genger ("Arie"). Dalia is the trustee of the 1993 Orly Genger Trust.

8.     Defendant Trans-Resources, a privately-held Delaware Corporation, is a manufacturer and worldwide distributor of agricultural fertilizer.

9.     Defendant TPR, a Delaware corporation, is the record holder of the 1,102.80 shares that the Orly Trust purchased in 2004.

10.     Defendant Investors, a New Jersey Limited Liability Company, purportedly exercised its rights under the 2008 Side Letter Agreement to purchase from TPR the Trans-Resources common stock that was previously purchased by the Orly Trust.

11.     Defendant Glenclova, a Cayman Islands company, purportedly exercised its rights under the 2008 Side Letter Agreement to purchase from TPR the Trans-Resources common stock that was previously purchased by the Orly Trust.

12.     Defendant Equity I, a Delaware limited liability company, purportedly exercised its rights under the 2008 Side Letter Agreement to purchase from TPR the Trans-Resources common stock that was previously purchased by the Orly Trust.

13.     Defendant Equity II, a Delaware limited liability company, purportedly exercised its rights under the 2008 Side Letter Agreement to purchase from TPR the Trans-Resources common stock that was previously purchased by the Orly Trust.

3

## JURISDICTION

14.     This Court has jurisdiction over this action pursuant to 8 *Del. C.* § 111 and 10 *Del. C.* § 6501, *et. seq.*

## FACTUAL BACKGROUND

### The 2001 Stockholders Agreement

15.     In 1985, Arie formed Trans-Resources.

16.     Until 2001, TPR held Arie's 100% stake in Trans-Resources. TPR was owned by Arie, Dalia and their two children, Sagi and Orly. As TPR's majority (51%) shareholder, Arie controlled Trans-Resources.

17.     Dalia, Sagi and Orly, through the Sagi and Orly Trusts (which were established by Arie in 1993 as part of a Genger family estate plan), held a minority (49%) interest in TPR.

18.     In 2001, Glenclova and Investors entered into an agreement with Trans-Resources and TPR to convert their bond holdings into an equity interest in Trans-Resources (the "Stockholders Agreement"). Under the Stockholders Agreement, Glenclova and Investors acquired 47.15% of Trans-Resources common stock from Arie (through TPR), thereby reducing Arie's ownership interest in Trans-Resources to 52.85%.

19.     The Stockholders Agreement restricted the transfer of Trans-Resources stock to any persons or entities except those who were designated as "Permitted Transferees." If a party to the Stockholders Agreement wished to transfer or sell its shares to a non-Permitted Transferee, the selling party was required to give written notice to the other Trans-Resources shareholders, who would have a right of first refusal. A transfer that failed to comply with those restrictions and the prior notice requirement

4

would be deemed invalid and void, and would trigger the non-selling shareholders' right to purchase the invalidly-transferred shares.

**The Orly Trust Receives Trans-Resources Stock, for Valuable Consideration, Without Notice of Any Adverse Claim**

20.    After years of litigation regarding their divorce, on October 30, 2004, Arie and Dalia executed a stipulation of settlement (the "Divorce Agreement").

21.    The Divorce Agreement equitably divided Arie and Dalia's marriage assets and provided for certain assets to be transferred to the Sagi and Orly Trusts, assets in which they already had an equitable stake through their minority ownership in TPR.

22.    Thus, simultaneously with the Divorce Agreement, TPR entered into an agreement (the "Letter Agreement") with the Sagi and Orly trusts to sell, transfer and convey 1,102.80 shares of Trans-Resources stock to each of those entities. *See* Letter Agreement dated October 29, 2004, attached hereto as Exhibit A.

23.    Arie, as CEO of Trans-Resources, represented in the Divorce Agreement that "[e]xcept for the Consent of TPR . . . no consent, approval or similar action of any person is required in connection with the transfer of [Trans-Resources] Stock as contemplated hereby . . . ."

24.    Moreover, in the Letter Agreement, which transferred the Trans-Resources stock from TPR to the Orly Trust, Arie caused TPR to represent that "the shares are being transferred hereunder free and clear of any liens, claims or encumbrances and such transfer does not violate the certificate of Incorporation of TPR or any agreement to which TPR is subject." Ex. A.

25.    Dalia relied on those representations in giving up certain claims in the divorce so as to financially benefit her children's trusts and provide for their inheritance.

5

The Orly Trust also relied on those representations in purchasing the Trans-Resources shares from TPR.

**Trans-Resources Delivers a Stock Certificate to the Orly Trust**

26.     On October 30, 2004, Trans-Resources issued a stock certificate to the Orly Trust for 1,102.80 shares of its common stock.

27.     The stock certificate was signed by Arie as President of Trans-Resources, and Edward Klimerman, as Assistant Secretary of Trans-Resources.

28.     The transfer of the Trans-Resources stock to the Orly Trust in October 2004 was registered in the books and records of Trans-Resources.

29.     Trans-Resources delivered the Orly Trust's share certificate to Arie, the Orly Trust's proxy for voting the Trans-Resources shares.

30.     Arie maintained physical possession of the Orly Trust's stock certificate, and forwarded a copy of the certificate to both Dalia and the Orly Trust.

**The Trump Group Exercises an Option to Purchase the Orly Trust Shares**

31.     On August 22, 2008, TPR entered into an agreement with the Trump Group to sell the Trump Group an option to purchase the Trans-Resources shares transferred to the Orly Trust in 2004 if a court found that the transfers of the Trans-Resources shares were void (the "Side Letter Agreement").

32.     The Side Letter Agreement expressly provides that if a court determines "that the Orly Genger 1993 Trust is not the record and beneficial owner of the 1,102.80 shares of Common Stock of the of the Company purportedly transferred to such Trust by TPR in October, 2004," then Trump Group could exercise an option to purchase those shares.

33.     In February 2011, the Trump Group exercised its option to purchase the

Trans-Resources stock held by the Orly Trust.

## The Supreme Court Reverses this Court's Holding Regarding Beneficial Ownership of the Shares Held in the Orly Trust

34.     On July 18, 2011, the Delaware Supreme Court affirmed, among other

things, this Court's finding in its August 9, 2010 Side Letter Opinion (the "Side Letter

Opinion") that TPR was the record owner of the shares transferred to Arie pursuant to the

2004 Letter Agreement.

35.     The Delaware Supreme Court reversed this Court's determinations in the

Side Letter Opinion and August 18, 2010 Final Judgment Order to the extent that it

adjudicated "the beneficial ownership of the Orly Trust Shares." (Op. at 44)

36.     This action addresses one of the issues that the Delaware Supreme Court

held that this Court did not have jurisdiction to decide: the Orly Trust's beneficial

ownership of the Trans-Resources shares.

## COUNT I
### (Declaratory Judgment that the Orly Trust is the Beneficial Owner of 1,102.80 of Trans-Resources Common Stock)

37.     Plaintiff repeats, re-alleges and incorporates by reference the allegations

set forth above in the preceding paragraphs.

38.     Based upon representations that Arie made or caused to be made that the

restrictions in the Stock Purchase Agreement did not apply or were waived, the Trustee

for the Orly Trust, Dalia (the eventual Trustee) and Orly had no knowledge, either actual

or constructive, of any current or potential adverse claim against those shares.

39.     In reliance upon those representations, Dalia provided valuable

consideration for the Trans-Resources shares that TPR transferred to the Orly Trust by

7

relinquishing significant claims in the divorce. In further reliance upon those representations, the Orly Trust purchased the 1,102.80 shares of Trans-Resources stock.

40.    The share certificate issued to the Orly Trust was signed by authorized officers of Trans-Resources.

41.    Trans-Resources delivered the Orly Trust's share certificate to Arie, who held possession of it as the Orly Trust's proxy for voting the shares. Arie delivered a copy of the share certificate to the Orly Trust and Dalia.

42.    Because the Orly Trust acquired the legal rights to the Trans-Resources shares for value, with no knowledge of any adverse claim, it is a "bona fide purchaser" or protected purchaser whose rights to the Trans-Resources shares may not be nullified by the Trump Group.

43.    The Orly Trust is entitled to a declaratory judgment that it is the beneficial owner of Trans-Resources shares that it purchased from TPR in October 2004.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court enter an order:

a)    Declaring that the Orly Trust is the beneficial owner of the 1,102.80 Trans-Resources shares that it purchased in 2004, for all purposes;

b)    Requiring Trans-Resources to pay to the Orly Trust any dividends that have been issued on the Trans-Resources shares since the Orly Trust acquired them on October 29, 2004.

c)    Granting the Orly Trust such other and further relief as the Court deems just and proper.

8

Dated: October 4, 2011

CONNOLLY BOVE LODGE & HUTZ LLP

/s/ Jeremy D. Anderson
Jeremy D. Anderson (No. 4515)
The Nemours Building
1007 N. Orange Street
P. O. Box 2207
Wilmington, DE  19899
Tel:  (302) 658-9141
Fax:  (302) 658-5614
Attorneys for Plaintiff

4493617_1.DOC

9

SUPREME COURT: NEW YORK COUNTY

| | |
|---|---|
| ARIE GENGER and ORLY GENGER, in her individual capacity and on behalf of the ORLY GENGER 1993 Trust,<br><br>                    Plaintiffs,<br><br>      -against-<br><br>SAGI GENGER, TPR INVESTMENT ASSOCIATES, INC., DALIA GENGER, THE SAGI GENGER 1993 TRUST, ROCHELLE FANG, Individually and as Trustee of THE SAGI GENGER 1993 TRUST, GLENCLOVA INVESTMENT COMPANY, TR INVESTORS, LLC, NEW TR EQUITY I, LLC, NEW TR EQUITY II, LLC, JULES TRUMP, EDDIE TRUMP and MARK HIRSCH,<br><br>                    Defendants. | Index No. 651089/10<br><br>(Justice Paul G. Feinman) |

### PLAINTIFF ORLY GENGER'S MEMORANDUM OF LAW IN SUPPORT OF HER MOTION TO ENJOIN DEFENDANT DALIA GENGER FROM PROSECUTING DUPLICATIVE LITIGATION IN DELAWARE CHANCERY COURT

**ZEICHNER ELLMAN & KRAUSE LLP**
575 Lexington Avenue
New York, New York 10022
Telephone: (212) 223-0400

## **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................... ii

PRELIMINARY STATEMENT .............................................................................. 1

STATEMENT OF FACTS ....................................................................................... 2

     The New York TRI Action ................................................................................ 2

     The Delaware DJ Action ................................................................................... 4

     The Delaware Proceedings Before Chancellor Strine .......................................... 5

     Additional Reasons Why Ownership of the TRI Shares should be Decided
     in New York ..................................................................................................... 7

ARGUMENT ........................................................................................................... 8

I.      THE COURT SHOULD ENJOIN DALIA FROM CONTINUING
        HER DUPLICATIVE DELAWARE LITIGATION ................................... 8

II.     THIS COURT SHOULD STOP DALIA FROM COLLATERALLY
        ATTACKING THIS COURT'S AUTHORITY AND
        IRREPARABLY HARMING ORLY THROUGH DUPLICATIVE
        LITIGATION ......................................................................................... 12

III.    THE COURT SHOULD ENJOIN DALIA FROM COMMENCING
        ANY FURTHER DUPLICATIVE ACTIONS ......................................... 14

CONCLUSION ...................................................................................................... 15

# TABLE OF AUTHORITIES

**Page(s)**

**NEW YORK CASES**

Browne v. Browne,
   53 A.D.2d 134, 385 N.Y.S.2d 983 (4th Dept. 1976) ............................................9, 13

Bryan v. Bryan,
   275 A.D.2d 688, 713 N.Y.S.2d 348 (1st Dept. 2000)...........................................9, 11

Fernandez v. Fernandez,
   39 Misc.2d 471, 240 N.Y.S.2d 926 (Sup. Ct. Bronx Cty. 1963) ...........................10

Garvin v. Garvin,
   302 N.Y. 96, 96 N.E.2d 721 (1951).......................................................................9

Hon v. Hon,
   164 Misc.2d 806, 624 N.Y.S.2d 553 (Sup. Ct. Queens Cty. 1995) ....................9, 13

Interested Underwriters at Lloyd's v. H.D.I. III Associates,
   213 A.D.2d 246, 623 N.Y.S.2d 871 (1st Dept. 1995)..............................................11

Jay Franco and Sons Inc. v. G Studios, LLC,
   34 A.D.3d 297, 825 N.Y.S.2d 20 (1st Dept. 2006)..................................................9

Jay Franco and Sons Inc. v. G Studios, LLC,
   Index No. 602236/05, 2006 WL 5110770 (Sup. Ct. N.Y. Cty. June 14, 2006)...................8, 9

Lafferty v. Lafferty,
   243 A.D.2d 541, 663 N.Y.S.2d 108 (2d Dept. 1997) ..........................................9, 13

Martin v. Martin,
   62 Misc.2d 703, 309 N.Y.S.2d 477 (Sup. Ct. Nassau Cty. 1970) ....................10, 14

Palmer v. Palmer,
   268 A.D. 1010, 52 N.Y.S.2d 383 (3d Dept. 1944) ..............................................9, 13

Pavlo v. Pavlo,
   137 Misc.2d 418, 520 N.Y.S.2d 991 (Sup. Ct. Kings Cty. 1987)............................10

Pereia v. Pereria,
   272 A.D. 281, 70 N.Y.S.2d 763 (1st Dept. 1947)................................................9, 13

## Statutes and Rules

8 Del. C. § 225 (2011) ..........................................................................................................5, 6

NY CPLR §3211(a)(10)..........................................................................................................11

Court of Chancery Rule 12(b)(7)............................................................................................11

Court of Chancery Rule 19(a)................................................................................................11

## PRELIMINARY STATEMENT

Orly Genger ("Orly") is the sole beneficiary of the Orly Genger 1993 Trust (the "Orly Trust"). On July 20, 2010, Orly began this action to determine the Orly Trust's ownership interest in the shares of a closely-held family company, Trans-Resources, Inc. ("TRI") (the "New York TRI Action"). On October 4, 2011, defendant Dalia Genger ("Dalia") commenced a declaratory judgment action in Delaware Chancery Court, purportedly seeking to determine the same issue: the Orly Trust's ownership interest in TRI (the "Delaware DJ Action"). To prevent forum shopping and conserve judicial resources, courts have not hesitated to enjoin a party's attempt to pursue duplicative litigation in other jurisdictions. The Court should issue such an injunction here.

An injunction enjoining the Delaware DJ Action is particularly appropriate given that Dalia's only real purpose in commencing the Delaware DJ Action is to help defendants Sagi Genger ("Sagi"), TPR Investment Associates, Inc. ("TPR"), and the Trump Group loot the TRI Shares. By now, the Court is well-aware of Dalia's myriad efforts to pauperize Orly and how, since becoming Trustee, Dalia has misused her position to dissipate all of the Orly Trust's assets. To strip away the Orly Trust's indirect interest in TPR, Dalia permitted Sagi to enforce a Note Dalia and Sagi had successfully argued in a prior legal proceeding was never intended to be enforced. To strip away the Orly Trust's interest in TPR, Dalia granted Sagi the unfettered right to sell the Orly Trust's TRI Shares for a fraction of its true price, while releasing him in advance from all potential claims. The Delaware DJ Action is just another transparent attempt by Dalia to misuse her Trusteeship to harm Orly and the Orly Trust.

No valid reason exists for the Delaware DJ Action. Dalia resides in New York; Orly resides in New York; the Orly Trust is governed by New York law; and the question raised

by the Delaware DJ Action is already before this Court. The only reason Dalia filed her action in Delaware is to provide the Delaware Chancery Court with personal jurisdiction over the Orly Trust. Specifically, in the course of a limited *in rem* proceeding to decide voting rights, Chancellor Strine of the Delaware Chancery Court purported to hold that the TRI Shares do not belong to the Orly Trust, but to TPR (and through TPR to the Trump Group). That holding was overturned, the Delaware Supreme Court ruling the lower court lacked, in that limited *in rem* proceeding, the personal jurisdiction over the Orly Trust necessary to decide beneficial ownership of the TRI Shares. By bringing her action, Dalia deliberately has given the Delaware Chancery Court the personal jurisdiction it lacked. Little wonder then that, at a recent hearing before this Court, Thomas J. Allingham II, the Trump Group's attorney, welcomed the filing of Dalia's new Delaware DJ Action.

Over fifteen months ago, Orly chose this Court as her desired forum for deciding who beneficially owns the TRI Shares, and it is this Court that should decide that issue. The Court should not allow Dalia to strip that choice from Orly, as she has stripped Orly of so many other things. Nor should Dalia be permitted to spark an unnecessary and unhelpful race to judgment between New York and Delaware. Instead, during the pendency of this action, the Court should enjoin Dalia from continuing the Delaware DJ Action, or commencing any other duplicative litigation.

## STATEMENT OF FACTS[1]

### The New York TRI Action

On July 20, 2010, Orly, on behalf of herself and the Orly Trust, and together with

---

[1] The Statement of Facts is supported by the Affidavit of plaintiff Orly Genger ("Orly Aff.") and exhibits attached thereto; the Attorney's Statement of Bryan D. Leinbach ("Leinbach Decl.") and exhibits attached thereto; and the Attorney's Statement of Judith Siegel-Baum ("Siegel-Baum Decl.") and exhibits attached thereto.

her father Arie Genger ("Arie"), commenced the instant New York TRI Action.  Leinbach Decl. ¶ 2; Orly Aff. ¶ 2.  The New York TRI Action seeks reformation of a Stipulation and Agreement of Settlement between Arie and Dalia in consummation of their divorce proceedings (the "Stipulation"), and a final determination of who beneficially owns the shares of TRI purportedly transferred to Arie, the Orly Trust, and the Sagi Genger 1993 Trust ("Sagi Trust") pursuant to that Stipulation. Complaint ¶¶ 32-173.[2]

The Stipulation provides, *inter alia*, that defendant TPR would transfer a 13.99% interest in TRI to Arie Genger (the "Arie TRI Shares") and 19.43% interests to the Orly Trust (the "Orly Trust TRI Shares") and Sagi Trust (the "Sagi Trust TRI Shares").  Complaint ¶ 34. The Stipulation also provided that Arie would transfer his 51% interest in TPR to Dalia.  Id.  In the event that any of the transfers contemplated by the Stipulation were found unenforceable for any reason, the Stipulation contained a reformation provision, stating:

> If any provision of this Agreement, for any reason whatsoever, be declared … unenforceable by any Court of competent jurisdiction … the remainder of this Agreement and the application of such provision to any person or situations, other than those as to which such provision may have been held invalid or unenforceable shall not be affected thereby and shall continue to be enforced to the fullest extent that such severance of the invalid portions is possible without vitiating the original intent and purposes and economic intentions of the parties (the "Original Intent"), as herein set forth ….  **In the event a provision is superseded under this Article XVI, either party may seek reformation of the affected provision in any court of competent jurisdiction, which shall be empowered to revise the provision to reflect the parties' Original Intent to the greatest extent possible, consistent with New York law.**  It is the intention of the parties hereto that the provisions may be enforced in equity in addition to, and not to the exclusion of any other remedies which may be available to the parties.

---

[2] "Complaint" means the New York TRI Action's Third Amended and Supplemental Complaint dated September 20, 2011.  For the Court's convenience, a copy of the Complaint, without exhibits, is attached as Exhibit R to the Leinbach Decl.

Stipulation, pp. 47-48 (emphasis added) (Complaint ¶ 38 and attached Ex. A).

Moreover, to effectuate the Genger family's wishes concerning ownership of the Genger's families TRI shares, defendant Sagi Genger, as CEO of defendant TPR Investment Associates, Inc., and David Parnes, as trustee of the Orly and Sagi Trusts, entered into an October 29, 2004 agreement (the "October 2004 Agreement"), stating:

> In case, at any time hereafter, any further action is necessary or desirable to carry out the purpose of this Letter Agreement, **each of the parties hereto shall take or cause to be taken all necessary action**, including, without limitation, the execution and delivery of such further instruments and documents **as may be reasonably requested by any party for such purpose or otherwise to complete or perfect the transactions contemplated hereby.**

October 2004 Agreement (emphases added) (Complaint ¶ 50 and attached Ex. B).[3]

**The Delaware DJ Action**

On October 4, 2011, Dalia commenced a declaratory judgment action in Delaware Chancery Court entitled *Dalia Genger as Trustee of the Orly Genger 1993 Trust v. TR Investors LLC et al.* (Orly Aff. ¶ 5 and Ex. A (Delaware DJ Action Complaint)).[4] Like the New York TRI Action, the Delaware DJ Action seeks a judicial determination regarding beneficial ownership of the Orly Trust TRI Shares. Id. However, unlike the New York TRI Action, Dalia's Chancery Court proceeding fails to include either Arie or the Sagi Trust as parties or take into account the reformation provision in the Stipulation. Orly Aff. ¶¶ 5-8; Leinbach Decl. ¶ 4.

---

[3] In addition, Arie was granted an irrevocable proxy and a backup proxy agreement to vote the two trust's TRI shares during his lifetime, thus maintaining the Genger family's majority voting control over TRI. Complaint ¶¶ 50-55 and attached Exs. B-E.

[4] Dalia's Delaware counsel is Jeremy Anderson, a former associate to Trump Group lawyer Allingham II. See Leinbach Decl. ¶ 6.

**The Delaware Proceedings Before Chancellor Strine**

In filing the Delaware DJ Action, Dalia deliberately seeks to have her case placed before a Court and Judge (Chancellor Strine) who already has determined the Orly Trust does not own the TRI Shares (a determination reversed by the Delaware Supreme Court on jurisdictional grounds). Orly Aff. ¶¶ 9-13 and Exs. D and E.

Chancellor Strine ruled on the issue as part of a limited action under 8 Del. C. § 225 between various members of the "Trump Group" and Arie Genger (Orly's father) to determine which stockholder group possessed majority voting interest and was entitled to elect the TRI board of directors. As part of that proceeding, in an August 29, 2010 Opinion (the "Side Letter Opinion"), the Chancery Court attempted to opine regarding who owned the TRI Shares.[5] (Orly Aff. ¶ 10 and Ex. D). In that Side Letter Opinion, the Chancellor expressly acknowledged the Orly Trust "was not formally before the Court" in any capacity. Side Letter Opinion at 1 (Orly Aff., Ex. D). The Chancellor nevertheless went on to determine that the Orly Trust did not beneficially own the TRI Shares. Rather, the Chancellor held that the TRI Shares are owned by TPR (and pursuant to the Side Letter Agreement between TPR and the Trump Group could be purchased by the Trump Group). Side Letter Opinion at 3; see also Final Judgment Order at ¶ 8 (Orly Aff., Ex. E) ("TPR is the record and beneficial owner of all [TRI] shares not presently owned by the Trump Group").

On July 18, 2011, the Delaware Supreme Court affirmed in part and reversed in part the decision of the Delaware Chancery Court. See Delaware Supreme Court Opinion (Orly Aff., Ex. C). Specifically, the Delaware Supreme Court held that, because the Delaware Court of

---

[5] The August 29 Opinion is referred to as the "Side Letter Opinion" because it purports to apply a "side letter" where TPR's CEO, Sagi Genger, contracted to sell TRI Shares to the Trump Group. Notably, TPR claims the right to sell the Orly Trust's TRI Shares because Dalia – in derogation of her fiduciary duties as Trustee – purported to give Sagi (for no apparent consideration) the unfettered right the sell, transfer, and otherwise dispose of, the TRI Shares. See Orly Aff. ¶ 10 n. 1; see also Meeting Agreement ¶¶ 3, 11 (Siegel-Baum Decl. Ex. I).

Chancery was deciding a Section 225 *in rem* proceeding (as opposed to a plenary proceeding), it

exceeded its jurisdiction in deciding the Trump Group's right to buy, and TPR's right to sell, the

Orly Trust TRI Shares. Del. Sup. Ct. Op. at 35-44. The Delaware Supreme Court concluded:

> To summarize, the trial court lacked personal jurisdiction over
> either the Orly Trust or TPR, which was required for a binding
> adjudication of the beneficial ownership of their respective stock
> ownership interests.   Without personal jurisdiction over these
> entities, the Court of Chancery lacked the power to augment TPR's
> beneficial ownership interest, or diminish the Orly Trust's
> beneficial ownership interest, in Trans-Resources by adjudicating
> that TPR beneficially owned the Genger Shares and Orly Trust
> Shares.   Therefore, the beneficial ownership determinations that
> flow from the Court of Chancery's August 9, 2010 Side Letter
> Opinion and its August 18, 2010 Final Judgment Order must be
> reversed.

Id. at 44. Notably, the Delaware Supreme Court also suggested that the adjudication of beneficial

ownership take place in the New York Courts. Id. at 44, n.98.

Rather than follow the Delaware Supreme Court's advice and bring an action in

New York, or conserve its resources by litigating the matter in the existing New York TRI

Action, Dalia deliberately chose the worst possible option – to bring a plenary action in

Delaware Chancery Court where the matter already has been decided adverse to the Orly Trust.

Orly Aff. ¶ 12.   By bringing her Delaware DJ Action, Dalia is attempting to cure the

jurisdictional defect that protected the Orly Trust, plainly intending to obtain from Chancellor

Strine the same erroneous findings adverse to the Orly Trust he had made previously (even

though Orly, the Orly Trust, and TPR were not parties to that prior proceeding). Id. Little

wonder then that, at a recent hearing before this Court, Mr. Allingham II, the Trump Group's

attorney, welcomed Dalia's filing of her new Delaware DJ Action. See October 11, 2011

Hearing Transcript at 28:3-8 (Leinbach Decl., Ex. V).

Dalia's use of the Delaware DJ Action to harm Orly and the Orly Trust is of a

piece with her many other efforts to financially damage Orly and the Orly Trust, in collusion

with her son, Sagi.  See Siegel-Baum Decl. ¶¶ 4-14 and Exs. G-M; Orly Aff. ¶¶ 2-4.  For this

reason, Orly has brought a proceeding in Surrogate Court to remove Dalia as Trustee of the Orly

Trust.  See *In the Matter of the Application of Orly Genger, as a person interested, for the removal*

*of Dalia Genger as Trustee of the Orly Genger 1993 Trust pursuant to SPCA § 711(11)*, Index

0017/2008. The Surrogate action is still pending before the Surrogate Court.  Siegel-Baum Decl.

¶ 19.

On July 1, 2009, the Surrogate Court imposed certain protective restraints upon

Dalia to preserve the status quo (the "Restraints"):

> ORDERED that, during the pendency of his proceeding,
> Respondent and/or her counsel are required to give notice by
> overnight mail to Petitioner's counsel of any (1) offer to purchase
> the Orly Trust's 19.3% interest in TRI within 10 days of receiving
> such offer and (2) act by Respondent, her agents and all other
> persons acting on her behalf to assign, mortgage, pledge, redeem,
> encumber, sell or otherwise alter the Orly Trust's interest in TRI at
> least 10 days prior to such act.

July 1, 2009 Order at 2 (emphases added) (Siegel-Baum Decl. Ex. N); accord September 8, 2010

Stipulation (Siegel-Baum Decl. Ex. O) (stipulating to same restraints).  Dalia did not provide Orly or

her counsel with any notice before filing the Delaware DJ Action. (Siegel-Baum Decl. ¶ 18).

## Additional Reasons Why Ownership of the TRI Shares should be Decided in New York

Any determination regarding the Orly Trust should be made in New York, not

Delaware.  Orly, the sole beneficiary of the Orly Trust, is a resident of New York and has chosen

this Court as her forum of choice.  (Orly Aff. ¶ 6).  Dalia, the present Trustee of the Orly Trust, is

a resident of New York.  Id.  The Trust Agreement creating the Orly Trust specifically states that

"This Trust Agreement and the trusts hereby created shall be governed by the Law of the State of

New York."  See Trust Agreement, Article Sixth (Governing Law) (Orly Aff., Ex. B).

7

More generally, every party necessary to determination of who owns the TRI Shares are parties to, and have appeared in, the New York TRI Action. (Orly Aff. ¶ 7). Further, the New York Court has jurisdiction to decide all necessary issues, including issues touching upon the dissolution of Arie and Dalia Genger's marriage and reformation of the Stipulation of Settlement arising therefrom. Id. Thus, it is not surprising that the Delaware Supreme Court recognized in its opinion that ownership of the TRI Shares should be decided in New York. See Del. Sup. Ct. Op. at 44, n.98 (Orly Aff., Ex. C).

Finally, this Court is already familiar with many of the issues in this case, having presided over extensive motion practice in the New York TRI Action, and in the related action before this Court, titled *Orly Genger v. Dalia Genger et al.,* Index No. 109749/09 (the "New York TPR Action").   Orly Aff. ¶ 8; Leinbach Decl. ¶ 3.   For example, this Court already has recognized that both the TPR and TRI Shares are "unique" and should "be protected from transfer, sale or assignment until this litigation is ultimately decided." See July 28, 2010 Amended Decision and Order in New York TPR Action (Leinbach Decl., Ex. T); February 17, 2011 Decision and Order in New York TRI Action (Leinbach Decl., Ex. V).

## ARGUMENT

### I.   THE COURT SHOULD ENJOIN DALIA FROM CONTINUING HER DUPLICATIVE DELAWARE LITIGATION

This Court has broad powers to prevent a defendant like Dalia from prosecuting foreign legal proceedings that duplicate litigation currently pending before it.  For example, in Jay Franco and Sons Inc. v. G Studios, LLC, Index No. 602236/05, 2006 WL 5110770 (Sup. Ct. N.Y. Cty. June 14, 2006), plaintiff filed an action in New York seeking the return of a $70,000 deposit paid to defendant, after the parties failed to complete and enter a trademark licensing agreement.  Ten months later, defendant commenced a fraud action in California, contending the

licensing agreement had failed due to plaintiff's fraud and the deposit did not have to be returned. Id. Although defendant contended the actions were not duplicative,[6] the New York Supreme Court disagreed and enjoined the California action. Id. (citing Matter of the Adoption of Baby Girl S., 181 Misc. 2d 117, 130 (Surr. Ct. Westchester Cty. 1999) ("the court has the authority to grant injunctive relief in order to protect the integrity of its jurisdiction and to prevent the parties from engaging in duplicative litigation")).

The First Department affirmed, holding that, although the legal claims differed, the operative facts and "underlying issue in both cases is the [same]," and the injunction was proper:

> In the interest of preventing duplicative litigation that might lead to conflicting results, and to prevent the waste of judicial resources and unnecessary legal expenses, the court did not improvidently exercise its discretion by invoking its equity power to enjoin defendant from prosecuting [an action the defendant filed in California].

Jay Franco and Sons Inc. v. G Studios, LLC, 34 A.D.3d 297, 825 N.Y.S.2d 20, 21 (1st Dept. 2006); see also Bryan v. Bryan, 275 A.D.2d 688, 713 N.Y.S.2d 348 (1st Dept. 2000) (affirming decision enjoining defendant from prosecuting duplicative action filed in Texas); Lafferty v. Lafferty, 243 A.D.2d 541, 663 N.Y.S.2d 108, 109 (2d Dept. 1997) (affirming decision enjoining defendant from prosecuting duplicative action filed in Connecticut).[7] The same result, enjoining

---

[6] Indeed, defendant's California attorneys submitted a certification in California stating that the California action was "not related to another action or proceeding pending in any state." Jay Franco and Sons, Inc., 2006 WL 5110770, at *1.

[7] See also Garvin v. Garvin, 302 N.Y. 96, 103, 96 N.E.2d 721 (1951) (affirming lower court's decision to enjoin defendant from prosecuting a subsequent action in the Virgin Islands); Pereia v. Pereria, 272 A.D. 281, 70 N.Y.S.2d 763 (1st Dept. 1947) (reversing lower court's decision and enjoining defendant from prosecuting a subsequent action in Nevada); Palmer v. Palmer, 268 A.D. 1010, 52 N.Y.S.2d 383 (3d Dept. 1944) (affirming lower court's decision to enjoin defendant from prosecuting a subsequent action in Nevada); Browne v. Browne, 53 A.D.2d 134, 385 N.Y.S.2d 983, 987 (4th Dept. 1976) (affirming Supreme Court's decision to enjoin defendant from prosecuting action in Texas); Hon v. Hon, 164 Misc.2d 806, 624 N.Y.S.2d 553,

Dalia from prosecuting the Delaware DJ Action, is called for here.

The Delaware DJ Action was commenced over <u>fifteen months</u> after the New York TRI Action, and seeks the same relief: a judgment affirming the Orly Trust's beneficial ownership to the Orly Trust TRI Shares. <u>Compare</u> First Cause of Action in New York TRI Complaint, at ¶¶ 174-189 (Leinbach Decl., Ex. R) <u>with</u> Count One of Delaware DJ Action Complaint, at ¶¶ 37-43 (Orly Aff., Ex. A). This Court has spent countess hours over the past year and a half familiarizing itself with the facts of the case and making substantive ruling regarding the property at issue in this case. Indeed, there are already over 100 entries on the Court's docket for this case. <u>See</u> E-filing docket (Leinbach Decl. ¶ 3 and Ex. S).

Allowing Dalia to prosecute the Delaware Action would only duplicate this Court's efforts in a state with no connection to the New York Stipulation that gave rise to the Genger family's division of wealth, and no connection to Dalia, Orly, or the Orly Trust. Indeed, while this Court has already addressed the issue of reformation of the Stipulation pursuant to the Genger family's original intent, the Delaware Chancery Court never addressed such issues in the prior special 225 proceeding before it, which was an *in rem* proceeding narrowly focused on the parties' relative rights to appoint board members to TRI's board of directors. Orly was not a party to these prior Delaware proceedings and had no opportunity to raise the New York Stipulation or related issues with the Delaware Court. <u>See</u> Del. Sup. Ct. Op. at 44; <u>see also</u> Orly Aff. ¶¶ 6-8, 14-16. For this reason alone, the Court should enjoin or stay the Delaware DJ Action. <u>See, e.g.</u>, <u>Interested Underwriters at Lloyd's v. H.D.I. III Associates</u>, 213 A.D.2d 246,

---

554 (Sup. Ct. Queens Cty. 1995) (enjoining plaintiff from prosecuting subsequent proceeding in Connecticut after commencing an action in New York); <u>Pavlo v. Pavlo</u>, 137 Misc.2d 418, 520 N.Y.S.2d 991, 994 (Sup. Ct. Kings Cty. 1987) (enjoining defendant from prosecuting subsequent action in New Jersey); <u>Fernandez v. Fernandez</u>, 39 Misc.2d 471, 240 N.Y.S.2d 926, 927 (Sup. Ct. Bronx Cty. 1963) (enjoining defendant from prosecuting subsequent action in Mexico); <u>Martin v. Martin</u>, 62 Misc.2d 703, 309 N.Y.S.2d 477, 480 (Sup. Ct. Nassau Cty. 1970)

247, 623 N.Y.S.2d 871, 873 (1st Dept. 1995) (affirming order staying Colorado action where "New York action was properly placed, ... a contrary decision in Colorado would interfere with the New York court's ability to resolve the issues before it, ... the facts indicate that the defendant may have engaged in forum-shopping ... [and] significant New York contacts existed") (internal citations omitted); Bryan v. Bryan, 275 A.D.2d 688, 689, 713 N.Y.S.2d 348, 349 (1st Dept. 2000) (enjoining action where "New York has the greater interest in and contacts with the ... litigation" because "most, if not all, of the marital property is located in New York; the antenuptial agreement was entered into in New York; the parties lived together in New York as husband and wife ... and the wife continues to reside in New York").

Both the Delaware and New York courts recognize a party's right to move to dismiss a complaint due to the plaintiff's failure to name all necessary parties. NY CPLR 3211(a)(10); Court of Chancery Rule 12(b)(7), 19(a). The New York TRI Action includes all necessary parties for an adjudication of the Orly Trust's beneficial ownership to the Orly Trust TRI Shares: Orly, Arie, the Orly Trust,[8] Dalia, Sagi, TPR, the Sagi Trust, and the Trump Group. In contrast, Dalia's newly minted Delaware DJ Action only names TPR and the Trump Group as defendants. See Delaware DJ Action Complaint at 1.

In this regard, Dalia's decision to exclude Orly as a party is telling. As a non-party, Orly cannot move the Delaware Court to dismiss the Delaware DJ Action, despite the fact that Dalia's prosecution of the Delaware DJ Action would rob Orly of her right to prosecute her

---

(enjoining defendant from commencing subsequent proceeding in Nevada).

[8] Dalia's contention that the Orly Trust is not a party to this action (see Dalia Brief in support of Motion to Dismiss) is meritless. Orly is prosecuting this action on behalf of the Orly Trust, a trust formed in and under the laws of New York, precisely because Dalia is acting against the interests of Orly and the Orly Trust, despite Orly's requests that Dalia fulfill her fiduciary duties to Orly and the Orly Trust. See Statement of Facts; Orly Aff. ¶¶ 2-13; Siegel-Baum Decl. ¶¶ 2-19.

case in her chosen forum before contrary rulings in Delaware make relief in this Court meaningless. Only this Court can provide Orly with the relief she seeks and deserves. Orly Aff. ¶ 16. For this additional reason, the Court should immediate enjoin Dalia from continuing her Delaware DJ Action.

Finally, Dalia should not be able to prosecute the Delaware DJ Action because Dalia should not be permitted to act against beneficiary Orly's interest while an action for Dalia's removal is pending. See Surrogate Court Petition (Siegel-Baum Decl., Ex. M). Indeed, to restrain Dalia during the pendency of the Surrogate Court proceeding, the Surrogate Court issued restraints preventing Dalia from taking any action to "affect the Orly Trust's interest in" the Orly Trust TRI Shares without giving Orly at least ten (10) days advanced notice of any such action. See Siegel-Baum Decl. Ex. N (signed Order to Show Cause), Ex. O (signed stipulation). Not only did Dalia fail to give Orly any notice of her plans to commence the Delaware Action, but Dalia continues to ignore Orly's express instruction to Dalia protect the Orly Trust's interest in the Orly Trust TRI Shares. See Siegel-Baum Decl. ¶¶ 5-11 and Ex. J (January 10, 2009 Letter). Allowing Dalia to prosecute the Delaware Action only further undermines the very Orders and Restraints meant to protect Orly from such misfeasance by Dalia. For this reason too, Dalia should be enjoined from prosecuting the Delaware Action.

## II.    THIS COURT SHOULD STOP DALIA FROM COLLATERALLY ATTACKING THIS COURT'S AUTHORITY AND IRREPARABLY HARMING ORLY THROUGH DUPLICATIVE LITIGATION

New York courts have the power to enjoin a defendant from prosecuting a foreign proceeding to protect the authority and dignity of the New York Courts:

> The plaintiff evidently expects to engage the defendant in an unseemly race to judgment in the two courts. What is being challenged here, therefore, is not the dignity and authority of the Connecticut Court, but of this Court."

Hon, 624 N.Y.S.2d at 554 (emphasis added).  This power to enjoin also exists as a matter of equity to protect the rights of its litigants where a subsequently filed action would damage a plaintiff's rights in the earlier filed action:

> In our opinion there is a sufficient and immediate necessity for equitable intervention by our courts to protect the marital status of the wife domiciled in New York. The failure of equity to act at the earliest opportunity when called upon to do so might result in irreparable harm to the domiciliary party who invokes its protection. Certainly there is every reason for a wife in plaintiff's position to fear the result of a foreign divorce proceeding prosecuted by the husband. It is difficult for her to determine whether she should go to Nevada, if possessed of means to do so, and there contest the *bona fides* of her husband's claim of domicile. Such procedure would entail the risk of acquiescing in the jurisdiction of the Nevada courts. The alternative risk in staying quiescent at home involves the possible inability to procure later the proof she now has to establish the husband's lack of bona fide domicile in the foreign jurisdiction.

Pereia, 70 N.Y.S.2d at 768 (emphasis added); see also Browne, 385 N.Y.S.2d at 986 (preventing defendant from prosecuting action in Texas where a Texas judgment would prejudice plaintiff's rights in New York proceeding); Lafferty, 663 N.Y.S.2d at 109 (preventing defendant from seeking a sister state ruling that would make New York decision ineffectual); Palmer, 52 N.Y.S.2d at 383 (same).  Indeed, the Delaware Chancery Court did not hesitate to impose an anti-litigation injunction against Orly, to prevent any duplication of effort and challenge to its authority in the New York Courts.  See Orly Aff. ¶¶ 14-16.  This Court should adopt the same precaution, and stop Dalia's transparent attempt to forum-shop these matters from New York.

By filing the Delaware DJ Action, Dalia improperly seeks to "engage [Orly] in an unseemly race to judgment in the two courts" (Hon, 624 N.Y.S.2d at 554) and irreparably and prejudice her rights in this proceeding (Pereia, 70 N.Y.S.2d at 768).  Dalia's Delaware DJ Action seeks to preempt this Court's determination of who owns the TRI Shares, and prevent this Court's reformation of the Stipulation of Settlement or consideration of TPR's prior agreement

13

to do all that is necessary to effectuate the transfer of the TRI Shares to the Orly Trust, the Sagi Trust, and Arie. See October 2004 Agreement (New York TRI Action Complaint ¶ 50 and attached Ex. B). As a matter of equity, the Court need not wait until Orly is actually foreclosed, in whole or in part, from prosecuting her action in this Court, but may (and should) act now and enjoin Dalia's Delaware DJ Action.

## III. THE COURT SHOULD ENJOIN DALIA FROM COMMENCING ANY FURTHER DUPLICATIVE ACTIONS

Not only does the Court have the power to enjoin Dalia from prosecuting the Delaware DJ Action, it also has the power to prevent Dalia from commencing new actions:

> Granting the preliminary injunction requested by the wife would do no more than maintain the status quo of the parties until the bona fides of the husband's alleged foreign domicile are determined in the main action. To permit the husband to institute divorce proceedings in Nevada would place his wife in an unfair position of imminent peril....she would then be placed on the horns of a dilemma, have the option of either sitting idly by while her marriage is purportedly dissolved in Nevada, keeping for herself what may be an illusory right to attack the decree at a later time, or of appearing in Nevada, at great expense, and placing all her marital rights at the mercy of a court ostensibly foreign to every aspect of their marital domicile and relationship.

> Under the circumstances, a preliminary injunction is proper and plaintiff may maintain her action for a permanent injunction. This is true, despite the fact that there is no matrimonial action pending presently between the parties.

Martin, 309 N.Y.S.2d at 479-80 (internal citations omitted). Pending a final determination by this Court in the New York TRI Action, Dalia should be enjoined from commencing any new actions as Trustee of the Orly Trust addressing the same subject-matter.

14

## CONCLUSION

For each and every one of the foregoing reasons, this Court should grant Orly's motion for an Order: (i) enjoining Dalia from prosecuting the Delaware Action; and (ii) enjoining Dalia from commencing any new actions as Trustee of the Orly Trust concerning the subject-matter of the operative Complaint in this action. Plaintiff Orly Genger also respectfully requests that the Court grant her such further and different relief as the Court deems just and proper.

Dated:   New York, New York
         October 25, 2011

Respectfully submitted,

ZEICHNER ELLMAN & KRAUSE LLP

By: _____
         Yoav M. Griver
         Bryan D. Leinbach
         Attorneys for plaintiff Orly Genger
         575 Lexington Avenue
         New York, New York 10022
         (212) 223-0400

Of Counsel
William B. Wachtel
Wachtel & Masyr LLP
One Dag Hammarskjold Plaza
885 Second Avenue
New York, New York 10017
(212)909-9595

15

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

| | |
|---|---|
| ARIE GENGER and ORLY GENGER, in her individual capacity and on behalf of the ORLY GENGER 1993 Trust, | INDEX NO.   651089/2010 |
| Plaintiffs, | **THIRD AMENDED AND SUPPLEMENTAL COMPLAINT** |
| -against- | |
| SAGI GENGER, TPR INVESTMENT ASSOCIATES, INC., DALIA GENGER, THE SAGI GENGER 1993 TRUST, ROCHELLE FANG, Individually and as Trustee of THE SAGI GENGER 1993 TRUST, GLENCLOVA INVESTMENT COMPANY, TR INVESTORS, LLC, NEW TR EQUITY I, LLC, NEW TR EQUITY II, LLC, JULES TRUMP, EDDIE TRUMP, MARK HIRSCH, and TRANS-RESOURCES, INC. | |
| Defendants. | |

Plaintiffs Arie Genger and Orly Genger, in her individual capacity and on behalf of the Orly Genger 1993 Trust, by their respective attorneys, for their Third Amended and Supplemental Complaint against the defendants in this action allege, on information and belief, as follows:

## I.   THE PARTIES

1.      Plaintiff Arie Genger ("Arie") is a resident of the State of Florida, and the father of the Plaintiff Orly Genger ("Orly") and the defendant Sagi Genger ("Sagi").

2.      Plaintiff Orly Genger is the adult daughter of Arie Genger and Dalia Genger, and the beneficiary of the Orly Trust, and a resident of the State of New York and is the beneficiary of the Orly Genger 1993 Trust (the "Orly Trust"). She brings this action on behalf of the Orly Trust as the beneficiary of the Orly Trust to protect her interests thereunder.

3.     Defendant Sagi Genger ("Sagi") is the estranged adult son of plaintiff Arie Genger and Defendant Dalia Genger, and is a resident of the City, County, and State of New York, and maintains an office at 1211 Park Avenue, New York, NY 10128.

4.     Defendant TPR Investment Associates, Inc. ("TPR") is a Delaware Corporation with a principal office located at 1211 Park Avenue, New York, NY 10128.

5.     At all relevant times to this Complaint Sagi is the President of defendant TPR and continues to be a controlling member of TPR's Board of Directors.

6.     Defendant Dalia Genger ("Dalia") is the mother of Sagi Genger and Orly Genger and the former wife of the Plaintiff Arie Genger, and is a resident of the City, County and State of New York.  Dalia is the putative trustee of the Orly Trust and at relevant times to this Complaint is believed to have been a director of TPR.

7.     Defendant The Sagi Genger 1993 Trust ("Sagi Trust") is a trust entity, and the beneficiary of the Sagi Trust is Sagi.

8.     Defendant Rochelle Fang ("Fang") is the mother-in-law of the Defendant Sagi Genger and was the Trustee of the Sagi Trust during relevant periods in 2008, and is a resident of the City, County and State of New York.

9.     Defendant Glenclova Investment Company ("Glenclova") is a Cayman Islands company with a business address in the Bahamas, and an owner of common stock of Trans-Resources, Inc. ("TRI").  On information and belief Glenclova is in turn owned by other off-shore companies directly or indirectly controlled by the Trump Parties as defined below.

10.     Defendant TR Investors, LLC ("TR Investors") is a New Jersey Limited Liability Company and an owner of common stock of TRI.  On information and belief TR Investors is in

2

turn owned by other off-shore companies directly or indirectly controlled by the Trump Parties as defined below.

11.     Together Glenclova and TR Investors are controlled by the Trump Group of South Africa and are collectively referred to herein as the "Trump Group".

12.     Defendant New TR Equity I, LLC ("New TR I") is a Delaware Limited Liability Company, controlled by Jules Trump and/or Eddie Trump.

13.     Defendant New TR Equity II, LLC ("New TR II") is a Delaware Limited Liability Company, controlled by Jules Trump and/or Eddie Trump.

14.     Defendant Jules Trump is a resident of Florida, and an officer and director of Glenclova.

15.     Defendant Eddie Trump is a resident of Florida, and an officer and director of Glenclova.

16.     Defendant Mark Hirsch is a resident of New York, and an officer and director of Glenclova.

17.     The Trump Group, New TR I , New TR II, Jules Trump, Eddie Trump and Mark Hirsch are referred to herein as the "Trump Parties."

18.     Defendant Trans-Resources, Inc. ("TRI") is a Delaware Corporation which is doing business in the City, County and State of New York, with its principal place of business located in the City, County and State of New York.

19.     The claims set forth in this Complaint arise from the conduct of each of the defendants, or their respective agents and co-conspirators, who committed one or more (i) tortious acts within the state, (ii) tortious acts without New York State causing injury to the

3

Plaintiffs or their property within New York State, and (iii) breaches of contract or fiduciary duty arising from contractual obligations, transactions and fiduciary obligations performed or to be performed in New York State.

## II.   NATURE OF THE CASE

20.     In this case, Plaintiffs Arie and Orly, in her individual capacity and on behalf of the Orly Trust, are seeking declaratory, injunctive, and other equitable relief, as well as additional compensatory damages in an amount yet to be determined arising from, inter alia, the loss of Arie's voting control of TRI and the tortious conduct of the defendants as set forth herein, in connection with the Trump Parties' campaign to take over and dilute the value of plaintiffs' interests in TRI, a company founded by Arie nearly three decades ago, including the defendants' wrongful, concerted efforts to strip Arie of his ownership and control of 52.85% of the shares of TRI's common stock, including the Orly Trust's interest in a portion of this TRI stock, and to oust Arie from his management control of TRI—all in an audacious series of breaches of contractual, fiduciary and legal obligations giving rise to each of the causes of action alleged in this Complaint.

## III.   FACTS RELEVANT TO ALL CLAIMS

### A.   Background

21.     The Plaintiff Arie is the founder and former Chairman of TRI, a private corporation which, through its subsidiaries, is a leading distributor and manufacturer of agricultural fertilizer worldwide.

22.     Arie founded TRI in 1985. Until 2001, TRI was wholly-owned by TPR Investment Associates, Inc. ("TPR"), a Genger family corporation established by Arie.

4

23.     Prior to October 30, 2004, TPR was controlled by Plaintiff Arie who owned 51% of TPR stock.

24.     Prior to October 30, 2004, Arie maintained majority control of TRI through his 51% majority ownership and control of TPR.

25.     The minority 49% interest in TPR, prior to October 30, 2004, was owned by D&K, Ltd. Partnership ("D&K"), also a Genger family company, which was in turn owned by Arie's wife, Dalia, (4%), the Sagi Trust and the Orly Trust (48% each).

26.     The Sagi and Orly Trusts were established in 1993 by Arie as part of a family estate plan.

27.     In 2001, defendants Glenclova and TR Investors became minority shareholders of TRI, acquiring approximately 47.15% of TRI common stock.

28.     As a result of the Trump Group acquiring 47.15% of TRI common stock, TPR became the owner of 52.85% of TRI stock with Arie maintaining a 51% controlling interest in TPR. Through his 51% ownership of TPR, Arie maintained control of a majority 52.85% interest in TRI, the company he founded.

29.     When the Trump Group became a minority shareholder of TRI, the Trump Group and TPR entered into the 2001 TRI Stockholders Agreement, dated March 30, 2001 (the "2001 TRI Stockholders Agreement") which, among other things, was intended to ensure that Arie (through his controlling interest in TPR) would continue to control the majority voting rights of TRI shares for the duration of his life.

5

30.     The 2001 TRI Stockholders Agreement specifically recognized that Arie was the 51% owner of TPR and that Dalia and the Orly Trust and the Sagi Trust through the D&K Limited Partnership together owned 49% of TPR.

31.     The 2001 TRI Stockholders Agreement contains certain provisions restricting the transfer of TPR's majority interest in TRI to someone other than Arie during his lifetime, except under certain enumerated conditions intended to ensure that Arie, as the majority shareholder of TPR, would maintain control over 52.85% of TRI shares during his life. The 2001 Stockholders Agreement specifically provides that exclusive jurisdiction over disputes relating to this 2001 TRI Stockholders Agreement shall be in Federal courts or New York State courts sitting in the City, State, and County of New York. The full terms and conditions of the 2001 TRI Stockholders Agreement are incorporated herein by reference.

**B.     The Genger Divorce and Court-Ordered Stipulation of Settlement**

32.     In 2002, Dalia and Arie became embroiled in a bitter divorce action venued in the Supreme Court, New York County, entitled *Dalia Genger v. Arie Genger*, Index No. 302436-2002 ("Genger Divorce Action").

33.     In October of 2004, Dalia and Arie agreed to a Stipulation of Settlement, which was incorporated into a Judgment of Divorce in the Genger Divorce Action on January 7, 2005 ("Stipulation of Settlement"), attached hereto as Exhibit A. This Court-Ordered Stipulation of Settlement, among other things equitably distributed between Arie and Dalia various marital assets, including the ownership interests in the family holding company TPR which then held 52.85% of TRI common stock which was controlled by Arie through his control of TPR. Pursuant to the terms of the Judgment of Divorce, the New York State Supreme Court retained

6

jurisdiction over the parties with respect to the enforcement of the terms of the Stipulation of Settlement.

34.     Pursuant to the terms of the Stipulation of Settlement and certain 2004 TPR Transaction Documents (described below) implementing the Stipulation of Settlement, it was agreed by and among Arie, Dalia, Sagi, Orly, the Orly Trust, and the Sagi Trust that as part of the settlement of the Genger Divorce Action, that Arie would transfer his 51% interest in the TPR marital asset to Dalia, in consideration of TPR concurrently divesting itself of its 52.85% majority interest in TRI on the following terms and conditions, which were all part of a single integrated transaction:

     i.    The defendant Sagi would become the President of TPR;

    ii.    TPR, by Sagi as President of TPR, would transfer to the plaintiff Arie direct ownership of 794.40 shares of TRI common stock representing 13.99468% of the common stock of TRI;

    iii.    TPR, by Sagi as President of TPR, would transfer to each of the Sagi Trust and Orly Trust, record ownership of 1,102.80 shares (or 19.42766 % each) of TRI stock, subject to and on the further conditions that:

        (a) the Sagi Trust and the Orly Trust would each execute and deliver a 2004 Voting Trust Agreement to Arie which provides further that:

            (i) the Sagi Trust and the Orly Trust would immediately execute and deliver to Arie an irrevocable voting proxy ("Putative Irrevocable Proxies") intended to ensure that Arie would maintain voting control over the Sagi Trust TRI shares and the Orly Trust TRI Shares for the duration of Arie's life, and

            (ii) in the event that the Putative Irrevocable Proxies granted by the Sagi Trust and the Orly Trust to Arie were ever held to be invalid then:

                (1) a Back-up Voting Trust Agreement would be entered into promptly between each of the Sagi and Orly Trusts and Arie which:

>(a) **grants Arie the right to vote the Orly Trust and Sagi Trust TRI shares for the duration of Arie's life,**
>
>(b) provides that Arie is entitled to keep possession of the Sagi Trust and Orly Trust TRI Shares pursuant to a Voting Trust Agreement in a form attached to the 2004 Voting Trust Agreement, and
>
>(c) provides that the Orly and Sagi Trust TRI shares would not be sold without a prior Court order,

and the 2004 Voting Trust Agreement further provides that:

>(2) **pending the execution of the Back–up Voting Trust Agreement, the Orly and Sagi Trusts would be obligated to vote the Orly Trust and Sagi Trust Shares as directed by Arie during his lifetime.**

**Id.(emphasis added)**

35.     The Court-Ordered Stipulation of Settlement in the Genger Divorce Action is attached as Exhibit A hereto.

36.     Article II of the Stipulation of Settlement in the Divorce Action, entitled "Distribution of Assets," specifically provides, in pertinent part, as follows:

>[2. (a)] "(ii) [Dalia] shall receive . . . sole ownership of the husband's [Arie's] two hundred and fifty (250) shares of common stock of TPR Investment Associates, Inc. ("TPR"), . . . which represents fifty-one percent (51%) of the issued and outstanding shares of common stock of TPR (exclusive of the 1.96% ownership of TPR, which the wife [Dalia] owns indirectly through her general partnership interests in D&K [partnership].
>
> *   *   *
>
>"9. (a) TPR owns 3,000 shares of stock in Trans-Resources, Inc. ("TRI Stock") . . . . <u>Concurrently with the execution of this agreement, the TRI Stock shall be distributed as follows:</u>
>
>     **"(i) The husband [Arie], shall receive 794.40 shares of the TRI Stock, representing 13.99468% of the common stock of TRI;**

8

**(ii) Each of Sagi Genger and Orly Genger, will receive
in trust 1,102.80 shares of TRI Stock representing 19.42766%
of the common stock of TRI for each of Sagi and Orly, and
such trusts will simultaneously therewith execute and deliver
irrevocable proxies to the husband for all of the TRI Stock
owned by the trusts; and**

**"(c)   Concurrently with the execution of this Agreement,
each of the Husband and Wife will execute and deliver or cause
TPR to execute and deliver (i) all documents reasonably
necessary to effect the transfers required by subparagraph (a)
of this Section 9, and (ii) duly executed stock powers to transfer
the shares as required by subparagraph (a) of this Section 9.**

*   *   *

"(e) Following the foregoing transfers of the TRI Stock, the wife
[Dalia] will have no ownership interest in TRI."

(Stipulation of Settlement, Exhibit A hereto, Article II, paragraph 2(a) (ii), p.5, and paragraph 9
(a), (c) & (e) at pp. 13, 14) (emphasis added).

37.    The Stipulation of Settlement also provides that this TPR/TRI transaction was a

fundamental part of the Stipulation of Settlement, and specifically states in pertinent part, in

bold and capital letter type:

**"A FUNDAMENTAL PART OF THIS AGREEMENT IS THE
HUSBAND'S RELINQUISHMENT OF HIS OWNERSHIP
OF SHARES OF COMMON STOCK IN TPR, AND THE
TRANSFER OF SUCH OWNERSHIP TO THE WIFE."**

Stipulation of Settlement, Exhibit A hereto, Article 3, para. 1.

38.    The Stipulation of Settlement also included an express reformation clause which

provides that in the event that any term of the Stipulation of Settlement were to be voided by a

court of competent jurisdiction for any reason, then either Dalia or Arie would be entitled to seek

court-ordered reformation of the Stipulation of Settlement in a New York Court to give effect to

9

the intent of the parties to the fullest extent permitted by the laws of the State of New York.  This

reformation clause of the Stipulation of Settlement provides:

### "ARTICLE XVI

### POSSIBLE INVALIDITY

> "If any provision of this [Stipulation of Settlement], for any reason
> whatsoever, be declared . . . unenforceable by any Court of
> competent jurisdiction . . . the remainder of this Agreement and
> the application of such provision to any person or situations, other
> than those as to which such provision may have been invalid or
> unenforceable shall not be affected thereby and shall continue to be
> enforced to the fullest extent that such severance of the invalid
> portions is possible without vitiating the original intent and
> purposes and economic intentions of the parties (the "Original
> Intent"), as herein set forth.... . **In the event a provision is
> superseded under this [Stipulation of Settlement], either party
> may seek reformation of the affected provision in any court of
> competent jurisdiction which shall be empowered to revise the
> provision to reflect the parties' Original Intent to the greatest
> extent possible, consistent with New York law.** It is the
> intention of the parties hereto that this provision may be enforced
> in equity in addition to, and not to the exclusion of, any other
> remedies which may be available to the parties."

(Stipulation of Settlement, ARTICLE XVI, Exhibit A at pages 47-48) (emphasis added)).

39.     Dalia was represented by separate, independent legal counsel in connection with

the negotiation and her execution of the Stipulation of Settlement.

40.     Dalia, through her counsel, received a complete copy of the 2001 TRI

Stockholders Agreement prior to the execution of the Stipulation of Settlement.

41.     Sagi had full knowledge of the terms of the Stipulation of Settlement prior to, and

at the time that it was negotiated and executed, and was named as a fiduciary with regard to

certain marital property distributed or to be distributed under the Stipulation of Settlement.

42.     Sagi and his own counsel were provided with a full and complete copy of the 2001 TRI Stockholders Agreement prior to the execution of the Stipulation of Settlement.

43.     Edward Klimmerman, a partner at Sonnenschein, Nath & Rosenthal, LLP (now known as SNR Denton), represented Arie in the Genger Divorce Action, had full knowledge of the negotiation and terms of the Stipulation of Settlement at the time the Stipulation of Settlement was executed.  Mr. Klimmerman signed the Stipulation of Settlement as a witness. Mr. Klimmerman was also legal counsel for TRI and TPR at the time the Stipulation of Settlement was executed.

44.     As counsel for TRI and TPR, Mr. Klimmerman participated in the actual drafting of the 2001 TRI Stockholders Agreement.  As Arie's counsel in the Genger Divorce Action, he did not advise Arie that anything in the Stipulation of Settlement violated any term of the 2001 TRI Stockholders Agreement between TPR and the Trump Group.

45.     Arie reasonably believed that the transfers set forth in the 2004 Transfer Documents and Court-Ordered Stipulation of Settlement were valid and enforceable.

46.     Dalia and her legal representatives reasonably believed that the 2004 Transfers provided for in the Stipulation of Settlement were valid and enforceable at the time Dalia entered into the Stipulation of Settlement.

47.     Defendant Jules Trump, a representative of the Trump Group was aware of the Genger Divorce Action, and prior to the execution of the Stipulation of Settlement testified as a witness in the Genger Divorce Action in connection with the ownership of TRI shares.

**C.      The 2004 TPR Transfer of TRI Shares Pursuant to the Stipulation of Settlement**

48.      To implement the TPR and TRI share transfer provisions in the Stipulation of Settlement, Arie, the Sagi Trust, the Orly Trust and TPR, concurrently with the execution of the Stipulation of Settlement, entered into the following "2004 TPR Transaction Documents" in accordance with the express terms and intent set forth in the Stipulation of Settlement:

> (i) a 2004 TPR Agreement to Transfer TRI Shares, dated October 29, 2004 (the "2004 TPR Transfer Agreement", attached hereto as Exhibit B); and

> (ii) a 2004 Voting Trust Agreement, dated October 29, 2004 (the "2004 Voting Trust Agreement", attached hereto as Exhibit C), which attached:

> (a) Executed Documents referred to as Putative Irrevocable Proxies, dated October 29, 2004, executed by the Sagi Trust and the Orly Trust ("Putative Irrevocable Proxies", attached hereto as Exhibit D) which by their specific terms purported to grant to the Plaintiff Arie the right to control and vote the Sagi Trust TRI shares and the Orly Trust TRI shares for the duration of his life, and

> (b) a form Back-up Voting Trust Agreements ("Back up Voting Trust Agreements", attached here to Exhibit E), which were to be executed promptly by the Sagi Trust and the Orly Trust in the event that the Putative Irrevocable Proxies granted by the Sagi Trust and the Orly Trust to Arie were ever held to be invalid, and provided that:

> (i) the Sagi Trust and the Orly Trust were required to vote the TRI shares in accordance with Arie's directions pending the execution of the Back-up Voting Trust Agreements in accordance with the express intent in the Stipulation of Settlement that Arie was to maintain voting control of the Sagi Trust and Orly Trust TRI shares for the duration of his life;

> (ii) Arie would be entitled to keep possession of the Sagi Trust and Orly Trust TRI Shares pursuant to a Voting Trust Agreement in the form attached to the 2004 Voting Trust Agreement; and

12

(iii) the Orly and Sagi Trust TRI shares would not be sold without a prior Court Order.

49.     Each of the 2004 Transaction Documents confirm the stated intention of the parties to the Stipulation of Settlement and 2004 Transaction Documents that Arie, for the duration of his life, would continue to have voting control over 52.85% of the outstanding shares of TRI that were previously owned by TPR and controlled in turn by Arie through his 51% ownership of TPR.

**D.     The 2004 TPR Transfer Agreement-Exhibit B**

50.     The 2004 Transfer Agreement executed by Sagi himself on behalf of TPR, provides :

> "This letter will set forth our agreement pursuant to which you will purchase the 3,000 shares of common stock ("the Shares") of Trans-Resources, Inc. ("TRI") owned by TPR Investment Associates, Inc. ("TPR"). TPR hereby sells, transfers and conveys the Shares to you as follows:
>
>     (i)     794.40 shares to Arie Genger;
>
>     (ii)    1,102.80 Shares to the Sagi Genger 1993 Trust, and
>
>     (iii)   1,102.80 Shares to the Orly Genger 1993 Trust.
>
> \*  \*  \*
>
> "The Shares represent 52.85% of the issued and outstanding shares of TRI. The Shares are being transferred hereunder free and clear of any liens, claims or encumbrances and **such transfer does not violate the Certificate of Incorporation of TPR or any agreement to which TPR is subject.**
>
> **"The trustees of the Sagi Genger 1993 Trust and of the Orly Genger 1993 Trust ("Trusts") have agreed to execute on behalf of the Trusts (i) an Irrevocable Proxy to appoint Arie Genger to vote the Shares owned by the Trusts and (ii) a voting trust letter agreement, copies of which are annexed hereto."**

13

> "**In case, at any time hereinafter, any further action is
> necessary or desirable to carry out the purposes of this Letter
> Agreement, each of the parties hereto shall take or cause to be
> taken all necessary action**, including, without limitation, the
> execution and delivery of such further instruments and documents
> which may be reasonably requested by any party for such purpose
> or otherwise **to complete or perfect the transactions
> contemplated hereby**."

> This Letter Agreement shall be governed by the laws of the State
> of New York without regard to conflicts of law principles.

(2004 TPR Transfer Agreement, Exhibit B) (emphasis added)

### E.   The 2004 Voting Trust Agreements (Exhibit C hereto)

51.     In accordance with the terms of the Stipulation of Settlement (Exhibit A) and the

2004 TPR Transfer Agreement (Exhibit B), Arie and the Sagi and Orly Trusts, respectively,

entered into identical 2004 Voting Trust Letter Agreements in favor of Arie (Exhibit C) which

provide as follows:

> "In connection with the transfer to the [Sagi and Orly Trusts] of
> 1,102.80 shares [each] of common stock (the "Shares") of Trans-
> Resources, Inc. (TRI) **pursuant to the terms and conditions of
> the Stipulation of Settlement of even date herewith**, the [Sagi
> and Orly] trust is [each] granting to Arie Genger an irrevocable
> proxy ("the Proxy") for the shares, a copy of which is annexed
> hereto.

(Exhibit C)(emphasis added).

### F.   The 2004 Putative Irrevocable Proxies Executed By The Sagi and Orly
   Trusts (Exhibit D, hereto)

52.     In accordance with the 2004 TPR Transfer Agreement, the Stipulation of

Settlement, and the 2004 Voting Trust Agreement, the Sagi and Orly Trusts executed two

identical Putative Irrevocable Proxies, each of which states, in relevant part, that:

> "[The Sagi Trust and Orly Trust, each respectively], ("the Trust")
> being the current record and beneficial owner of 1,102.80 shares of
> common stock of [TRI] **does hereby constitute and appoint Arie**

14

> **Genger, Chairman of the Board, Chief Executive Officer, and owner of approximately fourteen percent (14%) of the shares of common stock of TRI to vote as its proxy, all shares of common stock of TRI** which are now or hereafter owned by **the Trust**, at any and all meetings of the stockholders of TRI, regular or special, or by consent in lieu of meeting or any adjournments thereof in the same manner and to the same extent that the Trust might were the Trust present at said meeting (or executing such consent), upon any issue or proposal which may be brought before  such meeting or by such consent.
>
> **"This Irrevocable Proxy shall he deemed coupled with an interest and be irrevocable from the date hereof, and shall continue for the duration of Arie Genger's life."**

(Exhibit D)(emphasis added).

53.     The 2004 Voting Trust Agreement further provides that **in the event that the Putative Irrevocable Proxies were ever declared invalid**, the Orly and Sagi Trusts would be obligated to enter into a Back-up Voting Trust Agreement (Exhibit E) to assure that Arie would maintain voting control over a majority of TRI shares for the duration of his life.  This part of the 2004 Voting Trust Agreement, executed by the Sagi Trust and the Orly Trust, provides:

> **"In the event that for any reason the Proxy is declared invalid and is no longer in effect, the Trust agrees, as promptly as practicahle, to enter into a Voting Trust Agreement (the "Voting Agreement") with Arie Genger as the voting trustee, which shall be substantially in the form annexed hereto. During the time the Proxy is not in effect and prior to the time the Voting Agreement is entered into, the Sagi Trust agrees to vote the shares as directed in writing by Arie Genger."**

(2004 Voting Trust Agreement, Exhibit C ) (emphasis added).

### G.     Back-Up Voting Trust Agreement –(Exhibit E hereto)

54.     The Backup Voting Trust Agreement, which springs into effect upon the Putative Irrevocable Proxies being voided, provides:

> "The Trust Securities [the Sagi and Orly TRI Shares subject to
> the Voting Trust] shall be held by the Trustee [Arie Genger]
> for the purposes of and in accordance with this Agreement <u>and</u>
> <u>none of the Trust Securities shall be sold or otherwise disposed</u>
> <u>of by the Trustee except as herein expressly provided or in</u>
> <u>accordance with a final order of any Court or administrative</u>
> <u>agency with jurisdiction thereover."</u>

* * *

> "This Agreement shall continue in effect for the duration of
> Arie Genger's Life"

Exhibit E. (emphasis added)

55.     In order to ensure that he maintained absolute control of the TRI shares for the

duration of his life, Arie never delivered physical copies of TPR's TRI shares to the Orly or Sagi

Trusts.

## H.     The Intent of the Parties

56.     The written 2004 Transaction Documents and the Stipulation of Settlement reflect

the stated intention of all the parties to these collective documents, <u>to wit</u>, that in order to resolve

the contested Genger Divorce Action, Arie agreed as part of the distribution of marital assets to

transfer his 51% interest in the family holding company, TPR, to Dalia, in exchange for Dalia

agreeing that TPR would concurrently divest itself of its 52.85% interest in the common stock of

TRI by distributing TPR's 52.85% majority interest in TRI to Arie (14%), the Sagi Trust

(19.425%), and the Orly Trust (19.425%) each, **on the express further condition that Arie**

**maintain voting rights for the Sagi Trust and Orly Trust TRI shares for the duration of his**

**life.**

57.     Arie, Dalia, Sagi and Orly each reasonably believed that the 2004 Transfers

provided for in the Stipulation of Settlement were valid and enforceable.

16

58.    Arie, Dalia, Sagi and Orly each reasonably believed that the Putative Irrevocable Proxies and Voting Trust Agreements were valid and assured that Arie would be able to maintain 58.85% voting control for the duration of his life.

59.    Accordingly, the concurrently executed integrated 2004 Transfer Documents were intended to implement the terms of the Stipulation of Settlement which provided expressly that Arie was to retain his 52.85% voting control over TRI and concomitantly continue to control the management and Board of TRI during his lifetime.

60.    It was also the parties' stated intention, and all parties reasonably believed, that the terms of the court-ordered Stipulation of Settlement with Dalia would not violate the terms or intent of the 2001 TRI Stockholders Agreement because Arie would still control what had been TPR's voting majority of TRI shares.

61.    The Genger Divorce Action was not concealed from TRI, the Trump Group, or the Trump Parties at any time.

62.    The 2004 transfers of TRI shares to Arie, the Sagi Trust and the Orly Trust were reflected in the books and records of TRI.

63.    Prior to 2008, Jules Trump, and Mark Hirsch, each individually and on behalf of the Trump Group between 2004 and 2008 had access to the books and records of TRI.

64.    Between 2004 and 2008, as a Director of TRI, Jules Trump and Mark Hirsch, each had a fiduciary duty and legal duty of reasonable care to the record and beneficial owners, including TPR and TRI, to know the identity of all TRI shareholders of record as set forth in the books and records of TRI- a close corporation.

17

65.    As a Directors of TRI, Jules Trump, and Mark Hirsch, each individually and on behalf of TRI, had a fiduciary and legal duty of reasonable care to TPR and Arie to read all corporate Board minutes and other documents presented to the Directors and/or shareholders of TRI, in their entirety, prior to signing such documents.

66.    Prior to 2008, the books and records of TRI show that:

    (i) Arie was record owner of 794.40 shares of TRI, representing 13.9946% of the common stock of TRI;

    (ii) the Sagi Trust was the record owner of 1102.80 TRI shares, representing 19.42766% of the common stock of TRI; and

    (iii) the Orly Trust was the record owner of 1102.80 TRI shares, representing 19.42766% of the common stock of TRI.

67.    Prior to 2008, the 2004 Transfers and the record ownership of TRI shares was known by:

    (i) the officers and directors of TRI, in addition to Arie

    (ii) TRI's legal counsel; and

    (iii) TRI's Certified Public Accountant.

68.    Jules Trump, and Mark Hirsch, each individually and on behalf of the Trump Group executed corporate TRI documents as Director and/or on behalf of a shareholder of TRI which indicated that Arie, the Orly Trust and the Sagi Trust were the record owners of TRI shares.

18

69.     The terms of the Stipulation of Settlement relating to the distribution of TPR and TRI shares as marital assets in connection with the Genger Divorce Action were not in any way or at any time concealed from TRI, the Trump Group, or the Trump Parties.

70.     Prior to 2008, the Trump Group, through Jules Trump, who testified in the Genger Divorce Action, and otherwise knew, and was aware that the Genger Divorce Action could involve in some way the equitable distribution of TPR shares owned by Arie as part of the divorce action.

71.     Prior to 2008, the Trump Group, through Jules Trump, who testified in the Genger Divorce Action, knew, and was aware that the Genger Divorce Action involved in some way the value of TPR's ownership of TRI shares.

72.     Prior to 2008, the Trump Group, through Jules Trump, who testified in the Genger Divorce Action, knew, and was aware that the Genger Divorce Action involved in some way Arie's management and control over TRI, the company that he had founded and managed since 1985.

73.     Prior to 2008, Jules Trump knew that ownership of TPR, as a marital asset which owned 52.85% of TRI shares, was a major asset and was the subject of a claim by Dalia for equitable distribution in the Genger Divorce Action.

74.     Prior to 2008, the Trump Group, through Jules Trump, who testified in the Genger Divorce Action, knew, and was aware that the Genger Divorce Action would involve in some way the equitable distribution of TPR assets, including Arie's 51% majority ownership of TPR.

75.     Prior to 2008, the Trump Group, through Jules Trump who testified in the Genger Divorce Action, and otherwise knew, and was aware that the Genger Divorce Action could

19

involve D&K Limited Partnership, which was identified in the 2001 TRI Stockholders
Agreement as an owner of 49% of TPR (the majority Shareholder of TRI) and further disclosed
that in turn this 49% minority ownership of TPR by D&K was owned by Arie's wife Dalia (4%)
the Sagi Trust (48%) and the Orly Trust (48%), and that these Trust interests could be effected
by the equitable distribution of TPR assets as part of the Genger Divorce Action.

76.    The Trump Group knew that the 2001 TRI Stockholders Agreement did not
contain an express provision setting forth the rights and obligations of TPR, Arie or the Trump
Group in the event of a contested divorce involving Arie's ownership of TPR shares as marital
property, including TPR's ownership of TRI shares under New York's equitable distribution
laws or otherwise.

77.    Prior to 2008, Arie had reason to believe that The Trump Group, through Jules
Trump, and otherwise, had notice of the 2004 Transfers.

78.    Prior to 2008, Arie had reason to believe that The Trump Group had notice of the
2004 Transfers which were reflected in TRI corporate documents.

79.    Prior to 2008, the Trump Group and Jules Trump, in particular, had knowledge of
facts in 2002-2004 including, but not limited, to the fact that Arie was involved in a bitter
contested divorce, and that the issue of Arie's ownership interests in TRI, through TPR or
otherwise, was an issue raised in the Genger Divorce Action.

80.    Between 2004 and 2008, Directors of TRI, its legal counsel, Secretary, as well as
its Controller, knew of the 2004 transfers.

81.     Between 2004 and 2008, TRI, under Arie's management, reported the new

company ownership resulting from the 2004 transfers to its lead bank, the IRS, and TRI's

insurance company.

82.     Between October 2004 and August of 2008 nothing prevented the Trump Group,

Jules Trump, TRI or its officers or directors, or any of them, from making any inquiry

whatsoever of Arie, Orly, TPR, TRI, TRI's general counsel, Dalia,  Sagi, the Sagi Trust, the Orly

Trust, or D&K, concerning the effect, if any, that the Genger Divorce Action, or any judgment or

resolution of the Genger Divorce Action had, would or could have, on (i) the ownership of TPR,

(ii) Arie's ownership of a majority interest of TPR, (iii) TPR's ownership of TRI, (iv) Dalia's

interest in D&K minority ownership of TRI, or the rights of the Sagi Trust or the Orly Trust as

limited partners of D&K which owned approximately 49% each of TPR -- which ownership was

acknowledged by the Trump Group in the 2001 TRI Stockholders Agreement.

83.     Between October 2004 and August of 2008 nothing prevented the Trump Group,

Jules Trump, TRI or its officers or directors, or any of them, from making any inquiry

whatsoever of Arie, Orly, TPR, TRI, TRI's general counsel, Dalia, Sagi, the Sagi Trust, the Orly

Trust, or D&K as to the identity of the record owners of TRI.

84.     Jules Trump, Eddie Trump and Mark Hirsch (an attorney) at all times relevant to

this complaint were sophisticated business individuals, with special expertise in corporate

governance and ownership.

85.     At all times relevant to this action the Trump Parties had access to independent

legal counsel.

21

86.   Prior to 2008, the Trump Group, by Jules Trump, and otherwise, acted with willful blindness and indifference to facts which put The Trump Group on notice of (i) the 2004 Transfers, and (ii) that Arie, the Sagi Trust and the Orly Trust were record owners of their respective TRI shares.

87.   The Trump Group, by Jules Trump, and otherwise, waived any objection to the 2004 Transfers.

88.   Between 2004 and 2008, under Arie's management, TRI's business performance improved consistently without any complaint or objection by TRI's Board of Directors including but not limited to representatives of the Trump Group.

I.   **The Trump Parties' 2008 Scheme and Conspiracy to Seize Majority Control of TRI, Squeeze Out Arie as an Officer, Director and Shareholder of TRI and Dilute the Value of Arie's, Orly's and the Orly Trust's Interests in the Affected TRI Shares**

89.   There was no hint of any substantial disagreement between Arie and the Trump Group relating to the Genger Divorce Action, or otherwise, until June of 2008, when TRI's value increased substantially as a result of improved performance.

90.   In the early Spring of 2008, TRI was facing a threat of foreclosure of one of its major operating units by Bank Hapoalim, a long-time lender of TRI.

91.   To address this foreclosure threat, Arie and the Trump Group explored the possibility of a sale of assets and restructuring plan involving the spin-off of all of TRI's North American assets to a separate entity and a capital loan by the Trump Group into a residual TRI to retire the Bank Hapoalim debt in exchange for increasing the equity position of the Trump Group in the restructured TRI so that the Trump Group would obtain a majority position (the "Funding Plan").

22

92.     Had the Funding Plan been implemented, in return for providing funding Jules and Eddie Trump through TR-I and TR-II would, for the first time, have been permitted to obtain a direct ownership interest in TRI, and the Trump Parties, under the Funding Plan, would have obtained majority control over TRI, the company that Arie had founded and worked so hard to make succeed.

93.     TRI's legal counsel advised that it would be necessary for a special committee of the Board to be constituted in order for the Board to approve the Funding Plan without the vote of Jules Trump who was an interested Director with a conflict of interest.

94.     Despite requests from Arie to constitute such a committee, the Trump Group Directors failed to agree to the appointment of such committee.

95.     The Board of TRI never constituted a special committee in order for the Board to approve the Funding Plan.

96.     The implementation of the Funding Plan was also subject to other conditions relating to the value of the transaction which conditions were never met.

97.     While the proposed Funding Plan was being worked on, the financial condition of TRI began to improve substantially.  By late June 2004, TRI was generating positive cash flow of $15-20 million per month.  This represented a dramatic improvement in TRI's earnings within a matter of months in 2008, and rendered the Funding Plan unnecessary.

98.     As a result, there was no longer a need for TRI or Arie to move forward with the Trump Group Funding Plan that would have given the Trump Parties' majority control of TRI.

23

99.    To proceed with the Funding Agreement would have diluted the shares of existing shareholders and cause TRI to pay the Trump Group unreasonable fees for a loan that was not needed.

100.    Based on the advice of TRI's Delaware corporate counsel concerning the establishment of an independent committee of the Board to approve the Funding Plan, which the Trump Group refused to empanel, and the fact such a Funding Plan was no longer necessary because of improved performance of TRI which permitted the satisfaction of the Bank Hapoalim loan, the Funding Plan was rejected and the Bank Hapoalim loan satisfied with TRI's own substantially improved earnings without the need for funding from the Trump Parties or any other third-party.

101.    On information and belief, the Bank Haopolim's threat of foreclosure and the Funding Plan takeover proposed by the Trump Group were also engineered by Jules Trump, individually, and on behalf of the Trump Group with the aid, assistance and further illegal conduct of the Trump Group and a principal officer of Bank Haopolim with whom the Trump Group had other business entanglements.

102.    Thwarted in their effort to take over the controlling interest in TRI through the rejected Funding Plan, the Trump Group, Mark Hirsch, Eddie Trump, and Jules Trump formulated a further illegal scheme and plan to take over the then very profitable TRI, and oust Arie as its CEO, and steal the Genger family TRI shares at a fraction of their value.

103.    In furtherance of this plan, the Trump Group leveled an extortionate threat at Arie demanding that unless Arie agreed to turn over majority control of TRI to the Trump Group pursuant to the Funding Plan (which was no longer necessary ), the Trump Group would declare

24

that the 2004 TPR transfers of TRI shares to Arie, the Sagi Trust and the Orly Trust under the

Stipulation of Settlement were void under the 2001 TRI Stockholders Agreement even though

Arie as a permitted Transferee held 14% of TRI outright, and had received a Voting Trust

Agreement and Putative Irrevocable Proxies from the Sagi Trust and the Orly Trust which, on

their face, gave Arie the right during his lifetime to control the management of TRI, and vote the

same 52.85% shares of TRI stock that had been controlled by Arie through his 51% ownership of

TPR prior to the Stipulation of Settlement and the execution of the 2004 Transfer Documents.

Thus, there was virtually no effective difference in Arie's control of TRI Shares as between his

majority control of TPR prior to the execution of the Stipulation of Settlement, and the intended

control that Arie would exercise after the Stipulation of Settlement and 2004 Transfer

Documents were executed.

104.    At the time they made this threat in 2008, the Trump Parties, among other things,

knew that:

(i) the intent of the parties pursuant to the 2001 TRI Stockholders Agreement in

restricting certain transfers to Genger family members was to ensure that (a) Arie, personally,

would continue to have management and majority shareholder voting control over TPR's TRI

shares for the duration of his life, and (b) prevent any other Genger family member from having

any management or voting control over TRI during Arie's lifetime;

(ii) pursuant to the terms of the Stipulation of Settlement and the 2004 TPR-TRI

Transfer Documents Arie, Dalia, Orly and Sagi, specifically intended to preserve Arie's

management and voting control of TRI, in the context of resolving the equitable distribution of

marital property issues concerning TPR raised in the Genger Divorce Action;

25

(iii) that as a condition for Arie transferring his 51% interest in TPR to Dalia in the Genger Divorce Action, it was intended that pursuant to the Stipulation of Settlement and 2004 Transaction Documents Arie would receive valid Putative Irrevocable Proxies and Back-up Voting Trust Agreements from the Sagi Trust and the Orly Trust designed to ensure that Arie would retain voting control over a majority of TRI shares for the duration of his life even if the Putative Irrevocable Proxies were held to be invalid; and

(iv) that if the 2004 TPR transfer of TRI shares were voided, as threatened by the Trump Group, then:

(a)     52.85% of TRI shares would revert to TPR, which would be unjustly enriched because TPR, under the Stipulation of Settlement and implementing 2004 Transaction Documents, had already divested itself of those TRI shares in consideration of Arie relinquishing his 51% ownership of TPR to Dalia;

(b) that Arie would be the beneficial owners of such 3000 TRI Shares, and Arie would have the right to vote the 52.85% of TRI shares that were returned to TPR, subject to the Orly and Sagi Trust rights to receive certain of these shares upon Arie's death;

(c)     Sagi was not authorized to act on behalf of TPR to sell any of the TRI shares without the consent of Arie as the beneficial owner of the Arie TRI Shares, and the beneficial holder of the voting rights to TPR's TRI Shares;

(d)     Arie would be entitled to reform the Stipulation of Settlement, pursuant to the express terms of the Stipulation of Settlement, so that Arie would regain control of 51% of TPR's ownership and control of 52.85% of TRI's shares;

(e) that the New York Supreme Court under the Judgment of Divorce, had retained jurisdiction over Arie and Dalia in connection with enforcing the terms of the Stipulation of Settlement, including Arie's reformation claims; and

(f) TPR, under Sagi's control, was not authorized to sell TRI shares to the Trump Group without the consent of Arie, as beneficial owner of TPR's record ownership of the TRI shares, in the event the 2004 Transfers were held to be invalid;

(v) that if the Putative Irrevocable Proxies (Exhibit D) were held to be invalid, that the Sagi and Orly Trust shares would be subject to the Back-Up Voting Trust Agreement Exhibit E) which was referred to in the 2004 Voting Trust Agreement (Exhibit C).

105.    Nevertheless, on August 8, 2008, the Trump Group, in furtherance of their plan to pressure Arie and take over a majority control of TRI, sent a letter to TPR asserting that it had the right under Section 3.2 of the 2001 TRI Stockholders Agreement to purchase all of the TRI shares that were the subject of the Stipulation of Settlement transfers in 2004, **at 2004 prices** – a small fraction of what is believed to have been a TRI value in excess of $1 billion in 2008, which had net after-tax income in excess of $150 million in that year.  The Trump Group provided no such letter or notice to Orly or the Orly Trust or the Sagi Trust.

106.    Three days later, on August 11, 2008, the Trump Parties, through Glenclova, commenced an action in the Federal District Court of the Southern District of New York against TPR (the "Federal Action") claiming that the transfer of the TRI shares by TPR to Arie Genger, the Orly Trust and the Sagi Trust pursuant to the express terms of the Stipulation of Settlement and 2004 Transaction Documents, was void.

107.    Notwithstanding the Trump Parties' respective specific knowledge in 2008 of the existence and terms of the Court-ordered Stipulation of Settlement and the 2004 TPR Transfer Documents, the Trump Group did not name Arie, Dalia, the Sagi Trust or the Orly Trust as parties in the Federal Action.

108.    The Trump Parties knew at the time they commenced the Federal Action that Arie was a known third party beneficiary under the 2001 TRI Stockholders Agreement and that the 2004 Transfers were approved in a Court-Ordered Stipulation of Settlement in the Genger Divorce Action, but nevertheless opposed Arie's motion to intervene in the Federal Action.

109.    The Trump Parties also knew that Sagi, as a result of the Stipulation of Settlement and 2004 TPR Transfer Documents, became the president of TPR, but that he had since become estranged from his father, and that Sagi had installed his mother-in-law Rochelle Fang as the nominal trustee of the Sagi Trust and that he exercised total dominion and control over her.

110.    The Trump Parties also knew that if the 2004 TPR transfers of TRI shares to Arie, the Sagi Trust and the Orly Trust pursuant to the "So-Ordered" Stipulation of Settlement and 2004 Transfer Documents were voided, that Arie's transfer of his 51% ownership in TPR to Dalia would also have to be voided, and that as a consequence Dalia, or Sagi as her successor-in-interest, as a matter of New York law, would have to hold this 51% TPR interest in a constructive trust for the benefit of Arie with respect to TPR's ownership of the TRI Shares.

111.    The Trump Parties knew that neither TPR, nor Sagi as its President, would be authorized to sell any of TPR's shares of TRI to the Trump Group in the event that the 2004 TPR Transfers of TRI Shares to Arie, the Sagi Trust or the Orly Trust were voided because in that

28

event those TRI shares would be returned to TPR subject to a constructive trust for the benefit of Arie.

112.    Prior to August 22, 2008, the Trump Group also knew that in the event that the 2004 transfers by TPR of TRI Shares to Arie, the Sagi Trust or the Orly Trust were voided, Sagi, as the President of TPR, also owed a separate fiduciary duty to Arie and the Orly Trust with respect to the 3000 TRI shares that would revert to TPR.

113.    TPR and Sagi each had a fiduciary and contractual duty to Arie to hold any TRI shares that reverted to TPR in a constructive trust for their respective benefits as the beneficial owner of such shares, and also owed a fiduciary duty to Orly and the Orly Trust with respect to her interest in a portion of these shares.

114.    Nevertheless, in August, 2008, the Trump Group met, conspired and schemed with Sagi and/or his representatives to contrive a plan to offer Sagi approximately $26.7 million to induce Sagi to cause the Sagi Trust, through his mother-in-law Fang, to transfer to the Trump Parties the Sagi Trust's 19.425% of TRI shares that the Sagi Trust received pursuant to the Stipulation of Settlement and 2004 TPR Transaction Documents. This $26.7 million payment was a fraction of the value of those shares at that time given the performance of TRI which, in 2008 had after tax earnings of $150,000,000 of sales of approximately $1 billion.

115.    As part of this conspiracy and scheme, the purchase of the Sagi Trust Shares was to be conditioned on Sagi, purportedly as the President of TPR, further agreeing that if the Court in the Federal Action, or any other court, held that the 2004 TPR Transactions were void, then TPR would be "deemed" the Seller of the Sagi Shares, even though the Sagi Trust could keep the $26.7 million, and even though TPR had no right or authority to sell the Arie, the Sagi Trust and

29

Orly Trust Shares without the consent of Arie as beneficial owners of these respective shares, subject to Orly's interest to receive the Orly Trust TRI Shares upon Arie's death, and Arie's beneficial interest in the voting rights for the Sagi Trust, Orly Trust and Arie TRI Shares.

116.    The Trump Group defendants knew that if the $26.7 million purported purchase price of the Sagi Trust Shares was paid to the Sagi Trust that the money would need to be returned to TPR.

117.    The Trump Group defendants knew that Sagi, on behalf of TPR was not authorized to sell the Sagi Trust Shares, in the event the 2004 Transfers were declared invalid.

118.    The Trump Group defendants never sought or received a representation by TPR or Sagi that Sagi, on behalf of TPR was authorized to sell any TRI Shares to the Trump Group.

119.    The Trump Group defendants knew that Sagi on behalf of TPR was not authorized to sell any of TPR's TRI shares to the Trump Group in the event that the 2004 Shares reverted to TPR that Sagi and TPR had a fiduciary and contractual duty to protect Arie's control over the 52.85% of TRI Shares for the duration of his life.

120.    The Trump Group did not obtain a representation from Sagi or TPR as to whether any sale by the Sagi Trust or TPR would be subject to Arie's right to vote those Shares for the duration of his life in accordance with the terms of the Court-ordered Stipulation of Settlement and the 2004 Transaction Documents.

121.    As part of this conspiracy and scheme the Trump Parties also required that in order for Sagi to get the $26.7 million put in his Trust, Sagi purportedly as the President of TPR would have to further agree in a "side letter" that if the Court in the Federal Action, or any other court, held that the 2004 TPR Transactions were void, then TPR would also agree to sell the 14%

Arie TRI shares and the 19.425% Orly Trust Shares, which TPR had already sold to Arie and the Orly Trust pursuant to the Stipulation of Settlement and the 2004 Transaction Documents, to the Trump Parties at a price that was 60% less than the price per share to be paid to the Sagi Trust. Again, Sagi had no authority to make this sale on behalf of TPR.

122.    As part of the same conspiracy and scheme, the Trump Parties also insisted that neither the Sagi Trust nor TPR take any action to protect the voting rights of Arie that were granted to Arie by the Sagi Trust and the Orly Trust under the 2004 Voting Trust Agreements in accordance with the 2004 TPR Transfer Agreement.

123.    To induce Sagi to sell the Sagi Trust Shares to the Trump Parties, the Trump Group proposed a scheme and conspiracy that the Trump Parties knew would require Sagi to use his position as President of TPR to obtain a personal benefit by having $26.7 million paid to his Sagi Trust, while selling out Arie's and the Orly Trust's TRI shares for a fraction of their real value in an obvious breach of Sagi's fiduciary and contractual duties to Arie and the Orly Trust, which breaches of duty arose from, among other things, (i) Sagi's self-dealing transactions as an officer of TPR to get $26.7 million from the Trump Group for his Sagi Trust shares while at the same time and at the expense of Arie and the Orly Trust agreeing to sell their TRI shares at a price per share that was 60% lower than the deal Sagi was making for himself through the sale of the Sagi Trust shares to the Trump Parties, (ii) ignoring Arie's and the Orly Trust's beneficial interest in the value of TPR's ownership of specific TRI stock that TPR had already transferred to Arie and the Orly Trust for valuable consideration pursuant to the Stipulation of Settlement and the 2004 TPR Transaction documents; (iii) inducing Fang as the Trustee of the Sagi Trust to violate the 2004 Voting Trust Agreement with Arie; (iv) inducing the trustees of the Orly Trust

31

to violate their fiduciary obligations to the Orly Trust and Orly; (v) failing to protect Arie's voting rights to 52.85% of TRI shares in accordance with the express intent and provisions of the Stipulation of Settlement and the 2004 Transaction Documents; (vi) disposing of and substantially devaluing the asset value of TPR's ownership of TRI shares, with knowledge that such shares would be subject to Arie's claims for imposing a constructive trust on such shares, reformation and/or rescission under the terms of the Stipulation of Settlement with respect to restoring Arie's rights to a 51 % ownership of TPR insofar as TPR's ownership of TRI shares was concerned; (vii) failing to disclose to Arie, Orly, or the Orly Trust the terms of the Trump Parties' proposed scheme and plan to purchase the same TRI shares that TPR previously sold to Arie and the Orly Trust under the Stipulation of Settlement and 2004 TPR Transfer Agreement, (viii) failing to take all actions necessary to comply with the stated intentions of the parties to the Stipulation of Settlement and 2004 Transaction Documents, and (ix) entering a self-interested, unauthorized, ultra-vires agreement, ostensibly on behalf of TPR but in reality using his position as President of TPR for his own personal gain to the detriment of Arie's and the Orly Trust's legal and equitable interests in TPR's ownership of the TRI shares that were transferred to each of them by TPR four years earlier, pursuant to the Stipulation of Settlement and 2004 Transaction Documents.

124.   In furtherance of this scheme and conspiracy, the Trump Parties, the Sagi Trust, by Rochelle Fang, and Sagi, purportedly on behalf of TPR, executed a 2008 Stock Purchase Agreement with the Sagi Trust without the knowledge or consent of Arie or the Orly Trust, to sell the 1102.80 Sagi Trust Shares of TRI common stock representing 19.425% of the shares of