SURROGATE'S COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

| | |
|---|---|
| In the matter of the Application of ORLY GENGER, as a person interested, for the removal of DALIA GENGER, as Trustee of the Orly Genger 1993 Trust pursuant to SCPA § 711(11). | File No.:   2008-0017<br><br>Surrogate Nora S. Anderson |

## <u>AFFIRMATION OF MICHAEL PAUL BOWEN</u>

MICHAEL PAUL BOWEN, duly admitted to practice law before the courts of the State of New York, affirms the following to be true under penalties of perjury pursuant to CPLR 2106:

1.      I am counsel of record to petitioner Orly Genger ("Genger").  I submit this affirmation in support of Orly's motion to dismiss the cross-petition of respondent Dalia Genger.

2.      Attached hereto as <u>Exhibit A</u> is a true and correct copy of the Amended Answer of Dalia Genger to Third Amended Petition and Cross-Petition, dated August 12, 2017.

3.      Attached hereto as <u>Exhibit B</u> is a true and correct copy of the Decision and Order on attachment, dated September 12, 2016, from the action *Orly Genger v. Dalia Genger, et al.*, New York County Supreme Court, Index No. 109719/09 [Dkt. No. 1395].

4.      Attached hereto as <u>Exhibit C</u> is a true and correct copy of the Answer of Dalia Genger to Third Amended Petition, dated July 28, 2017.

5.      Attached hereto as <u>Exhibit D</u> is a true and correct copy of the Stipulation and Proposed Order of Dismissal in the action *Dalia Genger, as Trustee of the Orly Genger 1993 Trust v. TR Investors, LLC, et al.*, Delaware Chancery Court, C.A. No. 6906-CS, ordered by Chancellor Strine on August 30, 2013.

6.      Attached hereto as <u>Exhibit E</u> is a true and correct copy of the First Department appellate Brief for Defendant-Appellant Dalia Genger, dated December 15, 2014, from the action *Arie Genger et al. v. Sagi Genger et al.*, Index No. 651089/10.

7.      Attached hereto as <u>Exhibit F</u> is a true and correct copy of the Settlement Agreement and Release entered in as of June 16, 2013 amongst, among others, Orly Genger and members of the so-called "Trump Group."

8.      Attached hereto as <u>Exhibit G</u> is a true and correct copy of Dalia Genger's Memorandum of Law in Support of Trustee Dalia Genger's Motion to Substitute for Plaintiff Orly Genger on her Derivative Claims Against the Trump Group and for an Order Directing Settlement Proceeds to be Paid Into Court, dated August 11, 2014, from the action *Arie Genger et al. v. Sagi Genger et al.*, New York County Index No. 651089/10 [Dkt. No. 1108].


Dated:   New York, New York
         September 8, 2017

Michael Paul Bowen

STATE OF NEW YORK
SURROGATE'S COURT:  COUNTY OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - x

In the Matter of the Application of
ORLY GENGER, as a person interested, for the
removal of DALIA GENGER as Trustee of the
Orly Genger 1993 Trust pursuant to SCPA §711(11)

AMENDED ANSWER OF
DALIA GENGER TO
THIRD AMENDED PETITION
AND CROSS-PETTION
File No. 0017/2009

- - - - - - - - - - - - - - - - - - - - - - - - - x

<u>AMENDED ANSWER</u>

Respondent Dalia Genger, by her attorneys, answers the Third Amended Petition (the

"Petition") as follows:

1.  Denies.

2.  Admits, except deny knowledge or information as to specific date of appointment.

3.  Refers to the Orly Trust Agreement for the true and correct contents thereof, and

otherwise denies the first sentence.  Admit the second and third sentences.

4.  Paragraph 4 states a legal request to which no response is warranted.

5.  Admits that Dalia is Petitioner's mother and the sole Trustee of the Orly Trust,

and denies the remaining allegations.

6.  Denies.

7.  Denies.

8.  Denies.

9.  Denies.

10.  Denies.

11.  Denies.

12.  Denies.

13.  Denies.

14.     Admits the first two sentences.  Denies knowledge or information as to the third sentence.

15.     Denies the first four sentences.  Denies knowledge or information as to the fifth sentence.

16.     Admits.

17.     Denies.  Avers that Petitioner has previously admitted that "the Note was always intended to be repaid by the family."

18.     Refers to the referenced Note and Pledge Agreement for the true and correct contents thereof, and otherwise denies the allegations.

19.     Denies knowledge or information.

20.     Admits the first sentence.  Denies the second sentence.

21.     Admits the first sentence.  Denies knowledge or information as to the second sentence.

22.     Refers to the referenced Settlement Agreement for the true and correct contents thereof, and otherwise denies the allegations.

23.     Admits the first four sentences.  Avers that the last sentence states a legal conclusion to which no response is warranted.  Refers to the referenced Agreement, and otherwise denies the allegations.

24.     Refers to the referenced Shareholders Agreement for the true and correct contents thereof, and otherwise denies the allegations.

25.     Denies.

26.     Denies.

27.     Refers to the referenced Resolution for the true and correct contents thereof, and otherwise denies the allegations.

28.     Denies.

29.     Refers to the referenced Memorandum for the true and correct contents thereof, and otherwise denies the allegations.

30.     Refers to the referenced Memorandum for the true and correct contents thereof, and otherwise denies the allegations.

31.     Refers to the referenced Arbitration transcript for the true and correct contents thereof, and otherwise denies the allegations.

32.     Refers to the referenced Arbitration transcript for the true and correct contents thereof, and otherwise denies the allegations.

33.     Refers to the referenced Memorandum for the true and correct contents thereof, and otherwise denies the allegations.

34.     Refers to the referenced Arbitration Award for the true and correct contents thereof, and otherwise denies the allegations.

35.     Denies.

36.     Refers to the referenced Agreement for the true and correct contents thereof, and otherwise denies the allegations.

37.     Refers to the referenced Agreement for the true and correct contents thereof, and otherwise denies the allegations.

38.     Denies.

39.     Denies knowledge or information as to the first sentence.  Denies the remaining allegations.

40.     Denies.

41.     Refers to the referenced Application for the true and correct contents thereof, and otherwise denies the allegations.

42.     Refers to the referenced Court decision for the true and correct contents thereof, and otherwise denies the allegations.

43.     Denies.

44.     Denies.

45.     Denies.

46.     Refers to the referenced Letter for the true and correct contents thereof, and otherwise denies the allegations.

47.     Denies.

48.     Refers to the referenced Agreement for the true and correct contents thereof, and otherwise denies the allegations.

49.     Refers to the referenced Agreement for the true and correct contents thereof, and otherwise denies the allegations.

50.     Denies.

51.     Admits the first sentence.  Denies knowledge or information as to the remaining allegations.

52.     Refers to the referenced Letter for the true and correct contents thereof, and otherwise denies the allegations.

53.     Denies.

54.     Refers to the Court records for the true and correct contents thereof, and otherwise denies the allegations.

55.     Refers to the referenced Court decision for the true and correct contents thereof, and otherwise denies the allegations.

56.     Refers to the referenced Demand for the true and correct contents thereof, and otherwise denies the allegations.

57.     Refers to the referenced Letter for the true and correct contents thereof, and otherwise denies the allegations.

58.     Denies, and refers to Justice Feinman's decision construing the Arbitration Award.

59.     Denies.

60.     Denies.

61.     Denies.

62.     Denies.

63.     Denies.

64.     Denies.

65.     Denies.

66.     Refers to the referenced Complaint for the true and correct contents thereof, and otherwise denies the allegations.

67.     Refers to the referenced Petition for the true and correct contents thereof, and otherwise denies the allegations.

68.     Refers to the referenced Court order for the true and correct contents thereof, and otherwise denies the allegations.

69.     Refers to the referenced Court transcript for the true and correct contents thereof, and otherwise denies the allegations.

70.     Refers to the referenced Court order for the true and correct contents thereof, and otherwise denies the allegations.

71.     Refers to the referenced Petition for the true and correct contents thereof, and otherwise denies the allegations.

72.     Refers to the referenced Court order for the true and correct contents thereof, and otherwise denies the allegations.

73.     Refers to the referenced Court order for the true and correct contents thereof, and otherwise denies the allegations.

74.     Denies.

75.     Denies.

76.     Denies.

77.     Denies.

78.     Denies.

79.     Refers to the referenced Promissory Note for the true and correct contents thereof, and otherwise denies the allegations.

80.     Denies.

81.     Refers to the referenced Promissory Note for the true and correct contents thereof, and otherwise denies the allegations.

82.     Refers to the referenced Promissory Note for the true and correct contents thereof, and otherwise denies the allegations.

83.     Refers to the referenced Forbearance Agreement for the true and correct contents thereof, and otherwise denies the allegations.

84.     Denies.

AFFIRMATIVE DEFENSES

1.      The claims are barred by Petitioner's unclean hands and culpable conduct.

2.      The claims are time-barred.

3.      The claims are barred by findings made by other courts, and by the doctrines of

*res judicata*, collateral estoppel, and judicial estoppel.

4.      The claims are barred by illegality and public policy.

5.      The claims are barred by the statute of frauds and parol evidence rule.

## CROSS-PETITION

It is respectfully alleged:

### The Parties

1. Respondent/Cross-Petitioner Dalia Genger ("Dalia"), resides and is domiciled at 200 E.
   65th Street, in the City of New York, County of New York and State of New York.

2. Dalia the Trustee of the Orly Genger 1993 Trust (the "Orly Trust").

3. Petitioner/Cross-Respondent Orly Genger ("Orly") is the only non-contingent beneficiary
   of the Orly Trust.

### Jurisdiction and Venue

4. This Court has subject matter jurisdiction pursuant to the Surrogate's Court Procedure
   Act, inter alia, SCPA 103(50), SCPA 207(1), and SCPA 209(6).

5. Venue in this County is proper pursuant to, inter alia, SCPA 207(1).

### The Orly Trust

6. On or around December 13, 1993, Arie Genger ("Arie") settled the Orly Trust pursuant to
   a written Trust Agreement executed by Arie, as Grantor, and the two prior Trustees,

Lawrence M. Small and Sash A. Spencer (the "Trust Agreement").

7.  Pursuant to Article ELEVENTH, Section C of the Trust Agreement, all trust funds are to be held in the name of the Orly Trust, and no Orly Trust assets are to be used for the benefit of Orly's creditors (the "Trust Agreement Obligations").

### Orly Trust Derivative Litigation

8.  In July 2010, Orly instituted a derivative action in the Supreme Court, New York County entitled <u>Arie Genger, et al. v. Sagi Genger, et al.</u>, Index No. 651089/2010, by which she brought claims "on behalf of the Orly Trust as the beneficiary of the Orly Trust" (the "Orly Trust Derivative Litigation").  The Complaint sought to assert claims for the Orly Trust's ownership in shares of stock in a company called Trans-Resources, Inc. ("TRI"). Orly later amended her pleading to assert claims against, <u>inter alia,</u> the purchasers of those TRI shares, Glenclova Investment Company, TR Investors, LLC, New TR Equity I, LLC, and New TR Equity II, and TRI (collectively, the "Trump Group Entities").

9.  On January 2, 2013, in the Orly Trust Derivative Litigation, Justice Jaffe of the Supreme Court, New York County adopted Orly's position that she "has legal standing to represent the Orly Trust" and "may act on behalf of the Orly Trust unless and until the Surrogate's Court rules otherwise in an appropriate action there."

10. Earlier on in the same Orly Trust Derivative Litigation, Orly moved to restrain Dalia from pursuing what Orly characterized as a "duplicative" action as Trustee of the Orly Trust before the Delaware Chancery Court, by which Dalia was seeking a declaration of obtain ownership of the same TRI shares.  According to Orly: "In the instant action …, I seek, among other things, the return of those [same] TRI Shares to the Orly Trust."  Also according to Orly,  Dalia's "contention that the Orly Trust is not a party to this action …

is meritless. Orly is prosecuting this action on behalf of the Orly Trust." The Supreme Court, New York County, agreed, restraining Dalia from pursuing the action in the Delaware Chancery Court by which the Orly Trust had sought the TRI shares.

11. As a derivative plaintiff for the Orly Trust, having prevented the "duplicative litigation" brought by Dalia on behalf of the Orly Trust, Orly became the de facto trustee of the Orly Trust and owed fiduciary duties to the Orly Trust.

### Discontinuance With Prejudice of
### The Orly Trust Claims

12. In June 2013, Orly disclosed that she had "entered into a confidential settlement agreement to resolve all issues among the stipulating parties," which included the Trump Group Entities. However, the settlement terms were left undisclosed. Dalia sought production of the settlement agreement, but Orly refused to produce it, claiming the document was too "confidential." When it was proposed that the document be produced under "Attorney's Eye's Only" limitation, Orly refused that proposal as well. Instead, Orly submitted the Settlement Agreement to Justice Jaffe, unsolicited, for in camera inspection.

13. By letter dated June 28, 2013, counsel to the Trump Group Entities wrote to the Court on behalf of all settling parties "including … Orly Genger" confirming that: "A material term of the agreement among the settling parties was the dismissal of **all** claims presently pending against one another, in whatever capacity they were brought. [If the settlement stipulation was drafted so as to] have the effect of **not** dismissing Orly Genger's derivative claims against the Trump Group [Entities], contrary to the agreement of the settling parties. Excluding such claims from the claims that are to be dismissed is not

what the Trump Group [Entities] bargained and paid for in the settlement . . ."

14. Neither Orly nor any of the other settling parties disagreed with counsel's statements regarding the scope of the settlement. Accordingly, on July 1, 2013, Justice Jaffe signed the requested Stipulation and Order of Discontinuance with Prejudice.

## The Trump Group Entities Settlement Agreement

15. Months later, as part of a parallel proceeding, the United States District Court directed Orly to produce her settlement agreement with the Trump Group Entities (the "Trump Group Entities Settlement Agreement").   The document revealed that Orly had settled her claims against the Trump Group Entities both "in her individual capacity and in her capacity as beneficiary of the Orly Genger 1993 Trust" – the latter being the very capacity by which the Supreme Court permitted Orly to assert derivative claims.  According to its signatories, the purpose of the agreement was "to resolve all issues, disputes and disagreements between [Orly and the other Settling Parties], including but not limited to the issue of ownership of all [TRI] shares," most significantly those TRI shares claimed by the Orly Trust.

16. In exchange, the Trump Group Entities agreed to pay $32.3 million to the so-called "AG Group," consisting of Orly, her father Arie, and Arnold and David Broser (collectively, "the Brosers").  Upon information and belief, the Brosers are creditors of Orly personally, to whom Orly owes many millions of dollars.  The payments were broken up into: (a) an immediate payment of $17.3 million and (b) two follow-up payments of $7.5 million. According to the federal court, which reviewed the document, "Orly monetized her beneficial interest in the Orly Trust['s] [TRI] shares for $32.3 million ...."

17. The Trump Group Entities have since reaffirmed that the federal court construed the

Trump Group Entities Settlement Agreement correctly:

[Any suggestion] that the confidential settlement agreement *might* only dismiss Orly's individual claims against the Trump Group [Entities], but not resolve the Orly Trust's claims against the Trump Group [Entities] and the TPR Group . . . is counterfactual. This Court has already held that certain of Orly's claims in this action, including the remaining claims, are derivative in nature, and may be maintained by Orly on behalf of the Orly Genger 1993 Trust. ... In settling the claims among them, the Trump Group [Entities], Trans-Resources, Orly and Arie agreed to the dismissal of all claims presently pending against one another. This agreement is memorialized in the Second Amended Stipulation of Discontinuance.

18. Evidencing this intent, in Section 6(a) of the Trump Group Entities Settlement Agreement, Orly settled and released all of her claims in the Trump Group Entities Settlement in both her derivative and individual capacities. (Orly releasing the Trumps "in all capacities.") In Section 8(a) thereof, Orly further agreed to "cause" the Orly Trust to do the same, which she later did, advising the Delaware Chancery Court that she favored dismissal of Petitioner's action on behalf of the Orly Trust. The case was dismissed.

### The Settlement Proceeds

19. Under applicable law, the proceeds of a settlement obtained in a derivative lawsuit belong to the direct plaintiff (in this case, the Orly Trust), not the derivative plaintiff (in this case, Orly personally). Nonetheless, to date, none of the aforementioned $32.3 million (the "Settlement Proceeds") has been remitted to the Orly Trust, nor have any of the settling parties indicated an intention to do so in the future.

20. At a hearing before Justice Jaffe on March 25, 2015, counsel to the Trump Group Entities confirmed that $17.3 million of the Settlement Proceeds has already been paid, but that $15 million remains to be paid, less possible "set-offs" and subject to possible

acceleration or extension of those payment dates.

21. In a recent brief, Orly has alleged that, to date, she has not personally received any of the Settlement Proceeds.  If true, this means $17.3 million of the Settlement Proceeds has been paid to other members of the "AG Group," i.e., the Brosers and Arie (the "Initial Payment").  Orly has not disclosed the intended recipients of the remaining $15 million.

22. Consistent with her fiduciary duty to the Orly Trust and the express terms of the Trust Agreement Obligations, Orly was required to ensure that the Trump Group Entities Settlement proceeds were paid to the Orly Trust.  However, Orly failed to comply with these duties and obligations.  Orly breached her fiduciary duty to the Orly Trust and the express terms of the Trust Agreement Obligations.

### Cross-Petitioner's Substitution Motion

23. In order to protect the rights of the Orly Trust, Dalia moved in the Supreme Court, New York County, for an order permitting her to substitute for Orly as plaintiff in the Orly Trust Derivative Litigation and compelling the settling parties to deposit the Settlement Proceeds into Court.  Orly vigorously opposed Dalia's motion, on the ground, inter alia, that she is seeking to remove Dalia as Trustee of the Orly Trust.   By Interim Order dated May 7, 2015, Justice Jaffe neither granted nor denied the motion, but rather held it in abeyance pending this Court's determination of Orly's Petition.

24. At the March 25, 2015 hearing on Dalia's motion, Justice Jaffe suggested it might already be too late to deposit the Initial Payment into Court, as the $17.3 million apparently has already been paid out to non-parties. ("it sounds like that ship has sailed").  Accordingly, Dalia brings this Cross- Petition seeking, inter alia: retention of Dalia as the only non-contingent Trustee of the Orly Trust; monetary damages for misappropriation of Orly

-13-

Trust assets; and turnover of the Settlement Proceeds for the Orly Trust, to the extent such funds are recoverable.

## **Count I: Breach of Fiduciary Duty**

25. The allegations contained in paragraphs 1 through 24 hereinbefore are realleged as if fully set forth herein.

26. Because the Orly Trust Derivative Litigation was brought on behalf of the Orly Trust, the Settlement Proceeds therefrom belong to the Orly Trust.

27. Orly owed a fiduciary duty to the Orly Trust.

28. Consistent with her fiduciary duty to the Orly Trust, Orly was required to ensure that the Settlement Proceeds were paid to the Orly Trust.

29. Orly did not so do.  Instead, she entered into the Trump Group Entities Settlement Agreement, which provided for the Settlement Proceeds to be paid to parties other than the Orly Trust, and she authorized payment of the Settlement Proceeds to such other parties.

30. Orly's actions constitute a breach of fiduciary duty.

31. The Orly Trust has been injured by Orly's breach of her fiduciary duty to the Orly Trust in the amount of $32.3 million, plus statutory interest.

## **Count II: Breach of Loyalty**

32. The allegations contained in paragraphs 1 through 31 hereinbefore are realleged as if fully set forth herein.

33. Because the Orly Trust Derivative Litigation was brought on behalf of the Orly Trust, the Settlement Proceeds therefrom belong to the Orly Trust.

34. Orly owed a duty of loyalty to the Orly Trust.

-14-

35. Consistent with her duty of loyalty to the Orly Trust, Orly was required to ensure that the Settlement Proceeds were paid to the Orly Trust.

36. Orly did not so do. Instead, she entered into the Trump Group Entities Settlement Agreement, which provided for the Settlement Proceeds to be paid to parties other than the Orly Trust, and she authorized payment of the Settlement Proceeds to such other parties.

37. Orly's actions constitute a breach of her duty of loyalty.

38. The Orly Trust has been injured by Orly's breach of her duty of loyalty to the Orly Trust in the amount of $32.3 million, plus statutory interest.

### Count III: Turnover

39. The allegations contained in paragraphs 1 through 38 hereinbefore are realleged as if fully set forth herein.

40. Pursuant to the Trust Agreement Obligations, all trust funds were to be held in the name of the Orly Trust, and no Orly Trust assets were to be used for the benefit of Orly's creditors.

41. Because the Orly Trust Derivative Litigation was brought on behalf of the Orly Trust, the Settlement Proceeds therefrom belong to the Orly Trust.

42. Orly was required to ensure that the Settlement Proceeds were paid to the Orly Trust.

43. The Settlement Proceeds should be delivered to the Orly Trust.

44. Orly should be compelled to turn over to the Orly Trust all Settlement Proceeds in her possession, custody or control.

### Count IV: Accounting

45. The allegations contained in paragraphs 1 through 44 hereinbefore are realleged as if fully set forth herein.

46. Orly has never provided an accounting of the Settlement Proceeds, which are an asset of the Orly Trust.

47. As a matter of law and equity, Orly should provide an accounting of the Settlement Proceeds.

### Count V: Unjust Enrichment

48. The allegations contained in paragraphs 1 through 47 hereinbefore are realleged as if fully set forth herein.

49. Pursuant to the Trust Agreement Obligations, all trust funds were to be held in the name of the Orly Trust, and no Orly Trust assets were to be used for the benefit of Orly's creditors.

50. Because the Orly Trust Derivative Litigation was brought on behalf of the Orly Trust, the Settlement Proceeds therefrom belong to the Orly Trust.

51. Orly was required to ensure that the Settlement Proceeds were paid to the Orly Trust.

52. Orly's creditors received the Settlement Proceeds instead of the Orly Trust.

53. Orly received a benefit from the Settlement Proceeds which belong to the Orly Trust.

54. Orly received such benefit from the Settlement Proceeds at the expense of the Orly Trust.

55. Under principles of equity and good conscience, Orly must make restitution to the Orly Trust in the amount of $32.3 million, plus statutory interest.

### Count VI: Self-Dealing

56. The allegations contained in paragraphs 1 through 55 hereinbefore are realleged as if fully

set forth herein.

57. Because the Orly Trust Derivative Litigation was brought on behalf of the Orly Trust, the Settlement Proceeds therefrom belong to the Orly Trust.

58. Orly was required to ensure that the Settlement Proceeds were paid to the Orly Trust.

59. Orly did not so do.  Instead, she entered into the Trump Group Entities Settlement Agreement, which provided for the Settlement Proceeds to be paid to parties other than the Orly Trust, and she authorized payment of the Settlement Proceeds to such other parties.

60. Orly's actions constitute self-dealing.

61. The Orly Trust has been injured by Orly's self-dealing in the amount of $32.3 million, plus statutory interest.

### Count VII: Successor Trustee

62. The allegations contained in paragraphs 1 through 61 hereinbefore are realleged as if fully set forth herein.

63. Upon information and belief, Orly is seeking to have Dalia removed as Trustee and a new Trustee appointed who will not seek to recover the Settlement Proceeds on behalf of the Orly Trust.

64. Orly should not be permitted to have Dalia removed as Trustee and a new Trustee appointed who will not seek to recover the Settlement Proceeds on behalf of the Orly Trust.

65. Pursuant to Article SEVENTH of the Trust Agreement, an outgoing Trustee has the power to name a successor Trustee.

66. If this Court removes Dalia as trustee of the Orly Trust, Dalia should be permitted to

exercise her power to name a successor Trustee.

## Count VII: Successor Trustee

67. The allegations contained in paragraphs 1 through 66 hereinbefore are realleged as if fully set forth herein.

68. Upon information and belief, Orly is seeking to have Dalia removed as Trustee and a new Trustee appointed who will not seek to recover the Settlement Proceeds on behalf of the Orly Trust.

69. Orly should not be permitted to have Dalia removed as Trustee and a new Trustee appointed who will not seek to recover the Settlement Proceeds on behalf of the Orly Trust.

70. Pursuant to Article SEVENTH of the Trust Agreement, an outgoing Trustee has the power to name a successor Trustee.

71. If this Court removes Dalia as trustee of the Orly Trust, Dalia should be permitted to exercise her power to name a successor Trustee.

72. If Dalia is not permitted to exercise her power to name a successor Trustee, this Court should name an objective third party Trustee choosen from an independent list.

## Interested Parties

73. The names and addresses of all persons, other than the Petitioner, interested in the obtaining a determination of the issues presented in this Petition, and all other persons interested in this proceeding who are required to be cited upon this application or concerning whom this Court is required to have information, are:

    (a)    The following who are of full age and sound mind or are corporations or associations:

ORLY GENGER
780 Greenwich Street, Apt. 4P
New York, New York 10014

Interest: Beneficiary and Petitioner, Cross-Respondent

SAGI GENGER 1993 TRUST
C/O John Dellaportas
Kelley Drye & Warren
101 Park Avenue
New York, New York

Interest: Contingent Remainderman

(b)     The following who are persons under disability:
Infants: None
Others under a disability: None

(c)     The following persons who are confined in prison: None
(d)     The following persons whose names or whereabouts are unknown: None

74. There are no persons, corporations or associations other than those mentioned who are

interested in this proceeding.

75. No previous application for this or similar relief has been made to this or any other court

except:

a.    Motion Seq. 42 (for payment into Court) in the Orly Trust Derivative Litigation,

entitled Arie Genger, et al. v. Sagi Genger, et al., Index No. 651089/2010 in New

York Supreme Court, New York County.  Motion Seq. 42 was held in abeyance

by the Supreme Court pending a determination by this Court.

b.  Petition before this Court filed June 14, 2016, citation not yet issued.

WHEREFORE, Petitioner requests the following relief:

a.      declaratory judgment that Dalia is, and will remain, the only non-contingent

Trustee of the Orly Trust;

-19-

b.      damages in in the amount of $32.3 million, plus statutory interest;

c.      imposition of a constructive trust on the Settlement Proceeds;

d.      an order directing the delivery of the Settlement Proceeds to Dalia as Trustee of

the Orly Trust;

e.      an accounting of the Settlement Proceeds;

f.      if Dalia is removed as Trusee of the Orly Trust, then authorizing Dalia to name

the successor Trustee;

g.      if Dalia is removed as Trusee of the Orly Trust, then having the Court name a

third party successor Trustee from an independent list;  and

h.      such other relief as to the Court seems just and necessary.


Dated: New City, New York
       August 12, 2017

                                        _____
                                        Judith Lisa Bachman, Esq.
                                        254 S. Main Street
                                        Suite 306
                                        New City, New York 10017
                                        (845) 639-3210
                                        *Counsel to Respondent Dalia Genger*

WHEREFORE, your Respondent prays that the foregoing relief be granted and such other and further relief as the Court shall deem just and proper.


Dated: New York, New York
     August 12, 2017

                                       *Dalia Genger*
                                     DALIA GENGER

<u>VERIFICATION</u>

STATE OF NEW YORK     )
                                           ss.:
COUNTY OF NEW YORK   )

The undersigned, Respondent named in the foregoing Amended Answer, being duly sworn, says:

I have read the foregoing petition subscribed by me and know the contents thereof, and the same is true of my own knowledge, except as to the matters therein stated to be alleged upon information and belief, and as to those matters I believe it to be true.

_____*Dalia Genger*_____
DALIA GENGER

On __August 12, 2017__ Dalia Genger before me, the undersigned, personally appeared , personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he/she executed the same in his/her capacity, and that by his/her signature on the instrument, the individual, or the person upon behalf of which the individual acted, executed the instrument.

Sworn to before me this
12th day of August, 2017

_____
Notary Public

Judith Bachman
Notary Public, State of New York
No. 02-BA6048319
Qualified in Rockland County
Commission Expires Sept. 25, 2018

_____
Judith Lisa Bachman, Esq.
254 S. Main Street
Suite 406
New City, New York 10017
(845) 639-3210
*Counsel to Respondent Dalia Genger*

FILED: NEW YORK COUNTY CLERK 09/12/2016 01:21 PM

NYSCEF DOC. NO. 1395

INDEX NO. 109749/2009

RECEIVED NYSCEF: 09/12/2016

# SUPREME COURT OF THE STATE OF NEW YORK
# NEW YORK COUNTY

PRESENT: **BARBARA JAFFE** _J.S.C._

Justice

PART 12

Orly Genger, Et Al.

-v-

Dalia Genger, Et Al.

INDEX NO. 109749-09

MOTION DATE _____

MOTION SEQ. NO. 57

The following papers, numbered 1 to _____ , were read on this motion to/for _____ Order of Attachment

| | No(s). ____ |
|---|---|
| Notice of Motion/Order to Show Cause — Affidavits — Exhibits _____ | No(s). ____ |
| Answering Affidavits — Exhibits _____ | No(s). ____ |
| Replying Affidavits _____ | No(s). ____ |

Upon the foregoing papers, it is ordered that this motion is

DECIDED IN ACCORDANCE WITH
ACCOMPANYING DECISION / ORDER

MOTION/CASE IS RESPECTFULLY REFERRED TO JUSTICE _____
FOR THE FOLLOWING REASON(S):

Dated: 9/9/16

_____, J.S.C.

BARBARA JAFFE
J.S.C.

1. CHECK ONE: .................................................. ☐ CASE DISPOSED   ☑ NON-FINAL DISPOSITION
2. CHECK AS APPROPRIATE: ...........................MOTION IS: ☑ GRANTED   ☐ DENIED   ☐ GRANTED IN PART   ☐ OTHER
3. CHECK IF APPROPRIATE: ................................................. ☐ SETTLE ORDER   ☐ SUBMIT ORDER
☐ DO NOT POST   ☐ FIDUCIARY APPOINTMENT   ☐ REFERENCE

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK  : IAS PART 12
-------------------------------------------------------------------x
ORLY GENGER, in her individual capacity and on
behalf of the Orly Genger 1993 Trust (both in its
individual capacity and on behalf of D & K Limited
Partnership),

                              Plaintiff,

                    -against-


DALIA GENGER, SAGI GENGER, LEAH FANG,
D & K GP LLC, and TPR INVESTMENT
ASSOCIATES, INC.,

                             Defendants.
-------------------------------------------------------------------x
BARBARA JAFFE, JSC:

Index No. 109749/09

Mot. seq. nos. 057, 058

**DECISION AND ORDER**

       By decision and order dated April 8, 2016, I awarded plaintiff partial summary judgment

as to liability only with respect to the first, seventh, and eighth causes of action advanced in

plaintiff's amended complaint, denied the cross motion for summary judgment interposed by

defendants Sagi Genger, TPR Investment Associates, Inc., and D&K GP LLC, and referred the

matter for a trial on damages. (NYSCEF 1059).

       By order to show cause and affirmation of exigency for ex parte relief, each dated July 29,

2016, plaintiff moves for a prejudgment order of attachment, including a temporary restraining

order and preliminary injunction, attaching the assets of defendants Sagi Genger, D&K GP LLC,

TPR Investment Associates, Inc. and Dalia Genger and those of any entities, trusts, or escrow

accounts controlled by or affiliated with them, including the Sagi Genger 1993 Trust, the Orly

Genger 1993 Trust, Horizon 2009 Trust, Millennium USA LP,[1] Double Gen Trust, Genger Kids

---

[1] Removed from order on application of plaintiff's attorney. (NYSCEF 1215).

LP or other entities in which Sagi or his wife Elana Genger or their children are beneficiaries, Manhattan Safety Co., Joshua's Standing Sun, LLC, Batzad, LLC, Bristol Ivory LLC, and Rochelle Portfolio, Inc., and their respective officers, directors, trustees, escrow agents, attorneys, representative, and authorized signatories. I signed the order and TRO restraining and prohibiting those defendants and the aforementioned entities from transferring or paying any assets, except for ordinary and reasonable household expenses collectively not to exceed $50,000 per month, of the SG defendants or any personal or real property in which the SG defendants have an interest, including any and all bank or financial accounts in the name of any SG defendant or on any account in which any SG defendant is a signatory, or any debt owed to any of the SG defendants, to the extent of $50 million, where the garnishees included certain banks as well as David Parnes and his law offices. (NYSCEF 1213). (Mot. seq. 57).

By another order to show cause and affirmation of emergency for ex parte relief, each dated July 28, 2016, plaintiff moves for a prejudgment order of attachment against the assets of defendants Sagi Genger, D&K GP LLC, and TPR Investment Associates, Inc. (SG defendants), including a temporary restraining order and preliminary injunction, restraining and prohibiting certain garnishees from transferring or paying any of the defendants' assets, or any personal or real property in which they have an interest, or any debt owed them, to the extent of $50 million. I signed the order including the TRO. SG defendants were given seven days to efile their opposition. (NYSCEF 1234, 1235). (Mot. seq. 58). They were given four days to efile their opposition. (NYSCEF 1213, 1215).

By letter dated August 1, 2016, counsel for Sagi and TPR sought an extension of time to respond to the two motions (NYSCEF 1214), which I denied. If plaintiff's attorneys were able,

2

in a matter of days, to sort through defendants' documentation, defendants ought have had little difficulty going through and comprehending their own records.

Defendants oppose, as do nonparties Parnes and Elana Genger and her five minor children. Garnishees do not oppose.

Following oral argument on August 11, 2016, I extended the restraints pending my decision.

## I. PERTINENT BACKGROUND

### A. April 2016 decision and order

The pertinent factual background is set forth in my April 8, 2016 opinion, and will not be repeated here. In my decision, I ultimately held that Sagi, as CEO of TPR, notwithstanding the family understanding that the 1993 D&K note would never be enforced, caused TPR to foreclose on it at a UCC auction sale held in February 2009 at which the TPR shares pledged by the LP as security for the note were purchased by TPR for $2.2 million, thereby reducing the LP's debt obligation, but leaving an $8.8 million deficiency guaranteed by the Orly Trust and the Sagi Trust. As a consequence, the Orly Trust's interest in the LP's sole asset, its stock interest in TPR, was transferred and sold to TPR. I also found that Sagi had intended this transaction to inure to his benefit. Sagi then attempted, albeit unsuccessfully after court intervention, to rid himself of the remaining approximately $8 million debt on the note by agreeing with himself, via TPR and the Sagi Trust, to forgive it. Given this series of transactions and occurrence, I found that Sagi had breached his fiduciary duty to the Orly Trust in his capacity as general partner of the LP by conducting a sham auction of the LP's shares in TPR, thereby causing the Orly Trust's loss of its only collateral in the LP, while remaining liable on the note.

3

## B. Other pertinent actions involving the parties

On September 1, 2010, in connection with another Genger action, *Arie Genger and Orly Genger, in her individual capacity and on behalf of the Orly Genger 1993 Trust v Sagi Genger, TPR Investment Associates, Inc., Dalia Genger, The Sagi Genger 1993 Trust, Rochelle Fang, Individually and as Trustee of the Sagi Genger 1993 Trust, et al.*, index No. 651089/2010 (2010 action), the parties entered into an escrow agreement by which they provided, in section six, that in consideration of TPR's voluntary deposit of $10,314,005 in escrow, the Orly Trust "will refrain from applying for injunctive, or similar, relief (including but not limited to pre-judgment attachment, sequestration of funds and similar) in connection with the Escrow Amount or other amounts received by TPR in connection with the sale by TPR of any shares of TRI." (Index no. 109749/2009, NYSCEF 1329). By decision dated May 15, 2014, a judge of the federal district court in the Southern District of New York granted TPR summary judgment directing the release of approximately $10.3 million in escrowed proceeds arising from TPR's sale of TRI shares to the Trump Group, and emphasized that he was not deciding "who among the Genger siblings ultimately deserves recompense," and without resolving "any question other than whether TPR is the next (but not necessarily last) beneficiary of the sale of the Orly Trust Shares." (*TPR Investment Associates, Inc. v Pedowitz & Meister LLP, as escrow agent, Dalia Genger, as trustee of the Orly Genger 1993 Trust, and Orly Genger, as beneficiary of the Orly Genger 1993 Trust*, 2014 WL 1979932,* 6, 13 Civ 8423,* 15 [SD NY 2014]).

## C. The May 2014 TRO

Soon thereafter, by order to show case dated May 20, 2014 and filed in the 2010 action (NYSCEF 1007), Orly sought to attach the assets of TPR and Sagi. The parties appeared before

4

me on the record and I acknowledged Orly's concern that the escrowed funds will be dissipated "starting right now," and indicated that I was going to sign the TRO and then render a decision on the order to show cause. Defense counsel interjected to state that he would voluntarily commit that defendants would not spend money "between now and [my] prospective ruling," to which I replied, in essence, that my signing of the TRO should thus be of no consequence to Sagi. (NYSCEF 1015, at 29). The order reflects that the restraint was imposed pending the hearing on the motion, and the hearing on the motion was scheduled to be heard on the papers on June 4, 2014. (NYSCEF 1007). A decision was rendered moot on July 24, 2014, when the plaintiffs' claims in that action were dismissed on appeal. (*Genger v Genger*, 121 AD3d 270 [1st Dept 2014]).

### D.   June 2016 trial subpoenas and motions to quash them

On or about June 10, 2016, plaintiff served trial subpoenas on 13 banks and financial institutions commanding them to produce on June 16 for the damages trial ordered in the instant case all documents and records for any accounts in Sagi Genger's name and for any account for which Sagi, Dalia, and/or David Parnes have signing authority, or in the name of or for the benefit of TPR, the LP, or D&K GP LLC, a trial subpoena on Sagi commanding him to produce on June 16 for the damages trial all financial records of TPR, the LP, and the GP, all personal financial records showing every transfer of funds between him and TPR, the LP or the GP, and all documents concerning the purpose of such transfers (NYSCEF 1090), and the same trial subpoenas on David Parnes. (NYSCEF 1124). On or about June 15, plaintiff served a trial subpoena on Leah Fang, commanding her to appear on June 21 for the continued damages trial and produce all records in her possession or control relating to TPR, the LP, and the Orly Trust.

5

(NYSCEF 1131).

By notice of motion efiled on June 14, 2016, defendants advised that on July 28, 2016, they would move for an order quashing the subpoenas served on them. (NYSCEF 1088). The damages hearing commenced on June 16, and was adjourned to August 2.

On June 22, I ordered, on plaintiff's application, that defendants to show cause as to why their motion to quash should not be advanced and denied. (NYSCEF 1110).

By letter dated June 28, 2016, plaintiff's counsel advised that defendants' counsel had communicated with the banks to the effect that their compliance with the subpoenas had been stayed by me and that they need not respond. (NYSCEF 1115). On June 30, 2016, I held a telephone conference with the parties, and issued an order that day, prohibiting defense counsels from communicating with any subpoenaed party concerning the subpoenas. (NYSCEF 1121).

By notice efiled on July 4, 2016, nonparty David Parnes advised that on July 26, 2016, he would move for an order quashing the subpoenas served on the banks and financial institutions. (NYSCEF 1124). By order dated July 5, I granted plaintiff's motion to advance defendants' motion to quash, and thereupon denied defendants' motion to quash. (NYSCEF 1125). By notice efiled on July 11, Leah Fang advised that on July 28, she would move for an order quashing the trial subpoena served on her. (NYSCEF 1129). The motions to quash were denied, respectively, on July 22, 2016, and August 15, 2016, the latter as moot due to Fang's compliance with the subpoena. (NYSCEF 1166, 1347). Interim stays were denied by two Appellate Division justices. (NYSCEF 1116, 1238). On August 11, at oral argument on the motions for an attachment, the parties advised that the damages hearing had been continued to September 10, 2016.

6

## II. ATTACHMENT OF DEFENDANTS' ASSETS

### A. Governing law

An order of attachment may be granted where there exists a viable cause of action, a

probability of success on the merits, that the amount demanded from the defendant exceeds all

counterclaims known to the plaintiff (CPLR 6212[a]), and one or more grounds exist for an

attachment pursuant to CPLR 6201, which are, as pertinent here, that "the defendant is a

nondomiciliary residing without the state and that

> the defendant, with intent to defraud his creditors or frustrate the enforcement of a
> judgment that might be rendered in plaintiff's favor, has assigned, disposed of,
> encumbered or secreted property, or removed it from the state or is about to do any of
> these acts . . .

(CPLR 6201).

In order to establish this element, the plaintiff bears the burden of establishing the

defendant's fraudulent intent; mere allegations or suspicious of fraud are insufficient. (*DLJ*

*Mortg. Cap., Inc. v Kontogiannis*, 594 F Supp 2d 308, 319 [ED NY 2009]). As it is often

difficult to prove that the defendant harbored fraudulent intent, the courts scrutinize whether the

defendant's activities and/or transactions exhibit "badges of fraud" from which the fraudulent

intent may be inferred. (*Id.* at 319-320). Such badges of fraud may include: (1) gross inadequacy

of consideration; (2) a close relationship between transferor and transferee; (3) the transferor's

insolvency as a result of the conveyance; (4) a questionable transfer, which is not made in the

ordinary course of business; (5) secrecy of the transfer; and (6) retention of control of the

property by the transferor of the conveyance. (*Id.*). Also considered badges of fraud are "the

existence or a cumulative effect of a pattern or series of transactions or course of conduct after

7

the incurring of debt, onset of financial difficulties, or pendency or threat of suits by creditors," and the overall chronology of the events and transactions in question. (*In re Hypnotic Taxi LLC*, 543 BR 365 [Bank Ct ED NY 2016]).

As an order of attachment is an extreme and harsh remedy, the prayer for relief must be "construed narrowly in favor of the party against whom the remedy is invoked." (*VisionChina Media Inc. v S'holder Representative Servs.*, 109 AD3d 49, 59 [1ˢᵗ Dept 2013]). Thus, it has been held that a defendant's nondomiciliary status constitutes an insufficient basis for ordering an attachment, even if the other elements of CPLR 6212(a) are established.

On a motion for an order of attachment, the plaintiff is required to post an undertaking, in an amount fixed by the court but not less than $500, with a specified part of it conditioned that the plaintiff shall pay to the defendant all costs and damages, including reasonable attorney's fees, sustained by reason of the attachment if the defendant recovers a judgment or it is finally decided that the plaintiff was not entitled to the attachment, and the balance of it conditioned that the plaintiff shall pay to the sheriff all of his allowable fees. (CPLR 6212[c]).

### B.  Contentions and analysis

#### 1.  Viable cause of action

Having prevailed on her motion for partial summary judgment, plaintiff argues, without dispute, that she has thereby established a likelihood of success on the merits, a proposition not challenged by defendants.

#### 2.  Probability of success on the merits

*See* II.B.1., *supra.*

8

3. The amount demanded from the defendant exceeds all counterclaims known to the plaintiff

  As all counterclaims were dismissed, this element is indisputably established.

### 4. Defendants are nondomiciliaries residing without the state

  This element is undisputed.

### 5. With intent to defraud his creditors or frustrate the enforcement of a judgment that might be rendered in plaintiff's favor, defendant has assigned, disposed of, encumbered or secreted property, or removed it from the state or is about to do any of these acts

#### a. Motions to quash

  Plaintiff references the motions to quash the trial subpoenas and defendants' efforts to prevent the banks from complying with them, asserting that they thereby attempted to frustrate her attempts to obtain their certified bank records in advance of the damages trial.

  While the three aforementioned motions to quash were each filed by different parties and nonparties, they were served, respectively, on June 10, July 4, and July 11, and each movant sought to be heard as late as July 28, only two business days before the August 2 hearing. Additionally, counsel's reliance on CPLR 3103(b) as authority for informing the banks and financial institutions that there was no need for them to comply with the trial subpoenas was not only misplaced as that statute does not pertain to trial subpoenas (*compare* CPLR 3103[a] [court may make protective order denying or limiting use of device for seeking discovery], *with* CPLR 2304 [governing motions to quash or modify subpoenas, which provides for no stay upon making motion]), and his conduct was unethical (*see* Rules of Professional Conduct [22 NYCRR 1200.0] rule 4.1 ["In the course of representing a client, a lawyer shall not knowingly make a false statement of fact or law to a third person."]; rule 8.4[d] [lawyer shall not "engage in conduct that is prejudicial to the administration of justice"]).

9

The timing of the return dates for the motions and the prohibited communications with the subpoenaed entities permit a reasonable inference that defendants intentionally attempted to forestall timely cooperation with the subpoenas, which is tantamount to intentionally attempting to frustrate the enforcement of the judgment. But for plaintiff's orders to show cause advancing the first two motions to quash, defendants would have likely succeeded in significantly delaying cooperation with the subpoenas.

### b.  Sagi's purchase of a $4.85 home in Florida

As Sagi purchased the Florida house one month after I granted plaintiff summary judgment in this action, and three months after I rendered a verdict in her favor against Sagi in another action (*Genger v Genger*, index No. 100697/2008, NYSCEF 812), plaintiff claims that Sagi intended to shield it from the enforcement of a judgment. She observes, without challenge, that in June 2014, Sagi represented to the federal court in another action that he had moved his family residence from New York to Connecticut in order to "better address the special educational needs" of two of his children, and that he intended to remain in Connecticut for another 18 years or so, until his children graduated, whereas at the damages hearing, he testified that he moved his family to Florida for other reasons having nothing to do with the children's education. Thus, plaintiff maintains that Sagi's sudden move to Florida, notwithstanding the prior professed concern for his children, demonstrates his intent to frustrate the enforcement of a judgment in this case. She also details the mechanics behind the financing for the purchase, commencing with Sagi's transfer of $500,000 from an unknown account into his personal account, from which he paid $485,000 by wire to a Miami real estate law firm. Several weeks later, he transferred another $1.9 million into his personal account from an unknown account,

10

and later that day, sent $1,913,757.07 to the same law firm. (NYSCEF 1236).

Defendants argue that absent anything illegal about purchasing a home in Florida, plaintiff's claim that Sagi is thereby attempting to shield his home from judgment is unfounded, and they observe that Sagi had been living out of state before moving to Florida, and used overseas trust assets to purchase the Florida home. (NYSCEF 1306).

Given Sagi's inconsistent explanations for his family's moves, plaintiff's alternative explanation that he sought to obtain the protection of the Florida homestead law to shield his home from being subject to the judgment gains traction. (*See e.g. Sardis v Frankel*, 113 AD3d 135 [1st Dept 2014] [finding that series of transactions made by transferor after arbitration award rendered against her, including purchase of Florida real estate claimed as homestead, demonstrated concerted effort by transferor to shield assets from impending judgment debtors]).

### c.  TPR bank statement reflecting transfer of $5 million over six months to unknown overseas accounts

### d. Falsity of Sagi's testimony that TPR's $5 million note to Dalia for her TPR shares was transferred to Joshua Standing Sun, LLC (JSS), which was funded by TPR to cover the obligation

Although Sagi testified that the note TPR issued to Dalia for her TPR shares was transferred to JSS, plaintiff alleges that through a complex series of transactions between his trust and JSS, Sagi used JSS as a pass-through for the $5 million which ended up with Sagi.

Defendants rely on the date indicator of a fax transmission and a TPR board resolution to support their contention that, contrary to plaintiff's allegations, the August 1, 2008 assignment of TPR's obligation to pay Dalia pursuant to TPR's note obligating them to pay Sagi was not backdated and is legitimate, and that corporate minutes reflect a board resolution showing that

11

the $1.6 million payment was for loans Dalia made to TPR years earlier, and not for the note. (NYSCEF 1306).

It is difficult to overlook the nature and volume of the transactions entered into by defendants, credit their evidence and arguments, and find for them as to this issue. (*And see infra*, II.B.5.h.). (*See e.g. DLJ Mortg. Cap., Inc. v Kontogiannis*, 594 F Supp 2d 308, 319 [ED NY 2009] [badges of fraud include close relationship between transferor and transferee, and retention of control of property by transferor of conveyance]).

### e. Rochelle (Fang) Portfolio, Inc. (RPI)

Sagi testified that RPI acquired shares in TPR in exchange for cash and shares allegedly totaling $1 million, and that RPI was owned and controlled by Fang. However, when deposed, Fang indicated that she learned that she had shares in TPR from her daughter Elana, Sagi's wife, and that Sagi had "free reign to do what he wants" with her investments. Moreover, the bank records are alleged to show that Sagi was named as an officer of RPI on its bank account, and was a signatory on it, and that RPI's registered address is Sagi's Park Avenue townhouse. Consequently, plaintiff asserts, without dispute, that Sagi testified falsely that RPI is a non-related party that engaged in an arms-length transaction in acquiring TPR shares for $1 million. (NYSCEF 1236).

These circumstances further support plaintiff's application. (*See In re Hypnotic Taxi LLC*, 543 BR 365 [Bank Ct ED NY 2016] [finding, as sufficient badges of fraud warranting attachment, among others, that debtor structured trusts at issue to reserve right to continue use of properties transferred to trust, beneficiaries of trusts were debtor and his children and parents, debtor maintained control over and use of properties]).

12

### f.  Sagi's payments from TPR

Although Sagi has testified that he took no salary from TPR and that he loaned his services to Riverside Advisory and received periodic salary payments from Riverside, plaintiff contends, without dispute, that the records prove that TPR paid Sagi $100,000 in 2013 alone, and he admitted that his wife and Fang were also on TPR's payroll.

### g.  TPR's payments in 2007 of the legal fees of "parties adverse" to plaintiff

Plaintiff alleges, without dispute, that Sagi, through TPR, paid $1,190,000 in legal fees to Dalia's divorce attorney in 2007, even though Dalia was no longer a TPR shareholder.

### h. Nature and volume of defendants' financial transactions

Plaintiff alleges that the bank records that she obtained through the trial subpoenas, which defendants attempted to suppress (*supra*, II.B.5.a.), reveal illicit transactions, self-dealing, and suspicious "pass through" transactions, that millions of dollars have been deposited in Sagi Genger Trust accounts and sent to offshore accounts, and that Sagi and Parnes back-dated and falsified the records, which reflect "bizarre transfers that fit the profile of money laundering." (NYSCEF 1236).

Defendants maintain that plaintiff fails to show any fraudulent intent or any intent to frustrate the enforcement of a judgment, observing that mere suspicion is insufficient, as is the mere removal or other disposition of property, and that plaintiff is barred from seeking an attachment by virtue of her unclean hands based on what they allege are her "numerous false statements." (NYSCEF 1306).

October 2011 TPR note

Plaintiff alleges, without dispute, that Sagi and Parnes created a note issued by TPR in

13

October 2011, and amended in May 2012, that was based on the D&K note and sold to Manhattan Safety Company in exchange for $3.7 million paid to TPR, and that the bank records reflect that most of the funds were immediately transferred to Sagi as follow:

| | | |
|---|---|---|
| May 15, 2012 | $800,000 | Manhattan Safety to TPR |
| May 18, 2012 | 450,000 | TPR to Sagi's Morgan Stanley account |
| August 15, 2012 | 460,000 | received in Sagi's Morgan Stanley account |
| August 16, 2012 | 400,000 | withdrawn from Sagi's Morgan Stanley account |
| August 16, 2012 | 400,000 | deposited into Sagi's Citibank account |
| June 26, 2013 | 1,500,000 | Manhattan Safety to Sagi |
| June 27, 2013 | 680,000 | Sagi to Riverside Advisory LLC |
| June 27, 2013 | 632,000 | Riverside Advisory to Sagi |
| June 29, 2013 | 300,000 | Riverside Advisory to Parnes |
| June 29, 2013 | 250,000 | TPR to Riverside Advisory |
| June 29, 2013 | 250,000 | Parnes to Manhattan Safety |

Series of transactions in 2008

Plaintiff claims that the bank records show that in August 2008, after Sagi had entered into the agreement with the Trump Group, Sagi's Trust received $6.875 million in a Citibank account opened for that purpose on August 22, that the rest of the agreed upon funds were paid by the Trump Group and deposited in the trust account in October 2008, and that within two months, all of those funds were wired overseas, mostly to unidentified accounts including one in Liechtenstein, and from that account $10 million was transferred back to the trust via a series of transfers, with the rest going to the Batzad account in which TPR had an interest, but that Sagi

14

solely controlled.

Defendants argue that plaintiff's reliance on Sagi's sale of the Sagi Trust shares in TRI and overseas investment of the proceeds eight years ago is too remote to constitute evidence, and given the dismissal of plaintiff's claim with respect to that money, and that other payments were made in settlement of TPR's liability, which was approved by TPR's "independent" Board. Defendants disparage plaintiff's claim that the TRI share proceeds belong to TPR, alleging that her monetization of her beneficial interest in her Trust's TRI shares amounted to $32.3 million, none of which was contributed to TPR or her own Trust. They also complain that plaintiff's characterization of the transactions among Sagi, TPR, and other entities as "money laundering" is "incendiary" and without basis, as evidenced by the stillborn criminal investigation of TPR and Sagi, as is plaintiff's allegation that the justice previously presiding in the matter had indicated in 2012 that Sagi had engaged in illegal conduct.

While allegations of money laundering may be extreme, if not unfounded, defendants' entitlement to funds in the 2010 action is not the issue here. Rather, it is defendants' conduct in wiring funds overseas to unidentified accounts, and then engaging in unusually complex transfers, with proceeds ultimately received by Sagi or by entities controlled by him. These transactions and transfers go beyond the mere transfer of funds that have been found insufficient to warrant an attachment. (*See e.g. JSC Foreign Econ. Assn. Technostroyexport v Intl. Dev. and Trade Svces., Inc.*, 306 F Supp 2d 482 [SD NY 2004] [circumstances of transactions supported inference of fraudulent intent to frustrate enforcement of judgment against them, including, that transferors closed sales for properties while plaintiff's action pending; transferors allegedly received no part of sale proceeds; disbursement of proceeds "hazy at best" and unexplained as to

15

where all proceeds went; and while counsel explained that some part was paid two mortgage holders, one holder was offshore entity located in British Virgin Islands or Isle of Man and one of transferor's former directors was also director of holder]; *Fireman's Fund Ins. Co. v Kapralos*, 942 F Supp 836 [ED NY 1996] [order of attachment granted on evidence, among others, that most of money paid to debtor from insurance settlement "found its way into a bank account located in Switzerland"]).

### i. September 2010 escrow agreement

Defendants argue that the September 2010 escrow agreement precludes plaintiff from applying for injunctive relief, and that the escrowed funds, together with accrued interest, were released to TPR by the federal judge who placed no restriction on their use. As plaintiff's claims here are all brought derivatively on behalf of the Orly Trust, defendants assert that she has no rights greater than those of the Trust. And, as all of the money transfers listed by plaintiff were allegedly received by the Sagi Trust or TPR in connection with the sale of the TRI shares, plaintiff violates the escrow agreement with her motion for an attachment. That the escrow was released is of no moment, defendants claim, as it has not yet terminated absent payment to the escrow agent. (*Id.*).

As I indicated at oral argument on the motion, plaintiff has not violated the escrow agreement.

### j. May 2014 TRO

Plaintiff also alleges that in 2014, Sagi and TPR transferred millions of dollars out of TPR after the Trump Group paid it an additional $10.3 million which was deposited into TPR's Citibank account. In the 2010 action, TPR and Sagi were temporarily restrained from

16

transferring any assets to the extent of $10,377,439.47, and on May 21, 2014, the restraint was

extended pending a final decision on plaintiff's motion for an attachment. As plaintiff's claims

were subsequently dismissed on appeal on July 24, 2014, a final decision on her attachment

motion was rendered moot. Notwithstanding the restraint, plaintiff alleges, Sagi transferred $8.7

million from the Citibank account, leaving $963.18 in it, and over the next several weeks, the

account was allegedly used as a pass-through account through which funds were transferred by

wire overseas to unknown accounts, including $2.35 million on June 5, 2014, and $2 million on

June 16. (NYSCEF 1236).

Defendants deny that they violated the May 21, 2014 TRO, as it was not extended beyond

June 4, the date set for hearing plaintiff's application on the papers, and that between May 21 and

June 4, TPR "always maintained cash in excess of $10.3 million," observing that an entry in a

bank statement dated May 23, 2014 and included in plaintiff's papers reflects a transfer between

two domestic TPR accounts, thereby showing that the restrained funds remained within TPR and

in the United States for the requisite period. Moreover, they contend, any funds wired abroad

constituted "mainly money the Sagi Trust had received for selling its own shares," and any TRI-

related payments made by TPR to the Sagi Trust were approved by TPR's "independent" board.

(NYSCEF 1306).

Defendants base their interpretation of the May 21 proceeding on the written order,

ignoring the concern expressed by plaintiff that defendants would dissipate assets pending the

determination. As counsel is undoubtedly aware, temporary restraining orders are automatically

marked "pending the hearing" in the *ex parte* office before they are brought to the assigned

judge. Thus, given the record and my indication that the restraint would extend to the

17

determination of plaintiff's motion, defendants must be deemed to have violated that order, notwithstanding defendants' contentions.

### k.  Overbreadth of proposed order

Sagi and TPR contend that plaintiff fails to show that the drastic remedy of an attachment is necessary absent a "genuine risk" that any judgment entered in her favor will be unenforceable in New York.  Thus, they argue that plaintiff fails to demonstrate, as required by CPLR 6201(1) "a real identifiable risk that [they] will be unable to satisfy" any judgment obtained by her.  They identify "significant assets" including Sagi's $23 million in equity on the Manhattan townhouse, TPR's market value of $5 to 6 million, and $2 million held in escrow on the "Canadian transaction," and their prompt and full satisfaction of the "rare" judgments rendered against them.  They provide no evidence of the actual equity in the townhouse.

Plaintiff alleges that the alleged equity in the Manhattan townhouse, even in combination with the alleged market value of TPR, and the Canadian escrow, is insufficient in terms of the judgment to which they claim entitlement.

Defendants otherwise maintain that the proposed order is overbroad in that it is partly directed at nonparties and at Sagi's spendthrift trusts, and they deny that plaintiff has any damages.  Rather, the allegedly improper UCC auction "at most only harmed D&K Limited Partnership - whose majority owners want nothing to do with this attachment." (*Id.*).

### 6.  Undertaking

While plaintiff, in her order to show cause, was ordered that, upon a final determination that she is not entitled to a temporary restraining order, she would pay to SG defendants all damages and costs which may be sustained by the attachment, it appears that she did not post an

18

undertaking, and must do so now. (CPLR 6212[c]). I find that, given plaintiff's financial condition as well as the amount of money being attached here, an undertaking in the form of a bond of $5,000 per motion, for a total of $10,000, is sufficient. (*See Hume v 1 Prospect Park ALF, LLC*, 137 AD3d 1080 [2d Dept 2016] [$500 bond fixed as undertaking inadequate when court granted order of attachment against defendant's real property in sum of $5 million, and bond thus increased to $2,500]).

### 7.  Conclusion

The totality of this evidence, including badges of fraud emanating from the close relationships among defendants and transferees, some questionable transfers, such as the purchase of the Florida home, transactions which do not appear to have been made in the ordinary course of business, the secrecy of the transfers to unidentified overseas accounts, and Sagi's retention of control of property by the transferor of the conveyance, as well as the cumulative effect and byzantine nature of the transactions, course of conduct during the pendency of other actions, and overall chronology of the events and transactions in question, satisfy plaintiff's burden of proof on the issue of whether the SG defendants intend to frustrate the enforcement of the judgment, and have assigned, disposed of or encumbered or secreted property, or removed it from the state.

Thus, plaintiff has demonstrated that she has a viable cause of action, a probability of success on the merits, that the amount demanded from the defendant exceeds all counterclaims known to the plaintiff, that defendants are nondomiciliaries residing without the state, and that defendants, with intent to frustrate the enforcement of a judgment that might be rendered in plaintiff's favor, has assigned, disposed of, encumbered or secreted property, or removed it from

19

the state or is about to do any of these acts.

### III.  ATTACHMENT OF SAGI'S SPENDTHRIFT TRUST

Pursuant to CPLR 5205(c)(1), property held in trust for a judgment debtor, where the

trust was created by or funds held in trust proceeded from someone other than debtor, is exempt

from attachment, as is "property which a debtor holds in trust for others, even though he has

created the trust . . ." (*Wulff v Roseville Trust Co. of Newark, N.J.*, 164 AD 399 [1st Dept 1914]).

However, a defendant's right or interest to or in property or fund held or controlled by a fiduciary

is subject to attachment. (12 Carmody-Wait 2d § 76:139 [2016]; 30 NY Jur 2d, Creditors' Rights

§109 [2016] [interest in trust is attachable unless property is held by defendant as trustee]; *see*

*Helmsley-Spear, Inc. v Winter*, 101 Misc 2d 17 [Sup Ct, New York County 1979] [interest of

beneficiary of spendthrift trust may be attached]).  In any event, even if a spendthrift trust is

subject to exemption, only future income is exempt, while accrued income due and owing a trust

beneficiary may be attached. (*Pray v Boissevain*, 27 Misc 2d 703 [Sup Ct, New York County

1961]).

Here, as defendants concede that the trust is not controlled by Sagi but by an independent

trustee, and absent any allegation that the trust was created by or its funds proceeded from

someone other than Sagi or that Sagi holds the trust for others, the Sagi Genger spendthrift trust

may be attached. (*See Vanderbilt Credit Corp. v Chase Manhattan Bank, NA*, 100 AD2d 544 [2d

Dept 1984] [where spendthrift trust was created and funded by judgment debtor and debtor was

its beneficiary and someone other than debtor was trustee, trust was not exempt from attachment

by judgment creditor; irrelevant whether debtor in creating trust intended to defraud creditors];

*see also Helsmley-Spear, Inc. v Winter*, 74 AD2d 195 [1st Dept 1980, Fein, J.P., dissenting], *affd*

20

52 NY2d 984 [1981] [purpose of statutes exempting spendthrift trust from attachment is to ensure that beneficiary will not waste money provided for needs, and not to permit beneficiary of pension plan to steal from employer and hide behind exemption statute when employer seeks to recover stolen monies by attaching funds that were originally provided by employer]).

## IV.  ATTACHMENT OF DALIA'S ACCOUNT

At oral argument, Dalia objected to an attachment of an account she denominates as her "Bristol Ivory" account, which she contends consists of an Individual Retirement Account (IRA), which IRA funds were then used to buy interest or stock in Bristol Ivory, LLC.  She claims that the origin of the IRA funds was an IRA owned by Arie which she received as part of their divorce settlement, and that they are exempt from attachment, regardless of whether the IRA funds were then used to buy stock in Bristol.  She submits copies of account statements from "IRA Services," which reflect that her account type is a "traditional IRA" with an identified authorized representative, check book, and that it shows the following:

(1)     A custodial cash account was opened sometime in 2008, and had a zero balance before the following transfers:

(a)     on November 18, 2008, a "rollover from Millenium Trust" in the sum of $699,525.73; and

(b)     on December 5, 2008, another rollover from Millenium Trust in the sum of $830.41;

(2)     On December 9, 2008, shares in Bristol Ivory, LLC were bought in the sum of $700,321.51 and an account was then opened for those shares;

(3)     After other fees were paid and dividends received, as of December 31, 2008, the custodial cash account had a balance of $100.01; and

(4)     On December 31, 2008, the Bristol account had a share balance of $700,321.510.

The statement also reflects that for the tax year of 2007 to 2008, the deposited amount of

21

$700,356.14 constituted "rollovers received from prior plans."

For the tax year 2008-2009, Dalia deposited $45,286.06 as "rollovers received from prior plans," which are not identified, and after receiving distributions from Bristol and a cash dividend, her custodial cash account had an ending balance of $61,307. The Bristol account had no activity that year and its balance remained the same as in 2008.

In tax year 2009-2010, after deposits, dividend payments, and fees, the balance in the custodial cash account was $72,980.43, with the Bristol account unchanged.

By letter dated July 5, 2011, the State of Oregon's Secretary of State Corporation Division advised Bristol Ivory, LLC that it had failed to file its annual report with the appropriate fee, and that a failure to do so by August 20, 2011 would result in the administrative dissolution of Bristol and corporate inactive status. The letter reflects that Bristol's date of organization was June 30, 2008, and that it is a domestic limited liability company.

There are no records for the tax years 2010-2011 or 2012-2013. For tax years 2011-2012, 2013-2014, 2014-2015, and 2015-2016, there was minimal activity in the custodial cash account and none in the Bristol account. As of March 31, 2016, the balance in the custodial cash account was $48,663.82, and the balance in the Bristol account is the same as in 2008.

Plaintiff asserts that there is no evidence of the origins the funds or that they were part of Arie's IRA, and that the funds may not be exempt depending on the nature of Bristol, of which she has no information beyond that Dalia lives in a building named the "Bristol." Plaintiff thus raises the inference that Bristol is somehow personally related to Dalia, and, given Dalia's testimony that she knows little about her own financial affairs and relies on Sagi for advice and direction and permits him to exercise control over her affairs, that it is possible that Sagi is

22

financially involved in Bristol. (*Id.*).

Dalia's bank records do not establish that the approximately $700,000 deposited in her account in 2008 came from Arie's IRA or the connection between her or Arie and the Millenium Trust. Moreover, Dalia does not explain her purchase of shares in Bristol for that approximate amount four days after receiving the second payment from the Trust, and I observe that the Trust was apparently organized six months before the payments were made and in the State of Oregon, rather than in New York. Dalia has thus failed to establish that the funds in these accounts are exempt Trust funds.

V. ATTACHMENT OF NONPARTIES' ASSETS

Sagi's wife Elana, and their five children maintain that as nonparties who were never served with pleadings or with the notice of the order to show cause, and as they are not residents of New York, their accounts were wrongly restrained, as were their out-of-state accounts, and jurisdiction over them was never obtained. They also observe that plaintiff should have been required to post a bond. (NYSCEF 1331).

At oral argument, plaintiff observed that although the Sagi Genger Trust may be a spenthrift trust, Sagi's control of it renders it subject to attachment. Defendants disagreed, relying on the existence of an independent trust who exercises ultimate authority over the trust.

Pursuant to CPLR 6202, any property against which a money judgment may be enforced as provided in section 5201 is subject to attachment. Section 5201 specifies that property against which a money judgment may be enforced is that property which could be assigned or transferred, whether it consists of a present or future right or interest and whether or not it is vested, unless it is exempt from application to the satisfaction of the judgment.

23

It is undisputed that Sagi has an interest in these accounts and that the accounts constitute assignable and transferrable property. Sagi's wife and children complain that their accounts were restrained even though they are nonparties and not residents of New York, and their accounts are located outside of New York. For purposes of an attachment, however, the inquiry is whether the court has jurisdiction over the property sought to be attached, not the person. (*See Hotel 71 Mezz Lender LLC v Falor*, 14 NY3d 303 [2010] [attachment properly granted even though property not located in New York, as attachment operates against property located outside New York as long as court has acquired personal jurisdiction over person against whom attachment is sought]; *see also Koehler v Bank of Bermuda Ltd.*, 12 NY3d 533 [2009] [as New York court may issue judgment ordering turnover of out-of-state assets, if court has personal jurisdiction over garnishee bank, it may order bank to produce property located outside New York]). Thus, jurisdiction over Sagi's wife or children need not be obtained in order to attach out-of-state accounts in which Sagi has an interest. (*Id.*).

To the extent that defendants argue that Sagi has no interest in these bank accounts or that they do not contain defendants' property or interests, it is also undisputed that Sagi funded all of the accounts, whether from his personal funds or from those of the various companies he owns and manages. (*See eg Bd. of Educ. of City of N.Y. v Treyball*, 86 AD2d 639 [2d Dept 1982], *appeal dismissed* 56 NY2d 683 [court properly confirmed order of attachment against bank accounts belonging to defendant's sons, as evidence demonstrated that defendant placed money in bank accounts in sons' names with intent to defraud creditors]).

Moreover, if plaintiff seeks to levy upon the accounts rather than just restrain them, Sagi's wife and children may commence a special proceeding to vacate the attachment and attempt to

24

show that they have a right to funds in the accounts. On such a motion, the court may vacate the

attachment or grant any other appropriate remedy. (CPLR 6221) .

## VI. CONCLUSION

Accordingly, based on the foregoing, it is hereby

ORDERED, that plaintiff's motions seeking orders of attachment (motion sequence

numbers 57 and 58) is granted, on condition that, within 20 days of the date of this order,

plaintiff submit and file a bond in the sum of $10,000 as an undertaking.

ENTER:

Barbara Jaffe, JSC

Dated:       September 9, 2016
             New York, New York

25

STATE OF NEW YORK
SURROGATE'S COURT:  COUNTY OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - x
In the Matter of the Application of
ORLY GENGER, as a person interested, for the
removal of DALIA GENGER as Trustee of the
Orly Genger 1993 Trust pursuant to SCPA §711(11)
- - - - - - - - - - - - - - - - - - - - - - - - - x

ANSWER OF DALIA GENGER
TO THIRD AMENDED PETITION

File No. 0017/2009

## ANSWER

Respondent Dalia Genger, by her attorneys, answers the Third Amended Petition (the "Petition") as follows:

1. Denies.

2. Admits, except deny knowledge or information as to specific date of appointment.

3. Refers to the Orly Trust Agreement for the true and correct contents thereof, and otherwise denies the first sentence.  Admit the second and third sentences.

4. Paragraph 4 states a legal request to which no response is warranted.

5. Admits that Dalia is Petitioner's mother and the sole Trustee of the Orly Trust, and denies the remaining allegations.

6. Denies.

7. Denies.

8. Denies.

9. Denies.

10. Denies.

11. Denies.

12. Denies.

13. Denies.

14.     Admits the first two sentences.  Denies knowledge or information as to the third sentence.

15.     Denies the first four sentences.  Denies knowledge or information as to the fifth sentence.

16.     Admits.

17.     Denies.  Avers that Petitioner has previously admitted that "the Note was always intended to be repaid by the family."

18.     Refers to the referenced Note and Pledge Agreement for the true and correct contents thereof, and otherwise denies the allegations.

19.     Denies knowledge or information.

20.     Admits the first sentence.  Denies the second sentence.

21.     Admits the first sentence.  Denies knowledge or information as to the second sentence.

22.     Refers to the referenced Settlement Agreement for the true and correct contents thereof, and otherwise denies the allegations.

23.     Admits the first four sentences.  Avers that the last sentence states a legal conclusion to which no response is warranted.  Refers to the referenced Agreement, and otherwise denies the allegations.

24.     Refers to the referenced Shareholders Agreement for the true and correct contents thereof, and otherwise denies the allegations.

25.     Denies.

26.     Denies.

27.     Refers to the referenced Resolution for the true and correct contents thereof, and otherwise denies the allegations.

28.     Denies.

29.     Refers to the referenced Memorandum for the true and correct contents thereof, and otherwise denies the allegations.

30.     Refers to the referenced Memorandum for the true and correct contents thereof, and otherwise denies the allegations.

31.     Refers to the referenced Arbitration transcript for the true and correct contents thereof, and otherwise denies the allegations.

32.     Refers to the referenced Arbitration transcript for the true and correct contents thereof, and otherwise denies the allegations.

33.     Refers to the referenced Memorandum for the true and correct contents thereof, and otherwise denies the allegations.

34.     Refers to the referenced Arbitration Award for the true and correct contents thereof, and otherwise denies the allegations.

35.     Denies.

36.     Refers to the referenced Agreement for the true and correct contents thereof, and otherwise denies the allegations.

37.     Refers to the referenced Agreement for the true and correct contents thereof, and otherwise denies the allegations.

38.     Denies.

39.     Denies knowledge or information as to the first sentence.  Denies the remaining allegations.

40.     Denies.

41.     Refers to the referenced Application for the true and correct contents thereof, and otherwise denies the allegations.

42.     Refers to the referenced Court decision for the true and correct contents thereof, and otherwise denies the allegations.

43.     Denies.

44.     Denies.

45.     Denies.

46.     Refers to the referenced Letter for the true and correct contents thereof, and otherwise denies the allegations.

47.     Denies.

48.     Refers to the referenced Agreement for the true and correct contents thereof, and otherwise denies the allegations.

49.     Refers to the referenced Agreement for the true and correct contents thereof, and otherwise denies the allegations.

50.     Denies.

51.     Admits the first sentence.  Denies knowledge or information as to the remaining allegations.

52.     Refers to the referenced Letter for the true and correct contents thereof, and otherwise denies the allegations.

53.     Denies.

54.     Refers to the Court records for the true and correct contents thereof, and otherwise denies the allegations.

55.     Refers to the referenced Court decision for the true and correct contents thereof, and otherwise denies the allegations.

56.     Refers to the referenced Demand for the true and correct contents thereof, and otherwise denies the allegations.

57.     Refers to the referenced Letter for the true and correct contents thereof, and otherwise denies the allegations.

58.     Denies, and refers to Justice Feinman's decision construing the Arbitration Award.

59.     Denies.

60.     Denies.

61.     Denies.

62.     Denies.

63.     Denies.

64.     Denies.

65.     Denies.

66.     Refers to the referenced Complaint for the true and correct contents thereof, and otherwise denies the allegations.

67.     Refers to the referenced Petition for the true and correct contents thereof, and otherwise denies the allegations.

68.     Refers to the referenced Court order for the true and correct contents thereof, and otherwise denies the allegations.

69.     Refers to the referenced Court transcript for the true and correct contents thereof, and otherwise denies the allegations.

70.     Refers to the referenced Court order for the true and correct contents thereof, and otherwise denies the allegations.

71.     Refers to the referenced Petition for the true and correct contents thereof, and otherwise denies the allegations.

72.     Refers to the referenced Court order for the true and correct contents thereof, and otherwise denies the allegations.

73.     Refers to the referenced Court order for the true and correct contents thereof, and otherwise denies the allegations.

74.     Denies.

75.     Denies.

76.     Denies.

77.     Denies.

78.     Denies.

79.     Refers to the referenced Promissory Note for the true and correct contents thereof, and otherwise denies the allegations.

80.     Denies.

81.     Refers to the referenced Promissory Note for the true and correct contents thereof, and otherwise denies the allegations.

82.     Refers to the referenced Promissory Note for the true and correct contents thereof, and otherwise denies the allegations.

83.     Refers to the referenced Forbearance Agreement for the true and correct contents thereof, and otherwise denies the allegations.

84.     Denies.

85.   Admits that the parties endeavored to settle the referenced New York TPR Action, and otherwise denies the allegations.

86.   Denies.

87.   Refers to the referenced Settlement Agreement for the true and correct contents thereof, and otherwise denies the allegations.

88.   Refers to the referenced Settlement Agreement for the true and correct contents thereof, and otherwise denies the allegations.

89.   Refers to the referenced Settlement Agreement for the true and correct contents thereof, and otherwise denies the allegations.

90.   Denies.

91.   Denies.

92.   Denies.

93.   Denies.

94.   Denies.

95.   Denies.

96.   Denies that Mr. Isaacson is not acquainted with any members of the Genger family, and denied knowledge or information as the balance of the allegations.

<u>AFFIRMATIVE DEFENSES</u>

1.      The claims are barred by Petitioner's unclean hands and culpable conduct.

2.      The claims are time-barred.

3.      The claims are barred by findings made by other courts, and by the doctrines of

*res judicata*, collateral estoppel, and judicial estoppel.

4.      The claims are barred by illegality and public policy.

5.      The claims are barred by the statute of frauds and parol evidence rule.

Dated: New City, New York
       July 28, 2018

                              LAW OFFICES OF
                              JUDITH LISA BACHMAN, ESQ.


                              By: _____
                                     Judith Lisa Bachman, Esq.
                              254 S. Main Street
                              Suite 406
                              New City, New York 10017
                              (845) 639-3210
                              *Counsel to Respondent Dalia Genger*

<u>VERIFICATION</u>

STATE OF NEW YORK     )
                         ss.:
COUNTY OF ROCKLAND   )

      Pursuant to CPLR 3020(d)(3) and SCPA § 303, JUDITH L. BACHMAN, being duly sworn, deposes and says:

      1.   I am counsel to Respondent Dalia Genger in this matter.

      2.   This verification is made by me and not by Respondent Dalia Genger because such

           Respondent is located outside the County where my office is located.

      3.   I have read this Answer of Dalia Genegr to Third Amended Petition and, upon

           information and belief, believe the contents thereof to be true.

                                     _____
                                       JUDITH L. BACHMAN

Sworn to before me this
28 day of July, 2017

_____
Notary Public

          YANIRIS CASTILLO
    NOTARY PUBLIC-STATE OF NEW YORK
          No. 01CA6248212
      Qualified in Rockland County
   My Commission Expires 09-19-2019



| | |
|---|---|
| **GRANTED** | |

**IN THE COURT OF CHANCERY FOR THE STATE OF DELAWARE**

DALIA GENGER, as Trustee of the            :
Orly Genger 1993 Trust,                     :
                                            :
        Plaintiff,             :
    v.                             :
                                            :
TR INVESTORS, LLC, GLENCLOVA               :
INVESTMENT CO., NEW TR EQUITY I,           :
LLC, NEW TR EQUITY II, LLC,                :
TRANS-RESOURCES, INC., and                 :
TPR INVESTMENT ASSOCIATES, INC.            :
                                            :
        Defendants.            :

                              C.A. No. 6906-CS

TR INVESTORS, LLC, GLENCLOVA               :
INVESTMENT CO., NEW TR EQUITY I,           :
LLC, NEW TR EQUITY II, LLC, and            :
TRANS-RESOURCES, INC.,                     :
                                            :
        Counterclaim and Crossclaim  :
        Plaintiffs,            :
    v.                             :
                                            :
DALIA GENGER, as Trustee of the            :
Orly Genger 1993 Trust,                     :
                                            :
        Counterclaim Defendant,    :
                                            :
    and                            :
                                            :
TPR INVESTMENT ASSOCIATES, INC.,           :
                                            :
        Crossclaim Defendant       :


TPR INVESTMENT ASSOCIATES, INC.,           :
        Counterclaim and Crossclaim  :
        Plaintiff,             :
                                            :

v.                                        :
                                          :
DALIA GENGER, as Trustee of the           :
Orly Genger 1993 Trust,                   :
                                          :
              Counterclaim Defendant,     :
                                          :
       and                                :
                                          :
TR INVESTORS, LLC, GLENCLOVA             :
INVESTMENT CO., NEW TR EQUITY I,          :
LLC, NEW TR EQUITY II, LLC, and           :
TRANS-RESOURCES, INC.,                    :
                                          :
              Crossclaim Defendant        :

---

## STIPULATION AND PROPOSED ORDER OF DISMISSAL

Plaintiff/Counterclaim Defendant Dalia Genger, as Trustee of the Orly Genger 1993 Trust (the "Trustee of the Orly Trust"), Defendants/Counterclaim and Crossclaim Plaintiffs/Crossclaim Defendants TR Investors, LLC, Glenclova Investment Co., New TR Equity I, LLC, New TR Equity II, LLC and Trans-Resources, Inc. (collectively, the "Trump Group") and Defendant/Counterclaim and Crossclaim Plaintiff/Crossclaim Defendant TPR Investment Associates, Inc. ("TPR"), through the undersigned counsel, pursuant to Chancery Court Rules 41(a)(1)(ii) and 41(1)(c), hereby stipulate and agree as follows:

1. In the action styled *TR Investors, LLC, et al. v. Genger*, C.A. No. 3994-CS (the "3994 Action"), the Court found that (i) the transfers in October 2004 of Trans-Resources, Inc. ("Trans-Resources) stock out of TPR were in violation of the March 2001 Stockholders Agreement among Trans-Resources, TPR, TR Investors, LLC and Glenclova Investment Co., (ii) the transfers were void and the

stock reverted to TPR, and (iii) the Trump Group had the right to buy all of the improperly transferred Trans-Resources stock from TPR. These determinations and findings were essential to the Court's determinations and findings in the 3994 Action.

2. The Trump Group, having closed on the purchase of the so-called Orly Trust Shares (representing 1102.8 shares of Trans-Resources stock) pursuant to and under the terms of the Side Letter Agreement between TPR and the Trump Group entered into in August 2008, as was the Trump Group's right under that agreement, owns, for all purposes, all right, title and interest (beneficially, of record and otherwise) to the shares of Trans-Resources purportedly transferred by TPR to the Orly Genger 1993 Trust. As a result, the Trump Group owns, for all purposes, all right, title and interest (beneficially, of record and otherwise) to all authorized and issued shares of Trans-Resources.[1]

3. The $10,314,005 plus accrued interest in proceeds from the sale referenced in paragraph 2 above currently held in escrow (the "Sale Proceeds") shall remain in escrow, pursuant to that Escrow Agreement between and among all of the parties hereto, Orly Genger, as beneficiary of the Orly Trust, and Pedowitz & Meister LLP, as escrow agent, until such time as a court in New York shall direct the disposition of the Sale Proceeds, or as the parties to such Escrow Agreement shall otherwise jointly agree, provided that the escrow agent may interplead the Sale

---

[1] This amount equals 5,676.4428 Trans-Resources shares and includes all of the shares that were determined to be owned by the Trump Group in the 3994 Action, in the action captioned *TR Investors v. Genger*, C.A. No. 6697-CS (Del. Ch.) and that are the subject of the above-captioned litigation.

Proceeds into a court in New York at any time.   Upon the so-ordering of paragraphs 1-2 above concerning beneficial ownership, the Trump Group shall disclaim any and all claims to the Sale Proceeds and any and all rights under the Escrow Agreement.   Nothing herein shall constitute an adjudication of any claim for monetary damages pending in any other Court.

4.  The claims brought on behalf of the Orly Genger 1993 Trust by the Trustee of the Orly Trust against the Trump Group are dismissed with prejudice and the claims brought by the Trump Group against the Orly Trust and TPR are dismissed with prejudice.

5.  The claims brought by TPR for the Sale Proceeds against the Trustee of the Orly Trust and the Trump Group have already been dismissed without prejudice.

6. Each party shall bear its own costs.

/s/ Thomas J. Allingham
Thomas J. Allingham II (I.D. No. 476)
Anthony W. Clark (I.D. No. 2015)
Douglas D. Herrmann (I.D. No. 4872)
Amy C. Huffman (I.D. No. 5022)
SKADDEN, ARPS, SLATE,
    MEAGHER & FLOM LLP
One Rodney Square
P.O. Box 636
Wilmington, Delaware  19899-0636
(302) 651-3000

*Attorneys for TR Investors, LLC, Glenclova
Investment Co., New TR Equity I, LLC,
New TR Equity II, LLC, and Trans-
Resources, Inc.*

/s/ Jeremy D. Anderson
Jeremy D. Anderson (I.D. No. 4515)
Joseph B. Warden (I.D. No. 5401)
FISH & RICHARDSON P.C.
222 Delaware Avenue, 17th Floor
P.O. Box 1114
Wilmington, Delaware  19899

*Attorneys for Dalia Genger, as Trustee of
the Orly Genger 1993 Trust*

/s/ Colm F. Connolly
Colm F. Connolly (I.D. No. 3151)
Amy M. Dudash (#5741)
MORGAN, LEWIS & BOCKIUS LLP
The Nemours Building
1007 North Orange Street
Suite 501
Wilmington, Delaware 19801
(302) 574-3000

*Attorneys for TPR Investment Associates,
Inc.*

IT IS SO ORDERED this _____ day of _____, 2013.

_____
Chancellor Leo E. Strine, Jr.

**This document constitutes a ruling of the court and should be treated as such.**

|  |  |
|---|---|
| **Court:** | DE Court of Chancery Civil Action |
| **Judge:** | Leo E Strine |
| **File & Serve Transaction ID:** | 53943155 |
| **Current Date:** | Aug 30, 2013 |
| **Case Number:** | 6906-CS |
| **Case Name:** | Genger, Dalia vs T R Investors LLC |
| **Court Authorizer:** | Strine, Leo E |

/s/ Judge Strine, Leo E

*To Be Argued By*:
JUDITH BACHMAN

New York County Clerk's Index No. 651089/10

# New York Supreme Court

## APPELLATE DIVISION—FIRST DEPARTMENT

ARIE GENGER and ORLY GENGER, in her individual capacity
and on behalf of THE ORLY GENGER 1993 TRUST,

*Plaintiffs-Respondents,*

—against—

SAGI GENGER, TPR INVESTMENT ASSOCIATES, INC., THE SAGI GENGER 1993
TRUST, ROCHELLE FANG, individually and as trustee of THE SAGI GENGER 1993
TRUST, GLENCLOVA INVESTMENT COMPANY, TR INVESTORS, LLC, NEW TR
EQUITY I, LLC, NEW TR EQUITY II, LLC, JULES TRUMP, EDDIE TRUMP and
MARK HIRSCH,

*Defendants-Respondents,*

DALIA GENGER,

*Defendant-Appellant.*

*(Caption continued on inside cover)*

## BRIEF FOR DEFENDANT-APPELLANT

JUDITH BACHMAN
LAW OFFICES OF JUDITH BACHMAN
254 S. Main Street, Suite 306
New City, New York 10956
(845) 639-3210
jlbesq_99@yahoo.com

*Attorneys for Dalia Genger*

REPRODUCED ON RECYCLED PAPER

SAGI GENGER, individually and as assignee of
THE SAGI GENGER 1993 TRUST, and TPR INVESTMENT ASSOCIATES, INC.,

*Cross-Claimants, Counterclaimants, and Third-Party Claimants-Respondents,*

—against—

ARIE GENGER, ORLY GENGER, GLENCLOVA INVESTMENT COMPANY, TR
INVESTORS, LLC, NEW TR EQUITY I, LLC, NEW TR EQUITY II, LLC, JULES
TRUMP, EDDIE TRUMP, MARK HIRSCH, TRANS-RESOURCES, INC., WILLIAM
DOWD, and THE ORLY GENGER 1993 TRUST,

*Cross-Claim, Counterclaim and/or Third-Party Defendants-Respondents.*

**TABLE OF CONTENTS**

PAGE

TABLE OF AUTHORITIES ................................................... ii

QUESTION PRESENTED ................................................... 1

STATEMENT OF FACTS AND NATURE OF CASE ................... 1

ARGUMENT ................................................................. 4

    IT WAS ERROR FOR AN IAS COURT WITH INCOMPLETE
    INFORMATION AND NO BASIS TO DISMISS LIVE CLAIMS
    WITH PREJUDICE WHICH DISMISSAL CONTRADICTED
    A PRIOR ORDER AND A PENDING MOTION................... 4

CONCLUSION ............................................................... 7

i

# TABLE OF AUTHORITIES

PAGE(S)

## Cases

James v. Bernhard,
  106 A.D.3d 435, 965 N.Y.S.2d 56 (1st Dep't 2013) ................. 3

Kaiser v. J & S Realty, Inc.,
  173 A.D.2d 920 (3d Dep't 1991)..................................... 5

People v. Evans,
  94 N.Y.2d 499 (2000)................................................. 6

People v. Putziger,
  22 A.D.2d 821 (2d Dep't 1964) ...................................... 5

Samuels v. Consol. Edison Co. of N.Y.,
  96 A.D.3d 685 (1st Dep't 2012)...................................... 5

QUESTION PRESENTED

1. When an IAS Court has incomplete information and no basis, may it issue
   an Order dismissing live claims with prejudice based on a one-paragraph
   letter which contradicts a prior order of the IAS Court as well as a pending
   motion? The IAS Court answered yes.

STATEMENT OF FACTS AND NATURE OF CASE

In 2010, plaintiff Arie Genger and his daughter, co-plaintiff Orly Genger
("Orly") (collectively, "Plaintiffs"), commenced this action against, among other
defendants, those collectively known as the "Trump Group". (R. 134). Orly
brought her claims in this action both in her individual capacity and on behalf of
the Orly Genger 1993 Trust ("Orly Trust") (collectively, the "Orly Individual and
Orly Trust Claims"). (R. 134). Dalia Genger ("Dalia") is the trustee of the Orly
Trust. (R. 134). In 2013, the action was assigned to Justice Barbara Jaffe of the
Supreme Court, New York County (the "IAS Court").

On January 2, 2013, the IAS Court dismissed some, but not all, of the Orly
Individual and Orly Trust Claims against the Trump Group. The IAS Court found
that certain of those claims stated a viable cause of action, including ones for
aiding and abetting breach of fiduciary duty and unjust enrichment (collectively,
the "Remaining Claims"). That partial dismissal was set forth in an Amended
Decision and Order of the IAS Court ("January Order"). (R. 10).

1

The Trump Group filed a notice of appeal from the January Order but never perfected that appeal. Instead, in June 2013, the Trump Group entered into a settlement with Plaintiffs ("Settlement"). (R. 288). Plaintiffs refused to share the terms of the Settlement with Dalia or anyone else. (R. 288). Instead, they filed a proposed Second Amended Stipulation of Discontinuance with Prejudice in which each of the settling parties initialed and scratched out (from a prior Stipulation) the words "on behalf of" before the words "the Orly Genger 1993 Trust" and replaced them with the words "as beneficiary of" – thereby making clear that the parties were only discontinuing the claims that Orly had brought against the Trump Group individually and as a trust beneficiary, but not any of the claims she had brought on behalf of the Orly Trust. The IAS Court "so-ordered" the Stipulation. (R. 288).

Consistent with the Second Amended Stipulation of Discontinuance, for the next year, in multiple submissions, Orly's attorneys represented to the IAS Court that her Settlement with the Trump Group "only dismisses Orly's individual claims against the Trump Group, but does not resolve or dismiss any claims of the Orly Trust against the Trump Group". (R. 61). Orly's attorneys further represented that the Settlement (which they still declined to share) left Dalia Genger, as Trustee of the Orly Trust, free to "pick up the cudgel if she so [chose]" to prosecute the Remaining Claims. Id. (emphasis added). The Trump Group did not notify the Court that they took issue with Orly's characterizations.

2

With that representation, and following certain other rulings from the IAS Court which further crystallized the issue, in August 2014, Dalia moved, in part, to be substituted for Orly on behalf of the Orly Trust ("Substitution Motion") against the Trump Group to "pick up the cudgel" and use that cudgel to prosecute some or all of the Remaining Claims on behalf of the Orly Trust. (R. 52).[1]

Plaintiffs thereafter sought multiple extensions of their time to respond to the Substitution Motion, the last of which Dalia's objected but the IAS Court granted over that objection. Before they had even submitted any oppositions to the Substitution Motion, Plaintiffs' submitted a one paragraph letter requesting that the IAS Court enter a proposed order of dismissal and severance: (1) dismissing all of Plaintiffs' claims (necessarily including the never-dismissed Remaining Claims) and (2) severing the cross-claims, counterclaims and third-party claims of another party (the "Letter"). (R. 48).

Upon receipt of the Letter, Dalia's counsel objected to the entry of the proposed order of dismissal and severance because of Dalia's pending Substitution Motion which sought, inter alia, to prosecute the Remaining Claims. (R. 51). Without any meaningful, let alone complete, information in the form of papers, motion, hearing, or argument, however, the IAS Court entered the Order of

---

[1]     Such substitution is appropriate, and indeed necessary, when a derivative plaintiff, like Orly Genger, is no longer an appropriate representative plaintiff. James v. Bernhard, 106 A.D.3d 435, 965 N.Y.S.2d 56 (1st Dep't 2013).

dismissal and severance dated November 3, 2014 and entered November 25, 2014 (Jaffe, J.) (the "Order") that purportedly dismissed the Remaining Claims. That Order contradicted the IAS Court's own January Order leaving the Remaining Claims and ignored the pending Substitution Motion seeking, <u>inter alia</u>, to prosecute the Remaining Claims (R. 10).

Appellant, Dalia Genger , Trustee of the Orly Trust, now appeals that Order because it purportedly dismisses the Remaining Claims in contravention of the January Order and the Substitution Motion.

After entry of the Order and filing to the Notice of Appeal of it, the parties completed briefing on the Substitution Motion. (R. 144 - 545). The Appellees cited the Order as justification for the denial of the Substitution Motion claiming that the IAS Court had dismissed the Remaining Claims. (R. 290). After argument, the IAS Court held the Substitution Motion in abeyance until the Surrogate's Court determined whether Dalia should remain as trustee. (R. 579).

ARGUMENT

IT WAS ERROR FOR AN IAS COURT
WITH INCOMPLETE INFORMATION AND NO BASIS
TO DISMISS LIVE CLAIMS WITH PREJUDICE
WHICH DISMISSAL CONTRADICTED A PRIOR ORDER
AND A PENDING MOTION

When an order, such as the one at bar, is issued without complete information provided in the form of papers, motion, hearing or argument, it should

4

be reversed.  E.g., Samuels v. Consol. Edison Co. of N.Y., 96 A.D.3d 685 (1st Dep't 2012).  Without the submission of complete information in support of an application, a court cannot grant an order.  Kaiser v. J & S Realty, Inc., 173 A.D.2d 920 (3d Dep't 1991); People v. Putziger, 22 A.D.2d 821 (2d Dep't 1964).

Thus for instance in Kaiser v. J & S Realty, Inc., 173 A.D.2d 920 (3d Dep't 1991), the Third Department reversed an order issued on an oral motion because the movant had failed to present affidavits or other competent evidence in support of its factual assertions.  The court reasoned:

> Here, it appears that defendant made no evidentiary showing. In any event, the record on appeal, stipulated to by defendant, contains no affidavits, sworn testimony or other competent evidence in support of defendant's motion to vacate the default judgment. As such, Supreme Court's determination may not be sustained.

Likewise in People v. Putziger, 22 A.D.2d 821 (2d Dep't 1964), the Second Department held that "it was error for the trial court to enter an order without a hearing and without a judicial determination on the issues of fact and law raised by the petition and return."

Here too, the Order must be reversed because "it was error for the [IAS Court] to enter an [O]rder without a hearing and without a judicial determination on the issues of fact and law raised . . . ."

The IAS Court entered the Order in response to the one-paragraph Letter. Plaintiffs submitted no papers, motion, affidavits, sworn testimony or other competent evidence justifying the request for the Order purportedly dismissing the Remaining Claims, nor were any of the other parties afforded the opportunity to oppose entry of the Order through their own submissions.

Among other things, the IAS Court had no information, papers, motion or hearing on the interplay between the requested Order and the January Order. Nor did the IAS Court have any information, papers, motion or hearing on the interplay between the requested Order and the Substitution Motion. In fact, the Substitution Motion had not been fully briefed, heard or decided, at the time the Order was entered. The IAS Court had woefully incomplete information before it – merely a one-paragraph Letter and nothing else – when it entered the Order.

Even assuming arguendo that the Court did have complete information about the Order, it was error to enter the Order dismissing the Remaining Claims. There was no basis to dismiss the Remaining Claims. That purported dismissal was in direct contravention of the January Order which determined the Remaining Claims to be viable, which ruling remained the law of the case. See, People v. Evans, 94 N.Y.2d 499, 503 (2000) (holding that law of the case doctrine "expresses the practice of courts generally to refuse to reopen what has been decided") (quoting Messenger v. Anderson, 225 U.S. 436, 444 (1912)). Additionally, the Order was

6

issued notwithstanding the pendency of the Substitution Motion which sought to

prosecute the Remaining Claims.

## CONCLUSION

Because the IAS Court had incomplete information and no basis to issue the

Order, the Order must be reversed.

Dated:  November 6, 2015
        New City, New York

                                        _____/s/_____
                                        Judith Lisa Bachman, Esq.
                                        Attorney for Appellant, Dalia Genger
                                        254 South Main Street, Suite 306
                                        New City, New York 10956
                                        845-639-3210

7

## PRINTING SPECIFICATION STATEMENT

This computer generated brief was prepared using a proportionally spaced typeface.

Name of typeface: Times New Roman

Point size: 14 Points

Line spacing: Double

The total number of words in the brief, inclusive of point headings and footnotes and exclusive of pages containing the table of contents, table of authorities, proof of service, printing specification statement, or any authorized addendum is 1,472.

FILED: NEW YORK COUNTY CLERK 12/15/2014 04:35 PM        INDEX NO. 651089/2010
NYSCEF DOC. NO. 1156                                    RECEIVED NYSCEF: 12/15/2014

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
------------------------------------------------------------------x
ARIE GENGER and ORLY GENGER, in her            :
individual capacity and on behalf of
THE ORLY GENGER 1993 TRUST,                    :        Index No. 651089/2010
                                                        (Jaffe, B. JSC)
                                               :
                    Plaintiffs,                :

                                               :

                    -against-                  :

SAGI GENGER, TPR INVESTMENT                     :
ASSOCIATES, INC., DALIA GENGER, THE
SAGI GENGER 1993 TRUST, ROCHELLE               :
FANG, individually and as trustee of THE SAGI
GENGER 1993 TRUST, GLENCLOVA                    :
INVESTMENT COMPANY, TR INVESTORS,
LLC, NEW TR EQUITY I, LLC, NEW TR              :
EQUITY II, LLC, JULES TRUMP, EDDIE
TRUMP AND MARK HIRSCH,                          :

                    Defendants.
------------------------------------------------------------------x
SAGI GENGER, individually and as assignee of   :        PREARGUMENT STATEMENT
THE SAGI GENGER 1993 TRUST, and TPR
INVESTMENT ASSOCIATES, INC.                     :

         Cross-Claimants, Counterclaimants, and :
         Third-Party Claimants,
                                               :

                    -against-                  :

                                               :

ARIE GENGER, ORLY GENGER,                       :
GLENCLOVA INVESTMENT COMPANY,
TR INVESTORS, LLC, NEW TR EQUITY I, LLC,       :
NEW TR EQUITY II, LLC, JULES TRUMP,
EDDIE TRUMP, MARK HIRSCH,                       :
TRANS-RESOURCES, INC., WILLIAM
DOWD, and THE ORLY GENGER 1993 TRUST,          :

                                               :

         Cross-Claim, Counterclaim and/or
         Third-Party Defendants.               :
------------------------------------------------------------------x

1.  TITLE OF ACTION:    As set forth in caption.

2.  FULL NAMES OF     The original parties are as set forth in the
    ORIGINAL PARTIES AND  caption above.
    ANY CHANGE IN PARTIES

3.  NAME OF COUNSEL FOR  Judith Bachman, Esq.
    DEFENDANT- APPELLANT  254 S. Main Street, Suite 306
    DALIA GENGER     New City, New York 10956
                845-639-3210

4.  NAME OF COUNSEL FOR
    PLAINTIFF-RESPONDENTS

           Yoav M. Griver, Esq.
           Bryan D. Leinbach, Esq.
           ZEICHNER ELLMAN & KRAUSE LLP
           575 Lexington Avenue
           New York, New York 10022
           212-223-0400
           Attorneys for Orly Genger

           William Wachtel, Esq.
           Elliot Silverman, Esq.
           WACHTEL MASYR & MISSRY LLP
           One Dag Hammarskjold Plaza
           885 Second Avenue
           New York, New York 10017
           212-909-9595
           Attorneys for Orly Genger

           Lauren J. Wachtler, Esq.
           Paul D. Montclare, Esq.
           MITCHELL SILBERBERG & KNUPP LLP
           12 East 49th Street
           New York, New York 10017
           212-509-3900
           Attorney for Arie Genger

5.  NAME OF COUNSEL FOR
    DEFENDANT-RESPONDENTS

           John Dellaportas
           Morgan, Lewis & Bockius LLP
           101 Park Avenue
           New York, NY 10178-0060

212-309-6690
Attorneys for Defendants Sagi Genger,
The Sagi Genger 1993 Trust, and
TPR Investment Associates, Inc

Douglas Herrmann
William P. Frank
John Boyle
SKADDEN, ARPS, SLATE, MEAGHER &
FLOM LLP
Four Times Square
New York, New York 10036
(212) 735-3000
Attorneys for Defendants Glenclova
Investment Co., TR Investors, LLC, New
TR Equity I, LLC, New TR Equity II, LLC,
Jules Trump, Eddie Trump, Mark Hirsch
and Trans-Resources, Inc.

Brian T. Stapleton
GOLDBERG SEGALLA
11 Martine Avenue, Suite 1700
White Plains, New York 10606
(914) 79805470
Attorneys for Third-Party Defendant William Dowd

Ira Tokayer, Esq.
The Chrysler Building
405 Lexington Avenue, 7th Floor
New York 10174
(212) 695-5250
Attorney for Rochelle Fang

6.  COURT AND COUNTY        SUPREME COURT, NEW YORK COUNTY
    FROM WHICH APPEAL       (Barbara Jaffe, J.S.C.)
    IS TAKEN

7.  THE NATURE AND OBJECT
    OF THE CAUSE OF ACTION:

                            By her pending motion Dalia Genger, as trustee,
                            sought an order substituting her as plaintiff on Orly
                            Genger's Trump Group claims and for an order

pursuant to CPLR 2701 directing that the Trump Group settlement fund be paid into Court.

The Plaintiffs sought an order dismissing certain claims including those for which Dalia Genger sought to be substituted while the motion for substitution was pending

Dalia Genger objected to the issuance of the order while the substitution motion was still pending

8. RESULT REACHED IN THE COURT BELOW:

The IAS Court issued the order requested by Plaintiffs' dismissing certain claims including those for which Dalia Genger sought to be substituted while the motion for substitution was pending

9. GROUNDS FOR SEEKING REVERSAL:

The Court erred in issuing the order requested by Plaintiffs' dismissing certain claims including those for which Dalia Genger sought to be substituted while the motion for substitution was pending

10. RELATED ACTIONS:

Orly Genger et al. v. Dalia Genger et al., Index No. 109749/2009.  Pending

Orly Genger v. Sagi Genger, Index No. 100697/2008.  Pending

In the Matter of the Application of Orly Genger, as a person interested, for the removal of Dalia Genger, as Trustee of the Orly Genger Trust, File No. 0017/2008 N.Y. Surr. Ct. (Anderson, N. Surrogate. Pending.

Dalia Genger, et al. v. TR Investors LLC, C.A. No. 6906-CS Del. Chan. Ct., Stayed

11. OTHER APPEALS:

None pending by Dalia Genger.

**ATTORNEY'S CERTIFICATION**

The undersigned hereby certifies that, to the best of the undersigned's knowledge, information

and belief, formed after a reasonable inquiry under the circumstances, the Presentation of the

within PRE-ARGUMENT STATEMENT or the contentions contained herein is/are not frivolous

as defined in 22 NYCRR § 130-1.1

Dated:  December 15, 2014
      New City, New York

                                      /s/
                              Judith Lisa Bachman, Esq.
                              Attorney for Dalia Genger
                              254 South Main Street, Suite 306
                              New City, New York 10956
                              845-639-3210

## SETTLEMENT AGREEMENT AND RELEASE

This settlement agreement and release (this "Agreement") is entered into as of June 16, 2013, by and between Arie Genger and Orly Genger (in her individual capacity and in her capacity as beneficiary of the Orly Genger 1993 Trust), Arnold Broser, David Broser, (in their individual capacity and on behalf of all entities managed, owned or controlled in any way by Arnold Broser or David Broser and which are in any way related to the subject matter hereof ("Broser Entities" and collectively with Arie Genger and Orly Genger in all capacities referenced above, the "AG Group"), and TR Investors, LLC ("TR Investors"), Glenclova Investment Co. ("Glenclova"), New TR Equity I, LLC ("New TR I"), New TR Equity II, LLC ("New TR II" and, together with TR Investors, Glenclova and New TR I, the "Trump Entities"), Trans-Resources, LLC (the successor to Trans-Resources, Inc. and together with its predecessor entities referred to herein as, "Trans-Resources"), Jules Trump, Eddie Trump and Mark Hirsch (collectively, with the Trump Entities and Trans-Resources, the "Trump Group"). The members of the AG Group and the Trump Group are each referred to herein individually as a "Party" and together as the "Parties".

WHEREAS, in March 2001, TR Investors, Glenclova, Trans-Resources and TPR Investment Associates, Inc. ("TPR") entered into a stockholders agreement with respect the common stock of Trans-Resources (the "Stockholders Agreement");

1

WHEREAS, since August 2008, Arie Genger, Orly Genger, the Trump Group and others have been engaged in various litigations (described below) concerning the ownership and control of Trans-Resources; and

WHEREAS, the Parties wish to resolve all issues, disputes and disagreements between them, including but not limited to the issue of ownership of all Trans-Resources shares;

NOW, THEREFORE, in consideration of the promises and representations contained herein and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties, intending to be legally bound, hereby agree as follows:

1.      **Recitals.**      The above recitals are incorporated into and made a part of this Agreement and are binding on all Parties hereto.

2.      **Initial Consideration from the Trump Group.**      Upon dismissal with prejudice of the claims, counterclaims, cross-claims, third-party claims, issues and matters as provided in Paragraph 4 below, the Trump Group shall promptly:

(a)      release all claims they may have to the (i) $7,428,994.00 plus interest held by Skadden, Arps, Slate, Meagher & Flom LLP as escrow agent (the "Skadden Escrow") and (ii) $10,314,005.00 plus interest held by with Pedowitz & Meister as escrow agent (the "P&M Escrow");

(b)      pay to Wachtel, Masyr & Missry, LLP as attorneys for the AG Group ("Wachtel") an amount in cash equal to $35,000,000.00 minus (i) the amount held in the Skadden Escrow, and (ii) the amount held in the P&M Escrow.

2

3.     **Further Consideration from the Trump Group.**  Trans-Resources on behalf of the Trump Group shall pay: (i) $7,500,000 to Wachtel on the third  anniversary of the Effective Date (defined below), and (ii) $7,500,000 to Wachtel 364 days following the third anniversary of the Effective Date The payments provided under this paragraph shall be (a) subject to the terms and conditions herein and (b) evidenced by two (2) promissory notes that are substantially in the form attached as Exhibit A hereto (the "Notes").  Notwithstanding anything else herein, the maturity of the two $7,500,000 Notes shall be delayed beyond their due date until the earlier (the "Extended Maturity Date") of  (A) such time as all pending claims, cross-claims and counter-claims brought by any of TPR, Sagi Genger, the Sagi Genger 1993 Trust, the Orly Genger 1993 Trust (other than the Orly Trust Action (as defined below)), D&K Limited Partnership, D&K GP LLC, Rochelle Fang, and/or David Parnes (collectively, the "Sagi Group") against any member of the Trump Group have been dismissed with prejudice and the statute of limitations shall have run with respect to any other potential claims of the Sagi Group that might be the subject of the Indemnification provided for by Paragraph 5 below or (B) such time as each member of the Sagi Group shall have provided the Trump Group with a release of the Trump Group Released Parties (as defined below) and covenant not to sue in form and substance that is the same as the AG release and covenant not to sue contained in Paragraph 6(a) below (the "Sagi Group Release").

Subject to the foregoing, the Notes shall become immediately due and payable upon the occurrence of any transaction or series of transactions which shall result in the Trump Group owning or controlling neither (i) a majority of the voting stock of Trans-Resources or its successors or each of its two principal subsidiaries, Haifa Chemicals, Ltd. and Na-Churs Plant

3

Food Company or their successors, nor (ii) directly or indirectly, a majority of the assets currently owned by Trans-Resources and its subsidiaries; provided, however, that in such event, at the request of the Trump Group, the amounts then payable on the Notes shall be placed in escrow for the duration of their original term or until the Extended Maturity Date (if applicable) under the provisions of an escrow agreement on reasonable terms to be negotiated at such time in good faith between Trans-Resources, the payee and an escrow agent selected by their mutual consent, which shall provide for their release to the Trump Group in payment of Indemnification Amounts, AG Group Release Amounts and Discovery Costs (as such terms are defined below), if any, and payment to the payee of such amounts after reduction for Indemnification Amounts, AG Group Release Amounts and Discovery Costs, if any, upon their original maturity date or the Extended Maturity Date (if applicable).  If Trans-Resources is unable to pay the Notes as and when they mature, the Trump Group will be obligated to make payment thereon in an amount equal to the lesser of (x) the outstanding amounts not paid by the obligor thereunder and (y) any amount by which cash payments received by members of the Trump Group (other than Trans-Resources) from Trans-Resources and its subsidiaries since the Effective Date (whether in the form of dividends, distributions, compensation or otherwise) exceeds reasonable compensation for services rendered plus payments for goods, services and assets provided by such persons in amounts that would have been paid for such goods, services and assets in arms' length transactions with unaffiliated third parties; provided, however, that in neither case shall the Trump Group be obligated to pay any amount that exceeds the outstanding amounts not paid by Trans-Resources on the Notes (subject to any Indemnification Amounts, AG Group Release Amounts or Discovery Costs).

4

4.    **Dismissal of Claims with Prejudice**.  Within two (2) business days of the Effective Date (defined below), the AG Group and the Trump Group shall take all actions necessary or desirable to:  (i) effect the dismissal with prejudice of all claims, counterclaims, cross-claims, third-party claims, issues and matters between them, and to vacate all court orders which restrain, enjoin or in any way limit actions by any members of the Trump Group, in each pending action in which members of the AG Group and the Trump Group are parties (whether or not service of process with respect thereto has been effected), including, without limitation, each of the following pending actions (collectively, the "Litigation"):  *Genger v. TR Investors, LLC*, No. 168, 2013 (Del.); *TR Investors, LLC v. Genger*, C.A. No. 6697-CS (Del. Ch.); *Trans-Resources, Inc. v. Genger*, C.A. No. 4391-CS (Del. Ch.) (with respect to Arie Genger only); *TR Investors, LLC, et al. v. Genger*, C.A. No. 3994-CS (Del. Ch.); *Glenclova Investment Co. v. Trans-Resources, Inc., at al.*, No. 08 Civ. 7140 (JFK) (S.D.N.Y.); *Arie Genger and Orly Genger v. Sagi Genger, et al.*, Index No. 651089/2010 (N.Y. Supr.); and (ii) have the New York State Supreme Court enter a definitive non-appealable order declaring that members of the Trump Group own all right, title and interest (beneficially, of record and otherwise) to the shares of Trans-Resources purportedly transferred by TPR in October 2004 to Arie Genger (the ("Arie Shares") and to the Orly Genger 1993 Trust (the "Orly Trust Shares"),  with the understanding and agreement that should the request for the entry of such an order with respect to the "Orly Trust Shares" be denied or not entered in a reasonably timely fashion,  then the AG Group and the Trump Group shall take all action necessary or desirable to have the New York State Supreme Court vacate all court orders which restrain, enjoin or in any way limit actions by the

5

parties to the pending action captioned *Dalia Genger, as Trustee of the Orly Genger 1993 Trust*

*v. TR Investors, LLC, et al.,* C.A. No. 6906-CS (Del. Ch.) (the "Orly Trust Action"), to prosecute,

defend, compromise, settle and otherwise deal with all claims, counterclaims, cross-claims, third-

party claims, issues and matters asserted therein; provided, however, that nothing in this

Agreement is intended to require or permit the dismissal of any claims, counterclaims, cross-

claims, third-party claims, issues and matters, (i) in *Trans-Resources, Inc. v. Genger,* C.A. No.

4391-CS (Del. Ch.) (the "Breach of Fiduciary Duty Case"), as between the Trump Group and

Avi Pelossof and/or William Dowd (subject to the exchange of general releases between the

members of the Trump Group and William Dowd as contemplated below) and (b) against TPR,

the Sagi Genger 1993 Trust, the Orly Genger 1993 Trust, D&K Limited Partnership, D&K GP

LLC, Sagi Genger or Dalia Genger. Any member of the AG Group including, without

limitation, Orly Genger, who is called to testify in the Litigation or the Orly Trust Action, agrees

to testify that he, she (in her individual capacity, ~~on behalf of the Orly Genger 1993 Trust,~~ and as

beneficiary of the Orly Genger 1993 Trust) or it has waived all claims he, she (in her individual

capacity, ~~on behalf of the Orly Genger 1993 Trust,~~ and as beneficiary of the Orly Genger 1993

Trust) or it had or may have to ownership (record, beneficial or otherwise) of any shares of

Trans-Resources and that he, she (in her individual capacity, ~~on behalf of the Orly Genger 1993~~

~~Trust,~~ and as beneficiary of the Orly Genger 1993 Trust) or it is opposed to the Orly Genger

1993 Trust seeking any remedy of any kind against any member of the Trump Group.

Notwithstanding the foregoing, upon receipt by the Trump Group of a general release in form

and substance reasonably satisfactory to it, the Trump Group shall provide the same general

6

release to William Dowd and cause the dismissal of the Breach of Fiduciary Duty Case as
between the Trump Group and him.

      5.    **Indemnification.**

      (a)    Upon closing of this Agreement, each of the members of the AG
Group with the exception of Arnold Broser and David Broser and the Broser Entities, jointly
and severally, agrees to indemnify and hold harmless (i) each of the members of the Trump
Group, and their respective past and present affiliates and direct and indirect subsidiaries, and (ii)
each of the past and present agents, representatives, officers, directors, advisors, employees,
general partners, limited partners, shareholders, members, predecessors, successors, heirs,
executors, administrators and assigns of each person and entity referenced in clause (i), from all
reasonable costs, expenses, attorneys' fees of counsel selected by the Trump Group (it being
agreed that the Trump Group will cooperate with the AG Group in all reasonable respects to
cause the amount of such costs, expenses and its attorneys' fees to be minimized), settlements
and/or judgments (whether direct or related to joint and several liability) (the "Indemnification
Amounts") incurred as a result of, in connection with, or relating in any way to any (x) claims,
counterclaims, cross-claims or third-party claims raised or that could have been raised in the
Litigation, and (y) claims that are pending, have been brought, or that may in the future be
brought by or on behalf of any of TPR, the Sagi Genger 1993 Trust, the Orly Genger 1993 Trust
(other than those claims currently pending in the Orly Trust Action), D&K Limited Partnership,
D&K GP LLC, Sagi Genger, David Parnes or Dalia Genger, regardless of whether they were or
could have been raised in the Litigation or the Orly Trust Action, relating in any way, whether
directly or indirectly, to (A) the Shareholders Agreement entered into by Trans-Resources

7

shareholders and Trans-Resources on March 30, 2001, (B) the transfer of interests in TPR or the

purported transfer of shares of Trans-Resources by TPR in October 2004, (C) any activities or

developments relating to or conducted by Trans-Resources or any of its direct or indirect

subsidiaries that occurred prior to September 26, 2008, (D) the acquisition by the Trump Group

of all interests (record, beneficial or otherwise) of the so called "Arie Shares", "Orly Trust

Shares" and the shares of Trans-Resources purportedly transferred by TPR in October 2004 to

the Sagi Genger 1993 Trust (the "Sagi Trust Shares") (including, without limitation, the

negotiations for the ownership or acquisition of such shares), (E) the control of Trans-Resources

or any of its direct or indirect subsidiaries by the Trump Group through its acquisition of the

aforementioned shares, (F) records and documents (including but not limited to electronic files)

in the possession, custody or control of Trans-Resources or any of its direct or indirect

subsidiaries, (G) misrepresentations made or improper acts conducted prior to September 26,

2008 by any officer or director of Trans-Resources, (H) this Agreement, (I) the business or

operations of Trans-Resources or any of its direct or indirect subsidiaries conducted prior to

September 26, 2008 arising from or in any way related to the conduct of any member of the AG

Group, Avi Pelossof or William Dowd, or (J) the conduct of any other individual to the extent

Arie Genger is aware, or should have been aware, thereof. Notwithstanding the foregoing, the

indemnity provided for above shall not apply to any claims which may be brought subsequent to

the Effective Date (and which are entirely unrelated to any claim brought prior to such date) by

any of Sagi Genger, the Sagi Genger 1993 Trust or TPR and which arise solely out of actions

taken or not taken by members of the Trump Group which actions or inactions no member of the

AG Group was aware of or should have been aware of; provided, however, that such claim was

8

not encouraged or solicited by any member of the AG Group and no member thereof cooperates in asserting, instituting or prosecuting such claim. Notwithstanding anything herein to the contrary, the undertaking of William Wachtel hereunder shall not exceed under any circumstance an amount greater than $5,000,000.

(b)   The Trump Group may request payment or reimbursement of the Indemnification Amounts at any time by providing a written statement or copy of an underlying invoice or expense documentation to any member of the AG Group at the addresses set forth in Paragraph 16 below, and the AG Group shall pay such indemnified expenses in full and in cash within five (5) business days of the date such request is made. The supporting documentation submitted with any payment or reimbursement request hereunder may be redacted as necessary to preserve attorney-client privilege, attorney work product, or confidential information the Trump Group may, in its reasonable determination, need to protect. The Trump Group will provide the AG Group with reasonable notice prior to making any motion or taking any appeal with respect to, or in, any past, present or future action or claim for which the Trump Group is seeking indemnification, and such notice will be accompanied by a non-binding estimate of the legal fees and costs associated with such motion or appeal. The Trump Group authorizes the AG Group and their respective counsel to discuss directly with the Trump Group's appointed counsel the amount and scope of any invoice for which the Trump Group is seeking indemnification. The AG Group in its sole discretion may settle any indemnified claim so long as there is no monetary contribution to be paid by the Trump Group, and the Trump Group is released, in form and substance reasonably satisfactory to it, from any liability relating to any such indemnified

claim. The Trump Group shall not enter into any settlement of any indemnified claim, or discussions with respect thereto, without the express written consent of the AG Group.

(c)     With respect to each Indemnification Amount, until such time as it has been paid over to the Trump Group, the members of the AG Group shall remain jointly and severally liable for such Indemnification Amount and, the Trump Group may at its option pursue all legal remedies available to it and/or withhold an amount equal to such unreimbursed Indemnification Amount from any payments by Trans-Resources to be made pursuant to the Notes.

6.     **Releases**.

(a)     **The AG Group Release.** Effective on the Effective Date, each of the members of the AG Group, for itself, himself or herself, and in all capacities, and on behalf of its (and its respective affiliates' and direct and indirect subsidiaries'), his or her respective agents, representatives, officers, directors, advisors, employees, general partners, limited partners, shareholders, members, subsidiaries and affiliates, and each of their respective predecessors, successors, heirs, executors, administrators and assigns, and any other persons or entities acting in concert with any of them including, without limitation, any member of the Sagi Group which he, she or it shall at any time directly or indirectly control or be deemed authorized to act on behalf of (individually, an "AG Group Releasing Party" and collectively, the "AG Group Releasing Parties"): (i) fully, finally, irrevocably and unconditionally waives, releases and discharges each of the members of the Trump Group and its (and its respective past and present affiliates' and direct and indirect subsidiaries'), his or her respective past and present agents

10

(including Skadden, Arps, Slate, Meagher & Flom LLP in any capacity, including as Escrow Agent for the Skadden Escrow or for any escrow in which it held, holds, or may hold, any dividends or distributions from Trans-Resources), representatives, officers, directors, advisors, employees, general partners, limited partners, shareholders, members, subsidiaries and affiliates, and each of their respective predecessors, successors, heirs, executors, administrators and assigns (collectively, the "Trump Group Released Parties"), from any and all claims, counterclaims, demands, proceedings, actions, causes of action, orders, obligations, damages, debts, costs, expenses and other liabilities whatsoever and however arising, whether known or unknown, past, present or future, suspected or unsuspected, contingent or actual, both at law and in equity, including without limitation, claims for fraud or fraud in the inducement (collectively, "Claims"), which such AG Group Releasing Party now has, has ever had or may hereafter claim to have against any Trump Group Released Party or its, his or her assets, liabilities or operations from the beginning of the world through the Effective Date (individually, an "AG Group Released Claim" and collectively, the "AG Group Released Claims"); and (ii) agrees not to assert, institute or prosecute, or encourage, solicit or cooperate with any other person or entity in asserting, instituting or prosecuting, any proceeding against any of the Trump Group Released Parties in any jurisdiction (domestic or foreign, including, without limitation, the State of Israel) with respect to any AG Group Released Claim or any other Claim relating in any way, directly or indirectly, to Trans-Resources or any of its direct or indirect subsidiaries, the ownership or acquisition of Trans-Resources shares (including any dividends or distributions relating thereto or any escrow in which such dividends or distributions may currently be or in the past have been held), the Litigation, the Orly Trust Action, control of Trans-Resources or any of its direct or

11

indirect subsidiaries, the business or operations of Trans-Resources or any of its direct or indirect

subsidiaries, or arising out of this Agreement including, without limitation, the negotiation and

execution of this Agreement or the AG Group Releases provided hereunder; provided, however,

that this AG Group Release shall not apply to any Claims (x) seeking equitable relief to enforce

the terms of this Agreement or claims seeking payment of the Notes or any indemnification

payments required to be paid hereunder, (y) relating solely to events that transpired in their

entirety subsequent to the Effective Date and that could not, under any circumstances, have

possibly been pursued prior to the Effective Date whether or not then known, and (z) between

any of the AG Group Releasing Parties and TPR, and/or any other member of the Sagi Group.

If an AG Releasing Party brings an AG Group Released Claim or other Claim in

violation of the immediately preceding paragraph, the AG Group, jointly and severally, agrees to

indemnify the Trump Group for any and all settlements, judgments, costs and fees, including

legal fees and disbursements of counsel chosen by the Trump Group, incurred in working on,

preparing for or defending such claim ("AG Group Release Amounts"). With respect to each

AG Group Release Amount, until such time as such AG Group Release Amount has been paid

over to the Trump Group, the members of the AG Group shall remain jointly and severally liable

for such AG Group Release Amount, and the Trump Group may at its option pursue all legal

remedies available to it and/or withhold an amount equal to such unreimbursed AG Group

Release Amount from any payments to be made by Trans-Resources pursuant to the Notes. For

purposes of the removal of all doubt, it is the parties' intention that no claims shall be brought or

pursued by any member of the AG Group against any member of the Trump Group for any

reason whatsoever (other than claims permitted under clause (x), (y) and (z) of the immediately preceding paragraph).

(b)     **The Trump Group Release.** Effective on the Effective Date, each of the members of the Trump Group, for itself or himself, and in all capacities, and on behalf of its (and its respective affiliates' and direct and indirect subsidiaries'), or his respective agents, representatives, officers, directors, advisors, employees, general partners, limited partners, shareholders, members, subsidiaries and affiliates, and each of their respective predecessors, successors, heirs, executors, administrators and assigns, and any other persons or entities acting in concert with any of them (individually, a "Trump Group Releasing Party" and collectively, the "Trump Group Releasing Parties"):  (i) fully, finally, irrevocably and unconditionally waives, releases and discharges each of the members of the AG Group and its (and its respective past and present affiliates' and direct and indirect subsidiaries'), his or her respective past and present agents, representatives, officers, directors, advisors, employees, general partners, limited partners, shareholders, members, subsidiaries and affiliates, and each of their respective predecessors, successors, heirs, executors, administrators and assigns (collectively, the "AG Group Released Parties"), from any and all claims, counterclaims, demands, proceedings, actions, causes of action, orders, obligations, damages, debts, costs, expenses and other liabilities whatsoever and however arising, whether known or unknown, past, present or future, suspected or unsuspected, contingent or actual, both at law and in equity including, without limitation, claims for fraud or fraud in inducement, ("Claims"), which such Trump Group Releasing Party now has, has ever had or may hereafter claim to have against any AG Group Released Party or its, his or her assets, liabilities or operations from the beginning of the world through the Effective Date (individually,

13

a "Trump Group Released Claim" and collectively, the "Trump Group Released Claims"); and (ii) agrees not to assert, institute or prosecute, or encourage, solicit or cooperate with any other person or entity in asserting, instituting or prosecuting, any proceeding against any member of the AG Group Released Parties with respect to any Trump Group Released Claim or any other Claim relating in any way, directly or indirectly, to Trans-Resources or any of its direct or indirect subsidiaries, the ownership or acquisition of Trans-Resources shares, control of Trans-Resources or any of its direct or indirect subsidiaries, the business or operations of Trans-Resources or any of its direct or indirect subsidiaries, or the negotiation and execution of this Agreement or the Trump Group Releases provided hereunder; provided, however, that this Trump Group Release shall not apply to any Claims (x) seeking equitable relief to enforce  the terms of this Agreement or claims seeking payment of any indemnification payments required to be paid hereunder, (y) relating solely to events that transpired in their entirety subsequent to the Effective Date and that could not, under any circumstances, have possibly been pursued prior to the Effective Date whether or not then known, and (z) between any of the Trump Group Releasing Parties and Avi Pelossof, William Dowd (unless and until the exchange of mutual general releases between the Trump Group and William Dowd referred to above) and/or TPR.

If a Trump Group Releasing Party brings a Trump Group Released Claim or other Claim in violation of the immediately preceding paragraph, the Trump Group, jointly and severally, agrees to indemnify the AG Group for any and all settlements, judgments, costs and fees, including legal fees and disbursements of counsel chosen by the AG Group, incurred in working on, preparing for or defending such claim ("Trump Group Release Amounts").  With respect to each Trump Group Release Amount, until such time as such Trump Group Release Amount has

14

been paid over to the AG Group, the members of the Trump Group shall remain jointly and

severally liable for such Trump Group Release Amount, and the AG Group may at its option

pursue all legal remedies available to it. For purposes of the removal of all doubt, it is the parties

intention that no claims shall be brought or pursued by any member of the Trump Group against

any member of the AG Group for any reason whatsoever (other than claims permitted under

clause (x), (y) and (z) of the immediately preceding paragraph).

       7.    **Discovery Obligations**.    Effective on the Effective Date (defined

below), to the extent that a member of the AG Group or the Orly Genger 1993 Trust seeks

discovery or testimony from any member of the Trump Group, or if any member of the Trump

Group is subpoenaed by any party to an action in which any member of the AG Group or the

Orly Genger 1993 Trust is a party, each of the members of the AG Group, jointly and severally,

agrees that to the extent indemnities of the Trump Group provided for elsewhere in this

Agreement do not apply, they shall indemnify the Trump Group for any and all costs and fees,

including reasonable legal fees and disbursements of counsel to be chosen by the Trump Group

(it being understood that for the purposes of this Discovery Obligation indemnity only, the

indemnification for legal fees shall be limited to $750 per hour of legal services), incurred in

working on, preparing for or defending such claim, it being agreed that the Trump Group will

cooperate with the AG Group in all reasonable respects to cause the amount of such costs and

fees, including its attorneys' fees and disbursements to be minimized ("Discovery Costs"). With

respect to each Discovery Cost, until such time as such Discovery Cost has been paid over to the

Trump Group, the members of the AG Group shall remain jointly and severally liable for such

Discovery Cost, and the Trump Group may at its option pursue all legal remedies available to it

15

and/or withhold an amount equal to such unreimbursed Discovery Cost from any payments to be made by Trans-Resources pursuant to the Notes.

   8.   **Cooperation.**

(a)   Each member of the AG Group shall take all actions necessary or desirable, as promptly as practicable and as may be requested by the Trump Group from time to time including, without limitation, testifying in the Orly Trust Action, to (i) effectuate the release of the AG Group Released Claims and to prevent or preclude any other person or entity from asserting, instituting or prosecuting, or encouraging, soliciting or cooperating with any other person or entity in asserting, instituting or prosecuting, any proceeding or claims against any of the Trump Group Released Parties with respect to any AG Group Released Claim or any other Claim relating in any way, directly or indirectly, to Trans-Resources or any of its direct or indirect subsidiaries, the ownership or acquisition of Trans-Resources shares, the control of Trans-Resources or any of its direct or indirect subsidiaries, records and documents (including but not limited to electronic files) in the possession, custody or control of Trans-Resources or any of its direct or indirect subsidiaries or the business or operations of Trans-Resources or any of its direct or indirect subsidiaries brought by any party without regard to whether such party is a signatory hereto and (ii) cause the Orly Genger 1993 Trust to release any and all claims against the Trump Group Released Parties, including, without limitation, any claims pending in the Orly Trust Action.

   (b)   As a condition to any settlement that any member of the AG Group shall enter into with any member of the Sagi Group, the AG Group parties to such settlement shall cause each Sagi Group party to such settlement to (i) dismiss with prejudice all pending claims, cross-claims and counter claims against any of the Trump Group Released Parties (as defined below)

16

and to provide the Sagi Group Release, and (ii) if the Orly Genger 1993 Trust is a party to such settlement, cause it to agree in writing to become an AG Group member for purposes of providing the indemnity contained in Paragraph 5.  Likewise, as a condition to any agreement by the AG Group to a replacement trustee for the Orly Genger 1993 Trust, the AG Group shall use its best efforts to cause such trustee to agree in writing on behalf of the Orly Genger 1993 Trust that it shall be a member of the AG Group for purposes of providing the indemnity contained in Paragraph 5.

      (c)     Each member of the AG Group covenants that for so long as the indemnity contained in Paragraph 5 remains in effect, he, she or it shall not contribute or deposit any amounts, or permit to be contributed or deposited any amounts (including, without limitation, any payments made under Paragraphs 2 and 3), to or with the Orly Genger 1993 Trust or to any other trust or entity that any of them directly or indirectly controls or is or was established at their direction, or that is or was established or exists for any of their direct or indirect benefit, unless such trust or entity has agreed in writing to being a member of the AG Group for purposes of providing the indemnity contained in Paragraph 5.  The foregoing shall not restrict members of the AG Group from investing in or with such entities provided that that such investment may be liquidated, without restriction, by such member of the AG Group from time to time as may be necessary to comply with the terms of the indemnity contained in Paragraph 5.

      (d)     The AG Group covenants that, subject to any confidentiality orders of any court or other restrictions imposed by law (i) with respect to any court filing made or received by it concerning the Orly Genger 1993 Trust, it shall contemporaneously provide a copy thereof to the Trump Group, and (ii) contemporaneously with its becoming aware of any changes or

17

contemplated material changes to the Orly Genger 1993 Trust including, without limitation, the resignation of its trustee and/or the appointment of a replacement trustee, it shall provide written notice thereof to the Trump Group.

9. **Confidentiality.** The Parties and their counsel shall not disclose the terms of this Agreement, except if, upon written advice of counsel, it is required to do so by law. Notwithstanding the foregoing, disclosure may be made by the Parties: (i) to their respective accountants, financial advisors or attorneys (collectively, "Advisors") as required to obtain tax or legal advice, it being agreed that each Party shall apprise its Advisors of the obligation to maintain such confidentiality and that each Party shall be accountable for any breach of this provision by its respective Advisors, and (ii) notwithstanding anything to the contrary in this Agreement, the Parties may disclose the terms of this Agreement if necessary in any action to enforce this Agreement or as may be required to respond to a valid subpoena, court order or other legal process. Each Party agrees that he, she or it will promptly give notice of any attempt to compel disclosure of the terms of this Agreement to each of the other Parties, at least five (5) days before compliance is required.

10. **Third Party Beneficiaries.** This Agreement shall have no third party beneficiaries except for those persons and entities that are not Parties hereto but are covered by the releases set forth in Paragraph 6 above, who may enforce those releases.

11. **Binding Effect**

This Agreement shall be binding upon and inure to the benefit of each of the Parties hereto and (where applicable) their respective current and former agents, representatives, officers, directors, advisors, employees, general partners, limited partners, shareholders, members, subsidiaries and

18

affiliates, and each of their respective predecessors, successors, heirs, executors, administrators and assigns.

12.     **Representations and Warranties.**

(a)     Each Party represents that it, he or she is authorized to enter into this Agreement and to grant the rights granted by it, him or her in this Agreement. Each Party further represents that, to the extent any non-party consents are required for the performance of any of its, his or her obligations under this Agreement (including, without limitation, with any entity controlled by any Party, including any of its partners or equity holders), it, he or she has obtained such consents.

(b)     Each Party has the benefit of the advice of counsel chosen and employed by it, him or her concerning this Agreement.

(c)     Each Party is the sole owner and holder of the Claims it is releasing under this Agreement, and represents that none of the Claims released herein have been assigned, pledged, encumbered, or otherwise transferred in whole or in part, to any other person or entity.

(d)     Each member of the AG Group represents that he, she or it is knowledgeable, sophisticated and experienced in business, financial and other matters relevant to his, her or its entry into this Agreement and the transactions contemplated hereby, and has engaged advisors, experienced in the matters contemplated by this Agreement. Each member of the AG Group has undertaken such investigation and has been provided with and has evaluated such documents and information as he, she or it has deemed necessary to enable him, her or it to make an informed decision with respect to the execution, delivery and performance of this Agreement and the transactions contemplated hereby. Each member of the AG Group is

19

consummating the transactions contemplated hereby without reliance upon any express or
implied representations or warranties of any nature, whether in writing, orally or otherwise, made
by or on behalf of or imputed to any of the Trump Group Released Parties, except as expressly
set forth in this Agreement, and no member of the AG Group shall make any Claim with respect
thereto. Each member of the AG Group acknowledges that he, she or it is taking full
responsibility for making his, her or its own evaluation of the adequacy and accuracy of all
documents or information that may have been furnished to him, her or it, and that no member of
the AG Group shall have any Claim against any of the Trump Group Released Parties with
respect thereto, including for Claims relating to the accuracy or completeness of the information
that may have been furnished to him her or it. Each member of the AG Group acknowledges and
understands that each member of the Trump Group Released Parties expressly disclaims any and
all liability that may be based on any of the documents and information that may have been
furnished to any member of the AG Group and all liability based on such documents or
information or errors therein or omissions therefrom. Accordingly, each member of the AG
Group acknowledges that none of the Trump Group Released Parties has made any
representation or warranty with respect to (i) any historical information, financial or otherwise,
including without limitation results of operations (or any component thereof), cash flows, or
financial condition (or any component thereof), of Trans-Resources and/or any of its subsidiaries,
(ii) any valuations or projections or estimates of future revenues, future results of operations (or
any component thereof), future cash flows or future financial condition (or any component
thereof) of Trans-Resources and/or any of its subsidiaries or the future business and operations of
Trans-Resources and/or any of its subsidiaries, (iii) any Claims any member of the AG Group

20

may have against any of the Trump Group Released Parties or (iv) any other information or

documents that may have been made available to any member of the AG Group or their

respective counsel, accountants or advisors with respect to any of the Trump Group Released

Parties any of their respective businesses, assets, liabilities or operations, except as expressly set

forth in this Agreement. In addition to the foregoing, each member of the AG Group

acknowledges that his, her or its entry into this Agreement and the transactions contemplated

hereby is based solely on his, her or its respective assessment and valuation of all Claims that he,

she or it may have against any of the Trump Group Released Parties and the likelihood of

success of such Claims in a court of competent jurisdiction. Each member of the AG Group

acknowledges that the consideration to be received by the AG Group pursuant to this Agreement

constitutes full and fair consideration for the release of all Claims contemplated hereunder.

(e)     Each member of the Trump Group represents that he, she or it is knowledgeable,

sophisticated and experienced in business, financial and other matters relevant to his, her or its

entry into this Agreement and the transactions contemplated hereby, and has engaged advisors,

experienced in the matters contemplated by this Agreement. Each member of the Trump Group

has undertaken such investigation and has been provided with and has evaluated such documents

and information as he, she or it has deemed necessary to enable him, her or it to make an

informed decision with respect to the execution, delivery and performance of this Agreement and

the transactions contemplated hereby. Each member of the Trump Group is consummating the

transactions contemplated hereby without reliance upon any express or implied representations

or warranties of any nature, whether in writing, orally or otherwise, made by or on behalf of or

imputed to any of the AG Group Released Parties, except as expressly set forth in this

21

Agreement, and no member of the Trump Group shall make any Claim with respect

thereto. Each member of the Trump Group acknowledges that he, she or it is taking full

responsibility for making his, her or its own evaluation of the adequacy and accuracy of all

information that may have been furnished to him, her or it, and that no member of the Trump

Group shall have any Claim against any of the AG Group Released Parties with respect thereto,

including for Claims relating to the accuracy or completeness of the information that may have

been furnished to him her or it. Each member of the Trump Group acknowledges and

understands that each member of the AG Group Released Parties expressly disclaims any and all

liability that may be based on any of the documents and information that may have been

furnished to any member of the Trump Group and all liability based on such documents or

information or errors therein or omissions therefrom. Accordingly, each member of the Trump

Group acknowledges that none of the AG Group Released Parties has made any representation or

warranty with respect to (i) any historical information, financial or otherwise, including without

limitation results of operations (or any component thereof), cash flows, or financial condition (or

any component thereof), of Trans-Resources and/or any of its subsidiaries, (ii) any valuations or

projections or estimates of future revenues, future results of operations (or any component

thereof), future cash flows or future financial condition (or any component thereof) of Trans-

Resources and/or any of its subsidiaries or the future business and operations of Trans-Resources

and/or any of its subsidiaries, (iii) any claims any member of the Trump Group may have against

any of the AG Group Released Parties or (iv) any other information or documents that may have

been made available to any member of the Trump Group or their respective counsel, accountants

or advisors with respect to any of the AG Group Released Parties any of their respective

22

businesses, assets, liabilities or operations, except as expressly set forth in this Agreement. In addition to the foregoing, each member of the Trump Group acknowledges that his, her or its entry into this Agreement and the transactions contemplated hereby is based solely on his, her or its respective assessment and valuation of all Claims that he, she or it may have against any of the AG Group Released Parties and the likelihood of success of such Claims in a court of competent jurisdiction. Each member of the Trump Group acknowledges that the consideration to be received by the Trump Group pursuant to this Agreement constitutes full and fair consideration for the release of all claims contemplated hereunder.

13.    **Attorneys' Fees.** The Parties agree to be responsible for their own attorneys' fees and costs incurred in connection with this Agreement and negotiations related to and preparation of this Agreement and not to seek from each other reimbursement of any such costs, expenses or attorneys' fees.

14.    **Governing Law.**

This Agreement, and all disputes arising under this Agreement or related thereto, shall be governed by, construed and interpreted in accordance with the laws of the State of Delaware, applicable to instruments made, delivered and performed entirely in such state, without regard to the choice of law provisions thereof.

15.    **Arbitration.** UNLESS THIS AGREEMENT SPECIFICALLY PROVIDES FOR ANOTHER TYPE OF DISPUTE RESOLUTION WITH RESPECT TO A PARTICULAR KIND OF DISPUTE, ANY AND ALL CONTROVERSIES AND CLAIMS ARISING OUT OF OR RELATING TO THIS AGREEMENT, OR THE BREACH, TERMINATION OR VALIDITY THEREOF, SHALL BE EXCLUSIVELY SETTLED BY FINAL AND BINDING

23

ARBITRATION IN ACCORDANCE WITH THE PROCEDURES SET FORTH IN THIS
SECTION.

(a)     The arbitration shall be conducted in accordance with the Commercial
Arbitration Rules of the American Arbitration Association ("AAA") then in effect (the "Rules"),
except as set forth herein.  Any member of the Trump Group on behalf of the Trump Group, on
the one hand, and any member of the AG Group on behalf of the AG Group, on the other hand,
may demand arbitration by giving the other written notice to such effect in accordance with the
Rules.

(b)     The arbitration will be held before one neutral arbitrator.  Within thirty (30)
days after the other Party's receipt of the demand for arbitration, the Party seeking arbitration
will invite the other Party to join it in approaching the following list of individuals about serving
as arbitrator and will approach such individuals with such other Party (if its invitation is accepted)
or without such other Party (if its invitation is rejected or not responded to within five (5)
business days): The Honorable William B. Chandler III, David A. Jenkins, Esq., Stephen E.
Jenkins, Esq., Robert J. Katzenstein, Esq., and Andre G. Bouchard, Esq.  If only one such
individual is available and willing, he shall serve as the arbitrator.  If more than one such
individual is available and willing, the Parties will mutually determine which of those so
available and willing will serve as the arbitrator.  If the Parties are unable to agree, the arbitrator
will be selected by the AAA from the foregoing list in accordance with the listing, striking and
ranking procedure in the Rules, with each Party being given a limited number of strikes, except
for cause.  If none of the foregoing individuals is available, the arbitrator will be selected by the
AAA in accordance with the listing, striking and ranking procedure in the Rules, with each Party

24

being given a limited number of strikes, except for cause. Any arbitrator appointed by the AAA shall be a retired judge that presided over a state or federal court located in Delaware or a practicing attorney licensed in Delaware with no less than fifteen years of experience with large commercial cases. Any such arbitration proceedings shall be and remain confidential. The place of arbitration shall be in Manhattan, New York or elsewhere if otherwise agreed to.

(c)     Discovery will be limited to the request for and production of documents, directly related to the issues in dispute, limited depositions of limited duration, and interrogatories. Interrogatories will be allowed only as follows: a Party may request the other Party to identify by name, last known address and telephone number (i) all persons having knowledge of facts relevant to the dispute and a brief description of that person's knowledge, and (ii) any experts who may be called as an expert witness, the subject matter about which the expert is expected to testify, the mental impressions and opinions held by the expert and the facts known by the expert. All issues concerning discovery upon which the parties cannot agree will be submitted to the arbitrator for determination.

(d)     Each of the Parties agrees that it will use commercially reasonable efforts to join (and will allow the other party to join) any third party that the Parties have agreed is indispensable to the arbitration. If any such third party does not agree to be joined, the arbitration will proceed nonetheless.

(e)     The arbitrators are not empowered to award damages not permitted by the terms of this Agreement and if so permitted, then not in excess of compensatory damages, except with respect to indemnification obligations for punitive damages as provided hereunder, and

25

each Party irrevocably waives the right to recover punitive, exemplary or multiple damages with respect to any dispute other than with respect to indemnification obligations for such punitive damages as provided hereunder. The decision of, and award rendered by, the arbitrator will be final and binding on the Parties, will be in writing and will include the findings of fact and conclusions of law upon which it is based, if any.

(f)     The Parties specifically acknowledge that this Agreement evidences a transaction involving, affecting, affected by, and a part of, interstate commerce and that this agreement to arbitrate is governed by and enforceable under the Federal Arbitration Act, 9 U.S.C. §§ 1 et seq.

(g)     Except to the extent that any of the indemnification provisions contained herein shall be applicable (i) the Parties shall each be responsible for their own costs and expenses (including legal fees and disbursements) incurred in any arbitration, and (ii) the AG Group on the one hand and the Trump Group on the other shall each be responsible for 50% of the fees and disbursements of the arbitrator and of any costs and expenses payable to the AAA.

(h)     With respect to the enforcement, modification or vacating of any arbitration award (it being reconfirmed hereby that the arbitration award shall itself be final and binding on the Parties), the Parties submit to the exclusive jurisdiction of one or the other of (i) the United Stated District Court of the Southern District of New York sitting in the Borough of Manhattan in the City of New York and (ii) the Commercial Division of the New York State Supreme Court sitting in the Borough of Manhattan in the City of New York.

16.     **Notice.** If any Party is required to give notice to any other Party under this Agreement, such notice shall be in writing and shall be deemed to have been duly given upon receipt of hand delivery, one business day following its being sent to the recipient via Federal Express or another

26

nationally recognized over-night courier, or by e-mail with confirmation of receipt to the following individuals or to such other address or person as such Parties may from time to time specify by written notice given in the manner provided above:

**If to the Trump Group:**

Mark S. Hirsch, Esq.

The Trump Group

41 Madison Avenue, Suite 4101

New York, NY 10010

Phone: (212) 838-1000

E-mail: mhirsch@trumpgroup.com

**With Copy to:**

Thomas J. Allingham II, Esq.

Anthony W. Clark, Esq.

Douglas D. Herrmann, Esq.

Skadden, Arps, Slate, Meagher & Flom LLP

One Rodney Square

P.O. Box 636

Wilmington, DE 19899

Phone: (302) 651-3000

E-mail: thomas.allingham@skadden.com

27

E-mail:  anthony.clark@skadden.com

E-mail:  douglas.herrmann@skadden.com

**If to Arie Genger:**

Arie Genger

104 West 40th Street, 19th Floor

New York, NY 10018

E-mail:  wachtel@wmllp.com

**With Copy to:**

Stephen P. Lamb, Esq.

Paul Weiss

500 Delaware Avenue, Suite 200

Wilmington, DE 19889

**If to Orly Genger:**

Orly Genger

104 West 40th Street, 19th Floor

New York, NY 10018

E-mail: wachtel@wmllp.com

**With Copy to:**

28

William Wachtel

Wachtel Masyr & Missry LLP

885 second ave.

New York, NY 10017

[]

**If to Arnold Broser or David Broser:**

David Broser

104 West 40th, 19th FloorNew York, NY 10018

E-mail:  wachtel@wmll.com

**With Copy to:**

William Wachtel

Wachtel Masyr & Missry LLP

885 second ave.
New York, NY 10017

29

17.    **Entire Agreement.** This Agreement contains the entire agreement between the Parties concerning the subject matter hereof. Neither this Agreement nor any of its terms or provisions shall be binding on any Party until all the Parties hereto have signed. The Parties agree that all drafts of this Agreement are strictly confidential and shall supplement and complement any protection, which may attach to the exchange of confidential information in settlement discussions, whether by common law or statute including, but not limited to, Federal Rule of Evidence 408 and comparable state laws. Any and all prior discussions and agreements between the Parties concerning the subject matter of this Agreement are merged into this Agreement when signed. This Agreement may not be modified or amended, nor any of its provisions waived, except by an instrument in writing signed by all Parties. No Party has made any warranty or representation to the other Parties that is not set forth expressly herein. In entering into this Agreement, no Party has relied on any statement or representation made by or on behalf of any other Party, by or on behalf of any affiliate of such other Party, or by counsel for such other Party that is not set forth expressly in this Agreement.

18.    **No Drafting Presumption.** This Agreement shall be interpreted or construed without any presumption that the provisions hereof should be strictly construed against the drafter, it being agreed that the Parties and their respective counsel and other agents have fully and equally participated in the preparation, negotiation, review and approval of all provisions of this Agreement.

19.    **No Admissions.** The Parties have executed this Agreement for the sole purpose of settling and disposing of all Claims between them, and it is expressly understood and agreed that no Party hereto admits any wrongdoing on its, his or her part by executing this Agreement.

30

20.    **Binding Effect.** It is the intention of the parties to extinguish all AG Group Released Claims and all Trump Group Released Claims and, consistent with such intention, each of the Parties hereby waives any and all rights, to the extent permitted by law, to assert that the Release provided by it in Paragraph 6 hereunder is unenforceable as to any claim whatsoever and for any reason including, without limitation, any and all rights under section 1542 of the California Civil Code, if applicable, or any other applicable similar law or principle of common law, which may have the effect of limiting the Releases herein. Section 1542 of the California Civil Code provides:

> A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM OR HER MUST HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR.

21.    **Headings.** The section headings contained in this Agreement are for reference purposes only and shall not in any way effect or control the meaning or interpretation of this Agreement.

22.    **Execution in Counterparts and by PDF e-mail.** This Agreement may be executed in multiple counterparts and by fax or PDF e-mail, each of which, when so executed and delivered, shall be an original, but such counterparts shall together constitute one and the same instrument and agreement.

23.    **Effective Date.** This Agreement shall be effective immediately upon execution and delivery by all Parties hereto (the "Effective Date").

31

**IN WITNESS WHEREOF**, the Parties have caused this Agreement to be duly executed as follows:

**TR Investors, LLC**                     **Arie Genger**

By: _____

Print: _____         Date: ___6/15/13___

Title: _____

Date: _____


**Glenclova Investment Co.**              **Orly Genger (in her individual capacity and**

                                          **in her capacity as beneficiary of the**

By: _____              **Orly Genger 1993 Trust)**

Print: _____

Title: _____           Date: ___6/15/13___

Date: _____

32

**IN WITNESS WHEREOF**, the Parties have caused this Agreement to be duly executed as follows:

**TR Investors, LLC**                              **Arie Genger**

By: _Mark C Hirsch_                     _____

Print: _MARK J. HIRSCH_               Date: _____

Title: _Executive VP/General Counsel_

Date: _June 16, 2013_

**Glenclova Investment Co.**                **Orly Genger (in her individual capacity and**

                                          **in her capacity as beneficiary of the**

By: _Mark Hirsch_                         **Orly Genger 1993 Trust)**

Print: _MARK S. HIRSCH_

Title: _Executive VP/General Counsel_

                                          _____

                                          Date: _____

Date: _June 16, 2013_

32

**New TR Equity I, LLC**

**Arnold Broser**

By: _____

Print: _____

Date: ____ 6/11/13 ____

Title: _____

Date: _____


**New TR Equity II, LLC**

**David Broser**

By: _____

Print: _____

Date: ____ 6/16/13 ____

Title: _____

Date: _____

33

New TR Equity I, LLC                          Arnold Broser

By: _____          _____

Print: MARK S. Hirsch                         Date: _____

Title: Executive VP/General Counsel

Date: June 16, 2013


New TR Equity II, LLC                         David Broser

By: _____          _____

Print: MARK S. Hirsch                         Date: _____

Title: Executive VP/General Counsel

Date: June 16, 2013

33

**Trans-Resources, LLC**

By: _Mark S Hirsch_

Print: _MARK S. HIRSCH_

Title: _Executive VP/General Counsel_

Date: _June 16, 2013_

34

**Jules Trump**

Date: ___6 | 16 | 2013___

**Eddie Trump**

Date: _____

**Mark Hirsch**

Date: _____

35

**Jules Trump**

_____

Date: _____

**Eddie Trump**

_____

Date: June 16, 2013

**Mark Hirsch**

_____

Date: _____

35

**Jules Trump**

_____

Date: _____

**Eddie Trump**

_____

Date: _____

**Mark Hirsch**

_____

Date: June 16, 2013

EXHIBIT A

*6/16/13*
*Draft - Confidential*

## [FORM OF SUBORDINATED NOTE]

**THIS NOTE HAS NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR ANY APPLICABLE STATE SECURITIES LAWS AND MAY NOT BE SOLD OR TRANSFERRED WITHOUT COMPLIANCE WITH THE REGISTRATION OR QUALIFICATION PROVISIONS OF APPLICABLE FEDERAL AND STATE SECURITIES LAWS OR APPLICABLE EXEMPTIONS THEREFROM.**

TRANS-RESOURCES

### SUBORDINATED NOTE

$7,500,000.00                                                        June ___, 2013

      **FOR VALUE RECEIVED**, Trans-Resources, LLC a Delaware entity (the successor to Trans-Resources, Inc. and referred to herein as the "Maker"), hereby promises to pay to the order of [_____] (the "Payee"), the principal sum of Seven Million, Five-Hundred Thousand Dollars ($7,500,000.00) pursuant to the terms and conditions of and at the times provided in the Settlement Agreement (as defined below).

      1.    Notes. This Subordinated Note (this "Note") is issued pursuant to, and is subject to the terms and conditions of, the Settlement Agreement and Release, dated as of June ___, 2013 by and among the AG Group and the Trump Group, as amended, restated, supplemented or otherwise modified from time to time (the "Settlement Agreement"). Terms used herein and not otherwise defined herein shall have the respective meanings ascribed thereto in the Settlement Agreement.

      2.    No Interest. This Note will not accrue interest, pursuant to the terms of the Settlement Agreement.

      3.    Maturity. Subject to the terms and conditions of the Settlement Agreement and this Paragraph 3, this Note shall mature and be redeemed or satisfied in full by the Maker in one installment, which shall be paid by the Maker no later than the ___ anniversary of the Effective Date (the "Maturity Date"). Notwithstanding the foregoing, the Maturity Date shall automatically be extended until the earlier (the "Extended Maturity Date") of (i) such time as all pending claims, cross-claims and counter-claims brought by any of TPR, Sagi Genger, the Sagi Genger 1993 Trust, the Orly Genger 1993 Trust (other than the Orly Trust Action), D&K Limited Partnership, D&K GP LLC, Rochelle Fang, and/or David Parnes (collectively, the "Sagi Group") against any member of the Trump Group have been dismissed with prejudice and the statute of limitations shall have run with respect to any other potential claims of the Sagi Group that might be the subject of the indemnification obligations provided for by Paragraph 5 of the Settlement Agreement and (ii) such time as each member of the Sagi Group shall have provided the Trump Group with a release of the Trump Group Released Parties and covenant not to sue in form and substance that is the same as the AG Group Release and covenant not to sue contained in Paragraph 6(a) of the Settlement Agreement. Subject to the foregoing, this Note shall become immediately due and payable upon the occurrence of any transaction or series of transactions which shall result in the Trump Group owning or controlling neither (i) a majority of the voting stock of Trans-Resources or its successors or each of its two principal subsidiaries, Haifa

Chemicals, Ltd. and Na-Churs Plant Food Company or their successors, nor (ii) directly or indirectly, a majority of the assets currently owned by Trans-Resources and its subsidiaries; provided, however, that in such event, at the request of the Trump Group, the amounts then payable on this Note shall be placed in escrow until the Maturity Date or until the Extended Maturity Date (if applicable) under the provisions of an escrow agreement on reasonable terms to be negotiated at such time in good faith between the Maker, the Payee and an escrow agent selected by mutual consent of the Maker and the Payee (such consent, not to be unreasonably withheld, conditioned or delayed), which shall provide for the release of funds from such escrow to the Maker in satisfaction of any and all Indemnification Amounts, AG Group Release Amounts and Discovery Costs owing to Maker, if any, and payment to the Payee of any amounts remaining in escrow after payment to Maker of all Indemnification Amounts, AG Group Release Amounts and Discovery Costs, if any, upon the Maturity Date hereunder or the Extended Maturity Date (if applicable).

4.    Optional Prepayments. The Maker may voluntarily prepay this Note prior to the Maturity Date, in whole or in part, at any time, without premium or penalty.

5.    Adjustment. In accordance with the terms of the Settlement Agreement, in the event that at any time Indemnification Amounts, Discovery Costs, AG Group Release Amounts, or other amounts due and payable by the AG Group to the Trump Group pursuant to the Settlement Agreement (the "Costs") have not been paid to the Trump Group in accordance with the terms of the Settlement Agreement, the Maker may, upon written notice to the Payee, set off and apply as a credit against the amount due under this Note any and all due, unpaid and outstanding Costs. The rights and remedies described herein are in addition to any other rights and remedies the Parties may have under the Settlement Agreement or other applicable law.

6.    Subordination. Pursuant to the terms of the Settlement Agreement, this Note is unsecured and shall be fully subordinated to any obligation of Trans-Resources, including, but not limited to, outstanding credit facilities, bonds, loans, tax obligations and payables.

7.    Enforcement. The Maker hereby agrees to pay on demand all reasonable costs and expenses, including without limitation attorneys' fees and costs of collection, incurred or paid by the Payee in enforcing this Note in accordance with the Settlement Agreement.

8.    Amendments. No failure or delay on the part of the Maker or the Payee in exercising any right, power, privilege or remedy shall operate as a waiver thereof, nor shall any single or partial exercise of any such right, power, privilege or remedy preclude any other or further exercise thereof or the exercise of any other right, power, privilege or remedy. This Note may not be amended and the provisions hereof may not be waived, except in accordance with the terms of the Settlement Agreement.

9.    Lost Notes, etc. If this Note is mutilated, destroyed, lost or stolen, upon receipt of evidence satisfactory to the Maker of such loss, theft, destruction or mutilation of this Note and, if requested in the case of any such loss, theft or destruction, upon delivery of an indemnity agreement reasonably satisfactory to the Maker, or, in the case of any such mutilation, upon surrender and cancellation of this Note, the Maker shall issue a new Note of like tenor and amount, in lieu of this Note.

- 2 -

Error! Unknown document property name.

10.    ASSIGNMENT.  THIS NOTE, INCLUDING THE RESPECTIVE RIGHTS AND OBLIGATIONS OF THE MAKER AND THE PAYEE PURSUANT THIS NOTE, MAY NOT BE ASSIGNED, TRANSFERRED, SOLD OR OTHERWISE DISPOSED OF BY EITHER THE MAKER OR THE PAYEE WITHOUT THE PRIOR WRITTEN CONSENT OF THE OTHER WHICH CONSENT MAY BE WITHHELD IN SUCH PARTY'S SOLE DISCRETION.

11.    Binding Effect.  The provisions of this Note shall be binding upon and inure to the benefit of the parties hereto and their successors and assigns permitted hereby.

*[signature page follows]*

- 3 -

Error! Unknown document property name.

**IN WITNESS WHEREOF**, the Maker has caused this Subordinated Note to be duly executed under seal on the date set forth above by a duly authorized representative of the Maker.

TRANS-RESOURCES, LLC

By:_____
     Name:
     Title:

4

FILED: NEW YORK COUNTY CLERK 08/11/2014 10:36 AM

NYSCEF DOC. NO. 1108

INDEX NO. 651089/2010

RECEIVED NYSCEF: 08/11/2014

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

-----------------------------------------------------------------x

ARIE GENGER and ORLY GENGER, in her           :
individual capacity and on behalf of
THE ORLY GENGER 1993 TRUST,                   :          Index No. 651089/2010
                                                        (Jaffe, B. JSC)
                                              :

                    Plaintiffs,

                                              :

                    -against-                 :

SAGI GENGER, TPR INVESTMENT                   :
ASSOCIATES, INC., DALIA GENGER, THE
SAGI GENGER 1993 TRUST, ROCHELLE              :
FANG, individually and as trustee of THE SAGI
GENGER 1993 TRUST, GLENCLOVA                  :
INVESTMENT COMPANY, TR INVESTORS,
LLC, NEW TR EQUITY I, LLC, NEW TR             :
EQUITY II, LLC, JULES TRUMP, EDDIE
TRUMP AND MARK HIRSCH,                        :

                    Defendants.

-----------------------------------------------------------------x

SAGI GENGER, individually and as assignee of  :
THE SAGI GENGER 1993 TRUST, and TPR
INVESTMENT ASSOCIATES, INC.                   :

       Cross-Claimants, Counterclaimants, and :
       Third-Party Claimants.

                                              :

                    -against-                 :

ARIE GENGER, ORLY GENGER,                     :
GLENCLOVA INVESTMENT COMPANY,
TR INVESTORS, LLC, NEW TR EQUITY I, LLC,      :
NEW TR EQUITY II, LLC, JULES TRUMP,
EDDIE TRUMP, MARK HIRSCH,                      :
TRANS-RESOURCES, INC., WILLIAM
DOWD, and THE ORLY GENGER 1993 TRUST.         :

       Cross-Claim, Counterclaim and/or       :
       Third-Party Defendants.

-----------------------------------------------------------------x

MEMORANDUM OF LAW IN SUPPORT
OF TRUSTEE DALIA GENGER'S MOTION
TO SUBSTITUTE FOR PLAINTIFF ORLY GENGER
ON HER DERIVATIVE CLAIMS AGAINST THE TRUMP GROUP
AND FOR AN ORDER DIRECTING
SETTLEMENT PROCEEDS TO
BE PAID INTO COURT

Judith Lisa Bachman, Esq.
254 S. Main Street, Suite 306
New City, New York 10956
845-639-3210

Table of Contents

Table of Authorities                                                                    i

Preliminary Statement                                                                  1

Statement of Facts                                                                     1

Argument

      Point I

             Substitution of Derivative Plaintiff Orly Genger
             Is Necessary Because She No Longer
             Represents the Orly Trust on the
             Trump Group Claims And She Has Suggested the Trustee
             "Pick Up the Cudgel" on those Claims                                4

      Point II

             The Proceeds of the Settlement
             Should be Paid into Court
             To Protect the Fund                                                5

Conclusion                                                                            10

Table of Authorities

Cases

Bonham v Coe, 249 A.D. 428, 292 N.Y.S. 423 (4th Dep't 1937)                                    9

Clarke v. Greenberg, 71 N.E.2d 443, 296 N.Y. 146 (1947)                                         6

Conforti v. Goradia, 234 A.D.2d 237, 651 N.Y.S.2d 506  (1st Dep't 1996)                         6

Gusinsky v. Bailey, 21 Misc.3d 1107(A), 873 N.Y.S.2d 234 (Table)
(Sup. Ct. N.Y. County 2008), rev'd on other grounds,
66 A.D.3d 614, 887 N.Y.S.2d 585 (1st Dep't 2008)                                                6

In re Carroll's Estate, 153 Misc. 649, 275 N.Y.S. 911 (Sur. Ct. 1934)                           9

In re Martin's Estate, 96 N.Y.S.2d 842 (Surr. Ct. 1950)                                         9

In re Roosevelt's Estate, 131 Misc. 800, 228 N.Y.S. 323 (Sup. Ct. 1928)                         9

James v. Bernhard, 106 A.D.3d 435, 965 N.Y.S.2d 56 (1st Dep't 2013)                             4, 5

Lade v. Levitt, 33 A.D.2d 956, 306 N.Y.S.2d 704 (3d Dep't 1970)                                 6, 9

Rice v. DiNapoli, 23 Misc.3d 1128(A), 889 N.Y.S.2d 507 (Table)
(Sup. Ct. Albany County 2009)                                                                   6, 9

Titus v. Empire Mink Corp., 17 N.Y.S.2d 909  (Sup. Ct. 1939)                                    9

Werner v. Werner, 70 Misc.2d 1051, 334 N.Y.S.2d 966 (Sup. Ct. Albany County 1982)   6


Statutes and Rules

CPLR 2701                                                                                       6, 9

Preliminary Statement

Dalia Genger, as trustee for the Orly Trust, moves to be substituted in for derivative

plaintiff Orly Genger on the claims Orly brought on behalf of the Orly Trust against the Trump

Group since "Orly no longer represents the Orly Trust as to the Trump Group".

As the substituted plaintiff, Dalia Genger, as trustee for the Orly Trust, respectfully

requests an order pursuant to CPLR 2701 directing that the settlement fund from the Trump

Group be paid into court since the Court "cannot determine whether some or all of the settlement

proceeds with the Trump Group belong to Orly or the Orly Trust."   Order of the Court, Filed

May 13, 2014, Doc. 925 at 4 (emphasis added).

Statement of Facts

Dalia Genger is the trustee of the Orly Genger 1993 Trust ("Orly Trust").  In this action,

Orly Genger ("Orly") instituted direct and derivative claims on behalf of the Orly Trust against

various defendants, including the so-called Trump Group.

Orly settled with the Trump Group defendants.  Memorandum of Law of Orly Genger,

Doc. 775 at 2, attached as Exhibit 1 to the Affirmation of Judith Bachman, dated August 11,

2014 ("Bachman Aff.').

"A material term of the agreement among the settling parties was the dismissal of *all*

claims presently pending against one another, in whatever capacity they were brought. [If the

settlement stipulation was drafted so as to] have the effect of *not* dismissing Orly Genger's

derivative claims against the Trump Group, contrary to the agreement of the settling parties.

Excluding such claims from the claims that are to be dismissed is not what the Trump Group

bargained and paid for in the settlement . . ."  Letter to the Court from Thomas J. Allingham II,

dated June 28, 2010, Doc. 728 at 2, attached as Exhibit 2 to the Bachman Aff. (emphasis added).

The Trump Group later reaffirmed this aspect of the settlement:

> "[any suggestion] that the confidential settlement agreement ***might*** only dismiss Orly's individual claims against the Trump Group, but not resolve the Orly Trust's claims against the Trump Group and the TPR Group. (Opp'n Br. at 28) . . . is counterfactual. This Court has already held that certain of Orly's claims in this action, including the remaining claims, are derivative in nature, and may be maintained by Orly on behalf of the Orly Genger 1993 Trust. *See Genger v. Genger*, 966 N.Y.S.2d 346, 2013 WL 221485, at *6 (N.Y. Sup. Ct. Jan. 3, 2013) (TABLE) (citing *Genger v. Genger,* No. 109749/2009 (N.Y. Sup. Ct. June 28, 2010)). In settling the claims among them, the Trump Group, Trans-Resources, Orly and Arie agreed to the dismissal of all claims presently pending against one another. This agreement is memorialized in the Second Amended Stipulation of Discontinuance.

Reply Memorandum of Law of Trump Group, Filed April 17, 2014, Doc. 888 at 22-23, attached as Exhibit 3 to the Bachman Aff.

Evidencing this intent, in paragraph 8 of her settlement agreement, Orly agreed to "cooperate" and "cause" the Orly Trust to release any and all claims against the Trump Group." Order of the Court, Filed May 13, 2014, Doc. 925 at 4, attached as Exhibit 4 to the Bachman Aff.

Pursuant to that duty, Orly not only settled all her claims in this case; she also caused <u>the Orly Trust</u> to release claims against the Trump Group in a parallel Delaware case.  Specifically, at the time of the Trump Group settlement, the Orly Trust was maintaining a proceeding in Delaware Chancery Court.  Following her Trump Group settlement, Orly's counsel twice wrote to Chancellor Strine urging "the dismissal of the last remaining Genger related case in Delaware" and "acknowledg[ing] individually <u>and in her capacity as the beneficiary of her trust</u> that the Trump Group are the record and beneficial owners of the TRI shares which had been distributed to the Orly Trust." Exhibit M, Filed June 2, 2014, Doc. 1034, attached as Exhibit 5 to the Bachman Aff.  Satisfied that Orly no longer wanted the Orly Trust to pursue its claims, the

Chancery Court dismissed the Orly Trust's claims in that case with prejudice. Exhibit N, Filed June 2, 2014, Doc. 1034, attached as Exhibit 6 to the Bachman Aff.

Notwithstanding the provisions of her own Trump Group settlement agreement and her representations to the Delaware Chancery Court, Orly told this Court that her Trump Group settlement "only dismisses Orly's individual claims against the Trump Group, but does not resolve or dismiss any claims of the Orly Trust against the Trump Group". Memorandum of Law of Orly Genger, Doc. 775 at 2, attached as Exhibit 1 to the Bachman Aff. Moreover, Orly stated that she "no longer represents the Orly Trust as to the Trump Group (while allowing Dalia Genger to pick up the cudgel if she so chooses) . . ." Id. (emphasis added).

In light of these conflicting statements, this Court "invite[d] the parties to the settlement agreement to set forth the claims given up by Orly in her individual and beneficial capacities, and to explain why any derivative claims advanced in the complaint are not released in the agreement." Order of the Court, Filed May 13, 2014, Doc. 925 at 4, attached as Exhibit 4 to the Bachman Aff.

Conveniently for them, none of the parties to the settlement agreement complied with the Court's request to "set forth the claims given up by Orly in her individual and beneficial capacities, and to explain why any derivative claims advanced in the complaint are not released in the agreement." Id. In fact, Orly's counsel explicitly refused to comply with that request. Email Correspondence dated May 26, 2014, attached as Exhibit 7 to the Bachman Aff.

Accordingly, this Court held that "[u]nless and until the issue of [the status of the] derivative claims is resolved, I cannot determine whether some or all of the settlement proceeds with the Trump Group belong to Orly or the Orly Trust . . ." Order of the Court, Filed May 13, 2014, Doc. 925 at 4 (emphasis added), attached as Exhibit 4 to the Bachman Aff.

3

Even in the presence of this conveniently self-manufactured uncertainty by Orly as to whom the settlement proceeds belong to, *i.e.,* Orly or the Orly Trust, counsel for both Orly and the Trump Group have represented in Court that cash payments were made and will be made only to Orly. Exhibit N, Filed June 2, 2014, Doc. 1034, attached as Exhibit 6 to the Bachman Aff.  ("Orly did sign the settlement agreement, and that's a settlement in which real money is changing hands and will continue to change hands.").  Upon information and belief, Orly used the proceeds to pay her own debts, and those of her father, acts which are explicitly prohibited by the Orly Trust agreement.

To protect the interests of the Orly Trust, Dalia Genger, as trustee of the Orly Trust, now moves this Court for an order of substitution for derivative plaintiff Orly Genger on the Orly Trust Trump Group claims and for an order directing that the settlement fund with the Trump Group be deposited into Court.

Point I

Substitution of Derivative Plaintiff Orly Genger<br>
Is Necessary Because She No Longer<br>
Represents the Orly Trust on the<br>
Trump Group Claims And She Has Suggested the Trustee<br>
"Pick Up the Cudgel" on those Claims

Pursuant to CPLR 1021, "a motion for substitution may be made by the successors or representatives of a party or by any party."

Such substitution is appropriate, and indeed necessary, when a derivative plaintiff is no longer an appropriate representative plaintiff.  James v. Bernhard, 106 A.D.3d 435, 965 N.Y.S.2d 56 (1st Dep't 2013).

4

In _James_, the Court found that the substitution of independent directors in place of a club member derivative plaintiff was necessary where the derivative plaintiff club member no longer represented the club's interests.

Here too, substitution for derivative plaintiff Orly Genger is necessary because Orly Genger no longer represents the Orly Trust on those claims, and indeed she has suggested that the Trustee should "pick up the cudgel".  Memorandum of Law of Orly Genger, Doc. 775 at 2, attached as Exhibit 1 to the Bachman Aff.  Orly Genger, the party to be substituted, has expressly acknowledged that such substitution is appropriate: "Orly no longer represents the Orly Trust as to the Trump Group (while allowing  Dalia Genger to pick up the cudgel if she so chooses) . . ." Memorandum of Law of Orly Genger, Doc. 775 at 2, attached as Exhibit 1 to the Bachman Aff. (emphasis added).

Since, by her own admission and, in fact urging, Orly has said that Dalia Genger has standing to make this motion and "pick up the cudgel" on the Orly Trust Trump Claims, Dalia Genger, as Trustee, must be substituted for Orly as to the Orly Trust Trump Group claims. Memorandum of Law of Orly Genger, Doc. 775 at 2, attached as Exhibit 1 to the Bachman Aff. This substitution will, as described more fully below, protect the Orly Trust's interest in the settlement with the Trump Group.

Point II

The Proceeds of the Settlement
Should be Paid into Court
To Protect the Fund

A court may direct that funds should be paid into court if

> 1. a party has such property in his possession, custody or control as trustee for another party or where it belongs or is due to another party; or

5

> 2. a party has such property in his possession, custody or control and it belongs or is due to another party, where special circumstances make it desirable that payment or delivery to such other party should be withheld;
>
> 3. the ownership of such property will depend on the outcome of a pending action and no party is willing to accept possession or custody of it during the pendency of the action.

CPLR 2701. See, e.g., <u>Conforti v. Goradia</u>, 234 A.D.2d 237, 651 N.Y.S.2d 506 (1st Dep't 1996).

Where two parties dispute entitlement to a settlement fund of money, a court should direct payment of the fund into court under CPLR 2701, rather than allow payment to one party, to protect that fund and the mutual interests of the parties. <u>Lade v. Levitt</u>, 33 A.D.2d 956, 306 N.Y.S.2d 704 (3d Dep't 1970); <u>Rice v. DiNapoli</u>, 23 Misc.3d 1128(A), 889 N.Y.S.2d 507 (Table) (Sup. Ct. Albany County 2009); <u>Werner v. Werner</u>, 70 Misc.2d 1051, 334 N.Y.S.2d 966 (Sup. Ct. Albany County 1982)

In the instant action, this Court has held "[u]nless and until the issue of [the status of the] derivative claims is resolved, I cannot determine whether <u>some or all</u> of the settlement proceeds with the Trump Group <u>belong to Orly or the Orly Trust</u> . . ." ." Order of the Court, Field May 13, 2014, Doc. 925 at 4 (emphasis added), attached as Exhibit 4 to the Bachman Aff.

This difficulty flows from the fact that any settlement of Orly's derivative claims on behalf of the Orly Trust belongs to the Orly Trust and not to Orly, individually. See <u>Gusinsky v. Bailey</u>, 21 Misc.3d 1107(A), 873 N.Y.S.2d 234 (Table) (Sup. Ct. N.Y. County 2008), <u>rev'd on other grounds</u>, 66 A.D.3d 614, 887 N.Y.S.2d 585 (1st Dep't 2008); <u>Clarke v. Greenberg</u>, 71 N.E.2d 443, 296 N.Y. 146 (1947). Any payment of the settlement funds to Orly or any other person which belong to the Orly Trust, is improper.

It appears that Orly has deliberately manufactured confusion as to whether or not she settled the Orly Trust derivative claims against the Trump Group so that she can take all of the settlement funds for herself rather than have them paid to the Orly Trust. Counsel for both Orly and the Trump Group have represented in Court that cash payments were made and will be made only to Orly. Exhibit N, Filed June 2, 2014, Doc. 1034, attached as Exhibit 6 to the Bachman Aff. ("Orly did sign the settlement agreement, and that's a settlement in which real money is changing hands and will continue to change hands.")

Such payment only to Orly, and not the Orly Trust, is improper, since there is compelling evidence that some, if not all, of the settlement funds belong to the Orly Trust as the result of the settlement of derivative claims against the Trump Group.

The Trump Group, one of the settling parties, believes the derivative Orly Trust claims have been settled: "A material term of the agreement among the settling parties was the dismissal of *all* claims presently pending against one another, in whatever capacity they were brought. [If the settlement stipulation was drafted so as to] have the effect of *not* dismissing Orly Genger's derivative claims against the Trump Group, contrary to the agreement of the settling parties. Excluding such claims from the claims that are to be dismissed is not what the Trump Group bargained and paid for in the settlement . . ." Letter to the Court from Thomas J. Allingham II, dated June 28, 2010, Doc. 728 at 2, attached as Exhibit 2 to the Bachman Aff. (emphasis added). The Trump Group reaffirmed this aspect of the settlement:

> [any suggestion] that the confidential settlement agreement *might* only dis-miss Orly's individual claims against the Trump Group, but not resolve the Orly Trust's claims against the Trump Group and the TPR Group. (Opp'n Br. at 28) . . . is counterfactual. This Court has already held that certain of Or-ly's claims in this action, including the remaining claims, are derivative in nature, and may be maintained by Orly on behalf of the Orly Genger 1993 Trust. *See Genger v. Genger*, 966 N.Y.S.2d 346, 2013 WL 221485, at *6 (N.Y. Sup. Ct. Jan. 3, 2013) (TABLE) (citing *Genger v. Genger*, No. 109749/2009 (N.Y.

> Sup. Ct. June 28, 2010)). In settling the claims among them, the Trump Group, Trans-Resources, Orly and Arie agreed to the dismissal of all claims presently pending against one another. This agreement is memorialized in the Second Amended Stipulation of Discontinuance.

Reply Memorandum of Law of Trump Group, Filed April 17, 2014, Doc. 888 at 22-23, attached as Exhibit 3 to the Bachman Aff.

Further, in paragraph 8 of her settlement agreement, Orly agreed to "cooperate" and "cause" the Orly Trust to release any and all claims against the Trump Group." Order of the Court, Filed May 13, 2014, Doc. 925 at 4, attached as Exhibit 4 to the Bachman Aff. Pursuant to that duty, Orly not only settled all her claims in this case; she also caused the Orly Trust to release claims against the Trump Group in a parallel Delaware case, when she twice had her counsel urge (and later obtain) for "the dismissal of the last remaining Genger related case in Delaware" and "acknowledg[ing] individually and in her capacity as the beneficiary of her trust that the Trump Group are the record and beneficial owners of the TRI shares which had been distributed to the Orly Trust." Exhibit M, Filed June 2, 2014, Doc. 1034, attached as Exhibit 5 to the Bachman Aff.

All of these facts compel the conclusion that Orly's Trump Group settlement in this action resulted in the dismissal of both her individual and derivative claims, and that some, if not all, of the settlement fund belongs to the Orly Trust.

Yet, in self-manufactured confusion, notwithstanding the provisions of her own Trump Group settlement agreement and her representations to the Delaware Chancery Court, Orly told this Court that she "only dismisses Orly's individual claims against the Trump Group, but does not resolve or dismiss any claims of the Orly Trust against the Trump Group". Memorandum of Law of Orly Genger, Doc. 775 at 2, attached as Exhibit 1 to the Bachman Aff.

8

In light of the conflicting statements, this Court "invite[d] the parties to the settlement agreement to set forth the claims given up by Orly in her individual and beneficial capacities, and to explain why any derivative claims advanced in the complaint are not released in the agreement." Order of the Court, Filed May 13, 2014, Doc. 925 at 4, attached as Exhibit 4 to the Bachman Aff. Conveniently for them, none of the parties to the settlement agreement complied with the Court's request. Email Correspondence dated May 26, 2014, attached as Exhibit 7 to the Bachman Aff.

With these efforts, Orly succeeded in clouding the question of to whom the settlement proceeds belong: the Court "cannot determine whether <u>some or all</u> of the settlement proceeds with the Trump Group belong to <u>Orly or the Orly Trust</u> . . .".

Such self-manufactured confusion, though, is the very reason why the settlement proceeds must be paid into Court[1] - - to protect that fund and the mutual interest of the parties. <u>Lade v. Levitt</u>, 33 A.D.2d 956, 306 N.Y.S.2d 704 (3d Dep't 1970); <u>Rice v. DiNapoli</u>, 23 Misc.3d 1128(A), 889 N.Y.S.2d 507 (Table) (Sup. Ct. Albany County 2009). Without such an order, the Orly Trust will be denied the opportunity to obtain any of the settlement proceeds paid as the result of settling claims belonging to the Orly Trust.

---

[1] Such an order must be made against all of the settling parties since it is undisclosed who is holding the settlement proceeds. If such payment has already been made, then the recipient stands in relation as a quasi trustee of the Orly Trust and/or is in possession of funds which belong to the Orly Trust. <u>Bonham v Coe</u>, 249 A.D. 428, 292 N.Y.S. 423 (4th Dep't 1937); <u>In re Martin's Estate</u>, 96 N.Y.S.2d 842 (Surr. Ct. 1950); <u>In re Roosevelt's Estate</u>, 131 Misc. 800, 228 N.Y.S. 323 (Sup. Ct. 1928); <u>Titus v. Empire Mink Corp.</u>, 17 N.Y.S.2d 909 (Sup. Ct. 1939); <u>In re Carroll's Estate</u>, 153 Misc. 649, 275 N.Y.S. 911 (Sur. Ct. 1934). This state of facts fits squarely within CPLR 2701.

Conclusion

Dalia Genger as Trustee must be substituted in for derivative plaintiff Orly Genger since "Orly no longer represents the Orly Trust as to the Trump Group" and the settlement proceeds must be paid into Court since the Court "cannot determine whether <u>some or all</u> of the settlement proceeds with the Trump Group belong to <u>Orly or the Orly Trust</u> . . ."

Dated: New City, New York
      August 11, 2014

                                 _____/s/_____
                                 Judith Lisa Bachman, Esq.
                                 254 S. Main Street, Suite 306
                                 New City, New York 10956
                                 845-639-3210