SUPREME COURT OF THE STATE OF NEW YORK — NEW YORK COUNTY

PRESENT: _____ JAFFE _____                    *Amended Decision*
                                        *Justice*              PART 12

Genger

         - v -

Genger

INDEX NO. 651089/2010

MOTION DATE _____

MOTION SEQ. NO. 006

MOTION CAL. NO. _____

The following papers, numbered 1 to _____ were read on this motion to/for _____

| | PAPERS NUMBERED |
|---|---|
| Notice of Motion/ Order to Show Cause — Affidavits — Exhibits ... | 1, 2, 3, |
| Answering Affidavits — Exhibits _____ | 4, 5 |
| Replying Affidavits _____ | 6 |

**Cross-Motion:** ☐ Yes ☐ No

Upon the foregoing papers, it is ordered that this motion *is resolved by the annexed Decision and order*

*MOTION/CASE IS RESPECTFULLY REFERRED TO JUSTICE FOR THE FOLLOWING REASON(S):*

Dated: 1/2/13                    _____ J.S.C.

**Check one:** ☐ FINAL DISPOSITION  ☑ NON-FINAL DISPOSITION

**Check if appropriate:** ☐ DO NOT POST  ☐ REFERENCE

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK : PART 12
-------------------------------------------------------------------------x
ARIE GENGER and ORLY GENGER, in her individual
capacity and on behalf of THE ORLY GENGER 1993
TRUST,

                       Plaintiffs,

          -against-

SAGI GENGER, TPR INVESTMENT ASSOCIATES,
INC., DALIA GENGER, THE SAGI GENGER 1993
TRUST, ROCHELLE FANG, individually and as trustee
of THE SAGI GENGER 1993 TRUST, GLENCLOVA
INVESTMENT COMPANY, TR INVESTORS, LLC,
NEW TR EQUITY I, LLC, NEW TR EQUITY II, LLC,
JULES TRUMP, EDDIE TRUMP and MARK HIRSCH,

                      Defendants.
-------------------------------------------------------------------------x

Index No. 651089/2010

Argued:        3/13/12
Mot. seq. nos.:   006-007,
                009-011, 015

**AMENDED DECISION
AND ORDER**

BARBARA JAFFE, JSC:

      By notices of motion dated October 14, 2011, defendants move pursuant to CPLR 3211

for an order dismissing various causes of action asserted in the third amended and supplemental

complaint of Arie Genger and his daughter Orly Genger, in her individual capacity and on behalf

of the Orly Genger 1993 Trust (complaint). By order to show cause dated September 13, 2012,

defendants Glenclova Investment Company, TR Investors, LLC, New TR Equity I, LLC, New

TR Equity II, LLC, Jules Trump, Eddie Trump, and Mark Hirsch (Trump Group) move pursuant

to CPLR 2214(c) for an order permitting them to supplement the record of its motion (sequence

15) with a recent decision of the Delaware Chancery Court.  On or about October 17, 2012, I was

assigned to Part 12 where this action pends.

      In his complaint, Arie advances 10 causes of action including, as pertinent here, a

declaratory judgment authorizing him to reform the divorce settlement stipulation between him

and his ex-wife, Dalia Genger, the mother of Orly and Sagi Genger and trustee of the Orly Trust; constructive trust; breach of fiduciary duty, conspiracy and aiding and abetting breach of fiduciary duty; unjust enrichment and rescission; breach of contract; tortious interference with contract, and aiding and abetting tortious interference of contract; and preliminary and permanent injunctions.

## I. BACKGROUND

The history of this action is set out in opinions rendered by the justice previously assigned, the Surrogate's Court, the Delaware Chancery Court, the Delaware Supreme Court, and the United States District Court for the Southern District of New York (Southern District). Therefore, the only background provided here is for the purpose of addressing the instant motions.

In 1993, as part of a family estate plan for the benefit of his children Sagi and Orly, Arie established the Sagi Trust and the Orly Trust (the Trusts). In 2001, TPR Investment Associates (TPR), a Genger family-controlled corporation, entered into a stockholders agreement with Trump Group, whereby Trump Group obtained the right to purchase all of TPR's 3,000 shares in Trans-Resources, Inc. (TRI), another Genger family-controlled corporation. The agreement also provided that consent was required for any share transfers, except those to a "permitted transferee." (Stockholders Agreement, § 3.1).

### A. The divorce stipulation

In 2004, Arie and Dalia settled their bitterly contested divorce by entering into a so-ordered stipulation distributing their marital assets, including their interests in TPR and TRI. At the time, Arie held 51 percent of TPR's stock with the remaining 49 percent held by D&K

2

Limited Partnership (D&K). Dalia held four percent of D&K; the Sagi Trust, and the Orly Trust

held 48 percent each. TPR held 52.85 percent of TRI's common stock, and the remaining 47.15

percent was held by Trump Group.

Pursuant to the divorce stipulation and related documentation, Arie agreed to transfer his

51 percent interest in TPR to Dalia, with the proviso that TPR divest its 3,000 shares of TRI

common stock on the following terms: (1) Sagi would become TPR's president and chief

executive officer; (2) TPR would transfer to Arie 794.4 shares of TRI common stock (the Arie

Shares), representing a 13.4 percent interest in TRI; (3) TPR would transfer to each of the Trusts

1,102.8 shares of TRI common stock (the Sagi Trust Shares and the Orly Trust Shares, each

representing a 19.43 percent interest in TRI); and (4) each of the Trusts would execute

agreements providing for, *inter alia*, Arie's irrevocable right to vote the Sagi Trust Shares and

the Orly Trust Shares in TRI for the duration of his life. (2004 Transfers). The divorce

stipulation includes a clause which provides, in effect, that in the event any of the terms therein

are voided by a court of competent jurisdiction, the parties thereto may seek a court-ordered

reformation of the affected terms to give effect to the parties' original intent. (Divorce

Stipulation, Art. XVI, at 47-48).

In 2007, Dalia commenced an arbitration proceeding against Arie, contesting the

distribution of marital assets under the divorce stipulation. In 2008, an arbitration award in the

proximate amount of $3.85 million was entered in Dalia's favor.

### B.  Trump Group's acquisition of TRI shares

In early 2008, when TRI faced financial difficulties, Arie, now in control of TRI by

virtue of the 2004 Transfers, explored the possibility of obtaining capital funding for it from

Trump Group, in exchange for increasing Trump Group's equity position to become TRI's majority stockholder. While a funding plan was being negotiated and drafted, TRI's financial condition significantly improved. Arie then reneged on the funding agreement and threatened to sue Trump Group if it challenged the 2004 Transfers.

Subsequently, Trump Group asserted its right under the TRI stockholders agreement to purchase all of TPR's 3,000 TRI shares, and maintained that the 2004 Transfers under the divorce settlement and underlying transaction documents were invalid because Arie never sought its consent, as is required by the TRI stockholders agreement. Thus, on August 11, 2008, Trump Group filed an action in the Southern District against TPR and TRI, asserting that the 2004 Transfers were invalid as violative of the stockholders agreement. Arie intervened, and TPR interposed a third-party complaint against him, seeking a declaratory judgment that TPR is the true owner of all TRI shares, and that Arie had tortiously interfered with TPR's contractual and property rights in executing the divorce stipulation. In response, Arie asserted in his third-party answer various counterclaims substantially similar to those asserted in the instant action.

On or about August 22, 2008, Trump Group and TPR entered into a stock purchase agreement, whereby TPR agreed to sell the Sagi Trust's 1102.8 shares of TRI common stock to Trump Group for $26.7 million, which would result in Trump Group becoming TRI's majority stockholder. On the same day, the parties entered into a side letter agreement, whereby TPR agreed that, in the event that the 2004 Transfers of the TRI shares by TPR to the Orly Trust and Arie were determined to be invalid, Trump Group would be entitled to purchase directly from TPR the Orly Trust Shares and the Arie Shares at less than 60 percent of the per share price paid by Trump Group for the Sagi Trust Shares.

4

On August 25, 2008, after purchasing the Sagi Trust Shares from TPR, Trump Group commenced in the Delaware Chancery Court a "Section 225 proceeding" under Title 8 of the Delaware Code, asserting that it was in control of TRI via its purchase of the Sagi Trust Shares pursuant to the stock purchase agreement, and sought a judicial determination of the composition of TRI's board of directors. In an opinion dated July 23, 2010, the Chancery Court ruled, *inter alia*, that because the 2004 Transfers violated the TRI stockholders agreement, and because Trump Group never ratified the 2004 Transfers despite Arie's contrary allegation, by virtue of the stock purchase agreement, Trump Group owned the Sagi Trust Shares, giving it the majority voting control of TRI. (*TR Investors, LLC, v Genger*, 2010 WL 2901704 [Del. Ch. Ct. 2010]). The court concluded as follows:

> [T]he Trump Group controls the Trans-Resources board for the following reasons: (1) the Trump Group never received notice of the 2004 Transfers, which were made in violation of the Stockholders Agreement, until June 2008; and (2) the Trump Group did not ratify those Transfers when it bought the transferred shares from Sagi Genger and TPR. Because it never ratified the wrongful transaction, the Trump Group was free to deal with the relevant transferor, TPR, and its transferee, the Sagi Trust, and settle the matter by acquiring the wrongly transferred shares in an agreed upon negotiation. In doing so, the Trump Group clearly reserved its position that TPR made a void transfer, has proven that its position was correct, and is entitled, as a result, to be deemed to have taken the shares from TPR as a settlement of the improper Transfers. In the alternative, even if the Trump Group ratified the 2004 Transfers-which it did not-I find that the Trump Group did not purchase the shares from Sagi Genger subject to the proxy in favor of Arie Genger. Therefore, the Trump Group holds a majority equity and voting stake in Trans-Resources, and its ability to vote its shares is unaffected by the proxy.

(*TR Investors, LLC*, 2010 WL 2901704, *2).

Thereafter, in an opinion dated August 9, 2010, the Chancery Court expanded its ruling, holding that the Arie and Orly Trust Shares transferred in 2004 were also invalid, thereby entitling Trump Group to buy those shares from TPR pursuant to the side letter agreement if it

chose to do so. (*TR Investors, LLC v Genger*, 2010 WL 3279385 [Del. Ch. Ct. 2010]). Plaintiffs commenced the instant action promptly after the Chancery Court issued its July 2010 opinion.

While Arie was seeking relief in this court, he appealed the Chancery Court rulings. In an opinion dated July 19, 2011, the Delaware Supreme Court affirmed that part of the Chancery Court's findings and rulings that Trump Group had legally purchased the Sagi Trust Shares from TPR, giving it majority control of TRI, but it reversed the Chancery Court's August opinion as to the beneficial ownership of the Arie Shares and Orly Trust Shares absent personal jurisdiction over TPR and the Orly Trust which were not parties to the section 225 proceeding. (*Genger v TR Investors, LLC*, 26 A3d 180 [Del. Sup. Ct. 2011]). Promptly thereafter, Trump Group and Arie, which were parties to the Delaware court proceedings, negotiated a form of the Revised Final Judgment Order (Final Order) that reflected and implemented the various findings and rulings of the Delaware Chancery Court and the Delaware Supreme Court. It expressly provides that members of Trump Group are the "owners of . . . 67.7477 percent of the authorized and issued stock" of TRI, that TPR is the "record owner of all [TRI] shares not presently owned" by Trump Group, and that Arie and the Orly Trust "are not and have not been since at least the date of execution of the Stockholders Agreement the record owners of any [TRI] shares." (Final Order, ¶¶ 2-8). The Final Order was adopted and signed by the Chancery Court, and entered in the docket on or about August 19, 2011.

### C. Additional lawsuits arising from Trump Group's acquisition of TRI shares

On about July 22, 2011, in response to the Delaware Supreme Court's ruling, Trump Group commenced an action against Arie and TPR in the Delaware Chancery Court, seeking a declaration that it is both the record and beneficial owner of the Arie Shares. On October 4,

6

2011, Dalia, as trustee of the Orly Trust, also filed an action in the Delaware Chancery Court against Trump Group and TPR, seeking a declaration that the Orly Trust is the beneficial owner of the Orly Trust Shares. Pursuant to two separate temporary restraining orders, dated October 26, 2011 and November 9, 2011, and issued by the previously assigned justice, Dalia, TPR and Trump Group were prohibited from proceeding with the Delaware declaratory judgment actions. In addition to the foregoing court actions, counsels for TPR and Trump Group, in their capacity as escrow agents with respect to the sales of the Orly Trust Shares and the Arie Shares to Trump Group, filed separate interpleader actions in the Southern District and deposited escrowed funds of approximately $10.3 million and $7.4 million, respectively, with the Southern District clerk. As a result, there were no less than six separate actions pending in three different jurisdictions relating to the issue of the beneficial ownership of the Arie Shares and the Orly Trust Shares.

### D.  Instant motions

On March 13, 2012, oral argument on defendants' motions was heard by the previously assigned justice pending the Southern District's determination as to its jurisdiction to hear and adjudicate the primary issue of whether Arie and the Orly Trust each, respectively, has a beneficial interest in the Arie Shares and the Orly Trust Shares, which is at the heart of the parties' dispute. In an opinion dated June 14, 2012, the Southern District observed that the parties had created "a headache-inducing jurisdictional conflict" in requesting that it "clean up the mess they made by determining which of the federal or state courts should decide the issue underpinning all their claims - that is, the beneficial ownership of the Arie Shares and Orly Trust Shares." (*Glenclova Investments Co. v Trans-Resources, Inc., et al.,* __ F Supp 2d __, 2012 WL 2196670, at *5 [SDNY 2012]). While that court took "no position on the question of forum," in

7

light of the temporary restraining orders staying litigation in Delaware as to the issue of

beneficial ownership of the Orly Trust Shares and "the difficulty the Delaware Chancery Court

may have in obtaining personal jurisdiction over Arie and Orly," the Southern District concluded

that the foregoing "strongly suggests that the parties agree to litigate their claims in the New

York Supreme Court." (*Id.* at 19).

## II. ANALYSIS

In considering a motion to dismiss pursuant to CPLR 3211(a)(7), the court must

determine whether the pleadings state a cause of action. The motion must be denied if, from the

four corners of the pleadings, factual allegations are discerned which, taken together, manifest

any cause of action cognizable at law. (*Richbell Info. Servs. v Jupiter Partners*, 309 AD2d 288,

289 [1ˢᵗ Dept 2003], *quoting 511 W. 232nd Owners Corp. v Jennifer Realty Corp.*, 98 NY2d 144,

151-152 [2002]). The pleadings are afforded a liberal construction, and the court is to accord

plaintiffs the benefit of every possible favorable inference. (*Simkin v Blank*, 19 NY3d 46, 52

[2012]). However, while factual allegations in a complaint should be accorded every favorable

inference, bare legal conclusions and inherently incredible facts are insufficient. (*Matter of Sud v

Sud*, 211 AD2d 423, 424 [1ˢᵗ Dept 1995]).

Moreover, "[w]hen the moving party offers evidentiary material, the court is required to

determine whether the proponent of the [complaint] has a cause of action, not whether [he or] she

has stated one." (*Asgahar v Tringali Realty, Inc.*, 18 AD3d 408, 409 [2d Dept 2005]). And, a

cause of action may not be maintained if it is barred by, *inter alia*, collateral estoppel, res judicata

or issue preclusion. (CPLR 3211[a][5]).

8

### A. Trump Group's motion to dismiss (motion sequence number 011)

The complaint contains the following causes of action against Trump Group: declaratory judgment to reform the divorce stipulation (first cause of action); constructive trust, unjust enrichment, rescission, breach of fiduciary duty, aiding and abetting or conspiracy to commit a breach (second, third, fourth, and fifth causes of action); tortious interference with contract (ninth cause of action); and preliminary and permanent injunction (fifth and tenth causes of action). The gist of the complaint is that, because the 2004 Transfers effected by the divorce stipulation were held void and unenforceable by the Delaware courts, the divorce stipulation must be reformed in such a manner that Arie will resume beneficial ownership of the 3,000 shares of TRI stock that TPR owned before the 2004 Transfers. According to plaintiffs, any act of defendants that is inconsistent with Arie's beneficial ownership in such shares of stock is actionable and warrants the payment of damages.

### 1. Collateral estoppel

Seeking dismissal of the complaint, Trump Group argues that plaintiffs' claims are collaterally estopped by the Delaware courts' determination of factual and legal issues and even if plaintiffs are entitled to relitigate the issues underlying their claims, the complaint nonetheless does not state a cause of action. It identifies the following issues of fact and law that were decided by the Delaware courts: the invalidity of the 2004 Transfers that Arie caused TPR to make to himself and to the Orly and Sagi Trusts in violation of the TRI stockholders agreement, thereby entitling Trump Group to purchase all of TPR's 3,000 shares of stock in TRI; Trump Group's entitlement to control TRI as of 2004 when Arie caused TPR to breach the stockholders agreement; Arie's failure to provide notice of the 2004 Transfers and to obtain Trump Group's

9

consent to the Transfers, which violated the stockholders agreement; and Trump Group's ownership of 67.7 percent of TRI shares upon its purchase of the Sagi Trust Shares from TPR pursuant to the 2008 purchase agreement with TPR, which is now controlled by Sagi, as its current president and chief executive officer.

Arie argues in opposition that because: (1) the issues listed by Trump Group were decided in a statutorily limited section 225 *in rem* summary proceeding and not in a plenary action; and (2) the Delaware Supreme Court held that an adjudication of the right to vote corporate shares is not binding with respect to the beneficial ownership of such shares, the section 225 proceeding in the Chancery Court did not result in a determination of the beneficial ownership of all 3,000 TRI shares. He also contends that the Delaware courts' findings do not bind him because they neither conflict with the causes of action he advances in his complaint, nor are they essential to the Delaware courts' determinations, and because the court imposed on him a higher burden of proof. (Arie's Opposition Brief, at 11-13; Hearing Transcript, March 13, 2012, at 63). He does not contend that he did not have a full and fair opportunity to litigate in the Delaware courts. Rather, he contends that "essential parties were missing." (Arie's opposition brief, at 14).

Orly joins Arie's arguments and adds that, contrary to the position taken by TPR and Sagi, as well as Trump Group, she has legal standing to represent the Orly Trust, per the holding of the previously assigned justice. (*Genger v Genger*, NY County, June 28, 2010, Feinman, J., index no. 109749/2009). Thus, both she and Dalia assert that they may act on behalf of the Orly Trust unless and until the Surrogate's Court rules otherwise in an appropriate action there. Orly also denies that she is collaterally estopped by the Delaware decisions as she was not a party to

10

those proceedings and had no opportunity to litigate the issues there.

While a non-party may not be estopped from arguing a position previously litigated, many of the issues listed by Trump Group are closely related to the Delaware courts' invalidation of the 2004 Transfers and constitute the primary bases for the instant action, and Orly does not allege that her participation as a litigant or party in the Delaware proceedings would have altered the Delaware courts' findings and rulings that relate to the invalidation. In any event, the Delaware Supreme Court recognized that Delaware has no jurisdiction over the Orly Trust and TPR, and thus specifically left open the issue of the beneficial ownership of the Orly Trust Shares. Thus, that Orly did not litigate the 2004 Transfers issues in Delaware does not appear to have prejudiced her rights, and she does not argue otherwise. And, as Arie is estopped from arguing some of the issues (*infra*, at 12-16), and as Orly does not distinguish her arguments and issues from Arie's, instead fully adopting them, to the extent that the Delaware findings and rulings on the issues relating to such arguments apply to both Arie and Orly, and to which this court gives full faith and credit (US Const, art IV, § 1; *Ho v McCarthy,* 90 AD3d 710, 711 [2d Dept 2011]), they also bind Orly here. In this regard, I need not decide whether there is any merit to Trump Group's argument that, although Orly and the Orly Trust were not parties in the Delaware proceedings, their interest was fully represented by Arie, who acted as a fiduciary, was in privity with Orly, and actively litigated the issues raised in the Delaware proceedings on behalf of Orly and the Orly Trust.

Accordingly, where applicable, or unless otherwise specified or the context otherwise requires, all references hereinafter to "Arie" include "Orly" and the "Orly Trust." However, to avoid any possibility of risk or confusion, the decretal paragraphs set forth at the conclusion of

11

this decision and order will, where applicable, reflect the separate rulings with respect to Arie and Orly and/or the Orly Trust.

In claiming that he retains a beneficial interest in all 3,000 TRI shares including the Sagi Trust Shares purchased by Trump Group from TPR, Arie overlooks the Final Order which he himself negotiated and which gives neither Arie nor the Orly Trust record ownership of any TRI shares. And he identifies no clause or provision in the Delaware courts' opinions suggesting that he has a beneficial ownership interest in the Sagi Trust Shares. Therefore, any allegation or claim by Arie in opposition to Trump Group's motion that TPR's record ownership of all 3,000 TRI shares "remained subject to his beneficial ownership claims" has no factual or legal basis. (Arie's Opposition Brief, at 15-17). Indeed, Arie acknowledges that "[t]he Chancery Court also held that the Trumps owned the Sagi [Trust] shares under the 2008 Agreement and that the Sagi Trust Irrevocable Proxy [held by Arie] was not valid under New York or Delaware law." (*Id.* at 9).

Many of Arie's claims against Trump Group in this action are integrally related to the Delaware courts' invalidation of the 2004 Transfers, and the Delaware Supreme Court noted that Arie had "voluntarily asked the trial court to determine that he beneficially owned 13.99 percent" of TRI shares, and that Arie and Trump Group "were legally free to consent to the jurisdiction of the Court of Chancery exercising plenary *in personam* jurisdiction over themselves personally." (*Genger v TR Investors, LLC*, 26 A3d 180, 202 [Del. Sup. Ct. 2011]).

That a section 225 proceeding was *in rem* has no bearing on the preclusive effect of a decision on a subsequent action. (*Johnston v Arbitrium [Cayman Islands] Handels AG*, 198 F3d 342, 348 [2d Cir 1999] ["Under applicable Delaware law . . . the determination of an issue

12

actually litigated and decided against a defendant in an in rem case may have collateral estoppel effect in a subsequent in personam proceeding"]). In *Johnston*, the Second Circuit expressly rejected the argument that issues decided in a section 225 proceeding concerning disputed ownership and control of corporate shares could not collaterally estop claims raised in a subsequent *in personam* action involving findings and determinations made in the prior *in rem* action. And TPR and the Orly Trust's absence from Delaware was the basis for the Delaware Supreme Court's reversal of the Chancery Court's ruling with respect to the issue of beneficial ownership of the Arie Shares and the Orly Trust Shares, but not as to other findings and rulings of the Chancery Court.

The higher burden of proof imposed on Arie in the Chancery Court to prove the factual issues by clear and convincing evidence is immaterial. The Second Circuit in *Kosakow v New Rochelle Radiology Assoc.,* analyzed applicable New York law, as set forth by the Court of Appeals in *Schwartz* and followed in *Parker, supra,* and stated, in relevant part:

> The *Schwartz* opinion counsels that a functional approach should be taken in analyzing collateral estoppel in New York, and that it should not be applied rigidly . . . Notably, under this functional test, the court did not mention the burden of proof, let alone describe it as a dispositive factor. While there is a certain logical appeal to the decision in *Nesbitt* [that collateral estoppel may not apply if there is a difference in the burden of proof], *the value of collateral estoppel in fostering judicial economy and avoiding inconsistent results would be severely compromised if every shift in the burden of proof would make collateral estoppel unavailable.* . . . It follows that the New York Court of Appeals would similarly reject the proposition that collateral estoppel can never be applied where there is a difference in the burden of proof. *Schwartz's* practical approach to the issue dictates that parties not be permitted to relitigate the same issues, despite differing burdens of proof, where it is evident that burden of proof played little or no role in the prior factual determination.

13

*(Kosakow*, 274 F3d 706, 731-732 [2d Cir 2001][emphasis added]).  Absent any New York

authority to the contrary offered by Arie, *Kosakow* is persuasive.  Moreover, the Chancery Court

imposed on Arie a higher burden of proof as a sanction for spoliating evidence and contempt of

court.  To permit him to relitigate his claims here would render the sanction nugatory.

And, following *Kosakow*, the Second Circuit recently held that where a plaintiff had a full

and fair opportunity to litigate her claims in an earlier Article 78 proceeding under New York

law, she was collaterally estopped from advancing those claims in the federal action

notwithstanding the difference in the applicable burdens of proof between the proceeding and a

subsequent action in the federal court. (*Constantine v Teachers Coll.*, 448 Fed Appx 92, 94-95,

2011 WL 4509542 [2d Cir 2011]).

Most importantly, the underlying facts and record clearly reflect that Arie had a full and

fair opportunity in the Delaware courts to litigate the issues regarding invalidation of the 2004

Transfers. (*Schwartz v Public Adm'r of County of Bronx*, 24 NY2d 65, 73 [1969] [while burden

of proving identity of issues rests on proponent of collateral estoppel, opponent bears burden of

proving that he or she did not have full and fair opportunity to litigate issues in earlier action]);

*accord Parker v Blauvelt Volunteer Fire Co.*, 93 NY2d 343, 349 [1999]).  Accordingly, to the

extent that the allegations in support of the causes of action asserted in the complaint are

contradicted by the findings and rulings of the Delaware courts, Arie is collaterally estopped

from relitigating them. (CPLR 3211[a][5]).

2.  Declaratory judgment to reform the divorce stipulation (first cause of action)

Arie seeks a declaratory judgment against Trump Group and other defendants to reform

the divorce stipulation based on: (1) the provision giving the parties the right to seek a

14

court-ordered reformation to reflect their original intent in the event that any portion of the stipulation is held to be invalid; (2) the Delaware courts' invalidation of the 2004 Transfers and the irrevocable proxies held by Arie to vote the Orly Trust Shares and the Sagi Trust Shares; and (3) his and Dalia's mutual mistake in believing that the 2004 Transfers and the irrevocable proxies were valid.  In seeking reformation, Arie wants, *inter alia*, the 3,000 TRI shares held by TPR prior to the 2004 Transfers placed in a new entity to be controlled by him, and for him to retain all voting rights to such shares. (Complaint, ¶¶ 175-189).  This is the only cause of action where Orly and the Orly Trust are not co-plaintiffs with Arie.

The Southern District observed not only that the instant action is "little more than a collateral attack on the Delaware Supreme Court ruling," but that authorizing Arie to reform the corporate ownership structure in TPR and TRI, including allowing him to retain his voting rights in all 3,000 shares of TRI stock, constitutes a collateral attack on the Delaware courts' determinations, whereby they unequivocally ruled, *inter alia*, that he has no right to vote any of the shares because the irrevocable voting proxies held by him pursuant to the 2004 Transfers are invalid. (*Glenclova Investments Co. v Trans-Resources, Inc., et al.,* __ F Supp 2d __, 2012 WL 2196670, at *5).  It also noted that Arie's federal counterclaims, which are substantially similar to those advanced here, including the reformation claim, are directed against 13 counterclaiming defendants including Dalia, even though 12 of them were not parties to the divorce stipulation, and "the majority of the counterclaims do not name Dalia at all." (*Id.* at 17).  Moreover, the Southern District observed that:

> even though Arie is the party who made false representations in the [Divorce] Stipulation of Settlement, his reformation claim does not seek to right that wrong.  Instead, he wants to change the terms of

15

the [Stipulation] in a manner designed to undo the Delaware
Chancery Court's finding of liability against him, thereby allowing
him to avoid the consequences of his own breach of the 2001 [TRI]
Stockholders Agreement - Trump Group's right to purchase those
invalidly transferred shares.

(*Id*. at 17).  Consequently, Arie is collaterally estopped from seeking a declaratory judgment to

reform the divorce stipulation, at least as asserted against Trump Group, as it is "little more than

a collateral attack on the Delaware Supreme Court ruling," and as Trump Group is not a party to

the divorce stipulation.  Although Arie maintains that Trump Group is a necessary party because

it holds the 3,000 TRI shares needed to implement the reformation, the remedy of reformation or

rescission is unavailable against a nonparty to a contract. (*Baranek v Baranek*, 54 AD3d 789, 790

[2d Dept 2008]).

　　　And, as Trump Group was not a party to the divorce stipulation, Arie's and Dalie's

alleged "mutual mistake" in effecting the 2004 Transfers is immaterial and may not be used as a

defense in Arie's dispute with Trump Group.  Moreover, Arie seeks to undo the Delaware courts'

adverse findings against him and Trump Group's right to buy the "invalidly transferred shares,"

notwithstanding that they were transferred as a result of his misrepresentation in the divorce

stipulation that no consent, other than TPR's, was required for the 2004 Transfers.  In any event,

any equitable or contractual right in favor of Arie to reform the divorce stipulation does not

override the pre-existing contractual right of Trump Group to purchase the invalidly transferred

shares, when it was Arie then in control of TPR who caused TPR to breach the TRI stockholders

agreement.

　　3. Constructive trust, unjust enrichment and rescission (second and fourth causes of action)

　　　The elements of a cause of action for a constructive trust are: "(1) a confidential or

16

fiduciary relation; (2) a promise, express or implied; (3) a transfer made in reliance on that promise; and (4) unjust enrichment." (*Wachovia Sec., LLC v Joseph*, 56 AD3d 269, 271 [1st Dept 2008]). Arie asserts that New York courts frequently impose constructive trusts with "sufficient flexibility" to prevent enrichment and that the "constructive trust doctrine is not rigidly limited." (Arie's Opposition Brief, at 20).

Arie alleges that Trump Group is not a bona fide purchaser, and that a constructive trust should be imposed in his favor with respect to all 3,000 shares of TRI stock that reverted to TPR because Trump Group, as well as Sagi, TPR's current president, owe fiduciary and contractual duties to Arie and the Orly Trust. (*Id.* at 23). According to Trump Group, however, it had neither a confidential nor fiduciary relationship with Arie and/or the Orly Trust.

Courts have held that "a person wrongfully acquiring property can be treated as a constructive trustee notwithstanding the lack of a fiduciary relationship." (*See eg In re Koreag, Controle et Revision S.A. v Refco F/X Assoc.*, 961 F2d 341, 353 [2d Cir 1992]), *citing Simonds v Simonds*, 45 NY2d 233, 242 [1978]). Whether Trump Group was a bona fide purchaser or whether it owed a confidential or fiduciary relationship need not be decided for purposes of addressing Arie's claim for a constructive trust.

In an earlier decision in this action entered on January 3, 2012 (motion sequence numbers 004 and 005), the previously assigned justice denied plaintiffs' request for an order enjoining defendants from taking certain actions, including any act to sell or transfer the Arie and Orly Trust Shares pending a final adjudication of beneficial interest, finding that an injunction would interfere with TRI's management in which Trump Group holds majority control, that plaintiffs have alternative remedies even if they obtain a final judicial determination of beneficial interest,

17

and that requiring Trump Group and TPR to comply with the court's order in giving 10 business days' notice to plaintiffs of a proposed future transaction, except with respect to share dilution, is sufficient to maintain the status quo. (*Genger v Genger*, Dec. 28, 2011 [Sup Ct, NY County]).

The same considerations render unnecessary Arie's claim for a constructive trust as, *inter alia*, the notice requirement affords plaintiffs a sufficient opportunity to seek judicial relief in the event that defendants propose to enter into a transaction that may adversely affect plaintiffs' asserted interest in the Arie Shares and the Orly Trust Shares.

In order to plead a cause of action for unjust enrichment adequately, a plaintiff must allege "that (1) the other party was enriched, (2) at that party's expense, and (3) that it is against equity and good conscience to permit the other party to retain what is sought to be recovered." (*Georgia Malone, Inc. v Rieder*, 19 NY3d 511, 515 [2012], citing *Mandarin Trading Ltd. v Wildenstein*, 16 NY3d 173, 182 [2011]).

In his complaint, Arie alleges, *inter alia*, that: (1) TPR/Sagi had no authority to sell the 3,000 TRI shares to Trump Group when the Delaware courts had determined that the 2004 Transfers were void *ab initio* as the shares then reverted to TPR subject to Arie's interest by virtue of the divorce stipulation; (2) the purchase price paid by Trump Group for the 3,000 TRI shares under the purchase agreement for the Sagi Trust Shares and the side letter agreement for the Arie Shares and Orly Trust Shares was a fraction of the value of such shares; and (3) Trump Group was not a bona fide purchaser and would be unjustly enriched if allowed to benefit from TPR's sale of the TRI shares.

Trump Group does not specifically deny that the per share price paid for the Arie and the Orly Trust Shares was significantly lower than that for the Sagi Trust Shares, and its assertion

18

that the Delaware courts have held that it was "entitled to buy TPR's TRI shares at 2004 values, which were far less than the $26 million Trump Group paid TPR just for the Sagi Trust Shares" does not defeat a claim of unjust enrichment because that portion of the Chancery Court's opinion does not address the purchase price for the Arie Shares and Orly Trust Shares or the side letter agreement, nor does it compare the per share price difference. Moreover, Trump Group's contention that the claim for unjust enrichment requires a fiduciary or confidential relationship, and must be pleaded with specificity, is not supported by the opinions it cites in its moving papers. Rather, a fiduciary or confidential relation is an element of a constructive trust claim. (*Supra*, at 16-17). Consequently, Arie has sufficiently alleged, for the purpose of CPLR 3211(a)(7), a claim for unjust enrichment.

Rescission is a part of the fourth cause of action. As Trump Group was not a party to the divorce stipulation, and for the reasons fully discussed above in connection with the dismissal of the reformation claim (*supra*, at 16-18), rescission does not lie against Trump Group.

4. Permanent injunction (fifth cause of action) and preliminary injunction (tenth cause of action)

Plaintiffs seek to preliminarily and permanently enjoin Trump Group from transferring, selling, pledging, assigning, diluting, voting or otherwise disposing of all 3,000 shares of TRI stock that reverted to TPR as a result of the Delaware court rulings. The reasons set forth above for dismissing the constructive trust claim (*supra*, at 16-18) apply equally here. In addition, the Delaware courts held that Arie and the Orly Trust are not the record owners of any TRI shares, and that no TRI shares owned by Trump Group or owned of record by TPR are subject to any proxy of any kind in favor of Arie. (Final Order, ¶¶ 7-10). Thus, granting the requested injunctive relief in plaintiffs' favor to enjoin Trump Group and TPR from exercising their

19

respective voting rights in the TRI shares would constitute a collateral attack on the court rulings.

### 5. Breach of fiduciary duty, conspiracy, and aiding and abetting breach of fiduciary duty
### (third cause of action)

The elements of a cause of action for a breach of fiduciary duty are: "the existence of a fiduciary relationship . . . misconduct by the defendant, and . . . damages . . . caused by the defendant's misconduct." (*Rut v Young Adult Inst., Inc.*, 74 AD3d 776, 777 [2d Dept 2010]). Arie alleges, *inter alia*, that: (1) upon becoming the majority shareholder of TRI in 2008 after purchasing the Sagi Trust Shares from TPR, Trump Group owed a fiduciary duty to him and the Orly Trust as the "known beneficial owners" of the Arie Shares and Orly Trust Shares in TRI; and (2) as a majority shareholder, Trump Group breached its fiduciary duty by purchasing the Arie Shares and the Orly Trust Shares at a significant discount, thereby advancing its scheme to squeeze Arie out of TRI. (Complaint, ¶¶ 209-214).

Although Trump Group does not deny that it became a majority shareholder of TRI after it purchased the Sagi Trust Shares in 2008 and that as a majority shareholder, it owed a fiduciary duty to TRI minority shareholders (*Richbell Info. Servs.*, 309 AD2d at 300 ["(a) majority shareholder in a close corporation is in a fiduciary relationship with the minority"]), it denies knowing that plaintiffs were beneficial owners of any TRI shares, and thus could owe them no fiduciary duty.

Even assuming that Trump Group was unaware that plaintiffs were beneficial owners in 2008 when it entered into the side letter agreement to buy the Arie Shares and the Orly Trust Shares, it became aware of it by 2011 when it exercised its option to buy Arie's and the Orly Trust's shares, as since at least 2008, they asserted beneficial ownership in the shares, even if it

20

had not yet been judicially determined.

Trump Group also denies owing any duty because when it executed the side letter agreement it was not a majority shareholder, and that, even assuming it owed a fiduciary duty, the sole duty was to refrain from using its majority power to oppress the minority, and Arie does not allege that TPR, the minority shareholder, was oppressed.

Here, the fiduciary duty arose in 2008 after the Sagi Trust Shares were purchased, and the allegation is that the duty was breached in 2011 when Trump Group bought the Arie Shares and the Orly Trust Shares at a deep discount with the intent of removing plaintiffs, who have claimed, at least indirectly, to be putative minority shareholders of TRI through their interest in TPR, after the Delaware courts ruled that the 2004 Transfers were void and the transferred Arie Shares and Orly Trust Shares reverted to TPR.  In any event, "whether such [fiduciary] obligation exists is necessarily fact-specific to the particular case," and it would be premature to dismiss the claim before discovery is undertaken to ascertain the facts. (*Weiner v Lazard Freres & Co.*, 241 AD2d 114, 122 [1ˢᵗ Dept 1998]).  Consequently, for all of these reasons and for purposes of CPLR 3211(a)(7), the complaint adequately states a claim for breach of fiduciary duty against Trump Group.

It is also alleged, in addition to the direct breach of fiduciary duty, that Trump Group conspired with other defendants, and aided and abetted them in the breach of their fiduciary duty. To state a claim of aiding and abetting a breach of fiduciary duty, the complaint must contain facts to support "a fiduciary duty owed to plaintiff . . . a breach of that duty, and [the] defendant's substantial assistance in effecting the breach,'" which resulted in damages. (*Monaghan v Ford Motor Co.*, 71 AD3d 848, 850 [2d Dept 2010]).  While an entity such as TPR owes no fiduciary

21

duty to its shareholders under New York and Delaware laws, as argued by Trump Group, the complaint is replete with allegations that Sagi, as TPR's president, breached fiduciary duties he owed to Arie, as well as other allegations that the 2008 purchase agreement and the side letter agreement constituted a $26.7 million bribe offered by Trump Group to Sagi, to betray and rob his father and sister of their interests in the relevant TRI shares, and to squeeze them out of TRI at unconscionably low prices. (Complaint, ¶¶ 123, 135).

The complaint thus contains sufficient factual allegations supporting a claim that Sagi breached his fiduciary duty to Arie (*infra*, at 27-28), as does the claim that Trump Group aided and abetted Sagi in breaching it. Moreover, "actual knowledge" of the alleged wrongdoing "need only be pleaded generally . . . particularly at the pre-discovery stage." (*Oster v Kirschner*, 77 AD3d 51, 55 [1ˢᵗ Dept 2010]).

However, the complaint is not only bereft of an explicit and independent allegation of conspiracy, but such a cause of action does not exist, as it is well settled that "a mere conspiracy to commit a [tort] is never of itself a cause of action," even though allegations of a conspiracy are permitted to connect defendants with an otherwise actionable tort. (*See Alexander & Alexander v Fritzen*, 68 NY2d 968, 969 [1986]).

### 6. Tortious interference with contract (eighth cause of action)

The elements of a cause of action for tortious interference of contract are: "(1) the existence of a valid contract between the plaintiff and a third party, (2) the defendant's knowledge of that contract, (3) the defendant's intentional procurement of the third party's breach of that contract, and (4) damages." (*Chung v Wang*, 79 AD3d 693, 694 [2d Dept 2010]).

The complaint contains allegations that Trump Group interfered with several contracts,

22

including the divorce stipulation, the 2004 Transfer documents between Arie and TPR, and the 2004 voting trust agreements between Arie and the Orly and Sagi Trusts. However, absent any allegation in the complaint that Dalia breached the divorce stipulation and the related documentation, there can be no finding that Trump Group tortiously interfered with the divorce stipulation and the related documentation.

Although the Delaware courts held that the 2004 Transfers are void, Arie argues that the Delaware Chancery Court held that the 2004 Transfers are unenforceable, whereas the 2004 Transfer documents and the 2004 voting trust agreements are void. (Arie's Opposition Brief, at 32). He also maintains, however, that "[on] July 23, 2010, the Delaware Chancery Court issued a lengthy written decision which held that the 2004 transfers of TPR's TRI shares to Arie, the Sagi Trust and the Orly Trust pursuant to the Divorce Decree were void . . . ." (*Id.* at 9). Arie then asks that instead of considering the illegal contract void in toto, the illegal provision be severed, thereby permitting the validation of the balance of the agreement. (*Id.* at 33). In his view, because the 2004 Transfer documents and voting trust agreements contained "valid and binding provisions" that required Sagi and TPR to take "all necessary actions . . . to complete or perfect the transactions contemplated hereby," a tortious interference claim may be alleged against Trump Group for causing the other defendants to breach these contractual provisions. (*Id.*).

Trump Group, however, rightly maintains that "because the 2001 Stockholders Agreement prohibited any transfers to the Trusts, any purported obligations on the part of TPR and Sagi to cooperate with such improper transfers cannot be enforced and cannot give rise to an interference claim [against Trump Group.]" (Trump Group's Reply Brief, at 19). And, as Arie failed to provide notice to Trump Group with respect to TPR's transfer of the Arie Shares to

23

himself, which notice was required by the stockholders agreement even though he was a permitted transferee, the transfer of the Arie Shares was also void, as determined by the Delaware court.

### B. Motion of TPR and Sagi Trust to dismiss (motion sequence number 010), motion of Rochelle Fang, individually and as trustee of Sagi Trust to dismiss (motion sequence number 009), and motion of Sagi to dismiss (motion sequence number 007)

The complaint contains various causes of action against TPR, Sagi Trust, Sagi and Rochelle Fang (Fang), trustee of the Sagi Trust, including: a declaratory judgment to reform the divorce stipulation (first cause of action); constructive trust (second cause of action); breach of fiduciary duty, conspiracy and aiding and abetting in the breach of fiduciary duty (third cause of action); unjust enrichment and rescission (fourth cause of action); breach of contract (sixth and seventh causes of action); aiding and abetting tortious interference with contract (ninth cause of action); as well as preliminary and permanent injunctions (fifth and tenth causes of action). These defendants seek the dismissal of all of these causes of action as asserted against each of them. They also contend that this court lacks jurisdiction over the Sagi Trust, but they do not refute the assertion that the Sagi Trust is a New York trust and that its beneficiary resides in New York.

### 1. Declaratory judgment for reformation (first cause of action)

It cannot be disputed that TPR, Sagi Trust, Sagi, and Fang are not parties to the divorce stipulation. Yet, Arie argues in opposition to these defendants' motions to dismiss that, because reformation of the divorce stipulation requires these defendants' participation, they are "necessary parties" to the reformation process and that complete relief cannot be obtained in their absence. (Arie's Opposition Brief, at 9-10). The reasons set forth above, in connection with

24

Trump Group's motion to dismiss the declaratory judgment for reformation against it (*supra*, at 14-16), apply equally to the instant claim against these defendants.

### 2. Constructive trust, unjust enrichment and rescission (second and fourth causes of action)

The cause of action for a constructive trust claim against TPR, Sagi, the Sagi Trust and Fang fails for the same reasons set forth above in connection with dismissal of that cause of action against Trump Group. (*Supra*, at 16-18). More specifically, as TPR and Sagi are required to give 10 days' notice to plaintiffs of a proposed transaction (except share dilution) involving the Arie and Orly Trust Shares (*Genger v Genger*, Dec. 28, 2011 [Sup Ct, NY County]), such notice is sufficient to afford them an opportunity to seek any necessary judicial relief.

Arie argues that allowing TPR to retain any benefit arising from its record ownership of the TRI shares that reverted to it as a result of invalidation of the 2004 Transfers constitutes unjust enrichment because TPR had divested itself of such TRI shares "in consideration for and as a condition of Arie giving up his 51 percent ownership interest in TRI." (Arie's Opposition Brief, at 10-12). However, it was Arie who had control of TPR before the 2004 Transfers and it was he who caused TPR to enter into the 2004 Transfers, which were invalidated by the Delaware courts.

However, to the extent that Arie alleges in the complaint that TPR entered into the 2008 side letter agreement with Trump Group to sell the Arie Shares and the Orly Trust Shares at a discount and that TPR benefited from the transaction at his expense and that of Orly and the Orly Trust, there exists a viable claim of unjust enrichment, which the Chancery Court apparently noticed when it observed that "it may be that [Arie] Genger and Orly Genger have claims against TPR and Sagi Genger over how the price paid by Trump Group for the Arie and Orly Shares was

25

allocated . . . If those transferees [i.e., Arie and the Orly Trust] have any beef with TPR or Sagi Genger, the transferees are free to file suit against them." (*TR Investors, LLC v Genger*, 2010 WL 3279385, *3 [Del. Ch. Ct. 2010]).

Arie also argues that an inference must be drawn that "Fang benefited at Arie's expense from her involvement in the conspiracy designed to squeeze [him] out of TRI [and] her central role and complicity in accepting the $26.7 million bribe paid to the Sagi Trust by Trump Group for the purported sale of the Sagi Trust TRI shares." (Arie's Opposition Brief, at 12). He fails to allege, however, with any particularity, that Fang, individually or in her capacity as trustee of the Sagi Trust, was unjustly enriched, and at oral argument, Arie's counsel stated, in relevant part that the "claim is for aiding and abetting. For some reason [Fang] was brought back for a very short period of time . . . to execute the 2008 Stockholders [sic] Agreement, and we have alleged that they aided and abetted each other . . . and that [Fang] was the alter ego and co-agent of Sagi in his breaches of fiduciary duty. That is why she's in the case." (Hearing Transcript, March 13, 2012, at 139). Thus, the claim against Fang is based on her aiding and abetting Sagi in his breach of fiduciary duty, rather than on the allegation that she was unjust enriched, either individually or as trustee for the Sagi Trust. Moreover, Arie does not explain in either the complaint or his Opposition Brief how the Sagi Trust itself was unjustly enriched, and Arie failed in the Delaware court proceedings to mount a successful challenge to Trump Group's purchase of the Sagi Trust Shares.

Sagi contends that as unjust enrichment constitutes a "quasi-contract claim" and as there are "written contracts dealing with the same subject matter," the cause of action for unjust enrichment is not viable. (Sash Affirmation in Support of [Sagi] Motion to Dismiss, ¶ 12).

However, Arie, Orly and/or the Orly Trust were not parties to the 2008 side letter agreement and thus they have no standing to assert a breach of contract claim. Moreover, the side letter agreement was executed by Trump Group and TPR, by Sagi, and he knew or should have known that Arie and Orly have asserted beneficial interest claims in the Arie Shares and Orly Trust Shares since at least 2008, but he nonetheless caused TPR to sell the Shares in 2011 at an allegedly heavily discounted price. Indeed, Arie asserts that TPR is controlled by Sagi, and that Sagi, *inter alia*, breached his fiduciary duties and was unjustly enriched. In light of the foregoing, and given the position of the Delaware Chancery Court on the issue (*supra*, at 25-26), the unjust enrichment claim against Sagi is viable.

As TPR, Sagi, the Sagi Trust and Fang were not parties to the divorce stipulation, however, the cause of action seeking rescission has no factual or legal basis. (*Supra*, at 19).

### 3. Breach of fiduciary duty, conspiracy and aiding and abetting breach (third cause of action)

Arie fails to set forth any statutory or decisional law for the proposition that a corporation, such as TPR, takes on or otherwise assumes the fiduciary duties of its directors and officers such as Sagi, to its purported shareholders, such as Arie and the Orly Trust. Indeed, a corporation owes no fiduciary duties to its shareholders. (*See Gates v Bea Assoc., Inc.*, 1990 WL 180137, *6 [SD NY 1990] [to permit aiding and abetting claim against corporation would "completely undermine and negate the rule that a corporation does not have fiduciary duties to its shareholders."]).

The breach of fiduciary claim against the Sagi Trust and Fang is based, according to Arie, on their obligation, individually and as trustee under the divorce stipulation and the 2004 Transaction documents, to ensure that Arie would maintain voting control over the Sagi Trust

27

Shares for the duration of his life. (Arie's Opposition Brief, at 17). However, the voting trust agreements and the proxies held by Arie with respect to the Sagi Trust and Orly Trust Shares as well as the Arie Shares were invalidated by the Delaware courts, due to Arie's breach or violation of the stockholders agreement.

Arie also alleges that the Sagi Trust and Fang aided and abetted Sagi and Trump Group in breaching the respective fiduciary duties they owed to him. As the Delaware courts upheld the sale of the Sagi Trust Shares to Trump Group, and absent any allegation that the Sagi Trust and Fang owe Arie a fiduciary duty with respect to the Arie Shares and the Orly Trust Shares, the Sagi Trust and Fang could not have aided and abetted Trump Group or Sagi in breaching their fiduciary duties in such a transaction. Similarly, the complaint does not set forth facts as to why Orly can assert a breach of fiduciary duty claim against Fang, inasmuch as Orly does not allege that she is also a beneficiary of the Sagi Trust which Fang served as the trustee.

Sagi conclusorily denies owing a fiduciary duty to Arie, just as TPR owes no fiduciary duty to Arie. However, the complaint is replete with allegations of a fiduciary duty owed to Arie by Sagi, individually and as a TPR officer, which was breached by Sagi in causing TPR to enter into the stock purchase and side letter agreements, when he used his position as president of TPR and caused TPR to sell the Arie and Orly Trust Shares to Trump Group at a fraction of their fair market value. And, Sagi does not dispute that a director or officer of a corporation owes fiduciary duties to the corporation and its shareholders. Indeed, the Southern District observed that, even if Arie's reformation counterclaim constitutes a basis for abstaining from exercising jurisdiction, certain of his other counterclaims do not compel abstention, "particularly the claims for breach of fiduciary duty against Sagi and others (premised on Sagi's implementation of the

28

2008 side letter agreements on behalf of TPR) . . . ." (*Glenclova Investments Co. v Trans-Resources, Inc., et al.*, __ F Supp 2d __, 2012 WL 2196670, at *17 [SDNY 2012]). The aiding and abetting breach of fiduciary duty claim against Sagi also survives Sagi's motion to dismiss, as discussed above relating to the survival of the breach of fiduciary duty claim against Trump Group (*supra*, at 20-22), and it is alleged that Sagi assisted or aided and abetted Trump Group in the breach of such duty.

### 4. Breach of contract against TPR and Sagi Trust (sixth and seventh causes of action)

To state a claim for breach of contract, the complaint must allege the existence of a contract, plaintiff's performance, defendant's nonperformance, and resulting damages. (*Elisa Dreier Reporting Corp. v Global NAPS Networks, Inc.*, 84 AD3d 122, 127 [2d Dept 2011]).

Arie alleges that "TPR breached the 2004 Transfer Agreement by executing the 2008 Stock Purchase and Side Letter Agreements and purporting to sell the TRI shares to Trump Group in disregard of Arie's beneficial and voting rights, thereby failing to effectuate the express intent of the parties to the 2004 Transaction Documents and the [divorce stipulation.]" (Arie's Opposition Brief, at 22). As discussed *supra*, at 25, Arie brought about his own loss of voting rights in the TRI shares, in spite of the voting trust agreements and the irrevocable proxies held by him, by causing TPR to enter into the 2004 Transfers without obtaining the required consent, as a result of which the Delaware courts found the proxies unenforceable. Moreover, Arie was not a party to the 2008 side letter agreements which allegedly sought to deprive Arie and Orly of the asserted claims of beneficial interests in the Arie and Orly Trust Shares when such shares reverted to TRP, albeit such interests have not been judicially determined, and thus has no standing to assert a breach of contract claim as to these agreements.

Further, the breach of contract claim in the seventh cause of action against the Sagi Trust

is not viable for the same reason that the breach of fiduciary duty claim against the Sagi Trust is

not, as discussed above. (*Supra*, at 27).

Arie also observes that defendants "conveniently ignore the fact that the Delaware Courts

made no determinations as to the validity of the Back-Up Voting Trust Agreements, the express

intent of which was to ensure that Arie would maintain voting control . . . in the event the

irrevocable proxies were determined to be invalid." (Arie's Opposition Brief, at 23).  Having

failed to raise this claim or issue in Delaware, the argument is precluded, and in any event, does

not apply as to Orly as any voting right under the back-up voting trust agreements was held only

by Arie.  In the Delaware proceedings, voting right was clearly an important issue for Arie.

Thus, his belated attempt to raise it now is untenable and a waste of judicial resources. (*Olawoyin*

*v 520 W. 43rd St. Partners, LLC*, 34 Misc 3d 130 [A], 2011 NY Slip Op 52328 [U], *1 [App

Term, 1st Dept 2011] [plaintiff's claim "properly dismissed under familiar principles of res

judicata, since the claim could have been litigated in the prior . . . proceeding between the

parties"]; *see also Landau, P.C. v LaRossa, Mitchell & Ross*, 11 NY3d 8, 12-13 [2008] ["once a

claim is brought to a final conclusion, all other claims arising out of the same transaction or

series of transactions are barred, even if based upon different theories or if seeking a different

remedy."]).

### 5.  Aiding and abetting tortious interference with contract (ninth cause of action)

In the complaint, Arie alleges that Sagi, Fang and the Sagi Trust "each had knowledge of

[Trump Group's] tortious interference with the 2004 TPR Transaction Agreement and the

[divorce stipulation]" as well as "the 2004 Voting Trust Agreements," and that each had aided

and abetted, and provided substantial assistance to Trump Group in committing tortious acts.

(Complaint, ¶¶ 253-256).  As the tortious interference of contract claim against Trump Group

(eighth cause of action) is legally insufficient (*supra*, at 22-24), so too is the aiding and abetting

claim against Sagi, Fang and the Sagi Trust as they cannot have aided and abetted Trump Group

in committing a tort that could not have been committed.  Moreover, no liability for tortious

interference generally attaches when the defendant is a party to the subject contract (*UBS Sec.*

*L.L.C. v Highland Capital Mgt., L.P.*, 86 AD3d 469, 476-477 [1st Dept 2011]), and Arie offers no

proposition of law to the contrary.

　　　　In addition, Arie contends that the Sagi Trust "aided and abetted Trump Group's tortious

interference with the Back-Up Voting Trust Agreement between Arie and the Orly Trusts."

(Arie's Opposition Brief, at 24).  However, as discussed *supra*, at 30, any claim made by Arie

with respect to the back-up voting trust agreement is res judicata, and the allegation that the Sagi

Trust aided and abetted Trump Group in violating the agreement has no legal basis as the

agreement is longer legally enforceable.

　　　　6.  Preliminary and permanent injunctions (fifth and tenth causes of action)

　　　　For the reasons set forth in conjunction with the dismissal of the fifth and tenth causes of

action against Trump Group (*supra*, at 19-20), these causes of action against TPR, Sagi, Fang

and the Sagi Trust are also not viable.

　　　　C.  Motion of Dalia Genger to dismiss (motion sequence number 006)

　　　　In his complaint, Arie asserts causes of action against Dalia for a declaratory judgment to

reform the divorce stipulation (first cause of action), constructive trust (second cause of action),

unjust enrichment and rescission (fourth cause of action), and permanent injunction (fifth cause

31

of action).

### 1. Declaratory judgment for reformation (first cause of action)

According to Arie, the reformation claim is based on: (1) the right set forth in the divorce stipulation entitling him to seek reformation when the 2004 Transfers were voided by the Delaware courts; and (2) mutual mistake in that both he and Dalia reasonably believed that the 2004 Transfers were valid when they signed the divorce stipulation.

Dalia argues that the reformation claim must be dismissed because: (1) the relevant provision in the divorce stipulation was not triggered by the Delaware court which held only that Arie failed to give notice or seek consent of the other shareholders, such as the Trump Group, for the 2004 Transfers and did not hold that the provision was void or unenforceable; (2) Arie is barred from altering the economics of the divorce stipulation because the $3.85 million 2007-2008 arbitration award in favor of Dalia effected a final resolution and conclusion of all disputes thereunder; and (3) there was no mutual mistake because Arie knew that the consent of other shareholders was required for the 2004 Transfers.

Although the Delaware courts' ruling voiding the 2004 Transfers arguably gives rise to a claim for contractual reformation, the scope of the reformation sought is precluded because Arie seeks, *inter alia*, full control of all 3,000 shares of TRI stock and the voting rights related thereto, and the Delaware courts ruled that Trump Group outright owns 67.7 percent of all TRI shares, including the 1,100 Sagi Trust Shares, and that TPR is the record owner and has voting rights as to those TRI shares that are not currently owned by Trump Group. Thus, the requested reformation constitutes an impermissible collateral attack on the Delaware court's decisions, which are entitled to full faith and credit. Moreover, as observed by the Southern District,

32

instead of seeking to right the wrong he had committed with respect to the divorce stipulation,

Arie seeks a declaratory judgment to undo the Delaware rulings and avoid the consequences of

his own breach of the TRI stockholders agreement. (*Supra*, at 15-16). Thus, any right to

reformation Arie might have had pursuant to the divorce stipulation is vitiated by the Delaware

court rulings and by his own acts.

As Arie's claim is brought after the 2004 Transfers were invalidated by the Delaware

courts in 2010, it could not have been raised before or during the conclusion of the arbitration

proceedings in 2008. (*See Indosuez Intl. Fin. v National Reserve Bank*, 304 AD2d 429, 430 [1ˢᵗ

Dept 2003] [res judicata inapplicable if claim arose after conclusion of prior action]). Thus, the

arbitration award has no impact on the instant reformation claim.

In the alternative, Arie contends that the divorce stipulation may be equitably, as opposed

to contractually, reformed due to a "mutual mistake." Although he maintains that both he and

Dalia "reasonably believed" that the 2004 Transfers were valid, he was discredited by the

Delaware courts, and Dalia denies it. Moreover, the Delaware Supreme Court specifically stated

that "[Arie's] misrepresentation was false. In fact, the prior consent of Trump Group signatories

to the Stockholders Agreement . . . was required," and that "when [Arie] effectuated the 2004

Transfers, [he] knew that neither [the Orly or the Sagi] Trust was a 'Permitted Transferee' of the

[TRI] shares under the Stockholders Agreement." (*Genger v TR Investors, LLC*, 26 A3d 180,

184, 185 [Del. Sup. Ct. 2011]). Therefore, crediting Arie's unsubstantiated or conclusory

allegation of a "mutual mistake," would result in an improper end run around the Delaware

courts' determinations.

And, the Court of Appeals recently rebuffed a husband's attempt to reopen a divorce

33

settlement based on alleged post-divorce changes in asset valuation. (*Simkin v Blank*, 19 NY3d 46 [2012]). There, the husband alleged that he and his wife were mutually mistaken about the value of an investment account as it had never actually existed due to Bernard Madoff's Ponzi scheme. First, the Court observed that "a claim predicated on mutual mistake must be pleaded with the requisite particularity necessitated under CPLR 3016 (b) . . . [and] that the mutual mistake must exist at the time the contract is entered into and must be substantial," and that any court-ordered relief of reformation is reserved only for "exceptional situations." (*Id.* at 52). The Court, moreover, analogized the circumstances with a dispute over marital assets that unexpectedly gained or lost value after the dissolution of the marriage. (*Id.* at 55). Here, it is apparent that the value of TRI shares increased subsequent to the execution of the divorce stipulation and that Arie did not expect that the economic scheme he had carefully devised under it would be invalidated by the court.

    2.  Constructive trust, unjust enrichment and rescission (second and fourth causes of action)

        Arie alleges that Dalia has been unjustly enriched because (1) the 2004 Transfers were voided and the transferred shares reverted to TPR, and (2) if Dalia were permitted to retain the 51 percent interest in TPR she received under the divorce stipulation while Arie was divested of his 14 percent interest in TRI and his right to vote 52.25 percent of the TRI shares which he controlled prior to the voiding of those transfers, Dalia would be unjustly enriched at his expense. Thus, Dalia's alleged unjust enrichment stems from the voiding of the 2004 Transfers by the Delaware court. As the voiding of the 2004 Transfers was due to Arie's own acts in causing TPR to violate the shareholders agreement, as found by the Chancery Court, Arie cannot complain that Dalia was unjustly enriched by it. The same holds true for the cause of action for rescission.

34

In addition, as unjust enrichment is an element required for the imposition of a constructive trust, and as Arie has failed to show that Dalia was unjustly enriched, the constructive trust cause of action cannot stand as a matter of law. (*Simonds v Simonds*, 45 NY2d 233, 242 [1978] [purpose of constructive trust is to prevent unjust enrichment]). Alternatively, the constructive trust claim fails because the current facts do not warrant the relief requested, the reasons for which are set forth above (*supra*, at 16-18) in conjunction with Trump Group's motion to dismiss an identical claim against it.

### 3. Permanent injunction (fifth cause of action)

Arie argues in opposition to Dalia's motion to dismiss that Dalia should be permanently enjoined from interfering with his asserted interest in the TRI shares because his claims of reformation/rescission, constructive trust and unjust enrichment will result in an unraveling of the 2004 Transaction documents and the divorce stipulation, and will likely result in Dalia holding interests in the TRI shares. Thus, Arie argues that an injunction will prevent her from interfering with his interests in those shares. (Arie's Opposition Brief, at 20-21). Because all of the above claims against Dalia have no merit, there is no basis for granting injunctive relief.

### D. Motion of Trump Group to supplement the record (motion sequence number 015)

The Trump Group's motion to supplement the record on its motion is denied as, in light of the above findings, the documents it seeks to add are unnecessary.

### III. CONCLUSION

Based on all of the foregoing, it is hereby

ORDERED, that with respect to motion sequence number 006, the motion of defendant Dalia Genger seeking dismissal of all causes of action asserted in the complaint as against her is

35

granted in all respects, and the complaint is severed and dismissed as against said defendant with costs and disbursements as taxed by the Clerk of the Court, and the Clerk is directed to enter judgment accordingly; it is further

ORDERED, that with respect to motion sequence number 007, the motion of defendant Sagi Genger seeking dismissal of all causes of action asserted in the complaint as against him is granted to the extent of dismissing the first, second, fourth (rescission only), fifth, ninth and tenth causes of action, and is otherwise denied; it is further

ORDERED, that with respect to motion sequence number 009, the motion of defendant Rochelle Fang, individually and as trustee of the Sagi Genger 1993 Trust (the Sagi Trust), seeking dismissal of all causes of action asserted in the complaint as against her is granted in all respects, and the complaint is severed and dismissed as against said defendant with costs and disbursements as taxed by the Clerk of the Court, and the Clerk is directed to enter judgment accordingly; it is further

ORDERED, that with respect to motion sequence number 010, the motion of defendant TPR Investment Associates (TPR) seeking dismissal of all causes of action asserted in the complaint as against TPR is granted to the extent of dismissing the first, second, third, fourth (rescission only), fifth, sixth, and tenth causes of action, and is otherwise denied; it is further

ORDERED, that with respect to the motion sequence number 010, the motion of the Sagi Trust seeking dismissal of all causes of action asserted in the complaint as against the Sagi Trust is granted in all respects, and the complaint is severed and dismissed as against said defendant with costs and disbursements as taxed by the Clerk of the Court, and the Clerk is directed to enter judgment accordingly; it is further

36

ORDERED, that with respect to motion sequence number 011, the motion of defendants Glencova Invesment Company, TR Investors, LLC, New TR Equity I, LLC, New TR Equity II, LLC, Jules Trump, Eddie Trump and Mark Hirsch (collectively, Trump Group) seeking dismissal of all causes of action asserted in the complaint against Trump Group is granted to the extent of dismissing the first, second, third (conspiracy only), fourth (rescission only), fifth, eighth and tenth causes of action, and is otherwise denied; and it is further

ORDERED, that the conspiracy cause of action asserted against any of the defendants as part of the aiding and abetting causes of action sounding in tort is dismissed; it is further

ORDERED, that defendants Glenclova Investment Company, TR Investors, LLC, New TR Equity I, LLC, New TR Equity II, LLC, Jules Trump, Eddie Trump, and Mark Hirsch's motion for permission to supplement the record is denied.

ENTER:

Barbara Jaffe, JSC

DATED:      January 3, 2013
            New York, New York

37

FILED: NEW YORK COUNTY CLERK 07/02/2010   INDEX NO. 109749/2009

NYSCEF DOC. NO. 71                                    RECEIVED NYSCEF: 07/02/2010

SUPREME COURT OF THE STATE OF NEW YORK — NEW YORK COUNTY

HON. PAUL G. FEINMAN

PRESENT: _____        PART __12__

_____
                          *Justice*

_____        INDEX NO. __109749/09__

                    - v -                 MOTION DATE _____

_____        MOTION SEQ. NO. __001__

                                          MOTION CAL. NO. _____

The following papers, numbered 1 to _____ were read on this motion to/for _____

                                          **PAPERS NUMBERED**

Notice of Motion/ Order to Show Cause — Affidavits — Exhibits ...     _____

Answering Affidavits — Exhibits _____        _____

Replying Affidavits _____        _____

**Cross-Motion:**   ☐ **Yes**   ☐ **No**

Upon the foregoing papers, it is ordered that this motion

MOTION ~~AND CROSS MOTIONS ARE~~ DECIDED
IN ACCORDANCE WITH ANNEXED DECISION AND ORDER.

MOTION/CASE IS RESPECTFULLY REFERRED TO JUSTICE _____
FOR THE FOLLOWING REASON(S):

Dated: __6/28/10__ _____        _____ J.S.C.

Check one:        **FINAL DISPOSITION**        **NON-FINAL DISPOSITION**

Check if appropriate:        **DO NOT POST**

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK: CIVIL TERM: PART 12
------------------------------------------------------------------X

ORLY GENGER, in her individual capacity and on
behalf of the Orly Genger 1993 Trust (both in its

individual capacity and on behalf of D & K
Limited Partnership),

Plaintiff,

against

DALIA GENGER, SAGI GENGER, D & K GP
LLC, and TPR INVESTMENT ASSOCIATES,
INC.,

Defendants.

------------------------------------------------------------------X

|  |  |
|---|---|
| Index No. | <u>109749/2009</u> |
| Mot. Seq. Nos. | <u>001 through 006</u> |

**DECISION AND ORDER**

**For the Plaintiff:**
Zeichner Ellman & Krause LLP
575 Lexington Avenue
New York, NY 10022
(212) 223-0400

**For Dalia Genger:**
Pedowitz & Meister LLP
1501 Broadway
New York, NY 10036
(212) 403-7330

**For Sagi Genger:**
McLaughlin & Stern, LLP
260 Madison Avenue
New York, NY 10016
(212) 448-1100

**For D&K GP, LLC:**
Finkelstein Newman Ferrara LLP
225 Broadway
New York, NY 10007

**For TPR:**
Lyons McGovern, LLP
The Hennessy House
16 New Broadway
Sleepy Hollow, NY 10591
(914) 631-1336

E-filed papers considered in review of this motion brought by order to show cause for a preliminary injunction, motions for summary judgment, and motion to amend:

| | Papers: | E-File Number: |
|---|---|---|
| Seq. No. 001 | Order to Show Cause & TRO, Exhibits, Memo of Law in Support | 6 , 7, 7-1, 9 |
| | Affidavit & Affirmation in Opposition, Exhibits, Memo of Law | 35, 35-1 - 35-8, 36, 37 |
| | Affidavit & Affirmation in Opposition, Memo of Law, Exhibit | 38, 39, 40, 40-1 |
| Seq. No. 002 | Notice of Motion, Affirmations, Exhibits | 12, 13, 13-1 - 13-6, 18, 18-1 - 18-9 |
| | Pl.'s Omnibus Memo. of Law in Opp. | 52 |
| | Reply Memo of Law (Dalia Genger) | 61 |
| | Reply Memo of Law | 65 |
| Seq. No. 003 | Notice of Motion, Affirmation, Exhibits, Memo of Law | 15, 16, 16-1 - 16-9, 19 |
| | Pl.'s Omnibus Memo. of Law in Opp. | 52, 53 |
| | Memo of Law in Reply, Affirmation, Exhibit | 59, 60, 60-1 |
| | Reply Affirmation, Exhibits, Memo of Law | 62, 62-1, 64 |
| Seq. No. 004 | Notice of Motion, Affirmation, Memo of Law, Exhibits | 20, 21, 22, 22-1 - 22-8 |
| | Pl.'s Omnibus Memo. of Law in Opp. | 52, 54 |
| Seq. No. 005 | Notice of Motion, Affirmation, Memo of Law, Exhibits | 27, 28, 29, 29-1 |
| | Pl.'s Omnibus Memo. of Law in Opp. | 52, 55 |
| Seq. No. 006 | Notice of Motion, Affirmation, Exhibits | 45, 46, 46-1 - 46-7 |
| | Affirmation in Opp., Memo of Law, Exhibits | 47, 48, 48-1 - 48-2 |

| | |
|---|---|
| Affirmation in Reply & Opp | 49 |
| Affirmation in Opposition | 50 |
| Memo of Law in Reply | 51 |
| Affirmation in Opposition, Memo of Law, Exhibits | 56, 57, 57-1 - 57-2 |
| Memo of Law in Reply | 58 |
| Transcript of Oral Argument | 69 |

**PAUL G. FEINMAN, J.:**

The motions bearing sequence numbers 001 through 006 are consolidated for the purpose

of decision.

In motion sequence number 001, plaintiff moves by order to show cause for a

preliminary injunction and a temporary order restraining defendants from removing from the

State or otherwise disturbing shares of D&K Limited Partnership's 48 percent ownership interest

in the common stock of TPR Investment Associates, until there is a judicial determination as to

who owns these closely held family shares.[1]  At oral argument, the court continued the TRO

pending determination of these motions.

In motion sequence numbers 002 through 005, each of the defendants originally moved

to dismiss the complaint on various grounds.  By interim order dated October 21, 2009, these

motions were converted pursuant to CPLR 3211 ( c) to motions for summary judgment (Doc. 41,

42, 43, 44).[2]

In motion sequence number 006, plaintiff moves for leave to amend the complaint and

submits a proposed amended verified complaint containing additional allegations and naming an

additional defendant.

---

[1] Under the terms of the original TRO signed at the time of the signing of the Order to Show
Cause, defendants and their agents are stayed from removing or disposing in any manner the
shares at issue.  Plaintiff was directed to provide  an undertaking in the amount of $150,000.

[2] Documents and exhibits are referred herein by their designated e-filing document number in the
New York State Court's E-Filing System.

All the motions are opposed.

For the reasons set forth below, the motion for a preliminary injunction is granted ; the motions by defendants for summary judgment are each granted in part and otherwise denied, and the motion to amend the complaint is granted to the extent indicated.

### *Background*

The litigants are members of a nuclear family and certain of their family-owned corporations and companies. The central issue concerns the intent behind the signing of a promissory note and pledge agreement in December 1993, executed as part of estate planning tools of the parents of plaintiff Orly Genger and her brother, Sagi Genger, one of the defendants. Plaintiff contends that the note and pledge agreement were part of an entire estate planning scheme by which plaintiff's father, Arie Genger, and plaintiff's mother Dalia Genger, planned to provide for their two children, plaintiff and defendant Sagi Genger, with the greatest amount of funding possible and with minimum tax consequences. Arie and Dalia Genger were divorced in 2004 and the gravamen of this complaint is that in the years following the divorce, plaintiff's mother and brother have deliberately not adhered to the intent behind the promissory note and pledge, and have schemed to seize control of some of the family's closely held companies. Their schemes have been to the detriment of one of the entities, the D&K Limited Partnership, an entity partially owned by the Orly Genger 1993 Trust, and for the benefit of Sagi Genger and for defendant TPR Investment Associates, on which Sagi and Dalia Genger serve as the directors, and of which Sagi Genger is chief executive officer. Among the other relief sought by plaintiff is an injunction restraining further actions that would irreparably harm D&K Ltd. Partnership's ability to recover its interest in the shares originally held by it, that defendants be denied any ability to further erode the holdings of the Orly Genger 1993 Trust, and that shares

3

already sold be returned to the ownership of the Ltd. Partnership.

Plaintiff argues, and none of the defendants dispute her, that as beneficiary of the Orly Genger 1993 Trust, she has a right to assert causes of action on behalf of the trust, citing *Velez v Feinstein*, 87 AD2d 309 (1st Dept. 1982) (where trustee has failed to enforce a claim on behalf of the trust, the beneficiary may do so). She further argues that as the Orly Genger 1993 Trust is a limited partner of D&K Ltd. Partnership, she has the right to assert causes of action on behalf of the Partnership as against TPR Investment and the other defendants, citing among other cases, *CCG Assoc. I v Riverside Assoc.*, 157 AD2d 435, 442 (1st Dept. 1990) ("[t]he right of a limited partner to bring an action on behalf of the partnership to enforce a right belonging to the partnership is beyond dispute") (Pl Memo of Law [Doc. 9:4] p. 1 n. 1).[3]  Defendants' arguments in opposition are not persuasive.

According to the verified complaint (Doc. 7-1), plaintiff and her brother Sagi are individually beneficiaries of irrevocable trusts established in 1993 by their parents.  Each trust was funded with a $600,000 gift. As established, the Orly Genger Trust and the Sagi Genger Trust together owned 96 percent in defendant D&K Ltd. Partnership, a family-owned limited partnership.  Dalia Genger held the remaining four percent interest, and acted as the general manager. Defendant TPR Investment Associates, Inc. is a corporation founded by plaintiff's father, Arie Genger who originally was the sole shareholder, and serves as a holding company for the family's interests. Sagi Genger is presently Chief Executive Officer and a member of the board. Prior to 1993, TPR Investment held a majority interest in non-party Trans-Resources,

---

[3]Unless otherwise noted, all factual allegations are taken from plaintiff's verified complaint (Doc. 7-1).

4

Inc., a closely held private corporation.[4]

Around the time the two trusts were funded in 1993, D&K Ltd. Partnership purchased 240 shares of common stock, comprising 49 percent of all shares, in TPR Investment for $10,200,000. The Orly and Sagi Trusts each paid $600,000, Dalia Genger paid $50,000, and D&K Ltd. Partnership executed a promissory note dated December 21, 1993 for $8,950,000, in satisfaction of the balance (Ver. Compl. [Doc. 7-1] ¶ 16, citing attached Ex. 1 [eFile Doc. 7-1:49 *et seq.*]). The note was signed by Dalia Genger as General Partner of D&K Ltd. Partnership. The note required that D&K Ltd. Partnership repay principal and accrued interest in annual installments over a ten-year period. Both trusts, and Dalia Genger, assumed proportional liability for repayment. The note was secured with a Pledge Agreement dated December 21, 1993, signed by Dalia Genger, in which D&K Ltd. Partnership pledged its 240 TPR Investment shares as collateral for repayment of the note (Ver. Compl. [Doc. 7-1] ¶ 18) According to the September 6, 2007, testimony of Sagi Genger in the arbitration proceeding concerning his parents' divorce, the purpose of the note was "[e]ssentially an estate planning tool, to transfer wealth," with the intent to minimize taxes owed by the family members (Doc. 46-5:150-152 [S. Genger EBT, pp. 366, 368]). As a result of the purchase by D&K Ltd. Partnership of TPR Investment stock, the Orly and Sagi trusts each acquired 23.52 percent indirect interest in TPR Investment, and Dalia acquired a 1.96 percent indirect interest. Arie Genger retained 51 percent ownership.

As alleged in the complaint, each member of the family understood and agreed, in the

---

[4]Trans-Resources is the parent company of several subsidiaries that provide growers with specialty fertilizer and industrial chemicals, and is one of the two largest produces of potassium nitrate in the world (Ver. Compl. [Doc. 7-1] ¶ 12).

"desire to ensure equal wealth transfer to Sagi and Orly and with the estate-planning purposes underlying the creation of the Trusts and D&K [Ltd. Partnership]'s purchase of the TPR shares," that the note and Pledge Agreement "would never be enforced by any of them" (Ver. Compl. [Doc. 7-1] ¶ 20).   Sagi in particular was charged with ensuring that the promissory note and Pledge Agreement would not be enforced and, in the first years, took "specific steps to fulfill that charge," an example of which follows here (Ver. Compl. [Doc. 7-1] ¶ 20).

D&K Ltd. Partnership made payments on the note until 1999 and then ceased.  In November 2002, TPR Investment sent a letter to D&K Ltd. Partnership seeking payment of the past due principal and interest (Doc. 29-1:77-78]).  Sagi Genger, TPR's CEO, explained during his testimony in the above-mentioned arbitration proceeding that this November 2002 letter was merely "pro forma," and that there was no intent to collect on the note  (Doc. 46-5:153 [S. Genger EBT, p. 370]).

In October 2004, Dalia and Arie Genger were divorced, resulting in certain changes to the ownership of certain family entities, memorialized in the Stipulation and Agreement of Settlement, dated October 26, 2004 (Ver. Compl. [Doc. 7-1] ¶ 22, citing Ex. 2 [Doc. 7-1:66 *et seq.*]).  In particular, Dalia received sole ownership of Arie Genger's 250 shares of TPR Investment, the Trans-Resources shares were redistributed such that Dalia Genger owned no shares in that company, and Arie Genger was granted a lifetime voting proxy over the family Trans-Resources shares (Stipulation pp. 5, 8-14 [Doc. 7-1:71, 73-80]). The Stipulation and Agreement of Settlement gave Sagi Genger "full and complete authority" to sell non-liquid assets and distribute them as he saw fit, subject to his fiduciary duties to effectuate the intent of the parties entering the Agreement (Stipulation p. 7 [Doc. 7-1:73]).  However, the net proceeds were to be distributed so as to minimally fund a "basic escrow account" after which monies were

6

to go to TPR Investment "in satisfaction of the parties' indebtedness" (Stipulation p. 8 [Doc. 7-1:74]).

Despite the changes, both the Orly and Sagi trusts continued to have equal ownership interests in Trans-Resources shares as well as in the TPR Investment shares owned by D&K Ltd. Partnership (Ver. Compl. [Doc. 7-1] ¶ 23).

Also on October 26, 2004, TPR Investment, Arie Genger, and Dalia Genger signed an Assumption Agreement which acknowledged the promissory note's existence and noted that at that juncture, approximately $9,980,000, inclusive of interest, was owed by D&K Ltd. Partnership to TPR Investment (Doc. 22-4).

In addition, also on the same date, Sagi and Dalia Genger formed D&K GP LLC to serve as the general partner for D&K Ltd. Partnership (Pl. Mot. 001, Ex. 5 ¶ 5 [Doc. 7-1:151]). Under the agreement, Dalia Genger transferred her general partnership interest in D&K Ltd. Partnership, in exchange for a 99 percent interest in D&K GP; Sagi Genger was granted power to select the manager. Accordingly, D&K GP LLC now held a four percent interest in D&K Ltd. Partnership.

Plaintiff alleges that in the years subsequent to the divorce, Dalia Genger has sought, in collusion with her son Sagi Genger, to "destroy" her former husband financially, and their actions have threatened to destroy plaintiff financially as well (Ver. Compl.[Doc. 7-1] ¶ 25). Thus, when Dalia in effect ceded her control over D&K Ltd. Partnership to Sagi, the restructuring left only the two trusts liable to TPR Investment for repayment of the promissory note (Ver. Compl.[Doc. 7-1] ¶ 27). In August 2006, Sagi Genger on behalf of TPR Investment,

assigned the promissory note to David Parnes,[5] but stated in writing to Parnes that "D&K LP and

its partners have a variety of claims against TPR, and deny the enforceability of the Note." (Ver.

Compl. [Doc. 7-1] ¶ 47, citing Ex. 8 [Doc. 7-1:179-*et seq.*]). In 2007, Sagi Genger allegedly

stripped Dalia Genger of her majority interest in TPR Investment by selling an interest to his

mother-in-law, Rochelle Fang (Ver. Compl. [Doc. 7-1] ¶ 32). In late 2007 or early 2008, Dalia

Genger divested herself of the balance of her TPR Investment shares, leaving Sagi Genger in

direct control of TPR Investment and its interest in the promissory note (Ver. Compl. [Doc. 7-1]

¶ 33). As a result, Sagi Genger in essence now wore two hats, as CEO of TPR Investment, the

creditor of the note, and as manager of D&K Ltd. Partnership, the debtor on the note (Ver.

Compl. [Doc. 7-1] ¶ 34).

　　　In November 2007, Sagi Genger and Leah Fang executed an "Amended and Restated

Limited Partnership Agreement of D&K Limited Partnership," permitting D&K GP to

"mortgage, hypothecate, pledge, create a security interest in or lien upon, or otherwise encumber

the L[imited] P[artner] TRI Interests, for the benefit of the Partnership (Doc. 46-5:218). The

document was signed by Sagi Genger, managing member of D&K GP LLC, the General Partner,

and Leah Fang, as sole trustee for both the Sagi Genger 1993 Trust and the Orly Genger 1993

Trust, the Limited Partners (Doc. 46-5:223). Plaintiff only learned of this document's existence

in 2009.

　　　In January 2008, Dalia Genger was appointed successor trustee to the Orly Genger 1993

Trust (Ver. Compl. [Doc. 7-1] ¶ 39). She succeeded several other individuals, including two

---

[5] Parnes is a former trustee of the Orly Genger 1993 Trust, the present trustee of the Sagi Genger 1993 Trust, an officer of TPR Investment and director of Trans-Resources (Ver. Compl. [Doc. 7-1] ¶ 46). Parnes testified during the arbitration proceeding that the purpose of the transfer of the note to him was to prevent collection by any others (*Id.*).

long-term friends of her son's and her son's sister-in-law. As trustee, Dalia has "complete control over the assets of the Orly Trust, including its ownership interests in TPR (through D&K) and TRI" (Ver. Compl. [Doc. 7-1] ¶ 41).

In 2008, TPR Investment, through CEO Sagi Genger, reclaimed the promissory note from Parnes, and in August 2008, notified D&K Ltd. Partnership's general manager (Sagi Genger), that it was in default under the note and that if it failed to satisfy the full terms of the note, its shares would be sold at public auction (Ver. Compl. [Doc. 7-1] ¶ 52, citing Ex. 10 [Doc. 7-1:185-186]). As the payment was not made, D&K Ltd. Partnership was informed by TPR Investment that the latter would sell the former's 240 shares of common stock in TPR Investment to the highest qualified bidder on February 27, 2009 (Ver. Compl., Ex. 11 [Doc. 7-1:187-188]). Notice was not provided to either of the trusts, but was published in THE NEW YORK POST in October 2008 and again in February 2009 (Ver. Compl. [Doc. 7-1] ¶¶ 52-53, citing Ex. 12 [Doc. 7-1:189-191]).

On January 31, 2009, the general partner of D&K Ltd. Partnership, that is to say D&K GP, and the limited partners, the Sagi and Orly trusts, and TPR Investment, memorialized a document called "Meeting of Partners of D&K LP - Jan. 31, 2009 & Agreement," in which it was agreed that D&K GP could sign for the Limited Partnership and for each individual partner when making the limited partners' assets subject to a pledge (Doc. 22-4:17-18).[6] This same agreement included the promise of TPR Investment that it would "refrain from enforcing the

---

[6] Plaintiff alleges she first learned of this agreement only when the documents were provided as part of defendants' papers submitted in their motions to dismiss (Am. Ver. Compl.[Doc. 46-4] ¶ 94).

note against each limited partner for thirty days." (*Id.* [Doc. 22-4:18] ¶ 8).[7]

The note was foreclosed upon on February 27, 2009, less than the 30 days indicated in

the Agreement date, and D&K Ltd. Partnership's 240 shares of TPR Investment were purchased

back by TPR, decreasing the obligations of D&K Ltd. Partnership under the promissory note,

and leaving a balance of approximately $8.8 million that continues to be guaranteed by the Orly

and Sagi trusts (Ver. Compl. [Doc. 7-1] ¶ 57, citing Ex. 13 [Doc. 7-1:192-194]).   Plaintiff and

her attorney only learned in early June 2009 that the note had been foreclosed and that the

pledged shares had been sold back to the company (Ver. Compl. [Doc. 7-1] ¶ 65).  Plaintiff has

made a written demand that TPR Investment return the pledged shares to D&K Ltd. Partnership,

but TPR has declined to comply (Ver. Compl. [Doc. 7-1] ¶ 69, citing Ex. 20 [Doc. 7-1:225-

227]).

Also in August 2008, Rochelle Fang, as trustee of the Sagi Genger 1993 Trust, and Sagi

Genger, sold that trust's interest in Trans-Resources to another group (named "Trump"), which

sale divested Arie Genger from control and put the company in the control of the Trump group

(Ver. Compl. [Doc. 7-1] ¶ 60, citing Ex.14 [Doc. 7-1:195-207]).  The validity of this sale is

under challenge in Delaware Chancery Court, although plaintiff Orly Genger has not joined in

that action (Ver. Compl. [Doc. 7-1] ¶ 61).

After this purported sale of the Sagi Genger Trust's shares of Trans-Resources, plaintiff

feared her trust's shares would not be protected from sale.  She requested in writing from her

mother as trustee in January 2009 and again in June 2009 that the Orly Genger 1993 Trust retain

all of its shares of Trans-Resources and that they not be sold, but Dalia Genger has refused to

---

[7]The copy of the document e-filed with the court is not clear enough to discern who signed on
behalf of the trusts, although presumably it was Dalia Genger, or on behalf of TPR Investment.

agree, or even to respond (Ver. Compl. [Doc. 7-1] ¶¶ 63, 66, citing Ex. 15, 16 [Doc. 7-1:208-215]). Plaintiff, who had brought a proceeding in Surrogate's Court to remove her mother as trustee at the time of her appointment in January 2008, an application which was denied as being premature (Ver. Compl. [Doc. 7-1] ¶¶ 39-40), brought a second application on June 22, 2009, seeking to enjoin Dalia Genger or her agents from doing anything to affect the Orly Genger 1993 Trust's Trans-Resources shares, to remove Dalia as trustee and appoint another in her stead based on breach of fiduciary duties, and for a surcharge for damages (Ver. Compl.[Doc. 7-1] ¶ 67). At this juncture, the Surrogate's Court has ordered that Dalia Genger provide at least 10 days notice before disposing of any of the trust's Trans-Resources shares (Ver. Compl.[Doc. 7-1] ¶ 68, citing Ex.19 [Doc. 7-1:222- 224]).

Plaintiff contends that Dalia Genger has failed to act in the best interests of the Orly Genger 1993 Trust, that Sagi Genger has acted in a self-dealing manner and together with Dalia Genger has undermined the estate plans that intended for both children to benefit equally from the family's wealth (Ver. Compl. [Doc. 7-1] ¶ 58). Plaintiff fears that through defendants' continued scheming, the Orly Genger 1993 Trust's one remaining asset, its ownership of the Trans-Resources shares, will also be wrongly divested (Ver. Compl. [Doc. 7-1] ¶ 59).

The verified complaint alleged 16 causes of action against the various defendants, including replevin of the shares from TPR Investment back to D&K Ltd. Partnership, and a request for a preliminary injunction.

As stated above, defendants each submitted pre-answer motions to dismiss which, after notice by the Court, have been converted to motions for summary judgment pursuant to CPLR 3211 ( c). Subsequent to the filing by defendants of their motions, plaintiff moved to amend her complaint "to address, among other things," the defendants' "scheme regarding the Orly Trust's

11

TRI Shares," and the involvement in the scheme of Leah Fang, the proposed additional

defendant (Pl. Mot. 006, Ex. D, Part 1, Proposed First Am. Ver. Compl., [Doc. 46-4] ¶ 95).   The

proposed first amended verified complaint contains an additional four causes of action, two

against Leah Fang, and two seeking additional declaratory relief, and amends certain of the

original causes of action to include the new allegations and those against Leah Fang.

### *Legal Analysis*

For convenience, the motion to amend will be addressed first, and then the preliminary

injunction, followed by the motions to dismiss.  Because the motion to amend the complaint is

granted, the remainder of this decision addresses the claims as alleged in the amended complaint.

A.      Motion to Amend the Verified Complaint (Sequence Number 006)

Leave to amend pleadings is to be freely given upon terms that may be just (CPLR 3025

[b]).  In addition, CPLR 3025 (a) permits any party to amend a pleading once, without court

permission provided it is done under one of the following circumstances: within 20 days of the

service of the original pleading; at any time before the period for responding to it has expired, or

within 20 days after the service of a responsive pleading.  Plaintiff proffers a proposed amended

complaint to add a new defendant and new causes of action (Doc 46-4).

Contrary to defendants' arguments, case law holds that where a defendant has not

answered the complaint but instead interposed a motion to dismiss, as was done here, the

plaintiff may amend her complaint once as of right, because defendants, by making pre-answer

motions, have extended their time to answer (*see, Johnson v Spence*, 286 AD2d 481 [2d Dept.

2001]; *STS Mgt. Dev., Inc. v New York State Dept. of Taxation & Fin.*, 254 AD2d 409 [2d Dept.

2001]; *Miller v General Motors Corp.*, 99 AD2d 454 [1ˢᵗ Dept. 1984], *aff'd* 64 NY2d 1081

[1985]).  Although defendants oppose, plaintiff is entitled to serve and file her amended

complaint without review by the court, although the rulings below on defendants' motions shall refine the scope of the proposed amended complaint and require her to file and serve a second amended complaint.  Defendants' arguments in opposition, including that there is another action pending, can be pled as affirmative defenses.  Plaintiff's motion to amend her complaint is thus granted to the extent indicated.

B.    Motion for Preliminary Injunction (Sequence Number 001)

Among the purposes of a preliminary injunction are maintaining the status quo and preventing irreparable injury to a party (*see, e.g., Ma v Lien*, 198 AD2d 186 [1st Dept. 1993], *lv dismissed* 83 NY2d 847 [1994]).  To prevail, the party seeking injunctive relief must demonstrate a likelihood of success on the merits; that it will suffer irreparable injury if the relief is not granted; and that the equities balance in its favor (*Aetna Ins. Co. v Capasso*, 75 NY2d 860, 862 [1990]).  A preliminary injunction should generally not be granted where there are issues of fact (*Lincoln Plaza Tenants Corp. v MDS Properties Dev. Corp.*, 169 AD2d 509 [1st Dept. 1991]; *but see Ma v Lien, supra* at 187 ["even where the facts are in dispute, the nisi prius court can find that a plaintiff has a likelihood of success on the merits, from the evidence presented"]).  If money damages are an adequate remedy, irreparable harm does not exist and injunctive relief should be denied (*Sterling Fifth Assoc. v Carpentille Corp., Inc.*, 5 AD3d 328, 330 [1st Dept. 2004]).

Plaintiff argues that the shares of Ltd. Partnership are unique chattel as contemplated by CPLR 7109, and that accordingly the court should grant a preliminary injunction restraining defendants from disposing of the shares until order of the court.  She argues that the D&K Ltd. Partnership shares are unique because they are shares of a closely held family company which represents an ownership in another closely held family company, TPR Investment, and that their

value is dependent, at least in part, on the outcome of the family litigation currently before the Delaware Chancery Court concerning Trans-Resources (Pl. Memo of Law, 5-6 [Doc. 9:8-9]).

Under CPLR 7109, where the chattel is unique, the court may grant a preliminary injunction or temporary restraining order that it may not be transferred, sold, pledged, assigned or otherwise disposed of until the court orders (CPLR 7109 [a]). Defendants argue that the shares are in essence fungible, and that if appropriate, money damages would fully compensate plaintiff (TPR [S. Genger] Aff. in Opp. [Doc. 39] ¶ 6). Sagi Genger avers that the "TPR shares are currently not for sale and there is no intention to sell them at this time or in the near future." (S. Genger Aff. in Opp. [Doc. 35] ¶ 5]). He makes no statements concerning the TRI shares. Plaintiff's argument, however, is that her parents never meant for the promissory note to be enforced, but rather that the trust funds remain intact for the two children. The recent actions taken by defendants concerning the promissory note which have negatively impacted the Orly Genger 1993 Trust, and the sale of the Trans-Resources shares belonging to the Sagi Genger 1993 Trust, possibly foretell defendants' plans to sell her trust's shares of Trans-Resources and thus she seeks court intervention to prevent further dissipation of the trust.

The granting of a preliminary injunction is a discretionary remedy (*Ross v Schenectady*, 259 App. Div. 774, 774 [3d Dept. 1940]; *Dabrinsky v Seagate Assn.*, 239 NY 321 [1925]). Here, where the family shares at issue are intertwined among various family entities, defendants have not offered sufficient evidence to show that the shares of either TPR Investment or Trans-Resources owned by the Orly Genger 1993 Trust are not "unique" and should not be protected from transfer, sale, or assignment until this litigation is ultimately decided. In addition, given that defendant Sagi Genger states there is no immediate plan to sell or otherwise dispose of the TPR Investment shares, an injunction is not likely to cause much harm to defendants. The

14

balance of equities therefore lies in favor of plaintiff.  Accordingly, the motion for a preliminary injunction is granted.

### *Motions for Summary Judgment*

The proponent of a summary judgment motion must make a prima facie showing of entitlement to judgment as a matter of law, tendering sufficient evidence to eliminate any material issues of fact from the case (*Winegrad v New York Univ. Med. Ctr.*, 64 NY2d 851, 853 [ ]).  Evidentiary proof must be submitted in admissible form (*Zuckerman v City of N.Y.*, 49 NY2d 557, 562 [1980]).  Parties in opposition must submit "evidentiary facts or materials, by affidavit or otherwise … demonstrating the existence of a triable issue of ultimate fact." (*Tortorello v Carlin*, 260 AD2d 201, 204 [1ˢᵗ Dept. 1999]).  "Issue finding and not issue resolving" is the proper role of the court in deciding such motions (*Winegrad, supra*, at 853). Regardless of the sufficiency of the opposing papers,  in the absence of admissible evidence sufficient to preclude any material issue of fact, summary judgment is unavailable (*Alvarez v Prospect Hosp.*, 68 NY2d 320, 324 [1986]).

None of the converted motions for summary judgment contains first-person affidavits, and all rely upon documentary evidence and the pleadings for the bases of their motions. Although plaintiff objects to the lack of first-person affidavits, the converted motions are nonetheless considered by the court and decided on their merits.

Plaintiff argues that all of the motions should be preemptively denied based on the doctrines of issue preclusion and judicial estoppel, pointing to the testimony and evidence presented at the arbitration which resulted in the May 6, 2008, award entitled *Dalia Genger v Arie Genger*, Case No. 13 170 Y 00996 07 (American Arbitration Assn., Commercial Arbitration Tribunal, NYC).  (Doc. 46-5:131 *et seq.*]).  The doctrine of issue preclusion serves

15

to bar a party from "relitigating in a subsequent action or proceeding an issue that was raised in a prior action or proceeding and decided against that party or those in privity, whether or not the tribunals or causes of action are the same" (*Ryan v New York Tel. Co.*, 62 NY2d 494, 500 [1984]; *see also, Parker v Blauvelt Volunteer Fire Co.*, 93 NY2d 343, 349 [1999]). The doctrine of judicial estoppel prohibits a party that has assumed a certain position in a prior legal proceeding and secured a judgment in its favor, from assuming a contrary position in another action simply because the party's interests have changed (*City of N.Y. v College Point Sports Assn., Inc.*, 61 AD3d 33, 44 n. 1 [2d Dept. 2009], citations omitted). Notably, of course, the arbitration concerned issues arising from the divorce of plaintiff's parents, and determined, among other questions, that the promissory note could not be enforced by either parent as against each other. This is not the issue raised by plaintiff in her litigation. Additionally, because the testimony by Sagi Genger, Dalia Genger, and others in that arbitration was offered to answer the questions of whether the note was enforceable, and its value, *as between the former husband and wife*, the witnesses and parties did not address the value or enforceability of the note *as between the children* of Arie and Dalia Genger, *or the family owned companies*. Thus, the testimony adduced in the arbitration may well be admissible in this action, but there is no collateral estoppel effect.

C. <u>Dalia Genger's Motion for Summary Judgment (Sequence Number. 002)</u>

The first amended verified complaint alleges three causes of action against Dalia Genger: breach of fiduciary duty (1st cause of action), fraud (5th cause of action), and conspiracy to commit fraud (8th cause of action).

As argued by defendant, the claim of breach of fiduciary duty is also at issue in a proceeding currently before the Surrogate's Court entitled *In the Matter of the Application of*

16

*Orly Genger, as a person interested, for the removal of Dalia Genger as Trustee of the Orly Genger 1993 Trust pursuant to SCPA § 711 (1)*, File No. 17/2008 (Surrogate's Court NY County). Plaintiff does not address this argument. Accordingly, in the interest of judicial economy, the branch of defendant's motion seeking summary judgment and dismissal as to the complaint's 1st cause of action, is granted, on the ground that the same claim is pending in another court proceeding (CPLR 3211 [a] [4]).

The 5th Cause of Action sounds in fraud, while the 8th Cause of Action alleges conspiracy to commit fraud among the four defendants. As an initial matter, it is well established that "a mere conspiracy to commit a fraud is never of itself a cause of action," although allegations of conspiracy are permitted to connect the actions of separate defendants with an otherwise actionable tort (*Alexander & Alexander of N.Y. Inc. v Fritzen*, 68 NY2d 968, 969 [1986] [citation omitted]). As explained in *Brackett v Griswold*, "[t]he allegation that there was a conspiracy to commit the fraud does not effect the substantial ground of action," and "[t]he *gravamen* is fraud and damage, and not the conspiracy." (112 NY 454, 466-467 [1889]). "The allegation and proof of a conspiracy in an action of this character is only important to connect a defendant with the transaction and to charge him [*sic*] with the acts and declarations of his [*sic*] co-conspirators, where otherwise he [*sic*] could not have been implicated." (*Id.*). Accordingly, the 8th cause of action is dismissed as against this defendant, and the others.

To state a claim for fraud, plaintiff must allege "a material misrepresentation of a fact, knowledge of its falsity, an intent to induce reliance, justifiable reliance . . . and damages" (*Eurycleia Partners, LP v Seward & Kissel, LLP*, 12 NY3d 553, 559 [2009]). In addition, under CPLR 3016 (b), the circumstances constituting the wrong must be stated in detail.

Defendant Dalia Genger argues that plaintiff's claims are unspecific and general in

17

nature. In particular, she argues that there is no allegation of the manner in which plaintiff relied on any of her statements, or in what manner she, defendant, could have prevented the enforcement of the promissory note and the foreclosure sale. Although plaintiff argues in opposition that Dalia Genger made many statements over the years, including sworn statements, affirming that all interested parties to the note had agreed that TPR Investment would never seek to enforce the promissory note (Am. Ver. Compl. [Doc. 46-4] ¶¶ 62, 145-147), none of defendant's statements *explicitly* make this assertion other than in the context of the divorce proceedings. However, plaintiff also argues that even after she requested that her mother, as trustee, not encumber the remaining assets of the trust, her mother signed the January 2009 Meeting Agreement which gave power to D&K GP - the company controlled by Dalia and Sagi Genger - to pledge the Orly Genger 1993 Trust's shares of Trans-Resources as security for the promissory note, and which indemnified Sagi Genger, among others. There are also the transactions over the years that apparently have given Sagi Genger, and Dalia Genger, potential control over family assets in a way that has harmed plaintiff's share.

When claiming that the defendants together acted to commit a fraud, the plaintiff need not allege and prove that each defendant committed every element of fraud but only facts which support an inference that the defendants knowingly agreed to cooperate in a fraudulent scheme (*Snyder v Puente De Brooklyn Realty Corp*, 297 AD2d 432, 435 [3d Dept.2002], *lv denied*, 99 NY2d 506 [2003]; *LeFebre v New York Life Ins. & Ann. Corp.*, 214 AD2d 911, 912 [3d Dept. 1995]). Plaintiff alleges that the various defendants together committed fraud by, for example, creating the conditions that resulted in the "sham sale" of the TPR Investment assets owed by D&K Ltd. Partnership, and agreeing in the January 2009 Meeting Agreement to give power to D&K GP, the company controlled by Dalia and Sagi, to pledge the Orly Trust's shares of Trans-

18

Resources as security for the promissory note (Am. Ver. Compl. [Doc. 46-4] ¶¶ 76-68, 151). Plaintiff asked repeatedly for information about her trust, but because defendant has not been forthcoming nor kept her informed, she did not know that there was any need to attempt to protect the assets of her trust.

The evidence and arguments provided by both parties show that there is a question of fact as to whether Dalia Genger acted with intent to commit fraud against plaintiff's trust, and to lull plaintiff into a false sense of security as to the status of her trust. Accordingly, the branch of defendant's motion to dismiss the 5th cause of action is denied.

D.   Sagi Genger's Motion for Partial Summary Judgment (Sequence Number 003)

Defendant Sagi Genger seeks summary judgment and dismissal of the 6th, 7th, 8th, and 16th causes of action.[8]

The 6th cause of action sounds in fraud. The elements of fraud are set out above in the discussion of Dalia Genger's motion. The complaint focuses on the statements made by defendant in particular during the 2007 - 2008 arbitration proceeding, which helped form the basis for the arbitrator's decision that the parties never intended for the note to be collected and that it was not an asset to be valued, statements of which the plaintiff was aware and which caused her to believe that her trust fund was secure and that no one would enforce the note.

The 7th cause of action alleges aiding and abetting fraud. The elements of aiding and abetting fraud are that there exists a fraud, the defendant knew of the fraud, and the defendant provided substantial assistance to advance the fraud's commission (*M&T Bank Corp. v Gemstone CDO VII, Ltd.*, 23 Misc. 3d 1105A; 881 NYS2d 364, 2009 NY Slip Op 50590(U)

---

[8]He does not seek summary judgment as to the 2nd, 3rd, or 4th causes of action, in which he is also named.

19

{Sup. Ct., Erie County 2009], *aff'd in part, mod in part*, 68 AD3d 1747 [4th Dept. 2009],

quotation and citation omitted).  The complaint contends that defendant and D&K GP knowingly

assisted in the "sham sale" of the D&K Ltd. Partnership shares, failed to notify the Partnership

members of the foreclosure and sale, the sale of which harmed the Orly Trust, and entered into

the Meeting Agreement which now allows defendant and D&K GP to pledge or encumber the

Trans-Resources shares owned by the Orly Genger 1993 Trust.

Defendant argues that summary judgment is appropriate based on the documentary

evidence. He contends that prior to this litigation, plaintiff never claimed that the note or pledge

agreement were invalid.  Among the evidence he points to in arguing the note's enforceability, is

testimony of Arie Genger acknowledging that payments were made by D&K Ltd. Partnership on

the promissory note (Doc. 16-4:3-4]) , the Assumption Agreement signed by Dalia, Arie, and

Sagi Genger on October 25, 2004, acknowledging the nearly $10,000,000 due under the note

(Doc. 16-6]), the November 19, 2008 letter from plaintiff's counsel to the Surrogate, stating in

part that "D&K [Ltd. Partnership]  is indebted on a multi-million dollar note to TPR, which is

secured by D&K's 49% stock interest, and which has not been serviced for years" (Doc. 16-8]),

and a document signed by plaintiff dated December 27, 2007, in which she states that the trust

"is indebted in the amount of approximately $4.5 million" (Doc. 16-9]).

Defendant also argues that the statute of frauds bars plaintiff's 6th and 7th causes of action

because plaintiff claims that the promissory note has been orally modified.  General Obligations

Law § 5-701 requires that agreements which by their terms are not to be performed within one

year, or which are promises to answer for the debt or default of another person, must be in

writing and subscribed by the party to be charged therewith (GOL § 5-7-1 [a] [1]-[2]).  The parol

evidence rule of the General Obligations Law provides that where a written agreement  contains

20

a provision stating that it cannot be changed orally, then such a document cannot be changed by executory agreement unless it is in writing, signed by the party against whom enforcement of the change is sought (GOL § 15-301 [1]). Thus, defendant argues that plaintiff cannot claim that the parties legally agreed, orally, that the note would not be enforceable.

Defendant's arguments are unpersuasive. Courts have also found, specifically in regard to promissory notes, that when parties contest whether a notice is enforceable, there is an issue of fact that survives summary judgment and the statute of frauds will not prevent the court's examination of parol evidence on the issue. For example, in *Greenleaf v Lachman*, the Court examined a promissory note allegedly executed so as to avoid negative income tax treatment, and found an exception to the parol evidence rule in order to allow admission of parol evidence, not to vary the terms of the writing, but to show that a "writing, although purporting to be a contract, is, in fact, no contract at all." (216 AD2d 65, 66 [1st Dept.1995], *lv denied* 88 NY2d 802 [1996]). Similarly, in *Dayan v Yurkowski*, the Court denied summary judgment and held that the defendant's parol evidence should be considered to show that the note, while valid on its face, was not intended to take effect (238 AD2d 541 [2d Dep't 1997]; *see also, Paolangeli v Cowles*, 208 AD2d 1174, 1175 [3d Dep't 1994]).

Here, where plaintiff and all the defendants copiously cite to factual support, a material issue of fact exists regarding the intention of the note's enforceability. While the documents speak for themselves, plaintiff raises material questions of fact concerning the actual intent behind the promissory note. She argues that the promissory note's purpose was to facilitate the estate planning of Arie Genger and the transfer of funds between the family members with lessened tax consequences. Indeed, it is curious that interest payments were made by the Partnership for several years and then ceased, and that Sagi Genger testified that TPR

21

Investment's 2002 notice was "pro forma" and not meant as an actual request that payment be made. It could be found that enforcement of the note's terms was only made after Sagi Genger allegedly came into control of both TPR Investment and D&K Ltd. Partnership. Given the testimonial evidence in particular, there is a question of fact as to whether the promissory note was intended to be an enforceable agreement, and it would be premature to apply a Statute of Frauds analysis to the cause of action. In addition, as plaintiff has established that there are questions of fact as to whether defendant acted with intent to defraud plaintiff and D&K Ltd. Partnership and provided substantial assistance to D&K GP in particular to advance the fraud's commission, the branch of the motion seeking summary judgment and dismissal of the 6th and 7th causes of action is denied.

The 8th cause of action alleges conspiracy to commit fraud. For the same reasons set forth above in discussing Dalia Genger's motion, this branch of defendant's motion is granted.

The 16th cause of action alleges promissory estoppel. This is an equitable cause of action and must allege "a clear and unambiguous promise by defendants upon which [the plaintiff] reasonably and foreseeably relied to [plaintiff's] detriment." (*401 Hotel, L.P. v MTI/The Image Group, Inc.*, 251 AD2d 125, 126 [1[st] Dept. 1998]). Here, plaintiff alleges that it was the promise and intent of Arie Genger and the family as a whole, that the promissory note was not to be enforced, so as to preserve the trust accounts, and that she relied on that promise these many years only to learn that one of the main assets of her trust account had been sold in violation of the promise. Defendant argues not only that the documents state otherwise, but that plaintiff may not assert promissory estoppel in order to avoid the affirmative defense of the statute of frauds, citing *Cohen v Brown, Harris, Stevens, Inc.*, 64 NY2d 728 (1984), and *Lowinger v Lowinger*, 287 AD2d 39, 45 (1st Dept. 2001), *lv denied* 98 NY2d 605 (2002).

While the assertion of the statute of frauds is often sufficient to cause a dismissal of a claim of promissory estoppel, exceptions include where "the circumstances are such as to render it unconscionable to deny" the promise upon which the plaintiff has relied (*see, Philo Smith & Co. v. USLIFE Corp.*, 554 F.2d 34, 36 [2d Cir. N.Y. 1977]). Here, where there are questions of fact as to whether defendants intentionally breached the family agreement concerning the entirety of the estate planning and unconscionably caused plaintiff to lose a significant amount of her trust funds to their benefit, with the possibility of losing all of the funds, defendant has not established entitlement to summary judgment and dismissal of the claim of promissory estoppel notwithstanding his defense of the statute of frauds (*see, Swerdloff v Mobil Oil Corp.*, 74 AD2d 258, 261 [2d Dep't 1980], *app denied* 50 NY2d 913 [1980]). Accordingly, defendant's motion for summary judgment and dismissal of the 16th cause of action is denied.

E.    D&K GP's Motion for Partial Summary Judgment (Sequence Number 004)

Defendant D&K GP seeks summary judgment and dismissal of "all" the causes of action of the complaint as against it, but its motion papers specifically addresses only the 4th, 6th, 7th, and 8th causes of action.[9]

As an initial issue, D&K GP argues that plaintiff, "in her capacity as beneficiary under the Orly Trust and in the Orly Trust's capacity as limited partner in D&K LP, agreed not to bring an action against D&K GP." (Lyons {D&K GP} Aff. [Doc. 21] ¶ 5). Specifically, defendant points to the "Amended and Restated Limited Partnership Agreement of D&K Limited Partnership," in which Leah Fang as trustee for both the Orly and Sagi trusts, agreed that the trusts expressly waived their right to bring an action against D&K GP, the General Partner; Sagi

_____

[9]D&K GP did not seek summary judgment as against the 2nd or 3rd causes of action, in which it is also named as a defendant.

Genger signed on behalf of D&K GP (Doc. 22-8). Accordingly, D&K GP argues that summary judgment and dismissal of the claims against it should be dismissed in their entirety. However, this agreement provides that its partners, which include the Orly Genger 1993 Trust, may sue for "fraud, bad faith, or willful misconduct." (Doc. 22-8:5). Plaintiff alleges that there has been bad faith and fraud by various family entities as concerns the enforcement of the promissory note, and including various documents signed on behalf of the Genger trusts, as well as D&K Ltd. Partnership. At the very least, there appear to be irregularities. Summary judgment and dismissal on this ground is not appropriate.

The 4th cause of action, brought by the Orly Genger 1993 Trust and D&K Ltd. Partnership against both defendant D&K GP and Sagi Genger, claims defendants prevented the Ltd. Partnership from honoring its obligations under the note, and that it tortiously interfered with the contract.

Tortious interference with contractual relations consists of four elements: a contract between plaintiff and a third party; the defendant's knowledge of the contract; the defendant's intentional inducement of the third party to breach or otherwise render performance impossible; and resulting damages to plaintiff (*Kronos, Inc. v AVX Corp.*, 81 NY2d 90, 94 [1993], citation omitted). Defendant argues that, as the general partner to D&K Ltd. Partnership, it is a party to the contract at issue, that it, too, has also been injured by the nonpayment and resulting foreclosure, and that a party to a contract cannot tortiously interfere with the contract (Def. Memo of Law § IV [Doc. 22:12]). Plaintiff argues that according to Sagi Genger's testimony during the arbitration proceeding, Dalia Genger had repaid her four percent interest in the promissory note, and that therefore D&K GP was not a party to the agreement.

Here, the contract is the promissory note between D&K Ltd. Partnership and TPR

24

Investment.  Defendant D&K GP knew of the contract, but was also the general partner of the Limited Partnership from 2004 onward, and thus is understood to be a party to the contract. This is because the management of the property and the business of the partnership are vested exclusively in the general partners (*Durant v Abendroth*, 97 NY 132, 144 [1884]).  By law, a general partner in a limited partnership is subject to all the restrictions and liabilities of a partner in a partnership without limited partners, although it may not undertake certain actions without the written consent of the limited partners, as defined in the statute (Limited Partnerships § 98). Thus, plaintiff's argument that Dalia Genger had repaid the interest she owed on the promissory note, does not divest defendant of its rights and duties as general partner.  Accordingly, as it was the general partner of D&K Ltd. Partnership, no claim of tortious interference with the contract may lie.  Summary judgment and dismissal of the 4th cause of action against defendant is granted.

The 6th and 7th causes of action are fraud, and aiding and abetting fraud.  The elements of both causes of action have been previously set forth.  There are questions of material fact as to whether defendant engaged in fraud and in aiding and abetting fraud, and accordingly the branch of defendant's motion for summary dismissal of these two causes of action is denied.

The branch of the motion to dismiss the 8th cause of action, claiming conspiracy to commit fraud, is granted, for the reasons stated previously as concerns the other defendants.

F.    TPR's Motion for Summary Judgment (motion sequence no. 005)

Defendant TPR moves for summary judgment and dismissal of the 8th, 9th, 10th, 11th, 12th, 13th, 14th, 15th, and 16th causes of action as against it.  In sum, it argues that the documentary evidence establishes that there are no material questions of fact that would preclude a grant of summary judgment and dismissal of the complaint as against it.

The branch of the motion to dismiss the 8th cause of action, alleging conspiracy to

commit fraud, is granted for the reasons set forth above concerning the other defendants.

The 9th cause of action seeks declaratory relief and damages pursuant to NY UCC §§ 9-627, 610, and 611-614, as concerns the notice of foreclosure and the sale. UCC § 9-610 provides that every aspect of the disposition of collateral after a default must be commercially reasonable. UCC § 9-611 ( c) (2) provides that before the disposition of collateral, the secured party shall send an authenticated notification of disposition to "any secondary obligor." UCC § 9-612 (b) provides that for a non-consumer transaction, 10 days is sufficient notice before the disposition. UCC § 9-613 (a) (4) requires that for the notification of disposition to be sufficient, it must include a statement that the debtor is entitled to an accounting of the unpaid indebtedness and the charge, if any, for an accounting. UCC § 9-613 (a) (5) requires that for the notification of disposition to be sufficient, it must state the time and place of the public disposition or the time after which any other disposition is to be made. UCC § 9-627 provides that simply because a greater amount could have been obtained is not in itself sufficient to preclude the secured party from establishing that the disposition was made in a commercially reasonable manner, and describes what are commercially reasonable dispositions.

The complaint alleges that TPR Investment failed to properly notify the Orly Genger 1993 Trust or Orly Genger of the sale of the shares of TPR owed by D&K Ltd. Partnership, and that the notice of August 31, 2008 failed to state that D&K Ltd. Partnership is entitled to an accounting of its unpaid indebtedness, or to provide the time and place of the disposition of the collateral. In addition, the $2,200,000 sale price was only a "fraction" of the original $10,200,000 purchase price, and failed to take into consideration certain potential monies received from the sale of TRI shares to the Trump group.

Defendant TPR Investment argues that it fully complied with the UCC requirements

when noticing the default and conducting the foreclosure sale. In addition, it argues that even if it could be found that plaintiff never received notice of the default and sale, she has not alleged that she suffered redressable damages, as she makes only a generalized statement that the shares sold for a fraction of their original purchase price (Def. Memo of Law [Doc.29] p. 8, citing Ver. Compl. [Doc. 7-1] ¶ 146]). It also argues that plaintiff does not offer any evidence as to what the fair market value of the TPR Investment shares might have been and, as stated explicitly in the statute, an enforcement will not be found commercially unviable simply because a greater amount could have been obtained (UCC § 9-627 [a]).

An examination of the notice shows that certain of the complaint's allegations have no merit but that others are meritorious (Def. Memo of Law [Doc. 29] p. 7, citing Ex. K [Doc. 29-1:136]). The notice is not addressed to either of the limited partners, the Orly or Sagi Genger trusts, who as guarantors, are secondary obligors, and there is no proof of service provided by defendant establishing notification. The notice indicates that the date of the sale was February 27, 2009, but does not indicate the date of the notice itself, meaning that defendant has not established that the 10-day rule was adhered to. Furthermore, given that the January 31, 2009, Meeting Agreement stated in paragraph 8 that TPR would wait 30 days until selling the shares, it appears that the sale on February 27, 2009 was premature in any event (see Doc. 22-4:17-18]). As for the claimed violation of UCC § 9-627, there remain questions of fact as to whether the sale was itself conducted in a  commercially reasonable manner as set forth in the statute, whether or not the shares were sold at a value far lesser value than their worth. However, the notice clearly indicates the date, time, and location of the sale, and also that D&K Ltd. Partnership is entitled to an accounting and includes the telephone number to call. Accordingly, the branch of defendant's motion seeking summary judgment and dismissal of the 9th cause of

27

action is granted solely to the extent that the claims seeking declarations of violations of UCC § 9-613 (a) (4) and (a) (5), are dismissed. The remainder of the 9th cause of action remains.

The 10th cause of action alleges conversion and seeks replevin, and the 11th cause of action seeks a judgment declaring that D&K Ltd. Partnership has a superior right to possess chattel under CPLR 7101. Conversion is when a person, without authority, intentionally exercises control over the property of another person and interferes with the other person's right of possession (*see, Sporn v MCA Records Inc.*, 58 NY2d 482, 487 [1983]). Replevin, under Article 71 of the CPLR, is a remedy ancillary to an action to recover a chattel (*see Sears Roebuck & Co. v Austin*, 60 Misc. 2d 908, 908 [Civ. Ct., NY County 1969]). Defendant argues that plaintiff does not adequately plead the elements of conversion and thus cannot establish that replevin is appropriate, nor does she show that she is entitled in the 11th cause of action to a declaration that she has a superior right to that of defendant's in the TPR Investment shares. It argues that plaintiff does not establish that its assuming ownership rights to the shares was unauthorized, nor does she show that D&K Ltd. Partnership or any other entity had a superior right.

The claim of conversion and replevin, and the declaration as to whose right is superior, go to the heart of plaintiff's complaint. Because, as set forth in the discussion above, there are disputed questions of fact as to the intent of the promissory note and Pledge Agreement and whether enforcement of them was ever contemplated, there can be no summary determination as to who is entitled to the shares and no declaratory relief granted at this time. Accordingly, the branches of defendant's motion for summary dismissal of the 10th and 11th causes of action are denied.

The 12th cause of action seeks a preliminary injunction to enjoin TPR Investment from in

28

any matter disposing of the TPR shares pending a final determination of the declaratory judgment branch of the complaint. This cause of action is redundant of the motion separately brought by plaintiff and opposed by defendants on grounds similar to those articulated by defendant in its motion for summary judgment. As the plaintiff's motion for a preliminary injunction has been granted as set forth above, summary judgment and dismissal of this cause of action is granted. Of course, if what plaintiff is seeking is a permanent injunction, the cause of action would have to be repleaded.

The 13th cause of action seeks a constructive trust on behalf of D&K Ltd. Partnership. In equity, a constructive trust may be imposed when the movant establishes that there is a confidential or fiduciary relationship, a promise, a transfer in reliance thereon, and unjust enrichment (*Sharp v Kosmalski*, 40 NY2d 119, 121 [1976], citations omitted). Defendant argues that there is no relationship between it and plaintiff, perhaps overlooking that this claim is brought on behalf of D&K Ltd. Partnership, a minority shareholder of TPR Investment. It is disputed as to whether TPR Investment owed a fiduciary duty of care to minority shareholder D&K Ltd. Partnership (*see Alpert v 28 Williams St. Corp.*, 63 NY2d 557, 568 [1984] [fiduciary duty of majority to minority shareholders; *Salm v Feldstein*, 20 AD3d 469 [2d Dept. 2005] [fiduciary duty of managing member of company and co-member to plaintiff]). The parties dispute, of course, whether defendant was among the entities promising that the promissory note would never be enforced. Defendant argues that there was no transfer in reliance, however plaintiff sufficiently argues that D&K Ltd. Partnership pledged its shares of TPR in reliance of the promise that the note would be not enforced, citing *Lester v Zimmer*, 147 AD2d 340, 341-342 (3d Dept. 1989), which notes that the elements of a constructive trust are "flexible," and the "transfer" should be interpreted broadly. Whether defendant was unjustly enriched is a matter to

29

be determined at trial.  Accordingly, as there are questions of fact, summary judgment is denied as to the 13th cause of action.

The 14th and 15th causes of action, brought on behalf of the Orly Genger 1993 Trust, allege constructive and actual fraudulent conveyance under New York Debtor & Creditor Law §§ 273, 276, and 277.  Section 273 of the Debtor and Creditor Law provides that "every conveyance made . . . by a person who is or will be thereby rendered insolvent is fraudulent as to creditors without regard to his actual intent if the conveyance is made or the obligation is incurred without a fair consideration."  Section 276 of the Debtor & Creditor Law provides that a conveyance is actually fraudulent if it was made with actual intent "to hinder, delay, or defraud either present or future creditors."  Section 277 provides that a conveyance of partnership property made either when the partnership is insolvent or will be rendered insolvent by the conveyance, is fraudulent as to partnership creditors if the conveyance is made (a) to a partner even if there is a promise by the partner to pay partnership debts, or (b) to a non-partner without fair consideration to the partnership.

None of these statutes apply to the facts here, and defendant's motion for summary judgment and dismissal of the two causes of action must be granted based on failure to state a cause of action.  In New York, only creditors may maintain actions for fraudulent conveyance (*Geren v Quantum Chemical Corp.*, 99 F3d 401, 1995 WL 737512, **2 [2d Cir. [NY] 1995], *citing Pappa Bros. v Thompson*, 214 NYS2d 13, 15 [Sup. Ct. Nassau County, 1961]).  Although plaintiff argues that the Orly Genger 1993 Trust is a creditor, she is misapplying the statute.  A creditor is defined as an entity "having any claim, whether matured or unmatured, liquidated or unliquidated, absolute, fixed or contingent." (Debtors & Creditors Law § 270).  The complaint alleges that certain of the assets of the trust were wrongly conveyed to defendant by the actions

30

of Sagi Genger.  However, to establish a constructive fraudulent conveyance, plaintiff must demonstrate: (1) that there was a conveyance; (2) that the defendant would become insolvent as a result of the conveyance; and (3) there was no fair consideration for the conveyance (see, *United States v Sweeney,* 418 F. Supp. 2d 492, 498 [SDNY 2006], citation omitted). To establish intentional fraudulent conveyance, plaintiff must show in addition that there was actual intent "to hinder, delay, or defraud . . . creditors" (*Sweeney,* at 498).  Not only does plaintiff not establish that she is a creditor who has a claim, but she does not allege that *defendant* became insolvent because of the conveyance of the TPR shares.  Furthermore, she offers nothing more than the statement that the shares were bought by TPR Investment for a "fraction" of their original value, to establish that there was no fair consideration.  Her reliance on Debtor and Creditor Law § 277 is also misplaced, based on the facts alleged in the pleadings.  Accordingly, the 14th and 15th causes of action are dismissed on summary judgment.

The 16th cause of action alleges promissory estoppel on behalf of D&K Ltd. Partnership. Defendant's motion for summary dismissal of this cause of action is granted for the same reasons set forth in the discussion of the branch of Sagi Genger's motion for summary judgment and dismissal of this cause of action.

Therefore,

As to Motion Sequence Number 001, due deliberation having been had, and it appearing to this Court that a cause of action exists in favor of the plaintiff and against the defendants and that the plaintiff is entitled to a preliminary injunction on the ground that the subject of the action is unique and that the defendants threaten to do an act in violation of the plaintiff's rights respecting the subject of the action, tending to render the judgment ineffectual, as set forth in the aforesaid decision, it is

31

ORDERED that the undertaking is continued in the sum of $ 150,000.00 , conditioned that the plaintiff, if it is finally determined that she was not entitled to an injunction, will pay to the defendants all damages and costs which may be sustained by reason of this injunction; and it is further

ORDERED that defendants, their agents, servants, employees and all other persons acting under the jurisdiction, supervision and/or direction of defendants, are enjoined and restrained, during the pendency of this action, from doing or suffering to be done, directly or through any attorney, agent, servant, employee or other person under the supervision or control of defendant or otherwise, any of the following acts: removing the Shares from the state, or otherwise transferring, selling, pledging, assigning, or otherwise disposing of the Shares; and it is further

ORDERED that as to Motion Sequence Number 002, the motion for summary judgment by Dalia Genger is granted only to the extent of dismissing the 1st and 8th causes of action as against her in the first amended verified complaint, and is otherwise denied; and it is further

ORDERED that as to Motion Sequence Number 003, the motion for partial summary judgment by Sagi Genger is granted only to the extent of dismissing the 8th and 16th causes of action as against him in the first amended verified complaint, and is otherwise denied; and it is further

ORDERED that as to Motion Sequence Number 004, the motion for partial summary judgment by D&K GP is granted only to the extent of dismissing the 4th and 8th causes of action against it in the first amended verified complaint, and is otherwise denied, and it is further

ORDERED that as to Motion Sequence Number 005, the motion for summary judgment by TPR Investment Associates, Inc., is granted only to the extent of dismissing the 8th, 12th, 14th,

32

15th, and 16th causes of action in their entirety as against this defendant, and as to the 9th cause of action, dismissing the claims alleging violations of UCC § 9-613 (a) (4) and (a) (5); and the motion is otherwise denied; and it is further

ORDERED that as to Motion Sequence Number 006, the motion to amend the complaint is granted to the extent set forth above; plaintiff shall e-file and serve a second amended complaint incorporating the limitations set forth herein, and serve it on all parties who shall then serve their answers in accordance with the CPLR; and it is further

ORDERED that the parties shall appear for a preliminary conference in Supreme Court, 60 Centre Street, room 212, on September 15, 2010, at 2:15 p.m.

This constitutes the decision and order of the court.

Dated: June 28, 2010
       New York, New York

_____
               J.S.C.

FILED: NEW YORK COUNTY CLERK 04/10/2012

INDEX NO. 651089/2010

NYSCEF DOC. NO. 229

RECEIVED NYSCEF: 04/10/2012

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK: PART 12
------------------------------------------------x
ARIE GENGER and ORLY GENGER, in her
individual capacity and on behalf of
THE ORLY GENGER 1993 TRUST,

                          Plaintiffs,                    Index No. 651089-10

             -against-

SAGI GENGER, TPR INVESTMENT ASSOCIATES,        ORDER
INC., DALIA GENGER, THE SAGI GENGER 1993       Motion Sequence
TRUST, ROCHELLE FANG, individually and as      Numbers 012 and 013
trustee of THE SAGI GENGER 1993 TRUST,
GLENCLOVA INVESTMENT COMPANY, TR INVESTORS,
LLC, NEW TR EQUITY I, LLC, NEW TR EQUITY II,
LLC, JULES TRUMP, EDDIE TRUMP AND MARK HIRSCH,

                          Defendants.
------------------------------------------------x

**PAUL G. FEINMAN, J:**

The instant motions, brought on by orders to show cause

assigned motion sequence numbers 012 and 013, respectively, are

filed by plaintiff Orly Genger, in her individual capacity and on

behalf of the Orly Genger 1993 Trust, seek temporary restraining

orders and preliminary injunctions against the defendants named

in the above-captioned action, from proceeding with that certain

action commenced in the Delaware Chancery Court entitled *Dalia*

*Genger as Trustee of the Orly Genger 1993 Trust v. TR Investors*

*LLC et al* (the Delaware Action), in which Dalia Genger sought a

declaratory judgment with respect to the beneficial ownership of

the Orly Trust shares.  On October 26, 2011 and November 9, 2011,

after hearing from counsel for the plaintiff and the defendants,

1

this Court issued temporary restraining orders (the TROs) enjoining the defendants from proceeding with, or otherwise making any motion in or concerning, the Delaware Action until further order of this Court.  The TROs were issued to maintain the status quo in this matter, pending a decision of the United States District Court for the Southern District of New York (the Federal Court), which is anticipated to, inter alia, determine the proper forum or jurisdiction for hearing and adjudicating the beneficial interest in the disputed shares (the Federal Court Decision).  Inasmuch as the Federal Court Decision has not yet been issued, the instant motions are held in abeyance, pending the Federal Court's resolution of the jurisdictional issue.

Accordingly, it is

ORDERED that the temporary restraining orders dated October 26, 2011 and November 9, 2011 shall continue pending further order of this Court; and it is further

ORDERED that the parties are directed to notify the court when the Federal Court Decision has issued in order that this court may finally resolve the motions hereby held in abeyance.

Dated: April 9, 2012

_____
J.S.C.

2

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

ONE RODNEY SQUARE
P.O. BOX 636
WILMINGTON, DELAWARE 19899-0636
———
TEL: (302) 651-3000
FAX: (302) 651-3001
www.skadden.com

DIRECT DIAL
(302) 651-3070
DIRECT FAX
(302) 434-3070
EMAIL ADDRESS
THOMAS.ALLINGHMAN@SKADDEN.COM

FIRM/AFFILIATE OFFICES
———
BOSTON
CHICAGO
HOUSTON
LOS ANGELES
NEW YORK
PALO ALTO
WASHINGTON, D.C.
———
BEIJING
BRUSSELS
FRANKFURT
HONG KONG
LONDON
MOSCOW
MUNICH
PARIS
SÃO PAULO
SHANGHAI
SINGAPORE
SYDNEY
TOKYO
TORONTO
VIENNA

June 28, 2013

**BY EFILING AND ELECTRONIC MAIL**

The Honorable Barbara Jaffe
Supreme Court of the State of New York
County of New York
60 Centre Street
New York, New York 10007

RE:  *Genger, et al. v. Genger, et al.,*
     Index No. 651089/2010

Dear Justice Jaffe:

I write on behalf of the parties to the settlement agreement that was submitted in camera to Your Honor yesterday, including Arie and Orly Genger and my clients, the Trump Group. A material term of the agreement among the settling parties was the dismissal of *all* claims presently pending against one another, in whatever capacity they were brought. Certain of Orly Genger's claims against the Trump Group in this action have been held by Justice Feinman to be derivative in nature, brought by Orly on behalf of the Orly Genger 1993 Trust. (As I said on the call with the Court yesterday, the Trump Group argued that Orly lacked standing to bring such claims on behalf of the Orly Genger 1993 Trust, but Justice Feinman rejected our arguments.) The language that was drafted during yesterday's conference call as a potential "fix" for the issues raised by Mr. Dellaportas – that "nothing contained [in the Order] shall in any way affect any derivative claims presently before the Court" - - would have the effect of *not* dismissing Orly Genger's derivative claims against the Trump Group, contrary to the agreement of the settling parties. Excluding such claims from the claims that are to be dismissed is not what the Trump Group bargained and paid for in the settlement, and as a consequence we cannot stipulate to the entry of an order that includes such carve-out language. (I apologize to the Court for not having affirmatively objected to this language during yesterday's call; though

The Honorable Barbara Jaffe
June 28, 2013
Page 2

I did express concern about drafting language by committee on the telephone, I needed to compare the terms of our settlement agreement to the proposed language before the conflict between the two became apparent to me.)

The Second Amended Stipulation and Order of Discontinuance with Prejudice (Docket No. 471) (the "Stipulation and Order") that Ms. Wachtler previously submitted was intended to reflect the agreement of the settling parties regarding dismissal of *all* claims they have against one another and was agreed to by all of the parties to that stipulation and order. The Trump Group cannot support or stipulate to an order that does not effect a dismissal of all claims that the members of the AG Group, including Orly Genger, have pending against my clients, and none of the parties ever intended for the Trump Group to do that. For these reasons, we (and all the settling parties) respectfully request that the Court enter the Stipulation and Order previously submitted to the Court. Of course, nothing in the Stipulation and Order precludes the Orly Trust from commencing a lawsuit for claims it may have against any dismissed party or from pursuing claims in the action titled *Dalia Genger, as trustee of the Orly Genger 1993 Trust, v. TR Investors, LLC, et al., C.A. No. 6906-CS* (Del. Ch.).

I am, of course, available at the Court's call should the Court have any questions concerning this matter.

Respectfully,

*/s/ Thomas J. Allingham II*

Thomas J. Allingham II

cc:    All Counsel of Record (by eFiling and Electronic Mail)

## SETTLEMENT AGREEMENT AND RELEASE

This settlement agreement and release (this "Agreement") is entered into as of June 16, 2013, by and between Arie Genger and Orly Genger (in her individual capacity and in her capacity as beneficiary of the Orly Genger 1993 Trust), Arnold Broser, David Broser, (in their individual capacity and on behalf of all entities managed, owned or controlled in any way by Arnold Broser or David Broser and which are in any way related to the subject matter hereof ("Broser Entities" and collectively with Arie Genger and Orly Genger in all capacities referenced above, the "AG Group"), and TR Investors, LLC ("TR Investors"), Glenclova Investment Co. ("Glenclova"), New TR Equity I, LLC ("New TR I"), New TR Equity II, LLC ("New TR II" and, together with TR Investors, Glenclova and New TR I, the "Trump Entities"), Trans-Resources, LLC (the successor to Trans-Resources, Inc. and together with its predecessor entities referred to herein as, "Trans-Resources"), Jules Trump, Eddie Trump and Mark Hirsch (collectively, with the Trump Entities and Trans-Resources, the "Trump Group"). The members of the AG Group and the Trump Group are each referred to herein individually as a "Party" and together as the "Parties".

**WHEREAS**, in March 2001, TR Investors, Glenclova, Trans-Resources and TPR Investment Associates, Inc. ("TPR") entered into a stockholders agreement with respect the common stock of Trans-Resources (the "Stockholders Agreement");

1

**WHEREAS**, since August 2008, Arie Genger, Orly Genger, the Trump Group and others have been engaged in various litigations (described below) concerning the ownership and control of Trans-Resources; and

**WHEREAS**, the Parties wish to resolve all issues, disputes and disagreements between them, including but not limited to the issue of ownership of all Trans-Resources shares;

**NOW, THEREFORE**, in consideration of the promises and representations contained herein and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties, intending to be legally bound, hereby agree as follows:

    1.    **Recitals.**    The above recitals are incorporated into and made a part of this Agreement and are binding on all Parties hereto.

    2.    **Initial Consideration from the Trump Group.**    Upon dismissal with prejudice of the claims, counterclaims, cross-claims, third-party claims, issues and matters as provided in Paragraph 4 below, the Trump Group shall promptly:

    (a)    release all claims they may have to the (i) $7,428,994.00 plus interest held by Skadden, Arps, Slate, Meagher & Flom LLP as escrow agent (the "Skadden Escrow") and (ii) $10,314,005.00 plus interest held by with Pedowitz & Meister as escrow agent (the "P&M Escrow");

    (b)    pay to Wachtel, Masyr & Missry, LLP as attorneys for the AG Group ("Wachtel") an amount in cash equal to $35,000,000.00 minus (i) the amount held in the Skadden Escrow, and (ii) the amount held in the P&M Escrow.

2

3.     **Further Consideration from the Trump Group.**   Trans-Resources on behalf of the Trump Group shall pay: (i) $7,500,000 to Wachtel on the third  anniversary of the Effective Date (defined below), and (ii) $7,500,000 to Wachtel 364 days following the third anniversary of the Effective Date The payments provided under this paragraph shall be (a) subject to the terms and conditions herein and (b) evidenced by two (2) promissory notes that are substantially in the form attached as Exhibit A hereto (the "Notes").  Notwithstanding anything else herein, the maturity of the two $7,500,000 Notes shall be delayed beyond their due date until the earlier (the "Extended Maturity Date") of  (A) such time as all pending claims, cross-claims and counter-claims brought by any of TPR, Sagi Genger, the Sagi Genger 1993 Trust, the Orly Genger 1993 Trust (other than the Orly Trust Action (as defined below)), D&K Limited Partnership, D&K GP LLC, Rochelle Fang, and/or David Parnes (collectively, the "Sagi Group") against any member of the Trump Group have been dismissed with prejudice and the statute of limitations shall have run with respect to any other potential claims of the Sagi Group that might be the subject of the Indemnification provided for by Paragraph 5 below or (B) such time as each member of the Sagi Group shall have provided the Trump Group with a release of the Trump Group Released Parties (as defined below) and covenant not to sue in form and substance that is the same as the AG release and covenant not to sue contained in Paragraph 6(a) below (the "Sagi Group Release").

Subject to the foregoing, the Notes shall become immediately due and payable upon the occurrence of any transaction or series of transactions which shall result in the Trump Group owning or controlling neither (i) a majority of the voting stock of Trans-Resources or its successors or each of its two principal subsidiaries, Haifa Chemicals, Ltd. and Na-Churs Plant

3

Food Company or their successors, nor (ii) directly or indirectly, a majority of the assets currently owned by Trans-Resources and its subsidiaries; provided, however, that in such event, at the request of the Trump Group, the amounts then payable on the Notes shall be placed in escrow for the duration of their original term or until the Extended Maturity Date (if applicable) under the provisions of an escrow agreement on reasonable terms to be negotiated at such time in good faith between Trans-Resources, the payee and an escrow agent selected by their mutual consent, which shall provide for their release to the Trump Group in payment of Indemnification Amounts, AG Group Release Amounts and Discovery Costs (as such terms are defined below), if any, and payment to the payee of such amounts after reduction for Indemnification Amounts, AG Group Release Amounts and Discovery Costs, if any, upon their original maturity date or the Extended Maturity Date (if applicable). If Trans-Resources is unable to pay the Notes as and when they mature, the Trump Group will be obligated to make payment thereon in an amount equal to the lesser of (x) the outstanding amounts not paid by the obligor thereunder and (y) any amount by which cash payments received by members of the Trump Group (other than Trans-Resources) from Trans-Resources and its subsidiaries since the Effective Date (whether in the form of dividends, distributions, compensation or otherwise) exceeds reasonable compensation for services rendered plus payments for goods, services and assets provided by such persons in amounts that would have been paid for such goods, services and assets in arms' length transactions with unaffiliated third parties; provided, however, that in neither case shall the Trump Group be obligated to pay any amount that exceeds the outstanding amounts not paid by Trans-Resources on the Notes (subject to any Indemnification Amounts, AG Group Release Amounts or Discovery Costs).

4

4.    **Dismissal of Claims with Prejudice**.  Within two (2) business days of the

Effective Date (defined below), the AG Group and the Trump Group shall take all actions

necessary or desirable to:  (i) effect the dismissal with prejudice of all claims, counterclaims,

cross-claims, third-party claims, issues and matters between them, and to vacate all court orders

which restrain, enjoin or in any way limit actions by any members of the Trump Group, in each

pending action in which members of the AG Group and the Trump Group are parties (whether or

not service of process with respect thereto has been effected), including, without limitation, each

of the following pending actions (collectively, the "Litigation"):  *Genger v. TR Investors, LLC*,

No. 168, 2013 (Del.); *TR Investors, LLC v. Genger*, C.A. No. 6697-CS (Del. Ch.); *Trans-*

*Resources, Inc. v. Genger*, C.A. No. 4391-CS (Del. Ch.) (with respect to Arie Genger only); *TR*

*Investors, LLC, et al. v. Genger*, C.A. No. 3994-CS (Del. Ch.); *Glenclova Investment Co. v.*

*Trans-Resources, Inc., at al.*, No. 08 Civ. 7140 (JFK) (S.D.N.Y.); *Arie Genger and Orly Genger*

*v. Sagi Genger, et al.*, Index No. 651089/2010 (N.Y. Supr.); and (ii) have the New York State

Supreme Court enter a definitive non-appealable order declaring that members of the Trump

Group own all right, title and interest (beneficially, of record and otherwise) to the shares of

Trans-Resources purportedly transferred by TPR in October 2004 to Arie Genger (the ("Arie

Shares") and to the Orly Genger 1993 Trust (the "Orly Trust Shares"),  with the understanding

and agreement that should the request for the entry of such an order with respect to the "Orly

Trust Shares" be denied or not entered in a reasonably timely fashion,  then the AG Group and

the Trump Group shall take all action necessary or desirable to have the New York State

Supreme Court vacate all court orders which restrain, enjoin or in any way limit actions by the

5

parties to the pending action captioned *Dalia Genger, as Trustee of the Orly Genger 1993 Trust v. TR Investors, LLC, et al.,* C.A. No. 6906-CS (Del. Ch.) (the "Orly Trust Action"), to prosecute, defend, compromise, settle and otherwise deal with all claims, counterclaims, cross-claims, third-party claims, issues and matters asserted therein; provided, however, that nothing in this Agreement is intended to require or permit the dismissal of any claims, counterclaims, cross-claims, third-party claims, issues and matters, (i) in *Trans-Resources, Inc. v. Genger*, C.A. No. 4391-CS (Del. Ch.) (the "Breach of Fiduciary Duty Case"), as between the Trump Group and Avi Pelossof and/or William Dowd (subject to the exchange of general releases between the members of the Trump Group and William Dowd as contemplated below) and (b) against TPR, the Sagi Genger 1993 Trust, the Orly Genger 1993 Trust, D&K Limited Partnership, D&K GP LLC, Sagi Genger or Dalia Genger. Any member of the AG Group including, without limitation, Orly Genger, who is called to testify in the Litigation or the Orly Trust Action, agrees to testify that he, she (in her individual capacity, ~~on behalf of the Orly Genger 1993 Trust,~~ and as beneficiary of the Orly Genger 1993 Trust) or it has waived all claims he, she (in her individual capacity, ~~on behalf of the Orly Genger 1993 Trust,~~ and as beneficiary of the Orly Genger 1993 Trust) or it had or may have to ownership (record, beneficial or otherwise) of any shares of Trans-Resources and that he, she (in her individual capacity, ~~on behalf of the Orly Genger 1993 Trust,~~ and as beneficiary of the Orly Genger 1993 Trust) or it is opposed to the Orly Genger 1993 Trust seeking any remedy of any kind against any member of the Trump Group. Notwithstanding the foregoing, upon receipt by the Trump Group of a general release in form and substance reasonably satisfactory to it, the Trump Group shall provide the same general

6

release to William Dowd and cause the dismissal of the Breach of Fiduciary Duty Case as between the Trump Group and him.

      5.      **Indemnification.**

      (a)      Upon closing of this Agreement, each of the members of the AG Group with the exception of Arnold Broser and David Broser and the Broser Entities, jointly and severally, agrees to indemnify and hold harmless (i) each of the members of the Trump Group, and their respective past and present affiliates and direct and indirect subsidiaries, and (ii) each of the past and present agents, representatives, officers, directors, advisors, employees, general partners, limited partners, shareholders, members, predecessors, successors, heirs, executors, administrators and assigns of each person and entity referenced in clause (i), from all reasonable costs, expenses, attorneys' fees of counsel selected by the Trump Group (it being agreed that the Trump Group will cooperate with the AG Group in all reasonable respects to cause the amount of such costs, expenses and its attorneys' fees to be minimized), settlements and/or judgments (whether direct or related to joint and several liability) (the "Indemnification Amounts") incurred as a result of, in connection with, or relating in any way to any (x) claims, counterclaims, cross-claims or third-party claims raised or that could have been raised in the Litigation, and (y) claims that are pending, have been brought, or that may in the future be brought by or on behalf of any of TPR, the Sagi Genger 1993 Trust, the Orly Genger 1993 Trust (other than those claims currently pending in the Orly Trust Action), D&K Limited Partnership, D&K GP LLC, Sagi Genger, David Parnes or Dalia Genger, regardless of whether they were or could have been raised in the Litigation or the Orly Trust Action, relating in any way, whether directly or indirectly, to (A) the Shareholders Agreement entered into by Trans-Resources

7

shareholders and Trans-Resources on March 30, 2001, (B) the transfer of interests in TPR or the purported transfer of shares of Trans-Resources by TPR in October 2004, (C) any activities or developments relating to or conducted by Trans-Resources or any of its direct or indirect subsidiaries that occurred prior to September 26, 2008, (D) the acquisition by the Trump Group of all interests (record, beneficial or otherwise) of the so called "Arie Shares", "Orly Trust Shares" and the shares of Trans-Resources purportedly transferred by TPR in October 2004 to the Sagi Genger 1993 Trust (the "Sagi Trust Shares") (including, without limitation, the negotiations for the ownership or acquisition of such shares), (E) the control of Trans-Resources or any of its direct or indirect subsidiaries by the Trump Group through its acquisition of the aforementioned shares, (F) records and documents (including but not limited to electronic files) in the possession, custody or control of Trans-Resources or any of its direct or indirect subsidiaries, (G) misrepresentations made or improper acts conducted prior to September 26, 2008 by any officer or director of Trans-Resources, (H) this Agreement, (I) the business or operations of Trans-Resources or any of its direct or indirect subsidiaries conducted prior to September 26, 2008 arising from or in any way related to the conduct of any member of the AG Group, Avi Pelossof or William Dowd, or (J) the conduct of any other individual to the extent Arie Genger is aware, or should have been aware, thereof. Notwithstanding the foregoing, the indemnity provided for above shall not apply to any claims which may be brought subsequent to the Effective Date (and which are entirely unrelated to any claim brought prior to such date) by any of Sagi Genger, the Sagi Genger 1993 Trust or TPR and which arise solely out of actions taken or not taken by members of the Trump Group which actions or inactions no member of the AG Group was aware of or should have been aware of; provided, however, that such claim was

8

not encouraged or solicited by any member of the AG Group and no member thereof cooperates in asserting, instituting or prosecuting such claim. Notwithstanding anything herein to the contrary, the undertaking of William Wachtel hereunder shall not exceed under any circumstance an amount greater than $5,000,000.

(b)    The Trump Group may request payment or reimbursement of the Indemnification Amounts at any time by providing a written statement or copy of an underlying invoice or expense documentation to any member of the AG Group at the addresses set forth in Paragraph 16 below, and the AG Group shall pay such indemnified expenses in full and in cash within five (5) business days of the date such request is made. The supporting documentation submitted with any payment or reimbursement request hereunder may be redacted as necessary to preserve attorney-client privilege, attorney work product, or confidential information the Trump Group may, in its reasonable determination, need to protect. The Trump Group will provide the AG Group with reasonable notice prior to making any motion or taking any appeal with respect to, or in, any past, present or future action or claim for which the Trump Group is seeking indemnification, and such notice will be accompanied by a non-binding estimate of the legal fees and costs associated with such motion or appeal. The Trump Group authorizes the AG Group and their respective counsel to discuss directly with the Trump Group's appointed counsel the amount and scope of any invoice for which the Trump Group is seeking indemnification. The AG Group in its sole discretion may settle any indemnified claim so long as there is no monetary contribution to be paid by the Trump Group, and the Trump Group is released, in form and substance reasonably satisfactory to it, from any liability relating to any such indemnified

9

claim. The Trump Group shall not enter into any settlement of any indemnified claim, or

discussions with respect thereto, without the express written consent of the AG Group.

      (c)    With respect to each Indemnification Amount, until such time as it

has been paid over to the Trump Group, the members of the AG Group shall remain jointly and

severally liable for such Indemnification Amount and, the Trump Group may at its option pursue

all legal remedies available to it and/or withhold an amount equal to such unreimbursed

Indemnification Amount from any payments by Trans-Resources to be made pursuant to the

Notes.

      6.    **Releases.**

      (a)    **The AG Group Release.**  Effective on the Effective Date, each of

the members of the AG Group, for itself, himself or herself, and in all capacities, and on behalf

of its (and its respective affiliates' and direct and indirect subsidiaries'), his or her respective

agents, representatives, officers, directors, advisors, employees, general partners, limited partners,

shareholders, members, subsidiaries and affiliates, and each of their respective predecessors,

successors, heirs, executors, administrators and assigns, and any other persons or entities acting

in concert with any of them including, without limitation, any member of the Sagi Group which

he, she or it shall at any time directly or indirectly control or be deemed authorized to act on

behalf of (individually, an "AG Group Releasing Party" and collectively, the "AG Group

Releasing Parties"):  (i) fully, finally, irrevocably and unconditionally waives, releases and

discharges each of the members of the Trump Group and its (and its respective past and present

affiliates' and direct and indirect subsidiaries'), his or her respective past and present agents

10

(including Skadden, Arps, Slate, Meagher & Flom LLP in any capacity, including as Escrow

Agent for the Skadden Escrow or for any escrow in which it held, holds, or may hold, any

dividends or distributions from Trans-Resources), representatives, officers, directors, advisors,

employees, general partners, limited partners, shareholders, members, subsidiaries and affiliates,

and each of their respective predecessors, successors, heirs, executors, administrators and assigns

(collectively, the "Trump Group Released Parties"), from any and all claims, counterclaims,

demands, proceedings, actions, causes of action, orders, obligations, damages, debts, costs,

expenses and other liabilities whatsoever and however arising, whether known or unknown, past,

present or future, suspected or unsuspected, contingent or actual, both at law and in equity,

including without limitation, claims for fraud or fraud in the inducement (collectively, "Claims"),

which such AG Group Releasing Party now has, has ever had or may hereafter claim to have

against any Trump Group Released Party or its, his or her assets, liabilities or operations from

the beginning of the world through the Effective Date (individually, an "AG Group Released

Claim" and collectively, the "AG Group Released Claims"); and (ii) agrees not to assert, institute

or prosecute, or encourage, solicit or cooperate with any other person or entity in asserting,

instituting or prosecuting, any proceeding against any of the Trump Group Released Parties in

any jurisdiction (domestic or foreign, including, without limitation, the State of Israel) with

respect to any AG Group Released Claim or any other Claim relating in any way, directly or

indirectly, to Trans-Resources or any of its direct or indirect subsidiaries, the ownership or

acquisition of Trans-Resources shares (including any dividends or distributions relating thereto

or any escrow in which such dividends or distributions may currently be or in the past have been

held), the Litigation, the Orly Trust Action, control of Trans-Resources or any of its direct or

11

indirect subsidiaries, the business or operations of Trans-Resources or any of its direct or indirect subsidiaries, or arising out of this Agreement including, without limitation, the negotiation and execution of this Agreement or the AG Group Releases provided hereunder; provided, however, that this AG Group Release shall not apply to any Claims (x) seeking equitable relief to enforce the terms of this Agreement or claims seeking payment of the Notes or any indemnification payments required to be paid hereunder, (y) relating solely to events that transpired in their entirety subsequent to the Effective Date and that could not, under any circumstances, have possibly been pursued prior to the Effective Date whether or not then known, and (z) between any of the AG Group Releasing Parties and TPR, and/or any other member of the Sagi Group.

If an AG Releasing Party brings an AG Group Released Claim or other Claim in violation of the immediately preceding paragraph, the AG Group, jointly and severally, agrees to indemnify the Trump Group for any and all settlements, judgments, costs and fees, including legal fees and disbursements of counsel chosen by the Trump Group, incurred in working on, preparing for or defending such claim ("AG Group Release Amounts"). With respect to each AG Group Release Amount, until such time as such AG Group Release Amount has been paid over to the Trump Group, the members of the AG Group shall remain jointly and severally liable for such AG Group Release Amount, and the Trump Group may at its option pursue all legal remedies available to it and/or withhold an amount equal to such unreimbursed AG Group Release Amount from any payments to be made by Trans-Resources pursuant to the Notes. For purposes of the removal of all doubt, it is the parties' intention that no claims shall be brought or pursued by any member of the AG Group against any member of the Trump Group for any

12

reason whatsoever (other than claims permitted under clause (x), (y) and (z) of the immediately preceding paragraph).

(b)     **The Trump Group Release.** Effective on the Effective Date, each of the members of the Trump Group, for itself or himself, and in all capacities, and on behalf of its (and its respective affiliates' and direct and indirect subsidiaries'), or his respective agents, representatives, officers, directors, advisors, employees, general partners, limited partners, shareholders, members, subsidiaries and affiliates, and each of their respective predecessors, successors, heirs, executors, administrators and assigns, and any other persons or entities acting in concert with any of them (individually, a "Trump Group Releasing Party" and collectively, the "Trump Group Releasing Parties"):  (i) fully, finally, irrevocably and unconditionally waives, releases and discharges each of the members of the AG Group and its (and its respective past and present affiliates' and direct and indirect subsidiaries'), his or her respective past and present agents, representatives, officers, directors, advisors, employees, general partners, limited partners, shareholders, members, subsidiaries and affiliates, and each of their respective predecessors, successors, heirs, executors, administrators and assigns (collectively, the "AG Group Released Parties"), from any and all claims, counterclaims, demands, proceedings, actions, causes of action, orders, obligations, damages, debts, costs, expenses and other liabilities whatsoever and however arising, whether known or unknown, past, present or future, suspected or unsuspected, contingent or actual, both at law and in equity including, without limitation, claims for fraud or fraud in inducement, ("Claims"), which such Trump Group Releasing Party now has, has ever had or may hereafter claim to have against any AG Group Released Party or its, his or her assets, liabilities or operations from the beginning of the world through the Effective Date (individually,

13

a "Trump Group Released Claim" and collectively, the "Trump Group Released Claims"); and (ii) agrees not to assert, institute or prosecute, or encourage, solicit or cooperate with any other person or entity in asserting, instituting or prosecuting, any proceeding against any member of the AG Group Released Parties with respect to any Trump Group Released Claim or any other Claim relating in any way, directly or indirectly, to Trans-Resources or any of its direct or indirect subsidiaries, the ownership or acquisition of Trans-Resources shares, control of Trans-Resources or any of its direct or indirect subsidiaries, the business or operations of Trans-Resources or any of its direct or indirect subsidiaries, or the negotiation and execution of this Agreement or the Trump Group Releases provided hereunder; provided, however, that this Trump Group Release shall not apply to any Claims (x) seeking equitable relief to enforce  the terms of this Agreement or claims seeking payment of any indemnification payments required to be paid hereunder, (y) relating solely to events that transpired in their entirety subsequent to the Effective Date and that could not, under any circumstances, have possibly been pursued prior to the Effective Date whether or not then known, and (z) between any of the Trump Group Releasing Parties and Avi Pelossof, William Dowd (unless and until the exchange of mutual general releases between the Trump Group and William Dowd referred to above) and/or TPR.

If a Trump Group Releasing Party brings a Trump Group Released Claim or other Claim in violation of the immediately preceding paragraph, the Trump Group, jointly and severally, agrees to indemnify the AG Group for any and all settlements, judgments, costs and fees, including legal fees and disbursements of counsel chosen by the AG Group, incurred in working on, preparing for or defending such claim ("Trump Group Release Amounts").  With respect to each Trump Group Release Amount, until such time as such Trump Group Release Amount has

14

been paid over to the AG Group, the members of the Trump Group shall remain jointly and severally liable for such Trump Group Release Amount, and the AG Group may at its option pursue all legal remedies available to it. For purposes of the removal of all doubt, it is the parties intention that no claims shall be brought or pursued by any member of the Trump Group against any member of the AG Group for any reason whatsoever (other than claims permitted under clause (x), (y) and (z) of the immediately preceding paragraph).

7.    **Discovery Obligations.**    Effective on the Effective Date (defined below), to the extent that a member of the AG Group or the Orly Genger 1993 Trust seeks discovery or testimony from any member of the Trump Group, or if any member of the Trump Group is subpoenaed by any party to an action in which any member of the AG Group or the Orly Genger 1993 Trust is a party, each of the members of the AG Group, jointly and severally, agrees that to the extent indemnities of the Trump Group provided for elsewhere in this Agreement do not apply, they shall indemnify the Trump Group for any and all costs and fees, including reasonable legal fees and disbursements of counsel to be chosen by the Trump Group (it being understood that for the purposes of this Discovery Obligation indemnity only, the indemnification for legal fees shall be limited to $750 per hour of legal services), incurred in working on, preparing for or defending such claim, it being agreed that the Trump Group will cooperate with the AG Group in all reasonable respects to cause the amount of such costs and fees, including its attorneys' fees and disbursements to be minimized ("Discovery Costs"). With respect to each Discovery Cost, until such time as such Discovery Cost has been paid over to the Trump Group, the members of the AG Group shall remain jointly and severally liable for such Discovery Cost, and the Trump Group may at its option pursue all legal remedies available to it

15

and/or withhold an amount equal to such unreimbursed Discovery Cost from any payments to be made by Trans-Resources pursuant to the Notes.

### 8.   **Cooperation.**

(a)   Each member of the AG Group shall take all actions necessary or desirable, as promptly as practicable and as may be requested by the Trump Group from time to time including, without limitation, testifying in the Orly Trust Action, to (i) effectuate the release of the AG Group Released Claims and to prevent or preclude any other person or entity from asserting, instituting or prosecuting, or encouraging, soliciting or cooperating with any other person or entity in asserting, instituting or prosecuting, any proceeding or claims against any of the Trump Group Released Parties with respect to any AG Group Released Claim or any other Claim relating in any way, directly or indirectly, to Trans-Resources or any of its direct or indirect subsidiaries, the ownership or acquisition of Trans-Resources shares, the control of Trans-Resources or any of its direct or indirect subsidiaries, records and documents (including but not limited to electronic files) in the possession, custody or control of Trans-Resources or any of its direct or indirect subsidiaries or the business or operations of Trans-Resources or any of its direct or indirect subsidiaries brought by any party without regard to whether such party is a signatory hereto and (ii) cause the Orly Genger 1993 Trust to release any and all claims against the Trump Group Released Parties, including, without limitation, any claims pending in the Orly Trust Action.

(b)   As a condition to any settlement that any member of the AG Group shall enter into with any member of the Sagi Group, the AG Group parties to such settlement shall cause each Sagi Group party to such settlement to (i) dismiss with prejudice all pending claims, cross-claims and counter claims against any of the Trump Group Released Parties (as defined below)

16

and to provide the Sagi Group Release, and (ii) if the Orly Genger 1993 Trust is a party to such settlement, cause it to agree in writing to become an AG Group member for purposes of providing the indemnity contained in Paragraph 5. Likewise, as a condition to any agreement by the AG Group to a replacement trustee for the Orly Genger 1993 Trust, the AG Group shall use its best efforts to cause such trustee to agree in writing on behalf of the Orly Genger 1993 Trust that it shall be a member of the AG Group for purposes of providing the indemnity contained in Paragraph 5.

(c)      Each member of the AG Group covenants that for so long as the indemnity contained in Paragraph 5 remains in effect, he, she or it shall not contribute or deposit any amounts, or permit to be contributed or deposited any amounts (including, without limitation, any payments made under Paragraphs 2 and 3), to or with the Orly Genger 1993 Trust or to any other trust or entity that any of them directly or indirectly controls or is or was established at their direction, or that is or was established or exists for any of their direct or indirect benefit, unless such trust or entity has agreed in writing to being a member of the AG Group for purposes of providing the indemnity contained in Paragraph 5. The foregoing shall not restrict members of the AG Group from investing in or with such entities provided that that such investment may be liquidated, without restriction, by such member of the AG Group from time to time as may be necessary to comply with the terms of the indemnity contained in Paragraph 5.

(d)      The AG Group covenants that, subject to any confidentiality orders of any court or other restrictions imposed by law (i) with respect to any court filing made or received by it concerning the Orly Genger 1993 Trust, it shall contemporaneously provide a copy thereof to the Trump Group, and (ii) contemporaneously with its becoming aware of any changes or

17

contemplated material changes to the Orly Genger 1993 Trust including, without limitation, the resignation of its trustee and/or the appointment of a replacement trustee, it shall provide written notice thereof to the Trump Group.

9. **Confidentiality.** The Parties and their counsel shall not disclose the terms of this Agreement, except if, upon written advice of counsel, it is required to do so by law. Notwithstanding the foregoing, disclosure may be made by the Parties: (i) to their respective accountants, financial advisors or attorneys (collectively, "Advisors") as required to obtain tax or legal advice, it being agreed that each Party shall apprise its Advisors of the obligation to maintain such confidentiality and that each Party shall be accountable for any breach of this provision by its respective Advisors, and (ii) notwithstanding anything to the contrary in this Agreement, the Parties may disclose the terms of this Agreement if necessary in any action to enforce this Agreement or as may be required to respond to a valid subpoena, court order or other legal process. Each Party agrees that he, she or it will promptly give notice of any attempt to compel disclosure of the terms of this Agreement to each of the other Parties, at least five (5) days before compliance is required.

10. **Third Party Beneficiaries.** This Agreement shall have no third party beneficiaries except for those persons and entities that are not Parties hereto but are covered by the releases set forth in Paragraph 6 above, who may enforce those releases.

11. **Binding Effect**

This Agreement shall be binding upon and inure to the benefit of each of the Parties hereto and (where applicable) their respective current and former agents, representatives, officers, directors, advisors, employees, general partners, limited partners, shareholders, members, subsidiaries and

18

affiliates, and each of their respective predecessors, successors, heirs, executors, administrators and assigns.

12.      **Representations and Warranties.**

(a)      Each Party represents that it, he or she is authorized to enter into this Agreement and to grant the rights granted by it, him or her in this Agreement. Each Party further represents that, to the extent any non-party consents are required for the performance of any of its, his or her obligations under this Agreement (including, without limitation, with any entity controlled by any Party, including any of its partners or equity holders), it, he or she has obtained such consents.

(b)      Each Party has the benefit of the advice of counsel chosen and employed by it, him or her concerning this Agreement.

(c)      Each Party is the sole owner and holder of the Claims it is releasing under this Agreement, and represents that none of the Claims released herein have been assigned, pledged, encumbered, or otherwise transferred in whole or in part, to any other person or entity.

(d)      Each member of the AG Group represents that he, she or it is knowledgeable, sophisticated and experienced in business, financial and other matters relevant to his, her or its entry into this Agreement and the transactions contemplated hereby, and has engaged advisors, experienced in the matters contemplated by this Agreement. Each member of the AG Group has undertaken such investigation and has been provided with and has evaluated such documents and information as he, she or it has deemed necessary to enable him, her or it to make an informed decision with respect to the execution, delivery and performance of this Agreement and the transactions contemplated hereby. Each member of the AG Group is

19

consummating the transactions contemplated hereby without reliance upon any express or implied representations or warranties of any nature, whether in writing, orally or otherwise, made by or on behalf of or imputed to any of the Trump Group Released Parties, except as expressly set forth in this Agreement, and no member of the AG Group shall make any Claim with respect thereto. Each member of the AG Group acknowledges that he, she or it is taking full responsibility for making his, her or its own evaluation of the adequacy and accuracy of all documents or information that may have been furnished to him, her or it, and that no member of the AG Group shall have any Claim against any of the Trump Group Released Parties with respect thereto, including for Claims relating to the accuracy or completeness of the information that may have been furnished to him her or it. Each member of the AG Group acknowledges and understands that each member of the Trump Group Released Parties expressly disclaims any and all liability that may be based on any of the documents and information that may have been furnished to any member of the AG Group and all liability based on such documents or information or errors therein or omissions therefrom. Accordingly, each member of the AG Group acknowledges that none of the Trump Group Released Parties has made any representation or warranty with respect to (i) any historical information, financial or otherwise, including without limitation results of operations (or any component thereof), cash flows, or financial condition (or any component thereof), of Trans-Resources and/or any of its subsidiaries, (ii) any valuations or projections or estimates of future revenues, future results of operations (or any component thereof), future cash flows or future financial condition (or any component thereof) of Trans-Resources and/or any of its subsidiaries or the future business and operations of Trans-Resources and/or any of its subsidiaries, (iii) any Claims any member of the AG Group

20

may have against any of the Trump Group Released Parties or (iv) any other information or documents that may have been made available to any member of the AG Group or their respective counsel, accountants or advisors with respect to any of the Trump Group Released Parties any of their respective businesses, assets, liabilities or operations, except as expressly set forth in this Agreement. In addition to the foregoing, each member of the AG Group acknowledges that his, her or its entry into this Agreement and the transactions contemplated hereby is based solely on his, her or its respective assessment and valuation of all Claims that he, she or it may have against any of the Trump Group Released Parties and the likelihood of success of such Claims in a court of competent jurisdiction. Each member of the AG Group acknowledges that the consideration to be received by the AG Group pursuant to this Agreement constitutes full and fair consideration for the release of all Claims contemplated hereunder.

(e)     Each member of the Trump Group represents that he, she or it is knowledgeable, sophisticated and experienced in business, financial and other matters relevant to his, her or its entry into this Agreement and the transactions contemplated hereby, and has engaged advisors, experienced in the matters contemplated by this Agreement. Each member of the Trump Group has undertaken such investigation and has been provided with and has evaluated such documents and information as he, she or it has deemed necessary to enable him, her or it to make an informed decision with respect to the execution, delivery and performance of this Agreement and the transactions contemplated hereby. Each member of the Trump Group is consummating the transactions contemplated hereby without reliance upon any express or implied representations or warranties of any nature, whether in writing, orally or otherwise, made by or on behalf of or imputed to any of the AG Group Released Parties, except as expressly set forth in this

21

Agreement, and no member of the Trump Group shall make any Claim with respect

thereto. Each member of the Trump Group acknowledges that he, she or it is taking full

responsibility for making his, her or its own evaluation of the adequacy and accuracy of all

information that may have been furnished to him, her or it, and that no member of the Trump

Group shall have any Claim against any of the AG Group Released Parties with respect thereto,

including for Claims relating to the accuracy or completeness of the information that may have

been furnished to him her or it. Each member of the Trump Group acknowledges and

understands that each member of the AG Group Released Parties expressly disclaims any and all

liability that may be based on any of the documents and information that may have been

furnished to any member of the Trump Group and all liability based on such documents or

information or errors therein or omissions therefrom. Accordingly, each member of the Trump

Group acknowledges that none of the AG Group Released Parties has made any representation or

warranty with respect to (i) any historical information, financial or otherwise, including without

limitation results of operations (or any component thereof), cash flows, or financial condition (or

any component thereof), of Trans-Resources and/or any of its subsidiaries, (ii) any valuations or

projections or estimates of future revenues, future results of operations (or any component

thereof), future cash flows or future financial condition (or any component thereof) of Trans-

Resources and/or any of its subsidiaries or the future business and operations of Trans-Resources

and/or any of its subsidiaries, (iii) any claims any member of the Trump Group may have against

any of the AG Group Released Parties or (iv) any other information or documents that may have

been made available to any member of the Trump Group or their respective counsel, accountants

or advisors with respect to any of the AG Group Released Parties any of their respective

22

businesses, assets, liabilities or operations, except as expressly set forth in this Agreement. In

addition to the foregoing, each member of the Trump Group acknowledges that his, her or its

entry into this Agreement and the transactions contemplated hereby is based solely on his, her or

its respective assessment and valuation of all Claims that he, she or it may have against any of

the AG Group Released Parties and the likelihood of success of such Claims in a court of

competent jurisdiction. Each member of the Trump Group acknowledges that the consideration

to be received by the Trump Group pursuant to this Agreement constitutes full and fair

consideration for the release of all claims contemplated hereunder.

13.     **Attorneys' Fees.** The Parties agree to be responsible for their own attorneys' fees and

costs incurred in connection with this Agreement and negotiations related to and preparation of

this Agreement and not to seek from each other reimbursement of any such costs, expenses or

attorneys' fees.

14.     **Governing Law.**

This Agreement, and all disputes arising under this Agreement or related thereto, shall be

governed by, construed and interpreted in accordance with the laws of the State of Delaware,

applicable to instruments made, delivered and performed entirely in such state, without regard to

the choice of law provisions thereof.

15.     **Arbitration.** UNLESS THIS AGREEMENT SPECIFICALLY PROVIDES FOR

ANOTHER TYPE OF DISPUTE RESOLUTION WITH RESPECT TO A PARTICULAR

KIND OF DISPUTE, ANY AND ALL CONTROVERSIES AND CLAIMS ARISING OUT OF

OR RELATING TO THIS AGREEMENT, OR THE BREACH, TERMINATION OR

VALIDITY THEREOF, SHALL BE EXCLUSIVELY SETTLED BY FINAL AND BINDING

ARBITRATION IN ACCORDANCE WITH THE PROCEDURES SET FORTH IN THIS SECTION.

(a)     The arbitration shall be conducted in accordance with the Commercial Arbitration Rules of the American Arbitration Association ("AAA") then in effect (the "Rules"), except as set forth herein. Any member of the Trump Group on behalf of the Trump Group, on the one hand, and any member of the AG Group on behalf of the AG Group, on the other hand, may demand arbitration by giving the other written notice to such effect in accordance with the Rules.

(b)     The arbitration will be held before one neutral arbitrator. Within thirty (30) days after the other Party's receipt of the demand for arbitration, the Party seeking arbitration will invite the other Party to join it in approaching the following list of individuals about serving as arbitrator and will approach such individuals with such other Party (if its invitation is accepted) or without such other Party (if its invitation is rejected or not responded to within five (5) business days): The Honorable William B. Chandler III, David A. Jenkins, Esq., Stephen E. Jenkins, Esq., Robert J. Katzenstein, Esq., and Andre G. Bouchard, Esq. If only one such individual is available and willing, he shall serve as the arbitrator. If more than one such individual is available and willing, the Parties will mutually determine which of those so available and willing will serve as the arbitrator. If the Parties are unable to agree, the arbitrator will be selected by the AAA from the foregoing list in accordance with the listing, striking and ranking procedure in the Rules, with each Party being given a limited number of strikes, except for cause. If none of the foregoing individuals is available, the arbitrator will be selected by the AAA in accordance with the listing, striking and ranking procedure in the Rules, with each Party

24

being given a limited number of strikes, except for cause. Any arbitrator appointed by the AAA shall be a retired judge that presided over a state or federal court located in Delaware or a practicing attorney licensed in Delaware with no less than fifteen years of experience with large commercial cases. Any such arbitration proceedings shall be and remain confidential. The place of arbitration shall be in Manhattan, New York or elsewhere if otherwise agreed to.

(c)     Discovery will be limited to the request for and production of documents, directly related to the issues in dispute, limited depositions of limited duration, and interrogatories. Interrogatories will be allowed only as follows: a Party may request the other Party to identify by name, last known address and telephone number (i) all persons having knowledge of facts relevant to the dispute and a brief description of that person's knowledge, and (ii) any experts who may be called as an expert witness, the subject matter about which the expert is expected to testify, the mental impressions and opinions held by the expert and the facts known by the expert. All issues concerning discovery upon which the parties cannot agree will be submitted to the arbitrator for determination.

(d)     Each of the Parties agrees that it will use commercially reasonable efforts to join (and will allow the other party to join) any third party that the Parties have agreed is indispensable to the arbitration. If any such third party does not agree to be joined, the arbitration will proceed nonetheless.

(e)     The arbitrators are not empowered to award damages not permitted by the terms of this Agreement and if so permitted, then not in excess of compensatory damages, except with respect to indemnification obligations for punitive damages as provided hereunder, and

each Party irrevocably waives the right to recover punitive, exemplary or multiple damages with respect to any dispute other than with respect to indemnification obligations for such punitive damages as provided hereunder. The decision of, and award rendered by, the arbitrator will be final and binding on the Parties, will be in writing and will include the findings of fact and conclusions of law upon which it is based, if any.

(f)     The Parties specifically acknowledge that this Agreement evidences a transaction involving, affecting, affected by, and a part of, interstate commerce and that this agreement to arbitrate is governed by and enforceable under the Federal Arbitration Act, 9 U.S.C. §§ 1 et seq.

(g)     Except to the extent that any of the indemnification provisions contained herein shall be applicable (i) the Parties shall each be responsible for their own costs and expenses (including legal fees and disbursements) incurred in any arbitration, and (ii) the AG Group on the one hand and the Trump Group on the other shall each be responsible for 50% of the fees and disbursements of the arbitrator and of any costs and expenses payable to the AAA.

(h)     With respect to the enforcement, modification or vacating of any arbitration award (it being reconfirmed hereby that the arbitration award shall itself be final and binding on the Parties), the Parties submit to the exclusive jurisdiction of one or the other of (i) the United Stated District Court of the Southern District of New York sitting in the Borough of Manhattan in the City of New York and (ii) the Commercial Division of the New York State Supreme Court sitting in the Borough of Manhattan in the City of New York.

16.     **Notice.** If any Party is required to give notice to any other Party under this Agreement, such notice shall be in writing and shall be deemed to have been duly given upon receipt of hand delivery, one business day following its being sent to the recipient via Federal Express or another

716412-WILSR01A - MSW

nationally recognized over-night courier, or by e-mail with confirmation of receipt to the

following individuals or to such other address or person as such Parties may from time to time

specify by written notice given in the manner provided above:

**If to the Trump Group:**

Mark S. Hirsch, Esq.

The Trump Group

41 Madison Avenue, Suite 4101

New York, NY 10010

Phone: (212) 838-1000

E-mail: mhirsch@trumpgroup.com

**With Copy to:**

Thomas J. Allingham II, Esq.

Anthony W. Clark, Esq.

Douglas D. Herrmann, Esq.

Skadden, Arps, Slate, Meagher & Flom LLP

One Rodney Square

P.O. Box 636

Wilmington, DE 19899

Phone: (302) 651-3000

E-mail: thomas.allingham@skadden.com

27

E-mail:  anthony.clark@skadden.com

E-mail:  douglas.herrmann@skadden.com

**If to Arie Genger:**

Arie Genger

104 West 40th Street, 19th Floor

New York, NY 10018

E-mail:  wachtel@wmllp.com

**With Copy to:**

Stephen P. Lamb, Esq.

Paul Weiss

500 Delaware Avenue, Suite 200

Wilmington, DE 19889

**If to Orly Genger:**

Orly Genger

104 West 40th Street, 19th Floor

New York, NY 10018

E-mail: wachtel@wmllp.com

**With Copy to:**

28

William Wachtel

Wachtel Masyr & Missry LLP

885 second ave.

New York, NY 10017


[]


**If to Arnold Broser or David Broser:**

David Broser

104 West 40th, 19th FloorNew York, NY 10018

E-mail:  wachtel@wmll.com

**With Copy to:**

William Wachtel

Wachtel Masyr & Missry LLP

885 second ave.
New York, NY 10017

29

17.    **Entire Agreement.** This Agreement contains the entire agreement between the Parties concerning the subject matter hereof. Neither this Agreement nor any of its terms or provisions shall be binding on any Party until all the Parties hereto have signed.  The Parties agree that all drafts of this Agreement are strictly confidential and shall supplement and complement any protection, which may attach to the exchange of confidential information in settlement discussions, whether by common law or statute including, but not limited to, Federal Rule of Evidence 408 and comparable state laws.  Any and all prior discussions and agreements between the Parties concerning the subject matter of this Agreement are merged into this Agreement when signed.  This Agreement may not be modified or amended, nor any of its provisions waived, except by an instrument in writing signed by all Parties.  No Party has made any warranty or representation to the other Parties that is not set forth expressly herein.  In entering into this Agreement, no Party has relied on any statement or representation made by or on behalf of any other Party, by or on behalf of any affiliate of such other Party, or by counsel for such other Party that is not set forth expressly in this Agreement.

18.    **No Drafting Presumption.** This Agreement shall be interpreted or construed without any presumption that the provisions hereof should be strictly construed against the drafter, it being agreed that the Parties and their respective counsel and other agents have fully and equally participated in the preparation, negotiation, review and approval of all provisions of this Agreement.

19.    **No Admissions.** The Parties have executed this Agreement for the sole purpose of settling and disposing of all Claims between them, and it is expressly understood and agreed that no Party hereto admits any wrongdoing on its, his or her part by executing this Agreement.

30

20.     **Binding Effect.** It is the intention of the parties to extinguish all AG Group Released Claims and all Trump Group Released Claims and, consistent with such intention, each of the Parties hereby waives any and all rights, to the extent permitted by law, to assert that the Release provided by it in Paragraph 6 hereunder is unenforceable as to any claim whatsoever and for any reason including, without limitation, any and all rights under section 1542 of the California Civil Code, if applicable, or any other applicable similar law or principle of common law, which may have the effect of limiting the Releases herein.  Section 1542 of the California Civil Code provides:

> A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM OR HER MUST HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR.

21.     **Headings.** The section headings contained in this Agreement are for reference purposes only and shall not in any way effect or control the meaning or interpretation of this Agreement.

22.     **Execution in Counterparts and by PDF e-mail.** This Agreement may be executed in multiple counterparts and by fax or PDF e-mail, each of which, when so executed and delivered, shall be an original, but such counterparts shall together constitute one and the same instrument and agreement.

23.     **Effective Date.** This Agreement shall be effective immediately upon execution and delivery by all Parties hereto (the "Effective Date").

31

**IN WITNESS WHEREOF**, the Parties have caused this Agreement to be duly executed as follows:

**TR Investors, LLC**                              **Arie Genger**

By: _____

Print: _____          Date: _____6/15/13_____

Title: _____

Date: _____


**Glenclova Investment Co.**                **Orly Genger (in her individual capacity and**

                                            **in her capacity as beneficiary of the**

By: _____          **Orly Genger 1993 Trust)**

Print: _____

Title: _____          Date: _____6/15/13_____

Date: _____

32

**IN WITNESS WHEREOF**, the Parties have caused this Agreement to be duly executed as follows:

TR Investors, LLC                                    Arie Genger

By: _~Mark S Hirsch~_____            _____

Print: _MARK J. HIRSCH_                    Date: _____

Title: _Executive VP/General Counsel_

Date: _June 16, 2013_



Glenclova Investment Co.                    **Orly Genger (in her individual capacity and**

                                            **in her capacity as beneficiary of the**

By: _~Mark S Hirsch~_____              **Orly Genger 1993 Trust)**

Print: _MARK S. HIRSCH_

Title: _Executive VP/General Counsel_       _____

Date: _June 16, 2013_                       Date: _____

32

**New TR Equity I, LLC**

By: _____

Print: _____

Title: _____

Date: _____

**Arnold Broser**

Date: _____ 6/11/13 _____

**New TR Equity II, LLC**

By: _____

Print: _____

Title: _____

Date: _____

**David Broser**

Date: _____ 6/16/13 _____

33

**New TR Equity I, LLC**                    **Arnold Broser**

By: _Mark S. Hirsch_                        _____

Print: _MARK S. Hirsch_                     Date: _____

Title: _Executive VP/General Counsel_

Date: _June 16, 2013_


**New TR Equity II, LLC**                   **David Broser**

By: _Mark S. Hirsch_                        _____

Print: _MARK S. Hirsch_                     Date: _____

Title: _Executive VP/General Counsel_

Date: _June 16, 2013_

33

**Trans-Resources, LLC**

By: _~Mark S Hirsch_____

Print: _MARK S. HIRSCH_____

Title: _Executive VP/General Counsel_

Date: _June 16, 2013_____

34

**Jules Trump**

Date: 6/16/2013

**Eddie Trump**

Date: _____

**Mark Hirsch**

Date: _____

35

**Jules Trump**

_____

Date: _____

**Eddie Trump**

_____

Date: June 16, 2013

**Mark Hirsch**

_____

Date: _____

35

**Jules Trump**

_____

Date: _____

**Eddie Trump**

_____

Date: _____

**Mark Hirsch**

_____

Date: June 16, 2013

35

EXHIBIT A

6/16/13
*Draft - Confidential*

# [FORM OF SUBORDINATED NOTE]

**THIS NOTE HAS NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR ANY APPLICABLE STATE SECURITIES LAWS AND MAY NOT BE SOLD OR TRANSFERRED WITHOUT COMPLIANCE WITH THE REGISTRATION OR QUALIFICATION PROVISIONS OF APPLICABLE FEDERAL AND STATE SECURITIES LAWS OR APPLICABLE EXEMPTIONS THEREFROM.**

TRANS-RESOURCES

## <u>SUBORDINATED NOTE</u>

$7,500,000.00                                                                    June __, 2013

     **FOR VALUE RECEIVED**, Trans-Resources, LLC a Delaware entity (the successor to Trans-Resources, Inc. and referred to herein as the "<u>Maker</u>"), hereby promises to pay to the order of [_____] (the "<u>Payee</u>"), the principal sum of Seven Million, Five-Hundred Thousand Dollars ($7,500,000.00) pursuant to the terms and conditions of and at the times provided in the Settlement Agreement (as defined below).

    1.    <u>Notes</u>. This Subordinated Note (this "<u>Note</u>") is issued pursuant to, and is subject to the terms and conditions of, the Settlement Agreement and Release, dated as of June __, 2013 by and among the AG Group and the Trump Group, as amended, restated, supplemented or otherwise modified from time to time (the "<u>Settlement Agreement</u>"). Terms used herein and not otherwise defined herein shall have the respective meanings ascribed thereto in the Settlement Agreement.

    2.    <u>No Interest</u>. This Note will not accrue interest, pursuant to the terms of the Settlement Agreement.

    3.    <u>Maturity</u>. Subject to the terms and conditions of the Settlement Agreement and this Paragraph 3, this Note shall mature and be redeemed or satisfied in full by the Maker in one installment, which shall be paid by the Maker no later than the ___ anniversary of the Effective Date (the "<u>Maturity Date</u>"). Notwithstanding the foregoing, the Maturity Date shall automatically be extended until the earlier (the "<u>Extended Maturity Date</u>") of (i) such time as all pending claims, cross-claims and counter-claims brought by any of TPR, Sagi Genger, the Sagi Genger 1993 Trust, the Orly Genger 1993 Trust (other than the Orly Trust Action), D&K Limited Partnership, D&K GP LLC, Rochelle Fang, and/or David Parnes (collectively, the "<u>Sagi Group</u>") against any member of the Trump Group have been dismissed with prejudice and the statute of limitations shall have run with respect to any other potential claims of the Sagi Group that might be the subject of the indemnification obligations provided for by Paragraph 5 of the Settlement Agreement and (ii) such time as each member of the Sagi Group shall have provided the Trump Group with a release of the Trump Group Released Parties and covenant not to sue in form and substance that is the same as the AG Group Release and covenant not to sue contained in Paragraph 6(a) of the Settlement Agreement. Subject to the foregoing, this Note shall become immediately due and payable upon the occurrence of any transaction or series of transactions which shall result in the Trump Group owning or controlling neither (i) a majority of the voting stock of Trans-Resources or its successors or each of its two principal subsidiaries, Haifa

Chemicals, Ltd. and Na-Churs Plant Food Company or their successors, nor (ii) directly or indirectly, a majority of the assets currently owned by Trans-Resources and its subsidiaries; provided, however, that in such event, at the request of the Trump Group, the amounts then payable on this Note shall be placed in escrow until the Maturity Date or until the Extended Maturity Date (if applicable) under the provisions of an escrow agreement on reasonable terms to be negotiated at such time in good faith between the Maker, the Payee and an escrow agent selected by mutual consent of the Maker and the Payee (such consent, not to be unreasonably withheld, conditioned or delayed), which shall provide for the release of funds from such escrow to the Maker in satisfaction of any and all Indemnification Amounts, AG Group Release Amounts and Discovery Costs owing to Maker, if any, and payment to the Payee of any amounts remaining in escrow after payment to Maker of all Indemnification Amounts, AG Group Release Amounts and Discovery Costs, if any, upon the Maturity Date hereunder or the Extended Maturity Date (if applicable).

4.     Optional Prepayments. The Maker may voluntarily prepay this Note prior to the Maturity Date, in whole or in part, at any time, without premium or penalty.

5.     Adjustment. In accordance with the terms of the Settlement Agreement, in the event that at any time Indemnification Amounts, Discovery Costs, AG Group Release Amounts, or other amounts due and payable by the AG Group to the Trump Group pursuant to the Settlement Agreement (the "Costs") have not been paid to the Trump Group in accordance with the terms of the Settlement Agreement, the Maker may, upon written notice to the Payee, set off and apply as a credit against the amount due under this Note any and all due, unpaid and outstanding Costs. The rights and remedies described herein are in addition to any other rights and remedies the Parties may have under the Settlement Agreement or other applicable law.

6.     Subordination. Pursuant to the terms of the Settlement Agreement, this Note is unsecured and shall be fully subordinated to any obligation of Trans-Resources, including, but not limited to, outstanding credit facilities, bonds, loans, tax obligations and payables.

7.     Enforcement. The Maker hereby agrees to pay on demand all reasonable costs and expenses, including without limitation attorneys' fees and costs of collection, incurred or paid by the Payee in enforcing this Note in accordance with the Settlement Agreement.

8.     Amendments. No failure or delay on the part of the Maker or the Payee in exercising any right, power, privilege or remedy shall operate as a waiver thereof, nor shall any single or partial exercise of any such right, power, privilege or remedy preclude any other or further exercise thereof or the exercise of any other right, power, privilege or remedy. This Note may not be amended and the provisions hereof may not be waived, except in accordance with the terms of the Settlement Agreement.

9.     Lost Notes, etc. If this Note is mutilated, destroyed, lost or stolen, upon receipt of evidence satisfactory to the Maker of such loss, theft, destruction or mutilation of this Note and, if requested in the case of any such loss, theft or destruction, upon delivery of an indemnity agreement reasonably satisfactory to the Maker, or, in the case of any such mutilation, upon surrender and cancellation of this Note, the Maker shall issue a new Note of like tenor and amount, in lieu of this Note.

- 2 -

10.     <u>ASSIGNMENT</u>.  THIS NOTE, INCLUDING THE RESPECTIVE RIGHTS AND OBLIGATIONS OF THE MAKER AND THE PAYEE PURSUANT THIS NOTE, MAY NOT BE ASSIGNED, TRANSFERRED, SOLD OR OTHERWISE DISPOSED OF BY EITHER THE MAKER OR THE PAYEE WITHOUT THE PRIOR WRITTEN CONSENT OF THE OTHER WHICH CONSENT MAY BE WITHHELD IN SUCH PARTY'S SOLE DISCRETION.

11.     <u>Binding Effect</u>.  The provisions of this Note shall be binding upon and inure to the benefit of the parties hereto and their successors and assigns permitted hereby.

*[signature page follows]*

Error! Unknown document property name.

**IN WITNESS WHEREOF,** the Maker has caused this Subordinated Note to be duly executed under seal on the date set forth above by a duly authorized representative of the Maker.

TRANS-RESOURCES, LLC


By:_____
    Name:
    Title:

4

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: May 15, 2014
```

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------X
TPR INVESTMENT ASSOCIATES, INC.,      :
                                      :
                Plaintiff,            :
                                      :          No. 13 Civ. 8243 (JFK)
                -against-             :          **OPINION & ORDER**
                                      :
PEDOWITZ & MEISTER LLP, as escrow     :
agent, DALIA GENGER, as trustee of    :
the Orly Genger 1993 Trust, and       :
ORLY GENGER, as beneficiary of the    :
Orly Genger 1993 Trust,               :
                                      :
                Defendants.           :
------------------------------------X

Appearances

For TPR Investment Associates, Inc.
    MORGAN, LEWIS & BOCKIUS, LLP
    By:  John Dellaportas
         Mary C. Pennisi

For Orly Genger
    ZEICHNER, ELLMAN & KRAUSE, LLP
    By:  Yoav M. Griver
         Bryan Leinbach

For Pedowitz & Meister, LLP
    PEDOWITZ & MEISTER, LLP
    By:  Robert A. Meister

For Dalia Genger
    Judith Bachman

**JOHN F. KEENAN, United States District Judge:**

     We proceed once more unto the breach within the Genger

family.  In this latest action, TPR Investment Associates, Inc.

("TPR"), which is controlled by Sagi Genger, seeks a judgment

directing the release of about $10.3 million in escrowed

proceeds (the "Proceeds") arising out of TPR's sale of certain
shares of Trans-Resources Inc. to a group of parties known as
the "Trump Group." Defendant Orly Genger, Sagi's estranged
sister, has filed a motion to dismiss this action. TPR not only
opposes Orly's motion but has also cross-moved for summary
judgment. Most recently, Orly filed a motion to dismiss the
crossclaims against her by Pedowitz & Meister LLP and Dalia
Genger.

For the reasons that follow, Orly's motion to dismiss the
complaint is denied, and TPR's motion for summary judgment is
granted. Orly's motion to dismiss the interpleader crossclaim
by Pedowitz & Meister LLP is granted, and her motion to dismiss
Dalia's crossclaim against her is denied as moot.

## I.    Background

The Court assumes familiarity with the extensive history of
the Genger family imbroglio. See generally Glenclova Inv. Co. v.
Trans-Resources, Inc., 874 F. Supp. 2d 292, 295-300 (S.D.N.Y.
2012) (hereinafter, the "Omnibus Opinion" or Glenclova); TR
Investors, LLC v. Genger, No. 6697-CS, 2013 WL 603164, at *3-13
(Del. Ch. Feb. 18, 2013). The following section contains only
the background that is necessary to understand the instant
action and decision.

2

## A.     Relevant History

The Genger combatants include Arie Genger and his adult daughter Orly in one camp; Arie's former wife Dalia, who is the trustee of a trust benefitting her estranged daughter Orly in a second camp; and former Trans-Resources majority owner TPR and its president, Sagi, who is Arie and Dalia's adult son.  Also relevant is the collection of entities referred to as the "Trump Group."  These include Glenclova Investment Co.; TR Investors, LLC; New TR Equity I, LLC; New TR Equity II, LLC; Eddie Trump; Jules Trump; and Mark Hirsch.

Not including the instant action, most of the litigation between these disputants has been a battle over shares of Trans-Resources stock.  Some of the shares in dispute have been referred to as the "Orly Trust Shares."  These 1,102.8 shares had been transferred by TPR, which was then controlled by Arie, to the Orly Genger 1993 Trust (the "Orly Trust") as part of Arie and Dalia's 2004 divorce settlement.  Once the Trump Group learned of this and other transfers in 2008, it objected on the grounds that the transfers were prohibited by the March 31, 2001 Stockholders Agreement between Trans-Resources, TPR, and members of the Trump Group.  Ultimately, Glenclova filed the Glenclova action to enforce the 2001 Stockholders Agreement. See generally Glenclova, 874 F. Supp. 2d at 295-96.

3

To cover its bases, the Trump Group separately entered into an agreement with TPR (by then under Sagi's control), which gave the Trump Group an option to purchase the Orly Trust Shares should a court determine that the 2004 transfers were void.  If the transfers were ruled to be valid, then the Orly Trust would keep the Orly Trust Shares.  But if the transfers were deemed void, the shares would go back to TPR, which would then sell them to the Trump Group.

The Delaware Chancery Court determined that Arie's transfer of the Orly Trust Shares to the Orly Trust was void, such that TPR (and not Arie or the Orly Trust) retained legal and beneficial ownership of the disputed shares. TR Investors, LLC v. Genger, C.A. No. 3994-VCS, 2010 WL 3279385, at *3 (Del. Ch. Aug. 9, 2010).  While this ruling was being appealed, the Trump Group exercised its option to purchase the Orly Trust Shares from TPR for about $10.3 million.  All of the parties agreed that this amount, the Proceeds, should be held in escrow while the Delaware appeal continued.  Accordingly, the Proceeds were held in escrow by Pedowitz & Meister LLP ("P&M" or the "Escrow Agent"), pursuant to an agreement between Orly, Dalia, TPR, and the Trump Group (the "Escrow Agreement").

That Escrow Agreement is central to the instant litigation, and will be discussed at greater length below.  To summarize, it stated that the Trump Group would proceed with its plan to

4

purchase the Orly Trust Shares from TPR, but that the purchase amount would be held by the Escrow Agent pending a final ruling on beneficial ownership by the Delaware Supreme Court. Ultimately, the Delaware Supreme Court reversed the Chancery Court's determination of beneficial ownership because it ruled that the Chancery Court lacked in personam jurisdiction over TPR and the Orly Trust. Genger v. TR Investors, LLC, 26 A.3d 180, 201-03 (Del. 2011).

After the Delaware Supreme Court's ruling reopened the question of beneficial ownership of the Orly Trust Shares, the Escrow Agent filed an interpleader action before this Court. See Pedowitz & Meister LLP v. TPR Inv. Assocs., Inc., No. 11 Civ. 5602 (S.D.N.Y.). I dismissed the interpleader action for lack of subject matter jurisdiction, reasoning that the parties' competing claims were for beneficial ownership of the Orly Trust Shares, rather than for the Proceeds from the sale of those shares. See Glenclova, 874 F. Supp. 2d at 300-04. Thereafter, the Southern District Cashier's Office returned the $10.3 million to the Escrow Agent's escrow account, where it has remained. Since that time, the parties have litigated principally in New York Supreme Court. See Genger v. Genger, No. 651089/2010 (N.Y. Sup. Ct.). As part of a stipulation dismissing the action in Delaware Chancery Court, the parties to that action — TPR/Sagi, the Trump Group, and Dalia, but not Arie

5

or Orly — agreed that the Trump Group is the rightful owner of the Orly Trust Shares. (Dellaportas Dec. Ex. B ¶ 2.) Additionally, Orly and the Trump Group have settled their claims against each other. Pursuant to that settlement, Orly acknowledged that the Trump Group is the record and beneficial owner of the Orly Trust Shares. (Id. Ex. J at 2.) At long last, the dispute regarding ownership of the Orly Trust Shares is over.

Finally, it bears mentioning that in October 2011, TPR and Dalia signed a settlement agreement, which stated in part that TPR relinquished its right to the Proceeds in favor of the Orly Trust (still controlled by Dalia). When Orly later found out about this agreement, she denounced it in New York Supreme Court as a "sham defendants-only" agreement which violated that court's order enjoining Sagi/TPR and Dalia from spending or demanding the Proceeds before a court could determine beneficial ownership of the Orly Trust Shares. The Supreme Court agreed with Orly and declared the settlement agreement void, see Genger, 2013 WL 2396219, and the First Department recently affirmed that ruling, see Genger v. Genger, 982 N.Y.S.2d 11, 13 (1st Dep't 2014). Dalia has moved for reconsideration or leave to appeal to the New York Court of Appeals.

6

### B.   This Case, Orly's Motions to Dismiss, and TPR's Motion for Summary Judgment

The instant case differs from the previous <u>Glenclova</u> action in that here, the parties are fighting over the Proceeds from the sale of the Orly Trust Shares — not the shares themselves. As noted, Orly has relinquished her claim to the shares as part of her settlement with the Trump Group.  TPR's complaint seeks a permanent injunction directing the Escrow Agent to release the \$10.3 million in Proceeds to TPR.

Both P&M and Dalia filed answers and crossclaims "against the other Defendants."  P&M seeks to invoke "defensive" interpleader under Rule 22 of the Federal Rules of Civil Procedure. (Oral Arg. Tr. at 27–29; P&M Ans. ¶ 28.) <u>See</u> Fed. R. Civ. P. 22(a)(2).  This is a request to "do-over" the statutory interpleader action I dismissed, with the purported difference being that now there actually are adverse claimants to the Proceeds themselves. <u>See generally</u> <u>Pedowitz & Meister</u>, No. 11 Civ. 5602.  Orly moves to dismiss P&M's crossclaim for interpleader, contending that it violates both the Escrow Agreement and my prior rulings dismissing the statutory interpleader actions.

Meanwhile, Dalia's crossclaim sought the release of the Proceeds to the Orly Trust, on the grounds that the voided settlement agreement between the Orly Trust and TPR "is valid

7

and enforceable, and that the Appellate Division will so find."
(Dalia Crossclaim ¶¶ 19-20.).  Since Dalia filed her crossclaim,
the First Department ruled the opposite.  In light of this
development, Dalia's counsel advised at oral argument that she
no longer objects to TPR's requested relief. (Oral Arg. Tr. at
25-26.)  Dalia has thereby abandoned her crossclaim, mooting
Orly's motion to dismiss it.

     We now turn to the principal matter of Orly's motion to
dismiss TPR's complaint.  Orly urges that the complaint fails to
state a claim because none of the conditions to releasing the
Proceeds set forth in Section 2 of the Escrow Agreement have
been satisfied.  She also strongly contests TPR's representation
in the complaint that "all of the issues as to ownership of the
[Orly Trust] Shares and the accompanying . . . Proceeds are now
resolved." (Compl. ¶ 15.)  Not so, says Orly:  although she has
stopped pursuing beneficial ownership of the shares themselves,
the propriety of the 2004 transfer of the shares to the Orly
Trust remains an issue before the New York Supreme Court and the
First Department.  More generally, Orly accuses TPR of trying to
forum shop with this latest litigation.  As an alternative to
dismissal, she seeks a stay of this action while the litigation
in New York state remains ongoing.

In a single brief, TPR opposes Orly's motion to dismiss and moves for summary judgment.  Its position is largely predicated on my Omnibus Opinion, which stated that "if the 2004 transfer of shares to Arie and the Orly Trust is found to be invalid, then TPR had the right to sell the shares to the Trump Group, and TPR would be entitled to the interpleaded funds." Glenclova, 874 F. Supp. 2d at 303.  Arguing from this language, TPR asserts that the recent resolution of the beneficial ownership issue compels a ruling that the interpleaded $10.3 million must be released to TPR.  TPR further contends that the doctrines of collateral estoppel, res judicata, and judicial estoppel bar Orly from relitigating the rulings in the Omnibus Opinion. Second, TPR contends that the longstanding New York Supreme Court case, which the parties continue to litigate, does not include a claim by Orly for the Proceeds.  Instead, according to TPR, Orly filed a new action in New York Supreme Court on December 23, 2013 seeking to compel the Escrow Agent to release the money to her.  Third, TPR notes that Orly is pursuing a claim for unjust enrichment in state court, and argues that for TPR to be unjustly enriched it must first be enriched — that is, it must first possess the funds at issue.  Fourth, TPR urges that a stay of this action would be inappropriate, essentially because it would cause further delay.

9

## II.  Discussion

### A.  Relevant Legal Standards

The standards governing the instant motions are well settled.  In reviewing Orly's motions to dismiss under Rule 12(b)(6), the Court accepts TPR's allegations of fact as true, and draws all reasonable inferences in its favor. See Ganino v. Citizens Util. Co., 228 F.3d 154, 161 (2d Cir. 2000); Lee v. Bankers Trust Co., 166 F.3d 540, 543 (2d Cir. 1999).  Review of a motion for failure to state a claim "is limited to the facts as asserted within the four corners of the complaint, the documents attached to the complaint as exhibits, and any documents incorporated in the complaint by reference." McCarthy v. Dun & Bradstreet Corp., 482 F.3d 184, 191 (2d Cir. 2007) (citing Taylor v. Vt. Dep't of Educ., 313 F.3d 768, 776 (2d Cir. 2002)).  To survive a 12(b)(6) motion, the complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007)).

TPR, which moves for summary judgment, will prevail if the evidence, viewed in the light most favorable to Orly, shows that there is no genuine issue as to any material fact and that it is therefore entitled to a judgment as a matter of law. Fed. R. Civ. P. 56(a); Vacold LLC v. Cerami, 545 F.3d 114, 121 (2d Cir.

2010).  As the movant, TPR bears the initial burden of demonstrating "the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  If TPR meets that burden, then Orly must come forward with specific evidence demonstrating the existence of a genuine dispute of material fact. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986).  "The mere existence of a scintilla of evidence in support of the non-movant's position will be insufficient; there must be evidence on which the jury could reasonably find for the non-movant." Hayut v. State Univ. of N.Y., 352 F.3d 733, 743 (2d Cir. 2003) (alterations omitted).  "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson, 477 U.S. at 248.

## B.   Analysis

Although the motions by TPR and Orly stand on different procedural ground, they raise the same question in substance: Should this Court direct the Escrow Agent to release the Proceeds to TPR?  To answer this question, I must determine whether TPR is correct that judgment in its favor would be consistent with my prior rulings and with the goals of the Escrow Agreement, or instead whether Orly is correct that the Escrow Agreement compels dismissal of the complaint.

11

**1.    The Relevant Portion of the Omnibus Opinion Is Not Dicta**

TPR argues that my Omnibus Opinion, plus the recent

resolution of beneficial ownership, together compel release of

the Proceeds.  It relies on specific passages in the Omnibus

Opinion, in particular a passage in the discussion of this

Court's jurisdiction over the interpleader actions then before

me.  I concluded that the Court lacked subject matter

jurisdiction, because the parties' real dispute was over

beneficial ownership of the shares rather than the Proceeds from

their sale.  The Opinion states:

> The point is subtle but important.  All potential
> claimants acknowledge that if Arie and the Orly Trust
> are deemed to be the beneficial owners of the Arie
> Shares and Orly Trust Shares, then the Trump Group's
> purchase of shares from TPR would be rescinded and the
> interpleaded funds would go back to the Trump Group.
> But, if the 2004 transfer of shares to Arie and the
> Orly Trust is found to be invalid, then TPR had the
> right to sell the shares to the Trump Group, and TPR
> would be entitled to the interpleaded funds.
>
> [. . .]
>
> The condition precedent to disbursement of funds under
> either  of  the  escrow  agreements  is  judicial
> determination of the beneficial ownership of the Arie
> Shares and Orly Trust Shares, an issue left unresolved
> by the Delaware Supreme Court.  Nevertheless, once a
> court enters judgment on this issue, the escrow agents
> can disburse the escrowed funds to the prevailing
> claimant in accordance with guidance set forth in the
> escrow agreements.   In effect, the stakeholders have
> contracted around any possibility of "double liability
> or vexatious, conflicting claims" with respect to the
> interpleaded funds.
>
> [. . .]

12

[T]he stakeholder plaintiffs did not need to commence
the interpleader actions in order to get judicial
guidance as to who beneficially owns the Arie Shares
and Orly Trust Shares, and, as a result, who is
entitled to the escrowed funds. . . .   [Once] the New
York Supreme Court reaches the merits of beneficial
ownership of the Arie Shares, Orly Trust Shares, or
both, that judgment will have preclusive effect in any
other court where the parties have raised the matter—
be it through res judicata or collateral estoppel.   In
other words, only one court can determine the
beneficial ownership of the Arie Shares and/or the
Orly Trust Shares, and, once that has occurred, the
respective stakeholder plaintiffs will know which
claimant is entitled to the interpleaded funds.   There
is no risk of one claimant to the Arie Shares
prevailing in Delaware while another claimant to those
shares prevails in New York, and therefore, no risk
that the stakeholders will have to fend off adverse
claims to the interpleaded funds.   As the stakeholders
have not demonstrated that the interpleaded funds are
subject to actual or even potential adverse claims,
the Pedowitz and Skadden interpleader actions do not
meet the statutory requirements for subject matter
jurisdiction under § 1335.

Glenclova, 874 F. Supp. 2d at 303-04.   The Opinion also notes as

to Arie, who is in a substantively similar position as Orly on

this issue:   "Moreover, while Arie asserts a beneficial

ownership in the underlying Trans-Resources shares, in no case

does he have a claim against the interpleaded funds themselves.

Instead, Arie's numerous counterclaims seek money damages for

breach of fiduciary duties that are ancillary to, and beyond the

scope of," the interpleader. Id. at 303 n.2.

The beneficial ownership issue is now dead; Orly has

settled with the Trump Group.   Therefore, TPR argues, it is now

entitled to the Proceeds it received from the Trump Group in

13

consideration for those shares.  TPR continues, "That is not to say Orly loses her day in Court . . . .  Orly remains free to pursue her money damages, such as they are, in the New York Supreme Court." (TPR Br. at 3; see also id. at 4 ("TPR should receive the proceeds which unquestionably belong to it, while Orly can seek to litigate the equities of that in state court.").)

Orly strenuously objects to TPR's characterization of the Omnibus Opinion, and insists that the portion quoted by TPR is mere dicta.  This is so, Orly urges, because I did not purport to reach a legal conclusion in that passage, but only to explain the background of the parties' positions.  Accordingly, Orly argues, that language does not control the outcome here and cannot override the Escrow Agreement among the parties.  TPR replies that the quoted portion is not and cannot be dicta, because "it was the express basis upon which this Court found a lack of 'adverse claimants,' and thus dismissed on subject matter jurisdiction grounds." (TPR Reply Br. at 5.)  In other words, TPR contends that the Court could not have dismissed the interpleader action without the disputed passage, because that passage explains the Court's legal conclusion that the real dispute between the parties was not the Proceeds but rather beneficial ownership.

TPR is correct.  In dismissing the action for want of subject matter jurisdiction, I found that there was no genuine danger "of multiple liability when all potential claimants agree that only one of them is entitled to the res." Glenclova, 874 F. Supp. 2d at 303.  Simply put, I concluded that beneficial ownership and the Proceeds go hand-in-hand as issues.  Because the Trump Group is now the undisputed owner of the Orly Trust Shares, TPR is entitled to the Proceeds paid by the Trump Group for those shares. See id. at 303-04.  It follows that TPR's reliance on the Omnibus Opinion is not misplaced.

It must be emphasized, however, that neither my 2012 Omnibus Opinion nor today's decision announce any kind of equitable or normative conclusion as to who among the Genger siblings ultimately deserves recompense.  That is a different question, one that was left to the state courts to sort out. See Glenclova Inv. Co. v. Trans-Resources, Inc., No. 08 Civ. 7140, 2013 WL 6003512, at *3 (S.D.N.Y. Nov. 12, 2013).  Thus, nothing in this Opinion should be construed as resolving any question other than whether TPR is the next (but not necessarily last) beneficiary of the sale of the Orly Trust Shares.

## 2.   The Significance of the Escrow Agreement

Orly's main argument for dismissal is that none of the preconditions to releasing the escrowed Proceeds, which are set forth in Section 2 of the Escrow Agreement, have been satisfied.

15

Her interpretation of that section is correct.  The Escrow
Agreement was signed by the parties at a very specific point in
the litigation.  Chancellor Strine in Delaware had ruled that
Arie's transfer of the relevant shares to the Orly Trust was
invalid, returning them to TPR/Sagi, who wanted to sell them to
the Trump Group.  Arie planned to appeal that ruling, and the
Escrow Agreement was designed to dictate what would happen once
the Delaware Supreme Court decided his appeal.  Under the
Agreement's provisions, the Trump Group received the shares in
exchange for payment to the Escrow Agent, who would hold onto
the Proceeds until one of five contingencies occurred:  (1)
mutual consent of the parties; (2) a request from TPR plus an
affirmance by the Delaware Supreme Court of the Chancery Court's
ruling; (3) a request from the Trump Group plus an order from
the Delaware Supreme Court vacating the Chancery Court's ruling;
(4) a request from the Trump Group plus the expiration of Arie
and Orly's time to appeal the Chancery Court's determination; or
(5) a request by one of the parties plus silent acquiescence by
the other parties. (Escrow Agreement § 2(b).)

    As Orly correctly points out, what transpired thereafter
does not fit neatly into any one of these boxes.  Obviously, the
parties continue to be in active conflict, eliminating the first
and fifth contingencies above (mutual consent or silent
acquiescence).  Arie did appeal, eliminating the fourth

16

contingency. The Delaware Supreme Court reversed Chancellor
Strine's ruling on beneficial ownership, eliminating option 2.
But the Trump Group did not ask for its money back, as
contemplated in option 3 (the last remaining possibility),
likely because the reversal was on jurisdictional grounds and
not the merits.

The problem with Orly's proposed reading of the Escrow
Agreement is that the Agreement completely omits any mention of
the Genger v. Genger action in the New York state court.  That
case was filed by Orly and her father after the Delaware
Chancery Court ruled against them the first time.  The parties
have actively litigated the New York case in recent years, and
it has become the "epicenter for the Genger family litigation."
Glenclova Inv. Co., 2013 WL 6003512, at *2.

Orly now urges that this Court may not order the Escrow
Agent to release the Proceeds except in strict accordance with
the letter of the Escrow Agreement.  But because the Agreement's
terms do not allow for enforcement of any New York state
judgment, to accept Orly's argument would be akin to ruling that
the New York Supreme Court has no power to adjudicate disputes
relating to this money.  That result would be plainly
inconsistent with Orly's position that the 2010 New York Supreme
Court action (which she filed) is the appropriate place for
litigation of these issues. See Orly Moving Br. at 17-18; Orly

17

Reply Br. at 9.) It is also inconsistent with the position she took in the prior interpleader action. See Pedowitz & Meister LLP, No. 11 Civ. 5602, ECF No. 11 at 6-8. Having convinced me to stay or dismiss the other Southern District actions in favor of the state proceeding, Orly may not now insist on a reading of the Escrow Agreement that would render the state court impotent.

Orly's position that I cannot rule for TPR without "rewriting" the Escrow Agreement is also at odds with the Omnibus Opinion, which she has never challenged. First, in that ruling I recommended New York Supreme Court as the optimal venue for adjudicating beneficial ownership and the related issues. See Glenclova, 874 F. Supp. 2d at 304, 307, 309, 314. I also observe that by the time I issued the Omnibus Opinion, the three main scenarios enumerated in Section 2(b) of the Escrow Agreement whereby the Escrow Agent could release the funds were already impossible. Nor did I intend to give Orly a unilateral veto over release of the Proceeds, as would be required under the two remaining routes to release of the funds under Section 2(b). For these reasons, I reject Orly's position on this issue.[1]

---

[1] Orly also argues that she is the only party to make a valid written request for the Proceeds under the Escrow Agreement, and that the question of who-requested-what-first presents a material factual dispute barring the entry of summary judgment. She is incorrect. As an initial matter, TPR's letter requesting the Proceeds appears to comply with Section 2b(v) of the Escrow Agreement. See Dellaportas

I conclude that the Escrow Agreement does not prevent me
from giving effect to the plain import of my prior rulings.   The
Omnibus Opinion states that once "the New York Supreme Court
reaches the merits of beneficial ownership" of the Orly Trust
Shares, everyone involved would "know which claimant is entitled
to the interpleaded funds." Glenclova, 874 F. Supp. 2d at 303.
The question of beneficial ownership has now been resolved, and
all parties agree that the Trump Group owns the shares.   It
follows that TPR is entitled to the Proceeds, with Orly's
remaining claims for money damages against TPR and Sagi to be
resolved in New York Supreme Court.

### 3.    There Is No Need for an Interpleader

As previously noted, P&M seeks to interplead the Proceeds
under Rule 22.  For defensive interpleader to be proper, P&M
must reasonably fear double liability or vexatious claims. See
6247 Atlas Corp. v. Marine Ins. Co., 155 F.R.D. 454, 462
(S.D.N.Y. 1994); see also Washington Elec. Coop., Inc. v.
Paterson, Walke & Pratt, P.C., 985 F.2d 677, 679 (2d Cir. 1993).

---

Dec. Ex. C.  Regardless, today's decision in TPR's favor is not based
upon the mechanics of the Escrow Agreement, but upon this Court's
prior rulings.  Thus, the question whether it was TPR or Orly who
first validly requested the Proceeds is of no moment. See Anderson,
477 U.S. at 248 ("Only disputes over facts that might affect the
outcome of the suit under the governing law will properly preclude the
entry of summary judgment.").

At oral argument, counsel indicated that P&M prefers interpleader to protect itself from liability for damages, as opposed to mere overlapping claims to the Proceeds. (Oral Arg. Tr. at 28-29.)

Interpleader is not necessary in the circumstances of this case. Because summary judgment will be entered in favor of TPR, P&M as Escrow Agent is required by the force of this judgment to release the Proceeds to TPR. The mere act of complying with this Opinion and Order will not cause P&M to incur liability for damages to Orly or anyone else. Accordingly, Orly's motion to dismiss P&M's interpleader crossclaim is granted, albeit for a different reason than those offered by Orly. There is no record before me regarding whether P&M may be liable on any other basis, and I expressly decline to consider the issue.

### III. Conclusion

For the foregoing reasons, Orly's motion to dismiss the complaint is denied, and TPR's motion for summary judgment is granted.   P&M is directed to release the Proceeds, together with any interest accrued thereon, to TPR.   Orly's motion to dismiss the interpleader crossclaim by P&M is granted.   Orly's motion to dismiss Dalia's crossclaim against her is denied as moot.   The Clerk of Court is respectfully directed to close this case.

**SO ORDERED.**

Dated:    New York, New York
          May 15, 2014

                                        *John F. Keenan*
                                        ——————————————
                                           John F. Keenan
                                    United States District Judge

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: JAN 0 5 2015

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------- X
                               :

SAGI GENGER,                    :

                Plaintiff,     :

                                 :

            -v-               :          14-cv-5683 (KBF)

                                 :

ORLY GENGER,                :         OPINION & ORDER

               Defendant.     :

                                 :

---------------------------------------------------------------- X

KATHERINE B. FORREST, District Judge:

       As Tolstoy famously wrote, "Happy families are all alike; every unhappy family is unhappy in its own way." Leo Tolstoy, Anna Karenina 1 (Constance Garnett trans., 1978). In the case of the wealthy Genger family, that unhappiness has taken the form of a seemingly never-ending series of lawsuits stemming from the divorce of Arie Genger and Dalia Genger, the family patriarch and matriarch, respectively. Together, Arie, Dalia, their son Sagi, and their daughter Orly[1] have employed a small army of lawyers to fight over the pieces of the family pie and, it seems, to make each other's lives as miserable as possible.

       This latest installment in the Genger family's litigation saga concerns a straightforward contract dispute between Sagi and Orly. Sagi alleges that he and Orly entered into a tri-party agreement with Dalia, under which Sagi and Orly would receive shares of stock in exchange for providing Dalia with financial support

---

[1] For the sake of clarity, in this Opinion the Court will refer to the members of the Genger family by their given names.

derived from the economic value obtained from that stock. Sagi contends that Orly has breached the agreement, and now seeks damages from her. Orly, for her part, denies the agreement's validity and enforceability, primarily because she claims she never actually received the promised shares of stock, which means that the agreement is not supported by consideration. But, as it turns out, Orly has effectively monetized an interest in the very shares she claims not to have received to the tune of $32.3 million.

Orly contends that this case is "an attempt to push the camel's nose under the tent flaps," and that Sagi and Dalia "hope to create a pipeline allowing them to siphon money from Orly for the rest of her life." (ECF No. 92 at 1.) The Court sees things differently: this case is a simple breach of contract action. Nothing more, nothing less.

Because there is no triable issue as to whether there was a valid and enforceable agreement supported by consideration, and for the reasons that follow, the Court GRANTS Sagi's motion for summary judgment, DENIES Orly's motion for summary judgment, and DENIES AS MOOT Orly's motion to disqualify and all pending motions in limine.

I.    BACKGROUND

    A.    Factual Background[2]

The Genger family consists of father Arie, mother Dalia, son Sagi, and daughter Orly. (DSOF ¶ 5.) Sagi is currently the President and CEO of TPR Investment Associates, Inc. ("TPR"). (DSOF ¶ 4.) In 2004, Arie and Dalia divorced.[3] (DSOF ¶ 5; PRSOF ¶ 5.) As part of the divorce, Dalia agreed to convey her marital rights to 794.40 shares of TRI to trusts benefiting Sagi and Orly (the "Sagi Trust" and the "Orly Trust,"[4] respectively) in exchange for a commitment by Sagi and Orly to financially support her. This arrangement was effectuated via three documents.

First, Dalia and Arie signed a stipulation of settlement finalizing the terms of their divorce settlement (the "2004 Divorce Stipulation"), which was fully executed

---

[2] The following facts are taken from the Local Rule 56.1 statements submitted by the parties in connection with this motion for summary judgment and their supporting materials (ECF No. 34 ("PSOF"), 37 ("DSOF"), 51 ("DRSOF"), 52 ("DCMUF"), 55 ("PRSOF")), the factual materials submitted with the parties' letters dated November 25, 2014 (ECF Nos. 84-85), and public records of the parties' prior judicial proceedings. The Court cites to the parties' factual submissions only when they support a factual proposition, cite relevant material, and are not contradicted in pertinent part by a counter-statement supported by citation to evidence that would be admissible. See Local Civil Rule 56.1(d); Chimarev v. TD Waterhouse Investor Servs., Inc., 280 F. Supp. 2d 208, 223 (S.D.N.Y. 2003) (material facts set forth in a Rule 56.1 statement "are uncontested and may be accepted as true" where a Rule 56.1 counter-statement was "deficient" because it consisted solely of "blanket denials" and was "not supported by citation to any evidence"), aff'd, 99 Fed. App'x 259 (2d Cir. 2004). The Court recites only those facts relevant to the claims and defenses currently at issue, but also includes some factual allegations that are not material to the claims asserted but that are important to understanding the context for this case. Some of defendant's responses fail to directly address straightforward factual allegations, and these failures are considered admissions as a matter of law. See Local Civil Rule 56.1(c); Gubitosi v. Kapica, 154 F.3d 30, 31 n.1 (2d Cir. 1998); NAS Elecs., Inc. v. Transtech Elecs. PTE Ltd., 262 F.Supp.2d 134, 139 (S.D.N.Y. 2003).

[3] The divorce was finalized by a 2005 judgment. (PRSOF ¶ 5.)

[4] The trusts are officially named the "Sagi Genger 1993 Trust" and the "Orly Genger 1993 Trust." (DSOF ¶ 26.)

on October 30, 2004.[5]  (PSOF ¶ 1; DSOF ¶ 7.)  In the 2004 Divorce Stipulation,

Dalia promised to convey equal interests in a total of 794.40 shares of TRI to the

Orly Trust and the Sagi Trust.  (PSOF ¶ 1; DSOF ¶ 27.)  The 2004 Divorce

Stipulation contains an "entire understanding" clause, which is subject to a carve-

out for other agreements expressly incorporated by reference and those "entered

into concurrently herewith."  (DSOF ¶ 24.)

     The second was a letter signed by Sagi and Dalia dated October 30, 2004 (the

"2004 Promise").  (PSOF ¶ 3; DRSOF ¶ 51.)  In the 2004 Promise, Sagi agreed to

pay Dalia up to an amount equal to all dividends, distributions, proceeds or other

payments attributable to the TRI shares, upon Dalia's demand.  (PSOF ¶ 3.)  The

2004 Promise also states that the agreement is made "in consideration of" the

following: "Orly and [Sagi] are benefiting by the receipt of a total of 794.40 shares of

[TRI], or beneficial[6] interests in those shares, by trusts for [their] benefit."  (DSOF

¶ 52.)  The parties dispute whether the 2004 Promise was intended to be integrated

with the 2004 Divorce Stipulation.  (See DRSOF ¶ 3.)

     At the time the 2004 Promise was signed, Orly was vacationing in Fiji, and

thus could not contemporaneously sign the 2004 Promise.  (PSOF ¶ 4.)  However,

---

[5] The 2004 Divorce Stipulation states that it is "made as of October 26, 2004."  (DSOF ¶ 7.)

[6] Beneficial ownership is "[a] corporate shareholder's power to buy or sell the shares, though the
shareholder is not registered on the corporation's books as the owner."  Ownership, Black's Law
Dictionary (9th ed. 2009); see also Cartica Mgmt. v. CorpBanca, S.A., No. 14–CV–2258 PKC, 2014
WL 4804491, at *15 (S.D.N.Y. Sept. 25, 2014) (explaining the definition of beneficial ownership
under federal securities law).  Record ownership is determined based on who is "listed in the issuer's
books as the owner of stock on the record date."  Stockholder of Record, Black's Law Dictionary (9th
ed. 2009).

before Sagi signed the 2004 Promise, Orly verbally agreed to indemnify Sagi for

50% of the payments he would have to make under the 2004 Promise.[7]  (PSOF ¶ 4.)

The third agreement was a letter signed by Sagi and Orly dated November

10, 2004 (the "2004 Indemnity").[8]  (PSOF ¶ 5.)  In the 2004 Indemnity, Orly agreed

to indemnify Sagi "for and against one-half (1/2) of any and all payments, liabilities,

damages, claims, actions, losses, settlements, penalties, judgments or obligations

. . . , including [Sagi's] reasonable counsel and other professional fees, expenses and

costs, which arise from [Sagi's] undertakings in the [2004 Promise]."  (PSOF ¶ 5.)

On August 22, 2008, Sagi-controlled TPR entered an agreement with the

Trump Group to sell the Sagi Trust's shares of TRI to the Trump Group for $26.7

million.  (DSOF ¶ 34.)  Sagi also sold the Orly Trust's TRI shares to the Trump

Group for approximately $10.3 million, subject to the condition that TPR was

determined to be an owner of the shares.[9]  (DSOF ¶ 35.)

---

[7] In response to this factual allegation by Sagi, Orly counters that she does not remember a phone call with Sagi on the day of the divorce, and makes several non-responsive statements concerning the drafting and execution 2004 Promise and the 2004 Divorce Stipulation.  (See DRSOF ¶ 4.)  But she does not actually deny making this oral promise.

[8] At the initial case conference in the prior action, Orly's counsel stated that they believed the 2004 Indemnity was a forgery, and they would investigate this theory by, inter alia, using the services of an ink expert.  (DRSOF ¶ 11.)  The ink expert's examination of the 2004 Indemnity was also discussed at the October 31, 2014 status conference in the instant action; the Court ordered the parties to meet and confer regarding any outstanding issues with respect to expert discovery (ECF No. 48), and no such issues were subsequently raised with the Court.

Despite the considerable amount of discovery in this case, and her retention of an ink expert, Orly is unable to point to any admissible evidence suggesting that the 2004 Indemnity is a forgery.  Further, in her briefing on this motion, Orly did not advance the argument that the 2004 Indemnity is a forgery or is otherwise inauthentic.  Most importantly, in her Rule 56.1 responses, Orly does not affirmatively deny the existence of the 2004 Indemnity, or that she signed it.  (See DRSOF ¶¶ 5, 11.)  A party cannot create a genuine issue of material disputed fact through mere say-so and the hiring of an expert.  There is accordingly no genuine issue of material disputed fact as to the authenticity of the 2004 Indemnity or as to whether Orly signed it.

[9] The parties dispute exactly what ownership interest was required by the condition.  (See PRSOF ¶ 35.)

In 2011, the Supreme Court of Delaware affirmed a judgment invalidating the 2004 transfer of the TRI shares to the Orly Trust as to record ownership. Genger v. TR Investors, LLC, 26 A.3d 180, 198-200 (Del. 2011). As a result of this invalidation, record ownership of the TRI shares reverted to Sagi-controlled TPR. In that same decision, the Supreme Court of Delaware held that because the trial court lacked personal jurisdiction over the Orly Trust and TPR, it lacked the power to declare who beneficially owned the TRI shares, and therefore reversed the beneficial ownership determinations flowing from the trial court's orders. Id. at 203.

On June 16, 2013, Orly entered into a settlement agreement (the "2013 Settlement Agreement") with the Trump Group and others regarding her claims to ownership of the TRI shares. (ECF No. 84 ex. A ("2013 S.A.").) The agreement provides that Orly, Arie, and their litigation funders[10] will receive $32.3 million[11] in exchange for a declaration that the Trump Group owns "all right, title and interest (beneficially, of record, and otherwise)" to the TRI shares, and that Orly waives all of her claims to the TRI shares, both as a trust beneficiary[12] and individually. (2013 S.A. ¶¶ 2-4.) The 2013 Settlement Agreement does not waive any of the Orly Trust's claims. (See 2013 S.A. ¶ 4.) However, in the agreement Orly agreed to cause the Orly Trust to do the same. (2013 S.A. ¶ 8(a)(ii).)

---

[10] The 2013 Settlement Agreement refers to these parties collectively as the "AG Group." (2013 S.A. at 1.)

[11] The $32.3 million consists of $17.3 million in cash upfront, plus two additional $7.5 million payments to be made over four years. (2013 S.A. ¶¶ 2-3.)

[12] Specifically, as a beneficiary of the Orly Trust. (2013 S.A. ¶ 4.)

Then, on August 30, 2013, the Orly Trust (by Dalia), TPR, and the Trump

Group agreed that "the Trump Group owns, for all purposes, all right, title and

interest (beneficially, of record and otherwise) to all authorized and issued shares of

[TRI]." (ECF No. 85 ex. 5 ¶ 2.) This stipulated agreement was so-ordered by the

Delaware Court of Chancery. (ECF No. 85 ex. 5 at 7.) Subsequently, a court in this

District and New York's First Department both concluded that this so-ordered

stipulation determined the Trump Group to be the beneficial owner of the TRI

shares. TPR Inv. Assocs., Inc. v. Pedowitz & Meister LLP, No. 13 Civ. 8243 (JFK),

2014 U.S. Dist. LEXIS 67116, *5-6 (S.D.N.Y. May 15, 2014); Genger v. Genger, 121

A.D.3d 270, 280 (N.Y. App. Div. 2014).

On or about January 22, 2014, Dalia demanded $200,000 from Sagi under the

2004 Promise, which Sagi paid. (PSOF ¶¶ 6, 9.) On January 23, 2014, Sagi

informed Orly of Dalia's demand.[13] (PSOF ¶ 7.) On February 17, 2014, Sagi

demanded $100,000 from Orly under the 2004 Indemnity. (PSOF ¶ 10.) Orly

refused to pay. (PSOF ¶ 11.) This lawsuit for breach of contract followed.

    B.    Procedural Background[14]

        1.    General procedural background.

Sagi initially filed a breach of contract action against Orly in this Court on

February 18, 2014. (No. 14-cv-1006, ECF Nos. 1-2.) Orly filed a motion to dismiss

under Federal Rule of Civil Procedure 12(b)(6) on May 2, 2014. (No. 14-cv-1006,

---

[13] Sagi first provided Orly's counsel with a written copy of Dalia's demand on January 29, 2014. (DSOF ¶ 60.)

[14] The Court recounts only the procedural history immediately relevant to the disposition of this motion.

ECF No. 9.)  Orly then filed a motion to dismiss for lack of subject-matter
jurisdiction under Rules 12(b)(1) and 12(h)(3) on May 29, 2014.  (No. 14-cv-1006,
ECF No. 24.)  That same day, Sagi filed a motion for summary judgment.  (No. 14-
cv-1006, ECF No. 18.)

On July 22, 2014, the Court granted Orly's Rule 12(b)(1) motion[15] and
dismissed the action without prejudice, after finding that diversity jurisdiction was
inappropriate because both Sagi and Orly were domiciled in New York on the date
the action was filed.  (No. 14-cv-1006, ECF No. 52.)  Two days later, on July 24,
2014, Sagi commenced the instant proceeding, which was initially assigned to Judge
Caproni.  (ECF No. 1.)  On August 5, 2014, the case was reassigned to this Court,
which set an accelerated schedule for discovery, briefing, and trial owing to the
material similarity between this action and the previous one.  (ECF No. 9.)

Orly filed a motion to dismiss under Rule 12 on August 27, 2014.  (ECF No.
10.)  The motion became fully briefed on September 18, 2014.  (ECF No. 19.)  The
Court denied the motion on September 19, 2014, finding that (1) subject-matter
jurisdiction over this action was appropriate; (2) Sagi had sufficiently alleged the
elements of the causes of action; and (3) the parties' briefing revealed a host of
factual issues outside the four corners of the complaint.  (ECF No. 20.)

Both Sagi and Orly moved for summary judgment on October 20, 2014.  (ECF
Nos. 32, 35.)  Sagi filed motions in limine on November 17, 2014.  (ECF No. 59.)
The following day, Orly filed motions in limine, (ECF No. 68), as well as a motion to

---

[15] The Court also denied as moot Orly's Rule 12(b)(6) motion to dismiss and Sagi's motion for
summary judgment.

disqualify Sagi's counsel John Dellaportas from acting as counsel at trial on

November 18, 2014, (ECF No. 65). Sagi and Orly submitted their oppositions to

each others' motions in limine on November 24, 2014. (ECF Nos. 79, 81.)

Sagi then submitted his opposition to Orly's motion to disqualify on

November 26, 2014. (ECF No. 89.) That same day, the Court issued an order

stating its intention to decide the case on summary judgment, and adjourning the

trial date and all other dates. (ECF No. 90.) The parties submitted reply briefs on

December 5 and 6, 2014. (ECF Nos. 91, 92.)

      2.      Motion to compel production of the 2013 Settlement Agreement.

On September 30, 2014,[16] Sagi filed a letter-motion to compel production of

the 2013 Settlement Agreement. (ECF Nos. 22-23.) Orly filed her opposition to the

letter-motion on October 3, 2014, (ECF No. 25), the same day she filed her Answer,

(ECF No. 24). On October 7, 2014, the Court denied Sagi's letter-motion, based on

its mistaken belief that the 2013 Settlement Agreement was irrelevant to the claims

at issue. (ECF No. 26.)

Upon reviewing the parties' summary judgment briefing, the Court realized

its mistake, and on November 18, 2014 the Court vacated the October 7, 2014 order

and granted Sagi's letter-motion to compel.[17] (ECF No. 64.) In the November 18,

2014 order, the Court ordered the parties to submit three-page letters regarding the

potential impact of the 2010 Settlement Agreement on the claims and defenses at

---

[16] Sagi filed the same letter twice; once on September 30, 2014, and again on October 1, 2014. (ECF Nos. 22-23.) An additional exhibit is attached to the October 1, 2014 version.

[17] This order refers to the 2013 Settlement Agreement as the "2010 Settlement Agreement."

issue not later than November 25, 2014. (ECF No. 64.) The parties submitted their letters on November 25, 2014. (ECF Nos. 84-85.)

## II.   SUMMARY JUDGMENT STANDARD

Summary judgment may not be granted unless the movant shows, based on admissible evidence in the record placed before the court, "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the burden of demonstrating "the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). When the moving party does not bear the ultimate burden on a particular claim or issue, it need only make a showing that the non-moving party lacks evidence from which a reasonable jury could find in the non-moving party's favor at trial. Id. at 322-23. In making a determination on summary judgment, the court must "construe all evidence in the light most favorable to the nonmoving party, drawing all inferences and resolving all ambiguities in its favor." Dickerson v. Napolitano, 604 F.3d 732, 740 (2d Cir. 2010).

Once the moving party has asserted facts showing that the non-movant's claims cannot be sustained, the opposing party must set out specific facts showing a genuine issue of material fact for trial. Price v. Cushman & Wakefield, Inc., 808 F. Supp. 2d 670, 685 (S.D.N.Y. 2011); see also Wright v. Goord, 554 F.3d 255, 266 (2d Cir. 2009). "[A] party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment," as "[m]ere conclusory allegations or denials . . . cannot by themselves create a genuine issue of material fact where none would otherwise exist." Hicks v. Baines, 593 F.3d 159,

166 (2d Cir. 2010) (citations omitted); see also Price, 808 F. Supp. 2d at 685 ("In seeking to show that there is a genuine issue of material fact for trial, the non-moving party cannot rely on mere allegations, denials, conjectures or conclusory statements, but must present affirmative and specific evidence showing that there is a genuine issue for trial.").

Only disputes relating to material facts—"facts that might affect the outcome of the suit under the governing law"—will properly preclude the entry of summary judgment. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); see also Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986) (the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts").

III.   DISCUSSION

Under New York law, to recover for breach of contract, a plaintiff must prove "(1) the existence of a contract between [plaintiff] and that defendant; (2) performance of the plaintiff's obligations under the contract; (3) breach of the contract by that defendant; and (4) damages to the plaintiff caused by that defendant's breach." Diesel Props. S.r.l. v. Greystone Bus. Credit II LLC, 631 F.3d 42, 52 (2d Cir. 2011) (citation omitted); see also Flomenbaum v. N.Y. Univ., 71 A.D.3d 80, 91 (N.Y. App. Div. 2009); Clearmont Prop., LLC v. Eisner, 58 A.D.3d 1052, 1055 (N.Y. App. Div. 2009). There is no triable issue as to whether all four elements are satisfied in this case. Accordingly, the Court grants Sagi summary judgment as to his breach of contract claim. There is also no triable issue as to

11

Sagi's promissory estoppel cause action, and so the Court grants him summary judgment on that alternative basis.

A.   Enforceability

1.   Integrated agreement.

Under New York law, "all writings which form part of a single transaction and are designed to effectuate the same purpose [must] be read together, even though they were executed on different dates and were not all between the same parties." This Is Me, Inc. v. Taylor, 157 F.3d 139, 143 (2d Cir. 1998); accord Madeleine, L.L.C. v. Casden, 950 F. Supp. 2d 685, 695-96 (S.D.N.Y. 2013). Contracts that are executed at different times "should be interpreted together if 'the parties assented to all the promises as a whole so that there would have been no bargain whatever if any promise or set of promises had been stricken.'" Commander Oil Corp. v. Advance Food Serv. Equip., 991 F.2d 49, 53 (2d Cir. 1993) (quoting 6 Samuel Williston & Richard A. Lord, A Treatise on the Law of Contracts, § 863:275 (3d ed. 1970)).  Whether multiple documents should be read as constituting a single agreement depends on the intent of the parties.  TVT Records v. Island Def Jam Music Grp., 412 F.3d 82, 89 (2d Cir. 2005); accord Commander Oil, 991 F.2d at 52-53; Madeleine, 950 F. Supp. 2d at 696.  The intent of the parties is "typically a question of fact for the jury, . . . [b]ut if the documents in question reflect no ambiguity as to whether they should be read as a single contract, the question is a matter of law for the court." TVT Records, 412 F.3d at 89 (citation omitted).

12

In TVT Records, the Second Circuit determined two agreements to be integrated based, inter alia, on the fact that the documents were intended to effectuate the same result. Id. As the parties under the later agreement were obligated to honor all of the terms and conditions of the earlier agreement, the later agreement was "meaningless" without the first. Id. The fact that the documents were "negotiated and signed at different times, memorialized in different documents and involved different parties" did not dictate a contrary result, because these facts did not address "the legally operative question: whether the contracts were part of a single transaction intended to effectuate the same purpose." Id. at 90 (citations omitted).

Similarly, in This Is Me, the Second Circuit held that a jury was justified in reading two contracts together where they were executed "more or less" (but not exactly) concurrently, and where one of the two contracts stated that the two contracts were intended to be executed together, but the other contract did not. 157 F.3d at 145. The Court also noted that counsel for a defendant conceded in a letter that the two contracts were intended to be read together. Id.

The 2004 Promise and the 2004 Indemnity are sufficiently unambiguous such that there is no triable issue as to whether they form an integrated agreement, even though they were executed on different dates and were not all between the same parties, and in this sense no different than the agreements at issue in TVT Records. Indeed, neither agreement makes any sense without the promises expressed in the other. Without the 2004 Indemnity, Sagi could be obligated under the 2004 Promise

to pay Dalia double the economic benefit he received from his shares of TRI, and

Orly would effectively have received the shares as a gift. Further, the 2004

Indemnity explicitly attaches and cross-references the 2004 Promise, which makes

the situation here directly analogous to that in TVT Records, where the later

agreement was "meaningless" without the earlier one. Id. at 89.

There is accordingly no triable issue as to whether the documents were

"designed to effectuate the same purpose" and to "be read together." This Is Me,

157 F.3d at 143. For this reason, the Court will refer to the integrated agreement in

the rest of this Opinion as the "2004 Integrated Agreement.[18]

### 2.   Consideration.

Under New York law, to be valid, a contract must be supported by

consideration. Murray v. Northrop Grumman Info. Tech., Inc., 444 F.3d 169, 178

(2d Cir. 2006). Consideration to support an agreement exists where there is "either

a benefit to the promisor or a detriment to the promisee." Hollander v. Lipman, 65

A.D.3d 1086, 1087 (N.Y. App. Div. 2009) (quoting Weiner v. McGraw-Hill, Inc., 443

N.E.2 441, 445 (N.Y. 1982)).

As a general matter, "[a] promise to perform a pre-existing legal obligation

does not amount to consideration." Murray, 444 F.3d at 178 (citing Goncalves v.

Regent Int'l Hotels, Ltd., 447 N.E.2d 693, 700 (N.Y. 1983)). However, § 5-1105 of

New York's General Obligations Law provides:

---

[18] Orly vigorously disputes whether the 2004 Divorce Stipulation is integrated with the 2004
Promise and the 2004 Indemnity. However, Sagi does not contend that the 2004 Divorce Stipulation
is integrated with the 2004 Promise and the 2004 Indemnity (ECF No. 57 at 10), and so the Court
need not reach this issue.

> A promise in writing and signed by the promisor or by his
> agent shall not be denied effect as a valid contractual
> obligation on the ground that consideration for the
> promise is past or executed, if the consideration is
> expressed in the writing and is proved to have been given
> or performed and would be a valid consideration but for
> the time when it was given or performed.

N.Y. Gen. Oblig. Law § 5-1105.

To meet § 5-1105's requirement that the consideration be "expressed" in the writing, the recitation of consideration must not be vague or imprecise.[19] See United Res. Recovery Corp. v. Ramo Venture Mgmt., Inc., 584 F. Supp. 2d 645, 656 (S.D.N.Y. 2008); Movado Grp., Inc. v. Presberg, 259 A.D.2d 371, 371 (N.Y. App. Div. 1999); Umscheid v. Simnacher, 482 N.Y.S.2d 295, 297 (N.Y. App. Div. 1984). For example, courts have held that the statements "past work on the Company's behalf" and "services rendered on the respondent's behalf" are too vague and imprecise to meet the expression requirement. United Res. Recovery, 584 F. Supp. 2d at 656;

---

[19] In several cases, courts have stated that in order to recover under § 5-1105, "the writing must contain an unequivocal promise to pay a sum certain, at a date certain, and must express consideration for the promise." E.g., United Res. Recovery Corp. v. Ramo Venture Mgmt., Inc., 584 F. Supp. 2d 645, 656 (S.D.N.Y. 2008) (quoting Umscheid v. Simnacher, 482 N.Y.S.2d 295, 297 (N.Y. App. Div. 1984)); In re Maxwell Commc'n Corp., 198 B.R. 63, 69 (S.D.N.Y. 1996) (same); Kreuter v. Tsucalas, 734 N.Y.S.2d 185, 188 (N.Y. App. Div. 2001) (same). The citation provided for this statement of law is typically the Second Department's decision Umscheid v. Simnacher, 482 N.Y.S.2d 295 (N.Y. App. Div. 1984), which in turn cited as support Sarama v. John Mee, Inc., 102 Misc. 2d 132 (N.Y. Civ. Ct. 1979), and Citibank National Ass'n v. London, 526 F. Supp. 793 (S.D. Tex. 1981), the latter of which cited only Sarama as support for this proposition.

However, Sarama in fact states that "[i]n order for plaintiff to recover for breach of contract, defendant's letter must contain an unequivocal promise to pay a sum certain, at a date certain, and, further, it must conform with General Obligations Law [§] 5-1105, by expressing in the letter the consideration for the promise." Sarama, 102 Misc. 2d at 133 (emphasis added). Sarama thus states that the requirement of "an unequivocal promise to pay a sum certain, at a date certain" is a general requirement for recovery for breach of contract under the facts of that case, not a requirement for recovery under § 5-1105. The Court further notes that the "sum certain" and "date certain" requirements are found nowhere in the text of § 5-1105, nor can they be implied from that text, and that New York's Court of Appeals has never embraced an interpretation of § 5-1105 encompassing those requirements.

Umscheid, 482 N.Y.S.2d at 297. By contrast, in Movado Group, Inc. v. Presberg, the

Appellate Division of New York's First Judicial Department held that a

commitment to pay all of a company's debts to a party on an "absolute,

unconditional, and continuing" basis was sufficient to establish past consideration

under § 5-1105, despite its being "a broad commitment, certainly not limited to one

opening transaction." 259 A.D.2d at 371.

The 2004 Integrated Agreement clearly purports to provide each party with a

benefit in exchange for a legal obligation: Dalia receives financial support in

exchange for the transfer of the TRI shares to the Sagi Trust and the Orly Trust;

Sagi receives an ownership interest in the TRI shares[20] in exchange for a

commitment to financially support Dalia; and Orly receives an ownership interest

in TRI shares in exchange for a commitment to indemnify Sagi.

Orly contends that the 2004 Integrated Agreement is not supported by

consideration for two reasons. First, Orly contends that the 2004 Integrated is not

supported by consideration because the Orly Trust never received the TRI shares.

But the 2004 Promise states that Orly and Sagi are benefiting from receipt of either

the TRI shares or "beneficial interests in those shares," by their respective trusts.

(ECF No. 1 ex. A.) Thus, the question becomes whether Orly has benefited from the

---

[20] Sagi contends that the contract is supported by two forms of consideration: (1) the Orly Trust's
receipt of the TRI shares as part of the divorce stipulation; (2) love, affection, and the end to parental
strife. (Compl. ¶ 8.) The Court rejects Sagi's argument that the 2004 Integrated Agreement is
supported by consideration because Orly received an emotional and psychological benefit in helping
to bring about an end to her parents' bitter divorce. Affection, love, and feelings cannot constitute
consideration under New York law. See, e.g., McRay v. Citrin, 706 N.Y.S. 2d 27, 28 (N.Y. App. Div.
2000); Rose v. Elias, 576 N.Y.S.2d 257, 258 (N.Y. App. Div. 1991); see also 22 N.Y. Jur. 2d Contracts
§§ 116-17.

Orly Trust's receipt of beneficial interests in the TRI shares. There is no genuine dispute as to whether she has so benefited: Orly's claims to beneficial ownership of the TRI shares individually and as a trust beneficiary enabled her to obtain $32.3 million from the Trump Group under the 2013 Settlement Agreement. Further, no court has issued a binding final judgment that the Orly Trust did not receive a beneficial interest in the TRI shares.[21]

Second, Orly contends that the TRI shares cannot serve as valid consideration because they had already been transferred when the 2004 Indemnity was signed, and they were transferred pursuant to the 2004 Divorce Stipulation, which is a separate agreement. This argument fails because the 2004 Integrated Agreement satisfies § 5-1105 of New York's General Obligations Law. The past consideration is precisely and unambiguously stated in the 2004 Promise, which states that "Orly and [Sagi] are benefiting by the receipt of a total of 794.40 shares of Trans-Resources, Inc. ("TRI"), or beneficial interests in those shares, by trusts for [their] benefit." (ECF No. 1 ex. A.) This statement is sufficiently precise and unambiguous so as to satisfy § 1105's expression requirement—indeed, this statement is considerably more exact than a promise to pay all of a company's debts on an ongoing basis, which was found to be sufficient in Movado Group. And as established above, there is no triable issue as to whether Orly was for all intents and purposes given a beneficial interest in the TRI shares.

---

[21] The Delaware Court of Chancery's beneficial ownership determinations were reversed by the Supreme Court of Delaware's July 18, 2011 decision. Genger v. TR Investors, LLC, 26 A.3d 180, 203 (Del. 2011).

Accordingly, there is no triable issue as to whether the 2004 Integrated

Agreement was supported by valid consideration.[22]

B.      Defenses

There is no triable issue as to whether Orly has a viable defense to the 2004

Integrated Agreement.

1.      Judicial estoppel.

The doctrine of judicial estoppel "protect[s] the integrity of the judicial

process by prohibiting parties from deliberately changing positions according to the

exigencies of the moment." New Hampshire v. Maine, 532 U.S. 742, 749-50 (2001)

(citation and internal quotation marks omitted).  The decision whether judicial

estoppel should bar a litigant from making a particular argument is highly fact-

specific.  See id. at 751.  Several considerations counsel in favor of applying the

doctrine in a particular case: (1) the party's later position is clearly inconsistent

with its earlier position; (2) the party has succeeded in persuading a court to accept

its earlier position, so that judicial acceptance of an inconsistent position in a later

proceeding would create the perception that either the first or the second court was

misled; (3) the party asserting the inconsistent position would derive an unfair

advantage or impose an unfair detriment on the opposing party if not estopped.

Adelphia Recovery Trust v. Goldman Sachs & Co., 748 F.3d 110, 116 (2d Cir. 2014)

(citing New Hampshire, 532 U.S. at 750-51).  However, "[b]ecause the doctrine is

---

[22] Orly makes much of the fact that the 2013 Settlement Agreement did not release the Orly Trust's claims to the TRI shares.  But this fact does nothing to disprove that Orly benefited from her claim to beneficial ownership of the TRI shares, and to the extent that it is relevant, it just provides further evidence that the Orly Trust had a legitimate claim to beneficial ownership of the TRI shares.

primarily concerned with protecting the judicial process, relief is granted only when

the risk of inconsistent results with its impact on judicial integrity is certain." Id.

(alteration in original) (quoting Republic of Ecuador v. Chevron Corp., 638 F.3d 384,

397 (2d Cir. 2011)).

Orly argues that Sagi should be judicially estopped from arguing that the

Orly Trust received a beneficial interest in the TRI shares. However, in this case

embracing Sagi's position runs no risk of endangering judicial integrity, as no court

has issued a binding final judgment that the Orly Trust did not receive a beneficial

interest in the TRI shares. Further, there is no reason to believe that permitting

Sagi to argue that the Orly Trust received the beneficial interest in the TRI shares

would give Sagi an unfair advantage or impose an unfair detriment on Orly—

indeed, embracing Orly's argument here would effectively allow her to avoid paying

hundreds of thousands of dollars due under an otherwise valid agreement for a

technical and formalistic reason unrelated to the equities of the situation.

Accordingly, even assuming that Sagi has taken an inconsistent litigation

position,[23] judicial estoppel does not bar Sagi from arguing that the Orly Trust

received beneficial ownership of the TRI shares.

2.    Mutual mistake.

"A contract is voidable under the equitable remedy of rescission if both

parties entered into the contract under a mutual mistake of fact." Schultz v.

Hourihan, 656 N.Y.S.2d 526, 528 (N.Y. App. Div. 1997). In order to obtain

---

[23] Given the strong rationale for not applying the doctrine of judicial estoppel here, the Court need not delve into the specific arguments advanced by Sagi or TPR in the course of their numerous years of prior litigation involving Orly and/or the TRI shares.

rescission of a contract due to mutual mistake, "it must be shown that the mistake in question is mutual, substantial, material and exists at the time the contract is entered." Rodriguez v. Mower, 56 A.D.3d 857, 858 (3d Dep't 2008) (citation omitted). In New York, a mutual mistake must be established by "clear and convincing" evidence. E.g., Carney v. Carozza, 792 N.Y.S.2d 642, 644 (N.Y. App. Div. 2005); Silver v. Gilbert, 776 N.Y.S.2d 867, 867 (N.Y. App. Div. 2004).

Orly first argues that if the 2004 Integrated Agreement is valid, it should nevertheless be rescinded because there was a mutual mistake as to whether Sagi and Orly were being treated equally in their parents' divorce. This argument fails because there was no mistake of fact here—the 2004 Divorce Stipulation and the 2004 Integrated Agreement explicitly provide for equal treatment of Orly and Sagi.

Orly further argues that the parties were mutually mistaken with regard to whether the interests in the TRI shares could be validly transferred to their trusts, such that they would receive equal interests in the TRI shares. This argument too fails, because as established above, the parties were in fact only mistaken as to their ability to receive and/or monetize record ownership in the TRI shares, and this mistake was not substantial or material because the money was clearly in the beneficial interest—Orly monetized her beneficial interest in the Orly Trust shares for $32.3 million, while Sagi sold his interests in the TRI shares for $37.0 million.

In any event, rescission due to mutual mistake is an equitable remedy, and it would not serve the interests of equity to rescind the 2004 Integrated Agreement here, as doing so would enable Orly to obtain her benefit from the agreement (the

$32.3 million she received for the beneficial interest in the TRI shares) while escaping her obligations under it (her commitment to financially support her mother). Accordingly, the Court declines to rescind the contract under the doctrine of mutual mistake.

### 3.   Lack of opportunity to defend.

Orly argues that as an indemnitor she has no contractual duty to indemnify Sagi without first receiving notice and a chance to defend. Under New York law, an indemnitee cannot seek reimbursement from an indemnitor unless the indemnitee first notifies the indemnitor of a potentially covered claim and gives them an opportunity to defend against it. See Chase Manhattan Bank v. 264 Water St. Assocs., 634 N.Y.S.2d 687, 689 (N.Y. App. Div. 1995). However, notice to the indemnitor is not required if an indemnitee can "establish that [it] would have been liable and that there was no good defense to that liability." Deutsche Bank Trust Co. of Ams. v. Tri-Links Inv. Trust, 900 N.Y.S.2d 246, 253 (N.Y. App. Div. 2010).

Although the parties do not dispute that Sagi twice informed Orly and her counsel of Dalia's demand prior to paying Dalia, they do dispute whether Sagi informed Orly of his intention actually to honor Dalia's demand. (See DRSOF ¶ 7; PRSOF ¶ 61.) Ultimately, however, even if Sagi did fail to properly notify Orly, notice was not required as a matter of law because Sagi had no good defense against Dalia's demand—the 2004 Integrated Agreement expressly gives Dalia the right to make such a demand and clearly obligates Sagi to pay it, and as established above there is no valid argument against the agreement's enforceability or validity. Accordingly, the parties' dispute over whether Sagi properly provided Orly with

21

notice does not preclude this Court from granting Sagi summary judgment as to the validity of the indemnification obligation as a matter of law.

C.   Performance, Breach, and Damages

The parties do not dispute that Sagi performed his obligations under the 2004 Integrated Agreement, as it is undisputed that Sagi paid Dalia $200,000. There is also no dispute as to whether Orly breached the 2004 Indemnity by refusing to pay Sagi, and nor is there a dispute that Sagi suffered damages of at least $100,000 as a result. Accordingly, because the 2004 Integrated Agreement is valid and enforceable, there is no triable issue as to whether all of the elements of Sagi's breach of contract claim are satisfied, and summary judgment is thus granted in Sagi's favor as to his breach of contract claim.

D.   Promissory Estoppel

Even if the 2004 Integrated Agreement were not valid and enforceable, Sagi is also entitled to equitable relief under the doctrine of promissory estoppel. "A cause of action for promissory estoppel under New York law requires the plaintiff to prove three elements: 1) a clear and unambiguous promise; 2) reasonable and foreseeable reliance on that promise; and 3) injury to the relying party as a result of the reliance."[24] Kaye v. Grossman, 202 F.3d 611, 615 (2d Cir. 2000) (citing Readco, Inc. v. Marine Midland Bank, 81 F.3d 295, 301 (2d Cir. 1996)).

---

[24] "New York courts limit promissory estoppel claims to instances of unconscionable injury only where promissory estoppel is invoked as a defense to the Statute of Frauds. . . . But New York courts generally do not require a showing of unconscionability where promissory estoppel is invoked to prevent injustice stemming from reliance on a gratuitous promise." Pearce v. Manhattan Ensemble Theatre, Inc., 528 F. Supp. 2d 175, 181 (S.D.N.Y. 2007) (collecting cases).

In the 2004 Indemnity, Orly made a clear and unambiguous promise to indemnify Sagi for "one-half (1/2) of any and all payments, liabilities, damages, claims, actions, losses, settlements, penalties, judgments or obligations . . . , including [Sagi's] reasonable counsel and other professional fees, expenses and costs, which arise from [Sagi's] undertakings in the [2004 Promise]." (PSOF ¶ 5.) There is no material dispute as to whether Sagi relied on this promise in paying Dalia, or that he sustained injury as a result of this reliance.

However, Orly argues that Sagi's reliance was not reasonable or foreseeable, because when he paid Dalia he was already aware that Orly disputed the validity and enforceability of the 2004 Integrated Agreement. This argument is unpersuasive. First, the time from which foreseeability is determined is when the promise is made, not the time of performance, and there is no genuine dispute as to whether it was foreseeable that Sagi would rely on the promise when it was made. Second, there is no genuine dispute as to whether Sagi's reliance was reasonable, because as explained above, Orly's position that the 2004 Integrated Agreement was invalid and unenforceable objectively lacked merit.

Orly argues that Sagi should be barred from recovering under a theory of promissory estoppel due to unclean hands. "The doctrine of unclean hands applies when the complaining party shows that the offending party is guilty of immoral, unconscionable conduct and even then only when the conduct relied on is directly related to the subject matter in litigation and the party seeking to invoke the doctrine was injured by such conduct." Kopsidas v. Krokos, 742 N.Y.S.2d 342, 344

23

(N.Y. App. Div. 2002) (quoting Nat'l Distillers & Chem. Corp. v. Seyopp Corp., 17 N.Y.2d 12, 15-16 (N.Y. 1966)) (internal quotation marks omitted). Orly argues that Sagi's hands are unclean because under his Presidency, TPR was obligated to effectuate the transfer of the TRI shares to her, and failed to do so. However, on July 24, 2014, the Appellate Division of New York's First Judicial Department held that as an officer of TPR, Sagi's fiduciary duty was to the corporation and its stockholders, and that Sagi had not breached any duty to Orly in failing to honor the agreement to transfer the TRI shares to her trust. Genger v. Genger, 121 A.D.3d 270, 278-79 (N.Y. App. Div. 2014). Sagi's behavior here is consistent with his duty to TPR and its shareholders, and does not rise to the immoral or unconscionable level required to bar him from relief under the doctrine of unclean hands.

Accordingly, there is no triable issue as to Sagi's promissory estoppel claim, and Sagi is granted summary judgment on that cause of action in addition to his breach of contract cause of action.

IV.   CONCLUSION

For the above reasons, the Court GRANTS Sagi's motion for summary judgment, DENIES Orly's motion for summary judgment, and DENIES AS MOOT Orly's motion to disqualify and all pending motions in limine.

24

The Clerk of Court is directed to close the motions at ECF Nos. 32, 35, 59, 65,

and 68 and to terminate this action.

SO ORDERED.

Dated:    New York, New York
          January 5, 2015

                                    /K— B. Foc

                                    KATHERINE B. FORREST
                                    United States District Judge

25

Case 1:19-cv-09319-AKH   Document 1-131   Filed 10/08/19   Page 166 of 244

**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF NEW YORK**

---

ARIE GENGER and ORLY GENGER, in her individual
capacity and on behalf of THE ORLY GENGER 1993 TRUST,

      Plaintiffs,

      - against -

SAGI GENGER, TPR INVESTMENT ASSOCIATES, INC.,
DALIA GENGER, THE SAGI GENGER 1993 TRUST,
ROCHELLE FANG, Individually and as Trustee of THE
SAGI GENGER 1993 TRUST, GLENCLOVA INVESTMENT
CO., TR INVESTORS, LLC, NEW TR EQUITY I, LLC,
NEW TR EQUITY II, LLC, JULES TRUMP, EDDIE TRUMP,
MARK HIRSCH, and TRANS-RESOURCES, INC.,

      Defendants.

---

SAGI GENGER, individually and as assignee of THE SAGI
GENGER 1993 TRUST, and TPR INVESTMENT
ASSOCIATES, INC.,

      Cross-Claimants, Counterclaimants, and
      Third Party Claimants,

      - against -

ARIE GENGER, ORLY GENGER, GLENCLOVA
INVESTMENT CO., TR INVESTORS, LLC, NEW TR
EQUITY I, LLC, NEW TR EQUITY II, LLC, JULES TRUMP,
EDDIE TRUMP, MARK HIRSCH, TRANS-RESOURCES,
INC., AND WILLIAM DOWD,

      Cross-Claim, Counterclaim, and/or
      Third Party Defendants.

---

INDEX NO. 651089/2010E

Hon. Barbara Jaffe

Part 12

Motion Sequence 32

**ORAL ARGUMENT**
**REQUESTED**

GLENCLOVA INVESTMENT CO., TR INVESTORS, LLC,
NEW TR EQUITY I, LLC, NEW TR EQUITY II, LLC,
JULES TRUMP, EDDIE TRUMP, MARK HIRSCH, and
TRANS-RESOURCES, INC.,

        Counterclaimants, Cross-Claimants, and
        Third Party Plaintiffs,

        - against -

ARIE GENGER, ORLY GENGER, SAGI GENGER, TPR
INVESTMENT ASSOCIATES, INC., THE SAGI GENGER
1993 TRUST, WILLIAM DOWD, ARNOLD BROSER,
DAVID BROSER, and ONE OR MORE ENTITIES
DIRECTED, OWNED OR CONTROLLED BY ARNOLD
BROSER AND/OR DAVID BROSER,

        Counterclaim, Cross-Claim, and/or
        Third Party Defendants.

## REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF TRANS-RESOURCES' AND THE TRUMP GROUP'S MOTION TO DISMISS FIRST AMENDED ANSWER, COUNTERCLAIMS, CROSS-CLAIMS, AND THIRD PARTY COMPLAINT OF SAGI GENGER, INDIVIDUALLY AND AS ASSIGNEE OF THE SAGI GENGER 1993 TRUST, AND TPR INVESTMENT ASSOCIATES, INC.

                                   SKADDEN, ARPS, SLATE,
                                     MEAGHER & FLOM LLP

Of Counsel:                      William P. Frank
Thomas J. Allingham II          John Boyle
Anthony W. Clark              Four Times Square
Douglas D. Herrmann        New York, New York  10036
Christopher M. Foulds        (212) 735-3000
One Rodney Square           (212) 735-2000 (facsimile)
P.O. Box 636
Wilmington, Delaware  19899-0636   *Attorneys for Glenclova Investment Co.,*
(302) 651-3000                *TR Investors, LLC, New TR Equity I, LLC,*
(302) 651-3001 (facsimile)     *New TR Equity II, LLC, Jules Trump,*
                             *Eddie Trump, Mark Hirsch and*
                             *Trans-Resources*

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ...........................................................................................1

ARGUMENT....................................................................................................................5

I.      THE TPR GROUP'S CLAIMS FOR FRAUD AND AIDING AND ABETTING
        FRAUD AGAINST TRANS-RESOURCES SHOULD BE DISMISSED. .....................5

        A.      The Alleged Representations Concerning The Free Transferability Of
                Shares Do Not Support A Claim For Fraud...........................................................5

        B.      The Alleged Omissions Concerning The Funding Agreement Do Not State
                A Claim.................................................................................................................9

        C.      The TPR Group Cannot Profit From Their Own Misconduct. .............................12

II.     THE COMPLAINT FAILS TO STATE ANY CLAIM FOR BREACH OF
        FIDUCIARY DUTY OR AIDING AND ABETTING SUCH A BREACH. ..................14

III.    THE COMPLAINT FAILS TO STATE CLAIMS FOR BREACH OF THE
        STOCKHOLDERS AGREEMENT. ..............................................................................17

IV.     THE COMPLAINT FAILS TO STATE A CLAIM AGAINST TRANS-
        RESOURCES FOR TORTIOUS INTERFERENCE WITH THE TRANSFER
        AGREEMENT.................................................................................................................19

V.      THE COMPLAINT FAILS TO STATE A CLAIM AGAINST TRANS-
        RESOURCES FOR TORTIOUS INTERFERENCE WITH PROSPECTIVE
        BUSINESS RELATIONS. ..............................................................................................20

VI.     THE COMPLAINT FAILS TO STATE A CLAIM FOR CONTRIBUTION ................22

VII.    THE COMPLAINT FAILS TO STATE A CLAIM FOR INDEMNIFICATION. ...........23

VIII.   THE TPR GROUP'S CLAIMS ARE TIME-BARRED. ................................................26

        A.      Both Tortious Interference Claims Are Barred By The Statute Of
                Limitations ..........................................................................................................26

        B.      The Fraud Claims And The Breach Of Contract Claims Are Barred By
                The Statute Of Limitations:..................................................................................27

IX.     THE TPR GROUP SHOULD NOT BE GRANTED LEAVE TO REPLEAD.................29

CONCLUSION.................................................................................................................30

# TABLE OF CASES AND AUTHORITIES

**CASES**                                                                    **PAGE(S)**

*420 East Associates v. Kerner,*
   438 N.Y.S.2d 316 (1st Dep't 1981) .................................................................19

*Aldrich v. Marsh & McLennan Companies, Inc.,*
   861 N.Y.S.2d 30 (1st Dep't 2008) ....................................................................28

*Arnold v. Society for Savings Bancorp., Inc.,*
   678 A.2d 533 (Del. 1996) ................................................................................15

*Barrett v. Freifeld,*
   908 N.Y.S.2d 736 (2d Dep't 2010) ...................................................................15

*Basic, Inc. v. Levinson,*
   485 U.S. 224 (1988) .................................................................................11, 12

*Beverly v. Acme Scaffold Co.,*
   160 N.Y.S.2d 907 (N.Y. Sup. Ct. 1957) ...........................................................12

*Brooklyn Union Gas Co. v. Interboro Surface Co., Inc.,*
   449 N.Y.S.2d 274 (2d Dep't 1982) ...................................................................29

*Buller v. Giorno,*
   868 N.Y.S.2d 639 (1st Dep't 2008) ..................................................................26

*Cerra v. Scher Fabrics, Inc.,*
   748 N.Y.S.2d 483 (1st Dep't 2002) ..................................................................30

*Davis v. Breadstreet Holdings Corp.,*
   No. 117455/06, 2012 WL 1241000 (N.Y. Sup. Ct. Mar. 30, 2012) (ORDER) ..................7

*DePetris & Bachrach, LLP v. Srour,*
   898 N.Y.S.2d 4 (1st Dep't 2010) .....................................................................19

*Eastman Kodak Co. v. Roopak Enterprises, Ltd.,*
   608 N.Y.S.2d 445 (1st Dep't 1994) ....................................................................6

*Freeman v. City of New York,*
   975 N.Y.S.2d 141 (2d Dep't 2013) ...................................................................29

*Genger v. Genger,*
   966 N.Y.S.2d 346, 2013 WL 221485
   (N.Y. Sup. Ct. Jan. 3, 2013) (TABLE) .........................................................23, 24

*Hetchkop v. Woodlawn at Grassmere, Inc.*,
  116 F.3d 28 (2d Cir. 1997)..................................................................................10

*Hicinbothem v. Natural Golf Corp.*,
  697 N.Y.S.2d 760 (3d Dep't 1999).................................................................17

*Jaffe v. Gordon*,
  658 N.Y.S.2d 612 (1st Dep't 1997)...................................................................19

*Lama Holding Co. v. Smith Barney Inc.*,
  88 N.Y.2d 413 (N.Y. 1996) ..........................................................................19

*Laub v. Faessel*,
  745 N.Y.S.2d 534 (1st Dep't 2002) ...................................................................9

*Mashreqbank PSC v. Ahmad Hamad Algosaibi & Brothers Co.*,
  975 N.Y.S.2d 710, 2013 WL 3782228 (N.Y. Sup. Ct. July 18, 2013) (TABLE)..............12

*Mayer v. Sanders*,
  695 N.Y.S.2d 593 (2d Dep't 1999)...................................................................23

*McArthur v. J.M. Main Street, Inc.*,
  847 N.Y.S.2d 233 (2d Dep't 2007)...................................................................16

*MediaXposure Ltd. (Cayman) v. Omnireliant Holdings, Inc.*,
  918 N.Y.S.2d 398, 2010 WL 4225939 (N.Y. Sup. Ct. Oct. 25, 2010) (TABLE) .............17

*Nixon Peabody LLP v. de Senihles, Valsamdidis, Amsallem, Jonath, Flaicher Associates*,
  873 N.Y.S.2d 235, 2008 WL 4256476 (N.Y. Sup. Ct. 2008) (TABLE) ...............................19

*Oneida Indian Nation v. Hunt Construction Group, Inc.*,
  970 N.Y.S.2d 156 (4th Dep't 2013).................................................................29

*Oneida of Thames Band v. State of New York*,
  757 F.2d 19 (2d Cir. 1985)...........................................................................13

*Orlando v. Kukielka*,
  836 N.Y.S.2d 252 (2d Dep't 2007)....................................................................8

*PAMI-LEMB I Inc. v. EMB-NHC, L.L.C.*,
  857 A.2d 998 (Del. Ch. 2004).......................................................................13

*Patmos Fifth Real Estate Inc. v. Mazl Building LLC*,
  975 N.Y.S.2d 711, 2013 WL 3942115 (N.Y. Sup. Ct. July 29, 2013) (TABLE)...............8

*Procapui-Productores de Camaroes de Icapui Ltda. v. Leyani*,
  No. 07-CV-6627 (BSJ), 2010 WL 2720584 (S.D.N.Y. June 22, 2010) ...........................21

*Reis v. Hazelett Strip-Casting Corp.*,
    28 A.3d 442 (Del. Ch. 2011)..............................................................15

*Rojas v. Paine*,
    956 N.Y.S.2d 81 (2d Dep't 2012) .........................................................9

*Rosado v. Proctor & Schwartz, Inc.*,
    483 N.Y.S.2d 271 (1st Dep't 1984), *aff'd*, 66 N.Y.2d 21(N.Y. 1985) ............25

*Rotanelli v. Madden*,
    569 N.Y.S.2d 187 (2d Dep't 1991) ........................................................6

*Savannah Bank v. Savings Bank of Fingerlakes*,
    691 N.Y.S.2d 227 (4th Dep't 1999)..................................................19, 20

*St. George Hotel Associates v. Shurkin*,
    786 N.Y.S.2d 56 (2d Dep't 2004).........................................................29

*Susman v. Commerzbank Capital Markets Corp.*,
    945 N.Y.S.2d 5 (1st Dep't 2012) ........................................................26

*The Laurel Hill Advisory Grp., LLC v. American Stock Transfer & Trust Co.*,
    No. 6518322011, 2012 WL 10008211 (N.Y. Sup. Ct. Aug. 27, 2012) ...............6

*In re T.J. Ronan Paint Corp.*,
    469 N.Y.S.2d 931 (1st Dep't 1983) ......................................................26

*TR Investors, LLC v. Genger*,
    C.A. No. 6697-CS, 2013 WL 603164 (Del. Ch. Feb. 18, 2013)..........3, 8, 13, 18

*TR Investors, LLC v. Genger*,
    C.A. No. 3994-CS, 2010 WL 2901704 (Del. Ch. July 23, 2010) ...............1, 3, 15

*TR Investors, LLC v. Genger*,
    C.A. No. 3994-CS (Del. Ch. Sept. 18, 2009) (TRANSCRIPT).........................16

*Viacom Outdoor Inc. v. Wixon Jewelers, Inc.*,
    919 N.Y.S.2d 151 (1st Dep't 2011) ..................................................12, 13

*Village On Canon v. Bankers Trust Co.*,
    920 F. Supp. 520 (S.D.N.Y. 1996) ........................................................6

*Watts v. Exxon Corp.*,
    594 N.Y.S.2d 443 (3d Dep't 1993)........................................................28

*Worcester Creameries Corp. v. City of New York*,
    861 N.Y.S.2d 198 (3d Dep't 2008).......................................................18

**STATUTES AND RULES**

CPLR 213................................................................................................................27, 28

8 *Del. C.* § 342 ...............................................................................…..15

**OTHER AUTHORITIES**

Black's Law Dictionary (7th ed. 1999)........................................................…..10

McKinney's Consolidated Laws of New York Annotated
     General Obligations Law Section 15-108(b) .............................................22, 23

The Trump Group[1] and Trans-Resources submit this reply memorandum in response to the TPR Group's Memorandum of Law in Opposition to (A) Trans-Resources' Motion to Dismiss the First Through Fourth Cross-Claims, and (B) Trans-Resources' and the Trump Group's Motion to Dismiss the Fifth Cross-Claim for Contribution and Indemnification (the "Opposition Brief" and cited herein as "Opp'n Br. at __").

## PRELIMINARY STATEMENT

The Opposition Brief illustrates exactly why the Trump Group and Trans-Resources bargained with TPR for a Stockholders Agreement that prevented any transfer of TPR's Trans-Resources stock to Sagi Genger or any of Sagi's affiliates.  Because TPR nevertheless sought to transfer Trans-Resources stock to the Sagi Trust, in direct violation of the Stockholders Agreement (which Sagi negotiated and TPR signed), the Trump Group and Trans-Resources have been mired in six years of sordid Genger family litigations, including this one.  This is the exact result that the Stockholders Agreement's transfer prohibition was designed to prevent.  In language that squarely applies here, then-Vice Chancellor (now Chief Justice) Strine held that "if [the] violation of the Stockholders Agreement has deepened the Genger Family's internecine feud, that is unfortunate.  But it is not the Trump Group's problem, nor is it a basis for an appeal to this court's sense of equity." *TR Investors, LLC v. Genger*, C.A. No. 3994-VCS, 2010 WL 2901704, at *18 (Del. Ch. July 23, 2010).  The Complaint and the TPR Group's improper attempt to supplement their allegations in the Complaint with new allegations and the incorporation of over 20 new exhibits in the Opposition Brief amplify the now-Chief Justice's holding that TPR's violation enhanced the Genger family's desire to litigate with one another until the end of time and that none of their problems actually include Trans-Resources or the Trump Group.

---

[1]     Unless otherwise noted, all capitalized terms have the same meanings as in the Trump Group's Memorandum of Law in Support of Trans-Resources' and the Trump Group's Motion to Dismiss (the "Trump Brief" and cited herein as "Trump Br. at __").

The overarching issue infecting all of the TPR Group's claims and many arguments is their failure to acknowledge the actual cause of any injury to them. To borrow the TPR Group's analogy, an arsonist should not complain when he burns down his own house. (*See* Opp'n Br. at 3). Yet that is exactly what Sagi and the TPR Group are doing – as explained in the Opening Brief, the Complaint contains facially defective claims against Trans-Resources and the Trump Group *to recover alleged damages that the TPR Group inflicted upon themselves*. For all of their claims, the TPR Group insist that the Trump Group's contractual right under the Stockholders Agreement to purchase the so-called Sagi Trust Trans-Resources shares as the result of TPR's breach "is the injury." (Opp'n Br. at 26 (underlining in original)). Said differently, according to the TPR Group, the alleged injury is that the so-called Sagi Trust Trans-Resources shares were "encumbered" by the Trump Group's purchase rights. (Opp'n Br. at 11-12 (underlining in original)). It was *TPR's breach* that ignited those purchase rights.

For this claimed injury, the TPR Group seek damages equal to the difference between (i) the $26 million the Trump Group agreed to pay for the shares after the breach came to light (which at the time the TPR Group gladly accepted as "fair, reasonable and acceptable" and without qualification as to an "encumbrance" or otherwise), and (ii) a hypothetical value that the TPR Group now believe those shares would have been worth *if the TPR Group had not breached the Stockholders Agreement*. But the law does not permit the collection of damages resulting from one's own breach. For this reason alone, all of the TPR Group's claims should (and respectfully must) be dismissed.

In various places, the Opposition Brief insinuates that there is an open question as to whether TPR breached the Stockholders Agreement, or even whether the Sagi Trust was a permitted transferee. (*See, e.g.*, Opp'n Br. at 23 ("[The Trump Group] claims the Sagi Trust was not a permitted transferee, but any such judicial finding was [not] made in a case to which the Sagi Trust was a party."); *id.* at 11 n.4 ("suggest[ing] a possible defense to the Purchase

Rights")). But there can be no dispute that TPR breached the Stockholders Agreement when it purported to transfer shares to the Sagi Trust.

For starters, the TPR Group concede that "the Sagi Trust was not a 'Permitted Transferee' under the Stockholders Agreement. . . ." (Opp'n Br. at 6-7). And, TPR has previously argued to the Delaware Court of Chancery that "[Arie] caused *TPR to violate the Stockholders Agreement* by transferring, without any notice . . . 1102.8 shares to a trust for Sagi." (Ex. 1 at 6 (emphasis added)).[2] The Delaware courts agreed. *See TR Investors, LLC v. Genger*, C.A. No. 6697-CS, 2013 WL 603164, at *1 (Del. Ch. Feb. 18, 2013) ("[T]he transfer of the Trans-Resources stock out of TPR *violated the terms of the Stockholders Agreement that TPR had signed* with the Trump Group.") (emphasis added).

In the TPR Group's own words, that breach by TPR meant that "under the Stockholders Agreement, the Trump Group had the right to purchase the transferred [Trans-Resources] Shares at their 2004 values." (Opp'n Br. at 10 (underlining in original)). When the Trump Group began to exercise these rights in the summer of 2008, the Trump Group agreed to compromise such rights to purchase the so-called Sagi Trust shares at 2004 values. As the Delaware courts found, "the Trump Group was giving up its right to purchase the shares from TPR at 2004 prices, which likely would have allowed the Trump Group to obtain the Shares for *much less* than the approximately $26 million it paid to purchase the Sagi Shares." *TR Investors, LLC v. Genger*, 2010 WL 2901704, at *17 (emphasis added). The TPR Group also admit that the Trump Group were enti-

---

[2]     A copy of the pleading is attached as Exhibit 1 to the Affirmation of John Boyle in Support of The Reply Memorandum of Law in Further Support of Trans-Resources' and The Trump Group's Motion to Dismiss First Amended Answer, Counterclaims, Cross-Claims, and Third Party Complaint of Sagi Genger, Individually and as Assignee of The Sagi Genger 1993 Trust, and TPR Investment Associates, Inc.(the "Boyle Affirmation") submitted herewith. Copies of other documents relied upon in the Complaint and other documents that the Court may consider are similarly attached as exhibits to the Boyle Affirmation. The exhibits to the Boyle Affirmation are cited herein as "Ex. __".

tled "to purchase the TRI shares at 2004 market value" and "could have claimed a lower market value" than what it ultimately paid. (Compl. ¶ 28).

Given these admissions, it is unsurprising that the TPR Group confirmed in 2008 (without qualification or carve-outs) that $26 million was "fair, reasonable and acceptable to each [of] the [Sagi Trust], TPR and Sagi Genger." (Trump Br. at 2 (emphasis omitted)). Indeed, the TPR Group states in their brief that they "settle[d] with the Trump Group for the *maximum* that it could hope to recover in litigation. . . ." (Opp'n Br. at 11 (emphasis added)). These voluntary concessions conclusively rebut the TPR Group's current reckless allegation that the Trump Group stole the so-called Sagi Trust Trans-Resources shares, or somehow wrongfully bought them for "pennies on the dollar." These accusations are particularly indefensible given that (i) the Sagi Trust claims to have owned the shares solely as the result of what Sagi must have known (having participated in the negotiation of the Stockholders Agreement) was a void transfer, and (ii) the Sagi Trust either received the shares as a gift or paid *at most* $1.00 for the shares that TPR then sold to the Trump Entities for $26 million. (Trump Br., Ex. G). Sagi (the TPR executive who both executed the violative transfer, and participated in negotiating the Stockholders Agreement that such purported transfers violated) and TPR (the party that breached the Stockholders Agreement) are suing to recover damages for an injury that they caused.

All of the TPR Group's many arguments (which are addressed in turn below) depend on ignoring the consequences of their own actions. For this reason and for all the reasons explained below and in the Trump Brief, the Trump Group respectfully urge this Court to dismiss the Complaint.

4

## ARGUMENT

I. **THE TPR GROUP'S CLAIMS FOR FRAUD AND AIDING AND ABETTING FRAUD AGAINST TRANS-RESOURCES SHOULD BE DISMISSED.**

In their opening brief, the Trump Group show that the Complaint fails to state a claim for fraud and aiding and abetting fraud against Trans-Resources. (*See* Trump Br. at 13). Under New York law, a cause of action for fraud requires a plaintiff to plead with specificity that a defendant made a material representation of existing fact that was false and known by the defendant to be false when made, for the purpose of inducing plaintiff's reliance, which the plaintiff justifiably relied upon, and by which, as a proximate cause of such justifiable reliance, the plaintiff was damaged. (*Id.*) The Complaint's allegations fall well short of this burden.

### A. **The Alleged Representations Concerning The Free Transferability Of Shares Do Not Support A Claim For Fraud.**

The Trump Brief correctly argued that the TPR Group could not state a claim for fraud against Trans-Resources based on statements Arie made in his personal capacity. (Trump Br. at 12-16). The TPR Group concede this point. (Opp'n Br. at 18 ("Arie's lies in his divorce settlement . . . is [sic] an aspect of TPR's and Sagi's Counterclaim against Arie but not the Cross-Claims against [Trans-Resources].")). Accordingly, the TPR Group have abandoned any claim of reliance on Arie's misrepresentations in the MSA as against Trans-Resources. (*Compare* Trump Br. at 5 *with* Opp'n Br. at 18).

Recognizing that Arie's personal representations are not actionable, the TPR Group nevertheless argue that they were hoodwinked based upon their reliance on a boilerplate legend stamped on a stock certificate. (Opp'n Br. at 17). To support this argument, the TPR Group first claim that the stock certificate issued to the Sagi Trust stated the shares were "freely transferable." (Opp'n Br. at 17; *see also* Opp'n Br. at 5). That is factually incorrect; the word "freely" appears nowhere on the stock certificate the TPR Group attached to the Opposition Brief (but not to the Complaint). Instead, the stock certificate simply includes a boilerplate legend about trans-

5

ferring stock on the Trans-Resources stock ledger. But, even if the stock certificate had said that the shares were freely transferable, the TPR Group could not, as matter of law, have justifiably relied on a generic stock certificate legend to override the express terms of the Stockholders Agreement. (*See* Trump Br. at 14-15).

The TPR Group next argues that they "did not know" the Stockholders Agreement had been violated. (Opp'n Br. at 17). But the TPR Group do not (and cannot) allege that their members were unfamiliar with the transfer restrictions in the Stockholders Agreement. (*See* Opp'n Br. at 17). TPR signed, and was a party to, the Stockholders Agreement, and Sagi (the individual who consummated the improper transfers on behalf of TPR) helped to negotiate it. (*See* Trump Br. at 6). Accordingly, the TPR Group's fraud and aiding and abetting claims fail as a matter of law, since the TPR Group may not rely on the stock certificate's legend when they know such terms contradict the Stockholders Agreement. *See Vill. on Canon v. Bankers Trust Co.*, 920 F. Supp. 520, 530-31 (S.D.N.Y. 1996) (holding that a party to a contract is presumed to have read it, and rejecting argument that such party relied on representations that contradicted the terms of that contract); *Rotanelli v. Madden*, 569 N.Y.S.2d 187, 188 (2d Dep't 1991) (same). Tellingly, the TPR Group do not plead when (if ever) any of their members first saw the stock certificate or who, if anyone, actually read the legend and relied on it.[3] *See Eastman Kodak Co. v. Roopak Enters., Ltd.*, 608 N.Y.S.2d 445, 446 (1st Dep't 1994) (dismissing fraud claim because, among other things, party failed to allege with sufficient particularity the timing of purported misrepresentations); *The Laurel Hill Advisory Grp., LLC v. Am. Stock Transfer & Trust Co.*, No. 6518322011, 2012 WL 10008211, at *6 (N.Y. Sup. Ct. Aug. 27, 2012) ("Despite a thirty-page

---

[3]     Notably, no member of the TPR Group, including Sagi, was able to produce the stock certificate at the closing on the Stock Purchase Agreement on August 22, 2008. The Trump Entities, therefore, insisted on escrowing most of the sale proceeds until the stock certificate could be produced.

complaint, Mr. Siemann does not give even an approximate date, time, or location of the alleged misrepresentation. . . . This is fatal to his claim.").

The TPR Group also insist in the Opposition Brief (but again do not allege in their Complaint) that Arie's knowledge must be imputed to Trans-Resources, and that Trans-Resources is thus chargeable with knowing that the statement on the share certificate was false. (Opp'n Br. at 18-19). Even if this were alleged in the Complaint (it was not), then by the same logic Arie's knowledge must also be imputed to TPR (as Arie was an officer and director of TPR at the time TPR purportedly transferred its Trans-Resources' shares).

The TPR Group's argument is not saved by their allegation that Arie used his control over TPR to pass "a Board Resolution authorizing TPR to transfer" the shares. (Compl. ¶ 16.) It is telling that the TPR Group now state that TPR "unwittingly" violated the Stockholders Agreement when overlapping management at Trans-Resources and TPR "had contemporaneous knowledge," but "did not cause the company [TPR] to provide the requisite notice to the Trump Group." (Opp'n Br. at 6). This cavalier approach to pleading one thing, but arguing another should not be condoned. The TPR Group's attempt to impute Arie's knowledge to an entity of which he is an officer only when convenient (as it is with Trans-Resources), but not when such imputation is harmful to their position (as it is with TPR) should be rejected. Thus, even if the Court finds that Arie's knowledge somehow could be imputed to Trans-Resources, then, respectfully, it should equally find that his knowledge is imputed to TPR. In any event, TPR must have acted with its eyes wide open, and could not therefore have been defrauded.

Moreover, the TPR Group cannot credibly suggest that they were unaware of the Stockholders Agreement's prohibition on transfers without notice, or that Sagi, as President of TPR, lacked the obligation or ability to confirm (or discover) whether TPR had provided the contractually required notice, since (i) TPR was a party to the Stockholders Agreement, and (ii) Sagi, as its President, signed the Transfer Agreement on TPR's behalf and participated in negotiating the

7

Stockholders Agreement. (*See* Trump Br. at 6). The TPR Group does not dispute these points, and therefore concedes them. *See also Davis v. Breadstreet Holdings Corp.*, No. 117455/06, 2012 WL 1241000 (N.Y. Sup. Ct. Mar. 30, 2012) (ORDER) ("[P]laintiffs' 'failure to address this issue in its responding brief indicates an intention to abandon [these] [bases] of liability. . . .'"") (alteration in original) (quoting *Gary v. Flair Beverage Corp.*, 875 N.Y.S.2d 4, 6 (1st Dep't 2009)); *Patmos Fifth Real Estate Inc. v. Mazl Bldg. LLC*, 975 N.Y.S.2d 711, 2013 WL 3942115, at *9 (N.Y. Sup. Ct. July 29, 2013) (TABLE) (finding plaintiffs failed to state a claim because "a claim is deemed abandoned if the party asserting it fails to oppose the branch of a motion to dismiss it. . . .") (citations omitted).

It is even more revealing that the TPR Group now maintain that the Sagi Trust "did not realize [the lack of required notice], since Arie had 'represent[ed] falsely in the divorce settlement that the 2004 Transfers were not made in violation of any agreement.'" (Opp'n Br. at 6). But, the TPR Group explicitly disclaimed relying on Arie's statements in the MSA for its claims against the Trump Group so as not to have those statements attributed to Arie as an officer of TPR. (*See* Opp'n Br. at 18 ("Arie's lies in his divorce settlement . . . is [sic] an aspect of TPR's and Sagi's Counterclaim against Arie but not the Cross-Claims against TRI.")). In this respect, the TPR Group's failure to meet their burden concerning their reliance can (and respectfully should) be decided as a matter of law. *See Orlando v. Kukielka*, 836 N.Y.S.2d 252, 255 (2d Dep't 2007) (finding reliance "unreasonable as a matter of law" where plaintiff had the means to determine the truth).

Lastly, the TPR Group have not pleaded any proximate causation connecting the alleged misrepresentations to their claimed injury. The TPR Group's claimed injury is that the Sagi Trust had to sell its Trans-Resources shares at a discount because the shares were "encumbered" by the Trump Group's contractual right to purchase the shares. (Opp'n Br. at 11-12 (underlining in original)). However, the Delaware courts explicitly held that the Sagi Trust did not sell the

8

shares; TPR did. *See, e.g., TR Investors, LLC v. Genger*, 2013 WL 603164, at *10 ("[T]he Su-

preme Court explicitly and implicitly affirmed the three essential grounds on which my decisions

had rested: (1) that Genger had transferred the Trans-Resources stock out of TPR in violation of

the Stockholders Agreement, (2) that this stock reverted to TPR, and (3) that the Trump Group

had the right to buy this stock *from TPR*.") (emphasis added).  In addition, the cause of the "en-

cumbrance" was not the legend on the stock certificate; rather, the "encumbrance" was caused by

TPR's own breach of the Stockholders Agreement, which triggered the Trump Group's contrac-

tual purchase rights.  The TPR Group cannot hold the Trump Group liable for TPR's self-

inflicted harm. *See Laub v. Faessel*, 745 N.Y.S.2d 534, 537 (1st Dep't 2002) (dismissing fraud

claim where plaintiff failed to allege that the defendant's purported misrepresentations, rather

than another factor, caused the plaintiff's losses; and denying leave to replead, because amend-

ments to the complaint would not change such fundamental deficiency in the plaintiff's claims).

### B.      The Alleged Omissions Concerning The Funding Agreement Do Not State A Claim.

The TPR Group also incorrectly argue that Trans-Resources committed a fraud when, af-

ter execution of the Stockholders Agreement, "[Trans-Resources'] management actively con-

cealed from [the TPR Group] a series of events in 2008 that were highly material to the Sagi

Trust Shares, including [Trans-Resources'] scheme to strip the Sagi Trust of its shares, its reneg-

ing on the Funding Agreement, and the Trump Group's decision to invoke their Purchase Rights

in retaliation."  (Opp'n Br. at 17-18).

*First*, for the reasons detailed in the Trump Brief (Trump Br. at 15-16), the TPR Group's

fraud claim should be dismissed because Trans-Resources did not owe any duty of disclosure to

Sagi or the Sagi Trust, because neither was ever a valid stockholder of Trans-Resources. *See,*

*e.g., Rojas v. Paine*, 956 N.Y.S.2d 81 (2d Dep't 2012) (dismissing fraudulent concealment claim

for lack of duty).  In response, the TPR Group insist that Trans-Resources owed a duty of disclo-

sure to the Sagi Trust because "[t]he Sagi Trust was the beneficial owner of the Sagi Trust Shares until the Courts invalidated those transfers *in 2011*, *at which point* the shares reverted to TPR." (Opp'n Br. at 20 (emphasis added)). That statement is inaccurate.

The TPR Group is incredibly mistaken in claiming "the Chancery Court and this Court have held on multiple occasions that the Sagi Trust was the beneficial owner." (Opp'n Br. at 25 (citing Dellaportas Aff.[4] Ex. H, Stipulation and Proposed Order of Dismissal, *Genger v. TR Investors, LLC*, C.A. No. 6906-CS (Del. Ch.) ¶ 1; Dellaportas Aff. Ex. I, Final Judgment Order, *TR Investors LLC v. TPR Inv. Assoc., Inc.*, C.A. No. 6697-CS (Del. Ch.) ¶ 4). Neither of the exhibits cited by the TPR Group in the Opposition Brief (but not referred to in, or attached to, the Complaint) states that an impermissible transferee (including the Sagi Trust, Arie or the Orly Trust) was a "beneficial owner" at any time. Rather, the TPR Group's exhibits state that the transfers were "void" and that the Trans-Resources stock at all times belonged to TPR. (Dellaportas Aff. Ex. H, ¶ 2; Dellaportas Aff. Ex. I, ¶ 4) As consequence, the transfers never happened, the Sagi Trust's stock certificate would be voided, and Trans-Resources' books should be corrected to reflect that the transfers were void.

Even if the Sagi Trust really was a "beneficial owner" as a result of the invalid transfer (which it could not have been), the Stockholders Agreement is "binding upon . . . transferees." (Opp'n Br. at 23). The Stockholders Agreement states that violative transfers are "void," which means as a legal matter they never happened. *See Hetchkop v. Woodlawn at Grassmere, Inc.*, 116 F.3d 28, 32 (2d Cir. 1997) (a void contract is a "nullity"); Black's Law Dictionary (7th ed. 1999) (defining void as "of no legal effect"). Indeed, as the TPR Group admit on the face of the Complaint, "the Stockholders Agreement restricted the transfer of TRI shares. . . . A transfer that failed to comply with [the Stockholders Agreement's transfer] restrictions and the prior no-

---

[4]        "Dellaportas Aff." means the Affirmation of John Dellaportas dated March 28, 2014 (D.I. 845).

tice requirement would ***automatically*** be deemed ***invalid and void. . . .***" (Compl. ¶ 13 (emphasis added)). Because the TPR Group concede that any impermissible transfer is "automatically" void, the transfers were void at the time they were made in 2004 (as was found by the Delaware courts). Any other result would allow the breaching party to obtain the benefits of its own breach, and the TPR Group cite no authority that would support such a result.

*Second*, the Trump Brief established that the Complaint fails to state a claim against Trans-Resources for failing to disclose to the TPR Group that the Funding Agreement was being discussed, or that it thereafter had been tabled. (Trump Br. at 12-13). The TPR Group concede that the Funding Agreement was never an enforceable agreement because it was never finalized. (Opp'n Br. at 20-21). But even if the Funding Agreement had been finalized (which it was not) and there was a duty of disclosure owed to the TPR Group (which there was not), the TPR Group's claim would still fail – because any disclosure would have had no impact on the Trump Group's contractual purchase rights under the Stockholders Agreement. As explained in the Trump Brief, the draft Funding Agreement does not so much as mention the so-called Sagi Trust Shares, or the Trump Entities' "Purchase Rights" emanating from TPR's breach of the Stockholders Agreement.[5] (*See* Trump Br. at 16). And, even if the Funding Agreement had been finalized, the Trump Group retained the independent right under the Stockholders Agreement to void the transfer of the so-called Sagi Trust Shares and to purchase those shares at their 2004 value.

*Finally*, Trans-Resources neither issued affirmatively false statements to the TPR Group concerning the Funding Agreement, nor made incomplete statements that could have triggered a duty to disclose more. The TPR Group's only cited authority, *Basic, Inc. v. Levinson*, 485 U.S.

---

[5]    At the only Trans-Resources board meeting where the Funding Agreement was discussed, the minutes recite that Arie noted the 2004 Transfers were made in violation of the Stockholders Agreement without suggestion that such violation would be waived in connection with the unfinished Funding Agreement. Indeed, it was expressly noted that the Stockholders Agreement violation would need to be addressed at a later date.

224, 236 (1988), proves the point. (Opp'n Br. at 20-21). There, a corporation affirmatively is-sued a "public denial of merger activity and the suspension of trading in Basic stock just prior to the merger announcement." 485 U.S. at 224. By contrast, the most the TPR Group allege is that Trans-Resources never disclosed anything about the Funding Agreement. Accordingly, the TPR Group fail to state a claim for fraud based on disclosure of the negotiations surrounding the po-tential Funding Agreement.

### C. The TPR Group Cannot Profit From Their Own Misconduct.

As the Trump Group previously explained (Trump Br. at 14), the *in pari delicto* doctrine is an appropriate grounds for dismissal where a wrongdoer asserts a tort claim against another who is alleged to have participated in the wrong. *See Mashreqbank PSC v. Ahmad Hamad Algo-saibi & Bros.*, 975 N.Y.S.2d 710, 2013 WL 3782228, at *4-5 (N.Y. Sup. Ct. July 18, 2013) (TABLE) (explaining "[t]he doctrine of *in pari delicto* mandates that a wrongdoer cannot assert a tort claim against another who participated in the wrong," and dismissing fraud counterclaim for failure to state a claim); *see also Beverly v. Acme Scaffold Co.*, 160 N.Y.S.2d 907, 909 (N.Y. Sup. Ct. 1957) (granting motion to dismiss third party complaint under *in pari delicto* doctrine). In response, the TPR Group argue that "TRI does not specify . . . any immoral or unconscionable conduct by TPR." (Opp'n Br. at 18-19). But the TPR Group's own Complaint concedes that TPR agreed to the impermissible transfers, in direct contravention of a binding agreement (here the Stockholders Agreement). (Compl. ¶ 16). Indeed, TPR was a knowing, direct participant in the impermissible transfers, whereas Trans-Resources could only have any knowledge imputed to it through the knowledge of its Chairman (Arie), who was acting in his own personal capacity without disclosing the transfers to the Trans-Resources' board of directors. Moreover, it was TPR that failed to disclose the impermissible transfers and kept them secret for years.

This highlights the Trump Group's fundamental argument that the TPR Group cannot claim entitlements under a contract that they intentionally breached. *See Viacom Outdoor Inc. v.*

*Wixon Jewelers, Inc.*, 919 N.Y.S.2d 151, 152 (1st Dep't 2011) (holding that a party that repudi-ates or breaches a contract cannot then claim the benefits of that contract); *see also PAMI-LEMB I Inc. v. EMB-NHC, L.L.C.*, 857 A.2d 998, 1014-15 (Del. Ch. 2004).

In this connection, the members of the TPR Group are indistinguishable.  The TPR Group repeatedly state that they are not a "group" and that the Sagi Trust and TPR are "distinct enti-ties."  (Opp'n Br. at 5).  These arguments should lead the Court to question plaintiffs' credibility generally.  One member of the TPR Group, Sagi, admittedly controls the other member of the group, TPR.  *See TR Investors, LLC v. Genger*, 2013 WL 603164, at *5 ("Sagi had purchased control of TPR from his mother, Dalia, with whom he was aligned.").  It also bears mentioning that the third member of the TPR Group, the Sagi Trust (of which Sagi is the primary beneficiary and the representative by assigment of its claims), is not a party to this lawsuit.  Rather, Sagi (who participated in the negotiation of the Stockholders Agreement and signed the transfer doc-uments on behalf of TPR) claims that he is suing personally on the basis of an unspecified "writ-ten assignment" from the Sagi Trust (Compl. ¶ 3) – although the assignment was not proffered in support of the Complaint or in this Opposition Brief.[6]  Even if it were a party to this action, the Sagi Trust's alleged rights and injury in this litigation also arise entirely out of the TPR Group's wrongdoing – *i.e.*, TPR's impermissible transfer of shares.  (Opp'n Br. at 19).

---

[6]     Although granting the motion to dismiss will moot this issue for the Trump Group, it bears noting that the Second Circuit has held that even though clients may give informed consent, it "has required that the court must be satisfied that the client 'knowingly and intelligently wishes to proceed with joint representation.'"  *Oneida of Thames Band v. State of N.Y.*, 757 F.2d 19, 22 (2d Cir. 1985).  At the very least, recognizing the TPR Group's pro-pensity to revisit long-settled issues that had been resolved with their consent (*i.e.*, the sale by TPR of the Sagi Trust shares was on terms that were "fair, reasonable and acceptable"), the Trump Group would be "entitled to the assur-ance of an on-the-record consent sufficient to preclude any subsequent challenge to a judgment by either [client] because of [the] joint representation."  *Id.* (suggesting trial court "ascertain in open court . . . that each client under-stands the potentially adverse nature of the claims and nonetheless prefers to be jointly represented").

II.    **THE COMPLAINT FAILS TO STATE ANY CLAIM FOR BREACH OF FIDUCIARY DUTY OR AIDING AND ABETTING SUCH A BREACH.**

The Trump Brief conclusively demonstrated that the Complaint failed to state a claim against Trans-Resources for breach of fiduciary duty and aiding and abetting alleged breaches of fiduciary duty. (Trump Br. at 16-17). Specifically, with respect to the aiding and abetting portion of the TPR Group's claims, the Trump Group showed that, even assuming Arie and Dowd were acting in some capacity for Trans-Resources (which they were not) when Arie orchestrated the 2004 Transfers in order to resolve his marital issues and walked away from the Funding Agreement negotiations, Trans-Resources still cannot be liable for breaching any fiduciary duty or aiding and abetting a breach of fiduciary duty. (Trump Br. at 17). This Court has already held (in dismissing Arie's breach of fiduciary duty claims against TPR) that a corporate entity (as opposed to its directors or officers) owes no fiduciary duties to its stockholders. (*Id.*) And the TPR Group cannot circumvent this well-established rule by the transparent expedient of pleading that Trans-Resources aided and abetted Arie and Dowd in breaching their duties to the Trans-Resources purported stockholders. (*Id.*)

In opposition, the TPR Group abandon their claim for direct breach of fiduciary duty and concede there can be no aiding and abetting claim grounded on Arie's violation of his duties as a director or officer of Trans-Resources. (Opp'n Br. at 21-22). In so conceding, the TPR Group acknowledge that aiding and abetting claims are "limited to those cases where a plaintiff alleges only that a defendant corporation aided and abetted a breach of fiduciary duty owed by that corporation's directors or officers as such" – and then argues that Arie owed duties in other capacities. (Opp'n Br. at 21-22). Specifically, the TPR Group argue that (i) "Arie owed the Sagi Trust a fiduciary duty as a co-shareholder in TRI" in a "close corporation"; (ii) "as the Sagi Trust's proxy holder, Arie had 'superior knowledge of essential facts'" rendering non-disclosure inherently unfair; and (iii) Arie had a familial fiduciary duty or "acted . . . beyond the scope of his

agency," which "[i]f true, [means] TRI aided and abetted those wrongful acts as well." (Opp'n

Br. at 22). None of these ever-changing arguments pass muster. *Cf. TR Investors, LLC v.

Genger*, 2010 WL 2901704, at *12 (describing the Trump Group's efforts to address "ever-

changing arguments as playing a game of 'Whack-a-Mole'").

*First and foremost*, Arie could not possibly have owed any duty as a "co-stockholder,"

because Arie was never a stockholder of Trans-Resources. The purported transfers to him were

void. (*See* Dellaportas Aff. Ex. I, ¶ 4-5). And even if he had been a stockholder, Trans-

Resources is not a "close corporation" of the kind where co-stockholders may owe mutual duties

– as opposed to a "closely-held" corporation, a different animal – as the TPR Group surely

knows. A "close corporation" is a special type of entity that requires specific provisions in the

corporation's charter contained in 8 *Del. C.* § 342, which are nowhere to be found in the Trans-

Resources charter (and are not alleged to be). *See Reis v. Hazelett Strip-Casting Corp.*, 28 A.3d

442, 451 (Del. Ch. 2011) (noting that the company "was simply a closely held corporation in the

generic sense").

*Second*, the TPR Group offer no authority for the proposition that Arie, as a purported

proxy holder, owed a duty by virtue of any "superior knowledge of essential facts render[ing]

non-disclosure inherently unfair." (Opp'n Br. at 22). Indeed, in the only case cited by the TPR

Group in support of their position, the Appellate Division *dismissed* the plaintiff's claims, hold-

ing that "there was no duty to disclose." *Barrett v. Freifeld*, 908 N.Y.S.2d 736, 738 (2d Dep't

2010) (cited in Opp'n Br. at 22).

*Third*, if someone happens to be an executive, but breaches a duty solely in his personal

capacity or "outside the scope of his agency," the corporation the executive serves cannot be held

liable – precisely because the executive is acting outside the scope of his employment. *See Ar-

nold v. Soc'y for Sav. Bancorp., Inc.*, 678 A.2d 533, 539 (Del. 1996) (rejecting argument that

corporate entity could be liable for the actions of its directors because, among other things,

"[d]irectors, in the ordinary course of their service as directors, do not act as agents of the corpo-
ration. . . .") (citations omitted); *see also McArthur v. J.M. Main St., Inc.*, 847 N.Y.S.2d 233, 234
(2d Dep't 2007) (dismissing action to recover for alleged wrongs determined, as a matter of law,
to be outside scope of the employment). The TPR Group offer no case law or other authority
that would allow them to sidestep this hornbook rule by pleading alleged non-corporate fiduciary
duties, and then claiming that the corporation aided and abetted a breach by the executive of
those duties.

In this respect, the Opposition Brief improperly relies on allegations that appear nowhere
in the Complaint, and are raised here for the very first time. For instance, the TPR Group argue
– without citation to the Complaint – that "Arie was aware for months that the Trump Group was
about to foreclose on the Sagi Trust Shares, and yet he actively took steps to conceal this infor-
mation from Cross-Claimants, and indeed tried to misappropriate the Sagi Trust Shares for his
own benefit." (Opp'n Br. at 22). Also without citation to the Complaint, the TPR Group claim
that "[Trans-Resources'] CEO Dowd and its attorney Lentz actively collaborated with Arie on
his 'shock and awe' scheme against Sagi" and conclude (without citation) that "Arie could not
have gotten away with breaching these duties without the substantial assistance of TRI, including
its CEO Dowd. . . ." (Opp'n Br. at 22-23). In fact, Lentz was *not* acting as company counsel;
he was acting as Arie's personal counsel. *See* Ex. 2, *TR Investors, LLC v. Genger*, C.A. No.
3994-CS, Tr. Rul'g at 4-5 (Del. Ch. Sept. 18, 2009) ("I don't believe a reasonable reading of the
document permits of the construction that the lawyer involved was representing anyone other
than Mr. Genger personally. This is not at all written in a way that suggests that it is for the ben-
efit of the entity and all of its stakeholders. It is entirely written as a partisan piece of strategic
advice.") (emphasis added). And, Dowd – who the TPR Group acknowledges was Arie's "'loyal
subordinate'" – also was acting on behalf of Arie's personal interests and not for the benefit of

16

Trans-Resources. (*See* Opp'n Br. at 22 (citing *TR Investors, LLC v. Genger*, 2010 WL 2901704, at \*7).

Even were these newly minted assertions accurate (they are not), they must be ignored. *See MediaXposure Ltd. (Cayman) v. Omnireliant Holdings, Inc.*, 918 N.Y.S.2d 398, 2010 WL 4225939, at \*5 (N.Y. Sup. Ct. Oct. 25, 2010) (TABLE) (denying plaintiffs' attempt "to amend the complaint through an opposition brief, which is not permissible. . . ."); *see also Hicinbothem v. Natural Golf Corp.*, 697 N.Y.S.2d 760, 761 (3d Dep't 1999) (affirming dismissal where plaintiffs relied on allegation made in their opposition brief but not the complaint).

## III. THE COMPLAINT FAILS TO STATE CLAIMS FOR BREACH OF THE STOCKHOLDERS AGREEMENT.

In their opening brief, the Trump Group established that the TPR Group have no standing to enforce the Stockholders Agreement and have not sufficiently pleaded a cause of action for breach of the Stockholders Agreement. (*See* Trump Br. at 17-22). In the Opposition Brief, the TPR Group do not rebut that the Sagi Trust lacks standing, misreads the Stockholders Agreement as a matter of law and fails to provide any causal link between the alleged breaches of Sections 1.5, 2.2 and 2.4 of the Stockholders Agreement and its conclusory claims of damages.

*First*, the TPR Group improperly suggest that the Sagi Trust has standing under Section 6.2 of the Stockholders Agreement because it is "binding upon, and shall inure to the benefit of, the parties hereto, their legal representatives, and transferees in accordance with this Agreement, except as otherwise set forth herein." (Opp'n Br. at 23). But the Sagi Trust is neither a party to the Stockholders Agreement, nor a Permitted Transferee therein, and because the purported transfer to the Sagi Trust was void, it never became a stockholder. (*See* S.A. § 2.1; Dellaportas Aff. Ex. I, ¶ 4-5).

*Second*, the TPR Group cite language from the introductory section to the Court of Chancery's July 2010 opinion for their claim that Arie Genger personally, and not TPR, breached the

17

Stockholders Agreement. (Opp'n Br. at 23-24). This argument further reflects a willingness to misstate – and even ignore – that court's findings that TPR breached the agreement. (*See, e.g.*, Compl. ¶ 17: noting "*TPR* agreed to proceed with the 2004 Transfers"). *See also TR Investors, LLC v. Genger*, 2013 WL 603164, at *1 ("[T]he transfer of the Trans-Resources stock out of TPR *violated the terms of the Stockholders Agreement that TPR had signed* with the Trump Group.") (emphasis added).

*Third*, the Opposition Brief reiterates the conclusory allegation that "TRI . . . breach[ed] the Stockholders Agreement" by not providing "information" about the Funding Agreement. (Opp'n Br. at 23-24). But the Stockholders Agreement on its face limits any disclosure obliga-tions under Section 1.5 to only three types of "financial information": (i) "annual, quarterly and monthly Company financial statements"; (ii) "Company projections"; and (iii) "material reports from the Company to TPR regarding the Company's performance or prospects." (S.A. § 1.5). No matter how one parses the language of Section 1.5, the proposed Funding Agreement and re-lated negotiations do not fall within any of these limited categories. The proposed Funding Agreement was not a "financial statement" for which "information" was required; it did not con-tain "Company projections"; and it was not a "material report" sent to TPR concerning "the Company's performance or prospects." (*Cf.* S.A. § 1.5).

The TPR Group cannot rewrite the contract to manufacture a breach for non-disclosure of a non-existent agreement. The plain meaning of the Stockholders Agreement controls, and under New York law, where, as here, "the agreement was negotiated by sophisticated and well-counseled parties, courts are 'extremely reluctant to interpret an agreement as impliedly stating something which the parties have neglected to specifically include . . . .'" *Worcester Creameries Corp. v. City of N.Y.*, 861 N.Y.S.2d 198, 201 (3d Dep't 2008) (citation omitted). Thus, there could be no breach by Trans-Resources for non-disclosure, even if TPR had been a stockholder.

IV.     **THE COMPLAINT FAILS TO STATE A CLAIM AGAINST TRANS-
RESOURCES FOR TORTIOUS INTERFERENCE WITH THE TRANSFER
AGREEMENT.**

In the Trump Brief, the Trump Group established that (i) the Sagi Trust cannot recover

for tortious interference of contract where the underlying contract is void, and (ii) the Complaint

does not credibly allege the elements of a claim for tortious interference with a contract. (Trump

Br. at 22-23).

A tortious interference claim must allege (1) the existence of a valid contract between the

plaintiff and a third party, (2) the defendant's knowledge of the contract, (3) the defendant's in-

tentional procurement of the third party's breach of the contract without justification, (4) actual

breach of the contract by the third party, and (5) resulting damages. *See Lama Holding Co. v.

Smith Barney, Inc.*, 88 N.Y.2d 413, 424 (N.Y. 1996). (*See also* Trump Br. at 23-24).

The Delaware courts ruled that the 2004 transfers are void. Therefore, the Transfer Doc-

uments and 2004 Voting Trust Agreements are also void and unenforceable. (Rev. Fin. J. IN 10,

12, 14). Void agreements are a legal nullity incapable of being breached, *see 420 E. Assocs. v.

Kerner,* 438 N.Y.S.2d 316, 318 (1st Dep't 1981) (quoting 9 N.Y. Jur., Contracts § 7) ("A void

contract is no contract at all; it binds no one and is more a nullity."), and, therefore, cannot sup-

port a tortious interference claim.

The TPR Group also have never pleaded that the Transfer Agreement was enforceable, and

it is black-letter law there is no cause of action for tortious interference with unenforceable con-

tracts. *See Nixon Peabody LLP v. de Senihles, Valsamdidis, Amsallem, Jonath, Flaicher Assocs.,*

873 N.Y.S.2d 235, 2008 WL 4256476, at *10 (N.Y. Sup. Ct. 2008) (TABLE) ("These allegations

would not state a cause of action for tortious interference with either existing or prospective contrac-

tual or economic relations because the July 2007 agreement is unenforceable . . . ."); *Savannah Bank*

*v. Sav. Bank of Fingerlakes,* 691 N.Y.S.2d 227 (4th Dep't 1999) (accord); *Jaffe v. Gordon,* 658

N.Y.S.2d 612 (1st Dep't 1997) (accord).[7]

In the Opposition Brief, the TPR Group object to the Trump Group's argument that

Article 10 of the Stock Purchase Agreement provides an acknowledgment that the 2004 Trans-

fers might not be valid. (Opp'n Br. at 26). The Court need not take the Trump Group's word for

it; the Delaware Supreme Court has so held. (*See* Sup. Op. at 196 (noting, in Article 10, "both

the purported transferor (TPR) and the purported transferee (the Sagi Trust) agreed on a mecha-

nism whereby the Trump Group's share acquisition would be fully protected if the 2004 Trans-

fers were determined to be void")).

For the foregoing reasons, and those in the Trump Brief, the claim for tortious interfer-

ence should be dismissed.

## V.   THE COMPLAINT FAILS TO STATE A CLAIM AGAINST TRANS-RESOURCES FOR TORTIOUS INTERFERENCE WITH PROSPECTIVE BUSINESS RELATIONS.

In the Trump Brief, the Trump Group explained that "[a] claim for tortious interference

with prospective business advantage must allege that:  (a) the plaintiff had business relations

with a third party; (b) the defendant interfered with those business relations; (c) the defendant

acted with the sole purpose of harming the plaintiff or by using unlawful means; and (d) there

was resulting injury to the business relationship." (Trump Br. at 25).  Moreover, "[w]here there

has been no breach of an existing contract, but only interference with prospective contract

rights ... plaintiff must show more culpable conduct on the part of the defendant." (Trump Br. at

25).  The Trump Brief demonstrated that the TPR Group failed to allege these elements ade-

quately because the Sagi Trust and the Trump Group had no business relations before August 21,

---

[7]      The TPR Group's only cited authority, *DePetris & Bachrach, LLP v. Srour*, 898 N.Y.S.2d 4, 7 (1st Dep't 2010), supports the Trump Group's position. The *Srour* court held that a claim for tortious interference with a con-tract will fail in the absence of a viable contract. *Id.*

2008; the TPR Group did not allege that the Trump Group acted with the "sole purpose of harming" the TPR Group; and the TPR Group could not claim that it suffered an injury to any relationship with the Trump Group, given that the Trump Group engaged in business relations with the TPR Group only after the proposed Funding Agreement did not materialize. (Trump Br. at 25-27).

In response, the TPR Group maintain that, but for Trans-Resources' "wrongful conduct," the Trump Group and the Sagi Trust "would have remained co-owners." (Opp'n Br. at 26). But such unsupported speculation cannot support a claim. *See Procapui-Productores de Camaroes de Icapui Ltda. v. Leyani*, No. 07-CV-6627 (BSJ), 2010 WL 2720584, at *2 (S.D.N.Y. June 22, 2010) ("A court need not defer to sweeping and unsupported allegations and conclusions" in assessing adequacy of complaint). Indeed, the portion of Mark Hirsch's testimony cited by the TPR Group undercuts any assertion that the Sagi Trust would have remained a co-owner. (Opp'n Br. at 8). At the time the proposed Funding Agreement was being discussed, everyone recognized that the Trump Group could exercise their purchase rights, which is evidenced by Arie's statement to the Trump Group, cited by TPR, that "it's even a better idea if you give me an option to buy whatever shares [you] end up getting from Sagi." (Opp'n Br. at 8 (quoting Dellaportas Ex. A at 18)). The TPR Group also assert that as of August 6, 2008, "this deal was still in place." (*Id.* at 8 (citing Dellaportas Ex. X)).

In any event, the TPR Group's rank speculation is also fundamentally implausible, given that the Stockholders Agreement was designed to prevent exactly what the TPR Group suggest, without support, would have occurred:  the Trump Group's being forced to accept Sagi or his affiliates as co-owners of Trans-Resources. It is illogical to suggest that Trans-Resources could now be liable to the TPR Group for somehow failing to accommodate the exact state of affairs that the parties to the Stockholders Agreement, including TPR, contracted to avoid.

## VI.   THE COMPLAINT FAILS TO STATE A CLAIM FOR CONTRIBUTION

The Trump Brief established that the TPR Group have no basis for a claim of contribution against the Trump Group and Trans-Resources. (Trump Br. at 27-28). Arie and Orly settled with the Trump Group and Trans-Resources in June 2013. (*Id.* at 27). In connection with that settlement, on July 1, 2013, the Court entered the Second Amended Stipulation of Discontinuance with Prejudice. (*Id.* at 27-28). The Second Amended Stipulation of Discontinuance constitutes a release of all claims between the settling parties within the meaning of *General Obligations Law* § 15-108. (*Id.* at 28).

Nevertheless, the members of the TPR Group argue that they remain entitled to contribution for a subset of claims brought by Arie and Orly prior to the settlement against Trans-Resources and the Trump Group, and for unjust enrichment claims against TPR and Sagi. (*See* Opp'n Br. at 28). They are wrong. N.Y. Gen. Oblig. § 15-108(b) relieves an alleged tortfeasor "from liability to any other person for contribution as provided in article fourteen of the civil practice law and rules" when such alleged tortfeasor has settled with any injured parties. (*See also* Trump Br. at 28-29). In the face of this provision, the TPR Group attempt to argue that "[t]he 'unjust enrichment' [claim that] Arie and Orly were asserting against [Trans-Resources] and the Trump Group" was separate from the "surviving 'unjust enrichment' claim." (Opp'n Br. at 29). In actuality, there was ***only one count of unjust enrichment*** brought by Arie and Orly against the Trump Group, Trans-Resources and members of the TPR Group. *See* Third Amended and Supplemental Complaint, *Genger v. Genger*, Index No. 651089/2010 (N.Y. Sup. Ct. Sept. 20, 2011) [D.I. 112].

The TPR Group also argue that they remain entitled to contribution for certain claims brought against TPR and Sagi. Despite failing to cite any binding agreement or decision, the TPR Group suggest for the first time that the confidential settlement agreement ***might*** only dismiss Orly's individual claims against the Trump Group, but not resolve the Orly Trust's claims

22

against the Trump Group and the TPR Group. (Opp'n Br. at 28). These allegations fail because they were not alleged in the Complaint. *See Mayer v. Sanders*, 695 N.Y.S.2d 593, 595 (2d Dep't 1999) (dismissing because there were no factual allegations in the complaint sufficient to state a cause of action for indemnification and contribution); *see also supra*.

Moreover, the argument is counterfactual. This Court has already held that certain of Orly's claims in this action, including the remaining claims, are derivative in nature, and may be maintained by Orly on behalf of the Orly Genger 1993 Trust. *See Genger v. Genger*, 966 N.Y.S.2d 346, 2013 WL 221485, at *6 (N.Y. Sup. Ct. Jan. 3, 2013) (TABLE) (citing *Genger v. Genger*, No. 109749/2009 (N.Y. Sup. Ct. June 28, 2010)). In settling the claims among them, the Trump Group, Trans-Resources, Orly and Arie agreed to the dismissal of all claims presently pending against one another. This agreement is memorialized in the Second Amended Stipulation of Discontinuance. Accordingly, under N.Y. Gen. Oblig. § 15-108(b), the Trump Group and Trans-Resources have no liability to the TPR Group for contribution.

## VII.   THE COMPLAINT FAILS TO STATE A CLAIM FOR INDEMNIFICATION.

Although the TPR Group seek implied indemnification from the Trump Group and Trans-Resources for claims brought against the TPR Group by Arie and Orly, dismissal is required because the Complaint fails to state a claim for common law indemnification. (*See* Trump Br. at 27-30).

A cause of action for implied indemnification requires either (a) a showing that plaintiff and defendant owed a duty to third parties, and that plaintiff discharged the duty which, as between plaintiff and defendant, should have been discharged by defendant, or (b) vicarious liability without actual fault on the part of plaintiff (the proposed indemnitee). (Trump Br. at 28). This Court has already held that a party who has actually participated to some degree in the wrongdoing cannot receive the benefit of the implied indemnification doctrine. (*See id.* at 29).

The only remaining claims against TPR and Sagi are claims for breach of fiduciary duty (against only Sagi), and unjust enrichment (against both Sagi personally and TPR) for taking the proceeds of TPR's sale of those Trans-Resources shares that were purportedly transferred to the Orly Trust and to Arie.[8]  These were acts in which the TPR Group actively participated (and the TPR Group do not suggest otherwise), and in which neither the Trump Group nor Trans-Resources had any involvement other than being the source of the sale proceeds.  As a consequence, and as further detailed in the Trump Brief (*see* Trump Br. at 29), the TPR Group are not entitled to benefit under the implied indemnification doctrine, and the claims for such should be dismissed.

Additionally, the TPR Group's claim should be dismissed because the Complaint fails to allege that (i) the TPR Group together with any member of the Trump Group or Trans-Resources collectively owed a duty to Arie and Orly that was breached, or (ii) even if such a duty existed, the TPR Group discharged such duty even though, as between the TPR Group, on the one hand, and the Trump Group and Trans-Resources, on the other hand, that duty should have been discharged by the Trump Group and Trans-Resources.  (Trump Br. at 29).  Nor could it, as the Trump Group, including Trans-Resources, had no say in, or any knowledge of, how the proceeds received by TPR for the sale of Trans-Resources shares was to be divided among the feuding members of the Genger family.  Rather, the TPR Group offers only the conclusory allegation that "[t]o the extent [the TPR Group] incur liability on [Arie's and Orly's] surviving claims, the Trump Group and [Trans-Resources] should indemnify [the TPR Group]. . . ." (Compl. ¶ 95), which is insufficient to maintain a claim for implied indemnification.  (Trump Br. at 29).

---

[8]        The Court already dismissed all of Arie's and Orly's claims against the Sagi Trust. *See Genger v. Genger*, 2013 WL 221485, at *21.

In an ill-conceived effort to cure its legal and pleading insufficiencies, the TPR Group attempt to gap-fill the Complaint's deficits by providing an addendum, couched as its opposition brief, replete with facts and allegations not supported by the Complaint or reality.[9]  For instance, in response to the Trump Group's argument that the TPR Group failed to plead a duty (Trump Br. at 29-30), the TPR Group now argue that:

> TPR and Sagi are being sued for one and only one thing – their decision to settle the Trump Group's lawsuit by agreeing to the August 22, 2008 Stock Purchase Agreement and Side Letter Agreement. . . . [S]ettlement was needed because: (a) TRI "reneged" on the Funding Agreement; and (b) the Trump Group then "retaliated" against TRI's management, in particular Arie, by filing suit against TPR to undo the 2004 sale of the Sagi Trust Shares to the Sagi Trust. In other words, Cross-Claimants are being sued because, through no fault of their own, they were caught in the cross-fire between TRI and the Trump Group, and settled. Either TRI was right to renege, or the Trump Group was right to retaliate. But either way, one of them breached a duty which it would be inequitable to shift unto either TPR or Sagi.

(Opp'n Br. at 29-30) (citations omitted).  None of this can be found in the Complaint.  But in any case, this statement – like the Complaint – fails to allege any vicarious liability or collective duty owed by both the TPR Group and the Trump Group but discharged by members of the TPR Group.  Even if it did, the statement once again ignores the fundamental notions that it was TPR's (and its President, Sagi's) conscious decisions to (i) settle the litigation with the Trump Group by selling one block of its Trans-Resources stock for a price that they explicitly acknowledged was "fair, reasonable and acceptable to each" of TPR and Sagi Genger, and (ii) sell the other two blocks of its Trans-Resources stock to which Arie and the Orly Trust laid claim.  Of course, TPR (and Sagi, its president) had other options at the time, including defending the law-

---

[9]      The TPR Group cite the dissent in *Rosado v. Proctor & Schwartz, Inc.*, 483 N.Y.S.2d 271, 279 (1st Dep't 1984), claiming it was affirmed. (Opp'n Br. at 29).  What the Court of Appeals in *Rosado* actually affirmed was a finding that no implied indemnification existed because the damages that the third party plaintiff was "compelled to pay stems from its own wrong and there is not unjust enrichment on [the third party defendants'] part." *Rosado v. Proctor & Schwartz, Inc.*, 66 N.Y.2d 21, 27 (N.Y. 1985).  A similar result would be warranted here if the TPR Group is found liable to Arie and/or Orly based upon the TPR Group's own wrongdoing.

suit brought by the Trump Group using the same theories the TPR Group take here (*i.e.*, that 2004 Transfers were valid because Arie, but not TPR, failed to give notice, or that the Sagi Trust validly owned the shares). Instead, TPR gladly elected to take the offer on the table and lead the Trump Group to believe that the TPR Group were more than satisfied, and that the Trump Group were now insulated by at least one faction of the Genger family from any further involvement in that family's ongoing feud. Having chosen their path, TPR and Sagi – and they alone – should be required to bear the burden of their misconduct.[10]

## VIII.   THE TPR GROUP'S CLAIMS ARE TIME-BARRED.

### A.   Both Tortious Interference Claims Are Barred By The Statute Of Limitations

In the Trump Brief, the Trump Group established that the Sixth Counterclaim and Seventh Counterclaim – for tortious interference with the Transfer Agreement and for tortious interference with business relations, respectively – should be dismissed due to the applicable limitations periods. (Trump Br. at 23 n.22 & 25 n.24). Specifically, the Sixth Counterclaim, brought in 2013, but which is alleged to have occurred in 2008, should be dismissed because it is subject to a three-year statute of limitations. *See Buller v. Giorno*, 868 N.Y.S.2d 639 (1st Dep't 2008) (affirming dismissal of claim for tortious interference of contract due to the expiration of the statute of limitations). Likewise, the Seventh Counterclaim – a tort claim – brought in 2013 but alleged to have occurred in 2008, is barred by a three-year statute of limitations and should be dismissed. *See Susman v. Commerzbank Capital Mkts. Corp.*, 945 N.Y.S.2d 5, 7-8 (1st Dep't 2012). In its opposition, the TPR Group does not appear to contest that these limitations periods

---

[10]      *In re T.J. Ronan Paint Corp.*, 469 N.Y.S.2d 931, 936 (1st Dep't 1984), cited by the TPR Group, does not address indemnification of any kind, let alone implied indemnification of the kind the TPR Group seeks in the Complaint. Rather, that case stands for the unremarkable proposition that the relationship among stockholders in a "close corporation" is akin to that of partners. As noted above, Trans-Resources, a Delaware entity, is not a "close corporation" under Delaware law. Even if it were, the TPR Group's argument does not explain (a) how such a relationship constitutes the vicarious relationship required for implied indemnification or (b) how TPR or Sagi discharged a duty that should have been discharged by the Trump Group.

are applicable.[11] Thus, in addition to the reasons set forth above and in the Trump Brief, the

Sixth and Seventh Counterclaims also should be dismissed as time-barred.

### B.   The Fraud Claims And The Breach Of Contract Claims Are Barred By The Statute Of Limitations

The TPR Group devote their focus upon the Trump Group's argument that CPLR 213(8)

requires claims of fraud to be commenced no more than six years from the date the claim ac-

crued or two years from the time the fraud was discovered. (Opp'n Br. at 13-15).  In the Trump

Brief, the Trump Group argued that the First Counterclaim (filed in April 2013) is time-barred

and should be dismissed because any representation (and the only representation alleged in the

Complaint is Arie's statement in the MSA) about TPR's ability to convey its Trans-Resources

shares was made more than six years ago (in 2004) and was discovered more than two years ago

(in 2008) by the TPR Group when TPR sold its Trans-Resources shares to the Trump Entities.

(Trump Br. at 13).

In response, the TPR Group argue that the First Counterclaim: (i) at a minimum, relates

back to Arie's Second Amended and Supplemental Complaint (the "Arie Complaint"), which

was filed on September 22, 2010 (see Opp'n Br. at 13-14); (ii) did not accrue until August 2008,

"when the Trump Group exercised their Purchase Rights under the Stockholders Agreement"

(see Opp'n Br. at 14); or (iii) accrued, on some equitable basis, in 2011-12, when the TPR Group

claim to have "realize[d] the full scope of the wrongful scheme against them" because, among

other reasons, their discovery was somehow impeded due to Arie's spoliation efforts (see Opp'n

Br. at 15).  These arguments miss their mark.

*First*, the alleged basis for the First Counterclaim is Arie's representation in the MSA re-

garding TPR's ability to transfer its Trans-Resources shares – a representation made in 2004

---

[11]   The TPR Group glibly lump all of their claims together in defining them as the "Cross Claims." (Opp'n Br. at 1). Each of their claims, however, must be reviewed to determine whether they are barred by the applicable stat-
*(cont'd)*

(more than six years ago) that was discovered by the TPR Group in 2008 (more than two years ago) when TPR and the Sagi Trust negotiated the Stockholders Agreement with the Trump Entities. (Trump Br. at 13). Thus, even if the First Counterclaim relates back to the Arie Complaint (and it does not), the alleged conduct occurred outside time frames permitted by CPLR 213(8).

*Second*, the Trump Group are aware of no authority – and the TPR Group cite none – for the proposition posited by the TPR Group that a statute of limitations is tolled until a plaintiff completely discovers the "full scope" of an alleged wrong. Rather, established New York law stands completely to the contrary. *See Watts v. Exxon Corp.*, 594 N.Y.S.2d 443, 444 (3d Dep't 1993) ("[H]aving positive knowledge of fraud is not required to commence the running of the two-year Statute of Limitations. In order to start the limitations period regarding discovery, a plaintiff need only be aware of enough operative facts 'so that, with reasonable diligence, she could have discovered the fraud. . . .' In other words, all that is necessary are sufficient facts to suggest to a person of ordinary intelligence the probability that they may have been defrauded. . . .") (citations omitted); *see also Aldrich v. Marsh & McLennan Cos., Inc.*, 861 N.Y.S.2d 30, 31 (1st Dep't 2008) (merely requiring notice and ability with reasonable diligence to discover an alleged fraud, and holding that inquiry notice of a fraud may be supported by information in the public domain); *cf.* CPLR 213(8) (incorporating reasonable diligence standard).[12]

Similarly, the Trump Group established in the Trump Brief that the Third Counterclaim for breach of the Stockholders Agreement was time-barred because the alleged breach occurred in 2004, more than six years prior to the commencement of TPR's claim. (*See* Trump Br. at

---

*(cont'd from previous page)*

ute of limitations. Any argument lumping them together should be rejected out of hand.

[12]     Arie's deletion of certain documents is irrelevant to the analysis and does not create a basis for some sort of equitable tolling, as the TPR Group suggest. This is particularly the case where the members of the TPR Group had knowledge that Arie's representation was false.

18). In its opposition, the TPR Group merely recycle their same arguments made with respect to the First Counterclaim. (Opp'n Br. at 14-15). These arguments fail for the reasons noted above.

The TPR Group also argue that their breach of contract claim did not accrue until the Trump Group "exercised their Purchase Rights" under the Stockholders Agreement. (Opp'n Br. at 14). Even assuming the TPR Group are not factually mistaken, their argument is wrong as a matter of law. *See, e.g., St. George Hotel Assocs. v. Shurkin*, 786 N.Y.S.2d 56, 57 (2d Dep't 2004) (rejecting argument that cause of action accrues when damages are allegedly sustained, and holding that the cause of action accrued and began to run "upon the breach"). Such a claim accrues at the time of breach, *see id.*, here, in 2004 when TPR improperly transferred the shares.[13]

For the foregoing reasons, and the reasons discussed in the Trump Brief, the TPR Group's claims should be dismissed.

## IX. THE TPR GROUP SHOULD NOT BE GRANTED LEAVE TO REPLEAD.

The TPR Group's request to re-plead should be seen for what it is: a further attempt to keep litigating baseless claims. "[L]eave to amend a pleading should not be granted where the proposed amendment is 'palpably insufficient'. . . ." *Freeman v. City of N.Y.*, 975 N.Y.S.2d 141, 144 (2d Dep't 2013) (citations omitted). Moreover, the Court may not grant leave to amend where the proposed amendment lacks merit, including to the extent it is shown that a party possesses no cause of action. *See Oneida Indian Nation v. Hunt Constr. Grp., Inc.*, 970 N.Y.S.2d 156, 157 (4th Dep't 2013) ("We agree with plaintiff that Supreme Court erred in granting the motion inasmuch as it is well settled that such leave 'should not be granted where, as here, the proposed amendment lacks merit. . . .'") (citations omitted). For the reasons set forth herein and

---

[13]     The TPR Group rely on *Brooklyn Union Gas Co. v. Interboro Surface Co., Inc.*, 449 N.Y.S.2d 274, 275 (2d Dep't 1982) in aid of their argument that their alleged harm accrued after August 8, 2008, when the Trump Group invoked their Purchase Rights. The Second Department, however, has subsequently held, that *Brooklyn Union Gas Co.* "should not be followed. . . ." *St. George Hotel Assocs.*, 786 N.Y.S.2d at 57 (citations omitted).

in the Trump Brief, there is no merit to the causes of action alleged in the TPR Group's Complaint and any proposed amendment of their claims against the Trump Group would be "palpably insufficient." Accordingly, the Court should deny any request for leave to amend the Complaint.[14]

## CONCLUSION

For the reasons set forth above as well as those set forth in their Trump Brief, Trans-Resources and the Trump Group respectfully request that the Court dismiss the Complaint, including the First, Second, Third, Sixth, Seventh and Tenth Counterclaims against them, with prejudice and grant such other relief as is just and proper.

Dated: New York, New York
      April 17, 2014

Of Counsel:
Thomas J. Allingham II
Anthony W. Clark
Douglas D. Herrmann
Christopher M. Foulds
One Rodney Square
P.O. Box 636
Wilmington, Delaware  19899-0636
(302) 651-3000
(302) 651-3001 (facsimile)

Respectfully submitted,

SKADDEN, ARPS, SLATE,
    MEAGHER & FLOM LLP

By: /s/ John Boyle
William P. Frank
John Boyle
Four Times Square
New York, New York  10036
(212) 735-3000
(212) 735-2000 (facsimile)

*Attorneys for Glenclova Investment Co.,*
*TR Investors, LLC, New TR Equity I, LLC,*
*New TR Equity II, LLC, Jules Trump,*
*Eddie Trump, Mark Hirsch and*
*Trans-Resources*

---

[14]    The TPR Group cite *Cerra v. Scher Fabrics, Inc.*, 748 N.Y.S.2d 483 (1st Dep't 2002), for the proposition that the TPR Group may be granted leave to amend.  (Opp'n Br. at 30).  However, unlike here, the *Cerra* court did not face a situation in which the plaintiff's claims were completely devoid of any merit.

FILED: NEW YORK COUNTY CLERK 04/03/2015 12:31 PM

INDEX NO. 651089/2010

NYSCEF DOC. NO. 1275

RECEIVED NYSCEF: 04/03/2015

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK:  CIVIL TERM:  **PART:  12**
-------------------------------------------X
ARIE GENGER and ORLY GENGER, in her
individual capacity and on behalf of
THE ORLY GENGER 1993 TRUST,

                              Plaintiff(s),

                                                  INDEX NO.
               -against-                          651089/10

SAGI GENGER, TPR INVESTMENT ASSOCIATES,
INC., DALIA GENGER, THE SAGI GENGER 1993 TRUST,
ROCHELLE FANG, individually and as trustee
of THE SAGI GENGER 1993 TRUST, GLENCLOVA
INVESTMENT COMPANY, TR INVESTORS, LLC.,
NEW TR EQUITY I, LLC, NEW TR EQUITY II, LLC,
JULES TRUMP, EDDIE TRUMP and MARK HIRSCH,

                              Defendant(s).
-------------------------------------------X
SAGI GENGER, individually and as assignee of
THE SAGI GENGER 1993 TRUST, and TPR
INVESTMENT ASSOCIATES, INC.,

                    Cross-Claimants, Counterclaimants
                    and Third-Party Claimants,

               -against-

ARIE GENGER, ORLY GENGER,
GLENCOVA INVESTMENT COMPANY,
TR INVESTORS, LLC, NEW TR EQUITY I, LLC,
NEW TR EQUITY II, LLC., JULES TRUMP,
EDDIE TRUMP, MARK HIRSCH,
TRANS-RESOURCES, INC., WILLIAM
DOWD, and THE ORLY GENGER 1993 TRUST,

                    Cross-Claim, Counterclaim and/or
                    Third-Party Defendants.
-------------------------------------------X
                              80 Centre Street
                              New York, New York 10007
                              March 25, 2015

B E F O R E:

THE HONORABLE BARBARA JAFFE,
                              J U S T I C E

                    *Eric Allen*
              *Official Court Reporter*

1

2   **A P P E A R A N C E S:**

3   MITCHELL, SILBERBERG & KNUPP, LLP
     Attorneys for Arie Genger
4   12 East 49th Street
     New York, New York 10017
5   BY:  PAUL D. MONTCLARE, ESQ.

6

7   ZEICHNER ELLMAN & KRAUSE, LLP
     Attorneys for Plaintiff Orly Genger
8   1211 Avenue of The Americas
     New York, New York 10036
9   BY:  YOAV M. GRIVER, ESQ.

10

11   JUDITH LISA BACHMAN, ESQ.
     Attorney for Defendant Dalia Genger
12   254 South Main Street
     New City, New York 10956

13

14
     MORGAN, LEWIS & BOCKIUS, LLP
15   Attorneys for Defendant TPR Investments
     101 Park Avenue
16   New York, New York 10178
     BY:  JOHN DELLAPORTES

17

18

19

20

21

22

23

24

25

26

1

2          THE COURT:  So, this is your motion,

3    Ms. Bachman.

4          MS. BACHMAN:  It is, your Honor.

5          Good morning.

6          THE COURT:  Good morning.

7          MS. BACHMAN:  So, this motion has been pending

8    for a long time, so I want to make sure that the Court

9    is aware of sort of the context in which our --

10         THE COURT:  What happened in surrogates?

11   Nothing yet from --

12         MS. BACHMAN:  It has not -- Dalia is still the

13   trustee.  The court has required further proceedings

14   with regard to making sure that the Sagi Trust is

15   included in the matter, so it remains at the status quo

16   that Dalia is still the trustee.

17         THE COURT:  Do you know when -- is there any

18   clue as to when that case is going to be decided?

19         MS. BACHMAN:  I do not know, your Honor.

20         MR. GRIVER:  Your Honor, the only relevant

21   happening, I think, in the case, is that the surrogate

22   court appointed a guardian for the children who are the

23   remainder -- continuing remainderment for the Sagi

24   trust and he filed, I believe last week, position

25   papers saying that he agrees with our position that

26   Dalia should be removed as trustee and that she has

4

1

2   violated her obligations.

3            THE COURT:  Okay, but that's not part of the

4   record before me right now.

5            MR. GRIVER:  That is -- no.  The remainderment

6   for the -- excuse me.  The remainderment for the Orly

7   Trust.

8            THE COURT:  Yes.  That I understand.

9            MR. GRIVER:  We can certainly file it with the

10  Court.  We think it is a subsequent document that has

11  relevancy to these proceedings if your Honor thinks so.

12           MS. BACHMAN:  And, obviously, that issue hasn't

13  been adjudicated and, as the Court noted, is not part

14  of the record.

15           So, with that caveat in mind, I think it is

16  important to understand the context of what's happened

17  here.

18           When we brought this motion, I think, back in

19  August of last year, we had not yet seen the settlement

20  agreement and the Federal Court had not yet opined on

21  the effect that they believed that the settlement

22  agreement had on what Orly gained from the Orly trust

23  shares.  So, as part of this motion, I have included

24  Judge Keenan's two decisions which opine and conclude

25  that the settlement agreement is a monetization of

26  Orly's -- the Orly Trust shares.  Essentially, she

1

2         traded the trust shares as part of the settlement and

3         acknowledged that the Trump Group is the owner --

4              THE COURT:  Was it in Keenan's decision or was

5         it Forest's?

6              MS. BACHMAN:  I apologize, thank you.  Yes,

7         Forest.  I could tell by your face that I had gone

8         astray, so I appreciate it.

9              Judge Keenan's decision --

10             THE COURT:  No, Judge Forest.

11             MS. BACHMAN:  Sorry, Judge Forest's decision.

12        Delete Keenan from the record.

13             So, based on that decision, it is now our

14        understanding with that decision that the settlement

15        agreement was basically the exchange:  The Orly Trust

16        interest in the shares for a whole bunch of money.

17             The Trump Group had been consistent before this

18        Court in acknowledging that they viewed the settlement

19        as the settlement of the interest of the Orly Trust

20        shares and that it was an exchange of money for those

21        shares.  They effectuated that and acknowledged that by

22        encouraging and asking the Delaware chancery court to

23        dismiss and acknowledge that the shares now belonged to

24        the Trumps.

25             Orly's attorneys have taken somewhat interesting

26        turns along the way.  Before this Court, when this

Court was hearing the issue of whether it should so order the settlement, Mr. Griver, I believe, argued that, no, we are not settling the trust claims and, in fact, quote, "Dalia can pick up the cudgel."

The Court said in it's decision, look, I can't tell whether the trust shares -- whether the trust claims are dismissed or not as part of the settlement and until I get clarification, you accurately stated, I believe, I cannot tell who the settlement proceeds belonged to. I can't tell whether they belong to the trust or to Orly individually. So, the Court invited the parties to clarify who they viewed as the settling parties and whether the trust had dismissed its claims or not.

None of the settling parties acceded to the Court's invitation and with that ambiguity, we were left to protect the interests of the trust. We brought this motion seeking first for Dalia to be substituted in if claims remained since Orly has stepped back and said that she is no longer prosecuting the case as a derivative plaintiff. And under well-settled New York law, if a derivative plaintiff is no longer prosecuting the action on behalf of the principal, then it is appropriate for a party to be substituted who has an actual interest in protecting that principal. That

1

2      would be, obviously, the trustee of the trust.

3              Likewise, as a second branch and perhaps now

4      more importantly, we simultaneously moved for the

5      settlement proceeds to be paid into court pending an

6      allocation and determination of who that money belongs

7      to and that's why we are before you today.

8              We now have seen the settlement agreement and it

9      seems to confirm and be consistent with the Trump

10     Group's position that they intended to and did settle

11     all of the claims including, most importantly, the

12     trust claims and at the end of the day that's what they

13     bought and paid for:  The trust shares.  And if they

14     bought and paid for the trust shares, the money belongs

15     to the trust.

16              Thank you.

17              MR. ALLINGHAM:  Your Honor, I don't know who

18     should speak next, but I think it would be helpful I

19     should speak next to make clear submissions.

20              MR. GRIVER:  No objection.

21              MR. ALLINGHAM:  Tom Allingham for the Trump

22     Group.

23              The settlement agreement settles claims.  It

24     doesn't buy shares.  The shares had already been

25     purchased as the Delaware court has found, pursuant to

26     an agreement that was entered into back in 2008 and the

1

2       closing on those shares was 2012 or '13, '11, whenever.

3       Those shares had been purchased a long time ago.   There

4       remained claims of the Orly trust against the Trump

5       Group and that's what was settled in the settlement

6       agreement.   We paid money for a release of claims that

7       Arie, Orly and the Orly Trust had against the Trump

8       Group and that's what we paid the money for, so that's

9       point number 1.

10              Point number 2:   I think this is an unusual

11      situation, at least in my experience.   The moving party

12      now agrees with the position that we've taken since the

13      settlement agreement was entered into in June of 2013

14      that among the claims that we purchased a release of,

15      among the claims that we settled were the claims of the

16      Orly Trust and so the relief that is sought -- there

17      were two forms of relief sought in the motion, as

18      Ms. Bachman said.   One was, "I want to intervene to

19      pursue these claims."   That form of relief we oppose.

20      Because those claims have now, as conceded, I think, by

21      everybody -- everybody agrees that they were released,

22      there are no claims currently pending and, in fact,

23      there are no claims that could be pending into which

24      Dalia could intervene.   So, the motion --

25              THE COURT:   There is nothing to --

26              MR. ALLINGHAM:   Correct.   There is nothing

1

2        there, nothing to intervene in, so the motion to

3        intervene should be denied.

4              THE COURT:   It's a motion to be substituted.

5              MR. ALLINGHAM:   To be substituted.   I think of

6        it as an intervention motion, but, yes, your Honor.

7              And I don't think that if you look at the

8        papers, anybody really disputes that.   In Dalia's

9        brief, she says it has now been definitively revealed

10       that Orly settled the Orly Trust's claims against the

11       Trump Group.   In the Sagi submission, not a brief but

12       an affirmation from Mr. DellaPortas, it's the same

13       thing:   "Having finally seen the settlement agreement,

14       it is eminently clear that there is no cudgel for Dalia

15       to pick up.   The claims" -- and these are the claims of

16       the Orly Trust -- "were released, as Mr. Allingham had

17       correctly told the Court in his June 2013 letter."

18             So, where does that leave us?   That leaves us

19       with the second form of relief, which is should any

20       form of relief be entered against the settlement

21       proceeds that have either -- that have either been paid

22       or may in the future be paid pursuant to the settlement

23       agreement.

24             With respect to the 18 or so million dollars --

25       I think it's actually 17 and a quarter million dollars,

26       but the money that's already been paid in cash, we

1

2    don't have it. We have no claim to it. We take no

3    position on that money. The Court may or may not have

4    jurisdiction to enter relief against whoever has got

5    that money, but we don't know who it is. We know who

6    we paid it to, but we don't know who has the money now.

7         With respect to the remaining settlement

8    proceeds that may be paid in the future, that is in the

9    form of two notes; each in the principal amount of 7

10   and a half million dollars.

11        There are a number of conditions that may affect

12   the maturity date of those notes. They have a nominal

13   maturity date of June of 2016 and June of 2017, but

14   they could be accelerated or extended.

15        Also, we have a contractual right to set off any

16   unpaid indemnification amounts under the settlement

17   agreement. In the settlement agreement, we paid not

18   only for releases from Arie, Orly and the Orly Trust,

19   but we also paid -- so that's peace from those three

20   parties -- but we also paid for an indemnification from

21   Arie, Orly and the Orly Trust against any defense

22   costs, settlement payments or judgments in a broad

23   array of actions that could be brought by any Genger

24   family member. So although we couldn't buy complete

25   peace, we tried to buy an insurance policy against the

26   peace that remained out there.

1

2          So, we have a setoff right against -- we have a

3      contractual obligation to pay on those notes.   When

4      that will come due is determined by a lot of factors.

5      When they come due, we have a contractual right of

6      setoff against the $15 million face amount of those

7      notes.

8          And so, with respect to the future payments,

9      what I would say is this:  No payment is due now, so I

10     think any relief on the future payment would be

11     premature.

12         To the extent any relief were to be entered now

13     as to these future payments, it shouldn't be entered

14     against the Trump Group which has a contractual

15     obligation to pay the payee.   It should either be

16     entered in the nature of an in rem remedy against the

17     notes themselves, deliver them to you or whatever, or

18     it should be entered and directed at the payee that

19     we're contractually obligated to pay, rather than to

20     direct it to the Trump Group which would abrogate our

21     contractual obligation to pay under the note.

22         So that's our position.

23              THE COURT:   Thank you.

24              MR. ALLINGHAM:   Thank you, your Honor?

25              THE COURT:   Who is next?   You don't have to

26     stand, Mr. Griver.

1

2          MR. GRIVER: Thank you, your Honor. I am

3     sometimes better when I stand.

4          A lot of times, this case has become somewhat

5     surreal, but I think this motion takes the cake. There

6     is a museum in Cairo, Egypt called the October War

7     Museum that is dedicated to the proposition that Egypt

8     won the 1973 Yom Kippur war. It looks like a museum.

9     You go in, there are exhibits on the second floor, you

10    can watch a film on the third floor. There is a

11    diorama -- it's really nice. It is a moving diorama,

12    360 degrees, all dedicated to the idea that Egypt won

13    that war; right? Only problem is it's not true.

14         So, you go to someone who is at the museum, you

15    know, a guide and you say, well -- but Egypt lost the

16    war. And he says, no, no, but look at that piece of

17    paper, look at that newspaper article where it says it

18    won. Look at this piece of shrapnel. Look at this

19    tank we captured from the Israelis; all of this proves

20    that we won; right? And you can buy T-shirts and

21    everything and it looks real until you really look at

22    it and you realize that they are only talking about the

23    first day of the war and they completely ignore 99

24    percent of what happened; okay?

25         Mr. Allingham gets up here and says, oh, well,

26    we settled with the Trump -- we settled with the Orly

1

2      Trust; right?  Well, you know what?  You have to look

3      at the language of the CSA because the Orly Trust is

4      expressly excluded from the settling parties.

5      Mr. Allingham tried to get the trust claims included

6      and the Orly Trust included --

7              THE COURT:  Which Orly entities settled?  There

8      is three in all, I take it?

9              MR. GRIVER:  No.  There is the AG Group settled

10     so the Brosers settled, Arie settled --

11             THE COURT:  I don't consider them -- the Orly

12     people are Orly individually, Orly as beneficiary of

13     the trust and the Orly Trust; is that right?

14             MR. GRIVER:  Orly settled and it says it right

15     there:  Orly Genger in her individual capacity and in

16     her capacity as beneficiary of the Orly Genger 1993

17     trust.

18             THE COURT:  And as beneficiary.

19             MR. GRIVER:  And as beneficiary.

20             But the Orly Trust itself is expressly excluded

21     from the A.G. Group settling parties and is expressly

22     defined as a member of the nonsettling Sagi Group.

23             THE COURT:  Is that your understanding,

24     Mr. Allingham?

25             MR. GRIVER:  That is Page 3, by the way.

26             MR. ALLINGHAM:  It is, your Honor.  That is the

14

1

2          way the agreement reads.

3               When Justice Feinman in --

4               THE COURT:   That's the end of it.   So the Orly

5          Trust is not settled.

6               MR. GRIVER:   That is the language that he signed

7          in exchange.

8               MR. ALLINGHAM:   It's more complex than that.

9               MR. GRIVER:   You know what else is in that?   Any

10          changes to that have to be in writing, agreed to by all

11          the parties, and we don't agree and there is no

12          writing.   He is talking about what he wanted and there

13          is also a -- where everything, all prior agreements, et

14          cetera, are merged.   There is a merger clause in there,

15          as well.

16               THE COURT:   Oh, no, do I perceive another action

17          or motion?

18               MR. GRIVER:   No, I don't believe so, your Honor,

19          because here's what also happened.   There was a second

20          amended stipulation of dismissal where we crossed out,

21          by hand, because it was mistakenly put in -- crossed

22          out by hand and your Honor was concerned about it and

23          that's why it became the second amended stipulation of

24          dismissal because that language was taken out.   And the

25          language that was taken out was any idea that the Orly

26          Trust settled the claims as part of that confidential

1

2    settlement agreement, the Orly Trust was removed and,

3    indeed, the Orly Trust remained -- the claims of the

4    Orly Trust remained, specifically in that second

5    amended stipulation of dismissal, which allowed the two

6    injunctions -- the injunctions against the Trump Group

7    and the injunctions against everybody else, including

8    Dalia Genger -- to pursue her claims in Delaware --

9         THE COURT:  So you agree with Ms. Bachman on

10   that; that the Orly Trust claims remain and --

11        MR. GRIVER:  The Orly Trust claims remain --

12        THE COURT:  So the only issue remains, of

13   course, whether Dalia should be substituted, which I

14   take it -- but you say the trust claims remained --

15   does everybody agree?

16        MR. GRIVER:  No, it remained.  The second

17   amended stipulation of dismissal, which dismissed

18   Orly's claims as an individual and as a beneficiary is

19   what happened in this court.  As part of that

20   stipulation, the claims of the Orly Trust were not

21   settled -- were not dismissed and Ms. Bachman and Dalia

22   were permitted to reinvigorate a lawsuit in Delaware

23   that they had commenced claiming the right to the

24   shares and go moving against the Trump Group and TPR,

25   et cetera; right?

26        We had gotten those stayed previously because

*Eric Allen*
*Official Court Reporter*

1

2       our concern was that Dalia would not vigorously pursue

3       those claims on behalf of the Orly Trust.

4               Dalia went down to Delaware, immediately settled

5       with TPR and with the Trump Group.  Now, if her claims

6       had already been settled two months before, then what

7       was she doing down in Delaware?  But she went down to

8       Delaware.  She didn't come in at the time and say, hey,

9       wait a second, wait a second, I want my moneys.  No.

10      She went down to Delaware, settled with everybody else,

11      TPR and the Trump Group, and it was that settlement

12      that caused the 1st Department to dismiss the claims

13      here because they said there is nothing left because of

14      the Delaware stipulation.

15              So, Dalia has already taken care of it and

16      because of that there are no claims left.  The Court of

17      Appeals has so ruled, the 1st Department has so ruled

18      that the fact that we are here arguing about her

19      attempt to substitute herself in when she settled

20      already as a trustee -- she gets one chance to settle.

21      We gave you the Delaware stipulation.  That's what she

22      says.  She makes findings of fact that are -- that help

23      Sagi.  She makes statements that help Sagi and then

24      finally she settles all of her claims on behalf of the

25      trust claiming to properly represent the trust.

26              Now, that's something that we are going to raise

1

2      up in the surrogate's court.  That is another example

3      of Dalia misusing her power as trustee, but that has no

4      bearing on this.  There are no claims left because the

5      Orly trust settled her claims in Delaware and Orly

6      individually and as beneficiary settled the claims with

7      the Trumps in the confidential settlement agreement.

8           The money that they are trying to get now is

9      above the $10 million that the Delaware settlement

10     caused to be given to TPR and that's the Keenan

11     decision.  The Keenan decision was, well, now that the

12     Delaware stipulation exists and the Orly Trust is

13     decided, that everything's okay with the Orly Trust,

14     well, then the sale of the shares back in 2008, the

15     proceeds go to TPR.  It's in our papers.

16          THE COURT:  I am shaking my head nodding just to

17     the extent that I understand what you are saying.

18          MR. GRIVER:  Right, okay.

19          Very simply, Orly settled with the Trumps in

20     June.  The Orly Trust settled with the Trumps in

21     August, two months later.

22          Now, we go to -- and the main point, your Honor

23     is there are no claims left and since there are no

24     claims left, her substitution motion just fails.  It's

25     that simple.

26          Then we go to the second part of her claim,

1

2      which is CPLR 2701.  She wants the proceeds of Orly's

3      settlement with the Trumps to be paid into court and

4      she just can't do that.  Most attorneys, I think, would

5      simply read the language of the statute to determine

6      that the language of the statute bars their ability to

7      bring a motion and stop right there, but that's not

8      what happened here.  What happened here is that they

9      proceeded nonetheless.  And the motion to have the

10     proceeds paid in court doesn't work because under CPLR

11     2701, that CPLR provision, your Honor, is designed very

12     narrowly to take care and protect moneys that are the

13     subject of an action.  And there are three sub parts.

14          First of all, it has to be the subject of an

15     action.  The moneys that are the settlement with the

16     A.G. Group but not the Orly Trust are not part of the

17     2010 case which, in any event, no longer exists.

18          But you can go and look at each one of the

19     individual subparagraphs and see that it doesn't work.

20          The fourth one is if a third party is a trustee

21     and is holding the money, like the comptroller of the

22     -- the State comptroller.  The State comptroller has,

23     let's say, death benefits.  The person has died.  It is

24     claimed both by the beneficiary of the will and by the

25     ex-wife who is named in the policy for the death

26     benefits.  They are fighting over that specific sum of

1

2       money and the comptroller has to pay it to somebody so

3       he pays it into court on a monthly basis until the

4       court rules does widow A get it or widow B get it.

5       That's clearly not the situation here.

6               The second one is where there are special

7       circumstances that make it desirable that payment be

8       made to -- that payment be made into the court instead

9       of two the parties.  Well, as Mr. Allingham correctly

10      noted, some of the money has already been paid, some of

11      the money will be paid and there are no special

12      circumstances here that should delay any of that.

13      There is no evidence that they have come in that said

14      that there is a special circumstance that requires the

15      court to protect the moneys.  There is not even a claim

16      against those moneys in a court of law.

17              Third is the situation where ownership of the

18      property will depend on the outcome of the pending

19      action.  That also is inapplicable here.  There is no

20      pending action, number one.  And, number two, even if

21      there was, you can look at all the counterclaims, all

22      of the cross-claims, all of the original claims, none

23      of it has to do with the confidential settlement

24      agreement so it simply does not apply.

25              And it can't serve as a legal basis for what

26      Dalia is attempting to do.  She made her own decision

1

2     to settle and she settled it as she saw fit; in a way

3     that was destructive to Orly and we'll take care of

4     that later, but in a way that she decided to settle

5     those claims.  There is a stipulation in Delaware and

6     they ignore that.  They ignore the second amended

7     stipulation of dismissal in this court and what

8     happened -- the fact that they went ahead and then used

9     that stipulation to say, oh, there are still claims for

10    Orly Trust.  Now they are claiming that the Orly Trust

11    claims didn't even exist at the time that they went

12    into Delaware and how is that possible?  And

13    Mr. Allingham chooses to ignore the actual language of

14    the confidential settlement agreement which he cannot

15    do because he negotiated that language, he chose to

16    have his client sign that language and for him to come

17    in and say well let me explain to you how the language

18    should be ignored is improper, entirely so.

19          So, I am going to sit down and say nothing else.

20    Thank you.

21          MR. MONTCLARE:  Thank you, your Honor.  Paul

22    Montclare for Arie Genger.

23          I have just a few things to say.  I have to say

24    I agree with everything that Mr. Griver said.  It's not

25    to have him back in the courtroom.

26          It seems to me that we can address this really

1

2      pretty simply.  There is no action for her to

3      substitute into.  I mean, how can you substitute into

4      an action that's been completely dismissed, has been

5      completely affirmed, there is now no leave-to-appeal

6      motion pending to the Court of Appeals.  She is going

7      to be substituted in for Orly who lost the case against

8      the Trumps who are no longer in the case.  I mean, that

9      should end the whole analysis.  I don't understand why

10     we need to go past that.

11          The issue with respect to the confidential

12     settlement agreement, on behalf of Arie Genger, we were

13     a party to that agreement and they want to come in and

14     interfere with our property rights by just saying, oh,

15     we want it paid into court.  What action is there to

16     deprive us of our property rights being brought by --

17          THE COURT:  Well, I think what Mr. Griver

18     mentioned in his list of subdivisions of 2701, the only

19     one that piqued any interest was special circumstances,

20     so what about that?

21          MR. MONTCLARE:  But there are no -- there has to

22     be an existing action, your Honor.  There is no

23     existing action.

24          THE COURT:  So that -- you still need an

25     existing action for there to be special circumstances.

26          MR. MONTCLARE:  Yes.  Otherwise what do we just

1

2      have people walking in off the street and into court

3      and asking for an application to pay it into court?

4              THE COURT:  It happens all the time.

5              MR. MONTCLARE:  They could have early on tried

6      to get an attachment of that.  They could have done a

7      lot of things but the procedural mechanism they have

8      chosen is a little unusual.

9              But it's not grounded in anything.  I think --

10     and also, it proceeds from a false assumption of what

11     their -- what they conceded in Delaware, which I am not

12     going to repeat; why we settled with Mr. Allingham's

13     clients in Delaware at a time when there are open

14     issues that made settlement possibility.  Much to my

15     great disappointment, that is no longer the case.  That

16     case is over against the Trumps.  It's over.

17             And the reason she wants to substitute in is to

18     basically to sue the Trumps.  And that makes no sense

19     at all to me.

20             THE COURT:  Okay, thank you.

21             I think --

22             MR. DELLAPORTAS:  Very briefly, your Honor.

23             Three quick points:

24             Number 1, Orly Genger brought claims in this

25     case on behalf of the Orly Genger 1993 Trust.

26             Number 2, Orly Genger and her father got or are

1

2         going to get $32.3 million in settlement of those

3         claims and, number 3, those claims are no more and we

4         join in Ms. Genger's -- Mrs. Dalia Genger's position

5         that the money should be paid into court.

6             Subject to that, we respectfully disagree with

7         the comments of Mr. Montclare and Mr. Griver, except to

8         the extent that Mr. Griver described the Cairo museum,

9         which I have been to as well and I think it is an

10        accurate description of it.

11            And with that, we rest on our papers.

12            THE COURT:  Thank you.

13            MS. BACHMAN:  May I add something, your Honor?

14            THE COURT:  Sure.

15            MS. BACHMAN:  With regard to, I think, the

16        Court's very pointed question to Mr. Griver and

17        Mr. Allingham, who were the settling parties?  And I

18        think the Court described, at least conceptually, three

19        possibilities:  Orly as beneficiary and Orly

20        individually --

21            THE COURT:  Those were settled.

22            MS. BACHMAN:  Apparently.  Apparently that's

23        what Mr. Griver is saying.

24            THE COURT:  Signed, sealed, delivered.  You saw

25        the agreement.

26            MS. BACHMAN:  I have now seen the agreement.

1

2          The mystery party is what happened to the Orly

3     Trust.

4          THE COURT:  And that was in Delaware.  Kaputski

5     (phonetic) in Delaware; no?

6          MS. BACHMAN:  As I understand it, this case was

7     a derivative case presently pending today.  That's what

8     Orly described in her complaint, her claims to be.  She

9     is bringing this action, quote, "on behalf of the Orly

10    Trust as beneficiary of the Orly Trust to protect her

11    interest thereunder."  Her claim, as I understand it --

12    and unfortunately you have had a longer tenure in this

13    than I have -- but as I understand, it were purely

14    derivative claims.  I understand that she said in the

15    caption Orly Genger individually and on behalf of the

16    Orly Trust but the real claims were with regard to what

17    was done with the Orly Trust shares.  For them to say

18    she settled as a beneficiary and somehow that's

19    different than the trust is a distinction without a

20    difference.  If you are a beneficiary, you are, I

21    believe, saying I have a derivative right to sue

22    because the trust is not protecting my interest as the

23    beneficiary.

24          I don't understand how you can split that

25    difference and say, no, the beneficiary is something

26    different than the trust.  They have to be merged and

1

2    that's what she did in her complaint.

3         And the entire settlement agreement is replete

4    with all of those references.

5         It says, in defining who the A.G. Group is, that

6    Orly Trust, in quote, "all her capacities." It doesn't

7    say in her individual capacity --

8         THE COURT:  What about the second agreement?

9    Are you focusing on the second?

10        MS. BACHMAN:  I am looking at what I believe to

11   be the actual -- the CSA.

12        THE COURT:  The one where there is a writing, "I

13   wrote in" or something.

14        MS. BACHMAN:  Correct.

15        THE COURT:  I'm on Page 1 of that.

16        MS. BACHMAN:  I am actually looking at the

17   settlement agreement itself, what she actually did.  On

18   Page 1 of that settlement agreement, it says -- it

19   defines Orly as "Orly Genger in all capacities."

20        So, while they may be playing convenient word

21   games here -- I hope they are not -- but the settlement

22   agreement itself belies what I believe Mr. Griver is

23   trying to convince this Court of; that somehow there is

24   this distinction, this magical distinction that he is

25   now conveniently drawing which they weren't drawing in

26   the settlement agreement itself.

1

2       THE COURT:  Even assuming you are right, which I

3       am not sure you are, but assuming you are right, so

4       what?  If it was all settled, if two of the entities

5       settled in one way or the other and then Dalia went

6       down and settled with the Trump Group and TPR in

7       Delaware, what's left and why is there something left?

8       That's what I want to know.

9       MS. BACHMAN:  At least as I understand the

10      context of the Delaware settlement, it was motivated --

11      and if you look at the confidential settlement

12      agreement, it calls for the settlement of that Delaware

13      case.  It says go settle that case.  Orly --

14      THE COURT:  It doesn't say go settle it.  It

15      says something else; right?

16      MR. MONTCLARE:  Cooperate.

17      MR. GRIVER:  Cooperate.

18      MS. BACHMAN:  It says Orly will cause.

19      THE COURT:  Cause.

20      MR. GRIVER:  No, Orly will take efforts to

21      cause.

22      THE COURT:  Something like that.  It's a little

23      squishy.

24      MS. BACHMAN:  A little squishy, but the concept

25      is clearly there.  If he wants to look at the words,

26      which I think he had a part in drafting, that was idea.

1

2    The idea was we're buying peace, as Mr. Allingham said.

3    We're doing the best we can.  We don't want to hear

4    from you again.  Go away and make sure, as best you

5    can, this all goes away.

6        THE COURT:  So why is something left?  That's

7    what I don't understand.

8        MS. BACHMAN:  A, it's unclear if something is

9    left or not.  But even if it's not, fine, they settled

10   those cases.  They settled those claims and they got

11   paid for it.  If she brought this case as a derivative

12   plaintiff and she got paid for her derivative claims,

13   it is black letter law that that money, those

14   settlement proceeds on behalf of the derivative

15   plaintiff go to the principal.  They don't belong to

16   the individual.

17       THE COURT:  Aren't you too late?

18       MS. BACHMAN:  How so?

19       THE COURT:  It settled.

20       MS. BACHMAN:  But the payment hasn't been made

21   yet.

22       THE COURT:  I don't know.  It sounded like it

23   was.  And does it matter?  Does it matter that it

24   hasn't been paid?  Even if it hasn't been, the

25   agreement has been entered, it's -- is there a judgment

26   or something?

1

2          MR. ALLINGHAM:  Your Honor entered a stipulation

3     of dismissal and we have paid $17.25 million plus

4     interest and we are obligated on two more notes.

5          THE COURT:  As he said, it sounds like that ship

6     has sailed.

7          MS. BACHMAN:  There is $15 million that they owe

8     to the settling parties.  If you want to call that

9     spare change, I will take that change.  That's fine.

10          Mr. Griver talked about the fact that these --

11     the cases that I cited talk about a future stream of

12     payment; right?  He is talking about widows and orphans

13     getting paid in the future.  That is, by definition,

14     what this is.  We are talking about a future stream of

15     payment for claims that were settled.  Yes, the claims

16     were settled.  Mr. Allingham said repeatedly that he

17     bought peace.  The Orly Trust settled its claims under

18     the settlement agreement.  Otherwise, if -- as I

19     understand the Court's concern, if they settled the

20     claims, took all the money and we were not a party to

21     it, then they shouldn't have been in power to settle in

22     the first place.  They can't have it both ways.  They

23     can't settle the claims and take the money and then say

24     it's too late.  Either they settled the derivative

25     claims and money belongs to the trust or they didn't

26     settle the claims and those claims are out there and we

*Eric Allen*
*Official Court Reporter*

1

2    have the right to pursue them.

3    THE COURT:  I'll read your papers because I am

4    not quite sure I get it.

5    MR. GRIVER:  Your Honor, just very quickly.

6    Notice that she talks about the complaint.  She does

7    not talk about what happened in the settlement and she

8    misquotes the CSA.  The CSA is executed by the A.G.

9    Group and the Trump Group.  That's on Page 1.

10    Two defined groups:  The A.G. group is

11    specifically defined to be Orly Genger in her

12    individual capacity and in her capacity as beneficiary

13    of the Orly Genger 1993 trust.  The Orly Trust is

14    expressly excluded and on Page 3 is included with a

15    group called the Sagi Group which identifies the

16    nonsettling parties.  It's very simple.  There is an

17    entire agreement clause.  We have to amend it only by a

18    writing signed by all of the parties, so that language

19    is what controls; not the complaint but the language of

20    the settlement.

21    The second amended stipulation of dismissal,

22    Ms. Bachman wasn't here jumping up and down and saying,

23    hey, I have to be part of this because it's settling

24    the Orly Trust shares.  Instead, the Orly Trust was

25    specifically careted out and, in fact, Dalia, on behalf

26    of the Orly Trust, supposedly as the trustee, then

1

2          later went down to Delaware.  And she didn't say, hey,

3          you know what?  Good news.  All of my claims in this

4          case have been settled so see you later.  Bye.  She

5          went to the court and she said there is an existing

6          case, I have existing claims and here is the

7          settlement.  And when Orly went down and tried to get

8          involved in that settlement, then Dalia and her counsel

9          said, no, didn't listen to what Orly had to say and

10         then settled it against Orly's desires.

11              So for her to say, well, there is a provision

12         that says that Orly should attempt to get the Orly

13         Trust to settle, Orly wasn't involved in the

14         settlement.  She didn't cause the settlement in any

15         way, shape or form.

16              Please look at our papers and -- because our

17         papers are the only ones, the only ones to talk about

18         what actually happened; okay?  The rest of it, what

19         Ms. Bachman is talking about, she is talking about the

20         first day of the Yom Kippur war.  She knows the next

21         two weeks.  They may win this case in Egypt.  They will

22         not win in case before this Court.

23              MR. ALLINGHAM:  Your Honor, may I?

24              THE COURT:  If it's something you haven't

25         said --

26              MR. ALLINGHAM:  It's not something I have not

1

2     said.

3          What emerges from all of the arguments is that

4     everyone agrees that no claims remain for Dalia to pick

5     up, so the motion for substitution should be denied.

6          I agree with Mr. Griver that the Orly Trust

7     settled with the Trumps at some point.  He and I have a

8     disagreement about at what point.  Actually, we don't

9     even have a disagreement about at what point.  I

10    believe that the Orly Trust settled with the Trumps in

11    June in the settlement agreement.  I believe that the

12    Orly Trust settled with the Trumps in August in

13    Delaware --

14         THE COURT:  How can they do it twice?

15         MR. ALLINGHAM:  Your Honor, if you were in my

16    position and you had been involved in this litigation

17    as long as --

18         THE COURT:  I understand.

19         MR. ALLINGHAM:  I was looking for the

20    Delaware --

21         THE COURT:  It's belts and suspenders.

22         MR. ALLINGHAM:  -- the Delaware guarantee with

23    respect to title.  I was looking for whatever

24    protection I could get.

25         THE COURT:  Okay.

26         MR. ALLINGHAM:  Now, as to whether Orly could

1

2          settle as a beneficiary of the Orly Trust or

3          derivatively on behalf of the Orly Trust, Justice

4          Feinman, on January 3rd, 2013, found that Orly had

5          derivative standing to bring claims on behalf of the

6          Orly Trust.  I argued that she didn't.  I lost.

7          Justice Feinman found that she did and that ruling is

8          law of the case.

9               Orly had derivative standing to bring claims on

10         behalf of the Orly Trust, according to Justice Feinman.

11         In what capacity?  I can't think of any other -- there

12         may be someone, but I can't think of any other capacity

13         than as the beneficiary.  So I believed in June that

14         when we said she is settling individually and as

15         beneficiary of the Orly Trust, I got a release of the

16         claims that were made against me derivatively by the

17         Orly Trust.  But, as Mr. Griver says, in August we got

18         a release and dismissal from the Orly Trust in

19         Delaware.

20               THE COURT:  Thank you.

21               MR. ALLINGHAM:  What is clear, though, is that

22         we have a release and a dismissal of the Orly Trust

23         claims.  Everyone seems to agree to that and there are

24         no claims pending here to substitute it.

25               THE COURT:  So it seems, but I will read your

26         papers and I will keep an open mind and I will issue a

1

2        decision.

3             It's your motion, so you will upload this

4        transcript in the E-Filing system.  I see I have a nice

5        file here.  If I don't have hard copies of memos,

6        affirmations, affidavits, I need them all due on or

7        before April 8th.  Exhibits can remain E-Filed.

8             Thank you.

9             MR. ALLINGHAM:  Thank you, your Honor.

10            MR. DELLAPORTAS:  Thank you, your Honor.

11                 ***************

12  CERTIFIED THAT THE FOREGOING IS A TRUE AND ACCURATE TRANSCRIPT
     OF THE ORIGINAL STENOGRAPHIC MINUTES IN THIS CASE.

13

14

15                    -------------------------
                       ERIC ALLEN
                   SENIOR COURT REPORTER

16

17

18

19

20

21

22

23

24

25

26

Case 1:19-cv-09319-AKH Document 1-131 Filed 10/08/19 Page 236 of 244

# In The Matter Of:

*ORLY GENGER v.*
*DALIA GENGER ET AL.*

---

*Rochelle Fang, Sagi Genger, Orly Genger*
*August 08, 2016*

---

*Supreme Court State of New York*

Original File 080816GENGER.txt
**Min-U-Script®**

578

1

2   SUPREME COURT OF THE STATE OF NEW YORK
    COUNTY OF NEW YORK : CIVIL TERM : PART 12
3   ---------------------------------------------x
    ORLY GENGER, in her individual capacity and
4   on behalf of the Orly Genger 1993 Trust (both
    in its individual capacity and on behalf of
5   D&K Limited Partnership),

6                                       Plaintiff,

                                          Index No.
7           -against-                     109749/09

8   DALIA GENGER, SAGI GENGER, LEAH FANG, D&K GP
    LLC, and TPR INVESTMENT ASSOCIATES, INC.,
9
                                        Defendants.
10  ---------------------------------------------x
                                    August 8, 2016
11                                  60 Centre Street
                                    New York, NY  10007
12  B e f o r e:

13      HON. IRA GAMMERMAN, Judicial Hearing Officer.

14  A p p e a r a n c e s:

15

16      KASOWITZ, BENSON, TORRES, & FRIEDMAN, LLP
        Attorneys for Plaintiff
17          1633 Broadway
            New York, New York  10019
18      BY:  ERIC D. HERSCHMANN, ESQ., and
            MICHAEL PAUL BOWEN, ESQ.
19

20      KELLEY, DRYE & WARREN, LLP
        Attorneys for Defendants SAGI GENGER and
21  TPR INVESTMENT ASSOCIATES
            101 Park Avenue
22          New York, New York  10178
        BY:  JOHN G. DELLAPORTAS, ESQ.
23
                    MINUTES OF NONJURY TRIAL
24
                                Reported By:
25                              John Phelps, and
                                William L. Kutsch
26                              Senior Court Reporters

747

1                     O. Genger - by Plaintiff - Direct/Bowen
2    was settling it.
3        Q    So other people aside from yourself were also giving up
4    things as consideration with respect to the $32 million payment?
5                     MR. DELLAPORTAS:  Objection.
6                     THE COURT:  Sustained.
7                     If we have the document, I assume that's one of the
8        exhibits or will be?
9                     MR. BOWEN:  I think it's in evidence.
10                    THE COURT:  All right.  So the document will
11       reflect who gets what and who is giving up what.
12                    Let's move on.
13       Q    Did you receive any money or your trust receive any
14   money from this settlement agreement?
15       A    No.
16       Q    Are you expecting to receive any money yourself
17   personally from this settlement agreement?
18       A    No.
19       Q    Are you expecting that your trust, the Orly Genger
20   trust, is going to receive any money from the settlement
21   agreement?
22       A    No.
23                    MR. BOWEN:  May I have one second, Judge?
24                    THE COURT:  Okay.
25                    (Pause in the proceedings.)
26                    THE COURT:  Counsel, you said you wanted to call

748

```
 1               O. Genger - by Plaintiff - Direct/Bowen
 2      her.  She is here.  Ask her questions please.
 3               MR. DELLAPORTAS:  Your Honor --
 4               THE COURT:  I thought we were finished.
 5               MR. BOWEN:  No.  I just wanted to consult with my
 6      lead chair.
 7               THE COURT:  I was hopeful.
 8               MR. BOWEN:  I now pass the witness.
 9               THE COURT:  Go ahead.
10               MR. DELLAPORTAS:  I would prefer to call her as
11      part of my case.
12               THE COURT:  This is part of your case.  Go ahead.
13               MR. DELLAPORTAS:  I understand.  I don't have any
14      exhibits with me.
15               THE COURT:  It's okay.  You knew what you were
16      going to do.
17               Let's go ahead.
18               MR. DELLAPORTAS:  I don't have the exhibits with
19      me, your Honor.
20               THE COURT:  We don't need the exhibits.  Ask
21      whatever questions you have without the exhibits.
22               MR. DELLAPORTAS:  Okay.
23   CROSS-EXAMINATION
24   BY MR. DELLAPORTAS:
25      Q    Miss Genger, you said you signed a settlement agreement
26   for $33 million; is that correct?
```

WLK

749

O. Genger - by Plaintiff - Cross

1
2          THE WITNESS:  That's in evidence; isn't it?
3          MR. DELLAPORTAS:  Yes.  It's a foundational
4     question, your Honor.
5          THE COURT:  Go ahead.
6     Q    And you said, if I wrote correctly, you don't know who
7     gets the money?
8     A    Correct.
9     Q    It's not of interest to you?
10         THE COURT:  Are you interested in who gets the
11    money?
12         THE WITNESS:  Yeah.  Sure.
13    Q    You never asked anybody how there's a pot of
14    $33 million here, who is going to get it; that's what you are
15    telling the judge?
16    A    There isn't a pot of $33 million.
17         THE COURT:  Well, do you expect to receive a
18    portion of that $33 million at some point?
19         THE WITNESS:  At this point, no.
20         THE COURT:  Well, at what point?  At any point?
21         THE WITNESS:  It's depends on how things --
22         THE COURT:  Do you think that -- you think your
23    right to receive or the amount that you will receive or
24    whether you will receive depends on what happens in this
25    case?
26         THE WITNESS:  No.

WLK

750

O. Genger - by Plaintiff - Cross

1

2          THE COURT:  Is there another case that will affect

3      that?

4          THE WITNESS:  No.  It's just a matter of, I know

5      that the Trumps were estopped in paying money because my

6      mother filed a lawsuit.

7          THE COURT:  Well, that's the lawsuit in the

8      Surrogates' Court?

9          THE WITNESS:  Right.

10         THE COURT:  Okay.

11         THE WITNESS:  Because she filed a lawsuit, now they

12     won't pay.

13         THE COURT:  At some point, when that lawsuit is

14     resolved, do you expect to receive a portion of the

15     $33 million?

16         THE WITNESS:  I don't expect to.  I hope that I

17     will, but I don't know.

18         THE COURT:  Okay.  That's the answer.

19     Q   Miss Genger, so we are clear, approximately $18 million

20     will be paid; is that correct?

21         THE COURT:  I missed the question.

22     Q   Approximately $18 million of the 32, 33 has already

23     been paid; is that correct?

24     A   I don't know exactly.

25         THE COURT:  It's in escrow with the lawyer.

26         MR. DELLAPORTAS:  No, your Honor.  $18 million has

WLK

751

O. Genger - by Plaintiff - Cross

been distributed.

THE COURT:  Has been distributed?

MR. DELLAPORTAS:  Yes.

THE COURT:  Have you received any money of the $18 million?

THE WITNESS:  No.

Q    Where did that go?

A    I don't know.

Q    You're a signatory to a settlement agreement.  You have no idea where $18 million went?

A    I believe it went to pay off Broser and other things but I don't know.

Q    Who are the Brosers?

A    Arnold Broser and David Broser.  They are people who helped fund litigations and gave us funds for living.

Q    So they loaned you money?

A    Yes.

Q    So part of that $18 million, or maybe all of the $18 million that's already been paid, went to your creditors; correct?

MR. HERSCHMANN:  Objection.  Calls for speculation.

THE COURT:  Well, we don't know if they're creditors.  You didn't get any of the $18 million?

THE WITNESS:  No.

THE COURT:  Next question.

WLK

752

O. Genger - by Plaintiff - Cross

Q       But the Brosers are your creditors; correct?

MR. BOWEN:  Objection.

THE COURT:  Overruled.

Did they loan money to you and your father in order to finance the lawsuit?

THE WITNESS:  They loaned money to my father.

Q       In fact, you were a co-plaintiff in that lawsuit that they loaned money to; correct?  We have the complaint here.

THE COURT:  You were one of the plaintiffs in the lawsuit.

THE WITNESS:  Which lawsuit?

Q       The lawsuit in New York.

THE COURT:  The lawsuit that was settled as a result of the agreement.

MR. DELLAPORTAS:  Yes.

THE WITNESS:  Sorry.  What we signed?

THE COURT:  You were one of the plaintiffs.

THE WITNESS:  I'm sorry.  Can you show me?

THE COURT:  All right.  Everybody stop.

There is an agreement settling a lawsuit.  That's the agreement under which the $33 million was paid, 18 of which has already been paid, as I understand it?

THE WITNESS:  Yes.

MR. HERSCHMANN:  Your Honor, for the record --

THE COURT:  Were you one of the plaintiffs in that

WLK

## SUPREME COURT OF THE STATE OF NEW YORK — NEW YORK COUNTY

PRESENT:  Hon. BARBARA JAFFE                    **PART 12**
                    *Justice*

---

ARIE GENGER and ORLY GENGER, in her individual capacity
and on behalf of THE ORLY GENGER 1993 TRUST,

                    Plaintiffs,

       - v -

SAGI GENGER, TPR INVESTMENT ASSOCIATES, INC.,
DALIA GENGER, *et al.*,

                    Defendants.

INDEX NO. **651089/2010**
MOTION DATE
MOTION SEQ. NO.  **42**
CALENDAR NO.

**INTERIM ORDER**

---

The following paper, numbered 1, was read on this motion.

| | PAPERS NUMBERED |
|---|---|
| Notice of Motion/ Order to Show Cause — Affidavits — Exhibits ... | |
| Answer — Affidavits — Exhibits | |
| Replying Affidavits | |

Cross-Motion:  ☐ Yes  ☐ No

Defendant Dalia Genger's motion for an order substituting her, as trustee, as plaintiff for
Orly Genger's Trump Group claims, and for an order pursuant to CPLR 2701 directing that the
Trump Group settlement fund be paid into Court is held in abeyance pending the Surrogate's
Court's resolution of Orly Genger's petition to remove Dalia Genger as trustee of Orly Trust.
(*See Genger v Genger*, interim order dated Apr. 1, 2015, index No. 113862/2010 [mot. seq. no.
2]).

Dated:     **5/7/15**

                                              J.S. **BARBARA JAFFE**
                                                    J.S.C.

Check one:  ☐ FINAL DISPOSITION     ☐ NON-FINAL DISPOSITION
Check if appropriate:  ☐ DO NOT POST  ☐ REFERENCE

MOTION/CASE IS RESPECTFULLY REFERRED TO JUSTICE _____ J.S.C.